(COURT USE ONLY)

RECEIPT NO. [                    ]

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF INDIANA

| JOHN DOE | |
|---|---|
| v. | Cause No. [ 2:17-33-JD-PRC ] |
| PURDUE UNIVERSITY et al. | |

## MOTION FOR ADMISSION TO PRACTICE PRO HAC VICE ON BEHALF OF

Plaintiff-John Doe

Party(s) Represented

Prefix (check one) ☒ Mr.   ☐ Ms.   ☐ Mrs.

Last Name: [ Byler ]    First Name: [ Philip ]    Middle Name/Initial [ A. ]

Generation (Sr, Jr, etc): [          ]

Firm Name: [ Nesenoff & Miltenberg, LLP ]

Street Address: [ 363 Seventh Avenue ]    Suite/Room No.: [ 5th Floor ]

City: [ New York ]    State: [ New York ]    Zip: [ 10001 ]

Office Telephone No.: [ (212) 736-4500 ]    Fax No.: [ (212) 736-2260 ]

E-Mail Address: [ pbyler@nmllplaw.com ]

## EDUCATION:

College: [ DePauw University ]    Degree: [ BA ]    Year Completed: [ 1973 ]

Law School: [ Harward Law School ]    Year Graduated: [ 1976 ]

Other Post-Graduate Schooling: [                    ]

Page 1 of 3

**LIST EACH STATE TO WHICH YOU ARE ADMITTED TO PRACTICE LAW:**

| STATE | YEAR ADMITTED | CURRENT STATUS | BAR I.D. NUMBER |
|---|---|---|---|
| New York | 1979 | Active | 1475664 |
| Ohio | 1976 | Active | 0034303 |
| | | | |
| | | | |
| | | | |

Please include a current certificate of good standing (fewer than 60 days old) from each jurisdiction listed above in order to satisfy the requirements articulated in Local Rule 83-5(a)(2)(C)(ii).

**LIST EACH FEDERAL COURT TO WHICH YOU ARE ADMITTED TO PRACTICE LAW:**

| COURT | YEAR ADMITTED | CURRENT STATUS |
|---|---|---|
| Supreme Court of the United States | 1990 | Active |
| United States Court of Appeals for the Sixth Circuit | 1976 | Active |
| U.S. Court of Appeals for the Eleventh Circuit | 1998 | Active |
| U.S. District Court-Southern District of New York | 1979 | Active |
| U.S. District Court-Eastern District of New York | 1979 | Active |

If admitted to the U.S. Supreme Court, please provide a current certificate of good standing (fewer than 60 days old.) Otherwise, no certificate of good standing is needed for any other Federal Court listed above.

Have you ever been publicly disciplined by any other court in the United States or its territories, commonwealths, or possessions?    ☒ Yes (If yes, please attach an explanation)    ☐ No

Applicant: I, | Philip A. Byler |, do solemnly swear or affirm that:

I am a member in good standing of the bar of every jurisdiction to which I am admitted to practice.

I have read and will abide by the Local Rules of the United States District Court for the Northern District of Indiana, including Appendix B: Standards for Professional Conduct Within the Seventh Federal Judicial Circuit.

I declare under penalty of perjury that the statements in this application are true and correct.

Dated:    1/27/17

_____
Signature of Applicant

Considered and approved.

SO ORDERED.

Dated: _____     _____
                                                                        Judge, U. S. District Court

Revised 06/05/2013

# Appellate Division of the Supreme Court
## of the State of New York
### First Judicial Department

---

I, Susanna Rojas, Clerk of the Appellate Division of the Supreme Court of the State of New York, First Judicial Department, certify that

## PHILIP ARWOOD BYLER

was duly licensed and admitted to practice as an Attorney and Counsellor at Law in all the courts of the State of New York on **April 30, 1979**, has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counsellors at Law on file in my office, has duly registered with the administrative office of the courts, and according to the records of this court is in good standing as an attorney and counsellor at law.

In Witness Whereof, I have hereunto set my hand and affixed the seal of this court on

**January 18, 2017**

7102

Clerk of the Court

# The Supreme Court of Ohio

## C E R T I F I C A T E

I, LEE ANN WARD, Interim Director of the Attorney Services Division of the Supreme Court of Ohio, do hereby certify that I am the custodian of the records of the Office of Attorney Services of the Supreme Court and that the Attorney Services Division is responsible for reviewing Court records to determine the status of Ohio attorneys.  I further certify that, having fulfilled all of the requirements for admission to the practice of law in Ohio,

Philip Arwood Byler

was admitted to the practice of law in Ohio on November 19, 1976; has registered as an active attorney pursuant to the Supreme Court Rules for the Government of the Bar of Ohio; is in good standing with the Supreme Court of Ohio; and is entitled to practice law in this state.

IN TESTIMONY WHEREOF, I have subscribed my name and affixed the seal of the Supreme Court, this 17th day of January, 2017.

LEE ANN WARD
*Interim Director, Attorney Services Division*

Tammy White
*Attorney Services Manager*

Additional Federal Court Admissions for Philip A. Byler

| Court | Year Admitted | Current Status |
|---|---|---|
| United States Court of Appeals for the First Circuit | 2016 | Active |
| United States Court of Appeals for the Second Circuit | 1988 | Active[1] |
| United States District Court for the Southern District of Ohio | 1977 | Active |

[1] Renewed on June 29, 2010 and June 16, 2016

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
DISCIPLINARY EXPLANATION

When I renewed my Second Circuit Bar membership in June 2010, I submitted an explanation then of the one and only disciplinary case in what is now my nearly 40-year career. That one disciplinary case concerned events which occurred over 20 years ago and which resulted in an ordered one-year suspension in August 2000 by the New York Appellate Division-First Department for not putting in a never agreed upon escrow a fee that resulted from a client proposed agreement to assign to me an unexpected IRS refund for what was nearly 2½ years of performed, hugely successful work on a difficult cattle feed tax shelter matter in which the governing precedent in the Southern District of New York written by Judge Edward Weinfeld in *Dunn v United States*, 468 F.Supp.991 (1979), was against the client's tax shelter. My work had been performed on special alternative non-market retention terms, starting out with the financially struggling client in active collection for over $216,000 of tax liabilities but changing dramatically in the end due to the tax adjustment schedule that I negotiated with the IRS in audit. To my knowledge, it is the only suspension ever ordered in a contested disciplinary case when a charge of unfitness under DR 1-102 was made but rejected; also, reciprocal discipline was not imposed in the U.S. District Court for the Eastern District of New York after an Order To Show Cause proceeding.

Before discussing the disciplinary case, please consider my professional and personal background.

I am a 1976 graduate of the Harvard Law School. Upon graduation, I clerked for two years for the Honorable John W. Peck of the United States Court of Appeals for the Sixth Circuit. I then joined Cravath, Swaine & Moore in 1978 as an associate in the Litigation Department where I was for 5½ years followed by 6½ years at Weil Gotshal & Manges before establishing my own practice, and I have lived and have been a working litigator in New York since 1978. I am a member of the American Bar Association, and I have been an active member in the New York State and New York City Bar Associations, being a member of those Bar Associations' Professional Discipline Committees. For the Professional Discipline Committee of the New York State Bar Association, I have chaired a subcommittee that has done a 50-state review of discovery procedures in the states' disciplinary systems and made recommendations adopted by the vote of the whole Committee for changes to New York law; in the capacity of Subcommittee Chair, I have worked with Sarah Jo Hamilton, the Chair of the Professional Discipline Committee of the New York State Bar Association. I am a member of the Advisory Council of the Republican National Lawyers Association. I am a Delegate to the Republican Judicial Nominating Convention for New York's 10th Judicial District. In the course of my career,

1

I have done seven oral arguments before the U.S. Court of Appeals for the Second Circuit, more than ten oral arguments before the New York Appellate Divisions for the First and Second Departments and numerous oral arguments (I have lost count) before District Judges in the U.S. District Courts for the Southern District of New York and the Eastern District of New York as well in state and other federal courts. I have tried cases before District Judges of the U.S. District Court for the Southern District of New York as well in New York state court before juries, and I have filed briefs in the U.S. Supreme Court. I have been listed on the Thompson Reuters Super Lawyers for the New York Metro region since 2012.

I have also been active in my local community of Huntington, Long Island. I am a Director (for 18 years), an Executive Board member (for 11 years) and the Legal Advisor (for 10 years) to the Huntington Tri-Village Little League Association. For that organization, I managed Little League teams (including in 1997 a Williamsport Tournament Little League team), junior high level teams and high school level teams. I am a Commissioner of the Long Island Stan Musial Baseball League, and I am a player-manager for the Huntington Reds in that adult league. For that team, my sons played when in college at Purdue University before they went into the military, and my No. 1 pitcher for the current Stan Musial team was my No. 1 pitcher in 1997 for the Little League team that I managed. I am an Elder of the Central Presbyterian Church of Huntington, Long Island and have been for the past ten years. I am a Republican Party Committeeman for the Town of Huntington and the County of Suffolk. But most importantly, I am the father of two hero sons. My older son John is a U.S. Army Captain listed to become a Major who has served four tours of duty, two in Iraq (where he served as an infantry platoon leader during the "surge" and earned a Bronze Star) with the 25th and two in Afghanistan with the 10th Mountain. My younger son James is a Wounded Warrior Purple Heart recipient/U.S. Marine Captain who was badly wounded, losing his legs, when he was an infantry platoon commander for Lima Company in the "Darkhorse" 3/5 Battalion leading a combat engaged dismounted patrol in Sangin, Afghanistan (the 3/5 Marines suffered more casualties in that deployment than any other unit in the Afghan War); my younger son James has since earned an M.B.A. from New York University-Stern School of Business, is employed by Barclays Bank as a trader and, among other things, has done the Marine Marathon three times on his Marine red recumbent bike as a member of "Team Kelly" in honor of fellow 3/5 Lima Company infantry platoon commander Rob Kelly, who was killed about three weeks after James was wounded, and in honor of Rob's father 4-star Marine General John Kelly.

2

Now, back to the disciplinary case: it began in January 1995 with the filing of a disciplinary Complaint, went through investigation that would have ended in July 1996 with an Admonition and a requirement of escrowing all my compensation but for the fact I rejected the Admonition and demanded formal proceedings (while the Admonition recognized I had a compensation agreement with the client, the facts were in my view materially misstated so as to justify an escrow that had never been part of the compensation agreement). In December 1996, I was charged with violations of DR 9-102 and DR 1-102; in February 1997, I submitted a sworn Answer denying the disciplinary charges and defending the fairness of the fee. A hearing before a panel (chaired by someone who was not a member of the Disciplinary Committee) was held over four days on various dates through 1997. My position in post-hearing written briefs was that the record when evaluated with a preponderance of the proof standard showed no disciplinary violations; but the panel, after rejecting the charge of violating DR 1-102, held a sanction hearing in November 1998. A written report was issued in December 1999 that in my view misstated the facts, omitted the work performed and results achieved for the client, used rhetoric instead of legal reasoning, asserted I was unreasonable in relying on the fee agreement with the client, ridiculed me for being out of touch with reality, recommended a one-year suspension and required an escrow of all the money I had been paid. Staff Counsel moved to confirm; I opposed, respectfully citing what I thought were factual, legal and constitutional errors. In August 2000, the New York Appellate Division-First Department issued an order suspending me for one year and placing in Court deposit what had been my compensation for nearly 2½ years of work in a case. The disciplinary complainant, represented by a ranking member of the Disciplinary Committee, then sued me in state court. A quantum meruit hearing was held in that state court case, which was then settled in September 2001 for a payment of $10,000 (about 18% of what I had been paid) into an escrow of the ranking member of the Disciplinary Committee/complainant's counsel and a stipulation signed by the ranking member of the Disciplinary Committee/complainant's counsel that included the agreement I had earned all of the money I had been paid. In my view, what resolved the dispute with complainant was not an escrow, but a recognition of the value of my services. In any event, I thereafter moved for reinstatement; after almost a year of fighting with Staff Counsel, I was reinstated with the support of Staff Counsel on October 1, 2002; the First Department's Order of reinstatement commented that the Court had stated it was only to be a one-year suspension.

3

As a result of that 7⅔-year disciplinary case, I have resolved to try to improve the system -- hence my New York State and City Bar Association activities. Accompanying this explanation is a reply brief that I filed as amicus in the U.S. Supreme Court in further support of granting my motion to file an amicus brief for certiorari in a case in which a New York lawyer Joseph Sahid had been sanctioned by the New York Appellate Division-First Department after he had been directed below by the County Supreme Court justice not even to respond to the sanctions motion (which that County Supreme Court justice denied). Mr. Sahid's attorney was Richard ("Rick") Supple, who had been a Disciplinary Committee staff attorney before going into private practice and at the time of the Sahid case was Chair of the New York City Bar Association's Professional Discipline Committee. Rick Supple was seeking certiorari in the U.S. Supreme Court on the ground that Mr. Sahid had been denied notice and opportunity to be heard regarding sanctions before being sanctioned. Rick Supple also solicited an amicus brief from the State Bar Professional Discipline Committee, and while the State Bar Professional Discipline Committee did not have time to undertake the project, a small number of its members, including me, decided to file an amicus brief and motion for leave to file the amicus brief. I ended up filing the amicus brief and motion for leave to file the amicus brief alone due to what were represented to me as conflicts by the other Committee members. My motion for leave to file the amicus brief was vigorously and venomously opposed by the respondent, whose attorney attacked me on the basis of the disciplinary case. In response, I filed the reply brief and discussed the disciplinary case. The U.S. Supreme Court thereafter granted my motion and accepted my amicus brief, but denied Rick Supple's certiorari petition. Following the reply brief here is the decision letter from the U.S. Supreme Court. I do recommend the reading of my reply brief.

No. 12-1342

IN THE

# Supreme Court of the United States

≫»◄◄

JOSEPH R. SAHID,

*Petitioner,*

*v.*

CADLEROCK JOINT VENTURE, L.P.,

*Respondent.*

*On Petition for a Writ of Certiorari to the
New York Court of Appeals*

## REPLY OF PHILIP A. BYLER IN FURTHER SUPPORT OF MOTION FOR LEAVE TO FILE BRIEF AS AMICUS CURIAE IN SUPPORT OF GRANTING PETITIONER SAHID'S PETITION FOR A WRIT OF CERTIORARI

Philip A. Byler
  *Counsel of Record*
NESENOFF & MILTENBERG LLP
*Attorneys for Amicus Curiae*
363 Seventh Avenue, 5th Floor
New York, New York 10001
212-736-4500

June 24, 2013

i

## TABLE OF CONTENTS

*Page*

REPLY OF PHILIP A. BYLER IN FURTHER
SUPPORT OF MOTION FOR LEAVE
TO FILE BRIEF AS *AMICUS CURIAE*
IN SUPPORT OF GRANTING PETITIONER
SAHID'S PETITION FOR A WRIT OF
*CERTIORARI* .................................  1

ii

# TABLE OF AUTHORITIES

*Page(s)*

**Cases:**

*Dr. Bonham's Case,*
    8 Co.114a, 118a (1610) ...................... 6

*Dunn v United States,*
    468 F.Supp. 991 (1979)...................... 2

*Gibson v. Berryhill,*
    411 U.S. 564 (1973) .......................... 6

*In re Murchison,*
    349 U.S. 623 (1955) .......................... 5

*Joint Anti-Fascist Refugee Committee*
    *v. McGrath,*
    341 U.S. 123 (1951) .......................... 6

*Marshall v. Jerrico, Inc.,*
    446 U.S. 238 (1980) .......................... 1, 5

*Matter of Capoccia,*
    59 N.Y.2d 549, 453 N.E.2d 497,
    466 N.Y.S.2d 268 (1983) .................... 7

*Sardina v. State Committee On*
    *Judicial Conduct,*
    58 N.Y.2d 286, 448 N.E.2d 83,
    461 N.Y.S.2d 229 (1983) .................... 6

*Tumey v. State of Ohio,*
    273 U.S. 510 (1927).......................... 5, 7

## REPLY OF PHILIP A. BYLER IN FURTHER SUPPORT OF MOTION FOR LEAVE TO FILE BRIEF AS *AMICUS CURIAE* IN SUPPORT OF GRANTING PETITIONER SAHID'S PETITION FOR A WRIT OF *CERTIORARI*

Philip A. Byler—whose legal credentials are stated in the original motion, who is the father of two combat decorated military officer sons and who has been involved in his community for decades as a youth and adult baseball coach, Little League Director and Presbyterian Church elder—respectfully submits this reply in further support of his motion for leave to file the brief as *amicus curiae* in support of the petition of Petitioner Joseph R. Sahid ("Petitioner Sahid") for a writ of *certiorari*.

Respondent's venomous and distortion filled opposition would not deserve a reply but for the opportunity that opposition provides to illustrate how due process failures result in unjustified deprivations based on erroneous and distorted conceptions of law and fact, *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980), and why this Court thus needs to grant *certiorari* here to enforce due process of law on the New York appellate courts. Mr. Sahid's case is certainly not the first and only time that the New York appellate courts have cavalierly disregard constitutional due process.

Referenced in the opposition is the one and only disciplinary case in Mr. Byler's 37-year legal career. That case in fact involved a very successful

2

legal representation highly beneficial to the client
who was a "friend." That legal representation was
performed on non-market special retention terms
(payment to be worked out based on developments
in the case and the client's career) so that counsel
could be provided to a client who was in financial
difficulty (his businesses had failed). The client's
problem was that after not filing tax returns for
four years, he was in active collection—IRS Notice
To Levy and New York State Tax Warrant issued—
for over $216,000 with the IRS and New York State
resulting from the client's involvement in a cattle
feed tax shelter invalidated by the IRS as a busi-
ness sham and the governing precedent in the
Southern District of New York written by Judge
Edward Weinfeld in *Dunn v United States*, 468
F.Supp. 991 (1979), was against it. After nearly 2½
years of Mr. Byler's representation, the case ended,
because of the tax adjustment schedule put in place
by Mr. Byler's representation, with the wiping out
of all the tax liabilities and the triggering of a fed-
eral tax refund and a state tax refund and with Mr.
Byler's agreed upon compensation provided by a
client proposed assignment of the federal tax
refund that he testified was legally enforceable and
ethically fair. The client testified that his "hour of
need" had been a "terrible" situation, that Mr.
Byler had represented him on "special terms," that
Mr. Byler had done a "terrific," "superb job"
"absolutely" achieving "extraordinary results" and
that he had told Mr. Byler to "keep" the IRS
refund. A highly experienced tax expert testified at
a quantum meruit hearing that: (i) the tax shelter

3

was "highly risky" and had been invalidated by the IRS on the ground that it was a business sham; (ii) Mr. Byler had "hit a home run and a half," explaining that the client received $269,000 of economic benefit in the elimination of tax liabilities and triggering of tax refunds and that the percentage of fee to economic benefit to the client was 20%; and (iii) the Redbook time entries that were the basis of the *pro forma* bill to illustrate to the client the fairness of the fee agreement were what it would take to do the case.

It may fairly asked how could that legal representation give rise to a disciplinary case? The answer is that the due process weaknesses of the New York disciplinary system enabled a "lawyerly lie" cynically concocted by the law professor brother of the client to be perpetrated. The lie: (i) did not recognize the client's financial circumstances but pretended there were no financial difficulties; (ii) did not recognize the gravity of the client's legal difficulties but rather insanely characterized them as a problem to be easily solved; (iii) did not recognize the special non-market terms extended due to the financial problems of the client; (iv) did not recognize the work that was done but rather essentially ignored it; (v) did not recognize the results achieved but rather essentially ignored them; and (vi) did not recognize the fee agreement in the assignment of the IRS refund monies, but rather was either silent about it or treated it as not to be relied upon.

4

That "lawyerly lie" was the basis of an ethically misfocused disciplinary case that Disciplinary Committee Counsel's Office under prior leadership made a cause celebre in the interests of career advancement. That disciplinary case reflected outside undue influence in pursuing what were in fact private purposes to get money. That disciplinary case was also marked by the representation of the client by a Disciplinary Committee member in a New York state court case concerning the same subject matter as the disciplinary case and seeking to obtain the IRS refund monies by relying on the disciplinary case. That disciplinary case saw a disgrace of a Star Chamber trial, run by an overtly hostile, predisposed attorney who was not a member of the Disciplinary Committee as supposedly required by the Rules of the Appellate Division-First Department and replete with evidentiary error where, among many things, evidence of value of work for proof of agreement fairness was excluded, prejudicial comments reflecting pre-judgment were made and accusatory letters of the client's brother were received as expert testimony without cross-examination because the client's brother did not testify. That disciplinary case saw a Hearing Panel report that bought into the lie to use a theory of "disputed" funds ignoring the client's testimony and the notion it was "obvious" that DR 9-102(B)(4) of the Code of Professional Responsibility applied (never mind what the Disciplinary Rules actually said). The Hearing Panel recommended a court deposit of the entire IRS refund and, notwithstanding the Hearing Panel's rejection

5

of the unfitness charge under DR 1-102 of the Professional Code of Professional Responsibility, further recommended a one-year suspension based on case law where there was unfitness found under DR 1-102 of the Code of Professional Responsibility.

To the New York Appellate Division-First Department, there was presented, among many things, a serious constitutional challenge to the proceeding:

(1) There was a denial of a due process opportunity to be heard due to the lack of an impartial and neutral hearing body. *Marshall v. Jerrico. Inc.*, 446 U.S. at 242 ("The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision making process.") That lack of impartiality resulted from the combination of:

(a) the unconstitutional mixture of adjudicatory and prosecutorial roles in the then existing New York Appellate Division-First Department hearing panel system, *In re Murchison*, 349 U.S. 623 (1955) (violation of constitutional due process for same judge to charge grand jury witnesses with perjury and contempt to then try those witnesses for the charged offenses), *Tumey v. State of Ohio*, 273 U.S.

6

510, 534 (1927)("A situation in which an official perforce occupies two practically and seriously inconsistent positions, one partisan and the other judicial, necessarily involves a lack of due process of law . . . ."), *Dr. Bonham's Case*, 8 Co.114a, 118a (1610)(Coke, L)(a "person cannot be judge in his own cause . . . and one cannot be judge and attorney for any of the parties");

(b) the unconstitutional delegation to and the lack of due process accountability in a non-Committee member, who lacked jurisdiction, presiding over the trial and acting with undue hostility and biased predisposition, *see Sardina v. State Committee On Judicial Conduct*, 58 N.Y.2d 286, 290-291, 448 N.E.2d 83, 87, 461 N.Y.S.2d 229, 231 (1983); and

(c) the corrupting conflict of interest inherent in a sitting Committee member commencing, at the time of the disciplinary trial, a state court action for the then former client concerning the same subject matter as the disciplinary case, *see Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973).

(2) A private trial was held despite the demand for a public one. To quote Justice Felix Frankfurter: "The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S.

7

123, 149, 170 (1951)(Frankfurter, J.). That "secret, one-sided determination" is what happened in Mr. Byler's case.

(3) The disciplinary trial was riddled with serious prejudicial evidentiary error and having the nature of a private inquisition—a denial of due process that effectively denied an opportunity to be heard.

(4) There was a failure to apply the burden of proof, *Tumey v. Ohio*, 273 U.S. 510 (1927); the preponderance of the evidence standard is suppose to govern in New York disciplinary cases, *Matter of Capoccia*, 59 N.Y.2d 549, 453 N.E.2d 497, 466 N.Y.S.2d 268 (1983). Once the preponderance standard be applied to give the legally proper evaluation of the factual record, even with its evidentiary errors, a vastly different view of the case emerges: a conscientious attorney extended special terms of retention to a client in need, did an excellent job for years in a difficult tax shelter case, brought excellent results in the elimination of over $216,000 of tax liabilities and triggering of refunds and was compensated a reasonable amount by a fee agreement that assigned an IRS refund. That's not a disciplinary case.

The New York Appellate Division-First Department, however, stated nothing about these constitutional defects and instead, egged on by ambitious Disciplinary Staff Counsel, issued a decision that was a punishment for challenging the system. The New York Appellate Division-First Department,

8

relying upon a fictional misstatement of facts that
did not recognize the burden of proof and an erro-
neous treatment of contract law, imposed what was
an unprecedented suspension, given the lack of
unfitness under DR 1-102 of the Code of Profes-
sional Responsibility; and the New York Appellate
Division-First Department did so based on a theory
of client funds and DR 9-102(C)(4) that the Hearing
Panel had not specifically found and that was not
supported in the record. The New York Court of
Appeals did its usual thing in disciplinary cases
and turned its back on review and due process vio-
lations.

It was then that in the New York state court
case, a motion was made by a long standing Disci-
plinary Committee member who was the client's
attorney to use the disciplinary decision as the
basis for summary judgment to all the IRS refund.
A New York State court trial judge denied the
motion on the ground that the legal requirements
of collateral estoppel were not satisfied and
ordered a *quantum meruit* hearing, at which Mr.
Byler presented expert testimony, stipulated facts
and documents that established his right to be paid
what he had received. Only then was a settlement
reached in the state court case in a stipulation that
expressly recognized Mr. Byler had earned the
whole amount of the IRS refund and would keep
over 80% of that refund. Notably, the U.S. District
Court for the Eastern District of New York refused
reciprocal discipline entirely after a full Order To
Show Cause proceeding in which Mr. Byler's oppo-

9

sition was that there had been a corrupt denial of due process.

No one should doubt, after this experience, Mr. Byler's professional dedication, reflected in his Bar Association activities, to the improvement of the disciplinary system and the upholding of constitutional due process. Disciplinary cases need due process procedures for accurate fact-finding to decide cases as well as a more developed substantive body of ethics law to guide prosecutors and attorneys in practice alike. To quote Shakespeare's *King Henry V*: "Thus may we gather honey from the weed, And make a moral of the devil himself." (Act IV, Scene 1, lines 11-12.)

As stated in the original motion, the interest of the *amicus* is very much a point of fundamental principle: that the constitutional due process requirements of notice and opportunity to be heard before sanctions are imposed on an attorney. The failure to provide notice and opportunity to be heard in Mr. Sahid's case, given its circumstances, is a disturbing failure that should not go uncorrected. State courts should not be given license to disregard due process.

Accordingly, Movant's motion for leave to file an *amicus curiae* brief should be granted.

10

Respectfully submitted,

/s/ _Philip A. Byler_

PHILIP A. BYLER
*Counsel of Record*
NESENOFF & MILTENBERG LLP
*Attorneys for* Amicus Curiae
363 Seventh Avenue, Fifth Floor
New York, New York 10001
212-736-4500

# Supreme Court of the United States
## Office of the Clerk
## Washington, DC  20543-0001

Scott S. Harris
Clerk of the Court
(202) 479-3011

October 7, 2013

Mr. Philip A. Byler
Nesenoff & Miltenberg LLP
363 Seventh Avenue, 5th Floor
New York, NY  10153-0000

Re:  Joseph R. Sahid
     v. Cadlerock Joint Venture, L.P.
     No. 12-1342

Dear Mr. Byler:

The Court today entered the following order in the above-entitled case:

The motion of Philip A. Byler for leave to file a brief as *amicus curiae* is
granted.   The petition for a writ of certiorari is denied.

Sincerely,

Scott S. Harris, Clerk