**EXHIBIT B**

USDC IN/ND case 2:17-cv-00033-GSL    document 52-2    filed 09/03/19    page 2 of 16

📁    KeyCite Yellow Flag - Negative Treatment

Distinguished by Doe v. Columbia College Chicago, 7th Cir.(Ill.), August 13, 2019

928 F.3d 652
United States Court of Appeals, Seventh Circuit.

John DOE, Plaintiff-Appellant,

v.

PURDUE UNIVERSITY, et
al., Defendants-Appellees.

No. 17-3565
|
Argued September 18, 2018
|
Decided June 28, 2019

**Synopsis**

**Background:** Student filed § 1983 action against state university and university officials alleging that his expulsion after he was found guilty of sexual violence violated Due Process Clause and Title IX. The United States District Court for the Northern District of Indiana, No. 2:17-cv-00033-PRC, Paul R. Cherry, United States Magistrate Judge, 281 F.Supp.3d 754, dismissed complaint, and student appealed.

**Holdings:** The Court of Appeals, Barrett, Circuit Judge, held that:

[1] student adequately alleged protected liberty interest in pursuing his occupation of choice;

[2] student adequately pled that procedures employed by university in disciplinary proceeding were fundamentally unfair;

[3] university's president was not subject to liability under § 1983;

[4] officials were entitled to qualified immunity for due process violations;

[5] student lacked standing to seek injunction prohibiting officials from violating Due Process Clause in process of investigating and adjudicating sexual misconduct complaints;

[6] student lacked standing to seek injunction requiring officials to remove conditions of re-entry;

[7] student had standing to seek injunction requiring officials to expunge finding of guilt from his disciplinary record; and

[8] student pled plausible Title IX discrimination claim.

Reversed and remanded.

West Headnotes (23)

**[1]**    **Constitutional Law**
    Students

In context of higher education, any due process property interest is matter of contract between student and university. U.S. Const. Amend. 14.

Cases that cite this headnote

**[2]**    **Constitutional Law**
    Discipline, suspension, or expulsion

To demonstrate that he possesses due process property interest in continued education at state university, student must do more than show that he has contract with university; he must establish that contract entitled him to specific right that university allegedly took, such as right to continuing education or right not to be suspended without good cause. U.S. Const. Amend. 14.

Cases that cite this headnote

**[3]**    **Constitutional Law**
    Particular claims

In order for student to establish protected due process property interest in continued education at state university, generalities will not do; student's complaint must be specific about source of implied contract, exact promises that university made to student, and promises that student made in return. U.S. Const. Amend. 14.

Cases that cite this headnote

**[4]  Constitutional Law**
  ☛ Reputation; defamation

To succeed on claim that state deprived him of due process liberty interest, plaintiff must satisfy "stigma plus" test, which requires him to show that state inflicted reputational damage accompanied by alteration in legal status that deprived him of right he previously held. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[5]  Constitutional Law**
  ☛ Reputation; defamation

Loss of reputation is not itself loss of liberty protected by Due Process Clause, even when it causes serious impairment of one's future employment. U.S. Const. Amend. 14.

Cases that cite this headnote

**[6]  Constitutional Law**
  ☛ Discipline, suspension, or expulsion

**Education**
  ☛ Proceedings and review

State university student adequately alleged protected liberty interest in pursuing his occupation of choice under "stigma plus" test, as required to state procedural due process claim against university officials, arising from his suspension after officials found him guilty of sexual offense, where finding of guilty changed student's status from full-time student in good standing to one suspended for academic year, and caused his expulsion from Navy ROTC program, with accompanying loss of scholarship and foreclosed possibility of his re-enrollment in it. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[7]  Constitutional Law**
  ☛ Procedural due process in general

When right is protected by Due Process Clause, state may not withdraw it on grounds of misconduct absent fundamentally fair procedures to determine whether misconduct has occurred. U.S. Const. Amend. 14.

Cases that cite this headnote

**[8]  Constitutional Law**
  ☛ Discipline, suspension, or expulsion

Process due in university disciplinary context depends on number of factors, including severity of consequence and level of education. U.S. Const. Amend. 14.

Cases that cite this headnote

**[9]  Constitutional Law**
  ☛ Disciplinary proceedings

Due process requires, in connection with suspension from state university of 10 days or less, that student be given oral or written notice of charges against him and, if he denies them, explanation of evidence that authorities have an opportunity to present his side of story. U.S. Const. Amend. 14.

Cases that cite this headnote

**[10]  Constitutional Law**
  ☛ Disciplinary proceedings

**Education**
  ☛ Proceedings and review

State university student adequately pled that procedures employed by university in disciplinary proceeding arising from accusation of sexual violence were fundamentally unfair, in violation of his due process rights, by alleging that university did not disclose its evidence to him, that two of three panel members admitted that they had not read investigative report, that panel never spoke to accuser and never received sworn statement from her, and that he was not given opportunity to present impeachment evidence. U.S. Const. Amend. 14.

1 Cases that cite this headnote

**[11]  Constitutional Law**
  ☛ Notice and Hearing

To satisfy Due Process Clause, hearing must be a real one, not sham or pretense. U.S. Const. Amend. 14.

Cases that cite this headnote

**[12]    Education**
 Proceedings and review

Blending investigation and adjudication functions in university student disciplinary context does not necessarily render process unfair.

Cases that cite this headnote

**[13]    Constitutional Law**
 Notice and Hearing; Proceedings and Review

To rebut presumption that university administrators are honest and impartial, plaintiff asserting due process claim against administrators must lay specific foundation of prejudice or prejudgment, such that probability of actual bias is too high to be constitutionally tolerable, typically requiring evidence that adjudicator had pecuniary interest in case's outcome, or that he was previously target of plaintiff's abuse or criticism. U.S. Const. Amend. 14.

Cases that cite this headnote

**[14]    Civil Rights**
 Education

State university's president was not subject to liability in student's § 1983 action alleging that disciplinary proceeding against him violated his due process rights, absent allegation that president knew about disciplinary committee's conduct and facilitated, approved, or condoned it. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[15]    Civil Rights**
 Vicarious liability and respondeat superior in general; supervisory liability in general

Section 1983 does not allow actions against individuals merely for their supervisory role of others. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[16]    Civil Rights**
 Vicarious liability and respondeat superior in general; supervisory liability in general

To be liable under § 1983 for his subordinates' constitutional violation, supervisor must know about conduct and facilitate it, approve it, condone it, or turn blind eye. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**[17]    Federal Civil Procedure**
 Fact issues

If it is clear on face of complaint that constitutional right invoked was not clearly articulated in case law, existence of qualified immunity is purely legal question that district court can address on motion to dismiss.

1 Cases that cite this headnote

**[18]    Civil Rights**
 Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Qualified immunity protects government officials from liability for civil damages as long as their actions do not violate clearly established statutory or constitutional rights of which reasonable person would have known.

1 Cases that cite this headnote

**[19]    Civil Rights**
 Schools

It was not clearly established that university discipline could deprive student of due process liberty interest, and thus state university officials were entitled to qualified immunity from liability in student's § 1983 action alleging that his disciplinary suspension—which resulted in his expulsion from Navy ROTC program, with accompanying loss of scholarship—violated his

due process rights. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[20] **Civil Rights**
 🔑 Education

State university student who was suspended for one-year for sexual misconduct lacked standing to seek injunction prohibiting university officials from violating Due Process Clause in process of investigating and adjudicating sexual misconduct complaints, absent allegation that he intended to re-enroll at university, that he faced real and immediate threat that it would again investigate him for sexual misconduct, or that any such investigation would violate due process. U.S. Const. Amend. 14.

1 Cases that cite this headnote

[21] **Injunction**
 🔑 Persons entitled to apply; standing

State university student who was suspended for one year for sexual misconduct lacked standing to seek injunction requiring university officials to remove conditions of re-entry imposed by university as part of his discipline, absent allegation that he intended to re-enroll at university.

Cases that cite this headnote

[22] **Injunction**
 🔑 Persons entitled to apply; standing

State university student who was suspended for one year for sexual misconduct had standing to seek injunction requiring university officials to expunge finding of guilt from his disciplinary record, where his disciplinary suspension resulted in his expulsion from Navy ROTC program, with accompanying loss of scholarship, and career in Navy might once again be open to him if guilty finding were expunged.

Cases that cite this headnote

[23] **Civil Rights**

 🔑 Discrimination against males

Male student who was suspended from state university for sexual misconduct pled plausible Title IX discrimination claim by alleging that university's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct, that university's dean of students chose to credit accuser's account without hearing directly from her, that majority of disciplinary panel members appeared to credit accuser based on her unsworn accusation alone, that they refused to hear any impeachment evidence, and that university center dedicated to supporting victims of sexual violence believed that men as a class were responsible for problem of campus sexual assault. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a).

4 Cases that cite this headnote

 **\*655** Appeal from the United States District Court for the Northern District of Indiana, Hammond Division. No. 2:17-cv-00033-PRC—**Paul R. Cherry**, *Magistrate Judge*.

**Attorneys and Law Firms**

Philip A. Byler, Attorney, NESENOFF & MILTENBERG, LLP, New York, NY, Damon M. Cheronis, Attorney, LAW OFFICES OF DAMON M. CHERONIS, Chicago, IL, for Plaintiff-Appellant.

William Peter Kealey, James Francis Olds, Attorneys, STUART & BRANIGIN LLP, Lafayette, IN, for Defendants-Appellees.

Before Sykes, Barrett, and St. Eve, Circuit Judges.

**Opinion**

Barrett, Circuit Judge.

 **\*656** After finding John Doe guilty of sexual violence against Jane Doe, Purdue University suspended him for an academic year and imposed conditions on his readmission. As a result of that decision, John was expelled from the Navy ROTC program, which terminated both his ROTC scholarship and plan to pursue a career in the Navy.

John sued the university and several of its officials, asserting two basic claims. First, he argued that they had violated the Fourteenth Amendment by using constitutionally flawed procedures to determine his guilt or innocence. Second, he argued that Purdue had violated Title IX by imposing a punishment infected by sex bias. A magistrate judge dismissed John's suit on the ground that he had failed to state a claim under either theory. We disagree. John has adequately alleged violations of both the Fourteenth Amendment and Title IX.

I.

We are reviewing the magistrate judge's decision to dismiss John's complaint for failing to state a claim. That means that we must recount the facts as he describes them, drawing every inference in his favor. *See D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 682 (7th Cir. 2013). In other words, the story that follows is one-sided because the posture of the case requires it to be. Our task is not to determine what allegations are supported by the evidence but to determine whether John is entitled to relief if everything that he says is true. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

John and Jane were both students in Purdue's Navy ROTC program. They began dating in the fall of 2015, and between October and December, they had consensual sexual intercourse fifteen to twenty times. Jane's behavior became increasingly erratic over the course of that semester, and she told John that she felt hopeless, hated her life, and was contemplating running away. In December, Jane attempted suicide in front of John, and after that incident, they stopped having sex. They continued dating, however, until January, when John tried to get Jane help by reporting her suicide attempt to two resident assistants and an advisor. Jane was upset at John for reporting her, and she distanced herself from him. Soon thereafter, she began dating someone else.

For a few months, things were quiet between John and Jane. That changed in April 2016, which was Sexual Assault Awareness Month. During that month, Purdue hosted over a dozen events to promote the reporting of sexual assaults. Many of the events were sponsored by the Center for Advocacy, Response, and Education (CARE), a university center dedicated to supporting victims of sexual violence. CARE promoted the events on its Facebook page, along with posts containing information about sexual assault. One of its posts was an article from *The Washington Post* titled "Alcohol isn't the cause of campus sexual assault. Men are."

During the first ten days of April, five students reported sexual assault to the university. Jane was one of them. She alleged that in November 2015, she was sleeping with John in his room when she woke to him groping her over her clothes **\*657** without her consent. According to Jane, she told John that this was not okay, and John then confessed that he had digitally penetrated her while the two were sleeping in Jane's room earlier that month. Jane told the university that John had engaged in other misconduct as well: she asserted that he had gone through her underwear drawer without her permission, chased her through a hallway while joking about tasering her, gone to her room unannounced after they broke up, and lost his temper in front of her.

John learned about Jane's accusations in a letter from Katherine Sermersheim, Purdue's Dean of Students and a Title IX coordinator. Sermersheim informed John that the university had elected to pursue Jane's allegations even though Jane had not filed a formal complaint. She outlined the school's disciplinary procedures and explained that two employees who reported to her, Erin Oliver and Jacob Amberger, would investigate the case. She also instructed John not to have any contact with Jane. After he received the letter, John was suspended from the Navy ROTC, banned from all buildings where Jane had classes, and barred from eating in his usual dining hall because Jane also used it.

John submitted a written response denying all of Jane's allegations. He asserted that he never had sexual contact with Jane while she was sleeping, through digital penetration or otherwise. He said that there was one night in December, after Jane's suicide attempt, when he touched Jane's knee while she was sleeping on a futon and he was on the floor next to her. But he denied groping her or engaging in any of the harassing behavior of which she had accused him. John also recounted evidence that he thought inconsistent with Jane's claim of sexual assault: she texted and talked to him over the holidays, sent his family a package of homemade Christmas cookies, and invited him to her room when they returned to school in January. He also provided details suggesting that Jane was troubled and emotionally unstable, which he thought might explain her false accusations.

Under Purdue's procedures, John was allowed the assistance of a "supporter" at any meeting with investigators. In late April, John and his supporter met with Oliver and Amberger.

As he had in his written response, John steadfastly denied Jane's allegations. He provided the investigators with some of the friendly texts that he thought belied her story, as well as a list of over thirty people who could speak to his integrity.

When the investigators' report was complete, Sermersheim sent it to a three-person panel of Purdue's Advisory Committee on Equity, which was tasked with making a recommendation to her after reviewing the report and hearing from the parties. Sermersheim called John to appear before the panel, but consistent with Purdue's then-applicable procedures, she neither gave him a copy of the report nor shared its contents with him. Moments before his committee appearance, however, a Navy ROTC representative gave John a few minutes to review a redacted version of the report. To John's distress, he learned that it falsely claimed that he had confessed to Jane's allegations. The investigators' summary of John's testimony also failed to include John's description of Jane's suicide attempt.

John and his supporter met with the Advisory Committee and Sermersheim, who chaired the meeting, for about thirty minutes. Jane neither appeared before the panel nor submitted a written statement. Instead, Monica Soto Bloom, the director of CARE, wrote the Advisory Committee **\*658** and Sermersheim a letter summarizing Jane's accusations.

The meeting did not go well for John. Two members of the panel candidly stated that they had not read the investigative report. The one who apparently had read it asked John accusatory questions that assumed his guilt. Because John had not seen the evidence, he could not address it. He reiterated his innocence and told the panel about some of the friendly texts that Jane had sent him after the alleged assaults. The panel refused John permission to present witnesses, including character witnesses and a roommate who would state that he was present in the room at the time of the alleged assault and that Jane's rendition of events was false.

A week later, Sermersheim sent John a perfunctory letter informing him that she had found him guilty by a preponderance of the evidence of sexual violence. She suspended John from Purdue for one academic year. In addition, she conditioned John's reentry on his completion of a university-sponsored "bystander intervention training" and his agreement to meet with the Assistant Director of CARE during the first semester of his return.

John appealed this decision to Alysa Rollock, Purdue's Vice President for Ethics and Compliance, who instructed Sermersheim to identify the factual basis of her determination. Sermersheim sent a revised letter to John adding the following:

> Specifically, a preponderance of the evidence supports that:
>
> 1. [Jane Doe] had fallen asleep on a futon with you on the floor beside her. She woke up and found that you inappropriately touched her over her clothing and without her consent by placing your hand above her knee, between her legs, and moved it up to her "crotch" areas; and
>
> 2. On another occasion, while she was sleeping and without her consent, you inappropriately touched [Jane Doe] by digitally penetrating her vagina.

As the basis for these findings, Sermersheim offered: "I find by a preponderance of the evidence that [John Doe] is not a credible witness. I find by a preponderance of the evidence that [Jane Doe] is a credible witness." John appealed to Rollock again, but this time, Rollock upheld Sermersheim's determination of guilt and accompanying sanctions. A few weeks after his second appeal was denied, John involuntarily resigned from the Navy ROTC, which has a "zero tolerance" policy for sexual harassment.

John sued Mitch Daniels, the President of Purdue University; Rollock, the Vice President for Ethics and Compliance; Sermersheim, the Dean and a Title IX coordinator; and Oliver and Amberger, the investigators, in their individual capacities, seeking monetary relief under 42 U.S.C. § 1983. [1] He sued these same defendants, along with the members of Purdue's Board of Trustees, in their official capacities, seeking injunctive relief under *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), to remedy the Fourteenth Amendment violation. And he sued Purdue University for discriminating against him on the basis of sex in violation of Title IX.

The magistrate judge dismissed John's § 1983 claims with prejudice, holding that the disciplinary proceedings did not deprive John of either liberty or property, so **\*659** the Due Process Clause did not apply. He offered an additional reason for dismissing John's § 1983 claim against Daniels: John's theory of liability was based on Daniels's role as supervisor, and there is no supervisory liability under § 1983. As for John's claims for injunctive relief, the magistrate judge dismissed them without prejudice for lack of standing because

John had not alleged that the violations posed any threat of future harm. And he dismissed John's claims under Title IX with prejudice on the ground that John had not alleged facts sufficient to show that Purdue discriminated against him on the basis of sex. John appeals each of these rulings.

## II.

We begin with procedural due process. According to John, he was punished pursuant to a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause. He alleges the following deficiencies: he was not provided with the investigative report or any of the evidence on which the decisionmakers relied in determining his guilt and punishment; Jane did not appear before the Advisory Committee; he had no opportunity to cross-examine Jane; Sermersheim found Jane credible even though neither Sermersheim nor the Advisory Committee talked to her in person; Jane did not write her own statement for the panel, much less a sworn one; Sermersheim was in charge of both the investigation and the adjudication of his case; the Advisory Committee was blatantly biased against him; and the Advisory Committee refused to allow him to present any evidence, including witnesses.

Yet John cannot recover simply because the procedures were unfair, even if they were. The Due Process Clause is not a general fairness guarantee; its protection kicks in only when a state actor deprives someone of "life, liberty, or property." U.S. CONST. amend. XIV, § 1. The threshold question, then, is whether John lost a liberty or property interest when he was found guilty of sexual violence and punished. We address whether the procedures satisfied minimum constitutional requirements of fairness only if the answer to that question is yes.

## A.

Our precedent involving due process claims in the context of university discipline has focused on whether a student has a protected property interest in his education at a state university. We have explained that "[a] college education— any education—is not 'property' in the usual sense of the word." *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008); *see also Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013) ("[O]ur circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate education."). [2] Instead, "we ask whether the student has shown that he has a *legally protected entitlement* to his continued education at the university." **\*660** *Charleston*, 741 F.3d at 773 (emphasis in original). High school students (and, for that matter, elementary school students) have a property interest in their public education because state law entitles them to receive one. *Goss v. Lopez*, 419 U.S. 565, 573–74, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The same is not true, however, of students at public universities—certainly, John has not contended that Indiana guarantees its residents a college education.

[1] [2] [3] In the context of higher education, any property interest is a matter of contract between the student and the university. *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009) (explaining that the "basic legal relation between a student and a private university or college is contractual in nature" (citation omitted)). And to demonstrate that he possesses the requisite property interest, a university student must do more than show that he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, "such as the right to a continuing education or the right not to be suspended without good cause." *Id.* at 601. Generalities won't do; "the student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return." *Charleston*, 741 F.3d at 773.

John has not adequately alleged that Purdue deprived him of property because his complaint does not point to any specific contractual promise that Purdue allegedly broke. [3] To be sure, John asserts that he had a property interest in his continued enrollment at Purdue. But as support for that proposition, his complaint states only that the right arose "from the express and implied contractual relationship" between John and the university. It points to no "identifiable contractual promise that the [university] failed to honor." *Bissessur*, 581 F.3d at 602 (alteration in original) (citation omitted).

His brief does only slightly better. In it, John insists that the Indiana state courts have held that a student enrolled in a public institution has a property interest in continuing his education. He cites *Reilly v. Daly*, in which an Indiana court said: "It is without question that a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property and that a student facing expulsion or suspension from a public

educational institution is therefore entitled to the protections of due process." 666 N.E.2d 439, 444 (Ind. Ct. App. 1996). But John's reliance on *Reilly* is misplaced. To begin with, this cryptic sentence—the sum of what the case says on the topic—does not specify whether university disciplinary proceedings implicate liberty or property interests. And to the extent that *Reilly* refers to property, it does not purport to identify a state-granted property right to pursue higher education. Instead, it appears to express a view about federal law that we have already rejected: that the Due Process Clause protects a generalized property interest in higher education, irrespective of any specific state entitlement. While Indiana is free to align itself with courts taking that view, *see supra* note 2, our position is clear and to the contrary, *see Williams,* 530 F.3d at 589 (rejecting "the bald assertion that any student who is suspended from college has suffered a deprivation of constitutional property").

 **\*661**  **[4]**  John's failure to establish a property interest does not doom his claim, however, because he also maintains that Purdue deprived him of a protected liberty interest: his freedom to pursue naval service, his occupation of choice. To succeed on this theory, John must satisfy the "stigma plus" test, which requires him to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held. *See Mann v. Vogel,* 707 F.3d 872, 878 (7th Cir. 2013); *see also Paul v. Davis,* 424 U.S. 693, 708–09, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Hinkle v. White,* 793 F.3d 764, 767–68 (7th Cir. 2015). John argues that he has satisfied this test because he alleges that Purdue inflicted reputational harm by wrongfully branding him as a sex offender; that Purdue changed his legal status by suspending him, subjecting him to readmission requirements, and causing the loss of his Navy ROTC scholarship; and that these actions impaired his right to occupational liberty by making it virtually impossible for him to seek employment in his field of choice, the Navy. *See Lawson v. Sheriff of Tippecanoe Cty., Ind.,* 725 F.2d 1136, 1138 (7th Cir. 1984) ("The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling."); *Townsend v. Vallas,* 256 F.3d 661, 670 (7th Cir. 2001) (Liberty interests are impinged when someone's "good name, reputation, honor or integrity [are] called into question in a manner that makes it virtually impossible for ... [him] to find new employment in his chosen field.").

Purdue insists that John has not adequately alleged "stigma," much less the necessary "plus." The university maintains that it has not and will not divulge John's disciplinary record without his permission. The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began. Because John permitted the disclosure, Purdue says, he cannot complain that Purdue stigmatized him.

Purdue cites no cases in support of its position, but it is presumably trying to draw an analogy between John and a plaintiff who publishes damaging information about himself —because it is true that a plaintiff can't himself spill the beans and then blame the defendant for ruining his reputation. *Olivieri v. Rodriguez* illustrates the point. 122 F.3d 406 (7th Cir. 1997). There, a probationary police officer asserted a procedural due process claim against his superintendent after he was fired for sexually harassing other probationers. *Id.* at 407. We observed that "the defendant [had not] disclosed to anyone the grounds of the plaintiff's discharge." *Id.* at 408. The plaintiff, however, insisted that the defendant's silence didn't matter because the plaintiff would have to tell potential employers why he was fired—and "[i]f he answers truthfully, he will reveal the ground of the termination as effectively as (actually more effectively than) if the Department had taken out a full-page ad in every newspaper in the nation announcing the termination of Felix A. Olivieri for sexually harassing female probationary officers at the Chicago police training academy." *Id.*

We rejected Olivieri's claim, holding that a plaintiff who publicizes negative information about himself cannot establish that the *defendant* deprived him of a liberty interest. *Id.* As an initial matter, we noted that it was uncertain whether Olivieri's prospective employers would ever find out why he was discharged. *Id.* at 408–09 ("A prospective employer might not ask him—might ask only the Chicago Police Department, which for all we know might refuse to disclose the grounds of Olivieri's discharge; many former employers refuse to answer such inquiries, because of fear of **\*662** being sued for defamation."). In addition, we explained that "[t]he principle of self-defamation, applied in a case such as this, would encourage [the plaintiff] to apply for a job to every police force in the nation, in order to magnify his damages; and to blurt out to each of the them the ground of his discharge in the most lurid terms, to the same end." *Id.* at 409.

John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy.

That makes John's case more like *Dupuy v. Samuels,* 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510. In contrast to *Olivieri*, where disclosure was voluntary and speculative, it was compelled and certain in *Dupuy*. And in *Dupuy*, unlike in *Olivieri*, the disclosure was not self-published—it came from the defendant, even if the plaintiff had been obligated to authorize it. So too here: Purdue, not John, revealed to the Navy that it had found him guilty of sexual violence, and John had a legal obligation to authorize the disclosure.

 **[5]** Thus, if what John says is true, the university has stigmatized him by telling the Navy about the guilty finding. But the loss of reputation is not itself a loss of liberty, "even when it causes 'serious impairment of one's future employment.' " *Hojnacki v. Klein–Acosta,* 285 F.3d 544, 548 (7th Cir. 2002) (alteration and citation omitted). John must also show that the stigma was accompanied by a change in legal status. In *Paul v. Davis,* for example, the Supreme Court held that the police did not trigger the Due Process Clause by posting flyers falsely asserting that the plaintiff was an active shoplifter. 424 U.S. at 712, 96 S.Ct. 1155. The flyers undoubtedly harmed the plaintiff's professional reputation, but their posting did not alter his legal status. *Id.* at 708–12, 96 S.Ct. 1155. Similarly, in *Hinkle v. White*, loose-lipped state police officers spread word that they were investigating the plaintiff for child molestation and that he might be guilty of arson to boot. 793 F.3d at 767. But the gossip did not alter his legal status—the plaintiff was not prosecuted, much less found guilty; nor did the county impose a consequence like firing him from his job as county sheriff. *Id.* at 768–69. Even though the rumors made it "virtually impossible" for him to change to a new job in his chosen field, the lack of a status change meant that he could not state a due process claim. *Id.* at 768–70.

 **[6]** John's situation is unlike that of the plaintiffs in *Paul v. Davis* and *Hinkle v. White* because it is not a matter of state-spread rumors or an investigation that was ultimately dropped. After conducting an adjudicatory proceeding, Purdue formally determined that John was guilty of a sexual offense. That determination changed John's status: he went from a full-time student in good standing to one suspended for an academic year. *Cf. Mann,* 707 F.3d at 878 (holding that the state deprived the plaintiff of occupational liberty when, after

an investigation, it found that she had violated child-safety laws and suspended her ability to operate her daycare center); *Doyle v. Camelot Care Ctrs.,* 305 F.3d 603, 617 (7th Cir. 2002) (holding that the state deprived the plaintiffs of occupational liberty when, after an investigation, it found that they had neglected a minor and informed their respective employers, who fired them). And it was this official determination of guilt, not the preceding **\*663** charges or any accompanying rumors, that allegedly deprived John of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his re-enrollment in it. John has satisfied the "stigma plus" test.

B.

Having determined that John has adequately alleged that Purdue deprived him of a liberty interest, we turn to whether he has adequately claimed that Purdue used fundamentally unfair procedures in determining his guilt.

 **[7]** **[8]** When a right is protected by the Due Process Clause, a state "may not withdraw [it] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred." *Goss,* 419 U.S. at 574, 95 S.Ct. 729. Determining what is fundamentally fair is always a context-specific inquiry. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) ("[W]e have frequently emphasized that '[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' " (citation omitted)). Thus, for example, a university has much more flexibility in administering academic standards than its code of conduct. *See id.* ("[T]here are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter."). And even in the disciplinary context, the process due depends on a number of factors, including the severity of the consequence and the level of education. A 10-day suspension warrants fewer procedural safeguards than a longer one, *Goss,* 419 U.S. at 584, 95 S.Ct. 729, and universities are subject to more rigorous requirements than high schools, *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 663–64 (7th Cir. 2004).

 **[9]** **[10]** John's circumstances entitled him to relatively formal procedures: he was suspended by a university rather

than a high school, for sexual violence rather than academic failure, and for an academic year rather than a few days. Yet Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension. "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581, 95 S.Ct. 729. John received notice of Jane's allegations and denied them, but Purdue did not disclose its evidence to John. And withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair. *See id.* at 580, 95 S.Ct. 729 ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights...." (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring))).

 **[11]**  John has adequately alleged that the process was deficient in other respects as well. To satisfy the Due Process Clause, "a hearing must be a real one, not a sham or pretense." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016) (citation omitted). At John's meeting with the Advisory Committee, two of the three panel members candidly admitted that they had not read the investigative report, which suggests that they decided that John was guilty based on the accusation rather than the evidence. *See id.* at 630 **\*664**  (stating that a hearing would be a sham if "members of the school board came to the hearing having predetermined [the plaintiff's] guilt"). And in a case that boiled down to a "he said/she said," it is particularly concerning that Sermersheim and the committee concluded that Jane was the more credible witness—in fact, that she was credible at all—without ever speaking to her in person. Indeed, they did not even receive a statement written by Jane herself, much less a sworn statement. [4]  It is unclear, to say the least, how Sermersheim and the committee could have evaluated Jane's credibility.

Sermersheim and the Advisory Committee's failure to make any attempt to examine Jane's credibility is all the more troubling because John identified specific impeachment evidence. He said that Jane was depressed, had attempted suicide, and was angry at him for reporting the attempt. His roommate—with whom Sermersheim and the Advisory Committee refused to speak—maintained that he was present at the time of the alleged assault and that Jane's rendition of events was false. And John insisted that Jane's behavior after the alleged assault—including her texts, gifts, and

continued romantic relationship with him—was inconsistent with her claim that he had committed sexual violence against her. Sermersheim and the Advisory Committee may have concluded in the end that John's impeachment evidence did not undercut Jane's credibility. But their failure to even question Jane or John's roommate to probe whether this evidence was reason to disbelieve Jane was fundamentally unfair to John.

 **[12]     [13]**  John also faults Sermersheim for being in charge of both the investigation and adjudication of his case. We have held, however, that blending these two functions in the university context does not necessarily render a process unfair. *Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 675 (7th Cir. 2016). To rebut the presumption that university administrators are "honest and impartial," a plaintiff must "lay a specific foundation of prejudice or prejudgment, such that the probability of actual bias is too high to be constitutionally tolerable." *Id.* This burden is "heavy indeed," typically requiring evidence that "the adjudicator had a pecuniary interest in the outcome of the case, or that he was previously the target of the plaintiff's abuse or criticism." *Id.* (citations omitted). John has made no such allegation here.

### C.

To this point, we have analyzed the due process claim without distinguishing between defendants. Now, however, we separate them.

### (1)

 **[14]     [15]     [16]**  We begin with John's individual-capacity claim against Mitch Daniels, the president of Purdue. The magistrate judge was right to dismiss this claim. Section 1983 "does not allow actions against individuals merely for their supervisory role of others." *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir. 2000). To be liable, a supervisor "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Zentmyer v. Kendall Cty., Ill.*, 220 F.3d 805, 812 (7th Cir. 2000) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). John's **\*665**  complaint asserts nothing more about Daniels than that " 'The Buck Stops Here' with him." There is no allegation that Daniels knew about the conduct, much less that he facilitated, approved, or condoned it.

(2)

The individual-capacity claims against Rollock, Sermersheim, Oliver, and Amberger present a different obstacle for John: qualified immunity. For the reasons that we have already explained, John has alleged facts that amount to a constitutional violation. But because the defendants have asserted qualified immunity, John can recover damages from them only if his right to receive procedural due process in the disciplinary proceeding was clearly established. *See Rainsberger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019). The magistrate judge did not address qualified immunity because he concluded that John had failed to state a due process claim. The defendants raised it below, however, and they press it again here as an alternative ground for affirmance.

John insists that it would be premature for us to address the issue because we are reviewing the magistrate judge's dismissal of his claims under Rule 12(b)(6). As he points out, qualified immunity is generally addressed at summary judgment rather than on the pleadings. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) ("[A] complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds."); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000) ("[T]he dismissal of a § 1983 suit under Rule 12(b)(6) is a delicate matter."). Thus, John argues, we should send the case back to the district court for discovery.

 **[17]** There is no hard-and-fast rule, however, against resolving qualified immunity on the pleadings. The reason for deferring it to summary judgment is that an officer's entitlement to qualified immunity often "depend[s] on the particular facts of a given case," *Jacobs*, 215 F.3d at 765 n.3, and the Federal Rules of Civil Procedure do not require a plaintiff to include much factual detail in a complaint, *see* FED. R. CIV. P. 8 (providing that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief"). *See also Pearson v. Callahan*, 555 U.S. 223, 238–39, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) ("When qualified immunity is asserted at the pleading stage, the precise factual basis for the plaintiff's claim or claims may be hard to identify."). That said, the existence of qualified immunity is not always dependent on factual development —it is sometimes clear on the face of the complaint that the constitutional right invoked was not clearly articulated in the case law. In that circumstance, the existence of qualified

immunity is a "purely legal question" that the court can address on a motion to dismiss. *Jacobs*, 215 F.3d at 765 n.3.

 **[18]** **[19]** That is the situation here. Qualified immunity is a high standard. It protects government officials from liability for civil damages as long as their actions do not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." *Figgs v. Dawson*, 829 F.3d 895, 905 (7th Cir. 2016) (citation omitted). While the general stigma-plus test is well-settled in our law, *see Hinkle*, 793 F.3d at 768, we have never applied it specifically in the university setting. Instead, our cases in this area have considered only whether students have a *property* interest in their public university education—and to this point, no student has successfully shown the requisite interest. Because this is our first case addressing whether university discipline deprives a student of a *liberty* interest, the relevant legal rule was not "clearly established," **\*666** and a reasonable university officer would not have known at the time of John's proceeding that her actions violated the Fourteenth Amendment. We therefore affirm the dismissal of John's individual-capacity claims against Rollock, Sermersheim, Oliver, and Amberger.

(3)

 **[20]** That leaves John's claims for injunctive relief, which he seeks to obtain by suing Daniels, Rollock, Sermersheim, Oliver, and Amberger in their official capacities. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The magistrate judge dismissed this claim without prejudice on the ground that John lacked standing to bring it. In his complaint, John asked for "an injunction enjoining violations of the Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints." But John doesn't have standing to claim such relief. He has not alleged that he intends to re-enroll at Purdue, much less that he faces a "real and immediate threat" that Purdue would again investigate him for sexual misconduct, much less that any such investigation would violate due process. *See City of L.A. v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("That Lyons may have been illegally choked by the police on October 6, 1976, while presumably affording Lyons standing to claim damages against the individual officers and perhaps against the City, does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without

any provocation or resistance on his part."). What John really seeks to do is champion the rights of other men at Purdue who might be investigated for sexual misconduct using the flawed procedures that he describes in his complaint. That is a no-go: John plainly lacks standing to assert the Fourteenth Amendment rights of other students, even if he had alleged (which he didn't) that the threat of injury to any one of them was "real and immediate*." Id.*

 **[21]**   John also seeks to remove the conditions of re-entry imposed by Purdue as part of his discipline. John lacks standing here too. As we already noted, he has not alleged that he intends to return to Purdue—a necessary fact to demonstrate a cognizable injury from the barriers to re-entry. That said, the magistrate judge dismissed this claim without prejudice, so on remand John can seek to remedy his lack of standing by pleading the necessary facts, if he has them.

 **[22]**   In his response to the defendants' motion to dismiss, and then again in his brief and at oral argument, John argued that he is also entitled to an injunction ordering university officials to expunge the finding of guilt from his disciplinary record. For this relief, John has standing: John's marred record is a continuing harm for which he can seek redress. *See, e.g.*, *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records "serve[s] the purpose of preventing present and future harm"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to "remove the negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature"). And he claims that if the guilty finding is expunged, a career in the Navy may once again be open to him.

Because John did not specifically request this relief in his complaint, the university **\*667** officials object that it is too late for him to raise it now. But Federal Rule of Civil Procedure 54(c) states that "[e]very [ ] final judgment [other than default judgments] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." That means that even though John may not have asked specifically for expungement, he may still be entitled to it. In *Felce v. Fiedler*, for example, the plaintiff did not request injunctive relief but instead—using language similar to that in John's complaint—asked for "other and further relief as the court may deem to be just and equitable."

974 F.2d 1484, 1501 (7th Cir. 1992). The district court in *Felce* had not reached the question of injunctive relief because it had held—as the magistrate judge did in John's case—that the plaintiff had not alleged the necessary liberty interest. On appeal, we concluded that the plaintiff did have a liberty interest and instructed the district court to address the issue of injunctive relief on remand. *Id.* at 1502. We do the same here: having determined that John has pleaded a liberty interest, we instruct the court to address the issue of expungement on remand.

### III.

John also asserts a claim against Purdue under Title IX, which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (explaining that Title IX is enforceable through an implied private right of action). It is undisputed that Purdue receives federal funding and that John was "excluded from participation in [or] denied the benefits of ... [an] education program" when Purdue suspended him. 20 U.S.C. § 1681(a). The success of John's claim depends on whether Purdue discriminated against him "on the basis of sex." *Id.*

Some circuits use formal doctrinal tests to identify general bias in the context of university discipline. For example, the Second Circuit channels such claims into two general categories. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). In what has come to be called the "erroneous outcome" category, the plaintiff must show that he "was innocent and wrongly found to have committed the offense." *Id.* The other category, "selective enforcement," requires a plaintiff to prove that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*; *see also Plummer v. Univ. of Hous.*, 860 F.3d 767, 777–78 (5th Cir. 2017) (resolving the case by reference to the *Yusuf* framework); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018) ("[W]e will assume for present purposes that a student can show a violation of Title IX by satisfying the 'erroneous outcome' test applied by the Second Circuit in *Yusuf*."). The Sixth Circuit has added two more categories to the mix: "deliberate indifference" and "archaic assumptions."

*See Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (recognizing "at least four different theories of liability" in this context: "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions' " (citations omitted)).

We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged **\*668** facts, if true, raise a plausible inference that the university discriminated against John "on the basis of sex"?

John casts his Title IX claim against the backdrop of a 2011 "Dear Colleague" letter from the U.S. Department of Education to colleges and universities. *See* United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter (2011), https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html. That letter ushered in a more rigorous approach to campus sexual misconduct allegations by, among other things, defining "sexual harassment" more broadly than in comparable contexts, *id.* at 3, mandating that schools prioritize the investigation and resolution of harassment claims, *id.* at 4, and requiring them to adopt a lenient "more likely than not" burden of proof when adjudicating claims against alleged perpetrators, *id.* at 11. The Department of Education made clear that it took the letter and its enforcement very seriously. *See* Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.) ("[S]ome schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."). And it warned schools that "[t]his Administration is committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country." *Id.* In other words, a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct.

According to John, this letter reveals that Purdue had a financial motive for discriminating against males in sexual assault investigations. To protect its federal funds, John says, the university tilted the process against men accused of sexual

assault so that it could elevate the number of punishments imposed. The resulting track record of enforcement would permit Purdue to signal its commitment to cracking down on campus sexual assault, thereby fending off any suggestion that it was not complying with the Department of Education's directive. *Cf. Doe v. Columbia Univ.*, 831 F.3d 46, 58 n.11 (2d Cir. 2016) ("A covered university that adopts, even temporarily, a policy of bias favoring one sex over the other in a disciplinary dispute, doing so in order to avoid liability or bad publicity, has practiced sex discrimination, notwithstanding that the motive for the discrimination did not come from ingrained or permanent bias against that particular sex."). And because the Office of Civil Rights— a sub-agency of the Department of Education—had opened two investigations into Purdue during 2016, the pressure on the university to demonstrate compliance was far from abstract. That pressure may have been particularly acute for Sermersheim, who, as a Title IX coordinator, bore some responsibility for Purdue's compliance.

Other circuits have treated the Dear Colleague letter as relevant in evaluating the plausibility of a Title IX claim. For example, in *Doe v. Miami University*, the plaintiff alleged that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment—loss of all federal funds—if it failed to comply, led Miami University to discriminate against men in its sexual-assault adjudication process." 882 F.3d at 594. The Sixth Circuit held that this allegation, combined with others, "support[ed] a reasonable inference of gender discrimination." *Id.*; *see also Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) **\*669** (explaining that the pressure of a Department of Education investigation and the resulting negative publicity "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim."); *Columbia Univ.*, 831 F.3d at 58 ("There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults.").

That said, the letter, standing alone, is obviously not enough to get John over the plausibility line. *See Baum*, 903 F.3d at 586 (pressure from the Dear Colleague letter "alone is not enough to state a claim that the university acted with bias in this particular case"). The letter and accompanying pressure gives John a story about why Purdue might have been motivated

to discriminate against males accused of sexual assault. But to state a claim, he must allege facts raising the inference that Purdue acted at least partly on the basis of sex in his particular case. *See id.* (the Dear Colleague letter "provides a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding, gives rise to a plausible claim").

 **[23]** John has alleged such facts here, the strongest one being that Sermersheim chose to credit Jane's account without hearing directly from her. The case against him boiled down to a "he said/she said"—Purdue had to decide whether to believe John or Jane. Sermersheim's explanation for her decision (offered only after her supervisor required her to give a reason) was a cursory statement that she found Jane credible and John not credible. Her basis for believing Jane is perplexing, given that she never talked to Jane. Indeed, Jane did not even submit a statement in her own words to the Advisory Committee. Her side of the story was relayed in a letter submitted by Bloom, a Title IX coordinator and the director of CARE.

For their part, the three panelists on Purdue's Advisory Committee on Equity were similarly biased in favor of Jane and against John. As John tells it—and again, we must accept his account as true—the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account. They made up their minds without reading the investigative report and before even talking to John. They refused to hear from John's witnesses, including his male roommate who maintained that he was in the room at the time of the alleged assault and that Jane's rendition of events was false. And the panel members' hostility toward John from the start of the brief meeting despite their lack of familiarity with the details of the case—including Jane's depression, suicide attempt, and anger at John for reporting the attempt—further supports the conclusion that Jane's allegation was all they needed to hear to make their decision.

It is plausible that Sermersheim and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man. The plausibility of that inference is strengthened by a post that CARE put up on its Facebook page during the same month that John was disciplined: an article from *The Washington Post* titled "Alcohol isn't the cause of campus sexual assault. Men are." Construing reasonable inferences in John's favor, this statement, which CARE advertised to the campus community, could be understood to blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault. And it is pertinent here that Bloom, CARE's director, wrote the letter regarding Jane to which **\*670** Sermersheim apparently gave significant weight.

Taken together, John's allegations raise a plausible inference that he was denied an educational benefit on the basis of his sex. To be sure, John may face problems of proof, and the factfinder might not buy the inferences that he's selling. But his claim should have made it past the pleading stage, so we reverse the magistrate judge's premature dismissal of it.

A final note: John seeks both money damages and injunctive relief for his claim under Title IX. Our earlier discussion of his entitlement to injunctive relief for his due process claim applies equally here.

\* \* \*

John has pleaded facts sufficient to state a claim under both the Fourteenth Amendment and Title IX. We therefore REVERSE and REMAND this case to the district court for proceedings consistent with this opinion.

**All Citations**

928 F.3d 652, 367 Ed. Law Rep. 697

---

Footnotes

1    John's complaint also asserted § 1983 claims against Purdue and all other defendants in their official capacities. Before us, he concedes that § 1983 does not permit him either to assert official-capacity claims or to sue Purdue itself. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989).

2    The First, Sixth, and Tenth Circuits have recognized a generalized property interest in higher education. *See* Dalton Mott, Comment, *The Due Process Clause and Students: The Road to A Single Approach of Determining Property Interests in Education*, 65 U. KAN. L. REV. 651, 659–60 (2017); *see also, e.g.*, *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (asserting that "the Due Process Clause is implicated by university disciplinary decisions"). The Fifth and Eighth Circuits have assumed without deciding that such a property interest exists. *See* Mott, *supra*, at 663. The Second,

Third, Fourth, Ninth, and Eleventh Circuits join us in making a state-specific inquiry to determine whether a property interest exists. *See id.* at 658.

3   For simplicity's sake, we will refer to the university and its officers collectively as "Purdue" or "the university."

4   Citing a recent case from the Sixth Circuit, John also argues that he was entitled to cross-examine Jane. *See Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018). Because John has otherwise alleged procedural deficiencies sufficient to survive a motion to dismiss, we need not address this issue.

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.