**EXHIBIT B**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

-------------------------------------------------------------x

| | |
|---|---|
| **JOHN DOE**, | CIVIL ACTION |
| | No. 2:17-cv-33-JPK |
| Plaintiff, | |
| | |
| v. | |
| | |
| **PURDUE UNIVERSITY, PURDUE** | |
| **UNIVERSITY BOARD OF TRUSTEES,** | |
| **MITCHELL ELIAS DANIELS, JR.,** in | |
| his official capacity as President of Purdue | |
| University, **ALYSA CHRISTMAS** | |
| **ROLLOCK**, in her official capacity at | |
| Purdue University, and **KATHERINE** | |
| **SERMERSHEIM,** in her official | |
| capacity at Purdue University, | JURY TRIAL |
| | <u>DEMANDED</u> |
| Defendants. | |

-------------------------------------------------------------x

## <u>AMENDED COMPLAINT</u>

JOHN DOE (a pseudonym), by his attorneys NESENOFF & MILTENBERG

LLP and, as and for his Complaint against Defendants, respectfully alleges as

follows:

### <u>THE NATURE OF THIS ACTION</u>

1.      This constitutional due process and Title IX discrimination suit is

brought on behalf of Plaintiff John Doe, a now suspended student at Defendant

Purdue University despite a previously unblemished disciplinary record and a now

dismissed member of Navy ROTC.   John Doe's dream and hope had been to serve

[1]

his country as a Naval officer has been destroyed as the result of a disciplinary case based on false accusations of sexual assault made five months after the supposed occurrences with no contemporaneous documentation supporting them and contrary to the text messages shared by John Doe and the complainant.

2.     The false accusations of sexual assault were upheld by Defendant Purdue using a Kafkaesque process that denied due process of law in violation of constitutional due process and 42 U.S.C. § 1983: there was no hearing of any kind; there was no cross-examination; there was no sworn testimony; there was no access given for the respondent even to see the investigator's report, much less comment on it; there was no providing, to respondent, the evidence that supposedly supported the false allegations of complainant and thus no fair and adequate ability to prepare a defense to those allegations; there was no presumption of innocence but rather a presumption that the accusing female's story was true; there was no reasoned consideration of evidence as required by a burden of proof; there was a conflict of interest in decision-making on violation and sanction by one person who is both Dean of Students and Title IX Coordinator, who among other things can tailor decision-making in specific cases to give the appearance of vigorous Title IX enforcement and meet perceived reporting needs to the U.S. Department of Education Office of Civil Rights ("OCR"); there was no requirement for evidence to be stated in support of conclusions and thus an effective discretion to engage in

discriminatory decision-making and a prejudiced ability for the respondent to prepare and submit an appeal.

3.    An erroneous outcome and an unduly severe disproportionate sanction resulting from anti-male discriminatory bias afflicting Defendant Purdue's process occurred in this case in violation of Title IX.

## THE PARTIES

4.    Plaintiff John Doe ("John Doe") is a natural person residing in the State of Indiana.  During the events described herein, John Doe was a student at Purdue University, was a member of Navy ROTC and resided during the 2015-2016 school year in Tarkington Hall on the Purdue University campus in West Lafayette, Indiana. John Doe presently lives with his parents who reside in Valparaiso, Indiana, and has the intention of returning as a student to Defendant Purdue University ("Defendant Purdue") but faces readmission requirements as part of the disciplinary sanction.

5.    Defendant Purdue is a land grant university established by the State of Indiana and is located on a main campus in West Lafayette, Indiana and on three regional campuses in Indiana.  Defendant Purdue has 13 colleges and schools, including the College of Engineering, the College of Liberal Arts, the College of Sciences and the Krannert School of Management.  Defendant Purdue is audited by State of Indiana auditors, the beneficiary of state authorized bonds and the recipient of state and federal grants.

[3]

6.    Defendant Purdue University Board of Trustees ("Defendant Purdue Board of Trustees") has ten members, and they as a Board have the responsibility for making rules and regulations to govern the University. The selection of these Trustees is prescribed in Indiana Code IC 21-23-3. Three of the Trustees are selected by the Purdue Alumni Association. The remaining seven Trustees are selected by the Governor of the State of Indiana.

7.    Defendant Mitchell Elias Daniels, Jr. ("Defendant President Daniels"), joined herein in his official capacity at Defendant Purdue, is the President of Defendant Purdue who says "The Buck Stops Here" with him, and he may be contacted at a Defendant Purdue e-mail listed on Defendant Purdue's web site. Defendant Alysa Christmas Rollock ("Defendant Vice President Rollock"), joined herein in her official capacity at Defendant Purdue, is the Vice President of Ethics and Compliance at Defendant Purdue, and she may be contacted at a Defendant Purdue e-mail listed on Defendant Purdue's web site.  Defendant Katherine L. Sermersheim ("Defendant Dean Sermersheim"), joined herein in his official capacity at Defendant Purdue, is the Dean of Students at Defendant Purdue, and she may be contacted at the Office of the Dean of Students at Defendant Purdue on the West Lafayette campus.

8.    Defendant President Daniels as Defendant Purdue's President is ultimately responsible for the university's compliance with a federal court

[4]

injunction; Defendant Daniels is not in an individual capacity liable under 42 U.S.C. § 1983 for saying "The Buck Stops Here," but his saying "The Buck Stops Here" is a recognition of his official capacity responsibility for Defendant Purdue's performance and operations as an educational institution of higher learning, which includes compliance with federal and state laws and court decrees specific to Defendant Purdue, including any expungement of a disciplinary record.

9.     Defendant Vice President Rollock as Defendant Purdue's Vice President of Ethics and Compliance is responsible in her official capacity for the overall operation of the disciplinary investigation and adjudication process at Defendant Purdue, as seen in her decision-making on appeals, and thus would be tasked to have Defendant Purdue comply with any federal court injunction concerning ongoing due process violations in a disciplinary case, including any expungement of a disciplinary record.

10.     Defendant Dean Sermersheim as Defendant Purdue's Dean of Students is responsible in her official capacity for the conduct of disciplinary investigations and meetings with the disciplinary respondents and is responsible in her official capacity for making the decision in a disciplinary case.  Dean Sermersheim appointed Ms. Erin Oliver, Associate Director of Defendant Purdue's Office of Institutional Equity, and Mr. Jacob Amberger, an Investigator in Defendant Purdue's Office of Institutional Equity, to investigate what were false accusations against John

Doe, and Dean Sermersheim, after holding a meeting with John Doe along with members of the Equity Committee that failed to constitute a real hearing, made the disciplinary decision in John Doe's case.

11.     The constitutional due process violations here in John Doe's disciplinary case occurred because Defendant President Daniels, Defendant Vice President Rollock and Defendant Dean Sermersheim, when engaged in constitutional due process violations, effectively acted outside their respective authority.  For a federal court injunction ordering prospective relief in a case involving a sexual misconduct disciplinary proceeding at Defendant Purdue, joinder of Defendant President Daniels, Defendant Vice President Rollock and Defendant Dean Sermersheim in their respective official capacities is necessary so that the injunction is enforced.

## JURISDICTION AND VENUE

12.     This Court has federal and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343 and 28 U.S.C. § 1367 because: (i) the case arises under the laws of the United States; (ii) the claims brought under Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681 et seq., and 42 U.S.C. § 1983 are civil rights claims; and (iii) the state law claims are so closely related to the Title IX and 42 U.S.C. § 1983 federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

[6]

13.    This Court has personal jurisdiction over Defendants on the grounds that Defendants are conducting business at Defendant Purdue within the State of Indiana.

14.    Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.    Background: The "April 2011 Dear Colleague Letter"
Of The Department of Education's Office of Civil Rights.**

15.    On April 11, 2011, the Office of Civil Rights ("OCR") of the U.S. Department of Education ("DOE") sent a "Dear Colleague Letter" to colleges and universities (hereinafter referred to as the "April 2011 Dear Colleague Letter"). The "April 2011 Dear Colleague Letter" provides a necessary set of background facts to this action.

16.    The "April 2011 Dear Colleague Letter" advised that, in order to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.  Most notably, the "April 2011 Dear Colleague Letter" required schools to adopt a relatively low burden of proof -- "more likely than not" -- in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

[7]

The "April 2011 Dear Colleague Letter" states that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing. The "April 2011 Dear Colleague Letter," while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy. The "April 2011 Dear Colleague Letter" states that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student. After the "April 2011 Dear Colleague Letter" was published, many schools changed their sexual assault and sexual harassment policies and procedures.

17.     The Obama Administration, through the DOE and OCR, has treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.  Catherine Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge of its Office of Civil Rights ("OCR"), has delivered what has been treated as marching orders by colleges and universities.

(a)  In February 2014, Assistant Secretary Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents said afterward that there were "crisp marching orders from Washington."

"Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," Chronicle of Higher Education, February 11, 2014.

(b)  In June 2014, Assistant Secretary Lhamon testified at a Senate Hearing in that "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."  Assistant Secretary Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the 2011 Dear Colleague Letter.  Assistant Secretary Lhamon told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ." She further told the Committee: If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school.  Assistant Secretary Lhamon additionally stood behind the "April 2011 Dear Colleague Letter."

(c)  In July 2014, Assistant Secretary Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Assistant Secretary Lhamon warned. She went on to describe that enforcement mechanism as part of a

set of "very, very effective tools," adding "If a school refuses to comply with Title IX in any respect, I will enforce." Assistant Secretary Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

(d) Assistant Secretary Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward." Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

18. To support making the "April 2011 Dear Colleague Letter" binding, the OCR has hired hundreds of more investigators for Title IX enforcement. The Federal Government is investigating at least 129 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago and many top state universities. The Department of Education has negotiated settlements with many schools, including Ohio State University.

[10]

19.     Colleges and universities, including Defendant Purdue, are fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title lawsuits by the U.S. Department of Justice ("DOJ"). The White House issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds that a Title IX violation, the "school risks losing federal funds" and that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools, if a voluntary resolution cannot be reached, the DOJ may initiate litigation. In July 2016, Vice President Biden suggested that schools that do not comply with administration guidelines could be stripped of federal funding. "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

20.     To revoke federal funds -- the ultimate penalty -- is a powerful tool because institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think." She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead." "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

[11]

USDC IN/ND case 2:17-cv-00033-JPK document 51 filed 08/09/19 page 12 of 67

21.    The DOE and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt. The Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014. g.

22.    In response to pressure from OCR, DOJ, and the White House, educational institutions, like Defendant Purdue, have limited procedural protections afforded to male students, like John Doe, in sexual misconduct cases.

**B.    Fall Semester 2015 To January 2016:**
       **John Doe-Jane Doe's Dating Relationship.**

23.    Starting in the 2015 Fall semester and continuing into January 2016, John Doe and Jane Doe had a dating relationship that included their having, with mutual full consent, sexual intercourse 15 to 20 times over a three-month period from October to December 2015.  On December 13, 2015, Jane Doe attempted suicide in front of John Doe, after which all sexual activity ended.  In January 2016, John Doe reported Jane Doe's suicide attempt to two Purdue Resident Assistants and a Scholarship Advisor.  In mid- to late January 2016, Jane Doe began to distance herself from John Doe and their dating relationship ended.  From November 2015 to March 2016, Jane Doe made no reports to the university or to the police about any alleged sexual assault by John Doe.

**C.    April 1-10, 2016: Events At Defendant Purdue**
       **Concerning Reporting Of Sexual Assault.____**

24.    During the first ten days of April 2016, there were five reports of alleged sexual assault at Purdue, including the complaint that was made at that time by Jane Doe against John Doe. Nationally, April is Sexual Assault Awareness Month; and during April 2016, Defendant Purdue hosted more than a dozen events

to advocate the reporting of sexual assaults. Many of these events were sponsored by the Center for Advocacy, Response and Education ("CARE") at Purdue. CARE promoted many of these events on their Facebook page. Among the posts that CARE has shared on its Facebook page was an article dated June 21, 2016 from *The Washington Post,* "Alcohol isn't the cause of campus sexual assault. Men are." Monica Soto Bloom was the Title IX Coordinator and Director of CARE.

**D.  April 11, 2016: John Doe Notified Of Jane Doe's Allegations, John Doe's Suspension From Navy ROTC.**

25.   On April 11, 2016, John Doe received a letter dated that day from Defendant Katherine L. Sermersheim, Dean of Students at Defendant Purdue, notifying John Doe that Defendant Purdue has been made aware of allegations, including sexual allegations, regarding John Doe's conduct toward another undergraduate student -- referred to herein as "Jane Doe" -- that if substantiated, might constitute a violation or violations of Defendant Purdue's *Anti-Harassment Policy (III, Ch. 1)*.  Defendant Dean Semersheim's April 11, 2016 letter also stated that the allegations included John Doe's digital penetration of Jane Doe while she was sleeping without her consent and that a more detailed description of the allegations accompanied the letter. John Doe learned of Dean Sermersheim's April 11, 2016 letter to him at the Purdue ROTC Armory, and the Navy ROTC was aware at the same time of the sexual misconduct proceeding against John Doe.

26.     Defendant Dean Semersheim's April 11, 2016 letter stated further that Defendant Purdue had elected to investigate the allegations in absence of a formal complaint and that Defendant Ms. Erin Oliver, Associate Director of Defendant Purdue's Office of Institutional Equity, and Defendant Mr. Jacob Amberger, Investigator in Defendant Purdue's Office of Institutional Equity, were appointed to investigate the matter. Defendant Dean Semersheim's April 11, 2016 letter directed John Doe to give a written response within ten calendar days of the date of Defendant Dean Semersheim's April 11, 2016 letter to the allegations that John Doe's conduct had violated Defendant Purdue's *Anti-Harassment Policy* and to refrain from discussing this matter or having any contact with Jane Doe.

27.     Defendant Dean Semersheim's April 11, 2016 letter included a two-page document entitled "Information for Student Respondents."

28.     The "Information for Student Respondents" document stated that: (i) the Investigator would be neutral; (ii) a support person could be brought by Respondent to any meeting with the Investigator; (iii) a Respondent would be told enough information about the allegations to enable him to respond; (iv) the privacy of both parties would be respected; (v) the Investigator would first interview the complaining party and once the Investigator understands the allegations, the Respondent would be asked questions; (vi) the Interviewer would then interview other witnesses and review documentation deemed relevant; (vii) the Investigator

[15]

would prepare a report that would be shared with the Dean of Students but not with the parties or the witnesses; (viii) the Investigator's report would make findings and recommend whether a violation of Defendant Purdue's *Anti-Harassment Policy* had occurred and what sanction was appropriate; (ix) the Dean of Students would chair a meeting of a three-person panel of the Advisory Committee on Equity; (x) each party would be given the opportunity separately to meet with the panel meeting in order to give the decision-maker (the Dean of Students) and the panel members the opportunity to meet with the parties and the Investigator after reviewing the Investigator's report; (xi) the panel members would make a recommendation to the Dean of Students but the determination would be left to the discretion of the Dean of Students; (xii) if the Dean of Students determines there has been a violation of Defendant Purdue's *Anti-Harassment Policy*, the Dean of Students would impose sanctions.

29.     Accompanying Defendant Dean Semersheim's April 11, 2016 letter was a one half-page document entitled "Notice of Allegations."

30.     The Notice of Allegations stated that: (i) Jane Doe and John Doe were in a dating relationship during the Fall 2015 semester and that in November 2015, Jane Doe stayed the night in John Doe's room in Tarkington Hall; (ii) Jane Doe woke up to John Doe's groping her while she was fully clothed and said to John Doe that this was not OK; (iii) John Doe then told Jane Doe that during another night in

November 2015, while they were staying the night in Jane Doe's room, John Doe had penetrated her digitally while she was sleeping: (iv) Jane Doe was not aware of the incident in November 2015 while she was sleeping in her room, had not and did not consent to such sexual contact, and was upset when she was told about it; (v) John Doe expressed feeling bad about the first time, but nevertheless had sexual contact with her the second time when she was asleep; (vi) Jane Doe became very upset and left John Doe's room; (vii) John Doe also went through Jane Doe's underwear without her permission and chased her down a hallway joking about tasering her; (viii) after Jane Doe broke up with John Doe, he would still go to Jane Doe's room unannounced and without an escort; and (ix) John Doe displayed little control over his temper in front of Jane Doe.

31.     While John Doe and Jane Doe did have a relationship in the Fall 2015 semester, the rest of what was contained in the "Notice of Allegations" about purported events occurring in November 2015 was false. Quite differently, John Doe and Jane Doe had a fully consensual sexual relationship that included having sexual intercourse 15 to 20 times in a three-month period of October to December 2015 before the relationship ended. The November 2015 alleged incidents as purportedly described in the Notice of Allegations were not documented and in fact did not happen.

[17]

32.     The university no contact directive did not allow John Doe in university buildings in which Jane Doe had classes and did not allow John Doe in the university dining hall most used by John Doe and Jane Doe. As a result of the Navy ROTC's knowledge that a university sexual misconduct proceeding had been commenced against John Doe per Defendant Dean Semersheim's April 11, 2016 letter to John Doe, he was orally informed by Navy ROTC that he was not allowed to participate in Navy ROTC and not allowed in the ROTC armory unless to attend a class or to meet with a Naval superior.

**E.      April 20, 2016: John Doe's Written Response.**

33.     Within ten calendar days of Defendant Dean Semersheim's April 11, 2016 letter, John Doe submitted a written response to the allegations.

34.     As for Jane Doe's allegations, John Doe stated that: (i) he and Jane Doe were in a dating relationship from the Fall 2015 semester to the start of the Spring 2016 semester and were both in Navy ROTC; (ii) Jane Doe's accusations against him were false and without merit; (iii) it was not true that, as claimed by Jane Doe, in November 2015 she had stayed in John Doe's room and woke up when John Doe was groping her; (iv) what happened was that in mid-December 2015, after Jane Doe had attempted to commit suicide, Jane Doe stayed the night in John Doe's room, slept on a futon with John Doe on the floor and John Doe's roommate on his bed above the futon, woke up when John Doe touched her knee, immediately became

[18]

erratic and angry with John Doe and left the room; (v) it was not true that, as claimed by Jane Doe, in November 2015 John Doe digitally penetrated her while she was sleeping; (vi) it was not true that, as claimed by Jane Doe, Jane Doe became upset when John Doe told her about the alleged sexual contact; (vii) John Doe never had sexual contact with Jane Doe while she was sleeping; (viii) instead, Jane Doe engaged in behavior inconsistent with having been sexually assaulted, texting John Doe over the Christmas holidays, including texting and talking with John Doe wishing him a Happy Christmas Eve, sending a package of homemade Christmas cookies to John Doe's family and inviting John Doe to her room at the start of the Spring 2016 semester; (ix) John Doe never went through Jane Doe's underwear without her permission but rather at times did laundry for Jane Doe, for which she was grateful; (x) John Doe does not own a taser but does own a stun baton, yet never threatened Jane Doe with it; (xi) Jane Doe never formally broke up with John Doe, but the two saw each other less and less at the start of the Spring 2016 semester, as Jane Doe was distancing herself from John Doe, a choice he respected; and (xii) it was only after John Doe returned an item to Jane Doe in the Spring 2016 semester did Jane Doe say anything about John Doe not going to her room, after which he didn't.

35.     John Doe also provided additional information to show he had been falsely accused by Jane Doe: (i) John Doe and Jane Doe had a sexual relationship

USDC IN/ND case 2:17-cv-00033-JPK document 132 filed 09/03/19 page 21 of 68

from October to December 2015, but all sexual activity ceased after Jane Doe attempted suicide on December 13, 2015; (ii) Jane Doe told John Doe that she had been raped in high school in Colorado and had attempted suicide twice while in high school; (iii) Jane Doe had frequently displayed a temper, which she tried to project on to John Doe as his problem; (iv) Jane Doe told John Doe that she contemplated running away from home and not returning to Purdue; (v) on the night in December 2015 of the suicide attempt, Jane Doe was extremely erratic, had destroyed her room by throwing objects everywhere, was crying and talking about how much she hated life and felt hopeless and was questioning whether she wanted to be in the Navy and at Purdue at all; (vi) the suicide attempt took place on the top of the parking garage by the armory, which John Doe described in detail involving a ledge from which if Jane Doe fell or jumped it would likely be fatal; (vii) John Doe reported Jane Doe's suicide attempt to two Purdue Resident Advisors and a Scholarship Advisor, who filed reports with the University; (viii) John Doe took a suicide prevention course on February 16, 2016; and (ix) John Doe and Jane Doe continued to date in the month of January 2016, which included frequent texting and calling over the Winter Break, but thereafter, Jane Doe distanced herself from John Doe and started dating a Navy ROTC upperclassman shortly thereafter.

**F.      April 28-May 26, 2016: "Investigation"; John Doe
         On Interim Leave of Absence From Navy ROTC.**

36.      On April 28, 2016, John Doe met with the Defendant Investigators Erin
Oliver and Jacob Amberger in the presence of Steven Knecht, an attorney who acted
as John Doe's supporter during the meeting.  To the Investigators, John Doe
steadfastly denied sexually assaulting Jane Doe in any way and provided texts of his
communications with Jane Doe that showed nothing to indicate that a sexual assault
had taken place, as the texts were basically inconsistent with a sexual assault having
occurred.  John Doe explained a few texts to establish that no texts supported the
claim of sexual assault and further provided the Investigators with a list of over 30
names to substantiate the credibility of his character and integrity, which was
important because Jane Doe attacked John Doe's character and integrity in her
statements to Defendant Purdue.  The meeting with the Investigators appeared to
John Doe and Steven Knecht to go very well, but it was the one and only meeting
that John Doe had with the Investigators Defendant Oliver and Defendant Amberger
and there were no further communications that John Doe had with the Investigators
Defendant Oliver and Defendant Amberger.

37.      In the month following the April 28, 2016 meeting with John Doe, the
Defendant Investigators prepared a Report and sent it to Defendant Dean of Students
Sermersheim.   In accordance with Defendant Purdue's Disciplinary Process
Procedures in effect at the time, John Doe was not given an opportunity by the

[21]

Defendant Investigators or the three-person panel of the Advisory Committee on Equity to review the Investigator's Report then or any time during the process; and while Defendant Purdue's procedures in effect at the time were followed, John Doe's ability to defend himself was severely and unfairly prejudiced.

38.     On May 20, 2016, John Doe signed a formal acknowledgment of being placed on interim leave of absence from Navy ROTC; and on May 24, 2016, John Doe signed an authorization to release of information pertaining to the case to the Department of Naval Sciences at Defendant Purdue.  Since Jane Doe was also in Navy ROTC and with the commencement of the investigation, John Doe was to have no communication with Jane Doe, Captain Hutton (the captain in charge of the battalion) restricted John Doe from communicating at all with his fellow midshipmen about the case, allowing him to say to them only "I am on interim leave of absence pending a University investigation."  Since the vast majority of John Doe's friends were within the battalion, John Doe's communications with them were made unpleasantly uneasy.  John Doe would have been obligated to inform the Navy ROTC; however, the Navy ROTC had been of about the university sexual misconduct proceeding at about the same time that John Doe first learned of it.  John Doe was legally obligated to authorize disclosure of information about and documents from the university sexual misconduct proceeding by Purdue to the Navy ROTC.

39.     On May 26, 2016, Defendant Dean of Students Sermersheim sent the Investigator's Report to the panel members of the three-person panel of the Advisory Committee on Equity. The investigators had not allowed John Doe to verify that the summary by the investigators of his witness interview was accurate, and John Doe was never provided with the investigation report to state whether information had been excluded. Among other things, although Defendant Purdue had a documented report of Jane Doe's suicide attempt, the investigation report that would be relied upon by the Advisory Committee on Equity Hearing panel and that informed Defendant Dean Sermersheim's ultimate determination failed to include John Doe's testimony witnessing Jane Doe's suicide attempt.

## G.     June 6, 2016: No Hearing, Just A Meeting With Three-Person Panel of the Advisory Committee on Equity and Defendant Dean Sermersheim.

40.     On May 31, 2016, Defendant Dean Sermersheim sent a letter of that date to John Doe advising him that he was to attend a meeting with the three-person panel of the Advisory Committee on Equity on Monday, June 6, 2016, from 2:00 PM to 2:30 PM. Defendant Dean Sermersheim's May 31, 2016 letter further advised John Doe that the panel members had reviewed the complaint, the written responses and the Investigator's Report and that the purpose of the meeting was not to conduct another investigation but to listen to the parties who could provide clarification of the written materials.

41.     On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Defendant Dean Sermersheim; in fact, at no time did Jane Doe did appear in person before the Advisory Committee on Equity and Defendant Dean Sermersheim.  Instead, Jane Doe submitted a written statement dated June 5, 2016.  Notably, Jane Doe's June 5, 2016 written statement was not written by Jane Doe; rather, it was a letter written by Monica Soto Bloom, Title IX Coordinator and Director of CARE.  Ms. Bloom wrote the letter after talking with Jane Doe.  It was Monica Soto Bloom on behalf of Jane Doe who submitted the response to the panel.  Thus, the three-person panel of the Advisory Committee on Equity and Defendant Dean Sermersheim never met or heard any direct testimony from Jane Doe, nor did the three-person panel and Defendant Dean Sermersheim have the opportunity to ask any questions of Jane Doe.  In Jane Doe's June 5, 2016 written statement, she specifically requested only that John Doe be removed from the NROTC program.  Jane Doe did not request a suspension or an expulsion of John Doe, nor any type of separation from the university or restrictions to his presence on campus as a student. Jane Doe's written statement indicated that she did not have safety concerns about John Doe's status as a student on the campus at Purdue; she only wanted John Doe removed from the group of students who belonged to the NROTC program, a group which included Jane Doe and her new boyfriend.

42. On June 6, 2016, before the meeting with Dean Sermersheim and the three-person panel of the Advisory Committee on Equity, John Doe met with a representative of Navy ROTC, who briefly allowed John Doe to see a redacted version of the Investigator's Report that the Purdue Navy ROTC had received. John Doe had five minutes to review quickly the redacted Investigator's Report and saw that it falsely stated John Doe had confessed to what was said to be Jane Doe's allegations.

43. On June 6, 2016, John Doe along with his supporter Steven Knecht met with the three-person panel of the Advisory Committee on Equity and Defendant Dean Sermersheim. The meeting did not involve any sworn testimony, was not a hearing and was not recorded. There never was a hearing in the case of any kind, much less a hearing when, among other things, sworn testimony would be given, cross-examination questions could be posed to Jane Doe about her allegations and documentation could be presented chronologically.

44. John Doe's June 6, 2016 meeting with the three-person panel of the Advisory Committee on Equity and Defendant Dean Sermersheim involved just unrecorded discussion about the written materials which lasted for no more than a half-hour. From that discussion, two of the three members of the panel stated that they had not read the Investigator's Report beforehand and only read the report at the meeting while John Doe waited for them to come up with questions. The one

panel member who appeared to have read the Investigator's Report before the meeting, who was an older person, asked accusatory questions assuming John Doe's guilt, and all the panel members acted with hostility toward John Doe. John Doe reiterated at the meeting what he had stated in his written response -- that the accusations made by Jane Doe against him in the Notice of Allegations were false and were not substantiated by any documentation and the texts that John Doe had provided were basically inconsistent with any sexual assault having taken place. During the meeting, John Doe explained a few texts to establish that no texts supported the claim of sexual assault, but could not address what was in the Investigator's Report because he had not been provided a copy to review for the meeting (or ever) and was not able otherwise to address any evidence that Defendant Purdue had to support the allegations against John Doe. From Steven Knecht's perspective, John Doe did as well as he could under the circumstances of a stressful encounter in which John Doe was attempting to provide substantive answers to accusatory questions. After the meeting, both John Doe and Steven Knecht felt uneasy because the one older panel member who posed accusatory questions in a hostile manner did so without apparent reason and did not appear to be listening to John Doe's answers and because the other two panel members were unprepared.

45. Defendant Purdue, in appointing a three-member panel of the Advisory Committee on Equity, displayed a certain faith and trust in the members of the panel

to perform their responsibilities conscientiously. In John Doe's case, that it was acceptable that two of the three-member panel were not prepared for a meeting they must know is important to the final Determination in a case regarding a student's future in their school and, in this case, future career, exhibited the unfairness of Defendant Purdue's sexual misconduct procedures.

## H.  June 14, 2016: Dean Sermersheim's Determination and Sanctions.

46.    On June 14, 2016, Defendant Dean of Students Sermersheim sent a letter of that date to John Doe advising him that, after considering the information provided by John Doe, Jane Doe, the University Investigators and consulting with the three-member panel from the Advisory Committee on June 6, 2016, "**I [Dean Sermersheim] have made the determination that a preponderance of the evidence does support a finding that your [John Doe's] conduct violated the *Anti-Harassment Policy*.**" (Bold in the original.) This determination was made without a hearing on the accusations, much less a hearing where sworn testimony was taken, cross-examination afforded and documentation considered chronologically. Only an anti-male discriminatory bias presuming the female's story to be true can explain Dean Sermersheim's June 14, 2016 letter.

47.    Dean Sermersheim's June 14, 2016 letter went on to state that Defendant Purdue does not tolerate harassment of any person in the workplace or educational environment and ordered the following sanctions against John Doe: (1)

a suspension from Defendant Purdue commencing June 13, 2016 for one full academic year, which was a reflection of how detrimental John Doe's alleged conduct was to the university and which meant that John Doe was ineligible to register for any academic programs under the sponsorship of Defendant Purdue; (2) John Doe was to continue to have no contact with Jane Doe until she completes her current academic program; (3) as a condition of re-entry, John Doe would be required to complete a 90-minute bystander intervention training or equivalent program offered by the Vice President for Ethics and Compliance or Center for Advocacy, Response, and Education ("CARE"); and (4) as a condition of re-entry, John Doe would be required to meet with Chris Greggila, Assistant Director of CARE during the first semester of return. Dean Sermersheim's June 14, 2016 letter also reminded John Doe that Defendant Purdue prohibits any overt or covert act of reprisal, discrimination, intimidation or harassment against an individual complaining of harassment or enforcing Defendant Purdue's *Anti-Harassment Policy*. Included with Dean Sermersheim's June 14, 2016 letter was a document entitled "Re-Entry for Purdue University Students Separated from the University" providing re-entry instructions. The sanction was disproportionate, going beyond what Jane Doe had requested, which can only be explained by an anti-male discriminatory bias.

48.     Dean Sermersheim's June 14, 2016 letter finally advised John Doe that he could appeal her determination to the Vice President for Ethics and Compliance, Defendant Alysa Christmas Rollock, that the appeal must be in writing and filed within ten days of the issuance of the notification of the determination with all supporting materials and that the appeal in this case must be received by Defendant Vice President Rollock by Friday, June 24, 2016 by e-mail or by hand delivery.

**I.      June 23, 2016: John Doe's First Appeal.**

49.     On June 23, 2016, John Doe timely submitted an appeal of that date to Defendant Vice President Rollock.  John Doe stated in his June 23, 2016 appeal that Jane Doe's allegations of sexual assault were false, that he never penetrated Jane Doe while she was sleeping without her consent, digitally or otherwise, that determination that he did so was incorrect and false and contrary to the facts and that he was being suspended for something that John Doe did not do and that did not occur.

50.     John Doe's June 23, 2016 appeal also stated that a suspension would cause significant harm, including the loss of his scholarship and participation in NROTC.  John Doe's June 23, 2016 appeal noted the great emotional toll that the process had taken on him causing great depression and anxiety, the concerns about whether the process would be fair all the while knowing that Jane Doe's allegations

were false and the disruptions of all the friendships he had developed given that he could not talk to friends in Navy ROTC about what really had happened.

51.  John Doe's June 23, 2016 appeal further stated that his "rights to due process of law have been violated."  In support of this position, John Doe cited the points that: he "was never provided with the evidence that was supposed to support this allegation which prevented [him] from adequately preparing a defense to the false accusation"; that he had "also not been provided the evidence relied upon in making the finding against [him] in order to prepare and submit a proper appeal"; that at the June 6, 2016 meeting with the three-person panel of the Advisory Committee on Equity, two panel members by their own admission were not prepared at the meeting; that he had responded to everything that was asked of him, including providing ample documentation of his relationship with Jane Doe; that he had received a summary notification providing no basis for the determination.

**J.**     **June 28, 2016: Defendant Vice President Rollock's First Appeal Decision.**

52.    On or about June 28, 2016, Defendant Vice President Rollock sent a letter of that date to John Doe stating that she had reviewed John Doe's appeal, Defendant Dean Sermersheim's letters to John Doe and Jane Doe's letter dated June 14, 2016.

53.    According to Defendant Vice President Rollock's June 28, 2016 letter, because Defendant Dean Sermersheim had not included her reasoning in reaching

her determination that found John Doe in violation of Defendant Purdue's *Anti-Harassment Policy*, Defendant Vice President Rollock was not able to issue a decision on John Doe's appeal and was directing Defendant Dean Sermersheim, by June 30, 2016, to revise her June 14, 2016 letters to include the factual basis for her determination and the sanctions imposed. Defendant Vice President Rollock added that in light of what Defendant Dean Sermersheim issued in a revised determination, John Doe could supplement his appeal and Jane Doe could appeal by Sunday, July 10, 2016.

### K.   June 29, 2016: Defendant Dean Sermersheim's Re-Issued Determination and Sanctions.

54.    The very next day after Defendant Vice President Rollock's first appeal decision remanding the matter back to Defendant Dean Sermersheim, on June 29, 2016, Defendant Dean Sermersheim sent a letter to John Doe basically repeating her June 14, 2016 letter, only adding the following:

Specifically, a preponderance of the evidence supports that:

1. [Jane Doe] had fallen asleep on a futon with you on the floor beside her. She woke up and found that you inappropriately touched her over her clothing and without her consent by placing your hand above her knee, between her legs, and moved it up to her "crotch" areas; and
2. On another occasion, while she was sleeping and without her consent, you inappropriately touched [Jane Doe] by digitally penetrating her vagina.

The conduct described in the numbered paragraphs above constitutes "Sexual Violence" under the University's policy on Anti-Harassment.

Additionally, I find by a preponderance of the evidence that [John Doe is] not a credible witness. I find by a preponderance of the evidence that [Jane Doe] is a credible witness.

55.     Defendant Dean Sermersheim's additional statement reflected a failure in fact to apply a burden of proof, which requires a reasoned consideration of the evidence to reach a conclusion; and Defendant Dean Sermersheim's additional statement actually revealed the absence of a preponderance of evidence supporting the finding of a violation by John Doe.  There were evidence and circumstances that should have been considered in addition to the statements of John Doe and Jane Doe. While Jane Doe's unsworn allegations would support the numbered findings in Defendant Dean Sermersheim June 29, 2016 letter, Jane Doe had no supporting documentation for her allegations, her allegations were made five months after the alleged incidents took place with no contemporaneous reports to the university or the police and her allegations were made after a suicide attempt.

56.     In contrast, John Doe's written response to the "Notice of Allegations" and John Doe's statements to the Investigators and to the three-person panel of the Advisory Committee on Equity consistently denied Jane Doe's allegations, contradicting the numbered findings, and John Doe also submitted documentation in the texts between John Doe and Jane Doe that indicated that no sexual assault had occurred.  Additionally, John Doe's roommate corroborated John Doe's account in the sense that he did not observe any sexual assaults occurring as indicated in the

[32]

numbered paragraphs in Defendant Dean Sermersheim's additional statement. Further, there was nothing said by Defendant Dean Sermersheim about the dating relationship that John Doe and Jane Doe had for three months in the Fall 2015 that according to John Doe, included having consensual sexual intercourse 15 to 20 times.

57.    While Defendant Dean Sermersheim purported to find Jane Doe credible and John Doe not, there was no explanation supporting those purported credibility judgments, there was no objective evidence supporting them and without a hearing that included sworn testimony and the cross-examination of witnesses, there was no proper basis for making such credibility judgments.  In fact, there was no hearing of any kind that would permit a decision-maker even to begin to form impressions about who was telling the truth and who was not.

58.    Defendant Dean Sermersheim's additional statement about the credibility of witnesses again reflected a failure in fact to apply a burden of proof, which requires a reasoned consideration of the evidence to reach a conclusion. Consequently, only an anti-male bias to find for the female complainant and against the male respondent can explain Defendant Dean Sermersheim's purported findings concerning the preponderance of the evidence.  John Doe was presumed to be guilty.

59.    The sanctions ordered by Defendant Dean Sermersheim did not take into account that John Doe had a previously unblemished disciplinary record at

Defendant Purdue and had presented a list of names that would support his character and integrity.

60.    The Determination and Sanction were made by one person: Defendant Dean Sermersheim, Dean of Students and also Title IX Coordinator. Defendant Dean Sermersheim: (i) wrote the Notice of Investigation determining the allegations against John Doe; (ii) issued the No Contact Directive to John Doe; (iii) appointed subordinates Defendant Erin Oliver and Defendant Jacob Amberger as the Investigators for the complaint against John Doe; (iv) served as chair of the three-person Hearing panel of the Advisory Committee on Equity in deciding John Doe's case; (v) wrote a cursory and perfunctory decision letter stating that she had determined John Doe responsible; (vi) issued a decision letter that was rejected by the Defendant Purdue Vice President of Ethics and Compliance for lacking a stated rationale for the decision; and (vii) ultimately re-issued the decision letter to add one sentence of unsubstantiated postulation to suggest that the preponderance of the evidence standard had been met and that John Doe was responsible for "Sexual Violence."

61.    Defendant Dean Sermersheim's responsibilities were overbroad and held a conflict of interest as determined by Title IX guidance: "Title IX coordinators should not have other responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board

member or general counsel may create a conflict of interest." By putting decision-making as to violation and sanction in one person who is both Dean of Students and Title IX Coordinator, it permits, among other things, decision-making in specific cases be tailored to give the appearance of vigorous Title IX enforcement and meet perceived reporting needs to U.S. Department of Education Office of Civil Rights.

**L.      July 10, 2016: John Doe's Appeal Of
Re-Issued Determination and Sanctions.**

62.     On July 10, 2016, John Doe timely submitted an appeal of that date to Defendant Vice President Rollock from Defendant Dean Sermersheim's re-issued determination and sanctions.   John Doe began by stating that Defendant Vice President Rollock had directed Defendant Dean Sermersheim to provide the factual basis for her determination, but that Defendant Dean Sermersheim had failed to provide that factual basis, that she merely restated her conclusions at greater length.

63.     John Doe's July 10, 2016 appeal first noted that he never had the opportunity to review the Investigator's Report and thus could not address the allegations supposedly questioning his credibility, nor had he been permitted to respond to any "factual evidence."   John Doe's July 10, 2016 appeal stated: "[Defendant] Dean Sermersheim's unsubstantiated conclusion that I am not a credible witness still has not been corroborated with any facts." John Doe's July 10, 2016 appeal reported that he had provided the Investigators with a list of over 30 names to substantiate the credibility of his character and integrity, but he could not

defend himself against Defendant Dean Sermersheim's attack on his credibility if there is no factual evidence presented.

64. John Doe's July 10, 2016 appeal then discussed the point that the June 6, 2016 meeting with Defendant Dean Sermersheim and the three-person panel of the Advisory Committee on Equity was flawed at best. John Doe's July 10, 2016 appeal asserted that a reasonable person would question the fairness of a meeting where two of the three panel members did not read the Investigator's Report before the meeting and that a reasonable person would question whether they took seriousness of the importance of a process that has punitive and irreversible consequences. John Doe's July 10, 2016 appeal further asserted that the attitude of the panel members was "one of overt skepticism and hostility." John Doe asked "what could possibly explain their attitude other than that they had prejudged the outcome and my (alleged) guilt?"

65. John Doe's July 10, 2016 appeal pointed out that at the beginning of his Fall 2015 semester, he had started the year in Navy ROTC, and one of the issues discussed was the "zero tolerance" policy toward sexual harassment. John Doe reiterated that Jane Doe's accusations of sexual assault were false and noted that one of Jane Doe's accusations was based on what John Doe had allegedly told her about digitally penetrating her. John Doe asked: "Why would I not only admit to something

that didn't happen, but also knowingly admit to something that would jeopardize my ROTC scholarship and future serving my country?"

66.  John Doe's July 10, 2016 appeal discussed Jane Doe's possible motives for making false accusations against John Doe: to punish John Doe for having reported to the university Jane Doe's suicide attempt in December 2015, an attempt that could have been reported to Navy ROTC as well.  Also in this connection, Jane Doe had started up in the Spring 2016 semester a relationship with an upperclassman who was a member of Navy ROTC and who made it plain he did not like John Doe.

67.  John Doe's July 10, 2016 appeal noted behavior on the part of Jane Doe inconsistent with the accusations of sexual assault. After the relationship ended, Jane Doe contacted John Doe on a number of occasions, at times seeking advice, which Jane Doe would not do had there been any sexual assaults, John Doe had provided text evidence of these contacts.  John Doe asked: "If I had sexually violated [Jane Doe], why would she continue to initiate contact and even seeking my advice?"

68.  John Doe's July 10, 2016 appeal insisted on knowing what was the particular evidence used to determine Defendant Dean Sermersheim's finding that the preponderance of the evidence supported John Doe not being a credible witness and Jane Doe being a credible witness. John Doe's July 10, 2016 appeal repeated that he had been denied the evidence that supposedly supports the factual basis for Defendant Dean Sermersheim's determination and denied the Investigator's Report.

[37]

John Doe's July 10, 2016 appeal requested that the determination and sanctions be set aside and that the Investigator's Report be provided to him as well as "all documents and materials relating to his official file at [Defendant] Purdue University, including but not limited to . . . all materials, independent investigator's reports, and all files, letters, and documentation relating to the investigation", "all handwritten notes that have been generated by all parties representing the University" and "a copy of Ms. Erin Oliver and Mr. Jacob Amberger's report."

69.    Under Purdue's Policies, Purdue had 45 days in which to turn over the requested records.  To meet that time requirement, Defendant Purdue would have needed by August 24, 2016, to turn over the requested records to John Doe.

## M.    July 22, 2016: Defendant Vice President Rollock's Second Appeal Decision._____

70.    On July 21, 2016, Defendant Vice President Rollock sent a letter of that date to John Doe issuing her second appeal decision. Defendant Vice President Rollock's July 21, 2016 appeal decision stated that after reviewing (i) John Doe's appeal, (ii) Defendant Dean Sermersheim's April 11, 2016 letter notifying John Doe of the University's decision to investigate allegations regarding his conduct toward Jane Doe, (iii) John Doe's written response to the Notice of Allegations, (iv) the Investigator's Report, (v) Jane Doe's e-mail message of June 5, 2016, and (vi) Defendant Dean Sermersheim's letters of June 14, 2016 and June 29, 2016,

Defendant Vice President Rollock was upholding Defendant Dean Sermersheim's determination and sanctions.

71.    Defendant Vice President Rollock's July 21, 2016 appeal decision added that in reviewing the appropriateness of the sanctions imposed, she had considered the effects on Jane Doe's educational environment and the threat posed to the safety of Jane Doe and the university community.  According to Defendant Vice President Rollock's July 21, 2016 appeal decision, the seriousness of John Doe's misconduct supported the sanctions ordered by Defendant Dean Sermersheim.

72.    Defendant Vice President Rollock's July 21, 2016 appeal decision did not address any of the substantive issues raised by John Doe's appeal -- (i) not the failure of Defendant Dean Sermersheim to provide the factual basis for her determination despite Defendant Vice President Rollock's June 28, 2016 directive to provide that factual basis; (ii) not that John Doe never had the opportunity to review the Investigator's Report and thus could not address the allegations supposedly questioning his credibility; (iii) not that John Doe had not been permitted to respond to any "factual evidence"; (iv) not that the June 6, 2016 meeting with Defendant Dean Sermersheim and the three-person panel of the Advisory Committee on Equity showed hostility toward and prejudgment against John Doe; (v) not that Jane Doe's accusation about what John Doe had allegedly told her about digitally penetrating her made no sense given how such behavior would jeopardize

John Doe's Navy ROTC scholarship and career serving his country; (vi) <u>not</u> John Doe's question: "Why would I not only admit to something that didn't happen, but also knowingly admit to something that would jeopardize my ROTC scholarship and future serving my country?"; (vii) <u>not</u> Jane Doe's possible motive for making false accusations against John Doe in punishing John Doe for having reported to the university in January 2016 Jane Doe's suicide attempt in December 2015; (viii) <u>not</u> the behavior on the part of Jane Doe that was documented and that was inconsistent with the accusations of sexual assault; and (ix) <u>not</u> John Doe's question "If I had sexually violated [Jane Doe], why would she continue to initiate contact and even seeking my advice?"

73.    Instead, Defendant Vice President Rollock's July 21, 2016 appeal decision upheld perfunctorily Defendant Dean Sermersheim's June 29, 2016 re-issued determination and order of sanctions.

74.    On July 25, 2016, Defendant Vice President Rollock sent an e-mail letter to John Doe, copied to Ms. Tandra Foster, Associate Legal Counsel at Defendant Purdue, concerning John Doe's request for his education records. Defendant Vice President Rollock's July 25, 2016 e-mail letter quoted John Doe's July 10, 2016 letter appeal requesting "all documents and materials relating to his official file at [Defendant] Purdue University, including but not limited to . . . all materials, independent investigator's reports, and all files, letters, and

documentation relating to the investigation", "all handwritten notes that have been generated by all parties representing the University" and "a copy of Ms. Erin Oliver and Mr. Jacob Amberger's report." Defendant Vice President Rollock's July 25, 2016 e-mail letter then stated "[b]y a copy of this email to Tandra Foster, Associate Legal Counsel," Defendant Vice President Rollock was alerting Ms. Foster to John Doe's request for his education records and that Ms. Foster would process John Doe's request. The phone number and e-mail address for Ms. Foster was provided.

75.     After Defendant Vice President Rollock's July 25, 2016 e-mail letter, neither Tandra Foster nor anyone else at Defendant Purdue provided any documents in response to John Doe's request for the documents identified in John Doe's July 10, 2016 appeal letter and Defendant Vice President Rollock's July 25, 2016 e-mail letter.

76.     On August 16, 2016, John Doe involuntarily resigned from Navy ROTC, his dream of serving his country as a Naval officer destroyed. John Doe did not want to resign, but he could not maintain the requirements for Navy ROTC as a student suspended for sexual misconduct; and in any event, such a sexual misconduct disciplinary decision is unacceptable in terms of continued participation in Navy ROTC given, among other things, its zero tolerance policy toward sexual harassment and the disapproval of sexual misconduct in today's military.

77.   Meanwhile, in August 2016 at Defendant Purdue, an OCR investigation was opened, the student newspaper reported that a new "Sexual Assault Center" was opened on campus and procedures for adjudicating sexual misconduct cases were amended to permit respondents and complainants to have access to the investigative report and to submit comments and additional information to Defendant Purdue's Investigator in writing.  John Doe was a male sacrificed to give Defendant Purdue the appearance of being Title IX compliant.

**N.    John Doe's Repeated Request for the Investigator's Report.**

78.   On September 20, 2016, 72 days after John Doe's request had been made and well past the 45-days stated on Purdue's Policies, John Doe again requested the documents identified in his July 10, 2016 appeal, this time directly to Tandra Foster.  On that date, John Doe sent an e-mail to Tandra Foster, requesting the identified documents be "turn[ed] over" to him and citing the 2002 ruling of the U.S. Court of Appeals for the Sixth Circuit in *United States v. Miami University* for the right to read and inspect all documents relating to the investigation of his case.

79.  On October 11, 2016, 93 days after John Doe's first request was made for production of records, Tandra Foster replied, stating that John Doe and his parents could go to Purdue to review the documents during a scheduled time, of which only four options were made available by Purdue, on the mornings and afternoons of October 19 and October 20, more than a full week after Tandra Foster's response.

80.    On October 20, 2016, John Doe and his mother at Defendant Purdue reviewed documents that were made available.  John Doe and his mother could not, however, make copies of any of the documents made available for review; John Doe and his mother were also not permitted to take photographs or record audio of any of the documents; the only medium of copying that Defendant Purdue allowed was to write everything by hand. Also, while the documents made available did include the Investigator's Report, it was heavily redacted such that witnesses and other apparently important information were not identifiable   Despite the Investigator's Report forming a critical part of the basis for the determination against John Doe, that Investigator's Report was never provided to John Doe during the disciplinary case by Defendant Purdue and even after the disciplinary case was over, the Investigator's Report was never provided to John Doe without heavy redactions.

81.    The Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99, is a Federal law that protects the privacy of student education records. The law applies to all schools that receive funds under an applicable program of the U.S. Department of Education, which included Defendant Purdue.  FERPA provides that the educational agency or institution shall comply with a request for access to records within a reasonable period of time, but not more than 45 days after the school or educational agency has received the request.  John Doe's initial July 10, 2016 requests went unsatisfied for 93 days, until Tandra Foster

[43]

replied on October 11, 2016.  At this point it was long past the deadline for John Doe's appeal, for which access to the investigation report and other evidence was critical to allow John Doe to provide an informed defense.

**O.**      **John Doe's Intention To Re-Enroll.**

82.      John Doe intends to re-enroll at Purdue and continue his education there, but is faced with readmission requirements wrongly imposed as part of the sanction from the disciplinary proceeding against John Doe.

**COUNT I**
**(42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process)**

83.      John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

84.      The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case, Defendants are state actors subject to the Fourteenth Amendment.

85.      Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

86.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process. Deprivation of the protected liberty interest, identified by the "stigma-plus" test, occurs where, as here, the State inflicted reputational damage accompanied by an alteration in legal status that deprived the person of aright he previously held.  John Doe satisfies this test because Defendants inflicted reputational harm by wrongfully branding him as a sex offender and Defendants changed John Doe's legal status by suspending him, subjecting him to readmission requirements and causing the loss of his Navy ROTC scholarship. John Doe had an obligation to authorize Defendants to disclose the sexual misconduct proceedings to the Navy ROTC; and in any event, the Navy ROTC appeared to know of the sexual misconduct proceedings from Defendants as soon as Defendant Dean Semersheim's April 11, 2016 letter notice of investigation was issued to John Doe because John Doe at that point was not allowed to participate in Navy ROTC and was not allowed in the ROTC armory unless to attend a class or to meet with a Naval superior. The finding of responsibility for sexual misconduct and sanction of suspension made John Doe ineligible for Navy ROTC.

87.     A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.

[45]

88.     John Doe's constitutionally protected property interest in his continued enrollment at Defendant Purdue and to be free from arbitrary suspension and dismissal arises from the policies, courses of conduct, practices and understandings established by Defendant Purdue.

89.     John Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between Defendant Purdue and John Doe.

90.     Defendant Purdue created express and/or implied contracts when John Doe accepted an offer of admission to Defendant Purdue and paid the tuition and fees.

91.     Defendant Purdue breached express and/or implied contracts with John Doe.

92.     Defendant Purdue Policies provides that students are to have a fair and impartial disciplinary process in which it is the responsibility of the University to show that a violation has occurred before any sanctions are imposed.  Defendant Purdue breached its contract with John Doe when it failed to conduct a fair and impartial process, including not holding a hearing.  At no time was John Doe afforded the procedural guarantees that generally accompany a hearing, such as the right to present witnesses and evidence, confront one's accuser and cross-examine and challenge any witnesses against him, all before an impartial and objective

factfinder. Thus, Defendants violated the contract with John Doe when they failed to afford him a proper hearing on Jane Doe's accusations against him.

93. Defendant Purdue Policies provides that the investigation will be neutral. In this case, however, the investigation was not neutral. Defendant Purdue failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of Jane Doe's allegations and subsequent adjudication in a manner that was biased against John Doe. Further, John Doe was severely prejudiced in being able to defend himself because he was denied access to the Investigator's Report. The quick review of the Investigator's Report that a Navy ROTC officer allowed John Doe indicated that it misrepresented John Doe of confessing guilt.

94. The U.S. Department of Education Office for Civil Rights has required that the excessively low preponderance of the evidence burden of proof be used to evaluate allegations of sexual misconduct. Though an inadequate standard to protect the procedural rights of accused students, Defendant Purdue utilizes this standard of review, as recognized in its Policies. Defendant Purdue violated this provision when they improperly placed the burden of proof on John Doe to prove that Jane Doe's accusations were not true and when it failed to utilize the preponderance of the evidence standard in fact in reaching its Determination. Defendant Purdue therefore breached its contract with John Doe when it failed to utilize the requisite preponderance of the evidence standard.

[47]

95.     Based on the aforementioned facts and circumstances, Defendant Purdue breached and violated a covenant of good faith and fair dealing implied in the agreement(s) with John Doe.  Defendant Purdue failed its duty of good faith and fair dealing when it meted out a disproportionate sanction notwithstanding the flawed process and lack of evidence in support of Jane Doe's allegations of sexual misconduct.

96.     Defendant Purdue's various policies constitute representations and promises that Defendant Purdue should have reasonably expected to induce action or forbearance by John Doe.

97.     Defendant Purdue expected or should have expected John Doe to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Defendant Purdue would not tolerate, and John Doe would not suffer, harassment by fellow students and would not deny John Doe his procedural rights should he be accused of a violation of Purdue Policies.

98.     John Doe relied to his detriment on these express and implied promises and representations made by Defendant Purdue.

99.     It is well established that Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings.

100.   A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

101.   As a result, if John Doe as a Purdue student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that Defendant Purdue used.

102.   Defendant Purdue, as a land grant university established by the State of Indiana, and the individual Defendants, as agents of Defendant Purdue, have a duty to provide its students equal protection and due process of law by and through any and all policies and procedures set forth by the University.

103.   John Doe had obeyed all institutional rules when he was wrongly suspended from Defendant Purdue.

104.   Under both federal and state law, John Doe had a constitutionally protected property interest in continuing his education at Defendant Purdue.

105.   John Doe was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was

facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for John Doe.

106. John Doe was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

107. In the course of such investigation and adjudication, Defendants flagrantly violated John Doe's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimal requirements of procedural fairness by employing a Kafkaesque process in which there is no cross-examination, no sworn testimony, no hearing of any kind, no access for the respondent even to see the investigator's report, no provision to respondent of the evidence that supposedly supported the false allegations and thus no adequate ability to prepare a defense to them, no presumption of innocence but rather a presumption that the female's accusations are true, no reasoned consideration of evidence as required by a burden of proof, no requirement for evidence to be stated in support of conclusions and thus an effective discretion to engage in discriminatory decision-making and a prejudiced ability for the respondent to prepare and submit an appeal.

108. Cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases,

*Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997). Yet, in a case where Defendant Purdue relied upon a credibility assessment, there was no hearing and thus no cross-examination was available and no sworn testimony was taken in violation of due process of law. *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

109. Defendant Dean Sermersheim, Dean of Students and also Title IX Coordinator discharged responsibilities in university Title IX adjudications that involved a conflict of interest contrary to a Fourteenth Amendment interest in a fair process. Defendant Dean Sermersheim: (i) wrote the Notice of Investigation determining the allegations against John Doe; (ii) issued the No Contact Directive to John Doe; (iii) appointed subordinates Defendant Erin Oliver and Defendant Jacob Amberger as the Investigators for the complaint against John Doe; (iv) served as chair of the three-person Hearing panel of the Advisory Committee on Equity in deciding John Doe's case; (v) wrote a cursory and perfunctory decision letter stating that she had determined John Doe responsible; (vi) issued a decision letter that was rejected by the Defendant Purdue Vice President of Ethics and Compliance for lacking a stated rationale for the decision; and (vii) ultimately re-issued the decision letter to add one sentence of unsubstantiated postulation to suggest that the preponderance of the evidence standard had been met and that John Doe was responsible for "Sexual Violence."

[51]

110.   Defendant Dean Sermersheim's responsibilities were overbroad and held a conflict of interest as determined by Title IX guidance: "Title IX coordinators should not have other responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest."  By putting decision-making as to violation and sanction in one person who is both Dean of Students and Title IX Coordinator, it permits, among other things, decision-making in specific cases be tailored to give the appearance of vigorous Title IX enforcement and meet perceived reporting needs to U.S. Department of Education Office of Civil Rights.

111.   Defendants were pressured by the Obama Administration's DOE into following the Title IX investigative and adjudicatory process mandated by the "April 2011 Dear Colleague Letter" regardless of what otherwise would be due process considerations.  Defendant Purdue was the subject of two OCR investigations opened during 2016.  Assistant Secretary Lhamon, as quoted above, made numerous public statements about the obligation of colleges and universities to conform to the "April 2011 Dear Colleague Letter" or face the cut-off of federal funding.  The DOE and OCR have accordingly treated the "April 2011 Dear Colleague Letter" as binding on regulated parties for all practical purposes.

112.   The 2011 Dear Colleague Letter has in fact resulted in significant action and legal consequences.  At the July 2014 Dartmouth College conference, Ms.

[52]

Lhamon stated: "Our release of the 2011 DCL [Dear Colleague Letter] is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL [Dear Colleague Letter]."

113.   Defendants deprived John Doe of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free of bias, his right to be informed of the evidence against him, his right to be innocent until shown to be responsible and not to be subjected to the burden of proving innocence, his right to be heard by an impartial factfinder, to question his accuser, challenge the credibility of other adverse witnesses and present evidence and witnesses in support of his defense.

114.   In attempting to demonstrate their compliance with the "April 2011 Dear Colleague Letter," the Defendants subjected John Doe to an insufficient process when they failed to provide John Doe with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision tainted by gender bias.

115.   As a result, Defendants failed to provide John Doe with the basic due process protections that they are required to provide students accused of sexual misconduct at a state school.

116.    Defendants, as well as other agents, representatives, and employees of Defendant Purdue, were acting under color of state law when they showed intentional, outrageous, and reckless disregard for John Doe's constitutional rights.

117.    Defendants all agreed to, approved, and ratified this unconstitutional conduct.

118.    As a result of these due process violations, John Doe continues to suffer ongoing harm, including damages to his reputation and other non-economic and economic damages. In particular, suspension from Defendant Purdue denied him the benefits of education at his chosen school and also damaged John Doe's academic and professional reputation.  John Doe's lifelong goal of becoming of a naval officer and serving his country has been shattered.

119.    Defendant President Daniels as Defendant Purdue's President is ultimately responsible for the university's compliance with a federal court injunction; Defendant Daniels is not in an individual capacity liable under 42 U.S.C. § 1983 for saying "The Buck Stops Here," but his saying "The Buck Stops Here" is a recognition of his official capacity responsibility for Defendant Purdue's performance and operations as an educational institution of higher learning, which includes compliance with federal and state laws and court decrees specific to Defendant Purdue, including any expungement of a disciplinary record.

120. Defendant Vice President Rollock as Defendant Purdue's Vice President of Ethics and Compliance is responsible in her official capacity for the overall operation of the disciplinary investigation and adjudication process at Defendant Purdue, as seen in her decision-making on appeals, and thus would be tasked to have Defendant Purdue comply with any federal court injunction concerning ongoing due process violations in a disciplinary case, including any expungement of a disciplinary record.

121. Defendant Dean Sermersheim as Defendant Purdue's Dean of Students is responsible in her official capacity for the conduct of disciplinary investigations and meetings with the disciplinary respondents and is responsible in her official capacity for making the decision in a disciplinary case. Dean Sermersheim appointed Ms. Erin Oliver, Associate Director of Defendant Purdue's Office of Institutional Equity, and Mr. Jacob Amberger, an Investigator in Defendant Purdue's Office of Institutional Equity, to investigate what were false accusations against John Doe, and Dean Sermersheim, after holding a meeting with John Doe along with members of the Equity Committee that failed to constitute a real hearing, made the disciplinary decision in John Doe's case.

122. The constitutional due process violations here in John Doe's disciplinary case occurred because Defendant President Daniels, Defendant Vice President Rollock and Defendant Dean Sermersheim, when engaged in

constitutional due process violations, effectively acted outside their respective authority.  For a federal court injunction ordering prospective relief in a case involving a sexual misconduct disciplinary proceeding at Defendant Purdue, joinder of Defendant President Daniels, Defendant Vice President Rollock and Defendant Dean Sermersheim in their respective official capacities is necessary so that the injunction is enforced.

123.   As a result of the foregoing, John Doe has standing to seek and is entitled to an injunction vacating John Doe's disciplinary findings and decision, granting expungement of John Doe's transcript of the disciplinary record, ordering the ending of the suspension subject to any readmission requirements and enjoining future violations of due process in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action.

124.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress, loss of educational, military career opportunities, economic injuries and other direct and consequential damages.  John Doe's interests in the results of the disciplinary process are significant.

125.   As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the

Fourteenth Amendment in the process of investigating and adjudicating sexual misconduct complaints.

## COUNT II
## (Violation of Title IX of the Education Amendments of 1972)

126.   John Doe repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

127.   Title IX of the Education Amendments of 1972 provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

128.   Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX of the Education Amendments of 1972 even though there is very little direct federal funding of school sports.

129.   According to published audited financial statements, at fiscal year-end 2016, Defendant Purdue: received $14,796,000 in federal grants; had accrued long-term liability of $19,891,000 in advances from the federal government; and was the recipient of $356,066,000 in grants and contracts provided by both government and other sources.

130. Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline. In either case, the statute is enforceable through an implied private right of action.

131. The Obama Administration's DOE has promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b).

132. Even the Obama Administration's DOE has ostensibly recognized that the procedures adopted by a school such as Defendant Purdue covered by Title IX must accord due process to both parties involved. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

133. Even the Obama Administration's DOE has ostensibly recognized that there must be "[a]dequate, reliable, and impartial investigation of complaints" and that a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

134. Challenges to university disciplinary proceedings for sex discrimination fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

135. An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault and gender bias was a motivating factor.

136. The denial of due process in this case resulted in an "erroneous outcome" based on erroneous and distorted conception of the facts.

137. Defendant Purdue failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of Jane Doe's allegations and subsequent adjudication in a manner that was biased against John Doe. Further, John Doe was severely prejudiced in being able to defend himself because he was denied access to the Investigator's Report and case file as a whole. The quick review of the Investigator's Report that a Navy ROTC officer allowed John Doe indicated that the Investigator's Report misrepresented that John Doe had confessed guilt. Further, all the reports that John Doe has seen in his case file had redacted all names,

[59]

not providing John Doe the knowledge of who says what about John Doe or anything pertaining to the case.

138.   The quick review of the Investigator's Report that a Navy ROTC officer allowed John Doe indicated that it misrepresented John Doe of confessing guilt.

139.   Defendant Purdue made no provision, to John Doe as the respondent, of the evidence that supposedly supported the false allegations, and thus John Doe was severely prejudiced in being able to prepare a defense to those false allegations.

140.   Defendant Purdue has created a victim-centered process in which an accused male student is prosecuted under a presumption of guilt and improperly places the burden of proof in John Doe. Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Defendant Purdue on the basis of his sex.

141.   Defendant Purdue held no hearing of any kind to determine the facts, but rather relied upon the Dean of Students, Defendant Dean Sermersheim, to make a determination almost entirely based on a review of the written allegations, the written response to the allegations and the Investigator's Report that is not disclosed to the respondent (here, John Doe).  Yet, in a case where Defendant Purdue relied upon a credibility assessment, there was no hearing.

142.   As stated above, cross-examination has been recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116,

124 (1999), and has been ruled to be required for basic due process in campus disciplinary cases, *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997).  Yet, in a case where Defendant Purdue relied upon a credibility assessment, no cross-examination was available and no sworn testimony was taken in violation of due process of law.  *John Doe v. University of Cincinnati*, No. 16-cv-987, 2016 WL 6996194 (S.D. Ohio Nov. 30, 2016).

143.  Defendant Dean Sermersheim, Dean of Students and also Title IX Coordinator discharged responsibilities in university Title IX adjudications that involved a conflict of interest contrary to Title IX guidance.  Defendant Dean Sermersheim: (i) wrote the Notice of Investigation determining the allegations against John Doe; (ii) issued the No Contact Directive to John Doe; (iii) appointed subordinates Defendant Erin Oliver and Defendant Jacob Amberger as the Investigators for the complaint against John Doe; (iv) served as chair of the three-person Hearing panel of the Advisory Committee on Equity in deciding John Doe's case; (v) wrote a cursory and perfunctory decision letter stating that she had determined John Doe responsible; (vi) issued a decision letter that was rejected by the Defendant Purdue Vice President of Ethics and Compliance for lacking a stated rationale for the decision; and (vii) ultimately re-issued the decision letter to add one sentence of unsubstantiated postulation to suggest that the preponderance of the

evidence standard had been met and that John Doe was responsible for "Sexual Violence."

144.   Defendant Dean Sermersheim's responsibilities were overbroad and held a conflict of interest as determined by Title IX guidance: "Title IX coordinators should not have other responsibilities that may create a conflict of interest. For example, serving as the Title IX coordinator and a disciplinary hearing board member or general counsel may create a conflict of interest."  By putting decision-making as to violation and sanction in one person who is both Dean of Students and Title IX Coordinator, it permits, among other things, decision-making in specific cases be tailored to give the appearance of vigorous Title IX enforcement and meet perceived reporting needs to U.S. Department of Education Office of Civil Rights.

145.   The totality of the circumstances establish that Defendants acted out of gender bias in reaching the "erroneous outcome."  Defendant Purdue credited false accusations of sexual assault made by a female five months after the supposed occurrences with no supporting documentation and discredited the male John Doe and disregarded evidence tending to exculpate the male John Doe, including numerous text messages between Jane Doe and John Doe that indicated that no sexual assault occurred.

146.   Defendant Purdue required no reasoned consideration of evidence as required by a burden of proof.  Defendant Dean Sermersheim's additional statement

in her June 29, 2016 letter reflected a failure in fact to apply a burden of proof, which requires a reasoned consideration of the evidence to reach a conclusion, and actually revealed the absence of a preponderance of evidence supporting the finding of a violation by John Doe. Defendant Dean Sermersheim's additional statement in her June 29, 2016 letter provided no explanation supporting her stated credibility judgments for the female Jane Doe and against the male John Doe, there was no objective evidence supporting Defendant Dean Sermersheim's stated credibility judgments and without a hearing that included the questioning of witnesses, there was no proper basis for making such credibility judgments. Only an anti-male bias to find for the female complainant and against the male respondent can explain Defendant Dean Sermersheim's purported findings concerning the preponderance of the evidence.

147. Defendant Purdue failed to provide John Doe the factual basis for the violations determination and sanctions, resulting in a prejudiced ability for the John Doe as respondent to prepare and submit an appeal and allowing for discriminatory decision-making. Defendant Vice President Rollock's July 21, 2016 appeal decision did not address any of the substantive issues raised by John Doe's appeal, including the failure of Defendant Dean Sermersheim to provide the factual basis for her determination despite Defendant Vice President Rollock's June 28, 2016 directive to provide that factual basis, the prejudiced ability to present a defense as a result of

John Doe never having the opportunity to review the Investigator's Report and never having been permitted to respond to any "factual evidence," that Jane Doe's accusation about what John Doe had allegedly told her about digitally penetrating her made no sense given how such behavior would jeopardize John Doe's Navy ROTC scholarship and career serving his country and the behavior on the part of Jane Doe that was documented and that was inconsistent with the accusations of sexual assault. Instead, Defendant Vice President Rollock's July 21, 2016 appeal decision upheld perfunctorily Defendant Dean Sermersheim's June 29, 2016 re-issued determination and order of sanctions that were the product of gender bias.

148.   Defendant Dean Sermersheim's decision to order sanctions that were "unduly severe" was affected by John Doe's male gender. The false accusations were treated as posing a serious threat to the university when in fact there was no such threat, just an anti-male bias treating John Doe as a "rapist" on the loose. Defendant Dean Sermersheim's decision to order sanctions that were unduly severe did not take into account that John Doe had a previously unblemished disciplinary record at Defendant Purdue and had presented a list of names that would support his character and integrity.

149.   Upon information and belief, Defendants were pressured by the Obama Administration's Department of Education into following the Title IX investigative and adjudicatory process mandated by the 2011 Dear Colleague Letter regardless of

[64]

due process considerations.   Upon information and belief, Defendant Purdue's mishandling of John Doe's case was wrongfully affected by federal pressure from the Federal Defendants.

150.   The totality of circumstances establishes that Defendant Purdue has demonstrated a pattern of inherent and systematic gender bias and discrimination against male students accused of misconduct.

151.   Upon information and belief, all students that have been suspended or expelled from Defendant Purdue for sexual misconduct have been male.

152.   Male respondents, and particularly male athletes and male ROTC members, in sexual misconduct cases at Defendant Purdue are discriminated against solely on the basis of sex.   They are invariably found guilty, regardless of the evidence, or lack thereof.

153.   As a result of the foregoing, John Doe has standing to seek and is entitled to an injunction vacating John Doe's disciplinary findings and decision, granting expungement of John Doe's transcript of the disciplinary record, ordering the ending of the suspension subject to any readmission requirements and enjoining future violations of Title IX in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action.

154.   As a direct and proximate result of the above conduct, John Doe sustained tremendous damages, including, without limitation, emotional distress,

loss of educational, athletic and career opportunities, economic injuries and other direct and consequential damages.

155. As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and to an injunction enjoining violations of the Title IX in the process of investigating and adjudicating sexual misconduct complaints.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, John Doe demands Judgment, as follows:

    (i)    on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants Daniels, Rollock and Sermersheim awarding John Doe an injunction vacating John Doe's disciplinary findings and decision, granting expungement of the disciplinary record from John Doe's school records at Defendant Purdue, ordering the ending of the suspension subject to any readmission requirements and enjoining future due process violations in the process of investigating and adjudicating the sexual misconduct complaint that is the subject of this action; and

    (ii)    on the second cause of action for violation of Title IX of the Education Amendments of 1972, a judgment against Defendant Purdue awarding John Doe:

        (a)    damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, and loss of future

career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and

(b) an injunction vacating John Doe's disciplinary findings and decision, granting expungement of the disciplinary record from John Doe's school records at Defendant Purdue, ordering the ending of the suspension subject to any readmission requirements and enjoining future Title IX violations in the process for the sexual misconduct complaint that is the subject of this action; and

(iii) awarding John Doe such other and further relief as the Court deems just, equitable and proper, including attorneys' fees.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues presented herein that are capable of being tried by a jury.

Dated: September 3, 2019

NESENOFF & MILTENBERG, LLP

By: */s/ Philip A. Byler*
Philip A. Byler (*pro hac vice* admission)
Andrew T. Miltenberg (*pro hac vice* admission)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
pbyler@nmllplaw.com

*Attorneys for Plaintiff John Doe*