In the

# United States Court of Appeals

### For the Seventh Circuit

————————————

No. 17-3565

JOHN DOE,

*Plaintiff-Appellant,*

*v.*

PURDUE UNIVERSITY, *et al.,*

*Defendants-Appellees.*

————————————

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:17-cv-00033-PRC — **Paul R. Cherry**, *Magistrate Judge.*

————————————

ARGUED SEPTEMBER 18, 2018 — DECIDED JUNE 28, 2019

————————————

Before SYKES, BARRETT, and ST. EVE, *Circuit Judges.*

BARRETT, *Circuit Judge.* After finding John Doe guilty of sexual violence against Jane Doe, Purdue University suspended him for an academic year and imposed conditions on his readmission. As a result of that decision, John was expelled from the Navy ROTC program, which terminated both his ROTC scholarship and plan to pursue a career in the Navy.

John sued the university and several of its officials, asserting two basic claims. First, he argued that they had violated the Fourteenth Amendment by using constitutionally flawed procedures to determine his guilt or innocence. Second, he argued that Purdue had violated Title IX by imposing a punishment infected by sex bias. A magistrate judge dismissed John's suit on the ground that he had failed to state a claim under either theory. We disagree. John has adequately alleged violations of both the Fourteenth Amendment and Title IX.

## I.

We are reviewing the magistrate judge's decision to dismiss John's complaint for failing to state a claim. That means that we must recount the facts as he describes them, drawing every inference in his favor. *See D.B. ex rel. Kurtis B. v. Kopp*, 725 F.3d 681, 682 (7th Cir. 2013). In other words, the story that follows is one-sided because the posture of the case requires it to be. Our task is not to determine what allegations are supported by the evidence but to determine whether John is entitled to relief if everything that he says is true. *See McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011).

John and Jane were both students in Purdue's Navy ROTC program. They began dating in the fall of 2015, and between October and December, they had consensual sexual intercourse fifteen to twenty times. Jane's behavior became increasingly erratic over the course of that semester, and she told John that she felt hopeless, hated her life, and was contemplating running away. In December, Jane attempted suicide in front of John, and after that incident, they stopped having sex. They continued dating, however, until January, when John tried to get Jane help by reporting her suicide attempt to two resident assistants and an advisor. Jane was upset at John

for reporting her, and she distanced herself from him. Soon thereafter, she began dating someone else.

For a few months, things were quiet between John and Jane. That changed in April 2016, which was Sexual Assault Awareness Month. During that month, Purdue hosted over a dozen events to promote the reporting of sexual assaults. Many of the events were sponsored by the Center for Advocacy, Response, and Education (CARE), a university center dedicated to supporting victims of sexual violence. CARE promoted the events on its Facebook page, along with posts containing information about sexual assault. One of its posts was an article from *The Washington Post* titled "Alcohol isn't the cause of campus sexual assault. Men are."

During the first ten days of April, five students reported sexual assault to the university. Jane was one of them. She alleged that in November 2015, she was sleeping with John in his room when she woke to him groping her over her clothes without her consent. According to Jane, she told John that this was not okay, and John then confessed that he had digitally penetrated her while the two were sleeping in Jane's room earlier that month. Jane told the university that John had engaged in other misconduct as well: she asserted that he had gone through her underwear drawer without her permission, chased her through a hallway while joking about tasering her, gone to her room unannounced after they broke up, and lost his temper in front of her.

John learned about Jane's accusations in a letter from Katherine Sermersheim, Purdue's Dean of Students and a Title IX coordinator. Sermersheim informed John that the university had elected to pursue Jane's allegations even though Jane had not filed a formal complaint. She outlined the

school's disciplinary procedures and explained that two em-
ployees who reported to her, Erin Oliver and Jacob Amberger,
would investigate the case. She also instructed John not to
have any contact with Jane. After he received the letter, John
was suspended from the Navy ROTC, banned from all build-
ings where Jane had classes, and barred from eating in his
usual dining hall because Jane also used it.

John submitted a written response denying all of Jane's al-
legations. He asserted that he never had sexual contact with
Jane while she was sleeping, through digital penetration or
otherwise. He said that there was one night in December, after
Jane's suicide attempt, when he touched Jane's knee while she
was sleeping on a futon and he was on the floor next to her.
But he denied groping her or engaging in any of the harassing
behavior of which she had accused him. John also recounted
evidence that he thought inconsistent with Jane's claim of sex-
ual assault: she texted and talked to him over the holidays,
sent his family a package of homemade Christmas cookies,
and invited him to her room when they returned to school in
January. He also provided details suggesting that Jane was
troubled and emotionally unstable, which he thought might
explain her false accusations.

Under Purdue's procedures, John was allowed the assis-
tance of a "supporter" at any meeting with investigators. In
late April, John and his supporter met with Oliver and Am-
berger. As he had in his written response, John steadfastly de-
nied Jane's allegations. He provided the investigators with
some of the friendly texts that he thought belied her story, as
well as a list of over thirty people who could speak to his in-
tegrity.

When the investigators' report was complete, Sermersheim sent it to a three-person panel of Purdue's Advisory Committee on Equity, which was tasked with making a recommendation to her after reviewing the report and hearing from the parties. Sermersheim called John to appear before the panel, but consistent with Purdue's then-applicable procedures, she neither gave him a copy of the report nor shared its contents with him. Moments before his committee appearance, however, a Navy ROTC representative gave John a few minutes to review a redacted version of the report. To John's distress, he learned that it falsely claimed that he had confessed to Jane's allegations. The investigators' summary of John's testimony also failed to include John's description of Jane's suicide attempt.

John and his supporter met with the Advisory Committee and Sermersheim, who chaired the meeting, for about thirty minutes. Jane neither appeared before the panel nor submitted a written statement. Instead, Monica Soto Bloom, the director of CARE, wrote the Advisory Committee and Sermersheim a letter summarizing Jane's accusations.

The meeting did not go well for John. Two members of the panel candidly stated that they had not read the investigative report. The one who apparently had read it asked John accusatory questions that assumed his guilt. Because John had not seen the evidence, he could not address it. He reiterated his innocence and told the panel about some of the friendly texts that Jane had sent him after the alleged assaults. The panel refused John permission to present witnesses, including character witnesses and a roommate who would state that he was present in the room at the time of the alleged assault and that Jane's rendition of events was false.

A week later, Sermersheim sent John a perfunctory letter informing him that she had found him guilty by a preponderance of the evidence of sexual violence. She suspended John from Purdue for one academic year. In addition, she conditioned John's reentry on his completion of a university-sponsored "bystander intervention training" and his agreement to meet with the Assistant Director of CARE during the first semester of his return.

John appealed this decision to Alysa Rollock, Purdue's Vice President for Ethics and Compliance, who instructed Sermersheim to identify the factual basis of her determination. Sermersheim sent a revised letter to John adding the following:

> Specifically, a preponderance of the evidence supports that:
>
> 1. [Jane Doe] had fallen asleep on a futon with you on the floor beside her. She woke up and found that you inappropriately touched her over her clothing and without her consent by placing your hand above her knee, between her legs, and moved it up to her "crotch" areas; and
>
> 2. On another occasion, while she was sleeping and without her consent, you inappropriately touched [Jane Doe] by digitally penetrating her vagina.

As the basis for these findings, Sermersheim offered: "I find by a preponderance of the evidence that [John Doe] is not a credible witness. I find by a preponderance of the evidence that [Jane Doe] is a credible witness." John appealed to Rol-

lock again, but this time, Rollock upheld Sermersheim's determination of guilt and accompanying sanctions. A few weeks after his second appeal was denied, John involuntarily resigned from the Navy ROTC, which has a "zero tolerance" policy for sexual harassment.

John sued Mitch Daniels, the President of Purdue University; Rollock, the Vice President for Ethics and Compliance; Sermersheim, the Dean and a Title IX coordinator; and Oliver and Amberger, the investigators, in their individual capacities, seeking monetary relief under 42 U.S.C. § 1983.[1] He sued these same defendants, along with the members of Purdue's Board of Trustees, in their official capacities, seeking injunctive relief under *Ex Parte Young*, 209 U.S. 123 (1908), to remedy the Fourteenth Amendment violation. And he sued Purdue University for discriminating against him on the basis of sex in violation of Title IX.

The magistrate judge dismissed John's § 1983 claims with prejudice, holding that the disciplinary proceedings did not deprive John of either liberty or property, so the Due Process Clause did not apply. He offered an additional reason for dismissing John's § 1983 claim against Daniels: John's theory of liability was based on Daniels's role as supervisor, and there is no supervisory liability under § 1983. As for John's claims for injunctive relief, the magistrate judge dismissed them without prejudice for lack of standing because John had not alleged that the violations posed any threat of future harm.

---

[1] John's complaint also asserted § 1983 claims against Purdue and all other defendants in their official capacities. Before us, he concedes that § 1983 does not permit him either to assert official-capacity claims or to sue Purdue itself. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

And he dismissed John's claims under Title IX with prejudice on the ground that John had not alleged facts sufficient to show that Purdue discriminated against him on the basis of sex. John appeals each of these rulings.

## II.

We begin with procedural due process. According to John, he was punished pursuant to a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause. He alleges the following deficiencies: he was not provided with the investigative report or any of the evidence on which the decisionmakers relied in determining his guilt and punishment; Jane did not appear before the Advisory Committee; he had no opportunity to cross-examine Jane; Sermersheim found Jane credible even though neither Sermersheim nor the Advisory Committee talked to her in person; Jane did not write her own statement for the panel, much less a sworn one; Sermersheim was in charge of both the investigation and the adjudication of his case; the Advisory Committee was blatantly biased against him; and the Advisory Committee refused to allow him to present any evidence, including witnesses.

Yet John cannot recover simply because the procedures were unfair, even if they were. The Due Process Clause is not a general fairness guarantee; its protection kicks in only when a state actor deprives someone of "life, liberty, or property." U.S. CONST. amend. XIV, § 1. The threshold question, then, is whether John lost a liberty or property interest when he was found guilty of sexual violence and punished. We address whether the procedures satisfied minimum constitutional requirements of fairness only if the answer to that question is yes.

No. 17-3565                                                                9

## A.

Our precedent involving due process claims in the context of university discipline has focused on whether a student has a protected property interest in his education at a state university. We have explained that "[a] college education—any education—is not 'property' in the usual sense of the word." *Williams v. Wendler*, 530 F.3d 584, 589 (7th Cir. 2008); *see also Charleston v. Bd. of Trs. of Univ. of Ill. at Chi.*, 741 F.3d 769, 772 (7th Cir. 2013) ("[O]ur circuit has rejected the proposition that an individual has a stand-alone property interest in an education at a state university, including a graduate education.").[2] Instead, "we ask whether the student has shown that he has a *legally protected entitlement* to his continued education at the university." *Charleston*, 741 F.3d at 773 (emphasis in original). High school students (and, for that matter, elementary school students) have a property interest in their public education because state law entitles them to receive one. *Goss v. Lopez*, 419 U.S. 565, 573–74 (1975). The same is not true, however, of students at public universities—certainly, John has not contended that Indiana guarantees its residents a college education.

---

[2] The First, Sixth, and Tenth Circuits have recognized a generalized property interest in higher education. *See* Dalton Mott, Comment, *The Due Process Clause and Students: The Road to A Single Approach of Determining Property Interests in Education*, 65 U. KAN. L. REV. 651, 659–60 (2017); *see also, e.g., Flaim v. Med. Coll. Of Ohio*, 418 F.3d 629, 633 (6th Cir. 2005) (asserting that "the Due Process Clause is implicated by university disciplinary decisions"). The Fifth and Eighth Circuits have assumed without deciding that such a property interest exists. *See* Mott, *supra*, at 663. The Second, Third, Fourth, Ninth, and Eleventh Circuits join us in making a state-specific inquiry to determine whether a property interest exists. *See id.* at 658.

In the context of higher education, any property interest is a matter of contract between the student and the university. *Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 601 (7th Cir. 2009) (explaining that the "basic legal relation between a student and a private university or college is contractual in nature" (citation omitted)). And to demonstrate that he possesses the requisite property interest, a university student must do more than show that he has a contract with the university; he must establish that the contract entitled him to the specific right that the university allegedly took, "such as the right to a continuing education or the right not to be suspended without good cause." *Id.* at 601. Generalities won't do; "the student's complaint must be specific about the source of this implied contract, the exact promises the university made to the student, and the promises the student made in return." *Charleston*, 741 F.3d at 773.

John has not adequately alleged that Purdue deprived him of property because his complaint does not point to any specific contractual promise that Purdue allegedly broke.[3] To be sure, John asserts that he had a property interest in his continued enrollment at Purdue. But as support for that proposition, his complaint states only that the right arose "from the express and implied contractual relationship" between John and the university. It points to no "identifiable contractual promise that the [university] failed to honor." *Bissessur*, 581 F.3d at 602 (alteration in original) (citation omitted).

His brief does only slightly better. In it, John insists that the Indiana state courts have held that a student enrolled in a

---

[3] For simplicity's sake, we will refer to the university and its officers collectively as "Purdue" or "the university."

public institution has a property interest in continuing his education. He cites *Reilly v. Daly*, in which an Indiana court said: "It is without question that a student's interest in pursuing an education is included within the Fourteenth Amendment's protection of liberty and property and that a student facing expulsion or suspension from a public educational institution is therefore entitled to the protections of due process." 666 N.E.2d 439, 444 (Ind. Ct. App. 1996). But John's reliance on *Reilly* is misplaced. To begin with, this cryptic sentence—the sum of what the case says on the topic—does not specify whether university disciplinary proceedings implicate liberty or property interests. And to the extent that *Reilly* refers to property, it does not purport to identify a state-granted property right to pursue higher education. Instead, it appears to express a view about federal law that we have already rejected: that the Due Process Clause protects a generalized property interest in higher education, irrespective of any specific state entitlement. While Indiana is free to align itself with courts taking that view, *see supra* note 2, our position is clear and to the contrary, *see Williams*, 530 F.3d at 589 (rejecting "the bald assertion that any student who is suspended from college has suffered a deprivation of constitutional property").

John's failure to establish a property interest does not doom his claim, however, because he also maintains that Purdue deprived him of a protected liberty interest: his freedom to pursue naval service, his occupation of choice. To succeed on this theory, John must satisfy the "stigma plus" test, which requires him to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held. *See Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013); *see also Paul v. Davis*, 424 U.S. 693, 708–09 (1976); *Hinkle v. White*, 793 F.3d 764, 767–68 (7th Cir. 2015).

John argues that he has satisfied this test because he alleges that Purdue inflicted reputational harm by wrongfully branding him as a sex offender; that Purdue changed his legal status by suspending him, subjecting him to readmission requirements, and causing the loss of his Navy ROTC scholarship; and that these actions impaired his right to occupational liberty by making it virtually impossible for him to seek employment in his field of choice, the Navy. *See Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984) ("The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling."); *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (Liberty interests are impinged when someone's "good name, reputation, honor or integrity [are] called into question in a manner that makes it virtually impossible for … [him] to find new employment in his chosen field.").

Purdue insists that John has not adequately alleged "stigma," much less the necessary "plus." The university maintains that it has not and will not divulge John's disciplinary record without his permission. The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began. Because John permitted the disclosure, Purdue says, he cannot complain that Purdue stigmatized him.

Purdue cites no cases in support of its position, but it is presumably trying to draw an analogy between John and a plaintiff who publishes damaging information about himself—because it is true that a plaintiff can't himself spill the beans and then blame the defendant for ruining his reputation. *Olivieri v. Rodriguez* illustrates the point. 122 F.3d 406 (7th

Cir. 1997). There, a probationary police officer asserted a procedural due process claim against his superintendent after he was fired for sexually harassing other probationers. *Id.* at 407. We observed that "the defendant [had not] disclosed to anyone the grounds of the plaintiff's discharge." *Id.* at 408. The plaintiff, however, insisted that the defendant's silence didn't matter because the plaintiff would have to tell potential employers why he was fired—and "[i]f he answers truthfully, he will reveal the ground of the termination as effectively as (actually more effectively than) if the Department had taken out a full-page ad in every newspaper in the nation announcing the termination of Felix A. Olivieri for sexually harassing female probationary officers at the Chicago police training academy." *Id.*

We rejected Olivieri's claim, holding that a plaintiff who publicizes negative information about himself cannot establish that the *defendant* deprived him of a liberty interest. *Id.* As an initial matter, we noted that it was uncertain whether Olivieri's prospective employers would ever find out why he was discharged. *Id.* at 408–09 ("A prospective employer might not ask him—might ask only the Chicago Police Department, which for all we know might refuse to disclose the grounds of Olivieri's discharge; many former employers refuse to answer such inquiries, because of fear of being sued for defamation."). In addition, we explained that "[t]he principle of self-defamation, applied in a case such as this, would encourage [the plaintiff] to apply for a job to every police force in the nation, in order to magnify his damages; and to blurt out to each of the them the ground of his discharge in the most lurid terms, to the same end." *Id.* at 409.

John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510. In contrast to *Olivieri*, where disclosure was voluntary and speculative, it was compelled and certain in *Dupuy*. And in *Dupuy*, unlike in *Olivieri*, the disclosure was not self-published—it came from the defendant, even if the plaintiff had been obligated to authorize it. So too here: Purdue, not John, revealed to the Navy that it had found him guilty of sexual violence, and John had a legal obligation to authorize the disclosure.

Thus, if what John says is true, the university has stigmatized him by telling the Navy about the guilty finding. But the loss of reputation is not itself a loss of liberty, "even when it causes 'serious impairment of one's future employment.'" *Hojnacki v. Klein–Acosta,* 285 F.3d 544, 548 (7th Cir. 2002) (alteration and citation omitted). John must also show that the stigma was accompanied by a change in legal status. In *Paul v. Davis,* for example, the Supreme Court held that the police did not trigger the Due Process Clause by posting flyers falsely asserting that the plaintiff was an active shoplifter. 424 U.S. at 712. The flyers undoubtedly harmed the plaintiff's professional reputation, but their posting did not alter his legal status. *Id.* at 708–12. Similarly, in *Hinkle v. White*, loose-lipped state police officers spread word that they were investigating

No. 17-3565                                                                  15

the plaintiff for child molestation and that he might be guilty of arson to boot. 793 F.3d at 767. But the gossip did not alter his legal status—the plaintiff was not prosecuted, much less found guilty; nor did the county impose a consequence like firing him from his job as county sheriff. *Id.* at 768–69. Even though the rumors made it "virtually impossible" for him to change to a new job in his chosen field, the lack of a status change meant that he could not state a due process claim. *Id.* at 768–70.

John's situation is unlike that of the plaintiffs in *Paul v. Davis* and *Hinkle v. White* because it is not a matter of state-spread rumors or an investigation that was ultimately dropped. After conducting an adjudicatory proceeding, Purdue formally determined that John was guilty of a sexual offense. That determination changed John's status: he went from a full-time student in good standing to one suspended for an academic year. *Cf. Mann*, 707 F.3d at 878 (holding that the state deprived the plaintiff of occupational liberty when, after an investigation, it found that she had violated child-safety laws and suspended her ability to operate her daycare center); *Doyle v. Camelot Care Ctrs.*, 305 F.3d 603, 617 (7th Cir. 2002) (holding that the state deprived the plaintiffs of occupational liberty when, after an investigation, it found that they had neglected a minor and informed their respective employers, who fired them). And it was this official determination of guilt, not the preceding charges or any accompanying rumors, that allegedly deprived John of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his re-enrollment in it. John has satisfied the "stigma plus" test.

## B.

Having determined that John has adequately alleged that Purdue deprived him of a liberty interest, we turn to whether he has adequately claimed that Purdue used fundamentally unfair procedures in determining his guilt.

When a right is protected by the Due Process Clause, a state "may not withdraw [it] on grounds of misconduct absent[] fundamentally fair procedures to determine whether the misconduct has occurred." *Goss*, 419 U.S. at 574. Determining what is fundamentally fair is always a context-specific inquiry. *See Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 86 (1978) ("[W]e have frequently emphasized that '[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" (citation omitted)). Thus, for example, a university has much more flexibility in administering academic standards than its code of conduct. *See id.* ("[T]here are distinct differences between decisions to suspend or dismiss a student for disciplinary purposes and similar actions taken for academic reasons which may call for hearings in connection with the former but not the latter."). And even in the disciplinary context, the process due depends on a number of factors, including the severity of the consequence and the level of education. A 10-day suspension warrants fewer procedural safeguards than a longer one, *Goss*, 419 U.S. at 584, and universities are subject to more rigorous requirements than high schools, *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 663–64 (7th Cir. 2004).

John's circumstances entitled him to relatively formal procedures: he was suspended by a university rather than a high school, for sexual violence rather than academic failure, and

No. 17-3565                                                        17

for an academic year rather than a few days. Yet Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension. "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581. John received notice of Jane's allegations and denied them, but Purdue did not disclose its evidence to John. And withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair. *See id.* at 580 ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights…." (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring))).

John has adequately alleged that the process was deficient in other respects as well. To satisfy the Due Process Clause, "a hearing must be a real one, not a sham or pretense." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016) (citation omitted). At John's meeting with the Advisory Committee, two of the three panel members candidly admitted that they had not read the investigative report, which suggests that they decided that John was guilty based on the accusation rather than the evidence. *See id.* at 630 (stating that a hearing would be a sham if "members of the school board came to the hearing having predetermined [the plaintiff's] guilt"). And in a case that boiled down to a "he said/she said," it is particularly concerning that Sermersheim and the committee concluded that Jane was the more credible witness—in fact, that she was credible at all—without ever speaking to her

in person. Indeed, they did not even receive a statement writ-
ten by Jane herself, much less a sworn statement.[4] It is unclear,
to say the least, how Sermersheim and the committee could
have evaluated Jane's credibility.

Sermersheim and the Advisory Committee's failure to
make any attempt to examine Jane's credibility is all the more
troubling because John identified specific impeachment evi-
dence. He said that Jane was depressed, had attempted sui-
cide, and was angry at him for reporting the attempt. His
roommate—with whom Sermersheim and the Advisory
Committee refused to speak—maintained that he was present
at the time of the alleged assault and that Jane's rendition of
events was false. And John insisted that Jane's behavior after
the alleged assault—including her texts, gifts, and continued
romantic relationship with him—was inconsistent with her
claim that he had committed sexual violence against her.
Sermersheim and the Advisory Committee may have con-
cluded in the end that John's impeachment evidence did not
undercut Jane's credibility. But their failure to even question
Jane or John's roommate to probe whether this evidence was
reason to disbelieve Jane was fundamentally unfair to John.

John also faults Sermersheim for being in charge of both
the investigation and adjudication of his case. We have held,
however, that blending these two functions in the university
context does not necessarily render a process unfair. *Hess v.
Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 675 (7th Cir. 2016). To
rebut the presumption that university administrators are

---

[4] Citing a recent case from the Sixth Circuit, John also argues that he
was entitled to cross-examine Jane. *See Doe v. Baum*, 903 F.3d 575, 581 (6th
Cir. 2018). Because John has otherwise alleged procedural deficiencies suf-
ficient to survive a motion to dismiss, we need not address this issue.

"honest and impartial," a plaintiff must "lay a specific foun-
dation of prejudice or prejudgment, such that the probability
of actual bias is too high to be constitutionally tolerable." *Id.*
This burden is "heavy indeed," typically requiring evidence
that "the adjudicator had a pecuniary interest in the outcome
of the case, or that he was previously the target of the plain-
tiff's abuse or criticism." *Id.* (citations omitted). John has made
no such allegation here.

C.

To this point, we have analyzed the due process claim
without distinguishing between defendants. Now, however,
we separate them.

(1)

We begin with John's individual-capacity claim against
Mitch Daniels, the president of Purdue. The magistrate judge
was right to dismiss this claim. Section 1983 "does not allow
actions against individuals merely for their supervisory role
of others." *Zimmerman v. Tribble*, 226 F.3d 568, 574 (7th Cir.
2000). To be liable, a supervisor "must know about the con-
duct and facilitate it, approve it, condone it, or turn a blind
eye." *Zentmeyer v. Kendall Cty., Ill.*, 220 F.3d 805, 812 (7th Cir.
2000) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir.
1995)). John's complaint asserts nothing more about Daniels
than that "'The Buck Stops Here' with him." There is no alle-
gation that Daniels knew about the conduct, much less that
he facilitated, approved, or condoned it.

(2)

The individual-capacity claims against Rollock, Sermers-
heim, Oliver, and Amberger present a different obstacle for

No. 17-3565

John: qualified immunity. For the reasons that we have al-
ready explained, John has alleged facts that amount to a con-
stitutional violation. But because the defendants have as-
serted qualified immunity, John can recover damages from
them only if his right to receive procedural due process in the
disciplinary proceeding was clearly established. *See Rains-
berger v. Benner*, 913 F.3d 640, 647 (7th Cir. 2019). The magis-
trate judge did not address qualified immunity because he
concluded that John had failed to state a due process claim.
The defendants raised it below, however, and they press it
again here as an alternative ground for affirmance.

John insists that it would be premature for us to address
the issue because we are reviewing the magistrate judge's dis-
missal of his claims under Rule 12(b)(6). As he points out,
qualified immunity is generally addressed at summary judg-
ment rather than on the pleadings. *See Alvarado v. Litscher*, 267
F.3d 648, 651 (7th Cir. 2001) ("[A] complaint is generally not
dismissed under Rule 12(b)(6) on qualified immunity
grounds."); *see also Jacobs v. City of Chicago*, 215 F.3d 758, 765
n.3 (7th Cir. 2000) ("[T]he dismissal of a § 1983 suit under Rule
12(b)(6) is a delicate matter."). Thus, John argues, we should
send the case back to the district court for discovery.

There is no hard-and-fast rule, however, against resolving
qualified immunity on the pleadings. The reason for deferring
it to summary judgment is that an officer's entitlement to
qualified immunity often "depend[s] on the particular facts of
a given case," *Jacobs*, 215 F.3d at 765 n.3, and the Federal Rules
of Civil Procedure do not require a plaintiff to include much
factual detail in a complaint, *see* FED. R. CIV. P. 8 (providing
that a complaint must contain "a short and plain statement of
the claim showing that the pleader is entitled to relief"). *See*

*also Pearson v. Callahan*, 555 U.S. 223, 238–39 (2009) ("When
qualified immunity is asserted at the pleading stage, the pre-
cise factual basis for the plaintiff's claim or claims may be
hard to identify."). That said, the existence of qualified im-
munity is not always dependent on factual development—it
is sometimes clear on the face of the complaint that the con-
stitutional right invoked was not clearly articulated in the case
law. In that circumstance, the existence of qualified immunity
is a "purely legal question" that the court can address on a
motion to dismiss. *Jacobs*, 215 F.3d at 765 n.3.

That is the situation here. Qualified immunity is a high
standard. It protects government officials from liability for
civil damages as long as their actions do not violate "clearly
established statutory or constitutional rights of which a rea-
sonable person would have known." *Figgs v. Dawson*, 829 F.3d
895, 905 (7th Cir. 2016) (citation omitted). While the general
stigma-plus test is well-settled in our law, *see Hinkle*, 793 F.3d
at 768, we have never applied it specifically in the university
setting. Instead, our cases in this area have considered only
whether students have a *property* interest in their public uni-
versity education—and to this point, no student has success-
fully shown the requisite interest. Because this is our first case
addressing whether university discipline deprives a student
of a *liberty* interest, the relevant legal rule was not "clearly es-
tablished," and a reasonable university officer would not have
known at the time of John's proceeding that her actions vio-
lated the Fourteenth Amendment. We therefore affirm the dis-
missal of John's individual-capacity claims against Rollock,
Sermersheim, Oliver, and Amberger.

(3)

That leaves John's claims for injunctive relief, which he
seeks to obtain by suing Daniels, Rollock, Sermersheim, Oli-
ver, and Amberger in their official capacities. *See Ex Parte
Young*, 209 U.S. 123 (1908). The magistrate judge dismissed
this claim without prejudice on the ground that John lacked
standing to bring it. In his complaint, John asked for "an in-
junction enjoining violations of the Fourteenth Amendment
in the process of investigating and adjudicating sexual mis-
conduct complaints." But John doesn't have standing to claim
such relief. He has not alleged that he intends to re-enroll at
Purdue, much less that he faces a "real and immediate threat"
that Purdue would again investigate him for sexual miscon-
duct, much less that any such investigation would violate due
process. *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983) ("That
Lyons may have been illegally choked by the police on Octo-
ber 6, 1976, while presumably affording Lyons standing to
claim damages against the individual officers and perhaps
against the City, does nothing to establish a real and immedi-
ate threat that he would again be stopped for a traffic viola-
tion, or for any other offense, by an officer or officers who
would illegally choke him into unconsciousness without any
provocation or resistance on his part."). What John really
seeks to do is champion the rights of other men at Purdue who
might be investigated for sexual misconduct using the flawed
procedures that he describes in his complaint. That is a no-go:
John plainly lacks standing to assert the Fourteenth Amend-
ment rights of other students, even if he had alleged (which
he didn't) that the threat of injury to any one of them was "real
and immediate." *Id.*

John also seeks to remove the conditions of re-entry imposed by Purdue as part of his discipline. John lacks standing here too. As we already noted, he has not alleged that he intends to return to Purdue—a necessary fact to demonstrate a cognizable injury from the barriers to re-entry. That said, the magistrate judge dismissed this claim without prejudice, so on remand John can seek to remedy his lack of standing by pleading the necessary facts, if he has them.

In his response to the defendants' motion to dismiss, and then again in his brief and at oral argument, John argued that he is also entitled to an injunction ordering university officials to expunge the finding of guilt from his disciplinary record. For this relief, John has standing: John's marred record is a continuing harm for which he can seek redress. *See, e.g., Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records "serve[s] the purpose of preventing present and future harm"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to "remove the negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature"). And he claims that if the guilty finding is expunged, a career in the Navy may once again be open to him.

Because John did not specifically request this relief in his complaint, the university officials object that it is too late for him to raise it now. But Federal Rule of Civil Procedure 54(c) states that "[e]very [] final judgment [other than default judgments] should grant the relief to which each party is entitled,

even if the party has not demanded that relief in its plead-
ings." That means that even though John may not have asked
specifically for expungement, he may still be entitled to it. In
*Felce v. Fielder*, for example, the plaintiff did not request in-
junctive relief but instead—using language similar to that in
John's complaint—asked for "other and further relief as the
court may deem to be just and equitable." 974 F.2d 1484, 1501
(7th Cir. 1992). The district court in *Felce* had not reached the
question of injunctive relief because it had held—as the mag-
istrate judge did in John's case—that the plaintiff had not al-
leged the necessary liberty interest. On appeal, we concluded
that the plaintiff did have a liberty interest and instructed the
district court to address the issue of injunctive relief on re-
mand. *Id.* at 1502. We do the same here: having determined
that John has pleaded a liberty interest, we instruct the court
to address the issue of expungement on remand.

### III.

John also asserts a claim against Purdue under Title IX,
which provides that "[n]o person in the United States shall,
on the basis of sex, be excluded from participation in, be de-
nied the benefits of, or be subjected to discrimination under
any education program or activity receiving Federal financial
assistance." 20 U.S.C. § 1681(a); *see also Gebser v. Lago Vista In-
dep. Sch. Dist.*, 524 U.S. 274, 281 (1998) (explaining that Title IX
is enforceable through an implied private right of action). It is
undisputed that Purdue receives federal funding and that
John was "excluded from participation in [or] denied the ben-
efits of … [an] education program" when Purdue suspended
him. 20 U.S.C. § 1681(a). The success of John's claim depends
on whether Purdue discriminated against him "on the basis
of sex." *Id.*

No. 17-3565                                                              25

Some circuits use formal doctrinal tests to identify general bias in the context of university discipline. For example, the Second Circuit channels such claims into two general categories. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). In what has come to be called the "erroneous outcome" category, the plaintiff must show that he "was innocent and wrongly found to have committed the offense." *Id.* The other category, "selective enforcement," requires a plaintiff to prove that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*; *see also Plummer v. Univ. of Hous.*, 860 F.3d 767, 777–78 (5th Cir. 2017) (resolving the case by reference to the *Yusuf* framework); *Doe v. Valencia Coll.*, 903 F.3d 1220, 1236 (11th Cir. 2018) ("[W]e will assume for present purposes that a student can show a violation of Title IX by satisfying the 'erroneous outcome' test applied by the Second Circuit in *Yusuf*."). The Sixth Circuit has added two more categories to the mix: "deliberate indifference" and "archaic assumptions." *See Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (recognizing "at least four different theories of liability" in this context: "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions'" (citations omitted)).

We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John "on the basis of sex"?

26                                                      No. 17-3565

John casts his Title IX claim against the backdrop of a 2011 "Dear Colleague" letter from the U.S. Department of Education to colleges and universities. *See* United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter (2011), https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html. That letter ushered in a more rigorous approach to campus sexual misconduct allegations by, among other things, defining "sexual harassment" more broadly than in comparable contexts, *id*. at 3, mandating that schools prioritize the investigation and resolution of harassment claims, *id*. at 4, and requiring them to adopt a lenient "more likely than not" burden of proof when adjudicating claims against alleged perpetrators, *id*. at 11. The Department of Education made clear that it took the letter and its enforcement very seriously. *See* Examining Sexual Assault on Campus, Focusing on Working to Ensure Student Safety, Hearing Before the S. Comm. on Health, Educ., Labor, and Pensions, 113th Cong. 7 (2014) (statement of Catherine Lhamon, Assistant Secretary for Civil Rights, U.S. Dep't of Educ.) ("[S]ome schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."). And it warned schools that "[t]his Administration is committed to using all its tools to ensure that all schools comply with [T]itle IX so campuses will be safer for students across the country." *Id*. In other words, a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct.

According to John, this letter reveals that Purdue had a financial motive for discriminating against males in sexual assault investigations. To protect its federal funds, John says,

the university tilted the process against men accused of sexual
assault so that it could elevate the number of punishments im-
posed. The resulting track record of enforcement would per-
mit Purdue to signal its commitment to cracking down on
campus sexual assault, thereby fending off any suggestion
that it was not complying with the Department of Education's
directive. *Cf. Doe v. Columbia Univ.*, 831 F.3d 46, 58 n.11 (2d
Cir. 2016) ("A covered university that adopts, even temporar-
ily, a policy of bias favoring one sex over the other in a disci-
plinary dispute, doing so in order to avoid liability or bad
publicity, has practiced sex discrimination, notwithstanding
that the motive for the discrimination did not come from in-
grained or permanent bias against that particular sex."). And
because the Office of Civil Rights—a sub-agency of the De-
partment of Education—had opened two investigations into
Purdue during 2016, the pressure on the university to demon-
strate compliance was far from abstract. That pressure may
have been particularly acute for Sermersheim, who, as a Title
IX coordinator, bore some responsibility for Purdue's compli-
ance.

Other circuits have treated the Dear Colleague letter as rel-
evant in evaluating the plausibility of a Title IX claim. For ex-
ample, in *Doe v. Miami University*, the plaintiff alleged that
"pressure from the government to combat vigorously sexual
assault on college campuses and the severe potential punish-
ment—loss of all federal funds—if it failed to comply, led Mi-
ami University to discriminate against men in its sexual-as-
sault adjudication process." 882 F.3d at 594. The Sixth Circuit
held that this allegation, combined with others, "support[ed]
a reasonable inference of gender discrimination." *Id.*; *see also
Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (explaining that
the pressure of a Department of Education investigation and

the resulting negative publicity "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim."); *Columbia Univ.*, 831 F.3d at 58 ("There is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults.").

That said, the letter, standing alone, is obviously not enough to get John over the plausibility line. *See Baum*, 903 F.3d at 586 (pressure from the Dear Colleague letter "alone is not enough to state a claim that the university acted with bias in this particular case"). The letter and accompanying pressure gives John a story about why Purdue might have been motivated to discriminate against males accused of sexual assault. But to state a claim, he must allege facts raising the inference that Purdue acted at least partly on the basis of sex in his particular case. *See id.* (the Dear Colleague letter "provides a backdrop that, when combined with other circumstantial evidence of bias in [a] specific proceeding, gives rise to a plausible claim").

John has alleged such facts here, the strongest one being that Sermersheim chose to credit Jane's account without hearing directly from her. The case against him boiled down to a "he said/she said"—Purdue had to decide whether to believe John or Jane. Sermersheim's explanation for her decision (offered only after her supervisor required her to give a reason) was a cursory statement that she found Jane credible and John not credible. Her basis for believing Jane is perplexing, given that she never talked to Jane. Indeed, Jane did not even submit

a statement in her own words to the Advisory Committee. Her side of the story was relayed in a letter submitted by Bloom, a Title IX coordinator and the director of CARE.

For their part, the three panelists on Purdue's Advisory Committee on Equity were similarly biased in favor of Jane and against John. As John tells it—and again, we must accept his account as true—the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account. They made up their minds without reading the investigative report and before even talking to John. They refused to hear from John's witnesses, including his male roommate who maintained that he was in the room at the time of the alleged assault and that Jane's rendition of events was false. And the panel members' hostility toward John from the start of the brief meeting despite their lack of familiarity with the details of the case—including Jane's depression, suicide attempt, and anger at John for reporting the attempt—further supports the conclusion that Jane's allegation was all they needed to hear to make their decision.

It is plausible that Sermersheim and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man. The plausibility of that inference is strengthened by a post that CARE put up on its Facebook page during the same month that John was disciplined: an article from *The Washington Post* titled "Alcohol isn't the cause of campus sexual assault. Men are." Construing reasonable inferences in John's favor, this statement, which CARE advertised to the campus community, could be understood to blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault. And

it is pertinent here that Bloom, CARE's director, wrote the let-
ter regarding Jane to which Sermersheim apparently gave sig-
nificant weight.

Taken together, John's allegations raise a plausible infer-
ence that he was denied an educational benefit on the basis of
his sex. To be sure, John may face problems of proof, and the
factfinder might not buy the inferences that he's selling. But
his claim should have made it past the pleading stage, so we
reverse the magistrate judge's premature dismissal of it.

A final note: John seeks both money damages and injunc-
tive relief for his claim under Title IX. Our earlier discussion
of his entitlement to injunctive relief for his due process claim
applies equally here.

* * *

John has pleaded facts sufficient to state a claim under
both the Fourteenth Amendment and Title IX. We therefore
REVERSE and REMAND this case to the district court for pro-
ceedings consistent with this opinion.