1  A  Because I went through each of the authorizations
2     and wanted to know which, if any, of the medical
3     providers that you asked for authorizations from
4     had any material that I'd consider very private,
5     confidential or something that I wanted to keep to
6     myself. And the only one that met that condition
7     was the Family Concern Counseling.
8        And I discussed it with my family and I
9     discussed it with my lawyers, and we decided that
10    we would prefer to keep that sealed.
11 Q  You're alleging in this case that the anxiety and
12    depression for which you have been seeing Mr. Perry
13    is Purdue's fault, right?
14 A  Yes.
15 Q  And you're asking the court to award you money for
16    that anxiety and depression?
17 A  Yes, which is why I provided all the other
18    authorizations and all the medical documents that
19    lead to you asking for authorizations.
20 Q  And so part of the records that would show No. 1,
21    whether you had anxiety and depression, and No. 2,
22    the circumstances of it would be these counseling
23    records, right?
24 A  I believe the other records are more than adequate.
25 Q  That wasn't my question. These records talk about

Page 149

```
 1            the same things for which you're asking the court
 2            to award you money in this case, don't they?
 3                 MR. BYLER:  Objection to form.
 4     A      They cover a lot of things.
 5     Q      Including things that you don't want the court and
 6            defendants to know about?
 7     A      Things that I want to keep to myself because if
 8            you're in a counseling setting, the whole idea
 9            behind counseling is that you have confidentiality
10            between you and your counselor.  And in that
11            setting, you're allowed to be more vulnerable with
12            things you say and the feelings that you express.
13                 And that is how I was able to improve my
14            mental wellbeing.  And to crack it open, to me
15            would be a large violation of that confidentiality
16            and it would, I think, reverse some of the progress
17            that I made through the counseling for treating my
18            anxiety and depression.
19     Q      What are you hiding?
20     A      In regards to the case, nothing.  But I have plenty
21            of things in my personal life that I'd like to keep
22            between me and my counselor.
23     Q      Are you alleging that you are withholding your
24            medical authorization for Family Concern Counseling
25            on the advice of your lawyer?
```

Page 150

1           MR. BYLER: Objection, form.
2   A   I'm withholding that on the advice of my family and
3       my counselor.
4   Q   What about your lawyer?
5   A   My lawyer and I went around with it for a little
6       while.
7   Q   You're not asserting that advice of counsel
8       justifies you in withholding your medical
9       authorization?
10          MR. BYLER: Excuse me, objection, instruct not
11      to answer any privileged discussion between the
12      witness and his lawyer.
13  Q   You may answer?
14          MR. BYLER: Not any privileged information in
15      terms of communications between attorney and
16      client.
17          MR. KEALEY: All I asked him, Counselor, is to
18      confirm that he's not asserting advice of counsel
19      as the basis for withholding his medical
20      authorization.
21          MR. BYLER: He produced eight --
22          MR. KEALEY: You may let him answer the
23      question.
24          MR. BYLER: Yes, he has been very responsive,
25      I'm sorry.

1   MR. KEALEY: We will stay with this until we
2   get the answer.
3   MR. BYLER: I would instruct him not to
4   provide any privileged communications between the
5   attorney and client. And your question, as I heard
6   it, fairly does invade that attorney/client
7   privilege.
8   MR. KEALEY: Asking this witness whether he's
9   asserting advice of counsel is not an invasion of
10   the attorney/client privilege. He can tell me no
11   or yes, and that's all I'm asking for.
12       If you do not permit your client to answer
13   this question, I will call the magistrate. Are you
14   instructing your client not to answer the question?
15   MR. BYLER: State the question specifically or
16   have the record read, please.
17           (The last question was read.)
18   MR. BYLER: I think you are invading the
19   attorney/client privilege with that question
20   because an answer will presumably disclose what the
21   communication was. But I will allow the witness to
22   answer in terms of what -- I'm trying to balance
23   here. Go ahead and answer the question.
24  A  Would you repeat it one more time, please?
25  Q  Are you asserting that advice of your lawyer

Page 152

1   entitles you to refuse to execute a medical
2   authorization for Family Concern Counseling?
3        MR. BYLER:  That's a different question and
4   that is invading attorney/client privilege.  Why
5   don't you the read record in terms of the question
6   I heard and decided to let him to answer that
7   question?
8        MR. KEALEY:  I'm going to voir dire you.
9        MR. BYLER:  What?
10        MR. KEALEY:  I'm going to voir dire you.  Are
11   you asserting in this case --
12        MR. BYLER:  No, I'm not going to do a voir
13   dire here, sir.  You are asking questions --
14        MR. KEALEY:  You need to let me finish.  Are
15   you asserting in this case that your client is
16   refusing --
17        MR. BYLER:  You are directing your answers --
18   or your questions to the witness.  And what I have
19   objected to are questions that sound like they're
20   invading the attorney/client privilege.
21        MR. KEALEY:  And I'm entitled to voir dire
22   that.  If you assert --
23        MR. BYLER:  No, no, you're not entitled to
24   voir dire that.
25        MR. KEALEY:  Yes.  If you tell a witness not

Page 153

1 to answer a question, I'm entitled to voir dire you
2 on that instruction. You know that and I know
3 that.
4     MR. BYLER: Excuse me, I allowed him to go
5 ahead and answer a question which was reread. You
6 then reformulated it.
7     MR. KEALEY: He asked me to repeat it.
8     MR. BYLER: Well, no, but you didn't repeat
9 it.
10     MR. KEALEY: That's your view.
11     THE WITNESS: You did not repeat the question?
12     MR. KEALEY: Tell me what question you'd like
13 to answer, sir.
14     THE WITNESS: I'd like to hear the first
15 question repeated exactly as it was said the first
16 time.
17     MR. KEALEY: Please go back ten minutes and
18 read the last ten minutes of dialogue.
19     (The testimony was read.)
20     MR. BYLER: That's the question I said you
21 could answer.
22 A   For an authorization request, yes.
23 Q   You are asserting that advice of counsel justifies
24     your refusal to execute the authorization?
25 A   As I understood, there is no court order for the

Page 154

1       authorization.
2   Q   I'm not asking about a court order.  I'm asking
3       about advice of your lawyer.
4           MR. BYLER:  Well, that's the problem, you're
5       asking for my advice and that's attorney/client
6       privilege and that's why I interceded.  Now, I've
7       allowed him to ask -- answer the question you
8       posed, and you're trying to twist into getting
9       attorney/client privileged information, which quite
10      frankly is beyond the pale.  Why don't you ask more
11      questions of this witness?
12  BY MR. KEALEY:
13  Q   Are you asserting in this case that any legal rule
14      entitles you to refuse to execute a medical
15      authorization for Family Concern Counseling?
16          MR. BYLER:  Objection to form.
17  A   Yes.
18  Q   What is the legal rule?
19  A   The legal rule, I don't know.
20  Q   Then why did you answer yes?
21  A   Because I trust my lawyer's judgment.
22  Q   So your refusal to execute a medical authorization
23      for Family Concern Counseling is based on advice of
24      counsel?
25          MR. BYLER:  Objection, misstates the

1   testimony.  He gave full testimony about this
2   before, asked and answered.
3  A   Could you rephrase the question, please?
4  Q   No, I cannot.  That's the question.
5  A   Can you repeat the question?
6  Q   I'll have it read back.
7          (The last question was read.)
8  A   Counsel referring to him?
9  Q   Mr. Byler, yes.
10 A   It's not based solely on his counsel.
11 Q   On whose counsel is the advice of counsel?
12      MR. BYLER:  Is there a question pending?
13   Objection to form, then.
14 A   I spoke with Phil.  I spoke with my parents.  They
15   don't have legal experience.  And then I spoke with
16   my aunt as well.
17 Q   Any other advice of counsel besides Mr. Byler
18   and --
19 A   Cunningham.
20 Q   -- Ms. Cunningham?
21 A   Not to my recollection.
22 Q   Have you discussed your pornography addiction with
23   Counselor Perry?
24 A   It's not something I'm going to answer.
25 Q   On what basis are you refusing to answer?

Page 191

1  Q   I asked earlier about Facebook messenger.  Did you
2      use any other kind of texting apps such what's up
3      or other cloud tools like Snapchat to communicate
4      with each other?
5  A   I think Snapchat would have been the only one.
6  Q   Is there any other form of medium of communication
7      that you used with [redacted] that I haven't
8      asked about?
9  A   Not to my recollection.
10 Q   You have produced documents in this case that seem
11     to indicate that you have not worked since 2018; am
12     I understanding that correctly?
13 A   Yes, sir.
14 Q   Why haven't you worked since 2018?
15 A   For most of the -- for all of 2018 and some of
16     2019, I had very serve anxiety and had trouble
17     doing menial tasks due to the anxiety.  And as 2018
18     went on, I improved via counseling, and I improved
19     to a point where I could work.
20         And I would say the point at which I think I
21     could hopefully work was halfway through last year.
22     So I started doing like, not a regular job, but I
23     started doing more tasks and went off jobs.  I got
24     a lot of them through my mom or dad.
25         And it was like a ways to sort of work myself