# Exhibit A

Page 1

1              UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF INDIANA
2                   HAMMOND DIVISION
3
4      JOHN DOE,                    )
                                    )
5           Plaintiff,              )  CIVIL ACTION NUMBER
                                    )  2:17-cv-33-JPK
6           vs.                     )
                                    )
7      PURDUE UNIVERSITY, PURDUE    )
       UNIVERSITY BOARD OF          )
8      TRUSTEES, MITCHELL ELIAS     )
       DANIELS, JR., in his         )
9      official capacity as         )
       President of Purdue          )
10     University, ALYSA            )
       CHRISTMAS ROLLOCK, in her    )
11     official capacity at         )
       Purdue University,           )
12     KATHERINE SERMERSHEIM, in    )
       her official capacity at     )
13     Purdue University,           )
                                    )
14          Defendants.             )
15
16
17        VIDEOCONFERENCE DEPOSITION OF RODNEY HUTTON
18
19       The deposition upon oral examination of
       RODNEY HUTTON, a witness produced and sworn before me,
20     Megan M. Bowman, Notary Public in and for the County of
       Marion, State of Indiana, taken on behalf of the
21     Defendants, at the offices of Stuart & Branigin LLP,
       300 Main Street, Lafayette, Tippecanoe County, Indiana,
22     on Wednesday, May 20, 2020, scheduled to commence at
       8:30 a.m., pursuant to the Federal Rules of Civil
23     Procedure with written notice as to time and place
       thereof.
24
25

Page 2

```
 1            A P P E A R A N C E S
 2 FOR THE PLAINTIFF:
 3      Philip A  Byler
        NESENOFF & MILTENBERG LLP
 4      363 Seventh Avenue
        Fifth Floor
 5      New York, NY 10001
        212 736 4500
 6      pbyler@nmllplaw com
 7
   FOR THE DEFENDANT(S):
 8
        Tyler L  Jones
 9      William P  Kealey
        STUART & BRANIGIN LLP
10      300 Main Street
        Suite 900
11      P O  Box 1010
        Lafayette, IN 47902-1010
12      765 423 1561
        tlj@stuartlaw com
13      wpk@stuartlaw com
14
   FOR THE U S NAVY:
15
        John Matuszak
16      U S NAVY - NAVAL SERVICE TRAINING COMMAND
        2601 A Paul Jones Street
17      Building 1
        Great Lakes, IL 60088-2845
18      847 707 5057
        john matuszak@navy mil
19
20
21
22
23
24
25
```

Page 3

```
 1       INDEX OF EXAMINATION
 2
 3   Direct Examination          4
     Questions By Tyler L  Jones
     Cross-Examination           66
 4   Questions By Philip A  Byler
 5
        INDEX OF EXHIBITS
 6
 7 Deposition Exhibit No :
 8 Exhibit  1 - Fact witness approval        7
 9
10 Defendant's Exhibit No :
   Exhibit A  - Letter from Redlawsk to CO,  18
11     6/14/16
   Exhibit B  - Placement of Academic Warning   25
12     letter from Rodney Hutton to
        , 1/15/16
13 Exhibit C  - Notification of Interim Leave of  29
       Absence letter from Rodney
14     Hutton to        ,
       5/20/16
15 Exhibit D  - Scholarship contract       32
   Exhibit E  - Fitness Report & Counseling   36
16     Record
   Exhibit F  - Notification of Performance  46
17     Review Board 6/16/16
   Exhibit G  - PRB Summary & Recommendation,   49
18     8/10/16
   Exhibit H  - Appointment Termination   56
19     Disenrollment Authorization
   Exhibit I  - NROTC Student Disenrollment  52
20     Recommendation
   Exhibit L  - NROTC Concept of Honor    61
21 Exhibit M  - Subject: Thoughts on MIDN 4/C   63
        , NSTC-0184
22
23 Previously marked Exhibit No :
24 Exhibit  I  - Letter discharging        r   64
        , 8/20/16
25
```

Page 4

```
 1 (Time noted: 8:36 a m.)
 2         RODNEY HUTTON,
 3 having been duly sworn to tell the truth, the whole
 4 truth, and nothing but the truth relating to said
 5 matter, was examined and testified as follows:
 6
 7 DIRECT EXAMINATION
 8     QUESTIONS BY TYLER L. JONES:
 9 Q   Good morning, sir.
10 A   Good morning.
11 Q   My name's Tyler Jones.  I work for Stuart &
12     Branigin.  My partner Bill Kealey is also here.  We
13     represent the defendants Purdue University and
14     several other individually named parties.
15       For the record, could you please state your
16     full name?
17 A   My name is Rodney Earl Hutton.
18 Q   Thank you.  And how would you like me to address
19     you?
20 A   Rod is fine.
21 Q   Okay.  Thank you.  Have you ever given a deposition
22     before?
23 A   No.
24 Q   Rod, I'm just going to go over some basic ground
25     rules so that this goes as easily as possible.  A
```

Page 5

```
 1 deposition is basically -- I'm sure you've talked
 2 to your attorney about it.  It's just the chance
 3 for parties to ask you questions.
 4    I'd ask that you give me "yeses" or "noes" as
 5 opposed to head shakes or head nods so that when
 6 the court reporter, who's making a record of
 7 everything, is typing it down as clear what you're
 8 saying.
 9 A  I understand.
10 Q  Thank you.  I'd ask especially because we're doing
11 this remotely that we not interrupt each other.
12 I'm going to try my darndest to let you say your
13 answer even though I may know what you're going to
14 say.  I'd ask similarly that you let me finish my
15 question even if you know where -- what I'm going
16 with it.
17    Is that fair?
18 A  I understand.
19 Q  Thank you.  I'm going to assume that you understood
20 a question if you answer, but if you don't
21 understand a question, I ask you let me know so I
22 can rephrase it or make it more clear.
23    Is that fair?
24 A  I understand.
25 Q  Thank you.  Similarly, this is not a prison.  If
```

2 (Pages 2 - 5)

Page 6

1    you need a bathroom break, please let me know, and
2    we'll open it up so you can relieve yourself.
3 A   Thank you.
4 Q   And then, again, this case is proceeding under
5    pseudonym, so I ask that you not reveal the
6    identities of the individuals we talk about today.
7    Nevertheless, we are here for a matter called
8    John Doe v. Purdue, et al. We're going to be
9    discussing two individuals in particular. One,
10    ▮▮▮▮▮▮▮▮ and one, ▮▮▮▮▮▮▮▮.
11    I'd ask that you just confirm that you won't
12    disclose their identity absent a court order.
13 A   Are you saying outside of this or during --
14    recognizing that you just used their names?
15 Q   Correct, yes. Everything that is said in here is
16    confidential.
17 A   I understand.
18 Q   Thank you, sir. Just some background, if I
19    reference the time in question to this lawsuit, I'm
20    referring to August 2015 to August 2016.
21    Is that fair?
22 A   Yes.
23 Q   Okay. Thank you. For the record, can you please
24    state your position and title at the time in
25    question?

Page 7

1    MR. MATUSZAK: Mr. Jones, before you begin, can
2    we also admit the letter approving -- a Navy letter
3    approving this deposition?
4    MR. JONES: Yes. And I apologize, John. Go
5    ahead.
6    MR. MATUSZAK: I'd like to admit as Exhibit 1
7    the letter approving this Navy's -- that this --
8    I'm sorry. I admit as Exhibit 1 the letter from
9    the Navy approving this deposition.
10    (Deposition Exhibit 1 was marked for
11    identification.)
12    MR. JONES: Anything else you need to put into
13    the record, John?
14    MR. MATUSZAK: I'm sorry?
15    MR. JONES: Is there anything else you need to
16    put into the record?
17    MR. MATUSZAK: No, that's all right now.
18    MR. JONES: Thank you.
19 BY MR. JONES:
20 Q   Rod, for the record, during the time in question
21    with the Purdue NROTC, can you please state your
22    position and title?
23 A   Commanding Officer Purdue Navy ROTC.
24 Q   Thank you. What's a good mailing address for you,
25    sir?

Page 8

1 A   2129 Sunrise Avenue, Lafayette, Indiana, 47904.
2 Q   Thank you, sir. Is there a good contact email for
3    you?
4 A   H-U-T-T-O-N-R-E- @yahoo.com
5 Q   Thank you, sir. Very briefly, can you give me your
6    educational background?
7 A   I have a bachelor's degree from the University of
8    Minnesota. Master's degrees from the Naval
9    Postgraduate School and Faith Bible Seminary.
10 Q   Thank you, sir. And what is the year of your
11    graduating with a bachelor's degree?
12 A   1988.
13 Q   Thank you, sir. Can you tell me -- you said you
14    were the commanding officer during the time in
15    question?
16 A   Yes.
17 Q   What were your responsibilities as the commanding
18    officer?
19 A   I held overall responsibility for oversight and
20    training of staff and midshipmen.
21 Q   For the Purdue NROTC?
22 A   For Purdue NROTC.
23 Q   Okay. Did that responsibility branch out over any
24    other universities or NROTC units?
25 A   No.

Page 9

1 Q   Okay. Thank you. How long have you served with
2    the military in some capacity?
3 A   I served 30 years.
4 Q   Thank you, sir. And is it correct to say that
5    you've retired?
6 A   Yes.
7 Q   And what are you currently doing?
8 A   I am the pastor of Northend Community Ministries
9    with Faith Church in Lafayette, Indiana.
10 Q   Thank you, sir. Can you, for the record, explain
11    to folks like me who haven't been in the military
12    what the command structure is like at the Purdue
13    NROTC starting with yourself?
14 A   Purdue NROTC is set up with a single commanding
15    officer. He -- I had one executive officer and
16    several staff members representing -- providing the
17    training of the students.
18 Q   Understood, sir. And at the time in question, who
19    was immediately beneath you or subordinate to you?
20 A   My executive officer was Craig Remaly.
21 Q   Thank you, sir. During the time in question, what
22    rules of conduct were midshipmen required to adhere
23    to in the NROTC?
24 A   Can you be more specific? As that is a very broad
25    question.

3 (Pages 6 - 9)

Page 10

1  Q  Sure. Is there a set of rules or regulations that
2     midshipmen are directed to abide by when they are
3     in the Navy ROTC or were -- or when they were in
4     the Navy ROTC at the time in question?
5  A  Yes. There is a set of rules in conduct.
6  Q  What is the name of that, if you recall?
7  A  I don't recall specifically.
8  Q  Okay. Thank you. Were midshipmen also bound by
9     Naval rules and regulations or just NROTC rules and
10    regulations?
11       MR. MATUSZAK: I'm going to object to the
12    question. The ROTC regulations would be Navy rules
13    because legally it wouldn't make sense to have a --
14    you know, there's no separate rules for NROTC
15    program outside Navy regulation. So if you could
16    clarify what you're looking for there.
17       What I could offer to you that there's a set of
18    rules called the "Regulation of Officer
19    Development." That might be what you're looking
20    at.
21       MR. JONES: Okay.
22  BY MR. JONES:
23  Q  Well, we can come back to that.
24       Can you generally, Rod, explain to me how the
25    process works for a midshipman to enlist in the

Page 11

1     Navy after they graduate from Purdue University at
2     the time in question?
3  A  Are we speaking about the time entering into the
4     ROTC program or exiting the ROTC --
5        MR. MATUSZAK: I have to object.
6  A  -- program into the Navy?
7        MR. MATUSZAK: Yeah, I have to object to the
8     question. The graduate end of the NROTC program
9     would not be enlisted into the Navy. They would be
10    commissioned officers. There's a difference.
11  Q  Okay. After students at Purdue who are enrolled in
12    the NROTC program graduate, what are their options
13    for entering the military as a commissioned
14    officer?
15  A  Upon completion of all requirements of the NROTC
16    program, a student would be commissioned into the
17    Naval or Marine Corps Service as an officer.
18  Q  At what rank, sir?
19  A  That would be at the rank of ensign in the Navy.
20  Q  Thank you, sir. And when a midshipman -- and when
21    -- or when a midshipman joins the program initially
22    upon entering into a university, do they join at
23    the rank of Midshipman Forth Class?
24  A  Yes.
25  Q  Thank you. Earlier you confirmed that there are

Page 12

1     rules in place for midshipmen at the NROTC. Do
2     those same rules also apply to officers who are
3     subordinate to you in the NROTC unit?
4  A  The standards of ethical conduct are the same.
5  Q  Thank you. At the time in question, was there an
6     academic requirement for successfully completing
7     the NROTC program at Purdue as far as a GPA
8     requirement?
9  A  Yes.
10  Q  What was that, if you know?
11  A  I believe that it was 2.5.
12  Q  Cumulative?
13  A  There is a semester and cumulative requirement.
14  Q  Understood. And is it your understanding that the
15    GPA per semester and cumulatively needed to be
16    above 2.5?
17  A  I do not specifically recall the relation on
18    cumulative. In regards to semester, 2.5 was the
19    minimum.
20  Q  Thank you, sir. Sir, at the time in question, what
21    was the process in place for disenrolling a NROTC
22    midshipman from the program?
23  A  Let me ask: That question includes a broad
24    spectrum based on the reason for disenrollment.
25  Q  Okay.

Page 13

1  A  Can you be more specific?
2  Q  Okay. Assuming a student at the time in question
3     was alleged to have sexually assaulted or harassed
4     another midshipman, what procedures were in place
5     at that time for disenrolling a midshipman?
6  A  A procedure or process for an alleged violation as
7     described would require a process walking through
8     to include investigation, review boards, and
9     determinations, and review as part of
10    disenrollment.
11  Q  Thank you. And when you say "review board," do you
12    mean a public review board?
13  A  Specifically the review board is -- would be
14    described as a "performance review board." I would
15    not describe it as "public," but I also would not
16    describe it as a "closed."
17  Q  Fair enough. Thank you, sir. And you mentioned an
18    investigation. What did you mean by an
19    investigation?
20  A  Do you want me to speak about this specific event
21    or --
22  Q  We can get into that later. I just didn't know if
23    there was a -- when you say "investigation," if you
24    meant to a Purdue investigation or a university
25    investigation or a military investigation.

4 (Pages 10 - 13)

Page 14

1 A    In this case -- or in the described scenario that
2    you mentioned, based on my dual requirements as a
3    -- as under Purdue University Title IX
4    requirements, that investigation was referred to
5    Purdue University.
6 Q    Okay. Thank you. Are you familiar with someone by
7    the name of Craig Remaly -- or Remaly?
8 A    Yes.
9 Q    Who was he -- or who is he?
10 A    He was my executive officer.
11 Q    Thank you. As executive officer, what were his
12    responsibilities during the time in question?
13 A    As executive officer, he was responsible to me for
14    oversight and training of staff and midshipmen.
15 Q    Are you familiar with someone by the name of Megan
16    Redlawsk or perhaps Megan Chester?
17 A    Yes.
18 Q    Who is she?
19 A    She was in a staff lieutenant position.
20 Q    With the Purdue NROTC?
21 A    Yes.
22 Q    Do you know what her responsibilities would have
23    been during the time in question?
24 A    During the time in question, she was a company
25    officer responsible to me for a training of a

Page 15

1    portion of the midshipmen and as an instructor.
2 Q    Thank you. Are you familiar with someone by the
3    name of Adam Sheppard?
4 A    Yes.
5 Q    Who is he?
6 A    Adam was also a staff lieutenant.
7 Q    Would he have had the same responsibilities as
8    Megan?
9 A    At this time, Adam was assigned as the battalion
10    officer.
11       Do you want to know those responsibilities as
12    well?
13 Q    Yes, sir.
14 A    His responsibilities were for the training of the
15    midshipmen battalion leadership.
16 Q    Are midshipmen divided into battalions?
17 A    Purdue University, all midshipmen are in one
18    battalion, separated into four companies.
19 Q    Understood. So there's a single battalion at
20    Purdue University and then that battalion has four
21    subsets? Is that --
22 A    Yes.
23 Q    Thank you. Are those four companies further
24    divided into anything else?
25 A    Yes. They -- within, they would be divided into

Page 16

1    platoons and squads.
2 Q    Understood. To your best of your recollection, how
3    many midshipmen would be in a platoon or a squad at
4    the time?
5 A    I do not recall.
6 Q    Thank you. Are you familiar with someone by the
7    name of Kyle Willstatter?
8 A    Yes.
9 Q    Who is he?
10 A    Kyle was a staff lieutenant in the role of company
11    officer.
12 Q    Thank you. Would he have had the same
13    responsibilities as Megan?
14 A    Yes.
15 Q    Thank you. During the time in question, did the
16    NROTC at Purdue have rules against midshipmen
17    sexually harassing or sexually assaulting another
18    midshipman?
19 A    Yes.
20 Q    Do you know the name of those rules?
21 A    I don't recall specifically.
22 Q    If the NROTC received, during the time in question,
23    an allegation that one midshipman had sexually
24    assaulted another, are they obligated to forward
25    that to the university?

Page 17

1 A    Yes.
2 Q    If the allegations as described, one midshipman
3    sexually assaulting or harassing another are
4    substantiated whether by the NROTC or Purdue, what
5    are potential consequences that they might face
6    from the NROTC?
7       MR. BYLER: Objection to the form. You're
8    including some possibilities that I don't think
9    conform thus far to the witness's testimony.
10       MR. MATUSZAK: I'm going to object too. It
11    calls for a legal conclusion. The witness is not
12    here to provide legal testimony or a legal opinion.
13       MR. JONES: Well, my question was merely asking
14    if that midshipman would ultimately face
15    consequences from the NROT (sic) such as
16    disenrollment or other such things. I can clarify
17    it out though a little bit later on. That's fine.
18       MR. MATUSZAK: That's a hypothetical question.
19    You really can't address hypothetical questions
20    here.
21       MR. JONES: Well, I'll rephrase it here in a
22    little bit.
23 BY MR. JONES:
24 Q    I direct everyone to what's marked as Exhibit A.
25    It's -- the Bates number for everyone's reference

5 (Pages 14 - 17)

Connor Reporting
A Veritext Company                    800-554-3376

Page 18

1  in the first page should be NSTC-0168. I'll give
2  everyone a chance to get that open if they don't
3  have it already.
4       (Defendant's Exhibit A was marked
5  for identification.)
6       MR. BYLER: Tyler, is this NSTC-168 through
7  NSTC-184? Because that's what I have at my end.
8       MR. JONES: Phil, this should be NSTC-0168
9  through NSTC-195.
10      MR. BYLER: Okay, -195. Thank you.
11      MR. JONES: I'm assuming that everyone has this
12  document or has the ability to open it.
13 BY MR. JONES:
14 Q   Rod, have you had an chance to inspect this
15     document?
16 A   Briefly.
17 Q   Okay. Are you familiar with this document?
18 A   I am.
19 Q   Can you please identify the document for the
20     record?
21 A   The subject line is "Preliminary Inquiry
22     Recommendations Surrounding Allegation of Sexual
23     Assault Made Against Midshipman Fourth Class
24     ██████████."
25 Q   And this is addressed to Commanding Officer of

Page 19

1  Naval Reserve Officers Training Corps Unit, Purdue
2  University.
3       At that time, would that have been you or
4  Commander Remaly?
5  A   That was me.
6  Q   Okay. So you have seen this document prior to
7     today?
8  A   I have.
9  Q   Okay. Sir, can you explain to me, if you know, why
10    this document was created?
11 A   Lieutenant Redlawsk was assigned as a preliminary
12    inquiry officer. And this is her report back to me
13    on her actions.
14 Q   Thank you. What is a "preliminary inquiry
15    officer"?
16 A   The preliminary inquiry officer is the individual
17    assigned by the commanding officer to look into the
18    facts associated with an allegation.
19 Q   Okay. Would this be an allegation that's raised to
20    the NROTC or an allegation that's raised to the
21    university?
22 A   Specifically to the NROTC.
23 Q   Thank you. To the best of your knowledge, was this
24    document, Exhibit A in front of you, drafted
25    because ██████ alleged that ██████

Page 20

1  sexually assaulted her among other things?
2  A   Yes.
3  Q   To the best of your knowledge, did Megan Redlawsk
4     investigate whether or not ██████ sexually
5     assaulted, among other things, ██████?
6       MR. BYLER: Objection to form. Striking
7     ambiguous. The word "investigate" can mean very
8     different things and the witness has already
9     testified that the -- this case was referred to --
10      MR. JONES: All you need to say is object to
11    form, Phil. That's all you need to say. Your
12    objection's been preserved.
13 A   I would like to ask: Are you asking what actions
14    did Lieutenant Redlawsk take to investigate?
15 Q   Sure. We can start there.
16 A   I directed her to utilize the university
17    investigation for determinations of what occurred.
18 Q   Did you order her to make an independent
19    determination whether or not this had occurred?
20    And by "this" I mean, the allegations raised by
21    ██████.
22 A   No.
23 Q   What did you -- I'll rephrase.
24      Do you see in paragraph 2 in front of you, sir,
25    at the very end, it says, "Conduct -- Section 3-19:

Page 21

1  Conduct/Aptitude Standards of Midshipman
2  Performance, subsection 2.a Major Offenses, item
3  (11) Sexual harassment/assault"?
4  A   I see that.
5  Q   Earlier you had said you could not remember the
6     names of some of the particular rules. Would this
7     have been one of the rules that would've applied to
8     ██████ during the time in question?
9  A   Yes.
10 Q   Why did you direct Lieutenant Redlawsk to use the
11    university investigation?
12 A   Based on our dual reporting requirements with the
13    university and the Navy.
14 Q   When you say "dual reporting requirements," for the
15    record, can you explain what you mean?
16 A   As an -- I believe the correct terminology is
17    "associate professor." I had Title IX reporting
18    responsibilities in addition to my Naval reporting
19    responsibilities.
20 Q   So if I understand you right, you are stating that
21    you had an obligation to notify both Purdue and the
22    Navy of the allegations; is that correct?
23 A   Yes.
24 Q   Okay. What did you do when you got this report?
25    Did you take any action?

6 (Pages 18 - 21)

Page 22

1  A    Are you speaking specifically of the report Exhibit
2       A in front of me?
3  Q    Yes, sir.
4  A    Based on this, I reviewed all elements of the
5       report, reviewed Naval requirements, and carried
6       out the Naval requirements.
7  Q    What Naval requirements did you carry out?
8  A    The disenrollment of the student.
9  Q    And I don't want to mischaracterize your testimony.
10      I just want clarification.
11         When you say you disenrolled the student, you
12      mean you disenrolled him because you determined
13      that he sexually harassed and assaulted ████████
14      ████████?
15 A    No.
16 Q    What do you mean then?
17 A    Because the student was suspended from the
18      university upon completion of that process, the
19      NROTC requirements required that I disenroll the
20      student from the program.
21 Q    Okay.  My question, Mr. Hutton, if you were going
22      to disenroll Mr. ████ for being less than a
23      full-time student at Purdue, why did you have
24      Lieutenant Redlawsk look into the allegations of
25      ████████████?

Page 23

1         MR. BYLER:  Objection to form.
2  Q    You can answer.
3  A    The initial inquiry and investigation was based on
4       the reports made to me.  The actions taken as a
5       result were based on the student's status.
6  Q    At Purdue -- well, let me come back to that in a
7       little bit.
8         Under NROTC rules at the time, including the
9       rule I identified to you here in paragraph 2, is it
10      correct that Midshipman ████ could be disenrolled
11      from Purdue if these charges were substantiated by
12      the NROTC?
13        MR. BYLER:  Objection to form.
14        MR. MATUSZAK:  Objection.  It's -- object to
15      the question.  You asked whether he could be
16      disenrolled from it too.  He's here to speak about
17      the Navy's involvement -- I'm sorry -- about
18      Mr. ████'s participation in the program, not
19      whether he can be disenrolled from Purdue.
20        MR. JONES:  And that was a misspoke -- misspeak
21      on my part.  I meant, disenrolled from the NROTC.
22        MR. MATUSZAK:  Can you please repeat the
23      question?
24 BY MR. JONES:
25 Q    Is it correct that under rule Section 3-19:

Page 24

1       Conduct/Aptitude Standards of Midshipman
2       Performance, subsection 2.a Major Offenses, Item
3       (11) Sexual harassment/assault, during the time in
4       question, that a midshipman could be removed from
5       the NROTC for sexually assaulting or harassing
6       another midshipman?
7  A    Are you asking me --
8         MR. BYLER:  Object -- what's the question?
9  A    -- if the Navy found the allegation?
10 Q    Let's not talk over each other.  Can you please
11      repeat your question, Mr. Hutton?
12 A    I'm asking:  Are you asking me specific to
13      Mr. ████, or are you asking me a hypothetical
14      question about guilt -- a guilty party -- or a
15      party found guilty?
16 Q    I'm asking you as to Mr. ████.
17 A    I cannot speculate because I did not make a
18      determination in that specific case.
19 Q    Okay.  Are you familiar with the concept called
20      "academic warning" during the time in question?
21 A    In regards to the Naval ROTC program?
22 Q    Correct.
23 A    Yes.
24 Q    What does that mean, "academic warning"?
25 A    Based on a student's academics and their status in

Page 25

1       regards to academic standards, the unit had a
2       process of providing students additional assistance
3       and a warning in order -- when they were below the
4       standard in order to assist with regaining that
5       standard.
6  Q    When you say "the standard," do you mean NROTC
7       standard?
8  A    Yes.
9  Q    You said "additional assistance."  What additional
10      assistance would be provided?
11 A    Assistance would include formal study requirements,
12      meeting with staff personnel or others as deemed
13      appropriate and necessary.
14 Q    Thank you.  I would ask everyone to look at Exhibit
15      B.
16        (Defendant's Exhibit B was marked for
17      identification.)
18 Q    For identification purposes, the subject line is
19      "Placement on Academic Warning."  It is Bates
20      number NSTC-0156 through -0157.  I'll give everyone
21      a moment to open to that and turn to it.  And,
22      Mr. Hutton, please take a moment to review it if
23      you haven't already.
24        Have you had a moment to review it?
25 A    Yes.

7 (Pages 22 - 25)

Page 26

1 Q  Sir, have you seen this document before?
2 A  Yes.
3 Q  Are you familiar with it?
4 A  Yes.
5 Q  Can you please identify it for the record?
6 A  It is a letter signed by me placing Midshipman
7     Forth Class ████████ on academic warning.
8 Q  And the attached page, the second page, what is
9     that?
10 A  The second page is the student acknowledgement.
11 Q  Meaning that he received it and -- he received the
12    placement on academic warning notice; correct?
13 A  Yes.
14 Q  Why did you issue this letter?
15 A  As stated in paragraph 1(A), the student failed to
16    meet the minimum program semester GPA standard of
17    2.5, based on a 2.47 GPA in the fall of 2015.
18 Q  Okay.  And I note here in paragraph 2, it lists out
19    several terms of his academic warning.  When you
20    were describing earlier additional academic
21    assistance, is this what you were referring to?
22 A  Yes.
23 Q  What is super -- what is "supervised study"?
24 A  Supervised study were times requiring a student to
25    study with oversight.

Page 27

1 Q  Would that be with a lieutenant or with a higher
2     ranking midshipman?
3 A  Generally with a higher ranking midshipman or a
4     tutor provided by the NROTC program.
5 Q  Thank you, sir.  And if you know, does the GPA
6     requirement, is that solely for a student's major
7     or is it for all of their classes including Naval
8     science classes?
9 A  It applied to their full-semester GPA.
10 Q  Thank you, sir.  Do you know who ████████'s
11    company officer was at the time this letter was
12    issued?
13 A  I do not recall.
14 Q  What did you mean when you said -- or when the
15    letter says, "Meet all applicable program standards
16    by the end of the Spring of 2016 semester."
17       What does the phrase "all applicable program
18    standards" refer to?
19 A  That would be restoring his GPA for the semester
20    and cumulative above the program standards.
21 Q  It says in paragraph 3, for the record, "Failure to
22    make academic progress is cause for convening a
23    Performance Review Board with disenrollment a
24    possible outcome.  Meeting NROTC standards will
25    remove you from this status."

Page 28

1     Is that all correct?
2 A  Yes.
3 Q  And by "correct," I don't mean if I read it
4     correctly.  I'm merely asking:  Is that accurate
5     that at the time if there was a failure to make
6     academic progress, a Performance Review Board would
7     be convened with disenrollment as a possible
8     outcome?
9 A  Yes.
10 Q  Thank you.  For the record, can you explain what a
11    "leave of absence" is from the NROTC?
12 A  A leave of absence from the NROTC program results
13    in a suspension of student benefits.  Specifically
14    payment of tuition and fees.
15 Q  And an "interim leave of absence," would that be
16    the same thing except that it's on a limited basis?
17 A  The interim leave of absence would have been
18    established at a time while the continued
19    Performance Review Board process was being carried
20    out to make a final determination.
21 Q  I see.  So it's from the time a Performance Review
22    Board has been instituted or noticed until that
23    date that is when an inter -- an ILOA would be
24    issued.
25       Is that accurate?

Page 29

1 A  At the discretion of the commanding officer.
2 Q  Thank you.  Sir, I would have you go to Exhibit C.
3       (Defendant's Exhibit C was marked for
4     identification.)
5 Q  And for everyone's record, identification purposes,
6     this should say "Notification of Interim Leave of
7     Absence," in the subject line.  It is Bates number
8     NSTC-0152 through NSTC-0153.
9       Mr. Hutton, would you please review this while
10    everyone else is getting it open?
11 A  Yes.
12 Q  Thank you.
13       Have you had a moment to review it, sir?
14 A  I have.
15 Q  Are you familiar with this document?
16 A  I am.
17 Q  Can you please identify it for the record?
18 A  It is a letter from me as the commanding officer to
19    Midshipman Third Class ████████ notification
20    of interim leave of absence.
21 Q  Thank you, sir.  And, sir, just for identification
22    purposes, the second page, can you please identify
23    that as well?
24 A  The second page is the student acknowledgement from
25    Midshipman ████ to me acknowledging he's being

8 (Pages 26 - 29)

Page 30

1    placed on interim leave of absence.
2 Q  So basically just saying he got your letter?
3 A  Yes.
4 Q  Was Midshipman ███, in fact, placed on interim
5    leave of absence on May 20, 2016?
6 A  Yes.
7 Q  At that time, were his tuitions and -- let me
8    rephrase the question.
9       At that time pending the result of the
10   Performance Review Board for his academic benefits,
11   including tuition payment and fees by the NROTC
12   suspended?
13 A  Yes.
14 Q  And, sir, when the letter says, "You should plan to
15   pay tuition fees for the fall of 2016 semester," is
16   this because if the PRB determines that the GPA
17   requirements here were met that the student would
18   be responsibile for those academic benefits?
19 A  Yes.
20 Q  Thank, you.  Sir, I'll note that in line 3 -- and,
21   of course, that's redacted.  I'm not asking about
22   that redacted information.  What I do want to know,
23   why did you refer ██████ to A.P. Sheppard?
24 A  I do not recall specifically the connection between
25   the two.

Page 31

1 Q  And for the record, is A.P. Sheppard also Adam
2    Sheppard?
3 A  Yes.
4 Q  The Adam Sheppard you earlier identified in the
5    deposition?
6 A  Yes.
7 Q  Thank you.  Sir, are you aware of something called
8    "National Scholarship" for the NROTC?
9 A  Yes.
10 Q  What is the National Scholarship?
11 A  The National Scholarship is the program under which
12   a student applies for entry into the NROTC program,
13   which also pays for tuition fees and other
14   benefits.
15 Q  Understood.  Thank you.  Is that a scholarship that
16   goes to any NROTC midshipmen?
17 A  No.
18 Q  Does an applicant have to specifically apply and
19   qualify for that scholarship?
20 A  Yes.
21 Q  Do you know if ██████ had the National
22   Scholarship?
23 A  I believe so.
24 Q  Are the terms of that scholarship sent out by the
25   NROTC?

Page 32

1 A  The terms of the scholarship are sent out by the
2    Navy ROTC program above Purdue.
3 Q  Understood.  The national program you mean?
4 A  Yes.
5 Q  Referring to that then, I would direct everyone's
6    attention to Exhibit D.
7      (Defendant's Exhibit D was marked for
8    identification.)
9 Q  Of course, Rod, please take a moment to review this
10   while everyone's getting this open.
11      For the record, this is Bates number NSTC-0055
12   through NSTC-0060.
13 A  Ready.
14 Q  Have you had a moment to review this, sir?
15 A  Yes.
16 Q  Are you familiar with this document?
17 A  I am.
18 Q  Can you please identify this document for the
19   record?
20 A  This is form NSTC, Naval Service Training Command
21   1533/135.  It is the contract between the
22   Department of the Navy and the student receiving
23   this scholarship.
24 Q  And by the "scholarship," do you mean the National
25   Scholarship?

Page 33

1 A  Yes.
2 Q  Before we get into this, I would turn to the very
3    last page, sir.  Will you confirm if that is your
4    signature on the last page?
5 A  It is.
6 Q  And what's the date of that signature?
7 A  September 8, 2015.
8 Q  Thank you, sir.  Sir, I would have you briefly turn
9    to the second page.  This will be specifically
10   paragraph 3, subparagraph B.  It should say
11   "Continuing Eligibility for Scholarship Benefits."
12      Let me know when you've gotten there.
13 A  I'm there.
14 Q  Okay.  Sir, is it correct that to continue
15   receiving scholarship benefits in NROTC, for
16   specifically ██████ to continue receiving
17   scholarship benefits, had to be enrolled as a
18   full-time student at Purdue University?
19 A  Yes.
20 Q  Is it correct that he had to be in good standing
21   with Purdue University?
22 A  Yes.
23 Q  Is it correct that in order to maintain his
24   scholarship with NROTC, ██████ had to
25   remain qualified for military service as an officer

9 (Pages 30 - 33)

Page 34

1 in meeting all applicable requirements?
2 A   Yes.
3 Q   Is it also true that in order to be qualified for
4     the scholarship with the NROTC, ▮▮▮▮▮ had
5     to not be on a leave of absence from the NROTC and
6     remain in good standing with the unit and fulfill
7     all NROTC program requirements including those set
8     forth in the regulation?
9 A   Yes.
10 Q   Is it also correct that in order to maintain the
11     NROTC scholarship, a midshipman -- or specifically
12     ▮▮▮▮▮, had to be -- not be on a leave of
13     absence for the first 45 days of each academic
14     term?
15 A   Yes.
16 Q   Was that a "yes"?
17 A   Yes.
18 Q   I'm sorry. Sir, if we go back to paragraph B,
19     subparagraph 4 -- this is on page 2 of this
20     document -- when it says, "Remain qualified for
21     military service as an officer," what does that
22     mean, if you know?
23 A   Can you be more specific? That's a very broad
24     question.
25 Q   My question is merely, if you know, what does it

Page 35

1     mean to be qualified as a military service -- or a
2     military service as an officer?
3 A   To meet the requirements of the NROTC program as
4     set forth by Naval Service Training Command.
5 Q   Understood. And what you just said there, "Meet
6     the requirements of Naval Service Training
7     Command," to your knowledge is that what it means
8     when it says, "Meeting all applicable
9     requirements"?
10 A   Yes.
11 Q   Okay. What does it mean, if you know, to be in
12     good standing with the unit?
13 A   To meet all requirements.
14 Q   The same requirements you had just mentioned a
15     second ago?
16 A   Yes.
17 Q   Thank you. So we're done with that. Sir, do you
18     have any recollections of ▮▮▮▮▮?
19 A   Not detailed.
20 Q   Did you ever meet him?
21 A   Yes.
22 Q   Do you recall when you met him?
23 A   I would have met him as part of student orientation
24     when he entered the program.
25 Q   Would you have met with him -- or did you meet with

Page 36

1     him as a process of his disenrollment from the
2     NROTC?
3 A   Yes.
4 Q   Can you tell me why you would have met with him
5     prior to disenrolling him?
6 A   I would have met with him to inform him that we
7     were looking into the allegations in question.
8 Q   Do you recall if he said anything when you informed
9     him of that?
10 A   He did, but I cannot recall specifically what.
11 Q   Fair enough. Do you have any general recollection
12     of what he said?
13 A   No.
14 Q   Fair enough. Do you have any recollections of how
15     ▮▮▮▮▮ performed in the NROTC? And by
16     "performed," I'm referring to program requirements
17     in the NROTC.
18 A   Specifically based on the documents that we have
19     reviewed, he did not meet all requirements.
20 Q   Understood. I'd ask if you pull out Exhibit E
21     there.
22     (Defendant's Exhibit E was marked for
23     identification.)
24 Q   And for Counsel's record, this should be -- it's a
25     little -- it's a little cut at the Bates number,

Page 37

1     but it should be NSTC-0166 for everyone's
2     identification.
3     Rod, if you'd take a moment to review this at
4     your leisure.
5 A   Okay.
6 Q   Sir, are you familiar with this document?
7 A   I am.
8 Q   Have you ever seen this document before?
9 A   Yes.
10 Q   Can you please identify it for the record?
11 A   This is the second page of a fitness report and
12     counseling record.
13 Q   Can you explain to laypersons like me what a
14     fitness report and counseling record is?
15 A   This is the formal -- this is the formal counseling
16     record to indicate the performance of an
17     individual.
18 Q   You mean an individual in the NROTC?
19 A   Yes.
20 Q   And what do you mean by "performance"?
21 A   His status in meeting program requirements.
22 Q   Understood. Sir, is that your signature at the
23     very bottom of this?
24 A   It is.
25 Q   What's the date of your signature?

10 (Pages 34 - 37)

Connor Reporting
A Veritext Company

800-554-3376

Page 38

1  A    February 23rd, 2016.
2  Q    Thank you.  Sir, just for the record, does --
3       you'll see in the first boxes there's a little
4       check mark box that says, "NOB."
5           Does that mean "not observed"?
6  A    It does.
7  Q    Thank you.  Now, sir, you'll see obviously it looks
8       -- there's a -- there's a portion of this that's
9       blacked out.  I'm not going to ask you about that.
10      I am going to ask -- it says, "SGPA," and then,
11      "CGPA."
12          Do you see that?
13 A    Yes.
14 Q    What does "SGPA" mean?
15 A    Semester grade point average.
16 Q    What does "CGPA" mean?
17 A    Cumulative grade point average.
18 Q    Thank you, sir.  Sir, do you see immediately
19      underneath that it says, "Motivation and
20      initiative"?
21 A    Yes.
22 Q    Do you see where it says, "Very motivated, but has
23      had multiple problems with responding to commands
24      and showing up to PT and drill on time"?
25 A    Yes.

Page 39

1  Q    What does "PT" mean?
2  A    Physical training.
3  Q    What does physical training consist of?
4  A    It consists of group exercise multiple mornings of
5       the week.
6  Q    At the time in question, were you aware of problems
7       with ████ responding to commands and failing to
8       showing up to PT on time?
9           MR. BYLER:  Objection to form.
10 Q    You can answer.
11 A    I do not recall the specifics of, but my staff
12      maintained my awareness of student performance.
13 Q    And do you have any specific recollection of any of
14      your staff, whether it's Mr. Sheppard or -- and I
15      apologize if I'm getting the ranks wrong, but
16      Commander Remaly, Lieutenant Sheppard, Redlawsk, or
17      Willstatter informing you of any of these problems?
18 A    I do not recall.
19 Q    Understood, sir.  And then relatedly a little bit
20      down it has one that says, "Bearing:" -- colon.
21      What does "bearing" mean?
22 A    Military bearing.  His presence.
23 Q    For a layperson like me, can you explain what you
24      mean by that?
25 A    Professionalism.

Page 40

1  Q    How they conduct themselves; is that fair?
2  A    Yes.
3  Q    Does the Navy have standards on professionalism?
4  A    Yes.
5  Q    Are those the same standards NROTC has?
6  A    Yes.
7  Q    If you know, can you briefly state what those
8       standards are?
9  A    I'm unable to articulate that.
10 Q    Fair enough.  Immediately after that bearing, it
11      says quote, "Has had multiple issues with bearing
12      in professionalism."
13          Sir, did you write that?
14 A    No.
15 Q    Who wrote that?
16 A    That was provided by student leadership and staff.
17 Q    Understood.  Again, is this like earlier with
18      motivation and initiative where you would have been
19      kept informed, but you did not directly observe
20      anything related to this?
21 A    Yes.
22 Q    Understood.  A little bit further down it says,
23      "Midshipman ████'s performance could be improved in
24      the following areas."  And then it says,
25      "Academics, military bearing."

Page 41

1           Like above, do you have any recollection about
2       Mr. ████'s struggles with academic performance or
3       military bearing?
4           MR. BYLER:  Objection to form.
5  A    Specifically academics, as stated, his grade point
6       average did not -- semester GPA was below the
7       standard and military bearing as described.
8  Q    Thank you, sir.  I'll note one last thing on this
9       document, sir.  The very last paragraph, it starts
10      with, "To improve his performance."  I'll read it
11      and if you can just confirm a few things after
12      that.
13          It says, "To improve his performance next
14      semester, Midshipman ████ needs to:  Improve your
15      grades.  You need to meet academic standards.  Hold
16      yourself accountable and response to your chain's
17      attempts to mentor you."
18          Did I read that correctly?
19 A    Yes.
20 Q    What do you mean when you say "chain's attempts to
21      mentor you"?
22 A    That refers to the student leadership who was also
23      responsible for his training and his staff
24      lieutenant responsibile for his training.
25 Q    When you say "student leadership" -- you said it

11 (Pages 38 - 41)

Page 42

1  once or twice -- are you referring to
2  higher-ranking midshipmen?
3  A   Within the battalions there is a leadership
4  structure similar to a Navy chain of command.
5  Q   Could you describe that for me, please?
6  A   Within the student leadership there is a student
7  battalion commanding officer.  He has a staff to
8  include a battalion executive officer.  There are
9  student company commanders and company leaderships
10  down to the level of squad leader.
11  Q   Do you recall if ▮▮▮▮▮▮▮ held any of those
12  titles?
13  A   I do not recall.
14  Q   Thank you.  Do you recall who ▮▮▮▮▮▮▮'s
15  squad leader was at the time in question?
16  A   I do not recall.
17  Q   Thank you.  What do you mean when you say, "hold
18  yourself accountable"?
19  A   In counseling the student, we would have been
20  looking for the student to respond and demonstrate
21  change based on the feedback he had received.
22  Q   Thank you, sir.  The very last thing, you'll note
23  underneath your signature there are two little
24  boxes.  One says, "Member trait average:," and then
25  one says, "Summary group average:."

Page 43

1      Do you see those?
2  A   I do.
3  Q   What does "Member trait average" mean?
4  A   If you see at the -- the blocks at the top of this
5  form and what would have also been present on page
6  1, the member trade average is a -- is an average
7  of the blocks that are checked in each of those
8  specific performance traits.
9  Q   Understood, sir.  And what does "Summary group
10  average" mean?
11  A   That is the average of all students in a comparable
12  group.
13  Q   Understood.  And I apologize if it's not indicated
14  here, but does that 3.33 number refer to ▮▮▮▮▮
15  ▮▮'s?
16  A   Yes.
17  Q   Understood.  So the group's average was 3.85 and
18  Mr. ▮▮▮'s was 3.33 if I'm reading this correctly?
19  A   That's correct.
20  Q   Thank you.  During the time in question, did you
21  have any interactions with ▮▮▮▮▮▮▮?
22  A   Yes.
23  Q   What interactions did you have with her?
24  A   The same periodic interactions that I did with all
25  midshipmen, plus speaking with her at the time of

Page 44

1  -- that allegations were made.
2  Q   Do you recall -- and let me rephrase.
3      Did she specifically speak to you about her
4  allegations?
5  A   Yes.
6  Q   Do you recall what she said?
7  A   Not specifically.
8  Q   Is there anything you recall about that
9  conversation?
10  A   I could say that that conversation caused me to --
11  it was sufficient to cause me to investigate the
12  allegations made.
13  Q   By "investigate," do you mean what you assigned
14  Megan to do in the report we had earlier?
15  A   And reporting to the university.
16  Q   Understood.  And just so I understand what you just
17  said, are you telling me that you informed someone
18  to report this incident -- or this allegation to
19  Purdue University?
20  A   I do not recall if I made the report to -- the
21  Title IX report myself or I directed others.
22  Q   Understood.  Thank you, sir.  And one clarifying
23  question:  Did you become directly aware of
24  Ms. Lambert's allegations from her, or did you
25  become aware of them through another NROTC

Page 45

1  official?
2  A   I do not recall.
3  Q   Thank you, sir.  Sir, was ▮▮▮▮▮▮ required to
4  provide the Navy with information about his pending
5  investigation by Purdue University?
6  A   Are you saying -- are you asking the question if
7  that investigated -- if that investigation
8  commenced without my knowledge?
9  Q   Let me rephrase my question then.
10      In this case Purdue, of course, had its own
11  investigation of Mr. ▮▮▮?
12  A   Yes.
13  Q   Okay.  Was Purdue -- or rather was Mr. ▮▮▮, if you
14  did -- if you knew about it already -- and by "you"
15  I mean the NROTC --
16  A   Yes.
17  Q   -- was Mr. ▮▮▮ obligated to give you status
18  updates about it?
19  A   I don't specifically remember the direction I would
20  have given on that.
21  Q   Understood.  Do you know if Mr. ▮▮▮ voluntarily
22  provided information about his Purdue investigation
23  status?
24  A   I do not recall.
25  Q   Thank you.  I'm going to jump around a little bit

12 (Pages 42 - 45)

Page 46

1  everyone. I'm going to ask that everyone look at
2  Exhibit -- what is labeled as Exhibit G, but what I
3  will put into the record as Exhibit F.
4      (Defendant's Exhibit F was marked for
5  identification.)
6 Q   For identification purposes, this should state
7  "Subject line: Notification of Performance Review
8  Board," NSTC-0015 through NSTC-0016.
9      Mr. Hutton, would you take a moment to review
10  this while everyone's getting to it?
11      MR. BYLER: I'm sorry, Tyler. Could you give
12  me those numbers again?
13      MR. JONES: Absolutely, Phil. It's NSTC-0015
14  through NSTC-0016.
15 Q   Have you had a moment to review it, sir?
16 A   Yes.
17 Q   Thank you. Are you familiar with this document?
18 A   I am.
19 Q   Have you seen it before?
20 A   I have.
21 Q   Would you please identify it for the record?
22 A   It is the letter from myself, Commanding Officer,
23  NROTC Unit Purdue University to Midshipman
24  ▬▬▬▬▬▬ notifying of a performance review
25  board.

Page 47

1 Q   Thank you, sir. Sir, I just want to confirm on
2  that second page, is that your signature?
3 A   It is.
4 Q   Thank you. Sir, I'll note that it says in
5  paragraph 1 that it's being instituted because of
6  Mr. ▬▬'s suspension from the university.
7      Is that your understanding of why this
8  Performance Review Board was being instituted?
9 A   Yes.
10 Q   Okay. And I also noted in paragraph 3 it says,
11  "The PRB may recommend that any of the following
12  actions be taken. Ramifications these actions
13  are described in reference to" -- and it says in
14  paren -- parenthesis (A) "No action, warning,
15  probation, leave of absence." And then
16  "disenrollment" with some other language.
17      Do you see that?
18 A   I do.
19 Q   Is it accurate the PRB could have recommended that
20  Mr. ▬▬ be given a warning?
21 A   These are the standard options.
22 Q   Understood. And just so I understand what you just
23  said, when you say they're the standard options,
24  these are what could have resulted to Mr. ▬▬ at
25  his PRB?

Page 48

1 A   Yes.
2 Q   Understood. Thank you. And just so I understand
3  the process, the PRB makes a recommendation to you
4  as to what action to take?
5 A   That is correct.
6 Q   For the record, can you explain what a PRB consists
7  of?
8 A   The Performance Review Board consists of a senior
9  member with two additional members who are assigned
10  to independently review and -- the facts of what
11  have occurred, to review the requirements and then
12  make a recommendation to me as the commanding
13  officer.
14 Q   Is it ultimately your decision what to do with the
15  midshipman?
16 A   Yes.
17 Q   Thank you, sir. Do you recall what conclusion the
18  PRB in this case came to?
19      MR. BYLER: Objection. Assumes a conclusion.
20 Q   You can answer.
21 A   The Performance Review Board found that the student
22  had been suspended from the university and made a
23  recommendation of disenrollment.
24 Q   Understood, sir. And for the record, I would ask
25  everyone go to what's marked as Exhibit H, but what

Page 49

1  I will introduce into the record as Exhibit -- I
2  believe we're on G.
3      (Defendant's Exhibit G was marked for
4  identification.)
5 Q   This should, for identification purposes, be Bates
6  number S -- NSTC-0011 through NSTC-0012. I'll give
7  everyone a moment to get to it. And, Mr. Hutton,
8  if you please review it.
9 A   I have.
10 Q   Thank you, sir. Sir, are you familiar with this
11  document?
12 A   I am.
13 Q   Have you seen it before?
14 A   I have.
15 Q   Would you please identify it for the record?
16 A   This is the record from the senior member of the
17  Performance Review Board to me as the commanding
18  officer reporting on the execution of the
19  Performance Review Board and the information found.
20 Q   Understood. And for the record, was the senior
21  member Commander Craig Remaly?
22 A   Yes.
23 Q   Thank you. For identification purposes, can you
24  please identify the two other members of the PRB?
25 A   Major Mike McDowell was my marine option instructor

13 (Pages 46 - 49)

Page 50

1  and Lieutenant Leonard Taylor was a staff
2  instructor company officer.
3  Q   Thank you. Were these all members of the Purdue
4  NROTC?
5  A   Yes.
6  Q   Typically, sir, what do you do after you receive
7  one of these reports in your office?
8  A   I review the findings, I review the facts, I review
9  the requirements. I would typically review them
10  and depending on the case, may discuss them with
11  Naval Service Training Command. And then I would
12  make a decision.
13  Q   Do you recall if that's what you did in this case?
14  A   Yes.
15  Q   Did you talk to Naval Service Training Command
16  about this case?
17  A   Yes.
18  Q   When did you talk to them, if you know?
19  A   I would have spoken to them on multiple occasions
20  to include the initial reports through the
21  determination of the -- the determination of my
22  decision, then forwarding it to Naval Service
23  Training Command for their approval and action.
24  Q   Thank you, sir. Sir, I note that on the second
25  page it has some information about Mr. ███'s

Page 51

1  academic history.
2      Why is that noted on here?
3  A   That is a standard format for Performance Review
4  Boards.
5  Q   Is that a relevant consideration how they perform
6  -- how a midshipman was academically performing?
7  A   Not in this case.
8  Q   Not in this case. Okay. I note here, sir, it has
9  -- it notes some of the academic warnings that were
10  issued.
11      Do you see that?
12  A   Yes.
13  Q   And then it also notes "Professional performance
14  history."
15      Do you see that?
16  A   Yes.
17  Q   Okay. As I'm reading this, is it fair to say that
18  Mr. ███ ranked in the bottom half of his class for
19  professionalism?
20  A   Under "Professional Performance," he ranked number
21  22 of 28.
22  Q   Thank you. And what does Professional Performance
23  History refer to?
24  A   That refers back to his ranking compared to his
25  classmates.

Page 52

1  Q   Okay. And are these the same professional
2  standards that they're -- that midshipmen are
3  evaluated under that we had talked about earlier?
4  A   Yes.
5  Q   Thank you. Sir, I'd ask that you look at the next
6  document in the folder there. For -- this is
7  what's marked as Exhibit J, but what I'll put into
8  the record as Exhibit I, I believe we're on now.
9  This should be NSTC-0005 through NSTC-0006.
10      (Defendant's Exhibit I was marked for
11  identification.)
12  Q   I'll give everyone a moment to pull that out while
13  you review, Mr. Hutton.
14  A   Ready.
15  Q   Thank you. Are you familiar with this document?
16  A   I am.
17  Q   Have you seen it before?
18  A   Yes.
19  Q   Can you please identify it for the record?
20  A   It is the disenrollment recommendation based on my
21  decision.
22  Q   Understood, sir. For layfolks like myself, would
23  you please explain why you would fill this out?
24  A   This would be the formal process from the NROTC
25  unit to Naval Service Training Command to process

Page 53

1  for disenrollment from the National Scholarship
2  program.
3  Q   Understood, sir. And for confirmation purposes, is
4  that your signature -- is that one of -- there are
5  two signatures on the second page. The bottom one,
6  is that your signature?
7  A   Yes, it is.
8  Q   And what's the date of your signature?
9  A   29 August 2016.
10  Q   Understood, sir. And, sir, was it your
11  recommendation that Mr. ███ be disenrolled?
12  A   Yes.
13  Q   And who did you submit this to?
14  A   Naval Service Training Command.
15  Q   Understood. Is it Naval Service Training Command's
16  decision whether or not to disenroll Mr. ███?
17  A   They would review my decision.
18  Q   Understood.
19      MR. MATUSZAK: I'm going to object to that
20  question for the record. It does call --
21      MR. JONES: Can you --
22      MR. MATUSZAK: -- for a legal --
23      MR. JONES: -- a little bit, John.
24      MR. MATUSZAK: Sure.
25      MR. JONES: I'm having a hard time hearing you.

14 (Pages 50 - 53)

Page 54

1    MR. MATUSZAK: It does call for a legal
2    conclusion, the last question. I couldn't get my
3    mute button off. But so I'm objecting to the
4    question as it calls for a legal conclusion as to
5    who the final disenrollment party is. But for the
6    record, it's the secondary enrollment.
7    MR. JONES: Understood. Thank you.
8  BY MR. JONES:
9  Q    Sir, I want you to turn to the second page if you
10   could?
11 A   Yes.
12 Q   You'll see it says at the very top a box that says,
13   "Evaluate Future Acceptability for Officer
14   Programs."
15     Do you see that?
16 A   Yes.
17 Q   And you'll see there are five boxes there and they
18   range from "highly recommend" to "definitely NOT"
19   -- "not" in all capital letters -- "recommend."
20     And then in parentheticals, "Must provide
21   justification."
22     Do you see that?
23 A   Yes.
24 Q   What does this box refer to?
25 A   That is my assessment of whether he should be later

Page 55

1    brought into an officer program.
2  Q    Understood. If you know, why do you fill this out?
3  A   I do not recall specifically.
4  Q    Okay. Do you know why you checked the box
5    "definitely NOT recommended"?
6  A   That is my assessment of the student.
7  Q    How did you come to that assessment?
8  A   Based on my observation of the student.
9  Q    What observations led you to check that box?
10 A   Discussions and reviews of events and his
11   performance.
12 Q   Does that include a determination that he sexually
13   assaulted ▊▊▊▊▊?
14     MR. BYLER: Objection.
15 Q   You can answer.
16 A   I do not recall.
17 Q   Thank you. Do you know if you would have written
18   notes or had any paper notes about how you came to
19   that decision?
20 A   I do not recall.
21 Q   Thank you. And just so I understand this record
22   better, when it says, "Must provide justification,"
23   what does it mean by that, if you know?
24 A   That I have to justify that recommendation.
25 Q   Okay. Sir, if you could pull out what's marked as

Page 56

1    Exhibit K out of your binder there. I'll introduce
2    it into the record as I believe we're on Exhibit H
3    now. I may not do my -- be doing my alphabet
4    correctly. But for identification purposes it's
5    NSTC-0001 through NSTC-0004.
6      (Defendant's Exhibit H was marked for
7    identification.)
8  Q    Mr. Hutton, would you please review this and
9    indicate when you've had a chance.
10 A   Ready.
11 Q   Thank you. Have you seen this before?
12 A   I have.
13 Q   Are you familiar with it?
14 A   I am.
15 Q   Can you please identify it for the record?
16 A   It is the Appointment Termination Disenrollment
17   Authorization.
18 Q   Thank you. For Mr. ▊▊▊ you mean?
19 A   For Mr. ▊▊▊.
20 Q   Thank you. I'm unfamiliar with R.K. Wood, Director
21   of Officer Development.
22     Who is he?
23 A   R.K. Wood, Director of Officer Development was at
24   Naval Service Training Command.
25 Q   Understood. And at the bottom of the first page is

Page 57

1    that your signature?
2  A   It is.
3  Q    What's the date of that signature?
4  A   November 4th, 2016.
5  Q    Would you also please look at the signatures on
6    page 2 and page 4 for this document and indicate if
7    those are your signatures?
8  A   They are.
9  Q    Understood. Am I understanding correctly that this
10   is the form that formally disenrolled Mr. ▊▊▊ from
11   NROTC?
12 A   This is the letter from Naval Service Training
13   Command to the individual in this case, Midshipman
14   Fourth Class ▊▊▊, that they are to be disenrolled,
15   yes.
16 Q   Understood. And, sir, I just want to note page 3
17   and 4 appears to be a letter signed by you. Is
18   this a -- well, let me rephrase.
19     Is it true -- please turn to the last page,
20   page 4. You'll see number 7 -- paragraph number 7
21   says, "Mitigating factors?"
22     Is it true that you found no mitigating factors
23   for Mr. ▊▊▊?
24 A   Regarding disenrollment?
25 Q   Correct.

Page 58

1  A   Correct.
2  Q   Thank you. If you know, sir, according to these
3      documents, I mean, most of these documents appear
4      to be standard forms; is that fair?
5  A   That is correct.
6  Q   If you know, does -- would Purdue have any
7      authority to order the NROTC to take Mr. ███ back?
8  A   I do not know.
9  Q   Thank you.
10     MR. JONES: Counsel, I'd like to take a
11     five-minute break to review my notes and maybe let
12     Mr. Hutton get a drink of water. And then I'll
13     have a few concluding questions and then we can
14     kind of go from there.
15     Is that fair?
16     MR. BYLER: I'll have some follow-up questions.
17     All though I think I'll be relatively brief because
18     I'm just going to focus on what's in the documents.
19     Okay?
20     MR. JONES: Sure. Okay. Off the record,
21     please.
22     (A recess was taken between 10:05 a.m. and
23     10:17 a.m.)
24 BY MR. JONES:
25  Q   Are you ready to continue, Mr. Hutton?

Page 59

1  A   Yes.
2      MR. BYLER: Excuse me, Tyler. I can't hear
3      you. I can't hear you.
4      (A discussion was held off the record.)
5  BY MR. JONES:
6  Q   Mr. Hutton, how many years did you serve as an
7      NROTC Commander?
8  A   Three years.
9  Q   What dates did you range -- did that range from?
10 A   2015 through three academic years.
11 Q   Thank you. In your experience, have you ever
12     disenrolled a student for poor academic performance
13     before?
14 A   Yes.
15 Q   In those instances in your experience, have you
16     ever reenrolled the same student after disenrolling
17     them for academic problems?
18 A   I do not recall a case.
19 Q   Thank you. Sir, is it your -- we reviewed the
20     initial academic warning for ███████ and
21     then his notification of PRB for his GPA.
22     Do you recall that?
23 A   Yes.
24 Q   Sir, is it fair to say that his GPA necessitated a
25     review board panel for a Performance Review Board

Page 60

1      being held?
2      MR. BYLER: Objection.
3  A   (Inaudible.)
4  Q   Thank you. Sir, I would ask you --
5      THE REPORTER: I'm sorry. Did you -- I --
6  Q   -- to pull out the very last exhibit.
7      THE REPORTER: Sorry. I didn't hear his
8      answer.
9  Q   It's originally marked as Exhibit L.
10     THE REPORTER: Hello?
11 Q   I'm not sure what it is now.
12     THE REPORTER: Can you repeat that last answer?
13     MR. JONES: Yes.
14     MR. BYLER: Please repeat the question.
15     THE REPORTER: I'm sorry. I can't hear you
16     guys for some reason.
17     The question was: "Sir, is it fair to say that
18     his GPA necessitated a review board panel for a
19     Performance Review Board being held?" And I didn't
20     hear the answer.
21     THE WITNESS: Yes.
22     THE REPORTER: Okay. Sorry about that.
23     MR. JONES: All right. And, Ms. Court
24     Reporter, did you get the question about his
25     experience as an NROTC Commander and whether or not

Page 61

1      a disenrolled student would be reenrolled --
2      THE REPORTER: Yes.
3      MR. JONES: -- for academic performance?
4      THE REPORTER: Yes, I did.
5      MR. JONES: Okay. Thank you. I just wanted to
6      make sure.
7  BY MR. JONES:
8  Q   Okay. I'd asked the parties to look at what's
9      marked as Exhibit L. This is for identification
10     purposes. It's NT -- NSTC-0133.
11     (Defendant's Exhibit L was marked for
12     identification.)
13 Q   Mr. Hutton, have you seen this before?
14 A   Yes.
15 Q   Do you know what this is?
16 A   This is the NROTC Concept of Honor.
17 Q   To your knowledge, sir, do you know what it means
18     when it says, "I will bear true faith and
19     allegiance"?
20 A   Yes, I do.
21 Q   What does that mean?
22 A   As described on the form, "I will conduct myself
23     with the highest ethical manner in all that I do."
24 Q   Thank you. Similarly you'll see down by
25     "Commitment," it says, "I will well and faithfully

Connor Reporting
A Veritext Company                                    800-554-3376

Page 62

1  discharge."
2      Would it be fair to say that the following
3  paragraph accurately describes what is meant by
4  that phrase?
5 A   Yes.
6 Q   Sir, does this oath require midshipmen to tell the
7  truth regardless of the consequences?
8 A   Yes.
9 Q   Does this oath require NROTC midshipmen to abide by
10  NROTC in-school rules?
11 A   Yes.
12 Q   Does this oath require all NROTC midshipmen from
13  breaking any laws?
14 A   Yes.
15 Q   Does this oath require NROTC midshipmen to refrain
16  from using any illicit drugs such as LSD?
17 A   Yes.
18 Q   Does this oath require midshipmen to refrain from
19  sexually assaulting another midshipman?
20 A   Yes.
21 Q   Sir, we're done with that exhibit. I'd like to ask
22  you to pull out the very last exhibit that's listed
23  as Exhibit M. For identification purposes, it is
24  NSTC-0184.
25      Take a moment to review this.

Page 63

1      (Defendant's Exhibit M was marked for
2  identification.)
3 A   Okay.
4 Q   Sir, have you seen this document before?
5 A   Yes.
6 Q   Are you familiar with it?
7 A   I have seen it before.
8 Q   Do you know what it is? And if so, can you
9  identify it for the record?
10 A   I am unable to specifically identify when this was
11  provided.
12 Q   Understood. Do you have any idea why this would
13  have been made?
14 A   I cannot specifically recall.
15 Q   Thank you. Sir, to your recollection, did
16      ███████████ appeal the PRB's determine -- or let
17  me rephrase.
18      Did ███████████ appeal the decision that he
19  be disenrolled from the NROTC program?
20 A   I do not specifically recall.
21 Q   One moment. I would direct everyone's attention to
22  what was originally marked as Exhibit I. I believe
23  it was introduced as Exhibit H (sic). For
24  identification purposes this is NSTC-0008 through
25  0009. Specifically I would refer everyone to page

Page 64

1  0009.
2      (Exhibit I was previously marked for
3  identification.)
4      Mr. Hutton, do you remember looking at this
5  document?
6 A   Yes.
7 Q   After looking at this document, can you confirm
8  that ███████████ appealed his -- appealed a
9  determination to disenroll him?
10 A   Upon signing it on 25 August 2016, he indicated he
11  did not choose to submit a statement.
12 Q   Thank you. Finally, sir, my last question: Did --
13  don't worry it's not lagged -- did you -- you
14  reported -- you testified earlier that you reported
15      ███████████s allegations to Purdue University;
16  is that correct?
17      MR. BYLER: Objection. Misstates prior
18  testimony.
19 A   As I stated earlier, I do not recall if I was the
20  specific reporter or if I directed it to be
21  reported to Purdue University.
22 Q   Understood. Is it fair to say that you -- that the
23  NROTC notified Purdue University of ███████████
24      ███████████s allegations?
25 A   Yes.

Page 65

1 Q   Is it fair to say that when you or someone at your
2  direction notified Purdue University of the
3  allegations, you did not know whether or not Purdue
4  University was aware of the allegations?
5 A   Correct.
6      MR. JONES: That's all I have.
7      MR. BYLER: Okay. I'm going to be asking
8  questions related to documents, and I'm going to
9  ask that sequentially we put before the witness the
10  documents. I'm trying to note the exhibit letter
11  of what I had also marked to make it easier and
12  keep the record as clean as possible.
13      The first document I'd like presented to the
14  witness is -- got the Bates stamp of NSTC-0001
15  through -0004. I thought it might be Exhibit H,
16  but I'm not sure.
17      MR. JONES: Phil, as a courtesy to you, I have
18  gone ahead and printed out your exhibits so that we
19  don't have to play the guessing game so to speak.
20  So as long as you identify them by the Bates
21  number, I should have them. And I believe
22  Mr. Hutton has what you have indicated in front of
23  him now.
24      MR. BYLER: Okay. Well, there may be a few
25  variances between what you had marked and I marked

17 (Pages 62 - 65)

Page 66

1    in one of two cases, but this is the same. Okay.
2  CROSS-EXAMINATION
3      QUESTIONS BY PHILIP A. BYLER:
4  Q    You have them out in front of you?
5  A    Yes, sir.
6  Q    Okay. And on the front page it states, does it
7    not, "Reason for Disenrollment/Termination"?
8  A    Yes.
9  Q    Okay. And the signature on the bottom of the first
10    page is your signature?
11  A    In the first endorsement.
12  Q    Yes. And is the signature on the second page your
13    signature?
14  A    Yes.
15  Q    Okay. And is the signature on the fourth page your
16    signature?
17  A    Yes.
18  Q    Okay. Let me go on page 3 where item 2 says, "Type
19    of Disenrollment (Dropped by Institution)."
20      Is there a statement underneath that?
21  A    2(A).
22  Q    Okay.
23  A    "Midshipman ███ was" --
24  Q    Go ahead.
25  A    "2(A) Midshipman ███ was suspended by the

Page 67

1    University for one academic year."
2  Q    Okay. Is there anything else under item 2?
3  A    No.
4  Q    Okay. Go to point 9 on page 4 right above your
5    signature.
6  A    Yes.
7  Q    Is there a recommendation?
8  A    As I assigned "Recommend disenrollment of
9    Midshipman ███ due to suspension by the University
10    for one academic year."
11  Q    Okay. Was it a requirement of the Naval ROTC
12    program that a student cadet be continuously
13    enrolled in the university?
14  A    Yes.
15  Q    Okay. Now, let me go to -- by the way, one last
16    thing. On -1 through -4, the effective date of the
17    disenrollment was August 29th, 2016; correct?
18  A    The signature for disenrollment effective 29 August
19    2016.
20  Q    On the first page, yeah.
21  A    Yeah, page 1.
22  Q    Now, let me go to -- I think it's Exhibit F, which
23    is pages 15 and 16, NSTC-15 and -16. I have it
24    noted as Exhibit F.
25  A    Yes, sir.

Page 68

1  Q    Okay. And what's the date of this document?
2  A    16 June 2016.
3  Q    Okay. And paragraph 1 refers to a Performance
4    Review Board being convened on June 23, 2016;
5    correct?
6  A    Yes.
7  Q    Okay. And it further states "Per reference, you
8    are deficient in the following areas. Suspension
9    from the University."
10      Correct?
11  A    Yes.
12  Q    Is there any other reason listed?
13  A    No.
14  Q    Okay. Was it the case that the Performance Review
15    Board was postponed?
16  A    I do not believe so.
17  Q    Well, do you recall that an appeal was made and
18    that it was postponed to August?
19      MR. JONES: Object to form. Do you mean an
20    appeal to produce proceedings with Doe?
21      MR. BYLER: Okay.
22  Q    I'm sorry did I --
23  A    I do not recall a delay to the Navy's -- Navy RTOC
24    Performance Review Board.
25  Q    Okay. Let me go then to a document that's

Page 69

1  NSTC-0008 to -0010. I know I sent that document to
2    be presented.
3      MR. JONES: Phil, could you repeat that Bates
4    number again?
5      MR. BYLER: NSTC-008 (sic) through -0010.
6      MR. JONES: Found it.
7  A    Sir, I have that in front of me.
8  Q    Okay. And what's the date of the document?
9  A    20 August 2016.
10  Q    Okay. Does this document refer to the Performance
11    Review Board that was held?
12  A    It does refer -- it does refer to the Performance
13    Review Board.
14  Q    Okay. And does it state that Mr. ███ can submit a
15    statement?
16  A    Paragraph 2, "You are allowed five business days to
17    provide a statement."
18  Q    Okay. Can we go to page -0010 of this document?
19  A    Yes, sir.
20  Q    Okay. Do you recognize this as ███████'s
21    statement as referenced in the memo that you sent
22    August 20?
23  A    I have a memorandum dated 16 August 2016 from
24    Midshipman ███.
25  Q    Okay. Do you recall seeing this statement by him?

Page 70

1  A   I do recall it.
2  Q   Okay.  And in this statement, he informed you that
3      due to the unfortunate circumstances surrounding
4      his disenrollment, he was thanking you; correct?
5  A   Yes.
6  Q   Okay.  And he said further he understood the reason
7      for being disenrolled, "and as there is nothing
8      further I can do about it to prevent it (sic), I
9      have accepted this"; correct?
10 A   Yes.
11 Q   Okay.  And so he didn't appeal the disenrollment?
12 A   That is my understanding of this letter.
13 Q   Okay.  And does it not say then by Mr. ███, "I
14     will continue to refute the University's decision
15     in my case as I'm not guilty of the charges that
16     have leveled against me."
17         MR. JONES:  Objection.
18 Q   "I am satisfied in the sense that I know my
19     conscience in the matter is clear."
20         MR. JONES:  Objection.
21 A   That is what he's written.
22 Q   That's what he's written.  Okay.  And he again
23     concludes by thanking the NROTC; correct?
24 A   Correct.
25 Q   Now, let me go to what I think is -- I'm not sure

Page 71

1      what number -- that letter you gave it, but it was
2      NSTC-0011 through -0014.
3         MR. JONES:  Phil, is this one of your exhibits?
4         MR. BYLER:  It was one of your exhibits.
5         MR. JONES:  Okay.
6         MR. BYLER:  I don't know whether it was H or I,
7      but the first page is -11.
8         MR. JONES:  -11.  Okay.
9         THE WITNESS:  I got it.
10        MR. JONES:  Got it.
11 BY MR. BYLER:
12 Q   Okay.  What's the date of this document?
13 A   It's dated 10 August.
14 Q   Okay.  And is this the memo that records the
15     Performance Review Board's decision?
16 A   Yes.
17 Q   Okay.  And on the second page, do you recognize --
18     what is it -- Commander Remaly's signature?
19 A   I do.
20 Q   Okay.  And do you recognize Major McDowell and
21     Lieutenant Taylor's signatures?
22 A   I do.
23 Q   Okay.  Now, is there listed the enclosures with the
24     Performance Review Board on the first page, 12
25     items?

Page 72

1  A   Yes.
2  Q   Okay.  And in those 12 items are the University
3      Investigator's Report, Final Determination from the
4      Dean of Students, Midshipman ███'s Statement of
5      Appeal of Final Determination, and University
6      Response to Midshipman ███'s Appeal.
7         That was before the Performance Review Board?
8  A   They are enclosures to the report so they would
9      have had to have been done.
10 Q   Now, go up to item 3 in that listing.  You see
11     "Email agreeing to a delay in Performance Review
12     Board proceedings"?
13 A   Yes.
14 Q   Does that refresh your recollection that there was
15     indeed a delay because of the appeal that ███
16     ███ made in the university disciplinary case?
17 A   Yes.  There was a delay for the purpose of ensuring
18     the university process was adequately completed.
19 Q   Okay.  Now, listed here is the University
20     Investigator Report; correct?  As what was before
21     the Performance Review Board?
22 A   I'm sorry.  Can you restate that, sir?
23 Q   Listed here as number 9 is the University
24     Investigator Report; correct?
25 A   That is correct.

Page 73

1  Q   Okay.  Is there listed here any other
2      investigator's report?
3  A   No indication of a second investigative report.
4  Q   Okay.  Let's go then to a document which was marked
5      to be shown to you, but I don't know if it was, the
6      Bates stamp is NSTC-0042.
7  A   I have that, sir.
8  Q   Do you have that page now?
9  A   I do.
10 Q   Okay.  And this document is an authorization of
11     release of information; correct?
12 A   Yes.  It states, "I, ███████, hereby
13     authorize the release of all information pertaining
14     to investigation and corresponding case concerning"
15     -- blank -- "and ███████ to the Department
16     of Naval Sciences, Purdue University."
17 Q   Okay.  And this is dated May 24th, 2016?
18 A   Correct.
19 Q   Okay.  And the second paragraph can you read?
20 A   Second paragraph, "This release serves to allow the
21     Department of Naval Sciences, Purdue University, to
22     remain fully informed about my academic career at
23     Purdue University, including, but not limited to
24     any disciplinary, scheduling, and housing matter."
25 Q   Okay.  And there's a signature here for ███████

19 (Pages 70 - 73)

Page 74

1   ████; correct?
2 A   I believe so.
3 Q   Okay.  Now, let's go to -- well, I'll give the
4     Bates stamp, which was NSTC-0166, and I'm not sure
5     of the letter that you were given.  But this was
6     that Fitness and Counseling record.
7 A   I have that, sir.
8 Q   Okay.  I just, you know, for the sake of being fair
9     here, I thought I'd asked you whether there were
10     some other items in this record.
11         For "motivation and initiative," it does say,
12     "very motivated"; correct?
13 A   It does.
14 Q   And for "leadership and cohesiveness," it says,
15     "very vocal during PT in encouraging other
16     midshipmen, is a team player, and promotes unit
17     cohesion"; correct?
18 A   Correct.
19 Q   Okay.  And it also shows that "Midshipman ████
20     meets or exceeds program standards in the following
21     areas:  Physical fitness."
22 A   Correct.
23 Q   Okay.  So there were some positive notes about
24     ████████████ in this record?
25         MR. JONES:  Object to form.  You can answer.

Page 75

1 A   Yes, there are.
2 Q   Okay.  And that's your signature on this record?
3 A   That is my signature.
4 Q   Okay.  Can we go to Exhibit A, which was -- okay.
5     You have that in front of you?
6 A   I do.
7 Q   Okay.  Have you had a chance to look at the entire
8     document, at least briefly, to see what's in there?
9 A   Briefly.
10 Q   Okay.  What I want to ascertain is the first page
11     from Megan Redlawsk -- I guess that was her maiden
12     name at the time?
13 A   Yes.
14 Q   Are the remaining pages that go from -169 to -195
15     primarily, or if not all, Purdue investigation file
16     documents?
17 A   That is my understanding.
18 Q   Okay.  And at -169 is the dean's June 20 -- 14,
19     2016 determination letter; correct?
20 A   Yes.
21 Q   And at -170 through -180 is the Purdue
22     Investigation Report; correct?
23 A   Yes.
24 Q   Okay.  And from pages -181 to -187, texts that are
25     appended to the investigative report?

Page 76

1 A   Yes.
2 Q   Okay.  And at -188 are character references that
3     ████████████ submitted to the Purdue
4     investigators?
5 A   That is my understanding.
6 Q   Okay.  And then -189 to -191 is ████████'s
7     May 3rd, 2016, statement to the investigators at
8     Purdue?
9 A   Yes.
10 Q   Okay.  Give me a moment, please.  I told you I'd be
11     brief.  I just want to make sure I ask the
12     questions I intended to about the documents.
13         MR. BYLER:  Okay.  I am done.
14         MR. JONES:  One final question.  This is
15     actually for you, Phil.
16         MR. BYLER:  Yeah.
17         MR. JONES:  Can we agree on the admissibility
18     and the authenticity of all these documents we've
19     introduced in today?
20         MR. BYLER:  Well, I think of the most useful
21     things we could do is to agree to the authenticity,
22     so we don't have to bother the Navy in the future.
23     We should between us, you know, confirm, you know,
24     what those pages are, but that's what we would do
25     in the normal course anyway.

Page 77

1         MR. JONES:  Okay.  I just wanted to confirm
2     that we could at least agree that all these
3     documents are what they -- what the Navy has
4     represented they are to be, so --
5         MR. BYLER:  Yeah, I mean, I -- I pointed to
6     certain things in the documents that I felt put
7     things in proper context obviously.
8         MR. JONES:  Okay.
9         MR. BYLER:  Okay.
10         MR. JONES:  Off the record, please.
11     (Time noted:  10:50 a.m.)
12     AND FURTHER THE DEPONENT SAITH NOT.
13
14
15
16
17
18
19
20
21
22
23
24
25

20 (Pages 74 - 77)

Page 78

1 STATE OF INDIANA     )
                       ) SS:
2 COUNTY OF MARION     )

3

4     I, Megan M. Bowman, Notary Public in and for
5 the County of Marion, State of Indiana at Large, do
6 hereby certify that RODNEY HUTTON, the deponent
7 herein, was by me first duly sworn to tell the
8 truth, the whole truth, and nothing but the truth
9 in the aforementioned matter;
10     That the foregoing deposition was taken on
11 behalf of the Defendants, at the offices of Stuart
12 & Branigin LLP, 300 Main Street, Lafayette,
13 Tippecanoe County, Indiana, on Wednesday,
14 May 20, 2020, pursuant to the Federal Rules of
15 Civil Procedure;
16     That said deposition was taken down in
17 stenograph notes and afterwards reduced to
18 typewriting under my direction, and that the
19 typewritten transcript is a true record of the
20 testimony given by the said deponent; and that
21 signature was requested and thereafter presented to
22 said deponent for his/her signature;
23     That the parties were represented by their
24 counsel as aforementioned.
25     I do further certify that I am a disinterested

Page 79

1 person in this cause of action, that I am not a
2 relative or attorney of either party or otherwise
3 interested in the event of this action, and that I
4 am not in the employ of the attorneys for any
5 party.
6     IN WITNESS WHEREOF, I have hereunto set my hand
7 and affixed my notarial seal this 5th day of
8 June 2020.
9
10
11
12        Megan Bowman
13        Megan M. Bowman
14        Notary Public
15
16
17 My Commission Expires:
18 January 2, 2027
19 County of Residence:
20 Marion County, Indiana
21
22
23
24
25

Page 80

1        Veritext Legal Solutions
              1100 Superior Ave
2                Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   June 5, 2020
5
   To: Philip A. Byler
6
   Case Name: Doe, John v. Purdue University, et al
7
   Veritext Reference Number: 4108697
8
   Witness: Rodney Hutton     Deposition Date: 5/20/2020
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript. Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change. Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 81

1        DEPOSITION REVIEW
      CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 4108697
3 CASE NAME: Doe, John v. Purdue University, et al
   DATE OF DEPOSITION: 5/20/2020
4 WITNESS' NAME: Rodney Hutton
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6 my testimony or it has been read to me
7     I have made no changes to the testimony
   as transcribed by the court reporter
8
9 Date_____    Rodney Hutton_____
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
      They have read the transcript;
13    They signed the foregoing Sworn
      Statement; and
14    Their execution of this Statement is of
      their free act and deed
15
      I have affixed my name and official seal
16
   this_____ day of_____, 20___.
17
18    Notary Public
19
      Commission Expiration Date

21 (Pages 78 - 81)

Page 82

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4108697
 3  CASE NAME: Doe, John v  Purdue University, et al
    DATE OF DEPOSITION: 5/20/2020
 4  WITNESS' NAME: Rodney Hutton
 5     In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me
 7     I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s)
 9     I request that these changes be entered
    as part of the record of my testimony
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein
13  _____
    Date            Rodney Hutton
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18  in the appended Errata Sheet;
       They signed the foregoing Sworn
19  Statement; and
       Their execution of this Statement is of
20  their free act and deed
21     I have affixed my name and official seal
22  this _____ day of_____, 20____
23  _____
       Notary Public
24
25  _____
       Commission Expiration Date
```

Page 83

```
 1         ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2         ASSIGNMENT NO: 4108697
 3  PAGE/LINE(S) /    CHANGE    /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
20  Date _____   Rodney Hutton
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
       Notary Public
24
    _____
25     Commission Expiration Date
```

22 (Pages 82 - 83)

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at