# Exhibit F

Page 1

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF INDIANA
 2                INDIANAPOLIS DIVISION
 3              Case No. 2L17-cv-33-JPK
 4
     JOHN DOE,                       )
 5                                   )
              Plaintiff,             )
 6                                   )
                  -vs-               )
 7                                   )
     PURDUE UNIVERSITY, PURDUE       )
 8   UNIVERSITY BOARD OF TRUSTEES,   )
     MITCHELL ELIA DANIELS, JR., in  )
 9   his official capacity as        )
     President of Purdue University, )
10   ALYSA CHRISTMAS ROLLOCK, in her )
     official capacity at Purdue     )
11   University, KATHERINE           )
     SERMERSHEIM, in her official    )
12   capacity at Purdue University,  )
                                     )
13            Defendants.            )
14
15      VIDEOCONFERENCE DEPOSITION OF CRAIG REMALY
16
17         The videoconference deposition upon oral
        examination of CRAIG REMALY, a witness produced
        and sworn before me, Craig Williams, RPR, CMRS, a
18      Notary Public in and for the County of Marion,
        State of Indiana, taken on behalf of the
19      Defendants, at the offices of Stuart & Branigin,
        LLP, 300 Main Street, Suite 900, Lafayette,
20      Tippecanoe County, Indiana, on the 21st day of May,
        2020, at 9:00 a.m., pursuant to the Federal Rules
21      of Civil Procedure with written notice as to time
        and place thereof.
22
23
24
25
```

## Page 2

APPEARANCES

1
2
3  FOR THE PLAINTIFF:
4     Philip A. Byler
      NESENOFF & MILTENBERG
5     363 Seventh Avenue, Fifth Floor
      New York, NY 10001
6     212 736 4500
      pbyler@nmllplaw.com
7
   FOR THE DEFENDANTS:
8
      William P. Kealey
9     Tyler L. Jones
      STUART & BRANIGIN LLP
10    300 Main Street, Suite 900
      P O Box 1010
11    Lafayette, IN 47902-1010
      765 423 1561
12    wpk@stuartlaw.com
      tlj@stuartlaw.com
13
   FOR THE DEPONENT:
14
      John Matuszak
15    Counsel at U S Navy -
      Naval Service Training Command
16    2601 A Paul Jones Street
      Building 1
17    Great Lakes, IL 60088-2845
      847 707 5057
18    john.matuszak@navy.mil
19
20
21
22
23
24
25

## Page 3

INDEX OF EXAMINATION

1
2  DIRECT EXAMINATION . . . . . . . . . . . . . . . . .4
      Questions by Tyler L. Jones
3  CROSS-EXAMINATION . . . . . . . . . . . . . . . . . .46
      Questions by Philip A. Byler
4  REDIRECT EXAMINATION . . . . . . . . . . . . . . .62
      Questions by Tyler L. Jones
5
6          INDEX OF EXHIBITS
7  Navy Exhibit:
8  Exhibit 1 - Fact Witness Approval Letter . . . . . .5
9  Defendants' Deposition Exhibits:
10 Exhibit A - NSTC-0168-0195 . . . . . . . . . . . . .19
      Exhibit B - NSTC-0042 . . . . . . . . . . . . . .26
11 Exhibit C - NSTC-0015-0016, NSTC-0159-0160 . . . .27
      Exhibit D - NSTC-0140-0142 . . . . . . . . . . .30
12 Exhibit E - NSTC-0011-0012 . . . . . . . . . . . .35
13 Previously Marked Exhibits:
14 Exhibit 1 - NSTC-0001-0004 . . . . . . . . . . . .50
      Exhibit 5 - NTSC-0020-0050 . . . . . . . . . . .59
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1          CRAIG REMALY,
2  having been duly sworn to tell the truth, the whole
3  truth, and nothing but the truth relating to said
4  matter was examined and testified as follows:
5  DIRECT EXAMINATION,
6      QUESTIONS BY TYLER L. JONES:
7  Q  Good, morning, sir.  For the record, my name is
8     Tyler Jones, I'm an attorney at Stuart &
9     Branigin.  My partner Bill Kealey is also here.
10    We represent Purdue University and a couple
11    other named defendants.
12        For the record, I would note we provided
13    you with a check under the Federal Rules
14    pursuant to your mileage and some other
15    incidentals.  You have given that check back to
16    me.
17 A  That's correct.
18 Q  And so you do not have that check.
19        Mr. Matuszak, would you like to put in the
20    Navy's letter?
21        MR. MATUSZAK:  Right.  This deposition is
22    being conducted pursuant to the Touhy
23    Regulations.  The Navy has approved this
24    deposition and that approval letter is part of
25    the record.

## Page 5

1        (Deposition Exhibit 1 was marked for
2     identification.)
3  Q  Sir, could you, please, state your full name for
4     the record.
5  A  It's Craig Michael Remaly.
6  Q  Thank you.  Have you ever given a deposition
7     before?
8  A  I have not.
9  Q  I'm just going to go over a brief summary.  I'm
10    sure you've already spoken a little bit with
11    Mr. Matuszak about it.  A deposition is just a
12    chance for both parties to ask you questions
13    about what you may or may not know about the
14    case.  I'd ask, because we're making a record
15    here, that you give affirmatives or negatives,
16    yeses and noes as opposed to head shakes or head
17    nods.
18 A  Okay.  Yes.
19 Q  Very good.
20        Because we are trying to do this over
21    technology, I'd ask that even if you know the
22    question I'm asking you, you let me finish the
23    question for the record.  And even if I know the
24    answer you're trying to give, I'm going to be
25    quiet and let you finish your answer.

2 (Pages 2 - 5)

Page 6

1    MR. BYLER:  Tyler, one thing.  I don't mean
2  to interject.  Can we continue what we did
3  yesterday and make sure we identify each
4  document by the Bates stamp number, because that
5  way it makes clear what the documents are.  You
6  seemed to be very happy with that yesterday.
7    MR. JONES:  I have no objections to that,
8  Phil, I'm happy to accommodate.
9 Q  I'm going to assume you understand a question if
10  you answer it.  But if you don't, please ask me
11  or ask for clarification and I'll rephrase it.
12  If you need a restroom break, please ask.  This
13  isn't a prison.
14    I want to confirm, we're here for a
15  deposition today.  Plaintiff's name is John Doe
16  publicly.  He's proceeding under a pseudonym, as
17  is his accuser.  What stays in this room is
18  confidential.
19 A  So I can refer to them by their names?
20 Q  Right.  So for the rest of the deposition I'm
21  going to refer to them both as ▮▮▮▮▮ or
22  ▮▮▮▮▮ and ▮▮▮▮▮.  You can as
23  well.  I just ask that outside of this
24  deposition we don't use those names.  You can
25  refer to them as John Doe or Jane Doe.

Page 7

1 A  Okay.
2 Q  Sir, can you please give me your business
3  address.
4 A  It's the Armory at Purdue University.  The
5  street address is 812 3rd, West Lafayette.
6 Q  Excellent.  Is it okay that if anyone needs to
7  contact you, they do so in care of John Matuszak
8  here?
9 A  Yes.
10 Q  Sir, can you please give a brief educational
11  background?
12 A  My education?
13 Q  Yes, sorry.
14 A  Okay.  I'm a 1986 graduate of Rossville High
15  School, just down the road from here.  A 1990
16  graduate from Purdue with a Bachelor's in
17  aeronautical engineering.  Graduated from the
18  Navy War College in 2003, I believe, with a
19  Master's degree.
20 Q  Excellent.  Thank you, sir.
21    How long have you been with the Purdue
22  NROTC?
23 A  Since July of 2013.
24 Q  So approximately seven years?
25 A  Yes.

Page 8

1 Q  Between August 2015 and August 2016, what was
2  your title with the Purdue NROTC?
3 A  I was executive officer.
4 Q  What were the executive officer's
5  responsibilities and duties at that time?
6 A  The XO is the second in command.  I guess my
7  primary role as the XO would be twofold.  One is
8  as the principal advisor to the CO, and then
9  pretty much like the daily routine operations of
10  the unit.
11 Q  Understood, sir.  Do you oversee lieutenants?
12 A  I did.  I was their supervisor.
13 Q  Understood.
14    Were you the direct supervisor?
15 A  Yes.
16 Q  Sir, I know there was some confusion about
17  whether or not you are retired.  You are indeed
18  still with the Purdue NROTC?
19 A  I am, I'm active duty still.
20 Q  Are you planning on retiring soon?
21 A  My plans or the Navy's plans?  I'm coming up on
22  mandatory retirement, so January 1st is my
23  retirement date.
24 Q  Understood.  This year?  Of next year.
25 A  Next year.

Page 9

1 Q  Very good.
2    Can you for a layperson kind of give an
3  overview of the command structure of the Purdue
4  NROTC at the time of the incident, so 2015-2016?
5 A  Sure, there's the CO, XO, and then we have four
6  company officers, and three of them are Navy
7  lieutenants, one is a Marine captain.  The
8  Marine captain has all the Marine students under
9  him.  The Navy students are split into three
10  separate companies; Alpha, Bravo, Charlie, under
11  one of the lieutenants.  The Marine also had a
12  gunnery sergeant assigned to him, an assistant
13  Marine instructor.  And then we have one other
14  lieutenant who is the battalion officer.
15    So the student leadership; the student CO,
16  XO, CMC, commanding acting chief, and the
17  student department heads all report to the
18  battalion officer, and he is nominally our
19  operations officer.  That's it for the active
20  duty.
21    In addition, we have two Navy civilians.
22  One is the HRA, the human resources assistant.
23  At the time, I believe it was Jesse Christman,
24  and he would have been our admin officer in
25  charge of -- his responsibilities would be

Page 10

1  taking care of just the routine paperwork.
2      We have a supply clerk.  Pretty much
3  exactly what the title is.  He issues uniforms,
4  textbooks, oversees all of our Navy money in
5  terms of our Navy operating budget.  And then we
6  have one Purdue staff member, the CO's
7  assistant.
8  Q  Thank you, sir.
9      At the time in question, Rodney Hutton was
10  the commanding officer; correct?
11  A  Yes.
12  Q  Was he your current direct supervisor?
13  A  Yes, he was my direct supervisor.
14  Q  Understood.
15      And underneath you it's my understanding
16  that between August 2015 and August 2016 Adam
17  Sheppard was the battalion supervisor of the
18  battalion?
19  A  I believe so, yes.
20  Q  Then do you know the names of the three other
21  lieutenants?
22  A  Let's see, Lieutenant Kyle Willstatter was Alpha
23  Company.  Lieutenant Megan Redlawsk, Megan May,
24  was Charlie Company.  And Bravo was either
25  Lieutenant Rob Etter or -- I cannot think of his

Page 11

1  name.  It will come to me.
2  Q  Fair enough.
3  A  I think it was Rob Etter.  I don't remember
4  exactly the timing.
5  Q  Was ████████ in Alpha Company?
6  A  Yes.
7  Q  Was ████████████ also in Alpha Company?
8  A  Yes, I believe so.
9  Q  Do you know who their student leadership was in
10  Alpha Company at that time?
11  A  No, I don't.
12  Q  Understood.
13      Do NROTC program requirements require
14  midshipmen to maintain a semester and cumulative
15  GPA above a 2.5?
16  A  That's the current minimum requirement.  At this
17  time I think it was 2.5 per semester and 2.0
18  cumulative.  I don't remember exactly when the
19  change took place.
20  Q  Understood.
21      Is it correct to say that if a midshipman
22  doesn't meet that threshold, they cannot
23  complete the program?
24      MR. BYLER:  Objection to the form of the
25  question.  Hypothetical.

Page 12

1  Q  You can answer.
2  A  I'm sorry?
3  Q  You can answer.
4  A  There's no definite answer to that.  Can I ask
5  you a question?
6  Q  Sure.
7  A  So are you trying to figure out -- because I
8  know Midshipman ████ was below academic
9  standards.  So are you trying to see if he would
10  have been able to continue?
11  Q  Sure.  What would you say to that?
12  A  What I would say to that is, I have seen
13  students with worse GPAs succeed and students
14  with better GPAs fail.  So I have no idea.
15  Q  You can't say either way?
16  A  No.
17  Q  Understood.
18      Now, I understand that NROTC, at least at
19  the time and presumably now, has something
20  called a performance review board?
21  A  Yes, that's true.
22  Q  Can you give me an idea of what steps the Navy
23  took at that time to get to an NROTC review
24  board?
25  A  There are some general guidelines in the ROD,

Page 13

1  the Regulations for Officer Development.  I
2  don't know if you have reviewed those or not.
3  Like I said, those are recommendations.  In some
4  cases, some cases it's a requirement.
5      Generally for any students who are having
6  any kind of problems, our goal is to put in
7  place some sort of remediation with them in
8  order to address that problem, fix it, and get
9  them through the program to admission.
10      The CO has a few tools at his disposal.  He
11  can place a student on warning or probation
12  without a PRB.  Anything more extreme than that,
13  a leave of absence or disenrollment requires a
14  PRB.
15      So how the process works, if any student
16  had any kind of problems, academically,
17  physically, morally, you know, if they were
18  caught cheating on exam, arrested, anything
19  along those lines, generally what would happen
20  is the company officer would make the
21  recommendation, Midshipman X is below academic
22  standards, I recommend academic warning.  And I
23  would review those with the company officer, and
24  then we would pass those recommendations on to
25  the CO.  The CO makes the ultimate decision.  At

4 (Pages 10 - 13)

Page 14

1 which point the company officer says I recommend
2 academic warning. The CO would say no, I'm
3 going to refer this to a PRB.
4     Like I said, the purpose of any of those is
5 to get to the heart of the issue, find some way
6 to correct it, if it is something that can be
7 corrected, and then move on.
8 Q NROTC wants students to succeed.
9 A Yes.
10 Q You mentioned the regulations for officer
11 development?
12 A Yes.
13 Q Are those rules that are applicable to all
14 midshipmen?
15 A Yes. Well, actually they're applicable to
16 anybody assigned to the program. Not everyone
17 is a midshipman. We have some active duty
18 students as well.
19 Q Understood, sir.
20     But besides the regulations for officer
21 development, are there any other pertinent rules
22 that apply to a Navy NROTC midshipman?
23 A Could you be more specific? I mean, that's --
24 Q Sure. Are there any Navy specific, so not
25 Purdue, not Purdue rules, but like a Navy rule

Page 15

1 or NROTC rule that applies to a midshipman
2 beyond just these regulations?
3 A Yes. And that depends on the circumstance.
4 Q Can you tell me any of them?
5 A Well, for instance, there's about a two-week
6 period every summer where they go into active
7 duty. At that time, they're bound by every Navy
8 regulation in existence, including the uniform
9 code of military justice, you name it.
10     We do have some locally developed
11 instructions. Talk about how we will do
12 day-to-day operations. So, yes, there are other
13 instructions and regulations that they're bound
14 to.
15 Q Understood, sir. Thank you.
16     At the time, was it against any NROTC rule
17 at Purdue to sexually assault another
18 midshipman?
19 A Well, that's against the law. And I wouldn't
20 say we had a -- there's a CO's policy for sexual
21 assault, sexual harassment, that says something
22 along the lines that sexual assault, sexual
23 harassment will not be tolerated, so I guess you
24 could say that's a rule. It's policy. At that
25 point, it's more of I guess an order than a

Page 16

1 rule. And that word, simply summed up, everyone
2 knows that they are expected to obey the law.
3 Q Understood, sir, thank you.
4     Obviously we're here today in part because
5 of allegations made by ███████ against
6 ███████. I'll refer to them simply as
7 allegations. Before the allegations in
8 question, were you familiar with Midshipman
9 ███?
10 A Somewhat.
11 Q Had you met him before?
12 A Probably in passing. I teach the sophomores.
13 He was a freshman, so I had not had him in class
14 at that point. And as one of the senior
15 officers there, my interaction is normally with
16 the battalion leadership, not the fourth class.
17 Q Understood, sir. Do you have any recollection
18 of specific interactions with him prior to the
19 allegations?
20 A Prior to the allegations? No.
21 Q Understood.
22     Sir, prior to the allegations, were you
23 familiar with Midshipman ███?
24 A No. Again, she was also fourth class. I
25 probably met her and talked to her in passing.

Page 17

1 Q You can't remember any specific time you would
2 have talked to her specifically?
3 A No.
4 Q Understood, sir.
5     During the time in question, again that's
6 August 2015 to August 2016, did Purdue NROTC
7 have any procedures in place for how to handle
8 allegations of sexual assault by a midshipman?
9 A We would have, first and foremost as faculty
10 members, been bound by Title IX, so yes, we were
11 familiar with our responsibilities under
12 Title IX. There's annual training that Purdue
13 does that we all complete.
14 Q Besides your Title IX responsibilities you just
15 described, are there any reporting
16 responsibilities within the NROTC or the Navy
17 itself?
18 A I don't know if -- is that question germane to
19 what's going on here? I don't know if I should
20 answer that.
21     MR. JONES: John, you're the attorney here
22 for the Navy.
23     MR. MATUSZAK: What's the question again,
24 Tyler?
25     (The requested text was read by the

Page 18

```
 1   reporter as follows: "Besides your Title IX
 2   responsibilities you just described, are there
 3   any reporting responsibilities within the NROTC
 4   or the Navy itself?")
 5       MR. MATUSZAK:  You can answer the question
 6   to the extent you understand any other
 7   requirements you would have.  It's not a legal
 8   opinion -- can you rephrase the question, Tyler,
 9   make it so it's a question about his
10   understanding.
11 Q   At the time or now, are you personally aware of
12   any other responsibilities you had to report
13   sexual assault besides Purdue University?
14 A   Yes.
15 Q   Can you tell us which ones, which
16   responsibilities?
17 A   I can think of two off the top of my head.  One,
18   if it's involving a minor, that's an offense
19   that needs to be reported to law enforcement
20   right away.  Occasionally we have students under
21   the age of 18.  As far as the Navy goes, the
22   Navy has its own SAPR, Sexual Assault Prevention
23   and Reporting I think is the acronym, that
24   governs our reporting requirements.
25 Q   Understood, sir.  Thank you.
```

Page 19

```
 1       By your reference to SAPR, is it your
 2   understanding that the NROTC and the Navy was
 3   entitled to conduct its own investigation into
 4   allegations of sexual misconduct?
 5 A   Yes.  I mean -- yes.
 6       (Deposition Exhibit A was marked for
 7   identification.)
 8 Q   Sir, I would have you look at the first document
 9   there, it's marked as Exhibit A.  For the record
10   and for counsel's benefit, this is NSTC-0168
11   through -0195.  Sir, just take a minute to
12   review that and familiarize with it and let me
13   know when you're ready.
14       MR. BYLER:  While he's reviewing it, Tyler,
15   can you tell me again what exhibit letter you're
16   giving to this one.
17       MR. JONES:  This is Exhibit A.  It is
18   NSTC-0168 through NSTC-0195.
19       MR. BYLER:  Okay.  I got the document in
20   front of me then.
21 A   Okay.
22 Q   Have you taken a moment to review this, sir?
23 A   I have.
24 Q   Have you ever seen this document before?
25 A   Yes.
```

Page 20

```
 1 Q   Can you identify it for the record?
 2 A   It's preliminary investigating officer's report
 3   from Lieutenant Redlawsk to the CO.
 4 Q   When did you first see this that you recall?
 5 A   Probably on or about 14 June 2016.
 6 Q   Do you know if she provided this to both you and
 7   Commander Hutton?
 8 A   Yes, she would have.  It's from her to him, yes.
 9   It would have gone to him.
10 Q   So you would have seen it because it was sent to
11   him?
12 A   I would have seen it because he wanted me to.
13 Q   Understood.
14       Do you have a specific recollection of him
15   showing it to you?
16 A   No.
17 Q   Sir, can you confirm that Lieutenant Redlawsk
18   concluded that ███████ sexually assaulted
19   ███████?
20 A   That is what she stated in paragraph 2.
21 Q   In fact, did she conclude that ███████████
22   had violated ROTC policies, specifically Section
23   3-19:  Conduct/Aptitude Standards of Midshipman
24   Performance, Subsection 2.a Major Offenses,
25   item (11) Sexual harassment/assault?
```

Page 21

```
 1 A   Again, that's what she --
 2       MR. BYLER:  Object.  The document speaks
 3   for itself.
 4 Q   You can answer.
 5 A   Again, that's what she wrote in paragraph 2.
 6 Q   Sir, was her recommendation that ███████
 7   be dismissed?
 8 A   Yes, in paragraph 4 she states that Midshipman
 9   Fourth Class ████ be disenrolled from the NROTC
10   program.
11 Q   Understood.  Thank you, sir.
12       Sir, do you have any personal knowledge or
13   any belief to doubt the legitimacy of Lieutenant
14   Redlawsk's conclusions?
15       MR. MATUSZAK:  Object to the question.
16   Calls for his opinion.  Don't answer the
17   question.
18 Q   Commander, did you have any information at the
19   time that was inconsistent with Ms. Redlawsk's
20   conclusions?
21 A   No.
22 Q   Sir, at the time, what is an academic warning
23   with the NROTC?
24 A   Academic warning, as we discussed earlier, a
25   certain semester and cumulative GPA standards
```

6 (Pages 18 - 21)

Page 22

1  required.  When a student is below the
2  standards, again, they can be placed on warning,
3  probation, leave of absence or disenrolled based
4  on that.  So academic warning means that they
5  were below academic standards and needed to take
6  some corrective action.
7 Q  When a midshipman is placed on academic warning,
8  are they advised that failing to correct their
9  performance could result in dismissal or
10  disenrollment from the NROTC?
11 A  Yes.
12 Q  Turning now to the allegations themselves, do
13  you know when you were first made aware of
14  ██████████'s allegations?
15 A  No, I don't remember the date.
16 Q  Do you remember if it was by person or if you
17  received an email or a phone call from someone?
18 A  It would have been in person.
19 Q  Do you know from who?
20 A  Lieutenant Adam Sheppard.
21 Q  To confirm, Adam Sheppard came to you in person
22  and told you about the allegations?
23 A  Yes.
24 Q  Do you recall what you told him?
25 A  At that time -- I mean, I don't recall

Page 23

1  specifically.  But I would have reminded him of
2  our obligations under Title IX and then also to
3  the Navy.
4 Q  Understood.
5      Do you remember if you instructed him to
6  report it to Purdue?
7 A  We did report to Purdue.  I don't know who
8  decided that we needed to or -- yes, we did
9  report to Purdue as required.
10 Q  Fair enough, sir.  Thank you.
11      At that time, did you have any information
12  that Purdue was already aware of the
13  allegations?
14 A  No.
15 Q  Was it your understanding that Midshipman
16  ██████ had reported to the NROTC first?
17 A  I believe so but I don't know that.
18 Q  Understood.
19      Do you recall if you spoke with Lieutenant
20  Willstatter about the allegations at all?
21 A  In what terms?
22 Q  Did you take any action or suggest to Lieutenant
23  Willstatter that he take action to separate
24  Ms. ██████ and Mr. ██████ after the allegations
25  were made?

Page 24

1 A  I did not.
2 Q  Sir, do you know who instructed or who requested
3  Megan Redlawsk to investigate the allegations?
4      MR. BYLER:  Object to form.
5 A  The Commanding Officer Rod Hutton appointed her
6  as the PIO.
7 Q  Did you have any say in that?
8 A  Yes, he consulted with me.
9 Q  Is there any reason that you both selected Megan
10  Redlawsk?
11 A  Yes, we felt that Midshipman ██████ might be
12  more comfortable talking with another woman.
13 Q  Understood.  Was there any other reason?
14 A  No.  I mean, we thought she could handle it, but
15  that doesn't separate her from any of the other
16  lieutenants on staff.
17 Q  Understood, sir.
18      Now, you're aware that Purdue conducted its
19  own investigation of the allegations?
20 A  Yes.
21 Q  How did the NROTC stay abreast of what Purdue
22  was doing?
23 A  Through Lieutenant Redlawsk as our PIO, she
24  contacted the university.
25 Q  Are you aware if Midshipman ██████ was providing

Page 25

1  any information about his appeals or the
2  investigation process at Purdue to the NROTC?
3 A  To the NROTC?
4 Q  To the NROTC.
5 A  Oh, if he provided anything?
6 Q  Right.
7 A  I don't recall whether he did or not.
8 Q  Understood, sir.
9      Do you have any idea if any lieutenant or
10  any commander or any officer with the NROTC at
11  Purdue gave Midshipman ██████ an order to disclose
12  information about his Purdue investigation to
13  the NROTC?
14 A  We always request that our students provide us
15  copies of police reports, investigations from
16  the university, and we advise them that -- it
17  looks better for them if they are forthcoming
18  with what's going on and keeping us informed.
19  If anyone gave him an order, I don't know who
20  gave him an order.
21 Q  Would it be fair to say you requested the
22  information but you didn't command Midshipman
23  ██████ to provide it?
24 A  Again, I have no firsthand knowledge if -- that
25  would either have been Lieutenant Redlawsk in

Connor Reporting
A Veritext Company                              800-554-3376

Page 26

1  the course of her -- as the PIO, or Lieutenant
2  Willstatter as his company officer. And whether
3  they asked for it or ordered it, I don't know.
4     (Deposition Exhibit B was marked for
5  identification.)
6  Q  Understood. Thank you, sir.
7     If you could briefly, sir, the next
8  exhibit, Exhibit B in your folder there. For
9  the record, this is NSTC-0042. Please take a
10  moment to review that, sir, and let me know when
11  you're ready.
12  A  I'm familiar with it.
13  Q  Have you seen this document before, sir?
14  A  Probably. I don't have any direct knowledge of
15  it, seeing it, but I'm sure I did.
16  Q  Is this a standard release provided by the NROTC
17  to a midshipman?
18     MR. MATUSZAK: I'm going to object to the
19  question as to form. Can you clarify the
20  question?
21     MR. JONES: Sure.
22  Q  This is a form document the NROTC uses at Purdue
23  for the release of information?
24  A  Are you asking if every student signs this
25  particular form?

Page 27

1  Q  Yes, sir.
2  A  No, every student does not sign. We do have
3  a standard release that the students sign,
4  mainly so we can get their grades, but also any
5  disciplinary.
6     Purdue at the time requested we provide
7  them with that standard form, and they requested
8  one that said specifically in this corresponding
9  case.
10  Q  Understood, sir.
11     Just to confirm I heard you right earlier,
12  you said you don't have a recollection whether
13  someone gave Midshipman ▓▓▓ an order to fill
14  this out or whether or not he chose to?
15  A  That's correct.
16     (Deposition Exhibit C was marked for
17  identification.)
18  Q  Thank you.
19     Sir, I would have you turn to the next
20  document it looks like you already have. This
21  is Exhibit C. It is Bates No. NSTC-0015 through
22  0016, and then also at the back are two emails
23  that are NSTC-0159 through 0160. I'd ask you to
24  take a moment to review these, sir, and let me
25  know whether you're ready to proceed.

Page 28

1  A  Okay, I'm ready to proceed.
2  Q  Thank you. Sir, starting with the first two
3  pages there, it looks like a document from the
4  Navy. Have you seen this document before?
5  A  Again, I have no specific recollection, but I'm
6  sure I have.
7  Q  Can you identify for the record if you know what
8  it is?
9  A  This is the notification of the Performance
10  Review Board to Midshipman ▓▓▓.
11  Q  Understood.
12     Then if we turn to the back two pages, have
13  you seen any of these emails before?
14  A  Yes, I have. My name is on it, so yes.
15  Q  Just confirming that's you, sir.
16     In fact, you're cc'd on the first email and
17  it looks like to one of the emails on the second
18  page. I want to ask you some follow-up here.
19     Is it your understanding that Midshipman ▓▓▓'s
20  PRB was initially scheduled for June 23rd, 2016?
21  A  Yes. Again, that's from paragraph 1 in the
22  PRB notification.
23  Q  Is it your understanding that Midshipman ▓▓▓
24  initially requested that this be stayed pending
25  his appeal to Purdue's Dean's Office?

Page 29

1  A  Yes.
2  Q  Is there a reason that Kyle Willstatter was
3  giving this information to Midshipman ▓▓▓, or
4  is this something that lieutenants normally do?
5  A  Yes.
6  Q  Is it because he was the company officer?
7  A  Yes.
8  Q  Understood.
9     Is it a standard operating procedure at
10  that time for the NROTC or the midshipman's
11  company officer to get notification of the PRB?
12  A  Yes.
13  Q  Sir, if we turn to that first page again of the
14  document, NSTC-0015, I want to direct your
15  attention to paragraph 3. For the record, could
16  you read paragraph 3.
17  A  "PRP may recommend the following actions be
18  taken. Ramifications of these actions are
19  described in reference (a). No action.
20  Warning. Probation. Leave of absence.
21  Disenrollment with Interim Leave of Absence
22  pending final disenrollment from the NROTC
23  program."
24  Q  Thank you, sir.
25     Is it your understanding that at that time

8 (Pages 26 - 29)

Page 30

1  those were five options open to the PRB to
2  recommend to Commander Hutton?
3  A  For any standard -- yes, those are the five
4  options.
5  Q  And, in fact, in ███████'s PRB you had
6  the option of choosing any one of those five to
7  recommend to Commander Hutton; correct?
8      MR. MATUSZAK:  I'm going to object to the
9  question.  It calls for a legal conclusion.
10  MR. JONES:  Okay, I'll restate it.
11      I'll come back to this in a minute.
12  Q  Are you aware at some point that Lieutenant
13  Redlawsk left the Purdue NROTC to go elsewhere?
14  A  Do you mean did she transfer?
15  Q  Right.
16  A  Yes, I'm aware of that.
17  Q  After she transferred, who at Purdue NROTC was
18  responsible for monitoring the status of
19  ███████'s case?
20  A  First of all, I don't recall exactly when she
21  transferred, so I can't recall having anyone
22  else monitor the case with Purdue.
23      (Deposition Exhibit D was marked for
24  identification.)
25  Q  I'd like to direct your attention to Exhibit D.

Page 31

1  It's about three pages of emails here.  For your
2  reference, they go in reverse chronological
3  order, so it may be easier to read from the back
4  up.  It's NSTC-0140 through 0142.  After you've
5  had a moment to review, sir, let me know when
6  you're ready to proceed.
7  A  Okay, I'm ready to proceed.
8  Q  Sir, have you ever seen these emails before?
9  A  Yes, I have.
10  Q  In fact, are you cc'd in these emails?
11  A  I am on two of them it looks like.
12  Q  Thank you, sir.
13      I'll specifically direct you to it looks
14  like an email from Kyle Willstatter on the
15  second page sent August 2nd, 2016, at
16  approximately 9:48 a.m.  If you could take a
17  look specifically and if you could review this
18  briefly.
19  A  I'm sorry?
20  Q  Have you reviewed this?
21  A  I've glanced at it, yes.
22  Q  Is there anything Mr. Willstatter said that's
23  inconsistent with your understanding of how this
24  PRB is supposed to work?
25  A  Nothing that I see, no.

Page 32

1  Q  Do you take exception with anything that
2  Lieutenant Willstatter said to Midshipman ███
3  here?
4  A  No.
5  Q  Turning to the first page of the exhibit, you'll
6  see ███████ states something to the
7  effect of, "I will assume then that I am to be
8  disenrolled from the NROTC following the hearing
9  and final decision by CPT Hutton."
10      And you'll see Kyle Willstatter in response
11  says, "Well, I cannot categorically state
12  disenrollment will be the outcome of the PRB
13  process, I would advise that any decision
14  otherwise is a near impossibility."
15      Do you see that, sir?
16  A  I do.
17  Q  Do you take exception to anything Lieutenant
18  Willstatter stated?
19  A  No, that sentence -- there's two sentences, they
20  come almost straight out of the ROD.
21  Q  And what is the ROD, for the record?
22  A  Regulations for Officer Development.
23  Q  So is it fair to say that even though it wasn't
24  likely, it wasn't an impossibility that
25  Midshipman ███ could be retained by NROTC?

Page 33

1      MR. BYLER:  Objection to form.  It also
2  calls for a legal conclusion.
3  Q  It's not a legal conclusion, but you can answer.
4      MR. MATUSZAK:  You're asking a hypothetical
5  question.
6      MR. JONES:  I'm not asking a hypothetical,
7  I'm asking to understand exactly what Kyle
8  Willstatter was stating here.
9      MR. MATUSZAK:  Then that question should go
10  to Kyle Willstatter.
11  Q  Commander Remaly, do you have your own
12  understanding of what Kyle Willstatter meant in
13  that first sentence?
14  A  Yes.
15  Q  Can you state for the record what that
16  understanding is?
17  A  The way I read that, the way I understand it is
18  that -- and again, to reference the ROD, the
19  section in ROD in the PRB states that there are
20  five possible outcomes:  No action, warning,
21  probation, leave of absence, and interim leave
22  of absence pending disenrollment from the
23  program by the Assistant Secretary of the Navy.
24      So I think what Kyle is saying is that all
25  five of those options are allowed by the ROD for

9 (Pages 30 - 33)

Page 34

1  a PRB. And he's also saying "while I can't
2  categorically state that disenrollment will be
3  the outcome," meaning that we go to the PRB
4  without having made up our minds what the
5  outcome of the PRB will be.
6      And then he says "that any decision
7  otherwise is a near impossibility," and that's
8  because there's a section in the ROD that states
9  that if any midshipman is suspended, expelled,
10  prevented from registering from classes, or any
11  other such words, or something along those
12  lines, the PNS will disenroll them from the
13  program.
14 Q  Okay.
15 A  So in one section of the ROD, again, concerning
16  PRBs, it says that all five options are on the
17  table. And in another section of the ROD it
18  says that if you are suspended, you will be
19  disenrolled.
20 Q  Understood, sir.
21      Do you know if the ROD has changed between
22  2015 and 2016 and the present day?
23 A  Several times.
24 Q  Do you know if a past version of the 2015-2016
25  ROD is available to the public?

Page 35

1 A  That I do not know.
2      (Deposition Exhibit E was marked for
3  identification.)
4 Q  Sir, I'd like to move next to Exhibit E. This
5  is NSTC-0011 through 0012. Please take a moment
6  to review this, sir.
7 A  I'm familiar.
8 Q  Sir, you've seen this document before?
9 A  Yes. It's from me.
10 Q  Can you identify it for the record?
11 A  It's my report of the PRB from Mr. ███ to
12  the CO.
13 Q  On the second page there's a signature there
14  that purports to be yours. Can you confirm that
15  that's your signature?
16 A  That is my signature.
17 Q  Do you know if those are the signatures of Major
18  McDowell and Lieutenant Taylor?
19 A  They are.
20      In answer to the previous question,
21  Lieutenant Etter is not there, it's Lieutenant
22  Taylor who was his replacement.
23 Q  Understood.
24      Sir, do you recall the day of the PRB in
25  question here?

Page 36

1 A  Not specifically, no.
2 Q  Do you know where it was held?
3 A  Sorry, what?
4 Q  Do you know where the PRB was held?
5 A  At the Armory in the NROTC conference room.
6 Q  At West Lafayette?
7 A  Yes.
8 Q  How big is the conference room?
9 A  About the size of this room.
10 Q  For the record, is it fair to say maybe 30 feet
11  by 20 feet?
12 A  Sure. We could seat 12 around the table.
13 Q  Understood.
14      So it was a table setup?
15 A  Yes.
16 Q  Besides Midshipman ███ and the three
17  signatories here, was there anyone else at the
18  PRB?
19 A  Lieutenant Willstatter.
20 Q  Was he the recorder?
21 A  He was the recorder.
22 Q  Besides Lieutenant Willstatter, was anyone else
23  there?
24 A  No.
25 Q  At the PRB, was it set up so that you and the

Page 37

1  two other members of the PRB sat across from
2  Midshipman ███?
3 A  Yes. So the board sits at the table with the
4  recorder at the end, and the midshipman is on
5  the other side of the table.
6 Q  I noted in earlier documents it said that the
7  dress is Midshipman blue or formal blue maybe.
8 A  Service dress blue.
9 Q  That's it.
10      Are all members or attendees in service
11  dress?
12 A  No.
13 Q  Do you recall Midshipman ███'s demeanor that
14  day?
15 A  No.
16 Q  Specifically I direct you to the second page,
17  paragraph 9. Can you take a second to review
18  this?
19 A  Okay, I'm ready.
20 Q  Is there anything that occurred at the PRB that
21  isn't reflected in this paragraph?
22 A  To my recollection, no.
23 Q  Understood, sir.
24      Is there any difference between a senior
25  member and member of the PRB?

10 (Pages 34 - 37)

Page 38
1 A  Yes.
2 Q  Can you tell me what the difference is?
3 A  I guess maybe the best way to describe it is the
4    senior member chairs the PRB.  The senior member
5    is responsible for the conduct of the PRB.
6       One of the things that comes to mind is
7    that if Midshipman ███ or any student at a PRB
8    is going to challenge a member of the board,
9    that challenge, I decide that -- unless I'm the
10   one being challenged -- as the senior member.
11 Q  Understood, sir.
12      I note here at the very first page of the
13   exhibit, it states ENCL.  Does that mean
14   enclosure or enclosed?
15 A  Yes.
16 Q  Then it notes several documents.  Among those
17   documents it has the university investigator's
18   report.  Does that refer to Purdue's
19   investigation of ████████?
20 A  I believe so, yes.
21 Q  It also has the university's academic report.
22   Does that refer to ████████'s grades while
23   at Purdue?
24 A  Yes, his transcript.
25 Q  Then it looks like here there's also a final

Page 39
1    determination from the dean of students.  That
2    was also enclosed at the PRB?
3 A  Enclosure 10?
4 Q  Right.
5 A  Yes.
6 Q  And the PRB had all these documents in front of
7    it and considered it to the relevant extent
8    before making its decision?
9 A  Yes.  Yes.
10 Q  Sir, I note here paragraph 6 has academic
11   history noted.  Am I correct in reading this
12   that the semester GPAs of 2.11 and 2.47 refer to
13   ████████'s GPA during those times?
14 A  That is correct.
15 Q  And the cumulative GPAs referred to ████
16   ████'s cumulative GPAs during that time?
17 A  Yes, that's also correct.
18 Q  Then you also noted here disciplinary problems,
19   academic warning, spring 2016.
20 A  Yes.
21 Q  Then you also note ILOA pending PRB for
22   academics.  Is that correct?
23 A  That is correct.
24 Q  What is an ILOA?
25 A  ILOA is interim leave of absence.

Page 40
1 Q  You had said earlier that PRBs are somewhat
2    reserved for more serious actions like an LOA or
3    a disenrollment from the NROTC.  Is that true
4    also for an ILOA?
5 A  No.
6 Q  Is it unusual for an ILOA to be pending prior to
7    a PRB?
8 A  No.
9 Q  Paragraph 8 refers to professional performance
10   history.  Can you explain for laypeople like me
11   what professional performance means?
12 A  We evaluate midshipmen throughout the year,
13   throughout the course of their time at Purdue,
14   and give them an aptitude score, which is used
15   by the Navy for various things.  And what goes
16   into that is -- well, first off, our mission
17   statement says student development of midshipmen
18   morally, mentally and physically, so those are
19   three of the key things that go into determining
20   someone's aptitude.
21      Academics, the mental part, physical, what
22   did they score on their physical fitness
23   assessment.  And morally, are they making good
24   decisions.
25      Something that's not included in our

Page 41
1    mission statement that we do include in their
2    evaluation as far as aptitude is their
3    performance in the battalion.  I alluded to
4    earlier that we have a student CO, XO, CMC,
5    department heads.  The companies have company
6    commanders who are students.  We give various
7    other billets of jobs throughout the year and we
8    evaluate how well they perform there.  All that
9    is rolled up into our aptitude evaluation for
10   them.
11 Q  Understood.
12      And is this correct that Mr. ███ was
13   ranked 22 of 28?
14 A  Yes, I believe that's correct.
15 Q  Is that for his company?
16 A  No, that is for -- that is for all Fourth Class
17   midshipmen.
18 Q  So across all three companies, Alpha, Bravo,
19   Charlie?
20 A  I don't remember at the time if we were
21   including the Marines.  Since I've been at
22   Purdue, there was a change to break the Marines
23   out from the rest of the midshipmen so that the
24   Marines were ranked against Marines, Navy was
25   ranked against Navy.  I can't tell you if this

11 (Pages 38 - 41)

Page 42

1    was -- I don't remember if this was all Fourth
2    Class midshipmen or all Fourth Class Navy
3    midshipmen. Definitely across three Navy
4    companies, possibly the Marine company.
5  Q  Understood, sir.
6        Just a miscellaneous question for my
7    edification. Are all freshmen automatically
8    Fourth Class midshipmen entering the NROTC?
9  A  As a rule of thumb, yes. Determining whether
10    someone is a -- we've had midshipmen who were --
11    I think we had one who was classified as a
12    junior by Purdue who was a Fourth Class. It has
13    to do with how many of the Naval science
14    requirements they had met. So if someone picks
15    up a scholarship late, say between their
16    sophomore and junior year and shows up as a
17    junior, they will be a Fourth Class.
18  Q  When you say pick up a scholarship, do you mean
19    join the NROTC?
20  A  Yes, actually, because you don't have to have a
21    scholarship to join.
22  Q  Understood.
23  A  Yes.
24  Q  So Fourth Class doesn't correlate directly to
25    being a freshman, and Third Class isn't a

Page 43

1    sophomore, it just depends on military credit?
2  A  That's probably 99 percent correct.
3  Q  Okay, thank you.
4        Sir, it says here that the board closed for
5    deliberations at 10:07 and reconvened at 10:11;
6    is that correct, to the best of your knowledge?
7  A  To the best of my knowledge. I mean, that's
8    what we reported, so I'm sure it's correct.
9  Q  Did you leave the room for your deliberations?
10  A  No, we never leave the room for deliberations.
11  Q  Did the midshipman leave the room?
12  A  The midshipman and the recorder leave the room.
13    Deliberations are amongst board members only.
14  Q  Understood.
15        Do you remember what you discussed, if
16    anything, during those deliberations?
17  A  I don't know if I should answer that. The
18    deliberations and the voting are supposed to be
19    secret.
20        MR. JONES: Mr. Matuszak, is that fair
21    game?
22        MR. MATUSZAK: Well, the deliberations --
23    the party of interest would be Mr. ████, it
24    would be his rights protected. So I'll leave it
25    up to Mr. ████'s attorney to decide if he wants

Page 44

1    to release that information.
2        MR. BYLER: I'd have to consult with the
3    client. I'm not quite aware of what
4    specifically that referred to, because we've
5    been disclosing everything basically. And
6    there's that document, Bates stamp 42, where
7    ████████ authorizes the disclosure of
8    everything from the university to the Navy, so I
9    guess I'm a little puzzled that I'd have to talk
10    to the client in terms of what did that refer
11    to. This hasn't been brought up before to my
12    attention. I'm sorry I have to give that
13    answer.
14        MR. JONES: It sounds like, Phil -- off the
15    record briefly.
16        (Off the record discussion.)
17        MR. MATUSZAK: Mr. Williams, would you
18    please reread the question to the deponent.
19        (The requested text was read by the
20    reporter as follows: "Do you remember what you
21    discussed, if anything, during those
22    deliberations?")
23  A  In this case all we discussed was whether or not
24    he had been suspended from the university and if
25    we were required by the ROD to disenroll him.

Page 45

1  Q  Before making your recommendations, did you note
2    any mitigating circumstances in this case?
3  A  No.
4        MR. JONES: Off the record briefly. Let's
5    take a five-minute break and let everyone use
6    the restroom and get a drink if they need it.
7        (A recess was taken between 10:16 a.m. and
8    10:34 a.m.)
9  BY MR. JONES:
10  Q  Back on the record. Are you ready to proceed?
11  A  I am.
12  Q  I just have a few small questions.
13        During the minutes we just talked about
14    where you and the other members conferenced
15    together during the PRB, was there any
16    discussion of Lieutenant Redlawsk's report or
17    conclusions?
18  A  No.
19  Q  Was there any discussion of sexual misconduct by
20    ████?
21  A  No. And again, both of these answers are to my
22    recollection.
23  Q  Sure. I only ask that you answer to the best
24    you remember.
25        In fact, is it correct that the discussion

12 (Pages 42 - 45)

1  was limited solely to the fact that █████
2  █████ had been suspended by Purdue University?
3  A  Yes.
4  Q  I'm sorry?
5  A  Yes.
6      MR. JONES:  Nothing further at this time.
7  CROSS-EXAMINATION,
8      QUESTIONS BY PHILIP A. BYLER:
9  Q  Good morning.  Again, my name is Philip Byler,
10  I'm counsel to the Plaintiff, John Doe, who is
11  █████, versus Purdue University.  Thank
12  you for being here today.
13      I just want to go back to some documents,
14  and I'll ask that you have them in front of you
15  before you answer questions.
16  A  Yes.
17  Q  Let's go back to the document starting with
18  Bates stamp NSTC-0011.
19  A  So this is out of the other package?
20      MR. JONES:  Phil, I separated his exhibits
21  between our exhibits and yours.  Are you
22  referring to our exhibits now?
23      MR. BYLER:  Well, this one I think you
24  presented to him as Exhibit C, but I'm not sure.
25  But you did present to him the August 10, 2016,

1  document.
2      MR. JONES:  Would you give the Bates No.
3  again?
4      MR. BYLER:  NSTC-0011 is the first page.
5      MR. JONES:  You're referring to the
6  Performance Review Board summary.
7      MR. BYLER:  Yes.  You asked some questions.
8  I have some follow-up questions.  Okay?
9      MR. JONES:  No, that's fine.  I just wanted
10  to make sure he had the right document in front
11  of him.
12      MR. BYLER:  No, I appreciate you're making
13  sure.
14      MR. JONES:  You were just looking at it.
15  It will have Exhibit E at the bottom of it.  We
16  were just talking about it.
17  A  I'm sorry, I have it.
18  Q  Okay.  Do you have it in front of you?
19  A  I do.
20  Q  I just want to verify.  I think you testified
21  already that the signature on the second page of
22  this document, which is 0012, is your signature.
23  A  It is.
24  Q  And it's also signed by one of the voting
25  members of the Performance Review Board, along

.1  with you?
2  A  I'm sorry?
3  Q  Are also there signatures by two other voting
4  members of the Performance Review Board?
5  A  Yes, they signed it.
6  Q  This document is dated August 10, 2016?
7  A  Yes.
8  Q  Was it on or about August 10, 2016, that the
9  Performance Review Board was held at the Armory
10  at Purdue?
11  A  It would have been a few days prior to that, but
12  yes.
13  Q  Just looking at the listing of documents on the
14  first page, there's 12 items here; correct?
15  A  Twelve enclosures, yes.
16  Q  I just want to note, No. 9 is the university
17  investigative report; correct?
18  A  Correct.
19  Q  And No. 10 is the final determination from the
20  Dean of Students.  That's the Purdue Dean of
21  Students; correct?
22  A  Correct.
23  Q  And No. 11 is Midshipman █████ s statement of
24  appeal of the final determination; correct?
25  A  That is correct.

1  Q  Did you understand that Mr. █████ did appeal a
2  couple times the university determination?
3  A  Yes, I understand that.
4  Q  And No. 12 was the university response to
5  Midshipman █████'s appeal.
6  A  That's correct, yes.
7  Q  Let me turn to paragraph 1, which I'll publish
8  it and then I'll ask you a question about it.
9  "For references A through C, a Performance
10  Review Board was held 9 August 2016 to determine
11  Midshipman █████'s aptitude for
12  commission service while enrolled in the NROTC
13  program.  Midshipman █████ was suspended by
14  Purdue University."
15      That's what this document states; correct?
16  A  That's correct.
17  Q  And so it was August 9, 2016, that the
18  Performance Review Board was held?
19  A  Yes.
20  Q  And there's no other statement after "Midshipman
21  █████ was suspended by Purdue University" in that
22  paragraph; correct?
23  A  I'm sorry, there's no statement?
24  Q  After it says, "Midshipman █████ was suspended by
25  Purdue University," there's nothing else stated

Page 50

1   in this paragraph.
2 A  That is correct.
3 Q  I want to go to the second page of the document.
4 A  Okay.
5 Q  And to paragraph 10 where it says, "Board
6   Recommendation." I'm going to publish it again
7   and then I'll have some questions. "By a vote
8   of three to nothing, the Performance Review
9   Board found that Midshipman Fourth Class █████
10   was suspended by Purdue University by vote of
11   three to nothing. The Board recommends that
12   Midshipman ███ be disenrolled from the ROTC
13   program."
14      Did I read that correctly?
15 A  That is correct.
16 Q  And that was the board's recommendation?
17 A  Yes.
18 Q  Is there anything else stated here in this
19   document which you signed with respect to the
20   board recommendation?
21 A  No.
22      (Deposition Exhibit 1 previously marked for
23   identification.)
24 Q  Could the witness be provided the document which
25   was previously marked and shown to witnesses

Page 51

1   yesterday, starting with NSTC-0001 through
2   NSTC-0004.
3 A  Okay, I have it.
4 Q  My first general question, do you recall
5   reviewing this document in the time period that
6   the document is dated?
7 A  Not specifically, no, but I would have.
8 Q  Go to page 3.
9 A  Okay.
10 Q  Paragraph 2 at the bottom of the page.
11 A  Yes.
12 Q  Do you see -- and I'll publish it -- "Type of
13   disenrollment brought by institution.
14   Midshipman ███ was suspended by the university
15   for one academic year."
16 A  That's correct. That's what it says.
17 Q  Is there anything else in paragraph 2?
18 A  No, there's not.
19 Q  Paragraph 9 on the next page. Paragraph 9, I'll
20   publish it. "PNS Recommendation. Recommend
21   disenrollment of Midshipman ███ due to
22   suspension by the university for one academic
23   year."
24      Is that what it says?
25 A  Yes.

Page 52

1 Q  What does PNS refer to?
2 A  Professor of Naval Science.
3 Q  That in this instance is referring to
4   Mr. Hutton?
5 A  It is.
6 Q  Another document you were presented, it might
7   have been Exhibit C, I'm not sure, but it's
8   Bates stamped NSTC-140 to NSTC-142. It's a
9   series of emails.
10 A  NSTC-0042?
11 Q  0140 to 0142. I apologize.
12 A  The emails.
13 Q  Yes.
14 A  Okay, I have it.
15 Q  Looking at the document, do you see that this
16   goes in reverse chronological order?
17 A  I know that.
18 Q  So on 142 are some questions that Mr. ███
19   raises with Kyle Willstatter.
20 A  Yes.
21 Q  And NSTC-141, do we see Mr. Willstatter's
22   response that ███████ copied to you?
23 A  Yes.
24 Q  That would indicate that Mr. Willstatter decided
25   to copy you on his responses; correct?

Page 53

1 A  Yes.
2 Q  You were asked a few questions I think about
3   this document. I want to focus on paragraph 2
4   in Mr. Willstatter's email copied to you. I'll
5   publish it and then ask some questions. PRB
6   means Performance Review Board; correct?
7 A  Correct.
8 Q  And paragraph 2 says, "The PRB is not about the
9   circumstances surrounding your suspension, it is
10   about the fact that you have been suspended.
11   There is no reason to re-litigate the
12   university's decision. The fact is that you are
13   suspended, and the ROD requires disenrollment
14   for any case where a student is suspended. The
15   black and white nature of this PRB is why you
16   are allowed to waive, if you so choose, any
17   witnesses or other persons you would want to
18   have present. Please let me know their names
19   and the reason. You have the right to bring any
20   witnesses you want; however, unless they're
21   going to state contrary to facts that you have
22   not been suspended by the university, it will
23   basically be a waste of time."
24      That's what the paragraph states; correct?
25 A  Yes.

14 (Pages 50 - 53)

Page 54

1 Q  Did you at any time indicate to Mr. ██████ that
2    that was incorrect, that statement that
3    Mr. Willstatter said to Mr. ████?
4 A  No.
5 Q  And Mr. Willstatter was a nonvoting member of
6    the Performance Review Board?
7 A  That's correct.
8 Q  Go to page NSTC-0140.
9 A  Okay.
10 Q  I want to go to the first paragraph, because I'm
11    not sure the attention was on it.  This was the
12    August 5 email that Mr. Willstatter sent to
13    Mr. ████, copy to you.  Do you see it?  It's the
14    12:18 p.m. email in the middle of the page.
15 A  Yes.
16 Q  I want to pick up in the middle of the first
17    paragraph, and it says, "Even if the board were
18    to decide and the CO were to agree that you are
19    a lock to be the next CNO, they would still have
20    to find a way to justify keeping you in the
21    program when you can't attend the university."
22       Did I read that correctly?
23 A  You did.
24 Q  CNO means Chief of Naval Operations?
25 A  Correct.

Page 55

1 Q  I'm not asking you the person presently, but who
2    is the CNO in terms of the Navy hierarchy?
3 A  Chief of Naval Operations, he is in terms of our
4    administrative chain of command, he's at the
5    top.
6 Q  So you are talking about the top person in the
7    Navy?
8 A  Yes.
9 Q  And CO means commanding officer.
10 A  Correct.
11 Q  That would mean in this case Mr. Hutton?
12 A  Correct.
13 Q  Let me now go to my -- let's see, my notes
14    indicate it was marked as Exhibit A, which
15    starts on page 168 and goes to 195.
16 A  Okay, I have it.
17 Q  This is Ms. Redlawsk's document.  The first page
18    is a one-page memo by Ms. Redlawsk; correct?
19 A  Correct.
20 Q  The next page starts, what follows are all or
21    substantially all university documents for the
22    rest of the document to page 195; correct?
23       MR. JONES:  Object to form.  You can
24    answer, sir.
25 A  I believe so, yes.  Without examining each

Page 56

1    individual page, that's what it looks like.
2 Q  So in terms of this document, only the first
3    page is Ms. Redlawsk's own memo; correct?
4 A  Correct.
5 Q  She wrote this, did she not, as a preliminary
6    inquiry recommendation surrounding the
7    allegations of sexual assault made against
8    Midshipman Fourth Class ████████; correct?
9 A  That is correct.
10 Q  Ms. Redlawsk had no authority herself to do a
11    disenrollment.
12       MR. JONES:  Object to form.  You can
13    answer.
14 Q  Let me ask.  Who had the responsibility to
15    determine whether there should be disenrollment?
16 A  Are you asking me the final determination of
17    anybody that is going to be disenrolled, who
18    that is?
19 Q  Yes.
20 A  That's the Assistant Secretary of the Navy.
21 Q  Okay.  In terms of the Navy ROTC, who has the
22    authority to recommend the disenrollment?
23       MR. JONES:  Object to form.  Go ahead.
24 A  In order to disenroll someone, it has to be
25    through the PRB process.  It starts with the

Page 57

1    PRB, goes through the board to the CO, and then
2    up the chain of command to the Assistant
3    Secretary of the Navy.
4 Q  Thank you.  That's what I thought was the case,
5    but you're the one who can speak to that.
6       My question is, is Ms. Redlawsk's one-page
7    memo a recommendation that a Performance Review
8    Board be convened?
9 A  I'm sorry, yes, she did recommend that.
10 Q  Now, looking at the document in front of you,
11    Exhibit A, what follows -- first of all,
12    starting at page 169, Bates stamp 169 is the
13    Dean's June 14th, 2016, determination letter?
14 A  Yes, the Dean's final determination letter, yes.
15 Q  Yes.  And at 170 to 180 is the Purdue
16    investigation report.
17       MR. JONES:  Is that a question, Phil?
18       MR. BYLER:  I'm sorry, did Tyler say
19    something?
20       MR. JONES:  Is that a question, Phil, or
21    are you stating?
22 Q  Oh, yeah, the question.  Is the Purdue
23    investigation report at 170 to 180 in this
24    document?
25 A  It starts on 170, yes.  Actually I don't know if

15 (Pages 54 - 57)

**Page 58**

1  181 is part of the investigator's report or part
2  of Lieutenant Redlawsk's.
3 Q  Those are copies of texts starting at 181 going
4  to 187.
5 A  Yes. And I don't know the source of those.
6  Those might be part of the university
7  investigative report.
8 Q  I will represent to you it is, but that's not
9  the point.
10  At 188, do you see a list of character
11  references for ███?
12 A  I do.
13 Q  189 to 191 is a May 23, 2016, statement by
14  ███.
15 A  189 to 191?
16 Q  Yes.
17 A  Yes.
18 Q  Let me ask you to go back to a document which
19  was presented to you, it has Bates stamp
20  NTSC-42.
21 A  Okay. Authorization of Release of Information.
22 Q  Yes. It appears that Mr. ███ signed that
23  document; correct?
24 A  Yes.
25 Q  And he authorized the release of information to

**Page 59**

1  the Navy ROTC; correct?
2 A  That is correct.
3  (Deposition Exhibit 5 previously marked for
4  identification.)
5 Q  I ask that it be able to be presented to the
6  witness documents NTSC Bates stamp 0020, and
7  then 0021 through 0050. See if you can find
8  those, please.
9 A  I have 21. I don't see 20.
10  MR. JONES:  Phil, can you repeat the Bates
11  No. again?
12 A  Wait a minute. Here it is. Okay, I have
13  NSTC-0020, an email to Midshipman ███ from Vice
14  President Rollock.
15 Q  Addressed to who?
16 A  Addressed to Mr. ███, Midshipman ███.
17 Q  What's the date of that document?
18 A  July 21st, 2016.
19 Q  What is the content of that email?
20 A  What is the content?
21 Q  Yes.
22  MR. JONES:  Are you asking him to read it,
23  Phil?
24 Q  I'm asking him to review it because it's in the
25  Navy files.

**Page 60**

1 A  Okay. This is her response to his appeal, and
2  she upholds Dean Sermersheim's -- I think how
3  she pronounces it -- decision that he be
4  suspended for one full academic year.
5 Q  And the date of that document again was?
6 A  July 21st, 2016.
7 Q  And this was a document in the Navy files;
8  correct?
9  MR. JONES:  Object to form.
10 A  Yes, I believe so.
11 Q  And the Performance Review Board held on
12  August 9, 2016, was after that July 21, 2016,
13  document?
14 A  Yes, August usually comes after July.
15 Q  Yes, okay. It may seem obvious, but I just want
16  to make sure of the chronology.
17  Now, looking at the documents 21 to 50.
18 A  Okay, I have that in front of me.
19 Q  They're Bates stamped with the Navy file, are
20  they not?
21 A  They are.
22 Q  At pages 21 to 22, is that John Doe's academic
23  report from Purdue?
24 A  It is.
25 Q  Is page 23 a counseling page?

**Page 61**

1 A  It is.
2 Q  Are pages 24 to 34 the Purdue investigation
3  report?
4 A  From a quick cursory glance, it appears to be,
5  yes.
6 Q  Are pages 35 to 41 those texts that were
7  appended to the Purdue investigation report?
8 A  Yes.
9 Q  Is 42 that document in which Mr. ███ authorizes
10  the Navy to receive the university disciplinary
11  files as well as other files?
12 A  It is.
13 Q  Is 43 to 45 the Purdue Dean's June 14, 2016,
14  determination in ███'s university
15  disciplinary case?
16 A  Yes, this is from Dean Sermersheim to him. Yes,
17  it's her determination.
18 Q  Is 46 to 47 ███'s university appeal
19  letter of the dean's determination?
20 A  It is.
21 Q  And is 48 to 50 Mr. ███'s second university
22  appeal letter?
23 A  It is.
24  MR. BYLER:  I have no further questions.
25  MR. JONES:  Very briefly, Commander.

16 (Pages 58 - 61)

Connor Reporting
A Veritext Company                    800-554-3376

Page 62

1 REDIRECT EXAMINATION,
2     QUESTIONS BY TYLER L. JONES:
3 Q   You saw Mr. Byler just went over with you
4     NSTC-0023, it's a counseling notation page.
5 A   Okay.
6 Q   Do you know who drafted this?
7 A   His company officer.
8 Q   So this would have been Lieutenant Willstatter
9     then to the best of your knowledge?
10 A   Yes. So Lieutenant Sheppard had been Alpha
11     Company officer, but for this term he moved to
12     the billet of battalion officer, and this should
13     all have been Lieutenant Willstatter, and the
14     writing looks consistent with his.
15 Q   Understood, sir. Thank you.
16         Very briefly, you were provided with a
17     document labeled as NSTC-0001 and it goes
18     through NSTC-0004. At any point in here does
19     this indicate that ▇▇▇▇▇▇▇▇ was suspended
20     for sexually harassing or sexually assaulting
21     ▇▇▇▇▇▇▇▇?
22 A   No, not in these documents.
23 Q   In fact, according to these documents, is it
24     correct that ▇▇▇▇▇▇▇▇ was disenrolled from
25     NROTC solely for being suspended from Purdue

Page 63

1     University?
2 A   That's correct.
3         MR. JONES: Phil, I have nothing further
4     unless you do.
5         MR. BYLER: No, I have nothing further,
6     just to thank Commander Remaly.
7         MR. JONES: Once again for the record,
8     Phil, will you stipulate to the admissibility
9     and authenticity of these documents, despite
10     what we argue they may mean?
11         MR. BYLER: Yes, of course. Mr. Remaly
12     should know that I've been to the Armory because
13     my two sons were Purdue graduates, and one is an
14     Army major now, four combat tours of duty. The
15     other one is a wounded warrior Marine.
16         THE WITNESS: One of them picked the right
17     branch of service then.
18         MR. JONES: John, do you want to advise
19     Commander Remaly of his rights.
20         MR. MATUSZAK: Commander, the defense will
21     be providing a copy of the transcript to you of
22     this deposition. You should review the
23     transcript and you should call me if there are
24     any corrections to the transcript.
25         You can send it to me and we can get it to

Page 64

1     him.
2         COURT REPORTER: Could I just get
3     transcript copy orders, please.
4         MR. JONES: The defense will order an
5     electronic pdf copy. We will forward that copy
6     to the Navy and Commander Remaly for his
7     inspection.
8         COURT REPORTER: John, you're not ordering
9     a copy.
10         MR. MATUSZAK: No. Send my bill to Purdue.
11         COURT REPORTER: Phil, are you ordering a
12     copy of the deposition?
13         MR. BYLER: Yes. I gave you all the
14     information yesterday.
15         COURT REPORTER: That's fine, we have your
16     information.
17         (Time Noted: 11:06 a.m.)
18
19
20     AND FURTHER DEPONENT SAITH NOT.
21
22
23
24
25

Page 65

1 STATE OF INDIANA        )
                          ) SS:
2 COUNTY OF MARION        )
3
4     I, Craig Williams, RPR, CMRS, a Notary Public
5 in and for the County of Marion, State of Indiana,
6 at large, do hereby certify that CRAIG REMALY, the
7 deponent herein, was by me first duly sworn to tell
8 the truth, the whole truth, and nothing but the
9 truth in the aforementioned matter;
10     That the foregoing videoconference deposition
11 was taken on behalf of the Defendants, at the
12 offices of Stuart & Branigin, LLP, 300 Main Street,
13 Suite 900, Lafayette, Tippecanoe County, Indiana,
14 on the 21st day of May, 2020, at 9:00 a.m.,
15 pursuant to the Federal Rules of Civil Procedure;
16     That said deposition was taken down in
17 stenograph notes and translated into an English
18 transcript under my direction, and that said
19 transcript is a true record of the testimony given
20 by the said deponent; and that signature was
21 requested by the deponent and all parties present;
22     That the parties were represented by their
23 counsel as aforementioned.
24     I do further certify that I am a disinterested
25 person in this cause of action, that I am not a

17 (Pages 62 - 65)

Page 66

1 relative or attorney of either party or otherwise
2 interested in the event of this action, and that I
3 am not in the employ of the attorneys for any
4 party.
5    IN WITNESS WHEREOF, I have hereunto set my
6 hand and affixed my notarial seal on this 29 day of
7 May, 2020.
8
9
10                 N O T A R Y   P U B L I C
11
12 My Commission Expires:
13 January 14, 2024
14 County of Residence:
15 Marion County
16
17
18
19
20
21
22
23
24
25

Page 67

1        Veritext Legal Solutions
2         1100 Superior Ave
           Suite 1820
3        Cleveland, Ohio 44114
          Phone: 216-523-1313
4
June 8, 2020
5
To: John Matuszak
6
Case Name: Doe, John v. Purdue University, et al
7
Veritext Reference Number: 4108709
8
Witness: Craig Remaly    Deposition Date: 5/21/2020
9
10 Dear Sir/Madam:
11 Enclosed please find a deposition transcript. Please have the witness
12 review the transcript and note any changes or corrections on the
13 included errata sheet, indicating the page, line number, change, and
14 the reason for the change. Have the witness' signature notarized and
15 forward the completed page(s) back to us at the Production address
16 shown
17 above, or email to production-midwest@veritext.com.
18 If the errata is not returned within thirty days of your receipt of
19 this letter, the reading and signing will be deemed waived.
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 68

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4108709
CASE NAME: Doe, John v. Purdue University, et al
DATE OF DEPOSITION: 5/21/2020
WITNESS' NAME: Craig Remaly
   In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me
   I have made no changes to the testimony
as transcribed by the court reporter.

_____        _____
Date              Craig Remaly
   Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:

   They have read the transcript;
   They signed the foregoing Sworn
   Statement; and
   Their execution of this Statement is of
   their free act and deed

   I have affixed my name and official seal

this _____ day of_____, 20____

_____
Notary Public

_____
Commission Expiration Date

Page 69

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4108709
CASE NAME: Doe, John v. Purdue University, et al
DATE OF DEPOSITION: 5/21/2020
WITNESS' NAME: Craig Remaly
   In accordance with the Rules of Civil
Procedure, I have read the entire transcript of
my testimony or it has been read to me
   I have listed my changes on the attached
Errata Sheet, listing page and line numbers as
well as the reason(s) for the change(s)
   I request that these changes be entered
as part of the record of my testimony

   I have executed the Errata Sheet, as well
as this Certificate, and request and authorize
that both be appended to the transcript of my
testimony and be incorporated therein

_____        _____
Date              Craig Remaly

   Sworn to and subscribed before me, a
Notary Public in and for the State and County,
the referenced witness did personally appear
and acknowledge that:
   They have read the transcript;
   They have listed all of their corrections
   in the appended Errata Sheet;
   They signed the foregoing Sworn
   Statement; and
   Their execution of this Statement is of
   their free act and deed
   I have affixed my name and official seal

this _____ day of_____, 20____

_____
Notary Public

_____
Commission Expiration Date

18 (Pages 66 - 69)

Page 70

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 4108709
3   PAGE/LINE(S) /     CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19

20  Date _____   Craig Remaly _____
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____.
23      _____
        Notary Public
24
        _____
25      Commission Expiration Date
```

19 (Page 70)

Connor Reporting

A Veritext Company                          800-554-3376

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.


DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at