# Exhibit J

Page 1

1                UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF INDIANA
2                    HAMMOND DIVISION
3
4    JOHN DOE,                    )
                                  )
5          Plaintiff,             ) CIVIL ACTION NUMBER
                                  ) 2:17-cv-33-JPK
6          vs.                    )
                                  )
7    PURDUE UNIVERSITY, PURDUE    )
     UNIVERSITY BOARD OF          )
8    TRUSTEES, MITCHELL ELIAS     )
     DANIELS, JR., in his         )
9    official capacity as         )
     President of Purdue          )
10   University, ALYSA            )
     CHRISTMAS ROLLOCK, in her    )
11   official capacity at         )
     Purdue University,           )
12   KATHERINE SERMERSHEIM, in    )
     her official capacity at     )
13   Purdue University,           )
                                  )
14         Defendants.            )
15
16
17       VIDEOCONFERENCE DEPOSITION OF MEGAN CHESTER
18
19       The deposition upon oral examination of
     MEGAN CHESTER, a witness produced and sworn before me,
20   Megan M. Bowman, Notary Public in and for the County of
     Marion, State of Indiana, taken on behalf of the
21   Defendants, at the offices of Stuart & Branigin LLP,
     300 Main Street, Lafayette, Tippecanoe County, Indiana,
22   on Wednesday, May 20, 2020, scheduled to commence at
     2:00 p.m., pursuant to the Federal Rules of Civil
23   Procedure with written notice as to time and place
     thereof.
24
25

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF:

   Philip A  Byler
   NESENOFF & MILTENBERG LLP
   363 Seventh Avenue
   Fifth Floor
   New York, NY 10001
   212 736 4500
   pbyler@nmllplaw.com

FOR THE DEFENDANT(S):

   Tyler L  Jones
   William P  Kealey
   STUART & BRANIGIN LLP
   300 Main Street
   Suite 900
   P O Box 1010
   Lafayette, IN 47902-1010
   765 423 1561
   tlj@stuartlaw com
   wpk@stuartlaw com

FOR THE U S NAVY:

   John Matuszak
   U S NAVY - NAVAL SERVICE TRAINING COMMAND
   2601 A Paul Jones Street
   Building 1
   Great Lakes, IL 60088-2845
   847 707 5057
   john matuszak@navy mil

Page 3

INDEX OF EXAMINATION

Direct Examination............................ 4
   Questions By Tyler L. Jones
Cross-Examination............................. 30
   Questions by Philip A. Byler
Redirect Examination......................... 35
   Questions by Tyler L. Jones:
Recross-Examination.......................... 36
   Questions by Philip A. Byler

INDEX OF EXHIBITS

Deposition Exhibit No.:

Exhibit 1 - Fact witness approval............. 4

Defendant's Exhibit No.:

Exhibit A - Email between Adam Sheppard and .. 22
   , 5/3/16
Exhibit B - Memo from Megan Redlawsk to CO, .. 24
   6/14/16

Page 4

1 (Time noted: 2:01 p.m.)

2      MEGAN CHESTER,

3 having been duly sworn to tell the truth, the whole

4 truth, and nothing but the truth relating to said

5 matter, was examined and testified as follows:

6

7 DIRECT EXAMINATION

8   QUESTIONS BY TYLER L. JONES:

9 Q  Good morning, ma'am. Can you -- oh, very true. My

10  name is Tyler Jones. I am an associate with Stuart

11  & Branigin. I represent Purdue University and

12  several other named defendants that we have been

13  with defendants in the matter currently pending in

14  Federal Court brought by John Doe, who I'll

15  identify shortly.

16    Mr. Matuszak, do you want to submit your letter

17  for the record?

18    MR. MATUSZAK: Yeah. We have the attorney --

19  or the Navy approval of this deposition. That

20  should be the first exhibit in this -- in this

21  video -- or this deposition. I'm sorry.

22    (Deposition Exhibit 1 was marked for

23  identification.)

24 Q  Very good. And before we get started, I know

25  there's been some debate about your last name. For

Page 5

1 the record, what is your full name?

2 A  My full name is Megan Renee Chester.

3 Q  Thank you. And how would you prefer to be

4  addressed?

5 A  As Megan.

6 Q  Megan, okay. Megan, have you ever given a

7  deposition before?

8 A  I have not.

9 Q  Okay. I'm sure Mr. Matuszak talked to you a little

10  bit about it, but a deposition is basically the

11  parties' chance to ask you some questions about

12  your knowledge of any events in this case.

13  Everything that we are saying right now is being

14  reported, being typed down by a stenographer, so I

15  ask that if I ask you a question, give me a "yes"

16  or a "no," or a "yay" or a "nay," as opposed to

17  head shakes and head nods.

18 A  Okay.

19 Q  I ask that you try to let me finish my questions

20  even though you may know what I'm asking, and I

21  promise I'm going to try my hardest to let you

22  finish your questions -- your answers even though I

23  might know what you're answering.

24    I'm going to assume that you understand the

25  question if you answer it. But if you don't

2 (Pages 2 - 5)

Page 6

1  understand it, please let it be known and I'll try
2  to rephrase it or refrain the question if that's
3  fair.
4  A  Okay.
5  Q  And, again, if you need a restroom break, please
6  say so. You're not being held a prisoner here. We
7  can take a break.
8     At this time I want to put on notice that the
9  plaintiff and another party are proceeding under
10  pseudonym in this case. And I'd like to ask you to
11  keep everything -- every name you hear today you
12  confidential for the purposes of this deposition.
13  A  Okay.
14  Q  John Doe is a gentleman by the name of ████████ or
15  ████████, and Jane Doe is one,
16  ████████. So I'll refer to their legal names right
17  now, but just putting you on notice.
18     Ma'am, did you used to have -- go by the name
19  Megan Redlawsk?
20  A  Yes, I did.
21  Q  When did you change your name?
22  A  I legally changed my name in 2016 when I was
23  married. Megan Redlawsk is my maiden name.
24  Q  Understood. Have you at any point been Megan May?
25  A  I have, yes. That was my previously married name.

Page 7

1  Q  Okay. And then when did you change your name from
2  Megan May to Megan Chester?
3  A  That would have in 2016 when I was married.
4  Q  Understood. Okay. Ma'am, what is your date of
5  birth?
6  A  It is April 26, 1987.
7  Q  Thank you. This deposition is going to be mainly
8  focused on the events occurring between August 2016
9  -- August 2015 and August 2016. At that time, can
10  you give us your position and title with Purdue
11  NROTC?
12  A  I was the Charlie Company commander of Purdue ROTC.
13  I was also their surface warfare officer on staff
14  to advise in surface warfare. And then I also
15  taught a couple of the classes as an assistant
16  professor of Naval Science.
17  Q  Very good, ma'am. And what is a good mailing
18  address for you?
19  A  It is 7701 Langwood Drive, Indianapolis, Indiana,
20  46268.
21  Q  Thank you. And what is a good email address for
22  you?
23  A  It's M-E-G-R-M-A-Y- 87@gmail.com.
24  Q  Thank you, ma'am. Could you please provide a very
25  brief educational history?

Page 8

1  A  Yes. I received my bachelor's of arts in history
2  from the University of Washington in 2009. I
3  attended a few years of master's of arts online
4  program through Southern New Hampshire University,
5  but I did not finish that program.
6  Q  Excellent. Well, it's excellent you got your
7  degree in history.
8     During your time that you were a lieutenant for
9  Charlie Company, what were your duties and
10  responsibilities?
11  A  My primary duties were -- we had approximately 35
12  students that we were in charge of seeing them
13  through the Naval ROTC program. Both students that
14  were on scholarship and trying to be on
15  scholarship, helping them through their further
16  requirements and serving as their general advisor.
17  Q  Thank you, ma'am. And when you say "helping them
18  out," is there anything in particular you mean by
19  that?
20  A  Primarily just advise, mentorship. If they had any
21  questions, come to my office. I was their primary
22  point of contact on staff for any issues that they
23  had if they were officially in Charlie Company.
24  Q  I understand. And may I ask what your reason for
25  leaving the ROTC was?

Page 9

1  A  I transferred. So I was still in the Navy and so I
2  actually transferred in July of 2016 to Newport,
3  Rhode Island.
4  Q  Excellent. And when did you end up back in
5  Indianapolis?
6  A  That was August 2018. I separated from the Navy.
7  Q  Understood. Ma'am, just for abbreviation sake, you
8  understand that if I say "Purdue NROTC," I'm
9  referring to Purdue Naval Reserve Officer Training
10  Corps?
11  A  Yes, I do.
12  Q  Thank you. Can you give me a brief overview of the
13  command structure in place at the Purdue NROTC in
14  2015 to 2016, starting with your commanding
15  officer?
16  A  Yes. At that time, it would have been Captain
17  Hutton. There may have been a little overlap with
18  our previous CO, Commanding Officer Captain Mong, I
19  want to say his last name is, but Captain Hutton
20  was the primary CO during that time. And then
21  underneath him our executive officer was Commander
22  Craig Remaly. Underneath that we had Major --
23  whose last name I have forgotten at this time, but
24  he was our next highest in rank officer. And then
25  he was also in charge of our marine students.

3 (Pages 6 - 9)

Page 10

1    And then we had four Naval lieutenants, myself
2    being one of them. And then there was Lieutenant
3    Willstatter, Lieutenant Sheppard, and Lieutenant
4    Taylor. And then other individuals on staff would
5    have been -- we had administrative assistants and
6    then the CO secretary and then also a supply.
7 Q  Understood. Thank you, ma'am.
8 A  And also -- I apologize. We did also have an
9    enlisted marine on staff, a gunnery sergeant.
10 Q  Very good. Thank you. You said you were the
11   lieutenant of Charlie -- Charlie --
12 A  Company.
13 Q  Company, thank you. Does that mean that you were
14   primarily in charge of overseeing that company?
15 A  That is correct.
16 Q  Do you recall who the lieutenants were for Alpha
17   and Bravo?
18 A  I believe Lieutenant Kyle Willstatter was the Alpha
19   Company commander at that time and Lieutenant Oscar
20   Taylor was the Bravo Company commander.
21 Q  Understood. Do you happen to know offhand what
22   company ▮▮▮▮▮▮▮▮ was a member of?
23 A  I believe he was in Alpha Company.
24 Q  Okay. And do you know if ▮▮▮▮ -- ▮▮▮▮▮▮
25   ▮▮▮▮▮ was also in Alpha Company?

Page 11

1 A  That one I'm not sure of.
2 Q  Understood. Thank you. Were the lieutenants all
3    equal rank or was one lieutenant kind of a -- a
4    first among equals, if you will?
5 A  We were all equal rank. Lieutenant Adam Sheppard
6    was our battalion officer, so in positional
7    authority, I would say he had a little more
8    positional authority than the other three of us but
9    we were all same in the sense that we're
10   lieutenants.
11 Q  Understood. Thank you. Can you give us a very
12   brief idea of what a day in the life of a Charlie
13   Company NROTC recruit a freshman fall semester
14   would look like?
15 A  So depending on the day of the week, it would be
16   varied but Mondays and Wednesday mornings start off
17   with physical training. Then Tuesday mornings, in
18   place of physical training, we have what we call
19   "drill time," which was usually a lecture about 6
20   to 8 a.m.
21   Then they would attend classes throughout the
22   entire day. And then usually we try not to take
23   too much of their time in the evenings because our
24   students were typically involved with other
25   activities on campus and they also usually have a

Page 12

1    lot of early mornings with us. But typically our
2    students would meet in or around our armory spaces
3    that they had study spaces in there. So if they
4    weren't attending class or seeing to their own ROTC
5    duties, they could use our spaces for studying.
6 Q  Understood. Do you know if that's similar to what
7    Alpha Company would be doing?
8 A  Yes.
9 Q  Was it identical?
10 A  Yes.
11 Q  Okay. Wonderful. And does that schedule change at
12   all in the spring semester for those freshman?
13 A  Not to my knowledge. Some of the times might have
14   shifted. I know we were in the process of changing
15   how our companies did their physical training, so
16   it might have shifted to only one day a week
17   instead of two days a week. But for the most part
18   the schedule stayed the same.
19 Q  At that time -- at the time I mentioned earlier
20   between August 2015 and August 2016, did NROTC
21   midshipmen have any kind of code conduct they were
22   governed by?
23 A  Yes, they did.
24 Q  Do you know what the name of that was?
25 A  I don't off the top of my head. I'm sure we

Page 13

1    referred to it as our code of conduct.
2 Q  Understood. Is -- does the code of contact -- does
3    the code of conduct prohibit sexual assault?
4 A  Yes, it does.
5 Q  Does the code of conduct prohibit illegal drug use?
6 A  Yes, it does.
7 Q  Can violation of the code of conduct lead to
8    disenrollment?
9 A  Yes, it does --
10 Q  Understood.
11 A  -- can.
12 Q  I'm sorry. Could you say that again?
13 A  Yes, it can.
14 Q  Okay. Thank you. All right. I want to go through
15   a few names here and see if you recall any of these
16   individuals. I think you have already. But Craig
17   Remaly?
18 A  Yes.
19 Q  Okay. And he was your -- he was immediately
20   subordinate to Commander Hutton?
21 A  Yes, he was second in command.
22 Q  Understood. And Adam Sheppard?
23 A  Yes.
24 Q  I think you said he was kind of a ranking
25   lieutenant but still a lieutenant --

4 (Pages 10 - 13)

Page 14

1 A   That's correct.
2 Q   Okay. Rodney Hutton you just described. Kyle
3     Willstatter I think you also said was a lieutenant;
4     correct?
5 A   That is correct.
6 Q   Okay. Prior -- and when I refer to "allegations,"
7     I'm talking about allegations raised by ████
8     ████.
9 A   Mm-hmm.
10 Q   And we'll get into that later. But prior to the
11     allegations in question, had you met ████
12     ████ before?
13 A   I had, yes.
14 Q   Okay. Can you describe what kind of interactions
15     you've had with her?
16 A   It would have been very brief in the sense that we
17     all interacted with each other in the ROTC program.
18     She wasn't one of my students in Charlie Company,
19     and I also did not have a class where I taught her.
20     So it would more been in passing, seeing her in and
21     around our spaces, and exchanging a few words.
22 Q   Understood. Prior to the allegations did you have
23     any interaction that you can recall specifically
24     with her?
25 A   No.

Page 15

1 Q   Understood. Similarly, before the allegations,
2     were you aware of ████████?
3 A   Yes.
4 Q   Had you met him before?
5 A   Yes.
6 Q   Any -- are there any incidents -- not incidents --
7     are there any instances that you recall interacting
8     with him specifically?
9 A   I do not.
10 Q   Okay. Prior to the allegations, I mean?
11 A   I still do not.
12 Q   Okay. Can you help for a layperson like me
13     understand what kind of protocols the NROTC had in
14     place for sexual assault allegations? What would
15     happen?
16 A   So if our -- one of our students were to come to us
17     and -- if I'm using the correct word -- but to
18     discuss -- to discuss sexual assault, we were
19     obligated to report it, both ROTC-wise, and then
20     also as employees, in a sense, at Purdue
21     University. We're mandatory reporters. But what
22     -- our students were told that they could obviously
23     come to us to disclose any such information. We
24     made sure they would be aware of the fact that we
25     had to share that information with our chain of

Page 16

1     command.
2     And then in addition to that, as part of their
3     training among those Tuesday morning drill periods
4     that I had mentioned, part of our mandatory
5     curriculum was sexual assault and prevention and
6     reporting.
7 Q   Can you tell me a little bit more about that? What
8     do you mean by "mandatory curriculum" for sexual
9     assault?
10 A   So the Navy gives a list of subjects that we are
11     required to cover with our students. And those are
12     usually covered in our Tuesday morning drill
13     periods. They range from a variety of topics. All
14     Navy specifically. It's of various policies and
15     procedures in the Navy since our students are
16     training to be Naval officers.
17     And then also broad topics such as the
18     different warfare areas, but some of the policies
19     and procedures for things such as sexual assault
20     and prevention training. "Prevention response
21     training" is what it's called -- or was called.
22     Other things such as the "no hazing policy" and
23     similar things such as that.
24 Q   Understood, ma'am. And I assume you're speaking
25     from your experience teaching Charlie Company?

Page 17

1 A   Yes. But also because we were all on track to
2     attend and give those lectures as well.
3 Q   Understood. So would someone in Alpha Company also
4     receive those lectures?
5 A   Yes.
6 Q   Understood.
7 A   Yes. Our Tuesday morning drill periods, all of our
8     students were together at those.
9 Q   Understood. So the entire Purdue NROTC was
10     together Tuesday mornings?
11 A   Correct.
12 Q   Okay. Where did you all meet?
13 A   It varied on campus. Wherever there was a lecture
14     hall big enough to fit us that we could get in at
15     six in the morning.
16 Q   Fair enough. How many of there were you, if you
17     know?
18 A   The battalion was usually about 100 to 110 students
19     total. And then with the staff members there, we
20     were about 150.
21 Q   Was there enough room in the armory for all of you
22     to meet?
23 A   There would be on the drill day. There's enough
24     room for us. It's not been -- it's not a good
25     space for giving and receiving lectures.

5 (Pages 14 - 17)

Page 18

1  Q  Understood.
2  A  So we would typically not hold those there.
3  Q  Understood. In the mandatory course you were just
4     talking about, was one of the subjects you talked
5     about to the midshipmen reporting sexual assault?
6  A  Yes.
7  Q  Can you tell me what you would have advised them?
8  A  So we would have discussed it in the sense of how
9     it pertains to being in the Navy. So the different
10    types of reporting options that a naval personnel
11    has. There was always a little bit of a
12    interesting overlap between the fact that these
13    students were civilian students and we were
14    teaching them Navy policy and procedure. But we
15    would have discussed mandatory -- different kinds
16    of reporting so either restricted or unrestricted
17    report, who in the Navy could receive such a
18    report, the requirements of what to do if you do
19    receive a report of sexual assault or harassment.
20 Q  Was it the expectation that midshipmen who have
21    been sexual assault come forward and report it?
22 A  It was the expectation. It was also the hope that
23    our students were comfortable enough coming to us
24    to report such things.
25 Q  Understood. Does the NROTC normally investigate

Page 19

1     allegations of sexual assault?
2  A  This was the first time I had heard of such an
3     allegation coming forward, so it was the first
4     experience that I had in seeing that there was any
5     sort of investigation done. But it is my
6     understanding that if it had come forward in the
7     past, it would have been taken seriously and
8     investigated.
9  Q  Understood. Ma'am, do you recall allegations
10    brought by ███████████ against ████████ for
11    sexual assault?
12 A  I do.
13 Q  Okay. Were you ever asked to look into those
14    allegations?
15 A  Yes, I was.
16 Q  Who asked you to?
17 A  I was appointed by the commanding officer to be the
18    investigating officer on staff.
19 Q  Would that have been Commander Hutton?
20 A  Yes, it would have been.
21 Q  Do you know why he asked you to conduct the
22    investigation?
23 A  Most likely it was because I was not involved with
24    either of the students directly, not being their
25    company officer. And so I was therefore more

Page 20

1     removed than other staff members.
2  Q  Fair to say you weren't -- you didn't have any dog
3     in the race so to speak?
4  A  Correct.
5  Q  Do you recall what the conclusion of your
6     investigation was?
7  A  The --
8        MR. BYLER: Object to the form.
9  Q  That's fine. You can answer.
10 A  Okay. The investigation that I conducted concluded
11    that -- two things. That the student -- I had been
12    asked to investigate two things. Whether or not
13    our student had been suspended by the University
14    and then whether or not we believed that he did
15    commit sexual assault. So those are the two areas
16    I investigated.
17       And then both counts I found that yes, our
18    student was suspended by Purdue University, and
19    yes, he had been -- it would have been based on the
20    fact that they had found him guilty of sexual
21    assault.
22 Q  Understood, ma'am. Do you recall any of the
23    evidence in the case?
24 A  So we had the official report from Purdue
25    University, the investigation that they conducted.

Page 21

1     And then the student, ████████, had submitted
2     a statement on his own behalf.
3  Q  Understood. Did you review all of that?
4  A  Yes, I did.
5        MR. JONES: Are you good? Okay.
6  Q  I think I'll simply kind of pick up if I can. I
7     lost my train of thought.
8        Was there any particular piece of evidence that
9     stood out to you?
10 A  That would have been most like -- that would have
11    been the University's report.
12 Q  Okay. What about the University's report stood out
13    to you?
14 A  In it it had the -- all the information that both
15    students provided from their -- from their side of
16    the case to the University. So we were able to see
17    the information provided by both students. And
18    then it also had a summary of the discussion they
19    had specifically with ████████ and their
20    conclusions to explain why it led them to suspend
21    the student.
22 Q  Before reaching your conclusions, did you ever
23    speak with Midshipman ████?
24 A  I believe I remember speaking with him at least
25    once and that was in the sense that he wanted to be

6 (Pages 18 - 21)



Page 22

1  able to provide a statement and that was to give
2  him instructions on how to do so.
3  Q  Understood. Did you ever speak to ██████████?
4  A  I also believe I spoke to her once or twice.
5     Again, it was to keep her appraised of what our
6     investigation, the University -- or for the NROTC
7     unit entailed and then see if she wanted to provide
8     any additional information.
9  Q  Did she give you any sense that she was making
10    these charges up?
11 A  She did not.
12 Q  Do you have any concern now that she made all those
13    charges up?
14 A  I do not.
15 Q  I'd direct you to Exhibit A.
16    MR. JONES:  And for, Counsel, for
17    identification, this is NSTC-0180. This is a
18    single page.
19 Q  And for your reference, ma'am, if you start from
20    the bottom, it goes reverse chronological order.
21    Take a moment to review this and let me know when
22    you're ready.
23    (Defendant's Exhibit A was marked for
24    identification.)
25 A  All right. I am ready.

Page 23

1  Q  Okay. Ma'am, had you ever seen this email before?
2  A  Yes.
3  Q  When have you seen this email?
4  A  Most recently yesterday when I was reviewing these
5     exhibits beforehand.
6  Q  Fair enough.
7  A  Before that, I don't recall if I had seen this
8     particular email as it related to the incident.
9  Q  Understood, ma'am. Do you -- I'll direct you to
10    first line at the very top. It says, "Midshipman
11    ████, Lieutenant Redlawsk is the investigating
12    officer that will be collecting information on the
13    command's side."
14    Is that accurate?
15 A  Yes.
16 Q  And was it your -- I just want to make certain
17    here. Did -- excuse me.
18    Did ████████ reach out to you to try to
19    update you on his case at any time?
20 A  I don't remember specifically if we exchanged
21    emails or anything. I know we did speak at least
22    once so that he could provide his statement.
23 Q  Do you recall what his statement was?
24 A  I don't. I know that there is a copy of it as part
25    of the report I submitted to our commanding

Page 24

1  officer.
2  Q  Understood. So was it your conclusion that
3  ████████████ sexually assaulted ████████████?
4  A  It was, yes.
5     MR. BYLER:  Objection to form.
6  Q  Do you recall what you recommended the NROTC should
7     do?
8  A  Yes. I recommended that Midshipman ████ be
9     suspended and removed from the program.
10 Q  Understood. Do you believe that dismissal was
11    warranted under these circumstances?
12 A  Yes, I do.
13    MR. BYLER:  Objection. Calls for a legal
14    opinion.
15    MR. JONES:  She answered, so --
16 Q  I direct Counsel to Exhibit B. This is NSTC-0168
17    through NSTC-0195. Ma'am, take a minute or two to
18    look this over and let me know when you're ready.
19    (Defendant's Exhibit B was marked for
20    identification.)
21    MR. BYLER:  Tyler, I'm sorry. What is Exhibit
22    B? The Bates stamp numbers?
23    MR. JONES:  Again, Phil, Exhibit B is NSTC-0168
24    through -0195.
25    MR. BYLER:  I thought that was Exhibit A.

Page 25

1     MR. JONES:  Nope, Exhibit B.
2     THE WITNESS:  All right. I've reviewed it.
3  BY MR. JONES:
4  Q  Very good. Megan, having reviewed this, have you
5     seen this document before?
6  A  Yes, I have.
7  Q  Can you identify it for the record?
8  A  Yes. This is the recommendations I gave to our
9     commanding officer regarding the investigation that
10    occurred.
11 Q  Understood. And, again, is -- the first page,
12    there's a signature at the bottom. Is that your
13    signature?
14 A  Yes, it is.
15 Q  Okay. And in the course of compiling your -- or
16    coming to your conclusion here, did you consider
17    Purdue's investigation report?
18 A  Yes, I did.
19 Q  Did you consider the applicable text messages
20    between ████████ and ████████████?
21 A  Yes, I did.
22 Q  Did you consider ████████'s statements in
23    contradiction with ████████'s claims?
24 A  Yes, I did.
25 Q  And after considering all that, did you still come

7 (Pages 22 - 25)

Page 26

1  to the conclusion that ▮▮▮▮▮ sexually
2  assaulted ▮▮▮▮▮?
3  A   Yes, I did.
4       MR. JONES:  Counsel, I'd like to take a brief
5  five-minute break and then if nothing else, I don't
6  know if I'll have anything else for this witness,
7  so --
8       MR. BYLER:  Okay.
9       MR. JONES:  Five minutes.  Thank you.
10      MR. BYLER:  Yeah.  I'll have some questions.
11      MR. JONES:  Absolutely.
12      (A recess was taken between 2:34 p.m. and
13      2:42 p.m.)
14  BY MR. JONES:
15  Q   Megan, are you ready to proceed?
16  A   Yes, I am.
17  Q   Okay.  Megan, if I can direct your attention back
18     to Exhibit B here, particularly on that first page,
19     paragraph 2.  Do you see here where it says, "Per
20     reference (C) these actions violate established
21     Naval ROTC policy, specifically section 3-19"?
22  A   Yes, I do.
23  Q   Okay.  Are you familiar with that section that's
24     being talked about in that paragraph?
25  A   Not as familiar anymore as I would have been then.

Page 27

1  Q   Do you have any recollection of what that rule
2     says?
3  A   To the best of my knowledge, that specific section
4     as it says, "Conduct and Aptitude Standards,"
5     detailed what would -- what would constitute a
6     major versus a minor offense that our students
7     would commit.
8  Q   What's the difference between a major and a minor
9     offense?
10  A   Usually the major offenses were grounds for
11     immediate suspension from the program whereas the
12     minor offenses did not necessarily call for this.
13  Q   Understood.  And was it your conclusion from
14     paragraph 2 that ▮▮▮▮▮ had violated that
15     particular section?
16  A   Yes.
17  Q   Understood.  Do you know if the Navy has a zero
18     tolerance policy for sexual assault?
19  A   Yes, it does.
20  Q   What does that policy involve?  Yeah.  Let me
21     restate it.
22  A   Yeah.
23  Q   What is the "zero tolerance policy"?
24  A   An individual found guilty of sexual assault is --
25     typically would be court-martialed.  And then that

Page 28

1  the punishments would usually vary from time in the
2  brig or maybe jail or to be removal from armed
3  forces.
4  Q   Understood.  Do you know if that zero tolerance
5     policy was enforced back in 2015 to 2016?
6  A   Yes.
7  Q   Was it also enforced by the NROTC?
8  A   Yes.
9  Q   After you submitted Exhibit B, your preliminary
10     findings to -- well, let me back up.
11        Who did you submit this to when you finalized
12     it?
13  A   I submitted this to the Commanding Officer, Captain
14     Hutton.
15  Q   Understood.  Did he say anything to you?
16  A   I don't recall any conversation proceeding this.
17  Q   Understood.  Did Commander Hutton ever ask for your
18     opinion or ask for any more information after you
19     submitted this?
20  A   Not to my recollection, no.
21  Q   Understood.  Do you recall, Ms. Red -- Ms. Chester,
22     whether or not you were originally scheduled to be
23     part of a PRB for ▮▮▮▮▮?
24  A   Yes, I was.
25  Q   Okay.  Were you later not scheduled to attend that?

Page 29

1  A   Yes.  I had transferred.  It had to be rescheduled,
2     and it was rescheduled for a time after I had left
3     the unit.
4  Q   Understood.  So the only reason you weren't on PRB
5     was simply because you were no longer there?
6  A   Correct.
7  Q   Understood.  Did you ever order ▮▮▮▮▮ to
8     turn over information to the Navy about his Purdue
9     investigation?
10  A   I wouldn't say that I ordered him.  I don't recall
11     ever giving him an order to do so.  All the
12     information we received we received directly from
13     the University.  And then he submitted his own
14     statement on his own behalf.
15  Q   Understood.  Do you stand by the recommendations
16     you made in Exhibit B?
17  A   Yes, I do.
18  Q   Given the chance, would you change them in any way?
19  A   No, I wouldn't.
20  Q   Based on your review of the evidence and your
21     investigation, do you believe ▮▮▮▮▮ is a
22     proper candidate for a Naval officership?
23      MR. BYLER:  Objection to -- objection to form.
24     That calls for an opinion that's beyond the scope
25     of this witness.

8 (Pages 26 - 29)

Page 30

1    MR. MATUSZAK: The witness will be instructed
2  not to answer that question.
3    MR. JONES: Nothing further. Nothing further,
4  Phil.
5    MR. BYLER: Oh, I'm sorry. Your voice was very
6  low. I couldn't hear it. I'm sorry.
7    MR. JONES: I didn't want you to think I was
8  being dramatic.
9    MR. BYLER: Oh, okay.
10 CROSS-EXAMINATION
11    QUESTIONS BY PHILIP A. BYLER:
12 Q   Okay. Could you turn -- could the witness pick up
13  again what I understand now is Exhibit B? It's
14  Bates stamped -168 to -195.
15    Do you have that?
16 A   Yes, I do.
17 Q   Okay. And this is a document that's entitled, is
18  it not, "Preliminary Inquiry Recommendations
19  Surrounding Allegation of Sexual Assault Made
20  Against Midshipman Fourth Class ██████████";
21  correct?
22 A   Correct.
23 Q   Okay. So this is a preliminary inquiry
24  recommendation document; correct?
25 A   Correct.

Page 31

1 Q   Okay. And in this document, the first page is a
2  memo by you; correct?
3 A   Correct.
4 Q   Okay. And then what follows starting on page -169
5  to the end, -195, are all or potentially all Purdue
6  University documents; correct?
7 A   Correct.
8 Q   Okay. The -- at -168 is the Dean's June 14, 2016,
9  determination letter?
10 A   Correct.
11 Q   Okay. And that says that ██████████ is to be
12  suspended for a year; correct?
13 A   Correct.
14 Q   Okay. And at -170/-180 is the Purdue investigation
15  report; correct?
16 A   Correct.
17 Q   At -181 to -187 are texts that are appended to the
18  Purdue investigation report; correct?
19 A   Correct.
20 Q   And -188 is a list of John Doe's character
21  references -- that's ██████████ -- the
22  character reference he submitted to Purdue in the
23  disciplinary case; correct?
24 A   Correct.
25 Q   And then there's a statement of John Doe submitted

Page 32

1  to the Purdue disciplinary case on May 3, 2016, at
2  -189 to -191; correct?
3 A   Correct.
4 Q   Okay. So now, in this document that you've been
5  reviewing, there are no memorandum to the file by
6  you recording interviews of ██████████;
7  correct?
8 A   Correct.
9 Q   Okay. And there's no memorandum in interviews to
10  -- with respect to Ms. ██████ either?
11 A   Correct.
12 Q   Okay. And there's no report like what the Purdue
13  investigation report is. It's a, you know, a 10
14  page/11 page report. You didn't do that kind of
15  report, did you?
16 A   Correct.
17 Q   Okay. Now, I ask you -- I ask that you be provided
18  an exhibit that -- Bates stamp NSTC-00118 to -119
19  (sic).
20    MR. JONES: Hold on one second, Phil. I'm
21  handing it to her.
22    MR. BYLER: Okay. Good. No, I know I did
23  email it, but I appreciate providing it.
24    MR. JONES: I'm just trying to help you out,
25  Phil, and make sure we keep this moving.

Page 33

1    MR. BYLER: Okay.
2    MR. JONES: What was the number again?
3    MR. BYLER: -0018 to -0019.
4    THE WITNESS: Yes, I have that.
5    MR. BYLER: Okay. Good. Thank you.
6  BY MR. BYLER:
7 Q   Is this the June 16, 2016, "Appointment of the
8  Senior Performance Review Board Members" at that
9  point in time?
10 A   Yes, it is.
11 Q   Okay. And you were listed in this document as a
12  nonvoting member; correct?
13 A   Correct.
14 Q   Okay. I believe your preliminary inquiry
15  recommendation is really for recommending that the
16  commanding officer appoint a performance review
17  board; correct?
18 A   Correct.
19 Q   Okay. Look at paragraph number 1. I want to read
20  it out loud and you can follow along.
21    "Per reference (a), you are hereby appointed as
22  Senior Member of a Performance Review Board that
23  will consider the performance of Midshipman
24  ██████████, who is deficient in the
25  following areas outlined in reference (a): A.)

Page 34

1    Suspension from the University."
2        That's what the document says?
3 A   Yes.
4 Q   Okay.  And it doesn't give any other reason for
5     convening the Performance Review Board?
6 A   Correct.
7 Q   And this is from the commanding officer who was
8     Commander Hutton?
9 A   Correct.
10 Q  Okay.  Now go to the next page.
11       By any chance, do you recognize Commander
12    Hutton's signature at the bottom of the document
13    that's -0019?
14 A  Yes, I do.
15 Q  Okay.  Is this a document that provides a
16    notification of the Performance Review Board
17    schedule change?
18 A  Yes, it is.
19 Q  Okay.  And does it reflect that the schedule change
20    is to reflect an accommodation for the university
21    appeal by ███████ of his University
22    suspension?
23 A  Yes, it does.
24 Q  Okay.  Now, as a result of this change of schedule,
25    was it the case that you transferred out of Purdue

Page 35

1     and you were no longer at the Purdue ROTC?
2 A   That's correct.
3 Q   Okay.  So in August of 2016, when there was a
4     disenrollment Performance Review Board, you weren't
5     there at Purdue; correct?
6 A   That is correct.
7 Q   Okay.  So as to that Performance Review Board, you
8     didn't have personal knowledge of what they
9     reviewed; correct?
10 A  Correct.
11       MR. JONES:  Object to form.
12       MR. BYLER:  I'm just checking one thing.
13    Pardon me.
14 Q  All right.  Just to make it clear on the record
15    because the objection, in August of 2016, you were
16    not at Purdue; correct?
17 A  Correct.
18 Q  Okay.  And you were not at that point in time
19    affiliated with the Purdue NROTC program?
20 A  Correct.
21       MR. BYLER:  I have no further questions.
22       MR. JONES:  Very briefly.
23 REDIRECT EXAMINATION
24    QUESTIONS BY TYLER L. JONES:
25 Q  Megan, to your knowledge, are you the only person

Page 36

1     with the Purdue NROTC or the Navy to investigate
2     the allegations of ███████?
3        MR. BYLER:  Objection to the form.
4 A   Yes.
5 Q   Okay.  Would you -- you can answer.  Would you
6     please repeat your answer?
7 A   Yes.
8        MR. BYLER:  May I -- are you done?
9        MR. JONES:  I'm sorry?
10       MR. BYLER:  Did you have another question?
11       MR. JONES:  I was thinking about it.  Hold on,
12    Phil.
13       MR. BYLER:  Okay.  I didn't hear the first time
14    you said, you know, you had nothing more.
15       MR. JONES:  Okay.
16       The only thing, Phil, same question I've asked
17    you for is would you consent to the admissibility
18    and authenticity of the documents we reviewed as
19    exhibits in this deposition?
20       MR. BYLER:  Sure.  You know, we'll argue about
21    their meaning obviously.  I do have one more
22    question of the witness, if you don't mind.
23       MR. JONES:  I don't.  Go ahead.
24 RECROSS-EXAMINATION.
25    QUESTIONS BY PHILIP A. BYLER:

Page 37

1 Q   Okay.  When you refer to "investigation," it's
2     true, is it not, that's referring to what is
3     reflected in Exhibit B?
4 A   That is correct.
5        MR. BYLER:  No further questions.
6        MR. JONES:  John, would you like to advise her?
7        MR. MATUSZAK:  Sure.  So you'll be getting a
8     copy of the transcript for this.  You should --
9     when you get a copy, please read it.  If there's
10    any corrections or additions -- well, corrections
11    really, you should note them and you should contact
12    me and we will contact the attorneys and advise
13    that we have a correct -- some corrections on it.
14       Any other questions for me?
15       THE WITNESS:  Not at this time.
16       MR. JONES:  Okay.  Off the record then.
17    (Time noted:  2:57 p.m.)
18    AND FURTHER THE DEPONENT SAITH NOT.
19
20
21
22
23
24
25

10 (Pages 34 - 37)

Page 38

1  STATE OF INDIANA       )
                          ) SS:
2  COUNTY OF MARION       )

3

4      I, Megan M. Bowman, Notary Public in and for

5  the County of Marion, State of Indiana at Large, do

6  hereby certify that MEGAN CHESTER, the deponent

7  herein, was by me first duly sworn to tell the

8  truth, the whole truth, and nothing but the truth

9  in the aforementioned matter;

10     That the foregoing deposition was taken on

11 behalf of the Defendants, at the offices of Stuart

12 & Branigin LLP, 300 Main Street, Lafayette,

13 Tippecanoe County, Indiana, on Wednesday,

14 May 20, 2020, pursuant to the Federal Rules of

15 Civil Procedure;

16     That said deposition was taken down in

17 stenograph notes and afterwards reduced to

18 typewriting under my direction, and that the

19 typewritten transcript is a true record of the

20 testimony given by the said deponent; and that

21 signature was requested and thereafter presented to

22 said deponent for his/her signature;

23     That the parties were represented by their

24 counsel as aforementioned.

25     I do further certify that I am a disinterested

Page 39

1  person in this cause of action, that I am not a

2  relative or attorney of either party or otherwise

3  interested in the event of this action, and that I

4  am not in the employ of the attorneys for any

5  party.

6      IN WITNESS WHEREOF, I have hereunto set my hand

7  and affixed my notarial seal this 5th day of

8  June 2020.

9

10

11

12        *Megan Bowman*

13        Megan M. Bowman

14        Notary Public

15

16

17 My Commission Expires:

18 January 2, 2027

19 County of Residence:

20 Marion County, Indiana

21

22

23

24

25

Page 40

1            Veritext Legal Solutions
             1100 Superior Ave
2            Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
   June 5, 2020
5
   To: Philip A. Byler
6
   Case Name: Doe, John v. Purdue University, et al
7
   Veritext Reference Number: 4108697
8
   Witness: Megan Chester    Deposition Date: 5/20/2020
9
10 Dear Sir/Madam:
11
   Enclosed please find a deposition transcript. Please have the witness
12
   review the transcript and note any changes or corrections on the
13
   included errata sheet, indicating the page, line number, change, and
14
   the reason for the change. Have the witness' signature notarized and
15
   forward the completed page(s) back to us at the Production address
16 shown
   above, or email to production-midwest@veritext.com
17
18
   If the errata is not returned within thirty days of your receipt of
19
   this letter, the reading and signing will be deemed waived
20
21 Sincerely,
22 Production Department
23
24
25 NO NOTARY REQUIRED IN CA

Page 41

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
   ASSIGNMENT REFERENCE NO: 4108697
3  CASE NAME: Doe, John v. Purdue University, et al
   DATE OF DEPOSITION: 5/20/2020
4  WITNESS' NAME: Megan Chester
5      In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me
7      I have made no changes to the testimony
   as transcribed by the court reporter
8
9  Date_____    Megan Chester_____
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11 the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
   Statement; and
14     Their execution of this Statement is of
   their free act and deed
15
   I have affixed my name and official seal
16
   this_____ day of_____, 20____
17
18 _____
   Notary Public
19
   _____
   Commission Expiration Date
20
21
22
23
24
25

11 (Pages 38 - 41)

Page 42

```
 1        DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4108697
 3  CASE NAME: Doe, John v. Purdue University, et al
    DATE OF DEPOSITION: 5/20/2020
 4  WITNESS' NAME: Megan Chester
 5      In accordance with the Rules of Civil
        Procedure, I have read the entire transcript of
 6  my testimony or it has been read to me
 7      I have listed my changes on the attached
        Errata Sheet, listing page and line numbers as
 8  well as the reason(s) for the change(s)
 9      I request that these changes be entered
    as part of the record of my testimony
10
        I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
        that both be appended to the transcript of my
12  testimony and be incorporated therein
13  _____
    Date            Megan Chester
14
        Sworn and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17      They have read the transcript;
        They have listed all of their corrections
18  in the appended Errata Sheet;
        They signed the foregoing Sworn
19  Statement; and
        Their execution of this Statement is of
20  their free act and deed
21      I have affixed my name and official seal
22  this _____ day of _____, 20____
23
        Notary Public
24
25  _____
        Commission Expiration Date
```

Page 43

```
 1        ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2        ASSIGNMENT NO: 4108697
 3  PAGE/LINE(S) /     CHANGE     /REASON
 4  _____
 5  _____
 6  _____
 7  _____
 8  _____
 9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____

20  Date            Megan Chester
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23
        Notary Public
24
25  _____
        Commission Expiration Date
```

12 (Pages 42 - 43)

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at