# Exhibit K

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOHN DOE, )
)
Plaintiff, ) CIVIL ACTION NUMBER
) 2:17-cv-33-JPK
vs. )
)
PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his official capacity as President of Purdue University, ALYSA CHRISTMAS ROLLOCK, in her official capacity at Purdue University, KATHERINE SERMERSHEIM, in her official capacity at Purdue University, )
)
Defendants. )

VIDEOCONFERENCE DEPOSITION OF ADAM SHEPPARD

The deposition upon oral examination of ADAM SHEPPARD, a witness produced and sworn before me, Megan M. Bowman, Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Defendants, at 7912 West 26th Street, St. Louis Park, Hennepin County, Minnesota, on Wednesday, May 20, 2020, scheduled to commence at 11:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to time and place thereof.

APPEARANCES

FOR THE PLAINTIFF:

Philip A Byler
NESENOFF & MILTENBERG LLP
363 Seventh Avenue
Fifth Floor
New York, NY 10001
212 736 4500
pbyler@nmllplaw com

FOR THE DEFENDANT(S):

Tyler L Jones
William P Kealey
STUART & BRANIGIN LLP
300 Main Street
Suite 900
P O Box 1010
Lafayette, IN 47902-1010
765 423 1561
tlj@stuartlaw com
wpk@stuartlaw com

FOR THE U S NAVY:

John Matuszak
U S NAVY - NAVAL SERVICE TRAINING COMMAND
2601 A Paul Jones Street
Building 1
Great Lakes, IL 60088-2845
847 707 5057
john matuszak@navy mil

INDEX OF EXAMINATION

Direct Examination.......................... 4
Questions By Tyler L. Jones
Cross-Examination.......................... 42
Questions By Philip A. Byler
Further Cross-Examination................... 47
Questions by Philip A. Byler

INDEX OF EXHIBITS

Deposition Exhibit No.:

Exhibit 1 - Fact witness approval............ 6

Defendant's Exhibit No.:

Exhibit 1 - Sexual violence report............ 21
Exhibit 2 - Email between Adam Sheppard and .. 28 [redacted], 4/6/16
Exhibit 3 - Email between Adam Sheppard and .. 32 [redacted], 5/3/16
Exhibit 4 - Email from Adam Sheppard to ...... 38 [redacted], Placement on academic warning, 6/6/16
Exhibit 5 - NSTC-0184 Subject: Thoughts on ... 40 MIDN 4/C[redacted]

(Time noted: 11:01 a.m.)

ADAM SHEPPARD,

having been duly sworn to tell the truth, the whole truth, and nothing but the truth relating to said matter, was examined and testified as follows:

DIRECT EXAMINATION

QUESTIONS BY TYLER L. JONES:

Q Good morning, Mr. Sheppard.

A Good morning.

Q My name's Tyler Jones. I'm an associate with Stuart & Branigin. I, along with Bill Kealey represent Purdue University and several other named defendants against John Doe in the lawsuit here.

Briefly for the record, could you fully state your name?

A Adam Phillip Sheppard.

Q Thank you. Sir, have you ever given a deposition before?

A No, this is my first one.

Q Well, congratulations I suppose. I'm sure Mr. Matuszak has already kind of given you the down-low, but basically a deposition's an opportunity for both parties to ask you questions about what you may or may not know --

A Okay.

Q -- about facts relevant to this case. I'd ask because everything you are saying is being recorded by Megan over here, Connor Reporting, I'd ask that you give us "yeses," "noes," "yays," "nays," as opposed to head shakes or head bobs.

A Got it.

Q I would appreciate it if we let each other finish what we're saying. You may know the question I'm going to ask and I may know the answer you're going to give, but I'd like us to try not to interrupt each other, so it's a clear record, please.

A Sure.

Q If you answer, I'm going to assume you understood the question. If you don't understand the question, please ask me to rephrase it or ask me to repeat it. Like I said, if you answer, I'm going to assume that you understood; is that fair?

A Sounds good.

Q Okay. Again, you're not a prisoner here. If you need a restroom break or if something happens, the cat jumps on the computer or anything, or any reason like that, just let me know and we can take a brief break. Okay?

A Okay.

Page 6

Q Finally, I ask that you keep everything we're about to talk about confidential today. While we're in this deposition we're going to refer to two students. They're both proceeding under pseudonym. One is [redacted] and one is [redacted]. I'd ask that besides today you don't use those names in any other context unless you're authorized to.
A Okay.
Q Okay. Sir, what's your date of birth?
A July 26, 1984.
MR. MATUSZAK: Mr. Jones?
MR. JONES: Oh, I forgot. Yup, go ahead John.
MR. MATUSZAK: I'd like to include the Navy Approval letter in the record. This is the basis for this deposition.
MR. JONES: Okay. My apologies.
(Deposition Exhibit 1 was marked for identification.)
BY MR. JONES:
Q Adam, if you could -- again, how would you like to be addressed? Would you prefer Adam or Mr. Sheppard?
A Adam is fine.
Q Okay. Adam, what's your date of birth?
A July 26, 1984.

Page 7

Q Thank you. And at the time in question, that being August 2015 to August 2016, what was your position and title with the NROTC at Purdue?
A My title would have been lieutenant, United States Navy, and I was a staff -- I was an officer on their staff.
Q Understood. What's a good mailing address for you, sir?
A Currently would be my home address.
Q Can you please state that for the record?
A 7912 West 26th Street, St. Louis Park, Minnesota, 55426.
Q Thank you, sir. And can you please provide a good email for the record?
A Yup, A-D-A-M-P-S-H-E-P-P-A-R-D @gmail.com.
Q Thank you, sir. Could you please provide a brief education background, where you went to school and what degrees or certifications you may have?
A Sure. I went to undergraduate at the U.S. Naval Academy, and I majored in quantitative economics. As far as professional certifications, I guess I was a naval aviator to all of the sort of graduate level flight training that came along with that. And then additionally I attended graduate school at the University of Chicago Booth School of Business

Page 8

and have a MBA.
Q Excellent. What year is your MBA?
A That would have been fall of 2016. Fall of '16 I think is when I got my degree.
Q Congratulations. During your time as a lieutenant for the U.S. Navy with the Purdue NROTC, what were your responsibilities and duties?
A Well, overall, you know, we're -- the main goal of our mission of the program is to develop undergraduate college students, develop them into, you know, leaders. And so really it was very much of mentoring sort of leadership development role, but I also taught a number of naval science classes that are just, you know, three credit undergraduate courses as part of the curriculum.
Q Understood, sir. What was your reason for leaving the Navy or leaving the NROTC?
A Yeah. So I actually left the Navy at the same time that I left NROTC just my -- being a naval aviator, I was obligated for a number of years of active-duty service and that was -- the end of that was coincided with the end of my time stationed at Purdue. And just for family personal reasons we decided to get out of the Navy and move back home.
Q Understood. Were you honorably discharged?

Page 9

A Yes, I was.
MR. BYLER: I couldn't hear the question.
MR. JONES: I asked if he was honorably discharged, Phil.
MR. BYLER: Oh, okay.
A Yes, I was.
Q Thank you. Sir, fair to say if I say Purdue NROTC or if I forget to say "Purdue" and I just say "NROTC," I'm referring to the Purdue NROTC?
A Yup, yes.
Q Okay. And, again, Purdue NROTC stands for Purdue Naval Reserve Officer Training Corps; correct?
A Correct.
Q Okay. Can you give me an idea of what the command structure was like at time in the NROTC when you were there?
A Yeah. In terms of names of who was in what positions?
Q Yeah. If you don't mind.
A Yup. So --
Q Maybe starting with the top dog going all the way down.
A Sure. At this point in time the commanding officer would have been Captain Hutton. The executive officer would have been Commander Remaly. And then

as far as lieutenants, there was myself, there was Lieutenant Willstatter, and then Lieutenant Redlawsk, who I guess has a new last name now. And then there would have been a marine on staff, a marine captain or major. Either Captain McDowell or Major Inclum. One of these two. I don't remember when they transitioned.

That should be it.

Q Understood. Is there anybody immediately under lieutenants before you get to midshipman?

A No. Lieutenant is the lowest active-duty staff members there, so the next level down would be midshipman.

Q Understood. Earlier today I was told that the Purdue NROTC was divided into several -- into a command structure where you have a battalion and then that battalion is then divided down into other groups.

Do you know what I'm talking about?

A Yeah, that's correct.

Q Okay. I was told that there are squads and that squads may have leaders; is that correct?

A That's correct.

Q Are squad leaders typically students or are they typically officers like you?

A So squad leaders would be students. So the students, all of the midshipmen collectively have their own sort of student chain of command, if you will, that changes by semester. So, yes. I guess beneath myself -- getting beneath me then is -- I'm the lowest active duty. So then once you get into the students, they have their own sort of leadership structure, which would be like a battalion officer.

And then on the Navy side, we have three Navy companies, Alpha, Bravo, Charlie that are each led by a midshipman. And then within those companies, there would be squads, which would be led, again, by midshipmen.

Q So as a lieutenant did you oversee all of the companies, or did you oversee a specific company or a division?

A So I -- initially when I was at -- stationed there, I was a company officer. I was the Alpha Company officer. And then at some point I transitioned away from it. So we had four Navy lieutenants. One lieutenant for Alpha, Bravo, Charlie. And then we had a fourth that was sort of the battalion officer.

And at some point -- and I believe it may have

been around fall of '15 when I transitioned out of my Alpha Company officer responsibilities and took over the battalion officer.

Q Understood. Was Midshipman ████ or Midshipman ██████, did they immediately report to you or did they have to go through someone else before they got to you or another lieutenant?

A I believe they were both in Alpha Company. I'm not 100 percent on that, but I think they were both in Alpha Company.

Q Okay. So they both would have reported to you?

A Correct.

Q Okay. What is the -- what's the typical relationship like between lieutenants in the NROTC and their midshipmen? Is it more professional and collegial or is it more of a teacher/big brother kind of relationship?

A I would say it's more of a professional/collegial.

Q Okay. What's the most typical kind of interaction you have with midshipmen -- or you did?

A The most typical interaction would be -- a couple of things come to mind. One, like I said, I taught a three-credit class each semester, so I would see either freshman three times a week in the fall or I would see juniors three times a week in the spring.

Of course that wouldn't be all of the freshman. There was another lieutenant that taught another section. So that's one main interaction.

Another one would be during our physical training sessions in the mornings. So typically I think it was Monday/Wednesday mornings before classes began we would meet for physical training.

Another interaction would be Tuesday mornings. We would host what we call "Naval Drill" for about an hour and a half. And that would cover a variety of things. Sometimes classroom instructions, sometimes something else. So those would sort of be the main dedicated interactions.

And then at a minimum as a company officer, I would always meet -- I think twice a semester -- with each of my midshipmen. So when I was the Alpha Company officer, I probably had 25 to 30 midshipmen in Alpha Company. And like I said, I would meet with them always initially, beginning the semester, and then once again towards the end.

Q Understood. Thank you, sir. Sir, during August 2015 to August 2016, were there rules that midshipmen were required to follow?

A Were there rules that midshipmen were required to follow?

Page 14

Q Correct. Was there a rule book or was there a set of standards that they had to comport themselves with for NROTC purposes I mean?
A There was, yes. I want to stay it was just a -- the Purdue Navy ROTC Student Handbook.
Q Thank you. Were you subject to the same rules they were or did you have a separate officer sort of conduct you had to follow?
A Yes. So that rule book would have been for students within the program.
Q Okay.
A So without me being a student, that wasn't really applied to me.
Q Understood. Just because I'm not a midshipman and I've never seen it before, what's a typical schedule for a freshman midshipman, like, their first semester?
A Yeah. A typical schedule would be Monday morning join up with the unit by the armory for -- at about 5:45. We workout for about an hour. They go back, shower, have breakfast, do their things, go to classes throughout the day, you know, eat lunch, go back to classes. And potentially in the afternoon when classes were over, they may have some, you know, a little bit of responsibilities or duties

Page 15

within the unit. But, you know, we always encouraged, you know, engaging in some sort of a physical activity or extracurricular event in the afternoon after classes.
And then really just studying. Obviously Purdue is a very rigorous institution and so, you know, I think the majority of their time is probably -- well, you would hope -- is spent studying.
Q Are there any NROTC events that are mandatory on the weekends?
A No. We typically did not have -- no. The only events that they would have ever have been sort of required to do would be in the fall. We -- the students in the program would clean up the football stadium after home football games. And that was a way for them to sort of raise money.
Q Okay. Does the schedule you just described, does it change substantially from first fall semester to the first spring semester for the freshman?
A No, no. I think it would be pretty consistent for both other than having a different class -- class load.
Q Right. Would it be a larger class load or a smaller class load?

Page 16

A It would depend individually on the student. My assumption would be that maybe the fall class load could be a little bit easier and lighter, just the nature of being new to a university. Then potentially maybe the spring semester, you know, some more challenging courses.
Q Understood. Sir, I want to list off some names here and if you can confirm if you know them and what their position and title are or were, I'd appreciate it.
Craig Remaly?
A Yup. He was the executive officer.
Q Okay. Megan Redlawsk?
A She was a peer of mine, another lieutenant company officer on staff.
Q Rodney Hutton?
A Yup. That's Captain Hutton. He would have been the commanding officer.
Q Understood. And then Kyle Willstatter?
A Another Navy lieutenant on staff, a peer of mine.
Q Understood. Sir, did you -- prior to -- and when I say "the allegations," I'm referring to allegations of sexual assault by [redacted] against [redacted] [redacted]. Prior to those allegations being brought, did you have any interactions with [redacted]?

Page 17

A Yes.
Q Did you supervise her?
A Yes.
Q What were your general impressions of her?
A Nothing specific comes to mind other than, you know, just sort of seemed like a typical, you know, female midshipman.
Q Understood. Same question. Prior to the allegations did you know [redacted]?
A I did, yes.
Q Did you supervise him?
A I believe I supervised him. I don't recall 100 percent if he was in Alpha Company but, you know, again, just the nature of the program, I would have -- there would have been overlap where I would have seen him and come across him.
Q Sure. Do you have any general impressions of him?
A Nothing stands out. Again, just, you know, typical, you know, freshman midshipman.
Q Understood. As you best understood your duties at the time in 20 -- in August 2015 between -- from August 2015 to August 2016, as a lieutenant, what were your responsibilities if a midshipman came to you and alleged they'd been sexually assaulted?
A My responsibilities really would have been, A, to

Page 18

ensure that a report essentially is filed so that the University would have been made aware of it.

Q When you say "a report," you mean a report to Purdue University?

A Correct. And then really, I think, just in terms of other responsibilities ensuring that the individual is aware of the various resources available to them.

Q Like what?

A Mainly I'm speaking of the resources that would be available through Purdue University. Just in terms of, you know, counseling and those types of things.

Q Does that include something called "CARE"?

A "CARE" doesn't ring a bell. I know Purdue had their own sort of health office. They may be what CARE is part of.

Q Okay. Do you recall [REDACTED] reporting to you that [REDACTED] had sexually assaulted her?

A I do recall her reporting to me that she had been sexually assaulted. I don't know if she -- I don't recall if she specifically told me his name when she revealed that. But shortly thereafter I think we -- his name was brought up. I don't know if she was the one that brought it up.

Q Understood. To the best of your recollection, can

Page 19

you kind of summarize what you remember happening, how you learned, what she said, what you did, et cetera?

A Yeah. So really -- all I really remember was I was -- I believe I was in my office in the armory. And she came to my office. I'm pretty confident that she came with another student, another female midshipman that was in the program as well. Of course she, you know, revealed what had happened.

I don't recall her going into specific details other than just, "Hey, you know, sir. This happened to me. You know, I was -- I feel that I was sexually assaulted," et cetera. And I just kind of recall, you know, sitting there and listening to her.

And then at some point we just kind of talked about, "Okay. Next steps. You know, have you, you know, reported this to" -- Purdue has an anonymous intake form. And so we just kind of discussed that and then discussed, you know, where you can go and what Purdue -- what types of resources they have.

Q To your knowledge, did you show her how to make a report with Purdue University?

A I believe I did. I don't actually recall -- I'm fairly confident that I probably pulled up Purdue's

Page 20

-- the link to the Purdue's intake form and reviewed that with her in case she was unaware of that. That's about as -- all I recall there.

Q Sure. Did you report what Ms. [REDACTED] had told you to any of your superiors within NROTC?

A I'm not 100 percent confident, but I may have reported it to Commander Remaly.

Q When [REDACTED] made this report, did you have any reason to think that she was making it up?

MR. BYLER: Objection. Speculation.

Q You can answer.

A I'm sorry. The question: Did I believe that she was making it up?

Q Did you have any reason to believe that she was making up her allegations?

A At the time, no. She seemed to be telling the truth. And it seemed to -- I didn't have reason to doubt her at the time.

Q Have you ever had a reason to doubt her?

A Nothing -- no. I mean, nothing really comes to mind.

Q Understood, sir. Sir, you should have received from Mr. Matuszak some links to some exhibits.

Did you receive those?

A Let me check my email. Would these have come to my

Page 21

email?

MR. MATUSZAK: They were sent by Sarah, my paralegal. Sarah --

THE WITNESS: No. The only thing I got was -- sorry. You're referring to, like, exhibits regarding -- I don't have any. Yeah -- no. I don't have any exhibits.

MR. JONES: Okay. Off the record briefly.

(A recess was taken between 11:26 a m. and 11:32 a m.)

BY MR. JONES:

Q Mr. Sheppard, are you ready to proceed?

A Yes.

Q Sir, could you please take a look at what has been provided to you as Exhibit 1?

(Defendant's Exhibit 1 was marked for identification.)

A Okay.

MR. JONES: And for the record, Phil, this is Bates number PU 0057.

MR. BYLER: Okay. I have it.

Q Mr. Sheppard, do you have this document in front of you?

A Yup, Exhibit 1.

Q Yup. Could you take a moment to review this and

Page 22

let me know when you're done?
A Okay.
Q Great. Have you had a moment to look it over?
A Yup, I read it.
Q Have you seen this before?
A I haven't seen this actual document before, no.
Q Okay. And the kind of paragraph where the -- it says, "Detailed description of the incident," did you write that?
A That does -- it does appear to be from me. Again, I don't exactly remember the act of writing it but, yeah. I would assume there that that came from me.
Q Right. And at the very top of the document it says, "Reported by," and the name, colon, "Adam Sheppard."
Is that you?
A Yup, yes. It is.
Q And then it has title "Assistant Professor of Naval Science (Naval ROTC Instructor)."
Is that correct?
A Correct.
Q And then it also has an email address. Was that your email address at the time?
A That is, yes.
Q And the same, is that your phone number that you

Page 23

were using at the time?
A It looks right, yup.
Q Okay. Do you recall -- having read this now, has your memory been refreshed as to kind of what happened when the allegations against Mr. ███ were made?
A Yes. I mean, again, I guess I do -- this confirms I did recall that she joined with a friend and then now -- yes. Obviously she did reveal to me ███'s name at that occasion. And then some minor detail there about the incident.
Q Understood. To your recollection, do you remember if you made this report immediately after the meeting or if there was time in between?
A I probably would have made it very soon after the meeting just in the interest of not forgetting any of the detail but also just the urgency of, you know, getting the information out there.
Q Understood. If I'm understanding, you can't say 100 percent if you made it immediately after or 10 minutes after or an hour after?
A No. It certainly would have been the same day. I think that would be safe to say.
Q Okay. So you're confident that ███ would have reported this to you on April 4th, 2016?

Page 24

A April -- oh, spring of '16. That sounds about right, yeah.
Q Well, in fact, if you look at the top of the document, it says, "Submitted on April 4th, 2016, at 8:37."
A Okay.
Q So I just want to confirm based on your past practices and what you believe, any reason to think that she reported this -- she didn't report this on April 4th, 2016?
A I can't specifically recall what the date was.
Q Okay. Assuming for a minute, sir, that what you've written down here is an accurate summary or transcription of what ███ alleged to you, does this constitute sexual assault in your eyes?
MR. BYLER: Object to the form and it's also calling for a legal opinion.
Q You can answer.
MR. MATUSZAK: He can answer the question as he understands sexual assault --
MR. JONES: Sure.
MR. MATUSZAK: -- but it calls for a legal opinion.
A Yeah. I don't -- I guess I wouldn't -- I can't speculate on whether this would be considered

Page 25

sexual assault or not.
Q Okay. Why did you report this to Purdue?
A Well, because a Purdue student came to me and felt that she had been sexually assaulted and so as a, you know, I guess, a staff member or as a, you know, instructor, it was an obligation to report that information. Whether it's true or not, you know, that wasn't my job. But my job was just to report it.
Q Understood. Any reason to think that Purdue was already aware of this?
A I had no reason to think that Purdue was aware, no.
Q Understood. I think you already said this, but just for the sake of clarity, did you tell ███ you were going to take any specific action?
A Well, I can see at the bottom it looks like I had mentioned to her -- "I reviewed support services" -- "and ensured that she would not be crossing paths in the immediate future with ███, seeing as they are both students in the program (sic)."
So I -- based on that comment, I probably reassured her that because ███ was in the program, we would work out some accommodations or something and just so that, you know, she wouldn't, you

Page 26

know -- with him in the program as well -- I guess I don't know what I'm trying to say. Just work out accommodations so that they're not both -- I don't know -- sitting next to each other at Naval Science class or what have you.

Q Understood. So is that something the lieutenants had the authority to do is to kind of move around midshipmen to avoid contact?

MR. BYLER: Excuse me. I couldn't hear you. Your voice and connection totally dropped.

MR. JONES: Let me try again.

MR. BYLER: Now I can hear you.

Q Adam, is that something lieutenants would have the authority to do is to ensure that midshipmen didn't cross paths?

A I wouldn't say lieutenants, but certainly the commanding officer, Captain Hutton, or the executive officer, Commander Remaly. They could make that decision.

Q Understood. Did she indicate to you if you were the first NROTC official she had informed about this?

A I don't recall if she indicated I was the first. I would assume I was the first.

Q Understood. Did she say -- did she say or do you

Page 27

recall her saying that she wanted you to file a report on her behalf with Purdue?

A I don't specifically remember that, but I think just sort of to paraphrase the conversation that we had was that, yes. We would need to be filing a report. So she would have been aware of it.

Q Does that include a report with both Purdue and the NROTC?

A I don't specifically recall. Well, as I said, I think I may have verbally notified Commander Remaly, but then there may have been some -- there may have been a Navy email or a notification just to the broader navy R- -- the broader ROTC chain of command.

Q Understood. Do you recall what your plan was for separating ████ and █████?

A I don't specifically recall making a plan myself. I do just recall at some point -- at some point Captain Hutton, I think, may have sort of, you know, directed us to keep them separated or -- like I said, there was some accommodations that were made. It could have been, you know, ████ to not appear at Navy ROTC events during -- you know, in the near future. But I don't think there was anything in particular that I recall instituting.

Page 28

Q Fair enough. Did you directly contact ████ about these allegations?

A I don't recall directly contacting him, no.

Q Okay. Do you have any recollection who at the NROTC -- if someone at the NROTC contacted Mr. ████ about the allegations?

A Most likely it would have probably been Captain Hutton. He probably would have received, you know, a phone call from Purdue. And then I guess I would assume that he would have been the one to sort of approach ████ about it.

Q Okay. If you could -- sir, if you could open up Exhibit No. 2.

MR. JONES: And for everyone's reference, this should be NSTC-0179.

(Defendant's Exhibit 2 was marked for identification.)

Q And I'll represent to you, Mr. Sheppard, this email goes in reverse chronological order, so it might make more sense to read from the bottom up. And let me know when you've had a chance to review.

A Okay.

Okay. All finished.

Q Great. Do you recognize these emails?

A I do.

Page 29

Q Do you recall receiving and sending these emails?

A Yup.

Q Specifically there's -- the first email from you or from someone named Adam Sheppard dated Wednesday, April 6th, 2016, at 1:26 p.m. and signed "LT Sheppard."

Was that email drafted and sent by you?

A Yes.

Q Having reviewed this, do you recall whether or not you advised Mr. ████ to take any action regarding Ms. █████?

A Can you clarify take any action with Ms. █████?

Q Sure. Let me clarify. That wasn't very clear.

Is it correct that you told Mr. ████ that he wasn't to have any contact with her?

A Yes.

Q Is it true that you told Mr. ████ that he wasn't to participate in any battalion-related functions?

A Yes.

Q In fact, was there anything in the NROTC program that Mr. ████ could participate in at this time?

A Not that I would -- it doesn't seem so. It looks like I must have been aware of a letter that Captain Hutton, the CO, had written, which I'm referencing in this email. But, you know, as I

Page 30

said, "Per the letter from the CO, you are not allowed to participate in battalion-related function."

So that to me would indicate, no. He was not -- he would not have been permitted to participate in anything officially battalion sanctioned -- Navy sanctioned.

Q Understood. And do you see at the bottom where you -- the last sentence you wrote -- and it starts with, "I would advise you"?

A Yup.

Q Did you in fact advise ███ to reach out to Purdue's -- Purdue's website for resources?

A Yes.

Q Did you tell him that he should seek advocacy and counseling from Purdue if he needed help?

A Yes.

Q Did you have any reason to think that Purdue wouldn't offer advocacy or counseling to him if he'd ask for it?

MR. BYLER: Objection. Speculation.

Q You can answer.

A No. I had no reason to believe that he would not receive counseling from Purdue.

Q Okay. And just so I understand, you would have

Page 31

written this in response to -- you wrote this in response to Mr. ███'s email; correct?

A Correct.

Q And it sounds like you were basically just referring him to what the commander had already told him; is that fair?

A Yes, that's fair.

Q Okay. Fair to say that it was because of Ms. ███s accusations or allegations that the commander issued the letter causing Mr. ███ not be able to participate in battalion functions as far as you know?

MR. BYLER: Objection. Objection. Lack of foundation.

Q You can answer if you understand.

A Yeah. I would assume that -- sorry. What was the question?

Q Sure.

MR. JONES: Ms. Court Reporter, could you please read it back to him?

(The previous question was read by the reporter.)

MR. BYLER: I have an objection to the question, but please proceed to answer.

A Yes. I think it would be fair to say that would

Page 32

have been the impetus behind the letter from this commanding officer.

Q Thank you, sir. If you could open up what's marked as Exhibit 3 now. For identification purposes, this is NSTC-0180 through -0182.

If you could take a moment to review this, sir, and let me know when you're done.

(Defendant's Exhibit 3 was marked for identification.)

A Okay.

Q And, again, it might be easier to start from the bottom up, so --

A Okay.

Okay.

Q Have you had a chance to review this, sir?

A Yes.

Q Have you seen these emails before?

A Not other than, I guess, when I wrote them.

Q Fair enough. Do you have any reason to think that you did -- that you didn't write these emails or receive these responses from Midshipman ███?

A No. This was definitely, you know, me.

Q Okay. Starting with your first email on April 26th at -- 2016, at 9:34, why did you ask Midshipman ███ for an update on his classes?

Page 33

A That was just me checking in on him because he wasn't -- if I recall, based on the previous email, you know, he wasn't necessarily around the unit, coming to the armory, coming to the staff offices. And so that was just a way to reach out to him and kind of touch base with him.

Q Understood. Do you do that with all of your midshipmen?

A Yeah. Not necessarily via email, but it would have been, you know, more of a discussion in my office.

Q I'm looking at his response, it looks like he's saying he has mainly C's, but some A's and B's too or an A or B.

I mean, did he give you any indication that he was struggling with classes at that time?

A Not based off of this, no.

Q Did he say that he was having trouble concentrating for any reason?

A Nope. I don't recall that.

Q Did he ever reach out to you and say, you know, "I need help. I can't do my assignments," or, "I can't focus on my tests"?

A He may have. Nothing that I can recall.

Q Fair enough, sir. To your knowledge, did he have to maintain his grades over a certain threshold to

Page 34

remain in the NROTC?
A Yes.
Q Do you remember what that was? What the GPA was?
A I don't. I want to say 2.5 GPA.
Q Okay.
A Or maybe 2.0. Again, I don't recall specifically what the threshold was.
Q Fair enough, sir. I kind of want to fast forward through the emails to the very last one.
A Okay.
Q The very first sentence, that reads, "Lieutenant Redlawsk is the investigating officer that will be conduct- -- collecting information on the command's side."
Reviewing that email and the one you're responding to, what are you talking about there?
A So it looks like he had asked me -- he had brought up just discussion of his case and sort of the ongoing investigation and he had questions pertaining to that. And so I directed him to Lieutenant Redlawsk as she was sort of the point of contact on the Navy side.
And so I -- that's really all that is is I'm just saying, "Hey, this -- this isn't -- you know, I'm not -- I'm not the point of contact for this.

Page 35

Lieutenant Redlawsk is so, you know, reach out to her."
Q Do you remember when, if ever, someone told you that Ms. Redlawsk was looking into the allegations?
A Not specifically. I think I just kind of recall, you know, either Captain Hutton or Commander Remaly kind of directing, you know, Lieutenant Redlawsk to be the sort of the command's point of contact.
Q Understood. Do you have a reason to believe the NROTC conducted its own investigation to ███s allegations?
MR. BYLER: Objection to form.
Q You can answer.
A Do I have reason -- no. My understanding was that we were -- there was a University investigation and I don't -- I don't -- I'm unaware of any investigation that we -- I'm unaware of, like, a second or independent investigation that we would have done.
Q Understood, sir. Is it your understanding of the NROTC rules sometime that if a midshipman had sexually assaulted another that they would be disenrolled from the program?
A If a midshipman was found guilty of sexual assault, would they be disenrolled from the program?

Page 36

Q Right.
A No, not necessarily.
Q Why do you say that?
A I mean, not everything is, you know, cause for disenrollment, I guess. You know, I recall Navy, you know, there being sort of a zero tolerance on certain things, but I -- it would be speculation, I think, for me to say that, "Yes. He would have been disenrolled for any specific thing."
Q Understood.
A But that -- I'll leave it at that.
Q Fair enough. So your understanding the Navy had discretion on how to discipline its midshipmen?
MR. BYLER: Objection. Calls for a legal conclusion.
Q You can answer.
A There certainly would have been -- yes, official Navy guidelines on what would have been cause for disenrollments. Without that -- without those, I guess SOP, you know, "Standard of Procedures" in front of me, I wouldn't have recalled specifically what would have been cause for disenrollment and what wouldn't have.
Q Understood. Sir, were you aware that Midshipman ███ was on academic probation or academic warning

Page 37

during the spring semester?
MR. BYLER: Objection. Just because you had changed the question with your wording.
MR. JONES: Well, Phil, all you need to say is "Object to form," okay?
MR. BYLER: I object to form.
MR. JONES: Okay.
BY MR. JONES:
Q Adam, did you understand the question?
A Yeah. Was I aware that he was on any sort of academic warning or probation? Right now I don't recall, but he could have been. I don't remember.
Q Do you know if a lieutenant was responsible for monitoring his grades or his academic performance?
A There would have been -- yes, a lieutenant responsible for monitoring him.
Q Do you recall if that was yourself?
A Well, as I said, if I recall correctly, I think I may have been his company officer in the fall, but then at some point I transitioned to the battalion officer. Then, I think, Lieutenant Willstatter inherited all of my 30 or so students.
Q Understood. Go ahead. Sorry.
A But then -- but then I think the reason for the email is just that the -- Commander Remaly or

Page 38

Captain Hutton may have just specifically identified, "Hey, Adam. We'd like you to reach out sort of, you know, to [redacted]." It was just kind of a one-off, you know, since I was a battalion officer and he wasn't around, I think it was just, "Hey. Let's just have Adam check in on him."

Q Fair. I would have you -- if you could open up Exhibit 4, please, and take a quick look at that.

For identification purposes, this is NSTC-0183 through -- and then also including NSTC-0156 through -157.

(Defendant's Exhibit 4 was marked for identification.)

Q Take a moment to review that, sir, and then let me know when you're ready.

A Okay.

Okay.

Q Have you had a chance to review this?

A Yes.

Q Are you familiar with these emails and the attached documents?

A Yes.

Q What are they?

A Well, the first -- if I go to the bottom, [redacted] signs -- basically this is just an acknowledgement

Page 39

of the second to last page that came from the commanding officer. This is January, so this would have been -- it looks like he was placed on academic warning following his fall semester. Of course grades come out, you know, around December/January-ish. And then it looks like based on his grades -- oh, yeah. "Standard of 2.5." He earned a 2.47. Okay. So he -- that was what would have triggered him being placed on academic warning.

Scrolling up -- okay. So it looks like the date jumps to May, which would have been really all the way after finals of spring semester. Yeah. Okay. So then my email there from May 31st basically just calls out clearly he was below that 2.5 again in the spring, so that triggered this thing called "Academic Interim Leave of Absence." And then I just asked him to acknowledge that.

Q Understood. Is it your understanding that by triggering the Academic Interim Leave of Absence he was basically temporarily suspended from NROTC pending the results of a performance review board?

A No. That wouldn't necessarily be what that means. I think students on interim leave of absence would still participate and still be present with unit

Page 40

activities.

Q Okay. Is it your understanding that one result of a performance review board could be disenrollment?

A That is a -- one possible outcome, yes.

Q Okay. Any reason to believe that if Midshipman [redacted] had had his PRB on his substandard academic performance that he would have been disenrolled?

MR. BYLER: Objection as for speculation.

MR. MATUSZAK: I would agree with that. That's really speculation as to what could have happened, so object to the question.

Q Okay. Let's do this. We may come back to that.

If you could open up Exhibit 5 really briefly. This is the last exhibit I have, Adam.

(Defendant's Exhibit 5 was marked for identification.)

A Okay.

Q For identification purposes, this is NSTC-184. Take a moment to review this, sir.

A Okay.

Okay.

Q Have you had a chance to review this?

A Yes.

Q Have you seen this document before?

A I don't think I have.

Page 41

Q Okay. Do you have any idea why this would have been generated?

A It's coming from another midshipman so my really only assumption would be it was for some sort of a character reference or something.

Q Okay.

MR. JONES: Let's do this. I think I'm done, but let me take a five-minute break.

MR. BYLER: Sure.

MR. JONES: Double-check my notes.

MR. BYLER: Yeah. I'll have some questions but it'll be relatively short.

MR. JONES: All right. And then after that, we can break for lunch, so let's take a five-minute break. Okay?

MR. BYLER: Good.

THE WITNESS: Okay.

(A recess was taken between 12:06 p m. and 12:11 p m.)

MR. JONES: The only question I have is actually for Phil again. Phil, again, any issue with submitting to the authenticity of these exhibits?

MR. BYLER: No, no. I mean, we may argue about what they mean, but --

Page 42

MR. JONES: Sure. The admissibility and the authenticity are --
MR. BYLER: Yeah.
MR. JONES: Okay. Fair enough. That's all I have then.
MR. BYLER: Okay. I just have some follow-up questions.
CROSS-EXAMINATION
QUESTIONS BY PHILIP A. BYLER:
Q First of all, I want to pull up again that first exhibit, PU57.
A Okay.
Q Okay. And I think your intention was directed to the upper right-hand corner where it dates at April 4, 2018?
A Okay.
Q Okay.
MR. JONES: Objection to form. I think it says "2016."
MR. BYLER: Oh, I'm sorry. I meant '16.
Q April 4, 2016. It says that; correct?
A Correct.
Q Okay. Now, in what Ms. [redacted] told you, did you -- were you informed about when supposedly the offensive behavior occurred?

Page 43

A I don't recall specifically a date or a time, no.
Q Did it come up that it was six months earlier or anything like that?
A No. It looks like all I really was aware of was two different occasions. I don't recall a time -- a timeline.
Q Okay. So with what you understood, you didn't fix a time date on the two incidents of offensive behavior?
A I don't believe so, no.
Q Okay. Now, can I direct your attention to the middle of the page? And do you -- I'm just going to read it just so you can focus on it. And it's above the essay.
A Okay.
Q And it reads, "Has this been reported to any other Purdue University officer or official: Yes.
If you answered 'yes' to the above question, please identify the officer official: Title IX Coordinator (via online reporting form)."
Okay. I've read it to you correctly, haven't I?
A Yes.
Q Okay. Were you responsible for that information?
MR. JONES: Object to form. You can answer.

Page 44

A I'm trying to think about this. "Title IX Coordinator (via online reporting form)."
It could have been me. I would have assumed that this would have been what went to that Title IX Coordinator.
Q Okay. Let me direct your attention. "Has this been reported to any other Purdue University officer or official?" It says, "Yes."
Does not that indicate that at the time you were making a report, a report had already been made to Purdue?
MR. JONES: Object to form. Asked and answered. You can answer.
A Maybe -- maybe what's happening here was she had told me she wrote a report or that she had submitted a report and I submitted one as well. Meaning, when I submitted mine, I was potentially aware of the fact that she had already submitted one via the online reporting form.
Q Okay. Were you a member of the Performance Review Board?
A I could have been. I don't specifically recall. I was a member of a number of performance review boards.
Q Let me have you be handed the document that's been

Page 45

marked NSTC-0001 through -4.
THE WITNESS: Is that -- is that one of the ones, Tyler, you forwarded me earlier?
MR. BYLER: It might have been.
MR. JONES: Phil, is that -- is that one of my exhibits or is it one of -- is it your exhibit?
MR. BYLER: Your exhibit.
MR. JONES: Okay.
THE WITNESS: -00 -- -0014?
MR. BYLER: -001 through -0004.
MR. JONES: Phil, I don't -- that's not one of our exhibits to this witness.
MR. BYLER: Oh, so it wasn't sent to him?
MR. JONES: Unless you did, I didn't.
MR. BYLER: Okay.
BY MR. BYLER:
Q Let me ask you this as a general question: Are you aware of what the disenrollment -- official disenrollment documents show as to [redacted]?
MR. JONES: Object to form. You can answer.
A Not off the top of my head, but I do have these -0011 through -0014 from both -- both of your offices, if that's what you're referring to.
Q Yeah. That was the document I was referring to.
A Yup.

Q Okay. Did you see this document at the time or around the time?
A Nothing's -- I don't recall specifically, no.
Q Well, let me go to page 3.
A Okay.
Q And what I'm asking you to look at, "2. Type of disenrollment (Dropped by institution). Midshipman ████ was suspended by the University for one academic year."
Okay. Do you see that?
A I'm on page 3. Sorry. What's the NSTC number? -00 --
Q -0003.
A Oh, no. I only have -11 through -14.
MR. JONES: Right. Phil, your exhibits that you provided is simply NSTC-0011 through -0014. And I didn't provide -- or I didn't have that portion of the Navy record as an exhibit to this witness, so --
MR. BYLER: Okay. One of the limitations to a video deposition. Okay. I don't think I have any more questions.
MR. JONES: We don't either. John, do you want to advise him about his rights or I can?
You're muted, sorry.

MR. MATUSZAK: Mr. Sheppard, they'll be sending you a transcript electronically for you to review. You should review it. See if there's any corrections. If there are any, just call me and let me know that you've got some corrections. That's all I've got.
THE WITNESS: Okay.
MR. JONES: Off the record.
MR. BYLER: Can I ask one more question --
MR. MATUSZAK: Sure.
MR. JONES: Sure.
MR. BYLER: -- of the witness?
MR. JONES: Sure. On the record?
MR. BYLER: Yeah.

FURTHER CROSS-EXAMINATION

QUESTIONS BY PHILIP A. BYLER:
Q You graduated from the Naval Academy?
A I did.
Q Okay. And you went into Naval aviation?
A I did.
Q Okay. Do you know where John McCain was in his class at Naval -- at the Naval Academy?
A I want to say he was the anchor so the very bottom.
Q Okay.
MR. BYLER: Thank you.

MR. JONES: Off the record.
(Time noted: 12:21 p.m.)
AND FURTHER THE DEPONENT SAITH NOT.

STATE OF INDIANA )
) SS:
COUNTY OF MARION )

I, Megan M. Bowman, Notary Public in and for the County of Marion, State of Indiana at Large, do hereby certify that ADAM SHEPPARD, the deponent herein, was by me first duly sworn to tell the truth, the whole truth, and nothing but the truth in the aforementioned matter;

That the foregoing deposition was taken on behalf of the Defendants, at 7912 West 26th Street, St. Louis Park, Hennepin County, Minnesota, on Wednesday, May 20, 2020, pursuant to the Federal Rules of Civil Procedure;

That said deposition was taken down in stenograph notes and afterwards reduced to typewriting under my direction, and that the typewritten transcript is a true record of the testimony given by the said deponent; and that signature was requested and thereafter presented to said deponent for his/her signature;

That the parties were represented by their counsel as aforementioned.

I do further certify that I am a disinterested person in this cause of action, that I am not a

relative or attorney of either party or otherwise interested in the event of this action, and that I am not in the employ of the attorneys for any party.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 5th day of June 2020.

Megan M. Bowman
Notary Public

My Commission Expires:
January 2, 2027
County of Residence:
Marion County, Indiana

Veritext Legal Solutions
1100 Superior Ave
Suite 1820
Cleveland, Ohio 44114
Phone: 216-523-1313

June 5, 2020

To: Philip A. Byler

Case Name: Doe, John v. Purdue University, et al

Veritext Reference Number: 4108697

Witness: Adam Sheppard Deposition Date: 5/20/2020

Dear Sir/Madam:

Enclosed please find a deposition transcript. Please have the witness review the transcript and note any changes or corrections on the included errata sheet, indicating the page, line number, change, and the reason for the change. Have the witness' signature notarized and forward the completed page(s) back to us at the Production address shown above, or email to production-midwest@veritext.com.

If the errata is not returned within thirty days of your receipt of this letter, the reading and signing will be deemed waived.

Sincerely,
Production Department

NO NOTARY REQUIRED IN CA

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4108697
CASE NAME: Doe, John v. Purdue University, et al
DATE OF DEPOSITION: 5/20/2020
WITNESS' NAME: Adam Sheppard

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________ _______________
Date Adam Sheppard

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

_______________________
Notary Public

_______________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4108697
CASE NAME: Doe, John v. Purdue University, et al
DATE OF DEPOSITION: 5/20/2020
WITNESS' NAME: Adam Sheppard

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ _______________
Date Adam Sheppard

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

_______________________
Notary Public

_______________________
Commission Expiration Date

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS MIDWEST
ASSIGNMENT NO: 4108697

PAGE/LINE(S) / CHANGE /REASON

_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________

_______________ ________________________
Date Adam Sheppard

SUBSCRIBED AND SWORN TO BEFORE ME THIS _______ DAY OF ______________________, 20______ .

________________________________
Notary Public

________________________________
Commission Expiration Date

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at