# Exhibit H

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION
Case No. 2L17-cv-33-JPK

JOHN DOE,                                )
                                         )
         Plaintiff,                      )
                                         )
         -vs-                            )
                                         )
PURDUE UNIVERSITY, PURDUE                )
UNIVERSITY BOARD OF TRUSTEES,            )
MITCHELL ELIA DANIELS, JR., in           )
his official capacity as                 )
President of Purdue University,          )
ALYSA CHRISTMAS ROLLOCK, in her          )
official capacity at Purdue              )
University, KATHERINE                    )
SERMERSHEIM, in her official             )
capacity at Purdue University,           )
                                         )
         Defendants.                     )

VIDEOCONFERENCE DEPOSITION OF KYLE WILLSTATTER

    The videoconference deposition upon oral examination of KYLE WILLSTATTER, a witness produced and sworn before me, Craig Williams, RPR, CMRS, a Notary Public in and for the County of Marion, State of Indiana, taken on behalf of the Defendants, at the offices of Stuart & Branigin, LLP, 300 Main Street, Suite 900, Lafayette, Tippecanoe County, Indiana, on the 21st day of May, 2020, at 1:00 p.m., pursuant to the Federal Rules of Civil Procedure with written notice as to time and place thereof.

Page 2

```
 1              APPEARANCES
 2
 3  FOR THE PLAINTIFF:
 4      Philip A Byler
        NESENOFF & MILTENBERG
 5      363 Seventh Avenue, Fifth Floor
        New York, NY 10001
 6      212 736 4500
        pbyler@nmllplaw com
 7
    FOR THE DEFENDANTS:
 8
        William P Kealey
 9      Tyler L Jones
        STUART & BRANIGIN LLP
10      300 Main Street, Suite 900
        P O Box 1010
11      Lafayette, IN 47902-1010
        765 423 1561
12      wpk@stuartlaw com
        tlj@stuartlaw com
13
    FOR THE DEPONENT:
14
        John Matuszak
15      Counsel at U S Navy -
        Naval Service Training Command
16      2601 A Paul Jones Street
        Building 1
17      Great Lakes, IL 60088-2845
        847 707 5057
18      john matuszak@navy mil
19
20
21
22
23
24
25
```

Page 3

```
 1            INDEX OF EXAMINATION
 2  DIRECT EXAMINATION .................4
       Questions by Tyler L. Jones
 3  CROSS-EXAMINATION ..................41
       Questions by Philip A. Byler
 4
 5
 6
 7
 8
 9            INDEX OF EXHIBITS
10  Navy Exhibit:
11  Exhibit 1 - Fact Witness Approval Letter ......4
12  Defendants' Deposition Exhibit:
13  Exhibit A - NSTC-0165 and NSTC-O152 .........18
       Exhibit B - NSTC-0015-16 NSTC-0150-0160 .......20
14  Exhibit C - NSTC-0140-1042 ..............26
       Exhibit D - NSTC-0011-0012 ..............34
15
    Previously Marked Exhibits:
16
       Exhibit 6 - NSTC-0018-0019 .............44
17  Exhibit 10- NSTC-0127-0153 ..............47
18
19
20
21
22
23
24
25
```

Page 4

1    KYLE WILLSTATTER,
2  having been duly sworn to tell the truth, the whole
3  truth, and nothing but the truth relating to said
4  matter was examined and testified as follows:
5  DIRECT EXAMINATION,
6    QUESTIONS BY TYLER L. JONES:
7  Q  Good morning, sir.
8  A  Good morning.
9  Q  Or I guess this afternoon now.
10 A  Whatever time it happens to be.
11 Q  My name is Kyle Jones. I'm an associate at
12    Stuart Branigin. The man to my left is Bill
13    Kealey. He's the partner here at Stuart
14    Branigin. We represent Purdue University in a
15    federal lawsuit filed by John Doe.
16       Before we get started, Mr. Matuszak is
17    going to want to put the letter into the record,
18    so I'll let him do that.
19       MR. MATUSZAK: This deposition is being
20    conducted pursuant to the two regulations, and
21    the Navy has approved this deposition. There's
22    an approval letter that indicates that the
23    deposition can go forward, and that the letter
24    should be part of the record.
25       (Deposition Exhibit 1 was marked for

Page 5

1     identification.)
2  Q  Thank you.
3       Sir, could you, please, state your full
4     name.
5  A  Kyle Willstatter.
6  Q  Thank you. Have you ever given a deposition
7     before?
8  A  I have not.
9  Q  So I'm just going to give a couple brief ground
10    rules. I'm sure you talked a little bit with
11    Mr. Matuszak about it, but a deposition is just
12    a chance for both the parties in a lawsuit to
13    ask you questions about what you may or may not
14    know about pertinent facts.
15       Everything that we say, myself and you, is
16    being recorded and will be typed up into a
17    transcript. I ask because of that if I ask you
18    a question or someone else asks you a question,
19    you give me yeses, noes, yeas, nays, instead of
20    head shakes or head bobs. Otherwise, it won't
21    show up in the record exactly what you meant.
22    Does that make sense?
23 A  Yes, it does.
24 Q  I'd ask because we're recording this that we try
25    not to interrupt each other. I promise that if

Page 6

1   I know what you're trying to answer, I'm not
2   going to jump the gun, even though I may know
3   what you're going to say. Similarly, please let
4   me finish my question, even if you have a good
5   idea what I'm trying to ask.
6       If you answer a question, I'm going to
7   assume you understood. But if you don't
8   understand, please ask me to rephrase or ask me
9   to repeat the question.
10      If you need a restroom break, just ask me.
11      Another housekeeping matter, I'd ask that
12  you keep the names that we use in this
13  deposition confidential. The plaintiff in this
14  case is proceeding under a pseudonym, as is a
15  nonparty victim. The plaintiff's name is
16  ██████ or ██████, and the victim's
17  name is ██████. While we're in the
18  deposition, we'll use those names, but I'd ask
19  that outside of this deposition you don't use
20  either of those names in connection with this
21  lawsuit. Okay?
22 A  Yes, sir.
23 Q  Can you, please, provide your date of birth?
24 A  15 July 1987.
25 Q  Excellent. During the time in question, August

Page 7

1   2015 to August 2016, what was your position with
2   the Purdue Navy ROTC?
3 A  I was active duty staff as the Alpha Company
4   Officer.
5 Q  Were you a lieutenant?
6 A  Yes.
7 Q  What is a good mailing address for you?
8 A  412 Main Street, Apartment 1, Lafayette,
9   Indiana.
10 Q  Thank you, sir. And what is a good email
11  address for you?
12 A  Kwillstatter@purdue.edu.
13 Q  Can you please give us a brief educational
14  background for yourself?
15 A  Graduated in 2009 from the University of
16  Virginia. Commissioned into the Navy through
17  the ROTC program. Conducted eight years active
18  duty in the Navy, during which time I also while
19  I was at Purdue completed a Master's degree in
20  electrical engineering.
21 Q  Excellent. Is that what you do now?
22 A  I am currently a Ph.D. student and electrical
23  engineer.
24 Q  Even better. Congratulations.
25      MR. BYLER: Excuse me, I couldn't hear that

Page 8

1   answer.
2       THE WITNESS: I am a Ph.D. student and
3   electrical engineer.
4       MR. BYLER: At Purdue?
5       THE WITNESS: Yes, sir.
6 Q  Very good. Congratulations again.
7       How long were you with the Purdue NROTC?
8 A  I was part of the unit from possibly August 2015
9   to September of 2017.
10 Q  Excellent. And you may want to speak up just a
11  little bit, because this is the mic.
12      As a lieutenant and a commanding officer
13  for Alpha Company, can you, please, describe
14  what your responsibilities and duties were at
15  that time?
16 A  So my responsibilities were, or my primary
17  responsibilities were to advise and train a
18  group of approximately 40 midshipmen in the
19  RTC program. That's an adequate summary.
20 Q  Understood.
21      May I ask, what was your reason for leaving
22  the Purdue NROTC?
23 A  I resigned my commission at the end of my tour
24  with the unit.
25 Q  Understood, sir. Thank you.

Page 9

1       Sir, if you wouldn't mind just giving me
2   very briefly a summary of the command structure
3   at Purdue NROTC at that time.
4 A  So there were seven active duty staff members,
5   an enlisted Marine, a train drill instructor,
6   four company officers, a Marine major. There
7   was the XO, Commander Remaly; and the CO,
8   Captain Hutton.
9 Q  And Commander Hutton was at the very top of the
10  food chain, so to speak?
11 A  Yes, he was.
12 Q  Was there anyone immediately under you or
13  subordinate to you as far as a staff member
14  goes?
15 A  No.
16 Q  Were the midshipmen considered to be directly
17  underneath you?
18 A  Within the confines of the ROTC program, yes.
19 Q  Understood.
20      Sir, I'm going to give you a few names and
21  I'd just like to know if you're familiar with
22  them and if you can identify their rank at the
23  time in question, that being August 2015 to
24  August 2016.
25 A  Okay.

Page 10

1  Q   Craig Remaly.
2  A   Yes, sir.
3  Q   What was his title during the time in question?
4  A   He was the executive officer of Purdue NROTC.
5  Q   Understood.
6      Megan Redlawsk or Megan May?
7  A   Yes.
8  Q   What was her position at the time in question?
9  A   She was the Charlie Company officer.
10 Q   Understood.
11     Rodney Hutton or Rod Hutton.
12 A   Yes.
13 Q   What was his position at the time in question?
14 A   He was the commanding officer of Purdue NROTC.
15 Q   And then finally, Adam Sheppard.
16 A   Yes.
17 Q   What was his position at the time in question?
18 A   There were actually four lieutenants. He was
19     the battalion officer of Purdue NROTC.
20 Q   Is the battalion officer above the other three
21     lieutenants, or are you equal?
22 A   They were more or less equal. He had more
23     responsibility along the lines of dealing with
24     things such as medical.
25 Q   Understood, sir.

Page 11

1      Sir, obviously we are here today because of
2      allegations brought by ▓▓▓▓▓▓ against
3      ▓▓▓▓. I'll refer to those allegations
4      simply as allegations. But prior to the
5      allegations in this case, or when you became
6      aware of them, had you ever interacted with ▓▓
7      ▓▓?
8  A   Yes.
9  Q   When and how had you interacted with him?
10 A   He was one of the midshipmen in Alpha Company.
11     I was regularly interacting with him through the
12     entirety of the school year.
13 Q   Can you give me a summary of how you would
14     interact with him typically?
15 A   Most direct interaction we had was regular
16     counselings to make sure he was on track within
17     the program and his degree. Those were at least
18     twice a semester.
19 Q   Besides counseling sessions, did you meet with
20     him for any other reason normally?
21 A   Not individually.
22 Q   As a group then?
23 A   Yes.
24 Q   Did Alpha Company have group meetings or company
25     meetings that you led?

Page 12

1  A   There were some training times where it was
2      specifically broken out by company.
3  Q   Understood, sir.
4      Before the allegations, did you have any
5      general impressions of ▓▓▓▓▓▓?
6  A   Nothing specific. He was a freshman student.
7  Q   Understood.
8      And a freshman student, was his current
9      rank Midshipman Fourth Class?
10 A   Yes.
11 Q   Prior to the allegations, were you familiar with
12     ▓▓▓▓▓▓?
13 A   Yes.
14 Q   Did you interact with her?
15 A   Yes.
16 Q   What kind of interactions did you have prior to
17     the allegations?
18 A   Effectively the same as Mr. ▓▓. She was also
19     a member of Alpha Company.
20 Q   Understood. You two interacted during
21     counseling sessions?
22 A   Yes.
23 Q   Any general impressions of her?
24 A   Also a freshman student.
25 Q   So basically the same as Mr. ▓▓?

Page 13

1  A   More or less.
2  Q   Understood.
3      Are you familiar with something that's
4      abbreviated as the ROD?
5  A   Yes.
6  Q   What does that stand for?
7  A   It is the Regulations for Officer Development.
8  Q   Were there regulations in place at the time that
9      governed the conduct of ▓▓▓▓?
10 A   Are you referring to Navy regulations?
11 Q   Right. Let me rephrase the question.
12 A   Okay.
13 Q   Was ▓▓▓▓ supposed to follow the DOR?
14 A   Sorry, the DOR?
15 Q   The ROD, excuse me.
16 A   His actions within the ROTC are governed by the
17     ROD.
18 Q   Understood.
19     Besides the ROD, were there any other
20     pertinent rules that applied to him specifically
21     in the NROTC context?
22 A   Not that I can recall.
23 Q   Understood. Thank you, sir.
24     Sir, when did you first learn of the
25     allegations brought by ▓▓▓▓▓▓?

Page 14

1  A   I learned of them the day they were brought to
2      the attention of our Lieutenant Sheppard.
3  Q   How did you learn of them?
4  A   I was brought into Commander Remaly's office
5      with Lieutenant Sheppard, and then Lieutenant
6      Sheppard explained the allegation.
7  Q   Kind of breaking that down a little bit, did you
8      receive an email from Lieutenant Sheppard or
9      Commander Remaly telling you to meet them in his
10     office?
11 A   No.
12 Q   Did you receive a phone call?
13 A   No.
14 Q   Did someone tell you in person to meet him in
15     his office?
16 A   Yes.
17 Q   Who told you to meet him in person?
18 A   Commander Remaly.
19 Q   Do you remember what you were doing before he
20     came into your office to tell you to meet him in
21     his office?
22 A   Not specifically.
23 Q   Besides you, Lieutenant Sheppard, and Commander
24     Remaly, was there anyone else in this meeting?
25 A   No.

Page 15

1  Q   Do you recall what was said?
2  A   Only that there was an allegation of assault
3      between two midshipmen.
4  Q   Understood.
5          Was that Lieutenant Sheppard who said that?
6  A   Yes.
7  Q   Do you remember how Commander Remaly responded?
8  A   I don't remember his tone at all, if that's what
9      you're asking.
10 Q   No, sorry, I don't mean to interrupt. I was
11     only asking, do you remember if he said anything
12     at all or what he said?
13 A   Only that he needed to tell the CO and NSTC.
14 Q   And who?
15 A   NSTC, N-S-T-C.
16 Q   Does that stand for Naval Service Training
17     Command?
18 A   Yes.
19 Q   Understood.
20         Did Lieutenant Sheppard say whether or not
21     ███████████ had reported these allegations
22     to Purdue as of that time?
23 A   I don't believe he did. I don't remember.
24 Q   You don't remember?
25 A   No.

Page 16

1  Q   Did you have any reason to believe that he had
2      reported these allegations to Purdue at that
3      time?
4          MR. BYLER: Object to the form. Calls for
5      speculation.
6  Q   You can answer.
7  A   No, I have no knowledge whether or not he ever
8      reported them to Purdue.
9  Q   Understood.
10         Were you given any commands after this
11     meeting or any discretion how to handle the
12     situation?
13 A   Just to go through both of their records for
14     some things specifically that NSTC had asked
15     about for Navy specific actions that might be
16     necessary.
17 Q   Did you go back through both of their records?
18 A   Yes.
19 Q   What records did you look through?
20 A   Their student files.
21 Q   Are there any particular documents in their
22     student files you looked at?
23 A   There's a database printout and basic
24     biographical information.
25 Q   Did you make any decision to separate them?

Page 17

1  A   No.
2  Q   Can you tell me in the fall semester of 2015
3      this would have been ███ and ███████
4      freshman year at Purdue what typical schedule
5      looked like for Alpha Company fourth class
6      midshipman?
7  A   In addition to regular classes as Purdue
8      students, they had PT, physical training, twice
9      a week, which was approximately 5:00 a.m. Monday
10     and Wednesday. And they had a drill period or
11     leadership lab on Tuesday mornings. And they
12     also had a specific ROTC class in addition to
13     their regular classes.
14 Q   What is the leadership -- what did you call it?
15 A   Leadership lab.
16 Q   Right. What is the leadership lab?
17 A   It varies from week-to-week. The main training
18     periods for developing the students as potential
19     officers. So it can range anything from
20     training on Navy regulations to guest speakers,
21     things of that nature.
22 Q   Understood.
23         Did you ever teach a class to ███████
24     ███ as a student?
25 A   No.

Page 18

1  Q  Mr. Willstatter, do you recall who at the NROTC
2     made Mr. ▮▮▮ aware of the allegations?
3  A  No, I do not.
4        (Deposition Exhibit A was marked for
5     identification.)
6  Q  Sir, to your left are two manila folders, the
7     top one is exhibits that the defendants, myself,
8     would like you to look at. If you could open it
9     up and pull out the very first document. For
10    the record, this is Exhibit A, also Bates
11    stamped NSTC-0165, and followed by an email that
12    is Bates stamped NSTC-O152. Mr. Willstatter, if
13    you could take a moment to review these emails
14    and then let me know when you're ready to
15    proceed.
16 A  Okay.
17 Q  Have you had a chance to review those?
18 A  Yes.
19 Q  Have you seen these emails before?
20 A  Yes.
21 Q  For the record, can you identify why and when
22    you sent these emails?
23 A  No, I can't recall specifically why I sent this
24    email.
25 Q  It says, as I read it, "Come to my office at

Page 19

1     4:00 p.m. today and acknowledge receipt." And
2     then the following page seems to be a response
3     from Midshipman ▮▮▮ confirming or acknowledging
4     that he had received the email. Is that how you
5     read this?
6  A  Yes.
7  Q  Do you know if you had called him to your office
8     to discuss the allegations with ▮▮▮▮▮▮?
9  A  No.
10 Q  Did you ever directly discuss ▮▮▮▮▮'s
11    allegations with ▮▮▮▮▮?
12 A  No.
13 Q  Did you ever discuss her allegations with her?
14 A  No.
15 Q  At any point were you told to separate them
16    during the spring semester, that would have been
17    the spring of 2016?
18 A  No.
19 Q  Do you know what a PRB is?
20 A  Yes.
21 Q  What is it?
22 A  Performance Review Board.
23 Q  For a layperson like me, can you give me just a
24    very general idea of what a PRB is?
25 A  A PRB is a hearing for a midshipman who has in

Page 20

1     some form not met the standards of the ROTC
2     program and, among other things, it's to
3     determine whether or not the student failed to
4     meet those standards and what should be done
5     about it.
6  Q  Besides the PRB in question, have you been in
7     other PRBs?
8  A  Yes.
9  Q  Have you ever been a voting member of a PRB?
10 A  Yes.
11 Q  Is it your understanding that the PRB votes to
12    make a recommendation to the commanding officer
13    to continue in NROTC?
14 A  Yes.
15 Q  Is it your understanding that the commanding
16    officer ultimately has the discretion to decide
17    what to do with that situation?
18 A  Yes.
19       (Deposition Exhibit B was marked for
20    identification.)
21 Q  Sir, I'd have you open that manila folder up
22    again and pull out the very next paper. It is
23    Exhibit B. For the record, this is Bates
24    NSTC-0015 through 16; and then the third and the
25    fourth page are NSTC-0150 through 0160.

Page 21

1     Sir, I'd ask you to take a minute or two
2     and just review these and make yourself
3     familiar, please.
4  A  Okay.
5  Q  Have you had a moment to look these over?
6  A  Yes.
7  Q  Starting with the first and the second page,
8     have you seen this document before?
9  A  Yes.
10 Q  What is it?
11 A  It is a notification of a PRB.
12 Q  What's a notification of a PRB?
13 A  It is notification to the student that a PRB is
14    being convened about their performance.
15 Q  If we turn to the third and the fourth page,
16    have you seen these pages before?
17 A  Yes.
18 Q  What are these?
19 A  These are emails between myself and Mr. ▮▮▮.
20 Q  As the Alpha Company lieutenant, was it your
21    responsibility to communicate to a midshipman
22    when a PRB would be convened for them?
23 A  For an Alpha Company midshipman, yes.
24 Q  If I had been Alpha Company and I had broken a
25    rule, you would have noticed me, not another

Page 22

1  lieutenant.
2  A  Correct.
3  Q  Did you decide when to convene a PRB or were you
4     told to pass on a message?
5  A  For a PRB, I found a time that worked for all
6     members and for the midshipman and then
7     scheduled it.
8  Q  Were you ordered by a superior officer to
9     schedule a PRB in this case?
10 A  Yes.
11 Q  Do you remember who ordered you to do so?
12 A  It was either Commander Remaly or Captain
13    Hutton.
14 Q  Understood, sir.
15    As I read this, it looks like initially the
16    PRB was scheduled sometime in July, and then
17    Mr. ▇ requested a stay of sorts until his
18    appeal process at Purdue had completed. Is that
19    what you understood?
20 A  Yes.
21 Q  When Purdue's process did finish itself, how did
22    you become aware of that? And let me clarify.
23    By process, I mean when Mr. ▇'s appeal had
24    finalized and Purdue had upheld its decision,
25    how did you become aware of that fact, if at

Page 23

1  all?
2  A  I actually don't remember who sent me the letter
3     of Purdue's final determination.
4  Q  Was it Megan Redlawsk or Megan May?
5  A  It may have been.
6  Q  You don't know?
7  A  I don't know for sure.
8  Q  At any time, Mr. Willstatter, did you order
9     Midshipman ▇ to execute an authorization
10    disclosure of his records from Purdue University
11    to the Navy?
12 A  No, sir.
13 Q  Are you aware of anyone in the NROTC who issued
14    Midshipman ▇ an order to execute an
15    authorization to Purdue University to disclose
16    his records to the NROTC?
17 A  I don't remember anyone.
18 Q  Was that you don't know?
19 A  I don't know.
20 Q  Understood. Thank you, sir.
21    Sir, if you turn to the front page of that
22    exhibit we were looking at, this is NSTC-0015,
23    as I read here, it looks like Mr. ▇s PRB was
24    being convened because he was deficient in the
25    following areas, and it says suspension from the

Page 24

1  university; is that correct?
2  A  Yes.
3  Q  Does it say why he was suspended on here?
4  A  It does not.
5  Q  So I can understand better, was the purpose of
6     this PRB to get into why he was suspended from
7     the university?
8  A  It was not.
9  Q  Was the goal simply to determine whether or not
10    he had been suspended?
11 A  Yes, sir.
12 Q  Apparently it doesn't look like it matters
13    whether or not it was suspension for sexual
14    assault or suspension for being arrested or
15    suspension for any other reason. Would that be
16    accurate?
17    MR. BYLER: Objection to form.
18 Q  Let me restate the question.
19    Would it be accurate to say that this
20    document, this notice doesn't raise any
21    distinction between a reason why a midshipman
22    was suspended from the university?
23 A  Sorry, could you say that again?
24 Q  Let me rephrase it one last time.
25    There is no reason following the fact that

Page 25

1  it says suspension from the university; correct?
2  A  Correct.
3  Q  And as I read this also, if we kind of go down
4     to paragraph 3, which kind of goes between the
5     first and the second page, it says that there
6     are five potential outcomes, if you will, or
7     recommendations that could be made by the PRB.
8     Do you see that?
9  A  Yes.
10 Q  And it says it could take no action, they could
11    recommend a warning, they could recommend
12    probation, they could recommend a leave of
13    absence, or they could recommend disenrollment.
14    Do you see that?
15 A  Yes.
16 Q  Is that accurate with the ROD at the time?
17 A  Yes.
18 Q  According to this notice, the NROTC had the
19    discretion to disenroll Mr. ▇; correct?
20 A  Are you asking NROTC specifically or are you
21    asking Purdue NROTC?
22 Q  Let me rephrase. According to this document,
23    the PRB had the discretion to recommend
24    disenrollment for Mr. ▇; is that correct?
25 A  Yes.

Page 26

1  Q  It also had the discretion to recommend a
2     warning for Midshipman ▮; correct?
3  A  Yes.
4        MR. BYLER: Objection to form.
5  Q  Similarly, it had the discretion to recommend no
6     action or a leave of absence or probation;
7     correct?
8        MR. BYLER: Objection to form.
9  Q  You can answer.
10 A  Correct.
11       (Deposition Exhibit C was marked for
12    identification.)
13 Q  Sir, if you could put that aside and move to the
14    next exhibit, Exhibit C. For the record, this
15    is NSTC-0140 through 0142. I'll represent that
16    the emails are in reverse chronological order,
17    so it may make sense to start at the back.
18    Would you take a minute or two to review this
19    and make yourself familiar with it, please.
20 A  Okay.
21 Q  Have you had a moment to review these, sir?
22 A  Yes.
23 Q  Do you recognize these documents?
24 A  Yes.
25 Q  You've seen them before?

Page 27

1  A  Yes.
2  Q  For the record, can you identify what they are?
3  A  They are an email chain between myself and
4     Mr. ▮ regarding some questions he had about
5     his PRB.
6  Q  As you understand his first email, what was he
7     asking?
8  A  As I understood, he had four questions. First
9     was regarding the counseling directed in the
10    notification of the PRB as to what it was and
11    when it should be done.
12       He asked if he was permitted to bring
13    witnesses and any limitations on that.
14       He asked what record was referenced in the
15    notification of the PRB and how he could access
16    it. And whether or not he should bring anything
17    that he was issued by the unit to return if he
18    were disenrolled.
19 Q  Sir, that second question you mentioned just
20    now, how did you respond to that second
21    question?
22 A  So my answer to his second question regarding
23    witnesses, it's listed in the next consecutive
24    email following chronologically. And in summary
25    I said that the PRB was about the fact of his

Page 28

1     suspension and not the circumstances around it.
2     He was allowed to bring witnesses, but unless
3     they were going to argue about the fact of his
4     suspension, they were not particularly relevant
5     to the PRB.
6  Q  Understood.
7        It's your understanding that the PRB didn't
8     care why Purdue had suspended him?
9  A  Correct.
10 Q  Did you inform Mr. ▮ that you would be at the
11    PRB, whether in this email or elsewhere?
12 A  Yes.
13 Q  Is that normal for a company officer to be at
14    one of their midshipmen's PRB?
15 A  Yes, it is.
16 Q  One last question about these emails. You'll
17    see in the very last page, the third page, first
18    chronologically, Mr. ▮ types this, the second
19    sentence, "I have no more documents to add to my
20    case as I have already sent everything I have on
21    my case to you/Lieutenant Redlawsk."
22       Do you recall receiving documents from him?
23 A  Not specifically.
24 Q  Do you know why he would have included
25    Lieutenant Redlawsk in that?

Page 29

1  A  Lieutenant Redlawsk was assigned as the
2     investigating officer.
3  Q  What investigation are you talking about?
4  A  In this particular case, to collect the
5     documents from Purdue after the completion of
6     their investigation.
7  Q  Did you ever talk to Lieutenant Redlawsk about
8     her investigation?
9  A  Only to ask for the timeline.
10 Q  Did you ever talk to her about the substance of
11    it?
12 A  No, I didn't.
13 Q  Were you ever made privy to the specifics of
14    ▮'s allegations against Mr. ▮?
15 A  No, I was not.
16 Q  I'm sorry?
17 A  No, I was not.
18 Q  Understood, sir.
19       Sir, you said that you served in a
20    counseling role earlier for all of your
21    midshipman at least twice a semester, or the
22    ultimate midshipmen in your unit, the Alpha
23    Company; is that right?
24 A  Yes.
25 Q  What would normally happen during these

8 (Pages 26 - 29)

Page 30

1  meetings?
2  A  I would review with the student the courses they
3     were taking for the semester, their plan for
4     fulfilling all their graduation requirements and
5     all their ROTC requirements, make sure they were
6     on track.  Discuss how their classes were going
7     and any other issues that they may bring up or
8     any other deficiencies that they may have had.
9  Q  Understood.
10       In the spring semester, spring 2016, did
11     you ever have any of these meetings with
12     Mr. ▇?
13  A  Yes.
14  Q  Did he indicate to you at any time that he was
15     struggling with classes?
16  A  Not that I remember.
17  Q  Did he indicate to you at any time that he was
18     struggling with assignments?
19  A  Not that I remember.
20  Q  Did he indicate to you at any time that he was
21     struggling with studying or focusing on school?
22  A  Not that I remember.
23  Q  Did he ever mention to you that he believed that
24     ▇ had attempted to commit suicide?
25  A  No, he did not.

Page 31

1  Q  Are you familiar with Mr. ▇'s academic
2     performance in the spring semester?  And by
3     academic performance, are you familiar with his
4     grades for the spring semester?
5  A  Are you asking if I remember them now?
6  Q  Let me rephrase it.
7       Were you aware in the spring semester that
8     ▇ was on academic warning?
9  A  Yes.
10 Q  For the record, what is academic warning?
11 A  It is an administrative letter within the ROTC
12     units that a student is below the program
13     academic standards and directing them, providing
14     them with some resources to attempt to bring
15     their grades up.
16 Q  Were there academic thresholds for NROTC
17     midshipmen to meet?
18 A  Yes.
19 Q  What were those?
20 A  I believe it was a 2.5 semester GPA, a 2.5
21     overall GPA, and no failing grades in any
22     classes required either by their major or by the
23     NROTC program.
24 Q  Understood.  So ▇ was on academic
25     warning.  What additional resources were made

Page 32

1     available to him after being placed on academic
2     warning, to your knowledge?
3  A  I don't remember specifically what he was given.
4     I can only speak generally about what ROTC
5     students that were below standards were given.
6  Q  Can you tell me what those would be then?
7  A  Generally we would require them to have
8     mandatory study hours, provide them with various
9     tutoring resources through Purdue through other
10     students within the unit.
11 Q  Is it fair to say the NROTC wanted the
12     midshipmen to succeed at school?
13 A  Yes.
14 Q  Those resources you just described, those would
15     be in addition to whatever they would normally
16     have, such as counseling with their lieutenant?
17 A  Yes.
18 Q  I'm sorry?
19 A  Yes.
20 Q  What happens if I fail to get my grades above
21     the threshold that put me in academic warning?
22 A  Depending on the degree or amount by which a
23     student was below standards, it could be a PRB,
24     and then anything that a PRB could recommend, so
25     warning again or probation, leave of absence or

Page 33

1     disenrollment.
2  Q  Understood.
3       Again, it's kind of up to the discretion of
4     ultimately the commander but also those making
5     the recommendations; fair to say?
6  A  Yes.
7  Q  Now, you were at ▇'s PRB; correct?
8  A  Correct.
9  Q  Were you the recorder?
10 A  I was.
11 Q  What does the recorder do?
12 A  The recorder presents the documents applicable
13     to the PRB and then is responsible for writing
14     the report that is then signed by the voting
15     members.
16 Q  Understood.
17       I ask this for my edification.  Is a
18     recorder somewhat like a prosecutor and a
19     stenographer combined?
20 A  That's an adequate analogy.
21 Q  Okay.
22       Do you remember the date of Mr. ▇'s PRB?
23 A  Not off the top of my head.
24 Q  Fair enough.
25       Do you remember who was at his PRB besides

Page 34

1  yourself and himself?
2  A  I would have to look at documentation to know.
3     (Deposition Exhibit D was marked for
4     identification.)
5  Q  Let me assist you then. If you would look at
6     the next exhibit, this is Exhibit D. For the
7     record NSTC-0011 through 0012. Take a minute,
8     sir, to review this and let me know when you're
9     ready to proceed.
10 A  Okay.
11 Q  Have you had a moment to review this, sir?
12 A  Yes.
13 Q  What is this?
14 A  This is the report of the PRB to the commanding
15    officer for Mr. ▉.
16 Q  And I skipped a question and I apologize. You
17    have seen this document before; correct?
18 A  Yes.
19 Q  Understood.
20    Sir, before we go into this document, I
21    want to go into kind of what you remember about
22    that day. It appears to me that there were
23    three members, a senior member, Commander
24    Remaly, and then a Major McDowell and a
25    Lieutenant Taylor; is that correct?

Page 35

1  A  Yes.
2  Q  Were those three individuals there that day?
3  A  Yes.
4  Q  So besides those three individuals, yourself,
5     and Midshipman ▉, was there anyone else at
6     the PRB?
7  A  No.
8  Q  Is the PRB public?
9  A  No.
10 Q  So I can't just walk in and go watch a PRB
11    tomorrow?
12 A  No.
13 Q  How did it begin? Sorry, let me clarify. After
14    the PRB is convened and it starts, can you
15    describe what you said and what you stated to
16    the members, if anything?
17 A  So on this particular PRB, I brought the board's
18    attention to the letter from Purdue University
19    suspending Mr. ▉ and referenced the section
20    of the ROD that directs disenrollment for
21    students that are suspended.
22 Q  Did you recommend any action?
23 A  No.
24 Q  At any point did you say to the members, Purdue
25    has found that ▉ sexually assaulted

Page 36

1     ▉ so we should disenroll him from
2     the NROTC?
3  A  No.
4  Q  At any point did you say that ▉
5     sexually harassed or sexually assaulted ▉
6     ▉ during the PRB?
7  A  No.
8  Q  So it's correct to say that the only thing you
9     made the members aware of was the fact that
10    ▉ was suspended from Purdue
11    University?
12 A  Correct.
13 Q  Did you have a chance to observe ▉
14    that day? And by that day, I mean during the
15    PRB. Did you have an opportunity to look at
16    him?
17 A  Yes.
18 Q  Do you remember what his demeanor was like?
19 A  No.
20 Q  Nothing in particular?
21 A  Nothing that stands out.
22 Q  Understood.
23    Did he make a statement?
24 A  He did.
25 Q  I see that it appears a summary of that

Page 37

1     statement has been included in this summary. Is
2     there anything that's not reflected in this
3     document that he said?
4  A  No.
5  Q  Understood.
6     Now, after he made the statement, what
7     happened?
8  A  At that point the board members were allowed to
9     ask questions. As I recall, no one had any
10    questions. Midshipman ▉ was allowed to give
11    a closing statement, which he did not. And then
12    the board closed for deliberations.
13 Q  During those deliberations, did you and
14    Midshipman ▉ step out of the room?
15 A  Yes.
16 Q  You don't have any knowledge about what was
17    discussed during those deliberations; correct?
18 A  Correct.
19 Q  Were you told to come back into the room?
20 A  Yes.
21 Q  When you sat down for the next step, what were
22    you told by the members?
23 A  Only to bring in Midshipman ▉.
24 Q  What happened after that?
25 A  At that point, Commander Remaly disclosed the

10 (Pages 34 - 37)

Page 38

1  results of the PRB and then adjourned the board.
2  Q  And the results were a unanimous recommendation
3     that Midshipman ▓ be disenrolled?
4  A  Correct.
5  Q  Again, do you recall if Midshipman ▓ had any
6     reaction to that result?
7  A  No.
8  Q  Did you take any action with Midshipman ▓?
9     And let me clarify. Did you interact with
10    Midshipman ▓ to any extent after this PRB?
11 A  I provided the -- or I sent him the
12    documentation afterwards as required by the ROD.
13    But other than that, no.
14 Q  Looking at this record as a whole, this being
15    Exhibit D, NSTC-0011 through 0012, is there
16    anything that was said or done at the PRB that's
17    not reflected in this record?
18 A  No, sir.
19 Q  I did have one follow-up here. You'll see on
20    the front page it says enclosures, and there's a
21    list of 12 things. Were you in charge of
22    gathering those enclosures?
23 A  Yes.
24 Q  Did you, in fact, gather all of these documents
25    up?

Page 39

1  A  Yes.
2  Q  Did you provide a copy of each to each PRB
3     member?
4  A  Yes.
5  Q  Besides these documents, did you provide the
6     members with any other information?
7  A  No.
8  Q  Besides Midshipman ▓'s academics, did you
9     monitor his performance in the NROTC in any
10    other way?
11 A  Yes.
12 Q  How so?
13 A  All midshipmen are monitored or evaluated for
14    academics, physical fitness, and leadership.
15 Q  Did you monitor him for leadership?
16 A  Yes.
17 Q  What would you be looking for when you monitor
18    someone for leadership?
19 A  It depends on where the student is at in the
20    program.
21 Q  So for a Fourth Class midshipman, what would you
22    be monitoring for?
23 A  Responsibility for their academics, for their
24    performance, physical fitness, and their
25    willingness and ability to follow instructions.

Page 40

1  Q  Do you recall your recollection of how
2     Midshipman ▓ performed in the area of
3     leadership?
4  A  No.
5  Q  Do you recall if Midshipman ▓ contacted you
6     to return his military uniforms?
7  A  I don't remember if he contacted me
8     specifically.
9  Q  Understood.
10       MR. JONES: Off the record briefly. I'd
11    like to take a five-minute break.
12       We can reconvene and finish this up subject
13    to anything that you need to ask, Phil.
14       MR. BYLER: Yeah, I'll have a few follow-up
15    questions, I won't be very long, and I'll be
16    focused on the documents.
17       Sure. Let's adjourn for five minutes then.
18       (A recess was taken between 1:58 p.m. and
19    2:04 p m.)
20       MR. JONES: Mr. Willstatter are you ready
21    to continue?
22       THE WITNESS: Yes.
23       MR. JONES: We have nothing further. Phil,
24    your witness.
25       MR. BYLER: I won't be very long.

Page 41

1  CROSS-EXAMINATION,
2  QUESTIONS BY PHILIP A. BYLER:
3  Q  Hi, I'm Phil Byler, Plaintiff's counsel in a
4     case John Doe v. Purdue.
5     I have a couple follow-up questions. I
6     just want to clarify, when you talked about
7     separation in 2017, is that when you left the
8     Navy?
9  A  Yes, sir.
10 Q  And that's because your commission ended in
11    2017?
12 A  Effectively you could say that.
13 Q  Would you turn to the document which I believe
14    was Exhibit C. It had the Bates stamp NSTC-0140
15    to 142.
16 A  Yes, sir.
17 Q  I want to direct your attention first to
18    page 0141, which is the second page of this
19    document.
20 A  Yes, sir.
21 Q  You see that most of this page consists of an
22    email by you to ▓, August 2, 2016,
23    copy to Craig Remaly.
24 A  Yes, sir.
25 Q  I want to focus on point 2 of your email, if you

11 (Pages 38 - 41)

Page 42

1  don't mind. Do you have that in front of you?
2  A  Yes.
3  Q  For the sake of the record's clarity, I want to
4     publish paragraph 2 and then ask you some
5     questions about it. Paragraph 2 states, "The
6     PRB" -- that's the Performance Review Board;
7     correct?
8  A  Yes, sir.
9  Q  "The PRB is not about the circumstances
10    surrounding your suspension, it is about the
11    fact that you have been suspended. There's no
12    reason to re-litigate the university's decision.
13    The fact is that you're suspended and the ROD
14    requires disenrollment for any case where a
15    student is suspended. A black and white nature
16    of this PRB is why you are allowed to waive if
17    you so choose. Any witnesses or other persons
18    you want to have present, please let me know
19    their names and the reason. You have the right
20    to bring any witnesses you want; however, unless
21    they're going to state contrary to the facts
22    that you have not been suspended by the
23    university will basically be a waste of time."
24        I have read that accurately; correct?
25 A  Yes, sir.

Page 43

1  Q  And that's what you wrote at the time to
2     Mr. ▇?
3  A  Yes, sir.
4  Q  And that was, to your knowledge, a correct
5     statement?
6  A  Yes, sir.
7  Q  Turn the first page, I want to direct your
8     attention to the middle of the page and you see
9     your email to ▇, copied to Craig
10    Remaly, Friday, August 5, 2016. I want to
11    direct your attention to the second sentence of
12    the first paragraph. First, before I publish
13    it, CO means commanding officer?
14 A  Yes, sir.
15 Q  CNO means Chief of Naval Operations?
16 A  Yes, sir.
17 Q  And who is the Chief of Naval Operations in the
18    hierarchy of the Navy?
19 A  That is the senior military member of the Navy.
20 Q  I'm going to publish it and then ask you similar
21    questions. "Even if the board were to decide
22    and the CO were to agree that you are a lock to
23    be the next CNO, they would still have to find a
24    way to justify keeping you in the program when
25    you can't attend the university."

Page 44

1  Is that your statement in this email?
2  A  Yes.
3  Q  To your knowledge, at the time was that true?
4  A  Yes.
5     (Deposition Exhibit 6 previously marked for
6     identification.)
7  Q  I'm going to ask that you be provided a document
8     which I ask you to have. The first page, which
9     I'm not going to ask you about, is NSTC-0018,
10    and it goes to NSTC-0019. My interest in this
11    document is because of the second page. Do you
12    have the document in front of you?
13 A  Yes, sir.
14 Q  Can you go to the second page, 0019.
15 A  Yes, sir.
16 Q  0019 is dated July 25, 2016.
17 A  Yes.
18 Q  Does this document identify who the members of
19    the Performance Review Board for ▇
20    will be?
21 A  Yes.
22 Q  And who are they?
23 A  They are Commander Remaly, Major McDowell, and
24    Lieutenant Taylor.
25 Q  Does paragraph 1 state that, "To accommodate

Page 45

1     time for the appeal of his suspension, the
2     Performance Review Board that will consider the
3     performance of Midshipman ▇
4     originally scheduled for June 23, 2016, has been
5     rescheduled"?
6  A  Yes.
7  Q  So there was a rescheduling of the Performance
8     Review Board.
9  A  Yes, sir.
10 Q  That first paragraph says, "Midshipman ▇ is
11    deficient in the following areas outlined in
12    reference A: A. Suspension from the
13    university."
14        Is that what it states?
15 A  Yes.
16 Q  Is there any other reason stated for any
17    deficiency in performance?
18 A  No.
19 Q  Paragraph 3, if you look at that, says,
20    "Performance Review Board will begin at
21    10:00, August 9, 2016."
22        Correct?
23 A  Yes.
24 Q  Is that when it met?
25 A  Yes.

Page 46

1  Q  Let me go to the document that you were shown,
2     it's Exhibit D and it starts with NSTC-0011.
3  A  Yes, sir.
4  Q  Looking at 11 to 12. You were, of course, very
5     familiar with this because you wrote it?
6  A  Yes.
7  Q  Is this the record of the Performance Review
8     Board meeting? Or how would you call it? I
9     call it a meeting, that's the lay term. Is
10    there an official term for it?
11 A  It would generally be called a board.
12 Q  Now, let's go to 10, Board Recommendation on the
13    second page right above the signatures. I'm
14    going to publish it and then ask you some
15    questions.
16       "By a vote of 3 - 0, the Performance Review
17    Board found that Midshipman Fourth Class ▮
18    was suspended by Purdue University. By a vote
19    of 3 - 0, the board recommends that Midshipman
20    Fourth Class ▮ be disenrolled from the NROTC
21    program."
22       Is that what it says?
23 A  Yes, sir.
24 Q  Is that a full statement of what the
25    recommendation was?

Page 47

1  A  Yes, sir.
2  Q  On the first page, there's an itemization of
3     12 enclosures.
4        Do you see that?
5  A  Yes, sir.
6  Q  And that included the university investigator
7     report?
8  A  Yes, sir.
9  Q  And that included the final determination from
10    the Purdue Dean of Students?
11 A  Yes, sir.
12 Q  And that included Midshipman ▮'s statements
13    of appeal of the final determination?
14 A  Yes, sir.
15 Q  And that includes the university response to
16    Midshipman ▮'s appeal?
17 A  Yes, sir.
18       (Deposition Exhibit 10 previously marked
19    for identification.)
20 Q  I'd ask that it be presented to you a document
21    that started with NSTC-0127 to 0153. That
22    should be in the file folder of exhibits that I
23    requested that you be provided.
24 A  Yes, sir.
25 Q  Turn to page 128 at the bottom. Is that

Page 48

1     ▮'s June 18, 2016, request to you
2     to postpone the Performance Review Board pending
3     his appeal to the university?
4  A  Yes, sir.
5  Q  On page 127, ▮'s June 20, 2016, cover email
6     for sending you his appeal of the university
7     decision?
8  A  Yes.
9  Q  Is on page 128 your June 20, 2016, communication
10    to ▮ that the commanding officer was willing
11    to wait for the appeal?
12 A  Yes.
13 Q  And the commanding officer at the time was
14    Captain Hutton?
15       I'm sorry?
16 A  Correct.
17 Q  Some things are a little slow when you do it
18    video. Turn to page 145.
19 A  Yes, sir.
20 Q  At page 145, ▮, August 1, 2016,
21    emailed to you stating he wished to attend the
22    Performance Review Board.
23 A  Yes.
24 Q  And he, in fact, did according to the document
25    that you prepared for the Performance Review

Page 49

1     Board attend.
2  A  Yes.
3  Q  To your knowledge, was there ever any other
4     Performance Review Board ordered with respect to
5     Midshipman ▮?
6       MR. JONES: Object to the form. You can
7     answer.
8  Q  What I'm asking you, is this the one and only
9     Performance Review Board that was ever set up as
10    to the suspension as to Midshipman ▮?
11       MR. JONES: Same objection.
12       MR. BYLER: Does the witness understand my
13    question?
14       MR. JONES: I said he can answer.
15 A  You're asking if this was the only Performance
16    Review Board conducted in the matter of
17    Mr. ▮'s suspension?
18 Q  No, that's why I asked you what you understood.
19       Was there any other Performance Review
20    Board ever ordered as to ▮ for any
21    other reason?
22       MR. JONES: Same objection. You may
23    answer.
24 A  No.
25       MR. BYLER: I'm done.

13 (Pages 46 - 49)

Page 50

1  MR. JONES: We don't have any follow-up.
2  The only thing, Phil, once again, will you
3  consent to the admissibility and the
4  authenticity of the documents attached as
5  exhibits to this deposition?
6  MR. BYLER: Yeah, as long as we're
7  attaching to the transcript and we've been
8  identifying by Bates stamp and, of course, we'll
9  be arguing their meaning in light of the witness
10  testimony, but yes.
11  MR. JONES: John, do you want to give him
12  advice on his rights?
13  MR. MATUSZAK: Mr. Willstatter, you'll be
14  receiving a copy of the transcript. I'm asking
15  you to read the copy when you get an
16  opportunity. If there's any corrections, please
17  let me know and I will forward the information
18  to the parties.
19  THE WITNESS: Yes, sir.
20  MR. JONES: Just like the last deposition,
21  we will have the same setup. We'll purchase a
22  copy electronically, the defendants will at
23  least. If you could please make sure all the
24  exhibits are attached, I will make sure that the
25  exhibits are forwarded to you this afternoon.

Page 51

1  COURT REPORTER: John, would you like the
2  original sent to the witness for signature or to
3  you?
4  MR. MATUSZAK: You can send it to me, that
5  would be easier.
6  (Time noted: 2:18 p.m.)
7
8  AND FURTHER DEPONENT SAITH NOT.

Page 52

1 STATE OF INDIANA    )
                     ) SS:
2 COUNTY OF MARION    )
3
4    I, Craig Williams, RPR, CMRS, a Notary Public
5 in and for the County of Marion, State of Indiana,
6 at large, do hereby certify that KYLE WILLSTATTER,
7 the deponent herein, was by me first duly sworn to
8 tell the truth, the whole truth, and nothing but
9 the truth in the aforementioned matter;
10   That the foregoing deposition was taken on
11 behalf of the Defendants, at the offices of
12 Stuart & Branigin, LLP, 300 Main Street, Suite 900,
13 Lafayette, Tippecanoe County, Indiana, on the
14 21st day of May, 2020, at 1:00 p.m., pursuant to
15 the Federal Rules of Civil Procedure;
16   That said deposition was taken down in
17 stenograph notes and translated into an English
18 transcript under my direction, and that said
19 transcript is a true record of the testimony given
20 by the said deponent; and that signature was
21 requested by the deponent and all parties present;
22   That the parties were represented by their
23 counsel as aforementioned.
24   I do further certify that I am a disinterested
25 person in this cause of action, that I am not a

Page 53

1 relative or attorney of either party or otherwise
2 interested in the event of this action, and that I
3 am not in the employ of the attorneys for any
4 party.
5   IN WITNESS WHEREOF, I have hereunto set my
6 hand and affixed my notarial seal on this 29th day
7 of May, 2020.
8
9
10           NOTARY PUBLIC
11
12 My Commission Expires:
13 January 14, 2024
14 County of Residence:
15 Marion County

14 (Pages 50 - 53)

Page 54

```
 1           Veritext Legal Solutions
                 1100 Superior Ave
 2                   Suite 1820
               Cleveland, Ohio 44114
 3              Phone: 216-523-1313
 4
    June 8, 2020
 5
    To: John Matuszak
 6
    Case Name: Doe, John v Purdue University, et al
 7
    Veritext Reference Number: 4108709
 8
    Witness: Kyle Willstatter    Deposition Date: 5/21/2020
 9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript   Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change   Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext com
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA
```

Page 55

```
 1          DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
    ASSIGNMENT REFERENCE NO: 4108709
 3   CASE NAME: Doe, John v Purdue University, et al
     DATE OF DEPOSITION: 5/21/2020
 4   WITNESS' NAME: Kyle Willstatter
 5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me
 7      I have made no changes to the testimony
     as transcribed by the court reporter
 8
                    _____
 9   Date               Kyle Willstatter
10       Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
         They have read the transcript;
13       They signed the foregoing Sworn
         Statement; and
14       Their execution of this Statement is of
         their free act and deed
15
         I have affixed my name and official seal
16
     this _____ day of_____, 20____
17
         _____
18              Notary Public
19       _____
         Commission Expiration Date
20
21
22
23
24
25
```

Page 56

```
 1          DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
 2
     ASSIGNMENT REFERENCE NO: 4108709
 3   CASE NAME: Doe, John v Purdue University, et al
     DATE OF DEPOSITION: 5/21/2020
 4   WITNESS' NAME: Kyle Willstatter
 5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
 6   my testimony or it has been read to me
 7      I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
 8   well as the reason(s) for the change(s)
 9      I request that these changes be entered
     as part of the record of my testimony
10
        I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein
13   _____    _____
     Date               Kyle Willstatter
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18       in the appended Errata Sheet;
         They signed the foregoing Sworn
19       Statement; and
         Their execution of this Statement is of
20       their free act and deed
21       I have affixed my name and official seal
22   this _____ day of_____, 20____
23       _____
                    Notary Public
24
         _____
25       Commission Expiration Date
```

Page 57

```
 1              ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
 2          ASSIGNMENT NO: 4108709
 3   PAGE/LINE(S) /     CHANGE      /REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
     _____   _____
20   Date              Kyle Willstatter
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20____ .
23   _____
            Notary Public
24
     _____
25   Commission Expiration Date
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at