# Exhibit K

Page 1

```
 1                UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF INDIANA
 2                      HAMMOND DIVISION
 3
 4      JOHN DOE,                      )
                                       )
 5           Plaintiff,                ) CIVIL ACTION NUMBER
                                       ) 2:17-cv-33-JPK
 6           vs.                       )
                                       )
 7      PURDUE UNIVERSITY, PURDUE      )
        UNIVERSITY BOARD OF            )
 8      TRUSTEES, MITCHELL ELIAS       )
        DANIELS, JR., in his           )
 9      official capacity as           )
        President of Purdue            )
10      University, ALYSA              )
        CHRISTMAS ROLLOCK, in her      )
11      official capacity at           )
        Purdue University,             )
12      KATHERINE SERMERSHEIM, in      )
        her official capacity at       )
13      Purdue University,             )
                                       )
14           Defendants.               )
15
16
17        VIDEOCONFERENCE DEPOSITION OF ADAM SHEPPARD
18
19       The deposition upon oral examination of
        ADAM SHEPPARD, a witness produced and sworn before me,
20      Megan M. Bowman, Notary Public in and for the County of
        Marion, State of Indiana, taken on behalf of the
21      Defendants, at 7912 West 26th Street, St. Louis Park,
        Hennepin County, Minnesota, on Wednesday, May 20, 2020,
22      scheduled to commence at 11:00 a.m., pursuant to the
        Federal Rules of Civil Procedure with written notice as
23      to time and place thereof.
24
25
```

## Page 2

```
               A P P E A R A N C E S
 1
 2  FOR THE PLAINTIFF:
 3       Philip A. Byler
         NESENOFF & MILTENBERG LLP
 4       363 Seventh Avenue
         Fifth Floor
 5       New York, NY 10001
         212 736 4500
 6       pbyler@nmllplaw.com
 7
    FOR THE DEFENDANT(S):
 8
         Tyler L. Jones
 9       William P. Kealey
         STUART & BRANIGIN LLP
10       300 Main Street
         Suite 900
11       P O Box 1010
         Lafayette, IN 47902-1010
12       765 423 1561
         tlj@stuartlaw.com
13       wpk@stuartlaw.com
14
    FOR THE U S NAVY:
15
         John Matuszak
16       U S NAVY - NAVAL SERVICE TRAINING COMMAND
         2601 A Paul Jones Street
17       Building 1
         Great Lakes, IL 60088-2845
18       847 707 5057
         john.matuszak@navy.mil
19
20
21
22
23
24
25
```

## Page 3

```
 1             INDEX OF EXAMINATION
 2
 3  Direct Examination......................  4
       Questions By Tyler L. Jones
 4  Cross-Examination.......................  42
       Questions By Philip A. Byler
 5  Further Cross-Examination...............  47
       Questions by Philip A. Byler
 6
 7
 8             INDEX OF EXHIBITS
 9
    Deposition Exhibit No.:
10
    Exhibit 1 - Fact witness approval.......  6
11
12  Defendant's Exhibit No.:
13  Exhibit 1 - Sexual violence report......  21
    Exhibit 2 - Email between Adam Sheppard and .. 28
14             ███████, 4/6/16
    Exhibit 3 - Email between Adam Sheppard and .. 32
15             ███████, 5/3/16
    Exhibit 4 - Email from Adam Sheppard to ..... 38
16             ███████, Placement on
               academic warning, 6/6/16
17  Exhibit 5 - NSTC-0184 Subject: Thoughts on ... 40
               MIDN 4/C ███
18
19
20
21
22
23
24
25
```

## Page 4

1  (Time noted: 11:01 a.m.)
2              ADAM SHEPPARD,
3  having been duly sworn to tell the truth, the whole
4  truth, and nothing but the truth relating to said
5  matter, was examined and testified as follows:
6
7  DIRECT EXAMINATION
8     QUESTIONS BY TYLER L. JONES:
9  Q  Good morning, Mr. Sheppard.
10 A  Good morning.
11 Q  My name's Tyler Jones. I'm an associate with
12    Stuart & Branigin. I, along with Bill Kealey
13    represent Purdue University and several other named
14    defendants against John Doe in the lawsuit here.
15    Briefly for the record, could you fully state
16    your name?
17 A  Adam Phillip Sheppard.
18 Q  Thank you. Sir, have you ever given a deposition
19    before?
20 A  No, this is my first one.
21 Q  Well, congratulations I suppose. I'm sure
22    Mr. Matuszak has already kind of given you the
23    down-low, but basically a deposition's an
24    opportunity for both parties to ask you questions
25    about what you may or may not know --

## Page 5

1  A  Okay.
2  Q  -- about facts relevant to this case. I'd ask
3     because everything you are saying is being recorded
4     by Megan over here, Connor Reporting, I'd ask that
5     you give us "yeses," "noes," "yays," "nays," as
6     opposed to head shakes or head bobs.
7  A  Got it.
8  Q  I would appreciate it if we let each other finish
9     what we're saying. You may know the question I'm
10    going to ask and I may know the answer you're going
11    to give, but I'd like us to try not to interrupt
12    each other, so it's a clear record, please.
13 A  Sure.
14 Q  If you answer, I'm going to assume you understood
15    the question. If you don't understand the
16    question, please ask me to rephrase it or ask me to
17    repeat it. Like I said, if you answer, I'm going
18    to assume that you understood; is that fair?
19 A  Sounds good.
20 Q  Okay. Again, you're not a prisoner here. If you
21    need a restroom break or if something happens, the
22    cat jumps on the computer or anything, or any
23    reason like that, just let me know and we can take
24    a brief break. Okay?
25 A  Okay.

Page 6

1  Q   Finally, I ask that you keep everything we're about
2      to talk about confidential today. While we're in
3      this deposition we're going to refer to two
4      students. They're both proceeding under pseudonym.
5      One is ▮▮▮▮ and one is ▮▮▮▮▮▮▮. I'd
6      ask that besides today you don't use those names in
7      any other context unless you're authorized to.
8  A   Okay.
9  Q   Okay. Sir, what's your date of birth?
10 A   July 26, 1984.
11     MR. MATUSZAK: Mr. Jones?
12     MR. JONES: Oh, I forgot. Yup, go ahead John.
13     MR. MATUSZAK: I'd like to include the Navy
14     Approval letter in the record. This is the basis
15     for this deposition.
16     MR. JONES: Okay. My apologies.
17     (Deposition Exhibit 1 was marked for
18     identification.)
19 BY MR. JONES:
20 Q   Adam, if you could -- again, how would you like to
21     be addressed? Would you prefer Adam or
22     Mr. Sheppard?
23 A   Adam is fine.
24 Q   Okay. Adam, what's your date of birth?
25 A   July 26, 1984.

Page 7

1  Q   Thank you. And at the time in question, that being
2      August 2015 to August 2016, what was your position
3      and title with the NROTC at Purdue?
4  A   My title would have been lieutenant, United States
5      Navy, and I was a staff -- I was an officer on
6      their staff.
7  Q   Understood. What's a good mailing address for you,
8      sir?
9  A   Currently would be my home address.
10 Q   Can you please state that for the record?
11 A   7912 West 26th Street, St. Louis Park, Minnesota,
12     55426.
13 Q   Thank you, sir. And can you please provide a good
14     email for the record?
15 A   Yup, A-D-A-M-P-S-H-E-P-P-A-R-D @gmail.com.
16 Q   Thank you, sir. Could you please provide a brief
17     education background, where you went to school and
18     what degrees or certifications you may have?
19 A   Sure. I went to undergraduate at the U.S. Naval
20     Academy, and I majored in quantitative economics.
21     As far as professional certifications, I guess I
22     was a naval aviator to all of the sort of graduate
23     level flight training that came along with that.
24     And then additionally I attended graduate school at
25     the University of Chicago Booth School of Business

Page 8

1      and have a MBA.
2  Q   Excellent. What year is your MBA?
3  A   That would have been fall of 2016. Fall of '16 I
4      think is when I got my degree.
5  Q   Congratulations. During your time as a lieutenant
6      for the U.S. Navy with the Purdue NROTC, what were
7      your responsibilities and duties?
8  A   Well, overall, you know, we're -- the main goal of
9      our mission of the program is to develop
10     undergraduate college students, develop them into,
11     you know, leaders. And so really it was very much
12     of mentoring sort of leadership development role,
13     but I also taught a number of naval science classes
14     that are just, you know, three credit undergraduate
15     courses as part of the curriculum.
16 Q   Understood, sir. What was your reason for leaving
17     the Navy or leaving the NROTC?
18 A   Yeah. So I actually left the Navy at the same time
19     that I left NROTC just my -- being a naval aviator,
20     I was obligated for a number of years of
21     active-duty service and that was -- the end of that
22     was coincided with the end of my time stationed at
23     Purdue. And just for family personal reasons we
24     decided to get out of the Navy and move back home.
25 Q   Understood. Were you honorably discharged?

Page 9

1  A   Yes, I was.
2      MR. BYLER: I couldn't hear the question.
3      MR. JONES: I asked if he was honorably
4      discharged, Phil.
5      MR. BYLER: Oh, okay.
6  A   Yes, I was.
7  Q   Thank you. Sir, fair to say if I say Purdue NROTC
8      or if I forget to say "Purdue" and I just say
9      "NROTC," I'm referring to the Purdue NROTC?
10 A   Yup, yes.
11 Q   Okay. And, again, Purdue NROTC stands for Purdue
12     Naval Reserve Officer Training Corps; correct?
13 A   Correct.
14 Q   Okay. Can you give me an idea of what the command
15     structure was like at time in the NROTC when you
16     were there?
17 A   Yeah. In terms of names of who was in what
18     positions?
19 Q   Yeah. If you don't mind.
20 A   Yup. So --
21 Q   Maybe starting with the top dog going all the way
22     down.
23 A   Sure. At this point in time the commanding officer
24     would have been Captain Hutton. The executive
25     officer would have been Commander Remaly. And then

Connor Reporting
A Veritext Company                    800-554-3376

Page 10

1  as far as lieutenants, there was myself, there was
2  Lieutenant Willstatter, and then Lieutenant
3  Redlawsk, who I guess has a new last name now. And
4  then there would have been a marine on staff, a
5  marine captain or major. Either Captain McDowell
6  or Major Inclum. One of these two. I don't
7  remember when they transitioned.
8     That should be it.
9  Q  Understood. Is there anybody immediately under
10    lieutenants before you get to midshipman?
11 A  No. Lieutenant is the lowest active-duty staff
12    members there, so the next level down would be
13    midshipman.
14 Q  Understood. Earlier today I was told that the
15    Purdue NROTC was divided into several -- into a
16    command structure where you have a battalion and
17    then that battalion is then divided down into other
18    groups.
19     Do you know what I'm talking about?
20 A  Yeah, that's correct.
21 Q  Okay. I was told that there are squads and that
22    squads may have leaders; is that correct?
23 A  That's correct.
24 Q  Are squad leaders typically students or are they
25    typically officers like you?

Page 11

1  A  So squad leaders would be students. So the
2     students, all of the midshipmen collectively have
3     their own sort of student chain of command, if you
4     will, that changes by semester. So, yes. I guess
5     beneath myself -- getting beneath me then is -- I'm
6     the lowest active duty. So then once you get into
7     the students, they have their own sort of
8     leadership structure, which would be like a
9     battalion officer.
10     And then on the Navy side, we have three Navy
11    companies, Alpha, Bravo, Charlie that are each led
12    by a midshipman. And then within those companies,
13    there would be squads, which would be led, again,
14    by midshipmen.
15 Q  So as a lieutenant did you oversee all of the
16    companies, or did you oversee a specific company or
17    a division?
18 A  So I -- initially when I was at -- stationed there,
19    I was a company officer. I was the Alpha Company
20    officer. And then at some point I transitioned
21    away from it. So we had four Navy lieutenants.
22    One lieutenant for Alpha, Bravo, Charlie. And then
23    we had a fourth that was sort of the battalion
24    officer.
25     And at some point -- and I believe it may have

Page 12

1  been around fall of '15 when I transitioned out of
2  my Alpha Company officer responsibilities and took
3  over the battalion officer.
4  Q  Understood. Was Midshipman ▮ or Midshipman
5  ▮, did they immediately report to you or did
6  they have to go through someone else before they
7  got to you or another lieutenant?
8  A  I believe they were both in Alpha Company. I'm not
9  100 percent on that, but I think they were both in
10 Alpha Company.
11 Q  Okay. So they both would have reported to you?
12 A  Correct.
13 Q  Okay. What is the -- what's the typical
14    relationship like between lieutenants in the NROTC
15    and their midshipmen? Is it more professional and
16    collegial or is it more of a teacher/big brother
17    kind of relationship?
18 A  I would say it's more of a professional/collegial.
19 Q  Okay. What's the most typical kind of interaction
20    you have with midshipmen -- or you did?
21 A  The most typical interaction would be -- a couple
22    of things come to mind. One, like I said, I taught
23    a three-credit class each semester, so I would see
24    either freshman three times a week in the fall or I
25    would see juniors three times a week in the spring.

Page 13

1  Of course that wouldn't be all of the freshman.
2  There was another lieutenant that taught another
3  section. So that's one main interaction.
4     Another one would be during our physical
5  training sessions in the mornings. So typically I
6  think it was Monday/Wednesday mornings before
7  classes began we would meet for physical training.
8     Another interaction would be Tuesday mornings.
9  We would host what we call "Naval Drill" for about
10 an hour and a half. And that would cover a variety
11 of things. Sometimes classroom instructions,
12 sometimes something else. So those would sort of
13 be the main dedicated interactions.
14    And then at a minimum as a company officer, I
15 would always meet -- I think twice a semester --
16 with each of my midshipmen. So when I was the
17 Alpha Company officer, I probably had 25 to 30
18 midshipmen in Alpha Company. And like I said, I
19 would meet with them always initially, beginning
20 the semester, and then once again towards the end.
21 Q  Understood. Thank you, sir. Sir, during August
22    2015 to August 2016, were there rules that
23    midshipmen were required to follow?
24 A  Were there rules that midshipmen were required to
25    follow?

Page 14

1 Q  Correct. Was there a rule book or was there a set
2     of standards that they had to comport themselves
3     with for NROTC purposes I mean?
4 A  There was, yes. I want to stay it was just a --
5     the Purdue Navy ROTC Student Handbook.
6 Q  Thank you. Were you subject to the same rules they
7     were or did you have a separate officer sort of
8     conduct you had to follow?
9 A  Yes. So that rule book would have been for
10    students within the program.
11 Q  Okay.
12 A  So without me being a student, that wasn't really
13    applied to me.
14 Q  Understood. Just because I'm not a midshipman and
15    I've never seen it before, what's a typical
16    schedule for a freshman midshipman, like, their
17    first semester?
18 A  Yeah. A typical schedule would be Monday morning
19    join up with the unit by the armory for -- at about
20    5:45. We workout for about an hour. They go back,
21    shower, have breakfast, do their things, go to
22    classes throughout the day, you know, eat lunch, go
23    back to classes. And potentially in the afternoon
24    when classes were over, they may have some, you
25    know, a little bit of responsibilities or duties

Page 15

1     within the unit. But, you know, we always
2     encouraged, you know, engaging in some sort of a
3     physical activity or extracurricular event in the
4     afternoon after classes.
5         And then really just studying. Obviously
6     Purdue is a very rigorous institution and so, you
7     know, I think the majority of their time is
8     probably -- well, you would hope -- is spent
9     studying.
10 Q  Are there any NROTC events that are mandatory on
11    the weekends?
12 A  No. We typically did not have -- no. The only
13    events that they would have ever have been sort of
14    required to do would be in the fall. We -- the
15    students in the program would clean up the football
16    stadium after home football games. And that was a
17    way for them to sort of raise money.
18 Q  Okay. Does the schedule you just described, does
19    it change substantially from first fall semester to
20    the first spring semester for the freshman?
21 A  No, no. I think it would be pretty consistent for
22    both other than having a different class -- class
23    load.
24 Q  Right. Would it be a larger class load or a
25    smaller class load?

Page 16

1 A  It would depend individually on the student. My
2     assumption would be that maybe the fall class load
3     could be a little bit easier and lighter, just the
4     nature of being new to a university. Then
5     potentially maybe the spring semester, you know,
6     some more challenging courses.
7 Q  Understood. Sir, I want to list off some names
8     here and if you can confirm if you know them and
9     what their position and title are or were, I'd
10    appreciate it.
11       Craig Remaly?
12 A  Yup. He was the executive officer.
13 Q  Okay. Megan Redlawsk?
14 A  She was a peer of mine, another lieutenant company
15    officer on staff.
16 Q  Rodney Hutton?
17 A  Yup. That's Captain Hutton. He would have been
18    the commanding officer.
19 Q  Understood. And then Kyle Willstatter?
20 A  Another Navy lieutenant on staff, a peer of mine.
21 Q  Understood. Sir, did you -- prior to -- and when I
22    say "the allegations," I'm referring to allegations
23    of sexual assault by [redacted] against
24    [redacted]. Prior to those allegations being brought,
25    did you have any interactions with [redacted]?

Page 17

1 A  Yes.
2 Q  Did you supervise her?
3 A  Yes.
4 Q  What were your general impressions of her?
5 A  Nothing specific comes to mind other than, you
6     know, just sort of seemed like a typical, you know,
7     female midshipman.
8 Q  Understood. Same question. Prior to the
9     allegations did you know [redacted]?
10 A  I did, yes.
11 Q  Did you supervise him?
12 A  I believe I supervised him. I don't recall 100
13    percent if he was in Alpha Company but, you know,
14    again, just the nature of the program, I would have
15    -- there would have been overlap where I would have
16    seen him and come across him.
17 Q  Sure. Do you have any general impressions of him?
18 A  Nothing stands out. Again, just, you know,
19    typical, you know, freshman midshipman.
20 Q  Understood. As you best understood your duties at
21    the time in 20 -- in August 2015 between -- from
22    August 2015 to August 2016, as a lieutenant, what
23    were your responsibilities if a midshipman came to
24    you and alleged they'd been sexually assaulted?
25 A  My responsibilities really would have been, A, to

Page 18

1  ensure that a report essentially is filed so that
2  the University would have been made aware of it.
3  Q  When you say "a report," you mean a report to
4     Purdue University?
5  A  Correct. And then really, I think, just in terms
6     of other responsibilities ensuring that the
7     individual is aware of the various resources
8     available to them.
9  Q  Like what?
10 A  Mainly I'm speaking of the resources that would be
11    available through Purdue University. Just in terms
12    of, you know, counseling and those types of things.
13 Q  Does that include something called "CARE"?
14 A  "CARE" doesn't ring a bell. I know Purdue had
15    their own sort of health office. They may be what
16    CARE is part of.
17 Q  Okay. Do you recall ▇▇▇▇▇ reporting to
18    you that ▇▇▇▇▇ had sexually assaulted her?
19 A  I do recall her reporting to me that she had been
20    sexually assaulted. I don't know if she -- I don't
21    recall if she specifically told me his name when
22    she revealed that. But shortly thereafter I think
23    we -- his name was brought up. I don't know if she
24    was the one that brought it up.
25 Q  Understood. To the best of your recollection, can

Page 19

1     you kind of summarize what you remember happening,
2     how you learned, what she said, what you did, et
3     cetera?
4  A  Yeah. So really -- all I really remember was I was
5     -- I believe I was in my office in the armory. And
6     she came to my office. I'm pretty confident that
7     she came with another student, another female
8     midshipman that was in the program as well. Of
9     course she, you know, revealed what had happened.
10    I don't recall her going into specific details
11    other than just, "Hey, you know, sir. This
12    happened to me. You know, I was -- I feel that I
13    was sexually assaulted," et cetera. And I just
14    kind of recall, you know, sitting there and
15    listening to her.
16    And then at some point we just kind of talked
17    about, "Okay. Next steps. You know, have you, you
18    know, reported this to" -- Purdue has an anonymous
19    intake form. And so we just kind of discussed that
20    and then discussed, you know, where you can go and
21    what Purdue -- what types of resources they have.
22 Q  To your knowledge, did you show her how to make a
23    report with Purdue University?
24 A  I believe I did. I don't actually recall -- I'm
25    fairly confident that I probably pulled up Purdue's

Page 20

1     -- the link to the Purdue's intake form and
2     reviewed that with her in case she was unaware of
3     that. That's about as -- all I recall there.
4  Q  Sure. Did you report what Ms. ▇▇▇▇ had told you
5     to any of your superiors within NROTC?
6  A  I'm not 100 percent confident, but I may have
7     reported it to Commander Remaly.
8  Q  When ▇▇▇▇ made this report, did you have any
9     reason to think that she was making it up?
10    MR. BYLER: Objection. Speculation.
11 Q  You can answer.
12 A  I'm sorry. The question: Did I believe that she
13    was making it up?
14 Q  Did you have any reason to believe that she was
15    making up her allegations?
16 A  At the time, no. She seemed to be telling the
17    truth. And it seemed to -- I didn't have reason to
18    doubt her at the time.
19 Q  Have you ever had a reason to doubt her?
20 A  Nothing -- no. I mean, nothing really comes to
21    mind.
22 Q  Understood, sir. Sir, you should have received
23    from Mr. Matuszak some links to some exhibits.
24    Did you receive those?
25 A  Let me check my email. Would these have come to my

Page 21

1     email?
2     MR. MATUSZAK: They were sent by Sarah, my
3     paralegal. Sarah --
4     THE WITNESS: No. The only thing I got was --
5     sorry. You're referring to, like, exhibits
6     regarding -- I don't have any. Yeah -- no. I
7     don't have any exhibits.
8     MR. JONES: Okay. Off the record briefly.
9     (A recess was taken between 11:26 a.m. and
10    11:32 a.m.)
11 BY MR. JONES:
12 Q  Mr. Sheppard, are you ready to proceed?
13 A  Yes.
14 Q  Sir, could you please take a look at what has been
15    provided to you as Exhibit 1?
16    (Defendant's Exhibit 1 was marked for
17    identification.)
18 A  Okay.
19    MR. JONES: And for the record, Phil, this is
20    Bates number PU 0057.
21    MR. BYLER: Okay. I have it.
22 Q  Mr. Sheppard, do you have this document in front of
23    you?
24 A  Yup, Exhibit 1.
25 Q  Yup. Could you take a moment to review this and

Page 22

1  let me know when you're done?
2  A  Okay.
3  Q  Great. Have you had a moment to look it over?
4  A  Yup, I read it.
5  Q  Have you seen this before?
6  A  I haven't seen this actual document before, no.
7  Q  Okay. And the kind of paragraph where the -- it
8     says, "Detailed description of the incident," did
9     you write that?
10 A  That does -- it does appear to be from me. Again,
11    I don't exactly remember the act of writing it but,
12    yeah. I would assume there that that came from me.
13 Q  Right. And at the very top of the document it
14    says, "Reported by," and the name, colon, "Adam
15    Sheppard."
16    Is that you?
17 A  Yup, yes. It is.
18 Q  And then it has title "Assistant Professor of Naval
19    Science (Naval ROTC Instructor)."
20    Is that correct?
21 A  Correct.
22 Q  And then it also has an email address. Was that
23    your email address at the time?
24 A  That is, yes.
25 Q  And the same, is that your phone number that you

Page 23

1     were using at the time?
2  A  It looks right, yup.
3  Q  Okay. Do you recall -- having read this now, has
4     your memory been refreshed as to kind of what
5     happened when the allegations against Mr. ▮▮▮ were
6     made?
7  A  Yes. I mean, again, I guess I do -- this confirms
8     I did recall that she joined with a friend and then
9     now -- yes. Obviously she did reveal to me ▮▮▮'s
10    name at that occasion. And then some minor detail
11    there about the incident.
12 Q  Understood. To your recollection, do you remember
13    if you made this report immediately after the
14    meeting or if there was time in between?
15 A  I probably would have made it very soon after the
16    meeting just in the interest of not forgetting any
17    of the detail but also just the urgency of, you
18    know, getting the information out there.
19 Q  Understood. If I'm understanding, you can't say
20    100 percent if you made it immediately after or 10
21    minutes after or an hour after?
22 A  No. It certainly would have been the same day. I
23    think that would be safe to say.
24 Q  Okay. So you're confident that ▮▮▮ would have
25    reported this to you on April 4th, 2016?

Page 24

1  A  April -- oh, spring of '16. That sounds about
2     right, yeah.
3  Q  Well, in fact, if you look at the top of the
4     document, it says, "Submitted on April 4th, 2016,
5     at 8:37."
6  A  Okay.
7  Q  So I just want to confirm based on your past
8     practices and what you believe, any reason to think
9     that she reported this -- she didn't report this on
10    April 4th, 2016?
11 A  I can't specifically recall what the date was.
12 Q  Okay. Assuming for a minute, sir, that what you've
13    written down here is an accurate summary or
14    transcription of what ▮▮▮ alleged to you, does
15    this constitute sexual assault in your eyes?
16    MR. BYLER: Object to the form and it's also
17    calling for a legal opinion.
18 Q  You can answer.
19    MR. MATUSZAK: He can answer the question as he
20    understands sexual assault --
21    MR. JONES: Sure.
22    MR. MATUSZAK: -- but it calls for a legal
23    opinion.
24 A  Yeah. I don't -- I guess I wouldn't -- I can't
25    speculate on whether this would be considered

Page 25

1     sexual assault or not.
2  Q  Okay. Why did you report this to Purdue?
3  A  Well, because a Purdue student came to me and felt
4     that she had been sexually assaulted and so as a,
5     you know, I guess, a staff member or as a, you
6     know, instructor, it was an obligation to report
7     that information. Whether it's true or not, you
8     know, that wasn't my job. But my job was just to
9     report it.
10 Q  Understood. Any reason to think that Purdue was
11    already aware of this?
12 A  I had no reason to think that Purdue was aware, no.
13 Q  Understood. I think you already said this, but
14    just for the sake of clarity, did you tell ▮▮▮
15    you were going to take any specific action?
16 A  Well, I can see at the bottom it looks like I had
17    mentioned to her -- "I reviewed support services"
18    -- "and ensured that she would not be crossing
19    paths in the immediate future with ▮▮▮,
20    seeing as they are both students in the program
21    (sic)."
22    So I -- based on that comment, I probably
23    reassured her that because ▮▮▮ was in the program,
24    we would work out some accommodations or something
25    and just so that, you know, she wouldn't, you

Page 26

1  know -- with him in the program as well -- I guess
2  I don't know what I'm trying to say. Just work out
3  accommodations so that they're not both -- I don't
4  know -- sitting next to each other at Naval Science
5  class or what have you.
6  Q  Understood. So is that something the lieutenants
7  had the authority to do is to kind of move around
8  midshipmen to avoid contact?
9      MR. BYLER: Excuse me. I couldn't hear you.
10     Your voice and connection totally dropped.
11     MR. JONES: Let me try again.
12     MR. BYLER: Now I can hear you.
13 Q  Adam, is that something lieutenants would have the
14    authority to do is to ensure that midshipmen didn't
15    cross paths?
16 A  I wouldn't say lieutenants, but certainly the
17    commanding officer, Captain Hutton, or the
18    executive officer, Commander Remaly. They could
19    make that decision.
20 Q  Understood. Did she indicate to you if you were
21    the first NROTC official she had informed about
22    this?
23 A  I don't recall if she indicated I was the first. I
24    would assume I was the first.
25 Q  Understood. Did she say -- did she say or do you

Page 27

1  recall her saying that she wanted you to file a
2  report on her behalf with Purdue?
3  A  I don't specifically remember that, but I think
4     just sort of to paraphrase the conversation that we
5     had was that, yes. We would need to be filing a
6     report. So she would have been aware of it.
7  Q  Does that include a report with both Purdue and the
8     NROTC?
9  A  I don't specifically recall. Well, as I said, I
10    think I may have verbally notified Commander
11    Remaly, but then there may have been some -- there
12    may have been a Navy email or a notification just
13    to the broader navy R- -- the broader ROTC chain of
14    command.
15 Q  Understood. Do you recall what your plan was for
16    separating         and         ?
17 A  I don't specifically recall making a plan myself.
18    I do just recall at some point -- at some point
19    Captain Hutton, I think, may have sort of, you
20    know, directed us to keep them separated or -- like
21    I said, there was some accommodations that were
22    made. It could have been, you know,        to not
23    appear at Navy ROTC events during -- you know, in
24    the near future. But I don't think there was
25    anything in particular that I recall instituting.

Page 28

1  Q  Fair enough. Did you directly contact        about
2     these allegations?
3  A  I don't recall directly contacting him, no.
4  Q  Okay. Do you have any recollection who at the
5     NROTC -- if someone at the NROTC contacted Mr.
6     about the allegations?
7  A  Most likely it would have probably been Captain
8     Hutton. He probably would have received, you know,
9     a phone call from Purdue. And then I guess I would
10    assume that he would have been the one to sort of
11    approach       about it.
12 Q  Okay. If you could -- sir, if you could open up
13    Exhibit No. 2.
14     MR. JONES: And for everyone's reference, this
15    should be NSTC-0179.
16     (Defendant's Exhibit 2 was marked for
17    identification.)
18 Q  And I'll represent to you, Mr. Sheppard, this email
19    goes in reverse chronological order, so it might
20    make more sense to read from the bottom up. And
21    let me know when you've had a chance to review.
22 A  Okay.
23     Okay. All finished.
24 Q  Great. Do you recognize these emails?
25 A  I do.

Page 29

1  Q  Do you recall receiving and sending these emails?
2  A  Yup.
3  Q  Specifically there's -- the first email from you or
4     from someone named Adam Sheppard dated Wednesday,
5     April 6th, 2016, at 1:26 p.m. and signed "LT
6     Sheppard."
7     Was that email drafted and sent by you?
8  A  Yes.
9  Q  Having reviewed this, do you recall whether or not
10    you advised Mr.       to take any action regarding
11    Ms.       ?
12 A  Can you clarify take any action with Ms.       ?
13 Q  Sure. Let me clarify. That wasn't very clear.
14    Is it correct that you told Mr.       that he
15    wasn't to have any contact with her?
16 A  Yes.
17 Q  Is it true that you told Mr.       that he wasn't to
18    participate in any battalion-related functions?
19 A  Yes.
20 Q  In fact, was there anything in the NROTC program
21    that Mr.       could participate in at this time?
22 A  Not that I would -- it doesn't seem so. It looks
23    like I must have been aware of a letter that
24    Captain Hutton, the CO, had written, which I'm
25    referencing in this email. But, you know, as I

8 (Pages 26 - 29)

Page 30

1  said, "Per the letter from the CO, you are not
2  allowed to participate in battalion-related
3  function."
4       So that to me would indicate, no. He was not
5  -- he would not have been permitted to participate
6  in anything officially battalion sanctioned -- Navy
7  sanctioned.
8  Q  Understood. And do you see at the bottom where you
9  -- the last sentence you wrote -- and it starts
10 with, "I would advise you"?
11 A  Yup.
12 Q  Did you in fact advise [redacted] to reach out to
13 Purdue's -- Purdue's website for resources?
14 A  Yes.
15 Q  Did you tell him that he should seek advocacy and
16 counseling from Purdue if he needed help?
17 A  Yes.
18 Q  Did you have any reason to think that Purdue
19 wouldn't offer advocacy or counseling to him if
20 he'd ask for it?
21      MR. BYLER: Objection. Speculation.
22 Q  You can answer.
23 A  No. I had no reason to believe that he would not
24 receive counseling from Purdue.
25 Q  Okay. And just so I understand, you would have

Page 31

1  written this in response to -- you wrote this in
2  response to Mr. [redacted]'s email; correct?
3  A  Correct.
4  Q  And it sounds like you were basically just
5  referring him to what the commander had already
6  told him; is that fair?
7  A  Yes, that's fair.
8  Q  Okay. Fair to say that it was because of
9  Ms. [redacted]s accusations or allegations that the
10 commander issued the letter causing Mr. [redacted] not be
11 able to participate in battalion functions as far
12 as you know?
13      MR. BYLER: Objection. Objection. Lack of
14 foundation.
15 Q  You can answer if you understand.
16 A  Yeah. I would assume that -- sorry. What was the
17 question?
18 Q  Sure.
19      MR. JONES: Ms. Court Reporter, could you
20 please read it back to him?
21      (The previous question was read by the
22 reporter.)
23      MR. BYLER: I have an objection to the
24 question, but please proceed to answer.
25 A  Yes. I think it would be fair to say that would

Page 32

1  have been the impetus behind the letter from this
2  commanding officer.
3  Q  Thank you, sir. If you could open up what's marked
4  as Exhibit 3 now. For identification purposes,
5  this is NSTC-0180 through -0182.
6       If you could take a moment to review this, sir,
7  and let me know when you're done.
8       (Defendant's Exhibit 3 was marked for
9  identification.)
10 A  Okay.
11 Q  And, again, it might be easier to start from the
12 bottom up, so --
13 A  Okay.
14    Okay.
15 Q  Have you had a chance to review this, sir?
16 A  Yes.
17 Q  Have you seen these emails before?
18 A  Not other than, I guess, when I wrote them.
19 Q  Fair enough. Do you have any reason to think that
20 you did -- that you didn't write these emails or
21 receive these responses from Midshipman [redacted]?
22 A  No. This was definitely, you know, me.
23 Q  Okay. Starting with your first email on April 26th
24 at -- 2016, at 9:34, why did you ask Midshipman
25 [redacted] for an update on his classes?

Page 33

1  A  That was just me checking in on him because he
2  wasn't -- if I recall, based on the previous email,
3  you know, he wasn't necessarily around the unit,
4  coming to the armory, coming to the staff offices.
5  And so that was just a way to reach out to him and
6  kind of touch base with him.
7  Q  Understood. Do you do that with all of your
8  midshipmen?
9  A  Yeah. Not necessarily via email, but it would have
10 been, you know, more of a discussion in my office.
11 Q  I'm looking at his response, it looks like he's
12 saying he has mainly C's, but some A's and B's too
13 or an A or B.
14    I mean, did he give you any indication that he
15 was struggling with classes at that time?
16 A  Not based off of this, no.
17 Q  Did he say that he was having trouble concentrating
18 for any reason?
19 A  Nope. I don't recall that.
20 Q  Did he ever reach out to you and say, you know, "I
21 need help. I can't do my assignments," or, "I
22 can't focus on my tests"?
23 A  He may have. Nothing that I can recall.
24 Q  Fair enough, sir. To your knowledge, did he have
25 to maintain his grades over a certain threshold to

9 (Pages 30 - 33)

Connor Reporting
A Veritext Company                        800-554-3376

Page 34

1  remain in the NROTC?
2  A  Yes.
3  Q  Do you remember what that was? What the GPA was?
4  A  I don't. I want to say 2.5 GPA.
5  Q  Okay.
6  A  Or maybe 2.0. Again, I don't recall specifically
7     what the threshold was.
8  Q  Fair enough, sir. I kind of want to fast forward
9     through the emails to the very last one.
10 A  Okay.
11 Q  The very first sentence, that reads, "Lieutenant
12    Redlawsk is the investigating officer that will be
13    conduct- -- collecting information on the command's
14    side."
15       Reviewing that email and the one you're
16    responding to, what are you talking about there?
17 A  So it looks like he had asked me -- he had brought
18    up just discussion of his case and sort of the
19    ongoing investigation and he had questions
20    pertaining to that. And so I directed him to
21    Lieutenant Redlawsk as she was sort of the point of
22    contact on the Navy side.
23       And so I -- that's really all that is is I'm
24    just saying, "Hey, this -- this isn't -- you know,
25    I'm not -- I'm not the point of contact for this.

Page 35

1     Lieutenant Redlawsk is so, you know, reach out to
2     her."
3  Q  Do you remember when, if ever, someone told you
4     that Ms. Redlawsk was looking into the allegations?
5  A  Not specifically. I think I just kind of recall,
6     you know, either Captain Hutton or Commander Remaly
7     kind of directing, you know, Lieutenant Redlawsk to
8     be the sort of the command's point of contact.
9  Q  Understood. Do you have a reason to believe the
10    NROTC conducted its own investigation to ▇▇▇s
11    allegations?
12       MR. BYLER: Objection to form.
13 Q  You can answer.
14 A  Do I have reason -- no. My understanding was that
15    we were -- there was a University investigation and
16    I don't -- I don't -- I'm unaware of any
17    investigation that we -- I'm unaware of, like, a
18    second or independent investigation that we would
19    have done.
20 Q  Understood, sir. Is it your understanding of the
21    NROTC rules sometime that if a midshipman had
22    sexually assaulted another that they would be
23    disenrolled from the program?
24 A  If a midshipman was found guilty of sexual assault,
25    would they be disenrolled from the program?

Page 36

1  Q  Right.
2  A  No, not necessarily.
3  Q  Why do you say that?
4  A  I mean, not everything is, you know, cause for
5     disenrollment, I guess. You know, I recall Navy,
6     you know, there being sort of a zero tolerance on
7     certain things, but I -- it would be speculation, I
8     think, for me to say that, "Yes. He would have
9     been disenrolled for any specific thing."
10 Q  Understood.
11 A  But that -- I'll leave it at that.
12 Q  Fair enough. So your understanding the Navy had
13    discretion on how to discipline its midshipmen?
14       MR. BYLER: Objection. Calls for a legal
15    conclusion.
16 Q  You can answer.
17 A  There certainly would have been -- yes, official
18    Navy guidelines on what would have been cause for
19    disenrollments. Without that -- without those, I
20    guess SOP, you know, "Standard of Procedures" in
21    front of me, I wouldn't have recalled specifically
22    what would have been cause for disenrollment and
23    what wouldn't have.
24 Q  Understood. Sir, were you aware that Midshipman
25    ▇▇▇ was on academic probation or academic warning

Page 37

1     during the spring semester?
2        MR. BYLER: Objection. Just because you had
3     changed the question with your wording.
4        MR. JONES: Well, Phil, all you need to say is
5     "Object to form," okay?
6        MR. BYLER: I object to form.
7        MR. JONES: Okay.
8  BY MR. JONES:
9  Q  Adam, did you understand the question?
10 A  Yeah. Was I aware that he was on any sort of
11    academic warning or probation? Right now I don't
12    recall, but he could have been. I don't remember.
13 Q  Do you know if a lieutenant was responsible for
14    monitoring his grades or his academic performance?
15 A  There would have been -- yes, a lieutenant
16    responsible for monitoring him.
17 Q  Do you recall if that was yourself?
18 A  Well, as I said, if I recall correctly, I think I
19    may have been his company officer in the fall, but
20    then at some point I transitioned to the battalion
21    officer. Then, I think, Lieutenant Willstatter
22    inherited all of my 30 or so students.
23 Q  Understood. Go ahead. Sorry.
24 A  But then -- but then I think the reason for the
25    email is just that the -- Commander Remaly or

Page 38

1  Captain Hutton may have just specifically
2  identified, "Hey, Adam. We'd like you to reach out
3  sort of, you know, to ▇▇▇." It was just kind of a
4  one-off, you know, since I was a battalion officer
5  and he wasn't around, I think it was just, "Hey.
6  Let's just have Adam check in on him."
7  Q  Fair. I would have you -- if you could open up
8     Exhibit 4, please, and take a quick look at that.
9        For identification purposes, this is NSTC-0183
10    through -- and then also including NSTC-0156
11    through -157.
12       (Defendant's Exhibit 4 was marked for
13    identification.)
14 Q  Take a moment to review that, sir, and then let me
15    know when you're ready.
16 A  Okay.
17    Okay.
18 Q  Have you had a chance to review this?
19 A  Yes.
20 Q  Are you familiar with these emails and the attached
21    documents?
22 A  Yes.
23 Q  What are they?
24 A  Well, the first -- if I go to the bottom, ▇▇▇
25    signs -- basically this is just an acknowledgement

Page 39

1     of the second to last page that came from the
2     commanding officer. This is January, so this would
3     have been -- it looks like he was placed on
4     academic warning following his fall semester. Of
5     course grades come out, you know, around
6     December/January-ish. And then it looks like based
7     on his grades -- oh, yeah. "Standard of 2.5." He
8     earned a 2.47. Okay. So he -- that was what would
9     have triggered him being placed on academic
10    warning.
11       Scrolling up -- okay. So it looks like the
12    date jumps to May, which would have been really all
13    the way after finals of spring semester. Yeah.
14    Okay. So then my email there from May 31st
15    basically just calls out clearly he was below that
16    2.5 again in the spring, so that triggered this
17    thing called "Academic Interim Leave of Absence."
18    And then I just asked him to acknowledge that.
19 Q  Understood. Is it your understanding that by
20    triggering the Academic Interim Leave of Absence he
21    was basically temporarily suspended from NROTC
22    pending the results of a performance review board?
23 A  No. That wouldn't necessarily be what that means.
24    I think students on interim leave of absence would
25    still participate and still be present with unit

Page 40

1     activities.
2  Q  Okay. Is it your understanding that one result of
3     a performance review board could be disenrollment?
4  A  That is a -- one possible outcome, yes.
5  Q  Okay. Any reason to believe that if Midshipman
6     ▇▇▇ had had his PRB on his substandard academic
7     performance that he would have been disenrolled?
8        MR. BYLER: Objection as for speculation.
9        MR. MATUSZAK: I would agree with that. That's
10    really speculation as to what could have happened,
11    so object to the question.
12 Q  Okay. Let's do this. We may come back to that.
13       If you could open up Exhibit 5 really briefly.
14    This is the last exhibit I have, Adam.
15       (Defendant's Exhibit 5 was marked for
16    identification.)
17 A  Okay.
18 Q  For identification purposes, this is NSTC-184.
19    Take a moment to review this, sir.
20 A  Okay.
21    Okay.
22 Q  Have you had a chance to review this?
23 A  Yes.
24 Q  Have you seen this document before?
25 A  I don't think I have.

Page 41

1  Q  Okay. Do you have any idea why this would have
2     been generated?
3  A  It's coming from another midshipman so my really
4     only assumption would be it was for some sort of a
5     character reference or something.
6  Q  Okay.
7        MR. JONES: Let's do this. I think I'm done,
8     but let me take a five-minute break.
9        MR. BYLER: Sure.
10       MR. JONES: Double-check my notes.
11       MR. BYLER: Yeah. I'll have some questions but
12    it'll be relatively short.
13       MR. JONES: All right. And then after that, we
14    can break for lunch, so let's take a five-minute
15    break. Okay?
16       MR. BYLER: Good.
17       THE WITNESS: Okay.
18       (A recess was taken between 12:06 p.m. and
19    12:11 p.m.)
20       MR. JONES: The only question I have is
21    actually for Phil again. Phil, again, any issue
22    with submitting to the authenticity of these
23    exhibits?
24       MR. BYLER: No, no. I mean, we may argue about
25    what they mean, but --

11 (Pages 38 - 41)

Connor Reporting
A Veritext Company                      800-554-3376

Page 42

1   MR. JONES: Sure. The admissibility and the
2   authenticity are --
3   MR. BYLER: Yeah.
4   MR. JONES: Okay. Fair enough. That's all I
5   have then.
6   MR. BYLER: Okay. I just have some follow-up
7   questions.
8   CROSS-EXAMINATION
9   QUESTIONS BY PHILIP A. BYLER:
10  Q   First of all, I want to pull up again that first
11      exhibit, PU57.
12  A   Okay.
13  Q   Okay. And I think your intention was directed to
14      the upper right-hand corner where it dates at April
15      4, 2018?
16  A   Okay.
17  Q   Okay.
18      MR. JONES: Objection to form. I think it says
19      "2016."
20      MR. BYLER: Oh, I'm sorry. I meant '16.
21  Q   April 4, 2016. It says that; correct?
22  A   Correct.
23  Q   Okay. Now, in what Ms. ▮▮▮ told you, did you
24      -- were you informed about when supposedly the
25      offensive behavior occurred?

Page 43

1   A   I don't recall specifically a date or a time, no.
2   Q   Did it come up that it was six months earlier or
3       anything like that?
4   A   No. It looks like all I really was aware of was
5       two different occasions. I don't recall a time --
6       a timeline.
7   Q   Okay. So with what you understood, you didn't fix
8       a time date on the two incidents of offensive
9       behavior?
10  A   I don't believe so, no.
11  Q   Okay. Now, can I direct your attention to the
12      middle of the page? And do you -- I'm just going
13      to read it just so you can focus on it. And it's
14      above the essay.
15  A   Okay.
16  Q   And it reads, "Has this been reported to any other
17      Purdue University officer or official: Yes.
18      If you answered 'yes' to the above question,
19      please identify the officer official: Title IX
20      Coordinator (via online reporting form)."
21      Okay. I've read it to you correctly, haven't
22      I?
23  A   Yes.
24  Q   Okay. Were you responsible for that information?
25      MR. JONES: Object to form. You can answer.

Page 44

1   A   I'm trying to think about this. "Title IX
2       Coordinator (via online reporting form)."
3       It could have been me. I would have assumed
4       that this would have been what went to that
5       Title IX Coordinator.
6   Q   Okay. Let me direct your attention. "Has this
7       been reported to any other Purdue University
8       officer or official?" It says, "Yes."
9       Does not that indicate that at the time you
10      were making a report, a report had already been
11      made to Purdue?
12      MR. JONES: Object to form. Asked and
13      answered. You can answer.
14  A   Maybe -- maybe what's happening here was she had
15      told me she wrote a report or that she had
16      submitted a report and I submitted one as well.
17      Meaning, when I submitted mine, I was potentially
18      aware of the fact that she had already submitted
19      one via the online reporting form.
20  Q   Okay. Were you a member of the Performance Review
21      Board?
22  A   I could have been. I don't specifically recall. I
23      was a member of a number of performance review
24      boards.
25  Q   Let me have you be handed the document that's been

Page 45

1       marked NSTC-0001 through -4.
2       THE WITNESS: Is that -- is that one of the
3       ones, Tyler, you forwarded me earlier?
4       MR. BYLER: It might have been.
5       MR. JONES: Phil, is that -- is that one of my
6       exhibits or is it one of -- is it your exhibit?
7       MR. BYLER: Your exhibit.
8       MR. JONES: Okay.
9       THE WITNESS: -00 -- -0014?
10      MR. BYLER: -001 through -0004.
11      MR. JONES: Phil, I don't -- that's not one of
12      our exhibits to this witness.
13      MR. BYLER: Oh, so it wasn't sent to him?
14      MR. JONES: Unless you did, I didn't.
15      MR. BYLER: Okay.
16  BY MR. BYLER:
17  Q   Let me ask you this as a general question: Are you
18      aware of what the disenrollment -- official
19      disenrollment documents show as to ▮▮▮?
20      MR. JONES: Object to form. You can answer.
21  A   Not off the top of my head, but I do have these
22      -0011 through -0014 from both -- both of your
23      offices, if that's what you're referring to.
24  Q   Yeah. That was the document I was referring to.
25  A   Yup.

Page 46

1 Q   Okay. Did you see this document at the time or
2     around the time?
3 A   Nothing's -- I don't recall specifically, no.
4 Q   Well, let me go to page 3.
5 A   Okay.
6 Q   And what I'm asking you to look at, "2. Type of
7     disenrollment (Dropped by institution). Midshipman
8     ███ was suspended by the University for one
9     academic year."
10        Okay. Do you see that?
11 A   I'm on page 3. Sorry. What's the NSTC number?
12    -00 --
13 Q   -0003.
14 A   Oh, no. I only have -11 through -14.
15       MR. JONES: Right. Phil, your exhibits that
16    you provided is simply NSTC-0011 through -0014.
17    And I didn't provide -- or I didn't have that
18    portion of the Navy record as an exhibit to this
19    witness, so --
20       MR. BYLER: Okay. One of the limitations to a
21    video deposition. Okay. I don't think I have any
22    more questions.
23       MR. JONES: We don't either. John, do you want
24    to advise him about his rights or I can?
25       You're muted, sorry.

Page 47

1     MR. MATUSZAK: Mr. Sheppard, they'll be sending
2  you a transcript electronically for you to review.
3  You should review it. See if there's any
4  corrections. If there are any, just call me and
5  let me know that you've got some corrections.
6  That's all I've got.
7     THE WITNESS: Okay.
8     MR. JONES: Off the record.
9     MR. BYLER: Can I ask one more question --
10    MR. MATUSZAK: Sure.
11    MR. JONES: Sure.
12    MR. BYLER: -- of the witness?
13    MR. JONES: Sure. On the record?
14    MR. BYLER: Yeah.
15 FURTHER CROSS-EXAMINATION
16    QUESTIONS BY PHILIP A. BYLER:
17 Q   You graduated from the Naval Academy?
18 A   I did.
19 Q   Okay. And you went into Naval aviation?
20 A   I did.
21 Q   Okay. Do you know where John McCain was in his
22    class at Naval -- at the Naval Academy?
23 A   I want to say he was the anchor so the very bottom.
24 Q   Okay.
25    MR. BYLER: Thank you.

Page 48

1     MR. JONES: Off the record.
2     (Time noted: 12:21 p.m.)
3     AND FURTHER THE DEPONENT SAITH NOT.

Page 49

1 STATE OF INDIANA    )
                     ) SS:
2 COUNTY OF MARION    )
3
4     I, Megan M. Bowman, Notary Public in and for
5  the County of Marion, State of Indiana at Large, do
6  hereby certify that ADAM SHEPPARD, the deponent
7  herein, was by me first duly sworn to tell the
8  truth, the whole truth, and nothing but the truth
9  in the aforementioned matter;
10    That the foregoing deposition was taken on
11 behalf of the Defendants, at 7912 West 26th Street,
12 St. Louis Park, Hennepin County, Minnesota, on
13 Wednesday, May 20, 2020, pursuant to the Federal
14 Rules of Civil Procedure;
15    That said deposition was taken down in
16 stenograph notes and afterwards reduced to
17 typewriting under my direction, and that the
18 typewritten transcript is a true record of the
19 testimony given by the said deponent; and that
20 signature was requested and thereafter presented to
21 said deponent for his/her signature;
22    That the parties were represented by their
23 counsel as aforementioned.
24    I do further certify that I am a disinterested
25 person in this cause of action, that I am not a

13 (Pages 46 - 49)

## Page 50

1  relative or attorney of either party or otherwise
2  interested in the event of this action, and that I
3  am not in the employ of the attorneys for any
4  party.
5      IN WITNESS WHEREOF, I have hereunto set my hand
6  and affixed my notarial seal this 5th day of
7  June 2020.
8
9
10
11      *Megan Bowman*
12      Megan M. Bowman
13      Notary Public
14
15
16  My Commission Expires:
17  January 2, 2027
18  County of Residence:
19  Marion County, Indiana
20
21
22
23
24
25

## Page 51

1           Veritext Legal Solutions
                1100 Superior Ave
2                  Suite 1820
             Cleveland, Ohio 44114
3              Phone: 216-523-1313
4
    June 5, 2020
5
    To: Philip A. Byler
6
    Case Name: Doe, John v. Purdue University, et al
7
    Veritext Reference Number: 4108697
8
    Witness: Adam Sheppard    Deposition Date: 5/20/2020
9
10  Dear Sir/Madam:
11
    Enclosed please find a deposition transcript. Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change. Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24
25  NO NOTARY REQUIRED IN CA

## Page 52

1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4108697
3   CASE NAME: Doe, John v. Purdue University, et al
    DATE OF DEPOSITION: 5/20/2020
4   WITNESS' NAME: Adam Sheppard
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me
7      I have made no changes to the testimony
    as transcribed by the court reporter
8
    _____
9   Date               Adam Sheppard
10     Sworn to and subscribed before me, a
    Notary Public in and for the State and County,
11  the referenced witness did personally appear
    and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
       Statement; and
14     Their execution of this Statement is of
       their free act and deed
15
       I have affixed my name and official seal
16
    this _____ day of_____, 20____
17
18  _____
    Notary Public
19
    _____
20  Commission Expiration Date
21
22
23
24
25

## Page 53

1           DEPOSITION REVIEW
            CERTIFICATION OF WITNESS
2
    ASSIGNMENT REFERENCE NO: 4108697
3   CASE NAME: Doe, John v. Purdue University, et al
    DATE OF DEPOSITION: 5/20/2020
4   WITNESS' NAME: Adam Sheppard
5      In accordance with the Rules of Civil
    Procedure, I have read the entire transcript of
6   my testimony or it has been read to me
7      I have listed my changes on the attached
    Errata Sheet, listing page and line numbers as
8   well as the reason(s) for the change(s)
9      I request that these changes be entered
    as part of the record of my testimony
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
    that both be appended to the transcript of my
12  testimony and be incorporated therein
13  _____
    Date               Adam Sheppard
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
    the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18     in the appended Errata Sheet;
       They signed the foregoing Sworn
19     Statement; and
       Their execution of this Statement is of
20     their free act and deed
21     I have affixed my name and official seal
22  this _____ day of_____, 20____
23
    _____
24  Notary Public

25  _____
    Commission Expiration Date

```
                                              Page 54
 1              ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
 2           ASSIGNMENT NO: 4108697
 3   PAGE/LINE(S) /    CHANGE    /REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19

20   _____     _____
     Date              Adam Sheppard
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23         _____
             Notary Public
24
         _____
25         Commission Expiration Date
```

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at