**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| **JOHN DOE,** | ) |
| | ) **CIVIL ACTION** |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) |
| **DANIELS, JR.,** in his official capacity as President of | ) |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK,** | ) No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, | ) |
| **KATHERINE SERMERSHEIM**, in her official capacity | ) |
| at Purdue University, | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

William P. Kealey (18973-79)
Tyler L. Jones (34656-29)
James F. Olds (27989-53)
Stuart & Branigin, LLP
300 Main St., Ste. 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
        tlj@stuartlaw.com
        jfo@stuartlaw.com
Telephone: 765-423-1561
*Attorneys for Defendants*

## TABLE OF CONTENTS

Table of Authorities ............................................................................................. iii

Introduction ........................................................................................................ 1

Summary of Pending Allegations ...................................................................... 1

Statement of Issues ........................................................................................... 1

Statement of Material Facts Not in Dispute ...................................................... 2

    A. Background ............................................................................................. 2

        1. The Relationship Between the NROTC and Purdue ..................................... 2

        2. John and Jane Doe ............................................................................ 4

    B. Jane Doe's Report to the NROTC ................................................................ 5

    C. Purdue's Investigation .............................................................................. 8

    D. NROTC's Investigation .............................................................................. 16

    E. John's Academic Performance ..................................................................... 20

    F. John's Post-Suspension Life ........................................................................ 21

Law & Argument ................................................................................................ 22

    A. Summary Judgment Standard ...................................................................... 22

    B. John's "Stigma-Plus" Due Process Claim for Injunctive Relief Fails ................. 23

        1. John does not allege or show any current effort to obtain Navy ...................
           employment or Navy refusal to employ him.  He does not meet ...................
           the injury, redress, and ripeness requirements for standing ............................ 24

        2. There is no actionable deprivation because John retains a ............................
           meaningful post-deprivation remedy in state court ........................................ 30

        3. There is no issue of fact on deprivation of occupational liberty ..................... 31

           a. The Navy deprived John of his NROTC scholarship because of ...............
               bad grades.  That action was not a deprivation by Purdue and ...................
               does not meet the redress requirement for standing ................................... 31

b. Purdue's "official determination of guilt" is not material
because the Navy has its own disciplinary jurisdiction over Jane's
allegation .............................................................................. 31

c. The Navy's access to Purdue's investigation is not material ..................... 32

d. There is no evidence that Purdue disclosed its official determination of
guilt to the Navy or that the Navy compelled John to disclose that
determination .......................................................................... 33

4. Purdue afforded John the due process required by the Fourteenth
Amendment for imposition of school discipline for misconduct ................... 34

C. John's Title IX Allegation Fails .......................................................... 36

1. Purdue's Anti-Harassment Policy is gender-neutral ................................. 39

2. John's gender did not factor in Purdue's receipt of Jane's allegation or
Purdue's obligatory decision to investigate it ........................................ 40

3. There was no gender bias in Purdue's evidence-gathering ........................ 42

4. There was no gender bias in Purdue's weighing of the evidence ................. 43

a. No evidence of discriminatory animus .......................................... 44

b. Reasonable basis for finding culpability ........................................ 45

c. The totality of the circumstances ................................................ 48

Conclusion ................................................................................ 50

## Table of Authorities

**Cases**

*Altman v. Hurst*, 734 F.2d 1240 (7th Cir. 1984) ................................................... 30, 31

*Anderson v. Bessemer City*, 470 U.S. 564 (1985) ................................................. 47, 48

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).....................................22

*Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986 (7th Cir. 1993) ............................. 22

*Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78 (1978) ................................. 35

*Brewer v. Bd. of Trs. of Univ. of Illinois*, 479 F.3d 908 (7th Cir. 2007) ...................................... 44

*Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725 (N.D. Ill. 2017) ................................ 38

*Burbridge v. City of E. Chicago*, 2020 WL 1433836 (N.D. Ind. Mar. 24, 2020) ....................... 28

*Buttitta v. City of Chi.*, 9 F.3d 1198 (7th Cir. 1993) ........................................... 35

*Cannici v. Vill. of Melrose Park*, 885 F.3d 476 (7th Cir. 2018) ................................. 31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................... 22-23

Chang v. Purdue Univ., 985 N.E.2d 35 (Ind. Ct. App. 2013) …………………………………….. 30

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ............................................ 25, 30

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985) ..................................... 35

*Coronado v. Valleyview Pub. Sch. Dist. 365–U*, 537 F.3d 791 (7th Cir. 2008) .......................... 35

*Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629 (1999) ................ 41

*Dennis v. Potter*, 2012 U.S. Dist. LEXIS 40034 (N.D. Ind. March 23, 2012) .......................... 49

*Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875 (N.D. Ohio 2017) ................................. 40

*Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939 (N.D. Ill. 2017) ............................. 40

*Doe v. Columbia Coll. Chi.*, 933 F.3d 849 (7th Cir. 2019) ..................................... 38, 41

*Doe v. Cummins*, 662 F. App'x 437 (6th Cir. 2016) ................................................. 40

*Doe v. Galster*, 768 F.3d 611 (7th Cir. 2014) ................................................................ 44

*Doe v. Marian Univ.,* No. 19-CV-388-JPS, 2019 U.S. Dist. LEXIS 222842
 (E.D. Wis. Dec. 31, 2019).. ...................................................................... 37, 40, 44

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) ........ 23, 24, 25, 28-29, 32, 33, 34, 35, 37-38, 41, 45

*Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586 .............................................. 40,41,42

*Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064 (D. Colo. 2017) ...................................... 40

*Doe v. Univ. of Denver*, 952 F.3d 1182 (10th Cir. 2020) ................................... 41, 42, 43

*Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984 (D. Minn. 2017) ............................ 40

*Doe v. Vanderbilt Univ.,* No. 3:18-cv-00569, 2019 U.S. Dist. LEXIS 173269
 (M.D. Tenn. Sept. 30, 2019) ................................................................ 38, 39

*Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471 (7th Cir. 2010) .................................49

*Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56 (1st Cir. 2019) ...................... 37-38, 40

*Hayden v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569 (7th Cir. 2014) .................................. 37

*Hiatt v. Colo. Seminary*, 858 F.3d 1307 (10th Cir. 2017) .......................................... 44

*Holland v. Methodist Hosps.,* No. 2:14-CV-88-PRC, 2016 WL 5724355 (N.D. Ind. Sep. 30,
2016) ........................................................................................ 23

*Hudson v. Palmer*, 468 U.S. 517 (1984) ............................................... 30, 31

*Hunter v. Long*, 2019 U.S. Dist. LEXIS 164831, 2019 WL 4695463
 (N.D. Ind. Sept. 26, 2019) ................................................................ 28

*Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005) ..................................... 37

*Kenseth v. Dean Health Plan*, 722 F.3d 869 (7th Cir. 2013) ................................. 24, 25

King v. Depauw Univ., No. 2:14-cv-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, *29-30
(S.D. Ind. Aug. 22, 2014) ……………………………………………………………… 30

*Lauth v. Covance, Inc.*, 863 F.3d 708 (7th Cir. 2017) .............................................. 44

*Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580 (7th Cir. 2003) ................................. 28

*Lee v. Univ. of N.M.,* Case No. CIV 17-1230 JB\LF, 2020 U.S. Dist. LEXIS 54920
  (D.N.M. Mar. 30, 2020) ................................................................ 41, 42

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ......................................... 30

*Magin v. Monsanto Co.*, 420 F.3d 679 (7th Cir. 2005) .................................. 22

*Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201 (S.D. Ind. 2016) ........................ 31, 36

*Martin v. S. Ill. Univ. Sch. of Med.,* No. 16-CV-3294, 2017 U.S. Dist. LEXIS 174828
  (C.D. Ill. Oct. 23, 2017) .............................................................. 44

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ............................................... 35

*Ortiz v. Werner Enters. Inc.*, 834 F.3d 760 (7th Cir. 2016) ............................ 44, 48

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) ......................................... 23

*Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017) ............................. 38

*Prosser v. Becerra*, 2 F.4th 708 (7th Cir. June 25, 2021) .............................. 25, 29, 30

*Ross v. Ball State Univ.,* No. 118CV01258JRSTAB, 2020 U.S. Dist. LEXIS 37241
  (S.D. Ind. Mar. 4, 2020) .............................................................. 38

*Rossley v. Drake Univ.*, 979 F.3d 1184 (8th Cir. 2020) ................................. 40

*Saravanan v. Drexel Univ.*, No. 17-3409, 2017 U.S. Dist. LEXIS 193925
  (E.D. Penn. Nov. 24, 2017) ............................................................ 39

*Simic v. City of Chicago*, 851 F.3d 734 (7th Cir. 2017) ................................ 25, 28

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ....................................... 25, 31

*Stenzel v. Peterson,* No. CV 17-580 (JRT/LIB), 2017 WL 4081897 (D. Minn. Sept. 13, 2017)  38

*Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) ................................... 25,28

*Title VII. Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887 (7th Cir. 2018) .............. 48

*Tsuruta v. Augustana Univ., No.* 4:15-CV-04150-KES, 2015 WL 5838602
  (D.S.D. Oct. 7, 2015) ................................................................. 40

*Tyburski v. City of Chicago*, 964 F.3d 590 (7th Cir. 2020) ............................. 48, 49

*United States v. Beverly*, 913 F.2d 337 (7th Cir. 1990) ................................ 48

*United States v. Blas*, 947 F.2d 1320 (7th Cir. 1991) ................................................. 48

*United States v. Elder*, 840 F.3d 455 (7th Cir. 2016) .................................................. 48

*United States v. Lindsey*, 123 F.3d 978 (7th Cir. 1997) .............................................. 47

*Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751 (7th Cir. 2008) ............................... 28

*Yu v. Vassar Coll.*, 97 F. Supp. 3d 448 (S.D.N.Y. 2015) ...................................... 36, 39

**Statutes**

42 U.S.C. § 1983 ......................................................................................................... 23

**Other**

Fed. R. Civ. P. 56 .................................................................................................. 23, 37

## I.    INTRODUCTION

Five years ago, Plaintiff John Doe served a one-year enrollment suspension resulting from a sexual misconduct allegation that Navy ROTC student Jane Doe submitted to the Navy officers who operate the Navy ROTC program at Purdue. While suspended from Purdue, John could not participate in the Navy ROTC program at Purdue. In his long-winded complaints in this case, John has promised to show that the Navy has foreclosed him from ever serving in the Navy; that he would serve in the Navy if only this Court would clear his path to do so; that Jane Doe's allegation against him was a fabrication that he was never afforded a fair opportunity to address; and that Purdue credited Jane's allegation because Purdue is biased against male students accused of sexual misconduct. Each of these proof-promises is unmet, and there is no material issue for trial. Further, on John's allegation of a foreclosed Navy career, he fails even to meet the standing requirement to pursue his claim.

## II.    SUMMARY OF PENDING ALLEGATIONS

Defendants incorporate by reference the summary of Plaintiff's pending allegations stated as "Background" and "Conclusion" in this Court's May 19, 2020 Opinion and Order (DE 84). Plaintiff's allegations currently pend as Plaintiff's Second Amended Complaint (DE 161). Counterclaimant Purdue's allegations pend as Purdue's Amended Counterclaim (DE 162).

## III.    STATEMENT OF ISSUES

1.    Whether the lack of any allegation or evidence of a determination by the Navy foreclosing Plaintiff John Doe from a career in the Navy, together with the pendency of the Navy's own exercise of disciplinary jurisdiction over Jane's allegation against John and John's suspension from Navy ROTC for poor grades, are terminal to John's standing to assert his

Fourteenth Amendment Due Process stigma-plus claim and show the absence of a material issue of fact on loss of occupational liberty.

2.      Whether John's notice and opportunity to be heard in Purdue's investigation satisfied constitutional Due Process for discipline of misconduct in an educational environment.

3.      Whether John's sex factored in Purdue's investigation and weighing of evidence on the sexual misconduct allegation that Jane Doe submitted to Navy ROTC.

## IV.      STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**A. Background**

### 1.  *The Relationship Between the NROTC and Purdue*

Purdue and the NROTC are separate, independent entities. According to the United States Navy, "The purpose of the Navy ROTC Program is to educate and train qualified young men and women for service as commissioned officers in the Navy's unrestricted line, the Navy Nurse Corps and the Marine Corps."[1] An active-duty Navy officer serves as the Commanding Officer of the Navy Reserve Officers Training Corps Unit at Purdue.[2]  Students who participate in the NROTC are referred to as "midshipmen" and are both Purdue students and non-active duty, enlisted members of the Navy. Ex. A at p. 11. Upon completion of their NROTC program, midshipmen are commissioned into the Naval or the USMC as an officer. *Id.*

NROTC midshipmen are required to comply with the Regulations for Officer Development (ROD).[3] Ex. B at pp. 14-15; Ex. C at p. 13. The ROD includes rules governing academic

---

[1] ABOUT, https://www.netc.navy.mil/Commands/Naval-Service-Training-Command/NROTC/About/ (last visited June 22, 2021).

[2] Capt. D. Bretz, CO'S WELCOME https://polytechnic.purdue.edu/nrotc/cos-welcome (last visited June 22, 2021).

[3] Defendants have designated relevant excerpts of the ROD in effect during the pertinent time in this case.

performance, Ex. D at pp. 79-81, drug usage, *id.* at p. 102, maintaining enrollment at the university, *id.* at p. 214, and sexual assault, *id.* at pp. 80-81, 172.  An alleged violation of these rules could lead to discipline, including the issuance of an interim leave of absence, which would result in the NROTC investigating the allegation, *id.* at p. 195, and, if necessary, convening a Performance Review Board (PRB) to determine whether the midshipman failed to meet program standards.[4] *Id.*; Ex. C at p. 19; Ex. A at p. 13.

As an enrolled Purdue student, John was also subject to Purdue's campus conduct rules, including the *Anti-Harassment Policy (III.C.1)* (the "Policy").[5] The Policy's prohibition on "Harassment" encompasses "Sexual Harassment" and the sub-category "Sexual Violence," defined in part as "Non-Consensual sexual contact: touching, with any body part or object, another person's intimate parts (e.g., genitalia, groin, breast, buttocks), whether clothed or unclothed." The Policy warns that persons who violate it will be subject to disciplinary action, up to and including suspension or expulsion from Purdue. The accompanying "Procedures for Resolving Complaints

---

[4] "The Performance Review Board consists of a senior member with two additional members who are assigned to independently review . . . the facts of what have occurred, to review the requirements [of the NROTC program] and then make a recommendation to me as the commanding officer." Ex. A at p. 48.  It is ultimately the commanding officer's decision to determine whether there have been any violations of pertinent rules and, if so, how the NROTC should address them. *Id.* According to the ROD: "The PRB is an administrative tool available to the PNS to investigate, review, and document recommendations regarding the best course of action to be taken to ensure successful fulfillment of program requirements by students enrolled in any NSTC OD program. Ideally, the unit will identify potential problems that may lead to a PRB and solve the most problems through counseling or extra instruction, as appropriate." Ex. D at p. 197.

[5] The version in effect through June 30, 2016 is archived at
https://earchives.lib.purdue.edu/digital/collection/PPA/id/6210/rec/90 (last visited August 26, 2021). The version in effect as of July 1, 2016 is archived at
https://earchives.lib.purdue.edu/digital/collection/PPA/id/6924/rec/88 (last visited August 26, 2021).

of Discrimination and Harassment" state, "the implementation of these Procedures is the responsibility of the Vice President for Ethics and Compliance."[6]

### 2. *John and Jane Doe*

In 2015-16, John and Jane Doe were Freshmen at Purdue and first-year midshipmen in the NROTC unit at Purdue.  Ex. F at p. PU 0123. Jane and John initially met in August 2015 and began dating sometime thereafter until sometime around the beginning of the 2016 spring semester.[7]  *Id.*

John was the recipient of an NROTC scholarship and the NROTC paid his tuition and certain other expenses pursuant to a contract between him and the Navy. Ex. G. These benefits were extended to John solely by the Navy. *Id.* Purdue was not a party to the agreement, and Purdue had no input or control over the NROTC scholarship. *Id.* The contract provides, in relevant part, that to remain eligible for the scholarship, John needed to: (A) be enrolled as a full-time student in, and remain in good standing with Purdue, (B) remain qualified for military service as an officer, meeting all applicable requirements, and (C) not be on a leave of absence from, and remain in good standing with, the NROTC program, fulfilling all NROTC program requirements, including those set forth in the regulations. *Id.*; *see also* Ex. A at pp. 32-34. Though John had a scholarship, it was not required for his participation in the NROTC. Ex. B at p. 42.

---

[6] Procedures for Resolving Complaints of Discrimination and Harassment, Section C (version in effect through August 15, 2016 archived at https://earchives.lib.purdue.edu/digital/collection/PPA/id/6744/rec/5 (last visited August 26, 2021)).

[7] The 2015 fall semester ended on December 19, 2015, and the 2016 spring semester started on January 11, 2016. 2015-2016 ACADEMIC CALENDAR, https://www.purdue.edu/registrar/calendars/2015-16-Academic-Calendar.html (last visited June 22, 2021).

**B. Jane Doe's Report to the NROTC**

Sometime during the week after Purdue's 2016 Spring Break,[8] an older NROTC midshipman[9] (Midshipman A) was approached by her roommate, who reported that she wanted Midshipman A to meet with her NROTC mentee, Jane Doe. Ex. H at pp. 21-22. Midshipman A agreed to meet with Jane, and the two met at Midshipman A's house. *Id.* at p. 22. Midshipman A observed that Jane was distraught and, over the next three to four hours, Jane confided in Midshipman A that John Doe had digitally penetrated her while she was sleeping, among other things. *Id.* at pp. 25-27. Midshipman A recalled that Jane decided to tell someone because she was feeling increasingly unsafe, and these feelings were adversely impacting her grades and NROTC performance. *Id.* at pp. 27-28. Jane was not ready to report John that day, so Midshipman A gave Jane her personal phone number in case she wanted to talk or text. *Id.* at p. 28.

About a week after initially speaking with Midshipman A, Jane decided to report what happened to her to the NROTC. *Id.* at p. 28. As Midshipman A explained, she advised Jane to make her report to a NROTC lieutenant because this would constitute a report to the NROTC and the lieutenant would also be obliged to forward the report to Purdue. *Id.* at pp. 23, 32.

On April 4, 2016, Jane and Midshipman A met with Lieutenant (LT) Adam Sheppard.[10] Ex. L. During their meeting, Jane "did the talking," and reported that John had sexually assaulted

---

[8] According to Purdue's 2015-16 Academic Calendar, Spring Break was from March 14-19, 2016. 2015-2016 ACADEMIC CALENDAR, https://www.purdue.edu/registrar/calendars/2015-16-Academic-Calendar.html (last visited June 22, 2021).

[9] This student was a Junior at Purdue University during the Fall 2015 and Spring 2016 semesters. Ex. H at pp. 7-8. She was also a member of the NROTC. *Id.* She is not referred to by name to protect her identity, though her identity has been disclosed to the Plaintiff, and both parties have deposed her.

[10] LT Sheppard was a company officer who generally oversaw the lieutenants for the four NROTC companies. Ex. J at pp. 11-12; Ex. A at p. 15. He reported to the NROTC Executive Officer and Commanding Officer.  Ex. J at pp. 9-10.

her. Ex. H at p. 33; Ex. J at p. 19. Jane's report was formulated solely by Jane. *See* Ex. H at pp. 21-34. Specifically, she alleged that she had woken up twice to discover that John was making unwanted sexual contact with her and that she no longer felt safe around John. Ex. I. Jane's sexual assault report obligated the NROTC to notify the Navy[11] and Purdue of her allegations. Ex. A at p. 21; Ex. B at pp. 18-19, 22-23.

LT Sheppard asked Jane to complete and submit an online report, specifically a Purdue "Sexual Violence, Relationship Violence and Stalking Report." Ex. H at pp. 33-34. Jane did so at 1:49 p.m., and reported that on at least two occasions, John did "things to [her] while [she] was asleep." *Id.*; Ex. I.

Following Jane's report, LT Sheppard notified his superiors, Executive Officer (XO) Craig Remaly[12] and Commanding Officer (CO) Rodney Hutton, [13] and Jane and John's company lieutenant, LT Kyle Willstatter,[14] that there was an alleged assault between two midshipmen. Ex. J at p. 27; Ex. B at p. 22-23; Ex. C at pp. 13-15. Following the allegation to the NROTC, the Naval

---

[11] The NROTC had reporting responsibilities via the Navy's Sexual Assault Prevention and Response (SAPR) program. Ex. B at pp. 18-19. General information about the SAPR is available publicly at: https://www.cnic.navy.mil/ffr/family_readiness/fleet_and_family_support_program/sexual_assault_prevention_and_response.html (last visited Aug. 30, 2021). The Navy describes its SAPR program as being "designed to meet the needs of victims," including by providing advocacy, education, and a "comprehensive response," among other things.

[12] Craig Remaly served as the Executive Officer of the NROTC unit at Purdue, a position which reported directly to the Commanding Officer. Ex. B at p. 8. In that role, he was responsible for advising the Commanding Officer and overseeing the daily routine operations of the NROTC. *Id.*

[13] Rodney Hutton served as the Commanding Officer for the NROTC. Ex. A at p. 7. In that role, he was responsible for the oversight and training of staff and midshipmen. *Id.* at 8. He was ultimately responsible for disciplinary decisions in the NROTC unit at Purdue. Ex. B at pp. 12-13.

[14] Kyle Willstatter served as John's and Jane's Company Commander for the NROTC. Ex. C at pp. 6-7. He reported to CO Hutton and XO Remaly. *Id.* at p. 22. His primary responsibilities were to advise and train his company. *Id.* at p. 8.

Service Training Command (NSTC)[15] was notified, and LT Willstatter was charged with going through John and Jane's records for things that the "NSTC had asked about for Navy specific actions that might be necessary." Ex. C at p. 16. CO Hutton also generally recalls speaking to Jane about her allegations and that the conversation "was sufficient to cause me to investigate the allegations made" by assigning an officer to investigate, *see* Section D, *infra*, and by having the NROTC report the allegations to Purdue. Ex. A at pp. 43-44.

At 4:27 p.m., CO Hutton emailed Jeffery Stefancic with the Office of the Dean of Students and advised "I have an issue that involved two NROTC students that I expect is coming your way. . .. I would like to speak with you about [the] process your office would take as I have parallel actions I need to take with the alleged offender that would require your actions to officially have commenced." Ex. K. At 8:37 p.m., based on his conversation with Jane, LT Sheppard submitted his report to Purdue.  Ex. L.

An electronic notification of the reports was automatically forwarded to the Director of Purdue's Center for Advocacy, Response, and Education (CARE)[16], Monica Bloom.[17] Ex. M. Upon receipt, Ms. Bloom scheduled a meeting with Jane. *See* Ex. Q.

The next day, on April 5, 2016, CO Hutton sent a letter to John which referenced the Navy's ROD and notified John that he was being placed on an interim leave of absence from the NROTC because of a pending investigation into Jane's allegations. Ex. N. The letter informed John that he

---

[15] NTSC is the Naval Command responsible for overseeing the different NROTC units around the country. Mission, https://www.netc.navy.mil/Commands/Naval-Service-Training-Command/Mission/ (last visited Aug. 30, 2021).

[16] CARE, a division of the Office of the Dean of Students, supports students during situations of domestic violence, relationship violence, sexual assault, sexual misconduct, and supports students in general. Ex. O at pp. 14-15. CARE promotes education related to the prevention and awareness education. Ex. P at p. 11.

[17] Monica Bloom served as the Director of CARE for 18 months starting in February 2016. Ex. P at p. 6.

was "prohibited from participating in any NROTC Battalion activities." *Id.* The imposition of the interim leave of absence meant that the NROTC suspended all academic benefits it extended to John, including his scholarship, pending the result of a PRB. *Id.*; Ex. A at p. 28-30. The interim leave of absence was an NROTC decision, suspending NROTC benefits, based on an NROTC midshipman's allegation to an NROTC lieutenant, occurring prior to Purdue's investigation of Jane's allegations to the University. Ex. A at pp. 28-30; Ex. H at pp. 33-34; Ex. N.

On the same day (April 5, 2016), Ms. Bloom met with Jane to discuss her report to Purdue. Ex. Q. After the meeting, Ms. Bloom emailed Purdue Dean of Students, Katherine Sermersheim, PhD,[18] and Purdue Vice President Alysa Christmas Rollock,[19] to inform them that Jane wanted Purdue to investigate her allegations and wanted Purdue to issue a no-contact order between her and John. *Id.* Ms. Bloom drafted and attached a one-page summary of Jane's allegations (entitled "Notice of Allegations") to the email that was based on LT Sheppard's report, Jane's report, and Jane and Ms. Bloom's meeting. *Id.*; Ex. R. The Notice of Allegations described that John had, *inter alia*, groped Jane while she was sleeping in John's dorm room; told Jane that on a different occasion he had digitally penetrated her while they were sleeping in her room; and come into her room unannounced and without an escort. Ex. R.

### C. Purdue's Investigation

On April 11, 2016, Dean Sermersheim sent John and Jane letters advising that Purdue had been made aware of allegations that could constitute a violation of its Policy and had issued a no-

---

[18] Katherine Sermersheim, PhD, is the Dean of Students at Purdue University. Answer Second Am. Compl. (DE 161 at 4, ¶7). Her job duties include serving as the primary decisionmaker for student Title IX matters. Ex. O at pp. 9-10.

[19] Alysa Christmas Rollock is the Vice President of Ethics and Compliance at Purdue University. (DE 161 at 4, ¶7). Her job duties include serving as the chief ethics and compliance officer, Purdue's equal opportunity officer, and handling appeals for student Title IX matters. Ex. S at p. 13.

contact order to John. John and Jane were notified that Purdue had elected to investigate the allegations and that Dr. Sermersheim had appointed Investigators Erin Oliver[20] (a woman) and Jacob Amberger[21] (a man) to investigate the matter. Ex. T; Ex. U. Both students were advised that full copies of Purdue's Policy and Procedures were available upon request. *Id.* Summarized, John and Jane were advised that John would be permitted an opportunity to respond to Jane's allegations and then the Investigators would interview the parties to gather information about the allegations. *Id.* Following their meetings with the parties, the Investigators would interview and review any other relevant witnesses and documentation, and they would prepare a report, which would be shared with the Dean of Students but neither of the parties nor any witnesses. *Id.* The Dean of Students would then chair a meeting of a three-person panel of the Advisory Committee on Equity, made up of faculty and staff. [22] *Id.* Both parties were permitted, but not required, to attend the meeting. *Id.* They were permitted to submit statements in lieu of attending. Ex. P at p. 30.

John submitted his response to Jane's allegations on April 21, 2016, generally denying them, though conceding that he had touched Jane while she slept. Ex. V. Investigators Oliver and Amberger interviewed Jane Doe, John Doe, and six other individuals with potential personal knowledge related Jane's allegations, including John's roommate and Jane's residential assistant

---

[20] Erin Oliver served as Associate Director and Director of Purdue's Office of Institutional Equity. Ex. W at pp. 6-7. Prior to the events in question, Oliver received annual Title IX training and graduated from the Michigan State University College of Law. *Id.* at pp. 5-9.

[21] Jacob Amberger served as an Investigator at Purdue's Office of Institutional Equity. Ex. X at p. 7. Prior to the events in question, Amberger was trained and worked as a police officer (and sheriff's deputy) and completed Title IX investigator training. *Id.* at pp. 6-8.

[22] The "Advisory Committee on Equity" is "The committee composed of faculty and staff appointed by the Vice President for Ethics and Compliance … to advise the Chancellors, Director and Dean of Students pursuant to Section I of these Procedures." Procedures for Resolving Complaints of Discrimination and Harassment, Section D (version in effect through August 15, 2016 archived at https://earchives.lib.purdue.edu/digital/collection/PPA/id/6744/rec/5 (last visited August 26, 2021)).

(RA). Ex. F. For instance, they met with Jane Doe's RA, who John said had unlocked Jane's room while she was away to let him rearrange her furniture as a surprise. Ex. F at p. PU 0128. However, the RA told the Investigators that she did not provide permission for John to go into Jane's room and did not unlock Jane's door to allow John inside. *Id.*

The Investigators interviewed John on April 28, 2016. Ex. X at p. 19. During the interview, John had his attorney and support person, Steven Knecht, present. Second Am. Compl. (DE 161) at p. 21, ¶36. John thought the interview went well, *Id.*, and he produced text messages that he represented were between him and Jane, starting on December 23, 2015. Ex. F at pp. PU 0131-0137. Among those text messages were the following exchanges:

> **Received from [Jane Doe] on Mon Dec 28, 2015 10:22 PM:** "Or when I wake up to you touching me or I'm trying to do something and you just touch me I literally can't trust you if you don't respect my boundaries"
>
> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:37 PM:** "We already went over this several times. I cant even apologize anymore because you get angry at me for it."
>
> **Received from [Jane Doe] on Mon Dec 28, 2015 10:38 PM:** "No I get angry because you continue to do it and just say sorry you don't actually change Anything"
>
> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:56 PM:** "Im not going in circles any more [Jane]. What more do you want me to say? Do you want this to be over? We have literally talked about this for a week and **I already told you I cant change what i did, only what i will do from here on out. Do you want me to feel shitty for the rest of my life because of what I did? Im feeling like i will. Im sorry. I cant change what i did, as much as i want to. I violated you and never should have.** What do you want me to do?
>
> \*\*\*
> **Received from [Jane Doe] on Thu Jan 14, 2016 11:52 AM:** "That wasn't okay"
>
> **Sent to [Jane Doe] on Thu Jan 14, 2016 11:53 AM:** "?"
>
> **Received from [Jane Doe] on Thu Jan 14, 2016 11:54 AM:** "You should've left after I fell asleep or woken me back up"
>
> **Sent to [Jane Doe] on Thu Jan 14, 2016 1200 PM:** "ok"

**Received from [Jane Doe] on Thu Jan 14, 2016 12:03 PM:** "And please don't touch me especially when I'm sleeping"

\*\*\*

Ex. Y (grammar and punctuation in original) (emphasis added).

John admitted to the authenticity and accuracy of these text messages. Ex. Z at pp. 118-19. The Investigators asked John to explain several of his text messages, including the excerpts referring to him touching Jane. *Id.* After initially representing that the texts were solely about academic dishonesty with Jane, John later stated to the Investigators that the texts were also referring to an instance when John touched Jane Doe above her knee while she was sleeping sometime in December 2015. Ex. F at p. PU 0127; Ex. Z at p. 124; Ex. AAA at p. PU 067. According to John, when he apologized for "violat[ing]" Jane Doe, he was referring to touching her while she was sleeping. Ex. F at p. PU 0127; Ex. Z at p. 128. Jane also confirmed to investigators that the texts were John's apologies for touching her while she slept. Ex. F at p. PU 0127. John acknowledged that the Investigators acted reasonably and without bias when they questioned him about these texts because the texts refer to John touching Jane while she was sleeping. Ex. Z at pp. 118-19.

When the Investigators completed their investigation, they submitted a University Investigator's Report ("Purdue Report") on May 20, 2016. Ex. F. The Purdue Report outlined the Investigators' charge and the relevant standards found in Purdue's Policy. *Id.* The Purdue Report summarized Jane's allegations and the undisputed factual background. The Purdue Report included a single spaced, six-page overview of their investigation and the facts that they gathered, plus the Investigator's conclusions, recommended findings, and proposed discipline. *Id.*

The Investigators concluded that John had violated Purdue's Policy. Specifically, they offered the following fact-based rationale for their determination:

It was reported that [John]'s relationship with Jane was his first romantic relationship. Evidence supports that although he believed many of his actions were good intentioned and for the purpose of caring for [Jane], he crossed lines that made [Jane] uncomfortable. Specifically, entering her room and rearranging her personal belongings without consent. Further, when asked about the incident, [John] reported that a resident advisor provided him with permission and unlocked [Jane]'s door so that he could "surprise" her; however, a preponderance of the evidence supports that that did not occur.

[John] also apologized to [Jane] profusely in text messages. He explained the apologies were because he had lied to her about his own school work to help her with her own. However, when message[s] around those apologies were reviewed, statements made by [Jane] brought that explanation into question. When [John] was asked to clarify his apologies with [Jane]'s statements of inappropriate touching, he reluctantly confirmed that he was apologizing for that touching as well.

[John]'s uncomfortable, awkward, and unconfident clarification of the text message admission to violating [Jane] combined with the apparent dishonesty regarding his entrance into her dorm room have led us to determine that he is not a credible witness. Evidence does support that [Jane] was a credible witness. Therefore, we believe that a preponderance of the evidence supports that [John]'s admission to Jane that he digitally penetrated her vagina without her consent while she was sleeping was an accurate statement and the event did occur. Evidence also supports that [John] touched [Jane] while she was sleeping in an unwanted and nonconsensual way in December 2015.

*Id.* at p. 10.

On May 26, 2016, Dr. Sermersheim sent an email to the three-person panel of the Advisory Committee on Equity advising them that the panel meeting had been scheduled for June 6, 2016, and forwarding several attachments for their review: (1) The April 11, 2016 letters to John and Jane Doe, with the allegations, (2) John Doe's April 22, 2016 response letter, and (3) the Purdue Report. Ex. AA. The advisory panel was made up of men and women. *Id.*

On May 31, 2016, John and Jane were notified of the meeting of the Advisory Committee on Equity and Dean Sermersheim. Ex. BB. However, Jane was unable to attend that meeting because of mandatory obligations to the Navy. Ex. CC; Ex. DD; Ex. D at p. 66.

In lieu of attending, Jane wrote and submitted her statement to Ms. Bloom, who forwarded her statement to Dean Sermersheim's office on June 5, 2016, for inclusion with the other evidence and testimony available to Dr. Sermersheim and the Advisory Committee on Equity for the panel meeting the next day.  Ex. DD; Ex. P at pp. 28-29. In her statement, Jane Doe stated the following, among other things:

> One night, I went over to [John]'s room, someone I trusted, to watch a movie with one rule: to go back to my room alone that night.  I wasn't comfortable sleeping in the same room with his roommate, and I wanted to get some space. Instead, I wasn't woken up to be walked back to [my dorm]. I was woken up, still in his room, to him moving up my leg and going over my crotch.  I immediately got up, put my shoes on and left.  I had left believing I got away before things escalated. . .. Only later to be told it happened another time.  However, he had actually invaded me.  I wasn't even able to get up and leave or fight back.  How many other times could this have happened?  What else could he have done to me?
>
> ***
>
> [Over Christmas Break,] I tried to talk it out with him but he would just tell me "I said sorry, what else do you want me to do?"  He made it about him, but he could not and would not try to understand how he had hurt me. . ..
>
> ***
>
> [After I got back from Christmas Break], I started having panic attacks. Occasionally in NROTC I would have to fall out of our workouts because I would see him or be too close to his dorm.  I couldn't trust others, even my closest friends. I stopped going to class, I stopped sleeping, I stopped eating, anything to keep from running into him.  I didn't have any motivation, I'm still struggling to get out of bed every morning. . .. My nightmares are still getting worse.  I wake up screaming convinced [John] is in the room.  Even here in San Diego [(for summer Naval programing)] I've had to be pulled from various aspects of my training for my future career, because I couldn't handle it without a panic attack.  The chain of command considered my panic attacks such a problem, I was almost sent home during the first week without completing the training.  I'm constantly being punished for a decision I didn't make, and my judgement is often questioned because of the emotional damage from the experience he put me through.
>
> ***

Ex. DD.

On June 6, 2016, Dr. Sermersheim and the Advisory Committee on Equity conducted the panel meeting. Ex. EE. John Doe had the assistance of his support person, attorney Steven Knecht. Second Am. Compl. (DE 161) p. 25, ¶43. There is no evidence that John asked for the opportunity to bring and present witnesses or asked for Jane to appear for cross-examination.

Thirty minutes were set aside for John to go first at the panel meeting, followed by thirty minutes for the Investigators. Ex. EE. John was permitted to make a statement, wherein John intended to "reaffirm his innocence and explain [his] side of the allegations," Ex. Z at p. 185, though John admits he had no "primary point" he intended to make to "sway minds," *Id.* After making his statement, John was asked questions by the panel about Jane's allegations and the evidence presented to the panel, with an emphasis on John's text messages. *Id.* at p. 186. He was permitted to address the text messages and to offer an explanation. *Id.* at p. 187. Though John took exception with the tone of the questions (at least as he perceived it), he could not remember—or fault the panel for—any specific questions. *Id.* at p. 188. The Investigators were to meet with the panel after John, where they would review the Purdue Report with the panel and answer the panel's questions about their investigation and report. Ex. EE.

On June 14, 2016, after considering the information provided by the investigators, John, and Jane, Dr. Sermersheim notified the parties that she determined by a preponderance of the evidence that John's conduct violated Purdue's Policy. Ex. FF. Dr. Sermersheim suspended John for one academic year, extended the no-contact order until Jane Doe completed her academic program, and conditioned John's re-entry upon the completion of a 90-minute bystander intervention training and monthly meetings with an Assistant Director at CARE for the first semester of his return. *Id.*

14

John appealed Dr. Sermersheim's decision on June 23, 2016. Ex. GG. Though John's appeal questioned the evidence used to determine his guilt, his appeal did not seek a rehearing for the purposes cross-examining any witnesses. *Id.* On June 28, 2016, VP Rollock advised John that she was unable to issue a decision on his appeal and directed Dr. Sermersheim to revise her determination to include the factual basis for her determination and the sanctions imposed. Ex. HH. On June 29, 2016, Dr. Sermersheim issued her revised final determination, adding her specific findings, including her two bases for determining that John had violated Purdue's Policy:

[A] preponderance of evidence supports that:

> 1. [Jane Doe] had fallen asleep on a futon with you on [the] floor beside her. She woke up and found that you inappropriately touched her over her clothing and without her consent by placing your hand above her knee, between her legs, and moved it up to her 'crotch' area; and

> 2. On another occasion, while she was sleeping and without her consent, you inappropriately touched [Jane Doe] by digitally penetrating her vagina.

Ex. II.

John does not dispute that on one occasion touched Jane above her knee, without her consent, while she was sleeping. Ex. JJ; Ex. Z at pp. 123-24; Ex. O at p. 45; Ex. F at PU 0127. He disputes how high his hand was above her knee, including whether it was touching her crotch or genital area. *Id.* The credibility issue before Dr. Sermersheim was solely John's ability to reconcile his text messages to Jane, including his statement that he "violated" Jane, with Jane's account and the Investigator's findings. Ex. F; Ex. Y; Ex. Z at pp. 186-87. However, John did not dispute sending these messages, and he admitted (at least in part) that the "violated" message referred to touching Jane. Ex. Z at p. 128. He also acknowledged the texts' relevance to his case because they were the only pieces of evidence that he expected panel questions about. *See* Ex. Z at pp. 186-87.

15

John appealed Dr. Sermersheim's revised determination on July 10, 2016. Ex. KK. Like his first appeal, while John questioned the evidence, he did not request a rehearing for the purposes of cross-examining witnesses, despite having the assistance of a new attorney (specifically, his aunt, who was also the former President of Taylor University). Ex. KK; Ex. Z at pp. 130-33.

On July 21, 2016, after a review of John's appeal, including Dr. Sermersheim's letter notifying John of the allegations, the Purdue Report, Dr. Sermersheim's two determination letters, the "Notice of Allegations", John's response to the "Notice of Allegations", Jane Doe's letter to the panel, and John's July 10, 2016, message with additional information in connection with his appeal, VP Rollock upheld Dr. Sermersheim's determination and sanctions. Ex. LL.

John has conceded that he does not believe that Purdue subjected him to a different policy than what a female student accused of sexual assault might be. Ex. Z at pp. 137-38. He has also conceded that he has no evidence that a similarly situated woman who committed the same offense would have received a more lenient punishment. *Id.* at pp. 171-73.

Though he faults Purdue for not crediting his claim that Jane's were retaliation for reporting suicidal conduct by Jane, John does not have any evidence that Jane knew that John had reported any suicide attempt. *Id.* at pp. 142-45. John's self-serving suicide reports to Purdue were made weeks after the suicide attempt supposedly occurred, after Jane and John had broken up, and after the text messages provided above were exchanged. Ex. Z at pp. 115-18.

### D. NROTC's Investigation

After LT Sheppard reported Jane's allegations to his superiors at the NROTC on April 4, 2016, CO Hutton consulted with XO Remaly and appointed LT Megan Redlawsk[23] as the

---

[23] LT Redlawsk was the Charlie Company Commander during the time in question. Ex. E at p. 7. Her primary duties, besides serving as the PIO, were to guide her NROTC midshipmen through the program. *Id.* at p. 8. Like the other lieutenants, she reported to XO Remaly and CO Hutton. *Id.* at pp. 9-10.

Preliminary Inquiry Officer for the NROTC. Ex. B at pp. 23-24; Ex. E at pp. 19-20; Ex. A at p. 19; Ex. MM. NROTC command selected LT Redlawsk because they felt that Jane would be more comfortable speaking with another woman. Ex. B at p. 24.

The NROTC relied on LT Redlawsk to gather information from Purdue relating to Jane's allegations, Purdue's investigation, and any disciplinary action taken by Purdue. *Id.* at pp. 24-25; Ex. A at p. 19. As explained by CO Hutton, LT Redlawsk was asked to "look into the facts" associated with Jane's allegations of sexual assault *to the NROTC*. Ex. A at pp. 19-20. CO Hutton represents that he asked LT Redlawsk to "utilize the [Purdue] investigation for determinations of what occurred" and that he did not ask LT Redlawsk to make an independent determination on Jane's allegations to the NROTC. Ex. A at p. 20.

LT Redlawsk and John Doe understood that she was investigating potential violations of NROTC rules stemming Jane's allegations to the NROTC. Ex. E at pp. 18-19; Ex. Z at pp. 60-61. Specifically, LT Redlawsk represents that she was asked to investigate two things: (1) whether John Doe had been suspended by Purdue and (2) whether the NROTC believed that he committed sexual assault. Ex. E at p. 20.

John wanted the NROTC to investigate Jane's allegations, to investigate his side of the story, and to determine that Jane was lying. Ex. Z at pp. 56, 79; Ex. MM. In response to John's May 3, 2016, email, requesting an opportunity to "update [LT Sheppard] on [his] case and provide some information [he thought LT Sheppard] should know," LT Sheppard responded that same day and informed John:

> LT Redlawsk is the investigating officer that will be collecting information on the [NROTC] command's side. I think for now, she is waiting for the school to conduct its investigation. Regardless, she is the point of contact regarding any discussion related to facts about your case for the [NROTC] command. I have conveyed to her your intention to meet regarding your case and she will be reaching out to you to set up a time. . ..

17

Ex. MM.

LT Redlawsk met with John.  Ex. E at pp. 21-22. John was not prevented from supplying LT Redlawsk with any information, witness names, or evidence that he believed was pertinent to his case, and he had an opportunity to "tell [her] everything [he] wanted to tell her." Ex. Z at pp. 58-59, 90-91. Despite the options available to John, he opted to provide LT Redlawsk with just his written statement. Ex. JJ; Ex. Z at pp. 62-63.

On May 24, 2016, John Doe voluntarily executed an authorization for the release of his Purdue information to the NROTC. Ex. E at p. 29; Ex. Z at p. 21. No one with the NROTC ordered John to execute the authorization. Ex. E at p. 29; Ex. A at p. 45; Ex. C at p. 23; Ex. Z at pp. 21-22. With the authorization, LT Redlawsk and the NROTC obtained the Purdue report and Dr. Sermersheim's and Rollock's decisions.

LT Redlawsk also interviewed Jane and, after speaking with her, did not harbor any concerns that her allegations were false or insincere. Ex. E at pp. 21-22.

After LT Redlawsk completed her interviews of John and Jane, on June 14, 2016, she submitted a *Preliminary Inquiry Recommendations Surrounding Allegation of Sexual Assault Made Against Midshipman 4/C [John Doe]* (NROTC Report) to CO Hutton. Ex. NN. That NROTC Report determined that John Doe had been suspended from Purdue University *and* that he had sexually assaulted Jane Doe. *Id.*; Ex. E at p. 24. LT Redlawsk recommended that a PRB be convened, and that John be discharged from the program. *Id.*

On June 16, 2016, NROTC issued John a notice advising him that a PRB was being convened. Ex. OO. The PRB was later postponed permitting John to finish Purdue's appellate process. Following John's unsuccessful appeal to Purdue, on July 26, 2016, LT Willstatter sent John an email advising him that his PRB was scheduled for August 9, 2016. Ex. PP.

18

Even though LT Redlawsk concluded that John had sexually assaulted Jane, and even though John's academics had fallen below program standards, *see* Section E *infra*—each an offense for which John could be disenrolled from NROTC—the PRB held on August 9, 2016, was solely to address John's failure to maintain enrollment at Purdue. Ex. A at pp. 21-22; Ex. Z at pp. 183-84. On August 9, 2016, the NROTC convened a PRB. Ex. QQ; Ex. C at pp. 34-38. XO Remaly served as the senior member along with two other members. *Id.* LT Willstatter served as a non-voting recorder and presented evidence against John. *Id.* LT Willstatter presented twelve exhibits, noted that John had been suspended for at least one academic year, and observed that the ROD required that NROTC students be enrolled and in good standing with the university. *Id.* John did not present any evidence or argument in opposition to LT Willstatter's presentation. *Id.*

The PRB had the option to recommend: (1) no action, (2) warning, (3) probation, and (4) disenrollment, Ex. OO; Ex. B at pp. 29-30, however, they voted unanimously to recommend that John be disenrolled from the NROTC, Ex. QQ. The recommendation was forwarded to CO Hutton. Ex. A at pp. 49-50. On September 6, 2016, CO Hutton reviewed the facts and NROTC's requirements, discussed the matter with NSTC, and recommended that John be disenrolled from NROTC. Ex. A at pp. 50-53. John was disenrolled on September 25, 2016. *Id.* at p. 57; Ex. RR.

The sole ground for John's disenrollment from the NROTC was because he was "dropped by [Purdue]." Ex. RR; Ex SS. The NROTC disenrollment records do not address John's ability to (1) enlist in the Navy, (2) apply to participate in a different college or university's NROTC unit, or (3) reapply to the Purdue NROTC unit if he reenrolled at Purdue, save that CO Hutton did not recommend John for future officer programs. *Id.* Furthermore, the subpoena to the Navy and NROTC, issued via Court Order, *see* (DE 61), did not yield any citation for misconduct or any loss of eligibility to serve in the Navy or the NROTC.

Because John was only disenrolled from the program because of his failure to maintain enrollment at Purdue, there are no limitations—whether from Purdue or the NROTC—which prevent him from seeking reenrollment with the Purdue NROTC.  Ex. Z at pp. 168-69. However, to date John has not attempted to pursue his "dream" of serving in the military by seeking to enlist in the Navy or attempting to apply to any NROTC program. *Id.*

To date, the NROTC has not exonerated John of Jane's allegations to the NROTC, and the interim leave of absence dated April 5, 2016, corresponding to Jane's allegations, was never lifted or rescinded. Ex. N. Likewise, the NROTC has not lifted or rescinded its May 20, 2016, leave of absence, *see* Section E, *infra*, for his disqualifying academic performance. Ex. WW.

### E.  John's Academic Performance

To meet NROTC academic program standards, John needed to maintain a semester grade point average (GPA) of 2.5.  Failing to do so could result in John's disenrollment from the NROTC. Ex. TT. John's 2015 Fall semester GPA was 2.47. Ex. UU. That semester he took 7 courses amounting to 16 credit hours.  He failed one course in his major, but earned a mix of A's, B's, and C's for the remainder of his courses. *Id.*

John does not fault the Defendants for his poor fall grades. Ex. Z at pp. 40-41. Instead, he acknowledged poor study habits for his performance, such as skipping class. *Id.* at pp. 35-38. On January 16, 2015, John received a notice from CO Hutton and the NROTC advising him that he was being placed on Academic Warning. Ex. TT. The notice advised John that his semester GPA was below the floor of 2.5 and that he would need to attend weekly meetings with his Company Officer, participate in supervised study, and meet "all program standards by the end of the Spring 2016 semester." *Id.* As CO Hutton testified, these were steps to provide midshipmen like John "additional assistance and a warning." Ex. A at pp. 25-27. The NROTC warned John that failing

"to make academic progress is cause for convening a [PRB] with disenrollment a possible outcome." Ex. TT.

Despite this "additional assistance," John's 2016 Spring semester GPA was 2.11. Ex. UU. That semester he took 7 courses amounting to 15 credit hours.  He failed two courses in his major but earned a mix of A's and B's for the remainder of his courses. *Id.* Though he faults the Defendants' investigation for his continued poor grades, prior to the end of the Spring 2016 semester, on April 29, 2016 (the penultimate day of classes for the semester, less than a week before the start of final exams[24]) and more than two weeks after John learned that he was under investigation), John informed LT Sheppard that he "anticipate[d]" having passing grades in all of his courses." Ex. VV.

On May 20, 2016, John received a notice from CO Hutton and the NROTC advising him that he was being placed on Interim Leave of Absence pending a PRB for failing to meet NROTC academic standards.  Ex. WW. The notice advised him that he should plan on paying for his own tuition for the following semester and that he could be disenrolled from the program. *Id.* John has conceded that his future in the NROTC and as a scholarship student was in jeopardy because of his academic performance and not because of his sexual misconduct. Ex. Z at p. 65.

### F.  John's Post-Suspension Life

John applied and was accepted for enrollment at Taylor University, beginning in the 2016 Fall semester. Ex. XX. John elected to go to Taylor, despite knowing that they did not offer an NROTC program at that time. Ex. Z at pp. 70-71. John attended Taylor University for three semesters. During that time, he took a total of 16 courses, failed two, and received a mix of B's, C's, and D's in the remainder. Ex. XX. He finished with a GPA of 1.58. *Id.* John did not earn a

---

[24] 2015-2016 ACADEMIC CALENDAR, https://www.purdue.edu/registrar/calendars/2015-16-Academic-Calendar.html (last visited June 22, 2021).

degree from Taylor.  He returned home and resumed living with his parents following an incident where the University intercepted a package intended for John, containing an LSD-type substance. Ex. YY. Since 2018, John has not enrolled in college courses or felt the need to work. Ex. ZZ at p. 24-25. John has not testified to or produced any record of any initiative on his part since August 2016 to enroll in any Navy ROTC program anywhere or to enlist in the Navy.

## V.    LAW & ARGUMENT

### A.  Summary Judgment Standard

"Summary judgment is proper if 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Magin v. Monsanto Co.*, 420 F.3d 679, 686 (7th Cir. 2005) (quoting Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). "A fact is material only if [a fact] might affect the outcome of the case under the governing law." *Anweiler v. American Elec. Power Serv. Corp.*, 3 F.3d 986, 990 (7th Cir. 1993) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. "[A] party opposing summary judgment may not rest on the pleadings, but must affirmatively demonstrate that there is a genuine issue of material fact for trial." *Payne v. Pauley*, 337 F.3d 767, 771 (7th Cir. 2003). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Holland v. Methodist Hosps.*, No. 2:14-CV-88-PRC, 2016 WL 5724355, at *3 (N.D. Ind. Sep. 30, 2016) (quoting *Celotex*, 477 U.S. at 322).

**B.      John's "Stigma-Plus" Due Process Claim for Injunctive Relief Fails.**

In his Second Amended Complaint, John's first cause of action is captioned "42 U.S.C. §

1983: Denial of Fourteenth Amendment Due Process". (DE 160) at 44. This cause of action pends

as a claim for prospective injunctive relief in the form of "expungement" and "ending [] the

suspension subject to any readmission requirements." *Id.* at p. 54, ¶¶112-14.[25] John alleges that

Purdue deprived him of the freedom to pursue his occupation of choice (naval service) by

suspending him. *Doe v. Purdue Univ.*, 928 F.3d 652, 661 (7th Cir. 2019). He claims that he is

foreclosed from naval service because of his (now-complete) one-year suspension from Purdue.

*Id.*  John alleges that he had a legal obligation to execute a release to let Navy ROTC request

information from Purdue, which lead the NROTC to discover that John had been suspended and,

consequently, that John was no longer eligible for the NROTC. *Id.* John also avers that the

deprivation was without due process. (DE 160 at pp.  45-46, ¶¶ 86-87).

As a due process injunctive relief claim under *Ex Parte Young*, John must first prove

deprivation of a protected interest and then prove that the deprivation occurred without the

minimum due process guaranteed by the Fourteenth Amendment. *Purdue*, 928 F.3d at 659 ("The

threshold question, then, is whether John lost a liberty or property interest when he was found

---

[25] As a remedy for Count I, the Second Amended Complaint seeks (i) "an injunction vacating
John Doe's disciplinary findings and decision, granting expungement of John Doe's transcript of the
disciplinary record, ordering the ending of the suspension subject to any readmission requirements", (ii)
"damages", and (iii) "an injunction enjoining violations of the Fourteenth Amendment in the process of
investigating and adjudicating sexual misconduct complaints." (DE 160 at p. 54, ¶¶112-14.) However,
both the Court of Appeals and this Court have previously dismissed the damage claim and the injunction
regarding unspecified future complaints. *Purdue*, 928 F.3d at 666 ("In his complaint, John asked for 'an
injunction enjoining violations of the Fourteenth Amendment in the process of investigating and
adjudicating sexual misconduct complaints.' But John doesn't have standing to claim such relief."); (DE
84 at 24) (plaintiff has disclaimed any section 1983 damage claim and court construes Count I "as not
containing a request for damages for the alleged violations of § 1983 in Count I") DE 84 at p. 26
(dismissal of injunction claim for prospective due process violations).

guilty of sexual violence and punished. We address whether the procedures satisfied minimum constitutional requirements of fairness only if the answer to that question is yes.").

1.      **John does not allege or show any current effort to obtain Navy employment or Navy refusal to employ him. He does not meet the injury, redress, and ripeness requirements for standing.**

The Court of Appeals construed John's stigma-plus claim as: "John argues that he has satisfied this test because he alleges that Purdue inflicted reputational harm by wrongly branding him as a sex offender; that Purdue changed his legal status by suspending him, subjecting him to readmission requirements, and causing the loss of his Navy ROTC scholarship; and that these actions impaired his right to occupational liberty by making it virtually impossible for him to seek employment in his field of choice, the Navy." *Purdue*, 928 F.3d at 661 (citing multiple cases).[26]

As the Seventh Circuit has stated, John "must demonstrate standing for each form of relief sought. A plaintiff may have standing to pursue damages but not injunctive relief, for example, depending on the circumstances." *Kenseth v. Dean Health Plan*, 722 F.3d 869, 890 (7th Cir. 2013) (citing *Friends of the Earth*, *Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). "To have standing for prospective injunctive relief, a plaintiff must face a real and immediate threat of future injury as opposed to a threat that is merely conjectural or hypothetical." DE 84, at 22 (quoting *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir. 2017) (internal quotation marks omitted)). Article III "prevents federal courts from answering legal questions, however important, before those questions have ripened into actual controversies between someone who has experienced (or imminently faces) an injury and another whose action or inaction caused (or risks

---

[26] John's quest for injunctive relief from re-admission requirements at Purdue is unrelated to his stigma-plus claim. There is no contention that Purdue's re-admission requirements stigmatize John or affect his occupational liberty. Therefore, the question of injunctive relief from re-admission requirements only pends under Count II, as a remedy for John's Title IX claim.

causing) that injury." *Prosser v. Becerra*, 2 F.4th 708, 713 (7th Cir. 2021) (quoting *Sweeney v. Raoul*, 990 F.3d 555, 559 (7th Cir. 2021) (internal quotation marks omitted)). Even where Congress has defined an intangible harm such as a legal injury for which a plaintiff can seek relief, the "plaintiff must identify a concrete injury." *Prosser*, 2 F.4th at 714 (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)). "[A]llegations of possible future injury are not sufficient." *Prosser*, 2 F.4th at 714 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (internal quotation marks omitted)).

Whether John meets the standing requirement for subject-matter jurisdiction on his stigma-plus claim starts with the question whether he could serve in the Navy if he tried. As stated by the Court of Appeals, the material facts are whether "expulsion from the Navy ROTC program (with the accompanying loss of scholarship) . . . foreclosed the possibility of his re-enrollment in it." *Purdue*, 928 F.3d at 663.

John does not allege any current or prospective impediment to Navy enlistment or NROTC enrollment. Disenrollment from the Navy ROTC at Purdue is merely not being enrolled in the Navy ROTC curriculum at Purdue. Expulsion, by contrast, is a disciplinary sanction. The Navy never disciplined John, whether by expulsion or otherwise. Nor did the Navy foreclose John from re-enrollment in Navy ROTC. *See* Ex. RR; Ex UU. After promising the Court of Appeals that he could prove these claim elements, John no longer even alleges them.

John's Second Amended Complaint does not allege that it is impossible for him to seek employment in the Navy. The Second Amended Complaint does not even allege that John is presently seeking employment in the Navy. John merely alleges that he could not remain enrolled in Navy ROTC at Purdue during the period when he was not enrolled at Purdue University. John's pending allegation is:

> Because of the disciplinary decision of Defendant Purdue to suspend John Doe that had
> been upheld by Defendant Vice President Rollock against John Doe's appeal, the Navy
> called John Doe before a Performance Review Board that convened on August 10, 2016,
> and based solely on the consequences of the disciplinary decision of Defendant Purdue
> (suspension), John Doe was disenrolled from the Navy ROTC at Defendant Purdue . . ..
> John Doe could not maintain the requirement of continuous university attendance for Navy
> ROTC as a student suspended for sexual misconduct.

(DE 160 at pp. 41-42, ¶ 76). There is no allegation that the Navy disciplined John. There is no

allegation that the Navy limited John's liberty to reenroll in Navy ROTC if or when he enrolled at

a school with a Navy ROTC program.  There is no allegation that the Navy limited John's liberty

to enlist in the Navy.

What if Purdue had made an official determination of responsibility but the sanction had

not included a one-year suspension? John would then need to show that he was forever

"foreclosed" from continuing in NROTC even though he remained in school at Purdue. Instead,

the evidence shows only that John was foreclosed from enrolling in the Purdue NROTC curriculum

during the year that he was ineligible to enroll in any curriculum at Purdue.

In the Second Amended Complaint, John admits that the Navy disenrolled him from the

Purdue NROTC unit because he could not meet the requirement of simultaneous enrollment at

Purdue University for the 2016-17 school year. *Id.* The *reason* why John would not be enrolled at

Purdue in 2016-17 was not a factor in the NROTC disenrollment decision. If John had not returned

to Purdue for the 2016-17 school year for financial reasons—having lost his NROTC scholarship

due to bad grades—the identical NROTC disenrollment would have occurred.

This Court has analyzed how John's theory of relief must meet two standing elements; not

only an allegation of injury, but also an allegation that the injury is redressable by a judicial

remedy. "Plaintiff explains that . . . Plaintiff was deprived of occupational liberty by being rendered

ineligible for the Navy." (DE 84 at p. 18) (citing Pl.'s Mem. Opp'n 16-17, ECF No. 63 (internal

quotation marks omitted)). "Plaintiff further explains that expungement will redress his injury by removing the disciplinary case finding that he committed a sexual offense, thereby removing the cause of Plaintiff's ineligibility for the Navy." *Id.* (citing DE 63 at p. 17). This Court has added: "The obvious inference from this allegation is that, should the guilty finding be expunged, Plaintiff may once again be eligible to enroll in Navy ROTC and pursue a career in the Navy." *Id.* at 19. Therefore, to establish standing for his stigma-plus claim, John must come forward with evidence that (i) he is ineligible to serve in the Navy and (ii) expungement of Purdue's finding would expunge the Navy's own investigation file on Jane's allegation. There is no such evidence.

There is no evidence that Purdue's "official determination of guilt" has obstructed John from re-enrollment in NROTC or enlistment in the Navy. There is no evidence that, upon re-enrollment at Purdue, the Navy would refuse to re-enroll John. John's August 2016 disenrollment does not impose any conditions on John's re-enrollment in NROTC or enlistment in the Navy. No Navy document determines that he is ineligible to serve in the Navy today. No Navy witness has testified that he is ineligible to serve in the Navy. Since leaving Purdue, John has never sought to enlist in the Navy or enroll in NROTC. *See* Ex. Z at pp. 71-72. On the available evidence, John—like any other student applying to colleges—is free to apply to enroll at any school that has an NROTC program. Even for the 2016-17 school year, there is no evidence showing any limitation on John's freedom to enroll in NROTC at another school. Yet, since leaving Purdue, John has never sought to do so.

John cannot overcome this standing defect by hypothesizing what might happen if he were to seek to enlist in the Navy or re-enroll in NROTC. Any such hypothetical obstacle is an unripe basis for subject-matter jurisdiction. "Ripeness is predicated on the 'central perception . . . that courts should not render decisions absent a genuine need to resolve a real dispute,' and '[c]ases

27

are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts.'" *Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008) (alterations in original) (internal citations omitted); *see Sweeney*, 990 F.3d at 559-60*; Lear Corp. v. Johnson Elec. Holdings Ltd.*, 353 F.3d 580, 583 (7th Cir. 2003); *Burbridge v. City of E. Chicago*, 2020 WL 1433836, *2 (N.D. Ind. Mar. 24, 2020); *Hunter v. Long*, 2019 U.S. Dist. LEXIS 164831, 2019 WL 4695463, *4 (N.D. Ind. Sept. 26, 2019)).

What the Navy may do with its file on Jane's allegation against John is "merely conjectural or hypothetical" within the meaning of *Simic*, 851 F.3d at 738. On this point, the Court of Appeals construed John's then-pending complaint as an allegation that Purdue's verdict was conclusive for the Navy's purposes: "[I]t was this official determination of guilt, not the preceding charges or any accompanying rumors that allegedly deprived John of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his re-enrollment in it." *Purdue*, 928 F.3d at 662-63. Today, not even John contends that the Navy adopted Purdue's findings as a Navy disciplinary determination.

There is no evidence that the Navy itself has determined whether John assaulted Jane. There is no evidence that the Navy has adopted Purdue's assault determination or LT Redlawsk's investigatory determination. The Purdue NROTC unit's commanding officer (Hutton) testified:

> Q . . . When you say you disenrolled [John], you mean you disenrolled him because you determined that he sexually harassed and assaulted [Jane Doe]?
>
> A.      No.

Ex. A at p. 22. John himself has argued that the Purdue Navy ROTC Unit "did not make a determination that Plaintiff John Doe had committed sexual misconduct." (DE 138 at 2).

Whether, when, and how the Navy might make such a determination is unknown. If John were to seek employment in the Navy, multiple scenarios can be conjectured regarding the

allegation that Jane submitted to the Navy. The Navy could elect not to resume its own disciplinary process on that allegation. The Navy could resume its own disciplinary process on that allegation and decide not to discipline John. Or the Navy could resume its process and impose discipline; in turn, that hypothetical discipline may or may not limit John from Navy employment. Thus, foreclosure of Navy employment is not only unripe, but it is also contingent on what the Navy does with its own investigation of the allegation that Jane submitted to the Navy. A foreclosure scenario turning on Purdue's "official determination of guilt" begs the question of the Navy's own decision-making and therefore does not even meet the standing test, let alone proof of stigma-plus.

Further, there is no basis to conclude that John's eligibility to serve in the Navy turns on any determination in this case. John has not summoned the Navy before this Court and has not sought a declaratory judgment regarding his culpability under the Navy's ROD. There is no standing where the plaintiff's eligibility for participation in a government program—in this case, Navy ROTC—would be unaffected by a ruling, win or lose. *Prosser*, 2 F.4th at 714-15 (citing *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1619 (2020)).

Here, the Navy, a non-party, controls John's hypothetical future in the Navy. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (evaluation of standing where "[t]he existence of one or more of the essential elements of standing 'depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict,' and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury") (internal citations omitted); *see also Clapper*, 568 U.S. at 413-14 (2013) (the Supreme Court is "reluctant to endorse standing theories that require

29

guesswork as to how independent decisionmakers will exercise their judgment.") (citing *Whitmore v. Arkansas*, 495 U.S. 149, 159-60 (1990))).

John's stigma-plus claim for loss of occupational liberty is the only Due Process theory of relief on which the Court of Appeals permitted John to go forward. Outside of his theory of loss of occupational liberty, John has failed to state any other Due Process claim. Therefore, John's lack of standing for his stigma-plus claim terminates his Due Process claim altogether.

### 2.   There is no actionable deprivation because John retains a meaningful post-deprivation remedy in state court.

John has not exhausted the due process available to him under state law. John is free to petition an Indiana state court to afford him additional due process to obtain exoneration on Purdue's determination regarding Jane's allegation. John's original Complaint alleged a breach of contract claim for John's procedural grievances. (DE 1 at pp. 62-65). This Court dismissed that claim without prejudice because of the Eleventh Amendment bar. (DE 31 at p. 45).

John retains that contractual theory of relief under state law in state court. *See Chang v. Purdue Univ.*, 985 N.E.2d 35 (Ind. Ct. App. 2013); *see, e.g., King v. Depauw Univ.,* No. 2:14-cv-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, *29-30 (S.D. Ind. Aug. 22, 2014) (application of *Chang* regarding student sexual misconduct discipline). He has simply chosen not to pursue it.

An allegation that a state actor has not met the procedural requirements of the Due Process Clause is not an actionable deprivation if a "meaningful post-deprivation remedy" is available in state court. *Hudson v. Palmer*, 468 U.S. 517, 533-34 (1984). Where there is a state-law cause of action available to remedy the alleged deprivation, the deprivation is "not 'without due process of law". *Altman v. Hurst*, 734 F.2d 1240, 1242-43 (7th Cir. 1984); *see also Cannici v. Vill. of Melrose Park*, 885 F.3d 476, 479 (7th Cir. 2018) (citing *Leavell v. Ill. Dep't of Nat. Res.*, 600 F.3d 798, 805 (7th Cir. 2010)). "In this instance, the plaintiff must 'avail [himself] of state post-deprivation

remedies or demonstrate that the available remedies are inadequate.'" *Cannici*, 885 F.3d at 479 (quoting *Leavell*, 600 F.3d at 805). A deprivation of an allegedly protected interest "is not complete until and unless [the state] provides or refuses to provide a suitable post[-] deprivation remedy." *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). Because John has not pursued his available state-court remedies, he retains a meaningful post-deprivation remedy and has not established deprivation without due process of law.

> ### 3.     There is no issue of fact on deprivation of occupational liberty.
>
> #### a.     The Navy deprived John of his NROTC scholarship because of bad grades. That action was not a deprivation by Purdue and does not meet the redress requirement for standing.

Purdue NROTC notified John in May 2016 that he would not remain on a NROTC scholarship due to his bad grades. John's loss of his NROTC scholarship therefore was not a deprivation by Purdue. Expungement of Purdue's disciplinary file on Jane's allegation against John would not redress John's failure to meet NRTOC academic standards. Therefore, John does not have standing to petition this Court to remedy the loss of his NROTC scholarship. *See* DE 84 at 15 (authority for redress element of standing) (citing *Spokeo*, 136 S. Ct. at 1547).

> #### b.     Purdue's "official determination of guilt" is not material because the Navy has its own disciplinary jurisdiction over Jane's allegation.

An unstated premise of John's stigma-plus claim is that the Navy is reliant upon a Purdue "official determination of guilt" in lieu of the Navy making its own determination on John's culpability. This premise is unstated for the obvious reason that it is demonstrably false. The Navy's ROD regulates conduct among Navy personnel and specifies the due process provided for violations. Where, as here, the Navy has jurisdiction over the misconduct, the Navy decides for itself whether to deprive John of the occupational liberty to serve in the Navy. Purdue regulated

John's conduct as a Purdue student. The Navy regulated the conduct of John as a Navy midshipman. For stigma-plus purposes, the Navy's own regulatory regime is a dispositive fact.

### c. The Navy's access to Purdue's investigation is not material.

The Court of Appeals stated that only Purdue's "official determination of guilt"—not the preceding investigation—matters for stigma-plus analysis. *Purdue*, 928 F.3d at 662-63. Further, John cannot obtain relief for a reputational stain because the Court of Appeals rejected the proposition that "loss of reputation" is a "loss of liberty". *Id.* at 662 (citing *Hojnacki v. Klein-Acosta*, 285 F.3d 544, 548 (7th Cir. 2002)).

John's occupational peril with Navy ROTC hinged on Navy ROTC's own file. The Navy knew of Jane's allegation before Purdue did, because Jane submitted it directly to Navy ROTC. Ex. H at pp. 21-34; Ex. I; Ex. L.[27] Navy ROTC suspended John by placing him on an involuntary interim leave of absence before any investigation by Purdue occurred. Ex. N. Navy ROTC referred the allegation to Purdue. Ex. H at pp. 33-34; Ex. I; Ex. L. Thus, regardless of any action by Purdue, John was directly under the Navy's disciplinary jurisdiction from the day that Jane reported her allegation to the Navy.

These facts neuter John's allegation that (in the words of the Court of Appeals) "he had an obligation to authorize Purdue to disclose the proceedings to the Navy." *Purdue*, 928 F.3d at 662. For an allegation that came to the Navy first under a Navy regulation, then was referred to Purdue and simultaneously investigated by the Navy, it is impossible to conclude that, but for a Purdue disclosure, the Navy would have never known of "the proceedings."

---

[27] The Navy has its own protocol for encouraging internal assault reporting. SEXUAL ASSAULT AWARENESS & PREVENTION MONTH, https://www.cnic.navy.mil/ffr/family_readiness/fleet_and_family_support_program/sexual_assault_prevention_and_response/sexual-assault-awareness-month.html (last visited Aug. 30, 2021).

If the Navy chose to place a Purdue report in the Navy's file, that report became a *Navy record*. An injunction directed to Purdue's records obviously does not readdress the Navy's records, so the content of the Navy's file is not a material fact. Either the Navy's file is not injurious to John, or John has chosen not to summon the Navy and assert such an injury in this case.

> ### d.  There is no evidence that Purdue disclosed its official determination to the Navy or that the Navy compelled John to disclose that determination.

John's stigma-plus theory requires him to come forward with evidence that he was obligated to authorize Purdue to disclose its official determination of responsibility to NROTC. "In contrast to *Olivieri*, where disclosure was <u>voluntary</u> and <u>speculative</u>, it was <u>compelled</u> and <u>certain</u> in *Dupuy*. And in *Dupuy*, unlike in *Olivieri*, the disclosure was not self-published—it came from the defendant, even if the plaintiff had been obligated to authorize it." *Purdue*, 928 F.3d at 662 (emphasis in original).

However, there is no evidence that John was obligated to authorize the Navy to access Purdue's official determination. John testified in deposition:

> Q.    You don't recall one way or the other anybody at the Navy telling you that the Navy wanted access to information from Purdue?
>
> A:    No, I do not.

Ex. Z at pp. 21-22. Lieutenant Redlawsk, the Navy official in charge of NROTC's investigation of Jane's allegation corroborated that there was no compulsion.

> Q: . . . Did you ever order [Plaintiff] to turn over information to the Navy about his Purdue investigation?
>
> A:  I wouldn't say that I ordered him. I don't recall ever giving him an order to do so.

Ex. E at p. 29.

The stigma-plus theory of relief has no application to John's cooperation with a third-party's investigation. *Purdue*, 928 F.3d at 661 ("it is true that a plaintiff can't himself spill the beans and then blame the defendant for ruining his [reputation]." (citing *Olivieri v. Rodriguez*, 122 F.3d 406 (7th Cir. 1997)); *see also Doe v. Trs. of Ind. Univ.*, No. 1:20-cv-00123-JRS-DML, 2021 U.S. Dist. LEXIS 105760, at *12 (S.D. Ind. May 4, 2021) (plaintiff failed to demonstrate a "legal obligation to consent to disclosure of defamatory information" where he showed that he would have to disclose his suspension to transfer to a different university but failed to direct the court to a statute or regulation requiring the disclosure). John voluntarily provided Navy ROTC a release to access Purdue's records relating to the allegation that Jane had submitted to Navy ROTC, which was in turn referred to Purdue. John did so because he chose to cooperate with Navy ROTC's own investigatory and disciplinary jurisdiction.

### 4. Purdue afforded John the due process required by the Fourteenth Amendment for imposition of school discipline for misconduct.

John has alleged only a denial of Fourteenth Amendment Due Process. Fourteenth Amendment Due Process does not vary according to whether the discipline implicates Title IX or not. Therefore, John is limited to the skeletal Fourteenth Amendment Due Process that the United States Supreme Court has declared in long-standing precedents.

John does not dispute the sufficiency of notice of Jane's allegations.[28]

John contends: "[W]ithout a hearing that included sworn testimony and the cross-examination of witnesses, there was no proper basis for making such credibility judgments." DE

---

[28] In John's words, the sexual-contact allegations against him were that: "Jane Doe woke up to John Doe's [*sic*] groping her while she was fully clothed and said to John Doe that this was not OK"; "John Doe then told Jane Doe that during another night in November 2015, while they were staying the night in Jane Doe's room, John Doe had penetrated her digitally while she was sleeping"; "Jane Doe was not aware of the incident in November 2015 while she was sleeping in her room, had not and did not consent to such sexual contact, and was upset when she was told about it". (DE 160 at pp. 16-17, ¶ 30).

160 at 33, ¶ 57. However, for a disciplinary determination in the school environment, the Fourteenth Amendment does not afford John a procedure with sworn testimony and cross-examination of witnesses.

"Due process does not . . . require a judicial or quasi-judicial trial . . . before a school may punish misconduct." *Coronado v. Valleyview Pub. Sch. Dist. 365–U*, 537 F.3d 791, 795 (7th Cir. 2008) (citations and internal quotation marks omitted). In a school setting, the fundamental requirements of due process are notice and the opportunity to be heard in a meaningful time and a meaningful manner. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985); *see also Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Buttitta v. City of Chi.*, 9 F.3d 1198, 1206 (7th Cir. 1993). "A school is an academic institution, not a courtroom or administrative hearing room." *Bd. of Curators of Univ. of Mo. v. Horowitz*, 435 U.S. 78, 88 (1978). The Court of Appeals did not hold that the Fourteenth Amendment guarantees John a right of confrontation and cross-examination in a school disciplinary setting. *Purdue,* 928 F.3d at 664 n.4 ("we need not address this issue."). "The Court is bound by what the law is and not by what [Plaintiff] believes the law ought to be. . .. As the law stands in Indiana and in the Seventh Circuit, the Defendants were not required to give [Plaintiff] any more process than he received; and, therefore, dismissal of [Plaintiff's] due process claims is warranted." *Marshall v. Ind. Univ.*, 170 F. Supp. 3d 1201, 1208 (S.D. Ind. 2016).

John's Due Process argument is not grounded in any material facts. There is no dispute that Purdue provided John ample opportunity to present his side of the story. He was interviewed by two investigators, three panelists, and Defendant Sermersheim. Purdue did not refuse to consider any documents or other evidence that he wished to be considered.

John's two appeals to Defendant Rollock illustrate the sufficiency of the due process that Purdue afforded him. In those appeals, John complained of pro-victim bias and sought to reargue the weight of the evidence, including his argument that Jane's personal mental-health history was a retaliatory motive for her allegation. However, John did not contend that he had any further evidence to offer. *See* Ex. GG; Ex. KK. Those appeals establish that John had a complete opportunity to be heard before Purdue determined to discipline him.

John was represented by counsel during the Purdue disciplinary process, but he did not seek an evidentiary hearing and did not request an opportunity to cross-examine Jane or have any questions presented to Jane. He did not provide Purdue with any offer of proof as to what he would show if he were to cross-examine Jane.  *See, e.g.*, *Yu v. Vassar Coll*., 97 F. Supp. 3d 448, 465 (S.D.N.Y. 2015) ("Notwithstanding his conclusory statement that Inoa 'refused to ask many of my cross-examination questions,' Yu presents no evidence specifying which questions Inoa did not ask, their relevance to the proceedings, whether they were redundant, or whether not asking them may have prejudiced Yu in some way.").

When asked in deposition what he would have asked Jane in cross-examination, John said, "I would've asked her why she is lying." Ex. Z at pp. 84-85. That singular "question" is not in fact a cross-examination question; it is an accusation. In deposition, John also testified that he would also have challenged Jane on the lack of witnesses to the alleged sexual contact. *Id*. However, the lack of third-party witnesses to the alleged digital penetration was a limitation on both John's and Jane's contentions. Where, as here, the alleged sexual contact undisputedly related to a private encounter, cross-examination plays no role in the determination of that undisputed fact.

## C.    John's Title IX Allegation Fails.

John alleges that Purdue erroneously determined that he violated its Policy and excessively punished him on account of his gender. (DE 160 at 3, ¶ 3). John alleges that Purdue has established

a "victim-centered process" that placed the burden of proof on him at the hearing, conducted a biased investigation, and always results in men being found guilty of allegations brought by women. (*Id.* at 57, 62 ¶¶ 126, 129, 151-52). He believes that the Obama administration applied pressure to public universities like Purdue and that Purdue found him guilty to appease the Obama administration and avoid a potential loss of federal funding.  (*Id.* at 62, ¶ 138).[29]

However, even if these allegations meet the *Twombly/Iqbal* plausibility standard for stating a claim, they are nothing more than an offer of proof. Under Rule 56, John has the burden of producing evidence that Purdue University (the sole Title IX defendant) resorted to intentional gender discrimination. A private right of action under Title IX requires the claimant to show intentional gender discrimination.[30] Intentional gender discrimination is proved by "facts raising the inference that Purdue acted at least partly on the basis of sex in [his] particular case." *Purdue*, 928 F.3d at 669.[31]  In this formulation, the actions are: Purdue's decision to investigate the allegation that NROTC referred; Purdue's evidence-gathering; and Purdue's determination as to the preponderance of the evidence on Jane's allegation and John's response.

---

[29] Plaintiff's Second Amended Complaint jumps from paragraph number 138 to 150 on page 62.

[30] *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination."); *Hayden v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569, 583 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX."); *Doe v. Marian Univ.*, No. 19-CV-388-JPS, 2019 U.S. Dist. LEXIS 222842, at *25–26 (E.D. Wis. Dec. 31, 2019) ("Merely demonstrating a discriminating outcome falls short of demonstrating a discriminatory intent."). There is no private right of action under Title IX for disparate impact. *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019) (citing *Alexander v. Sandoval*, 532 U.S. 275, 283 (2001) (holding that there is no private right of action for disparate-impact discrimination under the similarly worded Title VI) and stating, "We have never recognized a private right of action for disparate-impact discrimination under Title IX."); *Briscoe v. Health Care Serv. Corp.*, 281 F. Supp. 3d 725, 738-39 (N.D. Ill. 2017).

[31] *See Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854 (7th Cir. 2019); *Ross v. Ball State Univ.*, No. 118CV01258JRSTAB, 2020 U.S. Dist. LEXIS 37241, *26 (S.D. Ind. Mar. 4, 2020) (granting summary judgment for the university on plaintiff's Title IX discrimination claim).

In reviewing these actions, the Court's inquiry for purposes of a Title IX intentional gender discrimination claim is narrow. This Court is not tasked with retrying Purdue's disciplinary proceeding. "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Plummer v. Univ. of Houston*, 860 F.3d 767, 772 (5th Cir. 2017). Where, as here, the claims against the university "are grounded upon the manner in which the university conducted the process leading to the conclusion that he had violated the Sexual Misconduct Policy and the resulting imposition of sanctions, the Court's review is 'substantially circumscribed'—namely, 'the law does not allow th[e] Court to retry the University's disciplinary proceeding.'" *Doe v. Vanderbilt Univ.*, No. 3:18-cv-00569, 2019 U.S. Dist. LEXIS 173269, at *15-16 (M.D. Tenn. Sept. 30, 2019) (quoting *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009)). "[I]t is not the business of lawyers and judges to tell universities what statements they may consider and what statements they must reject." *Stenzel v. Peterson*, No. CV 17-580 (JRT/LIB), 2017 WL 4081897, at *5 (D. Minn. Sept. 13, 2017) (quoting *Doe v. W. New England Univ.*, 228 F.Supp. 3d 154, 184 (D. Mass. 2017)).

Nor is this Court tasked with measuring the defendant university's disciplinary procedure against any yardstick of best practices. A gender-discrimination claim is about discriminatory intent, not a debate about competency. *See Saravanan v. Drexel Univ.*, No. 17-3409, 2017 U.S. Dist. LEXIS 193925, at *9 (E.D. Penn. Nov. 24, 2017) ("In reviewing Drexel's proceedings, we may not 'advocate for best practices nor . . . retry disciplinary proceedings." (quoting *Yu*, 97 F. Supp. 3d at 461)). "If we were to insist on a right to party-conducted cross-examination, it would be a short slide to insist on the participation of counsel able to conduct such examination, and at that point the mandated mimicry of a jury-waived trial would be near complete." *Haidek v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 69-70 (1st Cir. 2019) (citing *Goss v. Lopez*, 419 U.S. 565,

38

583 (1975), for the "admonition that student disciplinary proceedings need not mirror common law trials").

John cannot get past summary judgment by demanding that a jury reweigh the evidence of his culpability. Jane is not in this case, and no pending claim will decide John's culpability. John has never asked this Court to order Purdue to re-open and re-do its determination. Nor has John sought a declaration of exoneration in state court or in this Court. A case such as this one "is not a lawsuit between Plaintiff and [his accusers]. The Court therefore expresses no opinion as to whether [a violation of the anti-harassment policy] occurred, whether any such acts were consensual, or who, as between [Plaintiff] and [his accusers] is credible." *Vanderbilt Univ.*, 2019 U.S. Dist. LEXIS 173269, at *16 (quoting in part *Univ. of the S.*, 687 F. Supp. 2d at 755)).

In these respects, a Title IX gender-discrimination allegation parallels a Title VII gender-discrimination allegation. This Court is not tasked with second-guessing merit evaluations by employers under Title VII and is not tasked with second-guessing culpability evaluations by educational institutions who police sexual misconduct.

### 1. Purdue's Anti-Harassment Policy is gender-neutral.

John has never faulted Purdue for the text of its Anti-Harassment Policy. Having such a policy entails enforcing it according to its terms. A pro-enforcement stance is not an act of gender bias. "[G]eneral allegations about public pressure to resolve sexual assault complaints are insufficient to show that gender bias was the motivating factor in the erroneous result." *Doe v. Columbia Coll. Chi.*, 299 F. Supp. 3d 939, 953 (N.D. Ill. 2017). Courts have consistently rejected Title IX allegations based on alleged victim-centric bias.[32]  A disproportion of male respondents

---

[32]*See, e.g.*, *Rossley v. Drake Univ.*, 979 F.3d 1184, 1194-95 (8th Cir. 2020) ("Rossley contends that . . . Drake officials employ a 'victim-centered approach' . . .. Whatever descriptive phraseology one might use to characterize Drake's approach . . ., we do not believe that it can fairly be found to be

is also not material for identification of anti-male bias. "The fact that males are more often the subject of disciplinary (or criminal) proceedings stemming from allegations of sexual assault does not suggest that those proceedings are tainted by an improper motive." *Tsuruta v. Augustana Univ.*, No. 4:15-CV-04150-KES, 2015 WL 5838602, at *4 (D.S.D. Oct. 7, 2015).

Further, John does not allege any procedural differences for non-males accused of sexual misconduct. *See, e.g., Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 69 (1st Cir. 2019).

Nor does John allege that Purdue sanctions male and female offenders differently for like offenses under the Anti-Harassment Policy. Therefore, John's contention that his one-year suspension was unduly harsh is not an allegation of material fact.

### 2.  John's gender did not factor in Purdue's receipt of Jane's allegation or Purdue's obligatory decision to investigate it.

John falsely insisted to this Court and the Court of Appeals that Purdue drummed up Jane's allegation.[33] As John well knew, the truth was that a Jane submitted her allegation *to Navy ROTC*, which placed John on an involuntary interim leave of absence on April 5, 2016.  Ex. N.

---

inherently gender-biased."). "[A] disciplinary system that is biased in favor of alleged victims and against those accused of misconduct . . . does not equate to gender bias because sexual-assault victims can be both male and female." *Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016); *see also Marian Univ.*, 2019 U.S. Dist. LEXIS 222842, at *33-34 ("While their comments are pro-victim, this does not compel the conclusion that they are also pro-woman, or anti-man. . .. Similarly, allegations that a university was compelled to 'believe the victim' during an investigation do not sustain the inference that the university 'took the genders of the victim and the accused into account.'") (quoting *Ludlow v. Nw. Univ.*, 125 F. Supp. 3d 783, 793 (N.D. Ill. 2015)). *See also Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 992 (D. Minn. 2017); *Doe v. Univ. of Colo., Boulder*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 607-08; (S.D. Ohio 2016); *Doe v. Coll. of Wooster*, 243 F. Supp. 3d 875, 887 (N.D. Ohio 2017).

[33] As summarized by the Court of Appeals, John's stated claim was: "For a few months, things were quiet between John and Jane. That changed in April 2016, which was Sexual Assault Awareness Month. During that month, Purdue hosted over a dozen events to promote the reporting of sexual assaults. Many of the events were sponsored by the Center for Advocacy, Response, and Education (CARE), a university center dedicated to supporting victims of sexual violence. CARE promoted the events on its Facebook page, along with posts containing information about sexual assault. One of its posts was an article from The Washington Post titled 'Alcohol isn't the cause of campus sexual assault. Men are.'

Jane submitted her allegation to Navy ROTC with the aid of a Navy ROTC upperclassman. Ex. H at pp. 21-34. In turn, the Navy referred the allegation to Purdue. Ex. H at pp. 33-34; Ex. I; Ex. L. Those steps obviously cannot support any imputation of bias to Purdue.

John cannot show gender bias by faulting Purdue for responsiveness to the Navy referral. There is no dispute that Jane alleged a violation of Purdue's Anti-Harassment Policy, and Purdue's decision to investigate the allegation was therefore a gender-neutral step pursuant to that Policy. Further, Title IX obligated Purdue to respond to Jane's report of sexual harassment. *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

These facts show that the Obama Administration had nothing to do with Purdue's receipt of Jane's allegation or Purdue's obligatory decision to investigate it.[34] In any event, "[I]t is not reasonable to infer that [a university] has a practice of railroading students accused of sexual

---

During the first ten days of April, five students reported sexual assault to the university. Jane was one of them." *Purdue*, 928 F.3d at 656.

[34]The Court of Appeals instructed that the 2011 Dear Colleague Letter, by itself and unaccompanied by specific evidence does not allege facts that make it plausible that university acted on anti-male bias See *Purdue Univ.*, 928 F.3d 652, 669 (7th Cir. 2019). Other courts have reached the same conclusion. *See Doe v. Univ. of Denver*, 952 F.3d 1182, 1192 (10th Cir. 2020); *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 855-56 (7th Cir. 2019) (holding that generalized allegations of an anti-male environment and the Dear Colleague Letter do not support a claim of gender discrimination and stating, "plaintiff cannot rely on these generalized allegations alone, however, but must combine them with facts particular to his case to survive a motion to dismiss."); *see also Lee v. Univ. of N.M.*, Case No. CIV 17-1230 JB\LF, 2020 U.S. Dist. LEXIS 54920, at *156-57 (D.N.M. Mar. 30, 2020) ("The Court agrees that, standing alone, the 'Dear Colleague' letter is insufficient to demonstrate that UNM adopted anti-male bias in its disciplinary proceedings."; *Gischel v. Univ. of Cincinnati*, 302 F.Supp.3d 961, 973 (S.D. Ohio 2018) ("[G]eneralized allegations of hostility towards male students accused of sexual assault at universities arising from the OCR's now-rescinded Dear Colleague Letter and from Title IX advocacy groups are not sufficient to establish the required causal connection."); *Doe v. College of Wooster*, 243 F. Supp.3d 875, 887 (N.D. Ohio 2017) (allegations that the DOE exerted pressure on college through the issuance of the Dear Colleague Letter "fail to support a plausible inference of gender discrimination."); *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016) (claim that university had a practice of "railroading students accused of sexual misconduct simply to appease the [DOE]" do not support a claim of bias); *Doe v. Rider Univ.*, Case No. 3:16-cv-4882-BRM-DEA, 2018 U.S. Dist. LEXIS 7592, at *33-34 (D.N.J. Jan. 17, 2018) (holding that the allegation that "the OCR 'Dear Colleague Letter' in 2011 . . . induced Defendant to discriminate against male students in sexual misconduct cases, . . . on its own is insufficient to demonstrate an inference of gender bias . . . .").

misconduct simply to appease the Department of Education and preserve its federal funding." *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016).

For these same reasons, it is immaterial how many other women may submit sexual misconduct allegations to Purdue, or how many of the respondents are men. The gender of complainants and the gender of respondents trace to the underlying encounter, not to any selection by Purdue. *See Doe v. Univ. of Denver*, 952 F.3d 1182, 1193-94 (10th Cir. 2020) (discussion of what inferences can be drawn from statistics alone).

### 3.     There was no gender bias in Purdue's evidence-gathering.

Purdue's investigation report shows Purdue's diligence in gathering all available evidence. Purdue's two investigators were female and male: Erin Oliver and Jacob Amberger. They followed the evidence where it led. They did not forgo speaking with anyone with purported personal knowledge of Jane's allegation. They interviewed Jane. Ex. F at p. PU 0125 (Jane reports John had placed his hand above her knee while she was sleeping on a futon, that John had moved it over her clothed crotch area, and that John later admitted to digitally penetrating her). They interviewed John. *Id.* (describing that John generally denies Jane's allegations, but admits to touching Jane above her knee while she was asleep on a futon in his room). They interviewed John's roommate. *Id.* at p. 7 (roommate reporting that he was sleeping during the futon incident, but that he woke up when Jane left the room).  They interviewed Jane's RA, Christy Joel. *Id.* at p. 9 (Joel reporting that, contrary to John's statements, she never gave John permission to enter Jane's room while Jane was not there and did not unlock Jane's door). They also interviewed several other students about their potential personal knowledge. *See id.* at p. 3.

The Investigation Report lays out a detailed summary of Jane and John's accounts and how the investigators weighed credibility. *Id.* at pp. PU 0120-0137. The Investigation Report

demonstrates that there was substantial evidence supporting Jane's account of what happened.  *See, e.g., Univ. of Denver*, 952 F.3d at 1197-98 (could not be said that there was no evidence in support of Jane's account).

Oliver and Amberger interviewed John and asked him to explain his text message apologizing to Jane that he had "violated" her.  John disputes the investigators' interpretation of his responses, particularly whether he admitted that the "violation" involved touching Jane. However, the investigators took detailed notes of their meetings with Jane and John, and those notes corroborate their report that John admitted to touching Jane. Ex. AAA at PU 0067 (Amberger notes from meeting with John, providing "touching: several days after suicide attempt – [Jane] on futon, [John] on floor – [John] reached up [and] put hand on knee; just above knee [while she was sleeping]") (punctuation and formatting in original); Ex. BBB at PU 0040 (Oliver notes from meeting with John, providing "Nov '15 / Dec. '15 touching [] never discussed it in person . . . Touch couldn't be perceived as anything other than what it was.") (punctuation and formatting in original). Further, those notes are devoid of any language connoting an intent to discount John's account because he is male.

**4.    There was no gender bias in Purdue's weighing of the evidence.**

At summary judgment, the *McDonnell Douglas* burden-shifting framework can be employed to evaluate whether the evidence supports an inference of gender bias.[35] Such evidence

---

[35] "Title VI and Title IX are so similar that a decision interpreting one generally applies to the other." *Doe v. Galster*, 768 F.3d 611, 617 (7th Cir. 2014); *Brewer v. Bd. of Trs. of Univ. of Illinois*, 479 F.3d 908, 921 (7th Cir. 2007) ("The elements of a prima facie case are the same under both Title VI and VII."). *See Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) ("The *McDonnell Douglas* framework applies both to the Title IX and Title VII sex discrimination claims."); *Martin v. S. Ill. Univ. Sch. of Med.*, No. 16-CV-3294, 2017 U.S. Dist. LEXIS 174828, at *28-32 (C.D. Ill. Oct. 23, 2017) (collecting cases applying *McDonnel-Douglas* to Title VI and IX claims).

must be evaluated as a whole. *Lauth v. Covance, Inc.*, 863 F.3d 708, 715 (7th Cir. 2017) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765–66 (7th Cir. 2016)). Therefore, it is appropriate to examine whether there is evidence of discriminatory animus; whether the evidence shows that Purdue possessed an objectively reasonable basis for its adverse action; and whether the totality of the circumstances is sufficient to show a material issue of fact on discriminatory intent.

### a.   No evidence of discriminatory animus.

John does not point to any direct evidence of discrimination. There is no contention that the Purdue investigators or Sermersheim or Rollock expressed any anti-male animus. Nor is there a comparator proof "that women who were accused of sexual misconduct received a fairer investigation, or that he was punished extensively because he was male." *Doe v. Marian Univ.*, No. 19-CV-388-JPS, 2019 U.S. Dist. LEXIS 222842, at *29–30 (E.D. Wis. Dec. 31, 2019).

Instead, John contends that Purdue's rape-counseling center (CARE) adopted anti-male rhetoric, on a CARE Facebook page that tagged an article that blamed men for sexual assault. However, there is no contention that CARE investigated or decided John's allegation, nor any allegation connecting Sermersheim or Rollock to the posts on CARE's Facebook page.

Further, the tagged article is immaterial, for several reasons. First, a newspaper article is a form of third-party free speech on a university campus. Second, the act of hosting third-party speech on a Facebook page or in a student newspaper or a classroom or campus meeting space is facilitation of dialog, which is an educational activity, not an expression of bias by the host. Third, there is no evidence that the University's decision-makers, Dean Sermersheim and Vice-President Rollock, adopted the viewpoint of the author of the Washington Post piece. Fourth, the article was

not in fact anti-male.[36] Therefore, the tagged article is not probative to show that Sermersheim or Rollock employed John's gender as a factor in weighing the evidence of his culpability.

### b.      Reasonable basis for finding culpability.

In a Title VII case, the inquiry would consider whether there is a reasonable basis for the adverse action. In this Title IX case, there was a reasonable basis to find John culpable.

In a Title IX sexual harassment investigation, the reasonable basis is not a criminal law standard. No presumption applied in favor of John or against him, or in favor of Jane or against her. Each of them is afforded the identical Title IX protection of their educational opportunity.

For John, the Title IX gender bias proof-path is very narrow. Where, as here, there is a reasonable basis for the adverse action, John must show facts from which a jury could conclude that Purdue was motivated by John's sex, notwithstanding the available evidence. *Purdue*, 928 F.3d at 667 (summarizing "ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student").

Other than his self-interested denial, John's primary rebuttal was: "Jane Doe had no supporting documentation for her allegations, her allegations were made five months after the alleged incidents took place with no contemporaneous reports to the university or the police and her allegations were made after a suicide attempt." *Id.* at p. 32 ¶ 55.

These arguments were defective on their face. The "violated you" text message was a strongly corroborative document. John did not supply Purdue with any record that he made a contemporaneous suicide report or that Jane was aware of any such report.

---

[36] Lauren R. Taylor & Jessica Raven, WASH. POST, https://www.washingtonpost.com/posteverything/wp/2016/06/10/alcohol-isnt-what-causes-campus-sexual-assault-men-are/ (last visited Aug. 30, 2021). The article addresses the misconception that alcohol causes attackers to sexually assault victims. The article notes that men can be victims and ends by celebrating men who hold others accountable and step in to stop a sexual assault.

John admits that Sermersheim heard him out on the text message evidence. "During the meeting, [John] explained a few texts" and argued "that no texts supported the claim of sexual assault." *Id.* at p. 21 ¶ 36. John did not (and does not) dispute sending Jane a text apologizing for violating her. Ex. Y; Ex. Z at pp. 118-19. Jane alleged two instances in which John violated her: that he once touched her clothed leg above the knee while she was sleeping and startled her awake, and that he disclosed to her that he had once digitally penetrated her while she was sleeping. John did not dispute that he once touched Jane's clothed leg above the knee while she was sleeping and startled her awake. Ex. F at p. PU 0127; Ex. Z at p. 124; Ex. AAA at PU 0067. John's admission confirmed a history of touching Jane below the waist while she was sleeping.

In John's telling, his touching of Jane's clothed upper leg while she was sleeping was benign. If benign, that touching would not map up to a written apology for violating Jane. Thus, John's own argument implied that John's "I violated you" statement referred to touching on a different occasion. The credibility spotlight was therefore squarely on John as the author of the text and the only eyewitness to what he did while Jane slept. According to Jane, John had admitted to digital penetration. According to John, he was discussing bad schoolwork habits.

Forced to choose between those two explanations, a reasonable factfinder could find that the statement "I violated you" more likely referred to digital penetration than bad schoolwork habits. This conclusion amounts to following the evidence where it leads, to the conclusion that John used the words "violated you" as an active verb, to refer to his treatment of Jane, the person to whom he was apologizing.

Further, a reasonable factfinder can rely upon John's concession to investigators and to counsel that the "violated you" text referred to, at least in part, touching Jane while she slept. Ex. F at p. PU 0127; Ex. Z at p. 128. The verb "violate" is from the same root as "violence" and

ordinarily refers to a transgression. John's choice of that word, in the context of an abject written apology, is a gender-neutral basis for a reasonable factfinder to conclude that John was confessing a sexual transgression, as Jane alleged.

It is insufficient to contend that anyone who believes Jane's account is anti-male; by that primitive reasoning, crediting a woman's allegation against a man could never satisfy Title IX. Further, John cannot get past summary judgment by trying to establish his credibility at Jane's expense. Sermersheim could have found both to be credible, or neither to be credible. No credibility judgment in that range of possibilities is inherently biased or unbiased.

Whether conflicting evidence could be weighed differently is not a material fact for determination of bias. The law recognizes that reasonable factfinders can weigh conflicting evidence differently. *See United States v. Lindsey*, 123 F.3d 978, 980 (7th Cir. 1997) ("[T]he credibility of witnesses, even when there is strong reason to doubt it, remains uniquely within the province of the fact finder . . ."); *Anderson v. Bessemer City*, 470 U.S. 564, 576-77 (1985) (noting that the district court's determination of the weight to be assigned to conflicting evidence was entitled to deference).[37]

---

[37] *See, e.g.*, *United States v. Beverly*, 913 F.2d 337, 358 (7th Cir. 1990) (noting that a conviction may rest solely on circumstantial evidence and that, "[t]his is true even when the evidence at trial is 'totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant.'" (quoting *United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir. 1989))); *United States v. Blas*, 947 F.2d 1320, 1325 (7th Cir. 1991) (holding that an accomplice's uncorroborated testimony was sufficient evidence to support the conviction); *United States v. Elder*, 840 F.3d 455, 460 (7th Cir. 2016) (dismissing the defendant's argument that the evidence was insufficient to support his conviction because it came almost entirely from biased witnesses while noting, "As we have said time and again, however, '[i]t is for the jury—not the court of appeals—to judge the credibility of witnesses, and attacks on witness credibility are insufficient to sustain a challenge to the sufficiency of the evidence.'" (quoting *United States v. Griffin*, 84 F.3d 912, 927 (7th Cir. 1996) (alteration original))).

c.    **The totality of the circumstances.**

John must come forward with evidence from which a factfinder at trial could conclude, from the totality of the circumstances, that Purdue resorted to anti-male bias.[38] The totality of the circumstances does not show a basis from which a jury could conclude that Dean Sermersheim would have found John credible if he were a woman accused of digitally penetrating Jane while she was sleeping. Further, there is no contention that Sermersheim and Rollock did not honestly believe their stated reasoning. Under the jurisprudence of pretext, the evidence available to Dean Sermersheim was clearly "sufficient to motivate" a determination that John was not credible.[39]

Purdue investigators interviewed both Jane and John. Purdue's process at the time afforded both Jane and John a voluntary opportunity to meet with Dean Sermersheim and be heard on the evidence gathered by the investigators. This procedure was gender neutral. Regardless of gender, all complainants and respondents were free to decide not to meet with Dean Sermersheim and her advisory panel. Ex. U. Had neither Jane nor John met with Sermersheim, Purdue would decide the

---

[38]The totality-of-the-circumstance summary judgment standard has been adopted under Title VII. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018); *Ortiz v. Werner Enters. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). "[C]ourts must assess the evidence 'as a whole, rather than asking whether any particular piece of evidence proves the case by itself,' regardless of whether the court also analyzes the evidence pursuant to *McDonnell Douglas*.'" *Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) (quoting *Ortiz*, 834 F.3d at 765).

[39] Title VII caselaw provides a clear roadmap for analysis of a pretext allegation under Title IX. "To show pretext, a plaintiff 'must do more than simply allege that [defendant's] stated reasons are inaccurate; he must still have some circumstances to support an inference that there was an improper motivation proscribed by law." *Tyburski*, 964 F.3d at 599 (quoting *Benuzzi v. Bd. of Educ. of the City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011) and *McGowan v. Deere & Co.*, 581 F.3d 575, 581 (7th Cir. 2009)). In particular, the plaintiff must show that the decisionmaker "did not honestly believe the reasons given for their actions." *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 478-79 (7th Cir. 2010). *See also Dennis v. Potter*, 2012 U.S. Dist. LEXIS 40034, *60 (N.D. Ind. March 23, 2012) (a "justification may be considered pretextual where the plaintiff demonstrates that it had no basis in fact, it did not actually motivate the decision . . . or it was insufficient to motivate that decision.") (quoting *Radentz v. Marion Cnty.*, 640 F.3d 754, 757 (7th Cir. 2011)).

preponderance of evidence based on the available evidence, regardless of the gender of the complainant and respondent.

John, with counsel at his side, took the opportunity to meet with Sermersheim. Jane (who was away on Navy ROTC assignment) did not, but she did submit a written statement. There is no evidence that John and his counsel asked Sermersheim for a different process.

Thus, by consent the evidence before Sermersheim consisted of the investigators' report, including the evidence that they collected and their opinion on credibility of the accuser and accused; John's dialog with Sermersheim and her advisory panel; and Jane's written statement.

John complains that Dean Sermersheim did not meet with Jane. This is not a material fact for gender bias. The record does not show any failure to elicit material information from Jane. Dean Sermersheim adopted the conclusion of the investigators (Oliver and Amberger) who interviewed Jane and found her to be credible. Thus, Purdue interviewed Jane. Sermersheim's reliance upon the investigators' evaluation of Jane does not show anti-male bias. Further, John's appeals to Defendant Rollock did not ask Rollock to reopen the evidence-gathering process or to require Sermersheim to compel Jane to appear for questioning. Nor did John's appeals to Defendant Rollock tender any questions that John believed should be asked of Jane, whether by Sermersheim or a different examiner.

John argues that Jane had retaliatory intent and was mentally ill. But John has never backed up those contentions. John himself has not deposed Jane in this case. Even now, John apparently has no material facts to elicit from Jane. Further, John's mental-illness aspersion is a circular and self-serving allegation, since John stood accused of conduct toward Jane that could precipitate distress for Jane, and John was a spurned former boyfriend with his own motive to retaliate.

49

## VI.    CONCLUSION

For the above-stated reasons, Defendants respectfully request that the Court grant summary judgment in their favor and against all of Plaintiff John Doe's claims against Defendants, and for all other just and proper relief.

Date: August 31, 2021                          Respectfully submitted,

                                              /s/ William P. Kealey
                                              William P. Kealey (18973-79)
                                              Tyler L. Jones (34656-29)
                                              James F. Olds (27989-53)
                                              Stuart & Branigin, LLP
                                              300 Main St., Ste. 900
                                              P.O. Box 1010
                                              Lafayette, IN 47902-1010
                                              Email: wpk@stuartlaw.com
                                                     tlj@stuartlaw.com
                                                     jfo@stuartlaw.com
                                              Telephone: 765-423-1561
                                              *Attorneys for Defendants*

1401675v1

50