Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF INDIANA
 2                     HAMMOND DIVISION
 3                CASE NO. 2:17-cv-33-JPK
 4     JOHN DOE,                        )
                                        )
 5          Plaintiff,                  )
                                        )
 6          -vs-                        )
                                        )
 7     PURDUE UNIVERSITY, PURDUE        )
       UNIVERSITY BOARD OF TRUSTEES,    )
 8     MITCHELL ELIAS DANIELS, JR.,     )
       in his official capacity as      )
 9     President of Purdue              )
       University, ALYSA CHRISTMAS      )
10     ROLLOCK, in her official         )
       capacity at Purdue University,   )
11     KATHERINE SERMERSHEIM, in her    )
       official capacity at Purdue      )
12     University,                      )
                                        )
13          Defendants.
14
15              DEPOSITION OF ██████████████
16
17        The videotaped deposition upon oral examination of
       █████████████, a witness produced and sworn before me,
18     Clarice H. Howard, CCR-Ky, Notary Public in and for the
       County of Boone, State of Indiana, taken on behalf of
19     the Defendants, at the offices of Stuart & Branigin,
       LLP, 300 Main Street, Suite 900, Lafayette, Indiana, on
20     Tuesday, August 18, 2020, scheduled to commence at
       10:00 a.m., pursuant to the Federal Rules of Civil
21     Procedure with written notice as to time and place
       thereof.
22
23
24
25
```

EXHIBIT Z

1    Q    ██████████    I'm handing you Deposition Exhibit 2.

2         Please review this document.  Do you recognize this

3         document?

4    A    I recognize my signature.  Yes, I do.

5    Q    Who drafted that document?

6    A    That I do not recall.

7    Q    Did you draft it?

8    A    No, I don't think I did.

9    Q    Who requested that creation and signature on

10        Deposition Exhibit 2?

11   A    I don't recall.

12   Q    Was it somebody from Navy ROTC?

13   A    It may have been.  I don't recall.

14   Q    Do you recall whether Navy ROTC asked you to sign a

15        release for Navy ROTC to access the information

16        described in Deposition Exhibit 2?

17   A    No, but it's here, so they must have.

18   Q    After you signed this document, who did you give it

19        to?

20   A    I don't recall who I gave it to.

21   Q    What did you understand was the reason why you were

22        signing Deposition Exhibit 2?

23   A    Upon looking at the document, it seems pretty

24        straight to the point.  It's saying that the school

25        investigation is permitted to be seen by the Navy

1       and it's asking for my consent in that matter.

2  Q   What did you understand to be the reason why Navy

3       ROTC was obtaining your consent?

4  A   I imagine they wanted to be in the loop on what was

5       going on.

6  Q   You imagine that or did somebody tell you that?

7  A   Well, this document does.

8  Q   You don't recall one way or the other anybody at

9       the Navy telling you that the Navy wanted access to

10      information from Purdue?

11  A   No, I do not.

12  Q   So as you sit here today, you didn't have any

13      recollection of the circumstances under which you

14      signed Deposition Exhibit 2?

15        MR. BYLER:  Objection, form.

16  A   When this investigation started at the school, I

17      was in disarray.  I was in disbelief and a lot of

18      the details were or some of the details of the

19      early stages of the investigation and who got

20      access to what, was lost on my memory.

21  Q   As of May 24, 2016, you wanted access to the

22      investigator's report yourself, right?

23  A   I did want access to the investigator's report

24      because I want to defend myself in the case that

25      Purdue had me in.  If the 24 is that date, then

Page 35

1   A   They are.

2   Q   In that transcript listing for fall of 2015, there

3       are courses listed that include Navy courses,

4       Russian courses and some computer courses; would

5       you would agree with that description?

6   A   I would.

7   Q   And you are intending at the time to be majoring in

8       computer graphic technology?

9   A   Correct.

10  Q   Which is referred to on this transcript as CGT in

11      the left part of the entry we're looking at,

12      correct?

13  A   Correct.

14  Q   So in your first semester at Purdue, you were

15      taking two courses in your intended major, computer

16      graphic technology, correct?

17  A   In one of my intended majors, yes.

18  Q   What was your other intended major?

19  A   Russian.

20  Q   In your intended computer graphics technology, in

21      the two courses you were taking that fall, you

22      received a C in one and you failed the other,

23      correct?

24  A   Correct.

25  Q   What was the reason that you failed the course

1   entitled fundamentals of imaging technology?

2 A I struggled with my schoolwork towards the latter

3   half of the semester and especially during the

4   finals week.  And when I initially started school

5   at Purdue, I had an adjustment phase to the new

6   daily schedule and daily life, and I didn't do so

7   hot in that particular course.

8 Q Did you attend all of the classes in that course?

9 A I don't think so.

10 Q Why not?

11 A I may have been absent to some of them.

12 Q Why were you absent?

13 A I don't know.  I may have -- I don't know what time

14   of day I had this course, but I may have slept

15   through it a few times.  I slept through several

16   courses my fall semester.

17 Q What time of day did you have your ROTC drills in

18   the fall semester?

19 A We had PT, which as our physical exercise in the

20   mornings on Mondays, Wednesdays and Fridays, and

21   those were at 5:30 to my recollection.  And I also

22   had additional weekly workouts with a small group

23   of guys that wanted to go special order, and those

24   were in addition to the morning workouts.  Those

25   were evening workouts once or twice a week.

1    Q    So three out of the five school days a week you

2         were up very early in the morning for Navy ROTC?

3    A    At least.

4    Q    And possibly on Tuesdays and Thursdays as well?

5    A    Depending if I needed to be up for something

6         unrelated to the ROTC, yes.  But on the scheduled,

7         it was only three days a week that I needed needs

8         to be up.

9    Q    So when you say you may have slept through classes,

10        it wasn't that you didn't get out of the bed the

11        morning, it was that you just went back to your

12        room and slept through the classes?

13   A    It's difficult to say because I don't know what

14        days I had this class.  I don't recall what days I

15        had this class, and this document doesn't tell me

16        what days I had this class.  So it would be

17        speculation.

18   Q    Did you have any understanding as a Navy ROTC cadet

19        whether you were expected by Navy ROTC to be

20        attending all of your classes?

21   A    Yes, I did.

22   Q    What was your understanding?

23   A    My understanding was they expected ROTC midshipmen

24        to do the best in their classes and to attend their

25        classes.

Page 38

1    Q    Without exception?

2    A    Yes, without exception.

3    Q    So you were excepting yourself from the Navy ROTC

4         expectation when you attend your classes in the

5         fall of 2015?

6    A    It was not uncommon for midshipmen to not have

7         perfect attendance, and I always did my best to

8         attend my classes.  And the Navy set me up with

9         some older students to work on scheduling and

10        helping me adjust to the college scheduling

11        routine.

12   Q    Take a look at the same transcript, Deposition

13        Exhibit 3, further down in the same column for the

14        spring of 2016; do you see that?

15   A    I do.

16   Q    In the spring of 2016, you had three computer

17        graphics technology courses, correct?

18   A    Correct.

19   Q    And you failed two of them, correct?

20   A    Correct.

21   Q    Now, there was nothing that the defendants in this

22        case did to cause you to fail courses in both of

23        your semesters at Purdue, was there?

24            MR. BYLER:  Objection, form.

25   A    In my eyes, it seemed that they were making my life

Page 40

```
 1   A   Do the defendants include ████████████ in this
 2       question?
 3   Q   ████████, you have in front of you Deposition
 4       Exhibit 1, which is your amended complaint in this
 5       case.  Are you aware of who the defendants are in
 6       this case?
 7   A   The University is the defendant.
 8   Q   Please review the caption on the first page of
 9       Defendant's Deposition Exhibit 1 and refresh your
10       recollection as to how the defendants are in this
11       case?
12   A   Mitchell Elias Daniels, Jr., Alysa Christmas
13       Rollock and Katherine Sermersheim, Purdue
14       University and the Purdue University Board of
15       Trustees.
16   Q   Have you been under the impression for the 185 plus
17       weeks that this case was been pending, that this
18       was a lawsuit under -- against ████████████
19       among others?
20   A   No.
21   Q   Why, then, are you suggesting to me that the
22       question about the defendants in your fall of 2015
23       grades is a question about ████████████
24   A   I shouldn't have asked that.
25   Q   I'll ask you one more time.  Are you faulting the
```

Page 41

1         defendants in this case for your fall of 2015

2         grades?

3              MR. BYLER:  Objection, asked and answered.

4    A    I'm not faulting the defendants for my fall 2015

5         grades.

6    Q    During the spring semester of 2016, what did the

7         defendants do to cause you to fall two courses?

8    A    My grades as a whole suffered from the University

9         investigation, but to assume that fails

10        specifically are attributed is a bit presumptuous

11        in my eyes.  The grades as a whole did become

12        negatively affected by the University investigation

13        and the behavior of the University towards me

14        during the spring of 2016 semester.

15   Q    Sir, I'm asking a very simple and direct question.

16        My question was what did the defendants do in the

17        spring of 2016 semester to cause you to fail two

18        courses?

19             MR. BYLER:  Objection, asked and answered.

20        The defendants were pursuing a disciplinary case,

21        for heavens sake.

22   A    I don't think you're assumption that the fails were

23        directly attributed, but my grades as a whole did

24        suffer because of the behavior of the University

25        and the investigation.  Examples of the behavior

```
 1        there was any other information that you wanted

 2        Lieutenant Sheppard to know?

 3   A    Not to my recollection, no.

 4   Q    And have you in the May 3 e-mail informing

 5        Lieutenant Sheppard that your parents have urged

 6        you to have an attorney present for your meeting

 7        with him?

 8   A    Yes.

 9   Q    So your parents wanted you and your lawyer to meet

10        with the Navy?

11   A    According to this e-mail thread, yes, or I wanted

12        to.

13   Q    And the reason you wanted to provide information to

14        the Navy was that you wanted the Navy to look into

15        that information?

16   A    I think that's why I wanted to provide it, yes.

17   Q    So you were by this e-mail asking the Navy for an

18        opportunity to present information for the Navy to

19        investigate?

20            MR. BYLER:  Objection, form.

21   A    Yes.

22   Q    And in the next e-mail, that same morning, Tuesday,

23        May 3, 2016, Lieutenant Sheppard responded to you

24        stating in part "Lieutenant Redlawsk is the

25        investigating officer that will be collecting
```

```
 1        false accusations against me, and I alluded
 2        Lieutenant Redlawsk to her mental health history
 3        and her history of suicide attempts, one of which I
 4        borne -- I was witness to.  And I explained to her
 5        the understanding that I had at the time of what
 6        was going on.
 7   Q    Did you take any documents to the meeting?
 8   A    I don't recall if I did.
 9   Q    Do you Lieutenant Redlawsk interact with you at the
10        meeting?
11   A    Yes.
12   Q    Did she ask you questions?
13   A    I don't think she really did.
14   Q    Did you discuss whether she was in possession of
15        the University's investigation report?
16            MR. BYLER:  Objection to form.
17   A    I did not to my recollection ask her that.
18   Q    Did you have a complete opportunity to tell
19        Lieutenant Redlawsk everything you wanted to tell
20        her?
21            MR. BYLER:  Objection to form.
22   A    I believe so.
23   Q    Did you have a complete opportunity to give
24        Lieutenant Redlawsk all the documents you wanted to
25        give her?
```

Page 59

```
 1   A   I don't recall whether I gave her any documents.
 2   Q   But you had an opportunity to do so if you wanted
 3       to?
 4           MR. BYLER:  Objection to form.
 5   A   If at the time I felt it necessary, then yes.
 6   Q   Did you ask Lieutenant Redlawsk to see whatever she
 7       had in her investigation file?
 8           MR. BYLER:  Objection to form.
 9   A   I don't recall.
10   Q   Were you curious what she had in her investigation
11       file?
12   A   I don't recall.
13   Q   Did you ask her whether she had interviewed ██████
14       ██████?
15   A   I don't recall.
16   Q   When in Deposition Exhibit 5, in the May 3, 2016,
17       e-mail Lieutenant Sheppard identifies Lieutenant
18       Redlawsk as "the investigating officer that will be
19       collecting information on the command side," what
20       did you understand that description to mean?
21   A   I understood it as he put two sentences later that
22       she was my point of contact regarding any
23       discussion related to facts about my case for the
24       command.
25   Q   So in two places in this e-mail, the writer,
```

Page 60

```
 1        Lieutenant Sheppard refers the command, meaning

 2        Navy ROTC?

 3   A    The command of Navy ROTC, yes.

 4   Q    So collecting information on the command side means

 5        Navy ROTC's collection of information, correct?

 6            MR. BYLER:  Objection to form.

 7   A    She would their note, yes.

 8   Q    And the phrase your case for the command is

 9        referring to Navy ROTC's case?

10            MR. BYLER:  Objection to form.

11   A    No.

12   Q    Why do you say no?

13   A    Because the implication of that sentence is that

14        the command has its own case.  The implication is

15        that there's a case and that she's my point of

16        contact for the command.  That was my

17        understanding.

18   Q    Same e-mail refers to a Navy ROTC lieutenant as an

19        investigating officer for Navy ROTC, correct?

20   A    Yes, it does.

21   Q    Lieutenant Redlawsk was not an investigating

22        officer for Purdue University, was she?

23   A    No, she was not.

24   Q    So the Navy had its investigating officer and its

25        own case, didn't it?
```

Page 61

1          MR. BYLER:  Objection to form.

2     A    They did.

3     Q    And the reason they had their own investigating

4          officer and their own case was that, as you've

5          alleged in this federal court case, the Navy has a

6          zero tolerance policy regarding sexual harassment,

7          right?

8     A    They did.

9     Q    So under the Navy's own rules,  ████████████

10         allegations needed to be investigated and

11         determined according to the Navy's rules, didn't

12         it?

13    A    That seems to be the indication.

14         MR. KEALEY:  Let's go off the record for a

15         minute to give the reporter a break.

16         THE VIDEOGRAPHER:  The time is 11:47 a.m., and

17         we are going off the record.

18                   (A short break was taken.)

19         THE VIDEOGRAPHER:  We are now on the record.

20         The time is 12:03 p.m.

21    BY MR. KEALEY:

22    Q    ████████    I want to continue with Deposition

23         Exhibit 5.  We've been talking about your meeting

24         with Lieutenant Redlawsk.

25                   (Deposition Exhibit No. 7 marked

Page 62

```
 1                    for identification.)

 2    BY MR. KEALEY:

 3    Q    I'm handing you as Deposition Exhibit 7 a document

 4         produced by the Navy with ████████ name

 5         redacted in this case.  Take a look at this

 6         document and tell me whether you recognize it.

 7    A    I recognize this document.

 8    Q    Did you prepare it?

 9    A    I did.

10    Q    On the third page, is that your signature?

11    A    That's indeed my signature.

12    Q    And is the date May 3, 2016?

13    A    It is.

14    Q    So when we're looking at Deposition Exhibit 5, the

15         following e-mail in this string train was on May 3,

16         2016, from Lieutenant Sheppard at 9:14 in the

17         morning.  In that same string, you indicated that

18         you would be available from 11 o'clock onward that

19         day after an exam.

20            So did you write this document, Deposition

21         Exhibit 7, sometime that day after you morning

22         exam?

23    A    I don't think I wrote it that morning.

24    Q    I asked whether you wrote it sometime that day

25         after your morning exam?
```

Page 63

1   A    I don't recall when exactly I wrote this document.

2   Q    Anyway you wrote it on May 3, right?

3   A    I dated it for May 3, but I don't know that I wrote

4        it on May 3.

5   Q    You might have written it earlier?

6   A    I might have.

7   Q    Why do you say that you might have?

8   A    Because I don't know.

9   Q    This document was produced by the Navy as indicated

10       at the bottom with the NSTC number.  Is this a

11       document that you supplied to the Navy?

12  A    It looks like it.

13  Q    Is this a document that you supplied to Lieutenant

14       Redlawsk?

15  A    It may have been.

16  Q    Why do you say it may have been?

17  A    Because I say here in Exhibit 5 that I have

18       material I'd like to give to somebody, Lieutenant

19       Sheppard who directs me to Lieutenant Redlawsk.

20  Q    Other than this document, Exhibit 7, that you may

21       have given to Lieutenant Redlawsk, are there any

22       other documents that you prepared for the Navy for

23       the investigation referred to in your e-mail string

24       with Lieutenant Sheppard?

25            MR. BYLER:  Objection to form, assumes facts

Page 65

1    A    Yes.

2    Q    What did you understand a performance review board

3         to be?

4    A    My understanding of a performance review board was

5         that I would have several of the command side that

6         I would meet with and I would need to provide

7         explanation to them as to why I failed my academic

8         standards two semesters in a row and plead a case

9         to remain in the ROTC.

10   Q    At the end of paragraph 1 of Exhibit 8, Commander

11        Officer Hutton states "you should plan to pay

12        tuition and fees for the fall semester, the fall of

13        2016 semester."  Do you see that?

14   A    I do see that.

15   Q    So did you understand that as of May 20, 2016, your

16        status as a Navy supported scholarship student was

17        in jeopardy?

18   A    Yes, I did understand that.

19   Q    And it was in jeopardy for academic reasons?

20   A    It was.

21   Q    Not for sexual misconduct?

22   A    No, it was not.

23   Q    Did you notify your family that you had received

24        this notice?

25   A    I don't recall whether or not I notified my family

1      specifics, though.

2  Q   Who do you believe told it to you?

3  A   I don't recall.  It may have been Lieutenant

4      Sheppard.

5  Q   In the fall of 2016, you were enrolled at a

6      different school than Purdue, correct?

7  A   That's correct.

8  Q   You were enrolled at Taylor University?

9  A   That is correct.

10  Q   And Taylor University has an ROTC unit, correct?

11  A   That's not correct.

12  Q   No army ROTC at Taylor?

13  A   There's no army ROTC at Taylor.

14  Q   Why did you go in the fall of 2016 to a school that

15      had no ROTC unit?

16  A   Because the school to which I had been in ROTC unit

17      was giving me a suspension and after discussion

18      with my parent, they thought it would be a good

19      idea to continue enrolling at a school.  And we

20      have a family history with Taylor University, and

21      they recommended I give it a try as a stepping

22      stone at the time, and I went with it.

23  Q   And you're certain there's no ROTC unit at Taylor?

24  A   I'm certain.

25  Q   Could you look into that question?

Page 71

1    A    There are ROTC unit in schools close to Taylor that

2         you can partake in while attending Taylor.  But

3         Taylor itself does not directly offer ROTC, to my

4         knowledge.

5    Q    Is Taylor University located in Upland, Indiana?

6    A    It is.

7    Q    So after you were put on academic interim leave of

8         absence ROTC and continue on in your education

9         without ROTC support, according to you, you and

10        family chose for your to enroll at a school that

11        did not have ROTC --

12   A    That is correct.

13   Q    -- where according to you, you could not continue

14        to participate in ROTC as a nonscholarship

15        participant?

16   A    Not directly via Taylor University itself.

17   Q    When you were at Taylor University, you didn't

18        participate in any school's ROTC unit, did you?

19   A    That is correct.

20   Q    So you did not, in fact, participate in any ROTC

21        unit after Purdue in an effort to regain ROTC

22        scholarship status?

23            MR. BYLER:  Objection to form, assume facts

24        not in evidence.

25   A    I thought it be a good idea to give me a breather

1    at a different school, different environment and

2    see what would come of the legal action we were

3    pursuing against Purdue University.  And, no, I did

4    not immediately go to another ROTC unit?

5  Q  You did not every go back to any ROTC unit?

6  A  No, I did not.  As my experience has shown me, in

7    my years since Purdue University, I have difficulty

8    focusing and committing to the level that was

9    demanded of the ROTC while I was there due to the

10    stress of the legal case.  And the idea was that

11    once the legal case was concluded, I would go back

12    to an ROTC unit and I would continue pursuing that

13    military plan with my full focus.

14  Q  ▮▮▮▮▮▮▮ are familiar with the concept of grit?

15  A  I am.

16  Q  What do you understand it to mean?

17  A  Grit is commitment, just being able to not bow

18    under pressure.

19  Q  Do you consider yourself to have the necessary grit

20    to serve in the United States military?

21  A  I do.

22  Q  Do you consider yourself capable of overcoming

23    adversity?

24  A  I do.

25  Q  Do you have sufficient grit to enroll in an ROTC

Page 79

```
 1   A    I think so.

 2   Q    And that was the contention that you wanted

 3        Lieutenant Redlawsk to accept?

 4        MR. BYLER:  Objection to form.

 5   A    I explained to Lieutenant Redlawsk that she had a

 6        history of erratic behavior and irrationality and

 7        that I thought because of this, she was capable of

 8        doing that.

 9   Q    Capable of lying and throwing away her Navy career?

10   A    Capable of lying, but she didn't throw away her

11        Navy career with this.

12   Q    You wanted the Navy, specifically Lieutenant

13        Redlawsk, upon receipt of your May 3, 2016

14        statement, to conclude that you were telling the

15        truth and that midshipman ███████ was lying to the

16        Navy, correct?

17   A    Correct.

18   Q    And your contention, as you sit here today, is that

19        you wanted the Navy to conclude that she was

20        willing to do that just to get away from you?

21        MR. BYLER:  Objection to form, assumes fact

22        not in evidence.

23   A    I don't think she liked having me in the same

24        social circle as her after we were no longer

25        together.  And the reasons for that are
```

Page 84

```
 1   A    Yes.   She was the one that would have had the

 2        motive.

 3   Q    What questions would you have asked her?

 4   A    Why.

 5   Q    Why what?

 6   A    Why did you do this, why are you alleging these to

 7        me, why are you making up all of these lies.

 8   Q    Anything else?

 9   A    What your suicide attempt something that made you

10        feel uncomfortable around me from there on out.

11        But I was never given the opportunity to ask those

12        questions.

13   Q    Any other questions?

14   A    None that come to mind right now.

15   Q    So the two investigation questions you wanted to

16        ask            were the ones you just stated.

17        Were those also the cross-examination questions you

18        had for her?

19   A    No.

20   Q    What were the cross-examination questions?

21   A    I would have asked her in she had any evidence of

22        her claims and I would have asked her if she had

23        any witnesses to her claims.

24   Q    Anything else?

25   A    If I had the opportunity to cross-examine a witness
```

Page 85

```
 1        in an investigation, I would have hired a lawyer to

 2        assist me in procuring that line of questioning.

 3   Q    You have hired a lawyer, did you not?

 4   A    Yes, I did.

 5   Q    Did you already discuss cross-examination questions

 6        with your hired lawyer?

 7             MR. BYLER:  Objection, assumes fact not in

 8        evidence.

 9   A    No, I did not.  They followed the layout that

10        Purdue gave us for the investigation.

11             (Deposition Exhibit No. 11 marked

12                  for identification.)

13   BY MR. KEALEY:

14   Q    ███████████     I'm handing you Deposition Exhibit 11.

15        Please take a look at Deposition Exhibit 11 and

16        tell me whether you've seen it before today?

17   A    I recognize this.

18   Q    This is August 1 through 17 e-mail string between

19        you and ROTC Officer Willstatter from August of

20        2016.  I want to focus for the moment on the first

21        e-mail on August 1 at 10:17 p.m.

22             MR. BYLER:  On the second page.

23             MR. KEALEY:  First e-mail on the second page.

24             MR. BYLER:  Okay.  Second page.

25             MR. KEALEY:  It's the third page actually.
```

1   A    I do not.

2   Q    If you volunteered the texts to Purdue and you

3        volunteered your explanation of them, presumably

4        you took that step because you thought they were

5        evidence that needed to be considered?

6             MR. BYLER:  Objection to form, assumes facts

7        not in evidence.

8   A    My understanding from the Navy was that they relied

9        on the Purdue investigation for what they were

10       going to look at.  They weren't conducting their

11       own internal investigation.  Lieutenant Redlawsk

12       was considered the investigating officer, but the

13       extent of her involvement with any investigation

14       was simply looking at the production that Purdue

15       had and then making a determination based off of

16       the determine that Purdue had already made.

17  Q    That's not what you said in Deposition Exhibit 11

18       in your August 1 e-mail to Officer Willstatter, is

19       it?  In the e-mail we've already looked at, you

20       said that you have already sent everything I have

21       on my case to you/Lieutenant Redlawsk.

22            Doesn't that suggest to you that Lieutenant

23       Redlawsk was available to receive whatever you had

24       to give as evidence?

25            MR. BYLER:  Objection to form, assumes facts

Page 91

```
 1        not in evidence.

 2   A    Repeat the question, please.

 3   Q    Doesn't your statement in that August 1 e-mail

 4        indicate that Lieutenant Redlawsk was available to

 5        receive the very same text messages that you

 6        provided to the Purdue investigators?

 7            MR. BYLER:  Objection to form, assumes facts

 8        not in evidence.

 9   A    One more time, please.

10            MR. KEALEY:  I'll ask the reporter to read it

11        back.

12                (The last question was read.)

13   A    Able to receive from me?

14   Q    Yes.

15   A    It does.

16   Q    ███████        I want to now turn to one more paragraph

17        in the amended complaint and then we'll take our

18        lunch break.  Paragraph 31 of your amended

19        complaint, you allege your history of sexual

20        intercourse with ███████████████        do you see that?

21   A    I do.

22   Q    In this paragraph you allege that the two of you

23        had consensual sexual relationship that included

24        having sexual intercourse 15 to 20 times in the

25        three-month period of October to December of 2015.
```

Page 115

```
 1            mental fortitude and why I thought she was not a

 2            credible witness.  And everything but texts was

 3            ignored by the investigators.

 4     Q     What does ███████████ mental fortitude have to do

 5            with your contention?

 6     A     Her fortitude has to do with the allegations.

 7     Q     Well, you're alleging that she intentionally framed

 8            you for sexual assault?

 9     A     Yes.

10     Q     What does her mental fortitude have to do with

11            that?

12     A     Perhaps fortitude is not the right word.

13     Q     What does your contention that she was suicidal

14            have to do whether she intentionally framed you for

15            sexual assault?

16     A     As I said before, I think that the suicide attempt

17            was something that changed out relationship.  And

18            when I reported it, after our relationship was

19            over, I think that upset her.  And she decided

20            months later that she was going to get back at me

21            for that.

22     Q     Why did you make a report of suicide attempt after

23            your relationship was over?

24     A     Because when the attempt happened, I didn't know

25            what to do.  She was very mentally unstable around
```

1       the attempt and after the attempt, and she never

2       acted the same way.  But I debated for a while

3       whether it was a wise decision to report it because

4       I didn't want to further destabilize her mental

5       health, given that she had just tried to jump off

6       of a parking garage in front of me on the Sunday

7       before finals week.

8           So after about one month at the end of

9       January, I gathered up my courage and went to RA

10      and told them, hey, this is what's going on and I'm

11      really concerned for this girl.  And I don't know

12      what's on with her, but I want it to be aware just

13      in case that could be something that could help

14      her.

15          I reported that to Dillion Sinks and it's

16      inside the very large investigation report document

17      with many copies of texts.

18  Q   You testified a minute ago that you made a report

19      about ▮▮▮▮▮ after you relationship was over, not

20      after she allegedly attempt to commit suicide, but

21      after the relationship was over, right?

22  A   Yes.

23  Q   You did so in mid February, not January, right?

24  A   The date I remember seeing was late January.

25  Q   So somewhere between six and eight weeks after the

1        supposed incident in mid December?

2    A   Yes.

3    Q   Would you agree with me that if somebody was

4        concerned about suicide risk would not wait six to

5        eight weeks to report it?

6    A   No.

7    Q   You'd wait and see whether there was a suicide

8        during the six or eight weeks?

9    A   I was worried that doing that would further

10       destabilize her because the reasoning she was

11       giving me up to her suicide attempt was that she

12       was afraid she wasn't going to make in the Navy,

13       she wasn't going to get her grades where she needed

14       them to be, that she wasn't good enough to keep

15       following this path she had, saying she didn't even

16       know if she wanted to, all over the place.

17           And in my mind, if I were to go to the school

18       and say hey, this girl just tried to kill herself

19       and then the school were to go to her right away, I

20       think that would have upset her even more and

21       potentially put her at more risk.

22   Q   That's exactly what you did.  You went to the

23       school and said that exact thing, didn't you?

24   A   One month later when I thought it had calmed down.

25   Q   You went and reported that she was a suicide risk

Page 118

```
 1        after you thought she was no longer a suicide risk?
 2   A    I didn't report a suicide risk.  I reported the
 3        attempt to the school.
 4   Q    You reported the attempt to the school because you
 5        thought she needed help because you thought she was
 6        a suicide risk?
 7   A    Okay.  Yes.
 8   Q    And you did that somewhere between six weeks and
 9        two months after you concluded that she was a
10        suicide risk?
11   A    Yes.
12   Q    And you did that after the relationship had ended?
13   A    Yes.  It was several weeks after the relationship
14        had ended.
15   Q    In Deposition Exhibit 13, please turn to the page
16        that's marked at the bottom PU 262.  Please look
17        through the text messages on page 262 and tell me
18        when you've done so.
19   A    I've read it.
20   Q    Did the investigators discuss this sets of texts
21        with you?
22   A    They did.
23   Q    What did they discuss with you?
24   A    They pushed me, saying that this was evidence of a
25        sexual allegation.
```

Page 119

```
 1   Q    What exactly did they say?

 2   A    They asked me about the texts and they wanted to

 3        know what my explanations for them were.

 4   Q    Did you consider the investigators asking you about

 5        the texts and your explanation for them to be an

 6        act of bias?

 7   A    Could you say it again one more time?

 8   Q    Did you consider the investigators asking you about

 9        the texts on page 262 and your explanation for them

10        to be an act of bias?

11   A    The question itself being an act of bias, no.

12   Q    So it was a reasonable nonbiased step for the

13        investigators to read these texts and have

14        questions about them?

15   A    Yes.

16   Q    And the reason was a reasonable nonbiased reaction

17        for the investigators to read these texts and have

18        questions about them is that the texts refer at one

19        point to you touching ███████████

20   A    Yes.

21   Q    Which is a sexual contact?

22   A    No.

23   Q    Not possible for any person to read a reference to

24        you touching your girlfriend as a reference to

25        sexual contact?
```

Page 123

1      sort of scars that leaves on someone emotionally.

2      But I was very apologetic this whole time,

3      especially after the suicide attempt because I was

4      scared that she was becoming more unstable and me

5      being the person I was at the time, I thought that

6      apologizing was the right thing to do.

7           And I had never had any experience with a

8      relationship before, and I felt if I was the way I

9      was, which was apologetic and trying to take

10     responsibility for things and -- I felt responsible

11     for all the bad stuff that was happening to her in

12     her head and the suicide attempts because I felt

13     that in the relationship, I had been inadequate in

14     some way or I had done something to spur that.

15          And that -- I beat myself up for that for a

16     couple of years after that until I finally

17     reflected enough to realize that's now it was.  But

18     she was very push, pull and manipulative which

19     caused me to apologize a lot in the texts.  And

20     that's what I explained to the investigators was

21     that I was overly apologetic about things.

22          I think that context is important.

23  Q  Let's take a look back at Deposition Exhibit 7.

24     The first page of Deposition Exhibit 7 in the

25     second paragraph, you are discussing a date in mid

Page 124

1    December; do you see that?

2    A    I do.

3    Q    And you state on that date in mid December, I woke

4         up and placed my hand on ███████████ knee out

5         of affection.

6    A    Uh-huh.

7    Q    Yes?

8    A    Yes.

9    Q    Is that still your testimony today?

10   A    It is.

11   Q    And your testimony today is that the 10:22 p.m.

12        text message on December 28, in which ██████████

13        refers to wake up to you touching me was a

14        reference to that same event described in

15        Deposition Exhibit 7?

16   A    Yes.

17   Q    And that your next line on page 262 of Deposition

18        Exhibit 13, in your 10:37 p.m. text message is you

19        apologizing for placing your hand on her knee out

20        of affection?

21   A    Yes.

22   Q    And that texts exchange is not a reference to you

23        getting behind in your schoolwork?

24   A    It's reference to both, the one after it, the one

25        at 10:56.

Page 128

```
 1    A     Lying about schoolwork.

 2    Q     And touching?

 3    A     Yes.

 4    Q     So the phrase I violated you and never should have

 5          was referring to, according to you at least in part

 6          to, touching?

 7    A     Yes, because after her suicide attempt, she put up

 8          all of these boundaries and she freaked out when I

 9          just did basic nonsexual touching.  And I didn't

10          know what was going through her head, but this is

11          right after she has a suicide attempt.

12              She freaks out again and that makes me really

13          freaked out that she's going to go and do something

14          again.  So, yes, I felt very worried about that

15          and, of course, I apologized because I didn't want

16          her to be going off and doing something again.

17                  (Deposition Exhibit No. 14 marked

18                       for identification.)

19    BY MR. KEALEY:

20    Q     ▮▮▮▮▮▮▮▮  I'm handing you Deposition Exhibit 14.

21          Deposition Exhibit 14 is a Purdue University

22          record.  It's a report by somebody named Leanne

23          DeLosh.  And it has your name and ▮▮▮▮▮▮▮▮▮▮

24          name on it.  It has the date of February 16, 2016.

25                  MR. BYLER:  Just for the record, there's no
```

Page 130

```
 1       he approached his friend's RA who reported his

 2       behavior to his supervisor, and that would have

 3       happened prior to this document.

 4   Q   Is that what you did, you approached your friend's

 5       RA?

 6   A   It was Dillion Sinks.

 7   Q   You approached somebody else's RA?

 8   A   Yes.

 9   Q   Why didn't you approach your own RA?

10   A   I don't recall why.

11           MR. BYLER:  Rather than unbates document,

12       maybe you should have Purdue Bates stamp 32 to 33,

13       which is a University document, showing the report

14       that ████ made.

15              (Deposition Exhibit No. 15 marked

16                    for identification.)

17   BY MR. KEALEY:

18   Q   ████████     I'm handing you a document labeled

19       Deposition Exhibit 15.  Do you recognize this

20       document?

21   A   I do.

22   Q   Who wrote it?

23   A   I did.

24   Q   Every word of it?

25   A   I had help.
```

Page 131

| | | |
|---|---|---|
| 1 | Q | From your lawyer? |
| 2 | A | No. |
| 3 | Q | From who? |
| 4 | A | From my aunt. |
| 5 | Q | Who's is she to you? |
| 6 | A | Her name is Page Cunningham. |
| 7 | Q | Had she had any other involvement in this matter? |
| 8 | A | In this case as a whole? |
| 9 | Q | Yes. |
| 10 | A | She is a third party that I consult from time to |
| 11 | | time. |
| 12 | Q | Did she have -- is there a professional reason why |
| 13 | | you consult her? |
| 14 | A | Because she's family and she's a lawyer. |
| 15 | Q | When did she first get involved with this matter |
| 16 | | with you? |
| 17 | A | It likely would have been in the summer when I was |
| 18 | | doing the appeals.  She may have been involved |
| 19 | | sooner, but I don't think so, to my recollection. |
| 20 | Q | In the first paragraph of Deposition Exhibit 15, |
| 21 | | there is a sentence that reads as follows.  "I |
| 22 | | never penetrated ███████ while she was sleeping |
| 23 | | without her consent digitally or otherwise." |
| 24 | | Did you write that sentence? |
| 25 | A | I did. |

Page 132

1    Q    What do you mean by the words while she was

2         sleeping without her consent?

3    A    I mean what's there.

4    Q    Did you ever penetrate her while she was sleeping

5         with her consent?

6    A    No, I did not.

7    Q    Why doesn't the sentence just say I never

8         penetrated ██████████ while she was sleeping?

9    A    It could have read that, but it did not.

10   Q    You're not contending that she ever consented to

11        penetrating her while she was asleep?

12   A    No.

13   Q    What is this document?

14   A    Exhibit 15?

15   Q    Yes.

16   A    It's an appeal to the final determination that

17        Alysa Rollock was supposed to read and get back to

18        me on it.

19   Q    Did this letter state everything that you wanted

20        Alysa Rollock to consider in your appeal from Dean

21        Sermersheim's discipline determination?

22   A    Could you please repeat that question?

23   Q    Was this letter from you to Ms. Rollock state

24        everything you wanted her to consider as your

25        grounds for appeal from Dean Sermersheim's

Page 133

```
 1        discipline determination?
 2   A    I think so.
 3   Q    And you had the assistance of a lawyer to ensure
 4        that you would fully state everything you wanted
 5        considered, correct?
 6   A    At the time, yes.
 7   Q    In fact, at that time you had the assistance of two
 8        lawyers Ms. Cunningham and Mr. Connect, right?
 9   A    Uh-huh.
10   Q    Yes?
11   A    Yes.  Well, Mr. Connect, to my memory, was
12        primarily there to aid me through the process of
13        the investigation itself.  He was present for the
14        advisory committee on equity, a 30-minute meeting
15        that I joined.  And he basic -- gave me basic
16        guidance on how I should continue with the process.
17   Q    Where in Deposition Exhibit 15 do you describe any
18        behavior of the investigators that you thought was
19        based on antimale bias?
20   A    In paragraph 3 I was never provided with the
21        evidence that was supposed to support this
22        allegation, which prevented me from adequately
23        preparing a defense to the false accusation.  The
24        investigator report was never supplied during the
25        entirety of the investigation and through the
```

1      the investigation and determination of the

2      allegation against you were different for you than

3      they would have been for a woman accused of sexual

4      assault, are you?

5  A   No, I did not argue that in this document.

6  Q   And you're not arguing that in this case, are you?

7  A   I am arguing antimale bias, which would imply as

8      such.

9  Q   I'm not talking about anything implied.  I'm asking

10     you whether you're saying that in this case that

11     Purdue has two different set of procedures, one for

12     accused men and a different one a accused women?

13  A   According to Purdue's official proceedings, they're

14     the same.

15  Q   And you don't have any reason to believe that

16     they're different?

17  A   Well, I do based on how I was treated when the

18     allegations were initially leveled against me and I

19     was immediately bared from certain parts of the

20     campus.  And she was not given any concessions in

21     the sense that I was or restrictions.  She was

22     given concessions; I was not.

23  Q   You're saying that the accuser was treated

24     differently than the accused?

25  A   Yes, I was.

Page 138

```
 1    Q    You're not saying that an accused female would have

 2         been less restrictive or restricted differently

 3         than you are or were?

 4    A    No, I'm not arguing that.

 5    Q    And, in fact, the Navy maybe also put you under

 6         restrictions that they did not put midshipman

 7         ████████ under, correct?

 8    A    Yes.

 9    Q    You're not accusing the Navy of antimale bias?

10    A    The Navy did not have an investigation -- an

11         independent investigation against me, so, no, I do

12         not.

13    Q    With respect to the restrictions that the Navy

14         placed on you and not placed on midshipman ████████

15         you're not accusing the Navy of antimale bias, are

16         you?

17    A    No.

18    Q    Thank you.  ████████  the lawyer who assisted you

19         with Deposition Exhibit 15, who you identified as

20         your aunt is a graduate of Northwestern Law School,

21         correct?

22    A    I believe so.

23    Q    Is currently the president of Taylor University?

24    A    Yes.

25    Q    You would consider herself a highly accomplished
```

Page 142

```
 1        report about her mental health?

 2   A    No, not to my recollection.

 3   Q    Can you know point me to any document anywhere that

 4        shows that anybody made ███████ aware in or

 5        before April of 2016 that you had made a report to

 6        Purdue about her mental health?

 7   A    In Exhibit 14, it says in the third paragraph down,

 8        ████ spoke to that supervisor and she reassured him

 9        that ██████ was getting help, but obviously could

10        not and did not give details.

11   Q    What in that sentence refers to telling ███████

12        about a report by you?

13   A    I assume it would be fairly obvious since I was the

14        only one present for the suicide attempt.

15   Q    Anything else?

16   A    No.

17   Q    So in Deposition Exhibit 16, when you are appealing

18        to Vice President Rollock, you are in your words

19        only speculating about a retaliatory motive, aren't

20        you?

21            MR. BYLER:  Objection, the document speaks for

22        itself.

23   A    Yes, I'm speculating.

24   Q    You're not referring to any evidence that you had

25        provided to Purdue to show that ████████ knew of
```

Page 143

```
 1        your reports, are you?

 2    A   No.

 3    Q   So as of July 2016, after meeting with

 4        investigators and having the assistance of two

 5        lawyers and going through two appeals regarding ███

 6        ███████ allegations, you did not possess or

 7        supply any evidence to show that she had a

 8        retaliatory motive based on her speculated

 9        knowledge of your mental health reports on her?

10            MR. BYLER:  Objection to form.

11    A   No, I did not, and I was not permit to have contact

12        with her from the beginning of the investigation.

13        So if I had wanted to seek that out directly, it

14        would have been in violation of the orders I was

15        given pending the University investigation.

16    Q   And 185 plus weeks into this case, you have not

17        seen any evidence collected on your behalf in this

18        case to show that ███████ knew of any mental

19        health report made by you on her?

20            MR. BYLER:  Objection, asked and answered.

21    A   I think Exhibit 14 is a fairly logical piece to

22        look at and deduce that she figured that out

23        because there's only one person there for her

24        suicide attempt, which means the only person that

25        could have reported or told someone else to report
```

Page 144

```
 1              would have been me, so Exhibit 14.
 2     Q    Actually you yourself have testified today and have
 3          written it repeatedly, that you contend that ███
 4          ████████ had a history of suicide attempts?
 5     A    Yes.
 6     Q    Not involving any one person?
 7     A    She alleged that her suicide attempts were prior to
 8          attending Purdue University.
 9     Q    So there are other people that who knew something
10          about ██████████ mental health history,
11          including ████████████ right?
12     A    Yes.
13     Q    And they could have easily been addressing that
14          question without input from you, based on her
15          history as you've described it, correct?
16              MR. BYLER:  Objection to form.
17     A    Please repeat.
18     Q    ████████████ didn't need a report by you in order to
19          seek mental health assistance if she wanted to, did
20          she?
21     A    No, she did not.  But with her behavior after her
22          suicide attempt, I did not think she would seek it.
23     Q    So you were asking Purdue University to rely upon
24          your speculation of a retaliatory motive and you're
25          contending in this case that because Ms. Rollock
```

Page 145

```
 1        did not accept your invitation to speculate on that

 2        subject, that Ms. Rollock acted on the basis of

 3        antimale bias, right?

 4             MR. BYLER:  Objection to form, arguing with

 5        the witness.

 6   A    Please repeat the question one more time.

 7   Q    Are you contending that because Ms. Rollock did not

 8        accept your invitation to speculate about a

 9        retaliatory motive on the part of ███████████ that

10        Ms. Rollock denied your appeal based on antimale

11        bias?

12             MR. BYLER:  Objection to form.

13   A    I don't recall claiming antimale bias in any of the

14        appeals.  Antimale bias is something that I claim

15        after I was suspended and after -- well after I was

16        suspended, not in the summer.

17   Q    By the time you wrote your two appeals to Ms.

18        Rollock, you were already suspended, weren't you?

19   A    I was.

20   Q    So my question, again, is because Ms. Rollock did

21        not accept your invitation to speculate about a

22        retaliatory motive, you're accusing her of antimale

23        bias?

24             MR. BYLER:  Objection to form.

25   A    That is what I know.
```

1  don't remember exactly what they said about the

2  bystander training.

3  Q  But you're clear in your mind you don't want to do

4  it?

5  A  Yes, because when I read them, I decided I didn't

6  want to do it.  I didn't think it was a good idea.

7  Q  You think it's prerogative to decide what you

8  should and should not be asked to do as a student

9  at Purdue University?

10  A  Given the circumstances of my dismissal, I don't

11  think it would be wise to go back to Purdue right

12  now.

13  Q  That wasn't my question.  My question is are you

14  contesting that it's fair and reasonable for Purdue

15  to ask you to undergo bystander training?

16  A  How is this a follow-up question to the Navy, not

17  being in the Navy?

18  Q  You testified that you were not in the Navy because

19  you were waiting for your case to be over.

20  A  Uh-huh.

21  Q  You've also testified that's why you're not in

22  ROTC.

23  A  Uh-huh.

24  Q  Purdue has a Navy ROTC unit?

25  A  It does.

Page 169

1    Q    And you said you wanted to be back at Purdue?

2    A    Yes.

3    Q    So if you re-enroll at Purdue, which you are in

4         good standing to do and reapply to Navy ROTC, as

5         far as you know, you might be accepted into the

6         Navy ROTC, correct?

7    A    Might be, but I'm not confident in it.

8    Q    You don't know because you haven't tried, do you?

9              MR. BYLER:  Objection.  Don't need to get

10         argumentative with the witness.

11             MR. KEALEY:  The witness is wondering how this

12         is a follow-up.  So I'm explaining that to him.

13   A    I appreciate the explanation.  You are correct.  I

14        don't know because I have not tried.

15   Q    If the Navy asked to take bystander training, would

16        you take it?

17             MR. BYLER:  Objection, hypothetical.

18   A    I don't know.

19   Q    If the Navy asked you to meet with somebody on the

20        Navy ROTC staff monthly, would you comply with that

21        instruction?

22             MR. BYLER:  Objection, facts not in evidence.

23   A    I don't think that's a fair parallel to trial

24        because I was subject to that bystander training

25        upon re-entry to Purdue because of my suspension.

Page 171

1   Q   What sanction would have been proportionate?

2   A   Upon re-entry.

3   Q   What sanction would have been proportionate?

4   A   Please give more context.

5   Q   Please look at paragraph 28 of the amended

6       complaint, Exhibit 1 -- excuse me, page 28

7       paragraph 47.  And at the bottom of page 28 you

8       allege "the sanction was disproportionate."

9           I'm asking what sanction would have been

10      proportionate?

11  A   I think it's meant to say that these sanctions were

12      disproportionate.

13  Q   Once again, my question was and is what sanction

14      would have been proportionate?

15  A   I think proportionate sanctions would have simply

16      been a re-entry course and meeting with Chris

17      Greggila.

18  Q   So you're contending that Purdue should have

19      imposed a sanction that you're currently refusing

20      to honor?

21          MR. BYLER:  Objection to form.

22  A   I'm looking at the sanctions as a whole, and I

23      think as a whole it is excessive.

24  Q   You're contending that it's excessive because a

25      similarly situated accused woman would have been

Page 172

1          sanctioned differently?

2               MR. BYLER:  Objection to form.

3    A    I think so.

4    Q    On what basis do you make that allegation?

5    A    The overall trend of how men and women are treated

6         on college campuses.

7    Q    Have you made some study of that subject?

8    A    I read into it.

9    Q    What did you read?

10   A    I've read of cases where men have similar

11        experiences to mine and they became vilified and

12        kicked out of school with no due process.  And I've

13        read of different cases where women where

14        immediately believed upon their claims, and some of

15        them, they later admit that they were lying.  And

16        even then, sometimes the school still sides against

17        the men.

18   Q    We're talking about Purdue University in similarly

19        situated women accused of sexual assault and found

20        to have committed sexual assault and sanctioned for

21        sexual assault at Purdue University; have you read

22        something on that?

23   A    I have not.

24   Q    You're not aware of any such woman who was the

25        recipient of a lesser sanction than you for conduct

Page 173

```
 1        comparable to yours?

 2             MR. BYLER:  Objection, form.

 3   A    Not at Purdue University.

 4   Q    Not anywhere?

 5   A    No, not anywhere.

 6   Q    ████████    tell me where in your amended complaint

 7        you disclose to the court that the Navy disenrolled

 8        you for failing to remain enrolled at Purdue

 9        University?

10             MR. BYLER:  Can I have that question read?

11                  (The last question was read.)

12             MR. BYLER:  I'm going to object the question.

13        I don't understand it.  It's incomprehensible, but

14        the witness can do what he can with it.

15   BY MR. KEALEY:

16   Q    Let me make it a little easier for you, ████████

17        Would you agree with me that the word disenrollment

18        does not appear in your 67 page complaint?

19   A    Give me a few minutes here.

20   Q    ████████    do you ever using the word disenrolled in

21        any complaint that you filed in this case?  Are you

22        aware that I've asked you a question?

23   A    I am.

24   Q    Could you please answer it?

25   A    I'm aware of discussing disenrollment.
```

Page 183

1    A    In both the military and commercial, across the

2         board.

3    Q    If you're fired from a job or the reason you're not

4         in the job is that your employer told you that

5         you're no longer welcomed?

6    A    Yes.

7    Q    That's different from resigning, isn't it?

8    A    It is.

9    Q    The Navy told you that you were not welcome at

10        Purdue NROTC, correct?

11   A    They told me I was no longer eligible for Purdue

12        NROTC.  They never told me I was no longer welcomed

13        there.

14   Q    They told you you were not longer part of their

15        Navy ROTC unit, didn't them?

16   A    Yes, but they did not infer hostility in saying

17        you're no longer welcomed here.

18   Q    I'm not suggesting that inferred hostility.  I'm

19        just saying that you were no longer part of their

20        operation?

21   A    Correct.

22   Q    And that was their decision?

23   A    It was a decision they had to make.

24   Q    That was their decision, not your decision?

25   A    Correct.

Page 184

1    Q    It was their decision based on Navy regulations?

2    A    Yes.

3    Q    And it was their decision based on the simple fact

4         that you could not be in a Navy ROTC program at

5         Purdue University when you were not a student at

6         Purdue University, correct?

7    A    That is correct.

8              (Deposition Exhibit No. 24 marked

9                   for identification.)

10   BY MR. KEALEY:

11   Q    ██████████    I'm handing you Deposition Exhibit 24.

12        Please look at this document and tell me whether

13        you recognize it?

14   A    Yes, I understand this.

15   Q    You've seen it before?

16   A    I have.

17   Q    Did you receive it on or about May 31 2016?

18   A    I did.

19   Q    And at that time you had assistance of counsel,

20        Mr. Connect?

21   A    Yes.

22   Q    Did you share this letter with Mr. Connect?

23   A    I think I did.

24   Q    Upon receiving this letter, did you expect that at

25        the panel meeting to which you were being invited,

Page 185

| | | |
|---|---|---|
| 1 | | you would have an opportunity to give a statement? |
| 2 | A | I did. |
| 3 | Q | And when you got to the panel meeting, did you give |
| 4 | | a statement? |
| 5 | A | I did. |
| 6 | Q | Did you write it out? |
| 7 | A | No, I did not. |
| 8 | Q | So you have no record of what you said to the |
| 9 | | panel? |
| 10 | A | No. |
| 11 | Q | When you got to the panel meeting, what did you |
| 12 | | intend to communicate to the panel? |
| 13 | A | I intended to reaffirm my innocence and explain my |
| 14 | | side of the allegations and hopefully persuade some |
| 15 | | minds because I was looking for opportunities to |
| 16 | | help myself in this case.  And they give me this |
| 17 | | opportunity that ended up not going anywhere. |
| 18 | Q | What was the primary point you wanted to make to |
| 19 | | sway minds? |
| 20 | A | I don't know that there was a primary point. |
| 21 | Q | As you sit here today, you can't recall what was |
| 22 | | the most important point you wanted to communicate |
| 23 | | the panel? |
| 24 | A | My innocence. |
| 25 | Q | Just to assert your innocence? |

Page 186

1   A   I believe I gave an overview and those present had

2       copies of the investigator report and then they

3       began asking me questions from the investigator

4       report.

5   Q   What questions did they ask you?

6   A   They asked me -- I think Dean Sermersheim lead it

7       and two of the three present had never looked at

8       the report before.  So they were following along

9       with what was being asked.  But the questions were

10      regarding the text messages that I provided and he

11      overall allegations, the list of allegations.

12  Q   So the questions directed to you were about the

13      evidence and the allegations?

14  A   Correct.

15  Q   And the primary evidence they were asking you about

16      was the text messages?

17  A   Yes.

18  Q   Was there any other evidence that you expected them

19      to ask you about?

20  A   The only other documents that I had were character

21      references -- I don't know that I brought those

22      with me -- and my written explanations refuting the

23      other allegations.  And I think that would have

24      been the only piece of evidence that questions were

25      asked from.

Page 187

```
1    Q    My question was slightly different.  It was not was
2         that the only evidence question were asked from.
3              My question was was there any other evidence
4         you expected questions on?
5    A    Not to my recollection.  I didn't know of any other
6         evidence.
7    Q    At the hearing, did you have an opportunity to
8         explain the text messages?
9    A    I did.
10   Q    Were you cut short in your opportunity to explain
11        the text messages?
12   A    I don't believe so.
13   Q    There were three panel members.  Did all of them
14        ask you questions about the text messages?
15   A    I don't think so.
16   Q    One of them was an older gentleman, one of them
17        maybe middle aged to a younger gentleman and then
18        the third one a woman; do you remember that?
19   A    I don't remember all of them.
20   Q    Do you remember there being two men and a woman?
21   A    I think so.
22   Q    Do you remember whether the questions you received
23        were from men or women or both?
24   A    No, I don't remember.  I remember one the men
25        asking me, but I don't remember if the other two
```

Page 188

1          did.

2     Q    Did the Dean ask you any questions?

3     A    I think so.

4     Q    What questions did she ask you?

5     A    I don't remember.

6     Q    Did you take offense to any of the questions that

7          were asked of you?

8     A    I did not like the way in which they acted with

9          hostility and they seemed to be leading all the

10         questions.  I don't remember what the questions

11         were exactly, though.

12    Q    You thought you were being cross-examined?

13    A    I felt that the questions were loaded.

14    Q    You felt that you were being cross-examined?

15    A    Is that what cross-examine means?

16    Q    Well, you alleged in your complaint many things

17         about cross-examination, such as that you wanted

18         the opportunity to cross-examine ███████████

19              So I'm asking if you felt cross-examined by

20         the panel?

21    A    I don't know.

22    Q    Please turn to paragraph 41 of the complaint,

23         Deposition Exhibit 1.  Paragraph 41 is on page 24.

24              In paragraph 41 of your amended complaint, you

25         allege that a Purdue employee, Monica Bloom, wrote