**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF JOHN DOE'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**NESENOFF & MILTENBERG, LLP**
**Philip A. Byler, Esq.**
**Andrew T. Miltenberg, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
pbyler@nmllplaw.com
amiltenberg@nmllplaw.com
*Attorneys for Plaintiff John Doe*

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF MATERIAL UNDISPUTED FACTS ........................................... 1

    A.    Parties ................................................................................................. 1

    B.    Background: John Doe-Jane Doe's Dating Relationship ........................ 3

    C.    April 1-10, 2016: CARE; Sexual Assault Awareness Month; Jane Doe's Allegations ........................................................................................... 3

    D.    April 11, 2016: John Doe Notified of Jane Doe's Allegations ............... 4

    E.    April 20, 2016: John Doe's Written Response ..................................... 7

    F.    April 24-May 20, 2016: Investigation .................................................. 9

    G.    June 6, 2016: Meeting with Panel of the Advisory Committee on Equity and Dean Sermersheim ......................................................................... 12

    H.    June 14, 2016: Dean Sermersheim's Determination and Sanctions ...... 13

    I.    June 23, 2016: John Doe's First Appeal ............................................. 14

    J.    June 28, 2016: Vice President Rollock's First Appeal Decision ........... 16

    K.    June 29, 2016: Defendant Dean Sermersheim's  Re-Issued Determination and Sanctions .......................................................................................... 16

    L.    July 10, 2016: John Doe's Appeal of Re-Issued Determination and Sanctions ... 18

    M.    July 22, 2016: Vice President Rollock's Second Appeal Decision ...... 21

    N.    Disenrollment From Navy ROTC ....................................................... 23

    O.    Post-disciplinary Case Review of the Investigation Report; Location of Files; Intention to Return ....................................................................... 29

SUMMARY JUDGMENT STANDARD ............................................................... 30

ARGUMENT .................................................................................................... 31

I.    Undisputed Material Facts in the Summary Judgment Record Establish That John Doe Had a Fourteenth Amendment Stigma-Plus Liberty Interest and That Defendants Deprived John Doe of That Liberty Interest Without Due Process When Finding John Doe Guilty of Sexual Misconduct and Suspending Him ................................. 31

i

A.    John Doe Has a Stigma-Plus Liberty Interest ....................................... 31

    1.    The Law of the Case: Judge Barrett on Stigma-Plus Liberty Interest ...... 31

    2.    The Material Undisputed Facts Establish John Doe's Stigma- Plus Liberty Interest ................................................................................... 33

B.    Purdue Denied Due Process in Finding John Doe Guilty .................................... 35

    1.    The Law of the Case: Judge Barrett on the Requirements of Due Process ..................................................................................... 36

    2.    The Material Undisputed Facts Establish Purdue Denied Due Process in Finding John Doe Guilty ........................................................... 37

        a.    The Due Process Violations ........................................................ 37

            (i)    Purdue Never Provided John Doe with the Evidence and the Investigation Report During the Disciplinary Case ... 37

            (ii)    No Real Hearing .............................................................. 39

            (iii)    Pre-judgment Based on Complainant's Accusation; Credibility Determinations Without Proper Basis ........... 40

        b.    Why Due Process Matters ............................................................ 42

    1.    The Court Should Order the Injunctive Relief of the Removal of Conditions on Readmission and the Expungement of the Disciplinary Finding and Records Sought in the Second Amended Complaint ........... 42

II.    Defendants' Amended Counterclaim Should Be Dismissed as a Matter of Law ............. 43

A.    Defendants Are Seeking Declarations Impermissibly Based on State Law or Are Contrary to the Law of the Case ...................................................................... 43

B.    Denial of Due Process Precludes Defendants' Amended Counterclaim ............. 44

C.    The Case Law in The Seventh Circuit Establishes That Defendants' Amended Counterclaim Should Be Dismissed as a Misuse of the Declaratory Judgment Act ...................................................................................... 45

CONCLUSION ................................................................................................... 47

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................................................ 30

*Cincinnati Specialty, Underwriters Ins. Co. v. DMH Holdings, LLC,*
  2013 WL 683493 (N.D. Ind. Feb. 22, 2013) ............................................... 46

*DeBartolo v. Healthsouth Corp.,*
  569 F.3d 736 (7th Cir.2009) ........................................................................ 46

*Dietchweiler by Dietchweiler v. Lucas,*
  827 F.3d 622 (7th Cir. 2016) ....................................................................... 36

*Doe v Purdue,*
  928 F.3d 652 (7th Cir. 2019) ............................................................. passim

*Doe v. Baum,*
  903 F.3d 575 (6th Cir. 2018) ...................................................................... 39

*Doe v. Cummins,*
  662 F. App'x 437 (6th Cir. 2016) .............................................................. 42

*Doe v.* Miami,
  883 F.3d 579 (6th Cir. 2017) ...................................................................... 37

*Doe v. Univ of Cincinnati,*
  872 F.3d 393, 401 (6th Cir. 2017) ............................................................. 41

*Doyle v. Camelot Care Ctrs.,*
  305 F.3d 603 (7th Cir. 2002) ...................................................................... 33

*Dupuy v. Samuels,*
  397 F.3d 493 (7th Cir. 2005) ...................................................................... 32

*Elliott v. Hinds,*
  786 F.2d 298 (7th Cir. 1986) ...................................................................... 42

*Ex Parte Young,*
  209 U.S. 123 (1908) ...................................................................................... 42

*Flint v. Dennison,*
  488 F.3d 816 (9th Cir. 2007) ...................................................................... 42

*Green Bay Packaging, Inc. v. Hoganson & Assoc., Inc.*,
   362 F.Supp. 78 (N.D.Ill. 1973) ................................................................ 45

*Harney v. Speedway SuperAmerica, LLC.*,
   526 F.3d 1099 (7th Cir. 2008)................................................................ 30

*Heller Fin., Inc. v. Midwhey Powder Co., Inc.*,
   883 F.2d 1286 (7th Cir. 1989)................................................................ 47

*Hinkle v. White*,
   793 F.3d 764 (7th Cir. 2015)................................................................. 31

*Hojnacki v. Klein–Acosta*,
   285 F.3d 544 (7th Cir. 2002)................................................................. 32

*Johnson v. Western State Colorado University*, 7
   1 F. Supp.3d 1217 (D. Colo. 2014) ........................................................ 42

*Joint Anti-Fascist Refugee Comm. v. McGrath*,
   341 U.S. 123 (1951) ............................................................................. 36

*Lawson v. Sheriff of Tippecanoe Cty., Ind.*,
   725 F.2d 1136 (7th Cir. 1984)................................................................ 32

*Lilly v. Virginia*,
   527 U.S. 116 (1999) ............................................................................. 41

*Lincoln Nat'l Corp. v. Steadfast Ins. Co.*,
   2006 WL 1660591 (N.D. Ind. June 9, 2006)............................................ 47

*Logan v. Com. Union Ins. Co.*,
   96 F.3d 971 (7th Cir. 1996)................................................................... 30

*Manago v. Auto-Owners Ins. Co.*,
   2018 WL 620381 (N.D. Ind. Jan. 30, 2018)............................................ 46

*Mann v. Vogel*,
   707 F.3d 872 (7th Cir. 2013)................................................................. 31

*Marshall v. Jerrico, Inc.*,
   446 U.S. 238 (1980) ........................................................................ 42, 45

*Ortho-Tain Inc., v. Rocky Mountain Orthodontics, Inc.*,
   2006 WL 3782916 (N.D.Ill. Dec. 20, 2006) ........................................... 46

*Paul v. Davis*,
   424 U.S. 693 (1976) ............................................................................. 31

*Rayman v. Peoples Savings Corp.*,
  735 F.Supp. 842 (N.D.Ill.1990) ....................................................................... 45, 46

*Saporito v. Carr*,
  684 F.Supp.2d 1043 (N.D.Ill. 2010) ...................................................................... 46

*Sarks Café, Inc. v. Sarks In the Park LLC*,
  55 F.Supp.3d 1034 (N.D.Ill. 2014) ......................................................................... 46

*Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*,
  819 F.2d 746 (7th Cir. 1987)................................................................................... 47

*Tenneco Inc. v. Saxony Bar & Tube, Inc.*,
  776 F.2d 1375 (7th Cir.1985)................................................................................... 46

*Thomson v. Harmony*,
  65 F.3d 1314 (6th Cir. 1995).................................................................................... 42

*Townsend v. Vallas*,
  256 F.3d 661 (7th Cir. 2001).................................................................................... 32

*U.S. v. Zanfei*,
  353 F.Supp.2d 962 (N.D. Ill. 2005) ........................................................................ 45

*United States v. Zanfei*,
  353 F.Supp.2d 962 (N.D.Ill.2005) ......................................................................... 46

*Wolfel v. Morris*,
  972 F.2d 712 (6th Cir. 1992).................................................................................... 42

**Statutes**

28 U.S.C. § 2201 ................................................................................................... 43, 46

34 C.F.R. 106.45 .................................................................................................. 37, 41

**Rules**

Fed. R. Civ. P. 12 ....................................................................................................... 46

Fed. R. Civ. P. 56 ......................................................................................................... 1

Fed. R. Civ. P. 65 ......................................................................................................... 1

N.D. Ind. L.R. 56-1(a).................................................................................................. 1

**Constitutional Provisions**

U.S. CONST. amend. XIV, § 1 ....................................................................................................... 31

## PRELIMINARY STATEMENT

Plaintiff John Doe ("John Doe"), by counsel, respectfully moves for partial summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure, to enter judgment on John Doe's claim for denial of constitutional due process per *Doe v Purdue*, 928 F.3d 652 (7th Cir. 2019), and dismissal of Defendants' counterclaim for declaratory relief. There are no genuine issues of material fact and John Doe is entitled to summary judgment as a matter of law on John Doe's constitutional due process claim and for dismissal of Defendants' counterclaim.

## STATEMENT OF MATERIAL UNDISPUTED FACTS

Pursuant to Rule 65 of the Federal Rules of Civil Procedure and N.D. Ind. L.R. 56-1(a), the following Statement of Material Undisputed Facts supports Plaintiff John Doe's Motion for Partial Summary Judgment. This statement is in support of John Doe's motion on John Doe's due process claim; not included are some record facts relating to John Doe's Title IX claim. Most all of the Plaintiff John Doe's Statement of Material Undisputed Facts is based on Defendants' admissions in their Answer to the Second Amended Complaint, Defendants' deposition testimony, Defendants' documents and the Navy depositions and documents. A witness name with a "Dep tr" refers to the deposition pages cited. A witness name with a number or letter refers to the deposition exhibit designation and it will have an associated description and Bates numbering.

**A. Parties**

1.      Plaintiff John Doe ("John Doe") is a natural person who during the 2015-2016 school year, was a student at Defendant Purdue University ("Purdue") and a Navy ROTC midshipman living in Purdue's on-campus residence halls. Other than the case with Jane Doe, John Doe had no other sexual misconduct disciplinary cases at Purdue. (SJM 3: Df. Answer ¶¶ 4, 82; SJM 6: Rollock Dep tr 56; SJM 15: Oliver Dep tr 77.)

2.      Purdue is a land grant university established by the State of Indiana and is located on a main campus in West Lafayette, Indiana and on three regional campuses in Indiana.  Purdue has 13 colleges and schools.  Purdue is audited by State of Indiana auditors, the beneficiary of state authorized bonds and the recipient of state and federal grants. Purdue received hundreds of millions of dollars of federal funding in 2016.  (SJM 3: Df. Answer ¶¶ 5, 118.)

3.      Defendant Purdue University Board of Trustees ("Board of Trustees") has ten members, and they as a Board have the responsibility for making rules and regulations to govern Purdue. The selection of these Trustees is prescribed in Indiana Code IC 21-23-3. Seven of the ten Trustees are selected by the Governor of the State of Indiana.  (SJM 3; Df. Answer ¶ 6.)

4.      Defendant Mitchell Elias Daniels, Jr. ("President Daniels"), joined herein in his official capacity at Purdue, is the President of Purdue, the senior executive officer of the university. Daniels and the Board of Trustees have delegated to the General Counsel's Office evaluation of this lawsuit and compliance with any federal court order.  Defendant Alysa Christmas Rollock ("Vice President Rollock"), joined herein in her official capacity at Purdue, is the Vice President of Ethics and Compliance at Purdue reporting to President Daniels and directs the University's system-wide ethics and compliance programs applicable to Purdue's four campuses.  Defendant Katherine L. Sermersheim ("Dean Sermersheim"), joined herein in her official capacity at Purdue, is the Dean of Students at Purdue; she made the disciplinary decision in John Doe's case and has served as the primary decision maker for discipline of student-on-student sexual misconduct matters.  (SJM 3; Df. Answer ¶¶ 7-10; SJM 6: Rollock Dep tr 6-13; SJM 7: Sermersheim Dep tr 5, 9-10; SJM 42: Daniels Interrogatory Answers No. 7.)

2

**B.  Background: John Doe-Jane Doe's Dating Relationship**

5.      Consistent with paragraph 23 of the Second Amended Complaint, John Doe has testified under oath (Purdue says it is without knowledge or information sufficient to form a belief): that starting in the 2015 Fall semester and continuing into January 2016, John Doe and Jane Doe had a dating relationship that included their having consensual sexual intercourse 15 to 20 times over a three-month period from October to December 2015; that it was John Doe's first sexual relationship; that on December 13, 2015, Jane Doe attempted suicide in front of John Doe, after which all sexual activity ended; and that in mid-to late January 2016, Jane Doe began to distance herself from John Doe and their dating relationship ended.  Purdue's records show in February 2016, John Doe reported Jane Doe's suicide attempt to a Purdue Resident Assistant.  From November 2015 to March 2016, Jane Doe made no reports to the university or to the police about any alleged sexual assault by John Doe.   (SJM 2: Second Amended Complaint ¶ 23; SJM 3: Df. Answer ¶ 23; SJM 7: Sermersheim Dep tr 12-14 & SJM 33: 02/16/2016 Student of Concern Report (PU 32-33); SJM 8: John Doe 02/18/2021 Affidavit ¶¶ 1-12.)

**C.  April 1-10, 2016: CARE; Sexual Assault Awareness Month; Jane Doe's Allegations**

6.      The Center for Advocacy, Response and Education ("CARE") at Purdue provides support services to alleged survivors of sexual assault.  Starting in February 2016, Monica Soto Bloom was the Director of an Assistant Director of the Center for Advocacy, Response and Education ("CARE") reporting to the Dean of Students Sermersheim.  Nationally, April is Sexual Assault Awareness Month; and during April 2016, CARE hosted events. CARE promoted some events on their Facebook page. Among the posts that CARE shared on its Facebook page was an article dated June 21, 2016 from *The Washington Post,* "Alcohol isn't the cause of campus sexual

assault. Men are." (SJM 3: Df. Answer ¶ 24; SJM 9: Bloom Dep tr 6-11; SJM 7: Sermersheim

Dep tr 14-15; SJM 14: Amberger Dep tr 10; SJM 15: Oliver Dep tr 10-11.)

7.      On April 4, 2016, Jane Doe told Navy Lieutenant Sheppard that she had been

sexually assaulted by John Doe; and on April 6, 20116, Lieutenant Sheppard sent an e-mail to John

Doe stating that John Doe was not to participate in ROTC functions and to maintain distance from

Jane Doe.  (SJM 34: Shepard Dep tr 21-25, 28-30; SJM 43: Sheppard 2, Sheppard E-Mail (NSTC

0179).

8.      On April 5, 2016, Jane Doe met with Monica Bloom, Director of CARE and a

lawyer, to make a complaint about John Doe.  That day, April 5, 2016, Ms. Bloom sent an e-mail

about it to Dean Sermersheim and Vice President Rollock.  The e-mail contained a "Notice of

Allegations" that Ms. Bloom drafted containing the allegations of Jane Doe, the sexual misconduct

allegations of which were: (i) that in or around November 2015 Jane Doe stayed the night in John

Doe's room and in the morning woke up to John Doe groping her while she was fully clothed; and

(ii) that John Doe told Jane Doe he had digitally penetrated her on another night in November 2015

while Jane Doe was asleep, an  incident about which Jane Doe had not known.  Vice President

Rollock acknowledged receipt of Ms. Bloom's April 5, 2016 e-mail.  Ms. Bloom acted as Jane

Doe's support person during the disciplinary case.  (SJM 9: Bloom Dep tr 12-17; SJM 11: Bloom

2, Bloom E-Mail (PU 726-728); SJM 12: Bloom 3, Rollock E-Mail (PU 729-730); SJM 15: Oliver

Dep tr 38-39.)

### D. April 11, 2016: John Doe Notified of Jane Doe's Allegations

9.      On April 11, 2016, Dean Sermersheim issued a letter notifying John Doe that

Purdue has been made aware of allegations, including sexual allegations, regarding John Doe's

conduct toward another undergraduate student referred to herein as "Jane Doe" that if

substantiated, might constitute a violation or violations of Defendant Purdue's *Anti-Harassment Policy (III, Ch. 1)*. Dean Semersheim's April 11, 2016 letter also stated that the allegations included John Doe's digital penetration of Jane Doe while she was sleeping without her consent and that a more detailed description of the allegations accompanied the letter. (SJM 3: Df. Answer ¶ 25; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19; SJM 41: Custodian Klingerman Dep tr 25.)

10. Dean Semersheim's April 11, 2016 letter stated further that Purdue had elected to investigate the allegations in absence of a formal complaint and that Ms. Erin Oliver, Associate Director of Purdue's Office of Institutional Equity, and Mr. Jacob Amberger, Investigator in Purdue's Office of Institutional Equity, were appointed to investigate the matter. Dean Semersheim's April 11, 2016 letter directed John Doe to give a written response within ten calendar days of the date of Dean Semersheim's April 11, 2016 letter to the allegations that John Doe's conduct had violated Purdue's *Anti-Harassment Policy* and to refrain from discussing this matter or having any contact with Jane Doe. (SJM 3: Df. Answer ¶ 26; SJM 13: Semersheim/Rollock 10 (PU 568-572); SJM 7: Sermersheim Dep tr 17-19; SJM 14: Amberger Dep tr 10-14; SJM 15: Oliver Dep tr 6-7.)

11. Defendant Dean Semersheim's April 11, 2016 letter included a two-page document entitled "Information for Student Respondents." (SJM 3: Df. Answer ¶ 27; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.)

12. The "Information for Student Respondents" document stated that: (i) the Investigator would be neutral; (ii) a support person could be brought by Respondent to any meeting with the Investigator; (iii) a Respondent would be told enough information about the allegations to enable him to respond; (iv) the privacy of both parties would be respected; (v) the Investigator

would first interview the complaining party and once the Investigator understands the allegations, the Respondent would be asked questions; (vi) the Interviewer would then interview other witnesses and review documentation deemed relevant; (vii) the Investigator would prepare a report that would be shared with the Dean of Students but not with the parties or the witnesses; (viii) the Investigator's report would make findings and recommend whether a violation of Defendant Purdue's *Anti-Harassment Policy* had occurred and what sanction was appropriate; (ix) the Dean of Students would chair a meeting of a three-person panel of the Advisory Committee on Equity; (x) each party would be given the opportunity separately to meet with the panel meeting in order to give the decision-maker (the Dean of Students) and the panel members the opportunity to meet with the parties and the Investigator after reviewing the Investigator's report; (xi) the panel members would make a recommendation to the Dean of Students but the determination would be left to the discretion of the Dean of Students; (xii) if the Dean of Students determines there has been a violation of Defendant Purdue's *Anti-Harassment Policy*, the Dean of Students would impose sanctions.  (SJM 3: Df. Answer ¶ 28; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.)

13.    Accompanying Defendant Dean Semersheim's April 11, 2016 letter was a one half-page document entitled "Notice of Allegations."  (SJM 3: Df. Answer ¶ 29; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.)

14.    The Notice of Allegations stated that: (i) Jane Doe and John Doe were in a dating relationship during the Fall 2015 semester and that in November 2015, Jane Doe stayed the night in John Doe's room in Tarkington Hall; (ii) Jane Doe woke up to John Doe's groping her while she was fully clothed and said to John Doe that this was not OK; (iii) John Doe then told Jane Doe that during another night in November 2015, while they were staying the night in Jane Doe's room,

John Doe had penetrated her digitally while she was sleeping: (iv) Jane Doe was not aware of the incident in November 2015 while she was sleeping in her room, had not and did not consent to such sexual contact, and was upset when she was told about it; (v) John Doe expressed feeling bad about the first time, but nevertheless had sexual contact with her the second time when she was asleep; (vi) Jane Doe became very upset and left John Doe's room; (vii) John Doe also went through Jane Doe's underwear without her permission and chased her down a hallway joking about tasering her; (viii) after Jane Doe broke up with John Doe, he would still go to Jane Doe's room unannounced and without an escort; and (ix) John Doe displayed little control over his temper in front of Jane Doe.  (SJM 3: Df. Answer ¶ 30; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.)

15.    The university's no contact directive did not allow John Doe in university buildings in which Jane Doe had classes and did not allow John Doe in the university dining hall most used by John Doe and Jane Doe.  (SJM 3: Df. Answer ¶ 32.)

**E.    April 20, 2016: John Doe's Written Response**

16.    Within ten calendar days of Dean Semersheim's April 11, 2016, letter, John Doe submitted to Dean Sermersheim a written response to the allegations.  (SJM 3: Df. Answer ¶ 33; SJM 16: Sermersheim 11, John Doe Response to Allegations (PU 573-576); SJM 7: Sermersheim Dep tr 19; SJM 41: Custodian Klingerman Dep tr 26-27.)

17.    As for Jane Doe's allegations, John Doe stated in his written response to Dean Sermersheim's April 11, 2016 letter that: (i) John Doe and Jane Doe were in a dating relationship from the Fall 2015 semester to the start of the Spring 2016 semester and were both in Navy ROTC; (ii) Jane Doe's accusations against him were false and without merit; (iii) it was not true that, as claimed by Jane Doe, in November 2015 she had stayed in John Doe's room and woke up when

John Doe was groping her; (iv) what happened was that in mid-December 2015, after Jane Doe had attempted to commit suicide, Jane Doe stayed the night in John Doe's room, slept on a futon with John Doe on the floor and John Doe's roommate on his bed above the futon, woke up when John Doe touched her knee, immediately became erratic and angry with John Doe and left the room; (v) it was not true that, as claimed by Jane Doe, in November 2015 John Doe digitally penetrated her while she was sleeping; (vi) it was not true that, as claimed by Jane Doe, Jane Doe became upset when John Doe told her about the alleged sexual contact; (vii) John Doe never had sexual contact with Jane Doe while she was sleeping; (viii) instead, Jane Doe engaged in behavior inconsistent with having been sexually assaulted, texting John Doe over the Christmas holidays, including texting and talking with John Doe wishing him a Happy Christmas Eve, sending a package of homemade Christmas cookies to John Doe's family and inviting John Doe to her room at the start of the Spring 2016 semester; (ix) John Doe never went through Jane Doe's underwear without her permission but rather at times did laundry for Jane Doe, for which she was grateful; (x) John Doe did not own a taser but did own a stun baton, yet never threatened Jane Doe with it; (xi) Jane Doe never formally broke up with John Doe, but the two saw each other less and less at the start of the Spring 2016 semester, as Jane Doe was distancing herself from John Doe, a choice he respected; and (xii) it was only after John Doe returned an item to Jane Doe's room in the Spring 2016 semester did Jane Doe say anything about John Doe not going to her room, after which he didn't. (SJM 3: Df. Answer ¶ 34; SJM 16: Semersheim 11, John Doe Response to Allegations (PU 573-576); SJM 7: Sermersheim Dep tr 19.)

18. John Doe in his written response to Dean Sermersheim's April 11, 2016 letter also provided additional information to show he had been falsely accused by Jane Doe: (i) John Doe and Jane Doe had a sexual relationship from October to December 2015, but all sexual activity

ceased after Jane Doe attempted suicide on December 13, 2015; (ii) Jane Doe told John Doe that she had been raped in high school in Colorado and had attempted suicide twice while in high school; (iii) Jane Doe had frequently displayed a temper, which she tried to project on to John Doe as his problem; (iv) Jane Doe told John Doe that she contemplated running away from home and not returning to Purdue; (v) on the night in December 2015 of the suicide attempt, Jane Doe was extremely erratic, had destroyed her room by throwing objects everywhere, was crying and talking about how much she hated life and felt hopeless and was questioning whether she wanted to be in the Navy and at Purdue at all; (vi) the suicide attempt took place on the top of the parking garage by the armory, which John Doe described in detail involving a ledge from which if Jane Doe fell or jumped it would likely be fatal; (vii) John Doe reported Jane Doe's suicide attempt to two Purdue Resident Advisors and a Scholarship Advisor, who filed reports with the University; (viii) John Doe took a suicide prevention course on February 16, 2016; and (ix) John Doe and Jane Doe continued to date in the month of January 2016, which included frequent texting and calling over the Winter Break, but thereafter, Jane Doe distanced herself from John Doe and started dating a Navy ROTC upperclassman shortly thereafter.  (SJM 3: Df. Answer ¶ 35; SJM 16: Semersheim 11, John Doe Response to Allegations (PU 573-576); SJM 7: Sermersheim Dep tr 19.)

**F.    April 24-May 20, 2016: Investigation**

19.    On April 14, 2016, Purdue investigators Erin Oliver and Jacob Amberger met with Jane Doe; and then on April 28, 2016, Purdue investigators Erin Oliver and Jacob Amberger met with John Doe in the presence of Steven Knecht, an attorney who acted as John Doe's supporter during the meeting.  The interviews were not recorded or videotaped; the investigators wrote notes. To the investigators, John Doe provided 133 pages of text messages between John Doe and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because he

9

believed the texts showed there had not been a sexual assault. Jane Doe provided no texts to the investigators, telling them she had deleted the texts. John Doe also provided a list of character witnesses to the investigators Amberger and Oliver. To the investigators Amberger and Oliver, John Doe denied the sexual assault allegations in the Notice of Allegations; there is no express statement in the texts in which John Doe admitted or Jane Doe accused John Doe of committing the sexual acts alleged in the Notice of Allegations. The April 28, 2016 meeting was the one and only meeting that John Doe had with the investigators Oliver and Amberger, and there were no further communications that John Doe had with the investigators Oliver and Amberger. Also on April 28, 2016, Purdue investigators Oliver and Amberger met with John Doe's roommate, who told them that Jane Doe's allegations were not like John Doe and John Doe was a hard worker at ROTC. (SJM 3: Df. Answer ¶ 36; SJM 14: Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; SJM 11: Amberger 27, Texts (PU 206-339); SJM 18: Amberger/Oliver 25, Amberger Notes (PU 60-87); SJM 15: Oliver Dep tr 17-21, 50-54; SJM 19: Amberger/Oliver 24, Oliver Notes (PU 34-59); SJM 7: Semersheim Dep tr 34; SJM 5: Plaintiff John Doe Dep. tr. 111-114.)

20.    In the period May 9-12, 2016, Purdue investigator Amberger had e-mail correspondence with Monica Bloom, Director of CARE, about a follow up conversation with Jane Doe. On May 12, 2016, Purdue investigator Amberger had a follow up conversation with Jane Doe about the texts. Purdue investigators did not follow up with John Doe about interpretation of the texts after talking with Jane Doe. (SJM 14: Amberger Dep tr 46-49; SJM 20: Amberger 19, Amberger E-Mail to Bloom (PU 364), SJM 21: Amberger 21, Bloom E-Mail to Amberger (PU 370); SJM 15: Oliver Dep tr 102.)

21.    Purdue investigators prepared an investigation report, and on May 20, 2016, sent it to Dean Sermersheim. The investigation report included portions of 7 pages of the 133 pages of texts. Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John Doe to the investigators. In accordance with Purdue's procedures at the time, John Doe was not given an opportunity to review the investigation report then or any time before the June 6, 2016 panel meeting. (SJM 3: Df. Answer ¶¶ 2, 37; SJM 14: Amberger Dep tr 49-50, 61-62; SJM 22: Rollock/Sermersheim/Amberger/Oliver 14, Investigation Report with transmittal e-mail (PU 373-391); SJM 6: Rollock Dep tr 30, 46-47; SJM Sermersheim Dep tr 35; SJM 41: Custodian Klingerman Dep tr 27-28.)

22.    On May 20, 2016, John Doe signed a formal acknowledgment of being placed on interim leave of absence from Navy ROTC; and on May 24, 2016, John Doe signed an authorization to release of information pertaining to the case to the Department of Naval Sciences at Purdue. John Doe was restricted from communicating at all with his fellow midshipmen about the case, allowing him to say to them only "I am on interim leave of absence pending a University investigation." (SJM 3: Df. Answer ¶ 38; SJM 44: John Doe 2, Authorization (PU 704); SJM 5: John Doe Dep tr 21-23.)

23.    On May 26, 2016, Dean Sermersheim sent, to the panel members of the three-person panel of the Advisory Committee on Equity, (i) the investigation report, (ii) the April 11, 2016 Notice of Allegations and (iii) John Doe's April 21, 2016 written response to the Notice of Allegations. John Doe was not provided an opportunity to review the investigation report before the scheduled panel meeting on June 6, 2016 starting at 2:00 PM. (SJM 3: Df. Answer ¶ 39; SJM 7: Sermersheim Dep tr 21-23; SJM 23: Sermersheim 34, Sermersheim Memo (PU 655).

24.   On May 31, 2016, Dean Sermersheim sent a letter to John Doe, copied to Amberger and Oliver, informing John Doe of the scheduled "Panel Meeting" on June 6, 2016, at which John Doe was scheduled to appear between 2:00 PM to 2:30 PM.  Also on May 31, 2016, Joanna Sharp, the assistant to Dean Sermersheim, sent an e-mail to investigators Amberger and Oliver informing them of the "Panel Meeting" on June 6, 2016, with John Doe to appear between 2:00 PM to 2:2:30 PM and the investigator to appear between 2:30 PM to 3:00 PM.  (SJM 3: Df. Answer ¶ 40; SJM 7: Sermersheim Dep tr 24-25; SJM 24, Sermersheim E-Mail (PU 596); SJM 14: Amberger Dep tr 95-97; SJM 25: Amberger 29, Sharp E-Mail (PU 392).)

**G.    June 6, 2016: Meeting with Panel of the Advisory Committee on Equity and Dean Sermersheim**

25.    On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim, but rather Monica Bloom, Director of CARE and a lawyer, on June 5, 2016, submitted a written statement said to come from Jane Doe.  The three-person panel of the Advisory Committee on Equity and Dean Sermersheim never met and never heard any direct testimony from Jane Doe, nor did the Advisory Committee and Dean Sermersheim have the opportunity to ask any questions of Jane Doe.  In Jane Doe's June 5, 2016 written statement, she specifically requested that John Doe be removed from the Navy ROTC program and in this connection, referenced her new boyfriend who was in Navy ROTC.  (SJM 3: Df. Answer ¶ 41; SJM 9: Bloom Dep tr 28-32; SJM 26: Bloom 23, Bloom transmittal of June 5, 2016 statement (PU653-654).)

26.    On June 6, 2016, John Doe along with his supporter Steven Knecht met with Dean Sermersheim and the three-person panel of the Advisory Committee.  The meeting did not involve any sworn testimony and was not recorded or transcribed.  Jane Doe did not appear before the

Dean and the Advisory Committee; thus, there was no cross-examination of Jane Doe about her allegations.  (SJM 3: Df. Answer ¶¶ 2, 43-44; SJM 7: Sermersheim Dep tr 27-28.)

27.     John Doe testified in his deposition that at the June 6, 2016 meeting with Dean Sermersheim and the Advisory Committee, two members said they had not read the investigation report; while John Doe denied Jane Doe's allegations, the Dean and the Advisory Committee members acted with hostility in the way questions were asked; texts were asked about, but John Doe was not apprised of how those texts were interpreted in the investigation report.  Dean Sermersheim did not contradict John Doe's account because she could not recall the specific panel meeting and did not recall what the panel members and John Doe said at the meeting.  Dean Sermersheim was the decisionmaker in the case; the panel members are advisory.  (SJM 3: Df. Answer ¶ 44; SJM 5: John Doe Dep. tr. 185-188; SJM 7: Sermersheim Dep tr 27-29.)

**H.      June 14, 2016: Dean Sermersheim's Determination and Sanctions**

28.     On June 14, 2016, Dean Sermersheim, sent a letter of that date to John Doe advising him that, after considering the information provided by John Doe, Jane Doe, the University Investigators and consulting with the three-member panel from the Advisory Committee on June 6, 2016, "**I [Dean Sermersheim] have made the determination that a preponderance of the evidence does support a finding that your [John Doe's] conduct violated the *Anti-Harassment Policy***."  (Bold in the original.)  Dean Sermersheim's June 14, 2016 letter did not state any explanations or reasons for her finding.  Dean Sermersheim's determination was made without Jane Doe personally appearing before the Dean and the Advisory Committee and thus without examination or cross-examination of Jane Doe.  (SJM 3: Df. Answer ¶ 46; SJM 7: Sermersheim Dep tr 27-31; SJM 27: Sermersheim 4, Sermersheim June 14, 2016 Letter (PU 597-599); SJM 41: Custodian Klingerman Dep tr 20-21.)

13

29.    Dean Sermersheim's June 14, 2016 letter went on to state that Purdue does not tolerate harassment of any person in the workplace or educational environment and ordered the following sanctions against John Doe: (1) a suspension from Purdue commencing June 13, 2016 for one full academic year; (2) John Doe was to continue to have no contact with Jane Doe until she completes her current academic program; (3) as a condition of re-entry, John Doe would be required to complete a 90-minute bystander intervention training or equivalent program offered by the Vice President for Ethics and Compliance or by CARE; and (4) as a condition of re-entry, John Doe would be required to meet with Chris Greggila, Assistant Director of CARE, during the first semester of return.   Included with Dean Sermersheim's June 14, 2016 letter was a document entitled "Re-Entry for Purdue University Students Separated from the University" providing re-entry instructions.   (SJM 3: Df. Answer ¶ 47; SJM 7: Sermersheim Dep tr 30-31; SJM 27: Sermersheim 4, Sermersheim June 14, 2016 Letter (PU 597-599).)

30.    Dean Sermersheim's June 14, 2016 letter finally advised John Doe that he could appeal her determination to the Vice President for Ethics and Compliance, Defendant Alysa Christmas Rollock, that the appeal must be in writing and filed within ten days of the issuance of the notification of the determination with all supporting materials and that the appeal must be received by Defendant Vice President Rollock by Friday, June 24, 2016 by e-mail or by hand delivery.   (SJM 3: Df. Answer ¶ 48; SJM 7: Sermersheim Dep tr 30-31; SJM 27: Sermersheim/ Rollock 4, Sermersheim June 14, 2016 Letter (PU 597-599); SJM 6: Rollock Dep tr 27.)

I.    **June 23, 2016: John Doe's First Appeal**

31.    On June 23, 2016, John Doe timely submitted an appeal of that date to Defendant Vice President Rollock.  John Doe stated in his June 23, 2016 appeal document that Jane Doe's allegations of sexual assault were false, that he never penetrated Jane Doe while she was sleeping

without her consent, digitally or otherwise, that the determination he did so was incorrect and contrary to the facts and that he was being suspended for something John Doe did not do and did not occur.  (SJM 3: Df. Answer ¶ 49; SJM 6: Rollock Dep tr 27-30; SJM 28: Rollock 5, John Doe June 23 Appeal (PU 717-718); SJM 41: Custodian Klingerman Dep tr 21-22.)

32.    John Doe's June 23, 2016 appeal document also stated that a suspension would cause significant harm, including the loss of his scholarship and participation in NROTC.  John Doe's June 23, 2016, appeal document noted the great emotional toll that the process had taken on him causing great depression and anxiety, the concerns about whether the process would be fair all the while knowing that Jane Doe's allegations were false and the disruptions of all the friendships he had developed given that he could not talk to friends in Navy ROTC about what really had happened.  (SJM 3: Df. Answer ¶ 50; SJM 6: Rollock Dep tr 27-30; SJM 28: Rollock 5, John Doe June 23 Appeal (PU 717-718).)

33.  John Doe's June 23, 2016 appeal document further stated that his "rights to due process of law have been violated."  John Doe's June 23, 2016 appeal document cited the points that: he "was never provided with the evidence that was supposed to support this allegation which prevented [him] from adequately preparing a defense to the false accusation"; that he had "also not been provided the evidence relied upon in making the finding against [him] in order to prepare and submit a proper appeal"; that at the June 6, 2016 meeting with the three-person panel of the Advisory Committee on Equity, two panel members by their own admission were not prepared at the meeting; that he had responded to everything that was asked of him, including providing ample documentation of his relationship with Jane Doe; that he had received a summary notification providing no basis for the determination.   (SJM 3: Df. Answer ¶ 51; SJM 6: Rollock Dep tr 27-30; SJM 28: Rollock 5, John Doe June 23 Appeal (PU 717-718).)

**J.    June 28, 2016: Vice President Rollock's First Appeal Decision**

34.    On or about June 28, 2016, Defendant Vice President Rollock sent a letter of that date to John Doe stating that she had reviewed John Doe's appeal, Defendant Dean Sermersheim's letters to John Doe and Jane Doe's letter dated June 14, 2016.  (SJM 3: Df. Answer ¶ 52; SJM 6: Rollock Dep tr 30-32; SJM 29: Rollock 6, Rollock June 28 Letter (PU 600-601); SJM 41: Custodian Klingerman Dep tr 22-23.)

35.    According to Vice President Rollock's June 28, 2016 letter, because Dean Sermersheim had not included her reasoning in reaching her determination that found John Doe in violation of Defendant Purdue's *Anti-Harassment Policy*, Vice President Rollock was not able to issue a decision on John Doe's appeal and was directing Dean Sermersheim, by June 30, 2016, to revise her June 14, 2016 letters to include the factual basis for her determination and the sanctions imposed.  Vice President Rollock added that in light of what Dean Sermersheim issued in a revised determination, John Doe could supplement his appeal and John Doe could appeal by Sunday, July 10, 2016.  (SJM 3: Df. Answer ¶ 53; SJM 6: Rollock Dep tr 30-32; SJM 29: Rollock 6, Rollock June 28 Letter (PU 600-601).)

**K.    June 29, 2016: Defendant Dean Sermersheim's
Re-Issued Determination and Sanctions**

36.    The very next day after Defendant Vice President Rollock's first appeal decision remanding the matter back to Dean Sermersheim, on June 29, 2016, Dean Sermersheim sent a letter to John Doe basically repeating her June 14, 2016, letter, only adding the following:

Specifically, a preponderance of the evidence supports that:

1.    [Jane Doe] had fallen asleep on a futon with you on the floor beside her. She woke up and found that you inappropriately touched her over her clothing and without her consent by placing your hand above her knee, between her legs, and moved it up to her "crotch" areas; and

2.      On another occasion, while she was sleeping and without her consent, you inappropriately touched [Jane Doe] by digitally penetrating her vagina.

The conduct described in the numbered paragraphs above constitutes "Sexual Violence" under the University's policy on Anti-Harassment.  Additionally, I find by a preponderance of the evidence that [John Doe is] not a credible witness. I find by a preponderance of the evidence that [Jane Doe] is a credible witness.

(SJM 3: Df. Answer ¶ 54; SJM 7: Sermersheim Dep tr 39-43; SJM 30: Semersheim/Rollock 7, Sermersheim June 29, 2016 Letter (PU 603-607); SJM 41: Custodian Klingerman Dep tr 23-24.)

37.     Dean Sermersheim's June 29, 2016 letter imposed the same sanction as stated in her June 14, 2016 letter: (1) a suspension from Defendant Purdue commencing June 13, 2016 for one full academic year; (2) John Doe was to continue to have no contact with Jane Doe until she completes her current academic program; (3) as a condition of re-entry, John Doe would be required to complete a 90-minute bystander intervention training or equivalent program offered by the Vice President for Ethics and Compliance or by CARE; and (4) as a condition of re-entry, John Doe would be required to meet with Chris Greggila, Assistant Director of CARE, during the first semester of return.  (SJM 30: Semersheim/Rollock 7, Sermersheim June 29, 2016 Letter (PU 603-607).)

38.     The numbered findings in Dean Sermersheim's June 29, 2016 letter were contradicted by John Doe's April 20, 2016 written response to the "Notice of Allegations," John Doe's April 28, 2016 oral statements to the investigators and John Doe's June 6, 2016 oral statements to Advisory Committee and Dean Sermersheim, all denying Jane Doe's allegations. Dean Sermersheim's June 29, 2016 letter (i) did not state that John Doe and Jane Doe were in a dating relationship, (ii) did not state that John Doe and Jane Doe had previously engaged in sexual intercourse and (iii) did not state the fact that no other complaints of sexual misconduct were made against John Doe.  (SJM 3: Df. Answer ¶ 56; SJM 7: Sermersheim Dep tr 39-43; SJM 30:

Sermersheim/Rollcok 7, Semersheim June 29, 2016 Letter (PU 603-607); SJM 6: Rollock Dep tr 44, 55-56.)

39.     Dean Sermersheim: (i) issued the Notice of Investigation determining the allegations against John Doe which contained a No Contact Directive to John Doe and appointed Oliver and Amberger as the investigators for the complaint against John Doe; (ii) served as chair of the three-person panel of the Advisory Committee on Equity; (iii) issued an initial determination letter stating that she had determined John Doe responsible; and (vi) issued a revised determination letter finding John Doe responsible.  (SJM 3: Df. Answer ¶ 60; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19, 28-31, 39-43; SJM 27: Sermersheim 4, Sermersheim June 14, 2016 Letter (PU 597-599); SJM 30: Semersheim/Rollock 7, Sermersheim June 29, 2016 Letter (PU 603-607).)

**L.      July 10, 2016: John Doe's Appeal of Re-Issued Determination and Sanctions**

40.     John Doe timely submitted an appeal dated July 10, 2021, to Vice President Rollock from Dean Sermersheim's re-issued determination and sanctions.  John Doe began by referencing Vice President Rollock's June 28, 2021 letter directing Dean Sermersheim to provide the factual basis for her determination and asserting that Dean Sermersheim had failed to provide that factual basis.  (SJM 3: Df. Answer ¶ 62; Rollock Dep tr 35-37; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698); SJM 41: Custodian Klingerman Dep tr 24-25.)

41.     John Doe's July 10, 2016 appeal document stated that he never had the opportunity to review the investigation report and thus could not address the allegations supposedly questioning his credibility, nor had he been permitted to respond to any "factual evidence."  John Doe's July 10, 2016 appeal document stated: "Dean Sermersheim's unsubstantiated conclusion that I am not a credible witness still has not been corroborated with any facts."  John Doe's July

10, 2016 appeal document stated that he had provided the investigators with a list of over 30 names to substantiate the credibility of his character and integrity, but he could not defend himself against Dean Sermersheim's statements about his credibility if there was no factual evidence presented. Vice President Rollock in her deposition testimony confirmed that John Doe was not permitted to review the investigation report under Purdue's policies then in effect.  (SJM 3: Df. Answer ¶ 63; Rollock Dep tr 37-40; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

42.    John Doe's July 10, 2016 appeal document then discussed the point that the June 6, 2016 meeting with Defendant Dean Sermersheim and the three-person panel of the Advisory Committee on Equity was flawed at best.    John Doe's July 10, 2016 appeal document asserted that a reasonable person would question the fairness of a meeting where two of the three panel members did not read the investigation report before the meeting and that a reasonable person would question whether they took seriousness of the importance of a process that has punitive and irreversible consequences.  John Doe's July 10, 2016 appeal document further asserted that the attitude of the panel members was "one of overt skepticism and hostility."  John Doe's July 10, 2016 appeal document asked "what could possibly explain their attitude other than that they had prejudged the outcome and my (alleged) guilt?"  (SJM 3: Df. Answer ¶ 64; Rollock Dep tr 40-42; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

43.    John Doe's July 10, 2016 appeal document stated that at the beginning of his Fall 2015 semester, he had started the year in Navy ROTC and one of the issues discussed was the "zero tolerance" policy toward sexual harassment and that Jane Doe's accusations of sexual assault were false.    John Doe's July 10, 2016 appeal document stated that one of Jane Doe's accusations was based on what John Doe had allegedly told her about digitally penetrating her. John Doe asked: "Why would I not only admit to something that didn't happen, but also knowingly admit to

something that would jeopardize my ROTC scholarship and future serving my country?"  (SJM 3: Df. Answer ¶ 65; Rollock Dep tr 42-44; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

44.    John Doe's July 10, 2016 appeal document stated that Jane Doe was possibly motivated to make false accusations against John Doe: to punish John Doe for having reported to the university Jane Doe's suicide attempt in December 2015, an attempt that could have been reported to Navy ROTC as well.  John Doe's July 10, 2016 appeal document also stated that Jane Doe had started up in the Spring 2016 semester a relationship with an upperclassman who was a member of Navy ROTC and who made it plain he did not like John Doe.  (SJM 3: Df. Answer ¶ 66; Rollock Dep tr 44-46; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

45.    John Doe's July 10, 2016 appeal document asserted that Jane Doe behaved inconsistent with the sexual assault accusations.  John Doe's July 10, 2016 appeal document asserted that after the relationship ended, Jane Doe contacted John Doe, at times seeking advice, which Jane Doe would not do had there been any sexual assaults.  John Doe's July 10, 2016 appeal document asserted that he had provided text evidence of these contacts.  John Doe's July 10, 2016 appeal document asked: "If I had sexually violated [Jane Doe], why would she continue to initiate contact and even seeking my advice?"   (SJM 3: Df. Answer ¶ 67; Rollock Dep tr 46-47; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

46.    John Doe's July 10, 2016 appeal document demanded to know what was the particular evidence used to determine Dean Sermersheim's finding that the preponderance of the evidence supported John Doe not being a credible witness and Jane Doe being a credible witness. John Doe's July 10, 2016 appeal document stated that he had been denied review of the evidence that supposedly supported the factual basis for Dean Sermersheim's determination.  John Doe's

July 10, 2016 appeal document requested that the determination and sanctions be set aside and that Purdue provide to him "all documents and materials relating to his official file at Purdue University, including but not limited to . . . all materials, independent investigator's reports, and all files, letters, and documentation relating to the investigation", "all handwritten notes that have been generated by all parties representing the University" and "a copy of Ms. Erin Oliver and Mr. Jacob Amberger's report." (SJM 3: Df. Answer ¶ 68; Rollock Dep tr 47-48; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

**M.    July 22, 2016: Vice President Rollock's Second Appeal Decision**

47.    On July 21, 2016, Vice President Rollock sent a one-page letter of that date to John Doe issuing her second appeal decision. Defendant Vice President Rollock's July 21, 2016 appeal decision stated that after reviewing (i) John Doe's appeal, (ii) Defendant Dean Sermersheim's April 11, 2016 letter notifying John Doe of the University's decision to investigate allegations regarding his conduct toward Jane Doe, (iii) John Doe's written response to the Notice of Allegations, (iv) the investigation report, (v) Jane Doe's e-mail message of June 5, 2016, and (vi) Dean Sermersheim's letters of June 14, 2016 and June 29, 2016, Vice President Rollock was upholding Dean Sermersheim's determination and sanctions.  Vice President Rollock in her deposition testimony confirmed that John Doe had not seen the investigation report and had not been copied on Jane Doe's June 5, 2021 document. (SJM 3: Df. Answer ¶ 70; Rollock Dep tr 48-49; SJM 31: Rollock 9, Rollock July 21, 2021 Appeal (PU 608-609); SJM 41: Custodian Klingerman Dep tr 25.)

48.    Vice President Rollock's July 21, 2016 appeal decision added that in reviewing the appropriateness of the sanctions imposed, she had considered the effects on Jane Doe's educational environment and the threat posed to the safety of Jane Doe and the university community.

21

According to Vice President Rollock's July 21, 2016 appeal decision, the seriousness of John Doe's misconduct supported the sanctions ordered by Dean Sermersheim.  Vice President Rollock confirmed in her deposition testimony that John Doe had no other sexual misconduct complaints against him in the period November 2015 to July 2016 or in the entire period of the 2015-2016 school year.  According to Vice President Rollock, "[t]here was, in my view, little threat that he would reoffend." (SJM 3: Df. Answer ¶ 70; Rollock Dep tr 48-50, 54-57; SJM 31: Rollock 9, Rollock July 21, 2021 Appeal (PU 608-609).)

49.    On July 25, 2016, Vice President Rollock sent an e-mail letter to John Doe, copied to Ms. Tandra Foster, Associate Legal Counsel at Purdue, concerning John Doe's request for his education records.  Vice President Rollock's July 25, 2016 e-mail letter quoted John Doe's July 10, 2016 letter appeal requesting "all documents and materials relating to his official file at [Defendant] Purdue University, including but not limited to . . . all materials, independent investigator's reports, and all files, letters, and documentation relating to the investigation", "all handwritten notes that have been generated by all parties representing the University" and "a copy of Ms. Erin Oliver and Mr. Jacob Amberger's report."  Vice President Rollock's July 25, 2016 e-mail letter then stated "[b]y a copy of this email to Tandra Foster, Associate Legal Counsel," Vice President Rollock was alerting Ms. Foster to John Doe's records request and that Ms. Foster would process John Doe's request.  (SJM 3: Df. Answer ¶ 74; SJM 33: Rollock 16, Rollock July 25, 2016 E-Mail (PU 702-702); SJM 41: Custodian Klingerman Dep tr 29.)

50.    In August 2016, the Office for Civil Rights ("OCR") in the U.S. Department of Education notified Purdue that OCR was beginning an investigation of a complaint that "in the 2015-2016 academic year, the University subjected a female undergraduate student . . . to discrimination based on sex" and the Purdue Exponent ran an article that Purdue was to have a

22

"fully operational sexual assault center." Also, Purdue made amendments to its procedures for sexual misconduct investigations, including permitting respondents to review the investigation report.  (SJM 3: Df. Answer ¶ 77.)

**N.    Disenrollment From Navy ROTC**

51.    Following the disciplinary decision of Purdue to suspend John Doe that had been upheld by Vice President Rollock against John Doe's appeal, the Navy ROTC called John Doe before a Performance Review Board that convened on August 10, 2016, and based solely on the disciplinary decision of Purdue (suspension), John Doe was disenrolled from the Navy ROTC at Purdue.  (SJM 35: Hutton Dep tr 66-67, 71-73; SMJ 36: Hutton G, August 10, 2020 Performance Review Board document (NSTC 00011-0012); SMJ 36: Hutton H, August 2020 ROTC Appointment Termination and Disenrollment Authorization (NSTC 0001-0004); SJM 38: Remaly Dep tr 49-50, 54-55; SJM 39: Willstatter Dep tr 42-43; SJM 40: Remaly D/Willstatter C, E-mail by Staff Lieutenant Willstatter (NSTC 0140-0142).)  The Navy files showed receipt of the Purdue disciplinary documents.  (SJM 41: Custodian Klingerman Dep tr 15-19, 32-35.)

52.    The commander of the Purdue Navy ROTC, Captain Rodney Hutton, when asked by Defendants' counsel about the "investigation" of the sexual misconduct allegations against John Doe, Hutton responded that "that investigation was referred to Purdue University."  (Hutton tr. 14.)  Commanding Officer Hutton further explained:

> Q . . . When you say you disenrolled the student, you mean you disenrolled him because you determined that he sexually harassed and assaulted [Jane Doe]?
>
> A No.
>
> Q What do you mean then?
>
> A Because the student was suspended from the university upon completion of that process, the NROTC requirements required that I disenroll the student from the program.

23

(SJM 35: Hutton Dep tr 7, 22.) Hutton did not make a determination that John Doe had committed sexual misconduct; Hutton acknowledged that John Doe submitted a statement as part of the Navy ROTC disenrollment proceeding that he (John Doe) was not guilty of the sexual misconduct charges; and Hutton confirmed that the only investigation report listed in the disenrollment document was the Purdue investigation report. (SJM Dep 35: Hutton Dep tr 7, 24, 70, 73.)

53.    Exhibit H to the Hutton deposition was the August 2020 ROTC Appointment Termination and Disenrollment Authorization (NSTC 0001-0004). Commanding Officer Hutton identified the document and when asked about it, testified that the only reason for the ROTC disenrollment was the university suspension:

Q … Okay. And on the front page it states, does it not, "Reason for Disenrollment/Termination"?

A Yes.

Q Okay. And the signature on the bottom of the first page is your signature?

A In the first endorsement.

Q Yes. And is the signature on the second page your signature?

A Yes.

Q Okay. And is the signature on the fourth page your signature?

A Yes.

Q Okay. Let me go on page 3 where item 2 says, "Type of Disenrollment (Dropped by Institution)." Is there a statement underneath that?

A 2(A).

Q Okay.

A "Midshipman [Plaintiff John Doe] was" –

Q Go ahead.

A "2(A) Midshipman [Plaintiff John Doe] was suspended by the University for one academic year."

Q Okay. Is there anything else under item 2?

A No.

Q Okay. Go to point 9 on page 4 right above your signature.

A Yes.

Q Is there a recommendation?

A As I assigned "Recommend disenrollment of Midshipman [Plaintiff John Doe] due to suspension by the University for one academic year."

Q Okay. Was it a requirement of the Naval ROTC program that a student cadet be continuously enrolled in the university?

A Yes.

(SJM 35: Hutton Dep tr 56, 66-67; SJM 36: Hutton H, August 2020 ROTC Appointment Termination and Disenrollment Authorization (NSTC 0001-0004).)

54.     Hutton acknowledged that John Doe submitted a statement dated August 16, 2016, as part of the Navy ROTC disenrollment proceeding that he (John Doe) was not guilty of the sexual misconduct charges.  (SJM 35: Hutton Dep tr 69-70.)  The August 2020 ROTC Appointment Termination and Disenrollment Authorization document showed John Doe having a cumulative G.P.A. of 3.30 and 3.17.  (SJM 37: Hutton H, p. 4, August 2020 ROTC Appointment Termination and Disenrollment Authorization, p.4 (NSTC 0004).)

55.     Exhibit G to the Hutton deposition was an August 10, 2020 Performance Review Board document.  Hutton identified the voting members of the Performance Review Board as Executive Officer Craig Remaly, Major Mike McDowell and Lieutenant Leonard Taylor.  Hutton identified the August 10, 2020 Performance Review Board document and his signature on it, and

Hutton identified what was presented to the Performance Review Board, which included the delay document so that Plaintiff John Doe could appeal the university determination and which included only one investigation report -- Purdue's:

> Q Okay. Now, is there listed the enclosures with the Performance Review Board on the first page, 12 items?
>
> A Yes.
>
> Q Okay. And in those 12 items are the University Investigator's Report, Final Determination from the Dean of Students, Midshipman [Plaintiff John Doe] 's Statement of Appeal of Final Determination, and University Response to Midshipman [Plaintiff John Doe] 's Appeal.  That was before the Performance Board?
>
> A They are enclosures to the report so they would have had to have been done.
>
> Q Now, go up to item 3 in that listing. You see "Email agreeing to a delay in Performance Review Board proceedings"?
>
> A Yes.
>
> Q Does that refresh your recollection that there was indeed a delay because of the appeal that [John Doe] made in the university disciplinary case?
>
> A Yes. There was a delay for the purpose of ensuring the university process was adequately completed.
>
> Q Okay. Now, listed here is the University Investigator Report; correct? As what was before the Performance Review Board?
>
> A I'm sorry. Can you restate that, sir?
>
> Q Listed here as number 9 is the University Investigator Report; correct?
>
> A That is correct.
>
> Q Okay. Is there listed here any other investigator's report?
>
> A No indication of a second investigative report.

(SJM 35: Hutton Dep tr 49-50, 71-73; SJM 36: Hutton G, August 10, 2020 Performance Review Board (NSTC 00011-0012).)

56.     Commanding Officer Hutton acknowledged that John Doe's performance reviews showed John Doe to be "very motivated," that for "leadership and cohesiveness," he was "very vocal during PT in encouraging other midshipmen, is a team player, and promotes unit cohesion" and that he met or exceeded program standards in "Physical fitness."  Hutton acknowledged that there are positive notes about John Doe in the Navy record.  (SJM 35: Hutton tr. 74-75; SJM 45: Hutton E, Fitness Report (NSTC 0166).)

57.     The August 10, 2020 Performance Review Board document showed that the Board's finding was that John Doe was suspended by Purdue and that the recommendation was disenrollment of John Doe.  The August 10, 2020 Performance Review Board document also showed John Doe having a cumulative G.P.A. of 3.30 and 3.17.  (SJM 36: Hutton G, p. 2, August 10, 2020 Performance Review Board, p. 2 (NSTC 0012).)

58.     The second in command of the Purdue Navy ROTC, Executive Officer Craig Remaly, who was the head officer of the Performance Review Board, testified that the discussions of the Performance Review Board concerned the university suspension and did not include the personal opinions of Lieutenant Redlawsk Chester who compiled the university disciplinary documents on John Doe.  (SJM 38: Remaly Dep tr 8, 44-45.)  Remaly identified the documents that were listed as before the Performance Review Board, which included Purdue's investigation report, the Purdue Dean's determination and John Doe's appeals.  (SJM 38: Remaly Dep tr 46-49; SJM 36: Hutton G/Remaly E, August 10, 2020 Performance Review Board (NSTC 00011-0012).)  Remaly testified that the university suspension was the only reason for the disenrollment recommendation of the Performance Review Board. (SJM 38: Remaly Dep tr 49-50.)  Remaly also testified that he has seen ROTC students with worse G.P.A.s than John Doe succeed and ROTC students with better G.P.A.s than John Doe fail.  (SJM 38: Remaly Dep tr 12.)  Lieutenant

Sheppard, a Naval Academy graduate, when was asked John McCain's rank at the Naval Academy, said John McCain was "the anchor so the very bottom" and described John Doe as a "typical, you know, freshman midshipman." (SJM 34: Sheppard Dep tr 17, 47.)

59.     Staff Lieutenant Kyle Willstatter, who was a non-voting member of the Performance Review Board and its reporter, confirmed that the Performance Review Board did not care why John Doe was suspended by Purdue. Willstatter described Redlawsk Chester's role as collecting the disciplinary documents from Purdue. Just before the disenrollment, Willstatter e-mailed to John Doe to inform him of the nature of the Performance Review Board:

> The PRB [Performance Review Board] is not about the circumstances surrounding your suspension, it is about the fact that you have been suspended. There is no reason to re-litigate the university's decision. The fact is that you are suspended, and the ROD requires disenrollment for any case where a student is suspended. The black and white nature of this PRB is why you are allowed to waive, if you so choose, any witnesses or other persons you would want to have present. Please let me know their names and the reason. You have the right to bring any witnesses you want; however, unless they're going to state contrary to facts that you have not been suspended by the university, it will basically be a waste of time.

(SJM 40: Willstatter C/Remaly D, E-mail by Staff Lieutenant Willstatter (NSTC 0140-0142); SJM 38: Remaly tr. 54-55; SJM 39: Willstatter tr 6-8, 28-29, 42-43.)

60.     Willstatter was also presented with August 10, 2020 Performance Review Board document (NSTC 00111-0012), which he said was written by him. Willstatter reviewed the list of documents on the document that were reviewed by the Performance Review Board, which were the Purdue disciplinary case documents. Willstatter testified that the delay from June 2016 to August 2016 of the Performance Review Board was Plaintiff John Doe's appeal of the university suspension and that John Doe did attend the disenrollment proceeding. According to Willstatter, there was no other Performance Review Board ever held as to John Doe. (SJM 39: Willstatter Dep tr 46-49; SJM 36: Hutton G/Willstatter D, August 10, 2020 Performance Review Board.)

28

**O.    Post-disciplinary Case Review of the Investigation Report; Location of Files; Intention to Return**

61.    On September 20, 2016, John Doe requested Ms. Tandra Foster for the documents identified in his July 10, 2016, appeal.  (SJM 3: Df. Answer ¶ 78.)

62.  On October 11, 2016, 93 days after John Doe's first request was made for production of records, Tandra Foster replied, stating that John Doe and his parents could go to Purdue to review the documents during a scheduled time, of which only four options were made available by Purdue, on the mornings and afternoons of October 19 and October 20, 2016.  (SJM 3: Df. Answer ¶ 79.)

63.    On October 20, 2016, John Doe and his mother were permitted at Purdue to review documents that were made available and to take handwritten notes.  The investigation report provided to John Doe and his mother was redacted with respect to third-party students.  The investigation report was not provided to John Doe prior to the June 6, 2016 panel meeting.  (SJM 3: Df. Answer ¶ 80.)

64.    The Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g; 34 CFR Part 99, applies to student education records at Purdue and generally entitles an eligible student with an opportunity to inspect and review certain education records within 45 days following the students request to do so.  (SJM 3: Df. Answer ¶ 81.)

65.    The files that are the disciplinary case files in John Doe's case are maintained in several places: the Office of Institutional Equity, the Dean of Students, the Vice President of Ethics and Compliance, the Records Office and the Office of Legal Counsel.  (SJM 41: Custodian Klingerman Dep tr 18-30.)

66.    Consistent with paragraph 82 of the Second Amended Complaint, John Doe testified he intends to return as a student to Purdue but, as part of the disciplinary sanction, which

29

he has testified he views as a punishment, he would need to attend a bystander intervention course and to meet with an Assistant Director of CARE to secure his re-enrollment at Purdue. The investigation report by Oliver and Amberger recommended the sanctions that Dean Sermersheim imposed, including a bystander intervention course and to meet for the first semester upon return with an Assistant Director of CARE in order to secure John Doe's re-enrollment at Purdue. Investigator Oliver, who was the Associate Director of Purdue's Office of Institutional Equity for the 2015-2016 school year, could not say whether John Doe would be readmitted to Purdue if he did participate in the bystander intervention course and meet with an Assistant Director of CARE but still deny that he had committed the sexual acts for which he was found responsible. (SJM 5: John Doe Dep tr 167-170; SJM 2: Second Amended Complaint ¶ 82; SJM 15: Oliver Dep tr 78; (SJM 22: Rollock/Sermersheim/Amberger/Oliver 14, Investigation Report, p. 11 (PU 384); SJM 30: Semersheim 7, Sermersheim June 29, 2016 Letter (PU 603-607).; SJM 14: Amberger Dep tr 49-50.)

## SUMMARY JUDGMENT STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, the party moving for summary judgment is entitled to judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Rule requires that the moving party identify "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden is satisfied, the non-moving party bears the burden of demonstrating that there are, in fact, genuine issues of material fact. *Harney v. Speedway SuperAmerica, LLC.*, 526 F.3d 1099, 1104 (7th Cir. 2008). "If no genuine issue of material fact

exists, the sole question is whether the moving party is entitled to judgment as a matter of law."

*Logan v. Com. Union Ins. Co.,* 96 F.3d 971, 978 (7th Cir. 1996).

## ARGUMENT

I.    **Undisputed Material Facts in the Summary Judgment Record Establish That John Doe Had a Fourteenth Amendment Stigma-Plus Liberty Interest and That Defendants Deprived John Doe of That Liberty Interest Without Due Process When Finding John Doe Guilty of Sexual Misconduct and Suspending Him**

The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." Undisputed material facts in the summary judgment record establish that John Doe had a Fourteenth Amendment stigma-plus liberty interest and that Defendants deprived John Doe of that liberty interest without due process when finding John Doe guilty of sexual misconduct and suspending him from Purdue.

A.    **John Doe Has a Stigma-Plus Liberty Interest**

The material undisputed facts establish that John Doe has a stigma-plus liberty interest.

1.    **The Law of the Case: Judge Barrett on Stigma-Plus Liberty Interest**

In *Doe v. Purdue*, 928 F.3d 652, 659, 661-663 (7th Cir. 2019), Judge (now U.S. Supreme Court Justice) Amy Coney Barrett wrote the Court's opinion, which stated in pertinent part:

> . . . According to John, he was punished pursuant to a process that failed to satisfy the minimum standards of fairness required by the Due Process Clause … John cannot recover simply because the procedures were unfair, even if they were. The Due Process Clause is not a general fairness guarantee; its protection kicks in only when a state actor deprives someone of ''life, liberty, or property.'' U.S. CONST. amend. XIV, § 1. The threshold question, then, is whether John lost a liberty or property interest when he was found guilty of sexual violence and punished. . . .
>
> John's failure to establish a property interest does not doom his claim, however, because he also maintains that Purdue deprived him of a protected liberty interest: his freedom to pursue naval service, his occupation of choice. To succeed on this theory, John must satisfy the ''stigma plus'' test, which requires him to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held. *See Mann v. Vogel*, 707

31

F.3d 872, 878 (7th Cir. 2013); *see also Paul v. Davis*, 424 U.S. 693, 708–09, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Hinkle v. White*, 793 F.3d 764, 767–68 (7th Cir. 2015). John argues that he has satisfied this test because he alleges that Purdue inflicted reputational harm by wrongfully branding him as a sex offender; that Purdue changed his legal status by suspending him, subjecting him to readmission requirements, and causing the loss of his Navy ROTC scholarship; and that these actions impaired his right to occupational liberty by making it virtually impossible for him to seek employment in his field of choice, the Navy. *See Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984) (''The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling.''); *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (Liberty interests are impinged when someone's ''good name, reputation, honor or integrity [are] called into question in a manner that makes it virtually impossible for [him] to find new employment in his chosen field.''). Purdue insists that John has not adequately alleged ''stigma,'' much less the necessary ''plus.'' The university maintains that it has not and will not divulge John's disciplinary record without his permission. The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began. Because John permitted the disclosure, Purdue says, he cannot complain that Purdue stigmatized him. Purdue cites no cases in support of its position, but it is presumably trying to draw an analogy between John and a plaintiff who publishes damaging information about himself—because it is true that a plaintiff can't himself spill the beans and then blame the defendant for ruining his reputation.

John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510. In contrast to *Olivieri*, where disclosure was voluntary and speculative, it was compelled and certain in *Dupuy*. And in *Dupuy*, unlike in *Olivieri*, the disclosure was not self-published— it came from the defendant, even if the plaintiff had been obligated to authorize it. So too here: Purdue, not John, revealed to the Navy that it had found him guilty of sexual violence, and John had a legal obligation to authorize the disclosure.

Thus, if what John says is true, the university has stigmatized him by telling the Navy about the guilty finding. But the loss of reputation is not itself a loss of liberty, ''even when it causes 'serious impairment of one's future employment.''' *Hojnacki v. Klein–Acosta*, 285 F.3d 544, 548 (7th Cir. 2002) (alteration and citation omitted). John must also show that the stigma was accompanied by a change in legal status. In *Paul v. Davis,* for example, the Supreme Court held that the police did not trigger the Due Process Clause by posting flyers falsely asserting that the plaintiff was an active shoplifter. 424 U.S. at 712, 96 S.Ct. 1155. The flyers undoubtedly harmed the plaintiff's professional reputation, but their posting did not

alter his legal status. *Id.* at 708–12, 96 S.Ct. 1155. Similarly, in *Hinkle v. White*, loose lipped state police officers spread word that they were investigating the plaintiff for child molestation and that he might be guilty of arson to boot. 793 F.3d at 767. But the gossip did not alter his legal status— the plaintiff was not prosecuted, much less found guilty; nor did the county impose a consequence like firing him from his job as county sheriff. *Id.* at 768–69. Even though the rumors made it ''virtually impossible'' for him to change to a new job in his chosen field, the lack of a status change meant that he could not state a due process claim. *Id.* at 768–70.

John's situation is unlike that of the plaintiffs in *Paul v. Davis* and *Hinkle v. White* because it is not a matter of state spread rumors or an investigation that was ultimately dropped. After conducting an adjudicatory proceeding, Purdue formally determined that John was guilty of a sexual offense. That determination changed John's status: he went from a full-time student in good standing to one suspended for an academic year. *Cf. Mann*, 707 F.3d at 878 (holding that the state deprived the plaintiff of occupational liberty when, after an investigation, it found that she had violated child-safety laws and suspended her ability to operate her daycare center); *Doyle v. Camelot Care Ctrs.*, 305 F.3d 603, 617 (7th Cir. 2002) (holding that the state deprived the plaintiffs of occupational liberty when, after an investigation, it found that they had neglected a minor and informed their respective employers, who fired them). And it was this official determination of guilt, not the preceding charges or any accompanying rumors, that allegedly deprived John of occupational liberty. It caused his expulsion from the Navy ROTC program (with the accompanying loss of scholarship) and foreclosed the possibility of his re-enrollment in it. John has satisfied the ''stigma plus'' test.

## 2. The Material Undisputed Facts Establish John Doe's Stigma-Plus Liberty Interest

Discovery established John Doe's stigma-plus liberty interest even more solidly than the allegations of the Complaint.

As stated in the Statement of Material Undisputed Facts, following the disciplinary decision of Purdue to suspend John Doe that had been upheld by Vice President Rollock against John Doe's appeal, the Navy ROTC called John Doe before a Performance Review Board that convened on August 10, 2016, and based solely on the disciplinary decision of Purdue (suspension), John Doe was disenrolled from the Navy ROTC at Purdue. The Navy files showed receipt of the Purdue disciplinary documents. (Statement of Material Undisputed Facts, No. 51.)

The testimony of the commander of the Purdue Navy ROTC at the time, Captain Rodney Hutton, and the associated documents established that John Doe was not disenrolled because Captain Hutton determined that John Doe sexually assaulted Jane Doe (Captain Hutton did not so determine), but rather because John Doe had been disenrolled because he was suspended by Purdue; that the Navy looked to the Purdue investigation and no other investigation report was in the documents considered for disenrollment; that the Navy proceedings were delayed so that Purdue could complete its disciplinary proceeding; that it was a requirement the Naval ROTC program that a student midshipman be continuously enrolled in the university; that the Navy disenrollment document shows that the only reason for disenrollment was the Purdue suspension; that John Doe submitted a  statement to the Navy that he was not guilty of the sexual misconduct charges; and that that John Doe's performance reviews showed John Doe to be "very motivated," that for "leadership and cohesiveness,"  he was "very vocal during PT in encouraging other midshipmen, is a team player, and promotes unit cohesion" and that he met or exceeded program standards in "Physical fitness."    (Statement of Material Undisputed Facts, Nos. 52-57.)

The second in command of the Purdue Navy ROTC at the time, Executive Officer Craig Remaly, who was the head officer of the Performance Review Board, testified: that the discussions of the Performance Review Board concerned the university suspension and did not include the personal opinions of the Lieutenant who compiled the university disciplinary documents on John Doe; that the documents that were listed as before the Performance Review Board included Purdue's investigation report, the Purdue Dean's determination and John Doe's appeals; that the university suspension as the only reason for the disenrollment recommendation of the Performance Review Board; and that he has seen ROTC students with worse G.P.A.s than John Doe succeed

and ROTC students with better G.P.A.s than John Doe fail.  (Statement of Material Undisputed Facts, No. 58.)

Staff Lieutenant Kyle Willstatter, who was a non-voting member of the Performance Review Board and its reporter, confirmed that the Performance Review Board did not care why John Doe was suspended by Purdue.  Willstatter described Redlawsk Chester's role as collecting the disciplinary documents from Purdue.  Just before the disenrollment, Willstatter e-mailed to John Doe to inform him of the nature of the Performance Review Board:

> The PRB [Performance Review Board] is not about the circumstances surrounding your suspension, it is about the fact that you have been suspended. There is no reason to re-litigate the university's decision. The fact is that you are suspended, and the ROD requires disenrollment for any case where a student is suspended. The black and white nature of this PRB is why you are allowed to waive, if you so choose, any witnesses or other persons you would want to have present. Please let me know their names and the reason. You have the right to bring any witnesses you want; however, unless they're going to state contrary to facts that you have not been suspended by the university, it will basically be a waste of time.

Willstatter was also presented with August 10, 2020 Performance Review Board document (NSTC 00111-0012), which he said was written by him.  Willstatter reviewed the list of documents on the document that were reviewed by the Performance Review Board, which were the Purdue disciplinary case documents.  Willstatter testified that the delay from June 2016 to August 2016 of the Performance Review Board was Plaintiff John Doe's appeal of the university suspension and that John Doe did attend the disenrollment proceeding.  According to Willstatter, there was no other Performance Review Board ever held as to John Doe.  (Statement of Material Undisputed Facts, Nos. 59-60.)

### B.    Purdue Denied Due Process in Finding John Doe Guilty

The material undisputed facts establish that Purdue denied due process to John Doe in finding John Doe guilty of sexual misconduct and suspending him.

1.      **The Law of the Case: Judge Barrett on the Requirements of**
        <u>**Due Process**</u>

In *Doe v. Purdue*, 928 F.3d 652, 663-664 (7th Cir. 2019) (Barrett, J.), the Court's opinion

states in pertinent part:

> Having determined that John has adequately alleged that Purdue deprived him of a liberty interest, we turn to whether he has adequately claimed that Purdue used fundamentally unfair procedures in determining his guilt. . . .
>
> John's circumstances entitled him to relatively formal procedures: he was suspended by a university rather than a high school, for sexual violence rather than academic failure, and for an academic year rather than a few days. Yet Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension. ''[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story.'' *Goss*, 419 U.S. at 581, 95 S.Ct. 729. John received notice of Jane's allegations and denied them, but Purdue did not disclose its evidence to John. And withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair. *See id.* at 580, 95 S.Ct. 729 (''[F]airness can rarely be obtained by secret, one sided determination of facts decisive of rights' (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring))).
>
> John has adequately alleged that the process was deficient in other respects as well. To satisfy the Due Process Clause, ''a hearing must be a real one, not a sham or pretense.'' *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016) (citation omitted). At John's meeting with the Advisory Committee, two of the three panel members candidly admitted that they had not read the investigative report, which suggests that they decided that John was guilty based on the accusation rather than the evidence. *See id.* at 630 (stating that a hearing would be a sham if ''members of the school board came to the hearing having predetermined [the plaintiff's] guilt''). And in a case that boiled down to a ''he said/she said,'' it is particularly concerning that Sermersheim and the committee concluded that Jane was the more credible witness—in fact, that she was credible at all—without ever speaking to her in person. Indeed, they did not even receive a statement written by Jane herself, much less a sworn statement.  It is unclear, to say the least, how Sermersheim and the committee could have evaluated Jane's credibility.
>
> Sermersheim and the Advisory Committee's failure to make any attempt to examine Jane's credibility is all the more troubling because John identified specific impeachment evidence. . . .

928 F.3d at 663-664. *Doe v. Purdue* was one of the cases that informed the formulation of current Title IX regulations that mandate due process and fairness. "*Secretary DeVos Announces New Title IX Regulation,*" *https://www.youtube.com/watch?v=hTb*3yfMNGuA*;* U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020; 34 C.F.R. 106.45.

## 2.    The Material Undisputed Facts Establish Purdue Denied Due Process in Finding John Doe Guilty

Discovery has strengthened John Doe's case that he was denied due process when deprived of his liberty interest. The depositions of Purdue people with the documents that formed the basis of the allegations of the Complaint have shown a process more flawed than what was alleged in the Complaint, which is reflected in the above Statement of Material Undisputed Facts and discussed next.

### a.    The Due Process Violations

### (i)    Purdue Never Provided John Doe with the Evidence and the Investigation Report During the Disciplinary Case

Judge Barrett's opinion in *Doe v. Purdue* made clear that it was a violation of due process to deny to John Doe access to the evidence supporting the allegations and to deny to John Doe access to the investigation report, 928 F.3d at 663. *Accord*: *Doe v.* Miami, 883 F.3d 579, 803 (6th Cir. 2017) (denial of due process from denial of access to investigation report). Current Title IX regulations require timely disclosure of the evidence by the school obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, 34 C.F.R. 106.45(b)(5)(vi), and require further timely disclosure of the investigation report to the respondent before a hearing, 34 C.F.R. 106.45(5)(vii). Here, discovery showed Defendants violated these due process requirements.

On April 28, 2016, Purdue investigators Erin Oliver and Jacob Amberger met with John Doe met in the presence of Steven Knecht, an attorney who acted as John Doe's supporter during the meeting. The interviews were not recorded or videotaped; the investigators wrote notes. To the investigators, John Doe provided 133 pages of text messages between John Doe and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because he believed the texts showed there had not been a sexual assault. Jane Doe provided no texts to the investigators, telling them she had deleted the texts. John Doe also provided a list of character witnesses to the investigators Amberger and Oliver. To the investigators Amberger and Oliver, John Doe denied the sexual assault allegations in the Notice of Allegations. (Statement of Material Undisputed Facts, No. 19.)

In the period May 9-12, 2016, Purdue investigator Amberger had e-mail correspondence with Monica Bloom, Director of CARE, about a follow up conversation with Jane Doe. On May 12, 2016, Purdue investigator Amberger had a follow up conversation with Jane Doe about the texts. Purdue investigators did not follow up with John Doe about interpretation of the texts after talking with Jane Doe. (Statement of Material Undisputed Facts, Nos. 19-21.)

Purdue investigators prepared an investigation report, and on May 20, 2016, sent it to Dean Sermersheim. To the investigators, John Doe had provided 133 pages of text messages between John Doe and Jane Doe covering the period December 23, 2015 to March 15, 2016. The investigation report included portions of 7 pages of the 133 pages of texts. Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John Doe to the investigators. In accordance with Purdue's procedures at the time, John Doe was not given an opportunity to review the investigation report any time before the June 6, 2016 panel meeting. At

the hearing, John Doe did not know how the texts were interpreted in the investigation report. (Statement of Material Undisputed Facts, Nos. 21, 23, 27.)

After Dean Sermersheim had reaffirmed her decision to find John Doe responsible and suspend him on the purported ground Jane Doe was more credible, John Doe's July 10, 2016 appeal document, among other things, (i) demanded to know what was the particular evidence used to determine Dean Sermersheim's finding that the preponderance of the evidence supported John Doe not being a credible witness and Jane Doe being a credible witness, (ii) stated that he had been denied review of the evidence that supposedly supported the factual basis for Dean Sermersheim's determination and (iii) demanded, among other things, a copy of the investigation report. (Statement of Material Undisputed Facts, No. 36, 40, 46.)

Only after – well after – the disciplinary case was over did Purdue ever give John Doe an opportunity to review the investigation report. Four days after Vice President Rollock's decision to affirm the suspension, on July 25, 2016, Vice President Rollock sent an e-mail letter to John Doe, copied to Associate Legal Counsel Tandra Foster, concerning John Doe's request for his education records and the investigation report. On September 20, 2016, John Doe requested Ms. Foster for the documents identified in his July 10, 2016 appeal. On October 11, 2016, Tandra Foster replied, stating that John Doe and his parents could go to Purdue to review the documents. On October 20, 2016, John Doe and his mother were finally permitted at Purdue to review the investigation report. (Statement of Material Undisputed Facts, Nos. 49, 61-63.)

### (ii)    **No Real Hearing**

Judge Barrett's opinion for the Seventh Circuit made clear that a real hearing, not a sham one, was required, 928 F.3d at 663. *Accord*: *Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018). Current Title IX regulations require a real hearing, 34 C.F.R. 106.45(6). Here, though, there was

no real hearing, just an untranscribed half-hour meeting of John Doe with Dean Sermersheim and members of the Advisory Committee.

On May 31, 2016, Dean Sermersheim sent a letter to John Doe, copied to Amberger and Oliver, informing John Doe of the scheduled "Panel Meeting" on June 6, 2016, at which John Doe was scheduled to appear between 2:00 PM to 2:30 PM. Also on May 31, 2016, Joanna Sharp, the assistant to Dean Sermersheim, sent an e-mail to investigators Amberger and Oliver informing them of the "Panel Meeting" on June 6, 2016, with John Doe to appear between 2:00 PM to 2:30 PM and the investigators to appear between 2:30 PM to 3:00 PM. (Statement of Material Undisputed Facts, No. 24.)

On June 6, 2016, John Doe along with his supporter Steven Knecht met for a half-hour with the three-person panel of the Advisory Committee on Equity and Defendant Dean Sermersheim. The meeting did not involve any sworn testimony and was not recorded or transcribed. Jane Doe did not appear before the Advisory Committee and the Dean; thus, there was no live testimony by Jane Doe and no cross-examination of Jane Doe about her allegations. (Statement of Material Undisputed Facts, Nos. 25-26.)

### (iii)    Pre-judgment Based on Complainant's Accusation; Credibility Determinations Without Proper Basis

Judge Barrett's opinion for the Seventh Circuit made clear that judgment based on the complainant's accusation and credibility assessments without a proper evidentiary basis were violations of due process, 928 F.3d at 663-664; and current Title IX regulations prohibit bias for a complainant and prohibit credibility assessments based on a person's status—being a complainant does not support credibility, 34 C.F.R. 106.45(b)(1)(ii) and (iii).

John Doe testified in his deposition that at the June 6, 2016 meeting with Dean Sermersheim and the Advisory Committee, two members said they had not read the investigation

report; while John Doe denied Jane Doe's allegations, the Dean and the Advisory Committee members acted with hostility in the way questions were asked; texts were asked about, but John Doe was not apprised of how those texts were interpreted in the investigation report. John Doe's description of the meeting is not contradicted by Dean Sermersheim, who did not recall the specific panel meeting and did not recall what the panel members and John Doe said at the unrecorded, untranscribed meeting. (Statement of Material Undisputed Facts, No. 27.)

In contrast, Jane Doe never appeared in person before Dean Sermersheim and the Equity Committee and yet she was deemed more credible. On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim, but rather Monica Bloom, Director of CARE and a lawyer, on June 5, 2016, submitted an unsworn written statement said to come from Jane Doe. Consequently, the three-person panel of the Advisory Committee and Dean Sermersheim never met and never heard any direct testimony from Jane Doe, nor did the Advisory Committee and Dean Sermersheim have the opportunity to ask any questions of Jane Doe. (Statement of Material Undisputed Facts, Nos. 25-26.)

It has been held that where there are competing narratives in these Title IX cases, as there was here, cross-examination is really essential, *Doe v. Univ of Cincinnati*, 872 F.3d 393, 401, 404 (6th Cir. 2017), and current Title IX regulations require it conducted by the party's advisor, 34 C.F.R. 106.45(b)(6)(i). Cross-examination is recognized as the greatest legal engine ever invented for discovery of the truth, *Lilly v. Virginia*, 527 U.S. 116, 124 (1999), 3 Wigmore, Evidence §1367, p. 27 (2d ed. 1923). Here, though, there was not even live testimony by Jane Doe and not even questioning by the Advisory Panel and the Dean, much less cross-examination. A credibility assessment cannot properly be based upon an unsworn written document processed through a

41

sexual assault center director-lawyer without an opportunity to see the person testify in person.  In these circumstances, there was pre-judgment for Jane Doe.

**b.**    **Why Due Process Matters**

The practical reason why due process matters is so cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).  When there is a denial of due process, there is a need for corrective action.

**1.**    **The Court Should Order the Injunctive Relief of the Removal of Conditions on Readmission and the Expungement of the Disciplinary Finding and Records Sought in the Second Amended Complaint**

Application of *Ex Parte Young,* 209 U.S. 123 (1908), has been widely recognized to authorize prospective injunctive relief to clear a student's academic record: *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016); *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007); *Shepard v. Irving*, 77 F. App'x at 620; *Thomson v. Harmony*, 65 F.3d 1314, 1321 (6th Cir. 1995); *Johnson v. Western State Colorado University*, 71 F. Supp.3d 1217, 1230 (D. Colo. 2014); *see also Elliott v. Hinds*, 786 F.2d 298, 302 (7th Cir. 1986) ("[t]he injunctive relief requested here, reinstatement and expungement of personnel records, is clearly prospective in effect"); *Wolfel v. Morris*, 972 F.2d 712, 719 (6th Cir. 1992) (records of punished inmates cleared of any mention of discipline).

The Second Amended Complaint reads in pertinent part in the Prayer for Relief (ECF 160: Second Amended Complaint, pp. 64):

> on the first cause of action for violation of constitutional due process under 42 U.S.C. § 1983, a judgment against Defendants Daniels, Rollock and Sermersheim awarding John Doe an injunction vacating John Doe's disciplinary findings and decision, granting expungement of the disciplinary record from John Doe's school records at Defendant Purdue, ordering the ending of the suspension subject to any readmission requirements. . . .

This Court should order this injunctive relief: (i) removal of conditions on readmission and (ii) expungement of the disciplinary finding and records.  The Court already ruled, consistent with the

precedent, that this relief for due process violations stated in the Second Amended Complaint (ECF 160: Second Amended Complaint), which was in the First Amended Complaint (ECF 51 September 3, 2019, Amended Complaint), is proper to seek in this action (ECF 84: May 19, 2020, Opinion and Order). It was in the context of having found lack of due process that the Seventh Circuit stated: "having determined that John has pleaded a liberty interest, we instruct the court to address the issue of expungement on remand." *Doe v. Purdue*, 928 F.3d at 667.

Removal of conditions on readmission is a relatively simple matter of the Court so ordering. Expungement of John Doe's disciplinary finding and records, however, is a bit more complicated because of the multiple locations of where the disciplinary records are located. The disciplinary case files in John Doe's case are maintained in several places: the Office of Institutional Equity, the Dean of Students, the Vice President of Ethics and Compliance, the Records Office and the Office of Legal Counsel. (Statement of Material Undisputed Facts, No. 65.) The Court's Order should specify that the disciplinary case files at each location need to be expunged. Accordingly, President Daniels, Vice President Rollock, and Dean Sermersheim should be included in the injunctive relief order in their respective official capacities.

## II. <u>Defendants' Amended Counterclaim Should Be Dismissed as a Matter of Law</u>

Defendants' Amended Counterclaim (ECF 161) purports to be an action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and Title IX of the Education Amendments of 1972, but it contains no allegations supporting federal court subject matter jurisdiction. There are at least three fatal defects as a matter of law requiring dismissal of Defendants' Amended Counterclaim.

### A. <u>Defendants Are Seeking Declarations Impermissibly Based on State Law or Are Contrary to the Law of the Case</u>

The first fatal defect is that the Amended Counterclaim mostly seeks to invoke what are state law police powers; three of the four requested declarations involve state law police powers;

and the one requested declaration that is not state law based is at odds with the law of the case in

*Doe v. Purdue*, 928 F.3d 652.

The Amended Counterclaim seeks: (i) to "[d]eclare John Doe's conduct violated Purdue

University's conduct regulations"; (ii) to "[d]eclare that Purdue University, in the exercise of its

discretionary authority as an instrumentality of the State of Indiana to police the safety of its

campus, has at all relevant times possessed good and adequate cause to suspend John Doe from

enrollment at Purdue University"; (iii) to "[d]eclare that Purdue University, in the exercise of its

discretionary authority to protect its educational environment from interference with its

educational mission, has at all relevant times possessed good and adequate cause to exclude John

Doe from Purdue University's educational environment"; and (iv) to "[d]eclare that there is no

Purdue-imposed stigma on John Doe's occupational liberty for Navy ROTC enrollment or a career

in the United States Navy." (SJM 3: ECF 161, Defendants' Answer to Plaintiff's Second Amended

Complaint and Amended Counterclaim, pp. 64, 64.)

The first three requested declarations are state law based and do not involve application of

Title IX. It is not the federal court's role to determine independently and declare that conduct

violated the university's student code and that the university had the basis to suspend a student

from campus; the federal court's role is to determine whether the university took actions that were

in violation of federal due process and constituted federally prohibited discrimination. The fourth

declaration seeks a ruling denying John Doe has a stigma-plus liberty interest that Judge Barrett's

opinion in *Doe v. Purdue*, 928 F.3d at 661-663, specifically ruled John Doe had.

## B.  Denial of Due Process Precludes Defendants' Amended Counterclaim

The second fatal defect is that the denial of due process precludes Defendants' Amended

Counterclaim. Indisputably, Defendants during the disciplinary case did not give access to John

44

Doe to the evidence used against him, did not give John Doe access to the investigation report, did not give a real hearing and engaged in pre-judgment based on accusation -- which have already been ruled in the law of the case to be denials of due process. *Doe v. Purdue*, 928 F.3d at 663-664. The denial of due process here invalidates any effort to rely upon the university process for the purported declaratory relief. *See Marshall v. Jerrico, Inc.*, 446 U.S. at 242.

      **C.**    **The Case Law in The Seventh Circuit Establishes That Defendants' Amended Counterclaim Should Be Dismissed as a Misuse of the Declaratory Judgment Act**

The third fatal defect to Defendants' Amended Counterclaim is that under the case law in the Seventh Circuit, Defendants' declaratory judgment-based Amended Counterclaim is legally defective and should be dismissed because it "is repetitive and unnecessary . . . [and] merely restates an issue already before this Court." *U.S. v. Zanfei*, 353 F.Supp.2d 962, 965 (N.D. Ill. 2005) (quoting *Rayman v. Peoples Savings Corp.*, 735 F.Supp. 842, 851–52 (N.D.Ill.1990); *accord*, the decision of Judge William J. Bauer, subsequently of the Seventh Circuit, in *Green Bay Packaging, Inc. v. Hoganson & Assoc., Inc.*, 362 F.Supp. 78 (N.D.Ill. 1973) (a defendant's declaratory judgment counterclaim dismissed because it sought rulings on claims a plaintiff "asserted in his complaint but with the opposite effect"). Preserved in John Doe's First Affirmative Defense to Defendants' Amended Counterclaim was the failure of the Counterclaim to state a claim upon which relief may be granted. (SJM 4: ECF 162, Plaintiff's Answer to Counterclaim, p. 6.)

Defendants' Amended Counterclaim is similar to the dismissed counterclaims in *Zanfei* and *Green Bay Packaging* because it mirrors John Doe's claims except that Defendants seek the opposite effect. John Doe seeks rulings finding Defendants violated his due process and Title IX rights in Defendants' application of Purdue's student conduct policies. Defendants' Amended Counterclaim seeks the opposite: Defendants want this Court to "[d]eclare" John Doe violated

Purdue's conduct regulations and find Defendants had good and adequate cause to exclude John Doe from campus.

*Sarks Café, Inc. v. Sarks In the Park LLC*, 55 F.Supp.3d 1034, 1037-38 (N.D.Ill. 2014), *Saporito v. Carr*, 684 F.Supp.2d 1043, 1063 (N.D.Ill. 2010), and *Ortho-Tain Inc., v. Rocky Mountain Orthodontics, Inc*., 2006 WL 3782916, at *3 (N.D.Ill. Dec. 20, 2006), and *Manago v. Auto-Owners Ins. Co.*, 2018 WL 620381 (N.D. Ind. Jan. 30, 2018), provide four additional examples of why Defendants' declaratory judgment-based counterclaim should be dismissed as a matter of law.   The counterclaim in *Sarkis Café* was dismissed because it was "duplicative" of the plaintiff's claims and "serve[d] no useful purpose" since any "uncertainty" regarding the controversy between the parties was "alleviated" and "ripened" by the plaintiff's lawsuit. 55 F.Supp.3d at 1038.   Likewise, *Saporito,* 684 F.Supp.2d at 1063, ruled that 28 U.S.C. § 2201 prohibited a defendant from using a counterclaim to obtain "rul[ings] on what are in effect [defendant's] defenses" to the plaintiff's claims.   *Saporito* stated (684 F.Supp.2d at 1063):

> The Declaratory Judgment Act allows a party to bring a lawsuit based on a reasonable apprehension that it will be sued. *DeBartolo v. Healthsouth Corp.,* 569 F.3d 736, 741 (7th Cir.2009). It is not, however, a vehicle for bringing counterclaims to a suit that has already been filed when those counterclaims mirror defenses already raised. "'It is well settled that such repetitious and unnecessary pleadings should be stricken.'" *United States v. Zanfei,* 353 F.Supp.2d 962, 965 (N.D.Ill.2005) (*quoting Rayman v. Peoples Savings Corp.,* 735 F.Supp. 842, 851–52 (N.D.Ill.1990)); *see also Tenneco Inc. v. Saxony Bar & Tube, Inc.,* 776 F.2d 1375, 1379 (7th Cir.1985).

*Ortho-Tain,* 2006 WL 3782916, at *3, dismissed a 28 U.S.C. §2201 based counterclaim in part because it was duplicative of some of the defendant's "affirmative defenses."   In *Manago v. Auto-Owners Ins. Co.*, 2018 WL 620381 (N.D. Ind. Jan. 30, 2018), the Court dismissed a counterclaim under FRCP 12(f) without addressing the plaintiff's 12(b)(6) arguments. *Id.* It did so because FRCP 12(f) gave the Court the authority to "strike from a pleading ... any redundant, immaterial,

impertinent, or scandalous matter. . . ." Id., *2, discussing *Cincinnati Specialty, Underwriters Ins. Co. v. DMH Holdings, LLC*, 2013 WL 683493 (N.D. Ind. Feb. 22, 2013); *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286 (7th Cir. 1989); and *Lincoln Nat'l Corp. v. Steadfast Ins. Co.*, 2006 WL 1660591 (N.D. Ind. June 9, 2006). In explaining its decision, the Court noted, *inter alia*, defendant's declaratory judgment request served "no useful purpose" because "the controversy ha[d] 'ripened' and the uncertainty and anticipation of litigation [were] alleviated" by the plaintiff's lawsuit. *Id.*, at *3, quoting *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 749 (7th Cir. 1987).

## <u>CONCLUSION</u>

For the reasons stated above, John Doe's motion for partial summary judgment should be granted and judgment should be entered for John Doe on John Doe's claim for denial of constitutional due process per *Doe v Purdue*, 928 F.3d 652 (7th Cir. 2019), with the requested injunctive relief, and to dismiss Defendants' legally defective counterclaim for declaratory relief, and the Court should grant such further and other relief as deemed just and proper.

**Dated: September 1, 2021**                  **Respectfully submitted,**
                                              **NESENOFF & MILTENBERG, LLP**
                                              **By:** /s/ *Philip A. Byler*
                                              **Philip A. Byler, Esq.**
                                              **Andrew T. Miltenberg, Esq.**
                                              **363 Seventh Avenue, Fifth Floor**
                                              **New York, New York 10001**
                                              **(212) 736-4500**
                                              **pbyler@nmllplaw.com**
                                              **amiltenberg@nmllplaw.com**
                                              *Attorneys for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served upon the attorneys of record for each party to the above-entitled cause at the address shown below on September 1, 2021.

William P. Kealey, Esq.
Tyler L. Jones, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
        tlj@stuartlaw.com
*Attorneys for Defendants*

BY:     ☐ U.S. Mail          ☐      Federal Express

        ☐ Hand-Delivery    x      Other: Email & ECF


_____*Philip A. Byler, Esq.*_____
        Philip A. Byler, Esq.

48