**EXHIBIT SJM 5**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF INDIANA
 2                      HAMMOND DIVISION
                   CASE NO. 2:17-cv-33-JPK
 3
 4   JOHN DOE,                           )
                                         )
 5          Plaintiff,                   )
                                         )
 6          -vs-                         )
                                         )
 7   PURDUE UNIVERSITY, PURDUE           )
     UNIVERSITY BOARD OF TRUSTEES,       )
 8   MITCHELL ELIAS DANIELS, JR.,        )
     in his official capacity as         )
 9   President of Purdue                 )
     University, ALYSA CHRISTMAS         )
10   ROLLOCK, in her official            )
     capacity at Purdue University,      )
11   KATHERINE SERMERSHEIM, in her       )
     official capacity at Purdue         )
12   University,                         )
                                         )
13          Defendants.
```

DEPOSITION OF ███████████

The videotaped deposition upon oral examination of ███████████ a witness produced and sworn before me, Clarice H. Howard, CCR-Ky, Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Defendants, at the offices of Stuart & Branigin, LLP, 300 Main Street, Suite 900, Lafayette, Indiana, on Tuesday, August 18, 2020, scheduled to commence at 10:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to time and place thereof.

Page 6

1  University, Mitchell Daniels, Katherine Sermersheim
2  and Alysa Rollock.
3      MR. JONES:  Tyler Jones, Stuart & Branigin,
4  counsel for the defendants as previously
5  identified.
6      -------------------
7      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  having been duly sworn to tell the truth, the whole
9  truth, and nothing but the truth relating to said
10 matter, was examined and testified as follows:
11
12 DIRECT EXAMINATION
13     QUESTIONS BY MR. KEALEY:
14 Q  Good morning, Mr. ▮▮▮.
15 A  Good morning.
16 Q  Have you been deposed before?
17 A  I have not.
18 Q  Have you been a party to any lawsuit before this
19    lawsuit?
20 A  No.
21 Q  Are you currently a party to any other lawsuit?
22 A  No.
23 Q  I'll briefly describe the procedure this morning.
24    You're under oath testifying, that same as if
25    you're in court.  Your testimony is being

Page 7

1  videotaped and recorded by a reporter for use as
2  evidence in this case.
3      Because it's being recorded in those manners,
4  it is important for us not to speak over one
5  another.  So wait for me to finish my questions.
6  I'll wait for you to finish your answers.
7      Occasionally your counsel may have an
8  objection between a question and an answer.  And so
9  we each need to be attentive to the other so that
10 the reporter is only recorded one speaker at a
11 time.
12     Because the reporter is recording verbal
13 statements.  Nonverbal statements such as shaking
14 the head or nodding the head can't be recorded and
15 if you respond to a question of mine with a nod or
16 a nonverbal response, I may ask you to just say yes
17 or no.  That's because of the transcription that's
18 being prepared.
19     While we're on the record, everything that is
20 said in the room is recorded.  We will take
21 periodic breaks every 60 or 90 minutes as needed
22 and as requested by those in the room.  We
23 typically will not a break with a question pending.
24     Are you feeling well enough rested to go
25 forward with today's deposition?

Page 8

1  A  I am.
2  Q  Are you currently taking any medication?
3  A  No.
4  Q  None at all?
5  A  No.
6  Q  Are you currently prescribed any medication?
7  A  No.
8  Q  Have you ever been prescribed any Adderall?
9  A  I have.
10 Q  When was that last time you were prescribed
11    Adderall?
12 A  I believe I was prescribed Adderall briefly at
13    Taylor University.  Before that I took ADHD
14    medication through high school, and I stopped
15    taking ADHD medication in preparation for military
16    in college.
17     So after I left Pursue, I went to Taylor
18    University and I was prescribed it for a short
19    time.
20 Q  And when you say short time, less than a year?
21 A  I believe so.
22 Q  Did your prescription to Adderall end before your
23    time at Taylor ended?
24 A  I can't remember.  I hadn't thought about it.
25 Q  You left Taylor University at the end of the fall

Page 9

1  of 2017 semester, correct?
2  A  At the end of that semester, yes.
3  Q  So you've had no prescription for Adderall since
4     the beginning of 2018?
5  A  Correct, I believe so.
6  Q  Mr. ▮▮▮, how did you prepare for today's
7     deposition?
8  A  Review of the case thus far, lots of talking and
9     mental preparation, take a cold shower, talk with
10    my parents, talk with Phil, talk with Elvin and
11    just an overall review.
12 Q  What documents did you review?
13 A  I reviewed my medical records, the Navy documents,
14    the Taylor University documents, the long
15    investigation report document, that's 700 and
16    something pages long, and some miscellaneous legal
17    documents in between.
18 Q  Documents filed in court?
19 A  Yes, yes.
20 Q  Did you review any other documents?
21 A  Not to my recollection.  I think that covers it.
22 Q  Do you review anything on your phone or your
23    computer?
24 A  Oh, the social medial is what you're referring to,
25    I think.  The social medical documents I look at as

3 (Pages 6 - 9)

Page 18

1  Q    How is it that you review Deposition Exhibit 1
2       before it was filed and allowed paragraph 42 to be
3       filed on your behalf if it was inaccurate as to the
4       time and occasion on which you saw the
5       investigator's report?
6  A    How is it?
7  Q    Yes.
8  A    I missed it.
9  Q    You're stating that the correct date was two months
10      later, August of 2016?
11 A    Yes.
12 Q    And you're stating that the occasion had nothing to
13      do with anything going on at Purdue University, but
14      rather a Navy ROTC proceeding?
15 A    Yes.
16 Q    So the reference to prior to a meeting with Dean
17      Sermersheim and the three person panel, the
18      advisory committee on equity, in paragraph 42 is
19      also not accurate?
20 A    Correct.
21 Q    So my question is how did you read this paragraph
22      and conclude that it was accurate?
23 A    Well, I probably read it and didn't realize the
24      difference in date, and I clearly didn't pay enough
25      attention to the paragraph.

Page 19

1  Q    What information did you have that caused anyone to
2       write paragraph 42 as it is written?
3  A    I think that my recollection of the date was
4       incorrect when we filed this.  And when we looked
5       at the Navy documents that were obtained, we saw
6       that there was a difference in date and realized
7       that there was a mistake.
8  Q    Who is we?
9  A    Me and Mr. Byler.
10 Q    When did you realize there was a mistake in
11      paragraph 42?
12 A    After reviewing the Navy documents that were
13      subpoenaed by your firm.
14 Q    My question is slightly different.  What
15      information did you possession at the time you
16      started this case that caused you to allege you
17      were shown the investigator's report prior to the
18      panel meeting and that you were shown the report by
19      a member of Navy ROTC?
20           MR. BYLER:  Objection, asked and answered.
21      Witness, go ahead.
22 A    We may have had a miscommunication because I
23      distinctly remember the time I saw the report was
24      before I was dismissed from the ROTC unit.  I
25      remember my frustration at that time because the

Page 20

1       first time I was seeing this report was in August
2       after any sensible window of opportunity to review
3       it already passed, judgment had been passed by the
4       school, and I was never able to look at what was
5       written about me in order to defend myself.
6            And my understanding from looking at this is
7       that I may have just not looked at it correctly
8       when I reviewed it.  And it's clearly a mistake,
9       but we have since discussed the mistake and we
10      understand that this is not accurate.
11 Q    When did you plan to inform the court that this
12      allegation untrue?
13           MR. BYLER:  I'm sorry, I couldn't hear the
14      question.
15 BY MR. KEALEY:
16 Q    When did you plan to information the court that
17      this allegation in paragraph 42 was untrue?
18           MR. BYLER:  Objection to form.
19 A    I would think as soon as possible, but I don't
20      understand how corrections are done legally.  So I
21      notified Phil that as we had gone over it, I don't
22      recall when exactly I noticed the error.
23           (Deposition Exhibit No. 2 marked
24              for identification.)
25 BY MR. KEALEY:

Page 21

1  Q    Mr. ▊▊▊▊, I'm handing you Deposition Exhibit 2.
2       Please review this document.  Do you recognize this
3       document?
4  A    I recognize my signature.  Yes, I do.
5  Q    Who drafted that document?
6  A    That I do not recall.
7  Q    Did you draft it?
8  A    No, I don't think I did.
9  Q    Who requested that creation and signature on
10      Deposition Exhibit 2?
11 A    I don't recall.
12 Q    Was it somebody from Navy ROTC?
13 A    It may have been.  I don't recall.
14 Q    Do you recall whether Navy ROTC asked you to sign a
15      release for Navy ROTC to access the information
16      described in Deposition Exhibit 2?
17 A    No, but it's here, so they must have.
18 Q    After you signed this document, who did you give it
19      to?
20 A    I don't recall who I gave it to.
21 Q    What did you understand was the reason why you were
22      signing Deposition Exhibit 2?
23 A    Upon looking at the document, it seems pretty
24      straight to the point.  It's saying that the school
25      investigation is permitted to be seen by the Navy

Page 22

1  and it's asking for my consent in that matter.
2  Q  What did you understand to be the reason why Navy
3     ROTC was obtaining your consent?
4  A  I imagine they wanted to be in the loop on what was
5     going on.
6  Q  You imagine that or did somebody tell you that?
7  A  Well, this document does.
8  Q  You don't recall one way or the other anybody at
9     the Navy telling you that the Navy wanted access to
10    information from Purdue?
11 A  No, I do not.
12 Q  So as you sit here today, you didn't have any
13    recollection of the circumstances under which you
14    signed Deposition Exhibit 2?
15    MR. BYLER:  Objection, form.
16 A  When this investigation started at the school, I
17    was in disarray.  I was in disbelief and a lot of
18    the details were or some of the details of the
19    early stages of the investigation and who got
20    access to what, was lost on my memory.
21 Q  As of May 24, 2016, you wanted access to the
22    investigator's report yourself, right?
23 A  I did want access to the investigator's report
24    because I want to defend myself in the case that
25    Purdue had me in.  If the 24 is that date, then

Page 23

1  yes.
2  Q  The date that appears on Deposition Exhibit 2 is
3     May 24, 2016; did you see that?
4  A  I do.
5  Q  Do you have any reason to believe that that's not
6     the document on which you signed this document?
7  A  I do not.
8  Q  So as of the day you signed this document,
9     Deposition Exhibit 2, you yourself wanted access to
10    the investigator's report, correct?
11 A  Well, this document asks for authorization of
12    release of information pertaining to investigation
13    correspondent case concerning Jane Doe and
14    ▇▇▇▇▇▇▇▇ to the Department of Naval Sciences
15    Purdue University.  It does not say that it
16    authorizes release of all information to ▇▇▇▇▇
17    ▇▇▇.
18 Q  That wasn't my question.  My question was whether
19    on this date when you were signing Deposition
20    Exhibit 2, you yourself wanted access to the
21    investigator's report?
22 A  Yes, yes, I did want access to it.
23 Q  And you understood when you were signing this
24    document that the Navy was getting access to it,
25    correct?

Page 24

1  A  Yes.
2  Q  And so the Navy shortly after you signed Deposition
3     Exhibit 2 had the investigators report, right?
4  A  I did not how timely the school was going to be,
5     but --
6  Q  You certainly had the opportunity shortly after you
7     signed Deposition Exhibit 2 to receive the
8     investigator's report, correct?
9     MR. BYLER:  Objection, speculation.
10 A  I wasn't being told to when they were giving the
11    investigation report to anybody.
12 Q  You're not aware of any obstacle to the Navy
13    receiving your investigator's -- the investigator's
14    report after you signed Deposition Exhibit 2, are
15    you?
16    MR. BYLER:  Objection to form.
17 A  Could you repeat that question, please?
18 Q  You're not aware of any obstacle to the Navy
19    receiving the investigator's report you signed
20    Deposition Exhibit 2 on or May 24, 2016, are you?
21    MR. BYLER:  Objection, facts not in evidence.
22    Go ahead.
23 A  I was not aware -- I was not aware of the behind
24    the scenes on this at all.
25 Q  I'm just asking whether you were an obstacle to the

Page 25

1  Navy receiving the report after you signed
2  authorization for them to do so?
3     MR. BYLER:  Objection, asked and answered,
4     assumes facts not in evidence.
5  A  Could you give me examples of what you mean by
6     obstacles?
7  Q  Any obstacle you can dream up?
8     MR. BYLER:  Same objection.
9  A  I was not aware, no.
10 Q  Mr. ▇▇▇▇ when did you ask the Navy to let you see
11    Purdue's investigator report?
12 A  When I had correspondence with Navy personnel over
13    the summer, I mentioned that I did not have access
14    to the investigation report from Purdue, and I
15    mentioned that they had never given it to me.
16    And I think that prompted them to give brief
17    access to the investigation report when I drove
18    down to West Lafayette in August to turn in all of
19    my Naval gear.
20 Q  After you signed Deposition Exhibit 2, did you
21    contact anybody at the Navy ROTC between May 24 and
22    June 6 to ask to see their copy of the investigator
23    report?
24    MR. BYLER:  Objection to the form of the
25    question.

7 (Pages 22 - 25)

Page 110

1  texts. It's incomplete exhibit. Objection.
2  A  Those are some of the text that I provided.
3  Q  Which text tool were these from?
4  A  I don't recall. I don't know what it was. I found
5     something on-line that gave me a pdf version of
6     texts.
7  Q  From your phone?
8  A  Yes.
9  Q  On your Samsung native texting application?
10 A  Yes. It was not the texting application itself.
11    It was some third party application.
12 Q  Did you provide the investigators with any texts
13    predating December 13, 2015?
14 A  I didn't provide them with any texts predating
15    December 23, if I -- yeah, predating December 23.
16 Q  Why did you not provide the investigators with any
17    texts predating December 23, 2015?
18 A  Because I had no other texts in my phone at the
19    time.
20 Q  Are you texted with Ms. ▇▇▇▇ between the time
21    you met and December 23, 2015?
22 A  I don't recall any specific texts between us, but I
23    believe we did.
24 Q  You didn't just suddenly starting texting with each
25    other on December 23, did you?

Page 111

1  A  No.
2  Q  So what happened to the texts from the period
3     before December 23?
4  A  I probably cleared my phone. Slowing down, filled
5     with data. So speed it up by clearing all of my
6     photos and texts and applications I don't need,
7     just like routine maintenance.
8  Q  When did you do that?
9  A  Well, if the most recent text is December 23, then
10    it would have been before then.
11 Q  Did you make any effort to retrieve your pre
12    December 23 text messages from any backup archive?
13 A  I didn't know of any backup archive.
14 Q  When you provided to the investigators the text
15    messages that we've selected and marked as
16    Deposition Exhibit 13, what did you want the
17    investigators to do with these text messages?
18 A  I wanted them to look at the message history
19    between me and Ms. ▇▇▇▇ and see that it
20    disproved the allegation she was saying against me.
21 Q  What text that that batch of text messages proved
22    that you had sexually assaulted her?
23 A  All of them. If I had sexually assaulted her, I
24    would think she would have cut contact with me and
25    she would have very obvious evidence that something

Page 112

1  had happened or that she was no longer talking to
2  me, but that wasn't the case.
3     In the investigative report, she even claims
4  that she stopped communicating with me in the first
5  week of December. And she was found to be a
6  credible witness in the investigative report. And
7  I provided hundred and hundreds of text messages
8  that refuted that claim.
9     There were many holes in the investigative
10 report. That was one of them.
11 Q  Is there any text message between the two of you
12    that discusses whether you had sexually assaulted
13    her?
14 A  No.
15 Q  Is there any text message between the two of you
16    that discusses sexual contact between you?
17 A  No.
18 Q  So your contention is that none of the text
19    messages you provided the investigator talked about
20    sexual contact or sexual assault?
21 A  Correct. None of them talked about that.
22 Q  So your contention is that the absence of such
23    conversation in the text messages, as you
24    interpreted them, whereas the investigator to
25    interpret them to prove your innocence?

Page 113

1  A  Yes.
2  Q  Because you contend that if you had sexually
3     assaulted Ms. ▇▇▇▇ she would referred to it in
4     the text messages?
5  A  I would have thought so.
6  Q  And if there, in fact, text messages in which she
7     and you referred to sexual contact, that would be
8     bear on whether she was telling the truth or you
9     were telling the truth, correct?
10 A  Correct.
11 Q  So if the investigators found texts in which the
12    two of you were discussing sexual contact, it would
13    be appropriate for the investigators to rely upon
14    those texts as evidence, correct?
15 A  Correct.
16 Q  And if the investigators found such texts and
17    relied upon them, that would not be act of antimale
18    basis, would it?
19 A  It would depend on the manner in which they relied
20    upon it and whether they chose to ignore context or
21    conclude context. In some of the notes of the
22    investigator's report, they included context in the
23    notes and then they refused to add the context to
24    the final analysis findings.
25 Q  Explain.

29 (Pages 110 - 113)

Page 114

1  A   If they were unbiased in their findings, I would
2       think that they would try to be as clear as
3       possible with explanations in regards to texts.
4       Instead they went and they cherry picked several
5       different texts and they decided that those were
6       confessions on my part.
7          And they ignored the context surrounding those
8       texts. They ignored my explanation. They said I
9       was not a credible witness. They said that she
10      was. And they said in their report he's lying,
11      she's not.
12         The entire process, in my opinion, was deeply
13      flawed and is the only reason we ended up with the
14      result that we did.
15 Q   Your contention to the investigators was that none
16      of these texts deserved any attention at all,
17      correct?
18 A   My contention to the investigators was that these
19      texts showed there was no evidence of any sort of
20      sexual misconduct between the two of us.
21 Q   And so your credibility depended entirely on
22      whether that assertion by you was plausible?
23         MR. BYLER: Objection to form.
24 A   I also provided refutations to all of the other
25      allegations, and I provided explanations of her

Page 115

1       mental fortitude and why I thought she was not a
2       credible witness. And everything but texts was
3       ignored by the investigators.
4  Q   What does Ms. ▮▮▮▮ mental fortitude have to do
5       with your contention?
6  A   Her fortitude has to do with the allegations.
7  Q   Well, you're alleging that she intentionally framed
8       you for sexual assault?
9  A   Yes.
10 Q   What does her mental fortitude have to do with
11      that?
12 A   Perhaps fortitude is not the right word.
13 Q   What does your contention that she was suicidal
14      have to do whether she intentionally framed you for
15      sexual assault?
16 A   As I said before, I think that the suicide attempt
17      was something that changed out relationship. And
18      when I reported it, after our relationship was
19      over, I think that upset her. And she decided
20      months later that she was going to get back at me
21      for that.
22 Q   Why did you make a report of suicide attempt after
23      your relationship was over?
24 A   Because when the attempt happened, I didn't know
25      what to do. She was very mentally unstable around

Page 116

1       the attempt and after the attempt, and she never
2       acted the same way. But I debated for a while
3       whether it was a wise decision to report it because
4       I didn't want to further destabilize her mental
5       health, given that she had just tried to jump off
6       of a parking garage in front of me on the Sunday
7       before finals week.
8          So after about one month at the end of
9       January, I gathered up my courage and went to RA
10      and told them, hey, this is what's going on and I'm
11      really concerned for this girl. And I don't know
12      what's on with her, but I want it to be aware just
13      in case that could be something that could help
14      her.
15         I reported that to Dillion Sinks and it's
16      inside the very large investigation report document
17      with many copies of texts.
18 Q   You testified a minute ago that you made a report
19      about ▮▮▮▮ after you relationship was over, not
20      after she allegedly attempt to commit suicide, but
21      after the relationship was over, right?
22 A   Yes.
23 Q   You did so in mid February, not January, right?
24 A   The date I remember seeing was late January.
25 Q   So somewhere between six and eight weeks after the

Page 117

1       supposed incident in mid December?
2  A   Yes.
3  Q   Would you agree with me that if somebody was
4       concerned about suicide risk would not wait six to
5       eight weeks to report it?
6  A   No.
7  Q   You'd wait and see whether there was a suicide
8       during the six or eight weeks?
9  A   I was worried that doing that would further
10      destabilize her because the reasoning she was
11      giving me up to her suicide attempt was that she
12      was afraid she wasn't going to make in the Navy,
13      she wasn't going to get her grades where she needed
14      them to be, that she wasn't good enough to keep
15      following this path she had, saying she didn't even
16      know if she wanted to, all over the place.
17         And in my mind, if I were to go to the school
18      and say hey, this girl just tried to kill herself
19      and then the school were to go to her right away, I
20      think that would have upset her even more and
21      potentially put her at more risk.
22 Q   That's exactly what you did. You went to the
23      school and said that exact thing, didn't you?
24 A   One month later when I thought it had calmed down.
25 Q   You went and reported that she was a suicide risk

30 (Pages 114 - 117)

Page 166
1 Q So as of the end of your first semester at Purdue,
2   you were expressing to Ms. ▇▇▇▇ that you might
3   drop ROTC and you didn't think that you wanted to
4   be an officer in the seals, correct?
5 A That single time I did, yes.
6 Q Why did you have that sentiment at that time?
7 A I don't recall why I said that.
8 Q Why haven't you enlisted in the Navy?
9 A As we've mentioned before -- are you talking about
10   present tense, like in the past few years why
11   haven't I enlisted since my time at Purdue.
12 Q Since your time at Purdue, why haven't you enlisted
13   in the Navy?
14 A As we mentioned earlier in the deposition, when we
15   talked about grit, you asked me if I thought I had
16   grit to currently into an ROTC unit. And the same
17   answer applies to the Navy in general.
18     Currently I don't think that grit is there
19   while I'm also fighting a court case.
20 Q I want to explore your answer a bit.
21 A You'd like me to elaborate?
22 Q I'm going to ask you some follow-up questions.
23     MR. BYLER: Objection to form.
24     MR. KEALEY: I haven't asked the follow-up
25   question yet.

Page 167
1     MR. BYLER: Okay. I misheard you through your
2   mask. You were talking. I thought you asked a
3   question that I didn't understand.
4 BY MR. KEALEY:
5 Q Your Purdue University suspension ended long ago;
6   you know that?
7     MR. BYLER: Objection to form.
8 A I do.
9 Q You allege in your complaint in this case that you
10   intend to re-enroll at Purdue University?
11 A Assuming I win this case, because I don't agree to
12   the conditions currently subjected to me upon
13   re-entry.
14 Q What are they?
15 A That I take a course, have monthly meetings with
16   Chris Greggila for the first semester.
17 Q You consider it unfair for Purdue to ask you to
18   take bystander training?
19 A I do.
20 Q What is -- do you know what bystander training is?
21 A I don't recall exactly what it is.
22 Q Have you ever tried to find out?
23 A Yeah.
24 Q Who did you ask?
25 A I read the documents that Purdue gave me. I just

Page 168
1   don't remember exactly what they said about the
2   bystander training.
3 Q But you're clear in your mind you don't want to do
4   it?
5 A Yes, because when I read them, I decided I didn't
6   want to do it. I didn't think it was a good idea.
7 Q You think it's prerogative to decide what you
8   should and should not be asked to do as a student
9   at Purdue University?
10 A Given the circumstances of my dismissal, I don't
11   think it would be wise to go back to Purdue right
12   now.
13 Q That wasn't my question. My question is are you
14   contesting that it's fair and reasonable for Purdue
15   to ask you to undergo bystander training?
16 A How is this a follow-up question to the Navy, not
17   being in the Navy?
18 Q You testified that you were not in the Navy because
19   you were waiting for your case to be over.
20 A Uh-huh.
21 Q You've also testified that's why you're not in
22   ROTC.
23 A Uh-huh.
24 Q Purdue has a Navy ROTC unit?
25 A It does.

Page 169
1 Q And you said you wanted to be back at Purdue?
2 A Yes.
3 Q So if you re-enroll at Purdue, which you are in
4   good standing to do and reapply to Navy ROTC, as
5   far as you know, you might be accepted into the
6   Navy ROTC, correct?
7 A Might be, but I'm not confident in it.
8 Q You don't know because you haven't tried, do you?
9     MR. BYLER: Objection. Don't need to get
10   argumentative with the witness.
11     MR. KEALEY: The witness is wondering how this
12   is a follow-up. So I'm explaining that to him.
13 A I appreciate the explanation. You are correct. I
14   don't know because I have not tried.
15 Q If the Navy asked to take bystander training, would
16   you take it?
17     MR. BYLER: Objection, hypothetical.
18 A I don't know.
19 Q If the Navy asked you to meet with somebody on the
20   Navy ROTC staff monthly, would you comply with that
21   instruction?
22     MR. BYLER: Objection, facts not in evidence.
23 A I don't think that's a fair parallel to trial
24   because I was subject to that bystander training
25   upon re-entry to Purdue because of my suspension.

43 (Pages 166 - 169)

Connor Reporting
A Veritext Company

www.veritext.com                                    800-554-3376

Page 170
1   So if there was something of equal measure in
2   the Navy and I had to complete some sort of
3   re-entry as remedy or punishment, then I would do
4   so.
5 Q  Have you considered the possibility that Purdue has
6   asked you to take bystander training in order to
7   make you a better student and citizen on the
8   campus?
9      MR. BYLER:  Objection, hypothetical.
10 A  No, I've not.
11 Q  Do you think that taking the bystander training is
12   punishment?
13 A  If it's something required of me because of the
14   circumstances under which I left Purdue, then yes.
15 Q  In your complaint in this case, you allege that the
16   discipline imposed by Purdue was disproportionate;
17   do you recall that?
18      MR. BYLER:  Objection to form.
19 A  Please repeat the question.
20 Q  You're aware in this case you've alleged that the
21   disciplinary sanction imposed by the Dean of
22   Students was disproportionate?
23 A  Yes.
24 Q  What did you mean by that allegation?
25 A  I meant that it didn't seem fair.

Page 171
1 Q  What sanction would have been proportionate?
2 A  Upon re-entry.
3 Q  What sanction would have been proportionate?
4 A  Please give more context.
5 Q  Please look at paragraph 28 of the amended
6   complaint, Exhibit 1 -- excuse me, page 28
7   paragraph 47.  And at the bottom of page 28 you
8   allege "the sanction was disproportionate."
9      I'm asking what sanction would have been
10   proportionate?
11 A  I think it's meant to say that these sanctions were
12   disproportionate.
13 Q  Once again, my question was and is what sanction
14   would have been proportionate?
15 A  I think proportionate sanctions would have simply
16   been a re-entry course and meeting with Chris
17   Greggila.
18 Q  So you're contending that Purdue should have
19   imposed a sanction that you're currently refusing
20   to honor?
21      MR. BYLER:  Objection to form.
22 A  I'm looking at the sanctions as a whole, and I
23   think as a whole it is excessive.
24 Q  You're contending that it's excessive because a
25   similarly situated accused woman would have been

Page 172
1   sanctioned differently?
2      MR. BYLER:  Objection to form.
3 A  I think so.
4 Q  On what basis do you make that allegation?
5 A  The overall trend of how men and women are treated
6   on college campuses.
7 Q  Have you made some study of that subject?
8 A  I read into it.
9 Q  What did you read?
10 A  I've read of cases where men have similar
11   experiences to mine and they became vilified and
12   kicked out of school with no due process.  And I've
13   read of different cases where women where
14   immediately believed upon their claims, and some of
15   them, they later admit that they were lying.  And
16   even then, sometimes the school still sides against
17   the men.
18 Q  We're talking about Purdue University in similarly
19   situated women accused of sexual assault and found
20   to have committed sexual assault and sanctioned for
21   sexual assault at Purdue University; have you read
22   something on that?
23 A  I have not.
24 Q  You're not aware of any such woman who was the
25   recipient of a lesser sanction than you for conduct

Page 173
1   comparable to yours?
2      MR. BYLER:  Objection, form.
3 A  Not at Purdue University.
4 Q  Not anywhere?
5 A  No, not anywhere.
6 Q  Mr. ▮ tell me where in your amended complaint
7   you disclose to the court that the Navy disenrolled
8   you for failing to remain enrolled at Purdue
9   University?
10      MR. BYLER:  Can I have that question read?
11      (The last question was read.)
12      MR. BYLER:  I'm going to object the question.
13   I don't understand it.  It's incomprehensible, but
14   the witness can do what he can with it.
15 BY MR. KEALEY:
16 Q  Let me make it a little easier for you, Mr. ▮
17   Would you agree with me that the word disenrollment
18   does not appear in your 67 page complaint?
19 A  Give me a few minutes here.
20 Q  Mr. ▮ do you ever using the word disenrolled in
21   any complaint that you filed in this case?  Are you
22   aware that I've asked you a question?
23 A  I am.
24 Q  Could you please answer it?
25 A  I'm aware of discussing disenrollment.

44 (Pages 170 - 173)

Page 182

1  the Navy saying that?
2  A  Saying --
3  Q  That you involuntarily resign from the Navy?
4  A  Not to my recollection.
5  Q  Did you somebody at Navy on August 16, 2016, that
6     you were involuntarily resigning?
7  A  Not to my recollection.
8  Q  So you can't recall any basis, as you sit here
9     today, for your allegation in paragraph 76 of the
10    complaint that on August 16, 2016, you
11    involuntarily resigned from the Navy?
12     MR. BYLER:  Objection to form, misstates the
13    testimony.
14 A  Involuntarily resigned refers to disenrollment in
15    an accurate matter.
16 Q  In paragraph -- in Exhibit 23, your letter
17    addressed to the senior member of the performance
18    review board was addressed to the performance
19    review board that disenrolled you, correct?
20 A  Correct.
21 Q  Anywhere in Exhibit 23 do you use the word resign?
22 A  No.
23 Q  And you're aware that in military usage,
24    resignation has a very specific meaning, doesn't
25    it?

Page 183

1  A  In both the military and commercial, across the
2     board.
3  Q  If you're fired from a job or the reason you're not
4     in the job is that your employer told you that
5     you're no longer welcomed?
6  A  Yes.
7  Q  That's different from resigning, isn't it?
8  A  It is.
9  Q  The Navy told you that you were not welcome at
10    Purdue NROTC, correct?
11 A  They told me I was no longer eligible for Purdue
12    NROTC.  They never told me I was no longer welcomed
13    there.
14 Q  They told you you were not longer part of their
15    Navy ROTC unit, didn't them?
16 A  Yes, but they did not infer hostility in saying
17    you're no longer welcomed here.
18 Q  I'm not suggesting that inferred hostility.  I'm
19    just saying that you were no longer part of their
20    operation?
21 A  Correct.
22 Q  And that was their decision?
23 A  It was a decision they had to make.
24 Q  That was their decision, not your decision?
25 A  Correct.

Page 184

1  Q  It was their decision based on Navy regulations?
2  A  Yes.
3  Q  And it was their decision based on the simple fact
4     that you could not be in a Navy ROTC program at
5     Purdue University when you were not a student at
6     Purdue University, correct?
7  A  That is correct.
8       (Deposition Exhibit No. 24 marked
9         for identification.)
10 BY MR. KEALEY:
11 Q  Mr. ▮▮▮▮, I'm handing you Deposition Exhibit 24.
12    Please look at this document and tell me whether
13    you recognize it?
14 A  Yes, I understand this.
15 Q  You've seen it before?
16 A  I have.
17 Q  Did you receive it on or about May 31 2016?
18 A  I did.
19 Q  And at that time you had assistance of counsel,
20    Mr. Connect?
21 A  Yes.
22 Q  Did you share this letter with Mr. Connect?
23 A  I think I did.
24 Q  Upon receiving this letter, did you expect that at
25    the panel meeting to which you were being invited,

Page 185

1     you would have an opportunity to give a statement?
2  A  I did.
3  Q  And when you got to the panel meeting, did you give
4     a statement?
5  A  I did.
6  Q  Did you write it out?
7  A  No, I did not.
8  Q  So you have no record of what you said to the
9     panel?
10 A  No.
11 Q  When you got to the panel meeting, what did you
12    intend to communicate to the panel?
13 A  I intended to reaffirm my innocence and explain my
14    side of the allegations and hopefully persuade some
15    minds because I was looking for opportunities to
16    help myself in this case.  And they give me this
17    opportunity that ended up not going anywhere.
18 Q  What was the primary point you wanted to make to
19    sway minds?
20 A  I don't know that there was a primary point.
21 Q  As you sit here today, you can't recall what was
22    the most important point you wanted to communicate
23    the panel?
24 A  My innocence.
25 Q  Just to assert your innocence?

47 (Pages 182 - 185)

Page 186

1  A   I believe I gave an overview and those present had
2      copies of the investigator report and then they
3      began asking me questions from the investigator
4      report.
5  Q   What questions did they ask you?
6  A   They asked me -- I think Dean Sermersheim lead it
7      and two of the three present had never looked at
8      the report before. So they were following along
9      with what was being asked. But the questions were
10     regarding the text messages that I provided and he
11     overall allegations, the list of allegations.
12 Q   So the questions directed to you were about the
13     evidence and the allegations?
14 A   Correct.
15 Q   And the primary evidence they were asking you about
16     was the text messages?
17 A   Yes.
18 Q   Was there any other evidence that you expected them
19     to ask you about?
20 A   The only other documents that I had were character
21     references -- I don't know that I brought those
22     with me -- and my written explanations refuting the
23     other allegations. And I think that would have
24     been the only piece of evidence that questions were
25     asked from.

Page 187

1  Q   My question was slightly different. It was not was
2      that the only evidence question were asked from.
3       My question was was there any other evidence
4      you expected questions on?
5  A   Not to my recollection. I didn't know of any other
6      evidence.
7  Q   At the hearing, did you have an opportunity to
8      explain the text messages?
9  A   I did.
10 Q   Were you cut short in your opportunity to explain
11     the text messages?
12 A   I don't believe so.
13 Q   There were three panel members. Did all of them
14     ask you questions about the text messages?
15 A   I don't think so.
16 Q   One of them was an older gentleman, one of them
17     maybe middle aged to a younger gentleman and then
18     the third one a woman; do you remember that?
19 A   I don't remember all of them.
20 Q   Do you remember there being two men and a woman?
21 A   I think so.
22 Q   Do you remember whether the questions you received
23     were from men or women or both?
24 A   No, I don't remember. I remember one the men
25     asking me, but I don't remember if the other two

Page 188

1      did.
2  Q   Did the Dean ask you any questions?
3  A   I think so.
4  Q   What questions did she ask you?
5  A   I don't remember.
6  Q   Did you take offense to any of the questions that
7      were asked of you?
8  A   I did not like the way in which they acted with
9      hostility and they seemed to be leading all the
10     questions. I don't remember what the questions
11     were exactly, though.
12 Q   You thought you were being cross-examined?
13 A   I felt that the questions were loaded.
14 Q   You felt that you were being cross-examined?
15 A   Is that what cross-examine means?
16 Q   Well, you alleged in your complaint many things
17     about cross-examination, such as that you wanted
18     the opportunity to cross-examine Ms. _____.
19      So I'm asking if you felt cross-examined by
20     the panel?
21 A   I don't know.
22 Q   Please turn to paragraph 41 of the complaint,
23     Deposition Exhibit 1. Paragraph 41 is on page 24.
24      In paragraph 41 of your amended complaint, you
25     allege that a Purdue employee, Monica Bloom, wrote

Page 189

1      _____ statement to the disciplinary
2      process and that _____ did not write it.
3       Do you see that?
4  A   Yes, I do.
5  Q   Do you have any basis for that assertion?
6  A   The document itself, I believe she said that
7      _____ did not have access to a computer.
8      So they had a conversation and then she relayed
9      onto paper what she was told by _____
10 Q   Who said that?
11 A   Monica Bloom.
12 Q   When?
13 A   On the document dated June 5, if I recall
14     correctly.
15 Q   Would you consider this a serious allegation that a
16     Purdue University employee wrote the witness
17     statement of _____
18 A   I think so.
19 Q   And would you consider it a serious error if that
20     was a false allegation?
21      MR. BYLER: Objection, hypothetical.
22 A   I would.
23      MR. KEALEY: Let's go off the record.
24      THE VIDEOGRAPHER: The time is 5:53 p.m., and
25     we're going off the record.

48 (Pages 186 - 189)