# EXHIBIT SJM 6

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF INDIANA
 3                        HAMMOND DIVISION
 4              CIVIL ACTION NO. 2:17-cv-33-JPK
 5
 6   JOHN DOE,                                  )
                                                )
 7             Plaintiff,                       )
                                                )
 8                                              )
        -vs-                                    )
 9                                              )
     PURDUE UNIVERSITY, PURDUE                  )
10   UNIVERSITY BOARD OF TRUSTEES,              )
     MITCHELL ELIAS DANIELS, JR., in            )
11   his official capacity as                   )
     President of Purdue University,            )
12   ALYSA CHRISTMAS ROLLOCK, in her            )
     official capacity at Purdue                )
13   University, KATHERINE                      )
     SERMERSHEIM, in her official               )
14   capacity at Purdue University,             )
                                                )
15             Defendants.                      )
16
17                             ZOOM
18         DEPOSITION OF ALYSA CHRISTMAS ROLLOCK
19         The deposition upon oral examination of ALYSA
     CHRISTMAS ROLLOCK, a witness produced and sworn
20   before me, Tracy Larimore, RPR, Notary Public in and
     for the County of Allen, State of Indiana, taken on
21   behalf of the Plaintiff, c/o the offices of Stuart &
     Branigin, LLP, 300 Main Street, Suite 900,
22   Lafayette,, Indiana, on the 24th day of August,
     2020, scheduled to commence at 8:00 a.m. pursuant to
23   the Indiana Rules of Trial Procedure with written
     notice as to time and place thereof.
24
25
```

Page 2

```
 1   2
 2
       1        A P P E A R A N C E S
 3
       2   FOR THE PLAINTIFF(S):
 4         John Doe:
       3
 5            Philip A. Byler, Esq
       4      NESENOFF & MILTENBERG, LLP
 6            363 Seventh Avenue, Fifth Floor
       5      New York, New York 10001
 7            212 736 4500
       6      pbyler@nmllplaw.com
 8
       7
 9   FOR THE DEFENDANT(S):
       8   Purdue University, et al :
10
       9      William P Kealey, Esq
11            STUART & BRANIGIN LLP
      10      300 Main Street, Suite 900
12            PO Box 1010
      11      Lafayette, IN 47902
13            765 423 1561
      12      wpk@stuartlaw.com
14
      13
15
      14
16
      15
17
      16
18
      17
19
      18
20
      19
21
      20
22
      21
23
      22
24
      23
25
      24
```

Page 3

```
 1              INDEX OF EXAM
 2                                    Page
     DIRECT EXAMINATION                 4
 3   Questions by Mr Byler
 4
 5              INDEX OF EXHIBITS
 6   Deposition Exhibits:              Page
 7   Exhibit 1   Position Description -  8
                 "Exhibit C"
 8
     Exhibit 2   PU 0726 - 0728        19
 9
     Exhibit 3   PU 0729 - 0730        19
10
     Exhibit 4   PU 0597 - 0599        26
11
     Exhibit 5   PU 0717 - 0718        27
12
     Exhibit 6   PU 0600 - 0601        30
13
     Exhibit 7   PU 0603 - 0607        32
14
     Exhibit 8   PU 0695 - 0698        35
15
     Exhibit 9   PU 0608 - 0610        48
16
     Exhibit 10  PU 0568 - 0572        50
17
     Exhibit 11  PU 0573 - 0576        50
18
     Exhibit 14  PU 0373 - 0391        51
19
     Exhibit 15  PU 0653 - 0654        52
20
     Exhibit 16  PU 0701 - 0702        58
21
22
23
24
25
```

Page 4

```
 1      MR. BYLER:  On the record.  She has -- the
 2   witness will need to raise your right hand and
 3   be sworn in by the court reporter.
 4      Are you ready?
 5      MR. KEALEY:  We are.
 6           ALYSA CHRISTMAS ROLLOCK,
 7   having been duly sworn to tell the truth, the whole
 8   truth, and nothing but the truth relating to said
 9   matter, was examined and testified as follows:
10      DIRECT EXAMINATION OF ALYSA CHRISTMAS ROLLOCK
11   QUESTIONS BY MR. BYLER:
12  Q  Okay.  Good morning.  My name is Philip Byler.
13     I represent the plaintiff, John Doe, in this
14     case that's captioned Plaintiff John Doe versus
15     Defendant Purdue University and others.
16         The purpose of today is to take the
17     witness's deposition testimony.  I will note
18     that John Doe is a pseudonym and there are two
19     pseudonyms that have been, by court order, used
20     in the case.  Plaintiff John Doe is actually
21     ███████████.  Complainant in the underlying
22     disciplinary case is ██████████.  She is
23     referred to as Jane Doe.
24         Now, for the purpose of today, you can use
25     either because the proceeding here is subject to
```

Page 5

```
 1     a protective order that, you know, in terms of
 2     the proceeding.
 3         Now, can I ask the witness to identify
 4     herself by her name and her business address?
 5  A  My name is Alysa Christmas Rollock.  My business
 6     address is Purdue University, Ernest C. Young
 7     Hall, 155 South Grant Street, West Lafayette,
 8     Indiana.
 9  Q  Have you been deposed before?
10  A  Yes, I have.
11  Q  Okay.  And I will keep short what we do
12     typically say before a deposition, I say me, as
13     a deposing attorney, that in this proceeding,
14     everything you say will be taken down verbatim.
15     Everything I ask will be taken down verbatim.
16     Counsel may interpose an objection that will be
17     taken down verbatim.
18         Since we are doing a Zoom conference
19     deposition, I will ask that you speak clearly
20     and wait until I'm done with my question, even
21     though you know basically what I'm going to be
22     asking.  And I will wait until you're done
23     answering before I ask my next question.  It's
24     just that I have found in the Zoom conference
25     setting, you need to be extra careful about
```

Page 6

1  doing that.
2  Q  Is there any reason why you can't testify
3     today to the questions being posed to you?
4  A  No.
5  Q  Are you under any medication that affects how
6     you'll be giving testimony?
7  A  No.
8  Q  Can you summarize your educational and
9     employment background?
10 A  I received my undergraduate degree from
11    Princeton University in 1981, my JD from Yale
12    University School of Law in 1984. I then began
13    employment at the now-defunct law firm of Cahill
14    Gordon & Reindel.
15       From there, I went to the law firm of
16    Battle Fowler. Then went to the Indianapolis
17    law firm of Ice Miller. At the time, it was
18    known as Ice Miller Donadio & Ryan. From there,
19    I was appointed an associate professor of law at
20    the Indiana University School of Law,
21    Bloomington. And then came to Purdue
22    University, first as the interim vice president
23    for human relations, and then became an
24    associate professor in the Krannert School of
25    Management, and then in 2008 was named vice

Page 7

1     president for ethics and compliance.
2  Q  Is that your current position?
3  A  Yes, it is.
4  Q  Okay. So since 2008, you've been vice president
5     for ethics and compliance; correct?
6  A  That's correct.
7  Q  What drew you to Indiana from the East Coast?
8  A  My husband was appointed to the faculty at
9     Purdue University.
10 Q  Okay. Can you define for yourself -- for us,
11    what is the role of the vice president for
12    ethics and compliance at Purdue?
13 A  I serve as the chief ethics and compliance
14    officer for the institution, as well as its
15    equal opportunity officer.
16 Q  Okay. And to whom do you report?
17 A  I report to the president of the University,
18    Mitch Daniels.
19 Q  Is there a particular reason why you report
20    directly to the president?
21 A  That's the way our University is organized.
22 Q  Okay. Let me mark, as Rollock Exhibit 1, what
23    was Exhibit C to Defendants' Response to
24    Plaintiff's First Request for -- First Set of
25    Interrogatories.

Page 8

1       (WHEREUPON, Exhibit Number 1, Position
2     Description - "Exhibit C", was marked for
3     identification.)
4  Q  This document was produced in -- in response to
5     my request for a description of what you do.
6       MR. KEALEY: Do you have a Bates number for
7     it, Phil?
8       MR. BYLER: It doesn't have a Bates number.
9     It has a big "Exhibit C" in the lower right-hand
10    corner, and this is the only document that way.
11      MR. KEALEY: Yeah. We'll find it. Okay.
12    The witness has the exhibit.
13      MR. BYLER: Okay. I'll ask the witness to,
14    you know, familiarize herself with the exhibit
15    and then I'll start asking some questions about
16    it.
17      THE WITNESS: I'm prepared.
18 Q  Okay. Do you see the first paragraph, "Position
19    Summary"?
20 A  Yes, I do.
21 Q  In your experience, does that statement
22    summarize the position you hold as vice
23    president for ethics and compliance?
24 A  Under position summary, yes.
25 Q  Okay. Now, I see one item is the development

Page 9

1     and revision of University policies. Do you see
2     that, as included in the position summary?
3  A  Yes.
4  Q  Okay. What does that mean in terms of what work
5     you do?
6  A  The University, as you might imagine, has a
7     number of policies, procedures, standards,
8     guidelines, et cetera. My office, my department
9     is responsible for the coordination,
10    publication, communication, and the approval
11    process for system-wide and West Lafayette
12    Campus policies.
13 Q  Does that include the Title IX policies that
14    Purdue has?
15 A  Yes, it does.
16 Q  Okay. Now, in the last line of position
17    summary, it says, "Title IX Compliance." Do you
18    see that?
19 A  Yes, I do.
20 Q  What -- in your position as vice president for
21    ethics and compliance does Title IX compliance
22    mean in terms of what work you do?
23 A  I'm responsible for the policies and procedures
24    that carry out the University's commitment and
25    responsible for compliance with Title IX

3 (Pages 6 - 9)

Page 10

1    regulations.
2  Q  Okay. Now, next is "Essential functions," and
3     there's a whole, long list. I don't want to go
4     through each one, but I'd ask you first to take
5     a look at that list and see if it accurately
6     states the functions as you have known them in
7     your experience as vice president for ethics and
8     compliance?
9  A  At the time that this was developed, they were,
10    indeed, my responsibilities.
11 Q  When you say at the time, has it changed?
12 A  Yes, it has.
13 Q  In what way has it changed?
14 A  Effective August 14th, I ceased to be the
15    system-wide Title IX coordinator.
16 Q  Can you give me that date again? I didn't quite
17    hear it right.
18 A  August 14, 2020.
19 Q  2020. Okay. Okay. So the eighth line of the
20    functions states, quote, "Act as the
21    University's senior ethics and compliance
22    representative, equal opportunity officer, and
23    Title IX officer"; do you see that?
24 A  Yes, I do.
25 Q  Okay. So before August 14, 2020, you were the

Page 11

1     Title IX coordinator at Purdue?
2  A  I was the system-wide Title IX coordinator at
3     Purdue, yes.
4  Q  Were there other Title IX coordinators?
5  A  Each of the campuses of the University has a
6     Title IX coordinator.
7  Q  In the 2015/2016 -- excuse me, 2015 to 2016
8     school year, were you the Title IX system-wide
9     officer?
10 A  Yes, I was.
11 Q  Was there a campus Title IX officer on the
12    Lafayette, Indiana campus?
13 A  On the West Lafayette campus, yes, there was.
14    There were perhaps more than one during that
15    period of time. I would need to have a calendar
16    and guidance.
17 Q  Okay. Do you recall who such a person was for
18    the 2015/2016 school year?
19 A  As I said, without knowing the exact dates of
20    the school year, at least during a short period
21    of time, I served not only as the system-wide
22    coordinator, but was the campus coordinator.
23        Again, in terms of -- I can have my
24    recollection refreshed, but we had a vacancy and
25    I stepped in as the campus coordinator, and then

Page 12

1     when that position was filled, that person
2     became the campus Title IX coordinator. And I
3     don't recall the exact dates.
4  Q  Well, do you recall the person who was in that
5     role?
6  A  Erin Oliver became the Title IX coordinator when
7     she was appointed as director of the office of
8     institutional equity. Prior to that, I served
9     as the interim, as I said. And prior to that,
10    Monica Bloom served as the Title IX coordinator
11    for the West Lafayette campus. I just don't
12    have the dates and the transition time.
13 Q  Okay. What happened in August 14, 2020, that
14    you no longer were the system-wide Title IX
15    officer?
16 A  The regulations adopted by the Department of
17    Education went into effect as of August 14, as
18    did our policies and procedures to comply with
19    the Title IX regulations. And as a result of
20    that, I ceased to be the system-wide Title IX
21    coordinator.
22 Q  Why was it that the new Title IX regulations
23    that were promulgated by the current Secretary
24    of Education DeVos, after going through the APA
25    process, caused that change in your position?

Page 13

1  A  We wanted it clear that the -- that I was not
2     serving as a coordinator of -- there are certain
3     roles that are stipulated in the regulations for
4     Title IX coordinator, and I am not fulfilling
5     those roles.
6  Q  Okay. Do you still -- do you function as a
7     Title IX officer who decides appeals from
8     disciplinary decisions?
9  A  I do decide appeals. I do continue to decide
10    appeals.
11 Q  Okay. Have you, in the course of your time at
12    Purdue, received training in Title IX matters?
13 A  Yes, I have.
14 Q  When was the last time you attended a training
15    session?
16 A  I don't recall.
17 Q  Do you recall -- well, in the 12-year period
18    you've been vice president for ethics and
19    compliance, do you know how many times you went
20    to training sessions?
21 A  No, I don't.
22 Q  Or did it online?
23 A  I'm sorry. I did not hear you.
24 Q  In the course of the 12 years that you've been
25    vice president for ethics and compliance, do you

Page 26

1  Q   Okay.  Do you recall any discussions in that
2      general period of time with Dean Sermersheim
3      about what Monica Bloom had emailed you and Dean
4      Sermersheim?
5  A   I really don't recall.
6  Q   Do you recall, generally, in the 2015/2016
7      school year, how many sexual misconduct
8      disciplinary complaints there were?
9  A   No, I don't.
10 Q   Do you have any general recollection whether it
11     was 10?  20?  30?
12 A   I'm sorry, I don't.  I don't.  It's nullable
13     [ph.] but I don't know.
14 Q   Okay.  Let's go to Bates-stamped Number 597 to
15     599 as Rollock Deposition Exhibit 4.
16         (WHEREUPON, Exhibit Number 4, PU 0597 -
17     0599, was marked for identification.)
18 A   Yes.
19 Q   Okay.  Now, I -- I'd just note for the record on
20     Page 2, it does not show you to be copied on
21     this particular document.
22 A   Correct.
23 Q   Okay.  Do you recognize what the document is?
24 A   Yes, I do.
25 Q   Okay.  What is it?

Page 27

1  A   It is a letter from Katherine Sermersheim to
2      John Doe, whatever his name is, dated June 14,
3      2016.
4  Q   And this, did this contain at least the initial
5      determination of Dean Sermersheim as to the
6      sexual misconduct complaint that had been
7      brought against John Doe?
8  A   Yes.
9  Q   Okay.  And the last paragraph refers, does it
10     not, to an appeal that John Doe could make to
11     you; correct?
12 A   Correct.
13 Q   Do you recall receiving, at some point, this
14     document, Rollock Deposition Exhibit 4?
15 A   I received a copy of it when I reviewed his
16     appeal.
17 Q   Okay.  Now, let me mark, as Rollock Deposition
18     Exhibit 5, what has a Bates-stamp Number 77 --
19     wait.  Excuse me -- 717 to 718.
20         (WHEREUPON, Exhibit Number 5, PU 0717 -
21     0718, was marked for identification.)
22 A   I've got it.
23 Q   Okay.  Was this a letter addressed to you as
24     vice president for ethics and compliance?
25 A   Yes.

Page 28

1  Q   And was it addressed to you in the role that you
2      played as the appeal officer with respect to the
3      sexual misconduct proceeding against John Doe?
4  A   Yes.
5  Q   And this was dated June 22, 2016; correct?
6  A   Yes.
7  Q   Okay.  And it is signed by Mr. -- by John Doe?
8  A   Yes.
9  Q   Okay.  Do you recall receiving this Deposition
10     Exhibit 5?
11 A   Yes.
12 Q   Okay.  Now, in his first paragraph, he does
13     deny, does he not, that the allegations of
14     sexual assault are false?
15 A   Yes, that's what he asserts.
16 Q   Okay.  And further, he denies that he ever
17     penetrated her while sleeping without her
18     consent, digitally or otherwise; correct?
19 A   Correct.
20 Q   And Mr. John Doe's position, on appeal, was that
21     the determination is incorrect and contrary to
22     the facts?
23 A   Is that a question or...
24 Q   Yeah.  Was the position taken by Mr. ▮
25     addressed to you, was that the determination is

Page 29

1      incorrect and contrary to the facts?
2  A   He makes a number of assertions including that,
3      yes.
4  Q   Okay.  Well, let's drop down to the second
5      paragraph, another assertion he says, does he
6      not, "A suspension will cause me significant
7      harm not the least of which is harm to my
8      reputation.  Also, there is the loss of my
9      scholarships and participation in NROTC,"
10     unquote.
11         He makes that statement to you; correct?
12 A   Correct.
13 Q   And in the third paragraph, he states, does he
14     not, quote, "I believe that my rights to due
15     process of law have been violated.  I was never
16     provided with the evidence that was supposed to
17     support this allegation, which prevented me from
18     adequately preparing a defense to the false
19     accusation."
20         He states that to you; does he not?
21 A   Yes.
22 Q   Okay.  And it's true, is it not, that John Doe
23     was not provided access to the investigation
24     report done in this case at the time the
25     proceeding was going on?

8 (Pages 26 - 29)

Page 30

1  A  That's correct.
2  Q  Go to the second page, please.
3     Mr. [redacted] -- excuse me. John Doe also
4     asserts to you that he responded to everything
5     that was asked of him and included documentation
6     about the nature of his relationship with the
7     complainant; correct?
8  A  That's what he wrote, yes.
9  Q  Okay. And you -- were you aware at that time
10    that plaintiff, John Doe, had provided 133 pages
11    of texts between he and complainant that went
12    from mid-December to -- all the way to March of
13    2016? Mid-December, 2015, the last one in March
14    of 2016?
15 A  No.
16 Q  Were you aware that Ms. [redacted] -- that Jane Doe
17    didn't provide any documentation?
18 A  No.
19 Q  Let's go -- let's mark, as Rollock Deposition
20    Exhibit 6, Bates-stamped Numbers 600 to 601.
21       (WHEREUPON, Exhibit Number 6, PU 0600 -
22    0601, was marked for identification.)
23 A  Yes.
24 Q  Okay. Can you identify what we've marked as
25    Rollock Deposition Exhibit 6?

Page 31

1  A  It is my letter dated June 2nd, 2016 to John
2     Doe.
3  Q  Okay. And what were you informing John Doe in
4     your June 28, 2016 letter?
5  A  Would you like me to read the letter?
6  Q  If you wish, sure.
7  A  "I received your messages of June 23, 2016 filed
8     in accordance with Purdue University's
9     Procedures for Resolving Complaints of
10    Discrimination and Harassment (the
11    "Procedures" -- close -- well, it doesn't close
12    quote, shockingly, close paren. -- "in which
13    you appeal the determination of Dr. Katherine
14    Sermersheim, Dean of Students, set forth in her
15    letter to you of June 14, 2016.
16       "I have carefully reviewed your appeal, as
17    well as Dean Sermersheim's letters to you and
18    Jane Doe of June 14, 2016. Because Dean
19    Sermersheim's letters to you and Jane Doe does
20    not include her reasoning in reaching her
21    determination that found you in violation of the
22    University's anti-harassment policy, I am not
23    able to issue my decision on your appeal at this
24    time.
25       "For that reason, I direct Dean Sermersheim

Page 32

1     to revise her letters of June 14, 2016, to
2     include the factual basis for her determination
3     and the sanction imposed. I further direct that
4     Dean Sermersheim provide you" -- I assume that's
5     Jane Doe -- "and me with her letters of
6     determination no later than 9:00 a.m. Eastern
7     Daylight Time on June 30, 2016. In light of the
8     reissuance of Dean Sermersheim's determination,
9     you may supplement your appeal and Jane Doe may
10    appeal Dean Sermersheim's revised determination.
11    Such supplement or appeal must be in writing and
12    received by me by Sunday, July 10, 2016. Very
13    truly yours, Alysa."
14 Q  And you copied this letter to Dean Sermersheim?
15 A  Yes, I did, as well as to Jane Doe.
16 Q  Okay. Let's mark, as Rollock Exhibit Number 7,
17    a document Bates stamped 603 to 607.
18       (WHEREUPON, Exhibit Number 7, PU 0603 -
19    0607, was marked for identification.)
20 A  Yes.
21 Q  Okay. Go to what is the fourth page of the
22    document, Bates stamped 606.
23 A  Yes.
24 Q  Okay. Does this indicate that this document was
25    copied to you?

Page 33

1  A  Yes, it does.
2  Q  Okay. Did -- can you identify the document?
3  A  I'm sorry. I don't understand.
4  Q  Rollock Deposition Exhibit 7, can you identify
5     from your knowledge, what that is?
6  A  Oh, I'm sorry.
7  Q  It was, it was a real simple question.
8  A  Well, I, I was trying to figure out how I was
9     supposed to identify it. You want -- it is a
10    letter from Dean Sermersheim to John Doe with
11    her revised determination.
12 Q  And that was dated, when?
13 A  June 29.
14 Q  Okay. June 29, 2016; correct?
15 A  Correct.
16 Q  Okay. Now, what Dean Sermersheim added was a
17    lengthy sentence toward the bottom of the first
18    page, Bates stamped 603, starting with the word
19    "Specifically."
20 A  I see where you're referring to.
21 Q  Do you see that?
22 A  Yes, I do.
23 Q  Okay. I'm sorry. I didn't quite hear you.
24 A  Sorry. Yes, I do.
25 Q  It's all right. Okay.

Page 34

1  So what Dean Sermersheim added in response
2  to your June 28 letter was a sentence that says,
3  "Specifically, a preponderance of evidence
4  supports that," and then there's Point 1 and
5  Point 2, as I said in the long sentence;
6  correct?
7 A  I believe she added other things, but I don't
8  have a track change version in front of me.
9 Q  Okay. What else do you think that she added?
10 A  I believe there's a sentence that says, "The
11  conduct described in the numbered paragraphs
12  above."
13 Q  Oh, the next -- okay. The next what follows
14  Point 1 and 2 is, "The conduct described in the
15  numbered paragraphs above constitutes sexual
16  violence under the University's policy on
17  anti-harassment." Is that what you're
18  referring?
19 A  Referring to that, yes. And then, of course --
20 Q  And it goes on, does it not, "Additionally, I
21  find by a preponderance of the evidence that you
22  are not a credible witness. I ... find by a
23  preponderance of the evidence that Jane Doe is a
24  credible witness"; correct?
25 A  Correct.

Page 35

1 Q  Okay.
2 A  And there's updated information -- excuse me.
3  There's updated information as well regarding an
4  appeal, the appeal period that they have with
5  respect to this revised determination.
6 Q  Okay. And is, is that updated information in
7  the last paragraph on the second page a letter,
8  Bates stamped 604?
9 A  It is the, technically next-to-the-last
10  paragraph.
11 Q  Oh, you're right, because the last paragraph
12  says, "Please contact me."
13  In bold letters above it, is the reference
14  to the period in which John Doe can appeal;
15  correct?
16 A  Correct.
17 Q  And that appeal goes to you?
18 A  Correct.
19 Q  Now, let's turn to Rollock Deposition Exhibit 8,
20  which is numbered 695 to 698.
21  (WHEREUPON, Exhibit Number 8, PU 0695 -
22  0698, was marked for identification.)
23 A  Yes, I have it.
24 Q  Okay. Let's start with the first page of the
25  document that's Bates stamped 695, and in the

Page 36

1  lower half reflects, does it not, a transmittal
2  email from John Doe to you containing his
3  revised appeal?
4 A  Yes.
5 Q  Okay. And it's dated Sunday, July 10, 2016?
6 A  Yes.
7 Q  Okay. And with this transmission -- transmittal
8  email, he sent what was in the subsequent Pages
9  2, 3 and 4 of the document, Bates stamped 696
10  through 698?
11 A  Correct.
12 Q  Okay. Now, going back to 695, at the top of the
13  page is a -- it reflects, does it not, an email
14  from you to a Barbara Devine?
15 A  Yes.
16 Q  Or Devine?
17 A  Devine.
18 Q  Who is she?
19 A  She's my executive assistant.
20 Q  Oh, okay. And with this, you were putting in
21  the file the revised appeal of John Doe?
22 A  Correct.
23 Q  Okay. Now, let's, let's look at what
24  Mr. ▓▓▓▓ -- excuse me -- John Doe, presented to
25  you; okay?

Page 37

1  Do you recall reading this document at the
2  time?
3 A  Yes.
4 Q  By the way, on the third page of his appeal
5  letter, 698, he signs it; does he not?
6 A  Yes.
7 Q  Okay. And this letter is dated July 10, 2016,
8  and addressed to you?
9 A  Yes, it is.
10 Q  Okay. Now, let me just walk through what Mr. --
11  or what John Doe asserted to you.
12  He asserted to you, did he not, that Dean
13  Sermersheim had revised her final determination
14  but had not provided a factual basis, merely
15  restating her conclusions at greater length.
16  That was the position he took with you; was it
17  not?
18 A  In that first paragraph, yes.
19 Q  Okay. And then the second paragraph, he
20  asserts, does he not, that he's never had the
21  opportunity to see the investigation report?
22 A  Correct.
23 Q  And Mr. John Doe asserts, does he not, that he,
24  therefore, cannot address the specific
25  allegations supposedly questioning his

Page 38

1 credibility?
2 A That's correct.
3 Q Why wasn't it the policy at Purdue at that time,
4   to allow a respondent to review an investigation
5   report providing what was the basis for a sexual
6   misconduct finding?
7 A The procedures at that time did not provide any
8   party the opportunity to review the report.
9 Q When you say "any party," the complainant or the
10   respondent?
11 A Or an impacted party, correct.
12 Q Okay. But the respondent is the one who faces a
13   sanction from the University; does he, does he
14   not?
15 A Both parties potentially face sanctions from the
16   University.
17 Q In this instance, it was John Doe, as the
18   respondent, who was subject to a disciplinary
19   sanction; correct?
20 A Both parties were subject to a disciplinary
21   sanction.
22 Q Well, wait a minute. The complainant brought a
23   complaint of sexual misconduct; correct?
24 A Correct.
25 Q And these --

Page 39

1 A She brought forth allegations -- excuse me. She
2   brought forth allegations and the University
3   initiated an investigation.
4 Q Correct. And as a result, the respondent was
5   the subject of a disciplinary sanction?
6 A He received a sanction, yes.
7 Q Okay. And before the findings that resulted in
8   that sanction, he was not given an opportunity
9   to review the investigation report?
10 A Neither party was given the opportunity to
11   review the investigation report.
12 Q Yeah. But my question is, the respondent, John
13   Doe, was not given that opportunity; correct?
14 A Correct.
15 Q Okay.
16 A Correct.
17 Q Okay. In that second paragraph, John Doe
18   asserts, does he not, that without the specific
19   facts, he cannot address the assertion that he's
20   not a credible witness?
21 A Are you referring to the last sentence in that
22   paragraph?
23 Q The last two -- well, it's the last three
24   sentences, "Dean Sermersheim's unsubstantiated
25   conclusion that I'm not a credible witness still

Page 40

1 has not been corroborated with any facts. I
2 provided the investigators with a list of over
3 30 names to substantiate the credibility of
4 character and integrity. However, I cannot
5 defend myself against Dean Sermersheim's attack
6 on my credibility if there is no factual
7 evidence presented."
8 A That's his, that's his assertion, yes.
9 Q That's his, that's his -- okay.
10   Well, is John Doe not saying, "Look, I need
11   to know the factual basis for why you say I'm
12   not credible"?
13 A I don't know what is in his mind. I know what
14   he wrote.
15 Q Okay. And he's writing that he needs facts,
16   specific facts in order to defend himself
17   against an attack on his credibility; does he
18   not?
19 A He says he's not been permitted to respond to
20   any, quote, factual evidence, close quote.
21 Q And that was compiled in the investigation
22   report, correct? Or supposed to be compiled?
23 A He was not permitted to review the investigation
24   report.
25 Q Okay. Now, let's go to the third paragraph.

Page 41

1 The third paragraph gives John Doe's description
2 of the meeting with Dean Sermersheim and the
3 three-person panel; does he not?
4 A Yes.
5 Q Okay. And he's calling it flawed?
6 A Yes. That's what he says, "flawed at best."
7 Q And in that paragraph, he says, does he not,
8   quote, "A reasonable person would question the
9   fairness of the outcome of a meeting where two
10   of the three faculty members did not receive,
11   read, or review my case until I had entered the
12   room to meet with them," unquote.
13 A That's what he says, yes.
14 Q Okay. Did you ever ascertain whether this was
15   true or not?
16     MR. KEALEY: Object to form.
17     THE WITNESS: I'm sorry. What do you want
18   me to do?
19     MR. KEALEY: You can answer the question.
20 Q Did you ever ascertain whether or not the
21   meeting -- at the meeting, there were two of
22   three faculty members who had not received,
23   read, or reviewed his case until he entered the
24   room to meet with them?
25 A Yes.

11 (Pages 38 - 41)

Page 42

1  Q  And what did you find out?
2  A  That, in fact -- this was after the fact, that,
3     in fact, that Dean Sermersheim's practice is to
4     confirm with the panel members that they have
5     read the materials that were provided to them in
6     advance of the meeting.
7  Q  Now, that's what Dean Sermersheim told you;
8     right?
9  A  Correct.
10 Q  You didn't speak to the panel members?
11 A  No, I did not.
12 Q  Okay.  Next paragraph, Mr. -- or John Doe refers
13    to his involvement in the Naval ROTC program;
14    correct?
15 A  Yes.
16 Q  And at -- in this paragraph, he, again, denies
17    the allegation of the sexual misconduct; does he
18    not?
19 A  Yes.
20 Q  And he concludes in that paragraph, does he not,
21    with the next two sentences -- last two
22    sentences, "Why would I not only admit to
23    something that didn't happen, but also knowingly
24    admit to something that would jeopardize my
25    Navel ROTC scholarship and future serving my

Page 43

1     country?  I will also point out that Jane Doe
2     was also enrolled in the NROTC program, was
3     aware of the zero tolerance policy and
4     consequences of that policy."  Do you see that?
5  A  Yes, I see it.
6  Q  Okay.  And Mr. John Doe was telling you, was he
7     not, that given the zero tolerance policy at the
8     Navy ROTC, he would not have committed this
9     sexual misconduct?
10 A  I'm sorry.  I read that sentence as saying that
11    he wouldn't admit to doing such a thing.
12 Q  Well, earlier in the paragraph, does he not, he
13    makes a flat denial of the accusations?
14 A  I'm sorry.  Then I misunderstood your question.
15 Q  Okay.  Okay.  Let me step back to earlier in the
16    paragraph, starting with the second sentence, he
17    writes, does he not, "One of the issues
18    discussed at the outset of my student life was a
19    zero tolerance policy towards sexual assault" --
20    "sexual harassment and assault within NROTC.
21    One of Jane Doe's accusations state that I
22    digitally penetrated her while she was sleeping,
23    was not aware of this until I allegedly told her
24    of the incident.  I never touched her over her
25    clothes, and I never made any moves toward her

Page 44

1     in any sexual capacity.  I reiterate, her
2     allegation is false," unquote.  I'll stop there.
3        Now, that's what Mr. John Doe is telling
4     you; right?
5  A  Yes.
6  Q  Okay.  And he was very clear in this appeal
7     letter and his prior appeal letter that he
8     denied the accusations; correct?
9  A  Yes.
10 Q  Now, next paragraph of the -- let's see, on Page
11    697, Bates stamp, the fifth paragraph of his
12    appeal letter, he refers, does he not, to a
13    suicide attempt by Jane Doe?
14 A  I'm sorry.  Can you just give me the first
15    couple words of the paragraph where...
16 Q  "I can only speculate as to what Jane Doe's
17    motives are" --
18 A  I can --
19 Q  -- "but there is reason to suspect that she used
20    the zero tolerance policy to punish me.  Toward
21    the end of my relationship with Jane Doe, she
22    attempted to commit suicide, December 13, 2015,
23    while I was present.  From this point on, I
24    ended our sexual relationship as I was concerned
25    for her welfare first and foremost.  Rather than

Page 45

1     ignoring her distress, I followed the
2     University's protocol to get her help and
3     anonymously reported my fears for her safety and
4     even for her life," end quote.  He states that
5     in his letter to you; correct?
6  A  Yes, he does.
7  Q  Okay.  To your knowledge, was there any
8     consideration in this disciplinary proceeding
9     that there was report of a suicide attempt by
10    Jane Doe?
11 A  I certainly considered his appeal and the
12    statements that he made in his appeal, yes.
13 Q  Okay.  Were you aware before this appeal letter
14    that there was a suicide attempt by Jane Doe?
15       MR. KEALEY:  Object to form.
16 A  I don't know whether there was a suicide attempt
17    or not.  I was not aware of his assertions until
18    his appeal when I read the file.
19 Q  Well, there is at Purdue a report form, is there
20    not, for reports that would indicate that a
21    student attempted to commit suicide?
22 A  We have forms for reporting concerns about
23    students.  I don't receive those reports.
24 Q  I'm sorry.  I didn't get the last part of your
25    answer.

12 (Pages 42 - 45)

Page 46

1  A  We have reporting systems to report concerns
2     about students' well-being.  I do not receive
3     copies of those reports.
4  Q  Oh, okay.  You don't receive it.  In other
5     words, there are forms for a report of let's say
6     a suicide attempt, but you don't get those
7     forms?
8  A  No, I don't.
9  Q  Okay.  Who does?  Do you know?
10 A  I believe they go to the student affairs area.
11    I'm sorry.  I don't -- I could find out, but I
12    don't know.
13 Q  Now, sixth paragraph, John Doe states, does he
14    not, quote, "After our relationship, Jane Doe
15    contacted me a number of different occasions,
16    even seeking advice.  These are not the typical
17    actions of someone who was sexually harassed or
18    assaulted.  I provided textual evidence to these
19    multiple instances."  Okay.  Stop there.
20       Now, this was in John Doe's appeal letter
21    to you; correct?
22 A  Correct.
23 Q  Okay.  Were you aware at the time that John Doe
24    provided many pages of texts between he and
25    John -- Jane Doe?

Page 47

1  A  Not at the time I received his appeal.  I knew
2     there were text messages between the parties.  I
3     don't know who provided or how many were
4     provided.
5  Q  Page 698, Bates stamp, the next page, John Doe
6     requests, does he not, in summary, that this
7     damaging determination and punitive measures be
8     set aside and overturned?
9  A  Yes.
10 Q  He also requests a copy of the investigation
11    report; correct?
12 A  Correct.
13 Q  And in his July 10, 2016 letter, he states, "I
14    have never been given the opportunity to review
15    and defend myself to the accusations against my
16    credibility that are in the investigation
17    report."
18 A  He doesn't add that last bit, but he says,
19    "Accusations against his credibility."
20 Q  Well, okay.  Okay.  Well, that's part of the
21    sentence, is it not, that says, quote, "I am
22    also requesting a copy of Ms. Erin Oliver and
23    Mr. Jacob Amberger's report, which I've never
24    been given the opportunity to review, and to
25    defend myself to the accusations against my

Page 48

1     credibility."  That's what he wrote; correct?
2  A  Correct.  Yes.
3  Q  Okay.  And the next sentence, he says, quote,
4     "Purdue University has clearly violated my
5     opportunity for due process and is apparent to
6     me that I was found guilty from the onset of
7     these erroneous and false allegations and
8     treated as such."  That's what he's writing to
9     you?
10 A  Correct.
11 Q  Okay.  Let's mark, as Rollock Exhibit 9, what is
12    Bates-stamped Numbers 608 to 610.
13       (WHEREUPON, Exhibit Number 9, PU 0608 -
14    0610, was marked for identification.)
15 A  I have this document.
16 Q  Okay.  Can you identify what has been marked as
17    Rollock Exhibit -- Deposition Exhibit 9?
18 A  It is a -- Bates Numbers 6 -- 0608 and 0609 are
19    my letter to Mr. ▮▮▮▮ in response to his appeal.
20    Bates Number 0610 was not sent by me, and it is
21    a document captioned "Re-Entry Information for
22    Purdue University Students Separated from the
23    University."
24 Q  Okay.  So your document was 608 to 609?
25 A  I believe so, yes.

Page 49

1  Q  Okay.  Thank you for the clarification.
2        Now, this was addressed to John Doe;
3     correct?
4  A  Correct.
5  Q  And you signed it?
6  A  Yes, I did.
7  Q  And what did you do in -- and it's dated July
8     21, 2016?
9  A  Yes.
10 Q  And what did you do in your letter dated July
11    21, 2016?
12 A  I made my decision on the appeal.
13 Q  Okay.  And were you communicating that to John
14    Doe?
15 A  To John Doe, to Dean Sermersheim and to Jane
16    Doe.
17 Q  Okay.  And the second paragraph of your letter,
18    does it not, states that you upheld Dean
19    Sermersheim's determination and sanctions
20    imposed by her?
21 A  Yes.
22 Q  Okay.  Now, let me walk through what in that
23    second paragraph you reviewed; okay?
24       You reviewed, according to your letter,
25    John Doe's July 10 appeal, which is Rollock

13 (Pages 46 - 49)

Page 50

1  Exhibit 8; correct?
2  A  July 11th appeal, yes.
3  Q  Okay.
4  A  I'm sorry. I'm sorry. Yes.
5  Q  Okay. And then you say, "Dean Sermersheim's
6     letter to you of April 11 with the notice of
7     allegations."
8  A  Yes.
9  Q  Let's turn to 6- -- let's mark as Rollock
10    Exhibit 10 Bates stamps 568 to 572.
11       (WHEREUPON, Exhibit Number 10, PU 0568 -
12    0572, was marked for identification.)
13 A  Yes, I have it.
14 Q  Was this the -- Dean Sermersheim's April 11
15    letter that was referenced in your July 21
16    letter, Exhibit 9?
17 A  Without redactions, yes.
18 Q  Okay. Let's mark as Rollock Exhibit 11, Bates
19    stamp 655 to 660.
20       (WHEREUPON, Exhibit Number 11, PU 0573 -
21    0576, was marked for identification.)
22       MR. KEALEY: You mean 656 to 660?
23       MR. BYLER: 655 to 660 -- strike that. Not
24    655. I'm sorry. Hold it. That's not the right
25    number.

Page 51

1  Q  I'm sorry. That should be 573 to 576. I
2     apologize.
3  A  Yes.
4  Q  Okay. Was this what you referred to in your
5     letter of July 21 as your original response,
6     that's John Doe's written response to the notice
7     of allegations?
8  A  Yes, I believe it is.
9  Q  Okay. Let's mark as Rollock Exhibit 14, Bates
10    stamp Number 373 to 391.
11       (WHEREUPON, Exhibit Number 14, PU 0373 -
12    0391, was marked for identification.)
13       MR. KEALEY: Phil, before you start in on
14    this exhibit, is this a good time for a break?
15       MR. BYLER: Let's see. Where are we? I
16    presented a document to the witness. All I was
17    going to ask her is if she could identify that
18    document as what was listed in her July 21, 2016
19    letter.
20       MR. KEALEY: Okay.
21       MR. BYLER: And then we can take a break,
22    okay?
23       MR. KEALEY: Sure. Sure.
24 A  I sent you both. I did not receive the email
25    transmittal, but I did review the University

Page 52

1     investigator's report.
2  Q  Okay.
3  A  And that is what I referred to.
4  Q  Okay. Good.
5  A  Without the cover.
6  Q  Yeah, without the cover letter of transmittal.
7     You got the investigation report that follows;
8     right?
9  A  Correct.
10 Q  Okay.
11       MR. BYLER: Time for a break.
12       (A short recess was had.)
13 BY MR. BYLER:
14 Q  I would ask to mark, as Rollock Deposition
15    Exhibit 15, a document Bates-stamped 653 to -54.
16       (WHEREUPON, Exhibit Number 15, PU 0653 -
17    0654, was marked for identification.)
18 A  I've had a chance to look at it.
19 Q  You say you have it in front of you?
20 A  Yes, I do.
21 Q  Okay. Was that what you indicated was the email
22    message from June 5 of 2016?
23 A  Yes.
24 Q  Okay. And that was from Monica Bloom?
25 A  Yes.

Page 53

1  Q  Okay. Now, and the next item, little Roman
2     Numeral V, Dean Sermersheim's letter to you and
3     Jane Doe of June 14, 2016 and June 29, 2016.
4     Those we have previously marked, have we not, as
5     Rollock Deposition Exhibits 4 and 7, 4 being
6     Bates-stamped 497 to 499, and 7 being 603 to
7     607.
8        MR. KEALEY: He's talking about this.
9        THE WITNESS: What's the date on that?
10       MR. KEALEY: June 14 and this one --
11       THE WITNESS: Okay. All right.
12       MR. KEALEY: You can go ahead and have
13    these two.
14       THE WITNESS: Can I have these just for a
15    second?
16 A  I apologize. This is not the Dean's letter. I
17    don't know what your exhibit numbers are, but I
18    was referring to her letters of those dates.
19 Q  Those dates being June 14, 2016 and June 29th,
20    2016; correct?
21 A  Yes. Correct.
22 Q  Okay. And earlier in your deposition, you were
23    presented with those letters and you gave
24    testimony concerning them --
25 A  Correct.

14 (Pages 50 - 53)

Page 54

1 Q -- correct?
2 A Yes.
3 Q Okay. Now, just looking at your list, little
4   Roman Numeral III, the reports of the University
5   investigators, at the time you wrote this
6   letter, John Doe had not seen the investigation
7   report; correct?
8 A Correct.
9 Q And so he was not in a position to give you a
10   response to it at that time?
11 A To the report, correct.
12 Q Okay. Now, little IV says "Email message of
13   June 25, 2016." John Doe had not been presented
14   with Monica Bloom's June 5, 2016 document;
15   correct?
16 A I don't know whether he was or he was not. I
17   assume he was not.
18 Q Does that document, which was Bates stamped 653
19   to 654, indicate it was copied to John Doe?
20 A No, it does not.
21 Q Now, looking at the last paragraph of your July
22   21, 2016 letter that we've marked as Rollock
23   Exhibit 9, you review the appropriateness of the
24   sanctions; do you not?
25 A Yes.

Page 55

1 Q And you state, "In reviewing the appropriateness
2   of the sanctions proposed for your misconduct, I
3   considered its effects on Jane Doe's educational
4   environment and the threat posed to the safety
5   of Jane Doe and the University community. The
6   seriousness of your misconduct supports the
7   determination of Dean Sermersheim that
8   suspension for a period of one full academic
9   year and the other sanctions imposed are
10   warranted." That was your appeal decision with
11   respect to the sanction; correct?
12 A Correct.
13 Q Okay. Now, this is July 21, 2016; correct?
14 A Correct.
15 Q And according to Jane Doe, the alleged sexual
16   misconduct occurred in November, 2015; correct?
17 A And earlier. On or about, and an earlier
18   incident, yes.
19 Q Okay. And she didn't bring her complaint until
20   April, 2016?
21 A I believe that's correct.
22 Q And you're giving your final field decision in
23   July of 2016; correct?
24 A Correct.
25 Q Now, throughout the whole period of time, from

Page 56

1   November, 2015 to July, 2016, were there any
2   other complaints about John Doe at Purdue in
3   terms of sexual misconduct?
4 A No.
5 Q Were there --
6 A I don't believe so.
7 Q -- were -- I'm sorry. I didn't let you finish.
8   Please finish.
9 A I said no, I don't believe so.
10 Q Were there any complaints by Jane Doe about
11   sexual misconduct in that period of time
12   November, 2015 through July, 2016?
13 A I don't believe so.
14 Q Were there any prior complaints of sexual
15   misconduct alleged against John Doe in his
16   freshman year at any point in time? That was
17   the 2015/2016 school year.
18 A Thank you for that. I don't believe so.
19 Q Given that, those facts, what is the basis for
20   saying that John Doe was a threat to the safety
21   of Jane Doe and the University community?
22 A What I said was I considered the threat posed to
23   the University community, and by not expelling
24   him, I clearly did not believe that he posed a
25   threat such that he needed to be expelled.

Page 57

1 Q Well, what was the threat that warranted
2   suspension?
3 A There was, in my view, little threat that he
4   would reoffend; however, he violated our
5   policies and the one-year term of suspension and
6   the other sanctions, in my view, were an
7   appropriate sanction to hold him responsible for
8   his misconduct.
9 Q Now, when you say "other sanctions," do you mean
10   that he would have to report to CARE on a
11   monthly basis and that he would have to have a
12   re-entry interview?
13 A The other items identified in Dean Sermersheim's
14   letter of June 29, 2016.
15 Q The sanction was based, was it not, on the
16   premise that John Doe had committed the sexual
17   misconduct he had been accused of?
18 A Correct.
19 Q Okay. If John Doe hadn't committed it, then the
20   sanction would not have been appropriate;
21   correct?
22 A If he had not violated our policies, there would
23   have been no sanction, correct.
24 Q When you issued your July 21, 2016 letter, were
25   you aware of the harm to John Doe in terms of