**EXHIBIT SJM 7**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF INDIANA
 2                      HAMMOND DIVISION
 3                  CASE NO. 2:17-cv-33-JPK
 4   JOHN DOE,                               )
                                             )
 5        Plaintiff,                         )
                                             )
 6        -vs-                               )
                                             )
 7   PURDUE UNIVERSITY, PURDUE               )
     UNIVERSITY BOARD OF TRUSTEES,           )
 8   MITCHELL ELIAS DANIELS, JR.,            )
     in his official capacity as             )
 9   President of Purdue                     )
     University, ALYSA CHRISTMAS             )
10   ROLLOCK, in her official                )
     capacity at Purdue University,          )
11   KATHERINE SERMERSHEIM, in her           )
     official capacity at Purdue             )
12   University,                             )
                                             )
13        Defendants.
14
15          DEPOSITION OF KATHERINE SERMERSHEIM
16
17      The ZOOM deposition upon oral examination of
     KATHERINE SERMERSHEIM, a witness produced and sworn
18   before me, Clarice H. Howard, CCR-Ky, Notary Public in
     and for the County of Boone, State of Indiana, taken on
19   behalf of the Plaintiff, on Tuesday, August 25, 2020,
     scheduled to commence at 1:00 p.m., pursuant to the
20   Federal Rules of Civil Procedure with written notice as
     to time and place thereof.
21
22
23
24
25
```

Page 2

```
 1          A P P E A R A N C E S
 2
 3      FOR THE PLAINTIFF:
 4          Philip A. Byler
            NESENOFF & MILTENBERG LLP
 5          363 Seventh Avenue
            Fifth Floor
 6          New York, New York 10001
            1.212.736.4500
 7          pbyler@nmllplaw.com
 8      FOR THE DEFENDANTS:
 9
            William P. Kealey
10          STUART & BRANIGIN, LLP
            300 Main Street
11          Suite 900.
            Lafayette, Indiana 47902-1010
12          1.765.423.1561
            wpk@stuartlaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1          INDEX OF EXAMINATION
                                    PAGE
 2
    DIRECT EXAMINATION
 3    Questions by Mr. Byler           4
 4
 5          INDEX OF EXHIBITS
 6
    Deposition Exhibits:
 7
    Exhibit  2  -  E-mail from Monica Bloom     14
 8
    Exhibit  3  -  E-mail from VP Rollock       16
 9
    Exhibit  4  -  Final determination letter   30
10
    Exhibit  5  -  ▓▓▓▓▓ appeal                 37
11
    Exhibit  6  -  VP Rollock remand            38
12
    Exhibit  7  -  Revised determination letter 39
13
    Exhibit  8  -  ▓▓▓▓▓ appeal to revision     47
14
    Exhibit  9  -  Appeal determination         49
15
    Exhibit 10  -  Notice of investigation      17
16
    Exhibit 11  -  ▓▓▓▓▓ reply to notice        19
17
    Exhibit 14  -  Investigators' report        29
18
    Exhibit 29  -  E-mail from Joanna Sharp     25
19
    Exhibit 32  -  Exhibit B to interrogatories 11
20          (NOT AVAILABLE AT TIME OF TRANSCRIPTION)
21  Exhibit 33  -  Student of concern report    12
22  Exhibit 34  -  Memo to panel members        21
23  Exhibit 35  -  Invitation to attend panel meeting  24
24
25
```

Page 4

```
 1  (Time noted: 1:00 p.m.)
 2          THE REPORTER:  The attorneys participating in
 3  this deposition acknowledge that I am not
 4  physically present in the deposition room with the
 5  witness and that I will be reporting this
 6  deposition remotely.  They further acknowledge
 7  that, in lieu of an oath administered in person,
 8  the witness will verbally declare her testimony in
 9  this matter is under penalty of perjury.
10          The parties and their counsel consent to this
11  arrangement and waive any objection to the manner
12  of reporting.  Please indicate your agreement by
13  stating your name and your agreement on the record.
14          MR. BYLER:  Philip Byler, counsel for
15  plaintiff, John Doe; agree.
16          MR. KEALEY:  I agree.
17              -----------------
18          KATHERINE SERMERSHEIM,
19  having been duly sworn to tell the truth, the whole
20  truth, and nothing but the truth relating to said
21  matter, was examined and testified as follows:
22
23  DIRECT EXAMINATION
24      QUESTIONS BY MR. BYLER:
25  Q   Would the witness identify herself for the record?
```

Page 5

```
 1  A   Katherine Lynn Sermersheim, Associate Vice Provost
 2      and Dean of Students at Purdue University.
 3  Q   Would you state your business address?
 4  A   Purdue University.  Do you want more specifics?
 5  Q   Everybody else gave a street and a hall.
 6  A   Schleman Hall, Student Services, Room 207, 475
 7      Stadium Mail Drive, West Lafayette, Indiana,
 8      47907-2050.
 9  Q   Thank you.  My name is Philip Byler.  I am counsel
10      to plaintiff John Doe in this matter entitled John
11      Doe versus Purdue University and others.  We are
12      proceeding with this case under an order of the
13      court giving pseudonym treatment to both ▓▓▓▓▓
14      ▓▓▓▓▓ who's known as plaintiff John Doe, and ▓▓▓▓▓
15      ▓▓▓▓▓ who's known as Jane Doe.
16          Because this deposition is taken subject to
17      the protective order, if you slip up and call them
18      by their real names, it's okay.
19          Now, have you been deposed before?
20  A   Yes.
21  Q   So you know the basic rules, questions and answers
22      in the context of a deposition?
23  A   Yes.
24  Q   I will ask that because we're doing a ZOOM
25      conference deposition, that we do adhere to the
```

Page 6

1 rules, i.e., that I finish my question before you
2 start answering, even though you may understand
3 where I'm going, and I will refrain from
4 interrupting you and allow you to give an answer.
5 That way the court reporter can take our respective
6 responses down accurately.
7     Every now and then it happens invariably that
8 I talk and you talk, but don't worry about it. I
9 will stop or you will stop, but to the extent we
10 can maintain question, answer, question, answer, it
11 is helpful.
12     Today, do you have any reason why you can't
13 give full and honest testimony today?
14 A  No.
15 Q  Are you under any medication that would affect your
16 giving of testimony?
17 A  No.
18 Q  Can you state for the record your educational and
19 employment background?
20 A  Is that all to way to undergrad, I suppose?
21 Q  Yes.
22 A  I received my bachelors of science from the
23 University of Illinois in 1989, double majoring in
24 psychology and sociology. Graduated from Western
25 Illinois University in Macomb, Illinois in 1991

Page 7

1 with a masters of science, emphasis in college
2 student personnel educational administration.
3 Graduated from Southern Illinois University in
4 Carbondale in 2002 with a Ph.D. in education with
5 emphasis in educational administration.
6     Upon graduating with my masters degree, I took
7 employment at St. Joseph's College in Rensselaer,
8 Indiana, as a director of student activities. I
9 was there from 1991 to 1992. From 1992 to 1996, I
10 was at Western Illinois University as an assistant
11 director of student activities, primarily working
12 with fraternities and sororities.
13     In 1996 I moved to Southern Illinois
14 University in Carbondale and served that
15 institution for 18 years in a variety of positions,
16 starting out as an associate director of student
17 development, followed by the director of student
18 development, followed by an interim associate dean
19 of students and the permanent dean of students --
20 or an associate dean role. Then I became the
21 interim dean of students.
22     Prior to relocating to West Lafayette,
23 Indiana, to serve Purdue University as their dean
24 of students and was later retitled associate vice
25 provost and dean of students, where I currently

Page 8

1 serve in this capacity.
2 Q  In the 2015-1026 school year, what was your title?
3 A  '15, '16, I would have been dean of students.
4 Q  Now, could I show the witness what was Exhibit B,
5 the first page at least, to defendants' responses
6 to plaintiff's interrogatories. It's a position
7 description for the dean of students.
8 A  I think this is --
9 Q  Have you received the document in front of you?
10 A  Director of CARE.
11     MR. KEALEY: We're looking for it, Phil.
12     MR. BYLER: Okay. Exhibit B is down in the
13 right-hand corner.
14 A  I have it now.
15 Q  Okay. Do you see that it's a position description
16 for the dean of students?
17 A  I do.
18 Q  And the date was March 5, 2015, in the upper
19 left-hand corner?
20 A  Yes.
21 Q  And it shows as your supervisor Beth McCuskey, vice
22 provost student life; do you see that?
23 A  Yes.
24 Q  What is a vice provost?
25 A  A vice provost is similar to a vice president in

Page 9

1 the scheme of things. Should I elaborate?
2 Q  Yes.
3 A  A vice president is a senior level administrator at
4 a university at an institution of higher education.
5 Q  During the 2015-2016 school year, was your
6 supervisor's name Beth McCuskey?
7 A  Prior to? I started August 1, 2015.
8 Q  Okay. And who was your supervisor during the
9 2015-2016 school year?
10 A  Beth McCuskey.
11 Q  Now, looking at position summary, the first section
12 of this position description, given your experience
13 as dean of students, does this accurately state or
14 summarize the position of dean of students?
15 A  Yes, it does.
16 Q  I'll direct your attention to the last sentence in
17 that section of the position summary. It says
18 "additionally the dean of students serves as the
19 primary decisionmaker for students on student Title
20 IX matters, oversees the behavioral intervention
21 team and may serve on point for crisis response."
22     I read that accurately?
23 A  Yes.
24 Q  Are you the primary decisionmaker for students on
25 student Title IX matters?

Page 10
1  A   Yes.
2  Q   The next section is the essential functions. And
3      the first sentence under that says "advocacy ensure
4      ODOS, maintains a finger on the post of the student
5      culture and subcultures, while serving as an
6      advocate for student issues and concerns
7      institutionally." I'm going to stop there.
8         I read that accurately, didn't I?
9  A   Yes.
10 Q   What does that mean in terms of what a dean of
11     students does?
12 A   I believe that statement would imply that I have
13     awareness of the current issues and topics and
14     dynamics of student life on a University campus
15     setting.
16 Q   What kind of issues does that mean?
17 A   I would equate to present day issues such as Black
18     Lives Matter, financial challenges of students with
19     student loans, the Covid crisis and all dynamics
20     that would be associated with that, student
21     preparation in coming to a college campus with any
22     remedial work that may or may not be needed,
23     student adjustments in how students adjust to a new
24     college setting as a freshman, mental health and
25     wellbeing as it relates to our nation, our

Page 11
1      University, our world at large, crises that happen
2      within the country and within the world and how we
3      need to support our students, as a few examples.
4  Q   And for the 2015-2016 school year, were the issues
5      that you address in this context different?
6  A   I do not recall.
7  Q   We didn't have to deal in 2015-2016 with the
8      Covid-19 pandemic?
9  A   Correct.
10 Q   You didn't have on the forefront Black Lives
11     Matter?
12 A   Actually we did. We had protests out of Missouri,
13     with the University of Missouri had contextual
14     issues related to racial unrest.
15 Q   Were there any other issues back in the 2015-2016
16     school year that may not be necessarily on the
17     forefront today?
18 A   I cannot recall.
19         MR. BYLER: Okay. I'm going to mark -- what
20     we'll marked as Exhibit B, that will be Sermersheim
21     32.
22         (Deposition Exhibit No. 32 marked
23              for identification.)
24         MR. BYLER: I want to mark as Sermersheim 33,
25     Bates stamp 32 to 33.

Page 12
1         (Deposition Exhibit No. 33 marked
2              for identification.)
3  BY MR. BYLER:
4  Q   Okay. Have you looked at the document?
5  A   Yes.
6  Q   I want to give you that opportunity. Are you able
7      to identify what kind of document Sermersheim
8      Exhibit 33 is?
9  A   I think this is 32, is it not?
10 Q   The Exhibit number is 33. It's Bates stamp 32 and
11     33.
12 A   Okay. I just wanted to be clear.
13 Q   I appreciate it. We want to be on the same page.
14     It's Bates stamp 32 to 33. It's received in the
15     deposition as Exhibit No. 33.
16         So my question is can you identify what kind
17     of document this is?
18 A   Yes.
19 Q   What is it?
20 A   It's a student of concern report.
21 Q   And this particular one concerns what?
22 A   It would be reported as a concern for a student's
23     mental health.
24 Q   Okay. And does the report reflect why there was a
25     concern for a student's mental health?

Page 13
1  A   There is a narrative describing an interaction
2      between the Purdue Promise coach and a student,
3      yes.
4  Q   Who's the student about whom there's a concern for
5      mental health?
6  A   The name appears to be blacked out.
7  Q   Redacted. Okay. Does this report indicate who was
8      the one making the report?
9  A   It does.
10 Q   And who is it?
11 A   Leanne DeLosh.
12 Q   And does report indicate who she talked to that
13     prompted filing this report?
14 A   Yes.
15 Q   And who is that?
16 A   ███████.
17 Q   Does that report reflect that ███████ told the
18     reporter that the redacted name had committed --
19     had attempted to commit suicide?
20         MR. KEALEY: Objection to form.
21 A   It indicates that she had thoughts of suicide.
22 Q   Is this the kind of document that gets sent to you
23     in your capacity as dean of students?
24 A   I receive a copy of this, yes.
25 Q   So you would have received a copy of what we've

4 (Pages 10 - 13)

Page 14

1  marked as Sermersheim Exhibit 33 with Bates stamp
2  32 to 33?
3  A  Yes.
4  Q  Do you recall receiving a copy of that back in
5  February of 2016?
6  A  I do not.
7  Q  Okay. And let's go to what I'm going to mark as
8  Sermersheim Exhibit 2, which has the Bates stamp
9  726 to 728.
10        (Deposition Exhibit No. 2 marked
11           for identification.)
12        (Witness reviews documents.)
13  BY MR. BYLER:
14  Q  Have you looked at the document?
15  A  Yes.
16  Q  Is this an e-mail from one Monica Bloom to you and
17  Vice President Rollock?
18  A  Yes.
19  Q  At that point in time, what position do you know
20  that Monica Bloom had?
21  A  At that time Monica Bloom would have been the
22  director of CARE, our Center for Advocacy Response
23  and Education.
24  Q  Okay. What is your understanding that CARE does?
25  A  They support students during situations of domestic

Page 15

1  violence, relationship violence, sexual assault,
2  sexual misconduct, and supports students in
3  general.
4  Q  Do you recall receiving Sermersheim Exhibit 2?
5  A  I don't recall receiving it specifically, but I
6  certainly acknowledge it would have been in my
7  receipt.
8  Q  And that document is dated April 5, 2016?
9  A  Yes.
10  Q  Turn to the third page of that document, which is a
11  statement of allegation. Do you see in there a
12  date of November of 2015?
13  A  Yes.
14  Q  Do you have a recollection of looking at an initial
15  statement of allegations with a date of November of
16  2015?
17  A  No.
18  Q  Okay. Going back to the first page, again, to this
19  document that you have in hand, do you have any
20  recollection of talking to Monica Bloom upon
21  receipt of such a document?
22  A  No.
23  Q  Do you recall talking to Vice President Rollock
24  about receiving an e-mail from Monica Bloom
25  concerning a specific case?

Page 16

1  A  No.
2  Q  When you received Semersheim Exhibit 2, do you have
3  an understanding as to why Monica Bloom sent it to
4  you and Vice President Rollock?
5  A  No.
6  Q  Do you recall doing anything after, in the
7  timeframe right after April 5, 2016, concerning the
8  case referenced in Sermersheim 2?
9  A  No.
10  Q  Okay. I'm going to ask you to turn Sermersheim 3
11  which is Bates stamp 729 to 730. I see that
12  Semersheim 3, which is Bates stamp 729 to 730,
13  you're copied on an e-mail sent by Vice President
14  Rollock?
15        (Deposition Exhibit No. 3 marked
16           for identification.)
17     MR. KEALEY: We'll still looking for 729.
18     MR. BYLER: I'm sorry?
19     MR. KEALEY: It may be out sequence in the
20  stack from yesterday. Just bear with me for a
21  minute.
22     MR. BYLER: That's fine. I apologize for
23  rushing.
24     MR. KEALEY: Okay. Now, the witness has the
25  document.

Page 17

1  BY MR. BYLER:
2  Q  Okay. Take a look at it and then I'll ask the
3  question.
4  A  Okay.
5  Q  Does Semersheim 3 show you to be a copy on the
6  document that Vice President Rollock sent back to
7  Monica Bloom?
8  A  Yes.
9  Q  And that was April 5, 2016, also?
10  A  Correct.
11  Q  Okay. Now, the text of Semersheim 3 indicates
12  there would be some revision of the allegations; do
13  you see that?
14  A  Yes.
15  Q  Do you recall being involved in that revision?
16  A  No.
17  Q  Okay. Let's go to Semersheim Exhibit 10, which is
18  568 to 572.
19        (Deposition Exhibit No. 10 marked
20           for identification.)
21     MR. KEALEY: The witness has that document.
22  BY MR. BYLER:
23  Q  Can you identify what we have marked as Semersheim
24  Exhibit 10, which is 568 to 572?
25  A  This is a notice of investigation of possible

Page 18

1   harassment.
2 Q  And it's sent to ▓▓▓▓▓▓▓?
3 A  Yes.
4 Q  On the second page, does your signature appear?
5 A  Yes.
6 Q  And in this Semersheim 10, do you give Mr. ▓▓▓▓ a
7   opportunity to respond in writing?
8 A  Yes.
9 Q  And also do you include a no contact order?
10 A  Yes.
11 Q  On the second page, the cc's are shown to Erin
12   Oliver and Jacob Amberger, correct?
13 A  Yes.
14 Q  Were they the investigators that you appointed to
15   investigate the matter?
16 A  Yes.
17 Q  In the second paragraph of your letter on the first
18   page, 568, is there a reference to a description of
19   allegations that is enclosed with your April 11,
20   2016 letter?
21 A  Yes.
22 Q  Turn to 572 of the document. That's, I think, the
23   fifth page of this document, the last page of the
24   document of Semersheim Exhibit 10. Do you see what
25   I'm talking about?

Page 19

1 A  The notice of allegation?
2 Q  Yes. Was this the notice of allegation that was
3   included in your April 11 letter to ▓▓▓▓▓▓, that
4   gave the notice of allegations that Ms. ▓▓▓▓ had
5   made?
6 A  Yes.
7 Q  Do you recall how the notice of allegations was
8   drafted?
9 A  No.
10 Q  Okay. Let's go to Semersheim Deposition Exhibit
11   11, which is 573 to 576.
12     (Deposition Exhibit No. 11 marked
13       for identification.)
14 BY MR. BYLER:
15 Q  I'll make that clear. It's 573 to 576.
16   Okay. Have you reviewed that document?
17 A  Yes.
18 Q  Was Semersheim Exhibit 11, which has Bates stamp
19   573 to 576, the reply that ▓▓▓▓▓▓ submitted
20   to you in response to your April 11 letter,
21   Semersheim 10, which has the Bates stamp number 568
22   to 572?
23 A  Yes.
24 Q  Do you recall reading it at the time?
25 A  No.

Page 20

1 Q  Do you recall in this time period of April, talking
2   to anybody about the case?
3 A  No.
4 Q  Did you have any communication with the
5   investigators who you appointed to investigate the
6   case?
7 A  No, I do not recall.
8 Q  Do you recall in that time period, April 2016, of
9   talking to Monica Bloom about the case?
10 A  I do not recall.
11 Q  Let's go to Semersheim Exhibit 14, which is Bates
12   stamp 373 to 391.
13     (Deposition Exhibit No. 14 marked
14       for identification.)
15 BY MR. BYLER:
16 Q  You ready?
17 A  Yes.
18 Q  Can you identify what we've marked as Semersheim
19   Exhibit 14, Bates stamp 373 to 391?
20 A  Yes.
21 Q  What is it?
22 A  The University investigators' report.
23 Q  Was this the report you received from Erin Oliver
24   and Jacob Amberger in the ▓▓▓▓▓▓▓ matter?
25 A  Yes.

Page 21

1 Q  Do you recall receiving that report?
2 A  I don't recall receiving it, but I recall reading
3   it when it was time for the panel meeting.
4 Q  Do you recall reading it on May 21, May 22 up to
5   June 1?
6 A  Yes.
7 Q  Let's look at what's Bates stamp No. 655, and that
8   will be Semersheim Exhibit 34.
9     (Deposition Exhibit No. 34 marked
10       for identification.)
11   MR. KEALEY: Could you provide me the Bates
12   numbers, again, please?
13   MR. BYLER: 655.
14   MR. KEALEY: The witness has the document.
15 BY MR. BYLER:
16 Q  It's Semersheim Exhibit 34 with a Bates stamp of
17   655. Can the witness identify what that document
18   is?
19 A  It is a memo requesting presence of panel members
20   for a panel meeting.
21 Q  Was that -- and is the subject in your memo --
22   first of all, this was your memo, correct?
23 A  Yes.
24 Q  Okay. And it addressed to Mr. Matthew Conaway, Dr.
25   Ralph Webb and Ms. Paula Courtney?

6 (Pages 18 - 21)

|  | Page 22 |
|---|---|
| 1 A | Correct. |
| 2 Q | Who is Matthew Conaway? |
| 3 A | He is a staff member, faculty member on campus. |
| 4 Q | What kind of faculty member is he; what does he |
| 5 | teach or what is his area of work within the |
| 6 | University? |
| 7 A | I don't have an exact title, but I know he works |
| 8 | with marching band, performance band, music. |
| 9 Q | Who's Dr. Ralph Webb? |
| 10 A | He is likely now a retired faculty member. |
| 11 Q | He's an older gentleman? |
| 12 A | Yes, sir. |
| 13 Q | What, at this time in May of 2016, was he doing at |
| 14 | Purdue? |
| 15 A | Other than being a faculty member, I do not know |
| 16 | his discipline. |
| 17 Q | Who is Ms. Paula Courtney? |
| 18 A | I do not have recall of Paula Courtney. |
| 19 Q | Do you recall any particular reason why these three |
| 20 | individuals were going to be consisting of a panel? |
| 21 A | I do not. To elaborate, the memo and the panel |
| 22 | members are generated by my staff member, the |
| 23 | assistant to the dean of students, Joanna Sharp. |
| 24 Q | Okay. The date of this memo was May 25, 2016, |
| 25 | correct? |

|  | Page 23 |
|---|---|
| 1 A | Correct. |
| 2 Q | And the subject is entitled panel meeting, correct? |
| 3 A | Correct. |
| 4 Q | And you're thanking them for their willingness to |
| 5 | serve as panel members in the matter involving -- |
| 6 | well, it's redacted. It's ▇▇▇▇ against |
| 7 | ▇▇▇▇. |
| 8 A | Correct. |
| 9 Q | And that you had scheduled it for Monday, June 6, |
| 10 | 2016, right? |
| 11 A | Correct. |
| 12 Q | Okay. It was going to start at 2:00 p m.? |
| 13 A | Correct. |
| 14 Q | And with this memo, you sent your April 11 notice |
| 15 | of allegations to Mr. ▇▇▇ correct? |
| 16 A | I assume so. Again, this would have been managed |
| 17 | by my staff member, Joanna Sharp. |
| 18 Q | Also listed here is ▇▇▇▇ response to your |
| 19 | notice of allegations, correct? |
| 20 A | Correct. |
| 21 Q | And the University investigator report is listed |
| 22 | here? |
| 23 A | Correct. |
| 24 Q | Let me turn to 596 Bates stamp. I think that will |
| 25 | be Semersheim Exhibit 35. |

|  | Page 24 |
|---|---|
| 1 | (Deposition Exhibit No. 35 marked |
| 2 | for identification.) |
| 3 BY MR. BYLER: |
| 4 Q | When you're ready after you've reviewed the |
| 5 | document, I was going to ask you if you could |
| 6 | identify Semersheim Deposition Exhibit 35, Bates |
| 7 | stamp 596? |
| 8 A | Yes. |
| 9 Q | And what is it? |
| 10 A | It appears to be an invitation to attend the panel |
| 11 | meeting. |
| 12 Q | And that's addressed to ▇▇▇▇, right? |
| 13 A | Yes. |
| 14 Q | The first sentence of your letter -- well, let's |
| 15 | ask this. Is this dated May 31, 2016? |
| 16 A | Yes. |
| 17 Q | The first sentence of your letter states, does it |
| 18 | not, please be advised that you'll be scheduled to |
| 19 | meet with the panel on Monday, June 6, 2016 from |
| 20 | 2:00 p m. to 2:30 p.m. Did I read that correctly? |
| 21 A | Yes. |
| 22 Q | And for this panel meeting, ▇▇▇▇ was |
| 23 | granted a half hour time with you? |
| 24 A | Yes. |
| 25 Q | Now, with this meeting on June 6, are you present? |

|  | Page 25 |
|---|---|
| 1 A | Yes. |
| 2 Q | And the panel members are obviously present? |
| 3 A | Yes. |
| 4 Q | Anyone else? |
| 5 A | No, not for the general meeting. The respondent |
| 6 | can bring a support person. |
| 7 Q | Let's turn to Bates stamp 392, which I think is |
| 8 | Semersheim Exhibit 29. |
| 9 | (Deposition Exhibit No. 29 marked |
| 10 | for identification.) |
| 11 | MR. KEALEY: What's the Bates number, Phil? |
| 12 | MR. BYLER: I'm sorry, 392. |
| 13 | MR. KEALEY: The witness has the document. |
| 14 BY MR. BYLER: |
| 15 Q | Exhibit 29, Bates stamp 392, is an e-mail from |
| 16 | Joanna Sharp, is it not? |
| 17 A | Yes. |
| 18 Q | And that is your assistant? |
| 19 A | Yes. |
| 20 Q | And this is sent to -- well, who are these people? |
| 21 | Jacob Amberger and Erin Oliver were the |
| 22 | investigators, correct? |
| 23 A | Yes. |
| 24 Q | Who was Casey Richardson? |
| 25 A | Casey Richardson is -- was a member of the CARE |

Page 26

1  staff.
2  Q  What's that?
3  A  Center for Advocacy Response and Education.
4  Q  And who is Christopher Greggila?
5  A  Christopher Greggila was a member of the CARE
6     staff.
7  Q  So the first people listed under 2 are people from
8     CARE?
9  A  Correct.
10 Q  Do you have any understanding of why they would be
11    receiving a copy of this e-mail?
12 A  It is likely that they were support persons for one
13    or the other of the respondent or complainant.
14 Q  Do you know whether or not ▓▓▓▓▓▓▓ had a
15    support person from CARE?
16 A  I don't recall.
17 Q  Okay.  Now, there's a schedule here listed, is
18    there not, 2:00 p m. to 2:30 p m. ▓▓▓▓▓▓▓
19    and 2:30 to 3:00 p m., investigators; do you see
20    that?
21 A  Yes.
22 Q  And that was the schedule on June 6, 2:00 to 2:30
23    ▓▓▓▓▓▓▓ 2:30 to 3:00 investigators?
24 A  At this writing, yes.
25 Q  And the investigators, again, were Erin Oliver and

Page 27

1     Jacob Amberger?
2  A  Correct.
3  Q  Do you recall either Richardson or Greggila showing
4     up at the panel meeting that you officiated over?
5  A  I do not recall.
6  Q  And Joanna Sharp is your assistant who with
7     authority sent out this e-mail?
8  A  Yes.
9  Q  What do you recall happening during the June 6
10    panel meeting?  The document says panel meeting.
11 A  I do not recall.  I do not recall the specific
12    panel meeting.
13 Q  Do you have any specific recollection of ▓▓▓▓▓▓▓
14    ▓▓▓▓▓ appearing before -- in this panel meeting
15    before the panel and you on June 6, 2016?
16 A  I do not recall.
17 Q  Do you recall that ▓▓▓▓▓▓▓ did not appear at
18    that panel meeting that you officiated on June 6,
19    2016?
20 A  I don't recall it happening.  However, as
21    identified here, it would suggest she was not in
22    attendance.
23 Q  Now, with these panel meetings, there's not a court
24    reporter present, correct?
25 A  Correct.

Page 28

1  Q  There's no recording of the proceeding of the panel
2     meeting, correct?
3  A  Correct.  That is a statement that I make in the
4     beginning of every panel that I run.
5  Q  What's the statement you make?
6  A  A partial is specific to no recording, I share with
7     the respondent or the complainant that neither us
8     as panel members or I as the decisionmaker nor them
9     as the student or the support person are to be
10    recording the meeting audio or video.
11 Q  Now, do you recall the investigators speaking to
12    the panel you officiated on June 6, 2016, in the
13    ▓▓▓▓▓▓▓ matter?
14 A  I do not recall them speaking.
15 Q  Do you recall discussing with the panel members any
16    particular issue after both ▓▓▓▓▓▓▓ and the
17    investigators had spoken to the panel?
18 A  I do not recall.
19 Q  Do you recall at the end of this meeting anything
20    in terms of what was decided or not decided?
21 A  I do not recall the specifics.  However, I know the
22    outcome was based on my memo and finding letter.
23 Q  Okay.  In terms of the process, what role do you
24    play in making a decision?
25 A  I am the decisionmaker.

Page 29

1  Q  What role do the panel members play?
2  A  The panel members assist in asking clarifying
3     questions, providing a recommendation to me as to
4     whether or not there is a finding or a violation of
5     our antiharassment policy.  If they advise or
6     recommend that there is a violation, I ask for them
7     to assist me in brainstorming possible sanctions.
8  Q  In terms of the panel meeting, what is expected of
9     the investigators when they appear before the panel
10    members and you?
11 A  Generally speaking, the investigators will come
12    into the panel meeting and clarify any aspect of
13    the investigators' report or comments made by
14    either the respondent or the complainant that we
15    would like -- we the panel; I the decisionmaker --
16    further clarification on.
17 Q  In this particular case, do you recall any point or
18    points that the investigators made to you and the
19    panel concerning the investigation report?
20 A  I do not recall.
21 Q  Do you recall them outside of the investigation
22    report making any point or points to you and the
23    panel?
24 A  I do not recall.
25 Q  Let's go to Semersheim Exhibit 4, which is Bates

8 (Pages 26 - 29)

Page 30

1  stamp 597 to 599.
2      (Deposition Exhibit No. 4 marked
3       for identification.)
4      MR. KEALEY:  The witness has the document.
5  BY MR. BYLER:
6  Q   597 to 599, which we'll call Semersheim 4, because
7      that's what we gave four as the number during the
8      Rollock deposition.  Can you identify what we've
9      marked as Semersheim Exhibit 4 that has the Bates
10     stamp numbers 597 to 599?
11 A   Yes.
12 Q   What is it?
13 A   It is a final determination letter.
14 Q   And was that a final determination in the matter of
15     ▉▉▉▉▉▉▉▉▉?
16 A   Yes.
17 Q   And it's dated June 14, 2016?
18 A   Yes.
19 Q   Do you recall what you did in drafting this
20     document, Semersheim Exhibit 4, 597 to 599?
21 A   Can you rephrase, please?
22 Q   Well, do you recall drafting it?
23 A   No, not specifically.
24 Q   Well, do you recall generally what you did to
25     prepare Semersheim Deposition Exhibit 4, 597 to

Page 31

1      599, such that you were in a position to have it
2      sent to ▉▉▉▉▉▉▉▉▉?
3  A   I would have considered the case, recommendations
4      from the panel members, my review of the
5      investigators' report, and I made a decision to
6      find Mr. ▉▉▉▉ responsible for the allegations and
7      subsequently suspended him.
8  Q   And that decision is in the last couple of lines of
9      the second paragraph on 597?
10 A   Correct.
11 Q   Okay.  And you say I have made the determination
12     that a preponderance of the evidence does support a
13     finding as your conduct violated the antiharassment
14     policy, correct?
15 A   Correct.
16 Q   And you don't provide any particular reasons or
17     explanations after that for that finding, do you?
18 A   Correct.
19 Q   What caused you to think that a suspension was a
20     proper disciplinary sanction in this case?
21 A   I felt that Mr. ▉▉▉▉ by his own admission had
22     admitted to some wrongdoing.  The evidence and the
23     text messages reflected that he had participated in
24     sexual misconduct activities that he shouldn't have
25     and yet, I felt that it was not deserving of a

Page 32

1      two-year suspension, a three-year suspension or an
2      expulsion.
3      So I was trying to be understanding that we
4      had a young man here who was learning about
5      relationships.
6  Q   When you say ▉▉▉▉▉▉▉▉ admitted, was it your
7      understanding that he admitted in the investigation
8      to engaging in this behavior?
9  A   My understanding was in the text messages, that a
10     reasonable person would read that and perceive that
11     Mr. ▉▉▉▉ was acknowledging that he had done wrong,
12     was asking for forgiveness and later alluded to the
13     investigators that he did indeed touch her.
14 Q   Well, did you have an understanding that the text
15     messages attached to the investigation report were
16     all of the text messages that ▉▉▉▉▉▉▉▉
17     provided to the investigators?
18 A   I don't recall.
19 Q   Do you recall that the text messages did not
20     expressly on the part of the ▉▉▉▉▉▉▉▉ admit
21     to touching ▉▉▉▉▉▉▉▉ in her crotch or
22     digitally penetrating her?
23     MR. KEALEY:  Object to form, compound, lack of
24     foundation.  You may answer.
25 BY MR. BYLER:

Page 33

1  Q   Well, did you read the texts before rendering your
2      decision?
3  A   Yes, I'm sure I did.
4  Q   That's the foundation.  And the question is do you
5      recall that those texts do not include a statement
6      by ▉▉▉▉▉▉▉▉ that he digitally penetrated
7      ▉▉▉▉▉▉▉▉ or that he touched her in her crotch
8      area outside her clothing?
9      MR. KEALEY:  Renew objections.
10 BY MR. BYLER:
11 Q   I'll press that question.  Go ahead.
12 A   My interpretation as a professional in higher
13     education for 30 years and in working with students
14     and the student conduct, as I read and decipher the
15     text messages and recently reviewed for the
16     purposes of today, it is clear to me that Mr.▉▉▉▉
17     is a young man dealing with some maturity issues,
18     which is understandable for that age.
19     That's the one-year suspension rather than
20     longer and that he feels awful for the actions that
21     he took and the behaviors that he conducted against
22     Ms. ▉▉▉▉▉▉  He's begging for forgiveness.  He
23     feels that he's drifting from God.  He wants a
24     second chance.  He is sorry.
25     That coupled with the written documentation in

9 (Pages 30 - 33)

Page 34

1   the investigators' report where he did seem to
2   change directions and admit to touching, coupled
3   together, to allow me to come to a decision and a
4   finding of responsible, issuing a subsequent
5   sanction that I thought was fair and reasonable for
6   a young man who is learning and navigating through
7   his first real relationship.
8 Q   I understand you say it was your interpretation.
9   My specific question was it is true, is it not,
10   that the texts do not include ▮▮▮▮
11   expressly admitting to digitally penetrating ▮▮▮▮
12   ▮▮▮▮ or touching her crotch outside her
13   clothing?
14       MR. KEALEY: Object to form.
15 BY MR. BYLER:
16 Q   I'll press the question. Go ahead.
17 A   There is no specific statement from Mr. ▮▮▮▮ saying
18   such things.
19 Q   Okay. And there is also no specific accusation by
20   ▮▮▮▮ in those texts that you read that
21   accuse ▮▮▮▮ expressly of digitally
22   penetrating her and touching her crotch outside her
23   clothing?
24       MR. KEALEY: Object to form.
25 A   Correct.

Page 35

1 Q   Okay. Now, were you aware that there were about
2   133 pages of texts between ▮▮▮▮ and
3   ▮▮▮▮ that ▮▮▮▮ produced to the
4   investigators?
5 A   No, I was not.
6 Q   And you reviewed the texts you said. One day of
7   texts was December 23, 2015, was it not?
8 A   Yes.
9 Q   Were you aware that that day part of the texts that
10   you did not see involved back and forth between
11   ▮▮▮▮ and ▮▮▮▮ about ▮▮▮▮
12   ▮▮▮▮ sending cookies to ▮▮▮▮ home?
13 A   No, I am not.
14 Q   Did the investigators say anything to you that you
15   recall that there were more texts than what were
16   attached to the investigator report?
17 A   I do not recall.
18 Q   Attached to the investigator report were about six
19   or seven pages of texts, correct? It was in that
20   number.
21 A   Correct.
22 Q   Was anything said to you to indicate there were 133
23   pages of texts?
24 A   I do not recall.
25 Q   Well, without reviewing the 133 pages of texts,

Page 36

1   how would you know the context of what are the
2   statements that are attached to the investigation
3   report?
4 A   My role, sir, was to determine whether or not there
5   was a violation to the antiharassment policy and
6   specifically focus on the allegation of
7   inappropriate touching, digital penetration, the
8   claim or allegation of stalking, the allegation of
9   the taser or stun gun. And I specifically honed in
10   on the inappropriate touching and feel as though
11   there was a preponderance of evidence to suggest
12   that Mr. ▮▮▮▮ did indeed inappropriately touch and
13   digitally penetrate Ms. ▮▮▮▮.
14 Q   Did not the investigation report make it clear to
15   you that ▮▮▮▮ denied digitally
16   penetrating ▮▮▮▮?
17 A   I understand that Mr. ▮▮▮▮ denied that. My review
18   showed inconsistencies to suggest she was a more
19   credible participant in the process than Mr. ▮▮▮▮
20 Q   Well, did not ▮▮▮▮ say she didn't, of
21   her own recollection, remember the digital
22   penetration?
23       MR. KEALEY: Object to form.
24 A   I think that is correct.
25 Q   What makes you think she was more credible?

Page 37

1 A   As I interpreted the written review of the
2   investigators and statements submitted by the
3   respondent and the complainant, her statements were
4   consistent; his statements were not.
5 Q   What statements were not? You used the word
6   statements. I'm sorry, I wasn't sure what
7   statements you were referring to.
8 A   The statement that he in no way -- in his response
9   to the allegations, he stated that he did not touch
10   her inappropriately either evening, and I'm sorry,
11   I do not have the specific dates. However, upon
12   reviewing the text messages and the statement that
13   he made to the investigators, it was -- I viewed
14   that as a discrepancy in his report and statement.
15 Q   But did not Mr. ▮▮▮▮ state to the investigators
16   that he did touch her leg right above the knee but
17   denied touching her crotch?
18 A   He did make that statement.
19 Q   Okay. Let's go to Semersheim Exhibit 5, which is
20   Bates stamp 718 to 719. I'm sorry, that should be
21   717 to 719 and that's Exhibit 5.
22       (Deposition Exhibit No. 5 marked
23       for identification.)
24       MR. KEALEY: The witness has the document.
25 BY MR. BYLER:

| | |
|---|---|
| Page 38 | Page 40 |

Page 38
1  Q   You advised Mr. ▮▮▮ in Semersheim Exhibit 4, 597
2      to 599, that he could appeal your determination,
3      did you not?
4  A   Correct.
5  Q   And that appeal would go to Vice President Rollock?
6  A   Correct.
7  Q   Vice President Rollock is the appeal officer in the
8      process?
9  A   Correct.
10 Q   Okay. And do you recognize what is Semersheim
11     Exhibit 5, 717 to 718, as Mr. Hord's appeal from
12     your June 14, 2016 determination letter?
13 A   Yes.
14 Q   Did you see this at the time?
15 A   I don't recall.
16 Q   Do you recall Vice President Rollock discussing any
17     aspect of the appeal letter with you?
18 A   I do not recall.
19 Q   Okay. Let's go to Semersheim Exhibit 6, which is
20     Bates stamp 600 to 601.
21        (Deposition Exhibit No. 6 marked
22            for identification.)
23 BY MR. BYLER:
24 Q   Okay. Can you recognize what we've marked as
25     Semersheim Exhibit 6, which is Bates stamp 600 to

Page 39
1      601?
2  A   Yes.
3  Q   And was this Vice President Rollock's decision to
4      remand the matter back to you?
5  A   Yes.
6  Q   And the determination was copied to you, was it
7      not?
8  A   Yes.
9  Q   Okay. Upon receipt of this letter, did you talk to
10     Vice President Rollock at all?
11 A   I do not recall.
12 Q   Upon receipt of this letter, what did you do?
13 A   I would have followed her directive and elaborated
14     on the reasoning why my determination was what it
15     was.
16 Q   Let's turn to Semersheim Exhibit 7, which is 603 to
17     607.
18        (Deposition Exhibit No. 7 marked
19            for identification.)
20     MR. KEALEY: The witness has the document.
21 BY MR. BYLER:
22 Q   Can you identify what we've marked Semersheim
23     Exhibit 7, which consists of Bates stamp number 603
24     to 607?
25 A   It is the revised final determination letter for

Page 40
1      Mr. ▮▮▮
2  Q   Can you turn to page 606?
3  A   Yes.
4  Q   Is that your signature?
5  A   Yes.
6  Q   And is your revised determination letter dated
7      June 29, 2016?
8  A   Yes.
9  Q   And this was the very next day after Vice President
10     Rollock had remanded the case back to you?
11 A   I do not recall that, but the document reflects
12     that.
13 Q   Okay. I want to identify specifically what you
14     added in response to Vice President Rollock. Is
15     what you added towards the bottom of page 603,
16     starting with specifically a preponderance of
17     evidence supports that -- and there's two points,
18     one, two.
19        And it continues, the conduct described in the
20     number of paragraphs above constitute sexual
21     violence under the University's policies of
22     antiharassment. Additionally, I found by the
23     preponderance of the evidence that you are not a
24     credible witness, you being ▮▮▮.
25        I also find by preponderance of evidence that

Page 41
1      redacted, which is ▮▮▮, is a credible
2      witness. I'm stopping there. That's what you
3      added in response to Vice President Rollock?
4  A   Correct.
5  Q   On what did you base your conclusion about a
6      preponderance of evidence showing those two points
7      that appear at the bottom of 603 and 604 in
8      Semersheim Exhibit 7?
9  A   I believe, again, I was referencing the text
10     message exchange, the statements by Mr. ▮▮▮ and
11     the complainant, the investigators' report, the
12     questions by the panel and the subsequent totality
13     of the review I had following ten days after the
14     panel meeting to make my decision.
15 Q   Well, what questions of the panel do you recall
16     supporting what's Points 1 and 2 there?
17 A   I do not recall.
18 Q   Okay. Now, what was the basis for making a finding
19     of ▮▮▮ not being a credible witness and
20     ▮▮▮ being a credible witness?
21 A   I believe it was the inconsistencies in the
22     statements made by Mr. ▮▮▮ and the consistency in
23     the statements made by the complainant.
24 Q   Now, on June 6, 2016, ▮▮▮ appeared in
25     person before you and the panel, correct?

```
                                                    Page 42
 1  A    I don't recall.
 2  Q    Did you ever come across anything that would
 3       indicate he didn't show up and was subjecting
 4       himself to whatever questions the panel and you had
 5       for him?
 6  A    No.  The documents would suggest that he was
 7       present.
 8  Q    And Ms. ██████ was not present on June 6, 2016,
 9       before you and the panel?
10  A    I do not recall, but the previous document
11       referenced suggests that she submitted a statement.
12  Q    Was there anything else that, when you did
13       Semersheim Exhibit 7, supported the statement of
14       credibility on page 604?
15  A    I do not recall the specifics.  However, again, it
16       was an issue of inconsistencies in statements, the
17       text messaging and the consistency in statements by
18       the complainant.
19  Q    Well, what statements did Ms ██████ ever make in
20       person to you and the panel?
21  A    I do not recall.  If she wasn't in person, then it
22       would have been the written statement.
23  Q    Was there any other statement that Ms. ██████
24       submitted?
25            MR. KEALEY:  Object to form.
```

```
                                                    Page 43
 1  BY MR. BYLER:
 2  Q    Let me rephrase.  Other than the statement that was
 3       submitted in lieu of appearing in person, were you
 4       aware of any other statement made or submitted in
 5       the process by Ms. ██████?
 6            MR. KEALEY:  Object to form.
 7  A    Other than participating in the investigators'
 8       report and/or submitting her statement, I do not
 9       recall.
10  Q    What was consistent in the statement that you do
11       refer to concerning Ms. ██████.
12  A    I do not recall.
13  Q    When you say consistent, in that context that Ms.
14       ██████ is being consistent, my question is
15       consistent with what other statements?
16  A    I don't recall the specific statements.  I would
17       say that as a professional in the field of higher
18       education and student affairs, I watch and listen
19       for consistencies in the statements to ensure an
20       accurate consistent portrayal of the events.
21            And in my review of this case from 2016 would
22       suggest I saw inconsistencies in the text messages,
23       in the statements made by Mr. ██████ and in the
24       written response that he submitted.
25  Q    Are you calling inconsistencies what Mr. ██████ said
```

```
                                                    Page 44
 1       was meant by the texts that were submitted to the
 2       investigators?
 3  A    I believe that within the texts it is my
 4       presumption that he is -- again, identifying a
 5       preponderance of evidence that would suggest he is
 6       indeed responsible for inappropriately touching the
 7       complainant.
 8  Q    Mr. ██████ said he touched her above her knee.  How
 9       is that inconsistent with it being called
10       inappropriate touching?
11            MR. KEALEY:  Object to form.
12  BY MR. BYLER:
13  Q    I offer said question because I think we
14       established the predicate to it earlier in the
15       testimony.
16            MR. BYLER:  Court reporter, why don't you read
17       back the question I posed.  I might rephrase it
18       depending on what I hear you tell me.
19            (The last question was read.)
20  BY MR. BYLER:
21  Q    Yes, that's the question.
22  A    I believe that's actually a partial truth in that I
23       believe I recall seeing that the allegation was she
24       woke up to him touching her above the knee and
25       continued up to her crotch and another part of her
```

```
                                                    Page 45
 1       anatomy that I'm not recalling the exact language
 2       or finding in here.
 3            So there is partial truth in that statement.
 4       She alleges that not only did he touch her above
 5       the knee, but continued on to touch her outside her
 6       clothing and went on up to her crotch area.
 7  Q    Wait a minute.  I thought it had been established
 8       that Mr. ██████ never admitted to touching over the
 9       clothing Ms. ██████ crotch.
10            MR. KEALEY:  You asked the witness for what
11       inconsistent evidence she had and she answered
12       that.
13            MR. BYLER:  Right.  And I understood her
14       answer to be that there was something, and I didn't
15       understand what she meant by her answer.  And
16       pardon me, I was just trying to understand what she
17       was referring to.
18  BY MR. BYLER:
19  Q    Let me step back.  True, is it not, that Mr. ██████
20       acknowledged that he touched her leg above her
21       knee, correct?
22  A    Correct.
23  Q    And it's true, is it not, that Mr. ██████ denied
24       touching her crotch outside her clothing?
25  A    I believe that that is consistent with his
```