**EXHIBIT SJM 8**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF PLAINTIFF JOHN DOE

**PLAINTIFF JOHN DOE**, hereby declares subject to the penalties of perjury pursuant to 28 U.S.C. § 1746:

1.　I am the Plaintiff John Doe named in the above-captioned action. I write this Declaration to provide more detailed information about my personal relationship with Jane Doe regarding what is alleged in paragraph 23 of the Amended Complaint. When I was deposed by the Purdue attorney on August, 18 2018, I was not asked questions that would elicit much of this information, which is highly relevant context that speaks for itself.

2.　My upbringing was in a conservative Evangelical Protestant home with brothers, sisters, a mother, and a father. In high school, I did not have the opportunity to engage in any sexual activity, and I was raised of the mind that I shouldn't engage in sex before marriage. Sex before marriage was a violation of both my religious obligations and the values my parents instilled in me.

3. Both Jane Doe and I were freshmen in the Purdue Navy ROTC program. In mid-August 2015, we both arrived at Purdue. It was early September that at Jane Doe's initiation, she and I became interested in each other and started to spend time together, going to restaurants in town, walking around campus, and spending time in her room. I did not have a girlfriend prior to college, and so Jane Doe was my first girlfriend.

4. About 1 month after Jane Doe and I first began to spend time together, we started having sexual intercourse. The first time, which happened in early October 2015, was in Jane Doe's single room in Wiley Hall. Before that night, I was a virgin. Jane Doe was the aggressor. She engaged me in flirty and suggestive conversation with sexual overtones and was touchy to arouse my sexual desires. Jane Doe led the way by taking off her clothes and helping me take off my clothes.

5. Jane Doe and I had a sexual relationship from the early October to early December 2015. In that time period, we had sexual intercourse about 15-20 times; several of those times, Jane Doe, at her initiation, performed fellatio on me. Aside from fellatio, our sexual relationship was vanilla and intimate. I had no interest in engaging in deviant sexual acts. All but one of those times having sexual intercourse occurred in Jane Doe's room, with the one exception taking place in my room in Tarkington Hall during the day when nobody was around. About 15-20 times I stayed the night in her room. Jane Doe was almost always the one who initiated having sex.

6. During the course of our relationship, Jane Doe told me that she had multiple sexual partners before college, and claimed to have a personal history of rape and suicide attempts. On multiple occasions during our relationship, she would, without me, go out to fraternity parties and get severely drunk, later returning to her room and inviting me over, only to

spend the whole night vomiting into a toilet while I took care of her. I never had sexual interactions with Jane Doe while she was under the influence of alcohol, and I never drank alcohol myself while underage, nor have I ever had more than two drinks in a night while of age. For context, I was 19 at the time. I am only left to guess what other activities she partook in while attending those parties. Given my conservative Christian upbringing, I had conflicting feelings about the relationship.

7. Jane Doe and I kept our relationship relatively private, choosing not to flaunt it out in public or within the Navy ROTC unit. My close friends were aware that we were dating, and I was open about my relationship with Jane Doe when asked. My roommate Elvin held reservations about her, but decided not to say anything to me out of respect for my decision. He, having been raised in a similar situation to my own, saw the decisions Jane Doe was making with her life, and my decision to mingle my life with hers, and disapproved of both. He admitted to me months later that he wished he had spoken up about how he felt. We are on good terms.

8. On December 13, 2015, I was contacted by Jane Doe. She was in her room in Wiley Hall, and requested that I meet her there. Upon arrival, I immediately saw that her room was in a severe state of disarray.  She was quite agitated, railing against her parents and her uncertainty and unhappiness towards her life, and throwing her belongings against the walls. After I consoled her and she had calmed down, she asked to go out for a walk. I accompanied her, and she led us directly to the parking garage diagonally across the street from the armory. Jane Doe led us up to the top floor of the parking garage, and by this point her odd behavior began to give me cause for concern. She then proceeded to try and throw herself off the ledge of the parking garage, all the while trying to convince me to let her do so. This went on for approximately 45 minutes. At one point she had managed to swing her legs over the ledge, and

she tried to break free from my grip and jump over the side. The experience upset me, and right after her outburst subsided, she behaved as though nothing of importance had happened. She then proceeded to ask me inquisitively why it was that I was emotionally upset afterwards. She spent the 10-minute walk back to the dorms skipping and singing. From that point forward in our relationship, she implicitly established new physical touching boundaries and enforced them inconsistently. This contrasted sharply with her prior behavior over the previous three months. Jane Doe's personality and our relationship changed following her suicide attempt, although she would behave as though nothing was out of the ordinary. She would also refuse to provide me any explanation as to these changes, only expressing negativity towards me.

9. The investigators, by downplaying Jane Doe's suicide attempt, lose sight of the context of the texts discussed below. Investigator Jacob Amberger wrote in his investigation notes "maybe suicide attempt in December" in response to my direct statement that she did undoubtedly try to kill herself. The investigation report mitigated this further in stating "[Jane Doe] made statements to him that led him to believe that [she] was considering suicide. He reported that he was concerned about [Jane Doe] so a few days after the statements were made, he invited [Jane Doe] to his residence hall room to watch a movie". These statements underplay the real concerns I had as a result of Jane Doe's suicide attempt.

10. Several nights after the events of December 13, 2015, Jane Doe did stay in my room with me and my roommate Elvin. As I was still seriously concerned for her well-being, I insisted Jane Doe stay in my room for the night after asking my roommate for his permission that she do so. Jane Doe slept on the couch. I slept on the floor with my head leaning against the couch. My roommate was in his bed. After I woke up in the morning, I reached behind me out of concern for Jane Doe, to be reassuring. Sex was not even a thought I had, especially with the

recent events on my mind and my roommate in the room. All that was going through my head was getting her through finals week in one piece and doing whatever I could to prevent her from trying to take her own life again. I considered reporting her suicide attempt then, but decided that doing so would likely cost Jane Doe her Navy career, which I believed would most definitely destabilize her mind further. I touched her on her knee (but nothing more), which woke her up, at which time Jane Doe left to return to her dorm, seemingly upset. She later told me that touching her then was not okay, but would not elaborate.

11.  The following week was finals week for the semester. As my primary concern for Jane Doe was her mental well-being, given that she had just attempted to take her own life, I forsook my academic studies in order to aid in hers. As she had expressed self-doubt towards her ability to succeed and make it through the academic semester in good shape in the moments leading to her suicide attempt, I thought that this was a good idea. I was willing, because of my feelings for her and my concern about another suicide attempt, to risk my academic standing to help her so that what she wanted to do with her life, be it in the Navy or otherwise, would not be impeded by her then existing mental state.  However, I also felt that she would disprove of my decision, so I lied to her about the status of my studies and how well I was doing on my finals. I felt terrible about doing so, but rationalized it as a justified action. After the week was through, I admitted to her what I had done, which created tension between us. I had never lied to her before, and I felt badly about not being honest with her concerning the sacrifice I made to help her studies, and thus had damaged the part of our relationship which always entailed my being honest with her.

12.  Jane Doe never accused me in person or via text of what she accused me in the Purdue sexual misconduct proceeding that she initiated in April 2016, four months later.

13.     I provided to the Purdue investigators everything I could think of that was relevant to the false accusations leveled against me, including an extensive list of character references, explanations countering all of Jane Doe's false statements, an explanation of her mental instability, suicide attempt, my reporting of that suicide attempt, a certificate from a suicide prevention course that I attended shortly after reporting the suicide attempt, and all of the text history I had between Jane Doe and I, which amounted to 134 pages. I also took the initiative and offered them contextual explanations for any texts that I thought looked ambiguous in regards to the short note of allegations that I had received. I took every measure of transparency and thoroughness I could think of, expecting to receive fair treatment from an unbiased investigation. I provided all these to Purdue's investigators at the time of my interview in late April 2016, believing that the amount and content of the information I provided would surely clear my name.

14.     The texts that I voluntarily provided to the Purdue investigators covered the period December 23, 2015 to March 15, 2016, with the majority of the texts dated from December 23, 2015 to January 28, 2016. This stream of communication between Jane Doe and I showed an ongoing intense personal relationship between us from mid-December 2015 well into January 2016, with amicable communications well into February. The Purdue investigators never questioned me regarding the contents of the texts after I provided them, yet took the time to arrange a *second* interview with Jane Doe, at the suggestion of Monica Bloom, in order to review the texts and hear her interpretation of them. For reference, Monica Bloom was the CARE sexual assault center Director at Purdue University, with a professional background as a lawyer.

15. None of the 134 pages of text messages referred to what Jane Doe would accuse me of in April 2016. Our texts reflected the fact that Jane Doe and I did have a deeply personal relationship developed in part through sexual intercourse, and that Jane Doe was enforcing new physical boundaries between us. While doing this, our relationship was still intimate enough that she sent my family Christmas cookies, and we messaged one another frequently. These texts also reflected Jane Doe's difficult relationship with her mother and family, a fact she used at times to answer my questions to her about being unhappy, and also a fact that motivated her unfair behavior towards me. I became more apologetic towards Jane Doe the more she directed negativity towards me; her constant barrages eventually made me believe that I was in part somehow responsible for all her misfortune. Apologizing to placate Jane Doe was part of how I dealt with her tumultuous emotions throughout the relationship, even more so in the wake of her suicide attempt.

16. It was only after the disciplinary proceeding was over was I able to review the investigation report. Out of the 134 pages of texts I voluntarily provided the Purdue investigation, the investigators attached only short portions of texts from December 23, 2015, December 28, 2015, and January 14, 2016. The Purdue investigators ignored their respective contexts, and came to the conclusion that my explanations for them were "uncomfortable, awkward, and unconfident", which as discussed below was not true. The investigators wrote what they did despite never asking me about anything, including my or their interpretation of these texts, and after talking to Jane Doe a 2nd time about their interpretation of the texts. The Purdue legal defense followed suit in this same approach on August 18, 2020, focusing on isolated slices of texts as evidence without considering the respective context and questioning me as if the Purdue investigators' misinterpretation of the texts was correct, which it was not. I did

my best to provide context from memory in my testimony, seeing as the context completely changed the understanding from what they wanted the texts to infer.

17. In the December 23, 2015 text excerpt, I express regret and guilt towards Jane Doe for my dishonesty regarding academics in our finals week, going so far as to call myself "a terrible person". She initially lambastes my emotions, then becomes supportive and encouraging. Later that day we discuss a package of desserts that she baked and mailed to my home.

18. Purdue's investigation report claimed that my explanation of this excerpt was unconvincing. The investigators reached this conclusion without ever following up with me regarding their interpretation of the texts, and withheld this conclusion from ever being read by me; I was never given the opportunity to hear or dispute their conclusion in the investigation report, both before and after the investigation was concluded. However, they had no problem asking Jane Doe about texts, to which the investigators' own notes say that she believed I was apologizing for my dishonesty to her during finals week: "reported that she felt [John Doe] was apologizing for lying to her about putting off his own schoolwork to help her". Despite this, the Purdue investigators concluded that I was in fact apologizing for a sexual assault, despite both my and Jane Doe's disagreement with that conclusion regarding the December 23 texts.

19. On December 28, 2015, Jane Doe and I exchanged over 180 messages. We discuss the television show "Dexter", my whereabouts for the day, politics and the news, and religion/philosophy. We then had more personal conversation, going back on forth on communication in our relationship and issues we had with one another. In particular, I expressed my frustration with the vagueness of her emotions, refusal to speak more openly (to which she agreed), and projection of her behaviors onto me. I ended a long text with: "whenever I try to help or improve the situation, it always ends up getting worse". I reflected on my dishonesty

towards her several weeks prior at school with respect to helping her studies at the expense of my own, and I felt it had damaged our relationship by breaking her trust in my honesty.

20. The conversation on December 28 moved to Jane Doe then criticizing me for trying to force a dialogue about what was causing her to pull back in the relationship, and then complaining about my physical relationship towards her. "Or when I wake up to you touching me or I'm trying to do something and you just touch me I literally can't trust you if you don't respect my boundaries." Jane Doe only took issue with physical contact between us after her suicide attempt. She did not and would not clearly state her new boundaries to me. She never took issue with our sexual relationship prior to the night of December 13, 2015, which is why I believe that event became a catalyst for the confusing changes in her behavior and our relationship. I was discouraged by Jane Doe's refusal to communicate her issues, and her reactionary behavior made me feel guilty for overstepping a boundary of not touching her on her knee that had not previously existed, despite her refusal to ever establish them proactively. I would apologize when she told me I made mistakes, only for her to tell me I was not doing good enough whenever she was in a sour mood. She often claimed that I never changed and was constantly angry, which was untrue and seemed to me projection of her own behavior onto me. This manipulation and her weaponization of my words and apologies agitated me greatly, which led me to type the following message: "Im not going in circles any more [Jane]. What more do you want me to say? Do you want this to be over? We have literally talked about this for a week and I already told you I cant change what i did, only what i will do from here on out. Do you want me to feel shitty for the rest of my life because of what I did? Im feeling like i will. Im sorry. I cant change what i did, as much as i want to. I violated you and never should have. What do you want me to do?"

21.     I did not use that language quoted in the paragraph above to indicate I had violated her sexually. Jane Doe's immediate response was that I needed to change and I was still doing what I was when she and I first started going out, which was not a response that indicated I was talking about violating her in a sexual assault – because I wasn't. (This is yet more context that Purdue conveniently overlooked in their analysis and direction). I spoke about violating her boundaries, both of her trust for me and her physical boundaries. At the time and to this day, I thought Jane Doe was referring to my touching her knee that morning; nothing more, because there was nothing more, and that Jane Doe's new boundaries were an attempt to give herself more control over our relationship, perhaps as a response to the state of vulnerability she put herself in on the night of December 13, 2015. Because of my continuing loving feelings for Jane Doe in a confusing situation, I responded by being apologetic and remorseful: asking whether she wanted to end the relationship between us, asking whether she wanted me to feel shitty for the rest of my life, apologizing that I had violated her and asking me what she wanted me to do. I was apologizing to try and keep Jane Doe stable and because, at that time, I still had loving feelings for the first girlfriend in my life and the first girl with whom I had sexual relations, and because I was concerned about her mental well-being given her suicide attempt.

22.     The investigation report is written in a way that makes it sound as though I was pressed by the investigators for an explanation regarding the December 23 and December 28 texts, which is not accurate at all. I provided them an initial explanation of several texts that I thought looked ambiguous without context, of which those two excerpts were included, to which they listened quietly. They never "pressed" me about any texts, as they claim in the investigation report, and they never interviewed me a second time to discuss their interpretation of the texts.

23. In my deposition on August 18, 2020, the Purdue attorney deposing me asked: "Your contention in this lawsuit, Mr. [Doe], is that anyone who doesn't believe your explanation for the 10:56 p.m. text message and its meaning has antimale bias, right?" (Page 126.) I answered that the anti-male bias was ignoring the context of these messages and considering me a non-credible witness despite facts that I presented. I pointed out that Jane Doe had said the contact between the two of us had stopped in early December 2015, which the texts clearly showed it had not; what Jane Doe said about contact between us ending in early December 2015 was not true. The anti-male bias is thus shown in the Purdue investigators jumping to a conclusion so as to support Jane Doe's accusations in disregard of the contexts of the texts, without even asking me about what was their misinterpretation of the texts, and by impugning my credibility despite the texts contradicting Jane Doe's statement about the relationship ending in early December 2015. The investigators rationalized a conclusion to credit Jane Doe's accusations that on a morning several days after her suicide attempt on December 13, 2015, in my own room with my roommate present and fresh in my mind her attempt to break out of my arms to jump over the edge of a building in a fall that would likely kill her, I had touched her crotch area outside her clothes (which I did not do) and that in her sleep (from which she supposedly did not wake up) I fingered her (which I did not do).

24. Texts from January 13-14, 2016 showed Jane Doe inviting me over to her room in the late evening, where we watched a movie and fell asleep together. The following morning after I had left, she again voiced her new boundaries; she said I should have left or woken her up instead of falling asleep with her in the room.

25. Jane Doe initiated more friendly conversation on January 17, January 18, January 19, and early January 20, 2016. In the evening of January 20, 2016, I tried to initiate a

conversation regarding our relationship status, and she refused to have one, instead blaming me and ignoring my attempts to talk it out. On January 23, 2016, she again reached out to me, expressing concern for my mother, who had recently been in a car crash. She says "If you don't want to talk to me at all I get it just I do care and I'm here if you need me", and "I've been praying for you guys".

26. After this point, our relationship continued to fizzle out, and I was ready to move on. My upbringing was a family with brothers and a sister, a Mom and a Dad. Jane Doe's texts in which she expressed anger with her Mom and an intention to cut family members out of her wedding and her life disturbed me the more I reflected on them. Still, in February 2016, Jane Doe initiated casual conversation via text on February 21, 2016 and messaged me out of concern on February 22, 2016. Those are our last amicable text messages. She also attempted to revive our relationship via several flirtatious and overly friendly encounters with me in late February and March (which puzzled me), at which point I had mentally moved on from our relationship and had no desire to return, especially given how much happier I had been without her lately. This was a far cry from her testimony to the Purdue investigators that we ceased all communications in the first week of December 2015.

27. The investigation report concluded that I was a "non-credible witness" based on two points: (i) my "uncomfortable awkward, and unconfident clarification of the text message admission to violating [Jane Doe]", and (ii) "the apparent dishonesty regarding his entrance into her dorm room" (which occurred in November 2015).

28. As to (i), I explicitly recall being clear and concise in regards to all my points throughout my single conversation with the investigators, and the investigators never pressed me about the texts or my entry into Jane Doe's dorm room. (Perhaps if the Purdue investigators had

recorded our conversation, it could have been reviewed and examined properly). It simply is not true that I gave "uncomfortable awkward, and unconfident clarification of the text message admission to violating [Jane Doe]", and the texts were not an admission of what I was accused of by Jane Doe. Had I been able to review the investigation report during the disciplinary proceeding, I would have directly confronted the investigators' false statements.

29. As to (ii), the investigators' reliance upon the Dorm Resident Assistant's denial of giving me access to Jane Doe's room in November 2015 when Jane Doe and I were still in a relationship is problematic. Jane Doe was away for the weekend; she had a single room in the dorm; she did not leave it unlocked; and I did not have a key. The Dorm Resident Advisor would have likely gotten in trouble if she admitted to what she did, seeing as it was against the rules (she had something to lose and nothing to gain for not telling the truth); the speculation given as to how I would have otherwise entered the room does not hold up to the slightest of scrutiny (why did Jane Doe not report a missing key, change locks, or report me?); and there was nothing disingenuous in saying with the room locked for the weekend, the Dorm Resident Advisor gave me a key. In contrast, the investigators concluded "Evidence does support that [Jane Doe] was a credible witness", but no reasons are provided. Given this conclusion, is it any wonder they refused to provide me the investigation report?

30. All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false. I have maintained that all her claims were false from my initial statements in the Purdue disciplinary process at the start, all the way through to the appeals. I said so orally to Dean Sermersheim in June 2016. I said so in my oral statements to Navy ROTC personnel, and I said so in my written statement in August 2016 to Navy ROTC at the time of my disenrollment (which was based solely upon my university

suspension), and I have continued to maintain this truth for the past four and a half years of this legal case.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 18th day of February, 2021.

*John Doe (court-authorized pseudonym)*
**Plaintiff John Doe**