**EXHIBIT SJM 9**

Page 1

```
 1         IN THE UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF INDIANA
 3                   HAMMOND DIVISION
 4           CIVIL ACTION NO. 2:17-cv-33-JPK
 5
 6   JOHN DOE,                              )
                                            )
 7           Plaintiff,                     )
                                            )
 8                                          )
         -vs-                               )
 9                                          )
     PURDUE UNIVERSITY, PURDUE              )
10   UNIVERSITY BOARD OF TRUSTEES,          )
     MITCHELL ELIAS DANIELS, JR., in        )
11   his official capacity as               )
     President of Purdue University,        )
12   ALYSA CHRISTMAS ROLLOCK, in her        )
     official capacity at Purdue            )
13   University, KATHERINE                  )
     SERMERSHEIM, in her official           )
14   capacity at Purdue University,         )
                                            )
15           Defendants.                    )
16
17                          ZOOM
18              DEPOSITION OF MONICA BLOOM
19       The deposition upon oral examination of MONICA
     BLOOM, a witness produced and sworn before me, Tracy
20   Larimore, RPR, Notary Public in and for the County
     of Allen, State of Indiana, taken on behalf of the
21   Plaintiff, c/o the offices of Stuart & Branigin,
     LLP, 300 Main Street, Suite 900, Lafayette,,
22   Indiana, on the 24th day of August, 2020, scheduled
     to commence at 1:30 p.m. pursuant to the Indiana
23   Rules of Trial Procedure with written notice as to
     time and place thereof.
24
25
```

Page 2

1  A P P E A R A N C E S
2  FOR THE PLAINTIFF(S):
   John Doe:
3
      Philip A. Byler, Esq.
4  NESENOFF & MILTENBERG, LLP
      363 Seventh Avenue, Fifth Floor
5  New York, New York 10001
      212.736.4500
6  pbyler@nmllplaw.com
7
   FOR THE DEFENDANT(S):
8  Purdue University, et al.:
9     William P. Kealey, Esq.
      STUART & BRANIGIN LLP
10    300 Main Street, Suite 900
      PO Box 1010
11    Lafayette, IN 47902
      765.423.1561
12    wpk@stuartlaw.com
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        INDEX OF EXAM
2                         Page
   DIRECT EXAMINATION ..............................4
3  Questions by Mr. Byler
4
5        INDEX OF EXHIBITS
6  Deposition Exhibits:            Page
7  Exhibit 1   "Exhibit B".....................Attached
8  Exhibit 2   PU 0726 - 0728 ...................12
9  Exhibit 3   PU 0729 - 0730 ...................13
10 Exhibit 17  PU 0057 ..........................15
11 Exhibit 18  PU 0058 ..........................15
12 Exhibit 19  PU 0364 ..........................22
13 Exhibit 20  PU 0365 ..........................22
14 Exhibit 21  PU 0370 ..........................22
15 Exhibit 22  PU 0371 ..........................22
16 Exhibit 23  PU 0653 - 0654 ...................28
17
18
19
20
21
22
23
24
25

Page 4

1        MONICA BLOOM,
2  having been duly sworn to tell the truth, the whole
3  truth, and nothing but the truth relating to said
4  matter, was examined and testified as follows:
5        DIRECT EXAMINATION OF MONICA BLOOM
6  QUESTIONS BY MR. BYLER:
7  Q   Okay.  My name is Phil Byler.  I'm plaintiff's,
8      John Doe's counsel in this matter.  This is a
9      case in which there's a court order with respect
10     to pseudonyms.  That is the person, ████████
11     ████ is referred to as John Doe or Plaintiff
12     John Doe.  The person ████████████████ is Jane
13     Doe.
14         Would you -- the witness, could you
15     identify yourself for the record?
16 A   My name is Monica Bloom.
17 Q   Would you give your business address?
18 A   I am in Husby Hall, which is at 610 Purdue Mall
19     in West Lafayette, Indiana.
20 Q   What is your current title?
21 A   Associate legal counsel.
22 Q   Have you been deposed before?
23 A   Once.
24 Q   Once.  Okay.  Since this is a Zoom conference
25     deposition because of the COVID-19 situation in

Page 5

1      the country, I'm just going to review rules that
2      you may well know, but I'm going to have to ask,
3      because of the nature of the Zoom, we adhere to
4      them.
5          I ask questions and even though you may
6      know the question I'm asking, please wait until
7      I finish, and I will do the same when you
8      answer.  Invariably sometimes, you know, the
9      questioner and the witness will talk over each
10     other by accident.  But with the Zoom
11     conference, it's important to try to keep the
12     two separate.
13         Now, let me ask you this:  Is there any
14     reason today that you can't give full and
15     complete testimony?
16 A   No.
17 Q   Are you taking any medication that would affect
18     your giving of testimony?
19 A   No.
20 Q   Okay.  Would you summarize your educational
21     employment background?
22 A   I received an undergraduate degree from Duke
23     University, and I received my law degree from
24     the University of Illinois.  I practiced law
25     briefly here at Stuart and Branigin for about 18

Page 6

1  months after law school, after which I worked
2  for the -- at that time, it was called the
3  Affirmative Action Office at Purdue. Initially,
4  I served as an investigator, and then I served
5  as the interim director of the office, which I
6  believe at that time had been renamed the Office
7  of Institutional Equity, and I started as the
8  director of that office.
9      And after that -- and I don't recall the
10 years. But after that, I served as the
11 inaugural director of CARE at Purdue. And
12 following that -- I was there for about 18
13 months as well. I believe I moved into the
14 office of legal counsel first as a staff
15 attorney, and then in a full-time role as
16 assistant or associate legal counsel.
17 Q  In the school year 2015/2016, was that a time
18    that you were the director of what is called
19    CARE?
20 A  Beginning in, I believe the end of February,
21    2016 is when I assumed that position.
22 Q  What were you immediately before you assumed
23    that position?
24 A  I was the executive director of the Office of
25    Institutional Equity.

Page 7

1 Q  Okay. What does the acronym CARE stand for?
2 A  The Center for Advocacy, Response, and
3    Education.
4 Q  What is its mission or missions?
5 A  I can't recall what our mission as stated was.
6    I'm sure that if there's a document or website,
7    I could refresh my general recollection.
8 Q  Well, let me, first of all, present to you the
9    first three pages of Exhibit B to Plaintiff's --
10   excuse me -- the Defendant's Response to
11   Plaintiff's First Set of Interrogatories. There
12   was an Exhibit A, Exhibit A that deals with a
13   description of the position title of director of
14   Center for Advocacy, Response, and Education.
15 A  Okay.
16 Q  Okay. Let me direct your attention to the
17   middle of Page 2, where it says "Describe the
18   type of experience required and/or preferred."
19 A  Okay.
20 Q  Okay. Do you see what is there?
21 A  I do.
22 Q  Okay. The first line says, "Required experience
23   includes five years of sexual assault
24   prevention, education, response or victims
25   advocacy work."

Page 8

1    Why was that a type of experience required
2    or preferred for the position of director of
3    Center for Advocacy, Response, and Education?
4 A  I didn't write the position description, so I
5    don't know. I can't speak to why the specific
6    experience elements were included.
7 Q  Did CARE provide support services for what were
8    called survivors of sexual assault?
9 A  Yes.
10 Q  And what kind of services were they?
11 A  We would provide general support that included
12    going to an emergency room, if a student was
13    there seeking assistance following an assault.
14    We provided general information about reporting
15    options, about resources that are available,
16    both to Purdue students, but also to individuals
17    who experienced sexual violence within the
18    greater Lafayette community.
19       And we provided -- well, I'll stop there
20    with respect to support services. We provide
21    ongoing support to students if they decided to
22    participate in an internal university
23    investigation process. If they participated in
24    a law enforcement investigation, we could
25    provide them with support services throughout

Page 9

1    that process. And then we just provided ongoing
2    support as a student might request or need.
3 Q  In connection with your position at Purdue, did
4    you receive training in Title IX matters?
5 A  I did.
6 Q  What kind of training?
7 A  I can't recall. There's been quite a bit. What
8    I can recall, specifically, is I've attended
9    several conferences put on my NACUA, the
10   National Association of College and University
11   Attorneys, including sessions with respect to
12   Title IX. The university hosted external
13   trainers from what is now Cozen O'Connor and I
14   attended that training.
15      I attended the victim advocacy training
16   that was offered at the time by, I believe it's
17   called the Indiana Coalition Against Domestic
18   Violence, and that training was provided, or
19   offered to all individuals who served in the
20   role of victim advocates across the state of
21   Indiana.
22 Q  What were you taught in sum and substance in
23   victim advocacy training?
24 A  I can't recall. It's been about five years or
25   four years.

3 (Pages 6 - 9)

Page 10
1  Q  Was this before you were director of CARE?
2  A  No. This was when I was in the role of director
3     of CARE.
4  Q  As the director of CARE, to whom within the
5     university did you report?
6  A  Dr. Katie Sermersheim, the dean of students.
7  Q  Why was the director of CARE reporting to the
8     dean of students?
9  A  I can't answer that question. I don't know.
10 Q  Okay. In the acronym for CARE, the A stands for
11    advocacy?
12 A  Yes.
13 Q  What advocacy is that talking about?
14 A  My understanding of advocacy in this context is
15    that -- and this is part of what was included in
16    the victim advocacy training, is to provide
17    individuals who experience sexual violence with
18    information, with resources to help them
19    understand all of their options, both legal
20    options, other reporting options, which can
21    include nothing, and support services that are
22    available to them so that individuals can make
23    informed choices about what is best for them.
24        And if they choose to participate either in
25    a legal process or an investigative process to

Page 11
1     decide whether and how to participate.
2  Q  Does the R in the acronym CARE stand for
3     response?
4  A  Yes.
5  Q  What in this context does response refer to?
6  A  My recollection is that we understood that to
7     mean responding, especially after hours, to
8     students who were seeking medical examinations
9     or who had been reporting to the police, the
10    incidents of sexual violence.
11 Q  Okay. Does the E in the acronym CARE stand for
12    education?
13 A  Yes.
14 Q  What does, in this context, education refer to?
15 A  Generally -- again, my understanding is it
16    generally referred to prevention and awareness
17    education targeted for the university students.
18 Q  Is there -- well, in the school year 2015/2016,
19    was there a center at Purdue that analogously
20    provided support service to respondents in
21    sexual misconduct disciplinary proceedings?
22 A  I can't recall the timing, but I know that staff
23    with the office of dean of students does provide
24    those services to respondents and did, but I
25    can't recall when that started.

Page 12
1  Q  Was it after the 2015/2016 school year?
2  A  I can't recall.
3  Q  Was there a time it wasn't provided?
4  A  Those services were always available. So the
5     office of dean of students provided support
6     services to students who are experiencing any
7     number of issues, so a student could always
8     receive services from the office of dean of
9     students to help them as they saw fit or as they
10    needed.
11 Q  And that was through the office of the dean;
12    right?
13 A  Correct.
14 Q  Okay. There wasn't a center dedicated to
15    respondents?
16 A  Correct.
17 Q  Okay. I want to direct your attention to what
18    we're going to treat as Bloom Exhibit 2 and
19    Bloom Exhibit 3. And Bloom Exhibit 2 is 726
20    through 728.
21       (WHEREUPON, Exhibit Number 2, PU 0726 -
22    0728, was marked for identification.)
23 Q  And Bloom Exhibit 3 will be 729 to 730.
24
25

Page 13
1        (WHEREUPON, Exhibit Number 3, PU 0729 -
2     0730, was marked for identification.)
3  Q  The witness, once you have the documents, can
4     have a moment to review them, please.
5  A  Okay.
6  Q  Okay. Turning first to Bloom Exhibit 2,
7     Bates-stamped 726 to 728, can you identify what
8     that document is?
9  A  It appears to be an email that I sent on April
10    5th to Dr. Sermersheim and to Vice President
11    Rollock.
12 Q  Okay. That was April 25th, 2016?
13 A  Correct.
14 Q  Okay. And that was a time you were director of
15    CARE?
16 A  Correct.
17 Q  And at the time, Dean Sermersheim was dean of
18    students?
19 A  I believe so.
20 Q  And Vice President Rollock was vice president
21    for ethics and compliance for Purdue?
22 A  Correct.
23 Q  And was this an email describing the meeting you
24    had with Jane Doe?
25 A  Yes.

4 (Pages 10 - 13)

Page 14

1  Q   Was there a reason you sent this memo at this
2      point in time, on April 5, 2016, to Dean
3      Sermersheim and Vice President Rollock?
4  A   I can't recall why I sent it when I sent it.
5      My -- I shouldn't assume.  I can't recall what
6      was in my mind as to why I sent that at that
7      time.
8  Q   Okay.  Now, you see in the first paragraph, do
9      you not, a reference to a summary of
10     allegations?
11 A   Yes.
12 Q   Okay.  And in that summary of allegations, the
13     references to "I", which is you, "have written a
14     summary of allegations"?
15 A   It says "drafted."
16 Q   Yes.  Okay.  Drafted.  Turn over to Page 3 of
17     the document, Bates stamped 728, and my question
18     will be, is that what you drafted?
19 A   It appears to be, yes.
20 Q   Now, there's a reference to what you drafted to
21     two forms.  I'm going to ask that two documents
22     be marked and shown to you.  We'll mark one as a
23     Bloom Exhibit 17, and the other one Bloom
24     Exhibit 18.  Bates-stamped 57 for 17, and
25     Bates-stamped 58 for 18.

Page 15

1         (WHEREUPON, Exhibit Number 17, PU 0057, was
2      marked for identification.)
3         (WHEREUPON, Exhibit Number 18, PU 0058, was
4      marked for identification.)
5  A   Yes.  I have them.
6  Q   Okay.  And I'll ask you to review them.  My
7      simple question, are these the two forms that
8      you referenced in order to draft the notice
9      of -- or the summary of allegations that appears
10     on Bates-stamped Page 728 of Bloom Exhibit 3 --
11     2?
12 A   I can't recall.
13 Q   Did you look at these kind of University forms
14     in drafting the summary of allegations?
15 A   Can you repeat the question?
16 Q   Yeah.  I'm asking a more general question.  Is
17     this the type of University form that you
18     consulted in drafting the summary of allegations
19     that is part of Bloom Exhibit 2?
20 A   As I said, I can't recall if it was these two
21     specific forms, but yes, this is a typical
22     reporting form that individuals would use, and
23     that I was copied on so that I would see.
24 Q   Okay.  Now, in that first paragraph of your
25     email, memo on Page 726 of Bloom Exhibit 2, do

Page 16

1      you see the date, 2015?
2  A   I do not.
3  Q   You don't?
4  A   Bloom -- oh, I'm sorry.  Bloom 17?  Which
5      documents are you referring to again?
6  Q   No, not 57 or 58.  I was going back -- I'm
7      sorry.  Maybe I wasn't clear.  Go back --
8  A   That's okay.
9  Q   -- to Bloom Exhibit 2.
10 A   Okay.
11 Q   Your memo.
12 A   Yes.
13 Q   And do you see in there November of 2015 -- you
14     wouldn't see it in the other two documents,
15     that's right, actually, but I was jumping back
16     to Bloom Exhibit 2.
17     Do you see on that first paragraph the
18     dating of November, 2015?
19 A   Which page are you on Bloom 2?
20 Q   The first page.  First page, first paragraph.
21 A   I don't see 2015.  The first page of Bloom -- go
22     ahead.
23 Q   Do you see --
24        MR. KEALEY:  Phil, are you referring to PU
25     728?

Page 17

1         MR. BYLER:  No, 726.  The first page of the
2      document.  I'm sorry if I wasn't clear enough.
3  A   No.  You're clear.  I don't see 2015 anywhere on
4      Page 726.
5  Q   Hang on one moment.  I'm sorry.  It wasn't 726.
6      Could you go back to 728?
7  A   Yes.
8  Q   Okay.  Do you see November, 2015 in there?
9  A   I do.
10 Q   Okay.  And that -- was that information that
11     Jane Doe provided you?
12 A   I can't recall.
13 Q   Now, my question was going to be, do you recall
14     when Jane Doe told you the alleged incidents
15     occurred?
16 A   So I'm not sure I understand your question.
17 Q   Okay.  When Jane Doe met with you --
18 A   Uh-huh.
19 Q   -- and you're the director of CARE and you're
20     listening to her, do you recall her telling you
21     that the alleged incidents that she was
22     complaining about occurred in November, 2015?
23 A   I do not recall what she shared with me when I
24     first met with her.
25 Q   Well, do you recall how, in the summary of

Page 26

1  A   I don't specifically recall.  In Jake's first
2      email, he indicates that they wanted to ask her
3      some questions, so I would assume that the
4      purpose of the call was to ask her some
5      questions, to ask Ms. ▓▓▓▓ some questions.
6  Q   Did you understand at the time they had
7      already -- they, the investigators, had already
8      interviewed Jane Doe?
9  A   I don't recall what I knew at that time.
10 Q   Now, after you met with Jane Doe, that prompted
11     your email that we've marked as Bloom Exhibit 2,
12     what did you do in terms of working with Jane
13     Doe thereafter?
14 A   Again, I can't recall specifically with respect
15     to -- it's okay if I say Ms. ▓▓▓▓
16 Q   Yeah.  Sure.
17 A   Okay.  I can't recall specifically.  Generally
18     speaking, if a student was having -- needed to
19     speak me, was having difficulty, she could
20     schedule a time to come in and talk to me.  If a
21     student wanted somebody from CARE to attend
22     their investigative interview, we could also
23     attend any of those meetings in the role of a
24     support person.
25 Q   By the way, throughout this whole proceeding,

Page 27

1      did you ever meet with John Doe?
2  A   No.
3  Q   Do you recall if after this phone call that you
4      were helping arrange with Mr. Amberger, you
5      discussed with Jane Doe what happened in the
6      phone call?
7  A   I don't recall.  My email to Mr. Amberger
8      requested that he include me on the call.
9  Q   Do you recall --
10 A   I don't recall being on the -- sorry.  Go ahead.
11 Q   I didn't mean to cut you off.  Your email
12     indicated you were requesting -- I was going to
13     ask, do you recall being on the call?
14 A   I don't.
15 Q   When you say you don't, do you say you don't
16     recall because you don't think it happened?  Or
17     it might have happened, you just don't recall?
18 A   It might have happened.  I don't recall any
19     specific calls or meeting with Ms. ▓▓▓▓ that
20     I had.  It's just too long ago.
21 Q   Do you remember how many times you met with
22     Ms. ▓▓▓▓ in April and May 2016?
23 A   I do not recall.
24 Q   It was more than one time; wasn't it?
25 A   I do not recall.

Page 28

1  Q   Now, let's turn to 653 to 54, which we'll mark
2      as Bloom Exhibit 23.
3          (WHEREUPON, Exhibit Number 23, PU 0653 -
4      0654, was marked for identification.)
5          MR. KEALEY:  Can we go off the record for
6      just a moment?
7          MR. BYLER:  Yeah.  Sure.
8          (A short recess was had.)
9          THE WITNESS:  Okay.  I have it.
10 BY MR. BYLER:
11 Q   Okay.  Looking at the top, is the very top an
12     email -- does it show an email from you to
13     Joanna Sharp?
14 A   Yes.
15 Q   And it's dated June 5, 2016?
16 A   Yes.
17 Q   Who is Joanna Sharp?
18 A   She is the dean's -- Dean Sermersheim's
19     assistant.
20 Q   Is that Dean Sermersheim's office?
21 A   It's her assistant.
22 Q   Oh, assistant?
23 A   It's Dean Sermersheim's assistant.
24 Q   I gotcha.  I'm sorry.  I misunderstood.
25         Now, let me look at your first statement

Page 29

1      there, "Hey Joanna, below is," redacted,
2      "statement."  Is that Jane Doe's statement?
3  A   I believe so, yes.
4  Q   And then you say, "She doesn't have access to a
5      computer so the font may be a little weird in
6      points.  Please let us know if this works.  I
7      can put it in a Word document for Dr. Katie."
8      Okay.  That's what you write?
9  A   Correct.
10 Q   Okay.  Dr. Katie is, again, Dean Sermersheim?
11 A   Correct.
12 Q   Okay.  And what's below is a forwarded message
13     from "Redacted" to you; correct?
14 A   Correct.
15 Q   Okay.  And it seems to indicate this is from,
16     whom?
17 A   I believe it's from Ms. ▓▓▓▓
18 Q   Well, the question I have is if Ms. ▓▓▓▓
19     didn't have access to a computer, how could she
20     send this email?
21 A   So I cannot recall specifically.  She may have
22     had access to a phone or some other device where
23     it's a little harder to type out a statement,
24     but I can't recall specifically.
25 Q   Now, was this done for the reason that

8 (Pages 26 - 29)

```
                                                    Page 30                                                        Page 32
 1     Ms. ▇▇▇ was not going to attend a panel           1  Q   And in the context of the letter, over the
 2     meeting and was providing a statement instead?    2      Christmas break was after the alleged incidents?
 3  A  I believe so, yes.                                3  A  The way it's written, that appears to be the
 4  Q  In terms of the mission of CARE, why were you     4      case. It appears to be the case, yes.
 5     doing this in terms of providing -- you know,     5  Q  This statement is dated June 5, 2016?
 6     facilitating, providing a written statement from  6  A  Yes.
 7     the complainant in lieu of a personal appearance  7  Q  And so when we're talking about this statement,
 8     in front of the panel and Dean Sermersheim?       8      it's six months, at least, after alleged
 9  A  My recollection is that Ms. ▇▇▇ was -- and I      9      incidents; correct?
10     don't know the exact time frame, but I recall   10  A  Yes.
11     there was an issue where she was going to be in 11  Q  By the way, she refers in her statement that she
12     training with the Navy and so would be          12      now has a boyfriend; correct?
13     physically unable to be present.                13  A  Yes.
14         At the time, the procedures provided for -- 14  Q  And yet she also refers to having a panic attack
15     they did not require parties to be present, but 15      and nightmares; correct?
16     allowed them to participate in other ways,      16  A  Yes.
17     including providing a written statement.        17  Q  Now, it's true, is it not, that when she talked
18  Q  Okay. And that's what Ms. ▇▇▇ did in this       18      about digital penetration, that wasn't something
19     situation, provided a written statement?        19      she personally recalled?
20  A  Appears to be, yes.                             20  A  I don't recall.
21  Q  How would you have converted what's here into a 21  Q  Did you ever discuss with her that there were
22     Word document?                                  22      texts between John Doe and Ms. ▇▇▇ going
23  A  I would have copied and pasted it.              23      into February of 2016?
24  Q  Now, I want you to look at what is written here.24  A  I don't recall if we discussed any text
25     Do you know if John Doe was ever given an       25      messages.

                                                    Page 31                                                        Page 33
 1     opportunity to review and respond to this        1  Q  Did you ever discuss with Ms. ▇▇▇ whether
 2     statement?                                       2      she had text messages to give to the
 3  A  I don't know.                                    3      investigators?
 4  Q  Can you look at the last paragraph of the        4  A  I don't recall.
 5     statement?                                       5  Q  Do you recall her ever saying to you she didn't
 6  A  Okay.                                            6      preserve any text messages to give to the
 7  Q  Do you see the bolding -- bold, where it's, "He  7      investigator?
 8     absolutely should not be allowed to become a     8  A  I don't recall if we ever discussed text
 9     naval officer"?                                  9      messages or not.
10  A  Yes.                                            10  Q  Did you discuss with her the text messages that
11  Q  Why was it Ms. ▇▇▇ decision or a matter of      11      John Doe provided to the investigator, ever?
12     her opinion as to whether or not John Doe became12  A  I don't recall.
13     a naval officer?                                13  Q  Did you discuss with Ms. ▇▇▇ that John Doe
14  A  I can't speak for why she has that opinion.     14      should be immediately removed from the Navy ROTC
15     This was just her opinion that she was          15      program?
16     communicating.                                  16  A  I can't recall if she raised that with me or if
17  Q  Now, in this statement, is there any reference  17      she ever said anything like that to me.
18     to the date when these supposed incidents       18  Q  Did you have an understanding that there was one
19     occurred?                                       19      time in 2015, there was a personal relationship
20  A  The only inference to a time period is on the   20      between John Doe and Ms. ▇▇▇
21     first page, the last paragraph, she indicates   21  A  I recall that they were, as she described it,
22     something -- a reference to Christmas break.    22      boyfriend and girlfriend.
23  Q  And is that reference -- I'm sorry. Go ahead.   23  Q  Okay. And that was a relationship that went --
24  A  I was going to say, that's the only time period 24      well, I was going to say went south, but, you
25     that I see.                                     25      know, didn't work?
```

9 (Pages 30 - 33)