**EXHIBIT SJM 14**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION
CASE NO. 2:17-cv-33-JPK

```
JOHN DOE,                              )
                                       )
     Plaintiff,                        )
                                       )
     -vs-                              )
                                       )
PURDUE UNIVERSITY, PURDUE              )
UNIVERSITY BOARD OF TRUSTEES,          )
MITCHELL ELIAS DANIELS, JR.,           )
in his official capacity as            )
President of Purdue                    )
University, ALYSA CHRISTMAS            )
ROLLOCK, in her official               )
capacity at Purdue University,         )
KATHERINE SERMERSHEIM, in her          )
official capacity at Purdue            )
University,                            )
                                       )
     Defendants.
```

DEPOSITION OF JACOB AMBERGER

The ZOOM deposition upon oral examination of JACOB AMBERGER, a witness produced and sworn before me, Clarice H. Howard, CCR-Ky, Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Plaintiff, on Tuesday, August 25, 2020, scheduled to commence at 8:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to time and place thereof.

Page 2

```
 1            A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4       Philip A. Byler
         NESENOFF & MILTENBERG LLP
 5       363 Seventh Avenue
         Fifth Floor
 6       New York, New York 10001
         1.212.736.4500
 7       pbyler@nmllplaw.com
 8
     FOR THE DEFENDANTS:
 9
         Tyler L. Jones
10       STUART & BRANIGIN, LLP
         300 Main Street
11       Suite 900.
         Lafayette, Indiana 47902-1010
12       1.765.423.1561
         tlj@stuartlaw.com.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1         INDEX OF EXAMINATION
                                     PAGE
 2
     DIRECT EXAMINATION
 3     Questions by Mr. Byler......................... 4
 4
 5           INDEX OF EXHIBITS
 6
     Deposition Exhibits:
 7
 8   Exhibit 10 - Notice of investigation............ 12
 9   Exhibit 11 - ▓▓▓ reply to notice............... 15
10   Exhibit 14 - Investigators' report.............. 49
11   Exhibit 19 - E-mail to Bloom from Amberger...... 46
12   Exhibit 20 - E-mail response from Bloom......... 46
13   Exhibit 21 - E-mail from Bloom to Amberger...... 46
14   Exhibit 22 - E-mail response from Amberger...... 46
15   Exhibit 24 - Handwritten notes of Amberger...... 17
16   Exhibit 25 - Handwritten notes of Oliver........ 17
17   Exhibit 26 - E-mail from Amberger to ▓▓▓ ...... 33
18   Exhibit 27 - Text messages supplied by ▓▓▓ ..... 33
19   Exhibit 28 - E-mail from Amberger to witnesses.. 45
20   Exhibit 29 - E-mail from Joanna Sharp........... 96
21   Exhibit 30 - E-mail with final determination....100
22   Exhibit 31 - Revised determination..............100
23
24
25
```

Page 4

```
 1   (Time noted 8:00 a.m.)
 2         THE REPORTER:  The attorneys participating in
 3   this deposition acknowledge that I am not
 4   physically present in the deposition room with the
 5   witness and that I will be reporting this
 6   deposition remotely.  They further acknowledge
 7   that, in lieu of an oath administered in person,
 8   the witness will verbally declare his testimony in
 9   this matter is under penalty of perjury.
10         The parties and their counsel consent to this
11   arrangement and waive any objection to the manner
12   of reporting.  Please indicate your agreement by
13   stating your name and your agreement on the record.
14         MR. BYLER:  Philip Byler, for plaintiff, I
15   agree.
16         MR. JONES:  Tyler L. Jones for the defendants,
17   I agree.
18         -----------------
```

Page 5

```
 1              JACOB AMBERGER,
 2   having been duly sworn to tell the truth, the whole
 3   truth, and nothing but the truth relating to said
 4   matter, was examined and testified as follows:
 5
 6   DIRECT EXAMINATION
 7     QUESTIONS BY MR. BYLER:
 8 Q  Could you state your name for the record, please?
 9 A  Jacob Lee Amberger.
10 Q  Could you give me your business address?
11 A  Business address is 155 South Grant Street, Tenth
12   Floor, West Lafayette, Indiana, 47907.
13 Q  Okay.  My name is Phil Byler or Philip Byler.  I'm
14   counsel for plaintiff, John Doe, in a proceeding
15   entitled John Doe versus Purdue University and
16   others.
17     It is proceeding with use of pseudonyms by
18   court order.  John Doe is ▓▓▓▓▓▓▓.  Jane Doe
19   is ▓▓▓▓▓▓▓  You may in this deposition --
20   don't worry if you slip up and use one or the
21   other, because the deposition at present is being
22   held subjective to a protective order.
23     Let me begin by asking you, have you been
24   deposed before?
25 A  Yes, I have.
```

Page 10

1  Q  Could you elaborate what you mean by support for
2     advocacy?
3  A  I've heard it through the EVAWI, End Violence
4     Against Women International, through some of their
5     e-mails and training and things like that. I know
6     that CARE, the Center for Advocacy Response and
7     Education here on campus, has conducted training,
8     and I think that that starts by believing or
9     something along those lines has been a part of
10    their outreaches or whatever they're running
11    through their department.
12 Q  Is the Center for Advocacy Response and Education
13    known by its acronym CARE?
14 A  That is correct, CARE.
15 Q  And what is CARE?
16 A  Care is -- I work closely with them, but hopefully
17    I can get what they do here. They are responsible
18    for education on campus as it relates to
19    interpersonal violence by standard intervention,
20    things like that.
21       Also, they are advocates on campus,
22    confidential advocates on campus, for students who
23    have been impacted by interpersonal violence.
24 Q  Is that including sexual misconduct?
25 A  Correct.

Page 11

1  Q  Who is Erin Oliver?
2  A  Erin Oliver, when I first started here, Erin Oliver
3     was the associate director in the Office of
4     Institutional Equity. Her and I conducted most, if
5     not all, of the investigations, typically jointly.
6        Then I think in 2016-2017 -- I don't remember
7     when -- she was named director of the Office of
8     Institutional Equity. And then sometime in 2019
9     she left the University to take a position at
10    another University.
11 Q  When investigations were conducted, did you two
12    jointly sit in on interviews?
13 A  We tried to, yes. We did -- a vast majority of the
14    interviews we were both present. There may have
15    been some where Erin had a conflict or I had a
16    conflict and the other one did the interview
17    themselves, but typically we were both in the room.
18 Q  Just let me understand institutionally, as an
19    investigator, what office in Purdue are you part
20    of?
21 A  I am part of -- the office I'm in is the Office of
22    Institutional Equity.
23 Q  Okay. And is there a director of that office?
24 A  Yes, there is.
25 Q  In the 2015-2016 school year, who was the director?

Page 12

1  A  2015-2016 school year, it was either Monica Bloom
2     or there was a gap where there was no director and
3     then Erin Oliver. I cannot recall the exact dates
4     on the positions. When I started in 2015, it was
5     Monica Bloom.
6  Q  The 2015-2016 school year, did I understand that
7     Ms. Oliver was the associate director of the
8     office?
9  A  Yes. If you want to say the entire school year,
10    I'm not sure, but yes, she was.
11 Q  Okay. Would you go to that stack of exhibits and
12    we're going to mark as Amberger Exhibit 10 a
13    document that's Bates stamp range 568 to 572.
14         (Deposition Exhibit No. 10 marked
15              for identification.)
16 A  568 to 572?
17 Q  568 to 572.
18 A  I have it.
19 Q  I'm going to ask you to turn to the second page of
20    the document Bates stamp 569?
21 A  Okay.
22 Q  And do you see your name listed as a cc?
23 A  Sorry, I lost you for a second. Can you hear me?
24 Q  Yes, I can.
25 A  I was hooked up to the DPN from working from home

Page 13

1     and I forgot disconnect it. So when I came on, it
2     reconnected me and now it booted me off.
3        So yes, I am on page 569 and I see my name
4     under cc.
5  Q  And you see Ms. Oliver's name as well?
6  A  Yes, I do.
7  Q  You're the two cc's on this document, okay?
8  A  Yes.
9  Q  Is that correct?
10 A  Correct.
11 Q  Okay. Now, if you would take a look at the first
12    page of the document, it asks -- I will ask if you
13    can recall your receipt of it?
14 A  Yes, I do.
15 Q  And that's Katherine Sermersheim's signature on the
16    second page of the document?
17 A  Yes.
18 Q  Okay. Go to the fifth page of this document, which
19    is Bates stamp 572.
20 A  Okay.
21 Q  And the caption of that page is notice of
22    allegations, correct?
23 A  Correct.
24 Q  Do you recall receiving that notice of allegations
25    as part of a letter that Dean Sermersheim sent?

Page 14

1  A   Yes.  The notice of allegation is typically
2      attached to that, yes.
3  Q   Now, were you copied on this document because you
4      would be an investigator on this case?
5  A   Yes.
6  Q   Along with Erin Oliver?
7  A   Correct.
8  Q   Okay.  Now, this was April of 2016 that you were
9      sent this document, correct?
10 A   Yes.
11 Q   And in the notice of allegations it refers, does it
12     not, to incidents occurring in November of 2015,
13     correct?
14 A   Correct.
15 Q   And that's about a five-month gap?
16 A   Yes.
17 Q   Now, upon your receipt of Amberger Exhibit 10, do
18     you recall talking about it with anybody?
19 A   I'm sure Erin and I would have spoken kind of just
20     to discuss we've been assigned these allegations
21     and kind of start planning for our investigation.
22 Q   Do you recall any specifics of what you discussed
23     in terms of planning for the investigation?
24 A   Specifically, no.
25 Q   When you say planning for the investigation, what

Page 15

1      do you mean by that?
2  A   Planning for the investigation, it means okay, this
3      is who we're going to talk to first, reaching out
4      to the complainant.  Usually that's the first step.
5          So typically it would be -- I'd reach out to
6      my coinvestigator and say, okay, we've got this
7      complaint, now let's reach out to the complainant
8      or impacted party and let's start there.
9  Q   So you start an interview process?
10 A   Yeah.  That would be where we would start,
11     scheduling the interviews, talking to everybody.
12 Q   I'm going to mark as Amberger Exhibit 11, the
13     document with Bates stamp 573 through 576.
14         (Deposition Exhibit No. 11 marked
15          for identification.)
16 A   Okay.
17     MR. JONES:  I'm pulling it up.  Give me one
18     second.
19     MR. BYLER:  Okay.
20     MR. JONES:  Okay.  I'm there.  Sorry about the
21     interruption.
22     MR. BYLER:  Court reporter, can you read the
23     question?
24         (The last question was read.)
25 BY MR. BYLER:

Page 16

1  Q   My question is do you recall receiving this
2      document sometime in April of 2016?
3  A   Yes, yes, I do.
4  Q   Do you recall who sent it to you?
5  A   This would have been the response from Mr. ▓▓▓▓.
6  Q   Was it sent to you from the Dean's office?
7  A   Typically we're notified of it.  I don't know if it
8      was directly sent to us from the Dean's office or I
9      retrieved it from the records management system we
10     use, where it would have been uploaded.  But, yes,
11     I would have notified by the Dean's office that it
12     was available or had been submitted.
13 Q   Now, in terms of texts, there's three pages of
14     response, correct?
15 A   Yes, three pages of response.
16 Q   And the fourth page is a listing of people?
17 A   Yes.
18 Q   Okay.  Did you understand that listing of people to
19     be character witnesses for ▓▓▓▓▓▓▓▓▓▓▓▓▓?
20 A   Some were character witnesses.  Some he provided
21     as -- I think some of them he provided as witnesses
22     to maybe some of the interactions between him and
23     Ms. ▓▓▓▓▓.
24 Q   And in this response, ▓▓▓▓▓▓▓▓▓▓ denies the
25     allegations there in the notice of allegations that

Page 17

1      the Dean of Students sent you?
2  A   Correct.
3  Q   Okay.  Now, I' going to mark two sets of what look
4      like investigator's notes.  The only way I can do
5      this is to mark both and then ask the witness who
6      wrote them.  It's different handwriting as you'll
7      see.
8          I want to mark as Amberger Exhibit 24 Bates
9      stamp numbers 34 to 57, and Amberger 25 Bates?
10         (Deposition Exhibits No. 24 & 25 marked
11          for identification.)
12 A   Okay.  I have both.
13 Q   Now, looking at 34 to 57, which is Amberger 24 and
14     60 to 83, can you identify either set of notes as
15     yours?
16 A   The handwritten notes starting at 60.
17 Q   And are the notes starting at 34 Erin Oliver's
18     notes?
19 A   Yes, I believe so.
20 Q   Okay.  Now, right up in the right-hand corner
21     4/14/16, is that a dating of the date of the
22     interview?
23 A   On 60 on my notes?
24 Q   Yes.
25 A   Yes.  That would be the date and time of the

Page 18

1  interview.
2  Q  What I would like you to do is go from 60 to 87 and
3     identify each group of pages which are for each
4     person you interviewed. In other words, the
5     document Bates stamp 60 to 64 appears to be the
6     April 14 interview of somebody.
7     Is that one set of notes for that interview?
8  A  Yes.
9  Q  And was that of the complainant ▓▓▓▓▓▓▓▓▓
10 A  Yes, it was.
11 Q  Now, on page 65, it looks like there's two pages of
12    notes for April 18, 2016, for Christine Joehl; is
13    that correct?
14 A  Correct.
15 Q  Bates stamp 65 to 66 appear to be two pages of
16    notes for an interview of Christine Joehl; is that
17    correct?
18 A  That is correct, yes.
19 Q  And that occurred on April 18, 2016, correct?
20 A  Correct.
21 Q  Who was Christine Joehl?
22 A  She was the resident assistant on the floor that
23    Ms. ▓▓▓▓▓ lived on, the residence hall Ms.
24    ▓▓▓▓▓ lived in.
25 Q  Now, starting on page 67, it appeared another set

Page 19

1  of notes which appear to go to page 71; is that
2  true?
3  A  Correct, yes.
4  Q  Were these your notes of your interview of
5     ▓▓▓▓▓▓▓?
6  A  Yes, they are.
7  Q  And that occurred on April 28, correct?
8  A  Correct.
9  Q  Okay. Now, on Bates stamp 72 going over to --
10    well, yeah, 74, is that a set of notes of another
11    interviewee?
12 A  Yes, they are.
13 Q  And that occurred on April 28, 2016 --
14 A  Correct.
15 Q  -- correct?
16 A  Correct.
17 Q  That occurred on April 28?
18 A  Correct.
19 Q  Can you identify from your notes who this interview
20    was of?
21 A  These would have been Mr. ▓▓▓▓ roommate, Elvin --
22    I cannot remember his name -- Lutherpan, something
23    like that.
24 Q  Upton?
25 A  Yes, that sounds about right.

Page 20

1  Q  And we're still on 25, Bates stamp 75 and 76 appear
2     to be another interviewee notes. Is it just those
3     two pages before the next interviewee on 77?
4  A  Yes.
5  Q  Can you identify what interview this is?
6  A  This would have been a friend of ▓▓▓▓▓ Katlin,
7     I believe.
8  Q  And this interview occurred, according to your
9     notes, April 28, 2016?
10 A  Correct.
11 Q  What was the reason for interviewing this person?
12 A  When we conduct interviews with people, they
13    oftentimes name -- we ask if there's anyone we
14    should speak to. But oftentimes during the course
15    of the interview they may have mentioned somebody
16    that they had spoken with or they shared details
17    with.
18    So in this case it looks like Ms. ▓▓▓▓ had
19    shared some details of her relationship or her
20    experiences with Mr. ▓▓▓ with Katlin.
21 Q  Now, going to Bates stamp 77, are these your notes
22    of an interview of a Christopher Fox?
23 A  Yes, they are.
24 Q  And that occurred on May 2, 2016?
25 A  Yes.

Page 21

1  Q  And why was Christopher Fox interviewed?
2  A  He had -- Christopher had -- Mr. ▓▓▓ had shared
3     some details of his relationship or his experience
4     with Ms. ▓▓▓▓ with Christopher. So we
5     interviewed Christopher to understand his
6     perspective and see what he was able to recall.
7  Q  Okay. The next page is 78, and I'm going to ask if
8     you can look at 78, 79, 80 and 81 because I wasn't
9     sure whether this was one or two or three
10    interviewees. Can you tell us?
11 A  78, 79, 80, 81 and 82 are all one.
12 Q  And who was that interview of?
13 A  I believe Donald -- Mr. Alexander, Donald
14    Alexander.
15 Q  Who's he?
16 A  He is a member of Naval ROTC with Mr. ▓▓▓ and Ms.
17    ▓▓▓▓▓
18 Q  Was he, then, the boyfriend of Ms. ▓▓▓▓▓?
19 A  At the time we interviewed him in May of 2016, he
20    was, yes.
21 Q  And you interviewed him on May 3, 2016, correct?
22 A  Correct.
23 Q  Okay. Now, turn to page 83, and I believe there's
24    another interview here that goes over to 84.
25 A  Yes. I only have 83, but if you say there's

Page 30

1  time I touched her, too.
2 Q  Where is that in the notes?
3 A  Give me just a second here. On page 70 under the
4    December 28-29, 2015.
5 Q  Okay let's go to -- that's on 70 where it says
6    December 28-29; that's where you're referring to?
7 A  Yes, sir.
8 Q  And you say ▮ violated her, violated
9    her trust because didn't tell her something, lying
10   about something project, put off to help her.
11   Those are your notes?
12 A  Yeah. It's lying about a class project, put it
13   off.
14 Q  The word I couldn't see was class, right?
15 A  Yes, sir.
16 Q  Now, the next line, apologized; what does that say
17   more?
18 A  Any, a-n-y more, apologize any more.
19 Q  And then it says for touching because it upset her?
20 A  Yes.
21 Q  And it just says touching?
22 A  Yes.
23 Q  And that's what ▮ told you touching
24   upset her?
25 A  Yes.

Page 31

1 Q  And the next line says violated also for touching?
2 A  Yes.
3 Q  Next line says KL upset, correct?
4 A  Yes, sir.
5 Q  And then it says -- I cannot read it. It says
6    something, be there in 45 minutes, an hour and she
7    was upset. Can you translate your writing there?
8 A  Yes. It says KL upset. And then under that says
9    be there in 45 minutes, took an hour and she was
10   upset.
11 Q  Next says short temper?
12 A  Yes.
13 Q  Is that a reference to ▮ having a
14   short temper according to ▮?
15 A  I'd have to look at the text message to see the
16   full context. I cannot -- I'm not sure if it was
17   his short temper or her short temper. I apologize.
18 Q  Well, the next line says get upset and be quiet;
19   ▮ would get upset at that.
20 A  Correct, it does.
21 Q  And the next line says he wouldn't talk about it.
22   Is that he or she wouldn't talk about it?
23 A  He.
24 Q  He wouldn't talk about it right away?
25 A  Yes.

Page 32

1 Q  That's under the heading December 28-29, 2015 on
2    page 70, correct?
3 A  Correct.
4 Q  We've reviewed what's there?
5 A  Yes, sir.
6 Q  And the word you use in the middle of that section
7    is touching, correct?
8 A  Correct.
9 Q  And there's no wording in there to indicate
10   Mr. ▮ saying touching her crotch?
11 A  Yes, correct.
12 Q  And earlier in the interview he talked about
13   touching her just above her knee?
14 A  Yes.
15 Q  Okay. Now, you're referring here to texts. Maybe
16   we could deal with them. Did you have the texts at
17   the time you interviewed him on April 28?
18 A  I believe we did, yes, sir.
19 Q  First, pull out 340?
20 A  I do not -- I do have a 340, I'm sorry. It's an
21   e-mail. I do have it.
22 Q  Can you describe what's on page 340?
23 A  340 is an e-mail. Well, it's e-mail response that
24   I sent to ▮ on April 29, 2016, thanking him for
25   an e-mail and some text messages that he shared

Page 33

1    with us on April 28, 2016.
2 Q  Do you recall receiving the text messages from
3    ▮?
4 A  Yeah, I recall getting the messages from him. It
5    looks like it was after we had interviewed him.
6 Q  Okay. I'm going to ask that you pull -- let's
7    mark, first of all, for the record 340 as Amberger
8    Exhibit 26, and I'm going to ask that we mark as
9    Amberger 27, pages 206 to 339.
10        (Deposition Exhibits No. 26 & 27 marked
11        for identification.)
12 A  Okay. I have all of those.
13 Q  And are these the texts that ▮
14   supplied to you per your request that you made
15   reflected in Amberger Exhibit 26?
16 A  These are the text messages. He brought these to
17   our meeting, our interview with him, and we asked
18   if we could have a copy after the interview, and
19   then he shared those later that day.
20 Q  And he provided that copy?
21 A  Yes, he did.
22 Q  Just for the record, Amberger Exhibit 27 are the
23   texts supplied by ▮ and they go from
24   Bates stamp 206 to 339. These texts came in or
25   were produced in reverse chronological order,

9 (Pages 30 - 33)

Page 34

1  correct?
2  A  Correct.
3  Q  And the very first one is March 15, 2016, correct?
4  A  Correct.
5  Q  And the last one is December 23, 2015, correct?
6  A  Correct.
7  Q  Okay. So Mr. [redacted] produced to you texts between
8     when him and [redacted] ranging from a period
9     of time of December 23, 2015 to March 15, 2016?
10 A  Correct.
11 Q  It's true, is it not, that [redacted] didn't
12    provide you any texts?
13 A  That is correct.
14 Q  And did you ask her?
15 A  Yes.
16 Q  And what did she say?
17 A  Let me look back at my notes to see if I put it in
18    there. I believe she said she had deleted --
19    either his contact or deleted the text message
20    thread.
21 Q  Didn't she first tell you in your interview that
22    she and [redacted] had stopped texting in early
23    December?
24    MR. JONES: Object to the form. It
25    mischaracterizes the testimony. You can answer.

Page 35

1     MR. BYLER: Just for clarification, I was not
2     referring to any testimony. I was referring to
3     what [redacted] told Mr. Amberger and Ms.
4     Oliver.
5  A  Let me look back at my notes. I do not recall -- I
6     do not recall her sharing that, when they last
7     communicated.
8  Q  Okay. I jumped over it. I just want to go back to
9     Bates stamp page 72 in your notes in Amberger
10    Exhibit 25.
11 A  You said 72?
12 Q  Yes.
13 A  Okay.
14 Q  These were your notes of your interview with the
15    roommate Elvin, correct?
16 A  Correct.
17 Q  And in the middle of the page it says AH -- that's
18    [redacted] -- would share details, arguments
19    conflicting logic.
20 A  Uh-huh.
21 Q  Do you recall what Elvin said to you that you wrote
22    the note conflicting logic?
23 A  I do not.
24 Q  Next line says concerning -- next line after that
25    says seemed unstable, her mentality focused on

Page 36

1     grades. That's what you wrote, correct?
2  A  Correct.
3  Q  And that's what the roommate told you about who?
4  A  Ms. [redacted]
5  Q  Next line, attempted suicide; do you see that?
6  A  Yes, I do.
7  Q  Did Elvin, the roommate, tell you about Ms. [redacted]
8     attempting suicide?
9  A  Those details had been shared with Elvin by Mr.
10    [redacted] and Elvin shared what Mr. [redacted] had shared with
11    him.
12 Q  Go to the middle of the second page of that
13    document, 73 Bates stamp.
14 A  Okay.
15 Q  And do you see where it says shocked and annoyed by
16    allegations?
17 A  Yes, sir, I do.
18 Q  Do you recall what prompted you to write that in
19    the interview with Elvin?
20 A  That looks like Elvin's own, I guess, impression of
21    the allegations against Mr. [redacted]
22 Q  Now, the next line says not like him. Next line
23    says hard worker in ROTC. Those are the next two
24    lines in your notes, correct?
25 A  Correct.

Page 37

1  Q  Do you recall what the roommate Elvin told you that
2     prompted you to write those lines?
3  A  Just pretty much like it says, the allegations
4     against Mr. [redacted] were not like him, and Elvin
5     described him as a hard worker in ROTC.
6  Q  Go to the last page.
7  A  74?
8  Q  Yeah.
9  A  Okay.
10 Q  And the first line never saw them argue; do you see
11    that?
12 A  Yes, I do.
13 Q  Do you recall what prompted you to write that?
14 A  It was something Elvin shared. It was either a
15    response to a question or something he shared that
16    he said he never saw Mr. [redacted] and Ms. [redacted]
17    argue.
18 Q  And the next says AH upset dash doesn't raise his
19    voice dash if late for class, "ugh, why me, why
20    didn't you wake me," but never yells or raises
21    voice. That's what you wrote here, correct?
22 A  Correct.
23 Q  And do you remember Elvin, the roommate, telling
24    you that in the interview?
25 A  Yes, I do.

10 (Pages 34 - 37)

Page 42

1    ▮▮▮▮ and ▮▮▮▮?
2  A  Yes, I would have read the messages.
3  Q  Can you go to Bates stamp 311?
4  A  Okay.
5  Q  Let me direct your attention to December 23, 2016
6     at 3:01 a.m., received from ▮▮▮▮; do you
7     see that one?
8  A  Yes.
9  Q  And that one from ▮▮▮▮ said "yeah,
10    sorry, I'm pretty tired, kind of out it." That
11    says that?
12 A  Yes.
13 Q  Okay. Now, did you discuss these texts with Erin
14    Oliver?
15 A  That specific text or all of them?
16 Q  No, no, all of them, all of the 133 pages or any
17    part of it.
18 A  Yes, we would have discussed the messages.
19 Q  Do you recall Erin Oliver telling you anything
20    about the fact that ▮▮▮▮ had provided
21    what printed out were 133 pages of text messages?
22 A  Do I recall Erin saying anything about the messages
23    specifically?
24 Q  About the fact -- well, first of all, about the
25    fact that ▮▮▮▮ had provided, when printed

Page 43

1     out, 133 pages of text messages?
2  A  I do not recall if that specifically was spoken or
3     talked about.
4  Q  Well, did you have any conversation with Erin
5     Oliver about the fact that with these many pages of
6     text messages, there was a lot of conversation
7     going back and forth between ▮▮▮▮ and
8     ▮▮▮▮ in this time period?
9        MR. JONES: Object to the form, vague. You
10       can answer, if you know, Jake.
11 A  I do not recall that specific conversation.
12 Q  Do you recall ever discussing with Erin Oliver that
13    ▮▮▮▮ had sent cookies to ▮▮▮▮
14    during Christmas break according to the texts
15    messages?
16 A  I do not recall that specific conversation.
17 Q  Did you ever ask ▮▮▮▮ about why she sent
18    cookies to ▮▮▮▮ home during Christmas
19    break?
20 A  I do not recall asking that specific question to
21    ▮▮▮▮.
22 Q  Stepping back, we have your notes of those
23    interviews which you described. Thank you. Did
24    you record them by any means, I mean not
25    necessarily video, but video would be fine or by

Page 44

1     tape recorder?
2  A  No. At the time the meetings were not recorded at
3     all.
4  Q  So the only record we have of your interviews are
5     these notes?
6  A  Yes, would be the notes and the summary of the
7     interviews that was in the report.
8  Q  Did you ever review Erin Oliver's notes?
9  A  No.
10 Q  Did Erin Oliver ever review your notes?
11 A  I do not think so.
12 Q  When you say at the time, has the practice at
13    Purdue changed in terms of the recording of
14    interviews in an investigation?
15 A  We record all of our interviews, complainant and
16    impacted parties, respondents and witnesses.
17 Q  Do you know when you started that practice?
18 A  Maybe early 2017. I do not recall exactly when we
19    started.
20 Q  Do you recall what, if anything, prompted that
21    change in practice at Purdue?
22 A  I do not.
23 Q  I'd like to mark as a collective exhibit the
24    production that starts at 341 and goes to 350 and
25    mark that as Amberger Exhibit 28.

Page 45

1        (Deposition Exhibit No. 28 marked
2          for identification.)
3        MR. JONES: Did you say 28, Phil?
4        MR. BYLER: Yes, 28. I'm sorry, I muffled my
5     words because I was looking down.
6        MR. JONES: That's okay. Just wanted to make
7     sure.
8  A  341 to 350?
9  Q  Yes.
10 A  I have those.
11 Q  Can you describe what those pages are?
12 A  They are e-mail communications between me and the
13    parties that we wished to interview as witnesses.
14 Q  They're dated April 29, 2016, correct?
15 A  Yes. It looks like they're all dated April 29.
16 Q  Do you recall why it was on April 29, 2016, that
17    you were contacting people other than ▮▮▮▮
18    ▮▮▮▮ and ▮▮▮▮ about the investigation?
19 A  Why we waited till the 29 or why --
20 Q  Was there a particular reason why was it on or
21    about April 29, that you were sending these e-mails
22    to people other than ▮▮▮▮ and ▮▮▮▮?
23 A  That would have been after we had spoken with both
24    ▮▮▮▮ and ▮▮▮▮, or Ms. ▮▮▮▮ and Mr. ▮▮▮▮
25    and kind of made a list of people that they talked

Page 46

1  about that we wanted to interview.
2       So we spoke to ▊ on the 28 and we started
3  to reach out to some witnesses on the 29.
4  Q  Okay. I'm going to mark as Amberger Exhibit 19
5  Bates stamp 364 --
6       MR. JONES: You mean 29, Phil?
7       MR. BYLER: No, 19. These were marked during
8  the Bloom deposition with these numbers. That's
9  why I'm going to 19.
10      MR. JONES: Okay.
11 BY MR. BYLER:
12 Q  I'm going to do this as a group also. 364 will be
13 Amberger 19, 365 will be Amberger 20, 370 will be
14 Amberger 21 and 371 will be Amberger 22.
15      (Deposition Exhibits No. 19, 20, 21 & 22
16      marked for identification.)
17 A  Okay.
18 Q  Let's start with 364. Well, take a moment and look
19 at the document.
20 A  Okay.
21 Q  Let's start with 364, which is Amberger 19. It's
22 an e-mail, is it not, from you to Monica Soto
23 Bloom, correct?
24 A  Correct.
25 Q  And it's dated May 9, 2016, correct?

Page 47

1  A  Correct.
2  Q  At that point in time who was Monica Bloom?
3  A  At that time Monica was the director of CARE, the
4     Center for Advocacy Response and Education on
5     campus.
6  Q  Looking at Amberger 19, does it trigger your
7     recollection on your part as to why you were
8     sending this e-mail to Monica Bloom on May 9, 2016?
9  A  I'm trying to schedule a time to speak with Ms.
10    ▊ again.
11 Q  A follow-up conversation with Ms. ▊
12 A  Yes, it would be a follow-up interview, correct.
13 Q  Because you already had at this point in time
14    interviewed Ms. ▊ correct?
15 A  Yes.
16 Q  And you had already interviewed ▊,
17    correct?
18 A  Correct.
19 Q  Okay. I think I have it, but I just want to make
20    sure. You only interviewed and talked to ▊
21    ▊ once and that was back in April on a date in
22    2016?
23 A  Yes.
24 Q  So you never followed up in terms of further
25    questions to ▊, correct?

Page 48

1  A  Correct.
2  Q  Was there a particular reason you were reaching out
3     to Monica Bloom as to opposed to Ms. ▊
4     herself?
5  A  I'm not sure why I reached out to Monica and not
6     Ms. ▊ I do not know.
7  Q  Well, at this point in time you had already met
8     with Ms. ▊, correct?
9  A  Correct.
10 Q  Given that you already met with Ms. ▊, why
11    didn't you just contact her directly?
12 A  Again, I do not recall why I did not reach out to
13    Ms. ▊ and I reached out to Monica instead.
14 Q  Now, 365 is Ms. Bloom's response back to your
15    e-mail that we see on 364, correct?
16 A  Correct.
17 Q  And it's about arranging a phone call with Ms.
18    ▊ while you're having this e-mail exchange
19    with Monica Bloom?
20 A  Yes.
21 Q  Let's go now to 370, May 12.
22 A  Okay.
23 Q  Was this an e-mail from Monica Bloom to you dated
24    May 12, 2016 about when you could talk to ▊
25    ▊?

Page 49

1  A  Yes.
2  Q  And go over to 371, which is Amberger 22. Is that
3     your response back to Monica Bloom's e-mail?
4  A  Yes, it is.
5  Q  Do you recall having a phone call on or about
6     May 12, 2016, with ▊?
7  A  Yes.
8  Q  Did you record that in your notes?
9  A  Yes.
10 Q  Can you show me where?
11 A  It would be 83.
12 Q  Okay. Got you. So that page reflects your notes
13    that you had on a phone call with ▊?
14 A  Correct.
15 Q  Now, in terms of the investigation report that
16    you -- well, let's mark it. Amberger Exhibit 14.
17       MR. JONES: Bates on that, Phil?
18       MR. BYLER: 373 to 391.
19       MR. JONES: Thank you.
20       (Deposition Exhibit No. 14 marked
21       for identification.)
22 A  Okay.
23 Q  Now, there's a cover e-mail on page 373, is there
24    not, sent by Erin Oliver to Dean Sermersheim copied
25    to you?

13 (Pages 46 - 49)

### Page 50

1  A   Yes.
2  Q   Who is Joanna Sharp?
3  A   Joanna is Dean Sermersheim's administrative
4      assistant.
5  Q   And this is dated May 20, 2016, correct?
6  A   Correct.
7  Q   And we see starting on page 374 going over to page
8      391, the report, correct?
9  A   Correct.
10 Q   Okay. Now, can you describe generally, first of
11     all, how the investigator report was drafted?
12 A   The drafting of the report would have been a joint
13     effort by Erin and I to summarize the interviews
14     that we had conducted.
15 Q   Bates 374, next to your name are initials. Can you
16     identify them?
17 A   That would be my initials.
18 Q   And there are initials next Erin Oliver's. Could
19     you say whether that's Erin Oliver's initials?
20 A   Yes, I believe that's how she typically initiated
21     her reports.
22 Q   Okay. Now, let's walk through the investigation
23     report. By the way, it's 9:26, do you want to take
24     a short break?
25 A   I'm still okay.

### Page 51

1      MR. JONES: Let's push through, then.
2      MR. BYLER: I'm just trying to be courteous to
3      the witness.
4      MR. JONES: I appreciate that.
5      THE WITNESS: I'll let you know.
6  BY MR. BYLER:
7  Q   First, 374, Roman Numeral I says investigator's
8      charge, correct?
9  A   Correct.
10 Q   And this records, does it not, that Dean
11     Sermersheim appointed you and Erin Oliver to be
12     investigators in the complaint regarding
13     ?
14 A   Correct.
15 Q   Now, Roman Numeral II is relevant provisions and
16     that goes over from pages 374 to 376, correct?
17 A   Correct.
18 Q   Antiharassment is the first thing. What's the
19     point of discussing antiharassment in this
20     investigation report?
21 A   That's just the relevant University policy. It
22     just kind of describes it.
23 Q   The next item is harassment. What's the reason for
24     including a definition of harassment in this
25     investigation report?

### Page 52

1  A   That's just we were investigating sexual harassment
2      and other things, so it starts with the definition
3      of harassment and then goes to harassment includes
4      sexual harassment and then the definitions
5      continue.
6  Q   Now, you included a definition of sexual
7      harassment, correct?
8  A   Correct.
9  Q   Where does that definition come from?
10 A   That definition comes from the antiharassment
11     policy.
12 Q   Is that Purdue policies?
13 A   Yes.
14 Q   The next definition is sexual violence; do you see
15     that?
16 A   Yes, I do.
17 Q   What's the point of including that discussion in
18     the investigation report?
19 A   Because that's part of the allegations of sexual
20     violence.
21 Q   Is that because sexual violence is defined as
22     nonconsensual sexual contact including touching?
23 A   Yes.
24 Q   Okay. The next is consent/consensual. Why is that
25     included?

### Page 53

1  A   Because it's, again, part of the allegations, did
2      she or did she not consent. If the touching took
3      place, did she or did she not consent to it.
4  Q   And finally retaliation. Why is that included?
5  A   That's included in all of the reports just so that
6      everyone knows the definition, that retaliation is
7      prohibited.
8  Q   There was no instance of retaliation by Mr.      to
9      Ms.       through this investigation process, was
10     there?
11 A   No, there was not.
12 Q   Now, Roman Numeral III interviews and document
13     review. You have eight people listed here,
14     correct?
15 A   Correct.
16 Q   First one is              is the respondent,
17     correct?
18 A   Correct.
19 Q   The second one, I'm guessing, but you tell me is
20                 the complainant?
21 A   Yes.
22 Q   No. 3, can you identify who that is?
23 A   Not with -- no. Typically when we list interviews,
24     we do complainant and respondent or impacted party
25     and respondent first and second, and then it's

Page 54

1  alphabetical.
2 Q  So three through eight would be alphabetical?
3 A  Yes.
4 Q  No. 8 says undergraduate student computer science,
5     College of Science, was that Elvin Upton?
6 A  Most likely, yes.
7 Q  And the preceding one is Christine Joehl?
8 A  Yes.
9 Q  So we would jump from J in Joehl to U in Upton?
10 A  Yes.
11 Q  Do you recall why Christine Joehl was interviewed?
12 A  She was Ms. ▇ resident assistant at Wiler
13     Hall and had some interaction with Mr. ▇
14 Q  Let's go to six. Can you identify who that person
15     is?
16 A  Not with the information there.
17 Q  No. 5, Christopher Fox, do you know why he was
18     interviewed?
19 A  Mr. ▇ shared some details about Ms. ▇ with
20     Mr. Fox.
21 Q  What kind of details?
22 A  I can refer back to my notes, my handwritten notes.
23 Q  Okay.
24 A  I believe his name was not redacted. My
25     handwritten notes from my interview with him, with

Page 55

1     Mr. Fox is page 77.
2 Q  Uh-huh.
3 A  And it looks like ▇ shared with Mr. Fox that
4     ▇ had filed a report -- I don't know if Mr. Fox
5     filed the report or ▇ did, but it talks about
6     filing a report about Ms. ▇ suicidal
7     thoughts.
8        It looks like Mr. ▇ did not share an actual
9     name with Mr. Fox. It looks like only some details
10    about some woman that Mr. ▇ knew he was sharing
11    with Mr. Fox.
12       Mr. ▇ also shared with Mr. Fox that there
13    was some sort of investigation going, sexual
14    harassment investigation, and he sought out Mr. Fox
15    for some advice.
16 Q  Okay. Witness No. 4 or Interviewee No. 4, from
17    what is on page 376, can you identify who that
18    person is?
19 A  I cannot. No, I cannot, not with the information
20    there, no.
21 Q  Now, beneath the eight interviewees, it states,
22    does it not, pursuant to this complaint we also
23    reviewed the following documents/information, text
24    messages?
25 A  Uh-huh.

Page 56

1 Q  And text messages appears at the top of 377,
2     correct?
3 A  Correct.
4 Q  The text messages were supplied by ▇ ?
5 A  Correct.
6 Q  And when you refer to text messages, there were no
7     text messages supplied by ▇, correct?
8        MR. JONES: Form, asked and answered. You can
9     answer, Jake.
10 BY MR. BYLER:
11 Q  I'm referring to this investigation report where
12    you say text messages. I just want to establish
13    that the text messages referenced here are the ones
14    that were supplied by ▇ and none were
15    supplied by ▇; is that true?
16 A  That is correct.
17 Q  Now, by the way, going back, we reviewed the fact
18    that you had a follow-up telephone call with
19    ▇. Did you recall what lead you to
20    have that follow-up call?
21 A  Having earlier looked at some of my handwritten
22    notes from that follow-up interview with ▇,
23    it looks like information that ▇ shared during
24    his interview and also some questions about the
25    text messages, that we wanted to follow up with

Page 57

1     ▇ about.
2 Q  Well, how did that come about; did you discuss it
3     with Erin Oliver, for example, that we need to talk
4     to ▇ again?
5 A  Probably, yes.
6 Q  Probably. Okay. Was there any reason why after
7     talking to ▇ on the phone, that you
8     didn't call ▇ to get his comment on
9     the subjects that you discussed with ▇
10    ▇ ?
11       MR. JONES: Object to the form. It
12    mischaracterizes previous testimony. You can
13    answer, Jake.
14       MR. BYLER: I don't mean to mischaracterize
15    anything. Let me rephrase.
16 BY MR. BYLER:
17 Q  Is there any reason why after you talked to ▇
18    ▇ on the phone, you didn't, then, call and
19    talk to ▇ ?
20 A  The information that ▇ had provided in his first
21    interview, there was nothing -- was sufficient.
22    There was nothing that ▇ shared in her second
23    follow-up interview that we needed to follow up
24    with or clarify from ▇
25 Q  In the period of, let's say, April 28 to May 12,

15 (Pages 54 - 57)

Page 58

```
 1   2016, did you have any communication with Dean
 2   Sermersheim about what was going on in your
 3   investigation?
 4       MR. JONES: Object to the form, vague. You
 5   can answer, if you understand.
 6       MR. BYLER: I don't think I asked that
 7   question before.
 8       MR. JONES: I said vague, not asked and
 9   answered. You can answer, Jake.
10 A I do not recall if I did or not. I don't know why
11   I would unless we would need an extension to a
12   deadline or something.
13 Q Before you had your e-mail exchange with Monica
14   Bloom on May 9 and May 12, 2016, to set up the
15   follow-up phone call with          did you
16   have communications with Monica Bloom concerning
17   your investigation?
18 A After May 12?
19 Q Yes -- no, before May 9. In other words, the
20   period before you had your e-mail exchange, did you
21   have communications with Monica Bloom concerning
22   the investigation?
23 A I do not recall any.
24 Q Okay. After May 12 until you released your
25   investigation report of May 20, did you have any
```

Page 59

```
 1   communications with Monica Bloom concerning the
 2   investigation?
 3 A I do not recall any.
 4 Q When you say you don't recall, is that saying you
 5   don't recall because you just don't have a
 6   recollection or you don't think it happened?
 7 A I do not recall. I do not know if I did or not.
 8 Q Okay. Now, let's go to page 377, and that's page 4
 9   of the report. Paragraph 4 says allegations. Let
10   me just read it out loud and I'm going to follow up
11   with questions.
12       The University elected to exercise its right
13   to investigate the allegations of sexual
14   harassment. Specifically, it is alleged that
15   during or around November 2015, while
16        was sleeping in      's room, he touched her
17   intimate parts without her permission. He later
18   admitted to her that he digitally penetrated her
19   vagina while she was asleep in his room in early
20   November. It is also alleged that      threatened
21   and chased             with a stun gun, one
22   type device, down a hallway in his residence hall.
23       Okay. That's the statement of allegations
24   that you investigated?
25 A Yes.
```

Page 60

```
 1 Q Now, when you say here he later admitted, you're
 2   referring, are you not, to            saying
 3   that          admitted to her, not that
 4            admitted to you about digital
 5   penetration?
 6 A Yes. That allegation section was taken from the
 7   notice of allegation that was shared with him.
 8 Q I just want to clarify what you're describing.
 9 A Yes.
10 Q Now, the preceding was started by Dean
11   Sermersheim's April 11, 2016 letter, correct?
12 A That letter, whenever it was sent, would have been
13   the start of the investigation.
14 Q And we're talking about what
15   alleged happened in November of 2015, correct?
16 A Correct.
17 Q Now, that's a five-month gap in time, is it not?
18 A Yeah, roughly, yes.
19 Q Did you ever ask Ms.         why it was five months
20   before she said anything about the supposed event?
21 A If I do ask this question, I typically kind of
22   write down a person's response in my notes. I
23   don't recall seeing that in my notes. So it most
24   likely was not asked of her.
25 Q Okay. Section Roman Numeral V is background in
```

Page 61

```
 1   this investigation report, which is a description
 2   of who the parties are and how they met?
 3 A Correct.
 4 Q Six is "analysis and findings" that go from Bates
 5   stamp 377 to 383, correct?
 6 A Correct.
 7 Q And what follows on page 383 Roman Numeral VII is
 8   conclusion?
 9 A Correct.
10 Q And on page 384, there are recommendations as to
11   discipline, correct?
12 A Correct, yeah, that's the sanctions recommendation.
13 Q And what follows from page 385 to 391, are seven
14   pages in which texts occur, correct?
15 A Correct.
16 Q Now, did you cut and paste from the texts supplied
17   by            what appears on these pages from
18   385 to 391?
19 A I do not know if this is cut and pasted or if this
20   is just copies of the full page or a paper copy
21   that we had.
22 Q The reason I ask is go to page 391.
23 A Okay.
24 Q Most of that page is blank, is it not?
25 A It is, yes.
```

Page 62

1 Q And there's only one message on that page?
2 A Correct.
3 Q And 391 are five messages on January 14, but
4   two-thirds of the page is blank, correct?
5 A Correct.
6 Q Now, for what texts that you append, the dates are
7   December 23, December 28, and January 14?
8 A Correct.
9 Q And this is spread over seven pages appended to
10   your investigation report?
11 A Correct.
12 Q And we saw, did we not, that the texts supplied by
13   ▇▇▇ were 133 pages when printed out?
14 A Yes. There are more pages of texts that he
15   provided that are not attached to the report.
16 Q Well, seven pages is less than 133, is it not?
17 A It is, yes, sir.
18 Q Now, let's look at what's on page 377 and 378, the
19   first paragraph that goes over to 378 that starts
20   on 377.
21 A Okay.
22 Q What does this first paragraph in analysis and
23   findings on 377 to 378 relate to in terms of
24   accusations being made by ▇▇▇ against
25   ▇▇▇?

Page 63

1 A That paragraph is just background information and a
2   little bit of information about their relationship
3   as shared by ▇▇▇ and shared by Mr. ▇▇▇.
4 Q The subject of it shows loss of temper by Mr. ▇▇▇
5   was discussed by you on 378.
6 A Yes.
7 Q And you record, do you not, that ▇▇▇
8   denies losing his temper and that was a witness or
9   two who said that they never observed Mr. ▇▇▇ lose
10   his temper?
11 A Correct.
12 Q Ms. ▇▇▇ accused ▇▇▇ of having a
13   temper, correct?
14 A Yes. She shared that with us, yes.
15 Q Okay. Now, the second paragraph -- well, it's a
16   full paragraph on 378. What is the function of
17   this paragraph in findings and analysis?
18 A This paragraph we discuss the specific allegation
19   that Mr. ▇▇▇ threatened or chased Ms. ▇▇▇ with
20   some sort of stun gun or taser.
21 Q And Mr. ▇▇▇ denied that he did that?
22 A Correct.
23 Q And the roommate of Mr. ▇▇▇ said what was -- what
24   he saw was not what Ms. ▇▇▇ accused Mr. ▇▇▇
25   with respect to the taser?

Page 64

1 A Yes. His roommate shared what he was able to
2   recall about the interaction.
3 Q Let me go to the middle of that paragraph where it
4   starts ▇▇▇ did admit that he and his roommate had
5   jabbed each other with a baton on several
6   occasions, although in a playful manner. ▇▇▇'s
7   roommate reported that he and ▇▇▇ had shocked each
8   other a couple of times with the stun baton. He
9   stated that the shocks were consensual and always
10   in a joking manner.
11   He reported that typically they shocked at the
12   other to wake them up as their alarms went off. He
13   reported that they stopped shocking each other
14   because it got old.
15   The roommate reported that he knew of one
16   occasion that ▇▇▇ had the stun baton out and was
17   showing ▇▇▇ as they stood in the
18   hallway. He reported that ▇▇▇ activated the stun
19   baton and ▇▇▇ said don't do that. He
20   stated that ▇▇▇ promptly turned it off.
21   He reported that he did not observe ▇▇▇
22   chasing ▇▇▇ with a stun baton at any
23   time. Okay. Stop there.
24   That was what ▇▇▇ and the roommate
25   said about the use of the baton, correct?

Page 65

1 A Correct.
2 Q And that contradicted the allegation with respect
3   to chasing ▇▇▇ with a taser?
4 A That was the roommate sharing the one incident he
5   recalled.
6 Q Well, didn't he also share that he never saw
7   ▇▇▇ use the stun baton on any other
8   occasion with ▇▇▇?
9 A Correct. He never witnessed another occasion.
10 Q Okay. Now, let's go to 379. That's captioned
11   nonconsensual touching. There's nine paragraphs in
12   this section going over to page 381.
13   Now, the first paragraph states that ▇▇▇
14   ▇▇▇ and ▇▇▇ reported conflicting dates on the
15   incidents of nonconsensual touching. ▇▇▇
16   ▇▇▇ believed the incident took place in late
17   November, while ▇▇▇ believed the incident took
18   place around December 13, 2015.
19   Okay. There was a conflict of what the two
20   said as to when the alleged incidents occurred,
21   correct?
22 A Correct.
23 Q And ▇▇▇ said it was December, correct?
24 A Correct, yes.
25 Q And you eventually concluded it was December, did

Page 66

1  you not?
2      MR. JONES: Object to the form for vagueness.
3      When you say it, what do you mean, Phil?
4  BY MR. BYLER:
5  Q  Turn over to page 383 under conclusions.
6  A  Okay.
7  Q  The end of the third paragraph in conclusions.
8  A  Okay.
9  Q  And you state there, do you not, that evidence
10     supports ▮ touching ▮ while she
11     was sleeping in an unwanted and nonconsensual way
12     in December of 2015; you write that?
13 A  Yes.
14 Q  And did you understand my prior question to be a
15     reference to a conclusion that it was December of
16     2015 that the investigation concluded that this
17     occurred?
18 A  Yes.
19 Q  Okay. Now, the second paragraph on page 379 Bates
20     stamp, what is the function in the investigation
21     report in recording what you do here?
22 A  The second paragraph is a summary of what Ms.
23     ▮ shared with us.
24 Q  Now, the third paragraph, is that what ▮
25     ▮ said?

Page 67

1  A  Yes, it is.
2  Q  Now, I'm going to look at the first sentence here.
3     ▮ reported that around December 13, 2015, she
4     made statements to him that led him to believe that
5     ▮ was considering suicide.
6     Now, stop there. Now, that is what is written
7     here, correct?
8  A  Yes.
9  Q  Didn't ▮ tell you that, in fact,
10    ▮ attempted suicide by throwing
11    herself off the parking lot next to the ROTC
12    armory?
13 A  I do not recall if he specifically shared that or
14    not.
15 Q  Well, there's a difference between on one hand
16    saying a person is considering suicide and on the
17    other hand, a person attempting suicide.
18    MR. JONES: Is that a question, Phil?
19    MR. BYLER: Yeah.
20 BY MR. BYLER:
21 Q  There's a difference, is there not, between saying
22    a person is considering suicide and a person
23    attempting suicide?
24 A  Yes.
25 Q  Let me just look at the middle of that paragraph on

Page 68

1  379, the third paragraph. I'm just going to read.
2     While watching the movie, ▮ laid
3     on a futon and ▮ laid next to her on the floor.
4     ▮ reported that he simply reached up from the
5     floor and placed his hand on her leg just above the
6     knee out of affection and concern. He reported
7     that as soon as he did so, ▮ woke up,
8     became very upset, and left the room without saying
9     a word. He reported that they never specifically
10    spoke about the incident or her reaction.
11       Stop right there. Now, that's your recording
12    of what ▮ told you in his interview,
13    correct?
14 A  Correct.
15 Q  I'm going to go on and read. "He, that's ▮
16    ▮, denied ever digitally penetrating ▮
17    ▮ or touching her in a sexual way while she
18    slept. He reported that sometime after the
19    incident, ▮ told ▮ that she did
20    not like it when he touched her as she slept, and
21    he stopped doing that after she expressed concern."
22       Stop there. That's what you wrote?
23 A  Yes.
24 Q  ▮ statement was that the touching
25    was with respect to the touching above the knee,

Page 69

1  was it not?
2  A  Yes.
3  Q  And ▮ never told you that oh, yeah, I
4     touched her crotch?
5  A  Correct.
6  Q  Let me go on. "Both ▮ and ▮
7     reported that ▮ roommate was asleep in the
8     room during this incident. ▮ roommate
9     reported that he was asleep while ▮
10    was in the room, and he woke up as she was walking
11    out of the room. He reported that he did not see
12    anything occur, and ▮ did not appear
13    to be upset." That's what you wrote?
14 A  Correct.
15 Q  Did you ever ask ▮ if the roommate is
16    the room, why would a person, you know, make a move
17    in that kind of sexual nature in terms of going for
18    her crotch?
19 A  I do not recall that specific question.
20 Q  Did you ever ask ▮ that if she were
21    digitally penetrated, wouldn't she wake up?
22 A  I do not recall that specific question.
23 Q  Now, is it true, is it not, that ▮
24    did not have an independent recollection of being
25    digitally fingered?

|  | Page 70 |
|---|---|
| 1 A | Correct. |
| 2 Q | She was relying on what she said [redacted] |
| 3 | said, correct? |
| 4 A | Correct. |
| 5 Q | And [redacted] told you in the interview, as we |
| 6 | reviewed the notes, that he never did that, |
| 7 | correct? |
| 8 A | Correct. |
| 9 Q | Okay. Now, the findings and analysis go to the |
| 10 | text messages and I want to go back to the text |
| 11 | messages at this point. And I'm just going to go |
| 12 | sequentially page 1 through 7 of the text messages |
| 13 | that are attached to the report and that start on |
| 14 | 385. |
| 15 | Do you have them yet? I don't want to rush |
| 16 | you. |
| 17 A | From all of the text messages, those pages? |
| 18 Q | Well, the text messages attached to your |
| 19 | investigation report that start on 385. |
| 20 A | Yes, I have that. |
| 21 Q | And the first two pages of the text messages |
| 22 | include messages from December 23, 2015, correct? |
| 23 A | Correct. |
| 24 Q | And we looked at messages from December 23, 2015 |
| 25 | from the whole stack, did we not, where it reflects |

|  | Page 71 |
|---|---|
| 1 | that [redacted] sent cookies to [redacted] |
| 2 | -- |
| 3 A | Yes. |
| 4 Q | -- during Christmas break? |
| 5 | Okay. Now, in these two pages from |
| 6 | December 23, 2015, you don't include the text |
| 7 | messages about the cookies, do you? |
| 8 A | No. |
| 9 Q | Okay. Now, looking at these two pages, is there |
| 10 | anything in these two pages where [redacted] |
| 11 | says to [redacted] that he felt her crotch or |
| 12 | digitally penetrated her? |
| 13 A | No. |
| 14 Q | And is there anything in these two pages where |
| 15 | [redacted] accuses in words [redacted] of |
| 16 | feeling her crotch and digitally penetrating her? |
| 17 A | No. |
| 18 Q | Now, in the middle on page 386, in the middle, it |
| 19 | says sent to [redacted] December 23, 2015, |
| 20 | 1:06 a m. Message I just hate myself right now. |
| 21 | Received from [redacted] on Wednesday, |
| 22 | December 23, 2015, 1:06 a m. Message, you're so |
| 23 | amazing, please don't say that. |
| 24 | That's what the text messages at that point |
| 25 | read, correct? |

|  | Page 72 |
|---|---|
| 1 A | Correct. |
| 2 Q | It's [redacted] saying to [redacted], |
| 3 | you're so amazing, correct? |
| 4 A | Correct. |
| 5 Q | Okay. Now, let's go to the next -- well, four |
| 6 | pages, 387 to 390. These are messages from |
| 7 | December 28, 2015. |
| 8 A | Okay. |
| 9 Q | And this includes 390 where just most of the page |
| 10 | is blank. Okay. I want you to go through four |
| 11 | pages and tell me if at any place here [redacted] |
| 12 | [redacted] admits to expressly feeling [redacted] |
| 13 | crotch or digitally penetrating her? |
| 14 | (Witness reviews documents.) |
| 15 A | Okay. I'm done. Specifically he does not state |
| 16 | that. |
| 17 Q | And specifically does [redacted] accuse |
| 18 | [redacted] of feeling her crotch or of |
| 19 | digitally fingering her? |
| 20 A | Specifically, no. |
| 21 Q | Now, on December 28, 2015, what you attach here is |
| 22 | just some percentages of the messages on |
| 23 | December 28, 2015, that you can see in Amberger |
| 24 | Exhibit 27, that 133 pages of texts, correct? |
| 25 A | Yes, this is just some of the text messages. |

|  | Page 73 |
|---|---|
| 1 Q | Okay. Well, didn't you think that the other texts |
| 2 | on December 28, 2015 might provide the context in |
| 3 | understanding as to what was meant by the text |
| 4 | messages that you do reproduce on 387 through 390? |
| 5 A | If they would have provided additional context, we |
| 6 | would have attached them. |
| 7 Q | Okay. You indicate correctly that there are other |
| 8 | messages on December 28, 2015, between [redacted] |
| 9 | and [redacted] as it appears in |
| 10 | Amberger 27. And my question to you is don't you |
| 11 | think that having what you didn't include on |
| 12 | December 28, 2015, might provide context to what |
| 13 | was meant by what was in the texts that you |
| 14 | reproduced as part of the investigation report as |
| 15 | having been made on December 28, 2015? |
| 16 | MR. JONES: Object to the form, asked and |
| 17 | answer. You can answer, Jake. |
| 18 A | If they would have provided more context, we would |
| 19 | have included them. |
| 20 Q | Well, when you read the whole conversation on |
| 21 | December 28, 2015, don't you think that that might |
| 22 | lend to understanding what was said in this one |
| 23 | portion of the text messages between the two of |
| 24 | them? |
| 25 A | I'm not sure without having reread all of them. If |

19 (Pages 70 - 73)

Page 94

1  A  Yes.
2  Q  What would be the point of that kind of
3     intervention training?
4  A  Just some additional education for Mr. ▮ on
5     either University's policies or procedures,
6     bystander intervention, just to have a better
7     understanding of the impact of people's actions on
8     others.
9  Q  What if Mr. ▮ says with respect to taking that
10    training, look, I didn't do it; what is he supposed
11    to do?
12        MR. JONES: Object to the form. You can
13    answer, if you want, Jake.
14 A  If there's a policy violation found and that was
15    one of the sanctions for his re-entry and he
16    declined to take it or didn't want to take it, that
17    would be addressed at the Dean of Students office.
18    I wouldn't have any -- that would be something that
19    he would address to the Dean of Students.
20 Q  Well, is it your understanding that if he took the
21    training but said during the training, I didn't do
22    this, would he not be allowed to re-enter?
23        MR. JONES: Object to the form, improper
24    hypothetical. But you can answer, if you know,
25    Jake.

Page 95

1  A  That I don't know the answer to.
2  Q  Okay. Let's go to 4. As a condition of any
3     re-entry, ▮ should also be required to meet with
4     Chris Greggila, assistant director of CARE, prior
5     to returning to the University and one time per
6     month during his first semester of return.
7        That's what you put in your investigation
8     report there, correct?
9  A  Correct.
10 Q  What's the point of having such meetings with the
11    assistant director of CARE as a condition of
12    re-entry?
13 A  At the time Mr. Greggila was the support person
14    offered by CARE for respondents. So the point of
15    suggesting this was to help Mr. ▮, once he
16    returned to the University, stay on track.
17       I don't know how Chris handled these meetings,
18    but I know it was a suggestion just to say hey,
19    you're back, I'm here if you have any questions or
20    need anything. So that's why that was suggested as
21    a sanction.
22 Q  Okay. Let's turn to, I think, it's Exhibit 29 at
23    this point. It would be a new number, Bates stamp
24    392.
25       (Deposition Exhibit No. 29 marked

Page 96

1     for identification.)
2  A  Okay.
3  Q  Looking at -- I just want to double check the
4     number I'm giving you, 29, I believe.
5        MR. JONES: Yeah, you're right, Phil, you're
6     on 29.
7        MR. BYLER: Thank you very much.
8  BY MR. BYLER:
9  Q  Amberger 29 appears to be an e-mail from Joanna
10    Sharp to a number of people including you dated May
11    31, 2016; do you see that?
12 A  Yes.
13 Q  Do you remember receiving the e-mail?
14 A  Yes.
15 Q  Okay. And was this an e-mail notifying you when
16    you were to attend the panel meeting for ▮
17    correct?
18 A  Correct.
19 Q  And the document says in the line subject, panel
20    meeting for ▮ Monday, June 6, 2016, S-C-H-L 206,
21    it says that, right?
22 A  Correct.
23 Q  What does S-C-H-L mean?
24 A  That is Schleman Hall. That's the location of Dr.
25    Sermersheim's office, the Dean of Students office.

Page 97

1     And 206 is the conference room the panel was held
2     in.
3  Q  And the document shows, does it not, that ▮
4     ▮ is scheduled for the panel meeting from 2:00
5     p.m. to 2:30 p m., correct?
6  A  Correct.
7  Q  And the next line it says 2:30 p.m. to 3:00 p m. is
8     the investigators, correct?
9  A  Correct.
10 Q  That's you and Erin Oliver, right?
11 A  Yes.
12 Q  And then it says ▮ is sending in a statement
13    and will not be in attendance; do you see that?
14 A  Yes, I do.
15 Q  Were you aware that on June 6, Ms. ▮ did not
16    attend that panel meeting at any time?
17 A  I think this was shared with me at some point.
18    We're not in the panel at the same time. So I
19    wouldn't know unless someone shared it with me.
20 Q  Okay. Did you attend that panel meeting on June 6,
21    2016, with Erin Oliver?
22 A  Yes, I believe I did, yes.
23 Q  Was it about a half hour that you were there?
24 A  Usually, yeah. I don't remember an exact amount of
25    time we're there. Sometimes it's less than 30

25 (Pages 94 - 97)

Page 102

1  them to our file.
2  Q  Do you recall discussing with Ms. Oliver the letter
3     of June 14, 2016, that you received?
4  A  I do not recall any specific discussion, no.
5  Q  Let's turn to Amberger 31, which is 394.
6  A  Okay.
7  Q  Can you identify what this document is?
8  A  It's very similar to the last one. It's a
9     notification that Joanna Sharp shared a file with
10    me through Filelocker. It looks like a revised
11    determination letter.
12 Q  And the date of this document is June 29, 2016?
13 A  Yes.
14 Q  Did you access the document?
15 A  Yes, I would have opened it and viewed it and
16    probably printed it out to put with my file.
17 Q  What did you do, if anything, with respect the
18    revised determination?
19 A  I probably would have read it and then put in my
20    case file.
21 Q  Do you recall doing anything after receiving this
22    determination concerning the ▮▮▮▮ case?
23 A  No, I do not.
24 Q  Were you expected to do anything?
25 A  Typically not after a determination is sent, so no.

Page 103

1  Q  Was April 28, 2016, when you interviewed ▮▮▮▮
2     ▮▮▮▮ the only time you ever met with ▮▮▮▮
3     ▮▮▮▮?
4  A  I believe so, yes.
5     MR. BYLER:  Can you give me just a few minutes
6     to check my notes?  We may be done.
7     MR. JONES:  Sure, no problem.  Take your time,
8     Phil.
9     (A short break was taken.)
10 BY MR. BYLER:
11 Q  Let's go to 383.  That's the conclusion section of
12    the investigation report.
13 A  Okay.
14 Q  In that first paragraph, you're dealing with the
15    rearrangement of furniture in ▮▮▮▮
16    room, correct?
17 A  Correct.
18 Q  Now, had there been no sexual assault, would the
19    rearrangement of furniture be considered grounds
20    for a suspension?
21    MR. JONES:  Object to the form.  You can
22    answer, Jake.
23 BY MR. BYLER:
24 Q  In your role as an investigator making
25    recommendations -- so let's be specific -- would

Page 104

1  you have written this investigation report to
2  recommend a suspension, if it had been simply in
3  your conclusion that there was a rearrangement of
4  furniture?
5     MR. JONES:  Same objection, incomplete
6  hypothetical.  But you can answer, Jake.
7  A  Any recommendations would have been based on the
8     findings.  So it would have been, if it had risen
9     to a level of a policy violation, you know,
10    recommendations -- the recommendations made would
11    have been appropriate for the finding.
12    So what was your specific question, again, if
13    it was only furniture being moved?
14 Q  Yeah.  What if the conclusions ended at that first
15    paragraph?
16 A  That would have been evaluated on severe pervasive,
17    things like that, and definition of harassment.  So
18    just that basic information, I don't know what the
19    policy violation would have been or any
20    recommendations.
21 Q  Well, what was the policy -- was there a policy
22    violation of any harassment policy with respect to
23    the rearrangement of furniture?
24 A  No, no, you're right.  Specifically we just
25    discussed the sexual violence aspects.  We

Page 105

1  didn't --
2     MR. BYLER:  Okay.  I have no further
3  questions.
4     MR. JONES:  At this time, Jake, I'm going to
5  reserve any questions that Purdue has for trial, if
6  necessary.  I'll simply advise you that the court
7  reporter will send us a copy of the initial draft
8  of the text today.  We will provide it to you and
9  we'd like you to take a look and read it and review
10 it and make sure there aren't any errors in your
11 testimony, like a typographical error.
12    Once that's done, we'll send you a certificate
13 to sign, and then that's all you need to do as far
14 as this deposition goes today.  Do you understand
15 that?
16    THE WITNESS:  Yes, I do.
17    MR. JONES:  I think we're done, then.  We'll
18 take a electronic copy.
19
20 (Time noted 11:15 a.m.)
21
22    AND FURTHER THE DEPONENT SAITH NOT.
23
24
25

27 (Pages 102 - 105)