**EXHIBIT SJM 15**

```
                                                        Page 1

 1   IN THE UNITED STATES DISTRICT COURT FOR THE
 2   NORTHERN DISTRICT OF INDIANA HAMMOND DIVISION
 3   -------------------------------------------------x
 4   JOHN DOE,
 5                   Plaintiff,
 6           V.                   No. 2:17-cv-33-JPK
 7   PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF
 8   TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his
 9   official capacity as President of Purdue
10   University, ALYSA CHRISTMAS ROLLOCK, in her
11   official capacity of Purdue University, KATHERINE
12   SERMERSHEIM, in her official capacity at Purdue
13   University,
14                   Defendants.
15
16   -------------------------------------------------x
17
                               Videoconference
18
19                             December 4, 2020
                               1:30  P.M.
20
21
22
23   Deposition of ERIN OLIVER, held at the above time
24   and place, pursuant to Order, taken before a Court
25   Reporter of the State of Indiana.
```

### Page 2

```
 1  APPEARANCES:
 2
 3       NESENOFF & MILTENBERG, LLP.
         Attorneys for Plaintiff, John Doe.
 4       363 Seventh Avenue - 5th Floor
         New York, New york 10001
 5
         BY:  PHILIP A. BYLER, ESQ.
 6
 7       STUART & BRANIGAN, LLP.
         Attorneys for Defendants.
 8       300 Main Street - Suite 900
         P.O. Box 1010
 9       Lafayette, Indiana 47902-1010
10       BY:  WILLIAM P. KEALEY, ESQ.
11
12  ALSO PRESENT: Bill Lahey.
13
```

### Page 3

```
 2           I N D E X
 3  WITNESS        EXAMINATION BY        PAGE
 4  Ms. Oliver     Mr. Byler              4
 5                 Ms. Kealey             8
 6           E X H I B I T S
 7
 8  OLIVER         DESCRIPTION           PAGE
 9  Exhibit 1      Subpoena               4
10  Exhibit 10     Document              12
11  Exhibit 11     Response Statement    16
12  Exhibit 24     Notes                 18
13  Exhibit 25     Notes                 18
14  Exhibit 14     Investigation Report  32
15  Exhibit 19     Text                  36
16  Exhibit 20     Text                  36
17  Exhibit 21     Text                  36
18  Exhibit 22     Text                  39
19  Exhibit 29     Document              79
20  Exhibit 30     Document              82
21  Exhibit 31     Document              82
22
23       R E Q U E S T E D   I N F O R M A T I O N
24
25           R U L I N G S
```

### Page 4

 1  ERIN OLIVER, has been duly sworn in and testified
 2  as follows:
 3  EXAMINATION BY
 4  MR. BYLER:
 5      Q   Please state your name for the record.
 6      A   Erin Oliver.
 7      Q   Can you give me your business address?
 8      A   100 Grace Hall, Notre Dame, Indiana
 9  46556.
10          MR. BYLER: Okay, I was going to
11      mark the subpoena as Oliver exhibit one.
12      Does the Reporter have the exhibits,
13      there should be a subpoena. Mark that
14      and the simple question is, is the
15      witness appearing today pursuant to the
16      subpoena?
17          THE WITNESS: Yes.
18          MR. BYLER: Mark subpoena one
19      Oliver one, is the subpoena which was
20      provided to everybody including the
21      court reporter.
22          (Marked for Identification Oliver
23      Exhibit 1, Subpoena, dated December 4,
24      2020.)
25          MR. BYLER: My name is Philip

### Page 5

 1  Byler. I represent the plaintiff John
 2  Doe in the action John Doe vs. Purdue
 3  University and others.
 4      Q   May I first ask this question. Have
 5  you been deposed before?
 6      A   I have.
 7      Q   Okay, are you familiar with the
 8  question and answer format?
 9      A   Yes.
10      Q   Okay, now have you done a Zoom
11  deposition before?
12      A   No.
13      Q   Okay. I will just very quickly say it
14  is basically the same, it is just you have to be
15  careful we don't talk over each other. I will try
16  my best and you know you want to do this any ways,
17  it is important with technology.
18          Okay, is there any reason you can't
19  give full and complete testimony today?
20      A   No.
21      Q   Okay. Can you summarize your
22  educational backround?
23      A   I received a Bachelor's of Arts from
24  University of Notre Dame in 2005 in American
25  Studies and Anthropology. I graduated Michigan

Page 6

1  State University College of Law in 2012 focusing on
2  indigenous law policy.
3      Q    After 2012, what did you do?
4      A    Employed by Purdue University as an
5  investigator.  I was an investigator with Purdue
6  University in the office of --
7      Q    Between the time you graduated from
8  undergraduate in your law school was there
9  employment that you had?
10     A    Yes, I worked at the University of
11 Wyoming as a recruitment and retention manager.  I
12 worked for Purdue University in Indiana as a Public
13 Relations Director.
14     Q    What was the first school year you
15 worked for Purdue University?
16     A    I came to Purdue in the Fall of 2012.
17     Q    2012/2013 school year?
18     A    Correct.
19     Q    Okay, now after you came to Purdue what
20 position or positions did you hold at Purdue?
21     A    When I was originally hired as
22 assistant director of conflict resolution then I
23 was promoted as an associate director of the office
24 and then as the director in 2016.
25     Q    When in 2016?

Page 7

1      A    June.
2      Q    What was your position in 2015/2016
3  school year?
4      A    I was the associate director.
5      Q    What was the name of the agency?
6      A    The Office of Institutional Equity.
7      Q    Does the Office of Institutional Equity
8  house the investigators for Purdue?
9      A    Yes.
10     Q    Okay. How long did you remain as,
11 Director of the Office of Institutional Equity?
12     A    I was the director until, the spring --
13 I want to say March, spring of 2019, and then I
14 moved here to Notre Dame and started here in June
15 of 2020.
16     Q    Your current position at Notre Dame is?
17     A    I am sorry 2019, I am the Assistant
18 Vice-President of Institutional Equity and Title 9
19 Coordinator.
20     Q    That role, what did you do?
21     A    I oversee equal opportunity in general
22 across campus so I do the affirmative action
23 programs.  I am the AJ Coordinator, Title 9
24 Coordinator, oversee internal.
25     Q    When you went to Purdue did you receive

Page 8

1  any training in Title 9 administration or
2  enforcement?
3      A    Yes, we did minimally annual training.
4      Q    Who provided that, to your best
5  recollection?
6      A    A variety of outside -- the National
7  Association For College and University Attorneys, a
8  Tech 7 -- Organizational 7.  A number of law firms.
9  I can't recall all of those and some internal
10 policy training by the university.
11     Q    Okay, could you give a description what
12 is a TIKSA?
13     A    It is an Association of Title 9.  I
14 can't recall professionals so it is just an
15 organization ran by lawyers in the Title 9 field.
16     Q    Okay.  What was the purpose of the
17 training that you received in Title 9 matters?
18     A    To fully understand the legal
19 requirements of Title 9; interview techniques,
20 everything from legal writing to asking appropriate
21 questions relevant.
22          All the things kind of needed to fully
23 do internal investigation.
24     Q    Were you taught anything about getting
25 the story from both sides of a dispute?

Page 9

1      A    Yes.
2      Q    Okay what were you taught?
3      A    The importance of fair and equitable
4  unbiased investigation.
5      Q    Did you receive any training in terms
6  of trauma, of complainants?
7      A    Yes.
8      Q    What was that training?
9      A    Neurobiology of trauma.  How brains
10 code memories, do not code memories, during
11 traumatic instances.  That is really, all I recall
12 from the trainings.
13     Q    Do you recall who provided that kind of
14 trauma training?
15     A    I believe there was a faculty member
16 from Michigan State University; Rebecca Campbell.
17 Videos and research that is the only one I recall
18 off the top of my head.
19     Q    You do recall Professor Campbell?
20     A    Yes, I believe she has been the
21 prominent person on that subject?
22     Q    Did you ever hear the phrase, Believe
23 All Women?
24     A    No, it is not familiar.
25     Q    Or, Believe All Women?

3 (Pages 6 - 9)

Page 10

1  A   No.
2  Q   Do you recognize the acronym at Purdue
3  what was called CARE?
4  A   Yes, I do.
5  Q   What is CARE?
6  A   The Center for Advocacy Response
7  Education.
8  Q   What is that?
9  A   It was the office on campus or assume
10 the office on campus that provides primary
11 prevention intervention and outreach services for
12 students who had experienced violence.
13 Q   As the investigator in the Office of
14 Institutional Equity, did you work with anybody
15 from CARE?
16 A   Yes.
17 Q   In what ways?
18 A   Primarily, during the course of
19 investigations members of the CARE office served as
20 support people for the parties, available to
21 students from time to time staff and faculty, I
22 think primarily students.
23 Q   You mean student complainants, as
24 opposed to an issue with respect to a faculty
25 member?

Page 11

1  A   We had I recall there being a member of
2  the team that did sometimes work with respondents.
3  I don't recall the details of that.
4  Q   Okay, do you recognize the name of
5  Jacob Amberger?
6  A   Yes.
7  Q   Who is he?
8  A   He was a colleague of mine in the
9  Office of Institutional Equity.
10 Q   In the 2015/2016 school year, did you
11 two; Jacob Amberger work together in
12 investigations?
13 A   Yes.
14 Q   Was there a standard practice that you
15 and Mr. Amberger followed of having the both of you
16 in terms of investigation team?
17 A   Yes, every opportunity that was
18 possible.
19 Q   Okay, now do you understand where CARE
20 fits within the institution of Purdue University;
21 was it for example, part of the Office of
22 Institutional Equity?
23 A   No, it was within the Dean of Students
24 Office.
25     MR. BYLER: I am going to turn to,

Page 12

1  what was marked as Amberger exhibit 10,
2  mark it as Oliver Exhibit 10.
3  Oliver exhibit 10 I think it is a wise
4  thing to do that, Mr. Kealey suggested
5  keep the same numbers as exhibits if
6  they were marked previously.  I think
7  you have been provided really the set of
8  Amberger exhibits, the one I refer to is
9  now going to be marked as Oliver exhibit
10 10.  I haven't skipped over 2 through 9.
11 The first exhibit of relevance is, what
12 has been marked as Amberger exhibit 10.
13 It was marked that way by the way
14 because other documents got marked at
15 other depositions, okay.
16     (Marked for Identification,
17 Oliver Exhibit 10, Document, dated
18 December 4, 2020.)
19 Q   Do you have by chance Oliver exhibit 10
20 in front of you?
21 A   I do.
22 Q   Okay. Can you turn to the second page?
23 A   Yes.
24 Q   Do you see the CC?
25 A   I do.

Page 13

1  Q   And who is the CC on page two of Oliver
2  exhibit 10?
3  A   Myself and Mr. Amberger.
4  Q   It identifies you as an associate
5  director of the Office of Institutional Equity,
6  does it not?
7  A   Yes.
8  Q   At that point in time of Oliver exhibit
9  10, who is the director?
10 A   Alysa Rollock was acting as director
11 vice-president for ethics and compliance.  There
12 was no director in the office, at that time.
13 Q   Okay. Is that Kaitlyn Strong's
14 signature?
15 A   Appears to be, yes.
16 Q   Okay. I want to ask you to go to the
17 last page of this document which is bate stamped
18 Purdue 0572.
19     Do you have that in front of you?
20 A   I do.
21 Q   Okay and this is a notice of
22 allegations statement, is it not?
23 A   Yes.
24 Q   What function does the notice of
25 allegations serve with this kind of letter?

Page 38

1  Monica Bloom as director of CARE?
2     A    She again in her staff members and CARE
3  acted as support people within the procedures and
4  so throughout our processes, it was processes.
5     Q    Okay. Did she relate to the
6  investigator specific complaint?
7     A    I am sorry, again jumbled a little bit.
8     Q    Did you have dealing with Monica Bloom
9  at CARE, did you deal with her in the context of
10 dealing with specific complaints that were the
11 subject of that had triggered the investigation
12 that you were doing?
13    A    Yes.
14    Q    Okay. And what was the nature of what
15 Monica Bloom did in connection with you, in support
16 services that CARE provided?
17    A    Primarily would have been accompanying
18 students to the office of to report allegations of
19 sexual assault or sexual based discrimination, and
20 then acting as a support person through the
21 process; attending meetings, attending meetings
22 with those students when they were meeting with our
23 office.
24    Q    Did you ever deal with Monica Bloom as
25 director of CARE with ▇▇▇▇▇▇▇▇

Page 39

1     A    I recall her being the support person
2  for ▇▇▇▇▇ during the process. Outside of that
3  no.
4     Q    Ms. Bloom was in CARE? When support
5  person I would like to clarify you are referring to
6  a support person for ▇▇▇▇▇▇▇
7     A    Correct.
8     Q    Let me go to -- Amberger 22 which is a
9  one page document mark as Oliver 22.
10         (Marked for Identification,
11         Oliver Exhibit 22, Text Messages, dated
12         December 4, 2020.)
13    Q    The witness has Oliver 22 in front of
14 you.
15    A    Yes.
16    Q    Purdue 372.
17         Can you identify, Oliver 22?
18    A    Yes, this is a text message from the
19 Dean of Students to me in response to an e-mail
20 requesting an extension to complete our
21 investigation report.
22    Q    Do you recall why you requested an
23 extension?
24    A    E-mail indicates availability and
25 scheduling concerns, but I don't recall anything

Page 40

1  more than that.
2     Q    ▇▇▇▇▇▇▇ has made himself
3  available has it not?
4     A    I don't recall that being a problem he
5  was available in April when we met him, yes.
6     Q    In fact he provided all of those text
7  messages.
8         Okay, turn to the investigation report
9  Oliver 14 which is Purdue bate stamped 373 to 391.
10    A    Yes.
11    Q    The first page is a cover e-mail, is it
12 not?
13    A    Yes.
14    Q    Okay, is that for you?
15    A    It is.
16    Q    Okay. Was the investigation report a
17 product of you, both you and Jacob Amberger?
18    A    Yes.
19    Q    And it was made May 20, 2016 that you
20 sent to the Dean Sermersheim?
21    A    Correct.
22    Q    Do you recall the process by which
23 Mr. Amberger and you drafted Oliver 14?
24    A    I do not.
25    Q    Okay. Let's look at page 374. On the

Page 41

1  first page where it says it has your name and
2  Mr. Amberger's name, correct?
3     A    Yes.
4     Q    And is that your initials?
5     A    It is.
6     Q    And can you recognize Mr. Amberger's
7  initials?
8     A    Yes.
9     Q    Okay. And the first investigation
10 charge, was this the charge you were given for the
11 investigation?
12    A    Yes.
13    Q    And the second number two was relevant
14 provisions.
15         What was being laid out in relevant
16 provisions?
17    A    The section of the university anti-
18 harassment policy that were relevant to the
19 allegations.
20    Q    Okay. On page 376 interview, and do you
21 see that section?
22    A    Yes.
23    Q    And you see there is a list of people
24 there?
25    A    Correct.

11 (Pages 38 - 41)

Page 74

1  Wouldn't you as a matter of
2  investigation technique if you are reading into
3  texts there would have interpretation sit down with
4  that person here the respondent and go through and
5  recording your notes since you don't have video
6  what the response of the respondent was concerning
7  your markings and interpretation?
8     A   Possibly, I think it depends on the
9  case.  I don't recall those conversations from any
10 one investigation.
11    Q   Would you be surprised by ▇▇▇
12 ▇▇▇ saying it didn't happen?
13        MR. KEALEY:  Object to form.
14    A   I don't have a recollection.
15    Q   Okay. Turn to 384 these are your
16 recommendations, are they not?
17    A   Yes.
18    Q   And, the first of 4 recommendations,
19 concern the one what was the basis of making a
20 recommendation of one year suspension?
21    A   Again, I don't remember the specific
22 conversation as to why Jacob's case where the
23 finding where the proposed finding was digital
24 penetration that would have been a pretty standard
25 recommendation for a sanction, at that time.

Page 75

1     Q   Maybe taken into account that the
2  complainant didn't have an independent recollection
3  and the responsibilities saying it didn't happen?
4     A   Again, I don't recall the deliberations
5  and conversations that Jacob and I had.
6     Q   Okay. Your investigation you didn't
7  collect any medical evidence to support ▇▇▇
8  ▇▇▇ allegations, correct?
9     A   Correct.
10    Q   What?
11    A   Correct.
12    Q   Okay. The only documentation you have
13 were the text messages, correct?
14    A   Yes.
15    Q   There was no DNA?
16    A   No.
17    Q   Okay. And, so your recommending a year
18 suspension based on a credibility determination,
19 you say, where it imparts he says no and she says
20 well, he told me so but you don't have an
21 independent recollection?
22        MR. KEALEY:  Object to form.
23    A   Yes, we made the recommendation of a
24 one year suspension.
25    Q   Okay. The closest we have here of

Page 76

1  anybody being around supposedly saw this occurred
2  was the roommate that ▇▇▇ and he says he
3  didn't see anything correct?
4     A   Yes.
5         MR. KEALEY:  Object to form.
6     Q   Now, a no contact order, right?
7     A   Yes.
8     Q   And that runs until when you say the
9  academic program does that mean until graduation?
10    A   Correct.
11    Q   That means through the 2018, 2019
12 school year?
13    A   I do not -- yes, that was her date of
14 anticipated graduation, yes.
15    Q   Okay, did you consider what that means
16 in terms of ▇▇▇ trying to function on
17 Purdue campus, given the NCO?
18    A   I don't recall those conversations.
19    Q   Can you explain what is involved in
20 point three recommendations in terms of bystander
21 training and CARE meetings?
22    A   It would have just been an opportunity
23 to provide education in the space of bystander
24 intervention and check in to ensure the return to
25 campus was going well.  Again, I don't recall any

Page 77

1  further discussion about content in those areas.
2     Q   By the way ▇▇▇ didn't have
3  any other disciplinary violations for sexual
4  misconduct while he was at Purdue do you, right?
5     A   Not, that I recall.
6     Q   Well, what was Vice President Rollock
7  pointing out, under point three?
8     A   I am sorry can you repeat that.
9     Q   What was, Vice-President Rollock going
10 to be telling ▇▇▇ or in what you provide
11 for his requirement point three?
12    A   Did you say what would she be telling
13 him.
14    Q   No.
15    A   I don't feel I can speak to that I am
16 not sure.  I don't recall the conversations with
17 Jacob and I would have not have had that
18 conversation with Vice-President Rollock?
19    Q   What was it about including this point
20 three that you thought was desirable in terms of,
21 sanction.
22    A   It is an educational sanctions are
23 common in insuring that people are understanding
24 the importance of bystander intervention.
25    Q   What does bystander intervention mean,

20 (Pages 74 - 77)

Page 78
1 as a phrase?
2    A    Generally, knowing the appropriate time
3 to step in to assist, knowing what is acceptable
4 and not acceptable in the academic community
5 regarding behavior.
6    Q    Okay well -- what would happen if
7 ▓▓▓▓▓▓▓▓▓▓ such training is provided point
8 three and said, I didn't do it, would he be allowed
9 to reenter?
10          MR. KEALEY:  Object to form.
11    A    I couldn't speak to that.  It wouldn't
12 have been my decision as to whether or not he could
13 reenter or not.
14    Q    Do you know if ▓▓▓▓▓▓▓▓▓▓ would be
15 readmitted if he said in the training okay, I am
16 listening, I am attending everything, I am taking
17 all notes I am telling you right now I didn't do
18 it, what would happen?
19          MR. KEALEY:  Object to form.
20    A    I can't speculate to what would happen
21 it wouldn't be my role in the process.
22    Q    Well, is it true that you can't say he
23 would be readmitted then?
24          MR. KEALEY:  Object to form.
25    A    Again, I don't feel I could answer

Page 79
1 that, I know anyway.
2    Q    Go to ▓▓▓▓▓ 29.  I am almost done.
3 Oliver 29.
4          (Marked for Identification,
5           Oliver Exhibit 29, Document, dated
6           December 4, 2020.)
7    A    I am ready when you are.
8    Q    Bate stamp 392 for Purdue.
9    A    Okay.
10    Q    Can you identify what this document is?
11    A    It is -- is a notice from Johanna Sharp
12 who is the assistant to the dean of students to
13 schedule for the meeting for the or matter on
14 Monday June 6, 2016.
15    Q    Okay, it says panel meeting for ▓▓▓▓
16 Monday June 26, 2016?
17    A    Correct.
18    Q    What is SCHL206?
19    A    Sermersheim, the building 26 which is
20 the Dean Sermersheim.
21    Q    You identified who Diana Sharp,
22 administrative assistant?
23    A    Yes.
24    Q    Who is Casey Richardson?
25    A    Casey Richardson was a support person

Page 80
1 in CARE as was Chris Greggila.
2    Q    Both, Greggila and Richardson, are CARE
3 correct?
4    A    Correct.
5    Q    Did you understand why they were being
6 copied on this e-mail?
7    A    They are again they serve in support
8 roles, are former students.  I would assume it was
9 to notify them of the hearing for that purpose.
10    Q    Well do you know whether ▓▓▓▓▓▓▓▓▓▓
11 has his own lawyer, local lawyer as a support
12 person at this meeting?
13    A    He had a local attorney in our meeting
14 when we met with him during the course of the
15 investigation but I don't recall -- wouldn't have
16 known necessarily at the panel meeting stage who he
17 would have had with him.
18    Q    It says, 2 p.m., to 2:30 p.m. ▓▓▓▓▓▓▓
19 ▓▓▓ and 2:30 p.m., to 3 p.m., investigators?
20    A    Right.  Yes.
21    Q    You and Mr. Amberger were
22 investigators?
23    A    Yes.
24    Q    You appeared at that meeting?
25    A    I believe so, yes.

Page 81
1    Q    Were the CARE people there too while
2 you were there?
3    A    They would not have been in the space
4 when we were.  We would have met independently with
5 the Dean.
6    Q    And below that says ▓▓▓▓▓ in a
7 statement will not be in attendance, do you see
8 that?
9    A    Yes.
10    Q    You were aware at the time that ▓▓▓▓
11 ▓▓▓▓ was not going to be in person in attendance
12 on the June 6, meeting?
13    A    Yes.
14    Q    What do you recall, as to how long your
15 meeting on June 6th, was?
16    A    I don't have any recollection of the
17 meeting.
18    Q    Well, that was a broader answer, I have
19 to follow up, make sure I got it.
20          Do you have any recollection as to what
21 happened during this meeting?
22    A    I do not.
23    Q    Do you recall any questions that were
24 asked of you?
25    A    I do not.

21 (Pages 78 - 81)