**EXHIBIT SJM 34**

# Exhibit K

```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF INDIANA
 2                     HAMMOND DIVISION
 3
 4    JOHN DOE,                      )
                                     )
 5         Plaintiff,                ) CIVIL ACTION NUMBER
                                     ) 2:17-cv-33-JPK
 6         vs.                       )
                                     )
 7    PURDUE UNIVERSITY, PURDUE      )
      UNIVERSITY BOARD OF            )
 8    TRUSTEES, MITCHELL ELIAS       )
      DANIELS, JR., in his           )
 9    official capacity as           )
      President of Purdue            )
10    University, ALYSA              )
      CHRISTMAS ROLLOCK, in her      )
11    official capacity at           )
      Purdue University,             )
12    KATHERINE SERMERSHEIM, in      )
      her official capacity at       )
13    Purdue University,             )
                                     )
14         Defendants.               )
15
16
17       VIDEOCONFERENCE DEPOSITION OF ADAM SHEPPARD
18
19       The deposition upon oral examination of
      ADAM SHEPPARD, a witness produced and sworn before me,
20    Megan M. Bowman, Notary Public in and for the County of
      Marion, State of Indiana, taken on behalf of the
21    Defendants, at 7912 West 26th Street, St. Louis Park,
      Hennepin County, Minnesota, on Wednesday, May 20, 2020,
22    scheduled to commence at 11:00 a.m., pursuant to the
      Federal Rules of Civil Procedure with written notice as
23    to time and place thereof.
24
25
```

### Page 2

```
 1      A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3         Philip A. Byler
           NESENOFF & MILTENBERG LLP
 4         363 Seventh Avenue
           Fifth Floor
 5         New York, NY 10001
           212 736 4500
 6         pbyler@nmllplaw.com
 7
    FOR THE DEFENDANT(S):
 8
           Tyler L. Jones
 9         William P. Kealey
           STUART & BRANIGIN LLP
10         300 Main Street
           Suite 900
11         P O Box 1010
           Lafayette, IN 47902-1010
12         765 423 1561
           tlj@stuartlaw.com
13         wpk@stuartlaw.com
14
    FOR THE U S NAVY:
15
           John Matuszak
16         U S NAVY - NAVAL SERVICE TRAINING COMMAND
           2601 A Paul Jones Street
17         Building 1
           Great Lakes, IL 60088-2845
18         847 707 5057
           john.matuszak@navy.mil
19
20
21
22
23
24
25
```

### Page 3

```
 1           INDEX OF EXAMINATION
 2
 3  Direct Examination.......................... 4
       Questions By Tyler L. Jones
 4  Cross-Examination........................... 42
       Questions By Philip A. Byler
 5  Further Cross-Examination................... 47
       Questions by Philip A. Byler
 6
 7
 8           INDEX OF EXHIBITS
 9
    Deposition Exhibit No.:
10
    Exhibit 1 - Fact witness approval........... 6
11
12  Defendant's Exhibit No.:
13  Exhibit 1 - Sexual violence report.......... 21
    Exhibit 2 - Email between Adam Sheppard and .. 28
14            ███████████, 4/6/16
    Exhibit 3 - Email between Adam Sheppard and .. 32
15            ███████████, 5/3/16
    Exhibit 4 - Email from Adam Sheppard to ..... 38
16            ███████████, Placement on
              academic warning, 6/6/16
17  Exhibit 5 - NSTC-0184 Subject: Thoughts on ... 40
              MIDN 4/C ███
18
19
20
21
22
23
24
25
```

### Page 4

```
 1  (Time noted: 11:01 a.m.)
 2              ADAM SHEPPARD,
 3  having been duly sworn to tell the truth, the whole
 4  truth, and nothing but the truth relating to said
 5  matter, was examined and testified as follows:
 6
 7  DIRECT EXAMINATION
 8       QUESTIONS BY TYLER L. JONES:
 9  Q   Good morning, Mr. Sheppard.
10  A   Good morning.
11  Q   My name's Tyler Jones. I'm an associate with
12      Stuart & Branigin. I, along with Bill Kealey
13      represent Purdue University and several other named
14      defendants against John Doe in the lawsuit here.
15         Briefly for the record, could you fully state
16      your name?
17  A   Adam Phillip Sheppard.
18  Q   Thank you. Sir, have you ever given a deposition
19      before?
20  A   No, this is my first one.
21  Q   Well, congratulations I suppose. I'm sure
22      Mr. Matuszak has already kind of given you the
23      down-low, but basically a deposition's an
24      opportunity for both parties to ask you questions
25      about what you may or may not know --
```

### Page 5

```
 1  A   Okay.
 2  Q   -- about facts relevant to this case. I'd ask
 3      because everything you are saying is being recorded
 4      by Megan over here, Connor Reporting, I'd ask that
 5      you give us "yeses," "noes," "yays," "nays," as
 6      opposed to head shakes or head bobs.
 7  A   Got it.
 8  Q   I would appreciate it if we let each other finish
 9      what we're saying. You may know the question I'm
10      going to ask and I may know the answer you're going
11      to give, but I'd like us to try not to interrupt
12      each other, so it's a clear record, please.
13  A   Sure.
14  Q   If you answer, I'm going to assume you understood
15      the question. If you don't understand the
16      question, please ask me to rephrase it or ask me to
17      repeat it. Like I said, if you answer, I'm going
18      to assume that you understood; is that fair?
19  A   Sounds good.
20  Q   Okay. Again, you're not a prisoner here. If you
21      need a restroom break or if something happens, the
22      cat jumps on the computer or anything, or any
23      reason like that, just let me know and we can take
24      a brief break. Okay?
25  A   Okay.
```

Page 14

1 Q  Correct. Was there a rule book or was there a set
2    of standards that they had to comport themselves
3    with for NROTC purposes I mean?
4 A  There was, yes. I want to stay it was just a --
5    the Purdue Navy ROTC Student Handbook.
6 Q  Thank you. Were you subject to the same rules they
7    were or did you have a separate officer sort of
8    conduct you had to follow?
9 A  Yes. So that rule book would have been for
10   students within the program.
11 Q Okay.
12 A  So without me being a student, that wasn't really
13   applied to me.
14 Q  Understood. Just because I'm not a midshipman and
15   I've never seen it before, what's a typical
16   schedule for a freshman midshipman, like, their
17   first semester?
18 A  Yeah. A typical schedule would be Monday morning
19   join up with the unit by the armory for -- at about
20   5:45. We workout for about an hour. They go back,
21   shower, have breakfast, do their things, go to
22   classes throughout the day, you know, eat lunch, go
23   back to classes. And potentially in the afternoon
24   when classes were over, they may have some, you
25   know, a little bit of responsibilities or duties

Page 15

1    within the unit. But, you know, we always
2    encouraged, you know, engaging in some sort of a
3    physical activity or extracurricular event in the
4    afternoon after classes.
5       And then really just studying. Obviously
6    Purdue is a very rigorous institution and so, you
7    know, I think the majority of their time is
8    probably -- well, you would hope -- is spent
9    studying.
10 Q  Are there any NROTC events that are mandatory on
11   the weekends?
12 A  No. We typically did not have -- no. The only
13   events that they would have ever have been sort of
14   required to do would be in the fall. We -- the
15   students in the program would clean up the football
16   stadium after home football games. And that was a
17   way for them to sort of raise money.
18 Q  Okay. Does the schedule you just described, does
19   it change substantially from first fall semester to
20   the first spring semester for the freshman?
21 A  No, no. I think it would be pretty consistent for
22   both other than having a different class -- class
23   load.
24 Q  Right. Would it be a larger class load or a
25   smaller class load?

Page 16

1 A  It would depend individually on the student. My
2    assumption would be that maybe the fall class load
3    could be a little bit easier and lighter, just the
4    nature of being new to a university. Then
5    potentially maybe the spring semester, you know,
6    some more challenging courses.
7 Q  Understood. Sir, I want to list off some names
8    here and if you can confirm if you know them and
9    what their position and title are or were, I'd
10   appreciate it.
11      Craig Remaly?
12 A  Yup. He was the executive officer.
13 Q  Okay. Megan Redlawsk?
14 A  She was a peer of mine, another lieutenant company
15   officer on staff.
16 Q  Rodney Hutton?
17 A  Yup. That's Captain Hutton. He would have been
18   the commanding officer.
19 Q  Understood. And then Kyle Willstatter?
20 A  Another Navy lieutenant on staff, a peer of mine.
21 Q  Understood. Sir, did you -- prior to -- and when I
22   say "the allegations," I'm referring to allegations
23   of sexual assault by ▓▓▓▓▓▓▓ against
24   ▓▓▓. Prior to those allegations being brought,
25   did you have any interactions with ▓▓▓▓▓▓?

Page 17

1 A  Yes.
2 Q  Did you supervise her?
3 A  Yes.
4 Q  What were your general impressions of her?
5 A  Nothing specific comes to mind other than, you
6    know, just sort of seemed like a typical, you know,
7    female midshipman.
8 Q  Understood. Same question. Prior to the
9    allegations did you know ▓▓▓▓▓?
10 A  I did, yes.
11 Q  Did you supervise him?
12 A  I believe I supervised him. I don't recall 100
13   percent if he was in Alpha Company but, you know,
14   again, just the nature of the program, I would have
15   -- there would have been overlap where I would have
16   seen him and come across him.
17 Q  Sure. Do you have any general impressions of him?
18 A  Nothing stands out. Again, just, you know,
19   typical, you know, freshman midshipman.
20 Q  Understood. As you best understood your duties at
21   the time in 20 -- in August 2015 between -- from
22   August 2015 to August 2016, as a lieutenant, what
23   were your responsibilities if a midshipman came to
24   you and alleged they'd been sexually assaulted?
25 A  My responsibilities really would have been, A, to

Page 18

1  ensure that a report essentially is filed so that
2  the University would have been made aware of it.
3  Q  When you say "a report," you mean a report to
4  Purdue University?
5  A  Correct. And then really, I think, just in terms
6  of other responsibilities ensuring that the
7  individual is aware of the various resources
8  available to them.
9  Q  Like what?
10 A  Mainly I'm speaking of the resources that would be
11 available through Purdue University. Just in terms
12 of, you know, counseling and those types of things.
13 Q  Does that include something called "CARE"?
14 A  "CARE" doesn't ring a bell. I know Purdue had
15 their own sort of health office. They may be what
16 CARE is part of.
17 Q  Okay. Do you recall ▮▮▮▮ reporting to
18 you that ▮▮▮▮ had sexually assaulted her?
19 A  I do recall her reporting to me that she had been
20 sexually assaulted. I don't know if she -- I don't
21 recall if she specifically told me his name when
22 she revealed that. But shortly thereafter I think
23 we -- his name was brought up. I don't know if she
24 was the one that brought it up.
25 Q  Understood. To the best of your recollection, can

Page 19

1  you kind of summarize what you remember happening,
2  how you learned, what she said, what you did, et
3  cetera?
4  A  Yeah. So really -- all I really remember was I was
5  -- I believe I was in my office in the armory. And
6  she came to my office. I'm pretty confident that
7  she came with another student, another female
8  midshipman that was in the program as well. Of
9  course she, you know, revealed what had happened.
10    I don't recall her going into specific details
11 other than just, "Hey, you know, sir. This
12 happened to me. You know, I was -- I feel that I
13 was sexually assaulted," et cetera. And I just
14 kind of recall, you know, sitting there and
15 listening to her.
16    And then at some point we just kind of talked
17 about, "Okay. Next steps. You know, have you, you
18 know, reported this to" -- Purdue has an anonymous
19 intake form. And so we just kind of discussed that
20 and then discussed, you know, where you can go and
21 what Purdue -- what types of resources they have.
22 Q  To your knowledge, did you show her how to make a
23 report with Purdue University?
24 A  I believe I did. I don't actually recall -- I'm
25 fairly confident that I probably pulled up Purdue's

Page 20

1  -- the link to the Purdue's intake form and
2  reviewed that with her in case she was unaware of
3  that. That's about as -- all I recall there.
4  Q  Sure. Did you report what Ms. ▮▮▮▮ had told you
5  to any of your superiors within NROTC?
6  A  I'm not 100 percent confident, but I may have
7  reported it to Commander Remaly.
8  Q  When ▮▮▮▮ made this report, did you have any
9  reason to think that she was making it up?
10    MR. BYLER: Objection. Speculation.
11 Q  You can answer.
12 A  I'm sorry. The question: Did I believe that she
13 was making it up?
14 Q  Did you have any reason to believe that she was
15 making up her allegations?
16 A  At the time, no. She seemed to be telling the
17 truth. And it seemed to -- I didn't have reason to
18 doubt her at the time.
19 Q  Have you ever had a reason to doubt her?
20 A  Nothing -- no. I mean, nothing really comes to
21 mind.
22 Q  Understood, sir. Sir, you should have received
23 from Mr. Matuszak some links to some exhibits.
24    Did you receive those?
25 A  Let me check my email. Would these have come to my

Page 21

1  email?
2    MR. MATUSZAK: They were sent by Sarah, my
3  paralegal. Sarah --
4    THE WITNESS: No. The only thing I got was --
5  sorry. You're referring to, like, exhibits
6  regarding -- I don't have any. Yeah -- no. I
7  don't have any exhibits.
8    MR. JONES: Okay. Off the record briefly.
9    (A recess was taken between 11:26 a.m. and
10 11:32 a.m.)
11 BY MR. JONES:
12 Q  Mr. Sheppard, are you ready to proceed?
13 A  Yes.
14 Q  Sir, could you please take a look at what has been
15 provided to you as Exhibit 1?
16    (Defendant's Exhibit 1 was marked for
17 identification.)
18 A  Okay.
19    MR. JONES: And for the record, Phil, this is
20 Bates number PU 0057.
21    MR. BYLER: Okay. I have it.
22 Q  Mr. Sheppard, do you have this document in front of
23 you?
24 A  Yup, Exhibit 1.
25 Q  Yup. Could you take a moment to review this and

|  |  |
|---|---|
| Page 22 | Page 24 |
| 1  let me know when you're done? | 1  A  April -- oh, spring of '16. That sounds about |
| 2  A  Okay. | 2     right, yeah. |
| 3  Q  Great. Have you had a moment to look it over? | 3  Q  Well, in fact, if you look at the top of the |
| 4  A  Yup, I read it. | 4     document, it says, "Submitted on April 4th, 2016, |
| 5  Q  Have you seen this before? | 5     at 8:37." |
| 6  A  I haven't seen this actual document before, no. | 6  A  Okay. |
| 7  Q  Okay. And the kind of paragraph where the -- it | 7  Q  So I just want to confirm based on your past |
| 8     says, "Detailed description of the incident," did | 8     practices and what you believe, any reason to think |
| 9     you write that? | 9     that she reported this -- she didn't report this on |
| 10 A  That does -- it does appear to be from me. Again, | 10    April 4th, 2016? |
| 11    I don't exactly remember the act of writing it but, | 11 A  I can't specifically recall what the date was. |
| 12    yeah. I would assume there that that came from me. | 12 Q  Okay. Assuming for a minute, sir, that what you've |
| 13 Q  Right. And at the very top of the document it | 13    written down here is an accurate summary or |
| 14    says, "Reported by," and the name, colon, "Adam | 14    transcription of what ▇ alleged to you, does |
| 15    Sheppard." | 15    this constitute sexual assault in your eyes? |
| 16    Is that you? | 16    MR. BYLER: Object to the form and it's also |
| 17 A  Yup, yes. It is. | 17    calling for a legal opinion. |
| 18 Q  And then it has title "Assistant Professor of Naval | 18 Q  You can answer. |
| 19    Science (Naval ROTC Instructor)." | 19    MR. MATUSZAK: He can answer the question as he |
| 20    Is that correct? | 20    understands sexual assault -- |
| 21 A  Correct. | 21    MR. JONES: Sure. |
| 22 Q  And then it also has an email address. Was that | 22    MR. MATUSZAK: -- but it calls for a legal |
| 23    your email address at the time? | 23    opinion. |
| 24 A  That is, yes. | 24 A  Yeah. I don't -- I guess I wouldn't -- I can't |
| 25 Q  And the same, is that your phone number that you | 25    speculate on whether this would be considered |

|  |  |
|---|---|
| Page 23 | Page 25 |
| 1     were using at the time? | 1     sexual assault or not. |
| 2  A  It looks right, yup. | 2  Q  Okay. Why did you report this to Purdue? |
| 3  Q  Okay. Do you recall -- having read this now, has | 3  A  Well, because a Purdue student came to me and felt |
| 4     your memory been refreshed as to kind of what | 4     that she had been sexually assaulted and so as a, |
| 5     happened when the allegations against Mr. ▇ were | 5     you know, I guess, a staff member or as a, you |
| 6     made? | 6     know, instructor, it was an obligation to report |
| 7  A  Yes. I mean, again, I guess I do -- this confirms | 7     that information. Whether it's true or not, you |
| 8     I did recall that she joined with a friend and then | 8     know, that wasn't my job. But my job was just to |
| 9     now -- yes. Obviously she did reveal to me ▇'s | 9     report it. |
| 10    name at that occasion. And then some minor detail | 10 Q  Understood. Any reason to think that Purdue was |
| 11    there about the incident. | 11    already aware of this? |
| 12 Q  Understood. To your recollection, do you remember | 12 A  I had no reason to think that Purdue was aware, no. |
| 13    if you made this report immediately after the | 13 Q  Understood. I think you already said this, but |
| 14    meeting or if there was time in between? | 14    just for the sake of clarity, did you tell ▇ |
| 15 A  I probably would have made it very soon after the | 15    you were going to take any specific action? |
| 16    meeting just in the interest of not forgetting any | 16 A  Well, I can see at the bottom it looks like I had |
| 17    of the detail but also just the urgency of, you | 17    mentioned to her -- "I reviewed support services" |
| 18    know, getting the information out there. | 18    -- "and ensured that she would not be crossing |
| 19 Q  Understood. If I'm understanding, you can't say | 19    paths in the immediate future with ▇, |
| 20    100 percent if you made it immediately after or 10 | 20    seeing as they are both students in the program |
| 21    minutes after or an hour after? | 21    (sic)." |
| 22 A  No. It certainly would have been the same day. I | 22    So I -- based on that comment, I probably |
| 23    think that would be safe to say. | 23    reassured her that because ▇ was in the program, |
| 24 Q  Okay. So you're confident that ▇ would have | 24    we would work out some accommodations or something |
| 25    reported this to you on April 4th, 2016? | 25    and just so that, you know, she wouldn't, you |

Connor Reporting
A Veritext Company                                800-554-3376

Page 26

1  know -- with him in the program as well -- I guess
2  I don't know what I'm trying to say. Just work out
3  accommodations so that they're not both -- I don't
4  know -- sitting next to each other at Naval Science
5  class or what have you.
6  Q  Understood. So is that something the lieutenants
7  had the authority to do is to kind of move around
8  midshipmen to avoid contact?
9     MR. BYLER: Excuse me. I couldn't hear you.
10    Your voice and connection totally dropped.
11    MR. JONES: Let me try again.
12    MR. BYLER: Now I can hear you.
13 Q  Adam, is that something lieutenants would have the
14    authority to do is to ensure that midshipmen didn't
15    cross paths?
16 A  I wouldn't say lieutenants, but certainly the
17    commanding officer, Captain Hutton, or the
18    executive officer, Commander Remaly. They could
19    make that decision.
20 Q  Understood. Did she indicate to you if you were
21    the first NROTC official she had informed about
22    this?
23 A  I don't recall if she indicated I was the first. I
24    would assume I was the first.
25 Q  Understood. Did she say -- did she say or do you

Page 27

1  recall her saying that she wanted you to file a
2  report on her behalf with Purdue?
3  A  I don't specifically remember that, but I think
4     just sort of to paraphrase the conversation that we
5     had was that, yes. We would need to be filing a
6     report. So she would have been aware of it.
7  Q  Does that include a report with both Purdue and the
8     NROTC?
9  A  I don't specifically recall. Well, as I said, I
10    think I may have verbally notified Commander
11    Remaly, but then there may have been some -- there
12    may have been a Navy email or a notification just
13    to the broader navy R- -- the broader ROTC chain of
14    command.
15 Q  Understood. Do you recall what your plan was for
16    separating ▇ and ▇?
17 A  I don't specifically recall making a plan myself.
18    I do just recall at some point -- at some point
19    Captain Hutton, I think, may have sort of, you
20    know, directed us to keep them separated or -- like
21    I said, there was some accommodations that were
22    made. It could have been, you know, ▇ to not
23    appear at Navy ROTC events during -- you know, in
24    the near future. But I don't think there was
25    anything in particular that I recall instituting.

Page 28

1  Q  Fair enough. Did you directly contact ▇ about
2     these allegations?
3  A  I don't recall directly contacting him, no.
4  Q  Okay. Do you have any recollection who at the
5     NROTC -- if someone at the NROTC contacted Mr. ▇
6     about the allegations?
7  A  Most likely it would have probably been Captain
8     Hutton. He probably would have received, you know,
9     a phone call from Purdue. And then I guess I would
10    assume that he would have been the one to sort of
11    approach ▇ about it.
12 Q  Okay. If you could -- sir, if you could open up
13    Exhibit No. 2.
14    MR. JONES: And for everyone's reference, this
15    should be NSTC-0179.
16    (Defendant's Exhibit 2 was marked for
17    identification.)
18 Q  And I'll represent to you, Mr. Sheppard, this email
19    goes in reverse chronological order, so it might
20    make more sense to read from the bottom up. And
21    let me know when you've had a chance to review.
22 A  Okay.
23    Okay. All finished.
24 Q  Great. Do you recognize these emails?
25 A  I do.

Page 29

1  Q  Do you recall receiving and sending these emails?
2  A  Yup.
3  Q  Specifically there's -- the first email from you or
4     from someone named Adam Sheppard dated Wednesday,
5     April 6th, 2016, at 1:26 p.m. and signed "LT
6     Sheppard."
7     Was that email drafted and sent by you?
8  A  Yes.
9  Q  Having reviewed this, do you recall whether or not
10    you advised Mr. ▇ to take any action regarding
11    Ms. ▇?
12 A  Can you clarify take any action with Ms. ▇?
13 Q  Sure. Let me clarify. That wasn't very clear.
14    Is it correct that you told Mr. ▇ that he
15    wasn't to have any contact with her?
16 A  Yes.
17 Q  Is it true that you told Mr. ▇ that he wasn't to
18    participate in any battalion-related functions?
19 A  Yes.
20 Q  In fact, was there anything in the NROTC program
21    that Mr. ▇ could participate in at this time?
22 A  Not that I would -- it doesn't seem so. It looks
23    like I must have been aware of a letter that
24    Captain Hutton, the CO, had written, which I'm
25    referencing in this email. But, you know, as I

8 (Pages 26 - 29)

Connor Reporting
A Veritext Company                          800-554-3376

USDC IN/ND case 2:17-cv-00033-JPK   document 183-14   filed 02/22/21   page 9 of 10

|  | Page 30 |
|---|---|
| 1 | said, "Per the letter from the CO, you are not |
| 2 | allowed to participate in battalion-related |
| 3 | function." |
| 4 | So that to me would indicate, no. He was not |
| 5 | -- he would not have been permitted to participate |
| 6 | in anything officially battalion sanctioned -- Navy |
| 7 | sanctioned. |
| 8 Q | Understood. And do you see at the bottom where you |
| 9 | -- the last sentence you wrote -- and it starts |
| 10 | with, "I would advise you"? |
| 11 A | Yup. |
| 12 Q | Did you in fact advise ▇ to reach out to |
| 13 | Purdue's -- Purdue's website for resources? |
| 14 A | Yes. |
| 15 Q | Did you tell him that he should seek advocacy and |
| 16 | counseling from Purdue if he needed help? |
| 17 A | Yes. |
| 18 Q | Did you have any reason to think that Purdue |
| 19 | wouldn't offer advocacy or counseling to him if |
| 20 | he'd ask for it? |
| 21 | MR. BYLER: Objection. Speculation. |
| 22 Q | You can answer. |
| 23 A | No. I had no reason to believe that he would not |
| 24 | receive counseling from Purdue. |
| 25 Q | Okay. And just so I understand, you would have |

|  | Page 31 |
|---|---|
| 1 | written this in response to -- you wrote this in |
| 2 | response to Mr. ▇'s email; correct? |
| 3 A | Correct. |
| 4 Q | And it sounds like you were basically just |
| 5 | referring him to what the commander had already |
| 6 | told him; is that fair? |
| 7 A | Yes, that's fair. |
| 8 Q | Okay. Fair to say that it was because of |
| 9 | Ms. ▇'s accusations or allegations that the |
| 10 | commander issued the letter causing Mr. ▇ not be |
| 11 | able to participate in battalion functions as far |
| 12 | as you know? |
| 13 | MR. BYLER: Objection. Objection. Lack of |
| 14 | foundation. |
| 15 Q | You can answer if you understand. |
| 16 A | Yeah. I would assume that -- sorry. What was the |
| 17 | question? |
| 18 Q | Sure. |
| 19 | MR. JONES: Ms. Court Reporter, could you |
| 20 | please read it back to him? |
| 21 | (The previous question was read by the |
| 22 | reporter.) |
| 23 | MR. BYLER: I have an objection to the |
| 24 | question, but please proceed to answer. |
| 25 A | Yes. I think it would be fair to say that would |

|  | Page 32 |
|---|---|
| 1 | have been the impetus behind the letter from this |
| 2 | commanding officer. |
| 3 Q | Thank you, sir. If you could open up what's marked |
| 4 | as Exhibit 3 now. For identification purposes, |
| 5 | this is NSTC-0180 through -0182. |
| 6 | If you could take a moment to review this, sir, |
| 7 | and let me know when you're done. |
| 8 | (Defendant's Exhibit 3 was marked for |
| 9 | identification.) |
| 10 A | Okay. |
| 11 Q | And, again, it might be easier to start from the |
| 12 | bottom up, so -- |
| 13 A | Okay. |
| 14 | Okay. |
| 15 Q | Have you had a chance to review this, sir? |
| 16 A | Yes. |
| 17 Q | Have you seen these emails before? |
| 18 A | Not other than, I guess, when I wrote them. |
| 19 Q | Fair enough. Do you have any reason to think that |
| 20 | you did -- that you didn't write these emails or |
| 21 | receive these responses from Midshipman ▇? |
| 22 A | No. This was definitely, you know, me. |
| 23 Q | Okay. Starting with your first email on April 26th |
| 24 | at -- 2016, at 9:34, why did you ask Midshipman |
| 25 | ▇ for an update on his classes? |

|  | Page 33 |
|---|---|
| 1 A | That was just me checking in on him because he |
| 2 | wasn't -- if I recall, based on the previous email, |
| 3 | you know, he wasn't necessarily around the unit, |
| 4 | coming to the armory, coming to the staff offices. |
| 5 | And so that was just a way to reach out to him and |
| 6 | kind of touch base with him. |
| 7 Q | Understood. Do you do that with all of your |
| 8 | midshipmen? |
| 9 A | Yeah. Not necessarily via email, but it would have |
| 10 | been, you know, more of a discussion in my office. |
| 11 Q | I'm looking at his response, it looks like he's |
| 12 | saying he has mainly C's, but some A's and B's too |
| 13 | or an A or B. |
| 14 | I mean, did he give you any indication that he |
| 15 | was struggling with classes at that time? |
| 16 A | Not based off of this, no. |
| 17 Q | Did he say that he was having trouble concentrating |
| 18 | for any reason? |
| 19 A | Nope. I don't recall that. |
| 20 Q | Did he ever reach out to you and say, you know, "I |
| 21 | need help. I can't do my assignments," or, "I |
| 22 | can't focus on my tests"? |
| 23 A | He may have. Nothing that I can recall. |
| 24 Q | Fair enough, sir. To your knowledge, did he have |
| 25 | to maintain his grades over a certain threshold to |

Connor Reporting
A Veritext Company                                800-554-3376

|  | Page 46 |
|---|---|
| 1 Q | Okay. Did you see this document at the time or |
| 2 | around the time? |
| 3 A | Nothing's -- I don't recall specifically, no. |
| 4 Q | Well, let me go to page 3. |
| 5 A | Okay. |
| 6 Q | And what I'm asking you to look at, "2. Type of |
| 7 | disenrollment (Dropped by institution). Midshipman |
| 8 | ▇ was suspended by the University for one |
| 9 | academic year." |
| 10 | Okay. Do you see that? |
| 11 A | I'm on page 3. Sorry. What's the NSTC number? |
| 12 | -00 -- |
| 13 Q | -0003. |
| 14 A | Oh, no. I only have -11 through -14. |
| 15 | MR. JONES: Right. Phil, your exhibits that |
| 16 | you provided is simply NSTC-0011 through -0014. |
| 17 | And I didn't provide -- or I didn't have that |
| 18 | portion of the Navy record as an exhibit to this |
| 19 | witness, so -- |
| 20 | MR. BYLER: Okay. One of the limitations to a |
| 21 | video deposition. Okay. I don't think I have any |
| 22 | more questions. |
| 23 | MR. JONES: We don't either. John, do you want |
| 24 | to advise him about his rights or I can? |
| 25 | You're muted, sorry. |

|  | Page 47 |
|---|---|
| 1 | MR. MATUSZAK: Mr. Sheppard, they'll be sending |
| 2 | you a transcript electronically for you to review. |
| 3 | You should review it. See if there's any |
| 4 | corrections. If there are any, just call me and |
| 5 | let me know that you've got some corrections. |
| 6 | That's all I've got. |
| 7 | THE WITNESS: Okay. |
| 8 | MR. JONES: Off the record. |
| 9 | MR. BYLER: Can I ask one more question -- |
| 10 | MR. MATUSZAK: Sure. |
| 11 | MR. JONES: Sure. |
| 12 | MR. BYLER: -- of the witness? |
| 13 | MR. JONES: Sure. On the record? |
| 14 | MR. BYLER: Yeah. |
| 15 FURTHER CROSS-EXAMINATION |
| 16 | QUESTIONS BY PHILIP A. BYLER: |
| 17 Q | You graduated from the Naval Academy? |
| 18 A | I did. |
| 19 Q | Okay. And you went into Naval aviation? |
| 20 A | I did. |
| 21 Q | Okay. Do you know where John McCain was in his |
| 22 | class at Naval -- at the Naval Academy? |
| 23 A | I want to say he was the anchor so the very bottom. |
| 24 Q | Okay. |
| 25 | MR. BYLER: Thank you. |

|  | Page 48 |
|---|---|
| 1 | MR. JONES: Off the record. |
| 2 | (Time noted: 12:21 p.m.) |
| 3 | AND FURTHER THE DEPONENT SAITH NOT. |

|  | Page 49 |
|---|---|
| 1 STATE OF INDIANA ) |
| ) SS: |
| 2 COUNTY OF MARION ) |
| 3 |
| 4 | I, Megan M. Bowman, Notary Public in and for |
| 5 | the County of Marion, State of Indiana at Large, do |
| 6 | hereby certify that ADAM SHEPPARD, the deponent |
| 7 | herein, was by me first duly sworn to tell the |
| 8 | truth, the whole truth, and nothing but the truth |
| 9 | in the aforementioned matter; |
| 10 | That the foregoing deposition was taken on |
| 11 | behalf of the Defendants, at 7912 West 26th Street, |
| 12 | St. Louis Park, Hennepin County, Minnesota, on |
| 13 | Wednesday, May 20, 2020, pursuant to the Federal |
| 14 | Rules of Civil Procedure; |
| 15 | That said deposition was taken down in |
| 16 | stenograph notes and afterwards reduced to |
| 17 | typewriting under my direction, and that the |
| 18 | typewritten transcript is a true record of the |
| 19 | testimony given by the said deponent; and that |
| 20 | signature was requested and thereafter presented to |
| 21 | said deponent for his/her signature; |
| 22 | That the parties were represented by their |
| 23 | counsel as aforementioned. |
| 24 | I do further certify that I am a disinterested |
| 25 | person in this cause of action, that I am not a |

Connor Reporting
A Veritext Company          800-554-3376