**EXHIBIT SJM 38**

# Exhibit F

USDC IN/ND case 2:17-cv-00033-JPK document 153-38 filed 02/02/21 page 2 of 8

Page 1

```
                UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
                    INDIANAPOLIS DIVISION
                  Case No. 2L17-cv-33-JPK
```

JOHN DOE,                              )
                                       )
         Plaintiff,                    )
                                       )
         -vs-                          )
                                       )
PURDUE UNIVERSITY, PURDUE              )
UNIVERSITY BOARD OF TRUSTEES,          )
MITCHELL ELIA DANIELS, JR., in         )
his official capacity as               )
President of Purdue University,        )
ALYSA CHRISTMAS ROLLOCK, in her        )
official capacity at Purdue            )
University, KATHERINE                  )
SERMERSHEIM, in her official           )
capacity at Purdue University,         )
                                       )
         Defendants.                   )

         VIDEOCONFERENCE DEPOSITION OF CRAIG REMALY

    The videoconference deposition upon oral
examination of CRAIG REMALY, a witness produced
and sworn before me, Craig Williams, RPR, CMRS, a
Notary Public in and for the County of Marion,
State of Indiana, taken on behalf of the
Defendants, at the offices of Stuart & Branigin,
LLP, 300 Main Street, Suite 900, Lafayette,
Tippecanoe County, Indiana, on the 21st day of May,
2020, at 9:00 a.m., pursuant to the Federal Rules
of Civil Procedure with written notice as to time
and place thereof.

**Page 6**

1  MR. BYLER: Tyler, one thing. I don't mean
2  to interject. Can we continue what we did
3  yesterday and make sure we identify each
4  document by the Bates stamp number, because that
5  way it makes clear what the documents are. You
6  seemed to be very happy with that yesterday.
7  MR. JONES: I have no objections to that,
8  Phil, I'm happy to accommodate.
9 Q  I'm going to assume you understand a question if
10  you answer it. But if you don't, please ask me
11  or ask for clarification and I'll rephrase it.
12  If you need a restroom break, please ask. This
13  isn't a prison.
14  I want to confirm, we're here for a
15  deposition today. Plaintiff's name is John Doe
16  publicly. He's proceeding under a pseudonym, as
17  is his accuser. What stays in this room is
18  confidential.
19 A  So I can refer to them by their names?
20 Q  Right. So for the rest of the deposition I'm
21  going to refer to them both as ▌▌▌▌▌ or
22  ▌▌▌▌▌ and ▌▌▌▌▌. You can as
23  well. I just ask that outside of this
24  deposition we don't use those names. You can
25  refer to them as John Doe or Jane Doe.

**Page 7**

1 A  Okay.
2 Q  Sir, can you please give me your business
3  address.
4 A  It's the Armory at Purdue University. The
5  street address is 812 3rd, West Lafayette.
6 Q  Excellent. Is it okay that if anyone needs to
7  contact you, they do so in care of John Matuszak
8  here?
9 A  Yes.
10 Q  Sir, can you please give a brief educational
11  background?
12 A  My education?
13 Q  Yes, sorry.
14 A  Okay. I'm a 1986 graduate of Rossville High
15  School, just down the road from here. A 1990
16  graduate from Purdue with a Bachelor's in
17  aeronautical engineering. Graduated from the
18  Navy War College in 2003, I believe, with a
19  Master's degree.
20 Q  Excellent. Thank you, sir.
21  How long have you been with the Purdue
22  NROTC?
23 A  Since July of 2013.
24 Q  So approximately seven years?
25 A  Yes.

**Page 8**

1 Q  Between August 2015 and August 2016, what was
2  your title with the Purdue NROTC?
3 A  I was executive officer.
4 Q  What were the executive officer's
5  responsibilities and duties at that time?
6 A  The XO is the second in command. I guess my
7  primary role as the XO would be twofold. One is
8  as the principal advisor to the CO, and then
9  pretty much like the daily routine operations of
10  the unit.
11 Q  Understood, sir. Do you oversee lieutenants?
12 A  I did. I was their supervisor.
13 Q  Understood.
14  Were you the direct supervisor?
15 A  Yes.
16 Q  Sir, I know there was some confusion about
17  whether or not you are retired. You are indeed
18  still with the Purdue NROTC?
19 A  I am, I'm active duty still.
20 Q  Are you planning on retiring soon?
21 A  My plans or the Navy's plans? I'm coming up on
22  mandatory retirement, so January 1st is my
23  retirement date.
24 Q  Understood. This year? Of next year.
25 A  Next year.

**Page 9**

1 Q  Very good.
2  Can you for a layperson kind of give an
3  overview of the command structure of the Purdue
4  NROTC at the time of the incident, so 2015-2016?
5 A  Sure, there's the CO, XO, and then we have four
6  company officers, and three of them are Navy
7  lieutenants, one is a Marine captain. The
8  Marine captain has all the Marine students under
9  him. The Navy students are split into three
10  separate companies; Alpha, Bravo, Charlie, under
11  one of the lieutenants. The Marine also had a
12  gunnery sergeant assigned to him, an assistant
13  Marine instructor. And then we have one other
14  lieutenant who is the battalion officer.
15  So the student leadership; the student CO,
16  XO, CMC, commanding acting chief, and the
17  student department heads all report to the
18  battalion officer, and he is nominally our
19  operations officer. That's it for the active
20  duty.
21  In addition, we have two Navy civilians.
22  One is the HRA, the human resources assistant.
23  At the time, I believe it was Jesse Christman,
24  and he would have been our admin officer in
25  charge of -- his responsibilities would be

Connor Reporting
A Veritext Company          800-554-3376

## Page 10

1  taking care of just the routine paperwork.
2      We have a supply clerk. Pretty much
3  exactly what the title is. He issues uniforms,
4  textbooks, oversees all of our Navy money in
5  terms of our Navy operating budget. And then we
6  have one Purdue staff member, the CO's
7  assistant.
8  Q  Thank you, sir.
9      At the time in question, Rodney Hutton was
10  the commanding officer; correct?
11  A  Yes.
12  Q  Was he your current direct supervisor?
13  A  Yes, he was my direct supervisor.
14  Q  Understood.
15      And underneath you it's my understanding
16  that between August 2015 and August 2016 Adam
17  Sheppard was the battalion supervisor of the
18  battalion?
19  A  I believe so, yes.
20  Q  Then do you know the names of the three other
21  lieutenants?
22  A  Let's see, Lieutenant Kyle Willstatter was Alpha
23  Company. Lieutenant Megan Redlawsk, Megan May,
24  was Charlie Company. And Bravo was either
25  Lieutenant Rob Etter or -- I cannot think of his

## Page 11

1  name. It will come to me.
2  Q  Fair enough.
3  A  I think it was Rob Etter. I don't remember
4  exactly the timing.
5  Q  Was ▮▮▮ in Alpha Company?
6  A  Yes.
7  Q  Was ▮▮▮ also in Alpha Company?
8  A  Yes, I believe so.
9  Q  Do you know who their student leadership was in
10  Alpha Company at that time?
11  A  No, I don't.
12  Q  Understood.
13      Do NROTC program requirements require
14  midshipmen to maintain a semester and cumulative
15  GPA above a 2.5?
16  A  That's the current minimum requirement. At this
17  time I think it was 2.5 per semester and 2.0
18  cumulative. I don't remember exactly when the
19  change took place.
20  Q  Understood.
21      Is it correct to say that if a midshipman
22  doesn't meet that threshold, they cannot
23  complete the program?
24      MR. BYLER: Objection to the form of the
25  question. Hypothetical.

## Page 12

1  Q  You can answer.
2  A  I'm sorry?
3  Q  You can answer.
4  A  There's no definite answer to that. Can I ask
5  you a question?
6  Q  Sure.
7  A  So are you trying to figure out -- because I
8  know Midshipman ▮▮▮ was below academic
9  standards. So are you trying to see if he would
10  have been able to continue?
11  Q  Sure. What would you say to that?
12  A  What I would say to that is, I have seen
13  students with worse GPAs succeed and students
14  with better GPAs fail. So I have no idea.
15  Q  You can't say either way?
16  A  No.
17  Q  Understood.
18      Now, I understand that NROTC, at least at
19  the time and presumably now, has something
20  called a performance review board?
21  A  Yes, that's true.
22  Q  Can you give me an idea of what steps the Navy
23  took at that time to get to an NROTC review
24  board?
25  A  There are some general guidelines in the ROD,

## Page 13

1  the Regulations for Officer Development. I
2  don't know if you have reviewed those or not.
3  Like I said, those are recommendations. In some
4  cases, some cases it's a requirement.
5      Generally for any students who are having
6  any kind of problems, our goal is to put in
7  place some sort of remediation with them in
8  order to address that problem, fix it, and get
9  them through the program to admission.
10      The CO has a few tools at his disposal. He
11  can place a student on warning or probation
12  without a PRB. Anything more extreme than that,
13  a leave of absence or disenrollment requires a
14  PRB.
15      So how the process works, if any student
16  had any kind of problems, academically,
17  physically, morally, you know, if they were
18  caught cheating on exam, arrested, anything
19  along those lines, generally what would happen
20  is the company officer would make the
21  recommendation, Midshipman X is below academic
22  standards, I recommend academic warning. And I
23  would review those with the company officer, and
24  then we would pass those recommendations on to
25  the CO. The CO makes the ultimate decision. At

Connor Reporting
A Veritext Company                    800-554-3376

Page 42

1  was -- I don't remember if this was all Fourth
2  Class midshipmen or all Fourth Class Navy
3  midshipmen. Definitely across three Navy
4  companies, possibly the Marine company.
5 Q Understood, sir.
6    Just a miscellaneous question for my
7  edification. Are all freshmen automatically
8  Fourth Class midshipmen entering the NROTC?
9 A As a rule of thumb, yes. Determining whether
10  someone is a -- we've had midshipmen who were --
11  I think we had one who was classified as a
12  junior by Purdue who was a Fourth Class. It has
13  to do with how many of the Naval science
14  requirements they had met. So if someone picks
15  up a scholarship late, say between their
16  sophomore and junior year and shows up as a
17  junior, they will be a Fourth Class.
18 Q When you say pick up a scholarship, do you mean
19  join the NROTC?
20 A Yes, actually, because you don't have to have a
21  scholarship to join.
22 Q Understood.
23 A Yes.
24 Q So Fourth Class doesn't correlate directly to
25  being a freshman, and Third Class isn't a

Page 43

1  sophomore, it just depends on military credit?
2 A That's probably 99 percent correct.
3 Q Okay, thank you.
4    Sir, it says here that the board closed for
5  deliberations at 10:07 and reconvened at 10:11;
6  is that correct, to the best of your knowledge?
7 A To the best of my knowledge. I mean, that's
8  what we reported, so I'm sure it's correct.
9 Q Did you leave the room for your deliberations?
10 A No, we never leave the room for deliberations.
11 Q Did the midshipman leave the room?
12 A The midshipman and the recorder leave the room.
13  Deliberations are amongst board members only.
14 Q Understood.
15    Do you remember what you discussed, if
16  anything, during those deliberations?
17 A I don't know if I should answer that. The
18  deliberations and the voting are supposed to be
19  secret.
20    MR. JONES: Mr. Matuszak, is that fair
21  game?
22    MR. MATUSZAK: Well, the deliberations --
23  the party of interest would be Mr. ▊, it
24  would be his rights protected. So I'll leave it
25  up to Mr. ▊'s attorney to decide if he wants

Page 44

1  to release that information.
2    MR. BYLER: I'd have to consult with the
3  client. I'm not quite aware of what
4  specifically that referred to, because we've
5  been disclosing everything basically. And
6  there's that document, Bates stamp 42, where
7  ▊ authorizes the disclosure of
8  everything from the university to the Navy, so I
9  guess I'm a little puzzled that I'd have to talk
10  to the client in terms of what did that refer
11  to. This hasn't been brought up before to my
12  attention. I'm sorry I have to give that
13  answer.
14    MR. JONES: It sounds like, Phil -- off the
15  record briefly.
16    (Off the record discussion.)
17    MR. MATUSZAK: Mr. Williams, would you
18  please reread the question to the deponent.
19    (The requested text was read by the
20  reporter as follows: "Do you remember what you
21  discussed, if anything, during those
22  deliberations?")
23 A In this case all we discussed was whether or not
24  he had been suspended from the university and if
25  we were required by the ROD to disenroll him.

Page 45

1 Q Before making your recommendations, did you note
2  any mitigating circumstances in this case?
3 A No.
4    MR. JONES: Off the record briefly. Let's
5  take a five-minute break and let everyone use
6  the restroom and get a drink if they need it.
7    (A recess was taken between 10:16 a.m. and
8  10:34 a.m.)
9 BY MR. JONES:
10 Q Back on the record. Are you ready to proceed?
11 A I am.
12 Q I just have a few small questions.
13    During the minutes we just talked about
14  where you and the other members conferenced
15  together during the PRB, was there any
16  discussion of Lieutenant Redlawsk's report or
17  conclusions?
18 A No.
19 Q Was there any discussion of sexual misconduct by
20  ▊?
21 A No. And again, both of these answers are to my
22  recollection.
23 Q Sure. I only ask that you answer to the best
24  you remember.
25    In fact, is it correct that the discussion

12 (Pages 42 - 45)

Connor Reporting
A Veritext Company                    800-554-3376

|  |  |
|---|---|
| Page 46 | Page 48 |

**Page 46**

1  was limited solely to the fact that ▇
2  ▇ had been suspended by Purdue University?
3  A  Yes.
4  Q  I'm sorry?
5  A  Yes.
6     MR. JONES: Nothing further at this time.
7  CROSS-EXAMINATION,
8     QUESTIONS BY PHILIP A. BYLER:
9  Q  Good morning. Again, my name is Philip Byler,
10    I'm counsel to the Plaintiff, John Doe, who is
11    ▇, versus Purdue University. Thank
12    you for being here today.
13       I just want to go back to some documents,
14    and I'll ask that you have them in front of you
15    before you answer questions.
16 A  Yes.
17 Q  Let's go back to the document starting with
18    Bates stamp NSTC-0011.
19 A  So this is out of the other package?
20    MR. JONES: Phil, I separated his exhibits
21    between our exhibits and yours. Are you
22    referring to our exhibits now?
23    MR. BYLER: Well, this one I think you
24    presented to him as Exhibit C, but I'm not sure.
25    But you did present to him the August 10, 2016,

**Page 47**

1  document.
2     MR. JONES: Would you give the Bates No.
3  again?
4     MR. BYLER: NSTC-0011 is the first page.
5     MR. JONES: You're referring to the
6  Performance Review Board summary.
7     MR. BYLER: Yes. You asked some questions.
8  I have some follow-up questions. Okay?
9     MR. JONES: No, that's fine. I just wanted
10 to make sure he had the right document in front
11 of him.
12    MR. BYLER: No, I appreciate you're making
13 sure.
14    MR. JONES: You were just looking at it.
15 It will have Exhibit E at the bottom of it. We
16 were just talking about it.
17 A  I'm sorry, I have it.
18 Q  Okay. Do you have it in front of you?
19 A  I do.
20 Q  I just want to verify. I think you testified
21    already that the signature on the second page of
22    this document, which is 0012, is your signature.
23 A  It is.
24 Q  And it's also signed by one of the voting
25    members of the Performance Review Board, along

**Page 48**

1  with you?
2  A  I'm sorry?
3  Q  Are also there signatures by two other voting
4     members of the Performance Review Board?
5  A  Yes, they signed it.
6  Q  This document is dated August 10, 2016?
7  A  Yes.
8  Q  Was it on or about August 10, 2016, that the
9     Performance Review Board was held at the Armory
10    at Purdue?
11 A  It would have been a few days prior to that, but
12    yes.
13 Q  Just looking at the listing of documents on the
14    first page, there's 12 items here; correct?
15 A  Twelve enclosures, yes.
16 Q  I just want to note, No. 9 is the university
17    investigative report; correct?
18 A  Correct.
19 Q  And No. 10 is the final determination from the
20    Dean of Students. That's the Purdue Dean of
21    Students; correct?
22 A  Correct.
23 Q  And No. 11 is Midshipman ▇ s statement of
24    appeal of the final determination; correct?
25 A  That is correct.

**Page 49**

1  Q  Did you understand that Mr. ▇ did appeal a
2     couple times the university determination?
3  A  Yes, I understand that.
4  Q  And No. 12 was the university response to
5     Midshipman ▇'s appeal.
6  A  That's correct, yes.
7  Q  Let me turn to paragraph 1, which I'll publish
8     it and then I'll ask you a question about it.
9     "For references A through C, a Performance
10    Review Board was held 9 August 2016 to determine
11    Midshipman ▇'s aptitude for
12    commission service while enrolled in the NROTC
13    program. Midshipman ▇ was suspended by
14    Purdue University."
15       That's what this document states; correct?
16 A  That's correct.
17 Q  And so it was August 9, 2016, that the
18    Performance Review Board was held?
19 A  Yes.
20 Q  And there's no other statement after "Midshipman
21    ▇ was suspended by Purdue University" in that
22    paragraph; correct?
23 A  I'm sorry, there's no statement?
24 Q  After it says, "Midshipman ▇ was suspended by
25    Purdue University," there's nothing else stated

|  | Page 50 |  | Page 52 |
|---|---|---|---|
| 1 | in this paragraph. | 1 Q | What does PNS refer to? |
| 2 A | That is correct. | 2 A | Professor of Naval Science. |
| 3 Q | I want to go to the second page of the document. | 3 Q | That in this instance is referring to |
| 4 A | Okay. | 4 | Mr. Hutton? |
| 5 Q | And to paragraph 10 where it says, "Board | 5 A | It is. |
| 6 | Recommendation." I'm going to publish it again | 6 Q | Another document you were presented, it might |
| 7 | and then I'll have some questions. "By a vote | 7 | have been Exhibit C, I'm not sure, but it's |
| 8 | of three to nothing, the Performance Review | 8 | Bates stamped NSTC-140 to NSTC-142. It's a |
| 9 | Board found that Midshipman Fourth Class ▌ | 9 | series of emails. |
| 10 | was suspended by Purdue University by vote of | 10 A | NSTC-0042? |
| 11 | three to nothing. The Board recommends that | 11 Q | 0140 to 0142. I apologize. |
| 12 | Midshipman ▌ be disenrolled from the ROTC | 12 A | The emails. |
| 13 | program." | 13 Q | Yes. |
| 14 | Did I read that correctly? | 14 A | Okay, I have it. |
| 15 A | That is correct. | 15 Q | Looking at the document, do you see that this |
| 16 Q | And that was the board's recommendation? | 16 | goes in reverse chronological order? |
| 17 A | Yes. | 17 A | I know that. |
| 18 Q | Is there anything else stated here in this | 18 Q | So on 142 are some questions that Mr. ▌ |
| 19 | document which you signed with respect to the | 19 | raises with Kyle Willstatter. |
| 20 | board recommendation? | 20 A | Yes. |
| 21 A | No. | 21 Q | And NSTC-141, do we see Mr. Willstatter's |
| 22 | (Deposition Exhibit 1 previously marked for | 22 | response that ▌ copied to you? |
| 23 | identification.) | 23 A | Yes. |
| 24 Q | Could the witness be provided the document which | 24 Q | That would indicate that Mr. Willstatter decided |
| 25 | was previously marked and shown to witnesses | 25 | to copy you on his responses; correct? |

|  | Page 51 |  | Page 53 |
|---|---|---|---|
| 1 | yesterday, starting with NSTC-0001 through | 1 A | Yes. |
| 2 | NSTC-0004. | 2 Q | You were asked a few questions I think about |
| 3 A | Okay, I have it. | 3 | this document. I want to focus on paragraph 2 |
| 4 Q | My first general question, do you recall | 4 | in Mr. Willstatter's email copied to you. I'll |
| 5 | reviewing this document in the time period that | 5 | publish it and then ask some questions. PRB |
| 6 | the document is dated? | 6 | means Performance Review Board; correct? |
| 7 A | Not specifically, no, but I would have. | 7 A | Correct. |
| 8 Q | Go to page 3. | 8 Q | And paragraph 2 says, "The PRB is not about the |
| 9 A | Okay. | 9 | circumstances surrounding your suspension, it is |
| 10 Q | Paragraph 2 at the bottom of the page. | 10 | about the fact that you have been suspended. |
| 11 A | Yes. | 11 | There is no reason to re-litigate the |
| 12 Q | Do you see -- and I'll publish it -- "Type of | 12 | university's decision. The fact is that you are |
| 13 | disenrollment brought by institution. | 13 | suspended, and the ROD requires disenrollment |
| 14 | Midshipman ▌ was suspended by the university | 14 | for any case where a student is suspended. The |
| 15 | for one academic year." | 15 | black and white nature of this PRB is why you |
| 16 A | That's correct. That's what it says. | 16 | are allowed to waive, if you so choose, any |
| 17 Q | Is there anything else in paragraph 2? | 17 | witnesses or other persons you would want to |
| 18 A | No, there's not. | 18 | have present. Please let me know their names |
| 19 Q | Paragraph 9 on the next page. Paragraph 9, I'll | 19 | and the reason. You have the right to bring any |
| 20 | publish it. "PNS Recommendation. Recommend | 20 | witnesses you want; however, unless they're |
| 21 | disenrollment of Midshipman ▌ due to | 21 | going to state contrary to facts that you have |
| 22 | suspension by the university for one academic | 22 | not been suspended by the university, it will |
| 23 | year." | 23 | basically be a waste of time." |
| 24 | Is that what it says? | 24 | That's what the paragraph states; correct? |
| 25 A | Yes. | 25 A | Yes. |

14 (Pages 50 - 53)

Connor Reporting
A Veritext Company                       800-554-3376