**PL Opp DSJ 1**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

## STATEMENT OF FACTS AND GENUINE DISPUTES

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and N.D. Ind. L.R. 56-1(b)(2), the following Statement of Genuine Facts and Disputes supports John's opposition to Defendants' Motion for Summary Judgment. Incorporated herein by reference are: (i) Plaintiff's Statement of Material Undisputed Facts found in Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment (pp. 1-30) and in Plaintiff's Appendix in Support of Plaintiff's Motion for Partial Summary Judgment as SJM 1; and (ii) the exhibits contained in Plaintiff's Appendix In Support of Plaintiff's Motion for Partial Summary Judgment. Those exhibits will continue to be referenced with the same nomenclature as used in Plaintiff's Motion for Partial Summary Judgment. Additional exhibits in opposition to Defendants' Motion are contained in Plaintiff's Appendix in Opposition To Defendants' Motion For Summary Judgment and are referenced as "Pl Opp DSJ." "Defendants' Statement of Material Facts Not In Dispute," which is anything but not in dispute, does not have numbered paragraphs and thus will have to be

discussed by reference to the section and page numbers of Defendants' Memorandum of Law in

support of Defendants' Motion For Summary Judgment (Dfs. MOL p. __).

**A.**     **Defendants' "Background" Statement.**

    **1.**  **Defendants' Misstatement, By Omission, Of**
       **"The Relationship Between NROTC and Purdue."**

Defendants begin by purporting to describe the relationship between the Purdue Navy

ROTC ("NROTC") and Purdue University ("Purdue"), asserting that the Purdue NROTC and

Purdue are separate entities with separate requirements.  (Dfs. MOL pp. 2-4.) In doing so,

Defendants omit record evidence that demonstrates how Purdue and Purdue NROTC intersected.

According to Rodney Hutton, the Commanding Officer of the Purdue NROTC, the NROTC

required continuous university enrollment, and he had dual reporting responsibilities -- to the Navy

and to Purdue.  (SJM 35: Hutton Dep tr 7, 21-22.)  Consequently, when Jane Doe alleged that John

engaged in sexual misconduct, Commander Hutton referred the Navy "investigation" to Purdue.

(Pl Opp DSJ 2: Hutton Dep 14, 22.)  After Purdue suspended John, and Vice President Rollock

upheld that decision, NROTC called John before a Performance Review Board that convened on

August 10, 2016, and based solely on Purdue's decision (suspension), John was disenrolled from

the NROTC.  (SJM 35: Hutton Dep tr 22, 66-67, 71-73; SMJ 36: Hutton G, August 10, 2020

Performance Review Board document (NSTC 00011-0012); SMJ 36: Hutton H, August 2020

ROTC Appointment Termination and Disenrollment Authorization (NSTC 0001-0004); SJM 38:

Remaly Dep tr 49-50, 54-55; SJM 39: Willstatter Dep tr 42-43; SJM 40: Remaly D/Willstatter C,

E-mail by Staff Lieutenant Willstatter (NSTC 0140-0142).)

According to Commander Hutton, Navy regulations required that he disenroll John from

NROTC because NROTC had a requirement of continuous university enrollment.  Commander

Hutton: (i) did not make a determination that John had committed sexual misconduct; (ii)

acknowledged that John submitted a statement as part of the NROTC disenrollment proceeding that he (John) was not guilty of sexual misconduct; and (iii) confirmed that the only investigation report listed in the disenrollment document was the Purdue investigation report.  (SJM Dep 35: Hutton Dep tr 7, 22, 24, 70, 73.)

   **2.  Defendants' Misstatement, By Omission, of "John and Jane Doe."**

   Defendants purport to describe the relationship between John and Jane Doe, but say only that they were both Purdue freshmen and first-year midshipmen in the Purdue Navy ROTC.  (Dfs. MOL p. 4.)  What Defendants omit are details in and timing of the John-Jane Doe relationship that figure into an assessment of credibility and John's due process and Title IX claims.  Starting in the 2015 Fall semester and continuing into January 2016, John and Jane Doe had a dating relationship that included their having consensual sexual intercourse 15 to 20 times over a three-month period from October to December 2015; that it was John's first sexual relationship but not her first sexual relationship; that on December 13, 2015, Jane Doe attempted suicide in front of John, after which all sexual activity ended; that in mid-to late January 2016, Jane Doe began to distance herself from John and their dating relationship ended; that Purdue's records show in February 2016, John reported Jane Doe's suicide attempt to a Purdue Resident Assistant; that from November 2015 to March 2016, Jane Doe made no reports to the university or to the police about any alleged sexual assault by John; and that other than with Jane Doe, John had no other sexual misconduct disciplinary cases at Purdue.   (SJM 2: Second Amended Complaint ¶ 23; SJM 3: Df. Answer ¶ 23; SJM 7: Sermersheim Dep tr 12-14 & SJM 33: 02/16/2016 Student of Concern Report (PU 32-33); SJM 8: John Doe 02/18/2021 Affidavit ¶¶ 1-12; SJM 3: Df. Answer ¶¶ 4, 82; SJM 6: Rollock Dep tr 56; SJM 15: Oliver Dep tr 77; Pl Opp DSJ 8: John Doe Dep tr 91-93.)

Defendants acknowledge John was the recipient of a National NROTC scholarship. Defendants omit that the scholarship paid for tuition and other benefits, John had to apply for the scholarship to get it, the scholarship was not awarded to everyone, and Commander Hutton signed John's scholarship papers.  (Pl Opp DSJ 1: Hutton Dep tr 32-34; Pl Opp DSJ 3: Hutton D (NSTC 0055 – 0060).)  As will be discussed below (pp. 27-28, 29-30), John did not lose his ROTC scholarship for good in May 2016 and did not until the August 2016 disenrollment due to the suspension; John's loss of the ROTC scholarship was not the result of bad grades.

**B.    Jane Doe's Initial Contacts About John's Alleged Sexual Misconduct.**

Defendants' treatment of Jane Doe's reporting of John's alleged sexual misconduct (Dfs. MOL pp. 5-8) begins with Jane Doe supposedly talking to Midshipman A in mid-March 2016 about John sexually abusing Jane Doe; however, the story told by Midshipman A, a friend of Jane Doe, about talking for hours with Jane Doe in mid-March 2016 and Jane Doe being upset about John engaging in sexual misconduct is a fabrication.  *First*, Midshipman A testified that she and Jane Doe reviewed text messages together which supported Jane Doe's allegations against John – only according to both Purdue investigators and John, Jane Doe submitted that she deleted the texts and did not have them.  John was the one who produced the texts to the Purdue investigators and cited them as showing his innocence of the allegations.  *Second*, Midshipman A at first denied she was interviewed by Purdue investigators but then changed her story when shown investigator notes, stating it "must have slipped my mind" (Midshipman A was No. 4 in the list of interviewees in the investigation report); and further, Midshipman A did not tell the Purdue investigators about supposedly consoling Jane Doe one month earlier, in mid-March 2016, about alleged sexual misconduct by John.  *Third*, Midshipman A said that Jane Doe told her that the two alleged sexual misconduct incidents occurred in Fall 2015.  The supposed conversation that Midshipman A had

[4]

with a supposedly upset Jane Doe occurred months later in mid-March 2016 and were about John, a male whose virginity had been taken by Jane Doe.  (Pl Opp. DSJ 4: Midshipman A Dep tr 13-14, 41-47; SJM 18: Amberger/Oliver 25 PU078-079; SJM 15: Oliver Dep tr 50-54; SJM 22: Rollock/Sermersheim/Amberger/Oliver 14, Investigation Report with transmittal e-mail (PU 373-391) -- PU 376; SJM 7: Semersheim Dep tr 34; SJM 5: Plaintiff John Doe Dep. tr. 111-114.)

Defendants state that on April 4, 2016, Jane Doe told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John and that Lieutenant Sheppard informed his superior officers Commander Hutton and Executive Officer Craig Remaly about Jane Doe's allegations.  But Defendants omit that Lieutenant Sheppard could not recall in his deposition when in time the two instances of alleged sexual assault by John occurred and that Lieutenant Sheppard sent an e-mail to John stating that John was not to participate in NROTC functions and to maintain distance from Jane Doe.  (SJM 34: Shepard Dep tr 21-25, 28-30; SJM 43: Sheppard 2, Sheppard E-Mail (NSTC 0179); Pl Opp. DSJ 5: Sheppard Dep tr 42-43.)

Also on April 4, 2021, Commander Hutton reported Jane Doe's sexual misconduct allegations to Purdue's Office of the Dean of Students, reflecting the interrelationship of Purdue and the Purdue NROTC.  (Pl Opp. DSJ 6: PU 0731-0732 (Dfs. SJ Ex. K).)  It was Purdue's Dean of Students Sermersheim who on April 4, 2021, advised Purdue's CARE Director Bloom of Jane Doe's allegations.  (Pl Opp. DSJ 6: PU 0731-0732 (Dfs. SJ Ex. K).)

Defendants state that on April 5, 2021, Commander Hutton sent a letter to John informing him that John was placed on interim leave of absence, but Defendants mischaracterize and do not accurately state the letter.   The letter states that John was being placed on "an Interim Leave of Absence (ILOA) *due to your pending university investigation*" and that "[f]urther administrative action, potentially to include Performance Review Board (PRB), will be taken *on completion of*

*the university investigation*." (Pl Opp DSJ 7: NSTC 0154 & DSJ Ex. N; italics added.) The April 5, 2016 letter further states that John is prohibited from participating in NROTC activities, but would remain enrolled in NROTC although would not receive a stipend during the summer. (Pl Opp DSJ 7: NSTC 0154 & DSJ Ex. N.)

Defendants state that on April 5, 2016, Jane Doe met with Monica Bloom, Director of CARE, and that on April 5, 2016, Ms. Bloom sent, to Purdue Dean Sermersheim and Purdue Vice President Rollock, an e-mail about the meeting with Jane Doe concerning Jane Doe's allegations and desire for a "no contact" order to apply to John to cover a number of university facilities. Defendants state that CARE Director Bloom's April 5, 2016 e-mail included the "Notice of Allegations" that Ms. Bloom drafted that the "Notice of Allegations" stated that: (i) in or around November 2015 Jane Doe stayed the night in John's room and in the morning woke up to John groping her while she was fully clothed; and (ii) John told Jane Doe he had digitally penetrated her on another night in November 2015 while Jane Doe was asleep, an incident about which Jane Doe had not known. Defendants omit that Vice President Rollock would acknowledge receipt of Ms. Bloom's April 5, 2016 e-mail and that CARE Director Bloom would act as Jane Doe's support person during the Purdue disciplinary case. (SJM 9: Bloom Dep tr 12-17; SJM 11: Bloom 2, Bloom E-Mail (PU 726-728); SJM 12: Bloom 3, Rollock E-Mail (PU 729-730); SJM 15: Oliver Dep tr 38-39.) Also missing from Defendants' account of Jane Doe making her allegations against John in early April 2016 is any mention of April as Sexual Assault Awareness Month at Purdue. (SJM 3: Df. Answer ¶ 24; SJM 9: Bloom Dep tr 6-11; SJM 14: Amberger Dep tr 10; SJM 15: Oliver Dep tr 10-11.)

**C.**     **The Purdue Disciplinary Case (What Defendants Call "Purdue's Investigation").**

[6]

Defendants turn to "Purdue's investigation," which in fact addresses the entire Purdue disciplinary case ending in the suspension of John. (Dfs. MOL pp. 8-16.) For John's due process claim, Plaintiff's Statement of Material Undisputed Facts in support of Plaintiff's Motion For Partial Summary Judgment states the pertinent undisputed facts of the Purdue disciplinary case at pp. 3-23, 29-30.

### 1. April 11, 2016: John Doe Notified Of Jane Doe's Allegations.

Defendants state correctly that on April 11, 2016, Dean Sermersheim issued a letter notifying John that Purdue has been made aware of allegations, including sexual allegations, regarding John's conduct toward "Jane Doe" that if substantiated, might constitute a violation or violations of Purdue's *Anti-Harassment Policy (III, Ch. 1)* and had issued to John a no-contact directive. (Dfs. MOL pp. 8-9; SJM 3: Df. Answer ¶ 25; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19; SJM 41: Custodian Klingerman Dep tr 25.) Defendants do not acknowledge that the university's no contact directive prohibited John from entering the university dining hall most used by John and Jane Doe. (SJM 3: Df. Answer ¶ 32.)

Defendants inaccurately describe what Dean Semersheim's April 11, 2016 letter further stated, which was that Purdue "had elected to investigate the allegations *in absence of a formal complaint*" (italics added), that Ms. Erin Oliver, Associate Director of Purdue's Office of Institutional Equity, and Mr. Jacob Amberger, Investigator in Purdue's Office of Institutional Equity, were appointed to investigate the matter and that John was directed both to give a written response to Jane Doe's allegations within ten calendar days and to refrain from discussing this matter or having any contact with Jane Doe. (SJM 3: Df. Answer ¶ 26; SJM 13:

[7]

Semersheim/Rollock 10 (PU 568-572); SJM 7: Sermersheim Dep tr 17-19; SJM 14: Amberger Dep tr 10-14; SJM 15: Oliver Dep tr 6-7.)

Defendant state correctly that Dean Semersheim's April 11, 2016 letter included a two-page document entitled "Information for Student Respondents." (Dfs. MOL pp. 8-9; SJM 3: Df. Answer ¶ 27; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.) But Defendants' summary leaves out or inaccurately states some parts of the "Information for Student Respondents" document: (i) the Investigator is to be neutral; (ii) a support person could be brought by Respondent to any meeting with the Investigator; (iii) a Respondent would be told enough information about the allegations to enable him to respond; (iv) the privacy of both parties would be respected; (v) the Investigator would first interview the complaining party and once the Investigator understands the allegations, the Respondent would be asked questions; (vi) the Investigator would then interview other witnesses and review documentation deemed relevant; (vii) the Investigator would prepare a report that would be shared with the Dean of Students but not with the parties or the witnesses; (viii) the Investigator's report would make findings and recommend whether a violation of Defendant Purdue's *Anti-Harassment Policy* had occurred and what sanction was appropriate; (ix) the Dean of Students would chair a meeting of a three-person panel of the Advisory Committee on Equity; (x) each party would be given the opportunity separately to meet with the panel meeting in order to give the decision-maker (the Dean of Students) and the panel members the opportunity to meet with the parties and the Investigator after reviewing the Investigator's report; (xi) the panel members would make a recommendation to the Dean of Students but the determination would be left to the discretion of the Dean of Students; (xii) if the Dean of Students would determine whether there was a violation of Purdue's *Anti-Harassment Policy*, the Dean of Students would impose sanctions. (SJM 3: Df.

[8]

Answer ¶ 28; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.)

Not mentioned in Defendants' account was that accompanying Defendant Dean Semersheim's April 11, 2016 letter was a one half-page document entitled "Notice of Allegations." (SJM 3: Df. Answer ¶ 29; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.)   The Notice of Allegations included that: (i) Jane Doe and John were in a dating relationship during the Fall 2015 semester and that in November 2015, Jane Doe stayed the night in John's room in Tarkington Hall; (ii) Jane Doe woke up to John's groping her while she was fully clothed and said to John Doe that this was not OK; (iii) John then told Jane Doe that during another night in November 2015, while they were staying the night in Jane Doe's room, John had penetrated her digitally while she was sleeping: (iv) Jane Doe was not aware of the incident in November 2015 while she was sleeping in her room, had not and did not consent to such sexual contact, and was upset when she was told about it.  (SJM 3: Df. Answer ¶ 30; SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572); SJM 7: Sermersheim Dep tr 17-19.)

### 2. **April 21, 2016: John Doe's Written Response.**

Defendants note that on April 21, 2016, John submitted to Dean Sermersheim a written response to the allegations.  (Dfs. MOL p. 9.)   But Defendants badly mischaracterize John's response as a general denial and do not state the many specifics of John's written response: (i) John and Jane Doe were in a dating relationship from the Fall 2015 semester to the start of the Spring 2016 semester and were both in Navy ROTC; (ii) Jane Doe's accusations against him were false and without merit; (iii) it was not true that, as claimed by Jane Doe, in November 2015 she had stayed in John's room and woke up when John was groping her; (iv) what happened was that in mid-December 2015, after Jane Doe had attempted to commit suicide, Jane Doe stayed the night

[9]

in John's room, slept on a futon with John on the floor and John's roommate on his bed above the futon, woke up when John touched her knee, immediately became angry with John and left the room; (v) it was not true that, as claimed by Jane Doe, in November 2015 John digitally penetrated her while she was sleeping; (vi) it was not true that, as claimed by Jane Doe, Jane Doe became upset when John told her about the alleged sexual contact; (vii) John never had sexual contact with Jane Doe while she was sleeping; (viii) instead, Jane Doe engaged in behavior inconsistent with having been sexually assaulted, texting John over the Christmas holidays, including texting and talking with John Doe wishing him a Happy Christmas Eve, sending a package of homemade Christmas cookies to John's family and inviting John to her room at the start of the Spring 2016 semester; (ix) John never went through Jane Doe's underwear without her permission but rather at times did laundry for Jane Doe, for which she was grateful; (x) John did not own a taser but did own a stun baton, yet never threatened Jane Doe with it; (xi) Jane Doe never formally broke up with John, but the two saw each other less and less at the start of the Spring 2016 semester, as Jane Doe was distancing herself from John, a choice he respected; and (xii) it was only after John returned an item to Jane Doe's room during the Spring 2016 semester did Jane Doe say anything about John not going to her room, after which he didn't.  (SJM 3: Df. Answer ¶ 34; SJM 16: Semersheim 11, John Doe Response to Allegations (PU 573-576); SJM 7: Semersheim Dep tr 16, 19; SJM 41: Custodian Klingerman Dep tr 26-27.)

John, in his written response to Dean Sermersheim's April 11, 2016 letter, also provided additional information to show he had been falsely accused by Jane Doe: (i) John and Jane Doe had a sexual relationship from October to December 2015, but all sexual activity ceased after Jane Doe attempted suicide on December 13, 2015; (ii) Jane Doe told John that she had been raped in high school in Colorado and had attempted suicide twice while in high school; (iii) Jane Doe had

frequently displayed a temper, which she tried to project on to John as his problem; (iv) Jane Doe told John that she contemplated running away from home and not returning to Purdue; (v) on the night of the suicide attempt, Jane Doe was extremely erratic, destroyed her room by throwing objects everywhere, was crying and talking about how much she hated life and felt hopeless and was questioning whether she wanted to be in the Navy and at Purdue at all; (vi) the suicide attempt took place on a ledge on the top of the parking garage by the armory, a ledge from which if Jane Doe fell or jumped, would likely be fatal; (vii) John reported Jane Doe's suicide attempt to Resident Advisors and a Scholarship Advisor, who filed reports with the University; (viii) John and Jane Doe continued to date in the month of January 2016, which included frequent texting and calling over the Winter Break, but thereafter, Jane Doe distanced herself from John and started dating a NROTC upperclassman; and (ix) John took a suicide prevention course on February 16, 2016  (SJM 3: Df. Answer ¶ 35; SJM 16: Semersheim 11, John Doe Response to Allegations (PU 573-576); SJM 7: Semersheim Dep tr 19.)

### 3. <u>April 24-May 20, 2016: Investigation.</u>

Defendants note that the Purdue investigators met with Jane Doe, John and six others, including John's roommate and a Residential Assistant.  (Dfs. MOL pp. 9-10.)  Defendants omit that one of the six was Midshipman A, who said nothing to the investigators about meeting with Jane Doe in mid-March 2016.  Defendants also omitted the statements of John's roommate: that Jane Doe's allegations were not like John, that John was the hardest working ROTC guy he knew, that John denied any nonconsensual touching of Jane Doe, that he (the roommate) was in the room when Jane Doe stayed overnight, when Jane Doe left it was "normal" and there were no comments by Jane Doe, that John had told him about Jane Doe's suicide attempt which had caused John not to focus on school work, and that John was shocked by the disciplinary complaint. (SJM 18:

Amberger/Oliver 25 (PU078-079) -- PU072-073; SJM 15: Oliver Dep tr 50-54; SJM 22: Rollock/Sermersheim/Amberger/Oliver 14, Investigation Report with transmittal e-mail (PU 373-391) -- PU 376; SJM 19: Amberger/Oliver 24 (PU 34-59) -- PU 47-48.)

Defendants also skip over basic facts of the investigation.  The interviews were not recorded or videotaped; the investigators wrote notes.  To the investigators, John provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because he believed the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John and his family Christmas cookies.  Jane Doe provided no texts to the investigators, telling them she had deleted the texts.  The investigation report does not refer to any evidence from a health care provider.  John also provided a list of character witnesses to the investigators.  John specifically denied the sexual assault allegations in the Notice of Allegations when questioned by the investigators.  The April 28, 2016 meeting was the one and only meeting that John had with the investigators, and he had no communications with the investigators after the meeting.  (SJM 3: Df. Answer ¶ 36; SJM 14: Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; SJM 11: Amberger 27, Texts (PU 206-339); SJM 18: Amberger/Oliver 25, Amberger Notes (PU 60-87); SJM 15: Oliver Dep tr 17-21, 50-54; SJM 19: Amberger/Oliver 24, Oliver Notes (PU 34-59); SJM 7: Semersheim Dep tr 34; SJM 5: Plaintiff John Doe Dep. tr. 111-114; Pl Opp DSJ 27: Dfs' Responses To Plaintiff's RFAs No. 2.)

Defendants also skip over that in the period May 9-12, 2016, Purdue investigator Amberger emailed Monica Bloom, Director of CARE, about a follow up conversation with Jane Doe.  On May 12, 2016, Amberger had a follow up conversation with Jane Doe about the texts.  Purdue investigators did not follow up with John about the texts after talking with Jane Doe. (SJM 14:

Amberger Dep tr 46-49; SJM 20: Amberger 19, Amberger E-Mail to Bloom (PU 364), SJM 21:

Amberger 21, Bloom E-Mail to Amberger (PU 370); SJM 15: Oliver Dep tr 102.)

### 4.  **The Investigation Report and The Misinterpreted Texts.**

Defendants note that Purdue investigators prepared an investigation report, and on May 20,

2016, sent it to Dean Sermersheim.  (Dfs. MOL pp. 10-11.)  But Defendants ignore that the

investigation report included only short portions of 7 pages of the 133 pages of texts (the selected

portions did not include the texts showing that Jane Doe sent John's family Christmas cookies),

that Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of

texts submitted by John to the investigators and that in accordance with Purdue's procedures at the

time, John was not given an opportunity to review the investigation report then or any time before

the June 6, 2016 panel meeting.  (SJM 3: Df. Answer ¶¶ 2, 37; SJM 14: Amberger Dep tr 49-50,

61-62; SJM 22: Rollock/Sermersheim/Amberger/Oliver 14, Investigation Report with transmittal

e-mail (PU 373-391); SJM 6: Rollock Dep tr 30, 46-47; SJM Sermersheim Dep tr 35; SJM 41:

Custodian Klingerman Dep tr 27-28.)

Instead, Defendants quote passages of the incomplete texts as if they were admissions of

guilt.  (Dfs. MOL pp. 10-11.)  They weren't.  In deposition, Purdue Dean Sermersheim, Purdue

investigator Amberger and Purdue investigator Oliver each admitted that there is no express

statement in the texts in which John admitted or Jane Doe accused John of committing the sexual

acts alleged in the Notice of Allegations.  (SJM 7: Semersheim Dep tr 34; SJM 14: Amberger Dep

tr 70-72; Pl Opp DSJ 9: Oliver Dep 50-57.)

John testified in deposition that he "wanted [the investigators] to look at the message

history between [John] and [Jane Doe] and see that it disproved the allegation she was saying

against me," that the texts did not refer to any sexual contact between Jane Doe and John, and that

"these texts showed there was no evidence of any sort of sexual misconduct between the two of us."  (SJM 5: Plaintiff John Doe Dep. tr 111-114.) John in his deposition explained that the "context" of Jane Doe's suicide attempt was important in understanding them. (SJM 5: Plaintiff John Doe Dep. tr 121-123.)  According to John, the "texts reflected the fact that Jane Doe and [he] did have a deeply personal relationship developed in part through sexual intercourse," the "relationship was still intimate enough that she sent [John's] family Christmas cookies, and we messaged one another frequently," and the "texts also reflected Jane Doe's difficult relationship with her mother and family, a fact she used at times to answer [John's] questions to her about being unhappy, and also a fact that motivated her unfair behavior towards [John]," and that he "became more apologetic towards Jane Doe the more she directed negativity towards [John]." (SJM 8: John Doe 02/18/2021 Affidavit ¶ 15.)  John Doe then discussed the specific texts excerpted in the investigation report.  (SJM 8: John Doe 02/18/2021 Affidavit ¶¶ 16-21.)  John concludes:

> All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false.  I have maintained that all her claims were false from my initial statements in the Purdue disciplinary process at the start, all the way through to the appeals. I said so orally to Dean Sermersheim in June 2016.  I said so in my oral statements to Navy ROTC personnel, and I said so in my written statement in August 2016 to Navy ROTC at the time of my disenrollment (which was based solely upon my university suspension), and I have continued to maintain this truth for the past four and a half years of this legal case.

(SJM 8: John Doe 02/18/2021 Affidavit ¶ 30.)

   5.  **Scheduling Of Panel Meeting; No Opportunity To Review Investigation Report.**

Defendants note that on May 26, 2016, Dean Sermersheim sent, to the three-person panel of the Advisory Committee on Equity, (i) the investigation report, (ii) the April 11, 2016 Notice of Allegations and (iii) John's April 21, 2016 written response to the Notice of Allegations.  (Dfs. MOL p. 12.)   Defendants omit that John was not provided an opportunity to review the

investigation report before the scheduled panel meeting on June 6, 2016. (SJM 3: Df. Answer ¶ 39; SJM 7: Sermersheim Dep tr 21-23; SJM 23: Sermersheim 34, Sermersheim Memo (PU 655).

Defendants also state that on May 31, 2016, Dean Sermersheim notified John and Jane Doe of the June 6, 2016 panel meeting; but what the discovery record shows is that Dean Sermersheim sent a letter **only to John**, copied to Amberger and Oliver, informing John of the scheduled "Panel Meeting" on June 6, 2016, at which John was scheduled to appear between 2:00 PM to 2:30 PM. Also on May 31, 2016, Joanna Sharp, the assistant to Dean Sermersheim, sent an e-mail to investigators Amberger and Oliver informing them of the "Panel Meeting" on June 6, 2016, with John to appear between 2:00 PM to 2:30 PM and the investigator to appear between 2:30 PM to 3:00 PM. (Dfs. MOL p. 12; SJM 3: Df. Answer ¶ 40; SJM 7: Sermersheim Dep tr 24-25; SJM 24: Sermersheim 35, E-Mailed Letter (PU 596), bold added; SJM 14: Amberger Dep tr 95-97; SJM 25: Amberger 29, Sharp E-Mail (PU 392).)

### 6. CARE Director Bloom Submits Statement For Jane Doe.

Defendants state that on June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim, but rather Monica Bloom, Director of CARE and a lawyer, on June 5, 2016, submitted a written statement said to come from Jane Doe, who had commitments to the Navy and was said not to be able to attend the scheduled June 6, 2016 meeting. (Dfs. MOL p. 13.) The statement was in the form of an e-mail. Bloom was asked in her deposition how, if Jane Doe did not have access to a computer, she e-mailed the statement to Bloom. Bloom said she (Bloom) did not recall (SJM 9: Bloom Dep tr 29-30; SJM 26: Bloom 23, Bloom transmittal of June 5, 2016 statement (PU653-654)). Defendants do not deal with this testimony and also fail to address the fact that the three-person panel of the Advisory Committee on Equity and Dean Sermersheim, never met and never heard any direct testimony from Jane Doe.

Nor did the Advisory Committee and Dean Sermersheim have the opportunity to ask any questions of Jane Doe. In the June 5, 2016 written statement, Jane Doe makes the specific request that John be removed from the NROTC program and in this context, referenced her new boyfriend who was in NROTC. (SJM 3: Df. Answer ¶ 41; SJM 9: Bloom Dep tr 28-32; SJM 26: Bloom 23, Bloom transmittal of June 5, 2016 statement (PU653-654).)

### 7. June 6, 2016: Meeting With Panel of the Advisory Committee on Equity and Dean Sermersheim.

Defendants note that on June 6, 2016, John Doe met with Dean Sermersheim and the three-person panel of the Advisory Committee; Defendants give some of John's deposition testimony - - that he "intended to reaffirm [his] innocence and explain [his] side of the allegations" and that John responded to questions about the text messages; and Defendants acknowledge that John testified about the adverse tone of questions from the panel. (Dfs. MOL p. 14.)

Defendants omit that John was asked what was the most important point about the meeting and he testified "my innocence"; that the panel meeting was not recorded or transcribed; that because Jane Doe did not appear before the Dean and the Advisory Committee, there was no cross-examination of Jane Doe about her allegations; that John testified in his deposition that two members said they had not read the investigation report and that the Dean and the Advisory Committee members acted with hostility in the way questions were asked and the questions were "loaded"; and that texts were asked about, but John was not apprised of how those texts were interpreted in the investigation report. In contrast, Dean Sermersheim did not contradict John's account because she could not recall the specific panel meeting and did not recall what the panel members and John said at the meeting. (SJM 3: Df. Answer ¶¶ 2, 43-44; SJM 5: John Doe Dep. tr. 185-188; SJM 7: Sermersheim Dep tr 27-29.)

**8.  June 14, 2016: Dean Sermersheim's Determination and Sanctions.**

Defendants state that on June 14, 2016, Dean Sermersheim notified the parties that, after considering the information provided by John, Jane Doe, and the University investigators, she (Dean Sermersheim) determined by a preponderance of the evidence that John's conduct violated the *Anti-Harassment Policy* and that John was suspended from Purdue for a year, the no-contact order with Jane Doe was to continue while Jane Doe was in school, and conditioned John's re-entry upon a 90-minute bystander intervention training and monthly meetings with a CARE Assistant Director.  (Dfs. MOL p. 14.)  Defendants omit that Dean Sermersheim's June 14, 2016 letter did not state any explanations or reasons for her finding and that it was made without Jane Doe personally appearing before the Dean and the Advisory Committee and thus without examination or cross-examination of Jane Doe.  (SJM 3: Df. Answer ¶ 46; SJM 7: Sermersheim Dep tr 27-31; SJM 27: Sermersheim 4, Sermersheim June 14, 2016 Letter (PU 597-599); SJM 41: Custodian Klingerman Dep tr 20-21.)

**9.  June 23, 2016: John Doe's First Appeal.**

Defendants state that on June 23, 2016, John timely submitted an appeal to Vice President Rollock that questioned the evidence but did not ask for cross-examination. (Dfs. MOL p. 15.) Defendants ignore that a hearing with cross-examination was not part of Purdue's procedures. (SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572), and as noted above (p. 17), Jane Doe did not appear at the June 6, 2016 meeting with the Dean and the Advisory Committee panel.

 Defendants inaccurately state the grounds of John's June 23, 3016 appeal, which were that: (i) Jane Doe's allegations of sexual assault were false; (ii) he never penetrated Jane Doe while

she was sleeping without her consent, digitally or otherwise; (iii) the determination he did so was incorrect and contrary to the facts and he was being suspended for something John did not do and did not occur; (iv) a suspension would cause significant harm, including the loss of his scholarship and participation in NROTC;  (v)  he had suffered a great emotional toll as a result of Pursue's disciplinary process, causing significant  depression and anxiety, due to his concerns about the fairness of the process while knowing that Jane Doe's allegations were false and the disruption of all the friendships he had developed; (vi) his "rights to due process of law have been violated"; (vii) he "was never provided with the evidence that was supposed to support this allegation which prevented [him] from adequately preparing a defense to the false accusation"; (viii) he had "also not been provided the evidence relied upon in making the finding against [him] in order to prepare and submit a proper appeal"; (ix) at the June 6, 2016 meeting with the three-person panel of the Advisory Committee on Equity, two panel members admitted they were not prepared; (x) he had responded to everything that was asked of him, including providing ample documentation of his relationship with Jane Doe; and (xi) he had received a summary notification providing no basis for the determination.  (SJM 3: Df. Answer ¶¶ 49-51; SJM 6: Rollock Dep tr 27-30; SJM 28: Rollock 5, John Doe June 23 Appeal (PU 717-718); SJM 41: Custodian Klingerman Dep tr 21-22.)

### 10. **June 28, 2016: Vice President Rollock's First Appeal Decision.**

Defendants state that on June 28, 2016, Vice President Rollock advised John that she (Vice President Rollock) was not able to issue a decision on John's appeal and was directing Dean Sermersheim to revise her determination to include the factual basis for her determination and the sanctions imposed.  (Dfs. MOL p. 15.)  Defendants omit that John could supplement his appeal once Dean Sermersheim re-issued her decision.  (SJM 3: Df. Answer ¶ 52; SJM 6: Rollock Dep tr 30-32; SJM 29: Rollock 6, Rollock June 28 Letter (PU 600-601).)

[18]

**11. <u>June 29, 2016: Dean Sermersheim's Re-Issued Determination and Sanctions.</u>**

Defendants state that on June 29, 2016, Dean Sermersheim issued her revised final

determination finding John in violation of Purdue's policy adding the following:

Specifically, a preponderance of the evidence supports that:

1. [Jane Doe] had fallen asleep on a futon with you on the floor beside her. She woke up and found that you inappropriately touched her over her clothing and without her consent by placing your hand above her knee, between her legs, and moved it up to her "crotch" area; and
2. On another occasion, while she was sleeping and without her consent, you inappropriately touched [Jane Doe] by digitally penetrating her vagina.

(Dfs. MOL p. 15.) Defendants omit that Dean Sermersheim's revised determination: (i) added she

found "by a preponderance of the evidence that [John] is not a credible witness" and that "[Jane

Doe"] is a credible witness"; (ii) imposed the same sanction as stated in her June 14, 2016 letter;

(iii) had numbered findings that were contradicted by John's April 20, 2016 written response to

the "Notice of Allegations," John's April 28, 2016 oral statements to the investigators and John's

June 6, 2016 oral statements to the Advisory Committee and Dean Sermersheim, all denying Jane

Doe's allegations; (iv) did not state that John and Jane Doe were in a dating relationship; (v) did

not state that John and Jane Doe had previously engaged in sexual intercourse; and (vi) did not

state the fact that no other complaints of sexual misconduct were made against John.  (SJM 3: Df.

Answer ¶¶ 54, 56; SJM 7: Sermersheim Dep tr 39-43; SJM 30: Sermersheim/Rollcok 7,

Semersheim June 29, 2016 Letter (PU 603-607); SJM 6: Rollock Dep tr 44, 55-56; SJM 41:

Custodian Klingerman Dep tr 23-24.)

Instead, Defendants note that John "admits" that he touched Jane Doe above the knee and

disputes how high his hand went and that it was a credibility issue for Dean Sermersheim.  (Dfs.

MOL 15.)  That is not an accurate account of John's testimony and not a proper statement of what

was before Dean Sermersheim.  What John testified to was that on the night of Jane Doe's suicide

attempt, Jane Doe stayed overnight in John's room with his roommate present (who told investigators it was normal, no comments made by Jane Doe when she left); Jane Doe slept on John's futon and John was on the floor next to the futon.  John reached up at one point and touched Jane Doe on the leg just above the knee, which was "basic nonsexual touching" done "out of affection"; there was "nothing more."  (Pl Opp DSJ 8: John Dep tr 123-128; (SJM 8: John Doe 02/18/2021 Affidavit ¶ 21; SJM 15: Oliver Dep tr 28; SJM 19: Amberger/Oliver 24 (PU 34-59) -- PU 47-48.)  As for Dean Sermersheim judging credibility, the Seventh Circuit in this case made it clear that Dean Sernersheim could not properly do so when there was no real hearing and Jane Doe had not appeared in person before her; and the Seventh Circuit opinion was critical of Dean Sernersheim and the Equity Committee appearing to credit Jane Doe's story based on her accusations alone.  *Doe v Purdue*, 928 F.3d at 663-664, 669.

### 12. July 10, 2016: John Doe's Appeal Of Re-Issued Determination and Sanctions.

Defendants acknowledge that on July 10, 2016, John submitted an appeal to Vice President Rollock from Dean Sermersheim's re-issued determination and sanctions but only assert that John did not seek a hearing with cross-examination.  (Dfs. MOL p. 16.) But Defendants ignore that a hearing with cross-examination is not part of Purdue's procedures (SJM 13: Semersheim/Rollock 10, Sermersheim Letter (PU 568-572), and as noted above (p. 17), Jane Doe did not appear at the June 6, 2016 meeting with the Dean and the Advisory Committee panel.

Defendants also do not accurately state the grounds of John's detailed appeal.  John stated in his July 10, 2016 appeal that: (i) Dean Sermersheim failed to provide the factual basis for her determination;  (ii) he (John) never had the opportunity to review the investigation report and thus could not address the allegations supposedly questioning his credibility ("Dean Sermersheim's unsubstantiated conclusion that I am not a credible witness still has not been corroborated with

any facts"); (iii) he had provided the investigators with a list of over 30 names to substantiate the credibility of his character and integrity, but he could not defend himself against Dean Sermersheim's statements about his credibility if there was no factual evidence presented (Vice President Rollock in her deposition testimony confirmed that John was not permitted to review the investigation report under Purdue's policies then in effect); (iv) the June 6, 2016 meeting with Defendant Dean Sermersheim and the three-person panel of the Advisory Committee on Equity was flawed at best -- two of the three panel members did not read the investigation report before the meeting – and the attitude of the panel members was "one of overt skepticism and hostility" ("what could possibly explain their attitude other than that they had prejudged the outcome and my (alleged) guilt?"); (v) at the beginning of his Fall 2015 semester, he had started the year in Navy ROTC and one of the issues discussed was the "zero tolerance" policy toward sexual harassment and that Jane Doe's accusations of sexual assault were false; (vi) one of Jane Doe's accusations was based on what John had allegedly told her about digitally penetrating her to which John asked "Why would I not only admit to something that didn't happen, but also knowingly admit to something that would jeopardize my ROTC scholarship and future serving my country?"; (vii) Jane Doe was possibly motivated to make false accusations against John -- to punish John for having reported to the university Jane Doe's suicide attempt in December 2015; (viii) Jane Doe had started up in the Spring 2016 semester a relationship with an upperclassman who was a member of Navy ROTC and who made it plain he did not like John; and (ix) after the relationship ended with John, Jane Doe still contacted John, at times seeking advice, which Jane Doe would not do had there been any sexual assaults ("If I had sexually violated [Jane Doe], why would she continue to initiate contact and even seeking my advice?").  (SJM 3: Df. Answer ¶¶ 62-67; Rollock Dep tr 35-47; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

Defendants also omit that John's July 10, 2016 appeal stated that he had been denied review of the evidence that supposedly supported the factual basis for Dean Sermersheim's determination, requested that the determination and sanctions be set aside and further requested that Purdue provide to him, among other things, "a copy of Ms. Erin Oliver and Mr. Jacob Amberger's report." (SJM 3: Df. Answer ¶ 68; Rollock Dep tr 47-48; SJM 31: Rollock 8, John Doe July 10, 2021 Appeal (PU 695-698).)

### 13.    July 22, 2016: Vice President Rollock's Second Appeal Decision.

Defendants note that on July 21, 2016, Vice President Rollock upheld Dean Sermersheim's determination and sanctions after reviewing (i) John's appeal, (ii) Dean Sermersheim's April 11, 2016 letter notifying John of Purdue's decision to investigate allegations regarding his conduct toward Jane Doe, (iii) John's written response to the Notice of Allegations, (iv) the investigation report, (v) the e-mail message of June 5, 2016, said to be from Jane Doe, and (vi) Dean Sermersheim's letters of June 14, 2016 and June 29, 2016. (Dfs. MOL p. 16.)  Defendants omit that Rollock confirmed in her deposition testimony that John had not seen the investigation report and had not been copied on what was said to be Jane Doe's June 5, 2021 document and that John had no other sexual misconduct complaints against him in the entire period of the 2015-2016 school year. (SJM 3: Df. Answer ¶ 70; Rollock Dep tr 48-49, 56; SJM 31: Rollock 9, Rollock July 21, 2021 Appeal (PU 608-609); SJM 41: Custodian Klingerman Dep tr 25.)

### 14. Post-University Disciplinary Case.

Defendants do not acknowledge that on October 20, 2016, John and his mother were permitted at Purdue to review the investigation report and to take handwritten notes. (SJM 3: Df. Answer ¶ 80.)  Instead, Defendants misrepresent John's deposition testimony in two ways.

First, Defendants incorrectly assert John has conceded that he does not believe Purdue subjected him to a different policy than what a female student accused of sexual assault might be. (Dfs. MOL p. 16.) John testified that in his June 23, 2016 appeal, he did not argue that procedures used for investigation and determination of sexual misconduct were different for men and women, but that in his case he is "arguing antimale bias, which would imply as such." John testified that "[a]ccording to Purdue's official proceedings," procedures used for investigation and determination of sexual misconduct allegations were the same for men and women, but that he did believe the procedures were in fact used differently given the case he experienced. So, when asked if he was saying the accuser was treated differently than the accused, John said "Yes, I was." John said that he was not accusing the Navy of antimale bias. (Pl Opp DSJ 8: Plaintiff John Doe Dep tr 136-138.)

Second, Defendants incorrectly assert that John has conceded he does not believe that a similarly situated woman who committed the same offense would have received a more lenient punishment. (Dfs. MOL p. 16.) John testified that he had read about cases in which men were vilified and kicked out of school without due process while women were believed even where later they admitted lying. Pressed, John testified that he did not know of a case at Purdue where a similarly situated woman who committed the same offense would have received a more lenient punishment. (Pl Opp DSJ 8: Plaintiff John Dep tr 171-173.) But in this connection, Defendants fail to acknowledge that there were no woman respondents in sexual misconduct proceedings at Purdue in the 2015-2016 school year. (Pl Opp DSJ 11: Dfs Answers to Interrogatories.)

**D.      John Doe's Disenrollment From Navy ROTC (What**
**         Defendants Misstate As "NROTC's Investigation").**

Defendants then purport to describe "NROTC's Investigation," which in fact concludes with the NROTC disenrolling John based solely upon Purdue's disciplinary suspension. (Dfs.

MOL pp. 16-20.)   Plaintiff's Statement of Material Undisputed Facts found in Plaintiff's Memorandum of Law In Support of Plaintiff's Motion for Partial Summary Judgment (ECF 183, pp. 23-28) contains the pertinent material undisputed facts with respect to the NROTC disenrollment.

Defendants spend much effort playing up the role of Lieutenant Megan Redlawsk, but do so by omitting the facts showing her very limited role.   Redlawsk was directed by Commander Hutton to use the Purdue investigation (Pl Opp DSJ 2: Hutton Dep tr 20); Staff Lieutenant Kyle Willstatter, who was a non-voting member of the Performance Review Board and its reporter, described Redlawsk's role as merely collecting the disciplinary documents from Purdue (SJM 39: Kyle Willstetter Dep tr 29); there was no separate Navy investigation report (SJM 35: Hutton Dep tr 49-50, 71-73 & SJM 36: Hutton G, August 10, 2020 Performance Review Board (NSTC 00011-0012)); and Redlawsk was not part of the August 2016 NROTC Performance Review Board that disenrolled John based solely upon Purdue's suspension (SJM 35: Hutton Dep tr 49-50, 71-73; SJM 36: Hutton G, August 10, 2020 Performance Review Board (NSTC 00011-0012)); Pl Opp DSJ 12: Remaly tr. 35, 53-55; Pl Opp DSJ 13: Willstatter tr. 44-45).

Redlawsk admitted her June 14, 2016 memo and collection of documents was a "preliminary inquiry"; and when Redlawsk referred to investigation in terms of what she did, it was what was reflected in her June 14, 2016 memo and collection of documents.  (Pl Opp DSJ 14: Redlawsk Dep tr 9, 37.)  When asked to examine the document, Redlawsk acknowledged that after her one-page cover memorandum, the rest of the pages were Purdue disciplinary case documents in John's case – the university investigation report, the Purdue Dean's determination, a statement by John Doe.  (Pl Opp DSJ 14: Redlawsk Dep tr 31-32.)  Defendants describe John's authorization for Purdue to release disciplinary case files to the Navy ROTC as "voluntary" (Dfs. MOL p. 18);

however, John did not so testify, but rather that the Navy wanted to be "in the loop" (SJM 5: John Doe Dep tr 21-22), and Purdue NROTC Executive Officer Craig Remaly testified the authorization form was one that Purdue requested in John's case (Pl Opp DSJ 12: Remaly Dep tr 26-27).

John did want the NROTC to conduct its own inquiry because he wanted the NROTC to determine that Jane Doe was not truthful (Dfs. MOL p. 17), but that desire did not dictate the NROTC's handling of the matter.  Defendants say Redlawsk "interviewed" John and Jane Doe (Dfs. MOL p. 18), but that is not what the record shows.  Redlawsk testified she "spoke to" John and Jane Doe (Pl Opp DSJ 14: Redlawsk Dep tr. 21-22); John did tell Redlawsk that Jane Doe was making false accusations and John did submit a statement, but that Redlawsk did not ask John any questions (Pl Opp DSJ 8: John Doe Dep tr 57-63); and Redlawsk admitted that the file did not include any memorandum recording an interview of either John or Jane Doe. (Pl Opp DSJ 14: Redlawsk Dep tr 32).

Redlawsk acknowledged that the purpose of the "preliminary inquiry" document was to recommend the convening of a Performance Review Board and that the only reason given for the convening of the Performance Review Board by Commanding Officer Hutton was the university suspension.  (Pl Opp DSJ 14: Redlawsk Dep tr 33-34.)  Redlawsk testified that the reason for the delay in the Performance Review Board was John's appeal of the university suspension and that as a result of the change in schedule, Redlawsk was not at Purdue and no longer affiliated with Purdue's NROTC program in August 2016 when the Performance Review Board was held and disenrollment occurred. (Pl Opp DSJ 14: Ex. J hereto: Redlawsk Dep tr 34-35.) Consequently, Redlawsk does not have personal knowledge of what the members of the Performance Review Board reviewed.  (Pl Opp DSJ 14: Redlawsk Dep tr 35.)  In fact, the August 10, 2016 Performance Review Board document lists the documents reviewed, and while it lists Purdue disciplinary case

[25]

file documents and the Purdue investigation report (and no other investigation report), Redlawsk's June 14, 2016 memo about her own conclusions is not included. (SJM 35: Hutton Dep tr 49-50, 71-73; SJM 36: Hutton G, August 10, 2020 Performance Review Board (NSTC 00011-0012).)

Defendants omit what the record showed as to what those involved in the Performance Review Board testified. The second in command of the Purdue NROTC, Executive Officer Craig Remaly, who was the head officer of the Performance Review Board, testified that the discussions of the Performance Review Board concerned the university suspension and did not include the personal opinions of Lieutenant Redlawsk. (SJM 38: Remaly Dep tr 8, 44-45.) Remaly identified the documents that were listed as before the Performance Review Board, which included Purdue's investigation report, the Purdue Dean's determination and John Doe's appeals. (SJM 38: Remaly Dep tr 46-49; SJM 36: Hutton G/Remaly E, August 10, 2020 Performance Review Board (NSTC 00011-0012).) Remaly testified the university suspension was the only reason for the disenrollment recommendation of the Performance Review Board. (SJM 38: Remaly Dep tr 49-50.) At John's deposition, Defendants' counsel tried to get John to say that academics was the reason for the disenrollment, but John stood firm it was the suspension, as reflected in the document he was shown. (Pl Opp DSJ 8: John Dep tr 177-178; Pl Opp DSJ 16: John Dep Ex. 21.)

Staff Lieutenant Kyle Willstatter, who was a non-voting member of the Performance Review Board and its reporter, confirmed that the Performance Review Board did not care why John was suspended by Purdue. Just before the disenrollment, Willstatter e-mailed to John to inform him of the nature of the Performance Review Board:

> The PRB [Performance Review Board] is not about the circumstances surrounding your suspension, it is about the fact that you have been suspended. There is no reason to re-litigate the university's decision. The fact is that you are suspended, and the ROD requires disenrollment for any case where a student is suspended.

(SJM 40: Willstatter C/Remaly D, E-mail by Staff Lieutenant Willstatter (NSTC 0140-0142); SJM 38: Remaly tr. 54-55; SJM 39: Willstatter tr 6-8, 28-29, 42-43.)  Willstatter was also presented with August 10, 2020 Performance Review Board document (NSTC 00111-0012), which he said was written by him.  Willstatter reviewed the list of documents reviewed by the Performance Review Board, which were the Purdue disciplinary documents.  Willstatter testified that the delay from June 2016 to August 2016 of the Performance Review Board was John's appeal of the university suspension and that John attended the disenrollment proceeding.  Willstatter testified there was no other Performance Review Board ever held as to John.  (SJM 39: Willstatter Dep tr 46-49; SJM 36: Hutton G/Willstatter D, August 10, 2020 Performance Review Board.)

Defendants mistreat the August 2020 ROTC Appointment Termination and Disenrollment Authorization that Commander Hutton signed as giving possible alternatives. (Dfs. MOL p. 19.) That is not Commander Hutton's testimony. He testified that he signed the document for disenrollment because John had been suspended and it was a requirement of the NROTC program that a student cadet be continuously enrolled in the university.  (SJM 35: Hutton Dep tr 66-67.)

Defendants engage in speculation when asserting that nothing stops John from enrolling in NROTC because there were no other problems, citing John's testimony and the lack of anything in the Navy files that would otherwise be disqualifying. But what John testified was he didn't know whether he could re-enroll (Pl Opp DSJ 8: John Doe Dep tr 168-169); and the disenrollment documentation, based on the information in 2016, was not to allow re-enrollment. (Pl Opp DSJ 2: Hutton Dep tr 54-55 & Pl Opp DSJ Hutton Ex. I (NSTC 0005-0006).)  Defendants assert that the NROTC has not exonerated John of the sexual misconduct allegations (Dfs. MOL p. 20), but that ignores the Navy ROTC was required to disenroll John as a result of the Purdue suspension and the consequent disenrollment meant there was no occasion for Navy exoneration.

[27]

**E.**    **Defendants' Misstatement Of "John's Academic Performance."**

Defendants omit from their discussion of "John's Academic Performance" (Dfs. MOL pp. 20-21) the effect of the Purdue disciplinary case on John's academic performance.  John testified that his "grades as a whole did become negatively affected by the University investigation and the behavior of the University towards [him] during the spring of 2016 semester" treating him "as though [he] was guilty of the accusations brought against [him], even before [he] knew details of any of the accusations against [him]" and causing "an immense amount of stress."  In that Spring 2016 semester, John received an A in Naval Lab, a B in Sea Power & Maritime Affairs, a B- in Technical Graphic Communication, a B- in Russian Level II, a C in Conversational Russian and F's in Foundations of Technical Graphics and Fundamentals of Imaging Technology.  John explained "[he] felt stress for all of [his] classes. That C could have been a B, that B minus could have been an A, that B would have been a B plus." (Pl Opp DSJ 8: John Doe Dep tr 41-43.)

John's roommate also testified to John's stress from the disciplinary case adversely affecting John's academic performance:

> "He could not get anything done. He was just really worried about his future, like he was really worried about not being able to become a Navy SEAL, things like that. . . . .  Couldn't get homework done. I mean specifically like academics, he couldn't focus on it. . . . And I remember the end of that semester, it was just -- it was bad. He couldn't get tests studied for on time. . . .[H]e wasn't efficient at anything."

(Pl Opp. DSJ 10: Student R Dep tr 78-79.)

On May 20, 2016, John acknowledged that he was placed on an interim leave of absence pending a Performance Review Board on his failure to meet academic standards the 2016 Spring semester.  (Pl Opp DSJ 15: NSTC 0153.)  But at this point, John had not lost his ROTC scholarship and John's eventual loss of the ROTC scholarship was not the result of bad grades.  As shown above (pp. 27-28), the only Performance Review Board ever instituted was for the university

[28]

suspension, and it was that Performance Review Board that resulted in the disenrollment and the consequent loss of scholarship.  Had there been a Performance Review Board on academics, it was not a foregone conclusion what it would have been the result because as the disenrollment document reflected, John had a university cumulative grade point average of 3.17. (SJM 36: Hutton G, p. 2, August 10, 2020 Performance Review Board, p. 2 (NSTC 0012).)

F.    **Defendants' Misstatement Of "John's Post-Suspension Life."**

Defendants then purport to describe "John's Post-Suspension Life," which concerns John's unsuccessful effort at Taylor and living at home.  (Dfs. MOL pp. 21-22.) Defendants omit that while at Taylor John struggled with clinical depression caused by the Purdue disciplinary case, trying a legal LSD analogue to help him out of that depression.  (Pl Opp DSJ 8: John Dep tr 157.)

Defendants also omit reference to the testimony of Noel Perry, the counsellor for John in the period February 2018-August 2020.  Noel Perry, of Family Concern Counseling, is a Purdue graduate who after decades in industry, earned a Master's in mental health counseling and has become a counselor with training as an EMDR therapist for treatment of trauma.  John's parents first visited Noel Perry about their son; Perry described the parents as "heartbroken" about how their son, who had been "productive and fruitful," was "withdrawn," had "broken off relationships" and "could not focus" and "couldn't complete his classes" at Taylor; John initially resisted the counseling and exhibited clinical depression and had suffered physical issues.  But as a result of the counseling, Perry recorded how John made excellent progress, exhibiting an open mindedness and love of learning. Perry testified that John expressed vindication about his view he had been "railroaded" at Purdue, that John had the support of a nuclear family with brothers and sisters, and that John denied that he had done what he was accused of at Purdue.  Perry described John as a "very intelligent guy."  (Pl Opp DSJ 16: Perry Dep tr 5-6, 11-12, 18-23, 108-115.)

Dated:  October 15, 2021                    Respectfully submitted,
                                            **NESENOFF & MILTENBERG, LLP**
                                            **By:** /s/ *Philip A. Byler*
                                            _____
                                            **Philip A. Byler, Esq.**
                                            **Andrew T. Miltenberg, Esq.**
                                            **363 Seventh Avenue, Fifth Floor**
                                            **New York, New York 10001**
                                            **(212) 736-4500**
                                            **pbyler@nmllplaw.com**
                                            **amiltenberg@nmllplaw.com**
                                            ***Attorneys for Plaintiff John Doe***

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served upon the attorneys of record for

each party to the above-entitled cause at the address shown below on October 15, 2021.

William P. Kealey, Esq.
Tyler L. Jones, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
       tlj@stuartlaw.com
*Attorneys for Defendants*

BY:    ☐  U.S. Mail        ☐    Federal Express

       ☐  Hand-Delivery    x    Other: ECF

                    _____ *Philip A. Byler, Esq.* _____
                           Philip A. Byler, Esq.