**PL Opp DSJ 4**

```
                                                              Page 1

 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF INDIANA
 2                       HAMMOND DIVISION
 3                        CIVIL ACTION
                       No. 2:17-cv-33-JPK
 4
 5   JOHN DOE,                          )
                                        )
 6        Plaintiff,                    )
                                        )
 7   v.                                 )
                                        )
 8   PURDUE UNIVERSITY, PURDUE          )
     UNIVERSITY BOARD OF TRUSTEES,      )
 9   MITCHELL ELIAS DANIELS, JR.,       )
     in his official capacity as        )
10   President of Purdue University,    )
     ALYSA CHRISTMAS ROLLOCK,           )
11   in her official capacity at        )
     Purdue University,                 )
12   KATHERINE SERMERSHEIM,             )
     in her official capacity           )
13   at Purdue University,              )
                                        )
14        Defendants.                   )
15
16
17           REMOTE DEPOSITION OF ███████████
18
19        The remote deposition upon oral examination
     of ███████████  a witness produced and sworn
20   before me, Diane Zeyen, RPR, a Notary Public in
     and for the County of Hamilton, State of Indiana,
21   taken on behalf of the Defendants, at the residence
     of the deponent, Summerville, Dorchester County,
22   South Carolina, on the 10th day of September, 2020,
     at 2:00 p.m., pursuant to the Federal Rules of
23   Civil Procedure with written notice as to time and
     place thereof.
24
25
```

Page 2

```
 1        A P P E A R A N C E S
 2     (ALL PARTIES APPEARING VIA REMOTE)
 3
 4  FOR THE PLAINTIFF(S):
 5      Philip A. Byler
         NESENOFF & MILTENBERG LLP
 6       363 Seventh Avenue
         Fifth Floor
 7       New York, NY  10001
         212.736.4500
 8       pbyler@nmllplaw.com
 9
10  FOR THE DEFENDANTS:
11      Tyler L. Jones
         William P. Kealey
12       Stuart & Branigin LLP
         300 Main Street, Suite 900
13       P.O. Box 1010
         Lafayette, IN  47902-1010
14       765.423.1561
         tlj@stuartlaw.com
15       wpk@stuartlaw.com
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1      INDEX OF EXAMINATION
 2                           PAGE
 3  DIRECT EXAMINATION ..............................4
        Questions by Tyler L. Jones
 4  CROSS-EXAMINATION ..............................41
        Questions by Philip A. Byler
 5
 6
 7        (No exhibits marked.)
 8
 9
10
...
25
```

Page 4

```
 1  (Time noted:  2:00 p.m.)
 2       (Due to the need for this deposition
 3   to take place remotely because of the
 4   Government's order for social distancing,
 5   the parties will stipulate that the court
 6   reporter may swear in the witness over the
 7   phone/virtual videoconference and
 8   that the witness has verified that she
 9   is in fact ▮▮▮▮▮▮▮▮
10            - - -
11   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
12   having been duly sworn to tell the truth, the whole
13   truth, and nothing but the truth relating to said
14   matter was examined and testified as follows:
15            - - -
16       MR. JONES:  Wonderful.  Miss Court
17   Reporter, are you able to hear me clearly
18   without any delays or interruptions?
19       THE REPORTER:  Yes.
20       MR. JONES:  Okay.  Wonderful.
21
22  DIRECT EXAMINATION,
23   QUESTIONS BY TYLER L. JONES:
24  Q  Good morning, Ms. -- or I guess good afternoon,
25     Ms. ▮▮▮▮▮
```

Page 5

```
 1       My name is Tyler Jones.  I represent the
 2   defendants in the named action of John Doe v.
 3   Purdue, et al.
 4       This case is currently proceeding under a
 5   pseudonym, but I will represent to you that it's
 6   perfectly okay in the context of this deposition
 7   if we use the names of John and Jane Doe, which
 8   we will get into later, but it is perfectly okay
 9   if we refer to them by their first names, ▮▮▮▮
10   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ et cetera.
11       For the record, would you mind stating your
12   name.
13  A  My name is ▮▮▮▮▮▮▮▮.
14  Q  Okay.  ▮▮▮▮ have you ever given a deposition
15     before?
16  A  No, I have not.
17  Q  Okay.  ▮▮▮▮ just a couple of quick ground
18     rules.
19       The purpose of a deposition is just for the
20   parties to ask you questions, what you may or
21   may not know based on your own personal
22   knowledge.
23       Unfortunately, because of technology, it is
24   very easy to interrupt each other.  You may know
25   the question I am going to ask you and I may
```

2 (Pages 2 - 5)

Page 10

1  And then I was the training officer the
2  spring semester of my junior year and that was
3  my last position in the unit.
4 Q Understood. So that first position you told us
5  about your sophomore year, is that something you
6  were elected to or were you selected? How did
7  you get it?
8 A I was selected as the financial officer based
9  off of my performance in the unit my first year
10  there. And that also put me in charge of
11  planning the events for the unit.
12     And I continued to plan the events for the
13  unit, including the Navy Birthday Ball, as well
14  as the other ceremonial events that we had for
15  the next two years after that.
16 Q Understood, ma'am. I believe you said your
17  junior year you were a disciplinary officer; is
18  that correct?
19 A Correct. So in the unit the position is the
20  company chief, and we are in a position where we
21  enforce the standards.
22     I was in charge of that for Bravo Company.
23  There were four companies at the Purdue unit.
24  Each one has a company chief and then there is a
25  battalion chief, who is typically a senior.

Page 11

1 Q Were you the disciplinary officer or company
2  chief during the fall 2015, spring 2016 semester
3  at Purdue?
4 A I was the chief for fall of 2015 and then the
5  training officer for spring of 2016.
6 Q I see. Okay. As the disciplinary officer, were
7  you in charge of supervising any of the cadets
8  or midshipmen I should say?
9     (Mr. William Kealey joins the Zoom call.)
10 A So I was responsible for primarily the
11  supervision of Bravo Company. But as an upper
12  classroom in good academic standing, I also
13  would help run the study halls and monitor the
14  study halls. And I typically did that once
15  every two weeks.
16 Q If the midshipmen had been misbehaving for
17  whatever reason, would they have run in to you
18  at any point?
19     Did you have any -- go ahead and answer
20  that question, sorry.
21 A So I would have been able to discipline members
22  of my own company.
23     And if it was a serious offense, it would
24  go up to the actual active duty staff, the
25  lieutenants, if it needed to go to a Personnel

Page 12

1  Review Board. But if it was more of a
2  counseling or a first warning, that would have
3  come through me.
4 Q So it sounds like if there was sort of a petty
5  offense for Alpha or Charlie Company, you would
6  have handled it?
7 A Correct.
8 Q And if there was a serious offense and it fell
9  for a Charlie Company or Bravo Company, it would
10  have gone to the lieutenants on staff; is that
11  correct?
12 A That is correct.
13 Q I believe you said the spring of 2016 you took a
14  new role as a training officer. What does that
15  entail?
16 A So the training officer is responsible for our
17  weekly drill sessions. They plan what we will
18  do once a week.
19     The whole battalion gets together and we
20  conduct things, like require mandatory meeting
21  trainings that are annual requirements, and then
22  also organizes speakers to come in or for
23  providing leadership activities.
24 Q Understood. After the spring semester, did you
25  hold a different position in the ROTC at Purdue

Page 13

1  besides training officer?
2 A No. That was my last position.
3 Q How long did you hold the training officer
4  position?
5 A Just the spring semester of 2016.
6 Q Did you hold any other positions in the ROTC
7  after the training officer position?
8 A No.
9 Q Ms. ▇▇▇▇, are you familiar with a lady by the
10  name of the ▇▇▇▇▇
11 A I am.
12 Q How are you familiar with Ms. ▇▇▇▇
13 A She was a freshman the fall of 2015, and so I
14  was familiar with her as a midshipman and then
15  we were introduced on a more personal basis
16  rather than professional in the spring of 2016
17  and continued our friendship after that.
18 Q Do you consider her a friend?
19 A I do.
20 Q When did you form a friendship with her?
21 A It began mostly over the summer of 2016 and then
22  that next year, my senior year was when we got
23  close, and we were actually friends outside of
24  the unit.
25 Q I see. So would it be fair to say you didn't

Page 14

1  really consider her a friend until the summer of
2  2016?
3  A  Yes.
4  Q  Prior to considering her a friend, what kind of
5     relationship did you two have?
6  A  So it was a purely professional and a very
7     distant one at that.
8        In the fall of 2016 I was aware of her
9     being a freshman in ROTC. She had been to study
10    halls that I had presided over. And that was
11    pretty much the extent of it that fall.
12 Q  How did you first meet Ms. ▊
13 A  So she was at the freshman orientation, but she
14    wasn't in my company.
15       I believe my first interaction with her
16    would have been sometime early that semester in
17    the midshipman lounge, in the ROTC building,
18    which is where midshipmen typically hang out and
19    work on schoolwork in between classes because it
20    is pretty central on campus and we have more
21    computers available than a lot of people's
22    buildings have.
23 Q  Sure. Do you know what company she was in?
24 A  She was in Alpha Company.
25 Q  Okay. How would you describe Ms. ▊

Page 15

1     generally during the early parts of the fall
2     semester?
3  A  She was very outgoing, to the point that some of
4     the other classmen considered her too friendly
5     with upper classroom, not really understanding
6     what her role was as a freshman, very bubbly,
7     very personable, liked to talk to people.
8  Q  Are you familiar with a person by the name of
9     ▊ or ▊
10 A  Yes.
11 Q  Who is ▊
12 A  He was also a midshipman the first year, his
13    freshman year at Purdue, and I believe he was
14    also in Alpha Company that fall.
15 Q  During the fall semester, did you have any
16    opportunities to interact with Mr. ▊
17 A  I interacted with him twice. Once was at a PT
18    session and then I was invited to the Alpha
19    Company Christmas party.
20       Typically at the end of the semesters each
21    company will have an end-of-the-semester event
22    where midshipmen can get to know each other
23    better. And I was good friends with the Alpha
24    Company officer. So she invited me and I went
25    to their Christmas party.

Page 16

1  Q  So was the PT session before the Christmas
2     party?
3  A  I can't remember. It may have been in the
4     spring. I don't really have the timeline down
5     on that.
6  Q  Understood. Okay. Does anything stand out in
7     your memory from the PT session?
8  A  I distinctly remember being disconcerted by
9     ▊ He definitely is not on a calling
10    presence, I did not find working out in his
11    vicinity a very comfortable thing.
12 Q  Okay. Was there anything specifically at the PT
13    session?
14 A  At one point we made eye contact and he smiled
15    at me and I remember just getting chills.
16 Q  This Christmas party you mentioned, do you have
17    any recollection of what happened there?
18 A  So I remember being at the Christmas party, we
19    were playing a card game called Utter Nonsense,
20    it's very similar to Cards Against Humanity, but
21    it is ridiculous sayings and you do like
22    different accents with it.
23       And I remember noting that ▊ was
24    being very quiet and not outgoing, she seemed
25    very uncomfortable and that ▊ seemed to be

Page 17

1     kind of hovering around her. And she didn't
2     seem to want to interact with him at all, but he
3     seemed to not want to leave her alone.
4  Q  Was this Christmas party, to the best of your
5     recollection, in December of 2015?
6  A  Correct, yes, it was before the semester ended.
7  Q  So this would have been before winter break
8     started?
9  A  Yes.
10 Q  Do you know of any time -- well, let me
11    rephrase.
12       Did you see any change in ▊
13    attitude from the beginning of fall semester
14    till the end of fall semester?
15 A  That was the first time that I had noticed,
16    noted it at all.
17       Like I said, I didn't interact with her a
18    lot in the fall, but I had previously in the
19    semester noted that she was very outgoing. And
20    then at the Christmas party it was a big enough
21    change that I noticed she was not being very
22    sociable.
23 Q  During the fall 2015 and spring 2016 semester,
24    did you live off campus?
25 A  I did.

Page 38

1 did or didn't do.
2     MR. JONES: Phil, a simple objection to
3 form. And then if it becomes necessary, you can
4 move later.
5     MR. BYLER: She wasn't answering your
6 question. That was the problem. Your question
7 was okay, but she started out giving all this
8 testimony based on what supposedly ▮ said and
9 did, and you can't do that.
10     MR. JONES: Phil, Phil, a simple objection
11 is all you need.
12     THE REPORTER: One at a time.
13     MR. JONES: I think we are done there.
14 BY MR. JONES:
15 Q  Do you know if Ms. ▮ was interviewed by
16 any investigators?
17 A  She was on two occasions. I know that --
18     MR. BYLER: Object to form.
19 Q  You can answer.
20 A  The first time that she was interviewed she
21 requested that I be present with her. So she
22 was assigned a victim advocate through the
23 University through CARE.
24     Her name was Monica. So you can have a
25 representative in the room.

Page 39

1     The first interview she -- Monica and I
2 both showed up and she wanted me in the room, so
3 I sat with her during that investigation, and so
4 I did not take part. I was just there for moral
5 support and to physically be present.
6     And then the second time I went with her
7 but Monica was in the room with her that time.
8 Q  Do you remember the names of the investigators?
9 A  I do not remember.
10 Q  Could you describe them physically for us?
11 A  One was a woman. I can't remember much of her
12 physical appearance.
13     But the man had a beard and was in his
14 probably late forties, early fifties. And he
15 asked the majority of the questions, which is
16 why it is easier to recall his appearance.
17 Q  Could you describe -- well, do you remember what
18 the investigator's demeanor was like during
19 these interviews?
20     MR. BYLER: Objection to form.
21 Q  You can answer.
22 A  They were very professional. They did not
23 betray any emotions. It didn't seem like they
24 were coercing her in any way. They were very
25 impartial, very cold even.

Page 40

1 Q  Did ▮ ever tell you that someone had
2 reported that she had tried to commit suicide?
3 A  She did -- I was made aware of that very
4 recently. I did not know anything about that
5 back in 2016.
6 Q  Do you know when she became aware of the
7 reported suicide?
8 A  I believe that she became aware of that --
9     MR. BYLER: Hold on. Objection to form.
10 Q  You can answer.
11 A  She became aware of that very recently, in the
12 late spring of last year.
13 Q  Okay. Did ▮ ever give you any reason to
14 think that her report was anything less than
15 sincere?
16     MR. BYLER: Objection to form.
17     MR. JONES: She can answer.
18 A  She never gave me any indications of that.
19 Q  Did she ever give you any suggestion that she
20 was making the report to get back at ▮
21 A  No.
22     MR. JONES: Off the record briefly.
23     (A recess was taken between 2:52 p.m. and
24 2:56 p m.)
25     MR. JONES: Back on the record.

Page 41

1     I have no more questions. Your witness,
2 Phil.
3
4 CROSS-EXAMINATION,
5 QUESTIONS BY PHILIP A. BYLER:
6 Q  Okay. Ms. ▮ I am the lawyer for plaintiff
7 John Doe, ▮, and I will be asking you
8 some questions.
9     First of all, with respect to the testimony
10 that you have given about when ▮
11 told you about sexual assault, that was based
12 solely on what ▮ told you; is
13 that not true?
14 A  She was able to show me text messages, exchanges
15 between the two of them that referred to the
16 assault.
17 Q  Those text messages, it is true, is it not, did
18 not expressly refer to any physical action by
19 ▮ against ▮
20     MR. JONES: Object to the form.
21 Q  Is that not true?
22     MR. JONES: Object to the form. But you
23 can answer, Ms. ▮
24 A  To my recollection of what she showed me, it
25 referred to post-breakup, why she had broken up

11 (Pages 38 - 41)

Page 42

1  with him was because he was making contact with
2  her while she was sleeping.
3  Q  Were you aware at the time that ▮▮▮▮▮
4  and ▮▮▮▮▮ exchanged text messages from
5  December 13th through into February of 2016?
6  A  From what I remember, she was texting him to
7  tell him to stop showing up at her dorm, trying
8  to explain to him why they had broken up and for
9  him to leave her alone.
10 Q  Do you recall text messages referring to the
11    fact that ▮▮▮▮▮ sent cookies at
12    Christmastime to ▮▮▮▮▮ family?
13 A  No, I do not remember any of those text
14    messages.
15 Q  And do you recall typed messages that
16    ▮▮▮▮▮ and ▮▮▮▮▮ exchanged
17    concerning various TV shows and other things
18    that were a part of normal conversation?
19 A  I do not remember.
20 Q  Now, by the way, just to be clear, you never
21    personally were in the room when any supposed
22    alleged sexual assault occurred?
23 A  That is correct, I was never present.
24 Q  And you never talked to ▮▮▮▮▮ about it
25    either, did you?

Page 43

1 A  That is correct, I never talked to him.
2 Q  In fact, you never talked to ▮▮▮▮▮ about any
3    aspect of the relationship that he had with
4    ▮▮▮▮▮ correct?
5 A  Correct.
6 Q  Now in terms of what you were talking to
7    ▮▮▮▮▮ in the apartment for three or
8    four hours, did you understand when supposedly
9    that sexual assault occurred?
10 A  It had happened the previous fall when they were
11    dating.
12 Q  The previous fall. And, you know, after the
13    spring break would be late March, about April 1;
14    correct?
15 A  Correct. Late March.
16 Q  So ▮▮▮▮▮ was telling you at that
17    point in time about something supposedly that
18    had happened five months earlier?
19    MR. JONES: Object to the form. You can
20    answer if you understand, Ms. ▮▮▮▮▮
21 A  Correct. She was informing me of events that
22    had happened before.
23 Q  Well, five months earlier; correct?
24    MR. JONES: Objection. Form. Foundation.
25    I don't think she ever testified to a month,

Page 44

1    Phil. But you can answer if you understand it.
2    MR. BYLER: Ms. ▮▮▮▮▮ testified to the
3    fall of 2015, and she testified it is late
4    March, about April 1 as to when ▮▮▮▮▮
5    is talking to her in her apartment. And I am
6    trying to establish that --
7 Q  That's a gap in time, is it not?
8 A  Correct, it is a gap in time.
9 Q  Okay. And in that gap in time, you never talked
10    to ▮▮▮▮▮ about supposedly what
11    happened in the fall of 2015?
12 A  No. At the end of the March was the first time
13    we talked about it.
14 Q  Just to be clear, you never talked to ▮▮▮▮▮
15    about any aspects of his relationship with
16    ▮▮▮▮▮
17    MR. JONES: Objection to form. Asked and
18    answered. But you can answer, Ms. ▮▮▮▮▮
19 A  I did not talk to ▮▮▮▮▮
20 Q  In fact, you didn't talk to ▮▮▮▮▮ much at
21    all in the whole time that he was there at
22    Purdue; correct?
23 A  Correct. Professionally or personally, passing
24    by, polite conversation in the aspect of the
25    ROTC unit.

Page 45

1 Q  Now, the gap in time, let me go back to the gap
2    in time, you're now in a gap of time between the
3    fall of 2015, which is what you said, and late
4    March of 2016, there was no complaint by
5    ▮▮▮▮▮ to you about feeling unsafe,
6    was there?
7 A  No. When we talked in my apartment at the end
8    of March, that was the first time she had ever
9    expressed to me that she felt unsafe.
10 Q  And in that gap of time were you aware of any
11    incident involving ▮▮▮▮▮ and the ROTC with
12    respect to any misconduct?
13 A  I was not aware. But, as I stated earlier, I
14    was never in charge of him or ▮▮▮▮▮ in a
15    professional capacity in the unit.
16 Q  But you said you were a -- you had become a
17    friend of ▮▮▮▮▮ true?
18 A  We have since then, correct.
19 Q  Now you referred to the investigation of Purdue
20    in your testimony, did you not?
21 A  I did.
22 Q  You were interviewed, were you not?
23 A  I was never interviewed. I was present for an
24    interview.
25 Q  Well, now I have got notes in front of me from

12 (Pages 42 - 45)

Page 46

1  the University, 78 to 79, that indicate in an
2  interview of you on May 3rd, 2016, does that
3  refresh your recollection about being
4  interviewed by the investigators?
5      MR. JONES: Objection to form. She hasn't
6  been provided these documents. But you can
7  answer if you understand, Ms. ▬
8 A  That must have slipped my mind. I remember
9  being present for an interview. I did not
10 recall ever being put on record for the
11 interview.
12 Q Well, let me ask it this way, well, you
13 personally never called the investigators about
14 an alleged sexual assault by ▬ as to
15 ▬
16     MR. JONES: Objection.
17 Q You never said that to them?
18     MR. JONES: Object to the form. But you
19 can answer if you understand, Ms. ▬
20 A  I'm not sure I understand your question.
21 Q Well, let me put it this way, when you were with
22 the investigators, did you ever personally, not
23 listening to, but personally inform the
24 investigators about sexual assault by ▬
25 of ▬

Page 47

1 A No.
2 Q No, you didn't? I just want to make sure we
3  don't --
4 A No.
5 Q You didn't say anything to the investigation
6  yourself about a sexual assault?
7      MR. JONES: Objection to form. Asked and
8  answered.
9      MR. BYLER: Well, she said no. I just want
10 to make sure it is not ambiguous. And so that's
11 why I was just asking.
12     MR. JONES: Sure.
13 Q When the witness said "no," you meant, no, you
14 did not yourself say anything to the
15 investigators about a sexual assault by
16 ▬ of ▬
17 A Correct, I did not say.
18 Q Is it possible that you were interviewed by the
19 investigators and you just forget right now?
20     MR. JONES: Objection to form. Asked and
21 answered. But you can answer, Ms. ▬
22 A It is possible.
23     MR. BYLER: Let me have a moment.
24     MR. JONES: Sure.
25     MR. BYLER: I don't have any further

Page 48

1  questions.
2      MR. JONES: Briefly off the record.
3      MR. BYLER: Unless you have got a few that
4  spark me to ask another one.
5      MR. JONES: Briefly off the record.
6      (A recess was taken between 3:06 p.m. and
7  3:08 p m.)
8      MR. JONES: Phil, I don't think I have any
9  more questions.
10     MR. BYLER: You're done? I think we are
11 done for the day.
12     MR. JONES: That's right.
13     ▬ you have the right to request a copy
14 of the transcript, review it for any errors, if
15 you would like. And you can read it and then
16 fill out what's called an errata and correct any
17 things, like a typo or something, or you have
18 the right to waive.
19     I would suggest for you, given the short
20 length of the transcript and that we are not
21 dealing with a lot of special words, that you
22 waive signature and it simply goes to presses,
23 so to speak.
24     THE WITNESS: Yeah, I will choose to waive.
25     MR. JONES: Okay. Thanks, everyone. I

Page 49

1  appreciate everyone's time.
2      THE WITNESS: All right. Thank you.
3      THE REPORTER: What kind of copy do you
4  need, Tyler?
5      MR. JONES: Oh, we will just take Etran,
6  please.
7      MR. BYLER: Yeah, I will want a transcript.
8  We don't have any exhibits this time.
9      MR. JONES: So it should be nice and easy
10 to put together.
11     Thank you, Ms. ▬ have a good rest of
12 your day.
13     THE WITNESS: Thank you. You too.
14 (Time noted: 3:10 p m.)
15
16
17     AND FURTHER DEPONENT SAITH NOT.
18
19
20
            (Signature waived.)
21
          _____
22        ▬
23
24
25

13 (Pages 46 - 49)