**PL Opp DSJ 8**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF INDIANA
 2                      HAMMOND DIVISION
                   CASE NO. 2:17-cv-33-JPK
 3
 4   JOHN DOE,                           )
                                         )
 5         Plaintiff,                    )
                                         )
 6         -vs-                          )
                                         )
 7   PURDUE UNIVERSITY, PURDUE           )
     UNIVERSITY BOARD OF TRUSTEES,       )
 8   MITCHELL ELIAS DANIELS, JR.,        )
     in his official capacity as         )
 9   President of Purdue                 )
     University, ALYSA CHRISTMAS         )
10   ROLLOCK, in her official            )
     capacity at Purdue University,      )
11   KATHERINE SERMERSHEIM, in her       )
     official capacity at Purdue         )
12   University,                         )
                                         )
13         Defendants.
```

                    DEPOSITION OF ███████████

The videotaped deposition upon oral examination of ███████████ a witness produced and sworn before me, Clarice H. Howard, CCR-Ky, Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Defendants, at the offices of Stuart & Branigin, LLP, 300 Main Street, Suite 900, Lafayette, Indiana, on Tuesday, August 18, 2020, scheduled to commence at 10:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to time and place thereof.

Page 6

1 University, Mitchell Daniels, Katherine Sermersheim
2 and Alysa Rollock.
3     MR. JONES:  Tyler Jones, Stuart & Branigin,
4 counsel for the defendants as previously
5 identified.
6     -------------------
7     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8 having been duly sworn to tell the truth, the whole
9 truth, and nothing but the truth relating to said
10 matter, was examined and testified as follows:
11
12 DIRECT EXAMINATION
13     QUESTIONS BY MR. KEALEY:
14 Q   Good morning, Mr. ▮▮▮.
15 A   Good morning.
16 Q   Have you been deposed before?
17 A   I have not.
18 Q   Have you been a party to any lawsuit before this
19     lawsuit?
20 A   No.
21 Q   Are you currently a party to any other lawsuit?
22 A   No.
23 Q   I'll briefly describe the procedure this morning.
24     You're under oath testifying, that same as if
25     you're in court.  Your testimony is being

Page 7

1 videotaped and recorded by a reporter for use as
2 evidence in this case.
3     Because it's being recorded in those manners,
4 it is important for us not to speak over one
5 another.  So wait for me to finish my questions.
6 I'll wait for you to finish your answers.
7     Occasionally your counsel may have an
8 objection between a question and an answer.  And so
9 we each need to be attentive to the other so that
10 the reporter is only recorded one speaker at a
11 time.
12     Because the reporter is recording verbal
13 statements.  Nonverbal statements such as shaking
14 the head or nodding the head can't be recorded and
15 if you respond to a question of mine with a nod or
16 a nonverbal response, I may ask you to just say yes
17 or no.  That's because of the transcription that's
18 being prepared.
19     While we're on the record, everything that is
20 said in the room is recorded.  We will take
21 periodic breaks every 60 or 90 minutes as needed
22 and as requested by those in the room.  We
23 typically will not a break with a question pending.
24     Are you feeling well enough rested to go
25 forward with today's deposition?

Page 8

1 A   I am.
2 Q   Are you currently taking any medication?
3 A   No.
4 Q   None at all?
5 A   No.
6 Q   Are you currently prescribed any medication?
7 A   No.
8 Q   Have you ever been prescribed any Adderall?
9 A   I have.
10 Q   When was that last time you were prescribed
11     Adderall?
12 A   I believe I was prescribed Adderall briefly at
13     Taylor University.  Before that I took ADHD
14     medication through high school, and I stopped
15     taking ADHD medication in preparation for military
16     in college.
17     So after I left Pursue, I went to Taylor
18     University and I was prescribed it for a short
19     time.
20 Q   And when you say short time, less than a year?
21 A   I believe so.
22 Q   Did your prescription to Adderall end before your
23     time at Taylor ended?
24 A   I can't remember.  I hadn't thought about it.
25 Q   You left Taylor University at the end of the fall

Page 9

1     of 2017 semester, correct?
2 A   At the end of that semester, yes.
3 Q   So you've had no prescription for Adderall since
4     the beginning of 2018?
5 A   Correct, I believe so.
6 Q   Mr. ▮▮▮, how did you prepare for today's
7     deposition?
8 A   Review of the case thus far, lots of talking and
9     mental preparation, take a cold shower, talk with
10     my parents, talk with Phil, talk with Elvin and
11     just an overall review.
12 Q   What documents did you review?
13 A   I reviewed my medical records, the Navy documents,
14     the Taylor University documents, the long
15     investigation report document, that's 700 and
16     something pages long, and some miscellaneous legal
17     documents in between.
18 Q   Documents filed in court?
19 A   Yes, yes.
20 Q   Did you review any other documents?
21 A   Not to my recollection.  I think that covers it.
22 Q   Do you review anything on your phone or your
23     computer?
24 A   Oh, the social medial is what you're referring to,
25     I think.  The social medical documents I look at as

3 (Pages 6 - 9)

Page 38

1  Q  Without exception?
2  A  Yes, without exception.
3  Q  So you were excepting yourself from the Navy ROTC
4     expectation when you attend your classes in the
5     fall of 2015?
6  A  It was not uncommon for midshipmen to not have
7     perfect attendance, and I always did my best to
8     attend my classes. And the Navy set me up with
9     some older students to work on scheduling and
10    helping me adjust to the college scheduling
11    routine.
12 Q  Take a look at the same transcript, Deposition
13    Exhibit 3, further down in the same column for the
14    spring of 2016; do you see that?
15 A  I do.
16 Q  In the spring of 2016, you had three computer
17    graphics technology courses, correct?
18 A  Correct.
19 Q  And you failed two of them, correct?
20 A  Correct.
21 Q  Now, there was nothing that the defendants in this
22    case did to cause you to fail courses in both of
23    your semesters at Purdue, was there?
24       MR. BYLER: Objection, form.
25 A  In my eyes, it seemed that they were making my life

Page 39

1     much more difficult than it should have ever been,
2     and it gave me lots of frustration and stress that
3     did indeed to me suffering in grade and in
4     attendance.
5  Q  When I asked you about the fall semester, why you
6     got an F, you mentioned only yourself, not any of
7     the defendants, correct?
8        MR. BYLER: Objection, that was asked and
9     answered.
10 A  When I spoke of the semesters as a whole and
11    missing attendance, I was not speaking specifically
12    to the end of the semester. At the end of the
13    semester, I bombed most of my finals due to
14    circumstances laid out in our side of this case
15    regarding _____. And the overall effect
16    of that was that I dipped just below the GPA
17    required to stay acceptable for ROTC.
18 Q  Are you blaming the defendants in this case for
19    your fall of 2015 grades?
20       MR. BYLER: Objection, asked and answered.
21 A  I'm saying circumstances surrounding the defendants
22    did lead to that. They contributed.
23 Q  What did the defendants contributed to your fall of
24    fall of 2015 grades?
25       MR. BYLER: Objection, asked and answered.

Page 40

1  A  Do the defendants include _____ in this
2     question?
3  Q  Mr. ____ you have in front of you Deposition
4     Exhibit 1, which is your amended complaint in this
5     case. Are you aware of who the defendants are in
6     this case?
7  A  The University is the defendant.
8  Q  Please review the caption on the first page of
9     Defendant's Deposition Exhibit 1 and refresh your
10    recollection as to how the defendants are in this
11    case?
12 A  Mitchell Elias Daniels, Jr., Alysa Christmas
13    Rollock and Katherine Sermersheim, Purdue
14    University and the Purdue University Board of
15    Trustees.
16 Q  Have you been under the impression for the 185 plus
17    weeks that this case was been pending, that this
18    was a lawsuit under -- against _____
19    among others?
20 A  No.
21 Q  Why, then, are you suggesting to me that the
22    question about the defendants in your fall of 2015
23    grades is a question about _____
24 A  I shouldn't have asked that.
25 Q  I'll ask you one more time. Are you faulting the

Page 41

1     defendants in this case for your fall of 2015
2     grades?
3        MR. BYLER: Objection, asked and answered.
4  A  I'm not faulting the defendants for my fall 2015
5     grades.
6  Q  During the spring semester of 2016, what did the
7     defendants do to cause you to fall two courses?
8  A  My grades as a whole suffered from the University
9     investigation, but to assume that fails
10    specifically are attributed is a bit presumptuous
11    in my eyes. The grades as a whole did become
12    negatively affected by the University investigation
13    and the behavior of the University towards me
14    during the spring of 2016 semester.
15 Q  Sir, I'm asking a very simple and direct question.
16    My question was what did the defendants do in the
17    spring of 2016 semester to cause you to fail two
18    courses?
19       MR. BYLER: Objection, asked and answered.
20    The defendants were pursuing a disciplinary case,
21    for heavens sake.
22 A  I don't think you're assumption that the fails were
23    directly attributed, but my grades as a whole did
24    suffer because of the behavior of the University
25    and the investigation. Examples of the behavior

11 (Pages 38 - 41)

Page 42

1   were my hall director advising me that I was going
2   to be kicked out of my hall, by barred from
3   different parts of the campus, be treated overall
4   as though I was guilty before this case had ever
5   completed or what had its progress run.
6       I was treated as through I was guilty of the
7   accusations brought against me, even before I knew
8   details of any of the accusations against me.  It
9   cause an immense amount of stress for me, and it
10  made me in my focus towards the school and the
11  school activities and the schoolwork.
12 Q  During the spring semester of 2016, you received
13  four other grades between A and C, correct?
14 A  That's correct -- no, that's not correct.
15 Q  An A in Naval lab, a B in C Sea Power and Maritime,
16  a B minus in Russian level and a C in
17  conversational Russian.
18 A  And a B minus in technical graphic com, two up
19  from.  So the second one down, so five grades.
20 Q  So five out of the seven grades were not failing?
21 A  Correct.
22 Q  So all of these stress that you were experiencing
23  caused you to fail two out of seven courses?
24 A  May have, yes.
25 Q  I'm just asking you whether it did?

Page 43

1       MR. BYLER:  Objection, form.
2  A  I think so.
3  Q  So you only felt stresses when you were attending
4   your technical graphics and fundamentals of imaging
5   technology courses than that when you were
6   attending the other five?
7  A  No, I felt stress for all of my classes.  That C
8   could have been a B, that B minus could have been
9   an A, that B would have been a B plus.
10 Q  How come in five of the seven courses you didn't
11  fail?
12 A  I probably found the course work easier to do.
13 Q  You found Level 2 Russian easier to do than
14  fundamentals of imaging technology?
15 A  Yes.
16 Q  The same course that you failed in the fall?
17 A  Yeah, yes.
18 Q  When you had no stresses?
19 A  For the majority of the fall.
20      (Deposition Exhibit No. 4 marked
21       for identification.)
22 BY MR. KEALEY:
23 Q  Mr. ▓▓▓▓ I'm handing you Deposition Exhibit 4.
24  Please take a look at it and tell me whether you
25  recognize it?

Page 44

1  A  I recognize this.
2  Q  In the first e-mail on Deposition Exhibit 4 on
3   April 6, 2016, you sent an e-mail to Lieutenant
4   Sheppard of your Navy ROTC unit, correct?
5  A  I did.
6  Q  Asking, in your words, "two questions regarding my
7   current situation," right?
8  A  Yes.
9  Q  What had happened to cause you to send this e-mail?
10 A  I didn't want to misstep, so I asked for answers to
11  those two questions.
12 Q  What did you mean by "my current situation?"
13 A  The situation described in the e-mail above
14  where -- no.  Okay.  So this would have been -- so
15  this would have been in response to a notification,
16  I think, from Navy about the ramifications of the
17  Purdue investigation on my inclusion with the ROTC,
18  the Naval ROTC.
19 Q  As of April 6, 2016, was there a Purdue
20  investigation?
21 A  I believe there was.
22 Q  Had you had a conversation with Lieutenant Sheppard
23  between the beginning of that week, Monday, April 4
24  and the date of this e-mail, Wednesday, April 6,
25  about the ▓▓▓▓▓▓▓▓

Page 45

1  A  Not with Lieutenant Sheppard.
2  Q  Who was the conversation with?
3  A  I recall it was with Captain Hutton.  I received an
4   e-mail from Kyle Willstatter where he said in a
5   short manner report to my office at whatever time
6   it was.  I think it was around 4 o'clock in the
7   evening -- afternoon.
8       And I went there and there were several Navy
9   personnel, but Captain Hutton was the one that
10  spoke me and notified me of my situation, which was
11  that someone had accused me of sexual misconduct
12  and there was going to be a Purdue University
13  investigation and a basic understanding -- he
14  related a basic understanding of what that meant
15  for my status in the ROTC at the time.
16 Q  Was this meeting in the armory?
17 A  It was.
18 Q  Who will all of the Navy ROTC personnel present?
19 A  I recall Captain Hutton and Lieutenant Willstatter
20  confidently.  There may have been one or two more.
21 Q  And did Captain Hutton tell you who was the source
22  of the allegation or what was being alleged?
23 A  No, he did not.
24 Q  So you didn't know?
25 A  No, I did not.

Page 54

1  A   Yeah, yes, I do.
2  Q   And you recall receiving this Exhibit 6?
3  A   Yes.
4  Q   So you knew in the spring of 2016 semester that you
5      were at risk of not being able to continue in Navy
6      ROTC for academic reasons, right?
7         MR. BYLER:  Objection to form.
8  A   No.
9  Q   Deposition Exhibit 6 states in Section 2C that your
10     obligation was that you must meet all applicable
11     program standards by the end of the spring 2016
12     semester; do you see that?
13 A   Yes.
14 Q   And that failure to do so "is cause for convening a
15     performance review board with disenrollment a
16     possible outcome."  Do you see that?
17 A   Yes.
18 Q   So you knew those things going into the spring 2016
19     semester?
20 A   I did.
21 Q   And you understood that this was why Lieutenant
22     Sheppard was inquiring about your grade status
23     toward the end of classes in late April?
24        MR. BYLER:  Objection to form.
25 A   Yes.

Page 55

1  Q   So on April 29, 2016, you, in Exhibit 5, asked
2      Lieutenant Sheppard for an opportunity to meet the
3      following Monday or Tuesday?
4  A   I did.
5  Q   What was it that you wanted to discuss with
6      Lieutenant Sheppard?
7  A   It seems the following e-mail on May 3 gives
8      further clarification on what I wanted to ask,
9      which was general timeline of events, if dates
10     given to me by the University end up accurate, and
11     I say here that I also want to update him on my
12     case and provide some information that I think he
13     should know.
14 Q   What information did you want to provide to
15     Lieutenant Sheppard?
16 A   I wanted to provide what I thought was the reason
17     for the allegations against me.
18 Q   Anything else?
19 A   Well, I say here that I wanted to update him on my
20     case and that I want a general timeline of events
21     on the battalion side of things.  So I think that
22     would be the constraints to the discussion.
23 Q   As far as information you wanted him to know, you
24     stated one category of information was reasons for
25     allegations against you, and I'm asking whether

Page 56

1      there was any other information that you wanted
2      Lieutenant Sheppard to know?
3  A   Not to my recollection, no.
4  Q   And have you in the May 3 e-mail informing
5      Lieutenant Sheppard that your parents have urged
6      you to have an attorney present for your meeting
7      with him?
8  A   Yes.
9  Q   So your parents wanted you and your lawyer to meet
10     with the Navy?
11 A   According to this e-mail thread, yes, or I wanted
12     to.
13 Q   And the reason you wanted to provide information to
14     the Navy was that you wanted the Navy to look into
15     that information?
16 A   I think that's why I wanted to provide it, yes.
17 Q   So you were by this e-mail asking the Navy for an
18     opportunity to present information for the Navy to
19     investigate?
20        MR. BYLER:  Objection, form.
21 A   Yes.
22 Q   And in the next e-mail, that same morning, Tuesday,
23     May 3, 2016, Lieutenant Sheppard responded to you
24     stating in part "Lieutenant Redlawsk is the
25     investigating officer that will be collecting

Page 57

1      information on the command side."  Do you see that?
2  A   I do see that.
3  Q   And going onto to tell you that she would be your
4      point of contact, correct?
5  A   Correct.
6  Q   And that he had conveyed to her your intention to
7      meet with the Navy regarding your case, correct?
8  A   Correct.
9  Q   And that she would be reaching out to you to set up
10     a time, right?
11 A   That is what it says.
12 Q   And did you follow up with Lieutenant Redlawsk and
13     set up a meeting?
14 A   I believe I did.
15 Q   Who attended that meeting?
16 A   Lieutenant Redlawsk attended that meeting.  I
17     attended that meeting.  I don't recall if I had a
18     lawyer present for that meeting.  These e-mails
19     indicate that I likely did.
20 Q   Did anybody from the Navy other than Lieutenant
21     Redlawsk attend the meeting?
22 A   I do not believe so.
23 Q   What happened at the meeting?
24 A   It's my recollection I explained to Lieutenant
25     Redlawsk that I thought ▓▓▓▓▓▓▓▓▓▓ was making

15 (Pages 54 - 57)

Page 58

1  false accusations against me, and I alluded
2  Lieutenant Redlawsk to her mental health history
3  and her history of suicide attempts, one of which I
4  borne -- I was witness to. And I explained to her
5  the understanding that I had at the time of what
6  was going on.
7  Q  Did you take any documents to the meeting?
8  A  I don't recall if I did.
9  Q  Do you Lieutenant Redlawsk interact with you at the
10    meeting?
11 A  Yes.
12 Q  Did she ask you questions?
13 A  I don't think she really did.
14 Q  Did you discuss whether she was in possession of
15    the University's investigation report?
16    MR. BYLER: Objection to form.
17 A  I did not to my recollection ask her that.
18 Q  Did you have a complete opportunity to tell
19    Lieutenant Redlawsk everything you wanted to tell
20    her?
21    MR. BYLER: Objection to form.
22 A  I believe so.
23 Q  Did you have a complete opportunity to give
24    Lieutenant Redlawsk all the documents you wanted to
25    give her?

Page 59

1  A  I don't recall whether I gave her any documents.
2  Q  But you had an opportunity to do so if you wanted
3    to?
4    MR. BYLER: Objection to form.
5  A  If at the time I felt it necessary, then yes.
6  Q  Did you ask Lieutenant Redlawsk to see whatever she
7    had in her investigation file?
8    MR. BYLER: Objection to form.
9  A  I don't recall.
10 Q  Were you curious what she had in her investigation
11    file?
12 A  I don't recall.
13 Q  Did you ask her whether she had interviewed
14    
15 A  I don't recall.
16 Q  When in Deposition Exhibit 5, in the May 3, 2016,
17    e-mail Lieutenant Sheppard identifies Lieutenant
18    Redlawsk as "the investigating officer that will be
19    collecting information on the command side," what
20    did you understand that description to mean?
21 A  I understood it as he put two sentences later that
22    she was my point of contact regarding any
23    discussion related to facts about my case for the
24    command.
25 Q  So in two places in this e-mail, the writer,

Page 60

1  Lieutenant Sheppard refers the command, meaning
2  Navy ROTC?
3  A  The command of Navy ROTC, yes.
4  Q  So collecting information on the command side means
5    Navy ROTC's collection of information, correct?
6    MR. BYLER: Objection to form.
7  A  She would their note, yes.
8  Q  And the phrase your case for the command is
9    referring to Navy ROTC's case?
10    MR. BYLER: Objection to form.
11 A  No.
12 Q  Why do you say no?
13 A  Because the implication of that sentence is that
14    the command has its own case. The implication is
15    that there's a case and that she's my point of
16    contact for the command. That was my
17    understanding.
18 Q  Same e-mail refers to a Navy ROTC lieutenant as an
19    investigating officer for Navy ROTC, correct?
20 A  Yes, it does.
21 Q  Lieutenant Redlawsk was not an investigating
22    officer for Purdue University, was she?
23 A  No, she was not.
24 Q  So the Navy had its investigating officer and its
25    own case, didn't it?

Page 61

1    MR. BYLER: Objection to form.
2  A  They did.
3  Q  And the reason they had their own investigating
4    officer and their own case was that, as you've
5    alleged in this federal court case, the Navy has a
6    zero tolerance policy regarding sexual harassment,
7    right?
8  A  They did.
9  Q  So under the Navy's own rules, Ms. 
10    allegations needed to be investigated and
11    determined according to the Navy's rules, didn't
12    it?
13 A  That seems to be the indication.
14    MR. KEALEY: Let's go off the record for a
15    minute to give the reporter a break.
16    THE VIDEOGRAPHER: The time is 11:47 a.m., and
17    we are going off the record.
18    (A short break was taken.)
19    THE VIDEOGRAPHER: We are now on the record.
20    The time is 12:03 p.m.
21 BY MR. KEALEY:
22 Q  Mr.      I want to continue with Deposition
23    Exhibit 5. We've been talking about your meeting
24    with Lieutenant Redlawsk.
25    (Deposition Exhibit No. 7 marked

Page 62

1     for identification.)
2  BY MR. KEALEY:
3  Q    I'm handing you as Deposition Exhibit 7 a document
4     produced by the Navy with Ms. ▓▓▓▓ name
5     redacted in this case. Take a look at this
6     document and tell me whether you recognize it.
7  A    I recognize this document.
8  Q    Did you prepare it?
9  A    I did.
10 Q    On the third page, is that your signature?
11 A    That's indeed my signature.
12 Q    And is the date May 3, 2016?
13 A    It is.
14 Q    So when we're looking at Deposition Exhibit 5, the
15     following e-mail in this string train was on May 3,
16     2016, from Lieutenant Sheppard at 9:14 in the
17     morning. In that same string, you indicated that
18     you would be available from 11 o'clock onward that
19     day after an exam.
20        So did you write this document, Deposition
21     Exhibit 7, sometime that day after you morning
22     exam?
23 A    I don't think I wrote it that morning.
24 Q    I asked whether you wrote it sometime that day
25     after your morning exam?

Page 63

1  A    I don't recall when exactly I wrote this document.
2  Q    Anyway you wrote it on May 3, right?
3  A    I dated it for May 3, but I don't know that I wrote
4     it on May 3.
5  Q    You might have written it earlier?
6  A    I might have.
7  Q    Why do you say that you might have?
8  A    Because I don't know.
9  Q    This document was produced by the Navy as indicated
10     at the bottom with the NSTC number. Is this a
11     document that you supplied to the Navy?
12 A    It looks like it.
13 Q    Is this a document that you supplied to Lieutenant
14     Redlawsk?
15 A    It may have been.
16 Q    Why do you say it may have been?
17 A    Because I say here in Exhibit 5 that I have
18     material I'd like to give to somebody, Lieutenant
19     Sheppard who directs me to Lieutenant Redlawsk.
20 Q    Other than this document, Exhibit 7, that you may
21     have given to Lieutenant Redlawsk, are there any
22     other documents that you prepared for the Navy for
23     the investigation referred to in your e-mail string
24     with Lieutenant Sheppard?
25        MR. BYLER: Objection to form, assumes facts

Page 64

1     not in evidence.
2  A    I don't recall the documents that I procured for
3     the Navy in their entirety.
4        (Deposition Exhibit No. 8 marked
5        for identification.)
6  BY MR. KEALEY:
7  Q    Mr. ▓▓▓▓ I'm handing you as Deposition Exhibit 8 a
8     Department of Navy document dated May 20, 2016,
9     from the commanding officer of the ROTC unit at
10     Purdue University to you. Take a look at this
11     document and tell me if you recognize it.
12 A    I do recognize it.
13 Q    Do you remember receiving it?
14 A    I do remember receiving it.
15 Q    Did you receive it in a meeting or did you receive
16     it in some remote delivery?
17 A    I don't recall the form in which I received it.
18 Q    What did you understand to be the substance of the
19     message in Deposition Exhibit 8?
20 A    It's a Navy document telling me I didn't well
21     enough in school. And because that was my second
22     semester in a row below the Navy standards, there
23     was going to be a PRB as a result of my failure to
24     meet their academic standards during the semester.
25 Q    A PRB being performance review board?

Page 65

1  A    Yes.
2  Q    What did you understand a performance review board
3     to be?
4  A    My understanding of a performance review board was
5     that I would have several of the command side that
6     I would meet with and I would need to provide
7     explanation to them as to why I failed my academic
8     standards two semesters in a row and plead a case
9     to remain in the ROTC.
10 Q    At the end of paragraph 1 of Exhibit 8, Commander
11     Officer Hutton states "you should plan to pay
12     tuition and fees for the fall semester, the fall of
13     2016 semester." Do you see that?
14 A    I do see that.
15 Q    So did you understand that as of May 20, 2016, your
16     status as a Navy supported scholarship student was
17     in jeopardy?
18 A    Yes, I did understand that.
19 Q    And it was in jeopardy for academic reasons?
20 A    It was.
21 Q    Not for sexual misconduct?
22 A    No, it was not.
23 Q    Did you notify your family that you had received
24     this notice?
25 A    I don't recall whether or not I notified my family

17 (Pages 62 - 65)

Page 90

1  A   I do not.
2  Q   If you volunteered the texts to Purdue and you
3      volunteered your explanation of them, presumably
4      you took that step because you thought they were
5      evidence that needed to be considered?
6          MR. BYLER: Objection to form, assumes facts
7      not in evidence.
8  A   My understanding from the Navy was that they relied
9      on the Purdue investigation for what they were
10     going to look at. They weren't conducting their
11     own internal investigation. Lieutenant Redlawsk
12     was considered the investigating officer, but the
13     extent of her involvement with any investigation
14     was simply looking at the production that Purdue
15     had and then making a determination based off of
16     the determine that Purdue had already made.
17 Q   That's not what you said in Deposition Exhibit 11
18     in your August 1 e-mail to Officer Willstatter, is
19     it? In the e-mail we've already looked at, you
20     said that you have already sent everything I have
21     on my case to you/Lieutenant Redlawsk.
22         Doesn't that suggest to you that Lieutenant
23     Redlawsk was available to receive whatever you had
24     to give as evidence?
25         MR. BYLER: Objection to form, assumes facts

Page 91

1      not in evidence.
2  A   Repeat the question, please.
3  Q   Doesn't your statement in that August 1 e-mail
4      indicate that Lieutenant Redlawsk was available to
5      receive the very same text messages that you
6      provided to the Purdue investigators?
7          MR. BYLER: Objection to form, assumes facts
8      not in evidence.
9  A   One more time, please.
10         MR. KEALEY: I'll ask the reporter to read it
11     back.
12         (The last question was read.)
13 A   Able to receive from me?
14 Q   Yes.
15 A   It does.
16 Q   Mr. ▓▓▓▓, I want to now turn to one more paragraph
17     in the amended complaint and then we'll take our
18     lunch break. Paragraph 31 of your amended
19     complaint, you allege your history of sexual
20     intercourse with ▓▓▓▓▓▓▓▓▓ do you see that?
21 A   I do.
22 Q   In this paragraph you allege that the two of you
23     had consensual sexual relationship that included
24     having sexual intercourse 15 to 20 times in the
25     three-month period of October to December of 2015.

Page 92

1      Do you see that?
2  A   I do.
3  Q   And was this general intercourse, penis to vagina
4      penetration?
5  A   Yes.
6  Q   Any other form of intercourse?
7  A   Some oral sex. Beyond that, no.
8  Q   And where did these 15 to 20 occasions of sexual
9      intercourse?
10 A   Mostly in her room, a few times in the car, and
11     then I think once in my room.
12 Q   On the occasion in your room, was it during the day
13     or at night?
14 A   Daytime.
15 Q   Just the two of you in the room?
16 A   Yes.
17 Q   And the car, was it just the two of you in the car?
18 A   Yes.
19 Q   And other occasions in her room, was it just the
20     two of you in her room?
21 A   Yes.
22 Q   So what witnesses were there to your sexual
23     intercourse with ▓▓▓▓▓▓▓▓
24 A   I hope none.
25 Q   You're not contending in this case that the Purdue

Page 93

1      investigators failed to interview anybody who had
2      witnessed your sexual conduct with ▓▓▓▓▓▓▓▓
3      are you?
4  A   No.
5  Q   And with respect to any sexual conduct with ▓▓▓▓
6      ▓▓▓▓ while she was sleeping, who were the
7      witnesses?
8  A   There was never anything when she was sleeping.
9  Q   Who were the witnesses as to whether there was ever
10     anything while she was sleeping?
11 A   There was never any -- anything sexual, any sexual
12     intercourse or any sexual contact while she was
13     sleeping.
14 Q   Who can testify to that?
15 A   Well, me right now.
16 Q   Anybody else?
17 A   Well, for the one allegation, primary allegation in
18     my room, my roommate was present in the room during
19     the time that she claims that that happened.
20 Q   Was he asleep?
21 A   Who, him or her?
22 Q   The roommate.
23 A   He was awake as she left the room.
24 Q   Was he otherwise awake?
25 A   I don't believe so.

Page 118

1 after you thought she was no longer a suicide risk?
2 A  I didn't report a suicide risk.  I reported the
3    attempt to the school.
4 Q  You reported the attempt to the school because you
5    thought she needed help because you thought she was
6    a suicide risk?
7 A  Okay.  Yes.
8 Q  And you did that somewhere between six weeks and
9    two months after you concluded that she was a
10   suicide risk?
11 A  Yes.
12 Q  And you did that after the relationship had ended?
13 A  Yes.  It was several weeks after the relationship
14   had ended.
15 Q  In Deposition Exhibit 13, please turn to the page
16   that's marked at the bottom PU 262.  Please look
17   through the text messages on page 262 and tell me
18   when you've done so.
19 A  I've read it.
20 Q  Did the investigators discuss this sets of texts
21   with you?
22 A  They did.
23 Q  What did they discuss with you?
24 A  They pushed me, saying that this was evidence of a
25   sexual allegation.

Page 119

1 Q  What exactly did they say?
2 A  They asked me about the texts and they wanted to
3    know what my explanations for them were.
4 Q  Did you consider the investigators asking you about
5    the texts and your explanation for them to be an
6    act of bias?
7 A  Could you say it again one more time?
8 Q  Did you consider the investigators asking you about
9    the texts on page 262 and your explanation for them
10   to be an act of bias?
11 A  The question itself being an act of bias, no.
12 Q  So it was a reasonable nonbiased step for the
13   investigators to read these texts and have
14   questions about them?
15 A  Yes.
16 Q  And the reason was a reasonable nonbiased reaction
17   for the investigators to read these texts and have
18   questions about them is that the texts refer at one
19   point to you touching ▓▓▓▓▓▓▓▓▓▓?
20 A  Yes.
21 Q  Which is a sexual contact?
22 A  No.
23 Q  Not possible for any person to read a reference to
24   you touching your girlfriend as a reference to
25   sexual contact?

Page 120

1 A  In this context, it's not referring to anything
2    sexual.
3 Q  You said a moment ago, it was reasonable and not
4    biased for investigators looking into a sexual
5    assault allegation to ask questions about these
6    texts because they refer to you touching ▓▓▓▓
7    ▓▓▓▓▓▓.
8       MR. BYLER:  Objection to form, misstates
9    testimony.
10 A  Yes, because they refer to me touching her, but
11   they do not specify what kind of touching.  After
12   her suicide attempt, our entire relationship was
13   different.  She put up all of these boundaries.
14      And in the context before these texts, I don't
15   know if you have them here, but I explained to her
16   that I don't understand what she's doing because
17   she has no communication with me.  I don't
18   understand what she wants out of the relationship,
19   what she wants from me.  And she even replies and
20   says well, I'm not going to tell or I don't care to
21   communicate with you.
22      And after her suicide attempt on the 13 of
23   December, it was as though the relationship
24   completed bucked.  And any and all physical
25   interaction from that point on was very minimal and

Page 121

1    she didn't seem to be okay with stuff that she had
2    been okay with prior to the suicide attempt.  And
3    I'm referring to nonsexual touching, just anything
4    and everything.  And that was what I explained to
5    the investigators.
6 Q  You said she was putting up boundaries and in the
7    text message at 10:22 p.m. on December 28, 2015,
8    she says in parted "I literally can't trust you if
9    you don't respect my boundaries."  Do you see that?
10 A  Yeah.
11 Q  That's a reference to her boundaries, right?
12 A  Yeah.
13 Q  It's not a reference to your schoolwork, is it?
14 A  No.
15 Q  So in that text message, which starts out with a
16   reference to her waking up to you touching me, and
17   several words ends with an assertion that she
18   cannot trust you if you don't respect her
19   boundaries, she was talking about your physical
20   contact with her, not about your schoolwork?
21 A  She was talking about, I think, everything.  Her --
22   if you look at the texts right before here, I say
23   she's constantly vague about things.  She says I
24   know or I don't care.
25      And both this and the 23 of December texts

Page 122

1  were the one that were contended by the
2  investigators. Now, when the suicide attempt
3  happened or after the suicide attempt happened, she
4  started to no be okay with any sort of physical
5  contact. And that as something that I learned over
6  several instances, and we met one time only after
7  the Christmas break was over. That was the 14 of
8  January, where she invited me over to her room for
9  Netflix, despite her saying in the investigation
10 report that our relationship was over before we
11 went on Christmas vacation and her saying that she
12 hadn't communicated with me after the first week of
13 December. And we watched Netflix, fell asleep
14 together. There was nothing sexual and she got
15 upset by that.
16    And it was something that we had one plenty of
17 times prior to her suicide attempt. And I think at
18 that point she realized that she could no longer er
19 have that same sort of relationship. I don't know
20 where that came from. I think she has some sort of
21 deep seated trauma from her previous rape that she
22 claims to have happened in her past.
23    And she also had claimed that she had several
24 previous suicide attempts in her past, one of which
25 her parents walked in on. And I don't know what

Page 123

1  sort of scars that leaves on someone emotionally.
2  But I was very apologetic this whole time,
3  especially after the suicide attempt because I was
4  scared that she was becoming more unstable and me
5  being the person I was at the time, I thought that
6  apologizing was the right thing to do.
7     And I had never had any experience with a
8  relationship before, and I felt if I was the way I
9  was, which was apologetic and trying to take
10 responsibility for things and -- I felt responsible
11 for all the bad stuff that was happening to her in
12 her head and the suicide attempts because I felt
13 that in the relationship, I had been inadequate in
14 some way or I had done something to spur that.
15    And that -- I beat myself up for that for a
16 couple of years after that until I finally
17 reflected enough to realize that's now it was. But
18 she was very push, pull and manipulative which
19 caused me to apologize a lot in the texts. And
20 that's what I explained to the investigators was
21 that I was overly apologetic about things.
22    I think that context is important.
23 Q  Let's take a look back at Deposition Exhibit 7.
24 The first page of Deposition Exhibit 7 in the
25 second paragraph, you are discussing a date in mid

Page 124

1  December; do you see that?
2  A  I do.
3  Q  And you state on that date in mid December, I woke
4  up and placed my hand on ▇▇▇▇▇▇▇ knee out
5  of affection.
6  A  Uh-huh.
7  Q  Yes?
8  A  Yes.
9  Q  Is that still your testimony today?
10 A  It is.
11 Q  And your testimony today is that the 10:22 p m.
12 text message on December 28, in which Ms. ▇▇▇▇▇▇▇
13 refers to wake up to you touching me was a
14 reference to that same event described in
15 Deposition Exhibit 7?
16 A  Yes.
17 Q  And that your next line on page 262 of Deposition
18 Exhibit 13, in your 10:37 p.m. text message is you
19 apologizing for placing your hand on her knee out
20 of affection?
21 A  Yes.
22 Q  And that texts exchange is not a reference to you
23 getting behind in your schoolwork?
24 A  It's reference to both, the one after it, the one
25 at 10:56.

Page 125

1  Q  So the next text messages at 10:38 by Ms. ▇▇▇▇▇▇▇
2  states that she gets angry because you continue to
3  do it and just say sorry. You don't actually
4  change anything. That's a reference to the
5  previous two text messages, is it not?
6  A  Yes.
7  Q  So we now have three text messages at 10:22 by Ms.
8     ▇▇▇▇▇▇▇ at 10:37 by you and -- by you and then
9  10:38 by Ms. ▇▇▇▇▇▇▇ each talking about you
10 touching her. And then your contending that the
11 very next text message is suddenly a discussion of
12 your schoolwork?
13 A  No. It was an overall -- overarching apology.
14 Q  So in the very next text message you state that you
15 can't change what you did. You asks her whether
16 she wants you to feel shitty for the rest of your
17 life, that you can't change what you did and "I
18 violated you and never should have, what do you
19 want me to do."
20    That text message is referring to the three
21 text messages immediately preceding it, isn't it?
22 A  It is. In part it is.
23 Q  And when you were meeting with the investigators,
24 you tried to contend that your texts with Ms.
25 ▇▇▇▇▇▇▇ were referring to your schoolwork and not

32 (Pages 122 - 125)

Page 126

1  to touching her, didn't you?
2      MR. BYLER: Objection to form.
3  A  They were referring to both.
4  Q  So you were asking the investigators to conclude
5     that you were referring to your schoolwork when you
6     said "I violated you and never should have?"
7  A  I was referring to lying to her for that whole
8     finals week. She got really upset because she
9     probably felt some sort of responsibility that I
10    had neglected my schoolwork to help her. And then
11    that made her upset.
12        And lying was never something that was done
13    between us. So that felt like a violation of her
14    trust and her boundaries. And that was something
15    that I beat myself up for a while after that.
16 Q  Your contention in this lawsuit, Mr. ▇ is that
17    anyone who doesn't believe your explanation for the
18    10:56 p.m. text message and its meaning has
19    antimale bias, right?
20        MR. BYLER: Objection to form, arguing with
21    the witness.
22 A  The antimale bias was ignoring the context of these
23    messages and considering me a noncredible witness,
24    despite facts that I presented. She provide a
25    November date. I provided a December date.

Page 127

1     They said I was not a credible witness and
2     then they went with the December date. She was a
3     credible witness. I was not.
4         She said we stopped contact in early December.
5     We clearly did not. She was a credible witness. I
6     was not. She said that the relationship ended
7     before Christmas break.
8  Q  I'm not asking you about any of this.
9  A  I'm telling you.
10 Q  I'm asking you about one text messages that you
11    wrote and asking you whether your contention is
12    that anybody who reads that text message as a
13    reference to sexual violation by you is an antimale
14    bigot?
15        MR. BYLER: Objection to the form of the
16    question, arguing with the witness. Go ahead.
17 A  Anyone that concludes that, without looking at the
18    context and understanding the contest, and then
19    concluded that without looking at the context, yes,
20    they are at fault with that judgment.
21 Q  You testified two to three minute ago that the
22    10:56 p.m. text message was referring to both
23    touching and schoolwork, remember that?
24 A  Yes, touching and lying.
25 Q  You said both touching and schoolwork?

Page 128

1  A  Lying about schoolwork.
2  Q  And touching?
3  A  Yes.
4  Q  So the phrase I violated you and never should have
5     was referring to, according to you at least in part
6     to, touching?
7  A  Yes, because after her suicide attempt, she put up
8     all of these boundaries and she freaked out when I
9     just did basic nonsexual touching. And I didn't
10    know what was going through her head, but this is
11    right after she has a suicide attempt.
12        She freaks out again and that makes me really
13    freaked out that she's going to go and do something
14    again. So, yes, I felt very worried about that
15    and, of course, I apologized because I didn't want
16    her to be going off and doing something again.
17        (Deposition Exhibit No. 14 marked
18         for identification.)
19 BY MR. KEALEY:
20 Q  Mr. ▇ I'm handing you Deposition Exhibit 14.
21    Deposition Exhibit 14 is a Purdue University
22    record. It's a report by somebody named Leanne
23    DeLosh. And it has your name and Ms. ▇
24    name on it. It has the date of February 16, 2016.
25        MR. BYLER: Just for the record, there's no

Page 129

1     Bates stamp on this document, and I would expect it
2     to be included in the production.
3  BY MR. KEALEY:
4  Q  Mr. ▇ the document refers to you coming in for
5     your Purdue Promise coaching meeting. Were you
6     involved in something called Purdue Promise?
7  A  Yes, I was.
8  Q  What was that?
9  A  It seems it was the -- something related to the
10    suicide attempt that I reported for her. So it
11    looks like I got an update.
12 Q  I asked you what was Purdue Promise?
13 A  I don't recall what exactly Purdue Promise.
14 Q  You don't recall coming in for something called a
15    Purdue Promise coaching meeting?
16 A  I vaguely remember a meeting, but I didn't remember
17    the name of it.
18 Q  Is there anything in this document that is
19    inaccurate or inconsistent with your recollection?
20 A  Seems accurate to me.
21 Q  Does this refresh your recollection that you made
22    your report about the ▇ in mid
23    February?
24        MR. BYLER: Objection to form.
25 A  It says when ▇ got back to Purdue this semester,

33 (Pages 126 - 129)

Page 134

1  appeals process.
2  Q   Is there a reference somewhere in that paragraph to
3      antimale bias?
4      MR. BYLER: Objection to form.
5  A   Antimale is assumed in the behavior of the school.
6  Q   That wasn't my question. My question was where in
7      this document, particularly in paragraph 3 that
8      you're pointing to, did you tell Ms. Rollock that
9      the determination against you was based on an
10     investigation colored by antimale bias?
11     MR. BYLER: Objection, asked and answered.
12 A   I think I did not allege antimale bias in this
13     document.
14 Q   So as of this June 23, 2016, you could not point to
15     any conduct of anyone you had encountered among the
16     investigators, panel members or Dean Sermersheim
17     who had said and done anything to you that
18     expressed antimale bias?
19     MR. BYLER: Objection, assumes facts not in
20     evidence, ignores the limitations of the appeals
21     process.
22 A   At this point in time, I was still optimistic that
23     the school would listen to my side of story and to
24     what I had said. And I did not reflect on it and
25     look for evidence of antimale bias at this time.

Page 135

1  Q   Whether you looked for it or not, you had not
2      notice any antimale bias as of June 23, 2016, had
3      you?
4  A   I noticed it when I reflected on it.
5  Q   You hadn't reflected on your experience as of
6      June 23, 2016, when you had been suspended from
7      Purdue and were appealing the suspension; you
8      hadn't yet reflected on your experience?
9      MR. BYLER: Objection, misstates the
10     testimony.
11 A   I had, but I had no experience in how these things
12     worked, and I didn't know that that was something
13     to look for or that that was something that would
14     factor in.
15 Q   When you met with the investigators, you were
16     accompanied by Mr. Connect, right?
17 A   I was.
18 Q   When you went to the panel meeting, you were
19     accompanied by Mr. Connect, right?
20 A   I was.
21 Q   And when you wrote this document, Deposition
22     Exhibit 15, you were assisted by a lawyer, Ms.
23     Cunningham, right?
24 A   When I went to the investigators, actually I don't
25     recall if I had Connect with me. He may have been

Page 136

1      there. I only remember him with me at the
2      committee meeting. I wanted to say that.
3      Could you please repeat the third part?
4  Q   And you had the assistance of Ms. Cunningham when
5      you wrote Deposition Exhibit 15?
6  A   To my recollection.
7  Q   So as of the end of the panel meeting, you had
8      Mr. Connect's professional support in determining
9      whether you had experienced antimale basis, right?
10 A   No. He wasn't -- he wasn't guiding me on how to
11     identify antimale bias. He was simply telling me
12     how to behave in those meetings.
13     MR. BYLER: It's 3:31. When were you thinking
14     of a short mid afternoon break.
15     MR. KEALEY: I'm happy to do so right now, if
16     you'd like. Let's go off the record for ten
17     minutes.
18     THE VIDEOGRAPHER: The time is 3:31 p.m., and
19     we are going off the record.
20     (A short break was taken.)
21     THE VIDEOGRAPHER: The time is 3:47 p.m., and
22     we are back on the record.
23 BY MR. KEALEY:
24 Q   Mr. ▮▮▮▮, in Deposition Exhibit 15, you were not
25     arguing to Ms. Rollock that the procedures used in

Page 137

1      the investigation and determination of the
2      allegation against you were different for you than
3      they would have been for a woman accused of sexual
4      assault, are you?
5  A   No, I did not argue that in this document.
6  Q   And you're not arguing that in this case, are you?
7  A   I am arguing antimale bias, which would imply as
8      such.
9  Q   I'm not talking about anything implied. I'm asking
10     you whether you're saying that in this case that
11     Purdue has two different set of procedures, one for
12     accused men and a different one a accused women?
13 A   According to Purdue's official proceedings, they're
14     the same.
15 Q   And you don't have any reason to believe that
16     they're different?
17 A   Well, I do based on how I was treated when the
18     allegations were initially leveled against me and I
19     was immediately bared from certain parts of the
20     campus. And she was not given any concessions in
21     the sense that I was or restrictions. She was
22     given concessions; I was not.
23 Q   You're saying that the accuser was treated
24     differently than the accused?
25 A   Yes, I was.

Page 138

1  Q   You're not saying that an accused female would have
2      been less restrictive or restricted differently
3      than you are or were?
4  A   No, I'm not arguing that.
5  Q   And, in fact, the Navy maybe also put you under
6      restrictions that they did not put midshipman
7      ▮▮▮▮ under, correct?
8  A   Yes.
9  Q   You're not accusing the Navy of antimale bias?
10 A   The Navy did not have an investigation -- an
11     independent investigation against me, so, no, I do
12     not.
13 Q   With respect to the restrictions that the Navy
14     placed on you and not placed on midshipman ▮▮▮▮
15     you're not accusing the Navy of antimale bias, are
16     you?
17 A   No.
18 Q   Thank you.  Mr. ▮▮▮ the lawyer who assisted you
19     with Deposition Exhibit 15, who you identified as
20     your aunt is a graduate of Northwestern Law School,
21     correct?
22 A   I believe so.
23 Q   Is currently the president of Taylor University?
24 A   Yes.
25 Q   You would consider herself a highly accomplished

Page 139

1      lawyer?
2  A   I don't know her personal accomplishments.
3  Q   Is there some question in your mind whether your
4      aunt, the president of Taylor University, a trained
5      lawyer is highly accomplished lawyer?
6  A   I don't know if she's highly accomplished as a
7      lawyer.  She is highly accomplished and she is a
8      lawyer.
9           (Deposition Exhibit No. 16 marked
10             for identification.)
11 Q   Mr. ▮▮▮ I'm handing you Deposition Exhibit 16.
12     What is this document?
13 A   This document is a request for all documents and
14     materials relating to my official file at Purdue
15     University and a request for the rescindence, if
16     that's a word of the determination that they had
17     dated July 10, 2016.
18 Q   And who participated in the writing of this
19     document?
20 A   I don't recall, but if I had to guess, me and my
21     aunt as well.
22 Q   Where in this document marked as Deposition Exhibit
23     16, do you refer to any antimale bias?
24 A   I don't believe alleged antimale bias in this
25     document.

Page 140

1  Q   In this document, you accuse ▮▮▮▮▮▮ of
2      making a retaliatory allegation of sexual assault
3      against you, correct?
4  A   Yes.
5  Q   At the meeting that you had with the investigators,
6      did you accuse ▮▮▮▮▮▮ of a retaliatory
7      allegation?
8  A   I believe I did.
9  Q   What did you tell the investigators?
10 A   To my recollection, I explained to the
11     investigators the mental health history of her and
12     the suicide attempt that she had, and possibly
13     expressed similarly to this document, similar to
14     what is in this document to them.
15         I don't recall my exact words to the
16     investigators.
17 Q   So your contention in your second appeal to Ms.
18     Rollock was that one of the main reasons you
19     disagree with the determination by Dean Sermersheim
20     was that you believed you were more credible than
21     ▮▮▮▮▮▮ because she had a retaliatory
22     motive?
23 A   You're asking me that?
24 Q   I'm asking you whether that's what you
25     communicated?

Page 141

1         MR. BYLER:  Objection to form.  The document
2      speaks for itself.
3  A   Yes.
4  Q   Keeping Exhibit 16 near at hand, please go back to
5      Exhibit 15.  Tell me where in the Exhibit 15 in
6      your first appeal to Ms. Rollock, you asked that
7      your appeal by decided in your favor because of
8      your allegation of retaliatory motive.
9         MR. BYLER:  Objection to form.  The document
10     speaks for itself.
11 A   I did not have that in the June 23 document.
12 Q   Mr. ▮▮▮ you've had access to the Navy file
13     produced in this case?
14 A   I have.
15 Q   Do you find any indication in the Navy file that
16     anyone informed the Navy of a mental health or a
17     suicide history on the part of Ms. ▮▮▮▮
18 A   I don't recall.
19 Q   You don't recall seeing any such document?
20 A   I don't.
21 Q   And you now have access to the document production
22     from Purdue in this case, correct?
23 A   I do.
24 Q   Have you seen any document indicating that anyone
25     at Purdue told Ms. ▮▮▮▮ that you had made a

36 (Pages 138 - 141)

Page 154

1  authorization.
2  Q  I'm not asking about a court order.  I'm asking
3     about advice of your lawyer.
4        MR. BYLER:  Well, that's the problem, you're
5     asking for my advice and that's attorney/client
6     privilege and that's why I interceded.  Now, I've
7     allowed him to ask -- answer the question you
8     posed, and you're trying to twist into getting
9     attorney/client privileged information, which quite
10    frankly is beyond the pale.  Why don't you ask more
11    questions of this witness?
12 BY MR. KEALEY:
13 Q  Are you asserting in this case that any legal rule
14    entitles you to refuse to execute a medical
15    authorization for Family Concern Counseling?
16       MR. BYLER:  Objection to form.
17 A  Yes.
18 Q  What is the legal rule?
19 A  The legal rule, I don't know.
20 Q  Then why did you answer yes?
21 A  Because I trust my lawyer's judgment.
22 Q  So your refusal to execute a medical authorization
23    for Family Concern Counseling is based on advice of
24    counsel?
25       MR. BYLER:  Objection, misstates the

Page 155

1     testimony.  He gave full testimony about this
2     before, asked and answered.
3  A  Could you rephrase the question, please?
4  Q  No, I cannot.  That's the question.
5  A  Can you repeat the question?
6  Q  I'll have it read back.
7        (The last question was read.)
8  A  Counsel referring to him?
9  Q  Mr. Byler, yes.
10 A  It's not based solely on his counsel.
11 Q  On whose counsel is the advice of counsel?
12       MR. BYLER:  Is there a question pending?
13    Objection to form, then.
14 A  I spoke with Phil.  I spoke with my parents.  They
15    don't have legal experience.  And then I spoke with
16    my aunt as well.
17 Q  Any other advice of counsel besides Mr. Byler
18    and --
19 A  Cunningham.
20 Q  -- Ms. Cunningham?
21 A  Not to my recollection.
22 Q  Have you discussed your pornography addiction with
23    Counselor Perry?
24 A  It's not something I'm going to answer.
25 Q  On what basis are you refusing to answer?

Page 156

1  A  Confidentiality between my counselor and I.
2  Q  You have discussed your pornography addiction with
3     counselors at Taylor University, correct?
4        MR. BYLER:  Objection to the form.
5  A  I don't recall discussing with counselors there.
6  Q  Have you looked at the Taylor University production
7     in this case?
8  A  I have.
9  Q  So you've seen in those records that you did
10    discuss that topic with your counselors there?
11 A  What were their names?
12 Q  I can't quote you names.  I asked you whether you
13    saw in the records that you discussed with your
14    counselor at Taylor University --
15 A  Pornography was mentioned in several documents.  I
16    don't recall those documents being specifically
17    related to counseling.
18 Q  Pornography addiction was mentioned, correct?
19       MR. BYLER:  Objection, form.
20 A  It was.
21 Q  Referring to your pornography addiction.
22 A  Referring to what they called pornography
23    addiction.  I never referred it to that -- I never
24    referred to it as that when I discussed with them.
25 Q  Have you called it something else when you

Page 157

1     discussed with Mr. Perry?
2  A  I won't answer questions about me and Mr. Perry.
3  Q  Have you discussed with Mr. Perry your LSD use?
4  A  I won't answer questions regarding me and
5     Mr. Perry.
6  Q  Who have you discussed your LSD use with?
7  A  I discussed it with my hall director at school,
8     several friends.  It was not LSD; it was an analog
9     to LSD.  I discussed it with only a few people.
10       And I discussed it openly with the people at
11    Purdue because I had mentioned it to a friend and
12    then he reported it -- or at Taylor, sorry.  I had
13    mentioned it to a friend and then he reported it,
14    and then I talked to them about it.
15 Q  That's a hallucinogenic you've been taking?
16 A  Not currently.  It's an analog of a hallucinogenic,
17    and I took it in very small amounts because I had
18    read that it could help with focus and it was very
19    safe to use.  So I used it as directed and it did
20    not help with focus, as I had hoped, but it did
21    help with me lifting out of a severe depression I
22    had while I was at Taylor University.  And it
23    helped with breaking of bad habits, one of which I
24    said was porn.
25 Q  Used as directed by whom?

Page 174

1  Q    With whom?
2  A    With my counsel.
3  Q    Have you ever seen the word disenrollment used in
4       your allegations in this case?
5           MR. BYLER: Excuse me, when you say
6       allegations, that's ambiguous.
7           MR. KEALEY: I don't think it is when he's
8       holding the amended complaint in his hands. I
9       don't think it's ambiguous at all.
10 A    Are you asking me if I took --
11 Q    I'm asking you what you recall.
12 A    Well, right now I don't recall which is why I'm
13      reading through it.
14 Q    Okay. Let's go to paragraph 75 --
15          MR. BYLER: Mr. Kealey, why don't you mark the
16      disenrollment document of the Navy.
17          MR. KEALEY: I am going to. Thank you,
18      Counsel.
19          MR. BYLER: Please do.
20 BY MR. KEALEY:
21 Q    Yes. We're going to go to paragraph 76 of your
22      amended complaint filed in this case. Paragraph 76
23      is on page 41. Are you at paragraph 76?
24 A    I am.
25 Q    In paragraph 76, you told the court that on

Page 175

1       August 16, 2016, you involuntarily resigned from
2       Navy ROTC; do you see that?
3  A    I do see that.
4  Q    In fact, what happened was that the Navy
5       disenrolled you, correct?
6  A    Yes.
7  Q    What is disenrollment?
8  A    Well, I would equate disenrollment and involuntary
9       resignation to getting fired from a job.
10          (Deposition Exhibit No. 21 marked
11             for identification.)
12 BY MR. KEALEY:
13 Q    I'm handing you Deposition Exhibit 21, a document
14      produced by the Navy in this case. This document
15      is dated August 10, 2016. It is from the
16      performance review board of the NROTC unit at
17      Purdue University to the Commanding Officer of the
18      NROTC unit, and the subject is a performance review
19      board for you. Do you see that at the top of the
20      page?
21 A    I do.
22 Q    And you understood that as of August of 2016, you
23      were coming before a performance review board at
24      Purdue Navy ROTC?
25 A    Yes.

Page 176

1  Q    And if we go to the next page, there is a summary
2       of things considered by the performance review
3       board including your academic history; do you see
4       that in Item 6?
5           MR. BYLER: Objection to form, you're
6       misreading the document.
7  A    I see academic history No. 6.
8  Q    And Item 7 is disciplinary problems; do you see
9       that?
10 A    I see Item No. 7 disciplinary problems.
11 Q    And the disciplinary problems listed are an
12      academic warning for the falls semester and an
13      interim leave of absence pending PRB for academics
14      for the spring semester; do you see that?
15 A    Yes. I never had a PRB for academics, though.
16 Q    You had an interim leave of absence pending PRB for
17      academics?
18 A    I did.
19 Q    Now, if you go down to the text on this page, in
20      the second full paragraph of the text, it describes
21      that Lieutenant Willstatter presented a case to the
22      board and brought the board's attention to Section
23      6-16, paragraph 9 of reference A. Do you
24      understand that to be a reference to the
25      regulations for officer development?

Page 177

1  A    Yes.
2  Q    And under that provision of the regulation for
3       officer development, Lieutenant Willstatter
4       presented that a student suspended by the academic
5       institution shall be immediately disenrolled; do
6       you see that?
7  A    I do see that.
8  Q    And you understood that the subject of the
9       performance review board was disenrollment of you?
10          MR. BYLER: Objection to form. Paragraph 1
11      states the purpose of the performance review board.
12 A    Please repeat the question.
13 Q    You were present at this proceeding, were you not?
14 A    I was.
15 Q    And in item 10, it reports "by a vote of three to
16      zero, the performance review board found that
17      midshipman fourth class ▮ was suspended by
18      Purdue University. By a vote of three to zero, the
19      board recommends that midshipman fourth class ▮
20      be disenrolled from the NROTC program."
21      Do you see that?
22 A    I do see that.
23 Q    So that was the purpose of the performance review
24      board that you attended, correct?
25 A    Yes.

Page 178

1  Q   Was disenrollment?
2  A   Disenrollment due to my Purdue suspension, not due
3      to academics.
4  Q   Disenrollment due to your Purdue suspension period?
5  A   Yes.
6          (Deposition Exhibit No. 22 marked
7              for identification.)
8  BY MR. KEALEY:
9  Q   Paragraph 22 dated August 20 also produced by the
10     Navy in this case. It is authored by Commander
11     Hutton and it states that it is his decision for
12     you to be disenrolled from the NROTC program; do
13     you see that?
14 A   I do see that.
15 Q   And the date of this document is August 20?
16 A   Yes, it is.
17 Q   So your departure from Navy ROTC was due to
18     disenrollment on August 20, correct?
19        MR. BYLER: Objection to form.
20 A   It was due to my Purdue suspension.
21 Q   According to Commander Hutton, you were disenrolled
22     from the NROTC program; that's why you were not
23     less longer in it, right?
24 A   Yes.
25 Q   Okay. In paragraph 76 of your complaint in this

Page 179

1      case, you allege to the court that the reason you
2      were no longer in Navy ROTC was that you resigned?
3  A   Involuntarily.
4  Q   You allege that you resigned?
5         MR. BYLER: Objection, asked and answered.
6  BY MR. KEALEY:
7  Q   That's your allegation, right?
8  A   That is my allegation.
9  Q   Were in Commander Hutton's August 20 determination
10     does it state that you resigned from the Navy?
11 A   Clearly we got the wording wrong and should change
12     it.
13 Q   You've known since August of 2016, that you were
14     disenrolled from the Navy, haven't you?
15 A   Yes.
16 Q   And neither of the 60 plus page complaints that you
17     filed in this case disclosed that fact to the
18     court, did they?
19        MR. BYLER: Does the question say in the
20     complaint because it has been disclosed to the
21     court. Only you don't want it disclosed to the
22     court.
23        MR. KEALEY: It does say to the complaint,
24     Counsel.
25 BY MR. KEALEY:

Page 180

1  Q   You've known for four years that paragraph 76 was
2      not accurate, haven't you?
3  A   If I had realized it was inaccurate, I would have
4      changed it. So no, I've not realized it for four
5      years.
6  Q   You attended the disenrollment proceeding, knew
7      that you were being disenrolled pursuant to the
8      regulations for officer development. You knew that
9      that's why you were out of Navy ROTC, not because
10     of resignation. Read your complaints before they
11     were filed. You knew all of those things and did
12     all of those things, didn't you?
13 A   To me, the wording meant the same thing.
14        (Deposition Exhibit No. 23 marked
15            for identification.)
16 BY MR. KEALEY:
17 Q   I'm handing you Deposition Exhibit 23, Mr. ▮▮▮.
18        MR. BYLER: Is this 22 or 23.
19        MR. JONES: 23.
20        MR. KEALEY: 23.
21        MR. JONES: Commander Hutton was 22.
22 BY MR. KEALEY:
23 Q   Mr. ▮▮▮ this document is date at the top
24     August 16, 2016 and it's got your signature dated
25     August 17, 2016. Is this the document that you're

Page 181

1      referring to in paragraph 76 of your complaint?
2  A   Could you please point me to where in paragraph 76
3      I mention a document?
4  Q   Paragraph 76 you state on August 16, 2016, that you
5      had involuntarily resigned from the Navy, from Navy
6      ROTC.
7  A   Yes.
8  Q   I'm asking you if that allegation is referring to
9      this document that we marked as 23?
10 A   No.
11 Q   Is paragraph 76 referring to any document?
12 A   Paragraph 76 would be referring to Exhibit 21, I
13     believe. Involuntarily resigned refers to
14     disenrollment.
15 Q   To be precise, the Navy disenrolled you, not the
16     other way around, correct?
17 A   Correct.
18 Q   Disenrollment was not something you did; it was
19     something the Navy did, right?
20        MR. BYLER: Objection to form.
21 A   Hence, the words involuntary.
22 Q   Did you send something to the Navy saying you are
23     involuntarily resigning from the Navy?
24 A   As I said before, the word is clearly not precise.
25 Q   That's not my question. Did you send something to

46 (Pages 178 - 181)