**PL Opp DSJ 9**

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT FOR THE
 2   NORTHERN DISTRICT OF INDIANA HAMMOND DIVISION
 3   ----------------------------------------------x
 4   JOHN DOE,
 5                 Plaintiff,
 6          V.                    No. 2:17-cv-33-JPK
 7   PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF
 8   TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his
 9   official capacity as President of Purdue
10   University, ALYSA CHRISTMAS ROLLOCK, in her
11   official capacity of Purdue University, KATHERINE
12   SERMERSHEIM, in her official capacity at Purdue
13   University,
14                 Defendants.
15
16   ----------------------------------------------x
17
                              Videoconference
18
19                            December 4, 2020
                              1:30  P.M.
20
21
22
23   Deposition of ERIN OLIVER, held at the above time
24   and place, pursuant to Order, taken before a Court
25   Reporter of the State of Indiana.
```

Page 2

1  APPEARANCES:
2
3       NESENOFF & MILTENBERG, LLP.
        Attorneys for Plaintiff, John Doe.
4       363 Seventh Avenue - 5th Floor
        New York, New york 10001
5
        BY:  PHILIP A. BYLER, ESQ.
6
7       STUART & BRANIGAN, LLP.
        Attorneys for Defendants.
8       300 Main Street - Suite 900
        P.O. Box 1010
9       Lafayette, Indiana 47902-1010
10      BY:  WILLIAM P. KEALEY, ESQ.
11
12 ALSO PRESENT: Bill Lahey.
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2            I N D E X
3  WITNESS         EXAMINATION BY         PAGE
4  Ms. Oliver      Mr. Byler              4
5                  Ms. Kealey             8
6            E X H I B I T S
7
8  OLIVER          DESCRIPTION            PAGE
9  Exhibit 1       Subpoena               4
10 Exhibit 10      Document               12
11 Exhibit 11      Response Statement     16
12 Exhibit 24      Notes                  18
13 Exhibit 25      Notes                  18
14 Exhibit 14      Investigation Report   32
15 Exhibit 19      Text                   36
16 Exhibit 20      Text                   36
17 Exhibit 21      Text                   36
18 Exhibit 22      Text                   39
19 Exhibit 29      Document               79
20 Exhibit 30      Document               82
21 Exhibit 31      Document               82
22
23       R E Q U E S T E D   I N F O R M A T I O N
24
25            R U L I N G S

Page 4

1  ERIN OLIVER, has been duly sworn in and testified
2  as follows:
3  EXAMINATION BY
4  MR. BYLER:
5      Q    Please state your name for the record.
6      A    Erin Oliver.
7      Q    Can you give me your business address?
8      A    100 Grace Hall, Notre Dame, Indiana
9  46556.
10          MR. BYLER: Okay, I was going to
11     mark the subpoena as Oliver exhibit one.
12     Does the Reporter have the exhibits,
13     there should be a subpoena.  Mark that
14     and the simple question is, is the
15     witness appearing today pursuant to the
16     subpoena?
17          THE WITNESS: Yes.
18          MR. BYLER: Mark subpoena one
19     Oliver one, is the subpoena which was
20     provided to everybody including the
21     court reporter.
22          (Marked for Identification Oliver
23     Exhibit 1, Subpoena, dated December 4,
24     2020.)
25          MR. BYLER: My name is Philip

Page 5

1  Byler.  I represent the plaintiff John
2  Doe in the action John Doe vs. Purdue
3  University and others.
4      Q    May I first ask this question.  Have
5  you been deposed before?
6      A    I have.
7      Q    Okay, are you familiar with the
8  question and answer format?
9      A    Yes.
10     Q    Okay, now have you done a Zoom
11 deposition before?
12     A    No.
13     Q    Okay. I will just very quickly say it
14 is basically the same, it is just you have to be
15 careful we don't talk over each other.  I will try
16 my best and you know you want to do this any ways,
17 it is important with technology.
18          Okay, is there any reason you can't
19 give full and complete testimony today?
20     A    No.
21     Q    Okay. Can you summarize your
22 educational backround?
23     A    I received a Bachelor's of Arts from
24 University of Notre Dame in 2005 in American
25 Studies and Anthropology.  I graduated Michigan

Page 38

1 Monica Bloom as director of CARE?
2   A   She again in her staff members and CARE
3 acted as support people within the procedures and
4 so throughout our processes, it was processes.
5   Q   Okay. Did she relate to the
6 investigator specific complaint?
7   A   I am sorry, again jumbled a little bit.
8   Q   Did you have dealing with Monica Bloom
9 at CARE, did you deal with her in the context of
10 dealing with specific complaints that were the
11 subject of that had triggered the investigation
12 that you were doing?
13   A   Yes.
14   Q   Okay. And what was the nature of what
15 Monica Bloom did in connection with you, in support
16 services that CARE provided?
17   A   Primarily would have been accompanying
18 students to the office of to report allegations of
19 sexual assault or sexual based discrimination, and
20 then acting as a support person through the
21 process; attending meetings, attending meetings
22 with those students when they were meeting with our
23 office.
24   Q   Did you ever deal with Monica Bloom as
25 director of CARE with Alexander Horb?

Page 39

1   A   I recall her being the support person
2 for Korissa, during the process. Outside of that
3 no.
4   Q   Ms. Bloom was in CARE? When support
5 person I would like to clarify you are referring to
6 a support person for Korissa Lambert?
7   A   Correct.
8   Q   Let me go to -- Amberger 22 which is a
9 one page document mark as Oliver 22.
10         (Marked for Identification,
11         Oliver Exhibit 22, Text Messages, dated
12         December 4, 2020.)
13   Q   The witness has Oliver 22 in front of
14 you.
15   A   Yes.
16   Q   Purdue 372.
17       Can you identify, Oliver 22?
18   A   Yes, this is a text message from the
19 Dean of Students to me in response to an e-mail
20 requesting an extension to complete our
21 investigation report.
22   Q   Do you recall why you requested an
23 extension?
24   A   E-mail indicates availability and
25 scheduling concerns, but I don't recall anything

Page 40

1 more than that.
2   Q   Alexander Horb has made himself
3 available has it not?
4   A   I don't recall that being a problem he
5 was available in April when we met him, yes.
6   Q   In fact he provided all of those text
7 messages.
8       Okay, turn to the investigation report
9 Oliver 14 which is Purdue bate stamped 373 to 391.
10   A   Yes.
11   Q   The first page is a cover e-mail, is it
12 not?
13   A   Yes.
14   Q   Okay, is that for you?
15   A   It is.
16   Q   Okay. Was the investigation report a
17 product of you, both you and Jacob Amberger?
18   A   Yes.
19   Q   And it was made May 20, 2016 that you
20 sent to the Dean Sermersheim?
21   A   Correct.
22   Q   Do you recall the process by which
23 Mr. Amberger and you drafted Oliver 14?
24   A   I do not.
25   Q   Okay. Let's look at page 374. On the

Page 41

1 first page where it says it has your name and
2 Mr. Amberger's name, correct?
3   A   Yes.
4   Q   And is that your initials?
5   A   It is.
6   Q   And can you recognize Mr. Amberger's
7 initials?
8   A   Yes.
9   Q   Okay. And the first investigation
10 charge, was this the charge you were given for the
11 investigation?
12   A   Yes.
13   Q   And the second number two was relevant
14 provisions.
15       What was being laid out in relevant
16 provisions?
17   A   The section of the university anti-
18 harassment policy that were relevant to the
19 allegations.
20   Q   Okay. On page 376 interview, and do you
21 see that section?
22   A   Yes.
23   Q   And you see there is a list of people
24 there?
25   A   Correct.

11 (Pages 38 - 41)

Page 42

1  Q   Okay. Now I am going to go through the
2  list but I happen to have an un-redacted version,
3  okay, I am going to be asking you if you recall
4  interviewing them number one Alexander Horb?
5  A   I recall interviewing him, yes.
6  Q   Number two Korissa Lambert?
7  A   I do not recall the interview.
8  Q   Number three Donald Alexander?
9  A   No.
10 Q   Do you recall that at some point in
11 time in the 2016 portions of the 2014/2015 school
12 year that Korissa Lambert had a relationship with
13 Donald Alexander for a modest period of time?
14 A   I do not.
15 Q   Anna Early?
16 A   No.
17 Q   When you say no you mean you don't
18 recall the interview?
19 A   I do not recall interviewing.
20 Q   5 is Christopher Fox?
21 A   I do not recall interviewing him.
22 Q   6, Kaitlyn Harrison?
23 A   I do not recall.
24 Q   7, Christine Joel?
25 A   I also do not recall.

Page 43

1  Q   8, Uthuttan, who is the roommate?
2  A   I do not recall.
3  Q   When you say you don't recall, are you
4  saying you just don't recall the interview that you
5  took as opposed to saying you didn't do an
6  interview?
7  A   Correct if these individuals are listed
8  in the section 3, I recall I did interview them, I
9  just do not recall the interviews.
10 Q   That is what I wanted to establish so
11 you have no independent recollection sitting here
12 now, how the interview that was conducted -- of the
13 interviews plural that you conducted?
14 A   Yes.
15 Q   Do you recall that of all the
16 interviews you did on this case Mr. Amberger was
17 with you?
18 A   I do not recall.  Typically that would
19 have been indicated on my notes.
20 Q   Okay. Now, at the very bottom out of
21 page 376 says pursuant to this complaint, we also
22 reviewed the following document slash information,
23 text messages, do you see that?
24 A   Yes.
25 Q   And that reflects that you reviewed the

Page 44

1  text messages that Alexander provided you?
2  A   Yes.
3  Q   And according to the investigation
4  report there were no other documents that you
5  reviewed?
6  A   Correct.
7  Q   Okay. 4, on page 377 it was the
8  statement of allegations correct?
9  A   Correct.
10 Q   Roman numeral 5 is backround that
11 identifies who Korissa Lambert and Alexander Horb
12 and that they met at ROTC?
13 A   Yes.
14 Q   And Roman numeral 6 goes from pages 377
15 to 383 and that is the analysis and findings that
16 Mr. Amberger and you did?
17 A   Yes.
18 Q   And Roman numeral 7 conclusion on page
19 383 were your conclusions?
20 A   Yes.
21 Q   And, Roman numeral 8 on page 384 are
22 the recommendations that Mr. Amberger and you make?
23 A   Yes.
24 Q   By the way, why did you do that, not
25 all schools do that why were recommendations being

Page 45

1  given by the investigators?
2  A   Pursuant to the procedures, and our
3  vice-president for academic and compliance, it was
4  a request for investigators to do so.
5  Q   Have you done any investigations at
6  Notre Dame?
7  A   I have not.
8  Q   Okay, now and 385 through page 391 are
9  the 7 pages of text messages that you attended?
10 A   Yes.
11 Q   That is -- well let's look at it.
12     Page 390 is the 6th page and most of
13 that page is blank is it not?
14 A   I am sorry which page?
15 Q   390.
16 A   Yes.
17 Q   And in fact that just shows one text
18 message on the whole page?
19 A   Correct.
20 Q   And page 391 just shows 5 texts on the
21 page, with most of the page blank?
22 A   Yes.
23 Q   Okay.  Do you have in other words 7
24 pages of text that you have selected from 133
25 pages?

Page 46

1  A    Correct.
2  Q    Okay let's go through this. By the way,
3  on the text that started on 385 to 391 you
4  identified or you select texts only from December
5  23, December 28, and January 14?
6  A    Yes.
7  Q    Okay. In the text on page 385, 386 from
8  December 23, not included are the texts related to
9  cookies being sent by Korissa Lambert to Alexander
10 Horb?
11 A    Correct.
12 Q    If you go back to -- page Oliver 27,
13 pages 321 to 339 -- pages 292.
14      If you can start there; 292.
15 A    Okay.
16 Q    And that shows texts on December 26,
17 and go to page 290.
18 A    What page, I am sorry.
19 Q    287 to 301 these are texts from
20 December 26 and December 25?
21 A    287 -- December 26 text and what was
22 the other page, I am sorry.
23 Q    To 300. These are text on December 26
24 and 25?
25 A    Correct.

Page 47

1  Q    And if you look over to starting on
2  page 302 you have text for December 24 and you go
3  to 321.
4       Those are text on December 24.
5  A    I think it ends at 339 but --
6  Q    No, I said -- I started at 280 and go
7  to 321, 280 to 321.
8       My question is: We see do we not text
9  between Korissa Lambert and Alexander Horb, the
10 days December 24, Christmas Eve. December 25,
11 Christmas and December 26 the day after Christmas.
12      All those pages have text messages,
13 correct?
14 A    Correct.
15 Q    And if you go to -- pages 262 to 276,
16 those are pages reflecting text being on Monday
17 December 28?
18 A    Yes.
19 Q    Now, you attach 4 pages to your
20 investigation report from that day December 28, do
21 you not?
22 A    Yes.
23 Q    Okay. And in the text that we were
24 submitted to you we saw, I believe 18 pages of text
25 on that day, correct?

Page 48

1  A    Yes.
2  Q    Now let's go to -- the first paragraph
3  on page, 377, and it goes over to 378.
4       That first paragraph is a subject is
5  whether, Alexander Horb losses his temper, correct?
6  A    Yes, the end of the paragraph is.
7  Q    Okay, and that is what Korissa Lambert
8  accused Alexander Horb of losing his temper?
9  A    Yes.
10 Q    And Alexander Horb denied it?
11 A    Yes.
12 Q    And you say a witness contradicted that
13 Alexander Horb lost his temper, or would lose his
14 temper?
15 A    Yes.
16 Q    Okay. Now the second paragraph on the
17 first full paragraph on 378 second paragraph of
18 that section under findings and analysis, you deal
19 with a taser correct or a stun?
20 A    Yes.
21 Q    And what you report here is what
22 Alexander Horb and the roommate told you about that
23 taser, or stun at that time?
24 A    Yes.
25 Q    That contradicted what Korissa Lambert

Page 49

1  said about the subject?
2  A    Sorry -- re-read this paragraph, real
3  quick.
4  Q    Go ahead.
5  A    He specifically contradicted there was
6  anything that he chased her.
7  Q    Is the witness waiting for something, I
8  thought I had a question.
9  A    I believe I answered the question if
10 not.
11 Q    Now let's go still on 379, to the
12 third, well it is the paragraph toward the bottom
13 of the page, where it states around December 2015
14 redaction, Mr. Lambert made statements to him that
15 made him to believe that Lambert was considering
16 suicide.
17      Question to you: Do you recall
18 Alexander Horb saying that Lambert was considering
19 suicide or that she had attempted suicide?
20 A    I believe from my notes there was an
21 indication that there had been an incident on the
22 parking garage which I don't again recall the
23 details of and also disclosed my notes indicate
24 several attempts in high school. Again, I don't
25 recall any further detail of that.

13 (Pages 46 - 49)

Page 50

1  Q   Let me continue reading right there and
2  I am going to ask follow-up questions.
3       The investigation report says he
4  reported he was concerned about Lambert the few
5  days after the statements were made he invited
6  Lambert to the residence ballroom to watch a movie,
7  and while watching the movie, Lambert laid on a
8  futon and Horb laid next to her on the floor.
9       Horb reported that he simply reached up
10 from the floor and placed his hand on her leg just
11 above her knee out of affection and concern.
12      Reported that as soon as he did so
13 Lambert woke up became very upset and left the room
14 without saying a word.  He reported they never
15 specifically spoke about the incident or her
16 reaction.  He denied ever digitally penetrating
17 Lambert or touching her in a special way while she
18 slept.  Stop there.
19      This is what Alexander Horb told you in
20 the investigation?
21 A   Correct.
22 Q   Throughout the investigation, Alexander
23 Horb, sticks to what he said was that, he did not
24 engage in any digital penetration and he did not,
25 touch her outside her clothing in her crotch area?

Page 51

1  A   Correct.
2  Q   Go to the top, the bottom of the page
3  it says: "Both Lambert and Horb reported that
4  Horb's roommate was asleep in the room during this
5  incident his roommate reported he was asleep while
6  Lambert was in the room woke up while she was woke
7  walking out of the room reported didn't see
8  anything that occurred and Lambert did not seem to
9  be upset unquote.
10      That is what the roommate told you in
11 the investigation?
12 A   Yes.
13 Q   Did you ever ask Lambert when the
14 roommate was in the room what she said. Why would,
15 a person make a sexual move in terms of going to
16 her crotch?
17      MR. KEALEY:  Object to form.
18 Q   The question is simply:  Did you ever
19 ask her?
20 A   I do not recall asking her that.
21 Q   When you say, "you don't recall" you
22 don't recall in terms of you just don't have a
23 recollection or you don't recall in terms of you
24 didn't ask it?
25 A   I don't have a recollection.

Page 52

1  Q   Did you ask Korissa Lambert -- well on
2  a digital penetration it was true was it not that
3  Alexander Horb denied that he ever had digital
4  penetration, correct?
5  A   Correct.
6  Q   And Korissa Lambert did not have an
7  independent recollection of her being digitally
8  penetrated she was relying on what she said
9  Alexander Horb told her?
10 A   Yes.
11 Q   Now did you ever ask Korissa Lambert,
12 that if she had been digitally penetrated wouldn't
13 she have woken up?
14 A   I have no recollection of asking that
15 question.
16 Q   Pages 385 to 386 are the text messages
17 from December 23, 2015 that were attached to the
18 exhibit.  They are the selection not all but
19 December 23, 2015 text. Let me ask you this, you
20 know take a minute and just read the text on pages
21 385 to 386 which were the text from selected from
22 December 23, 2015, the same day that they had the
23 cookies conversation.
24      Tell me when you are ready.
25 A   Okay, I am sorry, ready.

Page 53

1  Q   Is there anything on these two pages
2  385 and 386 on December 23, where Alexander Horb
3  expressly says to Korissa Lambert that he felt her
4  crotch and digitally penetrated her?
5  A   No.
6  Q   Is there anything in these two pages
7  385 and 386 from December 23, where Korissa Lambert
8  expressly says, that accuses Alexander Horb of
9  feeling her crotch outside her clothing or
10 digitally penetrating her?
11 A   No.
12 Q   And in the middle of page 386 there is
13 a text from Korissa Lambert saying quote you are so
14 amazing.
15 A   Can you point me to the text again.
16 Q   1:06 a.m.?
17 A   Yes.
18 Q   Okay. Now let's go to the next 4 pages
19 of text pages 387 to 390 and I will do the same
20 here, I will ask the witness to read through those
21 4 pages of text before I start asking the question.
22 I have 7 and a half pages of notes, I have about 4
23 pages left.
24      Have you had a chance to review the
25 text of pages 387 to 390?

14 (Pages 50 - 53)

Page 54
1   A   Yes.
2   Q   Is there anything in those 4 pages for
3 December 28, where Alexander Horb expressly says
4 Korissa Lambert that he had felt her crotch outside
5 her clothing or digitally penetrated her?
6   A   No.
7   Q   Is there anything in those 4 pages
8 December 28, where Korissa Lambert accuses
9 Alexander Horb expressly of feeling her crouch
10 outside her clothing or digitally penetrating her?
11          MR. KEALEY: Objection to form.
12   A   No.
13   Q   Given on December 28, you admit 14
14 pages of the text on December 28.
15          How do you know that there wasn't
16 context that you didn't include?
17          MR. KEALEY: Object to form.
18   A   I had that conversation and determined
19 what to include, and I don't recall that
20 conversation.
21   Q   Page 391, this is -- 5 back and forth
22 on January 14?
23   A   Yes.
24   Q   Read those, and then I will ask
25 questions.

Page 55
1   A   I am ready.
2   Q   Okay. Didn't Alexander Horb tell you in
3 the investigation that sometime around January 14,
4 he went over to Korissa Lambert's room and watched
5 a movie with her and they both fell asleep?
6   A   Yes.
7   Q   And you see that the text says,
8 "Korissa you should have left after I fell asleep
9 or woken me back," correct?
10   A   Yes.
11   Q   And the response is, "okay?"
12   A   Yes.
13   Q   And the last is, "Please don't touch me
14 when I am sleeping," correct?
15   A   Yes.
16   Q   Didn't Alexander Horb say to you in the
17 investigation he didn't touch her when she was
18 sleeping in connection with the January 14, text?
19   A   I don't recall specific to that text.
20   Q   Do you recall generally that Alexander
21 Horb told you and Mr. Amberger in the investigation
22 that he didn't touch Korissa Lambert in a sexual
23 way while she was sleeping?
24   A   Yes.
25   Q   Okay. Let's go back to page 381. The

Page 56
1 third full paragraph on page 381 starts Horb
2 initially explained in the investigation a
3 statement in violating Lambert was in reference to
4 her learning that he had not been truthful with her
5 about his academic performance.
6          And then in that same paragraph when he
7 was pressed further about Lambert's statement of
8 her waking up to him touching her he reluctantly he
9 was referring to the incident around December 13,
10 2015 on which he placed his hand on Lambert's leg
11 and she woke up startled. He continued to deny he
12 touched her crouch while she was sleeping and
13 insisted he would merely placed his hand on her
14 thigh above her knee but below her crouch. Stop
15 there.
16          In this part of the report, Alexander
17 Horb is continuing to tell you that what words are
18 in the text are in relationship to other than what
19 Korissa Lambert was accusing him of?
20          MR. KEALEY: Object to form.
21          MR. BYLER: You can answer.
22   A   Yes.
23   Q   Okay. And Alexander Horb continues to
24 say with respect to touching her on her leg it was
25 just above the knee, correct?

Page 57
1   A   Yes.
2   Q   By the way if, Korissa Lambert woke up
3 to Alexander Horb touching her, why would she not
4 wake up if Alexander Horb had digitally penetrated
5 her?
6          MR. KEALEY: Object to form.
7   A   I don't think I can speculate on that.
8   Q   I am sorry, I didn't hear your answer.
9   A   I don't think that I can speculate to
10 that. I don't recall having any information
11 regarding that.
12   Q   Well -- wait a minute, is it true is it
13 not, that Korissa Lambert woke up after she was
14 touched while Alexander Horb says on the knee, she
15 says it was the crotch, right?
16   A   Correct.
17   Q   Okay given that, didn't you ask Korissa
18 Lambert okay, if you woke up startled as to that
19 kind of touching, why didn't you wake up supposedly
20 you were being digitally penetrated?
21          MR. KEALEY: Object to form.
22   A   I don't recall asking that.
23   Q   Go to page 382.
24   A   Okay.
25   Q   Okay. And, I am going to read it.

15 (Pages 54 - 57)

Page 66

```
 1  the text messages don't expressly refer to
 2  Alexander Horb digitally penetrating Korissa
 3  Lambert?
 4      A    Correct. They do talk about touching,
 5  violating and trust concerns.
 6      Q    Did Alexander Horb tell you that the
 7  violating was referring to the limits that Korissa
 8  Lambert was put on him after the touching of her
 9  knee?
10           MR. KEALEY:  Object to form.
11      Q    Do I have a question pending?
12           Question read back.
13           (The last question was read back
14        by the Reporter.)
15      A    Yes, was my answer.
16      Q    Alexander Horb when he talks about
17  touching was referring to touching her on her leg
18  just above her knee?
19           MR. KEALEY:  Object to form.
20      A    Yes.
21      Q    Turn to page 383 again. Conclusion.
22      A    Okay.
23      Q    The last sentence of that third
24  paragraph of the conclusion says evidence supports
25  that Horb touched Lambert while she was sleeping
```

Page 67

```
 1  and evidence also supports that Horb touched
 2  Lambert while she was sleeping in an unwanted and
 3  non-consensual way in December of 2015 okay.
 4           Do you see that December 2015 date?
 5      A    Yes.
 6      Q    That was the date Alexander Horb gave
 7  the incident, was it not?
 8      A    I believe so, yes.  I believe so.
 9      Q    Okay, was it not the case and you can
10  look back at the notice of allegations that Lambert
11  dated it November 2015.
12      A    Yes.
13      Q    So, given the fact that Alexander Horb
14  says December 2015 and Lambert says November 2015,
15  why are you crediting Alexander Horb on that point?
16      A    Not sure as much as crediting the
17  discrepancy and the date didn't seem to be all that
18  critical to the allegations.  They spent a lot of
19  time together and there were significant
20  interactions between that period of time.  There
21  was more of the conduct that occurred during that
22  period rather than a specific date.
23      Q    Your credibility determination did you
24  take in account the suicide attempt of Ms.
25  Lambert?
```

Page 68

```
 1      A    No.
 2      Q    Did you consider any aspect of the
 3  family relationships that Alexander Horb and
 4  Korissa Lambert had?
 5           MR. KEALEY:  Object to form.
 6      A    Can you repeat that.
 7      Q    Did you consider when assessing the
 8  case, any aspect of the family relationships that
 9  Alexander Horb and Korissa Lambert had?
10      A    Not, that I recall.
11      Q    Do you recall at all finding out that
12  Alexander Horb is the son of parents with brothers
13  and sisters?
14      A    No, not that I recall.
15      Q    Do you recall at all finding out that
16  Alexander Horb had sisters who he was thought to
17  respect?
18      A    Not, that I recall.
19      Q    Do you recall anything about Korissa
20  Lambert's family backround?
21      A    I do not.
22      Q    Now with respect to the digital
23  penetration allegation the only person that maybe
24  was in the room was a roommate, correct?
25      A    Correct.
```

Page 69

```
 1      Q    So there was no possibility for
 2  corroboration from some non-party who told what
 3  happened?
 4      A    Correct.
 5      Q    That was true also of the allegation
 6  that, Alexander Horb touched Korissa Lambert
 7  outside her clothes?
 8      A    Correct.
 9      Q    Okay, anything in terms of a person
10  around but her roommate?
11      A    Yes.
12      Q    He said to you, he didn't see any?
13      A    Correct.
14      Q    Well, is it a prime time for making a
15  sexual move if you got a roommate in a room?
16           MR. KEALEY:  Object to form.
17      A    Don't know without knowing the dynamics
18  of that relationship and things.
19      Q    Well, isn't it more credible that
20  Alexander Horb's story about touching the knee out
21  of concern given the fact that the roommate is in
22  the room?
23           MR. KEALEY:  Object to form.
24      A    I am not sure that would sway my
25  thoughts on credibility, one-way or the other.
```

18 (Pages 66 - 69)