**PL Opp DSJ 10**

CONFIDENTIAL

```
                                                        Page 1

 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF INDIANA
 2                 INDIANAPOLIS DIVISION
 3                CASE NO. 2L17-cv-33-JPK
 4
         JOHN DOE,                     )
 5                                     )
               Plaintiff,              )
 6                                     )
               vs.                     )
 7                                     )
         PURDUE UNIVERSITY, PURDUE     )
 8       UNIVERSITY BOARD OF           )
         TRUSTEES, MITCHELL ELIAS      )
 9       DANIELS, JR., in his          )
         official capacity as          )
10       President of Purdue           )
         University, ALYSA             )
11       CHRISTMAS ROLLOCK, in her     )
         official capacity at          )
12       Purdue University,            )
         KATHERINE SERMERSHEIM, in     )
13       her official capacity at      )
         Purdue University,            )
14                                     )
               Defendants.             )
15
16
                         CONFIDENTIAL
17
                   DEPOSITION OF ▄▄▄▄▄▄▄▄▄▄
18
19
            The deposition upon oral examination of
20       ▄▄▄▄▄▄▄▄▄▄, a witness produced and sworn before me,
         Amy Doman, Registered Merit Reporter, Certified
21       Realtime Reporter, Certified Shorthand Reporter, Notary
         Public in and for the County of Hamilton, State of
22       Indiana, taken on behalf of the Defendants, at the
         offices of Stuart & Branigin LLP, 300 Main Street,
23       Suite 900, The Life Building, Lafayette, Indiana,
         scheduled to begin at 9:00 a.m., on Monday,
24       August 17, 2020, pursuant to the Federal Rules of Civil
         Procedure.
25
```

```
                                                        Page 2
 1          A P P E A R A N C E S
 2   FOR THE PLAINTIFF:
 3       Philip A. Byler
         NESENOFF & MILTENBERG
 4       363 Seventh Avenue, Fifth Floor
         New York, NY 10001
 5       212.736.4500
         pbyler@nmllplaw.com
 6
     FOR THE DEFENDANTS:
 7
         William P. Kealey
 8       Tyler L. Jones
         STUART & BRANIGIN LLP
 9       300 Main Street, Suite 900
         P.O. Box 1010
10       Lafayette, IN 47902-1010
         765.423.1561
11       wpk@stuartlaw.com
         tlj@stuartlaw.com
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                        Page 3
 1              INDEX OF EXAM
 2                                   Page
 3   DIRECT EXAMINATION............................ 4
         Questions by Tyler L. Jones
 4
 5
              INDEX OF EXHIBITS
 6
            (No Exhibits Marked.)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                        Page 4
 1       (Time noted: 9:01 a.m.)
 2
 3
 4   having been duly sworn to tell the truth, the whole
 5   truth, and nothing but the truth relating to said
 6   matter, was examined and testified as follows:
 7
 8   DIRECT EXAMINATION
 9   QUESTIONS BY TYLER L. JONES:
10 Q   Good morning, sir.
11 A   Good morning.
12 Q   Can you state your full name for the record?
13 A   Sure.
14 Q   Thank you, sir.
15         My name is Tyler Jones. I represent Purdue
16     University in a matter currently pending in federal
17     court.
18 A   Uh-huh.
19 Q   It's captioned as John Doe V Purdue and a few other
20     people. Obviously, Joe Doe is            I'm sure
21     you know that, and he's proceeding under a
22     pseudonym for the purposes of this case.
23         Have you ever done a deposition before, sir?
24 A   My first time.
25 Q   Wonderful. Well, I'm sure you've spoken with Phil
```

```
                                                        Page 5
 1     Byler a little bit about what a deposition is.
 2     I'll go through a couple ground rules.
 3 A   Okay.
 4 Q   The purpose of a deposition is simply to allow me,
 5     Purdue, to ask questions about what, if anything,
 6     you may know about this case.
 7 A   Sure.
 8 Q   It's a fact-gathering exercise.
 9 A   Absolutely.
10 Q   Since everything we say is going to be typed down,
11     even if I say "strike that, don't take that," she's
12     going to type it down.
13 A   Gotcha.
14 Q   If I cough, it's going to be on the record. If I
15     stutter, it's going to be on the record.
16 A   Okay.
17 Q   Just make you aware --
18 A   Sure.
19 Q   Fair enough.
20         Likewise, because of that, if you could answer
21     with clear affirmatives or negatives as opposed to
22     head shakes, head nods --
23 A   Uh-huh.
24 Q   -- or "uh-huhs, that way it's clear if you're
25     saying "yes" or "no" to something.
```

Page 78

1  for himself, kind of wondering what just happened.
2  Q  Uh-huh.
3  A  Like, post-allegation, I just remember lots of
4     confusion. There's, like, a lot to unpack there.
5     So I'm just trying to, like, remember a lot of the
6     things that went through in his mind and what we
7     were seeing. But I can't remember fully off the
8     top of my head. Could you repeat it again just one
9     more time?
10 Q  Sure.
11    (Record read.)
12 A  I don't believe his attitude in terms of like his
13    sympathy towards her really changed at all.
14    BY MR. JONES:
15 Q  So he wasn't angry?
16 A  No. He never showed visible anger towards her.
17 Q  Not after the charges?
18 A  No.
19 Q  You said he was stressed?
20 A  Yeah, extremely.
21 Q  How so?
22 A  Just couldn't focus on school at all. He couldn't
23    get anything done. Are you talking about
24    post-allegation?
25 Q  Uh-huh.

Page 79

1  A  Yeah. He could not get anything done. He was just
2     really worried about his future, like he was really
3     worried about not being able to become a Navy SEAL,
4     things like that -- because he was instantly out
5     because of the -- yeah, the Navy giving him the
6     letter. I think it was the Navy that told him
7     first, I think.
8  Q  Gotcha.
9  A  Yeah.
10 Q  Can you give me an example? You said he couldn't
11    get anything done.
12    Can you give me an example of that?
13 A  Couldn't get homework done. I mean specifically
14    like academics, he couldn't focus on it. I don't
15    remember if he skipped classes. I can't fully
16    remember that. But I do remember that he just
17    couldn't get his homework done. And I remember the
18    end of that semester, it was just -- it was bad.
19    He couldn't get tests studied for on time. It
20    was just -- from my recollection, it wasn't
21    really -- he wasn't efficient at anything. It was
22    bad.
23 Q  Okay.
24 A  I think -- oh, I do remember one other stress.
25 Q  Uh-huh.

Page 80

1  A  And that was coming from the person who, like,
2     managed Tarkington, telling him that he probably
3     has to move out sooner than he expected because of
4     these allegations. That was another big
5     contributor, trying to figure out where he was
6     going to end up, you know?
7  Q  Who was that?
8  A  I remember the name of the manager. It was the
9     same person when we stayed in for the fire alarm,
10    the one who told us that's fine.
11 Q  Go ahead.
12 A  I was just going to say it was just -- it was an
13    African American lady, I believe. I can't remember
14    much else other than that. I can't remember her
15    name at all.
16 Q  Does the name DeLosch ring a bell?
17 A  It doesn't really, but I never really paid
18    attention to her name.
19 Q  Gotcha.
20 A  So I just kind of went to the office.
21 Q  Did he ever tell you that he thought [redacted] was
22    suicidal?
23 A  Yeah.
24 Q  When did he tell you that?
25 A  He told me that the day he asked me if she could

Page 81

1     come over and sleep over with him in our room. And
2     so what he did was, he came inside and said,
3     "[redacted] is it okay if she comes over?" And I said
4     "Yeah," I mean, we had the rules, right, to not
5     have a girl come over and sleep with each other,
6     you know. But he mentioned that she had tried to
7     commit suicide and then I was instantly totally
8     fine with it. I said, "That's fine, she can stay
9     for the night." So yeah. That's when he mentioned
10    it.
11 Q  How did he tell you she tried to commit suicide?
12 A  He kind of just said it pretty much in a
13    straightforward way, like she -- he kind of told me
14    she was at this, like -- I can't remember the full
15    setting. But she tried to just kill herself,
16    basically, is what he told me.
17 Q  Did he give you any details?
18 A  I think I might muddle them because I can't really
19    remember if it was over a parking garage or
20    something like that. I can't remember.
21 Q  You can't remember the details, if he told you any?
22 A  He definitely told me some, I just can't remember
23    them well. I'm sorry. Unfortunately.
24 Q  Do you remember when this was that you said it was
25    okay for her to come over?

21 (Pages 78 - 81)

Page 90

1 Q  What friend was that?
2 A  Cole Johnson.
3 Q  Cole Johnson?
4 A  I believe, yeah.
5 Q  Gotcha. And what did he say specifically to you?
6 A  He said, "Yeah, I got to show you something," I
7     think something like that, along those lines. And
8     that's when he took me back to the room and then he
9     showed me the letter.
10 Q  What was your reaction?
11 A  It was pure shock, I couldn't -- I almost couldn't
12    believe it was real.
13 Q  Why were you shocked?
14 A  Mostly because ▮ is pretty much a gentleman,
15    very, like, him and I are very similar in terms of
16    Judeo Christian values, and I couldn't see him
17    doing something like that without a woman's
18    consent.
19 Q  So you were shocked because of your past
20    observations with him with ▮
21 A  Yeah. It all seemed very normal and fine to me
22    from my end.
23 Q  From those five or eight observations you had made?
24 A  Uh-huh.
25 Q  Gotcha.

Page 91

1      When ▮ was telling you about these
2     allegations, how did he describe them?
3 A  I don't know if he really described them in detail.
4 Q  Uh-huh.
5 A  I think he just kind of was just visibly shocked
6     and we just kind of looked at it. And I can't
7     really think about much more about what he really
8     described about it.
9 Q  Uh-huh. Is it that you can't remember or you don't
10    know?
11 A  I can't really remember.
12 Q  Okay. I kind of want to get ▮ account, ▮
13    account, of what he told you happened for each one
14    of these.
15 A  Uh-huh.
16 Q  So I know it's kind of a shifting our --
17 A  Okay.
18 Q  -- our mind a little bit.
19 A  Okay.
20 Q  But with regard to the allegation that --
21 A  Uh-huh.
22 Q  -- that ▮ had woken up and ▮ hand was
23    over her genitals --
24 A  Oh, okay.
25 Q  -- what did he tell you happened?

Page 92

1 A  He told me that his hand was on her knee and he
2     tried to wake her up. I don't know actually if he
3     said he tried to wake her up. I'll back pedal on
4     that.
5     But I remember him saying he had his hand on
6     her knee and that she was visibly, like -- because
7     she was apparently erratic the night before. And
8     then apparently, she was erratic that morning as
9     well and just left. And I remember -- what I
10    remember from my personal knowledge, being on the
11    top bunk of the bed and just seeing her leave
12    without really saying much.
13    I can't really remember if any words were
14    exchanged, if any.
15 Q  Did he say why he put his hand on her knee?
16 A  I can't recall exactly what it was.
17 Q  Gotcha.
18 A  I think it was to -- oh, I do remember exactly. It
19    was to comfort her, basically.
20 Q  Okay.
21 A  Yeah.
22 Q  Was she awake?
23 A  I don't know.
24 Q  I mean, did he tell you that she was awake?
25 A  Oh, got it. I don't think he told me.

Page 93

1 Q  Gotcha.
2     What did he tell you about the allegation that
3     he had confessed to her about previously
4     penetrating her digitally?
5 A  Can you say that one more time?
6 Q  Sure.
7     What did ▮ tell you about the allegation
8     that he had confessed to digitally penetrating
9     ▮
10 A  He told me he absolutely didn't do it.
11 Q  Okay. And I know you kind of went into a little
12    bit of the detail with the Taser, the stun gun,
13    stun baton?
14 A  Yeah. I apologize for going too deep.
15 Q  No, no, no, no, no. Don't apologize, we're trying
16    to do some details here. If I call it a Taser,
17    will you know what I'm talking about?
18 A  Sure.
19 Q  Although it sounds like it wasn't a Taser?
20 A  No, it wasn't as strong.
21 Q  Describe it for me, since I haven't seen it.
22 A  It's just like something you can buy off Amazon,
23    something with much lower voltage. It was just
24    more like a little prick.
25 Q  What did it look like?