**PL Opp DSJ 14**

# Exhibit J

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

JOHN DOE,                        )
                                 )
     Plaintiff,                  ) CIVIL ACTION NUMBER
                                 ) 2:17-cv-33-JPK
     vs.                         )
                                 )
PURDUE UNIVERSITY, PURDUE        )
UNIVERSITY BOARD OF              )
TRUSTEES, MITCHELL ELIAS         )
DANIELS, JR., in his             )
official capacity as             )
President of Purdue              )
University, ALYSA                )
CHRISTMAS ROLLOCK, in her        )
official capacity at             )
Purdue University,               )
KATHERINE SERMERSHEIM, in        )
her official capacity at         )
Purdue University,               )
                                 )
     Defendants.                 )

Certified Copy

VIDEOCONFERENCE DEPOSITION OF MEGAN CHESTER

   The deposition upon oral examination of
MEGAN CHESTER, a witness produced and sworn before me,
Megan M. Bowman, Notary Public in and for the County of
Marion, State of Indiana, taken on behalf of the
Defendants, at the offices of Stuart & Branigin LLP,
300 Main Street, Lafayette, Tippecanoe County, Indiana,
on Wednesday, May 20, 2020, scheduled to commence at
2:00 p.m., pursuant to the Federal Rules of Civil
Procedure with written notice as to time and place
thereof.

Page 2

```
 1          APPEARANCES
 2  FOR THE PLAINTIFF:
 3       Philip A. Byler
         NESENOFF & MILTENBERG LLP
 4       363 Seventh Avenue
         Fifth Floor
 5       New York, NY 10001
         212.736.4500
 6       pbyler@nmllplaw.com
 7
    FOR THE DEFENDANT(S):
 8
         Tyler L. Jones
 9       William P. Kealey
         STUART & BRANIGIN LLP
10       300 Main Street
         Suite 900
11       P.O Box 1010
         Lafayette, IN 47902-1010
12       765.423.1561
         tlj@stuartlaw.com
13       wpk@stuartlaw.com
14
    FOR THE U.S. NAVY:
15
         John Matuszak
16       U.S. NAVY - NAVAL SERVICE TRAINING COMMAND
         2601 A Paul Jones Street
17       Building 1
         Great Lakes, IL 60088-2845
18       847.707.5057
         john.matuszak@navy.mil
19
20
21
22
23
24
25
```

Page 3

```
 1           INDEX OF EXAMINATION
 2
 3  Direct Examination..................... 4
       Questions By Tyler L. Jones
 4  Cross-Examination...................... 30
       Questions by Philip A. Byler
 5  Redirect Examination................... 35
       Questions By Tyler L. Jones:
 6  Recross-Examination.................... 36
       Questions by Philip A. Byler
 7
 8
 9           INDEX OF EXHIBITS
10
    Deposition Exhibit No.:
11
    Exhibit 1 - Fact witness approval.......... 4
12
13  Defendant's Exhibit No.:
14  Exhibit A - Email between Adam Sheppard and .. 22
       Alexander Horb, 5/3/16
15  Exhibit B - Memo from Megan Redlawsk to CO, .. 24
       6/14/16
```

Page 4

1 (Time noted: 2:01 p.m.)
2     MEGAN CHESTER,
3 having been duly sworn to tell the truth, the whole
4 truth, and nothing but the truth relating to said
5 matter, was examined and testified as follows:
6
7 DIRECT EXAMINATION
8     QUESTIONS BY TYLER L. JONES:
9 Q  Good morning, ma'am. Can you -- oh, very true. My
10   name is Tyler Jones. I am an associate with Stuart
11   & Branigin. I represent Purdue University and
12   several other named defendants that we have been
13   with defendants in the matter currently pending in
14   Federal Court brought by John Doe, who I'll
15   identify shortly.
16     Mr. Matuszak, do you want to submit your letter
17   for the record?
18     MR. MATUSZAK: Yeah. We have the attorney --
19   or the Navy approval of this deposition. That
20   should be the first exhibit in this -- in this
21   video -- or this deposition. I'm sorry.
22     (Deposition Exhibit 1 was marked for
23   identification.)
24 Q  Very good. And before we get started, I know
25   there's been some debate about your last name. For

Page 5

1   the record, what is your full name?
2 A  My full name is Megan Renee Chester.
3 Q  Thank you. And how would you prefer to be
4   addressed?
5 A  As Megan.
6 Q  Megan, okay. Megan, have you ever given a
7   deposition before?
8 A  I have not.
9 Q  Okay. I'm sure Mr. Matuszak talked to you a little
10   bit about it, but a deposition is basically the
11   parties' chance to ask you some questions about
12   your knowledge of any events in this case.
13   Everything that we are saying right now is being
14   reported, being typed down by a stenographer, so I
15   ask that if I ask you a question, give me a "yes"
16   or a "no," or a "yay" or a "nay," as opposed to
17   head shakes and head nods.
18 A  Okay.
19 Q  I ask that you try to let me finish my questions
20   even though you may know what I'm asking, and I
21   promise I'm going to try my hardest to let you
22   finish your questions -- your answers even though I
23   might know what you're answering.
24     I'm going to assume that you understand the
25   question if you answer it. But if you don't

www.veritext.com    Connor Reporting    800-554-3376
A Veritext Company

Page 6

1  understand it, please let it be known and I'll try
2  to rephrase it or refrain the question if that's
3  fair.
4  A  Okay.
5  Q  And, again, if you need a restroom break, please
6     say so. You're not being held a prisoner here. We
7     can take a break.
8        At this time I want to put on notice that the
9     plaintiff and another party are proceeding under
10    pseudonym in this case. And I'd like to ask you to
11    keep everything -- every name you hear today
12    confidential for the purposes of this deposition.
13 A  Okay.
14 Q  John Doe is a gentleman by the name of [redacted] or
15    [redacted] and Jane Doe is one [redacted]
16    [redacted]. So I'll refer to their legal names right
17    now, but just putting you on notice.
18       Ma'am, did you used to have -- go by the name
19    Megan Redlawsk?
20 A  Yes, I did.
21 Q  When did you change your name?
22 A  I legally changed my name in 2016 when I was
23    married. Megan Redlawsk is my maiden name.
24 Q  Understood. Have you at any point been Megan May?
25 A  I have, yes. That was my previously married name.

Page 7

1  Q  Okay. And then when did you change your name from
2     Megan May to Megan Chester?
3  A  That would have in 2016 when I was married.
4  Q  Understood. Okay. Ma'am, what is your date of
5     birth?
6  A  It is April 26, 1987.
7  Q  Thank you. This deposition is going to be mainly
8     focused on the events occurring between August 2016
9     -- August 2015 and August 2016. At that time, can
10    you give us your position and title with Purdue
11    NROTC?
12 A  I was the Charlie Company commander of Purdue ROTC.
13    I was also their surface warfare officer on staff
14    to advise in surface warfare. And then I also
15    taught a couple of the classes as an assistant
16    professor of Naval Science.
17 Q  Very good, ma'am. And what is a good mailing
18    address for you?
19 A  It is 7701 Langwood Drive, Indianapolis, Indiana,
20    46268.
21 Q  Thank you. And what is a good email address for
22    you?
23 A  It's M-E-G-R-M-A-Y- 87@gmail.com.
24 Q  Thank you, ma'am. Could you please provide a very
25    brief educational history?

Page 8

1  A  Yes. I received my bachelor's of arts in history
2     from the University of Washington in 2009. I
3     attended a few years of master's of arts online
4     program through Southern New Hampshire University,
5     but I did not finish that program.
6  Q  Excellent. Well, it's excellent you got your
7     degree in history.
8        During your time that you were a lieutenant for
9     Charlie Company, what were your duties and
10    responsibilities?
11 A  My primary duties were -- we had approximately 35
12    students that we were in charge of seeing them
13    through the Naval ROTC program. Both students that
14    were on scholarship and trying to be on
15    scholarship, helping them through their further
16    requirements and serving as their general advisor.
17 Q  Thank you, ma'am. And when you say "helping them
18    out," is there anything in particular you mean by
19    that?
20 A  Primarily just advise, mentorship. If they had any
21    questions, come to my office. I was their primary
22    point of contact on staff for any issues that they
23    had if they were officially in Charlie Company.
24 Q  I understand. And may I ask what your reason for
25    leaving the ROTC was?

Page 9

1  A  I transferred. So I was still in the Navy and so I
2     actually transferred in July of 2016 to Newport,
3     Rhode Island.
4  Q  Excellent. And when did you end up back in
5     Indianapolis?
6  A  That was August 2018. I separated from the Navy.
7  Q  Understood. Ma'am, just for abbreviation sake, you
8     understand that if I say "Purdue NROTC," I'm
9     referring to Purdue Naval Reserve Officer Training
10    Corps?
11 A  Yes, I do.
12 Q  Thank you. Can you give me a brief overview of the
13    command structure in place at the Purdue NROTC in
14    2015 to 2016, starting with your commanding
15    officer?
16 A  Yes. At that time, it would have been Captain
17    Hutton. There may have been a little overlap with
18    our previous CO, Commanding Officer Captain Mong, I
19    want to say his last name is, but Captain Hutton
20    was the primary CO during that time. And then
21    underneath him our executive officer was Commander
22    Craig Remaly. Underneath that we had Major --
23    whose last name I have forgotten at this time, but
24    he was our next highest in rank officer. And then
25    he was also in charge of our marine students.

3 (Pages 6 - 9)

Page 18

1 Q Understood.
2 A So we would typically not hold those there.
3 Q Understood. In the mandatory course you were just
4   talking about, was one of the subjects you talked
5   about to the midshipmen reporting sexual assault?
6 A Yes.
7 Q Can you tell me what you would have advised them?
8 A So we would have discussed it in the sense of how
9   it pertains to being in the Navy. So the different
10  types of reporting options that a naval personnel
11  has. There was always a little bit of a
12  interesting overlap between the fact that these
13  students were civilian students and we were
14  teaching them Navy policy and procedure. But we
15  would have discussed mandatory -- different kinds
16  of reporting so either restricted or unrestricted
17  report, who in the Navy could receive such a
18  report, the requirements of what to do if you do
19  receive a report of sexual assault or harassment.
20 Q Was it the expectation that midshipmen who have
21  been sexual assault come forward and report it?
22 A It was the expectation. It was also the hope that
23  our students were comfortable enough coming to us
24  to report such things.
25 Q Understood. Does the NROTC normally investigate

Page 19

1   allegations of sexual assault?
2 A This was the first time I had heard of such an
3   allegation coming forward, so it was the first
4   experience that I had in seeing that there was any
5   sort of investigation done. But it is my
6   understanding that if it had come forward in the
7   past, it would have been taken seriously and
8   investigated.
9 Q Understood. Ma'am, do you recall allegations
10  brought by ▮▮▮ against ▮▮▮ for
11  sexual assault?
12 A I do.
13 Q Okay. Were you ever asked to look into those
14  allegations?
15 A Yes, I was.
16 Q Who asked you to?
17 A I was appointed by the commanding officer to be the
18  investigating officer on staff.
19 Q Would that have been Commander Hutton?
20 A Yes, it would have been.
21 Q Do you know why he asked you to conduct the
22  investigation?
23 A Most likely it was because I was not involved with
24  either of the students directly, not being their
25  company officer. And so I was therefore more

Page 20

1   removed than other staff members.
2 Q Fair to say you weren't -- you didn't have any dog
3   in the race so to speak?
4 A Correct.
5 Q Do you recall what the conclusion of your
6   investigation was?
7 A The --
8   MR. BYLER: Object to the form.
9 Q That's fine. You can answer.
10 A Okay. The investigation that I conducted concluded
11  that -- two things. That the student -- I had been
12  asked to investigate two things. Whether or not
13  our student had been suspended by the University
14  and then whether or not we believed that he did
15  commit sexual assault. So those are the two areas
16  I investigated.
17    And then both counts I found that yes, our
18  student was suspended by Purdue University, and
19  yes, he had been -- it would have been based on the
20  fact that they had found him guilty of sexual
21  assault.
22 Q Understood, ma'am. Do you recall any of the
23  evidence in the case?
24 A So we had the official report from Purdue
25  University, the investigation that they conducted.

Page 21

1   And then the student, Alexander Horb, had submitted
2   a statement on his own behalf.
3 Q Understood. Did you review all of that?
4 A Yes, I did.
5   MR. JONES: Are you good? Okay.
6 Q I think I'll simply kind of pick up if I can. I
7   lost my train of thought.
8   Was there any particular piece of evidence that
9   stood out to you?
10 A That would have been most like -- that would have
11  been the University's report.
12 Q Okay. What about the University's report stood out
13  to you?
14 A In it it had the -- all the information that both
15  students provided from their -- from their side of
16  the case to the University. So we were able to see
17  the information provided by both students. And
18  then it also had a summary of the discussion they
19  had specifically with ▮▮▮ nd their
20  conclusions to explain why it led them to suspend
21  the student.
22 Q Before reaching your conclusions, did you ever
23  speak with Midshipman ▮▮▮
24 A I believe I remember speaking with him at least
25  once and that was in the sense that he wanted to be

6 (Pages 18 - 21)

Page 22

1 able to provide a statement and that was to give
2 him instructions on how to do so.
3 Q Understood. Did you ever speak to ▮?
4 A I also believe I spoke to her once or twice.
5 Again, it was to keep her appraised of what our
6 investigation, the University -- or for the NROTC
7 unit entailed and then see if she wanted to provide
8 any additional information.
9 Q Did she give you any sense that she was making
10 these charges up?
11 A She did not.
12 Q Do you have any concern now that she made all those
13 charges up?
14 A I do not.
15 Q I'd direct you to Exhibit A.
16   MR. JONES: And for, Counsel, for
17 identification, this is NSTC-0180. This is a
18 single page.
19 Q And for your reference, ma'am, if you start from
20 the bottom, it goes reverse chronological order.
21 Take a moment to review this and let me know when
22 you're ready.
23   (Defendant's Exhibit A was marked for
24 identification.)
25 A All right. I am ready.

Page 23

1 Q Okay. Ma'am, had you ever seen this email before?
2 A Yes.
3 Q When have you seen this email?
4 A Most recently yesterday when I was reviewing these
5 exhibits beforehand.
6 Q Fair enough.
7 A Before that, I don't recall if I had seen this
8 particular email as it related to the incident.
9 Q Understood, ma'am. Do you -- I'll direct you to
10 first line at the very top. It says, "Midshipman
11 ▮ Lieutenant Redlawsk is the investigating
12 officer that will be collecting information on the
13 command's side."
14 Is that accurate?
15 A Yes.
16 Q And was it your -- I just want to make certain
17 here. Did -- excuse me.
18 Did ▮ reach out to you to try to
19 update you on his case at any time?
20 A I don't remember specifically if we exchanged
21 emails or anything. I know we did speak at least
22 once so that he could provide his statement.
23 Q Do you recall what his statement was?
24 A I don't. I know that there is a copy of it as part
25 of the report I submitted to our commanding

Page 24

1 officer.
2 Q Understood. So was it your conclusion that
3 ▮ sexually assaulted ▮
4 A It was, yes.
5   MR. BYLER: Objection to form.
6 Q Do you recall what you recommended the NROTC should
7 do?
8 A Yes. I recommended that Midshipman Horb be
9 suspended and removed from the program.
10 Q Understood. Do you believe that dismissal was
11 warranted under these circumstances?
12 A Yes, I do.
13   MR. BYLER: Objection. Calls for a legal
14 opinion.
15   MR. JONES: She answered, so --
16 Q I direct Counsel to Exhibit B. This is NSTC-0168
17 through NSTC-0195. Ma'am, take a minute or two to
18 look this over and let me know when you're ready.
19   (Defendant's Exhibit B was marked for
20 identification.)
21   MR. BYLER: Tyler, I'm sorry. What is Exhibit
22 B? The Bates stamp numbers?
23   MR. JONES: Again, Phil, Exhibit B is NSTC-0168
24 through -0195.
25   MR. BYLER: I thought that was Exhibit A.

Page 25

1   MR. JONES: Nope, Exhibit B.
2   THE WITNESS: All right. I've reviewed it.
3 BY MR. JONES:
4 Q Very good. Megan, having reviewed this, have you
5 seen this document before?
6 A Yes, I have.
7 Q Can you identify it for the record?
8 A Yes. This is the recommendations I gave to our
9 commanding officer regarding the investigation that
10 occurred.
11 Q Understood. And, again, is -- the first page,
12 there's a signature at the bottom. Is that your
13 signature?
14 A Yes, it is.
15 Q Okay. And in the course of compiling your -- or
16 coming to your conclusion here, did you consider
17 Purdue's investigation report?
18 A Yes, I did.
19 Q Did you consider the applicable text messages
20 between ▮ and ▮
21 A Yes, I did.
22 Q Did you consider ▮'s statements in
23 contradiction with ▮ claims?
24 A Yes, I did.
25 Q And after considering all that, did you still come

| Page 30 | Page 32 |
|---|---|
| 1  MR. MATUSZAK: The witness will be instructed<br>2  not to answer that question.<br>3  MR. JONES: Nothing further. Nothing further,<br>4  Phil.<br>5  MR. BYLER: Oh, I'm sorry. Your voice was very<br>6  low. I couldn't hear it. I'm sorry.<br>7  MR. JONES: I didn't want you to think I was<br>8  being dramatic.<br>9  MR. BYLER: Oh, okay.<br>10 CROSS-EXAMINATION<br>11  QUESTIONS BY PHILIP A. BYLER:<br>12 Q  Okay. Could you turn -- could the witness pick up<br>13  again what I understand now is Exhibit B? It's<br>14  Bates stamped -168 to -195.<br>15  Do you have that?<br>16 A  Yes, I do.<br>17 Q  Okay. And this is a document that's entitled, is<br>18  it not, "Preliminary Inquiry Recommendations<br>19  Surrounding Allegation of Sexual Assault Made<br>20  Against Midshipman Fourth Class Alexander Horb";<br>21  correct?<br>22 A  Correct.<br>23 Q  Okay. So this is a preliminary inquiry<br>24  recommendation document; correct?<br>25 A  Correct. | 1  to the Purdue disciplinary case on May 3, 2016, at<br>2  -189 to -191; correct?<br>3 A  Correct.<br>4 Q  Okay. So now, in this document that you've been<br>5  reviewing, there are no memorandum to the file by<br>6  you recording interviews of ▓▓▓<br>7  correct?<br>8 A  Correct.<br>9 Q  Okay. And there's no memorandum in interviews to<br>10  -- with respect to ▓▓▓ either?<br>11 A  Correct.<br>12 Q  Okay. And there's no report like what the Purdue<br>13  investigation report is. It's a, you know, a 10<br>14  page/11 page report. You didn't do that kind of<br>15  report, did you?<br>16 A  Correct.<br>17 Q  Okay. Now, I ask you -- I ask that you be provided<br>18  an exhibit that -- Bates stamp NSTC-00118 to -119<br>19  (sic).<br>20  MR. JONES: Hold on one second, Phil. I'm<br>21  handing it to her.<br>22  MR. BYLER: Okay. Good. No, I know I did<br>23  email it, but I appreciate providing it.<br>24  MR. JONES: I'm just trying to help you out,<br>25  Phil, and make sure we keep this moving. |

| Page 31 | Page 33 |
|---|---|
| 1 Q  Okay. And in this document, the first page is a<br>2  memo by you; correct?<br>3 A  Correct.<br>4 Q  Okay. And then what follows starting on page -169<br>5  to the end, -195, are all or potentially all Purdue<br>6  University documents; correct?<br>7 A  Correct.<br>8 Q  Okay. The -- at -168 is the Dean's June 14, 2016,<br>9  determination letter?<br>10 A  Correct.<br>11 Q  Okay. And that says that Alexander Horb is to be<br>12  suspended for a year; correct?<br>13 A  Correct.<br>14 Q  Okay. And at -170/-180 is the Purdue investigation<br>15  report; correct?<br>16 A  Correct.<br>17 Q  At -181 to -187 are texts that are appended to the<br>18  Purdue investigation report; correct?<br>19 A  Correct.<br>20 Q  And -188 is a list of John Doe's character<br>21  references -- that's Alexander Horb -- the<br>22  character reference he submitted to Purdue in the<br>23  disciplinary case; correct?<br>24 A  Correct.<br>25 Q  And then there's a statement of John Doe submitted | 1  MR. BYLER: Okay.<br>2  MR. JONES: What was the number again?<br>3  MR. BYLER: -0018 to -0019.<br>4  THE WITNESS: Yes, I have that.<br>5  MR. BYLER: Okay. Good. Thank you.<br>6 BY MR. BYLER:<br>7 Q  Is this the June 16, 2016, "Appointment of the<br>8  Senior Performance Review Board Members" at that<br>9  point in time?<br>10 A  Yes, it is.<br>11 Q  Okay. And you were listed in this document as a<br>12  nonvoting member; correct?<br>13 A  Correct.<br>14 Q  Okay. I believe your preliminary inquiry<br>15  recommendation is really for recommending that the<br>16  commanding officer appoint a performance review<br>17  board; correct?<br>18 A  Correct.<br>19 Q  Okay. Look at paragraph number 1. I want to read<br>20  it out loud and you can follow along.<br>21  "Per reference (a), you are hereby appointed as<br>22  Senior Member of a Performance Review Board that<br>23  will consider the performance of Midshipman<br>24  Alexander E. Horb, who is deficient in the<br>25  following areas outlined in reference (a): A.) |

9 (Pages 30 - 33)

| Page 34 | Page 36 |
|---|---|
| 1  Suspension from the University." | 1  with the Purdue NROTC or the Navy to investigate |
| 2      That's what the document says? | 2  the allegations of Carissa Lambert? |
| 3 A  Yes. | 3      MR. BYLER: Objection to the form. |
| 4 Q  Okay. And it doesn't give any other reason for | 4 A  Yes. |
| 5  convening the Performance Review Board? | 5 Q  Okay. Would you -- you can answer. Would you |
| 6 A  Correct. | 6  please repeat your answer? |
| 7 Q  And this is from the commanding officer who was | 7 A  Yes. |
| 8  Commander Hutton? | 8      MR. BYLER: May I -- are you done? |
| 9 A  Correct. | 9      MR. JONES: I'm sorry? |
| 10 Q  Okay. Now go to the next page. | 10     MR. BYLER: Did you have another question? |
| 11     By any chance, do you recognize Commander | 11     MR. JONES: I was thinking about it. Hold on, |
| 12  Hutton's signature at the bottom of the document | 12  Phil. |
| 13  that's -0019? | 13     MR. BYLER: Okay. I didn't hear the first time |
| 14 A  Yes, I do. | 14  you said, you know, you had nothing more. |
| 15 Q  Okay. Is this a document that provides a | 15     MR. JONES: Okay. |
| 16  notification of the Performance Review Board | 16     The only thing, Phil, same question I've asked |
| 17  schedule change? | 17  you for is would you consent to the admissibility |
| 18 A  Yes, it is. | 18  and authenticity of the documents we reviewed as |
| 19 Q  Okay. And does it reflect that the schedule change | 19  exhibits in this deposition? |
| 20  is to reflect an accommodation for the university | 20     MR. BYLER: Sure. You know, we'll argue about |
| 21  appeal by ▓▓▓▓▓ of his University | 21  their meaning obviously. I do have one more |
| 22  suspension? | 22  question of the witness, if you don't mind. |
| 23 A  Yes, it does. | 23     MR. JONES: I don't. Go ahead. |
| 24 Q  Okay. Now, as a result of this change of schedule, | 24 RECROSS-EXAMINATION. |
| 25  was it the case that you transferred out of Purdue | 25  QUESTIONS BY PHILIP A. BYLER: |

| Page 35 | Page 37 |
|---|---|
| 1  and you were no longer at the Purdue ROTC? | 1 Q  Okay. When you refer to "investigation," it's |
| 2 A  That's correct. | 2  true, is it not, that's referring to what is |
| 3 Q  Okay. So in August of 2016, when there was a | 3  reflected in Exhibit B? |
| 4  disenrollment Performance Review Board, you weren't | 4 A  That is correct. |
| 5  there at Purdue; correct? | 5      MR. BYLER: No further questions. |
| 6 A  That is correct. | 6      MR. JONES: John, would you like to advise her? |
| 7 Q  Okay. So as to that Performance Review Board, you | 7      MR. MATUSZAK: Sure. So you'll be getting a |
| 8  didn't have personal knowledge of what they | 8  copy of the transcript for this. You should -- |
| 9  reviewed; correct? | 9  when you get a copy, please read it. If there's |
| 10 A  Correct. | 10  any corrections or additions -- well, corrections |
| 11     MR. JONES: Object to form. | 11  really, you should note them and you should contact |
| 12     MR. BYLER: I'm just checking one thing. | 12  me and we will contact the attorneys and advise |
| 13  Pardon me. | 13  that we have a correct -- some corrections on it. |
| 14 Q  All right. Just to make it clear on the record | 14  Any other questions for me? |
| 15  because the objection, in August of 2016, you were | 15  THE WITNESS: Not at this time. |
| 16  not at Purdue; correct? | 16     MR. JONES: Okay. Off the record then. |
| 17 A  Correct. | 17  (Time noted: 2:57 p.m.) |
| 18 Q  Okay. And you were not at that point in time | 18  AND FURTHER THE DEPONENT SAITH NOT. |
| 19  affiliated with the Purdue NROTC program? | 19 |
| 20 A  Correct. | 20 |
| 21     MR. BYLER: I have no further questions. | 21 |
| 22     MR. JONES: Very briefly. | 22 |
| 23 REDIRECT EXAMINATION | 23 |
| 24  QUESTIONS BY TYLER L. JONES: | 24 |
| 25 Q  Megan, to your knowledge, are you the only person | 25 |