**PL Opp DSJ 17**

```
                                                    Page 1
 1              UNITED STATES DISTRICT COURT
                NORTHERN DISTRICT OF INDIANA
 2                   HAMMOND DIVISION
 3          CIVIL ACTION NO. 2:17-cv-33-JPK
 4    JOHN DOE,                        )
                                       )
 5         Plaintiff,                  )
                                       )
 6         -vs-                        )
                                       )
 7    PURDUE UNIVERSITY, et al.,       )
                                       )
 8         Defendants.                 )
 9
10          REMOTE DEPOSITION OF NOEL PERRY
11
12
         The deposition upon oral examination of
13    NOEL PERRY, a witness produced and sworn before me,
      Janine A. Ferren, RPR, CRR, CSR-IL No. 84-4852,
14    Notary Public in and for the County of Hamilton,
      State of Indiana, taken on behalf of the
15    Defendants, in Valparaiso, port County, Indiana, on
      the 5th day of February 2021, at 1:02 p.m.,
16    pursuant to the Federal Rules of Civil Procedure
      with written notice as to time and place thereof.
17
18
19
20
21
22
23
24
25
```

```
                                                   Page 6
 1    (Time noted:  1:02 p.m.)
 2                    NOEL PERRY,
 3    having been duly sworn to tell the truth, the whole
 4    truth, and nothing but the truth relating to said
 5    matter, was examined and testified as follows:
 6
 7    DIRECT EXAMINATION,
 8       QUESTIONS BY WILLIAM P. KEALEY:
 9    Q  Good afternoon, Mr. Perry.  My name is William
10       Kealey.  I'm counsel for Purdue University.
11       Thank you for coming to your deposition today.
12       We'll handle a few preliminaries first.
13            Would you please state your full name,
14       including your middle name, and a mailing
15       address that you go by.
16    A  My name is Noel Edmond Perry.  My work address
17       is 2004 Valparaiso Street, Valparaiso, Indiana
18       46383.
19    Q  How long have you had that work address?
20    A  Think for a second.  Two and a half years.
21    Q  That's the address of Family Concern Counseling?
22    A  Yes, sir, it is.
23    Q  Have you been deposed before?
24    A  Yes, sir.
25    Q  How many occasions?
```

Page 11

1  Q   So if I say "yes or no" in that tone of voice,
2      it's just my prompt to please go ahead and
3      express your answer as a "yes" or a "no."
4  A   I understand.
5  Q   So in connection with this case, has anybody
6      asked you to prepare any report about Mr. ▮
7  A   No.
8  Q   Please provide me a rundown of your training and
9      studies and credentialing from the time you
10     graduated high school up to the present.
11 A   From the time I graduated from high school?
12 Q   Yes.
13 A   Okay.  I received my undergraduate degree at
14     Purdue University in a technical field unrelated
15     to my current profession.  I then worked in a
16     variety of capacities.  Career experience
17     doesn't matter if it's unrelated to this; is
18     that correct, sir?  Education only; is that
19     correct?
20 Q   This question is about your education, yes.
21 A   Then returned to school to get my master's to be
22     a mental health counselor roughly five years
23     ago.  Achieved that degree, and then sought
24     special certification as an EMDR therapist for
25     the treatment of trauma and other distorted

Page 12

```
 1        cognitions that go along with traumatic life
 2        events.
 3   Q    Just for my background reference, prior to
 4        making a career turn in the direction of
 5        therapy, what generally were the fields in which
 6        you were working?
 7   A    The first 20 years of my career I spent in an
 8        industrial field, marketing and sales.  The next
 9        ten years were also in a marketing/sales
10        capacity in the construction industry.  Those
11        are my primary experiences.
12   Q    So was it in 2015 or 2016 that you made a career
13        turn toward training for counseling work?
14   A    I don't remember exactly, I'd have to do the
15        math.  Let me think for a second here.  Would
16        have been '15, I believe, when I started.
17   Q    By "started," you mean when you started in
18        school?
19   A    Yes, sir.
20   Q    Where was that?
21   A    Grace College, Winona Lake, Indiana.  It's a
22        three-year program.
23   Q    A part-time program or full-time program?
24   A    I'm not sure how to categorize that.  I was in
25        school every week, every semester.
```

```
                                              Page 18

 1        and that was on the 26th of February 2018.
 2   Q    So you met with the parents, and then that same
 3        day, subsequently you met with --
 4   A    No.  That day I only met with the parents.
 5   Q    Okay.
 6             (Defendant's Deposition Exhibit 1 marked
 7        for identification.)
 8   Q    So if we look at Defendant's Exhibit 1, your
 9        note indicates, quote, Client's parents came in
10        for first consultation, end quote.  That's what
11        you mean as the meeting where it was parents
12        only, without ▮▮▮▮▮
13   A    Yes.
14   Q    Why did your engagement begin with the parents
15        in a meeting without ▮▮▮▮▮
16   A    They were concerned about his well-being, his
17        inability to thrive, and were seeking
18        professional help.
19   Q    Did they tell you what they thought the problem
20        was that needed help?
21   A    No, they didn't.  They didn't know what the
22        problem was.  It was a memorable meeting because
23        they were in tears for most of it.  They were
24        heartbroken.  Their son had a past that was very
25        productive and fruitful; had withdrawn, spending
```

1   most of his days in their basement, had broken
2   all relationships with friends, was not
3   thriving.
4       They'd told me he had an altercation at
5   Purdue where he lost his scholarship, was
6   removed from the university, removed from ROTC.
7   He then tried to reengage at another university,
8   I believe it was Taylor University; could not
9   complete the requirements there, couldn't focus,
10  couldn't complete his classes, withdrew, I
11  believe on probation of some kind because of his
12  academic -- inability to achieve academically.
13      They said, "He's just shut down, he's
14  changed, he's not the son we used to have."
15  They were very broken, very upset.
16 Q  In your Defendant's Exhibit 1, under the
17    assessment in connection with meeting with the
18    parents, your problem list entry shows, quote,
19    Anxiety, depression, end quote.
20      Do you see that?
21 A  Yes, sir.
22 Q  Was that their description of the problem?
23 A  At that point, yes.
24 Q  What did they describe as anxiety behaviors?
25 A  That he was having physical symptoms, that he

1   was fearful of going outside of the house, that
2   he had had -- I'm trying to remember at this
3   point. The hospitalizations I think had already
4   happened. He'd been in the hospital with
5   symptoms mocking a heart attack: shortness of
6   breath, palpitations, ongoing stomach problems,
7   fear, worry.
8 Q What did they describe as depression?
9 A No interest in the things he used to enjoy, not
10   relating to his friends that he used to spend
11   time with, not entering into family events,
12   fearful to go anywhere.
13   I remember cutting the grass -- that wasn't
14   their report, it was his report. Cutting the
15   grass was a major thing. He could go out for
16   five or ten minutes, panic would set in; he
17   couldn't breathe. He'd have to go in the house
18   and calm down. Come back out a half hour later;
19   cut a few more minutes.
20   So they shared several stories like that.
21 Q Did they tell you how long he'd been at Taylor?
22 A I don't recall.
23 Q Did you subsequently learn how long he had been
24   at Taylor?
25 A It may have been mentioned, but I don't remember

```
 1        at that point.
 2   Q    Did you have any understanding as to whether it
 3        was more than one semester?
 4   A    No, I don't know.
 5   Q    Did you understand that he had been at Taylor
 6        after he had been at Purdue?
 7   A    Yes, sir.
 8   Q    Over the course of your meetings with ████
 9        was there any discussion of what had worsened
10        between the time he was at Taylor as an
11        on-campus residential student going to classes,
12        and when he came home and couldn't mow the lawn
13        for five minutes?
14   A    I don't remember it in a comparative sense the
15        way you've asked the question.  I don't remember
16        discussing it that way.
17   Q    Do you understand the comparison I'm trying to
18        draw?
19   A    I believe so.
20   Q    That while he was at Taylor, he was living
21        outside the family home, sleeping outside the
22        family home, had a class schedule, was at least
23        a sometime student, maybe not a fully successful
24        student, but nonetheless doing some things as a
25        student in his courses, and then subsequently
```

Page 22

1      unable to mow the lawn for five minutes while
2      living at home?
3   A  We didn't discuss in that kind of detail his
4      experience at Taylor.  It was referenced
5      generally, that he went there and he could not
6      thrive; he came home.
7   Q  And when he came home, his condition worsened?
8   A  It was sometime, I don't know exactly when, it
9      wasn't specified, sometime after he left Taylor,
10     the condition worsened.
11  Q  Just a quick note about your note-taking
12     acronyms, does the term CIT refer to you?
13  A  Yes.
14  Q  Does that mean counselor in therapy?
15  A  Counselor in training.
16  Q  In training?
17  A  So when I first met him, it was at the very end
18     of my internship.  You'll see the transition to
19     CR, which refers to counselor; CL is client.
20         (Defendant's Deposition Exhibit 2 marked
21     for identification.)
22  Q  Let's turn to Defendant's Exhibit 2.  So in
23     Exhibit 1, you had met with the parents on
24     February 26.  Now in Exhibit 2, it is March 15
25     of 2018.  Just for clarity, I have not marked

```
                                                      Page 23
 1    every one of your notes.  To use our time well
 2    today, I've just selected the ones on which I
 3    have questions.
 4         So I want to first talk about the way your
 5    notes are set up.  Looking at Exhibit 2, under
 6    "Chief Concerns:  Mood state and depression,"
 7    are these chief concerns as reported by the
 8    client?
 9  A No.  They're recorded by me.
10  Q So when you wrote "mood state and depression" in
11    this exhibit, was that your concern after having
12    spent a session with Mr. ▓▓▓ that day?
13  A Yes.
14  Q In the same exhibit, in the same part of the
15    exhibit, under "Work Activity," you wrote,
16    quote, Refusing work, doesn't feel he needs to
17    work right now, unquote.
18         Do you see that?
19  A Yes.
20  Q What were you referring to when you made that
21    entry?
22  A The client's statement.
23  Q Did you ask questions about his work activity?
24  A Yeah.  Is he working; it was a simple question
25    asked.
```

Page 108

1        correct?
2    A   Yes.
3    Q   Okay. And "Client reported Friday he heard
4        three judges voted unanimously in appeals court
5        that his case must be retried."
6            Now, he's not a lawyer, but that's your
7        account of what he said?
8    A   Yes.
9    Q   Okay. "Client reported this is a big
10       affirmation that he was railroaded and
11       mistreated by Purdue and ROTC."
12           Do you see that?
13   A   Yes.
14   Q   And that's what the client was reporting to you?
15   A   Yes, that's what he said.
16   Q   Okay. Did he use the word "railroaded"?
17   A   I would have used his words in that situation,
18       yes.
19   Q   Do you recall the context in which this part of
20       your session came up in?
21   A   Let me think right here. I don't. My notes are
22       always in order of how they occurred, so it was
23       towards the end of the session he gave me an
24       update, I guess, on what was happening with the
25       legal matter. We weren't working on it as a

```
                                                    Page 109
 1        therapeutic element.
 2   Q    I was asking if there was some reason why it
 3        came up.
 4   A    I don't recall.
 5   Q    Can you turn to page 68, which is the next page
 6        of that session.  Under "Assessment, Available
 7        Support," you have listed "nuclear family," and
 8        I've seen that throughout your notes.  Why is
 9        that listed as part of your assessment?
10   A    There is substantial research that indicates
11        clients that have good supports in place,
12        consistent good supports in place, have better
13        outcomes.  So we made note of that.  If they
14        don't have it, we try to find it for them.
15   Q    Did ████████ have that kind of support of a
16        nuclear family?
17   A    Yes.
18   Q    Okay.  Do you know if he had brothers --
19   A    Yes.
20   Q    -- or sisters?
21            And this is a plus in terms of the therapy
22        work you do?
23   A    Yes.  He has -- yes, he has siblings, multiple
24        siblings.
25   Q    Above "Available Support" is "Virtue List" and
```

```
                                              Page 110

 1        you have "open-mindedness, love of learning,
 2        love."  That's your assessment?
 3    A   Yes.
 4    Q   Why did you choose these adjectives to describe
 5        ██████
 6    A   He spent a considerable amount of time
 7        researching, studying on the internet, anxiety,
 8        psychological disorders.  He started with
 9        medical research, and then he moved to
10        psychological research.  So he's like a student
11        of learning, is how he impressed me.  Most
12        people wouldn't bother to spend the amount of
13        time he did.  He'd bring comments in from
14        articles and share things with me constantly, so
15        I knew he loved to study and learn.
16             Once I built his trust, he became very
17        curious about EMDR therapy and what I was trying
18        to teach him.  And then he shifted from being
19        resistant and not trusting, to being a learner
20        and curious and open, so ...
21    Q   Okay.
22    A   He was always -- when I say "open-mindedness,"
23        he was always -- go ahead.
24    Q   No, no.  You started to talk about "he always,"
25        and then I didn't mean to interrupt you.
```

```
                                                    Page 111

 1   A   Oh, okay.  He was always very respectful, very
 2       kind.  He's a gentle spirit, warm-hearted, and
 3       very respectful of my time.  So when I say he
 4       was loving in nature, he wasn't selfish, he
 5       wasn't arrogant, you know.  In that sense, he
 6       was a very good client to work with.
 7   Q   Okay.  Now, was your development of trust with
 8       him progress in the therapy you did?
 9   A   Yes.  I would say in the beginning he was one of
10       the most resistant clients I've ever had.  It
11       took a long time to build trust with him.
12   Q   Toward the end, how would you describe the trust
13       relationship?
14   A   Excellent.
15   Q   Did he ever tell you that, at Purdue, he did
16       what he was accused of?
17   A   He told me he did not do what he was accused of,
18       but he never told me what he was accused of.  I
19       don't know.  He didn't tell me.
20   Q   Okay.  Let's turn back to 23, which is page 98
21       and 99, Defendant's Exhibit 23.  No, strike
22       that, I'm sorry.  Okay, I'm sorry.  I meant to
23       go to 25.  I misread my writing.  That's
24       pages 89 to 90.
25   A   I have it.
```

```
                                              Page 112

 1   Q   General question: Did ▓▓▓ describe having a
 2       relationship with his ex-girlfriend?
 3   A   Yes.  He said that they dated for several
 4       months.
 5   Q   Okay.  Do you recall him discussing in terms of
 6       feeling guilt with respect to that relationship?
 7   A   He did at one point; I don't remember which
 8       session it was.  Part of it was guilt for
 9       getting involved in that relationship, choosing
10       to be in that relationship.  I believe there was
11       another time when he talked about feeling guilt
12       related to what had happened.
13   Q   In 25, your attention was directed to the
14       language about client reporting "his actions to
15       be at fault for half of what happened, but his
16       girlfriend and the system was at fault for the
17       other half."
18           Do you recall more specifically what he was
19       talking about?  Was it the relationship in
20       general or was it something else?
21   A   He didn't specify.  He didn't go into detail
22       about what each half was, beyond what I wrote.
23   Q   Did he ever talk to you about guilt about having
24       the kind of relationship he had with that girl?
25   A   He had guilt about being in the relationship.
```

```
                                               Page 113
 1         That was the context when he would talk about
 2         it.
 3    Q    Was it guilt because they had sex?
 4              MR. KEALEY:  Object to form.
 5    A    It was regret -- it was regret, is what I
 6         recall, regret of choosing to be in that
 7         relationship.
 8              (Defendant's Deposition Exhibit 33 marked
 9         for identification.)
10    Q    Let me go to Defendant's Exhibit 33.  This is
11         October 7, 2019.
12    A    I have it.
13    Q    Under "Remarks Made During Session," I want to
14         direct your attention to the second paragraph.
15         "Client added that when he had to leave college,
16         he lost everything, his plan for life, career,
17         social community, and his purpose.  Client
18         reported now he feels that was his intended path
19         and now he feels lost, not knowing what to do
20         with his life."  Stop there.
21              In this session, what's the context of what
22         he's describing to you here?
23    A    Give me one moment to read all my notes.
24    Q    Please.
25    A    Best of my recollection, it was a session on
```

Page 114

1  reflecting on his life, where he's been, the
2  struggle he's been through.  It was more of a
3  reflection overall of his life, is what we were
4  talking about, and how he finds himself in this
5  place and he kind of like doesn't know what's
6  next.  He feels stuck, lost where he's at.
7  Q  When he was going to college at Purdue, he was
8     part of the ROTC program.  Did you have that
9     understanding?
10 A  Yes, I did.
11 Q  Okay.  And when he left Purdue, that is part of
12    what he lost; correct?
13 A  Correct.
14 Q  By the way, on the second page of this, page 36,
15    under "Executive Functioning," you have next to
16    "Intelligence:  Bright."
17 A  Yes.
18 Q  Is that an assessment you made of ▮ in terms
19    of hiss level of intellectual capacity?
20 A  Yes.
21 Q  How did he demonstrate that to you?
22 A  It was actually a challenge in the beginning,
23    because he was working so hard to figure out
24    what was wrong with himself, by researching and
25    these other things, that no matter what I would

```
                                              Page 115
 1      challenge him with or present, he would have an
 2      intellectual, thought-out argument based on
 3      facts he had learned.  It impeded progress in
 4      the beginning.  He was so capable of coming up
 5      with logical arguments, almost debating at
 6      times.  He's a very intelligent guy.
 7   Q  By the way, under "Plan," under "Goals" it says,
 8      "Progress excellent."
 9           By this time of October 7, 2019, was ███
10      making excellent progress?
11   A  Yes.  He was doing much, much better.
12   Q  And that meant that he had come a long way from
13      where he was at the beginning when you first met
14      him in March of 2018?
15   A  Yes, that's correct.
16           MR. BYLER:  I don't have any further
17      questions.
18           MR. KEALEY:  Nothing further from me.
19      Thank you, Mr. Perry.  This concludes the
20      questioning.
21           The only other business item we have with
22      you is that you have the opportunity to review
23      the transcript.  It's optional, not obligatory.
24      If you'd like to review it, then the reporter
25      will send it to you, as we say, for signature,
```