**PL Opp DSJ 19**

**TESTIMONY OF CATHERINE E. LHAMON, ASSISTANT SECRETARY**
**OFFICE FOR CIVIL RIGHTS, U.S. DEPARTMENT OF EDUCATION**

Before the
U.S. Senate Committee on Health, Education, Labor, and Pensions

Hearing on
"Sexual Assault on Campus: Working to Ensure Student Safety"

June 26, 2014

Chairman Harkin, Ranking Member Alexander, members of the Committee - thank you for this opportunity to share the work of the Department of Education's Office for Civil Rights, which enforces our nation's civil rights laws to ensure equal educational opportunity for young women and men attending more than 7,000 colleges and universities across the United States. It is critically important that we ensure safe, nondiscriminatory learning environments for students in schools and I am privileged to lead a dedicated, experienced, and visionary staff that is committed to that critical work.

**Office of Civil Rights**
As Assistant Secretary for Civil Rights at the Department of Education, I am charged with enforcing federal civil rights laws, including Title IX of the Education Amendments of 1972, which prohibits sex discrimination in education programs and activities receiving federal funds. Since the beginning of this Administration, my office has investigated over a hundred sexual violence cases at the postsecondary level, issued policy guidance documents regarding sexual harassment and sexual violence, and provided technical assistance related to sexual violence. Over my office's decades of work in this area, OCR has developed significant expertise in these issues that we regularly share with our federal partners in the effort to address sexual violence in schools.

As effective as we have been over the years, the problem of sexual violence has nonetheless persisted across too many of our students' experiences in institutions of higher education. The best available research suggests that 20% of college women, and roughly 6% of college men, are victims of attempted or completed sexual assault.

Operating from the fundamental principle that one student subject to sexual assault is too many, President Obama established the White House Task Force to Protect Students From Sexual Assault on January 22, 2014, directing the Task Force to focus specifically on permanently ending the cultural prevalence of sexual violence during our young people's typical transition from home to independence through college or university degree completion. This charge from the President commits the Task Force to "develop a coordinated Federal response to campus rape and sexual assault" to end what the President rightly called "an affront to our basic decency and humanity."

Colleges' and universities' core mission to educate students necessarily includes ensuring that their students are safe to learn in class, in school facilities, on their campuses. Sexual assault denies students the right to learn in an educational environment free from sex discrimination. When universities fail to respond adequately to campus sexual assault, they may be forcing the affected students to attend school in a sexually hostile environment. This environment deprives them of their freedom to go to class without being re-traumatized by a perpetrator sitting a few seats away, walk on campus without being harassed by a perpetrator's friends, attend a party on-campus, or even feel safe in their own dorm rooms. And it can profoundly damage students' physical and emotional well-being in ways that deprive them of the opportunity to obtain an education altogether.

I am pleased to see that many colleges and universities are stepping up to the challenge of addressing the problem of sexual assault. For example, within months of the release of the Department of Education's Office for Civil Rights 2011 Dear Colleague Letter on sexual violence, many colleges and universities revised their sexual violence policies and procedures consistent with our guidance. We applaud these schools for taking the initiative to keep their students safe without waiting for enforcement intervention from my office or from the Department of Justice.

But some schools still are failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over. This Administration is committed to using all its tools to ensure that all schools comply with Title IX so campuses will be safer for students across the country.

**Coordinating across Government and with Students, School Officials, and Other Stakeholders**
President Obama launched the White House Task Force to Protect Students from Sexual Assault (Task Force) in January 2014. This interagency effort is charged with addressing campus sexual assault by coordinating Federal enforcement efforts; consulting with advocates, students, colleges and universities, and other stakeholders; and developing recommendations and resources for students and higher education institutions. Led by the Office of the Vice President and the White House Council on Women and Girls, the Task Force includes designees of the Attorney General, the Secretary of the Interior, the Secretary of Health and Human Services, the Secretary of Education, the Director of the White House Office of Science and Technology Policy, the Director of the White House Domestic Policy Council, and the Cabinet Secretary. I serve as Secretary of Education Arne Duncan's designee on the Task Force.

During its first two months, the Task Force prioritized hearing from people across the country who are invested in this issue, holding 27 listening sessions (12 webinars and 15 in-person meetings) with thousands of people including survivors; students; alumni; faculty, staff, and administrators from colleges and universities; parents; national survivors' rights and education associations; local and campus-based service providers and advocates; law enforcement; civil

rights activists; school general counsels; men's and women's groups; Greek organizations; athletes; and researchers and academics.

After hearing from these stakeholders, the Task Force delivered its first report to the President in April 2014, which included recommendations and resources aimed at preventing and addressing campus sexual assault. Key deliverables in that first Task Force report included a 53-page detailed question and answer (Q&A) document issued from my office on April 29th of this year, regarding Title IX requirements for campus investigation and enforcement regarding sexual violence; the creation of a new website – www.NotAlone.gov – that compiles, in one place for the public to access, information related to the law, enforcement, and available government and nongovernmental resources; a compilation of materials related to effective training for students and for school and health center and victim services staff regarding such important topics as trauma-informed responses and best practices for investigations; a chart detailing a school's reporting obligations under Title IX and the Clery Act, and how each intersects with the Family Educational Rights and Privacy Act (FERPA); and a public service announcement about the need for transformation in attitudes toward sexual violence.

Among other provisions, the report calls on colleges and universities to conduct a campus climate survey to assess perceptions of safety on campuses and help identify areas for targeted safety efforts, identifies resources on primary prevention strategies and bystander intervention programs, provides schools with a sample reporting and confidentiality policy so that it is clear to whom on campus students can report confidentially, and delivers a checklist for colleges and universities to use while developing a sexual misconduct policy.

The Task Force report also details commitments to conduct more research, develop additional sample policy language on other key issues, develop training programs for school officials and investigators, and identify promising practices for investigating and adjudicating campus sexual assault cases. For example, several universities have volunteered to pursue research that will help us better understand and prevent sexual assault.

The Task Force report also details this Administration's commitment to improving and better coordinating our enforcement efforts within and across responsible agencies. For example, the Department's Federal Student Aid (FSA) office is responsible for Clery Act compliance, whereas OCR enforces Title IX, and sometimes our efforts overlap. The Clery Act requires institutions of higher education to provide current and prospective students and employees, the public, and the Department with crime statistics and information about campus crime prevention programs and policies. The Clery Act requirements apply to many crimes other than those addressed by Title IX. For those areas in which the Clery Act and Title IX both apply, the institution must comply with both laws. To clarify roles and increase efficiency, FSA and OCR have formalized an agreement to ensure effective handling of complaints and to facilitate information sharing.

3

Similarly, OCR and the U.S. Department of Justice's Department's Civil Rights Division (CRT) both enforce Title IX, and we have committed to improving our coordination and collaboration. The two offices have entered into an agreement to enhance our collaboration and strengthen enforcement. These changes will improve the Administration's collective enforcement efforts to ensure that schools comply with Title IX.

Finally, the Task Force report announced our commitment to make OCR enforcement activity more transparent, in this and all areas. Shortly after the Vice President released the Task Force report, my office began making public the list of colleges and universities we are investigating regarding sexual violence concerns. This new transparency adds an important tool to the culture change President Obama called for when creating the Task Force, beginning a new era when our collective disapprobation of sexual violence holds fuller salience and effect at colleges and universities.

**OCR's Efforts to Address Sexual Assault on College Campuses**
OCR's work begins with the recognition that each school has the ultimate responsibility for creating a nondiscriminatory learning environment and ensuring that its policies, practices, and procedures protect all students from discriminatory abuse, violence, and harassment. There is no universal, one-size-fits-all approach that will be right for every school or all students; and the Department makes no effort to mandate a single approach. School policies will vary in detail, specificity, and components, reflecting differences in state or local legal requirements and each school's students, size, administrative structure, and what it has learned from past experiences.

- **Issuing Policy Guidance on Title IX and Sexual Violence**

OCR issues policy guidance to inform schools and the public about critical and emerging issues arising under the laws and regulations OCR enforces, as a complement to our technical assistance and enforcement activities. This policy guidance offers clear direction to schools in areas of pressing concern, including sexual violence.

Despite the fact that schools have had a longstanding obligation under Title IX to respond to sexual harassment and sexual violence against students, our enforcement work and the technical assistance requests that we receive indicate that schools have been unsure of how to handle some of the unique issues that arise in this context. For example, through our investigations, we know that some colleges and universities are:

- Retaliating against students for filing complaints thereby discouraging other survivors from filing complaints
- Delaying investigations for months or longer
- Delaying services and support to survivors when their investigations are pending or providing inadequate interim relief

4

- Utilizing policies and procedures that are not clear, transparent, or fair, or not following its own procedures
- Addressing sexual violence solely as a criminal matter and not under Title IX or delaying the Title IX investigation pending the conclusion of the criminal investigation
- Allowing the perpetrator to remain in school after being found responsible for sexual assault and then sexually assaulting another student

To address this, OCR issued guidance in April 2011 in the form of a Dear Colleague letter (2011 DCL) to help schools better understand their obligations under Title IX to prevent and respond to sexual violence. OCR's 2011 DCL marked the first time that any Administration had issued guidance under Title IX specifically dealing with sexual violence.

The 2011 DCL affirms that the Title IX requirements for sexual harassment and OCR's 2001 guidance on sexual harassment also apply to sexual violence and lays out the specific Title IX requirements applicable to sexual violence. It addresses the unique concerns that arise in sexual violence cases, such as the role of criminal investigations and a school's independent responsibility to investigate and address incidents of sexual violence, regardless of whether a criminal violation is found. It also provides guidance and examples about key Title IX requirements and how they relate to sexual violence — including schools' obligations to have a policy against sex discrimination, the important role of Title IX coordinators, and the requirements for a school's grievance procedures to be prompt and equitable. The 2011 DCL discusses the proactive efforts schools can take to prevent sexual violence and to educate employees and students and provides examples of the types of remedies that schools and OCR may use to respond to sexual violence.

Our release of the 2011 DCL is widely credited with having sparked significant changes at colleges and universities as they worked to meet Title IX's requirements consistent with the 2011 DCL. Those efforts generated many further questions from schools and students about how to apply the requirements and recommendations articulated in the 2011 DCL. To answer those questions, OCR issued a Q&A document on Title IX and sexual violence (Q&A) on April 29, 2014, to give schools and students the information they need to ensure compliance with Title IX, and, more importantly to prevent and effectively respond to victims of sexual violence.

The Q&A answers questions OCR has received since the release of the 2011 DCL, provides perspective based on our more recent sexual violence investigations and resolutions, and offers recommendations for good policies and practices. It provides more guidance on what OCR means when we say that Title IX requires schools to take interim measures before the outcome of an investigation. It makes clear that Title IX protects all students from sexual violence, regardless of whether they have a disability or are international or undocumented, and regardless of their sexual orientation and gender identity. The Q&A provides answers to a number of questions OCR received with respect to confidentiality requests and employees' reporting

5

obligations. It also provides more information on training, education, and prevention, including detailed guidance on training employees to understand their role in protecting student's rights and education and prevention programs aimed at students. Finally, the Q&A answers questions that OCR has received regarding the intersection of Title IX and the Clery Act. The Q&A explains that Title IX and the Clery Act are two separate statutes and that schools must comply with both. It also reiterates that the amendments to the Clery Act in the Violence Against Women Reauthorization Act of 2013 in no way alter schools' obligations under Title IX, including those set forth in OCR's 2011 DCL.

- **Providing Resources and Technical Assistance**

OCR has 12 regional offices around the country that are equipped to provide technical assistance to school officials, parents, students, and others to inform them of their rights and responsibilities under the law.  OCR does this through a variety of methods, and the form of our assistance is dictated largely by the needs of the school, group, or individuals requesting information.  In some instances, a school will contact OCR because it has questions about the best way to comply with Title IX, and OCR will have a phone or in-person meeting with the relevant administrators of the school to listen to their concerns and provide guidance on how to ensure compliance.  This provides schools with a way to come into compliance without the threat of enforcement action.  Likewise, OCR routinely participates in trainings and conferences conducted by groups that count college and university leadership among their members, such as the National Association of College and University Attorneys.  Again, this type of assistance provides schools with an outlet to ask questions and receive answers directly from OCR—without worrying about opening themselves to an enforcement action.  OCR also participates in community meetings, and publishes and disseminates materials to students, parents, teachers, administrators, schools, and community groups.

- **Enforcing Title IX**

OCR's complaint process allows any member of the public to file a complaint with our office. Since the beginning of this administration, OCR has received 260 complaints involving sexual violence in educational institutions as of June 19, 2014. One-hundred and forty-seven of those 260 were at the postsecondary level. My office also launches proactive investigations, such as compliance reviews and directed investigations, to remedy possible violations of students' rights. We initiate compliance reviews to examine potential systemic violations based on various sources of information, including statistical data, news reports, and information from parents, advocacy groups, and community organizations.

We can also initiate directed investigations when a report or any other information indicates a possible failure to comply with the regulations and laws enforced by OCR. A directed investigation is a review that allows for immediate investigation of urgent and critical civil rights problems where the effects of possible discrimination are sufficiently serious to deny or limit the ability of students (and others) to participate in, or benefit from, the educational program or

6

activity. Since January 2009, OCR has initiated 20 proactive investigations (i.e. compliance reviews and directed investigations) focused on sexual violence and 14 of these are at the postsecondary level. The Obama Administration has prioritized addressing sexual violence in our nation's schools: sexual violence compliance reviews are almost 13 percent of the total number of compliance reviews that my office has initiated since 2009, while sexual violence complaints are less than 1 percent of the total number of complaints we receive.

Under the statutory enforcement scheme, when we find a recipient of Department funding to have violated Title IX or any of the civil rights provisions we enforce, we must attempt to obtain voluntary compliance by the recipient. If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school. To revoke federal funds— the ultimate penalty—is a powerful tool because institutions receive billions of dollars a year from the federal government for student financial aid, academic resources and many other functions of higher education. OCR has not had to impose this severe penalty on any institution recently because our enforcement has consistently resulted in institutions agreeing to take the steps necessary to come into compliance and ensure that students can learn in safe, nondiscriminatory environments.

OCR has strengthened our enforcement procedures, including instituting time limits for negotiating voluntary resolution agreements. The voluntary resolution process is usually much faster than litigation but it can still take time and include frustrating delays. To ensure efficient as well as effective resolution of noncompliance findings, and to help guard against the risk that a school might extend negotiations to delay enforcement, OCR has placed a 90-day limit on voluntary resolution agreement negotiations where we have found a school in violation of the civil rights laws we enforce, including Title IX. In addition, we have changed our procedures to make explicit that schools should provide survivors with interim relief – such as changing housing or class schedules, issuing no-contact orders, or providing counseling – where necessary because of safety concerns pending the outcome of an OCR investigation.

These outcomes highlight the robust remedies we require in our resolution agreements, which are designed to empower the entire school, college, or university community to address issues of sexual violence. Our remedies engage schools and communities to create lasting and meaningful change, and we remain actively involved in monitoring to ensure that paper promises translate into lived reality for students in affected schools.

- **Increasing Transparency**

Soon after I took office in August 2013, I instructed my staff to post nearly all recent resolution letters and agreements with recipients on our website, except those documents that raise individual privacy concerns. In addition, as discussed above, we have posted sexual violence resolution agreements and letters on NotAlone.gov to make them more accessible to students, parents, and community members.  And, as discussed above, we have made public, for the first

7

time, a list of all colleges and universities under OCR investigation for the handling of sexual violence and harassment complaints. My hope is that this increased transparency spurs community dialogue about this important issue. I expect that this additional transparency regarding resolution agreements, as well as institutions under investigation will be an important enforcement tool, raising public awareness regarding the issues and prompting action at additional schools to achieve fuller compliance with the laws.

Consistent with these transparency efforts, the Department also plans to collect and disseminate a list of Title IX coordinators at the postsecondary level starting in 2015. Every college and university is required by law to designate at least one Title IX coordinator, an employee charged with coordinating the school's Title IX responsibilities. Schools are required to notify students and employees of the name and contact information of the Title IX coordinator. However, there is currently no central, national repository of coordinator contact information. My office is working with the Department's Office of Postsecondary Education to collect and disseminate the list of higher education Title IX coordinators annually so students, employees, parents, and community members can easily locate their school's coordinator. We also hope that this information will encourage Title IX coordinators to communicate with each other and share best practices for Title IX compliance.

**Conclusion**

As Secretary Duncan has said, "All members of the campus community bear responsibility for acting now to end campus cultures that tolerate sexual violence. The days of telling survivors they should just forgive and forget sexual assaults must come to an end." Along with the rest of the Administration, we at OCR are committed to helping colleges and universities achieve these goals. By coordinating with other government agencies, vigorously enforcing Title IX, increasing transparency in our investigations and resolutions, issuing policy guidance on Title IX and sexual violence, and providing resources and technical assistance, OCR continues to work to remedy hostile campus climates and make campuses safe for all students.

I would be happy to respond to questions from the Committee.