# PL Opp DSJ 22

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF INDIANA

# HAMMOND DIVISION

## CASE NO. 2:17-cv-33-JPK

_____

|  |  |
|---|---|
| JOHN DOE, | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| -vs- | ) |
|  | ) |
| PURDUE UNIVERSITY, PURDUE | ) |
| UNIVERSITY BOARD OF TRUSTEES, | ) |
| MITCHELL ELIAS DANIELS, JR., | ) |
| in his official capacity as President of Purdue | ) |
| University, ALYSA CHRISTMAS | ) |
| ROLLOCK, in her official  capacity at | ) |
| Purdue University, KATHERINE | ) |
| SERMERSHEIM, in her official capacity | ) |
| at Purdue University, | ) |
|  | ) |
| **Defendants.** | ) |

_____

### INITIAL REPORT OF R. CHRISTOPHER BARDEN, Ph.D., J.D., LP

1.  I,  R. Christopher Barden, Ph.D., J.D., LP, a licensed psychologist ( MN and TX )
and licensed attorney (MN and many other states pro hac vice), have testified and/or

consulted as an expert witness in many jurisdictions with regard to a number of areas including investigative methodologies, standards of care in investigations including abuse cases, the science of memory-false memories-tainted memories, the science of investigative interviewing, misconduct and malpractice in investigations, clinical psychology, psychopathology, psychotherapy, diagnostic issues, coping-resilience science, the nature of science, Frye-Daubert-Kumho science analysis, history-methodology-standards of care in criminal and related investigations, the reliability of various scientific methodologies, investigative methods and procedures, as well as standards of care-licensing-ethical standards for attorneys and mental health professionals and investigators (psychologists-MSWs-Counselors-GALs-social workers-psychiatrists-parenting consultants, forensic experts, expert witnesses, etc).  I have given invited training addresses on these and/or related topics to the national meetings of the American Bar Association, American Psychiatric Association, American Psychological Association, the U.S. Surgeon General's Conference, as well as invited training talks at the United States Military Academy at West Point, regional F.B.I. training meetings, the Minnesota Sex Crimes Investigators Assn, the Midwestern Sex Crimes Investigators Assn, and many institutions including Harvard Law School, Harvard College, Yale, Columbia, for Oxford University Press, the University of Southern California, Penn State, and the State Universities of California, Minnesota, Georgia, Texas, Washington, North Carolina, and others.  As an expert in these (Science, Psychology, Methodology, Investigations, Standards of Care) and related areas, a former member of a State Board of Psychology (MN), a former Special Assistant Attorney General (UT), the recipient of two national research awards in the science of coping and resilience, and someone who has published in the leading journals/texts in social psychology, personality psychology,  psychiatry, child development, law, public policy, and pediatrics, I have written the following initial investigative report of my analysis in this case.   (See, Exhibit A, Resume of R. C. Barden).  My investigation in this matter is ongoing and updates to this report are expected as new information becomes available for review — including observations of witnesses at hearings, depositions, and trial.   All opinions herein are good faith hypotheses and/or other opinions to a reasonable degree of professional

certainty offered within the well-known limits of reviews of documentary and related evidence as listed below, potential conflicts of interest of various kinds, and the known limitations of expert witness reports by social science, psychological, and legal professionals. In this case, I have not psychologically investigated, nor assessed, nor interviewed, nor evaluated, nor tested, nor diagnosed, nor treated, nor conducted therapy, nor met, nor spoken to, any witness in this case. I will not offer diagnoses with regard to anyone in this matter. As always, I offer no legal opinions nor any opinions as to veracity of witnesses or the ultimate issues in any case. I do intend to offer expert opinions regarding A) <u>peer reviewed, scientific information</u> to assist the court, attorneys, and others in evaluating the complex issues in this case, B) a range of science based <u>investigative hypotheses</u>, C) <u>methodological and ethical analyses</u> of, and opinions about, the methods, procedures and practices applied in the investigation of this case, and D) related opinions and alternative investigative hypotheses. As in all legal cases, only the trier of fact can assess and/or determine the credibility of witnesses and the relevance of general scientific research to any particular case. This initial report is subject to time and cost limitations and is transmitted at this time to offer a good faith, informative disclosure of my opinions at this point in the investigative process. In my opinion, a key role of an expert witness is to help the court, lawyers, parties, and the public understand and apply reliable scientific, technical, and investigative principles, hypotheses, methods, and information. I expect that additional and updated opinions in this case will be issued following my observations, review, and methodological analyses of the testimony from witnesses at the trial of this matter.

2.      QUALIFICATIONS IN PSYCHOLOGY: I received a B.A. in child psychology from the internationally acclaimed Institute of Child Development at the University of Minnesota graduating Summa Cum Laude, Phi Beta Kappa and receiving the Distinguished Graduating Senior Award. I received my Ph.D. in clinical-child psychology from the University of Minnesota, an internationally respected, American Psychological Association accredited, training program in clinical psychology. I received additional

graduate and clinical training at the University of California, Berkeley and at the Palo Alto U. S. V.A./ Stanford University Medical Center. I received a number of national fellowship and other scholarship awards and grants from the United States National Institute of Mental Health (NIMH) and the National Science Foundation (NSF).  I am currently a licensed psychologist in the State of Minnesota (LP 1460) and in the State of Texas (LP 2-2624).  I have been in good standing in all jurisdictions where I have practiced as a psychologist and/or expert witness and have never been disciplined in any way at any time. I have extensive clinical psychology experience in conducting psychotherapy and assessments in medical, outpatient, forensic, correctional, educational and inpatient settings working with a wide range of client populations including adults, children, adolescents, families, prison inmates, hospitalized inpatients, traumatized veterans, surgical patients, pediatric patients,  and other patient groups.  I've served on the Editorial Consulting Board of the official American Psychological Association journal for child psychology, Developmental Psychology.  I've received two national research awards in psychology including the psychology of coping and resilience from the Foundation for Child Development and the W.T. Grant Foundation. I've served as a Principal Investigator (the person responsible for the project including the funds) on a number of state, federal, and private research grants. I have published in, and/or served as an editor or reviewer for, several of the most highly regarded journals and texts in psychology, medicine and law including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation. I have given invited addresses on a number of psychological topics to the American Bar Association, the American Psychological Association, the American Psychiatric Association, the U.S. Surgeon General's Conference, the International Association of Plastic and Reconstructive Surgeons and many other groups.  I served a four-year term as a member of the Minnesota State Board of Psychology appointed by Governor Arne Carlson.  Many of my invited addresses have focused on

methodological and scientific problems in the mental health and criminal investigative systems.  I have personally investigated — as an attorney and as a psychologist - hundreds of cases of negligence, malpractice, and misconduct by mental health professionals and criminal investigators including cases of accurate, and/or tainted, and/or false memories of abuse. I have also been asked to consult with and/or train groups of law enforcement personnel — regarding the proper methodology for investigations — including sex abuse investigators and other officials as well as F.B.I. agents, police officials, U.S. Department of Justice U.S. Attorney's Office personnel and related professionals. I served as a Special Assistant Attorney General for the State of Utah helping to prosecute licensing violations and misconduct by mental health professionals.  I have also given invited addresses on maximizing coping and resilience skills at Harvard Law School, the Center for Enhanced Performance at the United States Military Academy, West Point, NY, the International Sports Psychology Conference (at the 2008 Beijing Olympics) and to state and regional training meetings of the F.B.I.   One of my main areas of concentration as a clinical psychologist-scientist-investigations expert has been to <u>protect the mental health, legal, and criminal justice systems from misleading psychological myths and unreliable methodologies</u> including but not limited to helping courts and professionals understand the methodology of reliable investigations, the science of human memory, the science of memory contamination ( including the risks of false memories induced by poorly trained psychotherapists and/or investigators ), the risks of improper-unreliable interviewing/ therapy methods, proper and improper uses of psychological testing, the risks of reliance upon "clinical judgment" methods,  the well-documented limitations of "professional expertise" in the psychotherapy and investigative professions, the well-documented inability of psychotherapists and investigators to reliably distinguish true from false witness (or patient) statements in the absence of corroborating evidence, ethical and standard of care rules requiring therapists and investigators of all kinds to fully, fairly, honestly, and accurately disclose to attorneys-patients-courts-officials-committees-the public <u>the methodological limitations and defects in their practices</u>, <u>the risk of missing-hidden and/or manipulated evidence, the risks of failing to generate and test alternative</u>

<u>investigative hypotheses, and related issues</u>.  My work has been recognized nationally and internationally.  See e.g.  Barden, R.C., Memory and Reliability: Developments and Controversial Issues.  In Witness Testimony in Sex Cases,  Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover,  Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016.  See, the foreword by The Right Honorable, The Lord John Thomas of Cwmgiedd, Lord Chief Justice of England and Wales.

     3.     QUALIFICATIONS IN LAW:  I received a law degree with honors (J.D., cum laude) from Harvard Law School as well as training in forensic psychology/psychiatry from the joint Program in Law and Psychiatry at the Harvard Law and Medical Schools.  I served as Adjunct Professor of Law at the University of Minnesota Law School and at the Hamline University School of Law, teaching "Psychology, Psychiatry and the Law" at both institutions.  I was admitted to the practice of law in Minnesota on October 23, 1992 (License #227316), admitted to practice before the United States District Court of Minnesota on November 18, 1992 and admitted to Practice before the United States Court of Appeals for the Eighth Circuit on May 24, 1994.  I have practiced in more than a dozen state and federal jurisdictions via pro hac vice admission.  I am, and have always been, in good standing in every jurisdiction in which I have practiced.  As a trial attorney,  I have litigated dozens of cases in many states involving negligent mental health professionals including a number of complex Frye-Daubert hearings excluding junk science methodologies. I have been invited to speak on these and related topics to a number of State Bar Assn conferences as well as the American Bar Association's National Litigation meetings.  I served as a Special Assistant Attorney General for the State of Utah assisting in licensing prosecutions of mental health professionals.   One of my main areas of concentration as an attorney has been to <u>protect the mental health, legal, and criminal justice systems from unreliable methodologies</u> —  "junk science" — including but not limited to helping courts and professionals understand the methodology of investigations, the science of memory, the science of memory contamination, the nature of claims

regarding " repressed and recovered memories", improper-abusive interviewing/therapy, misuse of psychological testing, improper reliance upon "clinical judgment" and "professional experience",  research documenting the general lack of expertise in the psychotherapy and related professions (e.g. investigators), the well-documented inability of professionals to accurately distinguish true from false patient reports in the absence of corroborative evidence, the importance of generating and testing alternative investigative methodologies, the hazards of confirmation bias, and similar issues.

4.    IN MY OPINION, IT IS IMPORTANT THAT SEXUAL ABUSE and SEXUAL ASSAULT CASES — LIKE ALL IMPORTANT CASES — BE PROPERLY INVESTIGATED. PROPER INVESTIGATIONS PROTECT VICTIMS FROM ABUSERS, PROTECT THE PUBLIC FROM PREDATORS, AND ALSO PROTECT VICTIMS and the PUBLIC FROM  INCOMPETENT and/or POORLY TRAINED INVESTIGATORS APPLYING UNRELIABLE, PSEUDOSCIENTIFIC, INVALID METHODOLOGIES.

In 1996, I wrote the following statement — signed by a group of internationally renowned colleagues ( including several of the most widely cited social scientists in the world and a past President of the American Psychological Association  ) — to the U.S. Congress:

"[Sexual] abuse is a serious social problem that should be dealt with in an effective and responsible manner.  We strongly support the implementation of effective programs to reduce the incidence of [sexual] abuse, assist victims of abuse, and punish those who harm

[victims].  Efforts to attain these important goals must, however, be based in fact rather than prejudice, science rather than hysteria, and reason rather than political ideology." [1]


Protecting citizens from abuse and assault is a very important job in our society.  I have profound respect for law enforcement and other professionals, investigators, prosecutors, allied staff, committees and all who work in the university, law enforcement, health care, and mental health fields who strive to protect victims from harm.  I am deeply grateful for the very important work that they do.   I have consulted with, trained, and/or testified for, prosecutors, investigators, law enforcement professionals, and health care professionals in many states including conducting invited training and/or consultation with F.B.I. personnel,  the Minnesota Sex Crimes Investigators Association, the Midwestern Sex Crimes Investigators Association, the Texas Rangers, the Attorney General's Office of the State of Utah, state prosecutors in Texas, Washington, Colorado, Wisconsin, and others.   I have also served in public roles as a Member of the Minnesota State Board of Psychology, as a Special Assistant Attorney General in Utah,  as a Harvard Law School Legal Intern for the Massachusetts Attorney General's Office, as a U.S. Veterans Administration Psychology Intern for the Palo Alto V.A. /Stanford Medical Centers and in other positions. I have also taught Continuing Legal and Psychology Education seminars to many thousands of students in many states including crime investigators , FBI agents, psychologists, psychiatrists, social workers, medical students, Ph.D. psychology students, and/or others in many states.  I hope my opinions in this and other cases will assist and inform the legal process and all professionals and workers involved in protecting the public.

---

[1]   See,  Barden, R.C. Letter on Mental Health Reform to the U.S. Congress (with signatories Paul E. Meehl, Terence W. Campbell, Richard Ofshe, Richard A. Gardner, M.D., Margaret Singer, William Grove, Michael D. Yapko, Robyn Dawes, Richard Flyer, M.D., Robert Kinscherff, J.D., Mel Guyer, J.D., Francis Fincham, Thom Moore, Henry E. Adams, E. Mark Cummings, Lewis P. Lipsitt, Donald M. Kaplan, Robert R. Holt, Richard M. McFall, Hans H. Strupp, Stephen J. Lepore, Lee Sechrest, Paul Ekman, Hans J. Eysenck, ;  with Version. II signed by Jerome Kagan, George Stricker, Debra Ann Poole, Mark L. Howe, J. Don Read, and Howard Shevrin  (1994)  <u>Letter to the Congress of the United States of America regarding reform of the mental health system.</u>  reprinted in Dineen, Tana. <u>Manufacturing Victims</u>. Montreal. Robert Davies Publishing,  First Edition, 1996.

*DOE v. PURDUE, et al.   CONFIDENTIAL   Dr. Barden's Initial Report of Feb 19, 2021*

**4A.    ESSENTIAL HISTORIC and SCIENTIFIC BACKGROUND IS NEEDED TO UNDERSTAND THIS CASE :**

**IN MY OPINION,  A LONG and COMPLEX HISTORY OF MULTI-DISCIPLINARY EFFORTS HAS — over past decades — PRODUCED A MUCH MORE RELIABLE SYSTEM TO PROTECT CITIZENS OF ALL AGES FROM CRIMINAL ABUSERS AS WELL AS PROTECT CITIZENS FROM IMPROPER, UNRELIABLE, ABUSIVE INVESTIGATIONS.  NATIONAL REFORM EFFORTS HAVE INCLUDED THE CREATION AND VALIDATION OF PROTOCOLS, RULES, and STANDARDS OF CARE TO ENSURE ABUSE INVESTIGATION INTERVIEWS WILL BE A)  FEW IN NUMER AND B)  ALWAYS VIDEO and/or AUDIO RECORDED — TO PREVENT ABUSIVE,  LEADING, SUGGESTIVE, BIASED, and IMPROPER MEMORY CONTAMINATIVE INTERVIEWS and MANIPULATIVE-BIASED REPORTING.  THE INVESTIGATION IN THIS CASE BY PURDUE UNIVERSITY OFFICIALS VIOLATED MANY OF THE BASIC METHODOLOGIES and PROTECTIONS THUS IMPROPERLY TAINTING and CONTAMINATING A RECKLESS, MISINFORMED INVESTIGATIVE PROCESS.**

**In my opinion, it is important to understand the historical context for the evidence in this case including some of the methods and practices used by the Purdue University investigators in this case.**

**4A1.    UNTIL THE 19060s and 1970s:  CENTURIES OF INJUSTICE:  WOMEN AND CHILDREN WERE NOT PROPERLY PROTECTED:   For centuries, women and children were poorly served and not properly protected by legal systems. Millions suffered injustices over the ages.**

**4A2.    FROM the 1960s to the 1990s:  A NEW FORM OF INJUSTICE:  THE TIDE TURNED BRINGING INCREASED JUSTICE FOR ABUSE VICTIMS — BUT**

**HASTY and METHODOLOGICALLY UNSOUND REFORMS ALSO CREATED A NEW FORM OF INJUSTICE FOR THE FALSELY ACCUSED:    From the 1960s to the 1990s — due to political and broader societal reforms — criminal prosecutions based upon the testimony of children and women victims of assault grew rapidly protecting a wider range of citizens.  Unfortunately, zealous but science-illiterate prosecutions applied methods designed by police crime investigators rather than scientific memory experts and clinical-developmental psychologists.  In addition, until nearly the end of the 20th century, the relevant scientific community showed little interest in the quality of investigative interview methods nor the centuries old debate over the accuracy of trauma victim's memories, behavior, and testimony.  A wave of infamously failed criminal investigations and prosecutions involving improper and even abusive child interview practices — including the McMartin, Kelly Michaels, Wenatchee, Little Rascals and many other cases — generated considerable controversy and interest in science-based investigative interviewing methods.  See, e.g., Bruck, M. and Ceci, S. (1995). 'Amicus brief for the case of State of New Jersey v. Michaels presented by the committee of concerned social scientists'. Psychology, Public Policy, and Law, 1, 272-322.  Appellate court decisions led to an intense new interest in the science of memory and subsequent scientific research that brought reforms to forensic-investigative interviewing methods including <u>mandatory</u> video or audio recording of <u>all</u> interviews to :  protect the memory of interviewees, the integrity and reliability of the investigative reporting system, prevent abusive-suggestive-leading memory contaminating questioning,  avoid hypnotic-related memory contamination, avoid the dangers of confirmation bias, ensure the proper generation and testing of alternative investigative hypotheses, and other reforms.**

**    4A3.    POLITICIZED "TRAUMA" PSEUDOSCIENCE: WERE 150,000 DEATHS ANNUALLY ACTUALLY CAUSED  BY EATING DISORDERS?  <u>NO</u>.  WAS THIS A GROSSLY NEGLIGENT ERROR OR POLITICIZED MARXIST-FEMINIST PROPAGANDA and MEDIA CORRUPTION? :  In 1992, radical feminist activist Naomi Wolf along with others reportedly began a campaign of grossly exaggerating statistics**

regarding eating disorders — supposedly caused by America's anti-woman, "patriarchal culture". She wrote, "[D]uring the past decade, women breached the power structure; meanwhile, eating disorders rose exponentially". Wolf's reckless, misinformed, and wildly exaggerated attacks on traditional society appeared designed to inflame gender discord (and sell books). More specifically, Wolf reportedly claimed that <u>150,000 women were DYING ANNUALLY from anorexia</u> in the United States. Peer reviewed published research ( see Centers for Disease Control) numbers indicate the <u>actual number was closer to 500 deaths per year</u>. Every such death is tragic but publishing such false and frightening misinformation was, in my opinion, reckless, unethical, negligent, and/or corrupt. Schoemaker, in a peer reviewed publication, later calculated that there were actually some 525 annual deaths from anorexia, nearly <u>300 times fewer</u> than Wolf's manipulative, radical feminist pseudo-statistic. See, Schoemaker, C. (2004). A critical appraisal of the anorexia statistics in The Beauty Myth: introducing Wolf's Overdo and Lie Factor (WOLF). Eating Disorders, 12 (2), 97-102 PMID: 16864310 at https://www.ncbi.nlm.nih.gov/pubmed/ 16864310.

Similarly, in Who Stole Feminism? (1994) Christina Hoff Sommers publicly criticized Wolf for her false and disturbing claims. See, Sommers, Christina Hoff (1995). Who Stole Feminism? How Women Have Betrayed Women. New York: Simon & Schuster. pp. 11, 12. ISBN 0-684-80156-6. Wolf's apparent attempts to create hysteria, contention, and enmity surrounding gender issues and eating disorders subsequently led to feminist backed claims that eating disorders were almost certainly "caused" by childhood sexual abuse — especially if the victim had "repressed" all memories of the crime. Additional waves of pseudoscientific politicized "trauma" misinformation would follow.

4A4.    THE NEXT WAVE OF POLITICIZED "TRAUMA" PSEUDOSCIENCE:
In the early 1990s, another radical feminist publication (in various editions), The Courage to Heal (CTH), became a very popular and controversial book. CTH was written by radical feminist activists Ellen Bass, a poet and creative writing teacher and her student Laura Davis, an author and alleged incest survivor. To the best of my knowledge, neither author

had ANY psychological, medical, social work, psychotherapy, or related license or advanced training.  Bass and Davis attributed their efforts to confront incest and child sexual abuse to "the women's liberation movement" (See, e.g., Mallory Millet, Marxist Feminism's Ruined Lives:  The horror I witnessed inside the women's "liberation" movement. FrontPage Magazine, Sep 1, 2014). While working with writing students, Bass and Davis came to believe that the <u>stories</u> written by some of their <u>creative</u> writing students were actually conveying painful (previously "repressed") "<u>memories"</u> of incest.  From such irrational, pseudoscientific ideas, the two developed a series of methods to "assist students in "recovering memories of childhood abuse".

In my opinion, having investigated the histories of hundreds of cases of "repressed and recovered memory" therapy, The Courage to Heal published dangerous pseudoscientific misinformation that damaged the lives of millions of people.  It is a classic example of gender politicized, reckless pseudoscience.  It is still sold (in a somewhat watered down version) in bookstores today.   See, Ofshe, R. and Watters, E., Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria. 2nd Edition. University of California Press, 1996 ;   See, also Showalter E (1997). Hystories: hysterical epidemics and modern media. New York: Columbia University Press. pp. 149–154. ISBN 0-231-10459-6 ; See also, Acocella, J.  <u>The Politics of Hysteria</u>, The New Yorker,  April 6, 1998, pg. 64-79.


**4A5.    THE NEXT WAVE OF POLITICIZED "TRAUMA" PSEUDOSCIENCE : RECOVERED MEMORY THERAPY (RMT) and MULTIPLE PERSONALITY DISORDER (MPD)  PSEUDOSCIENCE PROMOTED BY MARXIST FEMINIST LEADERS to FIGHT the "PATRIARCHY".**


Driven by radical "anti-patriarchy", Marxist, political ideologies, the 1980s-1990s saw the mental health and criminal justice systems of the U.S. embroiled in the " memory wars " as tens of thousands of poorly trained psychotherapists applied politically tainted theories of "trauma" therapy — many trained by studying the radical feminist manual, The Courage to Heal.  Such quackery destroyed tens of thousands of families with ideology

and therapist-generated false memories of abuse and has been called the greatest disaster in the history of the mental health system.  In such therapy, vulnerable, suggestible patients were taught that American women were "socialized via incest and sexual abuse" with 50% of the U.S. population supposedly being victimized. Headaches, trouble sleeping, anxiety, depression,  social phobia, eating disorders, and other symptoms were all thought to be "sure signs" of childhood sexual abuse (whether the patient remembered the abuse or not). Pressured by poorly trained,  politically radicalized therapists using hypnotic processes, abusive leading-suggestive questioning, false statistical information,  an estimated several million patients "recovered memories" of abuse and accused once beloved parents of horrific crimes and thus destroying tens of thousands of families.  See, Ofshe, R. and Watters, E., Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria. 2nd Edition. University of California Press, 1996 and Pendergrast, Mark. The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It, 1st Edition, Springer International Publishing, 2017.

Politicized, irrational, and pseudoscientific theories were formulated and published throughout the world attacking the "patriarchal abusive culture" of America and offering "therapy" to recover "memories" of horrific abuse.  Therapists and prominent feminists jumped on board.  Feminist leader Gloria Steinem was a staunch supporter of the bizarre notion that international "satanic cults" were abusing and mind controlling tens of thousands of victims in a grand, hidden conspiracy.  Similarly, psychiatrist Bennett Braun, MD — former president and co-founder of the International Society for the Study of Dissociation (ISSD) and past editor of its journal Dissociation — claimed that Multiple Personality Disorder often resulted from "Satanic cult" abuse:

"[Dr. Braun] told the audience that children are often abused in day-care centers as a way of prepping them to join the cult. "You have to predispose the nervous system to this sort of behavior," he said. After the children are abused in day care, they are "then picked up in high school" and indoctrinated into the cult. The cult, he has come to understand, is networked with the Ku Klux Klan; neo-Nazi groups; the Mafia; big business; the intelligence community, including the CIA; and the military. He told the audience that he

has developed twelve P's for those involved in satanic abuse: "Pimps, Pushers, Prostitutes, Physicians, Psychiatrists, Psychotherapists, Principals and teachers, Pallbearers [meaning undertakers], Public workers, Police, Politicians and judges, and Priests and clergies from all religions." (Ofshe & Walters, 1996, p. 245) Braun was recently a co-defendant in a case alleging that he imposed his theories on a mother and her children using hypnosis and other means. Although he denied negligence, the plaintiff received a record $10.6 million settlement. Yet another former ex-president of the ISSD, Colin Ross, has written a book proposal expounding his theory that MPD cases may be caused by CIA-military brainwashing experiments (Ofshe & Walters, 1996, p. 223)." [2]

Dr. Braun, an internationally acclaimed leader of the RMT, MPD movement, lauded by feminist leader Gloria Steinem, Co-Chair of the Department of Psychiatry at Rush Medical Center in Chicago, was subsequently sued (by R.C. Barden, Ph.D, JD and our legal-science litigation team).  Dr. Braun's clinic was closed, Dr. Braun surrendered his medical license following prosecution by the licensing authorities of the State of Illinois. Dr. Braun's case settlement of $10.6 million for psychiatric malpractice reportedly remains the world record for such cases and was reported on page 1, col. 1 of the NY Times.  See, Belluck, P. Memory Therapy Leads to a Lawsuit and Big Settlement [$10.6 Million], The New York Times, Page 1, Column 1, Nov. 6, 1997.  Such lawsuits largely collapsed the radical feminist ideologically driven RMT, MPD, and "satanic cult" psychotherapy industries.  See, Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

During the years when the RMT, MPD and related therapy industries were growing exponentially and staunchly supported by radical feminist leaders, world renowned scientists in memory, trauma, suggestibility, psychiatry and psychology carefully studied

_____

[2]    See,  Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, Psychology, Public Policy and Law, Vol 5, No. 1, 234-242.  Excerpts reprinted in Fisher, George (Prof. Stanford Law School), Evidence: University Casebook Series, Foundation Press - West Group, New York, 2002, pg. 688.

the notion of "repressed and recovered memories" and discovered it was a hoax. See, McNally, R. J. (2003). Remembering trauma. Cambridge, MA: Belknap Press/Harvard University Press ; Pope H., Oliva P., & Hudson J. (2012). Repressed memories: The scientific status of research on repressed memories (pp. 807-913). In D. L. Faigman, D. H. Kaye, M.J. Saks, J. Sanders, eds. Science in the law: social and behavioral science issues. St. Paul, MN: West Group; Piper A., Lillevik L., Kritzner R. (2008). What's wrong with believing in repression? A review for legal professionals Psychology Public Policy and Law, 14, 223-242.

As a collection of the most highly cited scientists in the relevant scientific community wrote in an Amicus Brief to the California Supreme Court … "Despite the clinical beliefs of some therapists, there is simply no credible, methodologically sound, replicable scientific evidence whatsoever for the claim that victims repress and recover memories of traumatic events (McNally, 2003, pp. 186-228; Pope, et. al, 2002)…. Decades of research and scientific debate have clarified over and over again, that the notion of traumatic events being somehow 'repressed' and later accurately recovered is one of the most pernicious bits of folklore ever to infect psychology and psychiatry. This folklore provided the theoretical basis for 'recovered memory therapy' -- arguably the worst catastrophe to befall the mental health field since the lobotomy era." [3]

---

[3]    See, Barden, R. C. (2006) <u>Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty</u>, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, filed February 17, 2006 with AMICI Aaron T. Beck, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi Breslau and more.

**4A6.    COLLAPSING RMT, MPD POLITICIZED RADICAL FEMINIST PSEUDOSCIENCE:   BY ENGAGING COORDINATED, MULTIDISCIPLINARY PROCESSES, THE LEGAL, SCIENCE, LICENSING, and MEDIA SYSTEMS CRUSHED THE INITIAL RMT and MPD EPIDEMICS:**

From 1994 to 1997,  a coordinated, multi-disciplinary wave of lawsuits, multi-million dollar jury verdicts,  licensing revocation actions, and international media exposes largely collapsed the dangerous RMT and MPD industries but left a number of independently practicing, poorly trained mental health professionals still engaged in controversial, memory contaminative practices including the use of unrecorded ( unprotected ) therapy sessions with forensic witnesses in ongoing investigations.  From the 1980s through 1997, the "repressed and recovered memory therapy" and "multiple personality disorder" epidemics of mental health quackery led to tens of thousands of false allegations of abuse and assault, resulting finally in a tsunami of hundreds of lawsuits, licensing actions, and media exposes leading to the rapid collapse of the momentum of the RMT and MPD industries.  See,  Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014. International media reported cases of "recovered memory therapists" being successfully sued, clinics closing, and therapists being prosecuted and delicensed.  See, e.g. See, Belluck, P.,  Memory Therapy Leads to a Lawsuit and Big Settlement [$10.6 Million], The New York Times, Page 1, Column 1, Nov. 6, 1997;   See, Giordana, Kevin, False memory syndrome: As women bring lawsuits, therapists are having to pay for their mistakes, Dec. 22, 1999, www.Salon.com magazine ;  See, AP News Wire story, Psychiatrist loses license over satanic allegations. Chicago, Friday Oct. 8, 1999;  See, Ann Zimmerman, Cult of Madness: Seeking help for depression, Martha Hurt turned to therapists. That's when her insanity truly began, Dallas Observer, Oct 14, 1999 ; See,  Barden, R.C., Memory and Reliability: Developments and Controversial Issues.  In Witness Testimony in Sex Cases,  Eds. Pamela

Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016.

**4A7.    THE US SUPREME COURT BEGINS THE DAUBERT-KUMHO ERA: IN THE 1990s THE U.S. SUPREME COURT ACTED BROADLY TO PROTECT THE LEGAL SYSTEM FROM POLITICIZED PSEUDOSCIENTIFIC MISINFORMATION AND UNRELIABLE METHODOLOGIES:**

Well meaning but overzealous, misguided, and science illiterate attempts to identify, reduce, or halt sexual abuse and assaults resulted in a tsunami of poorly trained investigators, psychotherapists, and others whose efforts tainted the legal system, and damaged the lives of millions with with pseudo-scientific ideology and recklessly unreliable methodology, practices, and procedures. The U.S. legal system responded via a series of U.S. Supreme Court decisions — including the Daubert, Joiner, Kumho and related cases — designed to reduce and eliminate the taint of unreliable, pseudo-scientific information, methods and procedures. See,  Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, <u>Psychology, Public Policy and Law</u>, Vol 5, No. 1, 234-242. Excerpts reprinted in Fisher, George (Prof. Stanford Law School), <u>Evidence</u>: University Casebook Series, Foundation Press - West Group, New York, 2002, pg. 688;  See also, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S., 113 S. Ct. 2786 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct 1167 (1999).

**4A8.    A SERIES OF FRYE-DAUBERT RULINGS IN MULTIPLE JURISDICTIONS EXCLUDED TESTIMONY SUPPORTING THE PSEUDOSCIENTIFIC NOTIONS OF "RECOVERED REPRESSED MEMORIES" and "MULTIPLE PERSONALITY DISORDERS".**

I personally participated in a number of widely reported Frye-Daubert-Kumho hearings to exclude junk science notions and methodologies and thus protect the integrity of the legal system. For example:

See, e.g., Hamanne, et al. v. Humenansky, Ramsey County Minnesota File No. C4-94-203, Judge Betrand Poritsky, June 30, 1994, Transcript page 83-84. "The Frye hearing has been concluded and we are still on the record... It's my finding, first, that the theory a person can block out of awareness [repress or dissociate] a long stream of [traumatic] events and subsequently recall them accurately is not supported by experts in the field. And further that there is no agreement by experts that there is general agreement that such [recovered memory] evidence is reliable and trustworthy. That's the Frye standard. As to the Daubert standard, it is also my ruling that such [recovered memory] evidence is not reliable nor helpful to the jury."

See, Carlson v. Humenansky (Minnesota Trial Ct), Judge Betrand Poritsky (January, 1996). Judge Poritsky again found (as he had in Hamanne v. Humenansky) that repression and recovered memories were unreliable concepts, not accepted by the relevant scientific community, not helpful to a jury and thus inadmissible.

See, Engstrom v. Engstrom California App., 2nd App. Dist., Div 2, (CA 1997) "[Repressed memory] is not generally accepted as valid and reliable by a respectable majority of the pertinent scientific community..."

See, State of New Hampshire v. Hungerford and State of New Hampshire v. Morahan 698 A.2d 1244 (N.H. 1997) "The phenomenon of recovery of repressed memories has not yet reached the point where we may perceive these particular recovered memories as reliable."

See, <u>State of New Hampshire v. Walters</u> 697 A.2d 916 (N.H. 1997) "[W]e conclude, as we did in Hungerford , that " [t]he indicia of reliability present in the particular memories in [this] case[] do not rise to such a level that they overcome the divisive state of the scientific debate on the issue."

See, <u>Franklin v. Stevenson,</u> 987 P.2d 22 (1999). … Utah Supreme Court ruling … "Stevenson objected to the reliability of both the recovery techniques and Franklin's own testimony concerning the recovered memories, as well as to the experts' testimonies regarding both the theory of repressed memory and Franklin's memories in particular…. As we conclude below, the trial court erred in not finding the plaintiff's experts' testimonies [regarding "repressed memories"] inadmissible… On cross-examination in this case, Stevenson elicited concessions from both of Franklin's expert witnesses, Dr. Bessel van der Kolk, and Franklin's therapist, Dr. Laurie Hoover, regarding the lack of scientific foundation for the therapeutic techniques Dr. Hoover used with Franklin… Franklin's evidence clearly did not meet the initial foundational showing of reliability… Not only has this court held that unreliable techniques are inadmissible as evidence, but also that any expert testimony based upon unreliable techniques is also unreliable and inadmissible…. the necessary threshold reliability of these techniques was not established in the instant case."

See, <u>State of Rhode Island v. Quattrocchi,</u>  C.A. No. P92-3759 (R.I. 1999) [on remand from the Rhode Island Supreme Court    681 A.2d 879 (R.I. 1999)] "The State has not met its burden of establishing that repressed recollection is reliable and admissible as scientific evidence."

See, State of <u>New Hampshire vs. Bourgelais</u>,  Docket No. 02-S-2834, Judge T. Nadeau, April 4, 2005.  "the State's motion [to use repressed memory evidence at trial] is denied… the court determines, based on the law and the

evidence, that the reliability of memory retrieval has not been sufficiently established…"

See, <u>Rivers v. Father Flanagan's Boys Town</u>, Doc 1024, Case No. 743, Nebraska State Court Judge Sandra L. Dougherty, November 25, 2005. "In conclusion, the Court finds and concludes that Rivers has not met his burden of establishing that repressed and recovered memory is reliable and admissible as scientific evidence or that it is properly applied in this case. The Plaintiff's evidence lacks the scientific reliability and proper application necessary to admission under Rule 702 and Daubert/Schaferman. As a result, the Courts finds and concludes that the Defendants' Motion in Limine No. 1 (banning all testimony regarding repressed and recovered memories) shall be sustained."

See, Duffy v. <u>Father Flanagan's Boys Town</u>, Case No. 8:03CV31, United States District Court for the District of Nebraska, Memorandum and Order of January 26, 2006 by Hon. Laurie Smith Camp, U.S. District Judge. "[Plaintiff] Duffy filed a motion of withdrawal of expert testimony on the issue of repressed memory.... [thus] judgment will be granted to [Defendant] as a matter of law."

See, Karen Franklin Ph.D., Multiple Personality Disorder (DID) Excluded in Twilight Rapist Insanity Case, Psychology Today Blog, Oct 14, 2011. (Texas Rangers capture and prosecution of the "Twilight Rapist")… "After Dr. Barden's testimony that the condition is not generally accepted by the scientific community, despite the fact that it is listed in the DSM, District Judge Skipper Koetter ordered Dr. Ross's testimony on dissociative identity disorder stricken from the record." See, also Dissociative Identity Disorder: Multiple Personalities, Multiple Controversies" by Scott Lillienfeld & Steven Jay Lynn, Science and Pseudoscience in Clinical Psychology, The Guilford Press; First edition (2004).

and See, <u>John Doe (Keenan) v. Archdiocese of St. Paul</u>, **Case No. 62-C9-06-003962, December 8, 2009, 2ⁿᵈ Judicial District, Judge Gregg E. Johnson after a detailed, complex hearing found, "Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the concept of repressed and recovered memory is generally accepted in the relevant scientific community" …"Inclusion of the diagnosis of dissociative amnesia in the DSM-IV does not establish general acceptance of that diagnosis"… "Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the theory of repressed and recovered memory is reliable and trustworthy based on well-recognized scientific principles because of the significant methodological flaws in the studies presented by plaintiff in support of that theory and the lack of any test to show reliability. Defendant's Motion to Exclude Expert Testimony under the Frye-Mack standard is hereby GRANTED."   This decision was affirmed by the Minnesota Supreme Court on July 25, 2012,   <u>John Doe (Keenan) v. Archdiocese of St. Paul, 817 N.W.2d 150 (Minn. 2012).</u>**

**and others.  Following these initial, successful, multidisciplinary, "science intensive" litigation exclusions of RMT-MPD pseudo-science,  traditional attorneys tried to replicate previous results with mixed, controversial results.**

**4A9.    THE NEXT WAVE OF POLITICIZED "TRAUMA" PSEUDOSCIENCE.**

**"Sunlight is said to be the best of disinfectants" — Justice Louis Brandeis**

**"The procedures that are being adopted [ in University Title IX cases ] are taking us back to pre–Magna Carta, pre-due-process procedures."**
**— Harvard Law School Professor Janet Halley**

Much like Naomis Wolf's pseudoscience claim that 150,000 women die of eating disorders annually, a newer form of radical feminist propaganda — apparently aimed at increasing gender contention, enmity, fear, conflict, and chaos on campuses — claimed that "1 in 4 (or 1 in 5) women on college campuses are assaulted or raped".  As journalist E. Yoffe has noted, " headlines in newspapers across the country trumpeted the troubling findings from a massive new survey on campus sexual assault. "1 in 4 Women Experience Sex Assault on Campus," declared the New York Times. "One in four female undergraduates reports sexual misconduct, survey finds," reported the Los Angeles Times. "More than 1 in 5 female undergrads at top schools suffer sexual attacks," offered the Washington Post.  Emily Yoffe, The Problem with Campus Sexual Assault Surveys, Slate, (Sept. 24, 2015) at https://slate.me/1KxQBH0  (accessed on June 5, 2018). Apparently these journalists, failed to consult an actual science expert in such matters to discuss the methodological errors and limitations in the quoted research.

However, even the original authors of this very controversial study have debunked such propaganda, "If you've followed the discussion about sexual assault on college campuses in America, it's likely you've heard some variation of the claim that 1 in 5 women on college campuses in the United States has been sexually assaulted or raped. Or you may have heard the even more incorrect abbreviated version, that 1 in 5 women on campus has been raped. As two of the researchers who conducted the Campus Sexual Assault Study from which this number was derived, we feel we need to set the record straight." See, Christopher Krebs & Christine Lindquist, Setting the Record Straight on '1 in 5', TIME Magazine, http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/ (accessed June 5, 2018).  These researchers go on to list sampling limitations, the broad definition used for "sexual contact" (e.g., "unwanted kissing" and "rubbing up against you over your clothes" — few rational people would label these acts as "rape" or "assault"), and a dismally low response rate of 42% ( Note that an AAU study on this topic had only a 19 percent response rate rendering it essentially worthless).   It is important to note that these "researchers are NOT members of a credible relevant scientific community

and this controversial study was NOT funded by any scientific organization by rather by the National Institute of Justice — the US Dept of Justice — prosecutors.

The NIJ is apparently the very same science-challenged group that invited Dr R. Campbell of Michigan State to teach her <u>very</u> controversial — and apparently unreliable and pseudoscientific — notions about the "Neurobiology of Sexual Assault". The purpose of the NIJ as noted on its website in a related article is "To improve the likelihood that suspects will be identified, arrested, and convicted" — a worthy cause but hardly an unbiased motive for credible, valid, reliable "science". I note that author Krebs apparently has a Ph.D. in Criminology and is an expert in <u>corrections</u>. Dr Krebs is apparently NOT a member of any relevant scientific community. His resume web page apparently lists zero tenure or tenure track faculty positions, zero research awards and zero actual science grants. See, https://www.rti.org/expert/christopher-p-krebs (accessed June 6, 2018). Similarly, co-author Dr. Christine Lindquist apparently has a Ph.D. in "medical sociology" and specializes in <u>prisoner re-entry</u>, as well as families and <u>incarceration</u>. She is also apparently NOT a member of a relevant scientific community. Her resume web page also apparently lists zero tenure or tenure track faculty positions, zero research awards and zero actual science grants. See, https://www.rti.org/expert/christine-h-lindquist (accessed June 6, 2018). I look forward to learning more about these controversial researchers and their controversial work. I seek to review a full resume on both of them and to review the raw data from their "research".

In sharp contrast to Dept of Justice funded research, <u>over 90% of the colleges and universities in the United States apparently reported ZERO of their students were raped in 2014.</u> 91 Percent of Colleges Reported Zero Incidents of Rape in 2014, AAUW (Nov. 23, 2015), available at http://www.aauw.org/article/clery-act-data-analysis/ (last visited June 5, 2018). Consistent with this finding and contrary to the Dept of Justice funded study, A report from the Bureau of Justice Statistics entitled "Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013" . . . found that contrary to frequent assertions by some elected officials about the particular dangers female college students face, this study apparently reported college women were LESS likely to be victims of sexual

assault than their peers who are not enrolled in college.  More specifically, the report found . . . the incidence [of sexual assault] . . . was 0.76 percent for non-students and <u>0.61 percent for students thus far LESS than ONE percent</u> … not 1 in 5).  Emily Yoffe, The Problem with Campus Sexual Assault Surveys, Slate, (Sept. 24, 2015), available at https://slate.me/1KxQBH0  (accessed on June 5, 2018).  Such controversies and complexities are rarely accurately reported in the media.

As Ms. Yoffe notes, "But if these heads of institutions of higher education truly believe the  (1 in 5 ) survey results, their collective response constitutes a dereliction of duty. What the AAU survey describes is an epic criminal justice calamity that should prompt emergency action. If 1 in 4 women on their campuses can expect to be sexually victimized <u>each year</u>, college presidents should reinstate the long-abandoned sexual segregation of dorms; there should be a strictly enforced ban on underage drinking; and a large and visible law enforcement presence should prowl campus as a deterrent to sexual predators. But no college president is suggesting such things. I suspect that's in part because they recognize that there is a fundamental problem with these sexual assault surveys. These surveys are trying to describe the most intimate activities of people by forcing them to answer binary questions about behavior that can be ambiguous, complicated, and confusing."

This kind of confused, unreliable, junk science can lead to controversial government action including the "Dear Colleague" letter to colleges from the Obama administration leading to much controversy.  See,  "Harvard Law School Professors Sign Letter Slamming 'Victim-Centered' Sexual Harassment Policies" at https://www.thecrimson.com/article/2018/2/28/law-profs-sign-sexual-assault-letter/ (accessed on June 6, 2018).

"Two Harvard Law professors have joined nearly 140 professors from universities across the country in signing a public letter that critiques what the authors call "<u>victim-centered practices</u>" in higher education sexual harassment policies and procedures.

Law professors Janet E. Halley and Elizabeth Bartholet signed the letter, along with academics hailing from institutions including Northwestern University and the University of Pennsylvania Law School.

"'<u>Victim-centered' practices… threaten to subvert the objective collection and presentation of evidence in administrative, civil, and criminal sexual assault proceedings</u>," the letter reads.

The letter states <u>these victim-centered practices are based in the "believe the victim" ideology they say sprang up in the 1990s.</u> The document's authors assert that supporters of this ideology called for "swift and unquestioning judgments about the facts of [sexual] harassment without standard evidentiary procedures."

The letter culminates in a "call to <u>restore due process and fundamental fairness</u>" in university sexual harassment cases by <u>ending the "use of victim-centered, trauma-informed, and believe the victim practices</u>."

Halley and Bartholet also comprised two of the four Harvard Law School faculty members who submitted a memo to the U.S. Department of Justice last year asking for a review of the standards outlined in the 2011 "Dear Colleague" letter. That letter was an Obama-era order directed colleges and universities receiving federal funding to "<u>use a lower standard of proof</u>" in sexual assault cases as well as establishing a <u>broader definition of the term sexual harassment</u>. U.S. Secretary of Education Betsy DeVos rescinded those guidelines which might well be restored under the new Biden administration.

Professor Halley said in an interview that she signed the recent open letter because it aligned with her belief that the policies and procedures on sexual assault need to be revised.

"I signed it because I thought it was correct. I've seen the bad effects of *politically slanted training*," Halley said. [ Emphasis added ].

Similarly, another Harvard Law School professor, Jeannie Suk Gersen, explained the thinking behind her <u>2015</u> New Yorker essay. "It is a near-religious teaching among many people today that if you are against sexual assault, *then you must always believe individuals who say they have been assaulted*. Questioning in a particular instance whether a sexual assault occurred violates that principle. Examining evidence and concluding that a particular accuser is not indeed a survivor, or a particular accused is not an assailant, is a sin [ against radical feminism ] that reveals that one is a rape denier, or biased in favor of perpetrators.. . . . Fair process for investigating sexual-misconduct cases, for which I, along with many of my colleagues, have fought, in effect *violates the [ radical feminist ] tenet that you must always believe the accuser*…. (but ) …Fair process must be open to the possibility that either side might turn out to be correct. If the process is not at least open to both possibilities, we might as well put sexual-misconduct cases through no process at all…. there are many advocates today to the "always believe" orthodoxy. We have seen recent high-profile instances in which that article of faith has led to damaging errors, as in *Rolling Stone's* reporting of a rape at the University of Virginia, or the prosecution of the Duke lacrosse case. The extent of the damage comes out of the fact that "always believe" unwittingly renders the stakes of each individual case impossibly high, by linking the veracity of any one claim to the veracity of all claims. When the core belief is that accusers never lie, if any one accuser has lied, it brings into question the stability of the entire thought system, rendering uncertain all allegations of sexual assault. But this is neither sensible nor necessary:

that a few claims turn out to be false does not mean that all, most, or even many claims are wrongful. The imperative *to act as though every accusation must be true*—when we all know some number will not be—harms the over-all credibility of sexual assault claims… We should be attentive to our history and context, and be open to believing, disbelieving, agreeing, or disagreeing, in individual instances, *based on evidence*".  See, Gersen, J.S. "Shutting down Conversations about Rape at Harvard Law", New Yorker, Dec. 11, 2015.

In 2015, Janet Halley, the Royall Professor of Law at Harvard Law School starkly warned Title IX officials of *the dangers of giving "advocacy personnel" the power to adjudicate outcomes*.  She commented, "the only training provided to Harvard [ Title IX ] personnel handling sexual harassment claims directed to the social and psychological dynamics surrounding sexual assault [was] 100% aimed to *convince them to believe complainants*, precisely *when* they seem unreliable and incoherent." (Emphasis added).

She also suggested that "The best way to correct for this, in my view, is to reduce the Title IX Office to a compliance-monitoring role, and *get it out of the business of adjudicating cases*."…  "Cases should go to a body charged with *fairness to all members of our community.…"* (Emphasis added).

She also noted, "I think feminist governors have to think hard about what they are doing when they try, through provisions like this and by advocating their expansive interpretation, *to predetermine women as victims and men as wrongdoers.*" (Emphasis added).

She also commented, "Cases Arising from the Breakup of Long-term Intimate Relationships:  Where there is *no evidence of physical abuse*, accusations of sexual misconduct arising *after the breakup of*

*long-term [sexual ] relationships* **can — *and should be* — *very hard to sort out*. These cases involve not only what he or she says happened but what he or she says it *meant* in the private language of each relationship. The adjudicator steps into a *Rashomon*-like maze in which identical episodes have such dramatically different valences that both sides can be truthfully and credibly telling their own understandings and experiences *without offering a decision-maker any plausible basis of decision other than his or her own cultural assumptions and biases*.**" … "**somehow we have imagined sexual harassment charges to be pure of distorting motives like these. None of this is to deny that some breakups are precipitated or accompanied by acute sexual harassment, everything from quid pro quo to subtle but disadvantaging use of institutional power. But *sometimes it's just an immiserating breakup, morphed into the form of a sexual misconduct charge*. (Emphasis added).**

**She also commented, "Increasingly, schools are being required to *institutionalize prevention,* to control the *risk* of harm, and to take regulatory action to protect the environment. Academic administrators are welcoming these incentives, which harmonize with their risk-averse, compliance-driven, and *rights-indifferent worldviews* and justify large expansions of the powers and size of the administration generally." (Emphasis added).**

**She also noted, "In a related development, OCR increasingly implies that the only adequate "interim measure" that can protect a complainant in the Title IX process is the *exclusion of the accused person from campus pending resolution of the complaint*. To be sure, in these cases the accused may eventually be found to be responsible for violations, sometimes very serious ones. *But advocates and the OCR are arguing that all complainants are trauma victims* subject to continuing**

trauma if the persons they accuse continue in school: merely "seeing" the harasser is deemed traumatic."… "These cases are becoming increasingly easy. Interim measures and environmental security provisions are *justified as "merely administrative,"* the equivalent of determining that more lights should be installed on campus walkways or that food safety certificates should be required for all vending machines. And like merely administrative acts conducive to public safety, they follow a strict liability model. *But ending or hobbling someone's access to education should be much harder than that. It may well be that the only effective way to convince people that this tendency is dangerous is to point to the rights they invade: rights to privacy, to autonomy, to due process.* But the tendency *itself* is due for scrutiny. *Assuming* danger, risk, and holistic environmental contamination ensures that restrictions will go into effect *even where the facts don't justify them.* Will decision-makers — and in particular *governance feminist decision-makers* — be able to resist this trend?"

See, Halley, Janet, Trading the Megaphone for the Gavel in Title IX Enforcement : Backing off the hype in Title IX enforcement, Commentary, Feb 18, 2015 128 Harv. L. Rev. F. 103  https://harvardlawreview.org/2015/02/trading-the-megaphone-for-the-gavel-in-title-ix-enforcement-2/

In my opinion, this analysis does not reduce the horrific and criminal nature of actual sexual assaults — a serious problem in America at any frequency. However, the serious nature of this problem is most effectively and competently addressed without biased, hysterical, politicized, irrational, junk science, radical feminist tainted, pseudo-investigations and unrecorded, untranscribed "Equity Committee adjudication meetings" applying grossly negligent methodologies and methods clearly biased against men — such

as the reckless (and potentially fraudulent) investigation and grossly defective adjudication conducted by Purdue University in this case.

**4A10.   ANOTHER WAVE OF POLITICIZED, UNRELIABLE,  "FEMINIST PSEUDOSCIENCE" :** Controversial pseudo-scientific concepts such as the  "Neurobiology of Trauma",  "Neurobiology of Sexual Assault", "Fragmented Memories of Trauma", and claims that "less than 10% of assault allegations are false" in addition to other controversial, politically tainted, unreliable, controversial, pseudoscience notions, are, in my opinion, currently NOT accepted by the relevant scientific community, have NO known error rate, and are NOT supported by peer reviewed published research in competent journals. Nonetheless these, concepts have been recklessly disseminated into powerful investigative systems — including police and university Title IX systems.

For example, some reported "research" claims that "over 90 percent" of rape allegations are proven not to be fabrications.  More intelligent, logical and reliable is the conclusion of journalist E. Yoffe, who noted "<u>we simply don't know</u>" how often people make false claims.   As Michelle J. Anderson, the president of Brooklyn College and a scholar of rape law, acknowledged in a 2004 paper in the Boston University Law Review, "<u>There is no good empirical data on false rape complaints either historically or currently</u>." The data have not improved since 2004.   The flaws in claims that false accusations are very rare should be obvious to any logical, rational, competent observer.  The fatal methodological flaw is that nobody in the justice system typically investigates false allegations in detail.  The accuser is NOT the subject of the investigation. Investigators might interview the accused's family and friends, co-workers, etc.,  but they RARELY do detailed background interviews on the accuser as <u>the accuser is simply NOT investigated in most cases</u>. Similarly, while investigators might contact an accused's old love interests to find out if there is a pattern of prior sexual assaults, drug addiction, pornography or violence, investigators RARELY do such an investigation on the accuser to see if there is a history of false allegations or lack of credibility.  It should thus be obvious to even casual, rational observers untainted by gender bias and radical feminist ideology, that in the real

world, there is little or no funding and little or no time and little or no interest to do the kind of full, detailed, rigorous investigations of accusers in "dropped" or "failed" prosecutions that would permit anyone to hazard an intelligent guess as to the percentage of accusations that are actually false.  This lack of reliable data makes guessing about the "true percentage" of false allegations reckless and unethical speculation.  In my opinion, any author, speaker, or "expert" who claims to know the actual percentage of false criminal assault allegations should face a licensing investigation and prosecution.  See also, E. Yoffee, The Bad Science Behind Campus Response to Sexual Assault, September 8, 2017.  https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ (accessed June 5, 2018).

The history of such pseudoscience claims is instructive.  The oft reported claim that "only 2 percent of sexual assault reports are false" appears to be a politicized, gender-biased, anti-male, irrational claim by radical feminist Susan Brownmiller in her political, non-science book, Against Our Will, where she reportedly wrote "female police officers found that only 2 percent of all rape complaints were false.".   See, Edward Greer, The Truth Behind Legal Dominance Feminism's Two Percent False Rape Claim Figure, 33 Loy. L.A. L. Rev. 947 (2000), http://digitalcommons.lmu.edu/cgi/viewcontent.cgi?article=2216&context=llr (last accessed June 5, 2018)

Reportedly, the source notes from Brownmiller's book indicate this 98% accuracy claim came from a speech by Lawrence H Cooke, Appellate Division Justice, Before the Association of the Bar of the City of New York, January 16, 1974.  Reportedly, investigator Greer contacted Brownmiller and she provided a copy of the speech. The 2 percent figure allegedly came from the Commander of New York City's Rape Analysis Squad, who was offering a <u>personal opinion</u> about the occurrence of false rape claims.  Greer then reportedly contacted the speech author and no one in his office could recall how they arrived at the statistic nor could they recall any formal report on the matter.  <u>There was apparently no publication, no report, no data, no reliable protocol for assessment,</u>

<u>no science, no peer review, no research grant, no evidence of accuracy, no indicia of reliability, and this notion is clearly NOT accepted by the relevant scientific community</u>. It was apparently simply a gender-biased, "personal" opinion and yet it has been recklessly repeated as reliable fact many times apparently to manipulate gullible, science illiterate, gender biased, anti-male audiences — including apparently University Title IX investigative officials.

This is yet another example of the politicized, "anti-patriarchy", radical feminist pseudoscience that infects the "trauma" sexual assault, "anti-patriarchy" field. [4]  From Wolf's claims of 150,000 dead each year from eating disorders, to Steinem's support of recovered memories of "satanic cult abuse", to the dangerous memory recovery methods of The Courage to Heal, to Dr. Braun's infamous theories of multiple personality disorder as caused by millions of victims of childhood abuse hidden in "repressed memories", to hysterical claims of 1 in 4 college women being sexually assaulted, to Brownmiller's hysterical, misguided claim that only 2% of allegations are false, to Dr. R. Campbell's reckless and controversial lectures on the "Neurobiology of Sexual Trauma" … this clear and dangerous pattern of politicized pseudoscience continues to pose dangers to the integrity of the legal process.  In my opinion, Dr. Campbell should be properly and professionally investigated for the potential damages she appears to have created  in the justice and Title IX investigative systems. [ See, Neil Gilbert, The Phantom Epidemic of Sexual Assault, 103 PUB. INTEREST 54, 63 (1991) (stating that "estimates of sexual assault calculated by feminist researchers are <u>advocacy</u> numbers, figures that embody less

---

[4]    See Martha Nussbaum, Sex and Social Justice,  136 (1999) (stating that it is "difficult to elicit accurate figures on sexual force by survey or interview techniques" and acknowledging Sommers's critique, infra, of existing sex abuse data); Daphne Patai,  Heterophobia: Sexual Harassment and the Future of Feminism, 61-62 (1998) (discussing the "absence of serious research on the incidence of false or baseless accusations against men, as another result of the gender bias in the [sexual harassment] field"); Christina Hoff Sommers, Who Stole Feminism? : How Women Have Betrayed Women;  225-26 (1994) (stating that gender feminists are pushing forth their agenda by "alarm[ing] the public with inflated statistics"); Neil Gilbert, The Phantom Epidemic of Sexual Assault, 103 PUB. INTEREST 54, 63 (1991) (stating that "estimates of sexual assault calculated by feminist researchers are advocacy numbers, figures that embody less an effort at scientific understanding than an attempt to persuade the public that a problem is vastly larger than commonly recognized... [and are] ... derived not through outright deceit but through a more subtle process of distortion"); Edward Greer, Tales of Sexual Panic in the Legal Academy: The Assault on Reverse Incest Suits, 48 Case W. Res. L. Rev.  513 (1998) (showing that incidence of incest based on "recovered memory" is wildly inflated).

an effort at scientific understanding than an attempt to persuade the public that a problem is vastly larger than commonly recognized." ].

In contrast to politicized guessing, actual research by a Purdue University faculty member carefully documented a 41% rate of false rape allegations to police in a Midwestern city.  See,  Kanin, E. "False Rape Allegations", Archives of Sexual Behavior 23, no. 1 (1994). [ Note:  This 1994 study by *Purdue professor* Eugene Kanin, using data from an unidentified Midwestern city, found that between 1978 and 1987 the police department concluded that *41 percent of rape allegations were proven false.* Prof. Kanin noted : "These false rape allegations appear to serve three major functions for the complainants: providing an alibi, *seeking revenge*, and obtaining sympathy and attention."  The police dept investigated all allegations of rape and only rated them as false if the complainant *recanted and confessed* as to why they made the false charges.].

4A11.   JUNK SCIENCE CLAIMS  OF "FRAGMENTED MEMORY" FOLLOWING ASSAULT and IRRATIONAL CLAIMS THAT ANY POST-ASSAULT BEHAVIOR BY WOMEN IS CONSISTENT WITH ALLEGATIONS AGAINST MEN:  … ( see, the junk science presentation on the "Neurobiology of Trauma" by "Feminist Scientist" R. Campbell a Ph.D. , a community psychologist. (See, "The Feminist Movement was also developing momentum during the 1960s and into the 1970s… This socially-conscious atmosphere was ideal for the development of the field of Community Psychology, whose values emphasized social justice (politically biased junk science) …. it was in 1965 that a group of clinical psychologists gathered in Swampscott, MA, and gave birth to the field of Community Psychology, which they hoped would allow them to become social change agents (not competent scientists) to address many of these pressing social justice issues of the 1960s (political biased propaganda, not competent, reliable science).

In my opinion,  Dr. Campbell's expressed views — regarding the Fragmentary Nature of Trauma Memory (her claim that memory is like sticky notes that have to be assembled into "memories"— are VERY CONTROVERSIAL and UNRELIABLE, NOT

accepted by the relevant scientific community, and has NO KNOWN ERROR RATE. See, Transcript "The Neurobiology of Sexual Assault", An NIJ Research for the Real World Seminar, Rebecca Campbell , Ph.D. Professor of Psychology, Michigan State University, December 3, 2012. See, https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx (accessed June 6, 2018).

[ Question: Who was the negligent Purdue University official who reportedly used Dr Campbell's pseudo-science notions in training Title IX investigators? (See, Deposition of Jacob Amberger).

In my opinion, Dr. Campbell's claims appear reckless, improper, and unreliable — just another in a long chain of radical feminist-politicized, unreliable pseudoscience on trauma and assault. These issues are too important to be politicized in a web of sexual bias.

To the best of my knowledge:

— The controversial notions regarding the "fragmentary nature of trauma memories" apparently originated from an "expert", Bessel van der Kolk, MD (VDK).

— Dr VDK was fired from Harvard Medical School.

—- Dr. VDK's research assistant Danya Vardi was convicted of research fraud and banned from future funding by a federal investigation committee.

—A Federal District Court in Rhode Island ordered Dr. VDK to produce his data on the "Fragmentary Nature of Trauma Memory" for review by attorney-scientist R.C. Barden, Ph.D., J.D. Dr. VDK refused to comply with the Federal Court order, fled from the process server, dropped out of the relevant cases and years later claimed in sworn deposition testimony that the "only copy of his data" on the essential "fragmentary nature of trauma memories" study was "burned up in a fire." See, pg 171 of the May 4, 2005 Videotaped deposition of B. van der Kolk, MD in Bonse v. Archdiocese of St Paul and Minneapolis, Court File No. 62-C4-02-11412, Second Judicial District, Ramsey County, Minnesota.

— The claim that trauma memories are "fragmented" and must be pieced back together  as a predictable outcome of assault and/or trauma is a CONTROVERSIAL

notion NOT accepted by the relevant scientific community. This controversial notion has NO known error rate.   (See detailed discussion of the science of memory below).

— Prof. R. Campbell's training materials on the "Neurobiology of Sexual Assault" appears to include unreliable, unsupported pseudoscience that is NOT accepted by the relevant scientific community and has NO known error rate.  PURDUE UNIVERSITY's reported use of Dr. Campbell's reckless notions in the training of TITLE IX investigators without having such information properly reviewed and vetted by competent scientists appears politicized, unprofessional, and reckless. (See Deposition of Jacob Amberger). also See,  Transcript "The Neurobiology of Sexual Assault", An NIJ Research for the Real World Seminar  by Rebecca Campbell , Ph.D. Professor of Psychology, Michigan State University,  December 3, 2012 … See,  https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx (accessed June 6, 2018).

In my opinion, it appears that Dr. Campbell's presentations and training materials have damaged the integrity of the legal and educational systems that rely upon her radical feminist politicized training — including PURDUE UNIVERSITY's recklessly incompetent TITLE IX investigative practices .  As E. Yoffe has reported, Reportedly,  as of 2014, Harvard Law's Title IX training for its disciplinary board included Campbell's PowerPoint slides. Janet Halley,  a professor at Harvard Law School, has written of the intended effect of the training on recipients: "<u>It is 100% aimed to convince them to believe complainants, precisely when they seem unreliable and incoherent.</u>" — it appears that PURDUE UNIVERSITIES TITLE IX investigators and Dean followed this fatal advice diligently.

Dr. Campbell's controversial notions ( see, e.g., the University of Michigan's Sexual Assault Prevention and Awareness Center webpage for students on the "Neurobiology of Trauma" based largely on Campbell's lecture) include claims that as a result of the "hormone soup" provoked by an assault, "the survivor cannot move and is rendered immobile by the traumatic event," and "survivors may have trouble accurately remembering the assault." Bowdoin College's Title IX webpage on "The Neurobiology of Sexual Assault," also based on Campbell's lecture, tells students that "the flood of hormones can even, and often does, result in a complete shutdown of bodily function, a

state referred to as 'tonic immobility,' but better described as paralysis" and that victims "also may exhibit <u>fragmented memory</u> recall due to the disorganized encoding that occurred during the incident."

[ Dr Campbell's ] information sends the message to young people t<u>hat they are biologically programmed to become helpless during unwanted sexual encounters and to suffer serious mental impairment afterward</u>.  Various initiatives have spread ideas about this syndrome out into the collegiate world. In 2013, funding from the Obama administration's federal government established the National Center for Campus Public Safety, an educational resource for campus administrators that offers a "Trauma-Informed Sexual Assault Investigation and Adjudication" curriculum, and purveys the ideas popularized by Campbell and other "feminist scientists". Last year, the University of Texas at Austin released a state-funded report, "The Blueprint for Campus Police: Responding to Sexual Assault," with the hope of it becoming a national model. It codified "victim-centered and trauma-informed" investigations, asserting: "<u>Trauma victims often omit, exaggerate, or make up information</u> [i.e. become an incompetent witness or perjurer! ] when trying to make sense of what happened to them or to fill gaps in memory." And "due to the neurobiology of trauma, victims may suffer from a rape-induced paralysis called tonic immobility." See,  E. Yoffe, The Bad Science Behind Campus Response to Sexual Assault, The Atlantic, Sept. 8, 2017  at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/  accessed June 5, 2018.

It is my opinion that Dr Campbell should come forward and produce peer reviewed, published, reliable and valid research studies in actual, competent science journals (not "trauma" journals or "feminist science" journals) to justify her controversial and apparently false, deceptive, misleading, and potentially damaging, anti-male politicized lectures and speeches.

It is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's "feminist science" notions are reckless, controversial, and unproven.  It is my opinion that any competent and responsible University official as of Jan 2016 would know or should have known that Dr

Campbell's "feminist science" notions would fail Frye-Daubert-Kumho minimal methodological standards of reliability and validity. Further, it is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's "feminist science" notions should have been reviewed by competent experts and scientists as passing minimal reliability and validity tests <u>BEFORE</u> they were applied to the lives of people in real life assault investigations.

In my opinion, any competent University Title IX investigator or committee should have been aware of the NATIONAL CONTROVERSIES regarding Title IX due process violations and uses of junk science methodologies. Unprofessional reliance upon Dr Campbell's and other highly controversial and apparently pseudoscientific "feminist science" lectures and speeches could result in grossly defective, irrational, biased, and unfair investigations — as in this case.

My analysis of Dr Campbell's theories and publications will continue and become much more detailed in the near future. It appears, for example, that <u>Dr. Campbell is NOT licensed in anything</u> and thus apparently <u>avoids obeying licensing ethics rules</u> requiring the honest and proper disclosure of limitations on Campbell's methodologies, theories, and instructions.

It has been reported that Dr Campbell has given misleading, false, and pseudoscientific presentations — much as the RMT, MPD, and others have done in the past — offering unreliable, politicized, radical feminist tainted misinformation. For example, "[Dr. Campbell] asserted that the damaged memory of a victim can be likened to "tiny Post-it notes" scattered randomly across "the world's messiest desk." For a sexual-assault victim to "reconstruct what happened" requires a sympathetic questioner who will give the victim the time and space to "reassemble the Post-its in a coherent order" [ i.e. witness tampering! ]. Dr Campbell reportedly assures her audiences that <u>the story that emerges will be a true account of the crime.</u> [ NOTE: If Dr Campbell actually made such statements her conduct is be best viewed as a form of reckless fraud. ]. "What we know from the research is that the laying-down of that memory is accurate and the recall of it is accurate." [ NOTE: If Dr Campbell actually made such statements her conduct is be best viewed as a

form of reckless fraud. ]. "Tonic immobility", she said, is a "mammalian response that is in all of us," likely affecting <u>close to 50 percent of sexual-assault victims</u>. "Their body freezes on them," she said, and not just for a moment or two. The victims go into an extended state in which they can't speak or move, and hence cannot fend off an assailant." [ NOTE: If Dr Campbell actually made such statements her conduct is be best viewed as a form of reckless fraud. ].  See,  E. Yoffe, The Bad Science Behind Campus Response to Sexual Assault, The Atlantic, Sept. 8, 2017  at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/  accessed June 5, 2018.

     If media reports are accurate Dr. Campbell has already been recorded "backtracking" on her irrational radical feminist views, beliefs, and pseudoscientific pronouncements.  For example, " I spoke with Campbell about all of this [ including the obvious fact that actual international science experts in trauma and memory like Harvards Richard McNally and the University of California's Elizabeth Loftus sharply disagree with Campbell's politicized, unreliable "theories" ]  last fall, and in our conversation, Campbell said the goal of her work on neurobiology was to give law-enforcement officers a more nuanced understanding of how a sexual-trauma victim <u>MIGHT</u> behave. Campbell has apparently backtracked to saying that if her work was used as a guide for campus investigations and adjudications— particularly to support the idea that no matter how a complainant behaves, she is almost certainly telling the truth—such use was unintended, Campbell says, and "would be an overreach."  <u>Campbell has reportedly acknowledged that her talk incorrectly conflated freeze and tonic immobility</u>. "That is something in later presentations I've learned to correct," she said to journalists. While her lecture conveys certainty and assurance [ <u>NOTE: If Campbell's conveyed certainty and assurance when promulgating controversial, radical feminist, pseudoscientific information to science illiterate law enforcement or university Title IX investigators her conduct could well be construed as reckless fraud </u>], she told me that we don't know "as much as we'd like to" about tonic immobility and that there are "very valid questions" as to whether it occurs (at all) in humans."  Compare this backtracking to her previously quoted statements… "Tonic immobility", she said, is a "mammalian response that is in all of us,"  likely affecting close

to 50 percent of sexual-assault victims.  See, https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/

In my opinion, Dr. Campbell should be properly and professionally investigated for reckless misconduct and/or fraud. One Investigative Hypothesis would be that Dr. Campbell has engaged in misconduct and/or reckless fraud by misrepresenting herself as an "expert" in neurobiology and investigations, grossly misrepresenting the science of memory and memory contamination, deceitfully hiding the controversial nature of her work,  misrepresenting the science of "tonic immobility", and spreading false, deceptive, and manipulative radical feminist misinformation damaging the integrity of the legal system and producing sexual discrimination in University Title IX investigations — in a manner consistent with multiple, previous radical feminist pseudoscience scandals over the past decades (e.g. Wolf, Steinem, Braun, Ross, Van der Kolk, Brownmiller, etc, and now apparently Dr. Campbell as well).

In sum, it is my opinion to a reasonable degree of certainty that Dr Campbell's views — as reported above — are controversial, radical feminist politicized, anti-male, theoretical notions that are NOT accepted by the relevant scientific community.  It is further my opinion that such controversial radical feminist politicized notions have no known error rate.  It is my opinion that such controversial radical feminist politicized notions are unsupported — and often contradicted — by competent scientific research published in quality journals.  (See science of memory summary below).  My current investigative hypothesis on this issue is that Dr Campbell has committed reckless scientific fraud and misconduct in so egregiously mischaracterizing the research in this field for her own personal aggrandizement, or for political, and/or financial benefit or for other reasons. I will continue to investigate that hypothesis.  I note that Dr. Campbell should have a fair and proper opportunity to defend her controversial positions and I look forward to reviewing peer reviewed science published in credible scientific journals as proffered by Dr Campbell to support her controversial pronouncements, speeches and writings.

**4B.      IT IS MY OPINION THAT INVESTIGATORS and OTHER OFFICIALS AT PURDUE UNIVERSITY CONDUCTED A RECKLESS, TAINTED, UNRELIABLE, and HIGHLY IMPROPER INVESTIGATION IN THIS CASE AS THEY FAILED TO COMPLY WITH EVEN THE MOST BASIC, SIMPLE, AND ESSENTIAL RULES, METHODS and PRINCIPLES of PROPER INVESTIGATIONS.**

**A KEY INVESTIGATIVE QUESTION IN THIS CASE IS WHETHER THE OBVIOUS, MULTIPLE, EGREGIOUS FAILURES OF PURDUE's INVESTIGATION-ADJUDICATION PROCESS WERE THE RESULT OF A) GROSS NEGLIGENCE, B) RECKLESS FRAUD, or C) DELIBERATE FRAUD …that is, A DELIBERATE ATTEMPT TO MANIPULATE EVIDENCE AND DEFRAUD STUDENTS IN SUPPORT OF A RADICAL FEMINIST "BELIEVE WOMEN" AGENDA.**

**MUCH EVIDENCE SUPPORTS THE INVESTIGATIVE HYPOTHESIS THAT PURDUE PERSONNEL WERE ENGAGED IN A FRAUDULENT PROCESS OF HIDING and MANIPULATING EVIDENCE TO "BELIEVE WOMEN" and "SUBVERT THE PATRIARCHY"…**

**ANALYSIS OF INVESTIGATIVE HYPOTHESES:**

**For example, it appears that PURDUE PERSONNEL NEGLIGENTLY, RECKLESSLY (FRAUDULENTLY?) or DELIBERATELY HID, BURIED, CUT-and-PASTED, and IGNORED DISCONFIRMING EVIDENCE:**

**Disconfirming evidence included Jane Doe's obviously friendly and inviting texting messages seeking *MORE time and attention with John Doe* WEEKS following an alleged felony criminal assault.  These DISCONFIRMING texts were apparently CUT and PASTED OUT and this key evidence was thus HIDDEN and BURIED by Purdue investigators. (See Depositions of Amberger and Oliver and others).  Was this obvious misconduct due to Gross Negligence, Reckless Fraud, or Deliberate Fraud?**

**Similarly, texting evidence clearly documented Jane Doe's very close (almost like a married couple) relationship to John Doe,  her defective thinking style, her emotional instability, and her deeply deceitful-manipulative-pathological relationship with her mother — yet ALL of this evidence was apparently "cut and pasted" out, buried, hidden and/or**

ignored by the Purdue Investigators and Adjudicators…(See, 134 pages of Texting Evidence).  Was this misconduct due to Gross Negligence, Reckless Fraud, or Deliberate Fraud?

      Also,  the Purdue investigators apparently ignored the *<u>multiple witnesses</u>* who disconfirmed Jane Doe's claim of being abused or harassed by a stun baton (falsely labelled a "taser") as they apparently agreed that Jane Doe's reaction to the stun baton was laughing and joking happily about the low powered shock device.

      — Also, the Purdue investigators apparently ignored the *<u>multiple witnesses</u>* who disconfirmed Jane Doe's claim that John Doe had a temper problem.

      — Also the Purdue investigators apparently ignored the extensive evidence *<u>from multiple witnesses</u>* and documented texting evidence supporting the investigative hypothesis that Jane Doe was a serious emotionally disturbed,  multiply-traumatized in high school (reportedly claimed multiple rapes in high school), manipulative, and deeply deceitful witness. This texting evidence was also apparently hidden, buried, and/or ignored by Purdue personnel.

      — Also, Purdue personnel failed to competently investigate the allegations that Jane Doe suffers from chronic and serious emotional instability or mental illness including suicidal ideation and behaviors (e.g., borderline personality disorder? Depression? other Diagnoses? Alcohol abuse? Psychiatric medications?)?  Did Purdue personnel do anything to investigate the report that Jane Doe allegedly claimed she was raped several times in high school (one reportedly witnessed by her parents). Were Jane Doe's parents interviewed? If not, why not? What did Purdue personnel do to investigate reports of Jane Doe's actual suicide attempt at Purdue as well as her reported suicidal ideation as well as the corroborative evidence provided in the testimony of John Doe's roommate?  Was the roommates testimony simply ignored by Purdue because he is a white male member of the hated "patriarchy"?  What did Purdue personnel do to investigate Jane Doe's reportedly serious alcohol abuse?

      — Perdue personnel apparently fraudulently manipulated — cut and pasted out thus hid and buried — and/or ignored Jane Doe's shocking "admission" in her texting of a

deep hatred for her mother as well as Jane Doe's manipulative, deceitful, and deceptive plan to use her parents to pay tuition and fees until graduation then ban her mother from attending her wedding or seeing her children.  See, e.g. the Text of Dec 26, 2015 4:42 PM … pg 0282 … From Jane Doe to John Doe:   "She's just ugh. I'm literally never talking to her (Jane Doe's mother) once I graduate.  *She will not be at my graduation. She will not be at my wedding.  She will not see my children*." (Emphasis added). [ Note the manipulative, deceitful, and cruel nature of this documentary evidence. Did Purdue personnel ignore-bury-hide-cut/paste out this key evidence in order to fraudulently manipulate the record to protect a radical feminist "Believe Women" narrative and process?  Did the Dean even bother to review the full 134 pages of texts or only the fraudulently manipulated "selected" evidence supporting a "Believe Women" radical feminist agenda?

        —– Confirmation bias — so very evident in this case — is an often fatal investigative error. Why did Purdue's sham "investigators"  ignore ALL of the disconfirming evidence and apparently *fail to generate and test any alternative investigative hypotheses* in this complex case? Were they really only interested in "Believing Women"?

        — Why did Purdue's investigators apparently fail to investigate and document the reported fully sexual relationship these students engaged in for weeks-months (reportedly 15-20 nights of full sexual intercourse initiated by JANE DOE)? (See, Declaration of John Doe).  Was this evidence also cut-pasted out, buried, and hidden to protect a "Believe Women" radical feminist narrative and a process to "Subvert the Patriarchy"?

        — Why did Purdue investigators mysteriously fail to even ask Jane Doe about the timing of her allegations (5 MONTHS after the alleged event, after potential indoctrination by the CARE feminist program, after John Doe reported Jane Doe for suicide ideation and a suicide attempt, etc). See, Deposition of Amberger and Oliver and others).  Did Purdue personnel ignore this key evidence in order to continue to adhere to Purdue's radical feminist "Believe Women" agenda?

        — Why did Purdue select the radical feminist, junk science "expert" R. Campbell's controversial  program to "train" (indoctrinate) Purdue investigators? (See, Deposition of Amberger).

— Why  did Purdue personnel apparently ignore and dismiss or cut-paste-hide the substantial body of evidence supporting the alternative hypothesis that Jane Doe is a disturbed, deceitful, unstable, and unreliable witness who exaggerated normal dating boundary issues into a felony assault allegation seeking revenge for John Doe's reporting her suicide attempt?

— Why did the Dean's sham conclusory "decision" fail to deal with ANY of the disconfirming evidence and fail to engage in ANY rational discussion of  the weighing back and forth of the pros and cons of the *alternative hypotheses* and *disconfirming evidence*? Did the Dean simply ignore all the disconfirming evidence and fail to discuss alternative investigative hypotheses in order to continue to pursue a deeply biased, radical feminist "Believe Women" agenda?  Did the Dean review a Cut-and-Pasted manipulated file of "selected" evidence AND never once speak to Jane Doe or see ANY sworn statement from her? Were these egregious errors in pursuit of a radical feminist "Believe Women" agenda at Purdue University?

— The Dean's failure to have Jane Doe even appear at the hearing/committee meeting further supports the investigative hypothesis of consistent Anti-Male, Pro-Women bias and pursuit of a radical "Believe Women" process.

— Purdue investigators reportedly interviewed Jane Doe twice to obtain her interpretation of the text evidence while John Doe was ignored and never asked for his interpretation of the obviously vague text evidence, again Purdue was apparently following a biased, radical feminist "Believe Women" scheme.

— The Purdue investigators access to Jane Doe was apparently controlled by CARE director Bloom and CARE director Bloom was apparently the ONLY source of Jane Doe's unsworn-unsigned-unrecorded alleged "statement". The egregious failure to produce any indicia of reliability for Jane Doe's statement took place as Purdue ignored massive evidence of Jane Doe's long term defective thinking style, multiple exaggerated-false claims, and cruel-deceitful manipulation of her own parents. (See, text evidence and multiple depositions).

— Purdue's egregious, arrogant, and frankly reckless (fraudulent) methodological, process, and procedural failures — including the particularly egregious failure to video record ALL interviews and the equally egregious failure to record/transcribe the "Equity Committee" meeting — are also consistent with the investigative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist sham to "Believe Women"and "Attack the Patriarchy" without regard to logic, rational analysis, competent-responsible-professional investigative methodologies, or damage to falsely accused students.

In my opinion,  I rank Purdue's pseudo-investigation in this case in the bottom 1% of the hundreds of investigations I've reviewed in dozens of states over more than 25 years. In my opinion, the systemic reckless errors in this investigation (no recording of interviews, no sworn statement of allegations, no alternative hypotheses generation or testing, no knowledge of the relevant science of memory/false memory, no opportunity to question the complainant, blatant ignoring of significant disconfirming evidence, blatant failure to record or produce a transcript of the sham "Equity Committee meeting", etc. , etc ) is best described as a grossly negligent sham or reckless fraud on the public and a danger to the students of Purdue University.


### 4B1.  PERDUE PERSONNEL RECKLESSLY FAILED to AVOID CONFIRMATION BIAS — THEY FAILED TO GENERATE AND PROPERLY TEST ALTERNATIVE INVESTIGATIVE  HYPOTHESES:


From US Public Junior High Schools ( 8th Grade )  through police investigator training and up any competent Ph.D. science, M.D., or related programs, all students are taught that the central goal of a proper investigation is to generate <u>alternative investigative hypotheses</u> and to rationally, properly, and fairly explore-test those hypotheses to see if the evidence supports or refutes the hypotheses.  A common, serious error in recklessly improper, incompetent, and/or corrupt investigations — like the investigation in this case — is "confirmation bias" — the failure to properly generate and then explore alternative investigative hypotheses. In confirmation bias the investigators or therapists apply a

narrow "tunnel vision" approach to support a single, favorite, biased theory of a case. This investigation appears to be a classic example of CONFIRMATION BIAS in the service of radical feminist notions that the women should always be believed, and all assumptions should benefit the woman (or other "oppressed groups"),  no matter what the evidence indicates.

Motivated confirmation bias has long been thought by philosophers to be an important contaminating force against rational thought and analysis.  Francis Bacon (1620/1939) had this to say about it :

" The human understanding when it has once adopted an opinion (either as being the received opinion or as being agreeable to itself) draws all things else to support and agree with it. And though there be a greater number and weight of instances to be found on the other side, yet these it either neglects and despises, or else by some distinction sets aside and rejects; in order that by this great and pernicious predetermination the authority of its former conclusions may remain inviolate.. . . (p. 36) [5]

The Purdue University Investigators and Title IX officials in this case, including the Dean of Students and others clearly demonstrated several examples of investigation-tainting, confirmation bias including failing to honestly investigate a number of ALTERNATIVE hypotheses in this case.

THE RECKLESS FAILURES OF PURDUE PERSONNEL TO PROPERLY _RECORD_ ESSENTIAL INTERVIEWS and MEETINGS:   In this case, Purdue personnel committed one of the most fatal error of all errors in ANY investigation relying upon VERBAL STATEMENTS-ALLEGATIONS and lacking clear objective corroborative evidence — when they reportedly FAILED to properly record (video or audio) ANY interviews or committee meetings thus precluding a proper investigation of the alternative hypothesis that Purdue's "advocacy" and "support" officials, investigators, and "Equity

---

[5]    Bacon, F. (1939). Novum organum. In Burtt, E. A. (Ed.), The English philosophers from Bacon to Mill (pp. 24-123). New York: Random House. (Original work published in 1620).

*DOE v. PURDUE, et al.   CONFIDENTIAL   Dr. Barden's Initial Report of Feb 19, 2021*

Committee" members asked biased, manipulative, improper, leading, and manipulative questions consistent with radical feminist, identity politics, and Marxist ideologies that tainted the "memories" of the alleged victim. No "written notes" or other biased evidence — "created" by the very people whose investigative conduct should be evaluated — can compensate for missing RECORDINGS. The alleged "memories" of any alleged victim of any age *cannot be properly evaluated with knowing each and every question asked and the sequence of such questions as documented in RECORDINGS* — See, basic memory research summary infra). These egregious and reckless failures are consistent with the alternative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist sham to "Believe Women"and "attack the patriarchy" without regard to logic, rational analysis, appropriate investigative methodologies, or damage to falsely accused students.


THE RECKLESS FAILURE of PURDUE PERSONNEL TO OBTAIN SWORN-DATED-SIGNED WITNESS STATEMENT(S) FROM THE ALLEGED VICTIM: On this record, it is quite unclear if the alleged victim even made an allegation of abuse. Of the over 1,000 investigations I have reviewed (state, federal, criminal, administrative, licensing prosecutions, civil claims, etc) I do not recall any that involved ZERO recordings (audio or video) of the witness' statements, ZERO affidavits, and ZERO written-signed-dated statements of any kind. It is not clear on this record if the alleged victim still believes her alleged "memories" (no deposition?). Having worked on hundreds of cases in which the "memories" of abuse were later recanted I look forward to reviewing actual sworn testimony from the alleged victim. These egregious and reckless (fraudulent) failures are consistent with the alternative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist front to "Believe Women"and "attack the patriarchy" without regard to logic, rational analysis, investigative methodologies, or damage to the falsely accused.


THE RECKLESS FAILURES OF THE PURDUE FACT FINDER — the DEAN of STUDENTS — TO SEE, HEAR, and PERSONALLY ASSESS THE COMPETENCE and

**TRUTHFULNESS of the ALLEGED VICTIM :** On this record, the finder of fact, the Dean of Students, failed to ever MEET, TALK TO, or PERSONALLY ASSESS the alleged victim. This reckless failure (indicia of a fraudulent investigation) is, again, I believe unique in my experience over 30 years of reviewing proper, tainted, and grossly negligent "investigations".  These egregious and reckless (fraudulent) failures are consistent with the alternative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist front to "Believe Women"and "attack the patriarchy" without regard to logic, rational analysis, investigative methodologies, or damage to the falsely accused.

_**ANALYSIS of INVESTIGATIVE HYPOTHESES FROM THE ALLEGED VICTIM's STATEMENT**_ (pg 0654)  provided by Purdue Univ. employee Monica Bloom with ZERO indicia of reliability, that is, no sworn statement, no signed/dated affidavit, no video recorded statement, no sworn chain of custody of etc.  These failures of Purdue's investigation are extremely unusual, egregious, and reckless.

Much of the process surrounding Jane Doe's alleged statement is consistent with the investigative hypothesis that Purdue's "investigation" was a reckless sham (a fraud) — and simply a radical feminist process to "listen to women", "Believe Women"and "attack the patriarchy" with no real effort towards a competent, fair, professional, rational, proper investigation.

— Note there is no proper, documented "chain of custody" for Jane's Doe's alleged "statement" which was apparently transmitted by the Director of Purdue's CARE program — with NO sworn video recorded statement and NO signed/dated/notarized affidavit of any kind from Jane Doe.  On this record, Monica Bloom, Director of Purdue's apparently radical feminist, anti-male Center for Advocacy, Response, and Education (CARE) was the sole source of Jane Doe's

alleged "statement". *On this record, Jane Doe has never provided a sworn, recorded, signed statement of any kind at any time.* This is a reckless failure of the Purdue investigation and supports the investigative hypothesis that Purdue was simply employing "Believe Women"radical feminist ideologies in a sham investigation.

FAILURES of the Purdue Investigation:  On this record, apparently ZERO allegations of felony sexual assault were made by Jane Doe to anyone until MONTHS AFTER the alleged event and AFTER documented exposure to radical feminist, anti-male propaganda and/or "training" (indoctrination) from Monica Bloom and/or Purdue's apparently anti-male Center for Advocacy, Response, and Education (CARE).  See, e.g.,  the U.S. Seventh Circuit opinion in this case by Judge A.C. Barrett, "That changed in April 2016, which was Sexual Assault Awareness Month. During that month, Purdue hosted over a dozen events to promote the reporting of sexual assaults. Many of the events were sponsored by the Center for Advocacy, Response, and Education (CARE), a university center dedicated to supporting victims of sexual violence. CARE promoted the events on its Facebook page, along with posts containing information about sexual assault. One of its posts was an article from The Washington Post titled "Alcohol isn't the cause of campus sexual assault. *Men are.*" Emphasis added.

[ Note: This evidence appears to document that Purdue's CARE office disseminated classic radical feminist, anti-male propaganda which was also consistent with radical anti-male identity politics ideology. Was this a source of Jane Doe's "memories" of the alleged report of a felony sexual assault by John Doe?  See, a summary of decades of scientific research below on how post-event information

can *change, taint, or create entirely new false-believed-in "memories" of abuse*. Note also that Monica Bloom of the apparently radical feminist CARE program was — on this record — the *only* known source in the chain of custody of Jane Doe's alleged statement thus Ms. Bloom became a key witness to the investigation yet was apparently ignored by Purdue's negligent or fraudulent sham investigators.  Bloom also apparently improperly controlled access to Jane Doe for the investigators.  ]

FAILURES of the Purdue Investigation:  What parts of Jane Doe's alleged "memories of a "confession" of the alleged felony sexual assault in her alleged "statement" were the result of radical feminist propaganda training and indoctrination disseminated during the April 2016 Sexual Assault Awareness Month? On this record, no questions were asked and no investigation done into this key investigative hypothesis. On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to protect, defend, and"Believe Women"while manipulating the record of this case by ignoring or deleting (cut-and-pasting out) key evidence of alternative investigative hypotheses.

FAILURES of the Purdue Investigation:  Is there ANY reliable documentation of any kind that Jane Doe believed she had "memories" of John Doe "confessing" to felony sexual assault or reports of felony sexual attacks PRIOR to exposure to the Sexual Assault Awareness Month anti-male propaganda from Purdue's CARE office? On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to protect, defend,

and"Believe Women"while manipulating the record of this case by ignoring key evidence of alternative investigative hypotheses.

     **FAILURES of the Purdue Investigation:  The Purdue investigators** apparently followed radical feminist ideology and ignored that Jane Doe's alleged "statement" (if it is indeed her unsigned and unsworn and unrecorded statement) is consistent with the investigative hypothesis that Jane Doe is a deceitful, manipulative, emotionally unstable person. See the many places in her statement that Jane Doe makes claims that are A) immature, irrational and impossible (e.g. he <u>*NEVER*</u> left me alone) , B) quite inconsistent with her own Texting record (e.g. the record shows Jane Doe clearly <u>*SEEKING more time and attention from John Doe, long AFTER the alleged felony assault event*</u>) , C) inconsistent with other witnesses.  On this record, Purdue's investigators apparently followed radical feminist ideology to protect, defend, and"Believe Women"while manipulating the record of this case by ignoring key evidence of alternative investigative hypotheses.

     **FAILURES of the Purdue Investigation:  The alternative** investigative theory that Jane Doe is an emotionally disturbed, unstable, deceitful, cruel, and manipulative person is supported most clearly by Jane Doe's Text of Dec 26, 2015 4:42 PM … pg 0282 … to John Doe regarding Jane Doe's deep hatred and deceitful manipulation of her own mother:  "She's just ugh. I'm literally never talking to her (Jane Doe's mother) once I graduate.  <u>*She will not be at my graduation. She will not be at my wedding.  She will not see my children*</u>." (Emphasis added). [ Jane Doe was apparently manipulating and deceiving her parents into paying for her tuition/fees but planned

to destroy the relationship with her mother upon graduation and ban her from Jane Doe's life = remarkably deceitful, deceptive, manipulative, and cruel behavior). On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to protect, defend, and"Believe Women"while manipulating the record of this case by MANIPULATING EVIDENCE and cutting OUT this essential evidence. Fabricating evidence in this manner could be A CRIMINAL ACT in the legal system. Why did Purdue manipulate evidence?  Why did Purdue officials permit the investigators to do this?  Did the Dean ever see the actual evidence or just a manipulated file?

FAILURES of the Purdue Investigation:  In Jane Doe's alleged "statement" she demonstrates multiple indications of often pathological "all or nothing" thinking — a significant indicator of potential emotional instability, anxiety, and depression.  This evidence of a defective thinking style is consistent with HER report of "anxiety attacks" and John Doe's report of Jane Doe's suicidal ideation and suicide attempt. On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to protect, defend, and"Believe Women"while manipulating the record of this case by ignoring or deleting key evidence of alternative investigative hypotheses.

ANALYSIS OF ALTERNATIVE INVESTIGATIVE HYPOTHESES FROM THE ALLEGED UNSWORN STATEMENT OF JANE DOE: Below is an analysis of Jane Doe's alleged "statement" as transmitted by Monica Bloom of Purdue Univ. with no indicia of reliability (no

sworn statement, no video, no audio, no affidavit, none of the usual, essential indicia of reliability) :

See, "He started to get overly attached and _never_ leave me by myself" (Cf. Never? Really? This statement is exaggerated-irrational-immature-impossible and is NOT consistent with JD's texts seeking _more_ time with, and attention from, John Doe and his family WEEKS _after_ the supposed, alleged report of felony criminal assault). Purdue's sham "investigators" apparently followed radical feminist ideology and simply ignored such key evidence of alternative investigative hypotheses.

See, "he _never_ left me alone" (Cf. Never? Really? This statement is exaggerated-irrational-immature-impossible and is NOT consistent with JD's texts seeking _more_ time with, and attention from, with John Doe and his family WEEKS _after_ the supposed, alleged alleged felony criminal assault). Purdue's sham "investigators" apparently followed radical feminist ideology and simply ignored this key evidence of alternative investigative hypotheses.

See, "I was _always_ paranoid or scared" (Cf. Always? Really? This statement is clearly exaggerated-irrational-immature-impossible and is QUITE INCONSISTENT with Jane Doe's TEXT evidence (she was SEEKING more time and attention from John Doe) as well as the contrary witness testimony from John Doe and his roommate. Purdue's sham "investigators" apparently followed radical feminist ideology and simply ignored this key evidence of alternative investigative hypotheses.

See, "*Once I had gotten back from break I tried to forgive and forget. I had broken up with him before I left for break, but he never left me alone*. "  (Cf. this statement is clearly exaggerated-irrational-immature-impossible (never? really?) and on this record appears quite inconsistent with Jane Doe's Text messages (in the texts she appeared to be SEEKING time and ATTENTION from John Doe) in Dec, Jan. On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to "Believe Women"and simply ignored this key evidence of alternative investigative hypotheses.).

See,  "After the first month, I wanted to get away, but I just felt trapped and suffocated. I was *terrified* of what would happen. I didn't have to be directly threatened even just his presence would *make me cringe and drop my head*. He started to guilt me whenever I did something he didn't like or without him nearby." (Cf. This statement is clearly <u>NOT consistent with Jane Doe's own texts,</u> NOT consistent with the roommates testimony, and NOT consistent with John Doe's testimony.  Jane Doe's potential "rewrite" of her own auto-biographical "memories" is quite consistent with the history of millions of patients exposed to "ideologically driven therapy or radical feminist support groups" — such as "recovered repressed memory therapy" .  On this record, Purdue's investigators apparently followed radical feminist ideology to "Believe Women"and simply ignored key evidence of alternative investigative hypotheses.).

See, "wanted to get some space. Instead, I wasn't woken up to be walked back to Wiley. I was woken up, still in his room, to him moving up my leg and going over my crutch. I immediately got up, put my shoes on and left. I had left believing I got away before things

escalated. *I could take him out of my life,* Only later to be told it happened another time, However, he had actually invaded me. I wasn't even able to get up and leave or fight back. How many other times could this have happened? What else could he have done to me?"   (Cf. This statement — made months AFTER the alleged events — is clearly <u>NOT consistent with Jane Doe's own texts,</u> NOT consistent with the roommates testimony, and NOT consistent with John Doe's testimony.  Jane Doe's potential "rewrite" of her own auto-biographical "memories" month's after the alleged events is quite consistent with emotionally unstable patients exposed to "ideologically driven therapy and/or radical feminist support groups". See, Ofshe, R. and Watters, E. (1996)  Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria. 2nd Edition. University of California Press, for a detailed explanation of how ideologically driven therapists, feminist support groups, and biased survivor counseling can instill "new false memories of abuse" turning once beloved family members, spouses, or lovers into hated monsters. On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to "Believe Women"and DELETED-BURIED THIS EVIDENCE of alternative investigative hypotheses.).

See, "*he has a line of people behind him that he has hurt*" (Cf this statement appears quite inconsistent with the investigation report — who are the other "victims"? Names? Statements? ). On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to "Believe Women"and ignored this key evidence of alternative investigative hypotheses.).

See, "*I couldn't trust others, even my closest friends*" ... (Cf this is quite consistent with the theory that Jane Doe suffers from serious mental illness. Multiple Suicide attempts over many years? Serious alcohol abuse? Claims of multiple rapes in high school?  What is Jane Doe's therapy history? What are her Diagnoses? On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to "Believe Women"and simply ignored evidence of alternative investigative hypotheses.

See,  "*I stopped going to class, I stopped sleeping, I stopped eating, anything to keep from running into him*" (Cf. this statement appears VERY *Inconsistent with Jane Doe's own texts in which she appears to SEEK more contact /attention with John Doe*, NOT consistent with testimony from John Doe and testimony from the roommate. On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to "Believe Women"and DELETED-BURIED this key evidence of alternative investigative hypotheses. Did the DEAN ever see the text evidence of Jane Doe SEEKING more time and attention with John Doe or did she only review the MANIPULATED evidence file fabricated by Purdue investigators?

See, "*I'm still struggling to get out of bed every morning. I started going to parties to try and drink until I couldn't remember what happened or at least too far gone to be scared*" (Cf  NOT consistent with her Texting evidence ... this statement is, however,  quite consistent with the theory that Jane Doe suffers from serious mental illness. Multiple Suicide attempts over many years? Serious alcohol abuse? Multiple rapes in high school? What is Jane Doe's therapy history? What are her Diagnoses? On this record, Purdue's sham

"investigators" apparently followed radical feminist ideology to "Believe Women"and ignored or deleted key evidence of alternative investigative hypotheses.).

See, "My nightmares are still getting worse. I wake up screaming convinced ▮▮▮ is in the room. Even here in San Diego I've had to be pulled from various aspects of my training for my future career, because I couldn't handle it without a panic attack" (Cf. This statement is quite consistent with the alternative investigative theory that Jane Doe is seriously mentally ill (Suicide attempt, history of alcohol abuse, reports of multiple rapes in high school, her "all or nothing" defective thinking style, cruel-deceitful hatred of her own mother, etc. Diagnoses? Treatments? Psychiatric medications? ) On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to "Believe Women"and ignored or deleted key evidence of alternative investigative hypotheses.).

See, "*I'm constantly being punished for a decision I didn't make, and my judgement is often questioned because of the emotional damage from the experience he put me through.*" (Cf. these statements are consistent with the theory that Jane Doe — consistent with her documented cruel, manipulative abuse of her own parents — is using her allegations of abuse to excuse herself for academic and Navy failures — what do her records indicate?  On this record, Purdue's sham "investigators" apparently followed radical feminist ideology to "Believe Women"and ignored or deleted key evidence of alternative investigative hypotheses.).

See, ████ is charismatic and manipulative until he hurts you and you see the type of person he actually is. *He doesn't have a conscience*. I don't know if he ever will. In his mind it's about what he wants and the world owes it to him." **(Cf. This statement is quite inconsistent with Jane Doe's behavior as documented by Texting evidence SEEKING more time and attention with John Doe and multiple witnesses. This statement is quite consistent with the theory that a suggestible mental patient was subjected to radical feminist, "hate the patriarchy"and "blame abuse for all my troubles" training. Is there ANY documented evidence Jane Doe felt this way (not chit chat evidence ) prior to being exposed to Purdue's radical feminist CARE program in April of 2016? On this record, Purdue's investigators apparently followed radical feminist ideology to "Believe Women"and ignore or delete key evidence of alternative investigative hypotheses.).**

See, "*He makes others feel unsafe, bullies them, hurts them, and takes advantage of their vulnerable states*." **(Cf. If this is true, then where are the SIGNED WITNESS STATEMENTS of those who John Doe "made feel unsafe, bullied, hurt, or taken advantage of". If Jane Doe's statement is, in fact, FALSE it would be consistent with the alternative hypothesis the Jane Doe suffers from a radical feminist rewriting of her life story (as millions of women experienced in "recovered repressed memory therapy", and/or severe mental illness and/or an immature-exaggerated-hysterical-thinking style and/or is a deceitful-manipulative-cruel person (as her Text evidence regarding her mother indicates). On this record, Purdue's investigators apparently followed radical feminist ideology to "Believe Women"and**

ignored or deleted key evidence of alternative investigative hypotheses.).

## ANALYSIS OF ALTERNATIVE INVESTIGATIVE HYPOTHESES FROM THE SWORN-DATED-SIGNED WITNESS DECLARATION OF JOHN DOE, PLAINTIFF:

John Doe's sworn-dated-signed witness declaration of Feb 18, 2021 includes numerous claims and statements that were reportedly offered to but ignored by the Purdue investigators. If true, several may be among the most essential facts in this case.

John Doe's declaration supports the following alternative investigative hypotheses:

**A MANIPULATED, RADICAL FEMINIST SHAM INVESTIGATION:— John Doe alleges he offered much key evidence in this case and such evidence was ignored, buried, manipulated, or misinterpreted. (This fits the investigative hypothesis that Purdue's conducted a sham or fraudulent investigation within narrow, preconceived, radical feminist "Believe Women"ideologies.)**

**DECEITFUL, HATEFUL, and CRUEL JANE DOE: — Jane Doe's *text evidence documents* her often expressed hatred of her mother who she intended to ban from her life AFTER Jane Doe's parents paid for her tuition up to graduation.**

**A CONSERVATIVE, CHRISTIAN, VIRGIN prior to JANE DOE:— John Doe alleges he was a conservative Christian and had NO experience with a serious girlfriend nor sexual intercourse (he was a virgin) prior to meeting Jane Doe at Purdue. Three witnesses —**

John Doe, the roommate, and Jane Doe's statement appear to support this information.

**NO CONFESSION OF CRIMINAL ASSAULT : —** In his declaration, John Doe denies any "confession" *to any illegal or harassing activity* in his texts and offers detailed alternative explanations for texts that might have been interpreted as supporting Jane Doe's allegations.  For example, "I was apologizing to try and keep Jane Doe stable and because, at that time, I still had loving feelings for the first girlfriend in my life and the first girl with whom I had sexual relations, and because I was concerned about her mental well-being given her suicide attempt."  (Note: John Doe's explanations were reportedly ignored, manipulated or simply dismissed by Purdue's investigators supporting the theory of a radical feminist "investigation" designed to "Believe Women"only.)

**JANE DOE's TROUBLED HISTORY - MENTALLY ILL? :** "During the course of our relationship, Jane Doe told me that she had multiple sexual partners before college, and *claimed to have a personal history of rape and suicide attempts*. On multiple occasions during our relationship, she would, without me, go out to fraternity parties and get severely drunk, later returning to her room and inviting me over, only to spend the whole night vomiting into a toilet while I took care of her."

**JANE DOE'S SUICIDE ATTEMPT - MENTALLY ILL? :** John Doe reported "December 13, 2015, I was contacted by Jane Doe. She was in her room in Wiley Hall, and requested that I meet her there. Upon arrival, I immediately saw that her room was in a severe

*DOE v. PURDUE, et al.   CONFIDENTIAL   Dr. Barden's Initial Report of Feb 19, 2021*

state of disarray. *__She was quite agitated, railing against her parents__* and her uncertainty and unhappiness towards her life, and throwing her belongings against the walls. After I consoled her and she had calmed down, she asked to go out for a walk. I accompanied her, and she led us directly to the parking garage diagonally across the street from the armory. Jane Doe led us up to the top floor of the parking garage, and by this point her odd behavior began to give me cause for concern. *__She then proceeded to try and throw herself off the ledge of the parking garage__*, all the while trying to convince me to let her do so. This went on for approximately 45 minutes. At one point she had managed to swing her legs over the ledge, and she tried to break free from my grip and jump over the side. The experience upset me, and right after her outburst subsided, she behaved as though nothing of importance had happened."

JANE DOE WAS THE SEXUAL AGGRESSOR:  — John Doe reported,  "Jane Doe claimed to be sexually experienced, she claimed a history of previous sexual experiences in high school,  she claimed to have been raped in high school,  and <u>she was reportedly the initiator of MANY full sexual intercourse consensual experiences</u> with John Doe at Purdue including spending many nights sleeping together. (The fact that the Purdue investigators reportedly buried/hid/ignored these key essential facts supports the investigative hypothesis that Purdue conducted a sham "investigation" following radical feminist ideologies to simply "Believe Women"and attack the patriarchy (especially White cisgendered, Christian males) while negligently or fraudulently ignoring or manipulating key evidence of alternative investigative hypotheses.).

**WERE JANE DOE's "NEW MEMORIES of ABUSE"
PRODUCED BY RADICAL FEMINIST TRAINING IN APRIL or
2016?:** John Doe reported, "Jane Doe never accused me in person or
via text of what she accused me in the Purdue sexual misconduct
proceeding that she initiated in April 2016, four months later." …"
None of the 134 pages of text messages referred to what Jane Doe
would accuse me of in April 2016 Our texts reflected the fact that Jane
Doe and I did have a deeply personal relationship developed in part
through sexual intercourse, and that Jane Doe was enforcing new
physical boundaries between us. While doing this, our relationship
was still intimate enough that she sent my family Christmas cookies,
and we messaged one another frequently. These texts also reflected
Jane Doe's difficult relationship with her mother and family, a fact
she used at times to answer my questions to her about being unhappy,
and also a fact that motivated her unfair behavior towards me. I
became more apologetic towards Jane Doe the more she directed
negativity towards me; her constant barrages eventually made me
believe that I was in part somehow responsible for all her misfortune.
Apologizing to placate Jane Doe was part of how I dealt with her
tumultuous emotions throughout the relationship, even more so in the
wake of her suicide attempt." (See, Feb 18, 2021, Declaration of John
Doe ).


      **EVIDENCE OF RADICAL FEMINIST ANTI-MALE BIAS?
WAS MONICA BLOOM DIRECTING A SHAM, RADICAL
FEMINIST INVESTIGATION?** John Doe reported, "The Purdue
investigators *never questioned me regarding the contents of the texts
after I provided them*, yet took the time to arrange *a second interview
with Jane Doe, at the suggestion of Monica Bloom, in order to review*

_the texts and hear her interpretation of them_. **For reference, Monica Bloom was the CARE sexual assault center Director at Purdue University, with a professional background as a lawyer."  If true, on this record, Purdue's investigators appear to have followed radical feminist ideology to "Believe Women"and recklessly ignored or deleted John Doe's testimony, his roommates testimony, and essential Text evidence of alternative investigative hypotheses.**

**and other examples.**

**IF PURDUE WAS CAUGHT CONDUCTING A SHAM INVESTIGATION, ONE MIGHT EXPECT TO SEE LOTS OF "I DON'T REMEMBER" TESTIMONY FROM OFFICIALS :**

**See, 11 Q Okay. Have you, in the course of your time at Purdue, received training in Title IX matters? A Yes, I have. Q When was the last time you attended a training session? A I don't recall. Q Do you recall -- well, in the 12-year period you've been vice president for ethics and compliance, _do you know how many times you went to training sessions? A No, I don't._" See, Deposition of A.C. Rollock.**

**See, " Q Okay. Do you recall any discussions in that general period of time with Dean Sermersheim about what Monica Bloom had emailed you and Dean Sermersheim? A I really don't recall. Q Do you recall, generally, _in the 2015/2016 school year, how many sexual misconduct disciplinary complaints there were? A No, I don't_. Q Do you have any general recollection whether it was 10? 20? 30? A I'm sorry, I don't. I don't."  — really? See, Deposition of A.C. Rollock.**

**See, " 12 Q Okay. Let me ask a question: Is April, in the 2015/2016 school year, the sexual awareness month at Purdue? A I don't recall. I don't know." See, Deposition of A.C. Rollock.**

See, 22 Q Okay. Do you recall talking at this period of time with Monica Bloom about what she had emailed you on that date? A No. I don't recall. Q Okay. Do you recall any discussions in that general period of time with Dean Sermersheim about what Monica Bloom had emailed you and Dean Sermersheim? A I really don't recall." See, Deposition of A.C. Rollock.

See, 14 Q Okay. Did you have any substantive discussions (with the Dean of Students) about the case? A No, we did not. Q Did -- do you recall any other conversations with Dean Sermersheim concerning the John Doe case in the months of June and July? A No. Q Do you recall any discussions concerning this John Doe case in the months of June and July with Monica Bloom? A No, I don't recall. See, Deposition of A.C. Rollock.

ADMISSION: JOHN DOE WAS REPORTEDLY NOT PROVIDED WITH THE INVESTIGATION REPORT PRIOR TO THE COMMITTEE HEARING AND SUSPENSION: Q Okay. And it's true, is it not, that John Doe was not provided access to the investigation report done in this case at the time the proceeding was going on? A That's correct. …. Q Why wasn't it the policy at Purdue at that time, to allow a respondent to review an investigation report providing what was the basis for a sexual misconduct finding? A The procedures at that time did not provide any party the opportunity to review the report." See, Deposition of A.C. Rollock.

LACK OF COMMUNICATION?: Q Okay. And you -- were you aware at that time that plaintiff, John Doe, had provided 133 pages of texts between he and complainant that went from mid-December to -- all the way to March of 2016? Mid-December, 2015,

the last one in March of 2016? A No. Q Were you aware that Jane Doe -- that Jane Doe didn't provide any documentation? A No." See, Deposition of A.C. Rollock.

**INCOMPETENT APPEAL PROCESS:  Q Okay. Were you aware at the time that John Doe provided many pages of texts between he and John -- Jane Doe? A Not at the time I received his appeal. I knew there were text messages between the parties. I don't know who provided or how many were provided." See, Deposition of A.C. Rollock.**

**PURDUE's GROSSLY DEFECTIVE PROCEDURES HAVE BEEN CORRECTED BUT TOO LATE FOR JOHN DOE:  Q With respect to the panel meeting of the equity committee panel members and the dean, is there any transcript that is normally made of those meetings? A No, there's not. If I could clarify, starting August 14th, there is, but there was not at that time. Q I fully understand. The new regulations A I just wanted to be sure. Q -- went into effect. Under the new regulations, they have a requirement (for transcripts). I wanted, really, to ascertain in the 2015/2016 school here, _Purdue did not have a system in which there was a transcription of such a meeting_; correct? A Correct.   See, Deposition of A.C. Rollock (Purdue VP).**

**THE PURDUE INVESTIGATION WAS APPARENTLY TAINTED BY THE ANTI-MALE PSEUDO-SCIENCE OF RADICAL FEMINIST R. CAMPBELL  - THE PURDUE INVESTIGATOR WAS APPARENTLY CLUELESS AS TO UNRELIABLE NATURE OF DR CAMPBELL's METHODOLOGY. WHO INCORPORATED DR CAMPBELL's JUNK SCIENCE**

NOTIONS INTO PURDUE TRAINING? :  (see detailed discussion of Dr R. Campbell's misconduct and pseudoscience above)  : " Q Did you receive any training in terms of trauma, of complainants? A Yes. Q What was that training? A Neurobiology of trauma. How brains code memories, do not code memories, during traumatic instances. That is really, all I recall from the trainings.  Q Do you recall who provided that kind of trauma training? A I believe there *was a faculty member from Michigan State University; Rebecca Campbell.* Videos and research that is the only one I recall off the top of my head. Q You do recall Professor Campbell? A Yes, I believe she has been the prominent person on that subject?  — Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).

NOTE: This evidence supports the hypothesis that the Purdue Investigators were not deliberately engaged in fraud but rather were duped by ignorance and misinformation.


RECKLESS FAILURE TO RECORD INTERVIEWS: " Q Was there ever any video of these interviews that you took of people in your investigation? A No, not that I am aware of." Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).


PURDUE INVESTIGATORS IGNORED SUICIDE ATTEMPT TESTIMONY: 2 Q Do you recall that in that interview, Mr. Uthuttan was a roommate related to you that John Doe  was concerned about the suicide attempt that Jane Doe made? A Yes." Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).


*DOE v. PURDUE, et al.   CONFIDENTIAL   Dr. Barden's Initial Report of Feb 19, 2021*

**IRRATIONAL, INCOMPETENT, ARROGANT, UNSYSTEMATIC FAILURE TO REVIEW THE TEXT MESSAGES - NO ALTERNATIVE HYPOTHESES WERE GENERATED OR TESTED ( F- ) :** **"A We would have pulled and identified  text messages *that we felt were relevant* to the investigation. Q What do you mean by, relevant? A The things that spoke directly to the allegations or response to the allegations. Q How did you know if they did relate to the allegations? A I don't recall the exact reasoning of the practice would have been. I don't recall the specific conversation that Jacob or I had about what we included or did not include in the course of the investigation." Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).**

**MONICA BLOOM — SUPPORT PERSON FOR THE ALLEGED VICTIM:** **" Q Did you ever deal with Monica Bloom as director of CARE with JOHN DOE? A I recall her being the support person for JANE DOE, during the process. Outside of that no. Q Ms. Bloom was in CARE? When support person I would like to clarify you are referring to a support person for JANE DOE? A Correct.: Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).**

**Monica Bloom was thus the SUPPORT person for Jane Doe and also the ONLY source of her "statement" (no other chain of custody) — this appears to be a serious CONFLICT of INTEREST and role-boundary violation.**

**PURDUE INVESTIGATORS NEGLIGENTLY FAILED TO INTERVIEW JOHN DOE'S LIST OF WITNESSES:** **See, pg 42 of**

the Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).

### PURDUE INVESTIGATORS IGNORED and BURIED EVIDENCE THAT CONTRADICTED THEIR ANTI-MALE, RADICAL FEMINIST NARRATIVE:

" Q Okay, and that is what JANE DOE *accused JOHN DOE of losing his temper?* A Yes. Q And John Doe denied it? A Yes. Q And you say a witness *contradicted* that John Doe lost his temper, or would lose his temper? A Yes. Q Okay." … See, Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).

and … "John Doe denies losing his temper and there was a witness or two who said that they never observed John Doe lose his temper? A Correct. Q Jane Doe accused John Doe of having a temper, correct? A Yes. She shared that with us, yes."

NOTE: The Purdue investigators also apparently *ignored dozens of texts starkly inconsistent with their radical feminist narrative -* many of the texts show — Jane Doe seeking time and attention from John Doe — and Jane Doe demonstrating deceitful-manipulative-cruel conduct towards her own family — and also kind and friendly texts between the two —– and also texts documenting the emotional instability, immaturity, and defective thinking styles of Jane Doe — such evidence HIDDEN and IGNORED by the biased investigators….

NOTE: The Purdue investigators also apparently ignored the *text documenting Jane Doe's deceitful manipulation of, and apparent hatred for, her mother*." …

NOTE: The Purdue investigators also apparently ignored discrepant testimony regarding Jane Doe's description of the

terrifying "stun baton" incident …. but two witnesses said she laughed about it and/or was not frightened nor chased. " running around with it, she (Jane Doe) was smiling and laughing about it." Deposition of Elvin Uttuppan (roommate).

Such consistent anti-male manipulation of evidence appears to support the investigative theory that Purdue engaged in a sham, anti-male investigation consistent with the radical feminist, identity politics ideology of R. Campbell and others and in violation of proper investigation conduct, methods, and procedures.


**CONSISTENT ANTI-MALE BIAS APPEARS TO HAVE TAINTED THE ANALYSIS OF THE PURDUE INVESTIGATORS:** " Q Didn't you take into account as an adverse on credibility JANE DOE deleted the documents reflected the communication between John Doe  or and Jane Doe in December and January December 2015, January 2016? A I don't recall how that was considered." … They also ignored the suicide attempt and the text documenting deceitful manipulation of Jane Doe's mother… They also ignored the months delayed reporting.  " Q Did you ever ask Jane Doe why she waited five months according to her account between the time of the alleged incident and making a report to Purdue? A I do not recall asking that question."   See, Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).


**RECKLESS THAT THE MEETING WAS SCHEDULED SO JANE DOE — HAVING NEVER GIVEN A SWORN STATEMENT - COULD AVOID THE COMMITTEE MEETING:** " Q And below that says Jane Doe in a statement will not be in attendance, do you see that? A Yes. Q You were aware at the time that JANE DOE was not

going to be in person in attendance on the June 6, meeting? A Yes."
See, Deposition of Erin Oliver (Purdue Investigator, Associate
Director of the Office of Institutional Equity).


     **RECKLESS FAILURE TO RECORD OR TRANSCRIBE
THE COMMITTEE MEETING: "20 Do you have any recollection as
to what happened during this meeting? A I do not. Q Do you recall
any questions that were asked of you? A I do not." ... 1 Q Do you
recall any questions asked about JANE DOE? A I do not. Q Do you
recall any statements made by you? A I do not. Q Do you remember
any statements made by Mr. Amberger? A I do not.   Q Do you
remember anything being said while you were in that meeting with
Mr. Amberger about JOHN DOE? A I do not. Q *There was no court
reporter, correct?* A Correct.  See, Deposition of Erin Oliver (Purdue
Investigator, Associate Director of the Office of Institutional Equity).**


     **RECKLESS FAILURE TO VIDEO INTERVIEWS:  "Q You
did have video of your interview of John Doe  on April 28, correct? A I
did not have video of it." See, Deposition of Erin Oliver (Purdue
Investigator, Associate Director of the Office of Institutional Equity).**


     **IT APPEARS LIKELY THAT HUNDREDS OF OTHER
STUDENTS MAY HAVE ABUSED and DAMAGED BY PURDUE's
RECKLESS, INCOMPETENT INVESTIGATIVE SYSTEM:  " Q
You testified that you worked at Purdue as an Investigator in the
Office of Institutional Equity. Approximately how many investigations
do you recall performing? You may be on mute. A I think it is fair to
say, a few hundred maybe during my time there. Q *A few hundred
investigations* of allegations received in the Office of Institutional**

Equity? A Correct." See, Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).

**PURDUE's APPARENTLY ANTI-MALE BIASED PROCEDURES PERMITTED JANE DOE A 2nd INTERVIEW TO EXPLAIN HER VERSION OF TEXT EVIDENCE BUT DID NOT GIVE JOHN DOE A SIMILAR OPPORTUNITY - WHY SUCH BIASED PROCEDURES? : " Your testimony that you never asked JOHN DOE specifically about this text? A I am sorry, can you repeat that? Q You never sat down with JOHN DOE with this text and asked him any questions about it? A I have no recollection of doing that. Q There was no opportunity to determine from this text what JOHN DOE would say concerning feeling shitty? A If I did not speak to him about it no he would not had that opportunity. Q There was no opportunity then to determine what JOHN DOE had violated? A Again beyond the text message if I had not had that conversation, no. Q So, just a text message you are looking at correct? A I believe so, yes. Q Okay and so JOHN DOE wasn't given an opportunity to say what he meant with that specific message? A I don't recall what conversation we had or didn't have about the text messages in our interview." See, Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).**

**PURDUE's INCOMPETENT INVESTIGATION PROCEDURES included childish, scribbled notes instead of video recordings of interviews and transcripts of meetings. Such recklessly incompetent procedures are in the bottom 1/2 of the bottom 1% of investigations I've reviewed in the USA.**

**PURDUE INVESTIGATORS WERE EXPOSED TO POLICE PRACTICES and PROCEDURES AND SHOULD HAVE KNOWN THE DANGERS of THEIR RECKLESS FAILURES to A) PROPERLY VIDEO RECORDING INTERVIEWS, B) KEEP PROPER TRANSCRIPTS OF ADJUDICATION PROCEDURES, C) PROPERLY GENERATE and TEST ALTERNATIVE HYPOTHESES.**

**" I worked with the Indiana State Excise Police from June of 1997 to February of 2000. February of 2000 to April of 2003, I worked for the Delphi Indiana Police Department. And then from April of 2003 to January of 2015, I worked for the Tippecanoe County Sheriff Department here in Lafayette, Indiana.   See, Deposition of Jacob Amberger (Purdue Investigator).**

**"BELIEVE WOMEN" APPEARS TO BE THE CENTRAL IDEOLOGY of PURDUE's INVESTIGATIVE PROCESS:   "Q Have you ever heard the phrase believe women? A I have, yes. Q In what context have you heard it? A Just I've heard believe women or start by believing just in the context of support for advocacy." … 1 Q Could you elaborate what you mean by support for advocacy? A I've heard it through the EVAWI, End Violence Against Women International, through some of their e-mails and training and things like that. I know that _CARE, the Center for Advocacy Response and Education here on campus, has conducted training, and I think that that starts by believing or something along those lines has been a part of their outreaches or whatever they're running through their department._ Q Is the Center for Advocacy Response and Education known by its acronym CARE? A That is correct, CARE."  See, Deposition of Jacob Amberger (Purdue Investigator).**

PURDUE INVESTIGATORS APPARENTLY INTERVIEWED JANE DOE's BOYFRIEND BUT IGNORED JOHN DOE's CHARACTER WITNESSES - ANOTHER INDICATION OF ANTI-MALE BIAS : 18 Q Was he, then, the boyfriend of Jane Doe? A At the time we interviewed him in May of 2016, he was, yes. Q And you interviewed him on May 3, 2016, correct? A Correct."  See, Deposition of Jacob Amberger (Purdue Investigator).

THE ALLEGATIONS OF CHASING WITH A STUN BATON (falsely labelled a taser) — AS WITH THE ALLEGATIONS OF CRIMINAL ABUSE ARE VERBAL-ONLY WITH ZERO CORROBORATIVE EVIDENCE - both John Doe and the roommates testified that JANE DOE laughed with them about the "stun baton"… " It is also alleged that John Doe threatened and chased Jane Doe with a stun gun, one type device, down a hallway in his residence hall."  See, Deposition of Jacob Amberger (Purdue Investigator).

RECKLESSLY INCOMPETENT QUESTIONING:  " Q Did you ever ask Jane Doe *why it was five months before she said anything about the supposed event*? A If I do ask this question, I typically kind of write down a person's response in my notes. I don't recall seeing that in my notes. So *it most likely was not asked of her.*"  See, Deposition of Jacob Amberger (Purdue Investigator).

THE TEXT EVIDENCE WAS CUT and PASTED IN A MANIPULATIVE MANNER BY INVESTIGATORS … WAS DONE TO FIT AN ANTI-MALE, RADICAL FEMINIST NARRATIVE? :

"The texts from JOHN DOE were 133 pages when printed out? A Yes. There are more pages of texts that he provided that are not attached to the report. Q Well, seven pages is less than 133, is it not? A It is, yes, sir."… 11 Q Now, when you produced your investigation report, you didn't attach all 133 pages of the texts that JOHN DOE provided you, did you? A We did not, no. See, Deposition of Jacob Amberger (Purdue Investigator).

THERE APPEAR TO BE ZERO *CONFESSIONS* TO ANY ASSAULT ABUSE ALLEGATION IN ANY OF THE TEXTS : " And specifically does Jane Doe accuse John Doe of feeling her crotch or of digitally fingering her? A Specifically, no."

NOTE: The Purdue General Counsel, Steve Shulz, appears to have made a serious error of analysis, judgment, and ethics in a Wall Street Journal Op-Ed on Oct. 12, 2020. Mr Schultz reportedly wrote that the case evidence includes "the male student's texted *confession*". Having reviewed 134 pages of texts in this case (all of them apparently), it is my opinion that Mr Shulz's public and personal attack on John Doe claiming he "confessed" supports the ongoing investigative hypothesis that Purdue University has demonstrated — and continues to demonstrate — a striking anti-male, anti-John Doe bias in its investigation and in Mr. Shulz's public statements. Was Mr. Schulz's conclusory statement defamatory? Is Mr Shulz volunteering to testify in this matter? Is Mr. Shultz claiming to be an expert witness or a fact witness in this case? Was Mr. Schulz's highly unusual statement an attempt to publicly contaminate future jurors? Should the relevant State Bar Disciplinary Commission properly investigate Mr. Schulz's WSJ statement publicly attacking (defaming?) a young plaintiff in an ongoing lawsuit? Was Mr Schultz's conclusory attack

*DOE v. PURDUE, et al.   CONFIDENTIAL   Dr. Barden's Initial Report of Feb 19, 2021*

against John Doe in a public news forum beyond the protections of the litigation privilege?

QUESTION = Was General Counsel Shulz duped by the Purdue Investigators?   On this record, it appears that the Purdue Investigators recklessly (fraudulently) cut and pasted the Text Evidence thus REMOVING and HIDING some of the most important evidence in this case.  Did General Counsel Shulz see the Text evidence documenting Jane Doe's apparently pathological, deceitful, manipulative, and cruel relationship with her own mother?  Did he see the texts documenting defective thinking styles and defective emotional stability in Jane Doe... or was this key evidence hidden from him by the negligent (and/or fraudulent) Perdue sham investigators?

WHY WAS MONICA BLOOM — the woman in charge of what appears to be a radical feminist ADVOCACY Center — controlling investigator access to Jane Doe?  See,  " Looking at Amberger 19, does it trigger your recollection on your part as to why you were sending this e-mail to Monica Bloom on May 9, 2016? A I'm trying to schedule a time to speak with JANE DOE again" See, Deposition of Jacob Amberger (Purdue Investigator).

FAILURE TO INVESTIGATE THE ALTERNATIVE INVESTIGATIVE THEORY THAT JANE DOE ACCUSED JOHN DOE OF ABUSE FOR REVENGE IN RETALIATION FOR HIS REPORTING HER SUICIDE ATTEMPT. ALSO FAILED TO EXPLORE THE POTENTIAL MEMORY CONTAMINATING EFFECT OF RADICAL FEMINIST PROPAGANDA CAMPAIGNS ON CAMPUS?, THE CARE PROGRAM?, PSYCHOTHERAPY?,

**MONICA BLOOM?, etc?  NO ALTERNATIVE THEORIES WERE GENERATED OR TESTED =  F-  :  "Q Did you ever ask Ms.** ███████ **why it was five months before she said anything about the supposed event? A If I do ask this question, I typically kind of write down a person's response in my notes. I don't recall seeing that in my notes. So** *it most likely was not asked of her.*" **Deposition of Jacob Amberger (Purdue Investigator).**

**PURDUE's INVESTIGATORS USED AN UNINFORMED - WILDLY SUBJECTIVE, ANTI-MALE BIASED METHODOLOGY: "How do you have a preponderance of the evidence supporting a finding, when on the one hand** *you have a denial by the person John Doe* **and the other person,** *Jane Doe, doesn't have her own recollection of it?* **A That would be based on credibility, corroboration by witnesses or text messages or anything of information or statements that were given during the interviews. So it's kind of an aggregate of everything we gathered, not just specifically that one allegation." Deposition of Jacob Amberger (Purdue Investigator).**

**Note: Mr Amberger's answer is** *pure psychobabble***, relies on false assumptions about "clinical judgment" and human ability to "aggregate" discordant information, and again supports the hypothesis that the Purdue investigative personnel were recklessly untrained and unprepared to conduct any kind of serious investigation.**

**THE DEAN's APPARENTLY MANIPULATIVE LETTER DOCUMENTS GLARING FAILURES OF METHOD, PROCEDURE, and PROCESS  — Jane Doe did even NOT attend the unrecorded, untranscribed sham "Equity Committee" meeting. :**

The Dean claimed "the purpose of the meeting" was to hear from the parties —- but that never happened.  Jane Doe skipped the meeting and they let her do so — more evidence of anti-male bias.

As the Dean wrote, "We have reviewed the complaint, written responses, and the Investigator's Report. Accordingly, the purpose of the meeting is not to conduct another investigation but simply to be able *to hear directly from the parties* and get clarification on any questions we might have after having reviewed the written materials. Please contact me if you have any questions or concerns. I can be reached at ksermer@purdue.edu or by calling 765- 494 -1257."  (See, Letter from Dean of Students) — NOTE:  When did the Dean know Jane Doe was NOT attending?


A NUMBER OF JANE DOE'S STALKING ALLEGATIONS WERE CONTRADICTED BY MULTIPLE WITNESSES — these contradictions were apparently ignored by Purdue investigators: April 2016 Stalking complaint … " I don't want to file criminal charges. However, through the NROTC battalion I have a lot of contact with him  so I want authorities to be aware. In the fall semester we were dating. There were *two* separate incidences in which I fell asleep in his presence and he would do things to me while I was asleep. [NOTE: Reportedly, Jane Doe fell asleep MANY times with John Doe — if true, she hid an essential fact in a manipulative manner. (See, Decl of John Doe, Feb 18, 2021).  The potentially massive, deceptive fraud of hiding the reported 15-20 nights of full sexual intercourse and sleeping together — initiated by the sexually aggressor — JANE DOE - should have been properly investigated and reported, but was apparently ignored and/or buried by Purdue's negligent or fraudulent investigators.]  … He would also "*joke" with*

_his taser_ [ apparently it was NOT a taser, apparently yet another exaggerated-false claim ] and at one  point chased me down the dorm (no corroboration)  igniting it [ it cannot ignite ]  threatening to taze me [Cf. _two_ witnesses apparently said Jane Doe laughed about the stun baton].  "He would jokingly mention that he _tazed [ false exaggerated term ]_ his roommate twice while he was asleep [ NOTE: two witnesses said no tazer was involved only a stun baton ]. After breaking up with him he would still come to my room unannounced also without an escort. I have considerable fear of his reaction to anything as he has displayed little control over his temper (NOTE: this apparently false claim was contradicted by multiple witnesses) even displaying/describing _no emotions towards anyone or anything_. (NOTE: this apparently false claim was contradicted by multiple witnesses, the sham investigators failed to assess this claim by properly interviewing John Doe's list ).  See, Sexual Violence, Relationship Violence and Stalking Report Submitted on April 4, 2016 by Jane Doe.


    DEAN SERMERSHEIM APPARENTLY UTILIZED a PSYCHOBABBLE,  "CLINICAL JUDGMENT", PURE GUESSING GAME APPROACH TO HER SERIOUS ADJUDICATION DUTIES. HER CONDUCT WAS CLEARLY BIASED as she PERMITTED and APPLIED RECKLESSLY, JUNK SCIENCE, UNRELIABLE METHODS and PROCEDURES:

    See, "My interpretation as a professional in higher education for 30 years and in working with students and the student conduct, as I read and decipher the text messages and recently reviewed for the purposes of today, it is clear to me that…" See,  Deposition of Dean K. Sermersheim  = This appears to be reckless, unreliable psychobabble.

**ERROR = Dean Sermersheim permitted the reckless FAILURE to video/audio record ALL interviews with key witnesses. She apparently negligently knows little or nothing about the science of memory contamination and the dangers of misinterviewing witnesses OR she is deliberately using NON-transparent methods to permit manipulation of the evidence.**

**ERROR = Dean Sermersheim permitted the reckless FAILURE to video/audio record and create a transcript for the "Equity Committee" meeting. She apparently negligently knows little or nothing about rights of students to appeal (not possible without a transcript) OR she is deliberately using NON-transparent methods to permit manipulation of the evidence.**

**BIAS ERRORS = Dean Sermersheim appears to have permitted reckless BIAS in this investigation including a wholesale "Believe Women" process consistent with radical feminist ideologies. Jane Doe's witnesses were interviewed but John Doe's apparently were not. Jane Doe's deceitful/manipulative texts regarding her hatred for her parents were IGNORED while John Doe's text were SUBJECTIVELY "interpreted" — by the investigators, the Dean, and Attorney Shulz (in the Wall Street Journal) in the most negative light possible.**

**QUESTION = Was Dean Sermersheim duped by the Purdue Investigators? On this record, it appears that the Purdue Investigators recklessly (fraudulently) cut and pasted the Text Evidence REMOVING and HIDING some of the most important evidence in this case. Did Dean Sermersheim see the Text evidence documenting Jane Doe's apparently pathological, deceitful, manipulative, and cruel relationship with her own mother? Did she see the texts documenting defective thinking styles and defective**

emotional stability in Jane Doe… or was this key evidence hidden from him by the negligent (and/or fraudulent) Perdue sham investigators? (See, 134 pages of Text Evidence and compare with the "cut and pasted" and manipulated version "prepared" by Purdue's investigators).

**SUMMARY:**

In sum, this is one of the most defective, improper, misinformed, uninformed, highly biased, and apparently fraudulent (reckless or intentional?) "investigations" I have seen in the USA having reviewed of hundreds of investigations in dozens of states and federal jurisdictions over a 25 year timespan.

I look forward to continuing to review documents and evidence as such materials become available. I also look forward to observing any future depositions or observing witnesses as they testify at trial as part of my ongoing investigation of this important matter.

**A KEY INVESTIGATIVE QUESTION:   WERE THE PURDUE TITLE IX PERSONNEL GROSSLY NEGLIGENT or ENGAGED IN A DELIBERATE FRAUD ?:**  It remains unclear at this stage of my investigation whether the multiple, egregious defects in the Purdue Title IX "investigation" system were the product of gross negligence — a bunch of science illiterate laypersons bumbling around with little or no knowledge of the basic science of human memory, the processes by which improper interviewing can taint-change "memories",  the essential need to generate and test alternative hypotheses, the essential need to video or audio record ALL interviews to permit proper review,  the inability of humans to act as reliable "lie detectors" based on nothing but uncorroborated verbal (chit chat) evidence, the need to properly examine the mental health and emotional stability of an uncorroborated witness alleging serious felony criminal misconduct, and the potential for long-term debilitating damage to the emotional health of the falsely accused, etc. — or a

deliberate fraud process of being engaged in a radical feminist "attack on the patriarchy" without regard for science, logic, rational analysis, legal rights, or the facts of the case.

Similarly, it appears unlikely that ALL of the Purdue Title IX team negligently failed to understand the well-documented science that humans — including the investigators, committee members, and hearing officer (Dean) are very <u>unreliable human lie detectors</u> — often no better than chance.  Research shows that humans cannot <u>reliably</u> distinguish true from false verbal statements in the absence of corroborative evidence (as in this case). Professionals such as police, therapists, investigators, judges, hearing officers, and attorneys often arrogantly and/or negligently believe they have magical powers to detect false statements reliably but the available research disagrees indicating they cannot and, in fact, are typically <u>no better at this task than laypersons </u>(barbers, bartenders or cab drivers etc. ) and <u>often no better than FLIPPING COINS</u>.  See, e.g. , Vrij, Aldert, Granhag, P. and Porter, S. (2010) Pitfalls and opportunities in nonverbal and verbal lie detection. Psychological Science In The Public Interest, 11 (3). pp. 89-121. ISSN 1529-1006 10.1177/1529100610390861   "The final error that we will highlight is that professional lie catchers (i.e., including GALs, hearing officers, judges, investigators, psychotherapists, etc. ) tend to overestimate their ability to detect deceit. Research has consistently shown that when professional lie catchers and laypersons are compared, "<u>professionals are more confident in their veracity judgments but are no more accurate</u>" ;  See, also,   McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery.

Similarly, it appears unlikely that ALL of the Purdue Title IX team negligently failed to understand that the science of <u>"clinical judgment"</u> is essential in conducting proper investigations in cases like this one.  See,   Tracey, T.J., Wampold, B.E., Lichtenberg, J.W., Goodyear, R. K., (2014) Expertise in Psychotherapy: An Elusive Goal, American Psychologist, Vol. 69, No. 3, 218-229.  "In a review of expertise across professions, Shanteau (1992) identified several professions in which practitioners develop expertise, which he defined as increased quality of performance that is gained with additional experience. These professions, which demonstrate there can be a relation between experience and skill,

include astronomers, test pilots, chess masters, mathematicians, accountants, and insurance analysts. <u>Shanteau also identified several professions for which expertise was not demonstrated,</u> including psychiatrists, investigators, lawyers, therapists, etc.  He attributed the differences between the two types of professions to the predictability of their outcomes and <u>the unavailability of quality feedback</u>."

"Individual clinicians may not always recognize that errors in clinical judgement occur in their own practice. The core problem is that <u>people are often poor at judging their own performance.</u> For example, studies show that 85% of people believe that they are better-than-average drivers, contrary to the laws of probability. The reason for this misconception is that drivers are often unaware of their mistakes, and occasional lapses are more easily spotted by others. Similar distortions may occur in medicine and investigations because of <u>imperfect feedback to clinicians/investigators</u>…  confidence in one's judgement may merely indicate an unawareness of repeated mistakes. Bad judgment, like bad breath, is often not noticed by its source."  **http://www.ncbi.nlm.nih.gov/pmc/articles/PMC80731/**  ; Redelmeier, D.A., Ferris, L.E., Tu, J.V., Hux, J.E., and Schull, Michael J.  Problems for clinical judgement: introducing cognitive psychology as one more basic science, CMAJ. 2001 Feb 6; 164(3): 358–360.  PMCID: PMC80731  ;   Dawes RM, Faust D, Meehl PE. Clinical versus actuarial judgment. Science 1989;243:1668-74. [PubMed].  Mental health experts often justify diagnostic and predictive judgments on the basis of `years of experience' with a particular type of person. . . .

Similarly, research shows that <u>the validity of clinical judgment and amount of clinical experience are unrelated'</u> … with <u>(same with investigators)</u> (Dawes, 1989) Emphasis added.

-- [research studies] 'generally <u>fail to support the value of on-the-job experience in mental health fields' (same with investigators)</u> (Garb, 1989) Emphasis added.

– "clinicians (investigators) may have <u>considerable difficulties distinguishing valid and invalid variables</u>." (Dawes, Faust & Meehl 1989) Emphasis added.  See, Dawes, R.M., Faust, D., & Meehl, P.E., Clinical versus actuarial judgment, Science, 243, 1668- 1674 (1989) ;  See, Garb, H.N., Clinical judgment, clinical training, and professional experience,

Psychological Bulletin, 105, 387-396 (1989) ;  and see, Dawes, R.M., House of cards: Psychology and psychotherapy built on myth, New York: Free Press (1997). in people reporting abduction by space aliens. Psychol. Sci. 15: 493–497.

Similarly, it appears unlikely that ALL of the Purdue Title IX team negligently failed to understand that the science of human memory shows that memory is subject to manipulation, implantation, contamination and other errors via improper interviewing. It is thus essential to RECORD all interviews to protect the integrity of the process. See, Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498  ;  Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366 . ALL of the Purdue University Title IX investigation and adjudication teams apparently did NOT seem to understand that psychological science has <u>NOT yet developed a reliable way to classify memories as true or false in the absence of ANY corroborative evidence</u> and that memory is malleable and subject to contamination.


## EXAMPLES OF ALTERNATIVE HYPOTHESES and ISSUES TO INVESTIGATE:

1- Purdue University investigators/adjudicators/officers were poorly and improperly trained thus failing to meet minimal standards for a rational, competent investigation.

2- Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with rules that were manifestly unfair to John Doe and other males.

3 - Purdue University investigators/adjudicators/officers used improper investigational procedures intentionally and with politicized malice as well as manipulated evidence, failed to record interviews, and failed to obtain a sworn statement of allegation to fight and defeat the patriarchy, especially "white males of privilege" such as John Doe.

4 - Purdue University investigators/adjudicators/officers were deceived, duped, and manipulated by improper, incompetent, unethical, and unreliable junk science notions and ideas expressed in Title IX radical feminist training seminars.  For example, Dr. R.

Campbell has for years apparently been teaching incompetent, deceptive, misleading, and unethical workshops on the psychology of trauma, memory, and violence against women and children.  Why did Purdue use her controversial junk science notion for training?

5 - Purdue University investigators/adjudicators/officers deliberately and intentionally failed to properly RECORD all interviews <u>to make it impossible to review their interviews and </u>determine A) how accurate the claimed notes and quotes were, B) how much of the information allegedly reported was contaminated and/or fabricated by improper leading, suggestive, confusing, repeated, or biased questioning.

7 - <u>Purdue University investigators/adjudicators/officers were engaged in a radical feminist, anti-science, subjectively biased, anti-male fraud.</u>  In this hypothesis, the Purdue officials never intended to conduct a rational, logical, professional, fair, investigation free of bias against men.  They were instead engaged in a systemic, radical feminist ideological attack on the patriarchy — especially cis-gendered, Christian, white males.  All of the egregious "errors", failures, and defects of an objective-fair investigation documented above (e.g., no recording of interviews, no alternative hypotheses-confirmation bias, no sworn victim statement, the "fact finder" never met nor saw nor heard the allegations from the alleged victim, evidence of severe emotional instability, suicidality, deceit, alcohol abuse, and manipulation of her parents by the alleged victim were simply ignored, etc) FACILITATED a radical feminist "Believe Woman" methodology and such defects CONTRIBUTED to a biased, manipulated process that was simply designed to help "oppressed identity groups" crush the patriarchy.  In this analysis, the egregious misconduct of the Purdue team is quite consistent with radical feminist "science" — which is actually an irrational, politicized pseudo-science.

A detailed analysis of radical feminist "science" demonstrates how this anti-male ideology PREDICTS much of the documented misconduct of the Purdue Title IX investigation-adjudication process in this case.  See,  e.g.,  Campbell, R. and Wasco, S., Feminist Approaches to Social Science: Epistemological and Methodological Tenets, American Journal of Community Psychology, Vol. 28, No. 6, 2000.  [ "Much like the field of community psychology, feminist scholarship is defined by its values and process.

**Informed by the political ideologies of the 1970s women's movement** (liberal, radical, socialist feminism, and womanism), feminist scholars <u>reinterpreted classic concepts in philosophy of science</u> [ RCB:  Note the breathtaking arrogance involved in their "reinterpreting classic concepts in the philosophy of science".  ] to create *feminist epistemologies* and methodologies. Feminist epistemologies, such as feminist empiricism, standpoint theory, and postmodernism, recognize women's lived experiences [ note the bias against men ] as legitimate sources of knowledge… We view the traditions of community psychology and feminism as compatible and mutually informative… the chart lists "radical feminism", "socialist feminism", "feminist postmodernism", "critical theory" as foundational… We begin by defining the similarities and differences between four main forms of feminism—liberal, radical, and socialist feminism, and womanism…. At an epistemological level, feminist social science legitimates <u>women's</u> [ note the bias against men ] lived experiences as sources of knowledge. … <u>Socialist feminism</u> is based on the belief that the economic and class structure of our society is inherently problematic, which leads to multiple forms of oppression. <u>Rooted within Marxist ideology</u>, socialism has traditionally focused on classism, and paid less attention to racism and sexism…. socialist feminists remain focused on the inequalities created by capitalism more generally….<u>Radical feminism</u>, on the other hand, distinguishes itself from other forms of feminism by drawing central attention to gender oppression [ note the bias against men ] and calling for restructured social institutions…. Radical feminists acknowledge that classism and racism intersect with sexism, but stipulate that the systematic marginalization of women [ note the bias against men ] is the fundamental form of inequality…."<u>radical feminists are engaged in a power struggle with man</u> [ note the bias against men ], and that <u>the agent of our oppression is man</u> [ note the bias against men ] insofar as he identifies with and carries out the supremacy privileges of the male role" (New York Radical Feminists, 1969, as cited Kramarae & Treichler, 1985, p. 379)…. radical feminists argue that <u>the entire social order</u> must be reexamined and redefined … They believe that our society is sexist, racist, and classist, and therefore requires *substantial transformation*" [ note the Marxist-Communist bias against the USA and the bias against men ]… Therefore, feminist epistemologies <u>accept</u>

<u>women's [ but not men's ] stories of their lives as legitimate sources of knowledge</u>, and feminist methodologies embody an ethic of caring through the process of sharing those <u>(women's but not men's ) stories</u>." [ NOTE: This feminist ideology provides the intellectual basis for a *grossly biased* "Believe Women" Title IX pseudo-investigational system of fraudulent "investigations" where no sworn statements are taken from women, no recordings of interviews are made thus failing to protect the integrity of the process and any essential evidence against women is simply ignored — as in this case ] … Continuing … "If one accepts the premise of objective reality, then the goal of science is to discover the structure and function of that singular world… if one accepted the ontological notion of an objective reality, then the knower (i.e., the scientist) must assume a position of objective detachment, *free from bias* so as to be able to capture that reality accurately.

"By contrast, if a (feminist) researcher <u>rejected that notion of objectivity (an actual, objective reality)</u> , then it is not necessary, or even desirable, to conduct research [investigations] in a detached, [ unbiased ] dispassionate manner."… [ NOTE: This feminist ideology provides the intellectual basis for a *grossly biased* "Believe Women" Title IX pseudo-investigational system like Purdue's defective Title IX process in this case. ]… *Postpositivism/Critical Theory*. Critical theorists argue that ''reality" is interpreted through social, political, cultural, economic, ethnic, and gender values [ identity politics ] , and therefore there is no one objective reality (see Guba & Lincoln, 1994). What we consider to be knowledge is not "pure fact" because it is filtered through these various [ identity ] lenses. The goal of research, therefore, is to understand how the values of both the researcher and the participants determine perceptions of the social world. As a result, *science cannot possibly be an objective enterprise* because values enter into all phases of the research process. Thus, the *identity* ( race, class, gender ) of the knower is of critical importance" … *Postpositivism/Constructivism*. Constructivists take critical theory a step further by explicitly arguing that *"reality" is socially constructed* (see Guba & Lincoln, 1994). Social factors, such as gender, race, class, culture, and economics are not merely lenses through which we see reality, they are agents shaping how *we construct our visions of what constitutes our individual realities*. *There is no "real" reality*, no single truth, but

multiple truths that are *individually constructed*"… [ NOTE: Clearly such radical Marxist feminist ideology is quite incompatible with USA notions of justice, fairness, reality, and truth.  Such "radical feminist" ideology — widely applied on many US campuses and "gender studies" programs — is toxic and contrary to the US justice system and the opposite of Daubert-Kumho analysis. ]

Continuing with Campbell and Wasco, they write " Similar to critical theory, the *identity* of the knower is paramount because the scientist is actively involved in the social construction of the research reality. In this [ feminist ] view, research [ investigations are ] is an *inherently subjective process*." … " some feminist epistemologies … do indeed *fundamentally reconceptualize how we constitute knowledge*" (Note: The arrogance is breathtaking" ) … <u>Feminist Standpoint Theory</u>. Feminist standpoint theory is based upon postpositivist critical theory informed by the traditions of radical and socialist feminism as well as womanism. Working from the ontological *assumption that there is no single objective truth*, this theory claims that class, race, gender, and sexual orientation structure a person's understanding of reality."… *Feminist Postmodernism*. Feminist postmodernism integrates postpositivist constructivism with radical feminism. Like other constructivist theorists, *feminist postmodernists reject the notion that there is a single truth or reality, in any form*. In fact, *these feminists regard the concept of truth as a "destructive illusion"*… [ NOTE: Obviously, the administrative and legal systems of the USA should be based on an unbiased search for actual truth — <u>**the OPPOSITE of radical feminist approaches**</u>.  The Daubert-Kumho process is based upon Popperian positive, rational, methodologically competent, science — not radical feminism's subjective (very biased, very anti-male) focus on subjectively understanding "women's lived experiences". ]  … Feminist postmodernists argue that there can never be a feminist psychology, for example, but only "<u>many stories that different women [note the bias against men ] tell</u> about the different knowledge they have"… A key emphasis of this work is understanding the language people use in *constructing their social realities*." … See,  e.g.,  Campbell, R. and Wasco, S., Feminist Approaches to Social Science: Epistemological and Methodological Tenets,  American Journal of Community Psychology, Vol. 28, No. 6, 2000.

**4 C.  IT IS MY OPINION THAT A BASIC UNDERSTANDING OF THE SCIENCE OF MEMORY and MEMORY CONTAMINATION IS ESSENTIAL IN PROPER INVESTIGATIONS INVOLVED "MEMORIES" OF ABUSE  YET FEW LEGAL and INVESTIGATORS and OFFICIALS PROPERLY UNDERSTAND SUCH SCIENCE. IT IS ALSO MY OPINION THAT IN THIS CASE THE INVESTIGATION BY PURDUE UNIV. RECEIVES AN "F" — A FAILING GRADE — FOR FAILING TO UNDERSTAND AND APPLY EVEN THE MOST BASIC KNOWLEDGE OF MEMORY SCIENCE.**

**Research has shown memory contaminative processes are capable of generating "new" and/or false memories via source confusion (source amnesia).   As Prof. Dan Schachter, former Chairman of Psychology at Harvard University as noted, "... the false memories ... in studies often include bits and pieces of real memories that are melded together into a false one. In these and other situations, the content of a past event or imagining (or conversations, or discussions with others, or like a group that meets to reconstruct events of the previous evening) becomes "unglued" from its original source and mistakenly connected to another one.  Thus, there is both source amnesia and source confusion. When a false memory contains remnants of past experiences -- contents and sources of past experiences mistakenly put together -- it is easy to see how it could give rise to a strong subjective conviction that the memory is real." See,  Coyle, Joseph in  D. Schachter (Editor), Memory Distortion: How Minds, Brains, and Societies Reconstruct the Past,  page 24;  See also, D. Schacter. The Seven Sins of Memory, Houghton Mifflin, 2001. p.4.   See also, " Human memory is not like a photograph album, a collection of cassettes, compact discs or videos or any other accumulative archive of the past. Rather, memories are fragmentary, condensed, often distorted and inaccurate representations of past experience. This point is made in impressive detail by all the contributors to an excellent collection of essays on memory distortion...  -Martin A. Conway (review in Nature ). See additional citations infra and supra to the work of Ceci, Bruck, Loftus, and other memory experts.**

**BASIC SCIENCE OF MEMORY — SOURCE CONFUSION, SOURSE AMNESIA, AND MONITORING ERRORS CAN PRODUCE FALSE MEMORIES:**

Studies have shown that source amnesia or "source monitoring errors" can interfere with a witness's memory because incorrect and/or imagined post-event information suggested in improper questioning can result in distorted/false memories and source confusion. *This is why ALL investigative interviews MUST ALWAYS be properly VIDEO recorded and the history of such interviews carefully documented.* [ Note Purdue University's grossly negligent failure to record all interviews ]. See, Van Bergen, S., Horselenberg, R., Merckelbach, H., Jelicic, M., & Beckers, R. (2010). Memory distrust and acceptance of misinformation. Applied Cognitive Psychology, 24: 855-896. Post-event — memory contaminating — information can come from leading questions, statements made by others or suggestions of how events might have occurred. Since such suggested, improper memory encoding can lead to to source amnesia and source monitoring errors and *thus create FALSE memories*, witnesses who are exposed to suggestive questions or false information may encode the wrong, imagined details into their memory, convincingly claiming to have seen or experienced things they only imagined. See, Mitchell, K.J., & Johnson, M.K. (2009). Source monitoring 15 years later: What have we learned from fMRI about the neural mechanisms of source memory? Psychological Bulletin, 135(4): 638-677. Emphasis added. Such well-researched processes can lead to grave legal implications as they can produce false testimony and wrongful convictions therefore, it is important that interrogation practices are carefully conducted and always VIDEOTAPED for a proper analysis of leading, suggestive, or coercive -- potentially memory contaminative -- questioning. See, also Johnson, M.K., Hashtroudi, S., & Lindsay, D.S. (1993). Source monitoring. Psychological Bulletin, 114(1): 3-28.

**— IMAGINATION INFLATION CAN PRODUCE MEMORY ERRORS:**
Thinking about events that possibly or "probably" happened — but did not — can also produce false or distorted memories in a process called "imagination inflation".

Imagination inflation refers to the reliable research finding that imagining an event which never happened can increase false confidence that it actually occurred.  See, e.g.  Garry, Maryanne; Manning, Charles G., Loftus, Elizabeth F., Sherman, Steven J (1996). "Imagination inflation: imagining a childhood event inflates confidence that it occurred". Psychonomic Bulletin & Review 3 (2): 208–214. doi:10.3758/bf03212420.


NON-EXPERT CITIZENS ( INVESTIGATORS, HEARING OFFICERS, LAWYERS, and OTHERS ) ARE OFTEN NOT AWARE THAT HUMAN MEMORY IS QUITE MALLEABLE AND CAN BE CONTAMINATED BY IMPROPER QUESTIONING :


Memories are precious. They give us identity. They create a shared past that bonds us with family and friends. They seem fixed, like concrete, so that if you stepped on them they would still be there as they always were ... But *memories are not fixed*. Everyday experience tells us that they can be lost, but they can also be drastically changed or even created. Inaccurate memories can sometimes be just as compelling and "real" as an inaccurate memory. ... New studies show that you can do more than change a detail here and there in someone's memory. You could actually make people believe that a childhood experience had occurred when in fact it never happened. Examples include being lost in a shopping mall for an extended period of time, being rescued by a lifeguard, surviving a vicious animal attack .. or even going on a hot air balloon ride. None of these events actually happened [ to people who recalled "memories" of them ] but people became quite convinced these were true "memories". ... These studies and many more like them, show that people can develop beliefs and memories for events that definitely did not happen to them. They can do this when fed strong suggestions. They can even do this when induced to imagine the experiences. Large changes in autobiography can be achieved quickly. ...


Psychological science has not yet developed a reliable way to classify memories as true or false. Moreover, it should be kept in mind that many false memories have been

expressed with great confidence…..." [ NOTE:  Further believing in a false or contaminated memory is NOT the same as lying.  Persons with false or contaminated memories may truly believe their "memories" are real.]    "To reiterate the main points: memory is more prone to error than many people realize. Our memory system can be infused with compelling illusory memories of important events. These grand memory errors have contributed to injustices that could have been avoided or minimized. As a start, I suggest that we all remember an important truth about the mind-paraphrasing Galeano: memory is born anew every day."   See Loftus, E., Our changeable memories: legal and practical implications. Science and Society. Nature Reviews: Neuroscience Volume 4, March 2003, page 231- 235.

**NON-EXPERT CITIZENS — INCLUDING LEGAL PROFESSIONALS, INVESTIGATORS, DEANS, PSYCHOTHERAPISTS and others— OFTEN TEND TO OVERESTIMATE THE ACCURACY OF MEMORIES:**

"Studies confirm that jurors routinely "over believe" eyewitness testimony. See, e.g., Sigler & Couch, Eyewitness Testimony and the Jury Verdict, 4 N. Am. J. Psychol. 143, 146 (2002) (conviction rate by mock juries increased from 49 percent to 68 percent when a single, vague eyewitness account was added to the circumstantial evidence described in a case summary). Even when unreliable eyewitness identification is admitted, therefore, juries are quite likely to believe it.... Cross-examination cannot be relied on to address this problem. As the US Supreme Court has observed, "even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability."  Wade , 388 U.S. at 235. That is particularly true in this context: What most affects jurors' assessment of a particular eyewitness identification is the level of confidence expressed by the witness.  See Cutler & Penrod, Juror Sensitivity to Eyewitness Identification Evidence, 14 Law & Hum. Behav. 185, 185 (1990); Lindsay et al., Can People Detect Eyewitness-Identification Accuracy Within and Across Situations?, 66 J. Applied Psychol. 79, 83 (1981). And cross-examination is largely useless with a mistaken (albeit

honest) eyewitness who is very confident and consistent.... See, e.g., State v. Clopten , 223 P.3d 1103, 1110 (Utah 2009) ("Cross-examination will often expose a lie or half-truth, but may be far less effective when witnesses, although mistaken, believe that what they say is true.")..... Research shows that witness confidence is not an accurate indication of accuracy....  As one science report concluded, "[t]he outcomes of empirical studies, reviews, and meta-analyses have converged on the conclusion that the confidence-accuracy relationship for eyewitness identification is weak, with average confidence-accuracy correlations generally estimated between little more than 0 and .29." Brewer et al., The Confidence-Accuracy Relationship in Eyewitness Identification, 8 J. Experimental Psychol. Applied 44, 44-45 (2002). Even these various correlation figures are likely overestimates, moreover, because the confidence of eyewitnesses in actual cases, unlike in controlled experiments, may be infected by positive feedback received in the investigative process (for example, an officer stating during a photo array or line-up, "good, you identified the suspect").  See supra n.6; see also Wells et al., 7 Psychol. Sci. in Pub. Int. at 45; Wells & Bradfield, "Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience , 83 J. Applied Psychol. 360, 374 (1998). Indeed, witness confidence can be affected by a host of factors that have no relation to reliability. See, e.g. , Wells & Quinlivan, 33 Law & Hum. Behav. at 11-12" .... Above excerpts are from the Amicus Brief of the American Psychological Association to the US Supreme Court in Barion Perry v. State of New Hampshire, [Docket No. 10-8974],  2012.   It appears that Dr. Campbell in her "neurobiology" talks rarely discusses this aspect of the actual science of memories.


     **JUST ONE HOUR IS ENOUGH TO IMPLANT A FALSE MEMORY:  How many conversations about the alleged events took place in this case? How about the group meeting to piece together her evening "memories"?   Were any of those discussion sessions recorded?  How many such discussion sessions does it take to produce DETAILED, FALSE MEMORIES?  E.g.  William Bernet, M.D., Case Study: Allegations of Abuse Created in a Single Interview, Journal of the American Academy of Child and Adolescent Psychiatry,**

36:7, July 1997, pp. 966, 970.  Thus VIDEO RECORDING, or documenting <u>each question and each answer</u> of all interviews is essential to protect the integrity of the investigative process.  Again, Purdue's systems utterly failed in this crucial regard by ***<u>FAILING TO video record any of their interviews</u>***.  By failing to record interviews, they cannot refute the alternative hypothesis that Purdue Personnel asked improper, leading, suggestive, tainted questions that tainted the memory of a troubled young woman with well documented emotional troubles (e.g. deceitful and manipulative texts about hating her own mother, etc).

### A FALSE MEMORY CAN BE FERVENTLY BELIEVED — SUCH DUPED INDIVIDUALS MAKE VERY CONVINCING WITNESSES INDEED :

Once a false memory is induced can the victim tell the difference between true and false memories?   *Research indicates that once tainted, a false memory can seem just as real to the witness as other memories.*  See,  Stephen J. Ceci and Maggie Bruck, Jeopardy in the Courtroom, 1995, p.218, 220;  See, also,   McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. Psychol. Sci. 15: 493–497. [Consistent, emotionally powerful, stories from highly educated people -- e.g. alien abduction "memories" -- can be quite consistent, filled with much detail,  emotionally conveyed, and very compelling to listeners -- yet quite false. See also,  Ceci, S.J., Crotteau, M., Smith, E., & Lotus, E.W.  Repeatedly Thinking about a Non-event: Source Misattributions among Preschoolers. Consciousness & Cognition., Vol 3, 388-407 (1994); See also,  Loftus, E. F. (2002) Memory Faults and Fixes. Issues in Science & Technology (publication of the National Academies of Science), 18, # 4, pp 41-50 ; Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498  ;  Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366  ;  Mazzoni, G. and Memon, A. Imagination Can Create False Autobiographical Memories, Psychological Science, Vol. 14, No. 2, March, 2003 pg. 186-193 and other relevant research.

The science of memory and memory contamination is an essential feature of any criminal of Title IX investigation.  Understanding the key basics of the research work of Loftus, McNally, Ekman, and other international memory scientists is essential. This work explores the conditions under which witnesses can provide accurate reports about past episodes but also shows convincingly that <u>examiners ( or friends who engage in discussions about events ) who use suggestive or leading questions may introduce serious distortion into witness recollections</u>.  Indeed, some of the recent research has revealed that some witnesses can be rather easily induced to create detailed narrative recollections of events that never happened (e.g  false memories of being attacked by a wild animal) . These witnesses may seem firmly convinced that their memories are real even when they are not.  Protecting witnesses against repeated interviews, leading and suggestive questioning, and hypnotic-like processes is thus an important part of the investigative process.  See, e.g., Daniel L. Schacter, Jerome Kagan, and Michelle D. Leichtman,  True and False Memories in Children and Adults: A Cognitive Neuroscience Perspective, Psychology Public Policy, and Law,  American Psychological Assn, 1995, Vol 1, No. 2, 411-428 and other citations in this report.  See the Mousetrap Study, Ceci, et al,  Repeatedly Thinking About a Non-Event: Source Mis-Attributions among Preschoolers,  Consciousness and Cognition, Vol. 3, 388-407, 1994.


IN MY OPINION,   IT IS ESSENTIAL THAT <u>ALL</u> INTERVIEWERS and INVESTIGATORS PROPERLY DOCUMENT THE  "CHAIN OF CUSTODY OF THE ALLEGED VICTIM's MEMORY " —– THE HISTORY OF ALL DISCUSSIONs and CONVERSATIONS ABOUT THE ALLEGED EVENT.


It appears on this record, that Purdue Personnel showed little or no interest in the questions and answers and discussions that took place with the alleged victim in this case.

In too many cases, even when videotaping is done, interviewers fail to ask sufficient questions to establish a "chain of custody" of the alleged victims reports of abuse (e.g. a recorded, documented statement of the history of ALL interviews in this matter).  This lack

of a video or audio record of ALL interviews/therapy sessions makes it difficult to refute the investigative hypothesis that *the alleged victim was mis-interviewed by friends, family, peer groups, psychotherapists, abuse counselors, or others — often multiple times*.

In sum, without an audio and videotaped record NOBODY can form a reliable opinion as to <u>how many</u> interviews and how many *manipulative* interviews the alleged victim experienced or, more specifically, how Jane Doe might have been properly or improperly questioned in "secret" untaped, interviews/therapy sessions with Purdue employees (e.g. CARE), investigators and/or psychotherapists.

IN MY OPINION,  POORLY TRAINED INVESTIGATORS — APPARENTLY LIKE the PURDUE PERSONNEL IN THIS CASE — ASSUME  FALSELY THAT THEY ARE MAGICALLY CAPABLE OF RELIABLY ASSESSING THE VERACITY OF WITNESSES VIA VERBAL STATEMENTS LACKING ACTUAL CORROBORATIVE EVIDENCE … SUCH PROFESSIONALS  LACK BASIC TRAINING and POSE SERIOUS DANGERS TO THE PUBLIC.

Research generally shows that humans ( including therapists ) are very poor " lie detectors" although many investigators and police officers, psychotherapists, and lawyers mistakenly believe they are "experts" at this task.  See, Ekman, P. and O'Sullivan, M., <u>Who Can Catch a Liar?</u> American Psychologist, 46: 913-920, (1991);  See, Rosen, G. M. and Phillips, W.R., A Cautionary Lesson from Simulated Patients, Journal of the American Academy of Psychiatry and Law, 32, 132-133, (2004);  See, McNally, RJ, Troubles in Traumatology, Canadian Journal of Psychiatry 50:815–816 (2005) (showing experienced expert clinicians routinely misdiagnose PTSD in veterans who never saw combat);  See, Vrij, Aldert, Granhag, P. and Porter, S. (2010) Pitfalls and opportunities in nonverbal and verbal lie detection. Psychological Science In The Public Interest, 11 (3). pp. 89-121. ISSN 1529-1006 10.1177/1529100610390861   "The final error that we will highlight is that professional lie catchers (i.e., including GALs and psychotherapists) tend to overestimate their ability to detect deceit. Research has consistently shown that when professional lie

catchers and laypersons are compared, "<u>professionals are more confident in their veracity judgments but are NO more accurate</u>"  Emphasis added ;  See, also,   McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. Psychol. Sci. 15: 493–497. [ Consistent, emotionally powerful, stories from highly educated people — e.g. alien abduction "memories" -- can be quite consistent, filled with detail,  and very compelling -- yet quite false.]


    IN MY OPINION,  CONFIRMATION BIAS POSES SERIOUS DANGERS to the integrity of the legal system as clearly demonstrated in this case by Investigator Purdue Personnel and her colleagues' egregious Confirmation Bias in ignoring multiple instances of evidence that did NOT support her a priori beliefs about the case.   Confirmation bias is the tendency to search for, interpret, prefer, and recall information in a way that confirms one's beliefs or hypotheses while giving disproportionately less attention to information that contradicts it.  It is a type of cognitive bias and a systematic error of inductive reasoning. People display this bias when they gather or remember information selectively, or when they interpret it in a biased way… Experiments have found repeatedly that poorly trained people tend to test hypotheses in a one-sided way, by searching only for evidence consistent with their current hypothesis.  See,   Plous, Scott (1993). The Psychology of Judgment and Decision Making. p. 233;  Nickerson, Raymond S. (June 1998). "Confirmation Bias: A Ubiquitous Phenomenon in Many Guises". Review of General Psychology 2 (2): 175–220. doi:10.1037/1089-2680.2.2.17.   See, Joshua Klayman and Young-Won Ha, Confirmation, Disconfirmation, and Information in Hypothesis Testing, Psychological Review, Copyright 1987 by the AmericanPsychologicalAssociation,Inc. 1987, Vol.94, No. 2, 211-228.   Interviewer confirmation bias characterizes those interviewers who hold a priori beliefs about the occurrence of certain events and who mold the interview to maximize disclosures that are consistent with those prior beliefs.  One hallmark of interviewer bias is the single-minded attempt by an interviewer to gather only confirmatory evidence and to avoid avenues that may produce disconfirmatory evidence. Thus, biased

interviewers do not ask questions that might provide alternate explanations for the allegations or that might elicit information inconsistent with the interviewer's hypothesis. In addition, biased interviewers do not challenge the authenticity of a alleged victim's report when it is consistent with their hypothesis. Even when alleged victim's provide inconsistent or irrational evidence, it is either ignored or interpreted within the framework of the biased interviewer's initial belief. In contrast, when the defendant's statement is incongruent with what the biased interviewer believes, it will be challenged or pursued to align the defendant's reports with the interviewer's beliefs.

## <u>OTHER RELIABLE and AUTHORITATIVE CITATIONS AND REFERENCES:</u>

Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, <u>Psychology, Public Policy and Law</u>, Vol 5, No. 1, 234-242.  Excerpts reprinted in Fisher, George (Prof. Stanford Law School), <u>Evidence</u>: University Casebook Series, Foundation Press - West Group, New York, 2002, pg. 688

Loftus, E. F. (2002) Memory Faults and Fixes. Issues in Science & Technology (publication of the National Academies of Science), 18, # 4, pp 41-50.

Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498.

Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366.

Mazzoni, G. and Memon, A.  Imagination Can Create False Autobiographical Memories, Psychological Science, Vol. 14, No. 2, March, 2003 pg. 186-193.

McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. Psychol. Sci. 15: 493–497.

Nourkova, V.V., Bernstein D.M., and Loftus, E.F. 2004. Altering traumatic memories. Cognition and Emotion 18: 575–585.

Schacter, D.L. and Slotnick, S.D. 2004. The cognitive neuroscience of memory distortion. Neuron 44: 149–160. Schmolck, H., Buffalo, E.A., and Squire, L.R.

Thomas, A. K., Bulevich, J. B., & Loftus, E.F. (2003) Exploring the role of repetition and sensory elaboration in the imagination inflation effect. Memory & Cognition, 31, 630-640.

"Achieving Best Evidence in Criminal Proceedings: Guidance on Interviewing Victims and Witnesses, and Using Special Measures," 2007 revision, Home Office – UK: http://www.cps.gov.uk/publications/docs/ achieving_best_evidence_final.pdf

Michael E. Lamb, Irit Hershkowitz, Yael Orbach, & Phillip W. Esplin, Tell Me What Happened: Structured Investigative Interviews of Child Victims & Witnesses, Wiley Series in Psychology of Crime, Policing and Law, Sept. 2008 (and ALL citations and studies contained therein).

The U.S. Department of Justice training materials call the generation of — and investigation of — alternative hypotheses essential to the integrity of investigations.

Chris Newlin, Linda Cordisco Steele, et al , Child Forensic Interviewing: Best Practices, published by the U.S. Department of Justice… See, http://www.ojjdp.gov/pubs/ 248749.pdf September 2015, U.S. Department of Justice, Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention. "Alternative Hypotheses … Contextually appropriate questions that explore other viable hypotheses for a child's behaviors or statements are essential to the overall integrity of the interview." ]

Including all research cited within the works listed above.


5.    IT IS MY OPINON TO A REASONABLE DEGREE OF PSYCHOLOGICAL CERTAINTY THAT THE ANALYSES AND CONCLUSIONS IN

THIS REPORT ACCURATELY REFLECT KNOWLEDGE, RESEARCH, AND
METHODOLOGIES THAT ARE WIDELY ACCEPTED IN THE RELEVANT
SCIENTIFIC COMMUNITY.

In my opinion, the analyses and opinions in this affidavit reflect the knowledge,
research and methodologies of the relevant scientific and professional communities. The
court is encouraged to consult with other national experts in the field if there is any doubt
about the accuracy of the opinions expressed in this affidavit.

For example, I have written Amicus Briefs on complex science issues signed by
many international leaders in the fields of psychology and psychiatry. See e.g., also
Barden, R. C. (2006) Amicus Curiae Brief of the National Committee of Scientists for
Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to
the Supreme Court of the State of California, Feb., 2006.    with AMICI Aaron T. Beck,
Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M.
Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper,
B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen,
Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin,
James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert
Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant
J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A.
Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard D. Eisman, Mark
Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon,
Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron
Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J.
Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III,
Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John
Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred
Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G.

Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi Breslau and more.

6. **I HAVE PREVIOUSLY TESTIFIED REGARDING SIMILAR ISSUES IN A NUMBER OF JURISDICTIONS:**

I have testified in court and/or given depositions and/or submitted expert affidavits in a number of jurisdictions across the United States on similar subjects. I have also been invited to testify before several state legislatures. My testimony in these venues often focuses on a range of issues including but not limited to: child psychology, methodological errors and ethics violations, proper and improper investigation methods, standards of care in psychotherapy, improper questioning of witnesses, assessments of the reliability and validity of therapist-expert witness practices, parental alienation processes, coping and resilience in children, testing and assessment, psychopathology, the science of memory, family interactions, and related matters.

7. **BASES FOR MY EXPERT OPINIONS IN THIS MATTER:** My opinions in this matter are based upon my education, knowledge, training, and years of experience in the fields of adult-clinical, child-clinical and forensic psychology as well as my extensive review of case materials in this matter. My relevant experience in this field includes:

**PSYCHOTHERAPY:** providing psychotherapy to numerous patients including children, families and adults (in schools, clinics, and hospitals), as well as training psychology graduate students in interviewing and psychotherapy standards and methods;

**RESEARCH REVIEW AND ORIGINAL RESEARCH:** reviewing hundreds of peer reviewed published research studies, serving editorial roles for leading professional journals and initiating, conducting and publishing original research in the leading journals in child psychology, social psychology, personality psychology, surgery, public policy and

legislation. More specifically, I have published in, and/or served as an editor or reviewer for, several of the most highly regarded journals and texts in a number of professional fields including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation;

RECIPIENT OF TWO NATIONAL RESEARCH AWARDS in PSYCHOLOGY: including the Foundation for Child Development National Award for Young Scholars in Social and Affective Development, 1982 - 1983 and the National W. T. Grant Foundation Faculty Scholar Award for Research in Mental Health, Stress and Coping 1987.  Both awards are quite relevant to my analysis in this case;

TEACHING AND TRAINING.  I have given invited addresses and advanced courses at major Ph.D. graduate programs, leading law schools, and continuing education courses for Psychologists, Psychiatrists and Attorneys. I have also trained investigators including F.B.I., Sheriffs Officers, and police staff.  I was an Invited Training Speaker at the Minnesota Sex Crimes Investigators Association (1994) and Invited Training Speaker at the Midwestern Sex Crimes Investigators Association.  I also served as a Special Assistant Attorney General of the State of Utah as a trainer and consultant on cases involving licensing prosecutions of mental health professionals;

PUBLIC SERVICE EXPERIENCE:    See also the attached Illustrative Exhibit
-- Psychology Practicum - University of Minnesota Medical School, Dept. of Psychiatry
-- Psychology Practicum - Stillwater Minnesota Maximum Security Correctional Facility
-- Psychology Practicum - Minneapolis, Minnesota Public Schools
-- APA Approved Psychology Internship - Palo Alto V.A. Med Ctr/ Stanford U. Med Ctr.
-- Psychology Consultant Craniofacial Surgical Team, Baylor Medical School, Dallas, Tx

-- Psychology Consultant Craniofacial Surgical Team, Primary Children's Hospital, SLC, UT

-- Harvard Law School Intern, Mass. A.G.'s Office, Crime Victim Compensation Program

-- Chief Author and Legislative Consultant,  Emergency Medical Systems for Children Act

-- Forensic Psychology Intern, Harvard Medical School/Harvard Law School Forensic Program, Massachusetts Mental Health Center

-- Member, Minnesota State Board of Psychology (Appointment of MN Governor)

-- Member, Minnesota Higher Education Coordinating Board (responsible for overseeing the MN. multi-billion dollar budget for all state colleges, universities and trade schools) by appointment of Governor Arne Carlson (1993-1994))

-- Invited Training Speaker, Minnesota Sex Crimes Investigators Association (1994)

-- Invited Training Speaker, Midwestern Sex Crimes Investigators Association (1995)

-- Invited Training Speaker, US Surgeon General's Conference

-- Consultation with the U.S. Attorneys Office, F.B.I., other national experts

-- Court appointed expert witness, St Croix, Wisconsin

-- Legislative Consultant,  Legislation to ban "Holding Therapy" in Utah

-- Legislative Consultant, Legislation to ban "Rebirthing Therapy" in Colorado

-- Author, Emergency Medical System for Children Act

-- Consultant, Minnesota law protecting patient's rights

-- Consultant to various State Boards re: licensing actions

-- Special Assistant Attorney General for the State of Utah (2004-2005).

-- Expert Witness for the Prosecution, State of Colorado v. Watkins, et al. (Newmaker "rebirthing therapy" case) 2001.

-- Expert Witness for the Prosecution, State of Texas v. Harris,  (MPD "Twilight Rapist" case) 2011.

-- Prosecution consultant King County, Seattle, Washington  (Green MPD case 2003).

-- Prosecution consultant U.S. Attorneys Office, Houston, Texas U.S. v. Peterson, et al.

-- Testifying and consulting expert witness, U.S. Federal Public Defenders Office

-- Consultation with national experts in law and psychology

*102 of 107*

-- President, Board Member - Character & Morality in Entertainment (CAMIE Awards) 2008-2010

-- Invited International Address on Performance Psychology, Beijing Olympics (Aug-2008)

-- Legislative Consultant,  Minnesota Legislation to ban abuse of incompetent patients in research studies  See, 253B.095 RELEASE BEFORE COMMITMENT (2012)  "The treating psychiatrist must not be the psychiatrist conducting the psychiatric clinical drug trial. The court must determine that, under the circumstances of the case, the patient is competent to choose to participate in the trial, that the patient is freely choosing to participate in the trial, that the compulsion of the stayed commitment is not being used to coerce the person to participate in the clinical trial, and that a reasonable person may choose to participate in the clinical trial."

-- Pro bono consultation and testimony for Prosecution and Public Defender cases in many states

-- Invited address, Center for Enhanced Performance, US Military Academy, West Point (4-2010)

-- Invited address, F.B.I. Midwest Regional Supervisor Training Conference, (9-2010)

-- Unanimously endorsed Republican Party Candidate for Attorney General of Minnesota (Nov. 2010 election, 839,033 votes)

- Invited address, F.B.I. Midwest Regional All-Employees Training Conf., (12-2010)

- 2012 - Captain,  US Air Force Auxiliary Civil Air Patrol - Viking Wing, MN

- Reforming the EMERGENCY MEDICAL SYSTEMS FOR CHILDREN -  See,  Barden, R. C., Kinscherff, R., George, W., Flyer, R., Seidel, J., & Henderson, D., (1993), Emergency Medical Care and Injury Prevention Systems for Children:  An Economic-Medical-Legal-Psychological Analysis and Legislative Proposals, Harvard Journal on Legislation, Vol. 30, No. 2, pgs 461497.   Some version of this proposed legislation was reportedly enacted by the States of New Jersey (1992), Texas (1993), Utah (1994), Colorado (1995), Hawaii (1996), Louisiana (1996) and others.  These legislative ideas have continued to expand across the U.S. As of July 1997 18 states reported the creation of a separate Emergency Medical System for Children Advisory Board (as required by

this legislative proposal) and 15 states required pediatric representation on State EMS Advisory Boards. (See, EMSC News, Vol 10, No. 2, Summer 1997).

**EVIDENCE REVIEWED IN THIS CASE:**

- all articles, citations, and materials cited in this report as well as

Doe v Purdue 2015 Janet Halley "Trading the Megaphone for the Gavel in Title IX Enforcement Backing off the hype in Title IX enforcement"

Doe v Purdue Judge A.C. Barrett Decision University 928 F.3d 652.pdf

Doe v Purdue TEXT EVIDENCE JacobAmberger_27.pdf

Doe v Purdue 2016 4-11 NOTICE Ltr Information Summary Alysa Christmas Rollock_Ex_10.pdf

Doe v Purdue 2021 2-11 ECF 106 Plaintiff SurReply Navy Depos Sanctions 08 21 2020.pdf

DOE v PURDUE 2021 2-15 John Doe Declaration relationship with Jane Doe 02 15 2021.pdf

Doe v Purdue John Doe _MiniScript.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_1.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_2.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_3.pdf

Doe v Purdue DEAN's 1st DECISION Alysa Christmas Rollock_Ex_4.pdf

Doe v Purdue DEAN's 2nd DECISION LTR Alysa Christmas Rollock_Ex_7.pdf

Doe v Purdue DEPO John Doe _PDFTran.pdf

Doe v Purdue DEPO Elvin Uttuppan_Miniscript.pdf

Doe v Purdue PL's 1st APPEAL Alysa Christmas Rollock_Ex_5.pdf

Doe v Purdue PL's 2nd APPEAL & Demand for Records Alysa Christmas Rollock_Ex_8.pdf

DOE v PURDUE Plaintiff Answers to Third Interrogatories to Plaintiff.pdf

Doe v Purdue VP AFFIRMS 2nd DECISION Alysa Christmas Rollock_Ex_9.pdf

Doe v Purdue VP requires REASONS for DECISION Alysa Christmas Rollock_Ex_6.pdf

Doe v Purdue 2016 Aya Gruber Law Review on "Anti-Rape Culture".pdf

Doe v Purdue DEPO Records Custodian Trent Klingerman_MiniScript.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_11.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_14.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_15.pdf

Doe v purdue Alysa Christmas Rollock_Ex_16.pdf

Doe v Purdue Alysa Christmas Rollock_MiniScript.pdf

Doe v Purdue DEPO Alysa Christmas Rollock_PDFTran.pdf

Doe v Purdue DEPO Erin Oliver Mini Script.pdf

Doe v Purdue DEPO ErinOliver_COND Mini Script.pdf

Doe v Purdue DEPO Jacob Amberger_Ex_25.pdf

Doe v Purdue DEPO Jacob Amberger_MiniScript.pdf

Doe v Purdue DEPO Katherine Sermershein_MiniScript.pdf

Doe v Purdue DEPO Monica Bloom_MiniScript.pdf

Doe v purdue DEPO Monique H. _MiniScript copy.pdf

Doe v Purdue DEPO Rodney Hutton_G.pdf

Doe v Purdue ECF 106 Plaintiff SurReply re Sanctions 08 21 2020.pdf

Doe v Purdue Jacob Amberger_Ex_10.pdf

Doe v Purdue Jacob Amberger_Ex_11.pdf

Doe v Purdue Jacob Amberger_Ex_14.pdf

Doe v Purdue Jacob Amberger_Ex_19.pdf

Doe v Purdue Jacob Amberger_Ex_20.pdf

Doe v Purdue Jacob Amberger_Ex_21.pdf

Doe v Purdue Jacob Amberger_Ex_22.pdf

Doe v Purdue Jacob Amberger_Ex_24.pdf

Doe v Purdue Jacob Amberger_Ex_29.pdf

Doe v Purdue Jacob Amberger_Ex_30.pdf

**Doe v Purdue Jacob Amberger_Ex_31.pdf**

**Doe v Purdue Katherine Sermershein_ Ex_2.pdf**

**Doe v Purdue Katherine Sermershein_Ex_3.pdf**

**Doe v Purdue Katherine Sermershein_Ex_4.pdf**

**Doe v Purdue Katherine Sermershein_Ex_5.pdf**

**Doe v Purdue Katherine Sermershein_Ex_6.pdf**

**Doe v Purdue Katherine Sermershein_Ex_7.pdf**

**Doe v Purdue Katherine Sermershein_Ex_8.pdf**

**Doe v Purdue Katherine Sermershein_Ex_9.pdf**

**Doe v Purdue Katherine Sermershein_Ex_10.pdf**

**Doe v Purdue Katherine Sermershein_Ex_11.pdf**

**Doe v Purdue Katherine Sermershein_Ex_11 2.pdf**

**Doe v Purdue Katherine Sermershein_Ex_14.pdf**

**Doe v Purdue Katherine Sermershein_Ex_14 2.pdf**

**Doe v Purdue Katherine Sermershein_Ex_29.pdf**

**Doe v Purdue Katherine Sermershein_Ex_33.pdf**

**Doe v Purdue Katherine Sermershein_Ex_34.pdf**

**Doe v Purdue Katherine Sermershein_Ex_35.pdf**

**Doe v purdue Monica Bloom_Ex_1.pdf**

**Doe v Purdue Monica Bloom_Ex_2.pdf**

**Doe v Purdue Monica Bloom_Ex_3.pdf**

**Doe v Purdue Monica Bloom_Ex_17.pdf**

**Doe v purdue Monica Bloom_Ex_18.pdf**

**Doe v Purdue Monica Bloom_Ex_19.pdf**

**Doe v Purdue Monica Bloom_Ex_20.pdf**

**Doe v Purdue Monica Bloom_Ex_21.pdf**

**Doe v Purdue Monica Bloom_Ex_23.pdf**

**Doe v Purdue Monique H. _MiniScript.pdf**

Articles, Publications, Research on Trauma, Mental Health and related topics including controversial works by by R. Campbell, Ph.D. and her colleagues including but not limited to those cited above and…

Presentation on "The Neurobiology of Trauma" by R. Campbell, Ph.D. , U.S. Department of Justice, Office of Justice Programs, National Institute of Justice NIJ, December 3, 2012. Transcript on the internet at https://nij.gov/multimedia/presenter/ presenter-campbell/pages/presenter-campbell-transcript.aspx ( accessed on June 4, 2018).

Campbell, R., Dworkin, E., and Cabral, G., An Ecological Model of the Impact of Sexual Assault on Women's Mental Health, *Trauma, Violence, and Abuse*, Vol. 10, No. 3, July 2009 225-246  DOI: 10.1177/1524838009334456

Extensive reviews of the science of memory, false memory, memory contamination and related science.  (See multiple citations above).

Kanin, E. "False Rape Allegations", Archives of Sexual Behavior 23, no. 1 (1994). [ Note:  This 1994 study by *Purdue professor* Eugene Kanin, using data from an unidentified Midwestern city, found that between 1978 and 1987 the police department concluded that *41 percent of rape allegations were proven false.* Prof. Kanin noted : These false rape allegations appear to serve three major functions for the complainants: providing an alibi, *seeking revenge,* and obtaining sympathy and attention. The rape allegations were rated as false only when the complainant admitted they were false].

Extensive reviews of human "lie detector" research… discerning true from false statements based upon interviews lacking corroborative evidence.  (See citations above).

Extensive reviews of research on "clinical judgment" including the judgment of investigators. (See citations above).

and other evidence as it becomes available.


8.     LIMITATIONS ON THIS REPORT and TESTIMONY :  My opinions and hypotheses in this matter are subject to the limitations of all documentary and related evidence , the impossibility of absolute predictions, as well as the limitations of social science analysis. I have not met, nor interviewed,  nor evaluated, nor assessed, nor

produced any diagnoses nor psychological descriptions of anyone in this investigatory process.  As always, I have no expert opinions regarding the veracity of witnesses or the ultimate issues in this case.  <u>I will continue to review evidence in this case and update opinions.</u>  My opinions are thus subject to change at any time as new information becomes available to me including and especially my observations, analyses, and opinions at the trial of this matter. Time and cost limitations prevent a more complete analysis of all evidence in this case at this time.  I seek to review all relevant evidence in this matter.  I never offer opinions on guilt or innocence or the truthfulness of witnesses. Only the trier of fact can determine the credibility of witnesses and how scientific research may or may not be related to the specific facts of any particular case.   A key role of an expert witness is to help the court, lawyers, parties, and the public understand and apply reliable and proper scientific, technical, and investigative principles, hypotheses, methods, and information. I have transmitted this initial expert witness report on FEB 19, 2021 to the offices of Attorney Philip A. Byler, J.D. , for use consistent with the laws of the relevant jurisdiction.


9.     My investigation of this complex and important matter continues.

*R. Christopher Barden*

**Ongoing Investigative Expert Witness Initial Report signed FEB 19, 2021**

**R. Christopher Barden, Ph.D., J.D., LP**

**Expert Witness in DOE v. PURDUE, et al ( 2021 )**

As an expert witness I will offer no legal opinions nor psychological treatment-diagnostic advice in this case.

"A key role of an expert witness is to help the court, lawyers, and/or parties understand and apply reliable scientific, technical, ethical, and investigative principles, methods, alternative hypotheses, and information."