**PL Opp DSJ 24**

Page 1

```
 1   IN THE UNITED STATES DISTRICT COURT FOR THE
 2   NORTHERN DISTRICT OF INDIANA HAMMOND DIVISION
 3   ----------------------------------------------x
 4   JOHN DOE,
 5                      Plaintiff,
 6            V.                    No. 2:17-cv-33-JPK
 7   PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF
 8   TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his
 9   official capacity as President of Purdue
10   University, ALYSA CHRISTMAS ROLLOCK, in her
11   official capacity of Purdue University, KATHERINE
12   SERMERSHEIM, in her official capacity at Purdue
13   University,
14                      Defendants.
15
16   ----------------------------------------------x
17
                                    Videoconference
18
19                                  December 4, 2020
                                    1:30  P.M.
20
21
22
23   Deposition of ERIN OLIVER, held at the above time
24   and place, pursuant to Order, taken before a Court
25   Reporter of the State of Indiana.
```

Page 2

```
 1  APPEARANCES:
 2
 3       NESENOFF & MILTENBERG, LLP.
         Attorneys for Plaintiff, John Doe.
 4       363 Seventh Avenue - 5th Floor
         New York, New york 10001
 5
         BY:  PHILIP A. BYLER, ESQ.
 6
 7       STUART & BRANIGAN, LLP.
         Attorneys for Defendants.
 8       300 Main Street - Suite 900
         P.O. Box 1010
 9       Lafayette, Indiana 47902-1010
10       BY:  WILLIAM P. KEALEY, ESQ.
11
12  ALSO PRESENT: Bill Lahey.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2              I N D E X
 3  WITNESS            EXAMINATION BY          PAGE
 4  Ms. Oliver         Mr. Byler             4
 5                     Ms. Kealey            8
 6              E X H I B I T S
 7
 8  OLIVER         DESCRIPTION             PAGE
 9  Exhibit 1      Subpoena                  4
10  Exhibit 10     Document                 12
11  Exhibit 11     Response Statement       16
12  Exhibit 24     Notes                    18
13  Exhibit 25     Notes                    18
14  Exhibit 14     Investigation Report     32
15  Exhibit 19     Text                     36
16  Exhibit 20     Text                     36
17  Exhibit 21     Text                     36
18  Exhibit 22     Text                     39
19  Exhibit 29     Document                 79
20  Exhibit 30     Document                 82
21  Exhibit 31     Document                 82
22
23       R E Q U E S T E D   I N F O R M A T I O N
24
25              R U L I N G S
```

Page 4

```
 1  ERIN OLIVER, has been duly sworn in and testified
 2  as follows:
 3  EXAMINATION BY
 4  MR. BYLER:
 5    Q    Please state your name for the record.
 6    A    Erin Oliver.
 7    Q    Can you give me your business address?
 8    A    100 Grace Hall, Notre Dame, Indiana
 9  46556.
10         MR. BYLER: Okay, I was going to
11    mark the subpoena as Oliver exhibit one.
12    Does the Reporter have the exhibits,
13    there should be a subpoena.  Mark that
14    and the simple question is, is the
15    witness appearing today pursuant to the
16    subpoena?
17         THE WITNESS: Yes.
18         MR. BYLER: Mark subpoena one
19    Oliver one, is the subpoena which was
20    provided to everybody including the
21    court reporter.
22         (Marked for Identification Oliver
23    Exhibit 1, Subpoena, dated December 4,
24    2020.)
25         MR. BYLER: My name is Philip
```

Page 5

```
 1    Byler.  I represent the plaintiff John
 2    Doe in the action John Doe vs. Purdue
 3    University and others.
 4    Q    May I first ask this question.  Have
 5  you been deposed before?
 6    A    I have.
 7    Q    Okay, are you familiar with the
 8  question and answer format?
 9    A    Yes.
10    Q    Okay, now have you done a Zoom
11  deposition before?
12    A    No.
13    Q    Okay. I will just very quickly say it
14  is basically the same, it is just you have to be
15  careful we don't talk over each other.  I will try
16  my best and you know you want to do this any ways,
17  it is important with technology.
18         Okay, is there any reason you can't
19  give full and complete testimony today?
20    A    No.
21    Q    Okay. Can you summarize your
22  educational backround?
23    A    I received a Bachelor's of Arts from
24  University of Notre Dame in 2005 in American
25  Studies and Anthropology.  I graduated Michigan
```

Page 14

1    A    To provide the responding party with a
2  summary of the allegations that have been raised
3  against them, that the investigators are tasked
4  with investigating?
5    Q    Say, that the names of [redacted]
6  and [redacted] are going to come up, use those
7  names if there is a use of the deposition, there
8  will be redaction and so for our purposes you can
9  use the name in this instance.
10         The notice of allegations was for
11  [redacted]
12    A    Correct.
13    Q    Okay, do you recall reviewing the
14  notice of allegations in this page?
15    A    I do not.
16    Q    Now, your being copied on this letter
17  of by Dean Sermersheim.
18         Was Dean Sermersheim at the time was
19  the Dean of Students at Purdue?
20    A    Yes.
21    Q    By your being copied along with
22  Mr. Amberger on this letter, was that an indication
23  that you two would be the investigators on the
24  case?
25    A    Yes.

Page 15

1    Q    Okay this letter was April 11, 2016,
2  [redacted]
3    A    Yes.
4    Q    Do you recall talking to Mr. Amberger
5  about Oliver exhibit 10?
6    A    I do not recall any conversations.
7    Q    Do you recall talking to Dean
8  Sermersheim about the letter exhibit ten?
9    A    I do not.
10    Q    Okay. Now the last page again where it
11  is noticed of allegations and second line gives a
12  date, November 2015?
13    A    Yes.
14    Q    Is that the date that was given by
15  Ms. [redacted] for the alleged incident?
16    A    I do not recall.  That would have been
17  the assumption by reading this.
18    Q    Okay. That is not on the page of your
19  document that is your assumption, reading that?
20    A    Correct.
21    Q    Okay. When you get a letter such as
22  Oliver exhibit ten, what do you do in terms of
23  setting up your investigation?
24    A    Typical practice would be to meet with
25  my co-investigator talk about a plan an

Page 16

1  investigation plan, to reach out to the complaining
2  party to learn more details about the allegation
3  and then to the responding party to schedule a
4  meeting to discuss those allegations.
5    Q    Okay now as part of the process that
6  occurred after, Dean Sermersheim issued her letter
7  of April 10, 2016 the respondent was able to submit
8  a written statement, that response to notice of
9  allegations?
10    A    Yes.
11    Q    Okay. I am going to, mark as Oliver
12  exhibit 11 what was Amberger exhibit 11.
13         (Marked for Identification Oliver
14         Exhibit 11, Response Statement, dated
15         December 4, 2020.)
16    Q    Do you have that in front of you?
17    A    Yes.
18    Q    This part as [redacted] response
19  statement to Dean Sermersheim April 11, 2016 letter
20  the notice of allegations.
21    A    I can confirm it is his statement.
22  There is nothing made to Dr. King again that would
23  be my assumption, looking at the document.
24    Q    Okay. Now, go to the last page of
25  Oliver exhibit 11, and you see a list of names.

Page 17

1         Do you recall [redacted] providing
2  a list of character witnesses and other witnesses
3  on his behalf?
4    A    I don't recall outside of the 4 corners
5  of this document.
6    Q    Okay. Looking at this document, do you
7  recall interviewing any of the individuals that are
8  shown?
9    A    I do not.
10    Q    Do you recall that at the time
11  [redacted] did deny the allegations in writing
12  that are stated in the notice of allegations that
13  are attached to Dean Sermersheim letter?
14    A    Yes.
15    Q    Okay.
16    A    Again based on the letter not the
17  independent recollection.
18    Q    Do you recall anything independently?
19    A    Very little.  It has been some time.
20         MR. BYLER: I want to make clear
21         what your testimony is, whether you have
22         any independent recollection I certainly
23         want to get it, you are looking at
24         documents maybe refresh your
25         recollection maybe not, but I don't want

| Page 38 | Page 40 |
|---|---|
| 1  Monica Bloom as director of CARE?<br>2     A    She again in her staff members and CARE<br>3  acted as support people within the procedures and<br>4  so throughout our processes, it was processes.<br>5     Q    Okay. Did she relate to the<br>6  investigator specific complaint?<br>7     A    I am sorry, again jumbled a little bit.<br>8     Q    Did you have dealing with Monica Bloom<br>9  at CARE, did you deal with her in the context of<br>10 dealing with specific complaints that were the<br>11 subject of that had triggered the investigation<br>12 that you were doing?<br>13    A    Yes.<br>14    Q    Okay. And what was the nature of what<br>15 Monica Bloom did in connection with you, in support<br>16 services that CARE provided?<br>17    A    Primarily would have been accompanying<br>18 students to the office of to report allegations of<br>19 sexual assault or sexual based discrimination, and<br>20 then acting as a support person through the<br>21 process; attending meetings, attending meetings<br>22 with those students when they were meeting with our<br>23 office.<br>24    Q    Did you ever deal with Monica Bloom as<br>25 director of CARE with ▮▮▮▮▮▮▮▮ | 1  more than that.<br>2     Q    ▮▮▮▮▮▮▮▮ has made himself<br>3  available has it not?<br>4     A    I don't recall that being a problem he<br>5  was available in April when we met him, yes.<br>6     Q    In fact he provided all of those text<br>7  messages.<br>8         Okay, turn to the investigation report<br>9  Oliver 14 which is Purdue bate stamped 373 to 391.<br>10    A    Yes.<br>11    Q    The first page is a cover e-mail, is it<br>12 not?<br>13    A    Yes.<br>14    Q    Okay, is that for you?<br>15    A    It is.<br>16    Q    Okay. Was the investigation report a<br>17 product of you, both you and Jacob Amberger?<br>18    A    Yes.<br>19    Q    And it was made May 20, 2016 that you<br>20 sent to the Dean Sermersheim?<br>21    A    Correct.<br>22    Q    Do you recall the process by which<br>23 Mr. Amberger and you drafted Oliver 14?<br>24    A    I do not.<br>25    Q    Okay. Let's look at page 374. On the |

| Page 39 | Page 41 |
|---|---|
| 1     A    I recall her being the support person<br>2  for ▮▮▮▮▮▮ during the process.  Outside of that<br>3  no.<br>4     Q    Ms. Bloom  was in CARE? When support<br>5  person I would like to clarify you are referring to<br>6  a support person for ▮▮▮▮▮▮▮▮<br>7     A    Correct.<br>8     Q    Let me go to -- Amberger 22 which is a<br>9  one page document mark as Oliver 22.<br>10            (Marked for Identification,<br>11            Oliver Exhibit 22, Text Messages, dated<br>12            December 4, 2020.)<br>13    Q    The witness has Oliver 22 in front of<br>14 you.<br>15    A    Yes.<br>16    Q    Purdue 372.<br>17        Can you identify, Oliver 22?<br>18    A    Yes, this is a text message from the<br>19 Dean of Students to me in response to an e-mail<br>20 requesting an extension to complete our<br>21 investigation report.<br>22    Q    Do you recall why you requested an<br>23 extension?<br>24    A    E-mail indicates availability and<br>25 scheduling concerns, but I don't recall anything | 1  first page where it says it has your name and<br>2  Mr. Amberger's name, correct?<br>3     A    Yes.<br>4     Q    And is that your initials?<br>5     A    It is.<br>6     Q    And can you recognize Mr. Amberger's<br>7  initials?<br>8     A    Yes.<br>9     Q    Okay. And the first investigation<br>10 charge, was this the charge you were given for the<br>11 investigation?<br>12    A    Yes.<br>13    Q    And the second number two was relevant<br>14 provisions.<br>15        What was being laid out in relevant<br>16 provisions?<br>17    A    The section of the university anti-<br>18 harassment policy that were relevant to the<br>19 allegations.<br>20    Q    Okay. On page 376 interview, and do you<br>21 see that section?<br>22    A    Yes.<br>23    Q    And you see there is a list of people<br>24 there?<br>25    A    Correct. |

Page 42

1  Q   Okay. Now I am going to go through the
2  list but I happen to have an un-redacted version,
3  okay, I am going to be asking you if you recall
4  interviewing them number one ▮▮▮▮▮▮▮▮▮▮
5  A   I recall interviewing him, yes.
6  Q   Number two ▮▮▮▮▮▮▮▮▮▮
7  A   I do not recall the interview.
8  Q   Number three Donald Alexander?
9  A   No.
10 Q   Do you recall that at some point in
11 time in the 2016 portions of the 2014/2015 school
12 year that ▮▮▮▮▮▮▮▮ had a relationship with
13 Donald Alexander for a modest period of time?
14 A   I do not.
15 Q   Anna Early?
16 A   No.
17 Q   When you say no you mean you don't
18 recall the interview?
19 A   I do not recall interviewing.
20 Q   5 is Christopher Fox?
21 A   I do not recall interviewing him.
22 Q   6, Kaitlyn Harrison?
23 A   I do not recall.
24 Q   7, Christine Joel?
25 A   I also do not recall.

Page 43

1  Q   8, Uthuttan, who is the roommate?
2  A   I do not recall.
3  Q   When you say you don't recall, are you
4  saying you just don't recall the interview that you
5  took as opposed to saying you didn't do an
6  interview?
7  A   Correct if these individuals are listed
8  in the section 3, I recall I did interview them, I
9  just do not recall the interviews.
10 Q   That is what I wanted to establish so
11 you have no independent recollection sitting here
12 now, how the interview that was conducted -- of the
13 interviews plural that you conducted?
14 A   Yes.
15 Q   Do you recall that of all the
16 interviews you did on this case Mr. Amberger was
17 with you?
18 A   I do not recall. Typically that would
19 have been indicated on my notes.
20 Q   Okay. Now, at the very bottom out of
21 page 376 says pursuant to this complaint, we also
22 reviewed the following document slash information,
23 text messages, do you see that?
24 A   Yes.
25 Q   And that reflects that you reviewed the

Page 44

1  text messages that ▮▮▮▮▮▮ provided you?
2  A   Yes.
3  Q   And according to the investigation
4  report there were no other documents that you
5  reviewed?
6  A   Correct.
7  Q   Okay. 4, on page 377 it was the
8  statement of allegations correct?
9  A   Correct.
10 Q   Roman numeral 5 is backround that
11 identifies who ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮
12 and that they met at ROTC?
13 A   Yes.
14 Q   And Roman numeral 6 goes from pages 377
15 to 383 and that is the analysis and findings that
16 Mr. Amberger and you did?
17 A   Yes.
18 Q   And Roman numeral 7 conclusion on page
19 383 were your conclusions?
20 A   Yes.
21 Q   And, Roman numeral 8 on page 384 are
22 the recommendations that Mr. Amberger and you make?
23 A   Yes.
24 Q   By the way, why did you do that, not
25 all schools do that why were recommendations being

Page 45

1  given by the investigators?
2  A   Pursuant to the procedures, and our
3  vice-president for academic and compliance, it was
4  a request for investigators to do so.
5  Q   Have you done any investigations at
6  Notre Dame?
7  A   I have not.
8  Q   Okay, now and 385 through page 391 are
9  the 7 pages of text messages that you attended?
10 A   Yes.
11 Q   That is -- well let's look at it.
12     Page 390 is the 6th page and most of
13 that page is blank is it not?
14 A   I am sorry which page?
15 Q   390.
16 A   Yes.
17 Q   And in fact that just shows one text
18 message on the whole page?
19 A   Correct.
20 Q   And page 391 just shows 5 texts on the
21 page, with most of the page blank?
22 A   Yes.
23 Q   Okay. Do you have in other words 7
24 pages of text that you have selected from 133
25 pages?

12 (Pages 42 - 45)

Page 46

1  A  Correct.
2  Q  Okay let's go through this. By the way,
3  on the text that started on 385 to 391 you
4  identified or you select texts only from December
5  23, December 28, and January 14?
6  A  Yes.
7  Q  Okay. In the text on page 385, 386 from
8  December 23, not included are the texts related to
9  cookies being sent by ███████ to ███████
10 ███████
11 A  Correct.
12 Q  If you go back to -- page Oliver 27,
13 pages 321 to 339 -- pages 292.
14    If you can start there; 292.
15 A  Okay.
16 Q  And that shows texts on December 26,
17 and go to page 290.
18 A  What page, I am sorry.
19 Q  287 to 301 these are texts from
20 December 26 and December 25?
21 A  287 -- December 26 text and what was
22 the other page, I am sorry.
23 Q  To 300. These are text on December 26
24 and 25?
25 A  Correct.

Page 47

1  Q  And if you look over to starting on
2  page 302 you have text for December 24 and you go
3  to 321.
4     Those are text on December 24.
5  A  I think it ends at 339 but --
6  Q  No, I said -- I started at 280 and go
7  to 321, 280 to 321.
8     My question is: We see do we not text
9  between ███████ and ███████, the
10 days December 24, Christmas Eve. December 25,
11 Christmas and December 26 the day after Christmas.
12    All those pages have text messages,
13 correct?
14 A  Correct.
15 Q  And if you go to -- pages 262 to 276,
16 those are pages reflecting text being on Monday
17 December 28?
18 A  Yes.
19 Q  Now, you attach 4 pages to your
20 investigation report from that day December 28, do
21 you not?
22 A  Yes.
23 Q  Okay. And in the text that we were
24 submitted to you we saw, I believe 18 pages of text
25 on that day, correct?

Page 48

1  A  Yes.
2  Q  Now let's go to -- the first paragraph
3  on page, 377, and it goes over to 378.
4     That first paragraph is a subject is
5  whether, ███████ losses his temper, correct?
6  A  Yes, the end of the paragraph is.
7  Q  Okay, and that is what ███████
8  accused ███████ of losing his temper?
9  A  Yes.
10 Q  And ███████ denied it?
11 A  Yes.
12 Q  And you say a witness contradicted that
13 ███████ lost his temper, or would lose his
14 temper?
15 A  Yes.
16 Q  Okay. Now the second paragraph on the
17 first full paragraph on 378 second paragraph of
18 that section under findings and analysis, you deal
19 with a taser correct or a stun?
20 A  Yes.
21 Q  And what you report here is what
22 ███████ and the roommate told you about that
23 taser, or stun at that time?
24 A  Yes.
25 Q  That contradicted what ███████

Page 49

1  said about the subject?
2  A  Sorry -- re-read this paragraph, real
3  quick.
4  Q  Go ahead.
5  A  He specifically contradicted there was
6  anything that he chased her.
7  Q  Is the witness waiting for something, I
8  thought I had a question.
9  A  I believe I answered the question if
10 not.
11 Q  Now let's go still on 379, to the
12 third, well it is the paragraph toward the bottom
13 of the page, where it states around December 2015
14 redaction, Mr. ███████ made statements to him that
15 made him to believe that ███████ was considering
16 suicide.
17    Question to you: Do you recall
18 ███████ saying that ███████ was considering
19 suicide or that she had attempted suicide?
20 A  I believe from my notes there was an
21 indication that there had been an incident on the
22 parking garage which I don't again recall the
23 details of and also disclosed my notes indicate
24 several attempts in high school. Again, I don't
25 recall any further detail of that.

13 (Pages 46 - 49)

Page 50

1  Q   Let me continue reading right there and
2  I am going to ask follow-up questions.
3       The investigation report says he
4  reported he was concerned about _____ the few
5  days after the statements were made he invited
6  _____ to the residence ballroom to watch a movie,
7  and while watching the movie, _____ laid on a
8  futon and _____ laid next to her on the floor.
9       _____ reported that he simply reached up
10 from the floor and placed his hand on her leg just
11 above her knee out of affection and concern.
12      Reported that as soon as he did so
13 _____ woke up became very upset and left the room
14 without saying a word.  He reported they never
15 specifically spoke about the incident or her
16 reaction.  He denied ever digitally penetrating
17 _____ or touching her in a special way while she
18 slept.  Stop there.
19      This is what _____ told you in
20 the investigation?
21 A   Correct.
22 Q   Throughout the investigation, _____
23 sticks to what he said was that, he did not
24 engage in any digital penetration and he did not,
25 touch her outside her clothing in her crotch area?

Page 51

1  A   Correct.
2  Q   Go to the top, the bottom of the page
3  it says: "Both _____ and _____ reported that
4  _____ roommate was asleep in the room during this
5  incident his roommate reported he was asleep while
6  _____ was in the room woke up while she was woke
7  walking out of the room reported didn't see
8  anything that occurred and _____ did not seem to
9  be upset unquote.
10      That is what the roommate told you in
11 the investigation?
12 A   Yes.
13 Q   Did you ever ask _____ when the
14 roommate was in the room what she said.  Why would,
15 a person make a sexual move in terms of going to
16 her crotch?
17      MR. KEALEY:  Object to form.
18 Q   The question is simply:  Did you ever
19 ask her?
20 A   I do not recall asking her that.
21 Q   When you say, "you don't recall" you
22 don't recall in terms of you just don't have a
23 recollection or you don't recall in terms of you
24 didn't ask it?
25 A   I don't have a recollection.

Page 52

1  Q   Did you ask _____ -- well on
2  a digital penetration it was true was it not that
3  _____ denied that he ever had digital
4  penetration, correct?
5  A   Correct.
6  Q   And _____ did not have an
7  independent recollection of her being digitally
8  penetrated she was relying on what she said
9  _____ told her?
10 A   Yes.
11 Q   Now did you ever ask _____
12 that if she had been digitally penetrated wouldn't
13 she have woken up?
14 A   I have no recollection of asking that
15 question.
16 Q   Pages 385 to 386 are the text messages
17 from December 23, 2015 that were attached to the
18 exhibit.  They are the selection not all but
19 December 23, 2015 text. Let me ask you this, you
20 know take a minute and just read the text on pages
21 385 to 386 which were the text from selected from
22 December 23, 2015, the same day that they had the
23 cookies conversation.
24      Tell me when you are ready.
25 A   Okay, I am sorry, ready.

Page 53

1  Q   Is there anything on these two pages
2  385 and 386 on December 23, where _____
3  expressly says to _____ that he felt her
4  crotch and digitally penetrated her?
5  A   No.
6  Q   Is there anything in these two pages
7  385 and 386 from December 23, where _____
8  expressly says, that accuses _____ of
9  feeling her crotch outside her clothing or
10 digitally penetrating her?
11 A   No.
12 Q   And in the middle of page 386 there is
13 a text from _____ saying quote you are so
14 amazing.
15 A   Can you point me to the text again.
16 Q   1:06 a m.?
17 A   Yes.
18 Q   Okay. Now let's go to the next 4 pages
19 of text pages 387 to 390 and I will do the same
20 here, I will ask the witness to read through those
21 4 pages of text before I start asking the question.
22 I have 7 and a half pages of notes, I have about 4
23 pages left.
24      Have you had a chance to review the
25 text of pages 387 to 390?

14 (Pages 50 - 53)

```
                                                          Page 54
 1    A    Yes.
 2    Q    Is there anything in those 4 pages for
 3 December 28, where [redacted] expressly says
 4 [redacted] that he had felt her crotch outside
 5 her clothing or digitally penetrated her?
 6    A    No.
 7    Q    Is there anything in those 4 pages
 8 December 28, where [redacted] accuses
 9 [redacted] expressly of feeling her crouch
10 outside her clothing or digitally penetrating her?
11         MR. KEALEY:  Objection to form.
12    A    No.
13    Q    Given on December 28, you admit 14
14 pages of the text on December 28.
15         How do you know that there wasn't
16 context that you didn't include?
17         MR. KEALEY:  Object to form.
18    A    I had that conversation and determined
19 what to include, and I don't recall that
20 conversation.
21    Q    Page 391, this is -- 5 back and forth
22 on January 14?
23    A    Yes.
24    Q    Read those, and then I will ask
25 questions.
```

```
                                                          Page 55
 1    A    I am ready.
 2    Q    Okay. Didn't [redacted] tell you in
 3 the investigation that sometime around January 14,
 4 he went over to [redacted] room and watched
 5 a movie with her and they both fell asleep?
 6    A    Yes.
 7    Q    And you see that the text says,
 8 "[redacted] you should have left after I fell asleep
 9 or woken me back," correct?
10    A    Yes.
11    Q    And the response is, "okay?"
12    A    Yes.
13    Q    And the last is, "Please don't touch me
14 when I am sleeping," correct?
15    A    Yes.
16    Q    Didn't [redacted] say to you in the
17 investigation he didn't touch her when she was
18 sleeping in connection with the January 14, text?
19    A    I don't recall specific to that text.
20    Q    Do you recall generally that [redacted]
21 [redacted] told you and Mr. Amberger in the investigation
22 that he didn't touch [redacted] in a sexual
23 way while she was sleeping?
24    A    Yes.
25    Q    Okay. Let's go back to page 381. The
```

```
                                                          Page 56
 1 third full paragraph on page 381 starts [redacted]
 2 initially explained in the investigation a
 3 statement in violating [redacted] was in reference to
 4 her learning that he had not been truthful with her
 5 about his academic performance.
 6         And then in that same paragraph when he
 7 was pressed further about [redacted] statement of
 8 her waking up to him touching her he reluctantly he
 9 was referring to the incident around December 13,
10 2015 on which he placed his hand on [redacted] leg
11 and she woke up startled.  He continued to deny he
12 touched her crouch while she was sleeping and
13 insisted he would merely placed his hand on her
14 thigh above her knee but below her crouch. Stop
15 there.
16         In this part of the report, [redacted]
17 [redacted] is continuing to tell you that what words are
18 in the text are in relationship to other than what
19 [redacted] was accusing him of?
20         MR. KEALEY:  Object to form.
21         MR. BYLER:  You can answer.
22    A    Yes.
23    Q    Okay. And [redacted] continues to
24 say with respect to touching her on her leg it was
25 just above the knee, correct?
```

```
                                                          Page 57
 1    A    Yes.
 2    Q    By the way if, [redacted] woke up
 3 to [redacted] touching her, why would she not
 4 wake up if [redacted] had digitally penetrated
 5 her?
 6         MR. KEALEY:  Object to form.
 7    A    I don't think I can speculate on that.
 8    Q    I am sorry, I didn't hear your answer.
 9    A    I don't think that I can speculate to
10 that.  I don't recall having any information
11 regarding that.
12    Q    Well -- wait a minute, is it true is it
13 not, that [redacted] woke up after she was
14 touched while [redacted] says on the knee, she
15 says it was the crotch, right?
16    A    Correct.
17    Q    Okay given that, didn't you ask [redacted]
18 [redacted] okay, if you woke up startled as to that
19 kind of touching, why didn't you wake up supposedly
20 you were being digitally penetrated?
21         MR. KEALEY:  Object to form.
22    A    I don't recall asking that.
23    Q    Go to page 382.
24    A    Okay.
25    Q    Okay. And, I am going to read it.
```

15 (Pages 54 - 57)

Page 66

1  the text messages don't expressly refer to
2  ▮▮▮▮▮ digitally penetrating ▮▮▮
3  ▮▮▮
4      A    Correct. They do talk about touching,
5  violating and trust concerns.
6      Q    Did ▮▮▮▮▮ tell you that the
7  violating was referring to the limits that ▮▮▮
8  ▮▮▮ was put on him after the touching of her
9  knee?
10          MR. KEALEY:  Object to form.
11     Q    Do I have a question pending?
12          Question read back.
13          (The last question was read back
14      by the Reporter.)
15     A    Yes, was my answer.
16     Q    ▮▮▮▮▮ when he talks about
17  touching was referring to touching her on her leg
18  just above her knee?
19          MR. KEALEY:  Object to form.
20     A    Yes.
21     Q    Turn to page 383 again. Conclusion.
22     A    Okay.
23     Q    The last sentence of that third
24  paragraph of the conclusion says evidence supports
25  that ▮▮▮ touched ▮▮▮ while she was sleeping

Page 67

1  and evidence also supports that ▮▮▮ touched
2  ▮▮▮ while she was sleeping in an unwanted and
3  non-consensual way in December of 2015 okay.
4          Do you see that December 2015 date?
5      A    Yes.
6      Q    That was the date ▮▮▮▮▮ gave
7  the incident, was it not?
8      A    I believe so, yes.  I believe so.
9      Q    Okay, was it not the case and you can
10 look back at the notice of allegations that ▮▮▮
11 dated it November 2015.
12     A    Yes.
13     Q    So, given the fact that ▮▮▮▮▮
14 says December 2015 and ▮▮▮ says November 2015,
15 why are you crediting ▮▮▮▮▮ on that point?
16     A    Not sure as much as crediting the
17 discrepancy and the date didn't seem to be all that
18 critical to the allegations.  They spent a lot of
19 time together and there were significant
20 interactions between that period of time.  There
21 was more of the conduct that occurred during that
22 period rather than a specific date.
23     Q    Your credibility determination did you
24 take in account the suicide attempt of Ms.
25 ▮▮▮▮▮

Page 68

1      A    No.
2      Q    Did you consider any aspect of the
3  family relationships that ▮▮▮▮▮ and
4  ▮▮▮▮▮ had?
5          MR. KEALEY:  Object to form.
6      A    Can you repeat that.
7      Q    Did you consider when assessing the
8  case, any aspect of the family relationships that
9  ▮▮▮▮▮ and ▮▮▮▮▮ had?
10     A    Not, that I recall.
11     Q    Do you recall at all finding out that
12 ▮▮▮▮▮ is the son of parents with brothers
13 and sisters?
14     A    No, not that I recall.
15     Q    Do you recall at all finding out that
16 ▮▮▮▮▮ had sisters who he was thought to
17 respect?
18     A    Not, that I recall.
19     Q    Do you recall anything about ▮▮▮
20 ▮▮▮ family backround?
21     A    I do not.
22     Q    Now with respect to the digital
23 penetration allegation the only person that maybe
24 was in the room was a roommate, correct?
25     A    Correct.

Page 69

1      Q    So there was no possibility for
2  corroboration from some non-party who told what
3  happened?
4      A    Correct.
5      Q    That was true also of the allegation
6  that, ▮▮▮▮▮ touched ▮▮▮▮▮
7  outside her clothes?
8      A    Correct.
9      Q    Okay, anything in terms of a person
10 around but her roommate?
11     A    Yes.
12     Q    He said to you, he didn't see any?
13     A    Correct.
14     Q    Well, is it a prime time for making a
15 sexual move if you got a roommate in a room?
16          MR. KEALEY:  Object to form.
17     A    Don't know without knowing the dynamics
18 of that relationship and things.
19     Q    Well, isn't it more credible that
20 ▮▮▮▮▮ story about touching the knee out
21 of concern given the fact that the roommate is in
22 the room?
23          MR. KEALEY:  Object to form.
24     A    I am not sure that would sway my
25 thoughts on credibility, one-way or the other.

18 (Pages 66 - 69)