**PL Opp DSJ 25**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION
CASE NO. 2:17-cv-33-JPK

```
JOHN DOE,                              )
                                       )
      Plaintiff,                       )
                                       )
      -vs-                             )
                                       )
PURDUE UNIVERSITY, PURDUE              )
UNIVERSITY BOARD OF TRUSTEES,          )
MITCHELL ELIAS DANIELS, JR.,           )
in his official capacity as            )
President of Purdue                    )
University, ALYSA CHRISTMAS            )
ROLLOCK, in her official               )
capacity at Purdue University,         )
KATHERINE SERMERSHEIM, in her          )
official capacity at Purdue            )
University,                            )
                                       )
      Defendants.
```

DEPOSITION OF JACOB AMBERGER

The ZOOM deposition upon oral examination of JACOB AMBERGER, a witness produced and sworn before me, Clarice H. Howard, CCR-Ky, Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Plaintiff, on Tuesday, August 25, 2020, scheduled to commence at 8:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to time and place thereof.

Page 2

```
                  A P P E A R A N C E S

       FOR THE PLAINTIFF:
           Philip A. Byler
           NESENOFF & MILTENBERG LLP
           363 Seventh Avenue
           Fifth Floor
           New York, New York 10001
           1.212.736.4500
           pbyler@nmllplaw.com

       FOR THE DEFENDANTS:

           Tyler L. Jones
           STUART & BRANIGIN, LLP
           300 Main Street
           Suite 900.
           Lafayette, Indiana 47902-1010
           1.765.423.1561
           tlj@stuartlaw.com.
```

Page 4

(Time noted 8:00 a.m.)

   THE REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room with the witness and that I will be reporting this deposition remotely.  They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury.

   The parties and their counsel consent to this arrangement and waive any objection to the manner of reporting.  Please indicate your agreement by stating your name and your agreement on the record.

   MR. BYLER:  Philip Byler, for plaintiff, I agree.

   MR. JONES:  Tyler L. Jones for the defendants, I agree.

              -----------------

Page 3

INDEX OF EXAMINATION
                              PAGE

DIRECT EXAMINATION
   Questions by Mr. Byler.......................... 4

        INDEX OF EXHIBITS

Deposition Exhibits:

Exhibit 10 -  Notice of investigation............ 12
Exhibit 11 -  ▆▆▆ reply to notice............... 15
Exhibit 14 -  Investigators' report.............. 49
Exhibit 19 -  E-mail to Bloom from Amberger...... 46
Exhibit 20 -  E-mail response from Bloom......... 46
Exhibit 21 -  E-mail from Bloom to Amberger...... 46
Exhibit 22 -  E-mail response from Amberger...... 46
Exhibit 24 -  Handwritten notes of Amberger...... 17
Exhibit 25 -  Handwritten notes of Oliver........ 17
Exhibit 26 -  E-mail from Amberger to ▆▆▆....... 33
Exhibit 27 -  Text messages supplied by ▆▆▆..... 33
Exhibit 28 -  E-mail from Amberger to witnesses.. 45
Exhibit 29 -  E-mail from Joanna Sharp........... 96
Exhibit 30 -  E-mail with final determination....100
Exhibit 31 -  Revised determination..............100

Page 5

   JACOB AMBERGER, having been duly sworn to tell the truth, the whole truth, and nothing but the truth relating to said matter, was examined and testified as follows:

DIRECT EXAMINATION
   QUESTIONS BY MR. BYLER:
Q    Could you state your name for the record, please?
A    Jacob Lee Amberger.
Q    Could you give me your business address?
A    Business address is 155 South Grant Street, Tenth Floor, West Lafayette, Indiana, 47907.
Q    Okay.  My name is Phil Byler or Philip Byler.  I'm counsel for plaintiff, John Doe, in a proceeding entitled John Doe versus Purdue University and others.

   It is proceeding with use of pseudonyms by court order.  John Doe is ▆▆▆▆▆▆▆▆▆▆.  Jane Doe is ▆▆▆▆▆▆▆▆▆▆  You may in this deposition -- don't worry if you slip up and use one or the other, because the deposition at present is being held subjective to a protective order.

   Let me begin by asking you, have you been deposed before?
A    Yes, I have.

Page 22

1  another page, for some reason I must not have
2  printed it out.
3  Q  Is 83 and 84 your notes of another interview?
4     MR. JONES: Object to the form to the extent
5  he doesn't have 84 in front of him. But you can
6  answer to the extent you know, Mr. Amberger.
7  BY MR. BYLER:
8  Q  I'm sorry, you don't have 84?
9  A  No, I only had 83.
10    MR. JONES: I only have 83 as well, Phil.
11    MR. BYLER: Okay.
12 A  But 83 is -- it is my handwritten notes from an
13    interview.
14 Q  Can you tell who the interview is for?
15 A  This was a follow-up interview with Ms. ▓▓▓▓▓▓▓
16 Q  Now, were all of those interviews you did for this
17    investigation that we've reviewed in your
18    investigation notes?
19 A  Those would have been all of the interviews that I
20    was a part of, yes.
21 Q  Were you aware of any other interviews that Ms.
22    Oliver did separate from what you did?
23 A  She may have. Off the top of my head, I'm not
24    sure, but she may have.
25 Q  Was there just one interview of ▓▓▓▓▓▓▓

Page 23

1  A  There was only one interview of him that I was a
2     part of, yes.
3  Q  Okay. Now, let's go to page 67, your interview of
4     ▓▓▓▓▓▓▓
5  A  Okay.
6  Q  I want to just to run through the subjects of your
7     interview of ▓▓▓▓▓▓▓ so bear with me. The
8     first notes have to do with met through Navy ROTC.
9     Is that a reference to Mr. ▓▓ telling you that he
10    met Ms. ▓▓▓▓▓ through the Naval ROTC?
11 A  Correct.
12 Q  And that was two to four weeks between first
13    meeting and when they started dating?
14 A  Yes.
15 Q  And they liked each other at that time?
16 A  Yes.
17    MR. JONES: Object to the form. You can
18    answer, if you know.
19 BY MR. BYLER:
20 Q  Now, my questions are looking at your notes of what
21    ▓▓▓▓▓▓▓ is telling you; you understand that
22    is the context of my questions?
23 A  Yes, I do.
24 Q  Now, the next group of notes why speculate, because
25    don't know why. Those are your notes as to what

Page 24

1  ▓▓▓▓▓▓▓ told you as to why the sexual
2  misconduct allegations were made?
3  A  Yes.
4  Q  And he did make some suggestions to you as to why,
5     according to your notes?
6  A  Yes, he did.
7  Q  And he said dash things in her past. What's that a
8     reference to?
9  A  Specifically I do not recall. That just would have
10    been a statement he made, things that had happened
11    in her past.
12 Q  Next line says early to mid January stopped
13    talking; do you see that, according to your notes?
14 A  Yes.
15 Q  Do you recall what ▓▓▓▓▓▓▓ told you when you
16    interviewed him about stopped talking in mid
17    January?
18 A  Beyond what's in my notes, no, that they had just
19    stopped talking sometime in mid January of 2016.
20 Q  But ▓▓▓▓▓▓▓ did tell you that in the
21    interview, they had stopped talking mid January?
22 A  Yes.
23 Q  Next thing, think maybe suicide attempt in
24    December, never same after that; do you see those
25    notes?

Page 25

1  A  I do. Actually it starts with a down arrow hill.
2     I think it's downhill maybe since the suicide
3     attempt in December is what that is. My arrow is
4     not very good.
5  Q  Thank you for the clarification because I now see
6     it is an arrow downhill. Okay. So the
7     relationship went downhill after a suicide attempt
8     in December is what your note means?
9  A  Yes.
10 Q  And ▓▓▓▓▓▓▓ told you about the suicide
11    attempt in your interview of him on April 28?
12 A  Yes.
13 Q  Do you recall ever after you interviewed Mr. ▓▓
14    checking the University records for any formal
15    report of a suicide attempt?
16 A  I do not recall if I specifically did. I do know
17    there was information or we found information that
18    kind of gave us a timeline or date when that was
19    reported.
20 Q  I'm sorry, I'm not quite sure I understand. What
21    do you mean by timeline in your answer?
22 A  By timeline, he said sometime in January he
23    reported this. So we just researched it to see
24    when that was -- specifically it would have been
25    reported.

Page 26

1 Q Were you able to find any University report on a
2 University form by Mr. [redacted]
3 A There was a report through the University system on
4 a University form. I do not remember if it was
5 directly from him or if it was from someone -- I
6 believe it was from someone that he had reported it
7 to. And then that person reported it to the
8 University.
9 I do not recall if he directly reported it to
10 the Dean of Students office or wherever that report
11 would go.
12 Q Okay. Now, there's a line on that first page, is
13 there not, between the first two subjects and the
14 next subject on 67?
15 A There is, yes.
16 Q And you placed that line there?
17 A Yes, I did.
18 Q Was there any reason?
19 A That's my way of separating kind of sections in my
20 notes.
21 Q Now, the next line says touching several days after
22 suicide attempt; do you see that?
23 A Yes, I did.
24 Q Now, I want to just -- I'm going to read what's
25 here because it's important and ask you if you

Page 27

1 recall this is what [redacted] told you. It
2 says KL, that's [redacted] on futon, [redacted]
3 [redacted] on floor. That's what you wrote there in that
4 first line after the header touching?
5 A Correct.
6 Q And then you recall him telling you that?
7 A Yes, I do.
8 Q Next line, reached up and put hand on knee just
9 above knee; that's what you wrote there?
10 A Yes.
11 Q Do you recall him telling you that?
12 A Yes, I do.
13 Q Okay. Next line, [redacted] woke up
14 antsy and upset. [redacted] left, never said anything
15 before leaving. That's what you wrote there?
16 A Correct.
17 Q Dash never talked about it after. That's what you
18 wrote there?
19 A Yes.
20 Q And that's what [redacted] in his interview
21 with you said to you about the touching?
22 A Correct.
23 Q Okay. Next line, later [redacted] "I don't
24 like it when you touch me when I sleep." That's
25 what you wrote?

Page 28

1 A Yes.
2 Q And that's what [redacted] told you in the
3 interview?
4 A Correct.
5 Q Next page, top line, "never told [redacted]
6 that he touched her before." That's what you
7 wrote?
8 A Yes.
9 Q And you recall that [redacted] told you that?
10 A Yes.
11 Q Never put hand on her before while sleeping; is
12 that what you wrote there?
13 A Yes.
14 Q And do you recall [redacted] telling you that?
15 A Yes.
16 Q So was it in this portion of the interview
17 [redacted] was giving his account that was a
18 denial of the allegations of sexual misconduct in
19 the notice of allegations?
20 MR. JONES: Object to the form. You can
21 answer.
22 BY MR. BYLER:
23 Q Do you understand the question? I'm asking you in
24 this portion of the interview, was [redacted]
25 giving you his account which denied the allegations

Page 29

1 in the notice of allegations that you received from
2 the Dean?
3 MR. JONES: Same objection. You can answer.
4 A Yes, he was sharing his account, his perspective.
5 Q Okay. And at no point in this interview did
6 [redacted] ever tell you I did it, I did touch
7 her in the crotch, I did digitally penetrate her.
8 MR. JONES: Is that a question, Phil?
9 BY MR. BYLER:
10 Q At no time -- well, let me put it this way. It's
11 true, is it not, that [redacted] never told you
12 in this interview at any in time that he ever, you
13 know, touched her crotch or digitally penetrated
14 her?
15 A He never said he digitally penetrated her.
16 Touching her crotch, he never specifically said
17 that.
18 Q What he said, according to your notes, was that he
19 touched her just above the knee, correct?
20 A That is what he initially shared, yes.
21 Q When you say initially, where did he state anything
22 differently?
23 A Later in the interview when we were talking to him
24 about the text messages where he was apologizing
25 for violating for her, he quickly said well, that

Page 34

1  correct?
2  A   Correct.
3  Q   And the very first one is March 15, 2016, correct?
4  A   Correct.
5  Q   And the last one is December 23, 2015, correct?
6  A   Correct.
7  Q   Okay. So Mr. ▮ produced to you texts between
8      when him and ▮ ranging from a period
9      of time of December 23, 2015 to March 15, 2016?
10 A   Correct.
11 Q   It's true, is it not, that ▮ didn't
12     provide you any texts?
13 A   That is correct.
14 Q   And did you ask her?
15 A   Yes.
16 Q   And what did she say?
17 A   Let me look back at my notes to see if I put it in
18     there. I believe she said she had deleted --
19     either his contact or deleted the text message
20     thread.
21 Q   Didn't she first tell you in your interview that
22     she and ▮ had stopped texting in early
23     December?
24     MR. JONES: Object to the form. It
25     mischaracterizes the testimony. You can answer.

Page 35

1      MR. BYLER: Just for clarification, I was not
2      referring to any testimony. I was referring to
3      what ▮ told Mr. Amberger and Ms.
4      Oliver.
5  A   Let me look back at my notes. I do not recall -- I
6      do not recall her sharing that, when they last
7      communicated.
8  Q   Okay. I jumped over it. I just want to go back to
9      Bates stamp page 72 in your notes in Amberger
10     Exhibit 25.
11 A   You said 72?
12 Q   Yes.
13 A   Okay.
14 Q   These were your notes of your interview with the
15     roommate Elvin, correct?
16 A   Correct.
17 Q   And in the middle of the page it says AH -- that's
18     ▮ -- would share details, arguments
19     conflicting logic.
20 A   Uh-huh.
21 Q   Do you recall what Elvin said to you that you wrote
22     the note conflicting logic?
23 A   I do not.
24 Q   Next line says concerning -- next line after that
25     says seemed unstable, her mentality focused on

Page 36

1      grades. That's what you wrote, correct?
2  A   Correct.
3  Q   And that's what the roommate told you about who?
4  A   Ms. ▮
5  Q   Next line, attempted suicide; do you see that?
6  A   Yes, I do.
7  Q   Did Elvin, the roommate, tell you about Ms. ▮
8      attempting suicide?
9  A   Those details had been shared with Elvin by Mr.
10     ▮ and Elvin shared what Mr. ▮ had shared with
11     him.
12 Q   Go to the middle of the second page of that
13     document, 73 Bates stamp.
14 A   Okay.
15 Q   And do you see where it says shocked and annoyed by
16     allegations?
17 A   Yes, sir, I do.
18 Q   Do you recall what prompted you to write that in
19     the interview with Elvin?
20 A   That looks like Elvin's own, I guess, impression of
21     the allegations against Mr. ▮
22 Q   Now, the next line says not like him. Next line
23     says hard worker in ROTC. Those are the next two
24     lines in your notes, correct?
25 A   Correct.

Page 37

1  Q   Do you recall what the roommate Elvin told you that
2      prompted you to write those lines?
3  A   Just pretty much like it says, the allegations
4      against Mr. ▮ were not like him, and Elvin
5      described him as a hard worker in ROTC.
6  Q   Go to the last page.
7  A   74?
8  Q   Yeah.
9  A   Okay.
10 Q   And the first line never saw them argue; do you see
11     that?
12 A   Yes, I do.
13 Q   Do you recall what prompted you to write that?
14 A   It was something Elvin shared. It was either a
15     response to a question or something he shared that
16     he said he never saw Mr. ▮ and Ms. ▮
17     argue.
18 Q   And the next says AH upset dash doesn't raise his
19     voice dash if late for class, "ugh, why me, why
20     didn't you wake me," but never yells or raises
21     voice. That's what you wrote here, correct?
22 A   Correct.
23 Q   And do you remember Elvin, the roommate, telling
24     you that in the interview?
25 A   Yes, I do.

10 (Pages 34 - 37)

Page 58

1  2016, did you have any communication with Dean
2  Sermersheim about what was going on in your
3  investigation?
4      MR. JONES:  Object to the form, vague.  You
5  can answer, if you understand.
6      MR. BYLER:  I don't think I asked that
7  question before.
8      MR. JONES:  I said vague, not asked and
9  answered.  You can answer, Jake.
10 A  I do not recall if I did or not.  I don't know why
11 I would unless we would need an extension to a
12 deadline or something.
13 Q  Before you had your e-mail exchange with Monica
14 Bloom on May 9 and May 12, 2016, to set up the
15 follow-up phone call with _____ did you
16 have communications with Monica Bloom concerning
17 your investigation?
18 A  After May 12?
19 Q  Yes -- no, before May 9.  In other words, the
20 period before you had your e-mail exchange, did you
21 have communications with Monica Bloom concerning
22 the investigation?
23 A  I do not recall any.
24 Q  Okay.  After May 12 until you released your
25 investigation report of May 20, did you have any

Page 59

1  communications with Monica Bloom concerning the
2  investigation?
3 A  I do not recall any.
4 Q  When you say you don't recall, is that saying you
5  don't recall because you just don't have a
6  recollection or you don't think it happened?
7 A  I do not recall.  I do not know if I did or not.
8 Q  Okay.  Now, let's go to page 377, and that's page 4
9  of the report.  Paragraph 4 says allegations.  Let
10 me just read it out loud and I'm going to follow up
11 with questions.
12     The University elected to exercise its right
13 to investigate the allegations of sexual
14 harassment.  Specifically, it is alleged that
15 during or around November 2015, while _____
16 _____ was sleeping in _____ room, he touched her
17 intimate parts without her permission.  He later
18 admitted to her that he digitally penetrated her
19 vagina while she was asleep in his room in early
20 November.  It is also alleged that _____ threatened
21 and chased _____ with a stun gun, one
22 type device, down a hallway in his residence hall.
23     Okay.  That's the statement of allegations
24 that you investigated?
25 A  Yes.

Page 60

1 Q  Now, when you say here he later admitted, you're
2  referring, are you not, to _____ saying
3  that _____ admitted to her, not that
4  _____ admitted to you about digital
5  penetration?
6 A  Yes.  That allegation section was taken from the
7  notice of allegation that was shared with him.
8 Q  I just want to clarify what you're describing.
9 A  Yes.
10 Q  Now, the preceding was started by Dean
11 Sermersheim's April 11, 2016 letter, correct?
12 A  That letter, whenever it was sent, would have been
13 the start of the investigation.
14 Q  And we're talking about what _____
15 alleged happened in November of 2015, correct?
16 A  Correct.
17 Q  Now, that's a five-month gap in time, is it not?
18 A  Yeah, roughly, yes.
19 Q  Did you ever ask Ms. _____ why it was five months
20 before she said anything about the supposed event?
21 A  If I do ask this question, I typically kind of
22 write down a person's response in my notes.  I
23 don't recall seeing that in my notes.  So it most
24 likely was not asked of her.
25 Q  Okay.  Section Roman Numeral V is background in

Page 61

1  this investigation report, which is a description
2  of who the parties are and how they met?
3 A  Correct.
4 Q  Six is "analysis and findings" that go from Bates
5  stamp 377 to 383, correct?
6 A  Correct.
7 Q  And what follows on page 383 Roman Numeral VII is
8  conclusion?
9 A  Correct.
10 Q  And on page 384, there are recommendations as to
11 discipline, correct?
12 A  Correct, yeah, that's the sanctions recommendation.
13 Q  And what follows from page 385 to 391, are seven
14 pages in which texts occur, correct?
15 A  Correct.
16 Q  Now, did you cut and paste from the texts supplied
17 by _____ what appears on these pages from
18 385 to 391?
19 A  I do not know if this is cut and pasted or if this
20 is just copies of the full page or a paper copy
21 that we had.
22 Q  The reason I ask is go to page 391.
23 A  Okay.
24 Q  Most of that page is blank, is it not?
25 A  It is, yes.

16 (Pages 58 - 61)

Page 66

1  you not?
2      MR. JONES: Object to the form for vagueness.
3  When you say it, what do you mean, Phil?
4  BY MR. BYLER:
5  Q  Turn over to page 383 under conclusions.
6  A  Okay.
7  Q  The end of the third paragraph in conclusions.
8  A  Okay.
9  Q  And you state there, do you not, that evidence
10    supports ▮ touching ▮ while she
11    was sleeping in an unwanted and nonconsensual way
12    in December of 2015; you write that?
13 A  Yes.
14 Q  And did you understand my prior question to be a
15    reference to a conclusion that it was December of
16    2015 that the investigation concluded that this
17    occurred?
18 A  Yes.
19 Q  Okay. Now, the second paragraph on page 379 Bates
20    stamp, what is the function in the investigation
21    report in recording what you do here?
22 A  The second paragraph is a summary of what Ms.
23    ▮ shared with us.
24 Q  Now, the third paragraph, is that what ▮
25    ▮ said?

Page 67

1  A  Yes, it is.
2  Q  Now, I'm going to look at the first sentence here.
3     ▮ reported that around December 13, 2015, she
4     made statements to him that led him to believe that
5     ▮ was considering suicide.
6        Now, stop there. Now, that is what is written
7     here, correct?
8  A  Yes.
9  Q  Didn't ▮ tell you that, in fact,
10    ▮ attempted suicide by throwing
11    herself off the parking lot next to the ROTC
12    armory?
13 A  I do not recall if he specifically shared that or
14    not.
15 Q  Well, there's a difference between on one hand
16    saying a person is considering suicide and on the
17    other hand, a person attempting suicide.
18       MR. JONES: Is that a question, Phil?
19       MR. BYLER: Yeah.
20 BY MR. BYLER:
21 Q  There's a difference, is there not, between saying
22    a person is considering suicide and a person
23    attempting suicide?
24 A  Yes.
25 Q  Let me just look at the middle of that paragraph on

Page 68

1  379, the third paragraph. I'm just going to read.
2    While watching the movie, ▮ laid
3  on a futon and ▮ laid next to her on the floor.
4  ▮ reported that he simply reached up from the
5  floor and placed his hand on her leg just above the
6  knee out of affection and concern. He reported
7  that as soon as he did so, ▮ woke up,
8  became very upset, and left the room without saying
9  a word. He reported that they never specifically
10 spoke about the incident or her reaction.
11     Stop right there. Now, that's your recording
12 of what ▮ told you in his interview,
13 correct?
14 A  Correct.
15 Q  I'm going to go on and read. "He, that's ▮
16    ▮ denied ever digitally penetrating ▮
17    ▮ or touching her in a sexual way while she
18    slept. He reported that sometime after the
19    incident, ▮ told ▮ that she did
20    not like it when he touched her as she slept, and
21    he stopped doing that after she expressed concern."
22       Stop there. That's what you wrote?
23 A  Yes.
24 Q  ▮ statement was that the touching
25    was with respect to the touching above the knee,

Page 69

1  was it not?
2  A  Yes.
3  Q  And ▮ never told you that oh, yeah, I
4  touched her crotch?
5  A  Correct.
6  Q  Let me go on. "Both ▮ and ▮
7  reported that ▮ roommate was asleep in the
8  room during this incident. ▮ roommate
9  reported that he was asleep while ▮
10 was in the room, and he woke up as she was walking
11 out of the room. He reported that he did not see
12 anything occur, and ▮ did not appear
13 to be upset." That's what you wrote?
14 A  Correct.
15 Q  Did you ever ask ▮ if the roommate is
16    the room, why would a person, you know, make a move
17    in that kind of sexual nature in terms of going for
18    her crotch?
19 A  I do not recall that specific question.
20 Q  Did you ever ask ▮ that if she were
21    digitally penetrated, wouldn't she wake up?
22 A  I do not recall that specific question.
23 Q  Now, is it true, is it not, that ▮
24    did not have an independent recollection of being
25    digitally fingered?

Page 70

1  A   Correct.
2  Q   She was relying on what she said ▇▇▇▇
3      said, correct?
4  A   Correct.
5  Q   And ▇▇▇▇ told you in the interview, as we
6      reviewed the notes, that he never did that,
7      correct?
8  A   Correct.
9  Q   Okay.  Now, the findings and analysis go to the
10     text messages and I want to go back to the text
11     messages at this point.  And I'm just going to go
12     sequentially page 1 through 7 of the text messages
13     that are attached to the report and that start on
14     385.
15         Do you have them yet?  I don't want to rush
16     you.
17 A   From all of the text messages, those pages?
18 Q   Well, the text messages attached to your
19     investigation report that start on 385.
20 A   Yes, I have that.
21 Q   And the first two pages of the text messages
22     include messages from December 23, 2015, correct?
23 A   Correct.
24 Q   And we looked at messages from December 23, 2015
25     from the whole stack, did we not, where it reflects

Page 71

1      that ▇▇▇▇ sent cookies to ▇▇▇▇
2      ▇▇▇▇ --
3  A   Yes.
4  Q   -- during Christmas break?
5         Okay.  Now, in these two pages from
6      December 23, 2015, you don't include the text
7      messages about the cookies, do you?
8  A   No.
9  Q   Okay.  Now, looking at these two pages, is there
10     anything in these two pages where ▇▇▇▇
11     says to ▇▇▇▇ that he felt her crotch or
12     digitally penetrated her?
13 A   No.
14 Q   And is there anything in these two pages where
15     ▇▇▇▇ accuses in words ▇▇▇▇ of
16     feeling her crotch and digitally penetrating her?
17 A   No.
18 Q   Now, in the middle on page 386, in the middle, it
19     says sent to ▇▇▇▇ December 23, 2015,
20     1:06 a.m.  Message I just hate myself right now.
21     Received from ▇▇▇▇ on Wednesday,
22     December 23, 2015, 1:06 a.m.  Message, you're so
23     amazing, please don't say that.
24        That's what the text messages at that point
25     read, correct?

Page 72

1  A   Correct.
2  Q   It's ▇▇▇▇ saying to ▇▇▇▇
3      you're so amazing, correct?
4  A   Correct.
5  Q   Okay.  Now, let's go to the next -- well, four
6      pages, 387 to 390.  These are messages from
7      December 28, 2015.
8  A   Okay.
9  Q   And this includes 390 where just most of the page
10     is blank.  Okay.  I want you to go through four
11     pages and tell me if at any place here ▇▇▇▇
12     ▇▇▇▇ admits to expressly feeling ▇▇▇▇
13     crotch or digitally penetrating her?
14        (Witness reviews documents.)
15 A   Okay.  I'm done.  Specifically he does not state
16     that.
17 Q   And specifically does ▇▇▇▇ accuse
18     ▇▇▇▇ of feeling her crotch or of
19     digitally fingering her?
20 A   Specifically, no.
21 Q   Now, on December 28, 2015, what you attach here is
22     just some percentages of the messages on
23     December 28, 2015, that you can see in Amberger
24     Exhibit 27, that 133 pages of texts, correct?
25 A   Yes, this is just some of the text messages.

Page 73

1  Q   Okay.  Well, didn't you think that the other texts
2      on December 28, 2015 might provide the context in
3      understanding as to what was meant by the text
4      messages that you do reproduce on 387 through 390?
5  A   If they would have provided additional context, we
6      would have attached them.
7  Q   Okay.  You indicate correctly that there are other
8      messages on December 28, 2015, between ▇▇▇▇
9      ▇▇▇▇ and ▇▇▇▇ as it appears in
10     Amberger 27.  And my question to you is don't you
11     think that having what you didn't include on
12     December 28, 2015, might provide context to what
13     was meant by what was in the texts that you
14     reproduced as part of the investigation report as
15     having been made on December 28, 2015?
16        MR. JONES:  Object to the form, asked and
17     answer.  You can answer, Jake.
18 A   If they would have provided more context, we would
19     have included them.
20 Q   Well, when you read the whole conversation on
21     December 28, 2015, don't you think that that might
22     lend to understanding what was said in this one
23     portion of the text messages between the two of
24     them?
25 A   I'm not sure without having reread all of them.  If

19 (Pages 70 - 73)

Page 74

1  they would have provided additional context, we
2  would have attached them, like I said.
3  Q  Let's go to page 391.
4  A  Okay.
5  Q  And 391 are some text messages on January 14, 2016,
6     correct?
7  A  Correct.
8  Q  And these are not all of the text messages between
9     the two on January 14, 2016, were they?
10 A  I'm not sure. It may not have been.
11 Q  Didn't _____ tell you about an occasion on
12    January 14, 2016, when he went over to _____
13    _____ room and they watched a movie and they
14    both fell asleep?
15 A  I believe so, yes.
16 Q  In the third message received from _____
17    at 11:54 a.m., it says message, "you should have
18    left after I fell asleep or woke me back up,"
19    correct?
20 A  Correct.
21 Q  And didn't _____ tell you that this
22    incident happened in which _____ said you
23    should have left when I fell asleep?
24 A  Yes.
25 Q  And the last one at 12:03 p.m. is received from

Page 75

1     _____ "and please don't touch me
2     especially when I'm sleeping," correct?
3  A  Correct.
4  Q  And didn't _____ in his interview with you
5     flag to your attention that she said to him or
6     texted to him that don't touch me while I'm
7     sleeping?
8  A  Yes, he shared the messages with us and we
9     discussed it.
10 Q  Didn't _____ in that interview of him tell
11    you what he meant -- what he recall happening in
12    terms of touching; it was just above the knee,
13    correct?
14 A  He did, yes.
15    MR. JONES: Phil, are we getting close to the
16    end? I need to run to the restroom.
17    MR. BYLER: Well, we're getting there, maybe a
18    half hour. Why don't we take a break and we'll
19    resume in about ten minutes or so?
20    MR. JONES: That works. Thanks.
21    (A short break was taken.)
22 BY MR. BYLER:
23 Q  Let me go to page 381 in the investigation report.
24 A  Okay.
25 Q  And the paragraph started with _____ initially

Page 76

1     explained to investigators that a statement of
2     violating _____ was in reference to her learning
3     that he had not been truthful with her about his
4     academic performance.
5     That's the first sentence of that paragraph,
6     correct?
7  A  Correct.
8  Q  Now, in the middle paragraph it says when he was
9     pressed further about _____ statement about her
10    waking up to him touching her, he reluctantly
11    confirmed that he was referring to the incident
12    around December 13, 2015, in which he placed his
13    hand on _____ her leg and she woke up startled.
14    Okay. That's what's written there, first of
15    all?
16 A  Correct.
17 Q  When he says he was pressed further, what do you
18    mean by that?
19 A  Asked for more clarification. Specifically I don't
20    remember what we asked. I do recall him using the
21    term violating in his text message was a pretty
22    strong statement. So we said that's a pretty
23    strong statement, what do you mean by that. But he
24    kind of said oh, the time I touched her, but mostly
25    it was about my neglecting my academic performance.

Page 77

1  Q  But then he also told you about the reference to
2     the touching on the leg, correct?
3  A  Yes.
4  Q  Now, you say in the report "he continued to deny
5     that he touched her crotch while she was sleeping
6     and insisted that he had merely placed his hand on
7     her thigh above her knee but below her crotch."
8     Okay. And that's what in the report?
9  A  Correct.
10 Q  So what _____ told you in the investigation was that
11    the touching was in reference to his touching
12    _____ just above the knee?
13 A  Correct.
14 Q  Let's go to the next paragraph. That refers to
15    January 14, 2016, correct?
16 A  Yes, that text message thread.
17 Q  And that part of the report reflects that _____
18    told _____ that he should have left after she fell
19    asleep and that wasn't okay. _____ responded okay.
20    And this is what reflected in the text that's
21    attached to the report, which is the seventh page
22    of the texts attached to the report that we just
23    reviewed a few minutes ago.
24 A  Correct.
25 Q  Now, the next section of the investigation report

20 (Pages 74 - 77)

Page 78

1  refers, does it not, to alleged instances of
2  stalking, and you discuss what ▓▓▓ says in that
3  first paragraph, do you not?
4  A  Yes.
5  Q  And you conclude in that first paragraph on the top
6  of 382, "the RA reported that ▓▓▓ was always
7  polite when she spoke to him and she also had a
8  good impression of him."
9  A  Yes.
10 Q  That's what's written there?
11 A  Yes.
12 Q  That's the RA that you interviewed. What's her
13 name, Christine Joehl?
14 A  Yes.
15 Q  And you recall her saying that about ▓▓▓
16 ▓▓▓
17 A  Yes.
18 Q  Okay. You didn't record anything here about
19 ▓▓▓▓▓▓ told you about supposedly showing up
20 on her floor uninvited and unescorted.
21 A  We talk -- the next paragraph, again, is a
22 paragraph about what Ms. ▓▓▓ shared and then
23 the second full paragraph on that page is where we
24 summarized Mr. ▓▓▓ being on her floor.
25 Q  And what Mr. ▓▓▓ told you is that he moved her

Page 79

1  furniture to surprise her while she was out of town
2  for a weekend, correct?
3  A  Yes.
4  Q  How would Mr. ▓▓▓ get into Ms. ▓▓▓▓▓▓
5  room without the RA opening it for him?
6  A  The only way he would have been able to do that is
7  if he had a key or if the door was unlocked.
8  Q  The third paragraph on that page starts with
9  ▓▓▓ also reported that during early spring 2016
10 semester ▓▓▓ seemed always to be in places she was
11 going to such as the lounge area in the armory
12 utilized by ROTC members or dining courts she
13 frequented.
14     Stop there. There is a lounge area in the
15 armory, isn't there, that the ROTC students
16 fraternize?
17 A  Yes, I believe so. I've not been there, but that
18 was reported to us that that does exist.
19 Q  And the armory is both for Army and Navy ROTC,
20 correct?
21 A  Yes, it's for all members of the ROTC.
22 Q  And the lounge was an area where ROTC students
23 would talk with each other and be with each other,
24 correct?
25 A  Yeah, that's how it was described to us.

Page 80

1  Q  Purdue has fraternities, do they not?
2  A  Yes.
3  Q  But the ROTC students, in a sense they're a
4  fraternity, the ROTC program, is it not?
5  A  That program is what they have in common, yes.
6  Q  And so they socialize by being in the lounge and
7  talking with each other?
8     MR. JONES: Object to the form. You can
9  answer, if you know, Jake.
10 BY MR. BYLER:
11 Q  Well, it is true, is it not, that ROTC students are
12 in the lounge in order to talk with each other and
13 socialize?
14    MR. JONES: Same objection. You can answer,
15 if you like, Jake.
16 A  I believe so, yes. It's a common area where they
17 can all be and study and whatever they want to do.
18 Q  Well, what would be so unusual about ▓▓▓▓▓▓
19 being in the lounge area of the ROTC armory and
20 being in the lounge and talking with other ROTC
21 program students?
22    MR. JONES: Object to the form. You can
23 answer, if you know, Jake.
24 A  It's a common area that was accessible to him, so
25 it's a place he could be.

Page 81

1  Q  Well, isn't it a place you would expect him to be?
2  A  It's an area he can use. I don't know if all ROTC
3  members use it.
4  Q  Do you know how many dining courts there are at
5  Purdue that are open to undergraduate students?
6  A  Six or more, I believe, quite a few.
7  Q  Was Wiley Dining Hall one of them?
8  A  Yes.
9  Q  At the time using a dining hall was something that
10 ▓▓▓▓▓▓ was permitted to do until he
11 received a no contact order in 2016, early 2016?
12 A  Yes.
13 Q  Now, let me go to the third paragraph of
14 conclusions on 383. ▓▓▓ uncomfortable, awkward,
15 and unconfident clarification of the text message
16 admission to violating ▓▓▓ and combined with
17 the apparent dishonesty regarding his entrance into
18 her dorm room have lead us to determine that he is
19 not a credible witness. Do you see that?
20 A  Yes, I do.
21 Q  Where in your notes is there any indication that
22 ▓▓▓▓▓▓ was uncomfortable, awkward, and
23 unconfident regarding the text messages?
24 A  I'm not sure it is in my notes specifically or more
25 of how he answered the question when we were in the

21 (Pages 78 - 81)

Page 86
1  solely relying on what he elected to provide.
2  Q  Let's jump back up to the second paragraph of
3     conclusions, which says when ▮▮▮ was asked to
4     clarify his apologies with ▮▮▮▮ statements of
5     inappropriate touching, he reluctantly confirmed
6     that he was apologizing for that touching as well.
7         Now, that's what it reads in your report,
8     correct?
9  A  Correct.
10 Q  But ▮▮▮▮▮▮ when he talked about the
11    touching with you, it was only with respect to
12    touching her above the knee, correct?
13 A  Correct.
14 Q  Now, in the middle of the third paragraph, evidence
15    does support that ▮▮▮▮ was a credible witness.
16    That's what you say there, correct?
17 A  Correct.
18 Q  And then you go on to say therefore the
19    preponderance of the evidence, correct?
20 A  Correct.
21 Q  Okay.  You don't in that paragraph state any
22    reasons or facts that caused you to reach the
23    conclusion that she was credible?
24 A  Correct.
25 Q  Now, the therefore says therefore, we believe that

Page 87
1  a preponderance of the evidence supports that
2  ▮▮▮ admission to ▮▮▮▮ that he digitally
3  penetrated her vagina without her consent while she
4  was sleeping was an accurate statement and the
5  event did occur.  Stop there.
6  A  Yes.
7  Q  That's what it says.  Now, it just comes down to he
8     said, she said in making that conclusion, correct?
9  A  It comes down to all of the evidence and interviews
10    we had, evidence we gathered and interviews we
11    conducted.
12 Q  Now, with respect to this, however, it was just her
13    word because she didn't know as to what ▮▮▮▮▮
14    ▮▮▮ told her supposedly and she didn't have an
15    independent recollection, correct?
16 A  For the digital penetration, correct.  He shared
17    that with her.
18 Q  And ▮▮▮▮▮ said that didn't happen?
19 A  Correct.
20 Q  How do you have a preponderance of the evidence
21    supporting a finding, when on the one hand you have
22    a denial by the person and the other person,
23    ▮▮▮▮ doesn't have her own recollection of it?
24 A  That would be based on credibility, corroboration
25    by witnesses or text messages or anything of

Page 88
1  information or statements that were given during
2  the interviews.  So it's kind of an aggregate of
3  everything we gathered, not just specifically that
4  one allegation.
5  Q  Well, she got wrong the timing of the alleged
6     incident of touching her, did she not?
7        MR. JONES:  Object to the form.  You can
8     answer, Jake.
9  A  When she thought the incident took place was late
10    November, which is different from what Mr. ▮▮▮
11    shared.
12 Q  In your credibility determination, did you take
13    into account the suicide attempt of Ms. ▮▮▮▮
14 A  No.
15 Q  Did you, in your credibility determination, take
16    into account the gap in time between what she said
17    was November of 2015 when the alleged incident
18    occurred and April of 2016 when she made a
19    complaint?
20 A  That's considered, I will say.  It's part of it,
21    but I don't know what weight it would have had on
22    this determination.
23 Q  Did you consider any aspect of the family
24    relationships that ▮▮▮▮▮▮▮ and ▮▮▮▮
25    ▮▮▮ had?

Page 89
1        MR. JONES:  Object to the form, vague.  You
2     can answer.
3  BY MR. BYLER:
4  Q  Let me rephrase it.  Did you, in the course of the
5     investigation, develop an understanding that
6     ▮▮▮▮▮▮▮ came from a family of a father and a
7     mother who were married and several siblings that
8     included sisters?
9  A  No.
10 Q  You never asked?
11 A  I do not think I did or we did, no.
12 Q  Did you ever develop an understanding as to the
13    family relationship that ▮▮▮▮▮▮▮ had with
14    her parents?
15 A  No, I do not think we did.
16 Q  Do you know whether or not her parents were
17    divorced or still together?
18 A  I do not know that.
19 Q  Now, let me go to page 384.
20 A  Okay.
21 Q  These are -- this is Roman Number VIII,
22    recommendations.  What are you doing with this
23    section on recommendations?
24 A  The recommendation section at this time is if the
25    investigators found or believe that there was a

23 (Pages 86 - 89)