**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' *DAUBERT* MOTION
<u>TO EXCLUDE EXPERT TESTIMONY OF DR. R. CHRIS BARDEN</u>**

**NESENOFF & MILTENBERG, LLP**
**Philip A. Byler, Esq.**
**Andrew T. Miltenberg, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
<u>pbyler@nmllplaw.com</u>
<u>amiltenberg@nmllplaw.com</u>
*Attorneys for Plaintiff John Doe*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES……………………………………………………………....iii

PRELIMINARY STATEMENT…………………………………………………….……..1

FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*…………………………………1

ARGUMENT………………………………………………………………….......................3

   I.   DR. R. CHRIS BARDEN PROVIDES PROPER EXPERT TESTIMONY
       UNDER RULE 702 OF THE FEDERAL RULES OF EVIDENCE………………………3

   II.  EXAMINATION OF THE SIX POINTS OF DR. BARDEN'S TESTIMONY
       DISPUTED BY DEFENDANTS SHOW DR. R. CHRIS BARDEN PROVIDES
       PROPER EXPERT TESTIMONY……………………………….……………………...4

      A. Opinion No. 1: Faulting The Discriminatory "Believe The Woman"…………..……4

         1.  Investigators' Testimony……………………………………………………...5

         2.  The Briefing Context In Which Dr. Barden Is Cited………………..…..……..5

         3.  Dr. Barden's Discussion Of "Believe The Woman" and Assisting the Jury……..6

         4.  Inapposite Case Law Cited By Defendants……..……………………………..7

      B. Opinion No. 2: The False Statistic Cited In The 2011 Dear Colleague Letter……….8

         1.  Defendants' Continuing Disagreement With Judge Barrett………………….....8

         2.  The Briefing Context In Which Dr. Barden Is Cited……………………………9

         3.  Dr. Barden's Discussion and Assisting the Jury…………………………….…9

      C. Opinion No. 3: "Confirmation Bias"…………………………………………....10

         1.  "Confirmation Bias" Is An Investigative Defect, Not A Conclusory
            Characterization Of Fact…………………………………………………...11

         2.  The Briefing Context In Which Dr. Barden Is Cited…………………………..11

         3.  Dr. Barden's Discussion and Assisting The Jury…………………………..12

         4.  Inapposite Case Law Cited By Defendants……..……………………………14

i

    D.  Opinion No. 4:  Expert Reading of John-Jane Text Messages…………………………14

        1.  John-Jane Closeness and Jane's Manipulation Are Material: The
           Briefing Context In Which Dr. Barden Is Cited …………………………………14

        2.  Dr. Barden Is Eminently Qualified To State What The Texts Showed………...16

        3.  The Characterization Of Jane Doe As "Manipulative" In The
           Texts Is Proper…..………………………………………………………………18

        4.  Jane Being Suicidal and Mentally Troubled Is Relevant and Material…………19

        5.  Dr. Barden's Discussion and Assisting The Jury………………………………..19

    E.  Opinion No. 5: No Basis For Sermersheim To Rule Without Hearing Jane ………..19

        1.  Defendants Evade The Issue: The Briefing
           Context In Which Dr. Barden Is Cited……………………………………….…….20

        2.  Defendants Fail To Address What Dr. Barden Stated As To Dean
           Sermersheim Ruling without Hearing From Jane; Dr. Barden's
           Discussion and Assisting The Jury………………………………………………21

    F.  Opinion No. 6: Purdue Ignored Jane's Emotional Issues…………………………...22

III. DEFENDANTS' TWO GENERAL OBJECTIONS TO DR.
    BARDEN'S TESTIMONY ARE WITHOUT MERIT……………….….…………………23

    A.  University Experience …………………………………………………………………23

    B.  Helpfulness To Jury …………………………………………………………………25

CONCLUSION…………………………………………………………………………...25

**<u>TABLE OF AUTHORITIES</u>**

**Page**

<u>Cases</u>

*Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256 (2d Cir.2002)……………….…………….2

*Bullock v. Sheahan,* 519 F. Supp. 2d 760, 762 (N.D. Ill. 2007)……………………………….…………2

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993)……………..………………..……1-3, 25

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018)………………………………………………………..9
.
*Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) ……………………………………………….…………….9

*Doe v. Embry-Riddle Aer Univ.*, Case No. 6:20-cv-1220-WWB-LRH, ECF 180
   (M.D. Fla. Dec. 6, 2021)………………………………………………………………………..10

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) ……………………………………………………5, 8. 9

*Engler v. MTD Prods., Inc.*, 2015 WL 900126 (N.D.N.Y. Mar. 2, 2015)…………….………..……24

*Foster v. Trollhaugen, Inc.*, 2008 WL 5431178 (D. Minn. Sept. 12, 2008) ………………….…...24

*Goswami v. DePaul Univ.*, 8 F. Supp.3d 1004 (N. D. Ill. 2014)…………………………………..13

*Haynes v. Indiana Univ.*, 902 F.3d 724 (7th Cir. 2018)…………………………….…………14, 21

*Huey v. UPS*, 165 F.3d 1084 (7th Cir. 1999)……………………………………………..……14, 21

*Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2012)………………………………………8, 13

*Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021)……………………………………3

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999)……………………………………………2

*Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919 (7th Cir. 2000)…………………………..14-15, 21

*Malone v. Potter*, 2009 WL 10672523 (C.D. Cal. Feb. 25, 2009)……………………….………8

*McCulloch v. H.B. Fuller Co.,* 61 F.3d 1038 (2d Cir.1995)…………………………………………2

*McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651 (7th Cir. 1998)………………………..…14, 21

*Palmer v. Indiana Univ.*, 2021 WL 914030 (S.D. Ind. March 10, 2021)……………..…….7, 18, 24

*Pena v. Leombruni*, 200 F.3d 1031 (7th Cir. 1999)…………………………………………………7-8

*Rainsberger v. Benner*, 2019 WL 6131086 (S.D. Ind. Nov. 18, 2019)……………………………14

*Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000)……………………….………………2-3

*Sommerfield v. City of Chicago*, 254 F.R.D. 317 (N.D. Ill. 2008)…………………………………8

*Spearman Indus. v. St. Paul Fire & Marine Ins. Co.,* 128 F. Supp.2d 1148 (N.D. Ill. 2001)…..…2

*Stagl v. Delta Airlines, Inc.*, 117 F.3d 76 (2d Cir. 1997) …………………………………………24

*Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013)…………………………………3

*Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019)…….……………3

*U.S. Comm. Fut. Trad. Comm. v. Oystacher*, 2016 WL 3693429 (N.D. Ill. July 12, 2016)……..14

*United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999)…………………………………….……………8

*U.S. v. Wells*, 2019 WL 3229912 *8 (D. Alaska July 17, 2019)………………………………...14

*Washington v. Kellwood Co.*, 105 F. Supp.3d 293 (S.D.N.Y. 2015)……………….……………24

*Wechsler v. Hunt Health Sys., Ltd.*, 381 F.Supp.2d 135 (S.D.N.Y. 2003)…………..……………24

**Constitutional Provisions, Statutes and Court Rules**

42 U.S.C. § 1981 ……………………………………………………………………………………14

42 U.S.C. § 1983 ………………………………………………………………….……..…7

Title VII, 42 U.S.C. §2000e…………………………………………………...……7, 14, 17

Title IX, 20 U.S.C. §1681………………………………………………………………..5

Rule 702, Federal Rules of Evidence ……………………………………………1, 2, 3

**Other Authorities**

Advisory Committee's Note to Fed. R. Civ. 702 ……………………………………………2

## PRELIMINARY STATEMENT

Plaintiff John Doe ("John"), by counsel, respectfully submits this Memorandum of Law in opposition to Defendants' motion to exclude the expert testimony of Dr. R. Chris Barden. The motion should be denied. Dr. Barden's testimony is proper under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Defendants argue that Dr. Barden's opinions on six issues are not helpful to the jury. What a review of those six issues ironically reveals is how Dr. Barden's testimony will be helpful to assist the jury and how his testimony is based on his expertise. By moving to exclude Dr. Barden, Defendants seek to immunize Purdue's disciplinary process from expert analysis and leave in place the rationalizations of Purdue administrators that resulted in sex discrimination. The accompanying Declaration of Dr. Barden shows how irrational that is. (Pl Opp DDE 1: Barden Decl. pp. 4-5.)

## FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 581-589 (1993) ("*Daubert*"), the U.S. Supreme Court interpreted Federal Rule of Evidence 702 to require courts to evaluate whether

1

the proferred expert testimony is reliable and relevant. *Daubert* established that federal district courts must perform the function of evidentiary gatekeeper, in order to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). To this end, Rule 703 of the Federal Rules of Evidence allows an expert to proffer an opinion based on facts "that the expert has been made aware of or personally observed," or, alternatively, on facts or data that "experts in the particular field would reasonably rely on" in forming the opinion. But *Daubert* rejected a "rigid" standard that would require general acceptance of the expert's opinion in the scientific community because such a standard would be "inconsistent with the liberal thrust of the Federal Rules." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995) (citing *Daubert,* 509 U.S. at 588). Instead, "[t]he flexible Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002).

Rule 702 is a rule of admissibility rather than exclusion. *See Bullock v. Sheahan*, 519 F. Supp. 2d 760, 762 (N.D. Ill. 2007); *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.,* 128 F. Supp.2d 1148, 1150 (N.D. Ill. 2001) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 amendment) ("The rejection of expert testimony is the exception rather than the rule, and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'"

The "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of

fact . . . ." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000); *Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013). This is so because "[t]he jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Stollings,* 725 F.3d at 765. The Seventh Circuit has recognized that "[i]n *Daubert* the Supreme Court expressly envisioned this continued role for the jury when it reminded all that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Stollings,* 725 F.3d at 766 (alteration in original) (quoting *Daubert*, 509 U.S. at 596). Thus, "the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'" *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) (quoting *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019)).

## ARGUMENT

Before the Court is Defendants' motion to exclude the testimony of Dr. R. Chris Barden. The motion should be denied for the reasons that follow.

## I.   DR. R. CHRIS BARDEN PROVIDES PROPER EXPERT TESTIMONY UNDER RULE 702 OF THE FEDERAL RULES OF EVIDENCE.

A reading of the first six pages of Dr. Barden's report on his expert qualifications tells one how off base Defendants are.  Dr. Barden's report begins at pages 1-2:

> I, R. Christopher Barden, Ph.D., J.D., LP, a licensed psychologist (MN and TX ) and licensed attorney (MN and many other states pro hac vice), have testified and/or consulted as an expert witness in many jurisdictions with regard to a number of areas including investigative methodologies, standards of care in investigations including abuse cases, the science of memory-false memories-tainted memories, the science of investigative interviewing, misconduct and malpractice in investigations, clinical psychology, psychopathology, psychotherapy, diagnostic issues, coping-resilience science, the nature of science, Frye-Daubert-Kumho science analysis, history-methodology-standards of care in criminal and related investigations, the reliability of various scientific methodologies, investigative methods and procedures, as well as standards of care-licensing-ethical standards for attorneys and mental health

3

professionals and investigators (psychologists MSWs-Counselors-GALs-social workers-psychiatrists-parenting consultants, forensic experts, expert witnesses, etc). I have given invited training addresses on these and/or related topics to the national meetings of the American Bar Association, American Psychiatric Association, American Psychological Association, the U.S. Surgeon General's Conference, as well as invited training talks at the United States Military Academy at West Point, regional F.B.I. training meetings, the Minnesota Sex Crimes Investigators Assn, the Midwestern Sex Crimes Investigators Assn, and many institutions including Harvard Law School, Harvard College, Yale, Columbia, for Oxford University Press, the University of Southern California, Penn State, and the State Universities of California, Minnesota, Georgia, Texas, Washington, North Carolina, and others. As an expert in these (Science, Psychology, Methodology, Investigations, Standards of Care) and related areas, a former member of a State Board of Psychology (MN), a former Special Assistant Attorney General (UT), the recipient of two national research awards in the science of coping and resilience, and someone who has published in the leading journals/texts in social psychology, personality psychology, psychiatry, child development, law, public policy, and pediatrics, I have written the following initial investigative report of my analysis in this case.

Dr. Barden then further details his qualifications in psychology, investigations and law. (ECF 187, Pl Opp DSJ 22 & Pl. Opp. DDE 2: Barden Report, pp. 3-7.) Dr. Barden's Declaration explains his testimony is based on the most reliable methodology. (Pl Opp DDE 1: Barden Decl. pp. 2-3.)

The following discussion of the six points of Dr. Barden's testimony disputed by Defendants shows how Dr. Barden is a qualified expert, how his testimony is based on sound methodology and how his testimony will be helpful to assist the jury.

## II. EXAMINATION OF THE SIX POINTS OF DR. BARDEN'S TESTIMONY DISPUTED BY DEFENDANTS SHOW DR. R. CHRIS BARDEN PROVIDES PROPER EXPERT TESTIMONY.

### A. Opinion No. 1: Faulting The Discriminatory "Believe The Woman".

The first opinion of Dr. Barden attacked by Defendants is for the part of his report faulting Purdue's "believe the woman" approach. Defendants argue that Dr. Barden does not cite to facts in the record except for a reference to the deposition of Purdue investigator Amberger and that the opinion will not assist the trier of fact, citing what is inapposite case law. (ECF 193, Dfs. Mem. 5-6.) Defendants err for a series of reasons.

4

## 1.  Investigators' Testimony.

*First*, the testimony of Purdue investigators Amberger and Oliver concerning their training does provide a factual reference point for Dr. Barden's testimony on "believe the woman."  When questioned about his training, investigator Amberger testified that he recognized the phrase "believe women," citing the use of the phrase by End Violence Against Women International ("EVAWI") in some of their e-mails and training and by Purdue's "Center for Advocacy Response and Education" ("CARE") when conducted training and running education on campus.  (Pl Opp DDE 4: Jacob Amberger Dep tr 9-10.)  When questioned about her training, investigator Oliver testified about receiving training from Michigan State Professor Campbell on the neurobiology of trauma. (Pl Opp DDE 5: Erin Oliver Dep tr 9.)   Dr. Barden spends part of his report harshly criticizing the errors of Dr. Campbell, including as to the "neurobiology of trauma," and Dr. Campbell's impact on Title IX training at universities.  (Pl Opp. DDE 2: Barden Expert Report, pp. 35-39.)

## 2.  The Briefing Context In Which Dr. Barden Is Cited.

*Second*, Defendants does not address the specific context in which Dr. Barden's opinion is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and thus do not deal with how Dr. Barden's testimony properly helps John's Title IX case.  Plaintiff's Memorandum of Law (ECF 187, pp. 38-39) first quotes Judge Barrett's opinion on the facts alleged in the Complaint that Judge Barrett for the Seventh Circuit ruled supported a conclusion that John was discriminated against on the basis of sex; Plaintiff's Memorandum of Law (ECF 187, pp. 39-40) then reviews the summary judgment record to show the undisputed establishment of the pleaded facts supported the conclusion that John was discriminated against on the basis of sex. That discussion in Plaintiff's Memorandum of Law concludes (ECF 187, p. 40):

> . . . It is undisputed that among the posts that CARE shared on its Facebook page
> was an article dated June 21, 2016 from *The Washington Post,* "Alcohol isn't the
> cause of campus sexual assault. Men are." (SJM 3: Df. Answer ¶ 24.)

Discovery revealed additional CARE Facebook postings for the 2015-2016 school year reflecting a gender biased culture. (Pl Opp DSJ 20: CARE Facebook postings PU 0756-0884.) Plaintiff Answers To Defendants' Third Set of Interrogatories provides excerpts, which included:

- PU 0760: "Want to know how to support a survivor? Commit to #StartByBelieving"
- PU 0765, 0770: #StartByBelieving hashtag
- PU 0859, 0862, 0863, 0864 Sexual Assault Awareness Month – April 2016 recognizing "survivors" and #StartByBelieving
- PU 0866-0867: The linked website called "startbybelieving.org" is entirely targeting women and promotes simply believing women complaining about sexual assault regardless of circumstance
- PU 0870: "#WeBelieveYou #StartByBelieving"
- PU 0871, 0875: Advertising an event in which the speaker will "tackle rape culture." (See Law Professor Aya Gruber, *Anti-Rape Culture*, 64 U. Kansas L. Rev 1027 (2016): the notion that university procedures are to counteract the rape culture of young men)

(Pl Opp DSJ 21: Plaintiff Answers To Defendants' Third Set of Interrogatories.) Dr. Barden is a licensed psychologist who has testified concerning, *inter alia*, investigative methodologies, the science of memory and science of interviewing, and his expert report attributes the "believe the woman" approach at Purdue to feminist junk science "taught" in Title IX training. (Pl Opp DSJ 22: Barden Expert Report, pp. 1-3, 33-36.)

### 3. Dr. Barden's Discussion Of "Believe The Woman" and Assisting The Jury.

*Third*, Defendants do not address what Dr. Barden specifically says on the subject of "believe the woman"[1] and thus do not deal with how the specific testimony of Dr. Barden will assist the trier of fact. Dr. Barden discusses the "neurobiology of sexual assault" and "neurobiology of trauma," which he explains is not accepted by the relevant scientific community but still disseminated into investigative systems, including police and university Title IX systems, giving rise to unsubstantiated claims that false accusations of sexual assault are rare; the politicized claim

---

[1] The citation to Dr. Barden's report in Plaintiff's Memorandum of Law on this subject should be to pp. 1-3, 30-36. Dr. Barden summarizes his credentials and limitations of his opinions at pp. 1-7. The substance relevant here is on pp. 30-36.

that only 2% of accusations are false is without scientific support -- Dr. Barden cites, among other things, a study by a Purdue faculty member who carefully documented a 41% rate of false rape accusations to the police in a Midwestern city.    According to Dr. Barden, the unreliable "neurobiology of sexual assault" and "neurobiology of trauma" "taught" by Professor Campbell results in any post-assault behavior by women being considered consistent with allegations against men.  (ECF 187, Pl Opp DSJ 22 & Pl. Opp. DDE 2: Barden Expert Report, pp. 30-36.)

Dr. Barden's expertise in "the reliability of various scientific methodologies" (ECF 187, Pl Opp DSJ 22 & Pl. Opp. DDE 2: Barden Report, p. 2; Pl. Opp. DDE 1) qualifies him to testify that Dr. Campbell's "neurobiology of sexual assault" and "neurobiology of trauma" is unreliable and not accepted by the relevant scientific community.  A jury will be assisted in hearing that training in "believe the woman" is not following the science.  (*See* Pl Opp DDE 1&3: Barden Decl. pp. 22-28, 34-35 & Addendum of *Daubert-Kumbo* Expert Opinions.)  A jury should not hear just Purdue administrators and investigators talk about "believe the woman" as properly part of Title IX training.  But it is that very situation that Defendants seek with their motion.

### 4.  Inapposite Case Law Cited By Defendants.

*Fourth*, Defendants cite five quite inapposite cases in an erroneous attempt to justify Defendants' argument that Dr. Barden's testimony as not helpful to a jury.  *Palmer v. Indiana Univ.*, 2021 WL 914030 (S.D. Ind. March 10, 2021), was a much different Title VII case complaining about alleged racial discrimination in failure to promote a black IU professor; the case was dismissed on summary judgment for failure of proof that the alleged white comparator was treated more favorably than the plaintiff in pay, teaching opportunities and office space; expert testimony in differences in pay, teaching opportunities and office space was deemed unnecessary.  *Pena v. Leombruni*, 200 F.3d 1031 (7th Cir. 1999), was a § 1983 action by an estate against a deputy sheriff for use of excessive force; the case was dismissed on directed verdict; expert testimony on the use

of deadly force against a crazy person was deemed unnecessary. *Malone v. Potter*, 2009 WL 10672523 (C.D. Cal. Feb. 25, 2009), was a disability and age employment discrimination case; expert testimony as to whether the employer followed its own policies was deemed not helpful to the jury. *United States v. Hall*, 165 F.3d 1095 (7th Cir. 1999), was a child kidnapping case in which expert testimony on the reliability of eyewitness identification was excluded. *Sommerfield v. City of Chicago*, 254 F.R.D. 317 (N.D. Ill. 2008), was a national origin and religious employment discrimination case brought by a police officer against the City of Chicago, but even there, the Court recognized that expert testimony on police complaint and investigation procedures may be helpful to the jury. Indeed, the Seventh Circuit has held that expert testimony on police complaint and investigation procedures is admissible. *Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2012). None of the cases cited by Defendants undercuts, but *Jimenez* supports, the conclusion that Dr. Barden provides helpful testimony for the jury on the discriminatory "believe the woman."

**B.    Opinion No. 2: The False Statistic Cited In The 2011 Dear Colleague Letter.**

The second opinion of Dr. Barden attacked by Defendants is for the part of his report concerning the false statistic behind the "2011 Dear Colleague Letter." Defendants assert that it would not assist the trier of fact and discount the 2011 "Dear Colleague Letter" as a mere third-party document of no relevance. (ECF 193, Dfs. Mem. 7.) Defendants are just wrong.

**1.    Defendants' Continuing Disagreement With Judge Barrett.**

*First*, Defendants' argument that discounts the 2011 "Dear Colleague Letter" as a mere third-party document of no relevance bizarrely ignores Judge Barrett's treatment of what was a U.S. Government pronouncement that had profound effect on university campuses. Judge Barrett for the Seventh Circuit in *Doe v. Purdue* reviewed the 2011 Dear Colleague Letter that "ushered in a more rigorous approach to campus sexual misconduct allegations by, among other things, requiring "a lenient 'more likely than not' burden of proof when adjudicating claims against alleged

perpetrators," and Judge Barrett discussed Department of Education Assistant Secretary Catherine Lhamon's statements that meant "a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct." 928 F.3d at 668. Judge Barrett stated the 2011 Dear Colleague Letter was relevant in evaluating the plausibility of a Title IX claim, citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018), and *Doe v. Columbia*, 831 F.3d 46, 58 (2d Cir. 2016), but by itself was not sufficient absent other facts, facts which were present in this case.

### 2. The Briefing Context In Which Dr. Barden Is Cited.

*Second*, Defendants do not address the specific context in which Dr. Barden's opinion is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and thus do not deal with how Dr. Barden's testimony on this point properly helps John's Title IX case. That discussion in Plaintiff's Memorandum of Law states (ECF 187, p.44)[2]:

> As reflected in Judge Barrett's opinion, John's case has been focused on Defendants' actions in the backdrop of the April 2011 Dear Colleague Letter; and the April 2011 Dear Colleague Letter premised the need for universities to discipline sexual misconduct, using a preponderance of the evidence standard, to protect women, citing the statistic that 1 in 5 *women* on campus were victims of sexual assault. (Pl Opp DSJ 18: Dear Colleague Letter, p. 2.) But the 1 in 5 statistic is false and has been debunked, leading to Harvard Law professors headed by Harvard Law Royall Professor Janet Halley signing a letter condemning "victim-centered" sexual harassment policies (Pl Opp DSJ 22; Barden Expert Report, pp. 21-30); the real number of college women assault victims is more like .03 in 5 (Pl Opp DSJ 23: DOJ Special Report). University administrators' employment of a "victim-centered" process favoring female complainants without attending to fairness to male respondents can provide the basis for an inference that the administrators were motivated by gender bias. *Doe v. Purdue*, 928 F.3d at 669-670; *Doe v. Columbia*, 831 F.3d at 57-58.

### 3. Dr. Barden's Discussion and Assisting The Jury.

*Third*, Defendants do not address Dr. Barden's qualifications and what Dr. Barden says on the subject of the 1 in 5 statistic and university victim-centered policies and procedures. Dr. Barden

---

[2] Defendants cite p. 50 of Plaintiff's Memorandum of Law, but the discussion occurs on p. 44.

discusses: the emergence of a false statistic of 1 in 5 college women being subject to sexual assault; a Department of Justice funded study showing that 90% of U.S. universities and colleges reporting zero rapes; the report of the Bureau of Statistics of the Department of Justice that college women were less likely to be the victims of sexual assault than their peers not enrolled in college and that the incidence of were sexual assault was far less than 1%; the letter of Harvard Law Professors harshly criticizing the victim-centered, trauma informed policies and procedures adopted by universities and colleges as a result of the 2011 Dear Colleague Letter, identifying the source as the "believe the victim" ideology; the essay of Harvard Law Professor Jeannie Suk on how fair process must always be open to the idea that either side might turn out to be correct, but such an approach violates the ideological tenet of always believing the accuser; and that recognition of such points does not allow for unrecorded, untranscribed Equity Committee proceedings where bias against men is free to operate. (ECF 187, Pl Opp DSJ 22; Barden Expert Report, pp. 6-7, 21-30.)

A jury will be assisted in hearing from Dr. Barden that a factual premise of the 2011 Dear Colleague Letter with respect to the incidence of sexual assault on university and college campuses is false and that victim-centered, trauma informed policies and procedures adopted by universities and colleges as a result of the 2011 Dear Colleague Letter are not justified but are gender biased. *Doe v. Embry-Riddle Aer Univ.*, Case No. 6:20-cv-1220-WWB-LRH, ECF 180 (M.D. Fla. Dec. 6, 2021) (expert testimony on Title IX history and sexual stereotypes admissible). A jury should not hear just Purdue administrators and investigators talk about sexual assault on campus requiring victim-centered measures as if 1 in 5 college women are being subject to sexual assault. But it is that very situation that Defendants seek with their motion.

## C.   Opinion No. 3: "Confirmation Bias".

The third opinion of Dr. Barden attacked by Defendants is for the part of his report concerning the point that Purdue officials suffered from the investigative defect of "confirmation

bias." Defendants argue that Dr. Barden is engaging in unsubstantiated characterizations of fact. (ECF 193, Df. Mem. 7-8.) Defendants are wrong again for several reasons.

### 1. "Confirmation Bias" Is An Investigative Defect, Not A Conclusory Characterization Of Fact.

*First*, Defendants erroneously call Dr. Barden's report on "confirmation bias" as characterization of fact. As noted above (ECF 193, pp. 3-4, 6), Dr. Barden's expertise includes "history-methodology-standards of care in criminal and related investigations" and "investigative methods and procedures," and Dr. Barden has applied that expertise to level a criticism of "confirmation bias" as to Purdue's investigation. As discussed below, Dr. Barden did not just assert conclusions but rather discussed at length the evidence. Defendants' argument to the contrary is false. (ECF 187, Pl Opp DSJ 22: Barden Report, pp. 2, 40-46.)

### 2. The Briefing Context In Which Dr. Barden Is Cited.

*Second*, Defendants do not convey the specific context in which Dr. Barden's opinion is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and thus do not deal with how Dr. Barden's testimony on this point properly helps John's Title IX case. Plaintiff's Memorandum of Law states (ECF 187, pp. 44-45)[3]:

> Defendants' third argument is that there was no gender bias in Purdue's evidence gathering. (Dfs. MOL pp. 42-43.) For this argument, Defendants' account of the investigation is inaccurate. As discussed above (pp. 13-14), John did not generally deny Jane Doe's accusation; he specifically denied them. Amberger and Oliver testified that John denied Jane Doe's accusations with respect to both allegedly touching her crotch (when the roommate was in the room) and the digital penetration that Jane Doe said she herself did not remember. (SJM 14: Amberger Dep tr 68-69; SJM 15: Oliver Dep tr 50-52.) John's roommate said he saw Jane Doe leave on the night she later said John touched her crotch area and she seemed normal. Jane Doe's RA described John as polite and friendly. Defendants significantly misstate the contents of Amberger's notes at PU 067-068 (SJM 18: Amberger/Oliver 25, Amberger Notes (PU 60-83): those notes do not reflect John

---

[3] Defendants cite p. 51 of Plaintiff's Memorandum of Law, but the discussion occurs on pp. 44-45.

being asked about the text "violating her," but rather they show John telling Amberger that he did not do what Jane Doe accused him of doing.

The investigation suffered from "confirmation bias" (Pl Opp DSJ 22: Barden Report, pp. 40-46) and reflected gender bias that manifested itself in differing unjustified treatment to the male John and the female Jane Doe.

### 3. Dr. Barden's Discussion and Assisting The Jury.

*Third*, Defendants do not address what Dr. Barden specifically says on the subject of "confirmation bias." Dr. Barden, in seven pages of text (ECF 187, Pl Opp DSJ 22: Barden Report, pp. 40-46), discusses at length the extremely flawed Purdue investigation in which the evidence was manipulated to "believe the woman" and disconfirming evidence was ignored. (*See* Pl. Opp. DDE 1: Barden Decl. pp. 16-20.)

Dr. Barden noted the disconfirming evidence ignored by the investigators: Jane Doe's texts that were friendly and inviting and seeking more time and attention from John (which were cut out from what was attached to the investigation report); the John-Jane Doe texts that showed their having a very close, almost married relationship; the multiple witnesses who disconfirmed Jane Doe's complaint about the stun baton; the multiple witnesses who disconfirmed Jane Doe's complaint about John having a temper problem; the Purdue investigators ignoring evidence supporting that Jane Doe was emotionally disturbed and supposedly had traumatic events in high school; the Purdue investigators ignoring Jane Doe's suicide attempt; the Purdue investigators ignoring the testimony of John's roommate; the Purdue investigators ignoring Jane Doe's expressed hatred for her Mother (Dr. Barden quotes Jane's text on this point); the Purdue investigators ignoring and failing to document the full sexual relationship of John and Jane Doe that was initiated by Jane Doe and that lasted several months; the Purdue investigators failing to ask Jane Doe about the timing of her accusations, five months after the suppose incidents of which Jane Doe complained; the Purdue investigators ignoring the possibility that Jane Doe sought with her

12

allegations to seek revenge on John for reporting her suicide attempt; the Purdue investigators interviewing Jane Doe a second time about the texts while John Doe was not asked about the interpretation of texts adopted by the investigators, in accordance with "believe the woman" mantra. *See Goswami v. DePaul Univ.*, 8 F. Supp.3d 1004, 1018 n. 11 (N. D. Ill. 2014) ("Confirmation bias is 'the well-documented tendency, once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment.'")

Dr. Barden further noted that the access to Jane Doe was controlled by CARE, which was the source of Jane Doe's unsworn, unsigned-unrecorded statement, and that the Dean's decision in John's case was conclusory without any rational discussion of alternative hypostasis and disconfirming evidence and without ever speaking with Jane Doe or seeing a sworn statement from Jane Doe – conduct that supports the hypothesis of a "believe the woman" process at Purdue.

Dr. Barden concludes that Purdue personnel failed to avoid confirmation bias by failing to generate and test any alternative hypothesis. Dr. Barden explains that confirmation bias has long been thought to be an important contaminating force against rational thought and analysis. Dr. Barden also faults Purdue's failure to record essential meetings and interviews and failure to obtain a sworn dated statement from Jane Doe

A jury will be assisted in hearing Dr. Barden, an expert in "investigative methods and procedures," provide a reasoned critique of the extremely flawed Purdue investigation that suffered from a "confirmation bias," explaining the manipulation of evidence and ignoring of disconfirming evidence. *See Jimenez v. City of Chicago*, 732 F.3d 710 (7th Cir. 2012) (expert testimony admissible on police investigations). A jury should not hear just Purdue administrators and investigators assert that the Purdue investigation was reasonable and deny that the Purdue investigation was gender biased. But it is that very situation that Defendants seek with their motion.

4.  **Inapposite Case Law Cited By Defendants.**

*Fourth*, Defendants ignore directly applicable case law that expressly recognizes confirmation bias as a proper subject for expert testimony, *U.S. v. Wells*, 2019 WL 3229912 *8 (D. Alaska July 17, 2019); *Rainsberger v. Benner*, 2019 WL 6131086 *4 (S.D. Ind. Nov. 18, 2019) (relies on *Jimenez*); *U.S. Comm. Fut. Trad. Comm. v. Oystacher*, 2016 WL 3693429 *33 (N.D. Ill. July 12, 2016).  Instead, Defendants cite four inapposite cases in an erroneous attempt to justify Defendants' argument that Dr. Barden's "confirmation bias" testimony is improper.  *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651 (7th Cir. 1998), was a product liability case in which gas station convenience store customers sued a coffee maker manufacturer and producers of styrofoam cup and lid, alleging that customer was burned when styrofoam cup collapsed as she removed lid while traveling in car; the proferred expert testimony that the styrofoam cup was negligently designed was ruled conclusory, which is certainly not the case here with Dr. Barden's "confirmation bias" testimony. *Huey v. UPS*, 165 F.3d 1084 (7th Cir. 1999), was a racial employment discrimination and retaliation suit dismissed on summary judgment; the excluded proferred expert testimony that the discharge was retaliatory was lacked supporting analysis, which again is certainly not the case here with Dr. Barden's "confirmation bias" testimony.  *Haynes v. Indiana Univ.*, 902 F.3d 724 (7th Cir. 2018), was a Title VII and §1981 racial discrimination suit brought by a black professor complaining about denial of tenure was dismissed on summary judgment; proferred expert testimony was excluded because it was from someone who was not qualified, which is certainly not the case here with Dr. Barden's "confirmation bias" testimony.  In *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919 (7th Cir. 2000), female grocery store employees brought class action against employer under Title VII and Equal Pay Act, alleging that produce workers, who were mostly men, received higher pay than bakery and deli workers, who were mostly women; the proferred expert

testimony was excluded because it was conclusory without supporting analysis, which yet again is certainly not the case here with Dr. Barden's "confirmation bias" testimony.

**D.   Opinion No. 4: Expert Reading of John-Jane Text Messages.**

The fourth opinion of Dr. Barden attacked by Defendants is for the part of his report concerning the point that the John-Jane text messages show Jane and John were close and that Jane was unstable and manipulative. Defendants try to attack Dr. Barden's expert reading of the John-Jane texts with four misconceived arguments. (ECF 193, Df. Mem. 8-10.)

**1.   John-Jane Closeness and Jane's Manipulation Are Material: The Briefing Context In Which Dr. Barden Is Cited.**

Defendants' first argument is to assert that there is no material issue about John and Jane being close and Jane being manipulative, as it does not relate to whether Purdue engaged in sex discrimination when disciplining John. Defendants, however, are flat wrong. Defendants do not address the specific context in which Dr. Barden's opinion about the John-Jane text messages is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (pp. 45-46),[4] which discussed the first way "confirmation bias" was demonstrated:

> *First*, as discussed above (pp. 13-15), investigator Amberger had e-mail exchanges with CARE's Monica Bloom about re-interviewing Jane Doe about the texts, which second interview was arranged and held, but the investigators Amberger and Oliver did not re-interview John in order to elicit his understanding of the texts. When asked why John was not interviewed a second time, Oliver said they had what was sufficient without asking John (Pl Opp DSJ 24: Oliver Dep tr 57) -- never mind that, as discussed above (pp. 13-15), (i) Jane Doe had deleted the texts and did not supply any texts, (ii) John had voluntarily provided the texts (which covered the period December 23, 2015 to March 15, 2016) in the belief the texts showed no sexual assaults had occurred, and (iii) both Amberger and Oliver admitted that there is no express statement in the texts in which John admitted engaging in any sexual misconduct or Jane Doe accused John of committing the sexual acts alleged in the Notice of Allegations. Yet, the investigators Amberger and Oliver relied upon and made a centerpiece of the investigation report's analysis what was a misinterpretation of a small portion of texts without even asking John about what

---

[4] Defendants cite p. 52 of Plaintiff's Memorandum of Law, but the discussion occurs on pp. 45-46.

was a misinterpretation; the investigators thus attached to the investigation report portions of only 7 pages out of the 133 pages of texts, which hid the texts showing Jane Doe and John having a close almost married-like relationship engaging in friendly banter and showing Jane Doe to be emotionally unstable and manipulative. (SJM 22: Amberger/Oliver 14, Investigation Report (PU 373-391), pp. 7-8, 10; Pl Opp DSJ 22: Barden Report, pp. 45-46; SJM 11: Amberger 27, Texts (PU 206-339).)

That the texts show that John and Jane Doe were close and Jane was manipulative is material because of how the texts were misrepresented in the investigation report. The texts showing that John and Jane Doe were close and Jane was manipulative were not attached to the investigation report, and such texts undercut the misinterpretation of the texts by the investigators, who attached only portions of 7 pages out of 133 pages of texts but who relied upon those few attached texts critically to bolster the case against John. Also, the texts showing that John and Jane Doe were close and Jane was manipulative is material because those texts called for the development of hypotheses to account for what happened between John and Jane Doe other than John engaging in the accused behavior (which John denied).

## 2. Dr. Barden Is Eminently Qualified To State What The Texts Showed.

Defendants' second argument is a misfocused denial of Dr. Barden's qualification to address what the texts showed as to the John-Jane relationship or Jane Doe's psychological state.

Defendants acknowledge that Dr. Barden is a psychologist, and Dr. Barden details his extensive qualifications in psychology and investigations (ECF 187, Pl Opp DSJ 22: Barden Report, pp. 3-6). Some of the credentials are summarized by Dr. Barden:

> I received my Ph.D. in clinical-child psychology from the University of Minnesota, an internationally respected, American Psychological Association accredited, training program in clinical psychology. I received additional graduate and clinical training at the University of California, Berkeley and at the Palo Alto U. S. V.A./ Stanford University Medical Center. . . . I am currently a licensed psychologist in the State of Minnesota (LP 1460) and in the State of Texas (LP 2-2624). . . . I have extensive clinical psychology experience in conducting psychotherapy and assessments in medical, outpatient, forensic, correctional, educational and inpatient settings working with a wide range of client populations including adults, children, adolescents, families, prison inmates, hospitalized inpatients, traumatized veterans,

16

surgical patients, pediatric patients, and other patient groups. . . . I have published in, and/or served as an editor or reviewer for, several of the most highly regarded journals and texts in psychology, medicine and law including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation. I have given invited addresses on a number of psychological topics to the American Bar Association, the American Psychological Association, the American Psychiatric Association, the U.S. Surgeon General's Conference, the International Association of Plastic and Reconstructive Surgeons and many other groups. I served a four-year term as a member of the Minnesota State Board of Psychology appointed by Governor Arne Carlson. Many of my invited addresses have focused on methodological and scientific problems in the mental health and criminal investigative systems. I have personally investigated — as an attorney and as a psychologist -- hundreds of cases of negligence, malpractice, and misconduct by mental health professionals and criminal investigators including cases of accurate, and/or tainted, and/or false memories of abuse. I have also been asked to consult with and/or train groups of law enforcement personnel — regarding the proper methodology for investigations — including sex abuse investigators and other officials as well as F.B.I. agents, police officials, U.S. Department of Justice U.S. Attorney's Office personnel and related professionals. I served as a Special Assistant Attorney General for the State of Utah helping to prosecute licensing violations and misconduct by mental health professionals. . . . One of my main areas of concentration as a clinical psychologist-scientist-investigations expert has been to protect the mental health, legal, and criminal justice systems from misleading psychological myths and unreliable methodologies including but not limited to helping courts and professionals understand the methodology of reliable investigations, the science of human memory, the science of memory contamination (including the risks of false memories induced by poorly trained psychotherapists and/or investigators), the risks of improper-unreliable interviewing/therapy methods, proper and improper uses of psychological testing, the risks of reliance upon "clinical judgment" methods, the well-documented limitations of "professional expertise" in the psychotherapy and investigative professions, the well-documented inability of psychotherapists and investigators to reliably distinguish true from false witness (or patient) statements in the absence of corroborating evidence, ethical and standard of care rules requiring therapists and investigators of all kinds to fully, fairly, honestly, and accurately disclose to attorneys-patients-courts-officials-committees-the public the methodological limitations and defects in their practices, the risk of missing-hidden and/or manipulated evidence, the risks of failing to generate and test alternative investigative hypotheses, and related issues.

What Defendants do is to cite Dr. Barden's limitation of his report as not involving evaluations or diagnoses of individuals in order to jump to the conclusion that Dr. Barden cannot

testify about how close the relationship was between John and Jane and about Jane's psychological state. But that is not what Dr. Barden has done, and the case cited by Defendants on this point, *Palmer v. Indiana Univ.*, 2021 WL 914030, is a Title VII race failure to promote discrimination case that, as discussed above (p. 7), is way off point.

The John-Jane texts and John's sworn testimony about his relationship with Jane are in the summary judgment record (ECF 183, SJM 11: Amberger 27, Texts (PU 206-339), SJM 8: John Doe 02/18/2021 Affidavit ¶ 15) and were reviewed by Dr. Barden (ECF 187, Pl Opp DSJ 22: Barden Report, p. 103). According to John, the "texts reflected the fact that Jane Doe and [he] did have a deeply personal relationship developed in part through sexual intercourse," the "relationship was still intimate enough that she sent [John's] family Christmas cookies, and we messaged one another frequently," and the "texts also reflected Jane Doe's difficult relationship with her mother and family, a fact she used at times to answer [John's] questions to her about being unhappy, and also a fact that motivated her unfair behavior towards [John]," and that he "became more apologetic towards Jane Doe the more she directed negativity towards [John]." (ECF 183, SJM 8: John Doe 02/18/2021 Affidavit ¶ 15.) Dr. Barden is an expert also in "investigative methods and procedures" and "history-methodology-standards of care in criminal and related investigations" (ECF 187, Pl Opp DSJ 22: Barden Report, pp. 2-6), and Dr. Barden in reading the texts properly stated that they do show Jane and John having a close, married-like relationship and Jane Doe being manipulative, requiring alternative hypotheses. (Pl. Opp. DDE 1: Barden Decl. pp. 28-29.)

### 3. **The Characterization Of Jane Doe As "Manipulative" In The Texts Is Proper.**

Defendants' third argument is to assert that Dr. Barden's opinion that the texts reflect Jane being manipulative is making an improper character reference. That is not what Dr. Barden is doing. As noted above, however, the texts were in the summary judgment record (SJM 11: Amberger 27, Texts (PU 206-339)) and were reviewed by Dr. Barden (ECF 187, Pl Opp DSJ 22:

Barden Report, p. 103), who characterized the conduct of Jane Doe from what was in the texts and who is expert also in "investigative methods and procedures" and "history-methodology-standards of care in criminal and related investigations" (ECF 187, Pl Opp DSJ 22: Barden Report, pp. 2-6).

### 4.  Jane Being Suicidal and Mentally Troubled Is Relevant and Material.

Defendants' fourth argument is that it is not relevant and not material that Jane Doe was suicidal and mentally troubled even if true.  Defendants' argument is hard to fathom.  John in his deposition explained that the "context" of Jane Doe's suicide attempt was important in understanding the texts. (ECF 183, SJM 5: Plaintiff John Doe Dep. tr 121-123.)  Also, that the texts showed Jane Doe was suicidal and mentally troubled undercuts her accusations of sexual misconduct against John and supports John's case that Jane Doe sought with her misconduct allegations to seek revenge on John for reporting her suicide attempt.  Dr. Barden certainly recognized that significance.  (ECF 187, Pl Opp DSJ 22: Barden Report p. 42.)

### 5.  Dr. Barden's Discussion and Assisting The Jury.

A jury will be assisted in hearing Dr. Barden, a psychologist and an expert in "investigative methods and procedures," provide a reasoned critique of the John-Jane Doe texts, explaining what they show with respect to the relationship of John and Jane Doe and Jane Doe's conduct.  A jury should not hear just Purdue administrators and investigators assert their misinterpretation that the John-Jane Doe texts showed John was guilty.  But it is that very situation that Defendants seek with their motion.

### E.    Opinion No. 5: No Basis For Sermersheim To Rule Without Hearing Jane.

The fifth opinion of Dr. Barden attacked by Defendants is for the part of his report concerning the opinion that there was no basis for Dean Sermersheim to rule against John without hearing directly from Jane Doe and there was no basis for Dean Sermersheim to rely upon a

purported unsworn statement from Jane Doe lacking a chain of custody from CARE. (ECF 193, Dfs. Mem. 10-11.) Defendants' attack is misconceived.

### 1. Defendants Evade The Issue: The Briefing Context In Which Dr. Barden Is Cited.

Defendants argue, in a piece of misdirection, that the jury will not be assisted because there is no material issue of fact regarding whether Dean Sermersheim received a sworn statement from Jane Doe, whether there was chain of custody for Jane Doe's statement and whether Dean Sermmsheim relied upon the available evidence from Jane Doe. But Defendants, by talking about whether a material issue exists, evade Dr. Barden's points: (i) that Dean Sermersheim had no justification for making a decision crediting Jane Doe and adverse to John without hearing in person from Jane Doe; and (ii) that Dean Sermersheim had no justification for relying upon a purported unsworn statement from Jane Doe lacking a chain of custody from CARE. Thus, Defendants do not address the specific context in which Dr. Barden's opinion is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (p. 49)[5]:

> Defendants, by ignoring Judge Barrett's opinion, do not deal with the applicable legal question -- does the evidence show John was discriminated against on the basis of sex? That question does not establish that John has a burden to show the absence of a reasonable basis for the decision. Defendants also fail to demonstrate that there was a reasonable basis for the decision to suspend John. As Judge Barrett points out, Dean Sermersheim found Jane Doe credible and John not credible despite not seeing and hearing from Jane Doe in person. There was no justification for Dean Sermersheim making a decision adverse to John without seeing and hearing from Jane Doe in person and instead relying upon a written statement sent by CARE Director Bloom having no documented chain of custody for Jane Doe's statement and no supporting sworn statement by Jane Doe. (*See* Pl Opp DSJ 22: Barden Report, pp. 46-48.) As discussed above (pp. 14-16, 45-46), Dean Sermersheim and Vice President Rollack did not know there were 133 pages of texts and what was in them; the misinterpretation of the texts shows discrimination, and the texts when read in their entirety do not support the disciplinary decision.

[5] Defendants cite p. 55 of Plaintiff's Memorandum of Law, but the discussion occurs on p. 49.

**2. Defendants Fail To Address What Dr. Barden Stated As To Dean Sermersheim Ruling without Hearing From Jane; Dr. Barden's Discussion and Assisting The Jury.**

Defendants also complain, in another piece of misdirection, about the lack of methodology for Dr. Barden's opinion, saying that Dr. Barden does not show having a methodology concerning at pages 45-46 of his report supporting his opinion that there was no basis for Dean Sermersheim to rule against John without hearing directly from Jane Doe and there was no basis for Dean Sermersheim to rely upon a purported unsworn statement from Jane Doe lacking a chain of custody from CARE. In support, Defendants cite to the same four inapposite cases discussed above (pp. 14-15) in connection with Defendants' erroneous attempt to justify excluding Dr. Barden from testifying about "confirmation bias." Dr. Barden's discussion of his opinion, however, begins at the bottom of page 46 and continues over to page 48 of his report, and Defendants fail to address adequately what Dr. Barden states on those pages in support of his opinion. That discussion makes the cases cited by Defendants inapposite as well to Dr. Barden's opinion there was no basis for Dean Sermersheim to rule against John without hearing directly from Jane Doe and there was no basis for Dean Sermersheim to rely upon a purported unsworn statement from Jane Doe lacking a chain of custody from CARE.

Dr. Barden's report recounts the undisputed facts that Dean Sermersheim did not see, did not hear and did not personally assess the truthfulness and accuracy of Jane Doe concerning Jane Doe's allegations; that there was no properly documented chain of custody for the statement attributed by Jane Doe; that Jane Doe never provided a sworn, recorded, signed statement of any kind at any time; and that Jane Doe had not made her accusations of sexual misconduct to Purdue for many months after the supposed occurrences. Yet, Dean Sermersheim acted as the decision-maker crediting Jane Doe and finding John guilty. Defendants' apparent position is that what Dean Sermersheim did was just fine, but Dr. Barden makes clear it was not just fine.

A jury will be assisted in hearing Dr. Barden, a psychologist and an expert in "investigative methods and procedures," explain the failing of Dean Sermersheim as decision-maker in not personally hearing from Jane and relying instead upon an unsworn statement lacking a chain of custody from CARE.   A jury should not hear just Purdue administrators assert what Dean Sermersheim did in finding John guilty was appropriate educational treatment. But it is that very situation that Defendants seek with their motion.

**F.    Opinion No. 6: Purdue Ignored Jane's Emotional Issues.**

The sixth opinion of Dr. Barden attacked by Defendants is for the part of his report concerning the point that that Purdue ignored Jane's "emotional issues."  (ECF 193, Dfs. Mem. 11.) In doing so, Defendants do not address the specific context in which Dr. Barden's opinion is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (p. 50)[6]:

> Defendants finally complain, wrongly, that John never backed up his position that Jane Doe had emotional issues. John filed a report with Purdue about Jane Doe's suicide attempt (SJM 33: 02/16/2016 Student of Concern Report (PU 32-33)), and he brought the matter to the attention of the investigators who essentially ignored the problem, which Dr. Barden faults as one of many failures in the investigation (Pl Opp DSJ 22: Barden Report, p. 41.). The investigators learned of the university report made by John and were told by John and John's roommate about Jane Doe's suicide attempt (Pl Opp DSJ 25: Amberger Dep tr 24-26, 36; Pl Opp DSJ 24: Oliver Dep tr 49); however, the investigators did not consider the suicide attempt in assessment of Jane Doe's credibility (Pl Opp DSJ 24: Oliver Dep tr 67-68; Pl Opp DSJ 25: Amberger Dep tr 88) and the investigation report downplayed it as Jane Doe merely considering suicide and not actually making an attempt (Pl Opp DSJ 25: Amberger Dep tr 67).

Defendants wrongly argue that there is no stated basis for Dr. Barden to opine that Purdue ignored Jane's "emotional issues"; and Defendants cite to the same four inapposite cases discussed

---

[6] Defendants cite p. 56 of Plaintiff's Memorandum of Law, but the discussion occurs on p. 50.

above (pp. 13-14) in connection with Defendants' erroneous attempt to justify excluding Dr. Barden from testifying about "confirmation bias." In fact, Dr. Barden cites to the record evidence (also referred to in Plaintiff's Memorandum of Law) of multiple witnesses (John and his roommate) and text evidence that clearly pointed to Jane Doe having emotional problems. (ECF 187, Pl Opp DSJ 22 & Pl. Opp. DDE 2: Barden Report p. 41.) The cases cited by Defendants are not applicable.

A jury will be assisted in hearing Dr. Barden, a psychologist and an expert in "investigative methods and procedures," explain the failing of Purdue administrators and investigators to address Jane Doe's emotional problems and suicide attempt. A jury should not hear just Purdue administrators and investigators shrug off the evidence of Jane Doe's emotional problems and suicide attempt as inconsequential.

## III.  DEFENDANTS' TWO GENERAL OBJECTIONS TO DR. BARDEN'S TESTIMONY ARE WITHOUT MERIT.

Defendants additionally make two general objections to Dr. Barden's testimony. Both are without merit.

### A.  University Experience.

Defendants' first general objection is that Dr. Barden is not competent to speak about Purdue's policies, investigation, training, or decisions because he has no experience in working for universities or doing a university investigation. (ECF 193, Dfs. Mem. 11-12.) Defendants ignore the point quoted above from the Barden report (p. 4), that Dr. Barden has given "invited training talks at the United States Military Academy at West Point, regional F.B.I. training meetings, the Minnesota Sex Crimes Investigators Assn, the Midwestern Sex Crimes Investigators Assn, and many institutions including Harvard Law School, Harvard College, Yale, Columbia, for Oxford University Press, the University of Southern California, Penn State, and the State Universities of California, Minnesota, Georgia, Texas, Washington, North Carolina." (ECF 187, Pl Opp DSJ 22

& Pl Opp DDE 2: Barden Report p. 2.)  Defendants' objection is illogical. (Pl. Opp. DDE 1: Barden Decl. pp. 20-22.)

Furthermore, the one and only case cited by Defendants does not support them.  As noted above (p. 7), *Palmer v. Indiana Univ.*, 2021 WL 914030, was a Title VII case complaining about alleged racial discrimination in failure to promote a black IU professor; expert testimony in differences in pay, teaching opportunities and office space was deemed unnecessary to consider whether there was disparate treatment of a white comparator. In distinct contrast, the case law supports the conclusion that the lack of specific experience as a Title IX university officer does not render her unqualified to opine on the investigation and decision-making in a Title IX case in the university context.  *See Washington v. Kellwood Co.*, 105 F. Supp.3d 293, 308–309 (S.D.N.Y. 2015) (holding that a witness with expertise in business valuation need not have specific expertise in the apparel industry in order to testify to the valuation of an apparel-related enterprise); *Wechsler v. Hunt Health Sys., Ltd.*, 381 F.Supp.2d 135, 142–143 (S.D.N.Y. 2003) (rejecting the argument that an accountant lacking experience in the healthcare industry was unqualified to testify to the financial condition of a healthcare company); *Foster v. Trollhaugen, Inc.*, 2008 WL 5431178, at *7 (D. Minn. Sept. 12, 2008) ("there is no requirement that Bayer have personally snow tubed in order to render an opinion regarding the accident"); *Engler v. MTD Prods., Inc.*, 2015 WL 900126 at * 8 (N.D.N.Y. Mar. 2, 2015) ("When an expert's background is in a 'general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent.").  The Second Circuit in *Stagl v. Delta Airlines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997), reversed as an abuse of discretion the district court's exclusion of an expert, warning against requiring experts to be specifically qualified in the industry because it limits the availability of experts.

**B.**    <u>**Helpfulness To Jury.**</u>

Defendants' second general objection is that expert testimony is unnecessary in a Title IX case such as this one because "nuanced" facts are at issue.  (ECF 193, Dfs. Mem. 12-13.)  The short answer is that the review of the six disputed opinions of Dr. Barden (pp. 4-23 above) reveals how Dr. Barden's testimony will be helpful to assist the jury so that the jury does not hear just Purdue administrators and investigate rationalize their actions and decisions.

As noted at the outset, Defendants, by seeking to exclude Dr. Barden, seek to immunize Purdue's disciplinary process from expert analysis and leave in place the rationalizations of Purdue administrators that resulted in sex discrimination.  The irrationality of that effort is demonstrated in the Declaration of Dr. Barden, contrasting his qualifications with the lack of qualifications of the Purdue investigators and administrators.  (Pl Opp DDE 1: Barden Decl. pp. 4-5.)

<u>CONCLUSION</u>

For the reasons stated above, Defendants' *Daubert* motion to exclude the expert testimony of Dr. R. Chris Barden should be denied, and the Court should grant such further and other relief as deemed just and proper.

Dated: **January 6, 2022**                 **Respectfully submitted,**
                                           **NESENOFF & MILTENBERG, LLP**
                                           **By: /s/** *Philip A. Byler*
                                           **Philip A. Byler, Esq.**
                                           **Andrew T. Miltenberg, Esq.**
                                           **363 Seventh Avenue, Fifth Floor**
                                           **New York, New York 10001**
                                           **(212) 736-4500**
                                           **pbyler@nmllplaw.com**
                                           **amiltenberg@nmllplaw.com**
                                           *Attorneys for Plaintiff John Doe*

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this document was served upon the attorneys of record for

each party to the above-entitled cause at the address shown below on January 6, 2022:

William P. Kealey, Esq.
Tyler L. Jones, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
      tlj@stuartlaw.com
*Attorneys for Defendants*

BY:   ☐  U.S. Mail     ☐    Federal Express

        ☐  Hand-Delivery   x    <u>Other: ECF</u>

_____*Philip A. Byler, Esq.*_____
     Philip A. Byler, Esq.

26