PL Opp DDE 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | **)** | |
| | **)** | **CIVIL ACTION** |
| Plaintiff, | **)** | |
| v. | **)** | |
| | **)** | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | **)** | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | **)** | |
| **DANIELS, JR.**, in his official capacity as President of | **)** | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | **)** | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | **)** | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | **)** | |
| | **)** | |
| Defendants. | **)** | |

### R. Christopher Barden, Ph.D., JD, LP Expert Opinion Addendum of Jan 5, 2022

**R. CHRISTOPHER BARDEN, Ph.D., JD, LP hereby declares subject to the**

**penalties of perjury pursuant to 28 U.S.C. § 1746**

1.      **This Addendum and My Initial Filed Expert Report are Both Affirmed**

**Under Oath.**  I, R. Chris Barden, Ph.D., JD do swear and affirm the truthfulness of this

Addendum and also my Initial Expert Witness Report in this matter as filed.  This update is

subject to time limitations.

2.      **This Addendum Opinion Incorporates My Initial Filed Report.**  This

addendum opinion includes, incorporates, and relies upon my previously stated detailed opinions

and investigative hypotheses in this case (See, previously filed report). My previous and

incorporated opinions include statements regarding the limitations on expert witness analysis and

opinions as well as the listing of evidentiary, educational, scientific, clinical and other bases for

my opinions.   As with my previous opinions, these additional opinions are offered to a

reasonable degree of professional and scientific certainty.

**3**.      **My Opinions In this Case Are the Product of the Most Informed, Most**

**Rigorous, and Most Reliable Methodological Standards. My Opinions in this Case are**

**Quite Consistent with Those of the Relevant Scientific Community**. To ensure the reliability,

validity, consistency, and accuracy of my opinions in this case I have followed a very strict and

exemplary methodology that should serve as a model for expert witnesses in federal litigation.

3A.  **Acquire and demonstrate expert knowledge of the relevant standards for expert**

**testimony**. I have published peer reviewed articles on the importance of the proper use of

scientific methodologies and Daubert-Kumho analyses and standards to protect the integrity of

the legal process. These articles have been published in some of most authoritative and respected

journals and texts in the world including *Psychology, Public Policy, and Law* and with the

Oxford University Press. (See, e.g. Grove, W. M. and Barden, R.C. (2000). 'Protecting the

integrity of the legal system: The Admissibility of Testimony from mental health experts under

daubert/kumho analyses.' *Psychology, Public Policy and Law*, *5(1)*, 234-242.  Excerpts reprinted

in Fisher, G. *Evidence*: University Casebook Series (2002), Foundation Press – West Group, New

York, p. 688. I have also given invited training addresses on such issues to conventions of

attorneys, to continuing education groups in law-psychology-social work-psychiatry, to the

national convention of the American Bar Association Litigation Section, as well as to state and

federal judges including an invited training presentation at the request of the US 9th Circuit

Court of Appeals Program Office. (See, Resume).

Dr Barden Expert Addendum Report of Jan. 5, 2022

3B.  **Cite to and quote from peer reviewed published research articles and texts from some of the most reliable sources in the world with many published by world experts in the relevant fields**.  As someone who has performed editorial duties for leading journals and texts in psychology, medicine, law, and public policy, I am quite familiar with assessing the quality of research and other journal articles and the specifics of how to review and assess the methodological soundness, reliability, and validity of scientific research. In my reports in this case I cite in detail — with quotes and full citations — to the highest quality research often conducted by the most esteemed and methodologically sophisticated world experts in the field. I have known many of the world experts in the relevant field for many years. I am quite prepared to testify in great detail about the research methodology of any specific study I cite to and quote from in my reports.

3C.  **Form Opinions and Testify With Sufficient Knowledge, Training, and Experience to clearly be a member of the Relevant Scientific Community**.  Over a period of decades I have acquired, knowledge, training and experience that qualify me as a member of the "Relevant Scientific Community" (RSC) in the areas related to my opinions in this case.  In my opinion — this is a scientific, not a legal opinion —  the Relevant Scientific Community is the group of science experts like myself who actually "create, publish, and critique science", have received funding from Federal-State-Private research grants, have engaged in editorial duties for peer reviewed scientific journals, have given invited addresses at national science conventions, have received national science awards, have given invited addresses at national universities, have given invited addresses at the US Surgeon General's Conference, and other indications.)  It is my understanding on this record, that I am currently the *only* member of the relevant scientific

Dr Barden Expert Addendum Report of Jan. 5, 2022

community involved in any way at any time in this case including at all stages of Purdue's

"investigation".  I hope the following summary chart will be helpful to identify some of the

differences between my knowledge, training, and experience as compared to less qualified

experts that often testify in state and federal cases as well as the apparently science-illiterate

Purdue staff-investigators-administrators in this case.

### QUALIFICATIONS COMPARISON CHART:

| Criteria : | *Typical experts and Purdue Staff* | *Relevant Sci. Comm. Dr. Barden* |
|---|---|---|
| -Received national science award(s) | No | Yes |
| -Ph.D. from a leading (top 2) university | No | Yes |
| -JD from a leading (top 2) university | No | Yes |
| -Psychology Faculty Position at a leading University | No | Yes |
| -Medical Faculty Position at a leading University | No | Yes |
| -Law School Faculty Position at a leading University | No | Yes |
| -Published in leading child psychology journals/texts? | No | Yes |
| -Published in leading pediatric journals/texts? | No | Yes |
| -Published in leading social psychology journals/texts? | No | Yes |
| -Published in leading clinical psychology journals/texts? | No | Yes |
| -Published in leading psychiatric journals/texts? | No | Yes |
| -Published in leading surgical journals/texts? | No | Yes |
| -Published in leading legal/ethics journals/texts? | No | Yes |
| -Received Federal grant funds as P.I. to conduct research?   Note: P.I. means principal investigator (Scientist in Charge) | No | Yes |
| -Received State grant funds as P.I. to conduct research? | No | Yes |
| -Received Private grant funds as P.I.  to conduct research? | No | Yes |
| -Given invited addresses at the national convention of psychologists  (APA) | No | Yes |
| -Given invited addresses at the national convention of psychiatrists (APA) | No | Yes |
| -Given invited addresses at the national convention of lawyers re: expert witnesses (ABA) | No | Yes |
| -Given invited addresses at the US Surgeon General's Conference? | No | Yes |
| -Given invited addresses at Harvard University? | No | Yes |
| -Given invited addresses at Harvard Law School? | No | Yes |
| -Given invited addresses at Yale University? | No | Yes |
| -Given invited addresses at Columbia University? | No | Yes |
| -Given invited addresses at University of Southern Ca. ? | No | Yes |
| -Given invited addresses at University of Texas? | No | Yes |
| -Given invited addresses at University of Georgia? | No | Yes |
| -Given invited addresses at University of Iowa? | No | Yes |
| -Given invited addresses at University of California? | No | Yes |
| -Given invited addresses at University of Minnesota? | No | Yes |
| -Given invited training addresses to Federal Judges? | No | Yes |
| -Given invited training addresses to State Judges? | No | Yes |

| | | |
|---|---|---|
| -Given invited training addresses to the F.B.I.? | No | Yes |
| -Given invited training addresses to Sex Crimes Investigators Associations? | No | Yes |
| -Given invited training addresses to over 10,000 psychologists, social workers, MDs? | No | Yes |
| -Published with Oxford University Press? | No | Yes |
| -Editorial position(s) for leading Psychiatric Journals? | No | Yes |
| -Editorial position(s) for leading Law/Public Policy Journals? | No | Yes |
| -Editorial position(s) for leading Child Psychology Journals? | No | Yes |
| -Editorial position(s) for leading Social Psychology Journals? | No | Yes |
| -Editorial position(s) for leading Law/Public Policy Journals? | No | Yes |
| -State Government Appointment to Licensing Board? | No | Yes |
| -Served as Special Asst. Attorney General to prosecute Health Care Licensing Violations? | No | Yes |
| - Served as Expert Consultant on many licensing in prosecutions many jurisdictions? | No | Yes |
| -Successful exclusion of unreliable (junk) social science in multiple Daubert-Kumho hearings in multiple jurisdictions? | No | Yes |

### 3D.  Form Opinions and Testify With Sufficient Knowledge, Training, and Experience Such That No Opposing Expert Can Be Found to Disagree With My Opinions.

In *most* of my cases over the past 10 years, opposing counsel cannot find *any* expert to oppose my expert opinions. In this case, early on in the process of reviewing the evidence, I predicted that Purdue counsel would not be able to locate *any* credible expert from *any* profession (science, psychology, psychiatry, etc) to oppose my opinions or question my research summaries and analyses in this case.  Simply stated, the "investigation" errors by Purdue in this case are so signifiant, extreme, irrational, numerous, politicized, reckless, and so well-documented that in my view it would be quite unlikely that the defendants could find any expert witness foolish enough to risk a licensing prosecution by supporting Purdue's grossly defective, politicized, "investigation" methodologies (e.g., no recorded interviews of the alleged victim (AV) were made, no signed witness statements were obtained from the AV, the AV was not required to appear at any hearing or meeting with fact finders, no transcript(s) were made of any interview with the AV, Purdue investigators ignored or actively suppressed multiple disconfirming facts,

the Purdue Dean claimed he formed an "opinion" about the AV's credibility without ever meeting or speaking with the AV or seeing a video, the AV apparently reported no "memories" of abuse until after contacts with Purdue's politicized, anti-male CARE program, the CARE program appears based on a radical Victim Centered, Anti-Male ideology even posting viciously anti-male propaganda from the Washington Post (as documented in a US Court of Appeals decision), Purdue "investigators" attempted no follow-up interviews seeking the defendant's version of a large series of quite ambiguous texts, etc. All of these errors by Purdue are extreme, rare, and highly improper methodological failures contrary to what any science-informed organization would have done. Such errors demonstrate an historic failure to understand and properly apply A) the basic science of memory, B) the history-science of false memory, C) the science warning of the dangers of confirmation bias (e.g., Purdue's failure to consider and test alternative hypotheses while blatantly ignoring disconfirming evidence), and D) other essential, foundational knowledge essential for proper investigations (See, Dr Barden's initial filed report for numerous citations and summaries of the relevant science).

4.      **Protecting the Integrity of the Legal System.**  As a national expert in psychology, memory, contaminated memory, scientific methodology, confirmation bias, the scientific methodology of investigations, the history of unreliable-pseudo-science theories and practices in social science and investigations, psychopathology-assessment-psychotherapies, the contamination of science-investigation practices with political ideologies and related issues, I have testified in many cases in many jurisdictions. In virtually all of those cases, a pro forma motion of some kind is made to exclude or limit my testimony — as in this case.  All of those motions in all of those cases failed.  I testified in those cases as I will in this one to assist the

court and inform the legal process by explicating complex issues such as reliable and unreliable

investigation methodologies, the dangers of confirmation bias, the science of human memory, the

science of memory contamination processes and false memories, the science of victim interview

methodologies and protocols, the scientific history of ideologically tainted investigation-therapy

practices, the dangers of investigations tainted by confirmation bias, and related topics — all of

which are quite unknown by most laypersons, most jurors, and many if not most legal

professionals. (See scientific citations on this issue below).  In some cases, attorneys seeking my

exclusion failed to provide *any* opposing science-informed, expert witness opinion or analysis to

rebut *any* of my analyses — as in this case.  Such "lawyer argument only" motions, devoid of

any science-informed expert analysis or opinions, often mischaracterize, misstate, and or

misunderstand expert science opinions and demonstrate the general lack of scientific

background, knowledge, training, and understanding that commonly results from even the best

legal JD-only education.  Such uni-disciplinary (JD-only analysis) confusion is the very reason

why multi-disciplinary analyses — including scientifically literate and informed expert

testimony from a member of the relevant scientific community — and detailed discussions-cross

examinations in open court are all essential for *protecting the integrity of the legal process* in

cases involving complex scientific and methodological issues — as in this case.  See, e.g.,

Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The

Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses,

Psychology, Public Policy and Law, Vol 5, No. 1, 234-242.

**5.**    **Errors of Logic and Methodology**:  In reviewing the motion seeking to exclude my testimony I noted a number of errors of logic and methodology as well as misstatements and/or misunderstandings of my opinions.

**5A.**    **Dr Barden did indeed cite to specific pages of transcripts.**  Contrary to Purdue's motion to exclude, Dr Barden did indeed cite in his Initial Report to specific pages in transcripts. (See, Initial Report specific cites and specific cites below).  In addition, as often happened in this case, when essential, basic scientific knowledge and methodological knowledge and knowledge of basic investigational practices are missing from an *entire* deposition or document, demands for cites to "specific pages" makes no logical sense since the _absence_ of competent practice and knowledge is evident on *all* pages.

**5 B.    Purdue failed to apply scientific knowledge and instead sought out and applied junk science, unreliable, politicized misinformation designed to facilitate creative, "individual narratives" rather than seek objective truth via proper investigations and hearings.**  A key opinion — still unrebutted and uncontested — based on a detailed review of the mountain of evidence in this case and as cited in my initial report — the Purdue staff, and all of them, utterly failed (due to science-illiterate ignorance and/or gender-biased ideology and/or another as yet undisclosed rationale) to conduct a credible, proper, competent, reliable, investigation.  It is further my opinion that the Purdue staff tragically failed to properly apply even the most minimal, basic understanding of the science of memory, the science of memory contamination, the dangers of confirmation bias and other key knowledge required for competent investigations. For example, Purdue staff seemed oddly unaware of the universally recognized and essential need to *properly record interviews to protect against contaminating the memories*

*of victims with improper questioning.  Similarly, Purdue's other extreme failures of investigation (as listed below and in my initial report) were clear violations of* universally accepted *principles and methods based on foundational, broadly accepted, very reliable science* that serves as the standard bases for investigations throughout the US — from small towns to the largest cities.  I explained this foundational science in great detail in my initial report in this case and documented my opinions with many citations to and quotes from the highest quality, peer reviewed science publications — all accepted as reliable by the relevant scientific community — and often written by world experts many of whom I have known personally for decades.

Contrary to the motion to exclude, I carefully cited peer reviewed published articles serving as the basis for my opinions as well as detailed summary discussions of the relevant science as well as detailed citations to the large record I reviewed in this matter. As a member of the relevant scientific community, I am quite sure that my methods and opinions are accepted as reliable by the relevant scientific community. (See for example the citation in my Initial Report to my own Amicus Briefs supported and signed by *dozens of the world's leading science experts in relevant fields.* )

Given the highly unusual care and rare quality processes applied in this case to form, document, and support my opinions, to the best of my knowledge, no credible expert in the US will dare to disagree with my science-related opinions on Purdue's egregious failures in this case — and on this record, none have.   For example:

— It is my opinion, that there was no _rational_ or scientific basis on this record for Jane Doe being found credible when she reportedly *never* appeared in person at any hearing, *never* signed a sworn witness statement, and was *never* examined even once in a properly recorded

interview.  In contrast, Purdue's failed process is quite consistent with radical feminist ideology

so typical of many Community Psychologists such as R. Campbell, Purdue's chosen trainer. A

key feature of such radical feminist ideology is that women should be free to create a personal

narrative that all must "believe" and "objective reality" doesn't matter.  In fact, Purdue's errors

all the way down the line appear quite consistent with, and are predicted with specificity by, the

political ideology of radical feminist Community Psychology. See, e.g., all-to-typical

Community Psychology ideology as well-documented in Campbell, R. and Wasco, S., Feminist

Approaches to Social Science: Epistemological and Methodological Tenets,  American Journal of

Community Psychology, Vol. 28, No. 6, 2000 and also the detailed discussion in my initial report

(pg 83-85… quoting…*"reality" is socially constructed*. Social factors, such as gender, race,

class, culture, and economics are not merely lenses through which we see reality, they are agents

shaping how ***we construct our visions of what constitutes our individual realities***. **There is no**

**"real" reality**, **no single truth, but** *multiple truths that are individually constructed"*.  It

appears on this record that Purdue was following just such radical, irrational, anti-science

ideologies.

As Purdue followed this politicized path, there was, of course, no need to properly

question Jane Doe, nor properly cross examine Jane Doe, nor record Jane Doe's witness

statement, nor even for the Dean to meet Jane Doe because *Purdue was not seeking objective*

*truth* but clearly facilitating Jane Doe's process as she freely "constructed her own individual

reality".  This is also why Purdue's apparent strategy of "Believe All Women regardless of

Changing, Morphing, Discrepant, Disconfirmed, Narratives (and don't believe Men)" actually

makes sense in the Alice-In-Wonderland world of radical feminist ideology and critical theory

that believes in "individualized narrative realities" and disparages the "objective truth" sought by actual, competent investigations, scientists, and the legal process.

In my opinion, such radical, gender-biased, irrational ideology is, of course, the polar opposite of competent, reliable, science and actual, competent investigations.  Such radical ideologies are the opposite of the reliable information sought by the Daubert-Kumho process (this is my scientific opinion as an expert witness who must work with the Daubert-Kumho standards and not a legal opinion).

Purdue's clear choice of political ideology over science appears to explain with great clarity why Purdue apparently ignored virtually all of the relevant science and ignored world expert training in memory and investigations from institutions like Harvard (R. McNally), U of CA (E. Loftus), Cornell (S. Ceci), Oxford (M. Lamb) or other institutions, and ignored the DOJ instructions regarding investigating alternative hypotheses to avoid confirmation bias as *essential* to the integrity of investigations,  and instead sought training with a rogue, gender-biased, radical "Community Psychologist"such as Dr. R. Campbell. This was a fatal decision for the integrity and reliability of Purdue's investigation processes.  (See, Deposition of Jacob Amberger at page 10 and especially the Oliver Deposition at ***page 9*** as Oliver documents training with Dr R. Campbell**.**  See also, Purdue "Center for Advocacy Response and Education" "Believe the Women (but not the Men)" training as well as blatantly anti-male CARE hashtags and viciously anti-male postings at CARE as documented by Judge A.C. Barrett's opinion in this case citing to Wash Post anti-male propaganda publicly posted by Purdue's CARE.   See also, Dr Barden's detailed initial report in this case and the Transcript "The Neurobiology of Sexual Assault", An NIJ Research for the Real World Seminar  by Rebecca Campbell , Ph.D., Michigan State

University,  December 3, 2012 … See,  https://nij.gov/multimedia/presenter/presenter-campbell/

pages/presenter-campbell-transcript.aspx (accessed June 6, 2018).

Contrary to the defense motion, on this record uncontested testimony shows that Purdue

recklessly relied upon Dr. Campbell's junk science, politicized methods including her so-called

"Neurobiology of Trauma" training. Purdue's reliance upon Dr Campbell is fully documented in

my specific cite to the Deposition of Erin Oliver [ Associate Director of Purdue's Office of

Institutional Equity, one of the staff appointed to investigate this matter ] **at page 9** (cited with

specificity at page 33 of my Initial Report):   5 Q Did you receive any training in terms 6 of

trauma, of complainants? 7 A Yes. 8 Q What was that training? 9 A *Neurobiology of trauma*.

How brains 10 code memories, do not code memories, during 11 traumatic instances. That is

really, all I recall 12 from the trainings. 13 Q Do you recall who provided that kind of 14 trauma

training? 15 A I believe *there was a faculty member 16 from Michigan State University;* ***Rebecca***

***Campbell.*** 17 Videos and research that is the only one I recall 18 off the top of my head. 19 Q

You do recall Professor Campbell? 20 A Yes, I believe she has been the 21 prominent person on

that subject."

**5C.  On this Record, My Detailed, Science Based Opinions Remain Uncontested and**

**Unrebutted by Any Expert.**   As I predicted months ago, no credible expert witness was

produced who would dare show up in federal court and testify in defense of Purdue's reckless

"investigation" nor Dr Campbell's unreliable, gender-biased, pseudo-scientific, controversial,

"consumer fraud", misinformation training sought by Purdue.  It is important to note that no

Purdue staff or investigation seemed knowledgeable of the work of any reliable, credible science

experts in investigations or human memory or investigations (e.g., Profs E. Loftus of Univ CA,

Dr Barden Expert Addendum Report of Jan. 5, 2022

S. Ceci of Cornell, R. McNally of Harvard, M. Lamb of Oxford, or many others). No actual

science expert was quoted or cited or remembered by Purdue staffers and "investigators" — just

the infamous, pseudo-science, radically politicized teachings of Dr R. Campbell (See, Oliver

Depo at pg 9)— thus further documenting Purdue's choice to focus away from competent,

reliable, science-based investigation methodologies and toward a radical, politicized,

pseudoscientist who is known for her "Victim Centered Practices" and gender-biased "Believe

All Women Regardless of How Disorganized, Inconsistent, Disconfirmed, and Changing Her

Story Might Be (but don't believe Men)" methods and ideas. This is another well-documented

indicator of gender bias in Purdue's training and "investigation" practices.

My opinion on this record remains uncontested that *none* of Purdue's staffers or

"investigators" were properly aware of the controversial, pseudoscience nature of Campbell's

"Neurobiology" claims (i.e., Campbell's central claim is that "even fragmented, changing,

uncorroborated memories are accurate if they are expressed by a woman" ) is further evidence

supporting the opinion that the training Purdue offered was recklessly and/or negligently

misinformed and followed gender-biased, radical feminist, critical theory ideology rather than

peer reviewed scientific reliable research and standard investigation methods.

Purdue's disastrous pseudo-"investigation" process could easily have been avoided.  In

2015, Janet Halley, the Royall Professor of Law at Harvard Law School starkly warned Title IX

officials of *the dangers of giving "advocacy personnel" the power to adjudicate outcomes*.  She

commented, "the only training provided to [Title IX] personnel handling sexual harassment

claims directed to the social and psychological dynamics surrounding sexual assault was 100%

aimed to *convince them to believe complainants*, precisely *when* they seem unreliable and

incoherent." She further noted, *Assuming* danger, risk, and holistic environmental contamination ensures that restrictions will go into effect *even where the facts don't justify them*. Will decision-makers — and in particular *governance feminist decision-makers* — be able to resist this trend?" See, Halley, Janet, Trading the Megaphone for the Gavel in Title IX Enforcement : Backing off the hype in Title IX enforcement, Commentary, Feb 18, 2015 128 Harv. L. Rev. F. 103  https://harvardlawreview.org/2015/02/trading-the-megaphone-for-the-gavel-in-title-ix-enforcement-2/. On this record, Purdue sought training in pseudoscience, politicized ideology rather than peer reviewed, credible science on memory, false memory, confirmation bias, and standard investigation methods and procedures.

Further supporting my opinions regarding Purdue's defective training and methodology and futher supporting my opinions regarding the defects in Prof. Campbell's "Neurobiology of Trauma" controversial, unproven theories, and further supporting my opinion that my opinions are quite consistent with the relevant scientific community is an article by Professor Richard McNally, Ph.D., Chairman of the Clinical Psychology Training Program at Harvard University. Prof. McNally has published a peer reviewed, devastating, methodologically sophisticated critique and rejection of Dr R. Campbell's "Neurobiology of Trauma" theories including citations and discussions of studies and critiques going ***back to 2008*** — convincingly debunking Prof Campbell's theories. See, Richard J. McNally (2021): Are memories of sexual trauma fragmented?, Memory, DOI: 10.1080/09658211.2020.1871023**.** See also, the thorough debunking of Campbell's controversial theories in Rubin, D. C., Berntsen, D., & Bohni, M. K. (2008). A memory-based model of post-traumatic stress disorder: Evaluating basic assumptions underlying the PTSD diagnosis. Psychological Review, 115(4), 985–1011. https://doi.org/

10.1037/a0013397 ; and Rubin, D. C., Berntsen, D., Ogle, C. M., Deffler, S. A., & Beckham, J.

C. (2016a). Scientific evidence versus outdated beliefs: A response to Brewin (2016). Journal of

Abnormal Psychology, 125(7), 1018–1021. https://doi.org/10.1037/abn0000211;  and Rubin, D.

C., Deffler, S. A., Ogle, C. M., Dowell, N. M., Graesser, A. C., & Beckham, J. C. (2016b).

Participant, rater, and computer measures of coherence in post-traumatic stress disorder. Journal

of Abnormal Psychology, 125(1), 11–25. https://doi.org/10.1037/abn0000126).

 Again, it is important to note that on this record apparently none of the methodology-

illiterate, memory science-illiterate, investigation standards-illiterate, mis-trained and mis-

informed Purdue staffers and investigators were apparently even vaguely aware of the scientific,

methodological reasons why investigation interviews must *be recorded* so the alleged

"memories" can be assessed in light of the questions asked (e.g., Science shows that questions

can change memories as well as create new ones) and why *investigating alternative hypotheses*

*to avoid confirmation bias* is essential to the integrity of investigations as per US DOJ interview

instructions (See, US DOJ training,  "Confirmation Bias. Confirmation Bias errors are avoided

by properly Generating and Testing Alternative Hypotheses.  Confirmation bias is often fatal to

the integrity of investigations.  *For example, the U.S. Department of Justice calls investigations*

*of alternative hypotheses **essential for the integrity of investigations**. In,  Chris Newlin, Linda

Cordisco Steele, et al , *Child Forensic Interviewing: Best Practices,*  published by the U.S.

Department of Justice… See,  http://www.ojjdp.gov/pubs/248749.pdf  September 2015,  U.S.

Department of Justice, Office of Justice Programs,  Office of Juvenile Justice and Delinquency

Prevention).

In sum, the methodologically defective Purdue "investigation" process has — on this record — no other rationale than to protect, shield, and solidify the alleged "memories" of women no matter how "fragmented", disorganized, changeable, inconsistent, tainted by CARE counseling (the CARE hashtags were "#WeBelieveYou *#StartByBelieving", see PU 0870)* , or uncorroborated they may be.  Purdue's "investigation" methods are thus quite consistent with the politicized pseudoscientific ideas of Dr Rebecca Campbell, the "expert" Purdue sought out relied upon to the exclusion of decades of work from world experts in the credible, reliable, relevant scientific community. My opinions on these issues also remain unrebutted and uncontested by any expert opinion on this record.

We should also note the well-documented "training" presentations by Dr Campbell were grossly unethical as she failed to honestly and properly warn and inform her audience that her theories were A) quite controversial and B) have never been accepted by the relevant scientific community and C) had been tested and debunked with methodologically sophisticated studies showing no "disorganization" and no "fragmenting" of trauma memories as long ago as 2008. (See, cites to McNally and in this addendum). That Prof. Campbell got away for several years with such blatantly politicized,  gender-biased, "consumer fraud" presentations lacking any semblance of informed consent or proper disclosure of methodological defects and honest discussion of the controversies involved demonstrates the dire hazards of applying politicized junk science in academic, administrative, and legal systems. Purdue could have done proper due diligence and avoided the many investigational errors seen in this case.

**5 D.  Well-documented examples of Purdue's Confirmation Bias Methods on this Record**:  Jane Doe's Texts, Calls, Gifts, and Well-wishes were ignored or hidden.   When an

investigation is tainted by confirmation bias, evidence supporting alternative theories of the case *is simply ignored or actively hidden* —as the record shows happened in this case. It is uncontested on this record that Jane Doe engaged in behaviors quite inconsistent with having been sexually assaulted and also inconsistent with her statements to investigators to have fled from John Doe — such disconfirming evidence was ignored by Purdue "investigators" as they apparently were facilitating Jane Doe's creation of her changing, personal "narrative" while ignoring objective realities.

Just as egregious were Purdue's well-documented confirmation bias errors in ignoring and hiding evidence documenting Jane Doe's manipulative and cruel plan to ban her mother from her life completely - after ensuring her parents had paid for her expensive college education. On this record, it appears Purdue "investigators"  fraudulently or negligently manipulated — either deceitfully cut and pasted out and/or simply ignored Jane Doe's text "admissions" to John Doe of Jane Doe's hidden deep hatred for own mother as well as Jane Doe's manipulative, deceitful, and deceptive plan to use her parents to pay tuition and fees until graduation then ban her mother from attending her wedding or seeing her children.  See, e.g. the Text of Dec 26, 2015 4:42 PM … pg 0282 … From Jane Doe to John Doe:   "*She's just ugh. I'm literally never talking to her (Jane Doe's mother) once I graduate.  She will not be at my graduation. She will not be at my wedding.  She will not see my children.*" (Emphasis added).

Such evidence further supports my ongoing investigative opinion that the poorly trained and politicized Purdue "investigators" and staff ignored-buried-hid-cut/pasted out key evidence in order to manipulate the record to protect and support their "Believe All Women No Matter

What (but don't believe Men)" ideology and facilitate Jane Doe's creation of her changing

personal "narrative" — just as the radical, politicized training from Prof Campbell instructed.

On this record, no other explanation has been offered as to why Purdue selected a

"Community Psychologist",  a politicized, pseudo-expert Dr R. Campbell's controversial

program to "train" (indoctrinate) Purdue investigators while ignoring the science of memory, the

science of memory contamination, universally followed standards of care in investigations (e.g.

recording interviews, investigating alternative hypotheses), and the relevant scientific

communities debunking of politicized theories such as Dr. Campbell's and Dr. Bessel van der

Kolk, the actual original creator of the "Fragmentary Nature of Trauma Memories" theory later

adopted by Dr R. Campbell.

It appears on this record that no Purdue staff even know about that Dr van der Kolk

remains a very controversial figure as was fired from Harvard Medical School for misconduct.

Dr van der Kolk told me himself that he believed he was fired as a result of my deposition of him

in 1996.  The deposition documented research misconduct and perjury in a criminal trial. The

controversial Dr van der Kolk was later fired from his own "Trauma Clinic" for reportedly

abusing staff.  (See, e.g., Deposition of Bessel van der Kolk, Dec. 27, 1996, in Kenneth Smith vs.

Gelineau et al., US District Court for the District of Rhode Island, C.A. No. 93-0615-T reported

by Dorothy M. Depointe, Notary Public. Reporting Associates. 10 Dorrance Street, Suite 220,

Providence, Rhode Island 02903, (401) 351-1660).

Purdue should have known the history of Dr Campbell, Dr. van der Kolk and other

"trauma" pseudoscientists such as Dr B. Braun (licensed surrendered to the State of Illinois and

his clinic closed down after a world record civil litigation settlement) — as many members of the

relevant scientific community could have quickly informed them if they'd bothered to consult

with a credible expert and member of the relevant scientific community.  See, Belluck, P.

Memory Therapy Leads to a Lawsuit and Big Settlement [$10.6 Million], The New York Times,

*Page 1, Column 1*, Nov. 6, 1997.

      I note that Dr van der Kolk's testimony, methodology, and theories regarding special

"Trauma Memories" including "repression" and "fragmentation" have been excluded from

multiple cases as court's ruled his work failed to meet minimal Daubert-Kumho standards of

reliability and validity. See, e.g., State of New Hampshire v. Hungerford and  State of New

Hampshire v. Morahan  698 A.2d 1244  (N.H. 1997) and also Rivers v. Father Flanagan's Boys

Town, Doc 1024, Case No. 743, Nebraska State Court Judge Sandra L. Dougherty, November

25, 2005. Dr van der Kolk's testimony was apparently withdrawn from another case.  See, Duffy

v. Father Flanagan's Boys Town, Case No. 8:03CV31, United States District Court for the

District of Nebraska, Memorandum and Order of January 26, 2006 by Hon. Laurie Smith Camp,

U.S. District Judge.  I participated as a consultant or trial counsel in these Frye-Daubert-Kumho

exclusions of Dr van der Kolk's controversial and pseudoscience ideas which are apparently

being resuscitated by Dr R. Campbell, the controversial trainer chosen by officials at Purdue

University.

      I am not aware of Community Psychologist Dr R. Campbell's work ever surviving a

Daubert-Kumho challenge and in my opinion her work is a classic example of the highly

politicized, unreliable, wildly controversial junk science typical of too many in the "trauma"

field. My opinions remain uncontested and unrebutted on this record (as predicted) and are quite

consistent with multiple State and Federal judges who have all agreed with me regarding such

issues in multiple Daubert-Kumho hearings over many years in many jurisdictions. (See full citations in my initial report at pages 17-21).

My opinions are also consistent with the opinions of national legal experts on the history of such investigations including the legal (not science ) methodological analysis of Harvard Law School Professor Janet Halley who has opined, "The procedures that are being adopted [in many University Title IX cases] are taking us back to pre–Magna Carta, pre-due-process procedures." (cited in Initial Report).  Purdue should have known better.

In my opinion, as we all seek to reduce or eliminate criminal sexual assaults — a serious problem in America at any frequency or in any venue —we must agree that this problem is most effectively and competently addressed without biased, hysterical, politicized, irrational, junk science, radical feminist tainted, pseudo-investigations including unrecorded interviews and untranscribed "Committee meetings" where alleged victims aren't even asked to show up and never provide sworn statements, video, and transcripts that can be properly investigated using standard investigation procedures.

Science-supported and science-informed procedures are the minimal requirement for the proper investigation of allegations including the proper investigation of alternative hypotheses (thus avoiding confirmation bias) in contrast to methodologically defective processes that apply politicized, gender-biased methods and junk science designed to protect women's creative "personal narratives and individual realities" — such as the improper and methodologically defective, politicized "investigation" methods demonstrated by Purdue University in this case**.**

**5E.  Errors of Logic:**  Defense Counsel Argue that Dr Barden Should be Excluded Because He Hasn't Personally Done Title IX investigations Like the Purdue Staffers and

"Investigators":   This is yet another example of the limitations of JD-only education with regard to scientific and methodological analysis and shows why competent expert analysis and testimony is essential to aid the legal system in such cases.   For example, it is quite true that Dr Barden has not conducted lobotomies but nonetheless he is highly qualified to *testify* about the dangers of such abusive, methodologically defective "treatment" methods — and he has so testified.   Dr. Barden has also never improperly manipulated patients with "recovered memory therapy" theories and methods but nonetheless he is highly qualified to *testify* about the dangers of such abusive, methodologically defective "treatment" methods — and he has so testified.   It is similarly true that Dr. Barden has not conducted a Title IX investigation.   In fact, I am not aware of any Title IX investigation in the USA ever being conducted *by someone who is A) an MD or PhD member of the relevant scientific community in psychology, memory science and investigation methodologies, B)  a recipient of two national science awards, and C) a licensed mental health professional with decades of clinical training and experience in assessment, diagnosis, and therapy, and D) a recognized national expert in the history of defective, unreliable (junk science) theories, methods, and methodologies in investigations and mental health treatments."*   In sum, to the best of my knowledge no such person has ever conducted a Title IX investigation — and tragically no such person has ever supervised one — and likely never will because universities seem most eager to maintain control over such processes by involving only "insider" employees with deep loyalties — including financial ties — and other obvious conflicts of interest with conducting an independent accurate investigation that might discover serious misconduct by the institution.

Irrationally, defense counsel appear to be arguing that only bank robbers can analyze robbery tactics and evidence, only schizophrenics can teach about the science of schizophrenia, and only "science-illiterate, methodology-illiterate, radical politicized Title IX investigators and staff" should be permitted to teach juries about the underlying egregious errors and multiple methodological defects in the investigation of this case.

Given that the FBI, multiple prosecutors in various states, several Sex Crimes Investigators Associations,  Harvard University and Harvard Law School, national U.S. conventions of Psychologists, Psychiatrists, and Lawyers, as well as Oxford University Press have all asked me to analyze and opine on the type of issues involved in this case and train them about such issues — and if multiple courts in multiple jurisdictions — without exception — have permitted me to testify on such issues as a national expert — perhaps this defense "argument" for exclusion fails to meet the good faith basis requirement for submission to a court of laws.

**5F.  The Extreme Nature of the Errors in This Case**.   Of the over 1,000 investigations I have reviewed since the 1980s (state, federal, criminal, administrative, licensing prosecutions, civil claims,  consultations, my time as a Special Assistant Attorney General in Utah, my time on the Minnesota State Board of Psychology, and my time as an Intern at the Massachusetts Attorney General's Office, etc) I do not recall any others that involved zero recordings (audio or video) of the alleged victim's statements and zero affidavits or signed statements of any kind, zero opportunities to examine or cross-examine the alleged victim witness in any public-recorded or transcribed forum at any time by anybody, zero contact with the alleged victim by the ultimate decision-maker, and no lawyer being permitted to assist in the defense of the accused during key hearings, trials, or other adjudicative processes. (See, documentation pg 0654 as provided by

Purdue Univ. employee Monica Bloom showing zero indicia of reliability for the allegations, that

is, no sworn statement, no signed/dated affidavit, no video recorded statement, no sworn list of

previous interviews,  etc.)  These failures of Purdue's investigation are extremely (historically)

unusual, egregious, and reckless as they document an unreliable methodology that ignores what

science teaches us about such processes (See, my Initial Report). Purdue's misconduct was far

below the methodological standards of all other types of investigations in all other venues of

which I am aware.

       These errors and defects and all of them are consistent with and support my opinion that

the Purdue Title IX "investigation" system was based on Dr R. Campbell's and other's "Victim

Centered Practices or more accurately "Believe All Women No Matter What (and don't believe

Men)", gender-biased, community psychology, radical feminist, methods and ideas without

regard to or without knowledge of the actual science of memory, the actual science of false

memory, the scientific analysis of need for recording interviews to properly assess the influence

of questioning, the scientific analysis of the need to avoid confirmation bias by properly

investigating and openly discussing alternative hypotheses and other errors as listed in my

previously filed expert report.  In my opinion,  I rank Purdue's methodologically defective

investigation in this case in the bottom 1% of the many investigations I've reviewed in many

states over more than 35 years of practice.

       **Key Sub-Sections of Dr Barden's Opinions in this Case:**

**Section 1)  My opinions on *The Science of Human Memory* are *Methodologically***

*Sound, Generally Accepted by the Relevant Scientific Community, Highly Reliable, and there is*

*no credible controversy regarding my opinion that a basic and accurate knowledge of memory*

*science is essential to competent investigations including competent interviews of witnesses. My*

*opinions in this area are uncontested on this record. In addition, in my opinion, on this record*

*Purdue failed to properly train staff and investigators in the basics of accurate memory science*

*but in contrast they indoctrinated them with the unreliable, politicized, controversial, junk*

*science memory notions of Dr Campbell and other infamous "trauma theorists" including Dr B*

*van der Kolk, and Dr B. Braun.*

Misinformed or uninformed "investigators" questioning alleged victims who are not

aware of the basics of the science of human memory (e.g., that questions can drastically change,

taint, or create memories) pose real and serious dangers to the public. To the best of my

knowledge, all credible experts and all members of the relevant scientific community agree with

this opinion that reliable scientific knowledge is essential for competent investigations. Research

has documented that laypersons and jurors are not familiar with this essential science, in fact,

published research shows jurors often believe myths and false notions about memory including

thinking that memories are like a DVD or recording rather then understanding that memories are

a "reconstructive process" prone to contamination by post-event information and influences (e..g

in contrast, the Purdue CARE counselors offered politicized propaganda to "Believe All Women"

when they provide a "personal narrative". (*#WeBelieveYou #StartByBelieving)* regardless of

objective reality. Such misinformation is consistent with decades of politicized "Trauma

Propaganda" as documented in my Initial Report. (See, section discussing inaccurate propaganda

on the frequency of sexual assaults on campus).

The relevant scientific and professional communities have spoken out loud and clear on

these issues. **"**Very few jurisdictions do not freely permit expert testimony on the science of

human memory." See,  The American Psychological Association filed an Amicus brief in 2011 in

the Pennsylvania Supreme Court case *Commonwealth of PA v. Walker*. The APA brief states,

"*Given that well-established expert testimony regarding human perception, memory and recall in*

*cases involving eyewitness identification is generally accepted in the field and that the*

*overwhelming response of courts nationally is to allow such testimony*, it was determined that

APA would file a brief to educate Pennsylvania courts on this matter.  See, APA Walker case

Amicus at https://www.apa.org/about/offices/ogc/amicus/walker (accessed Jan 4, 2022).   Similar

arguments have led to courts increasingly accepting expert witness testimony on the foundational

science of memory in *any case where memory testimony is essential and contested as in this*

*case*.  The "memory myths" (e..g. memory is a recording, memory is unchangeable, memory is a

retrieval system, etc)  so often believed by uninformed and misinformed lawyers, investigators,

law enforcement, laypersons, and jurors pose grave dangers to the integrity of the Title IX and

the legal system. In sum, a minimal understanding of the science of memory is particularly

essential to a reliable and competent legal process. Criminal prosecutions and Title IX

investigations are often based upon nothing more than the contested memory report of one

individual in the absence of corroborative evidence - as in this case. On this record, my opinions

in this area are unrebutted and uncontested by any expert opinion.

**Section 2)  *The Science of False Memories and Memory Contamination*  :**

"Investigators" questioning alleged victims who are not aware of the history and science of

"False Memories", the history of the "Memory Wars", the history of  the science of human false

memories (e.g., questions can drastically change or create memories) pose dangers to the public.

To the best of my knowledge as a national expert in such issues for decades, all credible experts

and all members of the relevant scientific community I am aware of agree with my opinions that

investigators must know at least the essentials of memory science.  As the APA Amicus briefs on

memory testimony document in detail, laypersons and juries are not familiar with this science, in

fact, published research shows therapists, citizens, lawyers, and jurors too often believe myths

and false notions about memory including thinking that memories are like a DVD or recording or

can be reliably "repressed and recovered" rather then realizing memories are a "reconstructive

process" prone to contamination by post-event information and influences (compare with Purdue

CARE counselors trained to "Believe All Women No Matter What (but don't believe Men)")

(See, detailed discussion in Initial Report).  Purdue's failure to train their "investigators" in the

science of human memory was a reckless methodological error.  I have testified about these

topics in many cases in many jurisdictions without restriction.

The opinion of the relevant scientific community is well-documented in the peer

reviewed published article by Lacy, J., and Stark, C. , The Neuroscience of Memory:

Implications for the Courtroom,  Nat Rev Neurosci. 2013 Sep; 14(9): 649–658.  doi: 10.1038/

nrn3563 ; PMCID: PMC4183265 NIHMSID: NIHMS624859  PMID: 23942467.  See,

"Although memory can be hazy at times, it is often assumed that memories of violent or

otherwise stressful events are so well-encoded that they are largely indelible and that confidently

retrieved memories are likely to be accurate. However, *findings from basic psychological

research and neuroscience studies indicate that **memory is a reconstructive process that is

susceptible to distortion***. In the courtroom [ and in Title IX investigations ] , even minor memory

distortions can have severe consequences that are in part driven by ***common misunderstandings

about memory, e.g. expecting memory to be more veridical than it may actually be***… Jurors

[ like Title IX investigators and all legal professionals ] should likewise be instructed that *the memory of an eyewitness should not be considered to be indelible, even if the event was traumatic* 39-42; that ***a person's biases and expectations will change with time and new information or misinformation and that this can alter the memory***"… "The 'imperfection' of memory has been known since the first empirical memory experiments by Ebbinghaus.... In addition to simple forgetting, *memories routinely become distorted* . The public perception of memory, however, is typically that memory is akin to a video recorder 8 . This distinction between the perception and reality of memory has important consequences in the context of the courtroom. In the legal system, like among the general public, it is generally just assumed that memory is highly accurate and largely indelible, at least in the case of 'strong' memories."

"*Most individuals outside the field of memory research (including laypersons, legal professionals, and jurors) are largely unaware of the substantial malleability of memory.* Early studies on the public awareness of memory phenomena showed that when college students were asked how various factors influence memory they were *only 54% correct*. Although the students scored higher than chance, the score was surprisingly low considering the implications of these factors in court cases. Similar surveys have replicated these findings in nontraditional (older, working) students and in citizens of Washington, D.C. *In both of these studies, the respondents' accuracy was **below 50%**.* "*More recent studies revealed that judges and law enforcement personnel are not much more aware of memory phenomena than college students.* [ See, Simons DJ, Chabris CF. What people believe about how memory works: a representative survey of the U.S. population. *PLoS One.* 2011;6:e22757. [PubMed] [Google Scholar] … "Memory is imperfect and is susceptible to distortion and loss. There are adaptive reasons for generalization

and forgetting. … Unfortunately, in the courtroom 'memory' is often misunderstood and undue assumptions are made about its veridicality. Thus, there needs to be greater education and awareness of memory processes in judicial settings and in daily life." (U.S. National Institutes of Health,  Lacy, J., and Stark, C. , The Neuroscience of Memory: Implications for the Courtroom, Nat Rev Neurosci. 2013 Sep; 14(9): 649–658.  doi: 10.1038/nrn3563).

See also, Schacter, Daniel L, and Elizabeth F Loftus. 2013. Memory and Law: What Can Cognitive Neuroscience Contribute? Nature Neuroscience 16(2): 119–123.  [ Note that Prof D. Schacter formerly served as *Chair of the Department of Psychology at Harvard University* and Prof. E. Loftus, of the University of California, is the most cited and awarded memory contamination expert in the world.  Their work is methodologically superb and they are viewed as world experts in the relevant scientific community. Both are colleagues and have signed my Amicus Briefs educating courts on memory issues.  On this record, my opinions in this area are also unrebutted and uncontested by any expert opinion and accepted-supported by the relevant scientific community.  I have written Amicus Briefs in related subjects signed and supported by dozens of the world's experts in this field and I am very familiar with the opinions, methods, and conclusions of the relevant scientific community. (See Amicus cited in initial report, pg 15).

**Section 3)  *The Science of Confirmation Bias — Generating and Testing Alternative Hypotheses* :**

"The tendency to test one's beliefs or conjectures by seeking evidence that might confirm or verify them and to ignore evidence that might disconfirm or refute them."  — The Oxford Dictionary definition of confirmation bias

"He who does not expect the unexpected will not detect it" — Karl Popper (the Daubert and Kumho decisions are largely based on the philosophy of science of Sir Karl Popper.)

"If one were to attempt to identify a single problematic aspect of human reasoning that deserves attention above all others, the confirmation bias would have to be among the candidates for consideration." See, Nickerson, R. Confirmation Bias: A Ubiquitous Phenomenon In Many Guises, Review of General Psychology, 1998, Vol 2, No 2, 175-220.

"*Confirmation bias is perhaps the best known and most widely accepted notion of inferential error to come out of the literature on human reasoning.*" (Evans, 1989, p. 41)

"Because of confirmation bias and desirability bias, we will tend to collect and interpret evidence selectively to favor a judgment that, respectively, we already believe or wish to be true…. Dror coined a term for the impact of biasing information: the **forensic confirmation bias**. This bias has since been documented with other forensic techniques, including blood pattern analysis, arson investigation, the analysis of skeletal remains, and forensic pathology…. as soon as you know what others think, confirmation bias can lead you to form an overall impression too early and to ignore contradictory information."
— Noble Prize winner Daniel Kahneman, Ph.D. in Noise, A Flaw in Human Judgment and the Innocence Project: Innocence Project, "Overturning Wrongful Convictions Involving Misapplied Forensics," Misapplication of Forensic Science (2018): 1–7, www.innocenceproject.org/causes/misapplication-forensic-science. See also S. M. Kassin, I. E. Dror, J. Kukucka, and L. Butt, "The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions," Journal of Applied Research in Memory and Cognition 2 (2013): 42–52.
.

The most fundamental principle of science is the requirement to generate and test

alternative hypotheses (i.e., Sir Karl Popper's concept of falsification).  See, the summary of

relevant science including peer reviewed citations in Dr Barden's initial report.

Every 8th grade science student should know this essential principle but many

investigators, law enforcement professionals, legal professionals, and mental health professionals

are uninformed or misinformed on essential nature of this process. It is clear on this record that

Purdue followed a "Victim Centered, "Always Believe the Women (but not the Men)"

methodology and ignored multiple alternative hypotheses that could and should have been

investigated — thus demonstrating in classic confirmation bias errors throughout the

investigation.  In my opinion, Purdue failed to properly train and supervise staff and investigators

to avoid confirmation bias. For example,  Purdue investigators failed to investigate evidence

supporting alternative hypotheses including but not limited to : Jane Doe's texts show support for

the unexplored hypothesis that Jane Doe is a deceitful, manipulative, emotionally unstable

person prone to an irrational "all or nothing" thinking style. (See A) irrational exaggerated

thinking such as "he *never* left me alone", B) texts that are quite inconsistent with her own

statements to investigators (e.g. the record shows Jane Doe clearly *seeking time and seeking*

*attention from John Doe long after the alleged felony assault event — but before counseling at*

*the anti-male, politicized, CARE center*), C) text and other statements that are inconsistent with

other witnesses, and D) text evidence of Jane Doe's documented plan to deceive, manipulate, and

cruelly abandon her own mother.  On this record, it appears that Perdue personnel manipulated

— cut and pasted out or simply ignored — Jane Doe's shocking "admission" in her texting of a

deep hatred for her mother as well as Jane Doe's manipulative, deceitful, and deceptive plan to

use her parents to pay all of Jane Doe's tuition and fees until graduation then cruelly ban her own

mother from attending her wedding or seeing Jane Doe's future children.  See, e.g. the Text of

Dec 26, 2015 4:42 PM … pg 0282 … From Jane Doe to John Doe:   "She's just ugh. I'm literally

never talking to her (Jane Doe's mother) once I graduate.  *She will not be at my graduation. She*

*will not be at my wedding.  She will not see my children*." (Emphasis added).

       At trial, it will be important to determine by questioning if the Dean ever bothered to

review the full 134 pages of texts or only reviewed a manipulated (i.e., evidence tampering)

"selected" text file in support of a "Always Believe the Women (but not the Men)", gender-

biased agenda.  On this record, Perdue's investigators failed to properly investigate and

document:  the well-documented, fully sexual relationship these students engaged in for weeks-

months as well as failing to investigate the essential timing issues regarding her allegations

apparently appearing 5 months after the alleged event and most importantly after "counseling" at

the documented to be ideologically anti-male CARE center and apparently after John Doe

reported Jane Doe for suicidal ideation and behavior. On this record, Purdue investigators

interviewed Jane Doe *twice* to gather her "narrative" regarding the ambiguous text evidence

while John Doe was reportedly never interviewed nor ever asked for his "narrative" of the

ambiguous texts (e.g., men's narratives don't count only women's).  This clumsily obvious,

serious, gender-biased and methodologically defective procedure is consistent with multiple

other attempts by Purdue hide/protect and facilitate Jane Doe's personal narrative and Purdue's

"Always Believe the Women (but not the Men)" gender-biased methodology.

On this record, Purdue failed to properly train its staff and investigators in proper

investigation procedures and the science of memory but instead provided them with junk science,

politicized indoctrination by Dr R. Campbell and others. On this record, the Purdue investigators

apparently ignored testimony from *multiple witnesses* who disconfirmed Jane Doe's claim of

being abused by a stun baton and that John Doe had a "temper problem". On this record, John

Doe reported in his deposition that two committee members admitted to him that they had not

bothered to even read the investigation report - this would be consistent with radical feminist

ideology that a women's creative "personal narrative" is all that matters, not objective reality,

and certainly not the narrative individual reality of "oppressive males".  On this record, Purdue

never provided John Doe with the evidence against him nor the investigation report during the

disciplinary case, thus the investigators failed to inquire about John Doe's "narrative" to the

multiple alternative hypotheses that should have been properly investigated. On this record,

Purdue failed to have anyone other than Monica Bloom interview and assess Jane Doe about her

"memories". Committee members and the Dean apparently failed to assess the accuracy and completeness of Jane Doe's answers and properly investigate the many alternative hypotheses in this case that were never reviewed (ie., only a woman's creative "narrative" matters, not objective reality). The Dean's claim to have made a rational decision given his failure to even hear from, assess, or obtain a video of Jane Doe or view a recorded interview is unprecedented in my experience (ie., only a woman's creative "narrative" matters, not objective reality).  Judge (now Associate Justice) A. C. Barrett's opinion in this case highlighted the Dean's biased methodological failure when she wrote: "John has alleged such facts here, the strongest one being that *Sermersheim chose to credit Jane's account without hearing directly from her. ... and ...* "Sermersheim's explanation for her decision (offered only after her supervisor required her to give a reason) was a cursory statement that she found Jane credible and John not credible. *Her basis for believing Jane is perplexing, given that she never talked to Jane"... and "*Indeed, Jane did not even submit a statement in her own words to the Advisory Committee. Jane Doe's personal (uncorroborated) "narrative" was relayed in a letter submitted by Bloom, a Title IX coordinator and the director of the viciously anti-male CARE.   These kinds of methodological, irrational, errors are unprecedented and historically defective in my decades of reviewing investigations of many kinds (ie., at Purdue apparently only a woman's creative "narrative" matters, not objective reality).

In addition to this catalog of failures, the *"Panel" Failed to Meet Any Rational Procedure or Standard for Methodologies for Hearings or Investigations:*  Judge (now Associate Justice) A. C. Barrett's opinion in this case highlighted another egregious investigational, methodological error when she wrote: "For their part, the three panelists on Purdue's Advisory Committee on

Equity were *similarly biased in favor of Jane and against John*. As John tells it—and again, we must accept his account as true—*the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account*." This gender-biased committee process is quite inconsistent with all standards of investigations or hearings as well as the science of memory-false memory-confirmation bias. However, the committee's misconduct is quite consistent with the junk science, politicized training of Dr R. Campbell, and the anti-male propaganda posted by the CARE facility, and the manipulation/hiding/ignoring of disconfirming evidence by the investigators, and Purdue staff's woeful ignorance of the science of memory and false memory, and the multiple examples of confirmation bias listed in my initial report, and others.

All of these well-documented errors support my opinion that Purdue's program was designed and operated to facilitate Dr R. Campbell's "Always Believe the Women (but not the Men)" gender-biased methodology to facilitate the feminist goal of Jane Doe "creating her own personal narrative reality" — regardless of objective truth. As Judge Barrett wrote, "The plausibility of that inference (of gender-bias) is strengthened by a post that CARE put up on its Facebook page during the same month that John was disciplined: an article from *The Washington Post* titled "***Alcohol isn't the cause of campus sexual assault. Men are.***" See, Judge A.C. Barrett's opinion at (928 F.3d at 669-670). Facebook posts from the Purdue CARE project further document CARE's overtly hostile and misinformed attitude toward males and support the unexamined hypothesis that CARE counseling was the source of some or all of Jane Doe's alleged memories. (note, Science, law, and the international media documented tens of thousands of Americans who came to believe in false memories of abuse generated by feminist-tainted,

junk science "recovered memory" therapy methods). See, medical text, Pendergrast, M., (2017)

*The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*,

Springer International Publishing, ISBN 9783319633749.

On this record,  the Purdue investigators also demonstrated confirmation bias by

*ignoring evidence from multiple disconfirming witnesses*. On this record, Purdue failed to create

a record of Jane Doe's "memories" that could be analyzed for discrepancies, changing memories

over time, inconsistencies, impossibilities, or other errors indicate of false, manipulative and

deceptive testimony (ie., only a woman's creative "narrative" matters, not objective reality).

See the many peer reviewed, published citations in Dr Barden's initial report

documenting the importance of avoiding Confirmation Bias by generating and investigating

alternative hypotheses including the interview manual of the US DOJ stating, "Alternative

Hypotheses … Contextually appropriate questions that ***explore other viable hypotheses … are***

***essential to the overall integrity of the interview***." ], Dr Barden initial report at pg 97.  This

principle is true for all interviews for witnesses of all ages. )

*Dr Barden's opinions in this case remain unrebutted as no credible expert witness*

*testimony has been offered to counter my opinions that Purdue acted in an biased, irrational,*

*and imprudent manner, failed to use reliable and valid scientific and investigational methods and*

*instead sought out and applied, grossly defective, irrational, politicized, junk science methods.*

**Section 4)** *The Science and History of Gender-Biased Misinformation in the "Trauma" Field including Decades of Politicized Trauma Propaganda regarding the Incidence and Prevalence of Sexual Assaults in America, Incidence of Eating Disorders, the Possibility and Probability of "Recovered Repressed Memories", the Likelihood of False Allegations of Assault and Other Misinformation including the vicious, anti-male propaganda posted by Purdue's CARE facility.*

See the very detailed and lengthy discussion in my Initial Report of the politicized, gender-biased history of "trauma propaganda". This history has been verified in dozens of peer reviewed articles, court cases, textbooks and Dr Barden's own publication in Oxford University Press. (Cite in Initial Report). Purdue's training with, and application of, Dr Campbell's controversial, unproven, gender-biased, debunked "Believe all Women (but not Men)" theory of the "Neurobiology of Trauma" and the CARE programs ***#StartByBelieving*** and viciously anti-male posting from the Wash Post propaganda campaign are continuations of the long-standing, decades-long, "anti-patriarchy" misinformation campaign that has been promulgated by radical elements of the feminist movement for decades as my detailed report documents. This information provides key historic perspective and provides a clear explanation for Purdue's many failures and errors in this case.  Jurors will not know much if any of this key information.  The facts of this history are very well documented in my Initial report by peer reviewed science journal articles, many court decisions, media reports, and textbooks — all with solid indicia of reliability. On this record, my opinions in this area are unrebutted and uncontested by any expert

opinion. I have testified regarding this history and the relevant science in multiple cases in multiple jurisdictions as well as similar testimony before multiple State Legislatures.

Section 5) Dr Barden's Daubert-Kumho opinions. My opinions in this Addendum and the initial report are science expert opinions and *not* legal opinions. As stated clearly in my initial report and incorporated into this one I will offer no legal opinions in this case.  In my view, Dr Campbell's controversial, unproven theories and trainings are classic politicized, junk science. They are not based on competent, reliable methodology, they are not accepted by the relevant scientific community and, in fact, have been actively debunked and refuted (see Prof McNally's article and other citations above).  Dr Campbell's theories are based in feminist ideology not in science, are highly unreliable, and have error rates in individual cases that could approach 100% errors. Such junk science notions and politicized gender bias should not be relied upon by courts or universities. If Purdue had received training from an actual, credible, science-investigation expert Purdue's historic series of failures and errors in this case might never have taken place. See, articles cited and discussed above by Prof. McNally, Director of Clinical Psychology at Harvard University, reporting on research disconfirming Dr Campbell's controversial theory. In sum, as a science, methodology, and ethics expert it is my opinion that Dr R. Campbell's controversial politicized theories and misleading training presentations present a serious danger to public and to the the integrity of the legal system. (See, copies of multiple research articles and other cited publications in Exhibit A, attached.)

6) On this record, all of Dr Barden's Expert Opinions Remain Unrebutted and Uncontested by Any other Expert Analysis — as predicted last year:  All of Dr Barden's citations, descriptions, reports, and opinions remain uncontested in this case.  In sum, on this

record, there are zero opposing expert witness reports, analyses, or opinions. My science

opinions as offered here are very widely accepted by the relevant scientific community and have

been accepted in numerous courts in many jurisdictions. I have published regarding these issues

and Daubert-Kumho standards in one of the leading peer reviewed science-policy journals in the

world. (See, Grove, W. M. and Barden, R.C. (2000) initial report at pg 17 as well as with the

Oxford University Press in Barden, R.C., Memory and Reliability: Developments and

Controversial Issues. In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-

Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony

Hooper, University Press, 2016. Foreword by The Right Honorable, Lord John Thomas, Lord

Chief Justice of England and Wales.

     **9.**    **My investigation of this complex and important matter continues.**



**Ongoing Investigative Expert Witness Addendum Report signed Jan 5, 2022**
**R. Christopher Barden, Ph.D., J.D., LP**
**Expert Witness in DOE v. PURDUE, et al**
    As an expert witness I will offer no legal opinions nor psychological treatment-
diagnostic advice in this case.
    "A key role of an expert witness is to help the court, lawyers, and/or parties
understand and apply reliable scientific, technical, ethical, and investigative principles,
methods, alternative hypotheses, and information."