# PL Opp DDE 3

# EXHIBIT A

Psychology, Public Policy, and Law
1999, Vol. 5, No. 1, 224–242

Copyright 1999 by the American Psychological Association, Inc.
1076-8971/99/$5.00 DOI: 10.1037//1076-8971.5.1.224

# PROTECTING THE INTEGRITY OF THE LEGAL SYSTEM

## The Admissibility of Testimony From Mental Health Experts Under *Daubert/Kumho* Analyses

William M. Grove
University of Minnesota at Minneapolis
St. Paul

R. Christopher Barden
National Association for Consumer Protection in Mental Health Practices,
North Salt Lake, Utah

The authors discussed to what degree testimony from social science and mental health experts (psychologists, psychiatrists, social workers, therapists, others) meets admissibility requirements expressed by the U.S. Supreme Court in *Daubert* (1993), *Joiner* (*General Electric Co. v. Joiner,* 1997) and the recent *Kumho* (1999) decision. They reviewed data on *Daubert/Kumho* indicia of reliability using 2 exemplar areas of mental health testimony: psychodiagnostic assessment by means of the Rorschach and other "projective" assessment techniques and the diagnoses of posttraumatic stress disorder and multiple personality disorder (dissociative identity disorder). They concluded that some testimony offered by mental health professionals relating to these concepts should not survive scrutiny under the framework of *Daubert, Joiner,* and *Kumho.*

Prior to the ruling of the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993), testimony from mental health and social science experts was largely unregulated by the legal system. The *Frye* (*Frye v. United States,* 1923) standard had been in place for decades (Gianelli, 1980), requiring that to be admissible, the scientific bases of testimony must be "generally accepted" in the "field" to which they belong. This is a very lenient standard; experts can always be found who will swear that a theory is "generally accepted." Under *Frye,* the expert is not required to substantiate the scientific soundness of the theory by reference to proper research documenting other hallmarks of a reliable theory, such as the theory's survival of Popperian risky tests, survival of peer review, or calculable error rates. Moreover, "general acceptance" itself is usually established by the expert's say-so (subject to the finder of fact's judgment about the expert's credibility); citation of survey studies that document such acceptance are usually not required. Hence, testimony by mental health professionals regarding all sorts of controversial theories and methods has very often been admitted under *Frye.*

The 1993 *Daubert* ruling of the U.S. Supreme Court changed this unfortunate situation and heightened interest in, and concern about, expert testimony based on "junk science." In *Daubert,* the U.S. Supreme Court ruled that scientific expert

William M. Grove, Department of Psychology, University of Minnesota; R. Christopher Barden, National Association for Consumer Protection in Mental Health Practices, North Salt Lake, Utah.

We thank many colleagues for reviewing a draft of this article.

Correspondence concerning this article should be addressed to William M. Grove, Department of Psychology, University of Minnesota, N218 Elliott Hall, 75 East River Road, Minneapolis, Minnesota 55455-0344. Electronic mail may be sent to william.m.grove-1@tc.umn.edu.

testimony is admissible only if it is both relevant and reliable. The Court further held that the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand" (*Daubert,* 1993, p. 597). In addition, the Court discussed specific factors useful in determining the reliability of a scientific "theory or technique" (*Daubert,* 1993, pp. 593–594), generally following the philosophy of science of Sir Karl Popper (1959). We discuss these factors in the sections that follow.

Clarifying the review process enunciated in *Daubert,* the U.S. Supreme Court later ruled that the court of appeals must apply an abuse-of-discretion standard when it reviews the trial court's decision to admit or exclude expert testimony (*General Electric Co. v. Joiner,* 1997). The *Joiner* ruling further emphasized the responsibility of the trial court to fulfill a mandatory gatekeeper role—the duty to exclude unreliable expert testimony—assigned by the *Daubert* ruling.

In a March 1999 decision with enormous importance for the regulation of the testimony of mental health professionals, the U.S. Supreme Court expanded the *Daubert* analysis to the testimony of essentially all expert witnesses (*Kumho Tire Co., Ltd., et al. v. Carmichael et al.,* 1999). In *Kumho,* the defendant tire company moved to exclude the plaintiff's expert testimony on the ground that his methodology failed to satisfy Federal Rule of Evidence 702, which states: "If scientific, technical, or other specialized knowledge will assist the trier of fact, a witness qualified as an expert may testify thereto in the form of an opinion." Granting the motion to exclude the expert testimony in question and entering summary judgment for the defendants, the District Court acknowledged that it was acting as a reliability gatekeeper as required by *Daubert.*

Opining that *Daubert* was limited to "scientific" testimony, the U.S. 11th Circuit Court of Appeals held that the *Daubert* factors did not apply to the expert's testimony, which it attempted to distinguish as "skill- or experience-based." The U.S. Supreme Court overturned the 11th Circuit's interpretation and reinstated the District Court opinion by holding that the *Daubert* factors may apply to the testimony of engineers and other experts who are not claiming a basis for their testimony in rigorous scientific research and peer reviewed publications (*Kumho,* 1999, pp. 7–13). In an opinion written by Justice Breyer—a justice highly trained in methodology and philosophy of science issues—the Court ruled that the *Daubert* "gate keeping" obligation applies to all expert testimony. The Court held that judges would find it hard, if not impossible, to perform this function while distinguishing between "scientific" knowledge and "technical" or "other specialized" knowledge and that there is no clear line dividing the one from the others and no convincing need to make such distinctions (*Kumho,* 1999, pp. 7–9). Prior to Kumho, unscientific experts could testify if they showed the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." This loophole was noted by Justice Breyer, writing for the Court: "As the U.S. Supreme Court ruled in *Joiner,* 'nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert' " (*Kumho,* 1999, p. 146).

In the *Daubert* (1993), *Joiner* (*General Electric Co. v. Joiner,* 1997), and *Kumho* (1999) cases, the U.S. Supreme Court has begun the long-overdue process of educating legal professionals in the essential, minimal characteristics of science.

Six factors of scientific analysis, or indicia of testimonial reliability, can be distinguished in *Daubert:*

1. Is the proposed theory, on which the testimony is to be based, testable (falsified)?
2. Has the proposed theory been tested using valid and reliable procedures and with positive results?
3. Has the theory been subjected to peer review?
4. What is the known or potential error rate of the scientific theory or technique?
5. What standards, controlling the technique's operation, maximize its validity?
6. Has the theory been generally accepted as valid in the relevant scientific community?

As other contributors to this issue have pointed out (e.g., Krauss & Sales, 1999, this issue), these features were not enumerated as an exhaustive list. Furthermore, the *Daubert* Court did not require trial judges to combine these factors algorithmically in deciding on admissibility, nor did they assign weights to the factors. Hence, it has been left to case law to clarify the proper application of *Daubert.* The reader is referred to other articles where these features are discussed from a legal point of view (e.g., Lipton, 1999, this issue; Schopp, Scalora, & Pearce, 1999, this issue) and pertinent cases are analyzed. Bersoff, Glass, Dodds, Eckl and Peters (1999) have compiled a list of federal appellate *Daubert* cases.

*Daubert* admissibility hinged on acceptability of a theory or methodology, and not on conclusions drawn from it. However, the Joiner Court held that "[c]onclusions and methodology are not entirely distinct from one another; when the analytical gap between the data and the opinion proffered is simply too great [the evidence may be excluded]" (*General Electric v. Joiner,* 1997). Therefore, a seventh factor can be added to those above: Do the expert's conclusions reasonably follow from applying the theory to this case?

We consider two exemplar areas of expert mental health testimony that show how we go about analyzing *Daubert–Joiner–Kumho* factors: the Rorschach test and controversial diagnoses (e.g., posttraumatic stress disorder [PTSD], and multiple personality disorder, now known as *dissociative identity disorder* [MPD/DID]). We argue that the use of the Rorschach test for psychodiagnosis and personality description, and common courtroom testimony about PTSD and MPD diagnoses, should be found inadmissible. We end the article by considering how generalizable our examples are to forensic mental health testimony in general.

## Rorschach Testing for Diagnosis and Personality Description

Of the many extant projective tests, none has as much supporting research as the Rorschach. If it can be shown that testimony based on the Rorschach, when used for diagnosis of mental disorders and personality description, is inadmissible under *Daubert,* it likely follows that no other projective technique is admissible, either.

We prefer to deal solely with *The Rorschach: A Comprehensive System* (TRACS), Exner's (1993) method of administration, scoring, and interpretation. This method is the most researched of several Rorschach "schools," and confining

attention to TRACS would show the Rorschach to best advantage. However, sole attention to TRACS is not feasible for two reasons. First, many studies do not use TRACS or do not use it carefully, and so generalization to TRACS-based interpretations may be hazardous. Second, many clinicians do not use TRACS (Exner, 1980), and generalizing from TRACS-based studies may not accurately estimate the accuracy of non-TRACS interpretations.

*Daubert* concerns scientific theories, but a mental test is not a theory. Although early Rorschach workers proposed the "projective hypothesis" as a theoretical basis for the Rorschach, use of the Rorschach today seems instead to rely on the following less controversial theory: the Rorschach, when administered, scored, and interpreted in a specific manner, yields accurate diagnoses of psychological disorders or accurate personality descriptions. (We bypass the occasional objection that the Rorschach is not a test, because in the present context this is a distinction without a difference.)

1. Is this technique testable? Yes. It is relatively straightforward to determine whether an instrument yields scores that are valid, in the sense of notably correlating with external criteria including psychiatric diagnoses.

2. Has this technique been tested? Yes. This is true for two important aspects of validity. The first concerns zero-order validity correlations between Rorschach scores and various criteria, such as psychiatric diagnoses or non-Rorschach personality measures. The second is incremental validity, which is the ability of a test to add to diagnostic accuracy or personality description, when added to other commonly obtained information (e.g., chart data, interviews, Minnesota Multiphase Personality Inventory [MMPI–2]; Butcher, Dahlstrom, Graham, Tellegen, & Kaemmer, 1989).

The interpretation of zero-order validity studies is currently controversial; Rorschach proponents see the validity more optimistically than do skeptics. We read the literature as suggesting that typical Rorschach scores have low validity, in the .2–.3 range, somewhat lower than the MMPI (Garb, Florio, & Grove, 1998; Garb, Wood, Nezworski, Grove, & Stejskal, in press). Incremental validity studies, on the other hand, quite consistently show zero to negative validity for the Rorschach (Garb, 1985).

One could argue that if the Rorschach has any zero-order validity, it passes this *Daubert* test. However, it is more important to remember that without incremental validity, the Rorschach—on average—adds nothing to diagnostic evaluations. Indeed, the Rorschach can be expected to detract from testimonial accuracy, if it has no incremental validity. This is because it enhances confidence without enhancing validity. Psychologists (and other clinicians) often show increased confidence in their judgments when they have more information rather than less; but their judgments often do not grow more accurate as more information accures (Garb, 1985; Oskamp, 1965). Unwarranted but confidently expressed opinions from a testifying expert are more likely to be prejudicial than probative, and hence should not be admitted.

3. Is the Rorschach generally accepted as valid for diagnosis and personality description? No; it is quite controversial among personality assessment researchers and always has been. Courts are encouraged to analyze years of negative Rorschach reviews in authoritative sources, including Buros Institute's *Thirteenth*

*Mental Measurements Yearbook* (Impara & Plake, 1988; see e.g., Cronbach, 1949; Jensen, 1965; Nezworski & Wood, 1995; Wood, Nezworski, & Stejskal, 1996).

4. What is the error rate associated with Rorschach interpretations and diagnoses? This question cannot be succinctly answered, because accuracy varies across applications. Unquestionably, however, the Rorschach sometimes yields highly inaccurate diagnoses. For example, in a classic pre-TRACS study, Little and Schneidman (1959) suggested that the error rate can be 100%; in their report, the modal diagnosis given to psychiatrically undisturbed individuals by Rorschach experts was one of psychosis. These were standard Rorschach protocols, taken verbatim and interpreted by renowned experts (e.g., Zygmunt Piotrowski), but without benefit of direct comparison to normative data and without use of statistical prediction from scores. Using a similar expert–judge design but also with no explicit normative comparison or statistical prediction based on scores, Albert, Fox, and Kahn (1980) compared malingerers and psychotic individuals. They found 52% diagnostic errors among psychotic individuals, 46–72% errors with malingerers, and 24% with controls. In criminal forensic contexts such error rates are clearly unacceptable. For nonpsychotic diagnoses (e.g., depression), the Rorschach's validity is also quite weak (Wood, Lilienfeld, Garb & Nezworski, 1999; Wood et al., 1996).

Meta-analyses of the Rorschach (e.g., Parker, Hanson, & Hunsley, 1988) suggest typical Rorschach score validities of about .3. It is easily calculated that if a Gaussian measure has .3 validity, then individuals classified into the more abnormal group represent classification errors over 38% of the time (when the abnormal group has a relative frequency of 50%). This error rate climbs as the abnormal group's frequency goes down, being over half when the frequency is 10%.

The error rate for personality descriptions based on the Rorschach is likewise very substantial. If the validity of a Rorschach score is .3, then the error rate of a typical personality trait inference is 91% as great as that for completely random Rorschach interpretations. (In real life, the typical error rate almost surely exceeds this figure, because the typical validity figure of .3 stems from studies that statistically compare groups. Clinicians generally do not predict nearly as well as do statistical formulae; Grove et al., in press.) In our opinion, the adjudicated rights of citizens should not turn on such an error-prone way of obtaining diagnoses and personality descriptions.

5. Has the validity of the Rorschach been subjected to peer review? Yes, no, and maybe. The assessment community has been surprised to learn in recent years that many of Exner's studies cited in his 1993 volume as supporting TRACS, were apparently never peer reviewed; in fact, many do not even exist as actual written reports, and their data are not readily available to other investigators (Wood et al., 1996). Furthermore, pro-Rorschach studies often appear in a specialty journal, the *Journal of Personality Assessment* (originally called the *Rorschach Research Exchange*), which may potentially relate to quality of publication. Finally, the effectiveness of peer review in this area has been questioned, given notable problems with clarity and accuracy of some published Rorschach studies (Wood, Nezworski, Stejskal, Garven, & West, 1999).

6. From the increasing popularity of Exner's scoring and interpretation system, it might seem that using TRACS is a well-accepted way of enhancing the Rorschach's accuracy. However, this is not so. Hiller, Rosenthal, Bornstein, Berry,

and Brunell-Neuleib (1999) claimed to find evidence for superior validity of TRACS when compared to other systems. However, they reach this sanguine conclusion by misinterpreting a nonsignificant difference ($p \lessapprox .175$, two-tailed) as favoring TRACS (Garb et al., in press).

Based on information from Rorschach studies, it would seem that there is a way to maximize accuracy: confine Rorschach use to one or a few well-validated scores (e.g., F + % or X + %) that have been shown to reliably predict a diagnosis of psychosis. One might thereby do somewhat better than chance in making such diagnoses; but the error rate is still substantial. However, three problems prevent directly applying research error rates for this kind of problem to forensic clinicians. First, forensic experts apparently do not rely on statistical predictions from normed Rorschach scores; instead, they clinically combine information and do not explicitly reference good normative data. In addition, experts seldom testify based on a single score; mixing valid with invalid (or less valid) scores can easily "wash out" all the valid diagnostic information in a test protocol, owing to the deficiencies of clinical as opposed to statistical prediction (Grove et al., in press). Finally, in the typical clinical forensic situation, the Rorschach data come into a picture with a lot of other data on hand (life history data, interview information, other psychological test scores); hence, the error rates from Rorschach studies, which are essentially always based on zero-order validity, cannot be used to infer error rates for this kind of incremental validity situation.

In contrast to our analysis of Rorschach admissibility, McCann (1998) published a more sanguine review, but it antedates *Kumho*. Guidelines for ostensibly appropriate use of the Rorschach in court were offered by Meloy (1991). Weiner, Exner, and Sciara (1996) noted that the Rorschach has seldom been excluded in court (they noted only six challenges, one of them successful, out of 7,934 cases using Rorschach testimony).

The above is consistent with our experience that very few attorneys conduct rigorous *Daubert* (or even *Frye*) hearings to exclude unreliable, junk science testimony. We find the use of the Rorschach to be quite problematic under *Daubert/Kumho*. We also believe that the analysis in McCann (1998, pp. 133–140) is seriously flawed. McCann did not explain how Rorschach-generated impressions of a client are falsifiable, a fundamental *Daubert* criterion. He also misinterpreted the continuing controversy over this test as somehow constituting evidence for its general acceptance. (He does not note that a controversy can continue long after most disputants have reached a negative opinion.) McCann also erred in relying on Exner's (1993) self-cited, unpublished reports, which as discussed above are often not peer-reviewed or even physically extant manuscripts. McCann likewise relied on unreplicated and unrepresentative accuracy figures for selected Rorschach variables in concluding that the Rorschach has acceptable error rates under *Daubert*. He curiously did not rest his error rates on the then-best available review of Rorschach accuracy: Parker et al.'s (1988) meta-analysis. This review yielded two average Rorschach validities: .42 for "convergent" validity studies and .07 for other studies. Skeptical of this report, Garb et al. (1998) reanalyzed Parker et al.'s data and found an average validity of .3, which we used here for error rate calculations (above). We suggest that experts and courts not rely on McCann's analysis as definitive.

## Controversial Diagnoses (PTSD and MPD/DID)

We consider just two diagnoses here: PTSD and MPD, now called DID in the *Diagnostic and Statistical Manual of Mental Disorders* (4th ed.; *DSM–IV;* American Psychiatric Association, 1994). First, we note that PTSD and MPD are *labels,* not theories. This is a critical distinction—some experts have misled courts to believe falsely that the existence of a diagnostic label in *DSM–IV* somehow proves general acceptance of the existence of the described disorder as well as acceptance of proposed causal mechanisms for the etiology of such a disorder. This is a very serious error of logic and method. The *DSM–IV* is simply an agreed upon set of terms and descriptions—a catalog. It does not provide, and was not intended to provide, documentation of the general acceptance of the existence of disorders. Furthermore, the *DSM–IV* is not in any way documentation of general acceptance of the etiology (cause) of a disorder. To clarify with an example: The word *unicorn* is in the dictionary and we all agree on the concept and description of a unicorn, but this surely does not document the existence of unicorns.

DSM labels, considered only as labels, may not be generally accepted, even though they make it into the manual (just as the Volstead Act [National Prohibition Act, 1919] stayed on the books years after public support for it had eroded). With regard to the *DSM,* the manual's cautionary statement describes the categories and criteria as a "consensus" position. However, this must not be understood to imply any general polling to establish consensus. Indeed, the manual's introductory explanation of the *DSM* revision process makes clear that no polling was involved. Instead, specialty subcommittee (e.g., there was a subcommittee on dissociative disorders) members were assigned to review aspects of the literature relating to certain categories, using subjective methods (i.e., no requirement for meta-analysis) and following a common format. Analyses of existing data sets were sometimes undertaken. These reviews were then critiqued by others, chosen by Task Force members. Subcommittees then voted for revised labels (or criteria), and the Task Force voted whether to accept a subcommittee's recommendation. This procedure is defensible, but it is not completely explicit, repeatable, or tied to polling representative samples of scientists.

McHugh (1998) explained the distinction between *DSM* category inclusion and category validation in a *Daubert* hearing:

> Q: . . . is the fact that the term "dissociative amnesia" is found in the *DSM* any evidence at all of the scientific validity of the condition?
> A: No, it's not. *DSM–IV* is an attempt to, as *DSM–III* was, is an attempt to develop reliability among psychiatrists about what they are observing. It is not intended to say that they are claims for the existence of a particular condition as confirmed by its enclosure within *DSM–IV.* It's a question of reliability versus validity. (McHugh, 1998, pp. 530–531)
>
> [P]sychiatry is the only discipline that runs itself on a catalog, and the reason it did that was that back in the 19—late 1960s and early 1970s, it was discovered that they couldn't do much research in psychiatry because they couldn't get agreement on what they were observing, let alone what they were calling things. So a patient with a set of symptoms called schizophrenia in Baltimore was called manic depressive in London and demoralized in San Diego. It was the decision of the American Psychiatric Association and of the American psychiatric community that we should build a catalog of reliability, not of validity, so that we could do research.

> So that when we said these patients are showing these symptoms that we are going to call Dissociative Disorder or schizophrenia, we could have a common language. After that, we could discover whether they had, in fact, anything like dementia, or whether they were behaving in a particular way for other reasons. So when I'm saying this (DSM) is a book of reliability, I'm saying this gives you a code that whereby you can describe people whom you say will be given—will satisfy the criteria in this book [DSM] for Dissociative Disorder, but whether Dissociative Disorder exists in itself is not proven or even claimed in this book [DSM]. (McHugh, 1998, p. 637)

In use, *DSM* diagnoses of MPD (or PTSD) generally are linked to accompanying theories of etiology: namely, that these psychological disorders are caused, in whole or in large part, by psychological trauma. In the case of PTSD, this includes a wide range of upsetting events; for MPD, the cause is purported to be early, severe (and almost always repressed) abuse, chiefly sexual abuse (Putnam, 1989). The following *Daubert* features are related to admissibility for PTSD.

1. The concept of PTSD, simply as a diagnostic label, is testable in principle. However, to obtain a test placing such a diagnosis at risk of falsification, one would need a benchmark for accuracy. Because many, even most, forensic PTSD evaluations now use structured interviews and claim to adhere to *DSM* criteria, validity studies seldom have a benchmark better than the forensic diagnosis itself. Spitzer (1983) proposed a method for validating diagnoses that could be useful for PTSD: the "LEAD standard," denoting longitudinal, expert, and all-data based diagnoses. Unfortunately, this useful strategy has apparently never been used to assess the concept of PTSD.

Testing the theory that PTSD is caused by exposure to trauma is also possible: Compare people who have been exposed to an objectively verified, naturally occurring traumatic event with people who have not been exposed, and find out whether the traumatized group gets PTSD more often then the unexposed group does. (Ethical principles preclude a direct experimental test.)

2. Has the causal theory of PTSD been tested? Yes, but the tests have been weak because of ethical and practical problems. Tests to date have yielded variable, mostly weak confirmations demonstrating the unreliable nature of the concept (Bowman, 1997). For example, McFarlane (1987, 1988a, 1988b, 1988c, 1988d) found that just 9% of individuals' symptoms could be accounted for by exposure to a disastrous fire, whereas Galante and Foa (1987) found no relationship between proximity to an earthquake and children's behavioral disturbances. By contrast, preexisting symptoms may predict as much as half of the variance in posttrauma symptoms (Nolen-Hoeksema & Morrow, 1991). Only for those exposed to the severest, most prolonged traumas (e.g., prisoners of war) does the rate of PTSD rise to one-half or more (Engdahl, Dikel, Eberly, & Blank, 1997). In a review of 45 studies Kendall-Tackett, Williams, and Finkelhor (1993) reported that abused children displayed more symptoms than nonabused children, with abuse accounting for 15% to 45% of the variance, but they did not analyze rates of PTSD diagnoses.

One might argue that if any PTSD-type symptoms are significantly associated with trauma, this makes PTSD testimony probative and hence admissible. However, this ignores the difference between scientific and legal concepts of causation. An expert usually has to testify as to whether a specific trauma was a "substantial factor" in creating the disorder, because causation in the "but for"

sense is typically out of the question in trauma cases. As research shows that traumas usually account for only a minority of symptoms, an expert may have difficulty opining that a specific trauma is a substantial factor in causing symptoms. If "substantial factor" means "more likely results in the effect than not," then for a trauma to cause PTSD, one would need research showing that over half of those exposed to a particular type of trauma go on to develop PTSD.

Psychological causation is seldom so straightforward. Correlational studies relating traumas to symptoms often show that third variables (such as other adversity, preexisting symptoms, or coping styles) can account for much of the apparent trauma–symptom connection (Beitchman et al., 1992; Kendall-Tackett et al., 1993). If this is so, then theories like "PTSD is caused by trauma" cannot be fairly characterized as having survived strong risks of falsification. In sum, the causal connection between trauma and PTSD appears too unreliable to survive a thorough *Daubert/Kumho* analysis.

3. Is the theory of PTSD generally accepted? The label is more controversial than some (e.g., mania) but less so than others (e.g., MPD). We believe that the syndrome is generally, but by no means universally, accepted.

However, as noted above, acceptance of the label need not imply acceptance of the causal theory. PTSD positively invites misunderstanding on this score; its diagnostic requirement of a trauma event invites experts to commit the *post hoc ergo proper hoc* fallacy, assuming that the trauma caused the PTSD. The very name *posttraumatic stress disorder* seems to imply what the criteria do not state, namely causality.

If we consider an analogy from the depressive disorders, the fallacy is clarified. If *DSM–IV* erected a "reactive depression" category, with diagnostic criteria requiring a negative life event plus certain depressive symptoms, would this justify the conclusion that the negative event caused the symptoms? Of course not. In fact, negative life events have little proven relation to depression and "neurotic" ailments (Tennant, 1983; Tennant, Bebbington, & Hurry, 1981).

4. What is the known or potential error rate of a PTSD diagnosis? A relevant error rate would seem to be the frequency with which a court would err, if it equated a PTSD diagnosis with proof of traumatic causation. If symptoms are only 9% predictable from trauma exposure, as McFarlane (1988a) found, this would correspond to an error rate of over 35% in causal inferences, assuming a 50% base rate of actual trauma exposure; the error rate grows if trauma exposure is rarer than this. Because we do not know the true rate of trauma exposure suffered by plaintiffs, it is fair to say that the error rate is unknown. Such uncertain and potentially very high error rates clearly, should not survive thorough *Daubert/Kumho* scrutiny.

5. A major problem with standards in diagnosing *DSM–IV* (American Psychiatric Association, 1994) PTSD is the vagueness of its "A" criterion:

> The person has been exposed to a traumatic event in which both of the following were present: (1) the person experienced, witnessed, or was confronted with an event or events that involved actual or threatened death or serious injury, or a threat to the physical integrity of self or others; and (2) the person's response involved intense fear, helplessness, or horror. (p. 427–428)

The inclusion of the phrase "threat to the physical integrity of self or others" may allow a biased or careless "expert" to overdiagnose PTSD. Moreover, criterion

A(2) is obviously quite subjective, as are most of the symptoms of PTSD. Malingering these symptoms would not be difficult. Even though a PTSD diagnosis requires actual (not just claimed) trauma, it has been the authors' observation that many forensic clinicians do not even attempt to corroborate the trauma claim or make the PTSD diagnosis conditional on a court's determination of the accuracy of the trauma claim. This standards problem is especially striking given that, in many PTSD claims, it seems that the parties dispute all or part of the trauma claim.

For the sake of completeness, we add here the obvious fact that one cannot infer "backwards" from the existence of PTSD-type symptoms (or MPD) to the occurrence of a historical trauma. This is true for logical reasons: The cause is not deducible from its effects, because the effects have more than one possible cause. It is also true for two statistical reasons. First, the conditional probability of trauma, given the existence of symptoms, is not the same as the conditional probability of symptoms, given trauma; the latter is what PTSD research ordinarily documents. Second, the conditional probability of trauma, given symptoms, is ordinarily much lower than the conditional probability of symptoms, given trauma; this is because the frequency of specific types of trauma (e.g., sexual abuse) is much less than 50% in the relevant population.

6. With regard to peer review, many studies of the relationship between trauma and psychiatric symptoms have been published in mainstream journals (e.g., *Archives of General Psychiatry*) as well as in specialty journals (e.g., *Journal of Traumatic Stress, Child Maltreatment,* and *Child Abuse and Neglect*). As mentioned above, however, many of these studies report only weak support for the trauma–illness connection.

If PTSD diagnoses under *Daubert* are problematic, diagnoses of MPD/DID (hereinafter, MPD) are downright untrustworthy. Like PTSD, the underlying theory, not stated in the criteria, is that trauma causes the disorder. For MPD the assumed trauma is reportedly quite commonly sexual in nature, ostensibly beginning in early to middle childhood (Putnam, 1989).

In assessing the credibility of the MPD causal hypothesis, an acquaintance with the full range of theories about MPD is important. Courts must be truthfully informed that variants of the theory of MPD—crafted by central figures of MPD theory and practice—are unsupported by any credible evidence. One national leader, Corydon Hammond, has posited that MPD is often the product of "programming" by intergenerational, international Satanic cults. In a question-and-answer session with an audience of psychotherapists, he explained:

> Q: What's the difference between this kind of program and cult-type abuse and Satanic abuse in the kind of cults with the candles and the . . .
> A: This type of programming will be done in the cults with the candles and all the rest. My impression is this is simply done in people where they have great access to them or they're bloodline and their parents are in it and they can be raised in it from an early age. If they are bloodline they are the chosen generation. If not, they're expendable and they are expected to die and not get well. There will be booby traps in your way if they aren't non-bloodline people that when they get well they will kill themselves. I'll tell you just a little about that. My belief is that some people that have ritual abuse and don't have this have been ritually abused but they may be part of a non-mainstream group. The Satanism comes in the overall philosophy overriding all of this. People say, "What's the purpose of it?" My best guess is that

> the purpose of it is that they want an army of Manchurian Candidates, tens of thousands of mental robots who will do prostitution, do child pornography, smuggle drugs, engage in international arms smuggling, do snuff films, all sorts of very lucrative things and do their bidding and eventually the megalomaniacs at the top believe they'll create a Satanic order that will rule the world. (Hammond, 1992)

Similarly, Bennett Braun, former president and co-founder of the International Society for the Study of Dissociation (ISSD) and past editor of its journal *Dissociation,* has reportedly opined that MPD often results from "Satanic cult" abuse:

> [Braun] told the audience that children are often abused in day-care centers as a way of prepping them to join the cult. "You have to predispose the nervous system to this sort of behavior," he said. After the children are abused in day care, they are "then picked up in high school" and indoctrinated into the cult. The cult, he has come to understand, is networked with the Ku Klux Klan; neo-Nazi groups; the Mafia; big business; the intelligence community, including the CIA; and the military. He told the audience that he has developed twelve P's for those involved in satanic abuse: "Pimps, Pushers, Prostitutes, Physicians, Psychiatrists, Psychotherapists, Principals and teachers, Pallbearers [meaning undertakers], Public workers, Police, Politicians and judges, and Priests and clergies from all religions." (Ofshe & Watters, 1996, p. 245)

Braun was recently a co-defendant in a case alleging that he imposed his theories on a mother and her children using hypnosis and other means. Although he denied negligence, the plaintiff received a record $10.6 million settlement. Yet another former ex-president of the ISSD, Colin Ross, has written a book proposal expounding his theory that MPD cases may be caused by CIA-military brainwashing experiments (Ofshe & Watters, 1996, p. 223).

Although these theories may sound outlandish or at any rate utterly wanting in proof, professionals like Hammond, Braun, and Ross have had great influence in the MPD field. Other therapists, relying on MPD theories of these kinds (and related material published in *Dissociation* and elsewhere), have suffered multimillion-dollar jury verdicts for malpractice, and some have lost their medical licenses. These facts support the idea that such theories are not generally favorably regarded by the larger scientific or professional communities, although they have had currency in the MPD subcommunity.

Because of the sharp divergence of some of these leaders' MPD theories from more mainstream views, courts evaluating peer review for *Daubert* purposes need to understand that peer review may not always function in its normal manner (i.e., to detect and correct error). Courts may need to explore the knowledge, training, experience, and judgment of editors and peer reviewers, rather than simply assume that "peer review" is a simple, nonevaluative fact determination.

Less implausible variants of the MPD theory are also unlikely to survive *Daubert/Kumho* analysis. We now examine the six indicia, with regard to the tamer theory that MPD results from severe and prolonged child abuse, usually including sexual abuse (Putnam, 1989).

1. This hypothesis is testable in principle. A proper, prospective longitudinal study of children with known abuse would yield evidence about the rate of MPD in such children once they became adults. The use of proper controls, similar to the

traumatized children in many relevant ways other than trauma exposure, would be crucial.

2. However, the theory has not been tested in this straightforward fashion. All studies to date are retrospective and are based on self-reported abuse histories. Because MPD diagnosis and retrospective abuse histories have ill-determined error rates, existing tests of the theory are not good evidence that MPD is ever caused by severe child abuse, let alone that it is routinely so caused.

The following would be convincing evidence for the MPD-abuse theory, if shown in independent, replicated studies. Individuals with verified trauma histories are prospectively followed. They are later prospectively observed, by observers blind to the trauma histories, to show unmistakable signs of MPD (not signs shared with many other disorders, e.g., depersonalization). The only unequivocal MPD sign would seem to be obvious alter switching, because the *DSM–IV* amnesia criterion is quite vague ("amnesia for important personal information too extensive to be accounted for by ordinary forgetting"; p. 487). Concomitant variables (e.g., nonabuse adversity, family history of psychopathology, history of exposure to trauma-centric psychotherapies, or therapy with MPD advocates) would have to be convincingly ruled out as competing causes of MPD symptoms. There are no such published, peer-reviewed studies. Beitchman and colleagues (1992) reviewed the literature and concluded there was insufficient evidence of a link between child abuse and MPD.

3. Some studies of MPD/DID are peer reviewed. Much of the material is not peer-reviewed or is reviewed less stringently (books, conference presentations). Material skeptical of MPD is more likely to be published in mainstream and general journals (e.g., *British Journal of Psychiatry*), whereas much of the pro-MPD material appears in specialty journals (e.g., *Dissociation*).

4. What is required for a correct inference that abuse underlies a case of MPD? Consider whence the inference arises. From writings of MPD advocates as well as our own review of cases, it appears that abuse is inferred from "recovered" (i.e., ostensibly formerly "repressed" or "dissociated," then recalled) memories. Hence, the causal inference is usually no stronger than the evidence for "repression" or "dissociation" of trauma memories. This evidence is quite feeble (Pope & Hudson, 1995; Pope, Hudson, Bodkin, & Oliva, 1998; Pope, Oliva, & Hudson, 1999), and courts applying *Frye* or *Daubert* have very seldom held that this concept is admissible (*Barrett v. Hyldburg,* 1996; *Blackowiak v. Kemp,* 1996; *Borawick v. Shay,* 1995; *Carlson v. Humenansky,* 1995; *Comm. of Pennsylvania v. Crawford,* 1996; *Commonwealth v. Kater,* 1983; *Dalrymple v. Brown,* 1997; *Doe v. Maskell,* 1996; *Engstrom v. Engstrom,* 1997; *Hammane v. Humenansky,* 1995; *Hunter v. Brown,* 1996; *John BBB Doe v. Archdiocese of Milwaukee,* 1997; *Kelly et al., v. Marcantonio et al.,* 1996; *Lemmerman v. Fealk,* 1995; *M.E.H. v. L.H.,* 1996, 1997; *People v. Shirley,* 1982; *Ramona v. Ramona,* 1997; *State of New Hampshire v. Hungerford,* 1995, 1997; *State of New Hampshire v. Walters,* 1997; *State of Rhode Island v. Quattrocchi,* 1996; *State v. Atwood,* 1984; *Stokes v. State,* 1989; *S.V. v. R.V.,* 1996; *Travis v. Ziter,* 1996; *Woodroffe v. Hansenclever,* 1995). In the case of "dissociated" abuse memories in MPD patients, there appear to be no well-conducted longitudinal prospective studies showing that severe abuse precedes MPD (whether "dissociated" or not), let alone that such abuse causes MPD.

5. We have the gravest concern about the circumstances and frequency with which MPD diagnoses may be misapplied. There are only two main criteria for DID: two or more personalities that alternately control the patient's behavior, and amnesia. We have observed the diagnosis of MPD being made by clinicians who interpret a patient's varying moods, inconsistent attitudes, and varied likes and dislikes as "alter personalities" where another, more skeptical clinician would not see these behavioral changes as anything out of the ordinary. We have seen reports of clinicians telling patients that any significant forgetting of childhood events (including for events before age 2!) constituted "amnesia," and then using that "symptom" to qualify a patient for an MPD diagnosis. Indeed, supporters of the validity of MPD report that patients often do not manifest any MPD-type behavior when first seen (Kluft, 1984). Most have been treated by various clinicians and for several years under other diagnoses (Coons, Bowman, & Milstein, 1988; Putnam, Guroff, Silberman, Barban, & Post, 1986), with the MPD diagnosis often only made after months of contact with the patient and sometimes made without the symptoms being present (Kluft, 1984).

Under the current state of the art "experts" cannot offer responsible testimony to courts about what conditions favor accurate MPD diagnoses. Much clearer, objective behavioral or physiological criteria are needed. MPD advocates and skeptics alike must generally accept these criteria. Advocates and skeptics also must be able to routinely agree on the presence or absence of symptoms, in individual cases. Until that time, expert testimony supporting MPD diagnoses should not survive an appropriately conducted *Daubert/Kumho* attacks on "standards" grounds.

6. As far as we can tell, MPD/DID is one of the least generally accepted of all *DSM* diagnoses. There are extremely heated debates about the "reality" of MPD/DID, with some defenders (Bliss, 1986; Kluft & Fine, 1993; Putnam, 1989; Ross, 1997) and many skeptics (Aldridge-Morris, 1989; Merskey, 1992; North, Ryall, Ricci & Wetzel, 1993; Ofshe & Watters, 1996; Piper, 1997; Spanos, 1996). We prefer to think of the controversy not in terms of the "reality" of MPD, but rather in terms of its prevalence (near-zero vs. much higher) and its etiology. As a diagnostic label, MPD may conceivably serve as a reasonable label for a certain behavioral syndrome. This syndrome may be rare or more common. It remains to be determined whether it is primarily caused by abuse (Putnam, 1989), by misguided assessment and therapy techniques (Merskey, 1992; Ofshe & Watters, 1996; Piper, 1997), or by media influences (North et al., 1993; Ofshe & Watters, 1996) or is typically feigned or represents a role enactment (Spanos, 1996).

In a recent study by Pope, Oliva, Hudson, Bodkin, and Gruber (1999), U.S. psychiatrists were asked about their attitudes toward MPD. About a third (35%) of respondents favored including MPD in the next *DSM* "without reservations"; 15% thought it should not be included at all; and 43% thought it should be included "only with reservations." In an earlier report, Dell (1988) surveyed professionals treating MPD patients and found that "a total of 52% of the psychiatrists, [and] 80% of the psychologists . . . stated that other professionals had overtly told them that 'there is no such thing as multiple personality [disorder]' " (p. 529). Clearly there is and has been no general acceptance of MPD among general mental health professionals, let alone scientific researchers.

It has been claimed by a few that the relevant scientific community for

*Daubert* purposes is limited to those who publish research on numerous MPD patients. This superficially plausible requirement conceals several tendentious errors. First, MPD skeptics are highly unlikely to treat many MPD patients, if they view the disorder as created by improper therapy that focuses attention on MPD symptoms. Hence, like most clinicians in general, MPD skeptics are not in a position to see, let alone publish, research on significant numbers of MPD patients. Instead of only listening to clinicians publishing numerous MPD cases, courts should rely on experts in diagnosis and assessment, uses of the *DSM,* and the history of psychiatry to provide guidance regarding the admissibility of MPD.

A second problem with such a restriction is that pro-MPD researchers often publish in "specialty" journals such as the now apparently defunct *Dissociation* (Barach, 1999)—a fact that arguably supports skepticism about the quality of these articles. Third, of the few clinicians who have reported treating dozens to hundreds of MPD patients, a number have been sued or professionally sanctioned for their diagnosis and treatment methods.[1] Restricting the relevant community to such individuals seems unsound. In our view, an appropriate community for deciding on *Daubert* "general acceptance" of MPD would include several different kinds of scientists. It should, of course, include researchers who study MPD patients, but it should also include researchers on disorders frequently present before, after, alongside, or arguably instead of MPD in ostensible MPD patients (e.g., affective disorders, anxiety disorders, personality disorders) as well as diagnostic researchers. It should include developmental psychologists studying children's responses to trauma and experts in human memory (because MPD allegedly involves amnesia). It should include experts in the history of misadventures in psychiatry (because critics allege that MPD is another such misadventure). Finally, it should include psychological and sociological experts in social influence (relevant to judgments about ways MPD could result from suggestion).

How can the MPD concept become generally accepted? It is clearly up to proponents of a controversial theory to win over the scientific community with convincing data. Those proposing a high rate of MPD necessarily suggest that there are up to millions of hitherto hidden cases of MPD now coming to light (Piper, 1997); that such a blatant condition was missed by so many for so long needs a convincing explanation. Those advocating extreme abuse-etiology theories (CIA mind control programming, globe-spanning Satanic cults) must explain how these conspiracies have so successfully and uniformly escaped forensic detection when "ordinary" child molesters, serial killers, the Mafia's crimes, and White House-directed burglaries have not. Pro-MPD theorists must satisfactorily explain why thousands of trauma victims, longitudinally studied over the past several decades, have not been reported to develop MPD (Beitchman et al., 1992; Kendall-Tackett et al., 1993).

Investigators in the fields of child psychology, sociology, history of psychiatry, general clinical psychiatry and clinical psychology, and memory research commonly advocate a simpler alternative explanation for MPD—improper suggestion, chiefly by zealous and poorly trained therapists. The theory that MPD is the result of dissociated memories of horrific abuse is no more reliable than the theory of repression that so many courts have excluded as junk science. We conclude that the

[1]A list is available from the authors on request.

MPD concept, and especially the abuse theory of MPD etiology, does not currently come close to general acceptance under *Daubert/Kumho* analyses.

## Summary and Recommendations

The foregoing has implications for courts, expert witnesses, and attorneys. Following *Daubert/Kumho,* federal judges are now on notice by the U.S. Supreme Court that they bear an affirmative duty to actively exclude junk science testimony and thus protect the integrity of the legal process. We hope that state courts quickly follow this overdue analysis, because the admission of unreliable, junk science "expert" testimony is contrary to public policy and endangers the integrity of the legal system. We believe too many citizens have been harmed by inappropriate, unscientific testimony. Proper implementation of *Daubert/Kumho* analyses will go far toward correcting this serious social problem.

We have covered just a few examples of testimonial areas that would, we believe, fail careful *Daubert/Kumho* scrutiny. One cannot generalize to all mental health testimony from these examples. However, given the relatively rigorous requirements of *Daubert,* the recent extension of its reach by *Kumho,* and the limited scientific knowledge base in many areas of clinical psychology and psychiatry, we believe a significant portion of mental health-related social science testimony may have trouble withstanding a well-conducted *Daubert/Kumho* hearing.

In our view, experts have an affirmative ethical duty to refuse to give testimony that would not reasonably be expected to pass *Daubert/Kumho* scrutiny. This is true even if opposing counsel do not challenge its admissibility. In addition, experts have a similar duty to accurately report to judges and juries the kind of research we have summarized. This is true even if opposing counsel does not introduce such research. We say this because professionals are bound by their oath to tell the whole truth; trying to "slip one by" opposing counsel is hardly that. Moreover, unethical testimony (American Psychological Association [APA], 1992; APA Division 41, 1991) inevitably brings the profession into disrepute (Hagen, 1997).

Experts wishing to practice competently in a well-conducted *Daubert/Kumho* hearing will find the new environment a spur to improving their testimony about complex science issues. By contrast, careless experts in *Daubert/Kumho* cross-examinations may reveal culpable technical and ethical errors. It is up to experts to uphold the highest standards of their respective professions, disclose fully and fairly the bases for their opinions, rely to the greatest extent possible on solid scientific findings, explain in understandable terms the uncertainties in their opinions, and be frank about the degree to which their theories and methods meet, or fail to meet, *Daubert* requirements.

Knowledgeable experts can also contribute in another way. Helping educate legal and mental health professionals about scientific methods and about the distinction between good science and junk helps guard the legal system from many forms of bogus expert testimony.

Attorneys may also need to modify traditional practices, where *Daubert/ Kumho* hearings are involved. The common practice of "getting up to speed" by a rapid reading of general tomes is likely to prove inadequate in highly complex, science-intensive hearings dealing with multivariate analysis, sophisticated re-

search methodologies, philosophy of science, and detailed facts from decades of research findings (Krauss & Sales, 1999). In the world of *Daubert/Kumho* analysis, a science–law team should be the minimal standard of legal practice, to help ensure that these complexities are properly addressed. We believe attorneys have an affirmative duty to consult with or defer to expert attorneys or scientists in the relevant fields. Improper loss of a *Daubert/Kumho* hearing may yield dire consequences for clients (e.g., false imprisonment of an innocent client, or an innocent child's continued exposure to an abusive environment) and could even lead to a new area of legal malpractice claims. The demand for specialized education and knowledge created by *Daubert, Kumho,* and related decisions is likely to hasten the advent of the multidisciplinary team approach to science-intensive litigation.

## References

Albert, S., Fox, H. M., & Kahn, M. W. (1980). Faking psychosis on the Rorschach: Can expert judges detect malingering? *Journal of Personality Assessment, 44,* 115–119.

Aldridge-Morris, R. (1989). *Multiple personality: An exercise in deception.* London: Erlbaum.

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). Washington, DC: Author.

American Psychological Association. (1992). Ethical principles of psychologists and code of conduct. *American Psychologist, 47,* 1597–1611.

American Psychological Association Division 41 and American Psychology-Law Society (1991). Specialty guidelines for forensic psychologists. *Law and Human Behavior, 15,* 655–665.

Barach, P. (1999). President's message. *ISSD News, 17,* 1.

Barrett v. Hyldburg, Super. Ct., Buncombe Co., North Carolina, No. 94-CVS-0793 (January 23, 1996).

Beitchman, J. H., Zucker, K. J., Hood, J. E., daCosta, G. A., Ackman, D., & Cassavia, E. (1992). A review of the long-term effects of child sexual abuse. *Child Abuse and Neglect, 16,* 101–118.

Bersoff, D. N., Glass, D. J., Dodds, L. D., Eckl, L., & Peters, L. M. (1999). *The admissibility of forensic psychological and social science evidence.* Unpublished list of cases.

Blackowiak v. Kemp, 546 N.W. 2d 1, Minn. (April 19, 1996).

Bliss, E. L. (1986). *Multiple personality, allied disorders, and hypnosis.* New York: Oxford University Press.

Borawick v. Shay, 68 F. 3d 597, 2nd Cir., Conn., cert. denied (October 17, 1995)

Bowman, M. (1997). *Individual differences in post traumatic response: Problems with the adversity-distress connection.* Mahwah, NJ: Erlbaum.

Butcher, J. N., Dahlstrom, W. G., Graham, J. R., Tellegen, A., & Kaemmer, B. (1989). *Manual for administration and scoring of the MMPI–2.* Minneapolis: University of Minnesota Press.

Carlson v. Humenansky, No. CX-93-7260, 2nd Dist., Ramsey Co., Minn. (December 29, 1995).

Comm. of Pennsylvania v. Crawford, 682 A. 2d 323. Pa. Super. (July 30, 1996).

Commonwealth v. Kater, 447 N.E. 2d 1190 (Mass. 1983).

Coons, P. M., Bowman, E. S., & Milstein, V. (1988). Multiple personality disorder: A clinical investigation of fifty cases. *Journal of Nervous and Mental Disease, 176,* 519–527.

Cronbach, L. J. (1949). Statistical methods applied to Rorschach scores: A review. *Psychological Bulletin, 46,* 393–429.

Dalrymple v. Brown, 1997 WL 499945, Pa., Aug. 25 (1997).

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S., 113 S. Ct. 2786 (1993).

Dell, P. (1988). Professional skepticism about multiple personality. *The Journal of Nervous and Mental Disease, 176,* 528–531.

Doe v. Maskell, 679 A. 2d 1087 Md., July 29, 1996, cert. denied 117 S.Ct. 770 (1997).

Engdahl, B., Dikel, T. N., Eberly, R., & Blank, A., Jr. (1997). Post traumatic stress disorder in a community group of former prisoners of war: A normative response to severe trauma. *American Journal of Psychiatry, 154,* 1576–1581.

Engstrom v. Engstrom, No. B098146, Cal. App., 2nd App. Dist., Div. 2, June 18, 1997, unpublished, cert. denied Cal. (September 3, 1997).

Exner, J. E., Jr. (1980). But it's only an *inkblot. Journal of Personality Assessment, 44,* 563–577.

Exner, J. E., Jr. (1993). *The Rorschach: A comprehensive system: Vol. 1. Basic foundations* (3rd ed.). New York: Wiley.

Frye v. United States, 293 F. 1013 (D.C. Cir. 1923).

Galante, R., & Foa, D. (1987). An epidemiological study of psychic trauma and treatment effectiveness for children after a natural disaster. *Journal of the American Academy of Child Psychiatry, 25,* 357–363.

Garb, H. N. (1985). The incremental validity of information used in personality assessment. *Clinical Psychology Review, 4,* 641–655.

Garb, H. N., Florio, C. M., & Grove, W. M. (1998). The validity of the Rorschach and the MMPI. *Psychological Science, 9,* 402–404.

Garb, H. N., Wood, J. M., Nezworski, M. T., Grove, W. M., & Stejskal, W. J. (in press). Towards a resolution of the Rorschach controversy. *Psychological Assessment.*

General Electric Co. v. Joiner, 118 S. Ct. 512 (1997).

Gianelli, P. C. (1980). The admissibility of novel scientific evidence: *Frye v. United States,* a half-century later. *Columbia Law Review, 1197,* 1223–1224.

Grove, W. M., Zald, D. H., Hallberg, A. M., Lebow, B., Snitz, E., & Nelson, C. (in press). Clinical versus mechanical prediction: A meta-analysis. *Psychological Assessment.*

Hagen, M. A. (1997). *Whores of the court: The fraud of psychiatric testimony and the rape of American justice.* New York: Harpercollins.

Hammane v. Humenansky, No. C4-94-203, 2nd Dist., Ramsey Co., Minn. (1995).

Hammond, C. (1992, June). *Hypnosis in MPD and ritual abuse.* Paper presented at the Fourth Annual Eastern Regional Conference on Abuse and Multiple Personality, Alexandria, VA.

Hiller, J. B., Rosenthal, R., Bornstein, R. F., Berry, D. T. R., & Brunell-Neuleib, S. (1999). A comparative meta-analysis of Rorschach and MMPI validity. *Psychological Assessment, 11,* 278–296.

Hunter v. Brown, 1996 WL 57944, Tenn. App., slip copy (February 13, 1996).

Impara, J. C., & Plake, B. S. (Eds.). (1988). *Thirteenth mental measurements yearbook.* Lincoln, NE: Buros Institute.

Jensen, A. R. (1965). A review of the Rorschach. In O. K. Buros (Ed.), *Sixth mental measurement yearbook* (pp. 501–509) Highland Park, NH: Gryphon.

John BBB Doe v. Archdiocese of Milwaukee, 565 N.W. 2d 94, Wisc., June 27, 1997.

Kelly et al. v. Marcantonio et al., 678 A. 2d 873, R.I. (July 11, 1996).

Kendall-Tackett, K. A., Williams, L. M., & Finkelhor, D. (1993). Impact of sexual abuse on children: A review and synthesis of recent empirical studies. *Psychological Bulletin, 113,* 164–180.

Kluft, R. P. (1984). Introduction to multiple personality disorder. *Psychiatric Annals, 14,* 19–24.

Kluft, R. P., & Fine, C. G. (1993). *Clinical perspectives on multiple personality disorder.* Washington, DC: American Psychiatric Press.

Krauss, D. A., & Sales, B. D. (1999). The problem of "helpfulness" in applying *Daubert* to expert testimony: Child custody determinations in family law as an exemplar. *Psychology, Public Policy, and Law, 5,* 78–99.

Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct 1167 (1999).

Lemmerman v. Fealk, 534 N.W. 2d 695, Mich. (July 5, 1995).

Lipton, J. P. (1999). The use and acceptance of social science evidence in business litigation after *Daubert. Psychology, Public Policy, and Law, 5,* 59–77.

Little, K. B., & Schneidman, E. S. (1959). Congruencies among interpretations of psychological test and anamnestic data. *Psychological Monographs, 73*(6, Whole No. 476).

McCann, J. T. (1998). Defending the Rorschach in court: An analysis of admissibility using legal and professional standards. *Journal of Personality Assessment, 70,* 125–144.

McFarlane, A. C. (1987). Life events and psychiatric disorder: The role of a natural disaster. *British Journal of Psychiatry, 151,* 362–367.

McFarlane, A. C. (1988a). The aetiology of post-traumatic stress disorders following a natural disaster. *British Journal of Psychiatry, 152,* 116–121.

McFarlane, A. C. (1988b). The longitudinal course of posttraumatic morbidity: The range of outcomes and their predictors. *Journal of Nervous & Mental Disease, 176,* 30–39.

McFarlane, A. C. (1988c). The phenomenology of posttraumatic stress disorders following a natural disaster. *Journal of Nervous & Mental Disease, 176,* 22–29.

McFarlane, A. C. (1988d). Relationship between psychiatric impairment and a natural disaster: The role of distress. *Psychological Medicine, 18,* 129–139.

McHugh, P. R. (1998). Testimony given in *Daubert* hearing, *State of Rhode Island v. John Quattrocchi.*

M.E.H. v. L.H., 669 N.E. 2d 1228, 218 Ill. Dec. 702, Ill. App. 2nd Dist., affirmed by Ill. Sup. Ct. (August 28, 1996).

M.E.H. v. L.H., 1997 WL 562001, Ill., slip copy (September 4, 1997).

Meloy, J. R. (1991). Rorschach testimony. *Journal of Psychiatry and Law, 8,* 221–235.

Merskey, H. (1992). The manufacture of personalities: The production of multiple personality disorder. *British Journal of Psychiatry, 160,* 327–340.

National Prohibition Act, 41 Stat. 305 (1919) (enforcing the Eighteenth Amendment to the U.S. Constitution).

Nezworski, M. T., & Wood, J. M. (1995). Narcissism in the Comprehensive System for the Rorschach. *Clinical Psychology: Science and Practice, 2,* 179–199.

Nolen-Hoeksema, S., & Morrow, J. (1991). A prospective study of depression and posttraumatic stress symptoms after a natural disaster: The 1989 Loma Prieta earthquake. *Journal of Personality and Social Psychology, 61,* 115–121.

North, C. S., Ryall, J.-E. M., Ricci, D. A., & Wetzel, R. D. (1993). *Multiple personalities: Psychiatric classification and media influence.* New York: Oxford University Press.

Ofshe, R., & Watters, E. (1996). *Making monsters: False memories, psychotherapy, and sexual hysteria.* Berkeley: University of California Press.

Oskamp, S. (1965). Overconfidence in case-study judgments. *Journal of Consulting Psychology, 29,* 261–265.

Parker, K. C. H., Hanson, R. K., & Hunsley, J. (1988). MMPI, Rorschach, and WAIS: A meta-analytic comparison of reliability, stability, and validity. *Psychological Bulletin, 103,* 367–373.

People v. Shirley, 31 Cal. 3d 18 (1982).

Piper, A., Jr. (1997). *Hoax and reality: The bizarre world of multiple personality disorder.* Northvale, NJ: Jason Aronson.

Pope, H. G., Jr., & Hudson, J. I. (1995). Can individuals "repress" memories of childhood sexual abuse? An examination of the evidence. *Psychiatric Annals, 25,* 715–719.

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 21 of 245

Pope, H. G., Jr., Hudson, J. I., Bodkin, J. A., & Oliva, P. S. (1998). Questionable validity of "dissociative amnesia" in trauma victims: Evidence from prospective studies. *British Journal of Psychiatry, 172,* 210–215.

Pope, H. G., Jr., Oliva, P. S., & Hudson, J. I. (1999). The scientific status of research on repressed memories. In D. L. Faigman, D. H. Kaye, M. J. Saks, & J. Sanders (Eds.), *Modern scientific evidence: The law and science of expert testimony* (Vol. 1, pp. 115–155). St. Paul, MN: West Group.

Pope, H. G., Jr., Oliva, P. S., Hudson, J. I., Bodkin, J. A., & Gruber, A. J. (1999). Attitudes toward DSM–IV dissociative disorders diagnoses among board-certified American psychiatrists. *American Journal of Psychiatry, 156,* 321–323.

Popper, K. R. (1959). *The logic of scientific discovery.* New York: Basic Books.

Putnam, F. W. (1989). *Diagnosis and treatment of multiple personality disorder.* New York: Guilford Press.

Putnam, F. W., Guroff, J. J., Silberman, E. K., Barban, L., & Post, R. M. (1986). The clinical phenomenology of multiple personality disorder: Review of 100 recent cases. *Journal of Clinical Psychiatry, 47,* 285–293.

Ramona v. Ramona, 66 Cal. Rptr. 2d 766, Ca. App. (August 19, 1997).

Ross, C. A. (1997). *Dissociative identity disorder: Diagnosis, clinical features, and treatment of multiple personality* (2nd ed.). New York: Wiley.

Schopp, R., Scalora, M. J., & Pearce, M. (1999). Expert testimony and professional judgment: Psychological expertise and commitment as a sexual predator after *Hendricks. Psychology, Public Policy, and Law, 5,* 120–174.

Spanos, N. P. (1996). *Multiple identities and false memories: A socio-cognitive perspective.* Washington, DC: American Psychological Association.

Spitzer, R. L. (1983). Psychiatric diagnosis: Are clinicians still necessary? *Comprehensive Psychiatry, 24,* 399–411.

State of New Hampshire v. Hungerford, 1995 WL 378571, N.H. Super. Ct. (May 23, 1995).

State of New Hampshire v. Hungerford, 1997 WL 358620, N.H. (July 1, 1997).

State of New Hampshire v. Walters, 1997 WL 937024, N.H. (August 6, 1997).

State of Rhode Island v. Quattrocchi, 681 A. 2d 879, R.I. (1996).

State v. Atwood, 479 A. 2d 258 (Conn. 1984).

Stokes v. State, 548 So. 2d 1988 (Fla. 1989).

S. V. v. R. V., 933 S.W. 2d 1, 39 Tex. Supp. J. 386, Tex. (March 14, 1996).

Tennant, C. (1983). Life events and psychological morbidity: The evidence from prospective studies. *Psychological Medicine, 13,* 483–486.

Tennant, C., Bebbington, P., & Hurry, J. (1981). The role of life events in depressive illness: Is there a substantial causal relation? *Psychological Medicine, 11,* 379–389.

Travis v. Ziter, 681 So. 2d 1348, Ala. (July 12, 1996).

Weiner, I. B., Exner, J. E., Jr., & Sciara, A. (1996). Is the Rorschach welcome in the courtroom? *Journal of Personality Assessment, 67,* 422–424.

Wood, J. M., Lilienfeld, S. O., Garb, H. N., & Nezworski, M. T. (in press). *The Rorschach test in clinical diagnosis: A critical review, with a backward look at Garfield (1947).* Journal of Clinical Psychology.

Wood, J. M., Nezworski, M. T., & Stejskal, W. J. (1996). The Comprehensive System for the Rorschach: A critical examination. *Psychological Science, 7,* 3–10.

Wood, J. M., Nezworski, N. T., Stejskal, W. J., Garven, S., & West, S. T. (1999). Methodological issues in evaluating Rorschach validity: A comment on Burns and Viglione (1996), Weiner (1996), and Ganellan (1996). *Assessment, 6,* 115–129.

Woodroffe v. Hansenclever, 540 N.W. 2d 45, Iowa, Nov. 22, 1995.

Received June 8, 1999
Revision received August 20, 1999
Accepted August 28, 1999 ■

OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

# 22

# MEMORY AND RELIABILITY: DEVELOPMENTS AND CONTROVERSIAL ISSUES

*R. Christopher Barden*

A. Introduction 22.01

B. Science and Law are Essential Elements of Modern Civilization 22.04

C. Controversial Theories of Memory: Terminology and Methodological Limitations 22.05

D. *Daubert-Kumho* Hearings Assess the Relevance, Validity, and Admissibility of Controversial Memory Theories 22.09

E. Multidisciplinary, Science-litigation Teams 22.10

F. Selecting Expert Witnesses from the Relevant Scientific Community 22.13

G. Science–Litigation–Policy Teams Reformed the US Emergency Medical and Mental Health Systems 22.15

H. Science–Litigation Teams ended Criminal Prosecutions Based upon Uncorroborated 'Recovered Memories', 'RRM-MPD', and Related Controversial Notions 22.20

I. Science–Litigation Teams ended the Rebirthing–Coercive Holding–Attachment Therapy Industries 22.22

J. The Current Opinion of the Relevant Scientific Community Regarding RRM-MPD and Related Controversial Theories of Memory 22.23

K. Disease Classification Systems do not Provide Evidence of Validity or Error Rates for RRM-MPD or Other Controversial Theories of Memory 22.25

L. Public Statements from Professional Associations Document Controversy but no General Acceptance for RRM-MPD Theories 22.26

M. Misinformation on the Nature of Memory Remains Widespread 22.27

N. Professionals are Often Unreliable 'Lie Detectors' 22.28

O. Tested, Valid, and Reliable Interview Protocols (NICHD) are Available to Avoid Improperly Contaminating Children's Memories 22.29

P. False Memories may be Errors, not Lies 22.32

Q. Conclusion 22.33

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 343 10/8/2015 5:38:20 PM

## A. Introduction

**22.01** Reliance on science is essential to proper legal process. The science of memory is particularly important. Criminal investigations must often focus on individual memory reports in the absence of corroborative evidence. Controversial theories involving the notion of 'repressed-recovered memories' (RRM) include multiple personality disorder (MPD), dissociative identity disorder, traumatic amnesia, dissociative amnesia, betrayal trauma theory, and related concepts. Such theories have generated some of the most contentious, complex, and forensically challenging issues in the recent history of the mental health and legal systems.

**22.02** Co-ordinated, multidisciplinary efforts in legislation, litigation, licensing regulation, education (public and professional), and science (memory research) abruptly ended the widespread abuses of the RRM-MPD therapy movement while generating important legal and mental health reforms. The experienced application of recent legal reforms is often essential in such complex cases. These reforms include *Daubert/Kumho* reliability–validity hearings applying the doctrines of several historic US Supreme Court cases.[1] These hearings assess the reliability, validity, and admissibility of expert witness testimony and protect the legal system from unreliable information. The innovative, multidisciplinary, science-litigation team methods and practices that ended the RRM-MPD treatment industry (i.e. the 'memory wars' malpractice suits) also provide a highly effective model for litigating controversial memory cases in civil, criminal, administrative, and family law systems.[2]

**22.03** This chapter will clarify terminology, analyze current methodological issues, and discuss how to forensically assess and effectively litigate controversial theories of memory. Criteria for selecting effective expert witnesses who can properly articulate the opinions of the relevant scientific community are included. Scientific information is provided to preclude the use of unreliable, untested interviewing protocols for children (e.g. the RATAC or 'CornerHouse' protocol) while increasing reliance upon validated methodologies (e.g. the US National Institute of Child Health and Human Development (NICHD) interviewing protocol).[3] Finally, this chapter offers advice on avoiding unreliable clinical judgement methodologies including impressionistic assessments of witness credibility.

---

[1] *Daubert v Merrell Dow Pharmaceuticals, Inc.*, 509 U.S., 113 S. Ct. 2786 (1993); *Kumho Tire Co., Ltd v Carmichael*, 119 S. Ct 1167 (1999).

[2] Barden, R.C., 'Informed consent in psychotherapy: A multidisciplinary perspective' (2001) 29(2) *The Journal of the American Academy of Psychiatry and the Law*, 160–66; Barden, R.C., 'Reforming Mental Health Care: Ending "Recovered Memory" Treatments Brought Informed Consent to Psychotherapy' (2014) 31 *Psychiatric Times*, 6.

[3] Lamb, M.E., Orbach, Y., Hershkowitz, I., Esplin, P., and Horowitz, D., 'A structured forensic interview protocol improves the quality and informativeness of investigative interviews with children: A review of research using the NICHD Investigative Interview Protocol' (2007) 31 *Child Abuse & Neglect*, 1201–31.

OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

## B. Science and Law are Essential Elements of Modern Civilization

**22.04** The greatest achievements of civilization include science and law. These essential systems are enhanced when applied as integrated, multidisciplinary processes. History shows that legal professionals acting upon pseudoscientific notions, and scientists operating beyond legal restraints, pose significant risks to society. In contrast, science-informed professionals, including judges, attorneys and expert witnesses, assist the legal process with reliable, ethical, and relevant scientific methods and knowledge.[4]

## C. Controversial Theories of Memory: Terminology and Methodological Limitations

**22.05** Some of the most controversial theories in psychotherapy, criminal investigations, and civil litigation posit that memories of horrific trauma can be accurately encoded but later (a) repressed, blocked, dissociated, or 'split off' from the victim's awareness thus becoming involuntarily inaccessible to memory; (b) stored for years in a highly stable, reliable format; and (c) later (even after decades) somehow 'recovered' and accurately reported to therapists, investigators, and courts of law. Despite dozens of studies over decades, the notion that people can reliably encode traumatic experiences without being able to recall them still lacks credible empirical support. Although repressed-recovered memories (RRM), traumatic amnesia, dissociative amnesia, betrayal trauma theory,[5] multiple personality disorder (MPD) or other versions of this theory remain testable hypotheses, the key foundation of these theories—the notion of 'repressed-recovered memories'—has never been credibly supported by methodologically rigorous, peer-reviewed, published studies.[6]

**22.06** RRM-MPD and related controversial notions fail *Daubert-Kumho* analysis because they lack an acceptable, reliable, documented error rate. This a key issue in *Daubert-Kumho* legal analysis.[7] RRM-MPD notions also fail *Daubert-Kumho*

---

[4] Grove, W.M. and Barden, R.C., 'Protecting the Integrity of the Legal System: The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses' (1999) 5(1) *Psychology, Public Policy and Law*, 234–42. Excerpts reprinted in Fisher, G. (Prof. Stanford Law School) (2002) *Evidence*: University Casebook Series New York: Foundation Press–West Group, 688.

[5] McNally, R.J., 'Betrayal trauma theory: A critical appraisal' (2007) 15 *Memory*, 280–94.

[6] McNally, R.J. (2003) *Remembering Trauma*, Cambridge, MA: Belknap Press/Harvard University Press; Pope H., Oliva P., and Hudson J., 'Repressed memories: The scientific status of research on repressed memories' in Faigman, D.L., Kaye, D.H., Saks, M.J., and Sanders, J. (eds) (2012) *Science in the law: social and behavioral science issues*, St. Paul, MN: West Group, 807–913; Piper A., Lillevik L., and Kritzner R., 'What's wrong with believing in repression? A review for legal professionals' (2008) 14 *Psychology Public Policy and Law*, 223–42.

[7] Grove and Barden (1999), cited at n.4.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 345 10/8/2015 5:38:20 PM

OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

analysis because they have never been 'generally accepted' by the relevant scientific community.[8] In sharp contrast to general acceptance, RRM-MPD notions have been so controversial they generated the 'memory wars' of the 1990s, spreading contentious issues from psychotherapy into science, law, legislation, journalism, and public policy.[9]

**22.07** When litigating RRM-MPD and related notions, informed attorneys and experts ensure that courts are aware of the complex and exceptionally troubled history of RRM-MPD research. Methodological errors, state licensing prosecutions-revocations, admissions of gross misconduct, destruction of data, federally prosecuted research fraud, irrational ideas, malpractice litigation, and other indicia of unreliability in the RRM-MPD movement have been publicly documented via peer-reviewed publications, exhaustive trial cross-examinations, and expert affidavits.[10]

**22.08** When conducting investigations of complex memory reports, it is important to distinguish RRM-MPD and other controversial theories from memory impairments that are generally accepted among scientists including: (1) ordinary forgetfulness; (2) behaviour that is falsely viewed as amnesia such as lying to escape punishment; (3) incomplete encoding due to hyper-focus on salient details (e.g. a robbery victim might remember the gun but not the criminal's visage); (4) global amnesia (total memory loss from a limited time period); and (5) biological amnesia (drug and alcohol intoxication, head injuries, early-childhood neurological developmental processes).

## D. *Daubert-Kumho* Hearings Assess the Relevance, Validity, and Admissibility of Controversial Memory Theories

**22.09** As noted in para 22.02, the historic *Daubert-Kumho* rulings of the US Supreme Court were designed to require judges to make a reasoned assessment of the reliability, validity, and admissibility of expert witness methods, conclusions, and theories.[11] These cases are based upon the essential principle that 'scientific' testimony, methods, and evidence should be excluded if the underlying methodology

[8] Grove and Barden (1999), cited at n.4; Piper, et al. (2008), cited at n.6.

[9] McNally (2003), cited at n.6.; Grove and Barden (1999), cited at n.4.

[10] Belluck, P., 'Memory Therapy Leads to a Lawsuit and Big Settlement' *The New York Times*, 6 November 1997 (award of $10.6 million), 1, col. 1. See also citations to the work of McNally, Loftus, Pope, Hudson, and Piper in this chapter. See also cross-examination of Daniel Brown, PhD by R.C. Barden, PhD, J.D. in *Rhode Island v Quattrocchi*, C.A. No P92-3759 (R.I. 1999) (on remand from R.I. Supreme Court 681 A.2d 879 (R.I. 1999)); Cross-examination by R.C. Barden, PhD, J.D. of Bessel van der Kolk, MD in *Rivers v Father Flanagan's Boys* Town, Doc 1024, Case No 743, Nebraska State Court Judge Sandra L. Dougherty, 25 November 2005; Cross-examinations by R.C. Barden, PhD, J.D. of James Chu, MD and Constance Dalenberg, PhD, in *John Doe v Archdiocese of St. Paul*, Case No 62-C9-06-003962, 8 December 2009, and similar cases. See also Affidavits of Harrison G. Pope, Jr, MD, Richard J. McNally, PhD, and R. Chris Barden, PhD, J.D. reviewing the testimony of Daniel Brown, PhD, in *Anonymous v Vella*, 2007, US District Court of Nebraska, Case No 8:04CV-269 and see Grove and Barden (1999), cited at n.4.

[11] *Daubert* (1993), cited at n.1; *Kumho* (1999), cited at n. 1.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 346  10/8/2015 5:38:20 PM



USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 26 of 245
OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

and conclusions are irrelevant, unreliable (no reasonable error rates), illogical, improperly applied to the facts of the case, or not generally accepted by the relevant *scientific* (not clinical) community. In these landmark cases, the legal system began the long overdue process of creating powerful incentives for legal professionals to learn and properly apply scientific methodological analysis. Even in jurisdictions where *Daubert-Kumho* principles have no precedential value, similar methods can be used to effectively exclude, expose, or limit contaminative, unreliable evidence thus protecting the integrity of any legal system.

## E. Multidisciplinary, Science-litigation Teams

**22.10** Until the legal education system trains a generation of science-informed attorneys, multidisciplinary science-litigation teams will remain the most effective method for litigating controversial theories of memory. History shows that few traditionally trained lawyers, judges, therapists, or clinician expert witnesses have proven capable of effectively dealing with the methodological complexities posed by controversial memory issues such as RRM-MPD.[12] In contrast, multidisciplinary, science-litigation teams have proven remarkably successful in excluding controversial RRM-MPD evidence from courtrooms following detailed, science-informed *Frye-Daubert-Kumho* hearings.[13] In contrast, cases where RRM-MPD expert opinions have been admitted document a range of serious litigation errors.

**22.11** More specifically, cases where RRM-MPD testimony and evidence are admitted into evidence often demonstrate most or all of the 'top fifteen', often-fatal, science litigation errors including:

(1) Juris Doctor-only attorneys seem quite unable to cross-examine PhD's and MD's properly with regard to complex scientific issues;
(2) failing to explain to the court, aggressively and persuasively, the documented history of criminal prosecutions, licensing prosecutions, admissions of research fraud, and admissions of data destruction in the RRM-MPD movement;[14]

---

[12] Hagen, M. (1997) *Whores of the Court: The Fraud of Psychiatric Testimony and the Rape of American Justice*, New York: Harper Collins Press.

[13] Barden (2001a), cited at n.2; Barden (2014), cited at n.2. See, e.g., *Hamanne,* et al. *v Humenansky*, Ramsey County Mn, No C4-94-203, Judge Betrand Poritsky, 30 June 1995; *Carlson v Humenansky* (Minnesota Trial Ct), Judge Betrand Poritsky (January, 1996); *Engstrom v Engstrom*, California App., 2nd App. Dist., Div 2, (CA 1997); *State of New Hampshire v Hungerford and State of New Hampshire v Morahan*, 698 A.2d 1244 (N.H. 1997); *State of New Hampshire v Walters*, 697 A.2d 916 (N.H. 1997); *Franklin v Stevenson*, 987 P.2d 22 (1999); *Rhode Island v Quattrocchi*, C.A. No P92-3759 (R.I. 1999); *New Hampshire v Bourgelais*, Docket No 02-S-2834, 4 April 2005; *Rivers v Father Flanagan's Boys Town*, Doc 1024, Case No 743, Nebraska State Court, 25 November 2005; *John Doe (Keenan) v Archdiocese of St. Paul*, 817 N.W.2d 150 (Minn. 2012).

[14] Affidavit of R. Chris Barden, PhD, J.D. reviewing the documented history of errors, including criminal and licensing troubles, in RRM-MPD research in *Anonymous v Vella*, 2007, US District Court of Nebraska, Case No 8:04CV-269.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 347

10/8/2015 5:38:20 PM



OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

(3) failing to create a truly multidisciplinary team with expert witnesses—both scientists and also clinicians—from both psychology and psychiatry including special expertise in ethics, psychological testing, diagnostics, human memory, clinical judgement errors, and licensing issues;
(4) failing properly to clarify the severe methodological limitations of psychiatric diagnostic systems (e.g. DSM and ICD);
(5) failing to document—including preparing persuasive, summary graphic depictions in real time in front of the court—the many methodological errors of 'pro-repression' research studies;
(6) failing to distinguish highly cited scientists from controversial clinicians;
(7) failing to document that in the most completely and competently litigated cases courts have uniformly excluded RRM-MPD notions as unreliable, controversial, and lacking a known error rate;
(8) failing to explicate fully the serious errors of logic, analysis, and methodology demonstrated by those few courts permitting RRM-MPD testimony;[15]
(9) failing to distinguish members of the relevant scientific community from clinician-nonscientists;
(10) failing to share with the court the opinion of the relevant scientific community as documented in the Amicus Briefs of the National Committee of Scientists for Academic Liberty and the International Committee of Social, Psychiatric, Psychological, Cognitive Science, Neuroscience, and Neurological Scientists;[16]
(11) failing to obtain a numerical advantage in expert witnesses (easily done as few science experts will testify for 'repressed memory' while many will testify against it);
(12) failing to have a local, poplar clinician expert explain to the court that scientific principles and methods apply across state borders thus national science experts can be trusted;
(13) failing to explicate fully the history of fads and frauds in mental health care (e.g. from dream analysis to lobotomies to primal screaming to 'multiple personality' treatments) over the past hundred years;[17]
(14) failing to properly explain the full history of the 'memory wars' reform efforts including the co-ordinated multidisciplinary wave of internationally reported malpractice lawsuits;[18] and

[15] See Hagen (1997), cited at n.12, and see e.g. *Isely v Capuchin Province*, 877 F. Supp. 1055 (E.D. Mich. 1995); *Shazade v Gregory* (930 F. Supp. 673, D. Mass. 1996).

[16] Barden, R.C. (2006) Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Supreme Court of the State of California, February 2006. See also, Barden, R.C. (2009) 'Brief of the International Committee of Social, Psychiatric, Psychological, Cognitive Science, Neuroscience, and Neurological Scientists as Amicus Curiae in Commonwealth v Shanley', at *http://tillers.net/ev-course/materials/shanley.amicus.pdf.* Copies also available at rcbarden@mac.com.

[17] Singer, M.T. and Lalich, J. (1996) *Crazy Therapies*, San Francisco: Jossey-Bass.

[18] Barden, R.C. (2001a), cited at n.2; Barden, R.C. (2014), cited at n.2.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 348  10/8/2015 5:38:20 PM



OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

(15) failing competently to investigate and expose licensing and ethics violations of each of the therapists and experts involved in the case (this requires significant ethics and licensing expertise in psychology, psychiatry, and social work).

These are only the most obvious and general errors, many more errors lurk for the unprepared, uni-disciplinary litigator. In sum, even the most experienced JD-only litigators would be most unwise to attempt such hearings without detailed, multi-disciplinary consultation.

**22.12** As Grove and Barden (1999) noted over a decade ago, 'In the world of *Daubert/Kumho* analyses, science-intensive litigation teams should be the minimal standard of legal practice, to help ensure that these complexities are properly addressed.'[19]

## F. Selecting Expert Witnesses from the Relevant Scientific Community

**22.13** Effective science-litigation teams include: (1) a local attorney to handle local legal issues and filings; (2) an expert scientist-attorney to handle complex science (*Daubert-Kumho*) issues and the examinations and cross examinations of expert witnesses with advanced degrees (i.e. Master of Social Work, MD, PhD); and (3) science and also clinical expert witnesses from the relevant fields of knowledge including psychology and psychiatry. Choosing appropriate experts is an essential task in this process. The most effective expert witnesses for scientific litigation are members of the relevant scientific community. Such witnesses should optimally have :

(1) obtained several substantial state, federal, or private scientific research grants as a 'principal investigator';
(2) authored original scientific research in credible scientific journals published by national science-professional associations (i.e. American Psychological Association, American Psychiatric Association, American Medical Association and Association for Psychological Science) not specialty clinical journals;
(3) been frequently cited in credible peer-reviewed science journals by colleagues;
(4) participated actively in the editorial process of credible scientific (not clinical) journals;
(5) received national science awards from credible scientific (not clinical) national associations;
(6) given invited addresses at credible national science (not clinical) conventions;
(7) participated in previous *Daubert-Kumho* hearings;

[19] Grove and Barden, cited at n.4, 239.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 349 10/8/2015 5:38:20 PM

(8) served on research grant review panels; and
(9) practised as licensed clinicians who can offer standard of care opinions regarding treatment issues.

Some experts have also served on relevant state licensing boards. Although few experts will meet all of these standards, the best will meet many of them.

**22.14** Tragically, too many of the 'experts' testifying in courtrooms today meet few, if any, of these important standards. Most are clinicians who lack sufficient knowledge of scientific methodology, have no history of credible research grant funding, have never published in a credible scientific (not clinical) journal, and, if they have published, are not often cited by members of the relevant scientific community. Decades of research projects on the limitations of 'clinical judgement' have documented why clinician-therapist 'experts' often offer little reliable evidence to courts of law.[20]

## G. Science–Litigation–Policy Teams Reformed the US Emergency Medical and Mental Health Systems

**22.15** The power of multidisciplinary science-litigation teams has been well documented. A series of internationally reported, multidisciplinary reform projects began in the early 1990s. The first project brought important improvements to US health care. Multidisciplinary analysis led to model legislation that generated legislative and regulatory reforms to the US Emergency Medical System for Children. This process was assisted by peer-reviewed medical-legal publications, media exposes (e.g. national news magazines and television programmes), malpractice litigation, and involved citizen groups. In just a few years, these co-ordinated efforts reformed a complex multi-billion dollar industry. Several US Surgeon Generals have noted these reforms saved the lives of thousands of children.[21]

**22.16** Energized by the unexpectedly rapid success of emergency medical system reforms, similar reform processes were applied to the US mental health system. Responding to an unprecedented epidemic of injuries from RRM-MPD 'treatments', a national wave of co-ordinated malpractice lawsuits, media reports, integrated licensing actions, and scientific publications quickly collapsed this once rapidly growing and highly profitable therapy industry. In addition to the wave of

[20] Garb, Howard N. (1998) *Studying the clinician: Judgment research and psychological assessment*, Washington, DC: American Psychological Association Press, 333 doi: 10.1037/10299-002, 39–83; Dawes, R.M. (1997) *House of Cards: Psychology and Psychotherapy Built on Myth*, New York: Free Press; Grove, W.M. and Meehl, P.E. 'Comparative efficiency of informal (subjective, impressionistic) and formal (mechanical, algorithmic) prediction procedures: The clinical-statistical controversy' (1996) 2(2) *Psychology, Public Policy, and Law*, 293–323.

[21] Barden, R.C., Kinscherff, R., George, W., Flyer, R., Seidel, J., and Henderson, D., 'Emergency medical care and injury prevention systems for children: An economic-medical-legal-psychological analysis and legislative proposals' (1993) 30(2) *Harvard Journal on Legislation*, 461–97.



OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

AQ: Please confirm the running head.

lawsuits, science-legal litigation team members participated in a range of reform activities including: assisting state officials in licensing prosecutions,[22] working to block insurance payments for controversial 'treatments,'[23] organizing *Daubert/Kumho* legal hearings to exclude evidence related to RRM-MPD theories, enforcing informed consent protections for psychotherapy patients,[24] working on citizen education efforts with groups like the False Memory Syndrome Foundation,[25] and energizing a rapidly growing body of scientific research on trauma, memory, false memory, and eyewitness testimony.[26]

**22.17** Following months of multidisciplinary team litigation, in August 1995 a Minnesota jury in *Hamanne v Humenansky* returned a verdict of $2.67 million compensation for emotional damages from RRM-MPD therapy.[27] Dozens of cases were quickly placed with attorneys across the US as the *Hamanne* case had (finally) demonstrated the financial viability of psychotherapy malpractice litigation. In January of 1996, the same Minnesota multidisciplinary litigation team obtained a $2.54 million compensation jury verdict for emotional damages from RRM-MPD therapy.[28] These 'Minnesota Twins' multi-million dollar jury verdicts, reported throughout the world via newspapers, television, and radio, quickly generated a wave of similar, co-ordinated legal actions and media exposes. Multidisciplinary, science-litigation team methods, practices, and procedures were disseminated via detailed consultations with local lawyers in co-ordinated cases across the US.

**22.18** In 1996, two former RRM-MPD patients received widely reported settlements including a $1.57 million settlement in Oregon and a $1 million settlement in Missouri.[29] On 4 March 1997, a Wisconsin RRM-MPD patient followed the 'Minnesota Twins' template and settled for $2.4 million.[30] In August 1997,

---

[22] AP News Wire Chicago, 'Psychiatrist [Braun] loses license over satanic allegations' 8 October 1999; *Georgia Board of Psychology v George Greaves, PhD* (1994) Docket Number 93-598 (consent to Licence Revocation signed 4 April 1994); Lerner, M., 'Psychologist barred from treating cases involving false memories' *Minneapolis/St. Paul Tribune*, 3 June 1999.

[23] DiStefano, J.N. 'Pennsylvania liquidates the American Psychiatric Association Insurance Trust' (2003) *Philadelphia Inquirer.* 30 June, D-1.

[24] Barden, R.C. (2001a), cited at n.2; Barden, R.C. (2014), cited at n.2.

[25] See e.g. *http://www.fmsfonline.org*, Pamela Freyd, PhD, Director, Memory and Reality: Reconciliation Conference, Co-Sponsored by The False Memory Syndrome Foundation and The Johns Hopkins Medical Institutions, Baltimore, MD 9–11 December 1994.

[26] Loftus, E.F. and Davis, D., 'Recovered memories' in (2006) 2 *Annual Review of Clinical Psychology*, 469–98; McNally, R.J. (2003), cited at n.6; Pope et al. (2012), cited at n.6.

[27] Gustafson, P., 'Jury awards patient $2.6 million: Verdict finds therapist Humenansky liable in repressed memory trial' *Minneapolis St. Paul Tribune*, August 1 1995.

[28] Gustafson, P. 'Jury awards $2.5 million in lawsuit against psychiatrist: "Memories" were induced' *Minneapolis/St. Paul Tribune*, 25 January 1996, 1B.

[29] *Fultz v Carr and Walker* (1996), Circuit Court, Multnomah County Oregon, Case 9506-04080; *Rutherford v Strand* et al, Circuit Court of Green County, Missouri, Case 1960C2745; AP Newswire. 'Family [Springfield, Missouri] torn by false repressed memories settles for $1 million' *Lubbock, Avalanche-Journal*, 3 March 1996.

[30] AP newswire, '$2.4 Million Settlement Reached Over Multi-personality Diagnosis' *Chicago Times*, Tribune News Services, 4 March 1997.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 351 10/8/2015 5:38:21 PM

OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

a Texas jury raised the stakes by awarding $5.8 million for RRM-MPD therapy injuries.[31] In October 1997, a federal grand jury in Houston returned multiple criminal indictments against several RRM-MPD therapists included allegations of health care fraud that included 'bizarre and outlandish (RRM-MPD) treatment sessions'. The most influential~~and concluding~~ battle of 'Memory Wars I' (1994–1997) concluded in November of 1997 when the Burgus family accepted a $10.6 million settlement for damages suffered during years of RRM-MPD treatment. This record settlement was reported on page one, column one, of *The New York Times* and ~~was~~ highlighted in major magazines, television programmes, and on radio throughout the world.[32] Following the *Burgus* settlement, many other RRM-MPD cases were quickly, quietly, and confidentially settled across the US. By the end of 1997, co-ordinated, multidisciplinary reform processes had largely collapsed the once-burgeoning RRM-MPD therapy industry.

AQ: Check the striked text here..

**22.19** The 1997 collapse of the RRM-MPD industry included the closing of clinics, the surrender of licences, and a well-documented, precipitous decline in RRM-MPD research publications.[33] In just a few years, co-ordinated science-litigation teams saved tens of thousands of families from horrific emotional abuses by RRM-MPD 'therapists', shut down the once rapidly growing RRM-MPD treatment industry, and protected the integrity of the US legal and health care systems.[34] It is essential for historians to note that in contrast to the tragic damages of the RRM-MPD epidemic, the cleansing wave of successful reform lawsuits and licensing actions resulted in historic, lasting reforms in the US mental health system. Such reforms included a new focus on empirically supported therapies, new research on the nature of human memory, model applications of *Daubert-Kumho* legal proceedings to exclude unreliable social science theories, and the long overdue enforcement of informed consent protections for psychotherapy patients. By making 'failure to obtain proper informed consent' one of the key allegations in a national wave of lawsuits and licensing prosecutions, reformers forced the mental health system to (finally) protect the fundamental human right of informed consent for all health care patients—including those in psychotherapy.[35]

---

[31] Smith, M., '5.8 million awarded in Carl lawsuit, claims therapists implanted false memories of satanic ritual abuse' *Houston Chronicle*, 15 August 1997.

[32] Belluck, P. (1997), cited at n.10.

[33] Pope, H.G., Bodkin, S.B., and Hudson, J.I., 'Tracking Scientific Interest in the Dissociative Disorders: A Study of Scientific Publication Output 1984–2003' (2006) 75 *Psychother Psychosom*, 19–24 doi: 10.1159/000089223.

[34] Barden, R.C. (2001a), cited at n.1; Barden, R.C. (2014), cited at n.1.

[35] Barden R.C., 'Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy' *Psychiatric Times*. 31(6): 6 June 2014.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 352  10/8/2015 5:38:21 PM



AQ: Please confirm the running head.

## H. Science–Litigation Teams ended Criminal Prosecutions Based upon Uncorroborated 'Recovered Memories', 'RRM-MPD', and Related Controversial Notions

**22.20** At the peak of the RRM-MPD therapy epidemic many US citizens were prosecuted based solely upon RRM allegations lacking any reliable corroborative evidence. Widespread prosecutions based solely on RRM-MPD testimony ended in the US following the 1995–1997 wave of malpractice lawsuits, subsequent licensing prosecutions, and international media reports as well as the landmark hearing in *Rhode Island v Quattrocchi*.[36]

**22.21** The *Quattrocchi* hearings reportedly remain the most complex, lengthy, and exhaustively litigated *Daubert-Kumho* hearings on memory issues in history. Following several weeks of technical, detailed, methodological analyses of many dozens of research studies plus extensive examinations and cross-examinations of multiple (seven) expert witnesses including a number of internationally acclaimed scientists, the court ruled that RRM-MPD and related theories and practices were unreliable, controversial, and not generally accepted by the relevant scientific community—thus ending the case. US criminal prosecutions based solely on RRM-MPD testimony became rare in the US following the *Quattrocchi* decision.[37]

## I. Science–Litigation Teams ended the Rebirthing–Coercive Holding–Attachment Therapy Industries

**22.22** Energized by national reform successes in the emergency medical and mental health fields, from 2001 to 2005, multidisciplinary litigation teams next worked to collapse the controversial Rebirthing-Coercive Holding-Attachment Therapy industry in the US. Such 'therapies' were based on yet another controversial theory of memory—that coercive, painful, physical pressure could 'release trauma memories locked within muscles'. Litigation, prosecution, education, and legislation efforts to halt such practices resulted in lengthy prison sentences (sixteen years each) for several leading 'rebirthing' therapists,[38] licensing restrictions for other therapists,[39]

[36] C.A. No P92—3759 (R.I. 1999).

[37] Mooney, T., 'Recovered Memory Rejected: Judge rules out key element in landmark [*Quattrocchi*] case' *The Providence Journal (Rhode Island)*, 28 April 1999.

[38] Janofsky, M., 'Girl's Death Brings Ban on Kind of "Therapy"' *The New York Times*, 18 April 2001; Lowe, P., 'Rebirthing team convicted: Two therapists face mandatory terms of 16 to 48 years in jail' *Rocky Mountain News*, 21 April 2001.

[39] Hyde, J., 'Utah jettisons holding therapy' *Deseret Morning News*, 11 February 2005.



a legislative ban on such practices,[40] and the state's expert witness warning millions of citizens about such dangerous 'treatments' via a national television interview.[41] Once again, decisive, co-ordinated, actions by multidisciplinary science-litigation teams produced rapid, enforced, lasting reforms to protect the public as well as the integrity of the legal and mental health systems.

## J. The Current Opinion of the Relevant Scientific Community Regarding RRM-MPD and Related Controversial Theories of Memory

**22.23** The opinion of the relevant scientific community on RRM-MPD issues was first documented in the amicus brief of the National Committee of Scientists for Academic Liberty submitted to the Supreme Court of the State of California in February of 2006. An updated opinion was documented in the amicus brief of the International Committee of Social, Psychiatric, Psychological, Cognitive Science, Neuroscience, and Neurological Scientists submitted to the Supreme Court of the State of Massachusetts in 2009. A broad collection of internationally acclaimed scientists—many in the top 1 per cent of the most cited scientists in the world in psychology, psychiatry and neuroscience—joined both briefs. Their joint statement in 2006 concluded:

> [T]his unsupported theory [RRM-MPD] has caused incalculable harm to the fields of psychology and psychiatry, damaged tens if not hundreds of thousands of families, severely harmed the credibility of mental health professionals, and also misled the legislative, civil, criminal and family legal systems into many miscarriages of justice. The debate over 'repressed and recovered memories of trauma' is one of the most contentious, important and newsworthy debates in the history of psychology, psychiatry and the mental health system . . . Despite the clinical beliefs of some therapists, there is simply no credible, methodologically sound, replicable scientific evidence for the claim that victims repress and recover memories of traumatic events . . . Decades of research and scientific debate have clarified over and over again, that the notion of traumatic events being somehow 'repressed' and later accurately recovered is one of the most pernicious bits of folklore ever to infect psychology and psychiatry. This folklore provided the theoretical basis for 'recovered memory therapy'—arguably the worst catastrophe to befall the mental health field since the lobotomy era.[42]

**22.24** Similarly, experts in the UK reviewed the field of RRM-MPD and 'trauma memory' research and concluded: 'Despite clinical support and popular belief that memories can be "blocked out" by the mind, no empirical evidence exists to

[40] Josefson, D., 'Rebirthing therapy banned after girl died in 70 minute struggle' (2001) 322 (7293) *British Medical Journal*, 1014, 28 April.

[41] Barden, R.C. (2001b) 'Little Girl Lost: 10 Yr Old Dies From Controversial Rebirthing Therapy' *ABC NEWS* 20/20 (Interview by Barbara Walters and Deborah Roberts), 15 June.

[42] Quoted in Barden (2006), cited at n.16, 18–19.



USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 34 of 245
OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

support either repression or dissociation [of complete trauma memories].'[43] The best and most recently updated summaries of relevant research document these ongoing controversies as well as the ongoing general skepticism regarding RRM-MPD and related notions.[44]

## K. Disease Classification Systems do not Provide Evidence of Validity or Error Rates for RRM-MPD or Other Controversial Theories of Memory

**22.25** When litigating issues related to controversial theories of memories, informed professionals help courts understand that disease classification systems (DSM, ICD) are not scientifically valid, methodologically sound, scientific journal publications of research. The DSM and ICD classification systems were designed to serve essentially as 'dictionaries' compiled to improve the reliability of diagnostic terms. Reliability and error rates for such notions as RRM-MPD, 'traumatic amnesia', 'dissociative amnesia', 'dissociative identity disorder', or related concepts are simply not provided in the DSM or the ICD.[45]

## L. Public Statements from Professional Associations Document Controversy but no General Acceptance for RRM-MPD Theories

**22.26** Public statements of professional associations including the American Medical Association, the Canadian Psychological Association, the Australian Psychological Association, and others document a controversial, contentious debate over the existence and reliability of RRM-MPD and related concepts. None document general acceptance or a published, reliable error rate.[46]

## M. Misinformation on the Nature of Memory Remains Widespread

**22.27** Misinformation about the essential nature of human memory remains widespread in the public as well as in the mental health and legal professions. For example, a recent (2012) survey of licensed psychologist clinicians in Norway

[43] Brandon S., Boakes J., Glaser D., and Green R., 'Recovered Memories of Childhood Sexual Abuse: Implications for Clinical Practice' (1998) 172 *British Journal of Psychiatry*, 296–307, 302.

[44] Pope H.G. Jr, et al. (2012), cited at n.6; Piper A., et al. (2008), cited at n.6; Loftus, E.F. and Davis, D. (2006), cited at n.26; McNally, R.J. (2003), cited at n.6.

[45] Grove and Barden (1999), cited at n.4.

[46] Piper A., Lillevik L., and Kritzner R. (2008), cited at n. 6; Barden, R.C., cited at n.16.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 355 10/8/2015 5:38:21 PM

found that a substantial number still cling to the unreliable, controversial notion that 'recovered repressed memory' reports involve actual, accurate, memories. Similarly, research finds that a majority of US citizens mistakenly believe 'memory works like a video camera', with nearly half thinking 'memory is permanent', and a majority even believing the controversial notion that 'memory can be enhanced through hypnosis'.[47] Such unreliable, unscientific ideas pose serious hazards to the integrity of the legal process and should be countered by informed expert witness testimony.

## N. Professionals are Often Unreliable 'Lie Detectors'

**22.28** Too many investigators, police officers, psychotherapists, physicians, judges, and lawyers continue to believe they are highly reliable 'experts' at discerning truthful memory reports.[48] In contrast, informed litigators and expert witnesses help courts understand the relevant research findings noting that 'professionals are [often] more confident in their veracity judgements but *are no more accurate* [than laypersons]'.[49]

## O. Tested, Valid, and Reliable Interview Protocols (NICHD) are Available to Avoid Improperly Contaminating Children's Memories

**22.29** Another important memory-related controversy involves investigative interviews of children. For centuries, children were poorly served and infrequently protected by the legal system. From the 1960s to the 1990s criminal prosecutions based upon the testimony of children grew rapidly using methods designed by crime investigators rather than developmental psychologists. Until near the end of the twentieth century, the scientific community showed little interest in the centuries-old debate over the accuracy of children's testimony. A wave of infamous criminal cases involving abusive interview practices, including the *McMartin, Kelly Michaels, Wenatchee, Little Rascals* cases and many others, generated considerable controversy and interest in science-based investigative

[47] Patihis, L., Ho, L., Tingen, I., Lilienfeld, S., and Loftus, E., 'Are the "Memory Wars" Over? A Scientist-Practitioner Gap in Beliefs About Repressed Memory' (2013) *Psychological Science*, doi: 10.1177/0956797613510718.

[48] Rosen, G.M. and Phillips, W.R., 'A Cautionary Lesson from Simulated Patients' (2004) 32 *Journal of the American Academy of Psychiatry and Law*, 132–3.

[49] Vrij, A., Granhag, P. and Porter, S., 'Pitfalls and opportunities in nonverbal and verbal lie detection' (2010) 11(3) *Psychological Science in the Public Interest*, 89–121, ISSN 1529-1006 10.1177/1529100610390861, 13.

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 36 of 245
OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

interviewing methods.[50] In 1995, a group of international science and public policy experts wrote to the US Congress requesting science-based, legislative reforms to correct errors in the mental health (RRM-MPD) and investigative systems. They wrote:

> Child abuse is a serious social problem that should be dealt with in an effective and responsible manner. We strongly support the implementation of effective programs to reduce the incidence of child abuse, assist victims of abuse, and punish those who harm children. Efforts to attain these important goals must, however, be based in fact rather than prejudice, science rather than hysteria, and reason rather than political ideology.[51]

**22.30** Research has long demonstrated that when properly interviewed, even young children are often quite capable of reliable, accurate testimony. Proper interviewing procedures protect victims of abuse as well as the integrity of the legal process. Controversial, memory contaminative interviewing errors can be largely eliminated with proper training and expert witness review. A science-informed expert witness should assess methodological issues including:

(1) 'were the facts of the alleged crime first described by the witness or suggested during questioning?';
(2) 'is there a clear history of all investigative interviews documented in the videotaped interview?';
(3) 'were contaminative drawings or dolls used prior to statements of allegations?';
(4) 'did the investigator improperly repeat questions, fail to explore alternative theories, or ignore answers in an attempt to confirm preconceived theories?'; and
(5) 'did the investigator deceive the witness?'

These and other assessment issues are essential in efforts to protect children as well as the integrity of the investigative process.

**22.31** With no known error rate, no general acceptance in the relevant scientific community, and no credible research support, the 'CornerHouse' (also known as the 'RATAC' method) and other outdated protocols should not survive a proper

[50] Bruck, M. and Ceci, S., 'Amicus brief for the case of State of New Jersey v Michaels presented by the committee of concerned social scientists' (1995) 1 *Psychology, Public Policy, and Law*, 272–322; Rabinowitz, D., 'No Crueler Tyrannies: Accusation, False Witness, and Other Terrors of Our Times' *Free Press*, 24 February 2004.

[51] Barden, R.C. (1995) Letter to the Congress of the United States of America regarding reform of the mental health system. With co-signers Paul E. Meehl, Terence W. Campbell, Richard Ofshe, Richard A. Gardner, MD, Margaret Singer, William Grove, Michael D. Yapko, Robyn Dawes, Richard Flyer, Robert Kinscherff, Mel Guyer, Francis Fincham, Thom Moore, Henry E. Adams, E. Mark Cummings, Lewis P. Lipsitt, Donald M. Kaplan, Robert R. Holt, Richard M. McFall, Hans H. Strupp, Stephen J. Lepore, Lee Sechrest, Paul Ekman, Hans J. Eysenck; with Version. II signed by Jerome Kagan, George Stricker, Debra Ann Poole, Mark L. Howe, J. Don Read, and Howard Shevrin, quoted in Dineen, T. (1996) *Manufacturing Victims*, Montreal: Robert Davies Publishing.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 357

10/8/2015 5:38:21 PM



OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

*Daubert/Kumho* litigation challenge.[52] In contrast, validated, peer-reviewed, published protocols that are generally accepted by the relevant scientific community, such as the US National Institute of Child Health and Human Development (NICHD) protocols, have become the standard of care.[53]

## P. False Memories may be Errors, not Lies

**22.32** A final controversial memory issue involves the distinction between false memory reports and lies. Research has shown that memory reports may well be false-but-fervently-believed-in 'memories'. As Loftus, McNally, and others have demonstrated, inaccurate memories may be just as compelling and every bit as 'real' to a witness as inaccurate, false memories.[54] The *Hamanne, Carlson Burgus, Kelly Michaels, McMartin, Wenatchee*, and many other cases vividly and tragically document how improper interviewing and negligent psychotherapy practices and procedures can produce horrific, detailed, convincing, yet utterly false 'memories' of trauma in children and adults.

## Q. Conclusion

**22.33** Multidisciplinary science-litigation teams have produced historic reforms in the emergency medical, mental health, and legal systems. Competent investigations, proper prosecutions, and science-informed attorneys, experts, and courts are essential to ongoing efforts to preserve and protect the integrity of the legal system.

## Further Reading

Grove, W.M. and Barden, R.C., 'Protecting the integrity of the legal system: The Admissibility of Testimony from mental health experts under daubert/kumho analyses' (2000) 5(1) *Psychology, Public Policy and Law*, 234–42. Excerpts reprinted in Fisher, G. (2002) *Evidence*: University Casebook Series, Foundation Press–West Group, New York, 688.

[52] 'R.A.T.A.C.' signifies the components of the 'CornerHouse' interview protocol including Rapport, Anatomy Identification, Touch Inquiry, Abuse Scenario, and Closure; Todd, J. and Tomison, A., 'Comparing the NICHD and RATAC Child Forensic Interview Approaches—Do the Differences Matter?' (2011) 20(1) *THE LINK*: Official Newsletter of the International Society for Prevention of Child Abuse and Neglect (ISPCAN), Autumn; Grove and Barden (1999), cited at n.4.

[53] Lamb, et al. (2007), cited at n.3.

[54] Loftus, E., 'Our changeable memories: legal and practical implications' Science and Society (2003) 4 *Nature Reviews: Neuroscience*, 231–5; McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P., 'Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens' (2004) 15 *Psychological Science*, 493–7.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 358 10/8/2015 5:38:21 PM

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 38 of 245
OUP UNCORRECTED PROOF – FIRSTPROOFS, Thu Oct 08 2015, NEWGEN

Pope H.G. Jr, Oliva P.S., and Hudson J.I., 'Repressed memories: The scientific status of research on repressed memories' in Faigman, D.L., Kaye, D.H., Saks M.J. and Sanders, J. (eds) (2012) *Science in the law: social and behavioral science issues*. St. Paul, MN: West Group, 807–913.

Barden, R.C. (2009) Brief of the International Committee of Social, Psychiatric, Psychological, Cognitive Science, Neuroscience, and Neurological Scientists as Amicus Curiae in Commonwealth of Massachusetts v Shanley. SJC No 10282, *http://tillers.net/ev-course/materials/shanley.amicus.pdf* or at rcbarden@mac.com.

## Author Biography

**R. Christopher Barden, PhD, JD**, is a scientist-clinician-attorney-policy expert specializing in multi-disciplinary analysis and reform. He served as the President of the National Association for Consumer Protection in Mental Health Practices (1995–2005). As a practicing trial lawyer, Dr Barden has litigated cases in dozens of states and several countries resulting in record verdicts and settlements. As an expert witness in psychology, he has participated in civil, criminal, and licensing cases in dozens of jurisdictions. As a scientist, Dr Barden is the recipient of two national science awards in child clinical psychology with research funding from the National Science Foundation, the National Institute of Mental Health, the Foundation for Child Development, the W.T. Grant Foundation, and other sources. Dr Barden has published in leading journals and texts in law, clinical psychology, developmental psychology, social psychology, psychiatry, pediatrics, surgery, public policy, and legislation.

9780199672936_Radcliffe_Witness Testimony in Sexual Cases.indb 359

10/8/2015 5:38:21 PM






Updated 2021

**R. Christopher Barden, Ph.D., J.D., LP**
**National Voicemail - 801-230-8328**
**E-mail: rcbarden@mac.com**

**Dr. Barden has practiced law, psychology, social science, as a consultant, and/or as an expert witness in multiple countries and over 40 states in the U.S.**

## BIOGRAPHICAL SUMMARY

**R. Christopher Barden, J.D., Ph.D., LP is a licensed attorney, licensed psychologist, research scientist, speaker, writer, expert witness, and national science-litigation-legislation consultant. He has published in the leading journals and texts in child psychology, social psychology, clinical psychology, psychiatry, surgery, pediatrics, and law. Dr. Barden has helped draft and enact successful legislation to reform the U.S. emergency medical system for children. As an attorney, Dr. Barden's litigation clients have received a world record jury verdict and a world record settlement in complex health care-science litigation. Dr. Barden has published in, and/or served as an editor or reviewer for, several of the most highly regarded journals and texts in a number of professional fields including Developmental Psychology, Child Development, Psychological Bulletin, Cognitive Therapy and Research, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation.**

**Dr. Barden has held university faculty positions in a graduate science department, a medical school, and law school. He has given invited national training addresses to the American Psychological Association, the American Psychiatric Association, the American Bar Association, the U.S. Surgeon General's Conference, the International Association of Plastic and Reconstructive Surgeons, the United States Military Academy at West Point, at the International Sports Psychology meetings of the Beijing Olympics, and to other groups. Dr. Barden has also testified as an expert witness in state and federal courts on psychological, scientific and/or legal issues and before several state legislatures. Dr. Barden has also provided training and consultation to state and federal investigators including F.B.I., Sheriffs' Office staff and Police Investigators. He has also served as a member of a State Higher Education Coordinating Board (MN), a member of a State Licensing Board of Psychology (MN), and as a State Special Assistant Attorney General (UT) prosecuting misconduct by mental health professionals.**

**PSYCHOLOGICAL TRAINING: Dr. Barden received his training in psychology from the University of Minnesota, the University of California at Berkeley, and the U.S. Veterans Administration/Stanford University Medical Center with additional specialty training at the Harvard Medical School/Harvard Law School Program in Forensic Psychology/Psychiatry. As a result of his research and publishing efforts in the field of psychology, Dr. Barden received several Fellowships from the National Institute of Mental Health and was awarded a national Young Scholar Award from the Foundation for Child Development and a national Faculty Scholar Award from the W. T. Grant Foundation.**

**LEGAL TRAINING: After years of psychological research, teaching and clinical work, Dr. Barden turned his attention to legislative, social and public service issues. As the psychologist for the Craniofacial Surgical Teams of the University of Utah School of Medicine and the Humana International Craniofacial Institute, Dr. Barden studied the ways children, families, and adults cope with highly stressful and traumatic situations. Intrigued by the legislative and public policy issues such patients presented, Dr. Barden attended Harvard Law School (J.D., cum laude) with additional specialty training at the Harvard Medical School/ Harvard Law School Program in Forensic Psychology/Psychiatry.**

**LEGISLATIVE REFORMS: With colleagues in law, medicine and public policy, Dr. Barden drafted the Emergency Medical System for Children Act -- model legislation mandating improvements in the emergency medical system for children. This work was published in the Harvard Journal on Legislation. Some version of this legislation has been adopted in more than 20 states. Dr. Barden wrote the "Truth and Responsibility in Mental Health Practices Act" and has worked to draft and enact multiple laws banning "rebirthing therapy", ending "coercive holding therapy", and preventing the abuse of committed patients in experimental drug studies.**

**MULTIDISCIPLINARY REFORMS: Following successful efforts to reform the Emergency Medical System for Children, Dr. Barden began systematic efforts to reform the mental health system. Using a five prong approach of education, regulation, litigation, legislation and prosecution Dr. Barden focused on eliminating dangerous, pseudoscientific notions such as "recovered memory therapy", "multiple personality disorder" and coercive "holding therapies". Thanks to the collaborative, multidisciplinary efforts of scientists, concerned families, mental health practitioners and attorneys, after years of successful civil litigation, legislative hearings, prosecutions and licensing actions these dangerous, junk-science methods and procedures have been greatly reduced or eradicated across the United States. Dr. Barden's current projects include reform efforts in the family law, mental health licensing, public education and criminal justice systems.**

**RESILIENCE & PERFORMANCE PSYCHOLOGY: Dr. Barden is also working on the development of Optimal Performance Systems™ (OPS™), a science-based, performance enhancement program for students, athletes and professionals. OPS™ is the result of Dr. Barden's performance consulting work with Harvard Law students, Harvard College students, NBA All-stars, Olympic athletes, surgeons, attorneys, military leaders, the F.B.I., and business leaders.**

**MEDIA EFFORTS TO INFORM THE PUBLIC: Dr. Barden has been interviewed regarding complex science and legal issues by U.S. Congressional Quarterly, CBS 60 Minutes, ABC NIGHTLINE, the CBS Evening News, TIME Magazine, Newsweek Magazine, U.S. NEWS & WORLD REPORT Magazine, INSIGHT Magazine, THE NEW YORKER, the L.A. Times, the New York Times, the Chicago Tribune, the Minneapolis Star and Tribune, the St. Paul Pioneer Press, the London BBC, U.S. National Public Radio, ABC NEWS 20/20, National German Television, National Finnish Television, 60 Minutes Australia, Canadian Public Radio, PBS FRONTLINE, NBC DATELINE and many other media sources.**

## EDUCATION AND AWARDS

**B.A.** **Child Psychology, University of Minnesota 1976.**
**Summa Cum Laude / (4.0 G.P.A. of 4.0 possible)**
**Phi Beta Kappa**
**Distinguished Graduating Senior Award, University of Minnesota, 1976**
**University of California, Berkeley, Graduate School, 1976-77.**
**National Institute of Mental Health Graduate Fellowship, 1976-77.**
**National Institute of Mental Health Graduate Fellowship, 1977-78.**
**MN Governor's Internship Award, Stillwater Prison Psych. Unit, 1978**
**National Science Foundation Graduate Fellowship, 1978-79**
**Eva O. Miller Social Science Fellowship Award, U. of MN, 1979-80.**
**A.P.A. Approved Internship, Palo Alto Veterans Administration Medical Center/ Stanford University Medical Center 1979-80**

**Ph.D. University of Minnesota, Child and Adult Clinical Psychology - 1982**

**Foundation for Child Development National Award for Young Scholars in Social and Affective Development, 1982 - 1983.**

**L.P. Licensed Psychologist Texas (1984) #22624**
**L.P. Licensed Psychologist Minnesota (1988) #1460**

**National W. T. Grant Foundation Faculty Scholar Award for Research in Mental Health, Stress and Coping 1987.**

**J.D. cum laude Harvard Law School - 1992**

**Law and Psychology Intern, Program for Law and Psychiatry, Harvard Medical School Harvard Law School, Massachusetts Mental Health Center**

**J.D. Attorney at Law State of Minnesota - 1992 #0227316**

**Certified Mediator - State of Minnesota - 1994**

**Trial Lawyer Excellence Award from Jury Verdict Reporter, Law Bulletin Publishing Co. The award was for representation of the plaintiff in a record reported settlement in a psychiatric malpractice case (Burgus v. Braun $10.6 Million, Illinois, 1997).**

**Currently or previously listed in:**

- Who's Who in Science and Engineering
- Who's Who in the World
- Who's Who in America
- Who's Who in Medicine and Healthcare
- Who's Who in American Law
- Who's Who Among Human Services Professionals
- Who's Who in American Education
- Outstanding Young Men of America
- Wisdom Award of Honor
- Wisdom Hall of Fame, Fellow Award
- Honor Roll of Members, Phi Beta Kappa Society

## CURRENT AND/OR PREVIOUS SCIENTIFIC AND PROFESSIONAL PEER REVIEW EDITORIAL POSITIONS-SERVICES:

**Consulting Editorial Board APA Journal Developmental Psychology**

**Editorial Consultant/Reviewer**

- SRCD Journal : Child Development
- APA Journal : Psychological Bulletin
- APA Journal : Developmental Psychology
- APA Journal : Journal of Personality and Social Psychology
- Harvard Law School Journal : Harvard Journal of Law and Public Policy
- Harvard Law School Journal : Harvard Journal on Legislation
- Encyclopedia of Mental Health
- AAPL Journal : Journal of the American Academy of Psychiatry and the Law

## PREVIOUS AND/OR CURRENT MEMBERSHIPS IN SCIENTIFIC AND PROFESSIONAL ORGANIZATIONS :

- American Psychological Society
- Association for Psychological Science

Society for Research in Child Development
American Psychological Association
New York Academy of Sciences
Harvard Law School Society for Law and Medicine
Harvard Law School Committee on Sports & Entertainment Law
American Bar Association
Hennepin County Bar Association
American Society of Law, Medicine & Ethics
Diplomate, National Institute of Sports, Certified Sports Psychologist
NATIONAL BOARD OF LEGAL ADVISORS – U.S. Quackwatch
National Association of Scholars

Public Service - PRESIDENT, National Assn. for Consumer Protection in Mental Health Practices  1994-2004
AP NEWS WIRE, Amherst, NY, Friday, APRIL 23, 2004 – "In a joint press release today, the National Association for Consumer Protection in Mental Health Practices (NACPMHP) and the Commission for Scientific Medicine and Mental Health (CSMMH) announced they are merging to form a stronger international force against mental health quackery. The merger will provide CSMMH with greater resources for examining questionable mental health practices that are not based on scientific evidence and for educating consumers about the risks of those practices. CSMMH is an international group of distinguished researchers, academics, and health care practitioners from widely diverse disciplines -- including medicine, psychiatry, psychology, pathology, biochemistry, nutrition, and physics -- who are dedicated to maintaining high standards of quality in medical care and mental health practice. Members of the Commission are a virtual who's who of scientists and clinical practitioners from leading academic and research centers around the world, including five Nobel Laureates. The Commission also publishes two scientific journals, The Scientific Review of Alternative Medicine and The Scientific Review of Mental Health Practice."

Public Service - COUNCIL FOR SCIENTIFIC MENTAL HEALTH PRACTICE (2002-2004) - The Council for Scientific Mental Health practice is a group of distinguished researchers, academics, and practitioners from diverse disciplines who are deeply concerned about the increasing proliferation of unvalidated and scientifically questionable therapeutic and assessment techniques in mental health.

Public Service - MEMBER,  COMMISSION FOR SCIENTIFIC MEDICINE AND MENTAL HEALTH (2004-present) -  The Commission for Scientific Medicine and Mental Health is an international group of distinguished researchers, academics, and practitioners from widely diverse disciplines -- including medicine, psychiatry, psychology, pathology, biochemistry, nutrition, and physics -- who are dedicated to maintaining high standards of scientific quality in the health care system. Members represent a number of the most prominent scientists in the world including several recipients of the Nobel Prize.

Public Service - ADVISORY BOARD (1995-2005), C. Charles Jackson Foundation for Educational Excellence, with Bruce H. Jackson,  U.S. Congressman Jim Ramstad, Mark Williams, former U.S. Senator Dave Durrenberger,  Dr. Joe Kiser, John Mooty, George Pillsbury, Wheelock Whitney, and others.

Public Service - National Pioneer of Health Care Reform Award, U.S. Congressional Award (2004)

Public Service -  Invited training presentations at the U.S. Military Academy, West Point, FBI regional training meetings, and State and Regional Crime Investigation Assns. meetings.

**SUMMARY OF PUBLIC SERVICE ACTIVITIES :**

**-- Psychology Practicum - University of Minnesota Medical School, Dept. of Psychiatry**

**-- Psychology Practicum - Stillwater Minnesota Maximum Security Correctional Facility**

**-- Psychology Practicum - Minneapolis, Minnesota Public Schools**

**-- APA Approved Psychology Internship - Palo Alto V.A. Med Ctr/ Stanford U. Med Ctr.**

**-- Psychology Consultant Craniofacial Surgical Team, Baylor Medical School, Dallas, Tx**

**-- Psychology Consultant Craniofacial Surgical Team, Primary Children's Hosp, SLC, UT**

**-- Harvard Law School Intern, Mass. A.G.'s Office, Crime Victim Compensation Program**

**-- Chief Author and Legislative Consultant, Emergency Medical Systems for Children Act**

**-- Forensic Psychology Intern, Harvard Medical School/Harvard Law School Forensic Program, Massachusetts Mental Health Center**

**-- Member, Minnesota State Board of Psychology (Appointment of MN Governor)**

**-- Member, Minnesota Higher Education Coordinating Board (responsible for overseeing the MN. multi-billion dollar budget for all state colleges, universities and trade schools) by appointment of Governor Arne Carlson (1993-1994))**

**-- Invited Training Speaker, Minnesota Sex Crimes Investigators Association (1994)**

**-- Invited Training Speaker, Midwestern Sex Crimes Investigators Association (1995)**

**-- Invited Training Speaker, US Surgeon General's Conference**

**-- Consultation with the U.S. Attorneys Office, F.B.I., other national experts**

**-- Court appointed expert witness, St Croix, Wisconsin**

**-- Legislative Consultant, Legislation to ban "Holding Therapy" in Utah**

**-- Legislative Consultant, Legislation to ban "Rebirthing Therapy" in Colorado**

**-- Author, Emergency Medical System for Children Act**

**-- Consultant, Minnesota law protecting patient's rights**

**-- Consultant to various State Boards re: licensing actions**

**-- Special Assistant Attorney General for the State of Utah (2004-2005).**

**-- Expert Witness for the Prosecution, State of Colorado v. Watkins, et al. (Newmaker "rebirthing therapy" case) 2001.**

**-- Expert Witness for the Prosecution, State of Texas v. Harris, (MPD "Twilight Rapist" case) 2011.**

**-- Prosecution consultant King County, Seattle, Washington (Green MPD case 2003).**

**-- Prosecution consultant U.S. Attorneys Office, Houston, Texas U.S. v. Peterson, et al.**

**-- Testifying and consulting expert witness, U.S. Federal Public Defenders Office**

**-- Consultation with dozens of national experts in law and psychology**

**-- Invited International Address on Performance Psychology, "Optimal Performance in Athletics and Education", at the Beijing Olympics meetings of the First World Congress on Excellence in Sport and Life, Bejing, China (Aug-2008)**

**-- Legislative Consultant, Minnesota Legislation to ban abuse of incompetent patients in research studies See, 253B.095 RELEASE BEFORE COMMITMENT (2012)** "The treating psychiatrist must not be the psychiatrist conducting the psychiatric clinical drug trial. The court must determine that, under the circumstances of the case, the patient is competent to choose to participate in the trial, that the patient is freely choosing to participate in the trial, that the compulsion of the stayed commitment is not being used to coerce the person to participate in the clinical trial, and that a reasonable person may choose to participate in the clinical trial."

**-- Pro bono consultation and testimony for Prosecution and Public Defender cases in many states**

**-- Invited address, Center for Enhanced Performance, US Military Academy, West Point (4-2010)**

**-- Invited address, F.B.I. Midwest Regional Supervisor Training Conference, (9-2010)**

**- Invited address, F.B.I. Midwest Regional All-Employees Training Conf., (12-2010)**

**- Reforming the EMERGENCY MEDICAL SYSTEMS FOR CHILDREN - See, Barden, R. C., Kinscherff, R., George, W., Flyer, R., Seidel, J., & Henderson, D., (1993), Emergency Medical Care and Injury Prevention Systems for Children: An Economic-Medical-Legal-**

Psychological Analysis and Legislative Proposals, Harvard Journal on Legislation, Vol. 30, No. 2, pgs 461-497. Some version of this proposed legislation was enacted by the States of New Jersey (1992), Texas (1993), Utah (1994), Colorado (1995), Hawaii (1996), Louisiana (1996) and others. These legislative ideas have continued to expand across the U.S. As of July 1997 18 states reported the creation of a separate Emergency Medical System for Children Advisory Board (as required by this legislative proposal) and 15 states required pediatric representation on State EMS Advisory Boards. (See, EMSC News, Vol 10, No. 2, Summer 1997).

Expert Consultation and/or Testimony to State Governments

Legislature of New Hampshire – science, pseudoscience, and mental health reform

Legislature of Arizona - science, pseudoscience, and mental health reform

Legislature and Law Enforcement of Colorado - science, pseudoscience, and litigation reform

Legislature of Utah - science, pseudoscience, and mental health reform including the dangers of "holding therapy" (also served as Special Assistant Attorney General)

Legislature and Law Enforcement of Minnesota - served on Minnesota State Board of Psychology by appt. of Governor, drafted (enacted) legislative for informed consent protections, trained MN Sex Crimes Investigators Assn.

Legislature and Law Enforcement of Texas - Consultant and expert re: EMSC Act and also to the Texas Rangers Task Force in Texas v. Harris (2011)

Expert Opinions-Presentations Before National Professional Associations, etc - (Invited expert training addresses)

American Psychological Association
American Bar Association
American Psychiatric Association
International Association of Plastic and Craniofacial Surgeons
U.S. Surgeon General Conference

Law Enforcement Consultation and/or Court Appointed Expert

U.S. Attorney General's Office and F.B.I. (Texas, 1998-1999)
District Attorney (State of Washington , 1990s)
Court Appointed Expert, St. Croix County, Wisconsin (1997)
Invited Training Addresses (Crime Investigators Associations (MN and Midwest) and the F.B.I.
Consultant and expert witness —Texas Rangers Task Force in Texas v. Harris (2011)
Consultant and expert witness - Texas v. Hay (2015)

MEMBER OF THE RELEVANT SCIENTIFIC COMMUNITY:

- Graduate of an internationally acclaimed Ph.D. Program in Clinical and Child-Clinical Psychology
- Graduate of an internationally acclaimed Internship in Clinical Psychology
- Published in the leading peer reviewed journals and/or texts in social psychology, personality psychology, child psychology, child clinical psychology, pediatrics, surgery, and public policy psychology.
- National Science Award, W.T. Grant Faculty Scholar Award (for research in psychology)
- National Science Award, Young Scholar Award, Foundation for Child Development
- Principal investigator on research grants with Private, State, and Federal Funds
- Consulting Editorial Board Member, Reviewer, and Author for leading science journals
- Invited speaker at national associations of Psychologists, Psychiatrists, Lawyers, and U.S. Surgeon General's Conference
- Invited speaker at major training programs in Psychology and Psychiatry (Harvard, Yale, Columbia, Minnesota, Univ of North Carolina, Univ. of Georgia, U.S.C., Univ of Utah, Univ of Texas, Univ. of Iowa, and others)

RESEARCH PSYCHOLOGIST, CLINICAL PSYCHOLOGIST, AND EXPERT WITNESS:

EXPERT REVIEW OF SOCIAL SCIENCE METHODOLOGY e.g., Consulting Editorial Board member for the A.P.A. journal, Developmental Psychology , reviewer consultant for many peer reviewed journals and/or texts in Child Psychology, Social Psychology, Personality Psychology, Pediatrics, Child Clinical Psychology, consultant for research organizations, analysis for media organizations, etc. Invited scientific research speaker at Harvard, Yale, Columbia, U.S.C., S.M.U., the University of Minnesota, the University of Georgia, the University of Iowa, the University of Washington, and other institutions. Recipient of two national research awards in psychology. Publications regarding methodology in leading journals.

EXPERT REVIEW OF THERAPY, ASSESSMENT, and FORENSIC PSYCHOLOGY ISSUES; FACULTY - PH.D. PROGRAM IN CLINICAL AND CHILD-CLINICAL PSYCHOLOGY- former Coordinator and Tenure-Track faculty member in a highly ranked, APA approved, Child Clinical Psychology Ph.D. Training Program ( U of Utah), instructor of undergraduate, graduate and advanced graduate seminar classes in Psychotherapy, Research Methods, Personality Development, Abnormal Psychology, Child Development, Testing and Assessment, as well as Law and Psychology. Continuing Professional Education instructor for psychologists, social workers, psychiatrists, and attorneys throughout the U.S.

DIAGNOSTIC ANALYSIS: with adults, children and adolescents
PSYCHOTHERAPY: with adults, children, adolescents, groups, and families.
FORENSIC WORK: This includes including expert psychological testimony before courts, state legislatures and professional ethics committees. Drafting Amicus briefs related to the proper or improper use of social science in the legal system. Providing training lectures and preparation of training materials to State/ Regional Criminal Investigators Associations, State Bar Associations, University Law Schools and other organizations.

EXPERT WITNESS and/or CONSULTANT FOR PROSECUTION AND DEFENSE TEAMS - CONSULTANT TO LEGISLATIVE COMMITTEES Dr. Barden has testified as a psychologist expert witness or served as a consultant --for the prosecution or defense -- in criminal cases in a number of states. See, example cases below:

PROSECUTION EXPERT: TEXAS v. HARRIS (2011) "National law and science expert R. Chris Barden, together with the Texas Rangers, and District Attorney. Bobby Bell were able to convince the court to reject a junk science insanity defense. The case received national media coverage from the Associated Press. "

2011 TEXAS: Texas v. Harris : Testified as an expert witness for the prosecution on Daubert issues. Prosecution prevailed, defendant convicted. District Attorney, Bobby Bell, JD
See, Associated Press, "Texas man suspected of raping older women claims he suffers from multiple personality disorder", Washington Post, National Desk Sept. 19, 2011.
See, "Expert witnesses disagree on validity of multiple personality disorder" by Sonny Long, Victoria Advocate Newspaper, September 20, 2011 Edna, Texas
See, Platenberg, G. Jury sentences convicted rapist to life in prison, assess $10,000 fine, Victoria Texas Advocate, Sept. 30, 2011

Forensic psychology in the News at https://forensicpsychologist.blogspot.com/2011/10/multiple-personality-excluded-in-texas.html

**See, also https://www.psychologytoday.com/us/blog/witness/201110/multiple-personality-excluded-in-twilight-rapist-insanity-case**

***Multiple personality excluded in Texas insanity case.*** **After the defense rested, the prosecution called as a rebuttal witness a Minnesota psychologist and attorney who has made a crusade out of pushing so-called "junk science" out of the courts. Robert Christopher Barden testified that dissociative identity disorder (aka multiple personality disorder) is a controversial condition looked upon with skepticism by the scientific mainstream. He cited several articles rejecting the condition as a viable diagnosis, despite its presence in the DSM.After Barden's testimony that the condition is not generally accepted by the scientific community, despite the fact that it is listed in the DSM, District Judge Skipper Koetter ordered Dr. Ross's testimony on dissociative identity disorder stricken from the record." The defendant was convicted and sentenced to life in prison.**

**Lozano, J., Associated Press, Defense Expert claims Texas man accused in multiple rapes is mentally ill, Houston Chronicle, September 20, 2011 EDNA, Texas (AP) — A Texas man suspected of being a serial rapist suffers from multiple personality disorder likely brought on by abuse, a psychiatrist told jurors Tuesday.... Billy Joe Harris has pleaded not guilty by reason of insanity.... Colin Ross, a psychiatrist testifying on behalf of Harris, told jurors he believes Harris' multiple personality disorder was probably brought on by abuse he experienced as a child. ... Robert Christopher Barden, a psychologist and attorney, testified on behalf of prosecutors, telling jurors that scientists consider multiple personality disorder "junk science" and he has worked for years to keep such unreliable notions out of the U.S. and state legal systems. "The idea of multiple personality disorder is really a bizarre theory. It's highly controversial. Most scientists and psychiatrists are quite skeptical of these ideas," Barden said.**

**Long, S. "Expert witnesses disagree on validity of multiple personality disorder", Victoria Advocate Newspaper, September 20, 2011 Edna, Texas ... "Billy Harris, 54, is on trial for sexual assault of a disabled woman and several other rapes and burglaries in Central and South Texas beginning in 2009. He has pleaded not guilty by reason of insanity. .... psychiatrist Dr. Colin Ross, of Richardson, was on the stand and testified that Harris has multiple personality disorder.... District Attorney Bobby Bell began his cross examination of Ross by getting him to agree that the areas of dissociative identity disorder and multiple personality disorder are controversial... Bell called R. Chris Barden to the stand. Barden, a psychologist and attorney from Minnesota, is involved in assisting the legal system with mental health and science issues.... "to get junk science out of the legal system we rely on the relevant scientific community," Barden said. "these multiple personality notions are highly controversial and clearly not accepted as reliable by scientists." Barden cited at least a half dozen articles published in professional journals concerning the rejection of dissociative identity disorder and multiple personality disorder. He also said the DSM diagnostic manual Ross referred to is simply a dictionary or catalog so that psychiatrists and psychologists are "using the same language." ... "National experts in science condemn MPD as the worst kind of junk science and a danger to the public. Controversial and experimental theories should not be allowed to contaminate the legal system," said Barden."**

**PROSECUTION EXPERT WITNESS in COLORADO V. WATKINS, et al., trial consultant, legislative consultant in banning "rebirthing therapy":** **Dr. Barden served as an expert witness for the Jefferson County, Colorado District Attorneys Office in the nationally reported, first-of-its-kind, landmark criminal prosecution of improper "psychotherapy" -- the use of dangerous, experimental "rebirthing therapy" without**

informed consent. This trial resulting in convictions and substantial prison sentences for the two defendant therapists.

Media reports on the "Newmaker" case (Colorado v. Watkins, Ponder, et al) ran in major newspapers and on T.V., radio, internet news, and other media sources in the U.S. and throughout the world. Such cases improve public awareness of the dangers of pseudoscientific "psychotherapy" and have led to significant improvements in the U.S. mental health system.

See, Audrey Gillan, *The therapy that killed*, The Guardian (Great Britain), Wednesday 20 June 2001.

"Imagine four adults, whose combined weight is nearly 10 times your own, wrapping you in a blanket and sitting on you. It is a controversial therapy called rebirthing, used in the US to treat children with behavioural problems. Only now one of those children has died, suffocated despite her screams for help. Audrey Gillan reports from Washington "

See, Rouse, Karen. Rebirthing verdict may curb restraint therapy. Denver Post, April 22, 2001

See, Lowe, Peggy. Ethics specialist blasts 'rebirthing'. Rocky Mountain News, April 13, 2001.

"It's easily the most reckless and abusive treatment of a child I've ever seen," said Christopher Barden, a psychologist and lawyer who specializes in psychotherapy abuse cases. Barden testified for Jefferson County prosecutors in their criminal case against Evergreen therapists Connell Watkins and Julie Ponder. The pair are charged in connection with the April 18 rebirthing session that killed Candace Newmaker, a 10-year-old adopted girl from North Carolina."

See, Janofsky, M. Girl's Death Brings Ban on Kind of 'Therapy'. New York Times. April 18, 2001

See, Peggy Lowe, Rebirthing team convicted: Two therapists face mandatory terms of 16 to 48 years in jail, Rocky Mountain News, April 21, 2001

"Two Evergreen therapists sobbed as they were led to jail in handcuffs Friday night after a jury found them guilty in the rebirthing death of 10-year-old Candace Newmaker. An emotional Jefferson County District Court jury took about five hours to convict Connell Watkins and Julie Ponder of child abuse resulting in death."

See, ABC NEWS 20/20, "Little Girl Lost: 10 Yr Old Dies From Controversial Rebirthing Therapy, Barbara Walters, Deborah Roberts, June 15, 2001.

ABC 20/20 Transcripts: "Dr. R. Christopher Barden (on camera) "This is not therapy. This is child abuse."

See, Josefson, D. (2001, April 28) Rebirthing therapy [legislatively] banned after girl died in 70 minute struggle, BMJ, 322(7293): 1014.

"Rebirthing therapy, a controversial treatment for reactive detachment disorder, has been banned in the US state of Colorado one year after it resulted in the death of a 10 year old girl...The episode had been videotaped and was used in court against the therapists, who were convicted of reckless child abuse resulting in death and sentenced to 16-48 years' imprisonment.... The law, known as Candace's law, was signed by Colorado governor Bill Owens last

**week…. The new Colorado law will ban all psychotherapies from using active restraint."**

**See, ABC NEWS, 'Rebirthing' Therapist Denies Guilt, June 14, 2001. https://abcnews.go.com/2020/story?id=124076&page=1**

**"A psychotherapist convicted of reckless child abuse in death of a 10-year-old girl during a controversial therapy still insists the child's death was not her fault. Connell Watkins will be sentenced on Monday. She faces up to 48 years in prison in the death of Candace Newmaker during a therapy known as "rebirthing. … 'I'm Going to Die' In the 40 minutes of "therapy", Candace yelled out seven times that she couldn't breathe, and six times she yelled out that she was going to die…. Candace was pronounced dead at Children's Hospital in Denver. A month later, Watkins and Ponder were arrested and charged with child abuse. Both were convicted. Ponder will be sentenced Monday along with Wakins…. Psychologist and attorney Christoper Barden saw the videotape of the rebirthing and testified as an expert witness for the prosecution in the trial of Watkins and Ponder. "Holding children down, yelling at them, screaming at them, calling them names ... This is not therapy — this is child abuse," said Barden, an outspoken critic of alternative therapies. Barden says he does not believe Watkins' contention that Candace could have escaped the pillows and sheet she was wrapped in. "I think that she tried [to escape], I think she tried many times," he said."**

<u>EXPERT CONSULTATION</u> **-- Efforts to Enforce the Law and Protect Citizens from Illegal Recording Practices and Invasion of Privacy in Family Law Cases**

**See, Mike Tolson, Spy gadgets infiltrate divorces as domestic snooping booms, The Houston Chronicle, April 29, 2012. http://www.chron.com/default/article/Spy-gadgets-infiltrate-divorces-as-domestic-3518643.php#page-2**

**ABC World News with Diane Sawyer National Broadcast … client was interviewed regarding hidden, intrusive surveillance in the home., May 3, 2012, http://www.hulu.com/watch/357712/abc-world-news-with-diane-sawyer-thu-may-3-2012**

<u>EXPERT CONSULTATION for LEGISLATIVE REVIEWS OF IMPROPER "HOLDING" and "ATTACHMENT" THERAPIES:</u> **Prosecutions, license revocation cases, Continuing Education addresses and other activities led to national recognition that "attachment therapy", "holding therapy" and "rebirthing" are related, dangerous, junk science practices.**

**See, e.g. 109TH CONGRESS 2d Session, United States House of Representatives, DEPARTMENTS OF LABOR, HEALTH AND HUMAN SERVICES, AND EDUCATION, AND RELATED AGENCIES APPROPRIATIONS BILL, 2007 "The Committee expects that none of the funds provided for the Substance Abuse and Mental Health Services Administration will be used to support attachment therapy (AT), a controversial "treatment" on adoptive and foster children who present disciplinary problems. Reports have suggested that AT has been the cause of abuse, and even death, in several nationally prominent cases. While proponents of the "therapy" have been marketing AT [rebirthing, holding "therapy" and related methods] to child-protection agencies and workers, social-work professionals, parents, and others, AT is an un-validated intervention."**

See, e.g. Texas Administrative Code, DEPARTMENT OF FAMILY AND PROTECTIVE SERVICES, TITLE 40, PART 19, CHAPTER 749, SUBCHAPTER G, RULE §749.1021. CHILD PLACING AGENCIES. CHILDREN'S RIGHTS (Effective January 1, 2007). " What techniques am I prohibited from using on a child? You may not use any of the following techniques on a child: (1) Chemical restraints, mechanical restraints, and seclusion. For more information on emergency behavior intervention, see Subchapter L of this chapter (relating to Foster Care Services: Emergency Behavior Intervention): (2) Aversive conditioning, which includes, but is not limited to, any technique designed to or likely to cause a child physical pain, the application of startling stimuli, and the release of noxious stimuli or toxic sprays, mists, or substances in proximity to the child's face; (3) Pressure points; (4) Rebirthing therapy; and (5) Hug and/or holding therapy.

See, e.g., Barden, R. C. "Therapy and Pseudo-Therapy: Attachment Disorders and Holding Therapy", presented to the UTAH JOINT HOUSE-SENATE STATE CHILD WELFARE LEGISLATIVE OVERSIGHT PANEL, Thursday, September 19, 2002 - 2:00 p.m. - Room 416 State Capitol. Dr. Barden's and many others recommendations to pass a law banning abusive "holding therapy" practices was approved by unanimous vote. The bill Dr Barden co-authored and supported (HB05) to ban abusive practices later passed the House of Representatives by a 68-2 margin.

See, Santini, J., Legislative Panel Backs Measure That Would Ban 'Holding Therapy', The Salt Lake Tribune, September 20, 2002, Friday, at Pg. A10. "Before voting to support the measure, the Child Welfare Oversight Panel on Thursday considered testimony from Christopher Barden, an expert in child psychology, who called coercive holding therapy "quackery." "These therapists really believe they are helping people," Barden said, "just like lobotomizers believed they were helping people." The bill Dr Barden co-authored and supported (HB05) to ban abusive practices passed the House of Representatives by a 68-2 margin.

PROSECUTION CONSULTANT in WASHINGTON v. GREENE REGARDING "MULTIPLE PERSONALITY DISORDER" CLAIMS: Dr. Barden served as a consultant for a Washington State prosecution team in a widely reportedly criminal case involving "multiple personality" as a defense.

See, North, S. (2003, November 15). Doctor doubts mental illness. Daily Herald [Snohomish, WA] ;

See, Roberts, G. (2003, November 21). Man found guilty for crimes he blamed on other personality. Seattle Post-Intelligencer;

See, Sullivan, J. (2003, November 21). Insanity (MPD) defense fails for attacker. Seattle Times, p. B1.

PROSECUTION CONSULTANT REGARDING "MULTIPLE PERSONALITY THERAPY" ISSUES in UNITED STATES. v. PETERSON, et al. Dr. Barden consulted with the U.S. Attorneys Office in a case against "multiple personality disorder" clinic using "recovered memory therapy".

See, Smith, M. (October 29, 1997). Five psychiatric workers charged in scam. Insurance alledgedly collected after patients linked to ritual abuse. Houston Chronicle.

**<u>DEFENSE EXPERT WITNESS REGARDING MEMORY AND INTERVIEWING in UNITED STATES v. .JOURDAIN (2007 Minnesota Federal criminal trial).</u> Expert Witness and consultant for the defense in a Federal District of Minnesota criminal case. Testimony-Consultation regarding Daubert-Kumho standards, opinions regarding interviewing methodologies, memory, memory contamination, ethical standards in health care, peer reviewed research publications, science journals, and related issues. Defense verdict.**

**<u>DEFENSE EXPERT WITNESS REGARDING MEMORY AND INTERVIEWING in UNITED STATES v. HUGHSON (2008 Minnesota Federal perjury trial)</u> Expert Witness and consultant for the defense in a Federal District of Minnesota criminal case for perjury. Testimony-Consultation regarding Daubert-Kumho standards, opinions regarding memory, memory contamination, peer reviewed research publications, science journals, standard of care for trial lawyers (quality of questions) and related issues. Defense verdict.**

**<u>DEFENSE EXPERT WITNESS REGARDING PROPER INTERVIEWING AND MEMORY in UTAH v. HANSEN:</u> (2004 State criminal case). Dr. Barden has also served as an expert witness for the defense in several jurisdictions. Testimony in such cases often focuses on proper vs. improper ways to conduct investigations using reliable methodologies, including interviewing methodologies, that are accepted by the relevant scientific community. Research regarding human memory, memory contamination, peer reviewed studies, etc.**

**See, Walch, Tad , <u>Evidence against parents disputed: Defense witness blasts social worker's interview with boy</u>, Deseret Morning News, Utah Saturday, February 7, 2004. See, deseretnews.com "[Defense expert witness] R. Christopher Barden, accused interviewer Annes of lying to the boy several times. The psychologist, who has a law degree from Harvard, also said Annes used questions that were leading and inappropriate."**

**<u>DEFENSE EXPERT WITNESS REGARDING PROPER INTERVIEWING AND MEMORY in UTAH v. BOTCHER:</u> Dr. Barden has also served as an expert witness for the defense in several jurisdictions. Testimony in such cases often focuses on proper vs. improper ways to conduct investigations using reliable methodologies that are accepted by the relevant scientific community.**

**See, Pamela Manson , <u>Suit says detective botched criminal probe; $3 million sought</u>, The Salt Lake Tribune, June 21, 2005 at B2. [Summary... in the preceding criminal trial ] expert witness Dr. R. Chris Barden, who has trained FBI agents in conducting probes of child sex abuse, testified that the Bodtcher case "was the worst police investigation he had ever seen." On Oct. 31, 2003, after an hour and an half of deliberation, jurors returned with a not guilty verdict on all counts."**

**<u>EXPERT WITNESS and/or EXPERT CONSULTANT IN FAMILY LAW CASES REGARDING MEMORY, INTERVIEWING, THERAPY, ALIENATION, COPING-RESILIENCE, and OTHER ISSUES (Minnesota, Wisconsin, New York, Florida, Illinois, Indiana, Texas, Utah, Idaho, Wyoming, etc), : See, e.g. Bates v. Bates (Illinois, 2003)</u> Dr. Barden has also served as an expert witness in family law cases in several jurisdictions. Testimony in such cases often focuses on informing courts about reliable methodologies that are accepted by the relevant scientific community, peer reviewed journals, the nature of science, memory, parental alienation processes, mental illness issues, child development issues, best interests of children, mental health issues, testing/**

**assessment/diagnosis issues, and ethical guidelines/standards of care in the mental health professions.**

**See, BATES, Appellant, vs. BATES, Appellee, Supreme Court of the State of Illinois, Opinion filed October 28, 2004., [Docket No. 97059-Agenda 16-May 2004] "Dr. R. Christopher Barden, an attorney and a psychologist licensed in Minnesota and Texas, testified ... [testified re:] ... peer-review publications, journals and other compendiums where research articles are reviewed for accuracy and methodology by a panel of experts in the relevant field. ... At the conclusion of the hearing, the court found "that the principles of Parental Alienation are sufficiently established to have gained general acceptance in the particular field.... The trial court found that [the alienated father] had proved, by clear and convincing evidence, that [child's] present environment [living with the alienating mother] seriously endangered her physical, mental, moral or emotional health, and that it was in [the child's] best interests that [the father] be awarded sole custody immediately.... The court said it [based] its findings on the standard set out in [Illinois law], namely, "The willingness and ability of <u>each parent to facilitate and encourage a close and continuing relationship between the parents and child</u>."... The court announced that it found [the alienating mother's] testimony to be inventive, untruthful, manipulative, and self-serving. It found that she did not recognize or take responsibility for her actions and the resultant damage done to the child and the child's relationship with her father."**

**See, e.g., On July 20, 2006 the European Court of Human Rights at Strasbourg (Family Case Koudelka/ Tchech. Rep.; App. No. 1633/05) made an important decision expressively referring to and relying upon the "Syndrome d'Aliénation Parentale" in a case regarding violations of article 8 of the Human Rights' Convention. The PAS-Phenomenon has thus been judically recognized by this supra-national court. http://www.echr.coe.int/ECHR/EN/Header/Case-Law/ HUDOC/HUDOC+database/**

**See, e.g., Finnish National Television TV1, <u>A story of how a child kidnapping succeeded with help from Finnish authorities.</u> Dec.12th, 2002. "One speaker at a recent international parental alienation conference in Frankfurt, Germany is the American doctor of psychology and lawyer R. Christopher Barden, who has won several malpractice suits against incompetent psychotherapists. [Dr. Barden on camera: "I think everyone who works in family courts understands that some parents will coercively influence or indoctrinate their children to be very negative toward the other parent. This is a harmful process. Most everyone also agrees that such parental alienation is a form of emotional child abuse and should be prevented if possible. Children do best with two loving parents."**

**<u>EXPERT WITNESS, CONSULTANT and PUBLISHING REGARDING PROTECTING THE LEGAL SYSTEM FROM FORENSIC EXPERT ERRORS AND OTHER FAMILY LAW REFORMS:</u>**

**<u>See, Campbell, T. W. (2014). Review of: Bowers, C. M. (2014). Forensic testimony: Science, Law, and Expert Evidence. Academic Press, Open Access Journal of Forensic Psychology, 6, R1- R4.</u> "Authored by forensic expert C. Michael Bowers, *Forensic Testimony* focuses considerably on the 2009 report of the National Academy of Sciences (NAS) titled, "Strengthening Forensic Science in the United States: A Path Forward." The Hon. Harry Edwards' 2010 *Jurimetrics* article, "The National Academy of Sciences Report on Forensic Sciences: What it Means for the Bench and Bar," provides the book's Introduction. Reliability Threats to Forensic Science Edwards**

**identified various factors that compromise the reliability of forensic science. The factors that could apply to forensic psychology are: • the paucity of scientific research to confirm the validity and reliability of forensic disciplines and establish quantifiable measures of uncertainty in the conclusions of forensic analyses; — the absence of rigorous, mandatory certification requirements for practitioners; the failure of forensic experts to use standard terminology in reporting on and testifying about the results of forensic science investigations; • the lack of effective oversight; • a gross shortage of adequate training and continuing education for practitioners (p. xxi). One Congressional hearing witness described forensic science representing "a system plagued by a paucity of good research, fragmentation, inconsistent practices, and weak governance" (p. 24). If subjected to the scrutiny of the National Academy of Sciences, would forensic psychology suffer a similar verdict? Bowers quoted from the 2009 NAS report indicating, "the law's greatest dilemma in its heavy reliance on forensic evidence concerns the question of whether and to what extent there is any science in any given forensic discipline" (p. 24). This observation necessitates asking to what extent forensic psychology relies on psychological science.**

***Forensic Psychology and Family Law:*** **In family law matters, psychologist-attorney Christopher Barden insists that mental-health professionals can misinform and mislead legal proceedings. In his 2013 chapter—titled "Protecting the Integrity of the Family Law System"—that appears in *Parental Alienation: The Handbook for Mental Health and Legal Professionals,* Barden contends: Although unknown to most family lawyers and clinical "experts," it is well documented in widely available peer-reviewed, published, scientific journal articles that many of the methods currently employed by mental health experts in family law cases are unreliable, controversial, or unethical thus failing basic *Frye* or *Daubert* analyses (p. 270). Barden continued to chastise mental-health professionals who involve themselves in family law matters while neglecting to consider the appropriateness of their findings and recommendations. "Many family law-affiliated mental health professionals currently rely on unsound, unscientific practices (e.g., failing to disclose controversies regarding unreliable "clinical judgments"; failing to disclose controversies regarding forms of psychotherapy; and failing to disclose controversies regarding "projective tests," "drawing tests," and other errors) because they lack basic knowledge in scientific methodology" (p. 271). Barden quotes Eleanor Maccoby challenging psychological testing in family law matters.**

**"Standard measures of parents' and children's intelligence, personality traits, and emotional states are wholly inappropriate for custody evaluations, and that even the measures and constructs that have been designed specifically to assess child custody arrangements for individual children have no proven validity as predictors of a child's well-being in the care of one or the other of two disputing parents" (p. 274).**

**If forensic psychology rests on such shaky ground in family law matters, then our courts are guilty of duplicitous passivity. Addressing the bench's unresponsiveness, Bowers quoted from Jennifer Mnookin's February 2009 Op-Ed article in the L.A. Times. The courts have almost entirely turned a deaf ear to these [problems], essentially giving forensic science and its practices a free pass, simply because they've been part of the judicial system for so long. . . . The findings of the National Academy of Sciences should spur judges to require higher standards (p. xxxiii).**

**References Barden, R.C. (2013). Protecting the integrity of the family law system: Multidisciplinary processes and family law reform. In D. Loarandos, W. Bernet, & S.R. Sauber (Eds.) Parental alienation: The handbook for mental health professionals. Springfield, IL: Charles C. Thomas.**

**Edwards, Harry T. (2010, May). The National Academy of Sciences report on forensic sciences: What it means for the bench and bar. Presentation at the conference *The* Role of the Court in an Age of Developing Science and Technology, sponsored by the Superior Court of the District of Columbia, Washington, D.C.**

National Research Counsel of the National Academies (2009). Strengthening forensic science In the United States: A path forward. Washington, D.C.: *The National Academies Press.*

**EXPERIENCE AS AN ATTORNEY :**

**CIVIL LAW: PROFESSIONAL MALPRACTICE: JURY VERDICTS:**

In 1995, Dr. Barden's legal clients were awarded what was reportedly, at that time, the largest jury award in U.S. history for claims of psychotherapy malpractice (recovered memory therapy) resulting in emotional injury.

See, Gustafson, Paul. Jury awards patient $2.6 million: Verdict finds therapist Humenansky liable in repressed memory trial Minneapolis St. Paul Tribune, August 1, 1995.

See also, Associated Press, Doctor Loses False-memory Suit, Chicago Tribune, Wed. Aug. 2, 1995, Sec. 1, pg. 12

"I think the effect is a stunning warning to therapists... and to insurance companies that they had better start obeying the informed consent laws and stop using experimental treatments like recovered memory treatments on patients...," attorney R. Christopher Barden said. "This is a huge warning shot to them."

See, Merz, Jessica, You Must Remember This, Law & Politics, Jan. 1996, pg. 13.

"In the first-ever of its kind in this country, a civil suit was brought involving V. Hamanne, who sued her former psychiatrist, Dr. Diane Humenansky, for implanting false memories of child abuse.... After a six week trial, the jury awarded Hamanne $2.6 million for pain and suffering, lost earnings and medical expenses... R. Christopher Barden, Hamanne's attorney who also represents five other former Humenansky patients... who have sued the psychiatrist for planting false memories of abuse, says he expects the award to spur new settlement discussions in those cases."

See also, Repressed Memory, U.S.A. Today, Pg. A1, Col 1, Aug. 1, 1995.

See, also, Associated Press, "$2.5 million for fake sex abuse memories; verdict "a stunning warning to therapists,'" The Philadelphia Daily News, August 2, 1995.

See, also, Bauerlein, M., "The mirror cracked: Vynnette Hamanne spent three years losing her mind with the help of her recovered memory therapist," City Pages, Vol. 17, No. 768, August 23, 1995.

See also, Associated Press, False-Memory Patient Wins Suit, The Globe and Mail (Canada), Aug. 2, 1995.

See also, U.S. press release by R. C. Barden as President of the National Association for Consumer Protection in Mental Health Practices (Aug 2, 1995).

"These cases demonstrate that therapists must obey the informed consent laws or face serious legal consequences. Bogus theories such as "repression" and unproven treatments for junk science illnesses such as "multiple personality disorder" may not be used on American citizens until they have been proven safe and effective by reliable scientific research. Millions of dollars of taxpayers money are wasted every year on these experimental and potentially dangerous forms of mental health treatment and it is time for such unethical practices to cease. Until the professional associations and licensing boards stop these dangerous practices, victims of quack psychotherapies will continue to turn to the courts for justice."

In 1996, Dr. Barden's legal clients were awarded what was apparently at that time the second largest jury award in U.S. history for claims of psychotherapy malpractice resulting in emotional injury.

These cases were widely reported in newspapers, on T.V. and radio throughout the U.S. and other countries. Due to the plaintiffs' courage in resisting confidentiality restrictions, it has often been reported that these cases were instrumental in reforming the U.S. mental health system.

See, Gustafson, Paul. Jury awards $2.5 million in lawsuit against psychiatrist: 'Memories' were induced. Minneapolis/St. Paul Tribune, January 25, 1996, 1B

See also, Guthrey, M. and Kaplan, T., 2nd Patient Wins Against Psychiatrist: Accusation of planting memories brings multi-million ($2.5) dollar verdict. St. Paul Pioneer Press, Jan. 25, 1996, 4B.
            "This verdict establishes again for the rest of the country that this practice [repressed memory therapy] has got to stop. People do not repress memories of traumatic events, They remember them all too well. To have an entire treatment method based on junk science is inappropriate," said R. Christopher Barden, attorney for former patient Elizabeth Carlson.

See, Acocella, J. The Politics of Hysteria, The New Yorker Magazine, April 6, 1998, pg. 64-79.
            "In 1995, Christopher Barden who is Carlson's attorney (and also a psychologist), began circulating to the federal and state legislatures a proposal for a new law, the Truth and Responsibility in Mental Health Practices Act, which would read (in part) as follows: 'No tax or tax exempt monies may be used for any form of health care treatment, including any form of psychotherapy, that has not been proven safe and effective by rigorous, valid and reliable scientific investigations and accepted as safe and effective by a substantial majority of the relevant scientific community." Barden told me, "If these people want to set up booths outside astrology stores, that's fine. But there is no reason a hard working farmer in Kansas should send his tax dollars to Washington to pay for junkscience treatments."

See, Gustafson, Paul, Board suspends license of psychiatrist Diane Humenansky, Minneapolis/St. Paul Star Tribune, Feb. 8, 1997, Pg 1B
            The State Board of Medical Practice has suspended indefinitely the medical license of St. Paul psychiatrist Diane Humenansky, who has been

successfully sued by several former patients who claim she planted false memories of abuse... Humenansky, 61, must enter into psychotherapy with a board-approved professional, submit to a mental health evaluation to determine her fitness to practice medicine safely and cannot seek reinstatement of her medical license for at least three years, the board ruled.

See also, articles in USA today and in dozens of newspapers across the U.S. via the Associated Press Newswire.

See, In the Matter of the Medical License of Diane Bay Humenansky, M.D., License No. 32,069, Before the Minnesota Board of Medical Practice. Findings of Fact, Conclusions and Final Order dated December 20, 1996.

The board found numerous violations pursuant to the findings of fact and allegations which included engaging in medical practice which is professionally incompetent, an inability to practice medicine with reasonable skill and safety to patient.... The order states that respondent's license to practice medicine and surgery in the State of Minnesota shall be suspended for an indefinite period of time.

CIVIL LAW: PROFESSIONAL MALPRACTICE: SETTLEMENTS:

Since 1995, Dr. Barden has participated in the settlement of dozens of psychotherapy malpractice cases in the United States.

In 1997, Dr. Barden's legal clients received what was apparently the largest settlement in history in a psychotherapy negligence case ($10.6 Million). Reported over the Associated Press Newswire this story ran in major newspapers and on T.V., radio, internet news, and other media sources in the U.S. and throughout the world. Due to the plaintiffs' courage in resisting confidentiality restrictions, it has often been reported that this settlement was instrumental in generating significant public awareness of the dangers of "recovered memory therapy" with resulting reforms and significant improvements in the U.S. mental health system.

See, Belluck, P. Memory Therapy Leads to a Lawsuit and Big Settlement [$10.6 Million], The New York Times, Page 1, Column 1, Nov. 6, 1997.

"The next thing I think there will be is legislation to require informed consent from psychiatric patients for such [recovered memory] 'treatments'," said Dr. R. Christopher Barden, a psychologist and lawyer [for the plaintiff]... "I think insurance companies will stop reimbursing people for mental health treatments that are not proven safe and effective. This is the death knell for recovered memory therapy."

See, Belluck, P. She Recovered Memories, Then 10 Millions in Damages, The New York Times, Nov 9, 1997, Sec. 4, Week in Review, page 2, Column 3.

See, United Press International, Woman wins $10 M in false memory suit, Chicago, Ill. November 4, 1997

Irvine, M. Associated Press (1999, March 07) 'Satanic Abuse' Disorder Pioneer Comes Under Fire: Psychiatrist Bennett Braun gained fame

**with 'devil-worshiping' patients. Then doubters spoke up, Los Angeles Times, http://articles.latimes.com/1999/mar/07/news/mn-14693**

**See, Chicago Daily Herald, November 4, 1997 , Woman Settles for $10.6 Million with Her Former Psychiatrist and Chicago Hospital over Allegations she had been Brainwashed to Believe she was a Satanic High Priestess**

**"The settlement is apparently the largest in the world for a case involving recovered-memory therapy, said R. Christopher Barden, a psychologist and attorney who has been involved in about 20 similar cases across the nation and who represented Burgus. 'Psychologists have known for 100 years that false memories can be implanted using hypnosis,' Barden said. "**

**See, NBC DATELINE did a full hour story on the Burgus v Braun case, 1998.**

**See, https://www.youtube.com/watch?v=0NB1wohfgCE**

**"Deposition video on DATELINE:**

**Dr. Barden : Do you obtain informed consent before using hypnosis [to recover repressed memories ] on Pat Burgus?**

**Dr. Braun : No" ...**

**NCB Corresponsdent: "The hospital has closed down Dr Braun's clinic."**

**See, Hanson, Cynthia, Dangerous Therapy, Chicago Magazine, June, 1998.**

**"The [$10.6 Million] Burgus settlement is said to be the largest sum ever awarded in a psychiatric malpractice suit... Since 1993, more than 100 patients nationwide have sued therapists over treatment for MPD, which was diagnosed in explosive numbers throughout the eighties. "In many of these cases, we see a situation in which the poor training and instability of the therapist, coupled with the vulnerability of the patient, creates a situation fraught with the potential for a "folie a deux" -- that is, a delusion shared by therapist and patient, says R. Christopher Barden, a lawyer and psychologist on the Burgus legal team.... In January, citing "business reasons," Rush North Shore Medical Center in Skokie shut down Dr. Braun's dissociative disorders unit."**

**See, Giordana, Kevin, False memory syndrome: As women bring lawsuits, therapists are having to pay for their mistakes, Dec. 22, 1999, www.Salon.com magazine.**

**"Christopher Barden, a Minnesota attorney-psychologist and another of Jenks' attorneys [Idaho case], has made a career of successfully suing therapists in MPD [recovered memory] cases. Barden participated in one of the largest settlements in history in a psychotherapy negligence case when one of his clients, Patricia Burgus, received a $10.6 million settlement in November 1997."**

**See, also, Public Broadcasting Systems, FRONTLINE Documentary entitled, "The Search for Satan," aired October 24, 1995**

**See, AP News Wire story, Psychiatrist loses license over satanic allegations. Chicago, Friday Oct. 8, 1999. "The license of a psychiatrist [Dr. Bennett Braun] was suspended over allegations he used drugs, misinformation, and hypnosis to convince a patient she killed scores of people in satanic rituals....**

Once considered a leading expert in the treatment of multiple personality disorder, Braun will not be allowed to treat anyone with the disorder during a seven year suspension period."

See, Elizabeth Loftus, The Most Dangerous Book You May Already Be Reading, PSYCHOLOGY TODAY, Nov/Dec 2000. "The largest award went to Patricia Burgus, one of the first patients admitted to the Dissociative Disorders Unit of a major Chicago hospital. She endured six years of treatment, including hypnosis and powerful medication... Burgus finally realized that her memories were untrue, and she filed suit. When she and her family received the $10.6 million settlement, R. Christopher Barden, psychologist and attorney in the case, said: 'This is the end of the controversy regarding recovered memories .... This is its death knell.'"

See, Rosie Waterhouse, The woman who had 48 personalities, NEW SCIENTIST, Sept. 28, 2013 (London, U.K.) <<The first groundbreaking case involved Minnesota psychiatrist Diane Humenansky, who had diagnosed a patient with MPD caused by childhood sexual abuse. The patient received over $2 million after the jury concluded that the memories were false. Other successful lawsuits followed. A case against Chicago psychiatrist Bennett Braun, involving a patient with 300 personalities, was settled for a record-breaking $10.6 million. "The risk of legal liability effectively shut down most hospital MPD clinics," says Chris Barden, a psychologist and lawyer who organized many of the malpractice suits. Some of the main advocates of recovered memory therapy and MPD had their licences to practise medicine revoked or restricted. The backlash is also evident in the sharp drop in medical research into MPD (see graph, opposite). "Most of the MPD nonsense came to a crashing halt," says Barden.... In 2006, 83 psychologists and memory researchers put their name to an "amicus brief" – a summary of expert opinion submitted during a legal case, testifying against the idea of MPD. "We all agreed that the entire notions of repressed memories and MPD are pernicious myths,"says Barden, who who was a co-author and one of the signatories. >>

New York Times Digital Internet Version, Page One, 2014

See, http://www.nytimes.com/2014/11/24/us/debate-persists-over-diagnosing-mental-health-disorders-long-after-sybil.html?mabReward=RI%3A15&action=click&pgtype=Homepage®ion=CColumn&module=Recommendation&src=rechp&WT.nav=RecEngine&_r=0

Haberman, Clyde, Health: Debate Persists Over Diagnosing Mental Health Disorders, Long After 'Sybil', NOV. 23, 2014 and NY TIMES, Page One, Web Edition, U.S. & Politics Video, "SYBIL: A BRILLIANT HYSTERIC?"

<< Interview with R. Chris Barden "at 00:30 " Sybil really introduced the country to the notion that someone could have multiple personalities"... at 07:25 "After the public fascination with this diagnosis entire hospital units were turned into treatment centers for multiple personality disorder" [ discussion of lawsuits ending the epidemic ] >>

See, https://en.wikipedia.org/wiki/Herbert_Spiegel.

See, S. Mikkel Borch-Jacobsen (1997). "Sybil: The Making of a Disease? An interview with Dr. Herbert Spiegel". New York Review of Books.

See, Nathan, Debbie (2011). Sybil Exposed: The Extraordinary Story Behind the Famous Multiple Personality Case. Free Press. ISBN 9781439168271.

See, Wood, James (2012). "End to a Twisted and False Episode in Psychiatry". *Skeptical Inquirer*. Committee for Skeptical Inquiry. 36 (2): 54–55.

Dozens of additional settlements against "recovered memory therapists" were received by Dr. Barden's legal clients in many states. A number of these cases resulted in the closing of improper hospital clinics and license revocations or "retirements" for "recovered memory" therapists. Most of these cases settled under confidentiality agreements.

See, Rierden, A., "When a truth wants out, is it real?" The New York Times, April 24, 1994, Section 14 CW, p. 1, from the CT Weekly Desk of the NY Times.

"R. Christopher Barden, the lawyer-psychologist who is representing Mrs. Jan Downing, said he has talked to hundreds of women across the country who have undergone recovered memory therapy and that their stories are strikingly similar. He called the psychological technique one of the biggest consumer frauds of recent times. 'The trick for the therapist is to convince these people that they have multiple personality disorder or have experienced satanic ritual abuse, keep them in therapy for six years and make lots of money,' he said. 'It's pure New Age quackery.' "

[The Downing case in Boston was was reported nationally on CBS, 60 MINUTES (Morley Safer) ].

See, also, McKenna, M.A.J., "Abuse' backlash builds: "Victims' deny "memories,' sue therapists," The Boston Herald, April 8, 1994, p. 45.

In the case of Downing v. McDonough, Essex County Superior Court, Essex, Massachusetts. Plaintiff Downing alleged her former therapist coerced her, despite her resistance, into believing she had been abused as a child. The case was settled out of court.

The media reported the details of many of Dr. Barden's legal or consultation cases thus helping to educate the public.

See, Ann Zimmerman, Cult of Madness: Seeking help for depression, Martha Hurt turned to therapists. That's when her insanity truly began, Dallas Observer Oct 14, 1999.

"R. Chris Barden, a Minnesota psychologist and Harvard-educated lawyer, has made a career of successfully suing therapists in multiple personality disorder cases and is helping Hurt pursue her case. He says experts believe Hurt's is one of the worst cases of abuse they have seen, for in the course of losing her mind, she lost her parents, her husband, and her children. ... "What these therapists tell people is that they have no free will, that something that might have happened 30 years ago is controlling their lives today," Barden says. "They destroy families, and that is not just junk science, it's evil."

See, Johnson, P.M., "Patients sue psychologist over false abuse memories: Repressed memory cases on the rise nationwide," Idaho Falls Post Register, January 30, 1995, p. A-1.

See, Noreen v. Mark D. Stephenson, et al., Barnard v. Mark D. Stephenson, et al., North American Collections v. Goad, defendants and third-party plaintiffs v. Mark D. Stephenson, et al., third-party defendants, in the District Court of the Seventh Judicial District of the State of Idaho, in and for the County of Bonneville, Case Nos. CV-95-220, CV-95-222, CV-95-1157.

See, In the Matter of the License to Practice Psychology: Mark D. Stephenson, License No. Psy-253, Before the Board of Psychologists, State of Idaho, Case No. PSY-03-95-005. At issue was the treatment of three female patients who initiated complaints to the Board that said through hypnosis, he implanted false memories of sexual and satanic abuse into their minds. The State filed a complaint alleging that respondent violated the American Psychological Association (APA) ethical standards in his treatment of the three female patients. The board ordered respondent's license suspended for three years.

See, also, Wallace, C.G., Idaho Falls Post Register, "State board suspends psychologist's license," July 3, 1996, p. A-8.
Suits allege Idaho Falls psychologist, Mark D. Stephenson, used hypnosis to convince plaintiffs they were victims of childhood sexual abuse and satanic ritual abuse. The psychologist was suspended from practicing his profession after he was found to have committed a number of ethical violations. [Case settled].

See, also, Moore, P., "Patient alleges psychiatrist planted cult ideas," The Palm Beach Post, February 23, 1996, p. 1B.
Tinker v. Tesson, in the Circuit Court of the 19th Judicial Circuit, in and for Martin County, Florida, Case No. 95-444-CA. Suit brought by former patient against Dr. Alan R. Tesson, M.D. Plaintiff accused Tesson of implanting suggestions of satanic ritual abuse during 2 1/2 years of hypnosis sessions. ... Tesson is reported to have frequently consulted with Utah hypnotherapist Cory Hammond, a self-proclaimed expert in satanic ritual abuse, court records show. Tesson attended a lecture for hypnotherapists in which Hammond told the group a satanic cult was introduced to the United States by Nazi scientists who devised a mind-control system to induce cult members to commit murder, ritual sacrifices and child pornography, court records state. See, also, Associated Press, "Psychiatrist settles with patient," Times, December 25, 1996, p. 9B. A woman who sued her psychiatrist, claiming he implanted false memories of satanic ritual abuse, has agreed to a $650,000 settlement"

In January of 2001, Dr. Barden's legal clients were awarded what was apparently at that time one of the four largest jury awards in U.S. history (Drummond v. Dudly) for claims of psychotherapy malpractice resulting in emotional injury.

See, Duran, Sarah. Man wins therapy lawsuit and $2.1 Million, Tacoma Washington, The News Tribune, January 13, 2001.

See, Associated Press. Man wins suit against doctor: Renegade psychiatrist's penalty $2.1 million, Tacoma Washington, The Seattle Times, January 14, 2001, B3.

**See, Holt, J., Weird Science: Psychotherapy negligence cases gain credibility, TRIAL - Journal of the Association of Trial Lawyers of America , May 2001, pg. 88.**

**"A jury in Tacoma, Washington, returned one of the largest verdicts ($2.1 Million) in history for psychotherapy negligence -- a result some plaintiff attorneys cite as evidence that cases that once seemed hopeless may now be winnable... R. Christopher Barden of North Salt Lake City, Utah, one of the Drummonds attorneys and a licensed psychologist, said... many forms of psychotherapy are not supported by credible evidence... and plaintiff's attorneys are increasingly willing to challenge these therapies...Barden said that [these cases] require a multidisciplinary approach. Since most cases involve complex hearings on the admissibility of scientific evidence, plaintiff's attorneys should use "science-intensive litigation", including an expert psychologist or psychiatrist as part of the legal team from the start, 'to ensure that the complexities of mental health litigation are properly addressed… "The mental health system needs an overhaul," Barden said, and the verdict in the Drummond case is "a step in the right direction."**

**See, Rovella, David E. , Malpractice suit nets $2.1 million in mental health case, THE NATIONAL LAW JOURNAL, February 22, 2001.**

**"Last month, a Pierce County, Wash., jury awarded Stephen Drummond and his parents $2.1 million.... Dudley's case is an extreme example of what one plaintiffs' expert calls the brave new world of mental health malpractice litigation. R. Christopher Barden, a North Salt Lake, Utah, psychologist and attorney.... has spent the past several years litigating and consulting on similar cases.... Barden claims that plaintiffs' attorneys, with the help of medical experts, are fast filling the breach of what he calls a "seriously under-regulated" mental health system -- one that would allow an individual such as [psychiatrist] Dudley to operate unchecked.... Barden, a proponent of "science-intensive" litigation in the mental health field, says that similar malpractice cases are starting to attract the attention of traditional malpractice litigators. Although he has spent the bulk of his consulting work combatting "junk science" in recovered-memory cases, he says, lawyers who were once afraid of the complexities of mental health malpractice cases are starting to rely on the growing "psychotherapy negligence bar" to help bring these suits."**

**See, Lief, H. , Patients Versus Therapists: Legal Actions Over Recovered Memory Therapy, Psychiatric Times, November 1999 Vol. XVI Issue 11.**

**“This litigation against recovered memory therapists is a helpful boon to the entire field of psychiatric care”, said Harold Lief, M.D., emeritus professor of psychiatry at the University of Pennsylvania Medical School.**

**Lief, HI & Fetkewicz, JM. (1999) Casualties of recovered memory therapy: The impact of false allegations on accused fathers. In Review of Psychiatry, Vol. 1., RC Friedman & JI Downey, Eds., 115-141**

**"It has been argued in some quarters that an attack on RMT [recovered memory therapy] is an attack on psychotherapy in general. To the contrary, our hope is to support effective therapy as strongly as we can. By demonstrating that RMT is a dangerous form of treatment, adversely affecting the lives of the patients subjected to these techniques, and having a catastrophic effect on the family, we wish to enable professionals and their**

**patients to discriminate between 'good' and 'bad' psychotherapy. Any 'good' psychotherapy has to help patients to understand and, if they wish, change their irrational and maladaptive behavior patterns. This can be done without recourse to pseudo-memories of trauma. There is enough genuine trauma to go around."**

**See, http://www.towardfreedom.com/home/content/view/69/69/ << MULTIPLE MEMORIES (AUGUST, 1998)... R. Christopher Barden holds a doctorate in clinical psychology from the University of Minnesota and a law degree from Harvard... In January 1996, after the longest psychiatric malpractice trial in US history, Barden and colleagues won the case with a $2.5 million jury verdict, along with a similar finding for another former patient. Humenansky's lawyers rushed to settle the other cases out of court.... Since then, Barden has become a one-man dynamo, the legal scourge of recovered memory therapy. To date, he has been involved in dozens of cases and has yet to lose one. "The secret to science-intensive litigation," Barden emphasizes, "is to turn the courtroom into a classroom."... Working methodically, Barden slowly picks apart testimony intended to show that recovered memories are reliable, reducing veteran recovered memory experts to embarrassed pseudoscientists all too eager to get off the stand. "I demonstrate that these so-called treatments are highly experimental and hazardous. Only treatments proven to be safe and effective should be used on human beings", says Barden. Stressing the lack of informed consent, Barden hammers witnesses using research on memory. "Studies of over 10,000 trauma victims have produced no credible evidence for repression or dissociation. Victims of prolonged trauma remember what happened to them all too well." Barden also emphasizes that these cases have more to do with indoctrination and suggestibility than real memory.>>**

**As claims of so-called "recovered memories" surface from time to time, the junk science methods and iatrogenic effects of this quackery will be exposed.**

**See, Peggy Fletcher Stack , Rebel Mormon's memoir ignites a furor: Author Martha Nibley Beck claims her father, a respected LDS intellectual, abused her (based on recovered therapy memories), Salt Lake Tribune , Page A1, February 5, 2005. [Summary] "The family has hired R. Christopher Barden, a psychologist and lawyer who has conducted court cases on False Memory Syndrome. He has compiled affidavits from all the Nibley siblings, some in-laws and their mother, Phyllis. [All witnesses refuted Martha's claims as "absurd" and disclosed Martha's history of treatment with "recovered memory therapy"]. The family is considering legal action against Beck or her publisher, Random House in New York." Dr. Barden exposed Martha Beck's admissions — documented in her book - of her multiple and serious felony crimes against her father including elder abuse, kidnapping, terroristic threats, etc.**

**<u>EXPERT CONSULTANT CIVIL ATTORNEY:</u>**

**Dr. Barden has served as a Trial Attorney or Litigation consultant on dozens of cases across the U.S. including some of the largest cases in U.S. history examining negligent, dangerous psychotherapies.**

**See, Jones, Meg, "Doctor accused of bogus therapy, bills Appleton woman says former psychiatrist convinced her of many personalities, billed one patient for group therapy involving her multiple personalities," Milwaukee Journal Sentinel, February 4, 1997, p. 1.**

**See, Associated Press, March 3, 1997, "Wisconsin Doctor accused of planting false memories settles suit for $2.4 million."Nadean Cool, her husband and two adult children brought a complaint against the former director of St. Elizabeth Hospital, psychiatrist Kenneth C. Olson, for the negligent use of hypnosis, misinformation, and implanting false memories, negligent prescription of drugs, misdiagnosing multiple personality disorder with 120 separate and distinct personalities and continuing to counsel her after he recognized that his treatment was responsible for her deteriorating condition. On March 3, 1997, the defendants settled out-of-court for $2.4 million.**

**See, CBS NEWS 60 minutes broadcast on the Nadeen Cool case. "Nadeen Cool and three of Olson's other former patients appeared on "60 Minutes" charging Olson planted false memories in their minds during treatment for multiple personality disorder. The women were Olson's patients before he moved to Bozeman, Montana in 1992. During Olson's treatment of Cool between 1986 and 1992, Cool said Olson convinced her she had 126 personalities. One of those personalities was the bride of Satan. Memories that emerged under drugs and hypnosis administered by Olson involved Cool's father forcing her to eat and kill babies and his being involved in cult activities, she told Wallace. She had to enter St. Elizabeth Hospital in Appleton, Wis., between 35 and 38 times, she said. She felt suicidal. At one point, Cool told Wallace she had accused her father of murdering babies, being a Satanist and the ring leader of a cult. Her father said nothing in reply, but died of a heart attack 10 days later, she said. Cool accepted a $2.4 million settlement last March in a widely publicized malpractice lawsuit she brought against the doctor in an Appleton Circuit Court. Olson denied liability in the settlement."... Paul McHugh, MD, the chief of the psychiatry department at Johns Hopkins University said on "60 Minutes" that diagnosing people with multiple personalities, and the false memories that seem to follow, have hurt many thousands of people throughout the country."**

**See, "Therapist defendant settles out of court in third party suit," FMS Foundation Newsletter, September 1, 1996, p. 11.**

**In Fultz v. Carr [Circuit Court of the State of Oregon, for the County of Multnomah, Case No. 9506-04080], a malpractice suit was brought by a former client of therapist Carr, her husband, minor children and her husband's parents against the therapist Dr Carr. The plaintiffs alleged the techniques used were likely to produce mental images, ideas, thoughts and suggestions which would be misconstrued as real, historically accurate memories and that group therapy would reinforce these beliefs that the images were real and historically accurate. The Complaint also alleges that defendants failed to obtain informed consent or to disclose the highly controversial nature of the diagnosis and treatment. The Fultz family settled their case against Dr. Chyril Walker, one of the two defendants, for $1,150,000 and on September 11, 1996, settled with Dr. Sophia Carr for a confidential amount**

**TRIAL ATTORNEY and EXPERT CONSULTANT in CRIMINAL LAW:**

**Dr. Barden served as as the science-law expert attorney in the landmark Quattrocchi case in Rhode Island. This longest and most complex (at that time) social science Frye/Daubert hearing (7 experts and 5 attorneys battled through weeks of**

**hearings and motions) is widely thought to have largely ended criminal prosecutions in the U.S. based solely on uncorroborated "repressed and recovered memories".**

> **See, Mooney, Tom. Recovered Memory Rejected: Judge rules out key element in landmark case. The Providence Journal (Rhode Island). April 28, 1999.**
>
> **See, Rauch, James, If Paul Shanley Is Guilty, the State Didn't Prove It, National Journal, March 12, 2005. (See also, www.reason.com)**
> **"By the late 1990s, courts had become skeptical of traumatic-amnesia claims. It became clear that many recovered memories were false. Lawsuits and judgments dropped off sharply, as courts began insisting on corroboration and barring testimony that did not meet rigorous scientific standards. A 1999 Rhode Island decision "virtually ended criminal prosecutions — based solely upon recovered memories — in the United States," R. Christopher Barden, a lawyer and psychologist who has worked on dozens of such cases around the country, said in an e-mail interview."**

**REFORMING THE STRUCTURE OF THE MENTAL HEALTH SYSTEM THROUGH LITIGATION (including FRYE-DAUBERT-KUMHO HEARINGS TO EXCLUDE JUNK SCIENCE), LICENSING ACTIONS, and LEGISLATIVE ACTION:**

**Through many high profile litigation cases, a number of essential reforms and improvements have been made to the structure of the U.S. mental health system.**

**1) The End of the "Recovered Memory Therapy" Movement: see above.**

**2) The End of the "Multiple Personality Disorder" Movement: see above.**

**3) The End of criminal prosecutions based solely upon uncorroborated "Recovered Memory" Testimony:**
**See, Mooney, Tom. Recovered Memory Rejected: Judge rules out key element in landmark case. The Providence Journal (Rhode Island). April 28, 1999.**

**4) The Application of "Informed Consent" Protections to psychotherapy patients. See, Barden, R.C., (2001) Informed Consent in Psychotherapy: A Multidisciplinary Perspective, The Journal of the American Academy of Psychiatry and the Law, Vol 29, No. 2, pgs. 160-166 ; See also, Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.**

**This includes protecting committed patients from coerced inclusion in research studies as in Dr. Barden's Dan Markingson lawsuit and its aftermath.**

**See, Minnesota Statutes, 253B.095 RELEASE BEFORE COMMITMENT. Subdivision 1. Court release. After the hearing and before a commitment order has been issued, the court may release a proposed patient to the custody of an individual or agency upon conditions that guarantee the care and treatment of the patient..... a condition that the patient is prohibited from giving consent to participate in a clinical drug trial while the court order is in effect. (protection against coerced inclusion in research studies added 2009)**

**See, Olson, J. "Drug Recruiting at U of M questioned," *Mpls Star/Tribune*, Feb. 27, 2013 "As a result of the Markingson case [Dr Barden's Lawsuit] , the Minnesota Legislature has since made it illegal for a psychiatrist to recruit his own patients into his own clinical trials."**

**See, Perry, S. "U of M suspends enrollment in psychiatric drug trials in the wake of scathing report on Markingson case", MinnPost, 03/20/15. "In response to a scathing report released Thursday by the Minnesota Office of the Legislative Auditor, the University of Minnesota has announced that it is suspending enrollment into interventional drug studies being overseen by its psychiatry department until independent reviewers can determine that the studies fully protect all patients... [ The Minnesota Legislative Auditor found that] ... "the Markingson case raises serious ethical issues and numerous conflicts of interest, which University leaders have been consistently unwilling to acknowledge. They have repeatedly claimed that clinical research at the University meets the highest ethical standards and dismissed the need for further consideration for the Markingson case by making misleading statements about past reviews. This insular and inaccurate response has seriously harmed the University of Minnesota's credibility and reputation." See, http://www.minnpost.com/second-opinion/2015/03/u-m-suspends-enrollment-psychiatric-drug-trials-wake-scathing-report-markings [ accessed March 23, 2015 ].**

**See, Olson, J. , Legislative Auditor: U Should End New Psychiatric Drug Trials Until Lapses Are Addressed, *Mpls Star/Tribune*, March 19, 2015. "The University of Minnesota should suspend all new psychiatric drug trials until lapses in patient protections and ethical oversight are addressed in its psychiatry department, the state's legislative auditor recommended Thursday. "**

**See, Olson, J. "University Told to Freeze Psychiatric Drug Trials", *Mpls Star/ Tribune*, March 20, 2015, A1 ( Top of page one headline). "The University of Minnesota should suspend new psychiatric drug trials until lapses in patient protections and ethical oversight are addressed in its psychiatry department, the Minnesota State auditor said Thursday."**

**See, Alex Friedrich, "U's handling of drug study suicide earns an 'F' among peers," Minnesota Public Radio News, April 23, 2015.**

**See, Susan Perry, "U of M Suspends Enrollment in Psychiatric Drug Trials in the Wake of Scathing Report on Markingson Case," MinnPost, March 20, 2015.**

**See, Jeremy Olson, "*U psychiatry chief steps down* in wake of research criticism," Star Tribune (Minneapolis), April 13, 2015.**

**5) The End of Coercive "Holding Therapy". See, USA TODAY, Tuesday, February 15, 2005 State News. Utah Headline: Controversial holding therapy, used on troubled children, could be finished in Utah.**

**6) The End of "Rebirthing Therapy in the U.S. - See, Janofsky, M. Girl's Death Brings Ban on Kind of 'Therapy'. New York Times. April 18, 2001**

**7. Changes to the psychotherapy insurance system: For years insurers permitted therapists to pursue junk science therapies. These improper economic policy decisions resulted in harm to thousands of families. The wave of therapy negligence lawsuits of the 1990s punished insurance firms who failed to exclude coverage for reckless practices.**

**Legion Insurance paid the verdicts and settlements in many of the national cases listed above and below.**

> **See, DiStefano, J.N. (2003, June 30). Pennsylvania liquidates the American Psychiatric Association Insurance Trust. *Philadelphia Inquirer* , D-1. Legion Insurance Company -- During the 1980s the American Psychiatric Association created the American Psychiatric Association Insurance Trust through which psychiatrists could obtain malpractice insurance. In 1988, Pennsylvania-based Legion Insurance Company became the insurer for the program, and in 2000 the APA sold the program to Legion. Legion Insurance provided coverage for over 7,600 members of the American Psychiatric Association. ... Two years later Legion was downgraded in its rating, and the Pennsylvania Commonwealth Court placed Legion in rehabilitation.... In short, the Pennsylvania Insurance Commission took control and managed Legion Insurance... In July 2003, a Commonwealth of Pennsylvania court judge criticized the management of the company by the Pennsylvania Insurance Department and ordered them to liquidate the company.**

**Dr. Barden has also served as the science-law expert consultant or trial attorney in multiple case hearings applying Frye-Mack-Kelly-Daubert-Kumho and related legal standards to the exclusion of junk science. These hearings have been applied in criminal, civil and family courts. A number of these cases have been the subject of national and international media reports.**

**See, e.g., Hamanne, et al. v. Humenansky, Ramsey County Minnesota File No. C4-94-203, Judge Betrand Poritsky, June 30, 1994, Transcript page 83-84. "The Frye hearing has been concluded and we are still on the record... It's my finding, first, that the theory a person can block out of awareness [repress or dissociate] a long stream of [traumatic] events and subsequently recall them accurately is not supported by experts in the field. And further that there is general agreement by experts that such [recovered memory] evidence is not reliable nor trustworthy. That's the Frye standard. As to the Daubert standard, it is also my ruling that such [recovered memory] evidence is not reliable nor helpful to the jury."**

**See, Carlson v. Humenansky (Ramsey County Minnesota Trial Court), Judge Betrand Poritsky (January, 1996). Judge Poritsky again found (as he had in Hamanne v. Humenansky) that repression and recovered memories were unreliable concepts, not accepted by the relevant scientific community, not helpful to a jury and thus inadmissible.**

**See, Engstrom v. Engstrom California App., 2nd App. Dist., Div 2, (CA 1997) "[Repressed memory] is not generally accepted as valid and reliable by a respectable majority of the pertinent scientific community..."**

**See, State of New Hampshire v. Hungerford and State of New Hampshire v. Morahan 698 A.2d 1244 (N.H. 1997) "The phenomenon of recovery of repressed memories has not yet reached the point where we may perceive these particular recovered memories as reliable."**

**See, State of New Hampshire v. Walters 697 A.2d 916 (N.H. 1997) "[W]e conclude, as we did in Hungerford , that " [t]he indicia of reliability present in the particular memories in [this] case[] do not rise to such a level that they overcome the divisive state of the scientific debate on the issue."**

See, Franklin v. Stevenson, 987 P.2d 22 (1999) . … Utah Supreme Court ruling … "Stevenson objected to the reliability of both the recovery techniques and Franklin's own testimony concerning the recovered memories, as well as to the experts' testimonies regarding both the theory of repressed memory and Franklin's memories in particular…. As we conclude below, the trial court erred in not finding the plaintiff's experts' testimonies [regarding "repressed memories"] inadmissible… On cross-examination in this case, Stevenson elicited concessions from both of Franklin's expert witnesses, Dr. Bessel van der Kolk, and Franklin's therapist, Dr. Laurie Hoover, regarding the lack of scientific foundation for the therapeutic techniques Dr. Hoover used with Franklin… Franklin's evidence clearly did not meet the initial foundational showing of reliability… Not only has this court held that unreliable techniques are inadmissible as evidence, but also that any expert testimony based upon unreliable techniques is also unreliable and inadmissible…. the *necessary* threshold reliability of these techniques was not established in the instant case."

See, State of Rhode Island v. Quattrocchi, C.A. No. P92-3759 (R.I. 1999) [on remand from the Rhode Island Supreme Court 681 A.2d 879 (R.I. 1999)] "The State has not met its burden of establishing that repressed recollection is reliable and admissible as scientific evidence." [ The testimony of the alleged victim — based on recovered "memories" of abuse — was excluded and the case was dismissed. ]

See, State of New Hampshire vs. Bourgelais, Docket No. 02-S-2834, Judge T. Nadeau, April 4, 2005. "the State's motion [to use repressed memory evidence at trial] is denied… the court determines, based on the law and the evidence, that the reliability of memory retrieval has not been sufficiently established…"

See, Rivers v. Father Flanagan's Boys Town, Doc 1024, Case No. 743, Nebraska State Court Judge Sandra L. Dougherty, November 25, 2005. "In conclusion, the Court finds and concludes that Rivers has not met his burden of establishing that repressed and recovered memory is reliable and admissible as scientific evidence or that it is properly applied in this case. The Plaintiff's evidence lacks the scientific reliability and proper application necessary to admission under Rule 702 and Daubert/Schaferman. As a result, the Courts finds and concludes that the Defendants' Motion in Limine No. 1 (banning all testimony regarding repressed and recovered memories) shall be sustained." [ The testimony of the alleged victim — based on recovered "memories" of abuse — was excluded and the case was dismissed. ]

See, Duffy v. Father Flanagan's Boys Town, Case No. 8:03CV31, United States District Court for the District of Nebraska, Memorandum and Order of January 26, 2006 by Hon. Laurie Smith Camp, U.S. District Judge. "[Plaintiff] Duffy filed a motion of withdrawal of expert testimony on the issue of repressed memory.... [thus] judgment will be granted to [Defendant] as a matter of law." [ The testimony of the alleged victim — based on recovered "memories" of abuse — was excluded and the case was dismissed. ]

See, Texas vs. Harris. Associated Press, "Texas man suspected of raping older women claims he suffers from multiple personality disorder", Washington Post, National Desk Sept. 19, 2011; and see, "Expert witnesses disagree on validity of multiple personality disorder" by Sonny Long, Victoria Advocate Newspaper, September 20, 2011 Edna, Texas; and see, Platenberg, G. Jury sentences convicted rapist to life in prison, assess $10,000 fine, Victoria Texas Advocate, Sept. 30, 2011. The court excluded the testimony of the defense expert witness ( a psychiatrist ) who testified regarding the defendant's "multiple personalities", "dissociated memories", etc. The court found the testimony regarding Dissociative Identity Disorder (DID) [ … a variant

**of Repressed Recovered Memory -Multiple Personality Disorder ] was controversial, unreliable, and not accepted by the relevant scientific community."**

**See, John Doe v. Archdiocese of St. Paul, Case No. 62-C9-06-003962, December 8, 2009, 2nd Judicial District, Judge Gregg E. Johnson after a detailed, complex hearing found, "Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the concept of repressed and recovered memory is generally accepted in the relevant scientific community" ..."Inclusion of the diagnosis of dissociative amnesia in the DSM-IV does not establish general acceptance of that diagnosis"... "Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the theory of repressed and recovered memory is reliable and trustworthy based on well-recognized scientific principles because of the significant methodological flaws in the studies presented by plaintiff in support of that theory and the lack of any test to show reliability. Defendant's Motion to Exclude Expert Testimony under the Frye-Mack standard is hereby GRANTED." This decision was affirmed by the Minnesota Supreme Court on July 25, 2012, John Doe v. Archdiocese of St. Paul, 817 N.W.2d 150 (Minn. 2012). [ The testimony of the alleged victim — based on recovered "memories" of abuse — was excluded and the case was dismissed. ]**

**See, Texas v. Hays, No. CR14-095, CR14-096, CR14-097 & CR14-190 (Bandera Co., Tex. Dist. Ct. July 27, 2015). "It is hereby ordered that the expert testimony of Lisa Watts relating to her opinions regarding Dissociative Identity Disorder (DID) [ Testimony on DID ... a variant of Repressed Recovered Memory-Multiple Personality Disorder was excluded as controversial, unreliable, and not accepted by the relevant scientific community." ]**

**PROSECUTOR- CONSULTANT – STATE ATTORNEY GENERAL'S OFFICE:**

**Dr. Barden served as Special Assistant Attorney General for the State of Utah (Division of Occupational and Professional Licensing) in several licensing prosecutions (Appointed by the State Attorney General, 2004). Together with local and national experts, Dr. Barden was an active participant in the process that shut down the practice of "holding therapy" in the State of Utah and across the U.S.**

**See, Santini, J., Legislative Panel Backs Measure That Would Ban 'Holding Therapy', The Salt Lake Tribune, September 20, 2002, Friday, at Pg. A10. "Before voting to support the measure, the Child Welfare Oversight Panel on Thursday considered testimony from Christopher Barden, an expert in child psychology, who called coercive holding therapy "quackery."**

**See, Thalman, J. Lawmakers back plan to ban holding therapy, The Deseret News of Salt Lake City, UT, September 20, 2002, Friday. .... [Summary] "That's typical because those who offer it or participate in it operate outside public scrutiny, said Christopher Barden, a nationally known psychologist and widely quoted critic of coercive holding therapy.... He told lawmakers the treatment shouldn't even be called therapy because labeling it as such implies it has been shown to be therapeutic.... The only evidence that it works is the worst kind -- anecdotal -- and it has never stood up to competent scientific review, Barden said.**

**See, 2003-08-15 http://poundpuplegacy.org/node/46510 State revokes therapist's license by CHRIS COLLINS The Baker City Herald " Oregon has revoked the license of a marriage and family therapist who treated clients in Baker County, calling techniques he used to treat children "a danger to the public." Keith A.**

**Reber was found to have used an unapproved style of "holding therapy" that included " poking clients, pushing hard enough to cause vomiting and screaming in their faces," according to the Oregon Board of Licensed Professional Counselors and Therapists. "**

**See, September 8, 2004 – AGREEMENT between the Office of the Attorney General of the State of Utah and R. Christopher Barden, Ph.D., J.D. Authorization for R. Christopher Barden to act as Special Assistant Attorney General with regard to [holding therapy] licensing matters.**

**See, Therapy or abuse? Controversial treatments may sink Cascade Holding Therapy Clinic by Jesse Hyde, Deseret News. Nov. 28 2004 http:// www.deseretnews.com/article/595108087/Therapy-or-abuse-Controversial-treatments-may-sink-Cascade.html?pg=all " In June, Cascade was sued by Cheryl Denise Ely Haws, who said that during therapy sessions she was led to believe she was lesbian and that she had been the victim of ritualistic, satanic abuse as a child. The lawsuit also alleges that Gwilliam recommended Haws discipline her seven children with physical restraint, and that if they failed to obey her, she could make them drink a large glass of water. "**

**See, Jesse Hyde , Utah jettisons holding therapy: State orders last practitioner to end the controversial practice, Deseret Morning News, Friday, February 11, 2005. "The state's last practitioner of a controversial form of therapy has been ordered by state licensing officials to stop practicing it and will have her therapy sessions supervised for the next three years."**

**See, USA TODAY, Tuesday, February 15, 2005 State News. Headline: Controversial holding therapy, used on troubled children, could be finished in Utah.**

**See, Official Newsletter of the State of Utah, Department of Commerce, Division of Occupational and Professional Licensing, April 1, 2005, In the case of Jennie Murdock Gwilliam. Licensed Clinical Social Worker Action: Allegations Respondent engaged in unprofessional conduct in her [holding therapy] practice... Order: Respondent's license to practice as a licensed clinical social worker was placed on probation for three years with conditions and restrictions. Date: January 31, 2005.**

## EXPERIENCE AS A CHILD HEALTH CARE ADVOCATE, PUBLIC POLICY ANALYST AND AUTHOR OF LEGISLATION:

### ASSISTING CHILDREN WITH CHRONIC MEDICAL DISABILITIES AND THEIR FAMILIES:

**Dr. Barden served for several years as the psychologist on multi-disciplinary medical/surgical teams at Baylor Medical School, the University of Utah Medical School-Primary Children's Hospital, and the Humana International Craniofacial Institute. Dr. Barden has published the results of research projects for children suffering from chronic disabilities in major medical, surgical and psychological journals including Ambulatory Pediatrics, Advances in Child Clinical Psychology, Child Development and the Journal of Plastic and Reconstructive Surgery. The results of such research have also been reported to professional societies in North and South America, Asia, and Europe as well as in several media stories. See e.g., Jacobsen-Wells, J., Infant's appearance affects mom's behavior study shows. Deseret News, Nov. 17, 1988, A13.**

**EFFORTS TO REFORM THE U.S. EMERGENCY MEDICAL SYSTEM FOR CHILDREN VIA LEGISLATION:**

**In 1993 Dr. Barden worked with a multidisciplinary team (physicians, psychologists, methodologists, attorneys, economists and others) to propose legislative reforms for the U.S. Emergency Medical System for Children.**

**See, Barden, R. C., Kinscherff, R., George, W., Flyer, R., Seidel, J., & Henderson, D., (1993), Emergency Medical Care and Injury Prevention Systems for Children: An Economic-Medical-Legal-Psychological Analysis and Legislative Proposals, Harvard Journal on Legislation, Vol. 30, No. 2, pgs 461-497.**

**Some version of this proposed legislation was enacted by the States of New Jersey (1992), Texas (1993), Utah (1994), Colorado (1995), Hawaii (1996), Louisiana (1996) and others. These legislative ideas have continued to expand across the U.S. As of July 1997 18 states reported the creation of a separate Emergency Medical System for Children Advisory Board (as required by this legislative proposal) and 15 states required pediatric representation on State EMS Advisory Boards. (See, EMSC News, Vol 10, No. 2, Summer 1997).**

**Comments on Emergency Medical Systems for Children legislation**

**"Emergency medical services geared to the unique needs of our youngest citizens are absolutely necessary if we are to save critically ill or injured children... This [New Jersey] law could serve as a model for the rest of the United states to follow. Congratulations!"**

**Antonio C. Novello, M.D., M.P.H., Former Surgeon General of the United States of America, letter dated Sept. 9, 1992.**

**"This landmark law will save the lives of countless children in New Jersey and will serve as a model for the nation."**

**Daniel W. Shea, M.D., President, American Academy of Pediatrics, letter dated Sept. 14, 1992.**

**"This landmark bill will significantly improve services for critically ill and injured children in New Jersey and will serve as a model for other states... I salute your efforts!"**

**C. Everett Koop, M.D., Former Surgeon General of the United States of America, in a letter dated Oct. 28, 1992.**

**EFFORTS TO REFORM THE U.S. MENTAL HEALTH SYSTEM:**

**Dr. Barden has worked via regulation (serving on the Minnesota State Board of Psychology), litigation (see above), legislation, education (see lists of professional continuing education seminars offered), and prosecution (see above), to reform the U.S. mental health system. Efforts have included testifying before State Legislatures, serving as a State regulatory official, conducting lawsuits in more than a dozen states, participating as an expert witness in the prosecution of abusive "therapists", teaching advanced classes at law schools, presenting continuing education seminars to professional groups in many states and publishing history/ethics /policy analyses in peer reviewed journals.**

**This series of projects has included efforts to enforce the universal ethical principle of informed consent -- prior to the litigation battles of 1995-2000 this principle was widely ignored and thus violated by mental health professionals.**

> **"The informed consent in psychotherapy debate became a polarized focus of mental health reform efforts on August 8, 1994, when dozens of prominent psychology practitioners, researchers and academics (including Past Presidents of major mental health organizations) sent a public letter to U.S. Congressional leaders urging them to require that the rules of informed consent be applied to psychotherapy.**
>
> > **"Consumer, patient, and professional groups are just now realizing that psychotherapy patients across America are being subjected to experimental and potentially dangerous forms of "psychotherapy," including "memory retrieval/enhancement" therapy, at taxpayer expense. Even more disturbing is the almost universal practice of subjecting patients to these controversial and potentially dangerous procedures without any semblance of informed consent. We believe that fraud investigations by the F.B.I. and other agencies would reveal that virtually none of the therapists engaged in "memory retrieval" or "memory enhancement" procedures are informing their patients (or insurance companies) of the experimental, very controversial and potentially dangerous nature of these "treatments...."**
>
> **Further, this 1994 letter from the office of R. C. Barden -- thus often called the "Barden Letter" -- sought to tie informed consent compliance with tax funded health care reimbursements and to ban payments for non-empirically validated "treatments".**
>
> > **"To reduce the possibility of future, similar tragedies we suggest that the following language be included in all appropriate sections of relevant health care codes: "No tax or tax exempt monies may be used for any form of health care treatment, including any form of psychotherapy, that has not been proven safe and effective by rigorous, valid and reliable scientific Investigations and accepted as safe and effective by a substantial majority of the relevant scientific community."**
>
> **Although this letter created a firestorm of controversy that endures to the present, it is now clear that the fundamental ideas expressed in the letter have become more and more widely accepted in the legal, public policy, insurance, health care management and mental health systems."**
>
> > > **Barden, R.C., (2001) Informed Consent in Psychotherapy: A Multidisciplinary Perspective, The Journal of the American Academy of Psychiatry and the Law, Vol 29, No. 2, pgs. 160-166.**

**Many of the reforms discussed in the "Barden letters" of 1994 and 1995 were implemented by the year 2000 due to the synergistic efforts of prosecutors, litigators, scientists, educators, insurance companies, health care professionals, national media, concerned families, and legislators.**

**"The associations and licensing boards have proven virtually worthless in policing their own ranks," says R. Christopher Barden, a lawyer and psychologist who has led several successful malpractice suits against therapists. "In contrast, scientific**

**research, media exposure, continuing professional education and highly visible litigation will remain the major modes of mental health-care reform."**

**See, Glenn, Nightmare Scenarios: Science and Psychotherapy, Chronicle of Higher Education, October 24, 2003**

**"R. Christopher Barden, a lawyer and psychologist who served on the Minnesota Board of Psychology in the 1990s, said licensing boards struggle with inherent conflicts of interest because they're supervising their peers. In a previous interview with another newspaper, Barden described such agencies as "captured boards" that act more like therapists than regulators aimed at protecting the public.... " The problem of how to deal with harmful quack psychotherapies goes far beyond what the small staff of licensing boards can manage," Barden said this week.."**

**See, Disturbed patient, disturbing therapy by St. Cloud psychologist State board disciplines a St. Cloud psychologist who seemed to believe her client's delusions more than her client did. *Minneapolis Star Tribune*, Minneapolis/October 31, 2009**

**MEMBER - COMMISSION FOR SCIENTIFIC MEDICINE AND MENTAL HEALTH 2004-Present**

**The Commission for Scientific Medicine and Mental Health is an international group of distinguished researchers, academics, and practitioners from widely diverse disciplines -- including medicine, psychiatry, psychology, pathology, biochemistry, nutrition, and physics -- who are dedicated to maintaining high standards of scientific quality ifn the health care system. Members joining Dr. Barden on this commission include a number of the most prominent scientists in the world including:**

**See, http://www.csmmh.org/fellows.html**

**Baruj Benacerraf, MD, Nobel Laureate, President, Dana-Farber Inst.**
**Francis Crick, PhD, Nobel Laureate, Salk Institute (deceased)**
**Arthur Kornberg, MD, Nobel Laureate, Stanford University**
**Leon Lederman, PhD, Nobel Laureate, Illinois Inst of Technology**
**Glenn T. Seaborg, PhD, Nobel Laureate, Univ of California (deceased)**
**Marvin Minsky, PhD, M.I.T., Rank Prize, Royal Society of Medicine**
**R. C. Barden, Ph.D., J.D. Former Pres. Nat. Assn for Consumer Protection in M.H. Practices**
**David H. Barlow, Ph.D., Psychology, Boston University**
**Aaron T. Beck, M.D., Psychiatry, University of Pennsylvania**
**Gerald Davison, Ph.D., Psychology, University of Southern California**
**Robyn Dawes, Ph.D., Psychology, Carnegie Mellon University**
**Grant Devilly, Ph.D., Criminology, University of Melbourne, Australia**
**Albert Ellis, Ph.D., Albert Ellis Institute, New York, New York (deceased)**
**Howard N. Garb, Ph.D., VA Pittsburgh Health Sys & Univ. of Pittsburgh**
**William M. Grove, Ph.D., Psychology, University of Minnesota**
**Harrison G. Pope, M.D., MPH, McLean Hospital, Harvard University**
**Elizabeth F. Loftus, Ph.D., Psychology, University of California**
**Yuji Sakano, Ph.D., Psychology, Waseda University, Japan**
**Wallace Sampson, M.D., Editor, Scientific Rev. of Alternative Medicine, Los Altos, CA.**
**Margaret T. Singer, Ph.D., Psychology, Emerita, Univ of California at Berkeley (deceased)**
**Robert L. Spitzer, M.D., Columbia University and New York State Psychiatric Institute**
**Carol Tavris, Ph.D., Social Psychologist/Author, Los Angeles, California**
**Leland Shapiro, MD, Infectious Diseases, Univ. of CO, Boulder**
**Steven Pinker, PhD, Brain and Cognitive Sciences, MIT**

**Paul R. McHugh, MD, Psychiatry, Johns Hopkins Medical School**
**Henri Broch, ScDr, Physics, University of Nice, France**
**Robert H. Romer, PhD, Editor, American Journal of Physics**
**Richard McNally, Ph.D., Psychology, Harvard University**
**Harald Merckelbach, Ph.D., Psychology, Maastricht University, Netherlands**
**Harold Merskey, D.M., Psychiatry, Emeritus, University of Western Ontario, Canada**
**Yuji Sakano, PhD, Psychology, Waseda University, Japan**
**David Faust, Ph.D., Psychology, University of Rhode Island**
**Giovanni A. Fava, M.D., Psychology, University of Bologna, Italy**
**Adrian Furnham, D.Phil., Psychology, University College London, UK**
**Eileen Gambrill, Ph.D., School of Social Welfare, University of California at Berkeley**
**and many more.**

**MEMBER - COUNCIL FOR SCIENTIFIC MENTAL HEALTH PRACTICE 2000-2004**

**The Council for Scientific Mental Health practice is a group of distinguished researchers, academics, and practitioners from diverse disciplines who are deeply concerned about the increasing proliferation of unvalidated and scientifically questionable therapeutic and assessment techniques in mental health. Many of these techniques place the public at risk and undermine the scientific foundatious of clinical psychology, social work, counseling, and allied disciplines. We are committed to the objective scientific evaluation of all novel mental health practices and are dedicated to disseminating only those practices that have been shown to be effective or valid. We believe in keeping an open mind to all mental health claims, but also holding all such claims to high standards of scientific evidence.**

**MEMBERS:**

**Paul Kurtz, Ph.D., Publisher, Philosophy, Emeritus, State University of New York at Buffalo**
**Scott O. Lilienfeld, Ph.D., Editor and Executive Director**
**James Alcock, Ph.D., Psychology, York University, Canada**
**Robert Baker, Ph.D., Psychology, Emeritus, University of Kentucky**
**R.C. Barden, J.D., Ph.D., Nat. Assn Consumer Protection in Mental Health Practices**
**David H. Barlow, Ph.D., Psychology, Boston University**
**Stephen Barrett, M.D., Editor, Quackwatch, Allentown, Pennsylvania**
**Aaron T. Beck, M.D., Psychiatry, University of Pennsylvania**
**Gershon Ben-Shakhar, Ph.D., Psychology, Hebrew University of Jerusalem, Israel**
**Barry L. Beyerstein, Ph.D., Psychology, Simon Fraser University, Canada**
**Susan Blackmore, Ph.D., Psychology, University of the West of England, Bristol, UK**
**Marilyn Bowman, Ph.D., Psychology, Simon Fraser University, Canada**
**Patricia A. Brennan, Ph.D., Psychology, Emory University**
**Terence Campbell, Ph.D., Private Practice, Sterling Heights, Michigan**
**Frederick Crews, Ph.D., English, University of California at Berkeley**
**Patrick Curry, Consumer Advocate, Pittsburgh, Pennsylvania**
**Gerald Davison, Ph.D., Psychology, University of Southern California**
**Robyn Dawes, Ph.D., Psychology, Carnegie Mellon University**
**Grant Devilly, Ph.D., Criminology, University of Melbourne, Australia**
**Albert Ellis, Ph.D., Albert Ellis Institute, New York, New York (deceased)**
**Edwin Erwin, Ph.D., Philosophy, University of Miami**
**David Faust, Ph.D., Psychology, University of Rhode Island**
**Giovanni A. Fava, M.D., Psychology, University of Bologna, Italy**
**Adrian Furnham, D.Phil., Psychology, University College London, UK**
**Eileen Gambrill, Ph.D., School of Social Welfare, University of California at Berkeley**
**Howard N. Garb, Ph.D., VA Pittsburgh Health System and University of Pittsburgh**
**Gina Green, Ph.D., Institute for Effective Education, San Diego, California**

**William M. Grove, Ph.D., Psychology, University of Minnesota**
**Adolph Grunbaum, Ph.D., Philosophy, University of Pittsburgh**
**Allan R. Harkness, Ph.D., Psychology, University of Tulsa**
**James Herbert, Ph.D., MCP Hahnemann University, Philadelphia, Pennsylvania**
**Terence M. Hines, Ph.D., Psychology, Pace University**
**John Hochman, M.D., Private Practice, Los Angeles, California**
**John Hunsley, Ph.D., Psychology, University of Ottawa, Canada**
**Thomas Joiner, Ph.D., Psychology, Florida State University**
**Stuart Kirk, D.S.W., Dept. of Social Welfare, University of California at Los Angeles**
**Donald F. Klein, M.D., Psychiatry, Columbia Univ. and NY State Psychiatric Institute**
**John Kline, Ph.D., Psychology, Florida State University**
**Arnold Lazarus, Ph.D., Psychology, Emeritus, Rutgers University**
**Paul Lees-Haley, Ph.D., Private Practice, Woodland Hills, California**
**Jill Littrell, Ph.D., School of Social Work, Georgia State University**
**Jeffrey M. Lohr, Ph.D., Psychology, University of Arkansas**
**Elizabeth F. Loftus, Ph.D., Psychology and Law, University of Washington**
**Steven Jay Lynn, Ph.D., Psychology, Binghamton University, New York**
**Richard McFall, Ph.D., Psychology, Indiana University**
**Paul R. McHugh, M.D., Psychiatry, Johns Hopkins University**
**Richard McNally, Ph.D., Psychology, Harvard University**
**Harald Merckelbach, Ph.D., Psychology, Maastricht University, Netherlands**
**Harold Merskey, D.M., Psychiatry, Emeritus, University of Western Ontario, Canada**
**Robert Montgomery, Ph.D., Psychology, Georgia State University**
**Timothy Moore, Ph.D., Psychology, Glendon College, York University, Canada**
**Peter Muris, Ph.D., Psychology, Maastricht University, Netherlands**
**Charles B. Nemeroff, M.D., Psychiatry and Behavioral Sciences, Emory University**
**John Paddock, Ph.D., Psychology and Psychiatry, Emory University**
**Loren Pankratz, Ph.D., Oregon Health Sciences University**
**August Piper Jr., M.D., Private Practice, Seattle, Washington**
**Harrison G. Pope, M.D., MPH, McLean Hospital, Harvard University**
**Ron Rapee, Ph.D., Psychology, Macquarie University, Sydney, Australia**
**Lawrence Riso, Ph.D., Georgia State University**
**Gerald Rosen, Ph.D., Private Practice and University of Washington**
**Yuji Sakano, Ph.D., Psychology, Waseda University, Japan**
**Wallace Sampson, M.D., Editor, Scientific Review of Alternative Medicine, Los Altos, CA.**
**Margaret T. Singer, Ph.D., Psychology, Emerita, Univ of California at Berkeley (Deceased)**
**Robert L. Spitzer, M.D., Columbia University and New York State Psychiatric Institute**
**Carol Tavris, Ph.D., Social Psychologist/Author, Los Angeles, California**
**Bruce A. Thyer, Ph.D., LCSW, School of Social Work, University of Georgia**
**E. Fuller Torrey, M.D., Psychiatry, Uniformed Services Univ. of Health Sciences, Maryland**
**Samuel M. Turner, Ph.D., Psychology, University of Maryland**
**Irwin D. Waldman, Ph.D., Psychology, Emory University**
**Jerome C. Wakefield, D.S.W., School of Social Work, Rutgers University**
**Richard Wiseman, Ph.D., University of Hertfordshire, UK**
**James M. Wood, Ph.D., Psychology, University of Texas at El Paso**

MISSION STATEMENT BY THE COUNCIL FOR SCIENTIFIC MENTAL HEALTH PRACTICE

**"Over the past several decades the field of mental health has witnessed a widening gap between researchers and practitioners. This growing divide has led many observers to contend that the scientific foundations of clinical psychology and allied**

disciplines are steadily eroding. A wide variety of unsubstantiated or untested treatments (such as facilitated communication, recovered memories and hypnotic age regression) and assessment methods (such as human figure drawing tests and the Myers-Briggs Type Indicator) have flourished in popularity in recent years. Still other techniques (such as anatomically correct dolls and the Rorschach Inkblot Test) are widely used even though they are highly controversial or questionable on scientific grounds. It is disturbing that the frequency of use of such procedures greatly outstrips their evidentiary base.

The field of mental health is in crisis. The public's perception of mental health practice is shaped far more by self-help books, radio psychologists, and sensational media stories of dramatic "cures" than by objective scientific evaluations. Self-proclaimed gurus are often heralded in the mass media even though their treatments have not been submitted to randomized, double-blind trials, which should be standard procedure in the scientific evaluation of claims. Psychiatric labels that lack adequate research support (such as codependency and sexual addiction) are used with increasing frequency in the popular press and courts of law. Many treatment and assessment techniques promulgated to the general public rest on tenuous scientific foundations. Some of these techniques, such as rebirthing and highly suggestive therapeutic methods (e.g., hypnosis) to recover memories, are almost surely harmful in certain cases. Still other techniques, although not harmful per se, may deprive individuals of valuable time and financial resources that could be more effectively spent on other treatments."

EFFORTS TO EXCLUDE JUNKSCIENCE FROM THE U.S. LEGAL, HEALTH CARE AND MENTAL HEALTH SYSTEMS:

Dr. Barden has testified in courtrooms and state legislatures, given media interviews via newspapers, magazines, T.V. and radio, taught dozens of Continuing Education Courses in Law and Mental Health in dozens of states and published several peer reviewed articles [e.g. Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, Psychology, Public Policy and Law, Vol 5, No. 1, 234-242. -- all to warn of the dangers of pseudoscience "evidence" in the legal system; See, e.g., Horn, M. Unlocking Hidden Memories, U.S. NEWS AND WORLD REPORT, Nov. 29, 1993, pg. 52-63.

Dr. Barden has been quoted regarding the dangers of junkscience in many media reports including but not limited to the following:

See, e.g. Hansen, M. More False Memory Suits Likely, AMERICAN BAR ASSOCIATION JOURNAL, Aug. 1994, pg. 36-37.

"R. Christopher Barden, a lawyer and psychologist who represents 10 former patients in false memory suits against their ex-therapists, said the technique is 'only the more recent and most dangerous in a long line of bizarre pseudo-psychotherapeutic fads."

See, e.g. Sileo, C. Couches, Quacks and the Therapy Backlash, INSIGHT MAGAZINE, Aug. 29, 1994, pg. 6-11.

".. if [therapy is] powerful enough to help, then it is powerful enough to hurt" says R. Chris Barden, an attorney and clinical psychologist at the University of Minnesota, who is drafting legislation calling for consumer mental health protection... Barden believes that much of what goes on in psychotherapy is rampant consumer fraud and says psychotherapists should be subjected to the same accountability as medical practitioners. His consumer protection legislation calls for two-part reform. First, it would require psychotherapists to inform their clients of the risks and dangers of a particular therapy. Second, it

would require therapists to tell their clients whether the treatment has been tested or proven to be of value... Barden notes that in order to release a new drug to the public, the Food and Drug Administration has to find what it calls "substantial scientific agreement" about the drug's effectiveness. The same standard, he says, should apply to psychotherapies."

See, e.g., Rierden, Andi, When a Buried Truth Wants Out, Is it Real?, NEW YORK TIMES, April 24, 1994, section 14, page 1, col. 1, Conn. Weekly Desk.

"R. Christopher Barden.. the lawyer representing Mrs. Downing said he has talked to hundreds of women across the country who have undergone recovered memory therapy and that their stories are strikingly similar. He called the psychological technique of "recovering memories" one of the biggest consumer frauds of recent times.... its pure New Age quackery."

See, e.g. Geyelin, False-Memory Suits Facing Big Hurdles, WALL STREET JOURNAL, May 17, 1994, pg B5.

"... plaintiffs lawyer R. Christopher Barden, who is also a licensed psychologist.. is handling malpractice suits against seven psycho-therapists alleging that they planted suggestive memories in their patients. The use of guided imagery, visualization and similar techniques to enhance memory, he says, are nothing more than a form of hypnosis, long considered dangerously unreliable.... 'The biggest issue in all of this is informed conset' says Barden...the psychotherapist must inform the patient of risks, benefits, hazards and of alternative treatments."

See, e.g. Shuit, D., Verdict heats up memory debate, LOS ANGELES TIMES, May 22, 1994, pg. A3, Col 1.

"R. Christopher Barden, a psychologist and lawyer from Minneapolis, said the decision will force lawmakers and members of the mental health profession to set up practice parameters and ethics guidelines."

See, e.g. Worsnop, Richard. The Recovered Memory Debate, THE U.S. CONGRESSIONAL QUARTERLY, Vol 6, No. 25, July 5, 1996. pg. 579-599

"The basic issue is that the patient must decide [after being fully informed] if she is willing to risk a form of treatment that everyone agrees is very controversial when 'safe and effective' alternatives are available says R. Christopher Barden, lawyer and psychologist".

See, Howatt, Glenn, Psychologist accused of planting false abuse memories in patient, MINNEAPOLIS STAR TRIBUNE/April 5, 1997,

"A St. Paul psychologist and author of a book on repressed memory therapy was accused of malpractice Friday in a lawsuit filed by a former patient. The female patient, who was identified only as a resident of Ramsey County, alleged that Renee Fredrickson, who wrote "Repressed Memories: A Journey to Recovery from Sexual Abuse," manipulated her into experiencing false memories of ritual cult abuse .... The patient and her husband are seeking damages on eight counts of professional negligence and inflicting suffering. ... The plaintiffs are represented by R. Christopher Barden, a Plymouth attorney and a licensed psychologist who has represented a number of patients who have sued psychotherapists alleging they planted false memories of childhood abuse. ... Barden successfully sued former St. Paul psychiatrist Dr. Diane Humenansky in two false memory cases, receiving multimillion-dollar jury awards in both cases.

**See, e.g., "Pabst, Lora "Disturbed patient, disturbing therapy", Mpls. Star & Tribune, Nov. 1, 2009, pg. A1 headline.**

**"R. Christopher Barden, a lawyer and psychologist who served on the Minnesota Board of Psychology in the 1990s, said licensing boards struggle with inherent conflicts of interest because they are supervising their peers... the problem of how to deal with harmful quack psychotherapies goes far beyond what the small staffs of licensing boards can manage", Barden said.**

**See, e.g. American Psychological Association MONITOR, <u>Recovered-memory lawsuit is settled out of court</u>, VOLUME 29 , NUMBER 9 -September 1998.**

**"A malpractice lawsuit alleging that a psychologist implanted false memories in her patient was settled out of court in late June..... R. Christopher Barden, PhD, JD, a psychologist and lawyer who represented Sommerfeld in the suit... says the willingness of [Dr. Renee] Fredrickson's insurer to settle [so quickly] signifies the demise of recovered-memory therapy. The courts, and society in general, increasingly recognize that 'credible research demonstrates that repression [of memories] and dissociation are either extremely rare or myths,' he says."**

**See, Lerner, Maura, Psychologist barred from treating cases involving false memories, Minneapolis/St. Paul Tribune, June 3, 1999**

**"The Minnesota Board of Psychology has permanently barred Renee Fredrickson, a St. Paul psychologist, from treating patients for problems potentially involving "ritual cult abuse". ... The board restricted her license and fined her $15,000 for unprofessional conduct and causing potential harm to patients. She is one of three psychologists disciplined by the board this spring, according to newly released documents. Fredrickson, 52, author of the book "Repressed Memories: A Journey to Recovery from Sexual Abuse," was sued by a female patient two years ago for allegedly causing false memories of ritual cult abuse...and murder. That case was settled.... Following [the lawsuit, deposition and complaint by R.C. Barden and] an investigation by the Psychology Board, Fredrickson acknowledged allegations that, during the course of therapy, at least three patients came to believe they had been victims of sexual abuse and satanic cults, and at least one patient became suicidal as a result. The board also said she inappropriately used hypnosis in exploring those memories.... In addition, Fredrickson complained to police that she was being stalked by members of a cult. The board listed that as a sign of "possible mental dysfunction." ... She also agreed to undergo a psychological evaluation and to take a course on professional "boundaries," or proper behavior."**

**See, Santini, J., Legislative Panel Backs Measure That Would Ban 'Holding Therapy', The Salt Lake Tribune, September 20, 2002, Friday, at Pg. A10.**

**"Before voting to support the measure, the Child Welfare Oversight Panel on Thursday considered testimony from Christopher Barden, an expert in child psychology, who called coercive therapy "quackery." "These therapists really believe they are helping people," Barden said, "just like lobotomizers believed they were helping people."**

**See, Hyde, J. Utah jettisons holding therapy: State orders last practitioner to end the controversial practice, ; Deseret Morning News, Friday, February 11, 2005.**

**"The state's last practitioner of a controversial form of therapy has been ordered by state licensing officials to stop practicing it and will have her therapy sessions supervised for the next three years."**

**<u>INVITED TRAINING ADDRESSES TO NATIONAL PROFESSIONAL MEETINGS: (examples)</u>: Dr. Barden has given invited addresses to the American Bar Association National Litigation Section, the national convention of the American Psychiatric Association, the national convention of the American Psychological Association and the U.S. Surgeon General's National Conference on Children's Health Care regarding these aud related issues:**

**Barden, R. C. "A Multidisciplinary (Legal, Psychological, Economic, Ethical) Analysis of Legislation and Policy Arguments for Psychologist Prescription Privileges", invited address to the American Psychological Association Presidential Plenary Session, Toronto, Canada, August 9, 2003. "Prescription Privileges: Potential Prospects and Pitfalls."**

**Cochairs: Gloria Neumann, PsyD, Honolulu Police Dept., Hawaii; and John Winston Bush, PhD, New York Institute for Cognitive and Behavioral Therapies, Brooklyn. Opening Comments: Robert J. Sternberg, PhD, Yale University, President of the APA.**

**Participants: Ronald E. Fox, PsyD, The Consulting Group, Chapel Hill, NC; John Winston Bush, PhD; Roberta L. Nutt, PhD, Texas Woman's University; Robert K. Klepac, PhD, Lackland AFB, TX; Lt. Col. Elaine Orabona-Mantell, PhD, Seymour Johnson Air Force Base, Goldsboro, NC; R.C. Barden, PhD, JD, National Association for Consumer Protection in Mental Health Practices, North Salt Lake, UT; Erin S. Kappenberg, MA, Claremont Graduate University; and Jenny Carrillo, MS Matthew K. Nock, MPhil, Yale University, and Brandon A. Gaudiano, MA, Brown University Discussant: Judith E. Albino, PhD, Alliant International University, San Francisco Association.**

**Barden, R. C. "Protecting the Integrity of the Legal System: Eliminating Junkscience "Expert" Testimony with Science Intensive Litigation Methods", Invited address to the American Bar Association Litigation Section National Meetings, Phoenix, Arizona, May 11, 2001.**

**Chair, R. Nicholas Gimbel, J.D. (Editorial Board, <u>Litigation: Journal of the Litigation Section of the American Bar Association</u>); other panel members on this seminar included Ezra Griffiths, M.D. (Yale Medical School and Editor, <u>Jour. of the American Academy of Psychiatry and the Law</u>); Ronald Shouten, M.D. (Harvard Medical School); Professor Stephen A. Saltzburg (George Washington University Law Center); and the Honorable Joseph A. Greenway (Judge, U.S. Federal District New Jersey).**

**Barden, R. C. Invited Speaker for the U.S. Surgeon General's National Conference. "Strategies to Improve Children's Health Care", in the Panel <u>Ethics, Law, and Health Policy as Tools for Change,</u> OFFICE OF THE SURGEON GENERAL OF THE UNITED STATES, Conference on Children's Oral Health Care 2000, Washington, D.C. June 12-13, 2000**

**Barden, R.C. Invited Speaker for the American Psychiatric Association National Meetings. "<u>Recovered Memories: A Multidisciplinary Analysis</u>" Invited Address in the Symposium "Recovered Memory: Law, Science and the Clinician".**

**Chair, Alan A. Stone (Harvard Law School, Harvard Medical School) other panel members included: Paul R. McHugh (Chair, Johns Hopkins Medical School**

Psychiatry Dept.); David Spiegel (CoChair, Stanford Medical School Psychiatry Dept.); Dan Schacter (Chair, Harvard University Psychology Dept) and Alan Scheflin (Prof., Santa Clara Law School). American Psychiatric Association Annual Meetings, Chicago, May 16, 2000.

Recovered Memory: Law, Science, and the Clinician
A. Memory Distortion: Data, Theory, and Application Daniel L. Schacter, Ph.D.
B. Recovered Memories: A Multidisciplinary Analysis R.C. Barden, Ph.D., J.D.
C. Justice and Pseudoscience in the Memory Wars Alan W. Scheflin, LL.M.
D. Standard Practices with Recovered Memories Paul R. McHugh, M.D.
E. Recovery and Memory David Spiegel, M.D.

Barden, R.C. Invited Speaker for the American Bar Association National Meetings, International Law Section 2011 Meetings. "International Investigations: Too Fast Too Furious, Hyatt Regency Washington on Capitol Hill, 400 New Jersey Ave NW, Washington, DC 20001-2002. Wednesday, April 6, 2011. ( CLE credits ) Moderator, Ashish S. Joshi, J.D. Sponsoring Committees: International Litigation Committee, Export Controls and Economic Sanctions Committee, International Anti-Corruption Committee, International Criminal Law Committee, Ashish S. Joshi (Program Chair), Michael Clark (Moderator) , Mark Mendelsohn [formerly Deputy Chief of the Fraud Section of the Criminal Division of the United States Department of Justice (DOJ)] , Leslie Caldwell [formerly 1st Director of the U.S. D.of Justice Enron Task Force] , Dr. R. Chris Barden [research scientist, speaker, writer and national science-litigation-legislation consultant. An expert in the ethical regulation of the legal and health care professions, he has published in the leading journals and texts in law, medicine, and psychology].

EFFORTS TO IMPROVE THE QUALITY OF INVESTIGATIONS IN THE CRIMINAL JUSTICE SYSTEM :

Dr. Barden has consulted and/or testified in a number of cases in a number of states involving investigative interviews of children. In addition, Dr. Barden has given invited training addresses to groups including police, sheriffs employees, F.B.I. agents and other law enforcement professionals. E.g.:

Barden, R.C., "Protecting the Legal System from Inappropriate Social Science Testimony:' Memory Recovery' Psychotherapy, Improper Interview Techniques with Children and Anatomical Doll Interviews"" Invited keynote address to the Midwestern Sex Crimes Investigators Association, Des Moines, Iowa, March 1995.

Barden, R.C., "Protecting the Legal System from Pseudoscientific Error and Fraud: The Case of 'Memory Recovery' Psychotherapy, Improper Interview Techniques with Children and Anatomical Doll Interviews" Invited keynote presentation to the Minnesota Sex Crimes Investigators Association, Minneapolis, Minnesota, April 1994.

2004-2005 – Special Assistant Attorney General of the State of Utah (consulting on a Licensing Prosecution). Appointment June 10, 2004.

2003 – Founding President, Optimal Performance Systems

**1987 - Present. Consultant and Expert Witness. Private Practice in Forensic and Consulting Psychology. Public Policy Consultant.**

**Special Areas of Interest as a Licensed Psychologist and Consultant.**

1. **Analyses of the reliability and validity of expert testimony by social workers, psychologists and psychiatrists.**

2. **Expert witness testimony regarding appropriate use of social science information in the legal system.**

3. **Training lawyers and psychologists to maximize the truthfulness and effectiveness of social science evidence in legal and therapy settings.**

4. **Analysis and testimony regarding the suggestibility of children as witnesses in the criminal and civil justice systems.**

5. **Analysis and testimony regarding the reliability and validity of psychological, social work and psychiatric interview, testing and assessment procedures in the criminal, family and civil justice systems.**

6. **Analysis and testimony regarding ethical violations by social workers, psychologists, psychiatrists, health care executives and health care organizations in the criminal, family and civil justice systems. Analysis of informed consent and other bioethics and patients' rights issues.**

7. **Analysis and testimony regarding malpractice by psychiatrists, health care executives and health care organizations.**

8. **Analysis and testimony regarding research methodology and reliability (Frye and Daubert analysis) of expert testimony regarding psychological theories (e.g. "repression", "dissociation").**

9. **Analysis and testimony regarding the Rules of Evidence pertaining to scientific methodology and the testimony of social workers, psychologists and psychiatrists.**

10. **Analysis and testimony regarding public policy issues related to law, social science and mental health issues.**

11. **Analysis and testimony regarding legislation in the Law and Psychology field. Drafting of legislation regarding regulation of the mental health system.**

12. **Assisting, teaching and consulting with attorneys on a variety of forensic issues including:**
    - **A. How to effectively cross examine mental health professionals to protect the integrity of the legal system.**
    - **B. How to effectively expose improper and unethical behavior and testimony by mental health professionals.**
    - **C. Locating, selecting and preparing effective and ethical mental health and social science expert witnesses.**
    - **D. How to conduct effective voir dire procedures to protect the integrity of the legal system.**

E. Appellate strategy, drafting of interrogatory answers for experts, drafting appellate briefs, drafting opening and closing arguments, trial strategy, assessments of witness credibility and other legal matters.

Fall 1993 - 1997. Adjunct Professor of Law
University of Minnesota Law School, 1994 -1997
Hamline University School of Law 1993-1997

Classes "Law, Psychology and Psychiatry"
Univ. of Minnesota & Hamline Univ. Law School

1. Scientific Method Learning to think like a scientist
2. Expert Testimony Use and Abuse of Social Science in the Legal System
3. Cross Examination of Social Science Witnesses
4. "Repressed Memory Therapy", Boundary Violations and other forms of psychotherapy malpractice
5. Assessments, Tests, and Interviews Reliable and Valid or Fraud on the Court?
6. Children as Witnesses the hazards of suggestibility
7. Regulation of the Mental Health Industry Rules of Ethical Conduct, Licensing Boards and Legal Actions.
8. Legislative Issues in the Mental Health System Informed Consent, Limitations on treatments, Reimbursement Issues

"Health Care Law" Hamline Univ. School of Law
Topics -- public policy, legal, psychological and economic aspects of Health Care Law.

March, 1996 - Present. Attorney at Law in Private Practice. R. C. BARDEN & ASSOCIATES. A national law practice (plaintiff, defense and consultant) combined with a national practice as a psychological expert, a legislative/public policy consultant and speaker.

January, 1998 - 2005. Advisory Board Member, Minnesota Board of Psychology Public Advisory Board. This board assists in efforts to improve the quality of psychological services in the state of Minnesota.

February, 1997 - 1998. Advisory Board Member, Minnesota Emergency Medical Services for Children's Resource Center. This board assists in governing the EMSCR Center, a collaborative effort of Children's Health Care, the University of Minnesota, and the EMS Regulatory Board in efforts to improve the quality of emergency medical care for children.

July 1992 - March, 1996. Attorney at Lindquist & Vennum, Minneapolis, Minnesota.

July, 1992 present. Attorney. Admitted to Practice, Minnesota Bar, Attorney. Admitted to Practice, Minnesota Bar, License #227316, October 23, 1992.

Admitted to Practice, United States District Court, Minnesota, November 18, 1992.

Admitted to Practice, United States Court of Appeals for the Eighth Circuit, May 24, 1994.

PRO HAC VICE HISTORY ( from 1992 and by memory) : Admitted to practice pro hac vice in Massachusetts, Texas, Arizona, Colorado, New Jersey, New York, Rhode

Island, Washington, Indiana, Utah, Idaho, Illinois, Indiana, Wisconsin, South Dakota, Georgia, Arkansas, Texas, Florida, North Carolina, South Carolina, Rhode Island, the Federal District of Rhode Island, the Federal District of Montana. Serving as a consultant in many other states.

February, 1993 - 1997. Subcommittee Chair, Third U.S. Congressional District Health Care Advisory Committee, Congressman James Ramstad, Minnesota. This committee includes representatives from the Minnesota Medical Association, the Minnesota Hospital Association, other provider groups, the presidents of several group medical practices, and representatives of insurance, supplier and consumer groups. This committee advises Congressman Ramstad on health care public policy and legislative issues. My committee assembled public policy arguments and data for legislative use.

May, 1993 - February 1997. Public Official, State of Minnesota Board Member, Minnesota State Board of Psychology. The Board of Psychology regulates the practice of professional psychology in the State of Minnesota. Members of the Board are selected by the Governor of Minnesota.

1993. Public Official, State of Minnesota Board Member, Minnesota Higher Education Coordinating Board, appointed to a six year term by Governor Arne H. Carlson. Winter, 1993. The MHECB regulates colleges, universities, state colleges, community colleges and trade schools in the State of Minnesota.

Invited Instructor, Harvard College, commissioned by the Dunster House Commons Room, 1991-1992.

Invited Instructor, Harvard Law School, Optimal Performance Systems, commissioned by the Harvard Law School Alumni Association, 1990-1991.

August, 1989 June, 1992. Harvard Law School Class of 1992. Academic Advisor: Prof. Alan A. Stone, M.D., Touroff-Glueck Professor of Law and Psychiatry in the Faculty of Law and the Faculty of Medicine, Harvard University (617) 495-1000 [Former President of the American Psychiatric Association]; also Stephen G. Breyer, J.D. (Assoc. Justice, U.S. Supreme Court).

1987-1992: W. T. Grant Foundation Faculty Scholar Award Recipient. The W. T. Grant Foundation Faculty Scholar Award ($175,000) is given to five or fewer professionals in the U.S. each year to support investigations of mental health and coping processes in children and adolescents. The selection committee for this award included the former Surgeon General of the United States, Dr. Julius Richmond of Harvard University; the Chairman of Indiana University's School of Medicine, Dr. Morris Green; Professor W. W. Hartup of the University of Minnesota and other notable experts from anthropology, public policy, congressional committees, and psychology.

1988-1989: Visiting Asst. Professor of Psychology Gustavus Adolphus College, St. Peter, Minnesota.

1989-1993; 1985-1988: University of Utah. Chase Peterson, M.D., President of the University of Utah.
   Asst. Research Professor of Medicine, Department of Surgery; University of Utah Medical School, Department of Surgery, 1989-1993.
   Asst. Professor of Psychology and Coordinator of the Child Clinical Psychology Training Program, University of Utah. 1985-1988.

**1985-1989: Psychological Consultant, Intermountain Craniofacial Surgical Team University of Utah Medical School/ Primary Children's Hospital, Salt Lake City, Utah.**

**1982-1987: Psychologist (8487) and/or Psychological Consultant (8287), Texas Craniofacial Center/Baylor Medical Center, Dallas, Tx; National Craniofacial Foundation; Research consultant, Humana International Craniofacial Institute. Kenneth E. Salyer, M.D., Director.**

**1981-1984: Asst. Professor of Psychology, Southern Methodist University. Curt McIntyre, Ph.D. and Stan A. Kuczaj, Ph.D., Chairmen.**

**1980-1981: Clinical Psychology Intern, Palo Alto Veterans Administration Hospital/Stanford Medical Center Palo Alto, Calif. Behavioral Medicine, Drug Dependency, Neurological Injury, Family Therapy, and Assessment Units. Donald T. Lim, Ph.D. and Richard N. Bale, Ph.D., supervisors.**

**1979-1980: Recipient of the Eva O. Miller Social Science Fellowship at the University of Minnesota.**
**Advisors: Willard W. Hartup, Ph.D. [Former President, Div. 7 Developmental Psychology, American Psychological Association and Former President, Intl. Child Psychology Assn]; Norman Garmezy, Ph.D.[ Former President, Div. 12 Clinical Psychology, American Psychological Association]; Dr. Hartup and Dr. Garmezy served as Program Directors, Child Clinical Ph.D. Training Program.**

**1978-1979: Project Coordinator Graduate Stipend, National Science Foundation, Institute of Child Development, University of Minnesota**

**1977-1978: Recipient of a National Institute of Mental Health Trainee Fellowship, University of Minnesota.**

**1976-1977: Recipient of a National Institute of Mental Health Trainee Fellowship, University of California, Berkeley.**
**Advisor: Margaret Singer, Ph.D. [recipient of the Hofheimer Prize for research from the American Psychiatric Association; the Stanley R. Dean Award for Research in Schizophrenia from the American College of Psychiatrists; the McAlpine Award for Achievement in Research from the Mental Health Association of the United States; and the Research Scientist Award from the National Institute of Mental Health, as well as President of the American Psychosomatic Society and a member of U.S. President G. Ford's Biomedical Research Panel.]**

**PUBLICATIONS, SUBMISSIONS, MANUSCRIPTS, PROFESSIONAL JOURNAL ARTICLES, BOOKS, AMICUS BRIEFS, INVITED COMMENTARY and all forms of PUBLICATIONS, SUBMISSIONS and WORKS UNDER REVIEW OR IN PROGRESS:**

**Barden, R.C. and Lorandos, D., *Assessment and Litigation of Complex Social Science cases including Repressed-Recovered Memory, Dissociation, Trauma Therapies, and False Memories, in* D. Lorandos (Ed.) 2021 The Litigator's Handbook for Forensic Medicine, Psychiatry and Psychology. Thomson Reuters WEST, Egan, Mn. (3 vols). Expected April 2022.**

**Barden, R.C. R., "Multi-Disciplinary, Science Intensive Litigation Reforms Protect the Integrity of the Legal System " Chapter 4 in W. Koen and C.M. Bowers (Eds.), Forensic Science Reform: The Psychology and Sociology of Wrongful Convictions. Academic Press Elsevier**

**Publishing (2018). (Other authors in this publication include Stephen Ceci, Ph.D. and Elizabeth Loftus, Ph.D. ).**

*E.g.,"Multidisciplinary reforms and science intensive litigation methods have produced and will continue to produce historic improvements in the emergency medical, mental health, and legal systems. Competent investigations, proper prosecutions, and science-informed attorneys, experts, and courts are essential to ongoing efforts to preserve and protect the integrity of the legal system. JD-only attorneys should cease practicing "horse and buggy" traditional litigation and should not attempt to litigate complex social science cases involving RRM-MPD-DID notions, interviews of children, psychotherapy issues, diagnostic/assessment issues, child custody issues, and/or related topics without detailed science-informed consultation from a member of the relevant scientific (not clinical!) community. Protecting the integrity of the legal process remains one of the most important goals of civilization in the 21st century." — R.C. Barden, Ph.D., J.D.*

**Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749.**

**Barden, R.C., Memory and Reliability: Developments and Controversial Issues. In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, University Press, 2016,.**

*See, Foreword by The Right Honorable, Lord John Thomas, Lord Chief Justice of England and Wales. "It would be difficult to find a more lucid analysis of statutory provision and of authority which can then be applied to the working day in Crown Courts nationwide." also notes by The Right Honorable Lady Justice Rafferty QC, Chairman of the Board of the Judicial College of England and Wales. See, also, "A wonderful resource and required reading for anyone who wants to understand this important subject," His Honour Judge Nicholas Hilliard QC, the Recorder of London.*

> **March 14, 2016 - The current Lord Chief Justice of England and Wales, John Thomas, Baron Thomas of Cwmgiedd wrote the foreword to our book and personally came to speak with the authors at the Oxford University Press book launch at historic Gray's Inn, London.**

**Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014. http://www.psychiatrictimes.com/psychotherapy/reforming-mental-health-care-how-ending-recovered-memory-treatments-brought-informed-consent, viewed on June 6, 2014.**

**Barden, R.C. (2013) "Protecting the Integrity of the Family Law System: Multidisciplinary Processes and Family Law Reform" in Lorandos, D., Bernet, W. & Sauber, R. [Eds.] (2013) Parental Alienation: The Handbook for Mental Health and Legal Professionals, Springfield, Illinois, C. C. Thomas Publisher, Ltd., Springfield; IL.**

**Barden, R. C. (2009) Amicus Curiae Brief of The International Committee of Social, Psychiatric, Psychological, Cognitive Science, Neuroscience, and Neurological Scientists, Submitted to the Supreme Judicial Court of the State of Massachusetts in State v. Shanley, August 21, 2009.**

**with AMICI Aaron T. Beck, M.D., Mahzarin Rustum Banaji, Ph.D., Robert Perloff, Ph.D., Henry L. Roediger, Ph.D., Richard Shiffrin, Ph.D., Elizabeth Loftus, Ph.D., Jay Belsky, Ph.D., Benjamin Lahey, Ph.D., Dante Cicchetti, Ph.D., Robert L. Spitzer, M.D., Charles B. Nemeroff, M.D., Ph.D., James L. McGaugh Ph.D., Steven D. Hollon, Ph.D., Myrna Weissman, Ph.D., Laurence Steinberg, Ph.D, Donald F. Klein, M.D., D.Sc. , Harrison G. Pope Jr. M.D., Richard McNally, Ph.D., James I. Hudson, M.D., Richard Ofshe, Ph.D., William M. Grove, Ph.D., Paul R. McHugh, M.D. Stephen J. Ceci, Ph.D., Daniel L. Schacter, PhD., Steven Pinker, Ph.D , Hans F.M. Crombag, Ph.D. , David F. Bjorklund, Ph.D. , August Piper, M.D., B. Christopher Frueh, Ph.D., Steve Lynn, Ph.D., Peter von Koppen, J.D., John F. Kihlstrom, Ph.D., Gerald M. Rosen, Ph.D., Sally Satel, M.D. Maryanne Garry, Ph.D., Phillip W. Esplin,**

**Ed.D., James M. Wood, Ph.D., Richard Gist, Ph.D., Irving Kirsch, Ph.D., Steven Hayes, Ph.D., James D. Herbert, Ph.D., Robert Montgomery, Ph.D., Harald Merckelbach, Ph.D., James Ost, Ph.D., Scott O. Lillienfeld, Ph.D., Marc Sageman, M.D., Ph.D., Grant J. Devilly, Ph.D., Anthony Pratkanis, Ph.D., Jon D. Elhai, Timothy Tumlin, Peter A. Ornstein, Ph.D., Susan A. Clancy, Ph.D., Paul R. Lees-Haley, Ph.D., Howard D. Eisman, Ph.D., Mark Creamer, Ph.D., W. Jake Jacobs, Ph.D., Timothy Moore, Ph.D., Daniel David, Ph.D., Margaret Bruck, Ph.D., Amina Memon, Ph.D., Jeffrey M. Lohr, Ph.D., Giuliana Mazzoni, Ph.D., Jean-Roch Laurence, Ph.D., Elizabeth Meadows, Ph.D., Ron Acierno, Ph.D., Steven E. Clark, Ph.D., Saul Kassin, Ph.D., Richard Shiffrin, Michael Toglia, Ph.D., Robert V. Kail, Ph.D., J. Don Read, Ph.D., Loren Pankratz, Ph.D., Michael A. Persinger, Ph.D., C. Psych, Charles A. Weaver III, Ph.D., Joseph de Rivera, Ph.D., David S. Holmes, Ph.D., Terence W. Campbell, Ph.D., Emily Carota Orne, John Cannell, M.D., Richard Leo, Ph.D., J.D, Deborah C. Beidel, Ph.D., James Coyne, Ph.D., Fred Frankel, M.D., Nora S. Newcombe, Ph.D., Gordon J. G. Asmundson, Ph.D., R.D. Psych Howard N. Garb, Ph.D., William G. Reiner, M.D., Robyn M. Dawes, Ph.D., Robert A. Karllin, Ph.D.., Frederick Crews, Ph.D., Naomi Breslau, Ph.D., David Dinges, Ph.D., Susan Mineka, Ph.D., Simon Wessely, MA, BM, BCh, MSc, MD, FRCP, FRCP, Lila Gleitman, Ph.D., Lee Anna Clark, Ph.D., David Watson, Ph.D., Rochel Gelman, Ph.D., Rosalind Cartwright, Ph.D., and more.**

> ***Associated Press, Ex-priest challenges validity of repressed memory testimony by D. Lavoie, September 9, 2009 (See e.g., chicagotribune.com and many other sources).***
>
> ***"...[the defendant] is challenging his conviction based on an ongoing debate in the psychiatric community over the validity and reliability of repressed memories. The highest court in Massachusetts will hear Shanley's appeal Thursday. The case is being closely watched by experts on both sides of the issue. Nearly 100 scientists, psychiatrists and researchers have signed a friend-of-the court brief denouncing the theory of repressed-recovered memories..."***

**Barden, R.C. (2006) "Protecting the Fundamental Rights of Children and Families: Parental Alienation Syndrome and Family Law Reform" in Gardner, R., Sauber, R. and Lorandos, D. [Eds.] (2006) The International Handbook of Parental Alienation Syndrome: Conceptual, Clinical and Legal Considerations, Springfield, Illinois, C. C. Thomas Publisher, Ltd., Springfield; IL.**

> ***The legal, mental health and scientific communities share a sacred obligation to prevent children from becoming pawns in custody litigation. Protecting fundamental parental rights while aggressively preventing, investigating, and punishing child abuse are essential goals for family law. Efforts to attain such goals must be based in fact rather than prejudice, science rather than hysteria, and reason rather than political ideology. Multidisciplinary analyses of parental alienation processes -- including parental alienation syndrome (PAS) -- demonstrate why the family law system so often fails to protect the fundamental rights of children and families. Parental influence on children is not a novel nor controversial concept. Decades of research in psychology, psychiatry, and related fields have documented the powerful ability of adults to shape the ideas, beliefs, statements, and even memories of children. Improper legal incentives and substandard legal practices often generate and maintain alienation processes resulting in severe injuries to families. Parental alienation is also exacerbated when courts accept junk science "expert" testimony.***

**Barden, R. C. (2006) <u>Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty</u>, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, filed February 17, 2006.**

> **with AMICI Aaron T. Beck, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff,**

**Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi Breslau and more.**

**AMICUS QUOTE: "Decades of research and scientific debate have clarified over and over again, that the notion of traumatic events being somehow "repressed" and later accurately recovered is one of the most pernicious bits of folklore ever to infect psychology and psychiatry."**

**Boutrous, Theodore The Rule of Law: Memory Abuse, Wall Street Journal, 13 January 2007, A12**

*The California Supreme Court is expected to rule soon in a First Amendment lawsuit that could seriously affect scientific research and investigative journalism. .. The Court, which heard arguments in December, should dismiss this case -- and make clear that this kind of lawsuit will not be tolerated. The controversy over repressed memory is a matter of great public interest; and as the*

*U.S. Supreme Court has repeatedly held, "speech concerning matters of public affairs is more than self-expression; it is the essence of self-government," occupying the "highest rung of the hierarchy of First Amendment values." ... Dozens of renowned scholars and scientists declared in a friend-of-the-court brief that "[p]ermitting personal lawsuits against scientists who investigate, locate and expose errors or misconduct in controversial research publications would have damaging effects in all areas of science." Such lawsuits could also threaten investigative journalism.*

*Ruling may constrain researchers, Los Angeles Times, February 27, 2007*

*Scholars, journalists and other investigators may be held liable for invasion of privacy... the California Supreme Court decided 5 to 2 on Monday. Although the court rejected all other claims against Loftus, national media lawyers feared that journalists might be hurt by the one claim that was sent to trial. "I worry for everybody that the problem of source remorse is going to come back to haunt thousands of scientists, journalists and other scholars who are looking into a matter of great public interest," Loftus said.... The court threw out all of Taus' other claims against Loftus including public disclosure of private facts, defamation and intrusion into confidential juvenile court records.... the decision also ordered that Taus must pay Loftus' legal bills for having to contest the charges the court threw out.*

*Justices OK lawsuit, San Francisco Examiner, Feb 26, 2007, The Associated Press.*

*An interview was the main topic of today's 101-page, 5-2 decision by the California Supreme Court... the court ordered a trial on the narrow issue of whether Prof. Loftus acquired interview information under false pretenses.... A host of media groups had opposed the lawsuit, saying sources unhappy with coverage could claim that a reporter obtained the information from them by false pretenses. The high court assuaged much of those concerns when it tossed out the bulk of Taus' 2002 lawsuit against Loftus. The justices said the paper Loftus wrote was protected under the First*

*Amendment and that Loftus did not violate Taus' privacy by using court records to paint a picture of her past... Taus was also ordered to pay Loftus' legal bills.*

*Court Dismisses Most Claims Against Psychology Professor, CBS News 5, Bay City Newswire, Feb. 26, 2007*

*"The California Supreme Court today dismissed most of a Solano County woman's lawsuit against a prominent psychology professor who investigated and sought to debunk the woman's claim of recovered memory of childhood sexual abuse."*

**Barden, R.C. (2003) "Building Multi-Disciplinary Legal-Scientific Teams in Parental Alienation Syndrome Cases", In Boch-Galhau, W., Kodjoe, U., Andritzky, W. and Koeppel, P. (Eds) Parental Alienation Syndrome (PAS): A Challenge for Professionals Involved in Family Law (2003), VWB - Verlag fur Wissenschaft und Bildung, Frankfurt, Germany.**

**Grove, W. M., Barden, R. C., Garb, H. N., & Lilienfeld, S. O. (2002). The Failure of Rorschach-Comprehensive-System-based testimony to be admissible under the Daubert-Joiner-Kumho standards. Psychology, Public Policy, and Law, 8, 216-234.**

**Barden, R.C. (2001) Informed Consent in Psychotherapy: A Multidisciplinary Perspective, The Journal of the American Academy of Psychiatry and the Law, Vol 29, No. 2, pgs. 160-166, 2001.**

*See also, Drafting and enactment of a MINNESOTA STATUTE protecting the informed consent rights of mentally ill research subjects, CHAPTER 58–S.F.No. 431 "An act relating to mental illness; prohibiting participation in clinical drug trials; amending Minnesota Statutes 2008, section 253B.095, subdivision 1." Presented to the governor May 7, 2009 Signed by the governor May 11, 2009.*

**Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, Psychology, Public Policy and Law, Vol 5, No. 1, 234-242. Excerpts reprinted in Fisher, George (Prof. Stanford Law School), Evidence: University Casebook Series, Foundation Press - West Group, New York, 2002, pg. 688.**

**Barden, R. C. and Albert, S. "Informed Consent: An Interview with R. C. Barden" In the publication series "From the Board of Psychology". Minnesota Psychologist, Jan, 1997, pg. 1112.**

**Barden, R. C. "Repressed Memories: Science or Myth?", Internal Medicine, Audio Digest, Volume 43, Number 4, Feb. 1996. Interstate Postgraduate Medical Association of North America, San Francisco, CA.**

**Barden, R. C. Scientific Research on the Suggestibility of Children as Witnesses. Amicus Brief to the Texas State Court of Appeals. Argued by request of the Court on February 1, 1995 in State v. Perkins .**

**See, Barden, R.C. Letter on Mental Health Reform to the U.S. Congress including the Truth and Responsibility in Mental Health Practices Act (with signatories Paul E. Meehl, Terence W. Campbell, Richard Ofshe, Richard A. Gardner, M.D., Margaret Singer, William Grove, Michael D. Yapko, Robyn Dawes, Richard Flyer, M.D., Robert Kinscherff, Ph.D., J.D., Mel Guyer, J.D., Francis Fincham, Thom Moore, Henry E. Adams, E. Mark Cummings, Lewis P. Lipsitt, Donald M. Kaplan, Robert R. Holt, Richard M. McFall, Hans H. Strupp, Stephen J. Lepore, Lee Sechrest, Paul Ekman, Hans J. Eysenck, ; with Version. II signed by Jerome Kagan, George Stricker, Debra Ann Poole, Mark L. Howe, J. Don Read, and Howard Shevrin (1994) Letter to the Congress of the United States of America regarding reform of the mental health system. reprinted in Dineen, Tana. Manufacturing Victims. Montreal. Robert Davies Publishing, First Edition, 1996.**

Barden, R.C. as Secretary of the Committee together with the Hon. James Ramstad and the Minnesota 3rd U.S. Congressional District Health Care Advisory Board. (1994-1995) The Health Care System of the United States: Access, Cost Containment and other Public Policy Analyses.

Barden, R. C., Kinscherff, R., George, W., Flyer, R., Seidel, J., & Henderson, D., (1993), Emergency Medical Care and Injury Prevention Systems for Children: An Economic-Medical-Legal-Psychological Analysis and Legislative Proposals, Harvard Journal on Legislation, Vol. 30, No. 2, pgs 461-497.

Barden, R. C., Jackson, B. H. and Ford, M.E. (1992), Optimal Performance in Tennis: Mental Skills for Maximum Achievement in Athletics and Life. Optimal Performance Systems Research, Inc., Cambridge, MA. ISBN-13: 978-0964054301 ISBN-10: 0964054302

Duckworth, K., Kahn, M. & Barden, R. C., (1992), Mental Disability Law A Student Handbook. Educational manual for use at the Harvard Law School Harvard Medical School Clinical Practicum.

Barden, R. C., (1990), Optimal Performance in Law: Maximizing Achievement in Law School Through Mental Training. Optimal Performance Systems Research, Inc., Cambridge, MA.

> This book was the result of a series of invited lectures at the Harvard Law School. The program was made possible by a grant from the Office of the Dean of Students and advice/assistance from the members of the Harvard Law School faculty with special thanks to Prof. Alan A. Stone, Prof. Albert Sacks, Prof. Kathleen Sullivan, Prof. Stephen G. Breyer, Dean Sarah Wald and Harvard Law School Alumni Assoc. Executive Director Victor Koivumaki, III.

Barden, R. C., (1990), The Effects of Craniofacial Deformity, Chronic Illness, and Physical Handicaps on Patient and Familial Adjustment: Research and Clinical Perspectives. In B. Lahey and A. Kazdin, Eds. Advances in Clinical Child Psychology, Vol. 13, Plenum Press.

Rogers-Salyer, M., Barden, R. C., & Kuczaj, S., (1990), Psychosocial issues in the management of cleft lip and palate families. In J. Bardach (Ed) The Multidisciplinary Management of Cleft Lip and Palate, Saunders: Philadelphia.

Barden, R. C., (1990), Clinical management of the child with a cleft palate. In Green, M. and Haggerty, R. J. (Eds.) Ambulatory Pediatrics. 5th Edition, Harcort, Brace, and Jovanovich, Inc.

Barden, R. C., Ford, M. E., Jensen, G. A., Rogers, M., & Salyer, K. E., (1989), Effects of craniofacial deformity in infancy on mother infant interactions. Child Development, 60, 819 824.

Barden, R. C., Ford, M. E., Wilhelm, W. M., Rogers Salyer, M. & Salyer, K. E., (1988), Emotional and behavioral reactions to facially deformed patients before and after craniofacial surgery, Plastic & Reconstructive Surgery, Vol. 82, No. 3, 409416.

Barden, R. C., Ford, M. E., Wilhelm, W. M., Rogers Salyer, M. & Salyer, K. E., (1988), The physical attractiveness of facially deformed patients before and after craniofacial surgery, Plastic and Reconstructive Surgery, Vol. 82, No. 2, 229235.

Zelko, F., Duncan, S. W., Barden, R. C., Garber, J., & Masters, J. C., (1986), Adults' Expectancies About Children's Emotional Responsiveness: Implications for the Development of Implicit Theories of Affect, Developmental Psychology, Vol. 22, No. 1, 109-114.

Barden, R. C., and members of the National Craniofacial Center, Craniofacial Deformities: Helping Parents to Understand, F.C.D. Publications, 1986.

Barden, R. C. and members of the National Craniofacial Center The Craniofacial Team: An Educational Film, F.C.D., Publications, 1986.

Barden, R. C., Garber, J., Leiman, B., Ford, M. E., & Masters, J. C., (1985), Factors governing the effective remediation of negative emotion and its cognitive and behavioral consequences, Journal of Personality and Social Psychology, Vol. 49., No. 4, 10401053.

Felleman, E., Barden, R. C., Carlson, C. R., Rosenberg, L., & Masters, J. C. (1983). Children's and Adult's Recognition of Spontaneous and Posed Emotional Expressions in Young Children. Developmental Psychology, Vol. 19, No. 3, 405413.

Barden, R. C., Garber, J., Duncan, S. W., & Masters, J. C., (1981), Cumulative effects of induced emotional states: Insulation, remediation, and accentuation, Journal of Personality and Social Psychology, Vol. 40, No. 4, 750760.

Masters, J. C., Felleman, E., & Barden, R. C., (1981), Experimental studies of emotional states in children, Advances in Child Clinical Psychology, B. Lahey and A. Kazdin (Eds.), Vol. 4, Plenum Press.

Barden, R. C., Zelko, F. J., Duncan, S. W., & Masters, J. C., (1980), Children's consensual knowledge regarding the experiential determinants of emotion, Journal of Personality and Social Psychology, 39, 968 976.

Masters, J. C., Barden, R. C., & Ford, M. E., (1979), Emotional states, expressive behavior, and learning in children, Journal of Personality and Social Psychology, 37, 380390.

Masters, J. C., Furman, W., & Barden, R. C., (1977), Effects of achievement standards, tangible rewards, and self dispensed achievement evaluations on children's task mastery, Child Development, 48, 217224.

FUNDED RESEARCH GRANTS:

(Principal Investigator unless otherwise stated.)

Foundation for Child Development. "Induction and Remediation Effects of Different Modes of Emotional Experience on Cognitive, Social, and Expressive Behavior" (April, 1982).

National Craniofacial Foundation Psychosocial Aspects of Craniofacial Deformity and Craniofacial Surgery, (May, 1981).

National Institutes of Health and the University of Utah Biomedical Research Committee. "The Psychology of Attractiveness and Facial Deformity." (S07RR07092 19851986).

University Research Council of the University of Utah. "The Effects of Attractiveness and Facial Deformity on Personality Development" (19851986).

**Team Member for a Grant to the National Craniofacial Foundation from the General Electric Corporation "Treatment, Transportation, and Education for Craniofacially Deformed Children" ($300,000) (19851987).**

**Team Member for a Grant to the National Craniofacial Foundation from the American Legion "Production of Parent Education Booklets and Films for Craniofacial Anomalies" ($29,000) (19851986).**

**"Physical attractiveness, craniofacial deformity and craniofacial surgery: Studies of stress, coping, and self control of emotion in children and adolescents." W. T. Grant Foundation Faculty Scholars Program ($175,000) (19871992). (1987)**

**INVITED ADDRESSES, PROFESSIONAL TRAINING SEMINARS and PROFESSIONAL RESEARCH/POLICY AND RELATED PRESENTATIONS:**

**Barden, R.C. Invited address to the American Psychological Association 2021 Convention as a member the Panel: "The Ethics of Integrating Science and Practice: Which Ethics? Which Integration? Which Science?" , Wash. D.C. APA Convention August 12, 2021**

**R. C. Barden PhD, JD, (Attorney and Psychologist), "Protecting the Integrity of the Mental Health System - Duties of Psychologists and the APA"**

**Chair Alan C. Tjeltveit PhD, (Muhlenberg College) Chair of the Panel, "Ethical Ideals Concerning Integration Need to Address Science, Practice, and More"**

**Linda K. Knauss PhD, (former Chair of the APA Ethics Committee) Widener University Scientific Mindedness: An Aspirational Ethical Principle or an Enforceable Ethical Standard?**

**Robert T. Kinscherff PhD, JD, (twice former Chair of the APA Ethics Committee, Director of the Harvard University Brain, Behavior, and Law Committee), "An Uneasy Marriage: Ethics in Integration of Science and Law in Forensic Practice"**

**Melba J.T Vasquez PhD, (former President of the APA), Austin, TX - "Discussant" Symposium 376.**

**Barden, R.C. "The Science & Law of Investigating Child Criminal Cases" Invited address to the Minnesota Association of Criminal Defense Lawyers, September 28, 2018. Opus Hall, St. Thomas University. Minnesota Continuing Legal Education Seminar. (1.5 hs)**

**Barden, R.C. "Multidisciplinary Efforts to Reform the Medical, Mental Health, and Legal Systems: A Personal Journey", Invited address to the Department of Psychology, Harvard University, William James Hall, Clinical Science Speaker Series. February 28, 2018. Hosted by Prof. Richard J. McNally and Prof. John R. Weisz. (3 hrs)**

**Barden, R.C. , "The Science and Law of Proper and Improper Criminal, Civil, and Family Law Investigations and Expert Opinions", Pacific Judicial Council and American College of Trial Lawyers, Island of Guam, Jan 17-19, 2018. Invitation and funding from the U.S. Federal 9th Circuit Court of Appeals Programs and the Honorable F. Philip Carbullido. (2 hrs)**

**Barden, R.C. "Ethical Analysis of International Investigations" Part of the "International Investigations: Too Fast Too Furious" Symposium American Bar Association National Meetings, International Law Section 2011 Meetings, Hyatt Regency Washington on Capitol Hill, 400 New Jersey Ave NW, Washington, DC 20001-2002. Wednesday, April 6, 2011. ( CLE credits ) Moderator, Ashish S. Joshi, J.D. Sponsoring Committees: International Litigation Committee, Export Controls and Economic Sanctions Committee, International Anti-Corruption Committee, International Criminal Law Committee, Ashish S. Joshi (Program Chair), Michael Clark (Moderator) , Mark Mendelsohn [formerly Deputy Chief of the Fraud Section of the Criminal Division of the United States Department of Justice (DOJ)] , Leslie Caldwell [formerly 1st Director of the U.S. Dept. of Justice Enron Task Force] , Dr. R. Chris**

**Barden [research scientist, speaker, writer and national science-litigation-legislation consultant. An expert in the ethical regulation of the legal and health care professions, he has published in the leading journals and texts in law, medicine, and psychology].**

**Barden, R.C., "Optimal Performance Methods : General Theory and Specific Procedures", Invited address to the regional All Employee Conference training meeting of the Federal Bureau of Investigation, Minneapolis, Minnesota, December 10, 2010**

**Barden, R.C., "Stress Management and Optimal Performance", Presentation to the Regional Supervisors Training Conference of the Federal Bureau of Investigation, Craguns, Minnesota, September 8, 2010**

**Barden, R.C., "Optimal Performance under Extreme Stress", Invited address to the US Army Center for Enhanced Performance, U.S. Military Academy, West Point, NY, April 19, 2010**

**Barden, R.C., "Ethical and Scientific Restrictions on Evaluations and Testimony of Mental Health Professionals in Family Law", 2 hr. Continuing Legal Education (CLE) and Continuing Psychological Education (CPE) Training presentation (2 hr presentation with 40 hours preparation), Parental Defense Alliance of Utah, Park City, Utah, April 16, 2007.**

**Barden, R.C., "Using Daubert Legal Challenges and Psychological Expert Testimony to Prevent the Abusive Mis-Interviewing of Children", Continuing Legal Education (CLE) and Continuing Psychological Education (CPE) Training presentation, Parental Defense Alliance of Utah, Park City, Utah, May 4, 2006.**

**Barden, R.C., Excluding Improper Expert Testimony using Daubert/Kumho Hearings: Theory and Practice", Continuing Legal Education (CLE) and Continuing Psychological Education (CPE) Training presentation, Parental Defense Alliance of Utah, Park City, Utah, May 4, 2006.**

**Barden, R.C., "Psychological, Legal and Scientific Analyses of the Coming Revolution in Family Law:", Continuing Legal Education (CLE) and Continuing Psychological Education (CPE) Training, Legacy Foundation Seminar, Salt Lake City, Utah. Co-speakers: State Senator Chris Buttars, State House of Rep. member LaVar Christensen, John Harmer (former Lt. Gov. of California under R. Reagan), Michael S. Lee (Counsel for the Office of the Governor of Utah) , March 31, 2006.**

**Barden, R.C. "Protecting the Integrity of Science and the Law", testimony before a Legislative Committee of the Colorado State Senate, Denver, Colorado, March 27, 2006.**

**Barden, R.C., "Legal, Psychological and Social Analyses of Reactive Attachment Disorder and Related Behavior Problems: Conceptualizing Problems and Choosing Appropriate Validated Treatments", Continuing Psychological and Social Work Education (CPE, CSWE) Training, Mountain State Counselors Alliance Convention, Charleston, W.Va., Thursday, Nov. 17, 2005.**

**Barden, R.C., "When Good Intentions Lead to Bad Practices: A Legal-Psychological history of iatrogenic therapy methods and the future of reform, Continuing Psychological and Social Work Education (CPE, CSWE) Training, Mountain State Counselors Alliance Convention, Charleston, W.Va., Thursday, Nov. 18, 2005.**

**Barden, R.C., "The Psychological Science of Optimal Performance Systems", Invited address to the Center for Advancement of Leadership Conference, Utah Valley State College, Provo, Utah, Oct. 4, 2005. Other presenters included: C. Durham (Chief Justice, State of Utah), Coach Lavell Edwards and others.**

**Barden, R.C., "How the 'Memory Wars' Influenced Historic Reforms in the Legal and Mental Health Systems: A Multidisciplinary Analysis", presented at a Conference for the State University of New York, The Persistence of Memory, April 8, 2005, Niagara Falls, New York.**

**Other presenters included Elizabeth Loftus, Ph.D., Richard McNally, Ph.D., Steven Penrod, Ph.D., Steven Lynn, Ph.D., Phillip Stevens, Ph.D., Debbie Nathan, T. Eddie Bullard, Ph.D., and Stuart Appelle, Ph.D.**

**Barden, R.C., "Training NBA All-stars, Harvard Law Students, Olympic Athletes and other optimal performers: The Optimal Performance System in practice", Invited address to the Center for Advancement of Leadership Conference, Utah Valley State College, Provo, Utah, Oct. 5, 2004. Other presenters included: Jon Huntsman, Jr. (Gov. of Utah), Dr. Bruce H. Jackson, Robert H. Garff (former Speaker of the House, Utah) and others.**

**Barden, R. C. "Multidisciplinary Approaches to Reforming the Mental Health and Legal Systems: BRIDGING THE GAPS BETWEEN SCIENCE, LAW AND PRACTICE" CLE training presentation, University of Washington, Seattle, Washington, April 17, 2004. Co-speakers: Carol Tavris, Ph.D. and Scott Lilienfeld, Ph.D. (Emory University).**

**Barden, R. C. A "Multidisciplinary Analysis of Prescription Privileges for Psychologists", invited address to the American Psychological Association Presidential Plenary Session, Toronto, Canada, August 9, 2003. "Prescription Privileges: Potential Prospects and Pitfalls" .**

**Cochairs: Gloria Neumann, PsyD, Honolulu Police Dept., Hawaii; and John Winston Bush, PhD, New York Institute for Cognitive and Behavioral Therapies, Brooklyn**
**Opening Comments: Robert J. Sternberg, PhD, Yale University**
**Participants: Ronald E. Fox, PsyD, The Consulting Group, Chapel Hill, NC; John Winston Bush, PhD; Roberta L. Nutt, PhD, Texas Woman's University; Robert K. Klepac, PhD, Lackland AFB, TX; Lt. Col. Elaine Orabona-Mantell, PhD, Seymour Johnson Air Force Base, Goldsboro, NC; R.C. Barden, PhD, JD, National Association for Consumer Protection in Mental Health Practices, North Salt Lake, UT; Erin S. Kappenberg, MA, Claremont Graduate University; and Jenny Carrillo, MS Matthew K. Nock, MPhil, Yale University, and Brandon A. Gaudiano, MA, Brown University Discussant: Judith E. Albino, PhD, Alliant International University, San Francisco Association.**

**Barden, R.C. ""Building Multi-Disciplinary Legal-Scientific Teams in Parental Alienation Family Law Cases", International Conference on Parental Alienation Syndrome (PAS): A Challenge for Professionals Involved in Family Law, Hotel Maritim, Frankfurt (Main), Germany, 18/19, Oct. 2002. Chair, Wilfrid Boch-Galhau M.D., Facharzt für Psychotherapeutische Medizin, Neurologie, Psychiatrie und Psychotherapie, Praxis, Mitglied beim interdiszipl. Arbeitskreis Beratung bei Trennung und Scheidung, Würzburg, BRD.**

**Barden, R.C. "Special Issues in PAS cases: A Panel of Experts" International Conference on Parental Alienation Syndrome (PAS): A Challenge for Professionals Involved in Family Law, Hotel Maritim, Frankfurt (Main), Germany, 18/19, Oct. 2002. Chair, Wilfrid Boch-Galhau M.D., Facharzt für Psychotherapeutische Medizin, Neurologie, Psychiatrie und Psychotherapie, Praxis, Mitglied beim interdiszipl. Arbeitskreis Beratung bei Trennung und Scheidung, Würzburg, BRD.**

**Barden, R. C. "Legislation to Ban Pseudo-Therapy: Protecting the Public from Coercive Restraint", presented to the UTAH HOUSE of REPRESENTATIVES HEALTH AND HUMAN SERVICES COMMITTEE, Thursday, January 23, 2003 - 2:00 p.m. - Room 414 State Capitol. Dr. Barden's recommendation to pass a law banning abusive "therapy" practices was approved by a unanimous vote of the committee.**

See, Thalman, James, Holding-therapy ban clears hurdle, DESERET NEWS, SALT LAKE CITY, UTAH, Friday, January 24, 2003, pg. A6

"R. Christopher Barden, a lawyer and Ph.D. who was an expert witness in a holding therapy-linked death in Colorado two years ago, told legislators that no credible group in American psychology or psychiatry supports the use of coercive therapy techniques. He calls the technique "quack therapy" not unlike those such as primal screaming or rolfing that surface every few years and manage to attract a devoted few.

"There is no scientific evidence to support the effectiveness of such interventions," Barden said. "If what is being practiced in Utah doesn't include these harmful, coercive techniques, then why do local therapists oppose this bill."

See, Santini, Jacob,  HEADLINE: Lawmakers Butt Heads Over Bills to Address Restraint, THE SALT LAKE TRIBUNE,  February 14, 2003, Friday, Pg. A13.

"Two Utah County lawmakers are in a legislative battle over how to curtail controversial coercive restraint therapies. The winner probably will be decided today.After months of debate, dueling bills by Rep. Mike Thompson, R-Orem, and Sen. Parley Hellewell, R-Orem, are set for a vote before the Senate Business and Labor Committee. Thompson's bill, which was approved by the House on Jan. 30, would prohibit therapists from restraining patients for any reason other than to provide safety....

Dr. Chris Barden was one of the experts in child psychology who testified in a Colorado trial of two therapists who killed a girl while performing a rebirthing technique.... Dr. Barden's response [to opponents at Utah Legislative hearings] and numerous other documents are available at http://www.kidscomefirst.info."

NEWS PHOTO: RESTRAINT ON THE HILL Rep. Mike Thompson, right, listens as Dr. Chris Barden speaks on a bill to protect children from restraint therapy.

Barden, R. C. "Therapy and Pseudo-Therapy: Attachment Disorders and Holding Therapy", presented to the UTAH JOINT HOUSE-SENATE STATE CHILD WELFARE LEGISLATIVE OVERSIGHT PANEL, Thursday, September 19, 2002 - 2:00 p.m. - Room 416 State Capitol.  Dr. Barden's and many others recommendations to pass a law banning abusive "therapy" practices was approved by unanimous vote.  The bill in question HB05 later passed the House of Representatives by a 68-2 margin.

See, Santini, J.,  Legislative Panel Backs Measure That Would Ban 'Holding Therapy', The Salt Lake Tribune,  September 20, 2002, Friday, at  Pg. A10.  "Before voting to support the measure, the Child Welfare Oversight Panel on Thursday considered testimony from Christopher Barden, an expert in child psychology, who called coercive therapy "quackery." "These therapists really believe they are helping people," Barden said, "just like lobotomizers believed they were helping people."

See, Thalman, J. Lawmakers back plan to ban holding therapy,  The Deseret News of Salt Lake City, UT, September 20, 2002, Friday. .... "That's typical because those who offer it or participate in it always operate outside public scrutiny, said Christopher Barden, a nationally known psychologist and widely quoted critic of coercive therapy.... He told lawmakers the treatment shouldn't even be called therapy because labeling it as such implies it has been shown to be therapeutic.... The only evidence that it works is the worst kind -- anecdotal -- and it has never stood up to any kind of basic scientific review, Barden said. He likened the fervor of its supporters to those who also believed in bloodletting and leeching as a cure for physical illness... Not only does the therapy not meet even the most basic scientific criteria, it amounts to human experimentation and fraud, he added.... There are those who say they got better because of it, Barden said. "But just because an outcome and a treatment appear related doesn't prove cause and effect."

See also, Santini, J. , "Man Seeks Ban on Therapy He Used on Daughter",  The Salt Lake Tribune, September 29, 2002, Sunday,  Pg. A6.  "These treatments are being done in the dark corners of the mental health system," Christopher Barden, a North Salt Lake psychologist and attorney who testified in the Newmaker case, told a Utah legislative panel earlier this month....Elsewhere, the Colorado Legislature unanimously banned rebirthing therapy following the death of Candace Newmaker, 10, of North Carolina, who had been brought by her mother to the state for treatment in 2000. The two therapists who treated her are serving 16-year prison sentences.

Hyde, J.  "Holding therapy appears finished, State orders the last practitioner of holding therapy to end controversial method" Deseret News, Feb 13, 2005.  See, https://www.deseret.com/2005/2/13/19877054/holding-therapy-appears-finished

Barden, R. C. "Protecting the Integrity of the Legal System: Eliminating Junkscience "Expert" Testimony with Science Intensive Litigation Methods", American Bar Association Litigation Section National Meetings, Phoenix, Arizona, May 11, 2001.
    Chair, R. Nicholas Gimbel, J.D. (Editorial Board, Litigation: Journal of the Litigation Section of the American Bar Association);  other panel members on this seminar included Ezra Griffiths, M.D. (Yale Medical School and Editor, Jour. of the American Academy of Psychiatry and the Law);  Ronald Shouten, M.D. (Harvard Medical School); Professor Stephen A. Saltzburg (George Washington University Law Center); and the Honorable Joseph A. Greenway (Judge, U.S. Federal District New Jersey).

Barden, R. C. Invited Speaker for the U.S. Surgeon General's National Conference. "Strategies to Improve Children's Health Care", in the Panel Ethics, Law, and Health Policy as Tools for Change,  OFFICE OF THE SURGEON GENERAL OF THE UNITED STATES, Conference on Children's Health Care 2000, Washington, D.C. June 12-13, 2000

Barden, R. C. Moderator of the Law and Policy Panel, OFFICE OF THE SURGEON GENERAL OF THE UNITED STATES, Conference on Children's Health Care 2000, Washington, D.C. June 12-13, 2000

Barden, R.C. Invited Speaker for the American Psychiatric Association National Meetings. "Recovered Memories: A Multidisciplinary Analysis" Invited Address in the Symposium "Recovered Memory: Law, Science and the Clinician".
    Chair, Alan A. Stone (Harvard Law School, Harvard Medical School) other panel members included: Paul R. McHugh (Chair, Johns Hopkins Medical School Psychiatry Dept.); David Spiegel (CoChair, Stanford Medical School Psychiatry Dept.); Dan Schacter (Chair, Harvard University Psychology Dept) and Alan Scheflin (Prof., Santa Clara Law School). American Psychiatric Association Annual Meetings, Chicago, May 16, 2000.

Barden, R.C. Spectral Evidence vs. Science:  Legal Issues in Mental Health Reform. Invited Address to Memory and Reality: Return to Reason,  conference in White Plains, New York, April 8-9, 2000.  (panel with Ralph Slovenko, J.D., Ph.D.,  Martha Churchill, J.D.).
    Additional speakers included: Elizabeth Loftus, Ph.D., Paul McHugh, M.D., Paul Simpson, Ed.D., Terence Campbell, Ph.D., Pamela Freyd, Ph.D., Harold Lief, M.D., Harold Mersky, D.M., and others.

Barden, R.C. "Truth and Responsibility in Mental Health Practices", Invited testimony before the Arizona State Senate, December 1, 1999. Phoenix, Arizona.

Barden, R.C. "Expert Witnesses: Syndromes" Continuing Legal Education Seminar sponsored by the Texas State Bar, Dallas, Texas Oct. 21, 1999.

Barden, R.C. " Law, Science and Mental Health: Protecting Liberty and Reforming the Mental Health System. " Presented to the British False Memory Society at the Royal Aeronautical Society Center, London, England, May 8, 1999

Barden, R.C. "Science and the Legal System: Science Intensive Litigation" Professional training seminar presented at Washington D.C. Bar Association/ National Practice Institute, CLE Seminars, Washington, D.C., November 21, 1997.

Barden, R. C. Confidentiality, Ethics, Record Keeping, & Quality Management, Professional training seminar presented in Portland Oregon for Managed Healthcare Northwest, Behavioral Health Services & Legacy Health Systems, September 25, 1997.

Barden, R.C. "Mental Health Law: The Evolving Standard of Care and Avoiding Malpractice Law Suits" Professional training seminar presented in Boston, MA, September 12, 1997.

Barden, R.C. "Mental Health Law: The Evolving Standard of Care and Avoiding Malpractice Law Suits" Professional training seminar presented in New York City, NY, September 11, 1997.

Barden, R.C. "Mental Health Law: The Evolving Standard of Care and Avoiding Malpractice Law Suits" Professional training seminar presented in Philadelphia, PA, September 10,1997.

Barden, R.C. "Science and the Legal System: Science Intensive Litigation" Professional training seminar presented at Arkansas Bar Association/ National Practice Institute, CLE Seminars, University of Arkansas Law School, August 22, 1997.

Barden, R.C. "The Future of the Mental Health System: Consumer Protections and the Role of Law" Professional training seminar presented to the Faculty and Graduate Students of the University of Washington, Clinical Psychology Ph.D. Training Program, May 23, 1997.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Minneapolis, Minnesota, May 7, 1997.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Milwaukee, Wisconsin, May 8, 1997.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Chicago, Illinois, May 9, 1997.

Barden, R.C. "Legislative Aspects of Trauma Prevention: A Multidisciplinary Approach", presented at the Hennepin County Medical Center Symposium "Trauma: Surviving Into the 21st Century, Minneapolis, MN, April 24, 1997.

Barden, R.C. "Science, Law and Liberty" Keynote speaker at the Minneapolis Women's Club, April 8, 1997.

Barden, R.C. "Science and the Legal System: Science Intensive Litigation" Professional training seminar presented at University of Minnesota Law School/ National Practice Institute, CLE Seminars, Minneapolis, MN March 24, 1997.

Barden, R.C. "Reforming the Mental Health System: Education, Regulation, Litigation and Legislation" Professional training seminar presented at the False Memory Syndrome Foundation/Johns Hopkins Medical School Conference, Baltimore, Maryland, March 23, 1997.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Baltimore, Maryland, March 20, 1997.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Houston, Texas, March 12, 1997.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Dallas, Texas, March 11, 1997.

Barden, R.C. "Emergency Medical Systems for Children: Legal, Moral, Psychological and Legislative Analyses."  Professional training seminar presented for the Mayo Clinic Staff, Rochester, Minnesota,  November 18, 1996.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Albuquerque, New Mexico, November 21, 1996.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Phoenix, Arizona, November 22, 1996.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Portland, Oregon, December 5, 1996.

Barden, R.C. "Mental Health Law and Ethics" Professional training seminar presented in Seattle, Washington, December 6, 1996.

Barden, R.C. "Mental Health Law and Ethics: Expert Witness Testimony, the Suggestibility of Child and Adult Witnesses,   the "Repressed Memory" Fad and other topics." Professional training seminar presented in Columbus, Ohio, February, 27, 1996.

Barden, R.C. "Mental Health Law and Ethics: Confidentiality, Record Keeping, Expert Witness Testimony, the Suggestibility of Child and Adult Witnesses, the "Repressed Memory" Fad and other topics." Professional training seminar presented in Indianapolis, Indiana, February 28, 1996.

Barden, R. C. "Reforming the Mental Health System: Psychological, Legal and Legislative Analyses", Invited Address to "Memory Recovery and Creation:  Scientific, Clinical and Legal Perspectives", University of California,   Riverside, California,  March 8, 1996.

> Other Symposium Participants included:  Elizabeth F. Loftus, Ph.D. (Univ. of Washington); Stephen C. Ceci, Ph.D. (Cornell University); Stuart Zola, Ph.D., (Univ. of California, S.D., School of Medicine); Michael D. Yapko, Ph.D. (Milton Erickson Institute).

Barden, R.C. "Mental Health Law and Ethics:  Expert Witness Testimony, the Suggestibility of Child and Adult Witnesses, the "Repressed Memory" Fad and other topics." Professional training seminar presented in San Antonio, Texas, March 11, 1996.

Barden, R.C. "Mental Health Law and Ethics: Confidentiality, Record Keeping, Expert Witness Testimony, the Suggestibility of Child and Adult Witnesses,   the "Repressed Memory"

Fad and other topics." Professional training seminar presented in Dallas, Texas, March 12, 1996.

Barden, R.C. "Mental Health Law and Ethics: Confidentiality, Record Keeping, Expert Witness Testimony, the Suggestibility of Child and Adult Witnesses, the "Repressed Memory" Fad and other topics." Professional training seminar presented in Baltimore, Maryland, March 29, 1996.

Barden, R.C. "Mental Health Law and Ethics: Confidentiality, Record Keeping, Expert Witness Testimony, the Suggestibility of Child and Adult Witnesses, the "Repressed Memory" Fad and other topics." Professional training seminar presented in Minneapolis, Minnesota, May 8, 1996.

Barden, R.C. "Mental Health Law and Ethics: Confidentiality, Record Keeping, Expert Witness Testimony, the Suggestibility of Child and Adult Witnesses, the "Repressed Memory" Fad and other topics." Professional training seminar presented in Milwaukee, Wisconsin, May 10, 1996.

Barden, R.C. "Protecting the Integrity of the Legal System: Proper Use of Expert Witnesses", American Bar Association Criminal Justice Section. Presented in Minneapolis, Minnesota, November 10, 1995.

Barden, R.C. "Repressed Memories of Trauma: Science or Mythology; Mental Health Treatment or Quackery?", Invited address to the Interstate Postgraduate Medical Association of North America, San Francisco, October, 1995.

Barden, R.C. "Medical, Psychological, and Legal Issues in Dealing with 'Repressed Memories'", Invited address to the Interstate Postgraduate Medical Association of North America, San Francisco, October, 1995.

Barden, R.C. "Legal, Psychological, Ethical and Economic Analyses of the Health Care System: The Politics of Improving the Emergency Medical System for Children", Invited Address to the American Heart Association Advanced Pediatric Life Support Training Conference, Minnesota, Sept. 8, 1995.

Barden, R.C. "Mental Health Law and Ethics: Appropriate and Inappropriate Expert Testimony by Mental Health Professionals in the Legal System." Professional training seminar presented for the Health Education Network Program, Minneapolis, Minnesota, May 1995.

Barden, R.C. "Psychology and the Law: The Effects of Invalid and Unreliable Junk Science on the Legal System." Address to the Minneapolis Rotary Club, Minneapolis, Minnesota, March, 1995.

Barden, R. C. "General and Specific Issues in a Case of Unethical Behavior by a Forensic Psychiatrist", Testimony before the American Psychiatric Association Ethics Board in Tucson, Arizona, March, 1995.

Barden, R.C., "Protecting the Legal System from Inappropriate Social Science Testimony:' Memory Recovery' Psychotherapy, Improper Interview Techniques with Children and Anatomical Doll Interviews"" Invited keynote address to the Midwestern Sex Crimes Investigators Association, Des Moines, Iowa, March 1995.

Barden, R. C. "Research and Analyses regarding the Suggestibility of Children, the Use of Child Testimony, and the Dangers of Inappropriate Expert Testimony in the Legal System", An

Amicus Brief and Oral Argument (by Invitation of the Court) to the 8th Circuit Court of Appeals for the State of Texas, February, 1995.

Barden, R.C. "The Truth and Responsibility in Mental Health Practices Act:  Public Policy, Economic, Moral and Psychological Analyses",  Invited Testimony to the House of Representatives of the State of New Hampshire, February, 1995.

Barden, R. C. "Psychotherapy Malpractice Suits Against Repressed Memory Therapists: Legal, Psychological and Scientific Aspects."  Professional training seminar presented at the Johns Hopkins Medical School/False Memory Syndrome Foundation meeting, "Memory and Reality: Reconciliation,"  Baltimore, MD.,  December, 1994.

Barden, R.C. "Mental Health Law and Ethics: Professional Obligations, Risk Management and Ethical Issues." Professional training seminar presented in Milwaukee, Wisconsin, August, 1994.

Barden, R.C. "The Legal Rights of Families and Children in the Age of Psychotherapists." Continuing education seminar for legal professionals. "Competing Jurisdictions: Family, Church & State.", June, 1994.

Barden, R.C. "Avoiding Malpractice Suits in the Practice of Psychotherapy." Professional training seminar presented in Minneapolis, Minnesota, June, 1994.

Barden, R.C., "Protecting the Legal System from Pseudoscientific Error and Fraud: The Case of 'Memory Recovery' Psychotherapy,  Improper Interview Techniques with Children and Anatomical Doll Interviews" Invited keynote presentation to the Minnesota Sex Crimes Investigators Association, Minneapolis, Minnesota, April 1994.

Barden, R. C., "Optimal Performance in Tennis and Life."  Northwest Sectional Training Program, United States Tennis Association, Eagen, Minnesota, April 1994.

Barden, R. C., "Psychotherapists' Duty to Warn and Duty to Commit."  Professional training seminar presented at the Medical Education Services session on May 14, 1993 in Minneapolis, Minnesota.

Barden, R. C., "Success in Business:  Optimal Performance in Business."   Seminar presented at the Dept. of Psychology, Harvard College, April, 1992.  "Psychology Applied to Business," Prof. Phillip Stone.

Barden, R. C., "Cross cultural, psychodiagnostic, and legal issues in the case of a young woman from Sierra Leone."  Case presentation to the Mental Disability Law Seminar at Harvard Law School, April, 1992, Prof. Alan A. Stone.

Barden, R. C., "Optimal Performance and Health in Law School."  Seminar presented at the Harvard Law School, Cambridge, Massachusetts, April May, 1991.

Barden, R.C., Kinscherff, R., and George, W., "Legal, Economic, and Psychological Models for the Prevention of Drug Exposure in Infancy."  Presented to the 1991 National Conference on Drug Abuse Prevention, Atlantic City, New Jersey, April, 1991.

Barden, R. C., "Mental Training for Optimal Performance in Law School."  Seminar presented at the Harvard Law School, Cambridge, Massachusetts, April, 1990.

**Barden, R.C., "Improving tennis performance with advanced relaxation training and hypnosis." Invited address before the United States Tennis Association Sectional Clinic, Minneapolis, Minnesota, 1989.**

**Barden, R. C. "The effects of facial anomalies and other traumatic events on personality development: Research from a developmental model." Harvard University, Department of Psychology, 1988.**

**Barden, R.C., Rogers Salyer, M., Kuczaj, S., Morales, L., & Salyer, K.E., "Multidisciplinary management of craniofacial anomalies: The role of the psychosocial team." Presented at the 1988 meeting of the Latin American Congress on Craniofacial Anomalies, Santiago, Chile.**

**Barden, R.C., Ford, M.E., Rogers Salyer, M., Morales, L., & Salyer, K.E., "The effects of facial anomalies on personality development: Research from a developmental model." Presented at the August, 1988, meetings of the Latin American Congress on Craniofacial Anomalies, Santiago, Chile.**

**Barden, R.C., Ford, M.E., McCarty, S., Rogers Salyer, M., Morales, L., & Salyer, K.E., "The effectiveness of craniofacial surgery: Patients with Clefts, Downs Syndrome, Treacher Collins, and Aperts." Presented at the August, 1988, Latin American Congress on Craniofacial Anomalies, Santiago, Chile.**

**Barden, R. C. "The effects of facial anomalies, chronic illness and other traumatic events on personality development: Research from a developmental model." McGill University, Department of Psychology, 1988.**

**Barden, R. C. "The effects of facial anomalies, chronic illness and other childhood trauma on personality development: Research from a developmental model." University of North Carolina, Chapel Hill, Department of Psychology, 1988.**

**Barden, R. C. "The effects of facial anomalies, chronic illness and other childhood trauma on personality development: Research from a developmental model." University of Utah School of Medicine, Department of Genetics, Salt Lake City, Utah, 1987.**

**Barden, R. C, McCarty, S. R., Ford, M. E., Morales, L., Salyer, M., and Salyer, K.E., "The effectiveness of craniofacial surgery: The first empirical study." Presented at the 1987 convention of the American Cleft Palate Association, San Antonio, Texas.**

**Barden, R. C., Hale, J., and Ford, M. E., "The effects of physical attractiveness on social interaction and cognition: The mediating role of affect." Presented at the 1987 convention of the American Cleft Palate Association, San Antonio, Texas.**

**Barden, R. C. and Yim, K. E., "The role of emotion and cognition in athletic behaviors of children." Presented at the American Society for Clinical Hypnosis, 1987, Las Vegas, Nevada.**

**Barden, R. C., Discussant for the symposium "Research paradigms in sports psychology." Presented at the American Society for Clinical Hypnosis, 1987, Las Vegas, Nevada.**

**Barden, R. C., Hale, J., and Ford, M. E., "The effects of physical attractiveness on social interaction: The mediating role of affect." Presented to the Society for Research in Child Development, 1987, Baltimore, Maryland.**

**Barden, R. C., Ford, M. E., and Jensen, G. A., "Infant facial attractiveness and deformity: The effects on mother infant attachment." Presented at the 1987 meetings of the Society for Research in Child Development, Baltimore, Maryland.**

**Barden, R. C., Hale, J., and Ford, M. E., "The effects of physical attractiveness on social interaction: The mediating role of affect." Presented at the 1987 meetings of the Rocky Mountain Psychological Association, Albuquerque, New Mexico.**

**Barden, R. C., Ford, M. E., and Jensen, G. A., "Infant facial attractiveness and deformity: The effects on mother infant attachment." Presented at the 1987 meetings of the Rocky Mountain Psychological Association, Albuquerque, New Mexico.**

**Barden, R. C. "The effects of facial anomalies, chronic illness and other childhood trauma on personality development: Research from a developmental model." University of Utah School of Medicine, Division of Plastic Surgery, 1986.**

**Barden, R. C. "The effects of facial anomalies, chronic illness and other childhood trauma on personality development: Research from a developmental model." Primary Children's Hospital, Intermountain Craniofacial Surgical Team, Salt Lake City, Utah. 1986.**

**Barden, R. C., Ford, M. E., Jensen, G., Salyer, M., and Salyer, K., "The Effects of Physical Attractiveness and Facial Deformity on the Mother Infant Attachment Process." Presented at the May, 1986 American Cleft Palate Association Convention, New York, New York.**

**Barden, R. C., Ramsey, J., Salyer, M., and Salyer, K., "Craniofacial Surgery for Down's Syndrome Patients : A Psychosocial Rationale." Presented at the May, 1986, American Cleft Palate Association Convention, New York, New York.**

**Barden, R. C., Wilhelm, W., Ford, M. E., Salyer, M., and Salyer, K., "Popularity and Friendship Selection of Craniofacially Deformed Adolescents." Presented at the May, 1986 American Cleft Palate Association Convention, New York, New York.**

**Ramsey, J., Barden, R. C., Salyer, M., and Salyer, K. E., "Psychotherapy Support Groups for Craniofacial Patients: Why they succeed or fail." Presented at the May, 1986, American Cleft Palate Association Convention, New York, N.Y.**

**Barden, R. C. "The effects of facial anomalies, chronic illness and other childhood trauma on personality development: Research from a developmental model." University of Minnesota School of Medicine, Department of Child Psychiatry, 1985.**

**Barden, R. C. "The effects of facial anomalies, chronic illness and other childhood trauma on personality development: Research from a developmental model." Penn State University, Department of Psychology, 1985.**

**Barden, R. C., Wilhelm, W., Ford, M. E., Salyer, M., and Salyer, K. (1985), "The effects of facial deformities and physical attractiveness on sociometric status and conceptions of friendship in children and adolescents." Presented at the International Congress on Cleft Palate and Related Craniofacial Anomalies, Monte Carlo, Monaco.**

**Barden, R. C., Rogers Salyer, M., Ramsey, J., & Salyer, M. (1985), "Changes in attractiveness and expectations of others following craniofacial surgery with Downs Syndrome patients." Presented at the International Congress of Cleft Palate and Related Craniofacial Anomalies, Monte Carlo, Monaco.**

Barden, R. C., (1985), Coordinator for the "Psycho Social Research." Symposium International Congress on Cleft Palate and Related Craniofacial Anomalies, Monte Carlo, Monaco.

Barden, R. C., Hoffman, G., & Garber, J. (1984), "Depressed children's expectations of affective responses to social experiences." Paper presented at the meeting of the Southwestern Society for Research in Child Development, Denver.

Barden, R. C., & McKinley, D. C. (1984), "Physical attractiveness and personality development." Paper presented at the meeting of the Southwestern Society for Research in Child Development, Denver.

Barden, R. C., (1984), "Psychological stress and coping processes in children with facial abnormalities." Paper presented to the Texas Parents Cleft Palate Association, Dallas.

Barden, R. C. (1984), "Peer relations: Current research." Chairman and reviewer at a symposium conducted at the meeting of the Southeastern Society for Research in Child Development, University of Georgia.

Barden, R. C., Garber, J., Leiman, B., Ford, M. E., & Masters, J. C. (1983), "The effects of differential affective experiences and the remediation of such experiences on cognitive, social, and expressive behavior." Paper presented at the meeting of the Society for Research in Child Development, Detroit.

Barden, R. C., Garber, J., Leiman, B., Ford, M. E., McKinley, D., & Masters, J. C. (1983), "Maintenance of different types of affective experiences: Cognitions and attributions." Paper presented at the annual meeting of the Midwestern Psychological Association, Chicago.

Barden, R. C., Rogers, M., McKinley, D., & Salyer, K. (1983), "The psychosocial effects of plastic and reconstructive surgery." Paper presented at the annual meeting of the International Congress of Plastic and Reconstructive Surgery, Montreal.

Barden, R. C., Rogers, M., & Salyer, K. (1983), "The effects of plastic and reconstructive surgery on the physical attractiveness of children and adolescents." Paper presented at the annual meeting of the International Congress of Plastic and Reconstructive Surgery, Montreal.

Barden, R. C., & Masters, J. C. (1983), "Recognizing, understanding, and changing emotional states in children." Paper presented at the annnal meeting of the American Psychological Association, Los Angeles.

Barden, R. C. (1983), "Emotional behaviors, attributions, and defenses: Basic development research with clinical significance." Symposium conducted at the annual meeting of the American Psychological Association, Los Angeles.

Barden, R. C., & McKinley, D. C. (1983), "Physical attractiveness, altruism and self gratification in young children." Paper presented at the annual meeting of the Texas Psychological Association, San Antonio.

Felleman, E. S., Barden, R. C., Carlson, C. R., & Masters, J. C. (1981), "Children's and adults' recognition of spontaneous and posed emotional expressions in young children." Paper presented at the annual meeting of the American Psychological Association, Los Angeles.

**Barden, R. C. "The effects of differential affective experiences and the remediation of such experiences on cognitive, social, and expressive behavior." Columbia University , Department of Psychology, 1981.**

**Barden, R. C. "The effects of differential affective experiences and the remediation of such experiences on cognitive, social, and expressive behavior." University of Southern California, Department of Psychology, 1981.**

**Barden, R. C. "The effects of differential affective experiences and the remediation of such experiences on cognitive, social, and expressive behavior." University of Georgia at Athens, Department of Psychology, 1981.**

**Barden, R. C. "The effects of differential affective experiences and the remediation of such experiences on cognitive, social, and expressive behavior." University of Iowa, Department of Psychology, Iowa City, 1981.**

**Zelko, F. J., Duncan, S. W., Barden, R. C., Garber, J., & Masters, J.C. (1980), "Adult's knowledge of children's beliefs regarding the experiential determinants of emotion." Paper presented at the convention of the American Psychological Association, Montreal.**

**Barden, R. C., Garber, J., Duncan, S. W., & Masters, J. C. (1979), "Cumulative effects of induced affective states in children." Paper presented at the convention of the American Psychological Association, New York.**

**Barden, R. C., Zelko, F. J., Duncan, S. W., & Masters, J. C. (1979), "Consensual knowledge about the experiential determinants of emotion in children." Paper presented at the convention of the American Psychological Association, New York.**

**Masters, J. C. & Barden, R. C. (1977), "Learning and affect." Paper presented at the convention of the Society for Research in Child Development, New Orleans.**

**Masters, J. C., Furman, W., & Barden, R. C. (1975), "Effects of achievement standards, tangible rewards, and self dispensed achievement evaluations on children's task mastery." Paper presented at the Convention of the Society for Research in Child Development, Denver.**

**SUBJECT AREAS AND BASES FOR Dr Barden's EXPERT OPINIONS in LITIGATION CASES: Dr. Barden's opinions are often based upon his review of evidence as well as his education (Ph.D., J.D), knowledge, training, and experience (Licensed in Psychology and Law) in the fields of clinical psychology, child-clinical psychology, forensic psychology, law, and methodology.**

**The SUBJECT MATTER AREAS OF DR BARDEN's EXPERT OPINIONS AND THE BASES FOR EACH AREA INCLUDE BUT ARE NOT LIMITED TO:**

**- STANDARDS OF CARE and SCIENTIFICALLY VALIDATED PRACTICES IN PSYCHOTHERAPY and MENTAL HEALTH PRACTICES: providing psychotherapy to numerous patients including children, families and adults (in schools, clinics, and hospitals), as well as training psychology graduate students in interviewing and psychotherapy standards and methods (former President of the National Assn. for Consumer Protection in Mental Health Practices);**

**- STANDARDS OF CARE and SCIENTIFICALLY VALIDATED PRACTICES IN ASSESSMENT, TESTING and PSYCHOLOGICAL MEASUREMENT: testing and**

**assessment with numerous patients including children, families and adults (in schools, clinics, and hospitals), as well as training psychology graduate students in interviewing, testing and assessment standards and methods;**

**- STANDARDS OF CARE and SCIENTIFICALLY VALIDATED PRACTICES IN PSYCHOLOGICAL RESEARCH: initiating, conducting and publishing original research in the leading journals in child psychology, social psychology, personality psychology, surgery, public policy and legislation - receiving two national awards for such psychological research; reviewing hundreds of peer reviewed published research studies and serving in editorial roles for leading professional journals;**

**- STANDARDS OF CARE and SCIENTIFICALLY VALIDATED PRACTICES in TEACHING PROFESSIONAL COURSES: teaching Psychological Professional Continuing Education courses (including psychotherapy standards and practices) to thousands of mental health and legal professionals across the U.S as well as teaching graduate courses to psychology and law students.;**

**- STANDARDS OF CARE and SCIENTIFICALLY VALIDATED PRACTICES IN TRAINING and EVALUATING PROFESSIONAL LAW ENFORCEMENT INVESTIGATORS SUCH AS SHERIFF, POLICE, FBI, CHILD FORENSIC INTERVIEWERS, and SIMILAR AGENCIES and INDIVIDUALS: I have consulted, corresponded and/or conversed regarding these issues at great length with many of the major scientific, legal and public policy figures in the mental health and memory fields.**

**- LITIGATION OF COMPLEX PSYCHOLOGICAL CASES AS A TRIAL ATTORNEY: I have obtained what apparently remain world-record jury verdicts and settlements in suits for psychotherapy negligence. I have conducted and/or consulted on psychotherapy negligence suits in many jurisdictions.**

**- EXPERT WITNESS REVIEW AND TESTIMONY IN CRIMINAL, FAMILY, and CIVIL LAW CASES : I have served as an expert witness in many jurisdictions regarding the field of psychology, psychotherapy-assessment standards and practices, scientific methodology, Daubert issues, proper and improper investigations, and related issues including those listed above.**

**- RELEVANT PUBLIC SERVICE including serving as a Member of the State Board of Psychology in Minnesota (appointment by the Governor), Special Assistant Attorney General of the State of Utah (appointment by the State Attorney General) prosecuting mental health professionals for misconduct and other service, member of the Minnesota Higher Education Coordinating Board (appointment by the Governor). Testimony before multiple State Legislatures regarding science, legislative, mental health and related issuess.**

**My opinions in expert witness cases are limited by the type of documentary and other information I may review. I have no expert diagnostic opinions unless I have completed a formal, documented, and detailed assessment of the individuals in question. Opinions in the social sciences are viewed within well-known methodological limitations including the impossibility of absolute predictions.**

# PERSPECTIVES

SCIENCE AND SOCIETY 

## Our changeable memories: legal and practical implications

*Elizabeth Loftus*

The malleability of memory is becoming increasingly clear. Many influences can cause memories to change or even be created anew, including our imaginations and the leading questions or different recollections of others. The knowledge that we cannot rely on our memories, however compelling they might be, leads to questions about the validity of criminal convictions that are based largely on the testimony of victims or witnesses. Our scientific understanding of memory should be used to help the legal system to navigate this minefield.

Memories are precious. They give us identity. They create a shared past that bonds us with family and friends. They seem fixed, like concrete, so that if you 'stepped' on them they would still be there as they always were.

But memories are not fixed. Everyday experience tells us that they can be lost, but they can also be drastically changed or even created. Inaccurate memories can sometimes be as compelling and 'real' as an accurate memory. In this article, I discuss the ways in which memories can be reshaped and their implications for the legal system. If we cannot believe our own memories, how can we know whether the memories of a victim or a witness are accurate?

### Remaking memories

We are all familiar with temporary memory problems. "I can't remember the right word," says a colleague at a cocktail party. "Is it senility?" I reply: "Can you remember the word later?" And the usual answer will be yes, proving that the information was not lost, but only temporarily unavailable. Retrieval problems are common.

However, there are also problems with storing something new. This usually occurs simply because the person concerned is not paying attention. But some people are unable to store new information even if they are paying attention and have the opportunity to repeat the new information over and over again — several hours later, it is gone. Such people, including patients with Alzheimer's disease, might not even complain about 'losing their memory' because they do not realize that anything is missing[1].

More insidiously, memories can become scrambled, sometimes in the process of attempting to retrieve something. You might relate a story to a friend but unwittingly include some mistaken details. Later, as you attempt to recall the episode, you might come across your memory of the scrambled recall attempt instead of your original memory. Memory is malleable. It is not, as is commonly thought, like a museum piece sitting in a display case. "Memory is," as the Uruguayan novelist Eduardo Galeano once said, "born every day, springing from the past, and set against it."[2]

Usually the scrambled memory does not matter very much. But if you are an eyewitness to a crime, your scrambled recall could send someone to prison. And, rather than feeling hesitant, you might feel perfectly sure of the truth of your memory. The history of the United States justice system, like those of other countries, is littered with wrongful convictions made on the basis of mistaken memories[3]. Huff recently estimated[4] that about 7,500 people arrested for serious crimes were wrongly convicted in the United States in 1999. He further noted that the rate is thought to be much lower in Great Britain, Canada, Australia, New Zealand and many other nations, especially those that have established procedures for reviewing cases involving the potential of wrongful conviction.

Ronald Cotton, a North Carolina prisoner who was convicted in 1986 of raping a 22-year-old college student, Jennifer Thompson, puts a human face on these cases. Thompson stood up on the stand, put her hand on the Bible and swore to tell the truth. On the basis of her testimony, Cotton was sentenced to prison for life. Eventually, DNA testing — which began 11 years after Thompson had first identified Cotton — proved his innocence. Another man, Bobby Poole, pleaded guilty to the crime[3].

Faulty memory is not just about picking the wrong person. Memory problems were also evident during the sniper attacks that killed ten people in the Washington DC area in 2002 (see for example, REF. 5). Witnesses reported seeing a white truck or van fleeing several of the crime scenes. It seems that a white vehicle might have been near one of the first shootings and media repetition of this information contaminated the memories of witnesses to later attacks, making them more likely to remember white trucks. When caught, the sniper suspects were driving a blue car. Were we observing unwitting memory contamination on a nationwide scale?

Witnesses can be wrong for several reasons. A key reason is that they pick up information from other sources; they combine bits of memory from different experiences. A growing body of research shows that memory more closely resembles a synthesis of experiences than a replay of a videotape[6]. Three decades ago, a method of studying memory distortions was introduced. People watched a simulated crime or accident. Later they were given erroneous information about the details

of the event, such as the false detail that a man had curly rather than straight hair. Many of these people later claimed that they had seen a curly-haired person[7]. Studies such as this showed how leading questions or other forms of misinformation could contaminate the memories of witnesses about events that they had recently experienced[8].

In the past decade, the challenges have become greater. Newer studies showed that you could do more than change a detail here and there in someone's memory. You could actually make people believe that a childhood experience had occurred when in fact it never happened. Examples include being lost in a shopping mall for an extended period of time, being rescued by a lifeguard, or surviving a vicious animal attack[9-12]. How is this possible? In our studies, we enlist family members to help us to persuade their relatives that the events occurred. This method has led about a quarter of our subjects to believe that they were lost in a shopping mall for an extended period of time, and were ultimately rescued by an elderly person and reunited with their families. In other studies, we engaged people in guided imagination exercises. We asked people to imagine for a minute that as a child they had tripped and broken a window with their hand. Later, many of them became confident that the event had occurred. In other studies, we encouraged people to read stories and testimonials about witnessing demonic possession, and even these raised confidence that this rather implausible event had happened.

One recurring issue for memory distortion research is the question of whether the events being reported after such a manipulation might have actually happened. Perhaps the subject did break a window but had forgotten about it — the imagination exercise might have triggered a true memory rather than planting a false one. To prove that false memories can be insinuated into memory by these suggestive techniques, researchers have tried to plant memories that would be highly implausible or impossible. For example, one set of studies asked people to evaluate advertising copy. They were shown a fake print advertisement that described a visit to Disneyland and how they met and shook hands with Bugs Bunny. Later, 16% of these subjects said that they remembered meeting and shaking hands with Bugs Bunny[13]. In follow-up research carried out by Grinley in my laboratory, several presentations of fake advertisments involving Bugs Bunny at Disneyland resulted in 25–35% of subjects claiming to have met Bugs Bunny[14]. Moreover, when these subjects were subsequently asked to report precisely what they remembered about their encounter with Bugs Bunny, 62% remembered shaking his hand and 46% remembered hugging him. A few people remembered touching his ears or tail. One person remembered that he was holding a carrot. The scenes described in the advertisement never occurred, because Bugs Bunny is a Warner Bros. cartoon character and would not be featured at a Disney property.

> "One of the cleverest and most powerful techniques for planting highly implausible false memories involves the use of fake photographs."

Other 'impossible' memories have been recently planted in British students[15]. The false event was "having a nurse remove a skin sample from my little finger." This medical procedure was not one that was carried out in the United Kingdom, according to extensive investigation of health policy records. After guided imagination, many subjects came to remember the non-existent procedure occurring in their childhood. Some embellished their reported memory with significant detail such as, "There was a nurse and the place smelled horrible."

One of the cleverest and most powerful techniques for planting highly implausible false memories involves the use of fake photographs[16]. Subjects were shown a falsified photograph that was made up of a real photograph of the subject and a relative pasted into a prototype photograph of a hot-air balloon (FIG. 1). Family members confirmed that the event had never occurred. Subjects were shown the fake photograph and asked to tell "everything you can remember without leaving anything out, no matter how trivial it may seem." There were two further interviews, and by the end of the series 50% of the subjects had recalled, partially or clearly, the fictitious hot-air balloon ride. Some embellished their reports with sensory details of a hot-air balloon ride during childhood that had never occurred. For example, one subject said "I'm still pretty certain it occurred when I was in sixth grade at, um, the local school there ... I'm pretty certain that mum is down on the ground taking a photo."[16]

These studies, and many more like them, show that people can develop beliefs and memories for events that definitely did not happen to them. They can do this when fed strong suggestions — such as "your family told us about this event" or "look at this photograph of you from childhood". They can even do this when induced to imagine the experiences. Large changes in autobiography can be achieved quickly. Attempts to distinguish the false memories from true ones have occasionally shown statistical differences, such as differences in confidence, vividness or amount of detail[17], or differences in lateralized brain potentials[18,19]. For example, in the hot-air balloon study[16] the real memories were expressed with much more confidence than the fake ones. In most studies, any differences between true and false memories are observed only when comparing large groups of true and false memories, and these differences are typically too small to be useful for classifying a single autobiographical memory report as true or false. Psychological science has not yet developed a reliable way to classify memories as true or false. Moreover, it should be kept in mind that many false memories have been expressed with great confidence.

**Implications for society**

While researchers continue to investigate false memories, it is evident that there are already lessons to be learned. The fact that the memories of victims and witnesses can be false or inaccurate even though they believe them to be true has important implications for the legal system and for those who counsel or treat victims of crimes.

Some psychotherapists use techniques that are suggestive (along the lines of, "you don't remember sexual abuse, but you have the symptoms, so let's just imagine who might have done it"). These can lead patients to false beliefs and memories, causing great damage to the patients themselves and to those who are accused. In one Illinois case, psychiatrist Bennett Braun was accused by his patient, Patricia Burgus, of using drugs and hypnosis to convince her that she possessed 300 personalities, ate meat loaf made of human flesh and was a high priestess in a satanic cult[20]. By some estimates, thousands of people have been harmed in similar ways by well-meaning providers who apply a 'cure' that ends up being worse than the disease[21]. Law enforcement interrogations that are suggestive can lead witnesses to mistaken memories, even ones that are detailed and expressed with confidence. Hundreds of people have been harmed by witnesses who made a mistake that could have been avoided[22,23]. Of course, even before the police arrive on the scene, witnesses talk to one another and cross contamination can occur. I personally witnessed this when I entered a shop in Cambridge, Massachusetts, moments after a robbery had occurred and before the police arrived. In the immediate aftermath, customers and employees shared

Figure 1 | **An example of a composite photograph of a hot-air balloon flight.** The photograph on the left was used to create a misleading image (right) that could lead the subject to 'remember' a hot-air balloon flight as a child even when the experience had never occurred. Reproduced, with permission, from REF. 16 © (2002) Psychonomic Society.

their recollections, providing fuel for influencing the thoughts of one another. This is why, during the Washington DC area sniper attacks in 2002, law enforcement officials advised members of the public who might witness the 'next attack' to write down what they saw immediately, even using their hand if they did not have paper. Good advice, but I would suggest having paper handy because the best course of action is to write down everything that can be remembered before witnesses are interrogated or talk to one another. This activity strengthens the memory and protects it to some extent from later contamination[24].

It is often argued that a few false accusations are just the cost of doing business. But this cost includes the potential for the actual perpetrator to commit more crimes, and for the taxpayer to have to pay sizable sums of money in compensation when wrongful convictions are exposed (which probably happens in only a fraction of cases). Although the defendants in most wrongful prosecution cases are government officials or organizations, in one recent case the witness with mistaken memory was successfully sued[25]. Donna Parmeter, a former prison guard, was charged with kidnapping, robbery and torture. She had been identified by the victim, Peter Kretzu, who was tied up, blindfolded and tortured by two masked robbers. Although the attackers wore ski masks, Kretzu claimed that he recognized Donna (from her voice and eyes) and her husband Joseph (from his breathing, laugh, body shape and 'chicken soup' body odour). Kretzu was 100% certain. Donna was eventually exonerated when investigators substantiated her alibi. But she had spent a month in jail, and she later sued, eventually winning a US$100,000 civil judgement against Kretzu. In the past, mistaken witnesses simply went their own ways, although there are a few known instances in which they have made profound apologies to those whom they had falsely accused. Will we now see more cases in which mistaken witnesses end up paying financially for their mistakes?

Although much of the research has focused on wrongful convictions, there is another side to the criminal justice coin. Memory distortions can also contribute to failures to convict a guilty person, not because an innocent person is convicted in their place, but because accurate witness testimony can be undermined. If witnesses misremember some detail, or they are told that their stories conflict with other evidence, they might discount their testimony and be less persuasive than perhaps they should be, or the jury might consider their entire testimony to be unreliable.

Scientific research into memory has the potential to minimize these kinds of problem. Information from psychological scientists (and perhaps neuroscientists) could help to keep the people in power from making decisions on the basis of myths or misconceptions about memory. Scientific knowledge could be shared with relevant individuals in many ways: through workshops for mental health professionals, training for police, seminars for lawyers and judges, judicial instructions or expert testimony for jurors. In one example, Jacob Beard of West Virginia was wrongly convicted of murdering two women and spent many years in prison. He managed to win a second trial. Expert testimony on suggestion and false memory was presented in that second trial, and helped to secure his acquittal. Beard later filed a civil lawsuit, and eventually received a settlement of nearly US$2 million in his case against state and county police[26].

This list of potential venues for education about the nature of memory represents just one proposal for a possible programme for action. Some legislative remedies might also be called for, especially in the most serious cases that can result in a sentence of death. Recently, the Innocence Protection Act was introduced in the United States Congress. It has two useful elements: access to DNA testing for convicted people and improvement in the quality of lawyers who try death penalty cases. Better lawyers might be better acquainted with the problems of memory and how to educate judges and jurors about these problems. Congress will be considering this legislation again in 2003 (REF. 27).

The American Judicature Society proposed the creation of an 'innocence commission' that would study why the legal system has failed in known cases of wrongful conviction. After all, look what the National Transportation Safety Board does when a plane crashes. Few expenses are spared as every aspect of the crash is examined. Not long ago, I proposed an analogous 'National Memory Safety Board' that might concentrate specifically on memory problems that have led to injustice[28]. If the travesties of the past few decades were thoroughly examined side-by-side with scientific knowledge on memory, we would all benefit. It would be too late for the family of Steve Titus, who died of a heart attack at the age of 35 after being falsely convicted of rape. It would be too late for the many death row prisoners who have recently been exonerated by DNA evidence. It would be too late for the scores of innocent defendants who have had to face civil litigation over false claims of satanic ritual abuse and other dubious charges. But it might be in time to keep us from searching for that next white van that does not exist because someone inadvertently planted a false memory.

To reiterate the main points: memory is more prone to error than many people realize. Our memory system can be infused with compelling illusory memories of important events. These grand memory errors have contributed to injustices that could have been avoided or minimized. As a start, I suggest that we all remember an important truth about the mind — paraphrasing Galeano: memory is born anew every day.

*Elizabeth Loftus is at 2393 Social Ecology II, University of California, Irvine, California 92697-7085, USA.*
*e-mail: eloftus@uci.edu*

doi:10.1038/nrn1054

1. Duke, L. M., Seltzer, B., Seltzer, J. E. & Vasterling, J. J. Cognitive components of deficit awareness in Alzheimer's disease. *Neuropsychology* **16**, 359–369 (2002).
2. Galeano, E. H. translated by Belfrage, C. (with Schafer, M.) in *The Book of Embraces* 124–125 (Norton & Co., New York, 1991).
3. Connors, E., Lundregan, T., Miller, N. & McEwan, T. *Convicted by Juries, Exonerated by Science: Case Studies in the Use of DNA Evidence to Establish Innocence After Trial* (National Institute of Justice, Alexandria, Virginia, 1996).
4. Huff, C. R. What can we learn from other nations about the problem of wrongful conviction? *Judicature* **86**, 91–97 (2002).
5. Kennedy, H. Beltway sniper notches no. 8. Kills man gassing car in Va., dodges dragnet. *NY Daily News* [online], (cited 12 October 2002), http://www.nydailynews.com/news/crime_file/story/26305p-24892c.html (2002).
6. Schacter, D. L. *Searching for Memory* (Basic Books, New York, 1996).
7. Loftus, E. F. & Greene, E. Warning: even memory for faces may be contagious. *Law Hum. Behav.* **4**, 323–334 (1980).
8. Loftus, E. F. & Hoffman, H. G. Misinformation and memory: the creation of memory. *J. Exp. Psychol. Gen.* **118**, 100–104 (1989).
9. Heaps, C. M. & Nash, M. Comparing recollective experience in true and false autobiographical memories. *J. Exp. Psychol. Learn. Mem. Cogn.* **27**, 920–930 (2001).
10. Loftus, E. F. & Pickrell, J. E. The formation of false memories. *Psychiatr. Ann.* **25**, 720–725 (1995).
11. Loftus, E. F. Creating false memories. *Sci. Am.* **277**, 70–75 (1997).
12. Porter, S., Birt, A., Yuille, J. C. & Lehman, D. R. Negotiating false memories: interviewer and rememberer characteristics relate to memory distortion. *Psychol. Sci.* **11**, 507–510 (2000).
13. Braun, K. A., Ellis, R. E. & Loftus, E. F. Make my memory: how advertising can change our memories of the past. *Psychol. Mark.* **19**, 1–23 (2002).
14. Grinley, M. J. *Effects of Advertising on Semantic and Episodic Memory*. Thesis, Univ. Washington (2002).
15. Mazzoni, G. & Memon, A. Imagination can create false autobiographical memories. *Psychol. Sci.* (in the press).
16. Wade, K. A., Garry, M., Read, J. D. & Lindsay, S. A picture is worth a thousand lies. *Psychon. Bull. Rev.* **9**, 597–603 (2002).
17. Porter, S., Yuille, J. C. & Lehman, D. R. The nature of real, implanted, and fabricated memories for emotional childhood events. *Law Hum. Behav.* **23**, 517–537 (1999).
18. Fabiani, M., Stadler, M. A. & Wessels, P. M. True but not false memories produce a sensory signature in human lateralized brain potentials. *J. Cogn. Neurosci.* **12**, 941–949 (2000).
19. Gonsalves, B. & Paller, K. A. Neural events that underlie remembering something that never happened. *Nature Neurosci.* **3**, 1316–1320 (2000).
20. Bloomberg, D. Bennett Braun case update: trials set for May, July. *Skeptical Inquirer* **23**, 12–13 (1999).
21. Pendergrast, M. *Victims of Memory* 2nd edn (Upper Access, Hinesburg, Vermont, 1996).
22. Huff, C. R., Rattner, A. & Sagarin, E. *Convicted but Innocent: Wrongful Conviction and Public Policy* (Sage Publications, Thousand Oaks, California, 1996).
23. Radelet, M. L. Wrongful convictions of the innocent. *Judicature* **86**, 67–68 (2002).
24. Loftus, E. F. *Eyewitness Testimony* (Harvard Univ. Press, Cambridge, Massachusetts, 1996).
25. Pemberton, P. S. Woman falsely accused wins $100,000 judgment. *San Luis Obispo Tribune* B1 (7 December, 2002).
26. Richards, Z. Rainbow case is settled. *Charleston Daily Mail* A1 (4 January 2003).
27. Loge, P. The Innocence Protection Act. *Judicature* **86**, 121 (2002).
28. Loftus, E. F. Memory faults and fixes. *Issues Sci. Technol.* **18**, 41–50 (2002).

Acknowledgement

I thank the neurophysiologist W. Calvin, for provocative discussions about these issues and general guidance.

## Online links

**FURTHER INFORMATION**

**Elizabeth Loftus's homepage:** http://www.seweb.uci.edu/faculty/loftus/

**Encyclopedia of Life Sciences:** http:www.els.net/
Alzheimer disease | learning and memory

**Access to this interactive links box is free online.**

*Psychonomic Bulletin & Review*
*1996, 3 (2), 208–214*

# Imagination inflation: Imagining a childhood event inflates confidence that it occurred

MARYANNE GARRY, CHARLES G. MANNING, and ELIZABETH F. LOFTUS
*University of Washington, Seattle, Washington*

and

STEVEN J. SHERMAN
*Indiana University, Bloomington, Indiana*

Counterfactual imaginings are known to have far-reaching implications. In the present experiment, we ask if imagining events from one's past can affect memory for childhood events. We draw on the social psychology literature showing that imagining a future event increases the subjective likelihood that the event will occur. The concepts of cognitive availability and the source-monitoring framework provide reasons to expect that imagination may inflate confidence that a childhood event occurred. However, people routinely produce myriad counterfactual imaginings (i.e., daydreams and fantasies) but usually do not confuse them with past experiences. To determine the effects of imagining a childhood event, we pretested subjects on how confident they were that a number of childhood events had happened, asked them to imagine some of those events, and then gathered new confidence measures. For each of the target items, imagination inflated confidence that the event had occurred in childhood. We discuss implications for situations in which imagination is used as an aid in searching for presumably lost memories.

People often imagine the past as being different from what it really was. Many investigators have argued that people spontaneously imagine alternatives to real events more in some settings than in others. These mental musings, called counterfactual thinking, have far-reaching implications. They influence, for example, judgments of regret, perceived happiness, and causality (Kahneman & Tversky, 1982). For example, in one study subjects assigned more blame to an individual for a bad outcome when counterfactual thoughts—thoughts of what might have been done instead—would have undone the bad outcome (Wells & Gavanski, 1989). The question we ask here is whether these counterfactual imaginings also affect a person's *memory* for the past. For example, suppose you imagined stumbling on something in your house, and before you realize what is happening you've shattered a window with your hand. Would you later be more likely to claim that this unfortunate event had happened to you?

We already know, from the social psychology literature, that imagining a future event increases the subjective likelihood that the event will occur (Carroll, 1978; Gregory, Cialdini, & Carpenter, 1982; Sherman, Cialdini,

Schwartzman, & Reynolds, 1985). For example, consider Carroll's (1978) study on the power of imagination. Before the 1976 presidential election, subjects were asked to imagine either Carter or Ford winning the election. They were then asked to predict the outcome of the election using a scale from 0 (*sure Carter will win*) to 100 (*sure Ford will win*). Subjects who imagined that Carter had won were more certain that he eventually would; similarly, those who imagined Ford had won were more certain that he would later win.

But imagination does not always have these consequences. One determining variable is the ease with which the event can be imagined. Sherman et al. (1985) asked subjects to imagine getting a disease whose symptoms were either easy or difficult to imagine. The ease with which subjects stated they could imagine the symptoms was tied to likelihood estimates: Those who judged the symptoms as easy to imagine also tended to estimate the disease as more likely to occur; those who thought the symptoms were difficult to imagine thought it less likely to occur. Sherman et al. suggested that easily imagined future events somehow become more "available" in the sense pioneered by Tversky and Kahneman's (1973) research on judgment and decision making. Tversky and Kahneman proposed that when people are given uncertain conditions and asked to make outcome likelihood judgments, the more easily pictured outcomes are more "cognitively available," and seen as more likely. Put in different terms, the act of imagination may provide scaffolding, so that when subjects are tested, it is easier for them to build on this memorial framework. Perhaps if subjects imagined stumbling and shattering a window as a child, the

During much of this research, M.G. was supported by a postdoctoral training grant from the National Institutes of Alcohol Abuse & Alcoholism. Thanks to Roddy Roediger, Steve Lindsay, Jonathan Schooler, Gary Wells, Kathleen McDermott, Chris Schacherer, Sue DuBreuil, and two anonymous reviewers for their helpful comments and suggestions. Correspondence should be addressed to M. Garry, Victoria University of Wellington, Department of Psychology, Wellington, New Zealand (e-mail: maryanne.garry@vuw.ac.nz) or to C. G. Manning (cmg@u.washington.edu) or E. F. Loftus, Department of Psychology, University of Washington, Seattle, WA 98195-1525.

Copyright 1996 Psychonomic Society, Inc.

event might also become more available, and subjects would become more confident that it had occurred.

Imagining a childhood event might also change memory for it by inducing source attribution errors (Johnson, 1988; Johnson, Hashtroudi, & Lindsay, 1993). Simply put, source attribution errors occur when information is remembered, but its source is remembered incorrectly or not remembered at all. Koehler (1991) argued explicitly that source attribution errors were partly responsible for the increased confidence in the probability of imagined future events. He noted that the mere act of imagining a scenario forces people to create an alternate reality for a short time and to fit the imagined facts into their existing knowledge of the world. The imagination procedure generates event information that subjects may remember, even if they don't remember the source of the information. Event information becomes more available, and therefore more plausible; subjects become more confident that the event will occur.

A similar line of argument leads us to predict that subjects will also become more confident that imagined *past* events had occurred. The rationale for this prediction is straightforward. Imagination will produce event information, and the event information may become more accessible, but its source may be forgotten or misremembered. When subjects are later tested, the availability might make the past event seem more plausible, and they might become more confident that the past event had actually occurred.

There is even reason to believe that source confusion might be especially acute for the very distant events of childhood. For example, Johnson, Foley, Suengas, and Raye (1988) asked subjects to think of actual or imagined personal events from either the recent past or childhood and then to rate these memories on 39 different characteristics. There were far fewer significant differences (3/39) between actual and imagined childhood events than for actual and imagined recent events (20/39). Put another way, both experienced and imagined childhood memories contain far fewer qualitative differences that can be used to distinguish between what actually happened from what was only imagined. Perhaps the act of imagining a childhood event generates only diffuse information about it, but if even genuine childhood memories contain similar information, subjects might not have a reliable way of distinguishing between childhood fact and fantasy. In short, the act of imagining may generate information whose source later becomes confused, resulting in a stronger belief that the imagined childhood event actually occurred. Thus, source-monitoring research suggests why imagining a childhood accident window-shattering accident might promote greater confidence later that it actually occurred.

On the other hand, there are reasons to believe that imagining a childhood event will not increase confidence that it did occur. After all, people often imagine winning a multimillion dollar lottery jackpot, but they don't fool themselves into thinking that they have actually done so.

Most people daydream and imagine a variety of scenarios and outcomes yet don't routinely get confused between what really happened and what did not. Another reason to believe that imagination may have no effect on childhood memories is that subjects could make the conscious connection between imagining an event and being asked to make a judgment about it. Subjects who remember having imagined the event might become confident that their feeling of familiarity was attributable only to the recent act of imagining (Jacoby, Woloshyn, & Kelley, 1989). In fact, these subjects might become more certain that the event never occurred than if they had been asked the very same question prior to the act of imagining.

So, a goal of the present research was to determine whether imagination leads to increased confidence that the event occurred. Suppose imagining a childhood event does promote this increased confidence (which we term *imagination inflation*); why should we care? One reason is the puzzle of how people can come to remember their past in ways that diverge sharply from reality. For instance, some people remember their past in more socially desirable ways (Abelson, Loftus, & Greenwald, 1992), and people are often very confident about these memories. But the possibility of imagination inflation is not just theoretically interesting, for there are real-world instances in which imagination is deliberately used as a memory-recall tool. Law enforcement personnel sometimes repeatedly direct a suspect to imagine having participated in a criminal act as a means of obtaining a confession (Ofshe, 1992). In addition, some mental health professionals encourage a client to imagine an abusive childhood event as a way of recovering hidden memories. Maltz's (1991) specific technique is just one of many published examples: "Spend time imagining that you were sexually abused, without worrying about accuracy, proving anything, or having your ideas make sense. As you give rein to your imagination, let your intuitions guide your thoughts" (p. 50). If counterfactual imaginings can alter memory, we may have some evidence about a partial cause of these phenomena, another piece of the puzzle.

To explore whether imagination inflation occurs, we developed a three-stage procedure. First we asked subjects about a long list of possible childhood events, and they indicated whether or not these events had happened to them as children. Two weeks later, we asked them to imagine a few of these events. Finally, we gave the long list of possible childhood events to our subjects again, and they indicated whether or not the events had happened to them. To be specific, consider a group of subjects who all said that it was unlikely that they had ever broken a window with their hand. Later they imagine a scenario in which this happened to them, complete with how they tripped and fell, who else was there, and how they felt. Would these subjects later think it was more likely that they had broken a window with their hand as a child? Such a result would constitute empirical support for the hypothesis of imagination inflation.

## METHOD

### Subjects

Forty-six subjects enrolled in introductory psychology courses at the University of Washington participated for course credit during the pretest. Of these, 38 completed all phases of the study.

### Materials

A 40-item Life Events Inventory (LEI) was administered during the first session. It asked subjects to consider how certain they were that each event (or a very similar one) had or had not happened to them before the age of 10 (e.g., "Broke a window with your hand"; 1 = *definitely did not happen* and 8 = *definitely did happen*). They responded by circling the appropriate point on an 8-point scale. Three judges used pretest data to choose target items. Although the judges' selection criteria were informal, they were systematic in that they chose event items whose means indicated that they probably did not occur. The emergency room item did not fit the criteria, but it was selected as a target because it has been used in another study (Hyman, Husband, & Billings, 1995). We report pretest descriptive statistics for these items in Table 1.

### Procedure

Subjects participated in two sessions, in groups ranging from 1 to 10 each. In Session 1, they were told that the experimenters were interested in how vividly and completely people could imagine events, and that they would complete the LEI to gather baseline data on how frequently these events actually occurred. Subjects then completed the LEI at their own pace.

In Session 2, 2 weeks later, the eight items were split into two, four-item subsets. Subsets were randomly assigned to subjects, who were then asked to imagine the four critical items in that subset, while the other subset served as a control. For instance, Subject 1 imagined the four events in Subset A, and did not imagine the four events in Subset B; Subject 2 imagined the four events in Subset B but did not imagine the four events in Subset A. In both cases, items were imagined in specific steps.

Subjects were told that they would imagine some events that were described in packets that were on their desks. They were told that each page of the packet had a description of the events they were to imagine, as well as some questions about what they imagined. Subjects were instructed not to read ahead. Then the experimenter said,

> You are going to imagine several events. Each time, you will read a brief description of an event. You will be given a few moments to picture the event, and then you will answer some questions about the image. You will be given more details to imagine, and then take a few moments to picture them. Then you will answer some questions about your image. Try to picture each event as clearly and completely as you can. It may help you to form a more complete mental picture if you include familiar places, people, and things in the imagined event. Also, close your eyes if that helps your imagination.

Subjects were asked if they had any questions about the instructions. When they were ready to begin, they turned over their packet and the experimenter began with the first event. First, the experimenter read a sentence or two to create the event setting: "Imagine that it's after school and you are playing in the house. You hear a strange noise outside, so you run to the window to see what made the noise. As you are running, your feet catch on something and you trip and fall." Subjects were given between 20 and 60 sec to imagine the event that each experimenter read. If the experimenter observed that all subjects in a given session had completed their imagination task at the end of 20 sec, the experimenter moved to the next phase. If, however, some subjects were still engaged in the imagination task, the experimenter waited until a maximum of 60 sec had passed. Subjects then wrote answers to short questions in their booklets. These questions were included to encourage compliance ("What did you trip on?"). The experimenter then read the action part of the event: "As you're falling you reach out to catch yourself and your hand goes through the window. As the window breaks you get cut and there's some blood." Subjects again completed short questions ("What are you likely to do next?"). This basic procedure was repeated for all four target items, and lasted about 2 min per item. Then the experimenter pretended to be slightly panicked, told the subjects that their original LEIs had been misplaced, and asked them to complete another copy. (No specific instruction was given as to whether subjects should fill it out as they had before.) In fact, this administration of the LEI was the posttest. Finally, subjects were debriefed.

## RESULTS

The primary question in this study is whether imagining a childhood event inflates confidence that it occurred. Before addressing this question, we need to expand on our hypothesis by distinguishing between childhood events judged unlikely to have happened versus childhood events judged likely to have happened. Our interest was in events that were unlikely to have happened, because in this condition subjects must be using their imaginations to create an alternate reality. On the other hand, if subjects are asked to imagine an event that they previously said *had* happened to them, they might simply be recalling it—not imagining it. Recent research suggests that when subjects imagine something that actually did happen to them, the imagining task actually becomes a remembering task (Sarbin, 1995). Thus, we focused first and foremost on what happens when people imagine an event, not when they recall one.

We now turn our attention to events that were judged as unlikely to have happened, confining our analysis to the initial "did not happen" responses. These pretest responses constitute 76% of the total data; put another way, each subject reported that roughly 6/8 critical items probably did not happen (responses of 1–4). Of course, the eight critical items differed in how likely they were to produce a 1–4 response. A high of 92% of subjects responded in the 1–4 range for "Got stuck in a tree and had to have someone help you down," while 45% produced a

**Table 1**
**Pretest Answers for Critical Events**

| Event | *M* | *SD* | Mdn | Range | Percentage 1–4* |
|---|---|---|---|---|---|
| Got in trouble for calling 911. | 1.97 | 2.27 | 1.0 | 7 | 87 |
| Had to go to the emergency room late at night. | 4.58 | 2.95 | 5.0 | 7 | 45 |
| Found a $10 bill in a parking lot. | 2.47 | 2.20 | 1.0 | 7 | 79 |
| Won a stuffed animal at a carnival game. | 3.84 | 2.49 | 3.5 | 7 | 55 |
| Gave someone a haircut. | 2.66 | 2.22 | 1.0 | 7 | 76 |
| Had a lifeguard pull you out of the water. | 2.18 | 2.04 | 1.0 | 7 | 84 |
| Got stuck in a tree and had to have someone help you down. | 1.87 | 1.93 | 1.0 | 7 | 92 |
| Broke a window with your hand. | 2.13 | 2.03 | 1.0 | 7 | 89 |
| Overall | 2.71 | 2.44 | 1.0 | 7 | 76 |

*1–4, responses on the eight-item scale indicating that a given event probably did not happen.

1–4 response to "Had to go to the emergency room late at night." Across all items, the mean number of subjects who initially said an event did not happen was 29 (74%), and the median was 31 (80%).

To determine if imagination caused these subjects to become more confident that an event had occurred, we examined whether subjects moved up or down the scale. We calculated, for each critical item, the percentage of subjects whose responses increased, decreased, or did not change from the first to the second administration of the LEI test. We collapsed these change scores across all subjects and items, and display them separately according to whether or not the critical event was imagined. These data, for the 112 imagined items and 119 not-imagined items, are shown in Figure 1. Of particular interest are the positive change scores, which indicate that subjects move in the direction of becoming more confident that the event had happened to them.

As Figure 1 shows, the majority of scores did not change (57% in the imagined condition and 65% in the not-imagined condition). Additionally, when subjects did change their ratings, positive change scores were more likely to occur than were negative ones. But for the purposes of the present experiment, the most interesting result is found by comparing the bars on the extreme right of the figure: There was more positive change in the imagined items (34%) than for the not-imagined items (25%). In other words, subjects who initially reported that an event did not happen, but then imagined that it had, were more likely to increase their confidence that it had occurred when asked about it later than were subjects who did not imagine the event. However, because these data were obtained by combining all 1–4 responses from all subjects, individual subjects contributed different numbers of events, so overall statistical comparisons cannot be made at this level. We offer these results only for illustrative purposes, and now direct our attention to each event item.

Would this intriguing pattern repeat for the event items individually? For each of the eight critical items we calculated the percentage of positive change. Figure 2 shows these data displayed according to whether or not the critical event was imagined. For each item, the right-hand bar reveals the percentage of subjects with increased confidence after imagining the event. A paired $t$ test treating items as cases showed that the mean difference was 8.2% greater for imagined items than for not-imagined items; this difference was significant [$t(7) = 5.48$, $p = .0009$, $SE = 1.49$, two-tailed, adjusted power at $\alpha = .05$ was .97]. The effect size, calculated as [mean difference/ $SD_{\text{not imagined}}$], was a medium-to-large 0.72. So, for example, in the "Broke window" event, 24% of subjects who imagined the event increased their subjective confidence that it had happened to them, while the corresponding figure for subjects who had not imagined it was only 12%.

Why does imagining an event lead to more positive changes than not imagining the event? One possible explanation is that the act of imagination simply makes the event seem more familiar at the time the posttest LEI is completed. Another possibility, however, is that the act of imagination reminds some subjects of a true experience from their past. If this "reminder" hypothesis is correct, we might expect to see at least some instances in which subjects initially give a low score indicating that the event probably hadn't happened to them, but the second time jump to a score of 8, indicating that the event definitely did happen to them. On the other hand, if some subjects do make a "big jump" (i.e., they move from an initial score of 1–4 to a final score of 8), it may not be because they remember a genuine experience at all: It may be that imagining the event makes it seem very real, and subjects become quite sure that it happened.

**Figure 1. Percentage of events staying the same, increasing, and decreasing for subjects who initially responded 1–4 (responses indicating that the critical items probably did not happen).**





**Figure 2. Percentage of subjects who increased on each item (for subjects who initially responded 1–4; that is, responses indicating that the critical items probably did not happen).**

These are highly speculative inferences, and they rest on the assumption that being reminded of a genuine event causes one to be certain. However, to explore the possibilities, we calculated the number of "big jumps," defined as an increase to a score of 8 on the posttest. Such jumps were relatively rare, occurring in only 6 of the 112 imagined items, and in 2 of the 119 not-imagined items. These "big jumpers" were found in the following items from Table 1 (cases are in parentheses): "Found $10" (2 imagined); "Lifeguard" (2 imagined); "Emergency room" (1 not imagined); "Stuffed animal" (1 imagined); and "Haircut" (1 imagined, 1 not imagined). When these cases were removed from the analysis and change scores were collapsed across subjects and items, there was still an overall tendency toward imagination inflation. That is, there were still more positive change scores for imagined than not-imagined subjects (29.9% vs. 23.4%), and all but the "Lifeguard" item still showed an imagination effect. Over the eight items, the mean difference was 6.55% greater change in imagined items than not-imagined items. A paired $t$ test treating items as cases showed that this mean difference was significant [$t(7) = 3.02$, $p = .01$, $SE = 2.17$, two-tailed; adjusted power at $\alpha = .05$ was .53]. Effect size was a medium .55.

What kinds of change scores were produced by the subjects who originally did not think an event happened to them, and did not imagine it? Let us return to Figure 2 and examine what happened to these subjects. The left-hand bar for each item shows the percentage of subjects with positive change scores after merely being asked about the event twice, on the pretest and posttest. A paired $t$ test treating items as cases showed that when subjects did change their responses between the first and second LEI tests, the percentage of subjects with positive change scores was significantly greater than the percentage with negative change scores [mean difference = 13.9%, $t(7) = 2.67$, $p = .032$, $SE = 5.20$, two-tailed; adjusted power at $\alpha = .05$ was .41]. For instance, 43% of subjects who took only the pretest and posttest became more confident that they had found a $10 bill, and 7% of them became less confident. Thus, even when subjects who did not imagine an event changed their answers, they tended to report greater rather than less confidence that it had occurred. Did these subjects develop false memories because event items were repeated? Of course, there are other explanations for this result. Briefly, it could be regression to the mean. It could be that the second test promotes more accurate recall, or it could be that the second test causes the item to become more plausible, and that increased confidence does not point to completely developed false memories so much as to increased plausibility that they might have occurred. These issues are discussed in more depth later.

We have shown that when subjects imagine an event they do not think happened, they tend to become more confident that it did happen. But what about subjects who initially think an event probably did happen? Would imagination make them even more confident that an event had occurred? Although not the main question in our research, it is worth addressing. To examine the effect of imagination on events thought likely to have happened, we collapsed change scores for them across all subjects and items. We included only items initially judged as 5–7, removing the data for items initially reported as an 8 because these ratings could not increase.The most common outcome among these "probably did happen" subjects in the imagined condition was to stay the same, and the most common change in the not-imagined condition was to become less confident. Additionally, positive change occurred more often for not-imagined items than

for imagined items (36%, or 8/22, vs. 19%, or 4/21). However, because there were so few items, statistical analysis is inappropriate, and we avoid further interpretation.

## DISCUSSION

The major result from this experiment is that imagining a self-reported counterfactual event increased confidence that the event did happen. This result complements earlier findings on the power of imagination to increase people's subjective sense of the probability that a future event will occur (see, e.g., Sherman et al., 1985). Why should imagination influence reports of both future and past events in a similar way? On the face of it, future events and past events do not seem to have much in common. After all, future events are obviously not subject to memory *re*construction (as judged against objective, historical truth), but past events are. For instance, witnessed events are often reported inaccurately (Belli, 1989); more to the point, personal experiences are also subject to various memory distortions (Loftus, 1993). But Johnson and Sherman (1990) argued for less simplistic categories than mere past, present, and future. In their view, both past and future are constructions of the present. The present constantly flows into the past, so the past is always changing, and the future is always being constrained by this changing past. J. J. Gibson (1977/1986) made a similar point when he challenged psychologists to find the place where the present stops and the past takes over. That confidence-promoting effects are found for both future and past events suggests that the timeline is not necessarily so neatly carved up into past, present, and future.

Imagination did not have a systematic effect on events that were initially judged to have happened. Of course, the mental activity involved in imagining an actual past event is probably very different from the mental activity involved when one imagines something that did not happen. In other words, an instruction to imagine an event that did not happen may lead people to create an alternate reality, but an instruction to imagine an event that did happen may lead them simply to recall the past event. Thus the mental processes involved when people imagine the real versus the unreal past may be quite different.

In addition to the finding that the act of imagination promotes greater likelihood estimates, there was also a slight tendency for the repeating of an item to produce higher scores. For example, being asked if you had ever broken a window with your hand, then being asked again 2 weeks later, may lead to a small increase in likelihood scores—even without any intervening imagination. Of course, this increase might be nothing more than regression to the mean, but in other domains an analogous "repetition" effect has been found. For example, Arkes and colleagues (Arkes, Boehm, & Xu, 1991; Arkes, Hackett, & Boehm, 1989) have shown that validity ratings of true and false statements of fact that have been repeated are greater than validity ratings of unrepeated statements. Even with repeated tests, the largest gains in validity occur between the first and second tests.

Why should there be any gain at all in validity? Subjects do not have access to new, supporting information; they simply read the propositions again. One explanation that Arkes and his colleagues have offered for the repetition effect is that subjects tend to rely on familiarity as one measure of validity, even when the facts are constant. In other words, truth is inferred on the basis of what might be an easier cognitive route: It may be easier to judge the familiarity of content than it is to judge the content itself. In the context of imagination inflation, then, when subjects read an event in the second LEI, they may take the familiarity of the item to mean that it happened. Of course, such a mechanism is a classic case of source confusion, and it is worth repeating (if only to increase the validity of our argument) that source confusion is one of the explanations for the effects seen in the imagine-the-future literature (Koehler, 1991). This entire line of reasoning is similar to that in arguments made about the venerable "sleeper effect" (Pratkanis, Greenwald, Leippe, & Baumgardner, 1988), in which content and source eventually become dissociated, and a proposition that would immediately have been judged invalid (because its source was suspect) is now judged as true.

In short, if the work of Arkes et al. (1989, 1991) shows that asking twice about a purported fact results in higher validity ratings, it seems plausible that asking twice about a purported event may result in higher likelihood estimates. Perhaps pondering whether or not an event occurred involves a subset of the same strategies that are involved in imagination. On the other hand, we should exercise caution in going too far afield with a discussion of repetition effects; the effects observed in the present experiment might actually be explained by regression to the mean, and research is needed to specifically investigate the possibility of a repetition effect for past events.

Of course, there are other explanations for the present results. One account for at least some of these data is what we will call the *reinterpretation hypothesis*. It supposes that a given item is interpreted more broadly on the LEI posttest than it is on the pretest. In other words, the item expands to accommodate the event. The reinterpretation mechanism is entirely plausible, and it is not clear that it would generally work to produce imagination inflation. Reinterpretation could easily lead to imagination deflation. To see why, consider that the imagination procedure leads subjects to imagine a specific, complex scenario in which they are the protagonists. Thus, the "imagined" subjects should have more constrained item interpretations, and the "not-imagined" subjects should have a greater tendency to reinterpret items more broadly, permitting more instances of events that fit the item; such a pattern would work against the imagination inflation effect. In short, a reinterpretation mechanism might inflate confidence in some item and event combinations, and deflate confidence in others.

Another explanation for the increased confidence we observed after imagination involves the concept of *hypermnesia*. Hypermnesia is the tendency toward increased recall over successive tests. In a typical hypermnesia experiment, subjects study word lists and then take several successive tests. Recall performance often improves steadily over repeated testing (e.g., Roediger & Payne, 1985). Under the hypermnesia explanation, the design of the present experiment merely promotes the increasingly accurate recall of genuinely experienced events. For instance, the first LEI test is the first occasion to think about an event, and it thus produces the least accurate memory. The second test produces more accurate memory than the first, and the act of imagination is yet another chance to think about the target event. Subjects who imagine an event are given an additional opportunity to think about it, which explains imagination inflation. The newly remembered event could conceivably be one that fits the LEI item well, or one that fits somewhat.

We cannot rule out the hypermnesia possibility given the data we collected here. Perhaps imagination inflation is sometimes due to new genuine memories, and sometime to enhanced confidence about false memories. This is a question worthy of further research with more probative methods. Before leaving the topic of hypermnesia, however, we note two points about how the present study differs considerably from the typical hypermnesia study. The first difference is on what is being measured. The relatively neat content of hypermnesiac memories (see, e.g., Roediger & Payne, 1985) may not generalize to the messy complexity of real-life memories (see, e.g., Neisser, 1986). The second difference is in how these memories are measured. Hypermnesia is found with recall tests, but not with recognition tests (Payne & Roediger, 1987). However, we used a test that cannot be categorized neatly as either recall or recognition. Subjects were asked to indicate which of 40 possible childhood experiences had occurred. The items did not describe very simple experiences. Instead, they described events of some complexity, in that multiple idea units were in all of the critical items (except for the "Haircut event"; see Table 1). For example, subjects were not asked if they had ever found any amount of money anywhere at any time in their lives; they were asked if they had ever found a $10 bill in a parking lot before they were 10 years old.

In the present research, we do not know if imagining the event itself might cause imagination inflation, or if one must be the agent in the event. Source confusions might be increased (and imagination inflation be most pronounced) when subjects imagine themselves, say, finding a $10 bill in a parking lot, but not if they imagine Bill Clinton finding the same $10 bill. Imagining oneself should create more kinds of weak information (e.g., weak kinesthetic and haptic information) that could later increase familiarity. We also do not know which subjects in which events—if any—recognized that an LEI item asked about an event that had been imagined several minutes earlier. Future research is needed to ascertain whether subjects are drawing this link, and not showing imagination inflation when they do. Even if subjects do make a conscious link between the LEI item and the imagination exercise, we might still see an imagination effect. For instance, these subjects might not think

that *all* of the familiarity associated with the asked-about event was due to the earlier act of imagination, or they might think that the event is familiar for reasons *in addition* to imagining it. More to the point, if some subjects were indeed meeting the demand of the experiment by deliberately inflating their scores, we should have seen increased confidence among those subjects who originally were confident that a given event had happened. Instead, we saw no particular pattern in that category.

These results suggest appropriate restraint in situations in which imagination is used as an aid in searching for or shoring up presumably lost memories. When the police repeatedly ask a suspect to imagine his possible role in a murder he does not remember, or when a mental health professional repeatedly encourages a client to imagine an abusive childhood event, these imagination activities may unknowingly promote a greater belief that particular episodes occurred. The search for fact may create a fiction. Such is the power of imagination, long ago recognized by Keats (1817, cited in Bartlett, 1992, p. 417), who said, "The Imagination may be compared to Adam's dream—he awoke and found it truth."

## REFERENCES

ABELSON, R. P., LOFTUS, E. F., & GREENWALD, A. G. (1992). Attempts to improve the accuracy of self-reports of voting. In J. M. Tanur (Ed.), *Questions about survey questions: Meaning, memory, expression, and social interactions in surveys* (pp. 138-153). New York: Russell Sage.

ARKES, H. R., BOEHM, L. E., & XU, G. (1991). Determinants of judged validity. *Journal of Experimental Social Psychology*, **27**, 576-605.

ARKES, H. R., HACKETT, C., & BOEHM, L. (1989). The generality of the relation between familiarity and judged validity. *Journal of Behavioral Decision Making*, **2**, 81-94.

BARTLETT, J. (1992). *Familiar quotations: A collection of passages, phrases, and proverbs traced to their sources in ancient and modern literature* (16th ed.). Boston: Little, Brown.

BELLI, R. F. (1989). Influences of misleading postevent information: Misinformation interference and acceptance. *Journal of Experimental Psychology: General*, **118**, 72-85.

CARROLL, J. S. (1978). The effect of imagining an event on expecations for the event: An interpretation in terms of the availability heuristic. *Journal of Personality & Social Psychology*, **36**, 1501-1511.

GIBSON, J. J. (1977/1986). *The ecological approach to perception*. Hillsdale, NJ: Erlbaum.

GREGORY, W. L., CIALDINI, R. B., & CARPENTER, K. M. (1982). Self-relevant scenarios as mediators of likelihood estimates and compliance: Does imagining make it so? *Journal of Personality & Social Psychology*, **43**, 88-99.

HYMAN, I. E., HUSBAND, T. H., & BILLINGS, F. J. (1995). False memories of childhood experiences. *Applied Cognitive Psychology*, **9**, 181-197.

JACOBY, L. L., WOLOSHYN, V., & KELLEY, C. (1989). Becoming famous without being recognized: Unconscious influences of memory produced by dividing attention. *Journal of Experimental Psychology: General*, **118**, 115-125.

JOHNSON, M. K. (1988). Reality monitoring: An experimental phenomenological approach. *Journal of Experimental Psychology: General*, **117**, 390-394.

JOHNSON, M. K., FOLEY, M., SUENGAS, A. G., & RAYE, C. L. (1988). Phenomenal characteristics of memories for perceived and imagined autobiographical events. *Journal of Experimental Psychology: General*, **117**, 371-376.

JOHNSON, M. K., HASHTROUDI, S., & LINDSAY, D. S. (1993). Source monitoring. *Psychological Bulletin*, **114**, 3-28.

JOHNSON, M. K., & SHERMAN, S. J. (1990). Constructing and reconstructing the past and the future in the present. In E. T. Higgins & R. M. Sorrentino (Eds.), *Handbook of motivation and social cognition: Foundations of social behavior* (pp. 482-526). New York: Guilford Press.

KAHNEMAN, D., & TVERSKY, A. (1982). The simulation heuristic. In D. Kahneman, P. Slovik, & A. Tversky (Eds.), *Judgement under uncertainty: Heuristics and biases* (pp. 201-208). New York: Cambridge University Press.

KOEHLER, D. J. (1991). Explanation, imagination, and confidence in judgement. *Psychological Bulletin*, **110**, 499-519.

LOFTUS, E. F. (1993). The reality of repressed memories. *American Psychologist*, **48**, 518-537.

MALTZ, W. (1991). *The sexual abuse healing journey*. New York: Harper/Collins.

NEISSER, U. (1986). Nested structure in autobiographical memory. In D. C. Rubin (Ed.), *Autobiographical memory* (pp. 71-81). New York: Cambridge University Press.

OFSHE, R. J. (1992). Inadvertent hypnosis during interrogation: False confession due to dissociative state: Mis-identified multiple personality and the satanic cult hypothesis. *International Journal of Clinical & Experimental Hypnosis*, **40**, 125-156.

PAYNE, D. G., & ROEDIGER, H. L., III (1987). Hypermnesia occurs in recall but not in recognition. *American Journal of Psychology*, **100**, 145-165.

PRATKANIS, A. R., GREENWALD, A. G., LEIPPE, M. R., & BAUMGARDNER, M. H. (1988). In search of reliable persuasion effects: III. The sleeper effect is dead: Long live the sleeper effect. *Journal of Personality & Social Psychology*, **54**, 203-218.

ROEDIGER, H. L., III, & PAYNE, D. G. (1985). Recall criterion does not affect recall level or hypermnesia: A puzzle for generate/recognize theories. *Memory & Cognition*, **13**, 1-7.

SARBIN, T. R. (1995). On the belief that one body may be host to two or more personalities. *International Journal of Clinical & Experimental Hypnosis*, **43**, 163-183.

SHERMAN, S. J., CIALDINI, R. B., SCHWARTZMAN, D. F., & REYNOLDS, K. D. (1985). Imagining can heighten or lower the perceived likelihood of contracting a disease: The mediating effect of ease of imagery. *Personality & Social Psychology Bulletin*, **11**, 118-127.

TVERSKY, A., & KAHNEMAN, D. (1973). Availability: A heuristic for judging frequency and probability. *Cognitive Psychology*, **5**, 207-232.

WELLS, G. L., & GAVANSKI, I. (1989). Mental simulation of causality. *Journal of Personality & Social Psychology*, **56**, 161-169.

(Manuscript received April 7, 1995;
revision accepted for publication November 8, 1995.)

Annu. Rev. Clin. Psychol. 2006. 2:469–98
doi: 10.1146/annurev.clinpsy.2.022305.095315
Copyright © 2006 by Annual Reviews. All rights reserved
First published online as a Review in Advance on January 16, 2006

# RECOVERED MEMORIES

Elizabeth F. Loftus
*Department of Psychology and Social Behavior, University of California, Irvine, California 92697-7085; email: eloftus@uci.edu*

Deborah Davis
*Department of Psychology, University of Nevada, Reno, Nevada 89557; email: debdavis@unr.nevada.edu*

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

**Key Words** repression, influence, false memory, therapy, childhood sexual abuse

■ **Abstract** The issues surrounding repressed, recovered, or false memories have sparked one of the greatest controversies in the mental health profession in the twentieth century. We review evidence concerning the existence of the repression and recovery of autobiographical memories of traumatic events and research on the development of false autobiographical memories, how specific therapeutic procedures can lead to false memories, and individual vulnerability to resisting false memories. These findings have implications for therapeutic practice, for forensic practice, for research and training in psychology, and for public policy.

CONTENTS

INTRODUCTION .......... 470
EVIDENCE FOR REPRESSION AND RECOVERY OF MEMORIES OF TRAUMA .......... 471
Retrospective Studies .......... 471
Prospective Studies .......... 473
Case Histories .......... 473
EVIDENCE FOR THE EXISTENCE OF FALSE MEMORIES OF ABUSE .......... 476
False Memories of Real-Life Trauma .......... 476
Experiences of the "Retractors" .......... 477
Laboratory Research on the Malleability of Autobiographical Memory .......... 478
Summary .......... 480
THERAPEUTIC PROCESS AND FALSE MEMORIES OF ABUSE .......... 480
A Priori Assumptions Regarding Abuse .......... 480
Confirmation Biases and the Dangers of Specific Hypothesis Testing .......... 481
Plausibility-Enhancing "Evidence" .......... 482
Adopting and Confirming the Belief in Abuse .......... 483
THERAPY AND SOCIAL INFLUENCE .......... 489
Individual Vulnerability to False Memories .......... 489

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 116 of 245

Ability to Resist . . . . . . . . . . 490
Motivation to Resist . . . . . . . . . . 492
RECOVERED MEMORIES AND PUBLIC POLICY . . . . . . . . . . 492

## INTRODUCTION

On November 28, 1989, George Franklin was arrested for the murder of his daughter's childhood playmate—a murder that had allegedly occurred almost 20 years earlier (see MacLean 1993). The evidence against him? Nothing but the recently "recovered" memory of his now 29-year-old daughter, who claimed to have repressed her memory of having witnessed the murder two decades ago. The Franklin case was far from unique. Parents were being accused and convicted of other terrible crimes, primarily childhood sexual abuse, sometimes involving years of horrific abuse that was allegedly repressed in memory. Typically, these accusations arose on the basis of memories that adult children had "recovered" during psychotherapy. Some mental health professionals were even promoting the notion that numerous victims had experienced horrific satanic ritual abuse about which they were harboring repressed memories (Rogers 1992, Wright 1994).

But scholarly analyses (e.g., Holmes 1990) were revealing that there was little in the way of support for widespread assumptions among therapists and in popular folklore that traumatic memories are particularly likely, relative to nontraumatic memories, to be "repressed" and later recovered intact through techniques such as hypnosis, guided imagery, and other suggestive therapeutic procedures. Analyses of how false memories could develop in the therapeutic setting soon followed (e.g., Lindsay & Read 1994, Loftus 1993, Loftus & Ketcham 1994, Ofshe & Watters 1994, Tavris 1993) and sparked a heated response from the therapeutic community (e.g., Alpert 1995, Terr 1994, Whitfield 1995) and alleged survivors of sexual abuse and their supporters that marked the beginning of a controversy that has been among the most vitriolic and emotionally charged in the history of psychology. This debate, known as the memory wars, has been referred to as "psychology's most fiercely contested ground" (Crews 2004). But underlying a very practical side of the debate—centered on real-life concerns for victims of either true abuse or of false allegations—is another debate surrounding the very nature of memory and how it works: whether memory might work differently for traumatic versus more ordinary events, and whether it might be distorted or confabulated as a result of therapeutic procedures commonly employed by some therapists.

On the one side were primarily practicing therapists who argued that there was and still is overwhelming support for the psychoanalytic notion of repressed memories (sometimes referred to by other terms, such as dissociated memory or traumatic amnesia; e.g., Brown et al. 1998). Traumatic memories such as those of sexual abuse were viewed as fundamentally different from more ordinary memories because they tend to be encoded in ways that render them inaccessible in everyday life. Moreover, suggestive memory recovery procedures and therapeutic

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

interactions were viewed as necessary to break through the barrier of repression and bring memories into conscious awareness, which was in turn viewed as necessary for the patient to improve. Therapists who supported such a position tended to view the incidence of "repressed" memories of abuse as relatively high, and therefore the frequency with which such memories were "recovered" in therapy as unsurprising. Many such therapists also viewed even extremely bizarre claims such as satanic ritual abuse among children and adults as credible. And finally, they argued that false memories for such events were particularly unlikely.

On the other side were the clinical, social, and cognitive researchers who had long studied the fallibility and suggestibility of memory. Beginning with the assumption that, if anything, memories for trauma are stronger than are those for ordinary events, these researchers viewed traumatic experiences as unlikely to be repressed and as subject to the same sources of distortion and confabulation as memories of other kinds of experiences. These scholars and scientists found no compelling evidence that people massively repress sexual abuse and then reliably recover the memories later (see Piper at al. 2000, Pope et al. 1998). In one survey, 79% said that there was no support for the statement, "Traumatic experiences can be repressed for many years and then recovered," or that the data were inconclusive (Kassin et al. 2001). Moreover, the repression skeptics worried that suggestive procedures used by some psychotherapists to try to extract allegedly buried trauma memories (such as direct suggestion that the patient was probably abused, guided imagery, hypnosis, age regression, or dream analysis) could lead to false memories—even such seemingly improbable false memories as those of satanic abuse.

In the following sections, we review evidence concerning the existence of recovered memories. We focus upon the controversial sense of this term, which involves memories of abuse that are "recovered" during suggestive psychotherapy. We also review evidence for the existence and mechanisms of creation of false memories and discuss how these processes apply in therapy.

## EVIDENCE FOR REPRESSION AND RECOVERY OF MEMORIES OF TRAUMA

Most fundamentally, to demonstrate that memories can be repressed and later recovered, at least three things must be verified: (*a*) that the abuse did take place, (*b*) that it was forgotten and inaccessible for some period of time, and (*c*) that it was later remembered (see, e.g., Pope & Hudson 1995). Studies used to support repression generally do not meet these criteria.

### Retrospective Studies

In a retrospective memory study, individuals are interviewed today and asked whether they were abused in the past as well as other questions assessing the

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

continuity of memory over time, such as whether they ever forgot the abuse. In scores of such studies, some individuals will claim that they were abused and that there was a time when they forgot the abuse (see, e.g., Briere & Conte 1993, Melchert 1996), but the inherent common flaws of these studies render them virtually uninterpretable (see, e.g., Brenneis 2000; Kihlstrom 1998, 2005; McNally 2003b, 2004).

Perhaps the most fundamental flaws are lack of validation of the abuse and lack of assessment of the conditions under which the "memory" was retrieved. Though some studies have attempted to validate reported abuse, criteria for validation are often suspect, relying, for example, on participant reports that they had verified the abuse (see, e.g., Herman & Schatzow 1987) or the outcome of legal proceedings (see, e.g., Burgess et al. 1995). Often, researchers fail to report rates of verification separately for those who always remembered the abuse versus those who report periods of amnesia or repression, leaving open the question of the rate of verified "recovered" memories (see, e.g., van der Kolk & Fisler 1995). Still others mix self-reports of verification from patients with apparently more objective verification by police or therapists, but without clear delineation of the frequency of each (see, e.g., Kluft 1997). Nonetheless, although few instances of abuse have been conclusively verified, a number of studies have reported instances of apparent verification of once unrecalled abuse (see McNally 2003b).

Other studies have not attempted to validate the abuse at all, and have used persons whose memories were recovered in suspect circumstances without comparison to those whose memories were recovered more naturally. Incredibly, one of the most influential studies of this type recruited subjects through a national network of therapists specializing in treatment of abuse survivors (Briere & Conte 1993). Of those claiming past abuse, 59% reported experiencing a time when they could not remember the abuse. Given a variety of methodological issues (see McNally 2003a), the claim of past nonmemory is uninterpretable. In other studies, patients claiming recovered memory of abuse appear to have undergone questionable procedures such as hypnosis or guided imagination. Indeed, fully two thirds of those reporting periods of amnesia in Roe & Schwartz's (1996) study reported first recovery of the memory during hypnosis. In another study, participants who never remembered abuse but who had joined incest survivor groups to help them remember were classified as having repressed abuse (Herman & Schatzow 1987).

A second general set of concerns surrounds the interpretation of forgetting and recovery. Episodes of abuse may not be experienced as traumatic or even labeled as abuse at the time, and hence forgetting cannot be regarded as traumatic repression. Indeed, one study found that women who reported having forgotten their abuse rated it as having been less upsetting when it occurred than those who had never forgotten (Loftus et al. 1994). In other studies, participants' own interpretations of failures to remember abuse have included failure to understand the experience as abusive until later and deliberate attempts not to think about it. Many reported that they could have remembered if they tried or if they had been reminded or

asked about it. However, since all such reports are either guesses about whether the person could remember or subjective assessments of reasons for failure to remember rather than responses to actual attempts to remember, they are difficult to interpret.

Further, it is well documented that one can fail to remember that one previously remembered the abuse. For some apparently verified instances of recovered memories, it has been shown that the person actually did remember during the alleged amnestic period, but later forgot previously remembering and talking about the abuse to others (see Brenneis 2000). In one study, women who claimed that they had undergone periods of forgetting their abuse said later in the same interview that they had never forgotten (Fivush & Edwards 2004). Finally, studies of memory for real-life traumata of all sorts suffer from additional problems such as misinterpreting general difficulty with everyday memory as reflecting repression of a specific traumatic event or failure to rule out injury and organic causes of amnesia.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

## Prospective Studies

In a prospective memory study, individuals with a record of abuse or other trauma in the past are later interviewed to see what they remember. One well-known study (Williams 1994) involved women who had reported sexual abuse that had occurred when they were aged 10 months to 12 years old. In interviews some 17 years later, 38% did not mention the abuse incident. These results are frequently used to support the notion that a significant percentage of women repress their memories of sexual abuse. But numerous critics have questioned this interpretation (Kihlstrom 2005, Loftus et al. 1994, McNally 2003b), noting the myriad reasons other than repression that could cause participants to fail to mention the abuse. Some had experiences as children when they were so young (under age 2) that childhood amnesia would lead us to expect no memory for the abuse. Even if they did remember it, some may have simply not wanted to report the abuse to an interviewer for reasons such as embarrassment or lack of rapport (Della Femina et al. 1990). Moreover, by design, participants were not asked directly about the abuse, and had they been asked, may well have been able to report it. Finally, normal forgetting occurs for all sorts of events, even ones that would have been rather upsetting or traumatic.

Nearly a decade later, Goodman et al. (2003) published a conceptual "replication" of the Williams study. Participants had been involved in a study of the effects of criminal prosecutions on sex abuse victims when they were ages 3–17 and were interviewed by the authors three times 10–16 years later. By the final interview, only 8% did not report the abuse. Although their study has been criticized for using a "prosecution" sample, its results do cast doubt on the claim that large percentages of women have repressed their memories and have no awareness of real past abuse.

## Case Histories

A third source of evidence offered to support the claim of massive repression is anecdotal cases (sometimes called "anecdata"), where a therapist writes an account

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 120 of 245

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

of a case history along with an interpretation that the patient has repressed and later reliably recovered the memory. Other reports involve a set of case histories analyzed and possibly "verified" by the researcher. But one problem with case histories is that the therapist/author is typically the only person who has access to the "data," which are often subjective and not convincingly subjected to objective external verification. Few instances exist where the selectivity has been scrutinized, but one clear example can be found in the 1997 case history of "Jane Doe" (Corwin & Olafson 1997), who was videotaped in 1984 recounting specifics of sexual abuse allegedly committed by her mother. Eleven years later, when Jane was 17, she was videotaped again. This time, she at first did not remember the abuse, and then she did. The therapists published an account of Jane Doe's life, her allegedly repressed/recovered memory, and the case was cited as verified (e.g., Gleaves et al. 2004).

Loftus & Guyer (2002a,b) used public records and newspaper clippings and eventually located Doe's family. From court documents and other information, they learned that the case was not even remotely a proven case of repressed memory. In fact, much newly discovered evidence cast doubt on whether abuse had occurred at all and pointed to the very real possibility that the abuse narrative had been planted in Jane's mind by individuals who wished to remove her from her mother. This scrutinized case is a cautionary tale that raises questions about the role of case histories in medicine, science, and mental health. Case histories can be compelling, but they are bounded by the motivations and interpretations of the storyteller.

Problems with motivational biases characterize many case histories involving litigated events. Claims of repression are sometimes necessary in order to file suit after delays that would normally exceed statutes of limitations. Nor can out-of-court settlements be taken as proof of claims of abuse. Innocents sometimes settle to avoid legal and emotional costs and risks of litigation. Such issues limit the weight of evidence provided by allegedly "corroborated" cases of recovered memories of trauma involved in legal proceedings.

Notwithstanding these problems, there are a large number of case reports, some with better verification than others. Schooler et al. (1997) give the impression that they discovered several case histories for which the necessary three-pronged evidence specified by Pope & Hudson (1995) was obtained: The abuse did occur, it was forgotten for some period of time, and it was later remembered. Unfortunately, even in some of these the "documentation" was merely the subject's word. Moreover, these cases provided no evidence for repression per se. In fact, most memory recoveries reportedly occurred outside of therapy, and some subjects reported that they had forgotten the event even though it was later discovered that they had discussed it with others during the period of "amnesia."

Brenneis (2000) analyzed "verified" case histories provided by Schooler et al. (1997) and others, noting that the most adequately verified accounts tend to share several features: (*a*) the memories were typically not (with one exception) recovered in the context of therapy, and in all cases the moment of recovery was

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

unrelated to any therapeutic activity, (*b*) the memories were triggered by external events that "reminded" the person of the original abuse, (*c*) once prompted, the memories "completely unwound instantly" (Schooler et al. 1997, p. 271) and required no interpretation or deciphering, (*d*) the memories were mostly for single, not repeated, events, (*e*) assailants were primarily nonfamily members, and (*f*) the events dated from age 9 and older. Finally, information from friends and relatives often revealed that despite the person's claim of amnesia, the event had been discussed with others during the period of claimed amnesia. These features stand in contrast to the typical pattern for memory recovery in therapy, which involves very effortful and gradual recovery through extremely suggestive therapeutic processes and memory recovery procedures. When memories emerge in this context, they tend to begin as vague and lacking detail but to unfold and become more vivid and elaborate over time. Further, Brenneis (2000) noted that "this constellation of features—multiple events over long periods of time, beginning in early childhood, involving bodily penetration, and enacted by male family members—is seldom if ever found among verified recovered memory cases" (p. 75).

Wagenaar & Crombag (2005) provide a devastating analysis of the case of JR—a man Schooler interviewed some nine years after he allegedly recovered memories of abuse by a priest—in which they note that the JR narrative contains innumerable unproven and often suspicious assumptions. Schooler says that JR recovered his memory without a therapist, but JR was in therapy at the time. Schooler implies that JR had no motive, but JR actually did start a lawsuit. Schooler was impressed by a second individual who apparently also implied wrongdoing by the priest, but that second individual was not independent, as he came forth after learning about JR. As Wagenaar & Crombag (2005) note, case histories like that of JR do not meet two of the most important criteria for empirical research: public control and replicability. It is virtually impossible for readers to check most of the details of JR's story because of the anonymity. We cannot critically question those who provided information nor can we have access to case information. The story is simply hearsay. (See Wagenaar & Crombag 2005, Chapter 5, for an excellent discussion of when case histories can be used successfully to illustrate something important.)

In sum, there is little support for the notion that trauma is commonly banished out of awareness and later reliably recovered by processes beyond ordinary forgetting and remembering. Although there have been some apparent instances of verified lost and recovered memories (see, e.g., Brenneis 2000, Gleaves et al. 2004), it is not clear how much scrutiny has been applied, and crucial questions of the base rate at which such verified instances occur and how it depends upon the circumstances of retrieval (through specific procedures during therapy versus as the result of a retrieval cue that occurred in everyday life) remain essentially unanswered. Yet over the past couple of decades, many persons have reported having experienced massive abuse that was repressed and recovered, which raises the question of whether some or all such "memories" might be false.

## EVIDENCE FOR THE EXISTENCE OF FALSE MEMORIES OF ABUSE

Recovered memory therapy advocates note that no controlled experimental evidence confirms that false memories of traumatic events can be implanted. Indeed, ethics restrict experimentation on the impact of memory recovery procedures on recovery of true traumatic memories or implantation of false ones, making laboratory evidence specific to trauma and abuse for both camps rare. Given such limitations, critics of "recovered memories" offer several kinds of evidence demonstrating that false memories for mundane and relatively traumatic autobiographical events can be implanted.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

### False Memories of Real-Life Trauma

For most claims of massive repression and recovery, there is little confirming or disconfirming evidence. But some "memories" can be shown to be factually, psychologically, geographically, or biologically impossible. As with case histories of alleged lost and recovered memories, those of false memory for trauma must also meet stringent criteria of proof: both that the person did have memories for the trauma in question and that the event actually did not happen. Indeed, many such case histories are available for abuse- and nonabuse-related trauma (see reviews in McNally 2003b; Schacter 1996, 2001), such as being kidnapped and held hostage (something that happened to classmates instead of oneself), being gang-raped by Satanists (although one's hymen remains intact), enduring the surgical removal of one's clitoris (contradicted by the patient's gynecologist), witnessing the sacrificial killing of persons later found alive, and even for having committed heinous crimes such as murders or sexual abuse (Henkel & Coffman 2004, Kassin 2006, Wright 1994).

While some claims have been proven factually inaccurate, others are simply impossible, such as detailed narrative memories of events occurring in the first days to six months of life (Arnold 1994, Usher & Neisser 1993). Although children do encode and remember such events during early life, these memories tend to be eventually lost, as adult reports of childhood memories rarely address events that occurred earlier than age 3 (see Bauer 2006).

Among the most frequently reported impossible false memories of trauma are those of abduction by space aliens. Although approximately 17% of Americans believe that aliens have abducted humans (and presumably returned them alive), we assume that memories of such events are clearly false. Nevertheless, large numbers of patients have reported memories of alien abductions that have largely developed in therapy and under hypnosis or while the patient was subject to other methods used in recovered memory therapy (see Mack 1994, McNally 2003b).

A large category of false memories concerns various forms of satanic ritual abuse reported by patients in recovered memory therapy. Alleged acts included gang rape; sacrifice of babies and other ritual murders; consumption of blood and

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 123 of 245

human waste; forced pregnancies or abortions; dancing, chanting, and other Satan worship activities; and brutal torture designed to cause victims to forget all they endured (see Loftus & Ketcham 1994, Noblitt & Perskin 2000, Ofshe & Watters 1994, Scott 2001). Such cases had so permeated our culture that as of 1991, the American Bar Association reported that 25% of prosecuting attorneys had handled cases involving satanic abuse (Qin et al. 1998). In a 1996 survey of clinicians from the American Psychological Association (Bottoms et al. 1996), 13% had cases involving children and 11% had cases involving adults with claims of satanic ritual abuse (with some therapists reporting more than 100 cases). None had obtained convincing verification of the abuse, nor have subsequent attempts to examine the validity of such claims found reliable evidence (see, e.g., La Fontaine 1998, Lanning 1991, Weir & Wheatscroft 1995). One recent survey found that satanic ritual abuse was reported in 19% of more than 1700 cases involving families who reported false allegations of abuse against a family member (McHugh et al. 2004). Across studies, 95% to 100% of patients had no recollection of abuse prior to therapy (McNally 2003b). Despite vigorous protests from recovered memory therapists (Terr 1994, Whitfield 1995), there are cogent reasons to believe that almost all such claims are false (see McNally 2003a,b).

In summary, although there is disagreement regarding the plausibility of some of the above instances of memory for trauma, there can be no doubt that "memories" for factually false as well as impossible or at least highly improbable horrific traumatic events were developed, particularly among persons subjected to suggestive memory recovery procedures. Some have viewed the prevalence of memories for satanic ritual abuse as the strongest evidence of real-life false memories of trauma (e.g., Ofshe & Watters 1994, Ross 1995).

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org
by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

## Experiences of the "Retractors"

In the 1990s, hundreds of individuals who had been persuaded that they had repressed and recovered memories of abuse began to realize their memories were false, and many sued their former therapists for planting false memories. Scores were studied by psychologists trying to gain insight into the processes by which the patients developed and later retracted their beliefs (see, e.g., De Rivera 1997; Lief & Fetkewicz 1995; Nelson & Simpson 1994; Ost et al. 2001, 2002). These studies revealed that the modal retractor first sought therapy for depression and then recovered "memories" of abuse during therapy, but later came to believe the "memories" were actually products of therapeutic suggestion. More than 90% recovered their memories in therapy; in one study (Lief & Fetkewicz 1995), 48% recovered memories of satanic ritual abuse and 38% recovered memories of witnessing murder. The vast majority had undergone suggestive procedures such as hypnosis. Retractors reported substantial pressure to recover memories, and noted that when they expressed doubts in their new memories, they were told that such doubt is common but not a sign of inaccuracy. Most reported that outside pressure played little to no role in their retractions (see, e.g., Ost et al. 2002). Instead, the retractions appeared to be based primarily on the experiential qualities of the

"memories" themselves. In essence, the memories did not seem truly "real," being either too clear and vivid (and increasing in vividness over time, rather than declining, as do most memories) or too vague and dreamlike.

Although many retractors have provided some insights into the processes they went through, these are case histories and are therefore subject to many of the limitations of case histories identified earlier (see entire *Psychological Inquiry,* 1997, Vol. 8, #4 for commentaries on the meaning of retractor reports). Not surprisingly, therapists have found these accounts unconvincing, arguing—ironically—that retractors are easily swayed by social pressure or that they are motivated by the potential of lawsuits against their therapists (see, e.g., Blume 1995, Brown et al. 1998). Notwithstanding such criticisms, there is little doubt that at least some people have developed clearly false memories that they later recognize as such.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

## Laboratory Research on the Malleability of Autobiographical Memory

EVIDENCE THAT FALSE AUTOBIOGRAPHICAL MEMORIES CAN BE CREATED Research in the past several decades has shown that it is relatively easy to change details of memories for previously experienced events (see reviews in Davis & Loftus 2006; Loftus 2005; entire *Handbook of Eyewitness Psychology, Vols. I and II*), but it is also possible to implant entirely false autobiographical memories, even of highly implausible or even impossible events. Using strong forms of suggestion in a paradigm known as the "familial informant false narrative procedure" or simply the "lost-in-the-mall" technique (Lindsay et al. 2004, Loftus 1993, Loftus & Pickrell 1995), people have been led to believe that, as children, they were lost in a shopping mall for an extended time, had an accident at a family wedding, were the victim of a vicious animal attack, nearly drowned and had to be rescued by a lifeguard, etc. These false memories can be planted by telling individuals that their relatives have provided the information and then suggestively interviewing the individuals to try to elicit memory reports.

Across many studies utilizing the lost-in-the-mall procedure, an average of approximately 30% of subjects have developed partial or complete false beliefs or memories (Lindsay et al. 2004), although these rates can vary from 0% with relatively implausible events (receiving a rectal enema; Pezdek et al. 1997) to more than 50% for more mundane events (a ride in a hot air balloon; Wade et al. 2002). Techniques such as those involving guided imagination (e.g., Libby 2003), suggestive dream interpretation, or exposure to doctored photographs have also led subjects to believe falsely that they experienced events in their distant and even in their recent past (Loftus 2003). Some develop false memories right away, whereas others begin with little memory but after several suggestive interviews begin to recall false events in great detail (Ost et al. 2005).

Implanted memories might be viewed as fleeting and unimportant. But even false beliefs implanted in laboratory studies have repercussions affecting later thoughts, behaviors, and intentions. In several studies, false memories of having

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

gotten sick after eating particular foods as children led to avoidance of the foods as adults (Bernstein et al. 2005).

Several criticisms have been lodged regarding the autobiographical memory implantation research. Most prominent are (*a*) that we often cannot know for sure (despite familial reports otherwise) that those who develop "false" memories did *not* experience the target event, and (*b*) that target events in such experiments are less traumatic and more plausible than those commonly "recovered" in therapy. In response to such criticisms, researchers have endeavored to implant both impossible and highly traumatic or "implausible" autobiographical memories.

To address the criticism of verification, for example, Braun et al. (2002) led subjects to believe the impossible event that they had met Bugs Bunny (a Warner Brothers character) at a Disney resort (after exposure to fake Disney ads featuring Bugs Bunny). These authors found that a single fake ad led 16% of subjects to claim they had met Bugs. Even higher rates of false belief were obtained by Braun-LaTour et al. (2004), and ads containing pictures of Bugs produced more false memories than those with only verbal mention of him. The criticism involving the degree of trauma has been more widely addressed. Although researchers have not attempted to plant memories of abuse, they have attempted to plant memories for relatively unpleasant, and in some cases fairly traumatic, events such as hospitalizations, medical procedures, near drowning, or vicious animal attacks. Finally, researchers have planted highly implausible memories for both mundane (e.g., rubbing chalk on one's head or kissing a plastic frog) and strange and dramatic (witnessing demonic possession as a child) events (Loftus 2003).

Whereas it may be more difficult (or even sometimes impossible) to plant implausible memories in many circumstances, this difficulty can be overcome by changing the degree of implausibility first (Hyman & Loftus 2002). Just such a strategy was demonstrated by Mazzoni et al. (2001), who first exposed some participants to material designed to enhance the plausibility of demon possession and later attempted to plant memories of having personally witnessed such an event. Those exposed to the plausibility-enhancing manipulation later reported greater likelihood that they had personally witnessed demon possession.

A final criticism of the memory implantation studies is that although false beliefs that one has experienced the event may be planted in many subjects, detailed false memories, particularly for more implausible or more traumatic events, have been planted in relatively few individuals. However, one might argue that given the ease with which false memories can be planted in a short period of time, the rate of false memory development in long-term therapy might be substantially more.

RECONSTRUCTIVE INFLUENCES OF BELIEFS, GOALS, AND SELF-VIEWS ON AUTOBIOGRAPHICAL MEMORY Studies concerned with the retrospective bias have shown that reports of our own past attitudes or behaviors are biased by current self-views, goals, and beliefs (and vice versa; Dawes 1991, Wilson & Ross 2003). Similarly, recollections of one's own behavior tend to change to conform to newly acquired information about how one *should* behave, so that we believe we behaved in a

more consistent, sensible, or desirable way than we actually did. Given this reconstructive bias in autobiographical memory, what direct and indirect reconstructive effects might the sheer belief that one has been abused exert?

Even simply considering the possibility that one has been abused might exert such effects, but some patients may come to adopt a highly elaborate personal identity as an abuse survivor. Kihlstrom (1998) coined the term "false memory syndrome," which he described as "a condition in which a person's identity and interpersonal relationships are centered around a memory of traumatic experience which is objectively false but in which the person strongly believes . . . the syndrome may be diagnosed when the memory is so deeply ingrained that it orients the person's entire personality and lifestyle" (p. 16). Though some have objected to the use of the term "syndrome" (Pope 1996), clearly many patients do experience their status as abuse victims as the central or even the primary aspect of their identity. Self-definition as an abuse survivor is likely to exert reconstructive influence on autobiographical memory, which in turn is presumed to serve essentially as the basis of one's identity. Pressures exist to conform memories to current identity as well as to conform current identity to memories [see entire issue 11, no. 2, of *Memory* (2003) on autobiographical memory; Tafarodi et al. 2003 on self-esteem and memory].

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

### Summary

There is little doubt that abuse can be forgotten and later remembered, although ordinary forgetting and remembering seem more than adequate to account for this. Nor can there be doubt that false memories of abuse or other trauma can be confabulated. Doubt remains, however, regarding the base rates at which each occurs and the circumstances and persons for which each is most likely. Why do some people, and not others, develop false memories? How does this depend upon the social context in which memories are triggered? And fundamentally, how—if at all—are encoding, storage, and retrieval for traumatic or highly emotional content different? When traumatic material is inaccessible for a period of time, what are the processes responsible? Although progress has been made with respect to each question, much remains to be learned.

## THERAPEUTIC PROCESS AND FALSE MEMORIES OF ABUSE

Bearing in mind that false memories can be created, we consider below how this occurs and what might be done to minimize the likelihood.

### A Priori Assumptions Regarding Abuse

As most accounts of the "recovered memory" controversy have documented, a dramatic increase in awareness of sexual abuse began in the 1980s, accompanied by widespread media coverage of abuse and recovered memories as well as a number

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org
by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

of popular books on the topic. This situation has essentially "primed" the notion of abuse, including repressed memories of abuse, in the general population, and elevated awareness among therapists already acquainted with concepts of trauma and repression. Among the effects of priming particular "schemas" are selective attention to relevant information, biased interpretation of relevant information, and constructive and reconstructive memory processes that generally consist of confabulation of schema-consistent (but false) memories and distortion of memories of past events toward consistency with currently activated schemas (Davis & Follette 2001, Davis & Loftus 2006, Kunda 1999). A patient that has been exposed to accounts of repressed abuse, and with abuse fully primed in her mind, may present with a pre-existing idea that she may have been abused. Likewise, the therapist may expect a high rate of repressed abuse among patients, or particular types of patients, thereby setting in motion a biased assessment process—often followed with vigorous suggestive efforts to test and verify the abuse hypothesis.

## Confirmation Biases and the Dangers of Specific Hypothesis Testing

Confirmatory biases are likely to manifest in initial interview and assessment processes, possibly in both patient and therapist. A patient already considering or convinced of abuse may offer information she perceives as relevant to abuse, perhaps even arguing its significance in terms of abuse. A therapist who perceives abuse as prevalent or likely may inquire about symptoms and facts seen as diagnostic, and if the patient has already brought up the possibility of abuse, rather than engage in a systematic differential diagnosis to examine and rule out alternatives, the therapist may jump directly to the conclusion that the patient in fact was abused. Such "premature cognitive commitment" (Pope & Brown 1996) is among common errors of clinical judgment that some clinicians warn of. Rather than conducting objective hypothesis testing, the therapist may embark upon a quest to discover abuse-consistent evidence (including reports of consistent information and memories from the patient), discounting any inconsistent evidence and doggedly pursuing the presumption of abuse notwithstanding protests and inconsistent evidence from the patient.

In recognition of these processes, critics of recovered memory therapy point to scientific literature documenting the dangers of the confirmation bias (the tendency to affirm the diagnosis one is considering) in clinical diagnosis and judgment (see, e.g., Garb 1998). Indeed, even clinicians largely in the recovered memory camp of the debate have warned of the dangers of the confirmation bias in diagnosis (e.g., Pope & Brown 1996). This bias has been documented even under circumstances in which clinicians are asked to review an unknown patient's file to evaluate whether the patient suffers a particular disorder without any contact with the patient, without any reason to favor the designated diagnosis, and in an effort to provide an unbiased assessment (e.g., Copeland & Snyder 1995; see Kassin & Gudjonsson 2004 and Meissner & Kassin 2004 for discussion of confirmation biases among interrogators).

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 128 of 245

The tendency to confirm clinical hypotheses results in part from biases in interpretation. However, consistent with the vast literature documenting expectancy confirmation processes in social interaction (e.g., Kirsch 1999), biased interviewing procedures also contribute in that questions are typically asked in a manner that tends to elicit apparently confirming information from the patient or interviewee (see, e.g., Fazio et al. 1981, Snyder 1984, Snyder & Thomsen 1988). The therapist may also suggest activities to the patient that would likewise tend to elicit (apparently) confirmatory information, such as reading survivor literature, completing various "homework" activities focused on abuse, or participating in survivor groups. These activities may serve to elicit more apparently abuse-consistent information from the patient. Furthermore, some therapists instruct patients to avoid exposure to contradictory information and those who might provide it rather than objectively testing the abuse hypothesis by seeking, and encouraging patients to seek, informative abuse-inconsistent information as well.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

THE ROLE OF MOTIVATED COGNITION Many, if not most, patients enter therapy in search of an explanation for their problems. This very need for explanation may render patients vulnerable to accepting seemingly plausible potential causes. Believing a patient was abused, a therapist might directly suggest this hypothesis, as well as provide apparently confirmatory "evidence," such as the extent to which the patient's symptoms conform to those thought to be associated with abuse. Particularly when combined with other "evidence" gleaned from survivor literature, survivor groups, media, and other sources, the abuse hypothesis may seem a compelling explanation to patients who fail to realize their symptoms may be better explained in other ways. The very existence of a potential explanation may motivate some patients to prematurely seize and freeze on the abuse hypothesis, thereby causing them to engage in a strongly biased search for and interpretation of information and to defend against doubt. Some therapists may also be driven by motives—ranging from fierce victim advocacy to potential financial rewards of prolonged therapy—that tend to encourage confirmatory strategies.

## Plausibility-Enhancing "Evidence"

Biased hypothesis-testing strategies are likely to elicit apparently confirmatory evidence. The therapist faced with any set of evidence (even were it not selective and biased) can succumb to a number of heuristic and other fallacies of reasoning that result in a tendency to confirm the abuse hypothesis (see Garb 1998), as can patients. Schematic processing can result in selective attention to abuse-relevant information, disregard for abuse-irrelevant information, and interpretative biases toward consistency with the abuse hypothesis, including explaining away apparently inconsistent information. This includes retrospective biases of interpretation such as the "hindsight" bias (Fischhoff 1975), whereby the past is interpreted as consistent with current knowledge.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org
by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

Therapists may also fall prey to the "representativeness" heuristic (Kahneman & Tversky 1972), assuming that if a patient's symptoms fit those viewed as consistent with abuse, the patient must have been abused. This, of course, is the message of much of the survivor literature (e.g., Bass & Davis 1988). Such logic is fallacious, in that "If Abuse, then Symptom" does not logically imply "If Symptom, then Abuse." Abuse-related symptoms can result from abuse as well as from many other causes.

The problem is further complicated by a questionable assumption regarding the true association of various symptoms with abuse. "The phenomenon of recovered memories has been greatly confounded by the assumption made by some clinicians that repetitive behavioral patterns, special sensory reactivities, and unbidden ideation in the form of flashbacks or nightmares necessarily reflect implicit memory for unremembered events. . . . In short, without a corresponding explicit memory, the existence of past trauma cannot be conclusively inferred from any repetitive behaviors or intrusive ideation" (Brenneis 2000, p. 67). Notwithstanding these and other misunderstandings of what constitutes (or does not constitute) valid indicators of abuse, therapist and patient may each offer "evidence" to the other, in support of their own hypotheses. If the patient has not yet adopted the abuse hypothesis, the therapist may proceed with a number of leading and even coercive procedures designed to elicit confirmation, including persistent persuasion and efforts to elicit consistent information and failure to believe inconsistent information at all or to interpret it as actually inconsistent with repressed abuse.

PLAUSIBILITY, BELIEF, AND MEMORY    Just as the memory implantation research reveals, information that serves to render previously implausible information subjectively more plausible can smooth the way for the development of false memories. Suggestive influences inside and outside of therapy are likely to enhance the plausibility of abuse, notwithstanding the absence of memories. Persuasive information can come from the media, survivor literature, survivor groups, therapist suggestions, and other sources. When apparently authoritative sources state unequivocally that particular symptoms are pathognomic of abuse, the plausibility that a person suffering from such symptoms could have been abused is enhanced.

## Adopting and Confirming the Belief in Abuse

If a patient comes to believe that she may have been abused, efforts by both therapist and patient may ensue to confirm and defend the new survivor identity. These may include memory recovery procedures in and outside of therapy, participation in survivor groups, solicitation of consistent information from family, witnesses, and others—all with significant potential both to bias construction of historical narratives and to lead to confabulation of false memories.

MEMORY RECOVERY PROCEDURES    Whether the patient has yet adopted the survivor identity or not, the therapist may suggest a variety of memory recovery procedures, both in and outside of therapy, such as hypnosis, age regression, dream

interpretation, guided abuse-related imagery, use of photographs to trigger memories, instructions to work at remembering (including through journaling or other homework), and interpreting physical symptoms as implicit memories (see, e.g., Poole et al. 1995). These and other procedures, and their potential to cause false memories, have been extensively discussed (e.g., Brainerd & Reyna 2005, Loftus & Ketcham 1994, McNally 2003a,b).

HYPNOSIS Prominent in the memory recovery arsenal is hypnosis. Interestingly, however, as reviewed by Mazzoni et al. (2006), both memory-enhancing and memory-distorting functions of hypnosis have been recognized and employed by therapists beginning with Freud, Janet, and other early psychotherapists. Therapists have used hypnotic memory retrieval in two opposite ways, without any apparent awareness of the implications that one use had for the other. That is, while they viewed hypnosis as an excellent memory recovery tool to recover accurate memories, they also deliberately used hypnosis as a suggestive memory confabulation tool to create "healing" positive pseudomemories to replace "true" traumatic memories previously "recovered" through hypnosis. Indeed, modern research has verified both functions. Hypnosis can lead to retrieval of greater numbers of or increased detail for accurate memories as well as to greater production of false memories. Persons under hypnosis have developed a number of bizarre or impossible memories, such as memories of satanic ritual abuse (described above), impossible memories from infancy (Spanos et al. 1999), memories from previous lives, sexual abuse during past lives (Stevenson 1994, Spanos et al. 1991), and even memories from one's own future (see reviews by Kihlstrom 1997, Mazzoni et al. 2006, McNally 2003b). Hypnotic age-regression, a procedure commonly employed by recovered memory therapists (see Poole et al. 1995), is subject to the same distortions as hypnotic memories of recent events (see Nash 1987). As Mazzoni et al. (2006) point out, if hypnosis is not a reliable means of recovering memories of recent events, there is no reason to expect it to be more effective for memories of the distant past or childhood. Nor is there any reason to expect that it can facilitate retrieval of memories beyond the veil of infantile amnesia.

GUIDED IMAGERY Therapists commonly employ various imaging activities in their sessions and in homework assignments for clients. Guided imagery, whereby a client is asked to actively try to imagine and create images of past events, is viewed by researchers as dangerous in that these vivid and elaborate images may later become confused with memories. Indeed, memory researchers have shown that imagining events tends to inflate perceptions of the likelihood they had actually occurred—an effect generally referred to as "imagination inflation" (Garry et al. 1996), and a host of studies have shown that active imagination/visualization of events, objects, or persons can lead to false memories of having actually seen, performed, or experienced them. Imagination has produced false memories for simple perceptions, such as having seen or heard objects or sounds, as well as for more complex recent personal actions (such as having said or done something,

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

both mundane and bizarre) and distant autobiographical memories for a range of events (see reviews by Davis & Loftus 2006; Johnson et al. 1993; Mazzoni & Memon 2003; Schacter 1996, 2001; Thomas & Loftus 2002). Even paraphrasing event descriptions or explaining how an event might have happened can produce inflation (see, e.g., Sharman et al. 2004, 2005). Techniques emphasizing imagination not only can generate false memories, but also can inflate confidence in those memories (see Arbuthnott et al. 2001 on imagery, Mazzoni et al. 2006 on hypnosis, Spanos et al. 1999 on age regression).

Presumably, like other implantation techniques, imagination works in a three-stage process whereby people first come to believe an event is plausible, next come to believe the event did actually occur, and finally reinterpret their narratives and images of the event as actual memories (Mazzoni et al. 2001). Imagery and imagination may contribute to all levels of this process. Imagery is crucial to plausibility and hence persuasion [see Green & Brock (2002) for evidence that narratives are persuasive to the extent they evoke imagery of their contents]. Research from the source-monitoring tradition has shown that images can be confused with real memories, particularly when they have many of the subjective characteristics of real memories. Johnson et al. (1988) reasoned that when real memories are vague and lacking in vivid detail, as when memories are from the distant past or were never encoded richly in the first place, it is easier to confuse imagined and real events.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

DREAM INTERPRETATION Another common tool of psychotherapy, dream interpretation, can lead some to develop false memories. Mazzoni and her colleagues (see, e.g., Mazzoni et al. 1999) studied direct suggestion in the form of a psychologist's bogus interpretation of dreams. For some participants, these bogus interpretations (i.e., the same interpretation given to all subjects, regardless of the dream reported, and with no reason to believe the interpretation applied to each subject) led to false memories for mildly traumatic suggested events. Dreams themselves may also be confused with actual experiences in some cases (Kemp et al. 2003).

FAMILY PHOTOS As an apparently sensible "context reinstatement" procedure, therapists may recommend that patients use family photos to trigger lost memories. But autobiographical memory can be distorted through exposure to photographs (Lindsay et al. 2004). Brainerd & Reyna (2005) suggest that this apparently sensible procedure may backfire because the photos are employed in the context of delayed repeated attempts to recall after previous attempts have failed.

REPEATED RECALL When "memories" are difficult to retrieve, a variety of memory recovery techniques may be used repeatedly over a long period. Even in the absence of other suggestive procedures and influences, evidence exists to show that (*a*) as time passes, both spontaneous false memories and false reports in response to suggestion increase (even for short delays involving hours, days, or weeks), (*b*) repeated attempts to recall increase the yield of false as well as true information,

(*c*) information recalled in later attempts is proportionately more likely to be false, (*d*) the previous two findings are particularly likely when there are long delays between repeated-recall tests and the index experience, and (*e*) these patterns obtain for autobiographical memory as well as for laboratory tasks (see review by Brainerd & Reyna 2005).

ABUSE-RELATED IMAGES AND THEIR MISATTRIBUTION AS MEMORIES As images appear through various efforts to retrieve memories they may combine with related inferences to develop into full narratives of abusive events. The person may then misunderstand the source of these images and narratives [an error of source monitoring (Johnson et al. 1993)], misattributing them to true memories of the abusive events. But how does this process of misattribution occur? Figure 1 depicts a model of this process.

Modern theories of the development of false memories (Brainerd & Reyna 2005) assume that remembering consists of subjectively experienced internal representations of an event combined with judgment criteria for determining whether these representations correspond to a previously experienced index event. Internal representations can be either verbatim traces (i.e., of the exact surface form and other specific information, much like seeing with the mind's eye) or gist traces (i.e., of the essential semantic meaning or generalized physical form of objects and events, for example, "going to the movie" versus specific visual images of the people, objects, and actions involved). Judgment criterion can also vary in specificity. At one extreme, the person may require vivid, elaborate verbatim memory traces (i.e., the ability to fully picture the event in the mind's eye or ear) in order to label the internal representations as a memory. At the other, the person may label even fuzzy, unelaborated fragmented gist traces as memories. Generally, the stronger the person's verbatim and gist traces, and the weaker (or more gist-based) the judgment criterion, the more likely a particular representation is to be judged as a memory. Therefore, therapeutic and nontherapeutic factors that influence the strength of either form of trace or of the nature of the judgment criterion can contribute to source-monitoring errors. To understand how this would occur, we must first address what contributes to the strength of both verbatim and gist traces.

Verbatim traces consist of vivid internal images of the index event. A number of factors influence the strength of such images, including the depth of original encoding, personal memorial abilities, and the passage of time. Unfortunately, vivid images may also be created independent of actual experience, such as through the various guided imagery procedures commonly practiced in recovered memory therapy. These highly elaborated internally generated images would possess the apparent verbatim trace representations of actual events and therefore pass even the stringent verbatim-match judgment criterion for assessing validity. Gist traces, on the other hand, may be created through both overlapping and dissimilar processes. Like verbatim representations, gist traces may be strengthened by depth of encoding or personal memorial abilities. However, whereas verbatim memory becomes relatively weaker over time, gist traces become relatively more dominant.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org
by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.



**Figure 1**   Causes of source monitoring failures/memory misattributions

Also, whereas verbatim memory, by definition, can be contributed to only by the target event, gist memory may come to include overall meanings that represent the combined semantic understanding of the nature of the event. Hence, gist traces may be affected by one's overall event-relevant knowledge structure, such as when memory is affected by schematic processing. Thus, like verbatim traces, gist traces can be artificially created or strengthened through various imaging procedures, but can also be strengthened through other activities serving to develop abuse-related schemas, beliefs, and personal narratives.

When confronted with the need to judge a particular internal trace, the more existing memory support that can be retrieved to "verify" an experience (and the less contradictory information), the more likely the person will label the trace as a true memory. Such support can include the quality of verbatim and gist traces as well as related images, narratives within which the target event resides, semantic knowledge, beliefs, and other relevant traces. In other words, the more information of any kind that is available to increase the subjective likelihood that an internal trace represents an actual event, the more likely it will be judged as a memory. As depicted in Figure 1, repeated cueing of relevant information (such as through priming abuse, developing abuse narratives, discussing abuse) tends to create rich abuse-related memory support. One may also use familiarity as the judgment criteria, whereby things that simply feel sufficiently familiar are judged as memories. The feeling of familiarity may be increased through the same forms of memory "support" discussed above. Familiarity, or gist-based criteria generally, are more lax judgment criteria and are empirically associated with more reported false memories.

Given this background, we can now summarize how therapeutic and associated processes directly and indirectly promote source-monitoring errors. As shown in Figure 1, the social influences that keep abuse primed, promote schematic processing, and support belief in abuse exert persuasive influence on both verbatim and gist memory traces as well as on the judgment criteria applied to those traces. Above, we discussed the way in which verbatim and gist traces can be developed and/or elaborated through therapeutic procedures. Essentially, various imaging activities in and outside of therapy can produce vivid artificial images that resemble verbatim memories (particularly among those with substantial imaginative ability) and also contribute to gist traces. This abuse-related memory support is added to by the various suggestive procedures that develop rich abuse-related narratives, personal abuse-related identities, and abuse-supportive beliefs. These apparent verbatim and gist traces and semantic memory support enhance the plausibility of, and confer a sense of familiarity upon, abuse "memories."

As depicted in Figure 1, therapeutic and nontherapeutic processes also directly and indirectly affect the judgment criteria applied to target internal representations. Generally, the impaired cognitive processes that tend to be characteristic of recovered memory patients (see below) are known to be associated with source-monitoring errors, tendencies toward automatic (e.g., schematic) rather than controlled processing, susceptibility to social influence, and use of gist-based

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 135 of 245

judgment criteria (see Brainerd & Reyna 2005, Davis & Loftus 2005, Davis & O'Donohue 2004 for reviews). People who are already susceptible are then subject to other influences that affect judgment criteria.

Therapists often directly argue for lax criteria, suggesting that no "memory" should be doubted, and that even bodily sensations and other nonmental reactions should be interpreted as memories. Essentially, familiarity, gist-based, and other unique criteria are promoted. Further, all abuse-supportive beliefs (particularly those supporting specific episodic memories) can directly lower the criteria applied to internal representations. That is, the more the person simply believes an event occurred, the less episode-specific verbatim or gist trace is needed to support a conclusion of verity. The patient's own faith in the effectiveness of memory-recovery procedures can similarly directly lower the criteria. Once interpreted as real, of course, such "memories" serve to reinforce the belief in abuse and solidify the survivor identity, perhaps thereby encouraging development of additional false memories.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

## THERAPY AND SOCIAL INFLUENCE

Social influence is, in a sense, the point of therapy. The patient hopes to find solutions to problems with the help of a presumably knowledgeable authority. If the relationship develops as desired, the therapist will possess the primary attributes known to promote social influence: likeability, credibility, and power (control over desired resources) (see Pratkanis & Aronson 2001). The patient is likely to feel strong emotional attachment to, great respect for, and even dependence on, the therapist, feelings which would render her more susceptible to believing information and adopting behavioral suggestions such as joining survivor groups, reading survivor literature, or engaging in memory-recovery activities at home. These same feelings would render the person more susceptible to biasing therapist suggestions in and outside of specific activities such as hypnosis or guided imagery. But influence in therapy is actually bidirectional. The abuse hypothesis neither is always first suggested nor is most strongly promoted by the therapist. Patients' own biases and preconceptions developed outside of therapy can exert a strong influence upon their own hypothesis-testing activities as well as those of their therapists.

### Individual Vulnerability to False Memories

Given that therapeutic procedures possess considerable potential to create false beliefs and memories in some, it is important to consider which patients might be especially susceptible to social influence or memory distortion. Here, we focus upon the issue of social influence. (See Brainerd & Reyna 2005 for a discussion of individual differences in memory distortions.) One might expect patients to be generally more susceptible to influence, and particularly from therapists from

whom they are seeking answers. As Brainerd & Reyna (2005) note, "Confused and uncertain people are looking for information that will shed light in dark corners, and they may believe that it can be found in therapy. To find answers, however, they must adopt attitudes of openness, exploration, and discovery with respect to the events of their lives, and they must trust in the wisdom and experience of their therapists. Obviously, these latter characteristics are not commensurate with a narrow, reality-based perspective on memory. Rather, the perspective is a much broader one that searches for answers and solutions in the events of one's life, which is not precisely the same thing as searching for autobiographical facts" (pp. 386–387).

Notwithstanding elevated vulnerability within the general patient population, there will be notable individual differences. To understand who might be most vulnerable to social influence, it is first necessary to understand what is needed to resist social influence. Davis & O'Donohue (2004) provide an extensive analysis of the processes and abilities that promote or undermine resistance to influence with regard to resisting powerful influence in police interrogations (see Knowles & Linn 2004 on resistance to influence in other contexts). Sources of resistance that are most relevant here reduce to two general factors: (*a*) the ability to resist (consisting of the ability to understand and evaluate relevant information and the ability to exert one's will to refuse to comply) and (*b*) the motivation to resist.

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

## Ability to Resist

The immediate antecedents of the ability to resist are the abilities to (*a*) analyze relevant information and (*b*) exert one's will in a particular direction. These two abilities are in turn affected by both chronic and acute individual differences.

CHRONIC AND ACUTE INTELLECTUAL ABILITIES To understand and evaluate relevant information adequately, one must possess adequate relevant knowledge and have adequate chronic intellectual abilities. To see flaws in abuse-relevant suggestions, for example, one would be aided both by clear existing autobiographical knowledge and memories and by domain-specific knowledge regarding abuse, therapy, memory, and other relevant facts. Given this knowledge, one would also need to possess the intellectual abilities to analyze incoming suggestions in light of this knowledge and to have the acute capacity to bring relevant knowledge and abilities to bear. The latter requires the intact self-regulatory resources needed to control cognitive processes, including attention (to attend to relevant incoming information, to access relevant information from long-term memory, and to exclude distracting information) and working memory (to hold relevant information in mind while assessing its implications).

Self-regulation is central to these abilities. Although many may think of self-regulation as relevant to control of overt behaviors, substantial research has demonstrated that depletion of self-regulatory resources impairs intellectual performance of all sorts, including resistance to persuasion. Furthermore, self-regulatory capacity varies between individuals and can be easily depleted through such means as

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

previous exertions of effort or will, physical depletion, emotional stress, difficult social interactions, and resisting temptation (Baumeister & Vohs 2004; see Davis & O'Donohue 2004 for self-regulation and interrogation). Recovered-memory therapy patients are likely to suffer depleted self-regulatory resources due to psychopathology, emotional distress, poor physical condition secondary to distress (and such factors as sleep difficulties), difficult interactions with family, problems at work, and other factors. This depletion would impair intellectual functioning and ability to analyze relevant information as well as the ability to exert one's will.

Substantial evidence supports the importance of intellectual and self-regulatory capacities for suggestibility. Such factors as IQ, age-related intellectual abilities, physical and emotional status, and acute and chronic self-regulatory capacities have been shown to influence suggestibility and persuasion, including development of false memories and other memory distortions (see reviews by Bruck & Melnyk 2004, Davis & Loftus 2005, Davis & O'Donohue 2004, Gudjonsson 2003, Kassin & Gudjonsson 2004). The inclination to use these capacities is also relevant. Some are more inclined to carefully analyze incoming information (referred to as systematic or central route processing) whereas others rely on heuristic cues such as source attractiveness or credibility to assess likely accuracy (referred to as heuristic or peripheral route processing; see Cacioppo et al. 1996). The latter are particularly prone to rely on those seen as credible authorities without careful consideration of the basis of their opinions.

THE ABILITY TO EXERT ONE'S WILL    The ability to exert one's will in the direction of resistance to suggestion is also crucial. The most coercive form of recovered memory therapy will greatly resemble a coercive interrogation. That is, the suggestion will be relentless. Just as interrogators relentlessly pursue a particular preconceived version of the target crime and the suspect's guilt, the therapist will make many varied and repeated suggestions regarding abuse, will not recognize arguments or evidence provided by the patient against the abuse hypothesis as valid, and will reinterpret apparently inconsistent evidence as actually irrelevant or supportive and all consistent evidence as confirming evidence. In other words, in the strongest form of recovered memory therapy, the patient will be faced with consistent powerful external forces toward acceptance and compliance, thereby requiring strong and intact self-regulatory capacity to resist.

RESISTANCE IN THE CONTEXT OF STRONG PRIMING AND DIRECTED ATTENTION Even if a person suffers no impairments of self-regulation, knowledge, or cognitive resources, access to relevant information may be impaired by factors that selectively direct attention to confirming information. If the patient is in a situation where abuse has been suggested, where therapeutic interactions and procedures focus on abuse-related content, where suggestions to read survivor literature or to join survivor discussion groups have been adopted, and there has been a focus on efforts to remember abuse, the full situation will surely selectively direct attention to abuse-consistent content. The therapist is likely to ask questions that will tend to elicit

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

abuse-consistent content. Hence, even if the patient possesses knowledge (personal historical knowledge or other) that would contradict the abuse hypothesis, abuse and relevant consistent information may be so strongly primed and cognitively available that the contradictory information is effectively kept out of awareness.

THE ROLE OF DIRECTED INTERPRETATION The same therapeutic activities that selectively direct attention to abuse-related content will also tend to control the interpretation of information that is considered. As noted by researchers studying influence in the interrogation room, interrogators essentially persuade suspects to confess (including to confess falsely) by controlling both the information that is attended to and considered and the interpretation given to that information (e.g., Davis & O'Donohue 2004, Ofshe & Leo 1997).

## Motivation to Resist

One may see flaws in a suggestion and be able to resist but nevertheless have no desire to do so. Motivation can also affect the inclination to carefully scrutinize suggestions and therefore the initial detection of any flaws. Motivation to resist may be directly diffused by attraction and emotional attachment to the source, by his assumed expertise and authority, and by perceived helplessness in the face of his or her power or excessive dependence on the source (see Pratkanis & Aronson 2001 for reviews regarding source characteristics and influence). Individual differences in tendencies to trust authorities, to view them as credible or powerful, or to depend upon them are associated with greater deference and compliance (see Gudjonnson 2003, Kassin & Gudjonnson 2004).

Further, as thoroughly documented in the persuasion literature, resistance is fueled by motivated commitment to current beliefs and by pre-existing inconsistent attitudes and beliefs. In the context of therapy, motivation to resist may be undermined by the need to understand the source of one's problems (as discussed above) and by abuse-consistent beliefs developed prior to or in the process of therapy. Finally, external influences such as friends, other accusers, and family may directly encourage or discourage abuse-related assumptions. Generally, however, the therapeutic context is likely to undermine resistance in many patients, often progressively so as more abuse-consistent beliefs develop throughout the process. This is perhaps most likely to occur in dispositionally suggestible people who are also most confused, most motivated to find an explanation for their problems, and who possess pre-existing beliefs concerning themselves, repression, and the accused that would support developing abuse narratives.

# RECOVERED MEMORIES AND PUBLIC POLICY

The controversies surrounding allegedly repressed memories have created unfortunate tensions among professionals. But out of this process have come useful discussions by clinicians and nonclinicians writing together about changes in practices that would minimize the problems that false accusations can bring to all

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 139 of 245

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

involved. We found many instances where clinicians and scientists have provided useful advice that stemmed from the research we have reviewed. But we give one of the last words to a clinician, Sarnoff (2001), who has worried that a focus on "believing the victim" (p. 169) has essentially eliminated healthy skepticism as a quality to be encouraged in all who encounter questionable claims. We particularly resonate to her concerns, having learned this truth about memory: Just because a "memory" report is detailed, just because a person expresses it with confidence and emotion, does not mean that the event actually happened. Keeping that truth in mind may help to minimize harm to the many victims of the "memory wars": the patients who were misdiagnosed, the innocents who were falsely accused, the good therapists who suffered damaged reputations, and the genuine victims of abuse whose experiences were trivialized by the dubious claims of others.

Many clinicians will be aware that prominent professional organizations such as the American Medical Association, the American Psychological Association, the Australian Psychological Society, and the British Royal College of Psychiatrists have issued strong warnings against practices associated with recovered memory therapy (see the collected statements in Brainerd & Reyna 2005). It is our hope that this review will provide greater understanding of the basis of these recommendations and of the processes that contribute to the development of false memories of all kinds. In light of the biasing potential inherent to clinical diagnosis and therapy, it is essential for clinicians of the future to be well trained in the dangers of subjectivity and suggestive procedures such as those covered here.

## ACKNOWLEDGMENTS

Gratitude is expressed to the Grawemeyer Prize in Psychology for funding used to carry out this research. DD has testified as an expert witness on memory but has not done so specifically with respect to recovered memories. EL occasionally testifies as an expert witness in trials where recovered memories are an issue.

**The *Annual Review of Clinical Psychology* is online at http://clinpsy.annualreviews.org**

## LITERATURE CITED

Alpert JL. 1995. *Sexual Abuse Recalled*. Northvale, NJ: Jason Aronson

Arbuthnott KD, Arbuthnott DW, Rossiter L. 2001. Guided imagery and memory: implications for psychotherapists. *J. Couns. Psychol.* 48:123–32

Arnold R. 1994. *My Lives*. New York: Ballantine

Bass E, Davis L. 1988. *The Courage to Heal*. New York: Harper & Row

Bauer PJ. 2006. *Remembering the Times of Our Lives: Memory in Infancy and Beyond*. Mahwah, NJ: Erlbaum. In press

Baumeister RF, Vohs KD, eds. 2004. *Handbook of Self-Regulation: Research, Theory, and Applications*. New York: Guilford

Bernstein DM, Laney C, Morris EK, Loftus EF. 2005. False beliefs about fattening foods can have healthy consequences. *Proc. Natl. Acad. Sci. USA* 102:13724–31

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

Blume ES. 1995. *The Ownership of Truth*. New York: Wiley

Bottoms BL, Shaver PR, Goodman GS. 1996. An analysis of ritualistic and religion-related child abuse allegations. *Law Hum. Behav.* 20:1–34

Braun KA, Ellis R, Loftus EF. 2002. Make my memory: how advertising can change our memories of the past. *Psychol. Mark.* 19:1–23

Braun-LaTour KA, LaTour MS, Pickrell J, Loftus EF. 2004. How (and when) advertising can influence memory for consumer experience. *J. Advert.* 33:7–25

Brainerd CJ, Reyna VF. 2005. *The Science of False Memory*. New York: Oxford Univ. Press

Brenneis CB. 2000. Evaluating the evidence: Can we find authenticated recovered memory? *J. Am. Psychoanal. Assoc.* 17:61–77

Briere J, Conte J. 1993. Self-reported amnesia for abuse in adults molested as children. *J. Trauma. Stress* 6:21–31

Brown D, Scheflin AW, Hammond DC. 1998. *Memory, Trauma, Treatment, and the Law*. New York: Norton

Bruck M, Melnyk L. 2004. Individual differences in children's suggestibility: a review and synthesis. *Appl. Cogn. Psychol.* 18:947–96

Burgess AW, Hartman CR, Baker T. 1995. Memory presentations of childhood sexual abuse. *J. Psychosoc. Nurs.* 33:9–16

Cacioppo JT, Petty RE, Feinstein J, Jarvis B. 1996. Dispositional differences in cognitive motivation: the life and times of individuals low versus high in need for cognition. *Psychol. Bull.* 119:197–253

Clancy S. 2005. *Abducted: How People Come to Believe They Were Kidnapped By Aliens*. Cambridge, MA: Harvard Univ. Press

Copeland J, Snyder M. 1995. When counselors confirm: a functional analysis. *Personal. Soc. Psychol. Bull.* 21:1210–20

Corwin DL, Olafson E. 1997. Videotaped discovery of a reportedly unrecallable memory of child sexual abuse: comparison with a childhood interview videotaped 11 years before. *Child Maltreat.* 2:91–112

Crews FC. 2004. The trauma trap. *NY Rev. Books* 51(4)

Davis D, Follette WC. 2001. Foibles of witness memory for traumatic/high-profile events. *J. Air Law Commerce* 66:1421–549

Davis D, Loftus EF. 2005. Age and functioning in the legal system: victims, witnesses and jurors. In *Handbook of Human Factors in Litigation*, ed. YI Noy, W Karwowski, pp. 11–1–11–53. New York: CRC Press

Davis D, Loftus EF. 2006. Internal and external sources of distortion in adult witness memory. In *Handbook of Eyewitness Memory (Vol. 1): Memory for Events*, ed. MP Toglia, JD Read, DR Ross, RCL Lindsay. Mahwah, NJ: Erlbaum. In press

Davis D, Loftus EF, Follette WC. 2001. How, when, and whether to use informed consent for recovered memory therapy. *J. Am. Acad. Psychiatry Law* 29:148–59

Davis D, O'Donohue WT. 2004. The road to perdition: extreme influence tactics in the interrogation room. In *Handbook of Forensic Psychology*, ed. WT O'Donohue, E Levensky, pp. 897–996. New York: Elsevier

Dawes RM. 1991. Biases of retrospection. *Issues Child Abuse Accusations* 1:25–28

Della Femina D, Yeager C, Lewis DO. 1990. Child abuse: adolescent records vs. adult recall. *Child Abuse Negl.* 14:227–31

De Rivera J. 1997. The construction of false memory syndrome: the experience of retractors. *Psychol. Inq.* 8:271–92

Fazio RH, Effrein EA, Falender VJ. 1981. Self-perceptions following social interaction. *J. Personal. Soc. Psychol.* 41:232–42

Fischhoff B. 1975. Hindsight does not equal foresight: the effect of outcome knowledge on judgment under uncertainty. *J. Exp. Psychol. Hum. Percept. Perform.* 1:288–99

Fivush R, Edwards VJ. 2004. Remembering and forgetting childhood sexual abuse. *J. Child Sex. Abuse* 13:1–19

Ganaway GK. 1989. Historical versus narrative truth: clarifying the role of exogenous trauma

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org
by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

in the etiology of MPD and its variants. *Dissociation* 2:205–20

Garb HN. 1998. Clinical judgment. In *Studying the Clinician: Judgment Research and Psychological Assessment*, ed. HN Garb, pp. 173–206. Washington, DC: Am. Psychol. Assoc.

Garry M, Manning CG, Loftus EF. 1996. Imagination inflation: imagining a childhood event inflates confidence that it occurred. *Psychon. Bull. Rev.* 3:208–14

Gleaves DH, Smith SM, Butler LD, Speigel D. 2004. False and recovered memories in the laboratory and clinic: a review of experimental and clinical evidence. *Clin. Psychol. Sci. Pract.* 11:3–28

Goodman GS, Ghetti S, Quas JA, Edelstein RS, Alexander KW, et al. 2003. A prospective study of memory for child sexual abuse: new findings relevant to the repressed-memory controversy. *Psychol. Sci.* 14:113–18

Green MC, Brock TC. 2002. In the mind's eye: transportation-imagery model of narrative persuasion. In *Narrative Impact: Social and Cognitive Foundations*, ed. MC Green, JJ Strange, TC Brock, pp. 315–41. Mahwah, NJ: Erlbaum

Gudjonsson GH. 2003. *The Psychology of Interrogations and Confessions: A Handbook*. West Sussex, UK: Wiley

Henkel LA, Coffman KJ. 2004. Memory distortions in coerced false confessions: a source monitoring framework analysis. *Appl. Cogn. Psychol.* 18:567–88

Herman JL, Schatzow E. 1987. Recovery and verification of memories of childhood sexual trauma. *Psychoanal. Psychol.* 4:1–14

Holmes D. 1990. The evidence for repression: an examination of sixty years of research. In *Repression and Dissociation*, ed. J Singer, pp. 85–102. Chicago: Univ. Chicago Press

Hyman IE, Loftus EF. 2002. False childhood memories and eyewitness memory errors. In *Memory and Suggestibility in the Forensic Interview*, ed. ML Eisen, JA Quas, GS Goodman, pp. 63–84. Mahwah, NJ: Erlbaum

Johnson MK, Foley MA, Suengas AG, Raye CL. 1988. Phenomenal characteristics of memories for perceived and imagined autobiographical events. *J. Exp. Psychol. Gen.* 117:371–76

Johnson MK, Hashtroudi S, Lindsay DS. 1993. Source monitoring. *Psychol. Bull.* 114:3–28

Kahneman D, Tversky A. 1972. Subjective probability: a judgment of representativeness. *Cogn. Psychol.* 3:430–54

Kassin SM. 2006. Coerced internalized false confession. In *Handbook of Eyewitness Psychology (Vol. 1): Memory for Events*, ed. MP Toglia, JD Read, DR Ross, RCL Lindsay. Mahwah, NJ: Erlbaum. In press

Kassin SM, Gudjonsson GH. 2004. The psychology of confessions. *Psychol. Sci. Public Int.* 5:33–67

Kassin SM, Tubb VA, Hosch HM, Memon A. 2001. On the "general acceptance" of eyewitness testimony research. *Am. Psychol.* 56:405–16

Kemp S, Burt CDB, Sheen M. 2003. Remembering dreamt and actual experiences. *Appl. Cogn. Psychol.* 17:577–91

Kihlstrom JF. 1997. Hypnosis, memory and amnesia. *Philos. Trans. R. Soc. Biol. Sci.* 352:1727–32

Kihlstrom JF. 1998. Exhumed memory. In *Truth in Memory*, ed. KM McConkey, pp. 3–31. New York: Guilford

Kihlstrom JF. 2005. Dissociative disorders. *Annu. Rev. Clin. Psychol.* 1:227–53

Kirsch I. 1999. *How Expectancies Shape Experiences*. Washington, DC: Am. Psychol. Assoc.

Kluft RP. 1997. The argument for the reality of delayed recall of trauma. In *Trauma and Memory: Clinical and Legal Controversies*, ed. PS Appelbaum, LA Uyehara, MR Elin, pp. 25–27. New York: Oxford Univ. Press

Knowles ES, Linn JA. 2004. Approach-avoidance model of persuasion: alpha and omega strategies for change. In *Resistance and Persuasion*, ed. ES Knowles, JA Linn, pp. 117–48. Mahwah, NJ: Erlbaum

Kunda Z. 1999. *Social Cognition: Making Sense of People*. Cambridge, MA: MIT Press

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

La Fontaine JS. 1998. *Speak of the Devil: Tales of Satanic Abuse in Contemporary England*. Cambridge: Cambridge Univ. Press

Lanning KV. 1991. Ritual abuse: a law enforcement view or perspective. *Child Abuse Negl.* 15:171–73

Libby LK. 2003. Imagery perspective and source monitoring in imagination inflation. *Mem. Cogn.* 7:1072–81

Lief HI, Fetkewicz J. 1995. Retractors of false memories: The evolution of pseudomemories. *J. Psychiatry Law* 23:411–35

Lindsay DS, Hagen L, Read JD, Wade KA, Garry M. 2004. True photographs and false memories. *Psychol. Sci.* 15:149–54

Lindsay DS, Read JD. 1994. Psychotherapy and memories of childhood sexual abuse: a cognitive perspective. *Appl. Cogn. Psychol.* 8:281–338

Loftus EF. 1993. The reality of repressed memories. *Am. Psychol.* 48:518–37

Loftus EF. 2003. Make-believe memories. *Am. Psychol.* 58:867–73

Loftus EF. 2005. Planting misinformation in the human mind: a 30-year investigation of the malleability of memory. *Learn. Mem.* 12:361–66

Loftus EF, Garry M, Feldman J. 1994. Forgetting sexual trauma. *J. Consult. Clin. Psychol.* 62:1177–81

Loftus EF, Guyer M. 2002a. Who abused Jane Doe? The hazards of the single case history: part I. *Skeptical Inquirer* 26:24–32

Loftus EF, Guyer MJ. 2002b. Who abused Jane Doe? Part II. *Skeptical Inquirer* 26:37–40

Loftus EF, Ketcham K. 1994. *The Myth of Repressed Memory*. New York: St. Martin's

Loftus EF, Pickrell JE. 1995. The formation of false memories. *Psychiatr. Ann.* 25:720–25

Loftus EF, Polonsky S, Fullilove MT. 1994. Memories of childhood sexual abuse: remembering and repressing. *Psychol. Women Q.* 18:67–84

Mack JE. 1994. *Abduction: Human Encounters With Aliens*. New York: Ballantine. Rev. ed.

MacLean HN. 1993. *Once Upon a Time: A True Story of Memory, Murder, and the Law*. New York: Harper Collins

Mazzoni GAL, Loftus EF, Kirsch I. 2001. Changing beliefs about implausible autobiographical events: a little plausibility goes a long way. *J. Exp. Psychol. Appl.* 7:51–59

Mazzoni GAL, Loftus EF, Seitz A, Lynn SJ. 1999. Creating a new childhood: changing beliefs and memories through dream interpretation. *Appl. Cogn. Psychol.* 13:125–44

Mazzoni GAL, Lynn SJ, Kirsch I. 2006. Using hypnosis in eyewitness memory: past and current issues. In *Handbook of Eyewitness Memory (Vol. 1): Memory for Events*, ed. MP Toglia, JD Read, DR Ross, RCL Lindsay. Mahwah, NJ: Erlbaum. In press

Mazzoni GAL, Memon A. 2003. Imagination can create false autobiographical memories. *Psychol. Sci.* 14:186–88

McNally RJ. 2003a. Progress and controversy in the study of posttraumatic stress disorder. *Annu. Rev. Psychol.* 54:229–52

McNally RJ. 2003b. *Remembering Trauma*. Cambridge, MA: Harvard Univ. Press

McNally RJ. 2004. Is traumatic amnesia nothing but psychiatric folklore? *Cogn. Behav. Ther.* 33:97–101

McNally RJ, Ristuccia CS, Perlman CA. 2005. Forgetting of trauma cues in adults reporting continuous or recovered memories of childhood sexual abuse. *Psychol. Sci.* 16:336–40

Meissner CA, Kassin SM. 2004. "You're guilty, so just confess!" Cognitive and behavioral confirmation biases in the interrogation room. In *Interrogations, Confessions and Entrapment*, ed. GD Lassiter, pp. 85–106. New York: Kluwer Acad.

Melchert TP. 1996. Childhood memory and a history of different forms of abuse. *Prof. Psychol. Res. Pract.* 27:438–46

Nash MR. 1987. What, if anything, is regressed about hypnotic age regression? A review of the empirical literature. *Psychol. Bull.* 102:42–52

Nelson EL, Simpson P. 1994. First glimpse: an initial examination of subjects who have rejected their recovered visualizations as false memories. *Issues Child Abuse Accusations* 6:123–33

Noblitt JR, Perskin PS. 2000. *Cult and Ritual*

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 143 of 245

*Abuse: Its History, Anthropology, and Recent Discovery in Contemporary America*. Westport, CT: Praeger. Rev. ed.

Ofshe RJ, Leo RA. 1997. The decision to confess falsely: rational choice and irrational action. *Denver Univ. Law Rev.* 74:979–1122

Ofshe R, Watters E. 1994. *Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria*. New York: Scribner's

Ost J. 2003. Seeking the middle ground in the "memory wars." *Br. J. Psychol.* 94:125–39

Ost J, Costall A, Bull R. 2001. False confessions and false memories: a model for understanding retractors' experiences. *J. Forensic Psychiatry* 12:549–79

Ost J, Costall A, Bull R. 2002. A perfect symmetry? A study of retractor' experiences of making and then repudiating claims of early sexual abuse. *Psychol. Crime Law* 8:155–81

Ost J, Foster S, Costall A, Bull R. 2005. False reports in appropriate interviews. *Memory* 7:700–10

Pezdek K, Finger K, Hodge D. 1997. Planting false childhood memories: the role of event plausibility. *Psychol. Sci.* 8:437–41

Piper A Jr, Pope HG Jr, Borowiecki JJI. 2000. Custer's last stand: Brown, Scheflin, and Whitfield's latest attempt to salvage "dissociative amnesia." *J. Psychiatry Law* 28:149–213

Poole DA, Lindsay DS, Memon A, Bull R. 1995. Psychotherapy and the recovery of memories of childhood sexual abuse: U.S. and British practitioners' opinions, practices, and experiences. *J. Consult. Clin. Psychol.* 63:426–37

Pope HG Jr, Hudson JI. 1995. Can individuals "repress" memory of childhood sexual abuse? An examination of the evidence. *Psychiatr. Ann.* 25:715–19

Pope HG Jr, Hudson JI, Bodkin JA, Oliva P. 1998. Questionable validity of "dissociative amnesia" in trauma victims. *Br. J. Psychiatry* 172:210–15

Pope KS. 1996. Memory, abuse, and science. *Am. Psychol.* 51:957–74

Pope KS. 1998. Pseudoscience, cross-examination, and scientific evidence in the recovered memory controversy. *Psychol. Public Policy Law* 4:1160–81

Pope KS, Brown LS. 1996. *Recovered Memories of Abuse*. Washington, DC: Am. Psychol. Assoc.

Pratkanis AR, Aronson E. 2001. *Age of Propaganda*. New York: Freeman

Qin J, Goodman GS, Bottoms BL, Shaver PR. 1998. Repressed memories of ritualistic and religion-related child abuse. In *Truth in Memory*, ed. SJ Lynn, KM McConkey, pp. 163–89. New York: Guilford

Roe CM, Schwartz MF. 1996. Characteristics of previously forgotten memories of sexual abuse: a descriptive study. *J. Psychiatry Law* 24:189–206

Rogers ML, ed. 1992. Satanic ritual abuse. *J. Psychol. Theol.: Special Issue*. 20(3):entire issue

Ross CA. 1995. *Satanic Ritual Abuse: Principles of Treatment*. Toronto: Univ. Toronto Press

Sarnoff SK. 2001. *Sanctified Snake Oil: The Effect of Junk Science on Public Policy*. Westport, CT: Praeger

Schacter DL. 1996. *Searching for Memory: The Brain, the Mind, and the Past*. New York: Basic Books

Schacter DL. 2001. *The Seven Sins of Memory: How the Mind Forgets and Remembers*. New York: Houghton Mifflin

Schacter DL, Koutstall W, Johnson MK, Gross MS, Angell KE. 1997. False recollection induced by photographs: a comparison of older and younger adults. *Psychol. Aging* 12:203–15

Schooler JW, Bendiksen M, Ambadar Z. 1997. Taking the middle line: Can we accommodate both fabricated and recovered memories of sexual abuse? In *Recovered Memories and False Memories*, ed. MA Conway, pp. 251–92. Oxford: Oxford Univ. Press

Scott S. 2001. *The Politics and Experience of Ritual Abuse: Beyond Disbelief.* Buckingham, UK: Open Univ. Press

Sharman SJ, Garry M, Beuke CJ. 2004. Imagination or exposure causes imagination inflation. *Am. J. Psychol.* 117:157–69

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

Sharman SJ, Manning CG, Garry M. 2005. Explain this: explaining childhood events inflates confidence for those events. *Appl. Cogn. Psychol.* 19:67–74

Snyder M. 1984. When belief creates reality. In *Advances in Experimental Social Psychology*, ed. L Berkowitz, pp. 224–305. New York: Academic

Snyder M, Thomsen CJ. 1988. Interactions between therapists and clients: hypothesis testing and behavioral confirmation. In *Reasoning, Inference, and Judgment in Clinical Psychology*, ed. DC Turk, P Salovey, pp. 124–52. New York: Free Press

Spanos NP, Burgess CA, Burgess MF, Samuels C, Blois WO. 1999. Creating false memories of infancy with hypnotic and non-hypnotic procedures. *Appl. Cogn. Psychol.* 13:201–18

Spanos NP, Menary E, Gabora NJ, DuBreuil SC, Dewhirst B. 1991. Secondary identity enactments during hypnotic past-life regression: a sociocognitive perspective. *J. Personal. Soc. Psychol.* 61:308–20

Stevenson I. 1994. A case of the Psychotherapist's Fallacy: hypnotic regression to "previous lives." *Am. J. Clin. Hypn.* 26:188–93

Tafarodi RW, Marshall TC, Milne AB. 2003. Self-esteem and memory. *J. Personal. Soc. Psychol.* 84:29–45

Tavris C. 1993. Beware the incest-survivor machine. *NY Times Book Rev.* Jan. 3, pp. 1, 16–17

Taylor SE, Crocker J. 1981. Schematic bases of social information processing. In *Social Cognition: The Ontario Symposium*, ed. ET Higgins, CP Herman, MP Zanna, pp. 89–134. Hillsdale, NJ: Erlbaum

Terr L. 1994. *Unchained Memories*. New York: Basic Books

Thomas AK, Loftus EF. 2002. Creating bizarre false memories through imagination. *Mem. Cogn.* 30:423–31

Usher JA, Neisser U. 1993. Childhood amnesia and the beginnings of memory for four early life events. *J. Exp. Psychol.: Gen.* 122:155–65

van der Kolk BA, Fisler R. 1995. Dissociation and the fragmentary nature of traumatic memories: overview and exploratory study. *J. Trauma. Stress* 8:505–25

Wade KA, Garry M, Read JD, Lindsay DS. 2002. A picture is worth a thousand lies: using false photographs to create false childhood memories. *Psychon. Bull. Rev.* 9:597–603

Wagenaar WAC, Crombag H. 2005. *The Popular Policeman and Other Cases*. Chicago/Amsterdam: Univ. Chicago Press/Amsterdam Univ. Press

Weir IK, Wheatcroft MS. 1995. Allegations of children's involvement in ritual sexual abuse: clinical experience of 20 cases. *Child Abuse Negl.* 19:491–505

Whitfield CL. 1995. *Memory and Abuse*. Deerfield Beach, FL: Health Commun.

Williams LM. 1994. Recall of childhood trauma: a prospective study of women's memories of child sexual abuse. *J. Consult. Clin. Psychol.* 62:1167–76

Wilson AE, Ross M. 2003. The identity function of autobiographical memory: Time is on our side. *Memory* 11:137–49

Wright L. 1994. *Remembering Satan*. New York: Knopf

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.


Annual Review of Clinical Psychology
Volume 2, 2006

# CONTENTS

The History and Empirical Status of Key Psychoanalytic Concepts, *Lester Luborsky and Marna S. Barrett* 1

Doctoral Training in Clinical Psychology, *Richard M. McFall* 21

Methodological and Conceptual Issues in Functional Magnetic Resonance Imaging: Applications to Schizophrenia Research, *Gregory G. Brown and Lisa T. Eyler* 51

The Use of Structural Analysis of Social Behavior (SASB) as an Assessment Tool, *Lorna Smith Benjamin, Jeffrey Conrad Rothweiler, and Kenneth L. Critchfield* 83

Reinterpreting Comorbidity: A Model-Based Approach to Understanding and Classifying Psychopathology, *Robert F. Krueger and Kristian E. Markon* 111

Women's Mental Health Research: The Emergence of a Biomedical Field, *Mary C. Blehar* 135

Posttraumatic Stress Disorder: Etiology, Epidemiology, and Treatment Outcome, *Terence M. Keane, Amy D. Marshall, and Casey T. Taft* 161

The Psychopathology and Treatment of Bipolar Disorder, *David J. Miklowitz and Sheri L. Johnson* 199

Attempted and Completed Suicide in Adolescence, *Anthony Spirito and Christianne Esposito-Smythers* 237

Endophenotypes in the Genetic Analyses of Mental Disorders, *Tyrone D. Cannon and Matthew C. Keller* 267

Schizotypal Personality: Neurodevelopmental and Psychosocial Trajectories, *Adrian Raine* 291

Autism from Developmental and Neuropsychological Perspectives, *Marian Sigman, Sarah J. Spence, and A. Ting Wang* 327

Obesity, *Anthony N. Fabricatore and Thomas A. Wadden* 357

Mild Cognitive Impairment and Dementia, *Marilyn S. Albert and Deborah Blacker* 379

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.

COGNITION AND AGING IN PSYCHOPATHOLOGY: FOCUS ON
    SCHIZOPHRENIA AND DEPRESSION, *Philip D. Harvey, Abraham
    Reichenberg, and Christopher R. Bowie*                                389
CONTINGENCY MANAGEMENT FOR TREATMENT OF SUBSTANCE
    ABUSE, *Maxine Stitzer and Nancy Petry*                               411
PERSONALITY AND RISK OF PHYSICAL ILLNESS, *Timothy W. Smith and
    Justin MacKenzie*                                                     435
RECOVERED MEMORIES, *Elizabeth F. Loftus and Deborah Davis*               469

INDEX
    Subject Index                                                         499

ERRATA
    An online log of corrections to *Annual Review of Clinical Psychology* chapters
    (if any) may be found at http://www.AnnualReviews.org

Annu. Rev. Clin. Psychol. 2006.2:469-498. Downloaded from arjournals.annualreviews.org
by MEDICAL CENTER LIBRARY on 04/03/06. For personal use only.





Memory

ISSN: (Print) (Online) Journal homepage: https://www.tandfonline.com/loi/pmem20

# Are memories of sexual trauma fragmented?

Richard J. McNally

**To cite this article:** Richard J. McNally (2021): Are memories of sexual trauma fragmented?, Memory, DOI: 10.1080/09658211.2020.1871023

**To link to this article:** https://doi.org/10.1080/09658211.2020.1871023

Published online: 12 Jan 2021.

Submit your article to this journal

Article views: 211

View related articles

View Crossmark data

Full Terms & Conditions of access and use can be found at https://www.tandfonline.com/action/journalInformation?journalCode=pmem20

MEMORY
https://doi.org/10.1080/09658211.2020.1871023

# Are memories of sexual trauma fragmented?

Richard J. McNally

Department of Psychology, Harvard University, Cambridge, MA, USA

**ABSTRACT**

Alarmingly high rates of sexual assault on campus have motivated American colleges and universities to take steps to address this serious problem. Yet university administrators have often felt ill-equipped to assess allegations of sexual assault. Unsurprisingly, they have sought the expertise of psychologists who can educate administrative staff about the complexities of traumatic memory. Dr. Rebecca Campbell is among the most influential figures teaching university administrators about sexual trauma and memory. The purpose of this article is to review research pertinent to her views on fragmentation of traumatic memories, and the possible roles of tonic immobility and alcohol consumption on how survivors of sexual assault recall their experience.

**ARTICLE HISTORY**
Received 24 September 2020
Accepted 28 December 2020

**KEYWORDS**
Sexual assault; trauma; memory fragmentation; tonic immobility; alcohol blackout

Surveys have documented alarmingly high rates of sexual assault on the campuses of America's colleges and universities. For example, the Campus Climate Validation Survey, initiated by President Barack Obama under the auspices of the Department of Justice, involved nine diverse institutions of higher learning: universities, liberal arts schools, and community colleges, both public and private (Department of Justice Archives, 2016). More than 23,000 students completed the survey during the 2014–2015 academic year. Across the nine schools, the rate of completed sexual assault among undergraduate women ranged from 4% to 20%, and the rate of completed rape ranged from 2% to 8%. Among undergraduate men, the rate of completed sexual assault ranged from 1% to 6% during that year. By the time they reached their fourth year in college, between 13% and 51% of undergraduate women had been a victim of sexual battery or rape.

Although most victims disclosed their experience to a roommate, friend, or family member, only 4% of rape victims reported the crime to the police and only 7% reported it a school official. Nearly 30% feared retaliation should they report the assault. Finally, the survey documented the damaging psychological and academic consequences of these crimes on the survivors.

American institutions of higher learning have redoubled their efforts to address sexual assault on campus. Indeed, because women are disproportionately the victims, a failure to take steps to curb assaults would entail violating Title IX, a federal law mandating equal opportunity for education. Such violations imperil a university's access to federal funds, including research grants. Hence, moral, legal, and financial factors motivate the urgency to address the crisis effectively.

Few collegiate administrators are conversant with the psychology of trauma and memory. Accordingly, universities have turned to psychologists specialising in the assessment of rape victims for assistance in navigating these troubled waters. Among the most influential has been Dr. Rebecca Campbell, a community psychologist and Professor at Michigan State University (Yoffe, 2017). The PowerPoint slides accompanying her 2012 lecture at the National Institute of Justice on the neurobiology of trauma have been featured in numerous Title IX training programmes for educating administrators on how to evaluate allegations of campus sexual assault. Campbell's 2015 keynote address at the annual convention of the Association of Title IX Administrators further disseminated her views throughout higher education.

According to Campbell, the terror of sexual assault triggers the release of stress hormones and neurotransmitters that impair the formation of coherent memories of what happened. Survivors "may have significant trouble recalling their assault or describing it coherently or chronologically (Yoffe, 2017)". As Campbell puts it, trauma shatters the survivor's memory into "tiny Post-It notes" scattered across the brain – "the world's messiest desk" (R. Campbell, www.Youtube.com/watch?v=CnlXzD2pYSA). Nevertheless, she adds, "the research is very clear that the accuracy of the memory is intact".

Terror may also induce a state of *tonic immobility* whereby victims are incapable of speaking or moving, let alone resisting or fleeing from the perpetrator. She

**CONTACT** Richard J. McNally rjm@wjh.harvard.edu Department of Psychology, Harvard University, 1230 William James Hall, 33 Kirkland Street, Cambridge, MA 02138 USA

© 2021 Informa UK Limited, trading as Taylor & Francis Group

also acknowledges that alcohol consumption may further complicate recollection. Accordingly, university officials responsible for evaluating allegations of sexual assault must be sympathetically patient as survivors struggle to reassemble the scattered fragments of their shattered memory of trauma.

In this article, I consider the evidence bearing on Campbell's views. I address three questions: Are memories of trauma fragmented? Does tonic immobility affect memory for trauma? Can rapid consumption of alcohol impair memories of trauma?

## Does trauma fragment memory?

Asked about Campbell's theory, Elizabeth F. Loftus wondered whether Campbell was reviving the notion that victims often repress (or dissociate) their memories of trauma until therapists help them recover and process what happened (cited in Yoffe, 2017). Loftus's question is not unwarranted. To be sure, many behavioural neuroscientists (e.g., McGaugh, 2003), cognitive psychologists (e.g., Ceci & Loftus, 1994), and clinicians (e.g., McNally, 2003, pp. 186–228; McNally, 2007; Piper et al., 2000) presumably debunked the notion of repressed memories of trauma years ago, thereby ending the Memory Wars (Crews, 1995) that once inflamed our field (e.g., McHugh, 2006, p. 129). Nevertheless, the claim that people "often" repress their memories of trauma does seem resurgent (Otgaar et al., 2019; Otgaar et al., 2020); 81% of today's college students endorse it even though few practicing clinicians (24.1%) or applied cognitive psychologists (8.6%) do so (Patihis et al., 2014).

However, not everyone agrees (Brewin, in press; Brewin et al., 2019, in press). And so, we now have a "Meta-War" – a lively debate over whether the Memory Wars have ended – coupled to a dispute over whether terror strengthens or fragments narrative memories of trauma.

It is unclear whether Campbell would agree with Herman and Schatzow's (1987) concept of "massive repression" (p. 12) whereby symptomatic abuse survivors are *entirely* unaware of their trauma until they enter group therapy for women with abuse histories years later. Campbell's views seem closer to those of van der Kolk and Fisler (1995) who said that trauma can be "entirely organized on an implicit or perceptual level, without an accompanying narrative about what happened" (p. 512). However, Campbell emphasises a *disorganized* narrative, not one that is entirely missing. Her views also resemble those of Brewin (2011) who holds that people with posttraumatic stress disorder (PTSD) "find it difficult to deliberately construct and describe their conscious experience of the event, which tends to remain fragmented and disorganized" (p. 215).

Given that autobiographical memory does not operate like a videotape machine that infallibly records the story of our lives (e.g., Loftus & Loftus, 1980), it is unclear why Campbell asserts that the scattered fragments of a

memory of a sexual assault are each unfailingly accurate. Autobiographical memory is reconstructive, not reproductive. Nevertheless, *ceteris paribus*, intense fear will likely foster the encoding and storage of the most salient, central features of the trauma, sometimes at the expense of peripheral details (Loftus et al., 1987), but not necessarily at the expense of a coherent narrative of what happened. For example, survivors of the Nazi Holocaust have given vivid, detailed narrative accounts of their trauma (Langer, 1991).

Campbell's main point is that trauma impairs memory of trauma by scrambling its narrative structure, disorganising its otherwise accurate fragments. But if memory of trauma is fragmented, we need to ask, "As compared to what?"

In the most comprehensive and rigorous study done on memory fragmentation in trauma survivors, Rubin et al. (2016b) tested 60 trauma-exposed adults from the community, half of whom had PTSD. Trained assessors conducted structured diagnostic interviews, and subjects completed a battery of questionnaires assessing PTSD and other symptoms. All subjects had been exposed to a stressor qualifying as a DSM-IV Criterion A trauma (American Psychiatric Association, 1994). Subjects in the PTSD group had current PTSD, whereas those in the non-PTSD group had never developed PTSD. The two groups did not differ on other potentially confounding variables (e.g., percentage of women, percentage of minorities, social class, histories of substance abuse and dependence, depression symptoms and diagnoses). Moreover, the two groups did not differ in the proportion of subjects exposed to diverse trauma types (e.g., combat, childhood sexual abuse, natural disasters, accidents).

Subjects were then asked to recount their three most stressful or traumatic memories, their three most positive memories, and their three most important memories. These oral narratives were audiotaped and transcribed for later analyses.

Rubin et al. used 28 diverse measures of autobiographical memory coherence, using them to gauge the fragmentation of trauma, positive, and important autobiographical memories. The measures included self-ratings of coherence, judges' ratings, and computerised algorithmic metrics of temporal connectives, referential cohesion, concreteness, and so forth. Rubin et al. tested whether trauma narratives would be less coherent and more fragmented than positive narratives and important narratives, especially for those with PTSD.

Overall, trauma memories were no less coherent than positive memories and important memories. For some measures trauma memories were slightly less coherent than positive and important memories, whereas for others, trauma memories were more coherent. Rubin et al. found no evidence that the trauma memories of those subjects with PTSD were less coherent than those without PTSD. Rubin et al.'s study was especially strong methodologically, and more so than previous studies

including those adduced in support of the fragmentation claim.

In his critique of Rubin et al.'s study, Brewin (2016) proposed a reformulated version of the narrative (in)coherence hypothesis. He argued that the measures used by Rubin and colleagues assessed *global*, not *local*, coherence. That is, he said that clinicians most often observe fragmentation when survivors with PTSD attempt to recount the "hot spots" – the most emotionally disturbing parts – of their trauma memory. Accordingly, although survivors may be capable of providing a coherent, *global* account of their trauma, the most emotionally disturbing parts of the narrative are precisely the segments most likely to be fragmented, disorganised, and exhibiting "amnesic gaps" (Brewin, 2016, p. 1015). Brewin predicted that a focus on the "hot spots" (Brewin, 2016, p. 1014) would have corroborated the hypothesis that trauma impairs memory.

Rubin et al. (2016a) replied that 21 of the 28 indices did assess local coherence but did not reveal fragmentation in those with PTSD. Likewise, a phenomenological study of "flashbacks" in trauma survivors failed to uncover evidence of fragmentation in these terrifying, vivid, sensory recollections (Malaktaris & Lynn, 2019).

Rubin et al. (2016a) also faulted Brewin's (2014) review of nine studies, adduced by Brewin (2016) to support his claim of fragmented memories of trauma in survivors with PTSD. They noted that although seven of nine studies were supportive, Brewin (2014) failed to include five additional studies predating his review that otherwise satisfied his inclusion criteria but did not find memory fragmentation. Accordingly, Rubin et al. (2016a) concluded that previous research was at best inconclusive regarding memory fragmentation.

The importance of narrative fragmentation of trauma memories presumably rests on their maintenance of PTSD. Once the memories become integrated into a coherent narrative of the trauma, intrusive recollections, nightmares, and flashbacks presumptively diminish in frequency and intensity. Bedard-Gilligan et al. (2017) tested this hypothesis in a study of PTSD patients who received prolonged exposure therapy or sertraline for PTSD. Patients provided three narratives: one concerning their trauma, one concerning a positive experience, and one concerning a negative, but nontraumatic experience. Using self-report ratings, independent ratings, and objective measures of narrative structure, Bedard-Gilligan et al. assessed fragmentation of these memories before and after treatment.

The results revealed that across measures, memory fragmentation did not reliably change across the course of treatment. Neither treatment type nor response to treatment was related to change in fragmentation. In fact, pretreatment fragmentation in the nontraumatic negative and positive narratives correlated with fragmentation in trauma narratives. For some patients, fragmentation was a characteristic style of recounting autobiographical memories in general.

Finally, Taylor et al. (2020) conducted two online experiments showing that *how* a person retrieves and recounts memories, including traumatic ones, influences the person's judgements of the memory's coherence. If people are asked to describe an experience, they tend to furnish a narrative that they regard as more coherent than if they first answer a series of difficult questions about the experience (e.g., "On what day of the week did the event happen?" "What were you wearing at the time of the event? Describe your entire outfit"). Their findings indicate that judgments of coherence are attributions affected by the mode of retrieval rather than properties of the memory itself.

## Does tonic immobility impair memories of trauma?

Tonic immobility (TI) is an evolved adaptation for responding to mortal danger throughout the animal kingdom (e.g., insects, fish, chickens, rats, and human beings; Gallup, 1974). TI is a response of last resort in a prey animal's sequence of defensive survival maneuvers triggered by detection of a predator (Kozlowska et al., 2015). Prey animals first freeze voluntarily, becoming vigilant and motionless. If noticed by a predator, they flee, and fight only if flight is impossible. If fighting fails, prey animals exhibit the involuntary response of TI once they are in the grip of an overpowering predator. Although vigilant for a chance to escape, prey animals are unable to move or vocalise during TI. TI mimics death. Because many predators avoid dead prey, TI can save the lives of prey animals. TI typically terminates when the predator loosens its grip, enabling its prey to flee.

Substantial evidence indicates that human beings exhibit TI when trapped in terrifying, life-threatening situations (Kozlowska et al., 2015), exemplified by the nineteenth century Scottish explorer, David Livingstone, who survived an attack by a lion (quoted in Zoellner, 2008). As Campbell emphasised, TI is common in survivors of rape, especially when physically restrained by an assailant (e.g., Marx et al., 2008; Suarez & Gallup, 1979). Such rape-induced paralysis occurred in 41.5% of rape survivors assessed via the Tonic Immobility Scale in one study (Fusé et al., 2007), and in 69.8% of rape survivors in another (Möller et al., 2017).

The parallels between TI in rape victims and prey animals are striking. For example, in addition to terror, involuntary immobility, and inability to vocalise, rape survivors often report numbness and feeling cold, whereas animals experience analgesia and a sudden drop in core body temperature.

As Gallup (1974) wrote, "There is considerable evidence showing that animals continue to both monitor the environment and actually process information while in the immobile state" (p. 844). The same holds for humans. Although rape survivors often report depersonalisation (e.g., out-of-body experience) and derealization (e.g.,

feeling detached from one's surroundings) during TI (e.g., Fusé et al., 2007) they nevertheless retain vivid, terrifying memories of the experience (e.g., Kozlowska et al., 2015). Hence, dissociative symptoms of depersonalisation and derealization must not be confused with the notion of dissociative traumatic amnesia – the alleged inability to recall stored memories of one's trauma. Indeed, such vivid memories likely explain why TI predicts both the emergence (Möller et al., 2017) and the persistence of PTSD (Hagenaars & Hagenaars, 2020) in rape survivors.

Hence, although TI is common during sexual assault, it cannot account for reports of fragmented memories. Indeed, TI appears to run counter to any process that might possibly shatter narrative memory of an assault.

## Does rapid alcohol consumption impair memories of trauma?

Rapid, heavy alcohol consumption can cause blackouts that fragment memories in both perpetrators and victims of campus sexual assault. Such binge drinking often precedes assaults at fraternity parties (Armstrong & Hamilton, 2013, pp. 74–93).

The *rate* of increase in a person's blood alcohol level drives the severity of a blackout in anyone, not just those with alcoholism (White, 2003). Because of their lower average bodyweight, women are more susceptible to blackouts than men are. During a blackout, a person may drive an automobile, have sexual intercourse, and get into fights and yet have no memory for any of these experiences the following day. In milder cases, people can store some aspects of their experience into memory, but not others. The person who has had a blackout may learn from others what he or she did or said during the period of blackout. Such reminders do not prompt recollection because the memory is unavailable, not merely inaccessible. Blackout is a memory storage problem, not a memory retrieval problem. When memories of assault *are* fragmented, a rapid increase in blood alcohol level may be the cause. Alcohol blackouts may play a larger role in memory impairment than Campbell realises. Finally, blackouts must not be confused with "passing out" – losing consciousness from drinking too much.

In summary, memories of trauma, sexual or otherwise, appear to be no more fragmented or incoherent than other memories. All memories are reconstructive, not reproductive. There appears to be no need to postulate special neurocognitive mechanisms to account for memories of trauma (cf. Brewin, 2014); the general principles governing memory and emotion suffice (e.g., Rubin et al., 2008).

## Conclusions

The evidence reviewed above suggests the following:

- On average, memories of trauma are no more fragmented than are memories of positive, other negative, or important memories.
- Tonic immobility heightens rather than impairs memory for trauma.
- Alcohol blackouts can impair or prevent storage of memories for experiences, including trauma.

## Disclosure statement

No potential conflict of interest was reported by the author(s).

## References

American Psychiatric Association. (1994). *Diagnostic and statistical manual of mental disorders* (4th ed.). American Psychiatric Press.

Armstrong, E. A., & Hamilton, L. T. (2013). *Paying for the party: How college maintains inequality*. Harvard University Press.

Bedard-Gilligan, M., Zoellner, L. A., & Feeny, C. C. (2017). Is trauma memory special? Trauma narrative fragmentation in PTSD: Effects of treatment and response. *Clinical Psychological Science*, *5*(2), 212–225. https://doi.org/10.1177/2167702616676581

Brewin, C. R. (2011). The nature and significance of memory disturbance in posttraumatic stress disorder. *Annual Review of Clinical Psychology*, *7*(1), 203–227. https://doi.org/10.1146/annurev-clinpsy-032210-104544

Brewin, C. R. (2014). Episodic memory, perceptual memory, and their interaction: Foundations for a theory of posttraumatic stress disorder. *Psychological Bulletin*, *140*(1), 69–97. https://doi.org/10.1037/a0033722

Brewin, C. R. (2016). Coherence, disorganization, and fragmentation in traumatic memory reconsidered: A response to Rubin et al. (2016). *Journal of Abnormal Psychology*, *125*(7), 1011–1017. https://doi.org/10.1037/abn0000154

Brewin, C. R. (in press). Tilting at windmills: Why attacks on repression are misguided. *Perspectives on Psychological Science*. http://doi.org/10.1177/1745691620927674

Brewin, C. R., Li, H., Ntarantana, V., Unsworth, C., & McNeilis, J. (2019, in press). Is the public understanding of memory prone to widespread "myths"? *Journal of Experimental Psychology: General*. http://doi.org/101037/xge0000610

Ceci, S. J., & Loftus, E. F. (1994). "Memory work": A royal road to false memories? *Applied Cognitive Psychology*, *8*(4), 351–364. https://doi.org/10.1002/acp.2350080405

Crews, F. (1995). *The memory wars: Freud's legacy in dispute*. New York Review of Books.

Department of Justice Archives. (2016). *Understanding the campus climate validation survey validation study final technical report*. https://www.justice.gov/archives/opa/blog/understanding-campus-climate-survey-validation-study-final-technical-report.

Fusé, J., Forsyth, J., Marx, B., Gallup, G., & Weaver, S. (2007). Factor structure of the tonic immobility scale in female sexual assault survivors: An exploratory and confirmatory factor analysis. *Journal of Anxiety Disorders*, *21*(3), 265–283. https://doi.org/10.1016/j.janxdis.2006.05.004

Gallup, G. G., Jr. (1974). Animal hypnosis: Factual status of a fictional concept. *Psychological Bulletin*, *81*(11), 836–853. https://doi.org/10.1037/h0037227

Hagenaars, M. A., & Hagenaars, J. A. P. (2020). Tonic immobility predicts poorer recovery from posttraumatic stress. *Journal of Affective Disorders*, *264*, 365–369. https://doi.org/10.1016/j.jad.2019.11.027

Herman, J. L., & Schatzow, E. (1987). Recovery and verification of memories of childhood sexual trauma. *Psychoanalytic Psychology*, *4*(1), 1–14. https://doi.org/10.1037/h0079126



Kozlowska, K., Walker, P., McLean, L., & Carrive, P. (2015). Fear and the defense cascade: Clinical implications and management. *Harvard Review of Psychiatry*, *23*(4), 263–287. https://doi.org/10.1097/HRP.0000000000000065

Langer, L. L. (1991). *Holocaust testimonies: The ruins of memory*. Yale University Press.

Loftus, E. F., & Loftus, G. R. (1980). On the permanence of stored information in the human brain. *American Psychologist*, *35*(5), 409–420. https://doi.org/10.1037/0003-066X.35.5.409

Loftus, E. F., Loftus, G. R., & Messo, J. (1987). Some facts about "weapon focus". *Law and Human Behavior*, *11*(1), 55–62. https://doi.org/10.1007/BF01044839

Malaktaris, A. L., & Lynn, S. J. (2019). The phenomenology and correlates of flashbacks in individuals with posttraumatic stress symptoms. *Clinical Psychological Science*, *7*(2), 249–264. https://doi.org/10.1177/2167702618805081

Marx, B. P., Forsyth, J. P., Gallup, G. C., Fusé, T., & Lexington, J. M. (2008). Tonic immobility as an evolved predator defense: Implications for sexual assault survivors. *Clinical Psychology: Science and Practice*, *15*(1), 74–90. https://doi.org/10.1111/j.1468-2850.2008.00112.x

McGaugh, J. L. (2003). *Memory and emotion: The making of lasting memories*. Columbia University Press.

McHugh, P. R. (2006). *The mind has mountains: Reflections on society and psychiatry*. Johns Hopkins University Press.

McNally, R. J. (2003). *Remembering trauma*. Belknap Press/Harvard University Press.

McNally, R. J. (2007). Dispelling confusion about traumatic dissociative amnesia. *Mayo Clinic Proceedings*, *82*(9), 1083–1087. https://doi.org/10.4065/82.9.1083

Möller, A., Söndergaard, H. P., & Hellström, L. (2017). Tonic immobility during sexual assault – a common reaction predicting post-traumatic stress and severe depression. *Acta Obstetricia et Gynecologica Scandinavica*, *96*(8), 932–938. https://doi.org/10.1111/aogs.13174

Otgaar, H., Howe, M. L., Patihis, L., Merckelbach, H., Lynn, S. J., Lilienfeld, S. O., & Loftus, E. F. (2019). The return of the repressed: The persistent and problematic claims of long-forgotten trauma. *Perspectives on Psychological Science*, *14*(6), 1972–1095. https://doi.org/10.1177/1745691619862306

Otgaar, H., Wang, J., Dodier, O., Howe, M. L., Lilienfeld, S. O., Loftus, E. F., Lynn, S. J., Merckelbach, H., & Patihis, L. (2020). Skirting the issue: What does believing in repression mean? *Journal of Experimental Psychology: General*, *149*(10), 2005–2006.

Patihis, L., Ho, L. Y., Tingen, I. W., Lilienfeld, S. O., & Loftus, E. F. (2014). Are the "memory wars" over? A scientist-practitioner gap in beliefs about repressed memory. *Psychological Science*, *25*(2), 519–530. https://doi.org/10.1177/0956797613510718

Piper, A., Jr., Pope, H. G., Jr., & Borowiecki, J. J., III. (2000). Custer's last stand: Brown, Scheflin, and Whitfield's latest attempt to salvage "dissociative amnesia". *Journal of Psychiatry and Law*, *28*, 149–213.

Rubin, D. C., Berntsen, D., & Bohni, M. K. (2008). A memory-based model of posttraumatic stress disorder: Evaluating basic assumptions underlying the PTSD diagnosis. *Psychological Review*, *115*(4), 985–1011. https://doi.org/10.1037/a0013397

Rubin, D. C., Berntsen, D., Ogle, C. M., Deffler, S. A., & Beckham, J. C. (2016a). Scientific evidence versus outdated beliefs: A response to Brewin (2016). *Journal of Abnormal Psychology*, *125*(7), 1018–1021. https://doi.org/10.1037/abn0000211

Rubin, D. C., Deffler, S. A., Ogle, C. M., Dowell, N. M., Graesser, A. C., & Beckham, J. C. (2016b). Participant, rater, and computer measures of coherence in posttraumatic stress disorder. *Journal of Abnormal Psychology*, *125*(1), 11–25. https://doi.org/10.1037/abn0000126

Suarez, S., & Gallup, G. G., Jr. (1979). Tonic immobility as a response to rape in humans: A theoretical note. *Psychological Record*, *29*(3), 315–320. https://doi.org/10.1007/BF03394619

Taylor, A., Jordan, K., Zajac, R., Takarangi, M. K. T., & Garry, M. (2020). Judgments of memory coherence depend on the conditions under which a memory is retrieved, regardless of reported PTSD symptoms. *Journal of Applied Research in Memory and Cognition*, *9*(3), 396–409. https://doi.org/10/1016/j.jarmac.2020.07.003.

van der Kolk, B. A., & Fisler, R. (1995). Dissociation and the fragmentary nature of traumatic memories: Overview and exploratory study. *Journal of Traumatic Stress*, *8*(4), 505–525. https://doi.org/10.1002/jts.2490080402

White, A. M. (2003). What happened? Alcohol, memory blackouts, and the brain. *Alcohol Research & Health*, *27*, 186–196.

Yoffe, E. (2017, September 8). The bad science behind campus response to sexual assault. The Atlantic. https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/.

Zoellner, L. A. (2008). Translational challenges with tonic immobility. *Clinical Psychology: Science and Practice*, *15*(1), 98–101. https://doi.org/10.1111/j.1468-2850.2008.00114.x

Review of General Psychology
1998, Vol. 2, No. 2, 175–220

Copyright 1998 by the Educational Publishing Foundation
1089-2680/98/$3.00

# Confirmation Bias: A Ubiquitous Phenomenon in Many Guises

Raymond S. Nickerson
Tufts University

*Confirmation bias,* as the term is typically used in the psychological literature, connotes the seeking or interpreting of evidence in ways that are partial to existing beliefs, expectations, or a hypothesis in hand. The author reviews evidence of such a bias in a variety of guises and gives examples of its operation in several practical contexts. Possible explanations are considered, and the question of its utility or disutility is discussed.

> When men wish to construct or support a theory, how they torture facts into their service! (Mackay, 1852/1932, p. 552)

> Confirmation bias is perhaps the best known and most widely accepted notion of inferential error to come out of the literature on human reasoning. (Evans, 1989, p. 41)

If one were to attempt to identify a single problematic aspect of human reasoning that deserves attention above all others, the *confirmation bias* would have to be among the candidates for consideration. Many have written about this bias, and it appears to be sufficiently strong and pervasive that one is led to wonder whether the bias, by itself, might account for a significant fraction of the disputes, altercations, and misunderstandings that occur among individuals, groups, and nations.

*Confirmation bias* has been used in the psychological literature to refer to a variety of phenomena. Here I take the term to represent a generic concept that subsumes several more specific ideas that connote the inappropriate bolstering of hypotheses or beliefs whose truth is in question.

## Deliberate Versus Spontaneous Case Building

There is an obvious difference between impartially evaluating evidence in order to come to an unbiased conclusion and building a case to justify a conclusion already drawn. In the first instance one seeks evidence on all sides of a question, evaluates it as objectively as one can, and draws the conclusion that the evidence, in the aggregate, seems to dictate. In the second, one selectively gathers, or gives undue weight to, evidence that supports one's position while neglecting to gather, or discounting, evidence that would tell against it.

There is a perhaps less obvious, but also important, difference between building a case consciously and deliberately and engaging in case-building without being aware of doing so. The first type of case-building is illustrated by what attorneys and debaters do. An attorney's job is to make a case for one or the other side of a legal dispute. The prosecutor tries to marshal evidence to support the contention that a crime has been committed; the defense attorney tries to present evidence that will support the presumption that the defendant is innocent. Neither is committed to an unbiased weighing of all the evidence at hand, but each is motivated to confirm a particular position. Debaters also would be expected to give primary attention to arguments that support the positions they are defending; they might present counterarguments, but would do so only for the purpose of pointing out their weaknesses.

As the term is used in this article and, I believe, generally by psychologists, *confirmation bias* connotes a less explicit, less consciously one-sided case-building process. It refers usually to unwitting selectivity in the acquisition and use of evidence. The line between deliberate selectivity in the use of evidence and unwitting molding of facts to fit hypotheses or beliefs is a difficult one to draw in practice, but the distinction is meaningful conceptually, and confirmation bias has more to do with the latter than with the former. The

---

Correspondence concerning this article should be addressed to Raymond S. Nickerson, Department of Psychology, Paige Hall, Tufts University, Medford, Massachusetts 02155. Electronic mail may be sent to mickerson@infonet.tufts.edu.

assumption that people can and do engage in case-building unwittingly, without intending to treat evidence in a biased way or even being aware of doing so, is fundamental to the concept.

The question of what constitutes confirmation of a hypothesis has been a controversial matter among philosophers and logicians for a long time (Salmon, 1973). The controversy is exemplified by Hempel's (1945) famous argument that the observation of a white shoe is confirmatory for the hypothesis "All ravens are black," which can equally well be expressed in contrapositive form as "All nonblack things are nonravens." Goodman's (1966) claim that evidence that something is green is equally good evidence that it is "grue"—*grue* being defined as green before a specified future date and blue thereafter—also provides an example. A large literature has grown up around these and similar puzzles and paradoxes. Here this controversy is largely ignored. It is sufficiently clear for the purposes of this discussion that, as used in everyday language, *confirmation* connotes evidence that is perceived to *support*—to increase the credibility of—a hypothesis.

I also make a distinction between what might be called *motivated* and *unmotivated* forms of confirmation bias. People may treat evidence in a biased way when they are motivated by the desire to defend beliefs that they wish to maintain. (As already noted, this is not to suggest intentional mistreatment of evidence; one may be selective in seeking or interpreting evidence that pertains to a belief without being deliberately so, or even necessarily being aware of the selectivity.) But people also may proceed in a biased fashion even in the testing of hypotheses or claims in which they have no material stake or obvious personal interest. The former case is easier to understand in common-sense terms than the latter because one can appreciate the tendency to treat evidence selectively when a valued belief is at risk. But it is less apparent why people should be partial in their uses of evidence when they are indifferent to the answer to a question in hand. An adequate account of the confirmation bias must encompass both cases because the existence of each is well documented.

There are, of course, instances of one wishing to disconfirm a particular hypothesis. If, for example, one believes a hypothesis to be untrue, one may seek evidence of that fact or give undue weight to such evidence. But in such cases, the hypothesis in question is someone else's belief. For the individual who seeks to disconfirm such a hypothesis, a confirmation bias would be a bias to confirm the individual's own belief, namely that the hypothesis in question is false.

## A Long-Recognized Phenomenon

Motivated confirmation bias has long been believed by philosophers to be an important determinant of thought and behavior. Francis Bacon (1620/1939) had this to say about it, for example:

> The human understanding when it has once adopted an opinion (either as being the received opinion or as being agreeable to itself) draws all things else to support and agree with it. And though there be a greater number and weight of instances to be found on the other side, yet these it either neglects and despises, or else by some distinction sets aside and rejects; in order that by this great and pernicious predetermination the authority of its former conclusions may remain inviolate. . . . And such is the way of all superstitions, whether in astrology, dreams, omens, divine judgments, or the like; wherein men, having a delight in such vanities, mark the events where they are fulfilled, but where they fail, although this happened much oftener, neglect and pass them by. (p. 36)

Bacon noted that philosophy and the sciences do not escape this tendency.

The idea that people are prone to treat evidence in biased ways if the issue in question matters to them is an old one among psychologists also:

> If we have nothing personally at stake in a dispute between people who are strangers to us, we are remarkably intelligent about weighing the evidence and in reaching a rational conclusion. We can be convinced in favor of either of the fighting parties on the basis of good evidence. But let the fight be our own, or let our own friends, relatives, fraternity brothers, be parties to the fight, and we lose our ability to see any other side of the issue than our own. . . . The more urgent the impulse, or the closer it comes to the maintenance of our own selves, the more difficult it becomes to be rational and intelligent. (Thurstone, 1924, p. 101)

The data that I consider in what follows do not challenge either the notion that people generally like to avoid personally disquieting information or the belief that the strength of a bias in the interpretation of evidence increases with the degree to which the evidence relates directly to a dispute in which one has a personal

stake. They are difficult to reconcile, however, with the view that evidence is treated in a totally unbiased way if only one has no personal interest in that to which it pertains.

The following discussion of this widely recognized bias is organized in four major sections. In the first, I review experimental evidence of the operation of a confirmation bias. In the second, I provide examples of the bias at work in practical situations. The third section notes possible theoretical explanations of the bias that various researchers have proposed. The fourth addresses the question of the effects of the confirmation bias and whether it serves any useful purposes.

## Experimental Studies

A great deal of empirical evidence supports the idea that the confirmation bias is extensive and strong and that it appears in many guises. The evidence also supports the view that once one has taken a position on an issue, one's primary purpose becomes that of defending or justifying that position. This is to say that regardless of whether one's treatment of evidence was evenhanded before the stand was taken, it can become highly biased afterward.

### *Hypothesis-Determined Information Seeking and Interpretation*

People tend to seek information that they consider supportive of favored hypotheses or existing beliefs and to interpret information in ways that are partial to those hypotheses or beliefs. Conversely, they tend not to seek and perhaps even to avoid information that would be considered counterindicative with respect to those hypotheses or beliefs and supportive of alternative possibilities (Koriat, Lichtenstein, & Fischhoff, 1980).

Beyond seeking information that is supportive of an existing hypothesis or belief, it appears that people often tend to seek only, or primarily, information that will support that hypothesis or belief in a particular way. This qualification is necessary because it is generally found that people seek a specific type of information that they would expect to find, assuming the hypothesis is true. Also, they sometimes appear to give weight to information that is consistent with a hypothesis but not diagnostic with respect to it. These generalizations are illustrated by several of the following experimental findings.

*Restriction of attention to a favored hypothesis.* If one entertains only a single possible explanation of some event or phenomenon, one precludes the possibility of interpreting data as supportive of any alternative explanation. Even if one recognizes the possibility of other hypotheses or beliefs, perhaps being aware that other people hold them, but is strongly committed to a particular position, one may fail to consider the relevance of information to the alternative positions and apply it (favorably) only to one's own hypothesis or belief.

Restricting attention to a single hypothesis and failing to give appropriate consideration to alternative hypotheses is, in the Bayesian framework, tantamount to failing to take likelihood ratios into account. The likelihood ratio is the ratio of two conditional probabilities, $p(D|H_1)/p(D|H_j)$, and represents the probability of a particular observation (or datum) if one hypothesis is true relative to the probability of that same observation if the other hypothesis is true. Typically there are several plausible hypotheses to account for a specific observation, so a given hypothesis would have several likelihood ratios. The likelihood ratio for a hypothesis and its complement, $p(D|H)/p(D|\sim H)$, is of special interest, however, because an observation gives one little evidence about the probability of the truth of a hypothesis unless the probability of that observation, given that the hypothesis is true, is either substantially larger or substantially smaller than the probability of that observation, given that the hypothesis is false.

The notion of diagnosticity reflects the importance of considering the probability of an observation conditional on hypotheses other than the favored one. An observation is said to be *diagnostic* with respect to a particular hypothesis to the extent that it is consistent with that hypothesis and not consistent, or not as consistent, with competing hypotheses and in particular with the complementary hypothesis. One would consider an observation diagnostic with respect to a hypothesis and its complement to the degree that the likelihood ratio, $p(D|H)/p(D|\sim H)$, differed from 1. An observation that is consistent with more than one hypothesis is said not to be diagnostic with respect to those hypotheses; when one considers the probability

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 156 of 245

of an observation conditional on only a single hypothesis, one has no way of determining whether the observation is diagnostic.

Evidence suggests that people often do the equivalent of considering only $p(D|H)$ and failing to take into account the ratio of this and $p(D|{\sim}H)$, despite the fact that considering only one of these probabilities does not provide a legitimate basis for assessing the credibility of $H$ (Beyth-Marom & Fischhoff, 1983; Doherty & Mynatt, 1986; Doherty, Mynatt, Tweney, & Schiavo, 1979; Griffin & Tversky, 1992; Kern & Doherty, 1982; Troutman & Shanteau, 1977). This tendency to focus exclusively on the case in which the hypothesis is assumed to be true is often referred to as a tendency toward *pseudodiagnosticity* (Doherty & Mynatt, 1986; Doherty et al., 1979; Fischhoff & Beyth-Marom, 1983; Kern & Doherty, 1982). Fischhoff and Beyth-Marom (1983) have argued that much of what has been interpreted as a confirmation bias can be attributed to such a focus and the consequential failure to consider likelihood ratios.

*Preferential treatment of evidence supporting existing beliefs.* Closely related to the restriction of attention to a favored hypothesis is the tendency to give greater weight to information that is supportive of existing beliefs or opinions than to information that runs counter to them. This does not necessarily mean completely ignoring the counterindicative information but means being less receptive to it than to supportive information—more likely, for example, to seek to discredit it or to explain it away.

Preferential treatment of evidence supporting existing beliefs or opinions is seen in the tendency of people to recall or produce reasons supporting the side they favor—*my-side bias*—on a controversial issue and not to recall or produce reasons supporting the other side (Baron, 1991, 1995; Perkins, Allen, & Hafner, 1983; Perkins, Farady, & Bushey, 1991). It could be either that how well people remember a reason depends on whether it supports their position, or that people hold a position because they can think of more reasons to support it. Participants in the study by Perkins, Farady, and Bushey were capable of generating reasons for holding a view counter to their own when explicitly asked to do so; this finding led Tishman, Jay, and Perkins (1993) to interpret the failure to do so spontaneously as a motivational problem as distinct from a cognitive limitation.

Baron (1995) found that, when asked to judge the quality of arguments, many people were likely to rate one-sided arguments higher than two-sided arguments, suggesting that the bias is at least partially due to common beliefs about what makes an argument strong. In keeping with this result, participants in a mock jury trial who tended to use evidence selectively to build one view of what happened expressed greater confidence in their decisions than did those who spontaneously tried to weigh both sides of the case (D. Kuhn, Weinstock, & Flaton, 1994).

When children and young adults were given evidence that was inconsistent with a theory they favored, they often "either failed to acknowledge discrepant evidence or attended to it in a selective, distorting manner. Identical evidence was interpreted one way in relation to a favored theory and another way in relation to a theory that was not favored" (D. Kuhn, 1989, p. 677). Some of Kuhn's participants were unable to indicate what evidence would be inconsistent with their theories; some were able to generate alternative theories when asked, but they did not do so spontaneously. When they were asked to recall their theories and the related evidence that had been presented, participants were likely to recall the evidence as being more consistent with the theories than it actually was. The greater perceived consistency was achieved sometimes by inaccurate recall of theory and sometimes by inaccurate recall of evidence.

*Looking only or primarily for positive cases.* What is considerably more surprising than the fact that people seek and interpret information in ways that increase their confidence in favored hypotheses and established beliefs is the fact that they appear to seek confirmatory information even for hypotheses in whose truth value they have no vested interest. In their pioneering concept-discovery experiments, Bruner, Goodnow, and Austin (1956) found that participants often tested a hypothesized concept by choosing only examples that would be classified as instances of the sought-for concept if the hypothesis were correct. This strategy precludes discovery, in some cases, that an incorrect hypothesis is incorrect. For example, suppose the concept to be discovered is *small circle* and one's hypothesis is *small red circle.* If one tests the hypothesis by selecting only things that are

small, red, and circular, one will never discover that the class defined by the concept includes also small circular things that are yellow or blue. Several investigators (Levine, 1970; Millward & Spoehr, 1973; Taplin, 1975; Tweney et al., 1980; Wason & Johnson-Laird, 1972) subsequently observed the same behavior of participants testing only cases that are members of the hypothesized category.

Some studies demonstrating selective testing behavior of this sort involved a task invented by Wason (1960) in which people were asked to find the rule that was used to generate specified triplets of numbers. The experimenter presented a triplet, and the participant hypothesized the rule that produced it. The participant then tested the hypothesis by suggesting additional triplets and being told, in each case, whether it was consistent with the rule to be discovered. People typically tested hypothesized rules by producing only triplets that were consistent with them. Because in most cases they did not generate any test items that were inconsistent with the hypothesized rule, they precluded themselves from discovering that it was incorrect if the triplets it prescribed constituted a subset of those prescribed by the actual rule. Given the triplet 2–4–6, for example, people were likely to come up with the hypothesis *successive even numbers* and then proceed to test this hypothesis by generating additional sets of successive even numbers. If the 2–4–6 set had actually been produced by the rule *numbers increasing by 2, numbers increasing in size,* or *any three positive numbers,* the strategy of using only sets of successive even numbers would not reveal the incorrectness of the hypothesis because every test item would get a positive response.

The use only of test cases that will yield a positive response if a hypothesis under consideration is correct not only precludes discovering the incorrectness of certain types of hypotheses with a correct hypothesis, this strategy would not yield as strongly confirmatory evidence, logically, as would that of deliberately selecting tests that would show the hypothesis to be wrong, if it is wrong, and failing in the attempt. To the extent that the strategy of looking only for positive cases is motivated by a wish to find confirmatory evidence, it is misguided. The results this endeavor will yield will, at best, be consistent with the hypothesis, but the confirmatory evidence they provide will not be as

compelling as would the failure of a rigorous attempt at disconfirmation.

This point is worth emphasizing because the psychological literature contains many references to the confirmatory feedback a participant gets when testing a hypothesis with a positive case. These references do not generally distinguish between confirmatory in a logical sense and confirmatory in a psychological sense. The results obtained by Wason (1960) and others suggest that feedback that is typically interpreted by participants to be strongly confirmatory often is not logically confirmatory, or at least not strongly so. The "confirmation" the participant receives in this situation is, to some degree, illusory. This same observation applies to other studies mentioned in the remainder of this article.

In an early commentary on the triplet-rule task, Wetherick (1962) argued that the experimental situation did not reveal the participants' intentions in designating any particular triplet as a test case. He noted that any test triplet could either conform or not conform to the rule, as defined by the experimenter, and it could also either conform or not conform to the hypothesis being considered by the participant. Any given test case could relate to the rule and hypothesis in combination in any of four ways: conform–conform, conform–not conform, not conform–conform, and not conform–not conform. Wetherick argued that one could not determine whether an individual was intentionally attempting to eliminate a candidate hypothesis unless one could distinguish between test cases that were selected because they conformed to a hypothesis under consideration and those that were selected because they did not.

Suppose a participant selects the triplet 3–5–7 and is told that it is consistent with the rule (the rule being *any three numbers in ascending order*). The participant might have chosen this triplet because it conforms to the hypothesis being considered, say *numbers increasing by two,* and might have taken the positive response as evidence that the hypothesis is correct. On the other hand, the participant could have selected this triplet in order to eliminate one or more possible hypotheses (e.g., *even numbers ascending; a number, twice the number, three times the number*). In this case, the experimenter's positive response would constitute the discon-

firming evidence (with respect to these hypotheses) the participant sought.

Wetherick (1962) also pointed out that a test triplet may logically rule out possible hypotheses without people being aware of the fact because they never considered those hypotheses. A positive answer to the triplet 3–5–7 logically eliminates *even numbers ascending* and *a number, twice the number, three times the number,* among other possibilities, regardless of whether the participant thought of them. But of course, only if the triplet was selected with the intention of ruling out those options should its selection be taken as an instance of a falsification strategy. Wetherick's point was that without knowing what people have in mind in making the selections they do, one cannot tell whether they are attempting to eliminate candidates from further consideration or not.

Wason (1962, 1968/1977) responded to this objection with further analyses of the data from the original experiment and data from additional experiments showing that although some participants gave evidence of understanding the concept of falsification, many did not. Wason summarized the findings from these experiments this way: "there would appear to be compelling evidence to indicate that even intelligent individuals adhere to their own hypotheses with remarkable tenacity when they can produce confirming evidence for them" (1968/1977, p. 313).

In other experiments in which participants have been asked to determine which of several hypotheses is the correct one to explain some situation or event, they have tended to ask questions for which the correct answer would be *yes* if the hypothesis under consideration were true (Mynatt, Doherty, & Tweney, 1977; Shaklee & Fischhoff, 1982). These experiments are among many that have been taken to reveal not only a disinclination to test a hypothesis by selecting tests that would show it to be false if it is false, but also a preference for questions that will yield a positive answer if the hypothesis is true.

Others have noted the tendency to ask questions for which the answer is *yes* if the hypothesis being tested is correct in the context of experiments on personality perception (Hodgins & Zuckerman, 1993; Schwartz, 1982; Strohmer & Newman, 1983; Trope & Bassock, 1982, 1983; Trope, Bassock, & Alon, 1984;

Zuckerman, Knee, Hodgins, & Miyake, 1995). Fischhoff and Beyth-Marom (1983) also noted the possibility that participants in such experiments tend to assume that the hypothesis they are asked to test is true and select questions that would be the least awkward to answer if that is the case. For instance, participants asked assumed extroverts (or introverts) questions that extroverts (or introverts) would find particularly easy to answer.

*Overweighting positive confirmatory instances.* Studies of social judgment provide evidence that people tend to overweight positive confirmatory evidence or underweight negative discomfirmatory evidence. Pyszczynski and Greenberg (1987) interpreted such evidence as supportive of the view that people generally require less hypothesis-consistent evidence to accept a hypothesis than hypothesis-inconsistent information to reject a hypothesis. These investigators argued, however, that this asymmetry is modulated by such factors as the degree of confidence one has in the hypothesis to begin with and the importance attached to drawing a correct conclusion. Although they saw the need for accuracy as one important determinant of hypothesis-evaluating behavior, they suggested that other motivational factors, such as needs for self-esteem, control, and cognitive consistency, also play significant roles.

People can exploit others' tendency to overweight (psychologically) confirming evidence and underweight disconfirming evidence for many purposes. When the mind reader, for example, describes one's character in more-or-less universally valid terms, individuals who want to believe that their minds are being read will have little difficulty finding substantiating evidence in what the mind reader says if they focus on what fits and discount what does not and if they fail to consider the possibility that equally accurate descriptions can be produced if their minds are not being read (Fischhoff & Beyth-Marom, 1983; Forer, 1949; Hyman, 1977). People who wish to believe in astrology or the predictive power of psychics will have no problem finding some predictions that have turned out to be true, and this may suffice to strengthen their belief if they fail to consider either predictions that proved not to be accurate or the possibility that people without the ability to see the future could make predictions with equally high (or low) hit rates. A confirmation

bias can work here in two ways: (a) people may attend selectively to what is said that turns out to be true, ignoring or discounting what turns out to be false, and (b) they may consider only $p(D|H)$, the probability that what was said would be said if the seer could really see, and fail to consider $p(D|\sim H)$, the probability that what was said would be said if the seer had no special psychic powers. The tendency of gamblers to explain away their losses, thus permitting themselves to believe that their chances of winning are higher than they really are, also illustrates the overweighting of supportive evidence and the underweighting of opposing evidence (Gilovich, 1983).

*Seeing what one is looking for.* People sometimes see in data the patterns for which they are looking, regardless of whether the patterns are really there. An early study by Kelley (1950) of the effect of expectations on social perception found that students' perceptions of social qualities (e.g., relative sociability, friendliness) of a guest lecturer were influenced by what they had been led to expect from a prior description of the individual. Forer (1949) demonstrated the ease with which people could be convinced that a personality sketch was an accurate depiction of themselves and their disinclination to consider how adequately the sketch might describe others as well.

Several studies by Snyder and his colleagues involving the judgment of personality traits lend credence to the idea that the degree to which what people see or remember corresponds to what they are looking for exceeds the correspondence as objectively assessed (Snyder, 1981, 1984; Snyder & Campbell, 1980; Snyder & Gangestad, 1981; Snyder & Swann, 1978a, 1978b). In a study representative of this body of work, participants would be asked to assess the personality of a person they are about to meet. Some would be given a sketch of an extrovert (sociable, talkative, outgoing) and asked to determine whether the person is that type. Others would be asked to determine whether the person is an introvert (shy, timid, quiet). Participants tend to ask questions that, if given positive answers, would be seen as strongly confirmatory and that, if given negative answers, would be weakly disconfirmatory of the personality type for which they are primed to look (Snyder, 1981; Snyder & Swann, 1978a). Some of the questions that people ask in these situations are likely to evoke similar answers from extroverts and introverts (Swann, Giuliano, & Wegner, 1982)—answers not very diagnostic with respect to personality type. When this is the case, askers find it easy to see the answers they get as supportive of the hypothesis with which they are working, independently of what that hypothesis is.

The interpretation of the results of these studies is somewhat complicated by the finding of a tendency for people to respond to questions in a way that, in effect, acquiesces to whatever hypothesis the interrogator is entertaining (Lenski & Leggett, 1960; Ray, 1983; Schuman & Presser, 1981; Snyder, 1981; Zuckerman et al., 1995). For example, if the interrogator hypothesizes that the interviewee is an extrovert and asks questions that an extrovert would be expected to answer in the affirmative, the interviewee is more likely than not to answer in the affirmative independently of his or her personality type. Snyder, Tanke, and Berscheid (1977) have reported a related phenomenon. They found that male participants acted differently in a phone conversation toward female participants who had been described as attractive than toward those who had been described as unattractive, and that their behavior evoked more desirable responses from the "attractive" than from the "unattractive" partners.

Such results suggest that responders may inadvertently provide evidence for a working hypothesis by, in effect, accepting the assumption on which the questions or behavior are based and behaving in a way that is consistent with that assumption. Thus the observer's expectations become self-fulfilling prophecies in the sense suggested by Merton (1948, 1957); the expectations are "confirmed" because the behavior of the observed person has been shaped by them, to some degree. Studies in education have explored the effect of teachers' expectations on students' performance and have obtained similar results (Dusek, 1975; Meichenbaum, Bowers, & Ross, 1969; Rosenthal, 1974; Rosenthal & Jacobson, 1968; Wilkins, 1977; Zanna, Sheras, Cooper, & Shaw, 1975).

Darley and Fazio (1980) noted the importance of distinguishing between the case in which the behavior of a target person has changed in response to the perceiver's expectation-guided actions and that in which behavior has not changed but is interpreted to have done so in a

way that is consistent with the perceiver's expectations. Only the former is considered an example of a self-fulfilling prophecy. In that case, the change in behavior should be apparent to an observer whose observations are not subject to distortion by the expectations in question. When people's actions are interpreted in ways consistent with observers' expectations in the absence of any interaction between observer and observed, the self-fulfilling-prophecy effect cannot be a factor.

Darley and Gross (1983) provided evidence of seeing what one is looking for under the latter conditions noted above. These authors had two groups of people view the same videotape of a child taking an academic test. One of the groups had been led to believe that the child's socioeconomic background was high and the other had been led to believe that it was low. The former group rated the academic abilities, as indicated by what they could see of her performance on the test, as above grade level, whereas the latter group rated the same performance as below grade level. Darley and Gross saw this result as indicating that the participants in their study formed a hypothesis about the child's abilities on the basis of assumptions about the relationship between socioeconomic status and academic ability and then interpreted what they saw in the videotape so as to make it consistent with that hypothesis.

Numerous studies have reported evidence of participants seeing or remembering behavior that they expect. Sometimes the effects occur under conditions in which observers interact with the people observed and sometimes under conditions in which they do not. "Confirmed" expectations may be based on ethnic (Duncan, 1976), clinical (Langer & Abelson, 1974; Rosenhan, 1973; Swann et al., 1982), educational (Foster, Schmidt, & Sabatino, 1976; Rosenthal & Jacobson, 1968), socioeconomic (Rist, 1970), and lifestyle (Snyder & Uranowitz, 1978) stereotypes, among other factors. And they can involve induced expectations regarding oneself as well as others (Mischel, Ebbensen, & Zeiss, 1973).

Pennebaker and Skelton (1978) have pointed out how a confirmation bias can reinforce the worst fears of a hypochondriac. The body more or less continuously provides one with an assortment of signals that, if attended to, could be interpreted as symptoms of illness of one sort or another. Normally people ignore these signals. However, if one suspects that one is ill, one is likely to begin to attend to these signals and to notice those that are consistent with the assumed illness. Ironically, the acquisition of factual knowledge about diseases and their symptoms may exacerbate the problem. Upon learning of a specific illness and the symptoms that signal its existence, one may look for those symptoms in one's own body, thereby increasing the chances of detecting them even if they are not out of the normal range (Woods, Matterson, & Silverman, 1966).

Similar observations apply to paranoia and a variety of neurotic or psychotic states. If one believes strongly that one is a target of other people's ill will or aggression, one is likely to be able to fit many otherwise unaccounted-for incidents into this view. As Beck (1976) has suggested, the tendency of people suffering from mental depression to focus selectively on information that gives further reason to be depressed and ignore information of a more positive nature could help perpetuate the depressed state.

The results of experiments using such abstract tasks as estimating the proportions of beads of different colors in a bag after observing the color(s) of one or a few beads shows that data can be interpreted as favorable to a working hypothesis even when the data convey no diagnostic information. The drawing of beads of a given color may increase one's confidence in a hypothesis about the color distribution in the bag even when the probability of drawing a bead of that color is the same under the working hypothesis and its complement (Pitz, 1969; Troutman & Shanteau, 1977). After one has formed a preference for one brand of a commercial product over another, receiving information about an additional feature that is common to the two brands may strengthen one's preexisting preference (Chernev, 1997). Similarly, observers of a sports event may describe it very differently depending on which team they favor (Hastorf & Cantril, 1954).

It is true in science as it is elsewhere (Mitroff, 1974) that what one sees—actually or metaphorically—depends, to no small extent, on what one looks for and what one expects. Anatomist A. Kölliker criticized Charles Darwin for having

advanced the cause of teleological thinking, and botanist Asa Gray praised Darwin for the same reason. Meanwhile, biologist T. H. Huxley and naturalist Ernst Haeckel praised Darwin for thoroughly discrediting thinking of this kind (Gigerenzer et al., 1989).

Several investigators have stressed the importance of people's expectations as sources of bias in their judgments of covariation (Alloy & Abramson, 1980; Alloy & Tabachnik, 1984; Camerer, 1988; Crocker, 1981; Golding & Rorer, 1972; Hamilton, 1979; D. Kuhn, 1989; Nisbett & Ross, 1980). The belief that two variables are related appears to increase the chances that one will find evidence consistent with the relationship and decrease the chances of obtaining evidence that tends to disconfirm it. Judgments of covariation tend to be more accurate when people lack strong preconceptions of the relationship between the variables of interest or when the relationship is consistent with their preconceptions than when they have preconceptions that run counter to the relationship that exists.

The perception of a correlation where none exists is sometimes referred to as an *illusory correlation.* The term also has been applied when the variables in question are correlated but the correlation is perceived to be higher than it actually is Chapman and Chapman (1967a, 1967b, 1969; see also Chapman, 1967) did early work on the phenomenon. These investigators had participants view drawings of human figures, each of which occurred with two statements about the characteristics of the person who drew it. Statements were paired with drawings in such a way as to ensure no relationship between drawings and personality types, nevertheless participants saw the relationships they expected to see.

Nisbett and Ross (1980) summarized the Chapmans' work on illusory correlation by saying that "reported covariation was shown to reflect true covariation far *less* than it reflected theories or preconceptions of the nature of the associations that 'ought' to exist" (p. 97). Goldberg (1968) said that this research "illustrates the ease with which one can 'learn' relationships which do *not* exist" (p. 493). For present purposes, it provides another illustration of how the confirmation bias can work: the presumption of a relationship predisposes one to find evidence of that relationship, even when there is none to be found or, if there is evidence to be found, to overweight it and arrive at a conclusion that goes beyond what the evidence justifies.

A form of stereotyping involves believing that specific behaviors are more common among people who are members of particular groups than among those who are not. There is a perceived correlation between group membership and behavior. Such perceived correlations can be real or illusory. One possible explanation of the perception of illusory correlations is that unusual behavior by people in distinctive groups is more salient and easily remembered than similar behavior by people who are not members of those groups (Feldman, Camburn, & Gatti, 1986; Hamilton, Dugan, & Trolier, 1985). Another possibility is that, once a person is convinced that members of a specific group behave in certain ways, he or she is more likely to seek and find evidence to support the belief than evidence to oppose it, somewhat independently of the facts.

Some investigators have argued that people typically overestimate the degree to which behavior in different situations can be predicted from *trait variables* or the degree to which an individual's typical social behavior can be predicted from a knowledge of that person's behavior on a given occasion (Kunda & Nisbett, 1986). An *illusion of consistency,* according to this view, leads people to misjudge the extent to which a friendly individual's behavior is consistently friendly or a hostile individual's behavior is consistently hostile (Jennings, Amabile, & Ross, 1982; Mischel, 1968; Mischel & Peake, 1982). It is easy to see how a pervasive confirmation bias could be implicated in this illusion: once one has categorized an individual as friendly or hostile, one will be more attuned to evidence that supports that categorization than to evidence that undermines it.

A more subtle problem relating to categorization involves the phenomenon of *reification.* Taxonomies that are invented as conceptual conveniences often come to be seen as representing the way the world is really structured. Given the existence of a taxonomy, no matter how arbitrary, there is a tendency to view the world in terms of the categories it provides. One tends to

fit what one sees into the taxonomic bins at hand. In accordance with the confirmation bias, people are more likely to look for, and find, confirmation of the adequacy of a taxonomy than to seek and discover evidence of its limitations.

### *Formal Reasoning and the Selection Task*

I have already considered a task invented by Wason and much used in rule-discovery experiments that revealed a tendency for people to test a hypothesized rule primarily by considering instances that are consistent with it. Wason (1966, 1968) invented another task that also has been widely used to study formal reasoning. In a well-known version of this task, participants see an array of cards and are told that each card has a letter on one side and a number on the other. Each of the cards they see shows either a vowel, a consonant, an even number, or an odd number, and participants are asked to indicate which cards one would have to turn over in order to determine the truth or falsity of the following statement: *If a card has a vowel on one side then it has an even number on the other side.*

Suppose the array that people performing this task see is as follows:

A B 4 7

Given this set of cards, experimenters have generally considered selection of those showing *A* and *7* to be correct, because finding an odd number on the other side of the *A* or finding a vowel behind the *7* would reveal the statement to be false. The cards showing *B* and *4* have been considered incorrect selections, because whatever is on their other sides is consistent with the statement. In short, one can determine the claim to be false by finding *either* the card showing the *A* or the card showing the *7* to be inconsistent with it, or one can determine the claim to be true by finding *both* of these cards to be consistent with it. Wason found that people performing this task are most likely to select only the card showing a vowel or the card showing a vowel and the one showing an even number; people seldom select either the card showing a consonant or the one showing an odd number. Numerous investigators have obtained essentially the same result. Experiments with this task and variants of it have been reviewed many times (Cosmides, 1989; Evans, 1982; Evans, Newstead, & Byrne, 1993; Tweney & Doherty, 1983; Wason & Johnson-Laird, 1972).

The logic of Wason's selection task is that of the conditional: *if P then Q*. In the case of the above example, *P* is *there is a vowel on one side,* and *Q* is *there is an even number on the other.* Selecting the card showing the *7* is analogous to checking to see if the *not-Q* case is accompanied by *not-P,* as it must be if the conditional is true. The basic finding of experiments with the task lends support to the hypothesis—which is supported also by other research (Evans, Newstead, & Byrne, 1993; Hollis, 1970)—that people find the *modus tollens* argument (*not-Q,* therefore *not-P*) to be less natural than the *modus ponens* form (*P,* therefore *Q*). And it is consistent with the idea that, given the objective of assessing the credibility of a conditional assertion, people are more likely to look for the presence of the consequent given the presence of the antecedent than for the absence of the antecedent given the absence of the consequent.

Several experiments have shown that performance of the selection task tends to be considerably better when the problem is couched in familiar situational terms rather than abstractly (Johnson-Laird, Legrenzi, & Legrenzi, 1972; Wason & Shapiro, 1971), although it is by no means always perfect in the former case (Einhorn & Hogarth, 1978). People also generally do better when the task is couched in terms that require *deontic reasoning* (deciding whether a rule of behavior—e.g., permission, obligation, promise—has been violated) rather than *indicative reasoning* (determining whether a hypothesis is true or false; Cheng & Holyoak, 1985; Cosmides, 1989; Cosmides & Tooby, 1992; Gigerenzer & Hug, 1992; Griggs & Cox, 1993; Kroger, Cheng, & Holyoak, 1993; Manktelow & Over, 1990, 1991; Markovits & Savary, 1992; Valentine, 1985; Yachanin & Tweney, 1982).

In relating confirmation bias to Wason's selection task, it is important to make three distinctions. The first is the distinction between the objective of specifying which of four cards in view must be turned over in order to determine the truth or falsity of the assertion *with respect to those four cards* and the objective of saying which of the four *types* of cards represented should be turned over in order to determine the plausibility of the assertion

more generally. I believe that in most of the earlier experiments, the first of these tasks was the intended one, although instructions have not always made it explicit that this was the case. The distinction is critical because what one should do when given the first objective is clear and not controversial. However the answer to what one should do when given the second objective is considerably more complicated and debatable.

When the task is understood in the first way, the only correct answer is the card showing the vowel and the one showing the odd number. However, when one believes one is being asked how one should go about obtaining evidence regarding the truth or falsity of an assertion of the form *if P then Q* where *P* and *Q* can be understood to be proxies for larger sets, it is no longer so clear that the cards showing *P* and ~*Q* are the best choices. Depending on the specifics of the properties represented by *P* and *Q* and what is known or assumed about their prevalence in the population of interest, *P* may be the only selection that is likely to be very informative, and selection of ~*Q* may be essentially pointless (Kirby, 1994b; Nickerson, 1996; Oaksford & Chater, 1994; Over & Evans, 1994).

Although experimenters have often, perhaps more often than not, intended that the selection task be interpreted in the first of the two ways described, the second interpretation seems to me more representative of the kind of conditional reasoning that people are required to do in everyday life; it is hard to think of everyday examples of needing to determine the truth or falsity of a claim about four entities like the cards in the selection task, all of which are immediately available for inspection. Perhaps a tendency to carry over to the task, uncritically, an effective approach in the world of everyday hypothesis testing that is not always effective in the contrived world of the laboratory contributes to performance on the selection task.

The second and third distinctions pertain to instances when the task is understood to involve only the four cards in view. They are the distinctions that were made in the context of the discussion of how confirmation bias relates to "find-the-rule" tasks and other tasks involving conditional syllogisms, namely the distinction between evidence that is confirmatory by virtue of the presence of two entities rather than by their joint absence and the distinction between logical and psychological confirmation. As applied to the selection task, confirmation bias has typically connoted a tendency to look for the joint occurrence of the items specified in the task description. In the original version of the task, this means looking for instances of the joint occurrence of a vowel and an even number, and thus the turning over of the cards showing *A* and *4,* inasmuch as these are the only cards of the four shown that could have both of the named properties.

Selection of evidence that can only be confirmatory of the hypothesis under consideration—or avoidance of evidence that could possibly falsify the hypothesis—is one interpretation of the confirmation bias that is not consistent with the selection of *A* and *4* in Wason's task. *A* is a potentially falsifying card; if the rule that cards that have a vowel on one side have an even number on the other is false, turning over the card showing *A* could reveal the fact. So in selecting *A* one is not avoiding the possibility of falsification; one is performing an appropriate test, even in the strictest Popperian sense. The only way to avoid the possibility of disconfirming the hypothesized rule in Wason's task is to select either or both of the cards showing *B* and *4,* inasmuch as nothing that is on the other sides of these cards could be inconsistent with it.

The fact that, when given the selection task, people are at least as likely to select *A* as they are to select *4* weighs against the idea that their behavior can be attributed to a logically based desire to seek only confirming evidence and to avoid potentially disconfirming evidence. I say *logically based* because it may be that people select *A* because they are seeking confirming evidence, even though their selection also provides the opportunity to acquire falsifying evidence. From a strictly logical point of view, although selecting *A* is part of the correct solution, selecting only *A*, or *A* and *4,* not only fails to ensure the discovery that the hypothesized rule is false if it is false, it also fails to establish its truth if it is true. The only way to demonstrate its truth is to rule out the possibility that it is false, and this means checking all (both) cases (*A* and *7*) that could possibly show it to be false if it is.

So again, behavior that has been interpreted as evidence of a confirmation bias is not strongly confirmatory in a logical sense, al-

though it may well be seen (erroneously) as so by those who display it. Inasmuch as an observation can be confirming in a psychological sense (i.e., interpreted as confirming evidence) independently of whether it is logically confirmatory, perhaps the confirmation bias should be thought of as a tendency to seek evidence that increases one's confidence in a hypothesis regardless of whether it should. The distinction between logical confirmation and psychological confirmation deserves greater emphasis than it has received.

Although researchers have interpreted the considerable collection of results that have been obtained from experiments with variations of the selection task as generally reflective of a confirmation bias, alternative hypotheses have also been proposed. L. J. Cohen (1981) argued that it is not necessary to suppose that people do anything more in testing a conditional rule than check whether the consequent holds true whenever the antecedent does. The fact that people sometimes select the card representing *Q* (*4* in the case of the present example) as well as the one representing *P* (*A*) is because they falsely perceive *if P then Q* to be equivalent to *if Q then P* (*conversion error*); and the fact that they do not select the card representing *not-Q* (*7* in the present example) is attributed to a failure to apply the law of the contrapositive.

Several investigators have argued that people interpret the conditional relationship *if P then Q* as equivalent to the biconditional relationship *if and only if P then Q*, or that they fail to distinguish between *if P then Q* and *if Q then P*, especially as the *if–then* construction is used in everyday language (Chapman & Chapman, 1959; L. J. Cohen, 1981; Henle, 1962; Legrenzi, 1970; Politzer, 1986; Revlis, 1975a, 1975b). Others have assumed the operation of a *matching bias* whereby people tend to focus on (and select) cards explicitly named in the statement of the rule to be tested (Evans, 1972; Evans & Lynch, 1973; Hoch & Tschirgi, 1983). Evans (1989) has suggested that people make their selections, without thinking much about them, on the basis of a "preconscious heuristic judgment of relevance, probably linguistically determined" (p. 108).

Recent theorizing about the selection task has given rise to several new explanations of how people interpret it and deal with it, especially as presented in various concrete frames of reference. An idea common to several of these explanations is that people's performance of the task is indicative of behavior that has proved to be adaptively effective in analogous real-world situations. Cosmides (1989), for example, has argued that the typical results are consistent with the idea that people are predisposed to look for cheating on a social contract and are particularly skilled at detecting it. Consequently, they do well on selection tasks in which checking the *not-Q* condition is analogous to looking for an instance of violating a tacit social agreement, like failing to meet an obligation. Gigerenzer and Hug (1992) have defended a similar point of view.

Liberman and Klar (1996) proposed an alternative explanation of the results of research on cheating detection. They argued that a cheating-detection perspective is neither necessary nor sufficient to yield the *P* and *not-Q* selection; they contend that the logically correct choice will be likely if the conditional *if P then Q* is understood to represent a deterministic (as opposed to a probabilistic) unidirectional relationship between *P* and *Q*, if what constitutes a violation of the rule is clear, and if it is understood that the task is to look for such a violation.

Other investigators have begun to view the selection task as more a problem of data selection and decision making than of logical inference (Kirby, 1994a, 1994b; Manktelow & Over, 1991, 1992). Oaksford and Chater (1994), for example, have proposed a model of the task according to which people should make selections so as to maximize their gain in information regarding the tenability of the hypothesis that the conditional *if P then Q* is true relative to the tenability that it is false. I have done an analysis that leads to a similar conclusion, at least when the task is perceived as that of deciding whether the conditional is true in a general sense, as opposed to being true of four specific cards (Nickerson, 1996).

Wason's selection task has proved to be one of the most fertile paradigms in experimental psychology. It would be surprising if all the results obtained with the many variations of the task could be accounted for by a single simple hypothesis. I believe that, taken together, the results of experimentation support the hypothesis that one of the several factors determining performance on this task is a confirmation bias

that operates quite pervasively. This is not to suggest that a confirmation bias explains all the findings with this task, or even that it is the most important factor in all cases, but only that it exists and often plays a substantive role.

### *The Primacy Effect and Belief Persistence*

When a person must draw a conclusion on the basis of information acquired and integrated over time, the information acquired early in the process is likely to carry more weight than that acquired later (Lingle & Ostrom, 1981; Sherman, Zehner, Johnson, & Hirt, 1983). This is called the *primacy effect.* People often form an opinion early in the process and then evaluate subsequently acquired information in a way that is partial to that opinion (N. H. Anderson & Jacobson, 1965; Jones & Goethals, 1972; Nisbett & Ross, 1980; Webster, 1964). Francis Bacon (1620/1939) observed this tendency centuries ago: "the first conclusion colors and brings into conformity with itself all that come after" (p. 36).

Peterson and DuCharme (1967) had people sample a sequence of colored chips and estimate the probability that the sequence came from an urn with a specified distribution of colors rather than from a second urn with a different distribution. The sampling was arranged so that the first 30 trials favored one urn, the second 30 favored the other, and after 60 trials the evidence was equally strong for each possibility. Participants tended to favor the urn indicated by the first 30 draws, which is to say that the evidence in the first 30 draws was not countermanded by the evidence in the second 30 even though statistically it should have been.

Bruner and Potter (1964) showed people the same picture on a series of slides. The first slide was defocused so the picture was not recognizable. On successive slides the focus was made increasingly clear. After each presentation the participant was asked to identify what was shown. A hypothesis formed on the basis of a defocused picture persisted even after the picture was in sufficiently good focus that participants who had not looked at the poorly focused picture were able to identify it correctly. Jones, Rock, Shaver, Goethals, and Ward (1968) had participants form opinions about people's problem-solving abilities by watching them in action. The problem solvers were judged to be more competent if they solved many problems early in a problem series and few late than if they did the reverse.

The primacy effect is closely related to (and can perhaps be seen as a manifestation of) *belief persistence.* Once a belief or opinion has been formed, it can be very resistive to change, even in the face of fairly compelling evidence that it is wrong (Freedman, 1964; Hayden & Mischel, 1976; Luchins, 1942, 1957; Rhine & Severance, 1970; Ross, 1977; Ross & Lepper, 1980; Ross, Lepper, & Hubbard, 1975). Moreover it can bias the evaluation and interpretation of evidence that is subsequently acquired. People are more likely to question information that conflicts with preexisting beliefs than information that is consistent with them and are more likely to see ambiguous information to be confirming of preexisting beliefs than disconfirming of them (Ross & Anderson, 1982). And they can be quite facile at explaining away events that are inconsistent with their established beliefs (Henrion & Fischhoff, 1986).

I have already discussed studies by Pitz (1969) and Troutman and Shanteau (1977) showing that people sometimes take normatively uninformative data as supportive of a favored hypothesis. One could interpret results from these studies as evidence of a belief-preserving bias working in situations in which the "information" in hand is not really informative. This is in keeping with the finding that two people with initially conflicting views can examine the same evidence and both find reasons for increasing the strength of their existing opinions (Lord, Ross, & Lepper, 1979). The demonstration by Pitz, Downing, and Reinhold (1967) that people sometimes interpret evidence that should count against a hypothesis as counting in favor of it may be seen as an extreme example of the confirmation bias serving the interest of belief preservation.

Ross and his colleagues have also shown experimentally that people find it extremely easy to form beliefs about or generate explanations of individuals' behavior and to persevere in those beliefs or explanations even after learning that the data on which the beliefs or explanations were originally based were fictitious (Ross et al., 1975; Ross, Lepper, Strack, & Steinmetz, 1977). Ross et al. (1975), for example, had people attempt to distinguish between authentic and unauthentic suicide

notes. As the participants made their choices, they were given feedback according to a predetermined schedule that was independent of the choices they made, but that insured that the feedback some participants received indicated that they performed far above average on the task while that which others received indicated that they performed far below average.

Following completion of Ross et al.'s (1975) task, researchers informed participants of the arbitrary nature of the feedback and told them that their rate of "success" or "failure" was predetermined and independent of their choices. When the participants were later asked to rate their ability to make such judgments, those who had received much positive feedback on the experimental task rated themselves higher than did those who had received negative feedback, despite being told that they had been given arbitrary information. A follow-up experiment found similar perseverance for people who observed others performing this task (but did not perform it themselves) and also observed the debriefing session.

Nisbett and Ross (1980) pointed out how a confirmation bias could contribute to the perseverance of unfounded beliefs of the kind involved in experiments like this. Receiving feedback that supports the assumption that one is particularly good or particularly poor at a task may prompt one to search for additional information to confirm that assumption. To the extent that such a search is successful, the belief that persists may rest not exclusively on the fraudulent feedback but also on other evidence that one has been able to find (selectively) in support of it.

It is natural to associate the confirmation bias with the perseverance of false beliefs, but in fact the operation of the bias may be independent of the truth or falsity of the belief involved. Not only can it contribute to the perseverance of unfounded beliefs, but it can help make beliefs for which there is legitimate evidence stronger than the evidence warrants. Probably few beliefs of the type that matter to people are totally unfounded in the sense that there is no legitimate evidence that can be marshalled for them. On the other hand, the data regarding confirmation bias, in the aggregate, suggest that many beliefs may be held with a strength or degree of certainty that exceeds what the evidence justifies.

### *Own-Judgment Evaluation*

Many researchers have done experiments in which people have been asked to express their degree of confidence in judgments that they have made. When participants have expressed confidence as probability estimates or as ratings that, with some plausible assumptions, can be transformed into probability estimates, it has been possible to compare confidence with performance on the primary task. Thus researchers can determine for each confidence judgment the percentage of the correct items on the primary task to which that judgment was assigned. Plots of *actual percent correct* against *percent correct "predicted" by the confidence judgments* are often referred to as *calibration curves;* perfect calibration is represented by the unit line, which indicates that for a given confidence level, X, the proportion of all the judgments with that level that were correct was X.

In general, people tend to express a higher degree of confidence than is justified by the accuracy of their performance on the primary task, which is to say that calibration studies have typically shown overconfidence to be more common than underconfidence (Einhorn & Hogarth, 1978; Fischhoff, 1982; Lichtenstein & Fischhoff, 1977; Lichtenstein, Fischhoff, & Phillips, 1977; Pitz, 1974; Slovic, Fischhoff, & Lichtenstein, 1977). Kahneman and Tversky (1973) refer to the confidence that people feel for highly fallible performance as the *illusion of validity.* Being forced to evaluate one's views, especially when that includes providing reasons against one's position, has reduced overconfidence in some instances (Fischhoff, 1977; Hoch, 1984, 1985; Koriat, Lichtenstein, & Fischhoff, 1980; Tetlock & Kim, 1987). But generally overconfidence has only been reduced, not eliminated, and providing reasons against one's position is not something that most people do spontaneously.

One explanation of overconfidence starts with the assumption that people tend to be good judges of their knowledge as it relates to situations they are likely to encounter in everyday life. This explanation of overconfidence also notes that a minimum requirement for observing good calibration in experimental situations is that the questions people are to answer and that one to be used to judge the probability of the correctness of their answers

must be selected in such a way as to ensure that valid cues in the natural environment remain valid in the experimental situation. Juslin (1993) has argued that certain strategies commonly used to select items in experiments more or less ensure that valid knowledge from the participants' natural environment will be less valid in the experimental situation. More specifically, the argument is that such selection strategies typically result in sets of items for which cues leading to wrong answers are overrepresented relative to their commonness in the natural environment. Experiments showing good calibration for items selected at random from a set assumed to be representative of the natural environment (Gigerenzer, Hoffrage, & Kleinbölting, 1991; Juslin, 1993, 1994) support this explanation.

I believe this argument to be a forceful one. The evidence is fairly strong that some of the overconfidence reported, especially in experiments that require people to answer general-knowledge questions in a forced-choice format, is an artifact of item-selection procedures that do not ensure that cues have the same validity in experimental situations that they have in typical real-life situations. Not all studies of confidence or calibration have used general-knowledge questions and the forced-choice format for answers, however, and overconfidence has also been observed in other contexts. Researchers have shown that assessments of peoples' ability to recognize faces, for example, correlate poorly with performance on a face-recognition task (Baddeley & Woodhead, 1983) and observed that retrospective judgments of comprehension of expository texts are higher than justified (Glenberg, Wilkinson, & Epstein, 1982).

Experts are not immune from the illusion of validity. Attorneys tend, in the aggregate, to express confidence of obtaining outcomes better than those they actually obtain (Loftus & Wagenaar, 1988; Wagenaar & Keren, 1986). Other professionals who have been found to be overconfident when making judgments in their own areas of expertise include physicians (Lusted, 1977), psychologists (Oskamp, 1965), and engineers (Kidd, 1970). Experts appear to do better when there is a reliable basis for statistical prediction, such as when predicting bridge hands (Keren, 1987) or betting odds for horse racing (Hausch, Ziemba, & Rubenstein, 1981). On the other hand, despite the fact that clinical diagnoses based on case statistics tend to be more accurate than those based on clinical judgments, clinicians typically have greater confidence in their own judgments than in those derived statistically from incidence data (Arkes, Dawes, & Christensen, 1986; Goldberg, 1968; Meehl, 1954, 1960; Sawyer, 1966). In contrast, professional weather forecasters tend to be relatively well calibrated, at least with respect to their weather predictions (Murphy & Winkler, 1974, 1977; Winkler & Murphy, 1968); this has been attributed to the fact that they receive constant and immediate feedback regarding the accuracy of their predictions, which is the kind of information that makes learning feasible.

Griffin and Tversky (1992) have made a distinction between *strength* (extremeness) of evidence and *weight* (predictive validity) of evidence. They hypothesized that people tend to focus primarily on strength and make some (typically insufficient) adjustments in response to weight. This hypothesis leads to the expectation that overconfidence will be the rule especially when strength is high and weight low, whereas underconfidence becomes more likely when the opposite is the case. This account is consistent with the finding that overconfidence is the general rule because of the assumed greater importance attached to evidentiary strength. The account is even more predictive of general overconfidence if one assumes that strong evidence is more common than weighty evidence, as Griffin and Tversky use these terms.

Another account of why people tend to be overconfident of their own knowledge is that when one has produced a tentative answer to a question, one's natural inclination is to search memory for evidence to support that answer and to fail to consider possible alternative answers (Graesser & Hemphill, 1991; Griffin, Dunning, & Ross, 1990; Hoch, 1985; Koriat et al., 1980; Shaklee & Fischhoff, 1982). This is similar to the explanation already mentioned of why people sometimes persevere with a belief even after learning that the information on which the belief was based was fictitious: after having formed the belief they sought and found independent data to corroborate it.

## The Confirmation Bias in Real-World Contexts

As the foregoing review shows, the confirmation bias has been observed in a variety of guises

in many experimental situations. What makes it especially important to understand is that it can have significant consequences in many nonlaboratory contexts. The point is illustrated in what follows by a few examples.

*Number Mysticism*

Pythagoras discovered, by experimentation, how the pitch of a sound emitted by a vibrating string depends on the length of the string and was able to state this dependency in terms of simple numerical ratios: (a) two strings of the same material under the same tension differ in pitch by an octave when one of the strings is twice as long as the other, and (b) two strings the lengths of which are in the ratio 2 to 3 will produce a note and its fifth, and so on.

Observation was not the new thing that Pythagoras did in his study of harmonic relationships; people had been observing the heavens and recording what they saw for a long time. What he did that was new was manipulate what he was observing and take notice of the effects of those manipulations. He has been called the first experimentalist. Ironically, instead of establishing experimentation as an especially fruitful way to investigate the properties of the physical world, Pythagoras's discovery helped to usher in what Bell called "the golden age of number mysticism" and to delay the acceptance of experimentation as the primary method of science for 2000 years (Bell, 1946/1991). Pythagoras's intellectual heirs were so convinced of the validity of his pronouncement, "everything is number," that many of the most able thinkers over the next 2 millenia devoted much of their cognitive energy to the pursuit of numerology and the confirmation of its basic assumptions. It took a Galileo to kindle an interest in experimentation that would not again sputter and die.

Work done as recently as the mid-19th century involving the great pyramid of Egypt, which has extraordinary fascination for modern observers of artifacts of ancient cultures, illustrates the relevance of the confirmation bias to Pythagorean numerological pursuits. Much of this fascination is due to certain mathematical relationships discussed first by John Taylor (1859) and shortly later by Charles Smyth (1864/1890). Taylor noted, among other facts, that the ratio of twice the pyramid's base to its height was roughly the same as the ratio of the diameter of a circle to its circumference, which is to say, $\pi$. Smyth was inspired by Taylor's observations and set himself the task of discovering other mathematical relationships of interest that the monument might hide.

Smyth discovered that the ratio of the pyramid's base to the width of a casing stone was 365, the number of days in a year, and that the pyramid's height multiplied by $10^9$ was approximately equal to the distance from the earth to the sun. By comparing pyramid length measurements in various ways, he was able to find numbers that correspond to many quantitative properties of the world that were presumably unknown when the pyramid was built. These include the earth's mean density, the period of precession of the earth's axis, and the mean temperature of the earth's surface. Von Däniken (1969) used the existence of such relationships as the basis for arguing that the earth had been visited by intelligent extraterrestrials in the past.

Gardner (1957) referred to Smyth's book as a classic of its kind illustrating beautifully "the ease with which an intelligent man, passionately convinced of a theory, can manipulate his subject matter in such a way as to make it conform to precisely held opinions" (p. 176). He pointed out that a complicated structure like the pyramid provides one with a great assortment of possible length measurements, and that anyone with the patience to juggle them is quite sure to find a variety of numbers that will coincide with some dates or figures that are of interest for historical or scientific reasons. One simply makes an enormous number of observations, tries every manipulation on measurements and measurement relationships that one can imagine, and then selects from the results those few that coincide with numbers of interest in other contexts. He wrote, "Since you are bound by no rules, it would be odd indeed if this search for Pyramid 'Truths' failed to meet with considerable success" (p. 177). The search for pyramid truths is a striking illustration of how a bias to confirm is expressed by selectivity in the search for and interpretation of information.

*Witch Hunting*

From a modern vantage point, the convictions and executions of tens of thousands of individu-

als for practicing witchcraft during the 15th, 16th, and 17th centuries in Western Europe and to a lesser extent in 18th-century New England, is a particularly horrific case of the confirmation bias functioning in an extreme way at the societal level. From the perspective of many, perhaps most, of the people of the time, belief in witchcraft was perfectly natural and sorcery was widely viewed as the reason for ills and troubles that could not otherwise be explained. Executioners meted out punishment for practising witchcraft—generally the stake or the scaffold—with appalling regularity. Mackay (1852/1932) put the number executed in England alone, during the first 80 years of the 17th century, at 40,000.

People believed so strongly in witchcraft that some courts had special rules of evidence to apply only in cases involving it. Mackay (1852/1932) quoted Bodinus, a 17th-century French authority, as follows:

> The trial of this offense must not be conducted like other crimes. Whoever adheres to the ordinary course of justice perverts the spirit of the law, both divine and human. He who is accused of sorcery should never be acquitted, unless the malice of the prosecutor be clearer than the sun; for it is so difficult to bring full proof of this secret crime, that out of a million witches not one would be convicted if the usual course were followed! (p. 528)

Torture was an accepted and widely practiced means of exacting confessions from accused persons. Failure to denounce a witch was in some places a punishable offense.

It is hard for those who live in a society that recognizes the principle that a person accused of a crime is to be presumed innocent until proven guilty beyond a reasonable doubt to imagine what it must have been like to live at a time when—at least with respect to the accusation of witchcraft—just the opposite principle held. On the other hand, it is perhaps too easy to assume that nothing like the witchcraft mania could occur in our enlightened age. A moment's reflection on the instances of genocide or attempted genocide that have occurred in recent times should make people wary of any such assumption. These too can be seen as instances of what can happen when special rules of evidence are used to protect and support beliefs that individuals, groups or nations want, for whatever reasons, very much to hold. Awareness of a prevalent bias toward confirmation even under relatively ideal conditions of evidence evaluation should make people doubly cautious about the potential for disaster when circumstances encourage the bias to be carried to excess.

### *Policy Rationalization*

Tuchman (1984) described a form of confirmation bias at work in the process of justifying policies to which a government has committed itself: "Once a policy has been adopted and implemented, all subsequent activity becomes an effort to justify it" (p. 245). In the context of a discussion of the policy that drew the United States into war in Vietnam and kept the U.S. military engaged for 16 years despite countless evidences that it was a lost cause from the beginning, Tuchman argued that once a policy has been adopted and implemented by a government, all subsequent activity of that government becomes focused on justification of that policy:

> Wooden headedness, the source of self deception is a factor that plays a remarkably large role in government. It consists in assessing a situation in terms of preconceived fixed notions while ignoring or rejecting any contrary signs. It is acting according to wish while not allowing oneself to be deflected by the facts. It is epitomized in a historian's statement about Philip II of Spain, the surpassing wooden head of all sovereigns: "no experience of the failure of his policy could shake his belief in its essential excellence." (p. 7)

Folly, she argued, is a form of self-deception characterized by "insistence on a rooted notion regardless of contrary evidence" (p. 209).

At the beginning of this article, I gave examples of bias in the use of information that would not be considered illustrative of the *confirmation bias,* as that term is used here. These examples involved intentional selectivity in the use of information for the conscious purpose of supporting a position. Another example is that of politicians taking note of facts that are consistent with positions they have taken while intentionally ignoring those that are inconsistent with them. This is not to suggest, however, that all selective use of information in the political arena is knowing and deliberate and that confirmation bias, in the sense of unwitting selectivity, is not seen here. To the contrary, I suspect that this type of bias is especially prevalent in situations that are inherently complex and ambiguous, which many political

situations are. In situations characterized by interactions among numerous variables and in which the cause–effect relationships are obscure, data tend to be open to many interpretations. When that is the case, the confirmation bias can have a great effect, and people should not be surprised to see knowledgeable, well-intentioned people draw support for diametrically opposed views from the same set of data.

### *Medicine*

The importance of testing theories, hypotheses, speculations, or conjectures about the world and the way it works, by understanding their implications vis-a-vis observable phenomena and then making the observations necessary to check out those implications, was a common theme in the writings of the individuals who gave science its direction in the 16th, 17th, and 18th centuries. This spirit of empirical criticism had not dominated thinking in the preceding centuries but was a new attitude. Theretofore observation, and especially controlled experimentation, had played second fiddle to logic and tradition.

Consider, for example, the stagnated status of medical knowledge: "For 1500 years the main source of European physicians' knowledge about the human body was not the body itself . . . [but] the works of an ancient Greek physician [Galen]. 'Knowledge' was the barrier to knowledge. The classic source became a revered obstacle." Boorstin (1985, p. 344), who wrote these words, noted the irony of the fact that Galen himself was an experimentalist and urged others who wished to understand anatomy or medicine to become hands-on investigators and not to rely only on reading what others had said. But Galen's readers found it easier to rely on the knowledge he passed on to them than to follow his advice regarding how to extend it.

Although some physicians did "experiment" with various approaches to the treatment of different diseases and ailments, as Thomas (1979) pointed out, until quite recently, this experimentation left something to be desired as a scientific enterprise:

> Virtually anything that could be thought up for the treatment of disease was tried out at one time or another, and, once tried, lasted decades or even centuries before being given up. It was, in retrospect, the most frivolous and irresponsible kind of human experimentation, based on nothing but trial and error, and usually resulting in precisely that sequence. Bleeding, purging, cupping, the administration of infusions of every known plant, solutions of every known metal, every conceivable diet including total fasting, most of these based on the weirdest imaginings about the cause of disease, concocted out of nothing but thin air—this was the heritage of medicine up until a little over a century ago. It is astounding that the profession survived so long, and got away with so much with so little outcry. Almost everyone seems to have been taken in. (p. 159)

How is it that ineffective measures could be continued for decades or centuries without their ineffectiveness being discovered? Sometimes people got better when they were treated; sometimes they did not. And sometimes they got better when they were not treated at all. It appears that people's beliefs about the efficacy of specific treatments were influenced more strongly by those instances in which treatment was followed by recovery than in either those in which it was not or those in which it occurred spontaneously. A prevailing tendency to focus exclusively or primarily on positive cases—cases in which treatment was followed by recovery—would go a long way toward accounting for the fact that the discoveries that certain diseases have a natural history and people often recover from them with or without treatment was not made until the 19th century.

Fortunately such a tendency is no longer characteristic of medical science as a whole; but one would be hard pressed to argue that it no longer influences the beliefs of many people about the efficacy of various treatments of medical problems. Every practitioner of a form of pseudomedicine can point to a cadre of patients who will testify, in all sincerity, to having benefited from the treatment. More generally, people engage in specific behaviors (take a pill, rest, exercise, think positively) for the express purpose of bringing about a specific health-related result. If the desired result occurs, the natural tendency seems to be to attribute it to what was done for the purpose of causing it; considering seriously the possibility that the result might have been obtained in the absence of the associated "cause" appears not to come naturally to us but to have to be learned.

Medical diagnosis, as practiced today, has been the subject of some research. In looking for causes of illness, diagnosticians tend to generate one or a small set of hypotheses very early in the

diagnostic session (Elstein, Shulman, & Sprafka, 1978). The guidance that a hypothesis in hand represents for further information gathering can function as a constraint, decreasing the likelihood that one will consider an alternative hypothesis if the one in hand is not correct. Failure to generate a correct hypothesis has been a common cause of faulty diagnosis in some studies (Barrows, Feightner, Neufeld, & Norman, 1978; Barrows, Norman, Neufeld, & Feightner, 1977). A hypothesis in hand also can bias the interpretation of subsequently acquired data, either because one selectively looks for data that are supportive of the hypothesis and neglects to look for disconfirmatory data (Barrows et al., 1977) or because one interprets data to be confirmatory that really are not (Elstein et al., 1978).

Studies of physicians' estimates of the probability of specific diagnoses have often shown estimates to be too high (Christensen-Szalanski & Bushyhead, 1981/1988; DeSmet, Fryback, & Thornbury, 1979). Christensen-Szalanski and Bushyhead (1981/1988) had physicians judge, on the basis of a medical history and physical examination, the probability that patients at a walk-in clinic had pneumonia. Only about 20 percent of the patients who were judged to have pneumonia with a probability between .8 and .9 actually had pneumonia, as determined by chest X rays evaluated by radiologists. These investigators also got physicians to rate the various possible outcomes from such a diagnosis and found no difference between the values assigned to the two possible correct diagnoses and no difference between the values assigned to the possible incorrect ones. This suggests that the overly high estimates of probability of disease were not simply the result of a strong preference of false positive over false negative results.

Results from other studies suggest that physicians do not do very well at revising existing probability estimates to take into account the results of diagnostic tests (Berwick, Fineberg, & Weinstein, 1981; Cassells, Schoenberger, & Grayboys, 1978). A diagnostic finding that fails to confirm a favored hypothesis may be discounted on the grounds that, inasmuch as there is only a probabilistic relationship between symptoms and diseases, a perfect match is not to be expected (Elstein & Bordage, 1979).

### *Judicial Reasoning*

In the context of judicial proceedings, an attempt is made to decouple the process of acquiring information from that of drawing conclusions from that information. Jurors are admonished to maintain open minds during the part of a trial when evidence is being presented (before the jury-deliberation phase); they are not supposed to form opinions regarding what the verdict should be until all the evidence has been presented and they have been instructed by the judge as to their decision task. During the jury-deliberation phase, the jury's task is to review and consider, collectively, the evidence that has been presented and to arrive, through discussion and debate, at a consensus on the verdict. They are to be careful to omit from consideration any evidence that came to light during the trial that was deemed inadmissible and ordered stricken from the record.

The admonition to maintain an open mind during the evidence-presentation phase of a trial seems designed to counter the tendency to form an opinion early in an evidence-evaluation process and then to evaluate further evidence with a bias that favors that initial opinion. Whether jurors are able to follow this admonition and to delay forming an opinion as to the truth or falsity of the allegations against the accused until the jury-deliberation phase is a matter of some doubt. It is at least a plausible possibility that individual jurors (and judges) develop their personal mental models of "what really happened" as a case develops and continuously refine and elaborate those models as evidence continues to be presented (Holstein, 1985). To the extent that this is the way jurors actually think, a model, as it exists at any point in time, may strongly influence how new information is interpreted. If one has come to believe that a defendant is guilty (or innocent), further evidence that is open to various interpretations may be seen as supportive of that belief. Opinions formed about a defendant on the basis of superficial cues (such as demeanor while giving testimony) can bias the interpretation of inherently ambiguous evidence (Hendry & Shaffer, 1989).

Results of mock-trial experiments indicate that, although there are considerable individual differences among mock jurors with respect to

how they approach their task (D. Kuhn et al., 1994), jurors often come to favor a particular verdict early in the trial process (Devine & Ostrom, 1985). The final verdicts that juries return are usually the same as the tentative ones they initially form (Kalven & Zeisel, 1966; Lawson, 1968). The results of some mock trials suggest that deliberation following the presentation of evidence tends to have the effect of making a jury's average predeliberation opinion more extreme in the same direction (Myers & Lamm, 1976).

The tendency to stick with initial tentative verdicts could exist because in most cases the initial conclusions stand up to further objective evaluation; there is also the possibility, however, that the tentative verdict influences jurors' subsequent thinking and biases them to look for, or give undo weight to, evidence that supports it. This possibility gains credence from the finding by Pennington and Hastie (1993) that participants in mock-jury trials were more likely to remember statements consistent with their chosen verdict as having been presented as trial evidence than statements that were inconsistent with this verdict. This was true both of statements that had been presented (hits) and of those that had not (false positives).

### *Science*

Polya (1954a) has argued that a tendency to resist the confirmation bias is one of the ways in which scientific thinking differs from everyday thinking:

> The mental procedures of the trained naturalist are not essentially different from those of the common man, but they are more thorough. Both the common man and the scientist are led to conjectures by a few observations and they are both paying attention to later cases which could be in agreement or not with the conjecture. A case in agreement makes the conjecture more likely, a conflicting case disproves it, and here the difference begins: Ordinary people are usually more apt to look for the first kind of cases, but the scientist looks for the second kind. (p. 40)

If seeking data that would disconfirm a hypothesis that one holds is the general rule among scientists, the history of science gives us many exceptions to the rule (Mahoney, 1976, 1977; Mitroff, 1974). Michael Faraday was likely to seek confirming evidence for a hypothesis and ignore such disconfirming evidence as he obtained until the phenomenon under study was reasonably well understood, at which time he would begin to pay more attention to disconfirming evidence and actively seek to account for it (Tweney & Doherty, 1983). Louis Pasteur refused to accept or publish results of his experiments that seemed to tell against his position that life did not generate spontaneously, being sufficiently convinced of his hypothesis to consider any experiment that produced counterindicative evidence to be necessarily flawed (Farley & Geison, 1974). When Robert Millikan published the experimental work on determining the electric charge of a single electron, for which he won the Nobel prize in physics, he reported only slightly more than half (58) of his (107) observations, omitting from publication those that did not fit his hypothesis (Henrion & Fischhoff, 1986).

It is not so much the critical attitude that individual scientists have taken with respect to their own ideas that has given science the success it has enjoyed as a method for making new discoveries, but more the fact that individual scientists have been highly motivated to demonstrate that hypotheses that are held by some other scientist(s) are false. The insistence of science, as an institution, on the objective testability of hypotheses by publicly scrutable methods has ensured its relative independence from the biases of its practitioners.

*Conservatism among scientists.* The fact that scientific discoveries have often met resistance from economic, technological, religious, and ideological elements outside science has been highly publicized. That such discoveries have sometimes met even greater resistance from scientists, and especially from those whose theoretical positions were challenged or invalidated by those discoveries, is no less a fact if less well known (Barber, 1961; Mahoney, 1976, 1977). Galileo, for example, would not accept Kepler's hypothesis that the moon is responsible for the tidal motions of the earth's oceans. Newton refused to believe that the earth could be much older than 6,000 years on the strength of the reasoning that led Archbishop Usher to place the date of creation at 4,004 BC. Huygens and Leibniz rejected Newton's concept of universal gravity because they could not accept the idea of a force extending throughout space not reducible to matter and motion.

Humphrey Davy dismissed John Dalton's ideas about the atomic structure of matter as

more ingenious than important. William Thomson (Lord) Kelvin, who died in 1907, some years after the revolutionary work of Joseph Thomson on the electron, never accepted the idea that the atom was decomposable into simpler components. Lev Landau was willing in 1932 to dismiss the laws of quantum mechanics on the grounds that they led to such a ridiculous prediction as the contraction of large burned out stars to essentially a point. Arthur Eddington rejected Subrahmanyan Chandrasekhar's prediction in the early 1930s that cold stars with a mass of more than about one half that of the sun would collapse to a point. Chandrasekhar was sufficiently discouraged by Eddington's reaction to leave off for the better part of his professional career the line of thinking that eventually led to the now widely accepted theory of black holes.

*Theory persistence.*  The history of science contains many examples of individual scientists tenaciously holding on to favored theories long after the evidence against them had become sufficiently strong to persuade others without the same vested interests to discard them. I. B. Cohen (1985) has documented many of these struggles in his account of the role of revolution in science. All of them can be seen as examples of the confirmation bias manifesting itself as an unwillingness to give the deserved weight to evidence that tells against a favored view.

Roszak (1986) described the tenacity with which adherents to the cosmology of Ptolemy clung to their view in the face of mounting evidence of its untenability in this way:

> The Ptolemaic cosmology that prevailed in ancient times and during the Middle Ages had been compromised by countless contradictory observations over many generations. Still, it was an internally coherent, intellectually pleasing idea; therefore, keen minds stood by the familiar old system. Where there seemed to be any conflict, they simply adjusted and elaborated the idea, or restructured the observations in order to make them fit. If observations could not be made to fit, they might be allowed to stand along the cultural sidelines as curiosities, exceptions, freaks of nature. It was not until a highly imaginative constellation of ideas about celestial and terrestrial dynamics, replete with new concepts of gravitation, inertia, momentum, and matter, was created that the old system was retired. (p. 91)

Roszak pointed out also that scientists throughout the 18th and 19th centuries retained other inherited ideas in the fields of chemistry, geology, and biology in adjusted forms, despite increasing evidences of their inadequacies.

Science has held, often for very long times, some beliefs and theories that could have been invalidated if a serious effort had been made to show them to be false. The belief that heavier bodies fall faster than lighter ones, for example, prevailed from the time of Aristotle until that of Galileo. The experiments that Galileo performed to demonstrate that this belief was false could have been done at any time during that 2000-year period. This is a particularly interesting example of a persisting false belief because it might have been questioned strictly on the basis of reasoning, apart from any observations. Galileo posed a question that could have been asked by Aristotle or by anybody who believed that heavier bodies fall faster than lighter ones: If a 10 pound weight falls faster than a 1 pound weight, what will happen when the two are tied together? Will the 11 pound combination fall faster than the 10 pound weight, or will it fall more slowly because the 1 pound weight will hold back the 10 pound one?

Hawking (1988) argued that the fact that the universe is expanding could have been predicted from Newton's theory of gravity at any time after the late 17th century, and noted that Newton himself realized that the idea of universal gravity begged an explanation as to why the stars did not draw together. The assumption that the universe was static was a strong and persistent one, however. Newton dealt with the problem by assuming the universe was infinite and consequently had no center onto which it could collapse. Others introduced a notion that at very great distances gravity became repulsive instead of attractive. Einstein, in order to make his general theory of relativity compatible with the idea of a static universe, incorporated a "cosmological constant" in the theory which, in effect, nullified the otherwise expected contraction. Einstein later was embarrassed by this invention and saw it as his greatest mistake.

None of this is to suggest that scientists accept evidences of the inadequacy of an established theory with equanimity. Rather, I note that the typical reaction to the receipt of such evidences is not immediately to discard the theory to which the inadequacies relate but to find a way to defend it. The bias is definitely in the direction of giving the existing theory the

benefit of the doubt, so long as there is room for doubt and, in some cases, even when there is not. The usual strategy for dealing with anomalous data is first to challenge the data themselves. If they prove to be reliable, the next step is to complicate the existing theory just enough to accommodate the anomalous result to, as T. S. Kuhn (1970) put it, "devise numerous articulations and *ad hoc* modifications of [the] theory in order to eliminate any apparent conflict" (p. 78). If that proves to be too difficult, one may decide simply to live with the anomaly, at least for a while. When a theory is confronted with too many anomalies to be accommodated in this way—or when, as a consequence of a series of modifications the theory becomes too convoluted to manage and an alternative theory becomes available—there is the basis of a paradigm shift and a revolutionary reorientation of thinking.

*Overconfidence.* Overconfidence in experimental results has manifested itself in the reporting of a higher-than-warranted degree of certainty or precision in variable measurements. Scientific investigators often have underestimated the uncertainty of their measurements and thus reported errors of estimate that have not stood the test of time. Fundamental constants that have been reported with uncertainty estimates that later proved too small include the velocity of light, the gravitational constant, and the magnetic moment of the proton (Henrion & Fischhoff, 1986).

The 1919 British expedition to West Africa to take advantage of a solar eclipse in order to test Einstein's prediction that the path of light would be bent by a gravitational field represents an especially noteworthy case of the reporting of a higher-than-warranted degree of precision in measurement. Einstein had made the prediction in the 1915 paper on the general theory of relativity. Scientists later discovered that the error of measurement was as great as the effect that was being measured so that, as Hawking (1988) put it, "The British team's measurement had been sheer luck, or a case of knowing the result they wanted to get, not an uncommon occurrence in science" (p. 32).

The predictions have subsequently been verified with observations not subject to the same measurement problems, but as first made and reported, they suggest the operation a confirmation bias of considerable strength. In a detailed account of the event, Collins and Pinch (1993) noted that Eddington's data were noisy, that he had to decide which photographs to count and which to ignore, and that he used Einstein's theory to make these decisions. As they put it:

> Eddington could only claim to have confirmed Einstein because he used Einstein's derivations in deciding what his observations really were, while Einstein's derivations only became accepted because Eddington's observation seemed to confirm them. Observation and prediction were linked in a circle of mutual confirmation rather than being independent of each other as we would expect according to the conventional idea of an experimental test. (p. 45)

Collins and Pinch's account of the reporting of the results of the 1919 expedition and of the subsequent widespread adoption of relativity as the new standard paradigm of physics represents scientific advance as somewhat less inexorably determined by the cold objective assessment of theory in the light of observational fact than it is sometimes assumed to be.

Henrion and Fischhoff (1986) suggested that the overconfidence associated with the estimates they considered could have resulted from scientists overlooking, for one reason or another, specific sources of uncertainty in their measurements. This possibility is consistent with the results of laboratory studies of judgment showing that people typically find it easier to think of reasons that support a conclusion they have drawn than to think of reasons that contradict it and that people generally have difficulty in thinking of reasons why their best guess might be wrong (Koriat et al., 1980).

By way of rounding out this discussion of confirmation bias in science, it is worth noting that prevailing attitudes and opinions can change rapidly within scientific communities, as they can in other communities. Today's revolutionary idea is tomorrow's orthodoxy. Ideas considered daring, if not bizarre or downright ridiculous when first put forward, can become accepted doctrine or sometimes obvious truths that no reasonable person would contest in relatively short periods of time. According to Lakatos (1976)

> *Newton's mechanics and theory of gravitation* was put forward as a daring guess which was ridiculed and called "occult" by Leibniz and suspected even by Newton himself. But a few decades later—in absence of refutations—his axioms came to be taken as indubitably true. Suspicions were forgotten, critics

> branded "eccentric" if not "obscurantist"; some of his most doubtful assumptions came to be regarded as so trivial that textbooks never even stated them. (p. 49, Footnote 1)

One can see a confirmation bias both in the difficulty with which new ideas break through opposing established points of view and in the uncritical allegiance they are often given once they have become part of the established view themselves.

## Explanations of the Confirmation Bias

How is one to account for the confirmation bias and its prevalence in so many guises? Is it a matter of protecting one's ego, a simple reluctance to consider the possibility that a belief one holds or a hypothesis that one is entertaining is wrong? Is it a consequence of specific cognitive limitations? Does it reflect a lack of understanding of logic? Does it persist because it has some functional value? That is, does it provide some benefits that are as important as, or in some situations more important than, an attempt to determine the truth in an unbiased way would be?

### *The Desire to Believe*

Philosophers and psychologists alike have observed that people find it easier to believe propositions they would like to be true than propositions they would prefer to be false. This tendency has been seen as one manifestation of what has been dubbed *the Pollyanna principle* (Matlin & Stang, 1978), according to which people are likely to give preferential treatment to pleasant thoughts and memories over unpleasant ones.

Finding a positive correlation between the probability that one will believe a proposition to be true and the probability that one will consider it to be desirable (Lefford, 1946; McGuire, 1960; Weinstein, 1980, 1989) does not, in itself, establish a causal link between desirability and perceived truth. The correlation could reflect a relationship between truth and desirability in the real world, whereby what is likely to be true is likely also to be desirable, and the same is conversely true. On the other hand, the evidence is strong that the correlation is the result, at least to some degree, of beliefs being influenced by preferences. The continuing susceptibility of people to too-good-to-be-true promises of quick wealth is but one illustration of the fact that people sometimes demand very little in the way of compelling evidence to drive them to a conclusion that they would like to accept.

Although beliefs can be influenced by preferences, there is a limit to how much influence people's preferences can have. It is not the case, for most of us at least, that we are free to believe anything we want; what we believe must appear to us believable. We can be selective with respect to the evidence we seek, and we can tilt the scales when we weigh what we find, but we cannot completely ignore counterindicative evidence of which we are aware. Kunda (1990) has made this argument persuasively. The very fact that we sometimes seek to ignore or discount evidence that counts against what we would like to believe bears witness to the importance we attach to holding beliefs that are justified.

More generally, one could view, somewhat ironically perhaps, the tendency to treat data selectively and partially as a testament to the high value people attach to consistency. If consistency between beliefs and evidence were of no importance, people would have no reason to guard beliefs against data that are inconsistent with them. Consistency is usually taken to be an important requirement of rationality, possibly the most important such requirement. Paradoxically, it seems that the desire to be consistent can be so strong as to make it difficult for one to evaluate new evidence pertaining to a stated position in an objective way.

The quote from Mackay (1852/1932) that is used as an epigraph at the beginning of this article stresses the importance of motivation in efforts to confirm favored views. Some investigators have argued, however, that the basic problem is not motivational but reflects limitations of a cognitive nature. For example, Nisbett and Ross (1980) held that, on the whole, investigators have been too quick to attribute the behavior of participants in experimental situations to motivational biases when there were equally plausible alternative interpretations of the findings:

> One wonders how strongly the theory of self-serving bias must have been held to prompt such uncritical acceptance of empirical evidence. . . . We doubt that careful investigation will reveal ego-enhancing or ego-defensive biases in attribution to be as pervasive or

> potent as many lay people and most motivational theorists presume them to be. (p. 233)

This argument is especially interesting in the present context, because it invokes a form of confirmation bias to account for the tendency of some investigators to attribute certain behaviors to motivational causes and to ignore what, in Nisbett and Ross's view, are equally likely alternative explanations.

The role of motivation in reasoning has been a subject of debate for some time. Kunda (1990) noted that many of the phenomena that once were attributed to motivational variables have been reinterpreted more recently in cognitive terms; according to this interpretation, conclusions that appear to be drawn only because people want to draw them may be drawn because they are more consistent with prior beliefs and expectancies. She noted too that some theorists have come to believe that motivational effects are mediated by cognitive processes. According to this view, "[p]eople rely on cognitive processes and representations to arrive at their desired conclusions, but motivation plays a role in determining which of these will be used on a given occasion" (Kunda, 1990, p. 480).

Kunda defended this view, arguing that the evidence to date is consistent with the assumption that motivation affects reasoning, but it does so through cognitive strategies for accessing, constructing, and evaluating beliefs:

> Although cognitive processes cannot fully account for the existence of self-serving biases, it appears that they play a major role in producing these biases in that they provide the mechanisms through which motivation affects reasoning. Indeed, it is possible that motivation merely provides an initial trigger for the operation of cognitive processes that lead to the desired conclusions. (p. 493)

The primary cognitive operation hypothesized to mediate motivational effects is the biased searching of memory. Evidence of various types converges, she argued, on the conclusion that "goals enhance the accessibility of those knowledge structures—memories, beliefs, and rules—that are consistent with desired conclusions" (p. 494); "Motivation will cause bias, but cognitive factors such as the available beliefs and rules will determine the magnitude of the bias" (p. 495).

Several of the accounts of confirmation bias that follow stress the role of cognitive limitations as causal factors. It is possible, however, and probable, in my view, that both motivational and cognitive factors are involved and that each type can mediate effects of the other.

### *Information-Processing Bases for Confirmation Bias*

The confirmation bias is sometimes attributed in part to the tendency of people to gather information about only one hypothesis at a time and even with respect to that hypothesis to consider only the possibility that the hypothesis is true (or only the possibility that it is false) but not to consider both possibilities simultaneously (Tweney, 1984; Tweney & Doherty, 1983). Doherty and Mynatt (1986) argued, for example, that people are fundamentally limited to think of only one thing at a time, and once having focused on a particular hypothesis, they continue to do so. This, they suggested, explains why people often select nondiagnostic over diagnostic information in Bayesian decision situations. Suppose that one must attempt to decide which of two diseases, A or B, a patient with Symptoms X and Y has. One is informed of the relative frequency of Symptom X among people who have Disease A and is then given the choice of obtaining either of the following items of information: the relative frequency of people with A who have Symptom Y or the relative frequency of people with B who have symptom X. Most people who have been given choices of this sort opt for the first; they continue to focus on the hypothesis that the patient has A, even though learning the relative frequency of Y given A does not inform the diagnosis, whereas learning the relative frequency of X given B does.

Assuming a restricted focus on a single hypothesis, it is easy to see how that hypothesis might become strengthened even if it is false. An incorrect hypothesis can be sufficiently close to being correct that it receives a considerable amount of positive reinforcement, which may be taken as further evidence of the correctness of the hypothesis in hand and inhibit continued search for an alternative. In many contexts intermittent reinforcement suffices to sustain the behavior that yields it.

People also can increase the likelihood of getting information that is consistent with existing beliefs and decrease the likelihood of

getting information that is inconsistent with them by being selective with respect to where they get information (Frey, 1986). The idea that people tend to expose themselves more to information sources that share their beliefs than to those that do not has had considerable credibility among social psychologists (Festinger, 1957; Klapper, 1960). Sears and Freedman (1967) have challenged the conclusiveness of much of the evidence that has been evoked in support of this idea. They noted that, when given a choice of information that is supportive of a view one holds and information that is supportive of an opposing view, people sometimes select the former and sometimes the latter, and sometimes they show no preference. Behavior in these situations seems to depend on a number of factors in addition to the polarity of the information with respect to one's existing views, such as people's level of education or social status and the perceived usefulness of the information that is offered.

Sears and Freedman (1967) stopped short, however, of concluding that people are totally unbiased in this respect. They noted the possibility that "dramatic selectivity in preferences may not appear at any given moment in time, but, over a long period, people may organize their surroundings in a way that ensures *de facto* selectivity" (p. 213). People tend to associate, on a long-term basis, with people who think more or less as they do on matters important to them; they read authors with whom they tend to agree, listen to news commentators who interpret current events in a way that they like, and so on. The extent to which people choose their associates because of their beliefs versus forming their beliefs because of their associates is an open question. But it seems safe to assume that it goes a bit in both directions. Finding lots of support for one's beliefs and opinions would be a natural consequence of principally associating with people with whom one has much in common.

Gilovich (1991) made the important point that for many beliefs or expectations confirmatory events are likely to be more salient than nonconfirmatory ones. If a fortune teller predicts several events in one's life sometime during the indefinite future, for example, the occurrence of any predicted event is more likely to remind one of the original prediction of that event than is its nonoccurrence. Events predicted by a fortune teller illustrate *one-sided events.* Unlike *two-sided events,* which have the characteristic that their nonoccurrence is as noticeable as their occurrence, one-sided events are likely to be noticed while their nonoccurrence is not. (An example of a two-sided event would be the toss of a coin following the prediction of a head. In this case the nonoccurrence of the predicted outcome would be as noticeable as its occurrence.)

Sometimes decision policies that rule out the occurrence of certain types of events preclude the acquisition of information that is counterindicative with respect to a hypothesis. Consider, for example, the hypothesis that only students who meet certain admission requirements are likely to be successful as college students. If colleges admit only students who meet those requirements, a critical subset of the data that are necessary to falsify the hypothesis (the incidence of students who do not meet the admission requirements but are nevertheless successful college students) will not exist (Einhorn & Hogarth, 1978). One could argue that this preclusion may be justified if the hypothesis is correct, or nearly so, and if the negative consequences of one type of error (admitting many students who will fail) are much greater than those of the other type (failing to admit a few students who would succeed). But the argument is circular because it assumes the validity of the hypothesis in question.

Some beliefs are such that obtaining evidence that they are false is inherently impossible. If I believe, for example, that most crimes are discovered sooner or later, my belief may be reinforced every time a crime is reported by a law enforcement agency. But by definition, undiscovered crimes are not discovered, so there is no way of knowing how many or them there are. For the same reason, if I believe that most crimes go undiscovered, there is no way to demonstrate that this belief is wrong. No matter how many crimes are discovered, the number of undiscovered crimes is indeterminable because being undiscovered means being uncounted.

Some have also given information-processing accounts of why people, in effect, consider only the probability of an event, assuming the truth of a hypothesis of interest, and fail to consider the probability of the same event, assuming the falsity of that hypothesis. Evans (1989) argued

that one need not assume the operation of a *motivational bias*—a strong wish to confirm—in order to account for this failure. It could signify, according to Evans, a lack of understanding of the fact that, without a knowledge of $p(D|{\sim}H)$, $p(D|H)$ gives one no useful information about $p(H|D)$. That is, $p(D|H)$, by itself, is not diagnostic with respect to the truth or falsity of H. Possibly people confuse $p(D|H)$ with $p(H|D)$ and take its absolute value as an indication of the strength of the evidence in favor of H. Bayes's rule of inverse probability, a formula for getting from $p(D|H)$ to $p(H|D)$ presumably was motivated, in part, to resolve this confusion.

Another explanation of why people fail to consider alternatives to a hypothesis in hand is that they simply do not think to do so. Plausible alternatives do not come to mind. This is seen by some investigators to be, at least in part, a matter of inadequate effort, a failure to do a sufficiently extensive search for possibilities (Baron, 1985, 1994; Kanouse, 1972).

### *Positive-Test Strategy or Positivity Bias*

Arguing that failure to distinguish among different senses of confirmation in the literature has contributed to misinterpretations of both empirical findings and theoretical prescriptions, Klayman and Ha (1987) have suggested that many phenomena of human hypothesis testing can be accounted for by the assumption of a general *positive-test strategy.* Application of this strategy involves testing a hypothesis either by considering conditions under which the hypothesized event is expected to occur (to see if it does occur) or by examining known instances of its occurrence (to see if the hypothesized conditions prevailed). The phenomenon bears some resemblance to the finding that, in the absence of compelling evidence one way or the other, people are more inclined to assume that a statement is true than to assume that it is false (Clark & Chase, 1972; Gilbert, 1991; Trabasso, Rollins, & Shaughnessy, 1971; Wallsten & González-Vallejo, 1994).

Baron, Beattie, and Hershey (1988), who referred to the positive-test strategy as the *congruence heuristic,* have shown that the tendency to use it can be reduced if people are asked to consider alternatives, but that they tend not to consider them spontaneously. The fact that people show a preference for questions that would yield a positive answer if the hypothesis is correct over questions that would yield a negative answer if the hypothesis is correct demonstrates that the positive-test strategy is not a simple consequence of the confirmation bias (Baron et al., 1988; Devine, Hirt, & Gehrke, 1990; Skov & Sherman, 1986).

One could view the results that Wason (1960) originally obtained with the number-triplet task, which constituted the point of departure for much of the subsequent work on confirmation bias, as a manifestation of the positive-test strategy, according to which one tests cases one thinks likely to have the hypothesized property (Klayman & Ha, 1987). As already noted, this strategy precludes discovering the incorrectness of a hypothesized rule when instances that satisfy the hypothesized rule constitute a subset of those that satisfy the correct one, but it is an effective strategy when the instances that satisfy the correct rule constitute a subset of those that satisfy the hypothesized one.

Suppose, for example, that the hypothesized rule is *successive even numbers* and the correct one is *increasing numbers.* All triplets that satisfy the hypothesized rule also satisfy the correct one, so using only such triplets as test cases will not reveal the incorrectness of the hypothesized rule. But if the hypothesized rule is *increasing numbers* and the correct rule is *successive even numbers,* the positive-test strategy—which, in this case means trying various triplets of increasing numbers—is likely to provide the feedback necessary to discover that the hypothesized rule is wrong. In both of the examples considered, the strategy is to select instances for testing that satisfy the hypothesized rule; it is effective in revealing the rule to be wrong in the second case, not because the tester intentionally selects instances that will show the rule to be wrong if it is wrong, but because the relationship between hypothesized and correct rules is such that the tester is likely to discover the hypothesized rule to be wrong by selecting test cases intended to show that it is right.

Klayman and Ha (1987) analyzed various possible relationships between the sets of triplets delimited by hypothesized and correct rules in addition to the two cases in which one set is a proper subset of the other—overlapping sets, disjoint sets, identical sets—and showed

that the likely effectiveness of positive-test strategy depends on which relationship pertains. They also analyzed corresponding cases in which set membership is probabilistic and drew a similar conclusion. With respect to disconfirmation, Klayman and Ha argued the importance of distinguishing between two strategies, one involving examination of instances that are expected not to have the target property, and the other involving examination of instances that one expects to falsify, rather than verify, the hypothesis. Klayman and Ha contended that failure to make this distinction clearly in the past has been responsible for some confusion and debate.

Several investigators have argued that a positive-test strategy should not necessarily be considered a biased information-gathering technique because questions prompted by this strategy generally do not preclude negative answers and, therefore, falsification of the hypothesis being tested (Bassock & Trope, 1984; Hodgins & Zuckerman, 1993; Skov & Sherman, 1986; Trope & Mackie, 1987). It is important to distinguish, however, between obtaining information from a test because the test was intended to yield the information obtained and obtaining information adventitiously from a test that was intended to yield something other than what it did. Consider again the number-triplet task. One might select, say, 6–7–8 for either of the following reasons, among others: (a) because one believes the rule to be *increasing numbers* and wants a triplet that fits the rule, or (b) because one believes the rule to be *successive even numbers* and wants to increase one's confidence in this belief by selecting a triplet that fails to satisfy the rule. The chooser expects the experimenter's response to the selected triplet to be positive in the first case and negative in the second. In either case, the experimenter's response could be opposite from what the chooser expects and show the hypothesized rule to be wrong; the response is adventitious because the test yielded information that the chooser was not seeking and did not expect to obtain.

The fact that people appear to be more likely than not to test a hypothesized rule by selecting cases that they believe will pass muster (that fit the hypothesized rule) and lend credence to the hypothesis by doing so justifies describing typical performance on find-the-rule tasks like the triplet task as illustrative of a confirmation bias. People appear to be much less likely to attempt to get evidence for a hypothesized rule by choosing a case that they believe does not fit it (and expecting an informative-negative response) or to select cases with the intended purpose of ruling out one or more currently plausible hypotheses from further consideration. When a test that was expected to yield an outcome that is positive with respect to a hypothesized rule does not do so, it seems appropriate to say that the positive-test strategy has proved to be adventitiously informative. Clearly, it is possible to select an item that is consistent with a hypothesized rule for the purpose of revealing an alternative rule to be wrong, but there is little evidence that this is often done. It seems that people generally select test items that are consistent with the rule they believe to be correct and seldom select items with falsification in mind.

Klayman and Ha (1987) argued that the positive-test strategy is sometimes appropriate and sometimes not, depending on situational variables such as the base rates of the phenomena of interest, and that it is effective under commonly occurring conditions. They argued too, however, that people tend to rely on it overly much, treating it as a default strategy to be used when testing must be done under less-than-ideal conditions, and that it accounts for many of the phenomena that are generally interpreted as evidence of a pervasive confirmation bias.

Evans (1989) has proposed an explanation of the confirmation bias that is similar in some respects to Klayman and Ha's (1987) account and also discounts the possibility that people intentionally seek to confirm rather than falsify their hypotheses. Cognitive failure, and not motivation, he argued, is the basis of the phenomenon:

> Subjects confirm, not because they want to, but because they cannot think of the way to falsify. The cognitive failure is caused by a form of selective processing which is very fundamental indeed in cognition—a bias to think about positive rather than negative information. (p. 42)

With respect to Wason's (1960) results with the number-triplet task, Evans suggested that rather than attempting to confirm the hypotheses they were entertaining, participants may simply have been unable to think of testing them in a

negative manner; from a logical point of view, they should have used potentially disconfirming test cases, but they failed to think to do so.

Evans (1989) cited the results of several efforts by experimenters to modify hypothesis-testing behavior on derivatives of Wason's number-set task by instructing participants about the importance of seeking negative or disconfirming information. He noted that although behavioral changes were sometimes induced, more often performance was not improved. This too was taken as evidence that results that have been attributed to confirmation bias do not stem from a desire to confirm, but rather from the difficulty people have in thinking in explicitly disconfirmatory terms.

Evans used the same argument to account for the results typically obtained with Wason's (1966, 1968) selection task that have generally been interpreted as evidence of the operation of a confirmation bias. Participants select named items in this task, according to this view, because these are the only ones that come to mind when they are thinking about what to do. The bias that is operating is not that of wanting to confirm a tentative hypothesis but that of being strongly inclined to think only of information that is explicitly provided in the problem statement. In short, Evans (1989) distinguished between confirmatory *behavior,* which he acknowledges, and confirmatory *intentions,* which he denies. The "demonstrable deficiencies in the way in which people go about testing and eliminating hypotheses," he contended, "are a function of selective processing induced by a widespread cognitive difficulty in thinking about any information which is essentially negative in its conception" (p. 63). The tendency to focus on positive information and fail to consider negative information is regarded not as a conscious cognitive strategy but as the result of preattentive processes. *Positive* is not synonymous with *confirmatory,* but as most studies have been designed, looking for positive cases is tantamount to looking for confirmation.

The idea that people have a tendency to focus more on positive than on negative information, like the idea of a confirmation bias, is an old one. An observation by Francis Bacon (1620/1939) can again illustrate the point: "It is the peculiar and perpetual error of the human understanding to be more moved and excited by affirmatives than negatives; whereas it ought properly to hold itself indifferently disposed towards both alike" (p. 36). Evans's (1989) argument that such a bias can account, at least in part, for some of the phenomena that are attributed to a confirmation bias is an intuitively plausible one. A study in which Perkins et al., (1983) classified errors of reasoning made in informal arguments constructed by over 300 people of varying age and educational level supports the argument. Many of the errors Perkins et al. identified involved participants' failure to consider lines of reasoning that could be used to defeat or challenge their conclusions.

I will be surprised if a positivity bias turns out to be adequate to account for all of the ways in which what has here been called a *confirmation bias* manifests itself, but there are many evidences that people find it easier to deal with positive information than with negative: it is easier to decide the truth or falsity of positive than of negative sentences (Wason, 1959, 1961); the assertion that something is absent takes longer to comprehend than the assertion that something is present (Clark, 1974); and inferences from negative premises require more time to make or evaluate and are more likely to be erroneous or evaluated incorrectly than are those that are based on positive premises (Fodor, Fodor, & Garrett, 1975). How far the idea can be pushed is a question for research. I suspect that failure to try to construct counterarguments or to find counterevidence is a major and relatively pervasive weakness of human reasoning.

In any case, the positivity bias itself requires an explanation. Does such a bias have some functional value? Is it typically more important for people to be attuned to occurrences than to nonoccurrences of possible events? Is language processed more effectively by one who is predisposed to hear positive rather than negative assertions? Is it generally more important to be able to make valid inferences from positive than from negative premises? It would not be surprising to discover that a positivity bias is advantageous in certain ways, in which case Bacon's dictum that we should be indifferently disposed toward positives and negatives would be wrong.

There is also the possibility that the positivity bias is, at least in part, motivationally based. Perhaps it is the case that the processing of negative information generally takes more effort than does the processing of positive information

and often we are simply not willing to make the effort that adequate processing of the negative information requires. As to why the processing of negative information should require more effort than the processing of positive information, perhaps it is because positive information more often than not is provided by the situation, whereas negative information must be actively sought, from memory or some other source. It is generally clear from the statement of a hypothesis, for example, what a positive instance of the hypothesized event would be, whereas that which constitutes a negative instance may require some thought.

### Conditional Reference Frames

Several investigators have shown that when people are asked to explain or imagine why a hypothesis might be true or why a possible event might occur, they tend to become more convinced that the hypothesis is true or that the event will occur, especially if they have not given much thought to the hypothesis or event before being asked to do so (Campbell & Fairey, 1985; Hirt & Sherman, 1985; Sherman et al., 1983). In some cases, people who were asked to explain why a particular event had occurred and then were informed that the event did not occur after they did so, still considered the event more "likely" than did others who were not asked to explain why it might occur (Ross et al., 1977).

Koehler (1991), who has reviewed much of the work on how explanations influence beliefs, has suggested that producing an explanation is not the critical factor and that simply coming up with a focal hypothesis is enough to increase one's confidence in it. Anything, he suggested, that induces one to accept the truth of a hypothesis temporarily will increase one's confidence that it is, in fact, true. Calling attention to a specified hypothesis results in the establishment of a focal hypothesis, and this in turn induces the adoption of a *conditional reference frame,* in which the focal hypothesis is assumed to be true.

Adoption of a conditional reference frame influences subsequent hypothesis-evaluation processes in three ways, Koehler (1991) suggested: it affects the way the problem is perceived, how relevant evidence is interpreted, and the direction and duration of information search. According to this author,

> Once a conditional reference frame has been induced by an explanation task, a certain inertia sets in, which makes it more difficult to consider alternative hypotheses impartially. In other words, the initial impression seems to persist despite the person's efforts to ignore it while trying to give fair consideration to an alternative view. (p. 503)

Hoch's (1984) findings regarding people who were asked to generate reasons for expecting a specified event and reasons against expecting it support Koehler's conclusion: in Hoch's study those who generated the pro reasons first and the con reasons later considered the event more probable than did those who generated the pro and con reasons in the opposite order. Koehler related the phenomenon to that of *mental set* or *fixedness* that is sometimes described in discussions of problem solving. He argued that adopting a conditional reference frame to determine confidence in a hypothesis is probably a good general method but that, like other heuristic methods, it also can yield overconfidence in some instances.

In a recent study of gambling behavior, Gibson, Sanbonmatsu, and Posavac (1997) found that participants who were asked to estimate the probability that a particular team would win the NBA basketball championship made higher estimates of that team's probability of winning than did control participants who were not asked to focus on a single team; the focused participants also were more willing to bet on the focal team. This suggests that focusing on one among several possible event outcomes, even as a consequence of being arbitrarily forced to do so, can have the effect of increasing the subjective likelihood of that outcome.

### Pragmatism and Error Avoidance

Much of the discussion of confirmation bias is predicated on the assumption that, in the situations in which it has generally been observed, people have been interested in determining the truth or falsity of some hypothesis(es) under consideration. But determining its truth or falsity is not the only, or necessarily even the primary, objective one might have with respect to a hypothesis. Another possibility is that of guarding against the making of certain types of mistakes.

In many real-life situations involving the evaluation of a meaningful hypothesis, or the

making of a choice with an outcome that really matters to the one making it, some ways of being wrong are likely to be more regretable than others. Investigators have noted that this fact makes certain types of biases functional in specific situations (Cosmides, 1989; Friedrich, 1993; Hogarth, 1981; Schwartz, 1982). When, for example, the undesirable consequences of judging a true hypothesis to be false are greater than those of judging a false hypothesis to be true, a bias toward confirmation is dictated by some normative models of reasoning and by common sense.

Friedrich (1993) argued that "our inference processes are first and foremost pragmatic, survival mechanisms and only secondarily truth detection strategies" (p. 298). In this view, peoples' inferential strategies are well suited to the identification of potential rewards and the avoidance of costly errors, but not to the objective of hypothesis testing in accordance with the logic of science. Inference strategies that are often considered to be seriously flawed not only may have desired effects in real-world contexts, but may also be seen as correct when judged in terms of an appropriate standard.

To illustrate the point, Friedrich (1993) used the example of an employer who wants to test the hunch that extroverts make the best salespeople. If the employer checked the sales performance only of extroverts, found it to be very good and, on this basis, decided to hire only extroverts for sales positions, one would say that she had not made an adequate test of her hunch because she did not rule out the possibility that introverts might do well at sales also. But if her main objective was to avoid hiring people who will turn out to be poor at sales, satisfying herself that extroverts make good sales people suffices; the fact that she has not discovered that introverts can be good at sales too could mean that she will miss some opportunities by not hiring them, but it does not invalidate the decision to hire extroverts if the objective is to ensure that poor performers do not get hired.

Schwartz (1982) also argued that when responses have consequences that really matter, people are more likely to be concerned about producing desirable outcomes than about determining the truth or falsity of hypotheses. Contingent reinforcement may create functional behavioral units that people tend to repeat because the behaviors have worked in the past, and a bias toward confirmation is one of the stereotyped forms of behavior in which the operation of these units manifests itself. In performing a rule-discovery task, one may be attempting to maximize the probability of getting a positive response, which is tantamount to seeking a rule that is sufficient but not necessary to do so. Given that one has identified a condition that is sufficient for producing desired outcomes, there may be no compelling reason to attempt to determine whether that condition is also necessary. Schwartz pointed out too that, especially in social situations such as some of those studied by Snyder and colleagues attempting to evaluate hypotheses by falsification would require manipulating people and could involve considerable social cost.

Baron (1994) noted that truth seeking or hypothesis testing often may be combined with one or more other goals, and that one's behavior then also must be interpreted in the light of the other goal(s). If, for example, one is curious as to why a cake turned out well despite the fact that certain ingredients were substituted for those called for by the recipe, one may be motivated to explore the effects of the substitutions in such a way that the next experimental cake is likely to turn out well too.

When using a truth-seeking strategy would require taking a perceived risk, survival is likely to take precedence over truth finding, and it is hard to argue that rationality would dictate otherwise. It would seem odd to consider irrational the refusal, say, to eat mushrooms that one suspected of being poison because the decision is calculated to preserve one's well-being rather than to shed light on the question of whether the suspicion is indeed true. In general, the objective of avoiding disastrous errors may be more conducive to survival than is that of truth determination.

The desire to avoid a specific type of error may coincidentally dictate the same behavior as would the intention to determine the truth or falsity of a hypothesis. When this is the case, the behavior itself does not reveal whether the individual's intention is to avoid the error or to test the hypothesis. Friedrich (1993) suggested that some behavior that has been taken as evidence of people's preference for normative diagnostic tests of hypotheses and their interest in accuracy could have been motivated instead by the desire to avoid specific types of errors. In

other words, even when behavior is consistent with the assumption of truth seeking, it sometimes may be equally well interpreted, according to this view, in terms of error-minimizing strategies.

The assumption that decisions made or conclusions drawn in many real-life situations are motivated more by a desire to accomplish specific practical goals or to avoid certain types of errors than by the objective of determining the truth or falsity of hypotheses is a plausible one. Pragmatic considerations of this sort could often lead one to accept a hypothesis as true—to behave as though it were true—on less than compelling evidence that it is so, thus constituting a confirmation bias of sorts.

### *Educational Effects*

At all levels of education, stress is placed on the importance of being able to justify what one believes. I do not mean to question the appropriateness of this stress, but I do want to note the possibility that, depending on how it is conveyed, it can strengthen a tendency to seek confirming evidence selectively or establish such a tendency if it does not already exist. If one is constantly urged to present reasons for opinions that one holds and is not encouraged also to articulate reasons that could be given against them, one is being trained to exercise a confirmation bias.

Narveson (1980) noted that when students write compositions, they typically evaluate their claims by considering supporting evidence only. He argued that standard methods for teaching composition foster this. The extent to which the educational process makes explicit the distinction between case-building and evidence-weighing deserves more attention. If the distinction is not made and what is actually case-building passes for the impartial use of evidence, this could go some way toward accounting for the pervasiveness and strength of the confirmation bias among educated adults.

Ideally, one would like students, and people in general, to evaluate evidence objectively and impartially in the formation and evaluation of hypotheses. If, however, there are fairly pervasive tendencies to seek or give undue weight to evidence that is confirmatory with respect to hypotheses that people already hold and to avoid or discount evidence that is disconfirmatory with respect to them, there is a need to be especially sensitive to the educational practices that could serve to strengthen an already strong bias.

## Utility of Confirmation Bias

Most commentators, by far, have seen the confirmation bias as a human failing, a tendency that is at once pervasive and irrational. It is not difficult to make a case for this position. The bias can contribute to delusions of many sorts, to the development and survival of superstitions, and to a variety of undesirable states of mind, including paranoia and depression. It can be exploited to great advantage by seers, soothsayers, fortune tellers, and indeed anyone with an inclination to press unsubstantiated claims. One can also imagine it playing a significant role in the perpetuation of animosities and strife between people with conflicting views of the world.

Even if one accepts the idea that the confirmation bias is rooted more in cognitive limitations than in motivation, can anyone doubt that whenever one finds oneself engaged in a verbal dispute it becomes very strong indeed? In the heat of an argument people are seldom motivated to consider objectively whatever evidence can be brought to bear on the issue under contention. One's aim is to win and the way to do that is to make the strongest possible case for one's own position while countering, discounting, or simply ignoring any evidence that might be brought against it. And what is true of one disputant is generally true of the other, which is why so few disputes are clearly won or lost. The more likely outcome is the claim of victory by each party and an accusation of recalcitrance on the part of one's opponent.

But whenever an apparently dysfunctional trait or behavior pattern is discovered to be pervasive, the question arises as to how, if it is really dysfunctional, did it get to be so widespread. By definition, dysfunctional tendencies should be more prone to extinction than functional ones. But aspects of reasoning that are viewed as flawed from one perspective sometimes can be considered appropriate, perhaps because they are adaptively useful in certain real-world situations from another perspective (Arkes, 1991; Funder, 1987; Greenwald, 1980). Does the confirmation bias have

some adaptive value? Does it serve some useful purpose(s)?

*Utility in Science*

According to the principle of *falsifiability* (Popper, 1959), an explanation (theory, model, hypothesis) cannot qualify as scientific unless it is falsifiable in principle. This is to say there must be a way to show the explanation to be false if in fact it is false. Popper focused on falsifiability as the distinguishing characteristic of the scientific method because of a conviction that certain theories of the day (in particular, Marx's theory of history, Freud's theory of psychoanalysis, and Adler's individual psychology) "appeared to be able to explain practically everything that happened within the fields to which they referred" (Popper, 1962/1981, p. 94). Thus subscribers to any one of these theories were likely to see confirming evidence anywhere they looked. According to Popper (1959), the most characteristic element in this situation seemed to be the incessant stream of confirmations, of observations which 'verified' the theories in question; and this point was constantly emphasized by their adherents" (p. 94). There was, in Popper's view, no conceivable evidence that could be brought to bear on any of these theories that would be viewed by an adherent as grounds for judging it to be false. Einstein's theory of relativity impressed Popper as being qualitatively different in the important respect that it made risky predictions, which is to say predictions that were incompatible with specific possible results of observation. This theory was, in principle, refutable by empirical means and therefore qualified as scientific according to Popper's criterion.

Although Popper articulated the principle of falsifiability more completely than anyone before him, the idea has many antecedents in philosophy and science. It is foreshadowed, for example, in the Socratic method of refutation (*elenchos*), according to which what is to be taken as truth is whatever survives relentless efforts at refutation (MacIntyre, 1988). Lakatos (1976, 1978) and Polya (1954a, 1954b) have discussed the importance of this attitude in reasoning in mathematics—especially in proof-making—at length. The principle of falsifiability was also anticipated by T. H. Huxley (1894/1908), who spoke of "a beautiful hypothesis killed by an ugly fact," and by David Hartley (1748/1981), who proposed a *rule of false*. According to this rule, the acceptability of any supposition or hypothesis should be its ability to provide the basis for the deduction of observable phenomena: "He that forms hypotheses from the first, and tries them by the facts, soon rejects the most unlikely ones; and being freed from these, is better qualified for the examination of those that are probable" (p. 90).

Hypotheses are strengthened more when highly competent scientists make concerted efforts to disprove them and fail than when efforts at disproof are made by less competent investigators or in are made half-hearted ways. As Polya (1954a) put it, "the more danger, the more honor." What better support could Einstein's corpuscular theory of light have received than Millikan's failure to show it to be wrong, despite 10 years of experimentation aimed at doing so? (It is interesting to note that throughout this period of experimentation, Millikan continued to insist on the untenability of the theory despite his inability to show by experiment its predictions to be in error.)

Despite the acceptance of the falsifiability principle by the scientific community as a whole, one would look long and hard to find an example of a well-established theory that was discarded when the first bit of disconfirming evidence came to light. Typically an established theory has been discarded only after a better theory has been offered to replace it. Perhaps this should not be surprising. What astronomer, Waismann (1952) asked, would abandon Kepler's laws on the strength of a single observation? Scientists have not discarded the idea that light travels at a constant speed of about 300,000 kilometers per second and that nothing can travel faster simply because of the discovery of radio sources that seem to be emanating from a single quasar and moving away from each other at more than nine times that speed (Gardner, 1976). It appears that, the principle of falsifiability notwithstanding, "Science proceeds on preponderance of evidence, not on finality" (Drake, 1980, p. 55).

Application of the falsifiability principle to the work of individual scientists seems to indicate that when one comes up with a new hypothesis, one should immediately try to falsify it. Common sense suggests this too; if the hypothesis is false, the sooner one finds that out,

the less time one will waste entertaining it. In fact, as has already been noted, there is little evidence that scientists work this way. To the contrary, they often look much harder for evidence that is supportive of a hypothesis than for evidence that would show it to be false.

Kepler's laborious effort to find a connection between the perfect polyhedra and the planetary orbits is a striking example of a search by a scientist for evidence to confirm a favored hypothesis. Here is his account of the connection he finally worked out and his elation upon finding it, as quoted in Boorstin (1985):

> The earth's orbit is the measure of all things; circumscribe around it a dodecahedron, and the circle containing this will be Mars; circumscribe around Mars a tetrahedron, and the circle containing this will be Jupiter; circumscribe around Jupiter a cube, and the circle containing this will be Saturn. Now inscribe within the earth an icosahedron, and the circle contained in it will be Mercury. You now have the reason for the number of planets.... This was the occasion and success of my labors. And how intense was my pleasure from this discovery can never be expressed in words. I no longer regretted the time wasted. Day and night I was consumed by the computing, to see whether this idea would agree with the Copernican orbits, or if my joy would be carried away by the wind. Within a few days everything worked, and I watched as one body after another fit precisely into its place among the planets. (p. 310)

People are inclined to make light of this particular accomplishment of Kepler's today, but it was a remarkable intellectual feat. The energy with which he pursued what he saw as an intriguing clue to how the world works is inspiring. Bell (1946/1991) argued that it was Kepler's "Pythagorean faith in a numerical harmony of the universe" that sustained him "in his darkest hours of poverty, domestic tragedy, persecution, and twenty-two years of discouragement as he calculated, calculated, calculated to discover the laws of planetary orbits" (p. 181). The same commitment that kept Kepler in pursuit of confirmation of his polyhedral model of planetary orbits yielded the three exquisitly beautiful—and correct—laws of planetary motion for which he is honored today.

My point is not to defend the confirmation bias as an effective guide to truth or even as a heuristically practical principle of logical thinking. It is simply to note that the quest to find support for a particular idea is a common phenomenon in science (I. B. Cohen, 1985; Holton, 1973), that such a quest has often provided the motivation to keep scientists working on demanding intellectual problems against considerable odds, and that the resulting work has sometimes yielded lasting, if unexpected, results.

Students of the scientific process have noted the conservatism of science as an institution (I. B. Cohen, 1985; T. S. Kuhn, 1970), and illustrations of it were given in an earlier part of this article. This conservatism can be seen as an institutional confirmation bias of sorts. Should we view such a bias as beneficial overall or detrimental to the enterprise? An extensive discussion of this question is beyond the scope of this article. However, it can be argued that a degree of conservativism plays a stabilizing role in science and guards the field against uncritical acceptance of so-called discoveries that fail to stand the test of time.

Price (1963) referred to conservatism in the body of science as "a natural counterpart to the open-minded creativity that floods it with too many new ideas" (p. 64). Justification for a certain degree of conservatism is found in the embarrassment that the scientific community has occasionally experienced as a consequence of not being sufficiently sceptical of new discoveries. The discovery of magnetic monopoles, which was widely publicized before a close examination of the evidence forced more guarded interpretations, and that of polywater, which motivated hundreds of research projects over decade following its discovery in the 1960s, are examples.

The scientific community's peremtory rejection of Wegener's (1915/1966) theory of continental drift when it was first put forth is often held out as an especially egregious example of excessive—and self-serving—conservatism on the part of scientists. The view has also been expressed, however, that the geologists who dismissed Wegener's theory, whatever their motivations, acted in a way that was conducive to scientific success. Solomon (1992), who took this position, acknowledged that the behavior was biased and motivated by the desire to protect existing beliefs, but she argued that "bias and belief perseverance made possible the distribution of effort, and this in turn led to the advancement of the debate over [continental] drift" (p. 443).

Solomon's (1992) review of this chapter in the history of geological research makes it clear

that the situation was not quite as simple as some accounts that focus on the closed-mindedness of the geologists at the time would lead one to believe. The idea of continental drift was not entirely new with Wegener, for example, although Wegener was the first to propose a well-developed theory. A serious limitation of the theory was its failure to identify a force of sufficient magnitude to account for the hypothesized movement of continents. (The notion of plate tectonics and evidence regarding sea-floor spreading came much later; LeGrand, 1988.)

Solomon (1992) argued that it was, in part, because Wegener was not trained as a geologist and therefore not steeped in the "stabilist" theories of the time, that his thinking, relatively unconstrained by prior beliefs about the stability of continents, could easily embrace a possibility that was so contrary to the prevailing view. She pointed out too that when geologists began to accept the notion of drift, as evidence favoring it accumulated, it was those with low publication rates who were the most likely to do so: "their beliefs were less entrenched (cognitively speaking) than those who had reasoned more and produced more, so belief perseverance was less of an impediment to acceptance of drift" (p. 449).

Although Solomon (1992) argued that bias and belief perseverance were responsible for much of the distribution of research effort that led finally to the general acceptance of the theory of continental drift, and to that of plate tectonics to which it led in turn, she does not claim that a productive distribution could not have been effected without the operation of these factors. The question of whether these factors facilitated or impeded progress in geology remains an unanswered one; it is not inconceivable that progress could have been faster if the distribution of effort were determined on some other basis.

In any case, it can be argued that a certain degree of conservativism serves a useful stabilizing role in science and is consistent with, if not dictated by, the importance science attaches to testability and empirical validation. Moreover, if Ziman (1978) is right, the vast majority of the new hypotheses put forward by scientists prove to be wrong:

> Even in physics, there is no infallible procedure for generating reliable knowledge. The calm order and perfection of well-established theories, accredited by innumerable items of evidence from a thousand different hands, eyes and brains, is not characteristic of the front-line of research, where controversy, conjecture, contradiction and confusion are rife. The physics of undergraduate test-books is 90% true; the contents of the primary research journals of physics is 90% false. (p. 40)

"According to termperament," Ziman noted, "one may be impressed by the coherence of well-established theories, or horrified by the contradictions of knowledge in the making" (p. 100).

Fischhoff and Beyth-Marom (1983) made a related point when commenting on Mahoney's (1977) finding that scientists tended to be less critical of a fictitious study that reported results supportive of the dominant hypothesis in their field than of one that reported results that were inconsistent with it. They noted that a reluctance by scientists to relinquish pet beliefs is only one interpretation that could be put on the finding. Another possibility is that what appears to be biased behavior reflects "a belief that investigators who report disconfirming results tend to use inferior research methods (e.g., small samples leading to more spurious results), to commit common mistakes in experimental design, or, simply, to be charlatans" (Fischoff and Beyth-Marom, 1983, p. 251). To the extent that such a belief is accurate, a bias against the ready acceptance of results that are disconfirming of prevailing hypotheses can be seen as a safeguard against precipitous changes of view that may prove to be unjustified. It does not follow, of course, that this is the only reason for a confirmation bias in science or the only effect.

### *Is Belief Perseverance Always Bad?*

It is easy to see both how the confirmation bias helps preserve existing beliefs, whether true or false, and how the perseverance of unjustified beliefs can cause serious problems. Is there anything favorable to be said about a bias that tends to perpetuate beliefs independently of their factuality? Perhaps, at least from the narrow perspective of an individual's mental health. It may help, for example, to protect one's ego by making one's favored beliefs less vulnerable than they otherwise would be. Indeed, it seems likely that a major reason why the confirmation bias is so ubiquitous and so enduring is its effectiveness in preserving

preferred beliefs and opinions (Greenwald, 1980).

But even among people who might see some benefit to the individual in a confirmation bias, probably few would contest the claim that when the tendency to persevere in a belief is so strong that one refuses to consider evidence that does not support that belief, it is irrational and offends our sense of intellectual honesty. That is not to say that dogmatic confidence in one's own beliefs and intolerance of opposing views can never work to one's advantage. Boorstin (1958) argued, for example, that it was precisely these qualities that permitted the 17th-century New England Puritans to establish a society with the ingredients necessary for survival and prosperity. He wrote,

> Had they spent as much of their energy in debating with each other as did their English contemporaries, they might have lacked the single-mindedness needed to overcome the dark, unpredictable perils of a wilderness. They might have merited praise as precursors of modern liberalism, but they might never have helped found a nation. (p. 9)

Contrary to the popular stereotype of the Puritans, they were not preoccupied with religious dogma but rather with more practical matters because, as Boorstin noted, they had no doubts and allowed no dissent. They worried about such problems as how to select leaders and representatives, the way to establish the proper limits of political power, and how to construct a feasible federal organization.

The question of the conditions under which one should retain, reject, or modify an existing belief is a controversial one (Cherniak, 1986; Harman, 1986; Lycan, 1988). The controversy is not likely to be settled soon. Whatever the answer to the question is, the confirmation bias must be recognized as a major force that works against easy and frequent opinion change. Probably very few people would be willing to give up long-held and valued beliefs on the first bit of contrary evidence found. It is natural to be biased in favor of one's established beliefs. Whether it is rational is a complicated issue that can too easily be treated simplistically; however, the view that a person should be sufficiently objective and open minded to be willing to toss out any belief upon the first bit of evidence that it is false seems to me wrong for several reasons.

Many, perhaps most, of the beliefs that matter to individuals tend not to be the type that can be falsified, in the Popperian sense, by a single counterindicative bit of data. They tend rather to be beliefs for which both supportive and counterindicative evidence can be found, and the decision as to whether to hold them is appropriately made on the basis of the relative weights or merits of the pro and con arguments.

Second, it is possible to hold a belief for good and valid reasons without being able to produce all of those reasons on demand. Some beliefs are shaped over many years, and the fact that one cannot articulate every reason one has or has ever had for a particular one of them does not mean that it is unfounded. Also, as Nisbett and Ross (1980) pointed out, there are practical time constraints that often limit the amount of processing of new information one can do. In view of these limitations, the tendency to persevere may be a stabilizing hedge against overly frequent changes of view that would result if one were obliged to hold only beliefs that one could justify explicitly at a moment's notice. This argument is not unlike the one advanced by Blackstone (1769/1962) in defense of not lightly scuttling legal traditions.

Third, for assertions of the type that represent basic beliefs, there often are two ways to be wrong: to believe false ones, or to disbelieve true ones. For many beliefs that people hold, these two possibilities are not equally acceptable, which is to say that an individual might consider it more important to avoid one type of error than the other. This is, of course, the argument behind Pascal's famous wager.

To argue that it is not necessarily irrational to refuse to abandon a long-held belief upon encountering some evidence that appears contradictory is not to deny that there is such a thing as holding on to cherished beliefs too tenaciously and refusing to give a fair consideration to counterindicative evidence. The line between understandable conservativism with respect to changing established beliefs and obstinate closed-mindedness is not an easy one to draw. But clearly, people sometimes persevere beyond reason. Findings such as those of Pitz (1969), Pitz et al. (1967), Lord et al. (1979), and especially Ross et al. (1975), who showed that people sometimes persevere in beliefs even when the evidence on which the beliefs were initially formed has been demonstrated to them to be fraudulent, have provided strong evidence of that fact.

### *Confirmation Bias Compounding Inadequate Search*

The idea that inadequate effort is a basic cause of faulty reasoning is common among psychologists. Kanouse (1972) suggested that people may be satisfied to have an explanation for an event that is sufficient and not feel the need to seek the best of all possibilities. Nisbett and Ross (1980) supported the same idea and suggested that it is especially the case when attempting to come up with a causal explanation:

> The lay scientist seems to search only until a plausible antecedent is discovered that can be linked to the outcome through some theory in the repertoire. Given the richness and diversity of that repertoire, such a search generally will be concluded quickly and easily. A kind of vicious cycle results. The subjective ease of explanation encourages confidence, and confidence makes the lay scientist stop searching as soon as a plausible explanation is adduced, so that the complexities of the task, and the possibilities for "alternative explanations" no less plausible than the first, are never allowed to shake the lay scientist's confidence. (p. 119, 120)

Perkins and his colleagues expressed essentially the same idea with their characterization of people as *make-sense epistimologists* (Perkins et al., 1983, 1991). The idea here is that people think about a situation only to the extent necessary to make sense—perhaps superficial sense—of it:

> When sense is achieved, there is no need to continue. Indeed, because further examination of an issue might produce contrary evidence and diminish or cloud the sense of one's first pass, there is probably reinforcement for early closure to reduce the possibility of cognitive dissonance. Such a makes-sense approach is quick, easy, and, for many purposes, perfectly adequate. (Perkins et al., 1991, p. 99)

Baron (1985, 1994) and Pyszczynski and Greenberg (1987) also emphasized insufficient search as the primary reason for the premature drawing of conclusions.

All of these characterizations of the tendency of people to do a less-than-thorough search through the possibilities before drawing conclusions or settling on causal explanations are consistent with Simon's (1957, 1983/1990) view of humans as satisficers, as opposed to optimizers or maximizers. The question of interest in the present context is that of how the criterion for being satisfied should be set. Given that search is seldom exhaustive and assuming that, in many cases, it cannot be, how much should be enough? How should one decide when to stop?

Without at least tentative answers to these types of questions, it is difficult to say whether any particular stopping rule should be considered rational. Despite this vagueness with respect to criteria, I believe that the prevailing opinion among investigators of reasoning is that people often stop—come to conclusions, adopt explanations—before they should, which is not to deny that they may terminate a search more quickly when time is at a premium and search longer when accuracy is critical (Kruglanski, 1980; Kruglanski & Ajzen, 1983; Kruglanski & Freund, 1983). The search seems to be not only less than extensive but, in many cases, minimal, stopping at the first plausible endpoint.

If this view is correct, the operation of a confirmation bias will compound the problem. Having once arrived at a conclusion, belief, or point of view, however prematurely, one may thereafter seek evidence to support that position and interpret newly acquired information in a way that is partial to it, thereby strengthening it. Instead of making an effort to test an initial hypothesis against whatever counterindicative evidence might be marshalled against it, one may selectively focus on what can be said in its favor. As the evidence favoring the hypothesis mounts, as it is bound to do if one gives credence to evidence that is favorable and ignores or discounts that that is not, one will become increasingly convinced of the correctness of the belief one originally formed.

## Concluding Comments

We are sometimes admonished to be tolerant of the beliefs or opinions of others and critical of our own. Laplace (1814/1956), for example, gave this eloquent advice:

> What indulgence should we not have . . . for opinions different from ours, when this difference often depends only upon the various points of view where circumstances have placed us! Let us enlighten those whom we judge insufficiently instructed; but first let us examine critically our own opinions and weigh with impartiality their respective probabilities. (p. 1328)

But can we assess the merits of our own opinions impartially? Is it possible to put a belief that one holds in the balance with an opposing belief that one does not hold and give them a fair weighing? I doubt that it is. But that

is not to say that we cannot hope to learn to do better than we typically do in this regard.

In the aggregate, the evidence seems to me fairly compelling that people do not naturally adopt a falsifying strategy of hypothesis testing. Our natural tendency seems to be to look for evidence that is directly supportive of hypotheses we favor and even, in some instances, of those we are entertaining but about which are indifferent. We may look for evidence that is embarrassing to hypotheses we disbelieve or especially dislike, but this can be seen as looking for evidence that is supportive of the complementary hypotheses. The point is that we seldom seem to seek evidence naturally that would show a hypothesis to be wrong and to do so because we understand this to be an effective way to show it to be right if it really is right.

The question of the extent to which the confirmation bias can be modified by training deserves more research than it has received. Inasmuch as a critical step in dealing with any type of bias is recognizing its existence, perhaps simply being aware of the confirmation bias—of its pervasiveness and of the many guises in which it appears—might help one both to be a little cautious about making up one's mind quickly on important issues and to be somewhat more open to opinions that differ from one's own than one might otherwise be.

Understanding that people have a tendency to overestimate the probable accuracy of their judgments and that this tendency is due, at least in part, to a failure to consider reasons why these judgments might be inaccurate provides a rationale for attempting to think of reasons for and (especially) against a judgment that is to be made. Evidence that the appropriateness of people's confidence in their judgments can be improved as a consequence of such efforts is encouraging (Arkes, Faust, Guilmette, & Hart, 1988; Hoch, 1984, 1985; Koriat et al., 1980).

The knowledge that people typically consider only one hypothesis at a time and often make the assumption at the outset that that hypothesis is true leads to the conjecture that reasoning might be improved by training people to think of alternative hypotheses early in the hypothesis-evaluation process. They could be encouraged to attempt to identify reasons why the complement of the hypothesis in hand might be true. Again, the evidence provides reason for optimism that the approach can work (C. A. Anderson, 1982; C. A. Anderson & Sechler, 1986; Lord, Lepper, & Preston, 1984).

To the extent that what appear to be biases are sometimes the results of efforts to avoid certain types of decision errors (Friedrich, 1993), making these other types of possible errors more salient may have a debiasing effect. On the other hand, if the errors that one is trying to avoid are, in fact, more costly than bias errors, such debiasing might not be desirable in all instances. Here the distinction between the objective of determining the truth or falsity of a hypothesis and that of avoiding an undesirable error (at the expense of accepting the possibility of committing a less undesirable one) is an important one to keep in mind.

Finally, I have argued that the confirmation bias is pervasive and strong and have reviewed evidence that I believe supports this claim. The possibility will surely occur to the thoughtful reader that what I have done is itself an illustration of the confirmation bias at work. I can hardly rule the possibility out; to do so would be to deny the validity of what I am claiming to be a general rule.

## References

Alloy, L. B., & Abramson, L. Y. (1980). The cognitive component of human helplessness and depression: A critical analysis. In J. Garber & M. E. P. Seligman (Eds.), *Human helplessness: Theory and applications.* New York: Academic Press.

Alloy, L. B., & Tabachnik, N. (1984). Assessment of covariation by humans and animals: The joint influence of prior expectations and current situational information. *Psychological Review, 91,* 112–148.

Anderson, C. A. (1982). Inoculation and counterexplanation: Debiasing techniques in the perseverance of social theories. *Social Cognition, 1,* 126–139.

Anderson, C. A., & Sechler, E. S. (1986). Effects of explanation and counterexplanation on the development and use of social theories. *Journal of Personality and Social Psychology, 50,* 24–34.

Anderson, N. H., & Jacobson, A. (1965). Effect of stimulus inconsistency and discounting instructions in personality impression formation. *Journal of Personality and Social Psychology, 2,* 531–539.

Arkes, H. R. (1991). Costs and benefits of judgment errors: Implications for debiasing. *Psychological Bulletin, 110,* 486–498.

Arkes, H. R., Dawes, R. M., & Christensen, C. (1986). Factors influencing the use of a decision rule in a probabilistic task. *Organizational Behavior and Human Decision Processes, 37,* 93–110.

Arkes, H. R., Faust, D., Guilmette, T. J., & Hart, K. (1988). Elimination of the hindsight bias. *Journal of Applied Psychology, 73,* 305–307.

Bacon, F. (1939). *Novum organum.* In Burtt, E. A. (Ed.), *The English philosophers from Bacon to Mill* (pp. 24–123). New York: Random House. (Original work published in 1620)

Baddeley, A. D., & Woodhead, M. (1983). Improving face recognition ability. In S. M. A. Lloyd-Bostock & B. R. Clifford (Eds.), *Evaluating witness evidence.* Chichester, England: Wiley.

Barber, B. (1961). Resistence by scientists to scientific discovery. *Science, 134,* 596–602.

Baron, J. (1985). *Rationality and intelligence.* New York: Cambridge University Press.

Baron, J. (1991). Beliefs about thinking. In J. F. Voss, D. N. Perkins, & J. W. Segal (Eds.), *Informal reasoning and education* (pp. 169–186). Hillsdale, NJ: Erlbaum.

Baron, J. (1994). *Thinking and deciding* (2nd ed.). New York: Cambridge University Press.

Baron, J. (1995). Myside bias in thinking about abortion. *Thinking and reasoning, 7,* 221–235.

Baron, J., Beattie, J., & Hershey, J. C. (1988). Heuristics and biases in diagnostic reasoning II: Congruence, information, and certainty. *Organizational Behavior and Human Decision Processes, 42,* 88–110.

Barrows, H. S., Feightner, J. W., Neufeld, V. R., & Norman, G. R. (1978). *Analysis of the clinical methods of medical students and physicians.* Hamilton, Ontario, Canada: McMaster University School of Medicine.

Barrows, H. S., Norman, G. R., Neufeld, V. R., & Feightner, J. W. (1977). Studies of the clinical reasoning process of medical students and physicians. *Proceedings of the sixteenth annual conference on research in medical education.* Washington, DC: Association of American Medical Colleges.

Bassock, M., & Trope, Y. (1984). People's strategies for testing hypotheses about another's personality: Confirmatory or diagnostic? *Social Cognition, 2,* 199–216.

Beattie, J., & Baron, J. (1988). Confirmation and matching biases in hypothesis testing. *Quarterly Journal of Experimental Psychology, 40A,* 269–298.

Beck, A. T. (1976). *Cognitive therapy and the emotional disorders.* New York: International Universities Press.

Bell, E. T. (1991). *The magic of numbers.* New York: Dover. (Original work published 1946)

Berwick, D. M., Fineberg, H. V., & Weinstein, M. C. (1981). When doctors meet numbers. *American Journal of Medicine, 71,* 991.

Beyth-Marom, R., & Fischhoff, B. (1983). Diagnosticity and pseudodiagnosticity. *Journal of Personality and Social Research, 45,* 1185–1197.

Blackstone, W. (1962). *Commentaries on the laws of England of public wrongs.* Boston: Beacon. (Original work published 1769)

Boorstin, D. J. (1958). *The Americans: The colonial experience.* New York: Vintage Books.

Boorstin, D. J. (1985). *The discoverers: A history of man's search to know his world and himself.* New York: Vintage Books.

Bruner, J. S., Goodnow, J. J., & Austin, G. A. (1956). *A study of thinking.* New York: Wiley.

Bruner, J. S., & Potter, M. C. (1964). Interference in visual recognition. *Science, 144,* 424–425.

Camerer, C. (1988). Illusory correlations in perceptions and predictions of organizational traits. *Journal of Behavioral Decision Making, 1,* 77–94.

Campbell, J. D., & Fairey, P. J. (1985). Effects of self-esteem, hypothetical explanations, and verbalization of expectancies on future performance. *Journal of Personality and Social Psychology, 48,* 1097–1111.

Cassells, W., Schoenberger, A., & Grayboys, T. B. (1978). Interpretation by physicians of clinical laboratory results. *New England Journal of Medicine, 299,* 999.

Chapman, L. J. (1967). Illusory correlation in observational report. *Journal of Verbal Learning and Verbal Behavior, 6,* 151–155.

Chapman, L. J., & Chapman, J. P. (1959). Atmosphere effect reexamined. *Journal of Experimental Psychology, 58,* 220–226.

Chapman, L. J., & Chapman, J. P. (1967a). Genesis of popular but erroneous psychodiagnostic observations. *Journal of Abnormal Psychology, 72,* 193–204.

Chapman, L. J., & Chapman, J. P. (1967b). Illusory correlation as an obstacle to the use of valid psychodiagnostic signs. *Journal of Abnormal Psychology, 74,* 271–280.

Chapman, L. J. & Chapman, J. P. (1969). Illusory correlation as an obstacle to the use of valid psychodiagnostic signs. *Journal of Abnormal Psychology, 74,* 271–280.

Cheng, P. W., & Holyoak, K. J. (1985). Pragmatic reasoning schemas. *Cognitive Psychology, 17,* 391–416.

Chernev, A. (1997). The effect of common features on brand choice: Moderating the effect of attribute importance. *Journal of Consumer Research, 23,* 304–311.

Cherniak, C. (1986). *Minimal rationality.* Cambridge, MA: MIT Press.

Christensen-Szalanski, J. J., & Bushyhead, J. B. (1988). Physicians' use of probabilistic information in a real clinical setting. In J. Dowie & A. Elstein (Eds.), *Professional judgment. A reader in clinical decision making* (pp. 360–373). Cambridge, England: Cambridge University Press. (Original work published 1981)

Clark, H. H. (1974). Semantics and comprehension. In T. A. Sebeok (Ed.), *Current trends in linguistics.*

*Volume 12: Linguistics and adjacent arts and sciences.* The Hague, Netherlands: Mouton.

Clark, H. H., & Chase, W. B. (1972). On the process of comparing sentences against pictures. *Cognitive Psychology, 3,* 472–517.

Cohen, I. B. (1985). *Revolution in science.* Cambridge, MA: Harvard University Press.

Cohen, L. J. (1981). Can human irrationality be experimentally demonstrated? *Behavioral and Brain Sciences, 4,* 317–331.

Collins, S., & Pinch, J. (1993). *The Golem: What everyone should know about science.* New York: Cambridge University Press.

Cosmides, L. (1989). The logic of social exchange: Has natural selection shaped how humans reason? Studies with the Wason selection task. *Cognition, 31,* 187–276.

Cosmides, L., & Tooby, J. (1992). Cognitive adaptations for social exchange. In J. Barkow, L. Cosmides, & J. Tooby (Eds.), *The adapted mind: Evolutionary psychology and the generation of culture* (pp. 162–228). New York: Oxford University Press.

Crocker, J. (1981). Judgment of covariation by social perceivers. *Psychological Bulletin, 90,* 272–292.

Darley, J. M., & Fazio, R. H. (1980). Expectancy confirmation processes arising in the social interaction sequence. *American Psychologist, 35,* 867–881.

Darley, J. M., & Gross, P. H. (1983). A hypothesis-confirming bias in labelling effects. *Journal of Personality and Social Psychology, 44,* 20–33.

DeSmet, A. A., Fryback, D. G., & Thornbury, J. R. (1979). A second look at the utility of radiographic skull examinations for trauma. *American Journal of Roentgenology, 132,* 95.

Devine, P. G., Hirt, E. R., & Gehrke, E. M. (1990). Diagnostic and confirmation strategies in trait hypothesis testing. *Journal of Personality and Social Psychology, 58,* 952–963.

Devine, P. G., & Ostrom, T. M. (1985). Cognitive mediation of inconsistency discounting. *Journal of Personality and Social Psychology, 49,* 5–21.

Doherty, M. E., & Mynatt, C. R. (1986). The magical number one. In D. Moates & R. Butrick (Eds.), *Inference Ohio University Interdisciplinary Conference 86* (Proceedings of the Interdisciplinary Conference on Inference; pp. 221–230). Athens: Ohio University.

Doherty, M. E., Mynatt, C. R., Tweney, R. D., & Schiavo, M. D. (1979). Pseudodiagnosticity. *Acta Psychologica, 43,* 111–121.

Drake, S. (1980). *Galileo.* New York: Oxford University Press.

Duncan, B. L. (1976). Differential social perception and attribution of intergroup violence: Testing the lower limits of stereotyping of Blacks. *Journal of Personality and Social Psychology, 34,* 590–598.

Dusek, J. B. (1975). Do teachers bias children's learning? *Review of Educational Research, 45,* 661–684.

Einhorn, H. J., & Hogarth, R. M. (1978). Confidence in judgment: Persistence of the illusion of validity. *Psychological Review, 85,* 395–416.

Elstein, A. S., & Bordage, G. (1979). Psychology of clinical reasoning. In G. Stone, F. Cohen, & N. Adler (Eds.) *Health psychology: A handbook.* San Francisco: Jossey-Bass.

Elstein, A. S., Shulman, L. S., & Sprafka, S. A. (1978). *Medical problem solving: An analysis of clinical reasoning.* Cambridge, MA: Harvard University Press.

Evans, J. St. B. T. (1972). On the problems of interpreting reasoning data: Logical and psychological approaches. *Cognition, 1,* 373–384.

Evans, J. St. B. T. (1982). *The psychology of deductive reasoning.* London: Routledge & Kegan Paul.

Evans, J. St. B. T. (1989). *Bias in human reasoning: Causes and consequences.* Hillsdale, NJ: Erlbaum.

Evans, J. St. B. T., & Lynch, J. S. (1973). Matching bias in the selection task. *British Journal of Psychology, 64,* 391–397.

Evans, J. St., B. P., Newstead, E., & Byrne, R. M. J. (1993). *Human reasoning: The psychology of deduction.* Hove, England: Erlbaum.

Farley, J., & Geison, G. L. (1974). Science politics and spontaneous generation in nineteenth-century France: The Pasteur-Pouchet debate. *Bulletin for the History of Medicine, 48,* 161–198.

Feldman, J. M., Camburn, A., & Gatti, G. M. (1986). Shared distinctiveness as a source of illusory correlation in performance appraisal. *Organizational Behavior and Human Decision Process, 37,* 34–59.

Festinger, L. (1957). *A theory of cognitive dissonance.* Stanford, CA: Stanford University Press.

Fischhoff, B. (1977). Perceived informativeness of facts. *Journal of Experimental Psychology: Human Perception and Performance, 3,* 349–358.

Fischhoff, B. (1982). Debiasing. In D. Kahneman, P. Slovic, & A. Tversky (Eds.), *Judgment under uncertainty: Heuristics and biases* (pp. 422–444). Cambridge, England: Cambridge University Press.

Fischhoff, B., & Beyth-Marom, R. (1983). Hypothesis evaluation from a Bayesian perspective. *Psychological Review, 90,* 239–260.

Fodor, J. D., Fodor, J. A., & Garrett, M. F. (1975). The psychological unreality of semantic representations. *Linguistic Inquiry, 4,* 515–531.

Forer, B. (1949). The fallacy of personal validation: *A classroom demonstration of gullibility. Journal of Abnormal and Social Psychology, 44,* 118–123.

Foster, G., Schmidt, C., & Sabatino, D. (1976). Teacher expectancies and the label "learning disabilities." *Journal of Learning Disabilities, 9,* 111–114.

Freedman, J. L. (1964). Involvement, discrepancy, and change. *Journal of Abnormal and Social Psychology, 69,* 290–295.

Frey, D. (1986). Recent research on selective exposure to information. In L. Berkowitz (Ed.), *Advances in experimental social psychology* (Vol. 19, pp. 41–80). New York: Academic Press.

Friedrich, J. (1993). Primary error detection and minimization (PEDMIN) strategies in social cognition: A reinterpretation of confirmation bias phenomena. *Psychological Review, 100,* 298–319.

Funder, D. C. (1987). Errors and mistakes: Evaluating the accuracy of social judgment. *Psychological Bulletin, 101,* 79–90.

Gardner, M. (1957). *Fads and fallacies in the name of science.* New York: Dover.

Gardner, M. (1976). *The relativity explosion.* New York: Vintage Books.

Gibson, B., Sanbonmatsu, D. M., & Posavac, S. S. (1997). The effects of selective hypothesis testing on gambling. *Journal of Experimental Psychology: Applied, 3,* 126–142.

Gigerenzer, G., Hoffrage, U., & Kleinbölting, H. (1991). Probabilistic mental models: A Brunswikian theory of confidence. *Psychological Review, 98,* 506–528.

Gigerenzer, G., & Hug, K. (1992). Domain-specific reasoning: Social contracts, cheating, and perspective change. *Cognition, 43,* 127–171.

Gigerenzer, G., Swijtink, Z., Porter, T., Daston, L., Beatty, J., & Krüger, L. (1989). *The empire of chance: How probability changed science and everyday life.* New York: Cambridge University Press.

Gilbert, D. T. (1991). How mental systems believe. *American Psychologist, 46,* 107–119.

Gilovich, T. (1983). Biased evaluation and persistence in gambling. *Journal of Personality and Social Psychology, 44,* 1110–1126.

Gilovich, T. (1991). *How we know what isn't so: The fallibility of human reason in everyday life.* New York: Free Press.

Glenberg, A. M., Wilkinson, A. C., & Epstein, W. (1982). The illusion of knowing: Failure in the self-assessment of comprehension. *Memory and Cognition, 10,* 597–602.

Goldberg, L. R. (1968). Simple models or simple processes? Some research in clinical judgment. *American Psychologist, 23,* 483–496.

Golding, S. L., & Rorer, L. G. (1972). Illusory correlation and subjective judgement. *Journal of Abnormal Psychology, 80,* 249–260.

Goodman, N. (1966). *The structure of appearance* (2nd ed.). Indianapolis, IN: Bobbs-Merrill.

Graesser, A. C., & Hemphill, D. (1991). Question answering in the context of scientific mechanisms. *Journal of Memory and Language, 30,* 186–209.

Greenwald, A. G. (1980). The totalitarian ego: Fabrication and revision of personal history. *American Psychologist, 35,* 603–618.

Griffin, D. W., Dunning, D., & Ross, L. (1990). The role of construal processes in overconfident predictions about the self and others. *Journal of Personality and Social Psychology, 59,* 1128–1139.

Griffin, D. W., & Tversky, A. (1992). The weighing of evidence and the determinants of confidence. *Cognitive Psychology, 24,* 411–435.

Griggs, R. A., & Cox, J. R. (1993). Permission schemas and the selection task. In J. St. B. T. Evans (Ed.), *The cognitive psychology of reasoning* (pp. 637–651). Hillsdale, NJ: Erlbaum.

Hamilton, D. L. (1979). A cognitive attributional analysis of stereotyping. In L. Berkowitz (Ed.), *Advances in Experimental Social Psychology,* (Vol. 12). New York: Academic Press.

Hamilton, D. L., Dugan, P. M., & Trolier, T. K. (1985). The formation of stereotypic beliefs: Further evidence for distinctiveness-based illusory correlations. *Journal of Personality and Social Psychology, 48,* 5–17.

Harman, G. (1986). *Change in view: Principles of reasoning.* Cambridge, MA: MIT Press.

Hartley, D. (1981). Hypotheses and the "rule of the false." In R. D. Tweney, M. E. Doherty, & C. R. Mynatt (Eds.), *Scientific thinking* (pp. 89–91). New York: Columbia University Press. (Original work published 1748)

Hasdorf, A. H., & Cantril, H. (1954). They saw a game. *Journal of Abnormal and Social Psychology, 49,* 129–134.

Hausch, D. B., Ziemba, W. T., & Rubenstein, M. (1981). Efficiency of the market for racetrack betting. *Management Science, 27,* 1435–1452.

Hawking, S. W. (1988). *A brief history of time: From the big bang to black holes.* New York: Bantam Books.

Hayden, T., & Mischel, W. (1976). Maintaining trait consistency in the resolution of behavioral inconsistency: The wolf in sheep's clothing? *Journal of Personality, 44,* 109–132.

Hempel, C. (1945). Studies in the logic of confirmation. *Mind, 54*(213), 1–26.

Hendry, S. H., & Shaffer, D. R. (1989). On testifying in one's own behalf: Interactive effects of evidential strength and defendant's testimonial demeanor on jurors' decisions. *Journal of Applied Psychology, 74,* 539–545.

Henle, M. (1962). On the relation between logic and thinking. *Psychological Review, 69,* 366–378.

Henrion, M., & Fischhoff, B. (1986). Assessing uncertainty in physical constants. *American Journal of Physics, 54,* 791–798.

Hirt, E. R., & Sherman, S. J. (1985). The role of prior knowledge in explaining hypothetical events. *Journal of Experimental Social Psychology, 21,* 519–543.

Hoch, S. J. (1984). Availability and inference in predictive judgment. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 10,* 649–662.

Hoch, S. J. (1985). Counterfactual reasoning and accuracy in predicting personal events. *Journal of Experimental Psychology: Learning, Memory, and Cognition, 11,* 719–731.

Hoch, S. J., & Tschirgi, J. E. (1983). Cue redundancy and extra logical inferences in a deductive reasoning task. *Memory and Cognition, 11,* 200–209.

Hodgins, H. S., & Zuckerman, M. (1993). Beyond selecting information: Baises in spontaneous questions and resultant conclusions. *Journal of Experimental Social Psychology, 29,* 387–407.

Hogarth, R. M. (1981). Beyond discrete biases: Functional and dysfunctional aspects of judgmental heuristics. *Psychological Bulletin, 90,* 197–217.

Hollis, M. (1970). Reason and ritual. In B. R. Wilson (Ed.), *Rationality* (pp. 221–239). Oxford, England: Blackwell.

Holstein, J. A. (1985). Jurors' interpretations and jury decision making. *Law and Human Behavior, 9,* 83–99.

Holton, G. (1973). *Thematic origins of scientific thought.* Cambridge, MA: Harvard University Press.

Huxley, T. H. (1908). Discourses, biological and geological. In *Collected essays.* (Vol. 8). London: MacMillan and Company. (Original work published 1894)

Hyman, R. (1977). Cold reading. *The Skeptical Inquirer, 1,* 18–37.

Jennings, D., Amabile, T. M., & Ross, L. (1982). Informal covariation assessment: Data-based versus theory-based judgments. In A. Tversky, D. Kahneman, & P. Slovic (Eds.), *Judgment under uncertainty: Heuristics and biases.* New York: Cambridge University Press.

Johnson-Laird, P. N., Legrenzi, P., & Legrenzi, M. S. (1972). Reasoning and a sense of reality. *British Journal of Psychology, 63,* 395–400.

Jones, E. E., & Goethals, G. (1972). Order effects in impression formation: Attribution context and the nature of the entity. In E. E. Jones and others (Eds.), *Attribution: Perceiving the causes of behavior.* Morristown, NJ: General Learning Press.

Jones, E. E., Rock, L., Shaver, K. G., Goethals, G. R., & Ward, L. M. (1968). Pattern of performance and ability attribution: An unexpected primacy effect. *Journal of Personality and Social Psychology, 10,* 317–340.

Juslin, P. (1993). An explanation of the hard-easy effect in studies of realism of confidence in one's general knowledge. *European Journal of Cognitive Psychology, 5,* 55–71.

Juslin, P. (1994). The overconfidence phenomenon as a consequence of informal experimenter-guided selection of almanac items. *Organizational Behavior and Human Decision Processes, 57,* 226–246.

Kahneman, D., & Tversky, A. (1973). On the psychology of prediction. *Psychological Review, 80,* 237–251.

Kalven, H., & Zeisel, H. (1966). *The American jury.* Boston: Little, Brown.

Kanouse, D. E. (1972). Language, labeling, and attribution. In E. E. Jones, and others (Eds.), *Attribution: Perceiving the causes of behavior.* Morristown, NJ: General Learning Press.

Kelley, H. H. (1950). The warm-cold variable in first impressions of persons. *Journal of Personality, 18,* 431–439.

Keren, G. B. (1987). Facing uncertainty in the game of bridge: A calibration study. *Organizational Behavior and Human Decision Processes, 39,* 98–114.

Kern, L., & Doherty, M. E. (1982). "Pseudodiagnosticity" in an idealized medical problem-solving environment. *Journal of Medical Education, 57,* 100–104.

Kidd, J. B. (1970). The utilization of subjective probabilities in production planning. *Acta Psychologica, 34,* 338–347.

Kirby, K. N. (1994a). False alarm: A reply to Over and Evans. *Cognition, 52,* 245–250.

Kirby, K. N. (1994b). Probabilities and utilities of fictional outcomes in Wason's four-card selection task. *Cognition, 51,* 1–28.

Klapper, J. T. (1960). *The effects of mass communications.* Glencoe, IL: Free Press.

Klayman, J., & Ha, Y-W. (1987). Confirmation, disconfirmation, and information in hypothesis testing. *Psychological Review, 94,* 211–228.

Koehler, D. J. (1991). Explanation, imagination, and confidence in judgment. *Psychological Bulletin, 110,* 499–519.

Koriat, A., Lichtenstein, S., & Fischhoff, B. (1980). Reasons for confidence. *Journal of Experimental Psychology: Human Learning and Memory, 6,* 107–118.

Kroger, J. K., Cheng, P. W., & Holyoak, K. J. (1993). Evoking the permission schema: The impact of explicit negation and a violation-checking context. In J. St. B. T. Evans (Ed.), *The cognitive psychology of reasoning* (pp. 615–635). Hillsdale, NJ: Erlbaum.

Kruglanski, A. W. (1980). Lay epistemology process and contents. *Psychological Review, 87,* 70–87.

Kruglanski, A. W., & Ajzen, I. (1983). Bias and error in human judgment. *European Journal of Social Psychology, 13,* 1–44.

Kruglanski, A. W., & Freund, T. (1983). The freezing and unfreezing of lay-inferences: Effects on impressional primacy, ethnic stereotyping, and numerical anchoring. *Journal of Experimental Social Psychology, 19,* 448–468.

Kuhn, D. (1989). Children and adults as intuitive scientists. *Psychological Review, 96,* 674–689.

Kuhn, D., Weinstock, M., & Flaton, R. (1994). How

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 194 of 245

well do jurors reason? Competence dimensions of individual variations in a juror reasoning task. *Psychological Science, 5,* 289–296.

Kuhn, T. S. (1970). *The structure of scientific revolutions* (2nd ed). Chicago: University of Chicago Press.

Kunda, Z. (1990). The case for motivated reasoning. *Psychological Bulletin, 108,* 480–498.

Kunda, Z., & Nisbett, R. E. (1986). The psychometrics of everyday life. *Cognitive Psychology, 18,* 195–224.

Lakatos, I. (1976). *Proofs and refutations: The logic of mathematical discovery* (J. Worrall & E. Zahar, Eds.). New York: Cambridge University Press.

Lakatos, I. (1978). Falsification and the methodology of scientific research programmes. In I. Lakatos *The methodology of scientific research programmes* (J. Worrall & G. Currie, Eds.; pp. 8–101). New York: Cambridge University Press.

Langer, E. J., & Abelson, R. P. (1974). A patient by any other name. . . : Clinical group differences in labeling bias. *Journal of Consulting and Clinical Psychology, 42,* 4–9.

Laplace, P. S. (1956). Concerning probability. In J. R. Newman (Ed.), *The world of mathematics* (Vol. 2; pp. 1325–1333). New York: Simon and Schuster. (Original work published 1814)

Lawson, R. (1968). Order of presentation as a factor in jury persuasion. *Kentucky Law Journal, 56,* 523–555.

Lefford, A. (1946). The influence of emotional subject matter on logical reasoning. *Journal of General Psychology, 34,* 127–151.

LeGrand, H. E. (1988). *Drifting continents and shifting theories: The modern revolution in geology and scientific change.* Cambridge, England: Cambridge University Press.

Legrenzi, P. (1970). Relations between language and reasoning about deductive rules. In G. B. Flores d'Arcais & W. J. M. Levelt (Eds.), *Advances in psychologistics* (pp. 322–333). Amsterdam: North Holland.

Lenski, G. E., & Leggett, J. C. (1960). Caste, class, and deference in the research interview. *American Journal of Sociology, 65,* 463–467.

Levine, M. (1970). Human discrimination learning. The subset-sampling assumption. *Psychological Bulletin, 74,* 397–404.

Liberman, N., & Klar, Y. (1996). Hypothesis testing in Wason's selection task: Social exchange cheating detection or task understanding. *Cognition, 58,* 127–156.

Lichtenstein, S., & Fischhoff, B. (1977). Do those who know more also know more about how much they know? *Organizational Behavior and Human Performance, 20,* 159–183.

Lichtenstein, S., Fischhoff, B., & Phillips, L. D. (1977). Calibration of probabilities: The state of the art. In H. Jungermann & G. de Zeeuw (Eds.), *Decision making and change in human affairs* (pp. 275–324). Dordrecht, Netherlands: Reidel.

Lingle, J. H., & Ostrom, T. M. (1981). Principles of memory and cognition in attitude formation. In R. E. Petty, T. M. Ostrom, & T. C. Brock (Eds.), *Cognitive responses in persuasive communications: A text in attitude change* (pp. 399–420). Hillsdale, NJ: Erlbaum.

Loftus, E. F., & Wagenaar, W. A. (1988). Lawyers' predictions of success. *Jurimetrics Journal, 28,* 437–453.

Lord, C. G., Lepper, M. R., & Preston, E. (1984). Considering the opposite: A corrective strategy for social judgment. *Journal of Personality and Social Psychology, 47,* 1231–1243.

Lord, C., Ross, L., & Lepper, M. R. (1979). Biased assimilation and attitude polarization: The effects of prior theories on subsequently considered evidence. *Journal of Personality and Social Psychology, 37,* 2098–2109.

Luchins, A. S. (1942). Mechanization in problem solving: The effect of Einstellung. *Psychological Monographs, 54,* 1–95.

Luchins, A. S. (1957). Experimental attempts to minimize the impact of first impressions. In C. I. Hovland (Ed.), *The order of presentation in persuasion.* New Haven, CT: Yale University Press.

Lusted, L. B. (1977). *A study of the efficacy of diagnostic reaiologic procedures: Final report on diagnostic efficacy.* Chicago: Efficacy Study Committee of the American College of Radiology.

Lycan, W. C. (1988). *Judgment and justification.* New York: Cambridge University Press.

MacIntyre, A. (1988). *Whose justice? Which rationality?* Notre Dame, IN: University of Notre Dame Press.

Mackay, C. (1932). *Extraordinary popular delusions and the madness of crowds* (2nd ed.). Boston: Page. (Original second edition published 1852)

Mahoney, M. J. (1976). *Scientist as subject: The psychological imperative.* Cambridge, MA: Ballinger.

Mahoney, M. J. (1977). Publication prejudices. *Cognitive Therapy and Research, 1,* 161–175.

Manktelow, K. I., & Over, D. E. (1990). Deontic thought and the selection task. In K. J. Gilhooly, M. T. G. Keane, R. H. Logic, & G. Erdos. (Eds.), *Lines of thinking* (Vol. 1). London: Wiley.

Manktelow, K. I., & Over, D. E. (1991). Social roles and utilities in reasoning with deontic conditionals. *Cognition, 39,* 85–105.

Manktelow, K. I., & Over, D. E. (1992). Utility and deontic reasoning: Some comments on Johnson-Laird and Byrne. *Cognition, 43,* 183–188.

Markovits, H., & Savary, F. (1992). Pragmatic schemas and the selection task. *Quarterly Journal of Experimental Psychology, 45A,* 133–148.

Matlin, M. W., & Stang, D. J. (1978). *The Pollyanna principle: Selectivity in language, memory and thought.* Cambridge, MA: Shenkman.

McGuire, W. J. (1960). A syllogistic analysis of cognitive relationships. In M. J. Rosenberg, C. I. Hovland, W. J. McGuire, R. P. Abelson, & J. W. Brehm (Eds.), *Attitude organization and change* (pp. 65–110). New Haven, CT: Yale University Press.

Meehl, P. (1954). *Clinical versus statistical prediction: A theoretical analysis and a review of the evidence.* Minneapolis: University of Minnesota Press.

Meehl, P. (1960). The cognitive activity of the clinician. *American Psychologist, 15,* 19–27.

Meichenbaum, D. H., Bowers, K. S., & Ross, R. R. (1969). A behavioral analysis of teacher expectancy effect. *Journal of Personality and Social Psychology, 13,* 306–316.

Merton, R. K. (1948). The self-fulfilling prophecy. *Antioch Review, 8,* 193–210.

Merton, R. K. (1957). Priorities in scientific discovery: A chapter in the sociology of science. *American Sociological Review, 22,* 635–659.

Millward, R. B., & Spoehr, K. T. (1973). The direct measurement of hypothesis-testing strategies. *Cognitive Psychology, 4,* 1–38.

Mischel, W. (1968). *Personality and assessment.* New York: Wiley.

Mischel, W., Ebbesen, E., & Zeiss, A. (1973). Selective attention to the self: Situational and dispositional determinants. *Journal of Personality and Social Psychology, 27,* 129–142.

Mischel, W., & Peake, P. K. (1982). Beyond *deja vu* in the search for cross-situational consistency. *Psychological Review, 89,* 730–755.

Mitroff, I. (1974). *The subjective side of science.* Amsterdam: Elsevier.

Murphy, A. H., & Winkler, R. L. (1974). Subjective probability forecasting experiments in meteorology: Some preliminary results. *Bulletin of the American Meteorological Society, 55,* 1206–1216.

Murphy, A. H., & Winkler, R. L. (1977). Can weather forecasters formulate reliable probability forecasts of precipitation and temperature? *National Weather Digest, 2,* 2–9.

Myers, D. G., & Lamm, H. (1976). The group polarization phenomenon. *Psychological Bulletin, 83,* 602–627.

Mynatt, C. R., Doherty, M. E., & Tweney, R. D. (1977). Confirmation bias in a simulated research environment: An experimental study of scientific inferences. *Quarterly Journal of Experimental Psychology, 29,* 85–95.

Narveson, R. D. (1980). Development and learning: Complementary or conflicting aims in humanities education? In R. G. Fuller, R. F. Bergstrom, E. T. Carpenter, H. J. Corzine, J. A. McShance, D. W. Miller, D. S. Moshman, R. D. Narveson, J. L. Petr, M. C. Thornton, & V. G. Williams (Eds.), *Piagetian programs in higher education* (pp. 79–88). Lincoln, NE: ADAPT Program.

Nickerson, R. S. (1996). Hempel's paradox and Wason's selection task: Logical and psychological puzzles of confirmation. *Thinking and reasoning, 2,* 1–31.

Nisbett, R. E., & Ross, L. (1980). *Human inference: Strategies and shortcomings of social judgement.* Englewood Cliffs, NJ: Prentice-Hall.

Oaksford, M., & Chater, N. (1994). A rational analysis of the selection task as optimal data selection. *Psychological Review, 101,* 608–631.

Oskamp, S. (1965). Overconfidence in case study judgments. *Journal of Consulting Psychology, 29,* 261–265.

Over, D. E., & Evans, J. St. B. T. (1994). Hits and misses: Kirby on the selection task. *Cognition, 52,* 235–243.

Pennebaker, J. W., & Skelton, J. A. (1978). Psychological parameters of physical symptoms. *Personality and Social Psychology Bulletin, 4,* 524–530.

Pennington, N., & Hastie, R. (1993). The story model for juror decision making. In R. Hastie (Ed.), *Inside the juror: The psychology of juror decision making* (pp. 192–221). New York: Cambridge University Press.

Perkins, D. N., Allen, R., & Hafner, J. (1983). Difficulties in everyday reasoning. In W. Maxwell (Ed.), *Thinking: The frontier expands.* Hillsdale, NJ: Erlbaum.

Perkins, D. N., Farady, M., & Bushey, B. (1991). Everyday reasoning and the roots of intelligence. In J. F. Voss, D. N. Perkins, & J. W. Segal (Eds.), *Informal reasoning and education* (pp. 83–106). Hillsdale, NJ: Erlbaum.

Peterson, C. R., & DuCharme, W. M. (1967). A primacy effect in subjective probability revision. *Journal of Experimental Psychology, 73,* 61–65.

Pitz, G. F. (1969). An inertia effect (resistance to change) in the revision of opinion. *Canadian Journal of Psychology, 23,* 24–33.

Pitz, G. F. (1974). Subjective probability distributions for imperfectly know quantities. In L. W. Gregg (Ed.), *Knowledge and cognition.* New York: Lawrence Erlbaum Associates.

Pitz, G. F., Downing, L., & Reinhold, H. (1967). Sequential effects in the revision of subjective probabilities. *Canadian Journal of Psychology, 21,* 381–393.

Politzer, G. (1986). Laws of language use and formal logic. *Journal of Psycholinguistic Research, 15,* 47–92.

Polya, G. (1954a). *Mathematics and plausible reasoning. Volume 1: Induction and analogy in mathematics.* Princeton, NJ: Princeton University Press.

Polya, G. (1954b). *Mathematics and plausible reasoning. Volume 2: Patterns of plausible inference.* Princeton, NJ: Princeton University Press.

Popper, K. (1959). *The logic of scientific discovery.* New York: Basic Books.

Popper, K. (1981). Science, pseudo-science, and falsifiability. In R. D. Tweney, M. E. Doherty, & C. R. Mynatt (Eds.), *Scientific thinking* (pp. 92–99). New York: Columbia University Press. (Original work published in 1962)

Price, D. J. de S. (1963). *Little science, big science.* New York: Columbia University Press.

Pyszczynski, T., & Greenberg, J. (1987). Toward an integration of cognitive and motivational perspectives on social inference: A biased hypothesis-testing model. *Advances in experimental social psychology* (pp. 297–340). New York: Academic Press.

Ray, J. J. (1983). Reviving the problem of acquiescence response bias. *Journal of Social Psychology, 121,* 81–96.

Revlis, R. (1975a). Syllogistic reasoning: Logical decisions from a complex data base. In R. J. Falmagne (Ed.), *Reasoning: Representation and process.* New York: Wiley.

Revlis, R. (1975b). Two models of syllogistic inference: Feature selection and conversion. *Journal of Verbal Learning and Verbal Behavior, 14,* 180–195.

Rhine, R. J., & Severance, L. J. (1970). Ego-involvement, discrepancy, source credibility, and attitude change. *Journal of Personality and Social Psychology, 16,* 175–190.

Rist, R. C. (1970). Student social class and teacher expectations: The self-fulfilling prophecy in ghetto education. *Harvard Educational Review, 40,* 411–451.

Rosenhan, D. L. (1973). On being sane in insane places. *Science, 179,* 250–258.

Rosenthal, R. (1974). *On the social psychology of self-fulfilling prophecy: Further evidence for Pygmalion effects and their mediating mechanisms.* New York: MSS Modular Publications, Module 53.

Rosenthal, R., & Jacobson, L. (1968) *Pygmalion in the classroom.* New York: Hold, Rinehart and Winston.

Ross, L. (1977). The intuitive psychologist and his shortcomings. In L. Berkowitz (Ed.), *Advances in experimental social psychology, 10,* New York: Academic Press.

Ross, L., & Anderson, C. (1982). Shortcomings in the attribution process: On the origins and maintenance of erroneous social assessments. In A. Tversky, D. Kahneman, & P. Slovic (Eds.), *Judgement under uncertainty: Heursitics and biases.* Cambridge, England: Cambridge University Press.

Ross, L., & Lepper, M. R. (1980). The perseverance of beliefs: Empirical and normative considerations. In R. Shweder & D. Fiske (Eds.), *New directions for methodology of social and behavioral science: Fallibel judgement in behavioral research* (Vol. 4, pp. 17–36). San Francisco: Jossey-Bass.

Ross, L., Lepper, M. R., & Hubbard, M. (1975). Perserverance in self perception and social perception: Biased attributional processes in the debriefing paradigm. *Journal of Personality and Social Psychology, 32,* 880–892.

Ross, L., Lepper, M. R., Strack, F., & Steinmetz, J. L. (1977). Social explanation and social expection: The effects of real and hypothetical explanations upon subjective likelihood. *Journal of Personality and Social Psychology, 35,* 817–829.

Roszak, T. (1986). *The cult of information: The folklore of computers and the true art of thinking.* New York: Pantheon Books.

Salmon, W. C. (1973). Confirmation. *Scientific American, 228*(5), 75–83.

Sawyer, J. (1966). Measurement and prediction, clinical and statistical. *Psychological Bulletin, 66,* 178–200.

Schuman, H., & Presser, S. (1981). *Questions and answers in attitude surveys.* New York: Academic Press.

Schwartz, B. (1982). Reinforcement-induced behavioral stereotypy: How not to teach people to discover rules. *Journal of Experimental Psychology: General, 111,* 23–59.

Sears, D. O., & Freedman, J. L. (1967). Selective exposure to information: A critical review. *Public Opinion Quarterly, 31,* 194–213.

Shaklee, H., & Fischhoff, B. (1982). Strategies of information search in causal analysis. *Memory and Cognition, 10,* 520–530.

Sherman, S. J., Zehner, K. S., Johnson, J., & Hirt, E. R. (1983). Social explanation: The role of timing, set, and recall on subjective likelihood estimates. *Journal of Personality and Social Psychology, 44,* 1127–1143.

Simon, H. A. (1957). *Models of man: Social and rational.* New York: Wiley.

Simon, H. A. (1990). Alternative visions of rationality. In P. K. Moser (Ed.), *Rationality in action: Contemporary approaches* (pp. 189–204). New York: Cambridge University Press. (Original work published 1983)

Skov, R. B., & Sherman, S. J. (1986). Information-gathering processes: Diagnosticity, hypothesis confirmatory strategies and perceived hypothesis confirmation. *Journal of Experimental Social Psychology, 22,* 93–121.

Slovic, P., Fischhoff, B., & Lichtenstein, S. (1977). Behavioral decision theory. *Annual Review of Psychology, 28,* 1–39.

Smyth, C. P. (1890). *Our inheritance in the great*

*pyramid* (5th ed.). New York: Randolf. (Original work published 1864)

Snyder, M. (1981). Seek and ye shall find: Testing hypotheses about other people. In E. T. Higgins, C. P. Heiman, & M. P. Zanna (Eds.), *Social cognition: The Ontario symposium on personality and social psychology* (pp. 277–303). Hillsdale, NJ: Erlbaum.

Snyder, M. (1984). When belief creates reality. In L. Berkowitz (Ed.), *Advances in experimental social psychology* (Vol. 18). New York: Academic Press.

Snyder, M., & Campbell, B. H. (1980). Testing hypotheses about other people: The role of the hypothesis. *Personality and Social Psychology Bulletin, 6,* 421–426.

Snyder, M., & Gangestad, S. (1981). Hypotheses-testing processes. *New directions in attribution research* (Vol. 3). Hillsdale, NJ: Erlbaum.

Snyder, M., & Swann, W. B. (1978a). Behavioral confirmation in social interaction: From social perception to social reality. *Journal of Experimental Social Psychology, 14,* 148–162.

Snyder, M., & Swann, W. B. (1978b). Hypothesis-testing processes in social interaction. *Journal of Personality and Social Psychology, 36,* 1202–1212.

Snyder, M., Tanke, E. D., & Berscheid, E. (1977). Social perception and interpersonal behavior: On the self-fulfilling nature of social stereotypes. *Journal of Personality and Social Psychology, 35,* 656–666.

Snyder, M., & Uranowitz, S. W. (1978). Reconstructing the past: Some cognitive consequences of person perception. *Journal of Personality and Social Psychology, 36,* 941–950.

Solomon, M. (1992). Scientific rationality and human reasoning. *Philosophy of Science, 59,* 439–455.

Strohmer, D. C., & Newman, L. J. (1983). Counselor hypothesis-testing strategies. *Journal of Counseling Psychology, 30,* 557–565.

Swann, W. B., Jr., Giuliano, T., & Wegner, D. M. (1982). Where leading questions can lead: The power of conjecture in social interaction. *Journal of Personality and Social Psychology, 42,* 1025–1035.

Taplin, J. E. (1975). Evaluation of hypotheses in concept identification. *Memory and Cognition, 3,* 85–96.

Taylor, J. (1859). *The great pyramid: Why was it built? And who built it?* London: Longman, Green, Longman & Roberts.

Tetlock, P. E., & Kim, J. I. (1987). Accountability and judgment processes in a personality prediction task. *Journal of Personality and Social Psychology, 52,* 700–709.

Thomas, L. (1979). *The Medusa and the snail: More notes of a biology watcher.* New York: Viking Press.

Thurstone, L. L. (1924). *The nature of intelligence.* London: Routledge & Kegan Paul.

Tishman, S., Jay, E., & Perkins, D. N. (1993). Teaching thinking dispositions: From transmission to enculturation. *Theory into practice, 32,* 147–153.

Trabasso, T., Rollins, H., & Shaughnessey, E. (1971). Storage and verification stages in processing concepts. *Cognitive Psychology, 2,* 239–289.

Trope, Y., & Bassock, M. (1982). Confirmatory and diagnosing strategies in social information gathering. *Journal of Personality and Social Psychology, 43,* 22–34.

Trope, Y., & Bassock, M. (1983). Information-gathering strategies in hypothesis-testing. *Journal of Experimental Social Psychology, 19,* 560–576.

Trope, Y., Bassock, M., & Alon, E. (1984). The questions lay interviewers ask. *Journal of Personality, 52,* 90–106.

Trope, Y., & Mackie, D. M. (1987). Sensitivity to alternatives in social hypothesis-testing. *Journal of Experimental Social Psychology, 23,* 445–459.

Troutman, C. M., & Shanteau, J. (1977). Inferences based on nondiagnostic information. *Organizational Behavior and Human Performance, 19,* 43–55.

Tuchman, B. W. (1984). *The march of folly: From Troy to Vietnam.* New York: Ballantine Books.

Tweney, R. D. (1984). Cognitive psychology and the history of science: A new look at Michael Faraday. In H. Rappart, W. van Hoorn, & S. Bem. (Eds.), *Studies in the history of psychology and the social sciences* (pp. 235–246). Hague, The Netherlands: Mouton.

Tweney, R. D., & Doherty, M. E. (1983). Rationality and the psychology of inference. *Synthese, 57,* 139–161.

Tweney, R. D., Doherty, M. E., Worner, W. J., Pliske, D. B., Mynatt, C. R., Gross, K. A., & Arkkelin, D. L. (1980). Strategies of rule discovery in an inference task. *Quarterly Journal of Experimental Psychology, 32,* 109–123.

Valentine, E. R. (1985). The effect of instructions on performance in the Wason selection task. *Current Psychological Research and Reviews, 4,* 214–223.

Von Däniken, E. (1969). *Chariots of the gods?* New York: Putnam.

Wagenaar, W. A., & Keren, G. B. (1986). Does the expert know? The reliability of predictions and confidence ratings of experts. In E. Hollnagel, G. Maneine, & D. Woods (Eds), *Intelligent decision support in process environments* (pp. 87–107). Berlin: Springer.

Waismann, F. (1952). Verifiability. In A. G. N. Flew (Ed.), *Logic and language.* Oxford: Basil Blackwell.

Wallsten, T. S., & González-Vallejo, C. (1994). Statement verification: A stochastic model of

judgment and response. *Psychological Review, 101,* 490–504.

Wason, P. C. (1959). The processing of positive and negative information. *Quarterly Journal of Experimental Psychology, 11,* 92–107.

Wason, P. C. (1960). On the failure to eliminate hypotheses in a conceptual task. *Quarterly Journal of Experimental Psychology, 12,* 129–140.

Wason, P. C. (1961). Response to affirmative and negative binary statements. *British Journal of Psychology, 52,* 133–142.

Wason, P. C. (1962). Reply to Wetherick. *Quarterly Journal of Experimental Psychology, 14,* 250.

Wason, P. C. (1966). Reasoning. In B. M. Foss (Ed.), *New horizons in psychology I,* Harmondsworth, Middlesex, England: Penguin.

Wason, P. C. (1968). Reasoning about a rule. *Quarterly Journal of Experimental Psychology, 20,* 273–281.

Wason, P. C. (1977). "On the failure to eliminate hypotheses. . . ."—A second look. In P. N. Johnson-Laird & P. C. Wason (Eds.), *Thinking: Readings in cognitive science* (pp. 307–314). Cambridge, England: Cambridge University Press. (Original work published 1968)

Wason, P. C., & Johnson-Laird, P. N. (1972). *Psychology of reasoning: Structure and content.* Cambridge, MA: Harvard University Press.

Wason, P. C., & Shapiro, D. (1971). Natural and contrived experience in a reasoning problem. *Quarterly Journal of Experimental Psychology, 23,* 63–71.

Webster, E. C. (1964). *Decision making in the employment interview.* Montreal, Canada: Industrial Relations Center, McGill University.

Wegener, A. (1966). *The origin of continents and oceans* (4th ed.; J. Biram, Trans.) London: Dover. (Original work published in 1915)

Weinstein, N. D. (1980). Unrealistic optimism about future life events. *Journal of Personality and Social Psychology, 39,* 806–820.

Weinstein, N. D. (1989). Optimistic biases about personal risks. *Science, 246,* 1232–1233.

Wetherick, N. E. (1962). Eliminative and enumerative behaviour in a conceptual task. *Quarterly Journal of Experimental Psychology, 14,* 246–249.

Wilkins, W. (1977). Self-fulling prophecy: Is there a phenomenon to explain? *Psychological Bulletin, 84,* 55–56.

Winkler, R. L., & Murphy, A. H. (1968). "Good" probability assessors. *Journal of Applied Meteorology, 1,* 751–758.

Woods, S., Matterson, J., & Silverman, J. (1966). Medical students' disease: Hypocondriasis in medical education. *Journal of Medical Education, 41,* 785–790.

Yachanin, S. A., & Tweney, R. D. (1982). The effect of thematic content on cognitive strategies in the four-card selection task. *Bulletin of the Psychonomic Society, 19,* 87–90.

Zanna, M. P., Sheras, P., Cooper, J., & Shaw, C. (1975). Pygmalion and Galatea: The interactive effect of teacher and student expectancies. *Journal of Experimental Social Psychology, 11,* 279–287.

Ziman, J. (1978). *Reliable knowledge.* Cambridge, England: Cambridge University Press.

Zuckerman, M., Knee, R., Hodgins, H. S., & Miyake, K. (1995). Hypothesis confirmation: The joint effect of positive test stratecy and acquiescence response set. *Journal of Personality and Social Psychology, 68,* 52–60.

Received August 1, 1997
Revision received December 16, 1997
Accepted December 18, 1997 ■

EDITORIAL

# A Cautionary Lesson from Simulated Patients

Gerald M. Rosen, PhD, and William R. Phillips, MD, MPH

J Am Acad Psychiatry Law 32:132–3, 2004

Ekman and O'Sullivan[1] once asked, "Who can catch a liar?"—and they demonstrated that it was not mental health clinicians. As observed by Slovenko, "A good poker player probably knows better than a mental health professional whether or not a person is lying. A psychiatrist is a doctor, not a lie-detector" (Ref. 2, p 122). Six actors recently provided a dramatic demonstration of these concerns when they feigned the symptoms of Posttraumatic Stress Disorder (PTSD) at a clinic specializing in the assessment and treatment of that disorder; all were accepted as genuine.[3]

An extensive body of literature, heretofore ignored by mental health and medicolegal experts, further documents the inability of health professionals to identify individuals who feign disorders. These studies test physicians with "simulated patients"—normal persons trained to mimic the typical signs and symptoms of common disorders. This use of pseudopatients has its origins in the 1960s, when standardized clinical vignettes were developed to teach and test clinical skills in medical trainees.[4] Over time, the method was extended to assess physicians in community practice and health organizations.[5]

In a search of the medical literature, we identified 12 studies in which (1) normal persons presented significant clinical complaints as simulated patients (SPs), and (2) physicians were provided with a mechanism to report patients suspected to be simulators.[6–17] In all 12 studies, doctors detected simulators at low rates, ranging from 0 percent to 25 percent. Most studies simply reported the percentage of simulators whom physicians correctly identified, but Gordon *et al.*[8] provided additional and important data. These authors recruited 54 interns and trained six SPs to feign one of three clinical problems (urinary frequency, cough, and headache). A total of 233 SP cases resulted, of which only 22 (9.4%) were correctly identified by physicians as "definitely" not genuine. When the standard of judgment or level of confidence was reduced from "definite" to "probable," the number of correctly identified simulators increased to 56 (24.0%). Physicians also had 477 consultations with genuine patients and incorrectly labeled 10 (2.3%) as simulators when making "definite" judgments. When the standard of confidence was lowered to "probable," the rate of false positives increased; 45 (9.4%) genuine patients were misidentified as simulators.

It might be argued that studies using SPs overestimate the likelihood that physicians can be fooled, since clinicians are denied the additional information that may result from repeated visits and an ongoing relationship. However, no studies demonstrate that these factors improve physicians' detection of feigned disorders. Further, malingerers can be consistent when misreporting,[18] and lie detection is not necessarily more accurate in ongoing relationships.[19]

Findings on simulated patients and the general literature on lie detection demonstrate that clinicians are not skilled in judging the credibility of their patients. In the context of a physician-patient relationship, in which a working alliance must be developed, there are good reasons to accept subjective complaints at face value. In the context of legal proceedings, however, physicians should be more circumspect. Testimony should be based on objective findings and the awareness that we all can be fooled. Treating physicians bear special responsibility, since their testimony can create "echo attributions,"

Dr. Rosen is Clinical Professor, Department of Psychology, and Dr. Phillips is Clinical Professor, Department of Family Medicine, University of Washington, Seattle, WA. Address correspondence to: Gerald M. Rosen, PhD, 2825 Eastlake Center, Suite 205, Seattle, WA 98102. E-mail: grosen@u.washington.edu

wherein a false perception of validity attaches to a message delivered by a prestigious source.[20] The problem can be illustrated by the patient who reports a subjective symptom like "nightmares," after which the doctor testifies in court that "the patient suffers from nightmares." Such a declaration, untempered by the evidence from SP studies, creates a false sense of certainty. Clinicians who rely on their patient's reports are advised to state the subjective and objective findings and offer their professional assessment. When questioned about the actual occurrence of subjective symptoms, or the truthfulness of a patient's report, the wise clinician would do well to be less than certain.

## References

1. Ekman P, O'Sullivan M: Who can catch a liar? Am Psychol 46: 913–20, 1991
2. Slovenko R: Psychiatry in Law/Law in Psychiatry. New York: Brunner-Routledge, 2002
3. Hickling EJ, Blanchard EB, Mundy E, *et al*: Detection of malingered MVA related posttraumatic stress disorder: an investigation of the ability to detect professional actors by experienced clinicians, psychological tests, and psychophysiological assessment. J Forensic Psychol Pract 2:33–54, 2002
4. Barrows HS: Simulated Patients: The Development and Use of a New Tool in Medical Education. Springfield, IL: Charles C Thomas, 1971
5. Beullens J, Rethans JJ, Goedhuys J, *et al*: The use of standardized patients in research in general practice. Fam Pract 14:58–62, 1997
6. Burri A, McCaughan K, Barrows H: The feasibility of using the simulated patient as a means to evaluate clinical competence of practicing physicians in a community (a pilot project). Annu Conf Res Med Ed 15:295–9, 1976
7. Carney PA, Eliassen S, Wolford GL, *et al*: How physician communication influences recognition of depression in primary care. J Fam Pract 48:958–64, 1999
8. Gordon J, Sanson-Fisher R, Saunders NA: Identification of simulated patients by interns in a casualty setting. Med Educ 22: 533–8, 1988
9. Kopelow ML, Schnabl GK, Hassard TH, *et al*: Assessment of performance in the office setting with standardized patients: assessing practicing physicians in two settings using standardized patients. Acad Med 67(suppl):S19–21, 1992
10. McLeod PJ, Tamblyn RM, Gayton D, *et al*: Use of standardized patients to assess between-physician variations in resource utilization. JAMA 278:1164–8, 1997
11. Norman GR, Neufeld VR, Walsh A, *et al*: Measuring physicians' performances by using simulated patients. J Med Educ 60:925–34, 1985
12. O'Hagen JJ, Davies LJ, Pears RK: The use of simulated patients in the assessment of actual clinical performance in general practice. NZ Med J 99:948–51, 1986
13. Owen A, Winkler R: General practitioners and psychosocial problems: an evaluation using pseudopatients. Med J Aust 2:393–8, 1974
14. Peabody JW, Luck J, Glassman P, *et al*: Comparison of vignettes, standardized patients, and chart abstraction: a prospective validation study of 3 methods for measuring quality. JAMA 283:1715–22, 2000
15. Rethans J-J, Drop R, Sturmans F, *et al*: A method for introducing standardized (simulated) patients into general practice consultations. Br J Gen Pract 41:94–6, 1991
16. Rethans J-J, Saebu L: Do general practitioners act consistently in real practice when they meet the same patient twice?: examination of intradoctor variation using standardised (simulated) patients, BMJ 314:1170–3, 1997
17. Woodward CA, McConvey GA, Neufeld V, *et al*: Measurement of physician performance by standardized patients. Med Care 23:1019–27, 1985
18. Wetter MW, Deitsch SE: Faking specific disorders and temporal response consistency on the MMPI-2. Psychol Assess 8:39–47, 1996
19. Swann WB Jr, Silvera DH, Proske CU: On "knowing your partner": dangerous illusions in the age of AIDS? Pers Relationships 2:173–86, 1997
20. Rosen GM: Malingering and the PTSD Database, in Posttraumatic Stress Disorder: Issues and Controversies. Edited by Rosen GM. Chichester, UK: John Wiley & Sons, in press

# Expertise in Psychotherapy

## *An Elusive Goal?*

Terence J. G. Tracey *Arizona State University*
Bruce E. Wampold *University of Wisconsin–Madison and Modum Bad Psychiatric Center, Vikersund, Norway*
James W. Lichtenberg *University of Kansas*
Rodney K. Goodyear *University of Houston and University of Redlands*

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

*It has been argued that psychotherapy is a profession without any expertise (Shanteau, 1992). We examine the validity of this claim, reviewing the literature on expertise, clinical decision making, and psychotherapeutic outcome assessment, and find it a reasonable assessment. There is no demonstration of accuracy and skill that is associated with experience as a therapist. We posit that this absence of an expertise–experience relation is attributable to therapists' lack of access to quality outcome information regarding their interventions and an overreliance on fallible information-processing strategies even when such outcome information is available. The research on providing outcome feedback is reviewed, and although it does relate to client improvement, it has not been shown to be associated with any gains in therapist skill or expertise. We propose a model of outcome information usage and specific a priori hypothesis testing as a means of developing expertise.*

*Keywords:* clinical decision making, clinical feedback, expertise

There is little debate regarding the efficacy and effectiveness of psychotherapy. Its benefits have been demonstrated repeatedly (Lambert & Ogles, 2004; Smith & Glass, 1977; Wampold, 2001a, 2001b). But as is the case for any human endeavor, the quality of psychotherapy varies across the people who provide it. Indeed, differences in outcomes among therapists have been detected in clinical trials (Baldwin & Imel, 2013; Crits-Christoph et al., 1991; Kim, Wampold, & Bolt, 2006), in naturalistic settings with therapists delivering a variety of treatments (Lutz, Leon, Martinovich, Lyons, & Stiles, 2007; Saxon & Barkham, 2012; Wampold & Brown, 2005), and in specialty clinics delivering a single evidence-based treatment (Laska, Smith, Wislocki, & Wampold, 2013). Clearly, some therapists are better than others—and, therefore, one could assert that there are some who are (or may be) "expert" therapists. But what *is* expertise in psychotherapy? How does it develop? What can be done to improve the expertise of therapists? We address these questions, but as will be demonstrated, expertise in psychotherapy is not a simple subject of inquiry.

In a review of expertise across professions, Shanteau (1992) identified several professions in which practitioners develop expertise, which he defined as increased quality of performance that is gained with additional experience. These professions, which demonstrate there is a relation between experience and professional skill, include astronomers, test pilots, chess masters, mathematicians, accountants, and insurance analysts. Shanteau also identified several professions for which expertise was *not* demonstrated, including psychiatrists, college admissions officers, court judges, personnel selectors, as well as clinical psychologists. He attributed the differences between the two types of professions to the predictability of their outcomes and the availability of quality feedback.

We argue that the tasks of psychotherapy make it difficult to obtain quality feedback about past actions, which in turn makes it difficult to develop expertise (Shanteau, 1992). As noted, psychotherapy is efficacious, and although psychotherapy is not unique with regard to difficulties in developing expertise, attention needs to be devoted to understanding the constraints on the development of therapist expertise, with the goal being that such attention will lead to better training of psychotherapists and improvement in the quality of mental health services.

In this article, we review the literature on expertise and how it applies to psychotherapy. We then focus on the constraints on skilled practice as well as the developing literature on feedback to the therapist about client progress. Finally, we discuss the conditions that are necessary for feedback to lead to expertise.

Our premise, like Shanteau's (1992) conclusion, is that over the course of one's professional practice as a psychotherapist, there is little development of expertise. We posit that this lack of expertise development (i.e.,

This article was published Online First January 6, 2014.
Terence J. G. Tracey, Department of Counseling and Counseling Psychology, Arizona State University; Bruce E. Wampold, Department of Counseling Psychology, University of Wisconsin—Madison, and Research Institute, Modum Bad Psychiatric Center, Vikersund, Norway; James W. Lichtenberg, Department of Psychology and Research in Education, University of Kansas; Rodney K. Goodyear, Department of Educational Psychology, University of Houston, and School of Education, University of Redlands.
We wish to acknowledge and thank the Otsego Group for its helpful and always engaging discussions on the subject matter of this article.
Correspondence concerning this article should be addressed to Terence J. G. Tracey, 446 Payne Hall, MC-0811, Arizona State University, Tempe, AZ 85287-0811. E-mail: terence.tracey@asu.edu

© 2014 American Psychological Association 0003-066X/14/$12.00
Vol. 69, No. 3, 218–229 DOI: 10.1037/a0035099



**Terence J. G. Tracey**

greater skill with greater experience) is attributable to the lack of information available to individual therapists regarding the outcomes of their interventions, the lack of adequate models about how psychotherapy produces benefits, and the difficulty of using the information that does exist to improve one's performance over time. We view the causes of this state of affairs as attributable to the current practice of psychotherapy and human information-processing difficulties and not as a failing that is unique or specific to psychotherapists as individuals.

## Defining Expertise in Psychotherapy

One of the most obvious and enduring problems with respect to research on expertise has been the absence of a commonly accepted operational definition of expert performance—a problem that persists in considering expertise in psychotherapy. A therapist's expertise has been variously defined or understood in terms of his or her (a) reputation, (b) performance, or (c) client outcomes. Each of these conceptualizations is flawed. Reputation includes peer nomination, degree attainment, professional distinction such as diplomate status granted by the American Board of Professional Psychology, and overall amount of experience. Although these are desirable characteristics, their connection to improved performance and client outcomes is tenuous.

Performance has been defined via the demonstration of skill in performing psychotherapy tasks. For example, the APA Presidential Task Force on Evidence-Based Practice (2006; Sackett, Strauss, Richardson, Rosenberg, & Haynes, 2000) defined expertise as involving competence related to (a) assessment, diagnostic judgment, systematic case formulation, and treatment planning; (b) clinical decision making, treatment implementation, and monitoring of client progress; (c) interpersonal skills; (d) evaluation and use of research evidence; (e) understanding the influence of individual, cultural, and contextual differences; (f) understanding the influence of individual differences; and (g) having a cogent rationale for clinical strategies. These are desirable skills for a therapist to have, but they are difficult to define and assess, much less aggregate into an indicator of expertise. Further, an issue that arises is the distinction between expertise and competence. Although these two concepts are often used interchangeably, we think such usage fails to recognize that competence refers to capable performance, while expertise refers to expert performance that exceeds competence.

Performance has also been defined by treatment adherence, and the literature on the relation between treatment adherence and outcome is not clear. Webb, DeRubeis, and Barber (2010) found that, in general, competence in and adherence to clinical protocols (also known as "treatment manuals") appears to be unrelated to outcome overall, although these researchers did find modest support for relations with outcome when focusing on depression treatments. Also, research suggests that strict adherence to protocols might even attenuate therapeutic outcomes (Castonguay, Goldfried, Wiser, Raue, & Hayes, 1996; Henry, Strupp, Butler, Schacht, & Binder, 1993).

The final common definition of expertise is one based on client outcomes. Some have argued that the ultimate criterion of expertise is client outcome or client improvement (Wampold & Brown, 2005), with those therapists who produce the most improvement or best outcomes across clients being the experts. Although client outcome may be a reasonable criterion for evaluating expertise, especially considering accountability for services, it too is not without problems. Therapists do have an effect on outcomes of psychotherapy, although outcomes are due in large part to client variables, including severity of dysfunction, diagnosis, motivation (e.g., stage of change), social support, and resources (e.g., Bohart & Tallman, 2010; Groth–Marnat, Roberts, & Beutler, 2001). Some therapists work with more pathological or unmotivated clients than others and thus outcome scores will reflect this lack of comparability of client cases. In sum, there are many difficulties in the determination of individual expertise. However, here we focus on the expertise of the profession of psychotherapy and not on the determination of who is or is not an expert.

Given these limitations concerning the use simply of reputation, performance, or client outcome, we adopt the definition of expertise used by Shanteau (1992), which focuses on improvement over time. Expertise is improved performance that results from greater experience. Individuals should be able to use their practice to improve, and such improvement should manifest in better performance and outcomes.

As reasonable as this definition might be, the literature on experience fails to demonstrate that more experienced therapists are more effective than less experienced therapists (e.g., Hattie, Sharpley, & Rogers, 1984; Stein & Lambert, 1984, 1995; Wampold & Brown, 2005). Indeed,

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

**Bruce E. Wampold**

naturalistic studies have found that trainees attain client outcomes similar to those of licensed professionals (Beutler, 1997; Beutler et al., 2004; Budge et al., 2013; Laska et al., 2013; Minami et al., 2008; Okiishi, Lambert, Nielsen, & Ogles, 2003), as do untrained college professors (Strupp & Hadley, 1979). So there does not appear to be a relation between professional experience and increased skill even when client outcome is used as the basis of skill definition. This lack of relation between experience and skill is the key basis for Shanteau's (1992) conclusion.

## Barriers to Achieving Expertise in Psychotherapy

Several factors serve as barriers to achieving expertise in psychotherapy, including the cognitive and information processes of therapists, therapists' failure to engage routinely in deliberate practice, the inaccuracy of therapists' self-appraisals of their competence, and the lack of accurate feedback that affects learning. We address each of these barriers below.

### *Cognitive and Information-Processing Factors Affecting Expertise*

Cognitive differences between novices and experts (defined as those individuals who have better performance and outcomes) have been shown across a broad range of activities (domains), including computer programming, chess playing, teaching, driving a taxi cab, composing music, solving physics problems, deriving medical diagnoses, playing bridge, solving algebra word problems, solving economic problems, and judicial decision making (Chi, 2006; Feltovich, Prietula, & Ericsson, 2006). Compared with novices, experts have (a) the ability to perceive large meaningful patterns in their domain, (b) greater information-processing speed and accuracy, (c) superior long- and short-term memory, (d) the ability to see and represent a problem in their domain at a deeper (more meaningful) level than novices, (e) greater time spent understanding or analyzing problems qualitatively, and (f) stronger self-monitoring skills (i.e., they are better than novices at evaluating their own performance). Said another way, experts differ from novices by having (a) a larger knowledge base, (b) a better organized or structured knowledge base, and (c) greater proceduralization (automatic processing) of decision making.

For most situations, experts are advantaged by their larger and more structured knowledge base and the greater proceduralization of their decision making. But under some circumstances, expert performance is likely to be hampered (Lewandowsky & Thomas, 2009) and therefore poorer than that of nonexperts (Ericsson & Lehmann, 1996). This occurs when (a) basic-level information or nonintegrated information has to be retrieved, (b) individuals are forced to restructure their existing knowledge to incorporate new, incompatible information, or (c) existing knowledge has to be deliberately or consciously selected or new knowledge has to be created.

Although experienced therapists have more complete conceptualizations of clients than do novices, the accuracy of these conceptualizations has not been supported (Faust, 1991; Garb, 1998, 2005). In this regard, Dawes (1994) conceded that professional clinicians may make somewhat slightly better judgments in some circumstances than nonprofessionals, but these differences can generally be explained in terms of differences in such characteristics as intelligence and by the fact that people who have learned how to use valid diagnostic techniques employ them better than people who have not learned to use them. Further, once the rudiments of the techniques have been mastered, the accuracy of therapists' judgments generally does *not* increase with additional experience using them. Apparently, the selective advantage that professionals have over nonprofessionals lies in their mastering of the basics of valid techniques—the accuracy of those judgments being constrained by the accuracy of the techniques they employ. That is, even in the hands of experts, questionable techniques yield questionable predictions and judgments. In summary, clinical experience per se appears to do little to enhance accuracy of therapists' clinical judgments.

### *Failure to Engage Routinely in Deliberate Practice*

A key aspect of professional expertise is that it is acquired through practice. More specifically, it is acquired through *deliberate* practice (Ericsson, 2006), which differs from mere exposure and repetition in several important ways. First, deliberate practice involves a well-defined, specific task that the learner seeks to master; second, task performance is followed by immediate feedback; third, there is opportunity for repetition; and fourth, learners must actively exploit the opportunity for improvement afforded by errors (Lewandowsky & Thomas, 2009, p. 143).

**James W. Lichtenberg**

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

But post-licensure therapists typically do not engage in this type of deliberate practice and, as we will discuss later, do not routinely obtain suitable feedback. As a consequence, Dawes (1994) was able to conclude, "The empirical data suggest that mental health professionals' accuracy of judgment does not increase with increasing experience" (p. 106).

Dawes's (1994) conclusion about the relationship between experience and expertise has not gone unchallenged. Perhaps the most recent of those challenges was Spengler et al.'s (2009) meta-analysis of 75 clinical judgment studies published between 1970 and 1996 that combined the experience of 4,607 clinicians. Spengler et al. found that the accuracy of clinical judgments *was* enhanced as a result of experience, although not by much (effect size: $d = 0.12$). However, therapists specifically trained in or with extensive clinical experience in a particular domain were no more or less accurate in that specific domain than were those without such specific training or experience. Further, the study did not tease apart the contribution of training from that of experience. Although Spengler et al.'s effect size was significant (and as they interpreted it, "not trivial"), Lichtenberg (2009) noted in his commentary on their article, "There is much history (of non-significant experience effects) for such a small effect size to overcome" (p. 413). Moreover, Huppert et al. (2001) found that there was a small association of overall therapy experience and outcomes with cognitive behavioral therapy with panic disorder patients. However, Huppert et al. also found among their 14 therapists that there was no relation of specific experience in cognitive behavioral therapy with outcome. So although there may be some effects of experience with outcome, these effects are small and not associated with the specific interventions used. What does change with experience is clinicians' confidence, which we discuss in the next section.

### Inaccuracy of Therapists' Self-Appraisals of Competence

Clinicians have very unrealistic appraisals of their own competence. Walfish, McAlister, O'Donnell, and Lambert (2012) found, for example, that 25% of clinicians view themselves in the top 10% and that none viewed themselves as below average. Such perceptions of one's own competence are not unusual. There is a general tendency to fail to recognize one's own incompetence (Dunning, Johnson, Ehrlinger, & Kruger, 2003). Moreover, as Dawes (1994) pointed out, self-estimates of ability continue to grow with experience, even though actual ability does not. Such unwarranted growth in clinicians' confidence with experience has received substantial empirical documentation (Friedlander & Phillips, 1984; Goldberg, 1959, 1968; Oskamp, 1962, 1965; Rock, Bransford, Maist, & Morey, 1987).

People's confidence in their perception of others increases with experience and the richness of their mental representations, but this is not related to any increases in accuracy (Gill, Swann, & Silvera, 1998). The confidence that experienced therapists have in their predictions and the accuracy of these predictions are poorly related (Ægisdóttir et al., 2006; Garb, 1989, 2005; Goldberg, 1968; Spengler et al., 2009; Strasser & Gruber, 2004; Witteman & Van den Bercken, 2007; Witteman, Weiss, & Metzmacher, 2012). But to the extent that therapists *believe* they are growing more competent with experience, they are less likely to be motivated to take actions (e.g., obtain and use critical feedback) that would enhance their actual expertise (Pintrich, 2003).

### Lack of Accurate Feedback

In a recent article on the conditions for intuitive expertise (i.e., the development of expertise that arises from continued practice and experience), Kahneman and Klein (2009) concluded, like Shanteau (1992), that expertise develops when two conditions exist: (a) The environment is predictable and with explicit outcomes, and (b) there is an opportunity to learn, based on quality information on the accuracy of past decisions and predictions (see also Ericsson, 2006). But the typical practice of psychotherapy meets neither of these conditions. As a result, psychotherapy is a context that provides little feedback regarding the accuracy of past clinical decisions and behaviors as well as client outcomes in general. In this context, we employ Hattie and Timperley's (2007) definition of feedback, which concerns information that reduces the discrepancy between current understandings or behaviors and those that are desired. We attribute this lack of quality information as a key reason for the difficulty in the development of expertise in psychotherapists. But this does not mean that there is a lack of information that could be utilized; there is, although too often it is flawed.

Much of the information therapists receive comes from clients: both what the clients report and what the

**Rodney K. Goodyear**

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

therapists are able to observe about their clients' functioning. Unfortunately, both types of information tend to be unreliable.

The well-known "Barnum effect" (Meehl, 1956) can be used to exemplify problems with client reports. Clients have been found to be willing to accept almost any interpretation as accurate (C. R. Snyder, Shenkel, & Lowrey, 1977), so a client's report of therapist accuracy may be misleadingly affirmative. The literature on the predictive validity of interviewing has long demonstrated the weakness of interview-based decisions and predictions (Carroll, Wiener, Coates, Galegher, & Alibrio, 1982; DeVaul et al., 1987; Milstein, Wilkinson, Burrow, & Kessen, 1981)—a finding that has been shown to generalize to clinical practice (Garb, 1998; Oskamp, 1965). Using standardized interview formats or valid psychological assessment has been shown to provide better-quality information and enhanced validity of predictions.

Another problem related to information quality occurs with respect to the manner in which therapists assess treatment outcomes. Certainly therapists routinely make judgments about how their clients are functioning at termination and about the likelihood of their continuing to do well outside of therapy. From these judgments, they make outcome attributions and derive representations of why the changes occurred in therapy. This type of model creation is central to the work of therapists. In fact, Voss and his colleagues (Voss, Greene, Post, & Penner, 1983; Voss & Post, 1988; Voss, Tyler, & Yengo, 1983) have found that experts in any domain are better able than novices to build coherent and persuasive explanations for their solutions to problems.

But therapists rarely, if ever, test their models. It is uncommon enough for clinicians to get information on how their clients are doing during their therapy, but it is rarer still for them to do so after termination. All that therapists generally have is the report of clients in the last few sessions. It is generally understood and accepted that these tend to be overly positive and unrepresentative outcome evaluations—a phenomenon that is sufficiently common that it has been named the Hello-Goodbye effect (Hathaway, 1948), in which client assessments made at termination tend to be inflated relative to those obtained shortly thereafter. Unfortunately, as far as feedback goes, the only definitive outcome information therapists may get is that which occurs when a client later returns for more treatment.

The problem, however, goes beyond the simple availability of quality information and gets to therapists' intentionality in seeking and using what information is available to them. It is instructive to consider conclusions Miller, Hubble, and Duncan (2008) have drawn from studying the very best therapists, who are defined as those with the highest outcomes. They found that these therapists "without exception possess a keen 'situational awareness': they are observant, alert and attentive. They compare new information constantly with what they already know" (Miller et al., 2008, p. 19). So we see the failure of therapists getting better with experience as related to cognitive processing issues and lack of quality outcome information. But these issues can be overcome.

## Methods to Increase Expertise

Studies of different interventions and large-scale insurance data systems provide abundant aggregate client outcome information. But there is relatively little reporting of outcome information to individual therapists and even less reporting of one clinician's client outcomes relative to that of other clinicians. We see the issue of obtaining information on how the client is progressing as crucial in the development of clinical skill. Further, the ways in which therapists use this information for hypothesis development and testing is essential. In what follows we report promising practices even as we consider factors that temper their overall effectiveness.

### *Systematic Feedback on Client Progress*

One source of feedback is the provision of client progress information to the therapist, an idea attributed to Ken Howard and colleagues (Howard, Moras, Brill, Martinovich, & Lutz, 1996) and developed and tested by both Michael Lambert and colleagues (Lambert, Hansen, & Finch, 2001) and Scott Miller and colleagues (Miller, Duncan, & Hubble, 2005). The systems for providing feedback about client progress to therapists (e.g., Barkham, Hardy, & Mellor-Clark, 2010; Duncan, Miller, Wampold, & Hubble, 2010; Lambert, 2010; Lambert et al., 2001; Lambert, Harmon, Slade, Whipple, & Hawkins, 2005; Miller, Duncan, & Hubble, 2005) involve several components.

• First, a measure is used to assess the functioning of the client periodically during therapy. Typically that measure is global, as opposed to disorder-specific, in that it assesses well-being, role functioning, interpersonal func-

tioning, as well as symptom distress, issues that are applicable across disorders.

- Second, normative trajectories of client progress are derived from the progress of large samples of clients.
- Finally, individual client progress is compared to the normative trajectories, and feedback is provided to the therapist about client progress relative to the norms, usually adjusted for "case mix." For example, the therapist may receive a "red dot" or a "red light" if client progress is in the lowest percentiles—for example, if the client progress is less than the progress of 25% of clients with a comparable number of sessions and similar initial severity (Lambert et al., 2005; Miller, Duncan, & Hubble, 2005). Clients in this category have been labeled "not on track" (NOT) cases or signal cases. Because therapists typically do not recognize deteriorating cases (Hannan et al., 2005), providing therapists feedback on NOT cases demonstrates the discrepancy between the therapist's view of client progress and actual client progress, which is hypothesized to be an important aspect of feedback interventions (Sapyta, Riemer, & Bickman, 2005). Therapists also receive feedback about clients who are progressing normally (i.e., their client's change is at or above average) or are at risk for a poor outcome (i.e., below average but not in the bottom quartile).

There is sufficient evidence to conclude that providing this feedback to therapists positively affects outcome (Lambert & Shimokawa, 2011; Shimokawa, Lambert, & Smart, 2010). In randomized trials, clients in conditions in which their therapist received feedback had better outcomes than clients whose therapists did not receive feedback, although the effects were achieved primarily by reducing the proportion of clients who deteriorated—that is, by reducing the rate of failures in NOT cases (Lambert & Shimokawa, 2011; Shimokawa et al., 2010).

This is good news, but from our perspective and with particular regard to the development of therapist expertise, it is important to know what therapists who receive feedback do to improve their clients' outcomes and to reduce the rate of deterioration. It may well be that therapists receiving feedback learn skills that are generalizable to other clients and thus become more competent therapists (i.e., develop expertise), or it may be that therapists simply pay more attention to NOT cases than they were doing previously, may query the client about progress (but only when prompted by a red dot or red signal), or may encourage the client to respond more positively. Unfortunately, there has been no research aimed at identifying what therapists do in response to feedback or what the feedback affects.

In this regard, studies examining feedback by and large have examined the outcomes of *clients* rather than the behavior of *therapists*. Consequently, it is difficult to know what effect feedback has on therapists and specifically on therapist expertise. Indeed, the usual practice is to provide feedback about clients rather than feedback about therapists. This difference is important. In the latter situation, therapists would receive feedback about their performance *relative to the performance of other therapists*, which would then give therapists opportunity to understand the discrepancy between their belief about their competence and their actual competence. Although some systems are set up to provide therapists with feedback about their relative performance across clients, there has been no research focused on feedback to therapists about their performance relative to other therapists.

***Utility of systematically obtained client feedback.*** Feedback to therapists would be important for two reasons. First, outcome differences across therapists seem to be robust in practice settings (Laska et al., 2013; Lutz et al., 2007; Saxon & Barkham, 2012; Wampold & Brown, 2005; see Baldwin & Imel, 2013, for a review). Some therapists consistently attain better outcomes than others, and therefore feedback should help the less effective therapists improve their performance. It would be informative to know whether feedback about the progress of individual clients or feedback about therapists' relative performance is more helpful to therapists of different effectiveness levels. For example, it could be that feedback about clients would be more helpful to more effective therapists because these therapists may be more open to client information and skilled in using that information. Conversely, more effective therapists may already be aware of client progress through their interaction with clients, and it may be the less effective therapists, who need information about client progress, who benefit from feedback. Because therapists generally believe that they are effective (i.e., above average; Walfish et al, 2012), feedback concerning therapists' relative efficacy would make apparent the discrepancy between self-assessment and actual performance, which represents a fruitful focus for future research.

***Necessary but insufficient for developing expertise.*** We contend that feedback about client progress, either with regard to individual clients or with regard to therapists' relative effectiveness, is necessary but not sufficient to develop expertise. Feedback about client progress provides no information about what actions are necessary to improve performance. To develop expertise, feedback needs to be specific to the important components of psychotherapy. That observation, unfortunately, reveals exactly why developing expertise in psychotherapy is so elusive. Generally speaking, there is little agreement about models of psychotherapy that would form the basis of focusing on component processes.

It should be clear that there are very different treatments, with very different protocols, for any given disorder, some of which have been identified as empirically supported or research based (http://www.apa.org/divisions/div12/cppi.html). According to this perspective, expertise is defined for a specific treatment as suggested by Waltz, Addis, Koerner, and Jacobson (1993). However, because all treatments that are intended to be therapeutic seem to be approximately equally effective (Laska, Gurman, & Wampold, in press; Wampold, 2001b; Wampold et al., 1997) it may well be that adherence to a protocol for a specific treatment may involve focusing on a component that does not produce better outcomes. Such speculation is

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

supported by the fact that protocol adherence generally does not seem to be related to outcome. In this regard, a meta-analysis by Webb et al. (2010) found no relation between treatment adherence and client outcome except for a small effect for depression treatments (and, interestingly, many very different treatments have been found to be efficacious for the treatment of depression). Indeed Boswell et al. (2013) have found that both adherence and competence deteriorate over time—the opposite of what one would expect if the expertise–experience relation were defined using adherence and competence as the criteria for expertise. At best, current practice supports the need for provision of normative information in every case about (a) client progress over treatment as well as (b) client outcome.

The presence of feedback information does not appear to lead to the development of expertise. A meta-analysis of the general use of feedback interventions across all domains, not just clinical domains, reveals a small positive effect size, but the results are quite variable, with roughly one third of the interventions producing negative effects (Kluger & DeNosi, 1996).

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

### Planful Application of Feedback Information

There are several recommendations in the literature for improving our clinical decision making, which serves as one the cornerstones of clinical intervention (e.g., Arkes, 1981; Dumont, 1991; Faust, 1991; Garb, 1998; Garb & Boyle, 2003; Goldberg, 1991; Salovey & Turk, 1991; Tracey & Rounds, 1999; Wierzbicki, 1993), but these recommendations apparently have had little effect (Lilienfeld, Lynn, & Lohr, 2003; Lilienfeld, Ritschel, Lynn, Cautin, & Latzman, 2013). As demonstrated by Lewandowsky, Ecker, Seifert, Schwarz, and Cook (2012), it is difficult to dispel mistaken or inaccurate information and conclusions, and so this state of affairs is to be somewhat expected.

Recommended procedures for enhancing clinical decision making and practice include (a) adopting a Bayesian approach by looking at base rates and the predictability of behavior, (b) obtaining quality information (e.g., relying on valid measures rather than impressions), (c) relying less on memory, (d) recognizing personal biases and their effects, (e) being aware of regression to the mean where less extreme behavior follows extreme behavior, and (f) adopting a disconfirming, scientific approach to practice. We see merit in each of these recommendations but wish to focus specifically on the last of these, that of adopting a disconfirming, scientific method. We see this as the most central recommendation relative to obtaining expertise. Three issues are of particular relevance to adopting a disconfirming, scientific approach: (a) overuse of confirmatory bias, (b) overuse of hindsight bias, and (c) failure to engage in specific hypothesis testing. Seeking to alter each of these issues is crucial in gaining expertise.

***Adopt a disconfirmatory approach.*** People tend to seek confirmatory information concerning their beliefs (Davies, 2003; Granberg & Brent, 1983; Sears & Whitley, 1973) by seeking out and attending to information that confirms their concepts (Aldashev, Carletti, & Righi, 2011; Greenwald, Pratkanis, Leippe, & Baumgardner, 1986; Nisbett & Ross, 1980; M. Snyder & Campbell, 1980). The effect is that only partial evidence is perceived. This tendency to seek confirmation also has been demonstrated in therapists (Haverkamp, 1993; Strohmer, Shivy, & Chiodo, 1990). If therapists believe something to be true, the natural approach is to look for evidence that confirms, rather than tests, this belief.

Such a confirmatory approach leads to biased information searches and a high probability of incorrect conclusions. A wiser approach would be to adopt a disconfirming approach. Using this approach, the individual specifies what information would be needed to render the belief wrong and then seeks such disconfirming information. Such disconfirming information searches yield more and better-quality information and thus provide a more accurate base for decision making (Aldashev et al., 2011; Davies, 2003).

***Avoid hindsight bias.*** A second issue pertaining to the need to adopt a disconfirming, scientific approach is the avoidance of hindsight bias (Wedding & Faust, 1989) in clinical practice. Hindsight bias is akin to "Monday morning quarterbacking," in which everyone knows the optimal play after the fact. Such post hoc construction of models and explanations creates an illusion of learning in which individuals believe these counterfactual models to be accurate and that they knew about them all along (Roese & Vohs, 2012).

Although post hoc models do have some utility in furthering our understanding of clients, this learning is illusory in that it is never really examined. There is no a priori testing of hypotheses that emanate from therapists' understanding of the client. Hindsight bias is used frequently in practice (Arkes, Faust, Guilmette, & Hart, 1988; Arkes, Wortmann, Saville, & Harkness, 1981; Fischhoff, 1975) and results, unfortunately, in a lack of information gathering. If new information arises, then it is easily incorporated into clinical conceptualizations after the fact (Roese & Vohs, 2012). As a result, clinicians are rarely wrong because they have never really tested the validity of their beliefs. Hindsight bias is especially salient with respect to getting and dealing with feedback on client outcomes. If a therapist learns that a client had lower outcomes than thought based on termination comments, it becomes relatively easy to construct an explanation. But the key issue is that this explanation then needs to be explicitly tested on new clients. If the therapist made strong predictions about the outcome and then found out that the actual outcome differed, he or she would then have clear information on the need to change the clinical formulation. The probability of subsequent hypothesis specification would probably be greater in this case, and the likelihood of testing these hypotheses with future clients should also increase. A similar process could be used in ongoing work with continuing clients. Generating explicit predictions about client progress and then receiving feedback on the extent of that progress serves as an explicit guard against hindsight bias.

***Explicitly test hypotheses.*** The final aspect of our advocating the adoption of a disconfirming, scientific approach is the clear specification and evaluation of clinical

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

hypotheses. This evaluation requires collecting disconfirming information relative to future, not past, behavior. We argue that learning occurs by specifying and then testing specific, a priori, empirically verifiable hypotheses. If a therapist claims that a client will perform certain behaviors based upon his or her conceptualization of the client, the therapist needs to propose specific hypotheses, focusing on specific evidence that would disconfirm the hypothesis (i.e., alternative hypotheses), and then set up conditions to test the hypothesis. Doing this in a prospective manner enables the acquisition of information on the validity of the models and one's hypotheses. Evidence of inaccuracy is unequivocal and necessitates a change in the understanding of the client.

In this regard, we are suggesting that psychotherapists fail to develop clinical expertise because of their failure to adopt a disconfirming scientific process in practice even when there is quality feedback information such as information on outcomes. As an oversimplified example, a clinician with poorer than expected outcomes might hypothesize that the relative ratio of focus on positive to negative content could be a key variable accounting for these results. The clinician could then systematically vary the content of the session to see its effect on progress and outcomes. What also would be needed is a specification of what should occur in session should this hypothesis be either (a) correct or (b) incorrect. Besides the value of the specification of a hypothesis, it is the addition of the disconfirmation that makes this strategy valuable.

A key aspect of the disconfirming, scientific method is the generation of testable hypotheses. Although it is not difficult to proffer hypotheses—indeed, it is done frequently—a key requirement is that the hypotheses be embedded in a clearly articulated model of client processing and behavior. The tests of the hypotheses generated by the model thus provide information on the validity of the model. It is this generation of specific hypotheses, confirmed by experience in deliberate practice, that, we believe, forms the basis of the development of psychotherapeutic expertise. A recent study found that therapist perceptions of professional self-doubt were positively related to therapy outcome (Nissen-Lie, Monsen, Ulleberg, & Rønnestad, 2012). Although this professional self-doubt may not explicitly comprise our proposed scientific testing, it does appear to encompass a critical evaluation of one's work from a disconfirming stance. Williams, Dunning, and Kruger (2013) have demonstrated that inflated self-assessments of performance are associated with rational, rule-based methods relative to more variable approaches. Given the high occurrence of confirmatory approaches, it is likely that this rule-based rational approach includes a good deal of confirmatory bias. So being more pessimistic regarding one's client's outcome may be an asset in that it may be associated with the application of more alternative explanations than the rule-based confirmatory method.

***Deliberate practice.*** Miller (Miller, Duncan, Sorrell, & Brown, 2005; Miller, Hubble, Chow, & Seidel, 2013) has recommended deliberate practice as the means by which clinical expertise can be attained. Deliberate practice is defined as the explicit setting aside of private time to review one's behavior and outcome feedback, developing plans for improvement, and then following through on these. The expertise literature has demonstrated that such deliberate practice is associated with the attainment of expertise in a variety of domains (Ericsson, 2009). However, recent research has demonstrated, at least with chess masters, that deliberate practice is necessary, but not sufficient, for the development of expertise (Campitelli & Gobet, 2011). The specific type of deliberate practice matters. Fischer, Fischer, Weisweiler, and Frey (2010) found that confirmatory bias was greatest in conditions of deliberate cognitive analysis and intuitive and gut feelings. Conditions of distraction (i.e., doing other tasks) resulted in the least confirmatory bias. So deliberate rational processing alone (or intuitive processing alone) does not result in disconfirmatory processing. Given the literature on disconfirmatory or alternative hypothesis testing, it would be expected that this reflective method of deliberate processing coupled with alternate hypothesis generation would also result in less confirmatory bias. We agree with Miller, Duncan, et al. (2005; Miller et al., 2013) that deliberate practice is essential, but we add that this practice should be of a particular form, that of setting aside explicit time to generate a priori alternative or disconfirmatory hypotheses and then testing them explicitly. Simply reflecting in a deliberate manner on feedback information is insufficient.

## Conclusion

Shanteau (1992) claimed that the practice of psychotherapy does not have an expertise base in that there is little relation between experience and gains in professional skill. We have discussed several aspects of psychotherapy that make the development of expertise as a therapist particularly difficult. Essentially, psychotherapy is a process about which the therapist receives little explicit and valid feedback about what actions are productive of a therapeutic outcome.

Notwithstanding the above difficulty, there is extensive evidence that psychotherapy is effective. As well, there are documented differences among the outcomes achieved by therapists—some therapists consistently achieve better outcomes than others. Thus, although it appears that there exists such a thing as expertise, little is known about what differentiates the more effective therapists from others; certainly it does not appear to be the type of therapy delivered or the experience of the therapist (Beutler et al., 2004). What has emerged is that more effective therapists appear to be able to form working alliances across a range of clients (Baldwin, Wampold, & Imel, 2007) and have a greater level of facilitative skills (Anderson, Ogles, Patterson, Lambert, & Vermeersch, 2009). But this information provides little that is actionable to facilitate the development of expertise. Clearly, more research about the process and outcome of psychotherapy is needed (see Kazdin, 2008), including what characterizes expert therapists with better outcomes, because it is clear

that better outcomes do not emerge as a function of experience.

Despite the barriers to developing expertise in psychotherapy, there is much clinicians can do. Increasingly, there are reliable benchmarks for various disorders (e.g., see Minami et al., 2008, with regard to depression) to which therapists can compare the progress made by their clients. Therapists can use feedback about client progress to adjust therapy to achieve optimal outcomes and to compare their outcomes to those of other therapists. Therapists, particularly those who are underperforming relative to other therapists, can seek to improve.

In this regard, therapists may need to augment their general therapeutic competence or they may need to be trained to provide particular evidence-based psychological treatments, depending on the reasons for their relatively poor performance. It is crucial that therapists obtain quality information about both client and therapist outcomes if they are to establish expertise. However, as we have argued, outcome information alone, even if of high quality, does not ensure that expertise will develop. Cognitive heuristics, especially hindsight bias, can minimize the impact of outcome information on future practice. To benefit from quality information, therapists are encouraged to adopt a prospective testing of hypotheses, where the outcome information serves as the criterion. It is our hypothesis that adopting such a disconfirming, scientific approach to practice will result in expertise gains among therapists.

## REFERENCES

Ægisdóttir, S., White, M. J., Spengler, P. M., Maugherman, A. S., Anderson, L. A., Cook, R. S., & Nichols, C. S. (2006). The Meta-Analysis of Clinical Judgment Project: Fifty-six years of accumulated research on clinical versus statistical prediction. *The Counseling Psychologist, 34,* 341–382. doi:10.1177/0011000005285875

Aldashev, G., Carletti, T., & Righi, S. (2011). Follies subdued: Informational efficiency under adaptive expectations and confirmatory bias. *Journal of Economic Behavior & Organization, 80,* 110–121. doi:10.1016/j.jebo.2011.03.001

Anderson, T., Ogles, B. M., Patterson, C. L., Lambert, M. J., & Vermeersch, D. A. (2009). Therapist effects: Facilitative interpersonal skills as a predictor of therapist success. *Journal of Clinical Psychology, 65,* 755–768. doi:10.1002/jclp.20583

APA Presidential Task Force on Evidence-Based Practice. (2006). Evidence-based practice in psychology. *American Psychologist, 61,* 271–285. doi:10.1037/0003-066X.61.4.271

Arkes, H. R. (1981). Impediments to accurate clinical judgment and possible ways to minimize their impact. *Journal of Consulting and Clinical Psychology, 49,* 323–330. doi:10.1037/0022-006X.49.3.323

Arkes, H. R., Faust, D., Guilmette, T. J., & Hart, K. (1988). Eliminating the hindsight bias. *Journal of Applied Psychology, 73,* 305–307. doi:10.1037/0021-9010.73.2.305

Arkes, H. R., Wortmann, R. L., Saville, P., & Harkness, A. R. (1981). The hindsight bias among physicians weighting the likelihood of diagnosis. *Journal of Applied Psychology, 66,* 252–254. doi:10.1037/0021-9010.66.2.252

Baldwin, S. A., & Imel, Z. (2013). Therapist effects. In M. J. Lambert (Ed.), *Bergin and Garfield's handbook of psychotherapy and behavioral change* (6th ed., pp. 258–297). New York, NY: Wiley.

Baldwin, S. A., Wampold, B. E., & Imel, Z. E. (2007). Untangling the alliance–outcome correlation: Exploring the relative importance of therapist and patient variability in the alliance. *Journal of Consulting and Clinical Psychology, 75,* 842–852. doi:10.1037/0022-006X.75.6.842

Barkham, M., Hardy, G. E., & Mellor-Clark, J. (Eds.). (2010). *Developing and delivering practice-based evidence: A guide for the psychological therapies.* Chichester, England: Wiley Blackwell. doi:10.1002/9780470687994

Beutler, L. E. (1997). The psychotherapist as a neglected variable in psychotherapy: An illustration by reference to the role of therapist experience and training. *Clinical Psychology: Science and Practice, 4,* 44–52. doi:10.1111/j.1468-2850.1997.tb00098.x

Beutler, L. E., Malik, M., Alimohamed, S., Harwood, T. M., Talebi, H., Noble, S., & Wong, E. (2004). Therapist variables. In M. J. Lambert (Ed.), *Bergin and Garfield's handbook of psychotherapy and behavior change* (5th ed., pp. 227–306). New York, NY: Wiley.

Bohart, A. C., & Tallman, K. (2010). Clients: The neglected common factor in psychotherapy. In B. L. Duncan, S. D. Miller, B. E. Wampold, & M. A. Hubble (Eds.), *The heart and soul of change: Delivering what works in therapy* (2nd ed., pp. 83–111). Washington, DC: American Psychological Association. doi:10.1037/12075-003

Boswell, J. F., Gallagher, M. W., Sauer-Zavala, S. E., Bullis, J., Gorman, J. M., Shear, M. K., . . . Barlow, D. H. (2013). Patient characteristics and variability in adherence and competence in cognitive-behavioral therapy for panic disorder. *Journal of Consulting and Clinical Psychology, 81,* 443–454. doi:10.1037/a0031437

Budge, S. L., Owen, J. J., Kopta, S. M., Minami, T., Hansen, M. R., & Hirsch, G. (2013). Differences among trainees in client outcomes associated with the phase model of change. *Psychotherapy, 50,* 150–157. doi:10.1037/a0029565

Campitelli, G., & Gobet, F. (2011). Deliberate practice: Necessary but not sufficient. *Current Directions in Psychological Science, 20,* 280–285. doi:10.1177/0963721411421922

Carroll, J. S., Wiener, R. L., Coates, D., Galegher, J., & Alibrio, J. J. (1982). Evaluation, diagnosis, and prediction in parole decision-making. *Law & Society Review, 17,* 199–228. doi:10.2307/3053536

Castonguay, L. G., Goldfried, M. R., Wiser, S., Raue, P. J., & Hayes, A. M. (1996). Predicting the effect of cognitive therapy for depression: A study of unique and common factors. *Journal of Consulting and Clinical Psychology, 64,* 497–504. doi:10.1037/0022-006X.64.3.497

Chi, M. T. H. (2006). Two approaches to the study of experts' characteristics. In K. A. Ericsson, N. Charness, R. R. Hoffman, & P. J. Feltovich (Eds.), *Cambridge handbook of expertise and expert performance* (pp. 21–30). New York, NY: Cambridge University Press. doi:10.1017/CBO9780511816796.002

Crits-Christoph, P., Baranackie, K., Kurcias, J. S., Carroll, K., Luborsky, L., McLellan, T., & Zitrin, C. (1991). Meta-analysis of therapist effects in psychotherapy outcome studies. *Psychotherapy Research, 1,* 81–91. doi:10.1080/10503309112331335511

Davies, M. F. (2003). Confirmatory bias in the evaluation of personality descriptions: Positive test strategies and output interference. *Journal of Personality and Social Psychology, 85,* 736–744. doi:10.1037/0022-3514.85.4.736

Dawes, R. M. (1994). *House of cards: Psychology and psychiatry built on myth.* New York, NY: Free Press.

DeVaul, R. A., Jersey, F., Chappell, J. A., Carver, P., Short, B., & O'Keefe, S. (1987). Medical school performance of initially rejected students. *JAMA: Journal of the American Medical Association, 257,* 47–51. doi:10.1001/jama.1987.03390010051027

Dumont, F. (1991). Expertise in psychotherapy: Inherent liabilities of becoming experienced. *Psychotherapy: Theory, Research, Practice, Training, 28,* 422–428. doi:10.1037/0033-3204.28.3.422

Duncan, B. L., Miller, S. D., Wampold, B. E., & Hubble, M. A. (Eds.). (2010). *The heart and soul of change: Delivering what works in therapy* (2nd ed.). Washington, DC: American Psychological Association. doi:10.1037/12075-000

Dunning, D., Johnson, K., Ehrlinger, J., & Kruger, J. (2003). Why people fail to recognize their own incompetence. *Current Directions in Psychological Science, 12,* 83–87. doi:10.1111/1467-8721.01235

Ericsson, K. A. (2006). The influence of experience and deliberate practice on the development of superior expert performance. In K. A. Ericsson, N. Charness, P. J. Feltovich, & R. R. Hoffman (Eds.), *The Cambridge handbook of expertise and expert performance* (pp. 683–703). Cambridge, England: Cambridge University Press. doi:10.1017/CBO9780511816796.038

Ericsson, K. A. (2009). Enhancing the development of professional per-

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

formance: Implications from the study of deliberate practice. In K. A. Ericsson (Ed.), *Development of professional expertise: Toward measurement of expert performance and design of optimal learning environments* (pp. 405–431). New York, NY: Cambridge University Press. doi:10.1017/CBO9780511609817.022

Ericsson, K. A., & Lehmann, A. C. (1996). Expert and exceptional performance: Evidence of maximal adaptation to task constraints. *Annual Review of Psychology, 47,* 273–305. doi:10.1146/annurev.psych.47.1.273

Faust, D. (1991). What if we had really listened? Present reflections on altered pasts. In D. Cicchetti & W. M. Grove (Eds.), *Thinking clearly about psychology: Vol. 1. Matters of public interest* (pp. 185–216). Minneapolis, MN: University of Minnesota Press.

Feltovich, P. J., Prietula, M. J., & Ericsson, K. A. (2006). Studies of expertise from psychological perspectives. In K. A. Ericsson, N. Charness, R. R. Hoffman, & P. J. Feltovich (Eds.), *Cambridge handbook of expertise and expert performance* (pp. 41–67). New York, NY: Cambridge University Press. doi:10.1017/CBO9780511816796.004

Fischer, P., Fischer, J., Weisweiler, S., & Frey, D. (2010). Selective exposure to information: How different modes of decision making affect subsequent confirmatory information processing. *British Journal of Social Psychology, 49,* 871–881. doi:10.1348/014466610X499668

Fischhoff, B. (1975). Hindsight = foresight: The effect of outcome knowledge on judgment under uncertainty. *Journal of Experimental Psychology: Human Perception and Performance, 1,* 288–299. doi:10.1037/0096-1523.1.3.288

Friedlander, M. L., & Phillips, S. D. (1984). Preventing anchoring errors in clinical judgment. *Journal of Consulting and Clinical Psychology, 52,* 366–371. doi:10.1037/0022-006X.52.3.366

Garb, H. N. (1989). Clinical judgment, clinical training, and professional experience. *Psychological Bulletin, 105,* 387–396. doi:10.1037/0033-2909.105.3.387

Garb, H. N. (1998). *Studying the clinician: Judgment research and psychological assessment.* Washington, DC: American Psychological Association. doi:10.1037/10299-000

Garb, H. N. (2005). Clinical judgment and decision making. *Annual Review of Clinical Psychology, 1,* 67–89. doi:10.1146/annurev.clinpsy.1.102803.143810

Garb, H. N., & Boyle, P. A. (2003). Understanding why some clinicians use pseudoscientific methods: Findings from research on clinical judgment. In S. O. Lilienfeld, S. J. Lynn, & J. M. Lohr (Eds.), *Science and pseudoscience in clinical psychology* (pp. 17–38). New York, NY: Guilford Press.

Gill, M. J., Swann, W. B., & Silvera, D. H. (1998). On the genesis of confidence. *Journal of Personality and Social Psychology, 75,* 1101–1114. doi:10.1037/0022-3514.75.5.1101

Goldberg, L. R. (1959). The effectiveness of clinician's judgments: The diagnosis of organic brain damage from the Bender-Gestalt. *Journal of Consulting Psychology, 23,* 25–33. doi:10.1037/h0048736

Goldberg, L. R. (1968). Simple models or simple processes? Some research on clinical judgment. *American Psychologist, 23,* 483–496. doi:10.1037/h0026206

Goldberg, L. R. (1991). Human mind versus regression equation: Five contrasts. In D. Cicchetti & W. M. Grove (Eds.), *Thinking clearly about psychology: Vol. 1. Matters of public interest* (pp. 173–184). Minneapolis, MN: University of Minnesota Press.

Granberg, D., & Brent, E. (1983). When prophecy bends: The preference-expectation link in U.S. presidential elections, 1952–1980. *Journal of Personality and Social Psychology, 45,* 477–491. doi:10.1037/0022-3514.45.3.477

Greenwald, A. G., Pratkanis, A. R., Leippe, M. R., & Baumgardner, M. H. (1986). Under what conditions does theory obstruct research progress? *Psychological Review, 93,* 216–229. doi:10.1037/0033-295X.93.2.216

Groth-Marnat, G., Roberts, R., & Beutler, L. E. (2001). Client characteristics and psychotherapy: Perspectives, support, interactions, and implications for training. *Australian Psychologist, 36,* 115–121. doi:10.1080/00050060108259643

Hannan, C., Lambert, M. J., Harmon, C., Nielsen, S. L., Smart, D. W., Shimokawa, K., & Sutton, S. W. (2005). A lab test and algorithms for identifying clients at risk for treatment failure. *Journal of Clinical Psychology: In Session, 61,* 1–9.

Hathaway, S. R. (1948). Some considerations relative to nondirective counseling as therapy. *Journal of Clinical Psychology, 4,* 226–231. doi:10.1002/1097-4679(194807)4:3<226::AID-JCLP2270040303>3.0.CO;2-V

Hattie, J. A., Sharpley, C. F., & Rogers, H. F. (1984). Comparative effectiveness of professional and paraprofessional helpers. *Psychological Bulletin, 95,* 534–541. doi:10.1037/0033-2909.95.3.534

Hattie, J. A., & Timperley, H. (2007). The power of feedback. *Review of Educational Research, 77,* 81–112. doi:10.3102/003465430298487

Haverkamp, B. E. (1993). Confirmatory bias in hypothesis testing for client-identified and counselor self-generated hypotheses. *Journal of Counseling Psychology, 40,* 303–315. doi:10.1037/0022-0167.40.3.303

Henry, W. P., Strupp, H. H., Butler, S. F., Schacht, T. E., & Binder, J. (1993). Effects of training in time-limited psychotherapy: Changes in therapist behavior. *Journal of Consulting and Clinical Psychology, 61,* 434–440. doi:10.1037/0022-006X.61.3.434

Howard, K. I., Moras, K., Brill, P. L., Martinovich, Z., & Lutz, W. (1996). Evaluation of psychotherapy: Efficacy, effectiveness, and patient progress. *American Psychologist, 51,* 1059–1064. doi:10.1037/0003-066X.51.10.1059

Huppert, J. D., Bufka, L. F., Barlow, D. H., Gorman, J. M., Shear, M. K., & Woods, S. W. (2001). Therapists, therapists' variables, and cognitive behavioral therapy outcomes in a multicenter trial for panic disorder. *Journal of Consulting and Clinical Psychology, 69,* 747–755. doi:10.1037/0022-006X.69.5.747

Kahneman, D., & Klein, G. (2009). Conditions for intuitive expertise: A failure to disagree. *American Psychologist, 64,* 515–526. doi:10.1037/a0016755

Kazdin, A. E. (2008). Evidence-based treatment and practice: New opportunities to bridge clinical research and practice, enhance the knowledge base, and improve patient care. *American Psychologist, 63,* 146–159. doi:10.1037/0003-066X.63.3.146

Kim, D. M., Wampold, B. E., & Bolt, D. M. (2006). Therapist effects in psychotherapy: A random effects modeling of the NIMH TDCRP data. *Psychotherapy Research, 16,* 161–172. doi:10.1080/10503300500264911

Kluger, A. N., & DeNosi, A. (1996). The effects of feedback interventions on performance: A historical review, a meta-analysis, and a preliminary feedback intervention theory. *Psychological Bulletin, 119,* 254–284. doi:10.1037/0033-2909.119.2.254

Lambert, M. J. (2010). *Prevention of treatment failure: The use of measuring, monitoring, and feedback in clinical practice.* Washington, DC: American Psychological Association. doi:10.1037/12141-000

Lambert, M. J., Hansen, N. B., & Finch, A. E. (2001). Patient-focused research: Using patient outcome data to enhance treatment effects. *Journal of Consulting and Clinical Psychology, 69,* 159–172. doi:10.1037/0022-006X.69.2.159

Lambert, M. J., Harmon, C., Slade, K., Whipple, J. L., & Hawkins, E. J. (2005). Providing feedback to psychotherapists on their patients' progress: Clinical results and practice suggestions. *Journal of Clinical Psychology, 61*(2), 165–174. doi:10.1002/jclp.20113

Lambert, M. J., & Ogles, B. M. (2004). The efficacy and effectiveness of psychotherapy. In M. J. Lambert (Ed.), *Bergin and Garfield's handbook of psychotherapy and behavior change* (5th ed., pp. 139–193). New York, NY: Wiley.

Lambert, M. J., & Shimokawa, K. (2011). Collecting client feedback. In J. C. Norcross (Ed.), *Psychotherapy relationships that work: Evidence-based responsiveness* (2nd ed., pp. 203–223). New York, NY: Oxford University Press. doi:10.1093/acprof:oso/9780199737208.003.0010

Laska, K. M., Gurman, A. S., & Wampold, B. E. (in press). Expanding the lens of evidence based practice in psychotherapy: A common factors perspective. *Psychotherapy.*

Laska, K. M., Smith, T. L., Wislocki, A. P., & Wampold, B. E. (2013). Uniformity of evidence-based treatments in practice? Therapist effects in the delivery of cognitive processing therapy for PTSD. *Journal of Counseling Psychology, 60,* 31–41. doi:10.1037/a0031294

Lewandowsky, S., Ecker, U. K. H., Seifert, C. M., Schwarz, N., & Cook, J. (2012). Misinformation and its correction: Continued influence and successful debiasing. *Psychological Science in the Public Interest, 13,* 106–131. doi:10.1177/1529100612451018

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Lewandowsky, S., & Thomas, J. L. (2009). Expertise: Acquisition, limitations, and control. *Reviews of Human Factors and Ergonomics, 5,* 140–165. doi:10.1518/155723409X448044

Lichtenberg, J. W. (2009). Comment: Effects of experience on judgment accuracy. *The Counseling Psychologist, 37,* 410–415. doi:10.1177/0011000008330829

Lilienfeld, S. O., Lynn, S. J., & Lohr, J. M. (2003). Science and pseudoscience in clinical psychology: Initial thoughts, reflections, and considerations. In S. O. Lilienfeld, S. J. Lynn, & J. M. Lohr (Eds.), *Science and pseudoscience in clinical psychology* (pp. 1–14). New York, NY: Guilford Press.

Lilienfeld, S. O., Ritschel, L. A., Lynn, S. J., Cautin, R. L., & Latzman, R. D. (2013). Why many clinical psychologists are resistant to evidence-based practice: Root causes and constructive remedies. *Clinical Psychology Review, 33,* 883–900. doi:10.1016/j.cpr.2012.09.008

Lutz, W., Leon, S. C., Martinovich, Z., Lyons, J. S., & Stiles, W. B. (2007). Therapist effects in outpatient psychotherapy: A three-level growth curve approach. *Journal of Counseling Psychology, 54,* 32–39. doi:10.1037/0022-0167.54.1.32

Meehl, P. E. (1956). Wanted—A good cookbook. *American Psychologist, 11,* 263–272. doi:10.1037/h0044164

Miller, S. D., Duncan, B. L., & Hubble, M. A. (2005). Outcome-informed clinical work. In J. C. Norcross & M. R. Goldfried (Eds.), *Handbook of psychotherapy integration* (2nd ed., pp. 84–102). New York, NY: Oxford University Press.

Miller, S. D., Duncan, B. L., Sorrell, R., & Brown, J. (2005). The partners for change outcome management system. *Journal of Clinical Psychology, 61,* 199–208. doi:10.1002/jclp.20111

Miller, S. D., Hubble, M. A., Chow, D. L., & Seidel, J. A. (2013). The outcome of psychotherapy: Yesterday, today, and tomorrow. *Psychotherapy, 50,* 88–97. doi:10.1037/a0031097

Miller, S. D., Hubble, M., & Duncan, B. (2008). Supershrinks: What is the secret of their success? *Psychotherapy in Australia, 14*(4), 14–22.

Milstein, R. M., Wilkinson, L., Burrow, G. N., & Kessen, W. (1981). Admission decisions and performance during medical school. *Journal of Medical Education, 56,* 77–82.

Minami, T., Wampold, B. E., Serlin, R. C., Hamilton, E., Brown, G. S., & Kircher, J. (2008). Benchmarking the effectiveness of psychotherapy treatment for adult depression in a managed care environment: A preliminary study. *Journal of Consulting and Clinical Psychology, 76,* 116–124. doi:10.1037/0022-006X.76.1.116

Nisbett, R. E., & Ross, L. (1980). *Human inference: Strategies and shortcomings of social judgment.* New York, NY: Prentice-Hall.

Nissen-Lie, H. A., Monsen, J. T., Ulleberg, P., & Rønnestad, M. H. (2012). Psychotherapists' self-reports of their interpersonal functioning and difficulties in practice as predictors of patient outcome. *Psychotherapy Research, 23,* 86–104. doi:10.1080/10503307.2012.735775

Okiishi, J., Lambert, M. J., Nielsen, S. L., & Ogles, B. M. (2003). Waiting for supershrink: An empirical analysis of therapist effects. *Clinical Psychology and Psychotherapy, 10,* 361–373. doi:10.1002/cpp.383

Oskamp, S. (1962). The relationship of clinical experience and training methods to several criteria of clinical prediction. *Psychological Monographs: General and Applied, 76*(28), 1–27. doi:10.1037/h0093849

Oskamp, S. (1965). Overconfidence in case-study judgments. *Journal of Consulting Psychology, 29,* 261–265. doi:10.1037/h0022125

Pintrich, P. R. (2003). A motivational science perspective on the role of student motivation in learning and teaching contexts. *Journal of Educational Psychology, 95,* 667–686. doi:10.1037/0022-0663.95.4.667

Rock, D. L., Bransford, J. D., Maisto, S. A., & Morey, L. (1987). The study of clinical judgment: An ecological approach. *Clinical Psychology Review, 7,* 645–661. doi:10.1016/0272-7358(87)90011-0

Roese, N. J., & Vohs, K. D. (2012). Hindsight bias. *Perspectives on Psychological Science, 7,* 411–426. doi:10.1177/1745691612454303

Sackett, D. L., Strauss, S. E., Richardson, W. S., Rosenberg, W., & Haynes, R. B. (2000). *Evidence-based medicine: How to practice and teach EBM* (2nd ed.). New York, NY: Churchill Livingston.

Salovey, P., & Turk, D. C. (1991). Clinical judgment and decision-making. In C. R. Snyder & D. R. Forsyth (Eds.), *Handbook of social and clinical psychology: The health perspective* (pp. 416–437). New York, NY: Pergamon.

Sapyta, J., Riemer, M., & Bickman, L. (2005). Feedback to clinicians: Theory, research, and practice. *Journal of Clinical Psychology, 61,* 145–153. doi:10.1002/jclp.20107

Saxon, D., & Barkham, M. (2012). Patterns of therapist variability: Therapist effects and the contribution of patient severity and risk. *Journal of Consulting and Clinical Psychology, 80,* 535–546. doi:10.1037/a0028898

Sears, D. O., & Whitley, R. E. (1973). Political persuasion. In I. des Pool, W. Schramm, F. W. Frey, N. Maccoby, & E. B. Parker (Eds.), *Handbook of communication* (pp. 253–289). Chicago, IL: Rand-McNally.

Shanteau, J. (1992). Competence in experts: The role of task characteristics. *Organizational Behavior and Human Decision Processes, 53,* 252–266. doi:10.1016/0749-5978(92)90064-E

Shimokawa, K., Lambert, M. J., & Smart, D. W. (2010). Enhancing treatment outcome of patients at risk of treatment failure: Meta-analytic and mega-analytic review of a psychotherapy quality assurance system. *Journal of Consulting and Clinical Psychology, 78,* 298–311. doi:10.1037/a0019247

Smith, M. L., & Glass, G. V. (1977). Meta-analysis of psychotherapy outcome studies. *American Psychologist, 32,* 752–760. doi:10.1037/0003-066X.32.9.752

Snyder, C. R., Shenkel, R. J., & Lowrey, C. R. (1977). Acceptance of personality interpretations: The "Barnum effect" and beyond. *Journal of Consulting and Clinical Psychology, 45,* 104–114. doi:10.1037/0022-006X.45.1.104

Snyder, M., & Campbell, B. (1980). Testing hypotheses about other people: The role of the hypothesis. *Personality and Social Psychology Bulletin, 6,* 421–426. doi:10.1177/014616728063015

Spengler, P. M., White, M. J., Ægisdóttir, S., Maugherman, A. S., Anderson, L. A., Cook, R. S., . . . Rush, J. D. (2009). The Meta-Analysis of Clinical Judgment Project: Effects of experience on judgment accuracy. *The Counseling Psychologist, 37,* 350–399. doi:10.1177/0011000006295149

Stein, D. M., & Lambert, M. J. (1984). On the relationship between therapist experience and psychotherapy outcome. *Clinical Psychology Review, 4,* 127–142. doi:10.1016/0272-7358(84)90025-4

Stein, D. M., & Lambert, M. J. (1995). Graduate training in psychotherapy: Are therapy outcomes enhanced? *Journal of Consulting and Clinical Psychology, 63,* 182–196. doi:10.1037/0022-006X.63.2.182

Strasser, J., & Gruber, H. (2004). The role of experience in professional training and development of psychological counsellors. In H. P. A. Boshuizen, R. Bromme, & H. Gruber (Eds.), *Professional learning: Gaps and transitions on the way from novice to expert* (pp. 11–28). Dordrecht, The Netherlands: Kluwer Academic. doi:10.1007/1-4020-2094-5_2

Strohmer, D. C., Shivy, V. A., & Chiodo, A. L. (1990). Information processing strategies in counselor hypothesis testing: The role of selective memory and expectancy. *Journal of Counseling Psychology, 37,* 465–472. doi:10.1037/0022-0167.37.4.465

Strupp, H. H., & Hadley, S. W. (1979). Specific vs. nonspecific factors in psychotherapy: A controlled study of outcome. *Archives of General Psychiatry, 36,* 1125–1136. doi:10.1001/archpsyc.1979.01780100095009

Tracey, T. J. G., & Rounds, J. (1999). Inference and attribution errors in test interpretation. In R. K. Goodyear & J. W. Lichtenberg (Eds.), *Test interpretation: Integrating science and practice* (pp. 113–131). Boston, MA: Allyn & Bacon.

Voss, J. F., Greene, T. R., Post, T. A., & Penner, B. C. (1983). Problem-solving skill in the social sciences. In G. H. Bower (Ed.), *The psychology of learning and motivation: Advances in research and theory* (Vol. 17, pp. 165–213). New York, NY: Academic Press.

Voss, J. F., & Post, T. A. (1988). On the solving of ill-structured problems. In M. T. H. Chi R. Glaser & M. J. Farr (Eds.), *The nature of expertise* (pp. 261–285). Hillsdale, NJ: Erlbaum.

Voss, J. F., Tyler, S. W., & Yengo, L. A. (1983). Individual differences in the solving of social science problems. In R. Dillon & R. Schmeck (Eds.), *Individual differences in cognition* (Vol. 1, pp. 205–232). New York, NY: Academic Press.

Walfish, S., McAlister, B., O'Donnell, P., & Lambert, M. J. (2012). An investigation of self-assessment bias in mental health providers. *Psychological Reports, 110,* 639–644.

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

Waltz, J., Addis, M. E., Koerner, K., & Jacobson, N. S. (1993). Testing the integrity of a psychotherapy protocol: Assessment of adherence and competence. *Journal of Consulting and Clinical Psychology, 61,* 620–630. doi:10.1037/0022-006X.61.4.620

Wampold, B. E. (2001a). Contextualizing psychotherapy as a healing practice: Culture, history, and methods. *Applied and Preventative Psychology, 10,* 69–86.

Wampold, B. E. (2001b). *The great psychotherapy debate: Models, methods, and findings.* Mahwah, NJ: Erlbaum.

Wampold, B. E., & Brown, G. S. (2005). Estimating therapist variability: A naturalistic study of outcomes in managed care. *Journal of Consulting and Clinical Psychology, 73,* 914–923. doi:10.1037/0022-006X.73.5.914

Wampold, B. E., Mondin, G. W., Moody, M., Stich, F., Benson, K., & Ahn, H. (1997). A meta-analysis of outcome studies comparing bonafide psychotherapies: Empirically, "all must have prizes". *Psychological Bulletin, 122,* 203–215. doi:10.1037/0033-2909.122.3.203

Webb, C. A., DeRubeis, R. J., & Barber, J. P. (2010). Therapist adherence/competence and treatment outcome: A meta-analytic review. *Journal of Consulting and Clinical Psychology, 78,* 200–211. doi:10.1037/a0018912

Wedding, D., & Faust, D. (1989). Clinical judgment and decision making in neuropsychology. *Archives of Clinical Neuropsychology, 4,* 233–265. doi:10.1016/0887-6177(89)90016-4

Wierzbicki, M. (1993). *Issues in clinical psychology: Subjective versus objective approaches.* Boston, MA: Allyn & Bacon.

Williams, E. F., Dunning, D., & Kruger, J. (2013). The hobgoblin of consistency: Algorithmic judgment strategies underlie inflated self-assessment of performance. *Journal of Personality and Social Psychology, 104,* 976–994. doi:10.1037/a0032416

Witteman, C. L. M., & Van den Bercken, J. H. L. (2007). Intermediate effects in psychodiagnostic classification. *European Journal of Psychological Assessment, 23,* 56–61. doi:10.1027/1015-5759.23.1.56

Witteman, C. L. M., Weiss, D. J., & Metzmacher, M. (2012). Assessing diagnostic expertise of counselors using the Cochran-Weiss-Shanteau (CWS) Index. *Journal of Counseling and Development, 90,* 30–34. doi:10.1111/j.1556-6676.2012.00005.x

This document is copyrighted by the American Psychological Association or one of its allied publishers.
This article is intended solely for the personal use of the individual user and is not to be disseminated broadly.

aps ASSOCIATION FOR PSYCHOLOGICAL SCIENCE

Psychological Science in the Public Interest
11(3) 89–121
© The Author(s) 2010
Reprints and permission: sagepub.com/journalsPermissions.nav
DOI: 10.1177/1529100610390861
http://psi.sagepub.com
SAGE

# Pitfalls and Opportunities in Nonverbal and Verbal Lie Detection

**Aldert Vrij[1], Pär Anders Granhag[2], and Stephen Porter[3]**
[1]University of Portsmouth, [2]University of Gothenburg, [3]University of British Columbia

## Summary

*The question of whether discernible differences exist between liars and truth tellers has interested professional lie detectors and laypersons for centuries. In this article we discuss whether people can detect lies when observing someone's nonverbal behavior or analyzing someone's speech. An article about detecting lies by observing nonverbal and verbal cues is overdue. Scientific journals regularly publish overviews of research articles regarding nonverbal and verbal cues to deception, but they offer no explicit guidance about what lie detectors should do and should avoid doing to catch liars. We will present such guidance in the present article.*

*The article consists of two parts. The first section focuses on pitfalls to avoid and outlines the major factors that lead to failures in catching liars. Sixteen reasons are clustered into three categories: (a) a lack of motivation to detect lies (because accepting a fabrication might sometimes be more tolerable or pleasant than understanding the truth), (b) difficulties associated with lie detection, and (c) common errors made by lie detectors. We will argue that the absence of nonverbal and verbal cues uniquely related to deceit (akin Pinocchio's growing nose), the existence of typically small differences between truth tellers and liars, and the fact that liars actively try to appear credible contribute to making lie detection a difficult task. Other factors that add to difficulty is that lies are often embedded in truths, that lie detectors often do not receive adequate feedback about their judgments and therefore cannot learn from their mistakes, and that some methods to detect lies violate conversation rules and are therefore difficult to apply in real life. The final factor to be discussed in this category is that some people are just very good liars.*

*The common errors lie detectors make that we have identified are examining the wrong cues (in part, because professionals are taught these wrong cues); placing too great an emphasis on nonverbal cues (in part, because training encourages such emphasis); tending to too-readily interpret certain behaviors, particularly signs of nervousness, as diagnostic of deception; placing too great an emphasis on simplistic rules of thumb; and neglecting inter- and intrapersonal differences. We also discuss two final errors: that many interview strategies advocated by police manuals can impair lie detection, and that professionals tend to overestimate their ability to detect deceit.*

*The second section of this article discusses opportunities for maximizing one's chances of detecting lies and elaborates strategies for improving one's lie-detection skills. Within this section, we first provide five recommendations for avoiding the common errors in detecting lies that we identified earlier in the article. Next, we discuss a relatively recent wave of innovative lie-detection research that goes one step further and introduces novel interview styles aimed at eliciting and enhancing verbal and nonverbal differences between liars and truth tellers by exploiting their different psychological states. In this part of the article, we encourage lie detectors to use an information-gathering approach rather than an accusatory approach and to ask liars questions that they have not anticipated. We also encourage lie detectors to ask temporal questions—questions related to the particular time the interviewee claims to have been at a certain location—when a scripted answer (e.g., "I went to the gym") is expected. For attempts to detect lying about opinions, we introduce the devil's advocate approach, in which investigators first ask interviewees to argue in favor of their personal view and then ask them to argue against their personal view. The technique is based on the principle that it is easier for people to come up with arguments in favor than against their personal view. For situations in which investigators possess potentially incriminating information about a suspect, the "strategic use of evidence" technique is introduced. In this technique, interviewees are encouraged to discuss their activities, including those related to the incriminating information, while being unaware that the interviewer possesses this information. The final technique we discuss is the "imposing cognitive load" approach. Here, the assumption is that lying is often more difficult than truth telling. Investigators could increase the differences in cognitive load that truth*

**Corresponding Author:**
Aldert Vrij, University of Portsmouth, Psychology Department, King Henry Building, King Henry I Street, Portsmouth, United Kingdom PO1 2DY
E-mail: aldert.vrij@port.ac.uk

*tellers and liars experience by introducing mentally taxing interventions that impose additional cognitive demand. If people normally require more cognitive resources to lie than to tell the truth, they will have fewer cognitive resources left over to address these mentally taxing interventions when lying than when truth telling. We discuss two ways to impose cognitive load on interviewees during interviews: asking them to tell their stories in reverse order and asking them to maintain eye contact with the interviewer.*

*We conclude the article by outlining future research directions. We argue that research is needed that examines (a) the differences between truth tellers and liars when they discuss their future activities (intentions) rather than their past activities, (b) lies told by actual suspects in high-stakes situations rather than by university students in laboratory settings, and (c) lies told by a group of suspects (networks) rather than individuals. An additional line of fruitful and important research is to examine the strategies used by truth tellers and liars when they are interviewed. As we will argue in the present article, effective lie-detection interview techniques take advantage of the distinctive psychological processes of truth tellers and liars, and obtaining insight into these processes is thus vital for developing effective lie-detection interview tools.*

## Introduction

"Deception entered Western thought in a telling guise when the author of *Genesis* placed a serpent in the Garden of Eden. By lying, the serpent enticed Eve into committing the original sin" (C.F. Bond & DePaulo, 2006, p. 214). Lying has always posed a moral problem. For example, St. Augustine believed that every lie is a sin, and Aristotle and Kant expressed similar views. In contrast, Machiavelli highly praised deceit in the service of self (Bok, 1989; C.F. Bond & DePaulo). The nature of lying is two-pronged, and how we feel about deception depends on the reason for telling the lie (Seiter, Bruschke, & Bai, 2002). Most lies are told for psychological reasons, and people do not feel bad about telling these kinds of lies. We do not relish having to express all of our thoughts (e.g., "I find that woman more attractive than my own partner.") and thus, we would rather lie. Instead of always showing our true selves, we prefer to censor ourselves so that we are perceived by others in a positive light. We tell psychological lies for a number of reasons: to protect ourselves, to avoid tension and conflict in social interactions, and to minimize hurt feelings and ill will (DePaulo, Kashy, Kirkendol, Wyer, & Epstein, 1996).

However, sometimes the situation is different, such as when people really would like to know the truth; these situations can arise during activities such as watching the evening news or interviewing a candidate for employment. For example, a viewer may want to know whether a politician's denial of involvement in a bribery scandal is really the truth; a teacher may want to know whether a student has cheated during the exam he or she aced; a mother may want to know whether her daughter really has finished her homework; the potential buyer of a used car wants to know whether the vehicle is really as

good as the salesperson says; an interviewer may want to know whether the candidate is indeed as capable as he or she claims; a customs officer may want to know whether the traveler really has nothing to declare; an airport security officer wants to know whether the passenger really has no harmful intent when entering the aircraft; and a police detective wants to know whether a suspect's alibi is reliable. Successfully detecting lies in situations such as these would benefit individuals and the society as a whole.

For centuries, the question of whether discernable differences exist between liars and truth tellers has interested practitioners and laypersons (Trovillo, 1939). Throughout history, people have assumed that lying is accompanied by physiological activity in the liar's body. For example, in 1000 B.C., the Chinese forced suspected liars to chew rice powder and then spit it out. If the resultant powder was dry, then the person was judged to have been lying (Kleinmuntz & Szucko, 1984). There was a physiological basis for this assumption. Liars were assumed to fear being caught, and fear is associated with decreased salivation and a dry mouth (Ford, 2006). Nowadays, technology is used to measure physiological (and neurological) reactions—particularly the polygraph; voice-stress analyzers; electroencephalograms (EEG); and most recently, functional magnetic resonance imaging (fMRI). The promotion of such tools can be aggressive. For example, companies have begun to offer fMRI deception-detection services to investigators. Two companies—Cephos Corporation in Massachusetts and No Lie MRI, Inc. in California—claim to know with at least 90% accuracy whether a subject is telling the truth (Stix, 2008). However, a very small number of published studies have examined brain function during deception, and such claims lack strong empirical foundation (Greely & Illes, 2007; Porter & ten Brinke, 2010; Spence, 2008; Wolpe, Foster, & Langleben, 2005). Specifically, Spence (2008) points to problems with replication, large individual brain differences, and no clear brain regions associated with truth telling. Also, brain activity when lying varies depending on the situation. Ganis, Kosslyn, Stose, Thompson, and Yurgelun-Todd (2003) found that telling spontaneous lies corresponds to activation in different brain areas than does telling rehearsed lies; feeling strongly about the topic under investigation and the negative consequences of getting caught also corresponds to different brain activity than feeling less strong.

In this article, we neither discuss physiological or neurological cues to deceit nor focus on lie-detection tools that use equipment. Rather, we focus on an individual's overt nonverbal behavior or speech that human perceivers can discern without the aid of equipment. Further, we address whether people can detect lies when observing someone's nonverbal behavior or when analyzing someone's speech. This technique—observation—is the most common form of lie detection; in many situations, technologies that are used to measure physiological or neurological cues are unavailable or are not possible to implement.

In our view, research on lie detection through observations of nonverbal and verbal cues is overdue. Scientific journals

regularly publish overviews of research articles regarding nonverbal and verbal cues of deception (for recent examples, see DePaulo et al., 2003; Masip, Sporer, Garrido, & Herrero, 2005; Sporer & Schwandt, 2006, 2007; Vrij, 2005). These meta-analyses provide valuable information about how liars behave and the stories they tell, but they offer no explicit guidance about what lie detectors should do and avoid doing in order to detect deception.

This article consists of two sections. The first section focuses on pitfalls to avoid and outlines the major factors that lead to failures in detecting liars: We cluster 16 reasons into three categories (Vrij, 2007, 2008a): (a) a lack of motivation to detect lies, (b) difficulties associated with lie detection, and (c) common errors made by lie detectors. Discussing pitfalls is important because it provides insight into how lie detectors can improve their performance (e.g., by recognizing common biases and by avoiding common judgment errors). The second section of this article discusses opportunities for maximizing one's chances of detecting lies and elaborates on strategies for improving one's lie-detection skills. In this section, we first provide five recommendations for avoiding common errors in detecting lies. These recommendations are firmly based in a rich body of psychological research over the past few decades. Next, we discuss a relatively recent wave of innovative lie-detection research that goes one step further by introducing novel interview styles aimed at eliciting and enhancing verbal and nonverbal differences between liars and truth tellers by exploiting their different psychological states. The recommendations are relevant in varied walks of life, from the individual level (e.g., "Is my partner really working late to meet a deadline?") to the societal level (e.g., "Can we trust this informant when he claims that he can disclose information about an active terrorist cell in London?").

Before we discuss the common pitfalls associated with lie detection, three issues merit attention: (a) a definition of *deception*, (b) the underlying premises of verbal and nonverbal cues to deception and its detection, and (c) research methods used in deception research.

Defining *deception* is not a straightforward task. Deception has been studied through the lens of varied disciplines, including psychiatry, linguistics, and philosophy; and accordingly, diverse definitions have been offered (Granhag & Strömwall, 2004). In the present context, we deem Vrij's (2008a, p. 15) definition of *deception* to be sufficient: "*a successful or unsuccessful attempt, without forewarning, to create in another a belief which the communicator considers to be untrue.*" It is important to note that lying is an intentional act and that misremembering is not the same as lying.

Researchers have proposed different theoretical approaches to predict which verbal and nonverbal cues to deception may occur, particularly Ekman and Friesen's (1969) leakage and deception cues approach; Zuckerman, DePaulo, and Rosenthal's (1981) multifactor model; Ekman's (1985/2001) emotion approach; Buller and Burgoon's (1996) interpersonal deception theory; and DePaulo's self-presentational perspective (DePaulo, 1992; DePaulo et al., 2003). These approaches

have three elements in common that have influenced verbal and nonverbal lie detection: the notion that, compared with truth tellers, liars (a) may experience stronger emotions (particularly fear, as a result of detection apprehension), (b) may experience higher levels of cognitive load, and (c) are inclined to use more and different strategies to make a convincing impression on others.

Traditionally, verbal and nonverbal lie detection has focused on the difference in emotions that liars and truth tellers experience. Ekman's (1985/2001) analysis of microexpressions is a prime example, but also lie-detection techniques promoted in police manuals are primarily based on the notion that liars are more concerned and nervous than truth tellers (Vrij & Granhag, 2007). The approach has limitations. First, experiencing emotions is not the sole domain of liars: Truth tellers can experience the same emotions, particularly if they know that they are scrutinized and/or are afraid of not being believed (e.g., see our later discussion of the Othello error). If emotional displays or cues of nervousness per se do not reliably distinguish between truth tellers and liars, the next step is to ask questions that will elicit such cues in liars but not in truth tellers or, alternatively, that will enhance such cues more in liars than in truth tellers. No such questioning technique exists to date, and it is doubtful that it can ever be developed (National Research Council, 2003). For the latter reason, in more recent lie-detection studies, researchers have concentrated on cognitive load. The premise here is that lying is mentally more taxing than truth telling. This approach shares one limitation with the emotion approach. Cues of cognitive load are not the sole domain of liars either; truth tellers also may have to think hard, and therefore they may display cues of being mentally taxed. However, unlike the emotion approach, interview protocols that elicit and enhance cues of cognitive load more in liars than in truth tellers can be developed, making it possible to discriminate between the two. We elaborate on this concept later in the "Exploiting the Differential Mental Processes of Truth Tellers and Liars" section. The same section also discusses another strain of recent lie-detection research that aims to exploit the fact that liars use more and different strategies to avoid detection than do truth tellers. In sum, in verbal and nonverbal lie detection, the emphasis has moved in recent years from emotion-based lie-detection techniques to cognitive-load lie-detection techniques that focus on liars' and truth tellers' different psychological states and take their differential strategies into account.

We base our analysis of pitfalls and opportunities in nonverbal and verbal lie detection on scientific research. In studies in which researchers have examined nonverbal and verbal cues to deception, trained raters watch video footage or analyze transcripts of such footage of truth tellers and liars. They analyze with particular coding systems the frequency of occurrence or duration of various nonverbal and verbal cues displayed by truth tellers and liars (e.g., all sorts of movements, eye contact, smiles, pauses, amount of detail, type of detail, contradictions) and compare the truthful and deceptive responses. There are two types of studies—those conducted in the field

and those conducted in the laboratory. In real-life studies, typically called "field studies," video footage of real-life settings, such as police–suspect interviews, is analyzed (Mann, Vrij, & Bull, 2002). In laboratory studies, video footage and/or transcripts of participants who were instructed by researchers to tell the truth or lie for the purpose of the experiment are analyzed. Field studies probably have greater appeal because they are realistic. However, conducting field studies is problematic, particularly in establishing the *ground truth*—researchers can analyze only the responses known to be true or false. To establish this ground truth satisfactorily, independent case facts, such as medical evidence, material evidence, DNA evidence, or reliable eyewitnesses, are needed. Unfortunately, such facts are often unavailable. In laboratory studies, researchers (a) ask participants (mostly college students) to tell the truth or lie and (b) measure their nonverbal and verbal responses during both activities. In the studies published to date, participants have told the truth or lied about many different topics—a film they had just seen, possession of a certain object in their pocket, their involvement in the disappearance of some money, the number of dots that appeared on a screen, their feelings about certain people, or their opinions about controversial issues. More recently, researchers have introduced scenarios that better reflect forensic real-life situations. In a study by Hartwig, Granhag, Strömwall, and Kronkvist (2006), participants were sent to a shop to buy a product (truth tellers) or steal a wallet (liars) and were interviewed about the alleged shop visit. In a study by Vrij, Leal, Mann, and Granhag (in press), participants were sent to receive a package at a certain location and deliver it somewhere else and were then interviewed about this mission (liars had to hide the details of what they did). In study by Strömwall, Granhag, and Jonsson (2003), participants (a) were sent to a restaurant to have lunch (truth tellers) or (b) committed a mock crime (liars) and were asked to pretend that they had had lunch in a restaurant. And in a study by Vrij, Granhag, Mann, and Leal (in press), passengers at an international airport were asked to tell the truth or lie about their forthcoming trip. The advantage of laboratory studies is that researchers can establish the ground truth. However, laboratory studies have limitations. In such studies, participants do not choose to lie, but rather they are instructed to do so by the experimenter, meaning that lying is condoned. Another restriction is that the stakes (negative consequences of being caught or positive consequences of being believed) are never really high (Ekman, 1985/2001; Malone & DePaulo, 2001; Miller & Stiff, 1993). To raise the stakes in laboratory experiments, participants have been offered money if they succeed in lying (Vrij, Akehurst, Soukara, & Bull, 2002; Vrij, Edward, & Bull, 2001). In other studies, participants are told that they will be observed by their peers, who will judge their sincerity (DePaulo, Stone, & Lassiter, 1985), or told that being a good liar is an important indicator of being successful in a future career (DePaulo, Lanier, & Davis, 1983). Such studies provide useful examples of how people behave when they lie in daily life, because most of the lies people tell are low-stakes lies (DePaulo et al., 1996).

However, suspects in police interviews, smugglers at airports, corrupt politicians in conversations with suspicious journalists, and husbands who cheat on their wives all tell high-stakes lies. In an attempt to create examples of such lies, some researchers have raised the stakes further in laboratory studies. For example, participants in Frank and Ekman's (1997) experiment were given the opportunity to "steal" US $50. If they could convince the interviewer that they had not taken the money, they could keep all of it. If they took the money and the interviewer judged them as lying, they had to return the US $50 and they would also lose their US $10-per-hour participation fee. Moreover, some participants faced an additional punishment if they were found to be lying. They were told that they would have to sit on a cold, metal chair inside a cramped, darkened room ominously labeled "XXX," where they would have to endure anything from 10 to 40 randomly sequenced 110-decibel starting blasts of white noise over the course of 1 hour.

A study such as the one just mentioned raises ethical concerns. Yet, even apart from this concern, one might argue that the stakes in such a study do not compete with the stakes in some real-life situations. Providing even larger incentives to participants is always possible. For example, participants in Frank and Ekman's (1997) study could have been offered US $500 instead of US $50 if they succeed in convincing the interviewer that they are telling the truth. Introducing severe punishments for those who fail to convince the interviewer that they are telling the truth is, however, not possible, because university ethics committees will not approve such experiments. Also, punishments are never realistic, and participants may be aware of it. Ethical guidelines require researchers to inform participants before participation that they are free to withdraw from the study at any time. Hence, when participants are threatened with having to enter a dark room to face white noise for 1 hour, as in Frank and Ekman's study, they will realize that they are actually free to leave. In other words, it may not be possible to introduce truly high-stakes settings in laboratory experiments, and thus, examining how liars behave in high-stake real-life situations is often the only option (Barrett, 2005; Riggio, 1994).

In a typical lie-detection study, observers (often undergraduate students, but sometimes professionals such as police officers or police detectives) are shown short video fragments of people they do not know who are either telling the truth or lying. The fragments the observers have to judge are typically derived from the studies that have been discussed in the previous paragraph. The observers are asked to indicate after each fragment whether the person (often called the *sender*) was telling the truth or lying. Typically, half of the senders are truth tellers, and half are liars. (The observers are typically not informed what percentage will be truth tellers and liars, because this may result in them deliberately trying to achieve an equal number of truth and lie responses.) In such a study, simply guessing whether the sender spoke the truth or lied would result in correctly classifying 50% of the truths (truth accuracy rate) and 50% of the lies (lie accuracy rate),

resulting in a total accuracy rate (truth and lie accuracy rate combined) of 50%.

In lie-detection studies, observers are typically not given any background information about the senders and their statements, so the only source of information available to them is the senders' nonverbal and verbal behavior. (Exceptions are the "Strategic Use of Evidence" studies, which are discussed later in this article.) Such a situation is not typical of lie-detection in real life. In their study, Park, Levine, McCornack, Morrisson, and Ferrara (2002) asked college students (a) to recall an instance in their life in which they had detected that another person had lied to them and (b) to report how they had discovered the lie. Participants detected less than 2% of the lies by relying exclusively on the liars' nonverbal behavior or speech content at the time the lies were told. More commonly, participants discovered the lies through information from third parties (38%), physical evidence (23%), and confessions (14%). More than 80% of the lies were detected 1 hour or more after they were told, and 40% were detected more than a week later.

## Pitfalls in Lie Detection

### Lack of motivation to catch liars: The ostrich effect

Lies often remain undetected because people do not attempt to uncover the truth (Ekman, 1985/2001), a phenomenon labeled the *ostrich effect* (Vrij, 2008a). A fabrication might sometimes be more tolerable or pleasant than the truth for the message recipient, rendering ignorance the preferred option. For example, why bother trying to discover whether mendacious compliments about one's body shape, hairstyle, dress sense, or achievements are truthful?

For this reason, the ostrich effect extends to more serious lies, which thus also remain undiscovered. For example, Betty Currie, who was former U.S. President Bill Clinton's secretary, tried to avoid learning details of the relationship between the President and Monica Lewinsky (Vrij, 2008a). Indeed, rather than gain anything from knowing the truth, she would have been put in the difficult position of having to decide what to do with such knowledge. Not knowing what to do when having learned the truth may also be the reason why some people overlook evidence for possible infidelity by their romantic partners, instead remaining in denial (Feldman & Cauffman, 1999). If an individual discovers that his or her partner is having an affair, this discovery could create a difficult situation for the betrayed spouse. For example, there is the risk of the cheating partner leaving the betrayed spouse if confronted with the evidence. If they also have children, the betrayed spouse may feel that marital dissolution is undesirable because of its effect on their children. In such situations, it is worthwhile to engage defense mechanisms such as denial in order to avoid acknowledging the truth. In brief, even though the solution may be worse than the problem, ignorance can be bliss.

### Difficulty of lie detection: Absence of Pinocchio's growing nose

In the classic tale *The Adventures of Pinocchio*, Pinocchio's nose grew larger each time he lied, but it was unaltered each time he spoke the truth, so his growing nose was a reliable cue to deceit. The meta-analyses that have been published to date have made clear that there are no nonverbal and verbal cues uniquely related to deceit. In other words, reliable cues to deception akin to Pinocchio's growing nose do not exist (DePaulo et al., 2003; Masip et al., 2005; Sporer & Schwandt, 2006, 2007; Vrij, 2005). The fact that there is no single cue that lie detectors can consistently rely upon makes lie detection inherently difficult.

The meta-analyses further reveal that the majority of the nonverbal and verbal cues that researchers typically examine in deception studies are not related to deception at all. For example, in DePaulo et al.'s (2003) meta-analysis—the most extensive one to date—the researchers investigated 158 cues, of which 118 (75%) showed no association with deception at all (including cues people often associated with lying, such as gaze aversion, postural shifts, pauses, and self-references). Many cues that were found to be to some extent related to deception were often examined sporadically, and it is important for researchers to replicate those cues' diagnostic value before drawing conclusions.

### Subtle differences

Another difficulty that lie detectors face is that any behavioral differences between truth tellers and liars are typically small. For example, in DePaulo et al.'s (2003) meta-analysis, 14 of the 50 (28%) cues that had been examined in six or more deception studies revealed a significant association with deception, including liars who provided fewer details and less plausible answers than did truth tellers, and liars who made fewer illustrators (i.e., hand movements that accompany speech and illustrate it) than did truth tellers. However, the average effect size of the relation of the various behaviors with deception was only $d = .25$, which is considered to be a small or modest effect (Cohen, 1977). Because these relationships are modest, police manuals that describe nonverbal and verbal cues of deceit are misleading. Although such manuals often offer brief warnings about the unreliability of cues to deception, those caveats are easily lost in the ensuing detailed and enthusiastic descriptions of how behavior and speech differs between truth tellers and liars (see also Moston, 1992). Those descriptions are sometimes accompanied by photographs demonstrating "truthful forward posture" and "deceptive adaptor behaviors" (Inbau, Reid, Buckley, & Jayne, 2001, pp. 145, 149), thereby suggesting that (a) reliable cues to deception do exist and (b) the differences between truth tellers and liars are substantial and therefore easy to spot. Nevertheless, no scientific research supports these promises: Cues to deception are generally unreliable and faint.

The fact that cues to deception are unreliable and faint aligns with the previous contention that *emotions* and *cognitive load*—two main indicators of deception—can be displayed by both liars and truth tellers. A more promising picture may emerge when interviewers attempt to elicit and enhance cues to deceit. Such studies—discussed later in this article—are scarce and have only recently been conducted; in fact, none of these were published before 2003, the year that DePaulo et al.'s meta-analyses was published.

## Countermeasures

A further complication for lie detectors is that liars—particularly those communicating high-stakes lies—often deliberately attempt to appear credible in order to avoid detection; strategies to achieve this goal are called *countermeasures*. A verbal veracity assessment tool widely used by professional lie catchers is statement validity assessment. Statement validity assessments are accepted as evidence in some North American courts (Ruby & Brigham, 1997) and in criminal courts in several West European countries, including Austria, Germany, Sweden, Switzerland, and The Netherlands (Köhnken, 2002, 2004). The statement validity assessment originates from Sweden (Trankell, 1972) and Germany (Arntzen, 1970, 1982, 1983; Undeutsch, 1967, 1982, 1984, 1989) and has been designed to determine the credibility of child witnesses' testimonies in trials for sexual offenses. The core phase of the statement validity assessment is criteria-based content analysis, a list of 19 criteria thought to be more present in truthful accounts than in false ones (including mentioning space and time, replication of conversation, recall of interactions, unexpected complications, and accounts of mental state; for recent statement validity assessment reviews, see Vrij, 2005, 2008a). However, children (and adults) who learn how criteria-based content analysis works can tell stories that sound plausible to experts in using such analysis (Caso, Vrij, Mann, & de Leo, 2006; Joffe & Yuille, 1992; Vrij et al., 2002, Vrij, Akehurst, Soukara, & Bull, 2004b; Vrij, Kneller, & Mann, 2000). Thus, it is possible to become a "sophisticated" liar by using knowledge-based countermeasures.

Liars may further realize that observers pay attention to their behavioral reactions to ascertain their truthfulness. Liars therefore may attempt to control behavior that could betray their lies (Buller & Burgoon, 1996; Burgoon & Buller, 1994; Burgoon, Buller, Floyd, & Grandpre, 1996; Burgoon, Buller, White, Afifi, & Buslig, 1999; Krauss, 1981). In particular, they may avoid exhibiting behaviors they believe will create a dishonest impression, instead trying to display behaviors they believe will make them appear credible (Hocking & Leathers, 1980; Leary & Kowalski, 1990). Gaze aversion and grooming gestures are among the behaviors most widely believed to signal deceptive behavior (see subsequent section), and liars therefore may avoid displaying them. They appear to be successful in avoiding displaying them because gaze aversion and grooming gestures are unrelated to deception (DePaulo et al., 2003).

## Embedded lies

Another difficulty that lie detectors face is that lies are often embedded in truths. That is, rather than telling a blatant lie that is entirely untruthful, liars tend more to change specific vital details in an otherwise truthful story. Thus, when a man wants to conceal his illicit activities on, say, a Tuesday night, he could give details of what he really did on Monday night. Thus, most of the statement is truthful, with only a tiny, but vital, lie (e.g., having committed infidelity or murder) embedded (in this case, by omission or denial). Criminal suspects often tell such embedded lies (see Hartwig, Granhag, & Strömwall, 2007; Porter & Yuille, 1995; Strömwall, Granhag, & Landström, 2007). In a similar vein, when examining false identities adopted by criminals, Wang, Chen, and Atabakhsh (2004) found that such fraudsters typically alter only a small portion of their original identity.

Noncriminals who lie often use a similar embedded-lies strategy (DePaulo et al., 2003; Turner, Edgley, & Olmstead, 1975); this has also been demonstrated in experimental research. For example, in Bell and DePaulo's (1996) experiment, art students asked participants their views on a student's work. When the participants disliked the work, they sometimes overstated the specific elements they favored (e.g., the colors used in the painting) and understated what they disliked. In this lie strategy, most of what the participants said was truthful.

Embedded lies hamper the use of statement validity assessments and other verbal veracity assessment tools such as reality monitoring, because they typically examine the quantity and quality of details in a statement (Masip et al., 2005; Vrij, 2005). Lies that are embedded in predominantly truthful statements may be rich in high-quality details typically associated with credible statements, which could give the lie detector the erroneous impression that the statement is truthful. Lie detectors who focus on nonverbal behavior may make a similar mistake if the deceptive element of a liar's story remains unnoticed (e.g., *when* the person went to the gym) and if they overattend the truthful part instead (e.g., *what* the person did at the gym).

## No adequate feedback

Another complication in lie detection is that lie detectors often do not receive adequate feedback about their judgments and therefore cannot learn from their mistakes. For feedback to be helpful, it should be provided frequently, reliably, and immediately. Thus, observers should be informed immediately after every interaction with another person whether that person was lying. They could then learn how liars truly behave and what they really say and incorporate such knowledge into improved lie-catching strategies. However, adequate feedback is often unavailable (DePaulo & Kirkendol, 1989). People often never discover that they have been lied to, or such knowledge is gained long after the interaction (Park et al., 2002). In many cases of wrongful conviction, the police and/or judge only find out their credibility assessment errors years or decades after they occur. By the time they learn that they

attributed honesty to a deceptive person or vice versa, it is too late for them to make meaningful changes to their decision-making strategies.

Customs officers also face feedback problems (DePaulo & Pfeifer, 1986). Part of their jobs is to detect smugglers among travelers. From the numerous passengers they decide not to search, they virtually get no feedback at all. Some of them may be smugglers, but once the officers let them pass unsearched, they will almost never find out that they made a mistake. They may not even get adequate feedback from the people they do search. Among the latter may be smugglers whose illegal goods remain undetected despite a search.

### Violation of conversation rules

As we show in the "Exploiting the Different Mental Processes of Truth Tellers and Liars" section of this review, the act of lying becomes increasingly difficult when the lie detector asks further probing questions that follow an initial free recall by the target (Toris & DePaulo, 1984; Vrij, 2008a).[1] However, probes in daily-life conversations can violate social norms, being seen as inappropriate, strange, or impolite. Conversation partners may object to requests such as "Could you elaborate on that?" and "Could you repeat what you just said?" and may even end the conversation.

Further, although focusing on a speaker's body movements could benefit the lie detector because the speaker may reveal signs of deceit (DePaulo et al., 2003; Sporer & Schwandt, 2007), such movement scanning would seem strange and inappropriate in daily-life situations. Conversation rules dictate that a listener should look into a speaker's eyes, but the eyes themselves generally do not reveal reliable information about deception (DePaulo et al.; Sporer & Schwandt). Therefore, these conversation rules (i.e., discourage probing questions and maintain eye gaze) can hamper lie detection.

### Good liars

A final factor contributing to the complexity of lie detection is that some people are proficient liars. Although surprisingly little research has addressed the features of a good liar, we believe six features may be especially important. The best liars are those individuals (a) whose natural behavior disarms suspicion; (b) who do not find it cognitively difficult to lie; (c) who do not experience emotions such as fear, guilt, or delight when they are lying; (d) who are good actors and who display a seemingly honest demeanor; (e) whose attractiveness may lead to an inference of virtue and honesty; and/or (f) who are "good psychologists."

Regarding the first feature of the proficient deceiver—natural behavior—certain behavioral patterns are associated with honesty and likability. Such behavioral patterns include gaze directed to a conversation partner, smiling, head nodding, leaning forward, direct body orientation, posture mirroring, uncrossed arms, articulate gesturing, moderate speaking rates, a lack of "ums" and "ers," and vocal variety (Buller & Aune, 1988; Ekman, 1985/2001; Tickle-Degnen & Rosenthal, 1990). Some people show such demeanor naturally even when they are lying (e.g., *natural performers*; Ekman, 1997). Natural performers are likely to be good liars because their natural behavior is likely to allay suspicion. Former U.S. President Bill Clinton was blessed with this characteristic, being naturally warm and engaging, and he was able to tell lies that were highly convincing to his audience. To illustrate, he received a standing ovation in response to his assertive denial of having sexual relations with Monica Lewinsky.

Second, effective liars find the act of telling lies to be cognitively unchallenging. They may plan their statements and behavior well in advance of the lie, and this rehearsal probably facilitates the ease of deception. Although it is obvious that liars should prepare a story that sounds plausible, this task is difficult for many people. Vrij and Mann (2001b) described five cases in which people who were suspected of having killed one of their relatives and initially denied having done so. Some of the individuals described made serious mistakes when they planned their stories, which made it easy to discern that they probably were hiding the truth. For example, one individual reported being knocked unconscious for 10 hours, but medical professionals determined that this scenario was impossible. Even liars who are typically well prepared can face unexpected situations that require an explanation. For example, a wife may confront her husband with the telephone number and address of a woman—unknown to her—that she found in his pocket; or a police detective may tell a suspect that he was seen by a witness at the scene of crime directly after it occurred. To lie successfully in these or similar situations, the liar needs a convincing and plausible answer. To spontaneously invent a plausible answer is probably too difficult for many liars, but original thinkers who are mentally creative may be successful in dealing with such immediate cognitive demands.

Third, liars differ in the emotions they experience while communicating a lie. One job applicant may feel guilty or anxious when exaggerating his or her qualifications, whereas another may not. One suspect may experience extreme anxiety when presenting a false alibi, whereas another suspect may remain calm. One student may feel excitement when sensing that the teacher believes his or her excuse for being late (referred to as *duping delight*), whereas another may feel trepidation and guilt. Deceiving others is made easier if the liar does not experience feelings of guilt, fear, or delight, because in that case, no emotional behavior needs to be suppressed. An absence of emotions during deception can be related to (a) an absence of remorse concerning a specific incident (e.g., defrauding a wealthy corporation), (b) being practiced at and feeling confident when lying, or (c) a lack of emotion in general. Psychopathic individuals, for example, have a profound emotional impairment and, accordingly, they experience little fear or remorse, even when telling a high-stakes lie (e.g., Hare, 2006; Porter & Woodworth, 2007). Moreover, people with a powerful imagination and the capacity to believe what they are saying are unlikely to experience guilt or fear. Sometimes such people can come to develop a false belief in their original lies

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 220 of 245

after the passage of time and are thus not, strictly speaking, lying (e.g., Pickel, 2004).

Fourth, although natural performers and those who experience little cognitive load or emotions when lying make the best liars, those who can effectively mask signs of cognitive load and emotions and concurrently display behavior that appears credible probably also make good liars. This feat requires good acting skills. If such individuals are not natural performers, their lies may raise suspicion, and they should adapt themselves adequately to disarm this suspicion. The sooner they adapt themselves, the more chance they have of successfully disarming suspicion. It is thus crucial to notice suspicion quickly, which requires good decoding skills.

Fifth, elements of physical appearance can promote effective lying. For example, attractiveness and characteristics of faces can lead to inferences of trustworthiness that facilitate the liar's success (e.g., Porter, England, Juodis, ten Brinke, & Wilson, 2008; Porter, Gustaw, & ten Brinke, 2010).

Last, good liars probably also have good insight into another person's thought processes. They have a sense of what other people want to hear and how to convey it persuasively. In that respect, successful lying could be related to emotional intelligence. However, we are not aware of research that has examined this phenomenon (for in-depth discussions of factors that make people good liars, see Vrij, 2008a; Vrij, Granhag, & Mann, in press).

## Common Errors Made by Lie Detectors

People fail to catch liars not only because they are unmotivated to catch them or because the lie-detection task is difficult but also because they make systematic errors in the evaluation process. We believe that eight common errors can be identified, which we examine in this section.

### *Examining the wrong cues*

There are widespread beliefs about how people behave and what they say when they lie. Overwhelmingly, both laypersons and professional lie catchers expect liars to act nervously; exhibiting gaze aversion ("liars look away") and displaying grooming gestures ("liars fidget") are among the most popular beliefs (Strömwall, Granhag, & Hartwig, 2004; Taylor & Hick, 2007; The Global Deception Team, 2006; Vrij, 2008a; Vrij, Akehurst, & Knight, 2006).[2] Charles F. Bond conducted an ambitious "beliefs about cues to deception" project that he published under the name *The Global Deception Team*. The team consisted of an international group of researchers from 58 countries, each collecting data from 20 male and 20 female adult residents of his or her country. The participants were asked to write down their response to the question, "How can you tell when people are lying?" The respondents mentioned 103 different beliefs, 9 of which were given by more than 15% of the participants. One cue in particular was prevalent: gaze aversion. People overwhelmingly asserted that liars avert their gaze, and 64% of the participants expressed this belief. Gaze aversion was the most frequently mentioned belief about deception behavior in 51 out of 58 countries. Gaze aversion showed the lowest prevalence in the United Arab Emirates, where it was mentioned by 20% of the participants, making it the eighth most prevalent belief in that country.

Despite their overwhelming endorsement internationally, cues such as gaze aversion and grooming gestures are not reliable cues to deception (DePaulo et al., 2003; Sporer & Schwandt, 2007). Nonetheless, police and other legal professionals are encouraged to use such incorrect cues in detecting lies (Johnson, 2006a, 2006b). For example, in their influential police manual, Inbau et al. (2001) [3] advocated several nonverbal cues as being diagnostic of deception, including avoiding eye contact and grooming gestures, as well as cues such as frequent posture changes, placing hands over mouth or eyes, and lack of illustrators. Of these cues, only a decrease in illustrators has been found empirically to be associated with deception (e.g., DePaulo et al.). Thus, it is not surprising that, in a lie-detection study in which police officers viewed video fragments of suspects telling the truth or lying during their interviews, there was an inverse relation between (a) the endorsement of the lie cues promoted in the Inbau et al. manual and (b) the ability to distinguish suspects' truths and lies (Mann, Vrij, & Bull, 2004). In another study, college students who had been trained in the behavioral cues described by Inbau et al. performed worse on a subsequent lie-detection test than did untrained participants (Kassin & Fong, 1999). Police manuals often advise investigators to pay attention to signs of nervousness when attempting to detect deceit (Vrij & Granhag, 2007), advice that could easily lead to Othello errors (see subsequent section).

How do such false beliefs about lying develop? One likely contributing factor is moral reasoning. The stereotypical but sometimes incorrect view is that lying is "bad" (Backbier, Hoogstraten, & Meerum Terwogt-Kouwenhoven, 1997; Bok, 1989; DePaulo, 2004; DePaulo et al., 1996; Kowalski, Walker, Wilkinson, Queen, & Sharp, 2003; Robinson, 1994; Schweitzer, Hershey, & Bradlow, 2006). C.F. Bond argued that the prominent lying/gaze-aversion myth fits well with this lying-is-bad stereotype (The Global Deception Team, 2006). Because people often avert their gaze when they feel ashamed, they should do so, it is assumed, when engaging in the reprehensible act of lying (DePaulo et al., 2003). Moreover, because lying is bad, liars should feel nervous about the potential for getting caught, and they should exhibit signs of anxiety such as avoiding eye contact, increased fidgeting, and moving around. Because the association of lying and immorality is taught early in life, children as young as 5 to 6 years of age already associate gaze aversion and limb movements with deception (Rotenberg & Sullivan, 2003).

After such stereotypical beliefs are established, they persist for several reasons, including *illusory correlations*, or the perception of associations that do not exist, develop, strengthen, and cause observers to distort their information processing. For example, in Levine, Asada, and Park's (2006) intriguing experiment, observers who were led to believe that someone

was lying subsequently overestimated the amount of gaze aversion that the supposed liar had actually displayed. A second factor is the phenomenon of *confirmation bias*, a tendency to seek information that confirms existing beliefs (Darley & Gross, 1983); in this case, overattending to observations supposedly validates the relation between lying and gaze aversion/nervousness. Third, when people make observations that could disconfirm a false belief, they often disregard or downplay it instead of interpreting the new evidence properly, a phenomenon called *belief perseverance* (C.A. Anderson, Lepper, & Ross, 1980). Researchers have found such phenomena to influence flawed deception detection and evaluation of evidence in legal cases more generally (Porter, Gustaw, & ten Brinke, 2010). Fourth, after observers form a strong opinion that makes sense to them, they often create further reasons to support their view (Strömwall et al., 2004). In fact, an opinion is often strengthened by merely thinking about the topic (Tesser, 1978). Fifth, as previously mentioned, people typically receive inadequate feedback about the validity of their lie-detection judgments, disallowing effective learning and improvements with experience. Ironically, effective learning opportunities may be available to seasoned criminal offenders more so than to legal decision makers. Offenders probably need to lie frequently and effectively in order to succeed in their criminal careers (e.g., Porter & Woodworth, 2007), and they receive frequent and often immediate feedback on whether their attempts to lie are successful. Accordingly, offenders have more correct views about cues to deception than do laypersons and professional lie catchers (Strömwall et al., 2004; Vrij & Semin, 1996). For example, the erroneous stereotypical view that liars increase their movements is not common among offenders (Vrij & Semin).

The combination of how incorrect beliefs originate and why they last could explain the advocacy of such beliefs in many police manuals. These views are based on subjective impressions about verbal and nonverbal behavior displayed by suspects during police interviews rather than on empirical research. Psychological research and theory suggest that these impressions can easily become distorted. Our advice to authors of police manuals, therefore, is to base their writing on science and not subjective impressions.

## Overemphasis on nonverbal cues

In a minority of cases, observers rely on speech content when they attempt to detect deceit. This may occur for example with observers who are knowledgeable about the facts that are discussed by the target person. In such cases, the observer typically focuses on the narrative and compares his or her knowledge with the story the target person provides (e.g., Reinhard, Sporer, & Marksteiner, 2009). Second, observers occasionally have access to more than one statement—multiple statements from the same person or statements from different people—and thus focus on the level of consistency between the statements (Granhag & Strömwall, 1999, 2000a, 2000b, 2001; Strömwall & Granhag, 2005, 2007; Strömwall, Granhag, & Jonsson, 2003). Also, observers may rely on verbal cues when they are distinctive, particularly when a statement appears to be against the self-interest of the storyteller (Noller, 1985), such as a confession.

When the observer possesses no factual information, has no statements for comparison, and when the speech content is not distinctive, observers are inclined to pay greater attention to nonverbal behavior than to verbal behavior. For example, Mann et al. (2004) showed 99 British police officers 54 videotaped fragments of police interviews with individuals who were suspected of rape, arson, or murder. The officers were asked to make veracity judgments following each fragment and to report the cues on which they based their decisions. The majority of the cues reported (78%) were nonverbal (also see Porter, Woodworth, & Birt, 2000). Also, when observers notice that someone's nonverbal behavior and speech content are discrepant, they typically rely on the nonverbal channel. For example, a job applicant with a reserved demeanor who claims to be enthusiastic about the job will be perceived as less keen about it than he or she reports (DePaulo, Rosenthal, Eisenstat, Rogers, & Finkelstein, 1978; Hale & Stiff, 1990; Zuckerman, Driver, & Koestner, 1982; Zuckerman, Speigel, DePaulo, & Rosenthal, 1982).

Lie detectors pay so much attention to nonverbal behavior for several reasons. First, people are used to making inferences from nonverbal behavior, including facial expressions. By observing behavior alone, people draw, with reasonable accuracy, many conclusions about other people, including their personality traits (e.g., extraversion, sociability), masculinity, femininity, or sexual orientation. From behavior, it is also possible to discern information about status, dominance, romantic involvement, and relationship potential (Ambady, Bernieri, & Richeson, 2000), and women are able to accurately rate men's interest in infants based only on viewing their faces (Roney, Hanson, Durante, & Maestripieri, 2006). Observing only 5 seconds of a stranger's behavior can result in reasonably reliable inference of psychopathic personality, characterized by callousness, manipulation, and persistent antisocial behavior (Fowler, Lilienfeld, & Patrick, 2009). Observers may even be unaware of the specific nonverbal behavior that guides their evaluations of credibility. In the Canadian case *R. v. Lifchus* (1997), Justice Cory noted:

> It may be that the juror is unable to point to the precise aspect of the witness's demeanor which was found to be suspicious... A juror should not be made to feel that the overall, perhaps intangible, effect of a witness's demeanor cannot be taken into consideration in the assessment of credibility.

Second, expectancies about the truthfulness of a person may influence the observer's attention. For example, analyses of police interviews in England showed that the police interviewers were "certain" of the suspect's guilt before interviewing him or her in 73% of the cases (Moston, Stephenson, & Williamson, 1992). Saul M. Kassin (2005, p. 216), who had asked numerous American police officers whether they are

concerned that their persuasive interrogation methods may evoke false confessions, reported that the most common reply is "No, because I do not interrogate innocent people." When lying is expected, police officers may have little interest in listening to a suspect's flat denials and prefer to look at bodily signs to confirm deceit (Millar & Millar, 1998).

Third, formulating and asking the best questions in some contexts, particularly suspect interviews, can be a cognitively taxing task. Concurrent attempts to detect deceit during these interviews may further increase the cognitive demands on the interviewers (Patterson, 1995, 2006). Accordingly, interviewers may be inclined to detect deceit via nonverbal channels, because the processing of nonverbal cues requires fewer cognitive resources than the processing of verbal cues (Reinhard & Sporer, 2008).

Fourth, the preference for nonverbal behaviors as indicators of deception may result from training, which encourages such an emphasis. For example, police training manuals place greater emphasis on nonverbal cues than on speech-content cues as cues to deceit (for a review of visual cues mentioned in police manuals, see Vrij & Granhag, 2007). This nonverbal dominance is further emphasized with explicit statements. For example, Inbau et al. (2001) stated in their widely used training manual that "as much as 70 percent of a message communicated between persons occurs at the nonverbal level" (p. 143). Popular books by academics may also promote a reliance on nonverbal behaviors in catching liars. For example, in Paul Ekman's (1985/2001) book *Telling Lies: Clues to Deceit in the Marketplace, Politics and Marriage*, there is much greater attention to nonverbal cues of deception than to speech-related ones. Although this was probably justified when the first edition of the book was published in 1985, the past 25 years have witnessed the generation of a large body of speech-related deception research, particularly concerning criteria-based content analysis (for reviews, see Vrij, 2005, 2008a) and reality monitoring (for reviews, see Masip et al., 2005; Sporer, 2004; Vrij, 2008a).

This overemphasis on nonverbal cues to deception is problematic. Meta-analyses of verbal and nonverbal cues of deception have shown that many speech-related cues are more diagnostic of deception than are nonverbal cues (DePaulo et al., 2003; Vrij, 2008a). In addition, observers who pay sole attention to nonverbal cues are less accurate in discriminating truths and lies than are those who consider speech content (C.F. Bond & DePaulo, 2006; Burgoon, Blair, & Strom, 2008; Lindholm, 2008). In addition, paying attention to visual cues may encourage a lie bias, or tendency to judge someone to be a liar (C.F. Bond & DePaulo). An explanation for this is that people have stereotypical beliefs about the behavior of liars (e.g., gaze aversion, fidgeting) rather than of truth tellers (The Global Deception Team, 2006; Strömwall et al., 2004; Vrij et al., 2006). In other words, people can judge deception based on the presence of some cues, but they need to judge truthfulness based on the absence of some cues. People normally respond to the presence of a signal rather than to the absence of a signal. A lie bias heightens the risk of false suspicion, even conviction, of innocent suspects (Kassin, 2008a, 2008b; Kassin, Appleby, & Torkildson-Perillo, 2010; Kassin & Gudjonsson, 2004).

## The Othello error

A common error in lie detection is to too readily interpret certain behaviors, particularly signs of nervousness, as diagnostic of deception. A common mistake for lie detectors is the failure to consider that truth tellers (e.g., an innocent suspect or defendant) can be as nervous as liars. Truth tellers can be nervous as a result of being accused of wrongdoing or as a result of fear of not being believed, because they too could face negative consequences if they are not believed (C.F. Bond & Fahey, 1987; Ofshe & Leo, 1997). The misinterpretation of signs of nervousness in truth tellers as signs of deceit is referred to as the *Othello error* by deception researchers (Ekman, 1985/2001), based on Shakespeare's character. Othello falsely accuses his wife Desdemona of infidelity, and he tells her to confess because he is going to kill her for her treachery. When Desdemona asks Othello to summon Cassio (her alleged lover) so that he can testify her innocence, Othello tells her that he has already murdered Cassio. Realizing that she cannot prove her innocence, Desdemona reacts with an emotional outburst, which Othello misinterprets as a sign of her infidelity. The Othello error is particularly problematic in attempting to identify high-stakes lies because of the observer's sense of urgency and a host of powerful cognitive biases that contribute to tunnel-vision decision making (see Porter & ten Brinke, 2009).

## The use of heuristics

Instead of carefully scrutinizing someone's responses in evaluating his or her credibility, observers may rely on general decision rules (Fiedler & Walka, 1993). Person-perception researchers have observed that this can be an effective way for observers with limited time and attentional resources to deal with complex environments or demands (Albrechtsen, Meissner, & Susa, 2009; Macrae & Bodenhausen, 2001). However, general decision rules, or *heuristics*, can easily lead to systematic errors in decision making (Burgoon et al., 2008).

In the subsequent section, we review some heuristics that may lead to systematic errors when trying to detect deception. It should be noted, however, that there is a relatively recent wave of research that has challenged the view that relying on heuristics is necessarily bad. For example, since the mid-1990s, research has provided empirical support that the use of certain heuristics in certain contexts leads to effective, accurate decisions (Gigerenzer, Todd, & the ABC Research Group, 1999). Detecting deception can be a complex endeavor. Sometimes, observers have little time or information to formulate an informed decision, and they must rely on heuristics (consider, for example, a bank clerk confronted by a robber with one hand in his or her pocket and claiming to have a gun). The question then is *which* heuristics to use and which to avoid. Deception researchers have focused considerable attention on

problematic heuristics but little on potentially effective heuristics.

Several heuristics that are commonly used in assessing credibility can be identified. Because people encounter more truthful than deceptive messages in their daily lives, they assume that most behavior that they encounter is associated with honesty (i.e., the *availability heuristic*, O'Sullivan, Ekman, & Friesen, 1988), in stark contrast with the bias evidenced by police officers. A related heuristic is the *anchoring heuristic* (Elaad, 2003), referring to the tendency to make insufficient adjustments from an initial value or assessment (the anchor) resulting in a final decision that is biased toward this value. Thus, if observers are preoccupied in thinking that someone is telling the truth, they will make insufficient adjustments when contrasting evidence emerges. It has further been argued that as romantic relationships become more intimate, partners develop a strong tendency to judge the other as truthful, the so-called *relational truth-bias heuristic* (D.E. Anderson, Ansfield, & DePaulo, 1999; Stiff, Kim, & Ramesh, 1992). An opposite anchoring problem has been observed in the legal system. According to dangerous decisions theory (Porter, Gustaw, et al., 2010; Porter & ten Brinke, 2009), the reading of a suspect's or defendant's face and emotional expressions (the anchor) plays a powerful role in influencing decisions concerning his or her honesty. This theory predicts that the human brain makes instantaneous inferences about trustworthiness that influence various aspects of interpersonal evaluation, including those about credibility and culpability. For example, jurors make strong but often inaccurate intuitive judgments of a defendant's general trustworthiness quickly upon seeing his or her face for the first time, with this initial intuitive assessment having a substantial influence on the manner in which the credibility of ensuing information from and about the individual is interpreted (Bar, Neta, & Linz, 2006; Porter et al., 2008; Todorov, 2008).

The *probing heuristic* (Levine & McCornack, 1996a, 1996b, 2001) refers to observers' tendency to believe a source more after the source has been probed. Guided by the belief that probing is an effective lie-detection strategy, the source is more likely to be believed if probing does not result in clear signs of deceit (and it often will not). The *representativeness heuristic* (Stiff et al., 1989) refers to the tendency to evaluate a particular reaction as an example of a broader category. In the present context, it could explain people's inclination to interpret nervous behaviors as signs of deceit. The *consistency heuristic* refers to the tendency to judge consecutive consistent statements as being truthful and consecutive statements that are inconsistent as being deceptive (Granhag & Strömwall, 2000a, 200b). The *expectancy violation heuristic* (Vrij, 2004) refers to the tendency to judge reactions that seem odd according to conversation norms and have a low base rate (e.g., keeping the eyes closed, or conversely, staring intently during a conversation) as being deceptive. According to the *falsifiability heuristic*, messages that that are easily falsifiable via reality checks appear less credible than messages that are not easily falsifiable, such as feelings, preferences, attitudes, and opinions (Fiedler & Walka, 1993).

The *facial appearance heuristic* (Vrij, 2004) refers to the tendency to judge people with attractive, symmetrical faces or baby-faced appearances as honest, and people with certain facial characteristics suggesting anger and unkindness as dishonest (Porter, England, Juodis, ten Brinke, & Wilson, 2008). Willis and Todorov (2006) found that observers infer the trustworthiness of others almost instantaneously upon seeing the face (100 milliseconds of exposure) and do so with a high level of confidence. Yet, Porter et al. (2008) found that observers were unable to discriminate philanthropists from felons featured in the television program *America's Most Wanted* despite believing that they "knew" who were the most and least trustworthy. Similarly, there are some faces that people agree look like that of a rapist, robber, or murderer (R. Bull & McAlpine, 1998; Dumas & Testé, 2006), which will influence the observer's assessment of honesty concerning the alleged offense.

The *visual cue primacy heuristic* (e.g., Burgoon et al., 2008; Stiff et al., 1989) refers to a tendency to assign primacy to visual information when attempting to detect deceit. Last, we add to this list the *single cue heuristic*, the oversimplified belief that all liars under all circumstances can be identified via single clear-cut cues. The belief that "liars look away" is probably the most popular example in this category (the *gaze aversion heuristic*; The Global Deception Team, 2006; Porter & ten Brinke, 2010).

### Neglect of interpersonal differences

Obviously, there are large individual differences in people's behavior and speech (DePaulo & Friedman, 1998). Some people typically make many movements, others do not; some people are eloquent, others are not; some people show large variations in physiological responses, others do not, and so on. Although verbal lie-detection tools such as statement validity assessments attempt to control for these interpersonal behavioral differences via a validity checklist (Vrij, 2005, 2008a), assessing the impact of these individual differences remains a difficult task. Take, for example, controlling for *susceptibility to suggestion*, one of the factors appearing on the checklist. Some interviewees are more prone to an interviewers' suggestions than are others. The danger of suggestibility is that a suggestible person may be inclined to provide information that confirms the interviewer's expectations but that, in fact, is inaccurate. If the suggestible person is aware that the information that he or she provides is inaccurate, he or she is lying. Accordingly, Yuille (1988) and Landry and Brigham (1992) have recommended asking the interviewee a few misleading questions at the end of the interview to assess his or her susceptibility to suggestion. Because asking such questions about central information could harm the statement (it could contaminate someone's memory; Loftus, 2005; Loftus & Palmer, 1974; Porter, Yuille, & Lehman, 1999), Yuille (1988) recommends focusing on peripheral information (e.g., "When you were with your sister, which friend was also there, Claire or Sarah?" when the

interviewer is aware that there was no friend present). However, being restricted to asking questions about peripheral information is problematic because interviewees show more resistance to suggestibility for central aspects of an event than for peripheral aspects of an event (Dalton & Daneman, 2006; Goodman, Rudy, Bottoms, & Aman, 1990; Porter, Spencer, & Birt, 2003), and they are more resistant to suggestibility for stressful events, most likely the central information, than for less stressful events, most likely the peripheral information (Davies, 1991; Porter & Peace, 2007). Therefore, insight into interviewees' suggestibility for peripheral parts of the event cannot be effectively used to draw conclusions about their suggestibility for core events.

Nonetheless, professionals using statement validity assessments at least attempt to control for individual differences. Often, observers do not make such attempts when evaluating behavioral responses (Vrij, 2008a). Accordingly, people whose natural behavior looks "suspicious" (e.g., they are fidgety) run the risk of being falsely accused of lying. The literature provides examples of nervous-looking people whose nervousness led to being falsely accused. For example, in Florida, Tom Sawyer was interrogated for 16 hours regarding a sexual assault and murder and was issued threats, after which he gave a confession that likely was false. He became a prime suspect because he appeared embarrassed and his face flushed during an initial interview in which he denied involvement in the crime (Meissner & Kassin, 2002). In a notorious Canadian case, 14-year-old Steven Truscott was falsely convicted for the 1959 rape and murder of Lynn Harpur. In an initial interview with the suspect, inspector Graham observed that Truscott acted nervously and described him as a "lying, sexual deviant," initiating a process of tunnel vision that led to the boy's conviction and death sentence, later overturned (Porter & ten Brinke, 2009).

The tendency to interpret nervous behaviors as suspicious without taking individual differences into account puts several groups of people at risk, including introverted individuals and people who are socially anxious. The social clumsiness of introverts and the impression of tension, nervousness, or fear that is naturally given off by socially anxious individuals (DePaulo, Epstein, & LeMay, 1990; Riggio, Tucker, & Throckmorton, 1988; Schlenker & Leary, 1982) may be interpreted by observers as indicators of deception.

Errors are also easily made when people of different ethnic backgrounds or cultures interact, because behaviors naturally displayed by members of one ethnic group or culture may appear suspicious to members of another ethnic group or culture. Nonverbal behavior is culturally mediated. For example, Black Americans display more gaze aversion than do White Americans (Johnson, 2006a, 2006b; LaFrance & Mayo, 1976, 1978), and people from Turkey and Morocco who are living in the Netherlands show more gaze aversion than do native Dutch people (Van Rossum, 1998; Vrij, Dragt, & Koppelaar, 1992). It thus appears that looking into the eyes of the conversation partner is typical Caucasian behavior that is often not displayed by non-Caucasian individuals. Differences in culture contribute to this effect. Looking into the eyes of a conversation partner is regarded as polite in Western cultures but is considered to be rude in several other cultures such as, for example, Japan (Vrij & Winkel, 1991; Vrij, Winkel, & Koppelaar, 1991; Winkel & Vrij, 1990). Many groups of Aboriginals in Canada suppress expressions of their emotions, and such apparent flat affect may be considered inconsistent with the context at hand, and it may be interpreted as a sign of deception or lack of remorse by decision makers (Porter & ten Brinke, 2009). Brant (1993, p. 261) observed that most Caucasian Canadians see "people who do not provide direct eye contact . . . as being shifty, devious, dishonest, crooks, slippery, untrustworthy, etc." In contrast, most Aboriginal cultures in Canada consider direct, sustained eye contact as rude, hostile, and intrusive. That is, the Aboriginal custom of avoiding eye contact as a sign of respect may easily be interpreted as an indication of deception by non-Aboriginal observers, including members of the judiciary.

Researchers have found other culturally determined differences in nonverbal behavior. For example, in the Netherlands, an experiment examining the nonverbal behavioral patterns of native Dutch Caucasian and Black Surinamese residents (citizens originated from Suriname, a former Dutch colony, but now living in the Netherlands) revealed large behavioral differences between the two groups, regardless of whether they were telling the truth or lying. Surinamese people made more speech disturbances, exhibited more gaze aversion, smiled more, and made more self-adaptors (e.g., fidgeting) and illustrators whether lying or not (Vrij & Winkel, 1991). In the United States, Johnson (2006a, 2006b) reviewed 120 videotaped police–citizen interactions of a noncriminal nature. The findings replicated those of Vrij and Winkel (1991) in that Blacks displayed more gaze aversion, smiling, and hand gestures than did Whites.

This means that observers need to be careful in cross-cultural interactions and should interpret the nonverbal behaviors displayed by senders of a different ethnic origin in light of cultural differences (Ruby & Brigham, 1997; Vrij, 2008a). Experimental research has demonstrated that this does not always happen and that cross-cultural nonverbal communication errors occur. That is, nonverbal behavioral patterns that are typical for an ethnic group are interpreted by Caucasian observers as signs of deception (Vrij & Winkel, 1992, 1994). It is important to note that these issues are relevant not only for police investigators, but also for professionals working in the immigration service (Granhag, Strömwall, & Hartwig, 2005).

### Neglect of intrapersonal variations

Different people respond differently not only in the same situation (*inter*personal differences), but also in different contexts (*intra*personal differences). Neglecting or underestimating intrapersonal differences is another error that lie catchers make. In police interviews, detectives are advised to examine a suspect's natural, truthful behavior during the small talk preceding the interview and to compare this behavior with the behavior

shown by the suspect during the actual interview. Differences in behavior could then be interpreted as "significant" (Inbau et al., 2001). This approach is also used and advocated by researchers (Frank, Yarbrough, & Ekman, 2006; Hirsch & Wolf, 2001). Although the approach sounds appealing, it is conducive to forming incorrect judgments because it is based on an incongruent comparison. Engaging in small talk and discussing the crime itself are fundamentally different situations. Small-talk conversations are low-stakes situations in which the suspect's responses are unlikely to have any negative consequences. In contrast, the core investigative elements of the interview are high-stakes situations in which the suspect's reactions and responses are critical. Therefore, it is not surprising that both guilty and innocent suspects tend to show different behaviors during small talk compared to during the actual interview (Vrij, 1995). This problematic issue also plagues the control-question polygraph test, because it is difficult to come up with control questions that are as significant as the key questions concerning the crime (National Research Council, 2003). The tendency to neglect or underestimate the importance of intrapersonal differences is an error that not only lie detectors make; it is a well-known error in social perception and relates to the fundamental attribution error (Ross, 1977).

### *Existing interview techniques*

Many interview strategies advocated by police manuals can impair lie detection. For example, police detectives are sometimes advised to confront suspects at the beginning of the interview with the evidence they have previously in their investigation (Hartwig et al., 2006; Leo, 1996). This tactic is designed to show suspects that it is fruitless to remain silent and that they are better off confessing. Experimental research has revealed that this interview style hampers lie detection (Hartwig, Granhag, Strömwall, & Vrij, 2005). One of the problems liars can face is ignorance about the level of knowledge held by the observer. This makes it difficult to know what they can say without assuming the risk of offering statements that are contradictory with known facts. If police officers promptly disclose their knowledge, they reduce the uncertainty for deceptive suspects and may inadvertently facilitate the ease of lying. Disclosing evidence early on provides liars with the opportunity to change their stories and to give an innocent explanation for the evidence.

Another misguided strategy from an informed lie-detection perspective is to accuse someone of lying. This affords deceptive suspects the ideal opportunity to "escape" from the interview situation by saying that they will no longer cooperate with the investigation, claiming that further cooperation is futile because they are not believed anyway. Also, accusing someone of lying may elicit the same responses in liars and truth tellers. That is, both suspects correctly accused of lying and those wrongly accused of lying may become afraid of not being believed (Ofshe & Leo, 1997). Because of that fear, both groups may show the same nervous responses (C.F. Bond & Fahey, 1987).

### *Overconfidence in lie-detection skills*

The final error that we will highlight is that professional lie catchers tend to overestimate their ability to detect deceit. Research has consistently shown that when professional lie catchers and laypersons are compared, professionals are more confident in their veracity judgments but are no more accurate (DePaulo & Pfeifer, 1986; Garrido, Masip, & Herrero, 2004; Kassin, Meissner, & Norwick, 2005; Meissner & Kassin, 2002). This tendency to overconfidence is not unique to police officers but is common among many groups of professionals in carrying out their job duties (Allwood & Granhag, 1999). Further, some research has suggested that more experienced professional lie catchers are more confident in their credibility-assessment abilities than are their less experienced counterparts but that they are no more accurate (e.g., Porter et al., 2000).

The overconfidence could, in part, be explained by overzealous promotion of lie-detection tools by those with commercial interests. No lie-detection tool used to date that is based on analyzing nonverbal and verbal behavior is accurate—far from it (Vrij, 2008a). Despite the fallibility of those tests, Paul Ekman, an American emeritus professor of psychology who has specialized in nonverbal cues to deceit, said in an interview with *The New York Times* (Henig, 2006) that his system of lie detection can be taught to anyone, with an accuracy of more than 95%. However, there is no published study that supports this claim. In a similar vein, one of the interview techniques discussed in detail in Inbau et al.'s (2001) manual is the behavior analysis interview. The authors claimed that interviewers specifically trained and experienced in behavior analysis assessment can correctly identify the truthfulness of a person 85% of the time. However, conclusive evidence to support this claim is lacking (Blair & Kooi, 2004; Horvath, Jayne, & Buckley, 1994; Vrij, Mann, & Fisher, 2006a; Vrij, Mann, Kristen, & Fisher, 2007).

Confidence in lie detection is not related to accuracy. In a meta-analysis of the confidence–accuracy relation that included 18 samples, the relation appeared to be virtually nonexistent ($r = .04$), not differing significantly from zero (DePaulo, Charlton, Cooper, Lindsay, & Muhlenbruck, 1997). Such a low correlation between confidence and accuracy is not unique for veracity judgments; other areas of cognitive performance, such as eyewitness identification, reveal a similar pattern (Sporer, Penrod, Read, & Cutler, 1995).

High confidence in one's ability to catch liars can be harmful when the confidence is unjustified (Kalbfleisch, 1992). High confidence often results in making quick decisions on the basis of limited information (Levine & McCornack, 1992; Lord, Ross, & Lepper, 1979), or tunnel vision (Porter & ten Brinke, 2010). In addition, high confidence may make investigators attempt to detect lies via demeanor alone and not search for physical evidence (Colwell, Miller, Lyons, & Miller, 2006). High confidence also is likely to reduce motivation to learn more about lie detection, because investigators may consider themselves already experts in the area. An unwillingness to learn more about lie detection is obviously undesirable, given professional lie catchers' typically low performance at the task

(C.F. Bond & DePaulo, 2006; Vrij, 2008a). Regarding this performance, Vrij reviewed 28 lie-detection studies with professionals (e.g., police officers, police detectives, parole officers) as lie detectors. On average, these professionals correctly classified 56% of liars and 56% of truth tellers, whereas 50% could be expected by chance alone. A lively discussion about the existence of individual differences in the ability to detect deceit has recently emerged.[4]

Overconfidence is a problem not only when it comes to one's general ability to detect lies but also when it leads to serious problems in an individual veracity assessment. For example, overconfidence in assessing a denying (but guilty) suspect as a truth teller will result in the suspect being released, and it provides opportunities for the suspect to commit more crimes. In addition, if a police detective is confident that a suspect is lying, he or she may subject the suspect to persuasive interrogation techniques in order to obtain a confession. This can harm innocent suspects in particular. Kassin, Goldstein, and Savitsky (2003) found that when innocent suspects are mistakenly identified as guilty, an interrogation style that is even more coercive than those experienced by guilty suspects can occur. That is, interrogators who do not believe the innocent suspect's denials are inclined to double their efforts to elicit a confession (Kassin et al.).

## Opportunities in Lie Detection

### Avoiding the errors

***Avoid examining the wrong cues and pay attention to the more diagnostic verbal and nonverbal cues to deceit.*** As previously discussed, observers often base their veracity decisions on cues that are not diagnostic of deception. Thus, it sounds plausible that observers may become better at discriminating truths and lies if they are taught to pay attention instead to deception cues that are more diagnostic. Several training studies have addressed this issue, and these are reviewed in detail by Frank and Feeley (2003) and Vrij (2008a).

In all extant training studies, observers have been exposed to short videotaped or audiotaped interviews with a number of people who were telling either truths or lies. Generally, 1 of 3 procedures was used. Some studies have used a *focusing* procedure in which observers are asked to pay attention to specific cues and ignore others. Other studies have used an *information* procedure in which observers receive information about the actual relation between certain behaviors and deception. Yet other studies have used an *outcome feedback* procedure in which each time observers made a decision, they are informed about the accuracy of that decision. In all three types of procedures, the performance of these trained participants is then compared with the performance of untrained and uninformed (control) participants.

Most studies have revealed that trained observers are better at distinguishing between truths and lies than are control observers, regardless of the training method used. However, these improvements have typically been small. On average, the control observers detected 53.4% of the truths and lies correctly, and the trained observers 57.66%. In other words, people can, to a limited extent, be trained to become better lie detectors.

The training studies have revealed two more outcomes that are worth discussing. First, Levine, Feeley, McCornack, Hughes, and Harms's (2005) experiment included bogus training groups that were taught cues that are *not* diagnostic cues to deception. They found that sometimes these bogus training groups performed better than the control groups, suggesting that the simple act of training, rather than the content of the training, may improve accuracy. In alignment with this, Porter, Woodworth, McCabe, and Peace (2007) found that the provision of *any* feedback (accurate or inaccurate) following deception judgments had a positive, albeit modest, influence on deception detection. It could be that the trained observers assessed the messages more critically than the control observers (Levine et al., 2005). Alternatively, training may make observers more motivated to perform well (Hartwig & Bond, 2010).

Other studies have showed worse performance by trained observers than by control observers. For example, when Kassin and Fong (1999) trained observers to examine the cues taught by the Inbau group as reported in their manual (Inbau et al., 2001), the observers performed worse than their untrained counterparts. In other studies where it was found that training impaired lie detection (Köhnken, 1987; Vrij, 1994; Vrij & Graham, 1997), the observers were police officers rather than undergraduate students. Vrij and Graham found that the students performed better as a result of the information they received, whereas police officers performed worse after having received the same information. We can only speculate as to why police officers do not appear to benefit from the provision of such information. One explanation is that the information confuses them (see also Köhnken). Perhaps the information Vrij and Graham gave about the relation between personality traits and deceptive behavior was beyond the grasp of the police officers who are probably not familiar with personality theories. The student observers in their experiment were psychology students and hence familiar with personality theories (albeit not with the relation between personality traits and deception). A second explanation is that police officers refused to use the information provided because it contradicted their own beliefs. For example, in Vrij's (1994) study, the observers were told that liars typically show a decrease in hand and finger movements, whereas police officers typically assume that an increase in hand and finger movements indicates deception. Perhaps the officers refused to accept the information provided by an outsider (the experimenter) and continued to rely on their own experience and beliefs instead.

The small improvements found in research may not necessarily reflect the true potential of teaching people to detect deceit. The training programs were typically brief and sometimes lasted no more than 15 minutes. Longer, more intensive training sessions such as the ones used in Porter et al.'s (2000) study (2-day training: pretraining vs. posttraining, 40.4% vs. 76.7%)

and in Porter, Juodis, ten Brinke, Klein, and Wilson's (2010) study (2-hour training: pretraining vs. posttraining, 51.2% vs. 60.7%) achieved greater success. The training programs also did not address the complex nature of lie detection. For example, in studies using the information procedure, observers were taught a set of cues that liars may display. This approach is limited because not all liars will show these specific sets of cues. Moreover, in all of these studies, the observers were exposed to low-stakes truths and lies, and low-stakes situations do not provide much opportunity to detect deception. It could thus be possible that training has larger effects if observers are given more sophisticated training and are exposed to truths and lies told in high-stakes situations.

We believe, however, that training programs as described in this section will never yield high accuracy rates. The limitation of these programs is that trainees are restricted to passive observation of truth tellers and liars. Such a method is limited because cues of deception are faint and unreliable. We therefore see more potential in training programs that teach trainees to actively *elicit* or *enhance* diagnostic cues to deception. In the section on "Exploiting the Different Mental Processes of Truth Tellers and Liars," we present interview styles designed to achieve this.

***Avoid relying on nonverbal cues only.*** Research addressing the individual strategies of lie detectors has indicated that detecting truths and lies becomes more successful when speech content is taken into account. Mann et al. (2004) showed 99 police officers 54 videotaped fragments of police interviews with murderers, rapists, and arsonists and found that good lie detectors reported to have relied upon verbal cues (e.g., vague reply, contradictions in story) more often than did poor lie detectors. In addition, there was an inverse relation between the number of visual cues reported to have been relied upon (e.g., gaze aversion, posture, movements) and accuracy. In particular, police officers who mentioned that liars look away and fidget achieved the poorest scores. In other words, those who listened carefully to what suspects had to say were better lie detectors than those who concentrated on suspects' nonverbal behavior.

D.E. Anderson, DePaulo, Ansfield, Tickle, and Green (1999) and Feeley and Young (2000) found a positive relation between the number of vocal cues that participants reported to have relied upon (e.g., speech errors, speech fillers, pauses, voice) and accuracy. In a study in which participants attempted to detect truths and lies told by a convicted murderer, participants who mentioned gaze aversion and fidgeting as cues to deceit achieved the lowest accuracy scores (Vrij & Mann, 2001a). Also, Porter et al. (2007) found that the more visual cues the participants reported, the worse their ability to distinguish truths and lies. In summary, all of these studies showed that in order to detect lies, listening carefully to what is said is necessary and that merely paying attention to behavior impairs lie detection.

Another body of research suggests that a "holistic" approach to detecting deception may be ideal. Ekman and

O'Sullivan (1991) found that participants who reported to have relied upon both vocal/verbal and visual cues obtained higher accuracy rates than did participants who reported to have relied upon only vocal/verbal or visual cues. This is supported by experimental research in which the nonverbal and verbal cues of truth tellers and liars were examined. That research has demonstrated that the best classifications of truths and lies are made when both sets of cues are taken into account (Porter & Yuille, 1996; Porter et al., 1999; Vrij, Akehurst, Soukara, & Bull, 2004a; Vrij, Edward, Roberts, & Bull, 2000; Vrij, Evans, Akehurst, & Mann, 2004). Thus, attendance to multiple cues from words and the visual channel should provide the lie catcher with better ammunition for the task at hand (Porter & ten Brinke, 2010).

Observers can pay attention to nonverbal behavior and speech simultaneously in three different ways, which all enhance lie detection. First, observers could take into account both nonverbal and verbal cues without looking at the relation between the two sets of cues. This was the case in the previously discussed research. Second, observers could examine nonverbal behavior in relation to speech content, an approach common in communication research (Bavelas & Chovil, 2006; Bavelas, Chovil, Coates, & Roe, 1995; Bavelas & Gerwing, 2007; P. Bull, 2009; Freedman, 1972; Kendon, 1994, 2004; McNeill, 1985, 1992) but often ignored by deception researchers. A recent experiment showed the potential of this approach (Caso, Maricchiolo, Bonaiuto, Vrij, & Mann, 2006). When the entire interview was taken into account, truth tellers and liars displayed a similar number of illustrators. Differences did emerge between truth tellers and liars only when specific types of illustrators were examined when answering specific questions. Third, observers could examine mismatches between nonverbal behavior and speech content (Ekman, 1985/2001; Ekman & O'Sullivan, 2006). Thus, a person who makes a head shake while agreeing to cooperate may not actually be as cooperative as he or she wants to appear. Thus, although a perfectly reliable cue to deception does not exist, the combination of attention to changes in nonverbal/body language, verbal, and facial channels—ideally videotaped to permit review and systematic analysis—can provide the basis for an informed opinion about credibility as long as it is backed by other evidence (Porter & ten Brinke, 2010).

However, mistakes are easily made. For example, some people display clear signs of distress when they talk about a negative event they have experienced, whereas others do not (Burgess, 1985; Burgess & Homstrom, 1974; Vrij & Fischer, 1995). Thus, the varying communication styles represent a personality factor (Littman & Szewczyk, 1983). However, observers, including police detectives, typically believe that absence of distress during an interview about an upsetting event is a valid indicator of deceit (Greuel, 1992). As a result, different emotional displays have a differential effect on the perceived credibility of complainants, and emotional victims are more readily believed than victims who report their experience in a controlled manner (Baldry & Winkel, 1998; Baldry, Winkel, & Enthoven, 1997; Bollingmo, Wessel, Sandvold, Eilertsen,

& Magnussen, 2009; Bothwell & Jalil, 1992; Kaufmann, Drevland, Wessel, Overskeid, & Magnussen, 2003; Vrij & Fischer, 1997; Wessel, Drevland, Eilertsen, & Magnussen, 2006; Winkel & Koppelaar, 1991).

Another relevant point relating to the potential for misinterpretation by the lie catcher concerns facial expressions. Ekman has long argued that deceptive emotional information is betrayed (leaked) by *microexpressions*, fleeting but complete facial expressions that are thought to reveal the felt emotion during emotional concealment and are suppressed within 1/5th to 1/25th of a second (Ekman, 1985/2001). This idea has enjoyed increasing popularity in the media (Henig, 2006) and scientific community (Schubert, 2006), despite being backed by little empirical research. Porter and ten Brinke (2008) conducted the first thorough investigation of facial expressions associated with genuine and deceptive emotions. Participants viewed disgusting, sad, frightening, happy, and neutral images, responding to each with a genuine emotion or a deceptive one, by either *masking*, replacing one emotion with another, or *simulating*, creating an emotional expression in a neutral state, while being judged by "blind" observers. The researchers analyzed each 1/30-second frame (104,550 frames in 697 expressions) for the presence of the muscle actions of the universal expressions and for the presence of microexpressions. Their findings indicated that emotional expressions inconsistent with the intended display did occur more frequently in the masked condition than in the genuine or simulated conditions. All participants showed such predicted "leakage" on at least one attempt at faking an emotion. However, Porter and ten Brinke found only a small number of partial (lower or upper face) microexpressions. Although some of the microexpressions betrayed the hidden emotion, they sometimes occurred during genuine expressions. The leakage was typically longer and more salient than Ekman had predicted. As such, the lie catcher should attend to the expressions that are inconsistent with what is being said or with the context, but he or she should be cognizant that these expressions can be meaningless. Therefore, when lie detectors believe that there is a mismatch between someone's nonverbal behavior and speech content, they should be careful about how to interpret it. A final judgment that the person is lying should not be made too quickly, and alternative explanations should be considered. In this context, some researchers refer to these cues as "hotspots" deserving further attention rather than as being necessarily indicative of lying (Frank et al., 2006, p. 234). There is a serious risk that nonverbal hotspots are too easily interpreted as lies. In that context, we underline Porter and ten Brinke's (2010) conclusion that nonverbal cues only assist investigators who are informed about the complex relations between behavior and deceit.

***Avoid the Othello error: Consider alternative explanations when interpreting cues of emotions and cognitive load.*** As previously mentioned, the *Othello error* refers to mistakenly interpreting signs of nervousness as cues to deceit. The difficulty that lie detectors face is that both liars and truth tellers may display signs of emotions and/or nervousness in high-stakes situations. Consider the distress one must feel to be falsely accused by the police of having committed a serious crime or by a partner about having had an affair. Emotion cues may not conclusively demonstrate that someone is lying, and the lie detector should thus be cautious in interpreting such cues as signs of deceit. Instead, in interpreting emotional responses, the lie detector should consider questions such as the following: "Is my questioning likely to evoke emotions in the respondent, regardless of whether he or she is guilty?" "Is the present situation likely to evoke emotions in the respondent anyway?" And "Is this person the type who is likely to be emotional in this situation anyway?" (Ekman, 1985/2001).

In theory, another cluster of cues could betray deception—cues associated with having to think hard (labeled *cognitive load*; Buller & Burgoon, 1996; DePaulo et al., 2003; Ekman, 1985/2001; Vrij, 2008a). For example, Porter and ten Brinke (2008) found that when participants worked hard to neutralize an emotion (e.g., maintaining a neutral expression when viewing a horrific accident scene), their blink rate lowered relative to when they expressed a genuine emotion (e.g., showing fear or horror when viewing the same scene). A decrease in blink rate is a sign of cognitive load (Bageley & Manelis, 1979). In forensic settings, however, such cues are not solely exhibited by liars; truth tellers may have to think hard while answering questions in a cognitively and emotionally complex context. Again, in interpreting cues of cognitive load, the lie detector should ask him- or herself the same kinds of questions as when interpreting signs of emotions, such as "Is my questioning likely to evoke cognitive load in the respondent, regardless of whether he or she is guilty?"

***Avoid relying on heuristics and rely on multiple cues in a flexible manner.*** As previously discussed, deception research has revealed that no single behavioral or verbal cue is uniquely related to deception. In other words, there is no giveaway clue like Pinocchio's nose. Instead, different people show different cues to deception in a given situation (i.e., interpersonal differences) and the same person shows different cues to deception on different occasions (i.e., intrapersonal differences). Therefore, it is inappropriate to use fixed decision rules on the basis of heuristics such as "liars look away" when attempting to detect deceit. In fact, research has demonstrated that people who focus on single nonverbal or verbal cues are typically poor lie detectors (Mann et al., 2004; Vrij & Mann, 2001a). Instead, it is better to make veracity assessments on the basis of multiple cues (Ekman, O'Sullivan, Friesen, & Scherer, 1991; Porter & ten Brinke, 2010; Vrij et al., 2004a; Vrij, Edward, et al., 2000; Vrij & Mann, 2004). However, even such clusters of cues do not fit all liars; they also do not fit a particular liar in all situations. In other words, fixed decision rules that include multiple cues are not satisfactory either. Instead, better accuracy rates are achieved by using flexible decision rules that include multiple cues (Ekman & O'Sullivan, 1991; Ekman, O'Sullivan, & Frank, 1999; Mann et al., 2004; Vrij, 2008a).

***Take into account inter- and intrapersonal differences and pay attention to deviations from a person's honest reactions in similar situations: The comparable truth.*** Lie detectors should take inter- and intrapersonal differences into account when making veracity judgments. Therefore, the relevant question for the lie detector to ask is whether the nonverbal behavior and speech patterns displayed by a person differ from this person's known behavior when delivering truthful responses. As discussed earlier, we advise police detectives to examine a suspect's natural truthful behavior during the small-talk preceding the interview and to compare this behavior with the behavior displayed by the suspect during the actual interview. This approach is prone to incorrect judgments, because engaging in small talk and discussing the crime are two fundamentally different situations. For this technique to work, it is essential that the known truthful response (e.g., baseline response) is made under similar conditions to the response under investigation, labeled the comparable truth (Vrij, 2008a). People react differently in formal settings (e.g., during a selection interview) than in informal settings (e.g., when at home with the family). According to Vrij (2006), they also react differently when they are accused of wrongdoing (e.g., situation during the actual interview) than when they are unchallenged (e.g., situation during small talk), and they respond differently in high-stakes situations than in low-stakes situations (Porter & ten Brinke, 2010; Vrij, 1995). In addition, people show different behaviors when they are interviewed by different people (Vrij & Winkel, 1991). Behavior is also topic related: People respond differently when discussing a topic that embarrasses them than they do when discussing a neutral topic (Kleinke, 1986), and they respond differently when discussing a topic that they care about or is important to them than they do when discussing a topic with which they have less personal involvement (Davis & Hadiks, 1995; Matarazzo, Wiens, Jackson, & Manaugh, 1970). Last, people's behavior sometimes varies over time in the same interview (Buller & Burgoon, 1996; Burgoon et al., 1999; Stiff, Corman, Krizek, & Snider, 1994; White & Burgoon, 2001), or, if they are interviewed on more than one occasion, changes may occur over repeated interviews (Granhag & Strömwall, 2002). Therefore, when lie detectors wish to compare a person's given nonverbal response with his or her truthful nonverbal response, they need to make sure that the given and truthful responses are taken from the same interview setting, that the person talks about similar topics in the given and truthful parts, and that these topics are discussed within a short period of time.

Vrij and Mann (2001a) provided an example of how the comparable-truth technique could be used. During a videotaped real-life police interview, a man suspected and later convicted of murder was asked to describe his activities during a particular day. The murder suspect described his activities during the morning (went to work), afternoon (visited a market) and evening (visited a neighbor). Detailed analyses of the videotape revealed a sudden change in behavior as soon as he began to describe his activities during the afternoon and evening. A possible reason for this variation may have been that he was

lying, a view supported by the evidence. Police investigators could confirm his story with regard to his morning activities, but they revealed that his statement about the afternoon and evening was fabricated. In reality, he met the victim in the afternoon and killed her later that day. In this case, we were able to make a good comparison. The man described a seemingly normal day, and there are no good reasons why different behaviors would emerge while describing different parts of that day.

The comparable-truth technique has inevitable shortcomings, and mistakes will still be made with its application. The main problem is that it is difficult to rule out that the observed nonverbal and verbal differences are caused by factors other than deceit. Open-mindedness when interpreting the differences in behavior and speech is thus crucial. Also, differences between the baseline behavior and speech and the behavior and speech under investigation may be subtle and therefore difficult to spot. Last, an absence of behavioral and speech-related differences between the baseline behavior and speech and those under investigation does not necessarily mean that the person is telling the truth.

## Exploiting the different mental processes of truth tellers and liars

The first five guidelines share one feature: They all aim to examine and interpret more carefully the nonverbal and verbal cues displayed by liars. And they have one serious limitation: The cues that lie detectors are encouraged to examine and interpret are faint and unreliable. In this section we discuss a fundamentally different approach to nonverbal and verbal lie detection: to elicit more, more blatant, and more reliable cues to deceit. We achieve this aim by exploiting the different psychological states of truth tellers and liars via two different approaches. The first approach, *strategic questioning*, uses specific questions that elicit the most differential responses between truth tellers and liars. The second, *imposing cognitive load*, makes the interview setting more difficult for interviewees. We argue that this affects liars more than truth tellers, thereby resulting in more and more blatant differences between the two. Both approaches require interviewees to talk. Interviewees can be encouraged to talk via an information-gathering interview style, as discussed in the subsequent section.[5]

***Use an information-gathering interview style.*** The police commonly use two types of interview styles: information–gathering and accusatory (Moston & Engelberg, 1993). In the information–gathering style, interviewers ask suspects to give detailed statements about their activities through open questions (e.g., "What did you do yesterday between 3 p.m. and 4 p.m.?" "You just mentioned that you went to the gym; who else was there?"). By comparison, in the accusatory style, interviewers confront suspects with accusations (e.g., "Your reactions make me think that you are hiding something from me."). Information-gathering interviews encourage suspects to talk, whereas accusatory interviews often yield short denials

(e.g., "I am not hiding anything"). Therefore, information-gathering interviews typically elicit more information about an event and result in longer responses than do accusatory interviews (Fisher, Brennan, & McCauley, 2002; Vrij, Mann, & Fisher, 2006b; Vrij et al., 2007).

An information-gathering interview style is desirable for lie-detection purposes for several reasons. A good lie-detection strategy is to check the factual information provided by an alleged liar with the available evidence. The provision of a high quantity of details, most likely to result from an information-gathering interview, permits more opportunities for the lie detector to identify inconsistencies and contradictions between the answer and available evidence. Second, information-gathering interviews result in more nonverbal cues to deceit than do accusatory interviews (Vrij, 2006), because longer stories afford more opportunities for nonverbal cues to deception to be displayed (DePaulo et al., 2003). In addition, being accused of wrongdoing (i.e., accusatory interview style) is likely to affect the behavior of both truth tellers and liars in a similar way, and the accusation can have a stronger effect on someone's nonverbal behavior than the act of lying itself (C.F. Bond & Fahey, 1987; Ofshe & Leo, 1997). Consequently, differences in nonverbal behavior between truth tellers and liars are overshadowed by the effects of the accusation.

The third advantage of conducting an information-gathering interview is that it also results in more verbal cues to deceit (Vrij et al., 2007). Longer stories afford more opportunities for verbal cues of deceit to occur, because words are the carriers of such cues. A criteria-based content analysis, for example, requires the availability of a story and is not possible with an outright denial. Fourth, information-gathering interviewing does not involve accusing suspects of any wrongdoing or other tactics designed to cause distress. It could be a safeguard against false confessions that can occur with coercive interview styles aimed at creating duress/distress (Gudjonsson, 2003; Kassin, Appleby, & Torkildson-Perillo, 2010). Fifth, veracity judgments in accusatory interviews are made with more confidence than are those in information-gathering interviews (Vrij et al., 2007), potentially leading to tunnel vision. If lie detectors monitor their confidence and do not become overzealous (which is known to impair lie-detection accuracy; Porter et al., 2007), they are more likely to defer making such conclusive judgments and gather more evidence (see also Levine & McCornack, 1992).

Although the information-gathering interview is a good start in discriminating truth and deceit, that approach alone is not sufficient to elicit diagnostic cues to deception (Granhag & Vrij, 2010; Vrij & Granhag, 2007). More sophisticated strategies incorporated within the information-gathering interview are needed and are discussed in the remaining part of this review.

***The strategic-questioning approach: Ask unanticipated questions.*** A consistent finding in deception literature is that, when possible, liars prepare themselves for anticipated interviews (Granhag, Andersson, Strömwall, & Hartwig, 2004; Granhag, Strömwall, & Jonsson, 2003; Hartwig et al., 2007; Vrij et al., 2009). The act of planning and rehearsing a story can lead to vulnerabilities that investigators can consider. Rehearsal leads to overly scripted responses. One of the criteria of criteria-based content analysis with the greatest support in assessing credibility is unstructured reproduction (supported in at least 50% of relevant studies; see Vrij, 2008a). Truthful accounts tend to be more unstructured and less chronological than rehearsed deceptive accounts, which tend to be overly scripted and chronological (e.g., "I did this ... then this happened ... then I did this," and so on). A liar wants to keep his or her story straight (impression management) and will memorize the details of the story in order (Porter & ten Brinke, 2010).

Further, the effectiveness of a liar's planning strategy is limited, because it can only work when liars correctly anticipate the questions that will be asked. Investigators can exploit this limitation by asking questions that liars do not anticipate (e.g., spatial questions) or by asking questions in a format that liars do not anticipate (e.g., drawings).

In an empirical test of the unanticipated-questions technique, liars and truth tellers were interviewed individually about having lunch together at a restaurant (Vrij et al., 2009). Although the pairs of truth tellers did not have lunch together, the liars were instructed to pretend that they had. All pairs were given the opportunity to prepare for the interview. The interviewer asked typical opening questions that the interviewees later said they had anticipated (e.g., "What did you do in the restaurant?"), followed by questions about spatial details (e.g., "In relation to the front door and where you sat, where were the closest diners?") and temporal details (e.g., "Who finished their food first, you or your friend?") that the interviewees said they had not anticipated. Further, they were asked to draw the layout of the restaurant (unanticipated). On the basis of the overlap in responses to the anticipated opening questions between the individuals, the liars and truth tellers could not be classified at a level above chance. However, on the basis of the responses in the unanticipated questions, up to 80% of pairs of liars and truth tellers could be correctly classified, particularly when assessing drawings (i.e., the drawings were less alike for the pairs of liars than they were for the truth tellers). In summary, asking unanticipated questions about central topics leads to identifiable betrayals among liars.

Asking unanticipated questions can also be effective when assessing individual interviewees rather than pairs of interviewees. An interviewer could ask the same question twice in the same or different interviews. When liars have not anticipated the question, they have to fabricate an answer on the spot. A liar's memory of this fabricated answer may be more unstable than a truth teller's memory of the actual event. Therefore, liars may contradict themselves more than truth tellers may (Fisher, Vrij, & Leins, in press). This approach probably works best if the questions require detailed answers given in different formats. Truth tellers will have encoded the topic of investigation along more dimensions than will liars. As a result, compared with liars, truth tellers should be able to recall the event more flexibly (along more dimensions). Thus, the question "How old

are you?" followed by the question "What is your date of birth?" is more difficult to answer for liars than for truth tellers and results in longer latency periods in liars (Walczyk et al., 2005). In addition, when asked to verbally describe and sketch the layout of a restaurant, truth tellers' verbal answers and drawings show more overlap than do those of liars (Leins, Fisher, Vrij, Leal, & Mann, in press).

Another experiment showed further promise for the use of drawings as a lie-detection tool (Vrij, Leal, et al., 2010). The researchers sent 31 participants on a mission that included picking up a decoder from one agent and delivering it to a second agent. After delivering the decoder to the second agent, the participants were asked to (a) verbally describe what they had seen at the location where they had received the decoder and (b) sketch what they had seen at that location. Half of the participants were told to answer with a lie and half were told to answer with the truth. The liars were requested to pretend to have been on a different mission in which they received the decoder at a different location from a different agent. The results indicated that the drawings were more useful for lie detection than were the verbal accounts. Only 2 of 16 liars (12.5%) included the pretend agent from whom they claimed to have received the decoder in their drawing, whereas 12 of 15 truth tellers (80%) sketched the real agent from whom they had received the decoder. In their verbal descriptions, again 2 of 16 liars (12.5%) mentioned the pretend agent from whom they claimed to have received the decoder, whereas 8 of 15 truth tellers (53%) did mention the real agent. There are two possible reasons why liars were inclined to omit the pretend agent from the sketch and verbal description. First, since there was no actual agent present at the location they claimed to have received the decoder, they forgot to add an agent to their drawings and descriptions. Second, liars may be reluctant to include people in their drawings or verbal descriptions because it might trigger further questions about who those people actually were.

Why did more truth tellers sketch the agent (80%) than verbally described the agent (53%)? It may be hypothesized that after sketching the stable elements, the truth tellers may have noticed that the agent was missing from the drawing. After narrating the stable elements of the location, however, truth tellers will have been less aware of this omission because of difficulties in building a mental picture of a location on the basis of narratives. Future research could examine this hypothesis.

In a related vein, Liu et al. (2010) asked half of a group of children (10–12 years of age) to tell the truth about a self-experienced event and the other half to lie about such an event. The researchers found that lying children were more willing to answer odd questions (e.g., "Can you remember what you had in your left pocket when being stung by the bee?") than were truth-telling children, whereas no difference was found in the willingness to answer standard questions. Hence, asking unanticipated questions elicited a cue to deception (i.e., increased willingness to answer the impossible questions). The finding can be explained by acknowledging that the lying children had to *act* to appear honest, whereas truth-telling children did not have to do this. Liu et al. speculated that liars were afraid that

an "I don't know" answer would sound suspicious. Hence, merely acting in an honest manner might result in some actions that are more rarely seen among those who are truly honest.

***The strategic questioning approach: Ask temporal questions when suspecting a scripted answer.*** A good strategy for liars is to provide a story that is, in fact, true, but that happened at a different time than the time of interest (see the earlier section on embedded lies). For example, a guilty male suspect who denies involvement in a crime could claim that he was at the gym when the crime took place. If he is indeed familiar with the gym, he can now truthfully recall an experience there, describe its layout, the equipment that he uses there, and so on. The only fabricated part in this story is the time he was there. Lie detectors should be aware of this lying strategy. Questions about the layout of the gym and activities occurring are not necessarily effective because they enable liars to relate true experiences. Instead, questions should be asked that are specifically related to the particular time that the interviewee claims to have been where they say they were. For example, the interviewer could ask time-related questions about key events, such as which instructor was working at the time he or she claims to have visited the gym, who else was present, and so forth.

***The specific question approach: The devil's advocate approach.*** Verbal lie-detection tools (such as statement validity assessments) are designed to distinguish between truths and lies when people describe events that they claim to have experienced. As a result, many assessment criteria focus on perceptual detail to examine what people report having seen, heard, felt, or smelled during these events. However, people lie not only about their experiences but also about their opinions. Determining the veracity of such conceptual representations may not be important in typical police suspect interviews because these are mainly concerned with detecting lies about transgressions. However, it can be important in many security settings such as, for example, when deciding whether an informant is (a) indeed as much anti-Taliban or against Muslim fundamentalism as he or she claims or (b) truly entering the United Kingdom or the United States solely for the purpose of university study. Incorrect veracity judgments can do irreparable harm in such situations, as demonstrated by the loss of seven CIA agents in Afghanistan on December 30, 2009. The CIA agents were killed via a suicide attack by a man they thought was going to give them information about Taliban and Al-Qaeda targets in Pakistan's tribal areas. The CIA agents had used polygraph tests to check the man's sincerity and were aware that he had posted extreme anti-American views on the Internet. However, it was decided that the views he had expressed were part of a good cover, and the possibility that they were his real views was discounted (Leal, Vrij, Mann, & Fisher, 2010).

The devil's advocate lie-detection tool was developed to detect truths and lies in expressing opinions. Interviewees are first asked an opinion-eliciting question that induces them to

argue in favor of their personal view ("What are your reasons for supporting the Americans in the war in Afghanistan?"). This is followed by a question that asks participants to argue against their personal view ("Playing devil's advocate, is there anything you can say against the involvement of the Americans in Afghanistan?").

People normally think more deeply about, and hence are likely to be more able to generate reasons that support rather than oppose their beliefs and opinions (Ajzen, 2001; Darley & Gross, 1983; Waenke & Bless, 2000). Therefore, truth tellers are likely to provide more information in their responses to the opinion-eliciting question than to the devil's advocate question. This pattern is unlikely to to be found in liars because, for them, the devil's advocate question is more compatible with their beliefs than is the opinion-eliciting question. In an experiment testing the devil's advocate approach (Leal et al., 2010), truth tellers' opinion-eliciting answers were longer than their devil's advocate answers. Also, observers judged that the truth tellers' opinion-eliciting answers sounded more immediate and plausible and revealed more emotional involvement than did their devil's advocate answers. No clear differences emerged in liars' answers to the two types of question. On the basis of these differences in speech content, 86% of truth tellers and 79% of liars were correctly classified.

***The specific question approach: The strategic use of evidence.*** Guilty suspects (i.e., liars) and innocent suspects (i.e., truth tellers) enter police interviews in a different mental state (Granhag & Hartwig, 2008; Porter & Yuille, 1995). A guilty suspects will have unique knowledge about the crime, and this information, if it becomes known to the interviewer, will make it obvious that they are the perpetrator. A liar's main concern will be to ensure that the interviewer does not gain knowledge of their actions at the time of the crime. In contrast, innocent suspects face the opposite problem, fearing that the interviewer will not come to know what the suspect did at the time of the crime. Research has shown that these different mental states result in different strategies for liars and truth tellers (Colwell et al., 2006; Granhag & Strömwall, 2002; Granhag, Strömwall, & Hartwig, 2007; Hartwig et al., 2007; Strömwall et al., 2007). Guilty suspects are inclined to use avoidance strategies (e.g., in a free recall, avoid mentioning where they were at a certain place at a certain time) or denial strategies (e.g., denying to be at a certain place at a certain time when directly asked). In contrast, innocent suspects neither avoid nor escape but are forthcoming and tell the truth like it happened (Granhag & Hartwig, 2008).

The strategic-use-of-evidence (SUE) technique addresses how interviewers can consider these different strategies that guilty and innocent suspects use when they possess potentially incriminating information about a suspect (Granhag et al., 2007; Hartwig et al., 2006). Suppose that a man who left his briefcase in a bookstore on top of a box of stationery returns to find that his wallet has been stolen from the briefcase. Further suppose that the police found fingerprints on the briefcase that did not belong to the owner but did belong to another customer who had visited the bookshop. This makes the customer a suspect but not necessarily the culprit; perhaps the customer moved the briefcase to look in the box of stationery. In such circumstances, the police need to interview the suspect to find out the truth.

The first step of the SUE technique is to ask the suspect to describe his or her activities (in this example, to describe his or her activities in the bookshop) but not to reveal the fingerprint evidence. It is more likely that truth tellers will mention the briefcase than will liars. Truth tellers have nothing to hide and will recall what had happened, and this includes touching the briefcase; liars do not wish to associate themselves with the crime they have committed and thus distance themselves from the briefcase. However, not mentioning touching the briefcase still does not establish guilt, because truth tellers may simply have forgotten to mention this minor detail. In the second phase of the SUE technique, the questioning phase, the interviewer asks questions, including those involving the briefcase, without revealing the incriminating fingerprint evidence. There is a chance that a liar will deny having touched the briefcase and will thereby contradict the evidence known to the lie detector. A truth teller would be more likely to reveal that he or she had moved the briefcase. The third phase of the SUE technique is to reveal the evidence and ask the suspect to explain any contradictions between their account and the evidence. Here, it should be noted that some contradictions may be caused by factors other than deceit such as, for example, a truth teller discussing an event in the distant past may simply misremember some details. Hence, not every contradiction is a clear-cut sign of deception.

Hartwig et al. (2006) tested the SUE technique in their experiment, using the stolen wallet scenario previously mentioned. Swedish police trainees interviewed the mock suspects. Half of the interviewers were trained how to use the SUE technique before the experiment and were asked to use this technique in the subsequent interview. The other half of the interviewers did not receive training and were instructed to interview the suspects in the manner of their own choice. The untrained interviewers obtained a 56.1% accuracy rate, which is similar to that typically found in nonverbal and verbal deception-detection research (C.F. Bond & DePaulo, 2006; Vrij, 2008a). SUE-trained interviewers, however, obtained an 85.4% accuracy rate. It appeared that guilty suspects contradicted the evidence more than did innocent suspects, but more important is that they did so particularly when they were interviewed by SUE-trained interviewers.

The SUE technique differs from traditional police interviews in an important way. Traditionally, the police are inclined to present the evidence (e.g., "Your fingerprints have been found on the briefcase") at the beginning of the interview (Hartwig et al., 2006; Leo, 1996). As we mentioned earlier, the traditional police technique is limited because it gives the guilty suspects the opportunity to fabricate a story that is consistent with the evidence. The delayed disclosure of evidence approach has other benefits. First, it encourages interviewers to not show suspicion and enter the interview with an open

mind. Once people have made up their minds about the veracity of a message, they have the tendency to interpret additional information in such a way that it supports their decision (see the dangerous decisions theory previously discussed). As a result, after making up their minds, lie detectors run the risk of failing to notice further important information or of misinterpreting such information. Second, revealing suspicions may make truth tellers feel uncomfortable and this may result in the *Othello error*, the erroneous decision to interpret such nerves as a sign of guilt. Third, suspiciousness may also result in escape routes for liars. For example, it could result in them refusing to talk any longer (e.g., "Why should I speak to you? You don't believe me anyway!").

***Imposing cognitive load.*** As discussed earlier, deception theories postulate that liars may be more nervous and may have to think harder than truth tellers. However, research has shown that liars often do not display cues of nervousness and cognitive load and that cues to deception are typically faint and unreliable. But can interviewers go one step further? Are there interview techniques that elicit and enhance differences in nervousness or cognitive load? Together with the National Research Council (2003), we do not think that questions can be asked that will necessarily raise more concern in liars than in truth tellers; thus none of the interventions that we will now discuss aim to raise concern in interviewees. But research has demonstrated that it is possible to enhance differences in cognitive load between truth tellers and liars (Vrij et al., 2008; Vrij, Mann, Leal, & Fisher, 2010), so this is the aim of the following interventions.

Lying can be more cognitively demanding than truth telling for six reasons. First, formulating a lie itself may be cognitively demanding. A liar needs to invent a story and must monitor his or her fabrication so that it is plausible and adheres to everything observers would know or might find out. In addition, liars must remember what they have said to whom in order to maintain consistency. Liars should also avoid making slips of the tongue, while refraining from providing new leads (Vrij, 2008a).

A second aspect of lying that adds to mental load is the fact that liars are typically less likely than truth tellers to take their credibility for granted (DePaulo et al., 2003; Kassin, 2005; Kassin, Appleby, & Torkildson-Perillo, 2010; Kassin & Gudjonsson, 2004; Kassin & Norwick, 2004). Truth tellers typically assume that their innocence shines through (Granhag et al., 2007; Kassin; Kassin et al., 2009; Kassin & Gudjonsson; Kassin & Norwick; Vrij, Mann, & Fisher, 2006b), which could be explained with the *illusion of transparency* (Gilovich, Savitsky, & Medvec, 1998), the belief that one's inner feelings will manifest themselves on the outside, and *belief in a just world* (Lerner, 1980), the belief that people will get what they deserve, and deserve what they get. Liars will be more inclined than truth tellers to monitor and control their demeanor in order to appear honest to the lie detector (DePaulo & Kirkendol, 1989), and such monitoring and controlling is cognitively demanding (Baumeister, 1998). For example, the guilty suspect

may experience powerful emotions (e.g., fear, remorse, anger, or even excitement) that must be hidden or faked, and that may differ from those of the truth teller (Porter & ten Brinke, 2010). Consider a woman publicly pleading for the safe return of her partner who, in reality, she has murdered (see also Vrij & Mann, 2001b). She must monitor her body language and emotional expressions while keeping the details of the story straight. A high level of cognitive load accompanies high-stakes deception.

Third, because liars do not take credibility for granted, they may monitor *interviewers'* reactions more carefully in order to assess whether their lies appear to be successful (Buller & Burgoon, 1996; Schweitzer, Brodt, & Croson, 2002). Carefully monitoring an interviewer also requires cognitive resources.

Fourth, liars may be preoccupied by the task of reminding themselves to act and role play (DePaulo et al., 2003), which requires extra cognitive effort. Fifth, liars have to suppress the truth while they are lying, and this is also cognitively demanding (Spence et al., 2001). Last, while activation of the truth often happens automatically, activation of a lie is more intentional and deliberate, and thus it requires mental effort (Gilbert, 1991; Walczyk, Roper, Seemann, & Humphrey, 2003; Walczyk et al., 2005).

A lie detector could exploit the differential levels of cognitive load that truth tellers and liars experience, in order to discriminate more effectively between them. Liars who require more cognitive resources than truth tellers for the act of storytelling will have fewer cognitive resources left over than truth tellers will. This makes liars vulnerable, and so if cognitive demand is further raised—which could be achieved by making additional requests—liars may not be as good as truth tellers in coping with these additional requests.

One way to impose cognitive load on interviewees is by asking them to tell their stories in reverse order. This increases cognitive load because (a) it runs counter to the natural forward-order coding of sequentially occurring events (Gilbert & Fisher, 2006; Kahana, 1996) and (b) it disrupts reconstructing events from a schema (Geiselman & Callot, 1990). In one experiment, half of the liars and truth tellers were requested to recall their stories in reverse order, whereas no instruction was given to the other half of the participants (Vrij et al., 2008). More cues to deceit emerged in this reverse-order condition than in the control condition. More important is that observers who watched these videotaped interviews could distinguish between truths and lies better in the reverse-order condition than in the control condition. In the control condition, only 42% of the lies were correctly classified, well below what is found in a typical lie-detection experiment, suggesting that the lie-detection task in this experiment was particularly difficult. Yet, in the experimental condition, 60% of the lies were correctly classified, slightly more than what is typically found in lie-detection research.

Another way to increase cognitive load is by instructing interviewees to maintain eye contact with the interviewer (Beattie, 1981). When people have to concentrate on telling their stories, which is likely when they are requested to recall

what has happened, they are inclined to look every now and then away from their conversation partner (typically to a motionless point), because maintaining eye contact with the conversation partner is distracting (Doherty-Sneddon, Bruce, Bonner, Longbotham, & Doyle, 2002; Doherty-Sneddon & Phelps, 2005; Glenberg, Schroeder, & Robertson, 1998). When interviewees are instructed to maintain eye contact continuously, their concentration on telling their stories is therefore likely to be hampered, and, because lying is more mentally taxing than truth telling, this should impair the storytelling of liars more than the storytelling of truth tellers. In one experiment, half of the liars and truth tellers were requested to maintain eye contact with the interviewer continuously throughout the interview, whereas no instruction was given to the other half of the participants (Vrij, Mann, Leal, & Fisher, 2010). It was again found that more cues to deceit emerged in the eye-contact condition than in the control condition and that observers who watched these videotaped interviews could discriminate between truths and lies only in the eye-contact condition.

An experiment with children reveals a third type of additional request that can be made to increase a liar's cognitive load: asking event-irrelevant questions (Quas, Davis, Goodman, & Myers, 2007). Children played individually with a male confederate who touched each child twice on their stomach, nose, and neck. In the subsequent interview, children were asked to tell the truth or lie when asked questions about the touching. They also were asked a series of questions about the event that were unrelated to body touch and were asked to answer those questions truthfully. The children who lied about the body touch answered these unrelated questions less accurately than did the children who told the truth about the body touch. Quas et al. argued that remembering and rehearsing the lie required cognitive resources and that by devoting their resources to the lie, children had difficulty in conducting an adequate memory search for other event details.

## Future Research Directions

Although the nonverbal and verbal deception-detection literature is extensive, several important issues still remain to be addressed. We acknowledge four issues that we believe are fruitful and important avenues for future research. First, although much research has aimed at discriminating between truths and lies about past actions, virtually no research has been conducted on distinguishing between truths and lies about future actions (intentions). This is remarkable considering the frequency and importance of situations calling for assessments of whether a person is lying or truth telling about his or her intentions (e.g., stated reasons for crossing a border, for example). Consider the would-be 911 terrorists, smiling and chatting politely with airport staff while perhaps covertly feeling intense hatred and contempt toward their intended targets, as well as fear of discovery and/or death. Is it possible to identify such individuals by their behavior or responses to specific questions? The societal value of being able to detect planned but

not-yet-committed illegal actions (criminal intentions) is thus obvious (Granhag, 2010).

Deception research about intentions has commenced with the publication of three experimental studies (Granhag & Knieps, in press; Vrij, Granhag, Mann, & Leal, in press; Vrij, Leal, Mann, et al., in press). The pattern that emerges from these experiments is that deceptive intentions are associated with different cues to deceit than are deceptive descriptions of past activities. For example, research on past activities has shown that typically liars are less detailed than truth tellers (DePaulo et al., 2003; Vrij, 2005, 2008a), whereas no difference in detail emerged in any of the deceptive-intention experiments so far. One aspect that often makes truth tellers' stories about past activities more detailed than liars' stories is that there is a wealth of perceptual details that truth tellers have experienced during these past activities that they can recall (if they still remember them). In contrast, when discussing their intentions about a forthcoming activity, truth tellers have not yet experienced anything, and this restricts the amount of detail in their recall of intentions.

Some differences between truthful and deceptive intentions emerged. First, truthful intentions sounded more plausible than did deceptive intentions (Vrij, Granhag, Mann, & Leal, in press; Vrij, Leal, Mann, et al., in press), and truthful and deceptive intentions were associated with different mental images (Granhag & Kniep, in press). Participants who told the truth about their intentions agreed more frequently that planning their future actions evoked mental images than did participants who lied about their intentions. In addition, liars who claimed to have activated a mental image during the planning phase provided verbal descriptions of the most dominant mental image that were less rich in detail than those of the truth tellers. Those findings align with the concept of episodic future thought. In brief, episodic future thought represents the ability to mentally preexperience a one-time personal event that may occur in the future (Schacter & Addis, 2007). People who make up a plan for a future event that they intend to execute seem to activate a more concrete (detailed) mental image of the upcoming scenario than do those who adopt a plan that they do not intend to execute (Watanabe, 2005).

A second line of research that needs greater attention is work with real populations, such as actual suspects, and high-stakes lies. In fact, only three studies of high-stakes lies with actual suspects have been conducted (Mann et al., 2002; Vrij & Mann, 2001a, 2001b). Porter and ten Brinke (2010) argue that there may be qualitative and quantitative variations in the behavioral manifestations of lies of minor consequence versus those of major consequence. Although high-stakes lies may be harder for liars to tell, their behavioral signs are neither obvious (i.e., police perform just above chance when trying to identify them; Vrij & Mann, 2001b) and may simply not be more extreme than those of lower-stakes lies.

A third line of research that merits attention is lying by networks. Most deception research addresses individual truth tellers and liars, but criminals often act in pairs or larger groups. Research could focus on the development of interview tools

that can successfully discriminate between pairs of truth tellers and pairs of liars. Probably the dominant interview strategy to date is to interview each member of the group individually and compare the answers they give. If the members give consistent answers, they are considered truth tellers; if they give contradicting answers, they are considered liars. This strategy is limited, because it appears to ignore the fact that liars tend to prepare their alibis together, and therefore they are likely to give the same answers when asked about these alibis. The strategy works, however, if questions are asked that the liars have not anticipated, because in that case they cannot give their prepared answers (Vrij et al., 2009). Thus, examining contradictions could work, but only with answers to unanticipated questions. There is no evidence that professionals make this crucial distinction between anticipated and unanticipated questions when they interview multiple suspects.

A fourth line of fruitful and important research is examining the strategies used by truth tellers and liars when they are interviewed. As we have argued here, effective lie-detection interview techniques take advantage of the distinctive psychological processes and requirements of truth tellers and liars. To design such interview strategies, we need further insight into truth tellers' and liars' strategies through research. For example, research has shown that verbal cues are typically more diagnostic cues to deceit than are nonverbal cues (DePaulo et al., 2003; Vrij, 2008a, 2008b), and truth tellers' and liars' strategies can explain this. In one study, truth tellers and liars were found to use different verbal strategies (Vrij, Mann, Leal, & Granhag, 2010). Truth tellers were mainly concerned with telling what had happened. In contrast, liars were preparing their answers to possible questions. Liars further decided not to give too much detail, because providing details increases the chance of saying something that the interviewer knows to be untrue. The result of these different verbal strategies is that truth tellers' stories are likely to be more detailed than those of liars; research by DePaulo et al. (2003) and Vrij (2008a) supports this idea. Although truth tellers and liars in these studies did use different verbal strategies, they used the same nonverbal strategies. Both truth tellers and liars believed that signs of nervousness would appear suspicious. They therefore decided that they would try to suppress displaying signs of nervousness during the interview. The fact that truth tellers and liars employ different verbal strategies but the same nonverbal strategies (a finding also obtained by Hartwig, Granhag, Strömwall, & Doering, 2010) may explain, in part, why verbal cues to deceit are often more diagnostic than are nonverbal cues to deceit.

## Conclusion

We have presented an overview of pitfalls and opportunities in nonverbal and verbal lie detection. We presented 16 pitfalls and clustered them into three categories: (a) a lack of motivation to detect lies, (b) difficulties associated with lie detection, and (c) common errors made by lie detectors. We believe that the most important point to take home is that nonverbal and verbal cues to deception are ordinarily faint and unreliable. This makes lie detection a difficult task, as there is no nonverbal or verbal cue that lie detectors can truly rely upon.

We also discussed 11 guidelines to improve lie detection. First, we presented 5 guidelines aimed at avoiding common errors made in nonverbal and verbal lie detection. This has been the focus of research for a considerable period of time. We then discussed 6 guidelines aimed at creating more cues and more blatant and reliable cues to deception by exploiting truth tellers' and liars' distinctive psychological states. This has been the focus of recent research. We believe that the success of the traditional methods to improve lie detection is seriously hampered by the fact that cues are typically faint and unreliable. The recently introduced methods attempt to tackle exactly this problem, and, as we have demonstrated, are doing so with success. We encourage lie detectors to become actively engaged in exploiting truth tellers' and liars' different mental processes. This should not be restricted to police–suspect interviews, the topic of investigation in many deception experiments. It could equally be used in a variety of settings, including an intelligence context for the identification and apprehension of individuals with criminal intent. It may even be used for detecting lies told in the courtroom. We encourage researchers to focus their efforts on this line of innovative and promising lie-detection research.

## Endnotes

1. Not all probing questions facilitate lie detection. In many earlier studies examining the effect of questioning, probes such as "I don't understand this, could you please explain this to me?" (neutral probes); "I do believe you, but I don't understand this. How is it possible that...?" (positive probes); or "I don't believe you, are you trying to fool me?" (negative probes) were used. Intuitively, one might think that such probes make truth detection and lie detection easier: The liar is forced to continue to speak and give more information; and the more liars speak and the more information they give, the greater the possibility that they will make mistakes and give their lies away, either via verbal cues (by contradicting themselves or by saying something which an observer knows is incorrect) or via nonverbal cues. However, several studies have shown that these types of probing do not increase accuracy but tend to lead to judging the other as being truthful (G.D. Bond, Malloy, Thompson, Arias, & Nunn, 2004; Buller, Comstock, Aune, & Strzyzewski, 1989; Buller, Strzyzewski, & Comstock, 1991; Levine & McCornack, 2001; Stiff & Miller, 1986). This is called the *probing heuristic* (Levine, Park, & McCornack, 1999). The type of probing (negative, neutral, or positive) is irrelevant; all types of probing yield the same effect and benefit liars. In the "Exploiting the Different Mental Processes of Truth Tellers and Liars" section of this review, we discuss successful probing questions.

2. Note that when people overwhelmingly say that liars avert their gaze, it does not mean that they always rely on gaze aversion when they attempt to detect deceit. For example, Vrij (1993) correlated the behaviors displayed by the videotaped liars and truth tellers (e.g., gaze behavior, smiling, different types of movements, stutters) with the veracity judgments made by the police detectives

who observed these videotapes. The gaze patterns displayed by the liars and truth tellers did not predict the police detectives' veracity judgments in this particular study, whereas smiling (people who smiled less were perceived as more suspicious) and movements (people who moved their arms and hands more were perceived as more suspicious) did. In a meta-analysis of such studies, Hartwig and Bond (2010) found a correlation of $r = .27$ between averting gaze and veracity judgements (people who avert their gaze are perceived as more suspicious). Although this correlation was significant, it was somewhat lower than some other correlations. The cues that had the strongest relation with veracity judgments were incompetence ($r = -.54$) and ambivalence ($r = .51$). People who appear incompetent and/or ambivalent are judged as deceptive.

3. There are many interrogation manuals, and they are highly similar to each other (Vrij & Granhag, 2007). We mainly focus on the Inbau et al. (2001) manual, because this manual is commonly used by police and military interrogators and hence is highly influential (Gudjonsson, 2003).
4. Throughout the years, the Ekman group in particular has claimed that individual differences in the ability to detect deceit exist. They first reported that some groups of professionals (e.g., The Secret Service) are better lie detectors than other groups (Ekman & O'Sullivan, 1991; Ekman, O'Sullivan, & Frank, 1999). Later they reported that they had identified some individuals with extraordinarily good skills in lie detection, the so-called wizards (O'Sullivan & Ekman, 2004). Charles F. Bond has challenged these findings, arguing that individual differences are minute (Bond & DePaulo, 2008). Regarding the group differences, C.F. Bond (2008) noticed that a draft manuscript from Ekman et al.'s 1999 article, circulated in 1997, differed from the final 1999 article and that not all the findings reported in the 1997 draft were included in the 1999 article. Because the findings in 1999 were more in alignment with Ekman et al.'s argument about the superiority of certain groups in lie detection than the findings in the 1997 draft, C.F. Bond (2008) suspected manipulation and believed that Ekman and colleagues avoided reporting the findings that went against their general conclusion. Ekman, O'Sullivan, and Frank (2008) denied manipulation. They reported that after 1997, they tested additional groups of participants but that these new groups did not complete all the lie-detection tests that the earlier groups had completed. In their 1999 article, they only reported the results for the lie-detection tests that were completed by all the groups. Regarding their findings, Bond and Uysal (2007) reasoned that the number of wizards that were identified was so low (15 out of 13,000 people who were tested) that they could have emerged as wizards just by chance. However, O'Sullivan (2007) argued that subsequent follow-up testing has demonstrated that these wizards were true wizards. More important for this article is whether wizards use clearly identifiable strategies. If so, it would mean that others could learn from them. The Ekman group has not published detailed data about the strategies used by their wizards to date, but G.D. Bond (2009) has. In his wizard project, G.D. Bond started with 234 lie detectors and identified two wizards. Via eye-tracking equipment he determined the locations the two wizards looked at when making their veracity decisions. The two experts used different strategies: One wizard looked more at the face area, whereas the other looked more at the arm/torso area. In summary, if wizards exist, it is so far unclear what makes them wizards. O'Sullivan and colleagues further claimed that truth and lie detection becomes easier when there is more at stake for the truth tellers and liars (O'Sullivan, 2008; O'Sullivan, Frank, Hurley, & Tiwana, in press). This claim has been supported by experimental research (DePaulo, Blank, Swaim, & Hairfield, 1992; DePaulo, Kirkendol, Tang, & O'Brien, 1988; DePaulo, Lanier, & Davis, 1983; DePaulo, LeMay, & Epstein, 1991; DePaulo, Stone, & Lassiter, 1985; Lane & DePaulo, 1999; Vrij, 2000; Vrij, Harden, Terry, Edward, & Bull, 2001).
5. Many of these guidelines require interviewees to talk. We believe that interviewees are generally willing to talk even in situations in which such willingness may be less expected, such as in police interviews. In their analysis of 1,067 audiotaped police interviews, Moston, Stephenson, and Williamson (1993) found that only 5% of suspects remained silent.

## Acknowledgments

The authors are very grateful to Bella M. DePaulo for her constructive comments on an earlier draft of this article.

## References

Ajzen, I. (2001). Nature and operation of attitudes. *Annual Review of Psychology*, *52*, 27–58.

Albrechtsen, J.S., Meissner, C.A., & Susa, K.J. (2009). Can intuition improve deception detection performance? *Journal of Experimental Social Psychology*, *45*, 1052–1055.

Allwood, C.M., & Granhag, P.A. (1999). Feelings of confidence and the realism of confidence judgments in everyday life. In P. Juslin, & H. Montgomery (Eds.), *Judgment and decision making: Neo-Brunswikian and process-tracing approaches* (pp. 123–146). Mahwah, NJ: Erlbaum.

Ambady, N., Bernieri, F.J., & Richeson, J.A. (2000). Toward a histology of social behaviour: Judgmental accuracy from thin slices of the behavioural stream. *Advances in Experimental Social Psychology*, *32*, 201–271.

Anderson, C.A., Lepper, M.R., & Ross, L. (1980). Perseverance of social theories: The role of explanation in the persistence of discredited information. *Journal of Personality and Social Psychology*, *39*, 1037–1049.

Anderson, D.E., Ansfield, M.E., & DePaulo, B.M. (1999). Love's best habit: Deception in the context of relationships. In P. Philippot, R.S. Feldman, & E.J. Coats (Eds.), *The social context of nonverbal behavior* (pp. 372–409). Cambridge, England: Cambridge University Press.

Anderson, D.E., DePaulo, B.M., Ansfield, M.E., Tickle, J.J., & Green, E. (1999). Beliefs about cues to deception: Mindless stereotypes or untapped wisdom? *Journal of Nonverbal Behaviour*, *23*, 67–89.

Arntzen, F. (1970). *Psychologie der Zeugenaussage [Psychology of testimony]*. Göttingen, Germany: Hogrefe.

Arntzen, F. (1982). Die Situation der forensischen Aussagenpsychologie in der Bundesrepublik Deutschland. In A. Trankell (Ed.), *Reconstructing the past: The role of psychologists in criminal trials* (pp. 107–120). Deventer, The Netherlands: Kluwer.

Arntzen, F. (1983). *Psychologie der Zeugenaussage: Systematik der Glaubwürdigkeitsmerkmale* [Psychology of testimony: A systematic approach of credibility assessment]. München, Germany: Beck.

Backbier, E., Hoogstraten, J., & Meerum Terwogt-Kouwenhoven, K. (1997). Situational determinants of the acceptability of telling lies. *Journal of Applied Social Psychology*, *27*, 1048–1062.

Bageley, J., & Manelis, L. (1979). Effect of awareness on an indicator of cognitive load. *Perceptual and Motor Skills*, *49*, 591–594.

Baldry, A.C., & Winkel, F.W. (1998). Perceptions of the credibility and eventual value of victim and suspect statements in interviews. In J. Boros, I. Munnich, & M. Szegedi (Eds.), *Psychology and criminal justice: International review of theory and practice* (pp. 74–82). Berlin, Germany: de Gruyter.

Baldry, A.C., Winkel, F.W., & Enthoven, D.S. (1997). Paralinguistic and nonverbal triggers of biased credibility assessments of rape victims in Dutch police officers: An experimental study of "nonevidentiary" bias. In S. Redondo, V. Garrido, J. Perze, & R. Barbaret (Eds.), *Advances in psychology and law* (pp. 163–174). Berlin, Germany: de Gruyter.

Bar, M., Neta, M., & Linz, H. (2006). Very first impressions. *Emotion*, *6*, 269–278.

Barrett, E.C. (2005). Psychological research and police investigations: Does the research meet the needs? In L. Alison (Ed.), *The forensic psychologist's casebook* (pp. 47–67). Devon, England: Willan.

Baumeister, R.F. (1998). The self. In D.T. Gilbert, S.T. Fiske, & G. Lindzey (Eds.), *Handbook of social psychology* (4th ed., pp. 680–740). Boston: McGraw-Hill.

Bavelas, J.B., & Chovil, N. (2006). Nonverbal and verbal communication: Hand gestures and facial displays as part of language use in face-to-face dialogue. In V. Manusov, & M.L. Patterson (Eds.), *The SAGE handbook of nonverbal communication* (pp. 97–115). Thousand Oaks, CA: Sage.

Bavelas, J.B., Chovil, N., Coates, L., & Roe, L. (1995). Gestures specialized for dialogue. *Personality and Social Psychology Bulletin*, *21*, 394–405.

Bavelas, J.B., & Gerwing, J. (2007). Conversational hand gestures and facial displays in face-to-face dialogue. In K. Fiedler (Ed.), *Frontiers of social psychology: Social communication* (pp. 283–307). New York: Psychology Press.

Beattie, G.W. (1981). A further investigation of the cognitive interference hypothesis of gaze patterns during conversation. *British Journal of Social Psychology*, *20*, 243–248.

Bell, K.L., & DePaulo, B.M. (1996). Liking and lying. *Basic and Applied Social Psychology*, *18*, 243–266.

Blair, J.P., & Kooi, B. (2004). The gap between training and research in the detection of deception. *International Journal of Police Science and Management*, *6*, 77–83.

Bok, S. (1989). *Lying: Moral choice in public and private life*. New York: Random House.

Bollingmo, G., Wessel, E., Sandvold, Y., Eilertsen, D.E., & Magnussen, S. (2009). The effect of biased and non-biased information on judgements of witness credibility. *Psychology, Crime & Law*, *15*, 61–71.

Bond, C.F. (2008). A few can catch a liar, sometimes. *Applied Cognitive Psychology*, *22*, 1298–1300.

Bond, C.F., & DePaulo, B.M. (2006). Accuracy of deception judgements. *Personality and Social Psychology Review*, *10*, 214–234.

Bond, C.F., & DePaulo, B.M. (2008). Individual differences in judging deception: Accuracy and bias. *Psychological Bulletin*, *134*, 477–492.

Bond, C.F., & Fahey, W.E. (1987). False suspicion and the misperception of deceit. *British Journal of Social Psychology*, *26*, 41–46.

Bond, C.F., & Uysal, A. (2007). On lie detection "wizards." *Law and Human Behavior*, *31*, 109–115.

Bond, G.D. (2009). Deception detection expertise. *Law and Human Behavior*, *32*, 339–351.

Bond, G.D., Malloy, D.M., Thompson, L.A., Arias, E.A., & Nunn, S. (2004). Post-probe decision making in a prison context. *Communication Monographs*, *71*, 269–285.

Bothwell, R., & Jalil, M. (1992). The credibility of nervous witnesses. *Journal of Social Behavior and Personality*, *7*, 581–586.

Brant, C. (1993). Communication patterns in Indians: Verbal and nonverbal. *Sexual Abuse: A Journal of Research and Treatment*, *6*, 259–269.

Bull, P. (2009). Detecting deceit: Current issues. In T. Williamson, B. Milne, & S.P. Savage (Eds.), *International developments in investigative interviewing* (pp. 190–206). Cullompton, England: Willan.

Bull, R., & McAlpine, S. (1998). Facial appearance and criminality. In A. Memon, A. Vrij, & R. Bull (Eds.), *Psychology and law: Truthfulness, accuracy and credibility* (pp. 59–76). London: McGraw-Hill.

Buller, D.B., & Aune, R.K. (1988). The effects of vocalics and nonverbal sensitivity on compliance: A speech accommodation theory explanation. *Human Communication Research*, *14*, 301–332.

Buller, D.B., & Burgoon, J.K. (1996). Interpersonal deception theory. *Communication Theory*, *6*, 203–242.

Buller, D.B., Comstock, J., Aune, R.K., & Strzyzewski, K.D. (1989). The effect of probing on deceivers and truthtellers. *Journal of Nonverbal Behavior*, *13*, 155–170.

Buller, D.B., Strzyzewski, K.D., & Comstock, J. (1991). Interpersonal deception: I. Deceivers' reactions to receivers' suspicions and probing. *Communication Monographs*, *58*, 1–24.

Burgess, A.W. (1985). *Rape and sexual assault: A research book*. London: Garland.

Burgess, A.W., & Homstrom, L.L. (1974). *Rape: Victims of crisis*. Bowie, MD: Brady.

Burgoon, J.K., Blair, J.P., & Strom, R.E. (2008). Cognitive biases and nonverbal cue availability in deception detection. *Human Communication Research*, *34*, 572–599.

Burgoon, J.K., & Buller, D.B. (1994). Interpersonal deception: III. Effects of deceit on perceived communication and nonverbal dynamics. *Journal of Nonverbal Behavior*, *18*, 155–184.

Burgoon, J.K., Buller, D.B., Floyd, K., & Grandpre, J. (1996). Deceptive realities: Sender, receiver, and observer perspectives in deceptive conversations. *Communication Research*, *23*, 724–748.

Burgoon, J.K., Buller, D.B., White, C.H., Afifi, W., & Buslig, A.L.S. (1999). The role of conversation involvement in deceptive interpersonal interactions. *Personality and Social Psychology Bulletin*, *25*, 669–685.

Caso, L., Maricchiolo, F., Bonaiuto, M., Vrij, A., & Mann, S. (2006). The impact of deception and suspicion on different hand movements. *Journal of Nonverbal Behavior*, *30*, 1–19.

Caso, L., Vrij, A., Mann, S., & de Leo, G. (2006). Deceptive responses: The impact of verbal and nonverbal countermeasures. *Legal and Criminological Psychology*, *11*, 99–111.

Cohen, J. (1977). *Statistical power analysis for the behavioral sciences*. New York: Academic Press.

Colwell, L.H., Miller, H.A., Lyons, P.M., & Miller, R.S. (2006). The training of law enforcement officers in detecting deception: A survey of current practices and suggestions for improving accuracy. *Police Quarterly*, *9*, 275–290.

Dalton, A.L., & Daneman, M. (2006). Social suggestibility to central and peripheral misinformation. *Memory*, *14*, 486–501.

Darley, J.M., & Gross, P.H. (1983). A hypothesis-confirming bias in labelling effects. *Journal of Personality and Social Psychology*, *44*, 20–33.

Davies, G.M. (1991). Research on children's testimony: Implications for interviewing practice. In C.R. Hollin, & K. Howells (Eds.), *Clinical approaches to sex offenders and their victims* (pp. 177–191). New York: Wiley.

Davis, M., & Hadiks, D. (1995). Demeanor and credibility. *Semiotica*, *106*, 5–54.

DePaulo, B.M. (1992). Nonverbal behavior and self-presentation. *Psychological Bulletin*, *111*, 203–243.

DePaulo, B.M. (2004). The many faces of lies. In A.G. Miller (Ed.), *The social psychology of good and evil* (pp. 303–236). New York: Guilford Press.

DePaulo, B.M., Blank, A.L., Swaim, G.W., & Hairfield, J.G. (1992). Expressiveness and expressive control. *Personality and Social Psychology Bulletin*, *18*, 276–285.

DePaulo, B.M., Charlton, K., Cooper, H., Lindsay, J. L., & Muhlenbruck, L. (1997). The accuracy–confidence correlation in the detection of deception. *Personality and Social Psychology Review*, *1*, 346–357.

DePaulo, B.M., Epstein, J.A., & LeMay, C.S. (1990). Responses of the socially anxious to the prospect of interpersonal evaluation. *Journal of Personality*, *58*, 623–640.

DePaulo, B.M., & Friedman, H.S. (1998). Nonverbal communication. In D.T. Gilbert, S.T. Fiske, & G. Lindzey (Eds.), *The handbook of social psychology* (pp. 3–40). Boston: McGraw-Hill.

DePaulo, B.M., Kashy, D.A., Kirkendol, S.E., Wyer, M.M., & Epstein, J.A. (1996). Lying in everyday life. *Journal of Personality and Social Psychology*, *70*, 979–995.

DePaulo, B.M., & Kirkendol, S.E. (1989). The motivational impairment effect in the communication of deception. In J.C. Yuille (Ed.), *Credibility assessment* (pp. 51–70). Dordrecht, The Netherlands: Kluwer.

DePaulo, B.M., Kirkendol, S.E., Tang, J., & O'Brien, T.P. (1988). The motivational impairment effect in the communication of deception: Replications and extensions. *Journal of Nonverbal Behavior*, *12*, 177–202.

DePaulo, B.M., Lanier, K., & Davis, T. (1983). Detecting deceit of the motivated liar. *Journal of Personality and Social Psychology*, *45*, 1096–1103.

DePaulo, B.M., LeMay, C.S., & Epstein, J.A. (1991). Effects of importance of success and expectations for success on effectiveness at deceiving. *Personality and Social Psychology Bulletin*, *17*, 14–24.

DePaulo, B.M., Lindsay, J.L., Malone, B.E., Muhlenbruck, L., Charlton, K., & Cooper, H. (2003). Cues to deception. *Psychological Bulletin*, *129*, 74–118.

DePaulo, B.M., & Pfeifer, R.L. (1986). On-the-job experience and skill at detecting deception. *Journal of Applied Social Psychology*, *16*, 249–267.

DePaulo, B.M., Rosenthal, R., Eisenstat, R.A., Rogers, P.L., & Finkelstein, S. (1978). Decoding discrepant nonverbal cues. *Journal of Personality and Social Psychology*, *36*, 313–323.

DePaulo, B.M., Stone, J.I., & Lassiter, G.D. (1985). Telling ingratiating lies: Effects of target sex and target attractiveness on verbal and nonverbal deceptive success. *Journal of Personality and Social Psychology*, *48*, 1191–1203.

Doherty-Sneddon, G., Bruce, V., Bonner, L., Longbotham, S., & Doyle, C. (2002). Development of gaze aversion as disengagement of visual information. *Developmental Psychology*, *38*, 438–445.

Doherty-Sneddon, G., & Phelps, F.G. (2005). Gaze aversion: A response to cognitive or social difficulty? *Memory and Cognition*, *33*, 727–733.

Dumas, R., & Testé, B. (2006). The influence of criminal facial stereotypes on juridic judgments. *Swiss Journal of Psychology*, *65*, 237–244.

Ekman, P. (1997). Deception, lying, and demeanor. In D.F. Halpern, & A.E. Voiskounsky (Eds.), *States of mind: American and post-Soviet perspectives on contemporary issues in psychology* (pp. 93–105). New York: Oxford University Press.

Ekman, P. (2001). *Telling lies: Clues to deceit in the marketplace, politics and marriage*. New York: Norton. (Original work published 1985).

Ekman, P., & Friesen, W.V. (1969). Nonverbal leakage and clues to deception. *Psychiatry*, *32*, 88–106.

Ekman, P., & O'Sullivan, M. (1991). Who can catch a liar? *American Psychologist*, *46*, 913–920.

Ekman, P., & O'Sullivan, M. (2006). From flawed self-assessment to blatant whoppers: The utility of voluntary and involuntary behavior in detecting deception. *Behavioural Sciences & the Law*, *24*, 673–686.

Ekman, P., O'Sullivan, M., & Frank, M.G. (1999). A few can catch a liar. *Psychological Science*, *10*, 263–266.

Ekman, P., O'Sullivan, M., & Frank, M.G. (2008). Scoring and reporting: A response to Bond (2008). *Applied Cognitive Psychology*, *22*, 1315–1317.

Ekman, P., O'Sullivan, M., Friesen, W.V., & Scherer, K. (1991). Face, voice, and body in detecting deceit. *Journal of Nonverbal Behavior*, *15*, 125–135.

Elaad, E. (2003). Effects of feedback on the overestimated capacity to detect lies and the underestimated ability to tell lies. *Applied Cognitive Psychology*, *17*, 349–363.

Feeley, T.H., & Young, M.J. (2000). The effects of cognitive capacity on beliefs about deceptive communication. *Communication Quarterly*, *48*, 101–119.

Feldman, S.S., & Cauffman, E. (1999). Sexual betrayal among late adolescents: Perspectives of the perpetrator and the aggrieved. *Journal of Youth and Adolescence*, *28*, 235–258.

Fiedler, K., & Walka, I. (1993). Training lie detectors to use nonverbal cues instead of global heuristics. *Human Communication Research*, *20*, 199–223.

Fisher, R.P., Brennan, K.H., & McCauley, M.R. (2002). The cognitive interview method to enhance eyewitness recall. In M.L. Eisen, J.A. Quas, & G.S. Goodman (Eds.), *Memory and suggestibility in the forensic interview* (pp. 265–286). Mahwah, NJ: Erlbaum.

Fisher, R.P., Vrij, A., & Leins, D.A. (in press). Inconsistency as a predictor of memory inaccuracy and lying. In B.S. Cooper, D. Griesel, & M. Ternes (Eds.), *Applied issues in investigative interviewing, eyewitness memory, and credibility assessment* New York, NY: Springer.

Ford, E.B. (2006). Lie detection: Historical, neuropsychiatric and legal dimensions. *International Journal of Law and Psychiatry*, *29*, 159–177.

Fowler, K.A., Lilienfeld, S.O., & Patrick, C.J. (2009). Detecting psychopathy from thin slices of behavior. *Psychological Assessment*, *21*, 68–78.

Frank, M.G., & Ekman, P. (1997). The ability to detect deceit generalizes across different types of high-stake lies. *Journal of Personality and Social Psychology*, *72*, 1429–1439.

Frank, M.G., & Feeley, T.H. (2003). To catch a liar: Challenges for research in lie detection training. *Journal of Applied Communication Research*, *31*, 58–75.

Frank, M.G., Yarbrough, J.D., & Ekman, P. (2006). Investigative interviewing and the detection of deception. In T. Williamson (Ed.), *Investigative interviewing: Rights, research and regulation* (pp. 229–255). Cullompton, England: Willan.

Freedman, N. (1972). The analysis of movement behavior during the clinical interview. In A.R. Siegman, & B. Pope (Eds.), *Studies in dyadic communication* (pp. 153–175). Elmsford, NY: Pergamon.

Ganis, G., Kosslyn, S.M., Stose, S., Thompson, W.L., & Yurgelun-Todd, D.A. (2003). Neural correlates of different types of deception: An fMRI investigation. *Cerebral Cortex*, *13*, 830–836.

Garrido, E., Masip, J., & Herrero, C. (2004). Police officers' credibility judgements: Accuracy and estimated ability. *International Journal of Psychology*, *39*, 254–275.

Geiselman, R.E., Callot, R. (1990). Reverse versus forward recall of script-based texts. *Journal of Applied Cognitive Psychology*, *4*, 141–144.

Gigerenzer, G., Todd, P.M., & the ABC Research Group. (1999). *Simple heuristics that make us smart*. New York: Oxford University Press.

Gilbert, D.T. (1991). How mental systems believe. *American Psychologist*, *46*, 107–119.

Gilbert, J.A.E., & Fisher, R.P. (2006). The effects of varied retrieval cues on reminiscence in eyewitness memory. *Applied Cognitive Psychology*, *20*, 723–739.

Gilovich, T., Savitsky, K., & Medvec, V.H. (1998). The illusion of transparency: Biased assessments of others' ability to read one's emotional states. *Journal of Personality and Social Psychology*, *75*, 332–346.

Glenberg, A.M., Schroeder, J.L., & Robertson, D.A. (1998). Averting the gaze disengages the environment and facilitates remembering. *Memory & Cognition*, *26*, 651–658.

The Global Deception Team. (2006). A world of lies. *Journal of Cross-Cultural Psychology*, *37*, 60–74.

Goodman, G.S., Rudy, L., Bottoms, B., & Aman, C. (1990). Children's concerns and memory: Issues of ecological validity in the study of children's eyewitness testimony. In R. Fivush, & J. Hudson (Eds.), *Knowing and remembering in young children* (pp. 249–284). New York: Cambridge University Press.

Granhag, P.A. (2010). On the psycho-legal study of true and false intentions: Dangerous waters and some stepping stones. *The Open Criminology Journal*, *3*, 37–43.

Granhag, P.A., Andersson, L.O., Strömwall, L.A., & Hartwig, M. (2004). Imprisoned knowledge: Criminals' beliefs about deception. *Legal and Criminological Psychology*, *9*, 103–119.

Granhag, P.A., & Hartwig, M. (2008). A new theoretical perspective on deception detection: On the psychology of instrumental mind-reading. *Psychology, Crime & Law*, *14*, 189–200.

Granhag, P.A., & Knieps, M. (in press). Episodic future thought: Illuminating the trademarks of true and false intent. *Applied Cognitive Psychology*.

Granhag, P.A., & Strömwall, L.A. (1999). Repeated interrogations: Stretching the deception detection paradigm. *Expert Evidence: The International Journal of Behavioural Sciences in Legal Contexts*, *7*, 163–174.

Granhag, P.A., & Strömwall, L.A. (2000a). "Let's go over this again...": Effects of repeated interrogations on deception detection performance. In A. Czerederecka, T. Jaskiewicz-Obydzinska, & J. Wojcikiewicz (Eds.), *Forensic psychology and law: Traditional questions and new ideas* (pp. 191–196). Kraków, Poland: Institute of Forensic Research.

Granhag, P.A., & Strömwall, L.A. (2000b). Deception detection: Examining the consistency heuristic. In C.M. Breur, M.M. Kommer, J.F. Nijboer, & J.M. Reintjes (Eds.), *New trends in criminal investigation and evidence* (Vol. 2, pp. 309–321). Antwerpen, Belgium: Intresentia.

Granhag, P.A., & Strömwall, L.A. (2001). Deception detection: Interrogators' and observers' decoding of consecutive statements. *The Journal of Psychology*, *135*, 603–620.

Granhag, P.A., & Strömwall, L.A. (2002). Repeated interrogations: Verbal and nonverbal cues to deception. *Applied Cognitive Psychology*, *16*, 243–257.

Granhag, P.A., & Strömwall, L.A. (2004). *The detection of deception in forensic contexts*. Cambridge, UK: Cambridge University Press.

Granhag, P.A., Strömwall, L.A., & Hartwig, M. (2005). Granting asylum or not? Migration board personnel's beliefs about deception. *Journal of Ethnic and Migration Studies*, *31*, 29–50.

Granhag, P.A., Strömwall, L.A., & Hartwig, M. (2007). The SUE technique: The way to interview to detect deception. *Forensic Update*, *88*, 25–29.

Granhag, P.A., Strömwall, L.A., & Jonsson, A.C. (2003). Partners in crime: How liars in collusion betray themselves. *Journal of Applied Social Psychology*, *33*, 848–868.

Granhag, P.A., & Vrij, A. (2010). Interviewing to detect deception. In P.A. Granhag (Ed.), *Forensic psychology in context: Nordic and*

*international approaches* (pp. 75–93). Cullompton, England: Willan.

Greely, H., & Illes, J. (2007). Neuroscience-based lie detection: The urgent need for regulation. *American Journal of Law and Medicine*, *33*, 377–431.

Greuel, L. (1992). Police officers' beliefs about cues associated with deception in rape cases. In F. Lösel, D. Bender, & T. Bliesener (Eds.), *Psychology and law: International perspectives* (pp. 234–239). Berlin, Germany: de Gruyter.

Gudjonsson, G.H. (2003). *The psychology of interrogations and confessions*. Chichester, England: Wiley.

Hale, J.L., & Stiff, J.B. (1990). Nonverbal primacy in veracity judgments. *Communication Reports*, *3*, 75–83.

Hare, R.D. (2006). Psychopathy: A clinical and forensic overview. *Psychiatric Clinics of North America*, *29*, 709–724.

Hartwig, M., & Bond, C.F. (2010). *Why do lie-catchers fail? A Brunswikian lens model of human lie judgments*. Manuscript submitted for publication.

Hartwig, M., Granhag, P.A., & Strömwall, L. (2007). Guilty and innocent suspects' strategies during interrogations. *Psychology, Crime, & Law*, *13*, 213–227.

Hartwig, M., Granhag, P.A., Strömwall, L., & Doering, N. (2010). Impression and information management: On the strategic self-regulation of innocent and guilty suspects [Special issue]. *The Open Criminology Journal*, *3*, 10–16.

Hartwig, M., Granhag, P.A., Strömwall, L., & Kronkvist, O. (2006). Strategic use of evidence during police interrogations: When training to detect deception works. *Law and Human Behavior*, *30*, 603–619.

Hartwig, M., Granhag, P.A., Strömwall, L., & Vrij, A. (2005). Detecting deception via strategic disclosure of evidence. *Law and Human Behavior*, *29*, 469–484.

Henig, R.M. (2006, February 5). Looking for the lie. *The New York Times*. Retrieved July 12, 2007, from http://www.nytimes.com/2006/02/05/magazine/05lying.html

Hirsch, A.R., & Wolf, C.J. (2001). Practical methods for detecting mendacity: A case study. *Journal of the American Academy of Psychiatry and the Law*, *29*, 438–444.

Hocking, J.E., & Leathers, D.G. (1980). Nonverbal indicators of deception: A new theoretical perspective. *Communication Monographs*, *47*, 119–131.

Horvath, F., Jayne, B., & Buckley, J. (1994). Differentiation of truthful and deceptive criminal suspects in behavioral analysis interviews. *Journal of Forensic Sciences*, *39*, 793–807.

Inbau, F.E., Reid, J.E., Buckley, J.P., & Jayne, B.C. (2001). *Criminal interrogation and confessions*. (4th ed.). Gaithersburg, MD: Aspen.

Joffe, R., & Yuille, J.C. (1992, May). *Criteria-based content analysis: An experimental investigation*. Paper presented at the North Atlantic Treaty Organization Advanced Study Institute on the Child Witness in Context: Cognitive, Social and Legal Perspectives, Lucca, Italy.

Johnson, R.R. (2006a). Confounding influences on police detection of suspiciousness. *Journal of Criminal Justice*, *34*, 435–442.

Johnson, R.R. (2006b). Race and police reliance on suspicious nonverbal cues. *Policing: An International Journal of Police Strategies & Management*, *30*, 277–290.

Kahana, M.J. (1996). Associate retrieval processes in free recall. *Memory & Cognition*, *24*, 103–109.

Kalbfleisch, P.J. (1992). Deceit, distrust and the social milieu: Application of deception research in a troubled world. *Journal of Applied Communication Research*, *20*, 308–334.

Kassin, S.M. (2005). On the psychology of confessions: Does innocence put innocents at risk? *American Psychologist*, *60*, 215–228.

Kassin, S.M. (2008a). Confession evidence: Commonsense myths and misconceptions. *Criminal Justice and Behavior*, *35*, 1309–1322.

Kassin, S.M. (2008b). The psychology of confessions. *Annual Review of Law and Social Sciences*, *4*, 193–217.

Kassin, S.M., Appleby, S.C., & Torkildson-Perillo, J. (2010). Interviewing suspects: Practice, science, and future directions. *Legal and Criminological Psychology*, *15*, 39–56.

Kassin, S.M., & Fong, C.T. (1999). "I'm innocent!": Effects of training on judgments of truth and deception in the interrogation room. *Law and Human Behavior*, *23*, 499–516.

Kassin, S.M., Goldstein, C.J., & Savitsky, K. (2003). Behavioral confirmation in the interrogation room: On the dangers of presuming guilt. *Law and Human Behavior*, *27*, 187–203.

Kassin, S.M., & Gudjonsson, G.H. (2004). The psychology of confessions: A review of the literature and issues. *Psychological Science in the Public Interest*, *5*, 33–67.

Kassin, S.M., Meissner, C.A., & Norwick, R.J. (2005). "I'd know a false confession if I saw one": A comparative study of college students and police investigators. *Law and Human Behavior*, *29*, 211–227.

Kassin, S.M., & Norwick, R.J. (2004). Why people waive their Miranda rights: The power of innocence. *Law and Human Behavior*, *28*, 211–221.

Kaufmann, G., Drevland, G.C., Wessel, E., Overskeid, G., & Magnussen, S. (2003). The importance of being earnest: Displayed emotions and witness credibility. *Applied Cognitive Psychology*, *17*, 21–34.

Kendon, A. (1994). Do gestures communicate? A review. *Research on Language and Social Interaction*, *27*, 175–200.

Kendon, A. (2004). *Gesture: Visible action as utterance*. Cambridge, England: Cambridge University Press.

Kleinke, C L. (1986). Gaze and eye contact: A research review. *Psychological Bulletin*, *100*, 78–100.

Kleinmuntz, B., & Szucko, J. J. (1984). Lie detection in ancient and modern times: A call for contemporary scientific study. *American Psychologist*, *39*, 766–776.

Köhnken, G. (1987). Training police officers to detect deceptive eyewitness statements. Does it work? *Social Behaviour*, *2*, 1–17.

Köhnken, G. (2002). A German perspective on children's testimony. In H.L. Westcott, G.M. Davies, & R.H.C. Bull (Eds.), *Children's testimony: A handbook of psychological research and forensic practice* (pp. 233–244). Chichester, England: Wiley.

Köhnken, G. (2004). Statement validity analysis and the "detection of the truth." In P.A. Granhag, & L.A. Strömwall (Eds.), *Deception detection in forensic contexts* (pp. 41–63). Cambridge, England: Cambridge University Press.

Kowalski, R.M., Walker, S., Wilkinson, R., Queen, A., & Sharpe, B. (2003). Lying, cheating, complaining, and other aversive interpersonal behaviors: A narrative examination of the darker side

of relationships. *Journal of Social and Personal Relationships*, *20*, 471–490.

Krauss, R.M. (1981). Impression formation, impression management, and nonverbal behaviors. In E.T. Higgins, C.P. Herman, & M.P. Zanna (Eds.), *Social cognition: The Ontario Symposium* (Vol. 1, pp. 323–341). Hillsdale, NJ: Erlbaum.

LaFrance, M., & Mayo, C. (1976). Racial differences in gaze behavior during conversations: Two systematic observational studies. *Journal of Personality and Social Psychology*, *33*, 547–552.

LaFrance, M., & Mayo, C. (1978). Cultural aspects of nonverbal communication. *International Journal of Intercultural Relations*, *2*, 71–89.

Landry, K., & Brigham, J.C. (1992). The effect of training in criteria-based content analysis on the ability to detect deception in adults. *Law and Human Behavior*, *16*, 663–675.

Lane, J.D., & DePaulo, B.M. (1999). Completing Coyne's cycle: Dysphorics' ability to detect deception. *Journal of Research in Personality*, *33*, 311–329.

Leal, S., Vrij, A., Mann, S., & Fisher, R. (2010). Detecting true and false opinions: The Devil's Advocate approach as a lie detection aid. *Acta Psychologica*, *134*, 323–329.

Leary, M.R., & Kowalski, R.M. (1990). Impression management: A literature review and two-component model. *Psychological Bulletin*, *107*, 34–47.

Leins, D., Fisher, R.P., Vrij, A., Leal, S., & Mann, S. (in press). Using sketch-drawing to induce inconsistency: An active approach to detecting deception. *Legal and Criminological Psychology*.

Leo, R.A. (1996). Inside the interrogation room. *Journal of Criminal Law and Criminology*, *86*, 266–303.

Lerner, M.J. (1980). *The belief in a just world*. New York: Plenum Press.

Levine, T.R., Asada, K.J.K., & Park, H.S. (2006). The lying chicken and the gaze avoidant egg: Eye contact, deception and causal order. *Southern Journal of Communication*, *4*, 401–411.

Levine, T.R., Feeley, T.H., McCornack, S.A., Hughes, M., & Harms, C.M. (2005). Testing the effects of nonverbal behavior training on accuracy in deception detection with the inclusion of a bogus training control group. *Western Journal of Communication*, *69*, 203–217.

Levine, T.R., & McCornack, S.A. (1992). Linking love and lies: A formal test of the McCornack and Parks model of deception detection. *Journal of Social and Personal Relationships*, *9*, 143–154.

Levine, T.R., & McCornack, S.A. (1996a). A critical analysis of the behavioral adaptation explanation of the probing effect. *Human Communication Research*, *22*, 575–588.

Levine, T.R., & McCornack, S.A. (1996b). Can behavioral adaptation explain the probing effect? *Human Communication Research*, *22*, 604–613.

Levine, T.R., & McCornack, S.A. (2001). Behavioural adaptation, confidence, and heuristic-based explanations of the probing effect. *Human Communication Research*, *27*, 471–502.

Levine, T.R., Park, H.S., & McCornack, S.A. (1999). Accuracy in detecting truths and lies: Documenting the "veracity effect." *Communication Monographs*, *66*, 125–144.

Lindholm, T. (2008). Who can judge the accuracy of eyewitness statements? A comparison of professionals and lay-persons. *Applied Cognitive Psychology*, *22*, 1301–1314.

Littmann, E., & Szewczyk, H. (1983). Zu einigen Kriterien und Ergebnissen forensisch-psychologischer Glaubwürdigkeitsbegutachtung von sexuell mißbrauchten Kindern und Jugendlichen [Criteria to be examined in forensic-psychological credibility assessment in child sexual abuse cases]. *Forensia*, *4*, 55–72.

Liu, M, Granhag, P.A., Landström, S., Roos af Hjelmsäter, E., Strömwall, L.A., & Vrij, A. (2010). "Can you remember what was in your pocket when you were stung by a bee?"—Eliciting cues to deception by asking the unanticipated. *The Open Criminology Journal*, *3*, 31–36.

Loftus, E.F. (2005). Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. *Learning and Memory*, *12*, 361–366.

Loftus, E.F., & Palmer, J.C. (1974). Reconstructions of automobile destruction: An example of the interaction between language and memory. *Journal of Verbal Learning and Verbal Behavior*, *13*, 585–589.

Lord, C.G., Ross, L., & Lepper, M.R. (1979). Biased assimilation and attitude polarization: The effects of prior theories on subsequently considered evidence. *Journal of Personality and Social Psychology*, *37*, 2098–2109.

Macrae, C.N., & Bodenhausen, G.V. (2001). Social cognition: Categorical person perception. *British Journal of Psychology*, *92*, 239–256.

Malone, B.E., & DePaulo, B.M. (2001). Measuring sensitivity to deception. In J.A. Hall, & F.J. Bernieri (Eds.), *Interpersonal sensitivity: Theory and measurement* (pp. 103–124). Mahwah, NJ: Erlbaum.

Mann, S., Vrij, A., & Bull, R. (2002). Suspects, lies and videotape: An analysis of authentic high-stakes liars. *Law and Human Behavior*, *26*, 365–376.

Mann, S., Vrij, A., & Bull, R. (2004). Detecting true lies: Police officers' ability to detect deceit. *Journal of Applied Psychology*, *89*, 137–149.

Masip, J., Sporer, S., Garrido, E., & Herrero, C. (2005). The detection of deception with the reality monitoring approach: A review of the empirical evidence. *Psychology, Crime, & Law*, *11*, 99–122.

Matarazzo, J.D., Wiens, A.N., Jackson, R.H., & Manaugh, T.S. (1970). Interviewee speech behavior under conditions of endogenously-present and exogenously-induced motivational states. *Journal of Clinical Psychology*, *26*, 17–24.

McNeill, D. (1985). So you think gestures are nonverbal? *Psychological Review*, *92*, 350–371.

McNeill, D. (1992). *Hand and mind*. Chicago: The University of Chicago Press.

Meissner, C.A., & Kassin, S.M. (2002). "He's guilty!": Investigator bias in judgments of truth and deception. *Law and Human Behavior*, *26*, 469–480.

Millar, M.G., & Millar, K.U. (1998). The effects of suspicion on the recall of cues used to make veracity judgments. *Communication Reports*, *11*, 57–64.

Miller, G.R., & Stiff, J.B. (1993). *Deceptive communication*. Newbury Park, CA: Sage.

Moston, S.J. (1992). Truth or lies. *Policing*, *8*, 26–39.

Moston, S.J., & Engelberg, T. (1993). Police questioning techniques in tape recorded interviews with criminal suspects. *Policing and Society*, *6*, 61–75.

Moston, S.J., Stephenson, G.M., & Williamson, T.M. (1992). The effects of case characteristics on suspect behaviour during police questioning. *British Journal of Criminology*, *32*, 23–39.

National Research Council. (2003). *The polygraph and lie detection*. Washington, DC: National Academic Press.

Noller, P. (1985). Video primacy—A further look. *Journal of Nonverbal Behavior*, *9*, 28–47.

Ofshe, R.J., & Leo, R.A. (1997). The decision to confess falsely: Rational choice and irrational action. *Denver University Law Review*, *74*, 979–1112.

O'Sullivan, M. (2007). Unicorns or Tiger Woods: Are lie detection experts myths or rarities? A response to "On Lie Detection 'Wizards'" by Bond and Uysal. *Law and Human Behavior*, *31*, 117–123.

O'Sullivan, M. (2008). Home runs and humbugs: Comment on Bond and DePaulo (2008). *Psychological Bulletin*, *134*, 493–497.

O'Sullivan, M., & Ekman, P. (2004). The wizards of deception detection. In P.A. Granhag & L.A. Strömwall (Eds.), *Deception detection in forensic contexts* (pp. 269–286). Cambridge, England: Cambridge University Press.

O'Sullivan, M., Ekman, P., & Friesen, W.V. (1988). The effect of comparisons on detecting deceit. *Journal of Nonverbal Behavior*, *12*, 203–216.

O'Sullivan, M., Frank, M.G., Hurley, C.M., & Tiwana, J. (in press). Police lie detection accuracy: The effect of lie scenario. *Law and Human Behavior*.

Park, H.S., Levine, T.R., McCornack, S.A., Morrisson, K., & Ferrara, M. (2002). How people really detect lies. *Communication Monographs*, *69*, 144–157.

Patterson, M.L. (1995). Invited article: A parallel process model of nonverbal communication. *Journal of Nonverbal Behavior*, *19*, 3–29.

Patterson, M.L. (2006). The evolution of theories of interactive behavior. In V. Manusov, & M.L. Patterson (Eds.), *The SAGE handbook of nonverbal communication* (pp. 21–39). Thousand Oaks, CA: Sage.

Pickel, K.L. (2004). When a lie becomes the truth: The effects of self-generated misinformation on eyewitness memory. *Memory*, *12*, 14–26.

Porter, S., England, L., Juodis, M., ten Brinke, L., & Wilson, K. (2008). Is the face the window to the soul?: Investigation of the accuracy of intuitive judgments of the trustworthiness of human faces. *Canadian Journal of Behavioural Science*, *40*, 171–177.

Porter, S., Gustaw, C., & ten Brinke, L. (2010). Dangerous decisions: The impact of first impressions of trustworthiness on the evaluation of legal evidence and defendant culpability. *Psychology Crime & Law*, *16*, 477–491.

Porter, S., Juodis, M., ten Brinke, L., Klein, R., & Wilson, K. (2010). Evaluation of a brief deception detection training program. *Journal of Forensic Psychiatry & Psychology*, *21*, 66–76.

Porter, S., & Peace, K. (2007). The scars of memory: A prospective, longitudinal investigation of the consistency of traumatic and positive emotional memories in adulthood. *Psychological Science*, *18*, 435–441.

Porter, S., Spencer, L., & Birt, A. (2003). Blinded by emotion? Effect of emotionality of a scene on susceptibility to false memories. *Canadian Journal of Behavioral Science*, *35*, 165–175.

Porter, S., & ten Brinke, L. (2008). Reading between the lies: Identifying concealed and falsified emotions in universal facial expressions. *Psychological Science*, *19*, 508–514.

Porter, S., & ten Brinke, L. (2009). Dangerous decisions: A theoretical framework for understanding how judges assess credibility in the courtroom. *Legal and Criminological Psychology*, *14*, 119–134.

Porter, S., & ten Brinke, L. (2010). Truth about lies: What works in detecting high-stakes deception? [Special issue]. *Legal and Criminological Psychology*, *15*, 57–76.

Porter, S., & Woodworth, M. (2007). I'm sorry I did it ... but he started it: A comparison of the official and self-reported homicide descriptions of psychopath and non-psychopaths. *Law and Human Behavior*, *31*, 91–107.

Porter, S., Woodworth, M., & Birt, A.R. (2000). Truth, lies, and videotape: An investigation of the ability of federal parole officers to detect deception. *Law and Human Behavior*, *24*, 643–658.

Porter, S., Woodworth, M., McCabe, S., & Peace, K.A. (2007). "Genius is 1% inspiration and 99% perspiration" ... or is it? An investigation of the impact of motivation and feedback on deception detection. *Legal and Criminological Psychology*, *12*, 297–310.

Porter, S., & Yuille, J.C. (1995). Credibility assessment of criminal suspects through statement analysis. *Psychology, Crime and Law*, *1*, 319–331.

Porter, S., & Yuille, J.C. (1996). The language of deceit: An investigation of the verbal clues to deception in the interrogation context. *Law and Human Behavior*, *20*, 443–459.

Porter, S., Yuille, J.C., & Lehman, D.R. (1999). The nature of real, implanted and fabricated memories for emotional childhood events: Implications for the recovered memory debate. *Law and Human Behavior*, *23*, 517–537.

Quas, J.A., Davis, E.L., Goodman, G.S., & Myers, J.E.B. (2007). Repeated questions, deception, and children's true and false reports of body touch. *Child Maltreatment*, *12*, 60–67.

*R. v. Lifchus*, 3 S.C.R. 320 (1997).

Reinhard, M.A., & Sporer, S.L. (2008). Verbal and nonverbal behaviour as a basis for credibility attribution: The impact of task involvement and cognitive capacity. *Journal of Experimental Social Psychology*, *44*, 477–488.

Reinhard, M.A., Sporer, S.L., & Marksteiner, T. (2009). *Situational familiarity and the use of nonverbal and verbal information in judgments of veracity*. Manuscript under review.

Riggio, R.E. (1994). Epilogue: Where are we going, and how do we get there? *Journal of Language and Social Psychology*, *13*, 514–518.

Riggio, R.E., Tucker, J., & Throckmorton, B. (1988). Social skills and deception ability. *Personality and Social Psychology Bulletin*, *13*, 568–577.

Robinson, W.P. (1994). Reactions to falsifications in public and interpersonal contexts. *Journal of Language and Social Psychology*, *13*, 497–513.

Roney, J.R., Hanson, K.N., Durante, K.M., & Maestripieri, D. (2006). Reading men's faces: Women's mate attractiveness judgments track men's testosterone and interest in infants. *Proceedings of the Royal Society of London B*, *273*, 2169–2175.

Ross, L. (1977). The intuitive psychologist and his shortcomings: Distortions in the attribution process. In L. Berkowitz (Ed.), *Advances*

*in experimental psychology* (Vol. 10, pp. 174–221). New York: Academic Press.

Rotenberg, K.J., & Sullivan, C. (2003). Children's use of gaze and limb movement cues to infer deception. *The Journal of Genetic Psychology*, *164*, 175–187.

Ruby, C.L., & Brigham, J.C. (1997). The usefulness of the criteria-based content analysis technique in distinguishing between truthful and fabricated allegations. *Psychology, Public Policy, and Law*, *3*, 705–737.

Schacter, D.L., & Addis, R.D. (2007). The cognitive neuroscience of constructive memory: Remembering the past and imagining the future. *Philosophical Transactions of the Royal Society*, *392*, 773–786.

Schlenker, B.R., & Leary, M.R. (1982). Social anxiety and self-presentation: A conceptualization and model. *Psychological Bulletin*, *92*, 641–669.

Schubert, S. (2006). A look tells all. *Scientific American Mind.* Retrieved June 20, 2007, from http://www.scientificamerican.com/article.cfm?id=a-look-tells-all

Schweitzer, M.E., Brodt, S.E., & Croson, R.T.A. (2002). Seeing and believing: Visual access and the strategic use of deception. *The International Journal of Conflict Management*, *13*, 258–275.

Schweitzer, M.E., Hershey, J.C., & Bradlow, E.T. (2006). Promises and lies: Restoring violated trust. *Organizational Behavior and Human Decision Processes*, *101*, 1–9.

Seiter, J.S., Bruschke, J., & Bai, C. (2002). The acceptability of deception as a function of perceivers' culture, deceiver's intention, and deceiver–deceived relationship. *Western Journal of Communication*, *66*, 158–180.

Spence, S.A. (2008). Playing devil's advocate: The case against fMRI lie detection. *Legal and Criminological Psychology*, *13*, 11–26.

Spence, S.A., Farrow, T.F.D., Herford, A.E., Wilkinson, I.D., Zheng, Y., & Woodruff, P.W.R. (2001). Behavioural and functional anatomical correlates of deception in humans. *Neuroreport: For Rapid Communication of Neuroscience Research*, *12*, 2849–2853.

Sporer, S.L. (2004). Reality monitoring and detection of deception. In P.A. Granhag, & L.A. Strömwall (Eds.), *Deception detection in forensic contexts* (pp. 64–102). Cambridge, England: Cambridge University Press.

Sporer, S.L., Penrod, S.D., Read, J.D., & Cutler, B.L. (1995). Choosing, confidence, and accuracy: A meta-analysis of the confidence-accuracy relation in eyewitness identification studies. *Psychological Bulletin*, *118*, 315–327.

Sporer, S.L., & Schwandt, B. (2006). Paraverbal indicators of deception: A meta-analytic synthesis. *Applied Cognitive Psychology*, *20*, 421–446.

Sporer, S.L., & Schwandt, B. (2007). Moderators of nonverbal indicators of deception: A meta-analytic synthesis. *Psychology, Public Policy, and Law*, *13*, 1–34.

Stiff, J.B., Corman, S., Krizek, B., & Snider, E. (1994). Individual differences and changes in nonverbal behavior: Unmasking the changing faces of deception. *Communication Research*, *21*, 555–581.

Stiff, J.B., Kim, H.J., & Ramesh, C.N. (1992). Truth biases and aroused suspicion in relational deception. *Communication Research*, *19*, 326–345.

Stiff, J.B., & Miller, G.R. (1986). "Come to think of it...": Interrogative probes, deceptive communication, and deception detection. *Human Communication Research*, *12*, 339–357.

Stiff, J.B., Miller, G.R., Sleight, C., Mongeau, P., Garlick, R., & Rogan, R. (1989). Explanations for visual cue primacy in judgments of honesty and deceit. *Journal of Personality and Social Psychology*, *56*, 555–564.

Stix, G. (2008, August 13). Can fMRI really tell if you are lying? *Scientific American.* Retrieved September 23, 2010, from http://www.scientificamerican.com/article.cfm?id=new-lie-detector

Strömwall, L.A., & Granhag, P.A. (2005). Children's repeated lies and truths: Effects on adults' judgments and reality monitoring scores. *Psychiatry, Psychology, & Law*, *12*, 345–356.

Strömwall, L.A., & Granhag, P.A. (2007). Detecting deceit in pairs of children. *Journal of Applied Social Psychology*, *37*, 1285–1304.

Strömwall, L.A., Granhag, P.A., & Hartwig, M. (2004). Practitioners' beliefs about deception. In P.A. Granhag, & L.A. Strömwall (Eds.), *Deception detection in forensic contexts* (pp. 229–250). Cambridge, England: Cambridge University Press.

Strömwall, L.A., Granhag, P.A., & Jonsson, A.C. (2003). Deception among pairs: "Let's say we had lunch together and hope they will swallow it." *Psychology, Crime & Law*, *9*, 109–124.

Strömwall, L.A, Granhag, P.A., & Landström, S. (2007). Children's prepared and unprepared lies: Can adults see through their strategies? *Applied Cognitive Psychology*, *21*, 457–471.

Taylor, R., & Hick, R.F. (2007). Believed cues to deception: Judgments in self-generated serious and trivial situations. *Legal and Criminological Psychology*, *12*, 321–332.

Tesser, A. (1978). Self-generated attitude change. In L. Berkowitz (Ed.), *Advances in experimental social psychology* (Vol. 11, pp. 288–338). New York: Academic Press.

Tickle-Degnen, L., & Rosenthal, R. (1990). The nature of rapport and its nonverbal correlates. *Psychological Inquiry*, *1*, 285–293.

Todorov, A. (2008). Evaluating faces on trustworthiness: An extension of systems for recognition of emotions signaling approach/avoidance behaviors. *Annals of the New York Academy of Sciences*, *1124*, 208–224.

Toris, C., & DePaulo, B.M. (1984). Effects of actual deception and suspiciousness of deception on interpersonal perceptions. *Journal of Personality and Social Psychology*, *47*, 1063–1073.

Trankell, A. (1972). *Reliability of evidence*. Stockholm, Sweden: Beckmans.

Trovillo, P.V. (1939). A history of lie detection. *Journal of Criminal Law and Criminology*, *29*, 848–881.

Turner, R.E., Edgley, C., & Olmstead, G. (1975). Information control in conversations: Honesty is not always the best policy. *Kansas Journal of Sociology*, *11*, 69–89.

Undeutsch, U. (1967). Beurteilung der Glaubhaftigkeit von Aussagen [Evaluation of the credibility of statements]. In U. Undeutsch (Ed.), *Handbuch der Psychologie Vol. 11: Forensische Psychologie* [Handbook of Psychology Vol. 11: Forensic psychology] (pp. 26–181). Göttingen, Germany: Hogrefe.

Undeutsch, U. (1982). Statement reality analysis. In A. Trankell (Ed.), *Reconstructing the past: The role of psychologists in criminal trials* (pp. 27–56). Deventer, The Netherlands: Kluwer.

Undeutsch, U. (1984). Courtroom evaluation of eyewitness testimony. *International Review of Applied Psychology*, *33*, 51–67.

Undeutsch, U. (1989). The development of statement reality analysis. In J. C. Yuille (Ed.), *Credibility assessment* (pp. 101–121). Dordrecht, The Netherlands: Kluwer.

Van Rossum, W. (1998). *Verschijnen voor de rechter: Hoe het hoort en het ritueel van Turkse verdachten in de rechtszaal* [Appearing before the court: How to behave and the ritual of Turkish defendants in the courtroom]. Amsterdam, The Netherlands: Uitgeverij Duizend & Een.

Vrij, A. (1993). Credibility judgments of detectives: The impact of nonverbal behavior, social skills and physical characteristics on impression formation. *Journal of Social Psychology*, *133*, 601–611.

Vrij, A. (1994). The impact of information and setting on detection of deception by police detectives. *Journal of Nonverbal Behavior*, *18*, 117–137.

Vrij, A. (1995). Behavioral correlates of deception in a simulated police interview. *Journal of Psychology: Interdisciplinary and Applied*, *129*, 15–29.

Vrij, A. (2000). Telling and detecting lies as a function of raising the stakes. In C.M. Breur, M.M. Kommer, J.F. Nijboer, & J.M. Reintjes (Eds.), *New trends in criminal investigation and evidence* (Vol. 2, pp. 699–709). Antwerpen, Belgium: Intersentia.

Vrij, A. (2004). Invited article: Why professionals fail to catch liars and how they can improve. *Legal and Criminological Psychology*, *9*, 159–181.

Vrij, A. (2005). Criteria-based content analysis: A qualitative review of the first 37 studies. *Psychology, Public Policy, and Law*, *11*, 3–41.

Vrij, A. (2006). Challenging interviewees during interviews: The potential effects on lie detection. *Psychology, Crime & Law*, *12*, 193–206.

Vrij, A. (2007). Deception: A social lubricant and a selfish act. In K. Fiedler (Ed.), *Frontiers of social psychology: Social communication* (pp. 309–342). New York: Psychology Press.

Vrij, A. (2008a). *Detecting lies and deceit: Pitfalls and opportunities*. (2nd ed.). Chichester, England: Wiley.

Vrij, A. (2008b). Nonverbal dominance versus verbal accuracy in lie detection: A plea to change police practice. *Criminal Justice and Behavior*, *35*, 1323–1336.

Vrij, A., Akehurst, L., & Knight, S. (2006). Police officers', social workers', teachers' and the general public's beliefs about deception in children, adolescents and adults. *Legal and Criminological Psychology*, *11*, 297–312.

Vrij, A., Akehurst, L., Soukara, S., & Bull, R. (2002). Will the truth come out? The effect of deception, age, status, coaching, and social skills on CBCA scores. *Law and Human Behaviour*, *26*, 261–283.

Vrij, A., Akehurst, L., Soukara, S., & Bull, R. (2004a). Detecting deceit via analyses of verbal and nonverbal behavior in children and adults. *Human Communication Research*, *30*, 8–41.

Vrij, A., Akehurst, L., Soukara, S., & Bull, R. (2004b). Let me inform you how to tell a convincing story: CBCA and reality monitoring scores as a function of age, coaching and deception. *Canadian Journal of Behavioural Science*, *36*, 113–126.

Vrij, A., Dragt, A.W., & Koppelaar, L. (1992). Interviews with ethnic interviewees: Nonverbal communication errors in impression formation. *Journal of Community and Applied Social Psychology*, *2*, 199–209.

Vrij, A., Edward, K., & Bull, R. (2001). Stereotypical verbal and nonverbal responses while deceiving others. *Personality and Social Psychology Bulletin*, *27*, 899–909.

Vrij, A., Edward, K., Roberts, K.P., & Bull, R. (2000). Detecting deceit via analysis of verbal and nonverbal behavior. *Journal of Nonverbal Behavior*, *24*, 239–263.

Vrij, A., Evans, H., Akehurst, L., & Mann, S. (2004). Rapid judgements in assessing verbal and nonverbal cues: Their potential for deception researchers and lie detection. *Applied Cognitive Psychology*, *18*, 283–296.

Vrij, A., & Fischer, A. (1995). The expression of emotions in simulated rape interviews. *Journal of Police and Criminal Psychology*, *10*, 64–67.

Vrij, A., & Fischer, A. (1997). The role of displays of emotions and ethnicity in judgements of rape victims. *International Review of Victimology*, *4*, 255–265.

Vrij, A., & Graham, S. (1997). Individual differences between liars and the ability to detect lies. *Expert Evidence*, *5*, 144–148.

Vrij, A., & Granhag, P.A. (2007). Interviewing to detect deception. In S.A. Christianson (Ed.), *Offenders' memories of violent crimes* (pp. 279–304). Chichester, England: Wiley.

Vrij, A., Granhag, P.A., & Mann, S. (in press). Invited article: Good liars. *Journal of Psychiatry and Law*.

Vrij, A., Granhag, P.A., Mann, S., & Leal, S. (in press). Lying about flying: The first experiment to detect false intent. *Psychology, Crime & Law*.

Vrij, A., Harden, F., Terry, J., Edward, K., & Bull, R. (2001). The influence of personal characteristics, stakes and lie complexity on the accuracy and confidence to detect deceit. In R. Roesch, R.R. Corrado, & R.J. Dempster (Eds.), *Psychology in the courts: International advances in knowledge* (pp. 289–304). London: Routledge.

Vrij, A., Kneller, W., & Mann, S. (2000). The effect of informing liars about criteria-based content analysis on their ability to deceive CBCA-raters. *Legal and Criminological Psychology*, *5*, 57–70.

Vrij, A., Leal, S., Granhag, P.A., Mann, S., Fisher, R.P., Hillman, J., et al. (2009). Outsmarting the liars: The benefit of asking unanticipated questions. *Law and Human Behavior*, *33*, 159–166.

Vrij, A., Leal, S., Mann, S., & Granhag, P.A. (in press). A comparison between lying about intentions and past activities: Verbal cues and detection accuracy. *Applied Cognitive Psychology*.

Vrij, A., Leal, S., Mann, S., Warmelink, L., Granhag, P.A., & Fisher, R.P. (2010). Drawings as an innovative and successful lie detection tool. *Applied Cognitive Psychology*, *4*, 587–594.

Vrij, A., & Mann, S. (2001a). Telling and detecting lies in a high-stake situation: The case of a convicted murderer. *Applied Cognitive Psychology*, *15*, 187–203.

Vrij, A., & Mann, S. (2001b). Who killed my relative? Police officers' ability to detect real-life high-stake lies. *Psychology, Crime & Law*, *7*, 119–132.

Vrij, A., & Mann, S. (2004). Detecting deception: The benefit of looking at a combination of behavioral, auditory and speech content

USDC IN/ND case 2:17-cv-00033-GSL document 199-3 filed 01/06/22 page 245 of 245

related cues in a systematic manner. *Group Decision and Negotiation*, *13*, 61–79.

Vrij, A., Mann, S., & Fisher, R. (2006a). An empirical test of the Behaviour Analysis Interview. *Law and Human Behavior*, *30*, 329–345.

Vrij, A., Mann, S., & Fisher, R. (2006b). Information-gathering vs accusatory interview style: Individual differences in respondents' experiences. *Personality and Individual Differences*, *41*, 589–599.

Vrij, A., Mann, S., Fisher, R., Leal, S., Milne, B., & Bull, R. (2008). Increasing cognitive load to facilitate lie detection: The benefit of recalling an event in reverse order. *Law and Human Behavior*, *32*, 253–265.

Vrij, A., Mann, S., Kristen, S., & Fisher, R. (2007). Cues to deception and ability to detect lies as a function of police interview styles. *Law and Human Behavior*, *31*, 499–518.

Vrij, A., Mann, S., Leal, S., & Fisher, R. (2010). "Look into my eyes": Can an instruction to maintain eye contact facilitate lie detection? *Psychology, Crime & Law*, *16*, 327–348.

Vrij, A., Mann, S., Leal, S., & Granhag, P.A. (2010). Getting into the minds of pairs of liars and truth tellers: An examination of their strategies [Special issue]. *The Open Criminology Journal*, *3*, 17–22.

Vrij, A., & Semin, G.R. (1996). Lie experts' beliefs about nonverbal indicators of deception. *Journal of Nonverbal Behavior*, *20*, 65–80.

Vrij, A., & Winkel, F.W. (1991). Cultural patterns in Dutch and Surinam nonverbal behavior: An analysis of simulated police/citizen encounters. *Journal of Nonverbal Behavior*, *15*, 169–184.

Vrij, A., & Winkel, F.W. (1992). Crosscultural police–citizen interactions: The influence of race, beliefs and nonverbal communication on impression formation. *Journal of Applied Social Psychology*, *22*, 1546–1559.

Vrij, A., & Winkel, F.W. (1994). Perceptual distortions in cross-cultural interrogations: The impact of skin color, accent, speech style and spoken fluency on impression formation. *Journal of Cross-Cultural Psychology*, *25*, 284–296.

Vrij, A., Winkel, F.W., & Koppelaar, L. (1991). Interactie tussen politiefunctionarissen en allochtone burgers: twee studies naar de frequentie en het effect van aan- en wegkijken op de impressieformatie [Cross-cultural police–citizen interactions: Two experiments examining the impact of gaze behavior on impression formation]. *Nederlands Tijdschrift voor de Psychologie*, *46*, 8–20.

Waenke, M., & Bless, H. (2000). The effects of subjective ease of retrieval on attitudinal judgements: The moderating role of processing motivation. In H. Bless, & J.P. Forgas (Eds.), *The message within: The role of subjective experience in social cognition and behaviour* (pp. 143–161). Philadelphia, PA: Psychology Press.

Walczyk, J.J., Roper, K.S., Seemann, E., & Humphrey, A.M. (2003). Cognitive mechanisms underlying lying to questions: Response time as a cue to deception. *Applied Cognitive Psychology*, *17*, 755–774.

Walczyk, J.J., Schwartz, J.P., Clifton, R., Adams, B., Wei, M., & Zha, P. (2005). Lying person-to-person about live events: A cognitive framework for lie detection. *Personnel Psychology*, *58*, 141–170.

Wang, G., Chen, H., & Atabakhsh, H. (2004). Criminal identity deception and deception detection in law enforcement. *Group Decision and Negotiation*, *13*, 111–127.

Watanabe, H. (2005). Semantic and episodic predictions of memory for plans. *Japanese Psychological Research*, *47*, 40–45.

Wessel, E., Drevland, G., Eilertsen, D.E., & Magnussen, S. (2006). Credibility of the emotional witness: A comparison of ratings by laypersons and court judges. *Law and Human Behavior*, *30*, 221–230.

White, C.H., & Burgoon, J.K. (2001). Adaptation and communicative design: Patterns of interaction in truthful and deceptive conversations. *Human Communication Research*, *27*, 9–37.

Willis, J., & Todorov, A. (2006). First impressions: Making up your mind after a 100-ms exposure to a face. *Psychological Science*, *17*, 592–598.

Winkel, F.W., & Koppelaar, L. (1991). Rape victims' style of self-presentation and secondary victimization by the environment. *Journal of Interpersonal Violence*, *6*, 29–40.

Winkel, F.W., & Vrij, A. (1990). Interaction and impression formation in a cross-cultural dyad: Frequency and meaning of culturally determined gaze behaviour in a police interview setting. *Social Behaviour*, *5*, 335–350.

Wolpe, P.R., Foster, K.R., & Langleben, D.D. (2005). Emerging neurotechnologies for lie-detection: Promises and perils. *The American Journal of Bioethics*, *5*, 39–49.

Yuille, J.C. (1988). The systematic assessment of children's testimony. *Canadian Psychology*, *29*, 247–262.

Zuckerman, M., DePaulo, B.M., & Rosenthal, R. (1981). Verbal and nonverbal communication of deception. In L. Berkowitz (Ed.), *Advances in experimental social psychology* (Vol. 14, pp. 1–57). New York: Academic Press.

Zuckerman, M., Driver, R., & Koestner, R. (1982). Discrepancy as a cue to actual and perceived deception. *Journal of Nonverbal Behavior*, *7*, 95–100.

Zuckerman, M., Speigel, N.H., DePaulo, B.M., & Rosenthal, R. (1982). Nonverbal strategies for decoding deception. *Journal of Nonverbal Behavior*, *6*, 171–187.