PL Opp DDE 4

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF INDIANA
 2                    HAMMOND DIVISION
 3                CASE NO. 2:17-cv-33-JPK
 4   JOHN DOE,                           )
                                         )
 5        Plaintiff,                     )
                                         )
 6        -vs-                           )
                                         )
 7   PURDUE UNIVERSITY, PURDUE           )
     UNIVERSITY BOARD OF TRUSTEES,       )
 8   MITCHELL ELIAS DANIELS, JR.,        )
     in his official capacity as         )
 9   President of Purdue                 )
     University, ALYSA CHRISTMAS         )
10   ROLLOCK, in her official            )
     capacity at Purdue University,      )
11   KATHERINE SERMERSHEIM, in her       )
     official capacity at Purdue         )
12   University,                         )
                                         )
13        Defendants.
14
15              DEPOSITION OF JACOB AMBERGER
16
17      The ZOOM deposition upon oral examination of JACOB
     AMBERGER, a witness produced and sworn before me,
18   Clarice H. Howard, CCR-Ky, Notary Public in and for the
     County of Boone, State of Indiana, taken on behalf of
19   the Plaintiff, on Tuesday, August 25, 2020, scheduled
     to commence at 8:00 a.m., pursuant to the Federal Rules
20   of Civil Procedure with written notice as to time and
     place thereof.
21
22
23
24
25
```

Page 2

```
 1                A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4      Philip A. Byler
         NESENOFF & MILTENBERG LLP
 5       363 Seventh Avenue
         Fifth Floor
 6       New York, New York 10001
         1.212.736.4500
 7       pbyler@nmllplaw.com
 8   FOR THE DEFENDANTS:
 9
         Tyler L. Jones
10       STUART & BRANIGIN, LLP
         300 Main Street
11       Suite 900.
         Lafayette, Indiana 47902-1010
12       1.765.423.1561
         tlj@stuartlaw.com.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   (Time noted 8:00 a.m.)
 2        THE REPORTER:  The attorneys participating in
 3   this deposition acknowledge that I am not
 4   physically present in the deposition room with the
 5   witness and that I will be reporting this
 6   deposition remotely.  They further acknowledge
 7   that, in lieu of an oath administered in person,
 8   the witness will verbally declare his testimony in
 9   this matter is under penalty of perjury.
10        The parties and their counsel consent to this
11   arrangement and waive any objection to the manner
12   of reporting.  Please indicate your agreement by
13   stating your name and your agreement on the record.
14        MR. BYLER:  Philip Byler, for plaintiff, I
15   agree.
16        MR. JONES:  Tyler L. Jones for the defendants,
17   I agree.
18             -----------------
19
20
21
22
23
24
25
```

Page 3

```
 1         INDEX OF EXAMINATION
                                 PAGE
 2
     DIRECT EXAMINATION
 3     Questions by Mr. Byler.......................  4
 4
 5          INDEX OF EXHIBITS
 6
     Deposition Exhibits:
 7
 8   Exhibit 10 -  Notice of investigation............ 12
 9   Exhibit 11 -  ███ reply to notice............... 15
10   Exhibit 14 -  Investigators' report.............. 49
11   Exhibit 19 -  E-mail to Bloom from Amberger...... 46
12   Exhibit 20 -  E-mail response from Bloom......... 46
13   Exhibit 21 -  E-mail from Bloom to Amberger...... 46
14   Exhibit 22 -  E-mail response from Amberger...... 46
15   Exhibit 24 -  Handwritten notes of Amberger...... 17
16   Exhibit 25 -  Handwritten notes of Oliver........ 17
17   Exhibit 26 -  E-mail from Amberger to ███....... 33
18   Exhibit 27 -  Text messages supplied by ███..... 33
19   Exhibit 28 -  E-mail from Amberger to witnesses.. 45
20   Exhibit 29 -  E-mail from Joanna Sharp........... 96
21   Exhibit 30 -  E-mail with final determination....100
22   Exhibit 31 -  Revised determination..............100
23
24
25
```

Page 5

```
 1            JACOB AMBERGER,
 2   having been duly sworn to tell the truth, the whole
 3   truth, and nothing but the truth relating to said
 4   matter, was examined and testified as follows:
 5
 6   DIRECT EXAMINATION
 7     QUESTIONS BY MR. BYLER:
 8   Q   Could you state your name for the record, please?
 9   A   Jacob Lee Amberger.
10   Q   Could you give me your business address?
11   A   Business address is 155 South Grant Street, Tenth
12       Floor, West Lafayette, Indiana, 47907.
13   Q   Okay.  My name is Phil Byler or Philip Byler.  I'm
14       counsel for plaintiff, John Doe, in a proceeding
15       entitled John Doe versus Purdue University and
16       others.
17          It is proceeding with use of pseudonyms by
18       court order.  John Doe is ███████████.  Jane Doe
19       is ███████████  You may in this deposition --
20       don't worry if you slip up and use one or the
21       other, because the deposition at present is being
22       held subjective to a protective order.
23          Let me begin by asking you, have you been
24       deposed before?
25   A   Yes, I have.
```

2 (Pages 2 - 5)

Page 6

1  Q  So you basically know the rules of question and
2     answer?
3  A  Yes, I do.
4  Q  Now, we are doing it by ZOOM conference and so I do
5     ask particularly, given this format, that we
6     observe each other in terms of you waiting for me
7     to finish my question, even though you may know
8     where I'm going, and I will wait for you to finish
9     your answer.
10        Invariably every now and then witness and
11    questioner will talk over each other a little bit.
12    But if I ever do that, I'll try to quickly stop.
13        Now, is there any reason today that you can't
14    give full and complete testimony?
15 A  No, there is not.
16 Q  Are you taking any medication that will affect your
17    testimony?
18 A  No, I am not.
19 Q  Okay. Could you summarize your educational
20    background for the record?
21 A  Educational background, I received a masters of art
22    degree from Purdue in May of 1996. Employment
23    background, shortly after I graduated, about a year
24    after I graduated from Purdue, I started employment
25    with the Indiana State Excise Police in June of

Page 7

1     1997. I worked with the Indiana State Excise
2     Police from June of 1997 to February of 2000.
3        February of 2000 to April of 2003, I worked
4     for the Delphi Indiana Police Department. And then
5     from April of 2003 to January of 2015, I worked for
6     the Tippecanoe County Sheriff Department here in
7     Lafayette, Indiana.
8        And then from January of 2015 to September of
9     2019 I was an investigator in the Office of
10    Institutional Equity. And then in September of
11    2019 to present, I've been senior investigator in
12    the Office of Institutional Equity at Purdue.
13 Q  So you're currently employed by Purdue as a senior
14    investigator?
15 A  Yes, sir.
16 Q  Let me ask you, you went from law enforcement to
17    being an investigator for the University, correct;
18    that's the transition you made in 2015?
19 A  Correct.
20 Q  From the time that you started as an investigator
21    at Purdue, did you take any training courses in
22    investigative techniques?
23 A  Since I started at Purdue, yes, I have.
24 Q  I'm sorry, I didn't hear.
25 A  Since I started at Purdue, yes, I have.

Page 8

1  Q  Do you recall who provided those training sessions?
2  A  Annually at Purdue, the director of the Office of
3     Institutional Equity along with the Vice President
4     for Ethics and Compliance conduct investigator
5     training. I've been through investigator training
6     that was hosted and presented by ATIXA, the
7     Association for Title IX administrators as well as
8     the National Center for Campus Public Safety.
9        I've been training through them, training
10    through Cozen O'Connor. I believe that's a law
11    firm out of Philadelphia. They were brought in by
12    the vice president for the compliance office.
13        I've also been through training -- I can't
14    think of the name off the top of my head. I
15    believe Miler Options. They were somehow
16    affiliated with the National Center for Campus
17    Public Safety, a couple of instructors through
18    there. They had their own short training session
19    that I also attended.
20 Q  Do you remember the name of that Philadelphia law
21    firm?
22 A  I think it was Cozen O'Connor.
23 Q  When you took the ATIXA training, what did that
24    training focus on in terms of what it taught?
25 A  That training focused on -- the first training that

Page 9

1     I went through, the investigator training and I
2     think it was Level 3, it focused on conducting
3     interviews, asking questions. It also discussed
4     weighing information in terms of the evidence, kind
5     of passed the basic investigative or interview
6     techniques to the more putting it altogether,
7     sitting down, conducting mock interviews.
8        I've also been through training with ATIXA,
9     their due process training and went through one of
10    their annual conferences which was just a variety
11    of breakout sessions with different speakers.
12 Q  Did ATIXA teach anything about trauma experienced
13    or allegedly experienced by complainants?
14 A  I do not specifically remember that being part of
15    the training. It was just more asking questions,
16    following people answers, follow-up questions,
17    things like that.
18        I don't remember specifically about trauma or
19    trauma impact on parties and how they answered
20    questions.
21 Q  Have you ever heard the phrase believe women?
22 A  I have, yes.
23 Q  In what context have you heard it?
24 A  Just I've heard believe women or start by believing
25    just in the context of support for advocacy.

3 (Pages 6 - 9)

Page 10

1  Q  Could you elaborate what you mean by support for
2     advocacy?
3  A  I've heard it through the EVAWI, End Violence
4     Against Women International, through some of their
5     e-mails and training and things like that. I know
6     that CARE, the Center for Advocacy Response and
7     Education here on campus, has conducted training,
8     and I think that that starts by believing or
9     something along those lines has been a part of
10    their outreaches or whatever they're running
11    through their department.
12 Q  Is the Center for Advocacy Response and Education
13    known by its acronym CARE?
14 A  That is correct, CARE.
15 Q  And what is CARE?
16 A  Care is -- I work closely with them, but hopefully
17    I can get what they do here. They are responsible
18    for education on campus as it relates to
19    interpersonal violence by standard intervention,
20    things like that.
21       Also, they are advocates on campus,
22    confidential advocates on campus, for students who
23    have been impacted by interpersonal violence.
24 Q  Is that including sexual misconduct?
25 A  Correct.

Page 11

1  Q  Who is Erin Oliver?
2  A  Erin Oliver, when I first started here, Erin Oliver
3     was the associate director in the Office of
4     Institutional Equity. Her and I conducted most, if
5     not all, of the investigations, typically jointly.
6        Then I think in 2016-2017 -- I don't remember
7     when -- she was named director of the Office of
8     Institutional Equity. And then sometime in 2019
9     she left the University to take a position at
10    another University.
11 Q  When investigations were conducted, did you two
12    jointly sit in on interviews?
13 A  We tried to, yes. We did -- a vast majority of the
14    interviews we were both present. There may have
15    been some where Erin had a conflict or I had a
16    conflict and the other one did the interview
17    themselves, but typically we were both in the room.
18 Q  Just let me understand institutionally, as an
19    investigator, what office in Purdue are you part
20    of?
21 A  I am part of -- the office I'm in is the Office of
22    Institutional Equity.
23 Q  Okay. And is there a director of that office?
24 A  Yes, there is.
25 Q  In the 2015-2016 school year, who was the director?

Page 12

1  A  2015-2016 school year, it was either Monica Bloom
2     or there was a gap where there was no director and
3     then Erin Oliver. I cannot recall the exact dates
4     on the positions. When I started in 2015, it was
5     Monica Bloom.
6  Q  The 2015-2016 school year, did I understand that
7     Ms. Oliver was the associate director of the
8     office?
9  A  Yes. If you want to say the entire school year,
10    I'm not sure, but yes, she was.
11 Q  Okay. Would you go to that stack of exhibits and
12    we're going to mark as Amberger Exhibit 10 a
13    document that's Bates stamp range 568 to 572.
14       (Deposition Exhibit No. 10 marked
15        for identification.)
16 A  568 to 572?
17 Q  568 to 572.
18 A  I have it.
19 Q  I'm going to ask you to turn to the second page of
20    the document Bates stamp 569?
21 A  Okay.
22 Q  And do you see your name listed as a cc?
23 A  Sorry, I lost you for a second. Can you hear me?
24 Q  Yes, I can.
25 A  I was hooked up to the DPN from working from home

Page 13

1     and I forgot disconnect it. So when I came on, it
2     reconnected me and now it booted me off.
3        So yes, I am on page 569 and I see my name
4     under cc.
5  Q  And you see Ms. Oliver's name as well?
6  A  Yes, I do.
7  Q  You're the two cc's on this document, okay?
8  A  Yes.
9  Q  Is that correct?
10 A  Correct.
11 Q  Okay. Now, if you would take a look at the first
12    page of the document, it asks -- I will ask if you
13    can recall your receipt of it?
14 A  Yes, I do.
15 Q  And that's Katherine Sermersheim's signature on the
16    second page of the document?
17 A  Yes.
18 Q  Okay. Go to the fifth page of this document, which
19    is Bates stamp 572.
20 A  Okay.
21 Q  And the caption of that page is notice of
22    allegations, correct?
23 A  Correct.
24 Q  Do you recall receiving that notice of allegations
25    as part of a letter that Dean Sermersheim sent?