In the

# United States Court of Appeals

## for the Seventh Circuit

———————————

Nos. 19-2993 & 19-3109

RENETRICE R. PIERRE, individually and on
behalf of all others similarly situated,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

MIDLAND CREDIT MANAGEMENT, INC.,

*Defendant-Appellant/*
*Cross-Appellee.*

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16 C 2895 — **Harry D. Leinenweber**, *Judge.*

———————————

ARGUED NOVEMBER 9, 2020 — DECIDED APRIL 1, 2022

———————————

Before SYKES, *Chief Judge,* and HAMILTON and BRENNAN,
*Circuit Judges.*

SYKES, *Chief Judge.* Midland Credit Management, Inc.,
sent Renetrice Pierre a letter offering to resolve a long-
unpaid debt at a discount. The statute of limitations on the
debt had run. The letter advised Pierre that because of the

# Exhibit A

age of the debt, Midland Credit would neither sue her for it nor report it to a credit agency and that her credit score would be unaffected by either payment or nonpayment.

Pierre did not take Midland Credit up on the offer. Instead, she sued the company alleging that it violated the Fair Debt Collection Practices Act. Asking for payment of a time-barred debt isn't unlawful, but Pierre contended that the collection letter was a deceptive, unfair, and unconscionable method of debt collection, in violation of the Act. She sought to represent a class of Illinois residents who had received similar letters from Midland Credit. The district court certified the class and entered summary judgment in its favor on the merits. A jury awarded statutory damages totaling $350,000.

The parties have cross-appealed, raising issues related to standing, class certification, and the merits. We begin and end with standing. The letter might have created a risk that Pierre would suffer a harm, such as paying the time-barred debt. But a risk, at most, is all it was. That's not enough to establish an Article III injury in a suit for money damages, as the Supreme Court held last year in *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2210–11 (2021). Accordingly, we vacate and remand with instructions to dismiss the case for lack of subject-matter jurisdiction.

## I. Background

In 2006 Pierre opened a credit-card account with Target National Bank. She accumulated consumer debt on the account and defaulted on it. Midland Funding, LLC, bought the debt and sued Pierre for it in Illinois state court in 2010. Midland Funding later voluntarily dismissed the lawsuit.

Fast forward to 2015. Midland Credit, which collects debts for Midland Funding, sent Pierre a letter seeking payment of the debt. The letter told Pierre that she had been "pre-approved for a discount program designed to save [her] money." It listed multiple payment plans—one promising savings of 40%—and said that the offer would expire in 30 days.

Because the debt was so old, the statute of limitations had run. *See* 735 ILL. COMP. STAT. 5/13-205. Midland Credit could ask for payment, but it couldn't sue for it. The letter ended with this: "The law limits how long you can be sued on a debt. Because of the age of your debt, we will not sue you for it, we will not report it to any credit reporting agency, and payment or non-payment of this debt will not affect your credit score."

The letter surprised and confused Pierre. Midland Funding had sued her for the debt and then dropped the case. Now a company with a slightly different name sought payment. The new company with the similar name said it wouldn't sue her, but perhaps it (or another entity) could sue her if it really wanted to. Concerned about another lawsuit, she called Midland Credit to contest the collection effort. Then she contacted a lawyer and sued Midland Credit.

Pierre claimed that the collection letter violated various provisions of the Fair Debt Collection Practices Act ("FDCPA"). She alleged that the letter falsely represented the character and legal status of the debt, 15 U.S.C. § 1692e(2); was a deceptive means to attempt to collect the debt, *id.* § 1692e(10); and was an unfair or unconscionable means to attempt to collect the debt, *id.* § 1692f. She sought

to represent a class of Illinois residents who had received similar letters from Midland Credit.

The district judge certified the class and entered summary judgment in its favor on the merits based on our holding in *Pantoja v. Portfolio Recovery Associates, LLC*, 852 F.3d 679 (7th Cir. 2017). Damages were left to a jury, and it awarded just over $350,000. (Pierre also brought individual claims, but those were settled before final judgment so we mention them no further.)

Midland Credit twice asked the judge to dismiss the suit for lack of Article III standing. Both times he declined to do so, reasoning that the misleading nature of the letter risked real harm to the interests that Congress sought to protect with the FDCPA.

## II. Discussion

Article III of the Constitution limits the jurisdiction of the federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2. The case-or-controversy requirement ensures that the judiciary "confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 71 (2013). Requiring a plaintiff to establish standing to sue is an essential component of the case-or-controversy limitation, "serv[ing] to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

Standing has three elements. A plaintiff must have (1) a concrete and particularized injury in fact (2) that is traceable to the defendant's conduct and (3) that can be redressed by

judicial relief. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Without "an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Casillas v. Madison Ave. Assocs., Inc.*, 926 F.3d 329, 333 (7th Cir. 2019).

The concreteness requirement is our concern here. A concrete injury is "real, and not abstract." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016) (quotation marks omitted). Qualifying injuries are those with "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204 (quoting *Spokeo*, 578 U.S. at 341). This standard includes "traditional tangible harms, such as physical harms and monetary harms," as well as "[v]arious intangible harms," such as "reputational harms, disclosure of private information, and intrusion upon seclusion." *Id.*; *see also Spokeo*, 578 U.S. at 340–42.

Congress's decision to create a statutory cause of action may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Lujan*, 504 U.S. at 578. This does not mean, however, that Congress may "enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." *TransUnion*, 141 S. Ct. at 2205 (quotation marks omitted). History and tradition remain our ever-present guides, and legislatively identified harms must bear a close relationship in kind to those underlying suits at common law. *See Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462–63 (7th Cir. 2020).

Until recently there was a hint that the mere "risk of real harm" could concretely injure plaintiffs seeking money

damages. *Spokeo*, 578 U.S. at 341. However, as the Supreme Court clarified in *TransUnion*, a risk of harm qualifies as a concrete injury only for claims for "forward-looking, injunctive relief to prevent the harm from occurring." 141 S. Ct. at 2210; *see Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[A] plaintiff must demonstrate standing separately for each form of relief sought."). A plaintiff seeking money damages has standing to sue in federal court only for harms that have in fact materialized. *TransUnion*, 141 S. Ct. at 2210–11.

Many of our recent decisions mark the line between FDCPA violations inflicting concrete injuries and those causing no real harm. Discussion of just a few of these leaves the line clear enough to resolve this case. We found standing in *Ewing v. Med-1 Solutions, LLC*, 24 F.4th 1146, 1149–50 (7th Cir. 2022), where a debt collector failed to notify a credit-reporting agency that the plaintiffs had disputed the debts in question. There was evidence that the statutory violations caused the plaintiffs' credit scores to decline. *Id.* We reasoned that the incomplete reporting worked a harm analogous to that associated with common-law defamation. *Id.* at 1153–54. That "intangible, reputational injury [was] sufficiently concrete for purposes of Article III standing." *Id.* at 1154.

*Casillas* sits on the other side of the line. A debt collector sent Paula Casillas a notice demanding payment of a debt and informed her that she could dispute or request verification of it. *Casillas*, 926 F.3d at 332. But the notice failed to specify that any dispute or verification request must be made in writing to trigger certain statutory protections. *Id.* The failure, though a statutory violation, caused Casillas no harm. *Id.* at 334. She hadn't even considered disputing or

seeking verification of the debt, and the omission deprived her of no benefit. *Id.* As such, there was nothing for the court to remedy. *See id.* at 339.

We also found no standing in *Larkin v. Finance System of Green Bay, Inc.*, 982 F.3d 1060 (7th Cir. 2020). There the defendant debt collector's dunning letters admonished the plaintiffs: "You want to be worthy of the faith put in you by your creditor. … We are interested in you preserving a good credit rating with the above creditor." *Id.* at 1063 (alteration in original). The plaintiffs alleged that this collection tactic was deceptive and unconscionable in violation of the FDCPA. *Id.* Statutory violation or not, there was no concrete harm. Neither plaintiff paid a debt she did not owe or otherwise acted to her detriment in response to the letter. *Id.* at 1066. There was, again, nothing for the court to remedy. *See id.* at 1066–67.

With these principles and precedents in place, we turn to this case. Pierre, as the party invoking the federal court's jurisdiction, bears the burden of establishing her standing to sue. *Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018) (per curiam). Standing must be established "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Here, then, Pierre needed to establish standing with evidence offered at summary judgment, and her standing must remain adequately supported in the face of any adverse evidence introduced at trial. *See id.* Whether a plaintiff has established Article III standing is reviewed de novo. *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 966 (7th Cir. 2016).

Pierre argues that Midland Credit's deceptive letter created a risk that she might make a payment on a time-barred

debt, and a payment—or even a promise to pay—risked restarting the limitations period. *See Schmidt v. Desser*, 401 N.E.2d 1299, 1301 (Ill. App. Ct. 1980); *see also Pantoja*, 852 F.3d at 684–85 (discussing Illinois law). But critically, Pierre didn't make a payment, promise to do so, or otherwise act to her detriment in response to anything in or omitted from the letter. That aligns Pierre with the plaintiffs in *Casillas* and *Larkin*, who received allegedly defective letters but who did not experience any harm—or even a risk of real harm, which we now know isn't enough—caused by the defects.

Pierre's response to the letter was to call Midland Credit to dispute the debt and to contact a lawyer for legal advice. These are not legally cognizable harms. Making a call to a debt collector is not closely related to an injury that our legal tradition recognizes as providing a basis for a lawsuit. Nor is seeking legal advice. *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1069 (7th Cir. 2020); *see also Diamond v. Charles*, 476 U.S. 54, 70–71 (1986). Indeed, the concreteness requirement would be an empty one if all it took was contacting a lawyer and filing suit.

Psychological states induced by a debt collector's letter likewise fall short. Pierre testified that Midland Credit's letter confused her as to whether she could be sued for the debt. Confusion, we have held, is not a concrete injury in the FDCPA context. *E.g., Markakos v. Medicredit, Inc.*, 997 F.3d 778, 781 (7th Cir. 2021); *Brunett*, 982 F.3d at 1068. She further testified that she experienced emotional distress arising from her concern about being sued for the debt. But worry, like confusion, is insufficient to confer standing in this context. *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668

(7th Cir. 2021); *Pennell v. Glob. Tr. Mgmt., LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021).

Finally, Pierre points out that our decision in *Pantoja* involved similar facts and was decided on the merits rather than dismissed for lack of subject-matter jurisdiction. *See* 852 F.3d at 682. But we did not consider standing in *Pantoja*, which—importantly—was decided before *TransUnion*. A case that is not about standing cannot control the issue here. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 144 (2011).

Pierre did not experience a concrete injury giving her standing to pursue claims for money damages in federal court. Accordingly, we vacate the judgment and remand with instructions to dismiss this case for lack of subject-matter jurisdiction.

VACATED AND REMANDED WITH INSTRUCTIONS

HAMILTON, *Circuit Judge*, dissenting. The majority's dismissal of this "zombie debt" case for lack of standing is mistaken. It deepens an important and growing circuit split on the separation of powers between legislative and judicial branches. The issue is whether Congress has the power under the Constitution to create private causes of action under the Fair Debt Collection Practices Act and other consumer protection statutes for injuries that are intangible but quite real. Such injuries may include emotional distress, stress, and harm to reputation. These harms are all real and foreseeable results of unfair and deceptive debt-collection practices aimed directly at the plaintiffs. Congress has authorized private actions like this case to seek damages for them.

The majority follows several cases from the last two years in which this court has denied standing under the FDCPA on grounds that leave little or no room for intangible injuries, and apparently none for "psychological states" caused by statutory violations. These decisions have erred by failing to give the judgments of Congress the "due respect" the Supreme Court's precedents call for. They have also erred by overlooking close historical parallels—from both common law and constitutional law—for remedies for intangible harms caused by many violations of the FDCPA and similar statutes. These errors have led us to restrict standing under consumer protection laws much more tightly than the Supreme Court itself has. The cumulative effect may be close to a tipping point, leaving at least the FDCPA largely neutered in the three states of the Seventh Circuit.

At a broader level, this court's recent restrictions on standing threaten to undermine congressional efforts to protect consumers. They also threaten more broadly the

appropriate separation of powers under the Constitution, unduly restricting the legislative policy choices Congress should be able to make in regulating interstate commerce. I respectfully dissent.

Part I explains this case in terms of how the FDCPA applies to collecting "zombie" debts and how defendant's violation of the FDCPA affected plaintiff Pierre, with a particular eye on emotional distress, anxiety, confusion, and fear. Part II summarizes the key lessons from the Supreme Court's recent cases on standing in consumer protection cases asserting intangible injuries, *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), and *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Part III applies those lessons to Pierre's case, emphasizing first Congress's policy judgment to authorize damages actions for the effects she suffered and then the common-law and constitutional relatives of those actions and intangible harms. Part IV reviews this court's recent FDCPA standing cases and explains where some have gone astray. Parts V and VI summarize the deepening circuit split on intangible injuries under consumer protection statutes and the importance of the issue in terms of practical consequences and the separation of judicial and legislative powers.

I.   *Zombie Debt, the FDCPA, and Pierre's Case*

Plaintiff Pierre proved that defendant Midland Credit violated the FDCPA. Midland sent plaintiff Pierre a letter carefully designed to try to induce her to surrender her statute of limitations defense to an old debt, one so old it would be known in the debt collection business as "zombie" debt.[1] The

---

[1] See, e.g., Renae Merle, Zombie Debt: How Collectors Trick Consumers into Reviving Dead Debts, Washington Post, Aug. 7, 2019, available at

letter left Pierre confused and fearful. She consulted a lawyer. She then sued on behalf of a class of debtors who received such deceptive letters from Midland. The district court granted summary judgment to plaintiffs on the merits, and a jury awarded the class $350,000 in statutory damages. Both sides appealed.

### A.  *The FDCPA*

Congress enacted the Fair Debt Collection Practices Act in 1977 in response to widespread "abusive, deceptive, and un-fair debt collection practices." 15 U.S.C. § 1692(a). The tar-geted practices included "obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights, disclosing a consumer's personal affairs to friends, neighbors, or an em-ployer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process." S. Rep. No. 95-382, *as reprinted in* 1997 U.S.C.C.A.N. 1695, 1696.

Congress made statutory findings that these abusive prac-tices contributed to personal bankruptcies, marital instability,

---

www.washingtonpost.com/business/2019/08/07/zombie-debt-how-collec-tors-trick-consumers-into-reviving-dead-debts/ (last visited March 30, 2022). The industry prefers a less colorful term, "out-of-statute debt." See, e.g., Receivables Mgmt. Ass'n, Int'l, *Out-of-Statute Debt: What is a Smart, Balanced, and Responsible Approach?* (2015) (trade group policy paper on regulatory proposals), available at https://rmaintl.org/news-press/white-papers/ (last visited March 30, 2022). Much of this debt trades at prices of a penny or less per dollar of face value. Consumer Financial Protection Bureau, *Market Snapshot: Online Debt Sales* 9–10 (2017), available at www.consumerfinance.gov/data-research/research-reports/market-snap-shot-online-debt-sales/ (last visited March 30, 2022).

lost jobs, and invasions of privacy. 15 U.S.C. § 1692(a). The reference to marital instability is especially significant here, where a key question is whether emotional distress, fear, and anxiety prompted by a violation of the Act will support standing to recover statutory damages. More on that in Part III. The Act imposes substantive and procedural requirements on debt collectors, requiring certain specific practices and outlawing others, while including general prohibitions on "false, deceptive, or misleading representations or means," § 1692e, and "unfair or unconscionable means" to collect debts, § 1692f.

Relevant to the issue of standing for intangible injuries, including emotional distress, fear, and anxiety, the Act prohibits many actions likely to cause those reactions. These include threats, obscene or profane language, and harassing calls, § 1692d, and false or misleading representations or implications on many subjects, § 1692e. The Act also imposes many specific requirements intended to make sure the debtor receives accurate and clear (i.e., not confusing) information about the amount and nature of the debt and the identity of the creditor. § 1692g.

The Act provides for enforcement by federal agencies, § 1692*l*, but the more important enforcement tool is a private civil action under § 1692k. The Act authorizes actual damages, without limits. Congress also recognized that many abusive practices might not produce measurable harms. To encourage enforcement in such cases, the Act authorizes

additional damages of up to $1,000 in an individual's case and up to $500,000 in a class action.[2]

B. *Collecting Debts Barred by Statutes of Limitations*

One area of concern under the Act is deceptive and abusive efforts by debt collectors to collect debts so old that they cannot be enforced in court. Such debts, whether called "zombie" or "out-of-statute," can offer surprising potential for profit. As noted, the "rights" to such debts may be purchased for less than a penny on the dollar of the face amount. Collecting just a few percent of the face value of a portfolio of such debts can turn a large profit.

We explained the potential for abuse in *Pantoja v. Portfolio Recovery Associates, LLC*, 852 F.3d 679 (7th Cir. 2017), *McMahon v. LVNV Funding, LLC*, 744 F.3d 1010 (7th Cir. 2014), and *Phillips v. Asset Acceptance, LLC*, 736 F.3d 1076 (7th Cir. 2013). Those opinions cite similar decisions of other courts. It is well established that a debt collector violates the Act by either suing or threatening to sue to collect a debt after the statute of limitations has run. E.g., *Pantoja*, 852 F.3d at 683. In *Pantoja* we also affirmed summary judgment against a debt collector who had sent a collection letter offering to "settle" such a zombie debt despite the carefully phrased note that, "Because of the

---

[2] In its report on the final bill, the Senate Committee on Banking, Housing, and Urban Affairs described the new law as "primarily self-enforcing; consumers who have been subjected to collection abuses will be enforcing compliance." S. Rep. No. 95-382 at 5, *as reprinted in* 1977 U.S.C.C.A.N. 1695, 1699. The committee anticipated that the legislation would not result in any additional costs to the government. *Id.* at 1700. The plain implication was that no personnel or money would be provided to the FTC or other agencies to enforce the new Act, leaving the private civil action as the primary enforcement mechanism.

age of your debt, we will not sue you for it and we will not report it to any a credit reporting agency." *Id*. at 682. *Pantoja* and other cases have stopped short of declaring efforts to collect such out-of-statute per se illegal (as long as there is no litigation or threat of litigation). Still, the potential for profit—from buying such debts at less than a penny on the dollar and somehow "persuading" a few debtors to pay something—creates an obvious temptation. A buyer of these debts has a strong incentive to prey on unsophisticated consumers, pushing the envelope with abusive and deceptive tricks to give at least a few debtors the false impression that they need to pay. Given the high potential for abuse and the miniscule market value of such zombie debts, it's hard to see any good reason not to outlaw these efforts altogether.

Letters like Midland's can set a legal trap for debtors in many states. A partial payment or even a promise to make a partial payment may nullify the valid statute of limitations defense and start the statute's clock running all over again. See *Pantoja*, 852 F.3d 684–86; *Buchanan v. Northland Group, Inc.*, 776 F.3d 393, 398–400 (6th Cir. 2015); *McMahon*, 744 F.3d at 1021; Debt Collection, 78 Fed. Reg. 67,848, 67,876 (Nov. 12, 2013) (notice of proposed rulemaking by Consumer Financial Protection Bureau). As these cases and the CFPB recognize, many consumers will not understand the legal effects of the statute of limitations or the risk that they might unwittingly lose the statute's protections. In other words, the focus is on the risk that consumers will be misled and confused. The confusion spawned among many vulnerable recipients can predictably cause stress and anxiety, and it may lead those who have access to a lawyer to seek guidance about their rights, risks, and options.

### C. *Plaintiff Pierre*

That's exactly what happened with plaintiff Pierre. Midland sent her a letter claiming she owed it more than $7,000 on a zombie debt. Midland offered to "settle" this unenforceable debt for 60% of the face amount, as if that would have saved her money. The letter offered different settlement options and included a "due date" for accepting one.

Central to standing, Pierre testified in detail about the letter and her reaction. The prospect of a revived $7,000 debt threatened her with financial catastrophe. She was confused and afraid that she might be sued again on this debt. (An earlier suit on the same debt had been dismissed years earlier.) Pierre described her "emotional duress," and she was anxious about the prospect of the cost and hassle of more litigation. She was afraid of repercussions if she did not answer the letter and if she did not accept one of the settlement options. She was also afraid that her credit rating would be hurt. Pierre sought out a lawyer. She had read the statement that Midland would not sue her on the debt, but she worried that Midland could refer the debt to another party who would sue her or hurt her credit rating. Her testimony on these topics appears in her deposition at pages 67, 79, 82, 84, 104, 108–09, 114–17, and 141. At trial, she described her surprise, confusion, and distress when she received the letter claiming she owed more than twice as much on a debt that she thought she had successfully disputed years earlier. Dkt. 262 at 52–73.[3]

In other words, much of Pierre's reaction, apart from her consulting a lawyer and not actually paying, was just the kind

---

[3] I cite both her deposition and trial testimony because standing was never contested in the district court in 2019.

of reaction that Midland hoped for by its violation of the Act. Her stress and fear were some of the intangible but real harms that Congress enacted the FDCPA to protect her from. Pierre avoided the worst, most tangible potential consequences, like reviving the debt. But she still suffered concrete and particularized harm from the statutory violation in the form of stress, anxiety, confusion, and emotional distress.[4]

## II. *Standing and Intangible Injuries: Spokeo and TransUnion*

The majority opinion finds that none of the harm Pierre experienced was enough to show "injury in fact," relying primarily on recent decisions by this court. The critical point in the majority opinion is its assertion that "Psychological states induced by a debt collector's letter," including emotional distress, confusion, and anxiety, all fall short of showing concrete injury sufficient to support the civil remedy that Congress authorized. Ante at 8, citing *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665, 668 (7th Cir. 2021); *Markakos v. Medicredit, Inc.*, 997 F.3d 778, 781 (7th Cir. 2021); *Pennell v. Global Trust Mgmt., LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021); and *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020).

Those cases rejecting emotional distress, confusion, and anxiety as sufficient injuries built their analyses on two recent Supreme Court decisions, *Spokeo* and *TransUnion*, about

---

[4] In some debt-collection cases, the debtor may experience emotional distress and anxiety because of serious underlying financial problems, not a minor, hypertechnical violation of the FDCPA. In the case of an out-of-statute zombie debt, however, the effort to collect is an attempt to re-open a closed chapter. That may easily cause significant additional distress and anxiety, as Pierre's testimony described.

standing under another consumer protection law, the Fair Credit Reporting Act, but our cases have gone too far in restricting standing, losing sight of the limits of these Supreme Court decisions and the analysis they require. As Judge Ripple put it, we have been "traveling far out in front of our *Spokeo*-provided headlights," and I would now add, the *TransUnion*-provided headlights. See *Markakos*, 997 F.3d at 784 (Ripple, J., concurring in the judgment).

*Spokeo* and *TransUnion* established that a bare statutory violation is not necessarily enough to support standing. Both cases, however, left Congress much more room than our recent cases have to provide statutory remedies for violations of consumer protection laws that inflict intangible harm without inflicting measurable financial harm on the victim.

Starting with *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), the defendant was a consumer reporting agency that generated profiles of individual consumers. Plaintiff Robins discovered that his Spokeo profile contained inaccurate information. He sued for an allegedly willful violation of the Fair Credit Reporting Act's requirement to use reasonable procedures to assure maximum possible accuracy of such information. The Supreme Court held that the alleged statutory violation regarding his information was not enough, by itself, to establish the concrete and particularized injury in fact needed for constitutional standing. The Court remanded the case to the Ninth Circuit for further consideration of standing.

Along the way, the Court said that a plaintiff must allege and prove a "concrete" injury, but the Court also made clear that an intangible injury could be concrete for purposes of standing. 578 U.S. at 340–41. The key question in *Spokeo* and in cases like Pierre's is when an intangible injury is sufficiently

concrete. To answer that, *Spokeo* teaches, "both history and the judgment of Congress play important roles." *Id*. at 340. The Court told us to consider "whether an alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts," and to treat the judgment of Congress as "instructive and important." *Id*. at 341.

*Spokeo* also cited *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992), for the proposition that Congress may elevate to the status of legally cognizable injuries harms that were previously not adequate to support a case. The *Spokeo* Court concluded that a violation of the FCRA's procedural requirements could result in cognizable harm, but memorably warned that a "bare procedural violation," such as a report of an incorrect zip code, would not be enough by itself to establish concrete harm. 578 U.S. at 342.[5]

In another FCRA case, *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021), a major credit reporting agency offered to tell creditors whether particular consumers might be on a government list of suspected terrorists, drug-traffickers, and others with whom business dealings are generally unlawful. Lots of

---

[5] On remand in *Spokeo*, the Ninth Circuit found that the plaintiff had alleged a sufficiently concrete harm to sue. Giving deference to the judgment of Congress, the Ninth Circuit found that dissemination of false information in consumer reports posed a risk of serious harm and that consumers' interests in accurate information resembled reputational and privacy interests long protected under tort law. 867 F.3d 1108, 1113–15 (9th Cir. 2017). The court also concluded that the alleged inaccuracies regarding plaintiff Robins were neither harmless nor trivial, like the Supreme Court's hypothetical wrong zip code. *Id*. at 1116–17. The Supreme Court denied further review in the case. 138 S. Ct. 931 (2018).

law-abiding Americans share first and last names with people on the government's list, and TransUnion identified such people as "potential matches" for the terrorist list. When plaintiff Ramirez tried to buy a car, his name turned up as a potential match. The dealer refused to sell him the car. Ramirez sued TransUnion under the FCRA on behalf of a class for failing to use reasonable measures to ensure that it distributed accurate information.

All class members in *TransUnion* had viable FCRA claims as a matter of statute. The issue for the Court was standing under Article III of the Constitution. As in *Spokeo*, the key question was whether the intangible harms claimed by the class members were sufficiently concrete. The Court echoed *Spokeo* in saying that intangible harms close to those traditionally recognized in the law were sufficient, including the loss of a constitutional right. 141 S. Ct. at 2204 (citing freedoms of speech and religion). The Court also repeated that courts must afford "due respect" to Congress's decision to create a private right of action for statutory violations, though without giving Congress a blank check to "transform something that is not remotely harmful into something that is." *Id*. at 2204–05.

The Court gave more specific meaning to this abstract guidance in its different treatment of two subclasses. For one subclass, TransUnion files listed them as "potential matches" for the suspected terrorist list, but TransUnion had never provided that information to any potential creditors during the relevant period. *Id.* at 2209. Those class members lacked standing, the Court said. The undisclosed information simply had not caused them any harm. There was no evidence the members of that subclass had even known of the false information, let alone been affected by it. The plaintiffs also argued

Nos. 19-2993 & 19-3109                                      21

that the false information in those files put them at serious risk of having the false information disseminated to creditors in the future. The Court rejected that theory for standing, at least for a damages claim. *Id*. at 2210.

The other subclass in *TransUnion* presented an easier question. The misleading information about them was actually sent to third parties. The Court (including all four dissenters) agreed that those plaintiffs had standing. See 141 S. Ct. at 2208–09. The majority compared the misleading credit reports to the tort of defamation. The Court rejected TransUnion's attempt to distinguish its violations from defamation by arguing that merely "misleading" information was not literally false. The Court explained: "In looking to whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as a basis for a lawsuit in American courts, we do not require an exact duplicate." *Id*. at 2209.

For this case of zombie debt under the FDCPA, most significant is what the Court did *not* say about the plaintiffs who had standing. It did not ask for evidence that the disclosures caused financial harm, that they interfered with specific transactions, or that they altered the plaintiffs' lives or behavior. In short, it did not ask for any of the sorts of evidence of harm that the majority here and our court in other cases has demanded. The Court did not even ask for evidence of emotional harm or other actual disruptions of the plaintiffs' lives. The successful plaintiffs in *TransUnion* asserted harm similar to that in a common-law case for defamation per se, where harm to reputation is presumed and damages may be awarded without more specific proof of harm. That was enough. 141 S. Ct. at 2208–09.

*Spokeo* and *TransUnion* made clear that a plaintiff's proof of all elements of a statutory cause of action does not necessarily show a concrete and particularized injury to satisfy constitutional standing. *TransUnion* went a step further in rejecting standing for damages claims based on only a risk of future harm. Both cases, however, emphasized the need to give considerable deference—"due respect"—to the judgment of Congress and to allow standing based on injuries similar, not identical, to those long recognized in law.[6]

III. *Applying Spokeo and TransUnion Here*

Plaintiff Pierre's claim easily satisfies the Supreme Court's standing requirements. She proved all elements of an FDCPA claim for a deceptive unfair practice. She satisfied the constitutional requirements of *Spokeo* and *TransUnion* by offering evidence of harms that, first, lie close to the heart of the protection Congress reasonably tried to offer consumer debtors in the FDCPA, and second, bear close relationships to harms long recognized under the common law and constitutional law.

A. *The Judgment of Congress*

Congress wanted to provide a remedy for consumers subjected to abusive practices, including "obscene or profane language, threats of violence, telephone calls at unreasonable hours, misrepresentation of a consumer's legal rights,

---

[6]*TransUnion* also noted that the plaintiffs who lacked standing had not presented evidence of emotional injury. The Court plainly left open the possibility that a plaintiff could show standing by showing that her knowledge of a serious risk caused its own emotional or psychological harm. 141 S. Ct. at 2211 & n.7. Our recent decisions close that door in this circuit.

Nos. 19-2993 & 19-3109                                                    23

disclosing a consumer's personal affairs to friends, neighbors, or an employer, obtaining information about a consumer through false pretense, impersonating public officials and attorneys, and simulating legal process." S. Rep. No. 95-382 at 2, *as reprinted in* 1997 U.S.C.C.A.N. 1695, 1696. In the statutory findings, Congress said abusive practices contributed to personal bankruptcies, marital instability, job losses, and invasions of privacy. 15 U.S.C. § 1692(a). The statutory reference to marital instability and the prohibitions on using threats, obscene language, and harassing calls, § 1692d, show that Congress recognized how such abusive practices could upset the lives of those targeted by them. See *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685, 692 (8th Cir. 2017) (making this point in finding FDCPA standing based on mental distress resulting from attempt to collect out-of-statute "zombie" debt).

The emotional distress, confusion, and anxiety suffered by Pierre in response to the zombie debt collection effort fit well within the harms that would be expected from many of the abusive practices, regardless of whether the debtor actually made a payment or took some other tangible action in response to them. Standing for Pierre thus fits well within Congress's judgments about actionable harms. As the Supreme Court said in *Spokeo*, Congress may "elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." 578 U.S. at 341, quoting *Lujan*, 504 U.S. at 578.

### B. *Historical Guides*

*TransUnion* added that Congress "may not simply enact an injury into existence, using its lawmaking power to transform something that is not remotely harmful into something that is." 141 S. Ct. at 2205, quoting *Hagy v. Demers & Adams*,

882 F.3d 616, 622 (6th Cir. 2018). But that is not what happened here. Midland's violation of the FDCPA and the intangible but real harms that Pierre suffered bear close relationships to those recognized in both tort law and constitutional law.

### 1. *Tort Law Parallels*

Start with intentional or reckless infliction of emotional distress. "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress…." Restatement (Second) of Torts § 46(1) (Am. L. Inst. 1965).[7] Such tort cases often pose issues about what conduct is "extreme and outrageous" and when emotional distress is sufficiently severe. In enacting the FDCPA and its remedy for statutory damages, Congress itself outlawed the conduct that harmed Pierre.

The emotional distress, anxiety, fear, and stress she experienced were foreseeable, and arguably intended, responses to defendant's attempt to collect the zombie debt. Congress told the federal courts to provide a damages remedy for such conduct. That choice is well within Congress's legislative powers over interstate commerce to go beyond the common law. "To say that there is no injury in this economy when a person receives a dunning letter demanding money that is not owed not only ignores the realities of everyday life, it also

---

[7] For the sake of (relative) brevity, this discussion of tort-law parallels draws primarily on the Restatement (Second) of Torts, published in the years leading up to and right around the enactment of the FDCPA. The first and third Restatements, case law from around the nation, and other secondary sources offer further support for the points in the text.

ignores the findings of Congress and constitutes a direct affront to a congressional prerogative at the core of the legislative function." *Markakos*, 997 F.3d at 785 (Ripple, J., concurring in judgment); *Demarais*, 869 F.3d at 692 (attempt to collect debt not owed caused real and foreseeable mental distress familiar to law).

The torts of defamation and invasion of privacy and remedies for them also bear close relationships to the FDCPA and its private right of action. As noted, *TransUnion* invoked the parallel to defamation per se to find standing for Mr. Ramirez and the other plaintiffs whose potential listing were sent to potential creditors. 141 S. Ct. at 2209. We drew upon the defamation per se parallel in *Ewing v. Med-1 Solutions, LLC*, 24 F.4th 1146, 1151–54 (7th Cir. 2022). We held correctly that FDCPA plaintiffs whose debts were reported without noting they were disputed had standing based on publication of false or misleading information to third parties. We relied on the obvious parallel to defamation per se. No more specific showing of injury was required.

Other FDCPA violations parallel the tort of invasion of privacy, including its branches for intrusion upon seclusion, unreasonable publicity given to a person's private life, and publicity that places a person in a false light before the public. See Restatement (Second) of Torts § 652A et seq. (Am. L. Inst. 1977); *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1191–93 (10th Cir. 2021) (FDCPA plaintiff had standing based on harms akin to those caused by invasion of privacy in form of intrusion upon seclusion); *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 357 (3d Cir. 2018) (FDCPA plaintiff had standing for harm akin to unreasonable publicity of private life branch of invasion of privacy).

The majority here, though, adopts a sweeping rejection of standing based on "psychological states" induced by FDCPA violations. We should instead recognize that, more generally, the common law has long authorized damages for emotional distress in a wide range of cases lacking tangible injury. Section 905 of the Restatement (Second) of Torts (Am. L. Inst. 1979) states that compensatory damages may be awarded for emotional distress. The comments explain that the principal element of damages in actions for assault and defamation, among other torts, is "frequently the disagreeable emotion experienced by the plaintiff," § 905 cmt. c, and that the "mental distress known as humiliation" may also support a damages award, cmt. d. Section 924 states: "One whose interests of personality have been tortiously invaded is entitled to recover damages for past or prospective (a) bodily harm and emotional distress…." Comment a explains that this rule reaches assault (where no physical contact is made) and insulting conduct amounting to a tort. See also § 623 (emotional distress damages for defamation); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974) ("the more customary types of actual harm inflicted by defamatory falsehood include impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering").

Consider the difference between assault and battery, with the question of standing in mind. What harm is suffered in an assault that stops short of battery? Not physical harm, but fear and emotional distress. Does that mean a victim of an assault lacks Article III standing to sue in federal court? Of course not. The fear and emotional distress are sufficiently concrete and particularized to support standing. The same should be true here, especially based on the policy choice by Congress to

Nos. 19-2993 & 19-3109                                        27

offer this protection for vulnerable consumers from abusive
and deceptive bullying by debt collectors.

After *Spokeo*, I would not contend that every FDCPA vio-
lation can support standing. The Act outlaws some "bare pro-
cedural violations" that may not cause "injury in fact." But the
violation that plaintiff Pierre experienced with Midland's ef-
fort to pressure or trick her into paying the zombie debt, in-
ducing fear, anxiety, confusion, and more general emotional
distress, easily fits into this dimension of the common law of
torts.

### 2. *Constitutional Law Parallels*

The "history and tradition" relevant to standing for intan-
gible injuries are not limited to the common law. *TransUnion*,
141 S. Ct. at 2204. The United States Constitution protects peo-
ple from many wrongs that may cause intangible injuries, in-
cluding emotional distress and humiliation. A plaintiff may
not recover damages for the "abstract" value of a constitu-
tional right, *Memphis Comm. School Dist. v. Stachura*, 477 U.S.
299, 308 (1986), but a plaintiff may recover for intangible emo-
tional distress and humiliation caused by constitutional vio-
lations.

Our circuit's pattern jury instructions for § 1983 cases re-
flect this settled law by allowing consideration of mental and
emotional pain and suffering. Federal Civil Jury Instructions
of the Seventh Circuit § 7.26 (2017). Such damages for intan-
gible injuries can be appropriate for denials of free speech,
free exercise of religion, or due process of law. See *Carey v.
Piphus*, 435 U.S. 247, 264 (1978) (mental and emotional distress
constitute compensable injury in § 1983 cases); *Young v. Lane*,
922 F.2d 370, 374 (7th Cir. 1991) (recognizing prisoners could

recover damages for denial of free exercise rights if they could show violations of clearly established law); *Williams v. Lane*, 851 F.2d 867, 876 (7th Cir. 1988) (same).

Damages for what the majority calls "psychological states" are also available for intrusions on privacy in violation of the Fourth Amendment and for threats of clearly excessive force under the Fourth Amendment. E.g., *Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) (affirming denial of qualified immunity where officer pointed submachine gun at persons who posed no danger at site of search involving suspected non-violent crime). Humiliating strip searches of prisoners, detainees, and suspects may violate Fourth and/or Eighth Amendment rights under some circumstances, and damages for the intangible humiliation and emotional distress can be appropriate. E.g., *Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020) (en banc).

These examples should be sufficient to make the general point: plaintiffs can establish standing in a wide variety of constitutional cases by alleging and showing they have suffered various forms of emotional distress.

Consider also the issue of standing in constitutional cases where plaintiffs seek or are awarded only nominal damages. The Supreme Court held in *Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021), that where the plaintiff proved completed violations of his First Amendment rights, his request for only nominal damages—without proof of compensatory damages—was sufficient to satisfy the redressability element of Article III standing. The Court made clear that the plaintiff still needed to show an actual injury in the form of a completed violation of his rights, *id*. at 802 n.*, but it's difficult to reconcile the majority's holding here with *Uzuegbunam*. If

standing had been lacking in *Uzuegbunam* for lack of injury, the Court would have been obliged to order dismissal for lack of standing, regardless of the redressability element.

Justice Thomas's opinion for the Court in *Uzuegbunam* provides a good survey of the history and importance of nominal damage awards in the common law and constitutional law going back to the earliest years of the Republic and in English courts. See *id*. at 798–800, discussing, e.g., *Webb v. Portland Mfg. Co.*, 29 F. Cas. 506, 508–09 (C.C. Me. 1838) (Story, J.). The general principle is that nominal damages are available and even presumed where a plaintiff proves a violation of her legal rights. If that's correct under both the common law and constitutional law, I have trouble seeing why Congress cannot authorize a modest damages remedy where a plaintiff's statutory rights are violated.

To sum up, if we follow the teachings of *Spokeo* and *TransUnion*—if we give "due respect" for Congress's judgment and recognize that Pierre's statutory claim and intangible injuries fit closely in legal history and tradition—then we should affirm. Article III, *Spokeo*, and *TransUnion* do not prohibit standing for this statutory claim. The FDCPA civil action is constitutional as applied to a host of violations that cause intangible but real injuries like Pierre's.[8]

---

[8] One path toward more specific guidance for lower federal courts for these problems would be to embrace the distinction between private rights and public rights. Justice Thomas endorsed this analysis in his concurrence in *Spokeo*, 578 U.S. at 344–46, and his dissent in *TransUnion*: "At the time of the founding, whether a court possessed judicial power over an action with no showing of actual damages depended on whether the plaintiff sought to enforce a right held privately by an individual or a duty owed broadly to the community." 141 S. Ct. at 2217. The distinction

IV. *The Seventh Circuit's Restrictions on Standing in Consumer Protection Cases*

The majority reaches the opposite result by following several decisions this court issued beginning in December 2020, ordering dismissal of previously viable FDCPA claims for lack of standing. I focus here on those the majority relies upon to reject "psychological states," such as emotional distress, anxiety, and confusion, as grounds for standing here.

The key opinions supporting the majority's rejection of standing for Pierre are *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067 (7th Cir. 2020), and *Gunn v. Thrasher, Buschmann & Voelkel, P.C.*, 982 F.3d 1069 (7th Cir. 2020).

In *Brunett*, the debt collector sent a letter offering to settle a debt but warning that the IRS would be notified of any forgiveness of more than $600. The plaintiff said she had been confused and intimidated by the offer and the threat of notice to the IRS, and she had consulted a lawyer for advice. The panel found that she lacked standing. The opinion seemed to fear universal standing, equating standing based on the plaintiff's emotional distress and confusion from a misleading dunning letter *sent to her* with a taxpayer who wanted to know how her tax dollars were spent on covert projects. 982 F.3d at 1068–69, citing *United States v. Richardson*, 418 U.S. 166 (1974).

---

between private and public rights could go a long way to reconcile Supreme Court precedents on nominal damages with its conflicting and sometimes Delphic opinions on standing for intangible injuries. See also *Sierra v. Hallandale Beach*, 996 F.3d 1110, 1138–39 (11th Cir. 2021) (Newsom, J., concurring); William Baude, *Standing in the Shadow of Congress*, 2016 Sup. Ct. Rev. 197, 227–31 (2016). Plaintiff Pierre has easily shown standing under the majority opinions in *Spokeo* and *TransUnion*, and she would also have standing based on her assertion of a private right created by statute.

Consulting a lawyer could not be enough, we said, lest we open the door to "universal standing." There is of course plenty of room between allowing a statutory claim for foreseeable harms suffered by the person targeted by the violation, on one hand, and "universal standing" on the other. *Brunett* did not address the "due respect" for congressional choices. Nor did it engage with the facts that the plaintiff was the intended target of the alleged deception and that the FDCPA is supposed to protect her from such deception and intimidation. Nor did *Brunett* consider whether the plaintiff's alleged injuries were closely related to injuries recognized under the common law.

In *Gunn*, a debt collector sent a letter threatening foreclosure to enforce a debt to a homeowners' association. The debtors did not pay up, and the collector sued in state court for breach of contract but not foreclosure. The debtors sued under the FDCPA on the theory that the threat to foreclose must have been deceptive because it would make no economic sense to seek foreclosure for a debt of just $2,000. 982 F.3d at 1070. The district court had sensibly dismissed that unsympathetic suit on the merits. On appeal, however, our opinion instead found no standing. The debtors claimed standing based on annoyance and intimidation, without identifying how the allegedly deceptive threat had affected their actions. The *Gunn* opinion scoffed at the psychological effects of deceiving particular debtors, again comparing their claims to the very un-particularized claims in public-rights suits asserting taxpayer standing or environmental suits brought by citizens with no direct connection to the environment in question. The *Gunn* opinion's examples have little to do with the FDCPA or the harms that deceptive violations cause for the consumer-debtors it is intended to prevent or remedy. See 982 F.3d at

1071–72. And as in *Burnett*, the *Gunn* opinion did not address the "due respect" for Congress or the relevant common-law parallels.

*Burnett* and *Gunn* have been followed in several opinions that applied but did not otherwise justify the broad but mistaken view that emotional distress, anxiety, and other "psychological states" caused by FDCPA violations cannot support standing. A week after we issued *Gunn* and *Burnett*, a panel issued *Nettles v. Midland Funding LLC*, 983 F.3d 896 (7th Cir. 2020), where a debt collector violated the Act by sending a collection letter that overstated the amount of the debt by about $100. The debt collector took an interlocutory appeal from a denial of arbitration, but the panel ordered dismissal for lack of standing. Plaintiff Nettles apparently did little to support standing, arguing primarily that we should allow standing based on only a statutory violation. That would have been contrary to *Spokeo*. Nettles also argued, as "something of an afterthought at oral argument," that annoyance and consulting a lawyer gave her standing. The *Nettles* panel said without elaborating that *Gunn* had rejected those grounds for standing. 983 F.3d at 900.

In *Pennell v. Global Trust Mgmt., LLC*, 990 F.3d 1041 (7th Cir. 2021), the plaintiff and her lawyer had notified her lender that she refused to pay the debt and that any future contact should be through her lawyer. A debt collector sent a dunning letter to the plaintiff anyway. The FDCPA prohibits bypassing a lawyer after such notice. 15 U.S.C. § 1692c(a)(2). Plaintiff sued, alleging that the direct communication caused stress and confusion, making her think that she had no rights under the Act. The district court found no violation because there was no showing that the debt collector had known of the

Nos. 19-2993 & 19-3109                                              33

plaintiff's demand to communicate only through her lawyer. The *Pennell* panel held instead that the plaintiff lacked standing, following the broad statement in *Brunett* that "confusion is not itself an injury" and adding that stress without "physical manifestations and no qualified medical diagnosis" was not sufficient for standing. 990 F.3d at 1045.[9]

Next in this series came *Markakos v. Medicredit, Inc.*, 997 F.3d 778 (7th Cir. 2021), which drew three separate opinions that illuminate the problem we face in this case. The debt collector sent Markakos two dunning letters listing different amounts for the debt and the wrong name of the creditor. The FDCPA requires a debt collector to state accurately the amount of the debt and the name of the creditor. 15 U.S.C. § 1692g(a)(1) & (2). The panel rejected the plaintiff's claim of an informational injury because she did not show that accurate information would have changed her response. The

---

[9] After the appellate panel raised the issue of standing for the first time on appeal, the plaintiff argued that the letter harmed her by intruding on her privacy, relying on the obvious similarity to an invasion of privacy tort. The panel rejected this argument because the complaint had not included such an allegation. 990 F.3d at 1045. Under our usual practice, the plaintiff would have been entitled at least to amend her complaint (a) in response to the newly raised standing issue, and especially (b) in response to significant new precedents issued even after the oral argument in the case. See *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 281 (7th Cir. 2020) (remanding FDCPA case for possible amendment to pleadings to cure standing problem: "True, her complaint didn't detail such [a reliance] injury. But '[c]omplaints need not be elaborate.'"); see generally, e.g., *Runnion v. Girl Scouts of Greater Chicago and Northwest Indiana*, 786 F.3d 510, 519–20 (7th Cir. 2015) (when original complaint is dismissed, district courts should ordinarily allow at least one opportunity to amend the complaint unless it is certain that amendment would be futile or otherwise unwarranted, collecting cases).

plaintiff also alleged confusion and aggravation, but the lead opinion rejected those grounds for standing based on *Gunn* and *Brunett*. 997 F.3d at 781.

Judges Ripple and Rovner wrote separately in *Markakos*. They concurred in the judgment based on *stare decisis* but criticized the recent precedents restricting FDCPA standing. Judge Ripple pointed out that our court was effecting "a direct and complete frustration of Congress's attempt to regulate commerce in the manner that it has chosen." 997 F.3d at 783. *Spokeo* did not provide a "firm foundation for the construction of the ambitious enterprise that the court seems to be building at such a rapid pace." *Id.*; accord, *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1251 (7th Cir. 2021) (Hamilton, J., concurring). Judge Ripple criticized the recent opinions as having ignored the limits of *Spokeo* and the importance of both historical practice and congressional judgments. The substantive violations of the FDCPA in *Markakos* itself and other recent opinions were "a long way from an incorrect zip code on a credit report." 997 F.3d at 784.

Judge Ripple highlighted Congress's judgment about the need to protect consumers from abusive debt collection practices and its choice to rely on private enforcement. He also noted that the harms targeted under the FDCPA bear close relationships to harms recognized in fraudulent or negligent misrepresentation cases. *Id.* at 785. Judge Ripple's opinion recognized the genuine harms the FDCPA addresses, and that Pierre suffered in this case, in ways that our recent precedents have failed to:

> To say that there is no injury in this economy when a person receives a dunning letter *demanding money that is not owed* not only ignores the

> realities of everyday life, it also ignores the find-
> ings of Congress and constitutes a direct affront
> to a congressional prerogative at the core of the
> legislative function. The court's failure to recog-
> nize the injury that Congress saw and ad-
> dressed simply testifies to our failure to appre-
> ciate how the people we judicially govern live,
> or more precisely, it testifies to our failure to de-
> fer to the congressional appreciation as to how
> our fellow citizens live. The Supreme Court's
> holding in *Spokeo* provides no justification for
> our embarking on such a precarious course. I
> fear we have given Congress's judgment too lit-
> tle attention and erected an unnecessary consti-
> tutional barrier to enforcement of the FDCPA.

*Id.* (emphasis added).

That concurring opinion apparently led the author of the lead opinion to defend the wisdom of the recent precedents. See 997 F.3d at 781–82. That defense did not, however, address the respect due to Congress's policy choices and the close relationships between the alleged harms and those long recognized in common law and constitutional law. That defense drew a further concurrence from Judge Rovner, who joined in the criticism of our recent standing precedents, carefully described the emerging circuit split, and hoped for further guidance from the Supreme Court. *Id.* at 785–89.

Most recently, in *Wadsworth v. Kross, Lieberman & Stone, Inc.*, 12 F.4th 665 (7th Cir. 2021), also cited by the majority here, we reversed a plaintiff's judgment under the FDCPA and ordered dismissal for lack of standing. An employer hired a debt collector to try to claw back a hiring bonus from

a recent hire whom it had soon fired. The former employee sued the collector under the FDCPA for failing to provide notice of her rights under § 1692g(a) and failing to identify itself as a debt collector and its efforts as an attempt to collect a debt. The district court had granted summary judgment for the plaintiff on the merits, but our panel found no standing.

To show standing, Wadsworth did not try to show she had made payments she would not have made but for the violations. She relied on what the panel brushed off as "*only …* emotional harms"—personal humiliation, embarrassment, anxiety, stress, mental anguish and emotional distress. 12 F.4th at 668 (emphasis added). The panel rejected standing in broad terms: "As our bevy of recent decisions on FDCPA standing makes clear, anxiety and embarrassment are not injuries in fact," "stress" is not a concrete injury, and it is not enough for the plaintiff to be "annoyed" or "intimidated" by a violation or to experience "infuriation or disgust" or a "sense of indignation" or a "state of confusion." *Id*. Otherwise, the panel wrote, "then everyone would have standing to litigate about everything." *Id*., quoting *Brunett*, 982 F.3d at 1068–69. The panel concluded that an FDCPA plaintiff can sue only if she suffered "a concrete harm that he wouldn't have incurred had the debt collector complied with the Act." *Id*. at 669, citing *Casillas*, 926 F.3d at 334.

Again, there is a *very* long distance between "everyone [having] standing to litigate about everything" and respecting the choice of Congress to enforce the FDCPA with a civil remedy for intangible but real and foreseeable injuries caused by deceptive debt collection practices that were aimed directly at the plaintiff.

Nos. 19-2993 & 19-3109                                               37

The concurring opinions by Judges Ripple and Rovner in *Markakos* describe well where our recent FDCPA standing restrictions have erred. The most recent cases have paid only lip service to the Supreme Court's instructions in both *Spokeo* and *TransUnion* to give due respect to Congress's judgments about making harms actionable. Those decisions have also brushed off intangible harm like stress, fear, anxiety, confusion, and embarrassment as grounds for standing even though those harms have close relationships to harms long recognized under the common law. That brush-off started with the sweeping language and the fear of supposedly "universal standing" in *Gunn* and *Brunett*, without paying attention to both the congressional judgment and the many areas of common law that recognize such intangible but real harms and offer protection against them. We should overrule these cases' rejections of standing based on emotional distress, anxiety, and other psychological harm caused by FDCPA violations. I fear, however, that our circuit has committed itself so thoroughly to this mistaken path that now only the Supreme Court can provide a correction.

V.  *Other Circuits and Consequences*

Most other circuits have not followed these errors, despite a national effort by debt collectors to persuade them to do so. The Third, Tenth, and Eleventh Circuits have been less restrictive in allowing standing for intangible injuries under the FDCPA. See *Lupia v. Medicredit, Inc.*, 8 F.4th 1184 (10th Cir. 2021) (FDCPA violations caused harms akin to those caused by invasion of privacy); *Hunstein v. Preferred Collection and Mgmt. Services*, 17 F.4th 1016 (11th Cir. 2021) (explaining that *Spokeo* and *TransUnion* do not require perfect congruence with common-law harms, but only those similar in kind and not in

degree), vacated and rehearing en banc granted, 17 F.4th 1103 (11th Cir. 2021); *DiNaples v. MRS BPO, LLC*, 934 F.3d 275, 279–80 (3d Cir. 2019), following *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351, 357–58 (3d Cir. 2018) (FDCPA violations caused harms akin to invasion of privacy).

Some decisions of the Sixth Circuit also take a broader approach to standing for intangible injuries under the FDCPA. See *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (FDCPA violations caused harm akin to invasion of privacy); *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019) (implying that claim that plaintiff had wasted time or suffered emotional distress would have supported concrete injury).

The Eighth Circuit found standing based on emotional distress in a case quite similar to this one. In *Demarais v. Gurstel Chargo, P.A.*, 869 F.3d 685 (8th Cir. 2017), the defendant law firm actually filed suit to try to collect a time-barred "zombie" debt, hoping for a default judgment based on the debtor's non-appearance at trial. After the debtor appeared twice in state court for trial, the law firm agreed to dismiss the case with prejudice. Yet it later served discovery requests on the debtor. The Eighth Circuit held that the debtor had alleged an injury in fact. The Eighth Circuit drew on the common-law torts of malicious prosecution, wrongful use of civil proceedings, and abuse of process. 869 F.3d at 691–92. "The harm of being subjected to baseless legal claims, creating the risk of mental distress, provides the basis for both § 1692f(1) claims and the common-law unjustifiable-litigation torts." *Id*. at 692.

In language that could apply here, Judge Benton wrote for the court:

> Congress recognized that abusive debt collection practices contribute to harms that can flow from mental distress, like "marital instability" and "the loss of jobs." § 1692(a). "[B]ecause Congress is well positioned to identify intangible harms that meet minimum Article III requirements, its judgment is ... instructive and important." *Spokeo*, [578 U.S. at 341]. Congress created a statutory right to be free from attempts to collect debts not owed, helping to guard against identified harms. * * * The alleged violations of Demarais's § 1692f(1) rights were concrete injuries in fact.

869 F.3d at 692. I agree.

Other Sixth and Eighth Circuit decisions have moved in the direction of restricting standing in such cases. In *Buchholz v. Meyer Njus Tanick, PA*, 946 F.3d 855 (6th Cir. 2020), the Sixth Circuit affirmed dismissal for lack of standing, with a majority opinion by Judge Nalbandian and a separate opinion from Judge Murphy. The debtor alleged that dunning letters gave him the false impression that an attorney had reviewed the case and found that the debts were valid. The panel agreed that the debtor's anxiety was not fairly traceable to the collector's alleged violations, but the judges took different approaches to whether the debtor's anxiety amounted to an injury in fact that could support standing.

Judge Nalbandian looked at the question in detail. His opinion was skeptical but inconclusive on the question. Judge Murphy disagreed with those doubts and would have held that mental harm can support Article III standing. His opinion drew on the difference between private and public rights. 946

F.3d at 872, citing *Spokeo*, 578 U.S. at 343–48 (Thomas, J., concurring); see also William Baude, *Standing in the Shadow of Congress*, 2016 Sup. Ct. Rev. 197, 227–31 (2016) (endorsing reliance on that difference to decide standing on statutory claims asserting intangible harms). Judge Murphy recognized that the common law "typically" authorized no recovery for only mental suffering, but he also recognized the many exceptions in the common law and emphasized, per *Spokeo* and *Lujan*, that Congress may elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law. *Id*. at 873–74.[10]

The Eighth Circuit took a much narrower approach to FDCPA standing for intangible injuries in *Ojogwu v. Rodenburg Law Firm*, 26 F.4th 457, 463 (8th Cir. 2022), which distinguished *Demarais* and cited *Buchholz* and our decision in *Pennell* with approval for the proposition that stress and confusion were not sufficient. I should also note that the Eleventh Circuit's careful opinion in *Hunstein*, 17 F.4th 1016, has been vacated and is being considered en banc. 17 F.4th 1103 (11th Cir. 2021).

At this point, this circuit is at the far end of a circuit split on standing in FDCPA cases based on emotional distress,

---

[10] In a later opinion by Judge Nalbandian for a different panel, the Sixth Circuit held that confusion and anxiety alone are not enough to support standing in an FDCPA case. *Garland v. Orlans, PC*, 999 F.3d 432, 438–40 (6th Cir. 2021). The *Garland* opinion is considerably more careful than our court's opinions rejecting anxiety or emotional distress as sufficient. I nevertheless believe, with respect, that *Garland* does not appreciate sufficiently either the judgment of Congress or the common-law relatives identified in Judge Murphy's opinion in *Buchholz*, the Eighth Circuit's analysis in *Demarais*, or the considerations I have laid out here.

Nos. 19-2993 & 19-3109                                                41

confusion, and anxiety. That split seems entrenched, at least pending further guidance from the Supreme Court.

VI. *Consumer Protection and Separation of Powers*

I've explained in detail why our recent cases denying standing for many intangible injuries are wrong as a matter of standing doctrine and Supreme Court precedent. I conclude by noting some of the larger consequences and implications of those errors.

First, as Judge Ripple emphasized in his concurring opinion in *Markakos*, our court's series of decisions impose significant and unjustified constitutional restrictions on Congress's legislative powers. 997 F.3d at 784. The effect is to hold that the statute granting the civil remedy under the FDCPA, 15 U.S.C. § 1692k, is unconstitutional in many, and perhaps most, applications within the scope of the statutory language. Our opinions taking that step have not yet engaged seriously with the analysis required under *Spokeo* and *TransUnion*.

Second, our errors have broad implications for many statutes beyond the FDCPA. Congress has exercised its legislative power to protect consumers in a host of statutes based on the finding that the common law has not provided sufficient protection for their interests. Those statutes typically do not limit their prohibitions to only unfair *results* for consumers, which might already be actionable under prior law. Instead, consumer protection statutes typically try to *prevent* the worst harms by imposing a range of procedural, informational, and substantive requirements to reduce the risk of harm. "Congress had every right to decrease the confusion and concomitant disincentive to use the credit markets caused by the

profusion of sharp practices facilitated by modern technology." *Markakos*, 997 F.3d at 785 (Ripple, J., concurring in judgment).

Many consumer protection statutes authorize enforcement of those preventive measures by private rights of actions. The "due respect" that courts owe Congress in this field needs to include more respect for those policy choices. This is a basic issue of the separation of powers in our federal government. I do not suggest that Congress has an utterly free rein; *Spokeo* and *TransUnion* rejected that position. But we need to give much greater weight to the point in *Lujan*, *Spokeo*, and *TransUnion* that Congress may, in the exercise of policy judgment and legislative power, "elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *TransUnion*, 141 S. Ct. at 2204–05, quoting *Spokeo*, 578 U.S. at 341, quoting in turn *Lujan*, 504 U.S. at 578.

Third, to the extent that the courts use standing doctrine to prevent effective enforcement of the FDCPA or other consumer protection statutes, Congress has other tools. One obvious alternative is to rely more on enforcement through federal agencies. Congress certainly has the power to impose civil or even criminal penalties for violations of regulatory statutes, and an agency enforcement action to impose such penalties would not encounter any standing obstacle. *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1251 (7th Cir. 2021) (Hamilton, J., concurring). That path would require a lot more public money and personnel than Congress has chosen to use so far. But these new restrictions on standing will naturally push Congress in that direction. See generally *TransUnion*,

Nos. 19-2993 & 19-3109                                    43

141 S. Ct. at 2214–26 (dissenting opinions of Thomas and Kagan, JJ.).

For these reasons, I respectfully dissent. Judge Leinenweber in the district court decided this challenging case fairly and soundly. I would affirm the judgment of the district court in all respects.