**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| JOHN DOE, ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO.: 2:17-CV-33-JPK |
| ) | |
| PURDUE UNIVERSITY, *et al.*, ) | |
| Defendants. ) | |

## OPINION AND ORDER

This matter is before the Court on Defendants' motion for summary judgment [DE 177], Plaintiff's motion for partial summary judgment [DE 181], Defendants' motion to exclude the opinion of Plaintiff's expert witness [DE 193], and Defendants' motion for partial judgment on the pleadings [DE 203].

### A.      FACTUAL BACKGROUND

These facts are undisputed unless otherwise indicated. Plaintiff John Doe[1] was a male student at Purdue, and a member of the Navy's ROTC program ("NROTC")[2] during the 2015-16 school year. [DE 160, ¶ 4]. As an NROTC midshipman, he was required to follow the Navy's Regulations for Officer Development, which prescribes standards for academic performance and prohibits sexual harassment or assault, among other rules. [Def. Ex. D. at 16-17[3]]. A student who breaks NROTC rules may face discipline including "disenrollment" from NROTC. [*Id*. at 20-22].

---

[1] On May 31, 2017, the Court granted John's request that certain parties be referred to by pseudonym. [DE 26].

[2] The Navy ROTC program awards scholarships to college students, and upon graduation, the students are commissioned as officers in the Navy or the Marine Corps. Students who participate in the program are expected to take a normal course load for full-time students, during which they are considered non-active duty, enlisted members of the Navy. *See https://www.netc.navy.mil/Commands/Naval-Service-Training-Command/NROTC/About/* (last visited August 8, 2022); [Def. Ex. A, Deposition of Rodney Hutton, 11:11-24].

[3] Where the Court cites to specific pages in the record, the page numbers are those assigned by the CM/ECF filing system, unless otherwise indicated.

Similarly, John was subject to Purdue's own disciplinary policy, including rules prohibiting harassment and "Non-Consensual sexual contact."[4] Violation of these rules could result in sanctions up to and including expulsion.[5]

### 1. Jane Doe's Allegations

During the fall 2015 semester, John began dating Jane Doe, a freshman and fellow first-year midshipman in Purdue's NROTC program. [Def. Ex. F at 4]. At some point after Purdue's spring break[6], Jane reported to an older midshipman, "Midshipman A," that John had sexually assaulted her. Midshipman A testified that Jane told her John had digitally penetrated her while she was sleeping; that John had gone into Jane's room without her permission and "rearranged" her room, including her underwear drawer; that they broke up but John continued to "show[] up at her dorm"; and that based on these incidents Jane was afraid for her safety. [Def. Ex. H, Deposition of Midshipman A, 24:22-26:13]. Although John does not deny that Jane met with Midshipman A, he believes that Midshipman A's account of the conversation was a "fabrication." [*See* DE 187-2 at 4-5].

On April 4, 2016, roughly a week after speaking with Midshipman A, Jane reported the incident to Lt. Adam Sheppard, an officer within the NROTC, with Midshipman A present. Sheppard directed Jane to make an online report, which she did. [Def. Ex. H, 33:23-34:12; Def. Ex. I]. The report reflected the allegations described to Midshipman A, and further alleged that

---

[4] *See Anti-Harassment Policy (III.C.1)*, https://earchives.lib.purdue.edu/digital/collection/PPA/id/6210/rec/90 (last visited August 8, 2022). Although neither party attached the policy as an exhibit, John has not disputed that this was the Anti-Harassment Policy in force prior to July 1, 2016.

[5] *Procedures for Resolving Complaints of Discrimination and Harassment, Section J*, p. 14-16, https://earchives.lib.purdue.edu/digital/collection/PPA/id/6744/rec/5 (version in effect through August 15, 2016) (last visited August 8, 2022).

[6] Purdue's 2016 Spring Break ended on March 19, 2016. 2015-2016 ACADEMIC CALENDAR, https://www.purdue.edu/registrar/calendars/2015-16-Academic-Calendar.html (last visited August 8, 2022).

John Doe had "chased [Jane] down the dorm" with a Taser as a joke. [Def. Ex. I]. Jane further alleged: "I have considerable fear of his reaction to anything as he has displayed little control over his temper even displaying/describing no emotions towards anyone or anything." [*Id*.]. On April 5, 2016, Commanding Officer Rodney Hutton placed John on an interim leave of absence from the NROTC pending further investigation into Jane's allegations. [Def. Ex. N].

### 2.  Purdue's Investigation and Discipline

Meanwhile, Purdue began its own investigation. The director of Purdue's Center for Advocacy, Response, and Education ("CARE"), Monica Bloom, met with Jane and drafted a "Notice of Allegations" summarizing Jane's report, which was sent to Defendants Katherine Sermersheim (Purdue's Dean of Students) and Alysa Rollock (a vice president). [Def. Exs. Q, R]. On April 11, Semersheim sent letters to John and Jane advising that Purdue had appointed Erin Oliver and Jacob Amberger, from Purdue's Office of Institutional Equity, to investigate Jane's allegation. The letters described the investigation procedure: Purdue would meet with the parties, interview other witnesses, and gather evidence, before filing a report that would not be shared with the parties. The case would be considered during a meeting of a committee from the Advisory Panel on Equity. The purpose of the meeting was "to give [Semersheim] and the panel members the opportunity to meet with the parties and Investigator after having reviewed the Investigator's report." John and Jane would have separate sessions before the panel, and each could decline to attend and submit a written statement if they preferred. [Def. Exs. T, U].

On April 21, 2016, John denied the allegations in an e-mailed response to Semersheim. He stated that Jane's allegations were "false and without merit," and specifically denied having sexual contact with Jane while she was asleep, pursuing her with a Taser, or going through her clothes without permission. He then added "information [which was] important to show [he had] been

3

falsely accused." In summary, he stated that Jane had a bad temper, and spoke and behaved erratically around him. He alleged that, on December 13, 2015, he physically restrained Jane from committing suicide, after which she "seemed to resent me for what I did." Despite the alleged assault in November 2015, he and Jane continued to date until January 2016. He provided a list of character references including some who could address his relationship with Jane specifically. [Def. Ex. V].

In addition to John and Jane, the investigators interviewed six witnesses. [*See* Def. Ex. F at 3]. They also reviewed 133 pages of text messages submitted by John, stretching between December 23, 2015 and March 15, 2016. [*Id*. at 4; Pl. Ex. 8, ¶ 14]. Among those text messages were the following:

> **Received from [Jane Doe] on Mon Dec 28, 2015 10:22 PM:** "Or when I wake up to you touching me or I'm trying to do something and you just touch me I literally can't trust you if you don't respect my boundaries"
> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:37 PM:** "We already went over this several times. I cant even apologize anymore because you get angry at me for it."
> **. . .**
> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:56 PM:** "Im not going in circles any more [Jane]. What more do you want me to say? Do you want this to be over? We have literally talked about this for a week and I already told you I cant change what i did, only what i will do from here on out. Do you want me to feel shitty for the rest of my life because of what I did? Im feeling like i will. Im sorry. I cant change what i did, as much as i want to. I violated you and never should have. What do you want me to do?
> . . .
> **Received from [Jane Doe] on Thu Jan 14, 2016 11:52 AM:** "That wasn't okay"
> **Sent to [Jane Doe] on Thu Jan 14, 2016 11:53 AM:** "?"
> **Received from [Jane Doe] on Thu Jan 14, 2016 11:54 AM:** "You should've left after I fell asleep or woken me back up"
> **Sent to [Jane Doe] on Thu Jan 14, 2016 12:00 PM:** "ok"

[Def. Ex. Y]. John offers a declaration summarizing the rest of the messages: In some of them, Jane expressed anger or unhappiness with John or with other circumstances in her life; others were

"amicable communications" that indicated an "ongoing and intense personal relationship" between Jane and John during that period. [*See* Pl. Ex. 8, ¶¶ 14-15; Pl. Ex. 17 (messages)].

On May 20, 2016, the investigators released their written report, concluding that John had sexually assaulted Jane and therefore violated Purdue's Anti-Harassment Policy. [Def. Ex. F]. The report clarified a detail not reflected in Jane's initial report to Purdue: she was not aware at the time that John had touched her vagina, but he later admitted to her that he digitally penetrated her vagina while she was asleep. [*Id.* at 6]. That alleged admission was the basis for Jane's accusation.

The report referred specifically to the text messages cited above, and to another text sent by John to Jane on December 23, 2015: "Im so sorry I did what I did to you. I just cant change it no matter how much I want to, im just messed up and im a terrible person." The investigators highlighted John's explanation of these messages:

> [John] explained that he was apologizing because he had not been truthful with her about his academic performance . . . When he was pressed further, he reluctantly confirmed that he was also referring to the incident around December 13, 2015, in which he placed his hand on [Jane's] leg, and she woke up startled . . . He continued to deny that he touched her crotch while she was sleeping and insisted that he had merely placed his hand on her thigh, above her knee, but below her crotch."

[*Id*. at 7-8]. Regarding the allegations that John had rearranged Jane's dorm room without permission, the investigators noted that Jane's RA denied ever giving John permission to enter the room. The RA stated that, contrary to John's allegations, John repeatedly went to Jane's floor of the dorm without an escort. [*Id*. at 8-9]. The investigators concluded:

> [John's] uncomfortable, awkward, and unconfident clarification of the text message admission to violating [Jane] combined with the apparent dishonesty regarding his entrance into her dorm room have led us to determine that he is not a credible witness. Evidence does support that [Jane] was a credible witness. Therefore, we believe that a preponderance of the evidence supports that [John's] admission to [Jane] that he digitally penetrated her vagina without her consent while she was sleeping was an accurate statement and the event did occur. Evidence also supports that [John] touched [Jane] while she was sleeping in an unwanted and nonconsensual way in December 2015. Therefore, this investigation determined

that a preponderance of the evidence supports that [John] violated the University's
Anti-harassment policy.

[*Id*. at 10]. Consistent with the University's stated procedure, John was not permitted to review the
report before the hearing. [*See* DE 161, ¶ 39].

The hearing, held on June 6, 2016, was not recorded or transcribed. John made an opening
statement and was questioned by the panel regarding the text messages and Jane's allegations
generally. John believed the questioning was "loaded" and "hostile." He was not questioned about
any of the other evidence gathered by the investigators, nor was he aware of the other evidence,
other than what he had submitted. Two of the three panel members had not read the investigative
report. [Def. Ex. Z, Deposition of John Doe, 185:3-186:25, 188:8-21].

Jane stated that she was unable to attend the hearing, and instead opted to provide a written
statement. According to e-mail records produced by Purdue, Jane e-mailed[7] her statement to
Bloom, and it was subsequently forwarded to Semersheim. [Def. Exs. CC, DD]. Jane reaffirmed
her initial allegations, and described having panic attacks, among other mental health concerns,
after her relationship with John. Jane further alleged:

> [John] has a line of people behind him that he has hurt because he found it funny,
> or didn't see a problem . . . [John] doesn't have a conscience. I don't know if he
> ever will . . . **He absolutely should not be allowed to become a naval officer.**
> He should have no access to power[,] that would just encourage his lifestyle. He
> makes others feel unsafe, bullies them, hurts them, and takes advantage of their
> vulnerable states. **If he is found guilty or a danger to other students in any way,
> the Navy will immediately remove him from the NROTC program**.

---

[7] John notes that the statement was unsworn and unsigned and came from Bloom's e-mail account. The e-mails
indicate that Jane was at a naval training in San Diego and, according to Bloom, did not have access to a computer.
[Def. Ex. CC]. It is unclear to the Court if John disputes the authenticity of the statement itself, or simply believes that
an unsworn, e-mailed statement should not have been considered by the disciplinary panel. The Court does not believe
any dispute on this point changes the outcome of the motions, and in the interest of clarity, refers to the statement as
Jane's statement.

[Def. Ex. DD (emphasis in original)]. Semersheim issued her decision on June 14, 2016, finding by a preponderance of the evidence that John had violated Purdue's Anti-Harassment Policy. Semersheim suspended John for one academic year, and conditioned John's return on the completion of "bystander intervention training" and monthly meetings with CARE for the first semester of his return. [Def. Ex. FF]. John appealed, and Vice President Rollock directed Semersheim to provide a further factual basis for the decision. [Def. Exs. GG, HH]. Semersheim issued an amended decision, specifically finding that: "[Jane] woke up and found that [John] inappropriately touched her over her clothing and without her consent by placing [his] hand above her knee, between her legs, and moved it up to her 'crotch' area; and [on] another occasion, while she was sleeping and without her consent, [John] inappropriately touched [Jane] by digitally penetrating her vagina." Semersheim explicitly found that John was not a credible witness, but Jane was a credible witness. [Def. Ex. II].

John appealed the amended decision on July 10, 2016. In summary, he denied Jane's allegations, and argued: that he had not had a fair hearing because he was not confronted with the evidence against him; that two members of the three-person panel had not read the report; that the panel was unduly hostile toward him; and that the decision did not contain a basis for Semersheim's finding that he was not credible. [Def. Ex. KK]. On July 21, 2016, Vice President Rollock upheld Semersheim's decision, without addressing John's arguments. Rollock wrote that, having reviewed the case, the one-year suspension and related sanctions would stand, because "the seriousness of [John's] misconduct" supported Semersheim's determination. [Def. Ex. LL].

### 3.   Removal from NROTC

While Purdue's disciplinary process was ongoing, the NROTC had appointed Lt. Megan Redlawsk to lead its own inquiry. Redlawsk accepted a written statement from John and spoke to

John and Jane. [Def. Ex. E, Deposition of Megan Redlawsk Chester, 21:22-22:8]. Nonetheless, CO Hutton instructed Redlawsk to "utilize the [Purdue] investigation for determinations of what occurred," and not to make an independent determination on Jane's allegations to the NROTC. [Def. Ex. A, 20:3-22]. On June 14, 2016, having received Purdue's initial decision[8], Redlawsk submitted a report concluding that John "did in fact engage in sexual harassment and assault . . . per [Purdue's investigation report]." [Def. Ex. NN]. He was removed from the NROTC program on August 16, 2016. [Pl. Ex. 36]. Following his one-year suspension, John did not return to Purdue. He spent three semesters at Taylor University, which does not have NROTC. [*See* Def. Ex. XX]. He has not produced evidence of any further attempt to join the Navy, or an NROTC program.

## B.     PROCEDURAL HISTORY

John filed this complaint on January 24, 2017, bringing a claim for a due process violation under 42 U.S.C. § 1983, a Title IX discrimination claim, and a state law breach of contract claim. [DE 1]. The parties consented to have the case heard by a Magistrate Judge. [DE 27]. On November 15, 2017, Magistrate Judge Paul R. Cherry granted the defendants' motion to dismiss the complaint in its entirety. [DE 31]. John appealed, and the Seventh Circuit Court of Appeals issued an opinion reversing the decision in part, and remanding, holding that John had pled facts sufficient to state his due process and Title IX claims. *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019).

### 1.   *Doe v. Purdue Univ.*, 928 F.3d 652 (7th Cir. 2019)

Turning first to John's due process claims, the Seventh Circuit explained that John's continued enrollment at a public university did not establish a property interest. However, he had sufficiently alleged a protected liberty interest, namely "his freedom to pursue naval service, his

---

[8] John signed a form specifically "authoriz[ing] the release of all information" pertaining to Purdue's investigation. [Pl. Ex. 44]. He testified that he did so because he believed NROTC "wanted to be in the loop on what was going on." [Pl. Ex. 5, Deposition of John Doe, 21:1-22:7].

occupation of choice." Therefore, he could state a due process claim if he satisfied the "stigma-plus" test, by showing that the state "inflicted reputational damage accompanied by an alteration in legal status that deprived him" of the right to pursue a career in naval service. *Id*. at 659-661 (citing *Paul v. Davis*, 424 U.S. 693, 708–09 (1976); *Hinkle v. White*, 793 F.3d 764, 767–68 (7th Cir. 2015); *Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013)).

The court held that John alleged facts sufficient to satisfy the stigma-plus test. Specifically, the court pointed to John's allegation that Purdue had disclosed his disciplinary record to the NROTC, and that John had been "legally obligated" to permit this disclosure; "[t]hus, if what John says is true, the university has stigmatized him by telling the Navy about the guilty finding." The court contrasted this mandatory disclosure with a person who might voluntarily "self-publish" his own stigma in pursuit of some future job, which would not be sufficient. Ultimately, John had sufficiently alleged that the state inflicted reputational damage on him, accompanied by an alteration in legal status (his suspension from Purdue) that deprived him of a right he previously held (by causing his expulsion from NROTC). *Id.* at 661-63.

The court also held that John had adequately alleged Purdue used "fundamentally unfair" procedures, thus violating his protected right. *Id*. at 663 (citing *Goss*, 419 U.S. at 574 (a state "may not withdraw [a protected right] on grounds of misconduct absent[ ] fundamentally fair procedures to determine whether the misconduct has occurred.")). The court noted that "Purdue did not disclose its evidence to John . . . [which] was itself sufficient to render the process fundamentally unfair."). *Id*. (citations omitted). The court pointed to other alleged deficiencies, including the failure of two disciplinary panel members to read the investigative report; the committee's conclusion that Jane was a more credible witness without speaking to her in person; and that the

committee apparently ignored some of John's evidence that may have impeached Jane's credibility. *Id*. at 663-64.

Turning to John's Title IX claims, the court explained that John had to allege Purdue discriminated against him "on the basis of sex," 20 U.S.C. § 1681(a), and that this was a "motivating factor" in Purdue's decision to suspend him. John argued that Purdue had a financial motive to discriminate against men in sexual assault investigations, to publicly demonstrate that it was complying with recent U.S. Department of Education mandates that schools investigate sexual assault more rigorously. 928 F.3d at 663-64 (citing United States Department of Education, Office of the Assistant Secretary for Civil Rights, Dear Colleague Letter (2011), https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html). The court found that this argument, together with the allegedly flawed disciplinary process that appeared to be biased against John, gave rise to a plausible claim. The court also noted that a newspaper article that CARE posted on its Facebook page, headlined "Alcohol isn't the cause of campus sexual assault. Men are," could support an inference of bias based on sex in John's case, particularly because it was CARE's director, Monica Bloom, who submitted the statement on Jane's behalf.

### 2. Remand

Following remand, litigation continued in this Court. John filed an amended complaint [DE 51], and Defendants moved to dismiss all claims except his Title IX claims [DE 58]. The undersigned dismissed two claims for injunctive relief, and one due process claim based on deprivation of a property interest, but denied Defendants' motion as to all other claims. [DE 84]. A second amended complaint was filed incorporating the remaining claims, and Defendants filed an answer and counterclaim seeking declaratory judgments essentially stating that John's claims had no merit. [DE 160, 162]. Following the close of discovery, both parties filed motions for

summary judgment. [DE 177, 181]. Defendants moved to exclude the expert report of R. Christopher Barden, which accompanied John's opposition to their motion. [DE 193]. Finally, Defendants moved to partially dismiss Plaintiff's claim for damages, based on a recent Supreme Court decision holding that emotional distress damages are not recoverable under Title IX. [DE 203].

### C.  MOTION TO STRIKE

Before considering the dispositive motions, the Court turns to Dr. Barden's opinion, which Defendants seek to exclude from summary judgment and trial as irrelevant and insufficiently reliable. For the reasons described below, Defendants' motion will be granted. The report itself will be stricken from the summary judgment record and may not be used at trial. This ruling is without prejudice to any other expert evidence John may seek to introduce at trial. The Court is not barring any and all expert opinions Dr. Barden may offer. However, as discussed below, the report at issue is replete with conclusions and assertions that are neither admissible nor helpful.

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and the standards set forth by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). *See Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 provides that courts should admit expert evidence if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The Court may also consider whether the expert's theory has been tested and subjected to peer review and publication, the potential error rate of the method at issue, and whether the theory is generally accepted in the scientific community. *Daubert*, 509 U.S. at 593-

95. The inquiry is "flexible," and not every factor applies in every case. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The ultimate purpose is to determine if the evidence has "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id*. at 152.

Dr. Barden is a psychologist and attorney who claims expertise in sexual assault investigations. His wide-ranging report [Pl. Resp. Ex. 22, DE 187-23] can be briefly summarized as follows: He believes there has been a trend, beginning in the 1960s, in which sexual assault cases have been improperly prosecuted in the criminal courts and on campuses, aided by incorrect statistics and scientifically flawed research.[9] In John's case specifically, he argues that Purdue conducted a biased investigation due to "Gross Negligence, Reckless Fraud, or Deliberate Fraud." He speculates about the motives of the parties and witnesses: for example, Jane's allegations were "consistent with emotionally unstable patients exposed to 'ideologically driven therapy and/or radical feminist support groups.'" [*Id*. at 52-58]. He ultimately concludes that Purdue ignored "disconfirming evidence," such as Jane's "very close (almost like a married couple) relationship to John Doe, her defective thinking style, her emotional instability, and her deeply deceitful-manipulative-pathological relationship with her mother."[10] [*Id*. at 41].

Dr. Barden's opinions about the credibility of the parties and witnesses are neither specialized knowledge nor appropriate for expert testimony. *See Logan v. City of S. Bend*, 564 F. Supp. 3d 719, 734 (N.D. Ind. 2021) (quoting *Stachniak v. Hayes*, 989 F.2d 914, 925 (7th Cir. 1993) ("[C]redibility is not a proper subject for expert testimony; the jury does not need an expert to tell

---

[9] Dr. Barden believes this "radical feminist" trend reflects a "Marxist-Communist bias against the USA" [DE 187-23 at 85], and a bias against "White cisgendered, Christian males" [*Id*. at 62]. The Court's discussion is limited to the issues relevant to this case.

[10] To put it mildly, such statements cut against a finding that this report has "the same level of intellectual rigor that characterizes the practice of an expert." *Kumho Tire*, 526 U.S. at 152.

it whom to believe."). Speculation couched in the language of expertise is no exception. "Unless the expert uses his expertise to add something to the jury's ability to understand the evidence or evaluate [] witness credibility, those matters are left to the jurors to decide for themselves." *Est. of Arama v. Winfield*, No. 2:13-CV-381-JD, 2017 WL 1951462, at *4 (N.D. Ind. May 11, 2017) (citing *United States v. Hall*, 93 F.3d 1337, 1343–44 (7th Cir. 1996)).

Dr. Barden concludes, repeatedly, that Purdue's investigation reflects its pursuit of a "radical feminist" agenda. His argument boils down to this: Purdue's investigation was flawed, and other flawed investigations have been motivated by faulty science and bias against men, therefore Purdue's investigators were likely biased for the same reasons. But for his report to be admissible, he must offer "scientific, technical, or other specialized knowledge [that] will help the trier of fact" to understand that conclusion. Fed. R. Evid. 702(a). "The [expert evidence] must 'fit the issue to which the expert is testifying [and be] tied to the facts of the case.'" *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 819 (7th Cir. 2014) (quoting *Deimer v. Cincinnati Sub–Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir. 1995)).

To the extent Dr. Barden offers specialized knowledge, it is not helpful to the resolution of the case. For example, he rejects what he sees as a campaign to exaggerate the prevalence of sexual assault on campus. He believes some researchers are engaged in "junk science" about trauma and memory to further that agenda. [*See* DE 187-23 at 22-40]. Again, the relevant question is whether these defendants deprived John of a protected interest by denying him due process and intentionally discriminated against him based on sex. Dr. Barden's (unsupported) assumption that Purdue's administrators believed the "junk science" would only matter if they relied on that to intentionally discriminate against John. This report offers little to make that connection, other than his rumination about their motives. [*See, e.g., id.* at 38 ("Unprofessional reliance upon . . .

apparently pseudoscientific 'feminist science' lectures and speeches *could result in* grossly defective, irrational, biased, and unfair investigations — as in this case.") (emphasis added)]. Expert opinions premised on "subjective belief or unsupported speculation," like this one, must be excluded. *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996).

### D.    SUMMARY JUDGMENT

Purdue seeks summary judgment on all claims, while John seeks summary judgment on his due process claim. The Federal Rules of Civil Procedure require the entry of summary judgment against a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In other words, the record must reveal that no reasonable jury could find for the non-movant. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations omitted). A court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Srail v. Vill. of Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, judge witness credibility, or determine the truth of the matter, but to determine whether there is a genuine issue of triable fact. *Liberty Lobby*, 477 U.S. at 249-50.

### 1.  Due Process Claim

John alleges that Purdue deprived him of a protected liberty interest, namely the freedom to pursue naval service. For the reasons below, summary judgment will be granted for Purdue on John's due process claim.

As explained by the Seventh Circuit, John needs to satisfy the "stigma-plus test" by showing that the state (1) inflicted reputational damage (2) accompanied by an alteration in legal

14

status that (3) deprived him of a right[11] he previously held, and that (4) the deprivation occurred without the minimum due process guaranteed by the Fourteenth Amendment. *Purdue*, 928 F.3d at 659-661. The first element, the state's infliction of reputational damage, "roughly corresponds to the publication requirement of defamation law." *Doe v. Trustees of Indiana Univ.*, 496 F. Supp. 3d 1210, 1216 (S.D. Ind. 2020). John must show that what Purdue said about him was not true, and that he did not consent to the publication. *Doe v. Trustees of Indiana Univ.*, No. 120CV00123JRSDML, 2021 WL 2213257, at *2-4 (S.D. Ind. May 4, 2021) (citing *Paul v. Davis,* 424 U.S. 693 (1976), and discussing the history of the stigma-plus test).

For his part, John cannot be granted summary judgment because an issue of material fact remains about whether Purdue's conclusions about him were false. Put simply, a reasonable juror could infer that John sexually assaulted Jane, and therefore, that Purdue did not defame him. This evidence includes (1) the allegations of Jane herself, (2) the text messages between John and Jane:

> **Received from [Jane Doe] on Mon Dec 28, 2015 10:22 PM**: "Or when I wake up to you touching me or I'm trying to do something and you just touch me I literally can't trust you if you don't respect my boundaries"
> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:37 PM**: "We already went over this several times. I cant even apologize anymore because you get angry at me for it."
> . . .
> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:56 PM**: "Im not going in circles any more [Jane]. What more do you want me to say? Do you want this to be over? We have literally talked about this for a week and I already told you I cant change what i did, only what i will do from here on out. Do you want me to feel shitty for the rest of my life because of what I did? Im feeling like i will. Im sorry. I cant change what i did, as much as i want to. I violated you and never should have. What do you want me to do?

(3) the investigator's findings indicating that John lied about the subject of the text messages, and

(4) the testimony of Jane's RA indicating that John lied about going to Jane's dorm room

---

[11] Defendants argue that John has not shown how Purdue deprived him of occupational liberty, in part because he has not tried to rejoin to the Navy or shown that his return to NROTC was precluded by his suspension. Because the claim is dismissed on other grounds, the Court does not address whether John has satisfied this element.

unaccompanied. Without assessing the truth of these facts, this evidence creates a genuine issue of fact precluding summary judgment for John.

Meanwhile, Purdue argues it is entitled to summary judgment on this claim because John consented to Purdue's publication of his disciplinary files to NROTC. In permitting John's claim to go forward, the Seventh Circuit relied on John's allegation that he "had an obligation to authorize Purdue to disclose the proceedings to the Navy . . . Purdue, not John, revealed to the Navy that it had found him guilty of sexual violence, and *John had a legal obligation to authorize the disclosure*." 928 F.3d at 662 (emphasis added). The court analogized these allegations to *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), in which child care workers were obligated under state law to disclose a state agency's finding that they had abused children to their current and prospective employers. But it also made clear that a plaintiff's "self-defamation" is not a deprivation of a liberty interest. 928 F.3d at 661-62. In other words, a plaintiff's school does not violate his due process rights merely because he told a current or future employer what the school said about him.

Although the Seventh Circuit allowed John's claim to proceed based on the allegations in his complaint, the evidence presented here does not support those allegations. Ultimately, John signed a form specifically "authoriz[ing] the release of all information" pertaining to Purdue's investigation. [Pl. Ex. 44]. He testified that he did so because he believed NROTC "wanted to be in the loop on what was going on." [Pl. Ex. 5, John Doe Dep., 21:1-22:7]. John did not testify that he was legally obligated to do so, nor is any evidence presented to that effect. John felt he was "in no position to refuse the authorization," [Pl. Reply, DE 191 at 8], but that is not the same as an *obligation* for John to release the records. Perhaps John's claims would survive summary judgment if he had shown that any failure to provide authorization would have resulted in a sanction or

16

lawful order, pointed to an NROTC regulation compelling his cooperation, or even shown that he would have had to make a disclosure of Purdue's finding to reapply to NROTC after his suspension. If there was such an argument to be made, John has opted not to do so. It is not for the Court to construct an argument for the litigants and scour the record – or outside the record – for support. *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."). And there would have been undisputed facts weighing against such an argument: as Defendants pointed out, John did not recall anyone telling him that the Navy wanted access to information from Purdue, and a Navy officer indicated that they did not recall ever giving an order for John to turn over information about the investigation. [*See* DE 178 at 40-41].

This record is not analogous to *Dupuy*, the case involving child care workers. In that case, the defendants could be held liable for violating a liberty interest because under Illinois law, "all current and prospective [child care workers] must [permit] a background check to determine if the person has an indicated report against him." 397 F.3d at 510. The plaintiffs could not even apply to work in their chosen field without the information being shared, by direct operation of law. Here, there is no such law, and John has not pointed to anything in the record that indicates he faced a compelled disclosure. Having consented to Purdue's disclosure of his records, and presenting no evidence of a legal obligation to do so, John cannot proceed on his claim.[12] *See* 928 F.3d at 662; *Doe v. Trustees of Indiana Univ.*, 2021 WL 2213257, at *4 (S.D. Ind. May 4, 2021) ("[Plaintiff] would have needed to show that some extant legal obligation—like a statute or regulation—required him to consent to disclosure of his sexual misconduct finding."); *Doe v.*

---

[12] Because the claim is dismissed on other grounds, the Court does not address Defendants' arguments regarding standing, or whether John had a "meaningful post-deprivation remedy" foreclosing a due process claim. [DE 178 at 31-38].

*Purdue Univ.*, 464 F. Supp. 3d 989, 1002 (N.D. Ind. 2020) (stigma-plus test satisfied because plaintiff "allege[d] that [his chosen] occupations trigger a legal obligation to disclose the disciplinary proceedings").

### 2.  Title IX Claim

Defendants seek summary judgment on John's Title IX claim. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). It is undisputed that Purdue receives federal funding, and that John was "excluded from participation in [or] denied the benefits of . . . [an] education program" when Purdue suspended him. Therefore, the claim depends on whether the defendants discriminated against John "on the basis of sex," and whether this was a "motivating factor" in his suspension.[13] *Purdue*, 928 F.3d at 668. John must also show that the discrimination was intentional; a theory of "disparate impact" would not be sufficient. *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 75 (1st Cir. 2019) (citing *Alexander v. Sandoval*, 532 U.S. 275, 283 (2001); *Hayden v. Greensburg Comm. Sch. Corp.*, 743 F.3d 569, 583 (7th Cir. 2014) ("The discrimination must also be intentional in order to support a claim for damages under Title IX.")).

John presents some evidence supporting an inference of bias within the investigation and disciplinary process, as well as evidence suggesting broader reasons why Purdue might want to vigorously prosecute sexual assault cases. The question is whether that evidence supports an

---

[13] The Fourth Circuit Court of Appeals has suggested that the phrase "on the basis of sex" implies "but-for" causation, *i.e.*, that the plaintiff must show that the discipline would not have been imposed if there was no discrimination. *See Sheppard v. Visitors of Virginia State Univ.*, 993 F.3d 230, 236 (4th Cir. 2021). The Court finds no support for that view in this circuit, and therefore follows the "motivating factor" standard described in the Seventh Circuit's consideration of this case. However, in this case the outcome is the same under either standard.

inference of discrimination against John because he is a man[14], as opposed to discrimination in favor of accusers generally, a "culture" creating a disparate impact on men rather than intentional discrimination, simple human error, or some combination of these. Reasonable jurors could read this in different ways.

In remanding the case, the Seventh Circuit discussed several of John's allegations and explained why they supported a reasonable inference of discrimination based on sex, and many of those allegations are borne out in the evidentiary record. One example is the Facebook post by CARE Director Bloom, sharing an article called "Alcohol isn't the cause of campus sexual assault. Men are." Clearly, the empirical fact that men are accused of sexual assault more often than women does not prove that Purdue's Anti-Harassment Policy discriminates against men. But as the Seventh Circuit explained, the Facebook post "could be understood to blame men as a class for the problem of campus sexual assault rather than the individuals who commit sexual assault." 928 F.3d at 669. Or it could support a related inference argued by John: that in sexual assault cases, Purdue was determined to "believe the woman." The fact that Bloom herself participated in John's case could further support an inference of intentional discrimination against John.

Another example is the 2011 Dear Colleague letter, which John argues created a financial incentive for Purdue to discriminate against men in sexual assault investigations. This letter has come up in other cases, and Defendants point to courts finding that the letter, "by itself and unaccompanied by specific evidence," does not create a reasonable inference of discrimination. [DE 178 at 48 n. 43 (citing, *e.g.*, *Doe v. Univ. of Denver*, 952 F.3d 1182, 1192 (10th Cir. 2020);

---

[14] Although Title IX covers "sex," the parties often refer to "gender." The Court uses whatever term is reflected in the evidence, briefing, or legal authority being discussed. Any distinction between sex and gender does not affect the decision, because evidence of gender discrimination can support a Title IX claim. *See, e.g, Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047-50 (7th Cir. 2017).

*Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 855-56 (7th Cir. 2019))]. While conceding that it is not dispositive on its own, the Seventh Circuit noted how the pressure created by that letter might be "far from abstract," particularly for Semersheim, whose job included demonstrating compliance with those directives. Combined with other facts, it could support an inference of discrimination. *Purdue*, 928 F.3d at 668-69 (citing cases in which the letter supported or "provide[d] a backdrop" for an inference of discrimination).

John's due process claim has been dismissed, so arguments about the right to review evidence or cross-examine, or that the proceedings were fundamentally unfair, are not necessarily probative. The inquiry remains whether a reasonable juror could infer that Defendants discriminated against John because he was a man. For the reasons described below, certain aspects of John's disciplinary process could support that inference.

Justified or not, the investigators appeared to scrutinize John's character more than Jane's. For example, the report noted Jane's allegations that John had a temper and was "clingy," and that this was his first serious relationship, which the investigators concluded may have led him to unwittingly "cross lines" with Jane. [*See* Def. Ex. F at 4, 10]. It is unclear why the investigators felt John's temper was relevant, since he was not alleged to assaulted Jane in anger. Regardless, they ignored John's corresponding allegations: that Jane herself had a temper and tended to make erratic and impulsive statements, and that Jane resented him following his intervention in her alleged suicide attempt.[15]

Taking the evidence as John indicates he would present it to a jury, that imbalance continued into the disciplinary hearing. John faced "loaded" and "hostile" questioning from the

---

[15] The Court does not necessarily accept John's inference that Jane has any particular mental illness, nor presume that any mental illness or suicide attempt would constitute negative indicators of her credibility. The Court simply notes the allegation that Jane held resentment against John.

committee (Jane did not face questioning at all, having declined to attend as permitted by Purdue's policy). In lieu of her attendance, a statement prepared by Jane was presented to the panel. Although the statement reiterated Jane's initial allegations, it could support John's claim that she had animus against him, beyond the circumstances of the alleged assaults:

> [John] has a line of people behind him that he has hurt because he found it funny, or didn't see a problem . . . [John] doesn't have a conscience. I don't know if he ever will . . . **He absolutely should not be allowed to become a naval officer.** He should have no access to power[,] that would just encourage his lifestyle. He makes others feel unsafe, bullies them, hurts them, and takes advantage of their vulnerable states. **If he is found guilty or a danger to other students in any way, the Navy will immediately remove him from the NROTC program**.

[Def. Ex. DD (emphasis in original)]. Both parties agreed that Jane was John's first serious relationship; it appears that no inquiry was made about the alleged "line of people" that John had hurt, or his "lifestyle" of making others feel unsafe and "tak[ing] advantage of their vulnerable states" – claims that seemed to be undermined by multiple witnesses quoted in the report. John's statements were thoroughly scrutinized and held against him if they were found to be dishonest; Jane's were accepted, or at least not fully explored. In the end, Jane was labeled a "credible witness," but the record reflects little assessment of *her* credibility, other than the fact that John was deemed not credible. *See Doe v. Am. Univ.*, No. 19-CV-03097 (APM), 2020 WL 5593909, at *7 (D.D.C. Sept. 18, 2020) (investigator critiqued the alleged assailant's credibility, but "failed to grapple with [the accuser's questionable statements] or explain how they affected her view of [the accuser's] credibility"); *cf. Doe v. Trustees of Indiana Univ.*, No. 121CV00973JRSMPB, 2021 WL 2982186 at *4 (S.D. Ind. July 15, 2021) (finding no evidence of bias where "in order to resolve the charges against him, the Hearing Panel *had* to find that [one party] was credible and that the other was not") (emphasis in original).

Ultimately, the factfinder will have to judge whether the evidence supports an inference of victim bias or sex bias. The distinction is difficult to parse, because "sexual-misconduct claims in higher education overwhelmingly involve a female complainant and a male respondent. Title IX plaintiffs challenging the outcome of a sexual-misconduct proceeding will rarely have direct evidence or even strong circumstantial evidence sufficient to overcome a school's 'anti-respondent, not anti-male' argument." *Doe v. Univ. of Denver*, 1 F.4th 822, 835–36 (10th Cir. 2021). At the same time, categorizing a group that is mostly men by some other status does not make their gender irrelevant. They can still suffer, or benefit, from gender bias. *See*, *e.g.*, *Doe v. Bd. of Regents of Univ. of Wisconsin*, No. 20-CV-856-WMC, 2021 WL 5114371, at *5 (W.D. Wis. Nov. 3, 2021) (allegation of bias toward football players supported a reasonable inference of gender bias, because "college football is far and away a male sport, if not exclusively so"). John has not produced any examples in which a woman accused of sexual assault was treated differently than he was. But he does not need to identify similarly situated female "comparators," like in an employment discrimination claim. *See*, *e.g.*, *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012). All he needs to show is that his sex was "a motivating factor" in the defendants' decision to suspend him. *Purdue*, 928 F.3d at 668-69.

The Court acknowledges cases suggesting that as long as a school follows its own policies, a flawed investigation or a slanted weighing of the evidence supports an inference of victim bias, but not necessarily gender bias.[16] In that regard, John's specific complaints that the hearing and

---

[16] *See*, *e.g.*, *Doe v. Univ. of S. Indiana*, No. 321CV00144TWPMPB, 2022 WL 1471037, at *8 (S.D. Ind. May 10, 2022) (aff'd, No. 22-1864, 2022 WL 3152596 (7th Cir. Aug. 8, 2022)) ("John's numerous complaints about USI's Title IX grievance process, at most, amount to a claim that USI favors complainants over respondents."); *Indiana Univ.*, 2021 WL 2982186, at *5 ("A different view as to how the evidence should have been weighed by the Hearing Panel does not reasonably suggest a bias against Doe based on his sex . . . Doe's complaint amounts to a challenge to a bias in favor of alleged sexual-assault victims."); *Doe v. William Marsh Rice Univ.*, No. 4:20-CV-2985, 2021 WL 4215501, at *10 (S.D. Tex. Sept. 16, 2021) ("Plaintiff's assertions about the disciplinary procedural process are also not evidence of gender bias. Plaintiff has not alleged that the University failed to follow the procedures outlined in its Code . . . [i]nstead Plaintiff appears to express his dissatisfaction with the investigation procedures.").

interviews were not recorded or transcribed, that Jane was permitted to miss the hearing, and that the panel accepted an unsworn statement from her, are thin evidence of sex discrimination. Those standards applied to both parties. At the same time, the Court cannot simply assume that John's sex was not a motivating factor in the more biased aspects of the disciplinary process. *See Doe v. Univ. of S. Indiana*, No. 22-1864, 2022 WL 3152596, at *5 (7th Cir. Aug. 8, 2022) ("Procedural irregularities may support a finding of sex bias under Title IX if . . . the defendant deviated from proper procedures not because of human error but by design."). Construing all evidence in John's favor: the cursory inquiry into Jane's credibility juxtaposed with the rigorous inquiry into John's, the hostility of the panel toward John, the failure of two panelists to read the report before a hearing explicitly arranged for them to "meet with the parties . . . after having reviewed the [] report," and the background facts suggesting a potential culture of bias at Purdue against men in sexual assault cases, could lead a reasonable juror to infer that sex discrimination was a motivating factor in John's suspension.

### E.      DAMAGES FOR EMOTIONAL HARM

Defendants move to dismiss John's claim for "emotional and psychological damages" on his Title IX claim, based on the Supreme Court's holding in *Cummings v. Premier Rehab Keller*, *P.L.L.C.*, 142 S. Ct. 1562 (April 28, 2022). The court held that emotional distress damages are not available under antidiscrimination statutes enacted under the Spending Clause of the Constitution, such as Title IX. 142 S. Ct. at 1569, 1572 (listing Title IX as one of the four Spending Clause statutes: "[W]e . . . cannot treat federal funding recipients as having consented to be subject to damages for emotional distress. It follows that such damages are not recoverable under the Spending Clause statutes we consider here."). In response, John notes that these damages are "a minor component" of his overall damage claims, and Defendants' request should be "considered

in accordance with the motion's limitations." [DE 205]. Ultimately, he makes no argument against the requested relief. The Supreme Court's decision forecloses his claim for "emotional and psychological damages," so the motion will be granted.

### F.    CONCLUSION

For the reasons described above, the Court:

(1) **GRANTS in part and DENIES in part** Defendants' motion for summary judgment [DE 177]. Plaintiff's due process claim (Count I) is dismissed, while his Title IX claim (Count II) remains pending;

(2) **DENIES** Plaintiff's motion for partial summary judgment [DE 181];

(3) **GRANTS** Defendants' motion to strike the opinion of Plaintiff's expert [DE 193]. The opinion of Dr. Christopher Barden is excluded from the summary judgment record and may not be used at trial; and

(4) **GRANTS** Defendants' motion for judgment on the pleadings [DE 203]. Plaintiff's claim for "emotional and psychological damages" in connection with Count II is dismissed.

So ORDERED this 11th day of August, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT