Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF INDIANA
 2                       HAMMOND DIVISION
 3                   CASE NO. 2:17-cv-33-JPK
 4    JOHN DOE,                          )
                                         )
 5           Plaintiff,                  )
                                         )
 6           -vs-                        )
                                         )
 7    PURDUE UNIVERSITY, PURDUE          )
      UNIVERSITY BOARD OF TRUSTEES,      )
 8    MITCHELL ELIAS DANIELS, JR.,       )
      in his official capacity as        )
 9    President of Purdue                )
      University, ALYSA CHRISTMAS        )
10    ROLLOCK, in her official           )
      capacity at Purdue University,     )
11    KATHERINE SERMERSHEIM, in her      )
      official capacity at Purdue        )
12    University,                        )
                                         )
13           Defendants.
14
                                           JOHN DOE
15                DEPOSITION OF ~~~~~~~~~~~~~~~~
16
17         The videotaped deposition upon oral examination of
      JOHN DOE
      ~~~~~~~~, a witness produced and sworn before me,
18    Clarice H. Howard, CCR-Ky, Notary Public in and for the
      County of Boone, State of Indiana, taken on behalf of
19    the Defendants, at the offices of Stuart & Branigin,
      LLP, 300 Main Street, Suite 900, Lafayette, Indiana, on
20    Tuesday, August 18, 2020, scheduled to commence at
      10:00 a.m., pursuant to the Federal Rules of Civil
21    Procedure with written notice as to time and place
      thereof.
22
23
24
25
```

Page 22

1  and it's asking for my consent in that matter.
2  Q  What did you understand to be the reason why Navy
3     ROTC was obtaining your consent?
4  A  I imagine they wanted to be in the loop on what was
5     going on.
6  Q  You imagine that or did somebody tell you that?
7  A  Well, this document does.
8  Q  You don't recall one way or the other anybody at
9     the Navy telling you that the Navy wanted access to
10    information from Purdue?
11 A  No, I do not.
12 Q  So as you sit here today, you didn't have any
13    recollection of the circumstances under which you
14    signed Deposition Exhibit 2?
15    MR. BYLER: Objection, form.
16 A  When this investigation started at the school, I
17    was in disarray. I was in disbelief and a lot of
18    the details were or some of the details of the
19    early stages of the investigation and who got
20    access to what, was lost on my memory.
21 Q  As of May 24, 2016, you wanted access to the
22    investigator's report yourself, right?
23 A  I did want access to the investigator's report
24    because I want to defend myself in the case that
25    Purdue had me in. If the 24 is that date, then

Page 23

1     yes.
2  Q  The date that appears on Deposition Exhibit 2 is
3     May 24, 2016; did you see that?
4  A  I do.
5  Q  Do you have any reason to believe that that's not
6     the document on which you signed this document?
7  A  I do not.
8  Q  So as of the day you signed this document,
9     Deposition Exhibit 2, you yourself wanted access to
10    the investigator's report, correct?
11 A  Well, this document asks for authorization of
12    release of information pertaining to investigation
13    correspondent case concerning Jane Doe and
14    JOHN DOE to the Department of Naval Sciences
15    Purdue University. It does not say that it
16    authorizes release of all information to [redacted]
17    [redacted]
18 Q  That wasn't my question. My question was whether
19    on this date when you were signing Deposition
20    Exhibit 2, you yourself wanted access to the
21    investigator's report?
22 A  Yes, yes, I did want access to it.
23 Q  And you understood when you were signing this
24    document that the Navy was getting access to it,
25    correct?

Page 24

1  A  Yes.
2  Q  And so the Navy shortly after you signed Deposition
3     Exhibit 2 had the investigators report, right?
4  A  I did not how timely the school was going to be,
5     but --
6  Q  You certainly had the opportunity shortly after you
7     signed Deposition Exhibit 2 to receive the
8     investigator's report, correct?
9     MR. BYLER: Objection, speculation.
10 A  I wasn't being told to when they were giving the
11    investigation report to anybody.
12 Q  You're not aware of any obstacle to the Navy
13    receiving your investigator's -- the investigator's
14    report after you signed Deposition Exhibit 2, are
15    you?
16    MR. BYLER: Objection to form.
17 A  Could you repeat that question, please?
18 Q  You're not aware of any obstacle to the Navy
19    receiving the investigator's report you signed
20    Deposition Exhibit 2 on or May 24, 2016, are you?
21    MR. BYLER: Objection, facts not in evidence.
22    Go ahead.
23 A  I was not aware -- I was not aware of the behind
24    the scenes on this at all.
25 Q  I'm just asking whether you were an obstacle to the

Page 25

1     Navy receiving the report after you signed
2     authorization for them to do so?
3     MR. BYLER: Objection, asked and answered,
4     assumes facts not in evidence.
5  A  Could you give me examples of what you mean by
6     obstacles?
7  Q  Any obstacle you can dream up?
8     MR. BYLER: Same objection.
9  A  I was not aware, no.
10 Q  Mr. Doe, when did you ask the Navy to let you see
11    Purdue's investigator report?
12 A  When I had correspondence with Navy personnel over
13    the summer, I mentioned that I did not have access
14    to the investigation report from Purdue, and I
15    mentioned that they had never given it to me.
16    And I think that prompted them to give brief
17    access to the investigation report when I drove
18    down to West Lafayette in August to turn in all of
19    my Naval gear.
20 Q  After you signed Deposition Exhibit 2, did you
21    contact anybody at the Navy ROTC between May 24 and
22    June 6 to ask to see their copy of the investigator
23    report?
24    MR. BYLER: Objection to the form of the
25    question.

7 (Pages 22 - 25)

Page 26

1  A   So my understanding at the time the investigator's
2      report was to be sent to me by the school
3      conducting the investigation, not by the Navy, who
4      to me seemed be acting as a third party in this.
5          They were bearing witness to the proceedings,
6      but they themselves play very little part in the
7      proceedings. And it did not occur to me that I
8      should be asking the Navy for the investigation
9      report because in my mind Purdue would prioritize
10     giving the investigation report to the people that
11     it concerned most, and that would include me
12     because I was the topic.
13 Q   Do you remember my question?
14 A   Your question was if between May 24 and June 6,
15     I -- it occurred to me to ask the Navy for a copy
16     of the investigation.
17 Q   No, it's not. Between May 24 --
18         MR. KEALEY: We'll have the court reporter
19     read it back. Read the question back, please.
20         (The last question was read.)
21         MR. BYLER: And I object to that on the
22     grounds I said, but go ahead. And he did answer
23     that question.
24         MR. KEALEY: No, he didn't.
25         MR. BYLER: Yes, he did, but go ahead. He can

Page 27

1      answer it again.
2          MR. KEALEY: What did he say, Counsel, put on
3      the record, was it a yes or was it a no.
4          MR. BYLER: He testified as to his
5      understanding with respect to the Navy, this is a
6      Purdue investigation --
7          MR. KEALEY: That wasn't the question,
8      Counsel.
9          MR. BYLER: No, it was a Purdue investigative
10     report, and his understanding was Purdue would be
11     giving to him.
12 A   Because of that understanding, the answer is no, I
13     did not ask them.
14 Q   That's the answer. Thank you.
15 A   Okay. I was trying to give you some context to the
16     question, and I didn't punctuated it. So the
17     answer is no, I did not.
18 Q   So you did not ask the Navy before June 6, and on
19     June 6, you went to the panel meeting and you did
20     not ask Navy after June 6 until mid summer,
21     correct?
22         MR. BYLER: Objection, asked and answered.
23     It's also irrelevant, the Purdue investigative
24     report.
25 A   This is true.

Page 28

1  Q   And the Navy didn't offer to give you the report,
2      did they?
3  A   I'm not confident in answering that because to my
4      recollection, it was mentioned in an e-mail that if
5      I wanted to look at the report in August, I was to
6      show up early to look at it. And they gave me a
7      ten to 15-minute window to do so, to my
8      recollection.
9  Q   Was it an act of antimale basis on the part of the
10     Navy not to give you access to the investigator's
11     report until August 2016?
12         MR. BYLER: Objection to the pointed question,
13     assumes facts not in evidence and it's totally
14     irrelevant. Go ahead.
15 A   Could you repeat that question one more time,
16     please?
17         MR. KEALEY: I'll ask the reporter to read it
18     back.
19         (The last question was read.)
20         MR. BYLER: Objection, as to speculation. Go
21     ahead.
22 A   I don't understand how antimale basis would present
23     to that, the decision or lack thereof from a third
24     party in the investigation.
25 Q   Is your answer no?

Page 29

1  A   I'd like the question one more time?
2          (The last question was read.)
3  A   I think if you replaced Navy with Purdue, it would
4      make sense in that question, but the question does
5      not make sense, given how the proceedings went with
6      the case.
7  Q   Is your answer no?
8          MR. BYLER: Objection.
9  A   I think -- I don't think there was antimale basis
10     in the Navy not procuring a copy of the
11     investigation report to me, because to their
12     understanding I already had a copy of the
13     investigation report, as was related to me by Kyle
14     Willstatter in e-mail correspondence.
15         So in their mind, they must thinking he
16     already has the investigation report. So it
17     doesn't cross their mind to ask me do you have the
18     investigation report. I imagine to them it seemed
19     common sense that I already have the investigation
20     report in my hands before the investigation
21     concluded.
22 Q   Did anybody at the Navy between the time the Navy
23     received [redacted] allegation against you
24     and the date you were disenrolled from Navy ROTC
25     ever engage in any act of antimale basis towards

8 (Pages 26 - 29)

Page 90

1  A   I do not.
2  Q   If you volunteered the texts to Purdue and you
3      volunteered your explanation of them, presumably
4      you took that step because you thought they were
5      evidence that needed to be considered?
6          MR. BYLER: Objection to form, assumes facts
7      not in evidence.
8  A   My understanding from the Navy was that they relied
9      on the Purdue investigation for what they were
10     going to look at. They weren't conducting their
11     own internal investigation. Lieutenant Redlawsk
12     was considered the investigating officer, but the
13     extent of her involvement with any investigation
14     was simply looking at the production that Purdue
15     had and then making a determination based off of
16     the determine that Purdue had already made.
17 Q   That's not what you said in Deposition Exhibit 11
18     in your August 1 e-mail to Officer Willstatter, is
19     it? In the e-mail we've already looked at, you
20     said that you have already sent everything I have
21     on my case to you/Lieutenant Redlawsk.
22         Doesn't that suggest to you that Lieutenant
23     Redlawsk was available to receive whatever you had
24     to give as evidence?
25         MR. BYLER: Objection to form, assumes facts

Page 91

1      not in evidence.
2  A   Repeat the question, please.
3  Q   Doesn't your statement in that August 1 e-mail
4      indicate that Lieutenant Redlawsk was available to
5      receive the very same text messages that you
6      provided to the Purdue investigators?
7          MR. BYLER: Objection to form, assumes facts
8      not in evidence.
9  A   One more time, please.
10         MR. KEALEY: I'll ask the reporter to read it
11     back.
12         (The last question was read.)
13 A   Able to receive from me?
14 Q   Yes.
15 A   It does.
16 Q   Mr. Horb, I want to now turn to one more paragraph
17     in the amended complaint and then we'll take our
18     lunch break. Paragraph 31 of your amended
19     complaint, you allege your history of sexual
20     intercourse with [redacted], do you see that?
21 A   I do.
22 Q   In this paragraph you allege that the two of you
23     had consensual sexual relationship that included
24     having sexual intercourse 15 to 20 times in the
25     three-month period of October to December of 2015.

Page 92

1      Do you see that?
2  A   I do.
3  Q   And was this general intercourse, penis to vagina
4      penetration?
5  A   Yes.
6  Q   Any other form of intercourse?
7  A   Some oral sex. Beyond that, no.
8  Q   And where did these 15 to 20 occasions of sexual
9      intercourse?
10 A   Mostly in her room, a few times in the car, and
11     then I think once in my room.
12 Q   On the occasion in your room, was it during the day
13     or at night?
14 A   Daytime.
15 Q   Just the two of you in the room?
16 A   Yes.
17 Q   And the car, was it just the two of you in the car?
18 A   Yes.
19 Q   And other occasions in her room, was it just the
20     two of you in her room?
21 A   Yes.
22 Q   So what witnesses were there to your sexual
23     intercourse with [redacted]?
24 A   I hope none.
25 Q   You're not contending in this case that the Purdue

Page 93

1      investigators failed to interview anybody who had
2      witnessed your sexual conduct with [redacted],
3      are you?
4  A   No.
5  Q   And with respect to any sexual conduct with [redacted]
6      while she was sleeping, who were the
7      witnesses?
8  A   There was never anything when she was sleeping.
9  Q   Who were the witnesses as to whether there was ever
10     anything while she was sleeping?
11 A   There was never any -- anything sexual, any sexual
12     intercourse or any sexual contact while she was
13     sleeping.
14 Q   Who can testify to that?
15 A   Well, me right now.
16 Q   Anybody else?
17 A   Well, for the one allegation, primary allegation in
18     my room, my roommate was present in the room during
19     the time that she claims that that happened.
20 Q   Was he asleep?
21 A   Who, him or her?
22 Q   The roommate.
23 A   He was awake as she left the room.
24 Q   Was he otherwise awake?
25 A   I don't believe so.