**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW**
**IN SUPPORT OF PLAINTIFF JOHN DOE'S MOTION**
**FOR RECONSIDERATION AND/OR CERTIFICATION**

Plaintiff John Doe ("John Doe"), by counsel, respectfully moves pursuant to Rules 54(b)

and 60 of the Federal Rules of Civil Procedure for re-argument, reconsideration and amendment

of certain parts of the Court's non-final Opinion and Order dated August 11, 2022, that (i) deny

the stigma-plus liberty interest on the ground that the fact John Doe was not in a position to refuse

to give authorization to the Navy ROTC to have the university disciplinary files was not the same

as having a legal requirement to disclose the university disciplinary files to the Navy ROTC and

thus there was self-defamation, while indicating what would cause denial of summary judgment

(pp. 16-17 of Slip Opinion); (ii) fail to decide and dismiss Plaintiff John Doe's motion for summary

judgment for dismissal of Defendants' Counterclaim on the grounds that it is a legally defective

use of the Declaratory Judgment Act according to case law in the Seventh Circuit and there is no

stated and there is not federal court jurisdiction for the requested declarations; and (iii) state that

[1]

there are material issues of fact as to the stigma-plus interest on the basis of alleged falsity (pp. 15-16 of Slip Opinion), and for any ruling not reconsidered and not amended on this motion, certifying for appeal to the U.S. Court of Appeals for the Second Circuit any such ruling.

I.    **JOHN DOE WAS REQUIRED TO DISCLOSE THE UNIVERSITY DISCIPLINARY FILES TO THE NAVY ROTC.**

    A.    **The National Importance of Judge (Now Justice) Barrett's Due Process Opinion.**

This motion is made because of the national importance of the due process rulings of then Judge (now Justice) Barrett in *Doe v. Purdue*, 928 F. 3d 652, 661-664, 667 (7th Cir. 2019), holding: (i) that John Doe had pleaded a liberty interest; (ii) that Purdue's disciplinary process was woefully deficient and did not provide due process, citing among other things not giving John Doe the investigation report and not holding a real hearing ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension"); and (iii) that the District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand").

When then Education Secretary DeVos announced on May 6, 2020, what would be the current due process Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue*. "*Secretary DeVos Announces New Title IX Regulation*," https://www.youtube.com/watch?v=hTb*3yfMNGuA*; U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020; 34 C.F.R. 106.45.   Secretary DeVos noted that it was a three-woman panel with then Circuit Judge Amy Coney Barrett as the author of the opinion. "*Secretary DeVos Announces New Title IX Regulation*" https://www.youtube.com/watch?v=*hTb*3yfMNGuA.

When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention. Defending Judge Barrett's opinion in the Wall Street Journal was K.C. Johnson, "Sex, Due Process and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020. Purdue responded with its defense, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020. It is fair to say that Judge Barrett's opinion has been a thorn in Purdue's side.

This Court's Opinion and Order dated August 11, 2022, did not consider Purdue's due process violations and expungement of the disciplinary file. Very differently, this Court's Opinion and Order dated August 11, 2022, threw out the due process claim on the ground that the fact John Doe was not in a position to refuse to give authorization to the Navy ROTC to have the university disciplinary files was not the same as having a legal requirement to disclose the university disciplinary files to the Navy ROTC. As discussed herein, this Court should reconsider and amend the Court's ruling to reinstate the due process claim.

**B.  The Court's Opinion and Order On Disclosure of Disciplinary Files.**

Rather than summarize or characterize the Court's Opinion and Order concerning the disclosure of disciplinary files, the following quotes it:

> . . . Purdue argues it is entitled to summary judgment on this [due process] claim because John consented to Purdue's publication of his disciplinary files to NROTC. In permitting John's claim to go forward, the Seventh Circuit relied on John's allegation that he "had an obligation to authorize Purdue to disclose the proceedings to the Navy . . . Purdue, not John, revealed to the Navy that it had found him guilty of sexual violence, and *John had a legal obligation to authorize the disclosure*." 928 F.3d at 662 (emphasis added). The court analogized these allegations to *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), in which child care workers were obligated under state law to disclose a state agency's finding that they had abused children to their current and prospective employers. But it also made clear that a plaintiff's "self-defamation" is not a deprivation of a liberty interest. 928 F.3d at 661-62. In other words, a plaintiff's school does not violate his due process rights merely because he told a current or future employer what the school said about him.

Although the Seventh Circuit allowed John's claim to proceed based on the allegations in his complaint, the evidence presented here does not support those allegations. Ultimately, John signed a form specifically "authoriz[ing] the release of all information" pertaining to Purdue's investigation. [Pl. Ex. 44]. He testified that he did so because he believed NROTC "wanted to be in the loop on what was going on." [Pl. Ex. 5, John Doe Dep., 21:1-22:7]. John did not testify that he was legally obligated to do so, nor is any evidence presented to that effect. John felt he was "in no position to refuse the authorization," [Pl. Reply, DE 191 at 8], but that is not the same as an *obligation* for John to release the records. *Perhaps John's claims would have survive summary judgment if he had shown that any failure to provide authorization would have resulted in a sanction or lawful order, pointed to an NROTC regulation compelling his cooperation, or even shown that he would have had to make a disclosure of Purdue's finding to reapply to NROTC after his suspension.* If there was such an argument to be made, John has opted not to do so. It is not for the Court to construct an argument for the litigants and scour the record – or outside the record – for support. *DeSilva v. DiLeonardi*, 181 F.3d 865, 867 (7th Cir. 1999) ("A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record."). And there would have been undisputed facts weighing against such an argument: as Defendants pointed out, John did not recall anyone telling him that the Navy wanted access to information from Purdue, and a Navy officer indicated that they did not recall ever giving an order for John to turn over information about the investigation. [*See* DE 178 at 40-41].

(Slip Op. 16-18; italics added.)

### C. The Navy Knew About The Disciplinary Proceeding Before Authorization and Was Looking To Purdue's Investigation.

Defendants' argument to the Seventh Circuit about self-defamation was premised on the Navy ROTC only learning of John's disciplinary case because of John's authorization of disclosure to the Navy ROTC. According to Judge Barrett: "The university maintains that it has not and will not divulge John's disciplinary record without his permission. The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began." 928 F.3d at 661. The record facts, however, are indisputably: (i) that the Navy ROTC knew about the disciplinary proceeding well before the May 24, 2016 authorization because on April 4, 2016, Jane Doe first went to the Navy ROTC to make her accusations; (ii) that Purdue first learned of Jane

[4]

Doe's accusations from the Navy ROTC; and (iii) that the Navy ROTC was looking to the Purdue investigation from the start.

On April 4, 2016, Jane Doe told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John, and Lieutenant Sheppard informed his superior officers Commander Rodney Hutton and Executive Officer Craig Remaly about Jane Doe's allegations. (ECF 183-34: SJM 34 (Shepard Dep tr 21-25, 28-30); ECF 183-43:  SJM 43 (Sheppard 2, Sheppard E-Mail (NSTC 0179)); ECF 187: Pl Opp. DSJ 5 (Sheppard Dep tr 42-43).)  Also on April 4, 2021, Commander Hutton reported Jane Doe's sexual misconduct allegations to Purdue's Office of the Dean of Students, reflecting the interrelationship of Purdue and the Purdue Navy ROTC.  (ECF 187: Pl Opp. DSJ 6: PU 0731-0732 (Dfs. SJ Ex. K).)  Hutton, when asked by Defendants' counsel about the "investigation" of the sexual misconduct allegations against John Doe, Hutton responded that "that investigation was referred to Purdue University."  (ECF 183-35: SJM 35 (Hutton tr. 14).) On April 4, 2021, Purdue's Dean of Students Sermersheim who advised Purdue's CARE Director Bloom of Jane Doe's allegations.  (ECF 187: Pl Opp. DSJ 6: PU 0731-0732 (Dfs. SJ Ex. K).)

On April 5, 2021, Commander Hutton sent a letter to John Doe informing him that John was being placed on "an Interim Leave of Absence (ILOA) *due to your pending university investigation*" and that "[f]urther administrative action, potentially to include Performance Review Board (PRB), will be taken *on completion of the university investigation*."  (ECF 187: Pl Opp DSJ 7 (NSTC 0154 & DSJ Ex. N; italics added).)  The April 5, 2016 letter further stated that John was prohibited from participating in ROTC activities, but would remain enrolled in Navy ROTC.  (ECF 187: Pl Opp DSJ 7: NSTC 0154 & DSJ Ex. N.)   It was also on April 5, 2016, Jane Doe met with Monica Bloom, Director of CARE, and Ms. Bloom sent, to Purdue Dean Sermersheim and Purdue Vice President Rollock, an e-mail about the meeting with Jane Doe concerning Jane Doe's

allegations and desire for a "no contact" order to apply to John Doe to cover a number of university facilities. (ECF 183-0: SJM 9 (Bloom Dep tr 12-17); ECF 183-11, SJM 11 (Bloom 2, Bloom E-Mail (PU 726-728)); ECF 183-12: SJM 12 (Bloom 3, Rollock E-Mail (PU 729-730)).)

The authorization to the Navy ROTC for access to the Purdue disciplinary files was dated May 24, 2016, well after the Navy ROTC learned of the disciplinary proceeding. (ECF-183-5, ECF 183-44 (John Dep. 23, Dep. Ex. 2).) John Doe testified at his deposition that the Navy wanted "in the loop" (ECF 183: SJM 5 (John Doe's Dep tr 21-22), and when John Doe was deposed about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the Navy ROTC, not self-defamation. (Motion Ex. A: John 08/22 Declaration & Motion Ex. B – John Dep tr 22-26.)

**D. John Was Legally and Factually Obligated To Authorize Disclosure To The Navy.**

The argument that John Doe was not under a legal compulsion to authorize disclosure ignores the record, does not realistically assess the facts, and is contrary to the Navy Regulations for Officer Development that were in effect in the 2015-2016 school year ("Navy ROD 2015-2016"). Referenced and attached as Motion Exhibit C are the Navy ROD 2015-2016.

In the circumstances of the Navy ROTC knowing about the disciplinary case that would be proceeding in investigation at the university, the Navy wanted "in the loop" (ECF 183: SJM 5 (John Doe's Dep tr 22)), and Purdue Navy ROTC Executive Officer Craig Remaly testified the authorization form was one Purdue requested in this case (ECF 187: Pl Opp DSJ 12 (Remaly Dep tr 26-27)). With Jane Doe having reported her accusations to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, John Doe was in no position to refuse the authorization. (Motion Ex. A: John Doe 08/2022 Declaration ¶¶ 3, 7.) What that meant is the following, which fully satisfies what this Court wrote about what would call for the denial of summary judgment.

**1.  Navy Regulation Compelling Giving Authorization.**

Authorization to disclose the Purdue disciplinary files was expected under the governing Navy regulations at the time as a matter of "Honor" stated in the Navy ROD 2015-2016. Honesty and respect to his superior officers called upon John to provide the authorization. The Honor Code in the Navy ROD 2015-2016 at section 1-3 (pp. 1-3) provides that "Military systems, which often operate under extreme duress, are built on a foundation of absolute trust and fidelity", that NROTC must instill honor upon future officers during accession training and ensure that honor is carried into fleet service", that "[t]hroughout its history, the Naval Service has successfully operated through reliance on certain values held by its personnel", that "[c]ore values are Honor, Courage and Commitment", that "Honor is a keen sense of ethical conduct, honesty, integrity, and responsibility", that "Honor includes honesty, at all times no matter the outcome", and that "[i]t is respect to both juniors and seniors."

Also, authorization to disclose the Purdue disciplinary files was expected under the governing Navy regulations at the time as a matter of not showing a "disregard or contempt for authority" and not showing a "lack of a sense of responsibility" that would constitute a "major offense" per the Navy ROD 2015-2016, at section 3-19.2.a.(11) (pp. 3-40). The Navy ROTC knew there was a Purdue investigation of Jane Doe's accusations of sexual assault and wanted "in the loop" (ECF 183: SJM 5 (John Doe's Dep tr 22); Motion Ex. B John Dep tr 22). It was John's responsibility that the Navy ROTC be included in the loop.

**2.  Sanction Upon Refusing Authorization.**

In terms of what would have happened if John had refused to provide the authorization, given how the Navy knew that Purdue was doing an investigation, an order to provide the authorization would have been in order. Also, when a midshipmen student being put on interim

leave of absence, which John was by Commander Hutton's order of April 5, 2016, the Navy ROD 2015-2016 at section 6-7.3 (pp. 6-11 – 6-12) provides for a Performance Review Board ("PRB") "as soon as possible."  Because John provided the authorization, the PRB was not held until the completion of the university disciplinary case.  Without that authorization, a PRB is not delayed and is held in the circumstance of John showing a "disregard or contempt for authority," a "lack of a sense of responsibility," and a lack of "honor."  The interim leave of absence could then be converted into a disciplinary leave of absence per the Navy ROD 2015-2016 at section 6-7.3 (pp. 6-12) that would not be lifted unless John showed that he was exonerated by Purdue.

### 3.  Required Disclosure Upon Re-Application.

If John were to re-apply to the Navy ROTC, then of course he would have had to disclose the disciplinary finding.  Exhibit H to the Hutton deposition was the August 2020 ROTC Appointment Termination and Disenrollment Authorization (NSTC 0001-0004).  Commanding Officer Hutton identified the document and when asked about it, testified that the only reason for the ROTC disenrollment was the university suspension. (SJM 35: Hutton Dep tr 56, 66-67; SJM 36: Hutton H, August 2020 ROTC Appointment Termination and Disenrollment Authorization (NSTC 0001-0004).) The August 10, 2020 PRB document showed that the Board's finding was that John Doe was suspended by Purdue and that the recommendation was disenrollment of John Doe.  (SJM 36: Hutton G, p. 2, August 10, 2020 Performance Review Board, p. 2 (NSTC 0012).) A disciplinary disenrollment is for a "major offense" per the Navy ROD 2015-2016 section 6-14.1.b(1) (p.6-21), which includes "Sexual Harassment/Assault" the Navy ROD 2015-2016, at section 3-19.2.a.(11) (pp. 3-40 – 3-41).

The PRB document is made part of the student's file per the Navy ROD 2-15-2016 section 6-13.5 (pp. 6-20) and because it involved disenrollment is sent to Naval Operations per the Navy

ROD 2-15-2016 section 6-13.6 (p. 6-20). Disciplinary disenrollment documents are part of a "permanent federal record" per Navy ROD section 6-16 (pp. 6-26 – 6-27):

> c. Disciplinary disenrollments become a matter of permanent federal record and may prejudice the individual for future military or civil employment. Disciplinary disenrollments may be disqualifying for future federal security clearances that are often necessary for positions in private industry. Disciplinary disenrollments may be prejudicial to their interests should they ever apply for a commission in the Armed Forces. . . .

Thus, should John Doe re-apply to the Navy ROTC or to any commission in the U.S. Armed Forces, he would be honor-bound to disclose the disciplinary disenrollment that is part of permanent federal record and if he did not and were found out, termination would be expected. (*See* Motion Ex. A: John Doe 08/2022 Declaration ¶ 9.)

## E. <u>The Importance of Due Process.</u>

There is ample good reason here to reconsider and rule that John Doe was legally and factually required to disclose the university disciplinary files to the Navy ROTC and thus there was no self-defamation; and thus further, summary judgment could not be entered on John Doe's due process claim, as John Doe had a stigma-plus liberty interest consistent with the Court's Opinion and Order on what would cause denial of summary judgment. The due process rulings in Judge Barrett's opinion in *Doe v. Purdue* have national importance and should not be undercut by a decision by this Court that does not treat fairly and sensibly the circumstances of the authorization, which was legally and factually required.

## II. <u>DEFENDANTS' AMENDED COUNTERCLAIM SHOULD BE DISMISSED.</u>

The Court's Opinion and Order dated August 11, 2022, did not deal with the portion of Plaintiff's motion for partial summary judgment seeking dismissal of Defendants' Amended Counterclaim (ECF 161), which purports to be an action for a declaratory judgment pursuant to 28 U.S.C. § 2201 and Title IX of the Education Amendments of 1972, but it contains no allegations

supporting federal court subject matter jurisdiction. The parties fully briefed the Plaintiff's motion. (ECF 183: Pl MOL pp. 46-50; ECF 188: Dfs Opp MOL p. 6; ECF 191: Pl Reply MOL pp. 14-15.) This Court should decide the motion and order dismissal of Defendants' Amended Counterclaim.

John Doe argued that there are at least three fatal defects as a matter of law requiring dismissal of Defendants' Amended Counterclaim. *First*, the Amended Counterclaim mostly seeks to invoke what are state law police powers; three of the four requested declarations involve state law police powers; and the one requested declaration that is not state law based is at odds with the law of the case in *Doe v. Purdue*, 928 F.3d 652. *Second*, the denial of due process here invalidates any effort to rely upon the university process for the purported declaratory relief, *see Marshall v. Jerrico, Inc.*, 446 U.S. at 242; indisputably, Defendants during the disciplinary case did not give access to John Doe to the evidence used against him, did not give John Doe access to the investigation report, did not give a real hearing and engaged in pre-judgment based on accusation -- which have already been ruled in the law of the case to be denials of due process. *Doe v. Purdue*, 928 F.3d at 663-664. *Third*, under the case law in the Seventh Circuit, Defendants' declaratory judgment-based Amended Counterclaim is legally defective and should be dismissed because it "is repetitive and unnecessary . . . [and] merely restates an issue already before this Court." *U.S. v. Zanfei*, 353 F.Supp.2d 962, 965 (N.D. Ill. 2005) (quoting *Rayman v. Peoples Savings Corp.*, 735 F.Supp. 842, 851–52 (N.D.Ill.1990 *Green Bay Packaging, Inc. v. Hoganson & Assoc., Inc.*, 362 F.Supp. 78 (N.D.Ill. 1973) (a defendant's declaratory judgment counterclaim dismissed because it sought rulings on claims a plaintiff "asserted in his complaint but with the opposite effect"). Preserved in John Doe's First Affirmative Defense to Defendants' Amended Counterclaim was the failure of the Counterclaim to state a claim upon which relief may be granted (SJM 4: ECF 162, Plaintiff's Answer to Counterclaim, p. 6). (ECF 183: Pl MOL pp 46-50.)

Defendants argued, albeit briefly and without any factual references to the record, that the preponderance of the evidence was that John Doe was in violation of Defendants' regulation of sexual misconduct. (ECF 188: Dfs Opp MOL p. 6). As noted in John's Opposition Memorandum of Law to Defendants' motion (ECF 187: Pl Opp MOL p. 2), "[w]hile John's innocence is technically not required by due process and Title IX law, the discovery record does support that John was falsely accused by Jane Doe" and "[i]t took a gender biased process lacking in due process to find John responsible."  Further and dispositively, Defendants had no answer to the points that: (i) the Amended Counterclaim mostly seeks to invoke what are state law police powers outside federal court jurisdiction and (ii) under the case law in the Seventh Circuit, Defendants' declaratory judgment-based Amended Counterclaim is legally defective and should be dismissed because it is repetitious, unnecessary and merely restates an issue already before this Court.  (ECF 191: Pl Reply MOL pp. 14-15.)

III. **ALLEGATIONS, THE FACT RECORD AND STIGMA-PLUS LIBERTY.**

The Court's Opinion and Order ruled that there were triable issues of fact as to the stigma-plus liberty interest because John Doe had to prove the allegations of sexual misconduct were false. With all due respect, this is a mistaken ruling for at least two reasons.  *First*, a stigma-plus liberty interest is not contingent on the due process plaintiff proving that the accusations were false.  There is no case law so holding, not even the one case cited for the proposition that the due process plaintiff has the burden of proving falsity in order to establish a stigma-plus liberty interest; and it makes no sense because the due process plaintiff would have to prove first his innocence in order to get due process. *Second*, the four items listed in the Court's Opinion and Order do not create material issues of fact that could defeat a stigma-plus liberty interest.

A. **The Court's Opinion and Order On Allegations and Stigma-Plus Liberty.**

Rather than summarize or characterize the Court's Opinion and Order concerning the purported issues of fact as to the stigma-plus liberty interest, the following quotes the Court's Opinion and Order:

> As explained by the Seventh Circuit, John needs to satisfy the "stigma-plus test" by showing that the state (1) inflicted reputational damage (2) accompanied by an alteration in legal status that (3) deprived him of a right he previously held, and that (4) the deprivation occurred without the minimum due process guaranteed by the Fourteenth Amendment. *Purdue*,928 F.3d at659-661. The first element, the state's infliction of reputational damage, "roughly corresponds to the publication requirement of defamation law." *Doe v. Trustees of Indiana Univ.*, 496 F. Supp.3d 1210, 1216 (S.D. Ind. 2020). John must show that what Purdue said about him was not true, and that he did not consent to the publication. *Doe v. Trustees of Indiana Univ.*, No. 120CV00123JRSDML, 2021 WL 2213257, at *2-4(S.D. Ind. May 4, 2021) (citing *Paul v. Davis,* 424 U.S. 693 (1976), and discussing the history of the stigma-plus test).

> For his part, John cannot be granted summary judgment because an issue of material fact remains about whether Purdue's conclusions about him were false. Put simply, a reasonable juror could infer that John sexually assaulted Jane, and therefore, that Purdue did not defame him. This evidence includes (1) the allegations of Jane herself, (2) the text messages between John and Jane:

>> **Received from [Jane Doe] on Mon Dec 28, 2015 10:22 PM**: "Or when I wake up to you touching me or I'm trying to do something and you just touch me I literally can't trust you if you don't respect my boundaries"
>> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:37 PM**: "We already went over this several times. I cant even apologize anymore because you get angry at me for it."
>> . . .
>> **Sent to [Jane Doe] on Mon Dec 28, 2015 10:56 PM**: "Im not going in circles any more [Jane]. What more do you want me to say? Do you want this to be over? We have literally talked about this for a week and I already told you I cant change what i did, only what i will do from here on out. Do you want me to feel shitty for the rest of my life because of what I did? Im feeling like i will. Im sorry. I cant change what i did, as much as i want to. I violated you and never should  have. What do you want me to do?

> (3) the investigator's findings indicating that John lied about the subject of the text messages, and (4) the testimony of Jane's RA indicating that John lied about going

to Jane's dorm room unaccompanied. Without assessing the truth of these facts, this evidence creates a genuine issue of fact precluding summary judgment for John.

(Slip Op. 14-16.)

### B. A Stigma-Plus Liberty Interest Is Not Contingent On Proof Of Falsity.

It appears that the Court read *Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021), to require a falsity determination for stigma-plus to apply. That case, however, does not so rule. All the Court in *Doe v. Trustees of Indiana University* did was to describe the stigma part of the stigma-plus test: "Breaking down the term 'stigma-plus,' then, 'stigma' refers to the government's act of defamation, and 'plus' refers to a change in legal status. Notably, the 'stigma' part of the stigma-plus test has always been grounded in common-law conceptions of defamation, ever since the test's origin in *Paul* [*v. Davis*]." 2021 WL 2213257 *2. The Court did not then proceed to examine the due process plaintiff's proof of falsity, but rather the public disclosure issue, which in that case involved the plaintiff's voluntary disclosure for the purpose of transferring from IU to another school. What the Court meant was to identify what is stigmatizing for the purpose of the Fourteenth Amendment by what defamation law defines as defamatory -- statements exposing a person to public contempt, ridicule, aversion, disgrace or to induce an evil opinion of the person in the minds of right-thinking persons and to deprive the person of friendly intercourse in society. *Manfredonia v. Weiss*, 37 A.D.3d 286, 829 N.Y.S.2d 508 (1ˢᵗ Dep't 2007); *Foster v. Churchill*, 87 N.Y.2d 744, 665 N.E.2d 153, 642 N.Y.S.2d 583 (1996). It was not that all the elements of defamation law (which would include a culpability assessment) be examined.

The Seventh Circuit's discussion of stigma-plus has never involved a falsity requirement. Rather, stigma-plus is defined as "when a state actor casts doubt on an individual's 'good name,

reputation, honor or integrity' in such a manner that it becomes 'virtually impossible for the [individual] to find new employment in his chosen field.'" *Mann v. Vogel,* 707 F.3d 872, 878 (7th Cir. 2013); *see also Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001); *Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984) ("The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling.")

There is, then, no falsity analysis that the stigma-plus liberty test requires. It would make no sense because the due process plaintiff would have to prove first his innocence in order to get due process; and that is not the point of a liberty interest for Fourteenth Amendment purposes. The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Yet, the Court's Opinion and Order would have the dur process plaintiff prove false what the school purportedly found by a process that was not due process and thus unreliable.

## C. What The Court Cites As Creating Issues of Fact Don't.

What is stated in the Court's August 11, 2016 Opinion and Order is really nothing more than Defendants' position that was found wanting in discovery, points to the importance of the current Title IX due process regulations that were inspired in part by Judge Barrett's opinion in *Doe v. Purdue*, and reflects that striking the report of Dr. R. Christopher Barden unwittingly served Defendants' desires to lash out at the truth being told about the case.

### 1. Jane Doe's Accusations.

The first item cited in the Court's Opinion and Order is "the accusations of Jane herself." Jane Doe, however, has never put herself under oath to say that her accusations are true. In

contrast, John Doe has repeatedly put himself under oath to state that Jane's accusations are false.

In the summary judgment record is John Doe's statement under oath saying:

> All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false. I have maintained that all her claims were false from my initial statements in the Purdue disciplinary process at the start, all the way through to the appeals. I said so orally to Dean Sermersheim in June 2016.   I said so in my oral statements to Navy ROTC personnel, and I said so in my written statement in August 2016 to Navy ROTC at the time of my disenrollment (which was based solely upon my university suspension), and I have continued to maintain this truth for the past four and a half years of this legal case.

(ECF 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶ 30).)  John Doe does again on this motion.

(Motion Ex. A: John Doe 08/2-22 Declaration ¶ 10.)

Summary judgment is not a time when allegations suffice. Proof is needed. Jane's allegations are not proof. Defendants may think they are, but they aren't.  *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (facts needed to defeat summary judgment).

## 2.  **The Texts.**

The Court quotes passages of the texts as if they were admissions of guilt. They weren't; there is no evidence on summary judgment to treat them as evidence of guilt.  In deposition, Purdue Dean Sermersheim, Purdue investigator Amberger and Purdue investigator Oliver each admitted that there is no express statement in the texts in which John Doe admitted or Jane Doe accused John Doe of committing the sexual acts alleged in the Notice of Allegations.  (ECF 183-7: SJM 7 (Semersheim Dep tr 34); ECF 183-14: SJM 14 (Amberger Dep tr 70-72); ECF 187-9: Pl Opp DSJ 9 (Oliver Dep 50-57).)  Notably, before the alleged incidents, John Doe and Jane Doe had a three-month relationship in which John and Jane Doe had a sexual relationship, the first such relationship in John Doe's life after being brought up in an Evangelical Christian home where he was taught sex was for marriage.  (ECF 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶¶ 4-5); John Doe

[15]

8/2022 Declaration Ex. A: John Dep tr 92-93.)  Notably a;o, John Doe has put himself under oath as to the correct understanding of the text; Jane Doe has not. (Motion Ex. A: John Doe 08/2022 Declaration ¶ 11.)

To the investigators, John Doe provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because he believed the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John aDoe nd his family Christmas cookies.  Jane Doe provided no texts to the investigators, telling them she had deleted the texts.   (ECF 183-3: SJM 3 (Df. Answer ¶ 36); ECF 183-14: SJM 14 (Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103); ECF 183-11: SJM 11 (Amberger 27, Texts (PU 206-339)); ECF 183-7: SJM 7 (Semersheim Dep tr 34); ECF 183-5: SJM 5 (Plaintiff John Doe Dep. tr. 111-114).) John Doe testified in deposition that he "wanted [the investigators] to look at the message history between [John Doe] and [Jane Doe] and see that it disproved the allegation she was saying against me," that the texts did not refer to any sexual contact between Jane Doe and John Doe, and that was that "these texts showed there was no evidence of any sort of sexual misconduct between the two of us."  (ECF 183-5: SJM 5 (Plaintiff John Doe Dep. tr. 111-114).)

John Doe in his deposition explained that the "context" of Jane Doe's suicide attempt was important in understanding the texts. (ECF 183-5: SJM 5 (Plaintiff John Doe Dep. tr 121-123).) According to John Doe, "none" of "the text messages referred to what Jane Doe would accuse [him] of in April 2016," but rather that the "texts reflected the fact that Jane Doe and [he] did have a deeply personal relationship developed in part through sexual intercourse," the "relationship was still intimate enough that she sent [John Doe's] family Christmas cookies, and we messaged one another frequently," and the "texts also reflected Jane Doe's difficult relationship with her mother

and family, a fact she used at times to answer [John Doe's] questions to her about being unhappy, and also a fact that motivated her unfair behavior towards [John Doe]," and that he "became more apologetic towards Jane Doe the more she directed negativity towards [John Doe]." (ECF 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶ 15).).

Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators and that in accordance with Purdue's procedures at the time, John Doe was not given an opportunity to review the investigation report then or any time before the June 6, 2016 panel meeting.  (ECF 183-3: SJM 3 (Df. Answer ¶¶ 2, 37); ECF 183-14: SJM 14 (Amberger Dep tr 49-50, 61-62); SJM 22: (ECF 183-6: SJM 6 (Rollock Dep tr 30, 46-47); ECF 183-7: SJM 7 (Sermersheim Dep tr 35); ECF 183-41: SJM 41 (Custodian Klingerman Dep tr 27-28).)

John Doe discussed the specific texts excerpted in the investigation report and are the ones quoted by the Court to show to what they were really referring. His testimony given subject to the penalties of perjury is worth quoting:

> 16.     It was only after the disciplinary proceeding was over was I able to review the investigation report. Out of the 133 pages of texts I voluntarily provided the Purdue investigation, the investigators attached only short portions of texts from December 23, 2015, December 28, 2015, and January 14, 2016. The Purdue investigators ignored their respective contexts, and came to the conclusion that my explanations for them were "uncomfortable, awkward, and unconfident", which as discussed below was not true. The investigators wrote what they did despite never asking me about anything, including my or their interpretation of these texts, and after talking to Jane Doe a 2nd time about their interpretation of the texts. The Purdue legal defense followed suit in this same approach on August 18, 2020, focusing on isolated slices of texts as evidence without considering the respective context and questioning me as if the Purdue investigators' misinterpretation of the texts was correct, which it was not.  I did my best to provide context from memory in my testimony, seeing as the context completely changed the understanding from what they wanted the texts to infer.
>
> 17.     In the December 23, 2015 text excerpt, I express regret and guilt towards Jane Doe for my dishonesty regarding academics in our finals week, going

so far as to call myself "a terrible person". She initially lambastes my emotions, then becomes supportive and encouraging. Later that day we discuss a package of desserts that she baked and mailed to my home.

18.     Purdue's investigation report claimed that my explanation of this excerpt was unconvincing. The investigators reached this conclusion without ever following up with me regarding their interpretation of the texts, and withheld this conclusion from ever being read by me; I was never given the opportunity to hear or dispute their conclusion in the investigation report, both before and after the investigation was concluded. However, they had no problem asking Jane Doe about texts, to which the investigators' own notes say that she believed I was apologizing for my dishonesty to her during finals week: "reported that she felt [John Doe] was apologizing for lying to her about putting off his own schoolwork to help her". Despite this, the Purdue investigators concluded that I was in fact apologizing for a sexual assault, despite both my and Jane Doe's disagreement with that conclusion regarding the December 23 texts.

19.     On December 28, 2015, Jane Doe and I exchanged over 180 messages. We discuss the television show "Dexter", my whereabouts for the day, politics and the news, and religion/philosophy. We then had more personal conversation, going back on forth on communication in our relationship and issues we had with one another. In particular, I expressed my frustration with the vagueness of her emotions, refusal to speak more openly (to which she agreed), and projection of her behaviors onto me. I ended a long text with: "whenever I try to help or improve the situation, it always ends up getting worse". I reflected on my dishonesty towards her several weeks prior at school with respect to helping her studies at the expense of my own, and I felt it had damaged our relationship by breaking her trust in my honesty.

20.     The conversation on December 28 moved to Jane Doe then criticizing me for trying to force a dialogue about what was causing her to pull back in the relationship, and then complaining about my physical relationship towards her. "Or when I wake up to you touching me or I'm trying to do something and you just touch me I literally can't trust you if you don't respect my boundaries."  Jane Doe only took issue with physical contact between us after her suicide attempt. She did not and would not clearly state her new boundaries to me. She never took issue with our sexual relationship prior to the night of December 13, 2015, which is why I believe that event became a catalyst for the confusing changes in her behavior and our relationship. I was discouraged by Jane Doe's refusal to communicate her issues, and her reactionary behavior made me feel guilty for overstepping a boundary of not touching her on her knee that had not previously existed, despite her refusal to ever establish them proactively. I would apologize when she told me I made mistakes, only for her to tell me I was not doing good enough whenever she was in a sour mood. She often claimed that I never changed and was constantly angry, which was untrue and seemed to me projection of her own behavior onto me. This manipulation and her weaponization of my words and apologies agitated me greatly, which led me to type the following message: "Im not going in circles

any more [Jane]. What more do you want me to say? Do you want this to be over? We have literally talked about this for a week and I already told you I cant change what i did, only what i will do from here on out. Do you want me to feel shitty for the rest of my life because of what I did? Im feeling like i will. Im sorry. I cant change what i did, as much as i want to. I violated you and never should have. What do you want me to do?"

21.     I did not use that language quoted in the paragraph above to indicate I had violated her sexually.  Jane Doe's immediate response was that I needed to change and I was still doing what I was when she and I first started going out, which was not a response that indicated I was talking about violating her in a sexual assault – because I wasn't. (This is yet more context that Purdue conveniently overlooked in their analysis and direction). I spoke about violating her boundaries, both of her trust for me and her physical boundaries. At the time and to this day, I thought Jane Doe was referring to my touching her knee that morning; nothing more, because there was nothing more, and that Jane Doe's new boundaries were an attempt to give herself more control over our relationship, perhaps as a response to the state of vulnerability she put herself in on the night of December 13, 2015. Because of my continuing loving feelings for Jane Doe in a confusing situation, I responded by being apologetic and remorseful: asking whether she wanted to end the relationship between us, asking whether she wanted me to feel shitty for the rest of my life, apologizing that I had violated her and asking me what she wanted me to do.  I was apologizing to try and keep Jane Doe stable and because, at that time, I still had loving feelings for the first girlfriend in my life and the first girl with whom I had sexual relations, and because I was concerned about her mental well-being given her suicide attempt.

22.     The investigation report is written in a way that makes it sound as though I was pressed by the investigators for an explanation regarding the December 23 and December 28 texts, which is not accurate at all. I provided them an initial explanation of several texts that I thought looked ambiguous without context, of which those two excerpts were included, to which they listened quietly. They never "pressed" me about any texts, as they claim in the investigation report, and they never interviewed me a second time to discuss their interpretation of the texts.

23.     In my deposition on August 18, 2020, the Purdue attorney deposing me asked: "Your contention in this lawsuit, Mr. [Doe], is that anyone who doesn't believe your explanation for the 10:56 p.m. text message and its meaning has antimale bias, right?"  (Page 126.) I answered that the anti-male bias was ignoring the context of these messages and considering me a non-credible witness despite facts that I presented. I pointed out that Jane Doe had said the contact between the two of us had stopped in early December 2015, which the texts clearly showed it had not; what Jane Doe said about contact between us ending in early December 2015 was not true.  The anti-male bias is thus shown in the Purdue investigators jumping to a conclusion so as to support Jane Doe's accusations in disregard of the contexts of the texts, without even asking me about what was their misinterpretation

of the texts, and by impugning my credibility despite the texts contradicting Jane Doe's statement about the relationship ending in early December 2015. The investigators rationalized a conclusion to credit Jane Doe's accusations that on a morning several days after her suicide attempt on December 13, 2015, in my own room with my roommate present and fresh in my mind her attempt to break out of my arms to jump over the edge of a building in a fall that would likely kill her, I had touched her crotch area outside her clothes (which I did not do) and that in her sleep (from which she supposedly did not wake up) I fingered her (which I did not do).

(ECF 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶¶ 16-23).)

### 3. **The Investigator Finding.**

As noted above, both investigators Amberger and Oliver admitted that there is no express statement in the texts in which John admitted engaging in any sexual misconduct or Jane Doe accused John of committing the sexual acts alleged in the Notice of Allegations. Yet, the investigators Amberger and Oliver relied upon and made a centerpiece of the investigation report's analysis what was a misinterpretation of a small portion of texts without even asking John Doe about what was a misinterpretation; the investigators thus attached to the investigation report portions of only 7 pages out of the 133 pages of texts, which hid the texts showing Jane Doe and John having a close almost married-like relationship engaging in friendly banter and showing Jane Doe to be emotionally unstable and manipulative. (ECF 183-22: SJM 22 (Amberger/Oliver 14, Investigation Report (PU 373-391), pp. 7-8, 10); Pl Opp DSJ 22: ECF 183-11:(SJM 11 (Amberger 27, Texts (PU 206-339)).)

Despite the obvious relevance to Jane Doe's allegations, investigators Oliver and Amberger did not ask Jane Doe why would John feel her crotch area with John Doe's roommate in the room and did not even ask Jane Doe why she did not wake up if John was digitally penetrating her. (ECF 183-14: Pl SJM 14 (Amberger Dep tr 69); ECF 183-24: Pl Opp DSJ 24 (Oliver Dep tr 51-52).)

As for the allegation that John felt her crotch area, John maintained to the investigators Amberger and Oliver that he only touched Jane Doe's leg just above the knee and it was out of concern and was not sexual; Jane Doe's allegation of John touching her crotch area outside her clothing makes no sense when it is considered (i) that John's roommate was in the room and he told investigators that he did not see anything that supported Jane Doe and (ii) that John Doe acknowledged he was well aware of the Navy ROTC no tolerance policy. The investigation report's assertion that Jane Doe was more credible is not supportable given that (i) the investigation report credited John Doe's placement of the event in December 2015, not Jane Doe's, and (ii) the only basis for asserting John Doe was dishonest was saying the R.A. contradicted John Doe about providing a key to Jane Doe's room – which was but a conflict of recollection and which fails to address how John Doe got into the room without a key when Jane Doe was away for the weekend and left her room locked. As for the allegation that John digitally penetrated sleeping Jane Doe, John Doe maintained to the investigators Amberger and Oliver that he did not digitally penetrate Jane Doe in her sleep; Jane Doe did not have an independent recollection of the incident but said John Doe told her, which John adamantly denied; in these circumstances, the preponderance of the evidence is not weighed in favor of crediting Jane Doe's allegation. (ECF 183-22: SJM 22 (Amberger/Oliver 14, Investigation Report (PU 373-391), p. 10); (ECF 187-25 (Pl Opp DSJ 25: Amberger Dep tr 68-72, 88); ECF 183-24: Pl Opp DSJ 24 (Oliver Dep tr 17, 50-52).)

**4. The R.A. Denial.**

The R.A. did not testify under oath about not giving a key to John Doe to Jane Doe's room. Investigator Amberger said in deposition that John Doe would have gained access by having a key or the room was left unlocked. (Motion Ex. D: Amberger Dep tr 78-79.) But neither were true. John Doe did not have a key, the room was locked, the only way he gained access was by the R.A..

(Motion Ex. A: John Doe 08/2022 Declaration ¶ 12.)  In any event, this is at best a difference in recollection that cannot sensibly be used to assert that John Doe lied.

## IV. SUMMARY JUDGMENT SHOULD BE ENTERED FOR JOHN DOE ON JOHN DOE'S DUE PROCESS CLAIM.

Based on the allegations of the Complaint, Judge Barrett wrote (928 F.3d 663-664):

John's circumstances entitled him to relatively formal procedures: he was suspended by a university rather than a high school, for sexual violence rather than academic failure, and for an academic year rather than a few days. Yet Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension. "[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story." *Goss*, 419 U.S. at 581, 95 S.Ct. 729. John received notice of Jane's allegations and denied them, but Purdue did not disclose its evidence to John. And withholding the evidence on which it relied in adjudicating his guilt was itself sufficient to render the process fundamentally unfair. *See id.* at 580, 95 S.Ct. 729 ("[F]airness can rarely be obtained by secret, one-sided determination of facts decisive of rights...." (quoting *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring))).

John has adequately alleged that the process was deficient in other respects as well. To satisfy the Due Process Clause, "a hearing must be a real one, not a sham or pretense." *Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 629 (7th Cir. 2016) (citation omitted). At John's meeting with the Advisory Committee, two of the three panel members candidly admitted that they had not read the investigative report, which suggests that they decided that John was guilty based on the accusation rather than the evidence. *See id.* at 630 *664 (stating that a hearing would be a sham if "members of the school board came to the hearing having predetermined [the plaintiff's] guilt"). And in a case that boiled down to a "he said/she said," it is particularly concerning that Sermersheim and the committee concluded that Jane was the more credible witness—in fact, that she was credible at all—without ever speaking to her in person. Indeed, they did not even receive a statement written by Jane herself, much less a sworn statement.[4] It is unclear, to say the least, how Sermersheim and the committee could have evaluated Jane's credibility.

Sermersheim and the Advisory Committee's failure to make any attempt to examine Jane's credibility is all the more troubling because John identified specific impeachment evidence. He said that Jane was depressed, had attempted suicide, and was angry at him for reporting the attempt. His roommate—with whom Sermersheim and the Advisory Committee refused to speak—maintained that he

was present at the time of the alleged assault and that Jane's rendition of events was false. And John insisted that Jane's behavior after the alleged assault—including her texts, gifts, and continued romantic relationship with him—was inconsistent with her claim that he had committed sexual violence against her. Sermersheim and the Advisory Committee may have concluded in the end that John's impeachment evidence did not undercut Jane's credibility. But their failure to even question Jane or John's roommate to probe whether this evidence was reason to disbelieve Jane was fundamentally unfair to John.

Discovery strengthened John Doe's case that he was denied due process. The depositions of Purdue people with the documents that formed the basis of the allegations of the Complaint showed a process more flawed than what was alleged in the Complaint. Defendants never provided John Doe with the evidence and the investigation report during the disciplinary case, there was no real hearing, and there was pre-judgment based upon Jane Doe's accusations. Expungement of the disciplinary file was and is the proper remedy. (ECF 183: Pl Mem. SJ 6-33, 39-46.)

## V.    **CERTIFICATION TO SEVENTH CIRCUIT.**

For any ruling not reconsidered and not amended on this motion and not corrected by the Amended Complaint, the Court should certify for appeal, to the U.S. Court of Appeals for the Seventh Circuit, any such ruling not reconsidered and not amended on this motion. Key meritorious parts of this case should not be broken off. Defendants' Counterclaim should as a matter of law be dismissed. The Seventh Circuit should be the Court that determines now the issues on this motion.

## CONCLUSION

For the reasons stated above, the motion for re-argument, reconsideration and amendment of this Court's Opinion and Order dated August 11, 2022, should be granted, and the Court should rule that that (i) John was required to disclose the university disciplinary files to the Navy ROTC and thus there was no self-defamation and summary judgment could not be entered on John's due process claim, as John had a stigma-plus liberty interest consistent with the Court's Opinion and

[23]

Order on what would cause denial of summary judgment, (ii) Defendants' Counterclaim is dismissed with prejudice on the grounds that it is a legally defective use of the Declaratory Judgment Act according to case law in the Seventh Circuit and there is not stated and there is not a federal court jurisdiction for the requested declarations; and (iii) there are not material issues of fact as to the stigma-plus interest on the basis of alleged falsity; and for any ruling not reconsidered and not amended on this motion, certifying for appeal to the U.S. Court of Appeals for the Second Circuit any such ruling, and the Court should grant such other and further relief as the Court deems just and proper.

**Dated:  August 30, 2022**

> **Respectfully submitted,**
> **NESENOFF & MILTENBERG, LLP**
> **By: /s/ *Philip A. Byler***
> _____
> **Philip A. Byler, Esq.**
> **Andrew T. Miltenberg, Esq.**
> **363 Seventh Avenue, Fifth Floor**
> **New York, New York 10001**
> **(212) 736-4500**
> **pbyler@nmllplaw.com**
> **amiltenberg@nmllplaw.com**
> ***Attorneys for Plaintiff John Doe***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this document was served upon the attorneys of record for

each party to the above-entitled cause at the address shown below by ECF on August 30, 2022.

William P. Kealey, Esq.
Tyler L. Jones, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
          tlj@stuartlaw.com
*Attorneys for Defendants*

BY:    ☐  U.S. Mail        ☐     Federal Express

       ☐  Hand-Delivery    x     <u>Other: ECF</u>

_____*Philip A. Byler, Esq.*_____
          Philip A. Byler, Esq.