```
 1                 UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF INDIANA
 2                      HAMMOND DIVISION

 3   JOHN DOE,                        )
                                      )
 4        Plaintiff,                  )
                                      )
 5     vs.                            )   Case No.
                                      )   2:17-cv-00033-JPK
 6   PURDUE UNIVERSITY, PURDUE        )
     UNIVERSITY BOARD OF TRUSTEES,    )
 7   MITCHELL ELIAS DANIELS, JR.,     )
     in his official capacity as      )
 8   President of Purdue University,)
     ALYSA CHRISTMAS ROLLOCK,         )
 9   in her official capacity at      )
     Purdue University, KATHERINE     )
10   SERMERSHEIM, in her official     )
     capacity at Purdue University,   )
11                                    )
          Defendants.                 )
12   _____   )

13
                       MOTION HEARING
14                   DECEMBER 19, 2022
            BEFORE THE HONORABLE JOSHUA P. KOLAR
15            UNITED STATES MAGISTRATE JUDGE

16
     FOR THE PLAINTIFF:        PHILIP A. BYLER
17                             Nesenoff & Miltenberg LLP
                               363 Seventh Avenue, 5th Floor
18                             New York, New York 10001
                               212-736-4500
19                             Email: pbyler@nmllplaw.com

20   FOR THE DEFENDANTS:       WILLIAM P. KEALEY
                               Stuart & Branigin LLP
21                             300 Main Street, Suite 900
                               P.O. Box 1010
22                             Lafayette, Indiana 47902-1010
                               765-423-1561
23                             Email: wpk@stuartlaw.com

24   OFFICIAL REPORTER:        Angela Phipps, RMR, CRR
                               5400 Federal Plaza
25                             Hammond, Indiana 46320
                               (219) 852-3616
```

```
 1          (The following proceedings, commencing at 9:50 a.m., were
 2       had in open court, reported as follows:)
 3          THE COURT:  All right.  We are on the record now.
 4   This is Cause 2:17-cv-33.  It's John Doe vs. Purdue University,
 5   et al.  Plaintiff is represented by Philip Byler.  We have
 6   Defense by William Kealey.  And I will hear oral argument from
 7   both Plaintiff and Defense.
 8       I'm going to give everyone some time just to say whatever
 9   they'd like.  I'd like to kind of stress for both of you, just
10   to outline a few things that I'm going to be looking at very
11   carefully, is, again, this issue of whether or not the
12   authorization was signed voluntarily.
13       And then also in terms of the counterclaims.  I didn't
14   address it in the original Opinion.  I'm not sure I want to
15   address it now.  It seems to me like this is something that I
16   don't see how it's going to be necessarily anything that is
17   going to further this litigation.  So I may dismiss them.  We
18   can address that at a pretrial conference.
19          MR. BYLER:  Well, I think they should be dismissed.
20          THE COURT:  But I'll be listening to the Defense to
21   say, look, how is this going to at all advance any interest in
22   the litigation.
23       I understand I have the discretion to issue some of these
24   declarations.  I think at least one of them, given my ruling,
25   you know, wouldn't make sense any further.  But I'll listen to
```

1    hear about why the counterclaims would be necessary and, from

2    the Plaintiff's perspective, just whether they're going to

3    change trial at all.  Right?  I mean, I don't know how this

4    issue really is going to in any way shape how we're proceeding

5    going forward.  That's all.

6        Okay.  Mr. Byler, what --

7            **MR. BYLER:**  I'll address that, but I think most

8    important is to deal with the stigma-plus liberty interest.

9            **THE COURT:**  Absolutely.

10            **MR. BYLER:**  And our position obviously is, it was

11    fully satisfied here.

12        The authorization we're referring to was in the context of

13    the Navy already knowing about the investigation.  Now, when

14    the case was already at the Seventh Circuit, Purdue took the

15    position:  Look, the Navy only knew of this because of the

16    authorization.

17        Not so.  Not so.  Jane Doe went to the Navy first,

18    April 4, 2016, to Commander Sheppard, said what she did about

19    the sexual assault, which -- Well, we take the position it's

20    totally false.  But Sheppard reported it to Commander Hutton.

21    Commander Hutton reported it to Purdue; went to his

22    obligations.  You know, it was Purdue that was going to do the

23    investigation.

24        And Commander Hutton put John Doe on interim leave of

25    absence.  Didn't kick him out yet from the ROTC, but interim

1  leave of absence, which is change of status right there.

2      But at that point, you're talking about the Navy knowing

3  full well about an investigation into sexual impropriety by

4  John Doe.  And so you're not talking about, "Oh, gee what's

5  this?"  Because the authorization.

6      No, no, no, no.  The authorization was requested because

7  the Navy-- and this is the testimony --wanted "in the loop."

8  And that meant they wanted in the loop of the investigation.

9  And they were put into the loop.

10     And John Doe was not in the position to say no.  As ROTC

11  midshipmen, respecting his Navy superiors, wanting a career in

12  the Navy, you have a request, knowing that the Navy wants to be

13  in the loop.  You don't say no.

14     The suggestion that maybe he says no is just ridiculous.

15  I have combat officer sons, who, when asked this, of course,

16  you give the authorization.  There's nothing -- You would do

17  that.  Okay.

18          **THE COURT:**  That's not in the record, though; right?

19          **MR. BYLER:**  Okay.  No.

20          **THE COURT:**  What is in the record are multiple

21  depositions where the issue of whether or not an order was

22  issued was addressed.  And I have your client's deposition.  I

23  now have your client's declaration.  I know Mr. Kealey is going

24  to say I shouldn't consider any of this, and perhaps I

25  shouldn't.  But it's in front of me, and I want to be fair and

 1   say, okay, is there something I'm missing.

 2            **MR. BYLER:**  Yes.

 3            **THE COURT:**  Okay.  I get that that's your position,

 4   okay?

 5            **MR. BYLER:**  Yes.

 6            **THE COURT:**  But I see nothing.  I don't see your

 7   client saying, "I was given an order."

 8        I don't see any deposition that -- You're telling me, I

 9   think, right?  Judge, the situation was that, if he had not

10   signed this, he would have been told he has to sign it.  If he

11   didn't sign it, the ROD that you point out regarding honoring

12   your superiors, et cetera, would have kicked in.  I see none of

13   that in the record.

14            **MR. BYLER:**  Well, excuse me.  At his deposition, all

15   he was asked about the authorization was to identify it.  The

16   deposition then went off on, "Well, could you have gotten the

17   investigation report from the Navy," you know, from the Navy.

18   That was not focused in his deposition.

19        There was no testimony that there was any idea that

20   John Doe would have not honored the request for that -- access

21   to the investigation file.  As a Navy midshipmen, he absolutely

22   had to, not only because -- was the Navy ROD, but he has an

23   obligation of honor and honesty, respecting superiors, and

24   having a sense of responsibility.

25        He was in a position where he was put on interim leave of

 1  absence; and as a result, if he refuses it, there was a
 2  Performance Review Board that would have happened.  And that
 3  would have been prejudicial because he would have been put on
 4  disciplinary leave of absence.
 5      And then, finally, most of all, because he was disenrolled
 6  based on the Purdue investigation, he was in the position of
 7  having a major offense, which goes into a permanent federal
 8  record, which he has to disclose.
 9      You know, he can apply to the -- Whether it's to the
10  Armed Forces, CIA, National Security, he's got to disclose
11  that.  That is a change of status.
12      What "liberty stigma-plus" means is change in status, and
13  that most certainly occurred.  And there was no self-defamation
14  because, quite frankly, this is a stronger case than what
15  Judge Martin ruled in *Mary Doe and Jane Roe [verbatim] v.*
16  *Purdue*, where he found a stigma-plus liberty interest.  And
17  that should have been disclosed to you, because right now
18  you're in conflict with Judge Martin's decision.  And I have to
19  say very strongly that the right decision is, of course, to
20  find that there was a liberty stigma-plus interest.
21          **THE COURT:**  You're asking me to find that based on
22  Purdue's finding in the sexual misconduct investigation;
23  correct?
24          **MR. BYLER:**  Not just that.  I mean, it is a status of
25  a midshipman on scholarship, and I make the point multiple

 1   times in this whole case.  He was on scholarship.  He had to

 2   honor his commitments and obligations, and he didn't part with

 3   a legal obligation, if you will, but he was under an obligation

 4   to fulfill his role as a midshipman.  And that meant, when he

 5   gets a request for this kind of authorization, that kind of

 6   access, when the Navy knows and it's going to be relying on the

 7   investigation, yes, he has to give it.  He was in no position

 8   not to give it.

 9        **THE COURT:**  Was any of that explored with any of the

10   individuals who were deposed?  If John Doe said, you know,

11   "Respectfully, sir," "ma'am," "I would like the Navy and their

12   PRB to determine what happened.  I don't feel good about the

13   Purdue investigation.  If the Navy is going to rely on facts, I

14   want the Navy to find them."

15        **MR. BYLER:**  Well, John Doe's position was, he would

16   have preferred the Navy, but that's not how the Navy wished to

17   proceed.  It was not his decision how the Navy was going to

18   determine to deal with the allegations Jane Doe made.

19        The decision that Commander Hutton testified to was:

20   We're going to rely on the Purdue investigation.  That's

21   Hutton's testimony:  We're relying on the Purdue investigation.

22        And it was in that context in which John Doe knows that

23   they're wanting to be in the loop because the investigation

24   that's ongoing, he's requested by a superior officer for that

25   access.

1      Now, I'm sorry.  If you want a career in the Navy, you

2  just don't go say, "No, I'm not going to give it to you."  That

3  doesn't happen, and I'm a little surprised that there would be

4  a suggestion to that effect.

5           **THE COURT:**  That's not the suggestion, Counsel.

6           **MR. BYLER:**  I don't know what is, I mean, because he

7  was under an obligation as a scholarship student in the Navy

8  ROTC to honor his commitments to the Navy.  And it's clear from

9  the Navy ROD-- by the way, which wasn't available to us at the

10 time of the Navy depositions --that he certainly was under an

11 obligation and would have been prejudiced if he had not

12 provided the requested authorization.

13     To say, "Well, you know, we're not going to have liberty

14 stigma-plus interest here because, well, you should have pushed

15 it and gotten a formal order," uh-uh.  That's not military

16 reality.  That's not how the military works.

17     And it's expected of, you know, a midshipman in this case

18 or somebody who was in Army ROTC or Marine ROTC, you comply

19 with the request of your superior officer.  And there's no

20 sense whatsoever in saying somehow that you don't have the

21 liberty stigma-plus interest.  Because what?  You were

22 insubordinate?  Because that's what you would have been.  You

23 would have been insubordinate.

24          **THE COURT:**  Do you have anything to point to in the

25 record saying that it would have been insubordinate to simply

1   request that this PRB -- or say, "Sir," "ma'am," "if you order

2   me, absolutely, but I'm not going to voluntarily authorize

3   this"?

4          **MR. BYLER:**  Because John Doe's testimony, what's in

5   the record is:  I was not in a position to say no.

6          And that's all you need.  That's all you need.  Remaly

7   didn't need to issue an order because you would expect your

8   midshipman under these circumstances to provide the

9   authorization, and that was done.

10         Was John Doe, at his deposition, asked, "Well, why didn't

11  you say no?  Why didn't you force this?"  He wasn't asked that.

12         It would have been, I thought -- I would have thought at

13  the time it would be ridiculous to do so.  But, frankly, the

14  focus on the authorization, I'm very surprised, for all the

15  years of litigation I've done, very surprised that it was his

16  focus given Judge Barrett's treatment of it in the

17  Seventh Circuit Opinion.  This is not a basis to deny the

18  liberty stigma-plus interest, period.

19         The realities of the military are such that, when a

20  superior officer requests access to an investigation file which

21  they know exists, they know exists, and can exact punishment on

22  the midshipman if he says no, they can be -- as it would turn

23  the interim leave of absence into a disciplinary leave of

24  absence, you don't say no.

25         **THE COURT:**  Counsel, where is support for that in the

1    record --

2              **MR. BYLER:**  That's the Navy ROD.

3              **THE COURT:**  -- where, if he had respectfully said no,

4    that there would have been any discipline?  I've read --

5              **MR. BYLER:**  Because it would not --

6              **THE COURT:**  I've read your brief.  I went through the

7    ROD.  Is it essentially your argument that, because of those

8    sections in the ROD, it's the combination -- And I'm just

9    trying to make sure I understand this, right?  So it's the

10   combination of the Navy wanting to be in the loop and then the

11   sections in the ROD talking about honesty and respect for

12   superior officers that essentially created, if not an order, a

13   situation where, if he hadn't immediately signed it or if he

14   had asked if he had to sign it or, if this was an order, that

15   all the sudden these other provisions would have kicked in and

16   he would have been disciplined, is that the argument?

17             **MR. BYLER:**  Well, that's -- You know, you're going

18   through the ROD, and that's a fair way of looking at it.  The

19   point is, John Doe has been very clear he was not in a position

20   to say no.

21        It didn't have to go farther.  He wants a Navy career.

22   How is he going to do that when he is asked for access for an

23   investigation file that the Navy knows exists?  You don't say

24   no in that circumstance.

25             To be looking for mounds of depositions testimony, I'm

 1  taken aback by the suggestion, because it's very simple.  And
 2  you recognized it before --
 3          **THE COURT:**  Counsel, am I right that, at the time
 4  that he's asked for this authorization, the Purdue
 5  investigation is not complete; correct?
 6          **MR. BYLER:**  Well, at the time he's requested, they
 7  had finished the investigation report, he had not yet met with
 8  Dean Sermersheim.
 9          **THE COURT:**  Okay.  The PRB had yet to meet; correct?
10          **MR. BYLER:**  That didn't occur until August.
11          **THE COURT:**  Right.
12          **MR. BYLER:**  Until after all the appeals were done in
13  the Purdue investigation and disciplinary case.
14          **THE COURT:**  Because what I'm seeing are two parallel
15  tracks, okay?
16      I'm seeing a Purdue University investigation; absolutely
17  issues with that investigation.  I've addressed that in my
18  Opinion and Order.  The Seventh Circuit has addressed it.
19  Right?
20          **MR. BYLER:**  The Seventh Circuit definitely did.
21          **THE COURT:**  There's the Purdue University
22  investigation.  The Navy already knows about this --
23          **MR. BYLER:**  Yes.
24          **THE COURT:**  -- and is going to have a PRB.  To me, if
25  I'm looking at the record right, that PRB has not yet occurred.

1          MR. BYLER:  That's because the investigation was not

2    done.

3          THE COURT:  Correct.

4          MR. BYLER:  And the PRB would not be held until all

5    the appeals in the disciplinary case in Purdue were exhausted,

6    and so the PRB -- But the PRB could have been held if he

7    said no.

8          THE COURT:  And if he had said, "Respectfully, I'm

9    not comfortable authorizing the release of investigation that I

10   don't know how it's being conducted.  I know that I have

11   certain rights under the PRB, as your document points out in

12   this ROD" -- I'm just reading from 16-13 here.  The PRB is an

13   administrative tool, right?  That's the beginning in 1.  It

14   goes down in 3.  It says the PRB process protects certain

15   rights of midshipmen.  He could say, "Look, this is what I'm

16   being told.  I want that PRB to determine whether or not I did

17   anything wrong."

18         MR. BYLER:  In the circumstances and what the

19   testimony of John Doe was, that's what he preferred would have

20   happened, but the request was that they wanted -- And by the

21   way, Commander Hutton was very clear; they were going to rely

22   on the Purdue investigation.  That's what they wanted, and

23   that's what they requested.

24         And the notion that a midshipman can say, "Well, no, I

25   don't" -- No, you don't do that.  You want a career with the

 1  Navy, and you cooperate, and you show respect for your Navy

 2  superior officers.

 3          **THE COURT:**  Okay.  Is it disrespectful to say, "Sir,

 4  I don't know what my rights are here.  Do I need to sign this,

 5  or could I have the Navy" --

 6          **MR. BYLER:**  The answer is --

 7          **THE COURT:**  -- "determine this with the PRB board?"

 8          **MR. BYLER:**  -- it can be construed as

 9  disrespectful, yes.

10          **THE COURT:**  Okay.

11          **MR. BYLER:**  He has a duty of sense of responsibility,

12  and his responsibility to his Navy superior officers, since

13  they made an understandable request given that the Navy knows

14  about the investigation, is to comply with it.

15      He in his own mind, "Gee, I wish, you know, something

16  else," but this is how the Navy wanted to proceed.

17      To suggest that he presses the issue, I think, is totally

18  unrealistic, and the idea that he jeopardized the stigma-plus

19  liberty interest over this, I find that very strange.  Not

20  justified whatsoever.  It's just not.  When John Doe said:  I

21  was in no position to say no, that decides it there, period.

22          **THE COURT:**  That's all I'm to look at on summary

23  judgment?

24          **MR. BYLER:**  For this issue.  By the way, this

25  authorization issue, you know, I think both counsel have

1     three-ring binders of the briefs in this case on the summary

2     judgment, and they're three inches thick.  There's one little

3     issue here which you're focusing on.

4              **THE COURT:**  Didn't the Seventh Circuit and case law

5     focus on this?  If there's a voluntary authorization,

6     there's no defamation and --

7              **MR. BYLER:**  That's -- that's not --

8              **THE COURT:**  -- there's no stigma-plus.

9              **MR. BYLER:**  That's not a correct statement of the

10    Seventh Circuit decision.  That is not.  The argument was made

11    by Purdue that, but for the authorization, the Navy wouldn't

12    have known.  That's clear from the Opinion of Judge Barrett

13    herself.

14    And what Judge Barrett did:  Oh, Purdue, you're arguing

15    these cases.  But John Doe was compelled, required, to give

16    that authorization here.

17    It was not a case -- There are cases where there's a

18    voluntary provision.  I mean, the *Olivieri* case, for example,

19    was one in which the Seventh Circuit went so far as to say,

20    well, you know, they voluntarily disclosed it, and it was not

21    clear that this information would ever have come up.  In the

22    IU case, it was a voluntary transfer, voluntary disclosure

23    pursuant to a transfer of schools.  That's as far away from

24    what we're dealing with here as imaginable.

25              **THE COURT:**  But my question is, just as a matter of

 1   law, if there is a voluntary disclosure, there's no defamation

 2   and no stigma-plus?

 3          **MR. BYLER:**  No.  You're saying it too strongly, or

 4   else Judge Martin is wrong in *Jane Doe and Mary Roe [verbatim]*

 5   *v. Purdue*.  In the circumstances where there are -- there's no

 6   basis to say that you're somehow compelled factually to provide

 7   disclosure, it may never come up, that's one case.  That's not

 8   what we've got.  That's not what we've got and cannot

 9   reasonably be treated that way.

10          As a matter of law, if anything is a matter of law,

11   Judge Barrett ruled there's a liberty stigma-plus interest in

12   this case, period.  And nothing in this record changes that.

13   Nothing.  Because it was clear before the Seventh Circuit

14   John Doe was a scholarship student who had to honor his

15   obligations.  And when they refer to John Doe feeling the

16   obligation to disclose, that was in the circumstance, as a Navy

17   scholarship student, he had to comply with what's required, and

18   it's spelled out with the ROD.

19          So if you're -- Look, I'm doing a favor here.  I think any

20   ruling, "Well, he just did this voluntarily," would be

21   ridiculed.  It would not last, and I will not do anything but

22   take this case to the end to get a correction of that.

23          This is a very easy issue, actually.  Given military

24   realities, you cannot ask a midshipman or an Army ROTC guy to

25   say, "Well, I don't want to do it this way.  I want to do it

 1    some way else."  Your superior officers are saying, "We want
 2    this."  You have a duty of, you know, respecting your
 3    superiors.  You have a duty of honesty.  You have a duty of a
 4    sense of responsibility.  All of that says you do it; and if
 5    you don't, you're going to end up with, you know, a sanction,
 6    which would have been disciplinary leave of absence.  And right
 7    now, he's got the problem of a permanent federal record, which
 8    is a real problem for a young man.  And that's stigma-plus
 9    liberty.
10        I'll tell you this.  This case is as strong a case -- If
11    ever there was a liberty stigma-plus interest case, it's this.
12    And I hate to think I have to go to the Seventh Circuit to get
13    that straightened out, but I will, because they'll say that.
14    They will say that.  And I caution against it because you're
15    entertaining something which just makes no sense in terms of
16    military reality.  It just doesn't.  And I say it strongly the
17    way I do.  I don't mean to be disrespectful but --
18            THE COURT:  You're not being disrespectful.
19            MR. BYLER:  Okay.  Good.
20            THE COURT:  And I think that proves the point.
21    You're allowed to make arguments.
22            MR. BYLER:  But you're not my Navy superior officer
23    who's asking for access to investigation file because I'm under
24    investigation by the university and the university is
25    conducting an investigation.  I have an obligation --

1          **THE COURT:**  And in front of me --

2          **MR. BYLER:**  If you request, then I give it to you.

3          **THE COURT:**  In front of me, you're allowed to make

4   arguments; right?  And there's a respectful way to do it, a

5   disrespectful way to do it.

6          **MR. BYLER:**  I'm being respectful.  I'm trying to.

7          **THE COURT:**  I think you're completely within your

8   bounds.  I have --

9          **MR. BYLER:**  All I'm saying --

10          **THE COURT:**  -- no issues.  And within the military,

11  there's a respectful way to talk to your superior officer and

12  engage in a conversation and to get information, and there's a

13  disrespectful way.

14      Every time I have asked for in the record where is the

15  support, what I'm hearing from you is:  Well, my client

16  couldn't just say, "No, I'm not doing this."

17      That's not what I'm looking at at all.  I don't understand

18  where in the record it has been shown that, if he had

19  respectfully responded to his superior officer, "Sir," "ma'am,"

20  "Is this something I need to sign, or am I allowed to have the

21  Navy determine whether or not I did anything wrong in

22  their PRB."

23          **MR. BYLER:**  No.  You don't put a burden on a

24  midshipman or an Army ROTC guy to press the point in order to

25  have a situation which there is a liberty stigma-plus interest.

```
 1   That is wholly -- I'm sorry -- misconceived.

 2        If you're in the position where you have obligations of a

 3   Navy midshipman -- Okay?  You're a scholarship student.  You

 4   have to honor your obligations.  You've been asked, "Give us

 5   access."  You know they want in the loop.  And you're going to

 6   say no?

 7        And what I'm saying is, the suggestion that, well, he

 8   should have said no and maybe he could respectfully, I think,

 9   is nonsense.  I'm sorry.  It's nonsense.

10             THE COURT:  Okay.  Does anything in the record other

11   than what you've pointed to in the ROD support that?

12             MR. BYLER:  Well, John Doe's own testimony he's in no

13   position.

14             THE COURT:  Okay.

15             MR. BYLER:  You know, what I keep coming back to is,

16   with the Navy wanting in the loop as to an investigation that

17   they know is ongoing -- this is not a situation where, you

18   know, authorization is given and then -- and this isn't how it

19   was presented, but Purdue, at the Seventh Circuit, "Oh, what's

20   this?"

21        It was a situation where they know investigation because

22   they knew about this for six-and-a-half weeks before they

23   requested the authorization.  And the investigation was ongoing

24   when they requested it, and it was close to being done in terms

25   of the report.  You just didn't have the meetings with
```

 1  Dean Sermersheim and the appeals.

 2      But, you know, I'm sorry.  You're going to be in conflict

 3  with Judge Martin's decision if you go down that road, and I

 4  don't think that makes sense.  You're not making sense in terms

 5  of military reality.  When there's a request from a superior

 6  officer in these circumstances, you comply.

 7      And certainly there's no question, if he had not, he would

 8  have been subject to lawful order.  But it doesn't have to be

 9  pushed to that; it shouldn't have to be pushed to that.

10      **THE COURT:**  And that question wasn't asked in any of

11  the depositions of --

12      **MR. BYLER:**  No.  I pointed out that, when the

13  authorization was marked at John Doe's deposition, because he's

14  the person to ask about that, he was asked, you know, did --

15  identify it.  But then the testimony, the questions went off on

16  whether or not he could have gotten the investigation report

17  from the Navy as opposed to from Purdue, which didn't give the

18  investigation report, and it's one of the things that

19  Judge Barrett really faulted Purdue for, rightly.  So that

20  wasn't developed.

21      But from the Plaintiff's perspective, it didn't need to

22  be, given what's in Judge Barrett's Opinion about the liberty

23  stigma-plus interest.  And the fact he was not in a position to

24  say no, as a Navy scholarship student in the ROTC, saying no to

25  a superior officer, I'm taken aback by the suggestion because I

 1  know that is not what is expected behavior.  And the suggestion

 2  that he needs to push it further in order to establish liberty

 3  stigma-plus interest is just -- I'm sorry.  That is not

 4  consistent with liberty stigma-plus case law in the

 5  Seventh Circuit or anywhere.  It's just not.  And this whole

 6  discussion has gone farther in more detail in this than I ever

 7  would think would be necessary.

 8      Under the ROD, there's no question that John Doe was not

 9  in a position to say no, and honor his obligations.  He's just

10  not in a position to say no.

11      He can privately think, "Well, gee, I would prefer

12  something else," but the Navy -- Commander Hutton, in his

13  testimony, is very clear:  They were going to look to Purdue

14  for the investigation.  There was not going to be a separate

15  Navy investigation.  There was not.

16      And it is in that context that the request was made:  Give

17  us the authorization.  You don't say no, for Heaven's sakes.

18  You just don't.

19      Now, look, I made a motion to reconsider, consistent with

20  Rule 54(b) and 60(b), the text of which makes it clear.  The

21  Seventh Circuit decision in *Bank of Waunakee v. Rochester*

22  *Cheese Sales* makes it very clear the beneficial role on a

23  motion for reconsideration.  It's a situation where, I think,

24  you totally misapprehended the proper determination as to

25  stigma-plus.  And some other things.  But there's no question

 1   here that, if you would hold to the idea of what's in the

 2   August 11th Order, you're in conflict with Judge Martin, and

 3   I don't think that makes sense.

 4       Judge Martin found this liberty stigma-plus interest, I

 5   think in circumstances less compelling than here, and

 6   that's got to be a weighted concern for you, because there's no

 7   sense in that conflict of decision.

 8       And I would go further.  I say this, and maybe you don't

 9   appreciate it.  But Judge Barrett's Opinion is one of the most

10   significant appellate opinions in this country for years.  It

11   is followed around the country.

12       Secretary DeVos, then Secretary of Education DeVos, relied

13   on three cases to develop whether now the current Title IX

14   regulations -- One of them was *Doe v. Purdue*, and she pointed

15   out who was on the panel of the Seventh Circuit.  The due

16   process elements in the current Title IX regulations owe

17   themselves to the due process rulings in Judge Barrett's

18   Opinion; and the notion that that all be undercut by this, I

19   think, very ill-considered, very ill-conceived effort to focus

20   on the authorization, that is just not well observed.

21           **THE COURT:**  The Seventh Circuit ruled in the context

22   of a motion to dismiss.  I'm now looking at a record on summary

23   judgment.

24           **MR. BYLER:**  And all I'm saying is the record is very

25   clear that there's no issue about the authorization creating

 1  self-defamation.  Just none.  Judge Barrett, with what was
 2  before her, rejected it.  I'm saying it's clear from here
 3  because what you have to go to is, "Oh, John Doe, gee, you
 4  should have challenged your superior officers.  You shouldn't
 5  have just thought, 'I have no -- 'I'm not in a position to say
 6  no when they wanted to be in the loop.'"
 7      You're looking at a record that it's clear the Navy wanted
 8  in the loop of an investigation they knew about, and they were
 9  not going to do their own.  And in that circumstance, the
10  suggestion that somehow, "Oh, well, no liberty stigma-plus
11  interest" -- the position of Purdue at this stage is:  Oh, it's
12  all irrelevant about the Fourteenth Amendment violation.  You
13  don't want to go there.  I'll be bluntly honest with you; you
14  don't want to go there.  You want to be consistent with
15  Judge Martin.  You want to honor Judge Barrett's Opinion and
16  what role that has played in current law.  And you want, I
17  think, to get it right, and the August 11th Opinion doesn't,
18  clearly doesn't.
19      Now, I can talk more about that issue, but I do want to
20  deal with some other things.
21          **THE COURT:**  You may proceed.
22          **MR. BYLER:**  I may go back to it, depending on what is
23  raised.
24      Look, the amended counterclaim is defective as a matter of
25  law.  There's no reason not to dismiss it.  I didn't understand

1    why you didn't dismiss it.  It was fully briefed.  The

2    suggestion of Purdue it wasn't briefed, it was.  Page 46 to 50

3    of my memorandum of law for summary judgment, page 6 of the

4    opposition, page 14 and 15 of my reply, fully briefed.

5         And it is clear, as a matter of law, that amended

6    counterclaim gets dismissed.  There's no federal jurisdiction

7    to get state law police power declarations.  There's just none.

8    Federal courts usually are very careful about that kind of

9    thing when it is comes to federal court jurisdiction.

10        And, secondly, the existing case law in the Seventh

11   Circuit is, this is repetitive; it is redundant; it is

12   unnecessary; it gets dismissed.

13        I don't know why I'm hearing:  Well, I don't need to deal

14   with it.  You were presented, you know, with a motion that was

15   fully briefed; said you, as a matter of law, have to.  There's

16   no reason for that to hang around.  No good reason, I

17   should say.

18        **THE COURT:**  Counsel, to be perfectly frank, what I

19   said at the beginning is, I don't see how this advances the

20   case and --

21        **MR. BYLER:**  Well, it doesn't.  That's why you

22   dismiss it.

23        **THE COURT:**  That helps your argument.  I --

24        **MR. BYLER:**  I know.

25        **THE COURT:**  I don't necessarily disagree --

1          **MR. BYLER:**  Oh, okay.  Well, I misunderstood.

2          **COURT REPORTER:**  Excuse me, Counsel --

3          **MR. BYLER:**  I'm sorry.

4          **THE COURT:**  I don't understand, at this point, how it

5    changes anything at trial, okay?  I'm going to listen to

6    Mr. Kealey, but I honestly don't see -- I have discretion, the

7    way I'm reading the case law and the statute.  I have

8    discretion.  If I determine that declaratory judgment will

9    serve a useful purpose, I don't see what useful purpose it

10   serves here, but I'm going to listen to Mr. Kealey, but I also

11   do not see how it's going to change trial preparation or

12   anything one iota, so --

13         **MR. BYLER:**  Because it shouldn't be part of the

14   trial.

15         **THE COURT:**  How is it changing your --

16         **MR. BYLER:**  Because it's beyond the federal court

17   jurisdiction, number one.  And as a matter of law, you don't

18   have discretion to deal with what's outside the federal court

19   jurisdiction, for crying out loud.

20         **THE COURT:**  Yes.  If I don't have jurisdiction --

21         **MR. BYLER:**  And say yes and you --

22         **THE COURT:**  -- can't be part of the trial --

23         **MR. BYLER:**  -- and you don't --

24         **THE COURT:**  Counsel, I'm not speaking over you.  Do

25   not speak over me.

1          **MR. BYLER:**  I'm sorry if I started to.

2          **THE COURT:**  Yes.  If I saw a jurisdiction problem,

3   frankly, I would have to address it sua sponte.  If I have

4   jurisdiction, I don't see what is going to cause an issue at

5   trial.  I don't see how the presentation of facts are going to

6   be one iota different.

7          **MR. BYLER:**  There's no good reason to let the amended

8   counterclaim hang around.  There's just none.

9          **THE COURT:**  Understood.

10          **MR. BYLER:**  And there's no federal court jurisdiction

11   beyond that.  I mean, the case law doesn't say, oh, you have

12   discretion to dismiss it.  The case law in the Seventh Circuit

13   is very clear:  This is redundant; it's unnecessary; it is to

14   be dismissed.

15       You don't bring along in a trial that which is legally

16   defective, and that amended counterclaim is, and there should

17   be no effort to try to somehow keep it alive for trial.  That,

18   to me, seems very strange, in all honesty.  Anybody looking at

19   that amended counterclaim would basically say that thing's got

20   to go, and you didn't even rule on it, which makes no sense.

21   Now -- because it does matter for trial because of jury

22   instructions.

23       This notion of a falsity requirement for stigma-plus is

24   just flatly wrong.  Nowhere in the liberty stigma-plus interest

25   is there any basis to say that, well, you import all the

```
 1   elements of defamation into the analysis.  Then what you're
 2   saying is, "Oh, you've got to prove your innocence of what was
 3   a defective process."  It just does not work.  It just does not
 4   work.
 5       And I found disturbing what was said in support because,
 6   for example, you refer to Jane Doe's accusations.  On summary
 7   judgment, those accusations have to be proven.  They weren't.
 8   She never put herself under oath.  John Doe repeatedly has put
 9   himself under oath.  And so at the summary judgment stage, to
10   say, well, there's issues because of these accusations, no,
11   there aren't.  No, there aren't.
12       And the notion that one would have to prove falsity in
13   this country.  No court has ever ruled -- Look, I do these
14   cases.  No court has ever come close to ruling that.  At best,
15   it's a misunderstanding of the reference to defamation law
16   where it's a defamation element.  What is defamatory?  What
17   stigmatizes someone such that there's a change in status?
18   That's the only part of defamation law that matters.
19           THE COURT:  I agree with you, Counsel, as far as the
20   Seventh Circuit has never squarely addressed that.
21       My question is, if I find stigma-plus is not going forward
22   because there was a voluntary authorization, I'm not really
23   addressing the falsity issue; is that correct?
24           MR. BYLER:  I wouldn't say "if" because in no way
25   should you say there was a voluntary authorization here.
```

 1          **THE COURT:**  Okay.  But if that's my ruling, then it's

 2    a moot point whether or not there's a falsity requirement.

 3          **MR. BYLER:**  It's just one more mistake in the

 4    August 11 Opinion and Order, you know.

 5       But we get back to the point where you seem to be

 6    straining to say that that authorization somehow makes that

 7    stigma liberty interest go away.  And I'm saying, the basis

 8    that I'm hearing, it's just wrong, wrong, wrong.

 9       In no way, you shouldn't be ruling, and I would consider

10    it a serious matter if you went that road because I don't see

11    why you want to be in conflict with Judge Martin.  I don't see

12    why you would restrain to get to the point of treating

13    something that undercuts Judge Barrett's Opinion.

14          Purdue, desperately, for years, wants to get out from

15    under Judge Barrett's Opinion.  Let's not kid ourselves.  That

16    is not something that this Court should even be entertaining.

17          **THE COURT:**  Judge Barrett's Opinion is in the context

18    of a motion to dismiss and says John says he had an obligation

19    to authorize Purdue to disclose the proceedings to the Navy.

20    And earlier in that decision --

21          **MR. BYLER:**  Yes?

22          **THE COURT:**  -- now Justice Barrett --

23          **MR. BYLER:**  -- and that -- that was the --

24          **THE COURT:**  I am speaking, Counsel.

25          **MR. BYLER:**  I'm sorry.  Sorry.  I thought you were

```
 1   done.  I'm sorry.

 2        THE COURT:  Earlier in this decision, now Justice

 3   Barrett goes to great pains to point out the standard at a

 4   motion to dismiss.  That's all taken true.

 5        I'm now at a motion for summary judgment, and I need to

 6   determine whether or not the record supports whether or not

 7   there's a genuine issue of material fact as to that.

 8        MR. BYLER:  And what I'm saying is, with the record

 9   in front of you, there's no question about there not being any

10   self-defamation.  There's just not, because, to try to get

11   there, you have to talk about a midshipman, who is a

12   scholarship student -- And, by the way, I made that point clear

13   in the Seventh Circuit.  You know, it's all about a scholarship

14   student who's got to honor his obligations, and that's why

15   Barrett wrote what she did in the context of that Opinion.  He

16   didn't have an alternative but to give the authorization, and

17   that's what the summary judgment record shows.  The Navy wanted

18   to rely on the Purdue investigation.  They knew about it.  For

19   six-and-a-half weeks before they requested the authorization.

20        To say in those circumstances this was voluntary is just

21   not true and is something which, I don't think, people will

22   look kindly upon, because it's clear that, if you're a Navy

23   ROTC scholarship student and your superior officers ask

24   something of you and you have a duty of honesty, you have a

25   duty of responsibility, you don't say no.  You don't say this,
```

1   that, or the other.  You comply.  And the notion that you do

2   something else is just not military realities.

3       And I have no problem making that very pungently clear

4   outside the scope of this courtroom.  I'm sorry.  You're going

5   down a bad, wrong road, and I'm trying to stop it.  I'm trying

6   to do you a favor.  I'm sorry.

7       I don't mean to be disrespectful, but you're entertaining

8   something which is just flat-out erroneous.  It will make

9   Purdue happy.  But that's not the function of a judge.

10      The function of a judge is to decide things under the law

11  and what's before you.  And what is before you is that the Navy

12  knew about the investigation.  They wanted the investigation

13  for their own purposes, and they requested the authorization in

14  that context.  They wanted in the loop.  That's what Barrett

15  asserts.  They wanted in the loop, and John Doe was not in a

16  position to say no.

17      To suggest he was in a position to say other than no is

18  just not military realities and not consistent with the ROD.  I

19  have in my papers an analysis of the ROD, which makes it very

20  painfully clear how the liberty stigma-plus interest existed

21  here.  And I put it boldly, if ever there was a case for

22  liberty stigma-plus interest, it's in this case.  It's in this

23  case.

24          **THE COURT:**  Is it in this record?

25          **MR. BYLER:**  And it is most certainly in the record.

1    What I just reviewed -- That's all this issue, you know, is

2    worth.  You're trying to make it into some big issue.  It's

3    really not.

4             **THE COURT:**  Is it not legally dispositive, though?  I

5    mean, there are lots of issues in this case.  I'm not trying to

6    make one issue more important than another but the --

7             **MR. BYLER:**  Well, you have.

8             **THE COURT:**  Okay.

9             **MR. BYLER:**  You have.

10            **THE COURT:**  Is this not legally dispositive?  If

11   there is a voluntary authorization, is that not legally

12   dispositive?

13            **MR. BYLER:**  You don't have a voluntary authorization

14   here.

15            **THE COURT:**  That's not my question.

16            **MR. BYLER:**  Well, but that's what you're asserting;

17   there was a voluntary authorization here.  There was not.

18            **THE COURT:**  Okay.

19            **MR. BYLER:**  You want to say there was a material

20   issue of fact, that's one thing, but you can't say that there

21   was a voluntary authorization here, not given the circumstances

22   involved in this case.

23       And I point out the difference because I don't think it

24   should go to the point of asking a jury to determine, but

25   that's better than saying, "Oh, nope, voluntary authorization."

 1    There was no voluntary authorization here, for Heaven's sakes.

 2    That's not something that should even be thought about and

 3    considered.  It really shouldn't be.  And I'm trying to say it

 4    as respectfully as possible, but I'm concerned about the law

 5    here, and I'm concerned about the respect that's appropriate

 6    for Judge Barrett's Opinion, and it cannot be rationalized in

 7    the way that you just did because the record is strong enough

 8    with what's before you on summary judgment to say you can't

 9    call this a voluntary authorization, because it wasn't.

10        When he says:  I wasn't in a position to say no, that's

11    not voluntary.  With you facing what the obligations are in the

12    ROD to say no?  Excuse me -- to say, well, other than no,

13    that's not voluntary.  It was always a strained argument by

14    Purdue, and they carried it over to summary judgment, and it

15    shouldn't have gotten the treatment that you gave it in your

16    August 11th Opinion.  It just shouldn't have, because it's

17    very simple.  With the Navy wanting in the loop about an

18    investigation they knew about-- and that's how the Navy wanted

19    to handle it --John Doe was not in a position to say no.  He

20    was not in a position just to say, you know, "Oh, no.  I want

21    to do something else."  That's not a voluntary authorization.

22    It's just not.  Not even remotely.

23        You have a situation where it's clear.  His obligation as

24    a Navy ROTC scholarship student is to give that authorization,

25    period.  Period.  And to go farther is just something which

1    should not be entertained.

2         Do you have any further questions?

3              **THE COURT:**  No.

4         **MR. BYLER:**  I'm sorry if you felt I was disrespectful

5    at times.  I didn't mean to talk over you, but I'm anxious to

6    try to communicate to you, you're entertaining a position that

7    puts you in conflict with Judge Martin in terms of the issue,

8    and it also is not something that you want your name on, in all

9    honesty.  It's not something you want your name on.

10             **THE COURT:**  Counsel.

11        **MR. KEALEY:**  Thank you, Your Honor.  May I argue from

12   here?

13             **THE COURT:**  You may.

14        **MR. KEALEY:**  I'm going to read off the paper.

15        First, my apologies to the Court for my travel

16   difficulties, the problems between my assistant and me.  It has

17   not happened in 27 years of traveling to this court and --

18             **THE COURT:**  We're all traveling.  I used to travel in

19   my old job.  I understand.

20        **MR. KEALEY:**  Thank you.

21        I will speak to both the topics the Court asked that we

22   address today, and I'll speak first to the stigma-plus issues

23   and then to the counterclaim.

24        These are the pages of John Doe's summary judgment

25   response that speak to the Navy evidentiary designations:

1  Pages 24 to 29 and the exhibits that are cited therein.  That's

2  the full extent of the summary judgment record.

3      It is well established that a motion for reconsideration

4  is not a procedural opportunity to come in with additional

5  evidence or new arguments.

6      It is for reconsideration of the evidence that's already

7  in the designated record and of the law that's already in the

8  record and the arguments that are already in the record, save

9  only a change of controlling law, which happens in rare

10  circumstances but is not the circumstance we have here.

11      The Plaintiff is making arguments and referring to

12  evidence that are not in the summary judgment record.  The

13  Plaintiff came in on a motion for reconsideration with new

14  evidence and a new argument.  The new evidence was the ROD,

15  which was not cited in their brief in opposition to summary

16  judgment, not designated in their factual designations.  It is

17  simply outside the summary judgment record for their

18  opposition.

19      They are also coming in with a new argument.  The argument

20  that was made at the summary judgment phase about being in the

21  loop stopped there.  The argument about wanting the Navy to be

22  in the loop was simply that John wanted the Navy in the loop,

23  not that he had no option but to consent.

24      It was an affirmative, tactical choice by John.  He wanted

25  the Navy in the loop.  That is, by definition, a choice.  He

1  could have left them out of the loop.  He could have told them
2  why he wanted them out of the loop or not told them.  But
3  wanting somebody in the loop by the very colloquial phrasing is
4  something that people choose to do because they think that
5  it's --
6          **THE COURT:**  Well, if the Navy wanted to be in the
7  loop.
8          **MR. KEALEY:**  That would be different.  That would be
9  different.  But we would have to drill down on that a little
10 bit more than just what the Navy wants because stigma-plus is
11 about a statutory obligation, a legal obligation, to disclose.
12     The Navy in this context is just an employer.
13         **THE COURT:**  Counsel, just to be clear, right?  And I
14 think I went to some pains in my Opinion to point this out.  I
15 had some difficulty really drilling down and saying that that
16 obligation needs to necessarily be legal.  And, again, this was
17 in the context of a motion to dismiss.  But when this was at
18 the Seventh Circuit, now Justice Barrett says, instead, John
19 says he had an obligation to authorize Purdue to disclose the
20 proceedings to the Navy.  You could read that to say "legal,"
21 but "legal" is not there.  And I did try to point out in my
22 Opinion that, perhaps, an argument could be made.  I didn't
23 find that argument to be made.
24     But is your position that it needs to be legal?  Is there
25 any additional case law for that, or were you just using that

 1  kind of colloquially?

 2       **MR. KEALEY:**  I'm using it in the traditional Latin

 3  sense of the word "obligation."  "Obligation" means not a

 4  discretionary or negotiated disclosure.  It means a disclosure

 5  that it is an obligation where that obligation is sourced from

 6  somewhere other than just the employer's curiosity.

 7       It's hard to come up with examples of what would make

 8  something an obligation other than law.  But the case law,

 9  which there is not very much in stigma-plus to draw on, so I'm

10  sympathetic to the observation the Court just made, certainly

11  doesn't leave the door open to an employer saying, "Well, our

12  employee handbook says you really need to be transparent with

13  us about things, so that's an obligation to disclose."

14       This is not, in other words, an obligation that the

15  employer dreams up.  This is an obligation that exists

16  independent of that particular relationship.

17       **THE COURT:**  I understand what you're saying there,

18  Counsel.  I haven't heard a lot here, frankly, where I think

19  the trial is going to be significantly different than my Order

20  contemplated.  But I would agree with what counsel said, that

21  the military is different.  Absent a law, there still can be a

22  lawful order.  There doesn't need to be a law, a CFR saying

23  John Doe must provide X, Y, and Z to the Navy, even without a

24  CFR.  Someone could have potentially been given an order;

25  correct?

1        **MR. KEALEY:**  The term the Court just used, I think,

2   answers the question.

3        **THE COURT:**  That's not in the record.  I'm just

4   saying you're kind of drawing the analogy to a typical

5   employer, is the way I'm saying it.

6        I will say the one thing that I -- perhaps more than one.

7   I'm going to look at the record, and counsel is going to have

8   the last word here, but I do think -- I'm not blind to the

9   fact, right, that the military is a different type of employer,

10  and I don't think you're challenging that.

11       **MR. KEALEY:**  I'm not challenging that.  But the Court

12  just said a lawful order; and a lawful order means an order

13  that, if disobeyed, is not merely civil law or placed in

14  subordination, it can give rise to a court martial.  A lawful

15  order, if not complied with, is enforceable under military law.

16       **THE COURT:**  Okay.  Let's take one step down here

17  because, just to be clear, I don't think necessarily in the

18  ROTC program that John Doe would have been subject to UCMJ at

19  all times.  But if he was ordered to do something, that's

20  different than the normal -- There is a difference, and I want

21  to acknowledge this.  You were absolutely right, and I'm not

22  blind to this.

23       Look, I am relying on the record in this case.  But as

24  everyone is aware, because I brought it to everyone's attention

25  to make sure that I could adhere to my ethical obligations, I

1    also happen to have spent some time in the Navy, right?  There

2    is a difference.  And I spent time as an undergrad, and there

3    is a difference.  And I hear counsel that there is a

4    difference, and I understand that there's a difference.

5        And I think even this record shows, right, that there's a

6    difference between a professor saying, "Hey, I want you to sign

7    'X,' or will you sign 'X,'" right?  Certainly that, "I want you

8    to," or, "I'm telling you to," from a professor is different

9    than from a naval officer.

10       So I just want to acknowledge that, and I think it's

11   different, regardless of whether or not -- And I haven't peeled

12   back the onion on when UCMJ would be applicable, but I don't

13   think it's necessary because I agree with Mr. Byler to the

14   point of the ROTC program is different.  And if there was an

15   order given or if it was phrased as an order, I think this case

16   would be different, and specifically in the context of a motion

17   for summary judgment, if it was established that there was a

18   material issue of fact as to that.

19       So I don't mean to interrupt, but when I see these

20   analogies, I want to be clear about what my Opinion said and

21   clear about what some of what Mr. Byler is saying that I

22   certainly understand, and maybe not as far as Mr. Byler would

23   like me to go, but I agree with even in the narrow record of

24   this case.  And common sense, everyone understands that the

25   context of an ROTC midshipman is certainly different than the

1    context of a typical undergrad or a typical employer/employee.

2        I didn't mean to interrupt you.  Proceed.

3            **MR. KEALEY:**  Thank you.

4        In any event, there is no such order recounted in the

5    record.  So the hypothetical is interesting; but in the context

6    of this record, we really don't need to drill down on that

7    hypothetical because it has been made clear repeatedly by John

8    that this was a choice that he made and that he made it for

9    some reasons that are very plainly stated in the record.

10        He says in his most recent affidavit that he hoped for an

11    exoneration from Purdue, that the Navy itself was not going to

12    produce that exoneration on the timetable he had in mind.  He

13    was in an interim suspension status, not only because of Jane's

14    allegation which was pending with the Navy, but also because of

15    his grades.  So his Navy status was, at best, stalled.

16        And he has disclosed, as has Mr. Byler at the oral

17    argument that's been transcribed, that this was a choice that

18    was made for tactical reasons.

19        That's the evidence that's come in on the motion for

20    reconsideration; and it actually provides an even shorter path

21    to dismissal because a tactical disclosure is clearly not an

22    obligatory disclosure, and that's what this is.

23        A few of the statements that have been made on this topic

24    that I'll just touch on before I move to the rest of my

25    argument.

1    The Court has asked counsel to show where in the ROD it,

2  in fact, is phrased as an obligation.  It's not there.

3    There is no authority brought forth to this Court

4  suggesting that the obligation to disclose can somehow be

5  implied.  There is no case that says an implied obligation to

6  disclose is sufficient to meet the stigma-plus standard, and

7  there's no way to read *Doe vs. Purdue* and find in there that

8  Justice Barrett was talking about an implied obligation.

9    The assertion was made from the podium that John Doe --

10 that the military could "exact punishment" if John did not make

11 this disclosure that he made for tactical reasons.

12    Whether that's hypothetically a possibility for an order

13 that is refused, at least for court martial, we've just

14 discussed, we don't need to go there.  But certainly there's

15 nothing in this record at all to suggest that John acted out of

16 fear of punishment.

17    The initial argument was that John acted out of a sense of

18 honor.  Well, honor is a sense of what one chooses to do.

19 Punishment and honor are not synonyms.  They're antonyms.  If

20 somebody acts out of fear of punishment, that's not acting out

21 of honor.  So the punishment hypothetical has no basis in the

22 record and need not be discussed any further.

23    I want now to turn to some related topics that I think do

24 need to be at least touched upon in the context of the

25 assertions that have been made about peril to this Court or

 1   about precedent status or about an interlocutory appeal.

 2        There are multiple grounds shown in our summary judgment

 3   papers for dismissal of the stigma-plus allegation.  Several of

 4   those are not touched upon at all in the Court's Opinion.  But

 5   we submit that the ground of decision in the Opinion, if it was

 6   modified upon reconsideration, would, in turn, require that

 7   those remaining grounds be addressed and decided.

 8        We strongly submit that there is no record to show that

 9   there's any standing on the stigma-plus claim today.  There's

10   nothing in the record to show any initiative by John to pursue

11   a Navy career despite his suspension from Purdue ending over

12   five years ago.

13        There is nothing to show that his Purdue suspension ever

14   limited him from going to a different Navy ROTC program in

15   realtime and enrolling elsewhere.

16        And, in fact, the Judge Martin decision that counsel has

17   repeatedly referred to today includes a plaintiff in that case

18   who, while under suspension from Purdue, went to a different

19   ROTC program in realtime and never missed a semester of ROTC.

20   That's all in the record.

21        Either the initiative to pursue a Navy career or the

22   obstacle to a Navy career simply has not been established

23   factually in the record.  So we're talking about what

24   hypothetical?  What hypothetical would be remedied by this

25   stigma-plus allegation?  That John would come back to Purdue,

1    Navy ROTC?  He's shown no initiative to do that.  That he would

2    face an obstacle if he showed up at Navy ROTC?  There's no

3    record of that.  That he tried to go to Navy ROTC elsewhere?

4    There's no record of that.  That he tried to enlist in the Navy

5    as a sailor instead of an officer, there's no record of that.

6        We're spending a lot of energy on a contention that, in

7    2018, September of 2018, when John was arguing this in the

8    Seventh Circuit, fell proximate in time.  That's not where we

9    are anymore.  And we all know that standing analysis is an

10   analysis that never drops out of the case.

11       We also know-- and I won't drill down on this in any

12   detail because it's in our briefing --that John never sought

13   his meaningful post-deprivation state court remedy, even though

14   initially bringing state court claims in this case before

15   voluntarily dismissing them.

16       We know that the Navy has opened its own disciplinary

17   jurisdictional file.  At least there's no evidence that's been

18   adduced through subpoena and discovery from Navy officials that

19   that file was ever closed.

20       We know that that investigation -- We've shown in our

21   summary judgment record that that investigation was furthered

22   by the Navy in the form of Lieutenant Redlawsk's work product.

23       So we know that, regardless of the Purdue disciplinary

24   determination, if John is correct that the Navy cares about

25   sexual misconduct at all -- And there's no evidence in the

```
 1    record of that because he was not suspended for sexual
 2    misconduct; he was suspended because he wasn't enrolled at
 3    Purdue.  But if the Navy cared at all about that topic, surely
 4    the Navy would rely upon its own investigation today.  There's
 5    no evidence that they've either done so or that they've closed
 6    that file.  So that topic just dangles as another part of
 7    John's story that he can't be bothered to prove up.
 8         The assertion on that point made by plaintiff's counsel at
 9    the podium was, quote, there's not going to be a separate
10    investigation, unquote.
11         Where is that in this record?  Nowhere.
12         We submitted all the evidence showing that the Navy
13    conducted an investigation; that Lieutenant Redlawsk submitted
14    her report, characterized as a preliminary report; and that the
15    matter was not acted upon further one way or the other.
16         If John wants to argue that there's not going to be a
17    separate investigation at the Navy, then in this now nearly
18    six-year-old case, why hasn't John adduced any evidence of
19    that?  He's not here asking for more discovery from the Navy.
20         The Court has in the record of the motion for
21    reconsideration the transcript from the oral argument the last
22    time we were together by telephone.  And it must be pointed out
23    that, in a long argument from the podium today, plaintiff's
24    counsel made no effort to explain the statements made in that
25    transcript, which are binding statements on the Plaintiff.
```

1          Plaintiff's counsel has argued in this case for years

2    that, but for Purdue making a disclosure, the Navy wouldn't

3    have known about Jane's allegation, about Purdue's

4    investigation, about the outcome of Purdue's investigation.

5    That was the argument that was made in the Seventh Circuit.

6    That's not the argument being made today.

7          John asked the Seventh Circuit to rely upon an invented

8    narrative; then resisted our Navy subpoena, which we were able

9    to enforce only upon this Court's Order authorizing us to do

10   so, to bring out the record of what, in fact, happened at the

11   Navy.

12         The Seventh Circuit Opinion goes out of its way to say

13   it's only talking about John's representations to that Court;

14   and John's representations to that Court amount to:  If only

15   the Navy had been kept in the dark, I wouldn't have been

16   suspended.

17         He didn't tell that Court that he already had been

18   suspended for grades.  He didn't tell that Court that the Navy

19   was the original recipient of the allegation by a Navy

20   midshipman to a Navy officer under Navy rules.  He didn't tell

21   that Court that the Navy had put Lieutenant Redlawsk on an

22   investigation of the Navy's own.  He didn't tell that Court any

23   of those things.

24         Finally, recently in this court, it's become evident

25   through a combination of our summary judgment motion and

```
 1    plaintiff's counsel's statements in that transcript just how
 2    wrong that set of facts presented to the Seventh Circuit was.
 3         When this case ends up back in front of the
 4    Seventh Circuit-- which it will one way or another, and
 5    plaintiff's counsel wants to rely upon Justice Barrett's
 6    Opinion --the question is going to be, "How could plaintiff
 7    have so completely misled that Court about the facts that gave
 8    rise to that stigma-plus ruling?"
 9         I'll have an answer to that question, because our answer
10    is designated in the evidence and cemented in the transcript of
11    plaintiff's counsel's remarks.
12         The facts that are in our motion are so completely
13    different in such material ways from what John promised to
14    prove, so completely different, that we have to look at this
15    case today and say, "Has the Seventh Circuit even greenlighted
16    John's current theory of relief that he made a tactical
17    disclosure, that he did so because he thought the Navy wasn't
18    going to investigate fast enough, that he hoped for an
19    exoneration from Purdue, that he was leaning on Purdue to do
20    the investigation for the Navy?"  There's no opinion in this
21    case, no opinion anywhere in the Seventh Circuit, that supports
22    that set of facts.
23         The Court has identified a very appropriate ground for
24    decision on the stigma-plus issue.  The ruling that the Court
25    has already issued is sufficient to dismiss that cause of
```

1    action.

2        My remarks today are largely directed to the fact that it

3    is the minimum sufficient ground for dismissal.  I'm not

4    faulting the Court for that.  But if we end up back in the

5    Seventh Circuit on this issue, there are abundant additional

6    things that could be said and will be said as need be.

7        I want now just to speak briefly to the counterclaim

8    question.

9        The argument made in the briefing by Plaintiff was that

10   the counterclaim allegations were duplicative of Plaintiff's

11   own allegations.  The argument made today is the opposite.  Not

12   that they're duplicative, but that they're a state law question

13   and they're outside the scope of this case and there's no

14   federal jurisdiction to consider them.  Those are very

15   different arguments.

16       The kernel of the counterclaim is a point that Title IX

17   case law has skirted and has not squarely addressed and, we

18   submit, needs to be part of the determination.

19       Any institution in Purdue's position that is equipped by

20   the state legislature with the police power has an

21   authorization and a duty of public safety for the premises of

22   its campus.

23       There is no federal preemption of that campus safety

24   power.  That campus safety power is not inconsistent with

25   Title IX.  It is not something that Title IX purports to

 1    displace.

 2        And in this case, that question is ripe because John

 3    conspicuously has never asked this Court to decide whether, in

 4    fact, he assaulted Jane.

 5        All the procedural arguments and all the stigma-plus

 6    arguments, all the gender bias arguments are circling around

 7    the core question:  Did Purdue have reason, as a matter of

 8    campus safety, to suspend John?

 9        John doesn't want to litigate that issue, and it's easy to

10    see why not.

11            **THE COURT:**  Counsel.

12            **MR. KEALEY:**  Yeah.

13            **THE COURT:**  If the due process claim is out and we're

14    talking about Title IX, there's no falsity requirement in

15    Title IX.  If there were procedures and those procedures had

16    gender bias, that's what we're talking about.  Isn't this a

17    little far afield, then?

18            **MR. KEALEY:**  Actually, there's no procedural cause of

19    action in Title IX.

20            **THE COURT:**  Title IX is focused on the bias, on the

21    allegations of gender-based bias; correct?

22            **MR. KEALEY:**  That's exactly what it is.  Yes.

23            **THE COURT:**  So I don't see how these counterclaims

24    are necessary in this litigation, right?  Let's just take them

25    one at a time, right?

1      "John Doe's above alleged misconduct violated Purdue

2  University's conduct regulations," even if that's true, if

3  there is a significant degree of bias, isn't that what we're

4  looking at with Title IX?

5         **MR. KEALEY:**  I thought the Court's question was going

6  to be, even if that's true, what do we do?  Because if it's

7  true, whether or not there is gender bias in, say, the

8  discipline, if it's true that he committed sexual assault, then

9  the university needs to do something about it as a matter of

10  public safety.

11      So you can't get from gender bias to harm and skip over

12  proximate cause and say, "It doesn't matter whether or not he's

13  guilty.  We've proved gender bias; and, therefore, we're

14  entitled to remedies."  Well, wait, you skipped a step there,

15  and that's what our counterclaim is about, is that skipped

16  step.

17      I'll put it this way.  If the Court were to tell me at the

18  jury trial on Title IX Purdue is free to prove that John did

19  it, that he committed sexual assault, that's a different

20  conversation than what I worry about, which is, we get to that

21  jury trial, and we're told a very narrowed, crabbed

22  interpretation of what this dispute is.  It doesn't matter

23  whether he did it or not.  All that matters is that he's a male

24  and Jane is a female.  And if we can prove something about

25  their difference in gender, even if he sexually assaulted her,

1    Purdue has to answer in damages or otherwise.

2         That's my concern.  That's what the counterclaim

3    speaks to.

4              **THE COURT:**  Okay.

5              **MR. KEALEY:**  On this point, there are a lot of cases

6    outside of the Seventh Circuit that have been expressly brushed

7    aside in *Doe vs. Purdue*, all the erroneous determination line

8    of cases, and we're kind of circling around that line of cases

9    right now.

10        The tactical decision by the Plaintiff not to argue his

11   innocence, not to ask the fact finder in this case to exonerate

12   him, is tactical.

13             **THE COURT:**  I also don't think it's required under

14   Seventh Circuit law and under -- We were focusing a lot on the

15   due process argument earlier, for obvious reasons; but now

16   Justice Barrett also addressed the Title IX argument; right?

17             **MR. KEALEY:**  She did.  But she did not say in there

18   that John is entitled to relief under Title IX if he committed

19   sexual assault.  No case says that.  And that's why I refer to

20   this as an underdeveloped part of Title IX jurisprudence.

21        We landed in this place with Title IX being kind of

22   crosshatched with the criminal law through a path that we all

23   know from the case law.

24        We also know that the decision itself that the university

25   is tasked with by the Department of Education to decide whether

 1    or not sexual assault occurred is a conduct evaluation.

 2         So inherent in what the university has to do is decide:

 3    All right.  Jane's Title IX rights have to be considered.

 4    John's Title IX rights have to be considered.  Jane's right to

 5    be free of sexual assault has to be considered.  John's rights

 6    have to be considered.

 7         If Jane's right to be free of sexual assault can be

 8    considered without deciding whether John assaulted her, my

 9    question is, how?  It's impossible.

10         So that's what our counterclaim speaks to.

11         I appreciate that the Court has given deep consideration

12    to our arguments.  I'm happy to answer any further questions

13    the Court may have.  And I thank you for the Court's time.

14              **THE COURT:**  All right.  Counsel, it's your motion.

15    I'll give you the last word.

16              **MR. BYLER:**  I'm compelled to reply because there were

17    a lot of wild, loose statements by Mr. Kealey.

18         I'll deal with the last point.  The Title IX theory that

19    the Complaint goes on was that John Doe was innocent of the

20    allegations of sexual assault and he was found guilty because

21    of gender bias.

22         Now, to be talking as Mr. Kealey has about, "Gee, I'm

23    concerned about whether, you know, we litigate the issue of

24    whether John Doe committed sexual assault," it makes no sense

25    whatsoever.  John Doe has put himself under oath repeatedly in

1   depositions and affidavits:  I didn't do it.

2       For Mr. Kealey now to stand up and talk as if, well, he

3   may be guilty is just not faithful to this record and not fair

4   to John Doe.

5       The accusations Jane Roe made should have been rejected,

6   and that's in our papers.  We're very clear.  John Doe is

7   innocent.  There's no point to this counterclaim.  None.

8       And, you know, the notion that federal court takes

9   jurisdiction over something that's a state law question, a

10  state power question, state police power, I just don't

11  understand, particularly given that the Seventh Circuit case

12  law is against the amended counterclaim.  This is briefed.

13  Forty-six to 50 of my brief.  Six in his opposition.  14 and 15

14  of my reply.  Fully briefed.  There's just no point to any

15  counterclaim.

16      Your instinct is right here.  What point is this, and what

17  the case law says, it makes no -- it has no point whatsoever.

18      Now, let me go to what, I think, is really important

19  because I know I was hard, and I apologize, and if I --

20  no, I --

21      You're right to focus on Judge Barrett's Opinion.  She

22  doesn't use the word "legal" obligation.  Had she used the word

23  "legal" obligation, we would have set up our case differently.

24      She didn't.  She said "obligation."  And the case all

25  along was that John Doe had an obligation to provide that

```
 1   authorization; and it wasn't a matter of John Doe calculating
 2   that he wanted Purdue to -- No, no, no, no.  It was that the
 3   Navy insisted on.  And the record is very clear.  To suggest
 4   that otherwise right now by Mr. Kealey -- Commander Hutton
 5   testified Purdue was going to do the investigation.  He
 6   directed Redlawsk that it was going to be a Purdue
 7   investigation.  So the notion that somehow, some way --
 8            THE COURT:  Was that before or after the voluntary --
 9            MR. BYLER:  Well, what's the --
10            THE COURT:  I'll leave the language whether it's
11   voluntary.  Was it before or after the authorization?
12            MR. BYLER:  Before?
13            THE COURT:  Was that before or after the
14   authorization.
15            MR. BYLER:  Well, his testimony -- Yeah, that was
16   before because Redlawsk did a memo, and the authorization was
17   May twenty-- I mean, from the start, Commander Hutton's
18   testimony is clear, they were going to look to Purdue.  He, in
19   his responsibilities, reported it to Purdue.  He fully expected
20   Purdue to do the investigation.  The thought that somehow this
21   is calculated on John's part, no, no, no, no.  This was a fait
22   accompli that he was dealing with.  This was what the Navy
23   wanted to do, and he respected his superior officer.
24        Now, your August 11 Opinion does pick up and suggest what
25   would satisfy you in terms of denying summary judgment on this
```

1    issue of the authorization.  What my papers make very clear is

2    that, with the ROD -- And it's not equivalent arguments.  It's

3    really elaboration of the point the Navy wanted in the loop,

4    and John Doe did not believe he was in a position to say no to

5    the request of his superior officers.

6         He walked through the ROD.  And we satisfy what you lay

7    out.  We clearly satisfy what you lay out.  He had an

8    obligation under those ROD to give the authorization.

9         He would have been subjected to a sanction had he not done

10   so because he was on an interim leave of absence, it --

11   disciplinary leave of absence, which is more serious, and he

12   has a permanent federal record.

13        The suggestion is that somehow John Doe can go out and do

14   things.  Excuse me.  He's got a permanent federal record as a

15   result of a disciplinary disenrollment.  That's what happened

16   in the end, a disciplinary disenrollment.  That goes in a

17   permanent federal record that he's in a position that he has to

18   disclose.

19        And that satisfies the third point you made.  Given what

20   you wrote in the Opinion, it's very simple what you identified

21   as what would satisfy the obligation that Judge Barrett refers

22   to.  Not legal obligation.  The obligation.

23        John Doe had that obligation.  And that's why he said he

24   was in no position to say no.  And he wasn't.  And I appreciate

25   the -- I'm sorry if I sound a little hard, but, you know, I'm

1  very sensitive to the fact of how the military operates and how

2  somebody was a midshipman, needs to conduct himself to satisfy

3  his scholarship obligations as a midshipman.  And it's not

4  anything that allows for saying no to a request.  This is a

5  position where the Navy wanted in the loop, and that's the

6  point.

7        This wasn't curiosity.  I heard this word "curiosity"

8  of -- This wasn't curiosity.  This is a matter of the Navy, how

9  they wanted to proceed.

10       **THE COURT:**  Counsel, I'm going to look at this

11  transcript.  We're going to talk about where we're going to go

12  from here, and I'm not done listening to you.  But on this

13  point, I have a lot of records here.  I'm looking through them.

14  I've looked through them once.  I'm going to look through them

15  again.

16       Is there anything that I need to look at in the record, is

17  there anything that you are pointing to, that says that, from

18  the perspective of someone other than your client's subjective,

19  "Well, I thought I had to do this," and the ROD provisions that

20  you've laid out in your moving papers and to a certain extent

21  in your reply, I believe, is there anything from any of the

22  naval officers who were deposed or anyone else that says, "Hey,

23  if we were respectfully asked about what are the options here.

24  I'm not sure about whether I want to sign the authorization,"

25  that someone in the Navy would have come back and said, "You

 1  either have to do it or this is going to happen"?  Is there

 2  anything there?

 3          **MR. BYLER:**  Okay.  Let me respond why the record

 4  exists as it does.

 5      The Navy ROD was not available at the time of the Navy

 6  depositions.  We didn't have the opportunity of pulling out the

 7  Navy ROD and going through Remaly and Hutton and Sheppard as to

 8  what's in them.  They didn't come up.  We didn't get them until

 9  later.  And that was the Navy's doing.  They didn't send them

10  until later.  I didn't get them.  I got them indirectly through

11  defense counsel.  So there wasn't that opportunity at the time

12  of the Navy depositions.

13      John Doe could have been asked these questions.  At his

14  deposition, he was shown the authorization.  He wasn't asked, I

15  thought, at the time, and still do.  It was perfectly obvious.

16  He had no realistic choice but to give the authorization, and

17  it's as simple as that.  It really is.

18      Now, there are a number of different points that

19  Mr. Kealey was making that really -- I have to say that the

20  suggestion, "Well, he hasn't done this," "He hasn't done that,"

21  he has a permanent federal record he has to disclose, and that

22  satisfies your August 11 Opinion, by the way.

23      The notion that there may have been a separate Navy

24  investigation, no, no, no, no.  Hutton dispelled that in his

25  deposition.

1        The notion that John somehow was deficient in any way,

2    that's not what is shown in the Navy documents.  A lot of dirt

3    is being thrown at John Doe wrongly and not consistent with the

4    record, and I don't like hearing this kind of thing.

5        The facts in this case, if you look at the material

6    statement of facts that I provided in support of my motion for

7    summary judgment and opposition, they're -- it's a long

8    statement because it's based first and foremost on what's in

9    the Complaint and the Answer of Purdue.  To say it was wildly

10   different is not true at all.  The Purdue Answer admitted to so

11   much of the Complaint.

12       And so to suggest that there's, you know, wildly different

13   view of the facts, no.  And you will see that we painfully

14   point out how Jane Roe went to the Navy April 4, 2016, before

15   anything.  And that was the context in which the issue of the

16   authorization would eventually arise, and we were careful in

17   our summary judgment papers to point out the context of the

18   Navy wanting "in the loop" as to investigation they knew.

19       Now, I'm not sure what you may have picked up from

20   Mr. Kealey that was of interest to you.  All I can say is that

21   it just is not consistent with the record that was presented to

22   the Court on summary judgment and on reconsideration.

23       What, I guess, I want to leave on is that, although I may

24   seem hard, you're right in the August 11th Opinion to point

25   out the three ways that you could satisfy stigma-plus; and

1     those are satisfied by the analysis presented on

2     reconsideration.  My reconsideration papers point out why it's

3     completely proper, reconsideration motion, under the Seventh

4     Circuit case of *Bank of Waunakee v. Rochester Cheese Sales*,

5     which quotes Judge Cardozo on -- when reconsideration.  This is

6     very salutary, very good, and this is such a situation.  It's

7     important.  What you're dealing with is important.  And it's

8     not gratuitous.  I'm pointing out the importance of

9     Judge Barrett's Opinion to the whole country.

10         What you do will be looked at.  And you want to get it

11    right, and that's why the reconsideration motion was made,

12    because I honestly believe you didn't get it right, but you

13    outlined how you could.  In your August 11 Opinion, you did.

14    And we satisfied that with the Navy ROD regulations, and you

15    look at those regulations.  It's consistent with what generally

16    we know as to the situation with respect to the military.

17         You know, you respect your superior officers.  It's not

18    like in civilian life.  It really isn't.  Because the military

19    has to operate in circumstances of adversity and tension, and

20    you cannot be engaging in debate and discussion.  When you make

21    a specific request in these circumstances of, "We want the

22    investigation file," you know, they want "in the loop," yes,

23    okay, because you want a Navy career officer -- You want a

24    career.  How are you going to further that career if you're

25    obstructive or can be perceived as obstructive?

 1      Judge Barrett was right not to have the word "legal" in
 2   there when she discussed this point.  And you're right to see
 3   that, because what satisfies that is what we presented; and
 4   what we presented initially has been further elaborated on, and
 5   it's just elaboration with the ROD.
 6      It's proper to get it right because, under those ROD
 7   regulations, we satisfy what you outline in your August 11th
 8   Opinion.
 9      And I think, at the very least, that deals with the issue
10   satisfactorily.
11          **THE COURT:**  Okay.  Thank you, Counsel.
12          **MR. KEALEY:**  Your Honor, may I put a couple citations
13   in the record based on remarks just made?
14          **THE COURT:**  Very briefly.  We have some folks here
15   for a hearing that we're scheduled to do at 11:30.
16      Ms. Connor.
17      (WHEREUPON, discussion had off the record regarding a case
18       not related to the case herein.)
19          **THE COURT:**  I do need to address the next case.  I
20   don't want to shortchange anyone here.  If necessary, we'll
21   break and then reconvene here.  I'll always give the moving
22   party the last word, but I never turn down citations unless
23   there's an objection and need to.  I usually find I've looked
24   at them, but you never know.
25      So any objection to putting some citations in?  I'll give

1    you the same opportunity.

2         (No response.)

3         Okay.  Go ahead, Mr. Kealey.

4              **MR. KEALEY:**  Two points of evidence, Your Honor.

5         The ROD was produced by the Navy in 2020, and our records

6    show that Mr. Byler received the ROD on October 15, 2020, and,

7    therefore, had possession of the ROD when summary judgment was

8    briefed in 2021.  The -- In any event, had possession of the

9    ROD.

10        Second, the statement was made, "He's got a permanent

11   federal record."  That statement was made twice.

12        The summary judgment brief filed August 31st, 2021,

13   Docket Entry 178, Purdue's summary judgment brief at page 28

14   cites Exhibit A, which is the deposition of Rodney Hutton, and

15   cites the following question and answer of Officer Hutton:

16             "Q.   When you say you disenrolled John, you mean you

17        disenrolled him because you determined that he sexually

18        harassed and assaulted Jane Doe?

19             "A.   No."

20        Citation:  Exhibit A at page 22.

21        And the following sentence cites Docket Entry 138 at

22   page 2 that John himself has argued that the Purdue Navy ROTC

23   unit, "did not make a determination that Plaintiff, John Doe,

24   had committed sexual misconduct."

25        Therefore, it is incorrect, undisputed on the record, that

1    John does not have a Navy record of sexual misconduct.

2            **THE COURT:**  I think what Mr. Byler was getting at on

3    the dep transcripts was essentially that the ROD wasn't

4    available at the time of the deposition.  I appreciate the

5    information.  I'll give you a chance and --

6            **MR. KEALEY:**  If I may be clear, Your Honor.  It was

7    certainly available to Mr. Byler and his client, if his client

8    wanted to put in a declaration on summary judgment.

9            **THE COURT:**  Understood.  And I understand defense

10   argument here, and there's good argument, but, look, just don't

11   even consider the ROD.  Frankly, because there are so many

12   issues in this case and one of the things Mr. Byler was saying

13   was, "Look, this was one issue.  Here's how the briefing dealt

14   with it.  I think you should consider more," I will consider

15   that argument if ultimately I determine that the ROD changes my

16   analysis, as Mr. Byler just pointed out.

17       But just in the interest of making sure I'm considering

18   everything, I'm taking it a bit backwards, frankly.  I'm first

19   going to determine whether that's outcome-determinative.

20       Mr. Byler.

21           **MR. BYLER:**  Just one point as to my position on the

22   ROD.  It was sent to me in October, by a catastrophic computer

23   failure.  Not only was there COVID.  I lost most of my files.

24   And I was asking Mr. Kealey's office for this, that, and the

25   other over time.  And it wasn't until your Opinion came down.

1   Said wait a minute, I have a recollection that there was an ROD

2   that eventually was sent to us well after the depositions, and

3   that made a necessary request again that I get the ROD.  That's

4   the specific context.

5       I did not have it actually when we did the original

6   summary judgment papers.  I sorely regret it.  But in my mind

7   what's important is to get it right, and it was an elaboration

8   of the point that he didn't feel in a position to say no, and

9   we're in a military context.  And maybe I assumed that

10  everybody would understand, in a military context, of course

11  you couldn't say no in that situation.  The ROD makes that

12  expressly clear.  I just don't understand the idea, "Well,

13  let's ignore the ROD because of this, that, or the other."

14  It's very important to consider in this issue.

15          **MR. KEALEY:**  If everybody knows that, Your Honor,

16  then certainly counsel knew that when he was preparing his

17  summary judgment motion and could have obtained the ROD then as

18  easily as any other time.

19          **THE COURT:**  I understand the arguments and the

20  counter-arguments.  I don't think we need to belabor that.

21          **MR. BYLER:**  I can say a few things, but I won't.

22          **THE COURT:**  Ms. Connor, I assume that was

23  accomplished?

24          **MS. CONNOR:**  Yes.

25          **THE COURT:**  Sorry.  For the record, I'm addressing

 1    counsel for the next hearing, just in the interest of keeping

 2    everyone on track.

 3        Okay.  I need to break.  I need to get some things for

 4    this hearing.

 5        I think I've heard everything I need.  I don't want to

 6    just keep counsel here.  If anyone feels they haven't been

 7    heard, I'm happy to reconvene afterwards.

 8        Mr. Byler.

 9        **MR. BYLER:**  I just need to know if the transcript

10    person needs anything more from me.  Christmas is next Sunday,

11    and I don't want to interfere with her Christmas.

12        **THE COURT:**  I will state on the record I'm going to

13    get this out slightly after the holidays.  However this goes,

14    we're going to trial, right?  Because this is just on

15    essentially the due process claim.

16        So I'm looking at spring dates because I want to get this

17    done.  February is just -- We already have one trial, and I'm

18    duty, so that's out.  I think January would be a little too

19    early.  I would like to get a settlement conference in ahead of

20    that.  I considered, since everyone was flying in, doing it

21    today.  I think I correctly surmised everyone might be in a

22    different frame of mind than I think would be efficient for

23    settlement discussions.  I don't mean that critically at all.

24        So you'll get some dates very shortly here by email for

25    both a settlement conference and trial.  I'm just going to give

1    both counsel the next date we have, which will be very soon.

2        Obviously, if that doesn't work with counsel, we'll look

3    at some other ones.  If I need to, I'll get on the phone to

4    kind of work through those dates.  And by email, if there's any

5    transcript requests or whatnot, we can work that out.

6        **MR. BYLER:**  I'm from a smaller law firm, even though

7    I'm in New York.  And I just need a little bit advance notice

8    in terms of when we would have a trial because I have to

9    coordinate within my office having, you know, a person or two

10   help me with the trial.  I've been through this before with my

11   firm, and you just need a little bit of time to --

12       **THE COURT:**  We'll get some dates.  I'm looking right

13   now likely March and April.

14       **MR. BYLER:**  Okay.

15       **THE COURT:**  February, I'm criminal duty, and we have

16   some trials.  I think it would be pushing it.

17       Frankly, Counsel, I used to sit in those seats, and

18   turning this around for a January trial, I don't think, would

19   be in anyone's interest.  But, likely, while I do have that

20   trial in February and some criminal duty, we should have enough

21   time to potentially at least do the settlement conference then

22   or maybe even in January, but you'll get those dates by email.

23       **MR. BYLER:**  Thank you, Your Honor.

24       **THE COURT:**  Take care.

25       (Court adjourned at 11:37 a.m.)

1              CERTIFICATE OF REPORTER

2          I, Angela Phipps, RMR, CRR, certify that the

3    foregoing is a true, complete, and accurate transcript of the

4    record of proceedings from electronic recording in the

5    above-entitled matter before the Honorable Joshua P. Kolar, on

6    December 19, 2022.

7

8    Date:  January 5, 2023          S/Angela Phipps, RMR, CRR
                                     Federal Official Court Reporter
9                                    for the U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25