**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF ILLINOIS**
**ROCK ISLAND DIVISION**

| | | |
|---|---|---|
| BETH STOKES. | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:12-cv-04054-SLD-JAG |
| | ) | |
| v. | ) | District Judge Sara Darrow |
| | ) | |
| JOHN DEERE SEEDING GROUP, a | ) | Magistrate Judge John A. Gorman |
| subsidiary of DEERE & COMPANY a/k/a | ) | |
| JOHN DEERE COMPANY; and JIM | ) | |
| GUNNISON, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT JOHN DEERE SEEDING GROUP'S MEMORANDUM OF**
**LAW IN SUPPORT OF ITS MOTION TO EXCLUDE THE PROPOSED EXPERT**
**<u>TESTIMONY OF STAN V. SMITH</u>**

EXHIBIT C

Defendant John Deere Seeding Group ("Deere") respectfully submits this Memorandum of Law in Support of its Motion to Exclude the Proposed Expert Testimony of Stan V. Smith.

## INTRODUCTION

Plaintiff Stokes seeks to introduce the testimony of an economist, Stan V. Smith, Ph.D., who purports to calculate her "hedonic damages" resulting from alleged sexual harassment by Stokes' former coworker Defendant Jim Gunnison.  For this proposed expert testimony to be admissible, Stokes bears the burden of proving both its reliability and its relevance under Federal Rules of Evidence 702 and 403 and *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

However, federal courts, including the Seventh Circuit, have repeatedly rejected the hedonic damages methodology Dr. Smith employs here as unreliable and irrelevant and have therefore barred his testimony in case after case.  *See, e.g.*, *Smith v. Jenkins*, 732 F.3d 51, 66-67 (1st Cir. 2013); *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992); *Bailey v. Nyloncraft, Inc.*, 2012 WL 3717760, at *3-5 (E.D. Mich. Aug. 28, 2012); *Bolden v. Walsh Group*, 2012 WL 1079898, at *5 (N.D. Ill. Mar. 30, 2012); *Moriarty v. Dyson, Inc.*, No. 1:09-cv-0277, Doc. No. 125 (N.D. Ill. Aug. 31, 2011) (unreported); *Davis v. ROCOR Int'l*, 226 F. Supp. 2d 839, 842 (S.D. Miss. 2002); *Saia v. Sears Roebuck & Co., Inc.*, 47 F. Supp. 2d 141, 149-51 (D. Mass. 1999); *Crespo v. City of Chicago*, 1997 WL 537343, at *2-3 (N.D. Ill. Aug. 22, 1997); *Brereton v. U.S.*, 973 F. Supp. 752, 757 (E.D. Mich. 1997); *Kurncz v. Honda N. Am., Inc.*, 166 F.R.D. 386, 391 (W.D. Mich. 1996); *Ayers v. Robinson*, 887 F. Supp. 1049 (N.D. Ill. 1995); *Sullivan v. Gypsum Co.*, 862 F. Supp. 317, 320-22 (D. Kan. 1994); *Hein v. Merck & Co., Inc.*, 868 F. Supp. 230, 234 (M.D. Tenn. 1994); *Bramlette v. Hyundai Motor Co.*, 1992 WL 213956, at *5 (N.D. Ill. Aug. 28, 1992).

Indeed, at least when Dr. Smith's testimony has been challenged under Rule 702, it does not appear that any federal court has ever permitted him (without being reversed) to testify before a jury as to any quantification of hedonic damages. *See Smith*, 732 F.3d at 66 (recognizing same and holding that the trial court abused its discretion by admitting Dr. Smith's testimony).[1]  Accordingly, as explained below, Deere respectfully submits that this Court should exclude Dr. Smith's proposed testimony and his Report should be stricken.

**BACKGROUND**

**I.      Dr. Smith' Four-Step Methodology For Estimating Hedonic Damages.**

Dr. Smith purports to quantify Stokes' "hedonic damages," or loss of enjoyment of life, resulting from alleged "harassment" by Stokes' former coworker Defendant Jim Gunnison.  Ex. 1, Smith Dep. at 35:7-36:11; Ex. 2, Smith Rpt. at BS 369.  To that end, Dr. Smith employs a four-step methodology detailed below.

**A.      Dr. Smith Estimates A Value Of Statistical Life Based On His Unexplained Interpretation Of Five Meta-Analysis Articles.**

The jumping-off point of Dr. Smith's "methodology" is a concept in economics that seeks to measure the value society places on a statistical life.  *See* Ex. 2, Smith Rpt. at BS 370-71.  Economists have tried to measure this value of statistical life, or "VSL," through a "willingness-to-pay" approach.  Using this approach, "economists have argued" that choices people make "regarding tradeoffs of money and acceptance of risk of death" can provide an "implied valuation people place on avoiding death."  Ex. 3, Guryan Rpt. at p. 3.  For example, if

---

[1]    Notably, a decision in a wrongful death case to allow Dr. Smith to testify about the concept of hedonic damages, without offering any quantification of damages, was affirmed in *Sherrod v. Berry*, 827 F.2d 195, 205-06 (7th Cir. 1987) *reh'g granted and opinion vacated*, 835 F.2d 1222 (7th Cir. 1988) *on reh'g en banc*, 856 F.2d 802 (7th Cir. 1988).  *See* Ex. 1, Smith Dep. at 152:24-153:12 (acknowledging that he did not quantify damages in *Sherrod*).  Several years later, however, the Seventh Circuit affirmed the exclusion of Dr. Smith's hedonic damages testimony based on its "serious doubts" about Smith's methodology.  *Mercado*, 974 F.2d at 871.

consumers will pay $46 for a carbon monoxide detector, and that device reduces the risk of death by 1/100,000th, then the estimated VSL implied from such purchases is $4.6 million ($46 ÷ .00001 = $4,600,000). Ex. 2, Smith Rpt. at BS 371. Similarly, if employees are paid more for jobs that involve an increase in the risk of death, then that premium is divided by the associated increase in the risk of death to compute an implied VSL. *See id.* Thus, whether the data is culled from consumer spending or labor statistics, "VSL studies are based on decisions people make about risks of death" only. Ex. 3, Guryan Rpt. at p. 3.

Dr. Smith includes a table in his Report purporting to list the "best estimate" VSLs from five different meta-analyses articles. Ex. 2, Smith Rpt. at BS 378. Dr. Smith computes a simple average of these values to derive what he calls a "central tendency" VSL of $5.8 million in 2005 dollars, which he uses as the basis for the remaining steps in his analysis. *Id.* at BS 372.

However, the table on which Dr. Smith relies does not accurately reflect the "best estimate" figures from the five meta-analyses it identifies. For example, the table represents that a Mrozek and Taylor article from 2002 derived a "best estimate" VSL of $4.4 million in 2005 dollars. *Id.* at BS 378. However, as Dr. Smith acknowledged in his deposition, the "best estimate" VSL identified in the Mrozek and Taylor article was just $2 million in 1998 dollars, or just $2.4 million in 2005 dollars. Ex. 1, Smith Dep. at 105:10-106:1 & Smith Dep. Ex. 4 at p. 270; *see also* Ex. 4, Guryan Dep. at 75:19-76:5.

Dr. Smith could not explain during his deposition why the table in his Report inflated the Mrozek and Taylor best estimate by $2 million. Ex. 1, Smith Dep. at 105:22-106:11. Instead, a week later, Dr. Smith provided a letter in which he acknowledged for the first time that he altered the best estimate from the Mrozek and Taylor article based upon the reasoning in a different article not mentioned in his Report. Ex. 5, Sept. 16, 2013 Ltr. from Dr. Smith. Dr.

Smith apparently made other, but still unexplained, adjustments to the remaining "best estimate" values that he purportedly used to compute his "central tendency" VSL figure.  Ex. 4, Guryan Dep. at 74:22-75:9 (explaining that the best estimate values listed in Dr. Smith's chart were not replicable using the publications cited in his Report).

**B.      Dr. Smith Next Estimates A "Hedonic Value" Of Statistical Life.**

Next, Dr. Smith purports to estimate the "hedonic value" of a statistical life.  To that end, he reduces his chosen VSL of $5.8 million based on two adjustments.  First, Dr. Smith subtracts $1 million to reflect "human capital" associated with a statistical life.  Ex. 2, Smith Rpt. at BS 377.  However, Dr. Smith did not provide in his deposition any detailed explanation for how he came up with his $1 million "human capital" estimate, *see* Ex. 1, Smith Dep. at 94:1-15, 98:21-102:21, 112:12-24, nor did he offer any details in his Report, *see* Ex. 2, Smith Rpt. at BS 377. Second, Dr. Smith testified that he "lopped off" another $1.3 million "for . . . any and all possible conservative reasons."  Ex. 1, Smith Dep. at 101:17-102:1; *see also* Ex. 2, Smith Rpt. at BS 377 (noting without explanation that he reduces from $5.4 million to $4.1 million).  He further testified that, if the VSL figures he used at the start of his analysis had been different, then he might have chosen a different "conservative" adjustment.  Ex. 1, Smith Dep. at 108:17-109:11; Ex. 3, Guryan Report at pp. 5, 10-11.

**C.      Dr. Smith Next Purports To Estimate The Hedonic Value Of An Average 59-Year-Old White Woman's Life.**

Next, Dr. Smith purports to "tailor" his analysis to Stokes by estimating the hedonic value of life of an average 59-year-old white woman.  While not explained in his Report, Dr. Smith testified that he first divides the $4.5 million hedonic life value estimate by the remaining life expectancy of the average person (45 years), and then applies a real discount rate of 1.25% and a growth rate. Ex. 1, Smith Dep. at 160:18-166:21; Ex. 3, Guryan Rpt. at p. 2.  Using these

4

assumptions, Dr. Smith estimates the annual hedonic life value for the average statistical person to be $131,119, and applies that amount to the remaining life expectancy of an average 59-year-old white woman.  Ex. 1, Smith Dep. at 169:16-23; Ex. 3, Guryan Rpt. at p. 2.  The result, according to Dr. Smith, is the hedonic value of an "average" 59-year-old white woman's life.

### D.  Dr. Smith Assumes That Plaintiff Suffered A 60 Percent Reduction In Life Enjoyment Which, After Trial, Will Continue At 40 Percent For Life.

Finally, Dr. Smith estimates Stokes' "hedonic damages."  First, based solely on a brief telephone interview with Stokes conducted by a member of his staff, Dr. Smith assumes that Stokes was fully enjoying life prior to September 1, 2008, the first day of harassment alleged in her complaint.  Ex. 1, Smith Dep. at 48:15-49:1; Ex. 2, Smith Rpt. at BS 371-72.  Second, based on that same brief call, he assumes that Stokes immediately suffered a 60% reduction in life enjoyment on September 1, 2008.  Ex. 1, Smith Dep. at 41:22-42:7; 51:18-19; Ex. 2, Smith Rpt. at BS 371-72.  Third, Dr. Smith assumes that this 60% reduction continued and will continue until a presumed March 15, 2014 trial date, at which point the reduction will abate to 40% and continue for the rest of Stokes' life.  Ex. 1, Smith Dep. at 51:13-24; Ex. 2, Smith Rpt. at BS 371-72.  Applying these percentages to his estimated hedonic life value of an average 59-year-old white woman, Dr. Smith estimates Stokes' hedonic damages to be $1,543,455.  Ex. 2, Smith Rpt. at pp. BS 371-72, 380.[2]

## II.  Dr. Smith's Methodology Has Not Been Subjected To Peer Review.

Dr. Smith's methodology for estimating hedonic damages has never been subjected to peer review.  Ex. 3, Guryan Rpt. at p. 5.  Dr. Smith acknowledged this in his deposition: "You

---

[2]   Dr. Smith repeats the same computation above assuming a 30% pre-trial reduction in life enjoyment, and a 20% post-trial reduction continuing until Stokes' death.  *See* Ex. 1, Smith Dep. at 179:21-180:11.  Under these alternative assumptions, Dr. Smith estimates hedonic damages of $771,719.  Ex. 2, Smith Rpt. at BS 371-72, 380.

are not going to find an assessment of loss of enjoyment of life for a particular report, whether it is household services or wage loss, rising to the level of somebody submitting it to a peer reviewed study."  Ex. 1, Smith Dep. at 117:14-18.  Although Dr. Smith suggested that the absence of peer review is due to a lack of interest among economists, Dr. Guryan, also an economist, testified to the contrary and noted that economists have published extensively in the area of subjective well-being.  Ex. 4, Guryan Dep. at 98:14-100:8; Ex. 3, Guryan Rpt. at p. 6.

## ARGUMENT

### I.    The Legal Standard.

Federal Rule of Evidence 702 assigns district courts the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  The party proffering expert testimony bears the burden of establishing these requirements.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009).

To determine whether proposed testimony is "reliable," courts consider whether "the testimony is based on sufficient facts or data," whether the "testimony is the product of reliable principles and methods," and whether "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  The Supreme Court also has identified four non-exhaustive factors for assessing whether testimony is sufficiently reliable, including whether the methodology employed:  (a) can and has been tested; (b) has been subjected to peer-review and publication; (c) has a known or potential rate of error; and (d) has been generally accepted by the scientific community.  *Daubert*, 509 U.S. at 592-95.  The purpose of these requirements is to exclude testimony, unless it is clear that the expert will "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *see also Am. Honda Motor Co., Inc. v. Allen,* 600 F.3d 813, 818 (7th Cir. 2010).

6

Moreover, it is not enough that an expert's proffered testimony relates in part to reliable methods. The court must carefully examine each step of the expert's analysis and "any step that renders the [expert's] analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology." *Cage v. City of Chicago*, --- F. Supp. 2d ----, 2013 WL 5348310, at *10 (N.D. Ill. Sept. 24, 2013) (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)); *see also Apple, Inc. v. Motorola, Inc.*, 2012 WL 1959560, at *2 (N.D. Ill. May 22, 2012) (same) (Posner, Circuit Judge, sitting by designation).

To determine whether proposed expert testimony is "relevant," courts must consider whether it "will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592. The proposed testimony must offer "something more than what is 'obvious to the layperson.'" *Ancho v. Pentek Corp*., 157 F.3d 512, 519 (7th Cir. 1998) (citation omitted). Furthermore, even relevant expert testimony should be excluded if its "probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury[.]" Fed. R. Evid. 403. In this regard, a balancing approach is critical because expert testimony can be "both powerful and quite misleading because of the difficulty in evaluating it." *Ayers*, 887 F. Supp. at 1059 (quoting *Daubert*, 509 U.S. at 595).

## II.    Dr. Smith's Hedonic Damages Methodology Is Not Reliable.

### A.    The VSL Methodology On Which Dr. Smith Purports To Rely Depends Upon Flawed Assumptions And Produces Disparate And Unreliable Results.

Dr. Smith purports to ground his overall methodology in economic studies attempting to compute VSL. As discussed above, these studies employ a "willingness-to-pay" methodology under which some economists have argued that the economic value society places on a "statistical life" can be determined by the amount people "pay" for small reductions in their risk

7

of death. *See Ayers*, 887 F. Supp. at 1063 (discussing the willingness-to-pay methodology). Although Dr. Smith notes that VSL studies have been published, "[t]he overwhelming majority of courts have concluded" that the willingness-to-pay methodology on which these studies are based "is either unreliable or not likely to assist the jury in valuing hedonic damages, or both." *Smith*, 732 F.3d at 66 (collecting cases). This is because the methodology is predicated on questionable assumptions and yields widely varying results.

First, the willingness-to-pay methodology's focus on consumer spending is questionable. As the Seventh Circuit has pointed out, consumer spending on safety devices "is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth." *Mercado*, 974 F.2d at 871. And even more fundamentally, "spending on safety items reflects a consumer's willingness to pay to reduce *risk*, perhaps more a measure of how cautious a person is than how much he or she values life." *Id.* For precisely these reasons, both the Seventh Circuit and the First Circuit have expressed "serious doubts that the underlying [VSL] studies" on which Dr. Smith purports to rely "actually measure the value of life." *Smith*, 732 F.3d at 66-67 (citing *Mercado*, 974 F.2d at 871).

Second, courts, including the Seventh Circuit, have criticized the methodology's reliance on wage-risk premiums as follows: "[T]o say that the salary paid to those who hold risky jobs tells us something significant about how much we value life ignores the fact that humans are moved by more than monetary incentives." *Id.* at 67 (quoting *Mercado*, 974 F.2d at 871). Indeed, many jobs that involve great risk—*e.g.*, firefighter, police officer, the military—attract individuals motivated by a strong sense of duty. *See Mercado*, 974 F.2d at 871. By the same token, many high-risk jobs are filled by those who simply have no better options, on account of

education, the job market, or other factors. *See Smith*, 732 F.3d at 67; *Hein*, 868 F. Supp. at 234 (noting "[t]he dubious assumption[] . . . that workers are faced with a free choice of jobs").

Third, courts and economists are troubled by the fundamental assumption underlying the willingness-to-pay methodology that individuals are able to accurately estimate the value of small reductions in risk. *See, e.g.*, *Ayers*, 887 F. Supp. at 1063 (doubting the "assumption that people perceive risk accurately"); *Hein*, 868 F. Supp. at 234 ("the . . . assumption[] . . . that [people] perceive the risks accurately . . . . [is] subject to serious question"). As Dr. Guryan explained, economic literature suggests that the opposite is true—that individuals are unable to accurately measure small changes in risk. Ex. 4, Guryan Dep. at 42:15-45:12. If this literature is correct, then, even ignoring its other flaws, the willingness-to-pay methodology is likely to overstate VSL and is thus unreliable. *Id. See also Ayers*, 887 F. Supp. at 1063; *Hein*, 868 F. Supp. at 234.

In addition to questioning the underlying rationale, courts and economists alike have recognized that VSL estimates vary dramatically across studies. *See, e.g.*, *Ayers*, 887 F. Supp. at 1063 ("somewhere between $500 thousand and $9 million"); *Mercado v. Ahmed*, 756 F. Supp. 1097, 1103 (N.D. Ill. 1991) ("between less than $100,000 to more than $12,000,000"); *see also* Ex. 4, Guryan Dep. at 71:4-8. "[T]roubled by the disparity of results reached in published [VSL] studies and skeptical of their underlying methodology, the federal courts which have considered expert testimony on hedonic damages in the wake of *Daubert* have unanimously held quantifications of such damages inadmissible." *Smith*, 732 F.3d at 66 (quotations omitted); *see also, e.g.*, *Hein*, 868 F. Supp. at 233 ("A spread of this magnitude not only admits the possibility of error, it casts serious doubt on the validity and usefulness of the exercise."). Indeed, shortly before this filing, the First Circuit concluded that the problems outlined above demonstrate that

"Dr. Smith's method for valuing life is based on assumptions 'that appear to controvert logic and good sense,'" and therefore held that the district court abused its discretion by permitting Dr. Smith to testify about hedonic damages. *Smith*, 732 F.3d at 67 (citation omitted).

Further reinforcing the First Circuit's reasoning here is the unprincipled manner in which Dr. Smith manipulates the VSL analyses on which he purports to rely. As discussed *supra* at 3-4, Dr. Smith's Report does not state the "best estimate" VSL figures contained in the five meta-analyses on which he reportedly relies. The most glaring example is with respect to the Mrozek and Taylor article. While the authors of that article calculated a "best estimate" VSL of $2.4 (in 2005 dollars), Dr. Smith inexplicably represents in his Report that the "best estimate" from that article is $4.4 million. Not only did Dr. Smith fail to acknowledge—much less explain—this near-doubling of the Mrozek and Taylor estimate in his Report, but he could not offer any justification for it during his deposition either.

In sum, the Court need look no further than the very first step in Dr. Smith's "methodology" for estimating hedonic damages to determine that his methodology is flawed and unreliable. Not only is that first step based upon VSL studies that have repeatedly and consistently been deemed unreliable by federal courts, but Dr. Smith makes matters worse by manipulating the VSL figures on which he relies in unprincipled and unexplained ways. For these reasons alone, Dr. Smith's proposed expert testimony should be precluded under Rule 702.

### B.     Dr. Smith's Attempt To Adapt The VSL Concept To His Own Peculiar Hedonic Damages Methodology Is Unscientific, Unreasonable And Untested.

Importantly, Dr. Smith only uses his VSL estimate as a jumping-off point for his own peculiar method of estimating "hedonic values" for use in litigation. Indeed, none of the five studies on which Smith supposedly relies even contemplates using VSL to derive the "hedonic value" of statistical life—much less that VSL may be used to measure losses in any particular

person's enjoyment of life.  Not only is Dr. Smith's methodology a dramatic departure from VSL literature, but it (1) is unscientific, (2) is dependent upon unreasonable assumptions, and (3) has never been published in a formal study or subjected to peer-review.

1.  To estimate the "hedonic value" of a statistical life, Dr. Smith manipulates his VSL estimate in two ways.  He starts by subtracting $1 million from his VSL estimate to account for "human capital," and then "lop[s] off" another $1.3 million for unspecified "conservative reasons."  Ex. 1, Smith Dep. at 101:4-102:1; Ex. 2, Smith Rpt. at BS 377.  These adjustments are unscientific and multiply the unreliability of Dr. Smith's proposed testimony.

The lack of scientific foundation for the above adjustments is explained succinctly in Dr. Guryan's rebuttal report and in his deposition testimony.  First, Dr. Smith provides no justification in his Report for the value he attributes to human capital, meaning that there is no clear way to judge its validity or reliability.  Ex. 3, Guryan Rpt. at pp. 10-11; Ex. 4, Guryan Dep. at 10:12-18.  In other words, Dr. Smith's unexplained human capital figure is antithetical to a scientific approach.  Second and even more alarming, Dr. Smith's "conservative" adjustment appears to be completely arbitrary.  *See* Ex. 3, Guryan Rpt. at pp. 10-11; Ex. 4, Guryan Dep. at 34:4-13.  Indeed, when asked about it in his deposition, Dr. Smith testified that had the average VSL values upon which he purportedly relies been different, then he might have manipulated his "conservative" adjustment such that his ultimate damages estimate would have been unchanged. Ex. 1, Smith Dep. at 109:3-110:14; Ex. 3, Guryan Rpt. at pp. 5, 10-11.

In light of these adjustments, Dr. Smith's methodology for estimating the "hedonic value" of statistical life amounts to an unscientific "eyeballing" approach.  Indeed, this same observation has moved multiple courts to conclude that Dr. Smith's methodology flunks the requirements of Rule 702 and *Daubert*.  *See, e.g.*, *Smith*, 732 F.3d at 65 (criticizing Dr. Smith's

11

"conservative" adjustment and other uses of "arbitrarily conservative" figures); *Bailey*, 2012 WL 3717760, at *4 (noting that Dr. Smith does not explain exactly "how he arrived at this [hedonic value] figure," other than "to describe it as 'conservative'"); *Ayers*, 887 F. Supp. at 1060 ("Eyeballing may have the advantage of ease, but it surely lacks scientific reliability[.]").

2.    Dr. Smith's attempt to ground his methodology in VSL literature also depends upon a crucial logical leap—namely, that the findings in VSL studies can be extrapolated to measure losses in enjoyment of life.  As multiple courts have recognized, however, none of the VSL studies on which Dr. Smith relies "relate in any way to . . . the enjoyment of life."  *Smith*, 732 F.3d at 67; *see also Sullivan*, 862 F. Supp. at 321 ("The studies relied on by [D]r. Smith do not use methodology designed to calculate the loss of enjoyment of life, yet are nonetheless extrapolated by [D]r. Smith into what he claims to be valid data for calculating damages for . . . loss of enjoyment of life.").

To make the leap above, Dr. Smith precariously assumes that the value one attributes to avoiding a percentage increase in the risk of death is no different than the value one attributes to an equivalent reduction in the enjoyment of life.  *See* Ex. 1, Smith Dep. at 136:4-15 (testifying that his methodology equates a 1% *increase* in the risk of death with a 1% *decrease* in enjoyment of life); *see also* Ex. 3, Guryan Rpt. at p. 7 ("Dr. Smith does not base his estimate on any individual's behavior regarding incremental changes in the enjoyment of life.  Instead, he makes assumptions about the equivalence of proportional changes in the enjoyment of life and percentage chances of death.").  However, if this assumption were correct, it would mean that "the average person would be willing to pay the same amount to avoid a 50 percent chance of [immediate] death as to avoid a permanent 50 percent reduction in their enjoyment of life [and their earnings]."  *Id.* at p. 8.  A simple example illuminates the fallacy of this assumption.

12

Imagine being forced to choose between immediate-death if a coin-flip turns up heads or, alternatively, a permanent 50 percent reduction in the enjoyment of one's life and earnings. *Id.* For Dr. Smith's assumption above to be reasonable, the average person would have to be perfectly indifferent to these two alternatives. *Id.* However, common sense tells us that most people would readily choose a 50 percent reduction in the enjoyment of life over being killed immediately if a coin-flip turns up heads. Accordingly, because a critical assumption underlying Dr. Smith's methodology is unreasonable, his methodology is necessarily unreliable and in turn his testimony should be deemed inadmissible. *See Smith*, 732 F.3d at 67 ("Dr Smith equated the value of life with the value of enjoyment of life, though it is readily apparent that the two are not the same."); *Sullivan*, 862 F. Supp. at 321 (same); *see also Apple, Inc.*, 2012 WL 1959560, at *2 (if "any step" in the analysis is "unreliable," expert testimony is "inadmissible").

3.   Finally and importantly, Dr. Smith's methodology has not been published in a formal study or subjected to peer-review. Not only does Dr. Smith readily acknowledge this fact, *see* Ex. 1, Smith Dep. at 117:14-18; *see also* Ex. 3, Guryan Rpt. at p. 4, but at least one court has excluded his testimony for this reason alone, *see Bolden*, 2012 WL 1079898, at *5; *see also Bailey*, 2012 WL 3717760, at *5 (excluding Dr. Smith's proposed testimony and noting that "[o]f the 173 economists who responded [to a survey], 83.8% responded that they would not [be willing to calculate hedonic damages] because such damages 'are far too speculative to quantify' and '[t]his should be left up to the trier of fact.'").

## III.   Dr. Smith' Proposed Testimony Is Neither Relevant Not Useful To A Jury.

Whether expert testimony is "relevant" for purposes of Rule 702 boils down to whether it is a good "fit" to the facts being determined such that it would be useful to a jury. For reasons already discussed, it is clear that Dr. Smith's methodology is not a good fit. Indeed, courts have

13

repeatedly held that even if the methodology underlying VSL were not unreliable, the disconnects between that methodology and Dr. Smith's methodology render his testimony irrelevant under Rules 702 and 403 and *Daubert*.  *See, e.g.*, *Smith*, 732 F.3d at 67; *Ayers*, 887 F. Supp. at 1064-65.  Deere submits that additional considerations discussed below likewise support excluding Dr. Smith's proposed testimony.

### A.    Dr. Smith's Analysis Is Not Remotely "Tailored" To Stokes.

Courts have stressed that an impersonal or untailored damages analysis is entirely unhelpful to the jury.  *See Saia*, 47 F. Supp. 2d at 150 ("[Smith's] testimony is simply not sufficiently plaintiff-specific to make it helpful to the jury.").  Nevertheless, the only way in which Dr. Smith purports to "tailor" his analysis to Stokes is to consider the life expectancy of an average 59-year-old white woman.  *See supra* at 4-5.  Dr. Smith's analysis is so impersonal that he can—and indeed has—used it interchangeably among plaintiffs.  *See Saia,* 47 F. Supp. 2d at 150 (under Dr. Smith's methodology, "a healthy, 49-year-old mother of two, who is happily married and active in hobbies and community life would be the same as that of an unhappy, unhealthy, suicidal 49-year-old woman"); *Sullivan*, 862 F. Supp. at 321 ("Mr. and Mrs. Sullivan suffered totally distinct and different damages . . ., yet, under [D]r. Smith's analysis their damages are identical, save only an adjustment for differing [life] expectancy.").

Dr. Smith's proposed testimony, moreover, is likely to mislead insofar as it may leave a jury with the false impression that his methodology is tailored to Stokes in some meaningful way.  This same concern, among many others, led the Northern District of Illinois in *Ayers* to reject Dr. Smith's testimony.  *See* 887 F. Supp. at 1062.

Moreover, Dr. Smith admits that his analysis cannot sufficiently inform the jury on an appropriate award for loss of enjoyment of life.  Dr. Smith testified that the jurors, on their own, should consider Stokes' unique circumstances to determine, first, whether she fully enjoyed life

prior to her allegations and, second, the degree of reduction in enjoyment she may have suffered thereafter or may suffer in the future. *See* Ex. 1, Smith Dep. at 220:20-221:2. From there, Dr. Smith suggests that the jury should use his convoluted "methodology" like a calculator to compute an appropriate damage award—something he claims anyone with a "fifth grade" education ought to be able to do. *See id.* at 179:21-184:1. Unsurprisingly, courts have rejected Dr. Smith's identical attempts to offer his methodology as some form of "bluebook" valuation that can used by jurors to measure alleged hedonic damages. *See Saia*, 47 F. Supp. 2d at 149 ("Dr. Smith's bluebook analogy, while clever, does not hold up under scrutiny").

**B.      The Jury Does Not Need Dr. Smith's Assistance.**

Courts have repeatedly determined, including in the face of Dr. Smith's proposed testimony, that jurors are capable of assessing any appropriate damage award for reductions in the enjoyment of life. *See Sullivan*, 862 F. Supp. at 321 ("The court believes that a jury is capable of determining these losses from its own experiences and knowledge, and through testimony by [a fact witness], and further concludes that the proffered testimony of [D]r. Smith would improperly invade the province of the jury."); *Buckhalter v. Burlington N. R.R.*, 1992 WL 236676, at *2 (N.D. Miss. Mar. 23, 1992) (same). Jurors have lived their own lives and have experienced their own peaks and valleys. They are sufficiently equipped to assess any alleged reduction in the enjoyment of Stokes' life, without the "assistance" of Dr. Smith.

## CONCLUSION

For all of the foregoing reasons, Defendant, John Deere Seeding Group, respectfully requests the Court to exclude the report and testimony of Stan V. Smith, Ph.D. in its entirety pursuant to Federal Rules of Evidence 702 and 403 and *Daubert*.

Dated:  November 13, 2013                    Respectfully submitted,


                                             by:  s/ Christopher J. Boran

                                                  Nina G. Stillman
                                                  Christopher J. Boran
                                                  MORGAN, LEWIS & BOCKIUS LLP
                                                  77 West Wacker Drive
                                                  Chicago, Illinois  60601-5094
                                                  T:  312.324.1000
                                                  F:  312.324.1001
                                                  E:  cboran@morganlewis.com

                                                  **Attorneys for Defendant John Deere
                                                  Seeding Group**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing Defendant John Deere Seeding Group's Memorandum of Law in Support of its Motion to Exclude the Proposed Testimony of Stan V. Smith was served via the Court's Electronic Case Filing system on Plaintiff Beth Stokes' and Defendant Jim Gunnison's attorneys of record on this the 13th day of November, 2013.

s/ Christopher J. Boran

# EXHIBIT 2

# Smith Economics Group, Ltd.

A Division of Corporate Financial Group

*Economics / Finance / Litigation Support*

*Stan V. Smith, Ph.D.*
*President*

August 16, 2013

Mr. Amit S. Bindra
Prinz Law Firm
1 East Wacker Drive, Suite 550
Chicago, IL 60601

    Re: Stokes

Dear Mr. Bindra:

You have asked me to calculate the value of the reduction in value of life ("RVL"), also known as loss of enjoyment of life subsequent to the harassment of Beth Stokes.

Beth Stokes is a Caucasian, married female, who was born on July 31, 1954, and injured on September 1, 2008 at the age of 54.1 years.  Mrs. Stokes will be 59.6 years old at the estimated trial or settlement date of March 15, 2014, with a remaining life expectancy estimated at 24.5 years.  This data is from the National Center for Health Statistics, United States Life Tables, 2008, Vol. 61, No. 3, National Vital Statistics Reports, 2012.

In order to perform this evaluation, I have reviewed the following materials: (1) Plaintiff's Responses to Defendant John Deere Seeding Group's First Set of Interrogatories dated November 26, 2012; (2) Plaintiff's Second Amended Complaint dated May 6, 2013; (3) the deposition of Beth Stokes dated March 15, 2013; (4) the deposition of Beth Stokes dated June 10, 2013; (5) the deposition of Andrew Furgason dated May 8, 2013; (6) the deposition of Rita R. Melissano, Ph.D. dated May 8, 2013; (7) the deposition of Ralph Saintfort, M.D. dated June 13, 2013; (8) the deposition of Gina R. Ellison dated May 9, 2013; (9) medical records; (10) an informational interview with Beth Stokes dated August 16, 2013; and (11) the case information form.

My methodology for estimating the losses, which is explained below, is generally based on interest rates and consumer prices, as well as studies regarding the value of life.

My estimate of the real discount rate is 1.25 percent per year. This discount rate is based on the rate of return on 91-day U.S. Treasury Bills published in the Economic Report of the President for the real return on T-Bills primarily for the last 20 years. This rate is also consistent with historical rates published by Ibbotson Associates, Chicago, in its continuously updated series Stocks, Bonds, Bills and Inflation published by Morningstar, Inc. This series, which acknowledges me as the Originator while a

BS000369

SEG

Principal and Managing Director at Ibbotson Associates, is
generally regarded by academics in the field of finance as the
most widely accepted source of statistics on the rates of return
on investment securities.  It is relied upon almost exclusively
by academic and business economists, insurance companies, banks,
institutional investors, CPA's, actuaries, benefit analysts, and
economists in courts of law.

My estimates of the discount rate is net of inflation based on
the Consumer Price Index (CPI-U), published in monthly issues of
the U.S. Bureau of Labor Statistics, <u>CPI Detailed Report</u>
(Washington, D.C.: U.S. Government Printing Office) and available
at the U.S. Bureau of Labor Statistics website at
www.bls.gov/data/home.htm, Series ID: CUUR0000SA0.  The rate of
inflation for the past 20 years has been 2.44 percent.


I. REDUCTION IN VALUE OF LIFE

Economists have long agreed that life is valued at more than the
lost earnings capacity.  My estimate of the value of life is
based on many economic studies on what we, as a contemporary
society, actually pay to preserve the ability to lead a normal
life.  The studies examine incremental pay for risky occupations
as well as a multitude of data regarding expenditure for life
savings by individuals, industry, and state and federal agencies.

My estimate of the value of life is consistent with estimates
published in other studies that examine and review the broad
spectrum of economic literature on the value of life.  Among
these is "The Plausible Range for the Value of Life," <u>Journal of
Forensic Economics</u>, Vol. 3, No. 3, Fall 1990, pp. 17-39, by T. R.
Miller.  This study reviews 67 different estimates of the value
of life published by economists in peer-reviewed academic
journals.  The Miller results, in most instances, show the value
of life to range from approximately $1.6 million to $2.9 million
dollars in year 1988 after-tax dollars, with a mean of
approximately $2.2 million dollars.  In "The Value of Life:
Estimates with Risks by Occupation and Industry," <u>Economic
Inquiry</u>, Vol. 42, No. 1, May 2003, pp. 29-48,  Professor W. K.
Viscusi estimates the value of life to be approximately $4.7
million dollars in year 2000 dollars.  An early seminal paper on
the value of life was written by Richard Thaler and Sherwin
Rosen, "The Value of Saving a Life: Evidence from the Labor
Market." in N.E. Terlickyj (ed.), <u>Household Production and
Consumption</u>. New York: Columbia University Press, 1975, pp. 265-
300.  The Meta-Analyses Appendix to this report reviews
additional literature suggesting a value of life of approximately
$5.4 million in year 2008 dollars.

2

BS000370

# SEG

Because it is generally accepted by economists, the economic methodology for the valuation of life has been found to meet the Daubert and Frye standards by many courts, along with the Rules of Evidence in many states nationwide. My testimony on the value of life has been accepted in approximately 200 state and federal cases nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions. Testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate, and supreme courts. Proof of general acceptance and other standards is found in a discussion of the extensive references to the scientific economic peer-reviewed literature on the value of life listed in the **Value of Life Appendix** to this report.

The underlying, academic, peer-reviewed studies fall into two general groups: (1) consumer behavior and purchases of safety devices; (2) wage risk premiums to workers; in addition, there is a third group of studies consisting of cost-benefit analyses of regulations. For example, one consumer safety study analyzes the costs of smoke detectors and the lifesaving reduction associated with them. One wage premium study examines the differential rates of pay for dangerous occupations with a risk of death on the job. Just as workers receive shift premiums for undesirable work hours, workers also receive a higher rate of pay to accept a increased risk of death on the job. A study of government regulation examines the lifesaving resulting from the installation of smoke stack scrubbers at high-sulphur, coal-burning power plants. As a hypothetical example of the methodology, assume that a safety device such as a carbon monoxide detector costs $46 and results in lowering a person's risk of premature death by one chance in 100,000. The cost per life saved is obtained by dividing $46 by the one in 100,000 probability, yielding $4,600,000.

Tables 1 through 6 are based on several factors:
  (1)  An assumed lower impairment rating by the trier-of-fact of 30 percent in the ability to lead a normal life from September 1, 2008 through March 15, 2014, the estimated trial date. I assume that at the trial date there is some ameliorating factor, and the impairment rating from that point forward is illustrated at a 20 percent reduction in the ability to lead a normal life. An assumed upper impairment rating by the trier-of-fact of 60 percent through the date of trial and 40 percent thereafter in also illustrated. The diminished capacity to lead a normal life reflects the impact on career, social and leisure activities, the activities of daily living, and the internal emotional state, as discussed in Berla, Edward P., Michael L. Brookshire and Stan V. Smith, "Hedonic Damages and Personal Injury: A Conceptual Approach," Journal of Forensic Economics, Vol 3, No. 1, Winter 1990, pp. 1-8;

3

BS000371

SEG

(2)  The central tendency of the range of the economic studies cited above which I estimate to be approximately $4.5 million in year 2013 dollars; and

(3)  A life expectancy of 84.1 years.

Tables 1 through 3 are based on the lower estimated impairment rating; Tables 4 through 6 are based on the upper estimated impairment rating.  Based on these values and life expectancy, my opinion of the reduction in the value of life is estimated at $771,719 ▸ Table 3 to $1,543,455 ▸ Table 6, averaging $1,157,587.

-------------------------------------------

A trier-of-fact may weigh other factors to determine if these estimated losses for Beth Stokes should be adjusted because of special qualities or circumstances that economists do not as yet have a methodology for analysis.

In each set of tables, the estimated losses are calculated from September 1, 2008 through an assumed trial or settlement date of March 15, 2014, and from that date thereafter.  The last table in each set accumulates the past and future estimated losses.  These estimates are provided as an aid, tool and guide for the trier-of-fact.

All opinions expressed in this report are clearly labeled as such.  They are rendered in accordance with generally accepted standards within the field of economics and are expressed to a reasonable degree of economic certainty.  Estimates, assumptions, illustrations and the use of benchmarks, which are not opinions, but which can be viewed as hypothetical in nature, are also clearly disclosed and identified herein.

In my opinion, it is reasonable for experts in the field of economics and finance to rely on the materials and information I reviewed in this case for the formulation of my substantive opinions herein.

If additional information is provided to me, which could alter my opinions, I may incorporate any such information into an update, revision, addendum, or supplement of the opinions expressed in this report.

If you have any questions, please do not hesitate to call me.

Sincerely,

Stan V. Smith, Ph.D.
President

4

BS000372

SEG

## APPENDIX: VALUE OF LIFE

The economic methodology for the valuation of life has been found to meet the <u>Daubert</u> and <u>Frye</u> standards by many courts, along with the Rules of Evidence in many states nationwide. My testimony on the value of life has been accepted in approximately 200 state and federal cases nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions. Testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate, and supreme courts. The <u>Daubert</u> standard sets forth four criteria:

1.   Testing of the theory and science

2.   Peer Review

3.   Known or potential rate of error

4.   Generally accepted.


**Testing of the theory and science** has been accomplished over the past four decades, since the 1960s. Dozens of economists of high renown have published over a hundred articles in high quality, peer-reviewed economic journals measuring the value of life. The value of life theories are perhaps among the most well-tested in the field of economics, as evidenced by the enormous body of economic scientific literature that has been published in the field and is discussed below.


**Peer Review** of the concepts and methodology have been extraordinarily extensive. One excellent review of this extensive, peer-reviewed literature can be found in "The Value of Risks to Life and Health," W. K. Viscusi, <u>Journal of Economic Literature</u>, Vol. 31, December 1993, pp. 1912-1946. A second is "The Value of a Statistical Life: A Critical Review of Market Estimates throughout the World." W. K. Viscusi and J. E. Aldy, <u>Journal of Risk and Uncertainty</u>, Vol. 27, No. 1, November 2002, pp. 5-76. Additional theoretical and empirical work by Viscusi, a leading researcher in the field, can be found in: "The Value of Life", W. K. Viscusi, John M. Olin Center for Law, Economics, and Business, Harvard Law School, Discussion Paper No. 517, June 2005. An additional peer-reviewed article discusses the application to forensic economics: "The Plausible Range for the Value of Life," T. R. Miller, <u>Journal of Forensic Economics</u>, Vol. 3, No. 3, Fall 1990, pp. 17-39, which discusses the many dozens of articles published in other peer-reviewed economic journals on this topic. This concept is discussed in detail in "Willingness to Pay Comes of Age: Will the System Survive?" T. R. Miller, <u>Northwestern University Law Review</u>, Summer 1989, pp. 876-907, and "Hedonic Damages in Personal Injury and Wrongful Death

5

BS000373

SEG

Litigation," by S. V. Smith in Litigation Economics, pp. 39-59. Kenneth Arrow, a Nobel Laureate in economics, discusses this method for valuing life in "Invaluable Goods," Journal of Economic Literature, Vol. 35, No. 2, 1997, pp. 759. See the Meta-Analyses Appendix for an additional review of the literature.

**The known or potential rate of error** is well researched. All of these articles discuss the known or potential rate of error, well within the acceptable standard in the field of economics, generally using a 95% confidence rate for the statistical testing and acceptance of results. There are few areas in the field of economics where the known or potential rate of error has been as well-accepted and subject to more extensive investigation.

**General Acceptance** of the concepts and methodology on the value of life in the field of economics is extensive. This methodology is and has been generally accepted in the field of economics for many years. Indeed, according to the prestigious and highly-regarded research institute, The Rand Corporation, by 1988, the peer-reviewed scientific methods for estimating the value of life were well-accepted: "Most economists would agree that the willingness-to-pay methodology is the most conceptually appropriate criterion for establishing the value of life," Computing Economic loss in Cases of Wrongful Death, King and Smith, Rand Institute for Civil Justice, R-3549-ICJ, 1988.

While first discussed in cutting edge, peer-reviewed economic journals, additional proof of general acceptance is now indicated by the fact that this methodology is now taught in standard economics courses at the undergraduate and graduate level throughout hundreds of colleges and universities nationwide as well as the fact that it is taught and discussed in widely-accepted textbooks in the field of law and economics: Economics, Sixth Edition, David C. Colander, McGraw-Hill Irwin, Boston, 2006, pp. 463-465; this introductory economics textbook is the third most widely used textbook in college courses nationwide. Hamermesh and Rees's The Economics of Work and Pay, Harper-Collins, 1993, Chapter 13, a standard advanced textbook in labor economics, also discusses the methodology for valuing life. Other textbooks discuss this topic as well. Richard Posner, a Justice and former Chief Justice of the U.S. Court of Appeals for the highly regarded 7th Circuit and Senior Lecturer at the University of Chicago Law School, one of most prolific legal writers in America, details the Value of Life approach in his widely used textbooks: Economic Analysis of Law, 1986, Little Brown & Co., pp. 182-185 and Tort Law, 1982, Little Brown & Co., pp. 120-126.

As further evidence of general acceptance in the field, some surveys published in the field of forensic economics show that hundreds of economics nationwide are now familiar with this

6

BS000374

SEG

methodology and are available to prepare (and critique) forensic economic value of life estimates. Indeed, some economists who indicate they will prepare such analysis for plaintiffs also are willing to critique such analysis for defendants, as I have often done. That an economist is willing to critique a report does not indicate that he or she is opposed to the concept or the methodology, but merely available to assure that the plaintiff economist has employed proper techniques. The fact that there are economists who indicate they do not prepare estimates of value of life is again no indication that they oppose the methodology: many claim they are not familiar with the literature and untrained in this area. While some CPAs and others without a degree in economics have opposed these methods, such professionals do not have the requisite academic training and are unqualified to make such judgements. However, as in any field of economics, this area is not without any dissent. General acceptance does not mean universal acceptance.

Additional evidence of general acceptance in the field is found in the teaching of the concepts regarding the value of life. Forensic Economics is now taught as a special field in a number of institutions nationwide. I taught what is believed to be the first course ever presented in the field of Forensic Economics at DePaul University in Spring, 1990. My own book, <u>Economic/Hedonic Damages</u>, Anderson, 1990, and supplemental updates thereto, co-authored with Dr. Michael Brookshire, a Professor of Economics in West Virginia, has been used as a textbook in at least 5 colleges and universities nationwide in such courses in economics, and has a thorough discussion of the methodology. Toppino et. al., in "Forensic Economics in the Classroom," published in <u>The Earnings Analyst</u>, Journal of the American Rehabilitation Economics Association, Vol. 4, 2001, pp. 53-86, indicate that hedonic damages is one of 15 major topic areas taught in such courses.

Lastly, general acceptance is found by examining publications in the primary journal in the field of Forensic Economics, which is the peer-reviewed <u>Journal of Forensic Economics</u>, where there have been published many articles on the value of life. Some are cited above. Others include: "The Econometric Basis for Estimates of the Value of Life," W. K. Viscusi, Vol 3, No. 3, Fall 1990, pp. 61-70; "Hedonic Damages in the Courtroom Setting." S. V. Smith, Vol. 3, No. 3, Fall 1990, pp. 41-49; "Issues Affecting the Calculated Value of Life," E. P. Berla, M. L. Brookshire and S. V. Smith, Vol 3, No. 1, 1990, pp. 1-8; "Hedonic Damages and Personal Injury: A Conceptual Approach." G. R. Albrecht, Vol. 5., No. 2, Spring/Summer 1992, pp. 97-104.; "The Application of the Hedonic Damages Concept to Wrongful and Personal Injury Litigation." G. R. Albrecht, Vol. 7, No. 2, Spring/Summer 1994, pp. 143-150; and also "A Review of the Monte Carlo Evidence Concerning Hedonic Value of Life Estimates," R. F. Gilbert, Vol. 8, No. 2, Spring/Summer 1995, pp. 125-130.

7

BS000375

SEG

It is important to note that this methodology is endorsed and employed by the U. S. Government as the standard and recommended approach for use by all U. S. Agencies in valuing life for policy purposes, as mandated in current and past Presidential Executive Orders in effect since 1972, and as discussed in "Report to Congress on the Costs and Benefits of Federal Regulations," <u>Office of Management and Budget</u>, 1998, and "Economic Analysis of Federal Regulations Under Executive Order 12866," <u>Executive Office of the President, Office of Management and Budget</u>, pp. 1-37, and "Report to the President on Executive Order No. 12866," Regulatory Planning and Review, May 1, 1994, <u>Office of Information and Regulatory Affairs, Office of Management and Budget</u>. Prior presidents signed similar orders as discussed in "Federal Agency Valuations of Human life," <u>Administrative Conference of the United States, Report for Recommendation 88-7, December 1988</u>, pp. 368-408. 926

8

BS000376

SEG

## APPENDIX: META-ANALYSES AND VALUE OF LIFE RESULTS SINCE 2000

Below I list the principal systematic reviews (meta-analyses), since the year 2000, of the value of life literature, and the values of a statistical life that they recommend.  In statistics, a meta-analysis combines the results of several studies that address a set of related research hypotheses.  Meta-analysis increase the statistical power of studies by analyzing a group of studies and provide a more powerful and accurate data analysis than would result from analyzing each study alone.  Based on those reviews, the Summary Table suggests a best estimate. The following table summarizes the studies and their findings.

These statistically based studies place the value between $4.4 and $7.0 million, with $5.8 million in year 2005 dollars representing a conservative yet credible estimate of the average (and range midpoint) of the values of a statistical life published in the studies in year 2005 dollars.  Net of human capital, a credible net value of life based on all these literature reviews to be $4.8 million in year 2005 dollars, or $5.4 million in year 2008 dollars.

The actual value that I use, $4.1 million in year 2008 dollars ($4.5 million in year 2013 dollars) is approximately 24 percent lower than a conservative average estimate based on the credible meta-analyses.  This value was originally based on a review conducted in the late 1980s, averaging the results published by that time.  I have increased that late 1980s value only by inflation over time, despite the fact a review of literature over the years since that time has put obvious upward pressure on the figure that I use.

9

BS000377

SEG

Summary Table: Mean and range of value of statistical life
estimates (in 2005 dollars) from the best meta-analyses and
systematic reviews and characteristics of those reviews.

| Study | Formal Meta-Analysis? | Number of Values | Best Estimate (2005 Dollars) | Range | Context |
|---|---|---|---|---|---|
| Miller 2000 | Yes | 68 estimates | $5.1M | $4.5-$6.2M | US estimate from all |
| Mrozek & Taylor 2002 | Yes | 203 estimates, from 33 studies | $4.4M | + or - 35% | Labor market |
| Viscusi & Aldy 2003 | Yes | 49 estimates (reviewed more than 60 studies, but some lacked desired variables) | $6.5M | $5.1-$9.6M | Labor market, US estimate from all |
| Kochi et al. 2006 | Yes | 234 estimates from 40 studies | $6.0M | + or - 44% | Labor market, survey |
| Bellavance 2006 (published in 2009) | Yes | 37 estimates from 34 studies (rejected 15 others that lacked desired data or were flawed) | $7.0M | + or - 19% | Labor market |

10

Smith Economics Group, Ltd. ▪ *312-943-1551*

BS000378

SEG

Miller (2000) started from the Miller 1989 JFE estimates and used statistical methods to adjust for differences between studies. It also added newer studies, primarily ones outside the United States. The authors specified the most appropriate study approach a priori, which allowed calculation of a best estimate from the statistical regression. Miller, Ted R, "Variations between Countries in Values of Statistical Life", <u>Journal of Transport Economics and Policy</u>, Vol. 34, No. 2 (May 2000), pp. 169-188.

Mrozek and Taylor (2002) searched intensively for studies of the value of life implied by wages paid for risky jobs. They coded all values from each study rather than a most appropriate estimate. A statistical analysis identified what factors accounted for the differences in values between studies. The authors specified the most appropriate study approach a priori, which allowed calculation of a best estimate from the statistical regression. Mrozek, Janusz R. and Laura O. Taylor, "What Determines the Value of Life? A Meta-Analysis", <u>Journal of Policy Analysis and Management</u>, Vol. 21, No. 2 (2002), pp. 253-270.

Viscusi and Aldy (2003) focused on values from labor market studies that they considered of high quality and that provided data on risk levels and other important explanatory variables. They used statistical methods to account for variations between studies and derive a best estimate. W.K. Viscusi and J.E. Aldy, "The Value of a Statistical Life:  A Critical Review of Market Estimates Throughout the World", <u>Journal of Risk and Uncertainty</u>, Vol. 27, No. 1 (2003), pp. 5-76.

Kochi et al. (2006) searched intensively for studies of the value of life implied by wages and coded all values from each study rather than a most appropriate estimate. They did not filter study quality carefully. The best estimate was derived by statistical methods based on the distribution of the values within and across studies. Kochi, Ikuho, Bryan Hubbell, and Randall Kramer, "An Empirical Bayes Approach to Combining and Comparing Estimates of the Value of a Statistical Life for Environmental Policy Analysis", <u>Environmental and Resource Economics</u>, Vol. 34 (2006), pp. 385-406.

Bellavance et al. (2009) focused on values from labor market studies that they considered of high quality and that provided data on risk levels and other important explanatory variables. They used statistical methods to account for variations between studies and derive a best estimate. Bellavance, Francois, Georges Dionne, and Martin Lebeau, "The Value of a Statistical Life: A Meta-Analysis with a Mixed Effects Regression Model," <u>Journal of Health Economics</u>, Vol. 28, Issue 2, (2009), pp. 444-464. 289

11

BS000379

SEG

### SUMMARY OF LOSSES FOR BETH STOKES

| TABLE | DESCRIPTION | ESTIMATE |
|-------|-------------|----------|
| **** | ******************************** | ********** |
| | **LOSS OF ENJOYMENT OF LIFE** | |
| | REDUCTION IN VALUE OF LIFE | |
| 3 | Lower impairment rating | $  771,719 |
| 6 | Upper impairment rating | $1,543,455 |

The information on this Summary of Losses is intended to summarize
losses under certain given assumptions.  Please refer to the report
and the tables for all the opinions.

12

BS000380