IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| **JOHN DOE,** | ) |
| | ) **CIVIL ACTION** |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) |
| **DANIELS, JR.,** in his official capacity as President of | ) |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, | ) |
| **KATHERINE SERMERSHEIM**, in her official capacity | ) |
| at Purdue University, | ) |
| | ) |
| Defendants. | ) |

## MOTION TO EXCLUDE BARDEN OPINIONS

Defendant, the Trustees of Purdue University ("Purdue"), by counsel, moves this Court pursuant to Federal Rule of Civil Procedure 37(c) and Rules of Evidence 403 and 702 to enter an order excluding the recently disclosed opinions of R. Christopher Barden from the jury trial.

Plaintiff has never sought relief from the Court's August 11, 2022 ruling excluding the opinions disclosed in the *Initial Report of R. Christopher Barden, Ph.D., J.D., LP*, dated February 19, 2021 ("First Report") which determined: "The opinion of Dr. Christopher Barden is excluded from the summary judgment record and may not be used at trial". DE. 206 p. 24. Plaintiff has also never moved for leave to disclose additional opinions of Barden.

On March 16, 2023—755 days after the First Report was disclosed and 39 days before trial—Plaintiff disclosed the *Expert Witness Report of R. Christopher Barden, Ph.D., J.D., LP* dated March 16, 2023 ("Second Report") (**Exhibit A**). Plaintiff's counsel has not contended that the Second Report discloses any opinion that could not have been disclosed in the First Report.

1

Purdue incorporates by reference the standards, law, authority, and arguments in its original briefing to exclude the opinions in the First Report. *See* DE 193.

### A. History of Barden Disclosure and Exclusion of Opinions.

After several extensions, this Court ordered the Plaintiff to make his expert witness disclosures no later than February 19, 2021. DE 157. At the deadline, Plaintiff delivered the *Initial Report of R. Christopher Barden, Ph.D., J.D., LP*, dated February 19, 2021 ("First Report"). The First Report was designated as an exhibit in Plaintiff's summary judgment briefing. Purdue moved to exclude the First Report from consideration in trial or in the pending dispositive motions. DE 193.

On August 11, 2022, this Court issued its Opinion and Order, granting Purdue's motion for summary judgment in part and its motion to exclude. DE 206. Addressing the First Report, this Court applied the framework of Federal Rule of Evidence 702 and *Daubert / Kumho Tire* to determine if the Barden opinions met requisite thresholds for admissibility. DE 206, at pp. 11-12.

This Court dispatched the First Report by concluding the following about the central opinions of the report:

- "Dr. Barden's opinions about the credibility of the parties and witnesses are neither specialized knowledge nor appropriate for expert testimony. . . . Speculation couched in the language of expertise is no exception." *Id.* at pp. 12-13 (internal citations omitted).

- "[F]or his report to be admissible, he must offer 'scientific, technical, or other specialized knowledge [that] will help the trier of fact" to understand that conclusion. . . . To the extent Dr. Barden offers specialized knowledge, it is not helpful to the resolution of the case." *Id.* at pp. 13.

- "[The relevant question is whether these defendants . . . intentionally discriminated against [John] based on sex. Dr. Barden's (unsupported) assumption that Purdue's administrators believed the 'junk science' would only matter if they relied on that to intentionally discriminate against John. This report offers little to make that connection, other than his rumination about their motives. . . . Expert opinions premised on 'subjective belief or unsupported speculation,' like this one, must be excluded." *Id.* at pp. 13-14.

The Court found that "the report at issue is replete with conclusions and assertions that are neither admissible nor helpful." *Id.* at p. 11.

### B. Standard for Late Disclosure of Expert Opinion.

"When an act may or must be done within a specified time, the court may, for good cause, extend the time: . . . (B) on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b)(1)(B). "Excusable neglect has been interpreted as the missing of deadline because of such things as 'misrepresentations by judicial officers, lost mail, and plausible misinterpretations of ambiguous rules.' Put another way, 'excusable neglect . . . [means] that [a court] will grant relief [to the party missing a deadline] only where the actions leading to the default were not willful, careless, or negligent.'" *Cagle v. K-Five Constr. Co.*, 954 F. Supp. 1267, 1269 (N.D. Ill. 1997). "The burden to show that a late disclosure should not preclude the evidence under Rule 37(c)(2) is on the party that missed the deadline." *Coleman v. W. Bend Mut. Ins. Co.*, No. 2:21-CV-180-JVB-JPK, 2022 U.S. Dist. LEXIS 237241, at *24-25 (N.D. Ind. Dec. 12, 2022). Here, the burden is on Plaintiff to show that "the failure was substantially justified or harmless." Fed. R. Civ. Proc. 37(c)(1).

3

**C. The Second Report is untimely. There is no excusable neglect.**

On December 19, 2022, counsel for the parties appeared in open court for oral argument. At that time, the Court asked the parties to confirm availability for trial on April 24, 2023. At that time, Plaintiff's counsel said nothing about leave for additional expert disclosures. Nearly three months later, at the final pretrial conference on March 14, 2023, Plaintiff's counsel first broached the topic without prior notice and without any explanation for not doing so sooner.

Plaintiff has not even attempted to show excusable neglect for the timing of the Second Report. Plaintiff has not tendered any evidence or argument that the timing of the Second Report is substantially justified or harmless.

When Purdue consented to go to trial on April 24, 2023, Purdue reasonably relied upon the Court's prior ruling excluding the opinions in the First Report. Trial is now fewer than four weeks away, and the status quo is that Plaintiff "is not allowed to use" the opinions in the Second Report. Fed. R. Civ. Proc. 37(c)(1). Any change in that status quo would leave Purdue with little notice and opportunity to prepare for examination of Barden. This prejudice is embedded in the presumption stated in Federal Rule of Civil Procedure 26(a)(2)(D)(i) that disclosure of an expert opinion must be made "at least 90 days before the date set for trial."

**D. Barden's opinions in the Second Report must be excluded.**

Like the First Report, Barden's opinions in the Second Report fail to meet the necessary threshold for expert testimony. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); Fed. R. Evid. 702.

As detailed in the Appendix to this brief, in the Second Report Barden's opinions about Purdue fall into two general categories: (i) that Purdue's investigation evinces "confirmation

bias" by finding that the weight of the evidence supports Jane Doe's allegation; and (ii) that Purdue's investigation employed "defective, improper, misinformed, uninformed" methods.

Barden styles himself as a campaigner against risks to the "integrity of the legal system" and he is on a mission to "Train legal and mental health professionals in the basic and essential science that should guide and inform attorneys, judges, and juries . . .." **Exhibit A**, at p. 13. In another recent report, Barden grandly sets himself in judgment of the entire legal system that resulted in convictions of Jerry Sandusky for molesting ten boys: "the judges, prosecutors, and defense lawyers . . . *ALL failed to know, understand, comprehend, and properly apply the internationally reported essential science and history that was so relevant and essential to a proper investigation and trial in this case*." **Exhibit B** (copy of "Expert Witness Report of R. Christopher Barden" dated January 18, 2023) ("Sandusky Report"), at p. 20 n. 2 (emph. original).

Barden's Sandusky report, dated January 28, 2023, apparently served as his cut-and-paste template for his March 18, 2023 Second Report in this case (**Exhibit A**), which states at page 2: " I will also offer investigative hypotheses to assist future investigations of this case by PA State Legislative oversight committees, PA State Licensing Boards, and Federal investigative bodies having the power to subpoena records and question witnesses under oath to further explore the multiple kinds of misconduct, indications of corruption, and other controversies documented in this case."

The concluding section of the Second Report asserts an "investigational alternative hypothes[is] that should be properly investigated by the relevant authorities" that "Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with a defective methodology ('Believe Women, but not men')".

The standards for admissibility of Barden's opinions are not met in this case. He does not have any recognizable credential or training in ascertainment of gender discrimination. He does not apply any expert technique for ascertainment of gender bias. His opinions on methods are not relevant or reliable.

1. **No expert credential for ascertainment of gender discrimination.**

The Seventh Circuit tasks this Court with asking not merely whether an expert "is qualified in general" but rather whether he is qualified "to answer a specific question". *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal quotation omitted). For a generalist like Barden, the Court "must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them." *Id*.

In his Sandusky Report, Barden describes himself as a "forensic psychological expert" with expertise "in the fields of adult-clinical, child-clinical, and forensic psychology". **Exhibit B**, at pp. 13 n. 1 and 132. The Second Report does not disclose any education, skill or training of Barden in any technique for ascertainment of gender discrimination in a specific university sexual misconduct disciplinary process. The Second Report asserts that Barden has been qualified as an expert witness in criminal trials. The Second Report does not list any discrimination trial in which he has been qualified as a testifying expert. Second Report, at p. 16.

There is no evidence that Barden possesses the requisite "knowledge, skill, experience, training, or education" concerning university-specific standards for meeting their Title IX obligations. *See, e.g.*, *Palmer v. Ind. Univ. & Trs. of Ind. Univ.*, No. 1:19-cv-04610-JMS-MJD, 2021 U.S. Dist. LEXIS 44863, at *59-60 (excluding expert opinion where expert only demonstrated that he had worked at a different university but not that he was broadly qualified to offer opinions on what standards universities should follow or that he was qualified to speak

about a different university's policies). He does not disclose any experience administering student discipline, whether for sexual misconduct or otherwise. Barden does not disclose any familiarity with the Department of Education's requirements for a university's Title IX obligation to address sexual misconduct.

This Court can and should determine that Barden's generalist credential as a psychologist does not equip him to opine specifically on gender discrimination in a university disciplinary process for sexual misconduct. *See United States v. Truitt*, 938 F.3d 885, 889-91 (7th Cir. 2019) (affirming exclusion of opinion of forensic psychologist).

### 2. The Second Report will not help the jury. The Second Report is directed at a non-witness (Campbell) and a phantom "recovered memory" allegation.

Federal Rule of Civil Procedure 702 conditions admissibility of expert testimony on whether it "will help the trier of fact to understand the evidence or to determine a fact in issue." *United States v. Truitt*, 938 F.3d at 889.

Barden devotes most of the Second Report to arguments against the admissibility of scholarship that Barden attributes to Rebecca Campbell. A typical passage is: "Prof. R. Campbell's training materials on the 'Neurobiology of Sexual Assault' include unreliable, unsupported pseudoscience research and ideology that are NOT accepted by the relevant scientific community and has NO known error rate." Second Report, at p. 71. However, "Prof. R. Campbell" is not on Purdue's witness list for trial, so the only way that the jury would hear about Campbell's opinions on "Neurobiology of Sexual Assault" would be for Plaintiff's counsel to elicit those opinions before the jury.

Not only is Campbell not a witness, there also is no "recovered memory" allegation in this case. The Second Report uses the word memory 169 times and the term "recovered

memory" 19 times. Plaintiff John Doe has never alleged that this case concerns a "recovered memory". In the words of John's pending Complaint, the allegation is:

> John Doe then told Jane Doe that during another night in November 2015, while they were staying the night in Jane Doe's room, John Doe had penetrated her digitally while she was sleeping: (iv) Jane Doe was not aware of the incident in November 2015 while she was sleeping in her room, had not and did not consent to such sexual contact, and was upset when she was told about it.

DE 160, ¶ 30. John's 155-paragraph Complaint never uses the word "memory". This case centers on an allegation that John told Jane about an event she was otherwise unaware of because it happened while she was asleep. "John told Jane" means an alleged confession, not a memory suggested by Purdue.

Further, the undisputed evidence is that Jane first reported her allegation to the Navy, not Purdue. There is no contention that anyone at Purdue interacted with Jane in any way on the topic of sexual assault before she made her report to the Navy.

Barden has simply invented a straw-man "recovered memory" allegation and then set out to rebut it. His claimed expertise as a critic of the literature of "recovered memory" has no relevance to the jury's task.

    **3.   No expert technique for ascertainment of gender bias.**

        **a.  Barden describes "confirmation bias" as victim bias, not gender bias.**

In the jargon of the Second Report, "confirmation bias" is shorthand for finding that the weight of the evidence supports the victim's account. In his recent opinion in support of Jerry Sandusky's motion for a new trial, Barden quotes the Oxford Dictionary's definition of Confirmation Bias: "The tendency to test one's beliefs or conjectures by seeking evidence that might confirm or verify them and to ignore evidence that might disconfirm or refute them." **Exhibit B**, at p. 21. Barden adds that "confirmation bias" is a "problematic aspect of human

reasoning". *Id.* (quoting academic manuscript in "Review of General Psychology"). These citations show that, according to Barden, "confirmation bias" describes a tendency to try to prove "one's beliefs or conjectures", not a tendency to believe women and disbelieve men.

According to these passages, an allegation of "confirmation bias" begs the predicate question, what does the witness believe? To adduce evidence of what a Purdue witness believes, ask the witness, not Barden. If the witness does not have a prior belief about what the evidence will show, then "confirmation bias" is a pointless notion.

In his abundant self-confidence, Barden substitutes his own opinion about what Purdue witnesses believe. The Second Report describes "confirmation bias" in campus sexual assault investigations as an "imperative to act as through every accusation must be true." Second Report, p. 62. Barden states that, in this case, he equates "confirmation bias" with "a conviction that the suspect is guilty", a trait that he describes as "tunnel vision". Second Report, pp. 21, 27. In this usage, the term "suspect" is genderless. From the premise that all suspects are presumed guilty, Barden is opining that confirmation bias dictates the outcome, regardless of gender. Such an opinion will not help the jury perform its task to ascertain whether John Doe's discipline was motivated by his male gender. *See, e.g.*, *Doe v. Univ.-Chicago*, No. 20 CV 7293, 2021 U.S. Dist. LEXIS 116182, at *21 (N.D. Ill. June 22, 2021) ("a pro-victim bias is not sex bias—both women and men can commit or be victims of sexual assault."); *Doe v. Columbia Coll.*, 299 F. Supp. 3d 939, 955 (N.D. Ill. 2017).

The jury in this case is not tasked with deciding whether Purdue was motivated by pro-victim bias when investigating and deciding John's culpability. Therefore, Barden's opinions on "confirmation bias" do not supply the jury with expert insight into ascertainment of gender bias.

    **b.  Barden's hypothesis is mere speculation.**

At page 97 of the Second Report, Barden admits that he is offering nothing more than a "hypothesis" that "Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with a defective methodology ('Believe Women, but not men')". Barden thus pivots away from insisting that "confirmation bias" means believing all accusers, and abruptly concludes that Purdue exhibits "confirmation bias" only for women accusers, "not men".

Barden's hypothesis fails to meet the *Daubert* test for admissibility and must be excluded. *Adams v. BRG Sports, Inc.*, No. 17 C 8972, 2022 U.S. Dist. LEXIS 4297, at *13 (N.D. Ill. Jan. 10, 2022) ("Dr. Motley's own deposition testimony establishes that his opinion on the inadequacy of Riddell's warnings does not meet *Daubert*'s threshold. Dr. Motley conceded during his deposition that an opinion about a warning's efficacy is merely a hypothesis absent empirical testing.").

If "confirmation bias" is a technique for predicting and identifying anti-male bias, how then can Barden argue that the technique is relevant to the male-against-male convictions of Jerry Sandusky? The common denominator between Jerry Sandusky and John Doe is that they are both males whose lawyers have hired Barden. If "confirmation bias" operates the same whether the accuser is a male (who accused Sandusky) or a female (who accused John Doe), then Barden's opinions on "confirmation bias" do not equip the jury to ferret out "believe the woman" bias.

The Second Report fails a core requirement for admissibility of an expert opinion -- "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592–93.

As recently summarized by the Seventh Circuit:

> Some factors we look to include: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

*Anderson v. Raymond Corp.*, 59 F.4th 279, 284 (7th Cir. 2023) (citing and quoting *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) and *Daubert*, 509 U.S. at 593-94)).

The Second Report does not cite any literature to show that confirmation bias predicts a tendency to believe "women but not men". Barden offers no technique for distinguishing those who believe only women-victims, on one hand, from those who believe all victims, regardless of gender. Barden does not discuss any error metric for such a distinction. He does not discuss whether any technique for drawing such a distinction has achieved "general acceptance" in the psychological science community. This is unsurprising, given Barden's admission that he is offering a hypothesis, not a validated technique.

The Second Report, at page 2, also announces that Barden is offering expert opinions on "ideologies", among other things. Like the First Report, the Second Report is rife with overt political scapegoating. The term "feminist" appears 28 times. For extra spice, Barden opines on "Social feminism . . . [r]ooted within Marxist ideology." Second Report pp. 98-99. As this Court rightly observed previously, "[t]o put it mildly, such statements cut against a finding that this report has 'the same level of intellectual rigor that characterizes the practice of an expert.'" DE 206 at 12, n.12 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

A hypothesis about the state of mind of the allegedly discriminatory defendant is inadmissible. In a Title VII discrimination case where the expert opined "only that stereotypes 'may,' 'might,' or 'could have' played a role in [defendant's] decision making" and the expert "did not offer a definite opinion as to whether [defendant] discriminated against [plaintiff]" the

Seventh Circuit affirmed exclusion of an expert's opinion testimony. *Downing v. Abbott Lab'ys*, 48 F.4th 793, 810 (7th Cir. 2022). "For her opinions to help the jury, she needed to speak to whether [defendant's] decisionmakers racially discriminated against Downing. That requirement was not satisfied, the court correctly concluded, when [the expert] could not opine—with even five percent certainty—that anyone at [defendant] made a decision about [plaintiff's] employment on the basis of racial bias." *Id.* Further, the excluded expert's "testimony also would be unfairly prejudicial, as the court ruled, because jurors might incorrectly conclude she was offering an opinion on the ultimate liability question". *Id.*

To the extent Barden is opining on pertinent questions, a jury is more than capable of answering them because the existence of bias is not a topic beyond the scope of a jury's experience or abilities. *Palmer v. Ind. Univ. & Trs. of Ind. Univ.*, No. 1:19-cv-04610-JMS-MJD, 2021 U.S. Dist. LEXIS 44863, *61 (S.D. Ind. Mar. 10, 2021) (expert's opinion on whether the university "treated Professor Gildea more favorably than Professor Palmer . . . is an issue of fact, which the jury must analyze and upon which the jury must reach a conclusion. Expert testimony is simply not necessary or appropriate.").

### 4. Barden's opinions on methods are not relevant or reliable.

The Second Report states: "As an experienced scientist, psychotherapist, and trial attorney I will offer opinions about the failures of many involved in this case to meet minimal standards of care for psychotherapists, investigators, and legal professionals (judges, trial lawyers, and government officials)." Second Report, p. 2.

Barden's standard-of-care opinion has no relevance to the jury's task, for two reasons. First, this is an intentional gender discrimination case, not a negligence case. The jury is not

tasked with deciding whether Purdue's investigation of Jane Doe's allegation met any standard of care.

Second, Barden does not contend that Purdue's allegedly defective methods were selectively employed in John's case because he was a male. Instead, he imputes faulty methods to Purdue's approach to training investigators *for all investigations*. Second Report, p. 97 ("Purdue University investigators/adjudicators/officers were duped and manipulated by improper, incompetent, unethical, and unreliable RRM-MPD-DISS junk science notions and ideas expressed in Title IX training seminars."). On its face, this conclusion faults the competence and reliability of the methods in every Purdue investigation and decision of a sexual assault allegation, regardless of the gender of the accuser and accused.

## Conclusion

For these reasons, Barden's opinions must be excluded.

Respectfully submitted,

/s/ William P. Kealey
William P. Kealey (18973-79)
Tyler L. Jones (34656-29)
James F. Olds (27989-53)
Stuart & Branigin, LLP
300 Main St., Ste. 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
        tlj@stuartlaw.com
        jfo@stuartlaw.com
Telephone: 765-423-1561
*Attorneys for Defendants*

1554594v1

**Appendix – Quotations of Second Report's Statements of Opinion**

- In my opinion, this analysis does not reduce the horrific and criminal nature of actual sexual assaults — a serious problem in America at any frequency. However, the serious nature of this problem is most effectively and competently addressed without biased, hysterical, politicized, irrational, junk science, pseudo-investigations and unrecorded, un-transcribed "Equity Committee adjudication meetings" applying methodologically improper methods and practices — such as the pseudoscience methods, procedures, and training procedures (eg. Dr Campbell's training) conducted by Purdue University in this case. (p. 64)
- Controversial pseudo-scientific concepts such as the "Neurobiology of Trauma", "Neurobiology of Sexual Assault", "Fragmented Memories of Trauma", and claims that "less than 10% of assault allegations are false" in addition to other controversial, politically tainted, unreliable, controversial, pseudoscience notions, are, in my opinion, currently NOT accepted by the relevant scientific community, have NO known error rate, and are NOT supported by peer reviewed published research in competent journals. Nonetheless these, concepts have been recklessly disseminated into powerful investigative systems — including police and university Title IX systems. (p. 64)
- In my opinion, Purdue University's acceptance and use of the very controversial, untested, and unproven notions of Dr. Rebecca Campbell to train Title IX's investigators was a methodological error (See Deposition of Erin Oliver at pg 9) that tainted the integrity of the investigation process. (p. 68)
- It is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's pseudoscience" notions are unreliable, controversial, unproven and have never been accepted by the relevant scientific community and have no known error rates. (p. 71)
- Further, it is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's RRM-MPD-DISS ideology and claims notions should have been properly reviewed by competent experts and scientists as passing minimal reliability and validity tests BEFORE they were applied to the lives of people in real life assault investigations — as in this case. (p. 71)
- In my opinion, any competent University Title IX investigator or committee should have been aware of the NATIONAL CONTROVERSIES regarding Title IX due process violations and uses of junk science methodologies such as RRM-MPD-DISS ideology and claims. Unprofessional reliance upon Dr Campbell's and other highly controversial and apparently pseudoscientific RRM-MPD-DISS ideology and claims lectures and speeches could result in methodologically defective, unfair investigations — as in this case. (pp. 71-72)
- IN MY OPINION, PURDUE FAILED TO MEET MINIMAL STANDARDS FOR INVESTIGATIONS BY A) TRAINING PERSONNEL IN DR CAMPBELL's CONTROVERSIAL UNRELIABLE IDEOLOGY and BY B) ENGAGING IN MANY EXAMPLES OF THE METHODOLOGICAL ERROR KNOWN AS CONFIRMATION BIAS (ignoring disconfirming evidence, failing to generate and test alternative

investigative hypotheses) —BOTH ARE CLEAR VIOLATIONS OF BASIC STANDARDS FOR COMPETENT INVESTIGATIONS: (p. 74)
- In sum, this is one of the most methodological defective, improper, misinformed, uninformed, investigations I have seen in the USA having reviewed hundreds of investigations in dozens of states and federal jurisdictions over the past 30 years. (p. 96)
- EXAMPLES OF ALTERNATIVE HYPOTHESES and ISSUES FOR FUTURE INVESTIGATION :
    - 1 - Purdue University investigators/adjudicators/officers were poorly and improperly trained thus applying controversial and unreliable methodologies and failingto meet minimal standards for a rational, competent investigation.
    - 2 - Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with a defective methodology ("Believe Women, but not men").
    - 3 - Purdue University investigators/adjudicators/officers used unreliable investigational procedures intentionally and also manipulated evidence via "selected evidence files", failed to record ANY interviews, and failed to obtain ANY sworn statement of any allegation in order to manipulate and control the outcome of this case.
    - 4 - Purdue University investigators/adjudicators/officers were duped and manipulated by improper, incompetent, unethical, and unreliable RRM-MPD-DISS junk science notions and ideas expressed in Title IX training seminars. For example, Dr. R. Campbell has for years been teaching highly controversial, misleading, and unethical workshops on the "Neurobiology" of trauma, memory, and violence. Who at Purdue selected Dr Campbell's controversial, unproven, junk science notions for training?
    - 5 - Purdue University investigators/adjudicators/officers deliberately and intentionally failed to properly RECORD all interviews deliberately to make it impossible to review their interviews for bias and advocacy and determine A) how accurate the claimed notes and quotes were, B) how much of the information allegedly reported was contaminated and/or fabricated by improper leading, suggestive, confusing, repeated, or biased questioning.
    - 6 - Purdue University investigators/adjudicators/officers were engaged in a "Believe Women" (not men) political advocacy project for what they perceived to be "social justice" and they never intending to conduct a fair, competent, investigation using reliable and valid measures and methods.

These are investigational alternative hypotheses that should be properly investigated by the relevant authorities including licensing boards, the US DOJ, and legislative oversight committees - both State and Federal. I have offered to testify pro bono in all such investigations. (p. 97)