# Exhibit A2

misconduct arising *after the breakup of long-term [sexual ] relationships* can — *and should be — very hard to sort out*. These cases involve not only what he or she says happened but what he or she says it *meant* in the private language of each relationship. The adjudicator steps into a *Rashomon*-like maze in which identical episodes have such dramatically different valences that both sides can be truthfully and credibly telling their own understandings and experiences *without offering a decision-maker any plausible basis of decision other than his or her own cultural assumptions and biases*." …

"somehow we have imagined sexual harassment charges to be pure of distorting motives like these. None of this is to deny that some breakups are precipitated or accompanied by acute sexual harassment, everything from quid pro quo to subtle but disadvantaging use of institutional power.  But *sometimes it's just an immiserating breakup, morphed into the form of a sexual misconduct charge*. (Emphasis added).

She also commented, "Increasingly, schools are being required to *institutionalize prevention,* to control the *risk* of harm, and to take regulatory action to protect the environment. Academic administrators are welcoming these incentives, which harmonize with their risk-averse, compliance-driven, and *rights-indifferent worldviews* and justify large expansions of the powers and size of the administration generally."  (Emphasis added).

She also noted, "In a related development, OCR increasingly implies that the only adequate "interim measure" that can protect a complainant in the Title IX process is the exclusion of the accused person from campus pending resolution of the complaint. To be sure, in these cases the accused may eventually be found to be responsible for violations, sometimes very serious ones. *But advocates and the OCR are arguing that all complainants are trauma victims* subject to continuing trauma if the persons they accuse continue in school: merely "seeing" the harasser is deemed traumatic."… "These cases are becoming increasingly easy. Interim measures and environmental security provisions are justified as "merely administrative,*"* the equivalent of determining that more lights should be installed on campus walkways or that food safety certificates should be required for all vending machines. And like merely administrative acts conducive to public safety, they follow a strict liability model. But ending or hobbling someone's access to education should be much harder than that. It may well be that the only

effective way to convince people that this tendency is dangerous is to point to the rights they invade: rights to privacy, to autonomy, to due process. But the tendency *itself* is due for scrutiny. *Assuming* danger, risk, and holistic environmental contamination ensures that restrictions will go into effect even where the facts don't justify them. Will decision-makers — and in particular governance feminist decision-makers — be able to resist this trend?"

See, Halley, Janet, **Trading the Megaphone for the Gavel in Title IX Enforcement** : Backing off the hype in Title IX enforcement, Commentary, Feb 18, 2015 128 Harv. L. Rev. F. 103  https://harvardlawreview.org/2015/02/trading-the-megaphone-for-the-gavel-in-title-ix-enforcement-2/

In my opinion, this analysis does not reduce the horrific and criminal nature of actual sexual assaults — a serious problem in America at any frequency. However, the serious nature of this problem is most effectively and competently addressed without biased, hysterical, politicized, irrational, junk science,  pseudo-investigations and unrecorded, un-transcribed "Equity Committee adjudication meetings" applying methodologically improper methods and practices — such as the pseudoscience methods, procedures, and training procedures (eg. Dr Campbell's training) conducted by Purdue University in this case.


4A10.  ANOTHER WAVE OF POLITICIZED, UNRELIABLE, PSEUDOSCIENCE : Controversial pseudo-scientific concepts such as the "Neurobiology of Trauma",  "Neurobiology of Sexual Assault", "Fragmented Memories of Trauma", and claims that "less than 10% of assault allegations are false" in addition to other controversial, politically tainted, unreliable, controversial, pseudoscience notions, are, in my opinion, currently NOT accepted by the relevant scientific community, have NO known error rate, and are NOT supported by peer reviewed published research in competent journals. Nonetheless these, concepts have been recklessly disseminated into powerful investigative systems — including police and university Title IX systems.

For example, some reported "research" claims that "over 90 percent" of rape allegations are proven not to be fabrications.  More intelligent, logical and reliable is the conclusion of journalist E. Yoffe, who noted "we simply don't know" how often people

make false claims.  As Michelle J. Anderson, the president of Brooklyn College and a scholar of rape law, acknowledged in a 2004 paper in the Boston University Law Review, "There is no good empirical data on false rape complaints either historically or currently." The data have not improved since 2004.  The flaws in claims that false accusations are very rare should be obvious to any logical, rational, competent observer.  The fatal methodological flaw is that nobody in the justice system typically investigates false allegations in detail.  The accuser is NOT the subject of the investigation. Investigators might interview the accused's family and friends, co-workers, etc.,  but they RARELY do detailed background interviews on the accuser as the accuser is simply NOT thoroughly investigated in most cases. Similarly, while investigators might contact an accused's old love interests to find out if there is a pattern of prior sexual assaults, drug addiction, pornography or violence, investigators RARELY do such an investigation on the accuser to see if there is a history of false allegations or lack of credibility. In the real world, there is little or no funding and little or no time and little or no interest to do the kind of full, detailed, rigorous investigations of accusers in "dropped" or "failed" prosecutions that would permit anyone to hazard an intelligent guess as to the percentage of accusations that are actually false.  This lack of reliable data makes guessing about the "true percentage" of false allegations reckless and unethical speculation.  In my opinion,  any author, speaker, or "expert" who claims to know the actual percentage of false criminal assault allegations should face a licensing investigation and prosecution.  See also, E. Yoffee,  The Bad Science Behind Campus Response to Sexual Assault, September 8, 2017.  https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ (accessed June 5, 2018).

The history of such pseudoscience claims is instructive.  The oft reported claim that "only 2 percent of sexual assault reports are false" appears to be a politicized, unsupported claim by author Susan Brownmiller in her political ideology, non-science book, *Against Our Will*, where she reportedly wrote "female police officers found that only 2 percent of all rape complaints were false.".   See, Edward Greer, The Truth Behind Legal Dominance Feminism's Two Percent False Rape Claim Figure, 33 Loy. L. A. L. Rev. 947 (2000), http://digitalcommons.lmu.edu/cgi/viewcontent.cgi?article=2216&context=llr (last

accessed June 5, 2018)[11]      Reportedly, the source notes from Brownmiller's book indicate this 98% accuracy claim came from a speech by Lawrence H Cooke, Appellate Division Justice, Before the Association of the Bar of the City of New York, January 16, 1974. Reportedly, investigator Greer contacted Brownmiller and she provided a copy of the speech. The 2 percent figure allegedly came from the Commander of New York City's Rape Analysis Squad, who was offering a personal opinion about the occurrence of false rape claims. Greer then reportedly contacted the speech author and no one in his office could recall how they arrived at the statistic nor could they recall any formal report on the matter. There was apparently no publication, no report, no data, no reliable protocol for assessment, no science, no peer review, no research grant, no evidence of accuracy, no indicia of reliability, and this notion is clearly NOT accepted by the relevant scientific community. It was apparently simply a "personal" opinion and yet it has been recklessly repeated as reliable fact many times apparently to manipulate gullible, science illiterate audiences—including University Title IX investigative officials.

This is yet another example of the pseudoscience that infects the "trauma" field. From Wolf's claims of 150,000 dead each year from eating disorders, to Steinem's support of recovered memories of "satanic cult abuse", to the dangerous memory recovery methods of The Courage to Heal, to Dr. Braun's infamous theories of multiple personality disorder as caused by millions of victims of childhood abuse hidden in "repressed memories", to hysterical claims of 1 in 4 college women being sexually assaulted, to Brownmiller's unproven-untested-irrational claim that only 2% of abuse allegations are false, to Dr. R. Campbell's pseudoscience trainings to Title IX investigators on her notions of the "Neurobiology of Sexual Trauma" … this clear and dangerous pattern of politicized pseudoscience continues to pose dangers to the integrity of administrative and legal processes at many levels. In my opinion, Dr. Campbell should be properly and professionally investigated for the potential damages she appears to have created to the justice and Title IX investigative systems. [ See, Neil Gilbert, The Phantom Epidemic of Sexual Assault, 103 PUB. INTEREST 54, 63 (1991) (stating that "estimates of sexual assault calculated by feminist researchers are advocacy numbers,

figures that embody less an effort at scientific understanding than an attempt to persuade the public that a problem is vastly larger than commonly recognized." ].

In contrast to politicized guessing, actual research by a Purdue University faculty member carefully documented a 41% rate of false rape allegations to police in a Midwestern city. See, Kanin, E. "False Rape Allegations", Archives of Sexual Behavior 23, no. 1 (1994). [ Note: This 1994 study by *Purdue professor* Eugene Kanin, using data from an unidentified Midwestern city, found that between 1978 and 1987 the police department concluded that *41 percent of rape allegations were proven false.* Prof. Kanin noted : "These false rape allegations appear to serve three major functions for the complainants: providing an alibi, *seeking revenge*, and obtaining sympathy and attention." The police dept investigated all allegations of rape and only rated them as false if the complainant *recanted and confessed* as to why they made the false charges.]. Clearly, more competent research is needed on this important, controversial topic.

4A11.  HOW PSEUDOSCIENCE AND CONFIRMATION BIAS DAMAGED TITLE IX INVESTIGATIONS — INCLUDING THIS CASE INVESTIGATION — CLAIMS OF "FRAGMENTED MEMORY" FOLLOWING ASSAULT and IRRATIONAL CLAIMS THAT ANY POST-ASSAULT BEHAVIORS BY WOMEN ARE CONSISTENT WITH ALLEGATIONS OF ABUSE: … ( see, the junk science presentation on the "Neurobiology of Trauma" by "Feminist Scientist" R. Campbell a Ph.D. , a community psychologist, a subset of psychology that arose in the 1960s based on Marxist ideology and radical feminism.

In my opinion, Dr. Campbell's expressed views — regarding the "Neurobiology of Trauma", or "Fragmentary Nature of Trauma Memories" (her claims that trauma memories are like "sticky post-it notes that have to be re-assembled into coherent memories"— are highly controversial, untested, unproven, highly *unreliable*, NOT accepted by the relevant scientific community, and have no known error rate. See, Transcript "The Neurobiology of Sexual Assault", An NIJ Research for the Real World Seminar, Rebecca Campbell , Ph.D. Professor of Psychology, Michigan State University, December 3, 2012. See, https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx (accessed June 6, 2018).

_KEY EVIDENCE_ :   See,  December 4, 2020,  Deposition of Purdue Employee Erin Oliver at pg 9

Q Did you receive any training in terms of trauma, of complainants? A Yes.

Q What was that training?

A _Neurobiology of trauma_. _How brains code memories, do not code memories, during traumatic instances_. That is really, all I recall from the trainings.

Q Do you recall who provided that kind of trauma training?

A I believe there was a _faculty member from Michigan State University; Rebecca Campbell._ Videos and research that is the only one I recall off the top of my head.

Q You do recall Professor Campbell?

A Yes, I believe she has been the prominent person on that subject.


In my opinion, Purdue University's acceptance and use of the very controversial, untested, and unproven notions of Dr. Rebecca Campbell to train Title IX's  investigators was a methodological error (See Deposition of Erin Oliver at pg 9) that  tainted the integrity of the investigation process.   Dr Campbell's controversial, unreliable ideology is a clear link in an historical chain of RRM-MPD-DISS unreliable pseudoscience regarding trauma, assault, and memory that have tainted the public, the legal system, and Title IX investigations for decades..  (e.g., Wolf's misinformation on eating disorders, B. Van der Kolk's pseudoscience of "fragmentary trauma memories", B. Braun's pseudoscience of RRM-MPD-DISS and related controversial and unreliable notions of how "brains do not code "trauma" memories)

Debunking RRM-MPD-DISS ideology including Dr Rebecca Campbell's theories on trauma memories:

Reportedly:

— The controversial notions regarding the "fragmentary nature of trauma memories" apparently originated from an "expert", Bessel van der Kolk, MD (VDK).

— Dr VDK was fired, not retained, or "let go" from Harvard Medical School for misconduct.

—— Dr. VDK's research assistant Danya Vardi was convicted of research fraud and banned from future funding by a federal investigation committee.

— A Federal District Court in Rhode Island ordered Dr. VDK to produce his data on the "Fragmentary Nature of Trauma Memory" for review by attorney-scientist R.C. Barden, Ph.D., J.D. Dr. VDK refused to comply with the Federal Court order, fled from the process server, dropped out of the relevant cases and years later claimed in sworn deposition testimony that the "only copy of his data" on the essential "fragmentary nature of trauma memories" study "burned up in a fire." See, pg 171 of the May 4, 2005 Videotaped deposition of B. van der Kolk, MD by Attorney RC Barden in Bonse v. Archdiocese of St Paul and Minneapolis, Court File No. 62-C4-02-11412, Second Judicial District, Ramsey County, Minnesota.

— The claim that trauma memories are "fragmented" like "post it notes" (according to Dr Campbell) and must be pieced back together as a predictable outcome of assault and/or trauma is a very controversial, unproven, controversial notion NOT accepted by the relevant scientific community. This controversial notion has NO known error rate. (See detailed discussion of the science of memory in this report).

— Prof. R. Campbell's training materials on the "Neurobiology of Sexual Assault" include unreliable, unsupported pseudoscience research and ideology that are NOT accepted by the relevant scientific community and has NO known error rate. On this record, Purdue University's reported use of Dr. Campbell's reckless notions in the training of TITLE IX investigators (See Deposition of Erin Oliver at page 9) without having such information properly reviewed and vetted by competent scientists was reckless and irrational and far below the standards for competent investigations at any level. (See Deposition of Jacob Amberger). also See, Transcript "The Neurobiology of Sexual Assault", An NIJ Research for the Real World Seminar by Rebecca Campbell , Ph.D. Professor of Psychology, Michigan State University, December 3, 2012 … See, https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx (accessed June 6, 2018).

**In my opinion, Dr. Campbell's presentations and training materials are classic pseudoscience including the RRM-MPD-DISS notion of "fragmented memories" like "post it notes" that are "pieced together" later — somehow this**

**process is claimed to be reliable while in reality it is clearly an inherently UNRELIABLE process that has been excluded by multiple courts following a proper Daubert hearing.**  Dr Campbell's junk science notion have damaged the integrity of the legal and educational systems that rely upon her controversial, unproven methods and ideas — including PURDUE UNIVERSITY's unreliable TITLE IX investigative practices in this case (e.g. no signed/dated victim statement, no video/audio recorded investigative interview, no investigation of alternative hypotheses).  As E. Yoffe has reported, as of 2014, Harvard Law's Title IX training for its disciplinary board included Campbell's PowerPoint slides. Janet Halley,  a professor at Harvard Law School, has written of the intended effect of the training on recipients: *"It is 100% aimed to convince them to believe complainants, precisely when they seem unreliable and incoherent."* — on this record the Purdue University TITLE IX investigators and Dean followed this pseudoscience diligently.

UNRELIABLE NOTIONS OF FRAGMENTED TRAUMA "MEMORIES":  Dr. Campbell's controversial, pseudoscience, unreliable notions ( see, e.g., the University of Michigan's Sexual Assault Prevention and Awareness Center webpage for students on the "Neurobiology of Trauma" based largely on Campbell's lecture) include claims that as a result of the "hormone soup" provoked by an assault, "the survivor cannot move and is rendered immobile by the traumatic event," and "survivors may have trouble accurately remembering the assault." Bowdoin College's Title IX webpage on "The Neurobiology of Sexual Assault," also based on Campbell's lecture, tells students that ***victims "also may exhibit fragmented memory recall due to the disorganized encoding that occurred during the incident."*** — a very controversial, pseudoscience theory.

[ Dr Campbell's ] information instructs young people *that they are biologically programmed to become helpless during unwanted sexual encounters and to suffer serious mental impairment afterward.*  Various initiatives have spread ideas about this alleged "syndrome" out into the collegiate world. In 2013, funding from the federal government established the National Center for Campus Public Safety, an educational resource for campus administrators that offers a "Trauma-Informed Sexual Assault Investigation and Adjudication" curriculum, and ***purveys the ideas popularized by Campbell and other***

*controversial trauma theorists*. In addition, the University of Texas at Austin released a state-funded report, "The Blueprint for Campus Police: Responding to Sexual Assault," with the hope of it becoming a national model. It codified "victim-centered and trauma-informed" investigations, asserting: *"Trauma victims often omit, exaggerate, or make up information* [i.e. become an incompetent witness or perjurer! ] when trying to make sense of what happened to them or to fill gaps in memory." See, E. Yoffe, The Bad Science Behind Campus Response to Sexual Assault, The Atlantic, Sept. 8, 2017 at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ accessed June 5, 2018.

It is my opinion that Dr Campbell should come forward and produce peer reviewed, published, reliable and valid research studies in actual, competent science journals (not "trauma" journals or "feminist science" journals) to justify her controversial and apparently false, deceptive, misleading, and potentially damaging, politicized, pseudoscience lectures and speeches.

**It is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's pseudoscience" notions are unreliable, controversial, unproven and have never been accepted by the relevant scientific community and have no known error rates.** It is my opinion that any competent and responsible University official as of Jan 2016 would know or should have known that Dr Campbell's RRM-MPD-DISS ideology and claims would fail Frye-Daubert-Kumho minimal methodological standards of reliability and validity. Further, it is my opinion that any competent and responsible University official would know or should have known as of January 2016 that *Dr Campbell's RRM-MPD-DISS ideology and claims notions should have been properly reviewed by competent experts and scientists as passing minimal reliability and validity tests BEFORE they were applied to the lives of people in real life assault investigations* — as in this case.

**In my opinion, any competent University Title IX investigator or committee should have been aware of the NATIONAL CONTROVERSIES** regarding Title IX due process violations and uses of junk science methodologies such as RRM-MPD-DISS ideology and claims. Unprofessional reliance upon Dr Campbell's and other highly controversial and apparently pseudoscientific RRM-MPD-DISS ideology and claims

71

lectures and speeches could result in methodologically defective, unfair investigations — as in this case.

My analysis of Dr Campbell's theories and publications will continue and become more detailed over time. It appears, for example,  that <u>Dr. Campbell is NOT licensed in anything</u> and thus apparently <u>avoids obeying licensing ethics rules</u> requiring the honest and proper disclosure of limitations on Campbell's methodologies, theories, and instructions.

It has been widely reported that Dr Campbell has given misleading, false, and pseudoscientific presentations — much as the RRM-MPD-DISS and other "experts" have done over past decades  — offering unreliable, politicized, pseudoscience misinformation.  For example,  "[Dr. Campbell]  asserted that *the damaged memory of a victim can be likened to "tiny Post-it notes" scattered randomly across "the world's messiest desk.*" For a sexual-assault victim to "***reconstruct what happened***" requires a sympathetic questioner who will give the victim the time and space to **"*reassemble the Post-its in a coherent order*"**.  *It should be obvious to anyone aware of the Science of Memory that such a "reconstruction" process is an <u>INHERENTLY UNRELIABLE</u> process* — as multiple courts have ruled following Daubert hearings. (See cites in this report).

Dr Campbell *reportedly assures her audiences that <u>the story that emerges will be a true account of the crime.</u>* [ NOTE: If Dr Campbell actually made such statements her conduct is be best viewed as a form of speculation and/or scientific fraud. ].

Dr Campbell *reportedly assures her audiences that* "What we know from the research is that *the laying-down of that memory is accurate and the recall of it is accurate.*" [ NOTE: If Dr Campbell actually made such statements her conduct is best viewed as a form of speculation and/or scientific fraud. ].

Dr Campbell *reportedly assures her audiences that* "Tonic immobility", she said, is a "mammalian response *that is in all of us*,"… "A victim's body freezes on them," she said, and not just for a moment or two. The victims go into an extended state in which they can't speak or move, and hence cannot fend off an assailant." [ NOTE: If Dr Campbell actually made such statements her conduct is best viewed as a form of reckless speculation and/or scientific fraud. ].

See,  E. Yoffe, The Bad Science Behind Campus Response to Sexual Assault, The Atlantic, Sept. 8, 2017  at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/  accessed June 5, 2018.

*If media reports are accurate Dr. Campbell has already been recorded "backtracking" on her pseudoscientific training pronouncements.*  For example, " I spoke with Campbell about all of this last fall, and in our conversation, Campbell said the goal of her work on neurobiology was to give law-enforcement officers a more nuanced understanding of how a sexual-trauma victim <u>might</u> behave. Campbell has apparently <u>*backtracked*</u> to saying that if her work was used as <u>*a guide for campus investigations and adjudications*</u>— particularly to support the idea that no matter how a complainant behaves, she is almost certainly telling the truth—such use was unintended, Campbell says, and "would be an overreach." <u>Campbell has reportedly acknowledged that her talk incorrectly conflated freeze and tonic immobility</u>. "That is something in later presentations I've learned to correct," she said to journalists. While her lecture conveys certainty and assurance she told me that we don't know "as much as we'd like to" about tonic immobility and that there are "very valid questions" as to whether it occurs (at all) in humans."  Compare this <u>*backtracking*</u> to her previously quoted statements… "Tonic immobility", she said, is a "mammalian response *that is in all of us*,"  likely affecting close to 50 percent of sexual-assault victims.  See, https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/.  **We should note that actual international science experts in trauma and memory like Richard McNally of Harvard University and Elizabeth Loftus of the University of California sharply disagree with Campbell's politicized, unreliable RRM-MPD-DISS "theories".**

**In my opinion, Dr. Campbell should be properly and professionally investigated for misconduct and/or fraud.** One Investigative Hypothesis would be that Dr. Campbell has engaged in misconduct, reckless speculation, and/or fraud by misrepresenting herself as an "expert" in neurobiology and investigations, grossly misrepresenting the science of memory and memory contamination, deceitfully hiding the controversial nature of her work,  misrepresenting the science of "tonic immobility", and spreading misinformation damaging the integrity of the legal system and creating

increased risks of methodologically defective investigations in University Title IX investigations.

In sum, it is my opinion to a reasonable degree of certainty that Dr Campbell's views — as reported above — are controversial, unproven, untested, theoretical notions that have not been accepted by the relevant scientific community and have no known error rate. It is further my opinion that such controversial theories and practices are not supported — and often contradicted — by competent scientific research published in quality journals. (See science of memory summary below).  My current investigative hypothesis on this issue is that Dr Campbell has engaged in deceptive misconduct in mischaracterizing the research in this field and she poses hazards to the integrity of the legal system and Title IX investigative system.

4B.    IN MY OPINION, PURDUE FAILED TO MEET MINIMAL STANDARDS FOR INVESTIGATIONS BY A) TRAINING PERSONNEL IN DR CAMPBELL's CONTROVERSIAL UNRELIABLE IDEOLOGY and BY B) ENGAGING IN MANY EXAMPLES OF THE METHODOLOGICAL ERROR KNOWN AS CONFIRMATION BIAS (ignoring disconfirming evidence, failing to generate and test alternative investigative hypotheses) —BOTH ARE CLEAR VIOLATIONS OF BASIC STANDARDS FOR COMPETENT INVESTIGATIONS :

ON THIS RECORD MUCH EVIDENCE DOCUMENTS PURDUE's NEGLIGENT CONFIRMATION BIAS:   Confirmation Bias in the Purdue University investigation includes ignoring disconfirming evidence such as Jane Doe's friendly and inviting texting messages seeking *MORE time and attention with John Doe* WEEKS following an alleged felony criminal assault.  On this case record, such disconfirming texts were simply ignored and not properly reported Purdue investigators. (See Depositions of Amberger and Oliver and others).

EVIDENCE OF JANE DOE's STATEMENTS TO HER MOTHER (Text of Dec 26, 2015 4:42 PM … pg 0282)  WAS IGNORED:   Similarly, texting evidence documenting Jane Doe's clearly stated plan to "She's just ugh. I'm literally never talking to her once I graduate. *She will not be at my graduation. She will not be at my wedding.*

_She will not see my children._"). Emphasis added.  This essential disconfirming evidence was not properly documented, nor investigated by the Purdue Investigators and Adjudicators, another example of confirmation bias.

On this record, Defendant personnel ignored Jane Doe's texts to John Doe regarding Jane Doe's plan to use her parents to pay tuition and fees until graduation then ban her mother from attending her graduation and wedding and also ban the mother from seeing Jane Doe's future children.  See, e.g. the Text of Dec 26, 2015 4:42 PM … pg 0282 … From Jane Doe to John Doe:  "She's just ugh. I'm literally never talking to her (Jane Doe's mother) once I graduate. _She will not be at my graduation. She will not be at my wedding. She will not see my children._" (Emphasis added).  The manipulative, deceitful, and cruel nature of this documentary evidence should have been properly investigated . Did Purdue personnel deliberately ignore-bury-hide-cut/paste out this key evidence?  On this record, it appears that the Equity Committee and Dean did NOT review all texts but only the "selected" evidence supporting a "Believe Women" hypothesis, another example of confirmation bias.

EVIDENCE OF JANE DOE's LACK OF TRAUMA FROM A "STUN GUN" WAS IGNORED:  Similarly, Purdue investigators improperly ignored _multiple witnesses_ who disconfirmed Jane Doe's claim of being abused or harassed by a stun baton (falsely labelled a "taser") as these witnesses agreed that Jane Doe's reaction to the stun baton was laughing and joking happily about the low powered shock device, another example of confirmation bias.

EVIDENCE DISCONFIRMING JANE DOE's CLAIMS OF JOHN DOE's "TEMPER" WAS IGNORED :  Similarly, Purdue investigators improperly ignored the _multiple witnesses_ who disconfirmed Jane Doe's claim that John Doe had a temper problem, another example of confirmation bias.

EVIDENCE OF JANE DOE's UNPROVEN ALLEGATIONS OF MULTIPLE RAPES IN HIGH SCHOOL WAS IGNORED:  Similarly, Purdue investigators improperly ignored the extensive evidence _from multiple witnesses_ and documented texting evidence supporting the investigative hypothesis that Jane Doe had been multiply-traumatized in high school (e.g., she reportedly alleged being the victim of multiple rapes in high school including one witnessed by her own parents). This

disconfirming evidence and alternative hypothesis was improperly ignored by Purdue personnel. On this record, Jane Doe's parents were not even interviewed regarding such essential evidence, another example of confirmation bias.

EVIDENCE INDICATING JANE DOE SUFFERED FROM SIGNIFICANT EMOTIONAL STRUGGLES WAS IGNORED: Similarly, Purdue investigators improperly failed to document or investigate reports that Jane Doe made an actual suicide attempt at Purdue as well as discussed suicidal ideation as well as corroborative evidence provided in the testimony of John Doe's roommate. The essential alternative hypothesis that Ms Doe demonstrated clear indications of severe emotional struggles (and/or mental illness) was, on this record, not properly investigated, another example of confirmation bias.

EVIDENCE INDICATING JANE DOE SUFFERED FROM SIGNIFICANT ALCOHOL ABUSE WAS IGNORED : What did Purdue personnel do to investigate Jane Doe's reportedly serious alcohol abuse?

EVIDENCE OF A LONG-TERM SEXUAL RELATIONSHIP WAS IGNORED : Purdue's investigators failed to investigate and document the reported fully sexual relationship these students engaged in for weeks-months (reportedly 15-20 nights of full sexual intercourse reportedly initiated by Jane Doe)? (See, Declaration of John Doe).

EVIDENCE OF MULTIPLE-MONTHS LONG DELAY IN REPORTING — RESULTING IN MANY OPPORTUNITIES FOR JANE DOE MEMORY CONTAMINATION — WAS IGNORED : Purdue investigators failed to properly ask Jane Doe about the timing of her allegations (5 MONTHS after the alleged event, after conversations/training by the CARE program, after John Doe reported Jane Doe for suicidal ideation and a suicide attempt, etc). See, Deposition of Amberger and Oliver and others).

EVIDENCE OF INVESTIGATIONAL TAINT — VIA PURDUE TRAINING USING R CAMPBELL's PSEUDO-SCIENCE METHODS — WAS IGNORED : On this record, Purdue selected the very controversial, highly politicized, unreliable, junk science "expert" Dr R. Campbell's controversial program to "train" Purdue investigators? (See, Deposition of Erin Oliver at pg 9 as cited in this report).

EVIDENCE OF INVESTIGATIONAL BIAS — BY PURDUE's STAFF ONLY INTERVIEWING JANE DOE (not John Doe) REGARDING VAGUE TEXTS — WAS IGNORED  :  On this record, Purdue investigators interviewed Jane Doe TWICE to obtain her interpretation of the vague text evidence while John Doe was IGNORED and not asked for his interpretation of the vague text evidence. This is clear evidence supporting the hypothesis that Purdue was pursuing a "Believe Women Only" strategy.

EVIDENCE OF INVESTIGATIONAL BIAS BY PURDUE's STAFF — CARE Director Bloom controlled (and potentially manipulated) the witness Jane Doe — WAS IGNORED  :  The Purdue investigators access to Jane Doe was quite controlled by CARE director Bloom and CARE director Bloom was apparently the ONLY source of Jane Doe's unsworn-unsigned-unrecorded alleged "victim statement". The egregious failure to produce any indicia of reliability for Jane Doe's statement included Purdue ignoring  evidence of Jane Doe's long term alcohol abuse,  thinking style, multiple exaggerated-false claims, and cruel-deceitful manipulation of her own parents. (See, text evidence and multiple depositions).

EVIDENCE THAT PURDUE's KEY DECISIONAL MEETING (Equity Committee) ATTENDEES NEGLIGENTLY FAILED TO PROPERLY CONSIDER ALTERNATIVE HYPOTHESES OR DISCONFIRMING EVIDENCE WAS IGNORED :  On this record, the decisional meeting attendees clearly failed to consider, discuss, and review ANY ALTERNATIVE hypotheses or ANY DISCONFIRMING evidence — an egregious example of Confirmation Bias.  They failed to have Jane Doe provide a signed/dated statement. They failed to have Jane Doe forensically interviewed with a video record.  They failed to ask Jane Doe to appear and answer questions exploring alternative hypotheses in this case.

EVIDENCE THAT THE DEAN's ANALYSIS NEGLIGENTLY FAILED TO PROPERLY CONSIDER ALTERNATIVE HYPOTHESES OR DISCONFIRMING EVIDENCE WAS IGNORED  :

On this record,  the Dean failed to note and properly document consideration of any of the disconfirming evidence and also failed to document ANY rational discussion of  the weighing back and forth of the pros and cons of the *alternative hypotheses* and *disconfirming evidence*.  On this record,  the Dean ONLY reviewed a Cut-and-Pasted file

of "selected" evidence *AND never once speak to Jane Doe and did NOT review ANY sworn/dated statements from alleged victim Jane Doe.*

On this record, the Dean and Equity Committee failed to have Jane Doe provide a signed/dated statement of allegations, failed to view a video/audio of Jane Doe being forensically interviewed and failed to ask Jane Doe to appear and answer questions exploring alternative hypotheses in this case, all examples of confirmation bias errors.

**EVIDENCE OF PURDUE's CONFIRMATION BIAS IN THIS CASE WAS NOT PROPERLY NOTICED AND CORRECTED — ON THIS RECORD THIS FAILURE WAS DEMONSTRATED BY ALL PURDUE STAFF AT ALL LEVELS :** Confirmation bias errors — very evident in this case — are serious investigation errors. On this record, Purdue's "investigators", "committee members", and Dean all failed to properly investigate the disconfirming evidence listed above and ALL *failed to generate and test proper alternative investigative hypotheses* in this complex case and all failed to obtain standard investigation evidence including a signed witness statement and/or video recorded allegation/investigatory interview.

The Purdue University Investigators and Title IX officials in this case, including the Dean of Students and others clearly demonstrated multiple examples of investigation-tainting, confirmation bias including failing to properly investigate a number of ALTERNATIVE hypotheses in this case such as:

THE FAILURE OF PURDUE PERSONNEL TO PROPERLY *RECORD* ESSENTIAL INTERVIEWS and MEETINGS: In this case, Purdue personnel committed one of the most fatal error of all errors in ANY investigation relying upon VERBAL STATEMENTS-ALLEGATIONS and lacking clear objective corroborative evidence — when they reportedly FAILED to properly record (video or audio) ANY interviews or committee meetings thus precluding a proper investigation of the alternative hypothesis that Purdue's "advocacy" and "support" officials, investigators, and "Equity Committee" members asked biased, manipulative, improper, leading, and manipulative questions consistent with radical feminist, identity politics, and Marxist

ideologies that tainted the "memories" of the alleged victim. No "written notes" or other biased evidence — "created" by the very people whose investigative conduct should be evaluated — can compensate for missing RECORDINGS. The alleged "memories" of any alleged victim of any age *cannot be properly evaluated with knowing each and every question asked and the sequence of such questions as documented in RECORDINGS* — See, basic memory research summary infra). These egregious and reckless failures are consistent with the alternative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist sham to "Believe Women"and "attack the patriarchy" without regard to logic, rational analysis, appropriate investigative methodologies, or damage to falsely accused students.

THE FAILURE of PURDUE PERSONNEL TO OBTAIN SWORN-DATED-SIGNED WITNESS STATEMENT(S) FROM THE ALLEGED VICTIM: On this record, it is quite unclear if the alleged victim even made an allegation of abuse. Of the over 1,000 investigations I have reviewed (state, federal, criminal, administrative, licensing prosecutions, civil claims, etc) I do not recall any that involved ZERO recordings (audio or video) of the witness' statements, ZERO affidavits, and ZERO written-signed-dated statements of any kind. It is not clear on this record if the alleged victim still believes her alleged "memories" (no deposition?). Having worked on hundreds of cases in which the "memories" of abuse were later recanted I look forward to reviewing actual sworn testimony from the alleged victim. These egregious and reckless (fraudulent) failures are consistent with the alternative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist front to "Believe Women"and "attack the patriarchy" without regard to logic, rational analysis, investigative methodologies, or damage to the falsely accused.

CONFIRMATION BIAS : The PURDUE INVESTIGATORS, EQUITY COMMITTEE, and DEAN of STUDENTS ALL FAILED TO SEE, HEAR, and PERSONALLY ASSESS THE TRUTHFULNESS of the ALLEGED VICTIM : On this record, the finder of fact, the Dean of Students, failed to ever MEET, TALK TO, or PERSONALLY ASSESS the alleged victim. On this record, Purdue Univ. employee

Monica Bloom was the only person to speak to and assess Jane Doe failed to produce any indicia of reliability, that is, no sworn statement, no signed/dated affidavit, no video or audio recorded statement, no sworn "chain of custody of Jane Doe's memories" (that is the number of other interviews, therapy sessions, trauma book read, etc.). These failures of Purdue's investigation are highly unusual or unprecedented in my experience. (pg 0654) On this record, Monica Bloom, Director of Purdue's Center for Advocacy, Response, and Education (CARE) was the sole source of Jane Doe's allegations of abuse. _On this record, Jane Doe has never provided a sworn, recorded, signed statement of any kind at any time to anyone - an example of confirmation bias_ error.

**_____On this record, there are obvious indications regarding the neutrality and investigational competence of Purdue's Center for Advocacy, Response, and Education (CARE).** For example, on this record ZERO allegations of sexual assault were made by Jane Doe to anyone until MONTHS AFTER the alleged event and AFTER documented exposure to Monica Bloom and Purdue's Center for Advocacy, Response, and Education (CARE). Note the opinion of the U.S. Seventh Circuit opinion in this case by Judge A.C. Barrett, [The lack of allegations of abuse] "changed in April 2016, which was Sexual Assault Awareness Month. During that month, Purdue hosted over a dozen events to promote the reporting of sexual assaults. Many of the events were sponsored by the Center for Advocacy, Response, and Education (CARE), a university center dedicated to supporting victims of sexual violence. CARE promoted the events on its Facebook page, along with posts containing information about sexual assault. One of its posts was an article from The Washington Post titled "Alcohol isn't the cause of campus sexual assault. _Men are_." Emphasis added. On this record, there was no proper consideration or investigation of the alternative hypothesis that Jane Doe had ZERO "memories" of abuse until exposure to the Sexual Assault Awareness Month materials and "Advocacy" (not neutral) training from Purdue's CARE office. The hypothesis of memory contamination via improper "advocacy" interviewing-discussions by Monica Bloom and the CARE Center were never investigated by Purdue staff, the Equity Committee, or the Dean, more examples of Confirmation Bias errors.**

On this record, Jane Doe was never properly questioned nor cross examined regarding multiple alternative hypotheses about her statements (**as alleged — without recording or other indicia of reliable reporting — by Monica Bloom**).  See eg. Jane Doe's alleged statements according to Monica Bloom claiming that John Doe

> **"started to get overly attached and would _never_ leave me by myself" and**
>
> **"he _never_ left me alone" and**
>
> **"I was _always_ paranoid or scared" and**
>
> **"even just his presence would _make me cringe and drop my head_" and**
>
> **" I stopped going to class, I stopped sleeping, I stopped eating, _anything to keep from running into him_".**

> **These statements were never properly investigated in light of disconfirming (supporting alternative hypotheses) evidence including**
>
> **A) Jane Doe's own Texting Record which clearly and repeatedly documents Jane Doe _asking John Doe for more time and attention, long after the alleged assault_ and**
>
> **B) contrary witness testimony from John Doe and**
>
> **C) contrary witness testimony from John Doe's roommate.**
>
> **On this record, Purdue's investigators, Equity Committee and Dean all demonstrated _confirmation bias errors_ by failing to properly examine and cross examine Jane Doe in investigative interviews and/or at the Equity Committee regarding alternative hypotheses generated by multiple sources of disconfirming evidence.**

In addition, in Jane Doe's allegations according to Monica Bloom, Ms Doe asked "_How many other times could this have happened_? _What else_ could he have done to me?" **_Ms. Doe's questions demonstrate a "belief" that her memory is "missing" important information — a key article of faith for "recovering repressed memories" and adopting RRM-MPD-DISS ideology_.**  This questioning process is common in patients exposed to "trauma theory" "victim training" or "Believe Women" training and is often a precursor

to "recovered repressed memories".  See, Ofshe, R. and Watters, E. (1996)  Making
Monsters: False Memories, Psychotherapy, and Sexual Hysteria. 2nd Edition. University
of California Press, for a detailed explanation of how ideologically driven therapists,
feminist support groups, and biased survivor counseling can instill "new false memories
of abuse" turning once beloved family members, spouses, or lovers into hated monsters.
On this record, Purdue's investigators, Equity Committee and Dean all demonstrated
*confirmation bias errors* by failing to properly examine and cross examine Jane Doe in
investigative interviews and/or at the Equity Committee regarding such alternative
hypotheses generated by disconfirming evidence.

**In addition, in Jane Doe's allegations according to Monica Bloom, Jane Doe
stated, "** *he makes others feel unsafe, bullies them, hurts them, and takes advantage of
their vulnerable states*" **and "** *he has a line of people behind him that he has hurt*". **In
contrast to these statements, zero corroborative evidence was reported on this
record corroborating claims that ANY other person claimed John Doe hurt them or
"bullied others" or "takes advantage of their vulnerable states".**  Jane Doe's
statement according to Monica Bloom then is in contrast to other evidence on this record,
yet Purdue's investigators, Equity Committee and Dean all demonstrated *confirmation
bias errors* by failing to properly examine and cross examine Jane Doe in investigative
interviews and/or at the Equity Committee regarding the alternative hypotheses generated
by disconfirming evidence.

In addition,  John Doe's sworn-dated-signed witness declaration of Feb 18, 2021
includes numerous claims and statements that were offered to but not investigated by the
Purdue investigators, Equity Committee, or Dean.  John Doe alleges he offered much key
evidence in this case yet his evidence was not investigated - a confirmation bias error.
John Doe alleges he was a conservative Christian and had no experience with a serious
girlfriend nor sexual intercourse (he was a virgin) prior to meeting the sexually
experienced Jane Doe at Purdue.  Three witnesses — John Doe, John Doe's roommate,
and Jane Doe's statement appear to support his claim.

In his witness declaration, John Doe denied any "confession" *to any illegal or harassing activity* in his texts and offers detailed alternative explanations for texts that might have been misinterpreted as supporting Jane Doe's allegations. For example, "I was apologizing to try and keep Jane Doe stable and because, at that time, I still had loving feelings for the first girlfriend in my life and the first girl with whom I had sexual relations, and because I was concerned about her mental well-being given her suicide attempt." In addition, John Doe claimed, "During the course of our relationship, Jane Doe told me that she had multiple sexual partners before college, and *claimed to have a personal history of rape and suicide attempts*. On multiple occasions during our relationship, she would, without me, go out to fraternity parties and get severely drunk, later returning to her room and inviting me over, only to spend the whole night vomiting into a toilet while I took care of her." See, e.g. " Q Do you recall that in that interview, Mr. Uthuttan, as a roommate, related to you that John Doe was concerned about the suicide attempt that Jane Doe made? A Yes." Deposition of Erin Oliver at pg 27. (Purdue Investigator, Associate Director of the Office of Institutional Equity).

John Doe also alleged, "December 13, 2015, I was contacted by Jane Doe. She was in her room in Wiley Hall, and requested that I meet her there. Upon arrival, I immediately saw that her room was in a severe state of disarray. *She was quite agitated, railing against her parents* and her uncertainty and unhappiness towards her life, and throwing her belongings against the walls. After I consoled her and she had calmed down, she asked to go out for a walk. I accompanied her, and she led us directly to the parking garage diagonally across the street from the armory. Jane Doe led us up to the top floor of the parking garage, and by this point her odd behavior began to give me cause for concern. *She then proceeded to try and throw herself off the ledge of the parking garage,* all the while trying to convince me to let her do so. This went on for approximately 45 minutes. At one point she had managed to swing her legs over the ledge, and she tried to break free from my grip and jump over the side. The experience upset me, and right after her outburst subsided, she behaved as though nothing of importance had happened." In addition, John Doe stated, that Jane Doe claimed to be sexually experienced, she claimed a history of previous sexual experiences in high school, she claimed to have been raped

in high school,  and *Jane Doe was the initiator of their many full sexual intercourse consensual experiences* with John Doe at Purdue including spending many nights sleeping together.

Also, John Doe stated, "None of the 134 pages of text messages referred to what Jane Doe would accuse me of in April 2016.  Our texts reflected the fact that Jane Doe and I did have a deeply personal relationship developed in part through sexual intercourse, and that Jane Doe was enforcing new physical boundaries between us. While doing this, our relationship was still intimate enough that she sent my family Christmas cookies, and we messaged one another frequently. These texts also reflected Jane Doe's difficult relationship with her mother and family, a fact she used at times to answer my questions to her about being unhappy, and also a fact that motivated her unfair behavior towards me. I became more apologetic towards Jane Doe the more she directed negativity towards me; her constant barrages eventually made me believe that I was in part somehow responsible for all her misfortune. Apologizing to placate Jane Doe was part of how I dealt with her tumultuous emotions throughout the relationship, even more so in the wake of her suicide attempt." (See, Feb 18, 2021, Declaration of John Doe ).  Failing to properly investigate such disconfirming evidence is a classic example of confirmation bias by Purdue investigators, officials, Committee, Dean, and VP.

Finally, John Doe wrote,  "The Purdue investigators *never questioned me regarding the contents of the texts after I provided them*, yet took the time to arrange *a second interview with Jane Doe,* at the suggestion of Monica Bloom, in order to review the texts and hear HER (not his) interpretation of them.   On this record,  John Doe's statements were not properly nor fairly nor rationally investigated nor was any proper investigation of his claims documented by Purdue's investigators, thus further supporting the investigative hypothesis that Purdue investigators pursued a theory of "Believe Women"only.  Jane Doe was apparently on this record NOT even questioned about any of John Doe's statements again consistent with the hypothesis that Purdue investigators pursued a theory of "Believe Women"only.  Failing to properly investigate

such disconfirming evidence is a classic example of confirmation bias by Purdue investigators, officials, Committee, Dean, and VP.

**Depositions with Purdue Staff document multiple Confirmation Bias errors including failures of proper training, failures to generate and test alternative hypotheses, and failures to properly document actual investigations of disconfirming evidence. See, e.g.,**

11 Q Okay. Have you, in the course of your time at Purdue, received training in Title IX matters? A Yes, I have. Q When was the last time you attended a training session? A I don't recall. Q Do you recall -- well, in the 12-year period you've been vice president for ethics and compliance, *do you know how many times you went to training sessions? A No, I don't.*" See, Deposition of A.C. Rollock.

See, " Q Okay. Do you recall any discussions in that general period of time with Dean Sermersheim about what Monica Bloom had emailed you and Dean Sermersheim? A I really don't recall. Q Do you recall, generally, *in the 2015/2016 school year, how many sexual misconduct disciplinary complaints there were? A No, I don't.* Q Do you have any general recollection whether it was 10? 20? 30? A I'm sorry, I don't. I don't." — really? See, Deposition of A.C. Rollock.

See, " 12 Q Okay. Let me ask a question: Is April, in the 2015/2016 school year, the sexual awareness month at Purdue? A I don't recall. I don't know." See, Deposition of A.C. Rollock.

See, 22 Q Okay. Do you recall talking at this period of time with Monica Bloom about what she had emailed you on that date? A No. I don't recall. Q Okay. Do you recall any discussions in that general period of time with Dean Sermersheim about what Monica Bloom had emailed you and Dean Sermersheim? A I really don't recall." See, Deposition of A.C. Rollock.

See, 14 Q Okay. *Did you have any substantive discussions (with the Dean of Students) about the case? A No, we did not.* Q Did -- do you recall any other conversations with Dean Sermersheim concerning the John Doe case in the months of June and July? A No. Q Do you recall any discussions concerning this John Doe case in

the months of June and July *with Monica Bloom? A No, I don't recall.*  See, Deposition of A.C. Rollock.

Another confirmation bias error was the *failure of Purdue's staff to provide John Doe with a copy of the investigation report prior to the Equity Committee hearing* in time to obtain reactions and review, generate and test alternative hypotheses from issues, facts, or disconfirming evidence produced by John Doe following review of the investigation report. See, e.g. Q Okay. And it's true, is it not, that John Doe was not provided access to the investigation report done in this case at the time the proceeding was going on? A That's correct. …. Q Why wasn't it the policy at Purdue at that time, to allow a respondent to review an investigation report providing what was the basis for a sexual misconduct finding? A *The procedures at that time did not provide any party the opportunity to review the report*." See, Deposition of A.C. Rollock.  Emphasis added.

Another investigation error was the highly unusual lack of knowledge of investigators. E.g.  "Q Okay. And you -- were you aware at that time that plaintiff, John Doe, had provided 133 pages of texts between he and complainant that went from mid-December to -- all the way to March of 2016? Mid-December, 2015, the last one in March of 2016? A No. Q Were you aware that Jane Doe -- that Jane Doe didn't provide any documentation? A No." See, Deposition of A.C. Rollock.  Similarly,  "Q Okay. Were you aware at the time that John Doe provided many pages of texts between he and John -- Jane Doe? A Not at the time I received his appeal. I knew there were text messages between the parties. I don't know who provided or how many were provided." See, Deposition of A.C. Rollock.

On this record, Purdue should have known their procedure of failing to generate a Transcript in Equity Committee meetings — the procedure used in this case — was a methodological error —later they reportedly reformed this defective procedure.  See, e.g, Q With respect to the panel meeting of the equity committee panel members and the dean, *is there any transcript that is normally made of those meetings? A No, there's not*. *If I could clarify, starting August 14th, there is, but there was not at that time.* Q I fully

understand. The new regulations A I just wanted to be sure. Q -- went into effect. Under the new regulations, they have a requirement (for transcripts). I wanted, really, to ascertain in the 2015/2016 school here, *Purdue did not have a system in which there was a transcription of such a meeting*; correct? A Correct.   See, Deposition of A.C. Rollock (Purdue VP).

On this record, Purdue providing "trauma training" based on the pseudo-science, unproven, unreliable musings of Dr R. Campbell who is licensed in nothing and not considered a competent expert by the relevant scientific community. Further, Dr Campbell's work and publications contain her radical political ideology which has clearly tainted her reputation and serves as the unreliable foundation for her unreliable foundation.  (See detailed discussion below).    That Purdue would provide such defective training from a radical political ideologue demonstrates yet another failure to meet competent standards of training to conduct investigations.   See, e.g.  " Q Did you receive any training in terms of trauma, of complainants? A Yes. Q What was that training? A Neurobiology of trauma. How brains code memories, do not code memories, during traumatic instances. That is really, all I recall from the trainings.  Q Do you recall who provided that kind of trauma training? A I believe there *was a faculty member from Michigan State University; Rebecca Campbell.* Videos and research that is the only one I recall off the top of my head. Q You do recall Professor Campbell? A Yes, *I believe she has been the prominent person on that subject*.  — Deposition of Erin Oliver at page 9. (Purdue Investigator, Associate Director of the Office of Institutional Equity).

On this record, Purdue failed to properly record interviews with witnesses — a highly unusual failure unlike virtually all police investigations I've seen over 30 years in the USA in dozens of states.   See, e.g.  " Q Was there ever any video of these interviews that you took of people in your investigation? A No, not that I am aware of... Q Was it a practice of Purdue at the time in 2015/2016 not to take video or audio of interview witnesses? A Correct, we did not audio or video interviews"   See,  Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity). Having reviewed hundreds of investigations in dozens of states I do NOT recall more

than one or two other investigations in which NO audio or video was taken of ANY witness interview. This level of investigation negligence is quite extreme in my 30 year experience. Failing to video or audio record the interviews makes it IMPOSSIBLE to properly investigate the key alternative hypothesis — in all such cases — *that improper questioning changed and contaminated the witnesses memory* as per dozens of years of memory contamination science. (See detailed discussion of memory contamination science in this report).

**On this record, Purdue used an unprecedented, unreliable, subjective methodology for creating a "selected" (incomplete, manipulated) evidence base.** They admittedly crafted a "selected evidence file" and let the Equity Committee and Dean see ***ONLY texts the investigators FELT were relevant.*** Such a subjective methodology for the selection/manipulation of evidence is an unprecedented level of negligence in my 30 year experience. See, e.g. "A We would have pulled and identified text messages *that we felt were relevant* to the investigation. Q What do you mean by, relevant? A The things that spoke directly to the allegations or response to the allegations. Q How did you know if they did relate to the allegations? A I *don't recall the exact reasoning of the practice would have been*. I don't recall the specific conversation that Jacob or I had about what we included or did not include in the course of the investigation." Deposition of Erin Oliver at page 33, (Purdue Investigator, Associate Director of the Office of Institutional Equity).

**ETHICS VIOLATIONS - A COMPETING DUAL ROLE VIOLATION BY MONICA BLOOM:** On this record, Purdue permitted a highly unethical, dual role for Monica Bloom, a role that violated ethical restrictions against CONFLICTS OF INTEREST in the behavior of professionals. **On this record, Monica Bloom acted as a LAWYER-ADVOCATE-SUPPORT PERSON for Jane Doe — with a duty to advocate for and support Jane Doe and ALSO at the SAME TIME act as the ONLY INVESTIGATOR in this case to interview and document Jane Doe's allegations - with an INCOMPATIBLE duty to provide neutral and accurate evidence for the tribunal. Clearly, Monica Bloom's conduct was unethical , improper and a classic**

**"dual competing roles" boundary violation**. I do not recall seeing such an egregious conflict of interest in a sole interviewing investigator's conduct in the past 30 years. **It should be obvious to even the most poorly trained personnel that ONE person CANNOT simultaneously act as Victim Support Person and also as SOLE INVESTIGATIVE INTERVIEWER in the same case**. See, eg., " Q Did you ever deal with Monica Bloom as director of CARE with JOHN DOE? A I recall her being the support person for JANE DOE, during the process. Outside of that no. Q Ms. Bloom was in CARE? When support person I would like to clarify you are referring to a support person for JANE DOE? A Correct.: Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity). Note this ethical violation is ANOTHER example of confirmation bias error as **Ms Bloom did not and could not properly investigate the alternative hypothesis that Ms Bloom's incompetent, leading, and suggestive interview was the "cause" of Jane Doe's new "memory" reports of abuse.**

On this record, Purdue investigators failed to interview witnesses listed by John Doe, yet another example of Confirmation Bias as the failure to investigate the alternative hypothesis that John Doe's witnesses would provide disconfirming evidence. This failure is yet another clear fact supporting the investigative hypothesis that Purdue was following a "Believe Women" (but not men) investigation strategy. See, pg 42-43 of the Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).

**On this record, Purdue investigators improperly failed to investigate reports that Jane Doe had DELETED EVIDENCE, attempted suicide, and discussed manipulating her mother to pay for her college then banning the mother from her graduation-wedding-children.** These failures are **more examples of Confirmation Bias as *an apparently total failure to investigate these alternative hypotheses regarding a lack of honesty and integrity of Jane Doe.*** See, e.g. , " Q Didn't you take into account as an adverse on credibility Jane Doe deleted the documents reflected the communication between John Doe  or and Jane Doe in December and January December

2015, January 2016? A I don't recall how that was considered." … They also ignored the suicide attempt and the text documenting Jane Doe's plan to ban her mother from her wedding or seeing children AFTER her parents paid for her schooling" They also ignored the months delayed reporting. " Q Did you ever ask Jane Doe why she waited five months according to her account between the time of the alleged incident and making a report to Purdue? A I do not recall asking that question."   See, Deposition of Erin Oliver at pg 71, (Purdue Investigator, Associate Director of the Office of Institutional Equity).

On this record, Purdue investigators improperly scheduled the Equity Committee meeting so that Jane Doe would not have to appear at all. See, " Q And below that says Jane Doe in a statement will not be in attendance, do you see that? A Yes. Q You were aware at the time that Jane Doe was not going to be in person in attendance on the June 6, meeting? A Yes." See, Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity). See eg., "Do you have any recollection as to what happened during this meeting? A I do not. Q Do you recall any questions that were asked of you? A I do not." … 1 Q Do you recall any questions asked about Jane Doe? A I do not. Q Do you recall any statements made by you? A I do not. Q Do you remember any statements made by Mr. Amberger? A I do not.   Q Do you remember anything being said while you were in that meeting with Mr. Amberger about John Doe?  A I do not. **Q *There was no court reporter, correct?* A Correct.** See, Deposition of Erin Oliver at pg 81, 82  (Purdue Investigator, Associate Director of the Office of Institutional Equity).   This is yet another example of confirmation bias errors as Purdue vigorously investigated claims against John Doe but acted to PREVENT proper investigation of claims and allegations against Jane Doe thus supporting the hypothesis that Purdue was following a "Believe Women" (but not men) investigative strategy.

On this record, the methodologically defective, confirmation biased Purdue investigators have potentially damaged the lives of hundreds of people. See, e.g. " Q You testified that you worked at Purdue as an Investigator in the Office of Institutional Equity.

Approximately how many investigations do you recall performing? You may be on mute.
A I think it is fair to say, a few hundred maybe during my time there. Q *A few hundred investigations* of allegations received in the Office of Institutional Equity? A Correct."
See, Deposition of Erin Oliver at pg 86, (Purdue Investigator, Associate Director of the
Office of Institutional Equity).

On this record, Purdue investigators gave Jane Doe multiple interviews so she
could explain her version of the Texts but did NOT provide the same time for John Doe.
See, e.g. " Your testimony that you never asked John Doe specifically about this text? A I
am sorry, can you repeat that? Q You never sat down with John Doe with this text and
asked him any questions about it? A I have no recollection of doing that. Q There was no
opportunity to determine from this text what John Doe would say concerning feeling
shitty? A *I did not speak to him about it no he would not have had that opportunity*. Q
There was no opportunity then to determine what John Doe had violated? A Again
beyond the text message if I had not had that conversation, no. Q So, just a text message
you are looking at correct? A I believe so, yes. Q Okay and so John Doe wasn't given an
opportunity to say what he meant with that specific message? A I don't recall what
conversation we had or didn't have about the text messages in our interview." See,
Deposition of Erin Oliver at pg 102. (Purdue Investigator, Associate Director of the
Office of Institutional Equity).

On this record, some of Purdue's investigation staff had actual experience doing
police work — where all interviews are properly recorded.  Did he speak up? If not, why
not?  See, e.g. " I worked with the Indiana State Excise Police from June of 1997 to
February of 2000. February of 2000 to April of 2003, I worked for the Delphi Indiana
Police Department. And then from April of 2003 to January of 2015, I worked for the
Tippecanoe County Sheriff Department here in Lafayette, Indiana.  See, Deposition of
Jacob Amberger (Purdue Investigator).

**On this record, the improper investigate strategy of "Believe Women" was**
**used at Purdue's CARE center where Monica Bloom met Jane Doe and apparently**

**did ALL of the investigative interviews (none recorded) in this case.** "Believe Women" is a therapy strategy but a fatally defective investigation strategy as it guarantees Confirmation Bias. See, "Q Have you ever heard the phrase believe women? A I have, yes. Q In what context have you heard it? A Just I've heard believe women or start by believing just in the context of support for advocacy." … 1 Q Could you elaborate what you mean by support for advocacy? A I've heard it through the EVAWI, End Violence Against Women International, through some of their e-mails and training and things like that. I know that *CARE, the Center for Advocacy Response and Education here on* *campus, has conducted training, and I think that that* **starts by believing or something** **along those lines has been a part of their outreaches or whatever they're running** **through their department.** Q Is the Center for Advocacy Response and Education known by its acronym CARE? A That is correct, CARE." See, Deposition of Jacob Amberger (Purdue Investigator).

Purdue investigators apparently interviewed Jane Doe's supportive witness — her boyfriend— but failed to interview John Does supportive witnesses — another clear example of Confirmation Bias consistent with the hypotheses that Purdue was following a "Believe Women" (but not men) investigative methodology. See, e.g. 18 Q Was he, then, the boyfriend of Jane Doe? A At the time we interviewed him in May of 2016, he was, yes. Q And you interviewed him on May 3, 2016, correct? A Correct." See, Deposition of Jacob Amberger (Purdue Investigator).

Purdue investigators failed to explore the most obvious and essential questions exploring alternative hypotheses in this case. See, e.g. " Q Did you ever ask Jane Doe *why it was five months before she said anything about the supposed event*? A If I do ask this question, I typically kind of write down a person's response in my notes. I don't recall seeing that in my notes. So *it most likely was not asked of her.*" See, Deposition of Jacob Amberger (Purdue Investigator). Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

Purdue's investigator produced a highly selected "sample" of pro-prosecution Text Files and ignore the others — another example of Confirmation Bias. See, eg. "The texts from JOHN DOE were 133 pages when printed out? A Yes. There are more pages of texts that he  provided that are NOT attached to the report. Q Well, seven pages is less than 133, is it not? A It is, yes, sir."… 11 Q Now, when you produced your investigation report, you didn't attach all 133 pages of the texts that JOHN DOE provided you, did you? A We did not, no. See, Deposition of Jacob Amberger (Purdue Investigator).  Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

The Purdue General Counsel, Steve Schultz, appears to have made an error of analysis, judgment, and ethics in a Wall Street Journal Op-Ed on Oct. 12, 2020. Mr Schultz reportedly wrote that the case evidence includes "the male student's texted *confession*".  Having reviewed 134 pages of texts in this case (all of them apparently),  it is my opinion that Mr Shulz's public claim that John Doe "confessed" supports the ongoing investigative hypothesis that Purdue University has demonstrated — and continues to demonstrate — a striking example of Confirmation Bias consistent with the hypotheses that Purdue was following a "Believe Women" (but not men) investigative methodology.   By making such a public statement of opinion, was Mr. Shultz claiming to be an expert witness or a fact witness in this case? Was Mr. Schulz's highly unusual statement an improper attempt to contaminate the future jury pool?  Was Mr Schultz's conclusory attack against John Doe in a public news forum ***beyond the liability protections of the litigation privilege***? Was General Counsel, Steve Schultz shown the ENTIRE text file or was he manipulated and only shown the "selected portion" investigators "felt" would be helpful to their case?   Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

A particularly egregious methodological and ethical quagmire in this case is the question of why was MONICA BLOOM — the woman in charge of what appears to be an ADVOCACY CARE Center at Purdue — controlling all investigator access to Jane

93

Doe? How was this possible given the obvious conflict of interest? See, " Looking at Amberger 19, does it trigger your recollection on your part as to why you were sending this e-mail to Monica Bloom on May 9, 2016? A I'm trying to schedule a time to speak with Jane Doe again" See, Deposition of Jacob Amberger (Purdue Investigator). Was Monica Bloom acting in this case as A) an advocate for the "Believe Women", therapy-counseling-political ideology but AT THE SAME TIME acting as the Sole Investigative Interviewing in an Abuse Investigation? It is hard to imagine a more obvious or serious Conflict of Interest and Boundary Violation of serving Two Incompatible Roles at the same time. Did the CARE center obtain INFORMED CONSENT from Jane Doe for this arrangement? If so, where is the informed consent form in this case? Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

Another example of Confirmation Bias was the Purdue investigators' failure to ask Jane Doe questions about the alternative hypothesis that she accused John Doe of abuse as revenge for reporting her suicide attempt and suicidal thoughts. See e.g,, "Q Did you ever ask Ms. Lambert why it was five months before she said anything about the supposed event? A If I do ask this question, I typically kind of write down a person's response in my notes. I don't recall seeing that in my notes. So *it most likely was not asked of her*." Deposition of Jacob Amberger (Purdue Investigator). Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

Another example of Confirmation Bias was the Purdue investigators lack of any coherent protocol or investigation strategy other than "Believe Women" (and not men). See, e.g., "How do you have a preponderance of the evidence supporting a finding, when on the one hand *you have a denial by the person John Doe* and the other person, *Jane Doe, doesn't have her own recollection of it?* A That would be based on credibility, corroboration by witnesses or text messages or anything of information or statements that were given during the interviews. So it's kind of an aggregate of everything we gathered, not just specifically that one allegation." Deposition of Jacob Amberger (Purdue

Investigator).  Note that Mr Amberger's answer is *psychobabble ("kind of an aggregate")*, apparently relying on false assumptions about "clinical judgment" and pseudo science notions of a magical human ability to "aggregate" discordant information, and again supports the hypothesis that the Purdue investigative personnel were untrained and unprepared to conduct any kind of serious investigation.

Another example of Confirmation Bias and incompetence was the Dean's claim that : ***"the purpose of the meeting" was to hear from the parties*** — but that never happened. ***Jane Doe did NOT even attend the meeting* and Purdue Staff let her skip it** — more evidence of adhering to a defective "Believe Women" (but not men) investigative methodology.   As the Dean wrote, "We have reviewed the complaint, written responses, and the Investigator's Report. Accordingly, the purpose of the meeting is not to conduct another investigation but *simply to be able to hear directly from the parties* and get clarification on any questions we might have after having reviewed the written materials. Please contact me if you have any questions or concerns. I can be reached at ….." (See, Letter from Dean of Students) — Key Question:  When (what date and time) did the Dean find out Jane Doe was NOT attending the hearing and had never been interviewed on record, and had never signed any witness statement of any kind.

Another example of Confirmation Bias and incompetence was the Dean's claim "***My interpretation as a professional in higher education for 30 years* and in working** with students and the student conduct, as I read and decipher the text messages and recently reviewed for the purposes of today, it is clear to me that…" See,  Deposition of Dean K. Sermersheim  = This appears to be a ***highly unreliable methodology - actually tested to be about 50% accurate — just the same as flipping coins***.  Clearly the Dean appears very uninformed regarding basic memory science, nor clinical judgment limitation science, nor methodological analyses of reliability and validity. In addition, on this record, the Dean permitted the FAILURE to video/audio record interviews with key witnesses. The Dean apparently knows little or nothing about the science of memory contamination and the dangers of mis-interviewing and repeated interviewing of witnesses. In addition, the Dean apparently permitted the FAILURE to video/audio record

or at least create a transcript for the "Equity Committee" meeting. A key question is what evidence did the Dean review — the whole record or just the "selected" file created by Purdue investigators bases on what they "felt" would be relevant? Such errors are consistent with the hypothesis that Purdue was following a defective "Believe Women" (but not men) investigative methodology.

Another example of Confirmation Bias and incompetence: It appears on this record, that Purdue Personnel failed to document ALL previous interviews-therapy sessions and other potentially memory contaminating experiences. In too many cases, even when videotaping is done, interviewers fail to ask sufficient questions to establish a "chain of custody" of the alleged victims reports of abuse (e.g. a recorded, documented statement of *the history of ALL interviews with the witness* ). This lack of a video or audio record of ALL interviews/therapy sessions makes it difficult to refute the investigative hypothesis that *the alleged victim was mis-interviewed by friends, family, peer groups, CARE center psychotherapists and/or abuse counselors, or others — potentially multiple times*. In sum, without an audio and videotaped record NOBODY can form a reliable opinion as to how many interviews and how many *manipulative* interviews the alleged victim experienced or, more specifically, how Jane Doe might have been properly or improperly questioned in "secret" untaped, interviews/therapy sessions with Purdue employees (e.g. CARE), investigators and/or psychotherapists. Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

**In sum, this is one of the most methodological defective, improper, misinformed, uninformed, investigations I have seen in the USA having reviewed hundreds of investigations in dozens of states and federal jurisdictions over the past 30 years.**

**EXAMPLES OF ALTERNATIVE HYPOTHESES and ISSUES FOR FUTURE INVESTIGATION :**

1- Purdue University investigators/adjudicators/officers were poorly and improperly trained thus applying controversial and unreliable methodologies and failing to meet minimal standards for a rational, competent investigation.

2- Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with a defective methodology ("Believe Women, but not men").

3 - Purdue University investigators/adjudicators/officers used unreliable investigational procedures intentionally and also manipulated evidence via "selected evidence files", failed to record ANY interviews, and failed to obtain ANY sworn statement of any allegation in order to manipulate and control the outcome of this case.

4 - Purdue University investigators/adjudicators/officers were duped and manipulated by improper, incompetent, unethical, and unreliable RRM-MPD-DISS junk science notions and ideas expressed in Title IX training seminars.  For example, Dr. R. Campbell has for years been teaching highly controversial, misleading, and unethical workshops on the "Neurobiology" of trauma, memory, and violence.  Who at Purdue selected Dr Campbell's controversial, unproven, junk science notions for training?

5 - Purdue University investigators/adjudicators/officers deliberately and intentionally failed to properly RECORD all interviews deliberately <u>to make it impossible to review their interviews for bias and advocacy and</u> determine A) how accurate the claimed notes and quotes were, B) how much of the information allegedly reported was contaminated and/or fabricated by improper leading, suggestive, confusing, repeated, or biased questioning.

6 - Purdue University investigators/adjudicators/officers were engaged in a "Believe Women" (not men) political advocacy project for what they perceived to be "social justice" and they never intending to conduct a fair, competent, investigation using reliable and valid measures and methods.

**These are investigational alternative hypotheses that should be properly investigated by the relevant authorities including licensing boards,  the US DOJ, and legislative oversight committees - both State and Federal.  I have offered to testify pro bono in all such investigations.**

**QUESTIONS:** What Due Diligence did Purdue officials complete prior to obtaining training for investigators by Dr R Campbell? How many times, if any, did Dr Campbell train investigation or other personnel at Purdue University? Dr Campbell's highly politicized and controversial views are well known due to her publication, Campbell, R. and Wasco, S., *Feminist Approaches to Social Science: Epistemological and Methodological Tenets*, American Journal of Community Psychology, Vol. 28, No. 6, 2000. Did anyone review this publication prior to receiving "training in the Neurobiology of Trauma"

**DR CAMPBELL'S CONTROVERSIAL PUBLICATION:** Consider the following selections from Dr Campbell's publication. See, **Campbell, R. and Wasco, S., Feminist Approaches to Social Science: Epistemological and Methodological Tenets, American Journal of Community Psychology, Vol. 28, No. 6, 2000**.

"Much like the field of community psychology, feminist scholarship is defined by its values and process. Informed by the political ideologies of the 1970s women's movement (liberal, radical, socialist feminism, and womanism), feminist scholars reinterpreted classic concepts in philosophy of science [ RCB: Note the breathtaking arrogance involved in their "reinterpreting classic concepts in the philosophy of science". ] to create *feminist epistemologies* and methodologies. Feminist epistemologies, such as feminist empiricism, standpoint theory, and postmodernism, recognize women's lived experiences [ note the bias against men ] as legitimate sources of knowledge…

We view the traditions of community psychology and feminism as compatible and mutually informative… the chart lists "radical feminism", "socialist feminism", "feminist postmodernism", "critical theory" as foundational… We begin by defining the similarities and differences between four main forms of feminism—liberal, radical, and socialist feminism, and womanism…. At an epistemological level, feminist social science legitimates women's [ note the bias against men ] lived experiences as sources of knowledge. …

Socialist feminism is based on the belief that the economic and class structure of our society is inherently problematic, which leads to multiple forms of oppression. Rooted within Marxist ideology, socialism has traditionally focused on classism, and paid

less attention to racism and sexism…. socialist feminists remain focused on the inequalities created by capitalism more generally….

Radical feminism, on the other hand, distinguishes itself from other forms of feminism by drawing central attention to gender oppression [ note the bias against men ] and calling for restructured social institutions…. Radical feminists acknowledge that classism and racism intersect with sexism, but stipulate that the systematic marginalization of women [ note the bias against men ] is the fundamental form of inequality….“radical feminists are engaged in a power struggle with man [ note the bias against men ], and that the agent of our oppression is man [ note the bias against men ] insofar as he identifies with and carries out the supremacy privileges of the male role” (New York Radical Feminists, 1969, as cited Kramarae & Treichler, 1985, p. 379)….

Radical feminists argue that the entire social order must be reexamined and redefined … They believe that our society is sexist, racist, and classist, and therefore requires *substantial transformation*” … Therefore, feminist epistemologies accept women's stories of their lives as legitimate sources of knowledge, and feminist methodologies embody an ethic of caring through the process of sharing those stories.”

“If one accepts the premise of objective reality, then the goal of science is to discover the structure and function of that singular world… if one accepted the ontological notion of an objective reality, then the knower (i.e., the scientist) must assume a position of objective detachment, *free from bias* so as to be able to capture that reality accurately. By contrast, if a (feminist) researcher rejected that notion of objectivity (an actual, objective reality) , then it is not necessary, or even desirable, to conduct research in a detached,  dispassionate manner.”…

*Postpositivism/Critical Theory*. Critical theorists argue that ''reality'' is interpreted through social, political, cultural, economic, ethnic, and gender values [ identity politics ] , and therefore there is no one objective reality (see Guba & Lincoln, 1994). What we consider to be knowledge is not “pure fact” because it is filtered through these various [ identity ]  lenses. The goal of research, therefore, is to understand how the values of both the researcher and the participants determine perceptions of the social world. As a result, *science cannot possibly be an objective enterprise* because values

enter into all phases of the research process. Thus, the *identity* ( race, class, gender ) of the knower is of critical importance" …

 *Postpositivism/Constructivism*. Constructivists take critical theory a step further by explicitly arguing that *"reality" is socially constructed* (see Guba & Lincoln, 1994). Social factors, such as gender, race, class, culture, and economics are not merely lenses through which we see reality, they are agents shaping how *we construct our visions of what constitutes our individual realities*. *There is no "real" reality*, no single truth, but multiple truths that are *individually constructed*"…

 " Similar to critical theory, the *identity* of the knower is paramount because the scientist is actively involved in the social construction of the research reality. In this view, research is an *inherently subjective process*. … " some feminist epistemologies … do indeed *fundamentally reconceptualize how we constitute knowledge*" (Note: The arrogance is breathtaking" ) … Feminist Standpoint Theory. Feminist standpoint theory is based upon post-positivist critical theory informed by the traditions of radical and socialist feminism as well as womanism. Working from the ontological *assumption that there is no single objective truth*, this theory claims that class, race, gender, and sexual orientation structure a person's understanding of reality."… *Feminist Postmodernism*. Feminist postmodernism integrates post-positivist constructivism with radical feminism. Like other constructivist theorists, *feminist postmodernists reject the notion that there is a single truth or reality, in any form*. In fact, *these feminists regard the concept of truth as a "destructive illusion"* … See,  e.g.,  Campbell, R. and Wasco, S., Feminist Approaches to Social Science: Epistemological and Methodological Tenets,  American Journal of Community Psychology, Vol. 28, No. 6, 2000.

 OTHER RELIABLE and AUTHORITATIVE CITATIONS AND REFERENCES:

 Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

 Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, Psychology, Public Policy and Law, Vol 5, No. 1, 234-

242.  Excerpts reprinted in Fisher, George (Prof. Stanford Law School), <u>Evidence</u>: University Casebook Series, Foundation Press - West Group, New York, 2002, pg. 688

Loftus, E. F. (2002) Memory Faults and Fixes. Issues in Science & Technology (publication of the National Academies of Science), 18, # 4, pp 41-50.

Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498.

Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366.

Mazzoni, G. and Memon, A.  Imagination Can Create False Autobiographical Memories, Psychological Science, Vol. 14, No. 2, March, 2003 pg. 186-193.

McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. Psychol. Sci. 15: 493–497.

Nourkova, V.V., Bernstein D.M., and Loftus, E.F. 2004. Altering traumatic memories. Cognition and Emotion 18: 575–585.

Schacter, D.L. and Slotnick, S.D. 2004. The cognitive neuroscience of memory distortion. Neuron 44: 149–160. Schmolck, H., Buffalo, E.A., and Squire, L.R.

Thomas, A. K., Bulevich, J. B., & Loftus, E.F. (2003) Exploring the role of repetition and sensory elaboration in the imagination inflation effect. Memory & Cognition, 31, 630- 640.

"Achieving Best Evidence in Criminal Proceedings: Guidance on Interviewing Victims and Witnesses, and Using Special Measures," 2007 revision, Home Office – UK: http://www.cps.gov.uk/publications/docs/ achieving_best_evidence_final.pdf

Michael E. Lamb, Irit Hershkowitz, Yael Orbach, & Phillip W. Esplin, Tell Me What Happened: Structured Investigative Interviews of Child Victims & Witnesses,  Wiley Series in Psychology of Crime, Policing and Law, Sept. 2008 (and ALL citations and studies contained therein).

The U.S. Department of Justice training materials call the generation of — and investigation of — alternative hypotheses essential to the integrity of investigations.

Chris Newlin, Linda Cordisco Steele, et al , Child Forensic Interviewing: Best Practices, published by the U.S. Department of Justice… See,

http://www.ojjdp.gov/pubs/248749.pdf  September 2015,  U.S. Department of Justice, Office of Justice Programs,  Office of Juvenile Justice and Delinquency Prevention. "Alternative Hypotheses … Contextually appropriate questions that explore other viable hypotheses for a child's behaviors or statements *are essential to the overall integrity of the interview.*" ]

**Including all research cited in this report.**

5.     **IT IS MY OPINON TO A REASONABLE DEGREE OF PSYCHOLOGICAL CERTAINTY THAT THE ANALYSES AND CONCLUSIONS IN THIS REPORT ACCURATELY REFLECT KNOWLEDGE, RESEARCH, AND METHODOLOGIES THAT ARE WIDELY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY.**

In my opinion, the analyses and opinions in this affidavit reflect the knowledge, research and methodologies of the relevant scientific and professional communities.  The court is encouraged to consult with other national experts in the field if there is any doubt about the accuracy of the opinions expressed in this affidavit.

For example, I have written Amicus Briefs on complex science issues signed by many international leaders in the fields of psychology and psychiatry.  See e.g., also Barden, R. C. (2006) Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, Feb., 2006.    with AMICI Aaron T. Beck, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard

D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi  Breslau and more.

6.    **I HAVE PREVIOUSLY TESTIFIED REGARDING SIMILAR ISSUES IN A NUMBER OF JURISDICTIONS:**

I have testified in court and/or given depositions and/or submitted expert affidavits in a number of jurisdictions across the United States on similar subjects.  I have also been invited to testify before several state legislatures. My testimony in these venues often focuses on a range of issues including but not limited to: child psychology, methodological errors and ethics violations, proper and improper investigation methods, standards of care in psychotherapy, improper questioning of witnesses, assessments of the reliability and validity of therapist-expert witness practices, parental alienation processes, coping and resilience in children,  testing and assessment, psychopathology,  the science of memory, family interactions, and related matters.  See qualifications section at the beginning of this report.

7.    **BASES FOR MY EXPERT OPINIONS IN THIS MATTER:**  My opinions in this matter are based upon my education, knowledge, training, and years of experience in the fields of adult-clinical, child-clinical and forensic psychology as well as my extensive review of case materials in this matter.   See qualifications section at the beginning of this report.   My relevant experience in this field includes:

PSYCHOTHERAPY: providing psychotherapy to numerous patients including children, families and adults (in schools, clinics, and hospitals), as well as training psychology graduate students in interviewing and psychotherapy standards and methods;

RESEARCH REVIEW AND ORIGINAL RESEARCH: reviewing hundreds of peer reviewed published research studies, serving editorial roles for leading professional journals and initiating, conducting and publishing original research in the leading journals in child psychology, social psychology, personality psychology, surgery, public policy and legislation. More specifically, I have published in, and/or served as an editor or reviewer for, several of the most highly regarded journals and texts in a number of professional fields including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation;

RECIPIENT OF TWO NATIONAL RESEARCH AWARDS in PSYCHOLOGY: including the Foundation for Child Development National Award for Young Scholars in Social and Affective Development, 1982 - 1983 and the National W. T. Grant Foundation Faculty Scholar Award for Research in Mental Health, Stress and Coping 1987. Both awards are quite relevant to my analysis in this case;

TEACHING AND TRAINING. I have given invited addresses and advanced courses at major Ph.D. graduate programs, leading law schools, and continuing education courses for Psychologists, Psychiatrists and Attorneys. I have also trained investigators including F.B.I., Sheriffs Officers, and police staff. I was an Invited Training Speaker at the Minnesota Sex Crimes Investigators Association (1994) and Invited Training Speaker at the Midwestern Sex Crimes Investigators Association. I also served as a Special Assistant Attorney General of the State of Utah as a trainer and consultant on cases involving licensing prosecutions of mental health professionals;

104

PUBLIC SERVICE EXPERIENCE:    See also the attached Illustrative Exhibit

-- Psychology Practicum - University of Minnesota Medical School, Dept. of Psychiatry

-- Psychology Practicum - Stillwater Minnesota Maximum Security Correctional Facility

-- Psychology Practicum - Minneapolis, Minnesota Public Schools

-- APA Approved Psychology Internship - Palo Alto V.A. Med Ctr/ Stanford U. Med Ctr.

-- Psychology Consultant Craniofacial Surgical Team, Baylor Medical School, Dallas, Tx

-- Psychology Consultant Craniofacial Surgical Team, Primary Children's Hospital, SLC, UT

-- Harvard Law School Intern, Mass. A.G.'s Office, Crime Victim Compensation Program

-- Chief Author and Legislative Consultant,  Emergency Medical Systems for Children Act

-- Forensic Psychology Intern, Harvard Medical School/Harvard Law School Forensic Program, Massachusetts Mental Health Center

-- Member, Minnesota State Board of Psychology (Appointment of MN Governor)

-- Member, Minnesota Higher Education Coordinating Board (responsible for overseeing the MN. multi-billion dollar budget for all state colleges, universities and trade schools) by appointment of Governor Arne Carlson (1993-1994))

-- Invited Training Speaker, Minnesota Sex Crimes Investigators Association (1994)

-- Invited Training Speaker, Midwestern Sex Crimes Investigators Association (1995)

-- Invited Training Speaker, US Surgeon General's Conference

-- Consultation with the U.S. Attorneys Office, F.B.I., other national experts

-- Court appointed expert witness, St Croix, Wisconsin

-- Legislative Consultant,  Legislation to ban "Holding Therapy" in Utah

-- Legislative Consultant, Legislation to ban "Rebirthing Therapy" in Colorado

-- Author, Emergency Medical System for Children Act

-- Consultant, Minnesota law protecting patient's rights

-- Consultant to various State Boards re: licensing actions

-- Special Assistant Attorney General for the State of Utah (2004-2005).

-- Expert Witness for the Prosecution, State of Colorado v. Watkins, et al. (Newmaker "rebirthing therapy" case) 2001.

-- Expert Witness for the Prosecution, State of Texas v. Harris,  (MPD "Twilight Rapist" case) 2011.

-- Prosecution consultant King County, Seattle, Washington  (Green MPD case 2003).

-- Prosecution consultant U.S. Attorneys Office, Houston, Texas U.S. v. Peterson, et al.

-- Testifying and consulting expert witness, U.S. Federal Public Defenders Office

-- Consultation with national experts in law and psychology

-- President, Board Member - Character & Morality in Entertainment (CAMIE Awards) 2008-2010

-- Invited International Address on Performance Psychology, Beijing Olympics (Aug-2008)

-- Legislative Consultant,  Minnesota Legislation to ban abuse of incompetent patients in research studies  See, 253B.095 RELEASE BEFORE COMMITMENT (2012)  "The treating psychiatrist must not be the psychiatrist conducting the psychiatric clinical drug trial. The court must determine that, under the circumstances of the case, the patient is competent to choose to participate in the trial, that the patient is freely choosing to participate in the trial, that the compulsion of the stayed commitment is not being used to coerce the person to participate in the clinical trial, and that a reasonable person may choose to participate in the clinical trial."

-- Pro bono consultation and testimony for Prosecution and Public Defender cases in many states

-- Invited address, Center for Enhanced Performance, US Military Academy, West Point (4-2010)

-- Invited address, F.B.I. Midwest Regional Supervisor Training Conference, (9-2010)

-- Unanimously endorsed Republican Party Candidate for Attorney General of Minnesota (Nov. 2010 election, 839,033 votes)

- Invited address, F.B.I. Midwest Regional All-Employees Training Conf., (12-2010)

- 2012 - Captain,  US Air Force Auxiliary Civil Air Patrol - Viking Wing, MN

• Reforming the EMERGENCY MEDICAL SYSTEMS FOR CHILDREN

   - See,  Barden, R. C., Kinscherff, R., George, W., Flyer, R., Seidel, J., & Henderson, D., (1993), Emergency Medical Care and Injury Prevention Systems for Children:  An Economic-Medical-Legal-Psychological Analysis and Legislative Proposals, Harvard

Journal on Legislation, Vol. 30, No. 2, pgs 461497.    Some version of this proposed legislation was reportedly enacted by the States of New Jersey (1992), Texas (1993), Utah (1994), Colorado (1995), Hawaii (1996), Louisiana (1996) and others.  These legislative ideas have continued to expand across the U.S.  As of July 1997 18 states reported the creation of a separate Emergency Medical System for Children Advisory Board (as required by this legislative proposal) and 15 states required pediatric representation on State EMS Advisory Boards. (See, EMSC News, Vol 10, No. 2, Summer 1997).

**EVIDENCE REVIEWED IN THIS CASE:**

- all articles, citations, and materials cited in this report as well as

Doe v Purdue 2015 Janet Halley "Trading the Megaphone for the Gavel in Title IX Enforcement Backing off the hype in Title IX enforcement"

Doe v Purdue Judge A.C. Barrett Decision University 928 F.3d 652.pdf

Doe v Purdue TEXT EVIDENCE JacobAmberger_27.pdf

Doe v Purdue 2016 4-11 NOTICE Ltr Information Summary Alysa Christmas Rollock_Ex_10.pdf

Doe v Purdue 2021 2-11 ECF 106 Plaintiff SurReply Navy Depos Sanctions 08 21 2020.pdf

DOE v PURDUE 2021 2-15 John Doe Declaration relationship with Jane Doe 02 15 2021.pdf

Doe v Purdue John Doe _MiniScript.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_1.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_2.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_3.pdf

Doe v Purdue DEAN's 1st DECISION Alysa Christmas Rollock_Ex_4.pdf

Doe v Purdue DEAN's 2nd DECISION LTR Alysa Christmas Rollock_Ex_7.pdf

Doe v Purdue DEPO John Doe _PDFTran.pdf

Doe v Purdue DEPO Elvin Uttuppan_Miniscript.pdf

Doe v Purdue PL's 1st APPEAL Alysa Christmas Rollock_Ex_5.pdf

Doe v Purdue PL's 2nd APPEAL & Demand for Records Alysa Christmas Rollock_Ex_8.pdf

DOE v PURDUE Plaintiff Answers to Third Interrogatories to Plaintiff.pdf

Doe v Purdue VP AFFIRMS 2nd DECISION Alysa Christmas Rollock_Ex_9.pdf

Doe v Purdue VP requires REASONS for DECISION Alysa Christmas Rollock_Ex_6.pdf

Doe v Purdue 2016 Aya Gruber Law Review on "Anti-Rape Culture".pdf

Doe v Purdue DEPO Records Custodian Trent Klingerman_MiniScript.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_11.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_14.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_15.pdf

Doe v purdue Alysa Christmas Rollock_Ex_16.pdf

Doe v Purdue Alysa Christmas Rollock_MiniScript.pdf

Doe v Purdue DEPO Alysa Christmas Rollock_PDFTran.pdf

Doe v Purdue DEPO Erin Oliver Mini Script.pdf

Doe v Purdue DEPO ErinOliver_COND Mini Script.pdf

Doe v Purdue DEPO Jacob Amberger_Ex_25.pdf

Doe v Purdue DEPO Jacob Amberger_MiniScript.pdf

Doe v Purdue DEPO Katherine Sermershein_MiniScript.pdf

Doe v Purdue DEPO Monica Bloom_MiniScript.pdf

Doe v purdue DEPO Monique H. _MiniScript copy.pdf

Doe v Purdue DEPO Rodney Hutton_G.pdf

Doe v Purdue ECF 106 Plaintiff SurReply re Sanctions 08 21 2020.pdf

Doe v Purdue Jacob Amberger_Ex_10.pdf

Doe v Purdue Jacob Amberger_Ex_11.pdf

Doe v Purdue Jacob Amberger_Ex_14.pdf

Doe v Purdue Jacob Amberger_Ex_19.pdf

Doe v Purdue Jacob Amberger_Ex_20.pdf

Doe v Purdue Jacob Amberger_Ex_21.pdf

Doe v Purdue Jacob Amberger_Ex_22.pdf

Doe v Purdue Jacob Amberger_Ex_24.pdf

Doe v Purdue Jacob Amberger_Ex_29.pdf

Doe v Purdue Jacob Amberger_Ex_30.pdf

Doe v Purdue Jacob Amberger_Ex_31.pdf

Doe v Purdue Katherine Sermershein_ Ex_2.pdf

Doe v Purdue Katherine Sermershein_Ex_3.pdf

Doe v Purdue Katherine Sermershein_Ex_4.pdf

Doe v Purdue Katherine Sermershein_Ex_5.pdf

Doe v Purdue Katherine Sermershein_Ex_6.pdf

Doe v Purdue Katherine Sermershein_Ex_7.pdf

Doe v Purdue Katherine Sermershein_Ex_8.pdf

Doe v Purdue Katherine Sermershein_Ex_9.pdf

Doe v Purdue Katherine Sermershein_Ex_10.pdf

Doe v Purdue Katherine Sermershein_Ex_11.pdf

Doe v Purdue Katherine Sermershein_Ex_11 2.pdf

Doe v Purdue Katherine Sermershein_Ex_14.pdf

Doe v Purdue Katherine Sermershein_Ex_14 2.pdf

Doe v Purdue Katherine Sermershein_Ex_29.pdf

Doe v Purdue Katherine Sermershein_Ex_33.pdf

Doe v Purdue Katherine Sermershein_Ex_34.pdf

Doe v Purdue Katherine Sermershein_Ex_35.pdf

Doe v purdue Monica Bloom_Ex_1.pdf

Doe v Purdue Monica Bloom_Ex_2.pdf

Doe v Purdue Monica Bloom_Ex_3.pdf

Doe v Purdue Monica Bloom_Ex_17.pdf

Doe v purdue Monica Bloom_Ex_18.pdf

Doe v Purdue Monica Bloom_Ex_19.pdf

Doe v Purdue Monica Bloom_Ex_20.pdf

Doe v Purdue Monica Bloom_Ex_21.pdf

Doe v Purdue Monica Bloom_Ex_23.pdf

Doe v Purdue Monique H. _MiniScript.pdf

**All evidence and research as cited in this report.**

Articles, Publications, Research on Trauma, Mental Health and related topics including controversial works by by R. Campbell, Ph.D. and her colleagues including but not limited to those cited above and…

Presentation on "The Neurobiology of Trauma" by R. Campbell, Ph.D. , U.S. Department of Justice, Office of Justice Programs, National Institute of Justice NIJ, December 3, 2012. Transcript on the internet at https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx ( accessed on June 4, 2018).

Campbell, R., Dworkin, E., and Cabral, G., An Ecological Model of the Impact of Sexual Assault on Women's Mental Health, *Trauma, Violence, and Abuse*, Vol. 10, No. 3, July 2009 225-246  DOI: 10.1177/1524838009334456

Extensive reviews of the science of memory, false memory, memory contamination and related science. (See multiple citations in this report).

Kanin, E. "False Rape Allegations", Archives of Sexual Behavior 23, no. 1 (1994). [ Note:  This 1994 study by *Purdue professor* Eugene Kanin, using data from an unidentified Midwestern city, found that between 1978 and 1987 the police department concluded that *41 percent of rape allegations were proven false.* Prof. Kanin noted : These false rape allegations appear to serve three major functions for the complainants: providing an alibi, *seeking revenge*, and obtaining sympathy and attention. The rape allegations were rated as false only when the complainant admitted they were false].

Extensive reviews of human "lie detector" research… discerning true from false statements based upon interviews lacking corroborative evidence. (See citations above).

Extensive reviews of research on "clinical judgment" including the judgment of investigators. (See citations above).

and other evidence as it becomes available.


8.    **LIMITATIONS ON THIS REPORT and TESTIMONY** :  My opinions and hypotheses in this matter are subject to the limitations of all documentary and related evidence , the impossibility of absolute predictions, as well as the limitations of social science analysis. I have not met, nor interviewed,  nor evaluated, nor assessed, nor

produced any diagnoses nor psychological descriptions of anyone in this investigatory process. As always, I have no expert opinions regarding the veracity of witnesses or the ultimate issues in this case. I will continue to review evidence in this case and update opinions. My opinions are thus subject to change at any time as new information becomes available to me including and especially my observations, analyses, and opinions at the trial of this matter. Time and cost limitations prevent a more complete analysis of all evidence in this case at this time. I seek to review all relevant evidence in this matter. I never offer opinions on guilt or innocence or the truthfulness of witnesses. Only the trier of fact can determine the credibility of witnesses and how scientific research may or may not be related to the specific facts of any particular case. A key role of an expert witness is to help the court, lawyers, parties, and the public understand and apply reliable and proper scientific, technical, and investigative principles, hypotheses, methods, and information. I have transmitted this initial expert witness report on FEB 19, 2021 to the offices of Attorney Philip A. Byler, J.D. , for use consistent with the laws of the relevant jurisdiction.

9.    My investigation of this complex and important matter continues.

This Expert Witness Report is Affirmed Under Oath. I, R. Chris Barden, Ph.D., JD do swear and affirm the truthfulness of this Expert Witness Report as filed on March 16, 2023

*R Christopher Barden, Ph.D., JD*

Expert Witness in DOE v. PURDUE, et al

As an expert witness I will offer no legal opinions nor psychological treatment-diagnostic advice in this case.

"A key role of an expert witness is to help the court, lawyers, and/or parties understand and apply reliable scientific, technical, ethical, and investigative principles, methods, alternative hypotheses, and information."