# Exhibit B1

USDC IN/ND case 2:17-cv-00033-GSL    document 240-3    filed 03/28/23    page 1 of 68
Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

**IN THE COURT OF COMMON PLEAS OF CENTRE COUNTY, PENNSYLVANIA**

**CRIMINAL DIVISON**

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA,** | : | |
| vs. | : | **CP-14-CR-2421-2011** |
| | : | **CP-14-CR-2422-2011** |
| **GERALD A SANDUSKY** | : | |
| | : | |

---

**EXPERT WITNESS REPORT OF R. CHRISTOPHER BARDEN, Ph.D., J.D.**

     **I declare under penalty of perjury that this expert witness report is true and correct as** filed and signed on Jan 18, 2023. (See, e-signature below).  This expert witness investigative report was written under substantial time and cost restrictions but is offered in its current in-process form, drafted to the best of my knowledge at this time, with the expectation that it will assist the court in understanding several essential issues of science, methodology, history, and current, ongoing investigative hypotheses. There is much additional evidence I hope to review before updating this report in the months to come.  Clearly, it would years to review all relevant evidence in this very complex case.  I am grateful to the court for providing extensions of time in 2022 to extend my review of a much evidence as possible in this time frame.  My investigation of this complex case is continuing, and updates are expected.

     1.    I,  R. Christopher Barden, Ph.D., J.D., LP, a licensed psychologist ( MN and TX )  and licensed attorney (MN and many other states pro hac vice), have testified in and/or consulted on and/or reviewed and/or litigated cases in many jurisdictions (including NY, MA, ME, NJ, VA, NC, GA, FL, TX, NM, AZ, CA, OR, WA, ID, UT, CO, NE, SD, MN, IA, IN, IL, MI, AR, WI, and others) with regard to psychological and investigative issues similar to the issues in this case.  I have consulted and/or testified as an expert in psychology, child psychology, psychopathology, psychotherapy standards of care and ethics (including social work, psychology, psychiatry, counseling, etc.),  psychological testing-assessment, mental illness diagnostic issues, the science of coping-resilience, the nature and philosophy of science, history-methodology-standards of care in police investigations/interviews, the science of memory-memory contamination-false memory, the science of trauma-dissociation, the history of the "Memory Wars", the history of lawsuits and licensing revocation actions against "recovered repressed memory therapists", the history of abuse investigations, the reliability or unreliability of various

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

methodologies-investigative methods-procedures, as well as standards of care-licensing-ethical rules-history for mental health and psychotherapy professionals (psychologists-MSWs-Counselors-GALs-social workers-psychiatrists-MFTs-parenting consultants, forensic experts, expert witnesses, etc.) and related issues.

As an expert witness, I never offer opinions regarding the veracity of witnesses or the guilt or innocence of defendants. I will, however, offer multiple opinions regarding science, history, methodologies, practices, procedures, assumptions, ideologies, errors, and misconduct as documented on the records of this case as well as questions and investigative hypotheses for future investigations.  As an experienced scientist, psychotherapist, and trial attorney I will offer opinions and hypotheses about the conduct of psychotherapists and investigators. I will also offer questions and investigative hypotheses about the conduct of legal professionals (judges, lawyers, and government officials) in this case. I will also offer general investigative hypotheses to assist future investigations of controversial, unexplored issues in this case.

In my opinion, the key role/task of an expert witness is to assist courts, attorneys, government officials, defendants, litigation parties, the media, and the public to ***understand and apply reliable*** scientific, technical, and investigative principles, hypotheses, methods, and information ***to protect the integrity of the legal system***. All opinions offered herein are to a reasonable degree of professional and scientific certainty.  Alternative investigative hypotheses are offered to assist the process of investigating ongoing controversies in this case.

2.      **EXPERT QUALIFICATIONS IN PSYCHOLOGY (RELEVANT SCIENTIFIC COMMUNITY) AND LAW:**  I received a B.A. in child psychology from the internationally acclaimed Institute of Child Development at the University of Minnesota graduating Summa Cum Laude, Phi Beta Kappa and receiving the Distinguished Graduating Senior Award.  I received my Ph.D. in clinical-child psychology from the University of Minnesota, an internationally acclaimed, American Psychological Association accredited, training program in clinical psychology.  I received additional graduate and clinical training at the University of California, Berkeley and at the Palo Alto U. S. Veterans Administration/Stanford University Medical Center internship. I received several national fellowship awards from the United States National Institute of Mental Health.  I am currently a licensed psychologist in the State of Minnesota and in the State of Texas.  I have been in good standing in all jurisdictions where I have practiced as a psychologist, attorney, and/or expert witness and have never been disciplined in any way at any time.  I have extensive clinical psychology experience in conducting psychotherapy and

assessments in medical, outpatient, forensic, correctional, educational, and inpatient settings working with a wide range of client populations including adults, children, adolescents, families, prison inmates, hospitalized inpatients, traumatized veterans, surgical patients, pediatric patients, traumatized prison inmates, traumatized survivors of the Pol Pot concentration camps, and other patient groups.

I've served on the Editorial Consulting Board of the official American Psychological Association journal for child psychology, Developmental Psychology. I've received two national research awards in child psychology and the psychology of coping and resilience from the Foundation for Child Development and the W.T. Grant Foundation. I've served as a Principal Investigator (the person responsible for the funds and validity-integrity of the research) on state, federal, and private research grants. I have published in, and/or served editing/review duties for several of the most highly regarded journals and texts in psychology, medicine and law including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation.

I have given invited training addresses to the American Bar Association, the American Psychological Association, the American Psychiatric Association, the U.S. Surgeon General's Conference, the International Association of Plastic and Reconstructive Surgeons and other groups. I served a four-year term as a member of the Minnesota State Board of Psychology appointed by Minnesota Governor Arne Carlson. My national invited addresses have often focused on methodological and scientific problems in the mental health system. I have personally investigated — as an attorney, legal consultant, and/or as a psychological expert witness or consultant - hundreds of cases of negligence and malpractice by mental health professionals including cases of accurate, and/or tainted, and/or false memories. I have also been asked to consult with and/or train groups of law enforcement personnel — regarding the proper methodology for investigation and analysis of abuse cases — including the Midwest Sex Abuse Investigators Association meetings and other officials as well as F.B.I. agents, police officials, U.S. DOJ and Attorney's Office personnel and related professionals.

I served as a Special Assistant Attorney General for the State of Utah helping to enforce licensing rules and regulations, protect the public from junk science "therapies", and prosecute misconduct by mental health professionals. One of my main areas of concentration as a psychologist has been to ***protect the integrity of the mental health and legal systems and also protect vulnerable patients*** from

*misleading junk science myths and unreliable methodologies in the psychotherapy/mental health industry* including but not limited to helping courts and professionals understand the methodology of reliable investigations, the science of human memory, the science of memory contamination ( including the risks of false memories induced by poorly trained psychotherapists and/or investigators ), the risks of improper-unreliable interviewing and psychotherapies, proper and improper uses of psychological testing, the risks of reliance upon "clinical judgment" methods,  the well-documented limitations of professional expertise in all psychotherapy professions, the well-documented inability of psychotherapy professionals to reliably distinguish true from false patient reports in the absence of any corroborating evidence, ethical rules requiring psychotherapists and experts to fully, fairly, honestly, and accurately disclose to attorneys-patients-courts-officials the methodological limitations and risks of their methods/practices, the risks of missing-hidden and/or manipulated evidence, the risks of failing to generate and test alternative investigative hypotheses (avoiding confirmation bias), and other issues.

I received a law degree with honors (J.D., cum laude) from Harvard Law School as well as training in forensic psychology/psychiatry from the joint Program in Law and Psychiatry at the Harvard Law and Medical Schools.  I served as Adjunct Professor of Law at the University of Minnesota Law School and at the Hamline University School of Law, teaching "Psychology, Psychiatry and the Law" at both institutions.  I was admitted to the practice of law in Minnesota on October 23, 1992 (License #227316), admitted to practice before the United States District Court of Minnesota on November 18, 1992 and was admitted to Practice before the United States Court of Appeals for the Eighth Circuit on May 24, 1994. I have practiced in many jurisdictions via pro hac vice admission.  I am, and have always been, in good standing in every jurisdiction in which I have practiced.  As a trial attorney, I have litigated or consulted on many cases in many states over the past 30 years involving complex legal and mental health issues including exposing misconduct by psychotherapy professionals — social workers, psychiatrists, psychologists, counselors, etc. — including several complex Frye and Daubert-Kumho hearings excluding junk science methodologies including ***controversial, unproven, and inherently unreliable notions*** such as "recovered repressed memories", "multiple personality disorder", and "dissociative amnesia" ideologies and methods **(RRM-MPD-DISS)** including the very controversial theory that that "buried memories", "blocked out memories", and related non-normal memories are reliable, accurate representations of real events suitable for courts of law.

I have been invited to speak on issues relevant to this case to several State Bar Association conferences as well as the American Bar Association's National Litigation Section meetings.  I served as a Special Assistant Attorney General for the State of Utah assisting in licensing prosecutions of negligent

mental health professionals. I have also consulted with multiple states licensing boards regarding licensing prosecutions of negligent psychotherapists including social workers, psychologists, and psychiatrists.  One of my main areas of concentration as an attorney and as a science expert witness has been to ***protect the integrity of the mental health and legal systems as well as protect vulnerable patients and citizens from unreliable, unproven "treatment" methods*** — including but not limited to helping courts and professionals understand the methodology of investigations, the science of memory-false memory, the science of memory contamination via improper interviewing, the nature of scientific evidence regarding  alleged "repressed and recovered memories" "buried memories" "blocked memories" "dissociated memories", improper-abusive investigative interviewing methods and psychotherapy of children and adults, use and misuse of psychological testing, limitations on "clinical judgment", research documenting the general lack of expertise in the psychotherapy professions, the well-documented inability of psychotherapists to reliably distinguish true from false patient reports without corroborating evidence, the importance of generating and testing alternative investigative methodologies (avoiding confirmation bias), the standards of care in the psychotherapy professions (social work, psychology, psychiatry, counseling, etc.)  and similar issues.

My scientific research began with studies on the relationships between emotion and cognition. Later I worked doing research with some of the world's leading surgeons studying the ways in which children and families cope with the stresses of chronic, complex medical conditions. I was fortunate to receive several national research awards and was able to present my work at psychological and medical conventions in North America, South America, Australia, Europe, and Asia.  I developed an interest in reforming and improving the health care system for children and was admitted to Harvard Law School to study such legislative and policy issues. One of my professors-advisors at Harvard, Stephen G. Breyer (then Chief of the US 1st Circuit Court of Appeals, later Assoc. Justice of the US Supreme Court), encouraged me to use my unusual mixture of science-law knowledge to help the legal system *reduce the influence of unreliable, "junk science" theories, methods, and ideologies and thus **protect the integrity of the legal system.*** (Justice Breyer later wrote the Kumho decision of the US SCT applying Daubert analyses to a wide range of experts and related evidence but continuing to include the foundational Frye analysis of "acceptance by the relevant scientific community").  I have been following Justice Breyer's recommendation – to apply a multi-disciplinary process applying science-legal knowledge to ***protect the integrity of the legal system*** -- for over 30 years.

Following the success of our initial project – the Emergency Medical System for Children Act -- reform legislation enacted in many states that saved the lives of thousands of children annually (See

citations below).  The next major reform project took years as *I worked with science-therapy-legal colleagues to reduce the historic, disaster of the inherently unreliable, unproven and controversial "Recovered Repressed Memory-Multiple Personality Disorder-Dissociation" (RRM-MPD-DISS) therapy movement.*  Employing a multidisciplinary approach -- litigation (hundreds of therapy malpractice suits and/or Frye and also Daubert hearings), regulation (therapy licensing revocations, enforcement of informed consent rules), education (scientific research on research, international media), and legislation (the Truth and Responsibility in Mental Health Practices Act) -- my colleagues and I greatly reduced ( nearly eliminated ) the damage from this worst stain on the mental health system in history.  Multiple Frye and Daubert hearings excluding such unproven, controversial, inherently unreliable notions nearly ended prosecutions in the US based on RRM-MPD-DISS evidence. (See citations below).

My next project sought to reduce damage to vulnerable patients from the reckless "Re-Birthing Therapy" movement. I testified as an expert witness in the criminal trial against the therapists whose "rebirthing therapy" resulted in the death of child patient CN.  The therapists were convicted and received substantial prison sentences. I worked with the Colorado Legislature to pass a law banning "rebirthing therapy". I also flew to NY to be interviewed on the ABC 20/20 TV journalism show to warn millions of Americans of the dangers of "rebirthing therapy".  To the best of my knowledge, this multidisciplinary reform effort ended the reckless practice of "rebirthing therapy" in the U.S.

Other reform projects have included lawsuits and licensing renovation hearings to reduce damage from the reckless "Coercive Holding Therapy" movement, as well as forcing the resignation of a Chairman of Psychiatry at a major medical school for violating the informed consent rights of vulnerable patients.

I have consulted with and testified for prosecutors in several states to convict criminals and protect the public from abusers (See, e.g., my Frye-Daubert-Kumho hearing testimony in the successful prosecution of the "Twilight Rapist" in TX) as well as help many professionals across the nation become more science-informed when dealing with complex memory cases and investigative methodological issues.

When Oxford University Press planned to publish an international book on Abuse Cases with a chapter on specialized memory issues such as RRM-MPD-DISS theories and practices, Frye-Daubert hearings, and related issues they asked me to write the relevant chapter. The Right Honorable, Lord John

Thomas, Lord Chief Justice of England and Wales attended our Oxford University Press book launch at Gray's Inn in London and told me he was aware of my reform work and grateful.

In multiple Frye-Daubert-Kumho hearings (see citations below), when I have participated as a consultant, testifying expert, or the trial attorney questioning scientists on both sides of the issues, we have prevailed in such hearings as the courts rejected expert witness and alleged victim testimony based on RRM-MPD-DISS "memories", "blocked-off memories", "buried memories", "dissociated memories", "changing memories" and related inherently unreliable "recovered repressed memories" and related non-normal memory processes that were excluded by courts to *protect the integrity of the legal system.*

I hope that this report in PA v Sandusky will be helpful to the court and assist in the process of *protecting the integrity of the legal system* of Pennsylvania. The goals of this report include generating and testing alternative investigative hypotheses, formulating expert opinions, and helping the legal system learn how to incorporate reliable, valid science while excluding unreliable "junk science" notions and testimony.

**3. METHODOLOGY:** My opinions in this case are the product of scientifically informed, rigorous, valid, and reliable methodological standards, procedures, and practices. My opinions in this case are consistent with those of my colleagues in the Relevant Scientific Community. In my opinion (a science opinion), I am a member of the relevant scientific community (RSC) (see comparison chart below). On the case record reviewed, To the best of my knowledge, I am apparently the only expert witness *member of the relevant scientific community* to review a wide range of records in this case. To the best of my knowledge, I am also apparently the only expert in the science-history of reliable-proper vs. unreliable-improper police interviewing methodologies to review a wide range of records in this case. To the best of my knowledge, I am also apparently the only expert in this case on the science-history of the legal, legislative, licensing, and scientific methods – including Frye and Daubert hearings -- used to dramatically reduce societal harms from RRM-MPD-DISS ideologies-practices to review a wide range of records in this case. To ensure the reliability, validity, consistency, and accuracy of my opinions in this case I have followed a series of reliable methodologies. These methodologies include the following components.

**3A.** *Acquire and demonstrate expert knowledge of the relevant science and standards of care.* I have published peer reviewed articles on the importance of the proper use of scientific methodologies and Frye-Daubert-Kumho analyses and standards to protect the integrity of the legal and mental health systems. These articles have been published in some of most authoritative and respected journals and

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

texts in the world including *Psychology, Public Policy, and Law* and with the Oxford University Press.  I have also given invited training addresses on such issues to continuing education groups in law-psychology-social work-psychiatry, to the national convention of the American Bar Association Litigation Section, as well as to state and federal judges including an invited training presentation for Federal Judges at the request of the US 9th Circuit Court of Appeals Program Office. (See, 2022 CV Resume of RC Barden, Ph.D., JD).

   **3B.   *Cite to and quote from high quality peer reviewed published research articles and texts from some of the most reliable sources in the world with many published by world experts in the relevant fields.*** As a member of the relevant scientific community in psychological research ( that is, someone who has obtained federal, state, and private grant funding to conduct science research and someone who has published in and performed editorial duties for leading peer-reviewed science journals and texts in psychology and medicine – also in law and public policy -- I am familiar with assessing the quality of scientific research and other journal articles and the specifics of how to review and assess the methodological soundness, reliability and validity of scientific research. In my reports in this case, I cite in detail —with quotes and citations — to the highest quality research often conducted by the most esteemed and methodologically sophisticated world experts in the field. I have known and worked with many of the world experts in the relevant fields for many years.

   **3C. *Form Opinions and Testify Applying Sufficient Knowledge, Training, and Experience to offer expert opinions and explain foundational science as a member of the Relevant Scientific Community.*** As a member of the <u>***relevant scientific community***</u> -- the group of science experts like myself who —

   *--  create-write science articles, publish, and professionally write-edit-critique science journals* and

   -- have received ***funding as a principal investigator from Federal and also State and also Private research grants***, and

   -- have ***engaged in editorial duties for the major peer reviewed scientific journals***, and

   -- have given ***invited addresses at the national conventions of relevant professions/sciences (American Psychological Association, American Bar Association, American Psychiatric Association) and***

   -- have ***received national science awards***, and

   -- have given ***invited addresses at national science universities*** and the US Surgeon General's Conference, and other indications of membership in the relevant scientific community.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

I hope the following summary chart will be helpful to identify some of the differences between the knowledge, training, and experience of members of the Relevant Scientific Community as compared to local "counselors", "therapists" and/or legal professionals.

**EXPERT QUALIFICATIONS CHART:** As a member of the national *Relevant Scientific Community,* I answer **YES** to all of the questions below while "counselors", "psychotherapists", attorneys, judges, and "investigators" involved in such cases often would answer **NO** to virtually all of these questions.

- Have you received national science awards?

- Have you received a Ph.D. from a leading university program? (U of MN, UC Berkeley, Stanford Univ Medical Ctr/Palo Alto USVA Medical Ctr.)

- Have you received a JD from a leading tier law school? (Harvard Law School)

- Have you obtained a Psychology Faculty Position at a leading University?

- Have you obtained a Medical Faculty Position at a leading University?

- Have you obtained a Law School Faculty Position at a leading University?

- Have you published in leading child psychology journals/texts?

- Published in leading pediatric journals/text?

- Published in leading social psychology journals/text?

- Published in leading clinical psychology journals/text?

- Published in leading psychiatric journals/text?

- Published in leading surgical journals/text?

- Published in leading legal/ethics journals/text?

- Have you received Federal grant funds as P.I. to conduct research? (PI = Scientist in Charge)

- Received State grant funds as P.I. to conduct research?

- Received Private grant funds as P.I. to conduct research?

- Have you given invited addresses at the:

    — National convention of psychologists (APA)

    — National convention of psychiatrists (APA)

    — National convention of lawyers re: use of expert witnesses (ABA)

    — National convention of the American Society for Clinical Hypnosis

    — National United States Surgeon General's Conference?

    — International Medical Conferences... UK, France, US, Canada, India, Chile?

    — International Sports Psychology Conference at the Beijing Olympics (Aug-2008)

- Have you given an invited address at Harvard University?

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

- Have you given an invited address at Harvard Law School?

- Have you given an invited address at Yale University?

- Have you given an invited address at Columbia University?

- Have you given an invited address at University of Southern Ca.?

- Have you given an invited address at the Universities of TX, GA, IA, CA, MN, NC

- Have you given an invited address at the United States Military Academy at West Point, NY?

- Have you consulted with the US Department of Justice?

- Have you consulted with the US FBI?

- Testified as a Prosecution Expert Witness in Multiple States?

- Testified as a Defense Expert Witness in Multiple States?

- Given invited training addresses to Federal Judges?

- Given invited training addresses to State Judges?

- Given invited training addresses to the F.B.I.?

- Given invited training addresses to Sex Crimes Investigators Associations?

- Given invited CE addresses to over 10,000 psychologists, social workers, MDs?

- Have you written an invited chapter on Memory Issues in Law for Oxford University Press?

- Have you performed invited Editorial duties for leading Psychiatric Journals

- Performed invited Editorial duties for leading Law/Public Policy Journal?

- Performed invited Editorial duties for leading Child Psychology Journal?

- Editorial duties for leading Social Psychology Journal?

- Editorial duties for leading Law/Public Policy Journal?

- State Government Appointment to Licensing Board?

- Have you served as a Special Assistant State Attorney General prosecuting psychotherapists?

- Have you served as a Harvard Law School Intern for the Massachusetts Attorney General's Office for Victims of Violent Crimes?

- Expert Consultant to State Licensing Boards re: revocation hearings in many jurisdictions?

- Frye-Daubert Hearings: As a lawyer or expert have you succeeded in excluding unreliable, junk social science, psychotherapy, and/or medical evidence in multiple legal cases?

As a Psychotherapist/Counselor:

- have you treated patients in hospital inpatient settings?

- have you treated patients in outpatient settings?

- have you treated patients in prison-forensic settings?

- have you treated patients in independent practice?

- have you treated trauma victims in VA Hospitals, Clinics, Prisons, and Church settings?

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

- have you treated, counseled, and/or researched with victims of the Pol Pot concentration camps?

- have you treated, counseled, and/or researched with victims of the Holocaust?

- have you treated adult patients?

- have you treated psychotic patients?

- have you treated neurologically impaired patients?

- have you done diagnostic assessments of patients?

- have you treated families?

- you treated Children and Adolescents as patients?

- have you treated Medically ill patients?

- have you treated Drug Addicted patients?

- have you treated Incarcerated patients with criminal convictions?

- have you counseled troubled people included anxious, depressed, and traumatized victims in church settings?

- As a performance psychology consultant have you trained Olympic Athletes, NBA players, Navy Fighter Pilots, Harvard Law Students, Harvard College Students, and Intl Ranked Tennis players?

- As a University Faculty member have you trained MA graduate level psychotherapists?

- As a University Faculty member have you trained PhD graduate level psychotherapists?

- As a University Faculty member have you trained MD students and faculty in relevant areas?

- As a University Faculty member have you trained Law School students and faculty?


**3D.** *Formulate Opinions and Testify Applying Sufficient Knowledge, Training, and Experience to be a member of the Relevant Clinical Mental Health Professional Community.*


**3E.** *Offer detailed, relevant, reliable, peer-reviewed, published scientific information as well as detailed opinions including alternative investigative hypotheses and research summaries to provide the legal system (court, lawyers, parties) with essential knowledge to understand the issues in a case.* I have written this report to provide a summary for the court of my opinions and ongoing investigative hypotheses in this case, based upon my review of the case records as listed and discussed in this report.


**3F.  Train legal and mental health professionals in the basic and essential science that should guide and inform attorneys, judges, and juries in science-complex cases such as PA v Sandusky.** For example, in my opinion, the science discussed below is essential to properly inform the legal system (judges, lawyers, and juries) in such cases to *protect the integrity of the legal system*. The research

**Expert Witness Report of R Chris Barden, Ph.D., JD.  January 18, 2023**

discussed below includes essential, foundational, peer reviewed, published research to explicate and support the science information underlying my detailed opinions and hypotheses in this report.

        3G.      **RELIABLE SCIENCE IS ESSENTIAL FOR A RELIABLE LEGAL SYSTEM:** In an international publication for Oxford University Press on Sex Abuse cases, I was invited to contribute the chapter on Controversial Memory Issues (RRM-MPD-DISS, Frye-Daubert hearings, etc.) and began by writing:

        "*Reliance on science is essential to proper legal process. The science of memory is particularly important*. Criminal investigations must often focus on individual memory reports in the absence of corroborative evidence. Controversial theories involving the notion of 'repressed-recovered memories' (RRM) include multiple personality disorder (MPD), dissociative identity disorder (DID), traumatic amnesia, dissociative amnesia, betrayal trauma theory, and related concepts. Such theories have generated some of the most contentious, complex, and forensically challenging issues in the recent history of the mental health and legal systems."

        I also noted that coordinated, multidisciplinary efforts in legislation, litigation, licensing regulation, education (public and professional), and science (memory research) abruptly halted most all of the widespread abuses of the RRM-MPD-DISS therapy movement while generating important legal and mental health reforms. The informed application of recent legal publications is often essential in complex legal cases such as PA v Sandusky. These reforms include ***Frye-Daubert/Kumho hearings*** applying the doctrines of multiple historic U.S. Supreme Court cases spanning decades from Frye to Daubert-Kumho. It is my understanding that in both Frye and Daubert-Kumho hearings the judge – acting as a gatekeeper to protect the integrity of the legal system -- must assess whether or not an idea-theory-methods-practices have acquired "***acceptance in the relevant scientific community***". With regard to the controversial ideas/methods-practices known as RRM-MPD-DISS ideologies, our Frye-Daubert-Kumho hearings were to to review the relevant research so the court could assess whether such methods had been accepted by the relevant scientific community and thus act as a gatekeeper to **protect the integrity of the legal system** from unreliable, tainting misinformation and also from inherently unreliable, tainted "memory" reports. The innovative, multidisciplinary, science-litigation team methods and practices that ended the RRM-MPD-DISS treatment industry (i.e., the "memory wars" malpractice lawsuits and licensing revocations) also provide a highly effective model for litigating controversial memory cases in civil, criminal, administrative, and family law systems.

It is worth re-emphasizing that for the purpose of properly reviewing and/or ruling on issues regarding the exclusion of the inherently unreliable RRM-MPD-DISS ideology, methods, and results -- *the Frye standard and the Daubert-Kumho standards have produced identical results*. It is my understanding that both standards require a foundational analysis of whether these novel, unproven, controversial RRM-MPD-DISS notions are *"generally accepted by the relevant scientific community."* [1] As the Amicus cited below and multiple other publications demonstrate, *RRM-MPD-DISS ideology, methods, and results have been actively and repeatedly rejected by the relevant scientific community in both Frye and Daubert hearings. (See, case citations below).* See eg. in a Minnesota Frye hearing (MN uses a "Frye-Mack" standard) I participated in a complex week-long hearing with *five* national experts on these issues. Minnesota is one of the remaining "Frye" states yet came to the very same conclusion as my NH, RI, NE, CA, TX, and UT cases on such issues. For example, in the Frye hearing for John Doe v. Archdiocese of St. Paul (Case No. 62-C9-06-003962, December 8, 2009, 2nd Judicial District, Judge Gregg E. Johnson) after a detailed, complex, 5-days of science testimony the court ruled, *"Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the concept of repressed and recovered memory is generally accepted in the relevant scientific community"* …Defendant's Motion to Exclude Expert Testimony under the Frye- Mack standard is hereby GRANTED." This decision was affirmed by the Minnesota Supreme Court on July 25, 2012, John Doe v. Archdiocese of St. Paul, 817 N.W.2d 150 (Minn. 2012). Note that the "non-normal-memory" reports of the alleged victim were excluded as they were based on the same unreliable notions of RRM-MPD-DISS "recovered repressed memories" theory – notions not accepted by the relevant scientific community -–— and were thus also excluded and *the case was dismissed*. As I recall happening in other Frye-Daubert hearings in NH, NE, MN, and UT.

### 3H.    SUMMARY OUTLINE OF THIS REPORT:

-- Expert Qualifications and Methodology of this Report including a discussion on the "relevant scientific community" and review processes in Frye and Daubert hearings.

-- SCIENCE-HISTORY:  Essential Science-History Knowledge and Standards Designed to Ethically and Competently Investigate and Litigate Complex Abuse Cases

-- NEWLY DISCOVERED EVIDENCE:  Review and Analysis of the Newly Discovered Shubin-SS and AJ Dillon investigation evidence

---

[1] I am not offering legal opinions in this case but rather *forensic psychological expert opinions.* Forensic experts are expected to understand and apply the proper legal standards in their work.  Although I am an experienced attorney as well, I fully understand that *the court is the only legal expert in this case.*

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

-- DETAILED OPINIONS regarding science-memory issues in the PA vs. Sandusky
Investigation and Trial.
-- INVESTIGATIVE HYPOTHESES, QUESTIONS, and DISCUSSION OF EVIDENCE ON
THE RECORD.

### 4.    ESSENTIAL SCIENCE-HISTORY KNOWLEDGE REQUIRED TO PROPERLY INVESTIGATE AND LITIGATE ABUSE CASES:

It is essential that child abuse cases be properly, reliably, and professionally investigated and
prosecuted to protect the public.  To protect the integrity of the legal process, it is also essential that
professionals involved in abuse cases know, understand, and properly apply the lessons learned from the
relevant history and science.

In 1996, I wrote the following statement — signed by a stellar group of colleagues ( including
several of the most widely cited social and clinical scientists in the world and a past President of the
American Psychological Association  ) — to the U.S. Congress:

"Child abuse is a serious social problem that should be dealt with in an effective and responsible
manner.  We strongly support the implementation of effective programs to reduce the incidence of child
abuse, assist victims of abuse, and punish those who harm children.  Efforts to attain these important
goals must, however, be based in fact rather than prejudice, science rather than hysteria, and reason rather
than political ideology."

Protecting children and abuse victims is a very important job in our society.  I have profound
respect for law enforcement professionals, investigators, prosecutors, allied staff, and all who work in the
law enforcement, family law, and mental health fields who strive to protect our youth from harm.  I am
deeply grateful for the very important work that they do.  I have consulted with, trained, and/or testified
for, prosecutors in multiple states as well as conducted invited training for F.B.I. personnel and Sex
Crimes Investigators Associations.  I have also served in public roles as a Member of the Minnesota
Board of Psychology, as a Special Assistant Attorney General in Utah, as a Harvard Law School Legal
Intern for the Massachusetts Attorney General's Office, as a Clinical Psychology (therapy and
assessment) Intern for the Palo Alto Veterans Administration /Stanford Medical Centers and in other
positions. I have also taught Continuing Legal and Psychology Education seminars to thousands of
psychologists, psychiatrists, social workers, and/or investigators in many cities in many states.  I hope my

**Expert Witness Report of R Chris Barden, Ph.D., JD.    January 18, 2023**

opinions in this case will assist and inform the legal process and the hard-working professionals involved in protecting the public.

### 4A.    THE ESSENTIAL <u>HISTORY</u> OF INVESTIGATING and PROSECUTING ABUSE CASES

In complex cases like the one under review, it is essential that the professionals involved (investigators, lawyers, judges, therapists, etc) know, comprehend, and properly apply basic history-science knowledge.  Below is very short summary of essential information. See, e.g., Continuing Education presentation by Barden, R.C., "The Science and Law of Proper and Improper Criminal, Civil, and Family Law Investigations and Expert Opinions in Abuse Cases", presented to the Pacific Judicial Council and American College of Trial Lawyers, Island of Guam, Jan 17-19, 2018. Invitation and funding from the U.S. Federal 9th Circuit Court of Appeals Programs Office.

**For thousands of years, civilization produced little or no legal protections from abuse – finally we engaged in investigations-prosecutions, but the initial efforts were not well informed by science.**    Tragically, for centuries the legal system provided little or no protection or justice for the vulnerable and abused.  From the 1960s to the 1990s criminal prosecutions for abuse grew rapidly. Troubles arose when law enforcement and therapists used interview methods that were not properly informed by the science of memory. Until near the end of the 20th century, the scientific community showed little interest in the centuries old debate over the accuracy of witness testimony.

***Infamous Day Care Hysteria and related cases of abusive mis-interviewing led to science-informed protocols for proper interviewing methods***:  A wave of infamous criminal cases involving improper, abusive, memory-manipulative, repetitive, interview practices resulted in implanted-coerced false "memories" of abuse in multiple witnesses including the McMartin, Kelly Michaels, Wenatchee, Little Rascals, many therapist-tainted adult cases, and others.  These tragic, infamous cases demonstrated ***how improper interviewing methods could taint or destroy the integrity of the legal process.***

These cases generated considerable controversy and interest in the development of ***science-informed investigative interviewing methods.*** See, e.g., Bruck, M. and Ceci, S. (1995). Amicus brief for the case of State of New Jersey v. Kelly Michaels presented by the committee of concerned social scientists. Psychology, Public Policy, and Law, 1, 272-322; and exposés earning a 2001 Pulitzer Prize Award for Rabinowitz, D., See, *No Crueler Tyrannies: Accusation, False Witness, and Other Terrors of Our Times.*

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

Decades of diligent research in memory, cognition, and false memories produced much more *reliable, valid, science-tested methods and principles for the proper interviewing of witnesses of all ages in criminal cases*. See, e.g., Michael E. Lamb, Yael Orbach, Irit Hershkowitz, Phillip W. Esplin and Dvora Horowitz,   "A structured forensic interview protocol improves the quality and informativeness of investigative interviews with children: *A review of research using the NICHD Investigative Interview Protocol*," Child Abuse & Neglect, Volume 31, Issues 11-12, November, December 2007, Pages 1201-1231  ; and. Michael E. Lamb, Irit Hershkowitz, Yael Orbach, & Phillip W. Esplin, *Tell Me What Happened: Structured Investigative Interviews of Child Victims & Witnesses*,  Wiley Series in Psychology of Crime, Policing and Law, Sept. 2008 (and ALL citations and studies contained therein).

*Satanic Cult Hysteria, Multiple Personality Disorder Hysteria, "Recovered Repressed Memories" Hysteria, "Traumatic Amnesia" claims and "Memory Wars I"* –In the hysterias of the 1980s and 1990s, thousands of therapist-book-movie-induced false memories – many debunked by FBI and other investigations -- of horrific abuse in adults and children resulted from poorly trained therapists adopting the inherently unreliable RRM-MPD-DISS ideologies and methods.   We learned from that era, that witnesses of all ages are often vulnerable to outside influences including especially Repetitive, Leading, Suggestive, and Coercive interviews.  Vulnerable witnesses often *incorporate suggested facts or narratives or repeated instructions from an interviewer's questions or other sources into their memories – resulting in actual changes in the the memory of the witness*. *Repeated questioning is a particularly powerful methods of producing changes in the memories of vulnerable – changes the witness may not be aware of.*  Such witnesses are not lying but are instead reporting "**believed-in-but-false memories**" induced via improper interviewing.  See, Coyle, Joseph in D. Schachter (Editor), *Memory Distortion: How Minds, Brains, and Societies Reconstruct the Past,*  page 24;  See also, D. Schacter. *The Seven Sins of Memory*, Houghton Mifflin, 2001. p.4.

Poorly trained, science-uninformed, unethical psychotherapists by the thousands created a tsunami of false memories of abuse, cult abuse, "human sacrifice abuse" and other hysterical "memories" in the 1980 and 1990s.  The FBI spent millions of dollars investigating and debunking thousands of such cases (See details below). My colleagues and I put together teams of litigators and scientists and launched multi-disciplinary reforms that included hundreds of successful lawsuits and many successful licensing revocation actions with State Licensing Boards.  I was personally involved in many of these cases. See, Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. *Psychiatric Times*.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

2014;31(6): June 6, 2014; See also, Belluck, P. Memory Therapy Leads to a Lawsuit and Big Settlement [\$10.6 Million], The New York Times, Page 1, Column 1, Nov. 6, 1997 and many, many more.  The battle between radical RRM-MPD-DISS therapists vs. the scientists/lawyers/licensing boards was known as the "Memory Wars".  These cases and stories featured prominently in the international media for years. I was personally interviewed on such subjects by U.S. Congressional Quarterly, CBS 60 Minutes, ABC NIGHTLINE, the CBS Evening News, TIME Magazine, Newsweek Magazine, U.S. News & World Report Magazine, Insight Magazine, The New Yorker Magazine, the L.A. Times, the New York Times, the Chicago Tribune, the Minneapolis Star and Tribune, the St. Paul Pioneer Press, the London BBC, U.S. National Public Radio, ABC News 20/20, National German Television, National Finnish Television, 60 Minutes Australia, Canadian Public Radio, PBS Frontline, NBC Dateline and many other media sources.

During this era, thousands of abuse claims based on "recovered repressed memories" and "dissociated memories" were ***investigated and debunked*** by the FBI (led by Special Agent K. Lanning and the National Center for Child Abuse and Neglect (led by Prof. G. Goodman) ***finding essentially zero corroborating evidence for over 12,000 cases of recovered memory allegations*** of horrific abuse based on "memories starting to come back", "buried memories", "blocked memories" and other typical RRM-MPD-DISS ideologies and methods. Finally, after lengthy and expensive (tens of millions of dollars) investigations in many states, FBI Special Agent Kenneth Lanning held a press conference and said, "***it is time for the psychotherapists to explain why patients are claiming things that do not appear to be true***". (See, summaries of this history published by Ofshe/Watters, Pendergrast, Loftus, McNally,  Barden and others as cited in this report plus hundreds of science and media articles available on the internet.)

***Frye-Daubert-Kumho Hearings: The Legal System Adopted Frye and much later Daubert-Kumho Doctrines and Methods for Excluding Unreliable Junk Science – such as the RRM-MPD-DISS ideology tainted evidence so prominent in this case.***  Troubled by the weight of junk science corrupting the integrity of the legal system, the US Supreme Court has issued rulings over many decades from Frye to Daubert-Kumho and progeny instructing judges to act as gatekeepers to hold hearings, carefully examine evidence, then exclude from the legal system unreliable and invalid pseudoscience that has been ***rejected by the relevant scientific community*** (scientists not therapists!) to ***protect the integrity of the legal system***.

The foundational issue ***for both Frye and Daubert-Kumho analysis*** is whether the proposed evidence (whether expert or witness testimony) has been "***accepted by the relevant scientific community*** (scientists not therapists).  It is important to note that virtually all ***psychotherapists are not scientists*** and they do not obtain research grants, and they do not serve in the ***science*** journal editorial process, they

rarely if ever publish in credible science journals, and are thus not members of the relevant scientific community.  As discussed above, multiple Frye-Daubert-Kumho hearings have been conducted, several involving multiple international experts in the relevant science with some hearings extending for weeks and covering hundreds of peer-reviewed publications. ***Multiple Frye-Daubert science review hearings I participated in – whether applying the Frye or Daubert standards or both  – resulted in the judicial exclusion of RRM-MPD-DISS ideology-methods as well as the tainted "memories" that were "recovered" "buried" "blocked" "changed following multiple interviews-therapy) etc***.  (See details and full citations below).

### FOUNDATIONAL SCIENCE ESSENTIAL TO SUCH CASES

### 4B.    THE ESSENTIAL *SCIENCE* OF INVESTIGATING and PROSECUTING ABUSE CASES

***4B1. Basic Essential Science-History:***    Abuse cases rarely involve claims of clearly NON-NORMAL RRM-MPD-DISS "memories".  Multiple, non-normal "memory" claims are well documented in PA v Sandusky (See section below for citations to RRM-MPD-DISS allegations and testimony in this case).  Under the Frye-Daubert-Kumho minimal standards for evaluating science-related evidence from Experts AND Witnesses, the opinion of the *Relevant Scientific Community (RSC)* is essential.  With regard to the RRM-MPD-DISS controversial "memory" claims that were so essential in the investigation and trial of this case --and so totally ignored by the science-uninformed and/or corrupt PA investigators, lawyers, ad judges )— ***dozens of the world's leading experts in the relevant sciences have spoken publicly and clearly on the key issue of the reliability of RRM-MPD-DISS ideology and*** "dissociated" "blocked" "buried" or "repressed" memories of trauma that are "recovered" "clarified" "put together" "start coming back" or similar descriptions following multiple interviews/therapy/or exposure to RRM-MPD-Dissociation ideology (E.g. lawyer Shubin, therapist Macnab, Investigator Leiter, etc).

Regarding the reliability of transformed, changed, formerly "buried", formerly "blocked", alleged "memories" the world's science experts have clarified ***the relevant scientific community reviewed and rejected RRM-MPD-DISS ideology-methods-practices***:

***"Decades of research and scientific debate have clarified over and over again that the notion of traumatic events being somehow "repressed" and later accurately recovered is one of the most pernicious bits of folklore ever to infect psychology and psychiatry.  This folklore provided the***

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

*theoretical basis for "recovered memory therapy" — arguably the worst catastrophe to befall the mental health field since the lobotomy era."*

See, Barden, R. C. (2006) Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, Feb., 2006. With AMICI Aaron T. Beck, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi Breslau, and more.

See also, McNally, R.J. (2003) *Remembering Trauma*, Cambridge, MA: Belknap Press/Harvard University Press.

See also, Pope H., Oliva P., and Hudson J., 'Repressed memories: The scientific status of research on repressed memories' in Faigman, D.L., Kaye, D.H., Saks, M.J., and Sanders, J. (eds) (2012) *Science in the law: social and behavioral science issues*, St. Paul, MN: West Group, 807–913.

See also, Piper A., Lillevik L., and Kritzner R., 'What's wrong with believing in repression? A review for legal professionals' (2008) 14 *Psychology Public Policy and Law*, 223–42.

See, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749.

I have written an invited chapter for the Oxford University Press book on this subject. This publication is a peer reviewed summary of several essential issues relevant to the PA v Sandusky case including RRM-MPD-DISS ideology/methods, confirmation bias, the history of Frye and also Daubert hearing exclusions of this novel pseudo-science and related information essential to what ***could and***

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

*should have been* a competent, ethical, science-informed investigation and trial in PA v Sandusky.  See, Barden, R.C., Memory and Reliability: Developments and Controversial Issues.  In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016. [2]

For a 2022 update on this research area, we should discuss the latest peer reviewed published science evidence from several world experts showing the striking and well-documented *lack of interest by the relevant scientific community in the novel, unproven, controversial, inherently unreliable notions of RRM-MPD-DISSOCIATION claims and ideology that were so prominent in this case – but somehow ignored.*  See, e.g., H. G. Pope, J.Schnabel, J. I. Hudson, (2022),  Current scientific interest in dissociative amnesia: A bibliometric analysis, Appl Cognit Psychol. 2022;1–10.   DOI: 10.1002/acp.4021 In a bibliometric analysis, we used the PubMed search engine to count the number of publications identified by the search term "dissociative amnesia" for the years 2011– 2020. We then counted publications from the same decade for five representative comparison disorders: "panic disorder," "anorexia nervosa," "obsessive compulsive disorder," "attention deficit hyperactivity disorder," and "bipolar disorder." *Our search yielded only 89 publications for "dissociative amnesia," and only seven of these involved localized or selective amnesia for specific events. By contrast, we found between 3000 and 21,000 publications for each of the five comparison (actual) disorders during 2011–2020.* We performed several additional secondary analyses, all of which suggested that the diagnosis of "localized or selective dissociative amnesia" has generated little (virtually zero) actual scientific interest in recent years.  The

---

[2] This case:  On this record, it appears that the judges, prosecutors, and defense lawyers in PA v Sandusky were uninformed and misinformed with regard to the relevant science and history. *ALL failed to know, understand, comprehend, and properly apply the internationally reported essential science and history that was so relevant and essential to a proper investigation and trial in this case*. On this record, this essential information was never presented to the uninformed, misinformed jury. The attorneys failed to properly seek and conduct a FRYE hearing regarding admission of the novel, unproven, controversial, inherently unreliable evidence in this trial regarding "blocked", "buried", "changing memories". Highly improper, coercive, and abusive interviewing methods and other unreliable procedures failed minimal standards of care. The legal professionals involved did not know nor realize that much of the RRM-MPD-DISS ideology and evidence investigated and presented in the case has been carefully reviewed and then *rejected by the relevant scientific community* and also *excluded by courts in multiple states following proper Frye and Daubert hearings (citations below).*

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

RRM-MPD-DISS "myths" are, however, still popular among some groups of poorly trained psychotherapists such as the ones reportedly involved in this case.

      **4B2.**     ***Basic Essential Science-History:***  **CONFIRMATION BIAS is often the most serious of all investigation errors in law enforcement, science, law, medical diagnosis, and other professions.**  There are many examples of Confirmation Bias in this case.

      Confirmation bias is one of the most serious, damaging, and/or fatal error in *criminal investigations and trials — as in this case*.  To avoid Confirmation Bias -- the practitioner must follow the most basic procedures in science, that is first *generate then test alternative investigative hypotheses*.  This hypotheses-test-refine hypotheses process is the essential core of science and all proper criminal investigations, health care diagnosis, and policy analysis. (See, the US SCT decision in the Daubert case, Sir Karl Popper's philosophy of science, Sir Francis Bacon essays, etc. ) and all proper, reasonable, effective investigations of crimes, illnesses, etc.

      *Confirmation Bias is "The tendency to test one's beliefs or conjectures by seeking evidence that might confirm or verify them and to <u>ignore evidence</u> that might disconfirm or refute them."* — The Oxford Dictionary definition of confirmation bias

      "He who does not expect the unexpected will not detect it" — Karl Popper (the US SCT Daubert and Kumho rely on the philosophy of science of Sir Karl Popper.)  See also, C. Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("The criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").

      **"If one were to attempt to identify a single problematic aspect of human reasoning that deserves attention above all others, the confirmation bias would have to be among the candidates for consideration."** See, Nickerson, R. Confirmation Bias: A Ubiquitous Phenomenon In Many Guises, Review of General Psychology, 1998, Vol 2, No 2, 175-220.

      **"Confirmation bias is perhaps the best known and most widely accepted notion of inferential error to come out of the literature on human reasoning**". (Evans, 1989, p. 41)

      "Because of confirmation bias and desirability bias, *we will tend to collect and interpret evidence selectively to favor a judgment that, respectively, we already believe or wish to be true*.... Dror coined a term for the impact of biasing information: the forensic confirmation bias. As soon as you know what others think, confirmation bias can lead you to form an overall impression (diagnosis) too early and to *ignore contradictory information."* — Nobel Prize winner Daniel Kahneman, Ph.D. in *Noise, A Flaw in Human Judgment,* Little, Brown Publishers (May 18, 2021); See also S. M. Kassin, I. E. Dror, J.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

Kukucka, and L.  Butt, "The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions," Journal of Applied Research in Memory and Cognition 2 (2013): 42–52.

The most fundamental principle of science is the requirement to *generate and test alternative hypotheses* (i.e., Sir Karl Popper's concept of falsification was the philosophical core of the US Supreme Court Daubert ruling). Even 8th grade science students are typically taught this essential process *but too many science-uninformed, negligent psychotherapists, police investigators, judges, and trial attorneys (like those involved in the PA v Sandusky case) remain uninformed or misinformed on the essential nature of this process – or simply ignore this training.* Any criminal investigation, health care assessment-treatment, or analysis in hearings and trials that does not spend considerable time and attention discussing the "alternative investigative hypotheses" is defective and *a danger to the integrity of the legal system*. In my experience, most all well-trained PhD and MD professionals working in major medical and/or science centers understand and apply this essential process but far too many poorly trained professionals in the mental health and legal systems remain tragically uninformed or misinformed as to critical knowledge and methodologies regarding confirmation bias.

Training has been nationally widespread for years on the essential need to avoid confirmation bias. For example, *the U.S. Department of Justice calls investigations via questioning of alternative hypotheses <u>essential</u> for the integrity of an investigation.*  See   Chris Newlin, Linda Cordisco Steele, et al , *<u>Child Forensic Interviewing: Best Practices,  published by the</u>* U.S. Department of Justice… See,  http://www.ojjdp.gov/pubs/248749.pdf  September 2015,  U.S. Department of Justice, Office of Justice Programs,  Office of Juvenile Justice and Delinquency Prevention << *Alternative Hypotheses* … Contextually appropriate questions that explore *<u>other viable hypotheses</u> for a child's (or adult's) behaviors or statements are <u>essential to the overall integrity of the interview</u>*. >>

In stark contrast to proper conduct, on this record, PA v Sandusky demonstrates an historically egregious example of the dangers of extreme Confirmation Bias. In some of *most essential evidence in this case*, Inv. Leiter recorded statements during the interview of BH on April 21, 2011. Inv. Leiter forgot his microphone was "live" and inadvertently disclosed in detail an extraordinarily improper Confirmation Biased strategy (ie., Leiter claimed he "knew" beforehand what witnesses *should* say) . Even more importantly, Inv Leiter, in his recorded discussion also disclosed in detail the government's highly improper, deeply corrupt, systemic, abusive, repetitive process of manipulating witnesses' "memories" over and over again until the witness gave in and agreed with Inv. Leiter's pre-conceived version of the evidence. Inv. Leiter's disclosed, abusive, systemic government Witness Memory Manipulation strategy is unprecedented in my 30-years of experience reviewing cases throughout the US. (See, the April 21, 2011, recorded interview of alleged victim BH and detailed quotes/analysis below).  Inv. Leiter's April 21, 2011 "taped confession" of a highly improper, abusive, government program of memory manipulation

of witnesses should have been one of the key issues at the trial of this matter including motions to exclude all witnesses who experienced the Government Memory Manipulation Interviews disclosed by Inv. Leiter.  The science of Memory-False Memories is essential to understanding the improper-memory-contaminative nature of Inv. Leiter's interviewing methods was never properly explained to the jury in this case by an Expert Witness in Memory-False Memories. In addition, the essential history of similar abusive-manipulative interviewing programs (See, McMartin, Wenatchee, the dozens of RRM-MPD-DISS therapist malpractice cases with adults, state licensing prosecutions and revocations, the results of Special Agent K. Lanning's FBI Special Task Force, etc.) was never properly explained to the uninformed, misinformed, misled, jury.

According to noted experts Bruck and Ceci (2002), the concept of ***interviewer bias*** is a defining feature of leading-suggestive interviews. –like those documented in PA vs Sandusky.  Interviewer bias (i.e. a type of Confirmation Bias) characterizes those interviewers *who hold a priori beliefs about the occurrence of certain events and who mold the interview to maximize disclosures that are consistent with those prior belief (*This is exactly the kind of abusive, case contaminating, memory manipulating process that Inv. Leiter "confessed " to in the recording of  April 21, 2011. It is extraordinary that this most essential information was never presented to the uninformed, misinformed, misled jury in PA v Sandusky.*)*

One hallmark of such interviewer bias is *the single-minded attempt by an interviewer to gather only confirmatory evidence* and to *avoid all avenues that may produce disconfirming evidence. (This is, again, the highly improper, evidence-manipulative process that Inv. Leiter "confessed to" on April 21, 2011.* Again, it is extraordinary that this most essential information was never presented to the uninformed, misinformed, misled jury in PA v Sandusky.*)*.

Thus, biased interviewers do not ask questions that might provide alternate explanations for the allegations or that might elicit information inconsistent with the interviewer's hypothesis. In addition, biased interviewers do not challenge the authenticity of a witness' report when it is consistent with their hypothesis. Even when witnesses provide inconsistent or even bizarre evidence, it is either ignored or interpreted within the framework of ***the biased interviewer's pre-conceived beliefs***. In contrast, when the witness' statement is incongruent with what the biased interviewer believes, it will be challenged or pursued with repeated questions designed to manipulate the witnesses' subsequent reports with the interviewer's initial beliefs. ***(As Inv. Leiter "confessed to" on April 21, 2011)***.  See, Bruck, Ceci, & Hembrooke, "The Nature of Children's True and False Narratives", Developmental Review. Volume 22, Issue 3, September 2002, Pages 520–554 plus many additional citations in the memory science section below.)  Note that the Newly Discovered Evidence documenting the Memory Manipulation-Evidence Tampering method of interviewing used by civil attorney Shubin (discussed in detail later in this report) is

**Expert Witness Report of R Chris Barden, Ph.D., JD.    January 18, 2023**

very similar to the improper government interviewing methods disclosed by Inv. Leiter.  Again, none of this essential information was presented to the uninformed, misinformed, misled jury in PA v Sandusky

**4B3.** ***Basic Essential Science-History:*** **"**Fervently-Believed-In-But-False-"Memories" of abuse can be (and have been) induced in many *thousands* of adults, adolescents, and children via exposure to RRM-MPD-DISS ideology and improper-leading-suggestive interviewing/therapy methods by police investigators, prosecutors, civil attorneys, family members, psychotherapists, etc. ( See, Special Agent Ken Lanning's FBI Task Force national investigations of hundreds of alleged abuse cases and Prof Gail Goodman's Nat. Assn. of Child Abuse and Neglect investigation of reportedly over 10,000 such cases, the "Memory Wars" research debate, State Licensing Board licensing revocation actions in multiple states against therapist-leaders of the RRM-MPD-DISS movement, the improper-Memory Manipulation investigations in the McMartin, Wenatchee, Kelly Michaels, and other infamous-controversial cases, the many RRM-MPD-DISS malpractice lawsuits against poorly trained, science-uninformed therapists, etc. as cited later in this report.).  On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

The wave of "Day Care" prosecutions and other abusive mis-interviewing cases overturned by Appellate Courts and/or rejected by juries resulted in national science experts taking a very serious and sustained interest in reforming the abusive, memory-contaminating investigative methods used in such tragic cases.  See, e.g., Bruck, M. and Ceci, S. (1995). 'Amicus brief for the case of State of New Jersey v. Michaels presented by the committee of concerned social scientists. Psychology, Public Policy, and Law, 1, 272-322.  The science world and the legal world began to work together to create rational, science-based standards for investigating cases and conducting proper non-abusive interviews.

The process of reforming investigative procedures to incorporate science-informed methods and standards was motivated by the rise of RRM-MPD-DISS ideology that produced the "Memory Wars" and thus some of the most contentious science-therapy controversies in history. Years of research, clinical experience, and jury trial investigation and legal case records clearly documented and demonstrated that multiple methods -- including exposure to abusive-leading-suggestive-repetitive interviews (e.g. Inv. Leiter's and Attorney Shubin's methods in this case), misleading information provided by Police Interviews, Interviews/Therapy with Science Uninformed Therapists and Civil Attorneys, exposure to False and Misleading Ideas about "recovered repressed memories", "blocked memories", "buried memories", and improper, leading, suggestive psychotherapy -- can and have induced ***Fervently-Believed-In-But-False-"Memories"*** of horrific abuse in many thousands of people (children,

adolescents, and adults). To reduce the risk of false memories and *protect the integrity of the legal system*, the relevant scientific community and law enforcement have worked to create standards of care in abuse cases including :

MINIMAL STANDARDS FOR INVESTIGATIONS-TRIALS of ABUSE CASES:

A) It is essential that *ALL interviews be properly recorded* to permit proper review by supervising investigators, expert witnesses/consultants, judges, and defense attorneys. Such reviews are necessary to protect witnesses as well as *protect the integrity of the legal system* from abusive-leading-suggestive-repetitive questioning (such as Inv Leiter's and Attorney Shubin's methods in this case as Leiter's recorded discussion of April 21, 2011 and the reportedly newly discovered evidence of the Shubin-SS interview and investigative work of AJ Dillon.

*Failure to properly record and document each and every interview should be considered a powerful indicator of Negligence and/or local corruption in any abuse investigation with witnesses of any age.* In my experience, from rural Alabama, Nebraska, and Texas to Palm Beach, Beverley Hills, Scottsdale, and downtown NYC, interviewers across the USA now *record all interviews*. Why is this so important? *Without a recording the potential memory contaminating effects of an interview cannot be assessed,* and we return to the pre-1990s "bad old days" when interviewers could abuse and manipulate witnesses at will (e.g. Wenatchee, McMartin, Kelly Michaels, Therapist Malpractice Cases such as Hamanne, Carlson, Burgus v Braun, and many other infamous cases).

*Recordings protect <u>witnesses</u>* from overzealous and/or gross negligent and/or corrupt-abusive interviewing. In contrast to national practice, on this record MANY of the interviews – perhaps even MOST (?) – were never properly recorded. Alternatively, how many were recorded and then erased to hide evidence the abusive, improper Government interviewing program as confessed to by Inv Leiter on April 21, 2011.

*Recordings also protect <u>prosecutions</u>.* If a witness' "memory" reports change from one interview to the next – which apparently happened to multiple witnesses in PA v Sandusky. And IF there is no proper recording to review, *then the prosecution cannot prove beyond a reasonable doubt that improper interviewing was not the cause of the "new memory"*. A properly science-informed jury will not convict given such an egregious government error as failing to properly record all interviews. The jury in PA v Sandusky was not properly informed of the relevant science, nor the relevant history, nor the abusively

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

improper interviewing-memory contaminative methods used in this case, nor the unsolvable (without a recording to review) question of percentage of a witness' "new memories" were created by improper interviewing?

B) it is essential that investigators be properly **trained in science-informed, abuse interview methods/protocols** to protect witnesses from misleading-suggestive-repetitive-coercive-unrecorded-abusive interviews from police-therapists-lawyers to (cf. in contrast, on this record, note the unprecedented-in-my-experience, highly improper interview methods well-documented in PA v Sandusky) and reduce the risk of memory contamination.

C) it is essential that *all non-normal alleged "memories" (like many in this case) be properly reviewed and explained to the Jury by a Memory-False-Memory-RRM-MPD-DISS expert witness who generates and walks the jury through evidence for alternative investigative hypotheses in such cases. Experts should include a* member of the relevant scientific community (that is, no local, science-uninformed psychotherapist pseudo-experts) reviewing the reliable and validity of the methodology of underlying research and the evidence in the case.

D) it is essential to *chart ALL interviews with ALL witnesses as to Date, Interviewer, Location, and who was in the room during the interview.* This essential "Interview Chart" should be properly updated and shared with opposing counsel in all cases with sufficient time prior to trial for competent preparation.  Such an essential "Interview Chart" --- nor the information required to complete such a chart -- was apparently gathered and shared in time for competent preparation in PA v. Sandusky.

E). it is essential that *on each recorded interview the witness be asked to state ALL previous interviews*  (if not, the government might interview witnesses over and over and over again and not properly disclose the number of interviews nor who was present in the room, nor the abusive and improper methods used in some interviews -- as described in Inv. Leiter's recorded discussion (April 21, 2011) discussing his practice of repeated, leading-suggestive-coercive interviews (see quotes from Inv. Leiter's April 21, 2011 recording later in this report).

F) it is essential that all investigators must be properly trained to understand that *they are NOT reliable "human lie detectors"* and must therefore search for corroborative evidence and test alternative investigative hypotheses not overly and improperly rely upon unreliable "clinical experience" or "clinical judgment" or  detective "intuition" (See, relevant research quoted in this report).

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

G) it is essential that all investigators be properly trained to understand the necessity of *avoiding Confirmation Bias* by generating and testing *alternative hypotheses* of the case (including the alternative hypothesis that false/exaggerated pseudo-memories were generated from mis-interviews/improper therapy by psychotherapists, civil attorneys, and poorly trained/corrupt investigators

H) it is essential that witnesses should never be subjected to multiple (more than 2), unrecorded, repetitive, biased interviews-therapy by investigators, therapists, and civil attorneys offering financial payments for "new" abuse memories.

J)  ALL complex memory cases – especially those lacking corroborative evidence – should involve a competent *Expert Witness in the Science (not "therapy") of memory-false memory-contamination-science-history.* Such expert witnesses should be actual science experts and not local, science-uninformed psychotherapists -- to properly instruct the court, attorneys, and jury regarding the science-history of methods to evaluate "non-normal" memory claims including RRM-MPD-DISS "buried", "blocked", or "dissociated" memories that grow and/or transform and/or change over time. (Note memories do change over time – but memory claims regarding "buried", "blocked", or "dissociated" memories are Not Normal Memories and thus require expert witness explanation to avoid a misinformed, uninformed, jury as indicated on this record in PA v Sandusky.

On this record, in my opinion, *the PA vs Sandusky investigation and trial FAILED to meet ANY of these essential minimal standards of a reliable investigation and properly-fair trial* – as required by the basic foundational, and essential science-history. A key remaining questions remains -- where the historic, egregious, catastrophic failures documented in PA vs Sandusky the result of Negligence or local corruption driven by political-economic forces? (See, detailed analysis of this question later in this report).

See, citations to Loftus, McNally, Ofshe/Watters, Barden, Ceci/Bruck, Pendergrast, Snedden, Rabinowitz, Spanier, and many others in this report. See also, Michael E. Lamb, Yael Orbach, Irit Hershkowitz, Phillip W. Esplin and Dvora Horowitz,  "A structured forensic interview protocol improves the quality and informativeness of investigative interviews with children: *A review of research using the NICHD Investigative Interview Protocol*," Child Abuse & Neglect, Volume 31, Issues 11-12, November, December 2007, Pages 1201-1231  ; and. Michael E. Lamb, Irit Hershkowitz, Yael Orbach, & Phillip W. Esplin, Tell Me What Happened: Structured Investigative Interviews of Child Victims &

Witnesses,  Wiley Series in Psychology of Crime, Policing and Law, Sept. 2008 (and ALL citations and studies contained therein).

  ***4B4.***   ***Basic Essential Science-History:***   Science has conclusively demonstrated that *human memory is not a DVD nor video recording but is subject to manipulation, change, and even whole-creation of false memories via a variety of influences* (e,g, Alleged victims subjected to repetitive, leading, interviews-discussions-therapy with family members, therapists, investigators, civil lawyers – all of these types of potentially memory contaminating experiences are documented in PA v Sandusky).

  A brief history of memory contamination research should include the famous research questions … "How fast were the cars going when they collided?" and "How fast were the cars going when they smashed into each other?" (See, E. Loftus and Palmer, 1974).  *This one-word difference in questioning created different memories* in the minds of witnesses.  Those who were asked about cars that "smashed" into each other remembered faster car speeds and some even membered broken glass in the scene – when in fact no broken glass existed at all.  *Inducing false memories with a few simple questions was far easier than anyone had anticipated* prior to these studies and the decades of research that followed. See, See Loftus, E., Our changeable memories: legal and practical implications. Science and Society. Nature Reviews: Neuroscience Volume 4, March 2003, page 231- 235.

  Given our scientific knowledge of human memory,  juries ***cannot*** reliably evaluate an alleged victim's reported "memories" unless they also review ***the actual questions asked in sequence*** on a proper ***recording***.  *Thus recording all investigative interviews is essential to the integrity of investigations and jury trials.* This is also why psychotherapists or police investigators or civil attorneys conducting leading, suggestive, and improper conversations with witnesses in UNRECORDED interviews-therapy can indeed create, new, horrific, detailed, Fervently-Believed-In-But-False-"Memories" of abuse.  This is also why *the extraordinary failure to properly record all interviews is such a serious and fatal error that it should be viewed as evidence of actual corruption in an investigation* (as in this case in both the government's investigation and the negligent Freeh Report). (See, Freeh Group Report and the multiple reviews by Thornburgh, PSU BD review, Corman Report and others. The Freeh Group apparently failed to record interviews and also failed to even interview multiple key witnesses – both quite fatal methodological flaws.)

  Many years of research has shown memory contaminative processes can generate "new" and/or false memories via ***source confusion/source amnesia (***e.g., being trained to consider dreams, nightmares,

imagination, hypnotic images, etc. as reliable indicators of "memories").  As Prof. Dan Schachter, former Chairman of Psychology at Harvard University has noted, "...false memories ... in studies often include bits and pieces of memories that are melded together… In these and other situations, the content of a past event *or imagining* becomes "unglued" from its original source and mistakenly connected to another "memory"… "contents and sources of past experiences mistakenly put together -- *it is easy to see how it could give rise to a strong subjective conviction that a false memory is real*." See, Coyle, Joseph in D. Schachter (Editor), *Memory Distortion: How Minds, Brains, and Societies Reconstruct the Past,*  page 24;  See also, D. Schacter. *The Seven Sins of Memory*, Houghton Mifflin, 2001. p.4.  See also, "Human memory is *not like a photograph album, a collection of cassettes, compact discs or videos or any other accumulative archive of the past.* Rather, memories are fragmentary, condensed, often distorted and inaccurate representations of experience. -Martin A. Conway (review in *Nature*). See additional citations infra and supra to the work of Ceci, Bruck, Loftus, and other memory experts.

**Just one hour can be sufficient to implant false memories in some cases.** How many interviews/therapy sessions were conducted in a case? How many of these interviews/therapy sessions were not recorded?  How many interviews/therapy sessions does it take to produce detailed, false memories?  E.g.  William Bernet, M.D., Case Study: Allegations of Abuse Created in a Single Interview, *Journal of the American Academy of Child and Adolescent Psychiatry*, 36:7, July 1997, pp. 966, 970.   In many litigation malpractice suits against RRM-MPD-DISS therapists, I personally reviewed multiple cases where vulnerable witnesses were led — in just a few hours — to fervently believe in detailed, horrific, but later proven to be false memories of abuse. Reviewing proper recordings is the only real defense – for witnesses and prosecutions – from the alternative hypothesis of interview-induced false memories.  On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

**A FALSE MEMORY CAN BE FERVENTLY BELIEVED and REPORTED — SUCH REPORTS ARE "BELIEVED-IN-FALSE-MEMORIES" and THUS NOT LIES:**

Once a false memory is induced can the victim tell the difference between true and false memories?  ***Research indicates that once tainted, a false memory can seem just as real to the witness as other memories***.  See, Stephen J. Ceci and Maggie Bruck, *Jeopardy in the Courtroom*, 1995, p.218, 220;  See, also,  McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. *Psychol. Sci.* 15: 493–497. [Consistent, emotionally powerful, stories from highly educated people -- e.g. alien abduction "memories" -- can be quite consistent, filled with much detail, emotionally

conveyed, and very compelling to listeners -- yet quite false.] See also, Ceci, S.J., Crotteau, M., Smith, E., & Loftus, E.W.  Repeatedly Thinking about a Non-event: Source Misattributions among Preschoolers. Consciousness & Cognition., Vol 3, 388-407 (1994); See also, Loftus, E. F. (2002) Memory Faults and Fixes. Issues in Science & Technology (publication of the National Academies of Science), 18, #4, pp 41-50; Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498 ;  Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366; Mazzoni, G. and Memon, A.  Imagination Can Create False Autobiographical Memories, Psychological Science, Vol. 14, No. 2, March 2003 pg. 186-193 and other relevant research.

The science of memory and memory contamination is an essential feature of a proper review of such investigations. Thus clearly , *every jury in such cases should be properly educated about at least the essentials of basic science-history in this field* --  including the mouse trap study, imagination inflation, source amnesia/confusion, error rates, reliability and validity concepts, as well as the history of improper interview cases such as Wenatchee, McMartin, Kelly Michaels, Wee Care, Jordan Minnesota, and the hundreds of RRM-MPD-DISS therapy generated cases investigated and debunked by the FBI Task Force (Lanning) and thousands investigated and debunked by Goodman and others).  Understanding the key basics of the research work of Loftus, McNally, Ekman, and other international scientists is essential to *protect the integrity of the legal system.*  This research work explores the conditions under which *witnesses can provide accurate reports about past episodes but also shows convincingly that examiners (including psychotherapists and civil attorneys) who use suggestive or leading questions may introduce serious distortion into witness recollections*. Indeed, some of the recent research has revealed that some witnesses can be rather easily induced to create detailed narrative recollections of events that never happened (e.g , false memories of being attacked by a wild animal, riding in a hot air balloon, etc ). *These witnesses may seem firmly convinced that their memories are real even when they are not.  Protecting witnesses against repeated interviews, leading and suggestive questioning, and other memory contaminative processes is thus an essential part of a competent investigative process* (and the opposite of Inv. Leiter's and Attorney Shubin's highly improper methods).  See, e.g., Daniel L. Schacter, Jerome Kagan, and Michelle D. Leichtman, True and False Memories in Children and Adults: A Cognitive Neuroscience Perspective, *Psychology Public Policy, and Law*, American Psychological Assn, 1995, Vol 1, No. 2, 411-428 and other citations in this report.   See the "Mousetrap Study", Ceci, et al, Repeatedly Thinking About a Non-Event:  Source Mis-Attributions among Preschoolers, Consciousness and Cognition, Vol. 3, 388-407, 1994.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

**ALL COMPETENT POLICE INVESTIGATORS, JUDGES, LAWYERS, and THERAPISTS SHOULD KNOW THAT HUMAN MEMORY IS QUITE MALLEABLE AND CAN BE TAINTED, CHANGED, or CREATED BY IMPROPER INTERVIWING:**

"Memories are precious. They give us identity. They create a shared past that bonds us with family and friends. They seem fixed, like concrete, so that if you stepped on them they would still be there as they always were.... But memories are not fixed. Everyday experience tells us that they can be lost, but they can also be drastically changed or even created. Inaccurate, false memories can sometimes be just as compelling and "real" as an accurate memory. ... Studies show that you can do more than change a detail here and there in someone's memory. You could actually make people believe that a childhood experience had occurred when in fact it never happened. Examples include being lost in a shopping mall for an extended period of time, being rescued by a lifeguard, surviving a vicious animal attack … or even going on a hot air balloon ride. None of these events actually happened [ to people who recalled "memories" of them] but people became quite convinced these were true "memories". ... These studies and many more like them, show that *people can develop beliefs and memories for events that definitely did not happen to them. They can do this when fed strong suggestions. They can even do this when induced to imagine the experiences. Large changes in autobiography can be achieved quickly.* "
– Prof. E. Loftus, internationally renowned memory researcher

*Psychological science has not yet developed a reliable way to classify memories as true or false without corroborating evidence.* Moreover, it should be kept in mind that many false memories have been expressed with great confidence…." … "To reiterate the main points: memory is more prone to error than many people realize. **Our memory system can be infused with compelling illusory memories of important events.** These grand memory errors have contributed to injustices that could have been avoided or minimized."   See Loftus, E., Our changeable memories: legal and practical implications. Science and Society. Nature Reviews: Neuroscience Volume 4, March 2003, page 231- 235.

'Our memories are constructive. They're reconstructive. *Memory works ... like a Wikipedia page: you can go in there and change it, but so can other people*.' — Professor Elizabeth Loftus, PhD, memory researcher

" *Even the precious memories of our childhood can actually be shaped and reshaped like a ball of clay .... false memories – recollections that feel like memories, but which are not based on any real occurrence – are experienced all the time*. And the consequences of such false memories can be very real. *Believing fictitious representations of reality can affect anything in our lives, potentially causing*

31

*real joy, real upset, and even real trauma* ... Any event, no matter how important, emotional, or traumatic it may seem, can be forgotten, misremembered, or even be entirely fictitious. — Professor Julia Shaw, PhD, memory researcher.

"Studies confirm that jurors (laypersons who are not memory experts) routinely "over believe" eyewitness testimony. See, e.g., Sigler & Couch, Eyewitness Testimony, and the Jury Verdict, 4 N. Am. J. Psychol. 143, 146 (2002) (conviction rate by mock juries increased from 49 percent to 68 percent when a single, vague eyewitness account was added to the circumstantial evidence described in a case summary). Even when unreliable eyewitness identification is admitted, juries are quite likely to believe it.... Cross-examination cannot be relied on to address this problem. As the US Supreme Court has observed, "even though cross-examination is a precious safeguard to a fair trial, it cannot be viewed as an absolute assurance of accuracy and reliability." Wade, 388 U.S. at 235. That is particularly true with victims of RRM as *they often truly believe the mental images in their head are real, accurate "memories".*

*The process of false memory creation is a serious problem for in the legal system* because what most affects many jurors' assessment of a particular eyewitness is the level of confidence expressed by the witness. See Cutler & Penrod, Juror Sensitivity to Eyewitness Identification Evidence, 14 Law & Hum. Behav. 185, 185 (1990); Lindsay et al., Can People Detect Eyewitness-Identification Accuracy Within and Across Situations?, 66 J. Applied Psychol. 79, 83 (1981).  Importantly, cross-examination can be quite ineffective with a mistaken (albeit honest) eyewitness who is testifying as to *"False-But-Fervently-Believed-In-Memories"* with confidence and consistency ... See, e.g., State v. Clopten , 223 P.3d 1103, 1110 (Utah 2009) (*"Cross-examination will often expose a lie or half-truth, but may be far less effective when witnesses, although mistaken, believe that what they say is true."*).

Despite popular misperceptions, research shows that *witness confidence is quite often not a reliable, accurate indication of memory accuracy.*  As one science report concluded, "[t]he outcomes of empirical studies, reviews, and meta-analyses have converged on the conclusion that the confidence-accuracy relationship for eyewitness identification is weak."  Brewer et al., The Confidence-Accuracy Relationship in Eyewitness Identification, 8 *J. Experimental Psychol. Applied* 44, 44-45 (2002). In addition, the confidence of eyewitnesses in actual cases, unlike in controlled experiments, may be infected by misleading feedback received in the investigative process (for example, an officer stating "good, you've told us what others have told us" – Inv. Leiter disclosed in this case or a science-uninformed psychotherapist (e.g Therapists Gillum and Macnab in this case) supporting a "survivor" reporting "buried-blocked-recovered inherently unreliable alleged "memories "of abuse.  See supra n.6;

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

see also Wells et al., 7 *Psychol. Sci. in Pub. Int.* at 45; Wells & Bradfield, "Good, You Identified the Suspect": Feedback to Eyewitnesses Distorts Their Reports of the Witnessing Experience, 83 *J. Applied Psychol.* 360, 374 (1998). Indeed, witness confidence can be affected by a host of factors that have no relation to reliability.  See, e.g. , Wells & Quinlivan, 33 *Law & Hum. Behav.* at 11-12".  Above excerpts are from the Amicus Brief of the American Psychological Association to the US Supreme Court in *Barion Perry v. State of New Hampshire*, [Docket No. 10-8974], 2012.  Again, none of this essential information was properly presented to the uninformed, misinformed jury in this case.

    *4B5.   Basic Essential Science-History:*   The science of Memory and False Memory has documented specific methods by which memories can be contaminated, changed, manipulated, transformed, *or falsely created without the witness being aware of memory changes.*  The infamous cases of mis-interviewing discussed above led many States to expect and/or require *ALL interviews with alleged victims to be Audio or Video-Recorded and reviewed for abusive mis-interviewing.*  (cf. On this record it appears that many or most interviews in this case *were apparently NOT properly recorded* – a level of negligence or corruption that is unprecedented-in-my-30 years of experience reviewing cases in many states. (See, the indicia of corruption and manipulative mis-interviewing documented by Inv. Leiter's recorded discussion of Apr 21, 2011 and the Newly Discovered evidence regarding Attorney Shubin's interviews).

    *In this case it appears that an essential information needed to compile an "Interview Chart" for of ALL interviews conducted was never constructed nor shared* as required for competent, honest, proper trial preparation.  (E.g., All interviews recorded? Interviewers name listed? Location listed? Date listed? Who was present in the room listed?.). Such information was not collected and not properly shared with defense attorneys in time for a proper analysis with a competent expert. The defense attorneys also failed (due to Negligence or corrupt sabotage of their client's case) to present the interview evidence they had (including Inv Leiter's historic confession of an abusive Government Memory Manipulation scheme) to a competent memory Science (not a therapist) Expert Witness in Memory-False Memory-Interviewing Methodology for proper analysis. The totality of such egregious errors in this very troubled case is unprecedented in my 30-year experience and provides additional indicia of corruption in this matter. (See the detailed analysis of Indicia of Corruption below). Note that a Transcript should be considered quite Worthless without a Recording.  Tragically, I have discovered in many cases that transcripts are often NOT consistent with the actual recording.

4B6.  *<u>Basic Essential Science-History:</u>*   **Science has documented a series of methods, procedures, and ideologies that increase the risk of inducing Fervently-Believed-In-But-False-"Memories".**   Alleged victims/patients – after contemplation, memory misinformation, and indoctrination via interviews-therapy in RRM-MPD-DIS ideology – can become convinced that mental images (from movies-books, or a suggested by therapists (Gillum, Macnab, civil lawyers (Shubin) or improper investigative interviews (Leiter) are actual "memories. Such patients have –in thousands of cases become convinced that suggested images are actual and accurate "memories" of real trauma that were formerly "buried" "blocked" or "dissociated".   See, e.g. Garry, Maryanne; Manning, Charles G., Loftus, Elizabeth F., Sherman, Steven J (1996). "Imagination inflation: imagining a childhood event inflates confidence that it occurred". *Psychonomic Bulletin & Review* 3 (2): 208–214. doi:10.3758/bf03212420.   See, also Dodier et al. presented a large meta-analysis of 139 studies involving 24,007 participants which found *a high link between <u>fantasy proneness</u> and ''dissociative experiences''* as measured by the DES.   See, also Merckelbach H, Otgaar H, Lynn S J. Empirical research on ***fantasy proneness and its correlates*** 2000-2018: a meta-analysis. Psychol Conscious; in press.  See, Dodier O, Otgaar H, Lynn SJ. A critical analysis of myths about dissociative identity disorder. AnnMeˊd Psychol 2021. http://dx.doi.org/10.1016/ j.amp.2021.10.007.

See, also Laney, C and Loftus, E. ***Traumatic Memories Are Not Necessarily Accurate Memories***, Can J Psychiatry, Vol 50, No 13, 2005. … Some therapists argue that the hypothesized repression (blocking memories) is more likely to occur in response to specific types of trauma. In particular, Terr claimed that repeated traumas are more likely to produce repression. Freyd argued that repression is caused when a trauma is perpetrated by a loved one on whom one depends for the basic necessities of life. *<u>**These notions have virtually no credible, reliable, valid scientific support**</u>*…. Another observation lends support to the idea that people can become quite emotional about events that they have not personally experienced. How often do people cry in movies? …. *If there is one lesson from this research, it is probably this: Just because a memory seems detailed, just because the person seems confident in it, and just because emotion is expressed when the memory is contemplated, does not mean it really happened.*  See, e.g. Garry, Maryanne; Manning, Charles G., Loftus, Elizabeth F., Sherman, Steven J (1996). "Imagination inflation: imagining a childhood event inflates confidence that it occurred". *Psychonomic Bulletin & Review* 3 (2): 208–214. doi:10.3758/bf03212420.   See, also Dodier et al. presented a large meta-analysis of 139 studies involving 24,007 participants which found *a high link between fantasy proneness and ''dissociative experiences'' as measured by the DES.*  See, also Merckelbach H, Otgaar H, Lynn S J. Empirical research on fantasy proneness and its correlates 2000-2018: a meta-analysis. Psychol Conscious; in press.  See, Dodier O, Otgaar H, Lynn SJ. A critical

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

analysis of myths about dissociative identity disorder. AnnMe´d Psychol

2021. http://dx.doi.org/10.1016/ j.amp.2021.10.007.  See also, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749

See also, Van Bergen, S., Horselenberg, R., Merckelbach, H., Jelicic, M., & Beckers, R. (2010). Memory distrust and acceptance of misinformation. Applied Cognitive Psychology, 24: 855-896.  Post-event information can come from leading questions, statements made by others or suggestions of how events might have occurred (by lawyers, therapists, investigators, and judges).  Since such suggested, improper memory encoding can lead to source amnesia and source monitoring errors and thus false memories, *witnesses who are exposed to suggestive questions or false RRM-MPD-DISS  information may encode the wrong, imagined details into their memory, **convincingly claiming to have seen or experienced things they only imagined, dreamed, or "saw" in therapy, guided imagery, suggestive interviews, or hypnotic images.** "**Such processes can lead to grave legal implications** as they can produce false testimony and wrongful convictions therefore, it **is important that interrogation practices are carefully conducted and videotaped** for a proper analysis of leading, suggestive, or coercive -- potentially memory contaminative -- questioning."  See, also Johnson, M.K., Hashtroudi, S., & Lindsay, D.S. (1993). Source monitoring. *Psychological Bulletin,* 114(1): 3-28. Again, apparently none of this essential information was properly shared with the apparently uninformed, misinformed jury in this case.

**4B7. _Basic Essential Science-History:_   Human are not reliable "Human Lie Detectors" without reviewing actual corroborative evidence.  Even so,** poorly trained investigators (Leiter and others), therapists (Gillum, Macnab) and attorneys (Shubin) are VERY often not aware of this essential scientific information.  False hubris and science-uninformed beliefs in "professional experience" can lead to Confirmation Bias and induced false memories consistent with the assumptions of science-uninformed interviewing professionals (eg. see Leiter's recorded discussion and newly discovered Shubin evidence on this record).

Science-uninformed legal professionals, investigators, and therapists too often turn courtrooms, interviews, and therapy sessions into gambling casinos. Science-uninformed judges fail to fulfill their "gatekeeper" function and force juries to make choices that no person can reliably, accurately make – assessing "memory" claims ***without corroborating evidence***.  Science demonstrates that humans – including Investigators, Psychotherapists, Lawyers, Judges, and All other Humans are ***unreliable lie detectors in the absence of corroborating evidence.***  The science is clear that humans cannot ***reliably***

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

distinguish true from false verbal statements in the absence of corroborative evidence.  Professionals such as police, psychotherapists, and investigators often (gullibly) believe they can **_reliably_** detect false patient reports but the science shows they cannot and, in fact, professionals *are typically no better at this task than laypersons.*    See, Vrij, Aldert, Granhag, P. and Porter, S. (2010) Pitfalls and opportunities in nonverbal and verbal lie detection. *Psychological Science In The Public Interest*, 11 (3). pp. 89-121. ISSN 1529-1006 10.1177/1529100610390861 "The final error that we will highlight is that professional lie catchers (i.e., including GALs and psychotherapists) tend to overestimate their ability to detect deceit. **_Research has consistently shown that when professional lie catchers and laypersons are compared, "professionals are more confident in their veracity judgments but are NO more accurate_**" Emphasis added.  See, Rosen, G. M. and Phillips, W.R., A Cautionary Lesson from Simulated Patients, *Journal of the American Academy of Psychiatry and Law*, 32, 132-133, (2004);   See, McNally, RJ, Troubles in Traumatology, *Canadian Journal of Psychiatry* 50:815–816 (2005) (showing experienced expert clinicians routinely misdiagnose — fooled by false reports — of PTSD in veterans whose records prove they never actually experienced any combat).

During the past several decades, the detection of deception has come under increasing empirical scrutiny (e.g., see Vrij, 2008). One reason for the enormous scientific interest in deception is *the increasingly recognized problems that have arisen in the legal system **as a result of failed credibility assessments, such as wrongful convictions*** (e.g., Porter & ten Brinke, 2010; Vrij, Granhag, & Porter, 2010). Assessing the credibility of reports of sexual victimization – often in the absence of corroboration – presents a significant challenge for legal decision makers. This study examined the accuracy of observers in discriminating genuine and fabricated sexual assault allegations. "**_Results indicated that overall accuracy was below chance_** (M = 45.3%)" See, Kristine A. Peace, Stephen Porter and Daniel F. Almon, *Sidetracked by emotion: Observers' ability to discriminate genuine and fabricated sexual assault allegations,* Legal and Criminological Psychology (2011), The British Psychological Society.

See also, K. Peace and S. Porter, A Longitudinal Investigation of the Reliability of Memories for Trauma and other Emotional Experiences, Appl. Cognit. Psychol. 18: 1143–1159 (2004). The nature of traumatic memories has become a major focus of cognitive research and a heated debate in psychology (e.g. Read, 2001) ...."**_Traumatic images tended to persist in memory with NO apparent impairment,_** whereas features of positive memories were subject to considerable distortion, regardless of interview style. The findings contribute to the understanding of the impact of trauma on memory with the passage of time."   See also, Ivan Mangiulli, Henry Otgaar, Marko Jelicic & Harald Merckelbach, A Critical Review of Case Studies on Dissociative Amnesia (April, 2021) Clinical Psychological Science, DOI:

10.1177/21677026211018194 (and all citations and research discussed therein). See also, Henry Otgaar, Olivier Dodier, Maryanne Garry, Mark L. Howe, Elizabeth F. Loftus, Steven Jay Lynn, Ivan Mangiulli,, Richard J. McNally, and Lawrence Patihis., Oversimplifications and Misrepresentations in the Repressed Memory Debate: A Reply to Ross, Journal of Child Sexual Abuse, July 2022.

See also, Richard J. McNally (2021): Are memories of sexual trauma fragmented? Memory, DOI: 10.1080/09658211.2020.1871023 at https://doi.org/10.1080/09658211.2020.1871023 ... [*Findings do not support the existence of special memory mechanisms that are unique to experiencing traumatic events.*] ;  See also, Elke Geraerts, Dragica Kozaric´-Kovac˘ic´, Harald Merckelbach, et al, Traumatic memories of war veterans: Not so special after all. Consciousness and Cognition 16 (2007) 170–177.... *traumatic memories were not qualitatively different from neutral memories* with respect to their stability and sensory qualities. The severity of PTSD symptoms was not significantly correlated with dissociative experiences. Our findings do not support the existence of special memory mechanisms that are unique to experiencing traumatic events. *See also,* K. Peace and S. Porter, A Longitudinal Investigation of the Reliability of Memories for Trauma and other Emotional Experiences, Appl. Cognit. Psychol. 18: 1143–1159 (2004). *The nature of traumatic memories has become a major focus of cognitive research* and a heated debate *in psychology (e.g. Read, 2001) ...Traumatic memory imagery tended to <u>persist in memory</u>* whereas features of positive memories were subject to considerable distortion, regardless of interview style. The findings contribute to the understanding of the impact of trauma on memory with the passage of time.

We should note that "heated debates" over "controversial notions" have clearly *not been accepted by the relevant scientific community and thus fail the test of a competent Frye and also Daubert analysis leading to exclusion to protect the integrity of the legal system.* On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

### 4B8. *Basic Essential Science-History:* THE LIMITS ON CLINICAL KNOWLEDGE AND "CLINICAL JUDGMENT" ARE OFTEN UNKNOWN TO POORLY TRAINED THERAPISTS and LEGAL PROFESSIONALS.

The Mental Health System (therapists) lags far beyond the rest of Health Care in using science-evidence-based treatments. FRYE and/or DAUBERT hearings are supposed to *<u>protect the integrity of the legal system</u>* from such pseudo-science, unreliable methodologies. : Psychotherapists often do not receive reliable, accurate feedback in therapy work settings. Without accurate feedback they CANNOT develop reliable, improved expertise or "judgment" over time.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

See, Tracey, T.J., Wampold, B.E., Lichtenberg, J.W., Goodyear, R. K., (2014) Expertise in Psychotherapy: An Elusive Goal, American Psychologist, Vol. 69, No. 3, 218-229.  "In a review of expertise across professions, Shanteau (1992) identified several professions in which practitioners develop expertise, which he defined as increased quality of performance that is gained with additional experience. These professions, which demonstrate there can be a relation between experience and skill, include astronomers, pilots, chess masters, mathematicians, accountants, and insurance analysts. Shanteau *also identified several professions for which <u>expertise was not demonstrated [</u> including psychotherapists]*.  See also, Garb, H. N., & Boyle, P. A. (2003). Understanding why some clinicians use pseudoscientific methods:  Findings from research on clinical judgment. In S. O. Lilienfeld, S. J. Lynn, &. J. M. Lohr (Eds.), Science and pseudoscience in clinical psychology (pp. 17–38). New. York, NY: Guilford Press. See also, W. M. Grove and P. E. Meehl, Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures:  The Clinical-Statistical Controversy, *Psychology, Public Policy, and Law* (1996) Vol. 2, No. 2,293-323 1076-8971/96/

As a former faculty member in major University Departments of Medicine (Surgery) and Psychology (Clinical-Developmental) and also Law, I am well aware that over the past century many components of the health care system — surgery, radiology, laboratory testing, internal medicine, pharmacological systems — became science-driven and far more effective and reliable. Courts and families are too often unaware that this transformation — from the widespread use of unreliable methodologies (junk science) to the widespread use of reliable science-based methodologies has, in many ways, *<u>not yet occurred in the mental health system</u>*.  See, "A century ago, American medicine was an unregulated and unscientific craft, *with little research to support its practices*. In 1910, *The Flexner Report*, published by early 20th century Abraham Flexner of Harvard Medical School, under the auspices of the Carnegie Foundation for the Advancement of Teaching, exposed the sorry state of medical practice, leading to major reform of both the training and practice in medicine. Among other things, the report revealed that half of the nation's medical schools were sub-par, and many were closed down as a result. The remaining schools adopted rigorous admissions and training standards for their students, focusing on the scientific approach to medical education and practice that is still evident today. *Tragically, unknown to many legal professionals, clinical psychology, social work, psychiatry, and counseling, are currently in a tenuous situation similar to where medicine was in the early 20th century.* For example, the past President of the Association for Psychological Science, Prof. Walter Mischel, has stated *"<u>the current disconnect between psychological science and clinical practice is an unconscionable embarrassment</u>"*. See, e.g., West, Catherine, 'An Unconscionable Embarrassment', Association for Psychological Science, Observer, October 2009; Also see, Mischel, W. Connecting Clinical Practice to Scientific Progress,

Psychological Science in the Public Interest, Vol 9, No 2, 2009 ;_ See, also Baker, T., McFall, R. & Shoham, V., Current Status and Future Prospects of Clinical Psychology: Toward a Scientifically Principled Approach to Mental and Behavioral Health Care, Psychological Science in the Public Interest, Vol. 9, No. 2 (2009);  See also, Harrington, A., Mind Fixers: Psychiatry's Troubled Search for the Biology of Mental Illness, W. W. Norton & Company; 1st edition, April 16, 2019 ;  Dawes, R.M., House of cards: Psychology and psychotherapy built on myth, New York: Free Press (1997).

  **4B9.** *Basic Essential Science-History:* **PTSD symptoms other "trauma" mental health symptoms and DSM diagnoses, are often NOT *reliable* indicators of actual trauma or abuse**.  PTSD symptoms are often NOT reliable indicators of actual, historic trauma events — such *symptoms also occur with FALSE-believed-in memories* as well as real memories of trauma and such symptoms are also easily faked. For example, most "flashbacks" are of unknown origin and traumatized veterans have reported dying and other impossibilities in their "flashbacks".

  See, "Consistent, emotionally powerful, stories of memories from highly educated people — e.g. alien abduction "memories" -- can be quite consistent, filled with detail, and very compelling -- yet quite false."  See, McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. *Psychol. Sci.* 15: 493–497.].  During my clinical psychotherapy and assessment work at the Palo Alto VA Hospital/Stanford Medical School, I interviewed combat veterans who "died" in their "flashbacks" — obviously so-called "flashbacks" are NOT reliable depictions of accurate "real" memories.

  In sum, competent, properly trained, science-informed psychotherapists and investigators (cf. unlike the negligent, science-uninformed investigators, lawyers, and therapists involved in this case) readily admit that without actual, corroborative evidence they CANNOT reliably assess the accuracy of patient-witness verbal reports. ***It is a serious licensing-ethics violation for any therapist to claim they have ANY reliable method for evaluating the origin or accuracy of abuse allegations without corroborative evidence.***  (cf. On this record, compare this basic, essential knowledge to the incompetent-or corrupt, fully documented Confirmation Bias reportedly displayed in this case by Inv. Leiter and Therapist Gillum as on this record they both disclosed the firm (irrational, incompetent) belief that they (magically) "knew" what patients-witnesses were supposed to tell them and then they apparently worked via improper, repetitive, coercive, abusive, improper, mis-interviewing to get patients-witnesses to change their "memories" to fit a pre-conceived – confirmation biased- narrative).

***4B10    Basic Essential Science-History:*** **Human memory is a RECONSTRUCTIVE PROCESS NOT A RECORDING – not like a video recording and NOT a DVD record that can be "recovered" or played back at will.** Human memory is subject to post-event manipulation, contamination, and change via many processes but especially repetitive-leading interviews, improper-misleading psychotherapy, and/or suggestive mis-information from lawyers, media, and other sources (e.g., On this record, all of these memory-contaminating influences were documented in PA vs Sandusky). ***This is why proper interviewing methodology is ESSENTIAL to the integrity of the legal process and why review of ALL RECORDINGS of all interviews is essential to a fair investigation and trial.*** *Psychological science has not yet developed a reliable way to classify memories as true or false in the absence of corroborative evidence.* In some of the most significant and important psychological research in history, Prof. E. Loftus has demonstrated that ***ONE WORD in ONE QUESTION can induce a FALSE memory that did not exist prior to the ONE WORD in ONE question.*** This is why corroboration is so essential in accessing memories and this is why ALL conversations are potential sources of memory contamination and *why ALL interviews MUST BE PROPERLY RECORDED.* Memory is malleable and subject to contamination. "To reiterate the main points: memory is more prone to error than many people realize. Our memory system can be infused with compelling illusory memories of important events. These grand memory errors have contributed to injustices that could have been avoided or minimized."

See, Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

See Loftus, E., Our changeable memories: legal and practical implications. Science and Society. Nature Reviews: Neuroscience Volume 4, March 2003, page 231- 235;

See, Bruck, M. and Ceci, S. (1995). 'Amicus brief for the case of State of New Jersey v. Michaels presented by the committee of concerned social scientists. Psychology, Public Policy, and Law, 1, 272-322

See, Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498;

See, Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366.

See, Ofshe, R. and Watters, E., *Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria.* 2nd Edition. University of California Press, 1996;

See, Acocella, J., *The Politics of Hysteria*, The New Yorker,  April 6, 1998, pg. 64-79;  See also, Barden, R. C., Foreword in Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened*

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

*and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749 ; See also, Loftus, E. The Myth of Repressed Memory, False Memories and Allegations of Sexual Abuse, St. Martin's Press, 2013.

See, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749 ;

See, Loftus, E. *The Myth of Repressed Memory, False Memories and Allegations of Sexual Abuse*, St. Martin's Press, 2013;  See, McNally, R.J. (2003) *Remembering Trauma*, Cambridge, MA: Belknap Press/Harvard University Press.

See, Pope H., Oliva P., and Hudson J., *'Repressed memories: The scientific status of research on repressed memories'* in Faigman, D.L., Kaye, D.H., Saks, M.J., and Sanders, J. (eds) (2012) *Science in the law: social and behavioral science issues*, St. Paul, MN: West Group, 807–913; and

See, Piper A., Lillevik L., and Kritzner R., *'What's wrong with believing in repression? A review for legal professionals'* (2008) 14 *Psychology Public Policy and Law*, 223–42.

See, Barden, R.C., *Memory and Reliability: Developments and Controversial Issues.*  In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016.

See, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749.

**4B11    *Basic Essential Science-History:*    It is essential for Investigators, Attorneys, Therapists, and Journalists to understand the *history* of the "Memory Wars" and the collapse of the "Recovered Memory-Multiple Personality Disorder-Dissociative Ideology-Therapy Movement of the 1990s) (the novel notions of RRM-MPD-DISS fail Frye analysis ).**   History has documented that error-ridden RRM-MPD-DISS ideology taught to patients-clients via science-uninformed-misinformed-unethical therapists (e.g. On this record, Gillum and Macnab) have created false memories and damaged the integrity of the legal and mental health systems.  These apparently science-uninformed "therapists" should be properly questioned under oath at Legislative and Licensing Investigations. Note also that, reportedly, collusive memory contaminating discussions among alleged victim witnesses also took place (e.g. See the Newly Discovered information provided by "sting investigator" AJ Dillon who has alleged that Attorney Shubin and Therapist Macnab ran memory contaminative processes groups for alleged victims … and thus cross-contaminated "expected" memories worth apparently millions of dollars in settlement payoffs ).  More importantly, the well-documented, highly improper police investigations in this case (See, Inv. Leiter's April 21, 2011 recorded discussion of a program of systemic Government

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

witness memory contamination) failed to employ minimal standards for proper, ethical interviews. This information was apparently not properly shared with the jury in this case.

History documents that tens of thousands of families were destroyed by these very same RRM-MPD-DISS ideologies and methods in the 1990s before a tsunami of lawsuits and licensing revocations largely shut down the once thriving RRM-MPD-DISS therapy industry. See, Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

The history of the "Memory Wars" —shows that *many thousands of families were destroyed by therapist induced false memories* of abuse. This mental health system-legal system debacle was reformed by many lawsuits and licensing revocations. Although this history — is very well known and very well documented in articles, textbooks, published legal case decisions, and international media – apparently *none of this essential information was properly presented to the jury in this case.*   (See detailed citations below). See, Ofshe, R. and Watters, E., *Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria*. 2nd Edition. University of California Press, 1996; See, Acocella, J. The Politics of Hysteria, The New Yorker,  April 6, 1998, pg. 64-79;  See also, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749 ; See also, Loftus, E. The Myth of Repressed Memory, False Memories and Allegations of Sexual Abuse, St. Martin's Press, 2013 **and hundreds of additional citations See eg. [3]**

---

[3]     Barden, R.C., (2001) Informed Consent in Psychotherapy: A Multidisciplinary Perspective, The Journal of the American Academy of Psychiatry and the Law, Vol 29, No. 2, pgs. 160-166.

Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

Bruck and Ceci, Amicus Brief for the Case of State of  New Jersey V. Michaels Presented by Committee of  Concerned Social Scientists, 1 Psychology, Public  Policy and Law 272 (1995)

Ceci, S.J., & Bruck, M.  (1993b).  Children's recollections:  Translating research into policy.  SRCD Social Policy Reports.

Ceci, S.J., & Bruck, M.  (1995).  Jeopardy in the courtroom: A scientific analysis of children's testimony.  Washington, D.C.:  American Psychological Association.

Ceci, S.J., Crotteau, M., Smith, E., & Lotus, E.W.  Repeatedly Thinking about a Non-event: Source Misattributions among Preschoolers. Consciousness & Cognition., Vol 3, 388-407 (1994).

Dodier, O., Otgarr, H. , Lynn, S. , A Critical Analysis of Myths About Dissociative Identity Disorder, Medico-psychological annals, August 2021.  https://doi.org/10.1016/j.amp.2021.10.007

Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, Psychology, Public Policy and Law, Vol 5, No. 1, 234-242.  Excerpts reprinted in AF, George (Prof. Stanford Law School), Evidence: University Casebook Series, Foundation Press - West Group, New York, 2002, pg. 688.

Houben, S. T. L., Otgaar, H., Roelofs, J., Merckelbach, H. (2018). Lateral eye movements increase false memory rates. Clinical Psychological Science, 6, 610–616. https://doi.o rg/10.1177/2167702618757658.

Loftus, E. F. (2002) Memory Faults and Fixes. Issues in Science & Technology (publication of the National Academies of Science), 18, # 4, pp 41-50.

4B12.   Basic Science-History, Psychotherapy Ethics, and Licensing Violations:  Counseling or therapy with alleged "trauma" victims during an ongoing criminal investigation and prior to trial should be carefully examined as a potential form of tampering with the memories of witnesses.

---

Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498.

Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366.

Mazzoni, G. and Memon, A.  Imagination Can Create False Autobiographical Memories, Psychological Science, Vol. 14, No. 2, March, 2003 pg. 186-193.

Mangiulli, I., Otgaar, H., and Jelicic, M.,  A Critical Review of Case Studies on Dissociative Amnesia, Clinical Psychological Science (APS),  June 8, 2021.  https://doi.org/10.1177/21677026211018194 … *Dissociative amnesia, defined as an inability to remember important autobiographical experiences, usually of a stressful nature, is a controversial phenomenon*. We systematically reviewed 128 case studies of dissociative amnesia reported in 60 articles that appeared in peer-reviewed journals in English over the past 20 years (2000–2020). Our aim was to examine to what extent these cases met core features of dissociative amnesia. All cases were about reports of autobiographical memory loss, but the evidence offered in support of a dissociative amnesia interpretation was often *weak and plagued by an ambiguous heterogeneity with respect to nature, etiology, and differential diagnoses of alleged memory loss*. Most case studies failed to rule out plausible alternative explanations of dissociative amnesia, such as ordinary forgetting and malingering."

McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. Psychol. Sci. 15: 493–497.

Nourkova, V.V., Bernstein D.M., and Loftus, E.F. 2004. Altering traumatic memories. Cognition and Emotion 18: 575–585.

Patihis, L. and Pendergrast, M. , Reports of Recovered Memories of Abuse in Therapy in a Large Age-Representative U.S. National Sample: Therapy Type and Decade Comparisons, Clinical Psychological Science, 1-19, 2018…."The potential hazards of endeavoring to recover ostensibly repressed memories of abuse in therapy have previously been documented. Yet no large survey of the general public about memory recovery in therapy has been conducted. In an age-representative sample of 2,326 adults in the United States, we found that 9% (8% weighted to be representative) of the total sample reported seeing therapists who discussed the possibility of repressed abuse, and 5% (4% weighted) reported recovering memories of abuse in therapy for which they had no previous memory. *Participants who reported therapists discussing the possibility of repressed memories of abuse were 20 times more likely to report recovered abuse memories than those who did not.* Recovered memories of abuse were associated with most therapy types, and most associated with those who reported starting therapy in the 1990s. We discuss possible problems with such purported memory recovery and make recommendations for clinical training."

Schacter, D.L. and Slotnick, S.D. 2004. The cognitive neuroscience of memory distortion. Neuron 44: 149–160. Schmolck, H., Buffalo, E.A., and Squire, L.R.

Thomas, A. K., Bulevich, J. B., & Loftus, E.F. (2003) Exploring the role of repetition and sensory elaboration in the imagination inflation effect. Memory & Cognition, 31, 630- 640.

LINK Editorial Board,  Comparing the NICHD and RATAC Child Forensic Interview Approaches - Do the Differences Matter? *THE LINK:  Official Newsletter of the Intl Soc. for the Prevention of Child Abuse and Neglect* , Vol 20, No 1, Fall 2011.

Michael E. Lamb, Yael Orbach, Irit Hershkowitz, Phillip W. Esplin and Dvora Horowitz,  "A structured forensic interview protocol improves the quality and informativeness of investigative interviews with children: A review of research using the NICHD Investigative Interview Protocol," Child Abuse & Neglect, Volume 31, Issues 11-12, November, December 2007, Pages 1201-1231

Michael E. Lamb, Irit Hershkowitz, Yael Orbach, & Phillip W. Esplin, Tell Me What Happened: Structured Investigative Interviews of Child Victims & Witnesses,  Wiley Series in Psychology of Crime, Policing and Law, Sept. 2008 (and ALL citations and studies contained therein).

Including all research cited within the works listed above.

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

Science and history have shown that memories can be manipulated and radically changed by post-event information, leading interviews and therapy. Is that what happened in this case? Is that the reason multiple alleged victims' "memory" reports apparently changed substantially AFTER exposure to coercive-repeated interviews with Inv. Leiter and crew and AFTER interviews-therapy with Attorney Shubin and therapist Macnab.  See, Branaman, T. F. & Gottlieb, M. C.  *Ethical and Legal Considerations for Treatment of Alleged Victims: When Does It Become Witness Tampering?*  Professional Psychology: Research and Practice, 2013, Vol. 44, No. 5, 299–306.  The ethics of such practices is FAR more doubtful when the therapist is financially involved with a lawyer seeking millions of dollars in payment for transformed "new memories" of abuse. See for example, Attorney Shubin and Therapist Macnab's reportedly joint efforts resulting in new "changed memories" and payoffs of millions of dollars in cases apparently lacking proper vetting, investigation, or corroborative evidence of abuse.  (See, Newly Discovered evidence of this report).

**4B13.  *Basic Science, Psychotherapy Ethics, and Licensing Violations:* Science un-informed psychotherapists (See, e.g. Gillum, MacNab, and Chambers in this case) often violate the international human rights (and licensing duties, statutory duties, ethics codes, and common-sense fairness) of patients by *failing to obtain proper _informed consent_.*** On the record of this case, it appears that the therapists involved,  and all of them -- failed to understand professionally, competently, or ethically -- WHAT is required to obtain informed consent from the alleged victim patients involved in this case.  I have written on such issues in one of the leading journals in the world.  See, Barden, R.C., (2001) Informed Consent in Psychotherapy: A Multidisciplinary Perspective, The Journal of the American Academy of Psychiatry and the Law, Vol 29, No. 2, pgs. 160-166. I incorporate all references and citations in that publication into this report.   It is crucial to understand that informed consent is NOT just some statutory duty but rather *a key Quality Control process in ALL psychotherapies which requires maintaining an honest, open, trustworthy relationship with the patient.* Telling the patient negligent, false, misleading, harmful RRM-MPD-DISS misinformation while failing to tell the patient the honest truth about the contentious debates over science issues, the unreliability of the process, and the known dangers of RRM-MPD-DISS therapy is not just an informed consent rules/ethics violation it is a violation of the *Standard of Care for ALL psychotherapies* by social workers, counselors, psychologists, psychiatrists or any other mental health worker.

Note that a proper, ethically-informed, science-informed consent discussion must include *the known risks of Fervently-Believed-In-But-False-"Memories"* that "come back" or were "buried" or "blocked" or "dissociated". Such a documented discussion must include *a complex, detailed, proper,*

professional, and acceptable consent process which would require instruction and discussion about many essential issues including:

A) *the nature of reconstructive memory and how memory is subject to contamination* (e.g., source confusion/amnesia, misinformation, multiple interviews, etc._

B) *the history of the "Memory Wars"* and the tsunami of tens of thousands of Fervently-Believed-In-But-False-"Memories", the harm of false abuse claims, etc.

C) *the risk of mixing imagination-dreams-movie images with memory*

D) **that the relevant scientific community has rejected the novel notions of RRM-MPD-DISS including "recovered repressed memories" as a "pernicious myth"** and other critical information required for any patient to make an informed choice as to "counseling" treatments.

"Informed consent is the process in which a health care provider educates a patient about the risks, benefits, and alternatives of a given procedure or intervention. The patient must be competent to make a voluntary decision about whether to undergo the procedure or intervention. Informed consent is both an ethical and legal obligation of medical practitioners in the US and originates from the patient's right to direct what happens to their body. Implicit in providing informed consent is an assessment of the patient's understanding, rendering an actual recommendation, and documentation of the process. *The Joint Commission requires documentation of all the elements of informed consent* "in a form, progress notes or elsewhere in the record." The following are the *required elements for documentation* of the informed consent discussion: (1) the nature of the procedure, (2) the risks and benefits and the procedure, (3) reasonable alternatives, (4) risks and benefits of alternatives, and (5) assessment of the patient's understanding of elements 1 through 4.

It is the obligation of the provider to make it clear that the patient is participating in the decision-making process and avoid making the patient feel forced to agree to with the provider. The [health care] provider must make a recommendation and provide their reasoning for said recommendation… Obtaining informed consent in medicine is process that should include: (1) describing the proposed intervention, (2) emphasizing the patient's role in decision-making, (3) discussing alternatives to the proposed intervention, (4) discussing the risks of the proposed intervention and (5) eliciting the patient's preference (usually by signature). *Discussion of all risks is paramount to informed consent in this context.* Most consent includes general risks, risks specific to the procedure, risks of no treatment and alternatives to treatment."   See, Shah P, Thornton I, Turrin D, et al. Informed Consent. StatPearls Publishing; 2022 Jan. Available from: https://www.ncbi.nlm.nih.gov/books/NBK430827/.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

Such essential, minimal informed consent rules, principles and requirements have been in effect for decades.  Many of the "Memory Wars" lawsuits that shut down clinics and resulted in licensing revocations focused on just these kinds of informed consent violations. [4]

On this record, there is evidence indicating that *case-involved psychotherapists Gillum and Macnab are apparently "true believers" in controversial, unreliable, novel RRM-MPD-DISSOCIATION ideology but no evidence that they know or understand the science and history debunking such controversial notions.* Similarly, there is no evidence that such local therapists understand the hazards of confirmation bias, or the risks of coercive-multiple interviews, or the history of thousands of cases of false memories induced by therapist malpractice.  Given the defense attorneys negligent (or corrupt case sabotage) failure to investigate the influence of these local therapists on alleged victims' memories as well as their failure to obtain a competent memory-false memories expert who would have required such an investigation, the record I have to review is limited.  Future public investigations the multiple types of misconduct in the investigation-trial of this case should obtain detailed sworn depositions-testimony from all mental health professionals involved in PA v Sandusky using questions written by competent science and mental health ethics experts. These therapists should also be properly investigated for evidence of multiple licensing violations (eg., dual conflicting roles, failure to obtain informed consent, etc).

**4B14.  *Basic Essential Science-History:*   Coping and Resilience Science, Positive Psychology, and competently conducted Cognitive Behavioral Therapy offer a variety of effective science-validated methods for reducing multiple forms of mental health and emotional disturbance.**  On this record, none of the alleged victims in this case were apparently truthfully informed by any therapist involved (e.g. Gillum, Macnab) regarding the dangers and risks of the ***inherently unreliable process of recovering*** "blocked", "buried", "dissociated" "memories that come back" vs. the known benefits of multiple ***more effective treatment alternatives*** including scientifically validated Coping and Resilience Science, Positive Psychology, Cognitive Behavior Therapy, and others.

It is ESSENTIAL in such matters to obtain and review ALL *certified complete mental health records* of ALL alleged victims. This is especially true for all alleged victims who A) were in therapy

---

[4] The history of informed consent is instructive.  See also, Jochen Vollmann, Rolf Winau, Informed consent in human experimentation before the Nuremberg code, BMJ's Nuremberg issue, British Medical Journal 1997;314:439   See also, The Nuremberg Code and the Declaration of Helsinki, See also, "Trials of War Criminals before the Nuremberg Military Tribunals under Control Council Law No. 10", Vol. 2, pp. 181-182. Washington, D.C.: U.S. Government Printing Office, 1949.] and Nuremberg Code text from: https://history.nih.gov/display/history/Nuremberg+Code

during this investigation and trial and B) radically changed their "memory" reports during the investigation and trial. These complete mental health records should be obtained and reviewed by a competent EXPERT for evidence of RRM-MPD-DISSOCIATION malpractice, misinformation, failures of informed consent, dual role ethics violations (acting in dual conflicting roles as a therapist to a patient but also a consultant to the State in the same case – as Gillum and Macnab appear to have done on this record -- would be a serious ethics/dual conflicting role violation and should be properly reported to the PA licensing board.) (cf. On this record, during the corrupt, improper, often unrecorded, improperly repetitive, unethical investigative-therapist practices in this case involved permitting a RRM-MPD-DISSOCIATION therapist, Mr. Gillum, sit in on a police investigative interview (!) – egregious misconduct – for the investigator and for the therapist -- that is unprecedented in my 30 year experience reviewing hundreds of cases in dozens of jurisdictions.

Apparently safer, less controversial, and potentially more effective alternative treatments where not discussed nor offered to patients in this case.  see, Coping and Resilience Science treatments. See, e.g., S. Southwick and D. Charney, Resilience:  The Science of Mastering Life's Greatest Challenges, Cambridge University Press, Second Edition, 2018; Seligman, M. and Steen, Positive Psychology Progress: Empirical Validation of Interventions, American Psychologist, July 2005 ; See, Seligman, M. E. P. (2002). Authentic happiness: Using the new positive psychology to realize your potential for lasting fulfillment. New York, NY: Free Press ;  See, Seligman, M. E. P., & Csikszentmihalyi, M. (Eds.). (2000). Positive psychology [Special issue], *American Psychologist, 55*(1) ; See also, Linley, P. A., & Joseph, S. (Eds.). (2004). *Positive psychology in practice.*  Hoboken, NJ: Wiley ; See also, Burns, D. (Stanford Medical School), Feeling Good: the New Mood Therapy, Quill Harper Collins Publishers (January 1, 2000) ; See, King, L. A., Hicks, J. A., & Krull, J., & Del Gaiso, A. K.. (2006). Positive affect and the experience of meaning in life. Journal of Personality and Social Psychology, 90, 179–196 ; See, Feder, A., Nestler, E. J., & Charney, D. (2009). Psychobiology and molecular genetics of resilience. Nature Reviews, 10, 446–466 ; See, Charney, D. S. (2004). Psychobiological mechanisms of resilience and vulnerability: Implications for successful adaptation to extreme stress. American Journal of Psychiatry, 161,195–216 ; See, Bonanno, G. A. (2005). Resilience in the face of potential trauma. Current Directions in Psychological Science, 14, 135–138 ; See, Vaillant, G. E. (2002). Aging well: Surprising guideposts to a happier life from the landmark Harvard study of adult development. New York, NY: Little, Brown & Co.


**4B15.   NEGLIGENCE or CORRUPTION SERVING POLITICAL-ECONOMIC INTERESTS?   How is it possible that so much essential history and science evidence was never properly shared with the uninformed, misinformed, jury in PA vs Sandusky?**

What essential information was never shared with the jury in PA v Sandusky?

-- the well-documented history of RRM-MPD-DISS memories – like many in this case – being REJECTED as inherently unreliable by the relevant scientific community and excluded from multiple courts properly applying FRYE or DAUBERT-KUMHO analyses to evidence presented at complex, detailed, intensive hearings often involving multiple world experts.

-- the well-documented history of the *thousands of false "recovered repressed memory" claims of criminal sexual abuse that were investigated and debunked by the FBI* (Spec. Agent Kenneth Lanning Special Task Force) *and the National Center for Child Abuse and Neglect* (Gail Goodman, Ph.D). or

-- the well-documented history of years of intense international *scientific debates and a wave of national litigation -- "The Memory Wars"* – regarding the controversial "pernicious myth" of recovered repressed -- "buried", "blocked", dissociated", "trauma memories" (much like several of the alleged "memories" reported in PA v Sandusky) ;

-- the well-documented history of decades of science showing the trauma victims REMEMBER and do not forget in "fragmented" portions of memory to be recovered over time ;

-- the well-documented history of cases like McMartin, Wenatchee, Kelly Michaels and many others showing how systematic, abusive, repetitive interviewing methods (like those described in detail in Inv. Leiter's April 21, 2011 taped discussion) can produce horrific, detailed, yet quite false memories.

-- the well-documented history of *many psychotherapy malpractice lawsuits* that successfully shut down most of the RRM therapy industry as widely reported in the international news media for years.   See, e.g. Belluck, P. Memory Therapy Leads to a Lawsuit and Big Settlement [$10.6 Million], The New York Times, Page 1, Column 1, Nov. 6, 1997; See, Belluck, P. She Recovered Memories, Then 10 Millions in Damages, The New York Times, Nov 9, 1997, Sec. 4, Week in Review, page 2, Column 3 ; See, United Press International, Woman wins $10 M in false memory suit, Chicago, Ill. November 4, 1997; See, Gustafson, Paul. Jury awards $2.5 million in lawsuit against psychiatrist: 'Memories' were induced. Minneapolis/St. Paul Tribune, January 25, 1996, 1B ; See also, Guthrey, M. and Kaplan, T., 2nd Patient Wins Against Psychiatrist: Accusation of planting memories brings multi-million ($2.5) dollar verdict. St. Paul Pioneer Press, Jan. 25, 1996, 4B ;  See, Ann Zimmerman, Cult of Madness: Seeking help for depression, Martha Hurt turned to therapists. That's when her insanity truly began, Dallas Observer Oct 14, 1999; See, also, Wallace, C.G., Idaho Falls Post Register, "State board suspends psychologist's license," July 3, 1996, p. A-8 ; See, Duran, Sarah. Man wins therapy lawsuit and $2.1 Million, Tacoma Washington, The News Tribune, January 13, 2001 ; See, Rovella, David E. , Malpractice suit nets $2.1 million in mental health case, THE NATIONAL LAW JOURNAL, February 22, 2001;  See, Mooney, Tom. Recovered Memory Rejected: Judge rules out key element in landmark case. The Providence Journal (Rhode Island). April 28, 1999, etc.

*The Essential History of the RRM-MPD-DISS movement leaders was apparently not shared with the jury in PA v Sandusky: Why?* (e.g., On this record, it appears that Gillum and Macnab and also attorney Shubin as well as many others (See "RRM" evidence from the case record section below). were all "believers" in this novel, very controversial, unproven, unreliable RRM-MPD-DISS ideology, methods, and practices). On this record, it appears that the essential history of malpractice litigation, licensing revocations, and other documented misconduct of leaders of the "Recovered Repressed Memory" Movement was apparently unknown to everyone involved in confused PA vs Sandusky investigation and trial. None of this information was apparently offered to the misled jury in this case.

**For example, reportedly:**

— Dr Bennett Braun, MD. Former President of ISSD and Chief Editor of "Dissociation" was sued leading to a world record settlement. Dr Braun's clinic was also closed and his medical license was surrendered to the State of IL Licensing Board following prosecution by the Illinois Attorney General. Dr Braun's license – after years of suspension was restored – and then his license was reportedly surrendered again and this time permanently for drug offenses. In addition, Dr Braun has been on in many lawsuits as widely reported by the media. Several of these were listed by the State of Illinois in the formal complaint against Dr. Braun by the Attorney General's Office including but not limited to: Shanley v. Judith Peterson, Braun, et al. ; Schwidersky v. Peterson, Braun,. et al. ; Benoit v. Assoc. Mental Health Services ; Higgins v. Rush Presbyterian St Luke's Medical Center, Braun, et al. ; Becker v. Rush Presbyterian St Luke's Medical Center, Braun, et al. ; Bloom v. Braun, et al. ; Dale v. Braun, et al. ; Kreger v. Braun, et al. ; Doe v. Robins, Braun et al. ; Department v. Braun and others. This list includes the most famous of all "recovered memory" cases Burgus v. Braun, reportedly the largest psychiatric malpractice settlement in history. See, Belluck, P. (1997, November 6). Memory therapy leads to a lawsuit and big settlement. *The New York Times, page 1, col 1.* This report appears in hundreds of AP publications, TV shows, and radio stations worldwide. Virtually all MPD and RMT clinics in North America were closed following this news. Apparently, none of this historic information on the credibility of the RRM-MPD-DISS ideology that figure so prominently in the case was properly shared with the jury in PA v Sandusky. Such information is also essential in a properly litigated FRYE hearing on this novel ideology.

— Dr Bessel van der Kolk, MD (VDK) was reportedly fired ("released", "let go", "contract not renewed") from Harvard Medical School for multiple reasons including reportedly a deposition conducted by Dr RCB Barden in a RI federal case. The deposition documented serious misconduct (false statements to the NH v Hungerford court) and exposed serious questions about whether VDK ever actually conducted the research for his "Fragmentary Nature of Trauma Memories" research. For example, VDK reportedly admitted that Danya Vardi, VDK's 2nd named author in the paper offered to the Hungerford court, was actually prosecuted and found guilty of ***research fraud*** by Federal/Harvard investigation panel

prior to VDK giving their joint study to the court — the fraud conviction was apparently not honestly reported to the court in that NH criminal trial.  The Federal District Court in Rhode Island reportedly then ordered Dr. VDK to produce his alleged data for the "Fragmentary Nature of Trauma Memory" for review of accuracy and credibility. Dr. VDK reportedly refused to comply with the Federal Court order, fled from the process server, dropped out of the relevant cases and years later claimed in sworn deposition testimony that the "only copy of his data" on the essential "fragmentary nature of trauma memories" study "burned up in a fire", a fire that VDK never reported to fire, police or hospital officials. No other witness to the alleged "fire" apparently exists.  See, pg 171 of the May 4, 2005, Videotaped deposition of B. van der Kolk, MD in Bonse v. Archdiocese of St Paul and Minneapolis, Court File No. 62-C4-02-11412, Second Judicial District, Ramsey County, Minnesota.  VDK was also reportedly fired from his Trauma Clinic amidst allegations that he abused employees. VDK's expert testimony and analysis was reportedly excluded as ***unreliable*** following a DAUBERT hearing in  State of New Hampshire v. Hungerford and State of New Hampshire v. Morahan 698 A.2d 1244 (N.H. 1997). VDK's expert testimony and analysis was also excluded as ***unreliable*** following a DAUBERT hearing in a Neb case, Rivers v. Father Flanagan's Boys Town, Doc 1024, Case No. 743, Nebraska State Court Judge Sandra L. Dougherty, November 25, 2005 resulting in another case dismissal, Duffy v. Father Flanagan's Boys Town, Case No. 8:03CV31, United States District Court for the District of Nebraska, Memorandum and Order of January 26, 2006.  VDK's expert opinions on "trauma memories" were reportedly again excluded as ***unreliable in*** **Franklin v. Stevenson, 987 P.2d 22 (1999)** as the Utah Supreme Court noted the "evidence clearly did not meet the initial foundational showing of ***reliability***" ... "Not only has this court held that ***unreliable*** techniques are inadmissible as evidence, but also that any expert testimony based upon unreliable techniques is also ***unreliable and inadmissible....*** the *necessary* threshold *reliability* of these techniques was not established in the instant case."

— Dr Renee Fredrickson, PhD. Author of the RMT foundational book "Repressed Memories". Dr RF was sued, paid settlement, and was punished by MN licensing board with restriction on practice.  See, "Before the Minnesota Board of Psychology, Stipulation and Consent Order of May 7, 1999 In the Matter of Renee Fredrickson, Ph.D., L.P. License No. LP2653… "It is hereby ordered that the Licensee is placed in a Restricted and Conditional status and that all other terms of this stipulation are adopted and implemented by the Board this 7th day of May, 1999." See, e.g. American Psychological Association MONITOR, Recovered-memory lawsuit is settled out of court, Vol. 29, Number 9 -September 1998 ; See, Lerner, Maura, ***Psychologist barred from treating cases involving false memories***, Minneapolis/St. Paul Tribune, June 3, 1999.

— Dr George Greaves, PhD. RMT expert and **Past President** of Intl Society for the Study of Dissociation. His *license was permanently revoked* for abusing multiple patients using hypnosis and

"dissociation" to obtain sexual access to vulnerable patients.... "Despite his personal knowledge of the patient's extreme vulnerability due to emotional disorders.... [Dr Greaves} repeatedly hypnotized the patient for the purpose of engaging in sexual intercourse." See, "Before the Georgia State Board of Examiners of Psychologists, Docket Number 93-598 , AG NO. 64PB-CA-97300-92, In the Matter of George B. Greaves, Ph.D. , Consent to license revocation signed April 1, 1994.

— Dr Colin Ross, MD. Another **Past President** of ISSD. Dr Ross was reportedly sued ending in settlement, testimony excluded from Tx v Harris case following a Daubert hearing for unreliable methods (junk science),  testimony reportedly excluded from Hamanne vs Humenansky (MN) for unreliable methods (junk science).  See, Texas vs. Harris. Associated Press, "Texas man suspected of raping older women claims he suffers from multiple personality disorder", Washington Post, National Desk Sept. 19, 2011; and see, *"Expert witnesses disagree on validity of multiple personality disorder"* by Sonny Long, Victoria Advocate News, September 20, 2011 Edna, Texas; and see, Platenberg, G. Jury sentences convicted rapist to life in prison. Victoria Advocate News, Sept. 30, 2011. The court excluded the testimony of the defense expert witness ( psychiatrist Colin Ross, MD) who testified regarding the defendant's "multiple personalities", "dissociated memories", etc. The court found the testimony regarding Dissociative Identity Disorder (DID) [ ... a variant of Repressed Recovered Memory -Multiple Personality Disorder ] was *controversial, unreliable*, and *not accepted by the relevant scientific community*." Dr Ross has also produced unusual theories about controlling "energy" from his eyes. See, "Dr. Colin Ross Demonstrates How He Sends a Beam of Energy From His Eyes" at https://vimeo.com/1449829

— Dr Judith Herman, MD was reportedly arrested by Federal agents for multiple drug violations, lost prescription privileges, punished by MA licensing board, and paid large fines. See, July 5, 1995, Boston Globe, "US Attorney settles Drug Lawsuit with Cambridge Psychiatrist (fine paid and loss of prescription privileges).  "The United States of America seeks civil penalties against the defendant for numerous violations of the Comprehensive Drug Abuse Prevention and Control act of 1970, 21 U.S.C. §§ 801 et seq.." . Federal Complaint at pg 2. "on numerous occasions during the period relevant to this Complaint, Herman used her DEA registration to purchase controlled substances from wholesale drug distributors. Specifically, Herman purchased significant quantities of Schedule III narcotic and non-narcotic controlled substances, including Fiorinal with Codeine, Idenal, and Butalbital, and Schedule IV controlled substances such as Diazepam, Flurazepam, and Halcion. Each of these controlled substances has a high potential for abuse and poses a risk to the user of psychological or physical dependence" at pg. 3 of the Federal Complaint. "On March 16, 1994 representatives of the DEA and the Board visited the Collective and spoke with Dr. Herman. Dr Herman openly acknowledged her actions, voluntarily surrendered her DEA registration at that time..." See, page 4 of the MA ST Bd of Medicine Complaint.

— Dr Daniel Brown, PhD – opinions reportedly excluded from the RI vs. Quattrocchi case following a Frye-Daubert hearing for unreliable expert testimony. [ His cross examination reportedly exposed ethics violations and misrepresentations of research]. See, State of Rhode Island v. Quattrocchi, C.A. No. P92-3759 (R.I. 1999) [on remand from the Rhode Island Supreme Court 681 A.2d 879 (R.I. 1999)]. Dr Brown apparently has no history of obtaining Federal or State research grants.

— Dr Judith Peterson, PhD, was reportedly indicted by a Federal Grand Jury in Texas and criminally prosecuted by the US DOJ for implanting "recovered memories" and thus creating "dissociated splits" (MPD) in order to charge insurance to treat the fabricated symptoms. The case ended in a mistrial (too many jurors had to drop out of the very long trial). The co-defendant hospital was reportedly closed and sold. See, Criminal Charges Filed in Recovered Memory Case. December 1, 1997. Psychiatric Times, Psychiatric Times Vol 14 No 12, Volume 14, Issue 12. See, See, U.S.A. v. Judith Peterson, Ph.D., et al., U.S. Southern District of Texas, Crim. Case No. H-97-237, James H. Deatley, U. S. Attorney.

— Dr Constance Dalenberg, PhD – Her opinions were reportedly excluded as unreliable following a Frye-Mack-Daubert hearing in Doe vs. Archdiocese (MN is a Frye state.) [ See, John Doe v. Archdiocese of St. Paul, Case No. 62-C9-06-003962, December 8, 2009 and affirmed by the Minnesota Supreme Court on July 25, 2012, John Doe v. Archdiocese of St. Paul, 817 N.W.2d 150 (Minn. 2012). In testimony at that hearing, Dr Dalenberg admitted to refusing other scientists access to review her research data. She also admitted to later **destroying the only copy** of her essential data set and "nobody else" viewed such data.

— Dr Phillip Coons, MD. RMT expert psychiatrist. Dr Coons admitted that *he "destroyed" the only copy of his most important data* on repressed memories and dissociation and that no other person has apparently ever seen Dr. Coons' alleged data. See, Barden, R.C., Deposition of P. Coons, Hurt v. Ash et al. (Tx) Sept 20, 2000 at page 223… "8 Q. And do you still have the raw data for that 9 study? 10 A. No. 11 Q. Where did it go? 12 A. Well, as I said, I've -- I've not kept that 13 data. 14 Q. Meaning that it was destroyed? 15 A. Yeah, I -- I threw it out. 16 Q. So were you the one who personally destroyed 17 it, or did you hire somebody else to do it? 18 A. No, I personally destroyed it."

**4B16. _Basic Essential Science-History:_ As noted in this report, on this record, it appears that NONE of the science-history uninformed Legal Professionals (prosecutors, defense attorneys and judge) associated with this case seemed aware of the history of the "Memory Wars" one of most important chapters in the history of the Mental Health System in the U.S. Similarly,** on this record, it appears that *nobody associated with this case seems aware of the history of the many Frye-Daubert-Kumho hearings excluding such "junk science" testimony from "pieced together", "recovered", "buried", "blocked" or "dissociated" memories,* nor the many lawsuits successfully suing

and some reportedly bankrupting RRM-MPD-DISS therapists for some of the kinds of practices described in this case, nor the national and international news stories about these cases-suits-licensing revocations, nor the state licensing board revocation proceedings that ended the practices of several leaders of the recovered repressed memory movement.  The alternative hypothesis is that these legal professionals were aware but improperly (improperly?) kept all of this information from the jury.

Histories of these internationally reported events have been published in leading professional and science journals and in medical textbooks as well as international media including page one, col. one of the NY Times, hundreds of Associated Press newspaper articles, the BBC, NBC Dateline national TV broadcast, many magazines, and many other outlets.  There were many such lawsuits and licensing cases over a period of years resulting in the closing down of clinics practicing such dangerous forms of psychotherapy. This was one of the most infamous chapters in the history of the US mental health system. I participated in many of these cases, hearings, and licensing actions to protect the safety of the public and *protect the integrity of the legal system*.

I have also published histories of these events in leading scientific and professional outlets such as Oxford University Press. (See, Dr Barden's resume). Many of these cases received national or international press coverage.  See, Hanson, Cynthia, Dangerous Therapy, Chicago Magazine, June, 1998. "The [$10.6 Million] Burgus settlement is said to be the largest sum ever awarded in a psychiatric malpractice suit." See, Rierden, A., "When a buried truth wants out, is it real?" The New York Times, April 24, 1994, Section 14 CW, p. 1, Connecticut Weekly Desk. "R. Christopher Barden, the lawyer-psychologist who is representing Mrs. Downing, said he has talked to hundreds of women across the country who have undergone recovered memory therapy and that their stories are strikingly similar. He called the psychological technique one of the biggest consumer frauds of recent times." McKenna, M.A.J., "Abuse' backlash builds: "Victims' deny "memories,' sue therapists," The Boston Herald, April 8, 1994, p. 45 ; See, Ann Zimmerman, Cult of Madness: Seeking help for depression, Martha Hurt turned to therapists. That's when her insanity truly began, Dallas Observer Oct 14, 1999 ; Johnson, P.M., "Patients sue psychologist over false abuse memories: Repressed memory cases on the rise nationwide," Idaho Falls Post Register, January 30, 1995, p. A-1 ; See, In the Matter of the License to Practice Psychology: Mark D. Stephenson, License No. Psy-253, Before the Board of Psychologists, State of Idaho, Case No. PSY-03-95-005. "At issue was the treatment of female patients who initiated complaints to the Board. They said through hypnotic procedures, Dr Stephenson implanted false memories of sexual abuse into their minds. The State filed a complaint alleging that respondent violated the American Psychological Association (APA) ethical standards in his treatment of the female patients. The board ordered

respondent's license suspended for three years."; Duran, Sarah. <u>Man wins therapy lawsuit and $2.1 Million,</u> Tacoma Washington, The News Tribune, January 13, 2001 ; Lief, H. , Patients Versus Therapists: Legal Actions Over Recovered Memory Therapy, Psychiatric Times, November 1999 Vol. XVI Issue 11 ; Lief, HI & Fetkewicz, JM. (1999) Casualties of recovered memory therapy: The impact of false allegations on accused fathers. In Review of Psychiatry, Vol. 1., RC Friedman & JI Downey, Eds., 115-141 ; Mooney, Tom. <u>Recovered Memory Rejected: Judge rules out key element in landmark case.</u> The Providence Journal (Rhode Island). April 28, 1999; AP News Wire story, Psychiatrist loses license over cult abuse recovered memory allegations.  Chicago, Friday Oct. 8, 1999.

       **Publications on the History of the Rise and Fall of the RRM-MPD-DISS ideology that figured so prominently in PA v Sandusky but was never properly shared with the jury.**

       See, e.g. Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

       See, e.g. Barden, R.C., (**2016**) Memory and Reliability: Developments and Controversial Issues.  In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover,  Consultant Editor: Sir Anthony Hooper, **Oxford University Press**, Foreword by Lord John Thomas, Chief Justice of England and Wales.

       See,  Belluck, P. *Memory Therapy Leads to a Lawsuit and Big Settlement [$10.6 Million],* The New York Times, **Page 1, Column 1**, Nov. 6, 1997.

       See, e.g. Pendergrast, M., (**2017**) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It,* Springer International Publishing, ISBN 9783319633749. Preface by R. Chris Barden, Ph.D., JD.

       Thus a key investigative hypothesis in this case — essential to the integrity of this investigation — has never been properly investigated. *The theory is that the alleged victims in this case were defrauded by negligent, "recovered memory" therapists in PA — including Therapist Macnab (who was reportedly working with civil Attorney Shubin) and therapist Gillum who reportedly spent 3+ years in "treatment" with an alleged victim <u>before</u> the patient reported "memories" of criminal abuse.*  Why haven't the certified-complete office forms, all billing records, and all mental health treatment records of the alleged victims been properly reviewed by a national expert? Was this failure due to Negligence or a deliberate joint effort to sabotage this case and produce a rapid, certain conviction?

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

On this record, no other national expert in the field of therapist malpractice, misconduct, and licensing violations has reviewed these records and none testified at the science-ethics-uninformed PA v Sandusky trial.   On the records reviewed thus far this case appears to contain significant evidence supporting the alternative hypothesis that some or all of the *alleged victims were indoctrinated into the controversial, novel, pseudoscientific ideology of RRM-MPD-DISS including "recovered repressed memory" therapy, "traumatic amnesia", "dissociated memories" "pieced together memories" "recovered trauma memories" and even "speaking to an "inner child personality"* (See, alleged victim MS's book on how he recovered his "memories"and other cites to the record below ) and similar very controversial, unproven, inherently unreliable novel notions that have been *soundly rejected by the relevant scientific community* (as a "pernicious myth") and also excluded by multiple courts in multiple states following competent FRYE or DAUBERT hearings.  Apparently little or none of this essential information was shared with the jury in PA v Sandusky.

**4B17.**   *Basic Essential Science-History:*   Therapist Licensing Revocations:  The well-documented history of nationally reported *licensing revocations of leaders of the RRM-MPD "therapy" movement was apparently unknown to all of the science and history uninformed legal professionals in this case.* See, AP News Wire story, Psychiatrist loses license over satanic allegations. Chicago, Friday Oct. 8, 1999; See, also, Wallace, C.G., Idaho Falls Post Register, "State board suspends psychologist's license," July 3, 1996, p. A-8, and others.

**4B18.**   *Basic Essential Science-History* of Frye and Daubert-Kumho hearings:   *The well known, published, and widely discussed Science-History of multiple Frye-Daubert-Kumho hearings excluding "recovered memory" alleged victim testimony and expert testimony in cases like PA v Sandusky was apparently unknown to ALL of the legal professionals in this case.*  Specifically, such evidence (expert testimony and alleged victim "memories") was excluded following Frye and Daubert-Kumho hearings because RRM-MPD-DISS novel notions of "buried-blocked-dissociated "memories", methods, and science have been *rejected (not accepted) by the relevant scientific community* as inherently unreliable "therapy world" evidence not for use in the legal system.

The novel RRM-MPD-DISS ideology, controversial, unreliable evidence subjected to FRYE or DAUBERT hearings in other states was excluded to *protect the integrity of the legal system* because RRM-MPD-DISS ideology and practices have:

- *not been accepted by the relevant scientific community*  (see **cited science below and see Amicus from dozens of world-leading science experts who opined "Decades of research and**

scientific debate have clarified over and over again, that the notion of traumatic events being somehow "repressed" and later accurately recovered is one of *the most pernicious bits of folklore ever to infect psychology and psychiatry*."

— *NOT been supported by methodologically competent science* published in peer reviewed journals, and have...

— *NO known error rate* – (and thus might *have a potential error rate of 100%* ).

The results of properly conducted Frey and also Daubert-Kumho hearings on "memories" similar to some of those alleged by several of the PA vs Sandusky accusers *were apparently unknown to ALL of the legal professionals in this case. The hearings include:*

See, Hamanne, et al. v. Humenansky, Ramsey County Minnesota File No. C4-94-203, Judge Betrand Poritsky, June 30, 1994, Transcript page 83-84. "The Frye hearing has been concluded and we are still on the record... It's my finding, first, that the theory a person can block out of awareness [repress or dissociate] a long stream of [traumatic] events and subsequently recall them accurately is not supported by experts in the field. And further that there is general agreement by experts that such [recovered memory] evidence is not reliable nor trustworthy. That's the Frye standard. As to the Daubert standard, it is also my ruling that such [recovered memory] evidence is not reliable nor helpful to the jury."

See, Carlson v. Humenansky (Ramsey County Minnesota Trial Court), Judge Betrand Poritsky (January, 1996). Judge Poritsky again found (as he had in Hamanne v. Humenansky) that repression and recovered memories were unreliable concepts, not accepted by the relevant scientific community, not helpful to a jury and thus inadmissible.

See, Engstrom v. Engstrom California App., 2nd App. Dist., Div 2, (CA 1997) "[Repressed memory] is not generally accepted as valid and reliable by a respectable majority of the pertinent scientific community..."

See, State of New Hampshire v. Hungerford and State of New Hampshire v. Morahan 698 A.2d 1244 (N.H. 1997) "The phenomenon of recovery of repressed memories has not yet reached the point where we may perceive these particular recovered memories as reliable."

See, State of New Hampshire v. Walters 697 A.2d 916 (N.H. 1997) "[W]e conclude, as we did in Hungerford , that " [t]he indicia of reliability present in the particular memories in [this] case[] do not rise to such a level that they overcome the divisive state of the scientific debate on the issue."

See, Franklin v. Stevenson, 987 P.2d 22 (1999). Utah Supreme Court ruling. "Stevenson objected to the reliability of both the [recovered repressed memory] recovery techniques and Franklin's own

testimony concerning the recovered memories, as well as to the experts' testimonies regarding both the theory of repressed memory and Franklin's memories in particular.... As we conclude below, the trial court erred in not finding the plaintiff's experts' testimonies [regarding "repressed memories"] inadmissible... On cross-examination in this case, Stevenson elicited concessions from both of Franklin's expert witnesses, Dr. Bessel van der Kolk, and Franklin's therapist, Dr. Laurie Hoover, regarding *the lack of scientific foundation* for the therapeutic techniques Dr. Hoover used with Franklin... Franklin's evidence clearly did not meet the initial foundational showing of reliability... Not only has this court held that *unreliable techniques are inadmissible as evidence...* the *necessary* threshold reliability of these techniques was not established in the instant case."

See, State of Rhode Island v. Quattrocchi, C.A. No. P92-3759 (R.I. 1999) [on remand from the Rhode Island Supreme Court 681 A.2d 879 (R.I. 1999)] "The State has not met its burden of establishing that repressed recollection is reliable and admissible as scientific evidence." [ The testimony of the alleged victim — based on recovered "memories" of abuse — was excluded and the case was dismissed. ]

See, State of New Hampshire vs. Bourgelais, Docket No. 02-S-2834, Judge T. Nadeau, April 4, 2005. "the State's motion [to use repressed memory evidence at trial] is denied... the court determines, based on the law and the evidence, that *the reliability of memory retrieval has not been sufficiently established*..."

See, Rivers v. Father Flanagan's Boys Town, Doc 1024, Case No. 743, Nebraska State Court Judge Sandra L. Dougherty, November 25, 2005. "In conclusion, the Court finds and concludes that Rivers *has not met his burden of establishing that repressed and recovered memory is reliable and admissible as scientific evidence* or that it is properly applied in this case. The Plaintiff's evidence lacks the scientific reliability and proper application necessary to admission under Rule 702 and Daubert/Schaferman. As a result, the Courts finds and concludes that the Defendants' Motion in Limine No. 1 (banning all testimony regarding repressed and recovered memories) shall be sustained." [ The testimony of the alleged victim — based on recovered "memories" of abuse — was excluded and the case was dismissed. ]

See, Texas vs. Harris. Associated Press, "Texas man suspected of raping older women claims he suffers from multiple personality disorder", Washington Post, National Desk Sept. 19, 2011; and see, "Expert witnesses disagree on validity of multiple personality disorder" by Sonny Long, Victoria Advocate Newspaper, September 20, 2011 Edna, Texas; and see, Platenberg, G. Jury sentences convicted rapist to life in prison. Victoria Texas Advocate, Sept. 30, 2011. The court excluded the testimony of the defense expert witness ( a psychiatrist ) who testified regarding the defendant's "multiple personalities", "dissociated memories", etc. The court found the testimony regarding Dissociative Identity Disorder

(DID) [ ... a variant of Repressed Recovered Memory -Multiple Personality Disorder ] *was controversial, unreliable, and not accepted by the relevant scientific community.*"

See, John Doe v. Archdiocese of St. Paul, Case No. 62-C9-06-003962, December 8, 2009, 2nd Judicial District, Judge Gregg E. Johnson after a detailed, complex hearing found, "*Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the concept of repressed and recovered memory is generally accepted in the relevant scientific community*" ..."Inclusion of the diagnosis of dissociative amnesia in the DSM-IV does not establish general acceptance of that diagnosis"... "Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the theory of repressed and recovered memory is reliable and trustworthy based on well-recognized scientific principles because of the significant methodological flaws in the studies presented by plaintiff in support of that theory and the lack of any test to show reliability. Defendant's Motion to Exclude Expert Testimony under the Frye- Mack standard is hereby GRANTED." This decision was affirmed by the Minnesota Supreme Court on July 25, 2012, John Doe v. Archdiocese of St. Paul, 817 N.W.2d 150 (Minn. 2012). [ The testimony of the alleged victim — based on recovered "memories" of abuse — was excluded and the case was dismissed. ]

See, Texas v. Hays, No. CR14-095, CR14-096, CR14-097 & CR14-190 (Bandera Co., Tex. Dist. Ct. July 27, 2015). "It is hereby ordered that the expert testimony of Lisa Watts relating to her opinions regarding Dissociative Identity Disorder (DID) [ Testimony on DID ... a variant of Repressed Recovered Memory-Multiple Personality Disorder was excluded as *controversial, unreliable, and not accepted by the relevant scientific community.*"]   None of this information was apparently shared with the jury in PA v Sandusky.

**4B19.** *Basic Essential Science-History:*  National continuing education courses have taught this essential science-history, the requirement of informed consent for psychotherapy, and the dangers of memory contamination by improper leading-repetitive interviews by investigators, therapists, and attorneys. How is it possible given the world-wide distribution of this knowledge via media,education, CLEs, and other means for apparently ALL of the lawyers, judges, therapists and investigators involved in PA v Sandusky to demonstrate *unprecedented levels of ignorance of such basic science-history so essential to this case?* Or, alternatively, is this a case of systemic corruption and sabotage in pursuit of local political and economic goals? (See analysis of these questions later in the report).   In addition to the hundreds of national and international news media reports on the RRM-MPD-DISS malpractice cases, licensing revocations, and Memory Wars in addition to the numerous published DAUBERT hearings results excluding "buried" and "blocked" memories surfacing following interviews with local science-uninformed therapists (e.g. Gillum, Macnab), or abusive repetitive Government  interviews (as described

by Inv Leiter on April 21, 2011 recording) as were many of the alleged "memories" reported in the trial of this case,

See also, continuing education courses on the science memory-false memory, debunking "recovered repressed memories", proper use of the Frye-Daubert-Kumho process as taught to many thousands of lawyers, therapists, physicians etc. (CLE, CPE, CME, etc). I personally taught many of these courses in multiple states to thousands of professionals and others did also in addition to Medical, Psychological and Legal symposia on these important issues --- all apparently ignored (or improperly suppressed) in the investigation and trial of the PA v Sandusky case.

International journals, books, and other publications discussing this essential component of the history of the mental health system, the science of psychology/psychiatry, and historic interactions between law and science issues --- were all ***apparently ignored (or improperly suppressed and hidden )*** in the investigation and trial of the PA v Sandusky case.

See e.g. Barden, R.C., Memory and Reliability: Developments and Controversial Issues. In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016 with a foreword by The Right Honorable, The Lord John Thomas, Lord Chief Justice of England and Wales.

See, also, Grove, W. M. and Barden, R.C. (2000). 'Protecting the integrity of the legal system: The Admissibility of Testimony from mental health experts under Daubert/Kumho analyses.' *Psychology, Public Policy and Law*, *5(1)*, 234-242. Excerpts reprinted in AF, G. *Evidence*: University Casebook Series (2002), Foundation Press – West Group, New York, p. 688.

**4B20.    *Basic Essential Science-History:*  There is no credible, reliable research base to ascertain a guess as to what % of abuse allegations are false.**  ALL police or mental health or other professionals who report some "guess" (usually a low % hunch with ZERO competent scientific basis an no peer-reviewed citations offered ) are simply guessing and it is ***unethical to guess without letting everyone know it's just a guess***.  The only actual, peer reviewed, published study of this issue I am currently aware of was done by Dr E. Kanin in Indiana.  In PA v Sandusky, defense counsel failed to provide the jury with expert witness testimony on such key issues.  For example, zero evidence was properly presented to the jury regarding the research of Prof Kanin documenting that when his cases were fully investigated until actually solved -- that ***41% of all rape allegations were proven to be false*** (by confession of the false accusers)_ and that a key motivation in false rape claims was "*revenge*".  [ See, Kanin, E. "False Rape Allegations", Archives of Sexual Behavior 23, no. 1 (1994).  In my experience,

science uninformed therapists (e.g., Gillum, Macnab) are often quite unaware of the Kanin research and believe RRM-MPD-DISS misinformation claiming a "very low" rate of false allegations. Presenting such misinformation to patients or courts without stating "nobody really knows" is unethical, violates licensing and ethics rules, and is clearly misconduct that should be properly exposed and refuted by competent attorneys and opposing expert witnesses.

**4B21.   _Basic Essential Science-History:_   Defense Lawyer Negligence or Sabotage:** Why did the defense attorneys in this fail to provide the jury with competent expert witness testimony on Memory-False Memory RRM-MPD-DIS issues to help the jury understand the essential science-history issues so relevant to this case.

The jury in PA v Sandusky was not properly informed by a competent expert witness on Memory-False Memory- RRM-MPD-DISS that research on thousands of trauma patients studied in detail showed _they remembered many kinds of abuse without "blocking" memories, without "burying memories" and without "dissociating memories"_ or having such memories "come back" later.  (See Pope, et al. and other detailed research citations in this report).

The jury in PA v Sandusky was not properly informed by a competent expert witness that one of the key functions of the human brain is to _remember bad, terrifying, horrific, awful, abusive things so we can avoid them in the future_. The controversial, novel, unreliable RRM-MPD-DISS notion that trauma "blocks memories" or "buries memories" and that such "memories come back" in a **_reliable_** manner _is **a "pernicious myth"** according to the relevant scientific community._  See, dozens of research studies as cited in this report as well as the Amicus Statement of many of the world's leading scientists in this area (See research summaries and Amicus citation in this report).

**4B22.   _Basic Essential Science-History:   On this record, no competent expert witness testimony was provided to the jury on the memory-contaminating effects of multiple, leading-suggestive-coercive interviews-therapy by poorly trained and/or corrupt investigators (e.g. Leiter), civil attorneys (e.g. Shubin), and local therapists (e.g. Gillum, Macnab), etc._**

WERE MILLIONS of $ FOR NEW "MEMORIES"?:   No proper, essential science-history evidence was properly presented to the jury in this case regarding the millions of dollars potentially offered to alleged victims by civil attorneys (Shubin, Andreozzi) and therapists (e.g. Gillum, Macnab).

(See, e.g., Newly Discovered Evidence of sting investigator AJ Dillon's investigative recordings as well as the Newly Discovered SS-Shubin Interview Transcript ).

On the April 21, 2011 recording of the BH interview, Inv. Leiter disclosed to Attorney Andreozzi the corrupt-abusive-improper nature of the Government 's investigative interview process in this case including:

PLANNED MEMORY MANIPULATION -- the interviews were apparently carefully planned to be abusively coercive, leading, suggestive, and repetitive. (See, Inv Leiter's discussion of April 21, 2011 with transcript quotes in this report)

A HIGHLY IMPROPER, MEMORY CONTAMINATING INTERVIEW PROCESS. -- the Government interview process described by Leiter in the April 21, 2011 recording appear *carefully planned to deliberately and repetitively manipulate the memory reports of witnesses until they agreed with the Confirmation Bias Goals of Inv Leiter's pre-chosen narrative.* With a competent Expert Witness in Memory-False Memory, this extraordinary discussion of a corrupt interview system could have been the most important evidence in the trial but was instead not properly shared with the jury by the negligent and/or corrupt-sabotage efforts of defense counsel. (See, similar interviewing errors in the infamous McMartin, Wenatchee, Kelly Michaels cases as well as the many RRM-MPD-DISS malpractice litigation cases).  (See, Police Investigator Leiter's inadvertently recorded discussion statement at the April 21, 2011 police interview of BH. )

RRM-MPD-DISS IDEOLOGY – WHO INDOCTRINATED THE WITNESSES?  No proper evidence from a Memory Expert Witness was properly presented to the jury regarding one of the very ESSENTIAL issues in this trial – HOW, WHEN, WHY, and from WHOM did multiple alleged victims learn the terms, concepts, and ideas to become indoctrinated into the unreliable controversial RRM-MPD-DISS ideology and methods regarding "buried memories", "blocked memories", "dissociated memories" "memories stored in an inner child", "memories from abuse at age 2" and other controversial, inherently unreliable notions?  See, Ofshe, R. and Watters, E., *Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria.* 2nd Edition. University of California Press, 1996. [ This book explains in detail how and why patients and witnesses came to adopt new "memories" that re-wrote their auto-biographies].

**4B23.   OPINION:  *In sum, on this record, basic, reliable, valid scientific-historical information essential for a competent-fair trial in such cases was never provided to the jury.*** Was this the result of unprecedented, Negligence of the lawyers and/or deliberate corruption and sabotage of the case for local political-economic reasons, and/or other motivations?  (See detailed evidence and analysis of these investigative hypotheses later in this report).

Expert Witness Report of R Chris Barden, Ph.D., JD.    January 18, 2023

In sum, on this record, the jury in PA v Sandusky was misled and uninformed regarding essential scientific-historical issues of memory, false memory, systemically-abusive-corrupt interviewing methods and other essential issues.  Will these issues be properly investigated with public hearings and witnesses under oath?

## 5.  REVIEW and ANALYSIS OF THE NEWLY DISCOVERED ALLEGED VICTIM SS-ATTORNEY SHUBIN TRANSCRIPT and AJ DILLON TRANSCRIPT EVIDENCE – BOTH SHOWING IMPROPER, MEMORY CONTAMINATING, ABUSIVE MIS-INTERVIEWS. s

**5A.    Analysis of the newly discovered transcript of a discussion between attorney Shubin and alleged victim SS.**  In reviewing the newly discovered transcript of a Jan 15, 2018 interview of SS (reportedly since deceased) with his lawyer Andrew Shubin, JD, it is my opinion that this *interview transcript documents highly suggestive, unethical, improper, and abusively leading and memory contaminative interviewing methods by Attorney Shubin*.  It is quite clear on this transcript (and I have reviewed hundreds of transcripts as a consultant or testifying expert witness for prosecutors and defense attorneys in dozens of states) that Attorney Shubin was *not properly interviewing alleged victim SS* but *improperly and unethically instructing the witness as to the facts Shubin wanted to hear from* alleged *victim SS*.

This review of the newly discovered transcript produces at least two Investigative Hypotheses. First, that Mr. Shubin was a negligent attorney who somehow was not aware of the decades of basic science-legal history demonstrating how such improperly leading interviews can manipulate-influence-change and transform the "memories" of witnesses thus tainting the integrity of the legal process.  An alternative investigative hypothesis is that Mr. Shubin was engaged in an apparently improper and unethical attempt to manipulate and change alleged victim SS's testimony to obtain payments of settlement money for himself and SS. (See, Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022; (See, Transcript of Shubin- alleged victim SS's discussion and Affidavit from Attorney D. Litman ; See, Transcript of AJ Dillon Investigation and Affidavit from AJ Dillon).

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that other alleged victims in this case also apparently demonstrated *radical changes in their "memory" reports following meetings/interviews/discussions/ with Attorney Shubin.*

*On the available record, these "memory changes" apparently made the victim's "new memories" far more financially valuable in future lawsuits and settlements.*

On this record, discussions-interviews-therapy with Attorney Shubin and his affiliated psychotherapist Macnab were apparently involved prior to several alleged victim witnesses offering significant changes in their "memory" reports. These changes in memory reports were apparently in the direction of "new memories" of criminal abuse for which Shubin and the witness were likely to be paid enormous sums of money.  (See, Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022).

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that the PA Office of the Attorney General was reportedly concerned about Attorney Shubin's attempts to **control the testimony of his clients**. See, Police Report "*One of the OAG attorneys had advised me that one of several problem areas with Shubin was his insistence that he be present for the interview of Alleged Victim AM*"  [ Dr Barden notes:  It is **very** unusual anywhere in the US for a civil litigator to be present in a police investigation interview with the litigator's client, a potential crime victim and a future plaintiff of the civil litigator in a lawsuit for money damages. The serious potential memory-contaminating influences of the civil litigator's presence in an interview are obvious. ]

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation reveals that that on May 7, 2011 — SS (currently deceased) according to a police report told Investigator Anthony Sassano on May 7, 2011 that he did NOT view any of Sandusky's behavior around him as sexual in nature and never felt uncomfortable around him. Alleged victim SS reportedly told Office of the Attorney General Investigator Sassano "*Sandusky is a great role model as he helps people in need*." See, Exhibit C, June 1, 2011, Pennsylvania Office of the Attorney General, Investigative Report of Anthony Sassano as noted in the Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022.

Following my initial review of the newly discovered Shubin-alleged victim SS transcript, my additional and ongoing investigation revealed that the Office of the Attorney General Investigator Sassano *also reported on his June 1, 2011 interview with* JSi *, SS's brother.*  **On this record, unlike his brother, SS, the brother JSi was never interviewed by Attorney Shubin and was never in therapy with Shubin's affiliate psychotherapist, C. Macnab.**  The police report documents JSi (who reportedly spent

far more time with the defendant than his brother JSi) denied any abuse by Sandusky and told Sassano "he had heard of the allegations against Sandusky in the news and does not believe they are true. He indicated that Sandusky is a very generous and most positive person who helps kids with problems. He indicated that to this day, he has occasional contact with Sandusky via phone and considers him a friend." ( See, Exhibit C, Pennsylvania Office of the Attorney General, Investigative Report of Anthony Sassano, June 1, 2011. )

Investigator Sassano also reported on his May 9, 2021 interview with JSi  (File No: 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-1 …  [ Note: Again, JSi was never interviewed by attorney Shubin and was never in therapy with Shubin-affiliate Macnab and his reported "memories" did not change over time. ]  Inv. Sassano noted, "He stated that after staying at Sandusky's house many, many times he knows that Sandusky would have had ample opportunity to abuse him if he was so inclined to do so. He never once ever tried anything out of line with JSi.  JSi stated that Sandusky is kind of a grandfatherly, huggy type of guy and genuinely tries to encourage kids with his enthusiasm. His hugging and caring for kids was never sexual at all. He said that he does not believe that these allegations are true and *feels that this might be some type of attempt by these kids to get money or their parents to get money from Penn State and Jerry Sandusky.* He has never heard anyone speak about Jerry Sandusky in a negative way.  He (Sandusky) has always had a tremendous impact on a lot of kids … He said he speaks with (another alleged victim) AM on Facebook and AM never mentioned anything about any incident involving Jerry Sandusky.  He stated Jerry Sandusky was a positive influence in his life to say the least.  Sandusky set JSi on his life course and JSi feels he would have never gotten into college and would never be in the position he is in today without Sandusky's help. He said that Sandusky was extremely influential in his life.

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that alleged victim 2's (AM's) initial statements reportedly claimed he was "the boy in the shower" and that he reported suffering NO abuse at all from the defendant in this case. AM did not testify at trial as a witness in Sandusky's defense, reportedly because Attorney Shubin actually hid AM in an undisclosed location. (See, AM's statement to Investigator Everhart).  Consistent with this analysis on Nov 9, 2011 alleged victim #2 (AM), reportedly told investigator Curtis Everhart, "never in my life did I ever feel uncomfortable or violated by Sandusky…never did Jerry do wrong by me… I will never have anything bad to say about Jerry". In addition, in the Everhart interview the alleged victim AM reported gross misconduct by the investigators consistent with Inv. Leiter's recorded statements of April 21, 2011 -- documenting a highly improper, systemic, abusive, memory-contaminative government system of Memory Manipulation interviewing (See detailed analysis below). AM reportedly told

Everhart, after telling PSP interviewers that Sandusky never mistreated or abused him in any way "I felt very uncomfortable with the PSP interview process as *__they would try to put words in my mouth__, take my statements out of context.* The PSP investigators were *clearly very angry and upset when I would not say they wanted to hear*." (Exhibit D, Interview with Everhart in Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022).

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that both Investigator Sassano and Inspector Corricelli reportedly *suspected the honesty of Attorney Andrew Shubin with regard to AM's changed "memories".* Investigator Sassano reportedly claimed that *Attorney Shubin made a false representation to him (serious unethical misconduct for an attorney)* of alleged victim AM's "memories" of abuse. In addition, investigator Sassano reportedly rejected AM's written statement of "memories" as Inspector Correcelli indicated *he suspected Attorney "Shubin wrote it".* See, Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022, Exhibit E, Supplemental Report of Sassano at pg 5-6.

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that, JS (Alleged Victim #3, on July 19, 2011 - in JS's *first interview with police – that is, prior to interviews-therapy with Shubin and/or Macnab), said "Sandusky never did anything inappropriate to him"* and "*I don't believe any of this stuff is true and hope he is found not guilty*." See, Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022, at Exhibit F, JS Police Report.

Later, *__after six reported meetings with Attorney Shubin__ and "treatment" with affiliated __therapist C. Macnab__, JS's "memory" reports apparently changed radically, and JS then first began to report "memories" of criminal acts of abuse.* (N.T. Trial, Day 4 at 97, 99, 102-103). Mysteriously, after the allegations JS reportedly said he wanted to be adopted by Sandusky. (N.T. Trial, Day 4 at 109). See, Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022.

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that *alleged victim JS was reportedly paid $7.25 million for his "new memories"* that emerged AFTER discussions with Attorney Shubin and AFTER "treatment" in therapy with Shubin-affiliated therapist C. Macnab. As per typical civil litigation practices, *Attorney Shubin may well have*

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

*received 40% of that amount, a profound financial incentive to help his clients "find new abuse memories".* See, Exhibit G, affirmation by Ralph Ciprano regarding settlement amounts in Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022.]

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that *DS (Alleged Victim 7)* in 2004, *r*eportedly sent an application for financial aid writing "Jerry Sandusky, has helped me to understand so much about myself. He is such a kind and caring gentleman, and I will never forget him." (N.T. Trial, Day 3 at 138).   Consistent with the evidence reported above, *after multiple (10-15) reported meetings with Attorney Shubin and "therapy" with Shubin-affiliated therapist C. Macnab, DS's reported "memories" were apparently radically transformed.* After exposure to Shubin and Macnab DS stated that "**through counseling *different* "memories" were *"triggered"***… "that doorway that was closed, has since been opening more… *through counseling and different things I can remember a lot more detail that I had pushed aside* then" (N.T. Trial, day 3 at 143 in Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022.

As discussed in detail further in this report, this kind of classic "recovered repressed memory" RRM testimony was *not properly discussed by an expert witness* on Memory-False Memory-RRM at the trial of this matter, *no proper Daubert hearings* were sought or conducted (although many have been held on identical issues in other states as discussed in this report), and *the essential science-history of the RRM "Memory Wars" was never reported to the jury* including licensing revocation prosecutions against RRM-MPD-DISS therapists. (See Gillum and Macnab's publicly stated views and misconduct discussed below) . No history of the licensing revocations of therapists who engaged in such "therapy" was reported to the jury. No actual science debunking the notion that "different memories" that are "triggered" in therapy are *reliable or accurate* for real events or in any way suitable for admission in a court of law (See multiple Frye and also Daubert hearings in other states excluding such evidence). No essential charts documenting the number of interviews for each AV were produced for the jury. No essential charts were produced for the jury documenting how many of the interviews for each AV were not properly RECORDED nor who was present in the room and how many such interviews were NOT reported and not RECORDED.  On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that as predicted by the Alt. Hypothesis of unethical (and/or potentially criminal)

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

manipulation of witnesses for financial gain, enormous financial payments were indeed made to Attorney Shubin and to several of his clients (and affiliated Therapist Macnab's patients) ***after they reported radically new, changed "unblocked" RRM-MPD-DISS "memories" of criminal abuse***.  Reportedly Attorney Shubin's clients and Macnab's patients included alleged victims 2, 3, 7, and 10. Payments (financial incentives for new "memories") reportedly included :

AM - $6.9 million

JS - $7.25 million

DS - $3.25 million

RR - $5.5 million

FP - $9 million

(See, Exhibit G, affirmation by Ralph Ciprano in Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022. )

There is apparently zero corroborative evidence for the changed, transformed "memories" of abuse arising AFTER demonstrably improper, leading, interviews with Shubin and apparently RRM therapy with Macnab. (See, Newly Discovered Evidence of Shubin and Macnab interview methods.)

**OPINIONS:**  In my opinion, the newly discovered transcripts of Attorney Shubin's interviewing methods document improper, manipulative, leading-suggestive questioning methods well-known to be capable of, and likely to, manipulate and change the "memories" of witnesses. In addition, in my opinion the Shubin SS and AJ Dillon and other evidence in the Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022  further supports the Investigative Hypothesis of  unethical and/or negligent practices by attorney Shubin with potential assistance from affiliated therapist Macnab that manipulated and changed the "memory reports" of alleged victims -- by improper leading and suggestive interviews and psychotherapy. Was this possibly for the purpose of obtaining millions of dollars in settlement funds – as announced via a public offer? This important investigative question/hypothesis should be properly investigated.  On this record, the jury in PA vs Sandusky remained uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing issues.

### 5B.    Analysis of the newly discovered transcript in the investigation of A.J. Dillon.

In reviewing the newly discovered transcript of the interview of attorney Shubin with "sting investigator" A.J. Dillon.  In my opinion, his transcript provides further corroborative evidence supporting the investigative hypothesis that attorney Shubin and therapist Macnab were engaged in improper, manipulative, memory contaminating interviewing practices.  On this transcript, attorney

Shubin strives to *manipulate and change the "facts" of Mr Dillion's reported allegation "memories".* Shubin's conduct, on this newly discovered transcript, supports the investigative hypothesis that Shubin's goal was to manipulate the "memories" of alleged victims to enhance their monetary value for civil litigation. This transcript and the other newly discovered transcript of Shubin with alleged victim SS contain evidence of unethical and potentially criminal misconduct and should be properly reported to The Office of Disciplinary Counsel of the Disciplinary Board of the Supreme Court of Pennsylvania.

Given this prima facie evidence of a corrupt process of producing-indoctrinating "new memories of abuse" in exchange for life-altering-enormous cash payments (for apparently unvetted, uninvestigated stories of abuse) -- the defense attorneys should have obtained all emails-correspondence-phone records between Shubin and therapist Macnab as well as all billing records and therapy records of Macnab for each AV "patient" to properly assess the potential memory-transforming-manipulating therapy methods used.  Given the well-documented, FBI debunked, *thousands of cases of false memories of abuse implanted in the minds of gullible, vulnerable patients by science-uninformed and/or corrupt therapists* during the RRM-MPD-DISS debacle of the 1980s and 1990s, a key alternative defense hypothesis for presentation to the jury was this evidence supporting the investigative hypothesis that Shubin-Macnab were in business to create "brand new memories of abuse" for millions in cash.

As AJ Dillon reportedly said in a Podcast interview with journalist John Ziegler "I was shocked (that Shubin brazenly changed my story) and I am immediately thinking this entire thing (Sandusky investigation/trial) is BS. I came as a fake accuser (conducting a sting investigation), and he (Shubin) changed my story (to produce new and cash-valuable "memories of abuse"). *What makes me think he didn't do this with everyone*?" (See, With the Benefit of Hindsight, Podcast, 4/21/2021).  Dillon's report and hypothesis appears consistent with the "changing memories" of other alleged victims represented by Attorney Shubin and in therapy with Macnab.

Several of Shubin's clients reportedly previously told the OAG and state police investigators they were not abused by Sandusky but then gave different "memory" reports at trial after multiple interviews with attorney Shubin and/or after therapy with Shubin's affiliated therapist C. Macnab. On this record, the "new memories of abuse" were likely to produce large cash payments in the millions of dollars with essentially "few questions asked". (See, Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022).  On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.