Exhibit B2

USDC IN/ND case 2:17-cv-00033-GSL    document 240-4    filed 03/28/23    page 1 of 68
Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

The newly discovered transcripts of Attorney Shubin's interviews with alleged victim SS and AJ Dillon support the Investigative Hypothesis that Shubin (and his affiliated therapist Macnab) were either A) negligent of the science-history demonstrating the inherent unreliability of RRM-MPD-DISS notions as well as science showing that leading-suggestive interviews can improperly "change-manipulate memories" leading to substantial taint and defects in the integrity of the legal process and/or B) were engaged in an unethical and/or criminal scam to manipulate witnesses to produce "new memory claims of abuse" and thus obtain large settlement sums in civil litigation.

Both of these ongoing investigative hypotheses are supported by my continuing and ongoing investigation of this matter including reviews of evidence documenting a "Culture of Corruption" in the investigation and trial of this case including negligent and/or unethical, and/or deceitful and/or criminal misconduct by investigators, lawyers, and a judge (See, details below).  My investigation of these hypotheses continues.

**Following this analysis of the newly discovered evidence in this matter, my ongoing investigation, opinions, and investigative hypotheses in this case are detailed below.**

### 6.    DR BARDEN's OPINIONS and INVESTIGATIVE HYPOTHESES REGARDING AN ONGOING EXPERT REVIEW OF THE PA v SANDUSKY CASE:

Having reviewed much evidence in this case, I offer several opinions.

In my opinion,  the investigation and trial of this case was the most tragically science-uninformed and science-misinformed case I have reviewed in the past 30 years.

In my opinion, the Government's investigative interview procedure as described by investigator Leiter in his recorded statements of April 21, 2011 document a highly improper, abusive, and likely memory contaminative interview scheme that violates any ethical protocol or principles developed by law enforcement and science.  Inv. Leiter's recorded description documents one of the most improper, abusive, memory contaminating interview schemes I've reviewed in the past 30 years.  Any witness interviewed by Inv. Leiter or using Leiter's methodology should have been challenged by the defense and subject to Expert Witness review and explanation at trial of the relevant-science-history of the kinds of memory contamination often seen from such defective interviewing methods.

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

— In my opinion, the newly discovered evidence including the transcript of attorney Shubin's interview of alleged victim SS, as well as the transcript/results of AJ Dillon's reported "sting investigation" document a very improper, very leading, very suggestive, and likely memory contaminative interview process used by Attorney Shubin, in which he improperly instructs, leads, and suggests facts to "coach the witness" in ways that clearly would enhance the financial settlement value of a client's new "memories". The science regarding such memory-contaminating interviewing was never properly presented to the jury in this case.. This is one of many examples of why the investigation and trial of this case was the most tragically science-uninformed and science-misinformed case I have reviewed in the past 30 years.

— It appears on this record that government investigative interviews were conducted that *were not properly recorded* (and others were apparently recorded but the recordings were never properly reviewed by the extraordinarily negligent defense counsel in this case).  In my opinion, failures to properly ***record*** investigative interviews in such cases, should be viewed as powerful indicia of corruption and egregious misconduct and an attack on the integrity of the legal process.  Without proper recordings of all interviews, it is impossible to rebut the alternative hypothesis that changes in a witnesses "memory" reports over time were due to improper interviewing.   On the records reviewed, it is not clear how many interviews in this case were recorded and how many were not. Note that transcripts without accompanying recordings should also be viewed as indicia of corruption.  I have caught multiple government transcripts in cases with recordings where transcripts had been mis-transcribed  "in error" to assist the government's case. A jury must be able to see and hear the actual questions asked and the actual answers given to form any reliable opinion as to whether or not an interview was improperly leading and suggestive– after learning the relevant science from a competent Memory-False Memory expert witness. Missing recordings of interviews is one of many examples of why the investigation and trial of this case was the most tragically science-uninformed and science-misinformed I have reviewed in the past 30 years.

**Investigative Hypotheses, Questions for future Inquiry, and Relevant Evidence from the Record Reviewed.**

Given the limited evidence regarding a number of issues in this case, I am not able to provide expert opinions about a number of important investigative questions. For several questions and issues, I will generate and offer a number of investigative hypotheses to assist the court in ***avoiding confirmation bias*** and consider investigating important unanswered issues-questions in the future.  In assessing aspects of

these investigative hypothesis, I will also attempt to document evidence on the record relevant to various questions and hypotheses.  I hope this effort will assist the court in determining what further information and investigations might clarify what actually happened in this complex and troubled case -- and why.

The following information contains a summary of essential, foundational evidence as well as investigative hypotheses and questions regarding evidence of a a reportedly secret, "off the record", unrecorded motel meeting (Hilton Garden Inn on December 12, 2011), apparently secretly collusive investigations (Fina and Freeh), as well as evidence reportedly documenting the unprecedented, troubled group of legal professionals involved in this case including (based on subsequent evidence) a law license-suspended lawyer (Fina) and a disbarred-prosecuted-imprisoned lawyer (Rominger) and two lawyers publicly reprimanded for manipulative misconduct lawyers (Fina, Baldwin) and a lawyer fired for pornography misconduct (Fina) and a memory-manipulating investigator (See, Inv. Leiter's recorded statements on April 21, 2011describing an improper government interviewing scheme), and a collection of apparently science/history-uninformed lawyers (Fina, McGettigan, Amendola, Rominger, Kelley, , Cleland), and "secret meeting"-recused-fired-relieved of duty judges (Cleland, Feudale) involved in this historic, controversial, improperly conducted case.

The number and severity of misconduct charges, prosecutions, disbarments, firings, resignations, and recusals of the legal professionals involved in this troubled case is quite remarkable. In 30 years of reviewing cases I do not recall reviewing a case involving any attorney, judge or investigator who :

-- reportedly was disbarred or prosecuted for crimes and imprisoned (Rominger),

-- reportedly was suspended from the practice of law for manipulating and misleading a judge (Fina),

-- reportedly was publicly reprimanded for misconduct/violation of legal ethics including failure to protect client privileged information (Baldwin),

-- reportedly was proven to be mass transmitter of explicit, racist, violent pornography then resigned (Fina),

-- reportedly was held a secret-off the record, "secret" meeting producing key processes for a trial including waiving defendant's essential rights with no documented discussion (Cleland),

-- reportedly was hiding a secret off the record meeting for 4 years even hiding such a meeting from defense co-counsel (Cleland),

-- reportedly was hiding a secret Motel meeting for 4 years even from his own co-counsel (Amendola)

71

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

-- reportedly was harming (or was negligent in harming) his client's trial in multiple, serious ways (Amendola)

-- engaged in the level of documented misconduct shown by several of the "professionals" involved at some point in this case.

To have so many of the most reprimanded, suspended, fired, prosecuted-imprisoned, recused, hiding secret meetings, investigators, lawyers, and judges I've seen in 30 years **all involved in this one defective case** is indicia of a troubled, improper legal process.


More specifically, how and why did so many serious and unusual errors occur in the PA vs Sandusky investigation and trial?  Why does this case remain so controversial many years after the trial and conviction?  A key role of an expert witness in such cases is to assist the court, lawyers, and/or parties to understand and apply reliable scientific, technical, ethical, and investigative information principles, and methodologies, ***while generating/testing alternative hypotheses.***  These hypotheses will, I hope, assist the court in understanding what might have gone wrong in this controversial case.

### 6A.   KEY EVIDENCE, QUESTIONS, and ALTERNATIVE INVESTIGATIVE HYPOTHESES and OPINIONS IN PA v SANDUSKY.

To avoid Confirmation Bias all investigators and experts (like all scientists and medical diagnosticians) should ***generate* and *explore* alternative investigative hypotheses**.  This case leads to many complex and important alternative hypotheses – to the best of my knowledge, zero have been properly investigated thus far.  To assist the court in efforts to protect the integrity of the legal system, and to guide potential future investigations, I offer a series of investigative hypotheses and related questions and related evidence from the record.


### ***Ongoing Investigation of Alternative Investigative Hypotheses in this case***:


**Which Investigative Hypothesis -- or combination -- is correct?  Will public hearings explore these issues?**

1 – the defendant is guilty as charged and the many, well-documented, very serious errors in the investigation and trial of this case are irrelevant

2 – the defendant may be guilty or innocent but the many, well-documented, serious errors in the investigation and trial of this case as well as a science-uninformed media frenzy and collusive local political corruption deprived a citizen of PA of a fair and honestly conducted trial as well as misled an unsuspecting jury into rendering a false verdict.

3 -- the defendant may be guilty or innocent but the "changing uncorroborated abuse memories" of many or all of the "victims" were the product of investigators', lawyers', and/or therapists improper mis-interviewing methods, improper-witness memory tampering, science-uninformed psychotherapists (Gillum, Macnab) who apparently indoctrinated patients-clients into gullibly believing some of the most controversial and dangerous pseudo-scientific, inherently-unreliable notions in the history of psychology and law.

4 -- the defendant may be guilty or innocent but the level of improper misconduct in this case is highly unusual, even historic, and includes :

-- investigators (reckless, highly improper, memory-contaminative interviewing methods as documented by Inv. Leiter in his April 21, 2011 recorded statements during the break in interviewing BH. ),

-- Judge Cleland's reportedly secret, off the record, Hilton Garden Motel meeting that produced a held a "sure conviction, impossibly rapid trial schedule", a refusal to provide time for defense attorneys to even review basic evidence or retain a competent expert in Memory-False Memory Science, and continuing to hide the secret Motel meeting for 4 yrs, in collusion with Fina and Amendola.

-- legal professionals Cleland-Fina-Amendola entered into an agreement apparently to hide the secret Hilton Garden Motel meeting, quickly convict the defendant,  and thus prevent $500 million in damages to the local economy from the looming, threatened NCAA "death penalty" for Penn State football, this hypothesized agreement explains the very unusually long list of negligent failures to provide the jury with competent Science of Memory-False Memory Expert Witness testimony, no Frye hearings, no exposure of Shubin-Therapist mis-practices, no discussion of the relevant science-history, failure to fully expose the abusive, improper interviewing scheme of Inv. Letier as discussed in his recorded statements etc. and many other errors as listed in this report), and

-- politicians and allies (Corbett/Kelley/Fina desired to "get" and "remove" Corbett's most persuasive and powerful political foes in his efforts to radically defund PSU with a 50% reduced budget. The most persuasive foes to Corbett's plan to provide "half the previous budget" were PSU President Graham Spanier and Coach Joe Paterno – both were removed rapidly in the apparently pre-planned media frenzy resulting from this case.  )

-- outsiders (the negligent Freeh Group Report investigators apparently failed to even record interviews (!) – a sign of Negligence or corruption, the Freeh Groups Report investigators apparently failed to disclose secret collusion with AG prosecutors including Fina when an "*independent*" investigation had been promised and paid for with $8 MILLION dollars resulting in just "opinion", the negligent Freeh Group Report investigators reportedly failed to even interview key witness some were not interviewed reportedly upon instructions from the FINA/AG office).

-- these and other errors produced *severe damage to the reputation, credibility, and integrity of the PA legal system*

5 -- the defendant is innocent, and the victim of one of the most improper, corrupt, falsely investigated and improperly, negligently tried cases in US history.

6 – other hypotheses as they become available.


**6A1.   INVESTIGATIVE HYPOTHESES and RELATED QUESTIONS:  ARE THERE MULTIPLE INDICIA of A "CULTURE OF CORRUPTION" in the PA LEGAL SYSTEM? IS THERE EVIDENCE OF SIMILAR TYPES OF CORRUPTION IN THE CASE of PA v SANDUSKY?**


*Quis custodiet ipsos custodes?  Who judges the judges? Who polices the police?*


**On this Record, multiple indicia exist of a *"Culture of Corruption"* in the PA legal system. On this Record, evidence suggests similar types of corruption in the PA v. Sandusky case.**


**EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*** Does the State of PA have a well-documented history of Corruption and Criminal Misconduct at the highest levels of the State Legal System?  Were similar corrupt processes involved in PA v Sandusky?


**EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*  A SERIES OF KEY QUESTIONS:**

Why were there so many extraordinary errors and/or so much Negligence and/or so much corruption in PA v Sandusky?  Does a well-documented, remarkable history of serious corruption-misconduct in the PA legal system --  help us understand, and even predict, several of the many egregious, highly suspicious "errors" and/or corrupt acts that tainted the PA v Sandusky investigation and trial?

**EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption? Improper Economic Influences?  Did the looming NCAA "death penalty" economic damages improperly impact this case?***

On this record, it appears there were very real and serious concerns in the local jurisdiction in pre-trial 2011-2012 that the NCAA could invoke a "death penalty" sanction ending the Penn State football program for years thus predictably producing *economic damages of over $100 million per year for five*

*years or more* to PSU and the local economy.  Is it true that a rapid and sure conviction of the defendant in this case (as opposed to continuing the national media hysteria during a one-year proper preparation for a six week long, complex, multi-expert, FRYE hearing, controversial trial) could be viewed by some as the best way to avoid "the NCAA death penalty" and prevent a $500 + million loss and devastation to the local economy.

## EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

*Improper Political Influences?  Did the ongoing, intense, high-stakes political battle between Corbett-Kelley-Fina vs. Spanier/Paterno/PSU improperly impact this case?*  Did Corbett, Kelley, and Fina seek to destroy PSU President G. Spanier and Coach Joe Paterno and damage the reputation of the PSU football program for political gain?  On this record, there is evidence that former PA AG then PA Gov. *Corbett's key legislative-political goal was to drastically slash funding for Penn State Univ.  (Gov Corbett's State budget reportedly sought <u>a 50% cut</u> in funding to PSU, reportedly a devastating reduction in Univ. funding that was reportedly unprecedented in the history of US higher education.*  Corbett's goals were reportedly quite unpopular sending his popularity percentages from the 60s to the 30s.   On the record reviewed, there is evidence that Corbett-Kelley-Fina were politically aligned and sought to reduce the influence of – or find a way to fire -- *the very popular and highly nationally regarded PSU President Spanier and the very popular and highly nationally regarded Football Coach Joe Paterno* including some reports of efforts to "get Spanier and Paterno" and somehow remove them to stop their persuasive voices in support of PSU.  Reportedly, Corbett/Kelley had previously held multiple (2 or 3) Grand Juries to investigate the charitable work of J. Sandusky with hundreds of troubled youths – many in the "Second Mile Foundation" charity.  Reportedly, the early, multiple Grand Juries and investigations of AG Corbett and his protégé replacement PA AG Kelley resulted in many *(perhaps dozens to hundreds) of reports of non-abusive, effective charity work <u>with zero criminal allegations of abuse</u> thus the initial, multiple Grand Juries reportedly produced zero criminal charges filed.*[5]  The final (of 3 or 4?) Kelley/Fina Grand Juries did produce multiple witnesses with reportedly radically "newly changed, once-buried, once-blocked" memories of abuse and criminal charges and a controversial "presentment" (a public report of charges) with resulting controversies regarding questionable Grand Jury (GJ) testimony and accusations of Government corruption via GJ leaks, the misreporting of GJ evidence, and a (planned, pre-arranged?)

---

[5] See, **Snedden Federal Investigation Summary:** "The 1998 (ZK) investigation was aggressively investigated by the Penn State police, also by Children and Youth Services, also by Centre County District Attorney's Office then dismissed (insufficient evidence)… In regard to the 1998 investigation the police worked independently under the District Attorney – nobody at PSU managed the investigation at all" ( See, Snedden Federal Investigation at pg 21)

media frenzy that effectively smeared Corbett's opposition, Spanier and Paterno. The raging media scandal badly damaged PSU's reputation and resulted in Spanier's rapid resignation and Paterno's very controversial firing, and a controversial *misdemeanor* conviction for Spanier after years of PA court decisions that rejected all charges then reinstated charges followed by US federal court decisions rejecting (vacating) all charges then reinstating charges. In sum, how much of the PA vs Sandusky final (3rd or 4th?) grand jury process/media frenzy was driven by Corbett-Kelley-Fina political machinations to "get Spanier and Paterno" and damage PSU's political clout? Will the key witnesses be called to testify under oath in a proper investigation in a public forum on these issues? Will all Corbett-Kelley-Fina emails be properly obtained and reviewed to assess collusion on these issues, or have those emails already been destroyed?

Note that Spanier and Paterno were reportedly far more credible voices on multiple Higher Education/Sports Issues than Gov. Corbett and thus presented serious obstacles to Corbett's goal to drastically reduce funding to PSU and limit PSU's development and political clout. Spanier was also reportedly nationally very well-known and highly respected for his work in education as well as with law enforcement and national security issues. (See, J. Snedden Federal Investigation regarding G. Spanier's DOD, CIA, DOJ Security Clearances). For example, Spanier reportedly served as chair of the National Security Higher Education Advisory Board, a member of the National Counterintelligence Working Group, and as a member of the Board of Advisors of the Naval Postgraduate School and the Naval War College. Spanier had reportedly also received numerous recognitions for his contributions to national security, including being honored as one of the "Most Influential People in Security," the "Wings of Law" Award from the Respect for Law Alliance, the Director's Award for "Exceptional Public Service" presented by the FBI, and the Warren Medal for "Outstanding Contributions to the National Security of the United States of America." Spanier had also reportedly been a frequent speaker at FBI and other governmental and educational conferences and seminars on topics related to national security." The very detailed investigation by Federal Investigator John Snedden -- by far the best trained and most credible investigator involved in any way in this case -- cleared Spanier of any wrongdoing and noted that key Government witness Mike McQueary's multi-version-changing story of witnessing a violent shower attack but making no effort to stop it (even he was 6ft 5in and over 250 pds and a highly trained athlete) made "no sense" at all. (See, J. Snedden Federal Investigation regarding G. Spanier's DOD, CIA, DOJ Security Clearances). Also see, alleged victim AM's initial statement, McQueary's father, Dr Druvo, and Joe Paterno all apparently contradicted McQueary's changing, "no sense" testimony.[6]

---

[6] **"Why didn't Federal Investigator J. Snedden buy McQueary's "rape in the showers" story?** Back in 2001, Snedden told a media outlet thats "Mike McQueary was a 26-year-old, 6-foot-5, 240-pound former college quarterback used to running away from 350-pound defensive linemen. If McQueary actually saw Jerry Sandusky

### 6A2.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

*Why was an unprecedented (in my experience) <u>Secret</u> Motel Meeting reportedly arranged by Judge Cleland?  Was this "secret meeting" to produce a collusive "likely conviction, impossibly rapid" trial schedule?*   One investigative hypothesis is that a "likely conviction, impossibly rapid " trial schedule in PA v Sandusky was the result of an apparently *corrupt, secret, off the record, unrecorded, no court reporter invited, unprecedented, December 12, 2011 meeting of Judge Cleland, Prosecutors Fina-McGettigan, and Defense Counsel Amendola at a local Hilton Garden Motel?*  Why was the secret Motel meeting kept a secret even from Defense Co-counsel Rominger? (See, Rominger's testimony at Aug 2016 hearing ; See Motion to recuse Judge Cleland after the secret meeting was discovered by defense appellate counsel.)

Will this apparent evidence of corruption and these investigative hypotheses be properly explored in public hearings before PA Legislature Committees with witnesses under oath and/or by Federal Anti-Corruption investigators?

### 6A3.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

*Why was the Secret "Off the Record" Hilton Motel Meeting kept a secret until 4 YEARS after the Trial and Conviction?*  -- Why was the reportedly secret, off the record, unrecorded, no court reporter invited, unprecedented, December 12, 2011, meeting of Judge Cleland, Prosecutors Fina-McGettigan, and Defense Counsel Amendola at a Hilton Garden Motel meeting kept a <u>secret</u> – reportedly *even from Co-defense Attorney Rominger until 4 years after the trial and conviction when it was reportedly discovered by Appellate Counsel*? Was this an ongoing improper agreement to rig-sabotage the trial and continue covering-up the secret meeting for years? *Did this "agreement-to-sabotage the trial theory" help us understand why so many egregious and unusual, even "errors" were made by defense counsel in the PA v Sandusky trial including*

---

raping a young boy in the shower, Snedden said, he probably would have done something about it."  "I think your moral compass would cause you to act and not just flee," Snedden said.  If McQueary really thought he was witnessing a sexual assault on a child, Snedden said, wouldn't he have gotten between the victim and a "wet, defenseless naked 57-year-old guy in the shower?"   Or, if McQueary decided he wasn't going to physically intervene, Snedden said, instead of going home and doing nothing about a child rape in progress, why didn't he call the cops from the Lasch Building?  *As Snedden says, McQueary's story simply makes no sense.* Reportedly, in Snedden's view, it was also *egregious prosecutorial misconduct for the state attorney general's office to fictionalize and sensationalize such a flimsy, decade-old story, and then hang an entire grand jury presentment on it."*

-- no Memory-False Memory Expert was called by the "defense attorneys" ?

-- no Interviewing Methodology Expert was called by the "defense attorneys" ?

-- no member of the relevant scientific community expert on RRM-MPD-DISS junk science and Frye hearings was called by the "defense attorneys" ?

-- no expert on the malpractice, misconduct of therapists Gillum and Macnab was called by the "defense attorneys" ?

-- the "defense attorneys" reportedly convinced the defendant not to testify in his own defense (near-certain suicide in such cases)?

-- the "defense attorneys" failed to expose Judge Cleland's improper "off the record, secret, unreported, unrecorded meeting at a local Motel" where crucial decisions were made including setting a "likely conviction , ," trial schedule and also waiving the defendant's essential right to a preliminary hearing?

-- was this historic, unprecedented litany of extreme "errors" and the "secret unreported meeting" due to Negligence or to an actual improper agreement to manipulate "rig" and sabotage the trial and obstruct justice?  (See, the PA Attorney General Kane's conviction and the PA Judges "Kids for Cash" improper agreement case).


**6A4. EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Errors, and/or Negligence and/or Corruption?   If the SECRET MOTEL MEETING was proper, then why did Judge Cleland recuse from the case when his secret meeting was finally exposed?*   Why did Judge Cleland recuse himself following public exposure (finally) by defense appellate lawyers of the secret, off the record, unrecorded, no court reporter invited, unprecedented, December 12, 2011, meeting of Judge Cleland, Prosecutors Fina-McGettigan, and Defense Counsel Amendola at a Hilton Garden Motel? Why did Amendola participate in the secret meeting and keep the meeting secret even from his own co-counsel Rominger? (See Motion to Recuse Judge Cleland and Aug 2016 testimony of Rominger in Appellate hearing).


**6A5.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:**  *Errors, and/or Negligence and/or Corruption?*  **Are Secret, "Off the Record" Meetings to Decide Essential Trial Issues Standard in PA or was Judge Cleland's Dec 15, 2011 Secret Motel "off the record" "no court reporter" and "not even disclosed to Defense co-counsel" Meeting actually Evidence of Corruption in this Case?**

Did the secret, unreported, unrecorded Motel Meeting produce key decisions that sabotaged the trial of this case? For example, why did Judge Cleland set an impossibly rapid (a "likely conviction,

**Expert Witness Report of R Chris Barden, Ph.D., JD.    January 18, 2023**

impossibly rapid") trial schedule at the "secret Motel meeting"? Why did Defense Attorney Amendola waive the defendant's essential right to a preliminary hearing (where alleged victims could have been questioned about mental health issues, the number and type of interviews issues, memory-contaminating psychotherapy issues, RRM-MPD-DISS ideology indoctrination issues, and many others) – at the secret Motel meeting?   Are these kinds of "secret, unreported, unrecorded" Motel meetings (unprecedented in my 30+ year experience of reviewing cases throughout the US) a standard part of a deeply troubled PA legal system or is the secret meeting in this case evidence of improper, unusual, misconduct in PA?  Is PA vs Sandusky the ONLY case in PA where a "likely conviction impossibly rapid " trial schedule, and a waiver of the defendant's essential right to preliminary hearing, were produced in a secret, off the record, unrecorded, no court reporter invited, meeting of Judge, Prosecutors, and Defense Counsel at a local motel --- or is this a standard feature of the PA legal system?

　　　**6A6.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Errors, and/or Negligence and/or Corruption?*  Did defense attorney Amendola, Judge Cleland, and Prosecutor Fina enter into a corrupt improper agreement at the December 15, 2011 Secret Hilton Garden Motel Meeting to actively sabotage the defendant's case to prevent $500 million dollars in damages to the local economy from an expected, looming, threatened NCAA "death penalty" for the lucrative PSU football program? (… and to further the anti-PSU political goals of PA Gov Corbett and his protégé PA AG Kelley?).

　　　**Do these investigative hypotheses clearly explain and predict WHY defense attorneys Amendola and Rominger produced an historically defective "defense" at trial including why they:**

　　　**--** _**Failed**_ **to file a** _**FRYE motion**_ **for a hearing to exclude the** _inherently unreliable "recovered repressed memories"_ of multiple alleged victims in this case? Would any witnesses have remained?

　　　**--** _**Failed**_ **to call a Memory-False Memory-RRM-MPD-DISS expert in SCIENCE** witness – a member of the relevant scientific community -- to explain the odd, non-normal "memories" of alleged victims and how *the relevant scientific community has rejected the RRM-MPD-DISS ideology*, methods and results?

　　　**--** **Failed** **to call an Investigation Methods expert to expose the Government 's corrupt, abusive, repetitive interviewing procedure** that was disclosed by Inv Leiter in his April 21, 2011 recorded discussion on a break when interviewing BH.

　　　**--** _**Failed**_ **to publicly expose the December 15, 2011, apparently corrupt, secret, unreported, unrecorded Motel meeting** with Cleland, Fina, and Amendola at the Hilton Garden Inn. Is this why Amendola reportedly hid the "secret meeting" for over 4 years from his own defense co-counsel Attorney Rominger?

-- *Failed* to require a preliminary hearing where alleged victims could have been properly questioned about mental health issues, the number and type of interviews issues, memory-contaminating psychotherapy issues, RRM-MPD-DISS ideology indoctrination issues, and many other key evidence issues.  The results of a proper preliminary hearing would have produced the predicate for a FRYE hearing that may well have excluded many or even all of the alleged victim witnesses.  Attorney Amendola reportedly mysteriously waived his client's essential right to a preliminary hearing at the "secret, unreported, unrecorded" Hilton Garden Motel meeting of December 15, 2011.

-- *Failed* to demand and acquire a complete list of *all interviews conducted* in the investigation of the two (or three?) *previous Grand Juries that reportedly produced zero criminal charges*.  How many (dozens? hundreds?) of interviews were conducted where witnesses extolled the charity work of the defendant and denied any abuse of any kind at any time.?

-- *Failed* to demand and acquire a *complete set of all psychotherapy records* for any witness that changed "memory reports" following psychotherapy – especially with reportedly RRM-MPD-DISS science-uninformed RRM "believers" like Gillum and Macnab.  This is essential because *ANY unrecorded psychotherapy session in a witness' history* makes it quite impossible for the prosecution to meet the required burden of proving "beyond a reasonable doubt" that improper psychotherapy did not produce the "changed", potentially false memories of abuse in that witness.

-- *Failed* to properly have an Expert Witness explain to the jury the apparent *ethical and licensing violations of therapists Gillum and Macnab* including Gillum's dual-conflicting role boundary violations of attending a police investigation interview and spending "a full week" with a patient helping change that witness' memory reports and both Gillum's and Macnab's apparent failures to obtain proper informed consent for their therapy methods specifically failing to inform patients of the controversial (debunked) nature of their RRM-MPD-DISS beliefs and practices and the known risks of the induction of false memories. Macnab's financial arrangements with Shubin should also be properly explored – are they jointly running a business to generate unvetted, uncorroborated "new memories" of abuse in exchange for millions of dollars in settlements?

-- *Failed* to properly have an Expert Witness explain to the jury the history of thousands of examples of *therapist induced false memories* from the "Memory Wars" malpractice litigation as well as the hundreds of therapist-induced false memories of abuse debunked by Special Agent Lanning's FBI Task Force.

-- *Failed* to demand and acquire a complete list of *all unrecorded interviews.* Also failed to have a national Memory-False Memory expert witness explain to the jury that because abusive, leading, suggestive, repetitive, mis-interviewing (See, Inv. Leiter's April 21, 2011 taped confession of such

interviews) can easily change "memories" and produce false "memories" of abuse *ANY unrecorded interview* in a witness' history makes it quite impossible for the prosecution to meet the required burden of proving "beyond a reasonable doubt" that improper interviewing did not produce the "changed", potentially false memory of abuse in that witness. This is why, the best of my knowledge and experience, ALL jurisdictions in the US now record ALL interviews in such cases – except for the apparently deeply improper investigation in this case. (See, Inv. Leiter's April 21, 2011 taped confession).

    ***NEGLIGENCE or CORRUPTION?* :** Is this historic – unprecedented in my experience – list of extreme failures of the defense counsel due to historic levels of Negligence or it is more likely they participated in a joint effort to obtain a rapid and sure conviction of a retired PSU coach to save the local economy from the expected $500 million in economic damages from the looming NCAA "death penalty"? Either way, it seems clear on this record that the trial was a debacle of historic proportions. On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.


    **6A7. EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Negligence or Corrupt Sabotage? Why was there No Defense Memory-False Memory-RRM-MPD-DISS Expert Witness at trial?* Why did the defense lawyers in this case FAIL to retain, prepare, and bring to trial a competent Memory-False Memory Expert Witness to debunk and explain the inherently unreliable "recovered repressed memories", "buried memories", "blocked memories" and "dissociated memories" testimony of multiple alleged victims in this case?


    **6A8.   EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Errors, and/or Negligence and/or Corruption? – Why was No Defense Expert in Investigation Methodology provided by the Defense Lawyers to expose the grossly improper, abusive, interviewing misconduct of the Government in this case?* Why did the defense lawyers FAIL to retain, prepare, and bring to trial a competent Investigation Methodology Expert to expose and debunk, the extraordinarily improper, abusive, repetitive, memory-contaminative interview methods of the Government as disclosed by Investigator Leiter in his April 21, 2011 recorded discussion during a break in the BH interview?


    **6A9.   EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Errors, and/or Negligence and/or Corruption? Why were Inv. Leiter's Corrupt Interview Methods not properly exposed to the jury and the FOUNATIONAL SCIENCE of memory contamination not properly explained to the jury by a competent Memory-False Memory-Interview Methodology expert witness?* Why didn't Investigator Leiter's *April 21, 2011 recorded discussion of an abusive, manipulative,*

*repetitive, highly improper PA Government interviewing methodology* (essentially coercive witness memory tampering until the witness changed stories to agree with Leiter's pre-conceived ideas) result in Leiter being fired, or removed from the case for re-training, and the contaminated witnesses being excluded at trial?

### 6A10.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?  Did the defense attorneys let civil Attorney Shubin get away with Witness Tampering?*  Did Attorney Shubin actually hide witness AM (Shubin's civil litigation client) to prevent AM from testifying that he was the "shower boy" reported by Mike McQueary and that actually no abuse at all took place as per AM's previous witness statement --  thus destroying the credibility of the uncorroborated,  "multi-changing memories" of Mike McQueary whose story was used by Corbett allies Kelley-Fina to attack Paterno, Spanier, Curley, Shultz, and PSU?  Will this issue be investigated in public hearings?

### 6A11. EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption? Did Freeh Group and Prosecutor Fina defraud the public by secretly colluding on their claimed-to-be "Independent" investigations?*
Did Prosecutor Fina and the Freeh Group defraud the public and PSU (who reportedly paid the Freeh Group over $8 MILLION dollars for a defective, science-uninformed report) by lying about and secretly colluding together on investigations they both promised would be "*independent*"?  The Freeh investigation team's co-leader, Kathleen McChesney, reportedly created a diary that summarized her daily briefings and other highlights from the Freeh investigation, *including multiple, secret, collusive contacts with other agencies including FINA and other AG staff*. On November 4, 2019,  appellate counsel (Attorney Lindsay) for the Defendant reportedly received a copy of a document purporting to be a diary maintained by Ms. McChesney regarding events occurring during the Freeh investigation. In addition, in February of 2020 appellate counsel reportedly obtained copies of summaries of emails among, and including Freeh Group members showing secret, unreported collusion in the supposedly "independent" investigation. (See, multiple examples of diary entries in relevant Defense Motions).

### 6A12.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption? Why did the Freeh Group make so many fatal, "rookie", science-uninformed errors in their $8 MILLION investigation/report that was (negligently) relied upon by the apparently science-uninformed NCAA to fine PSU tens of millions of dollars and relied upon by the apparently science-uninformed PSU BD members to "adopt" the error-ridden report and thus "accept"*

tens of millions of dollars of NCAA sanctions based on Freeh Groups speculative, uncorroborated opinions?

-- Did the FREEH GROUP really *fail to properly RECORD* all investigative interviews. Did they in fact, record NO interviews –if so, a staggering failure and key indicator of a *corrupt* investigation?

-- Did the FREEH Group really *fail to interview essential witnesses* in this case – especially "the multi-changing memories, most controversial witness" Mike McQueary?

-- Was the FREEH GROUP really *collusively instructed by Prosecutor FINA or other AG staff* to *NOT interview key witnesses* including "the multi-changing memories, most essential" witness Mike McQueary?

-- Did the FREEH GROUP really *fail to notice and report the essential Secret Meeting* at the Hilton Garden Inn Motel that waived the defendant's right to a preliminary hearing and set the trial on a "impossibly rapid" rapid schedule to conviction?

-- Did the FREEH GROUP really *fail to notice and report the inherently unreliable "recovered repressed" RRM-MPD-DISS ideology-tainted memories"* of multiple alleged victims in this case several AFTER unrecorded interviews with Shubin and his reportedly RRM-MPD-DISS therapist ally Macnab?

-- Did the FREEH GROUP really fail to notice and report that the negligent or improperly sabotaging defense lawyers *failed to file a motion requesting a FRYE hearing* to exclude inherently unreliable non-normal "memory" RRM-MPD-DISS "memory" reports. Such tainted "memory" reports have been *excluded* following Frye and Daubert hearings in multiple other states *under both FRYE and DAUBERT analyses*?

-- Did the FREEH GROUP really fail to notice and report the defense lawyers' *failure to provide a Memory-False Memory-RRM-MPD-DISS expert witness thus* leaving the jury misled and misinformed in the PA v Sandusky case?

-- Did the FREEH GROUP really *fail to notice and report Investigator Leiter's April 21, 2011 recorded discussion* during a break in the BH interview in which Leiter reports in detail *the Government 's abusive, highly improper, repetitive, often unrecorded, leading-suggestive, manipulative interviewing methods?*

-- Did the FREEH GROUP really *fail to notice and report the rather obvious Alternative Hypothesis in this case of improper influences by Economic Forces* (i.e., the looming $500 MILLION in damages to the local economy from an NCAA "death penalty" ending the Penn State Football program).

-- Did the FREEH GROUP really *fail to notice and report the Alternative Hypothesis in this case of improper influences by Political Forces* including Corbett's attempt to slash 50% of the PSU budget, effectively opposed by the nationally admired Pres Spanier and Coach Paterno and reported efforts by

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

Corbett-Kelley-Fina to "get" or "remove" Spanier and Paterno to facilitate Corbett's reportedly unpopular political goals.

    -- Did the FREEH GROUP really claim as a defense to a defamation lawsuit filed by G. Spanier, that the Freeh Group report contained the *reporting of "no facts" but "just opinions"?*

    -- Did the FREEH GROUP really produce a *science-uninformed report by FAILING to retain and listen to a competent SCIENCE expert and member of the "relevant scientific community"*?

    -- Was the gullible "adoption" and payment of over $8 MILLION for a fatally flawed, amateurish, science-uninformed Freeh Report more evidence that local *Economic Forces* (the fear of $500 million in economic damages over years from an NCAA "death penalty" sanction) and *Political Forces* (Corbett-Kelly-Fina's drive to smear and remove Spanier and Paterno for political gain) improperly influenced this process at multiple stages?

### 6A13.   EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:   *Errors, and/or Negligence and/or Corruption?*

Did the PSU BD actually pay out millions of dollars for changing-morphing "memories" of "abuse" from "victims" with zero corroborative evidence and a documented history of abusive, unrecorded, mis-interviewing by Government investigators and a history of RRM-MPD-DISS ideology memory contamination and a history of exposure to "interviews" from a civil attorney seeking millions of dollars for "newly-changed abuse memories" and a history of exposure to apparently poorly trained RRM-believing, science-uninformed local psychotherapists (e.g., Gillum, Macnab).   Were Millions of dollars in payments made to multiple alleged "victims" with virtually no vetting, nor investigation, and no competent science-informed expert (a scientist-clinician with relevant peer reviewed, published science articles) evaluating such cases?   Were these payments issued to cover up the multiple, serious errors, and/or corruption and/or secret Motel meetings, etc. that tainted the investigation and trial in the first place?   Are these payments with no vetting and no competent investigation continuing today? If the conviction in this case is overturned for massive errors, gross negligence, and/or corruption and a "not guilty" verdict is rendered in a properly conducted trial, will the millions in payments be recovered from alleged "victims" with no corroborative evidence and a history of memory contaminative experiences with abusively leading-suggestive-repetitive Government investigators, lawyers with financial incentives, and therapists with RRM pseudo-science beliefs?

### 6B.   <u>FOUNDATIONAL EVIDENCE</u> ESSENTIAL TO THE ANALYSIS OF ALTERNATIVE HYPOTHESES IN THIS CASE:

### 6B1. EXPLORING CURRENT INVESTIGATIVE HYPOTHESES: *Errors, and/or Negligence and/or Corruption?*

**Indicia of Corruption:** Former Pennsylvania Attorney General Kane reportedly was sentenced to prison for committing multiple felonies involving manipulation of the legal system for political gain. (***Did something quite like this also happen in PA v Sandusky?***) …

Reportedly -- NATIONAL RANKINGS – The Pennsylvania AG was rated the worst in the nation. See, "In August 2015 the U.S. Comprehensive Enterprise Institute, in its evaluation of state attorneys general, rated Pennsylvania AG Kathleen Kane as *the worst of all fifty* in the country, citing a long list of abuses."

**Was AG Kane prosecuted as "payback" for exposing corruption in the PA legal system?** A lingering question is how much of PA AG Kane's downfall was payback from the "system" for her exposing so much PA legal system corruption that had taken place over so many years when the PA Attorney General's office was controlled by *former PA's Corbett and Kelly* as well as corruption at the highest levels of the Judiciary of PA including several members of the PA Supreme Court?

Indicia of PA Legal System Corruption: Reportedly -- PA ATTORNEY GENERAL *sentenced to prison*: -- A PA Attorney General was reportedly *sentenced to prison* (Kane) : — a PA Attorney General (Kane) was reportedly *disbarred, prosecuted, and imprisoned* for crimes of manipulation/deceit including perjury/obstruction of justice.

**Indicia of PA Legal System Corruption:** The Pennsylvania Attorney General, Kathleen Kale, JD, *reportedly committed perjury/obstruction, was disbarred, sentenced, and served time in prison…* This history documents actual criminal corruption at the highest levels of the PA legal system – including deceit, manipulation, and manipulation of the legal process by a PA Government Official at the very highest levels of the Pennsylvania Prosecution-Investigation Legal System. (Did this type of corruption also occur in the PA v Sandusky case?).

See, Former PA Attorney General Kathleen Kane gets prison term … A judge sentenced former Pennsylvania Attorney General Kathleen Kane on Monday to *10 to 23 months in prison* for committing **multiple felonies** stemming from a politically motivated act of retribution. Kane, who resigned after her conviction of perjury and obstruction in August, also will be on probation for eight years following her release, according to Kim Bathgate, spokeswoman for the Office of Pennsylvania Courts. Kane, a Democrat who was elected in 2012,

*faced a possible 12-24 years in prison,* according to Kate Delano, a spokeswoman for the Montgomery County District Attorney's Office. ... The charges had alleged that Kane acted in anger about a local newspaper article that accused her of dropping an investigation into politicians accepting bribes. To get back at her predecessors, the complaint said Kane (deceitfully, manipulatively) leaked sealed, confidential grand jury documents to the media and then lied under oath about her manipulative crimes.

https://www.cnn.com/2016/10/24/politics/pennsylvania-attorney-general-sentencing/index.html

### DO INDICIA OF HIGH LEVEL CORRUPTION SUPPORT ONGOING INVESTIGATIVE HYPOTHESES REGARDING CORRUPTION IN PA vs SANDUSKY? :

This example of egregious, brazen corruption in the Office of the PA State Attorney General– reportedly involving deceit and manipulation of evidence and judges as well as perjury -- are unprecedented in my 30+ year experience reviewing cases in many states. We should note that criminals often commit many crimes before being caught. How much corruption in this system remains undisclosed?

This history of well-documented improper activity *involves high ranking PA Government officials*

*A) creating criminal plans to*

*B) manipulate evidence,*

*C) deceive judges, and*

*D) lie to hide criminal plans, conspiracies, and practices. Such demonstrated misconduct supports* **investigative hypotheses** *of similar corruption occurring in the investigation and trial of PA v Sandusky.* (See, detailed evidence supporting hypotheses of corruption below).

### 6B2. EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

Additional Indicia of Corruption:  Two PA Supreme Court Justices Were Reportedly Involved in Gross Misconduct and Resigned in Disgrace.  (Was judicial misconduct also involved in PA v Sandusky?)

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

Reportedly -- TWO PA SUPREME COURT JUSTICES REPORTEDLY RESIGNED IN DISGRACE AND PA AG's PROSECUTORS WERE REPORTEDLY ALSO INVOLVED IN JOINT, MASSIVE, CORRUPT PORNOGRAPY TRANSMISSIONS (thousands of reportedly racist, sexist, violent, explicit, messages) ON GOVERNMENT EMAIL ACCOUNTS. WAS ADDITIONAL EVIDENCE of CORRUPTION ORDERED DESTROYED?   Two PA Supreme Court Justices reportedly resigned for sending and receiving massive batches (1,000s of images) of grotesque-depraved-explicit-violent-racist pornography transmissions to and from PA Attorney General (**Corbett and Kelley**) Staff prosecutors and also to the Governor's (**Corbett's**) Staff.

Reportedly -- Additional Indicia of Historic Systemic Corruption in the PA Legal System:  Reportedly, documented Thousands of *Explicit, Racist-Violent-Sexist-Explicit Pornography Transmitted by PA Supreme Court* Justices to and from *PA Attorney General's Staff* and also *PA Gov. Corbett's staff* and also AG *Prosecutor Frank Fina from the Sandusky case.*

Reportedly -- Pornography Cases against PA Supreme Court Justices and OAG Prosecutors:   See, Pa. Supreme Court suspends justice over porn emails … Pennsylvania's Supreme Court has suspended one of its justices, Democrat Seamus McCaffery, over the revelation that *he received and sent pornographic emails to friends.* … The episode also highlighted a long-running feud between Justice McCaffery and Chief Justice Ron Castille, a Republican, *who issued a separate statement saying his colleague (McCaffery) exhibits "pathological symptoms" of a "sociopath."* … Chief Justice Castille wrote that a "prominent medical journal" defined a sociopath as someone *"not caring about others, thinking he or she can do whatever is in that person's own self-interest and having little or no sympathy for others."*….The order suspending Justice McCaffery said *he exchanged "hundreds of sexually explicit emails" with staff of the PA Attorney General's office and that he "importuned"* (threatened) associate PA Supreme Court Justice J. Michael Eakin *to get Justice Castille to stop pursuing a probe of the matter, or else he'd leak embarrassing emails about Justice Eakin to the media (Blackmail? Improper agreement? Witness tampering?)* …. The state's "porn wars" have also become an issue in the governor's race, with *two top aides to Gov. Tom Corbett resigning after it was revealed they traded explicit, violent, racist pornographic emails while they worked for Mr. Corbett during his time as attorney general several years ago*…. Justice Eakin filed a complaint with the state's Judicial Conduct Board on Friday after the Philadelphia Daily News reported that he had received sexually explicit and racist emails … He told the board that Justice McCaffery had called him last week before

87

the emails were leaked to say *he "was not going down alone,"* the paper reported *(Blackmail? Improper agreement? Witness tampering?)*. … Justice Castille's statement on Monday said "that sort of threat *borders on criminal conduct.* ".… The order suspending Justice McCaffery said that Justice Castille found *some of the material in Justice McCaffery's emails "extremely disturbing."* He described one "depicting a naked 100-year-old woman as the target of a sexually explicit joke and a video of a woman in sexual congress with a snake." … Justice McCaffery last week apologized for a "lapse in judgment" about the emails… "  See,

https://m.washingtontimes.com/news/2014/oct/21/pa-supreme-court-suspends-justice-over-porn-emails/

**Reportedly --** And see also, *Pennsylvania Supreme Court justice in (violent, racist, sexist, explicit) porn email scandal retires,* "The decision followed a disclosure that McCaffery had sent or received 234 emails with sexually explicit content or pornography from late 2008 to May 2012 and an accusation by a fellow justice that McCaffery had tried to coerce him into taking his side against Chief Justice Ronald D. Castille."…" The suspension order brought up allegations that McCaffery had tried to exert influence over a Philadelphia judicial assignment and about a traffic citation received by his lawyer-wife, plus *referral fees the wife collected from law firms while working in his chambers."…* "The inappropriate emails surfaced during an internal review by the attorney general's office into how it had handled the Jerry Sandusky child molestation case. *Three senior officials in Governor Corbett's administration and a county prosecutor who all formerly worked under Gov. Corbett in the attorney general's office have resigned their government jobs as a result.*"

https://www.nydailynews.com/news/politics/pennsylvania-justice-porn-email-scandal-retires-article-1.1988800

**6B3.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Errors, and/or Negligence and/or Corruption?*

**Additional Indicia of Corruption? :    "Kids for Cash" -- the Ultimate Judicial Corruption. Reportedly -- 2 PA Judges engaged in a truly depraved *improper agreement to obstruct justice and sabotage over 4,000 cases*, depriving children and families of Constitutional Rights, in order to receive $2.8 million dollars in criminal kick back payments.  (Was an improper agreement *to obstruct justice and "sabotage just one trial"* involved in PA vs Sandusky?)**

Reportedly – The "Kids-For-Cash" Improper agreement Involved "Two PA judges who were reportedly sentenced to prison for an improper agreement to

A) shut down the county jail and

B) assist in building a "for profit" jail in collusion with criminal business owners then

C) the owners would bill the PA Government for private jail services and

D) the judges would falsely imprison innocent youth in the for-profit jail (some reportedly as young as 8yrs old! ) then

E) the improper agreement business owners would receive profitable Government payments to run the private, for-profit jail and

F) the improper agreement judges received reportedly some $2.8 _million_ in illegal kickback payments from the private jail company owners."

See, 2 PA judges pled guilty to improperly, illegally, deceitfully, and manipulatively sentencing hundreds of youth to a for-profit detention facility (jail) in exchange for illegal-criminal kick-backs of over $2 Million dollars. Both were sentenced to decades in prison for this _improper agreement to manipulate trials and hearings, defraud the public, and destroy the legal rights of citizens of Pennsylvania_. [ Is this what happened in Pa v Sandusky to obtain rapid-sure conviction and prevent the anticipated $500+ million in local economic damages expected from the threatened, looming NCAA "death penalty" for PSU football program?  Did Cleland-Fina-Amendola and allies sell-out – at the secret "off the record"  meeting at the Hilton Garden Motel and agree to sabotage the trial of one retired PSU coach to save the local economy? How else can we explain the unprecedented list of historic failures in the investigation and trial of this matter? ]

And also see, "Two Pennsylvania judges were ordered to pay _$200m in damages to kids-for-cash scandal victims_ "Judges Mark Ciavarella and Michael Conahan _accepted $2.8m in illegal bribe payments_ to send children were sent to for-profit jails. Two Pennsylvania judges who orchestrated a scheme to send children to for-profit jails in exchange for kickbacks were ordered to pay more than $200m to hundreds who fell victim to their crimes.

US district judge Christopher Conner awarded $106m in compensatory damages and $100m in punitive damages to nearly 300 people in a long-running civil suit against the judges, writing the plaintiffs are "the tragic human casualties of a scandal of epic proportions".

In what came to be known as the kids-for-cash scandal, Judge Mark Ciavarella and another Judge, Michael Conahan, *(entered into an improper agreement to)* shut down a county-run juvenile detention center and accepted $2.8m in illegal payments from the builder and co-owner of two for-profit lockups.

Ciavarella, who presided over juvenile court, pushed a zero-tolerance policy that *likely large numbers of children would be sent* to PA Child Care and its sister facility, Western PA Child Care.

*Ciavarella ordered children as young as eight to detention (jail)*, many of them first-time offenders convicted of petty theft and other minor crimes. *The judge often ordered youths he had found legally delinquent to be immediately shackled, handcuffed and taken away* without giving them a chance to say goodbye to their families.

"Ciavarella and Conahan abandoned their oath and breached the public trust," Conner wrote on Tuesday in his explanation of the judgment. *Their cruel and despicable actions* victimized a vulnerable population of young people, many of whom were suffering from emotional issues and mental health concerns. The Pennsylvania state supreme court *overturned and threw out some 4,000 juvenile convictions* after the scheme was uncovered.  Former PA Judge Ciavarella is *serving a 28-year prison sentence*. Conahan, who was *sentenced to more than 17 years in prison*, was released to home confinement in 2020, with six years left on his sentence, because of the coronavirus pandemic.

https://www.theguardian.com/us-news/2022/aug/17/pennsylvania-judges-kids-for-cash-damages-ciavarella-conahan

AND

*"The Kids-for-Cash improper agreement scandal* also included Robert Powell, Robert Mericle, Mericle Construction, Pinacle Group of Jupiter LCC, Beverage Marketing of PA, and Vision Holdings.  Judge Conahan *used his judicial position to remove funding from the Luzerne Court detention facility*, then "exerted influence to facilitate the construction, expansion and lease of the PACC facility." On Luzerne County's behalf, *he signed a secret improper agreement "Placement Guarantee Agreement" with PACC.* He also granted a corrupt injunction to prevent the results of a Pennsylvania Department of Public Welfare audit of PACC from being disclosed to the public.

In conjunction with Judge Conahan, Judge Ciavarella sentenced thousands of juveniles to terms of incarceration in violation of their constitutional rights – denying them counsel, the right to an impartial tribunal, and the right to free and voluntary guilty pleas. The two judges also pressured probation officers to make recommendations in favor of detention, even when they otherwise would have sought alternative sentences. [See: PLN, Nov. 2009, p.42; May 2009, p.20; *https://www.prisonlegalnews.org/news/2010/jun/15/pennsylvania-judges-involved-in-corruption-case-face-liability-5000-convictions-thrown-out/]. Such* egregious judicial corruption is unprecedented in my 30+ year experience of reviewing cases in dozens of states. Did such an improper agreement happen again in PA vs Sandusky?

The current investigative hypothesis of a Cleland-Fina-Amendolan improper agreement to sabotage and/or manipulate the PA vs Sandusky trial with -- an "impossibly rapid" trial schedule created at a secret-not reported-Motel meeting kept secret for 4 years after the trial-conviction, plus no Memory-False Memory expert, plus no Improper Interviewing methodology expert, plus no FRYE hearing, plus no discussion of the underlying Economic-Political pressures, plus no discussion of the history of the Memory Wars and the thousands of false memories of abuse implanted by RRM-MPD-DISS therapists and debunked by the FBI – such an improper agreement frankly looks quite tame indeed compared to the infamous "Cash for Kids" historic corruption in PA which resulted in the PA SUP CT overturning some 4,000 sabotaged, manipulated convictions!

### 6B4.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

**Reportedly –** YET ANOTHER PA SUPREME JUSTICE WAS *SENTENCED TO CONFINEMENT* for ILLEGAL POLITICAL ABUSE OF GOVERNMENT  WORKERS.  Reportedly -- Additional Indicia of Corruption in the PA Legal System:  Joan Orie Melvin is a former justice of the Pennsylvania Supreme Court. In 2013, Melvin was convicted of several criminal counts related to her use of legislative and judicial staff to perform campaign work. *Justice Joan Orie MELVIN resigned from the PA SUP CT as of May 1, 2014, a few days before she was sentenced to confinement for illegally using court and legislative employees to work on her political campaigns. That sentence is on hold while she*

*appeals*. See, https://www.nydailynews.com/news/politics/pennsylvania-justice-porn-email-scandal-retires-article-1.1988800 and

**6C.    INDICIA OF CORRUPTION in the case of PA v SANDUSKY? Does the historic evidence of general corruption in the PA legal system help us predict the misconduct in this case?**

**6C1.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?***

**On this record, it appears that** an unprecedented collections of suspended, prosecuted, disbarred, imprisoned, fied, reprimanded, and/or corrupt Lawyers, Investigators, and Judges were involved in this case (misconduct documented after the trial of this case is still illustrative of the character of the attorney, some of the misconduct occurred during the PA v Sandusky case).   On this record:  An unprecedented -- in my 30+ year experience -- astonishingly defective group of unethical, troubled, and/or suspended and/or prosecuted and/or imprisoned and/or publicly reprimanded and/or fired and/or negligent group of investigators, lawyers, and judges were involved in this historically defective case.

**6C2.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?***

**Reportedly –** The DECEMBER 15, 2011 SECRET HILTON GARDEN MOTEL MEETING produced a "impossibly rapid" trial schedule that sealed the fate of the defendant – with no discussions of such decisions on the record. Are such "secret" meetings unusual in PA?

Reportedly, AN UNPRECEDENTED *SECRET* "OFF THE RECORD" MEETING was held in a local Hilton Garden Motel involving Judge Cleland, prosecutors Fina and McGettigan, and Defense Counsel, Amendola.  A key investigative hypothesis is that these "improper lawyers and an improper judge" entered into an improper agreement at this secret meeting to set a corrupt "likely conviction impossibly rapid" trial schedule thus "rigging the outcome" of PA v Sandusky to ensure a rapid and sure conviction and thus prevent the expected NCAA "Death Penalty" to PSU football program that would have resulted in over $500 MILLION in economic damages to the local economy and PSU as well as assist the political goals of Gov. Corbett.  Judge Cleland, Prosecutor Fina, and Defense Attorney Amendola ALL reportedly, not only unethically attended this corrupt meeting but then collusively HID all evidence of this corrupt meeting until 4 YEARS AFTER the trial and conviction of the defendant. Reportedly, even defense co-counsel Rominger was NOT told about the corrupt, secret, Motel meeting until 4 years later. (See, Rominger's testimony in a subsequent appellate hearing). ***When the secret meeting finally became public Judge Cleland recused himself from the case***.  Has such a "secret" "off the record" meeting ever be held in any other PA case? If so, which case and who was involved?

6C3.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

**Investigator Leiter.**  INDICIA OF CORRUPTION IN THIS CASE:  Reportedly -- Investigator Leiter recorded a discussion of the Government's corrupt, abusive, improper, repetitive Memory Manipulating interview scam in this case.   On this record, in PA v Sandusky, Inv. Leiter's inadvertent recording of April 21, 2011 appears to be a clear discussion of an Improper, Systemic, Abusive Government Witness Memory Manipulation Scheme much like other infamous cases such as Wenatchee, McMartin, Kelley Michaels and the RRM-MPD-DISS malpractice trials and Licensing Revocation Actions. Investigator Leiter confessed on a recording during the April 21, 2011 interview of BH.  He described his abusive, improper, unethical, repetitive, leading-suggestive, memory manipulation strategy. Was the failure to record all interviews Negligence or an improper agreement to obstruct justice? That is, recordings were destroyed if they documented abusive interviews.  How many interviews were NOT properly recorded or documented in any way?

**OPINION:**  THE TAPED discussion OF INV LEITER on April 21, 2011 documents a corrupt, abusive, historically defective interview system that appears carefully designed to *to  MANIPULATE, SHAPE, and CHANGE WITNESS "MEMORIES" into agreement with Leiter's pre-conceived ideas that fit the government's narrative of this case. (e.g., Classic Confirmation Bias)* :  See, Investigator Leiter's recorded discussion discussion of an Abusive, Improper, Systemic Government Witness Manipulation Scheme of April 21, 2011 s

*Inv. Leiter's Recorded Confession of Systemic Witness Tampering by the Government Was Never Properly Presented to the Jury with an Expert Witness in memory to explain how memory contaminative such a procedure could be.* :  All legal professionals in this case appears to have Negligently and/or Improperly Failed to Properly Deal With the Systemic Witness Tampering  Methods Disclosed in Investigator Leiter's Recorded Statement (his discussion) :  All attorneys (both sides) appear to have negligently failed to note and properly deal with Investigator Leiter's recorded statement (confession) of abusive, unethical, corrupt, systemic witness tampering:  The attorneys (and all of them) in this case negligently or improperly failed to note and expose at trial — and provide competent expert witness testimony at trial to help the jury understand the well-documented dangers of such abusive and corrupt interviewing procedures. (See, Police Investigator Leiter's recorded *confession* at the April 21, 2011 interview of BH.  During a break in the interview Inv. Leiter apparently forgot he left the recorder running and told others in the room (apparently Inv. Rossman and/or Lawyer Benjamin Andreozzi his starkly corrupt, unethical, and abusive interview methods.  Essentially Inv. Leiter's confessed methods

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

sometimes took "months" of "repetition, repetition" until the witness agrees with Inv. Leiter's pre-conceived theory of the case. (E.g. Confirmation Bias).

TRANSCRIPT of Inv Leiter's recorded statements of April 21, 2011 -- (i.e., an historic confession of corrupt, abusive, Systemic Witness Memory Manipulation Methods ):

Inv. Leiter:   **"That's the way it was with the first one. *It took MONTHS to get this first kid* that brought this to our attention. *It took MONTHS to get him* ... because it was ... well he would rub my shoulders and then he would do this ... it just took *REPETITION and REPETITION and then finally he would tell us what happened"*. ...** [note the repetition questions = memory tampering manipulation plus the obvious, extraordinary confirmation bias, plus Inv Leiter clearly falsely believes he is a "human lie detector", an unresolved question is how many interviews, using the "repetition for months" to "get him" were NOT recorded?  Was there Obstruction of Justice to engage in interviews that were NOT recorded because they were abusively repetitive, leading, and suggestive?  Was there Obstruction of Justice to record interviews then destroy the recordings if the interviews were damaging to the prosecution case?

INDICIA OF CORRUPTION – See, INV. LEITER's TAPED CONFESSION of April 21, 2011:

See, 1:11:26 : Lawyer Andreozzi:  "Can we at some point in time say to him [ the witness ]…"listen we've interviewed other kids, other kids have told us that there was intercourse and that they've admitted this, um,  is there anything else that you want to tell us"

**Speaker Inv. Leiter (i.e., historic confession of corrupt, abusive, Systemic Witness Memory Manipulation Method ) :  "*We do that* with *ALL the other kids* and *they listen* …'This is what we've found so far and you do fit the same pattern *as ALL the other ones"*** (NOTE: e.g., Leiter admits to lying to witnesses and demonstrates a Confirmation Bias even though many interviewees apparently said no abuse ever happened**), that's the way he (Sandusky) operates and *we know*** (NOTE: e.g. a LIE and Confirmation Bias**) the progression of the way he operates (**NOTE: e.g. a LIE and Confirmation Bias**) *and the other kids we've dealt with have told us that this has happened after this and did that happen with you?***

**1:12:05 Speaker Lawyer Andreozzi:  *"And I need to tell 'em (that) too. OK." … ]***

**Dr Barden's Opinion: This appears to be an historic taped confession of an abusive, systemically corrupt interviewing procedure for Government Witness Memory Tampering** (see Wenatchee, McMartin, Kelly Michaels, and dozens of RRM-MPD-DISS therapist malpractice cases involving thousands of false memories of abuse generated by RRM-MPD-DISS therapists. This taped

confession is quite consistent with the Investigative Theory of a *Culture of Corruption* in the State of Pennsylvania legal system and in this case.

In addition, alleged victim AM's reported statement is very consistent with Leiter's confession report of abusive interviewing. On this record, alleged victim 2's (AM's) initial statements reportedly claimed he was "the boy in the shower" and that he reported suffering NO abuse at all from the defendant in this case. AM did not testify at trial as a witness in Sandusky's defense, reportedly because Attorney Shubin actually hid AM in an undisclosed location. (See, AM's statement to Investigator Everhart). Consistent with this analysis on Nov 9, 2011 alleged victim #2 (AM), reportedly told investigator Curtis Everhart, "never in my life did I ever feel uncomfortable or violated by Sandusky…never did Jerry do wrong by me… I will never have anything bad to say about Jerry". In addition, ***in the Everhart interview the alleged victim AM reported gross misconduct by the investigators consistent with Inv. Leiter's recorded statements of April 21, 2011*** -- documenting a highly improper, systemic, abusive, memory-contaminative government system of Memory Manipulation interviewing (See detailed analysis below). AM reportedly told Everhart, after telling PSP interviewers that Sandusky never mistreated or abused him in any way ***"I felt very uncomfortable with the PSP interview process as they would try to put words in my mouth and take my statements out of context. The PSP investigators were clearly very angry and upset when I would not say they wanted to hear."*** (Exhibit D, Interview with Everhart in Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022). This is confirmation, corroborative evidence of Leiter's confession of April 21, 2011.

**6C4.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?***

Frank Fina, JD . Reportedly -- How about Sandusky Prosecutor Frank Fina? Mr. Fina's *law license was reportedly underlined suspended for a full year by the State of PA for reportedly (deceitfully) manipulating a judge*. AG Prosecutor Fina – the key prosecutor in PA v Sandusky -- was also, reportedly,  guilty of transmitting massive batches of depraved, violent, racist, pornography files on Government Time and over Government  email systems to PA Attorney General prosecutors and PA Supreme Court judges?  Amelia Kittredge with the PA Office of Disciplinary Counsel *called AG Prosecutor Fina "someone who cannot or will not separate right from wrong. "*

> *Prosecutor Fina – Law License Suspended for Unethical, Misconduct —*
> 
> Frank Fina, JD – The key AG prosecutor in the Sandusky case was reportedly found guilty of unethical misconduct in the case.   Mr Fina's law license was suspended for a year for unethical misconduct by the PA Supreme Court. The justices issued a 5-1 decision *to suspend Frank Fina's law license for*

*a year* agreeing with the Office of Disciplinary Counsel that Fina's actions were
unethical and improper …. "*Mr. Fina chose to mislead the supervising judge*,
causing that jurist to believe such resolution was unnecessary because Fina
undertook to refrain from inquiry into areas of potential privilege," Wecht wrote.
"Fina promptly and *unethically reneged on those assurances*. This *conduct fell
far below the ethical standard we rightly demand* of a prosecutor in this type of
situation."… "Amelia Kittredge with the Office of Disciplinary Counsel *called
AG Prosecutor Fina "someone who cannot or will not separate right from wrong.*
"

See,  Feb. 19, 2020 news that Sandusky **prosecutor Frank Fina loses
his law license for a year** … https://www.pennlive.com/news/2020/02/frank-
fina-sandusky-prosecutor-and-former-penn-state-lawyer-loses-his-law-
license-for-a-year.html

See also, Prosecutor who led Jerry Sandusky investigation disciplined by
Pa. Supreme Court.  A lawyer who led the child molestation investigation and
prosecution of former Penn State assistant football coach Jerry Sandusky *lost his
law license for a year* Wednesday over his handling of a grand jury witness in the
case, the Pennsylvania Supreme Court ruled.

https://www.mcall.com/news/pennsylvania/mc-nws-pa-frank-fina-license-
suspended-20200219-meuwodyplrfwzkfwzfru6vng6y-story.html

**Reportedly -- WAS FINA ALSO A PORNOGRAPHY ADDICT?** :
See, Porn, Emails And Criminal Charges: Multiple Scandals Embroil
Pennsylvania's Legal Community.  Insisting that she has done nothing wrong,
Kane said in August that the chain of events that led to the charges against her
"*began with a group of state prosecutors and judges passing pornographic,
racially offensive, and religiously offensive emails amongst each other — email
traffic sent and received on government computers, and on government time.*" …
*Kane said she became a target as soon as she announced that her office's inquiry
would unearth every email that had passed through CORBETT's and KELLY's
offices.* In their inquiry, investigators pulled together thousands of raunchy emails
between officials, many of which had been forwarded on to others.

Hundreds of pages of those porn emails — and their attached images —
were released in late August, under an order by the Pennsylvania Supreme Court.
Many were sent either from or to high-ranking officials.

As Metro US reported:   ***"Several of the [ violent, racist, explicit, hard core ] porn emails <u>originated with Frank Fina</u>, a former prosecutor at the Attorney General's office and the lead prosecutor in the Sandusky case ...."***
https://www.wbur.org/npr/454872418/porn-emails-and-criminal-charges-scandal-embroils-pennsylvanias-legal-community

See the exposes reported regarding PA Supreme Court Justices and AG prosecutors like Sandusky prosecutor Frank Fina. They were reportedly sharing depraved, *hard-care, violent, sexist and racist pornography*, The Philadelphia Daily News published an editorial calling for PA Supreme Court Justice Eakin to be removed from office, citing conduct "so extreme that it brought the judicial office into disrepute," and saying, "the Eakin case is the tipping point we need to change the system."…"Governor Wolf then called on Eakin to resign.  The governor's spokesperson said, "This process is absurd…Justice Eakin's behavior is reprehensible and beyond unbecoming of an individual, let alone a supreme court Justice." The Pennsylvania Judicial Conduct Board reviewed the matter directly and charged Eakin with violating the state's rules of judicial conduct and the state constitution. They said he participated knowingly and often in email chains that were sexually suggestive, vulgar, and **offensive"**

See, Hundreds of Pages of PA Prosecutor's Pornographic Emails Released.  by Joanna Rothkopf, August 27, 2015. "On Monday, Pennsylvania Attorney General Kathleen Kane was instructed to stand trial for charges of perjury and obstruction of justice. Prior to her trial she revealed that a main enemy, *Philadelphia prosecutor Frank Fina, had <u>amassed thousands of emails containing graphic (explicit, violent, racist) pornographic content</u>.*"   On Wednesday, Fina's porno collection was released to the public. "*The attorney general knew full well that <u>Mr. Fina had a pornography collection of thousands and thousands of images</u>, inappropriate statements, misogynist points of view and disgraceful content,*" said Kane's attorney Gerald Shargel in the middle of the hearing   https://jezebel.com/hundreds-of-pages-of-pa-prosecutors-pornographic-emails-1727004974

And … *<u>Sandusky prosecutor FINA RESIGNS</u>* amid email scandal June 7, 2016,  "The prosecutor at the center of an email scandal that sparked fallout across Pennsylvania's legal system has resigned from his job at the Philadelphia District Attorney's Office. Frank Fina had been with the city DA's office since

2013. Action News learned Tuesday that *Fina quietly resigned last month*. Fina was a lead prosecutor in the Jerry Sandusky case when he worked at the state Attorney General's office. But he's also tied to the pornographic email scandal that has already forced two state Supreme Court justices to step down.   See, https://6abc.com/frank-fina-resigns-porngate-email-scandal/1375462/

      **6C5.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Errors, and/or Negligence and/or Corruption?*

      **History of Improper Misconduct?  How about PA Attorney Generals Corbett and Kelly?**

      "PA prosecutor Moulton discovered more than *1500 pornographic emails containing videos and pictures that had been* **exchanged during the Corbett and Kelly PA Attorney General administrations** among prosecutors and investigators in the Office of the Attorney General, politicians, and judges, including state Supreme Court Justices *Seamus McCaffery and Michael Eakin*. Moulton found the pornography exchanges amid **recovered emails** *that had been ordered deleted* **from the offices of former attorneys general Corbett and Kelly.**

      See, The Great Pennsylvania Government Porn Caper… "Loads of pornography littered the exchanges between government officials like so much cow sh*t in an open field. Office-secretary porn. Sarah Palin-Photoshopped porn. Hardcore, objects-stuck-in-a-woman's-every-orifice porn. The more she clicked, the worse it got. Fat jokes. Gay jokes. Racist jokes. Domestic-violence jokes. ***The bulk of which were sent on state computers, on state time, from one state employee to another.***   The emails on the disc were just the tip of the iceberg; the full scope wasn't immediately clear. In time, Kane and everyone else in the state would come to realize the emails were like strands of a spiderweb, stretching out in every possible direction, connecting small-town attorneys to big-name prosecutors to State Supreme Court Justices."

      The men exchanging these images were among the most prominent names in the state's judicial system. And *they'd been doing it for years*, with no fear of being reprimanded. *No,* Kane thought. *This is wrong. All wrong.* She had to blow the whistle, to show Pennsylvanians the true personas of men they could someday face inside a courtroom.

At first, Kane identified only a handful of top figures *on then-Governor Tom Corbett's staff. Corbett condemned the exchanges and called on the participants to resign. But the list of the participants kept growing. And growing."*

https://www.esquire.com/news-politics/a42234/porngate-pennsylvania-kathleen-kane/

### 6C6.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES: *Errors, and/or Negligence and/or Corruption?*

Judge Feudal    History of Improper Misconduct?

**Reportedly – Judge Feudal was reportedly removed for unethical misconduct and an improper relationship with Prosecutor FINA.**

Alt Hyp Questions:   How about Sandusky case PA Grand Jury Judge Feudal who was reportedly removed by the PA Supreme Court for Unethical Misconduct?
See, "The Philadelphia Inquirer published a report concerning emails sent and received from the *private email account of Judge Barry F. Feudale.*   Metadata from the Office of Attorney General's servers confirm the following:  These emails are currently housed on Office of Attorney General servers. Any implication that the OAG is in possession of emails from Judge Feudale's personal email account that are not currently on OAG servers is false. Any implication that these emails are on OAG servers by any other means than the ordinary course of business is, again, false…. Contrary to impressions created by the Philadelphia Inquirer's story that Judge Feudale was concerned with the law or his commitment to secrecy, make no mistake*: Judge Feudale's overriding concern was how to leak sealed Supreme Court documents without getting caught….*
*The seriousness of this reckless breach of sealed Supreme Court documents, orchestrated by the presiding judge of a state investigative grand jury, with attorneys and the very reporters who have covered some of the Sandusky, Computergate, and Bonusgate cases, cannot be overstated. The OAG is currently litigating post-conviction motions involving these cases. I have instructed my office to send a complete set of these emails to the Judicial Conduct Board."*   https://www.wgal.com/article/kane-responds-to-report-about-judge-feudale-emails/6239651

**AND**

"The Pennsylvania Supreme Court has removed a senior judge who once presided over many of the state's biggest grand jury investigations, accusing him of judicial misconduct and abandoning his sense of objectivity during a feud with Attorney

General Kathleen G. Kane.  In a letter, the PA high court told *Barry F. Feudale it was*
*"deeply concerned" about his judgment and behavior, citing in part emails he sent to*
*Inquirer reporters* after Kane had successfully bid to have him ousted as the supervising
grand jury judge in Harrisburg…. *The court also said it believed that Feudale's judicial*
*objectivity had been "clouded" by his relationship with a former prosecutor in Kane's*
*office - a reference to* Frank Fina, the once-ranking prosecutor in the Attorney General's
Office who has been in a long-running feud with Kane.  The court's letter, dated Oct. 20
and obtained this week by The Inquirer, gave Feudale two weeks to respond. Apparently,
he never did. On Nov. 12, the *court sent a second letter to Feudale, removing him.* See,
https://www.mcall.com/news/pennsylvania/mc-pa-kathleen-kane-judge-removed-
20151127-story.html

### 6C7.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or*
*Negligence and/or Corruption?*

**Attorney Rominger Alt Hyp:  History of Improper Misconduct?**

Reportedly -- *Defense Attorney Rominger -* Criminal Conviction and Imprisonment for
Deceitfully Manipulating Clients (Embezzlement) — A PA v Sandusky case involved attorney - Mr. Karl
Rominger, JD, subsequent to the Sandusky trial *was convicted of felony embezzlement and imprisoned for*
*five years.*  In addition, in my opinion, Mr Rominger demonstrated Negligence and misconduct at the
Sandusky trial by failing to conduct a proper investigation, failing to obtain a competent memory-false
memory expert, failing to obtain a competent Daubert expert, failing to obtain a competent investigation
methodology expert, failing to obtain a proper psychotherapy malpractice expert, failing to have his client
testify at trial and other errors.

### 6C8.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or*
*Negligence and/or Corruption?*

**Attorney Baldwin, Former Judge and PA Supreme Court Justice.   History of Improper**
**Misconduct?**

**Reportedly --** PSU Attorney Baldwin – Reportedly received a humiliating Public Reprimand for
her Unethical, Manipulative Misconduct and violation of Attorney-Client Privilege — Yet another former
PA SUP CT Justice-attorney involved in PA v Sandusky, at the time Penn State Counsel Cynthia
Baldwin, JD reportedly was *formally reprimanded by the Pennsylvania Supreme Court for manipulative*
*unethical misconduct related to the Sandusky case*.  Baldwin reportedly was present at the Grand Jury as
the lawyer representing 3 clients -- witnesses Spanier, Curley, and Shultz. Her representation of a witness

was apparently, under PA rules, the only reason Baldwin was permitted in the Grand Jury room. Then later, having apparently misled the court, Baldwin then reportedly "switched" and later claimed that actually, she had only been representing PSU and NOT her three clients. She later reportedly testified against her own clients leading to their prosecution.  This kind of misconduct is highly unusual in my experience.

### 6C9.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

**Judge Cleland    Investigative Questions:   History of Improper Misconduct?**

**Reportedly** -- Judge John Cleland *reportedly recused himself following Public Exposure of an apparently unprecedented, never explained, "off the record", un-recorded, un-transcribed, "secret" meeting with prosecutors and defense lawyers at a local Motel (Hilton Garden Inn).*

*That apparently corrupt meeting reportedly produced as "likely-conviction-death-march",  trial schedule that precluded any chance of a fair trial.*  Even highly specialized experts in such cases could NOT properly prepare and try such a complex case on the "likely-conviction-death-march" schedule set by Judge Cleland at his reportedly "secret off-the-record", unrecorded, apparently improper meeting at the Hilton Garden Inn with apparently improper (license suspended for misleading a judge) Prosecutor Frank Fina and apparently improper defense lawyer Amendola (e.g. Amendola attended a "secret, corrupt, off the record meeting" then HID this unprecedented "secret" meeting from his own defense co-counsel Rominger *until years after the trial* and conviction in PA vs Sandusky). **During the trial it appears that Amendola behaved at times like an attorney determined to harm his client's case, with no competent science experts, no competent science consultant to draft RRM-MPD-DISS questions, no motion for a FRYE hearing, and convincing his client to NOT testify in his own defense (often a fatal error in such cases), etc.**

Reportedly, when Judge Cleland's secret, unrecorded, unreported, local Motel meeting with AG Fina and Defense counsel Amendola finally did became public – 4 YEARS after the trial and conviction - - Judge Cleland  recused himself . Just how unusual was the secret, Motel meeting that produced two essential trial-controlling decisions (1- waived defendant's right to a preminary hearing and 2- set an impossibly rapid "impossibly rapid", no time to properly prepare, trial schedule) such decisions were reached with no discussions on the record?  See, Briefs, Motion, Appeals, and Media:

https://www.fox43.com/article/news/local/contests/judge-john-cleland-recusing-himself-from-all-future-jerry-sandusky-hearings/521-cfb89259-236f-4a6c-997f-b6d8a8cfbd29

**EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*** Judge Cleland's apparent sabotage of the Defense Case *during the trial:*

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

On this record, Judge Cleland bizarrely (or conspiratorially) dismissed concerns about the way Rossman and Leiter questioned BH or other "victims" and whether their interview methodology was likely to lead to false allegations.

Specifically, on this record, at trial Judge Cleland reportedly said "***The issue is not whether or not the witness's testimony was corrupted by any questions***".  Was this wildly false and trial contaminating statement a result of science-uninformed Negligence or a just another part of an improper agreement to sabotage the trial?

Cleland reportedly also instructed the jurors. "*The purpose of the evidence is to show that the troopers didn't tell the truth, not that BH didn't tell the truth.*"

*Judge Cleland's statements appear to eviscerate the most essential defense argument in such a case – that improper interviewing produced "changed-false" memories of abuse.*

Having litigated or consulted on hundreds of "recovered memory therapist" lawsuits in many states , consulted on multiple licensing revocation actions against "recovered memory therapists" and having testified in many criminal cases and family law cases where "memories", "morphing memories", "question contaminated memories", and related issues are essential, having written international reviews for Oxford University Press and Reuters-Thompson Publishers, having given invited talks on these and related issues at the national conventions of psychologists (APA), psychiatrists (APA), lawyers (ABA) and the US Surgeon General's conference, and having given training talks to Federal Judges, Sex Crimes Investigators Association conventions, and the FBI -- this statement by Judge Cleland "**The issue is not whether or not the witness's testimony was corrupted by any questions,**" is the most science-uninformed, incompetent, improper, illogical, and/or corrupt attempt to manipulate a trial to ensure a rapid conviction of the defendant that I've seen (e.g., just like Judge Cleland's secret meeting at the Hilton Garden Inn producing his order for a  "likely-conviction-death-march" schedule to overwhelm and crush the local science-uninformed defense counsel at the only such "secret meeting" I've seen or even heard of over the past 30 years.

Judge Cleland's misleading and apparently corrupt statement that "**The issue is not whether or not the witness's testimony was corrupted by any questions**" is, in my opinion, further evidence of a Culture of Corruption in the legal system of the State of Pennsylvania.  Note that multiple other States – with more science-literate or less corrupt legal systems spent enormous amounts of time and resources getting this issue right – in detailed Frye-Daubert science hearings involving multiple national experts (see numerous citations above).  In all such hearings in which I have been involved in – those courts rejected recovered repressed ("dissociated") memories of trauma as unproven, unreliable, NOT accepted by the relevant scientific community, and having NO known error rate (thus possibly 100% false) thus ***excluding the junk science based testimony and dismissing the entire case.***

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

It is truly astonishing that nobody involved in this case including the Freeh Group, the NCAA, the AG's office, the National and Local Media nor the incompetent, overwhelmed defense attorneys raised the issue of the wildly controversial claim that ""buried trauma memories *reliably* are reported following psychotherapy and lawyer interviews -- after being "blocked out". *A properly held Frye hearing would likely have eliminated many – if not all – of the alleged victims testimony in this case as RRM-MPD-DISS ideology and methods have been rejected by the relevant scientific community* (e.g. Frye standard) as a "pernicious myth" and would have resulted in a competent defense expert explaining the ease with which therapist/lawyer interviews can change-morph, distort, and contaminate "memories" as well as the U.S. history of thousands of RRM-MPD-DISS abuse hysteria-satanic cult hysteria - false memory cases debunked by law enforcement and others. Such a result would have produced a properly competent trial in this matter instead of the tragic debacle of the science-uninformed criminal investigation and trial that is documented on this record. The people of the State of Pennsylvania deserve a more competent, less corrupt legal system and public hearings at the Pennsylvania State Legislature would help to fully document what actually happened at the secret Motel meeting, was well as what actually happened in the investigation and trial of this very complex and controversial matter.

### 6C10.   EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:   *Errors, and/or Negligence and/or Corruption?*

**ADDITIONAL INDICIA OF CORRUPTION, RRM-MPD-DISS evidence on the record:**

Obvious "recovered repressed memories" and the underlying RRM-MPD-DISS ideology were never challenged at trial, no competent science Memory-False Memory expert debunked such inherently unreliable memories, no science expert exposed Leiter's corrupt interviewing practices.  Were such coordinated, multiple, unprecedented, egregious defense counsel "errors" possible without an actual improper agreement to sabotage the defendant's case?

EVIDENCE OF RECOVERED REPRESSED (buried, blocked, dissociated) MEMORIES IN THIS CASE-- IDEOLOGY, METHODS, and PRACTICES :

Evidence of Recovered Repressed (buried, blocked, etc) Memories in this statement from Corbett protégé PA Attorney General Linda Kelly.

"It was incredibly difficult for some of them to *unearth BURIED memories of the shocking abuse they suffered*. Most of us cannot possibly fully comprehend what they testified." See,

https://www.pennlive.com/midstate/2012/06/jerry_sandusky_verdict_attorne.html

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

*More Evidence of Recovered Repressed (buried, blocked, etc) Memories in this case from Alleged Victim DS.*

At trial (Day 3), Witness DS was asked <u>*if his testimony had changed dramatically*</u> over previous months. He said "<u>*Yes*</u>. That doorway that I had closed has since been <u>***reopening more***</u>. More <u>*things have been COMING BACK*</u> *and things have changed since that grand jury testimony.* <u>Through counseling and different things</u>*, I can* <u>remember a lot more detail that I had pushed aside</u> *than I did at that point.*" (Trial transcript, Day 3, p. 143) …

AND Witness DS also said…

"Through <u>***counseling***</u> and through talking about things in my past, <u>***different things triggered different memories***</u> and I have had <u>*more things COME BACK*</u>, and its <u>***changed a lot about what I can remember today***</u> and <u>*what I could remember before*</u>, <u>*because I had everything BLOCKED OUT.*</u>" (Trial Transcript, Day 3, p. 152 )

AND Witness DS also said…

"During his testimony, <u>DS also revealed that he and alleged victim ZK had talked about how their therapy was going</u>. "ZK would ask me sort of what happened to me almost—I feel so that he could confide in me. *But he had asked me if I remembered anything MORE, if* <u>*counseling was helping* …</u> " (Trial Transcript, Day 3, p. 154 )

AND Witness DS also said…

When Prosecutor McGettigan asked DS why he hadn't disclosed Sandusky's abuse to the police during his first or second interrogation, DS explained: "<u>*I had sort of BLOCKED OUT that part of my life*</u>. Obviously, going to football games and those kinds of things, I had chosen to sort of to keep out in the open, so to speak. And then the more negative things<u>*, I had sort of pushed into the back of my mind*</u>, sort of like <u>*closing a door*</u>, closing—putting stuff in the attic and closing the door to it. *That's what I* <u>*feel*</u> *like I did*." (Footnote 11, Trial Transcript, Day 3, p. 119).

AND Witness DS also said…

Witness DS was reportedly the only alleged Sandusky victim who agreed to speak to science writer and expert on RRM, Mark Pendergast  -- a Harvard College Alumni journalist/author who has written several books on RRM-MPD-DISS history and ideology.  In October 2014, Pendergast reportedly spoke with Witness DS at length in his home in State College, Pennsylvania, with follow-up by email and phone, and *Mr. DS verified that* <u>*he had indeed recovered memories of abuse in therapy*</u> *and that he thought the door to his abuse memories was still only part way open*. Pendergrast reported DS

said he remained *in therapy with Cindy MacNab* at The Highlands in State College, a therapist reportedly *suggested to and working with his civil lawyer, Andrew Shubin*.

> **DS reportedly told Pendergrast, "*Actually both of my therapists have suggested that I have repressed memories, and that's why we have been working on looking back on my life for triggers. My therapist has suggested that I may still have more repressed memories that have yet to be revealed, and this could be a big cause of the depression that I still carry today. We are still currently working on that.*"** (See, Pendergrast Interview of DS, DS Email, Oct. 15, 2014.) (See, Pendergrast, M., T*he Most Hated Man in America: Jerry Sandusky and the Rush to Judgment*, Sunbury Press (2017) ISBN-10: 162006765X; ISBN-13: 978-1620067659. )

*More Evidence of Recovered Repressed (buried, blocked, etc) Memories and Debunked Multiple Personality Disorder Methods and RRM Ideology in this case from Alleged Victim MS and his book.*

In 2016, alleged victim MS wrote "Undaunted: Breaking My Silence to Overcome the Trauma of Child Sexual Abuse" in which he reported radically transformed "new memories" of childhood abuse. MS disclosed classic RRM-MPD "dissociation" therapy methods. For example, he reportedly printed a conversation with his "inner child" in which *he recovered a new (developmentally virtually impossible) memory of being abused at TWO years of age* (Note: Virtually Zero chance of accuracy as 2 yrs olds' memories are quite unreliable due to the well-documented process of infantile amnesia). In his newly recovered "memory" MS claimed his father was "holding the red-hot flame of a cigarette lighter to his tiny, fragile toes" [ Zero medical evidence of burns or scars on this record.] **He said "this is what I do now *for my INNER CHILD*. I tell him (note the bizarre, debunked, inherently unreliable Multiple Personality aspect of this reported conversation with MS's "inner child") that it is safe to disclose, to admit what happened, to me".  MS noted that he "had to *access the traumatized child self  "[ this is an example of junk-science RRM-MPD therapy for which therapists LOST their license ]* .. in order to heal. MS further writes, "I had kept my child self *LOCKED UP* in the prison of my pain and my silence where HE (the "inner child" personality) couldn't grow up." (This is Classic Multiple Personality Ideology junk science).**

MS continued his classic RRM-MPD-DISS discussion writing that his "mental escape mechanisms allowed him to take his mind away".   He writes that when he unearthed his memories "I felt like my mind had been a swollen wound full of infection

and pus, and I had lanced it and all the poisonous junk had flowed out".. He continued, these were "things I had kept hidden deep within me in the deepest *LOCKED DOORS of my heart.*" (very standard, inherently unreliable, RRM-MPD-DISS ideology, practices and ideas EXCLUDED in multiple Frye and Daubert hearings in multiple states and IGNORED by negligent and/or corrupt sabotage by defense counsel ).  MS went on to write, the shame of abuse led him to "put it away in a compartment of your brain, and *LOCK THE KEY* to that dark place forever, which is the way a victim *DISSOCIATES* and denies." MS continued, "The more I tried to BLOCK IT OUT, the more visuals I would see. I had denied it for so long that now I was owning up to it, the (recovered repressed) memories flooding over me. I had spent most of my life *blocking out or DISSOCIATING from the victimization.*" MS disclosed that he had been seeing a "*specialized trauma therapist"* for years when he wrote the book.  Having perfectly described the classic recovered repressed memory RRM-MPD-DISS *inherently unreliable* process — including a DISSOCIATED "inner child" personality — MS futilely tried to claim that he had not really "recovered memories" — apparently knowing that the legal and science worlds had debunked RRM-MPD-DISS "memories" long ago. (See, *Undaunted* by MS at pg 20, 63, 122, 142, 146-155, 164, 192-193 ; See, M. Pendergrast book on the Sandusky case).

[ Note the theories and methods MS is describing are the classic controversial, inherently unreliable RRM-MPD-DISS psychobabble debunked by dozens of research studies and excluded in multiple states following complex FRYE and/or Daubert science hearings as unreliable junk science, a "pernicious myth", *rejected by the relevant scientific community.*

**More Evidence of Recovered Repressed (buried, blocked, etc) Memories in this case from Alleged Victim BH at Trial:**  On the witness stand, BH reportedly stated at Trial… "I have spent, you know, so many years ***BURYING this in the back of my head forever".***  [ Although BH admitted to major transformation in his "memory" stories over time, Attorney Amendola negligently failed to properly follow-up and ask how these "buried memories" were brought to the surface.]

***More Evidence of Recovered Repressed (buried, blocked, etc) Memories in this case from Alleged Victims.***

Testimony at trial J.S., B.S.H. and Z.K. reportedly also claimed their "memories" of abuse changed over time *as a result of psychotherapy* helping them to *UNBLOCK memories of past trauma. ….*

Classic (Science-uninformed) Recovered Repressed Memory Quote from ZK's Attorney Howard Janet:

ZK's attorney, Howard Janet, explained in an interview how ZK and the other alleged victims could "*create a bit of a Chinese wall in their minds. They _BURY these_ _events_ that were so painful to them deep in their subconscious.*" [ Classic RRM-MPD-DISS pernicious myth – yet another gullible, science-uninformed believer. ]

### 6C11.  EXPORING CURRENT INVESTIGATIVE HYPOTHESES:

**Therapist Gillum.**   *More Evidence of Recovered Repressed (buried, blocked, etc) Memories in this case from local, apparently science-uninformed, Psychotherapist Gillum's book: "Emotional signs of trauma, however, can remain LOCKED within the victim's psyche as they search for the magic bullet to mask their pain.*"  Therapist Gillum's controversial RRM-MPD-DISS ideology has been called a *"pernicious" myth by the relevant scientific community*.

Therapist Gillum should be properly deposed by a science-literate attorney (or an JD-only litigator with a science consultant) to properly document Gillum's reportedly unethical misconduct and licensing violation boundary issues and other violations in this complex case.

Clearly, given Gillum's apparent views on RRM-MPD-DISS ideology Therapist Gillum (like therapist Macnab) appears to have engaged in unethical misconduct and licensing violations by failing to properly **obtain informed consent** from patients by failing to inform them of the hazards of induced false memories, the history of the Memory Wars, and the existence of MUCH scientific research debunking RRM-MPD-DISS ideology. (See the many citations in this report).

*More Evidence of Recovered Repressed (buried, blocked, etc) Memories in this case from Alleged Victim AF (regarding his* 3 year therapist*, Mike Gillum):*

At trial… AF said that his therapist Mike Gillum *"believed something more did happen and we talked"* … he disclosed he'd been *seeing Gillum for "quite some time now" (3 years).* … AF also disclosed that the investigators had told him what "memories" they expect to hear (See, Ins. Leiter's taped confession of just such Memory Manipulative interviewing procedures of April 21, 2011). The investigators AF said,

encouraged him to tell them more and as "other Second Mile alums were claiming abuse, "They said I'm not alone", AF reported. (See Trial Transcript, Day 2, pg 4-104).

**6C12.   Yet another Defective, apparently Science-uninformed local psychotherapist was involved tangentially in PA vs Sandusky:  Alleged victim ZK's psychotherapist Alycia Chambers reportedly taught ZK science-uninformed-defective hydraulic "venting" notion of stress reduction.**

"During a therapy session that Monday, Chambers probed ZK for the details of an outing with the defendant (witness tampering by a therapist intruding into investigation "memories"?). …. Chambers at one point thought ZK seemed to be getting irritated, so she directed him to *do some "release" work*. In her notes, she expressed her satisfaction with the good job he did *whacking the chair with a tennis racket*. She explained how to make *a homemade punching bag so that he could release his anger safely at home*.  On this record, *Chambers also violated her patients right to informed consent* and engaged in quack practices while failing to honestly and properly disclose the risks and benefits and alternative including CBT, Positive Psychology, Gratitude Journals, and Coping/Resilience Science treatments.  (See, Pendergrast, M., T*he Most Hated Man in America: Jerry Sandusky and the Rush to Judgment*, Sunbury Press (2017) ISBN-10: 162006765X; ISBN-13: 978-1620067659. )

On this record, it is not clear what, if any, other kinds of controversial "therapies" were provided to patients by Therapist Chambers.  Her records should have been obtained and reviewed with a competent expert witness by defense counsel.

**6C13.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?***

Shubin and Macnab   Investigative Questions:  Were Attorney Shubin and Therapist Macnab in "business" together?   Reportedly -- Additional Indicia of Corruption in the Newly Discovered evidence regarding alleged memory contaminator Attorney Shubin and his affiliated RRM therapist Macnab? …

See previous review of the Newly Discovered Evidence interviews of SS-Shubin and AJ Dillon "sting investigation" recordings.  Based on my initial review of the newly discovered SS-Shubin transcript, my further and ongoing investigation revealed that *DS (Alleged Victim 7)* in 2004, *r*eportedly sent an application for financial aid writing "Jerry Sandusky, has helped me to

understand so much about myself. He is such a kind and caring gentleman, and I will never forget him." (N.T. Trial, Day 3 at 138).

Consistent with the evidence reported above, *after multiple reported meetings with Attorney Shubin and "therapy" with psychologist C. Macnab, DS's reported "memories" were apparently radically transformed into NEW "MEMORY" allegations of criminal abuse (worth millions of dollars).* After exposure to Shubin and Macnab DS stated that "through counseling *different "memories"* were "*triggered*"… "that doorway that was closed, has since been opening more… *through counseling and different things I can remember a lot more detail that I had pushed aside* then" (N.T. Trial, day 3 at 143 in Defendant's Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022.

The potential memory contaminating effects of Shubin-Macnab were not properly explored at trial. Macnab's records were not obtained and reviewed by an expert for evidence of RRM-MPD-DISS memory contaminating therapy. The jury apparently learned nothing of this essential alternative hypothesis in the case.

### 6C14.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

Was there an improper agreement in PA v SANDUSKY designed to produce a "sabotaged" trial? Is so, that would explain:

-- No Memory-False Memory, RRM-MPD-DISS Expert Witness … a goal to leave no time to find and retain an actual *Science* Expert Witness on RRM-MPD-DISSOCIATION and False Memory issues (not local, science-uninformed therapists like Gillum and Macnab who "treated" several alleged victims in this case)  -- (as result of an improper agreement a science-memory expert was never retained, and none testified at trial leaving the jury uninformed and/or misinformed about multiple key memory issues including THE SCIENCE OF FALSE-BUT-FERVENTLY-BELIEVED-IN-MEMORIES)

-- No Expert Memory Litigation Consultant -- the criminal co-conspirators also ensured there was no time to hire a science-litigation *consultant* to teach the poorly-trained, science uninformed local defense lawyers how to deal with the complex RRM-MPD-DISSOCIATION, changing "memories" issues so essential in this case and

-- No history of Therapist Quackery and License Revocations -- leave no time for an expert to properly instruct the jury as to the history of licensing revocations for the unethical, memory contaminating practices of RRM-MPD-DISS therapists like Gillum and Macnab (thus this history was never discussed) and

-- No history of the Infamous "False Conviction Cases" -- leave no time for an expert to properly instruct the jury as to the history of the Infamous "False Conviction Cases": (e.g., Amirault, Wenatchee, Wee Care, Kelly Michaels, etc). On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

-- No history of the Thousands of Proven False "memories" Created by Therapists -- leave no time to properly instruct the jury as to the history of THOUSANDS of F.B.I. investigation-documented FALSE allegations of abuse such false memories being induced by improper RRM-MPD-DISS ideology therapists like Therapists Gillum and Macnab of this case (thus this history was never explained to the jury)

-- No Review of Essential Evidence -- leave no time to even review the crucial evidence in this complex case which could take a year or more (thus much essential evidence was never reviewed.

-- No FRYE Hearing -- leave no time to file a proper DAUBERT motion (thus no DAUBERT motion was ever filed and no DAUBERT hearing was held, despite other states throwing out such cases based on RRM-MPD-DISS radically changing "memories")

-- No Proper or Competent Cross Examinations -- leave no time to prepare cross-examinations (thus the cross examinations were horrifically incompetent),

-- No Science Expert Explanation of the Memory Contaminative Power of Inv Leiter's Confessed Corrupt Interview Practices -- leave no time to fully expose and have an expert explain the gravity of the corruption displayed by Investigator Leiter's April 21, 2011 taped confession of massively unethical, improper, memory-manipulation, "repetition until the witness agrees" interviewing practices (thus the memory contaminative power of Leiter's systemically abusive interview process was never properly disclosed and properly explained to the jury)

-- No Testimony by the Defendant -- and to ensure that when the time came Defense Counsel Amendola would convince Defendant Sandusky NOT to testify in his own behalf know that such a move would guarantee conviction (thus the Defendant did not testify and was convicted).

-- Was the Motivation for misconduct Prevention of the NCAA Death Penalty that would have produced a loss of $500 MILLION and thus a Local Economic Disaster: Was the "likely-conviction-death-march" trial schedule and other corrupt goals designed to produce a very short trial and rapid conviction in order to prevent the PSU football program from receiving the publicly threatened NCAA "death penalty" closing down the PSU football program which *would have cost PSU and the local community hundreds of millions of dollars in economic damages ( losses of over $100 million per year for multiple years)?*

### 6C15.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

Was the "secret" , "off the record" , unreported,  Hilton Garden Motel meeting "likely-conviction-death-march" trial schedule of Cleland-Fina-Amendola designed to:

A) give lawyer Amendola cover and an excuse to not even bother to review the evidence, which was reportedly not even gathered at that time, and

B) give lawyer Amendola cover and an excuse to not even bother to retain proper Memory-False Memory-RRM-MPD-DISS expert witnesses to instruct the defense attorneys and the jury regarding the very essential and very complex science issues in this case, and

C) give lawyer Amendola cover and an excuse to not even bother to put together a competent FRYE motion and hearing which could have resulted in the testimony of many if not all "victims" who experienced radical changes in "memories" following multiple therapist-civil attorney meetings being excluded. (See the section on ignored Basic Essential Science-History above).

D) give lawyer Amendola cover and an excuse to not even bother to gather key evidence in the case including the certified-to-be-complete mental health records of all alleged victims including ALL therapy sessions and especially joint-group therapy sessions, hypnotic procedures, etc.

E) give lawyer Amendola cover and an excuse to not prepare competent cross examinations of the prosecution witnesses.


### 6C16.   EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:   *Errors, and/or Negligence and/or Corruption* ?

Dr Barden's Notes and Investigative Hypotheses:  In a non-corrupt legal system involving ethical attorneys -- local defense counsel Amendola *would have refused to attend a secret,  "off the record", un-recorded, un-transcribed meeting with Judge Cleland and the prosecutor Fina,* to set an all-important trial schedule and for the "defense" to suicidally waive a preliminary hearing where they could have questioned the alleged victims about their mental health history, exposure to RRM-MPD-DISS ideology, exposure to civil attorneys offering millions for abuse "memories", Inv. Leiter's abusive interviewing practices and other essential information.

Further, in a non-corrupt legal system, when the court refused to give the local science-uninformed defense attorneys time to review the evidence nor obtain competent experts and thus have a chance of understanding what happened in this multi-year complex investigation -- *both defense counsel should have resigned from the case and refused to participate in a sham trial rather than simply comply with Judge Cleland's "likely-conviction-death-march" trial schedule reportedly generated at the secret "off the record" motel meeting.*  Attorney Amendola knew or should have known this , "impossibly rapid" trial schedule would surely doom his client's case.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

On this record, *alleged criminal co-conspirators* Fina-Cleland-Amendola *did not tell anyone about the existence of the* "corrupt secret off-the-record Motel meeting" until *2016* – 4 years after the trial and conviction of the Defendant.

On this record, the alleged criminal co-conspirators – Cleland, Fina, and Amendola -- even hid the "corrupt secret meeting" from defense co-counsel Rominger. (See testimony of Rominger at the August 2016 post-conviction hearing).

On this record, the December 12, 2011 unprecedented, corrupt, secret Motel "off the record", no court reporter, hidden from defense co-counsel for 4 years, hidden from the public for 4 years, ***meeting*** remained hidden until MAY of 2016:  Defendant's Appellate Attorneys reported first learning of the "corrupt secret meeting on May 2, *2016*. (See, Motion for Recusal of Judge Cleland, filed on May 9, ***2016***. )

*As stated in the Motion for Recusal, on May 2, 2016 after the scheduled argument in the underlying PCRA matter, the PCRA hearing Judge Cleland placed on the record that HE could be a fact witness with respect to one of the Defendants claims.  Specifically, Judge Cleland represented, on the record, that HE was present with trial counsel Joe Amendola, counsel for the Commonwealth and District Magistrate Scott at the Hilton Garden Inn in State College before the scheduled preliminary hearing at a reportedly "unrecorded, "off-the-record", undisclosed for 4 YEARS, "secret" meeting.*

At this off-record, no court reporter, not disclosed to defense co-counsel, meeting at the Hilton Garden Inn, certain representations appear to have been made by both the Commonwealth and Mr. Amendola and an unrecorded agreement was reached regarding the mysterious waiver of Mr. Sandusky's essential preliminary hearing plus creating an impossibly rapid "likely conviction, ultra-fast, impossibly rapid" trial schedule – with the entire discussion "*off the record*" .

The Essential Alternative Investigative Hypothesis here is that a criminal co-Improper agreement was reached for Amendola to work with Fina and Cleland to actively ***sabotage the defendant's case*** (**much like the infamous PA Kids for Cash corruption scheme** only far more simple) to ensure a rapid, sure conviction thus saving the local economy from hundreds of millions of dollars in losses by preventing an NCAA "death penalty" for the PSU football program – and also facilitating the political goals of Gov Corbett, reportedly a mentor-ally of Cleland, Fina, and Kelley.

*More evidence the corrupt-appearing, secret Motel meeting was actually an improper agreement*: Defense Attorney (1 of 2) Carl Rominger, JD testified in the PCRA proceedings of August 12, 2016 that even *he, defense co-counsel Rominger, was reportedly NOT informed about the Cleland-Fina-Amendola secret Motel "off the record" meeting* until he was told by appellate defense counsel Lindsay, *the night before Rominger's testimony at the hearing on August 11, 2016*.  This appears to be powerful evidence that the alleged criminal co-conspirators, Cleland, Fina, Amendola were actively and successfully *hiding knowledge of the unprecedented, secret, unrecorded, meeting at the Hilton Garden Inn for years.*

112

### 6C17.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

*More evidence supporting the Investigative Hypothesis that the corrupt-appearing, secret Hilton Garden Motel meeting did indeed produce an improper agreement*:

To the best of my knowledge, no judge in any other state has ever held such a *secret Motel "off the record", with no court reporter, even hidden from defense co-counsel, also hidden from the public, meeting at a local motel to waive defendant's essential right to a preliminary hearing and set up a "likely conviction, impossibly rapid" trial schedule.   An ethical attorney would NEVER have attended such a meeting much less kept it secret from his own defense co-counsel for Four Years.*

*Key Inv. Hyp. Notes:*    In addition, on this record, an ethical, clean defense attorney *would not have stayed in the case* if they "lacked time to even review basic evidence" or had "no time to retain and hire essential expert witnesses) as Amendola reportedly claims in his "covering-up corruption" motions for additional time and to withdraw (both of which he apparently pre-arranged with Cleland to lose)  and his subsequent affidavits for appellate counsel.   *Given the lack of time, no experts, Amendola and Rominger had no ethical path but to RESIGN from the case and walk away* – but they stayed and participated in what appears to have been a historically uninformed and/or misinformed trial. On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

### 6C18.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

On this record, the dysfunction, misconduct, ignorance of basic-essential science-history, well-documented corruption, and Negligence displayed in the PA v Sandusky investigation and trial are all unprecedented in my 30+ years of experience in dozens of states reviewing hundreds of cases.  Why did such a disastrous investigation and trial take place?

Investigative Hypotheses Questions:   Why were fundamental standards violated including:

-- Where were *ALL interviews NOT properly recorded?  An essential Memory-False Memory-expert witness* was NOT provided to inform jury. On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

-- *A essential FRYE-DAUBERT motion and hearing required in such cases to protect the integrity of the legal system was NOT sought and NOT conducted* , and *secret "off the record" hearings held in a local Motel and not disclosed for YEARS -- to set a "likely-conviction-death-march" trial schedule --* are NEVER, EVER permitted?

113

Why were key issues like the obvious memory contaminative effects of exposure to science-uninformed local therapists Gillum and Macnab (both clearly uninformed proponents of the debunked RRM-MPD-DISS ideology) not properly raised and explained to the jury by expert witnesses at trial? Why was the history of lawsuits and licensing revocations for RRM-MPD-DISS therapists like Gillum and Macnab? Why were the apparent licensing violations and other misconduct by local therapists Gillum and Macnab not fully exposed at trial  (e.g., more evidence should have been gathered but on this record which includes Gillum's book plus public statements by both as well as the "sting investigation" by AJ Dillon plus other evidence, the local science-uninformed therapists Gillum and Macnab committed serious licensing-ethics informed consent violations, as well as unethical dual conflicting role violations, as well as applying-teaching-indoctrinating vulnerable patients in the "pernicious myth" of RRM-MPD-DISS ideology and other ethics-licensing violations NONE of which were raised at trial, nor explained to the jury by an expert in Memory-False Memory-Memory Contamination, etc).

### 6C19.   EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

Not Properly Dealing with Probable Memory Contamination Effects of Science Uninformed Psychotherapist Interviews:  Negligently and/or Improperly Ignoring the Controversial, Malpractice of Recovered Repressed Memory Psychotherapists Gillum, Macnab, and Chambers. –

All attorneys (both sides) also negligently or improperly failed to note and properly deal with and respond to the documented known-to-be often memory contaminating procedures and unethical methods of at least two (and potentially more) apparently poorly trained, science-uninformed psychotherapists Gillum and MacNab, — both of whom appear to have treated alleged victims and both of whom apparently gullibly believe that "recovering repressed (blocked, buried) memories via psychotherapy, via rumination, via interviews with civil attorneys, in "group RRM therapy",  *or other methods) can reliably "bring back" or "reconstruct" or "free up" or "open the door" to "newly reported" trauma memories that are somehow magically accurate representations of real events—a pernicious myth.*

In multiple, previous litigation cases RRM therapists lost malpractice lawsuits and several were prosecuted by State Licensing Boards and lost their license.

There is no evidence in this record that these local therapists were aware of the science debunking RRM-MPD-DISS ideology.  There is no evidence in this record that these local therapists were aware of such ideas being very controversial. *Failure to obtain informed consent from their patients – including informing them of the well-documented controversies of debunking of RRM-MPD-DISS would be unethical misconduct and subject them to potential license revocation.* None of this essential information

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

and analysis was apparently told to the jury. On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

### 6C20.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

**Not Properly Dealing With Probable Memory Contamination Effects of Science Uninformed Attorney Interviews :**   Negligently and/or Improperly Ignoring Potentially Memory Contaminating (Unrecorded) "Interviews with Civil Attorneys Shubin and Andreozzi :  All attorneys (both sides) also negligently or improperly failed to note and properly deal with and respond to — the memory contaminative interview process of several civil attorneys who — like the investigators — appear to have worked to synch with investigators and therapists to manipulate, coerce,  and change he memories of their clients to maximize financial recoveries.  (See, Newly Discovered Evidence of SS-Shubin interview and the Sting Investigation results of AJ Dillon)

Inv. Hyp Note:  It is important to consider that in the recorded discussion of Inv Leiter of April 21, 2011 – *Leiter was apparently TRAINING Attorney Andreozzi (who was improperly present at the interview) HOW to conduct memory manipulative, Confirmation Bias, improper interviews just like Leiter's improper interviews.*  In sum, on this record Leiter was apparently *helping attorney Andreozzi to SUE the STATE for millions of dollars* thus providing more damage/disrepute for PSU. Was this odd result actually predictable as a key political goal of Corbett-Kelley-Fina?

### 6C21.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

MUCH ESSENTIAL EVIDENCE WAS NEGLIGENTLY OR IMPROPERLY WITHELD FROM THE JURY IN THIS CASE:

A leading world expert on memory contamination and trauma memories Prof E. Loftus of the Univ of California wrote a book about the relevant research entitled **THE *MYTH* OF REPRESSED MEMORY but** the jury in the Sandusky trial was never informed of this essential evidence. [7]

The leading world trauma expert, Prof Richard McNally, Director of the Harvard Univ Clinical Psychology program, wrote a book about the relevant science entitled ***REMEMBERING* TRAUMA**, Harvard Press.  (not "repressing trauma" and not recovering memories of trauma and not when memories start to come back about trauma) but the jury in the Sandusky trial was never informed of this essential evidence.

---

[7]  Reportedly, Dr Loftus participated in a *post*-conviction hearing but apparently was only given a very slender, limited file of records to review in this case].

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

The leading expert on cult influence, coercive influence, and indoctrination Prof Richard Ofshe of UC Berkeley wrote a book on RRM cult indoctrination called *MAKING* **MONSTERS** (i.e., how RRM ideology and practices took people with no history of trauma and produced new "memories" that turned their parents into abusive monsters – with NO corroborating evidence and with the FBI investigating and debunking thousands of these cases – just like in Pennsylvania v Sandusky) but the jury in the Sandusky trial was never informed of this essential evidence.

World experts in the history of methodological errors of RRM-MPD-DISS ideology -- Profs Harrison Pope and James Hudson of Harvard Medical School -- wrote an exhaustive review of research on thousands of victims of trauma showing NONE blocked out and later reliably recovered memories – *because humans remember horrific trauma in searing detail and DO NOT BLOCK out such memories* -- but the jury in the Sandusky trial was never informed of this essential evidence.

An entire *medical textbook* was published on the RRM debacle and how lawsuits and licensing revocations cleaned MOST of this destructive ideology out of courts and hospitals but pockets remain. See, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It,* Springer International Publishing, ISBN 9783319633749 -- but the jury in the Sandusky trial was never informed of this essential evidence.

In the *International book on Sex Cases from Oxford University Press* the Oxford Press Editors invited me as an international expert in RRM-MPD-DISS ideology and the related history and legal-science issues to provide a chapter explaining the history of science of debunking and exposing as inherently unreliable (and based on junk science methods/theories) recovered repressed memories like the ones presented to the jury in Pennsylvania v Sandusky. See, Barden, R.C., Memory and Reliability: Developments and Controversial Issues.  In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016 -- *but the jury in the Sandusky trial was never informed of ANY this essential, published, widely discussed evidence.  ...*

On this record, the jury in PA vs Sandusky was uninformed and/or misinformed with regard to essential scientific-history-memory-interviewing and related issues.

**6C22.  Investigative Hypotheses:   Defense Counsel Failed to Retain, Prepare, and Have Testify an EXPERT WITNESS to PROPERLY EXPLAIN TO THE JURY THAT "Fervently-Believed-In-But-False-"Memories" are often not lies :**  A very essential issue for juries to hear and understand in such cases.  Juries often believed (mistakenly) that human memory is like Recording or DVD and can be "played back".  Such jurors are often torn between the "truth or lie" issues – helping them understand that Fervently-Believed-In-But-False-"Memories" are not lies permits jurors to consider

this essential alternative hypothesis in such cases. It is often one of the most powerful pieces of evidence in a case where alleged "memories" with no corroborative evidence are all the jury can consider.

### 6C24.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES: *Errors, and/or Negligence and/or Corruption?*

NO OPINIONS ON MOTIVATION ONLY INVESTIGATIVE HYPOTHESES: Alternative Hypotheses for future potential Investigations into the troubled Pa v Sandusky case.

As a SCIENCE Expert Witness, I, like everyone else, am *not a reliable human lie detector* and thus cannot offer any opinions as to the motivations of anyone engaged in *Errors? and/or Negligence? and/or Corruption?... in this case.*

in this case. To avoid Confirmation Bias and *protect the integrity of the legal system,* I have generated and offered in this report several Alternative Investigative Hypotheses that Federal Anti-Corruption or PA Legislative Committee Investigators could pursue.

### 6C25.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES: *Errors, and/or Negligence and/or Corruption?*

MISCONDUCT THEORY ONE = Did looming Economic Damages taint this case? Was this the motivation for the lawyers and judge joining forces to produce a sabotaged, rapid, and sure conviction?

Did a looming ECONOMIC disaster influence the legal process in this case? How much of this case was driven by corrupt manipulation of the legal system to avoid the threatened and expected NCAA death penalty and the resulting $500 million in economic damages to the local community and PSU?

### 6C25.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES: *Errors, and/or Negligence and/or Corruption?*

MISCONDUCT THEORY TWO = Did the misconduct of Local Civil Attorneys and Therapists taint this case? Were local civil lawyers and therapists contaminating-manipulating vulnerable clients-patients "memories" for millions of dollars in easy payoffs?

How much of this case was driven by corrupt manipulation of the legal system and the minds of troubled young men to obtain payoffs of millions of dollars? Were Attorney SHUBIN-Therapist MACNAB in business together to acquire huge payouts for unvetted, uninvestigated brand-new, "memories" that were formerly "blocked, buried, or dissociated"? How much of this case was driven by local civil *LAWYERS and PSYCHOTHERAPISTS involved in the process of "finding new memories of abuse" with reportedly no competent vetting, no competent investigations, and no corroborative evidence*

117

*required. Is it true that* OVER $100 MILLION has been paid thus far for "memories of abuse" with no corroboration, no competent vetting, and no competent investigation?

-- How many alleged victims "memories" were manipulated thus producing "new memories" following unrecorded interviews/therapy by negligent therapists Gillum and Macnab or by Civil Attorneys Shubin and Andreozzi,?

-- plus the unprecedented, corrupt, "confessed" PA AG systemic Government campaign of memory manipulation (See, Inv Leiter's confession of April 21, 2011 as analyzed in this report),

-- plus the use of local RRM-MPD-DISSOCIATION "true believers" to do "interviews-therapy" with multiple alleged victims resulting in "new memories" of abuse worth millions of dollars to low-income, troubled young men represented by civil attorneys (e.g. Andrew Shubin, JD and Benjamin Andreozzi, JD who reportedly repeatedly "interviewed" witnesses

-- plus the investigative issue of whether Attorneys like Andrew Shubin, JD and Benjamin Andreozzi, JD in multiple unrecorded "interviews" may have offered the low-income, troubled young men MILLIONS of dollars in exchange for "new memories" of abuse? No more factory work with multi-millions in PSU payout dollars the alleged – very wealthy – victims could buy a nice house, a nice car, buy beer, smoke weed, and play video games for life. Is this what happened?  Could the vetting system be improved?

--plus the alleged victims reportedly the novel, very controversial, the "pernicious myth", inherently unreliable, debunked in multiple Frye-Daubert hearings,  RRM-MPD-DISSOCIATION "victim" ideology notions including reporting new "memories" of abuse at age 2, gaining new memories by having conversations with an "inner child" personality, and/or finding new memories that had allegedly been "blocked", "buried" or "dissociated" etc (see detailed analysis of repressed memory statements by witnesses in this report).

-- plus why were lawyers Shubin and Andreozzi reportedly *permitted to attend police interviews with their civil litigation clients, in the same room (!) ...* something I've not seen in any other state over the last 30 years.  The memory contamination concerns are obvious.

.. how much of all this process was due to simple greed amid virtually assured payments of millions of dollars in exchange for a few, new, unverified, unvetted, non-corroborated, changed-over-time alleged "memories" of abuse?


### 6C26.    EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

MISCONDUCT THEORY THREE = Political Forces. How much of this case was the result of a corrupt manipulation of the prosecutorial system to smear and remove two of Gov Corbett's most

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

powerful and persuasive opponents, Pres. Spanier and Coach Paterno, in Corbett's desperate and unpopular political campaign to reduce the PSU budget by over 50% (thus destroying the school? ).

*Investigative Hypotheses and Questions:*  *On this record, PA GOV Corbet was AG then he became GOV. He then appointed one of his close associates Linda Kelly to serve as acting **Pennsylvania Attorney General**. Kelly reportedly proceeded to "go after " Gov Corbet's main political obstacles to his legislative priority of reducing the PSU budget by 50% (FIFTY percent).*

 PSU President G. Spanier – a FAR more educated and NATIONALLY successful public official than PA Gov Corbett could ever hope to be -- was reportedly, a key obstacle to Gov Corbet's most essential legislative-pollical agenda issue.  The other obstacle was renowned football Coach Joe Paterno, one of the most famous and revered coaches in the history of college sports.  These two powerful, persuasive defenders of PSU posed very real political dangers to Gov Corbet – did he act through proxies like Kelley and Fina to take them out?

Federal Investigator J. SNEDDEN – the best trained and most competent investigator in this case by far -- spent months on a very detailed investigation of Spaniers Federal Military-Intelligence Secrecy Clearance and Snedden's report noted that Spanier was a very highly regarding person not just in PA but nationally in the US-Military and Law Enforcement and Intelligence Communities. Snedden's report found Spanier not guilty of any misconduct but was in contrast very highly thought of at PSU, nationally, at the DOD, at the DOJ, at the CIA, etc etc.

Thus on this record, PSU Pres. Spanier was thoroughly investigated by experienced Federal Investigator Snedden and fully cleared of any wrongdoing. On this record Inv. See, Snedden Federal Investigation of PSU President Spanier's Federal Security Clearance, finding Spanier did nothing wrong. Snedden also found the changing, morphing story of a "shower attack" from highly controversial witness Mike McQueary ( the story used to "take out" Spanier and Paterno ) "*made no sense*".

Federal Investigator Snedden noted that McQueary's father, Dr Drunov, and Joe Paterno had *unanimously contradicted McQueary's sA5tory*. In addition, Snedden found it "made no sense" that a 6ft 5in 250+ pound agile athlete like McQueary would not have acted *immediately* to save a child being horrifically attacked just a few feet away.  In contrast, to Snedden, Corbett's ally-protege Kelley and "proven-to-be-a-improper" prosecutor FINA attacked Spanier and Paterno.

**See, https://www.mcall.com/news/mc-xpm-2012-11-01-mc-penn-state-president-graham-spanier-sandusky-20121101-story.html.**

**See,  Ex-Penn State president charged in Jerry Sandusky case.**  By John L. Micek and Peter Hall and Of the Morning Call … HARRISBURG —

When it really counted, three top administrators at Penn State University engaged in a "conspiracy of silence" to cover up child sex-abuse allegations against retired assistant football coach

Jerry Sandusky.  *Those were the words Pennsylvania Attorney General Linda Kelly (Corbet's protege and ally) used Thursday* as she made the announcement Nittany Nation had been expecting for months: that former Penn State President Graham Spanier has been charged in the Sandusky scandal.        "This was not a mistake. This was not an oversight. This was not misjudgment," Kelly said during a news conference at the state Capitol. "This was a conspiracy of silence."  …  **In a statement, Spanier's attorneys dismissed the charges as a "farce" and accused Gov. Tom Corbett, who initiated the Sandusky probe while serving as attorney general from 2004 to 2010**… *"These charges are the work of <u>a vindictive and politically motivated governor</u> working through an un-elected attorney general (Corbett's close ally who he appointed) Linda Kelly, whom he appointed to do his bidding* and who will be a lame duck five days from now," the statement jointly attributed to lawyers Timothy K. Harris, Elizabeth Ainslie and Peter F. Vaira reads.

Under questioning from reporters, *Kelly, a former federal prosecutor <u>who worked for Corbett when he was U.S. attorney for the Western District,</u>* defended the investigation.

See, https://www.mcall.com/news/mc-xpm-2012-11-01-mc-penn-state-president-graham-spanier-sandusky-20121101-story.html

**Also see March 9, 2011 – Fierce POLITICAL battle between Gov Corbett and PSU Pres. Spanier.  Corbett seeking a 50% reduction in PSU budget.**  "Yesterday morning, many in the Penn State community tuned in to PCN to watch Governor Tom Corbett announce his budget proposal, one chockfull of budget cuts. According to the Patriot News, nearly $850 million was cut from this year's budget by "eliminating funding for 103 budget lines, reducing funding for more than 150 appropriations and consolidating 55 others." *Corbett's plan included <u>a massive and unprecedented cut to Penn State's appropriations</u>– an overall reduction of at least $182 million, not including various other cuts hidden in the many pages of the budget, cuts associated with Penn State's massive array of extension programs. <u>The cut reduces Penn State's appropriation by more than 50%,</u> down from about $330 million this year.* Penn State officials had been anticipating budget cuts– the poor financial standing of our state's government is no secret– but according to President Graham Spanier, the university had not imagined that things would be this bad. See, https://onwardstate.com/2011/03/09/gov-corbett-proposes-huge-budget-cuts-for-penn-state/

**March 2011 – PA Governor Tom Corbett *proposed a 52.4% cut in Penn State Univ.  funding. Pres. Spanier pushed back against the proposed cut*** and gave a speech warning such a cut would be "devastating" to PSU. The GOV "got into fighting mode" "starting forcefully attacking PSU".… GOV Corbett is a Lebanon Valley College graduate (private college) and a strong supporter of the voucher system, where individuals can choose to utilize *funding toward private education as opposed to public*

*education* and is thus not fond of PSU and is *not fond of public higher education*. " (See, Snedden Federal Investigation report at pg 24).

   ***Investigative Hypotheses and Questions:*** NOTE the Fierce *political* Battle over the future of public university funding in PA. The battle of Spanier and Paterno vs Gov Corbett. … "During State Budget hearings, other University Presidents would ***defer to Spanier to make the presentation for public funding.*** Gov. Corbett proposed unprecedented major budget cuts to Public Education (50% cut for PSU). When Gov Corbett proposed these major budget cuts to public education, ***Spanier was the natural leader to lead the fight*** (against Corbett). Spanier's impression was that as someone who was very confident, persuasive, well-known and strongly opposing Gov Corbett's position (his main Legislative goal?), this must have greatly irritated Gov. Corbett. " **See, e.g. Snedden Federal Investigation report at pg 89.**

   ***Investigative Hypotheses and Questions:*** Federal Agent Snedden's investigation showed Pres Spaneir to be BY FAR the most competent and Nationally Successful person in the PA v Sandusky case story – along with Joe Paterno. See, *Snedden Federal Investigation* -- Interview report … "Spanier is very committed to making life better for people and was a great representative of Penn State. … Spanier was the most knowledgeable University President in the USA regarding collegiate athletics." See, Snedden Federal Investigation report at pg 92.

   See, Snedden Federal investigation re: Pres Spanier's US DOD, CIA, FBI consulting and U.S. Security Clearance history.
   — former PSU President, G. Spanier Board Memberships -- Graham Spanier, former President of PSU, has served as a **board member** for the following national boards of directors/trustees:
   — Association of American Universities, where he **served as chair,** 2007–08
   — Association of State Universities and Land-Grant Colleges, where **he served as chair,** 2001–02
   — Big Ten Conference Council of Presidents/Chancellors, where he served as chair
   — National Collegiate Athletic Association Division I, where **he served as chair** and was a member of the Association's executive committee, 1997–2001
   — Kellogg Commission on the Future of State and Land-Grant Universities for the Association of Public and Land-grant Universities, where **he served as chair,** 1996–2000
   — University Corporation for Advanced Internet Development (Internet2), where he was a founding member, 1997–2000
   — Child Fund International (formerly Christian Children's Fund), 1985–94; **chair**, 1992–94
   — Worldwide Universities Network, where he served as a **founding member and vice-chair**, 2000–07
   — National Council on Family Relations, where he served as president from 1987 to 1988
   — Universities Research Association, 2001–05
   — Business Higher Education Forum, 2005–11
   — Council on Competitiveness, 1998–2011
   — United States Department of Education Commission on Opportunity in Athletics], 2002–03

— U.S. Presidential Policy Advisory Board on Information Technology, **served as chair,** 1997–99

— Joint Commission on Accountability Reporting in Higher Education, 1994–97

— Association of Academic Health Centers Council on Health Sciences and the university, where he **served as co-chair,** 1996–99

— Joint Committee on Higher Education and the Entertainment Communities, where he **served as co-chair**, 2002–06

— National Security Higher Education Advisory Board, where he served as chair, 2005–11

— United States Steel Corporation, where he served as independent director and was a member of both the Audit Committee and the Corporate Governance & Public Policy Committee, 2008–11

— Citizens Financial Group, where he served as director, 2002–11

— Junior Achievement Worldwide, where he served on the Board of Governors, 2003–2011

— FM Global Insurance Company, where he served as director, 2010–12

— Bowl Championship Series, where he served as chair of the Presidential Oversight Committee

— In addition, Spanier served on the board of advisers for the U.S. President at the Naval Postgraduate School and Naval War College.

**-- Spanier served as _Chair_ of the Association of American Universities and _Chair_ of the Association of Land Grant Universities and on the _Board_ of the World Universities.**

**– Spanier was obviously FAR more credible, educated, and nationally successful that Gov Corbett – is that why Kelley and Fina targeted Spanier?**  (See, Snedden Federal Investigation report)

     **Also, Spanier was very involved nationally with ...**

— **National Counterintelligence Working Group,** 2005–11

**-- Advisor to the U.S. Department of Defense, (DOD)**

**-- Advisor to the Central Intelligence Agency (CIA),**

**-- Advisor to the Federal Bureau of Investigation (FBI)  See, Snedden Federal Investigation.**

**November 10, 2011 – Following the (pre-planned?) media firestorm** Graham B. Spanier resigned (negotiated as "without cause" thus not terminated) as President of Pennsylvania State University AND retained at that time his full faculty status as University Professor, and Professor of Human Development and Family Studies, Sociology, Demography, and Family and Community Medicine.  (See, Snedden Investigation Report at pg. 24).  d Dr. Spanier retained his U.S. Military Intelligence security clearance at that time following the detailed investigation report by Federal Investigator Snedden which cleared Spanier of any wrongdoing.  (See, Snedden Investigation Report at pg. 4).

     **Note:**  "_Spanier feels that his departure was retribution by Gov Corbet for his speaking out against Corbett's proposed PSU budget cuts_.  (See, Snedden Investigation Report).

     Snedden found that "Spanier had no knowledge of any circumstances involving Sandusky beyond the one meeting with Curly and Schultz who reported **McQueary's vague "concerns" that McQueary**

**did NOT report to police** ... Spanier attributed his departure as President of Penn State to a "Media Frenzy" and a "Rush To Judgment". Spanier had no contact with Mike McQueary.  Spanier served as Chair of the Association of American Universities and Chair of the Association of Land Grant Universities and on the Board of the World Universities.  (See, Snedden Federal Investigation Report at pg. 25-27).

Spanier was also on the Board of U.S. Naval Post Graduate School, Advisor to the U.S. Department of Defense, (DOD) Advisor to the Central Intelligence Agency (CIA), Advisor to the Federal Bureau of Investigation (FBI) – *Subject had a great reputation with those agencies.*  The circumstances surrounding Spanier's departure from the PSU Presidency does not adversely impact his judgement, reliability, or ability to safeguard national security information. *Spanier has a very high repuation and very high character, has very high moral character, is very responsible and takes on hard issues.... Spanier holds positions on various boards specifically the Board of US Steel, The Big Ten, The NCAA, the Association of Undergraduate Universities, etc.*  (See, Snedden Federal Investigation Report at pg. 40-43).

See, Snedden Federal Investigation Report at pg 75.  "Spanier's reputation as President was very high. *Spanier holds a very high standing, was a well acknowledged leader, one of the top guys in this field. Spanier's character and stature are very high.* Spanier is responsible, reliable, friendly, gets along well with others and is enthusiastic."  [ NOTE: Compare Snedden's character judgment regarding Spanier to the "character" of the reprimanded, disbarred, sentenced, fired, "secret meeting attending", recused, "porno addict", apparently sabotaged trial performance, attorneys and judges involved in PA vs Sandusky.].

**Snedden Federal Investigation at pg 86 and 87 ... eg.**  Spanier said Curley identified the source of the "concerned" Graduate Assistant to be Mike McQueary. (" NO rape was ever reported only "horseplay" and "wrestling" and McQueary was only expressing "concerns".

*Joe Paterno, Dr Drunov, Curley, Shultz, and McQueary's father reportedly all agreed that M. McQueary told them nothing about criminal abuse in the shower – only vague "concerns" and "horseplay". .  Upon detailed questioning from mandated reporter Dr Drunov, McQueary stated he saw NO crime of abuse. Apparently, No crime of abuse was reported to police by Mr. McQueary.* This information is consistent with the investigative hypothesis that the attack on Spanier and Paterno was a political smear with no factual basis. Is this yet another Indicia of Corruption in the PA Legal System? Will these questions be properly investigated in public Legislative and/or Federal hearings?


### 6C27.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

Expert Witness Report of R Chris Barden, Ph.D., JD.    January 18, 2023

_Investigative Hypotheses and Questions:_ **_Was there a Secretly Collusive Investigation with FINA and FREEH and the NCAA?_**

Freeh Group Investigator Ms McChesney's Secret Diary reportedly showed unethical, corrupt collusion in the supposedly "independent" investigation of the Freeh Group working with the "since proven to be an improper - license suspended - lawyer" Fina of the AG's Office. (See filed Motions with Exhibits).

**_Reportedly:_**

The Penn State BD of Trustees Special Investigative Task Force engaged the Freeh Law Firm (FLF) to "perform an _independent, full and complete investigation_ of the recently publicized allegations of sexual abuse… and the alleged failure "to report such sexual abuse to appropriate police and government authorities" …

The Freeh investigative team co-leader _Kathleen McChesney reportedly created a SECRET DAILY DIARY_ that summarized daily briefings — including contacts with the Office of Attorney General and Frank Fina.

On Nov 4, 2019 Defense appellate lawyer Mr Lindsay reportedly received a copy of Ms McChesney's "secret" diary.  Later, Defense Appellate attorney Lindsay reportedly received copies of "summaries of emails" from and to Freeh Group team members investigating this case as well as Defense Trial Lawyer documents and an Affidavit from Defense Attorney Amendola. The "secret diary" appears to _document substantial, secret, and collusive communications and sharing of information_ between the AG's Office and the Freeh team in direct contradiction to the public claims of an "independent investigation".  _These communications apparently included "information, even testimony, from the special investigating grand jury_ then in session (was this a _criminal_ violation of Grand Jury secrecy rules? )".

In sum, on this record, evidence (e.g. Freeh investigator McChesney's personal daily diary) indicates there was _never any independent investigation by the AG or Freeh Group as they were intensively and secretly sharing information throughout this process. In sum, claims of "independent investigations" appear to have been manipulative, deceitful, and false and issued to cover a corrupt, deceitful process to "control the narrative"._

_Note the conclusions of other reports regarding the Freeh Group report:_

-- "Louis Freeh produced a report with conclusions that were not supported by his own investigation, contrary to the terms of his engagement with University, in order to promote his own business interests"  See, 2018 - PSU BD of Trustees Report on the Freeh Report Flawed Methodology

-- Penn State's Board scapegoated some of the University's most loyal, honorable, and longstanding servants in a misguided attempt to quickly put the cisis behind them. See, 2018 - PSU BD of Trustees Report on the Freeh Report Flawed Methodology

-- Governor Corbett slashed the University's funding and *then actively influenced the handling of the Sandusky crisis in ways that harmed the Commonwealth's land grant University*, an institution he was obligated to support both as Governor and as a Trustee.  See, 2018 - PSU BD of Trustees Report on the Freeh Report Flawed Methodology

As a result of our full, fair, and thorough review of the Freeh investigation source materials, we repudiate the conclusions of the Freeh Report.  See, 2018 - PSU BD of Trustees Report on the Freeh Report Flawed Methodology, See also, Thornburgh, "Review of the Freeh Concerning Joseph Paterno,", February 6, 2013., See also,lawsuit of Corman and McCord vs. NCAA and PSU, December 15, 2014., See, Van Natta, "Court Documents indicate NCAA and Freeh Investigators worked together on Penn State Nittany Lions investigation. ESPN, November 12, 2014,  Senator Corman Sues NCAA to Keep Penn State Fine Money in PA, Centre Daily Times, January 5, 2013, Home, K. "New Emails Show NCAA Helped Freeh In Investigation. Onward State, Nov 12, 2014. ; How Penn State Turned a Crisis Into A Disaster: An Interview with Crisis Management Pioneer Steven Fink." Harvard Business Review, Sept 15, 2014. ;  Thompson, C. Penn State Alumni Trustees Win Battle to Review Freeh Report Files, PennLive.com, November, 19, 2015. ;  See, Freeh Group Diary, ; See Freeh, McNeill, McChesney June 25, 2012, and Email exchanges, and other evicence.

### 6C28.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:  *Errors, and/or Negligence and/or Corruption?*

Investigative Hypotheses and Questions: Indicia of Misconduct and/or Negligence in the FREEH GROUP investigation – Secret collusion with the PA AG (Fina)?

Was the AG/FREEH Investigation actually secretly and fraudulently *Collusive and not "Independent"* as was reportedly claimed by Freeh Group, the OAG, and the NCAA?    Were the massive errors and omissions in the FREEH GROUP report deliberate machinations to facilitate the AG-Corbett narrative?

*Why did the attorneys and judges in this case (including all attorneys on all sides) negligently or improperly fail to notice and properly deal with and respond to*

—the obvious and serious FRYE issues in this case with regard to the inherent unreliability of therapy-interview-tainted, "buried", "blocked", "repressed", "recovered", "dissociated" and other types of of abnormal and controversial RRM-MPD-DISS "memories" thus contaminating the integrity of the PA legal system

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

-- no competent expert witness testimony on Memory-False Memory-Interviewing Methods to explain the relevant science and history to the misled, uninformed, and/or misinformed jury.

-- Inv. Leiter's historic discussion of an infamous Memory Manipulative interviewing scheme

-- and other obvious, serious flaws in the investigation and trial of this matter as detailed in this report. Why did the "experts" at Freeh Group not notice (or deliberately hide) all of these errors? For $8 million, one might expect the Freeh Group to have noticed and reported on at least a few of the historic evidence of Negligence or corruption in this troubled case.

Many other reports have found faults in the Freeh report one concluding *the Freeh Report was a failure that does not meet the basic requirements of a thorough, objective and fair investigation.* [8]

---

[8] "*Former U.S. Attorney General and former PA Governor Dick Thornburgh* concluded in a February 10, 2013 report, "*A RUSH TO INJUSTICE THE FAILURE OF THE FREEH REPORT, that the Freeh investigative methodology was flawed, the factual findings limited and incomplete, and its observations about Joe Paterno unreliable and unfounded." And...* "The lack of factual support for the Freeh Group's Special Investigative Council's *inaccurate and unfounded findings* related to Mr. Paterno and its *numerous process-oriented deficiencies was a rush to injustice and calls into question the credibility of the entire Report.*" ... *He concluded that the "The Freeh Report is factually wrong, speculative and "fundamentally flawed."* Other experts on the report included: top FBI profiler Jim Clemente, prominent Washington attorney Wick Sollers and the director of The Johns Hopkins Sexual Behaviors Consultation Unit, Dr. Fred Berlin. They Concluded that , conclude that *the Freeh Report was a failure that does not meet the basic requirements of a thorough, objective and fair investigation.*

Among other findings, the experts determined that the conclusions of the Freeh Report are based on raw speculation and unsupported opinion—not facts and evidence. "*The Freeh report is a profound failure," Sollers said. "It isn't a little wrong on the minor issues. It is totally wrong on the most critical issues.* That the board and the NCAA relied on this report, without appropriate review or analysis, is a miscarriage of justice."

"Former attorney general Dick Thornburgh noted *Freeh's failure to conduct interviews with most of the key witnesses is a glaring deficiency.* ... Freeh investigators did not have subpoena power, and *no one testified under oath.* Worse, **witnesses were allowed to speak anonymously**, something that would never happen in a legitimate legal proceeding.

The conspiracy claim made by the Frdeeh report based on *a string of three (out of 100,000) emails* falls apart under scrutiny. Because of a an email system technology change in 2004, *most of the Penn State emails for the time in question are not accessible.* Moreover, there are no emails authored by Joe Paterno and none that he received. ... On August 22, 2012, Tim Lewis, a former federal appeals court judge issued *a strong condemnation of the Freeh Report* at a press conference in Philadelphia. Lewis's scathing attack on the Freeh Report stimulated some reporters, bloggers, and analysts to dig deeper into Freeh's report and question its truth.

Groups such as Penn Staters for Responsible Stewardship deconstructed the Freeh Report, exposing serious flaws. Other reviews include Ray Blehar, a former U.S. intelligence analyst, Eileen Morgan, a U.S. government technology analyst, and others. ... Freeh's negligent and defective report simply *assumes without credible evidence* that McQueary explicitly reported a sexual act to coach Paterno; It then *assumes without credible evidence* that either Paterno or McQueary reported a sexual act to either Curley, Schultz or both; It next *assumes without credible evidence* that either Curley or Schultz reported a sexual assault to Dr. Spanier. Curley and Schultz have denied that they ever told Dr. Spanier anything of the sort. Dr. Jonathan Dranov, a close friend to the McQueary family who heard McQueary's first-hand account of what happened just hours after the incident occurred, and who testified at Sandusky's trial, has consistently stated that he asked McQueary if he had witnessed any sexual contact or abuse. McQueary replied, unequivocally, "no." Moreover, the law requires any physician who receives information about the sexual abuse of a child to report it immediately. Nothing McQueary told Dr. Dranov suggested to the doctor a need to do so".... "A 2002 article in Salon summed up how some observers have criticized Freeh's time as Director of the FBI: "It's no secret the FBI suffered a series of embarrassments during Freeh's tenure, some of them deadly. They include the botched handling of the investigations into Waco and Ruby Ridge; the bombing at the Atlanta Olympic Village and the heavy-handed tactics used against Richard Jewell; the breakdown of the FBI crime labs; the inept pursuit of suspected atomic spy Wen Ho Lee; the belated discovery of turncoat agent Richard Hanssen; and

**6C29.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:**  *Errors, and/or Negligence and/or Corruption?*

**Investigative Hypotheses and Questions:**  Indicia of Negligence and/or Misconduct in the FREEH GROUP investigation?  Was grossly improper interview methodology permitted as reported by multiple interviewees at PSU?

Evidence of improper leading-suggestive, abusive and potentially fraudulent, improperly-improperly *unrecorded interviews* by Freeh Group investigators as reported by PSU faculty witnesses. Note when investigative interviews are NOT properly recorded it becomes impossible for investigators to convincingly rebut allegations that improper-coercive-threatening-repetitive-memory contaminative practices were used or statements of witnesses were improperly mis-reported.

See, evidence in The Report to the Board of Trustees of the Pennsylvania Univ" submitted June 29, 2018). "*Multiple individuals… told us they were "subjected to coercive tactics when interviewed by Freeh investigators….." Interviewers shouted, were insulting, and demanded specific information* (e.g. tell me that Joe Paterno knew Sandusky was abusing kids!".... Some *interviewees were told they could not leave until they provided the information interviewers wanted, even when interviewees protested that this would require them to lie*"… "Some individuals were called back for *multiple interviews where the same questions were repeated*; some were told they were being "uncooperative" for refusing to untruthfully agree, with an interviewer's statement. Those who were currently employed by the University, had been *told their cooperation was a requirement for keeping their jobs*.  One individual indicated that *he was fired for failing to tell the interviewers what they wanted to hear*; this is confirmed by a notation in the FREEH group diary of an interviewee contemporaneously reporting his firing to the investigators. Another entry in the diary indicated that "*coaches are scared for their jobs*". It is deeply disturbing that members of our community were allegedly *subjected to harassment and mistreatment at the hands of Freeh Groups investigators*. Further, the use of coercion indicates a lack of neutrality on the part of investigators and as previously noted, increases the likelihood of inaccuracy."

---

the failure to deliver thousands of documents to defense attorneys during the trial of Oklahoma City bomber Timothy McVeigh." … "On June 24, 2014, when an arbiter for the Pennsylvania State Employee Retirement System, hearing an appeal of a ruling about Sandusky's State pension, said in his ruling, "[The Freeh Report] was *based on significant hearsay and was mostly ruled inadmissible* [for the proceedings]." The hearing officer, Michael Bangs, went on to declare that *the Freeh Report had been misleading in significant ways.* He continued, "*The terrifically significant disparity between the findings in the Freeh Report and the actual truth is disturbing."* He adds that the error "calls into question the accuracy and veracity of the entire report."

**6C30.** **Investigative Hypotheses and Questions:**  Investigative Hypotheses and Questions: Indicia of Negligence and/or Misconduct in the FREEH GROUP investigation – Multiple "rookie" mistakes in the negligent/corrupt Freeh Group Investigation. (See, Thornburgh report noting Freeh Group errors and other critical reports from PSU BD members and others from various sources).

*Investigative Hypotheses and Questions:*

Why did the FREEH GROUP report *negligently fail to document, review, and be concerned about:*

-- the *lack of a FRYE hearing,*

-- evidence of highly controversial, junk science "recovered memories" at trial,

-- the lack of peer reviewed science on Memory and False Memory explained to the jury at the trial,

-- the lack of a competent Memory-False Memory expert in this complex-non-normal memory RRM-MPD-DISS case with little evidence but changing "memories",  Inv. Leiter's April 21, 2011 recorded statement regarding abusive repetitive interviewing methods, and the other errors documented in this report including:

--the multiple "recovered repressed memory" allegations – like those excluded in other states following a Frye or Daubert hearing

-- the failure of Defense Counsel to provide a Memory-False Memory Expert Witness for the jury

-- the failure of Defense Counsel to provide an expert to explain the history of the thousands of false memories debunked by the FBI (Ken Lanning) and the history of the Memory Wars including licensing revocations for RRM-MPD-DISS therapists like Gillum and Macnab.

-- the evidence of dramatic "memory changes" in witness following interviews-therapy with Attorney Shubin and/or Therapist Macnab?  (See, Motion for a New Trial On the Ground of After-Discovered Evidence and Request for Evidentiary Hearing filed June 16, 2022; (See, Transcript of Shubin-Alleged victim SS's discussion and Affidavit from Attorney D. Litman ; See, Transcript of AJ Dillon Investigation and Affidavit from AJ Dillon).

Will these investigative hypotheses and questions regarding potential Corruption/Negligence in this case be properly investigated in a public forum?


**6C31.  EXPLORING CURRENT INVESTIGATIVE HYPOTHESES:** *Errors, and/or Negligence and/or Corruption?  Protecting the integrity of the legal system.*

Will there be PA Legislature Oversight Committee hearings publicly investigating this case? Will such hearings provide everyone involved a full, fair, and proper opportunity to answer questions and explain in a public forum the multiple, unusual errors in this case and why they happened?

Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023

-- Consider for example, Cleland, Fina, and Amendola's apparently **"secret Motel meeting"** that seems to have set this case on a "likely-conviction-death-march" trial schedule. Why was this meeting not held in court? Why no court reporter? Why no recording? Why was this meeting hidden from defense co-counsel Rominger? Why was this meeting kept a secret until *4 years after* the trial and conviction? Has Judge Cleland held other secret "off the record" meetings in other cases? If so, what cases?

-- Consider for example, Inv. Leiter's April 21, 2011 recorded discussion of a "Systemic Memory Manipulation Process" in this case. Why did Inv. Leiter believe he "knew" what the witnesses' testimony was "supposed" to be and thus keep interviewing them via repetition and repetition until they agreed with him? Was Inv. Leiter aware of the McMartin, Wenatchee, Kelly Michaels and many other cases where convictions were overturned for abusive interviewing misconduct similar to what Leiter describes in his recorded discussion in the April 21, 2011 recording of witness BH?

-- Consider for example, defense counsels' failure to retain and provide an expert witness in memory-false memory-RRM-MPD-DISS. Why did Amendola-Rominger fail to retain and consult with a memory-false memory-RRM-MPD-DISS Scientist (not a therapist) expert?

-- Consider for example, defense counsels' failure to file Frye motions, *and the many other related errors listed in this report*. Why did Amendola-Rominger FAIL to file a Frye motion to exclude the "changing" "morphing" alleged "memories", memories the witnesses claimed were "buried", "blocked" and/or "dissociated" thus clearly-not-normal memories? Had Amendola even heard of a Frye hearing? Was he aware of cases similar to the Sandusky case that ended when such an unreliable "memory" process -- of unknown origin, rejected by the relevant scientific community and with no known error rate -- was excluded, along with all such tainted witnesses, *to protect the integrity of the legal system*?

-- Consider for example, the question of whether Judge Cleland held other secret, "off the record" meetings at a local motel to set "impossibly rapid" impossibly rapid trial schedules? *Is this the only case where such a secret motel meeting setting a very rapid "impossibly rapid" trial schedule was held?* If other secret Motel meetings were held – in what cases? Was this an improper agreement to control the trial process? Has anyone asked these rather obvious questions previously?

-- Shouldn't Cleland-Fina-Amendola have a fair, open and public opportunity to testify about why they participated in the reportedly secret-unrecorded-no court reporter meeting in a local Motel that apparently set a "likely conviction impossibly rapid" trial schedule that was so rapid and in such a complex trial that:

-- precluded competent review of evidence – which would have taken a full year by any attorneys and more for the local, poorly trained, science-uninformed Amendola-Rominger.

-- precluded a competent memory-false memory expert – required in such cases,

-- precluded competent cross-examination of witnesses – grossly incompetent during trial

-- precluded having the alleged victim AM testify who would have destroyed the credibility of the key prosecution witness Mike McQueary (Did Attorney Shubin commit criminal Obstruction of Justice by hiding witness AM so he could not testify?)

-- precluded holding an essential Frye hearing to exclude witnesses whose "memory" testimony was based upon the ***inherently unreliable, novel, pernicious myth notions rejected by the relevant scientific community*** notion of "blocked, buried, dissociated memories" that "come back" following unrecorded interviews with financially conflicted civil attorneys (Shubin) and science-uninformed "therapists" (Macnab)?

-- Shouldn't Freeh and McChesney and Fina and NCAA lawyers have a fair, open and public opportunity to testify about the reported secret collusion in the production of the Freeh Report and about the many "rookie", negligent errors in the Freeh report and investigation as listed in this report and other reports (cf. with the Corman, PSU Trustees, Thornburg, Snedden and other reports). Shouldn't Freeh-Kelley-Fina-Corbett have any opportunity to testify about publicly claiming that the FREEH investigation was "independent"? Was it? Didn't the PSU BD as well as the NCAA both state they relied upon the "independent" Freeh investigation when Ms. McChesney's diary, a key Freeh Group investigator reportedly documents many Secret and Extensive contacts between AG team and the FREEH team? Were there Grand Jury leaks and other information shared between the AG and FREEH investigators?

### 7.    DR BARDEN WILL OFFER PROBONO TESTIMONY:

**7A.    PA LEGISLATURE:**  I offer to testify as a pro bono donated service in any *PA Legislative public hearings* investigating the negligent and/or criminal debacle and alleged conspiracies involved in the PA v Sandusky case.  This testimony is offered as a pro bono donated service to the people of Pennsylvania to ***protect the integrity of the legal system.***

**7B.    PA LICENSING BOARDS:**  I offer to testify as a pro bono donated service in any PA *Licensing Board hearings* investigating the negligent and/or criminal misconduct by Therapists Gillum, Macnab, Chamgers or others involved in the PA v Sandusky case. This testimony is offered as a pro bono donated service to the people of Pennsylvania **to *protect the integrity of the legal and mental health systems*.**

### 8.    IT IS MY OPINON TO A REASONABLE DEGREE OF PROFESSIONAL CERTAINTY THAT THE ANALYSES AND CONCLUSIONS IN THIS REPORT ACCURATELY REFLECT KNOWLEDGE, RESEARCH, AND METHODOLOGIES THAT ARE WIDELY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY.

In my opinion, the analyses and opinions in this report reflect the knowledge, research and methodologies of the relevant scientific and professional communities.  For example, I have written Amicus Briefs on similar complex science and history issues joined by many international leaders in the fields of psychology and psychiatry.  See e.g., also Barden, R. C. (2006) Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, Feb., 2006 with AMICI Aaron T. Beck, Robert Spitzer, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi  Breslau and more.

### 9.    I HAVE PREVIOUSLY TESTIFIED REGARDING SIMILAR ISSUES IN A NUMBER OF JURISDICTIONS:

I have been qualified as an expert and testified in court and/or given depositions and/or submitted expert reports in a number of jurisdictions across the United States on similar subjects.  I have also testified before several state legislatures (NH, AZ, UT, CO, etc). My testimony in these venues often focuses on a range of issues including but not limited to: child and developmental psychology, methodological principles and errors, ethics violations, proper and improper investigation methods, standards of care in psychotherapy for all therapist professions, memory contaminative effects of improper questioning of witnesses, assessments of the reliability and validity of therapist-expert witness practices, the science of coping and resilience,  testing and assessment, psychopathology,  the science and history RRM-MPD-DISS memory-false memory-memory contamination, the history of the mental health system, and related matters as discussed in this report. .

### 10.    BASES FOR MY EXPERT OPINIONS IN THIS MATTER:

My opinions in this matter are based upon my education, knowledge, training, and years of experience in the fields of adult-clinical, child-clinical, and forensic psychology as well as my extensive review of case materials in this matter.  My relevant experience in these fields includes:

FORENSIC TRAINING and TEACHING:  I received forensic training at the joint Harvard Medical School/ Harvard Law School forensic training program. I have taught forensics at the Univ of MN Law School and at CLE, CME, CPE talks to thousands of professionals across the US as well as at invited talks to the American Psychological Association, the American Psychiatric Assn, the American Bar Association, and others.

PSYCHOTHERAPY TRAINING, EXPERIENCE and TEACHING:  I have provided psychotherapy to numerous patients including children, families, and adults (in schools, clinics, and hospitals), as well as training psychology graduate students in interviewing and psychotherapy standards and methods. I have done therapy-counseling with hundreds of patients/people in a wide range of settings including Stanford and the U of MN medical Schools, the Palo Alto VA Medical Ctr/Stanford Medical Ctr APA approved Internship, the Mental Health Clinic of the Stillwater Maximum Security Prison in MN, the UC Berkeley Psychology Clinic, the U of MN Hospitals, various church counseling settings, the Minneapolis Walk-In Counseling Center, and others.  At the University of Utah APA Approved PhD Clinical Psychology Program I taught and supervised PhD students in how to conduct psychotherapy.  See also, the detailed qualifications chart above that includes a list of therapy experiences.

RESEARCH REVIEW AND ORIGINAL RESEARCH: I have reviewed hundreds of peer reviewed published research studies, serving editorial roles for multiple leading professional journals, and initiating, as well as conducting and publishing original research in the leading journals in child psychology, social psychology, personality psychology, surgery, public policy and legislation. More specifically, I have published in, and/or served as an editor or reviewer for, several of the most highly regarded journals and texts in a number of professional fields including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation;

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

RECIPIENT OF NATIONAL RESEARCH AWARDS in PSYCHOLOGY: including the Foundation for Child Development National Award for Young Scholars in Social and Affective Development, 1982 - 1983 and the National W. T. Grant Foundation Faculty Scholar Award for Research in Mental Health, Stress and Coping 1987.  Both awards are relevant to my analysis in this case;

TEACHING AND TRAINING.  I have given invited addresses and advanced courses at major Ph.D. graduate programs, a leading law school, and continuing education courses for Psychologists, Psychiatrists and Attorneys. I have also trained investigators including F.B.I., Sheriff's Officers, and police staff.  I was an Invited Training Speaker at the Minnesota Sex Crimes Investigators Association (1994) and Invited Training Speaker at the Midwestern Sex Crimes Investigators Association.  I also served as a Special Assistant Attorney General of the State of Utah as a trainer and consultant on cases involving licensing prosecutions of mental health professionals.

### EVIDENCE REVIEWED IN THE PA v SANDUSKY CASE and RELATED ISSUES:

-- Evidence including trial-hearing transcripts, motions, exhibits, media, books, etc., the Freeh Report, Corman Report, Thornburgh report, PSU BD report, Snedden Federal Investigation Report, and other information as listed in this report.

-- Published Research on Memory, False Memory, Dissociation, and many other areas as cited and discussed in this report.

## PUBLIC SERVICE EXPERIENCE

-- Psychology Practicum - University of Minnesota Medical School, Dept. of Psychiatry

-- Psychology Practicum - Stillwater Minnesota Maximum Security Correctional Facility

-- Psychology Practicum - Minneapolis, Minnesota Public Schools

-- APA Approved Psychology Internship - Palo Alto V.A. Med Ctr/ Stanford U. Med Ctr.

-- Psychology Consultant Craniofacial Surgical Team, Baylor Medical School, Dallas, Tx

-- Psychology Consultant Craniofacial Surgical Team, Primary Children's Hospital, SLC, UT

-- Harvard Law School Intern, Mass. A.G.'s Office, Crime Victim Compensation Program

-- Chief Author and Legislative Consultant, Emergency Medical Systems for Children Act

-- Forensic Psychology Intern, Harvard Medical School/Harvard Law School Forensic Program, Massachusetts Mental Health Center

-- Member, Minnesota State Board of Psychology (Appointment of MN Governor)

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

-- Member, Minnesota Higher Education Coordinating Board (responsible for overseeing the MN. multi-billion-dollar budget for all state colleges, universities and trade schools) by appointment of Governor Arne Carlson (1993-1994))

-- Invited Training Speaker, Minnesota Sex Crimes Investigators Association (1994)

-- Invited Training Speaker, Midwestern Sex Crimes Investigators Association (1995)

-- Invited Training Speaker, US Surgeon General's Conference

-- Consultation with the U.S. Attorneys Office, F.B.I., other national experts

-- Court appointed expert witness, St Croix, Wisconsin

-- Legislative Consultant, Legislation to ban "Holding Therapy" in Utah

-- Legislative Consultant, Legislation to ban "Rebirthing Therapy" in Colorado

-- Author, Emergency Medical System for Children Act

-- Consultant, Minnesota law protecting patient's rights

-- Consultant to various State Boards re: licensing actions

-- Special Assistant Attorney General for the State of Utah (2004-2005).

-- Expert Witness for the Prosecution, State of Colorado v. Watkins, et al. (Newmaker "rebirthing therapy" case) 2001.

-- Expert Witness for the Prosecution, State of Texas v. Harris, (MPD "Twilight Rapist" case) 2011.

-- Prosecution consultant King County, Seattle, Washington (Green MPD case 2003).

-- Prosecution consultant U.S. Attorney's Office, Houston, Texas U.S. v. Peterson, et al.

-- Testifying and consulting expert witness, U.S. Federal Public Defenders Office

-- Consultation with national experts in law and psychology

-- President, Board Member - Character & Morality in Entertainment (CAMIE Awards) 2008-2010

-- Invited International Address on Performance Psychology, Beijing Olympics (Aug-2008)

-- Legislative Consultant, Minnesota Legislation to ban abuse of incompetent patients in research studies  See, 253B.095 RELEASE BEFORE COMMITMENT (2012)  *The treating psychiatrist must not be the psychiatrist conducting the psychiatric clinical drug trial. The court must determine that, under the circumstances of the case, the patient is competent to choose to participate in the trial, that the patient is freely choosing to participate in the trial, that the compulsion of the stayed commitment is not being used to coerce the person to participate in the clinical trial, and that a reasonable person may choose to participate in the clinical trial."*

-- Pro bono consultation and testimony for Prosecution and Public Defender cases in many states

-- Invited address, Center for Enhanced Performance, US Military Academy, West Point (4-2010)

-- Invited address, F.B.I. Midwest Regional Supervisor Training Conference, (9-2010)

- Invited address, F.B.I. Midwest Regional All-Employees Training Conf., (12-2010)

- 2012 - Captain, US Air Force Auxiliary Civil Air Patrol - Viking Wing, MN

- Reforming the EMERGENCY MEDICAL SYSTEM FOR CHILDREN -  See,  Barden, R. C., Kinscherff, R., George, W., Flyer, R., Seidel, J., & Henderson, D., (1993), Emergency Medical Care and Injury Prevention Systems for Children:  An Economic-Medical-Legal-Psychological Analysis and Legislative Proposals, Harvard Journal on Legislation, Vol. 30, No. 2, pgs 461497.   Some version of this proposed legislation was reportedly enacted by the States of New Jersey (1992), Texas (1993), Utah (1994), Colorado (1995), Hawaii (1996), Louisiana (1996) and others.  These legislative ideas have continued to expand across the U.S.  As of July 1997 18, states reported the creation of a separate Emergency Medical System for Children Advisory Board (as required by this legislative proposal) and 15 states required pediatric representation on State EMS Advisory Boards. (See, EMSC News, Vol 10, No. 2, Summer 1997).

**8.     LIMITATIONS ON THIS REPORT and TESTIMONY:**  My opinions and hypotheses in this matter are subject to the limitations of all documentary and related evidence, the impossibility of absolute predictions, as well as the limitations of social science analysis. I have not met, nor interviewed, nor evaluated, nor assessed, nor produced any diagnoses nor psychological diagnostic descriptions of anyone in this investigatory process.  As always, I have no expert opinions regarding the veracity of witnesses, the judgment of juries, or the guilt/innocence of any defendant.  I will continue to review evidence in this case and update opinions.  My opinions are thus subject to change at any time as new information becomes available to me including any observations, analyses, and opinions from observations at future public hearings, court hearings, or any future re-trial of this matter.  I continue to seek to review all relevant evidence in this case. Only the trier of fact can determine the credibility of witnesses and how scientific research may or may not be related to the specific facts of any case.  In my opinion, a key role of an expert witness is to help the court, lawyers, parties, and the public understand and apply reliable and proper scientific, technical, and investigative principles, hypotheses, methods, and information *to protect the integrity of the legal system*. I have transmitted this updated expert witness report to the PA office of Attorney Al Lindsay, JD for use consistent with the rules of the relevant jurisdiction.

**9.     My investigation of this complex and important matter continues and updates to this report are expected.** For future updates, I hope to have time to do a more thorough organization and editing process plus fully citing more of the evidence on this very complex case. There simply wasn't enough time for such finishing touches on this version of the report.

**Expert Witness Report of R Chris Barden, Ph.D., JD.   January 18, 2023**

I, R. C. Barden, Ph.D., JD, do swear and affirm the truthfulness of this expert witness report as filed and signed on January 18, 2023

**EXPERT REPORT E-Signed, Dated:  January 18, 2023**

*R. Christopher Barden, Ph.D., J.D.*

_____

**R. Christopher Barden, Ph.D., J.D.**

**Investigating Expert Witness in Pennsylvania v Sandusky**

A key role of an expert witness is to help the court, lawyers, and/or parties understand and apply reliable scientific, technical, ethical, and investigative principles, methods, alternative hypotheses, and information."

CONFIDENTIALITY NOTICE:  The information transmitted by this email communication, including any additional pages or attachments, is intended only for the addressee and may contain confidential and/or privileged material. Any interception, review, retransmission, disclosure, dissemination, or other use and/or taking of any action upon this information by persons or entities other than the intended recipient is prohibited by law and may subject them to criminal or civil liability. If you received this communication in error, please contact us immediately at 801-230-8328 or rcbarden@mac.com, and delete the communication from any computer or network system.

_____

136