**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW
<u>IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE</u>**

**NESENOFF & MILTENBERG, LLP**
**Philip A. Byler, Esq.**
**Andrew T. Miltenberg, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
<u>**pbyler@nmllplaw.com**</u>
***Attorneys for Plaintiff John Doe***

## TABLE OF CONTENTS

**Page**

TABLE OF OPPOSITION EXHIBITS ("Opp. Ex.")……………………………………………iii

TABLE OF AUTHORITIES…………………………………………………………….....v

DISCUSSION OF DEFENDANT'S ARGUMENTS……………………………….………..1

A.    Purdue's Disciplinary Process Is Criticized By Judge Barrett In Upholding John's
      Title IX Claim and Is Properly At Issue As Irregularities Evidencing Gender Bias……….1

B.    Arguments Regarding Expungement Is For The Court Following A Jury
      Verdict; the Seventh Circuit Upheld John's Right To Injunctive Relief,
      Including Expungement ……………………………………………………………2

C.    John's Supplementation Was Good; A Large Record Exists Showing The Loss
      of Navy ROTC and Navy Opportunity; John Has Disclosed His Employment and
      Educational History; Suspension Not A Subject Of Social Media and Current
      Employment………………………………………………………………………...3

D.    Emotional Damages Are Not Being Sought By John; John's Mental State
      Is Relevant To Post-Suspension Issues That Defendant Wishes To Raise………………4

E.    Dr. Stan V. Smith Is An Economist Giving Damages Testimony On Lost Wages
      and Benefits and Value of Life ("Hedonic Damages") – Only The Latter Is At Issue;
      Loss Of Value of Life Is A Recognized Form of Economic Damages ………….……..…..5

F.    Dr. Barden Provides Proper Expert Testimony; The Court Has Stated that The
      Court Is Not Barring Any And All Opinions Of Dr. Barden At Trial; The Court
      Granted Leave To John To Submit A Revised Report, and John Did Submit
      Such A Document Conforming To The Court's August 11, 2022 Opinion………………..7

G.    Purdue's "Golden Rule" Objection Is A Non-Issue…………………………………….9

H.    Purdue Again Shows Its Rejection Of The Seventh Circuit Opinion: Purdue
      Wrongly Seeks Banning Mentioning The Seventh Circuit Opinion and The
      Procedural History Except For Spoliation (Which Is What Should Not Be Mentioned)…..9

I.    Statements In The Press and Opinions of Non-Parties Reflect The Public
      Interest In The Case and Criticism of Purdue's Position …………………………………11

J.    Sending A Message and Punitive Damages Objections Are Non-Issues…………………12

K.    The Impact On John's Family and Friends Is A Fair Subject For Testimony……………..12

i

L.    Purdue's Request To Ban Argument and Evidence Regarding Education
      And Career Hypotheticals Is A Brazen and Misconceived Attempt To Ban
      John's Damages Case Relating To Purdue's Sex Discrimination; John Has
      Complied With Rule 26(a)(1)(a)(iii) of the Federal Rules of Civil Procedure ……………13

M.    Purdue's Request To Ban Argument and Evidence Regarding Purdue's Other
      Title IX Cases Means Purdue Cannot Argue That This Case Is Abnormal
      For Purdue……………………………………………………………………………...16

N.    Exclusion Of Reference To Purdue's Liability Insurance Means Purdue Cannot
      Argue That A Damage Award Would Take Money Away From Education……………...…17

O.    Purdue Seeks To Ban Evidence and Contentions About The History, Purpose or Intent
      of Title IX But Purdue's Proposed Jury Instruction No. 14 on Title IX Does Not
      Include Instruction on the History, Purpose or Intent of Title IX Whereas Plaintiff
      John's Proposed Jury Instruction No. 14 Asks The Dispositive Title IX Question………17

P.    Purdue Seeks To Insulate Purdue's Objections To John's Discovery
      While Falsely Claiming Spoliation Over 11 Irrelevant Snapchat Pictures……………….…17

Q.    The Sexual Relationship That John and Jane Had Initiated By Jane Is Part Of
      The Facts of The Case and That Investigators Ignored It Points To Investigator Bias…....18

R.    Jane's Mental Health, Because of Her Suicide Attempt, Is
      Part Of The Facts of The Case and Points To Investigator Bias…………………….….21

S.    John's Religious Upbringing Is Part Of The Facts of The Case and
      Helps Explain The John-Jane Texts…………………………………………………...24

T.    Purdue Seeks To Ban "Offer of Judgment" and Settlement
      Discussions But Cannot Then Claim John Wants Only Money…………………………..25

CONCLUSION…………………………………………………………………………...25

**<u>TABLE OF OPPOSITION EXHIBITS ("Opp. Ex.")</u>**

Opp. Ex. A: *Doe v. Purdue* Opinion of the Seventh Circuit, June 28, 2019

Opp. Ex. B: Re-Argument Transcript, December 19, 2022

Opp. Ex. C: John's Supplementation, March 16, 2023

Opp. Ex. D: John's Memorandum of Law for Due Process Summary Judgment

Opp. Ex. E: John's Memorandum of Law In Opposition To Defendant's Motion
        For Summary Judgment

Opp. Ex. F: Plaintiff's Reply Memorandum of Law in Further Support of John's
        Motion for Due Process Summary Judgment

Opp. Ex. G: John Doe Deposition tr. 41-43, 71-73, 104-105, 113-124, 166-170, 191-192, 194-195

Opp. Ex. I: Noel Perry Deposition

Opp. Ex. H: Rodney Hutton Deposition tr. 14, 27, 49-50, 54-55, 71-73

Opp. Ex. J: Dr. Stan V. Smith Report

Opp. Ex. K: Chart of Cases Where Dr. Smith's testimony on hedonic damages admitted

Opp. Ex. L:  Stokes opposition to exclusion in *Stokes v. John Deere Seeding Grp.*,
        DE 71 in No. 4:12-cv-4054-SLD-JAG

Opp. Ex. M: Revised Barden Report, March 16, 2023

Opp. Ex. N: Snapchat Listing Exhibit

Opp. Ex. O: Plaintiff John Doe's Mother Deposition tr. 44-46, 74-75, 94-101

Opp. Ex. P: Plaintiff John Doe's Father Deposition tr. 23, 31-32, 37, 40-41, 65-66

Opp. Ex. Q: Plaintiff John Doe's Roommate Deposition tr. 137-138, 140-141

Opp. Ex. R: Plaintiff Fourth Amended Rule 26 Disclosure Statement

Opp. Ex. S: Hutton Deposition Ex. I, Pl Opp DSJ Hutton Ex. I (NSTC 0005-0006)

Opp. Ex. T: John Declaration, February 18, 2021

Opp. Ex. U: SJM 33: 02/16/2016 Student of Concern Report (PU 32-33)

iii

Opp. Ex. V: Sermersheim Deposition tr 12-14

Opp. Ex. W: Oliver Deposition tr. 24, 27, 49

Opp. Ex. X: Amberger Deposition tr 25-26, 67, 88

## **TABLE OF AUTHORITIES**

**Page**

**Cases**

*Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715 (7th Cir.2001)…………………………………..…..10

*Cummings v. Premier Rehab Keller*, __ U.S. __, 142 S.Ct. 1562 (April 28, 2022)…………....…4-5
.
*Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016)………………………………………………..……2

*Doe v. Oberlin*, 963 F.3d 580 (6th Cir. 2020)…………………………………………………….2

*Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858 (8th Cir. 2020)……………………...……2

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) …………………………………………1-4, 11, 17, 24-25

*Doe v. Regents of the Univ. Of Cal.*, 23 F.4th 930 (9th Cir. 2022)…………………………….....2

*Dura Auto Sys. Of Ind. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002)…………………………….8

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
    2023 U.S. Dist. LEXIS 20323 (N.D. Ill. Feb. 7, 2023)………………………………………8

*McCleland v. Montgomery Ward & Co.*, 1995 WL 571324 (N.D. Ill. Sept. 25, 1995)……………20

*McQuiston v. Helms*, 2009 WL 554101 (S.D. Ind. Mar. 4, 2009)…………………………………17

*Menaker v. Hofstra*, 935 F.3d 20 (2d Cir. 2019)…………………………………………………2

*Neurografix v. Brainlab, Inc.*, 2021 U.S. Dist. LEXIS 20719 (N.D. Ill. Mar. 17, 2021)…………..13

*Park v. Secolsky*, 787 F. App'x 900 (7th Cir. 2019)………………………………………………20

*Smith v. United States,* 293 F.3d 984 (7th Cir.2002)…………………………………………...10

*Stillman v. Norfolk & Western Railway Company*, 811 F.2d 834 (4th Cir. 1987)…………………17

*Stokes v. John Deere Seeding Grp.*, DE 71 in No. 4:12-cv-4054-SLD-JAG,
    Opposition to Exclusion……………………………………………………………………7

*Stuhlmacher v. Home Depot USA, Inc.*, 2012 WL 5866297 (N.D. Ind. Nov. 19, 2012)……………8

*Taylor v. Union Pacific R.R. Co.*, 2010 WL 5343295 (S.D. Ill. Dec. 21, 2010)…………………17

*Warren v. Prejean*, 301 F.3d 893 (8th Cir. 2002)………………………………….……….....20

## Constitutional Provisions, Statutes and Court Rules

Title IX, 20 U.S.C. §1681……………………………………………….………………*passim*

Rule 26(a)(1)(a)(iii), Federal Rules of Civil Procedure…………………….…………………….13

Rule 37, Federal Rules of Civil Procedure………………………………………………………..13

Rule 401, Federal Rules of Evidence.………………………………………………….....17

Rule 402, Federal Rules of Evidence.………………………………………………….….17

Rule 403, Federal Rules of Evidence.………………………………………………...…………17

Rule 412(a), Federal Rule of Evidence………………………………………………….....19-20

Rule 701, Federal Rules of Evidence ………………………………………………….………15-16

Rule 702, Federal Rules of Evidence………………………………………………….....……16

## Other Authorities

R. Posner, *Economic Analysis of Law*, at 184 (8th ed. 2010)………………………………… 6

Plaintiff John Doe ("John"), by counsel, respectfully submits this Memorandum of Law in opposition to Defendants' motion to exclude 20 items of evidence at trial. Defendant Purdue's motion is a brazen attempt to deny John a fair trial by the improper exclusion of highly relevant evidence to prove sex discrimination, to distort the facts untruthfully, and to pave the way for false argument by Purdue and character assassination of John. The motion should be denied.  References to the accompanying Exhibits to this Opposition will be shown by "Opp. Ex. __."

## DISCUSSION OF DEFENDANT'S ARGUMENTS

**A.    Purdue's Disciplinary Process Is Criticized By Judge Barrett In Upholding John's Title IX Claim and Is Properly At Issue As Irregularities Evidencing Gender Bias.**

Purdue requests exclusion of evidence or argument directed to Purdue's disciplinary process, citing the Court's dismissal of the due process claim and non-pursuit of the state law claims (which the Eleventh Amendment precludes litigation in federal court). (Df. Mem. 1-2.)  Wrong.

*First*, during the oral argument on the motion for reconsideration, this Court recognized that the evidence at a Title IX trial would be not much different as for a due process trial.  (DE 221, Opp. Ex. B, Reconsideration Hearing tr 35) ("I haven't heard a lot here, frankly, where I think the trial is going to be significantly different than my Order contemplated.").  This Court's own August 11, 2022 opinion found evidence supporting sex discrimination reviewing the Seventh Circuit opinion, the 2011 Dear Colleague Letter, the investigators' conduct, and the adjudicators' behavior. (DE 206, pp. 18-23.)  Defendant is trying, again, to get this Court to reverse Judge Barrett and also to ignore established case law, but the Court had it right at the re-argument oral argument.

*Second*, the Court's recognition was a correct application of the Seventh Circuit opinion in this case when upholding the Title IX claim, *Doe v. Purdue*, 928 F.3d 652, 667-670 (7th Cir. 2019) (Opp. Ex. A), was, in the backdrop of the 2011 Dear Colleague Letter, a biased decision-making process, explained by Judge Barrett (928 F.3d at 669):

1

John has alleged such facts here, the strongest one being that Sermersheim chose to credit Jane's account without hearing directly from her. The case against him boiled down to a ''he said/she said''—Purdue had to decide whether to believe John or Jane. Sermersheim's explanation for her decision (offered only after her supervisor required her to give a reason) was a cursory statement that she found Jane credible and John not credible. Her basis for believing Jane is perplexing, given that she never talked to Jane. Indeed, Jane did not even submit a statement in her own words to the Advisory Committee. Her side of the story was relayed in a letter submitted by Bloom, a Title IX coordinator and the director of CARE.

For their part, the three panelists on Purdue's Advisory Committee on Equity were similarly biased in favor of Jane and against John. As John tells it—and again, we must accept his account as true—the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account. They made up their minds without reading the investigative report and before even talking to John. They refused to hear from John's witnesses, including his male roommate who maintained that he was in the room at the time of the alleged assault and that Jane's rendition of events was false. And the panel members' hostility toward John from the start of the brief meeting despite their lack of familiarity with the details of the case—including Jane's depression, suicide attempt, and anger at John for reporting the attempt—further supports the conclusion that Jane's allegation was all they needed to hear to make their decision.

It is plausible that Sermersheim and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man. . . .

*Third*, it is established case law that an inference of sex discrimination may be drawn from procedural and adjudicative irregularities. *Menaker v. Hofstra,* 935 F.3d 20, 34 (2d Cir. 2019); *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 864-865 (8th Cir. 2020); *Doe v. Oberlin*, 963 F.3d 580, 588 (6th Cir. 2020) citing *Doe v. Purdue*; *Doe v. Regents of the Univ. Of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022) ("[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise.").

## B. Arguments Regarding Expungement Is For The Court Following A Jury Verdict; the Seventh Circuit Upheld John's Right To Injunctive Relief, Including Expungement.

Purdue seeks to exclude argument concerning the content of disciplinary records or expungement. (Df. Mem. 2.) While during the course of trial, it will naturally come up that there

is a disciplinary file and what it contained because of what was sent to the Navy ROTC, argument

to the Court concerning expungement of disciplinary records will follow a jury verdict.  What the

Court should do is not allow Purdue to argue that John is out only for money damages, which is

what Purdue counsel falsely asserted in oral argument to the Seventh Circuit.  Injunctive relief is

critically important in this case, Judge Barrett's opinion is clear in upholding injunctive relief for

the Title IX claim, 928 F.3d at 670, and that injunctive relief includes expungement, 928 F.3d at

667.  At oral argument, all the Seventh Circuit judges on the panel expressed belief that injunctive

relief was available and John was appropriately seeking injunctive relief.

**C.    John's Supplementation Was Good; A Large Record Exists Showing The Loss of Navy ROTC and Navy Opportunity; John Has Disclosed His Employment and Educational History; Suspension Not A Subject Of Social Media and Current Employment.**

Purdue cites another *Doe v. Purdue* case that was before Judge Martin as if it were this case

saying undisclosed information and witnesses would not be permitted and then falsely asserts that

John's Supplementation defies the requirement to supplement his discovery responses and

disclosures. (Df. Mem. 2-3.)  That is as false as false can be.  John's Supplementation, which is

provided here (Opp. Ex. C) but not in Purdue's motion to exclude papers, more than fully satisfies

the obligation to supplement. A cursory examination of John's Supplementation shows it provides

the requested supplementation as to damages, specific interrogatories and specific documents.  It is

telling that Purdue cites no specific deficiency in the Supplementation.

Purdue also falsely asserts that John has disclosed no evidence for his claim of lost

opportunity in Navy ROTC or Navy career.  (Df. Mem. 3.)  That is as false as false can be. A whole

record was built with the Navy depositions that established the only reason for John's

disenrollment, stated in the Navy documents, was the Purdue suspension.  This subject was briefed

at length with record citations and quotations in John's motion for summary judgment (DE 183,

Opp. Ex. D, pp. 23-28) and its supporting Statement of Material Facts (DE 183-1, pp. 23-29) and

John's opposition to Defendant's motion for summary judgment (DE 187, Opp. Ex. E, pp. 24-30, 32-33) and its supporting Statement of Facts and Genuine Dispute (DE 187-2, p. 23-29). John's Reply in further support of summary judgment on due process rejected the argument advanced by Purdue. (DE 191, Opp. Ex. F, pp. 11-14.)  John in deposition gave testimony that Purdue did the investigation upon which the Navy relied. (Opp. Ex. G, John Doe tr.194-195.)

Purdue asserts that John has no record of having enrolled at Purdue or at any other educational institution since the end of 2017. (Df. Mem. 3.)  John has made no claim that he did so enroll, only that (which he has disclosed) he has limited financial means due to the loss of scholarships, but he testified in deposition he does intend to return to school once the distraction of this case is over.  (Opp. Ex. G, John Doe tr. 72, 166-170.)

Purdue misleads by saying that there is no awareness of John's disciplinary suspension with his employers and on social media. (Df. Mem. 3.)  John produced all his social media, which shows he only used it for personal purposes (DE 155, DE 156, Opp. Ex. N), not broadcasting about anything that happened at Purdue.  The jobs John has been able to get have not required disclosure of the Purdue suspension, as they were not federal or military in nature.

**D.    Emotional Damages Are Not Being Sought By John; John's Mental State Is Relevant To Post-Suspension Issues That Defendant Wishes To Raise.**

Purdue slightly misstates *Cummings v. Premier Rehab Keller*, __ U.S. __, 142 S.Ct. 1562 (April 28, 2022) (Df. Mem. 3), but the point is valid that after that decision, a Title IX plaintiff may not seek emotional distress damages.  John's Supplementation (Opp. Ex C), referencing John's Rule 26 Disclosures, identifies the kind of damages John seeks and the basis of their calculation, and emotional distress damages is not one kind of damages that John seeks. Since the April 2022 decision in *Cummings v. Premier Rehab Keller*, John has not been attempting to use emotional distress as a sword for damages.

What Purdue then does, however, is to engage in a *non sequitur* – to assert that also excluded should be references to John's anxiety and stress stemming from Jane's allegations, Purdue's investigation, Purdue's discipline and the impact of the distress on his education and career path. (Df. Mem. 4.) Wrong. There is nothing in *Cummings v. Premier Rehab Keller* that supports that result, and John has testified about his mental state as a shield in explaining the actions he took because Purdue called into question how he did at Purdue (the disciplinary proceeding negatively impacted his academic performance) and what John then did during post-suspension as to employment and education. (Opp. Ex. G, John Doe tr. 41-43, 71-73, 191-192; Opp. Ex. H: Perry Dep.; Opp. Ex. P: Plaintiff John Doe's Father Dep.; Opp. Ex. O: Plaintiff John Doe's Mother Dep.) Purdue has focused on post-suspension events; the Pre-Trial Order reflects, for example, Purdue's intention to call Taylor University witnesses about post-suspension events. It is entirely improper to cut off John, his parents and Noel Perry from telling the truth about such matters. In this connection, Purdue refers to a Navy investigation, but the Navy did not do an investigation; rather, according to Commander Hutton, the Navy referred the matter to Purdue for investigation and the Navy exclusively relied on the Purdue investigation. (Opp, Ex. I, Hutton tr. 14, 27, 49-50, 71-73.)

Purdue raises a red herring when saying John is not equipped to give a clinical diagnosis. (Df. Mem. 4.) What Purdue calls John's self-diagnosis is his factual testimony about his mental state in response to questions posed by Purdue. While Purdue asserts that it anticipates John will testify about his mental state when questioned about his post-suspension employment and educational history, such testimony would be given in response to Purdue posing the questions, thereby opening the door; that testimony is not about side-stepping anything. Furthermore, Noel Perry gives testimony as a trained counsellor about John's mental state. (Opp. Ex. H: Perry Dep.) Exclusion of testimony about John's mental state is not proper.

**E.    Dr. Stan V. Smith Is An Economist Giving Damages Testimony On Lost Wages and Benefits and Value of Life ("Hedonic Damages") – Only The Latter Is At Issue; Loss Of Value of Life Is A Recognized Form of Economic Damages.**

Dr. Smith, an economist, calculates damages in two categories: (i) lost wages and benefits; and (ii) loss of value in life, what sometimes is called "hedonic damages."  Purdue seeks to exclude only the second category of damages, not the first category of lost wages and benefits. Accompanying this opposition is the updated Smith report. (Opp. Ex. J.)

Economics minded Judge Richard Posner of the Seventh Circuit has supported the use of hedonic damages. *See Economic Analysis of Law*, at 184 (8th ed. 2010). Dr. Smith is a nationally recognized forensic economist able to explain to a jury the economic value of the loss of enjoyment of life (hedonic damages) that Defendants' conduct caused John.  Dr. Smith received both a Ph.D in economics and an MBA from the University of Chicago.  Dr. Smith has published more than fifty articles, including numerous articles in peer reviewed journals on the value of life.  He also co-authored a textbook on hedonic damages. (Opp. Ex. J; Opp. Ex. L, p. 2.)

Purdue errs in classifying economic hedonic damages as disallowed emotional distress damages.  Emotional distress damages concern the emotions from what was taken away; a dead person has no emotional distress damages.  Hedonic damages are based on an economic measure of the loss of what existed in terms of a normal life; a dead person may be awarded hedonic damages.  (Op. Ex. K.)  The Smith Report explains what hedonic damages are about:

> Economists have long agreed that life is valued at more than the lost earnings capacity.  My estimate of the value of life is based on many economic studies on that we, as a contemporary society, actually pay to preserve the ability to lead a normal life. The studies examine incremental pay for risky occupations as well as a multitude of data regarding expenditure for life savings by individuals, industry, and state and federal agencies. . . .
>
> **Because it is generally accepted by economists, the economic methodology for the valuation of life has been found to meet the *Daubert* and *Frye* standards by many courts, along with the Rules of Evidence in many states nationwide.** My testimony on the value of life has been accepted in over 275 state and federal cases

6

nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions. Testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate, and supreme courts. Proof of general acceptance and other standards is found in a discussion of the extensive references to scientific economic peer-reviewed literature on the value of life listed in the Value of Life Appendix to this report. . . .

(Opp. Ex. J: Dr. Stan V. Smith Report, p.7; emphasis added.) Accompanying John's opposition is a chart listing the 275+ cases in which Dr. Smith's testimony on hedonic damages has been ruled admissible and Dr. Smith's declaration attesting to the chart of cases. (Opp. Ex. K.)

Purdue tries to attack the reliability of Dr. Smith's calculation of hedonic damages by citing five cases that are range from 10 to almost 30 years old and supplying John Deere's 2013 brief for exclusion in *Stokes v. John Deere Seeding Grp.*, DE 66 in No. 4:12-cv-4054-SLD-JAG. Also accompanying John's opposition to exclusion here is the Stokes opposition to exclusion in *Stokes v. John Deere Seeding Grp.*, DE 71 in No. 4:12-cv-4054-SLD-JAG, that presents a much different view. (Opp. Ex. L.) As Dr. Smith explains in his report in this case, economists measure Value of Life by determining how much society is willing to pay to preserve the ability to lead a normal life. To determine Value of Life, scholars evaluate a plethora of data, including the wage differentials for dangerous jobs. The Value of Life literature is well regarded and universally recognized by economists. (Opp. Ex. J; Opp. Ex. L, p. 3.)

## F.    Dr. Barden Provides Proper Expert Testimony; The Court Has Stated that The Court Is Not Barring Any And All Opinions Of Dr. Barden At Trial; The Court Granted Leave To John To Submit A Revised Report, and John Did Submit Such A Document Conforming To The Court's August 11, 2022 Opinion._____

Purdue objects to Dr. Barden testifying based on various purported technical reasons that rely, mistakenly, upon the Court's striking of Dr. Barden's original report. (Df. Mem. 6-8.) Defendant's flawed approach makes three mistakes that deprive it of any merit.

*First*, Purdue ignores the fact that this Court in his August 11, 2022 opinion, while striking the Barden report, also expressly states on page 11 of the Court slip opinion: "The Court is not

barring any and all expert opinions Dr. Barden may offer." (DE 206, p. 11.) This part of the August 11, 2022 opinion was what sparked the discussion at the Court pretrial conference on March 14, 2023, about Dr. Barden as a trial witness, John's counsel saying Dr. Barden could testify in conformity with the Court's August 11, 2022 opinion, defense counsel saying they did not have a report, and John's counsel saying the report is to give notice of Dr. Barden's opinions and Purdue certainly has that notice already. Given the Court's statement in his August 11 2022 opinion "The Court is not barring any and all expert opinions Dr. Barden may offer" (DE 206, p. 11), Purdue's argument about John not seeking to move for relief from the striking of the Barden report is mistaken, based on not recognizing what this Court wrote about not barring Dr Barden from testifying at trial.

*Second*, Purdue ignores the fact that in response to Purdue's complaint that it did not have a replacement report by Dr. Barden, the Court ordered that John provide a revised report. The Court's Order from the March 14, 2023 pretrial conference states, among other things: "Pltf to provide Dft with document re expert opinion addressed during conference by 3/21/2023." (DE 234.) In fact, John delivered a revised Barden report on March 16, 2023, which is well before 30 days prior to the scheduled trial. Purdue objects to John including in his Supplementation reference to the revised Barden report as if he had just stuck it in. This Court, however, had granted leave to John to supply such revised report, and the Supplementation correctly incorporated reference to it. It follows that Purdue's citations to *Stuhlmacher v. Home Depot USA, Inc.*, 2012 WL 5866297 (N.D. Ind. Nov. 19, 2012), *Dura Auto Sys. Of Ind. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002), and *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 2023 U.S. Dist. LEXIS 20323 (N.D. Ill. Feb. 7, 2023), as to unauthorized reports are to entirely inapposite cases. In *Stuhlmacher*, the plaintiffs did not have a Court Order to serve what was a reply expert report and just served it to the defendant. In *Dura Auto,* there was no earlier report, and the plaintiff did not have a Court

Order to serve what was a late expert report and just served it to the defendant. In *In re Testosterone Replacement Therapy*, the plaintiff did not have a Court Order to serve what was a supplemental expert report and just served it to the defendant. Here, in contrast, John served the revised Barden report per a Court Order to satisfy the Court's August 11, 2022 opinion on expert testimony.

*Third*, Purdue fails to explain how the revised Barden report delivered on Mach 16, 2023 to Purdue (Opp. Ex. M) did not conform to the Court's August 11, 2022 opinion on expert testimony. Purdue just disparages Dr. Barden's revised report in a one-line hit and run attack as repackaging. Not true. Dr. Barden goes to great lengths to explain methodology and the support for the methodology he uses. Dr. Barden's revised report reflects his knowledge as a psychologist and an expert in investigations, and he is well qualified to opine about the shortcomings of Purdue's investigation and adjudication. Dr. Barden, in analyzing the shortcomings of Purdue's investigation and adjudication in John's case, explains what principles he is applying, how they are generally accepted, and how he reliably applies those principles.

**G.** **Purdue's "Golden Rule" Objection Is A Non-Issue.**

Purdue asks that John be precluded from making what Purdue calls a "Golden Rule" appeal – asking the jury to put itself in Plaintiff's position. (Df. Mem. 8-9.) There is nothing that John's counsel has ever said that would indicate John's counsel would make a specific request that members of the jury put themselves in John's position. John's counsel sees the task as how to present the facts of John's case to persuade the jury of Purdue's violation of Title IX; that presentation will provide the necessary understanding of John's conduct.

**H.** **Purdue Again Shows Its Rejection Of The Seventh Circuit Opinion: Purdue Wrongly Seeks Banning Mentioning The Seventh Circuit Opinion And The Procedural History Except For Spoliation (Which Is What Should Not Be Mentioned).**

In a request that reflects Purdue's continuing rejection of the Seventh Circuit opinion and Purdue's knowledge that the procedural history of the case before this Court does not reflect well

9

on Purdue (and it doesn't), Purdue seeks to ban mentioning the Seventh Circuit opinion and the procedural history of the case before this Court except for spoliation. (Df. Mem. 9-10.)

It is not appropriate for a District Court to ban mentioning the governing U.S. Court of Appeals opinion in the case. Purdue does disrespect the Seventh Circuit for its opinion in this case, but that is not something to which the Court should give expression. Nor is banning mentioning the procedural history of the case make any sense when it is not known how the subject would arise. Purdue's desire to escape the consequences of its litigation excesses is not something to which the Court should give countenance. In response to Purdue's questions about his post-suspension plans, John may have to say that this case has taken longer than expected. In response to Purdue's questions about any purported failure to do discovery or in response to any spoliation,, John may have to say that he produced all of the documents he had about the events of the case (including 133 pages of text message between Jane Doe and him), gave cell phone information and ten separate medical authorizations, and answered three sets of interrogatories (including work histories), produced all of his Instagram posts and produced the 75 Snapchat videos and pictures he had.

If anything should be banned, it is the subject of spoliation. This Court never finalized its decision with an award of attorneys fees, and so now is the appropriate time to revisit the subject. As noted, John produced all of the documents he had about the events of the case (including 133 pages of text message between Jane Doe and him), gave cell phone information and ten separate medical authorizations, and answered three sets of interrogatories. In response to Purdue's demand for all of John's post-suspension social media posts, John produced all of his Instagram posts and produced 75 Snapchat videos and pictures he had. (DE152, DE156; DE175.) Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001). Purdue had the Instagram and Snapchat production at the time of taking John's

deposition but never marked any as deposition exhibits and never asked John any questions about them.  Purdue never used any of social media in the summary judgment papers.  The whole spoliation argument strangely ignored all the discovery John complied with and focused on what little John did not have (11 Snapchat pictures out of 86).  This Court acknowledged "there is nothing in the record to indicate whether the [deleted] files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not inconceivable" the 11 Snapchat personal posts might be potentially relevant to John's desired Navy career without giving an explanation how it was at all conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing in the spoliation hearing record showed it wasn't (Opp. Ex. N).

## I.    Statements In The Press and Opinions of Non-Parties Reflect The Public Interest In The Case and Criticism of Purdue's Position.

Purdue seeks exclusion of statements in the press and opinions of non-parties (Df. Mem. 10) in a request that reflects Purdue's awareness that there has been press coverage of the case and that Purdue's position has been criticized.  When the *Doe v. Purdue* ruling of the Seventh Circuit was issued, there was reporting on it. M. Odendahl, "Purdue Ruling First In Flood Of Campus Sex Assault Appeals," *The Indiana Lawyer*, July 24, 2019.  When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention.  Defending Judge Barrett's opinion in the Wall Street Journal was noted Title IX commentator K.C. Johnson, "Sex, Due Process and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020.  Purdue's response, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020, received uniformly negative response from on-line reader comments.

There is nothing that John's counsel has said or done that would indicate John's counsel intends to put in evidence opinions of non-parties stated in the press (which excludes the qualified expert opinions of Dr. Barden and Dr. Smith). No such press statements and opinions published in

11

the press are listed by John in the Pre-Trial Order. John's counsel is more concerned that Purdue's

admissions in its Answer to the Second Amended Complaint are properly put in evidence.

**J.**     **Sending A Message and Punitive Damages Are Non-Issues.**

In a request that reflects Purdue's unease about being perceived (accurately) as a bad actor

in this case, Purdue seeks to exclude argument to the jury about sending a message to Purdue and

about punitive damages. (Df. Mem. 10-11.) There is nothing that John's counsel has said that

indicates an intention to argue punitive damages to the jury and that the jury should send a message

to Purdue. A verdict for John will be message enough to Purdue.

**K.**     **The Impact On John's Family and Friends Is A Fair Subject For Testimony.**

In a request that reflects Defendant's knowledge that John's suspension adversely affected

John's family and friends and that such adverse effect gives an understandable human dimension

to the case, Purdue seeks its exclusion from trial. (Df. Mem. 11-12.) Purdue's rationale is that the

impact of John's suspension on family and friends is not probative of gender bias. That, however,

misses the point of such evidence. The impact of John's suspension on is family and friends is

relevant to reputational damages and the post-suspension events upon which Purdue focuses. It is

not proper to allow Purdue to attack John over post-suspension educational and employment history

but to disallow evidence as to how the suspension affected John's family and friends.

After deposing John's parents and John's roommate, Purdue learned the strength of their

testimony. John's mother testified John went from being a straight-A enthusiastic student playing

soccer in high school to being depressed, unable to focus and concentrate, worrying about what

happened at Purdue to John's parents taking him to counseling because John didn't want to talk to

anybody about anything. (Opp. Ex. O, tr. 44-46, 74-75, 94-101.) John's father testified that John

went from being a straight-A student and involved in athletics in high school to being traumatized

by being suspended at Purdue, losing his scholarships and not being able to get back in ROTC and

as a result, apprehensive around his family, struggling emotionally and depressed at Taylor.  (Opp. Ex. P, tr. 23, 31-32, 37, 40-41, 65-66.)  John's roommate testified that post-suspension, the subject of what happened at Purdue changed John's mood and John lost energy.  (Opp. Ex. Q, tr. 136-137, 140-141.)

**L.    Purdue's Request To Ban Argument and Evidence Regarding Education And Career Hypotheticals Is A Brazen and Misconceived Attempt To Ban John's Damages Case Relating To Purdue's Sex Discrimination; John Has <u>Complied With Rule 26(a)(1)(a)(iii) of the Federal Rules of Civil Procedure.</u>**

In a request that reflects Purdue's unease about damages liability in this case, Purdue seeks to ban argument and evidence regarding education and career hypotheticals.  (Df. Mem. 12-13.) It is a brazen request to cut off a damages case based on a totally false assertion that John has not complied with Rule 26(a)(1)(a)(iii) of the Federal Rules of Civil Procedure and a totally false assertion that John's damages are speculative (which they are not).

*First*, John has complied with Rule 26(a)(1)(a)(iii) of the Federal Rules of Civil Procedure, which provides that a party must provide "a computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered."  Purdue's complaint that John has not done so is not accompanied by John's Rule 26 Statements and Answers to Purdue's Third Set of Interrogatories, which a review of them would show that John has in fact satisfy Rule 26(a)(1)(a)(iii) of the Federal Rules of Civil Procedure. Purdue's citation to Rule 37 of the Federal Rules of Civil Procedure and *Neurografix v. Brainlab, Inc.*, 2021 U.S. Dist. LEXIS 20719 (N.D. Ill. Mar. 17, 2021), are not remotely applicable.

John's Supplementation (Opp. Ex. C) quotes from John's Fourth Amended Rule 26(a)(1)(A) Initial Disclosures (Opp. Ex. R) that in turn are quoted as follows:

Plaintiff John Doe claims the following damages:

(1) Damages from past and future economic losses:

(a) Dr. Stan V. Smith Expert Calculation - $6,271,467

The calculation done by Dr. Stan V. Smith in the produced expert report puts (i) the loss of wages and employee benefits at an upper range of $4,600,700 (loss minus earnings offset) and (ii) the loss of potential value of life at an upper range of $1,670,767.

(b) Loss of Income To Date - $35,000

This amount is based upon a computation of loss of the income in the difference between a commissioned officer's salary ($45,450 based on Monthly Basic Pay Table) and the wages earned in the period June 2019 to April 2020 (with two more months added based on the 10-month average).

(a) Loss of Scholarships - $100,000

This amount is based upon a computation adding the loss of four years of a Navy scholarship to Purdue and of a Presidential Scholarship.

(b) Loss of Future Income - $3,000,000

In the alternative to Dr. Smith's calculations, this amount is based upon a computation of the present value of the difference between a projected income and economic benefits of a career Navy officer minus a projected income and economic benefits of a career white collar employee.

. . . .

(2) Damages from non-economic injuries:

(a) Damages to Reputation - $250,000
This amount is based upon a computation derived from considering jury instructions for awarding defamation damages.

John's Supplementation noted that:

Plaintiff John Doe's Third Amended Rule 26(a)(1)(A) Initial Disclosures, dated February 8, 2021, had the same damages numbers, but Defendants made no follow up discovery request or complaint about insufficiency then. Plaintiff [John]'s answers to Defendants' Third Set of Interrogatories, dated October 30, 2020, had the same damage numbers except for the Smith Report which had not yet been rendered, but [Purdue] Defendants made no follow up discovery request or complaint about insufficiency then either; and that was 2½ years ago.

14

John's Supplementation further stated:

> Just a cursory review of the foregoing disclosure shows that Defendant [Purdue]'s complaint about lacking computations is plainly false. The disclosures state computations:

> Defendants put aside Dr. Smith's report because the Smith Report containing Dr. Smith's calculations was provided to counsel for Defendants. An updated report from Dr. Smith is provided in an accompanying pdf.

> The "Loss of Income To Date - $35,000" is described as "the difference between a commissioned officer's salary ($45,450 based on Monthly Basic Pay Table) and the wages earned in the period June 2019 to April 2020 (with two more months added based on the 10-month average)." The Monthly Basic Pay Table for commissioned officers has been and is publicly available.

> The "Loss of Scholarships - $100,000" is described as being "based upon a computation adding the loss of four years of a Navy scholarship to Purdue and of a Presidential Scholarship." Both scholarships were full-ride, and the Navy scholarship was invoked to cover Purdue tuition and room/board. Defendants have the documents for the Navy scholarship and the Presidential scholarship and their value is known to Purdue. Scholarship documents were produced in the Navy document production and in Plaintiff John Doe's production. The amount for loss of scholarships, however, should be corrected to $75,000 because Plaintiff John Doe lost three years of scholarship, not four, because Plaintiff John Doe did get the benefit of one year of scholarship.

> The "Loss of Future Income - $3,000,000" is described as an "alternative to Dr. Smith's calculations, this amount is based upon a computation of the present value of the difference between a projected income and economic benefits of a career Navy officer minus a projected income and economic benefits of a career white collar employee."

> The "Damages to Reputation - $250,000" is described as an "amount is based upon a computation derived from considering jury instructions for awarding defamation damages."

*Second*, John's damages case is not speculative. Purdue cites Rule 701 of the Federal Rules of Evidence, nothing else, for the proposition that John cannot speculate about a hypothetical alternative career. Rule 701, however, defines permissible lay witness opinion testimony, stating:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

> **(a)** rationally based on the witness's perception;

15

(**b**) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(**c**) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

John is not speculating about a Navy career. He was a scholarship member of the Navy ROTC who was disenrolled solely because of the Purdue suspension; and based on the 2016 information of Purdue's disciplinary suspension for purported sexual misconduct, John would not be recommended for acceptance back in the ROTC. (Opp. Ex. H, Pl Opp DSJ 2: Hutton Dep tr 54- 55. & Opp. Ex. R, Pl Opp DSJ Hutton Ex. S (NSTC 0005-0006).)

It is Purdue that engages in "what if" speculative hypotheticals, and they are red herrings. Purdue asks what if John had returned to Purdue following the suspension, which ignores that Purdue's suspension resulted in the loss of the scholarship money that John would have needed to return to Purdue. Purdue asks what if John had gone to another school or enlisted in the Navy, which attempts to deflect attention from Purdue's defective discriminatory disciplinary process and decision that deprived John of his hope and dream of becoming a Navy career officer. That Commander Hutton did not make a determination that John engaged in sexual misconduct means the Navy relied 100% upon Purdue's disciplinary decision.

Purdue, building on its own speculative hypotheticals, then asserts there is no expert testimony addressing Purdue's speculations – establishing nothing. Dr. Smith's opinions about loss wages and benefits are based on the facts of John's loss of a Navy career caused by Purdue.

**M.    Purdue's Request To Ban Argument and Evidence Regarding Purdue's Other Title IX Cases Means Purdue Cannot Argue That This Case Is Abnormal For Purdue.**

Purdue requests banning argument and evidence regarding Purdue's other Title IX cases. (Df. Mem. 14.) John's counsel does not plan on citing other Title IX cases at Purdue unless Purdue claims that it is inappropriate to award damages; damages were ruled appropriate in *Mary Doe and Jane Roe v. Purdue*, 4: 18-cv-89, DE 188 (N.D. Ind.).

**N.**    **Exclusion Of Reference To Purdue's Liability Insurance Means Purdue Cannot Argue That A Damage Award Would Take Money Away From Education.**

In a request that reflects Purdue's concern about damage liability, Purdue seeks to exclude reference to Purdue's liability insurance. (Df. Mem. 14.) John's counsel does not plan on mentioning Purdue's liability insurance unless Purdue were to argue that a money damage award would take money away from education, which given the liability insurance, it would not.

**O.**    **Purdue Seeks To Ban Evidence and Contentions About The History, Purpose or Intent of Title IX But Purdue's Proposed Jury Instruction No. 14 on Title IX Does Not Include Instruction on the History, Purpose or Intent of Title IX Whereas Plaintiff John's Proposed Jury Instruction No. 14 Asks The Dispositive Title IX Question.**

Purdue seeks to ban evidence and contentions about the history, purpose or intent of Title IX, citing two railroad employee cases arising under the Federal Employers' Liability Act, *Stillman v. Norfolk & Western Railway Company*, 811 F.2d 834 (4th Cir. 1987), and *Taylor v. Union Pacific R.R. Co.*, 2010 WL 5343295 (S.D. Ill. Dec. 21, 2010) (Df. Mem. 15), which were not Title IX cases. Purdue's requested exclusion assumes the Court instructs the jury on the law. But Purdue's Proposed Jury Instruction No. 14 (DE 238, pp. 16-17) does not instruct the jury on the history, purpose or intent of Title IX; and Purdue's Proposed Jury Instruction Nos. 15-16 (DE 238, pp. 20-21) are intended to make Purdue's disciplinary process immune from Title IX challenge contrary to the text of Title IX (which is a non-discrimination statute) and contrary to Title IX as applied by the Seventh Circuit in *Doe v. Purdue*. Plaintiff's Proposed Jury Instruction No. 14 does instruct the jury on the dispositive Title IX question: "The question is do the facts that you find show that the university discriminated against Plaintiff John Doe on the basis of sex?" (DE 238, pp. 18-19.)

**P.**    **Purdue Seeks To Insulate Purdue's Objections To John's Discovery While Falsely Claiming Spoliation Over 11 Irrelevant Snapchat Pictures.**

Purdue, perhaps with a guilty conscience, has "unclean hands" in seeking to ban reference to Purdue's objections to John's discovery. Purdue defends its objections to discovery on the

ground of the Federal Rules of Evidence 401-403 without identifying what those objections were and asserts that such objections would be misunderstood by a lay jury, citing a 14-year old case from the Southern District of Indiana, *McQuiston v. Helms*, 2009 WL 554101, at *12 (S.D. Ind. Mar. 4, 2009). (Df. Mem. 15-16.) There, in a negligence case, the District Court summarily granted four groups of requests for exclusion, including objections to discovery, but did not face the situation present in this case where Purdue at the same time wants to claim spoliation over 11 irrelevant Snapchat pictures. Any treatment of those 11 Snapchat pictures as spoliation would clearly be prejudicial and doubly so if Purdue can posture itself as clean as to discovery. That is what would constitute Purdue not being upfront.

**Q.    The Sexual Relationship That John and Jane Had Initiated By Jane Is Part Of<br>The Facts of The Case and That Investigators Ignored It Points To Investigator Bias.**

Purdue tries to obfuscate by purporting to seek to exclude "Jane's sexual history" (Df. Mem. 16) when what Purdue seeks to exclude is part of the case that for months John and Jane had a sexual relationship, which was initiated by Jane and which was the first in John's life (but not Jane's), that their having a sexual relationship provided context to the accusations made in April 2016 by Jane, and that the Purdue investigators in ignoring that sexual relationship showed bias. John testified to the facts of that sexual relationship in a declaration that was part of the summary judgment record:

> 3.    Both Jane Doe and I were freshmen in the Purdue Navy ROTC program. In mid- August 2015, we both arrived at Purdue. It was early September that at Jane Doe's initiation, she and I became interested in each other and started to spend time together, going to restaurants in town, walking around campus, and spending time in her room. I did not have a girlfriend prior to college, and so Jane Doe was my first girlfriend.

> 4.    About 1 month after Jane Doe and I first began to spend time together, we started having sexual intercourse. The first time, which happened in early October 2015, was in Jane Doe's single room in Wiley Hall. Before that night, I was a virgin. Jane Doe was the aggressor. She engaged me in flirty and suggestive conversation with sexual overtones and was touchy to arouse my sexual

18

desires. Jane Doe led the way by taking off her clothes and helping me take off my clothes.

5.      Jane Doe and I had a sexual relationship from the early October to early December 2015. In that time period, we had sexual intercourse about 15-20 times; several of those times, Jane Doe, at her initiation, performed fellatio on me. Aside from fellatio, our sexual relationship was vanilla and intimate. I had no interest in engaging in deviant sexual acts. All but one of those times having sexual intercourse occurred in Jane Doe's room, with the one exception taking place in my room in Tarkington Hall during the day when nobody was around. About 15-20 times I stayed the night in her room. Jane Doe was almost always the one who initiated having sex.

6.      During the course of our relationship, Jane Doe told me that she had multiple sexual partners before college, and claimed to have a personal history of rape and suicide attempts. On multiple occasions during our relationship, she would, without me, go out to fraternity parties and get severely drunk, later returning to her room and inviting me over, only to spend the whole night vomiting into a toilet while I took care of her. I never had sexual interactions with Jane Doe while she was under the influence of alcohol, and I never drank alcohol myself while underage, nor have I ever had more than two drinks in a night while of age. . . .

(Opp. Ex. T: DE 183-8, pp. 2-3.)

The Purdue investigators ignored the John-Jane sexual relationship, which cast doubt on Jane's accusations of sexual assault and which points to investigator bias. Recognizing the John-Jane consensual sexual relationship and how it came about (i) undercuts Jane's two accusations of sexual molestation, as she was placing them in time when the two had consensual sexual intercourse, (ii) provides context that helps explain the John-Jane texts, and (iii) runs contrary to a notion that males are necessarily the assaulters.

Purdue objects that John's statements are hearsay, but John is giving percipient testimony about his personal experience with Jane. Purdue objects that Jane is not a party, and her statements are not party admissions. But they are admissions against Purdue's case, and Jane, unlike John, has never testified under oath.

19

Purdue invokes Federal Rule of Evidence 412(a), but that Rule does not render inadmissible John's account of what Jane told John about her sexual history. The objected to evidence is being offered to discredit Jane's false allegations about two instances of sexual molestation and show investigator bias in failing to address that John and Jane were engaged in a consensual relationship. John's account is not being offered to prove Jane in fact "engaged in other sexual behavior" or to prove Jane's "sexual predisposition" per Federal Rule of Evidence 412(a). Case law fully supports the admission of the objected to evidence. In *Warren v. Prejean*, 301 F.3d 893, 906 (8th Cir. 2002), the Eighth Circuit stated:

> Warren's testimony about Westerman's statements concerning his own sexual history and preferences is not "other sexual behavior" excluded by Rule 412. By its introduction, Warren merely attempted to discredit Westerman's claims that Warren had sexually harassed him. This evidence dealt only with the relationship between Warren and Westerman and no "other" sexual behavior.

301 F.3d at 906. In *McCleland v. Montgomery Ward & Co.*, 1995 WL 571324, at *4 (N.D. Ill. Sept. 25, 1995), the District Court stated:

> Rule 412 limits disclosure of a victim's sexual behavior or sexual predisposition. Rule 412 is inapplicable here because Montgomery Ward does not proffer plaintiffs' childhood abuse to prove sexual behavior or predisposition. Even if Rule 412 were applicable, Montgomery Ward shows that the evidence's probative value substantially outweighs danger of harm or unfair prejudice.

In *Park v. Secolsky*, 787 F. App'x 900, 906 (7th Cir. 2019), the Seventh Circuit stated:

> Park also argues that the district court erred by allowing the Board of Trustees' counsel to question her at trial about her medical records in which she revealed to her doctor that she had a "new partner." Although the court previously had granted Park's motion in limine to exclude evidence of her sexual predisposition, *see* Fed. R. Evid. 412(a), the court allowed the Board at trial to challenge Park's credibility through questioning about her partner. . . . The records were not impermissibly used to "prove that [Park] engaged in other sexual behavior." Fed. R. Evid. 412(a).

Purdue's objection that the sexual relationship has nothing to do with the issue for the jury is just wrong. The issue before the jury is whether Purdue engaged in sex discrimination, and investigator bias is potent proof that Purdue did discriminate against John on the basis of sex.

**R.  Jane's Mental Health, Because of Her Suicide Attempt, Is
Part Of The Facts of The Case and Points To Investigator Bias.**

In a request that reflects Purdue's knowledge that Jane's suicide attempt undercuts her claim of sexual assault, Purdue seeks to exclude the subject of Jane's mental health, asserting that John's percipient testimony is inadmissible because there is no corroboration. (Df. Mem. 16-17.) Not true. John filed a report with Purdue that is part of the discovery record in this case. (Opp. Ex. U, Sermersheim Dep. Ex. 33; Opp. Ex. V: Sermersheim Dep. tr 12-14.)  John gave testimony about Jane's suicide attempt:

> 8.    On December 13, 2015, I was contacted by Jane Doe. She was in her room in Wiley Hall, and requested that I meet her there. Upon arrival, I immediately saw that her room was in a severe state of disarray. She was quite agitated, railing against her parents and her uncertainty and unhappiness towards her life, and throwing her belongings against the walls. After I consoled her and she had calmed down, she asked to go out for a walk. I accompanied her, and she led us directly to the parking garage diagonally across the street from the armory. Jane Doe led us up to the top floor of the parking garage, and by this point her odd behavior began to give me cause for concern. She then proceeded to try and throw herself off the ledge of the parking garage, all the while trying to convince me to let her do so. This went on for approximately 45 minutes. At one point she had managed to swing her legs over the ledge, and she tried to break free from my grip and jump over the side. The experience upset me, and right after her outburst subsided, she behaved as though nothing of importance had happened. She then proceeded to ask me inquisitively why it was that I was emotionally upset afterwards. She spent the 10-minute walk back to the dorms skipping and singing. From that point forward in our relationship, she implicitly established new physical touching boundaries and enforced them inconsistently. This contrasted sharply with her prior behavior over the previous three months. Jane Doe's personality and our relationship changed following her suicide attempt, although she would behave as though nothing was out of the ordinary. She would also refuse to provide me any explanation as to these changes, only expressing negativity towards me.

> 9.    The investigators, by downplaying Jane Doe's suicide attempt, lose sight of the context of the texts discussed below. Investigator Jacob Amberger wrote in his investigation notes "maybe suicide attempt in December" in response

to my direct statement that she did undoubtedly try to kill herself. The investigation report mitigated this further in stating "[Jane Doe] made statements to him that led him to believe that [she] was considering suicide. He reported that he was concerned about [Jane Doe] so a few days after the statements were made, he invited [Jane Doe] to his residence hall room to watch a movie". These statements underplay the real concerns I had as a result of Jane Doe's suicide attempt.

(Opp. Ex. T: DE 183-8, pp. 3-4.)

John then explains Jane Doe's suicide attempt was the backdrop of the incident a few nights

later when Jane stayed overnight in John's room with John's roommate present.

> 10.    Several nights after the events of December 13, 2015, Jane Doe did stay in my room with me and my roommate Elvin.  As I was still seriously concerned for her well-being, I insisted Jane Doe stay in my room for the night after asking my roommate for his permission that she do so.  Jane Doe slept on the couch. I slept on the floor with my head leaning against the couch. My roommate was in his bed.  After I woke up in the morning, I reached behind me out of concern for Jane Doe, to be reassuring. Sex was not even a thought I had, especially with the recent events on my mind and my roommate in the room. All that was going through my head was getting her through finals week in one piece and doing whatever I could to prevent her from trying to take her own life again. I considered reporting her suicide attempt then, but decided that doing so would likely cost Jane Doe her Navy career, which I believed would most definitely destabilize her mind further. I touched her on her knee (but nothing more), which woke her up, at which time Jane Doe left to return to her dorm, seemingly upset. She later told me that touching her then was not okay, but would not elaborate.

(Opp. Ex. T: DE 183-8, pp. 4-5.)  John in deposition gave extensive testimony explaining how the

suicide report in February 2016 related to the false accusation of sexual assault which supposedly

occurred in December 2015 but which was only made during Sexual Assault Awareness Month in

April 2016, that the John-Jane texts showed there was not a sexual assault when considered in

context and without sex bias, that the suicide attempt ended the sexual relationship and that Jane

framed John for having reported the suicide attempt. (Opp. Ex. G, John Doe tr. 104-105, 113-124.)

John further explained in testimony about how the Purdue investigation showed sex bias

in ignoring the facts of the John-Jane sexual relationship and Jane's suicide attempt in favor of a

distortion of the John-Jane texts:

12.     Jane Doe never accused me in person or via text of what she accused me in the Purdue sexual misconduct proceeding that she initiated in April 2016, four months later.

13.     I provided to the Purdue investigators everything I could think of that was relevant to the false accusations leveled against me, including an extensive list of character references,   explanations countering all of Jane Doe's false statements, an explanation of her mental instability, suicide attempt, my reporting of that suicide attempt, a certificate from a suicide prevention course that I attended shortly after reporting the suicide attempt, and all of the text history I had between Jane Doe and I, which amounted to 134 pages. I also took the initiative and offered them contextual explanations for any texts that I thought looked ambiguous in regards to the short note of allegations that I had received. I took every measure of transparency and thoroughness I could think of, expecting to receive fair treatment from an unbiased investigation. I provided all these to Purdue's investigators at the time of my interview in late April 2016, believing that the amount and content of the information I provided would surely clear my name.

14.     The texts that I voluntarily provided to the Purdue investigators covered the period December 23, 2015 to March 15, 2016, with the majority of the texts dated from December 23, 2015 to January 28, 2016. This stream of communication between Jane Doe and I showed an ongoing intense personal relationship between us from mid-December 2015 well into January 2016, with amicable communications well into February.  The Purdue investigators never questioned me regarding the contents of the texts after I provided them, yet took the time to arrange a *second* interview with Jane Doe, at the suggestion of Monica Bloom, in order to review the texts and hear her interpretation of them. For reference, Monica Bloom was the CARE sexual assault center Director at Purdue University, with a professional background as a lawyer.

15.     None of the 134 pages of text messages referred to what Jane Doe would accuse me of in April 2016.  Our texts reflected the fact that Jane Doe and I did have a deeply personal relationship developed in part through sexual intercourse, and that Jane Doe was enforcing new physical boundaries between us. While doing this, our relationship was still intimate enough that she sent my family Christmas cookies, and we messaged one another frequently. These texts also reflected Jane Doe's difficult relationship with her mother and family, a fact she used at times to answer my questions to her about being unhappy, and also a fact that motivated her unfair behavior towards me. I became more apologetic towards Jane Doe the more she directed negativity towards me; her constant barrages eventually made me believe that I was in part somehow responsible for all her misfortune.  Apologizing to placate Jane Doe was part of how I dealt with her tumultuous emotions throughout the relationship, even more so in the wake of her suicide attempt.

16.     It was only after the disciplinary proceeding was over was I able to review the investigation report. Out of the 134 pages of texts I voluntarily provided

23

the Purdue investigation, the investigators attached only short portions of texts from December 23, 2015, December 28, 2015, and January 14, 2016. The Purdue investigators ignored their respective contexts, and came to the conclusion that my explanations for them were "uncomfortable, awkward, and unconfident", which as discussed below was not true. The investigators wrote what they did despite never asking me about anything, including my or their interpretation of these texts, and after talking to Jane Doe a 2nd time about their interpretation of the texts. The Purdue legal defense followed suit in this same approach on August 18, 2020, focusing on isolated slices of texts as evidence without considering the respective context and questioning me as if the Purdue investigators' misinterpretation of the texts was correct, which it was not.  I did my best to provide context from memory in my testimony, seeing as the context completely changed the understanding from what they wanted the texts to infer.

(Opp. Ex. T: DE 183-8, pp. 5-7.)

Purdue's mistaken attempt to say Jane's credibility is not marred by the suicide attempt misses the larger point.  The Purdue investigators gave short shrift to Jane Doe's suicide attempt (Opp. Ex. W: Oliver Dep. tr. 24, 27, 49; Opp. Ex. X: Amberger Dep. tr 25-26, 67, 88), even though it provided context to the John-Jane texts and called into question Jane's accusations, because the Purdue investigators were intent upon misreading the texts to support finding John responsible. That the Purdue investigators gave short shrift to Jane Doe's suicide attempt supports a finding that the investigators were biased in reporting John was responsible for sexual assault.

**S.     John's Religious Upbringing Is Part Of The Facts of The Case and Helps Explain The John-Jane Texts.**

In a request that reflects Purdue's knowledge that John's upbringing in a conservative Christian home helps explain the John-Jane texts, Purdue seeks to exclude John's religious upbring, saying it is sensitive subject. (Df. Mem. 17-18.)  Purdue says this is sensitive, but John's religious upbringing is part of the facts of the case and helps explain the John-Jane texts.  John testified:

2. My upbringing was in a conservative Evangelical Protestant home with brothers, sisters, a mother, and a father. In high school, I did not have the opportunity to engage in any sexual activity, and I was raised of the mind that I shouldn't engage in sex before marriage.  Sex before marriage was a violation of both my religious obligations and the values my parents instilled in me.

. . .

24

6. Given my conservative Christian upbringing, I had conflicting feelings about the relationship [with Jane].

(Opp. Ex. T: DE 183-8, pp. 1, 3.)  John's upbringing helps explain the John-Jane texts about which John testifies; John felt guilty about having a sexual relationship outside of marriage with Jane, not about any sexual assault of Jane (which did not occur). (Opp. Ex. S: DE 183-8, pp. 16-23.)

**T.    Purdue Seeks To Ban "Offer of Judgment" and Settlement
Discussions But Cannot Then Claim John Wants Only Money.**

Purdue seeks to exclude mentioning Purdue's so-called "Offer of Judgment" and settlement discussions.  (Df. Mem. 18.)   As for the "Offer of Judgment," John's counsel does not plan on mentioning it, as it was perceived as not a bona fide offer and did not include any injunctive-type relief, even of the kind discussed in the settlement conference.  As for settlement discussions, they focused on injunctive-type relief. As noted above (pp. 2-3), what the Court should do is not allow Purdue to argue that John is out only for money damages, which is what Purdue counsel falsely asserted in oral argument to the Seventh Circuit.  Injunctive relief is critically important in this case. Judge Barrett's opinion is clear in upholding injunctive relief for the Title IX claim, 928 F.3d at 670, and that injunctive relief includes expungement, 928 F.3d at 667.  If Purdue argues that John is out only for money damages, the settlement discussions dispositively disprove that.

## CONCLUSION

For the reasons stated above, Defendants' motion to exclude should be denied.

Dated:  **April 4, 2023**

**Respectfully submitted,
NESENOFF & MILTENBERG, LLP**
By: /s/ *Philip A. Byler*
_____
**Philip A. Byler, Esq.
Andrew T. Miltenberg, Esq.
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500**
pbyler@nmllplaw.com
amiltenberg@nmllplaw.com
*Attorneys for Plaintiff John Doe*

25

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that this document was served upon the attorneys of record for

each party to the above-entitled cause at the address shown below on April 4, 2023:

William P. Kealey, Esq.
Tyler L. Jones, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
      tlj@stuartlaw.com
*Attorneys for Defendants*

BY:   ☐  U.S. Mail    ☐    Federal Express

          ☐  Hand-Delivery   x   <u>Other: ECF</u>

            _____*Philip A. Byler, Esq.*_____
            Philip A. Byler, Esq.

26