# EXHIBIT G

Page 1

```
           IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF INDIANA
                    HAMMOND DIVISION
                CASE NO. 2:17-cv-33-JPK
```

JOHN DOE,                              )
                                       )
         Plaintiff,                    )
                                       )
         -vs-                          )
                                       )
PURDUE UNIVERSITY, PURDUE              )
UNIVERSITY BOARD OF TRUSTEES,          )
MITCHELL ELIAS DANIELS, JR.,           )
in his official capacity as            )
President of Purdue                    )
University, ALYSA CHRISTMAS            )
ROLLOCK, in her official               )
capacity at Purdue University,         )
KATHERINE SERMERSHEIM, in her          )
official capacity at Purdue            )
University,                            )
                                       )
         Defendants.

                DEPOSITION OF █████████

    The videotaped deposition upon oral examination of ███████████, a witness produced and sworn before me, Clarice H. Howard, CCR-Ky, Notary Public in and for the County of Boone, State of Indiana, taken on behalf of the Defendants, at the offices of Stuart & Branigin, LLP, 300 Main Street, Suite 900, Lafayette, Indiana, on Tuesday, August 18, 2020, scheduled to commence at 10:00 a.m., pursuant to the Federal Rules of Civil Procedure with written notice as to time and place thereof.

Page 2

1   A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       Philip A. Byler
        NESENOFF & MILTENBERG LLP
5       363 Seventh Avenue
        Fifth Floor
6       New York, New York 10001
        1.212.736.4500
7       pbyler@nmllplaw.com
8
    FOR THE DEFENDANTS:
9
        William P. Kealey
10      Tyler L. Jones
        STUART & BRANIGIN, LLP
11      300 Main Street
        Suite 900.
12      Lafayette, Indiana 47902-1010
        1.765.423.1561
13      wpk@stuartlaw.com

Page 3

INDEX OF EXAMINATION
                                  PAGE

DIRECT EXAMINATION
 Questions by Mr. Kealey......................... 4
CROSS-EXAMINATION
AQuestions by Mr. Byler.........................193

INDEX OF EXHIBITS

Deposition Exhibits:

Exhibit 1  - Amended complaint.................. 14
Exhibit 2  - Release by ████████ ................. 20
Exhibit 3  - Purdue academic transcript......... 33
Exhibit 4  - E-mail with ████████████ ........ 43
Exhibit 5  - E-mail with ████████████ ........ 51
Exhibit 6  - Notice of academic warning......... 53
Exhibit 7  - Statement from ████████ ........... 61
Exhibit 8  - Notice of interim leave............ 64
Exhibit 9  - E-mail with ████████████ ....... 66
Exhibit 10 - Third initial disclosures.......... 67
Exhibit 11 - E-mail with Willstatter & ████ ..... 85
Exhibit 12 - E-mail with ████████████ .........108
Exhibit 13 - Text messages......................109
Exhibit 14 - Report from ████████ ..............128
Exhibit 15 - Statement of ████████ .............130
Exhibit 16 - Request for documents..............139

Page 4

INDEX OF EXHIBITS

Deposition Exhibits:

Exhibit 17 - Interrogatory responses............146
Exhibit 18 - No Exhibit 18......................
Exhibit 19 - Transfer application...............163
Exhibit 20 - Text messages......................165
Exhibit 21 - Navy PRB document..................175
Exhibit 22 - Decision by Commander Hutton.......178
Exhibit 23 - Letter to panel Member by ████ ...180
Exhibit 24 - Notice of panel meeting............184

Page 5

1   THE VIDEOGRAPHER: Please note that
2   microphones are sensitive and they pick up
3   whispering and private conversations.
4       We are now on the record. My name is
5   Christopher Messer representing Veritext. Today is
6   August 18, 2020, and the time is approximately 9:53
7   a.m. This deposition is being held at Stuart &
8   Branigin located at 300 Main Street, Suite 900,
9   Lafayette, Indiana, 47901, and is being taken by
10  the counsel for the defense.
11      The caption of this case is John Doe versus
12  Purdue University, et al. This case is being held
13  in the United States District, Northern District,
14  Hammond Division, Case No. 2:17-cv-33-JPK. The
15  name of this witness is ████████ .
16      And at this time the attorneys present in the
17  room, and everyone attending remotely will identify
18  themselves and the parties they represent. Our
19  court reporter, Clarice Howard, representing
20  Veritext, will swear in the witness and we can
21  proceed.
22      MR. BYLER: Philip A. Byler, Nesenoff &
23  Miltenberg, attorneys for the plaintiff, John Doe.
24      MR. KEALEY: William Kealey, Stuart &
25  Branigin, counsel for the defendants, Purdue

2 (Pages 2 - 5)



Page 41

1  defendants in this case for your fall of 2015
2  grades?
3      MR. BYLER: Objection, asked and answered.
4  A  I'm not faulting the defendants for my fall 2015
5  grades.
6  Q  During the spring semester of 2016, what did the
7  defendants do to cause you to fall two courses?
8  A  My grades as a whole suffered from the University
9  investigation, but to assume that fails
10 specifically are attributed is a bit presumptuous
11 in my eyes. The grades as a whole did become
12 negatively affected by the University investigation
13 and the behavior of the University towards me
14 during the spring of 2016 semester.
15 Q  Sir, I'm asking a very simple and direct question.
16 My question was what did the defendants do in the
17 spring of 2016 semester to cause you to fail two
18 courses?
19     MR. BYLER: Objection, asked and answered.
20 The defendants were pursuing a disciplinary case,
21 for heavens sake.
22 A  I don't think you're assumption that the fails were
23 directly attributed, but my grades as a whole did
24 suffer because of the behavior of the University
25 and the investigation. Examples of the behavior

11 (Pages 38 - 41)

Page 42
1  were my hall director advising me that I was going
2  to be kicked out of my hall, by barred from
3  different parts of the campus, be treated overall
4  as though I was guilty before this case had ever
5  completed or what had its progress run.
6      I was treated as through I was guilty of the
7  accusations brought against me, even before I knew
8  details of any of the accusations against me.  It
9  cause an immense amount of stress for me, and it
10 made me in my focus towards the school and the
11 school activities and the schoolwork.
12 Q  During the spring semester of 2016, you received
13 four other grades between A and C, correct?
14 A  That's correct -- no, that's not correct.
15 Q  An A in Naval lab, a B in C Sea Power and Maritime,
16 a B minus in Russian level and a C in
17 conversational Russian.
18 A  And a B minus in technical graphic com, two up
19 from.  So the second one down, so five grades.
20 Q  So five out of the seven grades were not failing?
21 A  Correct.
22 Q  So all of these stress that you were experiencing
23 caused you to fail two out of seven courses?
24 A  May have, yes.
25 Q  I'm just asking you whether it did?

Page 43
1      MR. BYLER:  Objection, form.
2  A  I think so.
3  Q  So you only felt stresses when you were attending
4  your technical graphics and fundamentals of imaging
5  technology courses than that when you were
6  attending the other five?
7  A  No, I felt stress for all of my classes.  That C
8  could have been a B, that B minus could have been
9  an A, that B would have been a B plus.
10 Q  How come in five of the seven courses you didn't
11 fail?
12 A  I probably found the course work easier to do.
13 Q  You found Level 2 Russian easier to do than
14 fundamentals of imaging technology?
15 A  Yes.
16 Q  The same course that you failed in the fall?
17 A  Yeah, yes.
18 Q  When you had no stresses?
19 A  For the majority of the fall.
20     (Deposition Exhibit No. 4 marked
21        for identification.)
22 BY MR. KEALEY:
23 Q  Mr. ███, I'm handing you Deposition Exhibit 4.
24 Please take a look at it and tell me whether you
25 recognize it?

12 (Pages 42 - 45)

Page 71

1  A    There are ROTC unit in schools close to Taylor that
2       you can partake in while attending Taylor.  But
3       Taylor itself does not directly offer ROTC, to my
4       knowledge.
5  Q    Is Taylor University located in Upland, Indiana?
6  A    It is.
7  Q    So after you were put on academic interim leave of
8       absence ROTC and continue on in your education
9       without ROTC support, according to you, you and
10      family chose for your to enroll at a school that
11      did not have ROTC --
12 A    That is correct.
13 Q    -- where according to you, you could not continue
14      to participate in ROTC as a nonscholarship
15      participant?
16 A    Not directly via Taylor University itself.
17 Q    When you were at Taylor University, you didn't
18      participate in any school's ROTC unit, did you?
19 A    That is correct.
20 Q    So you did not, in fact, participate in any ROTC
21      unit after Purdue in an effort to regain ROTC
22      scholarship status?
23          MR. BYLER:  Objection to form, assume facts
24      not in evidence.
25 A    I thought it be a good idea to give me a breather

Page 72

1       at a different school, different environment and
2       see what would come of the legal action we were
3       pursuing against Purdue University.  And, no, I did
4       not immediately go to another ROTC unit?
5  Q    You did not every go back to any ROTC unit?
6  A    No, I did not.  As my experience has shown me, in
7       my years since Purdue University, I have difficulty
8       focusing and committing to the level that was
9       demanded of the ROTC while I was there due to the
10      stress of the legal case.  And the idea was that
11      once the legal case was concluded, I would go back
12      to an ROTC unit and I would continue pursuing that
13      military plan with my full focus.
14 Q    Mr.      , are familiar with the concept of grit?
15 A    I am.
16 Q    What do you understand it to mean?
17 A    Grit is commitment, just being able to not bow
18      under pressure.
19 Q    Do you consider yourself to have the necessary grit
20      to serve in the United States military?
21 A    I do.
22 Q    Do you consider yourself capable of overcoming
23      adversity?
24 A    I do.
25 Q    Do you have sufficient grit to enroll in an ROTC

Page 73

1       unit presently?
2  A    Present I don't think so.
3  Q    Have you at any time since leaving Purdue, had
4       sufficient grit to enroll in an ROTC unit?
5  A    No, unfortunately.
6  Q    Mr      , I'd like you to take a look at Deposition
7       Exhibit 1.  This is your amended complaint in this
8       case.
9  A    Uh-huh.
10 Q    Yes?
11 A    Yes.
12 Q    Please turn to paragraph 72.  Paragraph 72 is a
13      fairly long paragraph.  I'm going to refer you to a
14      particular part in the middle, but just for
15      context, paragraph 72 is talking about the July 21,
16      2016 decision by Purdue and your appeal.
17          And you have a list in paragraph 72 of
18      "substantive issues raised by John Doe's appeal."
19      And in that lists under Roman Numeral VI is a
20      reference to "John Doe's question why would I note
21      not only admit to something that didn't happen but
22      also knowingly admit to something that would
23      jeopardize my ROTC scholarship and future serving
24      my country."  Do you see that?
25 A    I do.

Page 104

1  you reporting suicide attempts or suicide risks on
2  the part of Ms. ▓▓▓▓ right?
3  A  Yes.
4  Q  So your complaint is premised on something totally
5    unrelated to sexual assault awareness month, is it
6    not?
7    MR. BYLER: Objection to form.
8  A  No, it is not totally unrelated.
9  Q  Was Ms. ▓▓▓▓ sensitive to your suicide reporting
10    because of sexual assault awareness month?
11 A  Could you repeat that one more time?
12 Q  What did sexual assault awareness month have to do
13    with your contention that you were accused of
14    sexual assault in retaliation for suicide
15    reporting?
16 A  Well, it's pretty crazy timing that she decided to
17    suddenly report something in April, which just
18    happens to be sexual assault awareness month, even
19    though this is five to six months after she's
20    alleging something happened.
21 Q  When did you make reports to her RA's about
22    suicide?
23 A  It would have been in late January or February.
24 Q  So isn't it pretty crazy to think that a report in
25    early April relates to acts you did in January?

Page 105

1  A  I don't think so.
2  Q  So you think the lag of time in between January and
3    April for response to suicide reporting is
4    plausible, yes?
5  A  I think there's a cocktail factor, yes.
6  Q  A cocktail. What are the other factors?
7  A  She tried to rekindle a relationship with me in
8    February and March and I shot that down. I was not
9    interested. And I don't think she was happy with
10    that rejection.
11    And April rolls around and here you have an
12    April promotion for sexual assault awareness, and I
13    think that's very possible that that idea gets put
14    in someone's head that when you see it's being
15    promoted towards women, that they will inherently
16    have advantage in those sorts of allegations.
17 Q  Let me be sure I'm crystal clear on your
18    allegation. Had there been no sexual assault
19    awareness month at Purdue University, Ms. ▓▓▓▓
20    would have never made her allegation against you?
21 A  I think it's quite possible.
22 Q  Regardless of your attempts to report suicidal
23    tendencies?
24 A  I think it's quite possibly. It's impossible to
25    say whether what the straw was that broke the

27 (Pages 102 - 105)

Page 113

1  A   Yes.
2  Q   Because you contend that if you had sexually
3      assaulted Ms. ▇▇▇▇, she would referred to it in
4      the text messages?
5  A   I would have thought so.
6  Q   And if there, in fact, text messages in which she
7      and you referred to sexual contact, that would be
8      bear on whether she was telling the truth or you
9      were telling the truth, correct?
10 A   Correct.
11 Q   So if the investigators found texts in which the
12     two of you were discussing sexual contact, it would
13     be appropriate for the investigators to rely upon
14     those texts as evidence, correct?
15 A   Correct.
16 Q   And if the investigators found such texts and
17     relied upon them, that would not be act of antimale
18     basis, would it?
19 A   It would depend on the manner in which they relied
20     upon it and whether they chose to ignore context or
21     conclude context.  In some of the notes of the
22     investigator's report, they included context in the
23     notes and then they refused to add the context to
24     the final analysis findings.
25 Q   Explain.

29 (Pages 110 - 113)

Page 114

1  A   If they were unbiased in their findings, I would
2      think that they would try to be as clear as
3      possible with explanations in regards to texts.
4      Instead they went and they cherry picked several
5      different texts and they decided that those were
6      confessions on my part.
7          And they ignored the context surrounding those
8      texts. They ignored my explanation. They said I
9      was not a credible witness. They said that she
10     was. And they said in their report he's lying,
11     she's not.
12         The entire process, in my opinion, was deeply
13     flawed and is the only reason we ended up with the
14     result that we did.
15 Q   Your contention to the investigators was that none
16     of these texts deserved any attention at all,
17     correct?
18 A   My contention to the investigators was that these
19     texts showed there was no evidence of any sort of
20     sexual misconduct between the two of us.
21 Q   And so your credibility depended entirely on
22     whether that assertion by you was plausible?
23         MR. BYLER: Objection to form.
24 A   I also provided refutations to all of the other
25     allegations, and I provided explanations of her

Page 115

1      mental fortitude and why I thought she was not a
2      credible witness. And everything but texts was
3      ignored by the investigators.
4  Q   What does Ms. ▮▮▮▮▮▮▮ mental fortitude have to do
5      with your contention?
6  A   Her fortitude has to do with the allegations.
7  Q   Well, you're alleging that she intentionally framed
8      you for sexual assault?
9  A   Yes.
10 Q   What does her mental fortitude have to do with
11     that?
12 A   Perhaps fortitude is not the right word.
13 Q   What does your contention that she was suicidal
14     have to do whether she intentionally framed you for
15     sexual assault?
16 A   As I said before, I think that the suicide attempt
17     was something that changed out relationship. And
18     when I reported it, after our relationship was
19     over, I think that upset her. And she decided
20     months later that she was going to get back at me
21     for that.
22 Q   Why did you make a report of suicide attempt after
23     your relationship was over?
24 A   Because when the attempt happened, I didn't know
25     what to do. She was very mentally unstable around

Page 116

1      the attempt and after the attempt, and she never
2      acted the same way. But I debated for a while
3      whether it was a wise decision to report it because
4      I didn't want to further destabilize her mental
5      health, given that she had just tried to jump off
6      of a parking garage in front of me on the Sunday
7      before finals week.
8          So after about one month at the end of
9      January, I gathered up my courage and went to RA
10     and told them, hey, this is what's going on and I'm
11     really concerned for this girl. And I don't know
12     what's on with her, but I want it to be aware just
13     in case that could be something that could help
14     her.
15         I reported that to Dillion Sinks and it's
16     inside the very large investigation report document
17     with many copies of texts.
18 Q   You testified a minute ago that you made a report
19     about ▮▮▮▮▮▮▮ after you relationship was over, not
20     after she allegedly attempt to commit suicide, but
21     after the relationship was over, right?
22 A   Yes.
23 Q   You did so in mid February, not January, right?
24 A   The date I remember seeing was late January.
25 Q   So somewhere between six and eight weeks after the

Page 117

1      supposed incident in mid December?
2  A   Yes.
3  Q   Would you agree with me that if somebody was
4      concerned about suicide risk would not wait six to
5      eight weeks to report it?
6  A   No.
7  Q   You'd wait and see whether there was a suicide
8      during the six or eight weeks?
9  A   I was worried that doing that would further
10     destabilize her because the reasoning she was
11     giving me up to her suicide attempt was that she
12     was afraid she wasn't going to make in the Navy,
13     she wasn't going to get her grades where she needed
14     them to be, that she wasn't good enough to keep
15     following this path she had, saying she didn't even
16     know if she wanted to, all over the place.
17         And in my mind, if I were to go to the school
18     and say hey, this girl just tried to kill herself
19     and then the school were to go to her right away, I
20     think that would have upset her even more and
21     potentially put her at more risk.
22 Q   That's exactly what you did. You went to the
23     school and said that exact thing, didn't you?
24 A   One month later when I thought it had calmed down.
25 Q   You went and reported that she was a suicide risk

Page 118

1  after you thought she was no longer a suicide risk?
2  A  I didn't report a suicide risk.  I reported the
3     attempt to the school.
4  Q  You reported the attempt to the school because you
5     thought she needed help because you thought she was
6     a suicide risk?
7  A  Okay.  Yes.
8  Q  And you did that somewhere between six weeks and
9     two months after you concluded that she was a
10    suicide risk?
11 A  Yes.
12 Q  And you did that after the relationship had ended?
13 A  Yes.  It was several weeks after the relationship
14    had ended.
15 Q  In Deposition Exhibit 13, please turn to the page
16    that's marked at the bottom PU 262.  Please look
17    through the text messages on page 262 and tell me
18    when you've done so.
19 A  I've read it.
20 Q  Did the investigators discuss this sets of texts
21    with you?
22 A  They did.
23 Q  What did they discuss with you?
24 A  They pushed me, saying that this was evidence of a
25    sexual allegation.

Page 119

1  Q  What exactly did they say?
2  A  They asked me about the texts and they wanted to
3     know what my explanations for them were.
4  Q  Did you consider the investigators asking you about
5     the texts and your explanation for them to be an
6     act of bias?
7  A  Could you say it again one more time?
8  Q  Did you consider the investigators asking you about
9     the texts on page 262 and your explanation for them
10    to be an act of bias?
11 A  The question itself being an act of bias, no.
12 Q  So it was a reasonable nonbiased step for the
13    investigators to read these texts and have
14    questions about them?
15 A  Yes.
16 Q  And the reason was a reasonable nonbiased reaction
17    for the investigators to read these texts and have
18    questions about them is that the texts refer at one
19    point to you touching ▓▓▓▓▓▓▓▓▓▓▓▓.
20 A  Yes.
21 Q  Which is a sexual contact?
22 A  No.
23 Q  Not possible for any person to read a reference to
24    you touching your girlfriend as a reference to
25    sexual contact?

Page 120

1  A  In this context, it's not referring to anything
2     sexual.
3  Q  You said a moment ago, it was reasonable and not
4     biased for investigators looking into a sexual
5     assault allegation to ask questions about these
6     texts because they refer to you touching ▓▓▓▓▓
7     ▓▓▓▓▓▓▓.
8        MR. BYLER:  Objection to form, misstates
9     testimony.
10 A  Yes, because they refer to me touching her, but
11    they do not specify what kind of touching.  After
12    her suicide attempt, our entire relationship was
13    different.  She put up all of these boundaries.
14       And in the context before these texts, I don't
15    know if you have them here, but I explained to her
16    that I don't understand what she's doing because
17    she has no communication with me.  I don't
18    understand what she wants out of the relationship,
19    what she wants from me.  And she even replies and
20    says well, I'm not going to tell or I don't care to
21    communicate with you.
22       And after her suicide attempt on the 13 of
23    December, it was as though the relationship
24    completed bucked.  And any and all physical
25    interaction from that point on was very minimal and

Page 121

1     she didn't seem to be okay with stuff that she had
2     been okay with prior to the suicide attempt.  And
3     I'm referring to nonsexual touching, just anything
4     and everything.  And that was what I explained to
5     the investigators.
6  Q  You said she was putting up boundaries and in the
7     text message at 10:22 p.m. on December 28, 2015,
8     she says in parted "I literally can't trust you if
9     you don't respect my boundaries."  Do you see that?
10 A  Yeah.
11 Q  That's a reference to her boundaries, right?
12 A  Yeah.
13 Q  It's not a reference to your schoolwork, is it?
14 A  No.
15 Q  So in that text message, which starts out with a
16    reference to her waking up to you touching me, and
17    several words ends with an assertion that she
18    cannot trust you if you don't respect her
19    boundaries, she was talking about your physical
20    contact with her, not about your schoolwork?
21 A  She was talking about, I think, everything.  Her --
22    if you look at the texts right before here, I say
23    she's constantly vague about things.  She says I
24    know or I don't care.
25       And both this and the 23 of December texts

Page 122

1  were the one that were contended by the
2  investigators.  Now, when the suicide attempt
3  happened or after the suicide attempt happened, she
4  started to no be okay with any sort of physical
5  contact.  And that as something that I learned over
6  several instances, and we met one time only after
7  the Christmas break was over.  That was the 14 of
8  January, where she invited me over to her room for
9  Netflix, despite her saying in the investigation
10 report that our relationship was over before we
11 went on Christmas vacation and her saying that she
12 hadn't communicated with me after the first week of
13 December.  And we watched Netflix, fell asleep
14 together.  There was nothing sexual and she got
15 upset by that.
16     And it was something that we had one plenty of
17 times prior to her suicide attempt.  And I think at
18 that point she realized that she could no longer er
19 have that same sort of relationship.  I don't know
20 where that came from.  I think she has some sort of
21 deep seated trauma from her previous rape that she
22 claims to have happened in her past.
23     And she also had claimed that she had several
24 previous suicide attempts in her past, one of which
25 her parents walked in on.  And I don't know what

Page 123

1  sort of scars that leaves on someone emotionally.
2  But I was very apologetic this whole time,
3  especially after the suicide attempt because I was
4  scared that she was becoming more unstable and me
5  being the person I was at the time, I thought that
6  apologizing was the right thing to do.
7     And I had never had any experience with a
8  relationship before, and I felt if I was the way I
9  was, which was apologetic and trying to take
10 responsibility for things and -- I felt responsible
11 for all the bad stuff that was happening to her in
12 her head and the suicide attempts because I felt
13 that in the relationship, I had been inadequate in
14 some way or I had done something to spur that.
15     And that -- I beat myself up for that for a
16 couple of years after that until I finally
17 reflected enough to realize that's now it was.  But
18 she was very push, pull and manipulative which
19 caused me to apologize a lot in the texts.  And
20 that's what I explained to the investigators was
21 that I was overly apologetic about things.
22     I think that context is important.
23 Q   Let's take a look back at Deposition Exhibit 7.
24 The first page of Deposition Exhibit 7 in the
25 second paragraph, you are discussing a date in mid

Page 124

1     December; do you see that?
2  A  I do.
3  Q  And you state on that date in mid December, I woke
4     up and placed my hand on               knee out
5     of affection.
6  A  Uh-huh.
7  Q  Yes?
8  A  Yes.
9  Q  Is that still your testimony today?
10 A  It is.
11 Q  And your testimony today is that the 10:22 p.m.
12    text message on December 28, in which Ms.
13    refers to wake up to you touching me was a
14    reference to that same event described in
15    Deposition Exhibit 7?
16 A  Yes.
17 Q  And that your next line on page 262 of Deposition
18    Exhibit 13, in your 10:37 p.m. text message is you
19    apologizing for placing your hand on her knee out
20    of affection?
21 A  Yes.
22 Q  And that texts exchange is not a reference to you
23    getting behind in your schoolwork?
24 A  It's reference to both, the one after it, the one
25    at 10:56.

Page 167

1    MR. BYLER: Okay. I misheard you through your
2    mask. You were talking. I thought you asked a
3    question that I didn't understand.
4  BY MR. KEALEY:
5  Q  Your Purdue University suspension ended long ago;
6    you know that?
7    MR. BYLER: Objection to form.
8  A  I do.
9  Q  You allege in your complaint in this case that you
10    intend to re-enroll at Purdue University?
11  A  Assuming I win this case, because I don't agree to
12    the conditions currently subjected to me upon
13    re-entry.
14  Q  What are they?
15  A  That I take a course, have monthly meetings with
16    Chris Greggila for the first semester.
17  Q  You consider it unfair for Purdue to ask you to
18    take bystander training?
19  A  I do.
20  Q  What is -- do you know what bystander training is?
21  A  I don't recall exactly what it is.
22  Q  Have you ever tried to find out?
23  A  Yeah.
24  Q  Who did you ask?
25  A  I read the documents that Purdue gave me. I just

Page 168

1    don't remember exactly what they said about the
2    bystander training.
3  Q  But you're clear in your mind you don't want to do
4    it?
5  A  Yes, because when I read them, I decided I didn't
6    want to do it. I didn't think it was a good idea.
7  Q  You think it's prerogative to decide what you
8    should and should not be asked to do as a student
9    at Purdue University?
10  A  Given the circumstances of my dismissal, I don't
11    think it would be wise to go back to Purdue right
12    now.
13  Q  That wasn't my question. My question is are you
14    contesting that it's fair and reasonable for Purdue
15    to ask you to undergo bystander training?
16  A  How is this a follow-up question to the Navy, not
17    being in the Navy?
18  Q  You testified that you were not in the Navy because
19    you were waiting for your case to be over.
20  A  Uh-huh.
21  Q  You've also testified that's why you're not in
22    ROTC.
23  A  Uh-huh.
24  Q  Purdue has a Navy ROTC unit?
25  A  It does.

Page 169

1  Q  And you said you wanted to be back at Purdue?
2  A  Yes.
3  Q  So if you re-enroll at Purdue, which you are in
4    good standing to do and reapply to Navy ROTC, as
5    far as you know, you might be accepted into the
6    Navy ROTC, correct?
7  A  Might be, but I'm not confident in it.
8  Q  You don't know because you haven't tried, do you?
9    MR. BYLER: Objection. Don't need to get
10    argumentative with the witness.
11    MR. KEALEY: The witness is wondering how this
12    is a follow-up. So I'm explaining that to him.
13  A  I appreciate the explanation. You are correct. I
14    don't know because I have not tried.
15  Q  If the Navy asked to take bystander training, would
16    you take it?
17    MR. BYLER: Objection, hypothetical.
18  A  I don't know.
19  Q  If the Navy asked you to meet with somebody on the
20    Navy ROTC staff monthly, would you comply with that
21    instruction?
22    MR. BYLER: Objection, facts not in evidence.
23  A  I don't think that's a fair parallel to trial
24    because I was subject to that bystander training
25    upon re-entry to Purdue because of my suspension.

Page 170

1  So if there was something of equal measure in
2  the Navy and I had to complete some sort of
3  re-entry as remedy or punishment, then I would do
4  so.
5 Q  Have you considered the possibility that Purdue has
6  asked you to take bystander training in order to
7  make you a better student and citizen on the
8  campus?
9    MR. BYLER:  Objection, hypothetical.
10 A  No, I've not.
11 Q  Do you think that taking the bystander training is
12  punishment?
13 A  If it's something required of me because of the
14  circumstances under which I left Purdue, then yes.
15 Q  In your complaint in this case, you allege that the
16  discipline imposed by Purdue was disproportionate;
17  do you recall that?
18    MR. BYLER:  Objection to form.
19 A  Please repeat the question.
20 Q  You're aware in this case you've alleged that the
21  disciplinary sanction imposed by the Dean of
22  Students was disproportionate?
23 A  Yes.
24 Q  What did you mean by that allegation?
25 A  I meant that it didn't seem fair.

44 (Pages 170 - 173)

Page 192

```
 1  back up to doing a full-time job again.  And I
 2  think I'm at a point where I'm capable to do that.
 3  And I've been trying to study to get into an
 4  on-line sales job for the time being.
 5     And it was within the last month, I would say,
 6  that I started working towards doing that.  Prior
 7  to that, it was still just all just like odd jobs.
 8  I do odd jobs and study to try and get a sales job
 9  on-line.
10  Q  So you're saying that even though the lawsuit
11     continues and has not been resolved in your favor,
12     your anxiety is improving?
13  A  It was, yes.
14  Q  And is?
15  A  Yes.
16  Q  Okay.  Who's paying your legal fees?
17  A  Right now, my father is doing what he can out of
18     pocket.
19  Q  Anybody else?
20  A  No.
21  Q  You've contended in this case that you've been
22     invoiced $200,000 in legal fees.  Do you stand on
23     that disclosure?
24  A  I do.
25  Q  All of those legal fees have been invoiced by mr.
```

Page 191

```
 1  Q  I asked earlier about Facebook messenger.  Did you
 2     use any other kind of texting apps such what's up
 3     or other cloud tools like Snapchat to communicate
 4     with each other?
 5  A  I think Snapchat would have been the only one.
 6  Q  Is there any other form of medium of communication
 7     that you used with ▇▇▇▇▇▇ that I haven't
 8     asked about?
 9  A  Not to my recollection.
10  Q  You have produced documents in this case that seem
11     to indicate that you have not worked since 2018; am
12     I understanding that correctly?
13  A  Yes, sir.
14  Q  Why haven't you worked since 2018?
15  A  For most of the -- for all of 2018 and some of
16     2019, I had very serve anxiety and had trouble
17     doing menial tasks due to the anxiety.  And as 2018
18     went on, I improved via counseling, and I improved
19     to a point where I could work.
20        And I would say the point at which I think I
21     could hopefully work was halfway through last year.
22     So I started doing like, not a regular job, but I
23     started doing more tasks and went off jobs.  I got
24     a lot of them through my mom or dad.
25        And it was like a ways to sort of work myself
```

Page 194

1  Q   Did you see the Navy documents and review them?
2  A   I did.
3  Q   Did you see in there any Navy investigation report?
4  A   They had no independent investigation report.  They
5      relied on the Purdue investigation report.
6  Q   Look at Plaintiff's Exhibit 1, the amended
7      complaint, can you tell me from the top what date
8      that is?
9  A   September 3, 2019.
10 Q   Was that before receiving and reviewing the Navy
11     production?
12 A   Yes, it was.
13 Q   You were shown Plaintiff's Exhibit 24 about meeting
14     with the panel report -- I mean panel review.  The
15     May 31 letter of Dean Sermersheim.  At this point
16     in time had you seen the investigation report?
17 A   I had not.
18 Q   And --
19 A   Nor was it offered to me at the meeting.
20 Q   Okay.  Finally, Plaintiff's Exhibit 11, which is
21     the Kyle Willstatter e-mail exchanges you had in
22     August of 2016, Plaintiff's Exhibit 11.
23        Okay.  Your attention when you were questioned
24     by Purdue counsel was to the third page of the
25     document?

Page 195

1  A   Yes, it was.
2  Q   And that was your e-mail?
3  A   Yes, it was.
4  Q   Okay.  Turn to page 2.  On page 2 is Lieutenant
5      Willstatter's reply to you contained -- to your
6      e-mail.
7  A   You're asking me what?
8  Q   Is that his reply to your e-mail that was on page 3
9      of the document?
10 A   Yes.
11 Q   Okay.  Now, what does this PRB mean?
12 A   Performance review board.
13 Q   Okay.  Look at paragraph 2 and read me the first
14     two sentences.
15 A   PRB is not about the circumstances surrounding your
16     suspension.  It is about the fact that you have
17     been suspended.  There's no reason to relitigate
18     the University's decision.
19 Q   Next sentence.
20 A   The fact is that you are suspended and the ROD
21     requires disenrollment for any case where a student
22     is suspended.
23 Q   And that was what was sent to you by Mr.
24     Willstatter?
25 A   It was.