# EXHIBIT I

Page 1

1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF INDIANA
2                   HAMMOND DIVISION
3             CIVIL ACTION NO. 2:17-cv-33-JPK
4    JOHN DOE,                      )
                                    )
5          Plaintiff,               )
                                    )
6              -vs-                 )
                                    )
7    PURDUE UNIVERSITY, et al.,     )
                                    )
8          Defendants.             )
9
10           REMOTE DEPOSITION OF NOEL PERRY
11
12
        The deposition upon oral examination of
13   NOEL PERRY, a witness produced and sworn before me,
     Janine A. Ferren, RPR, CRR, CSR-IL No. 84-4852,
14   Notary Public in and for the County of Hamilton,
     State of Indiana, taken on behalf of the
15   Defendants, in Valparaiso, port County, Indiana, on
     the 5th day of February 2021, at 1:02 p.m.,
16   pursuant to the Federal Rules of Civil Procedure
     with written notice as to time and place thereof.
17
18
19
20
21
22
23
24
25

Page 2

1                      APPEARANCES
2            (All appearances via videoconference)
3    FOR THE PLAINTIFF AND THE WITNESS:
4            Philip A. Byler
             NESENOFF & MILTENBERG LLP
5            363 Seventh Avenue
             Fifth Floor
6            New York, NY  10001
             212.736.4500
7            pbyler@nmllplaw.com
8
9    FOR THE DEFENDANTS:
10           William P. Kealey
             Tyler L. Jones
11           STUART & BRANIGIN LLP
             300 Main Street
12           Suite 900
             P.O. Box 1010
13           Lafayette, IN  47902-1010
             wpk@stuartlaw.com
14           tlj@stuartlaw.com
15
16   ALSO PRESENT:
17           Colleen Brady
18
19
20
21
22
23
24
25

Page 3

1                    INDEX OF EXAMINATION

2                                                    Page

3    DIRECT EXAMINATION  . . . . . . . . . . . . . . .6

         Questions by William P. Kealey

4

     CROSS-EXAMINATION . . . . . . . . . . . . . . .107

5        Questions by Philip A. Byler

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
                                              Page 4

 1                    INDEX OF EXHIBITS
 2                                              Page
 3   Defendant's Deposition Exhibit No.:
 4   Exhibit 1  - Progress Notes, 2/26/18, pages . . 18
                  179 and 180
 5
     Exhibit 2  - Progress Notes, 3/15/18, pages . . 22
 6                177 and 178
 7   Exhibit 4  - Progress Notes, 4/2/18, pages  . . 29
                  173 and 174
 8
     Exhibit 6  - Progress Notes, 5/15/18, pages . . 28
 9                166 and 167
10   Exhibit 7  - Progress Notes, 8/25/18, pages . . 41
                  165 and 166
11
     Exhibit 8  - Progress Notes, 8/29/18, pages . . 42
12                162 and 163
13   Exhibit 10 - Progress Notes, 9/19/18, . . . . . 49
                  pages 155 and 156
14
     Exhibit 11 - Progress Notes, 10/10/18,  . . . . 49
15                pages 151 and 152
16   Exhibit 12 - Progress Notes, 10/29/18,  . . . . 34
                  pages 149 and 150
17
     Exhibit 13 - Progress Notes, 11/12/18,  . . . . 83
18                pages 147 and 148
19   Exhibit 14 - Progress Notes, 12/10/18,  . . . . 45
                  pages 142 and 143
20
     Exhibit 15 - Progress Notes, 1/7/19, pages  . . 44
21                137 and 138
22   Exhibit 16 - Progress Notes, 1/14/19, . . . . . 63
                  pages 135 and 136
23
     Exhibit 20 - Progress Notes, 3/25/19, . . . . . 55
24                pages 106 and 107
25   Exhibit 21 - Progress Notes, 4/4/19, pages  . . 72
                  104 and 105
```

Page 5

1   Defendant's Deposition Exhibit No. (Continued):
2   Exhibit 22 - Progress Notes, 4/8/19, pages  . . 78
                 101 and 102
3
    Exhibit 23 - Progress Notes, 4/15/19, . . . . . 58
4                pages 98 and 99
5   Exhibit 24 - Progress Notes, 4/29/19, . . . . . 85
                 pages 92 and 93
6
    Exhibit 25 - Progress Notes, 5/6/19, pages  . . 86
7                89 and 90
8   Exhibit 26 - Progress Notes, 5/28/19, . . . . . 89
                 pages 79 and 80
9
    Exhibit 27 - Progress Notes, 6/10/19, . . . . . 91
10               pages 76 and 77
11  Exhibit 28 - Progress Notes, 7/1/19, pages  . .107
                 67 and 68
12
    Exhibit 30 - Progress Notes, 7/22/19, . . . . . 92
13               pages 60 and 61
14  Exhibit 33 - Progress Notes, 10/7/19, . . . . .113
                 pages 35 and 36
15
    Exhibit 34 - Progress Notes, 10/14/19,  . . . . 95
16               pages 32 and 33
17  Exhibit 35 - Progress Notes, 10/21/19,  . . . . 98
                 pages 29 and 30
18
    Exhibit 36 - Progress Notes, 10/28/19,  . . . . 99
19               pages 26 and 27
20  Exhibit 39 - Progress Notes, 11/18/19,  . . . .100
                 pages 17 and 18
21
    Exhibit 41 - Progress Notes, 6/22/20, . . . . . 35
22               pages 4 and 5
23  Exhibit 42 - Progress Notes, 8/27/20, . . . . . 99
                 pages 1 and 2
24
    Exhibit 43 - What is EMDR?  . . . . . . . . . .105
25

Page 6

1    (Time noted:  1:02 p.m.)

2                        NOEL PERRY,

3    having been duly sworn to tell the truth, the whole

4    truth, and nothing but the truth relating to said

5    matter, was examined and testified as follows:

6

7    DIRECT EXAMINATION,

8       QUESTIONS BY WILLIAM P. KEALEY:

9    Q   Good afternoon, Mr. Perry.  My name is William

10       Kealey.  I'm counsel for Purdue University.

11       Thank you for coming to your deposition today.

12       We'll handle a few preliminaries first.

13            Would you please state your full name,

14       including your middle name, and a mailing

15       address that you go by.

16   A   My name is Noel Edmond Perry.  My work address

17       is 2004 Valparaiso Street, Valparaiso, Indiana

18       46383.

19   Q   How long have you had that work address?

20   A   Think for a second.  Two and a half years.

21   Q   That's the address of Family Concern Counseling?

22   A   Yes, sir, it is.

23   Q   Have you been deposed before?

24   A   Yes, sir.

25   Q   How many occasions?

Page 7

1    A    One.

2    Q    How recent was that?

3    A    Several years ago.  It's not recent at all.

4    Q    Was it in connection with your work in the

5         therapy field?

6    A    No.

7    Q    What kind of case was it?

8    A    It was a wrongful death case.

9    Q    Were you a party to the litigation?

10   A    The company I worked for was.

11   Q    I'll refresh you, then, on the deposition

12        procedure.  We are on the record as if we were

13        in court.  There is no judge here, but the

14        testimony functions the same way as testimony in

15        court in the sense that it's under oath, it's

16        transcribed, and the objective is to collect

17        testimony for use in this case brought by █████

18        ████ as John Doe versus Purdue University and

19        others, a case that's pending in federal court

20        in the Northern District of Indiana.

21             While we're on the record, everything that

22        is said by you and by the lawyers will be

23        transcribed.  Because it's being transcribed,

24        it's important that we take precautions to not

25        speak over one another.  When I'm posing a

Page 8

```
 1    question, sometimes it will come out rather
 2    slowly because of my goal of precision, so
 3    please wait until the question is fully posed
 4    before you begin your answer.  Also, before you
 5    begin your answer, Mr. ████'s counsel who is
 6    here in this procedure with us today, Mr. Byler,
 7    will have an opportunity to assert an objection.
 8    So you need to allow a pause for that, too.
 9         When you're answering, I'll do my best to
10    ensure that you had a complete opportunity to
11    answer the question before we turn to the next
12    question.
13         You will have an opportunity to review the
14    transcript after it's prepared and make notes to
15    the transcript.  That process is intended for
16    minor corrections, such as the spelling of a
17    name, a juxtaposed date, or similar details, not
18    for changing your testimony.  If you do need to
19    correct an answer you've given, let us know
20    while we're all together today and we'll circle
21    back to the question and give you an opportunity
22    to add or supplement or modify your answer.
23         If you don't understand a question, please
24    say so.  Our goal is to ask questions that are
25    clear and that, for you, translate into
```

Page 9

1          something that you can answer.  If need be, I'll
2          try to rephrase or repose a question with that
3          in mind.
4               I understand from Mr. Byler that he is also
5          representing you at this deposition; is that
6          correct?
7     A    Yes, that is correct.
8     Q    Do you have any questions of me about the
9          process?
10    A    No, sir.
11    Q    How did you prepare for today's deposition?
12    A    Read through my notes.
13    Q    The same notes that have been produced to the
14         litigants?
15    A    Yes, that's correct.  Actually, I should correct
16         that.  I read through the exhibitions, the ones
17         generated.
18    Q    The once that are numbered in the lower
19         right-hand corner as Defendant's 1, Defendant's
20         2, and so forth?
21    A    Yes, sir.
22    Q    And you have a hard copy of those with you as
23         well?
24    A    Yes, sir, I do.
25    Q    Very good.  Did you do anything else to prepare

Page 10

1       for the deposition?

2    A  Got a good night's sleep.

3    Q  Didn't talk to anybody to try to gather

4       information or refresh your recollection?

5    A  No.

6    Q  Didn't consult any reference works or anything

7       like that?

8    A  No.

9    Q  In this case, have you been asked by Mr. Byler

10      to prepare any opinions for this case?

11   A  Prepare opinions?

12   Q  Yes.  Has he asked you to give him an analysis

13      or an opinion on any topic for his use in this

14      case?

15   A  No.  He asked me to review the exhibitions and

16      make sure I had a printed copy.

17   Q  So other than preparing for today's deposition,

18      you haven't interacted with Mr. Byler?

19   A  No.

20   Q  One note about process.  Because this is a

21      transcribed proceeding, if you're answering me

22      with a shake of the head or a nod of the head,

23      I'll know what you're communicating to me, but

24      it won't show up on the printed page.

25   A  Thanks for the reminder.

Page 11

```
 1   Q   So if I say "yes or no" in that tone of voice,
 2       it's just my prompt to please go ahead and
 3       express your answer as a "yes" or a "no."
 4   A   I understand.
 5   Q   So in connection with this case, has anybody
 6       asked you to prepare any report about Mr. ████?
 7   A   No.
 8   Q   Please provide me a rundown of your training and
 9       studies and credentialing from the time you
10       graduated high school up to the present.
11   A   From the time I graduated from high school?
12   Q   Yes.
13   A   Okay.  I received my undergraduate degree at
14       Purdue University in a technical field unrelated
15       to my current profession.  I then worked in a
16       variety of capacities.  Career experience
17       doesn't matter if it's unrelated to this; is
18       that correct, sir?  Education only; is that
19       correct?
20   Q   This question is about your education, yes.
21   A   Then returned to school to get my master's to be
22       a mental health counselor roughly five years
23       ago.  Achieved that degree, and then sought
24       special certification as an EMDR therapist for
25       the treatment of trauma and other distorted
```

Page 12

1      cognitions that go along with traumatic life

2      events.

3  Q   Just for my background reference, prior to

4      making a career turn in the direction of

5      therapy, what generally were the fields in which

6      you were working?

7  A   The first 20 years of my career I spent in an

8      industrial field, marketing and sales.  The next

9      ten years were also in a marketing/sales

10     capacity in the construction industry.  Those

11     are my primary experiences.

12  Q  So was it in 2015 or 2016 that you made a career

13     turn toward training for counseling work?

14  A   I don't remember exactly, I'd have to do the

15     math.  Let me think for a second here.  Would

16     have been '15, I believe, when I started.

17  Q   By "started," you mean when you started in

18     school?

19  A   Yes, sir.

20  Q   Where was that?

21  A   Grace College, Winona Lake, Indiana.  It's a

22     three-year program.

23  Q   A part-time program or full-time program?

24  A   I'm not sure how to categorize that.  I was in

25     school every week, every semester.

Page 13

1    Q    A six-semester program?

2    A    Yes, that's correct.

3    Q    When did you complete that program?

4    A    2018, May of 2018.

5    Q    What was the master's degree field that you

6         obtained that degree?

7    A    Clinical mental health counselor.

8    Q    You mentioned the EMDR therapy a few moments

9         ago.  Was that a particular focus of the program

10        at Grace College?

11   A    No.  It was provided by -- the certification was

12        through EMDRIA.

13   Q    How is that spelled?

14   A    E-M-D-R-I-A.  That was in addition to my degree

15        at Purdue, with a specific focus on trauma and

16        how to treat that with EMDR therapy.

17   Q    You said your degree at Purdue.  Did you mean

18        your degree at Grace College?

19   A    I'm sorry, yes.  My degree at Grace College.

20   Q    So in your degree work at Grace College, you had

21        a focus on trauma?

22   A    No.  My study at Grace was guided by the CACREP

23        certification, which is specifically for

24        clinical mental health counseling.

25   Q    Can you spell what you just described as the

Page 14

1       CACREP?

2    A  Yes.  CACREP is spelled C-A-C-R-E-P.

3    Q  What does that stand for?

4    A  I don't know what the acronym represents, but

5       they are the highest level of certification that

6       a master's program can have in the United

7       States.

8    Q  Did I hear you correctly an answer or two ago

9       referring to a trauma focus in your training?

10   A  Yes.

11   Q  What was that?  Could you repeat that for me?

12   A  Yes.  The EMDR therapy is specific to treat both

13      what they call small-t and large-T trauma.

14      Large-T trauma would be a war vet that returns

15      from Afghanistan and saw a friend die in an

16      intense and traumatic way.  Small-t trauma would

17      be someone that's bullied for three years and

18      the impact that has on their life going forward.

19   Q  How did you connect to the EMDR training?  How

20      did you get involved in that?

21   A  I was introduced through our training.  Our

22      master's program, we're exposed to many

23      different types of training.  We were introduced

24      to that as one possible area to work on.  And it

25      aligned very well with my core theory of

Page 15

```
 1        counseling, which is Adlerian theory.  So it was
 2        a complement to what I'd already been trained
 3        in.
 4    Q   And by Adlerian, you mean A-D-L-E-R-I-A-N,
 5        Arthur Adler?
 6    A   Yes, sir.
 7    Q   Have you been employed as a counselor anywhere
 8        other than Family Concern Counseling?
 9    A   No.
10    Q   How did you become affiliated with Family
11        Concern Counseling?  Does that employer have a
12        therapeutic focus that aligned specifically with
13        your interest, or was there some other factor
14        connecting you to that organization?
15    A   During our training for our graduate work, we
16        had to complete an internship, and this was one
17        place that offered internships.  So I completed
18        my internship there during my graduate training,
19        and then they hired me as a full-time employee.
20    Q   Do you hold any other credentials in the
21        counseling field other than your master's degree
22        from Grace College and the EMDR credential?
23    A   No, sir.
24    Q   Do you hold any license from the State of
25        Indiana?
```

Page 16

1    A    No, sir, I do not.

2    Q    Do you hold a license from any state?

3    A    No.

4    Q    What do you understand to be the counseling or

5         therapeutic services that you are not able to

6         offer due to not having a license as a

7         psychologist from the state of Indiana?

8    A    As long as I am under supervision of a licensed

9         therapist, there is no limit.

10   Q    So who is the licensed therapist who supervises

11        you currently?

12   A    Chris Hamrick.

13   Q    How is his or her last name spelled?

14   A    His last name is H-A-M-R-I-C-K.

15   Q    So how does that supervision work?

16   A    By state requirement, we have an hour of

17        face-to-face supervision weekly.

18   Q    In that hour, do you talk about all of your

19        cases, or maybe I should say all of your

20        clients?

21   A    No, not all of them.  Just selected clients

22        based on need.

23   Q    Does Family Concern Counseling have any

24        faith-based affiliation?

25   A    You mean with a specific organization?

Page 17

1    Q    With a particular denomination or a particular

2         church where the counseling services are offered

3         as complementary to that denomination or that

4         church.

5    A    We do not have any specific relationships with

6         churches or organizations.  Many of the

7         counselors are Christian.

8    Q    I'm going to begin asking you some questions

9         where we'll be looking at the notes as we go

10        along.  Each time I ask you to look at a note,

11        I'll tell you specifically which one we're

12        looking at.  Generally, we're going to proceed

13        in chronological order.

14   A    Okay.

15   Q    So Mr. ███ came to see you in 2018; correct?

16   A    Yes.

17   Q    Your first meeting with him was on February 26,

18        2018?

19   A    Yes, that's correct.  Actually, let me correct

20        that, I'm sorry.  The first meeting I had in

21        relationship to this client was with his

22        parents.

23   Q    Was that a separate meeting with the parents

24        only?

25   A    It was a separate meeting with the parents only,

Page 18

```
 1        and that was on the 26th of February 2018.
 2   Q    So you met with the parents, and then that same
 3        day, subsequently you met with --
 4   A    No.  That day I only met with the parents.
 5   Q    Okay.
 6             (Defendant's Deposition Exhibit 1 marked
 7        for identification.)
 8   Q    So if we look at Defendant's Exhibit 1, your
 9        note indicates, quote, Client's parents came in
10        for first consultation, end quote.  That's what
11        you mean as the meeting where it was parents
12        only, without ███████?
13   A    Yes.
14   Q    Why did your engagement begin with the parents
15        in a meeting without ████?
16   A    They were concerned about his well-being, his
17        inability to thrive, and were seeking
18        professional help.
19   Q    Did they tell you what they thought the problem
20        was that needed help?
21   A    No, they didn't.  They didn't know what the
22        problem was.  It was a memorable meeting because
23        they were in tears for most of it.  They were
24        heartbroken.  Their son had a past that was very
25        productive and fruitful; had withdrawn, spending
```

Page 19

1        most of his days in their basement, had broken

2        all relationships with friends, was not

3        thriving.

4             They'd told me he had an altercation at

5        Purdue where he lost his scholarship, was

6        removed from the university, removed from ROTC.

7        He then tried to reengage at another university,

8        I believe it was Taylor University; could not

9        complete the requirements there, couldn't focus,

10       couldn't complete his classes, withdrew, I

11       believe on probation of some kind because of his

12       academic -- inability to achieve academically.

13            They said, "He's just shut down, he's

14       changed, he's not the son we used to have."

15       They were very broken, very upset.

16   Q   In your Defendant's Exhibit 1, under the

17       assessment in connection with meeting with the

18       parents, your problem list entry shows, quote,

19       Anxiety, depression, end quote.

20            Do you see that?

21   A   Yes, sir.

22   Q   Was that their description of the problem?

23   A   At that point, yes.

24   Q   What did they describe as anxiety behaviors?

25   A   That he was having physical symptoms, that he

Page 20

1    was fearful of going outside of the house, that

2    he had had -- I'm trying to remember at this

3    point.  The hospitalizations I think had already

4    happened.  He'd been in the hospital with

5    symptoms mocking a heart attack:  shortness of

6    breath, palpitations, ongoing stomach problems,

7    fear, worry.

8  Q  What did they describe as depression?

9  A  No interest in the things he used to enjoy, not

10    relating to his friends that he used to spend

11    time with, not entering into family events,

12    fearful to go anywhere.

13        I remember cutting the grass -- that wasn't

14    their report, it was his report.  Cutting the

15    grass was a major thing.  He could go out for

16    five or ten minutes, panic would set in; he

17    couldn't breathe.  He'd have to go in the house

18    and calm down.  Come back out a half hour later;

19    cut a few more minutes.

20        So they shared several stories like that.

21  Q  Did they tell you how long he'd been at Taylor?

22  A  I don't recall.

23  Q  Did you subsequently learn how long he had been

24    at Taylor?

25  A  It may have been mentioned, but I don't remember

Page 21

```
 1        at that point.
 2    Q   Did you have any understanding as to whether it
 3        was more than one semester?
 4    A   No, I don't know.
 5    Q   Did you understand that he had been at Taylor
 6        after he had been at Purdue?
 7    A   Yes, sir.
 8    Q   Over the course of your meetings with ███████,
 9        was there any discussion of what had worsened
10        between the time he was at Taylor as an
11        on-campus residential student going to classes,
12        and when he came home and couldn't mow the lawn
13        for five minutes?
14    A   I don't remember it in a comparative sense the
15        way you've asked the question.  I don't remember
16        discussing it that way.
17    Q   Do you understand the comparison I'm trying to
18        draw?
19    A   I believe so.
20    Q   That while he was at Taylor, he was living
21        outside the family home, sleeping outside the
22        family home, had a class schedule, was at least
23        a sometime student, maybe not a fully successful
24        student, but nonetheless doing some things as a
25        student in his courses, and then subsequently
```

Page 22

1    unable to mow the lawn for five minutes while

2    living at home?

3  A  We didn't discuss in that kind of detail his

4    experience at Taylor.  It was referenced

5    generally, that he went there and he could not

6    thrive; he came home.

7  Q  And when he came home, his condition worsened?

8  A  It was sometime, I don't know exactly when, it

9    wasn't specified, sometime after he left Taylor,

10    the condition worsened.

11  Q  Just a quick note about your note-taking

12    acronyms, does the term CIT refer to you?

13  A  Yes.

14  Q  Does that mean counselor in therapy?

15  A  Counselor in training.

16  Q  In training?

17  A  So when I first met him, it was at the very end

18    of my internship.  You'll see the transition to

19    CR, which refers to counselor; CL is client.

20        (Defendant's Deposition Exhibit 2 marked

21    for identification.)

22  Q  Let's turn to Defendant's Exhibit 2.  So in

23    Exhibit 1, you had met with the parents on

24    February 26.  Now in Exhibit 2, it is March 15

25    of 2018.  Just for clarity, I have not marked

Page 23

```
 1        every one of your notes.  To use our time well

 2        today, I've just selected the ones on which I

 3        have questions.

 4             So I want to first talk about the way your

 5        notes are set up.  Looking at Exhibit 2, under

 6        "Chief Concerns:  Mood state and depression,"

 7        are these chief concerns as reported by the

 8        client?

 9   A    No.  They're recorded by me.

10   Q    So when you wrote "mood state and depression" in

11        this exhibit, was that your concern after having

12        spent a session with Mr. ███ that day?

13   A    Yes.

14   Q    In the same exhibit, in the same part of the

15        exhibit, under "Work Activity," you wrote,

16        quote, Refusing work, doesn't feel he needs to

17        work right now, unquote.

18             Do you see that?

19   A    Yes.

20   Q    What were you referring to when you made that

21        entry?

22   A    The client's statement.

23   Q    Did you ask questions about his work activity?

24   A    Yeah.  Is he working; it was a simple question

25        asked.
```

Page 24

```
 1    Q    And realizing this is some time ago, what
 2         generally do you recall about his answer?
 3    A    What I recorded in my notes.  That was all that
 4         he said.
 5    Q    He said he didn't feel he needed to work?
 6    A    That's correct.
 7    Q    Do you have an understanding what he meant by
 8         that statement?
 9    A    Not at that point.
10    Q    Did he clarify whether he meant he didn't need
11         to work because he had his parents' roof over
12         his head and meals on the table, or some other
13         meaning of needing to work?
14    A    It was a brand-new relationship.  I can only
15         report what happened that day.
16    Q    Something he said caused you to write that he
17         was refusing work.  Was there a discussion that
18         he had been offered work or asked to find work
19         and refused to do so?
20    A    No.  Refusing work is one of the choices on a
21         drop-down menu.
22    Q    What is that choice supposed to capture?
23    A    That the client is choosing not to work at this
24         point in time.
25    Q    So in other words, not a lack of access to work
```

Page 25

1      or an incapacity to work, but just a choice not

2      to work?

3   A  I didn't know at that time.  All I know is he

4      indicated that he was not working and didn't

5      feel he needed to.

6   Q  You understood "didn't feel he needed to" as an

7      expression of his choice?

8   A  All I can tell you is what he said that day.

9   Q  In Defendant's Exhibit 2, you have a number of

10     other notes about the session.  Are all of these

11     fields populated with drop-down menus?

12  A  On the first page labeled 177, up to "Additional

13     Information," everything above that is a

14     drop-down.  And there's space to add additional

15     note with every drop-down.

16  Q  Under "Additional Information" you wrote, quote,

17     Client was focused on defending everything he

18     said with highly intelligent complex answers,

19     unquote.

20         What did you mean by that?

21  A  In our profession, we have a term that is

22     "resistance."  If a client is not comfortable,

23     doesn't trust, is not interested or motivated in

24     the process of counseling, they become very

25     resistant.  So he would have an explanation of

Page 26

```
 1        his -- of some logic for anything I asked him.
 2    Q   Can you give me an example of a question you
 3        asked him that he had an answer for that you
 4        found to be resistant?
 5    A   I don't recall what the questions were that day.
 6    Q   But you do recall that he was resistant to the
 7        therapeutic session?
 8    A   That's correct.
 9    Q   Didn't want to be there?
10    A   I would say that he didn't want to be there and
11        that at that point he did not trust me.
12    Q   Did he express he was only there because his
13        parents were making him attend?
14    A   No, not on that day.
15    Q   In the initial sessions that you had with ███
16        ███ in the first few months of 2018, did he
17        disclose to you any trauma in his past?
18    A   In his past.  Are you asking me in his life?
19    Q   Yes.
20    A   I would have to review all those notes.  I don't
21        recall.
22    Q   In the meeting that you had with his parents as
23        documented in Defendant's Exhibit 1, did his
24        parents disclose to you any trauma in his past?
25    A   They were concerned that his experience at
```

Page 27

```
 1        Purdue was traumatic.  I believe they used the
 2        term that he may have PTSD or something to that
 3        effect.  That was the only mention of anything
 4        traumatic.
 5   Q    What is the procedure at Family Concern
 6        Counseling for making a diagnosis of a patient?
 7   A    As we learn more of the client's story, we
 8        compare that to the criteria in the DSM, which
 9        is the standard in our industry for
10        psychological disorders.  And we work toward, as
11        we learn more of their story and their struggles
12        and their symptomology, what criteria they meet.
13   Q    And for the diagnostic step, does that require
14        the involvement of Mr. Hamrick?
15   A    No, sir, it does not.
16   Q    So in ███████████ case, did any licensed
17        therapist make a diagnostic evaluation of him?
18   A    No.
19   Q    Was there any consideration to have a licensed
20        therapist make a diagnostic evaluation of ██████
21        ██████?
22   A    No.
23   Q    Have you ever made a diagnosis of PTSD?
24   A    Yes.
25   Q    When you make a diagnosis of PTSD, do you record
```

Page 28

1        that in the progress notes?

2    A   Yes.  It would be under the diagnosis.

3    Q   And it would include the diagnostic code for

4        PTSD?

5    A   Yes, sir.

6    Q   So in my understanding, the diagnostic code

7        under the ICD-10 for posttraumatic stress

8        disorder is F43.12.  Does that sound right to

9        you?

10   A   I'd have to look.  I don't have them memorized,

11       sir.

12           (Defendant's Deposition Exhibit 6 marked

13       for identification.)

14   Q   I'd like to jump forward for a moment to

15       Defendant's Exhibit 6.  Defendant's Exhibit 6 is

16       your progress note from the May 15, 2018 session

17       with Mr. ████.  On the second page, which is

18       numbered 167 in the lower right-hand corner, in

19       the "Diagnosis" field you have a diagnosis code,

20       F43.20.  Do you see that?

21   A   Yes, sir.

22   Q   Do you recall what that diagnosis code is for?

23   A   An adjustment disorder unspecified.

24   Q   So as of May 15, 2018, you had not diagnosed

25       PTSD in Mr. ████?

Page 29

1    A    That's correct.

2         (Defendant's Deposition Exhibit 4 marked

3         for identification.)

4    Q    Turn back now, please, to Defendant's Exhibit 4.

5         This is your April 2nd, 2018.

6    A    I have it.

7    Q    From your meeting with Mr. ███, in the "Remarks

8         Made During Session" field, you wrote, quote,

9         Client stated he should be able to support

10        himself by his mid-20s, unquote.

11             Do you see that?

12   A    Yes, sir.

13   Q    Did you understand that to be a statement by

14        Mr. ███ that he thought he would be living

15        independently and employed by his mid-20s?

16   A    It was his response to a question that I asked

17        him as an indication of when, yes, when he might

18        be independent and able to support himself.

19   Q    By "able to support himself," you meant able to

20        earn a paycheck?

21   A    Yes, sir.

22   Q    In the same field you wrote, quote, Client

23        reported his experience at Purdue with sex abuse

24        allegations may have been traumatic but now

25        positive, unquote.

Page 30

1           Do you see that?

2    A    Yes, I do.

3    Q    What did he tell you made that experience,

4         quote, now positive, unquote?

5    A    This was very early in the relationship.  Client

6         was still explaining his symptomology, his

7         medical.  He did not believe there was any

8         psychological basis for his struggle and,

9         therefore, dismissed what happened at Purdue as

10        a possible cause for his medical symptomology.

11   Q    Based on your note, I read it as he did more

12        than dismiss it; he described it as positive.

13   A    Yes, sir, that's what my note says.

14   Q    So in what way did he describe it as positive?

15   A    He didn't elaborate.

16   Q    Were you curious what made it positive?

17   A    No, because I felt he was in denial of what his

18        real problem was.

19   Q    What did you think his real problem was?

20   A    At that point -- let's see, where are we in the

21        journey?  I didn't know for sure at that point,

22        but some distorted cognition that he had taken

23        away from that experience, leading to social

24        anxiety or some other type of anxiety at that

25        point.

Page 31

```
 1   Q   You thought that because that's what his parents
 2       had told you in the first session?
 3   A   No, sir.  I thought that as my professional
 4       opinion.
 5   Q   In any of the notes that we've looked at, did
 6       you record anything about the Purdue experience?
 7   A   In any of the notes we've look at so far?
 8   Q   Yes.
 9   A   I'd have to look back through them.  I don't
10       remember precisely.
11   Q   So as of this April 2nd, 2018 session with ███
12       ███, both ███ and his parents thought that he
13       should and would be working, certainly by the
14       time he was in his mid-20s?
15   A   I don't know what his parents were thinking.
16       Client responded to the question I asked him and
17       he thought by his mid-20s he should be able to
18       support himself.
19   Q   Isn't it true that when his parents came to see
20       you, they were upset because he was living in
21       their basement and not working?
22   A   They were upset because he was withdrawn and
23       struggling.  I don't remember them specifically
24       saying it was because he wasn't working.
25   Q   ███ himself told you at a number of points over
```

Page 32

```
 1        your therapeutic relationship with him, that his
 2        father thought he should be working at that
 3        time; right?
 4    A   Yes.  His parents both desired him to have
 5        employment.
 6    Q   In their view, as ███ related to you, that was
 7        not something to be achieved by his mid-20s,
 8        that was something he should be doing as of the
 9        time he was doing therapy with you; right?
10    A   Can you restate the question, please?
11    Q   Sure.  As described by ██████, his parents
12        thought that he should have already been in a
13        job while he was meeting with you for a period
14        of more than a year?
15    A   Yes.
16    Q   And █████ himself thought that he should be in a
17        job by his mid-20s?
18            MR. BYLER:  Objection to form.
19    Q   It's still a pending question, Mr. Perry, so you
20        should answer.
21    A   When I asked the client the question at what
22        point in his life he feels he should be able to
23        support himself, he said mid-20s.
24    Q   Mr. Perry, in looking over your notes of your
25        meetings with ███████ between early 2018 and
```

Page 33

```
 1        mid-2020, I did not see any mention by you of
 2        any mention by ████████ of an aspiration to a
 3        military career.  Did --
 4   A    Are you asking me if I put in my notes that he
 5        aspired to have a military career?
 6   Q    Yes.
 7   A    We didn't discuss it.
 8   Q    He didn't bring the subject up to you and you
 9        didn't bring the subject up to him?
10   A    No.  I said I didn't put it in my notes.
11   Q    I think you just said you didn't discuss it.
12   A    Can you restate the question, please?
13   Q    I think you've answered it.  I'll go ahead and
14        move on.
15             So what did you understand from Mr. ████ to
16        have been his academic interests when he left
17        high school for college?  What did he want to
18        study?
19   A    He never told me what he wanted to study.  I
20        know that he was enrolled in the ROTC, he was
21        enrolled at Purdue as a full-time student, I
22        believe he had scholarships along with that.
23        That's all I know.
24   Q    Did he tell you anything about his academic
25        performance at Purdue?
```

Page 34

```
 1   A   No.

 2   Q   Did you ask?

 3   A   No, not that I recall.

 4   Q   Did he tell you whether he was academically

 5       eligible to continue at Purdue in ROTC for his

 6       sophomore year?

 7   A   I don't know when in reference to

 8       freshman-sophomore year.  I just know that he

 9       was told he had to withdraw from the program.

10   Q   From the ROTC program?

11   A   Yes.

12   Q   Your objective with Mr. ███ was to make

13       therapeutic progress in the course of

14       approximately ten sessions; right?

15   A   No.  My objective was to help him address his

16       goals in whatever time period that took.

17           (Defendant's Deposition Exhibit 12 marked

18       for identification.)

19   Q   Move forward, if you would, please, to

20       Defendant's Exhibit 12, which is your

21       October 29, 2019 progress note.

22   A   I have it.

23   Q   On the second page of that note, which is

24       numbered 150 in the lower right-hand corner, you

25       have a list of goals, and the number one goal
```

Page 35

1      refers to, quote, Client will learn why he has

2      anxiety and will lower from a 10 to 3 by client

3      reports in 10 to 12 sessions, unquote.

4          Do you see that?

5  A   Yes, sir.

6  Q   And you repeated that statement in many of your

7      subsequent progress notes; did you not?

8  A   I would have to look.

9          It's certainly in the next one.

10         (Defendant's Deposition Exhibit 41 marked

11     for identification.)

12 Q   For example, if we go forward to Defendant's

13     Exhibit 41, which is dated June 22 of 2020,

14     approximately 20 months after Defendant's

15     Exhibit 12, your statement of goals includes the

16     identical statement; does it not?

17 A   Yes, sir.

18 Q   So if Mr. ███ had an anxiety disorder, the

19     therapy that you had in mind was designed to be

20     effective in a course of 10 to 12 sessions to

21     lower his anxiety from a self-report of 10 to a

22     self-report of 3; correct?

23 A   No, sir.

24 Q   What about the statement I just made is not

25     correct?

Page 36

1   A   Goals are objectives that we work towards, that

2       we try to define and achieve them.  But they are

3       not an exact measurement.  They're a goal that

4       we strive for.

5   Q   Where did you come up with the number 10 to

6       12 sessions?

7   A   Best estimate at the time.

8   Q   Based on what?

9   A   What I knew at that point of his case.

10  Q   So everything that you knew about Mr. ████ when

11      you set this goal suggested to you that his

12      anxiety was a candidate for lowering in 10 to

13      12 sessions from a self-report of 10 to a

14      self-report of 3?

15  A   No.  That goal was to strive to achieve it in

16      that time period.

17  Q   It wasn't a random goal; it was a goal based on

18      your training; was it not?

19  A   Correct.

20  Q   So it was a goal based on your understanding of

21      the therapeutic literature and the therapeutic

22      techniques and how similarly situated patients

23      would respond; correct?

24  A   No.  It's an individual evaluation made based on

25      the needs of each client.

Page 37

```
 1   Q   Without regard to what the therapeutic
 2       literature says?
 3   A   No, I didn't say that.
 4   Q   You just disagreed with my statement, and my
 5       statement asked you about the therapeutic
 6       literature.
 7   A   Our training informs our goals and our approach,
 8       the therapies we might use, absolutely.  But a
 9       goal is something we strive for.  It is not an
10       exact definition of how it will happen.
11   Q   I didn't ask you anything about exact
12       definitions of how it will happen.  I asked you
13       whether that was what you thought was
14       achievable.
15   A   At that point in time, yes.
16   Q   And that never changed, did it?
17   A   I never changed the goal, that's correct.
18   Q   Did you meet the goal?
19   A   Ultimately, yes.
20   Q   Tell me what you mean by that.
21   A   By the end of his therapy, the goal was
22       achieved.
23   Q   And "by the end of his therapy," you mean his
24       last session with you in mid-2020?
25   A   Correct.
```

Page 38

```
 1   Q   And in what sense was the goal achieved as of
 2       that time?
 3   A   The client's report of his anxiety was at the
 4       level that we strive to reach.
 5   Q   It was at a self-report of 3?
 6   A   I'd have to look at the goals.  There were times
 7       when I did question him towards the end of
 8       therapy and he did comment specifically where it
 9       was.
10   Q   So if a client has a self-report of 3 on an
11       anxiety scale of 1 to 10, you would consider
12       that to be a success for the type of therapy you
13       were attempting with Mr. ████?
14   A   Yes.
15   Q   And reaching that milestone of success should
16       mean, in Mr. ████'s case, that he was ready, for
17       example, to return to the workforce as of
18       mid-2020?
19   A   It would mean that we met that goal.
20   Q   That you met that obstacle to his return to the
21       workforce?
22   A   It would mean that we met the goal of lowering
23       his anxiety to that level.
24   Q   As of mid-2020, was there anything in your
25       therapeutic interaction with Mr. ████ that
```

Page 39

```
 1          indicated to you that anxiety was an obstacle to

 2          his return to the workforce?

 3               MR. BYLER:  Objection to form.

 4     A    I was focused on achieving goals.  I don't

 5          recall an answer that would satisfy your

 6          question.

 7     Q    Well, every single therapeutic note that you

 8          took made an annotation on client's refusal to

 9          work.  So that was central to the therapeutic

10          project you were undergoing with Mr. ███;

11          correct?

12     A    It's one of the drop-down boxes that was marked.

13     Q    Not just a software box; it's an objective; is

14          it not?

15     A    It is one of the drop-down boxes we can choose

16          from in describing the case.

17     Q    So you never reached a professional opinion as

18          of mid-2020 whether Mr. ███ had an anxiety

19          condition that was an obstacle to his return to

20          the workforce?

21               MR. BYLER:  Objection to form.

22     A    We were focused on achieving the goals as we

23          initially established.

24     Q    That wasn't my question, with respect.  My

25          question is just a yes-or-no question.
```

Page 40

1          Did you have a professional opinion as of

2     mid-2020 on the topic of whether Mr. ███ had an

3     anxiety condition that stood in the way of his

4     return to the workforce?  Either you had such an

5     opinion or --

6   A  I don't recall an opinion at that point in time.

7   Q  Mr. ███ had a recurring usage of stimulants

8     before and during the time you were in therapy

9     with him; correct?

10  A  I have no knowledge of that the way you've

11    stated it.

12  Q  Well, you've reviewed your progress notes before

13    today's deposition.  You're aware that in many,

14    many of those notes, you record stimulant use;

15    right?

16  A  Yes, that was the initial entry; that remains

17    part of the file.

18  Q  And so for example, in August of 2018, about six

19    months after you first met with Mr. ███s

20    parents, ███ called you and said that he

21    was at the ER because ███ had been using

22    experimental mind-enhancing substances that

23    landed him in the ER twice.  Do you recall that?

24  A  Which exhibit are you looking at, sir?

25  Q  Defendant's Exhibit 7.

Page 41

1          (Defendant's Deposition Exhibit 7 marked

2      for identification.)

3  A   I see that note, yes, sir.

4  Q   The subject of stimulant use came up in several

5      of your sessions with Mr. ███, did it not?

6  A   What sessions are you referring to, please?

7  Q   I'm just asking you whether you remember it

8      coming up.

9  A   There was more than one session where it was

10     discussed.

11 Q   Did you explore with Mr. ███ why he was using

12     stimulants?

13 A   Only on one occasion.

14 Q   What did you discuss with him?

15 A   It was the occasion of when he started his new

16     job.

17 Q   How did the topic come up?

18 A   I believe I asked him why he chose to use

19     stimulants.

20 Q   What did he say?

21 A   I believe that he was -- I don't remember

22     exactly, but he was tired and anxious and

23     thought it might help him be more awake and

24     alert for his new job.

25 Q   Did you believe that explanation?

Page 42

1    A    I had no reason to question it.

2    Q    Did you ever obtain from Mr. ███ any disclosure

3         of what prescriptions he had for medications?

4    A    No.  He referenced -- he always referenced it

5         generically as "stimulants."  One time I believe

6         he used the word "Adderall."

7    Q    And he described it as self-prescribed Adderall?

8    A    I'd have to look at that note.

9              (Defendant's Deposition Exhibit 8 marked

10        for identification.)

11   Q    Take a look, please, at Defendant's Exhibit 8.

12   A    Okay.  I see that note.

13   Q    That he told you this was his second trip to the

14        ER possibly because of too much self-prescribed

15        Adderall?

16   A    Correct, I see the note.

17   Q    By "self-prescribed," did you understand that to

18        mean he didn't have a doctor's prescription?

19   A    I didn't know.  He didn't specify.

20   Q    He used the term "self-prescribed"?

21   A    I don't recall.

22   Q    Well, you said you don't know what the term

23        means, so it wasn't your term, I gather?  It

24        must have been his term?

25   A    I honestly don't remember.

Page 43

1    Q    In other words, he was acquiring Adderall
2         without a prescription?
3    A    We didn't discuss that.
4    Q    Did you not find it irrelevant to your
5         diagnostic task with Mr. ████ to have a full
6         disclosure of what medications he was taking and
7         where he was getting them, whether under a
8         doctor's care or otherwise?
9    A    I am not medically trained.  I knew he was under
10        the care of a physician, so that was not my
11        concern professionally.  Awareness of him
12        sharing it with me, I made note of.
13   Q    Why do you say he was under the care of a
14        physician?
15   A    He had been seeing a physician the entire time I
16        was seeing him.
17   Q    Well, he described the person as a holistic
18        doctor; correct?
19   A    He saw many healthcare professionals:  medical
20        doctors, holistic doctors, acupuncturists.
21        There were many professionals that helped him.
22   Q    There are drugs that can cause anxiety effects,
23        are there not?
24   A    I don't know.  I'm not a doctor.
25   Q    In your therapeutic training, did you ever

Page 44

1     encounter that proposition?

2  A  Yes, it is a possibility.

3  Q  Stimulants can cause anxiety in some people, can

4     they not?

5  A  I would have to know what stimulant you're

6     referring to specifically.

7  Q  Well, you've heard of the general proposition

8     that stimulants can stimulate anxiety, among

9     other things; right?

10  A  They can make it worse, is what I was trained.

11     Beyond that, I have no expertise.

12  Q  So stimulants can make anxiety worse, and you

13     were treating Mr. ███ for what he characterized

14     as anxiety.  Would it not be relevant to know

15     what stimulants he was taking?

16  A  In my professional opinion, I felt he was having

17     panic attacks and the stimulants were very

18     secondary.

19         (Defendant's Deposition Exhibit 15 marked

20     for identification.)

21  Q  Take a look at Defendant's Exhibit 15.

22         MR. BYLER:  Did you say 15 or 16?

23         MR. KEALEY:  15, one-five.

24         MR. BYLER:  Thank you.

25  BY MR. KEALEY:

Page 45

1    Q    Under your field for chief concerns in
2         Defendant's Exhibit 15, one of your chief
3         concerns listed was anxiety; right?
4    A    Correct.
5    Q    You didn't write panic attacks, you wrote
6         anxiety; right?
7    A    That note says anxiety, yes.
8    Q    Many of your notes say anxiety, do they not?
9    A    There's also reference to panic attacks in the
10        notes.
11   Q    My question is about where you write down
12        anxiety.
13   A    Where it says "Chief Concerns," mood state and
14        anxiety is what's written on the paper, yes,
15        sir.
16            (Defendant's Deposition Exhibit 14 marked
17        for identification.)
18   Q    In fact, you wrote that in every one of your
19        progress notes, starting on at least
20        Defendant's 14 on December 10, 2018, through the
21        end of your therapeutic relationship with
22        Mr. ███ in mid-2020, didn't you?
23   A    In that field, yes, sir.
24   Q    So you, in fact, were evaluating Mr. ███ as
25        somebody who had an anxiety condition?

Page 46

1    A    Yes, sir.

2    Q    That, as you stated, could be worsened by

3         stimulant use?

4              MR. BYLER:   Objection to form.

5    A    You asked me if I knew stimulants could impact

6         anxiety, and I said yes, part of my training

7         informed me of that.

8    Q    What you said is that it could make anxiety

9         worse?

10   A    Correct.

11   Q    So if you're treating a patient for anxiety and

12        you know that they're using stimulants, would it

13        not be important to know what stimulants they're

14        using, with what frequency and what dosage, and

15        whether prescribed or bought off the street?

16   A    The only concern I would have is if the client

17        is continuing to use those stimulants.   The

18        client reported that he had stopped, so I no

19        longer was concerned.

20   Q    Was stopping using the stimulants part of the

21        progress that you reported was achieved by

22        mid-2020?

23   A    No, that was not part of our -- that's not what

24        I recorded.

25   Q    I'm just asking you if it, in fact, is plausible

Page 47

```
 1        that that was one reason the anxiety got better
 2        by mid-2020.
 3   A    It was not one of our goals and I did not
 4        discuss it with him further.
 5   Q    So you don't have any view one way or the other
 6        whether Mr. ████ reporting that he was stopping
 7        using stimulants was one reason why his anxiety
 8        level was going down?
 9   A    No, because the majority of his symptoms
10        remained.
11   Q    You testified a few minutes ago that by
12        mid-2020, a majority of his symptoms did not
13        remain.
14   A    At the time I referenced originally, which was
15        when he started a new job, that was the
16        reference to when he was using stimulants.  I
17        don't remember the date of that specifically,
18        I'd have to look back at the notes.  When the
19        client reported he was no longer using
20        stimulants and his symptoms remained, I
21        eliminated that as a variable.
22   Q    A moment ago you told me you didn't consider it
23        as a variable, that it wasn't part of your
24        evaluation.
25   A    My professional opinion was, he was having panic
```

Page 48

1        attacks.

2    Q   Did you identify it as a variable or not?

3    A   At what point in time?

4    Q   Did you identify it as a variable at any point

5        in your therapeutic relationship with Mr. ███?

6    A   I considered it when he reported it.  But once

7        he reported no longer using them, it was no

8        longer a variable.

9    Q   Did you ever tell Mr. ███ that one step he

10       could take to reduce his anxiety was to reduce

11       his stimulant use?

12   A   I don't recall.

13   Q   One of your recorded diagnoses of Mr. ███ under

14       code 43.20 was adjustment disorder, as you've

15       testified.  What did you diagnose Mr. ███ as

16       adjusting to?

17   A   Adjustment disorder is a broad diagnosis until

18       we know the specific cause of the symptomology

19       we're treating.  So that diagnosis specifically

20       says, "Adjustment disorder unspecified."  As we

21       progressed with his care, the diagnosis was then

22       changed.

23   Q   How was it changed?

24   A   I'll have to look.  I believe I changed it

25       twice.  Once was to adjustment -- let me look to

Page 49

1    be sure.

2        It was changed on 9/19.  On 9/19/2018, your

3    Exhibit 10.  The diagnosis was changed to

4    F43.23, which is adjustment disorder with mixed

5    anxiety and depression.  And on October 10,

6    2018, my final diagnosis was social anxiety

7    disorder with panic attacks.

8        So it was changed twice after the original

9    diagnosis.

10        (Defendant's Deposition Exhibits 10 and 11

11    marked for identification.)

12  Q  When you were diagnosing it as adjustment

13     disorder, what did you theorize was the event to

14     which Mr. ████ was struggling to adjust?

15  A  At what point in time?

16  Q  Well, let's take the first point.  You just gave

17     me a chronology, so let's begin at the

18     beginning.

19  A  So are you asking me when I changed the

20     diagnosis the first time?

21  Q  You said you started with "adjustment disorder

22     unspecified."

23  A  That's correct.

24  Q  So let's begin with, when you first made that

25     diagnosis, what was the event to which he was

Page 50

```
 1        adjusting?
 2    A   At that point all I had to go on was what
 3        happened at Purdue and at Taylor.
 4    Q   What had happened at Taylor?
 5    A   That he was unable to thrive in that environment
 6        and had to come home.
 7    Q   Was that a cause or a symptom?
 8    A   I don't understand your question.
 9    Q   What was he failing to adjust to at Taylor?
10    A   I would define thriving as staying enrolled,
11        achieving academic accomplishment, and moving
12        forward in his education.  He was unable to do
13        that.
14    Q   The diagnosis of adjustment disorder is a
15        disordered response to a life event; correct?
16    A   Correct.
17    Q   So what life event was Mr. ███ failing to
18        adjust to while he was at Taylor?
19    A   As I repeated earlier, his trouble adjusting was
20        related to both events, Purdue and Taylor.
21    Q   Well, neither Purdue nor Taylor is an event;
22        they're both educational institutions.  So those
23        are places; places aren't events.
24            What event at Taylor was he failing to
25        adjust to?
```

Page 51

1   A   His inability to thrive.

2   Q   That's not an event.

3   A   I don't have knowledge beyond that, sir.

4   Q   Why did you change the diagnosis from adjustment

5       disorder to social anxiety?

6   A   When or why?

7   Q   Why.

8   A   Because it became more apparent, the nature of

9       his struggle, the origins of his struggle.

10  Q   One way it became more apparent was it became

11      more apparent that his struggle, by his account,

12      had to do with his negative experience with his

13      father when he was still living at home before

14      college; right?

15  A   What exhibit are you referring to, sir?

16  Q   Do you recall what I'm talking about?

17          MR. BYLER:  Object to form.

18  A   No.  What specifically are you referencing in my

19      notes, please?

20  Q   I'll get the note.  But you just testified that

21      you changed the diagnosis because he had changed

22      information.  Do you remember what changed

23      information you had?

24  A   Let me review my note and I'll let you know.

25  Q   Okay.

Page 52

1    A    It was a time frame of the increase in

2         symptomology reported by the client, if you look

3         at Exhibit 10.

4    Q    Yes.

5    A    Part of diagnosing something requires a specific

6         period of time of which they had those symptoms.

7         So as I progressed with his care and learned

8         more information, it allowed me to refine my

9         diagnosis.

10   Q    So in Exhibit 10, you used the acronym CR.  What

11        does the acronym CR stand for?

12   A    Counselor.

13   Q    The date of Exhibit 10 is September 19, 2018?

14   A    Correct.

15   Q    And you write in the middle of the "Remarks"

16        section, quote, CR assessed onset six months ago

17        with increase three months ago.  CL reported

18        started coming to counseling the first time six

19        months ago and his parents stepped up their game

20        three months ago, unquote.

21             Do you see that passage?

22   A    Yes, sir.

23   Q    Can you translate that for me?

24   A    I was trying to determine the severity of his

25        symptoms, and we use scaling to do that, either

Page 53

```
 1        time or other measures.  And this allowed me to
 2        find the point at which his symptomology
 3        increased and caused additional distress in his
 4        life.
 5   Q    Well, you used the word "additional," but you
 6        also, in this passage I quoted, used the word
 7        "onset."  That would mean the beginning; right?
 8   A    This was the client's report at that time, yes.
 9   Q    No, your entry says this was your assessment.
10   A    Based on what the client told me, that's
11        correct.
12   Q    So you assessed the onset of anxiety as
13        approximately March of 2018?
14   A    My questioning of the client gave me that time
15        frame.
16   Q    In the passage I quoted to you, there's a
17        reference to the parents stepping up their game
18        three months ago.  What does that mean?
19   A    They were having discussions with him about
20        moving forward in life.
21   Q    Their view as of September 2018 and the three
22        months leading up to September was that ███
23        ███  should be moving forward in life?
24   A    You'd have to ask them.  I don't know exactly
25        what they were thinking.  I can only tell you
```

Page 54

```
 1         what he told me.
 2    Q    I'm asking what he told you.
 3    A    He told me that his parents were increasing
 4         their conversations about him moving forward in
 5         life.
 6    Q    Did you ever learn in your therapeutic
 7         interaction with ███████ when he was enrolled
 8         at Purdue?
 9    A    You mean a specific date?
10    Q    Yes.
11    A    No, I don't know the specific date he enrolled.
12    Q    So in this entry, you're trying to create a
13         chronology of onset of symptoms by months.  Do
14         you know, as of September 2018, how long ████
15         ████ had been gone from Purdue?
16    A    No.
17    Q    Did it matter to you?
18    A    Did it matter to me?
19    Q    Did it have any therapeutic relevance to you to
20         know how long he had been gone from Purdue as of
21         the time of the, quote, onset, unquote, of the
22         anxiety described in Defendant's Exhibit 10?
23    A    No.  I was evaluating the severity of his
24         symptoms and what his report was as to when they
25         were worse.  I wasn't thinking about Purdue at
```

Page 55

1          that point in time.

2    Q    In the same entry, there are notes about Purdue

3         and Taylor.  Do you see that?

4    A    Yes, I do.

5    Q    How did that come up in this context?

6    A    The statement that the client made towards the

7         end of the session.

8    Q    Not something that you thought was relevant to

9         diagnosing the chronology of the anxiety onset?

10   A    Diagnosing the problem is not from my

11        profession.  I was not concerned about

12        chronology of things.  I was concerned about

13        distortions, the cognitive distortions in his

14        mind that that event may have impacted or

15        imprinted.  Identifying those and correcting

16        those would bring him healing and good health.

17   Q    What event are you talking about?

18   A    Purdue and Taylor.  Whatever -- that was his

19        struggle, that's been his reported struggle.

20             (Defendant's Deposition Exhibit 20 marked

21        for identification.)

22   Q    Take a look at Defendant's Exhibit 20, please.

23        A moment ago you referred to Mr. ████s reported

24        struggle.  So I'd ask you to take a look at the

25        next-to-last paragraph in the "Remarks" section

Page 56

```
1        on page 106 of Defendant's Exhibit 20.
2             In this paragraph, there is passage that
3        reads, quote, CR and CL also conceptualized how
4        his possible fear of failure could be part of
5        his struggle, unquote.
6             Do you see that?
7    A   I must be in the wrong paragraph.  Hold on.
8             Yes, I see it now.
9    Q   So fear of failure was part of the struggle that
10       the two of you together conceptualized as
11       needing therapeutic attention; right?
12   A   In March of 2019, yes, that's correct.
13   Q   And the fear of failure was attributed by
14       Mr. ████ in some degree to, quote, his middle
15       school years, remembering his father was and
16       still is very controlling, unquote.
17            Do you see that?
18   A   I see the note, yes.
19   Q   That was his own description of a factor in his
20       struggle with fear of failure; right?
21   A   That was his description, yes, that day.
22   Q   And he elaborated, quote, CL reported he did not
23       feel he could please his father and felt like a
24       failure, unquote; right?
25   A   When he was reflecting on his middle school
```

Page 57

```
 1        years, yes.
 2    Q   Well, actually in the previous sentence, he said
 3        it started in his middle school years and that
 4        his father, quote, still is very controlling.
 5        Do you see that?
 6    A   "Client reflected back on his middle school
 7        years, remembering his father was and still is
 8        very controlling."  Yes, I see the sentence.
 9    Q   So his fear of failure in the eyes of his father
10        was from his middle school years right up to the
11        date of that session?
12            MR. BYLER:  Object to the form.
13    A   You'd have to ask his father.  The way you asked
14        that, it sounds like you're asking me what his
15        father thinks.
16    Q   No, not at all.  I'm asking you what you wrote.
17    A   I can reread what I wrote, if that helps.
18    Q   Yes, since I'm asking you to confirm the meaning
19        of what you wrote.
20            MR. BYLER:  Object to the form.
21    Q   Mr. ██████ described fear of failure in the eyes
22        of his father as something that still was, as of
23        the date of that session, part of his struggle.
24    A   He said his father "was and still is very
25        controlling."  He didn't say his fear of failure
```

Page 58

1       was and still is.

2   Q   Well, the very next sentence says that he

3       "reported he did not feel he could please his

4       father."

5   A   Past tense.  This was in reference to middle

6       school.  The conversation was in reference to

7       middle school.  He did make the statement that

8       his father is still controlling presently, but

9       we were talking about middle school.

10  Q   The relevance of talking about middle school

11      fear of failure would be whether Mr. ███ was

12      experiencing a fear of failure on March 25th,

13      2019; right?

14  A   He was comparing the feeling he had in middle

15      school to the feeling he had after his

16      experience at Purdue and Taylor.  He was drawing

17      a comparison between those two feelings and

18      experiences in his life.

19          (Defendant's Deposition Exhibit 23 marked

20      for identification.)

21  Q   Take a look at Defendant's Exhibit 23, which is

22      an April 15, 2019 session note.  Under the

23      "Remarks" section, there is a discussion of the

24      urinary tract discomfort Mr. ███ was

25      experiencing at the time of the session, and the

Page 59

1           discussion of his decisions and interactions

2           regarding his doctor.

3    A      Yes.

4    Q      And your note states in the present tense,

5           quote, Client initially reported it could be

6           related to his strict, controlling father,

7           unquote.

8                 Do you see that?

9    A      I see the sentence.

10   Q      The next sentence, "Counselor challenged client

11          to reflect on other times authority broke his

12          trust."

13                Do you see that?

14   A      Yes, I see it.

15   Q      So he was stating that his distrust of anyone in

16          a position of authority as of April 2019 could

17          be related to his strict, controlling father?

18                MR. BYLER:  Objection to form.

19   A      All I can do is tell you what he said.  "Client

20          initially reported it could be related to a

21          strict, controlling father."  That was a

22          statement that he made.

23   Q      And it was a statement in the context of

24          something that was happening then, not something

25          that happened in his middle school years?  Then

1      in 2019.

2  A   We were talking about his struggle with trusting

3      authority figures in general, and that was the

4      context of the conversation.

5  Q   What did you attempt therapeutically to deal

6      with Mr. ████'s fear of failure in the eyes of

7      his strict, controlling father?

8  A   It was not a primary concern of my care.  His

9      symptomology was a result of distorted beliefs

10      and cognitions about himself and the world

11      around him.  I was focused on treating that

12      distortion to bring him healing and good mental

13      health.

14  Q   Was his relationship with his strict,

15      controlling father as of 2019 part of that

16      distortion?

17          MR. BYLER:  Objection to form.

18  A   I don't know.  That wasn't something I worked on

19      specifically.

20  Q   Well, you thought about it, you asked him about

21      it, and you wrote it down.

22  A   It was mentioned, but it wasn't the primary

23      focus of my care.  We explore many things when

24      we're trying to find the root of a problem.

25  Q   This was one of the roots that the client told

Page 61

1    you was troubling him, wasn't it?

2        MR. BYLER:  Object to the form.

3  A  No, sir, it wasn't a root.  It was an

4     observation and a comment made.

5  Q  It wasn't a root in your view or it wasn't a

6     root in Mr. █████'s view?

7  A  I don't know, because it wasn't what I treated

8     ultimately.

9  Q  As a therapist, weren't you in the business of

10    treating the roots of distress reported by the

11    client?

12 A  The roots of distress related specifically to

13    his present symptomology and symptoms, not every

14    problem he has in his life.

15 Q  If you're going to talk about things that

16    happened in the past at his colleges and you're

17    going to talk about things that happened in his

18    middle school years, and one of the things that

19    he says happened in his middle school years and

20    to the present is a strict, controlling father,

21    how do you set that aside as part of the

22    therapeutic task?

23 A  I would identify it as part of discovery.  And

24    then we moved from that point in therapy to

25    identifying the distorted cognitions we had.  We

Page 62

```
 1        treated that with EMDR therapy.
 2   Q    You just chose not to treat him for his fear of
 3        failure in the eyes of his strict, controlling
 4        father; is that what you're telling me?
 5   A    That was not my primary concern.
 6   Q    It wasn't your concern at all?
 7   A    I said that was not my primary concern.
 8   Q    I know, and I'm asking a follow-up question.
 9        Was it your concern at all?  Was it a secondary
10        concern?
11   A    It was part of discovery to learn and understand
12        what might be going on with my client.
13   Q    I'm asking a question about your therapeutic
14        objective.  Was it even a secondary therapeutic
15        objective for you to treat your client's fear of
16        failure in the eyes of his strict, controlling
17        father?
18   A    No.
19             MR. BYLER:  Objection to form.
20   Q    Thank you.
21             MR. KEALEY:  We've been going for an hour
22        and three quarters and I think I owe the
23        reporter a break, so let's go ahead and take a
24        five-minute break.
25             (A recess was taken between 2:44 p.m. and
```

Page 63

1        2:53 p.m.)

2             (Defendant's Deposition Exhibit 16 marked

3        for identification.)

4    BY MR. KEALEY:

5    Q    So we're back on the record.  Let's take a look

6         at Defendant's Exhibit 16, which is the progress

7         note for January 14, 2019.

8             Mr. Perry, in your "Remarks" section on

9         this progress note, you refer to starting EMDR

10        therapy.  Just for the record, can you recite

11        what the EMDR acronym stands for?

12   A    Yes.  It's eye motion desensitization and

13        reprocessing.

14   Q    In a sentence or two, what does the technique

15        involve?

16   A    The technique duplicates the process of our

17        brain during REM sleep, to cope with life,

18        correct distortions from life, and help us move

19        forward.  EMDR duplicates that process, allows

20        us to go into the unconscious mind, identify and

21        correct cognitive distortions that are causing

22        distress in a person's life.

23   Q    In the session itself, what are the types of

24        techniques used?

25   A    It's basically a three-phase process.  We

1      identify what is the cognitive distortion.  I'll

2      use as an example a young lady who is bullied

3      for multiple years in school, middle school.

4      She may leave that and, as a grown adult,

5      believe that she is undesirable, unlovable,

6      affecting relationships and marriage and other

7      parts of her life.

8           Once we identify in words the cognitive

9      distortion, "I'm unlovable," we go back to times

10     in her life when she felt that way, and we

11     process that event with the negative "I'm

12     unlovable"; we replace it with a new cognition

13     of the client's choosing, "I am lovable," that's

14     Phase 2.

15          And Phase 3 is called a body scan.  Our

16     body remembers trauma.  We have to clear out

17     anything that the body nervous system has stored

18     from that trauma and distorted cognition.

19  Q  In Defendant's 16 you use the phrase of

20     "securing his container."  What does that phrase

21     mean?

22  A  One of the things that we have to protect people

23     from is not retraumatizing them and not making

24     them relive a difficult life experience.  A

25     container is an object, a symbolic object that

Page 65

1      allows the mind to compartmentalize these events

2      and put them somewhere safe, and recognize and

3      connect with them, without reliving the

4      traumatic experience.

5   Q  So in Defendant's 16, your diagnosis on the

6      second page, numbered page 136, is diagnosis

7      code F40.10.  That's a change of code and a

8      change of diagnosis; correct?

9   A  Yes, sir.

10  Q  That's the code for social phobia?

11  A  Social anxiety disorder, yes, with a

12     specified -- by the number, with a specifier of

13     panic attacks.

14  Q  Is the term "social phobia" also used in that

15     code?

16  A  It may have been in the older diagnosis, the

17     ICD -- ICD, maybe, codes.  But on the current

18     DSM-V, which is the current standard, social

19     anxiety disorder.

20  Q  So in that context, what does the term "social"

21     refer to?

22  A  Interactions with other people where the person

23     feels judged, fears being judged by others.

24  Q  So your diagnosis as of Defendant's 16, the

25     January 14, 2019 note, was anxiety due to fear

Page 66

```
 1        of being judged?
 2    A   Yes, sir.
 3    Q   And your pursuit through the EMDR technique was
 4        to isolate the experiences of being judged and
 5        proceed from there?
 6    A   Genetically -- yes, generically, yes.  We have
 7        to use an event from the person's life to access
 8        where it is in the unconscious mind.
 9    Q   An experience, in Mr. ████'s case, of being
10        judged?
11    A   An experience where he felt what he describes as
12        his cognitive distortion.
13    Q   The distortion of feeling judged?
14    A   No.  Feeling judged is a description of how the
15        person is impacted by the disorder and what the
16        root of the fear is.
17            So when I mentioned earlier that he had
18        trouble mowing the grass, neighbors who knew
19        that he'd gotten a scholarship, was going to
20        have an ROTC Purdue experience, would see him
21        back home when he should be in college.  That's
22        an environment and a situation where he might
23        feel judged.
24    Q   Judged by the neighbors?
25    A   Correct, even though they may not even be
```

Page 67

```
 1        present.
 2   Q    Neighbors that have also seen him go off to
 3        Taylor and come back?
 4   A    Correct.
 5   Q    What about his father seeing him and judging him
 6        for not being in the workforce?
 7   A    Generally, it's in social settings where they
 8        have to interact with other people.  That
 9        diagnosis is specific to outside of their home,
10        social settings where they have to interact with
11        public, other people.
12   Q    So in the EMDR therapy, were you trying to
13        address negative recollections of his
14        interactions with his father?
15   A    I'd have to look and see.  We processed many
16        different distorted cognitions.  I don't recall
17        if we processed any related to him specifically
18        or not.
19   Q    Where would that be shown in your notes?
20   A    I have no idea.  It would be in one of the
21        sessions if it's in there; I just don't know
22        which one.
23   Q    For the social anxiety relating to perception of
24        being judged --
25   A    Yes.
```

Page 68

1    Q    -- being at home mowing the lawn also is
2         associated with not living independently;
3         correct?
4    A    I'm not sure how you're making that connection.
5         Can you elaborate on that, please?
6    Q    Well, you gave the example of people, in
7         Mr. ████s mind, people asking the question of,
8         "Why are you at home mowing the lawn?  I thought
9         you went off to college."  A variation on that
10        would be, "Why are you at home mowing the lawn?
11        I thought that you had moved out of the home and
12        were living independently."
13   A    Someone could have that variation, I suppose.
14   Q    Or, "Why are you at home mowing the lawn and not
15        at a job?"
16             MR. BYLER:  Objection.  Speculation.
17   A    At the time, the client said it was his fear of
18        what they thought of him, because he shouldn't
19        be at home right now, he should be at school.
20   Q    So the first part of it is "shouldn't be at home
21        right now."  The second part of it is, "If
22        you're not at home, where are you?"; right?
23             MR. BYLER:  Objection to form.
24   Q    And one of the things he had reported to you is
25        that his parents thought he should be at a job?

Page 69

```
 1          MR. BYLER:  Objection to form.
 2  A   I feel like you're combining two things that are
 3      unrelated.
 4  Q   Well, they're related enough for you to combine
 5      them in your notes.
 6  A   Where did I combine them in my notes?  Can you
 7      show me the exhibit?
 8  Q   Sure.  First we looked at Defendant's Exhibit 20
 9      previously, so let's go back there.  Exhibit 20
10      is the March 25, 2019 note.
11  A   I have it.
12  Q   On the first page, the end of the first
13      paragraph of "Remarks," quote, CL reported he
14      father [sic] is pressing him to get a job and
15      start producing an income for himself, unquote.
16          Do you see that?
17  A   Yes, I see that note.
18  Q   So that's reporting anxiety about how people
19      perceive him?
20  A   It doesn't say that.
21  Q   Isn't that the context in which you are
22      recording this observation?
23  A   Give me a moment.  I'll review the whole note.
24  Q   Okay.
25  A   Thank you.
```

Page 70

1          The context of that note was his feeling

2       the need to be in control as a means of coping

3       and managing his anxiety.  And he said he is not

4       ready to take the step that his father was

5       pressing him to take.

6   Q   And the context is a therapeutic session for

7       social anxiety disorder?

8   A   Correct.

9   Q   Which you have described as social anxiety about

10      perception of being judged?

11  A   Correct.

12  Q   So in the context of social anxiety about

13      perception of being judged, the client reported

14      his father's pressure on him to get a job and

15      start producing income for himself?

16  A   That can add to his existing anxiety, but it is

17      not causal.

18  Q   Well, you've testified that you weren't focused

19      on what was causing it.  I asked you that

20      earlier.

21  A   In this note, in the context of this note, his

22      reference to his father's pressuring him was

23      adding to his anxiety.  He's not ready for that

24      because that would force him to be in a public

25      setting, which is the thing that he's avoiding

Page 71

```
 1        and the root of his anxiety.
 2    Q   Being in a setting such as mowing the lawn in
 3        the front yard where he'd perceive being judged
 4        by, among others, his father?
 5            MR. BYLER:  Object to the form.
 6    A   In the context of mowing the front lawn, he did
 7        not discuss his father at all.  Other people
 8        seeing him, neighbors seeing him there.
 9    Q   That was your example, the mowing the front --
10        there's no mention of mowing the lawn anywhere
11        in the notes.  But you brought that up as an
12        illustration.
13    A   I don't believe that's correct.
14            This is the note, but I don't know how long
15        you want me to take to find it.  The reference
16        to the lawn mowing is in the notes, but I don't
17        know where.  It's your Exhibit 9.
18            I asked the client, "Counselor questioned
19        under what situations does he experience social
20        anxiety.  Client reported anything outside.
21        Client reported he can't even finish cutting the
22        grass without going inside to calm down."
23            That's the conversation I'm referencing.
24        It's not a generic example; it's a specific
25        account by the client.
```

Page 72

```
 1   Q   In this particular account that you're quoting
 2       from, does he say anything about strangers
 3       outside the family?
 4   A   He made no reference to family members during
 5       that conversation.
 6   Q   He made no reference to strangers either, did
 7       he?
 8   A   He said "neighbors."
 9   Q   In this paragraph, the word "neighbors"?
10   A   No.  I'm saying during the conversation, he
11       specifically said "neighbors," that's all.  He
12       didn't say which neighbors, he didn't say they
13       were driving by in -- he just said generically
14       "neighbors."
15   Q   On this specific conversation two and a half
16       years ago, you remember a word he used that you
17       didn't write down in your notes?
18   A   Yes, sir.  Notes are a summary.  They're not a
19       dictation of every word said.
20           (Defendant's Deposition Exhibit 21 marked
21       for identification.)
22   Q   So let's take a look at Defendant's Exhibit 21.
23       Defendant's Exhibit 21 in the "Remarks" section
24       refers to a "target event."  Do you see that?
25   A   Yes, I do.
```

Page 73

1   Q   Is that a term in EMDR therapy?

2   A   Yes, sir, it is.

3   Q   So what were all the target events that you used

4       in EMDR therapy with Mr. ██████?

5   A   I would have to go through all my notes and

6       create a list.

7   Q   Do you remember any of them as you sit here?

8   A   No, not specifically.  It was two years ago.  It

9       was a lot of care and counseling, so I don't

10      remember.

11  Q   A moment ago you remembered a specific word that

12      he used two years ago.

13  A   That's correct.

14  Q   But you can't remember any of the target events

15      from EMDR therapy?

16  A   Not that I would speak about casually without

17      looking at the notes.

18  Q   In this particular note, the target event is

19      when Mr. ██████ was in high school.  Do you see

20      that?

21  A   Yes, that's correct.

22  Q   So in this particular session, the diagnosis of

23      social anxiety was being treated by a

24      therapeutic technique with a target event when

25      he was in high school; right?

Page 74

1   A    Just one moment, let me look at the context.

2        One of the distorted cognitions was fear of

3        failure from the note prior, Defendant's

4        Exhibit 20.  That was a new theme and

5        disturbance the client brought up.  Any event in

6        his life where he felt fear of failure allows me

7        to go to the neural pathway where that's stored

8        in his unconscious mind and change the core

9        distortion.  So that is the one he chose and

10       that is the one we processed, yes.

11  Q    And that was the earliest one; right?

12  A    You mean the first time I treated him with EMDR?

13  Q    No.  The first target event in his life.

14  A    I don't know if it was the first.  It was the

15       one he chose to process.  We let the client

16       choose.  If we create a list of thee or four,

17       some may be easier for them to return back to

18       and process than others.  We always want to

19       avoid retraumatizing the client, so we let the

20       client choose which event they want to process

21       that relates to fear of failure.

22  Q    So the first one that Mr. ███ chose was when he

23       was in high school when his father yelled at him

24       for a bad soccer performance; right?

25  A    Yes.

Page 75

1    Q    So that would indicate that Mr. ████'s fear of
2         failure had a causal root, at least in part of
3         in his pre-college years, and specifically his
4         relationship with his father in his pre-college
5         years; right?
6              MR. BYLER:  Objection to form.
7    A    I wasn't treating that portion of his life or
8         struggle in his life.
9    Q    That wasn't my question.
10   A    But I can't answer the question the way you
11        asked the question.
12   Q    What about the question I asked you is beyond
13        your therapeutic skill to answer?
14   A    What I was treating was, in general, his fear of
15        failure, not specific to any time in his life.
16        It was a present fear.
17   Q    My question is straight out of your notes.
18   A    Okay.  Can you restate it, please?
19   Q    You have used the term "causal roots," you have
20        used the term "target event," and the EMDR
21        technique, as you've described it, is directed
22        to a target event that may be a causal root;
23        correct?
24   A    It's one of multiple target events that he can
25        use to attach to that cognitive distortion.

Page 76

1   Q   I'll take that as a "yes."  So --

2   A   That's not what I said.  I didn't say "yes."

3   Q   Is there any reason you can't answer that

4       question "yes"?

5   A   Yes, because you're saying that is the cause.  I

6       believe, if I understand your question --

7   Q   No, that's not.  I'll ask the question to be

8       read back to you.  I'm going to ask you to

9       answer it this time.

10  A   Okay.

11          MR. KEALEY:  Madam Reporter, can you just

12      read the previous question about causal root?

13          (The requested text was read by the

14      reporter.)

15          MR. BYLER:  Objection to form.

16          Go ahead.

17  Q   That's a yes-or-no question, Mr. Perry.

18  A   Are you asking me if that is the cause of his

19      fear of failure?

20  Q   The question on its face is a question about the

21      EMDR technique.

22  A   But the way you've phrased the question, it

23      would misrepresent the truth.

24          It's one of multiple events.  The client

25      chose that one.  That does not mean it is the

Page 77

```
 1        only root cause of fear of failure.
 2   Q    So you're saying it is a root cause but not the
 3        only one?
 4   A    It's one represented event in his life that
 5        connects with the neural pathway for his fear of
 6        failure.
 7   Q    So what were the root causes?
 8   A    I don't know all the root causes.  The point is
 9        change the distortion; that's what the therapy
10        does.  It's not to identify all root causes.
11   Q    Can you identify any root causes?
12   A    The target events are just a means to attach to
13        the distorted cognition, and through our --
14   Q    This is a yes-or-no question.  Can you identify
15        any root causes for Mr. ████? Yes or no.
16   A    Can I identify any?
17   Q    Just yes or no.
18   A    Yes.  There's multiple.
19   Q    What are they?
20   A    It could be his inability to thrive at Taylor,
21        it could be being removed from Purdue, it could
22        be a childhood event where he felt like he was a
23        failure.  It could be any of those.  They tend
24        to line up on the name neural pathway.  So as
25        long as we connect with that neural pathway, we
```

Page 78

1    can correct the distortion.  One is not the only

2    source.

3        (Defendant's Deposition Exhibit 22 marked

4    for identification.)

5  Q  Taking a look at Defendant's Exhibit 22, in your

6    "Remarks" section for the April 8, 2019 progress

7    note on page 101, in the last paragraph of the

8    "Remarks" section, the first sentence says,

9    quote, CR and CL continued discussion about

10    entering back into society and getting a job,

11    unquote.

12        Do you see that?

13  A  Yes.

14  Q  Why were you having that discussion?

15  A  To evaluate if his social anxiety and fear was

16    low enough that he could take a step forward in

17    life.

18  Q  You didn't say "step forward in life."  You just

19    said "entering back into society and getting a

20    job."  Why were you talking about getting a job?

21  A  Because he desired to correct his mental

22    struggle and enter back into the mainstream of

23    life.  I'm not quite sure --

24  Q  Did he tell you he wanted to get a job?

25  A  Did he tell me he wanted to get a job?  Yes,

Page 79

1      eventually.

2  Q   Mr. ███ told you that he wanted to get a job?

3  A   Yes.

4  Q   Not that his parents wanted him to get a job,

5      but that he himself wanted to get a job?

6  A   Yeah.  He wanted to be independent, he wanted to

7      get his own apartment, he wanted to live on his

8      own.

9  Q   In this same exhibit, first paragraph of the

10     "Remarks" section, you noted that there was a

11     discussion of anxiety, and Mr. ███ "reported

12     the best it has been in a year."

13         Do you see that?

14 A   Yes, sir.

15 Q   Had it been good a year previous?

16 A   Had it been good a year previous?  No, that's

17     not my understanding of the conversation.

18 Q   What is the meaning "best it has been in a

19     year"?

20 A   That it's improved, this is the best he's felt

21     in the last year.

22 Q   At this point you had been in therapy together

23     for more than a year?

24 A   Yeah, it looks like it.  I don't remember

25     exactly when we started, but yes, sir.

Page 80

1    Q    The next sentence says that Mr. ███ "reported
2         his anxiety is a 2 out of 10 down from 11 out of
3         10."
4              Do you see that?
5    A    Yes.
6    Q    So as of April 8, 2019, you achieved the
7         therapeutic objective of reducing his anxiety
8         down to 3 out of 10, in fact, you'd exceeded it
9         down to 2 out of 10; right?
10   A    At the time of that session, yes, sir.
11   Q    So the therapy had been successful?
12   A    Yes, sir.  We'd made marked progress.
13   Q    At the next session a week later, as shown in
14        Defendant's 23, on page 98, the anxiety had
15        declined apparently further down to be even 1 or
16        2 out of 10.  Do you see that?
17   A    Yes, sir.
18   Q    So with his anxiety at 1 or 2 out of 10, his
19        anxiety was not an obstacle to Mr. ███
20        returning to the workforce as of April 2019, was
21        it?
22            MR. BYLER:  Objection to form.
23   A    I can't comment on that.  All I can tell you is
24        that client reported it was reducing.
25   Q    Well, you did comment on that, because in this

Page 81

1    same note you gave Mr. ██████, in your words,

2    quote, Homework to bring a list of possible jobs

3    he might enjoy, unquote; right?

4  A  Yes, that's correct.

5  Q  So you gave him that homework because you

6    thought the progress of therapy had reached the

7    point where he should be making a list of jobs

8    that he would enjoy?

9  A  Yes.  I wanted to help him continue moving in

10   that direction to reengage in society, yes.

11 Q  Make a list of jobs and then go apply for some

12   of them; right?

13 A  Just make a list.  It was a next step.  It was a

14   next step, to make a list.

15 Q  Did he ever make the list?

16 A  I don't recall.

17 Q  You didn't follow up therapeutically and ask him

18   whether he'd done his homework?

19 A  That session actually I did, because he reported

20   he did not work on it.

21 Q  What did you take that to mean?

22 A  Didn't mean anything, just that he chose not to

23   do it.

24 Q  As a therapist, you must have had an

25   interpretation of his decision not to do the

Page 82

```
 1        homework you gave him.
 2   A    If it's a recurrent theme, then it's something
 3        we might address.  People often forget to do
 4        their homework in therapy; it's a very common
 5        occurrence.
 6   Q    It doesn't say that he forgot to do it.
 7   A    People fail to do their homework in therapy
 8        often; it's a common occurrence.
 9   Q    Did you ever ask him to do that homework again?
10   A    I'd have to look at my notes.
11   Q    At the same time he was telling you that he was
12        not doing that homework, you were continuing to
13        report, under "Work Activity," that he was
14        refusing; right?
15   A    I hadn't changed the status of that drop-down
16        box, that's correct.
17   Q    You didn't have reason to change it, did you?
18   A    At that point I hadn't changed it.
19   Q    Every session you go through all of the fields
20        in the software and you make a decision whether
21        to change them or not; right?
22   A    No, not every session.  Some of them are kept as
23        history.  So it's a historical value, not
24        current reflection.
25   Q    So there's something of interest to me,
```

Page 83

1    Mr. Perry.  If you go back to Defendant's

2    Exhibit 10 -- excuse me, let's go to Defendant's

3    Exhibit 13.

4         (Defendant's Deposition Exhibit 13 marked

5    for identification.)

6  A  Okay.  I have it.

7  Q  In Defendant's Exhibit 13, under "Work

8    Activity," your notation is, "Refusing work.

9    Doesn't feel he needs to work right now."

10        Do you see that?

11 A  Yes.

12 Q  And the phrasing "doesn't feel he needs to work

13   right now" isn't phrasing from the software,

14   it's phrasing that is from your keystroking;

15   right?

16 A  Correct.  "Refusing to work" is the drop-down

17   box item, and then the note beyond that is mine.

18 Q  So Mr. ███ told you, and you made this note,

19   that he didn't feel that he needs to work right

20   now?

21 A  I believe that was established earlier and it

22   just hadn't been established at that point in

23   time.  I don't know if that was the first time

24   that was recorded.  I'd have to look back

25   through the notes.

Page 84

```
 1   Q   It wasn't.  I'll just tell you that that's the
 2       phrasing as it appeared in a long series of
 3       notes going back to the beginning.
 4   A   Correct.
 5   Q   So Defendant's Exhibit 13 is dated November 12,
 6       2018.  Your next exhibit is Defendant's 14,
 7       dated December 10th, 2018.
 8   A   Yes.
 9   Q   In Defendant's 14, you changed that --
10   A   Yes, that's correct.
11   Q   -- "Work Activity" field and now it says,
12       "doesn't feel he can work right now."
13           Do you see that?
14   A   Yes, I do.
15   Q   So for most of the first year of therapy, from
16       March through November of 2018, it was that he
17       doesn't feel he needs to work, and then in
18       December it was he doesn't feel he can work?
19   A   Yes, that's correct.
20   Q   So up until December 2018, Mr. ███ wasn't
21       telling you that he couldn't work, just that he
22       didn't need to?
23   A   Yes.  If the statement says he doesn't feel he
24       needed to, yes, that's all he had reported.
25   Q   There is a difference between saying he didn't
```

Page 85

1          feel he needed to work and didn't feel he could
2          work; right?
3     A    Correct.  Significant, therapeutically
4          significant.
5     Q    Please elaborate on "therapeutically
6          significant."
7     A    That was the first acknowledgment that he was
8          avoiding work because of fear.
9     Q    Earlier when he said he didn't feel he needed to
10         work, do you think he meant something other than
11         what he said?
12    A    You'd have to ask him.  I'm not sure.  That's
13         what he was reporting at that time.
14             (Defendant's Deposition Exhibit 24 marked
15         for identification.)
16    Q    Let's take a look at Defendant's Exhibit 24.
17    A    Okay.  I have it.
18    Q    So Defendant's Exhibit 24, in the "Remarks"
19         section, reports a dialogue about Mr. █████
20         thinking about conspiracies.  Do you see that?
21    A    Can you tell me what sentence you're referring
22         to specifically?
23    Q    Sure.  The last sentence of the first paragraph
24         of the "Remarks" section.  Quote, He spends time
25         considering all the conspiracies there are

Page 86

```
 1        against us.
 2    A   Yes, I see it.
 3    Q   So that's a recordation of what he told you he
 4        was spending time thinking about; right?
 5    A   That's my summary of what he said.  We were
 6        working on trust, his struggle with trusting
 7        authority figures.  And I was challenging -- I
 8        believe I was challenging, is this grounded in
 9        truth and fact or are these conspiracy theories.
10    Q   And he said the onset of his type of thinking
11        about conspiracy theories was around the end of
12        high school or the start of college?
13    A   That's what he reported, yes.
14            (Defendant's Deposition Exhibit 25 marked
15        for identification.)
16    Q   Let's turn, then, to the next exhibit,
17        Number 25.
18    A   Okay.
19    Q   This progress note is for the May 6, 2019
20        session?
21    A   Yes, sir.
22    Q   On that date Mr. ████ reported that "his anxiety
23        is consistently better every day"; right?
24    A   Yes.
25    Q   In the second paragraph, he reported that he
```

Page 87

```
 1        "feels guilt"?
 2    A   I see that, yes.
 3    Q   And in the second sentence of that paragraph, it
 4        reads, quote, CL reported guilt is from what
 5        happened at Purdue, unquote.
 6            Do you see that?
 7    A   Yes, I see it.
 8    Q   So that's your recordation of what Mr. ████  said
 9        to you?
10    A   What he was feeling, yes.
11    Q   What he was feeling was guilt from what happened
12        at Purdue?
13    A   That's what it says, yes, sir.
14    Q   The reason it says that is that's what he said
15        to you?
16    A   Yes, that's what he reported to me, yes, in that
17        conversation.
18    Q   And in the next sentence, quote, CL reported his
19        actions to fault for half of what happened, but
20        his girlfriend in the system was at fault for
21        the other half, unquote.
22            Do you see that?
23    A   Yes, I see it.
24    Q   That's also a recordation of what Mr. ████ said
25        to you?
```

Page 88

1   A   Yes, sir.

2   Q   The next sentence says, quote, CL wrestled with

3       guilt over his actions that were beyond a

4       boundary his girlfriend had set, unquote.

5           Is that sentence also a recordation of what

6       Mr. ████ said to you?

7   A   So there's one distinction I'd like to make.

8       When I say "he reported," it's very close, as

9       close as I can to his words.  This next one

10      says, "Client wrestled with," that's an

11      observation by me.  In most accounts where it

12      says "he reported," it's something he said.

13      That's why I say it that way; it's very

14      intentional.

15  Q   In the sentence that says, "He wrestled," there

16      was a reference to his actions "were beyond a

17      boundary his girlfriend had set."

18  A   Yes.

19  Q   That's a reference to a description Mr. ████

20      gave you?

21  A   A -- you mean -- he was describing something,

22      yes.  He was making a description, yes.

23  Q   So he in some manner referred to actions of his

24      that were beyond the boundary his girlfriend had

25      set?

Page 89

1   A   Correct, yes.

2           (Defendant's Deposition Exhibit 26 marked

3       for identification.)

4   Q   Let's turn, then, to Defendant's Exhibit 26.

5   A   Okay.

6   Q   In the "Remarks" section of Defendant's

7       Exhibit 26, in the second paragraph, there is a

8       discussion between you and Mr. ████ of what

9       Mr. ████ called a, quote, wall of

10      procrastination, unquote.

11  A   Yes.

12  Q   Meaning procrastination by Mr. ████?

13  A   Correct.

14  Q   And Mr. ████ reported that the wall of

15      procrastination is "not fear but a response to

16      his father's controlling ways"; right?

17  A   Yes, that's correct.

18  Q   And Mr. ████ reported that the procrastination

19      response to his father's controlling ways "has

20      been a struggle since he was a child"; right?

21  A   Correct.

22  Q   And in the next sentence, Mr. ████ reported "his

23      father wants him to get a job immediately"?

24  A   Yes.

25  Q   So this paragraph is describing a wall of

1    procrastination that is a topic in the therapy

2    session, at least in part because of

3    procrastination in the face of his father's

4    wanting him to get a job immediately; right?

5  A    Yes.

6  Q    So Mr. ██████ father thought, as of May 2019,

7    that Mr. ████ should be getting a job, and

8    Mr. ████ was procrastinating and he attributed

9    his procrastination to something other than

10    social anxiety?

11  A    Correct.

12  Q    He attributed his procrastination to the

13    struggle between him and his father since he was

14    a child; right?

15  A    Correct.

16  Q    And the struggle turning on whether his father

17    could make him do something?

18  A    Yes.  He referenced that, yes.

19  Q    So Mr. ██████ description in this session in

20    May 2019 which follows several sessions where he

21    has reported his anxiety as a 1 or a 2 and

22    consistently better every day, he's still not

23    getting a job, he's procrastinating about

24    getting a job, and it's a subject of a struggle

25    between him and his father that dates back to

Page 91

1      when he was a child; right?

2   A  Yes.

3          (Defendant's Deposition Exhibit 27 marked

4      for identification.)

5   Q  Let's take a look at Defendant's Exhibit 27.  So

6      on Defendant's Exhibit 27, which is dated

7      June 10, 2019, on page 76 in the "Remarks"

8      section, Mr. ██████ reported that he was "doing

9      good with low anxiety the last two weeks" and

10     that he had "some spikes in anxiety when his

11     father pressed him to get a job"; right?

12  A  Yes, that's correct.

13  Q  So at the time of this particular session, the

14     anxiety that he experienced as a spike was

15     attributable to pressure from his father?

16  A  Yes.  Overall, his anxiety was low and then had

17     some spikes related to his father, yes.

18  Q  The next paragraph of this same exhibit, there's

19     another reference to the wall of procrastination

20     and, quote, CL also reported a strong resistance

21     to anything his father commands him to do,

22     unquote.

23          Do you see that?

24  A  Yes, I do.

25  Q  So that's a description of what Mr. ██████ said?

Page 92

1    A    Yes.

2    Q    So the term "strong resistance to anything his

3         father commands him to do" is not a report of an

4         emotional fear, is it?

5    A    No.  By client's report, he said that was not

6         the basis of it.

7    Q    It's a report of father-son friction?

8    A    Correct.

9              (Defendant's Deposition Exhibit 30 marked

10        for identification.)

11   Q    Let's turn forward to Defendant's Exhibit 20.

12   A    Okay.

13   Q    In the "Remarks" section, Mr. ████quote,

14        Reported he is encouraged by recent news from

15        his attorney but has some guilt about the one

16        choice he made that was not good, unquote.

17             Do you see that?

18   A    Exhibit 30?

19   Q    Yes.

20   A    I don't see it.  It's the second paragraph?

21   Q    Second paragraph of the "Remarks" section.

22   A    Oh, there it is, I found it.  Yes, I see it.

23   Q    So this sentence, you use the term "reported"

24        which, as I understand it, what you're writing

25        down is that Mr. ████ expressed some guilt about

Page 93

1         the one choice he made that was not good?
2    A    That's correct.
3    Q    And he made that statement of the emotion of
4         guilt in the context of recent news from his
5         attorney?
6    A    And being the responsible person I think was the
7         context of the conversation.
8    Q    Did you ask him what the choice was that he made
9         that was not good?
10   A    I did.
11   Q    What did he say?
12   A    He said he regretted telling the truth to Purdue
13        because they twisted the facts and it hurt him.
14   Q    He felt guilty about telling the truth?
15   A    He said, "I was raised to always tell the truth
16        and I did that with the officials at Purdue,"
17        and they twisted the facts and turned it against
18        him and it ended up hurting him, being moral and
19        truthful.  That was the dilemma he was wrestling
20        with.
21   Q    So he described it as he felt guilt about
22        telling the truth to Purdue?
23   A    Yeah.  "Guilt" is the word that he used.  That's
24        why it's described as a split.  I think he
25        called it a split.  Like he was feeling the

Page 94

```
 1        tension between what he was raised to believe
 2        and do, and how that played out.  He couldn't
 3        find peace about that conflict.
 4   Q    Specifically, the split was that he felt
 5        negative about taking responsibility and
 6        negative about not taking responsibility?
 7   A    He felt negative about the fact that he was
 8        responsible and told the truth and it ended up
 9        hurting him.
10   Q    What you wrote was "he felt negative about
11        taking responsibility and negative about not
12        taking responsibility."
13   A    Right.
14   Q    So responsibility for what?
15   A    For telling the truth, for being responsible.
16        That's my comment.  It doesn't say "reported."
17        It says, "Client commented," so that's my
18        impression of what he said, not a
19        client-reported.  That was identifying the
20        tension between those two things.
21   Q    Do you find it odd that somebody would say they
22        felt guilty about telling the truth?
23   A    Yeah.  That's how I remember the conversation.
24        It is odd, I agree.  They shouldn't feel guilt
25        about telling the truth.  That was the
```

Page 95

```
 1        dissonance, that was the problem.  It was a
 2        position of regret.
 3   Q    In the previous session, in Defendant's 25, he
 4        referred to --
 5   A    25?
 6   Q    25.
 7   A    I'm sorry, Exhibit 25, is that where we're at?
 8   Q    Yes.
 9   A    Okay.  Let me get back to that.
10             Okay.  I have it.  Go ahead.
11   Q    In Exhibit 25, as you recorded it, the guilt was
12        described by Mr. ████ as "his actions as fault
13        for half of what happened, his girlfriend and
14        the system at fault for the other half."
15   A    Okay.
16   Q    That's the guilt?
17   A    That's the guilt that he was talking about on
18        that day.  On that day, that's correct.
19   Q    So in that comment he was not expressing guilt
20        for telling the truth.  He was expressing guilt
21        for his half of what happened?
22   A    Correct.  Those are different events.
23             (Defendant's Deposition Exhibit 34 marked
24        for identification.)
25   Q    Let's turn Defendant's Exhibit 34.
```

Page 96

1    A    Okay.

2    Q    In the "Remarks" section of Defendant's 34, the

3         first sentence indicates that you advised

4         Mr. ██████ that Mr. ██████ father had contacted

5         you about a family meeting; right?

6    A    Correct.

7    Q    And then the next sentence refers to a follow-on

8         on that to question about a family meeting.  The

9         next sentence reads, quote, CL commented that he

10        does not want to comply with his father's desire

11        for him to get a job, unquote.

12             Do you see that?

13   A    Yes, correct.

14   Q    So still, as of October of 2019, Mr. ██████ was

15        defining the question of whether to get a job in

16        terms of whether he would resist or comply with

17        his father's desire for him to get a job?

18   A    I don't know how he's defining it, but he said

19        he does not want to comply with his father's

20        desire for him to get a job.

21   Q    Well, there's no indication in this paragraph

22        that he's defining it in terms of fear of

23        failure if he gets a job; right?

24   A    That is correct, there's no mention of that.

25   Q    And his stated rationale -- let me start over.

Page 97

```
 1         His description of his thinking included
 2     that he thought it was "a waste of time to get a
 3     minimum-wage job that he does not like or
 4     enjoy"?
 5  A  What's the context of that?  He said he was
 6     ready to try and get a low-stress job, volunteer
 7     or work position, but he didn't want to get a
 8     minimum-wage job, that's correct.
 9  Q  At that session, whether Mr. ███ got a job came
10     down to, number one, how he defined that as
11     between his father and himself, and number two,
12     whether he would have a job that he liked and
13     enjoyed?
14         MR. BYLER:  Objection to form.
15  A  One was a statement of feelings about his
16     interactions with his father, the other is his
17     state of what he believes he's ready to do.  I
18     don't quite know how to answer your question.
19  Q  It doesn't say what he's ready to do.  It says
20     what he likes or enjoys doing; right?
21  A  Context is "Client suggested that he is ready to
22     try a low-stress volunteer or work position.
23     Client reported he feels it is a waste of him to
24     get a minimum-wage job that he does not like or
25     enjoy."
```

Page 98

```
 1   Q   So a volunteer position is less than minimum
 2       wage, so he's ruling that out?
 3   A   That's what he said.  That's what he reported.
 4   Q   So in other words, it had to be a job that
 5       Mr. ████thought was worth his time?
 6           MR. BYLER:  Objection to form.
 7   A   No.  He was looking for something low stress,
 8       was the point of that comment.
 9   Q   Well, actually, his phrasing doesn't refer to
10       stress.  It says, "waste of time."
11   A   But in the context of the conversation, he was
12       commenting on what he was willing to do at that
13       point in time.  And volunteer or a work position
14       was an indication of a lower stress -- my
15       recollection of it was that was an indication of
16       a lower-stress position, he was ready to try a
17       lower-stress position.
18   Q   That was your statement.  His statement was what
19       he was willing to do was a job that was not a
20       waste of his time?
21   A   Yes.
22           (Defendant's Deposition Exhibit 35 marked
23       for identification.)
24   Q   In Defendant's 35, Mr. ████ affirms that "he is
25       ready to get a 15-hour-a-week job" and gradually
```

Page 99

1      increase how many hours he worked; right?

2  A  Yes, I see that note.

3  Q  I mean, that's what he said to you; right?

4  A  Yes, sir.

5  Q  So this is as of October 21st, 2019?

6  A  Yes, that's correct.

7  Q  Your last session with Mr. ███ was on

8      August 27th, 2020, based on Defendant's

9      Exhibit 42.

10      (Defendant's Deposition Exhibit 42 marked

11      for identification.)

12  Q  So between October 21st, 2019, and the end of

13      August 2020, did Mr. ███ tell you that he, in

14      fact, ever got a job?

15  A  No.  I don't recall him telling me he got a job.

16      (Defendant's Deposition Exhibit 36 marked

17      for identification.)

18  Q  In Defendant's 36 at page 26 at the last

19      paragraph of the "Remarks" section, you

20      suggested to Mr. ██ that he get in contact

21      with a "temp agency as a quick way to get

22      hours."

23      Do you see that?

24  A  Exhibit 36, is that what you said?

25  Q  Yes.

Page 100

1    A    Yes, I see it.

2    Q    And Mr. ██████ told you that he would consider

3         doing so?

4    A    Yes, that's correct.

5    Q    He didn't tell you that he would do so?

6    A    Correct.

7    Q    Did he ever tell you that he did do so?

8    A    I don't remember discussing it after that.

9              (Defendant's Deposition Exhibit 39 marked

10        for identification.)

11   Q    In Defendant's 39, on page 17, as of

12        November 18, 2019, Mr. ██████ was reporting

13        "consistent low anxiety"?

14   A    I don't see any specific statement about the

15        state of his anxiety during that session.

16   Q    The second-to-last line of the "Remarks"

17        section.

18   A    Oh, I'm sorry, forgive me.  Yes, I see it.

19   Q    That's what he told you?

20   A    Yes, sir.

21             MR. KEALEY:  Let's go off the record for a

22        few minutes.  I'm near the end of my questions.

23             Mr. Perry, what I'd like to do is give you

24        a chance to stretch your legs, and I'll go

25        through my outline and see if I've missed

Page 101

1      anything.  And then Mr. Byler will have a chance

2      to ask questions.

3            MR. BYLER:  I'll have a few, but not very

4      long.

5            MR. KEALEY:  So it's 4:01; get together

6      about 4:05, and we'll go from there.

7            THE WITNESS:  Sounds good.  Thank you.

8            (A recess was taken between 4:01 p.m. and

9      4:08 p.m.)

10  BY MR. KEALEY:

11  Q    Mr. Perry, do you have access to a web browser

12      right now?

13  A    Yes.

14  Q    Okay.  So I am looking at a website that you're

15      probably familiar with, www.emdr.com.  So take a

16      look at that website and tell me whether you

17      recognize it.

18            MR. BYLER:  Can you state the web address

19      you just gave again?

20            MR. KEALEY:  Sure.  It's E like elephant, M

21      like Mary, D like David, R like Robert, dot com.

22  BY MR. KEALEY:

23  Q    Are you familiar with that website, Mr. Perry?

24  A    I'll get my glasses; it's kind of small.

25            I don't know that I've been on this

Page 102

```
 1        website.  But it looks like it's related to the

 2        founding father -- or the founding mother, if

 3        you will, of EMDR, which is Francine Shapiro.

 4        She is the original founder of the technique.

 5    Q   That was my impression as well, because it

 6        refers to the EMDR Institute.  Do you recognize

 7        that as part of the governing of the EMDR field,

 8        that institute?

 9    A   Yes.  Francine Shapiro is the founder.  You bet.

10    Q   So under the button "EMDR Info," which is the

11        second --

12    A   Yes.

13    Q   -- under that, there is a subheading, "What is

14        EMDR?"

15    A   Yes.

16    Q   I just ask you to click on "What is EMDR?," if

17        you would, please.

18    A   Okay.

19    Q   Under the "What is EMDR?" button, there are

20        three sections, and the third one is entitled

21        "Treatment Description," so if you just scroll

22        down the page.

23    A   You bet.

24    Q   The treatment description shows Phase 1 through

25        Phase 8.
```

Page 103

1  A    Yes.

2  Q    I'm happy to give you as much time as you'd like

3       to look at this.

4            MR. KEALEY:  Mr. Byler, if you're having

5       trouble accessing it, I can email you a PDF of

6       it.  I think what I'll propose to do is email a

7       PDF to the reporter to be marked as the next

8       exhibit in order.

9  Q    What I'll ask you to do, Mr. Perry, is look at

10      the treatment description and tell me if it is

11      generally consistent with EMDR as you did it

12      with Mr. ███.

13 A    Yes, it is.

14           MR. BYLER:  I would appreciate a PDF, Bill.

15           MR. KEALEY:  I'm going to email it to you

16      right now and we'll get it marked as an exhibit.

17           MR. BYLER:  Rather than looking down at the

18      other exhibits, just in fairness to the

19      witnesses.

20 BY MR. KEALEY:

21 Q    Mr. Perry, if you have an email address you'd

22      like me to use right now, I can send it to you

23      right now.

24 A    Sure.  It's Noel, N-O-E-L, noel@familycounsel --

25 Q    Dot org?  You broke up a little.

Page 104

1    A    Yes.  Is the document you're sending different
2         than what I'm seeing on the web?
3    Q    No.  I'm just going to send it to you --
4    A    Yes, dot org.
5    Q    F-A-M-I-L-Y-C-O-U-N-S-E-L dot org?
6    A    Yes.
7              MR. KEALEY:  Madam Reporter, what address
8         should I use for you?
9              THE STENOGRAPHER:  Ferrenreporting, that's
10        F as in Frank, E-R-R-E-N reporting@gmail.com.
11             MR. KEALEY:  I'm hitting the send button
12        right now.
13             My request, Madam Reporter, is that this
14        will be marked as the next in order, which is
15        Defendant's 43.  I'm going to pause for however
16        long we need to allow for Mr. Byler and
17        Mr. Perry to receive the email, click open the
18        PDF, and ensure that everybody is comfortable
19        with what we're looking at.
20             MR. JONES:  This is Tyler Jones and, for
21        the record, I received the email.
22             THE WITNESS:  This is Noel Perry.  I now
23        have the email.
24             THE STENOGRAPHER:  I have received the
25        email.

Page 105

1          MR. BYLER:  I have received the email that
2      has an eight-page-long description of EMDR, it
3      looks like for a layperson.
4          (Defendant's Deposition Exhibit 43 marked
5      for identification.)
6  BY MR. KEALEY:
7  Q   So Mr. Perry, before I emailed the hard copy,
8      you indicated that the third section under
9      "Treatment Description" looked to you to be
10     consistent with the EMDR treatment that you
11     deployed with Mr. ████.  Now that you have the
12     hard copy or PDF, I'll just ask you to confirm
13     that that's still your response to this
14     document.
15 A   Yes, that is correct.
16 Q   Thank you.
17         So just a couple more questions, Mr. Perry.
18     What software tool did you use for the progress
19     notes that we've been looking at today?
20 A   TherapyAppointment.
21 Q   That's the name of the software product?
22 A   Yes, sir.
23 Q   Early on you referred to your relationship under
24     the oversight of Chris Hamrick.
25 A   Yes.

Page 106

```
 1   Q   Over the course of the sessions that we've been

 2       looking at chronologically for the last few

 3       hours, about how often did you consult with

 4       Mr. Hamrick?  To be a little more precise about

 5       it, how often did you consult with Mr. Hamrick

 6       about Mr. ████?

 7   A   I don't recall, to be honest with you.  We go

 8       through a lot of clients every session, so it's

 9       hard to remember which meeting I had spoke with

10       him about this case.

11   Q   Do you recall any specific input that

12       Mr. Hamrick gave about the therapy with

13       Mr. ████?

14   A   I really don't, quite honestly.  That's a long

15       period of time with a lot of conversations, so

16       I'm sorry, I don't.  But he would have -- he

17       would have general awareness.  We did discuss it

18       at different times.

19   Q   Earlier you also indicated that you hold a

20       credential with the acronym EMDRIA, E-M-D-R-I-A.

21       Does that credential put you into a directory of

22       authorized EMDR practitioners?

23   A   I don't know.  It may.  I haven't looked.

24   Q   Within Family Concern Counseling, is EMDR a

25       widely used technique?
```

Page 107

1   A    It's becoming more widely.  I and one other

2        person are the first ones trained.  It's on my

3        business card.  There are four -- I believe we

4        now have four therapists trained in it of the 16

5        that we have.  So it's a newer therapy to our

6        company.

7             MR. KEALEY:  Thank you, Mr. Perry.  I don't

8        have any other questions at that point.

9             (Defendant's Deposition Exhibit 28 marked

10        for identification.)

11   CROSS-EXAMINATION,

12     QUESTIONS BY PHILIP A. BYLER:

13   Q    I'd like you to turn to what's been marked as

14        Defendant's Exhibit 28, which is pages 67 to 68

15        of a session held on July 1, 2019.

16   A    What was the exhibit again?  I'm sorry.

17   Q    Two-eight, 28.

18   A    Thank you.  Okay.  I have it.

19   Q    Okay.  Do you recognize this as your notes for a

20        session meeting you had on July 1, 2019?

21   A    Yes, I do.

22   Q    Okay.  Let me go down to "Remarks Made During

23        Session," and the second paragraph.

24   A    Yes.

25   Q    I'd ask you to look at that.  CL means client;

Page 108

1      correct?

2    A    Yes.

3    Q    Okay.  And "Client reported Friday he heard

4         three judges voted unanimously in appeals court

5         that his case must be retried."

6              Now, he's not a lawyer, but that's your

7         account of what he said?

8    A    Yes.

9    Q    Okay.  "Client reported this is a big

10        affirmation that he was railroaded and

11        mistreated by Purdue and ROTC."

12             Do you see that?

13   A    Yes.

14   Q    And that's what the client was reporting to you?

15   A    Yes, that's what he said.

16   Q    Okay.  Did he use the word "railroaded"?

17   A    I would have used his words in that situation,

18        yes.

19   Q    Do you recall the context in which this part of

20        your session came up in?

21   A    Let me think right here.  I don't.  My notes are

22        always in order of how they occurred, so it was

23        towards the end of the session he gave me an

24        update, I guess, on what was happening with the

25        legal matter.  We weren't working on it as a

Page 109

1      therapeutic element.

2   Q  I was asking if there was some reason why it

3      came up.

4   A  I don't recall.

5   Q  Can you turn to page 68, which is the next page

6      of that session.  Under "Assessment, Available

7      Support," you have listed "nuclear family," and

8      I've seen that throughout your notes.  Why is

9      that listed as part of your assessment?

10  A  There is substantial research that indicates

11     clients that have good supports in place,

12     consistent good supports in place, have better

13     outcomes.  So we made note of that.  If they

14     don't have it, we try to find it for them.

15  Q  Did ███████ have that kind of support of a

16     nuclear family?

17  A  Yes.

18  Q  Okay.  Do you know if he had brothers --

19  A  Yes.

20  Q  -- or sisters?

21          And this is a plus in terms of the therapy

22     work you do?

23  A  Yes.  He has -- yes, he has siblings, multiple

24     siblings.

25  Q  Above "Available Support" is "Virtue List" and

Page 110

1        you have "open-mindedness, love of learning,

2        love."  That's your assessment?

3   A    Yes.

4   Q    Why did you choose these adjectives to describe

5        ████?

6   A    He spent a considerable amount of time

7        researching, studying on the internet, anxiety,

8        psychological disorders.  He started with

9        medical research, and then he moved to

10       psychological research.  So he's like a student

11       of learning, is how he impressed me.  Most

12       people wouldn't bother to spend the amount of

13       time he did.  He'd bring comments in from

14       articles and share things with me constantly, so

15       I knew he loved to study and learn.

16            Once I built his trust, he became very

17       curious about EMDR therapy and what I was trying

18       to teach him.  And then he shifted from being

19       resistant and not trusting, to being a learner

20       and curious and open, so ...

21   Q   Okay.

22   A   He was always -- when I say "open-mindedness,"

23       he was always -- go ahead.

24   Q   No, no.  You started to talk about "he always,"

25       and then I didn't mean to interrupt you.

Page 111

1    A    Oh, okay.  He was always very respectful, very

2         kind.  He's a gentle spirit, warm-hearted, and

3         very respectful of my time.  So when I say he

4         was loving in nature, he wasn't selfish, he

5         wasn't arrogant, you know.  In that sense, he

6         was a very good client to work with.

7    Q    Okay.  Now, was your development of trust with

8         him progress in the therapy you did?

9    A    Yes.  I would say in the beginning he was one of

10        the most resistant clients I've ever had.  It

11        took a long time to build trust with him.

12   Q    Toward the end, how would you describe the trust

13        relationship?

14   A    Excellent.

15   Q    Did he ever tell you that, at Purdue, he did

16        what he was accused of?

17   A    He told me he did not do what he was accused of,

18        but he never told me what he was accused of.  I

19        don't know.  He didn't tell me.

20   Q    Okay.  Let's turn back to 23, which is page 98

21        and 99, Defendant's Exhibit 23.  No, strike

22        that, I'm sorry.  Okay, I'm sorry.  I meant to

23        go to 25.  I misread my writing.  That's

24        pages 89 to 90.

25   A    I have it.

Page 112

1   Q   General question:  Did ███ describe having a

2       relationship with his ex-girlfriend?

3   A   Yes.  He said that they dated for several

4       months.

5   Q   Okay.  Do you recall him discussing in terms of

6       feeling guilt with respect to that relationship?

7   A   He did at one point; I don't remember which

8       session it was.  Part of it was guilt for

9       getting involved in that relationship, choosing

10      to be in that relationship.  I believe there was

11      another time when he talked about feeling guilt

12      related to what had happened.

13   Q   In 25, your attention was directed to the

14      language about client reporting "his actions to

15      be at fault for half of what happened, but his

16      girlfriend and the system was at fault for the

17      other half."

18         Do you recall more specifically what he was

19      talking about?  Was it the relationship in

20      general or was it something else?

21   A   He didn't specify.  He didn't go into detail

22      about what each half was, beyond what I wrote.

23   Q   Did he ever talk to you about guilt about having

24      the kind of relationship he had with that girl?

25   A   He had guilt about being in the relationship.

Page 113

```
 1       That was the context when he would talk about
 2       it.
 3   Q   Was it guilt because they had sex?
 4           MR. KEALEY:   Object to form.
 5   A   It was regret -- it was regret, is what I
 6       recall, regret of choosing to be in that
 7       relationship.
 8           (Defendant's Deposition Exhibit 33 marked
 9       for identification.)
10   Q   Let me go to Defendant's Exhibit 33.  This is
11       October 7, 2019.
12   A   I have it.
13   Q   Under "Remarks Made During Session," I want to
14       direct your attention to the second paragraph.
15       "Client added that when he had to leave college,
16       he lost everything, his plan for life, career,
17       social community, and his purpose.  Client
18       reported now he feels that was his intended path
19       and now he feels lost, not knowing what to do
20       with his life."  Stop there.
21           In this session, what's the context of what
22       he's describing to you here?
23   A   Give me one moment to read all my notes.
24   Q   Please.
25   A   Best of my recollection, it was a session on
```

Page 114

1    reflecting on his life, where he's been, the
2    struggle he's been through.  It was more of a
3    reflection overall of his life, is what we were
4    talking about, and how he finds himself in this
5    place and he kind of like doesn't know what's
6    next.  He feels stuck, lost where he's at.
7  Q   When he was going to college at Purdue, he was
8    part of the ROTC program.  Did you have that
9    understanding?
10 A   Yes, I did.
11 Q   Okay.  And when he left Purdue, that is part of
12   what he lost; correct?
13 A   Correct.
14 Q   By the way, on the second page of this, page 36,
15   under "Executive Functioning," you have next to
16   "Intelligence:  Bright."
17 A   Yes.
18 Q   Is that an assessment you made of ███ in terms
19   of hiss level of intellectual capacity?
20 A   Yes.
21 Q   How did he demonstrate that to you?
22 A   It was actually a challenge in the beginning,
23   because he was working so hard to figure out
24   what was wrong with himself, by researching and
25   these other things, that no matter what I would

Page 115

1      challenge him with or present, he would have an

2      intellectual, thought-out argument based on

3      facts he had learned.  It impeded progress in

4      the beginning.  He was so capable of coming up

5      with logical arguments, almost debating at

6      times.  He's a very intelligent guy.

7   Q  By the way, under "Plan," under "Goals" it says,

8      "Progress excellent."

9          By this time of October 7, 2019, was ███

10     making excellent progress?

11  A  Yes.  He was doing much, much better.

12  Q  And that meant that he had come a long way from

13     where he was at the beginning when you first met

14     him in March of 2018?

15  A  Yes, that's correct.

16         MR. BYLER:  I don't have any further

17     questions.

18         MR. KEALEY:  Nothing further from me.

19     Thank you, Mr. Perry.  This concludes the

20     questioning.

21         The only other business item we have with

22     you is that you have the opportunity to review

23     the transcript.  It's optional, not obligatory.

24     If you'd like to review it, then the reporter

25     will send it to you, as we say, for signature,

Page 116

1    meaning that you'll go through it and note

2    whether it's an accurate transcript, and sign it

3    and send it back to the reporter.

4        So just let us know now, if you would,

5    please, whether you'd like to do that.

6        THE WITNESS:  Yes, I would be willing to do

7    that.

8        MR. BYLER:  I was going to say, I recommend

9    to witnesses they do that.

10        THE STENOGRAPHER:  In what format are you

11    purchasing the transcript?

12        MR. BYLER:  I like both, the minuscript and

13    the full page, for different purposes.  The

14    minuscript is easier and faster to read.  The

15    long page sometimes, I've had courts say, "Give

16    me the long page."

17        THE STENOGRAPHER:  Do you want that in hard

18    copy or electronic?

19        MR. BYLER:  Electronic's fine.

20        MR. KEALEY:  Same for us.

21        (Time noted:  4:40 p.m.)

22

23

24

25

Page 117

1          AND FURTHER THE DEPONENT SAITH NOT.

2

3

4

                              _____

5                            NOEL PERRY

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 118

1    STATE OF INDIANA              )

                                  )  SS:

2    COUNTY OF HAMILTON            )

3         I, Janine A. Ferren, a Notary Public in and

4     for the County of Hamilton, State of Indiana at

5     large, do hereby certify that NOEL PERRY, the

6     deponent herein, was by me first duly sworn to tell

7     the truth, the whole truth, and nothing but the

8     truth in the aforementioned matter;

9         That the foregoing deposition was remotely

10    taken on behalf of the Defendants, in Valparaiso,

11    Porter County, Indiana, on the 5th day of February

12    2021, commencing at the hour of 1:02 p.m., pursuant

13    to the Federal Rules of Civil Procedure;

14        That said deposition was taken down

15    stenographically and transcribed under my direction

16    as accurately as possible, considering the quality

17    of the videoconference communication, and that the

18    typewritten transcript is a true record of the

19    testimony given by the said deponent; and

20    thereafter presented to said deponent for his

21    signature;

22        That the parties were represented by their

23    counsel as aforementioned.

24        I do further certify that I am a disinterested

25    person in this cause of action; that I am not a

Page 119

1    relative or attorney of any party, or otherwise

2    interested in the event of this action, and am not

3    in the employ of the attorneys for any party.

4        IN WITNESS WHEREOF, I have hereunto set my

5    hand and affixed my notarial seal on this 19th

6    day of February 2021.

7

8

9

10                      Janine A. Ferren

11

12

Seal, Notary Public          My Commission Expires:

13   State of Indiana          April 22, 2024

14   Janine A. Ferren          County of Residence:

Commission No. NP0681591     Hamilton

15

16

17

18

19

20

21

22

23

24

25

Page 120

```
 1                    Veritext Legal Solutions

                         1100 Superior Ave

 2                          Suite 1820

                      Cleveland, Ohio 44114

 3                    Phone: 216-523-1313

 4

       February 19, 2021

 5

       Noel Perry

 6

 7     Case Name: Doe, John v. Purdue University, et al.

 8     Veritext Reference Number: 4450374  Deposition Date:  2/5/2021

 9

       Dear Sir/Madam:

10

11     Enclosed you will find a transcript of your deposition.

12     As the reading and signing have not been expressly

13     waived, please review the transcript and note any

14     changes or corrections on the errata sheet

15     included, indicating the page, line number, change and

16     reason for the change. Sign at the bottom of the sheet

17     in the presence of a notary and forward the errata sheet

18     back to us at the address shown above or email to

19     production-midwest@veritext.com.

20

       If the errata is not returned within thirty days of your receipt of

21

       this letter, the reading and signing will be deemed waived.

22

23     Sincerely,

24     Production Department

25

       NO NOTARY REQUIRED IN CA
```

Page 121

1                    DEPOSITION REVIEW
                 CERTIFICATION OF WITNESS
2

     ASSIGNMENT REFERENCE NO: 4450374
3    CASE NAME: Doe, John v. Purdue University, et al.
     DATE OF DEPOSITION: 2/5/2021
4    WITNESS' NAME: Noel Perry
5          In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7          I have made no changes to the testimony
     as transcribed by the court reporter.
8

     _____            _____
9    Date                                 Noel Perry
10         Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
           They have read the transcript;
13         They signed the foregoing Sworn
           Statement; and
14         Their execution of this Statement is of
           their free act and deed.
15
           I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
                   _____
18                 Notary Public
19                 _____
                   Commission Expiration Date
20
21
22
23
24
25

Page 122

1                    DEPOSITION REVIEW
                CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 4450374
3    CASE NAME: Doe, John v. Purdue University, et al.
     DATE OF DEPOSITION: 2/5/2021
4    WITNESS' NAME: Noel Perry
5         In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7         I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9         I request that these changes be entered
     as part of the record of my testimony.
10
          I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____          _____
     Date                                Noel Perry
14
          Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17        They have read the transcript;
          They have listed all of their corrections
18        in the appended Errata Sheet;
          They signed the foregoing Sworn
19        Statement; and
          Their execution of this Statement is of
20        their free act and deed.
21        I have affixed my name and official seal
22   this _____ day of_____, 20_____.
23        _____
          Notary Public
24
          _____
25        Commission Expiration Date

Page 123

1                        ERRATA SHEET

                 VERITEXT LEGAL SOLUTIONS MIDWEST

2                   ASSIGNMENT NO: 4450374

3        PAGE/LINE(S) /        CHANGE         /REASON

4        _____

5        _____

6        _____

7        _____

8        _____

9        _____

10       _____

11       _____

12       _____

13       _____

14       _____

15       _____

16       _____

17       _____

18       _____

19

         _____        _____

20       Date                        Noel Perry

21       SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22       DAY OF _____, 20_____ .

23                       _____

                 Notary Public

24

                         _____

25               Commission Expiration Date

[& - 3]                                                        Page 1

| & | 1820   120:2 | 46:22 47:2,12 |
|---|---|---|

**&**   2:4,11

**1**

**1**   4:4 5:23 9:19
  18:6,8 19:16
  22:23 26:23 38:11
  80:15,18 90:21
  102:24 107:15,20
**1/14/19**   4:22
**1/7/19**   4:20
**10**   4:13 28:7 35:2
  35:3,20,21 36:5,12
  36:13 38:11 45:20
  49:3,5,10 52:3,10
  52:13 54:22 80:2
  80:3,8,9,16,18
  83:2 91:7
**10/10/18**   4:14
**10/14/19**   5:15
**10/21/19**   5:17
**10/28/19**   5:18
**10/29/18**   4:16
**10/7/19**   5:14
**100**   5:20
**10001**   2:6
**101**   5:2 78:7
**1010**   2:12
**102**   5:2
**104**   4:25
**105**   4:25 5:24
**106**   4:24 56:1
**107**   3:4 4:24 5:11
**10th**   84:7
**11**   4:14 49:10 80:2
**11/12/18**   4:17
**11/18/19**   5:20
**1100**   120:1
**113**   5:14
**12**   4:16 34:17,20
  35:3,15,20 36:6,13

84:5
**12/10/18**   4:19
**13**   4:17 83:3,4,7
  84:5
**135**   4:22
**136**   4:22 65:6
**137**   4:21
**138**   4:21
**14**   4:19 45:16,20
  63:7 65:25 84:6,9
**142**   4:19
**143**   4:19
**147**   4:18
**148**   4:18
**149**   4:16
**15**   4:20 12:16
  22:24 28:16,24
  44:19,21,22,23
  45:2 58:22 98:25
**150**   4:16 34:24
**151**   4:15
**152**   4:15
**155**   4:13
**156**   4:13
**16**   4:22 44:22 63:2
  63:6 64:19 65:5
  65:24 107:4
**162**   4:12
**163**   4:12
**165**   4:10
**166**   4:9,10
**167**   4:9 28:18
**17**   5:20 100:11
**173**   4:7
**174**   4:7
**177**   4:6 25:12
**178**   4:6
**179**   4:4
**18**   4:4 5:20 100:12
**180**   4:4

**1820**   120:2
**19**   52:13 120:4
**19th**   119:5
**1:02**   1:15 6:1
  118:12

**2**

**2**   4:5 5:23 9:20
  22:20,22,24 23:5
  25:9 64:14 80:2,9
  80:16,18 90:21
**2/26/18**   4:4
**2/5/2021**   120:8
  121:3 122:3
**20**   4:23 12:7 35:14
  55:20,22 56:1
  69:8,9 74:4 92:11
  121:16 122:22
  123:22
**2004**   6:17
**2015**   12:12
**2016**   12:12
**2018**   13:4,4 17:15
  17:18 18:1 22:25
  26:16 28:16,24
  29:5 31:11 32:25
  40:18 45:20 49:6
  52:13 53:13,21
  54:14 84:6,7,16,20
  115:14
**2019**   34:21 56:12
  58:13,22 59:16
  60:1,15 63:7
  65:25 69:10 78:6
  80:6,20 86:19
  90:6,20 91:7
  96:14 99:5,12
  100:12 107:15,20
  113:11 115:9
**2020**   33:1 35:13
  37:24 38:18,24
  39:18 40:2 45:22

46:22 47:2,12
  99:8,13
**2021**   1:15 118:12
  119:6 120:4
**2024**   119:13
**20s**   29:10,15 31:14
  31:17 32:7,17,23
**21**   4:25 72:20,22
  72:23
**21167**   119:9
**212.736.4500**   2:6
**216-523-1313**
  120:3
**21st**   99:5,12
**22**   4:5 5:2 35:13
  78:3,5 119:13
**23**   5:3 58:19,21
  80:14 111:20,21
**24**   5:5 85:14,16,18
**25**   5:6 69:10 86:14
  86:17 95:3,5,6,7
  95:11 111:23
  112:13
**25th**   58:12
**26**   5:8,19 17:17
  22:24 89:2,4,7
  99:18
**26th**   18:1
**27**   5:9,19 91:3,5,6
**27th**   99:8
**28**   4:8 5:11 107:9
  107:14,17
**29**   4:7 5:17 34:21
**2:17**   1:3
**2:44**   62:25
**2:53**   63:1
**2nd**   29:5 31:11

**3**

**3**   35:2,22 36:14
  38:5,10 64:15
  80:8

**3/15/18** 4:5
**3/25/19** 4:23
**30** 5:12,17 92:9,18
**300** 2:11
**32** 5:16
**33** 1:3 5:14,16
113:8,10
**34** 4:16 5:15 95:23
95:25 96:2
**35** 5:14,17,21
98:22,24
**36** 5:14,18 99:16
99:18,24 114:14
**363** 2:5
**39** 5:20 100:9,11

**4**

**4** 4:7 5:22 29:2,4
**4/15/19** 5:3
**4/2/18** 4:7
**4/29/19** 5:5
**4/4/19** 4:25
**4/8/19** 5:2
**41** 4:10 5:21 35:10
35:13
**42** 4:11 5:23 99:9
99:10
**43** 5:24 104:15
105:4
**43.20** 48:14
**44** 4:20
**44114** 120:2
**4450374** 120:8
121:2 122:2 123:2
**45** 4:19
**46383** 6:18
**47902-1010** 2:13
**49** 4:13,14
**4:01** 101:5,8
**4:05** 101:6
**4:08** 101:9

**4:40** 116:21

**5**

**5** 5:22
**5/15/18** 4:8
**5/28/19** 5:8
**5/6/19** 5:6
**55** 4:23
**58** 5:3
**5th** 1:15 118:11

**6**

**6** 3:3 4:8 28:12,15
28:15 86:19
**6/10/19** 5:9
**6/22/20** 5:21
**60** 5:13
**61** 5:13
**63** 4:22
**67** 5:11 107:14
**68** 5:11 107:14
109:5

**7**

**7** 4:10 40:25 41:1
113:11 115:9
**7/1/19** 5:11
**7/22/19** 5:12
**72** 4:25
**76** 5:10 91:7
**77** 5:10
**78** 5:2
**79** 5:8

**8**

**8** 4:11 42:9,11
78:6 80:6 102:25
**8/25/18** 4:10
**8/27/20** 5:23
**8/29/18** 4:11
**80** 5:8
**83** 4:17

**84-4852** 1:13
**85** 5:5
**86** 5:6
**89** 5:7,8 111:24

**9**

**9** 71:17
**9/19** 49:2
**9/19/18** 4:13
**9/19/2018** 49:2
**90** 5:7 111:24
**900** 2:12
**91** 5:9
**92** 5:5,12
**93** 5:5
**95** 5:15
**98** 5:4,17 80:14
111:20
**99** 5:4,18,23
111:21

**a**

**able** 16:5 29:9,18
29:19,19 31:17
32:22
**absolutely** 37:8
**abuse** 29:23
**academic** 19:12
33:16,24 50:11
**academically**
19:12 34:4
**access** 24:25 66:7
101:11
**accessing** 103:5
**accomplishment**
50:11
**account** 51:11
71:25 72:1 108:7
**accounts** 88:11
**accurate** 116:2
**accurately** 118:16

**accused** 111:16,17
111:18
**achievable** 37:14
**achieve** 19:12 36:2
36:15
**achieved** 11:23
32:7 37:22 38:1
46:21 80:6
**achieving** 39:4,22
50:11
**acknowledge**
121:11 122:16
**acknowledgment**
85:7
**acquiring** 43:1
**acronym** 14:4
52:10,11 63:11
106:20
**acronyms** 22:12
**act** 121:14 122:20
**action** 1:3 118:25
119:2
**actions** 87:19 88:3
88:16,23 95:12
112:14
**activity** 23:15,23
82:13 83:8 84:11
**acupuncturists**
43:20
**add** 8:22 25:14
70:16
**added** 113:15
**adderall** 42:6,7,15
43:1
**adding** 70:23
**addition** 13:14
**additional** 25:12
25:14,16 53:3,5
**address** 6:15,16,19
6:21 34:15 67:13
82:3 101:18

103:21 104:7
120:18
**adjectives** 110:4
**adjust** 49:14 50:9
50:18,25
**adjusting** 48:16
50:1,19
**adjustment** 28:23
48:14,17,20,25
49:4,12,21 50:14
51:4
**adler** 15:5
**adlerian** 15:1,4
**adult** 64:4
**advised** 96:3
**affiliated** 15:10
**affiliation** 16:24
**affirmation**
108:10
**affirms** 98:24
**affixed** 119:5
121:15 122:21
**afghanistan** 14:15
**aforementioned**
118:8,23
**afternoon** 6:9
**agency** 99:21
**ago** 7:3 11:23 13:9
14:8 24:1 47:11
47:22 52:16,17,19
52:20 53:18 55:23
72:16 73:8,11,12
**agree** 94:24
**ahead** 11:2 33:13
62:23 76:16 95:10
110:23
**al** 1:7 120:7 121:3
122:3
**alert** 41:24



**aligned** 14:25
15:12
**allegations** 29:24
**allow** 8:8 104:16
**allowed** 52:8 53:1
**allows** 63:19 65:1
74:6
**altercation** 19:4
**amount** 110:6,12
**analysis** 10:12
**annotation** 39:8
**answer** 8:4,5,11
8:19,22 9:1 11:3
14:8 24:2 26:3
32:20 39:5 75:10
75:13 76:3,9
97:18
**answered** 33:13
**answering** 8:9
10:21
**answers** 25:18
**anxiety** 19:19,24
30:24,24 35:2,18
35:21 36:12 38:3
38:11,23 39:1,18
40:3 43:22 44:3,8
44:12,14 45:3,6,7
45:8,12,14,25 46:6
46:8,11 47:1,7
48:10 49:5,6 51:5
53:12 54:22 55:9
65:11,19,25 67:23
69:18 70:3,7,9,12
70:16,23 71:1,20
73:23 78:15 79:11

80:2,7,14,18,19
86:22 90:10,21
91:9,10,14,16
100:13,15 110:7
**anxious** 41:22
**anybody** 10:3 11:5
**apartment** 79:7
**apparent** 51:8,10
51:11
**apparently** 80:15
**appeals** 108:4
**appear** 121:11
122:15
**appearances** 2:1,2
**appeared** 84:2
**appended** 122:11
122:18
**apply** 81:11
**appreciate** 103:14
**approach** 37:7
**approximately**
34:14 35:14 53:13
**april** 29:5 31:11
58:22 59:16 78:6
80:6,20 119:13
**area** 14:24
**argument** 115:2
**arguments** 115:5
**arrogant** 111:5
**arthur** 15:5
**articles** 110:14
**aside** 61:21
**asked** 10:9,12,15
11:6 21:15 23:25
24:18 26:1,3
29:16 31:16 32:21
37:5,12 41:18
46:5 57:13 60:20
70:19 71:18 75:11
75:12

**asking** 17:8 26:18
33:4 41:7 46:25
49:19 54:2 57:14
57:16,18 62:8,13
68:7 76:18 109:2
**aspiration** 33:2
**aspired** 33:5
**assert** 8:7
**assessed** 52:16
53:12
**assessment** 19:17
53:9 109:6,9
110:2 114:18
**assignment** 121:2
122:2 123:2
**associated** 68:2
**attach** 75:25 77:12
**attached** 122:7
**attack** 20:5
**attacks** 44:17 45:5
45:9 48:1 49:7
65:13
**attempt** 60:5
**attempting** 38:13
**attend** 26:13
**attention** 56:11
112:13 113:14
**attorney** 92:15
93:5 119:1
**attorneys** 119:3
**attributable** 91:15
**attributed** 56:13
90:8,12
**august** 40:18 99:8
99:13
**authority** 59:11,16
60:3 86:7
**authorize** 122:11
**authorized** 106:22
**available** 109:6,25

**ave** 120:1
**avenue** 2:5
**avoid** 74:19
**avoiding** 70:25
  85:8
**awake** 41:23
**aware** 40:13
**awareness** 43:11
  106:17

**b**

**back** 8:21 20:18
  29:4 31:9 47:18
  57:6 63:5 64:9
  66:21 67:3 69:9
  74:17 76:8 78:10
  78:19,22 83:1,24
  84:3 90:25 95:9
  111:20 116:3
  120:18
**background** 12:3
**bad** 74:24
**based** 16:22,24
  30:11 36:8,17,20
  36:24 53:10 99:8
  115:2
**basement** 19:1
  31:21
**basically** 63:25
**basis** 30:8 92:6
**becoming** 107:1
**beginning** 49:18
  53:7 84:3 111:9
  114:22 115:4,13
**behalf** 1:14 118:10
**behaviors** 19:24
**beliefs** 60:9
**believe** 12:16 19:8
  19:11 21:19 27:1
  30:7 33:22 41:18
  41:21,25 42:5
  48:24 64:5 71:13

76:6 83:21 86:8
  94:1 107:3 112:10
**believes** 97:17
**best** 8:9 36:7 79:12
  79:18,20 113:25
**bet** 102:9,23
**better** 47:1 86:23
  90:22 109:12
  115:11
**beyond** 44:11 51:3
  75:12 83:17 88:3
  88:16,24 112:22
**big** 108:9
**bill** 103:14
**body** 64:15,16,17
**bother** 110:12
**bottom** 120:16
**bought** 46:15
**boundary** 88:4,17
  88:24
**box** 2:12 39:13
  82:16 83:17
**boxes** 39:12,15
**brady** 2:17
**brain** 63:17
**brand** 24:14
**branigin** 2:11
**break** 62:23,24
**breath** 20:6
**breathe** 20:17
**bright** 114:16
**bring** 33:8,9 55:16
  60:12 81:2 110:13
**broad** 48:17
**broke** 59:11
  103:25
**broken** 19:1,15
**brothers** 109:18
**brought** 7:17
  71:11 74:5

**browser** 101:11
**build** 111:11
**built** 110:16
**bullied** 14:17 64:2
**business** 61:9
  107:3 115:21
**button** 102:10,19
  104:11
**byler** 2:4 3:5 8:6
  9:4 10:9,18 32:18
  39:3,21 44:22,24
  46:4 51:17 57:12
  57:20 59:18 60:17
  61:2 62:19 68:16
  68:23 69:1 71:5
  75:6 76:15 80:22
  97:14 98:6 101:1
  101:3,18 103:4,14
  103:17 104:16
  105:1 107:12
  115:16 116:8,12
  116:19

**c**

**c** 14:2,2 16:14
  104:5
**ca** 120:25
**cacrep** 13:22 14:1
  14:2
**call** 14:13
**called** 40:20 64:15
  89:9 93:25
**calm** 20:18 71:22
**campus** 21:11
**candidate** 36:12
**capable** 115:4
**capacities** 11:16
**capacity** 12:10
  114:19
**capture** 24:22
**card** 107:3

**care** 43:8,10,13
  48:21 52:7 60:8
  60:23 73:9
**career** 11:16 12:4
  12:7,12 33:3,5
  113:16
**case** 7:7,8,17,19
  10:9,10,14 11:5
  27:16 36:9 38:16
  39:16 66:9 106:10
  108:5 120:7 121:3
  122:3
**cases** 16:19
**casually** 73:16
**categorize** 12:24
**causal** 70:17 75:2
  75:19,22 76:12
**cause** 30:10 43:22
  44:3 48:18 50:7
  76:5,18 77:1,2
  118:25
**caused** 24:16 53:3
**causes** 77:7,8,10
  77:11,15
**causing** 63:21
  70:19
**central** 39:9
**certainly** 31:13
  35:9
**certificate** 122:11
**certification** 11:24
  13:11,23 14:5
  121:1 122:1
**certify** 118:5,24
**challenge** 114:22
  115:1
**challenged** 59:10
**challenging** 86:7,8
**chance** 100:24
  101:1

change 51:4 65:7,8
74:8 77:9 82:17
82:21 120:15,16
122:8 123:3
changed 19:14
37:16,17 48:22,23
48:24 49:2,3,8,19
51:21,21,22 82:15
82:18 84:9
changes 120:14
121:7 122:7,9
changing 8:18
characterized
44:13
chief 23:6,7 45:1,2
45:13
child 89:20 90:14
91:1
childhood 77:22
choice 24:22 25:1
25:7 92:16 93:1,8
choices 24:20
choose 39:15
74:16,20 110:4
choosing 24:23
64:13 112:9 113:6
chose 41:18 62:2
74:9,15,22 76:25
81:22
chris 16:12 105:24
christian 17:7
chronological
17:13
chronologically
106:2
chronology 49:17
54:13 55:9,12
church 17:2,4
churches 17:6
circle 8:20

cit 22:12
civil 1:3,16 118:13
121:5 122:5
cl 22:19 52:17 56:3
56:22 69:13 78:9
87:4,18 88:2
91:20 96:9 107:25
clarify 24:10
clarity 22:25
class 21:22
classes 19:10
21:11
clear 8:25 64:16
cleveland 120:2
click 102:16
104:17
client 17:21 22:19
23:8 24:23 25:17
25:22 29:9,22
30:5 31:16 32:21
35:1,2 36:25
38:10 46:16,18
47:19 52:2 53:10
53:14 55:6 57:6
59:5,10,19 60:25
61:11 62:12 68:17
70:13 71:18,20,21
71:25 74:5,15,19
74:20 76:24 80:24
88:10 94:17,19
97:21,23 107:25
108:3,9,14 111:6
112:14 113:15,17
client's 18:9 23:22
27:7 38:3 39:8
53:8 62:15 64:13
92:5
clients 16:20,21
106:8 109:11
111:10

clinical 13:7,24
close 88:8,9
code 28:3,6,19,22
48:14 65:7,7,10,15
codes 65:17
cognition 30:22
64:12,18 77:13
cognitions 12:1
60:10 61:25 67:16
74:2
cognitive 55:13
63:21 64:1,8
66:12 75:25
collect 7:16
colleen 2:17
college 12:21
13:10,18,19,20
15:22 33:17 51:14
66:21 68:9 75:3,4
86:12 113:15
114:7
colleges 61:16
com 101:21
combine 69:4,6
combining 69:2
come 8:1 20:18
36:5 41:17 50:6
55:5 67:3 115:12
comfortable 25:22
104:18
coming 6:11 41:8
52:18 115:4
commands 91:21
92:3
commencing
118:12
comment 38:8
61:4 80:23,25
94:16 95:19 98:8
commented 94:17
96:9

commenting 98:12
comments 110:13
commission
119:12,14 121:19
122:25 123:25
common 82:4,8
communicating
10:23
communication
118:17
community
113:17
company 7:10
107:6
comparative
21:14
compare 27:8
comparing 58:14
comparison 21:17
58:17
compartmentalize
65:1
complement 15:2
complementary
17:3
complete 8:10
13:3 15:16 19:9
19:10
completed 15:17
complex 25:18
comply 96:10,16
96:19
conceptualized
56:3,10
concern 6:21 15:8
15:11 16:23 23:11
27:5 43:11 46:16
60:8 62:5,6,7,9,10
106:24
concerned 18:16
26:25 46:19 55:11

[concerned - day]                                                              Page 6

55:12

**concerns**  23:6,7
45:1,3,13

**concludes**  115:19

**condition**  22:7,10
39:19 40:3 45:25

**confirm**  57:18
105:12

**conflict**  94:3

**connect**  14:19
65:3 77:25

**connecting**  15:14

**connection**  7:4
11:5 19:17 68:4

**connects**  77:5

**consider**  38:11
47:22 100:2

**considerable**
110:6

**consideration**
27:19

**considered**  48:6

**considering**  85:25
118:16

**consistent**  100:13
103:11 105:10
109:12

**consistently**  86:23
90:22

**conspiracies**  85:20
85:25

**conspiracy**  86:9
86:11

**constantly**  110:14

**construction**
12:10

**consult**  10:6 106:3
106:5

**consultation**  18:10

**contact**  99:20

**contacted**  96:4

**container**  64:20
64:25

**context**  55:5 59:23
60:4 65:20 69:21
70:1,6,12,21 71:6
74:1 93:4,7 97:5
97:21 98:11
108:19 113:1,21

**continue**  34:5 81:9

**continued**  5:1 78:9

**continuing**  46:17
82:12

**control**  70:2

**controlling**  56:16
57:4,8,25 58:8
59:6,17,21 60:7,15
61:20 62:3,16
89:16,19

**conversation**  58:6
60:4 71:23 72:5
72:10,15 79:17
87:17 93:7 94:23
98:11

**conversations**
54:4 106:15

**cope**  63:17

**coping**  70:2

**copy**  9:22 10:16
105:7,12 116:18

**core**  14:25 74:8

**corner**  9:19 28:18
34:24

**correct**  8:19 9:6,7
9:15,15 11:18,19
13:2 17:15,19,19
24:6 26:8 29:1
35:22,25 36:19,23
37:17,25 39:11
40:9 42:16 43:18
45:4 46:10 49:23

50:15,16 52:14
53:11 56:12 63:18
63:21 65:8 66:25
67:4 68:3 70:8,11
71:13 73:13,21
75:23 78:1,21
81:4 82:16 83:16
84:4,10,19 85:3
89:1,13,17,21
90:11,15 91:12
92:8 93:2 95:18
95:22 96:6,13,24
97:8 99:6 100:4,6
105:15 108:1
114:12,13 115:15

**correcting**  55:15

**corrections**  8:16
120:14 122:17

**correctly**  14:8

**counsel**  6:10 8:5
118:23

**counseling**  6:21
12:13 13:24 15:1
15:8,11,21 16:4,23
17:2 25:24 27:6
52:18 73:9 106:24

**counselor**  11:22
13:7 15:7 22:14
22:15,19 52:12
59:10 71:18

**counselors**  17:7

**county**  1:14,15
118:2,4,11 119:14
121:10 122:15

**couple**  105:17

**course**  21:8 34:13
35:20 106:1

**courses**  21:25

**court**  1:1 7:13,15
7:19 108:4 121:7

**courts**  116:15

**cr**  22:19 52:10,11
52:16 56:3 78:9

**create**  54:12 73:6
74:16

**credential**  15:22
106:20,21

**credentialing**  11:9

**credentials**  15:20

**criteria**  27:8,12

**cross**  3:4 107:11

**crr**  1:13

**csr**  1:13

**curious**  30:16
110:17,20

**current**  11:15
65:17,18 82:24

**currently**  16:11

**cut**  20:19

**cutting**  20:13,14
71:21

**cv**  1:3

---

**d**

**d**  13:14 15:4
101:21 106:20

**date**  8:17 47:17
52:13 54:9,11
57:11,23 86:22
120:8 121:3,9,19
122:3,13,25
123:20,25

**dated**  35:13 84:5,7
91:6 112:3

**dates**  90:25

**david**  101:21

**day**  1:15 18:3,4
23:12 24:15 25:8
26:5,14 56:21
86:23 90:22 95:18
95:18 118:11
119:6 121:16

122:22 123:22

**days**   19:1 120:20

**deal**   60:5

**dear**   120:9

**death**   7:8

**debating**   115:5

**december**   45:20
84:7,18,20

**decision**   81:25
82:20

**decisions**   59:1

**declined**   80:15

**deed**   121:14
122:20

**deemed**   120:21

**defendant's**   4:3
5:1 9:19,19 18:6,8
19:16 22:20,22
25:9 26:23 28:12
28:15,15 29:2,4
34:17,20 35:10,12
35:14 40:25 41:1
42:9,11 44:19,21
45:2,16,20 49:10
54:22 55:20,22
56:1 58:19,21
63:2,6 64:19 65:5
65:24 69:8 72:20
72:22,23 74:3
78:3,5 80:14 83:1
83:2,4,7 84:5,6,9
85:14,16,18 86:14
89:2,4,6 91:3,5,6
92:9,11 95:3,23,25
96:2 98:22,24
99:8,10,16,18
100:9,11 104:15
105:4 107:9,14
111:21 113:8,10

**defendants**   1:8,15
2:9 118:10

**defending**   25:17

**define**   36:2 50:10

**defined**   97:10

**defining**   96:15,18
96:22

**definition**   37:10

**definitions**   37:12

**degree**   11:13,23
13:5,6,14,17,18,19
13:20 15:21 56:14

**demonstrate**
114:21

**denial**   30:17

**denomination**
17:1,3

**department**
120:24

**deployed**   105:11

**deponent**   117:1
118:6,19,20

**deposed**   6:23

**deposition**   1:10,12
4:3 5:1 6:11 7:11
9:5,11 10:1,17
18:6 22:20 28:12
29:2 34:17 35:10
40:13 41:1 42:9
44:19 45:16 49:10
55:20 58:19 63:2
72:20 78:3 83:4
85:14 86:14 89:2
91:3 92:9 95:23
98:22 99:10,16
100:9 105:4 107:9
113:8 118:9,14
120:8,11 121:1,3
122:1,3

**depression**   19:19
20:8 23:6,10 49:5

**describe**   19:24
20:8 30:14 110:4

111:12 112:1

**described**   13:25
30:12 32:11 42:7
43:17 54:22 57:21
70:9 75:21 93:21
93:24 95:12

**describes**   66:11

**describing**   39:16
88:21 89:25
113:22

**description**   19:22
56:19,21 66:14
88:19,22 90:19
91:25 97:1 102:21
102:24 103:10
105:2,9

**desensitization**
63:12

**designed**   35:19

**desire**   96:10,17,20

**desired**   32:4 78:21

**detail**   22:3 112:21

**details**   8:17

**determine**   52:24

**development**
111:7

**diagnose**   48:15

**diagnosed**   28:24

**diagnoses**   48:13

**diagnosing**   49:12
52:5 55:9,10

**diagnosis**   27:6,23
27:25 28:2,19,19
28:22 48:17,19,21
49:3,6,9,20,25
50:14 51:4,21
52:9 65:5,6,8,16
65:24 67:9 73:22

**diagnostic**   27:13
27:17,20 28:3,6
43:5

**dialogue**   85:19

**dictation**   72:19

**die**   14:15

**difference**   84:25

**different**   14:23
67:16 95:22 104:1
106:18 116:13

**difficult**   64:24

**dilemma**   93:19

**direct**   3:3 6:7
113:14

**directed**   75:21
112:13

**direction**   12:4
81:10 118:15

**directory**   106:21

**disagreed**   37:4

**disclose**   26:17,24

**disclosure**   42:2
43:6

**discomfort**   58:24

**discovery**   61:23
62:11

**discuss**   22:3 33:7
33:11 41:14 43:3
47:4 71:7 106:17

**discussed**   41:10

**discussing**   21:16
100:8 112:5

**discussion**   21:9
24:17 58:23 59:1
78:9,14 79:11
89:8

**discussions**   53:19

**disinterested**
118:24

**dismiss**   30:12

**dismissed**   30:9

**disorder**   28:8,23
35:18 48:14,17,20
49:4,7,13,21 50:14

51:5 65:11,19 66:15 70:7

**disordered** 50:15

**disorders** 27:10 110:8

**dissonance** 95:1

**distinction** 88:7

**distorted** 11:25 30:22 60:9 61:25 64:18 67:16 74:2 77:13

**distortion** 60:12 60:16 64:1,9 66:12,13 74:9 75:25 77:9 78:1

**distortions** 55:13 55:13 63:18,21

**distress** 53:3 61:10 61:12 63:22

**district** 1:1,1 7:20

**distrust** 59:15

**disturbance** 74:5

**division** 1:2

**doctor** 43:18,24 59:2

**doctor's** 42:18 43:8

**doctors** 43:20,20

**document** 104:1 105:14

**documented** 26:23

**doe** 1:4 7:18 120:7 121:3 122:3

**doing** 21:24 32:8,9 82:12 91:8 97:20 100:3 115:11

**dosage** 46:14

**dot** 101:21 103:25 104:4,5

**draw** 21:18

**drawing** 58:16

**driving** 72:13

**drop** 24:21 25:11 25:14,15 39:12,15 82:15 83:16

**drugs** 43:22

**dsm** 27:8 65:18

**due** 16:6 65:25

**duly** 6:3 118:6

**duplicates** 63:16 63:19

---

**e**

**e** 13:14 14:2 15:4 101:20 103:24 104:5,10,10 106:20

**earlier** 50:19 66:17 70:20 83:21 85:9 106:19

**earliest** 74:11

**early** 30:5 32:25 105:23

**earn** 29:20

**easier** 74:17 116:14

**edmond** 6:16

**education** 11:18 11:20 50:12

**educational** 50:22

**effect** 27:3

**effective** 35:20

**effects** 43:22

**eight** 105:2 107:17

**either** 40:4 52:25 72:6

**elaborate** 30:15 68:5 85:5

**elaborated** 56:22

**electronic** 116:18

**electronic's** 116:19

**element** 109:1

**elephant** 101:20

**eligible** 34:5

**eliminated** 47:21

**email** 103:5,6,15 103:21 104:17,21 104:23,25 105:1 120:18

**emailed** 105:7

**emdr** 5:24 11:24 13:8,16 14:12,19 15:22 62:1 63:9 63:11,19 66:3 67:12 73:1,4,15 74:12 75:20 76:21 102:3,6,7,10,14,16 102:19 103:11 105:2,10 106:22 106:24 110:17

**emdria** 13:12 106:20

**emotion** 93:3

**emotional** 92:4

**employ** 119:3

**employed** 15:7 29:15

**employee** 15:19

**employer** 15:11

**employment** 32:5

**enclosed** 120:11

**encounter** 44:1

**encouraged** 92:14

**ended** 93:18 94:8

**engagement** 18:14

**enhancing** 40:22

**enjoy** 20:9 81:3,8 97:4,25

**enjoyed** 97:13

**enjoys** 97:20

**enrolled** 33:20,21 50:10 54:7,11

**ensure** 8:10 104:18

**enter** 78:22

**entered** 122:9

**entering** 20:11 78:10,19

**entire** 43:15 121:5 122:5

**entitled** 102:20

**entry** 19:18 23:21 40:16 53:9 54:12 55:2

**environment** 50:5 66:22

**er** 40:21,23 42:14

**errata** 120:14,17 120:20 122:7,10 122:18 123:1

**established** 39:23 83:21,22

**estimate** 36:7

**et** 1:7 120:7 121:3 122:3

**evaluate** 78:15

**evaluating** 45:24 54:23

**evaluation** 27:17 27:20 36:24 47:24

**event** 49:13,25 50:15,17,21,24 51:2 55:14,17 64:11 66:7 72:24 73:18,24 74:5,13 74:20 75:20,22 77:4,22 119:2

**events** 12:2 20:11 50:20,23 65:1 73:3,14 75:24 76:24 77:12 95:22

**eventually** 79:1

everybody  104:18
ex  112:2
exact  36:3 37:10
  37:11
exactly  12:14 22:8
  41:22 53:24 79:25
examination  1:12
  3:1,3,4 6:7 107:11
examined  6:5
example  26:2
  35:12 38:17 40:18
  64:2 68:6 71:9,24
exceeded  80:8
excellent  111:14
  115:8,10
excuse  83:2
executed  122:10
execution  121:14
  122:19
executive  114:15
exhibit  4:3,4,5,7,8
  4:10,11,13,14,16
  4:17,19,20,22,23
  4:25 5:1,2,3,5,6,8
  5:9,11,12,14,15,17
  5:18,20,21,23,24
  18:6,8 19:16
  22:20,22,23,24
  23:5,11,14,15 25:9
  26:23 28:12,15,15
  29:2,4 34:17,20
  35:10,13,15 40:24
  40:25 41:1 42:9
  42:11 44:19,21
  45:2,16 49:3
  51:15 52:3,10,13
  54:22 55:20,22
  56:1 58:19,21
  63:2,6 69:7,8,9
  72:20,22,23 74:4
  78:3,5 79:9 83:2,3

83:4,7 84:5,6
  85:14,16,18 86:14
  86:16 89:2,4,7
  91:3,5,6,18 92:9
  92:11,18 95:7,11
  95:23,25 98:22
  99:9,10,16,24
  100:9 103:8,16
  105:4 107:9,14,16
  111:21 113:8,10
exhibition  71:17
exhibitions  9:16
  10:15
exhibits  4:1 49:10
  103:18
existing  70:16
experience  11:16
  22:4 26:25 29:23
  30:3,23 31:6
  51:12 58:16 64:24
  65:4 66:9,11,20
  71:19
experienced  91:14
experiences  12:11
  58:18 66:4
experiencing
  58:12,25
experimental
  40:22
expertise  44:11
expiration  121:19
  122:25 123:25
expires  119:12
explaining  30:6
explanation  25:25
  41:25
explore  41:11
  60:23
exposed  14:22
express  11:3 26:12

expressed  92:25
expressing  95:19
  95:20
expression  25:7
expressly  120:12
eye  63:12
eyes  57:9,21 60:6
  62:3,16

**f**

f  104:5,10
f40.10.  65:7
f43.12.  28:8
f43.20.  28:20
f43.23  49:4
face  16:17,17
  76:20 90:3
fact  45:18,24
  46:25 80:8 86:9
  94:7 99:14
factor  15:13 56:19
facts  93:13,17
  115:3
fail  82:7
failing  50:9,17,24
failure  56:4,9,13
  56:20,24 57:9,21
  57:25 58:11,12
  60:6 62:3,16 74:3
  74:6,21 75:2,15
  76:19 77:1,6,23
  96:23
fairness  103:18
faith  16:24
familiar  101:15,23
family  6:21 15:8
  15:10 16:23 20:11
  21:21,22 27:5
  72:3,4 96:5,8
  106:24 109:7,16
familycounsel
  103:24

far  31:7
faster  116:14
father  32:2 51:13
  56:15,23 57:4,7,9
  57:13,15,22,24
  58:4,8 59:6,17,21
  60:7,15 61:20
  62:4,17 67:5,14
  69:14 70:4 71:4,7
  74:23 75:4 89:23
  90:6,13,16,25
  91:11,15,17,21
  92:3,7 96:4 97:11
  97:16 102:2
father's  70:14,22
  89:16,19 90:3
  96:10,17,19
fault  87:19,20
  95:12,14 112:15
  112:16
fear  20:7 56:4,9,13
  56:20 57:9,21,25
  58:11,12 60:6
  62:2,15 65:25
  66:16 68:17 74:2
  74:6,21 75:1,14,16
  76:19 77:1,5
  78:15 85:8 89:15
  92:4 96:22
fearful  20:1,12
fears  65:23
february  1:15
  17:17 18:1 22:24
  118:11 119:6
  120:4
federal  1:16 7:19
  118:13
feel  23:16 24:5
  25:5,6 56:23 58:3
  66:23 69:2 83:9
  83:12,19 84:12,17

84:18,23 85:1,1,9
94:24
**feeling**  58:14,15
66:13,14 70:1
87:10,11 93:25
112:6,11
**feelings**  58:17
97:15
**feels**  32:22 65:23
87:1 97:23 113:18
113:19 114:6
**felt**  30:17 44:16
56:23 64:10 66:11
74:6 77:22 79:20
93:14,21 94:4,7,10
94:22
**ferren**  1:13 118:3
119:10,14
**ferrenreporting**
104:9
**field**  7:5 11:14
12:8 13:5 15:21
28:19 29:8,22
45:1,23 84:11
102:7
**fields**  12:5 25:11
82:19
**fifth**  2:5
**figure**  114:23
**figures**  60:3 86:7
**file**  40:17
**final**  49:6
**find**  24:18 43:4
53:2 60:24 71:15
94:3,21 109:14
120:11
**finds**  114:4
**fine**  116:19
**finish**  71:21
**first**  6:12 12:7
17:17,20 18:10

22:17 23:4 25:12
26:16 31:2 40:19
49:16,20,24 52:18
68:20 69:8,12,12
74:12,13,14,22
78:8 79:9 83:23
84:15 85:7,23
96:3 107:2 115:13
118:6
**five**  11:22 20:16
21:13 22:1 44:23
62:24
**floor**  2:5
**focus**  13:9,15,21
14:9 15:12 19:9
60:23
**focused**  25:17 39:4
39:22 60:11 70:18
**follow**  62:8 81:17
96:7
**follows**  6:5 90:20
**force**  70:24
**foregoing**  118:9
121:13 122:18
**forget**  82:3
**forgive**  100:18
**forgot**  82:6
**form**  32:18 39:3
39:21 46:4 51:17
57:12,20 59:18
60:17 61:2 62:19
68:23 69:1 71:5
75:6 76:15 80:22
97:14 98:6 113:4
**format**  116:10
**forth**  9:20
**forward**  14:18
28:14 34:19 35:12
50:12 53:20,23
54:4 63:19 78:16
78:18 92:11

120:17
**found**  26:4 92:22
**founder**  102:4,9
**founding**  102:2,2
**four**  74:16 107:3,4
**frame**  52:1 53:15
**francine**  102:3,9
**frank**  104:10
**free**  121:14 122:20
**frequency**  46:14
**freshman**  34:8
**friction**  92:7
**friday**  108:3
**friend**  14:15
**friends**  19:2 20:10
**front**  71:3,6,9
**fruitful**  18:25
**full**  6:13 12:23
15:19 33:21 43:5
116:13
**fully**  8:3 21:23
**functioning**
114:15
**functions**  7:14
**further**  47:4 80:15
115:16,18 117:1
118:24

**g**

**game**  52:19 53:17
**gather**  10:3 42:23
**general**  44:7 60:3
75:14 106:17
112:1,20
**generally**  12:5
17:12 22:5 24:2
67:7 103:11
**generated**  9:17
**generic**  71:24
**generically**  42:5
66:6 72:13

**genetically**  66:6
**gentle**  111:2
**getting**  43:7 78:10
78:19,20 90:7,23
90:24 112:9
**girl**  112:24
**girlfriend**  87:20
88:4,17,24 95:13
112:2,16
**give**  8:21 10:12
26:2 69:23 100:23
103:2 113:23
116:15
**given**  8:19 118:19
**glasses**  101:24
**gmail.com.**  104:10
**go**  6:15 11:2 12:1
17:9 20:12,15,17
33:13 35:12 50:2
62:23 63:20 64:9
67:2 69:9 73:5
74:7 76:16 81:11
82:19 83:1,2
95:10 100:21,24
101:6 106:7
107:22 110:23
111:23 112:21
113:10 116:1
**goal**  8:2,24 34:25
36:3,11,15,17,17
36:20 37:9,17,18
37:21 38:1,19,22
**goals**  34:16,25
35:15 36:1 37:7
38:6 39:4,22 47:3
115:7
**going**  14:18 17:8
17:12 20:1 21:11
47:8 61:15,17
62:12,21 66:19
71:22 76:8 84:3

103:15 104:3,15
114:7 116:8
**good**   6:9 9:25 10:2
55:16 60:12 79:15
79:16 91:9 92:16
93:1,9 101:7
109:11,12 111:6
**gotten**   66:19
**governing**   102:7
**grace**   12:21 13:10
13:18,19,20,22
15:22
**gradually**   98:25
**graduate**   15:15,18
**graduated**   11:10
11:11
**grass**   20:13,15
66:18 71:22
**grounded**   86:8
**grown**   64:4
**guess**   108:24
**guided**   13:22
**guilt**   87:1,4,11
88:3 92:15,25
93:4,21,23 94:24
95:11,16,17,19,20
112:6,8,11,23,25
113:3
**guilty**   93:14 94:22
**guy**   115:6

**h**

**h**   16:14
**half**   6:20 20:18
72:15 87:19,21
95:13,14,21
112:15,17,22
**hamilton**   1:14
118:2,4 119:14
**hammond**   1:2
**hamrick**   16:12
27:14 105:24

106:4,5,12
**hand**   9:19 28:18
34:24 119:5
**handle**   6:12
**happen**   37:10,12
**happened**   20:4
24:15 30:9 50:3,4
59:25 61:16,17,19
87:5,11,19 95:13
95:21 112:12,15
**happening**   59:24
108:24
**happy**   103:2
**hard**   9:22 105:7
105:12 106:9
114:23 116:17
**head**   10:22,22
24:12
**healing**   55:16
60:12
**health**   11:22 13:7
13:24 55:16 60:13
**healthcare**   43:19
**hear**   14:8
**heard**   44:7 108:3
**heart**   20:5
**heartbroken**
18:24
**hearted**   111:2
**held**   107:15
**help**   18:18,20
34:15 41:23 63:18
81:9
**helped**   43:21
**helps**   57:17
**hereunto**   119:4
**high**   11:10,11
33:17 73:19,25
74:23 86:12
**highest**   14:5

**highly**   25:18
**hired**   15:19
**hiss**   114:19
**historical**   82:23
**history**   82:23
**hitting**   104:11
**hold**   15:20,24 16:2
56:7 106:19
**holistic**   43:17,20
**home**   21:12,21,22
22:2,6,7 50:6
51:13 66:21 67:9
68:1,8,10,11,14,19
68:20,22
**homework**   81:2,5
81:18 82:1,4,7,9
82:12
**honest**   106:7
**honestly**   42:25
106:14

**hospital**   20:4
**hospitalizations**
20:3
**hour**   16:16,18
20:18 62:21 98:25
118:12
**hours**   99:1,22
106:3
**house**   20:1,17
**hurt**   93:13
**hurting**   93:18 94:9

**i**

**icd**   28:7 65:17,17
**idea**   67:20
**identical**   35:16
**identification**   18:7
22:21 28:13 29:3
34:18 35:11 41:2
42:10 44:20 45:17
49:11 55:21 58:20
63:3 72:21 78:4
83:5 85:15 86:15
89:3 91:4 92:10
95:24 98:23 99:11
99:17 100:10
105:5 107:10
113:9
**identify**   48:2,4
61:23 63:20 64:1
64:8 77:10,11,14

77:16
**identifying** 55:15
61:25 94:19
**il** 1:13
**illustration** 71:12
**immediately** 89:23
90:4
**impact** 14:18 46:5
**impacted** 55:14
66:15
**impeded** 115:3
**important** 7:24
46:13
**impressed** 110:11
**impression** 94:18
102:5
**imprinted** 55:15
**improved** 79:20
**inability** 18:17
19:12 51:1 77:20
**incapacity** 25:1
**include** 28:3
**included** 97:1
120:15
**includes** 35:15
**including** 6:14
**income** 69:15
70:15
**incorporated**
122:12
**increase** 52:1,17
99:1
**increased** 53:3
**increasing** 54:3
**independent** 29:18
79:6
**independently**
29:15 68:2,12
**index** 3:1 4:1
**indiana** 1:1,14,15
6:17 7:20 12:21

15:25 16:7 118:1
118:4,11 119:13
**indicate** 75:1
**indicated** 25:4
39:1 105:8 106:19
**indicates** 18:9
96:3 109:10
**indicating** 120:15
**indication** 29:17
96:21 98:14,15
**individual** 36:24
**industrial** 12:8
**industry** 12:10
27:9
**info** 102:10
**information** 10:4
25:13,16 51:22,23
52:8
**informed** 46:7
**informs** 37:7
**initial** 26:15 40:16
**initially** 39:23
59:5,20
**input** 106:11
**inside** 71:22
**institute** 102:6,8
**institutions** 50:22
**intellectual** 114:19
115:2
**intelligence**
114:16
**intelligent** 25:18
115:6
**intended** 8:15
113:18
**intense** 14:16
**intentional** 88:14
**interact** 67:8,10
**interacted** 10:18
**interaction** 38:25
54:7

**interactions** 59:1
65:22 67:14 97:16
**interest** 15:13 20:9
82:25
**interested** 25:23
119:2
**interests** 33:16
**internet** 110:7
**internship** 15:16
15:18 22:18
**internships** 15:17
**interpretation**
81:25
**interrupt** 110:25
**introduced** 14:21
14:23
**involve** 63:15
**involved** 14:20
112:9
**involvement** 27:14
**irrelevant** 43:4
**isolate** 66:4
**item** 83:17 115:21

**j**

**janine** 1:13 118:3
119:10,14
**january** 63:7
65:25
**job** 32:13,17 41:16
41:24 47:15 68:15
68:25 69:14 70:14
78:10,20,20,24,25
79:2,4,5 89:23
90:4,7,23,24 91:11
96:11,15,17,20,23
97:3,6,8,9,12,24
98:4,19,25 99:14
99:15
**jobs** 81:2,7,11
**john** 1:4 7:18
120:7 121:3 122:3

**jones** 2:10 104:20
104:20
**journey** 30:21
**jpk** 1:3
**judge** 7:13
**judged** 65:23,23
66:1,4,10,13,14,23
66:24 67:24 70:10
70:13 71:3
**judges** 108:4
**judging** 67:5
**july** 107:15,20
**jump** 28:14
**june** 35:13 91:7
**juxtaposed** 8:17

**k**

**k** 16:14
**kealey** 2:10 3:3
6:8,10 44:23,25
62:21 63:4 76:11
100:21 101:5,10
101:20,22 103:4
103:15,20 104:7
104:11 105:6
107:7 113:4
115:18 116:20
**kept** 82:22
**keystroking** 83:14
**kind** 7:7 19:11
22:3 101:24
109:15 111:2
112:24 114:5
**knew** 36:9,10 43:9
46:5 66:18 110:15
**know** 8:19 10:23
14:4 18:21 21:4
22:8 25:3,3 30:21
31:15 33:20,23
34:7,8 42:19,22
43:24 44:5,14
46:12,13 48:18

51:24 53:24 54:11
54:14,20 60:18
61:7 62:8 67:21
71:14,17 74:14
77:8 83:23 96:18
97:18 101:25
106:23 109:18
111:5,19 114:5
116:4
**knowing**  113:19
**knowledge**  40:10
51:3

**l**

**l**  2:10 15:4 103:24
104:5,5
**labeled**  25:12
**lack**  24:25
**lady**  64:2
**lafayette**  2:13
**lake**  12:21
**landed**  40:23
**language**  112:14
**large**  14:13,14
118:5
**lawn**  21:12 22:1
68:1,8,10,14 71:2
71:6,10,16
**lawyer**  108:6
**lawyers**  7:22
**layperson**  105:3
**leading**  30:23
53:22
**learn**  20:23 27:7
27:11 35:1 54:6
62:11 110:15
**learned**  52:7 115:3
**learner**  110:19
**learning**  110:1,11
**leave**  64:4 113:15
**left**  22:9 33:16
114:11

**legal**  108:25 120:1
123:1
**legs**  100:24
**letter**  120:21
**level**  14:5 38:4,23
47:8 114:19
**license**  15:24 16:2
16:6
**licensed**  16:8,10
27:16,19
**life**  12:1 14:18
26:18 32:22 50:15
50:17 53:4,20,23
54:5 58:18 61:14
63:17,18,22 64:7
64:10,24 66:7
74:6,13 75:7,8,15
77:4 78:17,18,23
113:16,20 114:1,3
**liked**  97:12
**likes**  97:20
**limit**  16:9
**line**  77:24 100:16
120:15 122:7
123:3
**list**  19:18 34:25
73:6 74:16 81:2,7
81:11,13,14,15
109:25
**listed**  45:3 109:7,9
122:7,17
**listing**  122:7
**literature**  36:21
37:2,6
**litigants**  9:14
**litigation**  7:9
**little**  103:25 106:4
**live**  79:7
**living**  21:20 22:2
29:14 31:20 51:13
68:2,12

**llp**  2:4,11
**logic**  26:1
**logical**  115:5
**long**  6:19 16:8
20:21,23 54:14,20
71:14 77:25 84:2
101:4 104:16
105:2 106:14
111:11 115:12
116:15,16
**longer**  46:19 47:19
48:7,8
**look**  17:10 18:8
28:10 31:7,9 35:8
38:6 42:8,11
44:21 47:18 48:24
48:25 52:2 55:22
55:24 58:21 63:5
67:15 72:22 74:1
78:5 82:10 83:24
85:16 91:5 101:16
103:3,9 107:25
**looked**  31:5 69:8
105:9 106:23
**looking**  17:9,12
23:5 32:24 40:24
73:17 98:7 101:14
103:17 104:19
105:19 106:2
**looks**  79:24 102:1
105:3
**lost**  19:5 113:16,19
114:6,12
**lot**  73:9 106:8,15
**lovable**  64:13
**love**  110:1,2
**loved**  110:15
**loving**  111:4
**low**  78:16 91:9,16
97:6,22 98:7
100:13

**lower**  9:18 28:18
34:24 35:2,21
98:14,16,17
**lowering**  36:12
38:22

**m**

**m**  13:14 16:14
101:20 104:5
106:20
**madam**  76:11
104:7,13 120:9
**mailing**  6:14
**main**  2:11
**mainstream**  78:22
**major**  20:15
**majority**  47:9,12
**making**  12:4 26:13
27:6 64:23 68:4
81:7 88:22 115:10
**managing**  70:3
**manner**  88:23
**march**  22:24
53:13 56:12 58:12
69:10 84:16
115:14
**marked**  18:6
22:20,25 28:12
29:2 34:17 35:10
39:12 41:1 42:9
44:19 45:16 49:11
55:20 58:19 63:2
72:20 78:3 80:12
83:4 85:14 86:14
89:2 91:3 92:9
95:23 98:22 99:10
99:16 100:9 103:7
103:16 104:14
105:4 107:9,13
113:8
**marketing**  12:8,9

**marriage** 64:6
**mary** 101:21
**master's** 11:21
  13:5 14:6,22
  15:21
**math** 12:15
**matter** 6:5 11:17
  54:17,18 108:25
  114:25 118:8
**meals** 24:12
**mean** 12:17 13:17
  15:4 16:25 18:11
  22:14 25:20 37:20
  37:23 38:16,19,22
  42:18 53:7,18
  54:9 64:21 74:12
  76:25 81:21,22
  88:21 99:3 110:25
**meaning** 24:13
  57:18 79:18 89:12
  116:1
**means** 42:23 70:2
  77:12 107:25
**meant** 24:7,10
  29:19 85:10
  111:22 115:12
**measurement** 36:3
**measures** 53:1
**medical** 30:7,10
  43:19 110:9
**medically** 43:9
**medications** 42:3
  43:6
**meet** 27:12 37:18
**meeting** 17:17,20
  17:23,25 18:11,15
  18:22 19:17 26:22
  29:7 32:13 96:5,8
  106:9 107:20
**meetings** 21:8
  32:25

**members** 72:4
**memorable** 18:22
**memorized** 28:10
**mental** 11:22 13:7
  13:24 60:12 78:21
**mention** 27:3 33:1
  33:2 71:10 96:24
**mentioned** 13:8
  20:25 60:22 66:17
**menu** 24:21
**menus** 25:11
**met** 18:2,3,4 22:17
  22:23 38:19,20,22
  40:19 115:13
**mid** 29:10,15
  31:14,17 32:7,17
  32:23 33:1 37:24
  38:18,24 39:18
  40:2 45:22 46:22
  47:2,12
**middle** 6:14 52:15
  56:14,25 57:3,6,10
  58:5,7,9,10,14
  59:25 61:18,19
  64:3
**midwest** 120:19
  123:1
**milestone** 38:15
**military** 33:3,5
**miltenberg** 2:4
**mind** 9:3 35:19
  40:22 55:14 63:20
  65:1 66:8 68:7
  74:8
**mindedness** 110:1
  110:22
**mine** 83:17
**minimum** 97:3,8
  97:24 98:1
**minor** 8:16

**minuscript** 116:12
  116:14
**minute** 62:24
**minutes** 20:16,19
  21:13 22:1 47:11
  100:22
**misread** 111:23
**misrepresent**
  76:23
**missed** 100:25
**mistreated** 108:11
**mixed** 49:4
**mocking** 20:5
**modify** 8:22
**moment** 28:14
  47:22 55:23 69:23
  73:11 74:1 113:23
**moments** 13:8
**months** 26:16
  35:14 40:19 52:16
  52:17,19,20 53:18
  53:22 54:13 112:4
**mood** 23:6,10
  45:13
**moral** 93:18
**mother** 102:2
**motion** 63:12
**motivated** 25:23
**move** 33:14 34:19
  63:18
**moved** 61:24
  68:11 110:9
**moving** 50:11
  53:20,23 54:4
  81:9
**mow** 21:12 22:1
**mowing** 66:18
  68:1,8,10,14 71:2
  71:6,9,10,16
**multiple** 64:3
  75:24 76:24 77:18

**minuscript** 109:23

**n**

**n** 15:4 103:24
  104:5,10
**name** 6:9,13,14,16
  8:17 16:13,14
  77:24 105:21
  120:7 121:3,4,15
  122:3,4,21
**nature** 51:8 111:4
**near** 100:22
**need** 8:8,18 9:1
  16:22 24:10 70:2
  84:22 104:16
**needed** 18:20 24:5
  25:5,6 84:24 85:1
  85:9
**needing** 24:13
  56:11
**needs** 23:16 36:25
  83:9,12,19 84:17
**negative** 51:12
  64:11 67:13 94:5
  94:6,7,10,11
**neighbors** 66:18
  66:24 67:2 71:8
  72:8,9,11,12,14
**neither** 50:21
**nervous** 64:17
**nesenoff** 2:4
**neural** 74:7 77:5
  77:24,25
**never** 33:19 37:16
  37:17 39:17
  111:18
**new** 2:6 24:14
  41:15,24 47:15
  64:12 74:4
**newer** 107:5
**news** 92:14 93:4

**night's** 10:2
**nmllplaw.com** 2:7
**nod** 10:22
**noel** 1:10,13 6:2
6:16 103:24,24
104:22 117:5
118:5 120:5 121:4
121:9 122:4,13
123:20
**northern** 1:1 7:20
**notarial** 119:5
**notary** 1:14 118:3
119:12 120:17,25
121:10,18 122:15
122:23 123:23
**notation** 83:8
**note** 10:20 17:10
18:9 22:11,11
25:15 28:16 30:11
30:13 34:21,23
39:7 41:3 42:8,12
42:16 43:12 45:7
51:20,24 56:18
58:22 59:4 63:7,9
65:25 69:10,17,23
70:1,21,21 71:14
73:18 74:3 78:7
81:1 83:17,18
86:19 99:2 109:13
116:1 120:13
**noted** 6:1 79:10
116:21
**notes** 4:4,5,7,8,10
4:11,13,14,16,17
4:19,20,22,23,25
5:2,3,5,6,8,9,11,12
5:14,15,17,18,20
5:21,23 8:14 9:12
9:13 17:9 23:1,5
24:3 25:10 26:20
28:1 31:5,7 32:24

33:4,10 35:7
40:12,14 45:8,10
45:19 47:18 51:19
55:2 67:19 69:5,6
71:11,16 72:17,18
73:5,17 75:17
82:10 83:25 84:3
105:19 107:19
108:21 109:8
113:23
**notice** 1:16
**november** 84:5,16
100:12
**np0681591** 119:14
**nuclear** 109:7,16
**number** 25:9
31:25 34:25 36:5
65:12 86:17 97:10
97:11 120:8,15
**numbered** 9:18
28:18 34:24 65:6
**numbers** 122:7
**ny** 2:6

## o

**o** 103:24 104:5
**oath** 7:15
**object** 51:17 57:12
57:20 61:2 64:25
64:25 71:5 113:4
**objection** 8:7
32:18 39:3,21
46:4 59:18 60:17
62:19 68:16,23
69:1 75:6 76:15
80:22 97:14 98:6
**objective** 7:16
34:12,15 39:13
62:14,15 80:7
**objectives** 36:1
**obligatory** 115:23

**observation** 61:4
69:22 88:11
**obstacle** 38:20
39:1,19 80:19
**obtain** 42:2
**obtained** 13:6
**occasion** 41:13,15
**occasions** 6:25
**occurred** 108:22
**occurrence** 82:5,8
**october** 34:21 49:5
96:14 99:5,12
113:11 115:9
**odd** 94:21,24
**offer** 16:6
**offered** 15:17 17:2
24:18
**official** 121:15
122:21
**officials** 93:16
**oh** 92:22 100:18
111:1
**ohio** 120:2
**okay** 11:13 17:14
18:5 42:12 51:25
69:24 75:18 76:10
83:6 85:17 86:18
89:5 92:12 95:9
95:10,15 96:1
101:14 102:18
107:18,19,22
108:3,9,16 109:18
110:21 111:1,7,20
111:22 112:5
114:11
**older** 65:16
**once** 9:18 48:6,25
64:8 110:16
**ones** 9:16 23:2
107:2

**ongoing** 20:6
**onset** 52:16 53:7
53:12 54:13,21
55:9 86:10
**open** 104:17 110:1
110:20,22
**opinion** 10:13 31:4
39:17 40:1,5,6
44:16 47:25
**opinions** 10:10,11
**opportunity** 8:7
8:10,13,21 115:22
**optional** 115:23
**oral** 1:12
**order** 17:13 103:8
104:14 108:22
**org** 103:25 104:4,5
**organization**
15:14 16:25
**organizations** 17:6
**original** 49:8
102:4
**originally** 47:14
**origins** 51:9
**outcomes** 109:13
**outline** 100:25
**outside** 20:1 21:21
21:21 67:9 71:20
72:3
**overall** 91:16
114:3
**oversight** 105:24
**owe** 62:22

## p

**p** 2:10 3:3 6:8 14:2
**p.m.** 1:15 6:1
62:25 63:1 101:8
101:9 116:21
118:12
**p.o.** 2:12

**page** 3:2 4:2 10:24 25:12 28:17 34:23 56:1 65:6,6 69:12 78:7 80:14 91:7 99:18 100:11 102:22 105:2 109:5,5 111:20 114:14,14 116:13 116:15,16 120:15 122:7 123:3

**pages** 4:4,5,7,8,10 4:11,13,15,16,18 4:19,20,22,24,25 5:2,4,5,6,8,10,11 5:13,14,16,17,19 5:20,22,23 107:14 111:24

**palpitations** 20:6

**panic** 20:16 44:17 45:5,9 47:25 49:7 65:13

**paper** 45:14

**paragraph** 55:25 56:2,7 69:13 72:9 78:7 79:9 85:23 86:25 87:3 89:7 89:25 91:18 92:20 92:21 96:21 99:19 107:23 113:14

**parents** 17:22,23 17:25 18:2,4,9,11 18:14 19:18 22:23 24:11 26:13,22,24 31:1,12,15,19 32:4 32:11 40:20 52:19 53:17 54:3 68:25 79:4

**part** 12:23 23:14 40:17 46:6,20,23 47:23 52:5 56:4,9 57:23 60:15 61:21

61:23 62:11 68:20 68:21 75:2 90:2 102:7 108:19 109:9 112:8 114:8 114:11 122:9

**particular** 13:9 17:1,1 72:1 73:18 73:22 91:13

**parties** 118:22

**parts** 64:7

**party** 7:9 119:1,3

**passage** 52:21 53:6,16 56:2

**path** 113:18

**pathway** 74:7 77:5 77:24,25

**patient** 27:6 46:11

**patients** 36:22

**pause** 8:8 104:15

**paycheck** 29:20

**pbyler** 2:7

**pdf** 103:5,7,14 104:18 105:12

**peace** 94:3

**pending** 7:19 32:19

**people** 44:3 64:22 65:22 67:8,11 68:6,7 69:18 71:7 82:3,7 110:12

**perceive** 69:19 71:3

**perception** 67:23 70:10,13

**performance** 33:25 74:24

**period** 32:13 34:16 36:16 52:6 106:15

**perry** 1:10,13 6:2 6:9,16 32:19,24

63:8 76:17 83:1 100:23 101:11,23 103:9,21 104:17 104:22 105:7,17 107:7 115:19 117:5 118:5 120:5 121:4,9 122:4,13 123:20

**person** 43:17 65:22 66:15 93:6 107:2 118:25

**person's** 63:22 66:7

**personally** 121:11 122:15

**phase** 63:25 64:14 64:15 102:24,25

**philip** 2:4 3:5 107:12

**phobia** 65:10,14

**phone** 120:3

**phrase** 64:19,20

**phrased** 76:22

**phrasing** 83:12,13 83:14 84:2 98:9

**physical** 19:25

**physician** 43:10 43:14,15

**place** 1:16 15:17 109:11,12 114:5

**places** 50:23,23

**plaintiff** 1:5 2:3

**plan** 113:16 115:7

**plausible** 46:25

**played** 94:2

**please** 6:13 8:3,23 11:2,8 29:4 32:10 33:12 34:19 41:6 42:11 51:19 55:22 56:23 58:3 68:5 75:18 85:5 102:17

113:24 116:5 120:13

**plus** 109:21

**point** 19:23 20:3 21:1 24:9,24 26:11 30:20,21,25 32:22 36:9 37:15 40:6 48:3,4 49:15 49:16 50:2 53:2 55:1 61:24 77:8 79:22 81:7 82:18 83:22 98:8,13 107:8 112:7

**points** 31:25

**populated** 25:11

**port** 1:15

**porter** 118:11

**portion** 75:7

**posed** 8:3

**posing** 7:25

**position** 59:16 95:2 97:7,22 98:1 98:13,16,17

**positive** 29:25 30:4,12,14,16

**possibility** 44:2

**possible** 14:24 30:10 56:4 81:2 118:16

**possibly** 42:14

**posttraumatic** 28:7

**practitioners** 106:22

**pre** 75:3,4

**precautions** 7:24

**precise** 106:4

**precisely** 31:10

**precision** 8:2

**preliminaries** 6:12

**prepare** 9:11,25
10:10,11 11:6
**prepared** 8:14
**preparing** 10:17
**prescribed** 42:7
42:14,17,20 46:15
**prescription** 42:18
43:2
**prescriptions** 42:3
**presence** 120:17
**present** 2:16 11:10
59:4 61:13,20
67:1 75:16 115:1
**presented** 118:20
**presently** 58:8
**pressed** 91:11
**pressing** 69:14
70:5
**pressure** 70:14
91:15
**pressuring** 70:22
**previous** 57:2
76:12 79:15,16
95:3
**previously** 69:9
**primary** 12:11
60:8,22 62:5,7
**printed** 10:16,24
**prior** 12:3 74:3
**probably** 101:15
**probation** 19:11
**problem** 18:19,22
19:18,22 30:18,19
55:10 60:24 61:14
95:1
**problems** 20:6
**procedure** 1:16
7:12 8:6 27:5
118:13 121:5
122:5

**proceed** 17:12
66:5
**proceeding** 10:21
**process** 8:15 9:9
10:20 25:24 63:16
63:19,25 64:11
74:15,18,20
**processed** 67:15
67:17 74:10
**procrastinating**
90:8,23
**procrastination**
89:10,12,15,18
90:1,3,9,12 91:19
**produced** 1:13
9:13
**producing** 69:15
70:15
**product** 105:21
**production** 120:19
120:24
**productive** 18:25
**profession** 11:15
25:21 55:11
**professional** 18:18
31:3 39:17 40:1
44:16 47:25
**professionally**
43:11
**professionals**
43:19,21
**program** 12:22,23
12:23 13:1,3,9
14:6,22 34:9,10
114:8
**progress** 4:4,5,7,8
4:10,11,13,14,16
4:17,19,20,22,23
4:25 5:2,3,5,6,8,9
5:11,12,14,15,17
5:18,20,21,23 28:1

28:16 34:13,21
35:7 40:12 45:19
46:21 63:6,9 78:6
80:12 81:6 86:19
105:18 111:8
115:3,8,10
**progressed** 48:21
52:7
**project** 39:10
**prompt** 11:2
**propose** 103:6
**proposition** 44:1,7
**protect** 64:22
**provide** 11:8
**provided** 13:11
**psychological**
27:10 30:8 110:8
110:10
**psychologist** 16:7
**ptsd** 27:2,23,25
28:4,25
**public** 1:14 67:11
70:24 118:3
119:12 121:10,18
122:15,23 123:23
**purchasing** 116:11
**purdue** 1:7 6:10
7:18 11:14 13:15
13:17 19:5 21:6
27:1 29:23 30:9
31:6 33:21,25
34:5 50:3,20,21
54:8,15,20,25 55:2
55:18 58:16 66:20
77:21 87:5,12
93:12,16,22
108:11 111:15
114:7,11 120:7
121:3 122:3
**purpose** 113:17

**purposes** 116:13
**pursuant** 1:16
118:12
**pursuit** 66:3
**put** 33:4,10 65:2
106:21

---

**q**

**quality** 118:16
**quarters** 62:22
**question** 8:1,3,11
8:12,21,23 9:2
11:20 21:15 23:24
26:2 29:16 31:16
32:10,19,21 33:12
38:7 39:6,24,25,25
42:1 45:11 50:8
62:8,13 68:7 75:9
75:10,11,12,17
76:4,6,7,12,17,20
76:20,22 77:14
96:8,15 97:18
112:1
**questioned** 71:18
**questioning** 53:14
115:20
**questions** 3:3,5 6:8
8:24 9:8 17:8 23:3
23:23 26:5 100:22
101:2 105:17
107:8,12 115:17
**quick** 22:11 99:21
**quite** 78:23 97:18
106:14
**quote** 18:9,10
19:18,19 23:16
25:16 29:8,22
30:4 35:1 52:16
54:21 56:3,14,22
57:4 59:5 69:13
78:9 81:2 85:24
87:4,18 88:2 89:9

[quote - reminder]                                                                    Page 18

91:20 92:13 96:9
**quoted**  53:6,16
**quoting**  72:1

**r**

**r**  13:14 14:2 15:4
16:14 101:21
104:10,10 106:20
**railroaded**  108:10
108:16
**raised**  93:15 94:1
**random**  36:17
**rationale**  96:25
**reach**  38:4
**reached**  39:17
81:6
**reaching**  38:15
**read**  9:12,16 30:11
76:8,12,13 113:23
116:14 121:5,6,12
122:5,6,17
**reading**  120:12,21
**reads**  56:3 87:4
96:9
**ready**  38:16 70:4
70:23 97:6,17,19
97:21 98:16,25
**real**  30:18,19
**realizing**  24:1
**really**  106:14
**reason**  42:1 47:1,7
76:3 82:17 87:14
109:2 120:16
122:8 123:3
**recall**  20:22 24:2
26:5,6,21 28:22
34:3 39:5 40:6,23
42:21 48:12 51:16
67:16 81:16 99:15
106:7,11 108:19
109:4 112:5,18
113:6

**receipt**  120:20
**receive**  104:17
**received**  11:13
104:21,24 105:1
**recess**  62:25 101:8
**recite**  63:10
**recognize**  65:2
101:17 102:6
107:19
**recollection**  10:4
98:15 113:25
**recollections**
67:13
**recommend**  116:8
**record**  7:12,21
27:25 31:6 40:14
63:5,10 100:21
104:21 118:18
122:9
**recordation**  86:3
87:8,24 88:5
**recorded**  23:9
24:3 46:24 48:13
83:24 95:11
**recording**  69:22
**recurrent**  82:2
**recurring**  40:7
**reduce**  48:10,10
**reducing**  80:7,24
**reengage**  19:7
81:10
**refer**  22:12 63:9
65:21 98:9
**reference**  10:6
12:3 34:7 45:9
47:16 53:17 58:5
58:6 70:22 71:15
72:4,6 88:16,19
91:19 120:8 121:2
122:2

**referenced**  22:4
42:4,4 47:14
90:18 121:11
122:15
**referencing**  51:18
71:23
**referred**  55:23
88:23 95:4 105:23
**referring**  14:9
23:20 41:6 44:6
51:15 85:21
**refers**  22:19 35:1
72:24 96:7 102:6
**refine**  52:8
**reflect**  59:11
**reflected**  57:6
**reflecting**  56:25
114:1
**reflection**  82:24
114:3
**refresh**  7:11 10:4
**refusal**  39:8
**refused**  24:19
**refusing**  23:16
24:17,20 82:14
83:8,16
**regard**  37:1
**regarding**  59:2
**regret**  95:2 113:5
113:5,6
**regretted**  93:12
**related**  32:6 50:20
59:6,17,20 61:12
67:17 69:4 91:17
102:1 112:12
**relates**  74:21
**relating**  6:4 20:10
67:23
**relationship**  17:21
24:14 30:5 32:1
45:21 48:5 60:14

75:4 105:23
111:13 112:2,6,9
112:10,19,24,25
113:7
**relationships**  17:5
19:2 64:6
**relative**  119:1
**relevance**  54:19
58:10
**relevant**  44:14
55:8
**relive**  64:24
**reliving**  65:3
**rem**  63:17
**remain**  47:13
**remained**  47:10
47:20
**remains**  40:16
**remarks**  29:7
52:15 55:25 58:23
63:8 69:13 72:23
78:6,8 79:10
85:18,24 89:6
91:7 92:13,21
96:2 99:19 100:16
107:22 113:13
**remember**  12:14
20:2,13,25 21:14
21:15 31:10,23
41:7,21 42:25
47:17 51:22 72:16
73:7,10,14 79:24
94:23 100:8 106:9
112:7
**remembered**
73:11
**remembering**
56:15 57:7
**remembers**  64:16
**reminder**  10:25

remote 1:10
remotely 118:9
removed 19:6,6
  77:21
repeat 14:11
repeated 35:6
  50:19
rephrase 9:2
replace 64:12
report 11:6 20:14
  20:14 24:15 35:21
  35:22 36:13,14
  38:3,5,10 53:8
  54:24 82:13 92:3
  92:5,7
reported 23:7
  29:23 46:18,21
  47:19 48:6,7 52:2
  52:17 55:19,23
  56:22 58:3 59:5
  59:20 61:10 68:24
  69:13 70:13 71:20
  71:21 79:11 80:1
  80:24 81:19 84:24
  86:13,22,25 87:4
  87:16,18 88:8,12
  89:14,18,22 90:21
  91:8,20 92:14,23
  94:16,19 97:23
  98:3 108:3,9
  113:18
reporter 62:23
  76:11,14 103:7
  104:7,13 115:24
  116:3 121:7
reporting 47:6
  69:18 85:13
  100:12 104:10
  108:14 112:14
reports 35:3 85:19

repose 9:2
represented 77:4
  118:22
representing 9:5
represents 14:4
reprocessing
  63:13
request 104:13
  122:9,11
requested 76:13
require 27:13
required 120:25
requirement
  16:16
requirements 19:9
requires 52:5
reread 57:17
research 109:10
  110:9,10
researching 110:7
  114:24
residence 119:14
residential 21:11
resist 96:16
resistance 25:22
  91:20 92:2
resistant 25:25
  26:4,6 110:19
  111:10
respect 39:24
  112:6
respectful 111:1,3
respond 36:23
responded 31:16
response 29:16
  50:15 89:15,19
  105:13
responsibility
  94:5,6,11,12,14
responsible 93:6
  94:8,15

restate 32:10
  33:12 75:18
result 60:9
retraumatizing
  64:23 74:19
retried 108:5
return 38:17,20
  39:2,19 40:4
  74:17
returned 11:21
  120:20
returning 80:20
returns 14:14
review 8:13 10:15
  26:20 51:24 69:23
  115:22,24 120:13
  121:1 122:1
reviewed 40:12
right 9:19 23:17
  28:8,18 32:3,9
  34:14,24 40:15
  44:9 45:3,6 51:14
  53:7 56:11,20,24
  57:10 58:13 68:19
  68:21,22 73:25
  74:11,24 75:5
  80:9 81:3,12
  82:14,21 83:9,13
  83:15,19 84:12
  85:2 86:4,23
  89:16,20 90:4,14
  91:1,11 94:13
  96:5,23 97:20
  99:1,3 101:12
  103:16,22,23
  104:12 108:21
robert 101:21
roof 24:11
root 60:24 61:3,5
  61:6 66:16 71:1
  75:2,22 76:12

77:1,2,7,8,10,11
  77:15
roots 60:25 61:10
  61:12 75:19
rotc 19:6 33:20
  34:5,10 66:20
  108:11 114:8
roughly 11:22
rpr 1:13
rules 1:16 118:13
  121:5 122:5
ruling 98:2
rundown 11:8

s

s 104:5 122:8,8
  123:3
safe 65:2
saith 117:1
sales 12:8,9
satisfy 39:5
saw 14:15 43:19
saying 31:24 72:10
  76:5 77:2 84:25
says 30:13 37:2
  45:7,13 48:20
  53:9 58:2 61:19
  78:8 80:1 84:11
  84:23 87:13,14
  88:2,10,12,15
  94:17 97:19 98:10
  115:7
scale 38:11
scaling 52:25
scan 64:15
schedule 21:22
scholarship 19:5
  66:19
scholarships 33:22
school 11:10,11,21
  12:18,25 33:17
  56:15,25 57:3,6,10

58:6,7,9,10,15
59:25 61:18,19
64:3,3 68:19
73:19,25 74:23
86:12
**scroll** 102:21
**seal** 119:5,12
121:15 122:21
**second** 6:20 12:15
28:17 34:23 42:13
65:6 68:21 86:25
87:3 89:7 92:20
92:21 100:16
102:11 107:23
113:14 114:14
**secondary** 44:18
62:9,14
**section** 52:16
55:25 58:23 63:8
72:23 78:6,8
79:10 85:19,24
89:6 91:8 92:13
92:21 96:2 99:19
100:17 105:8
**sections** 102:20
**securing** 64:20
**see** 17:15 19:20
22:18 23:18 28:20
29:11 30:1,20
31:19 33:1 35:4
41:3 42:12,16
52:21 55:3 56:6,8
56:17,18 57:5,8
59:8,9,13,14 66:20
67:15 69:16,17
72:24 73:19 78:12
79:13 80:4,16
83:10 84:13 85:20
86:2 87:2,6,7,22
87:23 91:23 92:17
92:20,22 96:12

99:2,23 100:1,14
100:18,25 108:12
**seeing** 43:15,16
67:5 71:8,8 104:2
**seeking** 18:17
**seen** 67:2 109:8
**selected** 16:21
23:2
**self** 35:21,22 36:13
36:14 38:5,10
42:7,14,17,20
**selfish** 111:4
**semester** 12:25
13:1 21:3
**send** 103:22 104:3
104:11 115:25
116:3
**sending** 104:1
**sense** 7:15 21:14
38:1 111:5
**sentence** 57:2,8
58:2 59:9,10
63:14 78:8 80:1
85:21,23 87:3,18
88:2,5,15 89:22
92:23 96:3,7,9
**separate** 17:23,25
**september** 52:13
53:21,22 54:14
**series** 84:2
**services** 16:5 17:2
**session** 23:12
25:10 26:7 28:16
29:8 31:2,11
37:24 41:9 55:7
57:11,23 58:22,25
63:23 70:6 73:22
80:10,13 81:19
82:19,22 86:20
90:2,19 91:13
95:3 97:9 99:7

100:15 106:8
107:15,20,23
108:20,23 109:6
112:8 113:13,21
113:25
**sessions** 26:15
34:14 35:3,20
36:6,13 41:5,6
67:21 90:20 106:1
**set** 20:16 23:5
36:11 61:21 88:4
88:17,25 119:4
**setting** 70:25 71:2
**settings** 67:7,10
**seventh** 2:5
**severity** 52:24
54:23
**sex** 29:23 113:3
**shake** 10:22
**shapiro** 102:3,9
**share** 110:14
**shared** 20:20
**sharing** 43:12
**sheet** 120:14,16,17
122:7,10,18 123:1
**shifted** 110:18
**shortness** 20:5
**show** 10:24 69:7
**shown** 67:19 80:13
120:18
**shows** 19:18
102:24
**shut** 19:13
**siblings** 109:23,24
**sic** 69:14
**sign** 116:2 120:16
**signature** 115:25
118:21 119:9
**signed** 121:13
122:18

**significant** 85:3,4
85:6
**signing** 120:12,21
**similar** 8:17
**similarly** 36:22
**simple** 23:24
**sincerely** 120:23
**single** 39:7
**sir** 6:22,24 9:10,21
9:24 11:18 12:19
15:6,23 16:1
19:21 21:7 27:15
28:5,11,21 29:12
29:21 30:13 31:3
35:5,17,23 40:24
41:3 45:15,23
46:1 51:3,15
52:22 61:3 65:9
66:2 72:18 73:2
79:14,25 80:10,12
80:17 86:21 87:13
88:1 99:4 100:20
105:22 120:9
**sisters** 109:20
**sit** 73:7
**situated** 36:22
**situation** 66:22
108:17
**situations** 71:19
**six** 13:1 40:18
52:16,18
**skill** 75:13
**sleep** 10:2 63:17
**sleeping** 21:21
**slowly** 8:2
**small** 14:13,16
101:24
**soccer** 74:24
**social** 30:23 49:6
51:5 65:10,11,14
65:18,20 67:7,10

67:23 70:7,9,12
71:19 73:23 78:15
90:10 113:17
**society** 78:10,19
81:10
**software** 39:13
82:20 83:13
105:18,21
**solutions** 120:1
123:1
**somebody** 45:25
94:21
**son** 18:24 19:14
92:7
**sophomore** 34:6,8
**sorry** 13:19 17:20
95:7 100:18
106:16 107:16
111:22,22
**sought** 11:23
**sound** 28:8
**sounds** 57:14
101:7
**source** 78:2
**space** 25:14
**speak** 7:25 73:16
**special** 11:24
**specific** 13:15
14:12 16:25 17:5
48:18 52:5 54:9
54:11 67:9 71:24
72:15 73:11 75:15
100:14 106:11
**specifically** 13:23
15:12 17:11 31:23
38:8 44:6 47:17
48:19 51:18 60:19
61:12 67:17 72:11
73:8 75:3 85:22
94:4 112:18

**specified** 22:9
65:12
**specifier** 65:12
**specify** 42:19
112:21
**speculation** 68:16
**spell** 13:25
**spelled** 13:13 14:2
16:13
**spelling** 8:16
**spend** 20:10
110:12
**spending** 18:25
86:4
**spends** 85:24
**spent** 12:7 23:12
110:6
**spike** 91:14
**spikes** 91:10,17
**spirit** 111:2
**split** 93:24,25 94:4
**spoke** 106:9
**ss** 118:1
**stand** 14:3 52:11
**standard** 27:9
65:18
**stands** 63:11
**start** 69:15 70:15
86:12 96:25
**started** 12:16,17
12:17 41:15 47:15
49:21 52:18 57:3
79:25 110:8,24
**starting** 45:19
63:9
**state** 1:14 6:13
15:24 16:2,7,16
23:6,10 45:13
97:17 100:15
101:18 118:1,4
119:13 121:10

122:15
**stated** 29:9 40:11
46:2 96:25
**statement** 23:22
24:8 29:13 35:6
35:15,16,24 37:4,5
55:6 58:7 59:22
59:23 84:23 93:3
97:15 98:18,18
100:14 121:13,14
122:19,19
**states** 1:1 14:7
59:4
**stating** 59:15
**status** 82:15
**staying** 50:10
**stenographer**
104:9,24 116:10
116:17
**stenographically**
118:15
**step** 27:13 48:9
70:4 78:16,18
81:13,14
**stepped** 52:19
**stepping** 53:17
**stimulant** 40:14
41:4 44:5 46:3
48:11
**stimulants** 40:7
41:12,19 42:5
44:3,8,12,15,17
46:5,12,13,17,20
47:7,16,20
**stimulate** 44:8
**stomach** 20:6
**stood** 40:3
**stop** 113:20
**stopped** 46:18
**stopping** 46:20
47:6

**stored** 64:17 74:7
**stories** 20:20
**story** 27:7,11
**straight** 75:17
**strangers** 72:2,6
**street** 2:11 6:17
46:15
**stress** 28:7 97:6,22
98:7,10,14,16,17
**stretch** 100:24
**strict** 59:6,17,21
60:7,14 61:20
62:3,16
**strike** 111:21
**strive** 36:4,15 37:9
38:4
**strong** 91:20 92:2
**struggle** 30:8 51:9
51:9,11 55:19,19
55:24 56:5,9,20
57:23 60:2 75:8
78:22 86:6 89:20
90:13,16,24 114:2
**struggles** 27:11
**struggling** 31:23
49:14
**stuart** 2:11
**stuartlaw.com**
2:13,14
**stuck** 114:6
**student** 21:11,23
21:24,25 33:21
110:10
**studies** 11:9
**study** 13:22 33:18
33:19 110:15
**studying** 110:7
**subheading**
102:13
**subject** 33:8,9
41:4 90:24

**subscribed** 121:10 122:14 123:21
**subsequent** 35:7
**subsequently** 18:3 20:23 21:25
**substances** 40:22
**substantial** 109:10
**success** 38:12,15
**successful** 21:23 80:11
**suggested** 36:11 97:21 99:20
**suite** 2:12 120:2
**summary** 72:18 86:5
**superior** 120:1
**supervises** 16:10
**supervision** 16:8 16:15,17
**supplement** 8:22
**support** 29:9,18 29:19 31:18 32:23 109:7,15,25
**supports** 109:11 109:12
**suppose** 68:13
**supposed** 24:22
**sure** 10:16 12:24 30:21 32:11 49:1 68:4 69:8 78:23 85:12,23 101:20 103:24
**sworn** 1:13 6:3 118:6 121:10,13 122:14,18 123:21
**symbolic** 64:25
**symptom** 50:7
**symptomology** 27:12 30:6,10 48:18 52:2 53:2 60:9 61:13

**symptoms** 19:25 20:5 47:9,12,20 52:6,25 54:13,24 61:13
**system** 64:17 87:20 95:14 112:16

**t**

**t** 14:13,13,14,16
**table** 24:12
**take** 7:24 42:11 44:21 48:10 49:16 55:22,24 58:21 62:23 63:5 70:4,5 71:15 72:22 76:1 78:16 81:21 85:16 91:5 101:15
**taken** 1:14 30:22 62:25 101:8 118:10,14
**talk** 10:3 16:18 23:4 61:15,17 110:24 112:23 113:1
**talked** 112:11
**talking** 51:16 55:17 58:9,10 60:2 78:20 95:17 112:19 114:4
**target** 72:24 73:3 73:14,18,24 74:13 75:20,22,24 77:12
**task** 43:5 61:22
**taylor** 19:8 20:21 20:24 21:5,10,20 22:4,9 50:3,4,9,18 50:20,21,24 55:3 55:18 58:16 67:3 77:20
**teach** 110:18

**tears** 18:23
**technical** 11:14
**technique** 63:14 63:16 66:3 73:24 75:21 76:21 102:4 106:25
**techniques** 36:22 63:24
**tell** 6:3 17:11 18:19 20:21 25:8 30:3 33:24 34:4 37:20 48:9 53:25 59:19 78:24,25 80:23 84:1 85:21 93:15 99:13 100:5 100:7 101:16 103:10 111:15,19 118:6
**telling** 62:4 82:11 84:21 93:12,14,22 94:15,22,25 95:20 99:15
**temp** 99:21
**ten** 12:9 20:16 34:14
**tend** 77:23
**tense** 58:5 59:4
**tension** 94:1,20
**term** 22:12 25:21 27:2 42:20,22,23 42:24 65:14,20 73:1 75:19,20 92:2,23
**terms** 96:16,22 109:21 112:5 114:18
**testified** 6:5 47:11 48:15 51:20 70:18
**testimony** 7:14,14 7:17 8:18 118:19 121:6,7 122:6,9,12

**text** 76:13
**thank** 6:11 44:24 62:20 69:25 101:7 105:16 107:7,18 115:19
**thanks** 10:25
**thee** 74:16
**theme** 74:4 82:2
**theories** 86:9,11
**theorize** 49:13
**theory** 14:25 15:1
**therapeutic** 15:12 16:5 26:7 32:1 34:13 36:21,21 37:1,5 38:25 39:7 39:9 43:25 45:21 48:5 54:6,19 56:11 61:22 62:13 62:14 70:6 73:24 75:13 80:7 109:1
**therapeutically** 60:5 81:17 85:3,5
**therapies** 37:8
**therapist** 11:24 16:9,10 27:17,20 61:9 81:24
**therapists** 107:4
**therapy** 7:5 12:5 13:8,16 14:12 22:14 32:9 35:19 37:21,23 38:8,12 40:8 61:24 62:1 63:10 67:12 73:1 73:4,15 77:9 79:22 80:11 81:6 82:4,7 84:15 90:1 106:12 107:5 109:21 110:17 111:8
**therapyappoint...** 105:20

**thereof** 1:16
**thing** 20:15 70:25
**things** 20:9 21:24
  44:9 55:12 60:23
  61:15,17,18 64:22
  68:24 69:2 94:20
  110:14 114:25
**think** 6:20 12:15
  20:3 30:19 33:11
  33:13 62:22 85:10
  93:6,24 103:6
  108:21
**thinking** 31:15
  53:25 54:25 85:20
  86:4,10 97:1
**thinks** 57:15
**third** 102:20 105:8
**thirty** 120:20
**thought** 18:19
  29:14 31:1,3,12,17
  32:2,12,16 37:13
  41:23 55:8 60:20
  68:8,11,18,25 81:6
  90:6 97:2 98:5
  115:2
**three** 12:22 14:17
  52:17,20 53:18,21
  62:22 63:25
  102:20 108:4
**thrive** 18:17 22:6
  50:5 51:1 77:20
**thriving** 19:3
  50:10
**time** 1:16 6:1 11:9
  11:11 12:23,23
  15:19 17:10 20:11
  21:10 23:1 24:1
  24:24 25:3 31:14
  32:3,9 33:21
  34:16 36:7,16
  37:15 38:2 40:6,8

42:5 43:15 47:14
48:3 49:15,20
52:1,6,18 53:1,8
53:14 54:21 55:1
58:25 68:17 74:12
75:15 76:9 80:10
82:11 83:23,23
85:13,24 86:4
91:13 97:2 98:5
98:10,13,20 103:2
106:15 110:6,13
111:3,11 112:11
115:9 116:21
**times** 38:6 59:11
  64:9 106:18 115:6
**tired** 41:22
**tlj** 2:14
**today** 6:11 8:6,20
  23:2 105:19
**today's** 9:11 10:17
  40:13
**told** 19:4 31:2,25
  33:19 34:9 42:13
  47:22 53:10 54:1
  54:2,3 60:25 79:2
  83:18 86:3 94:8
  100:2,19 111:17
  111:18
**tone** 11:1
**tool** 105:18
**topic** 10:13 40:2
  41:17 90:1
**tract** 58:24
**trained** 15:2 43:9
  44:10 107:2,4
**training** 11:8
  12:13 14:9,19,21
  14:23 15:15,18
  22:15,16 36:18
  37:7 43:25 46:6

**transcribed** 7:16
  7:23,23 10:21
  118:15 121:7
**transcript** 8:14,15
  115:23 116:2,11
  118:18 120:11,13
  121:5,12 122:5,11
  122:17
**transition** 22:18
**translate** 8:25
  52:23
**trauma** 11:25
  13:15,21 14:9,13
  14:14,16 26:17,24
  64:16,18
**traumatic** 12:1
  14:16 27:1,4
  29:24 65:4
**treat** 13:16 14:12
  62:2,15
**treated** 61:7 62:1
  73:23 74:12
**treating** 44:13
  46:11 48:19 60:11
  61:10 75:7,14
**treatment** 11:25
  102:21,24 103:10
  105:9,10
**tried** 19:7
**trip** 42:13
**trouble** 50:19
  66:18 103:5
**troubling** 61:1
**true** 31:19 118:18
**trust** 25:23 26:11
  59:12 86:6 110:16
  111:7,11,12
**trusting** 60:2 86:6
  110:19
**truth** 6:3,4,4 76:23
  86:9 93:12,14,15

93:22 94:8,15,22
94:25 95:20 118:7
118:7,8
**truthful** 93:19
**try** 9:2 10:3 36:2
  97:6,22 98:16
  109:14
**trying** 20:2 21:17
  52:24 54:12 60:24
  67:12 110:17
**turn** 8:11 12:4,13
  22:22 29:4 86:16
  89:4 92:11 95:25
  107:13 109:5
  111:20
**turned** 93:17
**turning** 90:16
**twice** 40:23 48:25
  49:8
**twisted** 93:13,17
**two** 6:20 14:8
  56:10 58:17 63:14
  69:2 72:15 73:8
  73:12 91:9 94:20
  97:11 107:17
**tyler** 2:10 104:20
**type** 30:24 38:12
  86:10
**types** 14:23 63:23
**typewritten**
  118:18

| u |
| --- |

**u** 104:5
**ultimately** 37:19
  61:8
**unable** 22:1 50:5
  50:12
**unanimously**
  108:4
**unconscious** 63:20
  66:8 74:8

**undergoing** 39:10
**undergraduate**
  11:13
**understand** 8:23
  9:4 11:4 16:4 21:5
  21:17 29:13 33:15
  42:17 50:8 62:11
  76:6 92:24
**understanding**
  21:2 24:7 28:6
  36:20 79:17 114:9
**understood** 25:6
**undesirable** 64:5
**united** 1:1 14:6
**university** 1:7
  6:10 7:18 11:14
  19:6,7,8 120:7
  121:3 122:3
**unlovable** 64:5,9
  64:12
**unquote** 23:17
  25:19 29:10,25
  30:4 35:3 52:20
  54:21 56:5,16,24
  59:7 69:15 78:11
  81:3 87:5,21 88:4
  89:10 91:22 92:16
  96:11
**unrelated** 11:14
  11:17 69:3
**unspecified** 28:23
  48:20 49:22
**update** 108:24
**upset** 19:15 31:20
  31:22
**urinary** 58:24
**usage** 40:7
**use** 7:17 10:13
  23:1 37:8 40:14
  41:4,18 46:3,17
  48:11 52:25 64:2

64:19 66:7 75:25
  92:23 103:22
  104:8 105:18
  108:16

**v**

**v** 65:18 120:7
  121:3 122:3
**valparaiso** 1:15
  6:17,17 118:10
**value** 82:23
**variable** 47:21,23
  48:2,4,8
**variation** 68:9,13
**variety** 11:16
**veritext** 120:1,8
  123:1
**veritext.com.**
  120:19
**versus** 7:18
**vet** 14:14
**videoconference**
  2:2 118:17
**view** 32:6 47:5
  53:21 61:5,6
**virtue** 109:25
**voice** 11:1
**volunteer** 97:6,22
  98:1,13
**voted** 108:4
**vs** 1:6

**w**

**wage** 97:3,8,24
  98:2
**wait** 8:3
**waived** 120:13,21
**wall** 89:9,14,25
  91:19
**want** 23:4 26:9,10
  33:17 71:15 74:18
  74:20 96:10,19

97:7 113:13
  116:17
**wanted** 33:19
  78:24,25 79:2,4,5
  79:6,6,7 81:9
**wanting** 90:4
**wants** 89:23
**war** 14:14
**warm** 111:2
**waste** 97:2,23
  98:10,20
**way** 7:14 14:16
  21:15,16 23:4
  30:14 40:3,10
  47:5 51:10 57:13
  64:10 75:10 76:22
  88:13 99:21
  114:14 115:7,12
**ways** 89:16,19
**we've** 31:5,7 62:21
  105:19 106:1
**web** 101:11,18
  104:2
**website** 101:14,16
  101:23 102:1
**week** 12:25 80:13
  98:25
**weekly** 16:17
**weeks** 91:9
**went** 22:5 68:9
**whereof** 119:4
**widely** 106:25
  107:1
**william** 2:10 3:3
  6:8,9
**willing** 98:12,19
  116:6
**winona** 12:21
**withdraw** 34:9
**withdrawn** 18:25
  31:22

**withdrew** 19:10
**witness** 1:13 2:3
  101:7 104:22
  116:6 119:4 121:1
  121:4,11 122:1,4
  122:15
**witnesses** 103:19
  116:9
**word** 42:6 53:5,6
  72:9,16,19 73:11
  93:23 108:16
**words** 24:25 43:1
  64:8 81:1 88:9
  98:4 108:17
**work** 6:16,19 7:4
  12:13 13:20 14:24
  15:15 16:15 23:15
  23:16,17,23 24:5
  24:11,13,17,18,18
  24:20,23,25 25:1,2
  27:10 36:1 39:9
  81:20 82:13 83:7
  83:8,9,12,16,19
  84:11,12,17,18,21
  85:1,2,8,10 97:7
  97:22 98:13
  109:22 111:6
**worked** 7:10 11:15
  60:18 99:1
**workforce** 38:17
  38:21 39:2,20
  40:4 67:6 80:20
**working** 12:6
  23:24 25:4 31:13
  31:21,24 32:2
  86:6 108:25
  114:23
**works** 10:6
**world** 60:10
**worry** 20:7

[worse - ████ ]                                                                Page 25

| | |
|---|---|
| **worse**  44:10,12 46:9 54:25 | **young**  64:2 |
| **worsened**  21:9 22:7,10 46:2 | **z** |
| **worth**  98:5 | ████████ |
| **wpk**  2:13 | |
| **wrestled**  88:2,10 88:15 | |
| **wrestling**  93:19 | |
| **write**  24:16 45:5 45:11 52:15 72:17 | |
| **writing**  92:24 111:23 | |
| **written**  1:16 45:14 | |
| **wrong**  56:7 114:24 | |
| **wrongful**  7:8 | |
| **wrote**  23:10,15 25:16 29:8,22 45:5,18 57:16,17 57:19 60:21 94:10 112:22 | |
| **www.emdr.com.**  101:15 | |

**y**

**y**  104:5
**yard**  71:3
**yeah**  23:24 79:6 79:24 93:23 94:23
**year**  12:22 32:14 34:6,8 79:12,15,16 79:19,21,23 84:15
**years**  6:20 7:3 11:22 12:7,9 14:17 56:15 57:1 57:3,7,10 59:25 61:18,19 64:3 72:16 73:8,12 75:3,5
**yelled**  74:23
**york**  2:6

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.


DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.