# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| **BETH A. STOKES** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:12-cv-04054-SLD-JAG |
| | ) | |
| v. | ) | District Judge: Sara L. Darrow |
| | ) | |
| **JOHN DEERE SEEDING GROUP**, a subsidiary | ) | Magistrate Judge: John A. Gorman |
| of **DEERE & COMPANY** a/k/a **JOHN DEERE** | ) | |
| **COMPANY**; and **JIM GUNNISON** | ) | Trial By Jury Demanded |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT JOHN DEERE SEEDING GROUP'S MOTION TO EXCLUDE THE PROPOSED EXPERT TESTIMONY OF STAN V. SMITH**

Plaintiff, **Beth Stokes** ("Plaintiff" or "Beth"), by and through her attorneys, The Prinz Law Firm, P.C., respectfully submits this Response to Defendant **John Deere Seeding Group's** ("Defendant Deere") Motion to Exclude the Proposed Expert Testimony of Stan V. Smith.

**I.    INTRODUCTION**

Defendant Deere's Motion is ripe with misrepresentations and mischaracterizations of Dr. Smith's testimony and report. Dr. Smith has testified in over two hundred cases, including in jurisdictions that conduct *Daubert* analysis, on the concept of hedonic damages. (Dr. Smith's Rpt., attached as Ex. 1, at BS 000371.) He has published a text book on hedonic damages, along with several articles in peer reviewed journals. (*See generally* Dr. Smith's CV, attached as Ex. 2, at BS000445–48.) Dr. Smith cited studies and analysis that highly qualified economic scholars conducted. (Ex. 1, at BS000373–79.) Importantly, Defendant Deere failed to cite a single peer reviewed article to justify any of its criticisms of Dr. Smith's methodology. Instead, it cited the report and testimony of Dr. Jonathan Guryan. However, Dr. Guryan's testimony is not credible because he is not an expert on the value of statistical life ("VSL") or hedonic damages, he has never published an article on either topic, and he did not cite any articles in his Report that

mentioned either topic. (Dr. Guryan's Dep., attached as Ex. 3, at 107:4–107:15, 110:5–110:21.) Further, Dr. Guryan cited studies that either did not support his position, or studies other authors refuted. *Id.* at 45:13–51:9, 53:20–54:24, 58:5–58:11, 100:9–106:7. Ultimately, this Court should rely on the Seventh Circuit's decision in *Sherrod*, unanimously endorsed *en banc*, and find that Dr. Smith's testimony would be "invaluable to a jury." *Sherrod v. Berry*, 827 F.2d 195, 206 (7th Cir. 1987) (*vacated and remanded on other grounds* 856 F.2d 802 (7th Cir. 1988)).

## II. DR. SMITH IS A RELIABLE AND CREDIBLE EXPERT WITNESS.

Dr. Smith is a nationally recognized forensic economist who is able to explain to a jury the economic value of the loss of enjoyment of life, or hedonic damages, that Defendants' conduct caused Beth.[1] He received both a Ph.D in economics and an MBA from the University of Chicago. (Ex. 2, at BS000445.) While pursuing his Ph.D, Dr. Gary Becker, a Nobel prize-winning economist, supervised Dr. Smith's dissertation. (Dr. Smith's Dep., attached as Ex. 5, at 20:8–20:13.) Dr. Smith has published more than fifty articles, including numerous articles in peer reviewed journals. (*See generally* Ex. 2, at BS000445–48.)[2] He also co-authored a textbook on the loss of enjoyment of life, or hedonic damages. *Id.* In addition, he was a

---

[1] Justice Richard Posner has supported the use of hedonic damages. *See generally* RICHARD POSNER, ECONOMIC ANALYSIS OF LAW 184 (1986), attached as Ex. 4 ("Suppose we know that the average person demands $100 in order to assume .0001 risk of death. Can we infer that he values his life at $1 million? We can – at least for the purpose of setting tort damages for low-probability injuries (i.e., accidents) at the correct level, which is our purpose here.").

[2] *See also* Stan V. Smith, et al., *Hedonic Damages and Personal Injury: A Conceptual Approach*, 3 J. FORENSIC ECON. 1 (1990); Stan V. Smith, *Hedonic Damages in the Courtroom Setting – A Bridge Over Troubled Waters*, 3 J. FORENSIC ECON. 41 (1990); Stan V. Smith, *The Value of Life to Close Family Members: Calculating the Loss of Society and Companionship*, AM. REHABILITATION ECON. ASS'N MONOGRAPH 10 (1990); STAN V. SMITH, *Hedonic Damages in Personal Injury and Wrongful Death Litigation*, *in* LITIGATION ECONOMICS 39 (1993); Stan V. Smith, *Abstract: Jury Verdicts in Drunken Driving Cases*, 11 J. FORENSIC ECON. 67 (1998); Stan V. Smith, *Jury Verdicts and the Dollar Value of Human Life*, 13 J. FORENSIC ECON. 169 (2000); Stan V. Smith et al., *Estimating the Value of Family Household Management Services: Approaches and Markups*, 3 FORENSIC REHABILITATION & ECON. 85 (2010).

professor at the DePaul University College of Law, where he taught a course on damages. *Id.* Colleges and law schools across the nation have used his text book and articles as part of their curriculum. He has provided expert economic testimony on value to life and the loss of enjoyment of life in over two hundred cases across the nations, including jurisdictions that conduct *Daubert* analysis. (Dr. Smith Decl., ¶¶ 2–3, attached as Ex. 6.)

Economists measure VSL by determining how much society is willing to pay ("WTP") to preserve the ability to lead a normal life. (*See* Ex. 1, at BS000370–72.) To determine VSL, scholars evaluate a plethora of data, including the wage differentials for dangerous jobs. *Id.* at BS000371. The VSL literature is well regarded and universally recognized by economists. *See generally id.* at BS000370 (collecting journal citations). Tellingly, neither Defendant Deere nor Dr. Guryan cite a single study regarding VSL. (*See* Ex. 3 at 107:4–107:15, 110:5–110:21; Dr. Guryan's Rpt., attached as Ex. 7.)

To determine an average VSL, Dr. Smith cited an entire body of peer reviewed literature, consisting of numerous articles, including five peer reviewed summary articles that conducted meta-analysis on the other studies. (Ex. 1, at BS000378.) Dr. Smith translated the VSL amount into hedonic damages to determine the value of the loss of enjoyment of life. He subtracted human capital from VSL, relying upon Dr. Ted Miller's work.[3] (*See* Ex. 6, ¶ 5.)[4] Dr. Smith then conducted a downward adjustment, or a conservative estimate, to account for any potential errors, a common method among forensic economists. (Ex. 5, at 110:3–110:5.) To determine

---

[3] *See* Ex. 1, at BS000370 (*citing* Ted Miller, *The Plausible Range for the Value of Life*, 3 J. FORENSIC ECON. 17, 33 (1990) ("[L]ost enjoyment of life, which some courts have labelled hedonic damages, can be separated from this value. . . . [S]ubtract[] after-tax earnings, the value of household production, and the value of financial security.")), attached as Ex. 8.

[4] Defendant Deere argues that Dr. Smith did not provide "any detailed explanation" to determine human capital, however, Defendant Deere never asked for such a "detailed explanation." *See generally* ECF No. 6, at 4 (*citing* Smith Dep., at 94:1–94:15, 98:21–102:21, 112:12–120:24).

the final hedonic damages amount, Dr. Smith applied Beth's testimony that she enjoys life forty percent less due to Defendants' conduct.

### III. DEFENDANT DEERE'S MOTION IS RIPE WITH MISCHARACTERIZATIONS.

To support its Motion, Defendant Deere incorporated improper citations, and out of context statements from Dr. Smith's report and deposition testimony. While there are numerous misrepresentations, two examples uniquely indicate that this Court should be skeptical of Defendant's entire Motion. For example, on page five of its Memorandum, Defendant Deere alleges that "Dr. Smith assumes that Stokes was fully enjoying life prior to September 1, 2008." ECF No. 66, at 6. However, Defendant Deere's citation does not state that Beth did not fully enjoy her life prior 2008, but merely indicates that Dr. Smith's staff assisted in conducting an interview with Beth. Importantly, Dr. Smith testified in response to a similar question, "I have only assumed that she had the statistically average capacity. . . . I have assumed that based on what I've read that she was in the middle of the range." (Ex. 5, at 55:7–55:16.)

Another example of Defendant Deere's misrepresentations occurred again on page five of its Memorandum. Defendant alleged that Dr. Smith's "methodology for estimating hedonic damages has never been subjected to peer review" and then cited to Dr. Smith's deposition regarding testimony for "a particular [expert] report." ECF No. 66, at 6–7. However, Defendant Deere failed to cite to Dr. Smith's report, or his deposition testimony, clearly outlining the peer reviewed articles regarding hedonic damages. (Ex. 5, at 10:10–11:14, 14:11–14:21; *see also supra* note 2.)[5] Importantly, Dr. Smith testified that a journal would not conduct a peer review

---

[5] *See also* Ex. 1, at BS000375 (*citing* Gary Albrecht, *Hedonic Damages and Personal Injury: A Conceptual Approach*, 5 J. FORENSIC ECON. 97 (1992); Gary Albrecht, *The Application of the Hedonic Damages Concept to Wrongful and Personal Injury Litigation*, 7 J. FORENSIC ECON. 143 (1994); Roy Gilbert, *A review of the Monte Carlo Evidence Concerning Hedonic Value of*

of the reports he prepared for the purposes of *litigation*. (*See* Ex. 5, at 117:3–118:4 ("Q. But do you mean a report prepared in litigation or do you mean a peer reviewed study? A. Yes. No.")) Defendant Deere's mischaracterizations call into question the validity of its entire Motion.

### IV.    THIS COURT SHOULD NOT RELY ON DR. GURYAN'S TESTIMONY.

Dr. Guryan's Report is flawed for two reasons. First, he is not an expert on VSL or hedonic damages. He never published an article on either topic, nor did he cite a single article for either topic in his Report. (Ex. 3, at 107:4–107:15, 110:5–110:21.) It is even unclear if he fully reviewed the studies Dr. Smith cited. *Id.* at 29:22–30:11, 61:3–61:15, 62:20–65:24.

Second, Dr. Guryan picked flawed studies. He incorrectly cited several studies for the proposition that bettors incorrectly evaluate the probability of winning. (Ex. 7, at 6.) One study conceded that the proposition was not applicable in the context of evaluating the probability of death. (Ex. 3, at 45:13–49:15.) Another study found no evidence that bettors incorrectly make predictions. *Id.* at 49:16–51:9. A third study indicated that its results were limited and contained weaknesses. *Id.* at 53:20–54:24. This Court should also question the credibility of Dr. Guryan's entire Report as he cited to a study that other authors recently refuted. *Id.* at 100:9–106:7.

### V.    DEFENDANT DEERE'S CRITICISMS REGARDING VSL METHODOLOGY ARE FLAWED.

Economists and governmental agencies have accepted VSL methodology, as Dr. Kip Viscusi and Dr. Joseph Aldy wrote, "[u]se of economic research on the value of mortality and injury risks in government policy evaluation has been a key benefit component of policy evaluations for a wide range of . . . policies."[6] Defendant Deere attempts to oppose Dr. Smith's

---

*Life Estimates*, 8 J. FORENSIC ECON. 125 (1995); W. Kip Viscusi, *The Econometric Basis for Estimates of the Value of Life*, 3 J. FORENSIC ECON. 61 (1990)).

[6] W. Kip Viscusi, and Joseph Aldy, *The Value of a Statistical Life: A Critical Review of Market Estimates Throughout the World*, 27 J. RISK & UNCERTAINTY 5, 6, 53–54 (2003), attached as Ex. 9.

testimony by outlining "flaws" underlying VSL methodology. However, neither Defendant Deere nor Dr. Guryan cite a single peer reviewed study to support these "flaws." (*See generally* ECF No. 66, at 7–10; Ex. 3, at 107:4–107:15, 110:5–110:21.) Unlike Defendant Deere, Dr. Smith cited numerous peer reviewed articles justifying the use of VSL. (*See* Ex. 1.) Importantly, Defendant Deere provided an over-simplified view of the VSL literature. Dr. Smith relied upon studies that proceeded through the rigors of peer review, and conducted complex analysis. The authors Dr. Smith cited are professors of economics and have received doctorates from esteemed institutions including Harvard and the University of Pennsylvania.

Dr. Smith cited five scholars that conducted meta-analysis of other VSL studies. Essentially, "meta-analysis provides a quantitative, systematic analysis of the existing literature to inform the researcher's judgments."[7] Dr. Francois Bellavance, Dr. Georges Dionne, and Dr. Martin Lebeau were the first to use a "mixed effects regression model . . . to analyze studies on the value of a statistical life."[8] Dr. Janusz Mrozek and Dr. Laura Taylor conducted meta-analysis and indicated that "[a] primary benefit of these applications is the increased evidentiary weight of the larger data set, which incorporates a larger design space than any one study could provide." (Ex. 10, at 255.) Dr. Ikuho Kochi, Dr. Bryan Hubbell, and Dr. Randall Kramer used

---

[7] Janusz Mrozek & Laura Taylor, *What Determines the Value of Life? A Meta-Analysis*, 21 J. POL'Y ANALYSIS & MGMT. 253, 254 (2002), attached as Ex. 10.

[8] Francois Bellavance, et al., *The Value of a Statistical Life: A Meta-Analysis with a Mixed Effects Regression Model*, 28 J. HEALTH ECON. 444, 445 (2009), attached as Ex. 11; *see also Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, No. 12-2688, 2013 U.S. LEXIS 20959, at *30–32 (7th Cir. Oct. 16, 2013) ("The latitude we afford to statisticians employing regression analysis, a proven statistical methodology used in a wide variety of contexts, further illustrates the point. Regression analysis permits the comparison between an outcome (called the dependent variable) and one or more factors (called independent variables) that may be related to that outcome. As such, the choice of independent variables to include in any regression analysis is critical to the probative value of that analysis. Nevertheless, the Supreme Court and this Circuit have confirmed on a number of occasions that the selection of the variables to include in a regression analysis is normally a question that goes to the probative weight of the analysis rather than to its admissibility.") (collecting cases).

an empirical Bayes estimation method to conduct their analysis, which was the first time scholars used the method for economic studies.[9]

Importantly, Defendant Deere's criticisms are erroneous to the VSL articles Dr. Smith relied upon, mostly because the authors control for numerous variables, a fact that Dr. Guryan conceded in his deposition. (Ex. 3, at 60:8–60:16, 61:3–69:7.) The scholars Dr. Smith cited rejected certain studies due to potential issues. Dr. Bellavance, Dr. Dionne, and Dr. LeBeau's analysis excluded studies that they believed incorrectly evaluated VSL. (Ex. 11, at 451–52.) Dr. Mrozek and Dr. Taylor incorporated within their analysis "[a]n important and controversial aspect of the labor market literature." (Ex. 10, at 256.) Dr. Kochi, Dr. Hubbell, and Dr. Kramer conducted "careful examination of the studies" for the purposes of overall quality. (Ex. 12, at 388.) They also "re-estimated all possible VSLs" because the scholars wanted "[t]o minimize potential judgment biases, as well as make use of all available information." *Id.* at 389. Finally, most of the authors focused on wage related studies, as opposed to consumer purchasing decisions. (Ex. 11, at 450–52; Ex. 10, at 255, 257; Ex. 12, at 387–89; Ex. 9, at 6–7.)

### A. Dr. Smith Cited Meta-Analysis that Controlled for Specialized Results.

The scholars Dr. Smith cited excluded studies that focused on specific industries. Dr. Mrozek and Dr. Taylor controlled for a "specialized sample used in the studies" that relied upon data regarding police officers. (Ex. 10, at 260.) They constructed "[v]ariables . . . to control for variation in sample characteristics that arise through either the data sources or the choice of what type of workers are included in the analysis." *Id.* 261. Dr. Kochi, Dr. Hubbell, and Dr. Kramer excluded studies that only considered samples "from extremely dangerous jobs, such as police

---

[9] Ikuho Kochi, et al., *An Empirical Bayes Approach to Combining and Comparing Estimates of the Value of a Statistical Life for Environmental Policy Analysis*, 34 ENV'T & RESOURCE ECON., 385, 387 (2006), attached as Ex. 12.

7

officer." (Ex. 12, at 388–89.) Dr. Viscusi and Dr. Aldy stated in their study that "economics have relied on statistical models that control both for differences in worker productivity as well as different quality components of the job." (Ex. 9, at 7.)

### B. Defendant Deere's Academic Support for an Individual's Predictions of Small Risks is Inadequate.

While Defendant Deere argues that individuals incorrectly make predictions, Dr. Smith cited scholars that controlled for risk misperceptions. Dr. Miller indicated that regressions he used "adjust for risk misperception. . . . The regression models specifically estimate the impact of these problems on VSL estimates and permit removal of their influence."[10] Dr. Viscusi and Dr. Aldy indicated that it is common to restrict samples to address problems. (Ex. 9, at 13.)[11]

Further, Dr. Guryan's Report failed to support this position. Dr. Guryan wrote that individuals misperceive risks, and he cited gambling studies. However, he did not cite any articles that accurately extrapolated these studies to predictions regarding death, VSL, or hedonic damages. During his deposition, Dr. Guryan conceded that three of the studies he cited for this position failed to support his conclusion: one study conceded that in the context of death, individuals' predictions are different than gambling predictions; one study indicated that there is no correlation between risk perception and the outcome; and a third study indicated its results were limited and contained weaknesses. (Ex. 3, at 45:13–49:15, 53:20–54:24, 58:5–58:11.)

### C. Dr. Smith Relied Upon a Best Estimate.

Dr. Smith adjusted for the wide variance within the VSL literature by using a best estimate figure. He determined the average VSL from data he acquired from five studies that

---

[10] Ted Miller, *Variations Between Countries in Values of Statistical Life*, 34 TRANSPORT ECON. & POL'Y, 169, 174 (2000), attached as Ex. 13.
[11] In fact, Dr. Miller in his 1990 study indicated that he found that workers underestimate their risks, and thus made upward adjustments. (Ex. 8, at 19.)

8

conducted meta-analysis of over one hundred other studies. (Ex. 1, at BS000378–79.) To mislead this Court, Defendant argues that Dr. Smith misapplied the Dr. Mrozek and Dr. Taylor's article. However, he provided a written response explaining his process. ECF No. 66-6.

## VI. LEGAL ARGUMENT

This Court must determine whether Dr. Smith's testimony is relevant and reliable. *Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, No. 12-2688, 2013 U.S. LEXIS 20959, at *24 (7th Cir. Oct. 16, 2013) (*citing Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). While "District judges have 'considerable leeway in . . . determining whether particular expert testimony is reliable[,]' [r]eliability . . . is primarily a question of the validity of the methodology . . . not the quality of the data used . . . or the conclusions produced." *Id.* at *25 (*quoting Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)). "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions." *Id.* at *26. "[H]ow the selection of data inputs affect the merits of the conclusions produced by an accepted methodology should normally be left to the jury." *Id.* at *32. Importantly, "an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility. 'Our system relies on cross-examination to alert the jury to the difference between good data and speculation.'" *Id.* at *35–36. (citations omitted).

Recently, in *Manpower* and in *Stollings*, the Seventh Circuit found district courts abused their discretion by setting the bar too high regarding expert testimony. *Id.* at *37 ("We conclude that the district court set the bar too high and therefore abused its discretion in barring [the expert's] testimony."); *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013) ("We conclude here that the district judge's decision to exclude [the expert's] testimony in this case

9

was too great an intrusion into the role of the jury.").[12]  Finally, numerous courts have allowed an economist's testimony regarding hedonic damages.  (*See* Ex. 6, ¶¶ 2–3).[13]

### A. This Court should Follow the Seventh Circuit's Decision in *Sherrod*.

The Seventh Circuit previously affirmed a trial court's decision in allowing Dr. Smith's testimony because it was "invaluable to a jury."  *Sherrod v. Berry*, 827 F.2d 195, 206 (7th Cir. 1987) (*vacated and remanded on other grounds* 856 F.2d 802 (7th Cir. 1988)).  In *Sherrod*, the Seventh Circuit determined whether the trial court properly admitted Dr. Smith's testimony regarding hedonic damages.  *Id.* at 205–06.  The Seventh Circuit affirmed the trial court's decision to allow Dr. Smith's testimony because Dr. "Smith was well qualified to discuss this matter. . . . The testimony of expert economist Stanley Smith was invaluable to the jury. . . .The trial court committed no error by admitting that testimony."  *Id.*  Importantly, since Dr. Smith's testimony in *Sherrod*, his methodology has become more nuanced.  Due to limited literature at

---

[12] *See also Stollings*, 725 F.3d at 766 ("As the Second Circuit has explained, trial judges acting as gatekeepers do not assume 'the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness's soul' that would 'inexorably lead to evaluating witness credibility and weight of the evidence, the ageless role of the jury.'") (citation omitted).

[13] *See also Dorn v. Burlington N. Santa Fe*, 397 F.3d 1183, 1195 (9th Cir. 2005) ("The admissibility of testimony such as that given by Smith concerning hedonic damages is committed to the district court's sound discretion"); *Sena v. New Mexico State Police*, 892 P.2d 604, 611 (N.M. App. Ct. 1995) ("it is not improper for the trial court to permit an economist to testify regarding his or her opinion concerning the economic value of a plaintiff's loss of enjoyment of life."); *Lewis v. Alfa Laval Separation, Inc.*, 714 N.E.2d 426, 438 (Ohio Ct. App. 1998) (relying on *Daubert* and affirming trial court's decision to admit testimony regarding hedonic damages); *Couch v. Astec Indus.*, 53 P.3d 398, 403 (N.M. App. Ct. 2002) (affirming trial court's decision to allow testimony regarding hedonic damages and writing "[The economist's] testimony regarding statistical life studies gave the jury a range of monetary values that likely proved helpful in evaluating Plaintiff's claim. He also provided concrete guidance to the jury in determining a percentage of the monetary value that might reasonably compensate Plaintiff."); *Banks v. Sunrise Hosp.*, 102 P.3d 52, 63 (Nev. 2004) (allowing testimony on hedonic damages and writing "[the economist's] methodology for the valuation of hedonic damages assisted the jury to understand the amount of damages that would compensate [plaintiff] for the loss of his enjoyment of life. [The economist's] valuation theories were matters within the scope of his specialized knowledge concerning the monetary value of intangibles.").

the time, Dr. Smith relied on less economic data and consensus in *Sherrod* than in his current Report. *Compare Sherrod v. Berry*, 629 F. Supp. 159, 163 (N.D. Ill. 1985) (relying upon fifteen studies), *with* Ex. 1 (*citing* five peer reviewed articles reviewing more than 100 studies).

### B. *Mercado* does not Provide Sufficient Precedent to Reject Dr. Smith's Testimony.

The Seventh Circuit's decision in *Mercado* provides precedent to defer to the trial court, not to reject Dr. Smith's analysis. *Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992). In *Mercado*, the trial court did not allow Dr. Smith's testimony because "the court was troubled by the lack of any 'basic agreement among economists'" and the trial court believed that Dr. Smith relied upon the beliefs of individuals. *Id.* at 869–70 (*quoting Mercado v. Ahmed*, 756 F. Supp. 1097, 1103 (N.D. Ill. 1991)). Based upon the standard of review for expert testimony, the Seventh Circuit stated that the trial court's decision "was not reversible error." *Id.* at 871.

Ultimately, *Mercado* is no longer applicable because the court relied upon flawed assumptions. In 1992, the Seventh Circuit believed that consumer purchasing decisions were based upon advertisement, and that workers are motivated by non-monetary factors. *Id.* However, the peer reviewed articles that Dr. Smith cited in the Report for this matter focused on wage studies, and control for these criticisms. (*See* Ex. 11, at 450–52; Ex. 10, at 255, 257; Ex. 12, at 387–89; Ex. 9, at 6–7; *see also supra* Sections II, V, V(A)). Importantly, the *Mercado* decision criticized Dr. Smith's methodology without relying upon peer reviewed sources. Regardless of the consensus in 1992, Defendant Deere's failure to cite to academic literature is a telling sign regarding the validity of Dr. Smith's current methodology and testimony.

### C. Defendant Deere's Reliance on *Smith* Fails for Similar Reasons as *Mercado*.

Defendant Deere relies upon the First Circuit's opinion in *Smith* to support its Motion. *Smith v. Dorchester Real Estate, Inc.*, 732 F.3d 51, 65–67 (1st Cir. 2013). However, there are

several flaws with *Smith*. First, neither the district court nor the appellate court conducted a formal *Daubert* hearing or *Daubert* analysis. *Id.* at 65. Instead, it appears that the First Circuit relied upon other cases to support its position. *See generally id.* at 65–67. This is an important distinction because the First Circuit made several incorrect assumptions. The court in *Smith* relied upon *Mercado*, and suffered the same flaws as outlined in *supra* Section VI(B). *Id.* at 66–67 (*citing Mercado v. Ahmed*, 974 F.2d 863, 871 (7th Cir. 1992)). Further, *Smith* took issue with the lack of peer reviewed literature defending Dr. Smith's hedonic damages calculation. However, Dr. Smith has published several peer reviewed articles regarding his concept of hedonic damages. *See supra* note 2; *see also supra* note 5. Further, Dr. Miller indicated in his peer reviewed article that the hedonic amount occurs by subtracting human capital from the VSL amount. *See supra* note 3. Unfortunately, the court in *Smith* did not consider these factors.

### D. Dr. Smith's Methodology has Become More Nuanced since *Ayers*.

Similar to *Mercado*, the district court's analysis in *Ayers* is not applicable to Dr. Smith's current methodology. In *Ayers*, the district court conducted an extensive review of Dr. Miller's article published in 1990. *Ayers v. Robinson*, 887 F. Supp. 1049, 1055, 1059–1064 (N.D. Ill. 1995). However, Dr. Smith did not rely on that publication alone but instead cited recent academic literature to determine his VSL baseline. (Ex. 1, at BS000378–78.) The court in *Ayers* further criticized the use of a statistically average person. *Id.* at 1062.[14] As Dr. Smith testified, an "average person" represents a broad range that deals with several obstacles during the course of a lifetime. (Ex. 5, at 76:16–77:17.) If a jury determines that Beth enjoyed life at less than the amount for an "average person" prior to Defendants' conduct, it can make a simple adjustment to

---

[14] The court also criticizes the reliance on Adam Smith. Importantly, Dr. Smith only testified that Adam Smith wrote that riskier jobs lead to higher pay, a fact that the court conceded. *Id.* at 1063 (*citing* ADAM SMITH, THE WEALTH OF NATIONS 112 (1776)).

the final amount. *Id.* at 179:21–182:20. The court in *Ayers* finally criticized a worker's ability to make accurate risk predictions. However, the studies that Dr. Smith cited in his Report control for these criticisms. (*See supra* Section V, V(A)).

### VII. HEDONIC DAMAGES ARE RELIABLE AND SCIENTIFIC.

Defendant Deere failed to acknowledge that Dr. Smith cited numerous peer reviewed articles defending his methodology. Again, Defendant Deere failed to rely on any peer reviewed or academic literature to support its position. Dr. Smith literally wrote the text book on hedonic damages, has taught a course on concept, and published several articles in peer reviewed sources. Other economic scholars have indicated that if they were to determine the loss of enjoyment of life, they would follow Dr. Smith's methodology. (*See* Ex. 6, ¶ 4.) Instead, Defendant Deere cited a survey, not a peer reviewed study, to support its position. *See* ECF No. 66, at 14. The "survey" Defendant Deere cited is not a scientific study, but merely a questionnaire sent to many individuals that do not have a Ph.D in economics. (Ex. 5, at 242:3–246:12.) The authors did not follow any scientific method, and merely conducted an opinion poll. *Id.* Tellingly, Defendant Deere failed to include the following response to the "survey": "Ted Miller and others are more correct now than ever. The straightforward application of (statistically significant) willingness to pay conclusions about whole life values provides more of a scientific basis here than in many other areas of our loss estimates."[15] Importantly, the poll did not include whether the respondents knew how to compute hedonic damages. *Id.*

Defendant Deere further attempts to indict Dr. Smith's methodology by using an inadequate example regarding a linear relationship. However, Dr. Smith does not create such a relationship between a large risk of death and a large decrease in the enjoyment of life. Instead,

---

[15] Michael Brookshire, et al., *A 2009 Survey of Forensic Economists: Their Methods, Estimates, and Perspectives*, 21 J. FORENSIC ECON. 5, 24 (2009), attached as Ex. 14.

a small risk of death can equate to a decrease in the enjoyment of life when human capital is removed from the equation. Both Dr. Smith and Dr. Guryan testified that sufficient data and research does not exist at even a ten percent level to determine how individuals value the risk of death. (Ex. 3, at 38:17–39:8, 79:20–80:10; Ex. 5 at 125:6–127:5.) Thus, Defendant Deere's example of a coin flip fails to support its position, because Dr. Smith is not relying on data for a large risk of death.

Importantly, Dr. Smith used a proper mathematical calculation to determine his baseline amount of $4.5 million. Dr. Smith used the average of five different studies that conducted meta-analysis regarding VSL to determine the average VSL for the statistically average person: $5.9 million. (*See* Ex. 6, ¶5.) He then deducted future expected wages and benefits for a statistically average person with forty-five years of remaining life expectancy: $1,110,087. *Id.* He further deducted the value of household services for a statistically average person with forty-five years of life expectancy: $533,764. *Id.* While Dr. Smith used $4.5 million to determine his input, his calculations derived an amount of $5,187,615. Dr. Smith relied upon actuarial tables to determine life expectancy, a method courts defend. *See generally Rossi v. Groft*, No. 10 C 50240, 2013 U.S. Dist. LEXIS 54552, at * 2–14 (N.D. Ill. Apr. 16, 2013).

Defendant Deere's objection to a conservative estimate appears illogical. If understood properly, Defendant Deere's argument seems to be that Dr. Smith should not have made a downward adjustment to account for potential variables. However, a downward adjustment would *decrease* the damage calculation, and only aid Defendant Deere's position in this matter. Forensic economists also use conservative estimates to prevent errors. (Ex. 5, at 110:3–110:5.)[16]

---

[16] *See generally United States Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 748, 759–60 (N.D. Ill. 2009) (allowing use of a conservative estimate).

**VIII. DR. SMITH'S TESTIMONY IS USEFUL FOR THE CONCEPT OF HEDONIC DAMAGES.**

At a minimum, Dr. Smith's testimony is helpful for a jury to understand the general concept of hedonic damages. Numerous courts, within this jurisdiction and outside, have found a middle ground and allowed economists to explain the concept to a jury. *See Richman v. Burgeson*, No. 98 C 7350, 2008 U.S. Dist. LEXIS 48349, at *14–15 (N.D. Ill. June 24, 2008); *Case v. Town of Cicero*, No. 10 C 7392, 2013 U.S. Dist. LEXIS 148656, at *34 (N.D. Ill., Oct. 16, 2013); *Smith v. Ingersoll-Rand Co.*, 214 F.3d 1235, 1244–46 (10th Cir. 2000); *Chavez v. Marten Transport, Ltd.*, No. 10-0004MV/RLP, 2012 U.S. Dist. LEXIS 39586, at *4–5 (D.N.M., Mar. 22, 2012); *Flowers v. Lea Power Partners, LLC*, No. 09-CV-569 JAP/SMV, 2012 U.S. Dist. LEXIS 67359, at *12–13 (D.N.M. Apr. 2, 2012); *Gurrule v. Ford Motor Co.*, No. 29,296, 2011 N.M. App. Unpub. LEXIS 51, at *25–26 (N.M. App. Ct., Feb. 17, 2011).

**IX. HEARING**

To fully determine the reliability and relevance of Dr. Smith's testimony, this Court should conduct a *Daubert* hearing to determining the value of the testimony. *See generally Estate of Sinthasomphone v. City of Milwaukee*, 878 F. Supp. 147, 152 (E.D. Wis. 1995) (requiring offer of proof for Dr. Smith's testimony).

**X. CONCLUSION**

For all of the foregoing reasons, Plaintiff, Beth Stokes, respectfully requests that this Court deny Defendant Deere's Motion and allow the Report and testimony of Stan V. Smith, Ph.D. In the alternative, Plaintiff respectfully requests that this Court conduct a *Daubert* hearing to hear Dr. Smith's testimony. Finally, in the alternative, Plaintiff respectfully requests that this Court at least allow Dr. Smith to testify regarding the concept of hedonic damages.

Dated: December 2, 2013   Respectfully submitted,

Beth Stokes

by: /s/ Amit Bindra
One of the Attorneys for the Plaintiff

Kristen E. Prinz
Amit Bindra
The Prinz Law Firm, P.C.
One East Wacker, Suite 550
Chicago, Illinois 60601
P: 312-212-4450
F: 312-284-4822
E: kprinz@prinz-lawfirm.com
E: abindra@prinz-lawfirm.com

16

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing Plaintiff's Response to Defendant John Deere Seeding Group's Motion to Exclude the Proposed Expert Testimony of Stan V. Smith via the Court's CM/ECF system to the attorneys of record for Defendant Jim Gunnison and Defendant John Deere Seeding Group on December 2, 2013.

    Respectfully submitted,

    Beth Stokes

    by: /s/ Amit Bindra
    One of the Attorneys for the Plaintiff

Kristen E. Prinz
Amit Bindra
The Prinz Law Firm, P.C.
One East Wacker, Suite 550
Chicago, Illinois 60601
P: 312-212-4450
F: 312-284-4822
E: kprinz@prinz-lawfirm.com
E: abindra@prinz-lawfirm.com