**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| *Plaintiff,* | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK,** | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| *Defendants.* | ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN OPPOSITION
TO DEFENDANTS' MOTION TO EXCLUDE DR. BARDEN'S OPINIONS**

**NESENOFF & MILTENBERG, LLP**
**Philip A. Byler, Esq.**
**Andrew T. Miltenberg, Esq.**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
pbyler@nmllplaw.com
*Attorneys for Plaintiff John Doe*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF OPPOSITION EXHIBITS ("Opp. Ex.")……………………………………………..ii

TABLE OF AUTHORITIES…………………………………………………………………...iii

PRELIMINARY STATEMENT……………………………………………………….………..1

ARGUMENT …………………………………………………………………………………....1

  I.    PURDUE'S PROCEDURAL ARGUMENT FALSELY IGNORES THE
       COURT'S AUGUST 11, 2022 OPINION STATING DR. BARDEN'S
       OPINIONS WOULD NOT BE BARRED AT TRIAL AND THE COURT'S
       MARCH 14, 2023 ORDER DIRECTING PLAINTIFF TO SERVE A
       REVISED REPORT…………………………………………………………………...…1

  II.    DR. BARDEN'S OPINIONS SHOULD BE ADMITTED AT TRIAL……………………3

       A.    Misdescription of Dr. Barden's Opinions………………………………………….4

       B.    Purdue's Misstatement of Dr. Barden's Report
            In the *Sandusky* Case…………………………………………………………..5

       C.    Dr. Barden Has An Expertise In A Methodology
            That Helps In Ascertaining Sex Discrimination …………………………………..7

       D.    Dr. Barden's Opinions Will Help The Jury………………………………………10

       E.    Dr. Barden Correctly Defines and Applies Confirmation
            Bias, Which Is Not A Victim Bias But A Bias Seeking
            Evidence Consistent With Investigatory Beliefs……………………….……..14

       F.    Dr. Barden's Revised Report Does Not Engage In Speculation ………………..18

       G.    Dr. Barden's Opinions on Methods Are
            Relevant and Reliable…………………………………….……………………22

CONCLUSION…………………………………………………………………...……...…..23

i

## <u>TABLE OF OPPOSITION EXHIBITS ("Opp. Ex.")</u>

Opp. Ex. A: Dr. Barden's report dated March 16, 2023

Opp. Ex. B: Erin Oliver Deposition, tr 9, 19, 23, 32-33, 52, 68-71, 102

Opp. Ex. C: Jacob Amberger Deposition tr 9-10, 47-48, 57

Opp. Ex. D: John Doe Deposition tr. 21-22, 104-105, 113-124, 185-188

Opp. Ex. E: Df. Answer (Mar. 16, 2021) – DE 161

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256 (2d Cir.2002)…………………………20

*Anderson v. Raymond Corp.*, 59 F.4th 279, 284 (7th Cir. 2023)…………………….…………20

*Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887 (7th Cir. 2011)…………………………………..3

*Bullock v. Sheahan*, 519 F. Supp. 2d 760 (N.D. Ill. 2007)……………………………………20

*Cagle v. K-Five Constr. Co.*, 954 F.Supp. 1267 (N.D. Ill. 1997)………………………………...2-3

*Coleman v. W. Bend Mut. Ins. Co.*, 2022 U.S. Dist. 237241 (N.D. Ind. Dec. 12, 2022)…………2-3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)…………………3, 4, 20, 22

*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003)…………………………………20

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) …………………………………………..……9-10, 14

*Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2020)…………………………………………………...7

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)………………………………………3, 4, 19, 22
.
*Palmer v. Indian University & Trs, of Ind. Univ.*, 2021 WL 914030,
       2021 U.S. Dist. LEXIS 44863 (S.D. Ind. Mar. 10, 2021)…………………………………..9

*Spearman Indus. v. St. Paul Fire & Marine Ins. Co.,* 128 F. Supp.2d 1148 (N.D. Ill. 2001)……..20

*United States v. Truitt*, 938 F.3d 885 (7th Cir. 2019)……………………………….……3, 5, 10-11

**Constitutional Provisions, Statutes and Court Rules**

Rule 6(b)(1)(B), Federal Rules of Civil Procedure …………………………..………………………2

Rule 12(b)(6), Federal Rules of Civil Procedure ……………………..……………………...…14

Rule 702, Federal Rules of Evidence…………………………………...….…3, 4-5, 10-11, 19, 20, 22
.
34 C.F.R. 106.45………………………………………………………………………...…………10

Title IX, 20 U.S.C. § 1681 …………………………………………………………………..9, 10

**<u>Other Authorities</u>**

Federal Rule of Evidence 702 Advisory Committee's Note to 2000 amendment....................20

"*Secretary DeVos Announces New Title IX Regulation,"*
    *https://www.youtube.com/watch?v=hTb3yfMNGuA* ........................................10

U.S. Department of Education Press Release, "Secretary DeVos Takes Historic
    Action to Strengthen Title IX Protections for All Students," May 6, 2020.................10

<u>**PRELIMINARY STATEMENT**</u>

Plaintiff John Doe ("John"), by counsel, submits this Memorandum of Law in opposition to Defendants Purdue's motion to exclude Dr. Barden's opinions. The motion should be denied.

The motion is premised on false procedural premises, unacceptably ignoring two facts. *First*, this Court in his August 11, 2022 opinion, while striking the Barden report, also expressly states on page 11 of the Court slip opinion: "The Court is not barring any and all expert opinions Dr. Barden may offer." (DE 206, p. 11.) *Second*, at the March 14, 2023 pretrial conference, in response to John's counsel noting the Court's statement above and saying the purpose of an expert report was to give notice of opinions which the original report did and Purdue's complaint that it did not have a replacement report by Dr. Barden, the Court ordered that John provide a revised report -- the Court's Order from the March 14, 2023 pretrial conference states: "Pltf to provide Dft with document re expert opinion addressed during conference by 3/21/2023" (DE 234).

The motion then makes a misfocused and erroneous attack on Dr. Barden's opinions so as to insulate Purdue's badly flawed investigation from dissection per the science of investigation methodology. Among many things, Purdue's motion sidesteps a full recognition of Dr. Barden's expertise, ignores Dr. Barden's explication of the science of investigation methodology, badly misstates what confirmation bias is and how it operated in what was a biased investigation, and wrongly treats Dr. Barden's application of the investigation methodology as speculation.

<u>**ARGUMENT**</u>

**I.    PURDUE'S PROCEDURAL ARGUMENT FALSELY IGNORES THE COURT'S AUGUST 11, 2022 OPINION STATING DR. BARDEN'S OPINIONS WOULD NOT BE BARRED AT TRIAL AND THE COURT'S MARCH 14, 2023 ORDER <u>DIRECTING PLAINTIFF TO SERVE A REVISED REPORT.</u>**

Purdue's procedural argument rests upon the Court's August 11, 2022 opinion striking Dr. Barden's report dated February 19, 2021 and case law governing late submission of expert reports,

concluding that Dr. Barden is late with the March 16, 2023 Report.  (Df. Mot. 1-4.)  That argument, however, totally ignores what is stated above in the Preliminary Statement about Purdue unacceptably ignoring procedurally dispositive facts.  Purdue describes the Court's striking of Dr. Barden's February 19, 2021 report in the Court's August 11, 2022 opinion (Df. Mot. 2-3), but Purdue says nothing -- nothing at all -- about what the Court also states in the August 11, 2022 opinion on page 11 of the Court slip opinion: "The Court is not barring any and all expert opinions Dr. Barden may offer."  (DE 206, p. 11.)  This statement in the Court's August 11, 2022 opinion prompted discussion at the March 14, 2023 pretrial conference.  John's counsel stated that Dr. Barden could testify in conformity with the Court's August 11, 2022 opinion, the Defendants' counsel stated that they did not have a report, and John's counsel stated that the report is to give notice of Dr. Barden's opinions, which the Purdue Defendants certainly have already.  In response, the Court's Order from the March 14, 2023 pretrial conference states, among other things: "Pltf to provide Dft with document re expert opinion addressed during conference by 3/21/2023" (DE 234).  John's counsel complied early with the Court's March 14, 2023 Order: on March 16, 2023, John's counsel provided the ordered Barden report.

Purdue's legal citations (Df. Mot. 3) are thus way off point.  Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure addresses Court extensions for excusable neglect, but that Rule does not apply given the Court's August 11, 2022 statement that "[t]he Court is not barring any and all expert opinions Dr. Barden may offer"  (DE 206, p. 11) and the Court's Order from the March 14, 2023 pretrial conference stating, among other things, "Pltf to provide Dft with document re expert opinion addressed during conference by 3/21/2023" (DE 234).  The two cases cited by Purdue, *Cagle v. K-Five Constr. Co.*, 954 F.Supp. 1267 (N.D. Ill. 1997), and *Coleman v. W. Bend Mut. Ins. Co.*, 2022 U.S. Dist. 237241 (N.D. Ind. Dec. 12, 2022), concern a situation of a missed deadline, when a Court gives relief for a missed deadline, and the burden on the party missing the deadline

2

to show that the evidence should not be excluded. The Court's August 11, 2022 statement about not barring at trial Dr. Barden's expert opinions makes this a vastly different case than what Purdue's legal citations concern.

Purdue's reference to the oral argument on John's motion for reconsideration of the August 11, 2022 opinion (Df. Mot. 4) does not help Purdue. John's motion for reconsideration addressed John's due process claim and Purdue's legally defective Counterclaim, and the lengthy oral argument concerned those subjects. John's motion for reconsideration did not address the admissibility of Dr. Barden's expert opinions at trial given the Court's statement in his August 11, 2022 opinion that "[t]he Court is not barring any and all expert opinions Dr. Barden may offer." (DE 206, p. 11.) Oral argument on John's motion for reconsideration was not an occasion for dealing with the many trial issues outside what were the subjects of the motion for reconsideration.

## II.  DR. BARDEN'S OPINIONS SHOULD BE ADMITTED AT TRIAL.

In *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019), the Seventh Circuit stated:

> Rule 702 entrusts trial judges with a gatekeeping role designed "to ensure that expert testimony is both relevant and reliable." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). To that end, the judge must determine whether the expert is qualified, whether his methodology is scientifically reliable, and whether the proposed testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 592, 113 S.Ct. 2786 (explaining that the latitude given to experts under the Rules of Evidence "is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline").

Dr. Barden's opinions in the March 16, 2023 report meet the necessary threshold for expert testimony. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ("*Kumho*"); Rule 702, Federal Rules of Evidence. Accompanying this Memorandum of Law as Exhibit A ("Opp. Ex. A") is Dr. Barden's

March 16, 2023 report ("Dr. Barden's Revised Report") intended to satisfy this Court's August 11, 2022 opinion on expert testimony.

Purdue's arguments to exclude Dr. Barden's opinions are misconceived and mistaken. Dr. Barden states his impressive expert credentials on pages 3-17, 103-107 of the Barden Revised Report, and in Dr. Barden's Revised Report, he shows how he provides expert testimony that is relevant to the case, that is based upon an accepted and reliable methodology in the science of investigation methodology and that is helpful to a jury. Dr. Barden also notes, among other things, he is conversant in the requirements of *Daubert* and *Kumho*:

> One of my advisors at Harvard, Stephen G. Breyer (then Chief of the US 1st Circuit Court of Appeals, later Assoc. Justice of the US Supreme Court), encouraged me to use my unusual mix of science-law knowledge to help the legal system reduce the influence of unreliable, "junk science" theories, methods, and ideologies and thus protect the integrity of the legal system. (Justice Breyer later wrote the *Kumho* decision of the US SCT applying *Daubert* analyses to a wide range of experts and related evidence). I have been following Justice Breyer's recommendation – to protect the integrity of the legal system. . . . I have participated in multiple *Frye-Daubert-Kumho* science hearings in multiple states. . . .

(Opp. Ex. A, pp. 6-7.)

### A. Misdescription of Dr. Barden's Opinions.

Purdue begins its argument for exclusion of Dr, Barden's opinions by misdescribing Dr. Barden's opinions. Purdue puts Dr. Barden's opinions in two categories: (i) that Purdue's investigation evinces "confirmation bias" (which Purdue does not accurately describe) to find John responsible despite the preponderance of the evidence; and (ii) that Purdue's investigation employed "defective, improper, misinformed, uninformed" methods (which it did when analyzed under the science of investigation methodology).

In addition to misdescribing confirmation bias, Purdue omits Dr. Barden's discussions in Dr. Barden's Revised Report that satisfy this Court's August 11, 2022 opinion on expert testimony. Dr. Barden discusses the science of memory, the science of false memory, the science of proper

interviewing, and the history of improper investigation of alleged abuse due to lack of science information, in order to provide a Federal Rule of Evidence 702 foundation for the specific opinions he states about the deficiencies in Purdue's investigation. The opinions compiled in Purdue's Appendix (Df. Mot. 14-15) are not stated in a vacuum in the Barden Revised Report, but rather flow from the discussions of the science of memory, the science of false memory, the science of proper interviewing, and the history of improper investigation of alleged abuse due to lack of science information. The opinions compiled in Purdue's Appendix are not the totality and are not representative of Dr. Barden's opinions, which center more on the defects of confirmation bias in Purdue's investigation and the defects in Purdue's investigation method such as not properly recording interviews, confirmation bias, not having signed and dated statement of allegations or video forensic recording of allegations, the failure to consider alternative hypotheses, and the failure to obtain and consider corroborative evidence. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 8-17, 20-36, 45-57, 74-88, 100-103.)

**B.  Purdue's Misstatement of Dr. Barden's Report in the *Sandusky* Case.**

Purdue then brings up, misstates and mischaracterizes Dr. Barden's report in another case - - the *Sandusky* case. Purdue spins Dr. Barden's report in the *Sandusky* case as a judgment on the entire legal system because judges, prosecutors and defense lawyers failed to apply recognized science and history with respect to proper investigation and adjudication. (Df. Mot. 5.)

Purdue wrongly labels Dr. Barden a forensic psychologist; he did not identify himself as such in the *Sandusky* case when he testified at an appellate stage of the case. Dr. Barden stated in his *Sandusky* report:

> "I have consulted and/or testified as an expert in psychology, child psychology, psychopathology, psychotherapy standards of care and ethics (including social work, psychology, psychiatry, counseling, etc.), psychological testing-assessment, mental illness diagnostic issues, the science of coping-resilience, **the nature and philosophy of science, history-methodology-standards of care in police**

>**investigations/interviews, the science of memory-memory contamination-false memory, the science of trauma-dissociation,** the history of the "Memory Wars", the history of lawsuits and licensing revocation actions against "recovered repressed memory therapists", ***the history of abuse investigations, the reliability or unreliability of various methodologies-investigative methods-procedures***, as well as standards of care-licensing-ethical rules-history for mental health and psychotherapy professionals (psychologists-MSWs-Counselors-GALs-social workers-psychiatrists-MFTs-parenting consultants, forensic experts, expert witnesses, etc.) **and related issues.**

(Purdue Ex. B, p. 1; emphasis in the original.)  As noted below (p. 7), Dr. Barden cannot be pigeonholed as a forensic psychologist given his science awards, invited addresses, and publications.

Purdue also wrongly asserts, in a hit and run attack, that Dr. Barden's report in the *Sandusky* case is the "apparent" basis for a cut and paste job for his report in this case.  That assertion is patently false -- the reports are very different: the longer 130-page *Sandusky* report fully documents historically unique examples of a corrupt criminal legal process (Ex. B to Purdue Motion), whereas the report in this case concerns the methodological errors of the Purdue disciplinary process (Opp. Ex. A).  Importantly, Purdue does not discuss the facts in the *Sandusky* case that led to Dr. Barden levelling the criticisms of the *Sandusky* case that he did and that have nothing to do with this case.  What Dr. Barden did in the *Sandusky* case was not to set himself up in judgment of the entire legal system, but rather to document corrupt conduct in the case, including: (i) an unrecorded motel meeting of the judge, the prosecutor and one defense attorney in which the defendant's right to a preliminary hearing was waived without the defendant's consent and without the knowledge of the second defense attorney; (ii) the chief police investigator admitted to repeatedly conducting multiple secret unrecorded coercive interviews with the alleged victims to get the evidence the police wanted for the prosecution and the jury was not told of these coercive interviews; (iii) several of the alleged victims were in "repressed memory therapy" leading to radically changed testimony and the jury was not told of the errors and distortions of "repressed memory therapy"; (v) the chief

prosecutor in the case was later disbarred for deceitful manipulation of a Court; and (vi) the Pennsylvania AG was sentenced to prison for perjury and obstruction in another matter.

Purdue's raising of the *Sandusky* case is disturbing for two reasons. *First*, it is disturbing to think that Purdue finds informative for this case Dr. Barden's exposure of corruption in another case. Why is Purdue raising here a case in which the problem was corruption? *Second*, it is disturbing for Purdue to raise another case to defame John with an implicit comparison to Coach Sandusky who while in a position of authority was alleged to have committed heinous acts. While Jane has never put herself under oath, John has repeatedly under oath in this case denied the sexual molestation accusations of Jane. (DE 183-8, John Doe Declaration, pp. 13-14; Opp. Ex. D, John Doe Dep tr. 104-105, 113-124.)

### C.  Dr. Barden Has An Expertise In A Methodology That Helps In Ascertaining Sex Discrimination.

Dr. Barden's Revised Report does disclose an expertise in a methodology that does help in ascertaining sex discrimination: the science of investigation methodology.

Purdue cites *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2020), where the Seventh Circuit ruled that the district court had abused its discretion in finding a physician unqualified to offer expert testimony that an inmate's vomiting may have contributed to her death. Purdue cites the part of the Seventh Circuit opinion stating the question is not merely whether the expert is qualified in general but rather whether he is qualified to answer a specific question (Df. Mot. 6) – a reflection that Purdue recognizes Dr. Barden is a highly qualified individual.  Purdue then notes that Dr. Barden is a forensic psychological expert and jumps to arguing that Dr. Barden's report does not disclose any technique for the ascertainment of sex discrimination. (Df. Mot. 6.)  Wrong for two reasons:

*First*, Dr. Barden cannot be pigeonholed as a forensic psychologist. Dr. Barden's national science awards are in research, not forensic psychology. Dr. Barden's invited training addresses to the APA, ABA, and the Surgeon General's conference are on science, methodology and history – none of them involved "forensic psychology" assessments. Dr. Barden's publications on memory-false memory investigation methodology and the relevant history of investigation methodology as published in leading peer-reviewed journals in the world are not forensic psychology. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 3-17, 103-107.)

*Second*, as noted, Dr. Barden's Revised Report does disclose an expertise in a methodology – as accepted by multiple courts, the National Association of Lawyers, psychologists, psychiatrists and the U.S. Surgeon General's Conference -- that does help in ascertaining sex discrimination: the science of investigation methodology. (Opp. Ex. A, pp. 17-111.)

Purdue's treatment of whether Dr. Barden is qualified to answer a specific question – here, sex discrimination -- is somewhat misfocused with respect to this case. No expert credential can or should exist for determining sex discrimination; the determination of whether there was sex discrimination itself is for the jury; it would be impermissible for Dr. Barden to opine directly that there was sex discrimination. What Dr. Barden can testify to and the report discloses is the science of investigation methodology and the failures of Purdue in that regard. Highly informative to ascertaining sex discrimination is Dr. Barden's expertise in the science and history of investigation methodology. Dr. Barden explains that basic, minimal science-methodology standards for sexual abuse investigations require properly recording interviews, avoiding confirmation bias, signed and dated statement of allegations or video forensic recording of allegations, consideration of alternative hypotheses, and the need for corroborative evidence. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 20-27, 74-88.)

Aiding Dr. Barden in his explication of the science of investigation methodology is the fact that he has testified and/or consulted as an expert in, among other subjects, the "history-methodology-standards of care in police investigations/interviews, the science of memory, memory contamination and false memory, the science of trauma-dissociation, the history of the 'Memory Wars', the history of lawsuits and licensing revocation actions against 'recovered repressed memory therapists', the history of abuse investigations, the reliability or unreliability of various methodologies-investigative methods-procedures." (Dr. Barden's Revised Report, Opp. Ex. A, p. 2, 103-107.)

What Dr. Barden demonstrates is that Purdue's investigation was woefully deficient: among other things, no written and signed statement by the alleged victim; no video recording of an interview of the alleged victim; the failure of the investigator and adjudicators to ask questions pursuing alternative explanations (as required by U.S. Department of Justice guidelines); the infection of confirmation bias; no appearance much less cross-examination of the alleged victim at the meeting of the Dean and Equity Committee members; the training in Dr. Campbell's unscientific theories. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 17-111.)

Purdue objects that Dr. Barden has not testified in a Title IX discrimination case. (Df. Mot. 6.) There have been, however, in the entirety of this country, only two Title IX trials involving male plaintiffs who were university respondents. The opportunity to testify in such a capacity has been extremely limited, at best.

Purdue cannot insulate itself from expert dissection concerning investigations by invoking "university-specific standards for meeting their Title IX obligations." (Df. Mot. 6-7.) The case invoked by Purdue, *Palmer v. Indiana University & Trs. of Ind. Univ.*, 2021 WL 914030, 2021 U.S. Dist. LEXIS 44863 (S.D. Ind. Mar. 10, 2021), does not support Purdue's argument. It was a race discrimination case in which the plaintiff Palmer complained of a failure to promote based on race

where the issues discussed in the proffered expert testimony concerned early promotion review, the timing of salary adjustments, additional service and teaching opportunities, and the provision of appropriate office space – all matters of university administration that do not involve compliance with Title IX.

Furthermore, it is nonsense to be referring to supposed university-specific standards for meeting Title IX obligations. This is a case in which the procedures employed by Purdue for Title IX enforcement were lambasted as wholly inadequate by the Seventh Circuit in an opinion by now Justice Barrett, *Doe v. Purdue*, 928 F.3d 652, 663-664 (7th Cir. 2019) ("**Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension**.") When then Education Secretary DeVos announced on May 6, 2020, what would be the current Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue*. "*Secretary DeVos Announces New Title IX Regulation,*" *https://www.youtube.com/watch?v=hTb3yfMNGuA*; U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020. Those regulations for all universities and colleges, including Purdue, are at 34 C.F.R. 106.45.

That Purdue would still talk about university-specific standards for meeting Title IX obligations only establishes a need to bring the science and history of investigation methodology to bear on Purdue's deficient Title IX procedures. Knowing the grave deficiencies of Purdue's procedures in terms of the science of investigation methodology assists in understanding how sex biased investigations and adjudications could and did occur in John's disciplinary case.

Wholly inapposite and off point is another case cited by Purdue, *United States v. Truitt*, 938 F.3d 885, 889 (7th Cir. 2019) (Df. Mot. 7), which was a criminal case involving the filing of obviously false tax returns for multiple years. A defense was raised that the conduct of the criminal

defendant was excusable because she was subject to indoctrination in a charismatic group, relying upon the testimony of a forensic psychologist. The trial judge excluded the proffered expert testimony, and the Seventh Circuit upheld the exclusion, on the stated ground that the proffered expert had no relevant experience with charismatic groups. One can further rationally question more generally the viability of the defense.

**D. Dr. Barden's Opinions Will Help The Jury.**

Federal Rule of Evidence 702(a) requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Dr. Barden's opinions will assist the jury with such opinions as the defects of confirmation bias in Purdue's investigation and the defects in Purdue's investigation method such as the failure to consider alternative hypotheses. Purdue, by seeking to exclude Dr. Barden, seek to immunize Purdue's disciplinary process from expert analysis and leave in place the rationalizations of Purdue administrators that resulted in sex discrimination.

Purdue's objection to Dr. Barden's opinions in terms of assisting the jury focuses on Dr. Barden's opinions concerning Purdue's reliance on the theories of Rebecca Campbell, which Purdue calls a "non-witness." Purdue says, inaccurately, that most of Dr. Barden's opinions concern the theories of Rebecca Campbell. (Df. Mot. 7.) As noted above, Dr. Barden's opinions center more on the defects of confirmation bias in Purdue's investigation and the defects in Purdue's investigation method such as properly recording interviews, avoiding confirmation bias, signed and dated statement of allegations or video forensic recording of allegations, consideration of alternative hypotheses, and the need for corroborative evidence. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 20-27, 74-88.)

11

Purdue's calling Campbell a non-witness is beside the point. The part of Dr. Barden's report concerning Purdue's reliance on Campbell was triggered by the deposition testimony of Purdue Investigator Erin Oliver:

Q Did you receive any training in terms of trauma, of complainants?

A Yes.

Q What was that training?

A Neurobiology of trauma. How brains code memories, do not code memories, during traumatic instances. That is really, all I recall from the trainings.

Q Do you recall who provided that kind of trauma training?

A I believe there was a faculty member from Michigan State University; Rebecca Campbell. Videos and research that is the only one I recall off the top of my head.

Q You do recall Professor Campbell?

A Yes, I believe she has been the prominent person on that subject.

(Opp. Ex. B, Oliver Dep tr. 9, quoted in Dr. Barden Revised Report, Opp. Ex. A, pp. 18, 68, 87.) As Dr. Barden explains, the theories of R. Campbell as applied in this case lead to a "Believe Women" (but not men) bias. Protecting the narrative of the alleged victim is part of R. Campbell's ideological framework, which is totally contrary to the science of investigation methodology. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 18-22, 68-71, 98-102.)

Purdue argues there are no recovered memories in this case (Df. Mot. 7-8), but that is because, as Dr. Barden explains, Purdue failed to record any statements from the alleged victim, whether by video or signed and sworn statement. The science of recovered memory is discussed in Dr. Barden's report because it is important to know that the notion of "repressed memories" is fallacious: it is exactly the kind of science-history knowledge that all competent investigators should have to conduct a fair investigation. Protecting the "narrative of the women" is the goal of Dr Campbell's ideology — just what Purdue did in this case. R. Campbell's ideology will lead to

12

avoiding gathering any statements (written or recorded) from the alleged victim. This rigs a process against the male respondent and infects other aspects of the investigation. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 22, 68-69, 98-102.)

One aspect was that Purdue failed to properly record interviews with witnesses. Further testimony by Erin Oliver established that fact:

> Q Was there ever any video of these interviews that you took of people in your investigation?
> A No, not that I am aware of...
>
> Q Was it a practice of Purdue at the time in 2015/2016 not to take video or audio of interview witnesses?
>
> A Correct, we did not audio or video interviews.

(Opp. Ex. B, Oliver Dep tr. 19.) Recording by video or audio interviews is the standard practice of police investigations and is a required practice of the science of investigation methodology. The consequence of failing to video or audio record the interviews make it impossible to properly investigate key alternative hypotheses, as mandated by the science of investigation methodology. According to Dr. Barden, confirmation bias is the most serious of investigation errors. (Dr. Barden's Revised Report, Opp. Ex. A, p. 20, 25-27, 87.)

Another aspect was that Purdue used an unreliable, subjective methodology for creating a "selected" (incomplete, manipulated) evidence base of the John-Jane texts. The investigators admittedly crafted a "selected evidence file" and let the Equity Committee and Dean see only texts the investigators felt were relevant to supporting the conclusion of finding John responsible and protecting the narrative of believing the woman. Investigator Erin Oliver testified:

> Q Okay. Why didn't Mr. Amberger and you attach 133 pages of the text communications?
>
> A We would have pulled and identified text messages *that we felt were relevant* to the investigation.

13

Q What do you mean by relevant?

A The things that spoke directly to the allegations or response to the allegations.

Q How did you know if they did relate to the allegations?

A I *don't recall the exact reasoning of the practice would have been*. I don't recall the specific conversation that [Investigator] Jacob [Amberger] or I had about what we included or did not include in the course of the investigation."

(Opp. Ex. B, Oliver Dep tr 32-33, emphasis supplied; *see* discussion in Dr. Barden's Revised Report, Opp. Ex. A, pp. 89-91.)

Purdue also invokes two red herrings. (Df. Mt. 8.)  The first is that John did not discuss memory in his Complaint (DE 160), but so what?  The purpose of a Complaint is to state a claim, not give a complete description of all the specific evidence supporting a claim.  A Rule 12(b)(6) motion challenges whether a claim is stated, not whether evidence supports the claim. *Doe v. Purdue*, 928 F.3d at 656. The second is that according to the undisputed evidence, Jane first went to the Navy in April 2016 with her allegations, but again so what?  That does not help Purdue one bit with respect to the jury being assisted by the opinions of Dr. Barden; it just establishes that the Navy knew about Jane's allegations from the start and why, as John testified, the Navy "wanted in the loop" of Purdue's investigation (DE183-5 & Opp. Ex. D, John Doe Dep tr 21-22).

## E.  Dr. Barden Correctly Defines and Applies Confirmation Bias, Which Is Not A Victim Bias But A Bias Seeking Evidence Consistent With Investigatory Beliefs.

Dr. Barden's Revised Report states: "Confirmation bias is the tendency to bolster a hypothesis by seeking consistent evidence while disregarding inconsistent evidence."  (Dr. Barden's Revised Report, Opp. Ex. A, p. 21.) Dr. Barden's Revised Report also quotes the Oxford Dictionary definition of confirmation bias: "The tendency to test one's beliefs or conjectures by seeking evidence that might confirm or verify them and to ignore evidence that might disconfirm

or refute them." (Dr. Barden's Revised Report, Opp. Ex. A, p. 25.)  Purdue recognizes that Dr. Barden quotes the Oxford Dictionary definition of confirmation bias.  (Df, Mot. 8.)

But Purdue then very badly misstates Dr Barden's treatment of confirmation bias when asserting, incorrectly, that Dr. Barden describes confirmation bias as a "victim bias" and not as a tendency to believe women and believe men. (Df, Mot. 9.)  Dr. Barden argues no such thing, and the definition of confirmation bias precludes it. Conformation bias is seeking evidence consistent with investigatory beliefs whatever they are. Purdue nevertheless uses its misstatement about victim bias and other misstatements about confirmation bias, incorrectly, to argue that Dr. Barden's opinions on confirmation bias are irrelevant to the jury's task to determine sex discrimination. (Df. Mot. 9.)  Dr. Barden's quite relevant treatment of confirmation bias, however, shows that it concerns bias that can affect all investigators; it is not accuser based -- confirmation bias is <u>not</u> shorthand for finding the weight of the evidence supports the victim's account; and confirmation bias does not predict anti-male bias in all cases. But, as the record here documents, confirmation bias in this case involves a consistent pro-woman bias consistent with R. Campbell's training and the "Believe the Woman" mantra discussed below (pp. 17-18, *infra*).  (Dr. Barden's Revised Report, Opp. Ex. A, pp. 19, 25-27, 73-78, 84, 98-102.)

Confirmation bias was exhibited when the Purdue investigators disregarded that it was Jane Doe who deleted evidence. Investigator Oliver testified:

Q Okay. And you asked Jane Doe for texts, did you not?

A Correct, I did.

Q And I was just going to say, did she tell you she had deleted them?

A In reviewing them I was reminded that she had deleted them and no longer had them, yes. . . .

Q . . .It was John Doe was it not that provided the text?

A Yes.

Q And Jane Doe deleted her texts?

A Yes, for some reason did not happen. I don't recall if it was a deletion -- no longer.

Q Didn't you take into account as an adverse on credibility Jane Doe deleted the documents reflected the communication between John Doe and Jane Doe in December and January December 2015, January 2016?

A I don't recall how that was considered.

(Opp. Ex. B, Oliver Dep tr 23, 70; *see* discussion in Dr. Barden's Revised Report, Opp. Ex. A, pp.

89-90.)

The Purdue investigators further exhibited confirmation bias when they disregarded that

Jane Doe took five months before reporting her sexual allegations. Investigator Oliver testified:

Q Did you ever ask Jane Doe why she waited five months according to her account between the time of the alleged accident and making a report to Purdue?

A I do not recall asking that question.

Q Isn't it a concern if there is a delay of more than a few months at least 4 or 5 months why there was a delay in testimonies of assessing credibility?

A I just -- I don't recall having the conversation or what she would have shared regarding -- that it is a question I would have typically asked, yes.

Q Did you have any recollection at all of any conversation with Jane Doe about that?

A I do not.

(Opp. Ex. B, Oliver Dep tr. 70.-71; *see* discussion in Dr. Barden's Revised Report, Opp. Ex. A,

pp. 92-94.)

Confirmation bias was exhibited when the Purdue investigators disregarded Jane Doe's

suicide attempt with respect to credibility. Investigator Oliver testified:

Q Do you recall that in that interview, Mr. Uthuppan was a roommate related to you that John was concerned about the suicide attempt that Jane Dooe made?

16

A Yes.

. . . .

Q Your credibility determination did you take in account the suicide attempt of Jane Doe?

A No.

(Opp. Ex. B, Oliver Dep tr. 23, 68-69.; *see* discussion in Dr. Barden's Revised Report, Opp. Ex. A, pp. 83, 94.)

Confirmation bias was exhibited once again when the Purdue investigators gave Jane Doe a second interview so she could give her version of certain John-Jane text messages, but did not provide the same time for John Doe.  Investigator Jacob Amberger corresponded via e-mail with CARE Director Monica Bloom about re-interviewing Jane Doe about the text messages, for which a second interview was arranged and held, but the investigators Amberger and Oliver did not re-interview John in order to elicit his understanding of the John-Jane texts. Opp. Ex. C, Amberger Dep tr. 47-48; Opp. Ex. B, Oliver Dep tr 102.)   Investigator Amberger testified:

Q Is there any reason why after you talked to Jane Doe on the phone, you didn't, then, call and talk to John Doe?

A The information that John Doe had provided in his first interview, there was nothing -- *was sufficient. There was nothing that Jane Doe shared in her second follow-up interview that we needed to follow up with or clarify from John Doe.*

(Opp. Ex. C, Amberger Dep tr. 57, emphasis supplied; *see* discussion in Dr. Barden's Revised Report, Opp. Ex. A, p. 84.  What was done here is a manifestation of "protecting the narrative of the woman" and "Believe the Woman" – which is what R. Campbell teaches according to her own publications. (*See* discussion in Dr. Barden's Revised Report, Opp. Ex. A, pp. 77, 84, 98-102.)

Confirmation bias was aided and abetted by the "Believe the Woman" mantra at Purdue. Investigator Jacob Amberger testified:

Q Have you ever heard the phrase believe women?

17

A I have, yes.

Q In what context have you heard it?

A Just I've heard believe women or start by believing just in the context of support for advocacy.

Q Could you elaborate what you mean by support for advocacy?

A I've heard it through the EVAWI, End Violence Against Women International, through some of their e-mails and training and things like that. I know that CARE, the Center for Advocacy Response and Education here on campus, has conducted training, and I think that that starts by believing or something along those lines has been a part of their outreaches or whatever they're running through their department.

(Opp. Ex. C, Amberger Dep tr. 9-10; Dr. Barden's Revised Report, Opp. Ex. A, pp. 77, 84, 91-92, 98-102; see also DE 187-21, Facebook Postings PU 0760 ("Want to know how to support a survivor? Commit to #StartByBelieving"), 0765, 0770, 0859, 0862, 0863, 0864, 0866-0867, 0870 "#WeBelieveYou #StartByBelieving"), 0871, 0875 ("tackl[ing] rape culture"); Opp. Ex. E, DE 161, Df. Answer ¶ 24: "Alcohol isn't the cause of campus sexual assault. Men are.".)

An expression of "believe the woman" permeated the meeting that occurred on June 6, 2016, that John Doe, without having the investigation report, had with Dean Sermersheim and unfriendly members of the Equity Committee, who in contrast accepted a written statement ostensibly from Jane Doe delivered by CARE Director Monica Bloom and did not require a personal appearance with cross-examination. Dean Sermersheim would find John responsible for the alleged sexual misconduct.  (Opp. Ex. D: John Doe Dep. tr. 185-188; Opp. Ex. E:DE 161, Df. Answer ¶¶ 41-54; see Dr. Barden's Revised Report. Opp. Ex. A, pp. 77, 79-80, 84, 91-92, 95).

### F. **Dr. Barden's Revised Report Does Not Engage In Speculation.**

The foregoing examples of confirmation bias in the record in this case disposes of Purdue's false assertion that Dr. Barden is engaging in speculation concerning confirmation bias (Df. Mot. 10-11.)

Purdue nevertheless argues that Dr. Barden states on page 97 of Dr. Barden's Revised Report that he is offering only a hypothesis. (Df. Mot. 10.)  What Dr. Barden actually states on page 97 of his Revised Report is as follows:

> 1- Purdue University investigators/adjudicators/officers were poorly and improperly trained thus applying controversial and unreliable methodologies and failing to meet minimal standards for a rational, competent investigation.

> 2- Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with a defective methodology ("Believe Women, but not men").

> 3- Purdue University investigators/adjudicators/officers used unreliable investigational procedures intentionally and also manipulated evidence via "selected evidence files", failed to record ANY interviews, and failed to obtain ANY sworn statement of any allegation in order to manipulate and control the outcome of this case.

> 4 - Purdue University investigators/adjudicators/officers were duped and manipulated by improper, incompetent, unethical, and unreliable RRM-MPD-DISS junk science notions and ideas expressed in Title IX training seminars. For example, Dr. R. Campbell has for years been teaching highly controversial, misleading, and unethical workshops on the "Neurobiology" of trauma, memory, and violence. Who at Purdue selected Dr Campbell's controversial, unproven, junk science notions for training?

> 5 - Purdue University investigators/adjudicators/officers deliberately and intentionally failed to properly RECORD all interviews deliberately to make it impossible to review their interviews for bias and advocacy and determine A) how accurate the claimed notes and quotes were, B) how much of the information allegedly reported was contaminated and/or fabricated by improper leading, suggestive, confusing, repeated, or biased questioning.

> 6 - Purdue University investigators/adjudicators/officers were engaged in a "Believe Women" (not men) political advocacy project for what they perceived to be "social justice" and they never intended to conduct a fair, competent, investigation using reliable and valid measures and methods.

(Dr. Barden's Revised Report, Opp. Ex. A, p. 97.)  What Purdue derides as speculation is where Dr. Barden's application of the science of investigation methodology leads him, given the record in this case.

Purdue errs when asserting that Dr. Barden's opinions do not meet the *Daubert* standard. In *Daubert*, the U.S. Supreme Court interpreted Federal Rule of Evidence 702 to require courts to evaluate whether the proffered expert testimony is reliable and relevant. *Daubert* established that federal district courts must perform the function of evidentiary gatekeeper, in order to "ensure the reliability and relevancy of expert testimony." *Kumho*, 526 U.S. at 152. Purdue can only make the argument it does because Purdue ignores Dr. Barden's explication of the science of investigation methodology which satisfies the factors stated in *Anderson v. Raymond Corp.*, 59 F.4th 279, 284 (7th Cir. 2023), citing and quoting *Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003), and *Daubert*, 509 U.S. at 593-594. As Dr. Barden explains in his Revised Report, the science of investigation methodology can be tested, has been subjected to peer review, has indicia of reliability, has standards controlling its application, and has been generally accepted. (Dr. Barden's Revised Report, Opp. Ex. A, pp. 8-17, 20-36, 45-57, 100-103.)

Rule 702 is a rule of admissibility rather than exclusion. *See Bullock v. Sheahan*, 519 F. Supp. 2d 760, 762 (N.D. Ill. 2007); *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.,* 128 F. Supp.2d 1148, 1150 (N.D. Ill. 2001) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 amendment) ("The rejection of expert testimony is the exception rather than the rule, and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'" "[t]he flexible Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002).

Purdue is badly mistaken in raising the *Sandusky* case in connection with confirmation bias. Purdue questions how confirmation bias can show anti-male bias when the perpetrator and the victims were all male. (Df. Mot. 10.) The short answer is, as noted above, Dr. Barden's quite

relevant treatment of confirmation bias shows that it concerns bias that can affect all investigators and is directed to confirming the investigatory beliefs whatever they may be; it is not victim based and it is not exclusively directed to an anti-male agenda. The *Sandusky* case involved negligent and corrupt conduct, but no one in the *Sandusky* case was trained in the R. Campbell method of "believe the woman."

Purdue argues that Dr. Barden offers no technique for distinguishing between believe all women versus believe all victims. (Df, Mot. 11.) The assertion reflects a misunderstanding of confirmation bias. Again, Dr. Barden's quite relevant treatment of confirmation bias shows that it concerns bias that can affect all investigators, it is not victim based and it is not exclusively directed to an anti-male agenda. Further, the above quoted passages from deposition testimony in this case reflect a believe the woman bias. Purdue's strained effort to raise victim bias is an effort to create a distraction away from clear believe the woman bias in this case.

Purdue is also mistaken in attacking Dr. Barden for addressing ideology. (Df. Mot. 11.) Dr. Barden's expertise in "the reliability of various scientific methodologies" qualifies him to testify that that R. Campbell's "Neurobiology of Sexual Assault," "Neurobiology of Trauma," and "Feminist Approaches to Social Science" publications and training materials ARE unreliable, unproven, not accepted by the relevant scientific community, and have no known error rate. Yet Purdue clearly adopted, followed, and applied Dr Campbell's controversial, uniquely-biased, methods. (Dr. Barden Revised Report, Opp. Ex. A, pp. 18, 68, 87.) A jury will be assisted in hearing that training in "believe the woman" is not following the science.

Purdue is wrong in asserting that Dr. Barden is offering a hypothesis about the state of mind of the discriminatory defendant. (Df. Mot. 11-12.) Dr. Barden is doing no such thing. He is explaining the science of investigation methodology and seeing in the record in this case that Purdue ran an investigation rife with conformation bias based on the actions of investigators. The above

21

quoted passages from deposition testimony in this case (pp. 11-17, *supra*) show actions taken or not taken, not a subjective mental inquiry.

Purdue is misfocused, perhaps deliberately, in asserting that to the extent that Dr. Barden is addressing pertinent questions, the jury is better suited to address those questions.  (Df. Mot. 12.) Dr. Barden's role as expert is to provide specialized knowledge so that the jury can better address the questions reserved for the jury.  Dr. Barden's role is not to address questions that are reserved for the jury. Purdue's confusion of the two roles suggests that Purdue does not want the jury to be properly informed about the science and history of investigation methodology. Without Dr. Barden's expert explanations, a juror will not understand the science and history of investigations, including the methodological error of confirmation bias.

### G.  Dr. Barden's Opinions on Methods Are Relevant and Reliable.

Purdue argues that Dr. Barden's opinions on methods are not relevant or reliable based on two misconceived arguments. (Df. Mot. 12-13.)

*First*, Purdue argues that Dr. Barden's statement in his report that he observed the minimal standards of care for psychotherapists, investigators, and legal professionals (judges, trial lawyers, and government officials)" (Dr. Barden's Revised Report, Opp. Ex. A, p. 2) rendered Dr. Barden's analysis irrelevant for an intentional discrimination case.  (Df. Mot. 12-13.)  The assertion is a *non sequitur*.   That Dr. Barden holds himself to a certain standard of care in rendering expert opinions is not rationally related to a decision whether there is sex discrimination.  Rather, it is Dr. Barden meeting his obligations under *Daubert* and *Kumho*.  The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho,* 526 U.S. at 152.

*Second*, Purdue argues that Dr. Barden does not contend that Purdue's allegedly defective methods were selectively employed in John's case because he was a male, but instead imputes faulty methods to Purdue's approach to training investigators for all investigations. That is at best misfocused. Dr. Barden documents the reckless, irrational, wildly improper, unfair, methods and processes used in Purdue's "investigation," the investigation defects enable sex discrimination to occur, and Dr. Barden documents the training received from R. Campbell who by her own statements in her own publications is an anti-male, anti-patriarchy, very biased against men and purveyor of what Dr. Barden calls junk science methods and "Believe the Woman" bias.

Dr. Barden goes to great lengths in his Revised Report to describe the science of investigation methodology, citing the supporting literature, so that there is no reasonable question but that Dr. Barden's discussions of methods are relevant and reliable.

## CONCLUSION

For the reasons stated above, Defendants' motion to exclude Dr. Barden's opinions should be denied.

Dated: **April 11, 2023**                    **Respectfully submitted,**
                                                                 **NESENOFF & MILTENBERG, LLP**
                                                                 **By: /s/** *Philip A. Byler*
                                                                 **Philip A. Byler, Esq.**
                                                                 **Andrew T. Miltenberg, Esq.**
                                                                 **363 Seventh Avenue, Fifth Floor**
                                                                 **New York, New York 10001**
                                                                 **(212) 736-4500**
                                                                 **pbyler@nmllplaw.com**
                                                                 **amiltenberg@nmllplaw.com**
                                                                 *Attorneys for Plaintiff John Doe*

23

## **<u>CERTIFICATE OF SERVICE</u>**

The undersigned certifies that this document was served upon the attorneys of record for

each party to the above-entitled cause at the address shown below on April 11, 2023:

William P. Kealey, Esq.
Tyler L. Jones, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
       tlj@stuartlaw.com
*Attorneys for Defendants*


BY:   ☐  U.S. Mail     ☐    Federal Express

        ☐ Hand-Delivery   x    <u>Other: ECF</u>


                    ____*Philip A. Byler, Esq.*_____
                    Philip A. Byler, Esq.

24