# EXHIBIT B

Page 1

1  IN THE UNITED STATES DISTRICT COURT FOR THE
2  NORTHERN DISTRICT OF INDIANA HAMMOND DIVISION
3  ------------------------------------------------x
4  JOHN DOE,
5                   Plaintiff,
6            V.                    No. 2:17-cv-33-JPK
7  PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF
8  TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his
9  official capacity as President of Purdue
10 University, ALYSA CHRISTMAS ROLLOCK, in her
11 official capacity of Purdue University, KATHERINE
12 SERMERSHEIM, in her official capacity at Purdue
13 University,
14                 Defendants.
15
16 ------------------------------------------------x
17
                           Videoconference
18
19                         December 4, 2020
                           1:30  P.M.
20
21
22
23 Deposition of ERIN OLIVER, held at the above time
24 and place, pursuant to Order, taken before a Court
25 Reporter of the State of Indiana.

Page 9

1   A   Yes.
2   Q   Okay what were you taught?
3   A   The importance of fair and equitable
4 unbiased investigation.
5   Q   Did you receive any training in terms
6 of trauma, of complainants?
7   A   Yes.
8   Q   What was that training?
9   A   Neurobiology of trauma.  How brains
10 code memories, do not code memories, during
11 traumatic instances.  That is really, all I recall
12 from the trainings.
13   Q   Do you recall who provided that kind of
14 trauma training?
15   A   I believe there was a faculty member
16 from Michigan State University; Rebecca Campbell.
17 Videos and research that is the only one I recall
18 off the top of my head.
19   Q   You do recall Professor Campbell?
20   A   Yes, I believe she has been the
21 prominent person on that subject?
22   Q   Did you ever hear the phrase, Believe
23 All Women?
24   A   No, it is not familiar.
25   Q   Or, Believe All Women?

3 (Pages 6 - 9)



Page 19
1  Q   Jacob Amberger?
2  A   Correct.
3  Q   You and Jacob Amberger were on the
4  investigation team on the personal
5  ▬▬▬▬▬▬▬▬ Matter and what we have are
6  the notes to what is Oliver 24 and 25, correct?
7      I thought you were checking the notes
8  to make sure I have it right.
9      I will repeat the question.
10     My question is:  Are Oliver 24 and
11 Oliver 25 the notes that you and Mr. Amberger took
12 in the investigation of the ▬▬▬▬▬▬▬
13 ▬▬▬ Matter?
14 A   Yes.
15 Q   Was there ever any video of these
16 interviews that you took of people in your
17 investigation?
18 A   No, not that I am aware of.
19 Q   Did you take any on notation?
20 A   Not, that I am aware.
21 Q   Was it a practice of Purdue at the time
22 in 2015/2016 not to take video or audio of
23 interview witnesses?
24 A   Correct, we did not audio or video
25 interviews.

6 (Pages 18 - 21)



Page 23

1  have those texts before ▓▓▓▓▓▓▓▓ provided
2  them?
3     A    Correct.
4     Q    Okay. And you asked Ms. ▓▓▓▓▓ for
5  text, did you not?
6     A    Correct, I did.
7     Q    And I was just going to say, did she
8  tell you she had deleted them?
9     A    In reviewing them I was reminded that
10 she had deleted them and no longer had them, yes.
11    Q    The first time you saw a text was on or
12 about April 28, 2016?
13    A    Correct.
14    Q    Okay. Now on, do you have what has been
15 marked as exhibit 27, Amberger 27 which goes from
16 Purdue 206 to Purdue 339?
17    A    Yes, I do.
18    Q    Okay. Good. The printout of these texts
19 are in reverse chronological order the last one
20 being Tuesday, March 15, 2016, the first one being
21 Wednesday December 23, 2015?
22    A    Yes.
23    Q    That is the time frame of the text that
24 was provided to you by ▓▓▓▓▓▓▓▓ to you and
25 Mr. Amberger, correct?

7 (Pages 22 - 25)

Page 32

1  Q   Let me rephrase. Okay.
2      Oliver 27 reveals a line of text the
3  communications between, ▮▮▮▮▮ and ▮▮▮▮
4  ▮▮▮▮ do they not?
5  A   Yes.
6  Q   So they are talking in effect
7  electronically to each other a lot from a period of
8  time just before Christmas into the next year?
9  A   Yes.
10 Q   Now, let me ask you a question, and I
11 will have to step back for a moment. Can you pull
12 what was Amberger 14 that will now become Oliver
13 14.
14      (Marked for Identification,
15      Oliver 14, Investigation Report, dated
16      December 4, 2020.)
17 Q   Okay and is it the case but what has
18 been marked as Oliver 14 the investigation report
19 that Mr. Amberger submitted to Dean Sermersheim?
20 A   Yes.
21 Q   At the end of the investigation report
22 there were 7 pages attached of some of the text
23 between ▮▮▮▮▮▮ and ▮▮▮▮▮▮?
24 A   Yes.
25 Q   Okay. Why didn't Mr. Amberger and you

Page 33

1  attach 133 pages of the text communications?
2  A   We would have pulled and identified
3  text messages that we felt were relevant to the
4  investigation.
5  Q   What do you mean by, relevant?
6  A   The things that spoke directly to the
7  allegations or response to the allegations.
8  Q   How did you know if they did relate to
9  the allegations?
10 A   I don't recall the exact reasoning of
11 the practice would have been. I don't recall the
12 specific conversation that Jacob or I had about
13 what we included or did not include in the course
14 of the investigation.
15 Q   Now let's look at, can you go to pages
16 333 to 336 and Oliver 27 the text relates to
17 December 23.
18 A   Okay.
19 Q   Okay. Again you have to go in order,
20 okay. Page 336 and at the top of the line, December
21 23, 2015 message about cookies.
22     Do you see that?
23 A   Yes.
24 Q   Look on page 335 the text the cookies,
25 right?

9 (Pages 30 - 33)

Page 52

```
 1     Q    Did you ask ███████████ -- well on
 2  a digital penetration it was true was it not that
 3  ███████████ denied that he ever had digital
 4  penetration, correct?
 5     A    Correct.
 6     Q    And ███████████ did not have an
 7  independent recollection of her being digitally
 8  penetrated she was relying on what she said
 9  ███████████ told her?
10     A    Yes.
11     Q    Now did you ever ask ███████████,
12  that if she had been digitally penetrated wouldn't
13  she have woken up?
14     A    I have no recollection of asking that
15  question.
16     Q    Pages 385 to 386 are the text messages
17  from December 23, 2015 that were attached to the
18  exhibit.  They are the selection not all but
19  December 23, 2015 text. Let me ask you this, you
20  know take a minute and just read the text on pages
21  385 to 386 which were the text from selected from
22  December 23, 2015, the same day that they had the
23  cookies conversation.
24          Tell me when you are ready.
25     A    Okay, I am sorry, ready.
```

14 (Pages 50 - 53)

Page 68

```
 1   A    No.
 2   Q    Did you consider any aspect of the
 3  family relationships that ▮▮▮▮▮ and
 4  ▮▮▮▮▮ had?
 5        MR. KEALEY:  Object to form.
 6   A    Can you repeat that.
 7   Q    Did you consider when assessing the
 8  case, any aspect of the family relationships that
 9  ▮▮▮▮▮ and ▮▮▮▮▮ had?
10   A    Not, that I recall.
11   Q    Do you recall at all finding out that
12  ▮▮▮▮▮ is the son of parents with brothers
13  and sisters?
14   A    No, not that I recall.
15   Q    Do you recall at all finding out that
16  ▮▮▮▮▮ had sisters who he was thought to
17  respect?
18   A    Not, that I recall.
19   Q    Do you recall anything about ▮▮▮▮▮
20  ▮▮▮▮▮ family backround?
21   A    I do not.
22   Q    Now with respect to the digital
23  penetration allegation the only person that maybe
24  was in the room was a roommate, correct?
25   A    Correct.
```

Page 69

```
 1   Q    So there was no possibility for
 2  corroboration from some non-party who told what
 3  happened?
 4   A    Correct.
 5   Q    That was true also of the allegation
 6  that, ▮▮▮▮▮ touched ▮▮▮▮▮
 7  outside her clothes?
 8   A    Correct.
 9   Q    Okay, anything in terms of a person
10  around but her roommate?
11   A    Yes.
12   Q    He said to you, he didn't see any?
13   A    Correct.
14   Q    Well, is it a prime time for making a
15  sexual move if you got a roommate in a room?
16        MR. KEALEY:  Object to form.
17   A    Don't know without knowing the dynamics
18  of that relationship and things.
19   Q    Well, isn't it more credible that
20  ▮▮▮▮▮ story about touching the knee out
21  of concern given the fact that the roommate is in
22  the room?
23        MR. KEALEY:  Object to form.
24   A    I am not sure that would sway my
25  thoughts on credibility, one-way or the other.
```

18 (Pages 66 - 69)

Page 70

```
 1   Q   Well, let me ask you point blank.
 2       You gave [redacted] credibility
 3   because she was a woman and [redacted] was a
 4   male?
 5       MR. KEALEY: Object to form.
 6   A   That is not true.
 7   Q   Wait a minute who provided the text?
 8       MR. KEALEY: Object to form.
 9       MR. BYLER: I can ask that
10   question.
11       MR. KEALEY: What does the wait a
12   minute have to do with it.
13   Q   Excuse me credibility. It was
14   [redacted] was it not that provided the text?
15   A   Yes.
16   Q   And [redacted] deleted her text?
17   A   Yes, for some reason did not happen. I
18   don't recall if it was a deletion -- no longer.
19   Q   Didn't you take into account as an
20   adverse on credibility [redacted] deleted the
21   documents reflected the communication between
22   [redacted] or and [redacted] in December
23   and January December 2015, January 2016?
24   A   I don't recall how that was considered.
25   Q   Did you ever ask [redacted] why
```

Page 71

```
 1   she waited five months according to her account
 2   between the time of the alleged accident and making
 3   a report to Purdue?
 4   A   I do not recall asking that question.
 5   Q   Isn't it a concern if there is a delay
 6   of more than a few months at least 4 or 5 months
 7   why there was a delay in testimonies of assessing
 8   credibility?
 9   A   I just -- I don't recall having the
10   conversation or what she would have shared
11   regarding -- that it is a question I would have
12   typically asked, yes.
13   Q   Did you have any recollection at all of
14   any conversation with [redacted] about that?
15   A   I do not.
16   Q   Okay let's turn to page three and 4
17   which is the recommendation.
18       Let me step back to the investigation
19   report. Before we turn to the recommendation, look
20   at 385 and 386. That is two pages.
21       Did you in your interpretation on April
22   28, 2016, ask and discuss with [redacted] for
23   these specific texts?
24   A   I don't recall. When I look back it
25   appears that he sent those to us at 4:46 on that
```

19 (Pages 70 - 73)

Page 102
1   Q   Page 262, the December 28th text.
2       Your testimony that you never asked
3   ▓▓▓▓▓ specifically about this text?
4   A   I am sorry, can you repeat that?
5   Q   You never sat down with ▓▓▓▓▓ with
6  this text and asked him any questions about it?
7   A   I have no recollection of doing that.
8   Q   There was no opportunity to determine
9  from this text what ▓▓▓▓▓ would say concerning
10 feeling shitty?
11  A   If I did not speak to him about it no
12 he would not had that opportunity.
13  Q   There was no opportunity then to
14 determine what ▓▓▓▓▓ had violated?
15  A   Again beyond the text message if I had
16 not had that conversation, no.
17  Q   So, just a text message you are looking
18 at correct?
19  A   I believe so, yes.
20  Q   Okay and so ▓▓▓▓▓ wasn't given
21 an opportunity to say what he meant with that
22 specific message?
23  A   I don't recall what conversation we had
24 or didn't have about the text messages in our
25 interview.



27 (Pages 102 - 105)