# EXHIBIT C

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF INDIANA
 2                       HAMMOND DIVISION
 3                    CASE NO. 2:17-cv-33-JPK
 4     JOHN DOE,                              )
                                              )
 5         Plaintiff,                         )
                                              )
 6         -vs-                               )
                                              )
 7     PURDUE UNIVERSITY, PURDUE              )
       UNIVERSITY BOARD OF TRUSTEES,          )
 8     MITCHELL ELIAS DANIELS, JR.,           )
       in his official capacity as            )
 9     President of Purdue                    )
       University, ALYSA CHRISTMAS            )
10     ROLLOCK, in her official               )
       capacity at Purdue University,         )
11     KATHERINE SERMERSHEIM, in her          )
       official capacity at Purdue            )
12     University,                            )
                                              )
13         Defendants.
14
15              DEPOSITION OF JACOB AMBERGER
16
17       The ZOOM deposition upon oral examination of JACOB
      AMBERGER, a witness produced and sworn before me,
18    Clarice H. Howard, CCR-Ky, Notary Public in and for the
      County of Boone, State of Indiana, taken on behalf of
19    the Plaintiff, on Tuesday, August 25, 2020, scheduled
      to commence at 8:00 a.m., pursuant to the Federal Rules
20    of Civil Procedure with written notice as to time and
      place thereof.
21
22
23
24
25
```

Page 9

1    I went through, the investigator training and I
2    think it was Level 3, it focused on conducting
3    interviews, asking questions.  It also discussed
4    weighing information in terms of the evidence, kind
5    of passed the basic investigative or interview
6    techniques to the more putting it altogether,
7    sitting down, conducting mock interviews.
8        I've also been through training with ATIXA,
9    their due process training and went through one of
10   their annual conferences which was just a variety
11   of breakout sessions with different speakers.
12 Q   Did ATIXA teach anything about trauma experienced
13   or allegedly experienced by complainants?
14 A   I do not specifically remember that being part of
15   the training.  It was just more asking questions,
16   following people answers, follow-up questions,
17   things like that.
18       I don't remember specifically about trauma or
19   trauma impact on parties and how they answered
20   questions.
21 Q   Have you ever heard the phrase believe women?
22 A   I have, yes.
23 Q   In what context have you heard it?
24 A   Just I've heard believe women or start by believing
25   just in the context of support for advocacy.

3 (Pages 6 - 9)

Page 10

1  Q   Could you elaborate what you mean by support for
2      advocacy?
3  A   I've heard it through the EVAWI, End Violence
4      Against Women International, through some of their
5      e-mails and training and things like that.  I know
6      that CARE, the Center for Advocacy Response and
7      Education here on campus, has conducted training,
8      and I think that that starts by believing or
9      something along those lines has been a part of
10     their outreaches or whatever they're running
11     through their department.
12 Q   Is the Center for Advocacy Response and Education
13     known by its acronym CARE?
14 A   That is correct, CARE.
15 Q   And what is CARE?
16 A   Care is -- I work closely with them, but hopefully
17     I can get what they do here.  They are responsible
18     for education on campus as it relates to
19     interpersonal violence by standard intervention,
20     things like that.
21         Also, they are advocates on campus,
22     confidential advocates on campus, for students who
23     have been impacted by interpersonal violence.
24 Q   Is that including sexual misconduct?
25 A   Correct.

4 (Pages 10 - 13)

Page 48

1  A   Correct.
2  Q   Was there a particular reason you were reaching out
3      to Monica Bloom as to opposed to Ms. ▮▮▮
4      herself?
5  A   I'm not sure why I reached out to Monica and not
6      Ms. ▮▮▮   I do not know.
7  Q   Well, at this point in time you had already met
8      with Ms. ▮▮▮, correct?
9  A   Correct.
10 Q   Given that you already met with Ms. ▮▮▮, why
11     didn't you just contact her directly?
12 A   Again, I do not recall why I did not reach out to
13     Ms. ▮▮▮ and I reached out to Monica instead.
14 Q   Now, 365 is Ms. Bloom's response back to your
15     e-mail that we see on 364, correct?
16 A   Correct.
17 Q   And it's about arranging a phone call with Ms.
18     ▮▮▮ while you're having this e-mail exchange
19     with Monica Bloom?
20 A   Yes.
21 Q   Let's go now to 370, May 12.
22 A   Okay.
23 Q   Was this an e-mail from Monica Bloom to you dated
24     May 12, 2016 about when you could talk to ▮▮▮
25     ▮▮▮

Page 47

1  A   Correct.
2  Q   At that point in time who was Monica Bloom?
3  A   At that time Monica was the director of CARE, the
4      Center for Advocacy Response and Education on
5      campus.
6  Q   Looking at Amberger 19, does it trigger your
7      recollection on your part as to why you were
8      sending this e-mail to Monica Bloom on May 9, 2016?
9  A   I'm trying to schedule a time to speak with Ms.
10     ▮▮▮ again.
11 Q   A follow-up conversation with Ms. ▮▮▮?
12 A   Yes, it would be a follow-up interview, correct.
13 Q   Because you already had at this point in time
14     interviewed Ms. ▮▮▮, correct?
15 A   Yes.
16 Q   And you had already interviewed ▮▮▮▮▮,
17     correct?
18 A   Correct.
19 Q   Okay. I think I have it, but I just want to make
20     sure. You only interviewed and talked to ▮▮▮
21     ▮▮▮ once and that was back in April on a date in
22     2016?
23 A   Yes.
24 Q   So you never followed up in terms of further
25     questions to ▮▮▮▮▮, correct?



Page 57

1     ▓▓▓▓ about.
2  Q  Well, how did that come about; did you discuss it
3     with Erin Oliver, for example, that we need to talk
4     to ▓▓▓▓ again?
5  A  Probably, yes.
6  Q  Probably. Okay. Was there any reason why after
7     talking to ▓▓▓▓ on the phone, that you
8     didn't call ▓▓▓▓ to get his comment on
9     the subjects that you discussed with ▓▓▓▓
10    ▓▓▓▓
11       MR. JONES: Object to the form. It
12    mischaracterizes previous testimony. You can
13    answer, Jake.
14       MR. BYLER: I don't mean to mischaracterize
15    anything. Let me rephrase.
16 BY MR. BYLER:
17 Q  Is there any reason why after you talked to ▓▓▓▓
18    ▓▓▓▓ on the phone, you didn't, then, call and
19    talk to ▓▓▓▓ ?
20 A  The information that ▓▓▓ had provided in his first
21    interview, there was nothing -- was sufficient.
22    There was nothing that ▓▓▓▓ shared in her second
23    follow-up interview that we needed to follow up
24    with or clarify from ▓▓▓ .
25 Q  In the period of, let's say, April 28 to May 12,

15 (Pages 54 - 57)