## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, | ) | |
| **KATHERINE SERMERSHEIM**, in her official | ) | |
| capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF PLAINTIFF'S ATTORNEY PHILIP A. BYLER, ESQ. TO RECUSE MAGISTRATE JUDGE KOLAR AS TRIAL JUDGE

**PHILIP A. BYLER**, hereby declares subject to the penalties of perjury pursuant to 28 U.S.C. § 1746:

### Introduction

1.      I am the lawyer for Plaintiff John Doe in this case, and I am admitted *pro hac vice* to this Court for this case.  I have appeared in this action from its start, I drafted the original Complaint in this action that was upheld in *Doe v.* Purdue, 928 F.3d 652 (7th Cir. 2019) (Barrett, J.), and I am the signatory on Plaintiff's Second Amended Complaint.

2.      I make this Declaration in support of Plaintiff's motion to recuse Magistrate Judge Kolar from being the judge for pre-trial proceedings and the trial

judge in this case pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455.  The facts of this matter show that Judge Kolar's "impartiality might reasonably be questioned" and that Magistrate Judge Kolar "has a personal bias or prejudice either against [Plaintiff John Doe] or in favor of the adverse party [Defendant Purdue University]."  Indeed, while Judge Kolar apparently has an extra-judicial bias, this is a case of "pervasive bias," *Liteky v. United States,* 510 U.S. 540, 551 (1994), not necessitating an extra-judicial bias.  Magistrate Judge Kolar has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate Justice Barrett's opinion in this case, 928 F.3d 652 (7th Cir. 2019), even though as discussed below the U.S. Department of Education relied upon Justice Barrett's opinion in this case in formulating the current Title IX regulations containing due process protections and even though Justice Barrett's opinion in this case has been widely adopted: *Doe v. University of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235 (4th Cir. 2021); *Doe v. Oberlin*, 963 F.3d 580, 588 (6th Cir. 2020); *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Doe v. Univ. of Denver*, 1 F.4th 830, 838 (10th Cir. 2021) ("*Denver II*"); *Doe v. Samford Univ.*, 29 F.4th 675, 688 (11th Cir. 2022); *Doe v. Rice University*, 675 F.4th 702 (5th Cir. 2023).

## Professional Credentials

3.     I begin with a statement of professional credentials because Plaintiff's motion is being made upon serious reflection and will likely be scrutinized. As such,

as the author, I believe my professional background speaks for seriousness of the application.

4.  I am a member of the Bars of, among others, the States of New York and Ohio, the U.S. District Courts for the Southern, Eastern, Northern and Western Districts of New York, the Southern District of Ohio, the District of Columbia and the District of Colorado, the U.S. Courts of Appeals for the First, Second, Third, Sixth, Seventh, Eighth, Ninth and Tenth Circuits and the U.S. Supreme Court.

5.  I received my J.D. degree in 1976 from the Harvard Law School.  From 1976 to 1978, I was law clerk to the Honorable Judge John W. Peck of the U.S. Court of Appeals for the Sixth Circuit.  In 1978, I began the private practice of law as an associate in the Litigation Department of Cravath, Swaine & Moore in New York City working on antitrust, securities, First Amendment and civil rights litigations. In 1984, I moved to Weil Gotshal & Manges in New York City, where I worked on international trade, accounting fraud, First Amendment, RICO, ERISA, breach of contract and commercial litigations.  In 1990, I established my own practice. From 2002 to recently, I was Senior Litigation Counsel at Nesenoff & Miltenberg LLP in New York City where I was engaged in federal court and complex state court practice, specializing in appeals and trials.

6.  I have tried cases in New York state court and in federal court to decision. I have briefed and orally argued cases in the U.S. Courts of Appeals for the First, Second, Seventh, Eighth, Ninth and Tenth Circuits, the New York Court of Appeals, the New York Appellate Divisions for the First and Second Departments,

and the Arizona Supreme Court.  Among others, I briefed and orally argued *Immuno A.G. v. Moor-Jankowski*, 77 N.Y.2d 235, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (Kaye, J.), *cert. denied*, 500 U.S. 954 (1991); *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) (Leval, J.); *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) (Barrett, J.); and *Doe v. MIT*, 46 F.4th 61 (1st Cir. 2022) (Selya, J.).

7.    I am and have been for 14 years a Delegate to Judicial Nominating Conventions for New York's 10th Judicial District.  I am active in Bar Associations, including the New York State Bar Association and the New York City Bar Association.  I am and have been since 2007 a member of the Professional Discipline Committee of the New York State Bar Association, its Secretary since 2015 and its Chair of its Subcommittee on Fitness To Practice; and I am and have been since 2009 a member of the Professional Discipline Committee of the New York City Bar Association.  For the last consecutive twelve years, I have been listed on the Thomson Reuters Super Lawyers list for the New York Metro region.   I was given the Community Service Award by DePauw University in 2008.

8.    As much as Plaintiff's counsel has done his best to get along with Magistrate Judge Kolar and does not relish making this motion, sadly the motion must be made because, in my professional opinion, Magistrate Judge Kolar should recuse himself from pre-trial proceedings and  the trial and another judge step in to be the trial judge, given the history of the case as stated in the mandamus petition that showed Magistrate Judge Kolar kowtowing to Purdue and its implacable public rejection of Justice Barrett's nationally significant opinion. Even before trial, there

are important pre-trial *in limine* and expert testimony motions that are pending that will impact the fairness of the trial, and those rulings as well as trial rulings should not be made by a judge who lacks impartiality.

## The Legal Basis For This Recusal Motion

9.      This motion to recuse Magistrate Judge Joshua Kolar as trial judge is based upon the application of two federal statutes that by their literal texts apply here: 28 U.S.C. § 144 and 28 U.S.C. § 455. 28 U.S.C. § 455(a) provides that "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 144 provides that "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

10.     The goal of section 455(a) is to avoid even the appearance of partiality. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). "A violation of § 455(a)—which requires a judge to disqualify himself in any proceeding in which his impartiality might reasonably be questioned—is established when a reasonable person, knowing the relevant facts, would expect that a judge knew of circumstances creating an appearance of partiality," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 848 (1988).

11.     As for the "extrajudicial source" doctrine, "there is not much doctrine to the doctrine." *Liteky v. United States*, 510 U.S. 540, 554 (1994). Establishing an extrajudicial source of bias "is not a *necessary* condition for 'bias or prejudice' recusal." *Liteky v. United States*, 510 U.S. 540, 554 (1994) (emphasis in the original). This is because "'extrajudicial source' is . . .   not the exclusive [basis for establishing disqualifying bias or prejudice], since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment. (That explains what some courts have called the 'pervasive bias' exception to the 'extrajudicial source' doctrine. See, *e.g., Davis v. Board of School Comm'rs of Mobile County,* 517 F.2d 1044, 1051 (CA5 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).)" *Liteky v. United States,* 510 U.S. at 551 (emphasis in the original). "Recusal is required *whenever* there exists a genuine question concerning a judge's impartiality, and not merely when the question arises from an extrajudicial source." *Liteky v. United States,* 510 U.S. at 551 (emphasis in the original).

12.     Plaintiff is not relying upon the mere fact of adverse rulings but upon the manifestations of "judicial predispositions that go beyond what is normal and acceptable," and show a case of "pervasive bias." *Liteky v. United States,* 510 U.S. at 551.   In particular, Magistrate Judge Kolar's July 2, 2021, August 11, 2022 and February 14, 2023 opinions mishandling the law in a way an impartial judge would

not do, misstating the factual record in a way an impartial judge would not do, and do so all to Purdue's benefit, issuing what were propaganda pieces for Purdue, establishing Magistrate Judge Kolar won't be impartial due to pervasive bias.

### February 13, 2023 Settlement Conference

13.     At the February 13, 2023 settlement conference, when conducting shuttle diplomacy, Magistrate Judge Kolar was insistent in telling Plaintiff and his counsel that things were not likely to go our way at trial. He strongly urged Plaintiff to take Purdue's offer that was unacceptable to Plaintiff because it did not deal with expungement of his disciplinary files, as Justice Barrett had directed be considered, and did not deal with accumulated legal fees under 42 U.S.C.§ 1988.   This behavior was not consistent with the proper mediation efforts of a settlement judge, and is particularly concerning when added to the fact that Magistrate Judge Kolar also *insists* on overseeing the jury trial.

14.     Respectfully, the problems go back to when the case was returned to the District Court by the Seventh Circuit.  Over the course of four years since Justice Barrett sent *Doe v Purdue* back to the District Court, Judge Kolar has issued eight opinions in that time, and in every single one he has adopted Purdue's arguments or eventually adopted them, with the exception of reluctantly,with convoluted reasoning,  dismissing Purdue's legally defective Counterclaim in his reconsideration decision.

### Purdue's Second Motion To Dismiss

15.     On September 17, 2019, less than three months after Judge Barrett's opinion for the Seventh Circuit, reversing Magistrate Judge Cherry's dismissal of the case, Purdue moved to dismiss again, seeking dismissal of Plaintiff John Doe's due

process claim, notwithstanding that Judge Barrett's opinion for the Seventh Circuit had upheld that due process claim, and seeking reduction of the case to a Title IX damages claim. (DE58, 60.) Plaintiff's opposition made clear that Purdue's second motion to dismiss was entirely out of order, suggesting sanctions for Purdue's motion in disregard of the then relatively recent Seventh Circuit's decision. (DE 63.) After the briefing was submitted, out of the blue, Purdue counsel felt comfortable submitting, to Judge Kolar by e-mail, an entire draft opinion that would grant Purdue's motion to dismiss to reduce the case to a Title IX damages case. Plaintiff objected to Purdue's unsolicited submission of an opinion by e-mail. Judge Kolar held a conference reminding the parties of their obligation for filing (DE 67); although Judge Kolar did not adopt the submitted opinion at that time, Purdue's action certainly seems to shed light on Judge Kolar's later opinions. Nine months later, on May 19, 2020, Magistrate Judge Kolar granted in part and denied in part Purdue's motion, trimming a few injunctive requests. (DE84.)

**Propaganda Piece One For Purdue: Irrelevancy Treated As Spoliation**

16.     Purdue engaged aggressively in extensive discovery. Among other things, nineteen depositions were taken, including Navy personnel (establishing that the Navy relied upon the university investigation and the only basis for the disenrollment was the university suspension, DE 183-1), including John Doe's parents (establishing John Doe came from a loving home where he had two brothers and three sisters) and including (by Court Order) John's post-suspension mental health counsellor as to whom the Magistrate Judge Kolar said HIPPA did not apply

(DE143) but whose testimony showed the emotional travail the Plaintiff experienced as a result of the suspension based on false accusations and the consequent loss of his Navy ROTC position (DE187-18). Magistrate Judge Kolar, however, granted Purdue's motion for a protective order and did not allow Plaintiff to depose named Defendant President Daniels. (DE 73.)

17.     Counsel for Plaintiff John Doe took depositions of the principal Purdue personnel (Sermersheim, Rollock, investigators, CARE Director Bloom), focusing on establishing the allegations of the Complaint using the documents relied upon in drafting the Complaint, and a 30(b)(6) deposition to identify the location of disciplinary files.

18.     In response to Purdue's demands, Plaintiff John Doe personally produced all of the documents he had about the events of the case (including 133 pages of text message between Jane Doe and him), gave cell phone information and ten separate medical authorizations, answered three sets of interrogatories and gave a day-long deposition.  In response to Purdue's demand for all of John's post-suspension social media posts, John produced all of his Instagram posts and produced the 75 Snapchat videos and pictures he had. (DE152, DE156; DE175.)  Purdue had the Instagram and Snapchat production at the time of taking John's deposition but never marked any as deposition exhibits and never asked John any questions about them.

19.     In the backdrop of Plaintiff factually building his due process and Title IX case, Purdue moved for sanctions against Plaintiff John Doe, making a plethora of

inaccurate accusations about discovery and seeking (again) the due process claim be struck. (DE 148.) John Doe opposed, showing his compliance with discovery. (DE 152, DE 152-1, DE 152-2.) On February 22, 2021, the Court held a multi-hour evidentiary hearing on Purdue's motion. (DE 155.) John Doe testified under oath how 11 Snapchat documents were accidentally deleted when John cleared memory from his cell phone without realizing deletion from his cell phone would affect his Snapchat account; John Doe also testified under oath that the deleted documents were more of the same of what was produced (DE156; Snapchat Memories received in evidence. (A32-35; DE155). The Snapchat documents and indeed, all his social media were irrelevant, spanning years after the 2016 events at Purdue and relating only to personal matters (e.g., one of John's sisters playing piano). Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001).

20.    On July 2, 2021, Magistrate Judge Kolar ruled there was spoliation, granting relief albeit different than requested because striking the due process claim was said to be disproportionate (but which Purdue sought because the record had established the due process claim). The Magistrate Judge showed a lack of impartiality by strangely ignoring all the discovery Plaintiff John Doe complied with and focused on what little Plaintiff John Doe did not have. The Magistrate Judge acknowledged "there is nothing in the record to indicate whether the files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not

inconceivable" the 11 Snapchat personal posts might be potentially relevant to John Doe's desired Navy career without giving an explanation how it was conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing showed it wasn't (*see* A33-35 in Mandamus Appendix). The Magistrate Judge unjustly lambasted John Doe for the deletion, ordered payment of Purdue's attorney fees (which were claimed to be $30,000 and which would wrongly burden John Doe's effort to vindicate his due process and Title IX rights), and outlined jury instructions regarding what were totally irrelevant documents. (DE168.) However, adverse inference instructions require intentional destruction and relevance. *Crabtree v. Nat'l Steel Corp.,* 261 F.3d at 721; *Keller v. United States,* 58 F.3d 1194 (7th Cir.1995) (collecting cases). Such adverse jury instructions, although erroneously given, would wrongly impact John Doe at trial and further wrongly burden John Doe's effort to vindicate his due process and Title IX rights. At a July 5, 2023 teleconference involving the transfer of responsibilities for Plaintiff's representation, the Magistrate Judge *sua sponte* brought up the spoliation sanction, even though it was irrelevant to to the teleconference and at that point it was clear the spoliation ruling was in error, as it concerned totally irrelevant post-suspension Snapchat memories. The point appeared to be that the Magistrate Judge was quite prepared to do Purdue a favor and order Plaintiff to pay Purdue an amount that wrongly burden John Doe's effort to vindicate his due process and Title IX rights.

### Summary Judgment Briefing

21.     John Doe moved for summary judgment on his due process claim and to dismiss Purdue's state police power counterclaim. DE183 is his memorandum of law, DE191 is his reply memorandum of law, and DE183-1 is Plaintiff's material statement of facts in support of summary judgment on due process. Summary judgment was premised on discovery having conclusively established the facts alleged in the Complaint that Judge Barrett had relied upon in upholding Plaintiff's due process claim and additional facts that made the denials of due process even more egregious.  Purdue moved for summary judgment to dismiss John's due process and Title IX claims.  DE187 is John's opposition memorandum of law, and DE187-2 is John's material facts in opposition to Purdue's motion.  Purdue never used any of John's social media production in the summary judgment briefing. (DE178, DE180.)

### Propaganda Piece Two for Purdue:
### De Facto Rejection of Justice Barrett on Liberty Stigma-Plus Interest

22.     On August 11, 2022, the Magistrate Judge showed a lack of impartiality when denying John Doe's motion for summary judgment on his due process claim on the ground there were issues of fact with respect to the stigma-plus liberty interest whether the stigma was false, even though the Seventh Circuit has never adopted a falsity element for a stigma-plus liberty interest and the record did not support that there were the issues purportedly identified. Purdue's motion for summary judgment dismissing the due process claim was granted, rejecting John Doe's stigma-plus liberty interest, reviving the self-defamation ground that Judge Barrett had rejected and requiring a narrow, unrealistic legal obligation divorced from military realities

to authorize disclosure of the university disciplinary file to the Navy. Struck was Plaintiff's expert report from Dr. R. Chris Barden, who had critiqued and found seriously wanting Purdue's gender biased investigation. Ignored in the August 11 opinion was Plaintiff's motion to dismiss Purdue's legally defective state police power counterclaim that would allow Purdue to put Plaintiff John Doe on trial. (DE206, A168-216.) Judge Kolar's August 11th Opinion gave Purdue what Purdue sought in its 2019 second motion to dismiss, the dismissal of Plaintiff's due process claim.

**The National Importance of Judge (Now Justice) Barrett's Due Process Opinion.**

23. The national importance of the due process rulings of then Judge (now Justice) Barrett in *Doe v. Purdue*, 928 F.3d 652, 661-664, 667 (7th Cir. 2019), cannot be understated, holding: (i) that John had pleaded a stigma-plus liberty interest; (ii) that Purdue's disciplinary process was woefully deficient and did not provide due process, citing among other things not giving John the investigation report and not holding a real hearing ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension"); and (iii) that the District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand").

24. When then Education Secretary DeVos announced on May 6, 2020, what would be the current due process Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue*. "*Secretary DeVos Announces New Title IX Regulation,*" https://www.youtube.com/watch?v=hTb3yfMNGuA; U.S. Department of Education

Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020; 34 C.F.R. 106.45.   Secretary DeVos noted that it was a three-woman panel with then Circuit Judge Amy Coney Barrett as the author of the opinion. *"Secretary DeVos Announces New Title IX Regulation"* https://www.youtube.com/*watch*?v=*hTb*3yfMNGuA.

25.     When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention.  Defending Judge Barrett's opinion in the Wall Street Journal was K.C. Johnson, "Sex, Due Process and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020.   Purdue responded with its defiant defense, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020.  Judge Barrett's opinion has been a thorn in Purdue's side, and Purdue does not want to live in accordance with it.

26.     The Magistrate Judge misstates John's argument as meaning the national importance of the *Doe v. Purdue* due process ruling by itself compels denial of summary judgment.   (DE224, p. 10.)  That is not Plaintiff's argument.  It is that the Magistrate Judge's August 11 Opinion did not consider Purdue's due process violations and expungement of the disciplinary file as contemplated in Judge Barrett's opinion, but rather with insubordinate pettifoggery dismissed the due process claim (DE206, pp.16-18, DE224, pp. 2-4), by adopting Purdue's self-defamation argument expressly rejected by Judge Barrett, marginalizing chain of command military realities and effecting an absurd result wholly inconsistent with Judge Barrett's opinion.

**Judge Barrett's Rejection of Self-Defamation for the Court.**

27.     Before the Seventh Circuit in 2019, Purdue had argued that John had engaged in self-defamation by authorizing the release of the university disciplinary files to the Navy.  That argument then was premised on the NROTC only learning of John's disciplinary case because of John's authorization of disclosure to the Navy ROTC.   Judge Barrett stated in her opinion Purdue's position: "The university maintains that it has not and will not divulge John's disciplinary record without his permission.  The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began."  928 F.3d at 661.  Purdue cited *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997), where a voluntary disclosure was the reason for an employment discharge in a situation that the Seventh Circuit considered it speculative whether the disclosure would ever be called for.   Judge Barrett, however, rejected Purdue's argument (928 F.3d at 652):

> John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510.

(928 F.3d at 662.)

28.     The discovery record made Purdue's argument and Magistrate Judge Kolar's ruling about self-defamation wholly untenable.  Indisputably: (i) the NROTC knew about the disciplinary proceeding well before the May 24, 2016 authorization

because on April 4, 2016, Jane Doe first went to the NROTC to make her accusations; (ii) Purdue first learned of Jane Doe's accusations from the NROTC; and (iii) the NROTC was looking to the Purdue investigation from the start.

**The Navy Knew About The Disciplinary Proceeding Before Authorization and Was Looking To Purdue's Investigation.**

29.     On April 4, 2016, Jane Doe falsely told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John Doe, and Lieutenant Sheppard informed his superior officers Commander Hutton and Executive Officer Remaly about Jane Doe's allegations.   (DE183-34: Shepard tr 21-25, 28-30; DE183-43:  Sheppard Ex 2; DE187: Sheppard tr 42-43.)  Also on April 4, 2021, Commander Hutton reported Jane Doe's sexual misconduct allegations to Purdue's Office of the Dean of Students, reflecting the interrelationship of Purdue and the Purdue Navy ROTC.  (DE 187-6: Dfs. SJ Ex. K.)  When asked by Purdue counsel about the "investigation" of the sexual misconduct allegations against John, NROTC Commander Hutton responded that "that investigation was referred to Purdue University." (DE 183-35: Hutton tr. 14.)  On April 4, 2021, Purdue's Dean of Students Sermersheim advised Purdue's CARE Director Bloom of Jane Doe's allegations.  (DE 187-6: Dfs. SJ Ex. K).)

30.     On April 5, 2021, Commander Hutton sent a letter to John informing him that John was being placed on "an Interim Leave of Absence (ILOA) *due to your pending university investigation*" and that "[f]urther administrative action, potentially to include Performance Review Board (PRB), will be taken *on completion of the university investigation.*"  (DE 187-7; italics added.)  The April 5, 2016 letter

further stated that John was prohibited from participating in ROTC activities, but would remain enrolled in NROTC.  (DE 187-7.)

31.     The authorization to the NROTC for access to the Purdue disciplinary files was dated May 24, 2016, well after the NROTC learned of the disciplinary proceeding.  (DE183-5, John tr. 23; DE183-44.)  John Doe testified at his deposition that the Navy wanted "in the loop" (DE183-5, tr 21-22), and when John Doe was deposed by Purdue about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the NROTC, not self-defamation (which was never raised).  (DE208-1, DE208-2, tr 22-26.)

32.     The significance was explained by John Doe: "With Jane Roe having reported her accusation to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, I really was in no position to refuse the authorization." (DE208-1 ¶ 7.)  According to John: "Soon after Jane Roe complained to the Navy, I was put on interim leave of absence pending the university investigation.  If I had refused authorization, I would not only have looked bad, but I also would have been sanctioned in some way." (DE208-1 ¶¶ 3, 5.)  John thus had no choice but to authorize the Navy to be "in the loop" in the university disciplinary proceeding; it was not voluntary. John's case is "more like *DuPuy v. Samuels*." 928 F.3d at 662.  Purdue's authorization argument made no sense given the actual facts.

**The Magistrate Judge's Narrow Legal Obligation**
**Ruling Is At Odds With Judge Barrett's Opinion**
**And Is Divorced From Military Realities.**

33.    John's situation as a NROTC midshipman who was not in a position to refuse the authorization to the Navy is totally inapposite to the situation of a voluntary disclosure of a disciplinary record for a school transfer, as in *Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021), and to the situation of a voluntary disclosure of the reason for an employment discharge in *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997). Here, the obligation to disclose was not, as wrongly asserted by the Magistrate Judge, speculative. Rationalizing away the distinction between civilian and military life in this context amounts to willful blindness, which resulted in the Magistrate Judge incorrectly treating John's authorization as voluntary and John's testimony the Navy "wanted in the loop" as not a legal obligation to authorize.  (DE221, p. 16; DE224, pp. 2-4.)

34.    Dismissing military realities as speculation, as the Magistrate Judge does, is erroneous at best.  The December 19 reconsideration hearing exchanges lay bare the unreasonableness of the Magistrate Judge's opinion:

[**MR. BYLER**]: . . .  The authorization was requested because the Navy – and this is the testimony – "wanted in the loop."  And that meant they wanted in the loop of the investigation. And they were put into the loop.

And John Doe was not in a position to say no.  As ROTC midshipmen, respecting his Navy superiors, wanting a career in the Navy, you have a request; knowing that the Navy wants to be in the loop.  You don't say no.

The suggestion that maybe he says no is just ridiculous.  I have combat officer sons, who, when asked this, of course you give the authorization. . . .

**THE COURT**: But I see nothing.  I don't see your client saying, "I was given order."

I don't see any deposition . . . .

[**MR. BYLER**]: Well, excuse me. At his deposition, all he was asked about the authorization was to identify it.  The deposition then went off, "Well, could you have gotten the investigation report from the Navy." . . .

[Plaintiff] was on scholarship.  He had to honor his commitments and obligations. . .  And that meant, when he gets a request for this kind of authorization, that kind of access, when the Navy knows and it's going to be relying on the [Purdue] investigation, yes, he has to give it.  He was in no position not to give it. . . .

The decision that Commander Hutton testified to was: We're going to rely on the Purdue investigation. . . .

And it was in that context in which John Doe knows that they're wanting to be in the loop because the investigation that's ongoing, he's requested by a superior officer for that access.

. . . .

**THE COURT**]: I don't understand where in the record it has been shown that, if he had respectfully responded to his superior officer, "Sir," "ma'am," "Is this something I need to sign, or am I allowed to have the Navy determine whether I did anything wrong in their PRB,"

**MR. BYLER**: No.  You don't put a burden on a midshipman or an Army ROTC guy to press the point in order to have a situation which there is a liberty stigma-plus interest.  That's wholly – I'm sorry – misconceived.

If you're in the position where you have obligations of Navy midshipman – okay?  You're a scholarship student.  You have to honor your obligations.  You've been asked, "Give us access."  You know they want in the loop.  And you're going to say no?

  And what I'm saying is, the suggestion that, well, he should have said no and maybe he could respectfully, I think is nonsense. . . .

. . . You're going to be in conflict with Judge Martin's decision if you go down that road, and I don't think that makes sense.  You're not making sense in

terms of military reality.  When there's a request from a superior officer in these circumstances, you comply.

And certainly there's no question, if he had said no, he would have been subject to lawful order.  But it doesn't have to be pushed to that; it shouldn't have to be pushed to that.

(DE 221, tr.5-22.)  Given these exchanges, it is more than strange that the Magistrate Judge faults John Doe's counsel for not asking at John Doe's deposition about the authorization (DE224, p. 3) when the point was that Purdue's counsel didn't ask in a deposition taken by Purdue. Magistrate Judge Kolar's reference to a PRB as somehow providing a mechanism for a midshipman to dispute a superior officer's demand for access to a university investigation file (DE224, p. 9, A314) disregards that a PRB is for determining sanctioning for improper conduct and that Commander Hutton made it clear the Navy was relying upon the Purdue investigation.  What John Doe might have preferred was immaterial.

35.     Magistrate Judge Kolar essentially adopted Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to compel executing the authorization (DE221, p. 12). That, however, leads to the absurd result that a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD has no due process rights. Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.

## Discovery Strengthened The Denial of Due Process Case

36.     Based on the allegations of the Complaint, Judge Barrett wrote strongly about the denial of due process in this case: "Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension." 928 F.3d 663-664. Discovery strengthened John's case that he was denied due process.  The depositions of Purdue employees with the documents that formed the basis of the allegations of the Complaint not only substantiated the allegations, but showed a process more flawed than what was alleged in the Complaint.  Purdue never provided John Doe with the evidence and the investigation report during the disciplinary case, there was no real hearing, and there was pre-judgment based upon treatment of Jane Doe's accusations.  Expungement of the disciplinary file was and is the proper remedy.  (DE183-1 through 183-41; DE 183, pp. 6-33, 39-46.) The District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand"), but Magistrate Judge Kolar refuses to do so, knowing how opposed Purdue is to expungement.

37.     Due process matters so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts."  *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). The Magistrate Judge, however, rationalized the jarring result of adopting Purdue's position that "whether Purdue complied with due process is immaterial" by also adopting what are Purdue's gross misstatements of the record. It reflects the lack of impartiality on the part of the Magistrate Judge.

### The Non-Existent Alleged Triable Issues for Stigma Plus

38.     As discussed, the Magistrate Judge's ruling on stigma-plus liberty interest was legally and factually erroneous, divorced from military chain of command realities in order to avoid the grant of summary judgment on Plaintiff John's due process claim.   In addition, Magistrate Judge Kolar's proof of falsity requirement to establish a stigma plus liberty interest, which the Seventh Circuit has never adopted, was fundamentally flawed: the August 14, 2022 opinion gave a purported review of triable issues that did not reflect the factual record but that did reflect a lack of impartiality and that contributed significantly to the August 11 Opinion being a propaganda piece for Purdue.

**Cover Up of Jane Doe Never Testifying**
**Versus John Doe Repeatedly Testifying.**

39.     Magistrate Judge Kolar, in a partisan slip, repeated what were the allegations of Jane Doe when in fact she never testified.  Summary judgment is not a time when allegations suffice. Proof is needed. Jane's allegations were not and are not proof.  *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (evidentiary facts are required to defeat summary judgment).

40.     In contrast, John Doe has repeatedly put himself under oath to testify that Jane's accusations are false.  In the summary judgment record is John Doe's statement under oath saying:

> All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false.  I have maintained that all her claims were false from my initial statements in

the Purdue disciplinary process at the start, all the way through to the
appeals. I said so orally to Dean Sermersheim in June 2016.  I said so
in my oral statements to Navy ROTC personnel, and I said so in my
written statement in August 2016 to Navy ROTC at the time of my
disenrollment (which was based solely upon my university suspension),
and I have continued to maintain this truth for the past four and a half
years of this legal case.

(ECF 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶ 30).)  John Doe did again on

reconsideration.  (DE208-1, Motion Ex. A: John Doe 08/2/22 Declaration ¶ 10.)

**John-Jane Doe Texts.**

41.  Magistrate Judge Kolar showed a lack of impartiality when referring to

what were 133 pages of John Doe-Jane Doe texts in accordance with Purdue's

jaundiced misreading as admissions of guilt (which they weren't) based on Purdue's

misleading excerpting without discussing John Doe's testimony on the texts that he

alone had provided.

42.  Magistrate Judge Kolar quotes passages of John Doe-Jane Doe texts as

if they were admissions of guilt. They weren't; and there was no evidence before Judge

Kolar to treat them as evidence of guilt.  That Magistrate Judge Kolar does so, shows

a lack of impartiality. In depositions, Purdue's Dean Sermersheim, Purdue's

investigator Amberger and Purdue's investigator Oliver each admitted that there is

no statement in the texts in which John admitted or Jane Doe accused John of

committing the sexual acts alleged in the Notice of Allegations. (DE183-7:

Semersheim tr 34; DE183-14: Amberger tr 70-72; DE187-9: Oliver tr. 50-

57).)  Notably, before the alleged incidents, John and Jane Doe had a three-month

relationship in which John and Jane Doe had a sexual relationship initiated by Jane,

the first such relationship in John Doe's life after being brought up in an Evangelical Christian home where he was taught sex was for marriage. (DE183-8: John 02/18/2021 Affidavit ¶¶ 4-5; DE 208-1: Ex. A, John tr 92-93.) John Doe has put himself under oath as to the correct understanding of the texts (where the surrounding context makes them all clear, yet Purdue hid when cherry-picking them); Jane Doe never did. (DE208-1: John 08/2022 Declaration ¶ 11.)

43.      To the investigators, John provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John and his family Christmas cookies after the supposed sexual assault occurred and after Jane Doe initially claimed the relationship had ended.  Jane Doe provided *no* texts to the investigators, telling them she had deleted the texts.   (DE183-3: Df. Answer ¶ 36; DE183-14: Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; DE183-11: Amberger 27, Texts (PU 206-339)); DE183-7: Semersheim tr. 34; DE 183-5: John Dep. tr. 111-114.)

44.      Yet, the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship after Jane Doe's claims), and Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators.  (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.)   The investigation report

twisted the texts and contained many other inaccuracies including the fabrication that John Doe confessed to the allegations. Knowing this, it is no wonder they refused to let John Doe view the investigation report and defend himself while at Purdue, something other schools typically provide, but not Purdue. (DE183-8: John 02/18/2021 Affidavit ¶ 15; DE187, pp. 44-47.)

**The Investigation Report.**

45.     There is no good impartial reason for Magistrate Judge Kolar to ignore that: (i) Plaintiff John was not provided an opportunity to review the investigation report during the disciplinary case, (ii) the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship after Jane Doe's claims), and (iii) Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators. (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.) Only a partisanship for Purdue explains why Magistrate Judge Kolar also ignored that the investigation report had twisted the texts and contained many other inaccuracies pointed out by Plaintiff. (DE183-8: John 02/18/2021 Affidavit ¶ 15; DE187, pp. 44-47.)

**The Letter Sent On Behalf Of Jane Doe To The Committee.**

46.     On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim; instead, on June 5, 2016,

Monica Bloom, Director of CARE and a lawyer, submitted a written statement said to come from Jane Doe, which was in the form of an e-mail. Bloom was asked in her deposition how, if Jane Doe did not have access to a computer, she e-mailed the statement to Bloom. Bloom said she (Bloom) did not recall (DE183-9, Bloom Dep tr 29-30; 183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement (PU653-654)). The Magistrate Judge does not deal with this testimony, but rather incorrectly states it was undisputed the e-mail came from Jane Doe, the point was very much in dispute, and further, the Magistrate Judge also does not address the fact that the three-person panel of the Advisory Committee on Equity and Dean Sermersheim, never met and never heard any direct testimony from Jane Doe and did not have the opportunity to ask any questions of Jane Doe.  (DE183-3: Df. Answer ¶ 41; DE183-9: Bloom tr 28-32; DE183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement.)

## Propaganda Piece Three for Purdue: The Reconsideration Decision: Ignoring the Navy ROD

47.    On February 14, 2023, Magistrate Judge Kolar yet again showed a lack of impartiality in his reconsideration decision, another propaganda piece for Purdue. Magistrate Judge Kolar adhered to dismissing the due process claim, ruling that John Doe failed on summary judgment to show a legally obligated disclosure, that John Doe's position he was in no position to refuse authorization was insufficient even though the Navy ROD clearly substantiated that John could not properly refuse authorization.  (DE208-3.)

48.    The Navy ROD (which was not available at the time of the Navy depositions) clearly substantiates that John could not properly refuse authorization.

(DE208-3.)  The Magistrate Judge showed a lack of impartiality in not addressing Plaintiff's full presentation of the Navy ROD that established the stigma-plus liberty interest.

## Navy Regulations Compelling Giving Authorization

40.    Authorization to disclose the Purdue disciplinary files was expected under the governing Navy regulations at the time as a matter of "Honor" stated in the Navy ROD. Honesty and respect to his superior officers called upon John to provide the authorization. The Honor Code in the Navy ROD (DE208-3) at section 1-3 (pp. 1-3) provides that "Military systems, which often operate under extreme duress, are built on a foundation of absolute trust and fidelity", that NROTC must instill honor upon future officers during accession training and ensure that honor is carried into fleet service", that "[t]hroughout its history, the Naval Service has successfully operated through reliance on certain values held by its personnel", that "Honor is a keen sense of ethical conduct, honesty, integrity, and responsibility", that "Honor includes honesty, at all times no matter the outcome", and that "[i]t is respect to both juniors and seniors."  The Magistrate Judge's belittling of the significance of the Honor Code is quite ill-considered.

41.    Authorization to disclose the Purdue disciplinary files was also expected under the governing Navy regulations at the time as a matter of not showing a "disregard or contempt for authority" and not showing a "lack of a sense of responsibility" that would constitute a "major offense" per the Navy ROD (DE208-3), at section 3-19.2.a.(11) (pp. 3-40).   The NROTC knew there was a Purdue

investigation of Jane Doe's accusations of sexual assault and wanted "in the loop" (DE183: SJM 5, tr 22).  It was John's responsibility that the NROTC be included in the loop.  The Magistrate Judge's failure to address this point is unjustifiable.

**Sanction Upon Refusing Authorization**

42.    Had John refused to provide the authorization, there would have been an order to provide the authorization.  Also, when a midshipmen student is put on interim leave of absence, which John was by Commander Hutton's order of April 5, 2016, the Navy ROD (DE208-3 at section 6-7.3, pp. 6-11 – 6-12) requires a Performance Review Board ("PRB") "as soon as possible."  Because John provided the authorization, a PRB was not held, and when one was held after completion of the university disciplinary case, the PRB only concerned the university suspension.  Had John shown a "disregard or contempt for authority," a "lack of a sense of responsibility," and a lack of "honor" by refusing authorization, an additional PRB would have been ordered. The interim leave of absence would have been converted into a disciplinary leave of absence per the Navy ROD at section 6-7.3, pp. 6-12.  The Magistrate Judge's failure to address this point was unjustifiable.

**Required Disclosure Upon Re-Application**

43.    If John were to re-apply to the NROTC, he would have to disclose the disciplinary finding.  Commanding Officer Hutton identified the ROTC Appointment Termination and Disenrollment Authorization and testified the only reason for the ROTC disenrollment was the university suspension. (DE183-35: Hutton Dep tr 56, 66-67; DE 183-36: Hutton H, ROTC Appointment Termination and Disenrollment

Authorization.) The August 10, 2016 PRB document showed the Board's finding was that John was suspended by Purdue and the recommendation was disenrollment of John. (DE183-36: Aug. 10, 2016 Performance Review Board, p. 2.)

44.    The PRB document is made part of the student's file per the Navy ROD (DE208-3, section 6-13.5, pp. 6-20) and because it involved disenrollment is sent to Naval Operations per the Navy ROD section 6-13.6, p. 6-20.    Disciplinary disenrollment documents are part of his "permanent federal record" per Navy ROD (DE 208-3) section 6-16 (pp. 6-26 – 6-27):

> c. Disciplinary disenrollments become a matter of permanent federal record and may prejudice the individual for future military or civil employment. Disciplinary disenrollments may be disqualifying for future federal security clearances that are often necessary for positions in private industry. Disciplinary disenrollments may be prejudicial to their interests should they ever apply for a commission in the Armed Forces. . . .

45.    Should John re-apply to the NROTC or to any commission in the U.S. Armed Forces, he would be honor-bound to disclose the disciplinary disenrollment that is part of permanent federal record and if he did not and it were inevitably discovered in a mandatory background check, termination would be expected. (DE208-1 ¶ 9.) The permanent federal record exists only as a result of the university disciplinary case (DE209, pp. 8-9); the Navy did not conduct its own investigation but relied 100% on the university disciplinary suspension. (DE187-2, pp. 23-27 and record citations therein.) The Magistrate Judge's failure to address this point is more than strange, it was a partisan slip.

## The Absurd, Erroneous Result Showing A Lack of Impartiality

46.     The Navy ROD compelled giving authorization, would make John subject to sanction upon refusing authorization, and required disclosure upon re-application due to a permanent federal record – which even the Magistrate Judge's August 11 opinion indicated would make summary judgment inappropriate (DE206, pp. 16-17) but which the Magistrate Judge avoided on reconsideration, so much lacking in impartiality Magistrate Judge Kolar had become.  Instead, the Magistrate Judge essentially adopted Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to compel executing the authorization (DE221, p. 12).   That, however, leads to the absurd, erroneous result that a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD has no due process rights. Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's effective adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.

## False Basis For Rejecting Reconsideration.

47.     Reconsideration here was sought based upon the texts of Rule 54(b) and 60(b) of the Federal Rules of Civil Procedure, *see* A. Scalia, *Reading Law: The Interpretation of Legal Texts* p. 56 (West Pub. 2012), and *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191-1192 (7th Cir. 1990), where it is stated:

A motion for reconsideration performs a valuable function where:

the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. . . .

Justice Cardozo also recognized the utility of the motion to reconsider to the misunderstood litigant:

. . . A grievous wrong may be committed by some misapprehension or inadvertence by the judge for which there would be no redress, if this power did not exist.

48.     The Magistrate Judge's mistreatment of the stigma-plus liberty interest was particularly untenable given the Navy ROD.   The Magistrate Judge, in order to rely on inapposite case law more restrictive of reconsideration, treats authorization as a central issue in the summary judgment briefing.  (DE224, 4-5.) It was not – far from it.  The authorization was drowned in hundreds of pages of briefs on other issues and statements of material facts (*see* ¶ 21, p. 12 above), the reconsideration evidence was to provide an elaboration of what was originally submitted, and an entirely new argument was not raised.

**Ignoring Contrary Northern District of Indiana Precedent**

49.     Magistrate Judge Kolar strangely did what an impartial judge would not do: omit addressing the point for reconsideration that two Northern District of Indiana precedents are contrary to his ruling and that, in particular, Attorney Kealey, who has been counsel for the Purdue in this case and in *Mary Doe and Nancy Roe v. Purdue*, 4:18-CV-89-JEM (N.D. Ind. Jan. 13, 2022), did not advise the Magistrate Judge of Judge Martin's January 13, 2022 ruling (after the summary

judgment briefing) upholding and sending to trial those plaintiffs' due process claim.

(DE214-1, DE72 in 4:18-CV-89-JEM.)  Judge Martin wrote:

> Roe asserts that she will be obligated to self-report this sanction to other institutions of higher education, including law schools, and by implication, bar admission authorities, meaning her stigma of a sanction will continue to be disseminated.
>
> As in *Doe v. Purdue Univ.*, supra, in which the plaintiff was required to authorize Purdue to release information about a sanction to his ROTC program and the Court of Appeals found that even with his permission to disclose, the disclosure satisfied the stigma-plus standard, the disclosure of Roe's sanction may impact her future education and employment opportunities. . . . Roe has asserted that the decision by Purdue, which she asserts was based on a flawed process, has resulted in a loss of future educational and employment opportunities, and a factfinder could agree.

(DE241-1, DE72 in 4:18-CV-89-JEM: Slip Op. at 20-21.)  In that case, Roe felt an obligation to self-report; this case is even stronger, as John Doe here had an obligation because he was in no position to not give authorization. A second Northern District of Indiana case also found stigma-plus liberty interest. *Doe v. Purdue*, 464 F. Supp.3d 989, 1001-1003 (N.D. Ind. 2020) (Springmann, J.).

50.    Magistrate Judge Kolar did finally dismiss Purdue's Amended Counterclaim, albeit reluctantly, but Magistrate Judge Kolar refused to certify for appeal the due process ruling, a step that was appropriate here because of the importance of due process in this case and the national importance of Justice Barrett's opinion in this case.  (DE224.)  The petition for mandamus was then promptly brought.

## Settlement Conference Remarks

51.     As noted above, at a February 13, 2023 settlement conference, when conducting shuttle diplomacy, Magistrate Judge Kolar was insistent in telling Plaintiff and his counsel that things would not go our way were we to continue on to trial. His attitude was not consistent with the mediation efforts of a settlement judge. He seemed rather determined in seeing Plaintiff take any sort of deal regardless of fairness, this coming from the judge that has behaved noticeably one-sided for 4 years now. Given the fact that Magistrate Judge Kolar appears insistent and persistent to oversee our trial, Plaintiff and his counsel have found this more than concerning.

52.     Frankly, Plaintiff and I have found it rather strange that despite how obviously at odds we are with Magistrate Judge Kolar and the facts that he was subject to a mandamus petition and already oversaw a settlement conference, he is still insistent on pushing forward with overseeing our jury trial. Given the presence of our mandamus petition alone, he should have already recused himself from the trial. The fact that Magistrate Judge Kolar has NOT addressed the matter of his impartiality given the mandamus petition makes us all the more concerned.

## Conclusion

32.     For the reasons discussed above, "a reasonable person, knowing the relevant facts, would expect that a judge kn[ows] of circumstances creating an appearance of partiality," *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. at 848 – this is a case of pervasive bias, *Liteky v. United States,* 510 U.S. at 551, and therefore, Magistrate Judge Kolar should recuse himself from the pretrial proceedings and from being the trial judge in this case.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 9th day of July, 2023.

_____ *Philip A. Byler* _____

**Philip A. Byler**