## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | **)** | |
| | **)** | **CIVIL ACTION** |
| Plaintiff, | **)** | |
| v. | **)** | |
| | **)** | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | **)** | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | **)** | |
| **DANIELS, JR.**, in his official capacity as President of | **)** | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | **)** | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, | **)** | |
| **KATHERINE SERMERSHEIM**, in her official | **)** | |
| capacity at Purdue University, | **)** | |
| | **)** | |
| Defendants. | **)** | |

## NOTICE OF APPEAL TO THE U.S. COURT
## OF APPEALS FOR THE SEVENTH CIRCUIT

Notice is hereby given that Plaintiff John Doe hereby appeals to the United States Court of Appeals for the Seventh Circuit from the August 14, 2023, Magistrate Judge's Opinion and Order (DE 261) denying the Plaintiff John Doe's Motion to recuse Magistrate Judge Joshua Kolar for bias (Dkts 257, 260). This is an appeal from "a final decision" denying recusal due to bias "which is separate from the merits and unreviewable on appeal." *Powers v. Chicago Transit Auth.*, 846 F.2d 1139, 1141 (7th Cir. 1988) (Easterbrook, J.). Bias of a trial judge is too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. *United States v. Henderson,* 915 F.3d 1127, 1130 (7th Cir. 2019) (Sykes, C.J.).

This appeal relies upon the guidance of such Seventh Circuit precedents in *United States v. Henderson*, 915 F.3d 1127, 1130–1132 (7th Cir. 2019)(Sykes, C.J.); *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 868–869 (7th Cir. 2013) (Sykes, .C.J.); *Ott v. City of Milwaukee*, 682 F.3d 552, 554–555 (7th Cir. 2012) (Wood, J.); *United States v. J.J.K.*, 76 F.3d 870, 872 (7th Cir. 1996) (Posner, J.); *Powers v. Chicago Transit Auth.*, 846 F.2d 1139 (7th Cir. 1988) (Easterbrook, J.); and *R.R. Donnelley & Sons Co. v. F.T.C.*, 931 F.2d 430 (7th Cir. 1991) (Easterbrook, J.).

*United States v. Henderson,* 915 F.3d 1127, 1130–1132, recognized the immediate appealability of what was called a collateral order fixing security in *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949), as such orders "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. . . .To qualify for immediate review under this exception, an order 'must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.'" *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978). Here, the denial of recusal due to bias conclusively determines the disputed question, resolves (incorrectly) a critically important issue completely separate from the merits of the action, and is effectively unreviewable on appeal from a final judgment.

*JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 868–869 (7th Cir. 2013), recognizes, as does this appeal, that "Collateral-order review is based

on a practical construction of 28 U.S.C. § 1291; it is not an exception to the final-judgment rule." *Ott v. City of Milwaukee,* 682 F.3d 552, 554 (7th Cir.2012) (internal quotation marks omitted). *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.,* 707 F.3d at 868–869, also recognizes, as does this appeal, that we "'do not engage in an 'individualized jurisdictional inquiry.'," *Mohawk Indus., Inc. v. Carpenter,* 558 U.S. 100 (2009); *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 473 (1978)). The focus is on "'the entire category to which a claim belongs,' " (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.,* 511 U.S. 863, 868 (1994)) and whether "the class of claims, taken as a whole, can be adequately vindicated by other means," 707 F.3d at 868–869.

Such review was recognized, for example, in *United States v. Henderson,* 915 F.3d at 1131, for a category including (1) an order denying bail, *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951); (2) an order denying dismissal based on double jeopardy, *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); (3) an order denying dismissal under the Speech or Debate Clause, *Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979); and (4) an order for the administration of psychotropic medication to render a defendant competent for trial, *Sell v. United States*, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Such review was also recognized by the U.S. Supreme Court in *Mitchell v. Forsyth,* 472 U.S. 511 (1985), for the denial of summary judgment based on qualified immunity, but not by the Seventh Circuit in *Gosnell v. City of Troy, Ill.*, 979 F.2d 1257, 1260–61 (7th Cir. 1992), *as amended* (Nov. 17, 1992)

Such review has been denied: in *United States v. Henderson,* 915 F.3d at 1132, for an order of shackling; in *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d 853, 868–69 (7th Cir. 2013), for an order staying enforcement of asset discovery for an order staying enforcement of the asset discovery and for an order denying a motion to quash a nonparty subpoena for pretrial discovery; in *Ott v. City of Milwaukee*, 682 F.3d 552, 554–555 (7th Cir. 2012), for an order violating the attorney-client privilege; in *Powers v. Chicago Transit Auth.*, 846 F.2d 1139, for an order holding a person in civil contempt for failure to supply information in discovery; in *Judd v. First Federal Savings*, 599 F.2d 820 (7th Cir. 1979), for denial of permission to use mortgage company's computer-generated list of its mortgagors for class notification purposes; in *Judd v. First Fed. Sav. & Loan Ass'n of Indianapolis*, 599 F.2d 820, 822 (7th Cir. 1979), for an order decertifying a class; in *R.R. Donnelley & Sons Co. v. F.T.C.*, 931 F.2d 430 (7th Cir. 1991), for the denial of a motion for summary judgment and for the grant of discovery.

The denial of recusal due to bias does not fit in a category of claim for which the review has been denied per *Powers v. Chicago Transit Auth* and *United States v. Henderson*, and as stated above, the denial of recusal due to bias does satisfy the requirements of *Powers v. Chicago Transit Auth* and *United States v. Henderson*.

Magistrate Judge Kolar's opinion denying recusal for bias [DE 261] is a final order" within the meaning of *Powers v. Chicago Transit Auth.*, 846 F.2d 1139, 1141 (7th Cir. 1988) (Easterbrook, J.). that is too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. *United*

*States v. Henderson,* 915 F.3d 1127, 1130 (7th Cir. 2019) (Sykes, C.J.). Magistrate Judge Kolar's opinion denying recusal for bias [DE 261] avoids the actual reasons establishing the pervasive bias in this case presented and certified in the Declaration of Philip A. Byler [DE 257-1], and instead gives rationalizations and inapposite propositions to justify his functioning as a biased trial judge in an important case.

## I.    Magistrate Judge Kolar's Avoidance of Discussing the Specifics of His Opinions.

Magistrate Judge Kolar acknowledges that the Byler Declaration relies on (i) "[r]ecusal [being] required *whenever* there exists a genuine question concerning a judge's impartiality" *Liteky v. United States,* 510 U.S. 540, 551 (1994) (emphasis in the original) [DE 257-1, p. 7], (ii) the "pervasive bias" theory recognized by *Liteky v. United States,* 510 U.S. at 551 [DE 257-1, p. 7], and (iii) the Byler Declaration's primary focus on three opinions that are presented as key points establishing evidence of bias -- the July 2, 2021 spoliation opinion; the August 22, 2022 summary judgment opinion; and the February 14, 2023 reconsideration opinion [DE 257-1, pp. 8-31]. [DE 261, p. 8.] The details that Magistrate Judge Kolar has chosen to omit, alter and ignore in each and every opinion have consistently influenced his final decisions against Plaintiff John Doe, and the same CANNOT be said for his treatment of Purdue.

Magistrate Judge Kolar says he won't relitigate these opinions here (but in reality not at all) and further says, in a conclusory way, all that is involved is Plaintiff's "disagreement" with those opinions which he asserts is for appeal after trial [DE 261, p. 8]. That statement assumes a conclusion the Byler Declaration does

not allow unless the Byler Declaration's details establishing evidence of bias are effectively ignored which, consistent in his bias against Plaintiff John, Magistrate Judge Kolar does ignore.  No mere "disagreements" are involved here.  The Byler Declaration states [DE 257-1, pp. 6-7]:

> Plaintiff is not relying upon the mere fact of adverse rulings but upon the manifestations of "judicial predispositions that go beyond what is normal and acceptable," and show a case of "pervasive bias." *Liteky v. United States,* 510 U.S. at 551.  In particular, Magistrate Judge Kolar's July 2, 2021, August 11, 2022 and February 14, 2023 opinions mishandled the law in a way an impartial judge would not do, misstate the factual record in a way an impartial judge would not do, and do so all to Purdue's benefit, establishing Magistrate Judge Kolar won't be impartial due to pervasive bias.

Magistrate Judge Kolar relegates attacks on the Byler Declaration and defends his rulings mostly within a series of footnotes, while in the text of his opinion rationalizes why he does not need to address the specifics in the Byler Declaration which overwhelmingly establish lack of impartiality and bias.

## II.   Inadequately Documented Consent and Bias.

Magistrate Judge Kolar's opinion refusing recusal assumes he has consent pursuant to 28 U.S.C. § 636.  [DE 261, p. 1.] The Docket Entries regarding consent, however, do not conclusively establish that consent was properly obtained. The first Docket Entry regarding consent states Magistrate Judge Kolar is assigned to the case, but the Docket Entry has no number and says the assignment is pursuant to a General Order.  The following Docket Entry 40, dated July 24, 2019, records an Order of Magistrate Judge Kolar that if the parties do not intend to object to the continued exercise of jurisdiction of Magistrate Judge Kolar, to notify Magistrate Judge Kolar.

[DE 40.]  Docket Entry 41, dated August 1, 2019, then records the assignment of the case to Magistrate Judge Kolar upon the consent of the parties.  [DE 41.]  The Docket Entries, however, do not record the filing of signed consents of the parties required by 28 U.S.C. § 636 for Magistrate Judge Kolar to be the judge for all purposes, including for trial.  There was no indication of bias then in July 2019 on the part of Magistrate Judge Kolar, who had seemingly good credentials, or what would follow in subsequent years that now form the basis of Plaintiff's pervasive bias motion. Despite his coverage of litigation, discovery, settlement conference, and partial pre-trial, Magistrate Judge Kolar absolutely insists on also handling the rest of pre-trial and trial. The obvious question to ask here is: why is Magistrate Judge Kolar so keen on handling this case all the way through trial?

### III.   Footnote Attacks and Defenses
####       Of Opinions; Text Rationalizations.

Magistrate Judge Kolar in a footnote asserts he will disregard Plaintiff's "inflammatory accusations" that Magistrate Judge Kolar says are without factual content [DE 261, p. 3 n. 4] Given his position here, Magistrate Judge Kolar may call them inflammatory, but to claim they are without factual content is far from the truth. We stand by our statements, which are directly stated factual assessments of Magistrate Judge Kolar's conduct that are supported by the detailed factual content of the 33-page Byler Declaration and that objectively establish Magistrate Judge Kolar's lack of impartiality and bias  [DE 257-1].  What Magistrate Judge Kolar complains about are the statements in the Byler Declaration (i) that Magistrate Judge Kolar "has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to

vindicate his due process and Title IX rights and to undermine and eviscerate [current U.S. Supreme Court] Justice Barrett's opinion in this case" (DE 257-1 p. 2); (ii) that the history of the case shows Magistrate Judge Kolar "kowtowing to Purdue and its implacable public rejection of Justice Barrett's nationally significant opinion" (DE 257-1 p. 4); and (iii) that Magistrate Judge Kolar's rulings are "propaganda pieces for Purdue" (DE 257-1 p. 7). Direct language, yes; but true, as shown in the Byler Declaration and, more importantly, never directly addressed by Magistrate Judge Kolar.

Magistrate Judge Kolar in another footnote calls into question whether the Byler Declaration is a good faith affidavit and certificate. [DE 261, p. 5 n. 6.] The Byler Declaration is most certainly a good faith affidavit with its detailed discussions, and paragraphs 3 and 8 of the Byler Declaration essentially constitute the requisite certificate. (DE 257-1.) The Byler Declaration leaves no doubt that Magistrate Judge Kolar is biased and lacks impartiality.  At the time the motion to recuse was made on July 9, 2023, the Attorney of Record was effectively Philip A. Byler because on July 5, 2023, Magistrate Judge Kolar granted Nesenoff & Miltenberg's motion to withdraw, leaving Philip A. Byler, operating in The Law Offices of Philip A. Byler, as the Attorney of Record for Plaintiff John Doe. [DE 255.]

Magistrate Judge Kolar in yet another footnote [DE 261, p. 4 n. 5] lashes out at the Byler Declaration's discussion of Magistrate Judge Kolar veering off topic in a July 5, 2023 teleconference, a conference that had been scheduled with the sole purpose of addressing John's change in representation. Instead of justifying his

still unclear mention of sanctions related to the July 2021 spoliation opinion (where there was no spoliation), Magistrate Judge Kolar strangely pushed back in an attempt to strengthen his unrelated argument by saying that no new facts regarding spoliation were presented by John at the teleconference (no new facts are necessary to show bias with respect to the July 2, 2021 spoliation opinion). Magistrate Judge Kolar's line of logic here is nonsensical and puzzling to say the least, and his motive for doing so appeared to be an attempt to antagonize John and appease Purdue. The sanctions mentioned here would mean adverse jury instructions and awarding Purdue fees amounting to nearly $30,000 against John before the trial even began. The entire situation reveals further bias from Magistrate Judge Kolar.

Magistrate Judge Kolar cites the requirement that the moving party file at the earliest moment after the moving party acquires knowledge of the facts demonstrating the basis for disqualification, citing *United States v. Sykes*, 7 F.3d 1331, 1333 (7th Cir. 1993), *United States v. Betts-Gaston*, 860 F.3d 525, 538 (7th Cir.2017), and *United States v. Barnes*, 909 F.2d 1059, 1072 (7th Cir. 1990). Those cases, however, all involved much different circumstances -- a relatively short period of a trial or a sentencing relating to courtroom annoyances, antagonistic relationships, possible baiting, or suppression of evidence. Those circumstances bore no relevance to the bias shown in Magistrate Judge Kolar's July 2, 2021 spoliation opinion, the August 11, 2022 summary judgment opinion and the February 14, 2023 reconsideration opinion.

Magistrate Judge Kolar noted that the bias motion is premised on a series of events over four years in which Plaintiff's counsel has been involved, but that is why the Byler Declaration can and did provide the good faith certificate for the bias motion.  The conclusion that Magistrate Judge Kolar was biased developed as Judge Kolar went from the July 2, 2021 spoliation opinion where irrelevancy was mistreated as spoliation and there was no spoliation but John Doe was still threatened adverse jury instructions and Purdue awarded attorney fees, the August 11, 2022 summary judgment opinion where Magistrate Judge Kolar rationalized rejecting Justice Barrett's nationally recognized due process precedent that Purdue had publicly attacked, and the February 14, 2023 reconsideration opinion where Magistrate Judge Kolar embraced Purdue's positions that the Navy ROD and Purdue's due process violations are irrelevant.  Although the major focus of Plaintiff's bias claim comes from the three opinions, of which the latest one was released in February 2023, Magistrate Judge Kolar's biased behavior has remained evident in the proceedings since.

Making a bias motion against someone who has clearly intended to be the trial judge would be no easy step.  Purdue had no answer as to what would have been a timely bias motion, just an irate reaction to the effort to recuse Magistrate Judge Kolar and assign an Article III judge to the case and some false posturing about what was and is the strong case Plaintiff has.  [DE 258, p. 2.]  It was not reasonable to expect Plaintiff to have filed the bias motion before the June 7, 2023 settlement conference requested by Purdue and before the July 3, 2023 conference called by

Magistrate Judge Kolar -- then his conference remarks contributed to the case for bias. Magistrate Judge Kolar nevertheless treats the bias motion as late, which is a conclusion to run away from the fact he is actively seeking to be a biased trial judge after a series of decisions that are biased.

As Magistrate Judge Kolar recognizes, Plaintiff invokes § 144 and § 455(a), § 455(a) has broader reach than § 455(b), citing *Liteky v. United States,* 510 U.S. at 553 n. 2, and bias is to be evaluated on an objective basis. [DE 261, pp. 5-6]. The initial analysis may be performed by the judge whose disqualification is sought. Magistrate Judge Kolar argues that a bias motion premised on a judge's rulings will rarely be the basis of a proper bias motion [DE 261, pp. 7-8]. Even if that proposition were accepted, *arguendo*, this would be that rare case, something that Plaintiff's counsel has not seen in almost 50 years of practice.

## IV.    Improper Communication: Purdue's Second Motion To Dismiss and E-Mailed Opinion To Magistrate Judge Kolar.

Magistrate Judge Kolar refers to "reasonable case management decisions" not showing bias and lack of impartiality, but his cover up misstatement about proposed orders being permitted to be emailed to Chambers [DE 261, p. 10] does show bias and lack of impartiality. "Reasonable case management decisions" [DE 261, p. 10] were not involved here. The Byler Declaration describes what really happened concerning what was Purdue's second motion to dismiss and an opinion (not an order ) e-mailed by Purdue counsel to Magistrate Judge Kolar [DE 257-1, pp. 7-8]:

> 15.    On September 17, 2019, less than three months after Judge Barrett's opinion for the Seventh Circuit, reversing Magistrate Judge Cherry's dismissal of the case, Purdue moved to dismiss again, seeking

dismissal of Plaintiff John Doe's due process claim, notwithstanding that Judge Barrett's opinion for the Seventh Circuit had upheld that due process claim, and seeking reduction of the case to a Title IX damages claim. (DE58, 60.) Plaintiff's opposition made clear that Purdue's second motion to dismiss was entirely out of order, suggesting sanctions for Purdue's motion in disregard of the then relatively recent Seventh Circuit's decision. (DE 63.) After the briefing was submitted, out of the blue, Purdue counsel felt comfortable submitting, to Judge Kolar by e-mail, an entire draft opinion that would grant Purdue's motion to dismiss to reduce the case to a Title IX damages case. Plaintiff objected to Purdue's unsolicited submission of an opinion by e-mail. Judge Kolar held a conference reminding the parties of their obligation for filing (DE 67); although Judge Kolar did not adopt the submitted opinion at that time, Purdue's action certainly seems to shed light on Judge Kolar's later opinions. Nine months later, on May 19, 2020, Magistrate Judge Kolar granted in part and denied in part Purdue's motion, trimming a few injunctive requests. (DE84.)

It is one thing for a Court to receive an emailed proposed order to formalize a decision the Court has made; there is no bias shown in that procedure. But it is quite another thing for a Court to receive and defend receiving a complete opinion with the litigant's desired result, which is what happened here.

Magistrate Judge Kolar tries to describe the event as John objecting to an overly long proposed order, which is contrary to the case docket entry indicating that the judge admonished the parties about email submissions [DE 67]. What happened is reflected in Docket Entry 67. What did NOT happen is what Magistrate Judge Kolar says in his denial of recusal for bias opinion. What Magistrate Judge Kolar says is that Purdue emailed a proposed order and John objected to the length of the proposed order [DE 261, p. 10]. That's false. As the Byler Declaration documents, the actual problem was Purdue's emailed submission of an opinion granting Purdue's

proposed second motion to dismiss reducing the case to a Title IX damages case; the problem was not an overly long proposed order. [DE 257-1, pp. 7-8.]

Magistrate Judge Kolar's cover up misstatement does show bias. Purdue's strategy from the start after this Court ruled in June 2019 was somehow to get rid of John Doe's due process claim and oversee a strip trial of Plaintiff's Title IX claim with Purdue's state police power counterclaim [DE 91]. What Purdue sought in its second motion to dismiss, Magistrate Judge Kolar gave in his August 11, 2022 summary judgment opinion, a continuation of the bias that started becoming obvious after the July 2, 2021 spoliation opinion, and a bias that will certainly extend through trial if allowed to continue but not before showing what a biased trial judge, he would be in his July 2, 2021 spoliation opinion.

## V.    The July 2, 2021 Spoliation Opinion.

There was good reason for the Byler Declaration to include the fact that at a July 5, 2023 conference, Judge Kolar brought up the subject of his July 2, 2021 spoliation opinion. Paragraphs 19 and 20 of the Byler Declaration [DE 57-1, pp. 9-11] discuss the bias shown in Magistrate Judge Kolar's July 2, 2021 spoliation opinion, including Magistrate Judge Kolar's remarks at the July 5, 2023 conference. Magistrate Judge Kolar's assertion in his denial of bias opinion that he decided spoliation on the evidence before the Court [DE 261, p.12] is false and further evidence of his bias. It was not a matter of "mere disagreement":

> 19. In the backdrop of Plaintiff factually building his due process and Title IX case, Purdue moved for sanctions against Plaintiff John Doe, making a plethora of inaccurate accusations about discovery and seeking (again) the due process claim be struck. (DE 148.) John Doe

opposed, showing his compliance with discovery. (DE 152, DE 152-1, DE 152-2.) On February 22, 2021, the Court held a multi-hour evidentiary hearing on Purdue's motion. (DE 155.) John Doe testified under oath how 11 Snapchat documents were accidentally deleted when John cleared memory from his cell phone without realizing deletion from his cell phone would affect his Snapchat account and that the deleted documents were more of the same of what was produced (DE156; Snapchat Memories received in evidence, A32-35; DE155). The Snapchat documents and indeed, all his social media were irrelevant, spanning years after the 2016 events at Purdue and relating only to personal matters (e.g., one of John's sisters playing piano). Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001).

20.    On July 2, 2021, Magistrate Judge Kolar ruled there was spoliation, granting relief albeit different than requested because striking the due process claim was said to be disproportionate (but which Purdue sought because the record had established the due process claim). The Magistrate Judge showed a lack of impartiality by strangely ignoring all the discovery Plaintiff John Doe complied with and focused on what little Plaintiff John Doe did not have. The Magistrate Judge acknowledged "there is nothing in the record to indicate whether the files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not inconceivable" the 11 Snapchat personal posts might be potentially relevant to John Doe's desired Navy career without giving an explanation how it was conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing showed it wasn't (*see* A33-35 in Mandamus Appendix). The Magistrate Judge unjustly lambasted John Doe for the deletion, ordered payment of Purdue's attorney fees (which were claimed to be $30,000 and which would wrongly burden John Doe's effort to vindicate his due process and Title IX rights), and outlined jury instructions regarding what were totally irrelevant documents. (DE168.) However, adverse inference instructions require intentional destruction and relevance. *Crabtree v. Nat'l Steel Corp.,* 261 F.3d at 721; *Keller v. United States,* 58 F.3d 1194 (7th Cir.1995) (collecting cases). Such adverse jury instructions, although erroneously given, would wrongly impact John Doe at trial and further wrongly burden John Doe's effort to vindicate his due process and Title IX rights. At a July 5, 2023 teleconference involving the transfer of responsibilities for Plaintiff's representation, the Magistrate Judge *sua sponte* brought up the spoliation sanction, even though it was irrelevant to the teleconference and at that point it was clear the

spoliation ruling was in error, as it concerned totally irrelevant post-suspension Snapchat memories. The point appeared to be that the Magistrate Judge was quite prepared to do Purdue a favor and order Plaintiff to pay Purdue an amount that wrongly burden John Doe's effort to vindicate his due process and Title IX rights.

Magistrate Judge Kolar so ruled without an evidentiary basis, reflected in the fact that Purdue never used any of John's social media production in the summary judgment briefing despite the extensive aggression into his personal life throughout discovery. (DE 178, DE 180.)

## VI.   Summary Judgment Briefing.

Purdue has liked to posture that John just hasn't come forward with proof of his case, but the summary judgment briefing very much dispels that false notion. The Byler Declaration states [DE 257-1, p. 12]:

> 21.   John Doe moved for summary judgment on his due process claim and to dismiss Purdue's state police power counterclaim. DE183 is his memorandum of law, DE191 is his reply memorandum of law, and DE183-1 is Plaintiff's material statement of facts in support of summary judgment on due process. Summary judgment was premised on discovery having conclusively established the facts alleged in the Complaint that Judge Barrett had relied upon in upholding Plaintiff's due process claim and additional facts that made the denials of due process even more egregious. Purdue moved for summary judgment to dismiss John's due process and Title IX claims. DE187 is John's opposition memorandum of law, and DE 187-2 is John's material facts in opposition to Purdue's motion. Purdue never used any of John's social media production in the summary judgment briefing. (DE178, DE180.)

The evidentiary material compiled and listed at DE 187 and organized in John's material fact statement at DE 187-2 powerfully supported John's Title IX case.

## VII.   The August 11, 2022 Summary Judgment Opinion.

Magistrate Judge Kolar, in a footnote {DE 261, p. 9 n. 8], defended the dismissal of Plaintiff John's due process claim based on the difference between a motion to dismiss and a motion for summary judgment.  Magistrate Judge Kolar's technical discussion of that difference simply does not address what was terribly wrong in his August 11, 2022 opinion that reflected a lack of impartiality and bias on the part of Magistrate Judge Kolar for Purdue.  Judge (now Justice) Barrett's opinion made clear that Purdue's disciplinary procedures were woefully deficient and that expungement was to be considered, but Magistrate Judge Kolar ignored the procedural defects and the directive to consider expungement of the disciplinary file. This was not a matter of "mere disagreement"; this was not a matter of Plaintiff looking for "goblins" [DE 261, p. 11]; this was not a matter of ruling for Purdue and against Plaintiff.  The Byler Declaration explained [DE 257-1, pp. 12-18]:

### De Facto Rejection of Justice Barrett on Liberty Stigma-Plus Interest

22. On August 11, 2022, the Magistrate Judge showed a lack of impartiality when denying John Doe's motion for summary judgment on his due process claim on the ground there were issues of fact with respect to the stigma-plus liberty interest whether the stigma was false, even though the Seventh Circuit has never adopted a falsity element for a stigma-plus liberty interest and the record did not support there were the issues identified. Purdue's motion for summary judgment dismissing the due process claim was granted, rejecting John Doe's stigma-plus liberty interest, reviving the self-defamation ground that Judge Barrett had rejected and requiring a narrow, unrealistic legal obligation divorced from military realities to authorize disclosure of the university disciplinary file to the Navy. Struck was Plaintiff's expert report from Dr. R. Chris Barden, who had critiqued and found seriously wanting Purdue's biased investigation.  Ignored in the August 11 opinion was Plaintiff's motion to dismiss Purdue's legally defective state police power

counterclaim that would allow Purdue to put Plaintiff on trial. (DE206, A168-216.) Judge Kolar's August 11th Opinion gave Purdue what Purdue sought in its 2019 second motion to dismiss, the dismissal of Plaintiff's due process claim.

**The National Importance of Judge (Now Justice) Barrett's Due Process Opinion.**

23. The national importance of the due process rulings of then Judge (now Justice) Barrett in *Doe v. Purdue*, 928 F.3d 652, 661-664, 667 (7th Cir. 2019), cannot be understated, holding: (i) that John had pleaded a stigma-plus liberty interest; (ii) that Purdue's disciplinary process was woefully deficient and did not provide due process, citing among other things not giving John the investigation report and not holding a real hearing ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension"); and (iii) that the District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand").

24. When then Education Secretary DeVos announced on May 6, 2020, what would be the current due process Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue*. "*Secretary DeVos Announces New Title IX Regulation,*" *https://www.youtube.com/watch?v=hTb3yfMNGuA;* U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020; 34 C.F.R. 106.45. Secretary DeVos noted that it was a three-woman panel with then Circuit Judge Amy Coney Barrett as the author of the opinion. "*Secretary DeVos Announces New Title IX Regulation*" https://www.youtube.com/*watch*?v=*hTb3yfMNGuA*.

25. When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention. Defending Judge Barrett's opinion in the Wall Street Journal was K.C. Johnson, "Sex, Due Process and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020. Purdue responded with its defiant defense, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020. Judge Barrett's opinion has been a thorn in Purdue's side, and Purdue does not want to live in accordance with it.

26. The Magistrate Judge misstates John's argument as meaning the national importance of the *Doe v. Purdue* due process

ruling by itself compels denial of summary judgment.   (DE224, p. 10.) That is not Plaintiff's argument.   It is that the Magistrate Judge's August 11 Opinion did not consider Purdue's due process violations and expungement of the disciplinary file as contemplated in Judge Barrett's opinion, but rather with specious, insubordinate pettifoggery dismissed the due process claim (DE206, pp.16-18, DE224, pp. 2-4), by adopting Purdue's self-defamation argument expressly rejected by Judge Barrett, marginalizing chain of command military realities and effecting an absurd result wholly inconsistent with Judge Barrett's opinion.

## Judge Barrett's Rejection of Self-Defamation for the Court.

27.    Before the Seventh Circuit in 2019, Purdue had argued that John had engaged in self-defamation by authorizing the release of the university disciplinary files to the Navy.  That argument then was premised on the NROTC only learning of John's disciplinary case because of John's authorization of disclosure to the Navy ROTC.  Judge Barrett stated in her opinion Purdue's position: "The university maintains that it has not and will not divulge John's disciplinary record without his permission.  The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began." 928 F.3d at 661.  Purdue cited *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997), where a voluntary disclosure was the reason for an employment discharge in a situation that the Seventh Circuit considered it speculative whether the disclosure would ever be called for. Judge Barrett, however, rejected Purdue's argument (928 F.3d at 652): John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510. (928 F.3d at 662.)

28.    The discovery record made Purdue's argument and Magistrate Judge Kolar's ruling about self-defamation wholly untenable.  Indisputably: (i) the NROTC knew about the disciplinary proceeding well before the May 24, 2016 authorization because on April 4, 2016, Jane Doe first went to the NROTC to make her accusations; (ii) Purdue first learned of Jane Doe's accusations from the NROTC; and (iii) the NROTC was looking to the Purdue investigation from the start.

**The Navy Knew About The Disciplinary Proceeding Before Authorization and Was Looking To Purdue's Investigation.**

29.   On April 4, 2016, Jane Doe (falsely) told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John, and Lieutenant Sheppard informed his superior officers Commander Hutton and Executive Officer Remaly about Jane Doe's allegations.   (DE183-34: Shepard tr 21-25, 28-30; DE183-43:  Sheppard Ex 2; DE187: Sheppard tr 42-43.)  Also on April 4, 2021, Commander Hutton reported Jane Doe's sexual misconduct allegations to Purdue's Office of the Dean of Students, reflecting the interrelationship of Purdue and the Purdue Navy ROTC.  (DE 187-6: Dfs. SJ Ex. K.)  When asked by Purdue counsel about the "investigation" of the sexual misconduct allegations against John, NROTC Commander Hutton responded that "that investigation was referred to Purdue University."  (DE 183-35: Hutton tr. 14.)   On April 4, 2021, Purdue's Dean of Students Sermersheim advised Purdue's CARE Director Bloom of Jane Doe's allegations.  (DE 187-6: Dfs. SJ Ex. K).)

30.   On April 5, 2021, Commander Hutton sent a letter to John informing him that John was being placed on "an Interim Leave of Absence (ILOA) *due to your pending university investigation*" and that "[f]urther administrative action, potentially to include Performance Review Board (PRB), will be taken *on completion of the university investigation*."   (DE 187-7; italics added.)   The April 5, 2016 letter further stated that John was prohibited from participating in ROTC activities, but would remain enrolled in NROTC.  (DE 187-7.)

31.   The authorization to the NROTC for access to the Purdue disciplinary files was dated May 24, 2016, well after the NROTC learned of the disciplinary proceeding.  (DE183-5, John tr. 23; DE183-44.)  John Doe testified at his deposition that the Navy wanted "in the loop" (DE183-5, tr 21-22), and when John Doe was deposed by Purdue about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the NROTC, not self-defamation (which was never raised).  (DE208-1, DE208-2, tr 22-26.)

32.   The significance was explained by John Doe: "With Jane Roe having reported her accusation to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, I really was in no position to refuse the authorization." (DE208-1 ¶ 7.)  According to John: "Soon after Jane Roe complained to the Navy, I was put on interim leave of absence pending the university investigation.   If I had refused

authorization, I would not only have looked bad, but I also would have been sanctioned in some way." (DE208-1 ¶¶ 3, 5.)  John thus had no choice but to authorize the Navy to be "in the loop" in the university disciplinary proceeding; it was not voluntary. John's case is "more like *DuPuy v. Samuels*." 928 F.3d at 662.  Purdue's authorization argument made no sense given the actual facts.

**The Magistrate Judge's Narrow Legal Obligation
Ruling Is At Odds With Judge Barrett's Opinion
And Is Divorced From Military Realities.**

33.    John's situation as a NROTC midshipman who was not in a position to refuse the authorization to the Navy is totally inapposite to the situation of a voluntary disclosure of a disciplinary record for a school transfer, as in *Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021), and to the situation of a voluntary disclosure of the reason for an employment discharge in *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997). Here, the obligation to disclose was not, as wrongly asserted by the Magistrate Judge, speculative. Rationalizing away the distinction between civilian and military life in this context amounts to willful blindness, which resulted in the Magistrate Judge incorrectly treating John's authorization as voluntary and John's testimony the Navy "wanted in the loop" as not a legal obligation to authorize.  (DE221, p. 16; DE224, pp. 2-4.)

34.    Dismissing military realities as speculation, as the Magistrate Judge does, is erroneous at best.  The December 19 hearing exchanges lay bare the unreasonableness of the Magistrate Judge's opinion:

[**MR. BYLER**]: . . .  The authorization was requested because the Navy – and this is the testimony – "wanted in the loop."  And that meant they wanted in the loop of the investigation. And they were put into the loop.

And John Doe was not in a position to say no.  As ROTC midshipmen, respecting his Navy superiors, wanting a career in the Navy, you have a request; knowing that the Navy wants to be in the loop.  You don't say no.

The suggestion that maybe he says no is just ridiculous.  I have combat officer sons, who, when asked this, of course you give the authorization. . . .

**THE COURT**: But I see nothing.  I don't see your client saying, "I was given order."

I don't see any deposition . . . .

[**MR. BYLER**]: Well, excuse me. At his deposition, all he was asked about the authorization was to identify it.  The deposition then went off, "Well, could you have gotten the investigation report from the Navy." . . .

[Plaintiff] was on scholarship.  He had to honor his commitments and obligations. . .  And that meant, when he gets a request for this kind of authorization, that kind of access, when the Navy knows and it's going to be relying on the [Purdue] investigation, yes, he has to give it.  He was in no position not to give it. . . .

The decision that Commander Hutton testified to was: We're going to rely on the Purdue investigation. . . .

And it was in that context in which John Doe knows that they're wanting to be in the loop because the investigation that's ongoing, he's requested by a superior officer for that access. . . .

## VIII.  Judge Kolar's Allowance of Purdue's State
##        Police Power Counterclaim (Putting John on Trial).

Magistrate Judge Kolar, in denying bias, points out he denied summary Judgment on John's Title IX claim [DE 261, p. 10; DE 206.] Magistrate Judge Kolar is not being fully candid.  It would not be just a Title IX trial per the August 11, 2022 summary judgment opinion because Magistrate Judge Kolar also refused to dismiss Purdue's state police power counterclaim [DE 206] despite the lack of legal and factual merit to Purdue's state police power counterclaim [DE 183, pp. 43-47; DE 191, pp. 14-15].  In a Title IX/state police power trial sought by Purdue and then to be allowed by Magistrate Judge Kolar, an individual in John is put on trial, just as John had been with respect to spoliation. That the summary judgment record and papers

would have made difficult dismissing John's Title IX claim [DE 177-178, 187, 192] is beside the point given Magistrate Judge Kolar's refusal to address and dismiss Purdue's state police power counterclaim in the August 11, 2022 summary judgment opinion.

## IX. Magistrate Judge Kolar's Partisan
## Slip in the August 11, 2022 Opinion.

Magistrate Judge Kolar does address what is called the "partisan slip" of treating Jane Roe as testifying, asserting that the August 11, 2022 summary judgment opinion never assumed that Jane Roe had testified. [DE 261, pp. 10-11.] That treatment is at odds with Magistrate Judge Kolar's own August 11, 2022 opinion.  Further, the August 11, 2022 opinion showed bias and lack of impartiality with respect to the discovery related to summary judgment and with respect to Magistrate Judge Kolar's defective notion of triable issues for stigma plus.  The Byler Declaration explains [DE 257-1, pp. 20-25]:

### Discovery Strengthened The Denial of Due Process Case

36.    Based on the allegations of the Complaint, Judge Barrett wrote strongly about the denial of due process in this case: "Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension." 928 F.3d 663-664. Discovery strengthened John's case that he was denied due process.  The depositions of Purdue employees with the documents that formed the basis of the allegations of the Complaint not only substantiated the allegations, but showed a process more flawed than what was alleged in the Complaint.  Purdue never provided John Doe with the evidence and the investigation report during the disciplinary case, there was no real hearing, and there was pre-judgment based upon treatment of Jane Doe's accusations.  Expungement of the disciplinary file was and is the proper remedy. (DE183-1 through 183-41; DE 183, pp. 6-33, 39-46.) The District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of

expungement on remand"), but Magistrate Judge Kolar refuses to do so, knowing how opposed Purdue is to expungement.

37.     Due process matters so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). The Magistrate Judge, however, rationalized the jarring result of adopting Purdue's position that "whether Purdue complied with due process is immaterial" by also adopting what are Purdue's gross misstatements of the record. It reflects the lack of impartiality on the part of the Magistrate Judge.

## The Non-Existent Alleged Triable Issues for Stigma Plus

38.     As discussed, the Magistrate Judge's ruling on stigma-plus liberty interest was legally and factually erroneous, divorced from military chain of command realities in order to avoid the grant of summary judgment on Plaintiff John's due process claim.  In addition, Magistrate Judge Kolar's proof of falsity requirement to establish a stigma plus liberty interest, which the Seventh Circuit has never adopted, was fundamentally flawed: the August 14, 2022 opinion gave a purported review of triable issues that did not reflect the factual record but that did reflect a lack of impartiality.

## Jane Doe Never Testifying Versus John Doe Repeatedly Testifying.

39.     Magistrate Judge Kolar strangely repeated what were the allegations of Jane Doe when in fact she never testified.   Summary judgment is not a time when allegations suffice. Proof is needed. Jane's allegations were not and are not proof. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (facts needed to defeat summary judgment).

40.     In contrast, John Doe has repeatedly put himself under oath to state that Jane's accusations are false.   In the summary judgment record is John Doe's statement under oath saying:

> All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false.  I have maintained that all her claims were false from my initial statements in the Purdue disciplinary process at the start, all the way through to the appeals. I said so orally to Dean Sermersheim in June 2016.   I said so in my oral statements to Navy ROTC personnel, and I said so in my

written statement in August 2016 to Navy ROTC at the time of my disenrollment (which was based solely upon my university suspension), and I have continued to maintain this truth for the past four and a half years of this legal case.

(DE 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶ 30).)  John Doe did again on reconsideration.  (Motion Ex. A: John Doe 08/2/22 Declaration ¶ 10.)

### John-Jane Doe Texts.

41.    Magistrate Judge Kolar showed a lack of impartiality when referring to what were 133 pages of John Doe-Jane Doe texts in accordance with Purdue's misreading based on Purdue's misleading excerpts without discussing John Doe's testimony on the texts that he alone had provided.

42.    The Court quotes passages of John Doe-Jane Doe texts as if they were admissions of guilt. They weren't; and there was no evidence before Judge Kolar to treat them as evidence of guilt.  That Magistrate Judge Kolar does so shows a lack of impartiality. In depositions, Purdue's Dean Sermersheim, Purdue's investigator Amberger and Purdue's investigator Oliver each admitted that there is no statement in the texts in which John admitted or Jane Doe accused John of committing the sexual acts alleged in the Notice of Allegations.  (DE183-7: Semersheim tr 34; DE183-14: Amberger tr 70-72; DE187-9: Oliver tr. 50-57).)  Notably, before the alleged incidents, John and Jane Doe had a three-month relationship in which John and Jane Doe had a sexual relationship initiated by Jane, the first such relationship in John Doe's life after being brought up in an Evangelical Christian home where he was taught sex was for marriage.  (DE183-8: John 02/18/2021 Affidavit ¶¶ 4-5; DE 208-1: Ex. A, John tr 92-93.)  John Doe has put himself under oath as to the correct understanding of the texts (where the surrounding context makes them all clear, yet Purdue hid when cherry-picking them); Jane Doe never did. (DE208-1: John 08/2022 Declaration ¶ 11.)

43.    To the investigators, John provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John and his family Christmas cookies after the supposed sexual assault occurred and after Jane Doe initially claimed the relationship had ended.  Jane Doe provided *no* texts to the investigators, telling them she had deleted the texts.  (DE183-3: Df. Answer ¶ 36; DE183-14:

Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; DE183-11: Amberger 27, Texts (PU 206-339)); DE183-7: Semersheim tr. 34; DE 183-5: John Dep. tr. 111-114.)

44. Yet, the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship after Jane Doe's claims), and Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators. (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.) The investigation report twisted the texts and contained many other inaccuracies including the fabrication that John Doe confessed to the allegations. Knowing this, it is no wonder they refused to let him view the investigation report and defend himself while at Purdue, something other schools typically provide, but not Purdue. (DE183-8: John 02/18/2021 Affidavit ¶ 15; DE187, pp. 44-47.)

## The Investigation Report.

45. There is no good reason for Magistrate Judge Kolar to ignore: (i) Plaintiff John was not provided an opportunity to review the investigation report during the disciplinary case, (ii) the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship after Jane Doe's claims), and (iii) Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators. (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.) Only a partisanship for Purdue explains why Magistrate Judge Kolar also ignored that the investigation report had twisted the texts and contained many other inaccuracies pointed out by Plaintiff. (DE183-8: John 02/18/2021 Affidavit ¶ 15; DE187, pp. 44-47.)

## The Letter Sent On Behalf Of Jane Doe To The Committee.

46. On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim; instead, on June 5, 2016, Monica Bloom, Director of CARE and a lawyer, submitted a written statement said to come from Jane Doe, which was in the form of an e-mail. Bloom was asked in her deposition how, if Jane

Doe did not have access to a computer, she e-mailed the statement to Bloom. Bloom said she (Bloom) did not recall (DE183-9, Bloom Dep tr 29-30; 183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement (PU653-654)).  The Magistrate Judge does not deal with this testimony, but rather incorrectly states it was undisputed the e-mail came from Jane Doe, the point was very much in dispute, and further, the Magistrate Judge also does not address the fact that the three-person panel of the Advisory Committee on Equity and Dean Sermersheim, never met and never heard any direct testimony from Jane Doe and did not have the opportunity to ask any questions of Jane Doe.  (DE183-3: Df. Answer ¶ 41; DE183-9: Bloom tr 28-32; DE183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement.)

## X.    The February 14, 2023 Reconsideration Opinion (Rejection of Navy ROD for Obligation).

Magistrate Judge Kolar does not have a footnote about reconsideration or even much discussion about the February 14, 2023 reconsideration opinion other than to say the reconsideration motion did not provide a basis for reconsideration. [DE 261, p. 8.]  But the reconsideration motion provided more than a basis for reconsideration; the reconsideration opinion showed an alarming bias and an abject lack of impartiality with respect to the application of the Navy ROD establishing the obligation for stigma-plus.  The legal requirement for stigma-plus advocated by Purdue and adopted by Magistrate Judge Kolar was not Judge (now Justice) Barrett's test.  This was again no mere disagreement.  The Byler Declaration explained [DE 257-1, pp. 26-29]:

### Ignoring the Navy ROD

47.    On February 14, 2023, Magistrate Judge Kolar yet again showed a lack of impartiality in his reconsideration decision. Magistrate Judge Kolar adhered to dismissing the due process claim, ruling that John Doe failed on summary judgment to show a legally obligated disclosure, that John Doe's position he was in no position to refuse authorization was insufficient even though the Navy ROD clearly

substantiated that John could not properly refuse authorization. (DE208-3.)

48. The Navy ROD (which was not available at the time of the Navy depositions) clearly substantiates that John could not properly refuse authorization. (DE208-3.) The Magistrate Judge showed a lack of impartiality in not addressing Plaintiff's full presentation of the Navy ROD.

## Navy Regulations Compelling Giving Authorization

49. Authorization to disclose the Purdue disciplinary files was expected under the governing Navy regulations at the time as a matter of "Honor" stated in the Navy ROD. Honesty and respect to his superior officers called upon John to provide the authorization. The Honor Code in the Navy ROD (DE208-3) at section 1-3 (pp. 1-3) provides that "Military systems, which often operate under extreme duress, are built on a foundation of absolute trust and fidelity", that NROTC must instill honor upon future officers during accession training and ensure that honor is carried into fleet service", that "[t]hroughout its history, the Naval Service has successfully operated through reliance on certain values held by its personnel", that "Honor is a keen sense of ethical conduct, honesty, integrity, and responsibility", that "Honor includes honesty, at all times no matter the outcome", and that "[i]t is respect to both juniors and seniors." The Magistrate Judge's belittling of the significance of the Honor Code is quite ill-considered.

50. Authorization to disclose the Purdue disciplinary files was also expected under the governing Navy regulations at the time as a matter of not showing a "disregard or contempt for authority" and not showing a "lack of a sense of responsibility" that would constitute a "major offense" per the Navy ROD (DE208-3), at section 3-19.2.a.(11) (pp. 3-40). The NROTC knew there was a Purdue investigation of Jane Doe's accusations of sexual assault and wanted "in the loop" (DE183: SJM 5, tr 22). It was John's responsibility that the NROTC be included in the loop. The Magistrate Judge's failure to address this point is unjustifiable.

## Sanction Upon Refusing Authorization

51 Had John refused to provide the authorization, there would have been an order to provide the authorization. Also, when a midshipmen student is put on interim leave of absence, which John was by Commander Hutton's order of April 5, 2016, the Navy ROD (DE208-

3 at section 6-7.3, pp. 6-11 – 6-12) requires a Performance Review Board ("PRB") "as soon as possible." Because John provided the authorization, a PRB was not held, and when one was held after completion of the university disciplinary case, the PRB only concerned the university suspension. Had John shown a "disregard or contempt for authority," a "lack of a sense of responsibility," and a lack of "honor" by refusing authorization, an additional PRB would have been ordered. The interim leave of absence would have been converted into a disciplinary leave of absence per the Navy ROD at section 6-7.3, pp. 6-12. The Magistrate Judge's failure to address this point is unjustifiable.

## Required Disclosure Upon Re-Application

52.    If John were to re-apply to the NROTC, he would have to disclose the disciplinary finding. Commanding Officer Hutton identified the ROTC Appointment Termination and Disenrollment Authorization and testified the only reason for the ROTC disenrollment was the university suspension. (DE183-35: Hutton Dep tr 56, 66-67; DE 183-36: Hutton H, ROTC Appointment Termination and Disenrollment Authorization.) The August 10, 2016 PRB document showed the Board's finding was that John was suspended by Purdue and the recommendation was disenrollment of John. (DE183-36: Aug. 10, 2016 Performance Review Board, p. 2.)

53.    The PRB document is made part of the student's file per the Navy ROD (DE208-3, section 6-13.5, pp. 6-20) and because it involved disenrollment is sent to Naval Operations per the Navy ROD section 6-13.6, p. 6-20. Disciplinary disenrollment documents are part of his "permanent federal record" per Navy ROD (DE 208-3) section 6-16 (pp. 6-26 – 6-27):

c.    Disciplinary disenrollments become a matter of permanent federal record and may prejudice the individual for future military or civil employment. Disciplinary disenrollments may be disqualifying for future federal security clearances that are often necessary for positions in private industry. Disciplinary disenrollments may be prejudicial to their interests should they ever apply for a commission in the Armed Forces. . . .

54.    Should John re-apply to the NROTC or to any commission in the U.S. Armed Forces, he would be honor-bound to disclose the disciplinary disenrollment that is part of permanent federal record and if he did not and it were inevitably discovered in a mandatory

background check, termination would be expected.  (DE208-1 ¶ 9.)  The permanent federal record exists only as a result of the university disciplinary case (DE209, pp. 8-9); the Navy did not conduct its own investigation but relied 100% on the university disciplinary suspension. (DE187-2, pp. 23-27 and record citations therein.)  The Magistrate Judge's failure to address this point is more than strange, it was a partisan slip.

## XI.    The February 14, 2023 Reconsideration Opinion
##         <u>(Erroneous Result and Ignoring Contrary Precedent)</u>.

Magistrate Judge Kolar's reconsideration opinion changed the goalposts as to what would be the basis for denying summary judgment, adopting a legal requirement for refusing authorization and rejecting the Navy ROD as just internal rules and not law, so as to render due process immaterial.  This showed an alarming bias and an abject lack of impartiality with respect to the result which ignored contrary precedent on point. This was yet again no mere disagreement.  The Byler Declaration explained [DE 257-1, pp. 29-32]:

### <u>The Erroneous Result</u>

55.    The Navy ROD compelled giving authorization, would make John subject to sanction upon refusing authorization, and required disclosure upon re-application due to a permanent federal record – which even the Magistrate Judge's August 11 opinion indicated would make summary judgment inappropriate (DE206, pp. 16-17) but which the Magistrate Judge avoided on reconsideration, so much lacking in impartiality Magistrate Judge Kolar had become.  Instead, the Magistrate Judge essentially adopted Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to compel executing the authorization (DE 221, p. 12).  That, however, leads to the absurd result that a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD has no due process rights. Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's effective

adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.

### False Basis For Rejecting Reconsideration.

56.    Reconsideration here was sought based upon the texts of Rule 54(b) and 60(b) of the Federal Rules of Civil Procedure, *see* A. Scalia, *Reading Law: The Interpretation of Legal Texts* p. 56 (West Pub. 2012), and *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191-1192 (7th Cir. 1990), where it is stated:

> A motion for reconsideration performs a valuable function where:
>
>> the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. . . .
>
>> Justice Cardozo also recognized the utility of the motion to reconsider to the misunderstood litigant:
>
>> . . . A grievous wrong may be committed by some misapprehension or inadvertence by the judge for which there would be no redress, if this power did not exist.

57.    The Magistrate Judge's mistreatment of the stigma-plus liberty interest was particularly untenable given the Navy ROD.   The Magistrate Judge, in order to rely on inapposite case law more restrictive of reconsideration, treats authorization as a central issue in the summary judgment briefing.  (DE224, 4-5.) It was not – far from it. The authorization was drowned in hundreds of pages of briefs on other issues and statements of material facts (*see* ¶ 19, p. 10 above), the reconsideration evidence was to provide an elaboration of what was originally submitted, and a whole new argument was not raised.

### Ignoring Contrary Northern District of Indiana Precedent

58.    Magistrate Judge Kolar strangely omitted addressing the point for reconsideration that two Northern District of Indiana precedents are contrary to his ruling and that, in particular, Attorney Kealey, who has been counsel for the Purdue in this case and in *Mary Doe and Nancy Roe v. Purdue*, 4:18-CV-89-JEM (N.D. Ind. Jan. 13,

2022), did not advise the Magistrate Judge of Judge Martin's January 13, 2022 ruling (after the summary judgment briefing) upholding and sending to trial those plaintiffs' due process claim. (DE214-1, DE72 in 4:18-CV-89-JEM.) Judge Martin wrote:

> Roe asserts that she will be obligated to self-report this sanction to other institutions of higher education, including law schools, and by implication, bar admission authorities, meaning her stigma of a sanction will continue to be disseminated.
>
> As in *Doe v. Purdue Univ.*, supra, in which the plaintiff was required to authorize Purdue to release information about a sanction to his ROTC program and the Court of Appeals found that even with his permission to disclose, the disclosure satisfied the stigma-plus standard, the disclosure of Roe's sanction may impact her future education and employment opportunities. . . . Roe has asserted that the decision by Purdue, which she asserts was based on a flawed process, has resulted in a loss of future educational and employment opportunities, and a factfinder could agree.

(DE241-1, DE72 in 4:18-CV-89-JEM: Slip Op. at 20-21.) In that case, Roe felt an obligation to self-report; this case is even stronger, as John Doe here had an obligation because he was in no position to not give authorization. A second Northern District of Indiana case also found stigma-plus liberty interest. *Doe v. Purdue*, 464 F. Supp.3d 989, 1001-1003 (N.D. Ind. 2020) (Springmann, J.).

## XII. Magistrate Judge Kolar's Mischaracterization About His Pattern of Rulings, Adoption of Purdue Positions, Rulings Against Plaintiff and Plaintiff Looking for Goblins.

Magistrate Judge Kolar engages in mischaracterization when saying Plaintiff John Doe argues that his pattern of rulings, adoption of Purdue positions and rulings against Plaintiff are evidence of bias and that Plaintiff is looking for "goblins." [DE 261, p.11.] The implication by Magistrate Judge Kolar that Plaintiff is paranoid and overreacting to the relentless bias of his opinions despite Magistrate Judge

Kolar himself refusing to address the specific details that Plaintiff continues to raise in regards to those rulings is frankly unjudicial and unbecoming.

It wasn't just the pattern of rulings, adoption of Purdue's positions and the rulings against Plaintiff; it was what paragraphs 22-34 of the Byler Declaration discussed, quoted above, about "Rejection of Justice Barrett on Liberty Stigma-Plus Interest," "The National Importance of Judge (Now Justice) Barrett's Due Process Opinion," "Judge Barrett's Rejection of Self-Defamation for the Court," "The Navy Knew About The Disciplinary Proceeding Before Authorization and Was Looking To Purdue's Investigation," "The Magistrate Judge's Narrow Legal Obligation Ruling Is At Odds With Judge Barrett's Opinion And Is Divorced From Military Realities." [DE 57-1, pp. 12-19.]   This and the spoliation and reconsideration opinions are what specifically support the points that Magistrate Judge Kolar "has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate [current Supreme Court] Justice Barrett's opinion in this case" (DE 257-1 p. 2), and that the history of the case shows Magistrate Judge Kolar "kowtowing to Purdue and its implacable public rejection of Justice Barrett's nationally significant opinion" (DE 257-1 p. 4).

Second, Magistrate Judge Kolar's July 2, 2021 spoliation opinion; the August 22, 2022 summary judgment opinion, and the February 14, 2023 reconsideration opinion are propaganda pieces for Purdue.  As discussed in the Byler Declaration, Magistrate Judge Kolar's July 2, 2021 spoliation opinion ignored John's otherwise complete compliance with extensive discovery and, without meeting the law's basic

requirements, finds John guilty of spoliation over 11 irrelevant post-suspension Snapchat entries and speculates without reason that somehow they could relate to John's desired Navy career; and further, Magistrate Judge Kolar's July 2, 2021 spoliation opinion ordered adverse jury instructions and fees paid to Purdue. [DE 257-1, pp. 8-11].  That opinion was quite a propaganda piece for Purdue to falsely portray John as derelict in discovery. As discussed above and in the Byler Declaration, Magistrate Judge Kolar's August 22, 2022 summary judgment opinion, with a legalistic approach misapprehending the discovery record. rejected Justice Barrett's due process opinion of national importance and exonerated Purdue from egregious due process violations despite military realities.  That was quite a propaganda piece for Purdue.  [DE 257-1, pp. 12-25].  As discussed above and in the Byler Declaration, Magistrate Judge Kolar's February 14, 2023 reconsideration opinion brushed aside the Navy ROD and Judge Martin's contrary precedent in the Northern District of Indiana applying stigma plus and exonerated Purdue from its due process violations.  [DE 257-1, pp. 26-31].  That was a propaganda piece for Purdue.

### XIII.  **Magistrate Judge Kolar On "Discovery Disputes".**

Magistrate Judge Kolar engages in mischaracterization that is as false as false can be when asserting that the Byler Declaration only shows Magistrate Judge Kolar considered the evidence before him as to the alleged spoliation.  [DE 261, p.12.]  The Byler Declaration shows Magistrate Judge Kolar not considering the evidence before him and not considering the applicable law.  [DE 57-1, pp. 9-11.] Magistrate Judge

Kolar's July 2, 2021 spoliation opinion ignored John's compliance with discovery and, without meeting the law's basic requirements, finds John guilty of spoliation over 11 irrelevant post-suspension Snapchat entries and speculates without reason that somehow they could relate to John's desired Navy career.  [DE 57-1, pp. 9-11.]

Magistrate Judge Kolar ignores giving a protective order against deposing Purdue President Mitch Daniels. [DE 137.]  Daniels was a named defendant in his official capacity for the enforcement of injunctive relief under claims for denial of constitutional due process per *Ex Parte Young*, 209 U.S. 123 (1908).  President Daniels as Defendant Purdue's President was pleaded as ultimately responsible for the university's compliance with a federal injunction. [DE 51, p. 4.]

Magistrate Judge Kolar ignores the discovery disputes in overriding HIPAA and ordering the deposition of Noel Perry, John's personal counsellor. [DE 143.] Noel Perry gave helpful testimony for John, but the issue of bias concerns the overriding of HIPAA, ordering the turnover of all notes concerning John's private sessions and ordering the deposition of John's personal counsellor at Purdue's request.  Because of the invasion of John's privacy and disregard of HIPAA, John no longer uses such counseling.

Magistrate Judge Kolar ignores his striking the expert opinion of Dr. R. Christopher Barden. [DE 206.]  Dr. Barden, a clearly qualified expert, has never been excluded from testifying; and here, Dr. Barden's testimony is proper under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  Dr. Barden is a licensed psychologist (MN and TX ) and licensed

attorney, has testified and/or consulted as an expert witness in many jurisdictions with regard to a number of areas including investigative methodologies, standards of care in investigations including abuse cases, the science of memory-false memories-tainted memories, the science of investigative interviewing, misconduct and malpractice in investigations, clinical psychology, psychopathology, psychotherapy, diagnostic issues, coping-resilience science, the nature of science, Frye-Daubert-Kumho science analysis, history-methodology-standards of care in criminal and related investigations, the reliability of various scientific methodologies, investigative methods and procedures. [DE 199-1; 199-2.]

The original Barden report faults Purdue's "believe the woman" approach, citing the testimony of Purdue investigators Amberger and Oliver concerning their training as a factual reference point for Dr. Barden's testimony on "believe the woman." [DE 199-1.] When questioned about his training, investigator Amberger testified that he recognized the phrase "believe women," citing the use of the phrase by End Violence Against Women International ("EVAWI") in some of their e-mails and training and by Purdue's "Center for Advocacy Response and Education" ("CARE") when conducted training and running education on campus. (DE 187-26; Amberger Dep tr 9-10.) When questioned about her training, investigator Oliver testified about receiving training from Michigan State Professor Campbell on the neurobiology of trauma (DE 187-24, Erin Oliver Dep tr 9) – which Dr. Barden harshly criticizes as junk science. [DE 199-1; DE 199-2.] The original Barden report also discussed the Purdue CARE Facebook postings [DE 187-21; DE 199-1], the kind of

which was referenced in Judge (now Justice) Barrett's opinion.  928 F.3d at 669.  The original Barden report further rejects the 1 in 5 statistic and criticizes its effect leading to university victim-centered policies and procedures. [DE 199-1; DE 199-2.]

As a result of Magistrate Judge Kolar's striking the original Barden report and Plaintiff objecting, Plaintiff was ordered to provide a revised report by Dr. Barden, which was done with a March 16, 2023 report focusing on confirmation bias and defective investigative methodologies used by Purdue. [DE 234; DE 245-1.]  Purdue moved to exclude the opinions in Dr. Barden's March 16, 2023 report [DE 240], and Plaintiff has opposed Purdue's motion [DE 245]. This is one of the important pre-trial motions for the trial judge.

So also is Purdue's general motion *in limine* seemingly intended to hamstring John's case. [DE 235.] Purdue's motion contains a laundry list of requested exclusions including: evidence or argument directed to Purdue's disciplinary process; the content of disciplinary records or expungement; John's claim of lost opportunity in Navy ROTC or Navy career; the economic value of the loss of enjoyment of life (hedonic damages) that Defendants' conduct caused John (which is the subject of Dr. Stan Smith's expert testimony); the Seventh Circuit opinion and the procedural history of the case before this Court except for spoliation; how John's suspension adversely affected John's family and friends; argument and evidence regarding education and career hypotheticals; evidence and contentions about the history, purpose or intent of Title IX; Purdue's objections to John's discovery; details about John's and Jane's relationship that provided essential context to the false accusations made in April

2016 by Jane; that the Purdue investigators ignored the John-Jane Doe sexual relationship; Jane's suicide attempt; John's religious upbringing. [DE 235.]  Plaintiff has strenuously opposed that motion.  [DE 242.]  A trial judge has a certain amount of discretion with respect to such matters, and that discretion should not be in the hands of a biased judge lacking in impartiality.

### XIV.   February 13, 2023 Settlement Conference and Mandamus.

Magistrate Judge Kolar's references to the settlement conference and mandamus [DE 261, pp. 1,14] ignore that John got the impression Magistrate Judge Kolar would not be fair at trial and that the mandamus petition challenged Magistrate Judge Kolar for exceeding his jurisdiction, not bias.  That the mandamus petition was denied does not establish Magistrate Judge Kolar is not biased within his jurisdiction. A decision badly misreading Justice Barett's opinion can be within the jurisdiction of the Magistrate Judge's jurisdiction, but it can and is here evidence of bias and lack of impartiality.

### XV.   Closing Question.

In the end, the question is why Magistrate Judge Kolar is so intent upon being the trial judge? Plaintiff's answer is to run a biased trial.  An Article III judge should be assigned to be trial judge in this important case.


Respectfully submitted on this 7th day of September, 2023.

**Respectfully submitted,**
**LAW OFFICES OF PHILIP A. BYLER**
By: /s/ *Philip A. Byler*
**Philip A. Byler, Esq.**

**11 Broadview Drive**
 **Huntington, New York 11743**
**(631) 848-5175**
pbyler1976@gmail.com
philb@optonline.net
***Attorneys for Plaintiff John Doe***