## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| Plaintiff, | ) | **CIVIL ACTION** |
| | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE** | ) | |
| **UNIVERSITY BOARD OF TRUSTEES,** | ) | |
| **MITCHELL ELIAS DANIELS, JR.,** in his official | ) | |
| capacity as President of Purdue University, | ) | No. 2:17-cv-33-GSL |
| **ALYSA CHRISTMAS ROLLOCK**, in her official | ) | |
| capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at | ) | |
| Purdue University, | ) | |
| | ) | |
| Defendants. | | |

### PURDUE UNIVERSITY'S MOTION TO EXCLUDE EXPERT OPINIONS

Defendant, the Trustees of Purdue University ("Purdue"), by counsel, moves this Court pursuant to Federal Rule of Civil Procedure 37(c)(1) and Rules of Evidence 403 and 702 to enter an order excluding Plaintiff's disclosed expert opinions of R. Christopher Barden and Stan V. Smith.

On November 9, 2023, the Court entered a minute order that stated in part as follows:

> FINAL PRETRIAL CONFERENCE held on 11/8/2023, before Magistrate Judge Joshua P Kolar. Pltf appeared w/atty Philip Byler via Zoom. Dfts appeared by attys James Olds, William Kealey in person and Scotty Teal via Zoom. Parties discuss various issues pertaining to trial. Court sets the following deadlines: . . . Daubert hearing on 11/14/2023 will address both Stan Smith and R. Christopher Barden; court will also discuss other evidentiary issues.

USDC IN/ND case 2:17-cv-00033-GSL    document 330    filed 06/28/24    page 2 of 27

DE 282.

The November 14, 2023 hearing was vacated. That hearing has been reset for November 7, 2024. Pursuant to Docket Entries 315 and 324, this Motion re-dockets the "Stan Smith and R. Christopher Barden" matters previously set for hearing on November 14, 2023.

## Opinions of R. Christopher Barden

### A. This Court has excluded the opinions in Barden's First Report.

This Court ordered Plaintiff to make his expert witness disclosures no later than February 19, 2021. DE 157. At the deadline, Plaintiff delivered the *Initial Report of R. Christopher Barden, Ph.D., J.D., LP*, dated February 19, 2021 ("First Report"). The First Report was designated as an exhibit in Plaintiff's summary judgment briefing. Purdue moved to exclude the First Report from consideration in trial or in the pending dispositive motions. DE 193. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); Fed. R. Evid. 702.

On August 11, 2022, this Court issued its Opinion and Order. DE 206. Addressing the First Report, this Court applied the framework of Federal Rule of Evidence 702 and *Daubert/Kumho Tire* to decide the admissibility of the Barden opinions. DE 206, at pp. 11-12. For the gatekeeping function under Rule 702 and *Daubert/Kumho Tire*, "the district court must evaluate: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of

2

the expert's testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (emphasis omitted).

This Court addressed the First Report as follows:

- "Dr. Barden's opinions about the credibility of the parties and witnesses are neither specialized knowledge nor appropriate for expert testimony. . . . Speculation couched in the language of expertise is no exception." DE 206 at pp. 12-13 (internal citations omitted).

- "[F]or his report to be admissible, he must offer 'scientific, technical, or other specialized knowledge [that] will help the trier of fact" to understand that conclusion. . . . To the extent Dr. Barden offers specialized knowledge, it is not helpful to the resolution of the case." *Id.* at pp. 13.

- "[The relevant question is whether these defendants . . . intentionally discriminated against [John] based on sex. Dr. Barden's (unsupported) assumption that Purdue's administrators believed the 'junk science' would only matter if they relied on that to intentionally discriminate against John. This report offers little to make that connection, other than his rumination about their motives. . . . Expert opinions premised on 'subjective belief or unsupported speculation,' like this one, must be excluded." *Id.* at pp. 13-14.

The Court found that "the report at issue is replete with conclusions and assertions that are neither admissible nor helpful." *Id.* at p. 11. The Court ruled: "The opinion of Dr. Christopher Barden is excluded from the summary judgment record and may

not be used at trial." *Id*. at p. 24. Thus, the inadmissibility of the opinions in the First Report has already been decided.

**B. The February 19, 2021 deadline for expert opinion disclosure was more than three years ago. Plaintiff never moved for leave to disclose the opinions in the Second Report.**

Plaintiff never moved for leave to disclose additional opinions of Barden. Nonetheless, on March 16, 2023, Plaintiff disclosed the *Expert Witness Report of R. Christopher Barden, Ph.D., J.D., LP* dated March 16, 2023 ("Second Report"). Purdue has previously docketed a copy of the Second Report as Exhibit A to DE 240 and Exhibit D to DE 235.

Because the Second Report is untimely on its face, it is presumed to be automatically excluded. As summarized in *Suleiman v. Pella Corp.*, No. 2:18-CV-261-TLS-APR, 2022 U.S. Dist. LEXIS 84108, at *6-7 (N.D. Ind. May 10, 2022):

> The Federal Rules of Civil Procedure require a party to disclose any expert witnesses to be relied on at trial and to produce the expert witness' written report. Fed. R. Civ. P. 26(a)(2). Pursuant to Rule 37(c)(1), "[i]f a party does not timely file [the] reports, the district court may exclude the party's expert from testifying at trial on the matters the party was required to disclose." *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 785 (7th Cir. 2000) (citing Fed. R. Civ. P. 37(c)(1)). "The sanction of exclusion is 'automatic and mandatory unless the party to be sanctioned can show that its violation of Rule 26(a) was either justified or harmless.'" *Id*. at 785-86 (quoting *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996)).

*See also Dura Auto. Sys. of Ind. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002).

Because the Second Report was disclosed years after the deadline for doing so, and because Plaintiff has never even tried to obtain relief for the late disclosure, the Second Report's opinions must be excluded as untimely.

4

**C. To the extent the Second Report is identical to the First Report, admissibility has already been decided. To the extent Plaintiff contends that the opinions in the Second Report are new and different from the First Report, those opinions nonetheless suffer from the same terminal defects as the First Report.**

The Second Report merely repackages the excluded opinions in the First Report. As detailed above, this Court has already excluded those opinions. Therefore, even if this Court were to excuse the untimeliness of the Second Report, the opinions in the Second Report fail to meet the necessary threshold for expert testimony.

To the extent Plaintiff contends that the opinions in the Second Report are new and different from the First Report, those opinions nonetheless suffer from the same terminal defects as the First Report. Purdue therefore incorporates by reference the standards, law, authority, and arguments in its original briefing to exclude the opinions in the First Report. *See* DE 193.

As detailed in the Appendix to this brief, Barden's opinions in the Second Report fall into two general categories: (i) that Purdue's investigation evinces "confirmation bias" by finding that the weight of the evidence supports Jane Doe's allegation; and (ii) that Purdue's investigation employed "defective, improper, misinformed, uninformed" methods.

In the following discussion, **Exhibit A** and **Exhibit B** are references to exhibits in DE 240.

Barden styles himself as a campaigner against risks to the "integrity of the legal system", on a mission to "Train legal and mental health professionals in the

basic and essential science that should guide and inform attorneys, judges, and juries . . .." **<u>Exhibit A</u>**, at p. 13.

In another report issued shortly before the Second Report, Barden grandly set himself in judgment of the entire legal system that resulted in convictions of Jerry Sandusky for molesting ten boys: "the judges, prosecutors, and defense lawyers . . . *ALL failed to know, understand, comprehend, and properly apply the internationally reported essential science and history that was so relevant and essential to a proper investigation and trial in this case*." **<u>Exhibit B</u>** (copy of "Expert Witness Report of R. Christopher Barden" dated January 18, 2023) ("Sandusky Report"), at p. 20 n. 2 (emph. original).

Barden's Sandusky report, dated January 28, 2023, apparently served as his cut-and-paste template for his March 18, 2023 Second Report in this case (**<u>Exhibit A</u>**), which states at page 2: "I will also offer investigative hypotheses to assist future investigations of this case by PA State Legislative oversight committees, PA State Licensing Boards, and Federal investigative bodies having the power to subpoena records and question witnesses under oath to further explore the multiple kinds of misconduct, indications of corruption, and other controversies documented in this case."

The concluding section of the Second Report asserts an "investigational alternative hypothes[is] that should be properly investigated by the relevant authorities" that "Purdue University investigators/adjudicators/officers were

operating under improper and unethical pressures to comply with a defective methodology ('Believe Women, but not men')".

The standards for admissibility of Barden's opinions are not met in this case. He does not have any recognizable credential or training in ascertainment of gender discrimination. He does not apply any expert technique for ascertainment of gender bias. His opinion on questions that are within the ordinary knowledge of jurors is not a proper matter for supposed expert testimony. His opinions on methods are not relevant or reliable.

**1. No expert credential for ascertainment of gender discrimination.**

The Seventh Circuit tasks this Court with asking not merely whether an expert "is qualified in general" but rather whether he is qualified "to answer a specific question". *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal quotation omitted). For a generalist like Barden, the Court "must look at each of the conclusions he draws individually to see if he has the adequate education, skill, and training to reach them." *Id*.

In his Sandusky Report, Barden describes himself as a "forensic psychological expert" with expertise "in the fields of adult-clinical, child-clinical, and forensic psychology". **Exhibit B**, at pp. 13 n. 1 and 132.

However, the Second Report does not disclose any education, skill or training of Barden in any technique for ascertainment of gender discrimination in a specific university sexual misconduct disciplinary process. The Second Report asserts that Barden has been qualified as an expert witness in criminal trials. The Second

Report does not list any discrimination trial in which he has been qualified as a testifying expert. **Exhibit A**, at p. 16.

There is no evidence that Barden possesses the requisite "knowledge, skill, experience, training, or education" concerning university-specific standards for meeting their Title IX obligations. *See, e.g.*, *Palmer v. Ind. Univ. & Trs. of Ind. Univ.*, No. 1:19-cv-04610-JMS-MJD, 2021 U.S. Dist. LEXIS 44863, at *59-60 (excluding expert opinion where expert only demonstrated that he had worked at a different university but not that he was broadly qualified to offer opinions on what standards universities should follow or that he was qualified to speak about a different university's policies). The Second Report does not disclose any experience administering student discipline, whether for sexual misconduct or otherwise. The Second Report does not disclose any familiarity with the Department of Education's requirements for a university's Title IX obligation to address sexual misconduct.

This Court can and should determine that Barden's generalist credential as a psychologist does not equip him to opine specifically on gender discrimination in a university disciplinary process for sexual misconduct. *See United States v. Truitt*, 938 F.3d 885, 889-91 (7th Cir. 2019) (affirming exclusion of opinion of forensic psychologist).

2.  **The Second Report will not help the jury. The Second Report is directed at a non-witness (Campbell) and a phantom "recovered memory" allegation.**

To be admissible under Federal Rule of Civil Procedure 702, the expert's testimony must "assist the trier of fact." *Owens v. Auxilium Pharms., Inc.*, 895 F.3d

971, 972 (7th Cir. 2018) (citation omitted). "To do so, the testimony must 'fit the issue to which the expert is testifying and be tied to the facts of the case." *Id*. at 973 (quoting *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 819 (7th Cir. 2014)). The question of "whether an expert's approach lines up with the basic facts of the case goes to the relevance and admissibility of the testimony itself." *Owens*, 895 F.3d at 973 (citation omitted). "*Daubert* instructs that expert testimony must be relevant and factually linked to the case in order to meet Rule 702's 'helpfulness' requirement." *United States v. Gallardo*, 497 F.3d 727, 733 (7th Cir. 2007).

Barden devotes most of the Second Report to arguments against the admissibility of scholarship that Barden attributes to Rebecca Campbell. A typical passage is: "Prof. R. Campbell's training materials on the 'Neurobiology of Sexual Assault' include unreliable, unsupported pseudoscience research and ideology that are NOT accepted by the relevant scientific community and has NO known error rate." **Exhibit A**, at p. 71. However, "Prof. R. Campbell" is not a witness in this case. There is no relevance in asking the jury to consider opinions of a non-witness (Campbell) and then asking the jury to consider Barden's opinions of Campbell.

Not only is Campbell not a witness, there also is no "recovered memory" allegation in this case. The Second Report uses the word memory 169 times and the term "recovered memory" 19 times. Plaintiff John Doe has never alleged that this case concerns a "recovered memory". In the words of Plaintiff John Doe's pending Complaint, the allegation is:

> John Doe then told Jane Doe that during another night in November 2015, while they were staying the night in Jane Doe's room, John Doe had

penetrated her digitally while she was sleeping: (iv) Jane Doe was not aware of the incident in November 2015 while she was sleeping in her room, had not and did not consent to such sexual contact, and was upset when she was told about it.

DE 160, ¶ 30. That Complaint never uses the word "memory". This case centers on an allegation that John told Jane about an event she was otherwise unaware of because it happened while she was asleep. "John told Jane" means an alleged confession, not a memory suggested by Purdue.

Barden has simply invented a straw-man "recovered memory" allegation and then set out to rebut it. His claimed expertise as a critic of the literature of "recovered memory" has no relevance to the jury's task.

### 3. No expert technique for ascertainment of gender bias.

#### a. Barden describes "confirmation bias" as victim bias, not gender bias.

In the jargon of the Second Report, "confirmation bias" is shorthand for finding that the weight of the evidence supports the victim's account. In his 2023 opinion in support of Jerry Sandusky's motion for a new trial, Barden quotes the Oxford Dictionary's definition of Confirmation Bias: "The tendency to test one's beliefs or conjectures by seeking evidence that might confirm or verify them and to ignore evidence that might disconfirm or refute them." **<u>Exhibit B</u>**, at p. 21. Barden adds that "confirmation bias" is a "problematic aspect of human reasoning". *Id*. (quoting academic manuscript in "Review of General Psychology"). These citations show that, according to Barden, "confirmation bias" describes a tendency to try to

prove "one's beliefs or conjectures", not a tendency to believe women and disbelieve men.

The Second Report describes "confirmation bias" in campus sexual assault investigations as an "imperative to act as through every accusation must be true." **Exhibit A**, p. 62. Barden states that, in this case, he equates "confirmation bias" with "a conviction that the suspect is guilty", a trait that he describes as "tunnel vision". *Id.*, pp. 21, 27. In this usage, the term "suspect" is genderless. From the premise that all suspects are presumed guilty, Barden is opining that confirmation bias dictates the outcome, *regardless of gender*. Such an opinion will not help the jury perform its task to ascertain whether John Doe's discipline was motivated by his male gender. *See, e.g.*, *Gash v. Rosalind Franklin Univ.*, No. 1:23-cv-02054, 2023 U.S. Dist. LEXIS 160189, at *10 (N.D. Ill. Sep. 11, 2023) (allegation of "a pro-victim bias" does not support a claim for sex discrimination because "both women and men can be victims of sexual assault") (quoting *Johnson v. Marian Univ.*, 829 F. App'x 731, 733 (7th Cir. 2020).

The jury in this case is not tasked with deciding whether Purdue was motivated by pro-victim bias when investigating and deciding John's culpability. Therefore, Barden's opinions on "confirmation bias" do not supply the jury with expert insight into ascertainment of gender bias.

### b. Barden's hypothesis is mere speculation.

At page 97 of the Second Report, Barden admits that he is offering only a "hypothesis" that "Purdue University investigators/adjudicators/officers were

11

operating under improper and unethical pressures to comply with a defective methodology ('Believe Women, but not men')". Barden thus pivots away from insisting that "confirmation bias" means believing all accusers, and abruptly concludes that Purdue exhibits "confirmation bias" only when the accuser is a woman.

If "confirmation bias" is a technique for predicting and identifying anti-male bias, how then can Barden argue that the technique is relevant to the male-against-male convictions of Jerry Sandusky? The common denominator between Jerry Sandusky and John Doe is that they are both males whose lawyers have hired Barden. If "confirmation bias" operates the same whether the accuser is a male (who accused Sandusky) or a female (who accused John Doe), then Barden's opinions on "confirmation bias" do not equip the jury to ferret out "believe the woman" bias.

The Second Report fails a core requirement for admissibility of an expert opinion -- "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592–93.

As recently summarized by the Seventh Circuit:

Some factors we look to include: (1) whether the particular scientific theory "can be (and has been) tested"; (2) whether the theory "has been subjected to peer review and publication"; (3) the "known or potential rate of error"; (4) the "existence and maintenance of standards controlling the technique's operation"; and (5) whether the technique has achieved "general acceptance" in the relevant scientific or expert community.

*Anderson v. Raymond Corp.*, 59 F.4th 279, 284 (7th Cir. 2023) (citing and quoting

*Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 505 (7th Cir. 2003) and *Daubert*, 509

U.S. at 593-94)).

The Second Report does not cite any literature to show that confirmation bias

predicts a tendency to believe "women but not men". Barden offers no technique for

distinguishing those who believe only women-victims, on one hand, from those who

believe all victims, regardless of gender. Barden does not discuss any error metric

for such a distinction. He does not discuss whether any technique for drawing such

a distinction has achieved "general acceptance" in the psychological science

community. This is unsurprising, given Barden's admission that he is offering a

hypothesis, not a validated technique.

The Second Report, at page 2, also announces that Barden is offering expert

opinions on "ideologies", among other things. Like the First Report, the Second

Report is rife with overt political scapegoating. The term "feminist" appears 28

times. For extra spice, Barden opines on "Social feminism . . . [r]ooted within

Marxist ideology." Second Report pp. 98-99. As this Court has already rightly

observed, "[t]o put it mildly, such statements cut against a finding that this report

has 'the same level of intellectual rigor that characterizes the practice of an expert.'"

DE 206 at 12, n.12 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152

(1999)).

A hypothesis about the state of mind of the allegedly discriminatory

defendant is inadmissible. In a Title VII discrimination case where the expert

opined "only that stereotypes 'may,' 'might,' or 'could have' played a role in [defendant's] decision making" and the expert "did not offer a definite opinion as to whether [defendant] discriminated against [plaintiff]" the Seventh Circuit affirmed exclusion of an expert's opinion testimony. *Downing v. Abbott Lab'ys*, 48 F.4th 793, 810 (7th Cir. 2022). "For her opinions to help the jury, she needed to speak to whether [defendant's] decisionmakers racially discriminated against Downing. That requirement was not satisfied, the court correctly concluded, when [the expert] could not opine—with even five percent certainty—that anyone at [defendant] made a decision about [plaintiff's] employment on the basis of racial bias." *Id.*  Further, the excluded expert's "testimony also would be unfairly prejudicial, as the court ruled, because jurors might incorrectly conclude she was offering an opinion on the ultimate liability question." *Id.*

To the extent Barden is opining on pertinent questions, a jury is more than capable of answering them because the existence of bias is not a topic beyond the scope of a jury's experience or abilities.  *Palmer v. Ind. Univ. & Trs. of Ind. Univ.*, No. 1:19-cv-04610-JMS-MJD, 2021 U.S. Dist. LEXIS 44863, *61 (S.D. Ind. Mar. 10, 2021) (expert's opinion on whether the university "treated Professor Gildea more favorably than Professor Palmer . . . is an issue of fact, which the jury must analyze and upon which the jury must reach a conclusion. Expert testimony is simply not necessary or appropriate.").

### 4. Barden's opinions on methods are not relevant or reliable.

The Second Report states: "As an experienced scientist, psychotherapist, and trial attorney I will offer opinions about the failures of many involved in this case to meet minimal standards of care for psychotherapists, investigators, and legal professionals (judges, trial lawyers, and government officials)." Second Report, p. 2.

Barden's standard-of-care opinion has no relevance to the jury's task, for two reasons. First, this is an intentional gender discrimination case, not a negligence case. The jury is not tasked with deciding whether Purdue's investigation of Jane Doe's allegation met any standard of care.

Second, Barden does not contend that Purdue's allegedly defective methods were selectively employed in John's case because he was a male. Instead, he imputes faulty methods to Purdue's approach to training investigators *for all investigations*. Second Report, p. 97 ("Purdue University investigators/adjudicators/officers were duped and manipulated by improper, incompetent, unethical, and unreliable RRM-MPD-DISS junk science notions and ideas expressed in Title IX training seminars."). On its face, this conclusion faults the competence and reliability of the methods in every Purdue investigation and decision of a sexual assault allegation, regardless of the gender of the accuser and accused.  Such an opinion has no relevance to the jury's task.

**Opinions of Stan V. Smith**

Plaintiff has designated opinions of Dr. Stan V. Smith in a report on "loss of earning capacity" and  "reduction in value of life" (sometimes referred to as

"hedonic" damages). A copy of that report was previously filed as Exhibit B at DE 235-2.

### A. Smith's opinion on loss of earnings capacity is inadmissible.

Smith opines that Plaintiff (who was a Purdue freshman in 2016, when Purdue suspended him for one academic year) has a "net loss of earnings capacity" due to the 2016-17 suspension that will accumulate to a total between $1.542 million and $2.589 million through age 67. DE 235-2 Ex. B p. 6.

### 1. The topic of alleged loss of earning capacity is irrelevant because there is no available Title IX remedy for such consequential damages.

The Supreme Court has made clear that the remedies available to a plaintiff in a Spending Clause case such as this one are limited to "the usual forms of relief for breaching a legally enforceable commitment." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562, 1573 (2022). Under general formulations of contract law, for any damages to be recoverable, they must "be established with reasonable certainty." Restatement (Second) of Contracts § 352.

See, for example, *Chatragadda v. Duquesne University*, No. 15-1051, 2017 U.S. Dist. LEXIS 226287 (W.D. Penn. Feb. 23, 2017), in which the court ruled out future income losses because "consequential damages are not recoverable" under Title VI or Title IX. *Id.* at *1-2. The court went on to explain that, in assessing contract damages, "consequential damages are 'special damages' and to recover, Plaintiff must show at the time the contract was entered, the damages subsequently

claimed were in the reasonable contemplation of the parties." *Id.* at *2 n.3 (cleaned up). The court concluded as follows:

> The contract in a Title IX case is the school's agreement not to discriminate when accepting federal funding. Plaintiff makes no showing Defendant contemplated the diminished future earnings of a student who suffered discrimination when it accepted federal funding. Future earnings are too distant from an agreement centered on equal access to education and facilities regardless of gender and race.

*Id.* This conclusion is validated by *Cummings*.

In *Doe v. Fairfax Cty. Sch. Bd.*, No. 1:18-cv-00614-MSN-IDD, 2023 U.S. Dist. LEXIS 13886 (E.D. Va. Jan. 25, 2023), the court granted a motion in limine to exclude the Title IX plaintiff's "evidence or argument" for a claim "for diminished earning capacity or lost future earnings" or "lost employment opportunities". *Doe v. Fairfax Cty. Sch. Bd.*, Civil Action No. 1:18-cv-00614-MSN-IDD, 2023 U.S. Dist. LEXIS 13886, at *19 (E.D. Va. Jan. 25, 2023).).  The court found "that any such losses would be too attenuated in time from the alleged Title IX violations during Plaintiff's high school years to prove Defendant's 'breach actually adversely influenced or affected job opportunities.' 24 Williston on Contracts § 66.4." *Id.* at *19.

As shown by the million-dollar gap between his two calculations ($1.542 million and $2.589 million), even now Plaintiff's earnings prospects cannot be established with reasonable certainty. It is impossible for Plaintiff himself, in 2024 (eight years after he left Purdue), to describe his own alleged consequential damages with reasonable certainty. Therefore, it is impossible to conclude that, when Plaintiff enrolled at Purdue, consequential damages were established with

reasonable certainty and bargained for. Because there is no Title IX remedy for such speculative harm, Smith's opinions are irrelevant to the jury's task.

### 2. Smith's methodology is unreliable and does not fit the facts.

Smith's methodology is unreliable. He does not identify any foundation for any probability that Plaintiff would earn a college degree; commence a career in a particular occupation; or succeed in the occupation. Smith models Plaintiff's lifetime earnings based on generic assumptions about holders of a bachelor's degree from Purdue and about military personnel.

Smith states:

> [Plaintiff] began at Purdue in the Fall of 2015 and was on a scholarship to take part in the Navy ROTC program. [Plaintiff] states that he initially was interested in majoring in Computer Graphics Technology, but later switched to Mechanical Engineering Technology. He reports that he planned to pursue a double-major in Mechanical Engineering Technology and Russian language. [Plaintiff] states that with ROTC, he would get a minor in Naval Science. He was expected to graduate with a Bachelor's degree in the Spring of 2019.

DE 235-2 Ex. B p. 3.

Smith's description takes no account of the facts that (i) Plaintiff had a 2.11 GPA for the spring semester of his freshman year at Purdue and (ii) Navy ROTC advised him at the end of his freshman year (before Purdue suspended him) that, due to his low grades, he should plan on paying his own tuition for the following semester and that he could be disenrolled from Navy ROTC. DE 178 pp. 27-28. Smith's description begs the question of the probability that any similarly situated college freshman stays in school, completes a degree in their initial field of study, and finds employment in that field.

To model Plaintiff's probable career earnings, an expert would need to address the probability that Plaintiff would have left school altogether after losing his Navy ROTC scholarship due to his poor grades; the probability that he would have flunked out of Purdue even if he tried to continue without a Navy ROTC scholarship; the probability that he would never have completed any degree anywhere; and so forth.

The question of "whether an expert's approach lines up with the basic facts of the case goes to the relevance and admissibility of the testimony itself." *Owens v. Auxilium Pharm., Inc.*, 895 F.3d 971, 973 (7th Cir. 2018). Even after Plaintiff's Purdue suspension ended in 2017, Plaintiff never re-enrolled at Purdue. Instead, as Smith's report acknowledges:

> [Plaintiff] reports that he spent 3 semesters at Taylor University before dropping out of school. He states that he was suffering from depression and anxiety due to the situation,and was not in the frame of mind to succeed in school. [Plaintiff] spent 2018 and 2019 working part-time for a few months at Indiana Beverage and doing small jobs for his mother's business. He moved to Texas with his cousin, where he worked for a landscaping for a few months. In 2021 and 2022, he worked several jobs on and off. He worked a commission based sales job with salesprocess.io for approximately 3-4 months. In November of 2022, he got a job with Chalk Performance Training in a sales role. He states that he is paid $15 per hour in addition to small commissions for sales, and works 30 to 40 hours per week on average. He estimates that he is earning around $2,000 to $2,500 per month currently. He plans to continue working there and hopes to eventually get a job with benefits. He still has not returned to school to get a bachelor's degree.

DE 235-2 Ex. B p. 5.

Seven years have passed since the end of Plaintiff's one-year suspension. Smith cites no foundation to assume that Plaintiff has any educational or career ambition. Smith does not cite any expert explanation for Plaintiff's lack of

accomplishment. Therefore, Smith has no foundation to project that Plaintiff's current and prospective earnings have any nexus to Plaintiff's one-year disciplinary suspension in 2016-17.

Despite this lack of foundation, Smith employs three speculations. First, he speculates that Plaintiff would have completed a bachelor's degree in 2019, if he had not been suspended, with annual earnings equal to "the mean early career pay for Purdue graduates with a Bachelor's degree." DE 235-2 Ex. B p. 4. Second, he speculates that Plaintiff will never return to college, so his lifetime wages will be "based on the mean wages for white males with at least 1 year of non-graduate education." *Id.* p. 5. Third, he makes the contradictory speculation that Plaintiff "returns to college to pursue a Bachelor's degree in the Fall of 2024." *Id.* p. 6.

These are mere algebraic hypotheses, not economic analysis. Their contradictory terms show that Smith has no idea which of them is plausible or probable. A method that produces contradictory opinions is, by definition, unreliable. *See Castrillon v. St. Vincent Hospital & Health Care Center, Inc.*, No. 1:11-cv-430-WTL-DML, 2015 U.S. Dist. LEXIS 69530, at *7-8 (S.D. Ind. May 29, 2015) (without data showing probability of career stepping stones "the jury will have no way of knowing whether the Plaintiff's hope to become a critical care specialist was reasonably certain to be realized or more likely a pipe dream."). *See also Artunduaga v. University of Chicago Medical Center*, No. 12 C 8733, 2016 U.S. Dist. LEXIS 176402 (N.D. Ill. Dec. 21, 2016) (discussion of type of foundation sufficient for assumptions about career prospects).

Further, Smith's speculations are utterly generic. In *Sturgis v. R & L Carriers, Inc.*, 554 F. Supp. 3d 976 (N.D. Ind. 2021), the court excluded the plaintiff's designated earnings-loss opinion for failure to articulate variables regarding occupation and employability. "Omitting something so plain as a person's occupation or employability in calculating lost earning capacity makes this method unreliable." *Id.* at 984. "Using a method unrooted in a [claimant's] occupation… necessarily amplifies the risk of error beyond a reliable and recognized economic method." *Id.* at 985.

For these reasons, Smith's methodology falls far short of the factual grounding and reliability required by Rule 702 and *Daubert*.

**B. Smith's opinion on hedonic damages is inadmissible.**

Smith opines that, due to the 2016-17 suspension, Plaintiff has a "50 percent to 70 percent reduction in the ability to lead a normal life through an assumed trial or resolution date of May 1, 2023, and 15 percent to 20 percent reduction thereafter. The diminished capacity to lead a normal life reflects the impact on career, social and leisure activities, the activities of daily living, and the internal emotional state . . .." DE 235-2 Ex. B p. 8.

### 1. The topic of hedonic damages is irrelevant because this Court has dismissed Plaintiff's claim for "emotional and psychological damages".

On August 11, 2022, this Court ruled:

Defendants move to dismiss John's claim for "emotional and psychological damages" on his Title IX claim, based on the Supreme Court's holding in *Cummings v. Premier Rehab Keller, P.L.L.C.*, 142 S. Ct. 1562 (April 28, 2022). The court held that emotional distress damages are not available

under antidiscrimination statutes enacted under the Spending Clause of the Constitution, such as Title IX. 142 S. Ct. at 1569, 1572 (listing Title IX as one of the four Spending Clause statutes: "[W]e . . . cannot treat federal funding recipients as having consented to be subject to damages for emotional distress. It follows that such damages are not recoverable under the Spending Clause statutes we consider here."). In response, John notes that these damages are "a minor component" of his overall damage claims, and Defendants' request should be "considered in accordance with the motion's limitations." [DE 205]. Ultimately, he makes no argument against the requested relief. The Supreme Court's decision forecloses his claim for "emotional and psychological damages," so the motion will be granted.

DE 206 pp. 23-24. That dismissal establishes that there is no relevance for Smith's opinion on hedonic damages.

Smith's "hedonic damage" opinions are viewed by courts as attempts to quantify "loss of enjoyment of life". *See, e.g.*, *Michon v. Campbell*, No. 16 C 6104, 2019 U.S. Dist. LEXIS 230156, at *4 (N.D. Ill. May 31, 2019). Alleged diminishment of "enjoyment of life" is just another way of describing the "emotional and psychological damages" that this Court has already dismissed. "Hedonic damages are '[d]amages that attempt to compensate for the loss of the pleasure of being alive.' *Hedonic damages*, Black's Law Dictionary (10th ed. 2014)." *Diperna v. Chi. Sch. of Prof'l Psychology*, 893 F.3d 1001, 1006 n.5 (7th Cir. 2018). In *Diperna*, a disciplined student sued the school and claimed hedonic damages on the basis of an opinion by Dr. Smith. The district court "saw Dr. Smith's testimony, which went to DiPerna's 'enjoyment of life,' as a ploy to recover emotional distress damages" and excluded the testimony, and the Seventh Circuit affirmed. *Id*. at 1006.

**2. The topic of hedonic damages is irrelevant because there is no available Title IX remedy for such consequential damages.**

As discussed above with respect to Smith's opinions on loss of earning capacity, the Supreme Court's *Cummings* decision effectively bars any form of damages that are not a "usual form[] of relief for breaching a legally enforceable commitment". Like opinions on loss of earning capacity, opinions on loss of enjoyment of life are not a usual form of relief for breach of contract and therefore are not available as a remedy for Plaintiff's Title IX private right of action.

### 3. Smith's methodology is unreliable.

Smith's method of quantifying hedonic damages has been repeatedly rejected by courts in the Seventh Circuit and around country as unreliable and inadmissible under *Daubert*, Rule 702, and Rule 403. *See, e.g., Glisson v. Corr. Med. Servs.*, No. 1:12-cv-01418-SEB-MJD, 2018 U.S. Dist. LEXIS 216420, at *14 (S.D. Ind. Dec. 27, 2018) ("Defendant's argument that Dr. Smith's testimony on hedonic damages should be excluded because his methodology and results do not comport with the *Daubert* requirements and Rule 702 is persuasive. This conclusion is in line with several district courts within the Seventh Circuit that have excluded Dr. Smith's testimony on similar grounds in other cases."); *Stokes v. John Deere Seeding Grp.*, No. 4:12-cv-04054-SLD-JAG, 2014 U.S. Dist. LEXIS 21725, at *11, 17-19 (C.D. Ill. Feb. 21, 2014) (excluding Smith's hedonic damage opinions and a discussion on hedonic damages as "unreliable," not "generally accepted," and otherwise impermissible under Rule 403, while also noting that "the weight of mandatory and persuasive precedent counsels strongly against admitting Dr. Smith's testimony."); *Bolden v. Walsh Grp.*, No. 06 C 4104, 2012 U.S. Dist. LEXIS 44351, at *18-20 (N.D.

Ill. Mar. 30, 2012) (excluding Smith's hedonic damages opinion where Smith acknowledged that it was not subject to scientific testing and there was a lack of any peer-review). *See also Aghaeepour v. N. Leasing Sys.*, 2024 U.S. Dist. LEXIS 93322, at *18 (S.D.N.Y. May 24, 2024) ("The Court therefore agrees that Dr. Smith's analysis 'amounts to nothing more than eyeballing' and 'lacks scientific reliability in the sense of producing consistent results.'") (quoting *Ziegler v. Polaris Indus.*, Inc., No. 1:23-CV-00112-MR-WCM, 2024 U.S. Dist. LEXIS 21733, 2024 WL 482212, at *5 (W.D.N.C. Feb. 7, 2024)); *Moe v. Grinnell Coll.*, 547 F. Supp. 3d 841, 851-52 (S.D. Iowa 2021) (Smith's opinions on hedonic damages are "unreliable," "cannot be tested," and are not "generally accepted").

## Conclusion

For these reasons, the Barden and Smith opinions should be excluded.

Respectfully submitted,

/s/ William P. Kealey
William P. Kealey (18973-79)
James F. Olds (27989-53)
Scotty N. Teal (35713-53)
Stuart & Branigin, LLP
300 Main St., Ste. 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
        tlj@stuartlaw.com
        jfo@stuartlaw.com
Tel. 765-423-1561
*Attorneys for Defendants*

1554594v3

24

## <u>Appendix – Quotations of Second Report's Statements of Opinion</u>

- In my opinion, this analysis does not reduce the horrific and criminal nature of actual sexual assaults — a serious problem in America at any frequency. However, the serious nature of this problem is most effectively and competently addressed without biased, hysterical, politicized, irrational, junk science, pseudo-investigations and unrecorded, un-transcribed "Equity Committee adjudication meetings" applying methodologically improper methods and practices — such as the pseudoscience methods, procedures, and training procedures (eg. Dr Campbell's training) conducted by Purdue University in this case. (p. 64)
- Controversial pseudo-scientific concepts such as the "Neurobiology of Trauma", "Neurobiology of Sexual Assault", "Fragmented Memories of Trauma", and claims that "less than 10% of assault allegations are false" in addition to other controversial, politically tainted, unreliable, controversial, pseudoscience notions, are, in my opinion, currently NOT accepted by the relevant scientific community, have NO known error rate, and are NOT supported by peer reviewed published research in competent journals. Nonetheless these, concepts have been recklessly disseminated into powerful investigative systems — including police and university Title IX systems. (p. 64)
- In my opinion, Purdue University's acceptance and use of the very controversial, untested, and unproven notions of Dr. Rebecca Campbell to train Title IX's investigators was a methodological error (See Deposition of Erin Oliver at pg 9) that tainted the integrity of the investigation process. (p. 68)
- It is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's pseudoscience" notions are unreliable, controversial, unproven and have never been accepted by the relevant scientific community and have no known error rates. (p. 71)
- Further, it is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's RRM-MPD-DISS ideology and claims notions should have been properly reviewed by competent experts and scientists as passing minimal reliability and validity tests BEFORE they were applied to the lives of people in real life assault investigations — as in this case. (p. 71)
- In my opinion, any competent University Title IX investigator or committee should have been aware of the NATIONAL CONTROVERSIES regarding Title IX due process violations and uses of junk science methodologies such as RRM-MPD-DISS ideology and claims. Unprofessional reliance upon Dr Campbell's and other highly controversial and apparently pseudoscientific

RRM-MPD-DISS ideology and claims lectures and speeches could result in methodologically defective, unfair investigations — as in this case. (pp. 71-72)

- IN MY OPINION, PURDUE FAILED TO MEET MINIMAL STANDARDS FOR INVESTIGATIONS BY A) TRAINING PERSONNEL IN DR CAMPBELL's CONTROVERSIAL UNRELIABLE IDEOLOGY and BY B) ENGAGING IN MANY EXAMPLES OF THE METHODOLOGICAL ERROR KNOWN AS CONFIRMATION BIAS (ignoring disconfirming evidence, failing to generate and test alternative investigative hypotheses) —BOTH ARE CLEAR VIOLATIONS OF BASIC STANDARDS FOR COMPETENT INVESTIGATIONS: (p. 74)
- In sum, this is one of the most methodological defective, improper, misinformed, uninformed, investigations I have seen in the USA having reviewed hundreds of investigations in dozens of states and federal jurisdictions over the past 30 years. (p. 96)
- EXAMPLES OF ALTERNATIVE HYPOTHESES and ISSUES FOR FUTURE INVESTIGATION:
  - 1 - Purdue University investigators/adjudicators/officers were poorly and improperly trained thus applying controversial and unreliable methodologies and failingto meet minimal standards for a rational, competent investigation.
  - 2 - Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with a defective methodology ("Believe Women, but not men").
  - 3 - Purdue University investigators/adjudicators/officers used unreliable investigational procedures intentionally and also manipulated evidence via "selected evidence files", failed to record ANY interviews, and failed to obtain ANY sworn statement of any allegation in order to manipulate and control the outcome of this case.
  - 4 - Purdue University investigators/adjudicators/officers were duped and manipulated by improper, incompetent, unethical, and unreliable RRM-MPD-DISS junk science notions and ideas expressed in Title IX training seminars. For example, Dr. R. Campbell has for years been teaching highly controversial, misleading, and unethical workshops on the "Neurobiology" of trauma, memory, and violence. Who at Purdue selected Dr Campbell's controversial, unproven, junk science notions for training?
  - 5 - Purdue University investigators/adjudicators/officers deliberately and intentionally failed to properly RECORD all interviews deliberately to make it impossible to review their interviews for bias and advocacy and determine A) how accurate the claimed notes and quotes were, B) how much of the information allegedly reported was contaminated and/or

26

fabricated by improper leading, suggestive, confusing, repeated, or biased questioning.

- 6 - Purdue University investigators/adjudicators/officers were engaged in a "Believe Women" (not men) political advocacy project for what they perceived to be "social justice" and they never intending to conduct a fair, competent, investigation using reliable and valid measures and methods. These are investigational alternative hypotheses that should be properly investigated by the relevant authorities including licensing boards, the DOJ, and legislative oversight committees - both State and Federal. I have offered to testify pro bono in all such investigations. (p. 97)