# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-JPK |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT
TESTIMONY OF DR. R. CHRISTOPHER BARDEN AND DR. STAN SMITH**

**LAW OFFICES OF PHILIP A. BYLER**
**Philip A. Byler, Esq.**
**11 Broadview Drive**
**Huntington, New York 17431**
**(631) 848-5175**
**pbyler1976@gmail.com**r
*Attorneys for Plaintiff John Doe*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES…………………………………………………………………....iii

ARGUMENT…………………………………………………………………......................1

I.   FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*…………………..…………1

II.  DR. R. CHRISTOPHER BARDEN PROVIDES PROPER EXPERT
    TESTIMONY UNDER RULE 702 OF THE FEDERAL RULES
    OF EVIDENCE AND *DAUBERT*.…………………………….…………………………...3

    A.   Dr. Barden's Second Report Was Authorized By The Court…………………………5

    B.   Dr. Barden's Second Report Was Intended To and
       Did Remedy The Issues Raised By Judge Kolar ………………………..………… 6

    C.   Defendants' Erroneous Attack on Dr. Barden For His
       *Sandusky* Case Report……………………………………………………………6

    D.   Dr. Barden's Expert Testimony Concerns Investigation
       Methodology, Not The Ultimate Question of Sex Discrimination………..……...8

    E.   Dr. Barden's Testimony Will Help The Jury………………………………………10

        1.   "Confirmation Bias" Is An Investigative Defect,
            Not A Conclusory Characterization Of Fact …………………………………10

        2.   The "Believe the Woman" Bias…………………………………………..…12

        3.   The Anti-Male Sexist Theories of Dr. Rebecca Campbell
            Resulting in "Confirmation Bias" and "Believe The Woman Bias"………....15

        4.   The John-Jane Texts………………………….………………………………18

        5.   The False 1 in 5 Statistic……………………………………………………18

III.   DR. STAN SMITH PROVIDES PROPER EXPERT TESTIMONY UNDER
     RULE 702 OF THE FEDERAL RULES OF EVIDENCE AND *DAUBERT*……...20

     A.  Compensatory Damages……………………………………………..…20

     B.  Hedonic Damages………………………………………………………22

CONCLUSION……………………………………………………………………………...23

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256 (2d Cir.2002)……………….………….2

*Bullock v. Sheahan*, 519 F. Supp. 2d 760, 762 (N.D. Ill. 2007)……………………….…………4

*Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022)……………………….……21

*Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993)…………..………………….....1-4, 5

*Desmond v. PNGI Charles Town Gaming LLC*, 630 F.3d 351 (4th Cir. 2011)……………………21

*Doe v. Embry-Riddle Aer Univ.*, Case No. 6:20-cv-1220-WWB-LRH, ECF 180
    (M.D. Fla. Dec. 6, 2021)……………………………………………………………………..10

*Gayton v. McCoy*, 593 F.3d 610 (7th Cir. 2010)………………………………………………8, 9

*Goswami v. DePaul Univ.*, 8 F. Supp.3d 1004 (N. D. Ill. 2014)…………………………………..13

*In re General Motors LLC Ignition Switch Litigation,* 257 F.Supp.3d 372 (S.D.N.Y. 2017)..……21

*Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021)………………………………………3

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999)………………………………………………2

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir.1995)………………………………………2

*Reid Hospital and Health Care Services, Inc. v. Conifer Revenue Cycle Solutions, LLC,*
    8 F.4th 642 (7th Cir. 2021)……………………………………………………………...……21

*Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000)………………….…………………2

*Spearman Indus. v. St. Paul Fire & Marine Ins. Co.,* 128 F. Supp.2d 1148 (N.D. Ill. 2001)…...…2

*Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753 (7th Cir. 2013)…………………………………2-3

*Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019)…….……………3

*Vukadinovich v. Hanover Community School Corporation,* 2016 WL 5939517
    (N.D. Ind. Oct 12, 2016)……………………………………………………………….……21

**<u>Constitutional Provisions, Statutes and Court Rules</u>**

Americans with Disabilities Act, 42 U.S.C. §§ 1201 *et seq*……………………….………………21

Rehabilitation Act, 29 U,S.C. §§ 791 *et seq*……………………………………………………..21

Title IX, 20 U.S.C. §1681……………………………………………………………………..5

Rule 702, Federal Rules of Evidence ……………………………………………….1-4, 5, 6

**<u>Other Authorities</u>**

Advisory Committee's Note to Fed. R. Civ. 702 …………………………………………………4

*Economic Analysis of Law*, at 184 (8th ed. 2010)…………………………………………….……22

## PRELIMINARY STATEMENT

Plaintiff John Doe ("John"), by counsel, respectfully submits this Memorandum of Law in opposition to Defendants' motion, made almost four months before the scheduled *Daubert* hearings, to exclude from trial the expert testimony of Dr. R. Christopher Barden on investigation methodology and Dr. Stan Smith on damages. The motion should be denied. Contrary to Defendants' motion, Dr. Barden's expert testimony and Dr. Smith's expert testimony are proper under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)("*Daubert*"). This Memorandum of Law: (I) discusses Federal Rule of Evidence 702 and *Daubert*; (II) the admissibility of Dr. Barden's expert testimony on investigation methodology; and (III) the admissibility of Dr. Smith's expert testimony on damages.

## I. FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*

"The admissibility of expert testimony is governed by Federal Rule of Evidence 702, as well as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006). Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and methods; and
>
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 581-589 (1993) ("*Daubert*"), the U.S. Supreme Court interpreted Federal Rule of Evidence 702 to require courts to evaluate whether the proffered expert testimony is reliable and relevant. *Daubert* established that federal district

courts must perform the function of evidentiary gatekeeper, in order to "ensure the reliability and relevancy of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

The ultimate object of the court's gate-keeping role under Rule 702 is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152 (1999). To this end, Rule 703 of the Federal Rules of Evidence allows an expert to proffer an opinion based on facts "that the expert has been made aware of or personally observed," or, alternatively, on facts or data that "experts in the particular field would reasonably rely on" in forming the opinion. But *Daubert* rejected a "rigid" standard that would require general acceptance of the expert's opinion in the scientific community because such a standard would be "inconsistent with the liberal thrust of the Federal Rules." *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1042 (2d Cir.1995) (citing *Daubert,* 509 U.S. at 588). Instead, "[t]he flexible Daubert inquiry gives the district court the discretion needed to ensure that the courtroom door remains closed to junk science while admitting reliable expert testimony that will assist the trier of fact." *Amorgianos v. Nat'l R.R. Passenger Corp.,* 303 F.3d 256, 267 (2d Cir.2002).

Rule 702 is a rule of admissibility rather than exclusion. *See Bullock v. Sheahan*, 519 F. Supp. 2d 760, 762 (N.D. Ill. 2007); *Spearman Indus. v. St. Paul Fire & Marine Ins. Co.,* 128 F. Supp.2d 1148, 1150 (N.D. Ill. 2001) (quoting Fed. R. Evid. 702 Advisory Committee's Note to 2000 amendment) ("The rejection of expert testimony is the exception rather than the rule, and 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system.'")

The "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000); *Stollings v. Ryobi Techs.,*

*Inc.,* 725 F.3d 753, 765 (7th Cir. 2013). This is so because "[t]he jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Stollings,* 725 F.3d at 765. The Seventh Circuit has recognized that "[i]n *Daubert* the Supreme Court expressly envisioned this continued role for the jury when it reminded all that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Stollings,* 725 F.3d at 766 (alteration in original) (quoting *Daubert*, 509 U.S. at 596). Thus, "the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at [his or]her opinion.'" *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021) (quoting *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019)).

## II.    DR. R. CHRISTOPHER BARDEN PROVIDES PROPER EXPERT TESTIMONY UNDER RULE 702 OF THE FEDERAL RULES OF EVIDENCE AND *DAUBERT.*

The motion that was originally made by Defendants to exclude Dr. Barden's opinions in his second report may be found at DE 240, and the opposition of John's counsel to that original motion may be found at DE 245.  Defendants' selective quotations of Dr. Barden's report contained in their Appendix is at best misleading (DE 330, pp. 25-27), as Defendants have edited out what was in the second report that corrected the first.  Exhibit A to this opposition is Dr. Barden's second report.

Dr. Barden unquestionably has expert qualifications.  Dr. Barden's second report begins:

I, R. Christopher Barden, Ph.D., J.D., LP, a licensed psychologist (MN and TX ) and licensed attorney (MN and many other states pro hac vice), have testified and/or consulted as an expert witness in many jurisdictions with regard to a number of areas including investigative methodologies, standards of care in investigations including abuse cases, the science of memory-false memories-tainted memories, the science of investigative interviewing, misconduct and malpractice in investigations, clinical psychology, psychopathology, psychotherapy, diagnostic issues, coping-resilience science, the nature of science, Frye-Daubert-Kumho science analysis, history-methodology-standards of care in criminal and related investigations, the reliability

3

of various scientific methodologies, investigative methods and procedures, as well as standards of care-licensing-ethical standards for attorneys and mental health professionals and investigators (psychologists MSWs-Counselors-GALs-social workers-psychiatrists-parenting consultants, forensic experts, expert witnesses, etc). I have given invited training addresses on these and/or related topics to the national meetings of the American Bar Association, American Psychiatric Association, American Psychological Association, the U.S. Surgeon General's Conference, as well as invited training talks at the United States Military Academy at West Point, regional F.B.I. training meetings, the Minnesota Sex Crimes Investigators Assn, the Midwestern Sex Crimes Investigators Assn, and many institutions including Harvard Law School, Harvard College, Yale, Columbia, for Oxford University Press, the University of Southern California, Penn State, and the State Universities of California, Minnesota, Georgia, Texas, Washington, North Carolina, and others. As an expert in these (Science, Psychology, Methodology, Investigations, Standards of Care) and related areas, a former member of a State Board of Psychology (MN), a former Special Assistant Attorney General (UT), the recipient of two national research awards in the science of coping and resilience, and someone who has published in the leading journals/texts in social psychology, personality psychology, psychiatry, child development, law, public policy, and pediatrics. . .

As an expert witness, I never offer opinions regarding the veracity of witnesses or the guilt or innocence of defendants. I will, however, offer multiple opinions regarding the methodologies, practices, procedures, assumptions, ideologies, and misconduct that are well-documented on the records of this case. . . .

(Ex. A 1-2)   Dr. Barden gives testimony on Defendants' methodological errors such as: "confirmation bias"; "believe the woman" bias; the errors and misconduct of Michigan State Professor Rebecca Campbell (the only expert expressly relied upon by Purdue in training Title IX investigators) with regard to her "neurobiology of trauma" theories resulting in scientifically disproven false beliefs -- "confirmation bias" methodological errors, and "believe the women" bias in this case;  the false statistic cited in the 2011 Dear Colleague Letter of 1 in 5 women being sexually assaulted;  the Jane Doe text for the meeting with Dean Sermersheim lacking a chain of custody from Purdue's sexual assault center ("CARE"); and the investigators' ignoring Jane Roe's emotional issues.  (DE 245.)  The arguments that Defendants now make still fail.

4

A.    <u>**Dr. Barden's Second Report Was Authorized By The Court.**</u>

Judge Kolar, in his August 11, 2022 opinion did exclude Dr. Barden's first report, but as discussed below, qualified that exclusion.  (DE 206, 10-12.)  Defendants falsely argue that John's counsel delivered untimely what was Dr. Barden's second report and that John never sought leave of Court. (Dfs. MOL 3-5.)  Very differently, at a March 14, 2023 Court conference, after discussion involving Judge Kolar and counsel for the parties, John's counsel was given leave by the Court to provide what was Dr. Barden's second report. (DE 234), which was done March 16, 2023 (Ex. A hereto).   At the March 14, 2023 conference, John's counsel had noted that Judge Kolar's August 11, 2022 opinion stated his ruling was without prejudice to expert opinion being admitted at trial (DE 206, p. 10) and that "The Court is not barring any and all expert opinions Dr. Barden may offer." (DE 206, p. 11). John's counsel then argued that the purpose of an expert report is to give notice of opinions which the original Barden report did; that Defendants' complaint that they did not have a replacement report by Dr. Barden could be remedied, because Dr. Barden's report could be corrected for what Judge Kolar had faulted it -- whereupon Judge Kolar ordered that John's counsel provide a revised report. Judge Kolar's Order from the March 14, 2023 pretrial conference states: "Pltf to provide Dft with document re expert opinion addressed during conference by 3/21/2023" (DE 234).

John's counsel in fact provided what was the second Barden report early on March 16, 2023. On March 28, 2023, Defendants moved to strike Dr. Barden's expert opinion (DE 240.); it was to that motion that John defended Dr. Barden's second report as proper under Rule 702 and *Daubert* (DE 245).

The case cited by Defendants on the timeliness of producing an expert report, *Suleiman v. Pellin Corp.,* 2012 U,S. Dist LEXIS 84108 (N.D. Ind. May 10, 2022), is totally off point.

**B.**  **Dr. Barden's Second Report Was Intended To and Did  Remedy The Issues Raised By Judge Kolar.**

Defendants are misfocused in arguing, as they do, that to the extent the second report is identical to the first report, the decision to exclude has been made and to the extent the second report was different, the second report suffered from the same defects as the first.  (Dfs. Mem. 5-15.).  The reason for the second Barden report was, as noted above, to remedy the faults that Judge Kolar saw in the first report. Judge Kolar faulted Dr. Barden's first report for engaging in speculation about motives and credibility of parties and witnesses, for criticizing Defendants' actions as being motivated by an anti-male radical feminism and for not tying his critique of Purdue's investigation as flawed to scientific, technical or specialized knowledge.  (DE 206, 12-14).  What Judge Kolar did not do and could not reasonably do was to reject the science of investigation methodology and specialized knowledge concerning investigations.  A reading of Dr. Barden's second report (Ex. A hereto) reveals correction of the first report and a further  insightful analysis of Defendants' investigations. Defendants omit Dr. Barden's discussions in his revised report that satisfy this Court's August 11, 2022 opinion on expert testimony. Dr. Barden discusses, among other things, the science of memory, the science of false memory, the specialized knowledge of proper interviewing, and the history of improper investigation of alleged abuse, all in order to provide a foundation per Rule 702 of the Federal Rule of Evidence for the specific opinions he states about the deficiencies in Defendants' investigation and adjudication of Jane's false allegations.

**C.**  **Defendants' Erroneous Attack on Dr. Barden For His *Sandusky* Case Report.**

Defendants attack Dr. Barden for his report in an entirely separate case involving Jerry Sandusky.  Dr. Barden's report in the *Sandusky* case was critical of the investigation methodology used in that case.

6

In that connection, Defendants wrongly label Dr. Barden a forensic psychologist. Dr. Barden, however, did not identify himself as such in the *Sandusky* case when he testified at an appellate stage of the case. Dr. Barden stated in his *Sandusky* report: "I have consulted and/or testified as an expert in psychology, child psychology, psychopathology, psychotherapy standards of care and ethics (including social work, psychology, psychiatry, counseling, etc.), psychological testing-assessment, mental illness diagnostic issues, the science of coping-resilience, the nature and philosophy of science, history-methodology-standards of care in police investigations/interviews, the science of memory-memory contamination-false memory, the science of trauma-dissociation, the history of the 'Memory Wars' the history of lawsuits and licensing revocation actions against 'recovered repressed memory therapists,' the history of abuse investigations, the reliability or unreliability of various methodologies…." Dr. Barden cannot be pigeonholed as a forensic psychologist given his science awards, invited addresses, and publications.

Defendants also wrongly assert, in a hit and run attack, that Dr. Barden's report in the *Sandusky* case is the "apparent" basis for a cut and paste job for his report in this case. That assertion is patently false -- the reports are very different: the longer 130-page *Sandusky* report fully documents historically unique examples of a corrupt criminal legal process, whereas the report in this case concerns the methodological errors of the Purdue disciplinary process (Opp. Ex. A). Importantly, Purdue does not discuss the facts in the Sandusky case that led to Dr. Barden's criticisms there, which in any event have nothing to do with this case. What Dr. Barden did in the *Sandusky* case was to document questionable, if not corrupt, conduct in the case, including: (i) an unrecorded motel meeting of the judge, the prosecutor and one defense attorney in which the defendant's right to a preliminary hearing was waived without the defendant's consent and without the knowledge of the second defense attorney; (ii) the chief police investigator admitted to repeatedly conducting multiple secret unrecorded coercive interviews with the alleged victims to

7

get the evidence the police wanted for the prosecution and the jury was not told of these coercive interviews; (iii) several of the alleged victims were in "repressed memory therapy" leading to radically changed testimony and the jury was not told of the errors and distortions of "repressed memory therapy"; (v) the chief prosecutor in the case was later disbarred for deceitful manipulation of a Court;.

Defendants' raising of the *Sandusky* case is disturbing for three reasons. *First,* it is disturbing to think that Purdue finds informative for this case Dr. Barden's exposure of corruption in a completely separate case. Why are Defendants raising here a completely separate case in which the problem was corruption? *Second*, it is disturbing for Defendants to raise another case to defame John with an implicit comparison to Coach Sandusky who, while in a position of authority, was alleged to have committed heinous acts. While Jane has never put herself under oath, Plaintiff John has repeatedly under oath in this case flatly denied the sexual accusations of Jane. (DE 183-8, John Doe Declaration, pp. 13-14; Opp. Ex. D, John Doe Dep tr. 104-105, 113-124.) *Third*, Defendants are defaming Dr. Barden with the implication that he defended a convicted child molester in a separate case, which was most certainly NOT his involvement but is most certainly Defendants' implication.

**D.    Dr. Barden's Expert Testimony Concerns Investigation Methodology, Not The Ultimate Question of Sex Discrimination.**

Defendants object that Dr. Barden is not an expert in ascertaining sex discrimination. (Dfs MOL, p. 7.)  That objection is based on a misreading and misapplication of the Seventh Circuit opinion in *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). *Gayton v. McCoy* held that being qualified in general is insufficient to answer a specific question.  Dr. Barden, however, is not fairly characterized, as Defendants do, as a generalist or as a forensic psychological expert, and he has not endeavored to ascertain sex discrimination *per se*.  The purpose of his testimony is not to opine

about the ultimate question of whether sex discrimination occurred, but to help prove an utterly flawed investigation that permitted sex discrimination to operate.

Dr. Barden's second report does disclose an expertise in a methodology that does help in ascertaining sex discrimination: the science of investigation methodology. Defendants' reliance on *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2020), does not help their argument. In *Gayton v. McCoy*, the Seventh Circuit ruled that the district court had abused its discretion in finding a physician unqualified to offer expert testimony that an inmate's vomiting may have contributed to her death. Defendants cite the part of the Seventh Circuit opinion stating the question is not merely whether the expert is qualified in general but rather whether he is qualified to answer a specific question -- a reflection that Defendants recognize Dr. Barden is a highly qualified individual. Defendants argue that Dr. Barden's report does not disclose any technique for the ascertainment of sex discrimination. (Df. Mot. 7.) Wrong for two reasons:

*First*, as noted above, Dr. Barden cannot be pigeonholed as a forensic psychologist. Dr. Barden's national science awards are in research, not forensic psychology. Dr. Barden's invited training addresses to the APA, ABA, and the Surgeon General's conference are in science, methodology and history – none of them involved "forensic psychology" assessments. Dr. Barden's publications on memory-false memory investigation methodology and the relevant history of investigation methodology as published in leading peer-reviewed journals in the world are not forensic psychology. (Dr. Barden's second report, Ex. A, pp. 3-17, 103-107.)

*Second*, as noted, Dr. Barden's second report does disclose an expertise in a methodology – as accepted by multiple courts (**State and Federal**), the **American College of Trial Lawyers, the US 9th Circuit CLE Program Office, and the national conventions of** psychologists, psychiatrists **as well as** the U.S. Surgeon General's Conference -- that does help in ascertaining sex discrimination: the science of investigation methodology. (Ex. A, pp. 17-111.)

As noted, Dr. Barden's second report does disclose an expertise in a methodology – as accepted by multiple courts, the National Association of Lawyers, psychologists, psychiatrists and the U.S. Surgeon General's Conference -- that does help in ascertaining sex discrimination: the science of investigation methodology. (Ex. A, pp. 17-111.)

Contrary to Defendants' argument (Dfs, MOL, pp.10-11), Defendants' treatment of whether Dr. Barden is qualified to answer a specific question – here, sex discrimination – is misfocused with respect to this case. No expert credential can or should exist for determining sex discrimination; the determination of whether there was sex discrimination itself is for the jury; it would be impermissible for Dr. Barden to opine directly that there was sex discrimination. *What Dr. Barden can testify to and his revised report discloses* is the science of investigation methodology and the failures of Purdue in that regard. Highly informative to ascertaining sex discrimination is Dr. Barden's expertise in the science and history of investigation methodology. Dr. Barden explains that basic, minimal science-methodology standards for sexual abuse investigations require properly recording interviews, avoiding confirmation bias, signed and dated statements of allegations or video forensic recording of allegations, consideration of alternative hypotheses, and the importance of corroborative evidence. (Dr. Barden's second report, Ex. A, pp. 20-27, 74-88.)

**E.      Dr. Barden's Testimony Will Help The Jury.**

Defendants argue that Dr. Barden's testimony will not help the jury. (Dfs. MOL, pp, 8-10.) What Dr. Barden demonstrates is that Purdue's investigation was woefully deficient -- among other things: no written and signed statement by the alleged victim; no video recording of an interview of the alleged victim; the failure of the investigator and adjudicators to ask questions pursuing alternative explanations (as required by U.S. Department of Justice guidelines); the infection of confirmation bias; no appearance much less cross-examination of the alleged victim at the meeting

10

of the Dean and Equity Committee members; the training in Dr. Campbell's unscientific theories. (Dr. Barden's second report,, Ex. A, pp. 17-111.)

Federal Rule of Evidence 702(a) requires that "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Dr. Barden's opinions will assist the jury in regards to the defects of confirmation bias in Purdue's investigation and the defects in Purdue's investigation method such as the failure to consider alternative hypotheses. Purdue, by seeking to exclude Dr. Barden, seek to immunize Purdue's disciplinary process from expert analysis and leave in place the rationalizations of Purdue administrators that resulted in sex discrimination.

1.  **"Confirmation Bias" Is An Investigative Defect,**
    **Not A Conclusory Characterization Of Fact.**

Defendants attack Dr. Barden for his discussion of "confirmation bias," erroneously calling Dr. Barden's report on "confirmation bias" as characterization of fact.  Dr. Barden's expertise includes "history-methodology-standards of care in criminal and related investigations" and "investigative methods and procedures," and Dr. Barden, in applying that expertise, has levelled a criticism of "confirmation bias" as to Purdue's investigation.  As discussed below, Dr. Barden did not just assert a conclusion but rather discussed at length the evidence.  Defendants' argument to the contrary is false.

Significantly, Defendants ignore the specific context in which Dr. Barden's opinion (which was then in the first report but properly included in the second report) is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and thus do not deal with how Dr. Barden's testimony on "confirmation bias" and properly carried over to the second report) properly will assist the jury.  Plaintiff's Memorandum of Law states (DE 187, pp. 44-45):

Defendants' third argument is that there was no gender bias in Purdue's evidence gathering. (Dfs. MOL pp. 42-43.) For this argument, Defendants' account of the investigation is inaccurate. As discussed above (pp. 13-14), John did not generally deny Jane Doe's accusations; he specifically denied them. Amberger and Oliver testified that John denied Jane Doe's accusations with respect to both allegedly touching her crotch (when the roommate was in the room) and the digital penetration that Jane Doe said she herself did not remember. (SJM 14: Amberger Dep tr 68-69; SJM 15: Oliver Dep tr 50-52.) John's roommate said he saw Jane Doe leave on the night she later said John touched her crotch area and she seemed normal. Jane Doe's RA described John as polite and friendly. Defendants significantly misstate the contents of Amberger's notes at PU 067-068 (SJM 18: Amberger/Oliver 25, Amberger Notes (PU 60-83): those notes do not reflect John being asked about the text "violating her," but rather they show John telling Amberger that he did not do what Jane Doe accused him of doing.

The investigation suffered from "confirmation bias" (Pl Opp DSJ 22: Barden Report, pp. 40-46) and reflected gender bias that manifested itself in differing unjustified treatment to the male John and the female Jane Doe.

Defendants also do not address what Dr. Barden specifically says on the subject of "confirmation bias."  Dr. Barden critiques the extremely flawed Purdue investigation in which the evidence was manipulated to "believe the woman" and disconfirming evidence was ignored.

Dr. Barden noted the disconfirming evidence ignored by the investigators: Jane Doe's texts that were friendly and inviting and sought more time and attention from John (which were cut out from what was attached to the investigation report); the John-Jane Doe texts that showed their having a very close relationship; coming from their sexual relationship; the multiple witnesses who disconfirmed Jane Doe's complaint about the stun baton; the multiple witnesses who disconfirmed Jane Doe's complaint about John having a temper problem; the Purdue investigators ignoring evidence supporting that Jane Doe was emotionally disturbed and supposedly had traumatic events in high school; the Purdue investigators ignoring Jane Doe's suicide attempt; the Purdue investigators ignoring the testimony of John's roommate; the Purdue investigators ignoring Jane Doe's expressed hatred for her mother (Dr. Barden quotes Jane's text on this point); the Purdue investigators ignoring and failing to document the full sexual relationship of John and Jane Doe

12

that was initiated by Jane Doe and that lasted several months; the Purdue investigators failing to ask Jane Doe about the timing of her accusations, five months after the supposed incidents of which Jane Doe complained; the Purdue investigators ignoring the possibility that Jane Doe sought with her allegations to seek revenge on John for reporting her suicide attempt; the Purdue investigators interviewing Jane Doe a second time about the texts while John Doe was not asked about the interpretation of texts adopted by the investigators, in accordance with "believe the woman" mantra. *See Goswami v. DePaul Univ.*, 8 F. Supp.3d 1004, 1018 n. 11 (N. D. Ill. 2014) ("Confirmation bias is 'the well-documented tendency, once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment.'")

### 2.  The "Believe the Woman" Bias.

Defendants attack Dr. Barden for faulting Defendants for "believe the woman" bias. Defendants argue that Dr. Barden does not cite to facts in the record except for a reference to the deposition of Purdue investigator Amberger and that the opinion will not assist the jury. The record, however, is full of evidence, quoted below, of Purdue's "believe the woman" bias. Dr. Barden's opinion faulting Purdue's "believe the woman" bias will certainly assist the jury.

The testimony of Purdue investigators Amberger and Oliver concerning their training provides a factual reference point for Dr. Barden's testimony on "believe the woman." When questioned about his training, investigator Amberger testified that he recognized the phrase "believe women," citing the use of the phrase by End Violence Against Women International ("EVAWI") in some of their e-mails and training and by Purdue's "Center for Advocacy Response and Education" ("CARE") when conducted training and running education on campus. (Pl Opp DDE 4: Jacob Amberger Dep tr 9-10.) When questioned about her training, investigator Oliver testified about receiving training from Michigan State Professor Rebecca Campbell on the neurobiology of trauma. (Pl Opp DDE 5: Erin Oliver Dep tr 9.)  Dr. Barden spends part of his report harshly

criticizing the errors of Dr. Campbell, including as to the errors of "neurobiology of trauma," and Dr. Campbell's impact on Title IX training at universities.  (Pl Opp. DDE 2: Barden Expert Report, pp. 35-39.

Defendants ignore how Dr. Barden's opinion (which was then in the first report but properly included in the second report) is cited in Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and thus do not deal with how Dr. Barden's testimony will properly assist the jury.  Plaintiff's Memorandum of Law (DE 187, pp. 38-39) first quotes Judge Barrett's opinion on the facts alleged in the Complaint that Judge Barrett for the Seventh Circuit ruled supported a conclusion that John was discriminated against on the basis of sex (Plaintiff's Memorandum of Law (DE 187, pp. 39-40), then reviews the summary judgment record to show the undisputed facts supported the conclusion that John was discriminated against on the basis of sex. That discussion in Plaintiff's Memorandum of Law concludes (ECF 187, p. 40):

> . . . It is undisputed that among the posts that CARE shared on its Facebook page was an article dated June 21, 2016 from *The Washington Post,* "Alcohol isn't the cause of campus sexual assault. Men are." (SJM 3: Df. Answer ¶ 24.)

> Discovery revealed additional CARE Facebook postings for the 2015-2016 school year reflecting a gender biased culture. (Pl Opp DSJ 20: CARE Facebook postings PU 0756-0884.) Plaintiff Answers To Defendants' Third Set of Interrogatories provides excerpts, which included:

> • PU 0760: "Want to know how to support a survivor? Commit to #StartByBelieving"
> • PU 0765, 0770: #StartByBelieving hashtag
> • PU 0859, 0862, 0863, 0864 Sexual Assault Awareness Month – April 2016 recognizing "survivors" and #StartByBelieving
> • PU 0866-0867: The linked website called "startbybelieving.org" is entirely targeting women and promotes simply believing women complaining about sexual assault regardless of circumstance
> • PU 0870: "#WeBelieveYou #StartByBelieving"
> • PU 0871, 0875: Advertising an event in which the speaker will "tackle rape culture." (See Law Professor Aya Gruber, *Anti-Rape Culture*, 64 U. Kansas L. Rev 1027 (2016): the notion that university procedures are to counteract the rape culture of young men)

14

(Pl Opp DSJ 21: Plaintiff Answers To Defendants' Third Set of Interrogatories.) Dr. Barden is a licensed psychologist who has testified concerning, *inter alia*, investigative methodologies, the science of memory and science of interviewing, and his expert report attributes the "believe the woman" approach at Purdue to feminist junk science "taught" in Title IX training. (Pl Opp DSJ 22: Barden Expert Report, pp. 1-3, 33-36.)

Defendants also do not address what Dr. Barden specifically says on the subject of "believe the woman" and thus do not deal with how the specific testimony of Dr. Barden will assist the trier of fact. Dr. Barden discusses the "neurobiology of sexual assault" and "neurobiology of trauma," which he explains is not accepted by the relevant scientific community but still disseminated into police and university Title IX investigative systems, giving rise to unsubstantiated claims that false accusations of sexual assault are rare; the politicized claim that only 2% of accusations are false is without scientific support -- Dr. Barden cites, *inter alia*, a Purdue faculty member's study that documented a 41% rate of false rape accusations to the police in a Midwestern city.

### 3. The Anti-Male Sexist Theories of Dr. Rebecca Campbell Resulting in "Confirmation Bias" and "Believe The Woman Bias".

According to Dr. Barden, the unreliable "neurobiology of sexual assault" and "neurobiology of trauma" taught by Professor Rebecca Campbell results in any post-assault behavior by women being considered consistent with allegations against men. (ECF 187, Pl Opp DSJ 22 & Pl. Opp. DDE 2: Barden Expert Report, pp. 30-36.)

Dr. Barden's expertise in "the reliability of various scientific methodologies" qualifies him to testify that Dr. Campbell's "neurobiology of sexual assault" and "neurobiology of trauma" is unreliable and not accepted by the relevant scientific community. A jury will be assisted in hearing that training in "believe the woman" is not following the science. A jury should not hear just Purdue administrators and investigators talk about "believe the woman" as properly part of Title IX training. But it is that very situation that Defendants seek with their motion.

Defendants' objection to Dr. Barden's opinions in terms of assisting the jury criticizes Dr. Barden's opinions concerning Purdue's reliance on the theories of Rebecca Campbell, which Purdue calls a "non-witness."  Defendants say, inaccurately, that most of Dr. Barden's opinions concern the theories of Rebecca Campbell. As noted above, Dr. Barden's opinions center more on the defects of confirmation bias in Purdue's investigation and the defects in Purdue's investigation methods such as properly recording interviews, avoiding confirmation bias, signed and dated statement of allegations or video forensic recording of allegations, lack of consideration of alternative hypotheses, and the need for corroborative evidence. (Dr. Barden's second report, Ex. A, pp. 20-27, 74-88.) Purdue's calling Campbell a non-witness is beside the point. The part of Dr. Barden's report concerning Purdue's reliance on Campbell was triggered by the deposition testimony of Purdue Investigator Erin Oliver:

> Q Did you receive any training in terms of trauma, of complainants? A Yes. Q What was that training? A Neurobiology of trauma. How brains code memories, do not code memories, during traumatic instances. That is really, all I recall from the trainings. Q Do you recall who provided that kind of trauma training? A I believe there was a faculty member from Michigan State University; Rebecca Campbell. Videos and research that is the only one I recall off the top of my head. Q You do recall Professor Campbell? A Yes, I believe she has been the prominent person on that subject.

(Opp. Ex. B, Oliver Dep tr. 9, quoted in Dr. Barden second Report, Opp. Ex. A, pp. 18, 68, 87.) As Dr. Barden explains, the theories of Dr. Campbell as applied in this case lead to a "Believe Women" (but not men) bias and a "confirmation bias.". Protecting the narrative of the alleged victim is part of Dr. Campbell's ideological framework, which is totally contrary to the science of investigation methodology. (Dr. Barden's second report, Ex. A, pp. 18-22, 68-71, 98-102.)

Defendants argue there are no recovered memories in this case, but that is because, as Dr. Barden explains, Defendants failed to record any statements from the alleged victim, whether by video or signed and sworn statement. The science of recovered memory is discussed in Dr. Barden's

report because it is important to know that the notion of "repressed memories" is fallacious: it is exactly the kind of science-history knowledge that all competent investigators should have to conduct a fair investigation. Protecting the "narrative of the women" is the goal of Dr Campbell's ideology — just what Purdue did in this case. Dr. Campbell's ideology will lead to avoidance of gathering any statements (written or recorded) from the alleged victim. This rigs a process against the male respondent and infects other aspects of the investigation. (Dr. Barden's second report, Ex. A, pp. 22, 68-69, 98-102.) One aspect was that Purdue failed to properly record interviews with witnesses. Further testimony by Erin Oliver established that fact:

> Q Was there ever any video of these interviews that you took of people in your investigation? A No, not that I am aware of... Q Was it a practice of Purdue at the time in 2015/2016 not to take video or audio of interview witnesses? A Correct, we did not audio or video interviews.

(Opp. Ex. B, Oliver Dep tr. 19.) Recording by video or audio interviews is the standard practice of police investigations and is a required practice of the science of investigation methodology. The consequence of failing to video or audio record the interviews makes it impossible to properly investigate key alternative hypotheses, as mandated by the science of investigation methodology. According to Dr. Barden, confirmation bias, discussed above, is the most serious of investigation errors. (Dr. Barden's second report, Ex. A, p. 20, 25-27, 87.)

Another aspect was that Purdue used an unreliable, subjective methodology for creating a "selected" (incomplete, manipulated) evidence base of the John-Jane texts. The investigators admittedly crafted a "selected evidence file" and let the Equity Committee and Dean see only texts the investigators felt were relevant to supporting the conclusion of finding John responsible and protecting the narrative of believing the woman. Investigator Erin Oliver testified:

> Q Okay. Why didn't Mr. Amberger and you attach 133 pages of the text communications? A We would have pulled and identified text messages that we felt were relevant to the investigation. 13 Q What do you mean by relevant? A The things that spoke directly to the allegations or response to the allegations. Q How

did you know if they did relate to the allegations? A I don't recall the exact reasoning of the practice would have been. I don't recall the specific conversation that [Investigator] Jacob [Amberger] or I had about what we included or did not include in the course of the investigation."

(Ex. B, Oliver Dep tr 32-33, emphasis supplied; see discussion in Dr. Barden's second report, (Ex. A, pp. 89-91.)

### 4.    The John-Jane Texts.

Dr. Barden's expert reading of the John-Jane text messages is that they show Jane and John were close and that Jane was unstable and manipulative.  The John-Jane texts and John's sworn testimony about his relationship with Jane are in the summary judgment record (DE 183, SJM 11: Amberger 27, Texts (PU 206-339), SJM 8: John Doe 02/18/2021). Dr. Barden's testimony on the texts will assist the jury because the full text history shows that John and Jane Doe were close and Jane was manipulative, which is material because of how the texts were misrepresented in the investigation report.  The texts showing that John and Jane Doe were close and Jane was manipulative were not attached to the investigation report, and such texts undercut the misinterpretation of the texts by the investigators, who attached only portions of 7 pages out of 133 pages of texts but who relied upon those few attached texts critically to bolster the case against John.   Also, the texts showing that John and Jane Doe were close and Jane was manipulative is material because those texts called for the development of hypotheses to account for what happened between John and Jane Doe other than John engaging in the accused behavior (which John denied).  As Dr. Barden can point out, he received his Ph.D. in clinical-child psychology from the University of Minnesota, an internationally respected, American Psychological Association accredited, training program in clinical psychology, and he also received additional graduate and clinical training at the University of California, Berkeley and at the Palo Alto U. S.

18

V.A./ Stanford University Medical Center and is currently a licensed psychologist in the State of Minnesota (LP 1460) and in the State of Texas (LP 2-2624).

**5.    The False 1 in 5 Statistic.**

Dr. Barden discusses: the emergence of a false statistic of 1 in 5 college women being subject to sexual assault, along with: a Department of Justice funded study showing that 90% of U.S. universities and colleges reporting zero rapes; the report of the Bureau of Statistics of the Department of Justice that college women were less likely to be the victims of sexual assault than their peers not enrolled in college and that the incidence of sexual assault was far less than 1%; the letter of Harvard Law Professors harshly criticizing the victim-centered, trauma informed policies and procedures adopted by universities and colleges as a result of the 2011 Dear Colleague Letter, identifying the source as the "believe the victim" ideology; the essay of Harvard Law Professor Jeannie Suk on how fair process must always be open to the idea that either side might turn out to be correct, but such an approach violates the ideological tenet of always believing the accuser; and that recognition of such points does not allow for unrecorded, untranscribed Equity Committee proceedings where bias against men is free to operate. (ECF 187, Pl Opp DSJ 22; Barden Expert Report, pp. 6-7, 21-30.)

Judge Barrett's treatment of what was a U.S. Government-Department of Education pronouncement in that had profound effect on university campuses. Judge Barrett for the Seventh Circuit in *Doe v. Purdue* reviewed the 2011 Dear Colleague Letter that "ushered in a more rigorous approach to campus sexual misconduct allegations by, among other things, requiring "a lenient 'more likely than not' burden of proof when adjudicating claims against alleged perpetrators," and Judge Barrett discussed Department of Education Assistant Secretary Catherine Lhamon's statements that meant "a school's federal funding was at risk if it could not show that it was vigorously investigating and punishing sexual misconduct." 928 F.3d at 668. Judge Barrett stated

the 2011 Dear Colleague Letter was relevant in evaluating the plausibility of a Title IX claim, citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018), and *Doe v. Columbia*, 831 F.3d 46, 58 (2d Cir. 2016)

A jury will be assisted in hearing from Dr. Barden that a factual premise of the 2011 Dear Colleague Letter with respect to the incidence of sexual assault on university and college campuses is false and that victim-centered, trauma informed policies and procedures adopted by universities and colleges as a result of the 2011 Dear Colleague Letter are not justified but are gender biased. *Doe v. Embry-Riddle Aer Univ.*, Case No. 6:20-cv-1220-WWB-LRH, ECF 180 (M.D. Fla. Dec. 6, 2021) (expert testimony on Title IX history and sexual stereotypes admissible). A jury should not hear just Purdue administrators and investigators talk about sexual assault on campus requiring victim-centered measures as if 1 in 5 college women are being subject to sexual assault. But it is that very situation that Defendants seek with their motion.

### Iii.    DR. STAN SMITH PROVIDES PROPER EXPERT TESTIMONY UNDER RULE 702 OF THE FEDERAL RULES OF EVIDENCE AND *DAUBERT*.

The motion that was originally made by Defendants to exclude Dr. Smith's opinions on hedonic damages only (not compensatory damages) may be found included at DE 235, and Plaintiff John's opposition to that original motion may be found included at DE 242. Dr. Smith's report is Exbibit B to this opposition and will be updated so as to deal with Defendants' argument over the passage of time (which ignores Defendants' culpability, with their scorched earth litigation in lengthening the time of this litigation). The list of cases where Dr. Smith's testimony was accepted over objection and motions to exclude is Exbibits C and D to this opposition.

#### A.   Compensatory Damages.

Defendants make two arguments against Dr. Smith's compensatory damage calculations, neither of which have merit.

20

The first is that what Defendants call the loss of earnings capacity is a form of consequential damages not compensable under Title IX. Wrong factually and legally. John has sought lost wages and benefits, which is what Dr. Smith calculates. What John has sought in lost wages and benefits are "compensatory damages," which are damages sufficient in amount to indemnify the injured person for loss suffered. *Desmond v. PNGI Charles Town Gaming LLC*, 630 F.3d 351 (4th Cir. 2011); . ); *Vukadinovich v. Hanover Community School Corporation,* 2016 WL 5939517 (N.D. Ind. Oct 12, 2016)(Simon, J.)(compensatory damages not limited to actual loss of money). This is in contrast to "consequential damages," which are generally defined as damages which arise from special circumstances that make them probable, although they would be unusual apart from such circumstances. *In re General Motors LLC Ignition Switch Litigation,* 257 F.Supp.3d 372 (S.D.N.Y. 2017). Defendants are trying to take advantage of the point that "the definition of consequential damages is 'elusive,' 'ambiguous[,] and equivocal.' *Damages*, Black's Law Dictionary (11th ed. 2019)." *Reid Hospital and Health Care Services, Inc. v. Conifer Revenue Cycle Solutions, LLC,* 8 F.4th 642, 648 (7th Cir. 2021), which is why Defendants do not elaborate on their assertion as to consequential damages..

Defendants' argument, though, is in vain because Defendants miscite and misapply *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212 (2022), which disallowed punitive and emotional distress damages in a case brought under the Rehabilitation Act and Americans with Disabilities Act. Defendants argue that Title IX is limited to the usual forms of relief for breaching a legally enforceable contract. (Dfs. Mem. 16-18.) That limitation, however, includes compensatory and consequential damages. What is calculated in the Smith report for John are lost wages and benefits and hedonic damages.

Defendants' second argument is that Dr. Smith's methodology is unreliable and does not fit the facts. (Dfs. Mot. 18-21.) Defendants attack Dr. Smith for not accepting Defendants' mentally

unbalanced personal attacks on John and thus assume John would earn a college degree, commence a career and succeed and further that Plaintiff John would probably leave school altogether (never mind John's testimony that he intends to return to school once the distraction of this case is over). Defendants also attack Dr. Smith for not recognizing that Plaintiff John's GPA 2.1 – never mind that total GPA was above 3.0 and that the Navy ROTC leadership recognized that grades don't equal career success and acknowledged John McCain as the last in his class but went on to be a success (U.S. Senator, Presidential candidate). Defendants' mentally imbalanced personal attacks on John are not actual facts.

### B. Hedonic Damages.

Dr. Smith, an economist, calculates damages in two categories: (i) lost wages and benefits; and (ii) loss of value in life, what sometimes is called "hedonic damages." Purdue seeks to exclude the second category of damages, which are still direct damages seeking to compensate loss.

Economics minded Judge Richard Posner of the Seventh Circuit has supported the use of hedonic damages. *See Economic Analysis of Law*, at 184 (8th ed. 2010). Dr. Smith is a nationally recognized forensic economist able to explain to a jury the economic value of the loss of enjoyment of life (hedonic damages) that Defendants' conduct caused John. Dr. Smith received both a Ph.D in economics and an MBA from the University of Chicago. Dr. Smith has published more than fifty articles, including numerous articles in peer reviewed journals on the value of life. He also co-authored a textbook on hedonic damages. (Opp. Ex. B.)

Defendants err in classifying economic hedonic damages as disallowed emotional distress damages. Emotional distress damages concern the emotions from what was taken away; a dead person has no emotional distress damages. Hedonic damages are based on an economic measure of the loss of what existed in terms of a normal life; a dead person may be awarded hedonic damages. (Opp. Ex. B.) The Smith Report explains what hedonic damages are about:

Economists have long agreed that life is valued at more than the lost earnings capacity. My estimate of the value of life is based on many economic studies on that we, as a contemporary society, actually pay to preserve the ability to lead a normal life. The studies examine incremental pay for risky occupations as well as a multitude of data regarding expenditure for life savings by individuals, industry, and state and federal agencies. . . .

**Because it is generally accepted by economists, the economic methodology for the valuation of life has been found to meet the *Daubert* and *Frye* standards by many courts, along with the Rules of Evidence in many states nationwide.** My testimony on the value of life has been accepted in over 275 state and federal cases nationwide in approximately two-thirds of the states and two-thirds of the federal jurisdictions. Testimony has been accepted by U.S. district and appellate courts as well as in state circuit, appellate, and supreme courts. Proof of general acceptance and other standards is found in a discussion of the extensive references to scientific economic peer-reviewed literature on the value of life listed in the Value of Life Appendix to this report. . . .

(Opp. Ex. B: Dr. Stan V. Smith Report, p.7; emphasis added.) Accompanying John's opposition is a chart listing cases in which Dr. Smith's testimony has been ruled admissible. (Opp. Exs. C-D.)

Defendants tries to attack the reliability of Dr. Smith's calculation of hedonic damages by citing a few unofficially reported cases. As Dr. Smith explains in his report in this case, economists measure Value of Life by determining how much society is willing to pay to preserve the ability to lead a normal life. To determine Value of Life, scholars evaluate a plethora of data, including the wage differentials for dangerous jobs. The Value of Life literature is well regarded and universally recognized by economists. Dr. Smith has supplied two charts showing court acceptance of Dr. Smith's testimony over objection and motion to exclude. (Opp. Exs. C- D.)

## CONCLUSION

For the reasons stated above, Defendants' *Daubert* motion to exclude the expert testimony of Dr. R. Chris Barden should be denied, and the Court should grant such further and other relief as deemed just and proper.

**Dated: July 26, 2024**

                                    **Respectfully submitted,**
                                    **LAW OFFICES OF PHILIP A. BYLER**

By: /s/ *Philip A. Byler*
_____
**Philip A. Byler, Esq.**
**11 Broadview Drive**
**Huntington, New York 11743**
**(631) 848-5175**
**pbyler1976@gmail.com**
*Attorneys for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

The undersigned certifies that this document and its referenced exhibits were served upon the attorneys of record for each party to the above-entitled cause at the address shown below on July 26. 2024:

William P. Kealey, Esq.
James Olds, Esq.
Scotty Teal, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com

*Attorneys for Defendants*

BY: ECF

By: /s/ *Philip A. Byler*
_____

24