# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF INDIANA

HAMMOND DIVISION

_____

|   |   |   |
|---|---|---|
| | ) | |
| JOHN DOE, | ) | |
| | ) | CIVIL ACTION |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| PURDUE UNIVERSITY, PURDUE | ) | |
| UNIVERSITY BOARD OF TRUSTEES, | ) | |
| MITCHELL ELIAS DANIELS, JR., | ) | |
| in his official capacity as President of Purdue | ) | |
| University, ALYSA CHRISTMAS | ) | |
| ROLLOCK, in her official    capacity at | ) | CASE NO. 2:17-cv-33-JPK |
| Purdue University, KATHERINE | ) | |
| SERMERSHEIM, in her official capacity | ) | |
| at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

_____


**EXPERT WITNESS REPORT OF R. CHRISTOPHER BARDEN, Ph.D., J.D., LP**


    **R. CHRISTOPHER BARDEN, Ph.D., JD, LP hereby declares subject to the penalties of perjury pursuant to 28 U.S.C. § 1746**

    **This Expert Witness Report is Affirmed Under Oath. I, R. Chris Barden, Ph.D., JD do swear and affirm the truthfulness of this Expert Witness Report as filed on March 16, 2023**

1.      I, R. Christopher Barden, Ph.D., J.D., LP, a licensed psychologist ( MN and
TX)  and licensed attorney (MN and many other states pro hac vice), have testified and/or
consulted and/or reviewed cases in many jurisdictions (including NY, MA, ME, NJ, VA,
NC, GA, FL, TX, NM, AZ, CA, OR, WA, ID, UT, CO, NE, SD, MN, IA, IN, IL, MI,
AR, WI, and others) with regard to psychological and investigative issues.  I have
consulted and/or testified as an expert in psychology, child psychology, psychopathology,
psychotherapy standards of care and ethics (including social work, psychology,
psychiatry, counseling, etc.),  psychological testing-assessment, mental illness diagnostic
issues, the science of coping-resilience, the nature and philosophy of science, history-
methodology-standards of care in police investigations/interviews, the science of
memory-memory contamination-false memory, the science of trauma-dissociation, the
history of the "Memory Wars", the history of lawsuits and licensing revocation actions
against "recovered repressed memory therapists", the history of abuse investigations, the
reliability or unreliability of various methodologies-investigative methods-procedures, as
well as standards of care-licensing-ethical rules-history for mental health and
psychotherapy professionals (psychologists-MSWs-Counselors-GALs-social workers-
psychiatrists-MFTs-parenting consultants, forensic experts, expert witnesses, etc.)  and
related issues.

        As an expert witness, I never offer opinions regarding the veracity of witnesses or
the guilt or innocence of defendants. I will, however, offer multiple opinions regarding
the methodologies, practices, procedures, assumptions, ideologies, and misconduct that
are well-documented on the records of this case. As an experienced scientist,
psychotherapist, and trial attorney I will offer opinions about the failures of many
involved in this case to meet minimal standards of care for psychotherapists,
investigators, and legal professionals (judges, trial lawyers, and government officials). I
will also offer investigative hypotheses to assist future investigations of this case by PA
State Legislative oversight committees, PA State Licensing Boards, and Federal
investigative bodies having the power to subpoena records and question witnesses under
oath to further explore the multiple kinds of misconduct, indications of corruption, and
other controversies documented in this case.

In my opinion, the key role/task of an expert witness is to assist courts, attorneys, government officials, defendants, litigation parties, the media, and the public **understand and apply reliable** scientific, technical, and investigative principles, hypotheses, methods, and information **_to protect the integrity of the legal system_**. All opinions offered herein are to a reasonable degree of professional and scientific certainty.

**2.      EXPERT QUALIFICATIONS IN PSYCHOLOGY (CLINICAL AND SCIENCE) AND LAW:** I received a B.A. in child psychology from the internationally acclaimed Institute of Child Development at the University of Minnesota graduating Summa Cum Laude, Phi Beta Kappa and receiving the Distinguished Graduating Senior Award. I received my Ph.D. in clinical-child psychology from the University of Minnesota, an internationally acclaimed, American Psychological Association accredited, training program in clinical psychology. I received additional graduate and clinical training at the University of California, Berkeley and at the Palo Alto U. S. Veterans Administration/Stanford University Medical Center internship. I received several national fellowship awards from the United States National Institute of Mental Health. I am currently a licensed psychologist in the State of Minnesota and in the State of Texas. I have been in good standing in all jurisdictions where I have practiced as a psychologist, attorney, and/or expert witness and have never been disciplined in any way at any time. I have extensive clinical psychology experience in conducting psychotherapy and assessments in medical, outpatient, forensic, correctional, educational, and inpatient settings working with a wide range of client populations including adults, children, adolescents, families, prison inmates, hospitalized inpatients, traumatized veterans, surgical patients, pediatric patients, traumatized prison inmates, traumatized survivors of the Pol Pot concentration camps, and other patient groups.

I've served on the Editorial Consulting Board of the official American Psychological Association journal for child psychology, Developmental Psychology. I've received two national research awards in child psychology and the psychology of coping and resilience from the Foundation for Child Development and the

W.T. Grant Foundation. I've served as a Principal Investigator (the person responsible for the funds and validity-integrity of the research) on state, federal, and private research grants. I have published in, and/or served editing/review duties for several of the most highly regarded journals and texts in psychology, medicine and law including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation.

I have given invited training addresses to the American Bar Association, the American Psychological Association, the American Psychiatric Association, the U.S. Surgeon General's Conference, the International Association of Plastic and Reconstructive Surgeons and other groups.  I served a four-year term as a member of the Minnesota State Board of Psychology appointed by Minnesota Governor Arne Carlson.  My national invited addresses have often focused on methodological and scientific problems in the mental health system.  I have personally investigated — as an attorney, legal consultant, and/or as a psychological expert witness or consultant - hundreds of cases of negligence and malpractice by mental health professionals including cases of accurate, and/or tainted, and/or false memories. I have also been asked to consult with and/or train groups of law enforcement personnel — regarding the proper methodology for investigation and analysis of abuse cases — including the Midwest Sex Abuse Investigators Association meetings and other officials as well as F.B.I. agents, police officials, U.S. DOJ and Attorney's Office personnel and related professionals.

I served as a Special Assistant Attorney General for the State of Utah helping to enforce licensing rules and regulations, protect the public from junk science "therapies", and prosecute misconduct by mental health professionals.  One of my main areas of concentration as a psychologist has been to *protect the mental health and legal systems and vulnerable patients from misleading junk science myths and unreliable methodologies in the psychotherapy/mental health industry* including but not limited to

helping courts and professionals understand the methodology of reliable investigations, the science of human memory, the science of memory contamination ( including the risks of false memories induced by poorly trained psychotherapists and/or investigators ), the risks of improper-unreliable interviewing and psychotherapies, proper and improper uses of psychological testing, the risks of reliance upon "clinical judgment" methods,  the well-documented limitations of professional expertise in all psychotherapy professions, the well-documented inability of psychotherapy professionals to reliably distinguish true from false patient reports in the absence of any corroborating evidence, ethical rules requiring psychotherapists and experts to fully, fairly, honestly, and accurately disclose to attorneys-patients-courts-officials the methodological limitations on their methods/practices, the risks of missing-hidden and/or manipulated evidence, the risks of failing to generate and test alternative investigative hypotheses (avoiding confirmation bias), and other issues.

I received a law degree with honors (J.D., cum laude) from Harvard Law School as well as training in forensic psychology/psychiatry from the joint Program in Law and Psychiatry at the Harvard Law and Medical Schools.  I served as Adjunct Professor of Law at the University of Minnesota Law School and at the Hamline University School of Law, teaching "Psychology, Psychiatry and the Law" at both institutions.  I was admitted to the practice of law in Minnesota on October 23, 1992 (License #227316), admitted to practice before the United States District Court of Minnesota on November 18, 1992 and was admitted to Practice before the United States Court of Appeals for the Eighth Circuit on May 24, 1994. I have practiced in many jurisdictions via pro hac vice admission.  I am, and have always been, in good standing in every jurisdiction in which I have practiced.  As a trial attorney, I have litigated or consulted on many cases in many states over the past 30 years involving negligent mental health and psychotherapy professionals — social workers, psychiatrists, psychologists, counselors, etc. — including several complex Frye-Daubert-Kumho hearings excluding junk science methodologies including the notion of "recovered repressed memories", "dissociative amnesia", "trauma memories", the "neurobiology of trauma" and related notions. I have been invited to speak on issues relevant to this case to several State Bar Assn conferences as well as the

American Bar Association's National Litigation Section meetings.  I served as a Special Assistant Attorney General for the State of Utah assisting in licensing prosecutions of negligent mental health professionals. I have also consulted with multiple states licensing boards regarding licensing prosecutions of negligent psychotherapists including social workers, psychologists, and psychiatrists.  One of my main areas of concentration as an attorney and as a science expert witness has been to ***protect the integrity of the mental health and legal systems and protect vulnerable patients and citizens from unreliable, dangerous "treatment" methods*** — including but not limited to helping courts and professionals understand the proper and improper methodology of investigations, the science of memory-false memory, the science of memory contamination via improper interviewing, the nature of scientific evidence regarding  alleged "repressed and recovered memories", "dissociative amnesia", "trauma memories"  improper-abusive investigative interviewing methods and psychotherapy of children and adults, use and misuse of psychological testing, limitations on "clinical judgment", research documenting the general lack of expertise in the psychotherapy professions, the well-documented inability of psychotherapists to reliably distinguish true from false patient reports without corroborating evidence, the importance of generating and testing alternative investigative methodologies (avoiding confirmation bias), the standards of care in the psychotherapy professions (social work, psychology, psychiatry, counseling, etc.)  and similar issues.

My scientific research began with studies on the relationships between emotion and cognition. Later I worked doing research with some of the world's leading surgeons studying the ways in which children and families cope with the stresses of chronic, complex medical conditions. I was fortunate to receive several national research awards and was able to present my work at psychological and medical conventions in North America, South America, Australia, Europe, and Asia.  I developed an interest in reforming and improving the health care system for children and was admitted to Harvard Law School to study such legislative and policy issues. One of my advisors at Harvard, Stephen G. Breyer (then Chief of the US 1st Circuit Court of Appeals, later Assoc. Justice of the US Supreme Court), encouraged me to use my unusual mix of science-law

knowledge to help the legal system *reduce the influence of unreliable, "junk science" theories, methods, and ideologies and thus **protect the integrity of the legal system.*** (Justice Breyer later wrote the Kumho decision of the US SCT applying Daubert analyses to a wide range of experts and related evidence). I have been following Justice Breyer's recommendation – to ***protect the integrity of the legal system*** -- for over 30 years helping to reduce damage to the mental health and legal systems from the reckless "**Recovered Repressed Memory-Multiple Personality Disorder-Dissociation**" **(RRM-MPD-DISS)** therapy movements, reduce damage to vulnerable patients from the reckless "Re-Birthing Therapy" movement, reduce damage from the reckless "Coercive Holding Therapy" movement, as well as win many Frye-Daubert-Kumho hearings to improve the integrity of the legal system in multiple states. I have also helped many states prosecute and revoke the license of multiple prominent members of the RRM-MPD-Dissociation movement. I have participated in ***multiple Frye-Daubert-Kumho science hearings in multiple states ALL of which ended in the exclusion of inherently unreliable testimony based on RRM-MPD-Dissociation*** "trauma memories", and/or changes in "memories" following memory-contaminating therapy sessions and/or improper conducted (or unrecorded) investigative interviews and/or exposure to RRM-MPD-DISS ideology. I have consulted with and testified for prosecutors in a number of states to help local professionals become more science-informed when dealing with complex memory cases and investigative methodological issues. When Oxford University Press planned to publish an international book on Abuse Cases with a chapter on these specialized memory RRM-MPD-Dissociation-Daubert hearings and related issues they asked me to write the relevant chapter. The Right Honorable, Lord John Thomas, Lord Chief Justice of England and Wales attended our Oxford University Press book launch at Gray's Inn in London and told me he was aware of my reform work and grateful.

In multiple Frye-Daubert-Kumho hearings (see citations below), when I have participated as a consultant, testifying expert, or the trial attorney questioning scientists on both sides of the issues, we have prevailed in all such hearings as the courts rejected expert witness and alleged victim testimony based on RRM-MPD-DISS "memories" and ideology, "dissociative amnesia", and related inherently unreliable non-normal memory processes that were excluded by courts to ***protect the integrity of the legal system.***

**3.  METHODOLOGY:**   My opinions In this case are the product of scientifically informed, rigorous, valid, and reliable methodological standards, procedures, and practices. My opinions in this case are consistent with those of my colleagues in the Relevant Scientific Community.  In my opinion (a science opinion), I am a member of the relevant scientific community (RSC) (see comparison chart below). I am apparently *the only member of the relevant scientific community to review full records of this case.* To ensure the reliability, validity, consistency, and accuracy of my opinions in this case I have followed reliable methodologies. These methodologies include the following components.

**3A.** *Acquire and demonstrate expert knowledge of the relevant science and standards of care.* I have published peer reviewed articles on the importance of the proper use of scientific methodologies and Frye-Daubert-Kumho analyses and standards to protect the integrity of the legal and mental health systems. These articles have been published in some of most authoritative and respected journals and texts in the world including *Psychology, Public Policy, and Law* and with Oxford University Press.  (See, e.g. Grove, W. M. and Barden, R.C. (2000). 'Protecting the integrity of the legal system: The Admissibility of Testimony from mental health experts under Daubert/Kumho analyses.' *Psychology, Public Policy and Law*, *5(1)*, 234-242). Excerpts reprinted in Fisher, G. *Evidence*: University Casebook Series (2002), Foundation Press – West Group, New York, p. 688 ;  and Barden, R.C., Memory and Reliability: Developments and Controversial Issues. In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, *Oxford University Press,* 2016.  Foreword by The Right Honorable, Lord John Thomas, Lord Chief Justice of England and Wales*)*.  I have also given invited training addresses on such issues to continuing education groups in law-psychology-social work-psychiatry, to the national convention of the American Bar Association Litigation Section, as well as to state and federal judges including an invited training presentation at the request of the US 9th Circuit Court of Appeals Program Office. (See, 2022 CV Resume of RC Barden, Ph.D., JD).

8

**3B.** *Cite to and quote from high quality peer reviewed published research articles and texts from some of the most reliable sources in the world with many published by world experts in the relevant fields.* As someone who has obtain federal, state, and private grant funding for science research and someone who has published in and performed editorial duties for leading journals and texts in psychology, medicine, law, and public policy, I am quite familiar with assessing the quality of scientific research and other journal articles and the specifics of how to review and assess the methodological soundness, reliability, and validity of scientific research. In my reports in this case, I cite in detail —quotes and full citations — to the highest quality research often conducted by the most esteemed and methodologically sophisticated world experts in the field. I have known and worked with many of the world experts in the relevant fields for many years.

**3C.** *Form Opinions and Testify Applying Sufficient Knowledge, Training, and Experience to offer expert opinions and explain foundational science as a member of the Relevant Scientific Community.* As a member of the <u>**relevant scientific community**</u> - - the group of science experts like myself who —

-- *actually "create, publish, and professionally write-edit-critique science journals* and

-- have received *funding as a principal investigator from Federal-State-Private research grants*, and

-- have *engaged in editorial duties for the major peer reviewed scientific journals*, and

-- have given *invited addresses at the national conventions of relevant professions/sciences (American Psychological Association, American Bar Association, American Psychiatric Association) and*

**--** have *received national science awards*, and

-- have given *invited addresses at national science universities* and the US Surgeon General's Conference, and other indications.

I hope the following summary chart will be helpful to identify some of the differences between the knowledge, training, and experience of members of the Relevant

Scientific Community as compared to local "counselors", "therapists", "administrators", ex-police officers, or too-often science uninformed attorneys who attempt investigations with or no competent training — as in this case.

**EXPERT QUALIFICATIONS CHART:**   As a member of the national **Relevant Scientific Community,** I answer **YES to all of the questions below** while "counselors", "psychotherapists" or too-often science uninformed attorneys and poorly trained "administrators" "advocates" or lawyer-investigators will answer NO to virtually all of these questions.

- Have you received national science awards?

- Have you received a Ph.D. from a leading university program? (MN, UC Berkeley, Stanford Univ/USVA)

- Have you received a JD from a leading law school? (Harvard Law School)

- Have you obtained a Psychology Faculty Position at a leading University?

- Have you obtained a Medical Faculty Position at a leading University?

- Have you obtained a Law School Faculty Position at a leading University?

- Have you published in leading child psychology journals/texts?

- Published in leading pediatric journals/text?

- Published in leading social psychology journals/text?

- Published in leading clinical psychology journals/text?

- Published in leading psychiatric journals/text?

- Published in leading surgical journals/text?

- Published in leading legal/ethics journals/text?

- Have you received Federal grant funds as P.I. to conduct research? (PI = Scientist in Charge)

- Received State grant funds as P.I. to conduct research?

- Received Private grant funds as P.I. to conduct research?

- Have you given invited addresses at the:

— National convention of psychologists (APA)

— National convention of psychiatrists (APA)

— National convention of lawyers re: use of expert witnesses (ABA)

10

— National convention of the American Society for Clinical Hypnosis

— National United States Surgeon General's Conference?

— International Medical Conferences... UK, France, US, Canada, India, Chile?

— International Sports Psychology Conference at the Beijing Olympics (Aug-2008)

- Have you given an invited address at Harvard University?

- Have you given an invited address at Harvard Law School?

- Have you given an invited address at Yale University?

- Have you given an invited address at Columbia University?

- Have you given an invited address at University of Southern Ca.?

- Have you given an invited address at the Universities of TX, GA, IA, CA, MN, NC

- Have you given an invited address at the United States Military Academy at West Point, NY?

- Have you consulted with the US Department of Justice?

- Have you consulted with the US FBI?

- Testified as a Prosecution Expert Witness in Multiple States?

- Testified as a Defense Expert Witness in Multiple States?

- Given invited training addresses to Federal Judges?

- Given invited training addresses to State Judges?

- Given invited training addresses to the F.B.I.?

- Given invited training addresses to Sex Crimes Investigators Associations?

- Given invited CE addresses to over 10,000 psychologists, social workers, MDs?

- Have you written an invited chapter on Memory Issues in Law for Oxford University Press?

- Have you performed invited Editorial duties for leading Psychiatric Journals

- Performed invited Editorial duties for leading Law/Public Policy Journal?

- Performed invited Editorial duties for leading Child Psychology Journal?

11

- Editorial duties for leading Social Psychology Journal?

- Editorial duties for leading Law/Public Policy Journal?

- State Government Appointment to Licensing Board?

- Have you served as a Special Assistant State Attorney General prosecuting psychotherapists?

- Have you served as a Harvard Law School Intern for the Massachusetts Attorney General's Office for Victims of Violent Crimes?

- Expert Consultant to State Licensing Boards re: revocation hearings in many jurisdictions?

- Frye-Daubert Hearings: As a lawyer or expert have you succeeded in excluding unreliable,

junk social science, psychotherapy, and/or medical evidence in multiple legal cases?

As a Psychotherapist/Counselor:

- have you treated patients in hospital inpatient settings?

- have you treated patients in outpatient settings?

- have you treated patients in prison-forensic settings?

- have you treated patients in independent practice?

- have you treated trauma victims in VA Hospitals, Clinics, Prisons, and Church settings?

- have you treated, counseled, and/or researched with victims of the Pol Pot concentration camps?

- have you treated, counseled, and/or researched with victims of the Holocaust?

- have you treated adult patients?

- have you treated psychotic patients?

- have you treated neurologically impaired patients?

- have you done diagnostic assessments of patients?

- have you treated families?

- you treated Children and Adolescents as patients?

- have you treated Medically ill patients?

- have you treated Drug Addicted patients?

- have you treated Incarcerated patients with criminal convictions?

- have you counseled troubled people included anxious, depressed, and traumatized victims in church settings?

- As a performance psychology consultant have you trained Olympic Athletes, NBA players, Navy Fighter Pilots, Harvard Law Students, Harvard College Students, and Intl Ranked Tennis players?

- As a University Faculty member have you trained MA graduate level psychotherapists?

- As a University Faculty member have you trained PhD graduate level psychotherapists?

- As a University Faculty member have you trained MD students and faculty in relevant areas?

- As a University Faculty member have you trained Law School students and faculty?

**3D.** ***Formulate Opinions and Testify Applying Sufficient Knowledge, Training, and Experience to be a member of the Relevant Clinical Mental Health Professional Community.***

**3E.** ***Offer detailed, relevant, reliable, peer-reviewed, published scientific information as well as detailed opinions including alternative investigative hypotheses and research summaries to provide the legal system (court, lawyers, parties) with essential knowledge to understand the issues in a case.*** I have written this report to provide a summary of my opinions in this case, based upon my extensive and detailed review of all of the case records (see listed below in detail).

**3F. Train legal and mental health professionals in the basic and essential science that should guide and inform attorneys, judges, and juries in science-complex cases like this one.** For example, the science discussed below is essential in such cases to ***protect the integrity of the legal system***. The exhibits discussed below are essential, foundational, peer reviewed, published research articles that help to document and explicate the science underlying my detailed opinions in this report.

**3G.  Offer opinions regarding proper Methodology-Practices for Criminal-Civil-Science-Medical _Investigations_, History, Science of Memories/False Memories/Contaminated Memories/ and other opinions as offered below.**

Who believes Dr Barden is an expert in Investigations (Criminal, Administrative, Medical, Scientific), Investigation Methodology, and the history of proper and improper Investigations in Abuse Cases?

**PUBLISHERS:**

**_Oxford University Press_** invited me to write the Chapter in an International Text re: Memory and Memory Contamination (RRM-MPD-DISS) issues in Criminal Investigation Cases.  See, Barden, R.C., Memory and Reliability: Developments and Controversial Issues. In _Witness Testimony in Sex Cases_, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, 2016,.  _See, Foreword by The Right Honorable, Lord John Thomas, Lord Chief Justice of England and Wales._

**_Thomson Reuters WEST Publishing_** invited me to write the chapter on RRM-MPD-DISS and related Investigation issues in The Litigator's Handbook for Forensic Medicine, Psychiatry and Psychology.  See,  Barden, R.C. and Lorandos, D., _Assessment and Litigation of Complex Social Science cases including Repressed-Recovered Memory, Dissociation, Trauma Therapies, and False Memories, in_ D. Lorandos (Ed.) 2021 The Litigator's Handbook for Forensic Medicine, Psychiatry and Psychology. Thomson Reuters WEST, Egan, Mn. (3 vols). Expected April 2022.

**NATIONAL CONVENTIONS:**  I have been invited to speak regarding training issues at the national conventions of Lawyers, (ABA) Psychologists (APA), and Psychiatrists (APA) regarding Methodological Competence in Scientific Investigations, Psychotherapy, and the History of Methodological-Investigation-Therapy Errors in the Mental Health System.

**JOURNALS:**  I have been invited to review scientific and medical publications regarding Methodological Competence in Science Investigations for leading journals in Medicine, Clinical Psychology, Social Psychology, Personality Psychology, and others.

14

**THE RELEVANT SCIENTIFIC COMMUNITY:  The world's leading scientists in issues relevant to this case joined with me to draft and file Amicus Briefs.**  See, Barden, R. C. (2006) Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, Feb., 2006. With AMICI Aaron T. Beck, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi Breslau, and more.

**FEDERAL AND STATE COURTS:  I have been qualified and admitted to testify as an expert witness on methodology (investigations), science, history and related issues in multiple State and Federal Courts including for example:**

_US v Hughson_ (District of MN) Jury criminal trial. I testified for the defense regarding methodological errors in the investigation of the US Attorney's Office and the FBI. The jury returned a Not Guilty verdict.

_US vs. Jourdain_ (District of MN) Jury criminal trial.  I testified for the defense regarding methodological errors in the investigation and conduct of a local physician-

investigator, the US Attorney's Office, and the FBI. The jury returned a Not Guilty verdict.

 *Tennessee v. Manser.* Jury criminal trial. I testified for the defense regarding methodological errors in the investigation and conduct of a local therapist-investigator, the local prosecutors' office, and local investigators. The jury returned a Not Guilty verdict.

 *Minnesota v Olyinloye*. Jury criminal trial. I testified for the defense regarding methodological errors in the investigation conduct and practices of a local therapist-investigator, the local prosecutors' office, and local investigators. The jury returned a Not Guilty verdict.

 *Minnesota vs. Horn*: Jury criminal trial. I testified for the defense regarding methodological errors in the investigation conduct and practices of a local therapist-investigator, the local prosecutors' office, and local investigators. The jury returned a Not Guilty verdict.

 *Utah v Bodtcher:* Jury criminal trial. I testified for the defense regarding methodological errors in the investigation conduct and practices of the local prosecutors' office and local investigators. The jury returned a Not Guilty verdict.

 *Texas v. Harris* : Jury criminal trial. I testified for the prosecution (State of Texas) regarding methodological errors in the investigation conduct and practices of the defense expert witness who was excluded as per Daubert analysis following my testimony. The jury returned a Guilty verdict.

 and others.

 3G. **SCIENCE AND LAW**:   In an international publication for Oxford University Press on Sex Abuse cases, I was invited to contribute the chapter on Controversial Memory Issues (RRM-MPD-DISSOCIATION, etc) and began by writing:

 "***Reliance on science is essential to proper legal process. The science of memory is particularly important***. Criminal investigations must often focus on individual memory reports in the absence of corroborative evidence. Controversial theories involving the notion of 'repressed-recovered memories' (RRM) include multiple

16

personality disorder (MPD), dissociative identity disorder, traumatic amnesia, dissociative amnesia, betrayal trauma theory, and related concepts. Such theories have generated some of the most contentious, complex, and forensically challenging issues in the recent history of the mental health and legal systems."

Coordinated, multidisciplinary efforts in legislation, litigation, licensing regulation, education (public and professional), and science (memory research) abruptly ended the widespread abuses of the RRM-MPD therapy movement while generating important legal and mental health reforms. The experienced application of recent legal reforms is often essential in such complex cases. ***These reforms include <u>Daubert/Kumho reliability-validity hearings</u> applying the doctrines of several historic U.S. Supreme Court cases. (***Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S., 113 S. Ct. 2786 (1993); Kumho Tire Co., Ltd. v. Carmichael, 119 S. Ct 1167 (1999).  These hearings assess the reliability, validity, and admissibility of expert witness testimony and protect the legal system from unreliable information. The innovative, multidisciplinary, science-litigation team methods and practices that ended the RRM-MPD treatment industry (i.e., the "memory wars" malpractice suits and licensing revocations) also provide a highly effective model for litigating controversial memory cases in civil, criminal, administrative, and family law systems."

### 3H.  SUMMARY OUTLINE OF THIS REPORT:

**— Competent investigations require a basic level of scientific knowledge and proper application of the basic science of memory, memory contamination, confirmation bias, the history of horrifically botched investigations etc.  Summaries of the basic science-methodology information required for a competent investigation are provided in this report with citations to peer reviewed published research from world experts.  Clearly, on this record, such basic information was not known and/or not properly applied in Purdue's methodologically flawed investigation.**

**— Alternative hypotheses that should have been properly investigated — but were not — are discussed.**

— Multiple investigational, methodological errors by Purdue personnel at all levels are listed and discussed — with specific citations to the evidence in this case. (E.g. Dr Campbell's RRM-MPD-DISS unreliable, very controversial, unscientific theories were taught to Purdue investigators.   See December 4, 2020 Deposition of Purdue Employee Erin Oliver at pg 9).

See, December 4, 2020,  Deposition of Purdue Employee Erin Oliver at pg 9

Q Did you receive any training in terms of trauma, of complainants? A Yes.

Q What was that training?

A *Neurobiology of trauma*. *How brains code memories, do not code memories, during traumatic instances*. That is really, all I recall from the trainings.

Q Do you recall who provided that kind of trauma training?

A I believe there was a *faculty member from Michigan State University; Rebecca Campbell.* Videos and research that is the only one I recall off the top of my head.

Q You do recall Professor Campbell?

A Yes, *I believe she has been the prominent person on that subject.*

Emphasis added.


4.   *ESSENTIAL SCIENCE-HISTORY* KNOWLEDGE REQUIRED TO PROPERLY INVESTIGATE AND LITIGATE ABUSE CASES:


*Basic Essential Science-History:*  The Pseudo-Science Notions and Pernicious Myths of RRM-MPD-DIS ideology (e.g.,  Dr Campbell's "Neurobiology of Trauma" training as taught to science-confused Purdue investigators, See December 4, 2020 Deposition of Purdue Employee Erin Oliver at pg 9, see direct quotes in this report )  :

Science-Uninformed-Misinformed Investigators, Therapists, and Legal Professionals too often gullibly rely upon the very controversial, unproven, inherently unreliable, "pernicious myths" of RRM-MPD-DIS ideology and practices and controversial theories of "trauma memories". These controversial notions have been excluded from the legal systems of multiple states following competent

18

**DAUBERT science hearings involving detailed testimony by multiple national experts on this complex science issue. I have participated as a consultant, attorney, and testifying science expert in such Daubert hearings with RRM-MPD-DISS ideology and witnesses excluded as "unreliable", "not accepted by the relevant scientific community"and the "product of defective methodologies" in all cases.**

On this record, Purdue's investigators, Equity Committee members, Dean and VP involved in this case appear to demonstrate an extraordinary and unusual lack of basic knowledge regarding investigations, memory, memory-contamination, "trauma memories", the history of Daubert exclusions, the history of proper-improper investigations of abuse, and the need to properly record ALL investigation interviews, and the essential requirement so avoid Confirmation Bias by properly generating and testing alternative hypotheses.

**PURDUE's UNRELIABLE TRAINING FROM DR CAMPBELL's CONTROVERSIAL PSEUDOSCIENCE RRM-MPD-DISS NOTIONS:** In addition, Purdue's *__training__* of investigators also demonstrated an extraordinary and unusual lack of basic knowledge regarding the controversial, unproven, unreliable, **RRM-MPD-DISS** notions of "trauma memories" and "Neurobiology of Memory" as espoused by Dr R Campbell, one of the most controversial psychologists in the US, a radical political ideologue (see quotes from her publications below),  and proponent of debunked **RRM-MPD-DISS** "Trauma Memory" ideologies that have been excluded from multiple courts following Daubert hearings. (See full citations of Daubert and related decisions below including multiple State Supreme Courts.

In the multiple DAUBERT hearings I have been involved in regarding such RRM-MPD-DISS (Dr Campbell) issues, the courts noted:

— such ideas have *NOT been accepted* by the relevant scientific community

— such ideas have *NOT been reliably supported by methodologically competent, peer reviewed, published science* in competent journals

— such ideas have *NO known error rate* (and thus *could have an error rate as high as 100% )*

**THE PURDUE INVESTIGATION INCLUDED MANY**
**METHODOLOGICAL and RELATED ERRORS**:

It is unprecedented in my experience that no investigator-administrator-Dean-VP-Equity Committee Member or other person involved in this case properly applied even the most basic, minimal science-methodology standards for abuse investigations including:

A) FAILING TO PROPERLY RECORD INTERVIEWS :  All investigative interviews (video or audio) must be recorded in such cases to investigate essential alternative hypotheses. ***All competent investigators in the US have known for decades that failing to record interviews precludes any testing of essential alternative hypotheses thus ensuring Confirmation Bias, one of the most serious of all investigation errors. See US DOJ training and US NIH protocols and instructions fully cited below). (e.g. The hypothesis that poorly conducted interviews created the change in Jane Doe's "memory" reports cannot be investigated with RECORDINGS of all interviews to assess changes in alleged "memories" over time. )***

B) AVOIDING CONFIRMATION BIAS - one of the most serious types of methodological errors :   Generate and Investigate Alternative Hypotheses (avoid Confirmation Bias) - as Nobel Prize winners and world experts in investigations, science, medicine have noted "Confirmation Bias" — a METHODOLOGICAL error and not a state of mind — is perhaps the most fatal of investigation failings as the US DOJ training instructs.  See, Chris Newlin, Linda Cordisco Steele, et al , *Child Forensic Interviewing: Best Practices,  published by the* U.S. Department of Justice…
See,  http://www.ojjdp.gov/pubs/248749.pdf  September 2015,  U.S. Department of Justice, Office of Justice Programs,  << *Alternative Hypotheses* … **Contextually appropriate questions that explore other viable hypotheses for witness behaviors or statements *are ESSENTIAL to the overall integrity of the interview*.** >> Emphasis added. See also, Grove WM and Barden RC. *Protecting the integrity of the legal system*: the admissibility of testimony from mental health experts under Daubert/Kumho analyses. *Psychology Public Policy Law*. 1999;5 (1):224- 242 ; See also, O'Brien,

Barbara and Ellsworth, Phoebe C., Confirmation Bias in Criminal Investigations (September 19, 2006). 1st Annual Conference on Empirical Legal Studies Paper, Available at SSRN: https://ssrn.com/abstract=913357 or http://dx.doi.org/10.2139/ssrn.913357 "Confirmation bias is the tendency to bolster a hypothesis by seeking consistent evidence while disregarding inconsistent evidence. In criminal investigations, preference for hypothesis-consistent information could contribute to false convictions by leading investigators to disregard evidence that challenges their theory of a case." ;

See also, Nickerson, R. S. (1998). ***Confirmation bias: A ubiquitous phenomenon in many guises***. Review of General Psychology, 2(2), 175-220 ; Jonas, E., Schulz-Hardt, S., Frey, D., & Thelen, N. (2001). Confirmation bias in sequential information search after preliminary decisions: An expansion of dissonance theoretical research on selective exposure to information. Journal of Personality & Social Psychology, 80(4), 557-571 ;  Klayman, J., & Ha, Y. (1987). Confirmation, disconfirmation, and information in hypothesis testing. Psychological Review, 94(2), 211-228;  Darley, J. M., & Gross, P. H. (1983). A hypothesis-confirming bias in labeling effects. Journal of Personality & Social Psychology, 44(1), 20-33 ; See also, Anderson, C. A., Lepper, M. R., & Ross, L. (1980). Perseverance of social theories: The role of explanation in the persistence of discredited information. Journal of Personality & Social Psychology, 39(1), 1037-1049 ;

See also,  Eric Rassin, Anita Eerland, Ilse Kuijpers, (2010) Let's find the evidence: an analogue study of confirmation bias in criminal investigations, Journal of Investigative Psychology,  https://doi.org/10.1002/jip.126. "*People involved in criminal proceedings (e.g. police officers, district attorneys, judges, and jury members) **may run the risk of developing <u>confirmation bias, or tunnel vision.</u> That is, these parties may readily become convinced that the suspect is guilty, and may then <u>no longer be open to alternative scenarios in which the suspect is actually innocent</u>. This may be reflected in a <u>preference for guilt-confirming investigation hypotheses</u>, as opposed to investigations that are aimed at <u>confirming, or even excluding, alternative hypotheses.</u>***" — as clearly happened, in my opinion, in this case.

21

C) OBTAIN SIGNED/DATED ALLEGATIONS OR VIDEO FORENSIC INTERVIEW OF ALLEGATIONS:  Obtain a signed/dated witness statement from Jane Doe or a video-audio record of a properly conducted forensic interview that tests alternative hypotheses (*as taught by the US DOJ and the US NIH interview protocols, see full citations in this report*),

D) interview the disconfirming witnesses provided by John Doe - Failing to interview John Doe witnesses is another example of Confirmation Bias.

E) **construct evidence-review files so they are accurate and complete** (Purdue investigators admitted in depositions that they **"selected evidence for the files based what they _FELT_ would be relevant"**.  These unreliable methods and procedures are very rare methodological errors not seen in the US since the 1990s.  These methodological errors are so numerous and serious and unreliable as to be unprecedented in my 30 year experience reviewing many hundreds of cases in dozens of states.

and other errors.

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in abuse cases was _never available to, and/or never properly applied by, Purdue staff and officials._

***Basic Essential Science-History:***  The _**Relevant Scientific Community**_ — **dozens of the world's leading experts in the relevant sciences — has spoken publicly and clearly on the key issue of RRM-MPD-DISS notions of "trauma memories"** like the theories of Dr R Campbell as apparently applied in this case (e.g., "Believe Women" (but not men).  Regarding the reliability of such "believed" "memories" a highly distinguished collection of the world's experts stated:

***"Decades of research and scientific debate have clarified over and over again that the notion of traumatic events being somehow "repressed" and later accurately recovered is _one of the most pernicious bits of folklore ever to infect psychology and psychiatry._  This folklore provided the theoretical basis for "recovered memory***

22

therapy" -- arguably the worst catastrophe to befall the mental health field since the lobotomy era."

See, Barden, R. C. (2006) Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, Feb., 2006. With AMICI Aaron T. Beck, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi Breslau, and more.

See also, McNally, R.J. (2003) *Remembering Trauma*, Cambridge, MA: Belknap Press/Harvard University Press.

See also, Pope H., Oliva P., and Hudson J., 'Repressed memories: The scientific status of research on repressed memories' in Faigman, D.L., Kaye, D.H., Saks, M.J., and Sanders, J. (eds) (2012) *Science in the law: social and behavioral science issues*, St. Paul, MN: West Group, 807–913.

See also, Piper A., Lillevik L., and Kritzner R., 'What's wrong with believing in repression? A review for legal professionals' (2008) 14 *Psychology Public Policy and Law*, 223–42.

See, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749.

See also, I have written an invited chapter for an Oxford University Press that is a peer reviewed, published, summary of a number of essential issues relevant to this case including RRM-MPD-DISS ideology/methods, confirmation bias, the history of Daubert hearing exclusions and related information essential to a competent, ethical, science-informed investigation.   See, Barden, R.C., Memory and Reliability: Developments and Controversial Issues.  In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016.

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was <u>never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean</u>  In contrast, Purdue sought training from Dr R Campbell,  a very controversial, source of pseudoscience information.

<u>***Basic Essential Science-History:***</u>  **This case presents a clear example of the dangers of CONFIRMATION BIAS – often the most fatal of all investigation errors.**

Confirmation bias is often a serious, damaging, and/or fatal error in medicine, psychotherapy, *<u>and criminal or civil investigation and prosecutions — as in this case</u>*.  To avoid Confirmation Bias, an essential duty of investigators is to *GENERATE then TEST alternative investigative hypotheses* — this is the essential core of science and all proper investigation and health care assessments and treatment plans (See, US SCT decision in the Daubert case, Sir Karl Popper's philosophy of science, Sir Francis Bacon essays, etc. ) and proper, intelligent, effective health care:

"The tendency to test one's beliefs or conjectures by seeking evidence that might confirm or verify them and to <u>ignore evidence</u> that might disconfirm or refute them." — The Oxford Dictionary definition of confirmation bias

"He who does not expect the unexpected will not detect it" — Karl Popper (the US SCT Daubert and Kumho rely on the philosophy of science of Sir Karl Popper.)  See also, C. Hempel, Philosophy of Natural Science 49 (1966) ("[T]he statements constituting a scientific explanation must be capable of empirical test"); K. Popper, Conjectures and Refutations: The Growth of Scientific Knowledge 37 (5th ed. 1989) ("[T]he criterion of the scientific status of a theory is its falsifiability, or refutability, or testability").

"If one were to attempt to identify a single problematic aspect of human reasoning that deserves attention above all others, the confirmation bias would have to be among the candidates for consideration." See, Nickerson, R. Confirmation Bias: A Ubiquitous Phenomenon In Many Guises, Review of General Psychology, 1998, Vol 2, No 2, 175-220.

*"Confirmation bias is perhaps the best known and most widely accepted notion of inferential error to come out of the literature on human reasoning."* (Evans, 1989, p. 41)

"Because of confirmation bias and desirability bias, we will tend to collect and interpret evidence selectively to favor a judgment that, respectively, we already believe or wish to be true.... Dror coined a term for the impact of biasing information: the forensic confirmation bias. Confirmation bias can lead you to form an overall impression too early and *to ignore contradictory information.*"
— **Nobel Prize winner Daniel Kahneman, Ph.D**. in *Noise, A Flaw in Human Judgment,* Little, Brown Publishers (May 18, 2021); See also S. M. Kassin, I. E. Dror, J. Kukucka, and L.  Butt, "The Forensic Confirmation Bias: Problems, Perspectives, and Proposed Solutions," Journal of Applied Research in Memory and Cognition 2 (2013): 42–52.

*The most fundamental principle of science is the requirement to generate and test alternative hypotheses (i.e., Sir Karl Popper's concept of falsification as adopted by the US SUP CT in Daubert-Kumho).* Every 8th grade science student should be taught this essential process *but too many negligent investigators remain uninformed or misinformed on the essential nature of this process — as in this case.*

**Any investigation that does not spend considerable time and attention on generating and testing "alternative investigative hypotheses" is defective and a danger to the integrity of the process — as in this case. (See instructions on interviewing by the US DOJ and US NIH protocols as cited in this report).**

In my experience, most well trained investigation and health care professionals understand and apply such essential scientific methodology but too many poorly trained investigators remain tragically uninformed or misinformed as to critical knowledge and methodologies regarding confirmation bias — as in this case.  Training has been nationally widespread for years on the essential need to avoid confirmation bias. For example, ***the U.S. Department of Justice*** calls *investigations via questioning of alternative hypotheses* **_essential_ _for the integrity of an investigation_**.  See, Chris Newlin, Linda Cordisco Steele, et al , *Child Forensic Interviewing: Best Practices,  published by the* U.S. Department of Justice…

See,  http://www.ojjdp.gov/pubs/248749.pdf  September 2015,  U.S. Department of Justice, Office of Justice Programs,  Office of Juvenile Justice and Delinquency Prevention << *Alternative Hypotheses* … Contextually appropriate questions that explore *other viable hypotheses for a child's (or adult's) behaviors or statements are essential to the overall integrity of the interview*. >> See also, O'Brien, Barbara and Ellsworth, Phoebe C., Confirmation Bias in Criminal Investigations (September 19, 2006). 1st Annual Conference on Empirical Legal Studies Paper, Available at SSRN: https://ssrn.com/abstract=913357 or http://dx.doi.org/10.2139/ssrn.913357

"Confirmation bias is the tendency to bolster a hypothesis by seeking consistent evidence while disregarding inconsistent evidence. In criminal investigations, preference for hypothesis-consistent information could contribute to false convictions by leading investigators to disregard evidence that challenges their theory of a case." ;   See also, Nickerson, R. S. (1998). ***Confirmation bias: A ubiquitous phenomenon in many guises***.

Review of General Psychology, 2(2), 175-220 ; Jonas, E., Schulz-Hardt, S., Frey, D., & Thelen, N. (2001). Confirmation bias in sequential information search after preliminary decisions: An expansion of dissonance theoretical research on selective exposure to information. Journal of Personality & Social Psychology, 80(4), 557-571 ;  Klayman, J., & Ha, Y. (1987). Confirmation, disconfirmation, and information in hypothesis testing. Psychological Review, 94(2), 211-228;  Darley, J. M., & Gross, P. H. (1983). A hypothesis-confirming bias in labeling effects. Journal of Personality & Social Psychology, 44(1), 20-33 ; See also, Anderson, C. A., Lepper, M. R., & Ross, L. (1980). Perseverance of social theories: The role of explanation in the persistence of discredited information. Journal of Personality & Social Psychology, 39(1), 1037-1049 ;  Eric Rassin, Anita Eerland, Ilse Kuijpers, (2010) Let's find the evidence: an analogue study of confirmation bias in criminal investigations, Journal of Investigative Psychology, https://doi.org/10.1002/jip.126. "***People involved in criminal proceedings (e.g. police officers, district attorneys, judges, and jury members) may run the risk of developing <u>confirmation bias, or tunnel vision.</u> That is, these parties may readily become convinced that the suspect is guilty, and may then <u>no longer be open to alternative scenarios in which the suspect is actually innocent</u>. This may be reflected in a <u>preference for guilt-confirming investigation hypotheses</u>, as opposed to investigations that are aimed at <u>confirming, or even excluding, alternative hypotheses</u>.***"

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean.


***<u>Basic Essential Science-History:</u>***  **"Fervently-Believed-In-But-False-"Memories"** **of abuse can be (and have been) induced in many THOUSANDS of adults, adolescents, and children via improper investigative interviews-therapy sessions-and exposure to RRM-MPD-DISS ideology improper-leading-suggestive interviewing/therapy (by counselors, lawyers, police, civil attorneys, family members, therapists, etc** ). See, the history of Special Agent Ken Lanning's FBI Task Force, Prof Gail Goodman's Nat. Assn. of Child Abuse and Neglect investigation, the

"Memory Wars" research debate, licensing revocations in multiple states of the leaders in the RRM-MPD-DISS movement, the abusively improper investigations in the McMartin, Wenatchee, Kelly Michaels, and other infamous cases, etc. cited below. On this record, none of the Purdue investigators was aware — of made proper use of — such basic, fundamental knowledge-science-history.

The wave of abusive "Day Care" and other abusive mis-interviewing cases overturned by Appellate Courts and/or rejected by juries resulted in national science experts taking a keen interest in reviewing the abusive, memory-contaminating investigative methods used in such tragic cases.  See, e.g., Bruck, M. and Ceci, S. (1995). 'Amicus brief for the case of State of New Jersey v. Michaels presented by the committee of concerned social scientists. Psychology, Public Policy, and Law, 1, 272-322.  The science world and the legal world began to work together to create rational, science-based standards for investigating cases and conducting proper non-abusive interviews.

*This process of reforming investigative procedures to incorporate science-informed methods and standards* was motivated by the rise of the RRM-MPD-DISS ideology that led to the "Memory Wars" some of the greatest controversies in the history of the mental health sciences-professions. Years of research, clinical experience, and jury trial investigation and legal case records clearly documented and demonstrated that multiple methods -- including exposure to leading-suggestive counselor-therapist interviews-sessions, misleading information provided by Investigator or Police Interviews, Negligent Psychotherapists, Leading Interviews from Civil Attorneys, exposure to False and Misleading Ideas about RRM-MPD-DISS ideology can and have induced ***Fervently-Believed-In-But-False-"Memories"*** of horrific abuse in tens of THOUSANDS of people (children, adolescents, and adults).  To reduce the risk of false memories and *protect the integrity of the legal system*,  the relevant scientific community and law enforcement worked to *create standards of care for investigating abuse cases* including

A) ensuring the proper ***recording of ALL interviews*** to permit review and protect witnesses and the integrity of the legal system (see Memory Contamination Research below) (In contrast, in this investigation NO allegations were recorded, NO interviews were recorded, NO "counseling sessions" with Monica Bloom were recorded,

and NO hearings were recorded - an historic failure unprecedented in my 30 year career. Unrecorded interviews cannot be properly reviewed for indoctrination, bias, leading-suggestive questions, changing-morphing "memories" and other errors. Alternative hypotheses cannot be investigated, such cases are thus a clear example of fatal **confirmation bias.** See, citations to Loftus, McNally, Ofshe/Watters, Barden, Ceci/Bruck, Pendergrast, and many others in this report.

B) ensuring the proper use of ***standardized interview protocols*** to *protect witnesses from abusive-leading-suggestive-repetitive-coercive-unrecorded interviews from investigators-counselors-police-therapists-lawyers.* See e.g., Michael E. Lamb, Yael Orbach, Irit Hershkowitz, Phillip W. Esplin and Dvora Horowitz, "A structured forensic interview protocol improves the quality and informativeness of investigative interviews with children: *A review of research using the NICHD Investigative Interview Protocol*," Child Abuse & Neglect, Volume 31, Issues 11-12, November, December 2007, Pages 1201-1231 ; and. Michael E. Lamb, Irit Hershkowitz, Yael Orbach, & Phillip W. Esplin, Tell Me What Happened: Structured Investigative Interviews of Child Victims & Witnesses, Wiley Series in Psychology of Crime, Policing and Law, Sept. 2008 (and ALL citations and studies contained therein).

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied in this cased by Purdue's staff, investigators, VP or Dean.

**Basic Essential Science-History:** **Memory is NOT a DVD or video recording and IS subject to manipulation, change, and even whole creation via multiple influences (e.g, leading interviews-discussions with friends-psychotherapy and counseling- discussions with family members, interviews with investigators, books, movies, etc etc.). NONE of these alternative hypotheses based on the SCIENCE OF MEMORY can be properly investigated when incompetent, poorly trained, or corrupt investigators FAIL TO RECORD all interviews — as happened in this case.**

A brief history of memory contamination research including the following famous questions … "How fast were the cars going when they collided or **smashed** into each

other?"  - E. Loftus and Palmer, 1974).   This one-word **difference in questioning created different memories** in the minds of witnesses.  Those who were asked about cars that "smashed" into each other remembered faster car speeds and some even membered broken glass in the scene – when in fact no broken glass existed. **Inducing false memories with a few simple questions was far easier than anyone had anticipated** prior to these studies and the decades of research that followed.

Given this knowledge of human memory,  juries or Equity Committees cannot **reliably** evaluate an alleged victim's reported "memories" unless they also review **the actual questions asked in sequence** (this is why **fully recording all investigative interviews is essential to the integrity of investigations and jury trials** and also why counselors (like Monica Bloom), investigators (as in this case), psychotherapists or police investigators or others — conducting leading, suggestive, and improper conversations with witnesses — can create, new,  horrific, detailed, **Fervently-Believed-In-But-False-"Memories" of abuse**.

Research has shown memory contaminative processes can generate "new" and/or false memories via **source confusion/amnesia** (e.g., being trained to consider dreams, nightmares, imagination, hypnotic images, etc as "post it notes trauma memories" as does Dr R Campbell.

As Prof. Dan Schachter, former Chairman of Psychology at Harvard University has noted, "... the false memories ... in studies often include bits and pieces of real memories that are melded together into a false one. In these and other situations, the content of a past event or imagining becomes "unglued" from its original source and mistakenly connected to another one.  Thus, there is both source amnesia and source confusion. When a false memory contains remnants of past experiences -- contents and sources of past experiences mistakenly put together -- **it is easy to see how it could give rise to a strong subjective conviction that a false memory is real**."  See, Coyle, Joseph in  D. Schachter (Editor), *Memory Distortion: How Minds, Brains, and Societies Reconstruct the Past,*  page 24;  See also, D. Schacter. *The Seven Sins of Memory*, Houghton Mifflin, 2001. p.4.   See also, "**Human memory is not like a photograph album, a collection of cassettes, compact discs or videos or any other accumulative archive of the past. Rather, memories are fragmentary, condensed, often distorted and**

*inaccurate representations of experience.*  -Martin A. Conway (review in *Nature* ). See additional citations infra and supra to the work of Ceci, Bruck, Loftus, and other memory experts.

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean.

*Basic Essential Science-History:*   The science of Memory and False Memory has documented specific methods by which memories can be contaminated, changed, manipulated, transformed, ***or falsely created without the witness being aware of such memory changes. Such research led to many States requiring ALL interviews with alleged victims to be Audio or Video-Recorded and reviewed for abusive mis-interviewing***.  (cf. On this record it appears that ALL interviews in this case *were NOT recorded* – an unprecedented-in-my-30 years of experience- an *indicia of incompetence or corruption.*

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean.

*Basic Essential Science-History:*   **Science has documented a series of methods, procedures, and ideologies that increase the risk of inducing Fervently-Believed-In-But-False mental images that the alleged victim later – often after contemplation, mis-training, and false RRM-MPD-DISS ideology indoctrination -- becomes convinced are actual and accurate "memories" of real trauma**.   See, e.g.  Garry, Maryanne; Manning, Charles G., Loftus, Elizabeth F., Sherman, Steven J (1996). "Imagination inflation: imagining a childhood event inflates confidence that it occurred". *Psychonomic Bulletin & Review* 3 (2): 208–214. doi:10.3758/bf03212420.   See, also Dodier et al. presented a large meta-analysis of 139

studies involving 24,007 participants which found *a high link between <u>fantasy proneness</u> and ''dissociative experiences''* as measured by the DES.

 See, also Merckelbach H, Otgaar H, Lynn S J. Empirical research on fantasy proneness and its correlates 2000-2018: a meta-analysis. Psychol Conscious; in press.  See, Dodier O, Otgaar H, Lynn SJ. A critical analysis of myths about dissociative identity disorder. AnnMe´d Psychol 2021. <u>http://dx.doi.org/10.1016/</u> j.amp.2021.10.007.

 See, also Laney, C and Loftus, E.  *<u>Traumatic Memories Are Not Necessarily Accurate Memories</u>*, Can J Psychiatry, Vol 50, No 13, 202005. … Some therapists argue that the hypothesized repression (blocking memories) is more likely to occur in response to specific types of trauma. In particular, Terr claimed that repeated traumas are more likely to produce repression. Freyd argued that repression is caused when a trauma is perpetrated by a loved one on whom one depends for the basic necessities of life. *<u>These notions have virtually no credible scientific support</u>*…. Another observation lends support to the idea that people can become quite emotional about events that they have not personally experienced. How often do people cry in movies? ….  *If there is one lesson from this research, it is probably this: Just because a memory seems detailed, just because the person seems confident in it, and just because emotion is expressed when the memory is contemplated, does not mean it really happened.*

 See, e.g.  Garry, Maryanne; Manning, Charles G., Loftus, Elizabeth F., Sherman, Steven J (1996). "Imagination inflation: imagining a childhood event inflates confidence that it occurred". *Psychonomic Bulletin & Review* 3 (2): 208–214. <u>doi</u>:<u>10.3758/bf03212420</u>.

 See, also Dodier et al. presented a large meta-analysis of 139 studies involving 24,007 participants which found *a high link between <u>fantasy proneness</u> and ''dissociative experiences''* as measured by the DES.

 See, also Merckelbach H, Otgaar H, Lynn S J. Empirical research on fantasy proneness and its correlates 2000-2018: a meta-analysis. Psychol Conscious; in press.  See, Dodier O, Otgaar H, Lynn SJ. A critical analysis of myths about dissociative identity disorder. AnnMe´d Psychol 2021. <u>http://dx.doi.org/10.1016/</u> j.amp.2021.10.007.

See also, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied in this cased by Purdue's staff, investigators, VP or Dean. ***Because the interviews of allegations were NOT properly recorded — the case is a clear example of the serious methodological defect known as Confirmation Bias — that is, essential alternative hypotheses generated by the evidence in this case (See detailed examples below). COULD NOT possibly be properly investigated. (Eg. Investigating the role of improper, leading-suggestive "advocacy" interviewing by CARE counselors/therapists in creating Jane Doe's "new memories" of abuse.) (Eg. Investigating the role of improper, leading-suggestive Purdue investigators" interviewing in changing Jane Doe's "new memories" of abuse — without recording EACH interview, changes in memories over time CANNOT be properly assessed (e.g., often dramatic memory changes occur in many such cases). Such memories were "hidden" by the failure to properly record ALL investigative interviews as in done in ALL other jurisdictions I am aware of in the US, Canada, and Europe.***

***Basic Essential Science-History:*** **HUMANS ARE *NOT* RELIABLE LIE DETECTORS WITHOUT CORROBORATIVE EVIDENCE.** Science-uninformed legal professionals too often turn courtrooms into gambling casinos and force juries to make choices that no person can reliably, accurately make without corroborating evidence. Humans – including Investigators, Psychotherapists, Lawyers, Judges, and All other Humans are unreliable lie detectors *in the absence of corroborating evidence*. The science is clear that humans cannot *reliably* distinguish true from false verbal statements in the absence of corroborative evidence. Professionals such as police, psychotherapists, and investigators often (gullibly) THINK they can reliably detect false patient reports but the science shows they cannot and, in fact, they *are typically no better at this task than laypersons.*

See, Vrij, Aldert, Granhag, P. and Porter, S. (2010) Pitfalls and opportunities in nonverbal and verbal lie detection. *Psychological Science In The Public Interest*, 11 (3). pp. 89-121. ISSN 1529-1006 10.1177/1529100610390861 "The final error that we will highlight is that professional lie catchers (i.e., including GALs and psychotherapists) tend to overestimate their ability to detect deceit. *Research has consistently shown that when professional lie catchers and laypersons are compared, "professionals are more confident in their veracity judgments but are NO more accurate*" Emphasis added.

See, Rosen, G. M. and Phillips, W.R., A Cautionary Lesson from Simulated Patients, *Journal of the American Academy of Psychiatry and Law*, 32, 132-133, (2004);

See, McNally, RJ, Troubles in Traumatology, *Canadian Journal of Psychiatry* 50:815–816 (2005) (showing experienced expert clinicians routinely misdiagnose — fooled by false reports — of PTSD in veterans whose records prove they never actually experienced any combat).

During the past several decades, the detection of deception has come under increasing empirical scrutiny (e.g., see Vrij, 2008). One reason for the enormous scientific interest in deception is *the increasingly recognized problems that have arisen in the legal system as a result of failed credibility assessments, such as wrongful convictions* (e.g., Porter & ten Brinke, 2010; Vrij, Granhag, & Porter, 2010). Assessing the credibility of reports of sexual victimization – often in the absence of corroboration – presents a significant challenge for legal decision makers. This study examined the accuracy of observers in discriminating genuine and fabricated sexual assault allegations. "Results indicated that overall accuracy was below chance (M = 45.3%)" See, Kristine A. Peace, Stephen Porter and Daniel F. Almon, *Sidetracked by emotion: Observers' ability to discriminate genuine and fabricated sexual assault allegations,* Legal and Criminological Psychology (2011), The British Psychological Society.

See also, K. Peace and S. Porter, A Longitudinal Investigation of the Reliability of Memories for Trauma and other Emotional Experiences, Appl. Cognit. Psychol. 18: 1143–1159 (2004). The nature of traumatic memories has become a major focus of cognitive research and a heated debate in psychology (e.g. Read, 2001) ...."*Traumatic images tended to persist in memory with NO apparent impairment,* whereas features of positive memories were subject to considerable distortion, regardless of interview style.

The findings contribute to the understanding of the impact of trauma on memory with the passage of time."

See also, Ivan Mangiulli, Henry Otgaar, Marko Jelicic  & Harald Merckelbach, A Critical Review of Case Studies on Dissociative Amnesia (April, 2021) Clinical Psychological Science, DOI: 10.1177/21677026211018194 (and all citations and research discussed therein).

See also, Henry Otgaar, Olivier Dodier, Maryanne Garry, Mark L. Howe, Elizabeth F. Loftus, Steven Jay Lynn, Ivan Mangiulli,, Richard J. McNally, and Lawrence Patihis.,  Oversimplifications and Misrepresentations in the Repressed Memory Debate: A Reply to Ross, Journal of Child Sexual Abuse, July 2022.

See also, Richard J. McNally (2021): Are memories of sexual trauma fragmented? Memory, DOI: 10.1080/09658211.2020.1871023 at https://doi.org/10.1080/09658211.2020.1871023 … [Findings do not support the existence of special memory mechanisms that are unique to experiencing traumatic events.]

See also, Elke Geraerts, Dragica Kozarić-Kovačić, Harald Merckelbach, et al, Traumatic memories of war veterans: Not so special after all. Consciousness and Cognition 16 (2007) 170–177…. _traumatic memories were not qualitatively different from neutral memories_ with respect to their stability and sensory qualities. The severity of PTSD symptoms was not significantly correlated with dissociative experiences. Our findings do not support the existence of special memory mechanisms that are unique to experiencing traumatic events.

_See also,_ K. Peace and S. Porter, A Longitudinal Investigation of the Reliability of Memories for Trauma and other Emotional Experiences, Appl. Cognit. Psychol. 18: 1143–1159 (2004). The nature of traumatic memories has become a major focus of cognitive research and a heated debate in psychology (e.g. Read, 2001) …_Traumatic memory imagery tended to persist in memory (with no apparent impairment),_ whereas features of positive memories were subject to considerable distortion, regardless of interview style. The findings contribute to the understanding of the impact of trauma on memory with the passage of time.

35

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean.

**_Basic Essential Science-History:_**    **THE WELL-DOCUMENTED LIMITS ON CLINICAL KNOWLEDGE AND "CLINICAL JUDGMENT" ARE OFTEN UNKNOWN TO POORLY TRAINED INVESTIGATORS, DEANS, VPs, THERAPISTS and LEGAL PROFESSIONALS:**  Psychotherapists often do not receive reliable, accurate feedback in therapy work settings. Without accurate feedback they CANNOT develop reliable, improved expertise or "judgment" over time.

See, Tracey, T.J., Wampold, B.E., Lichtenberg, J.W., Goodyear, R. K., (2014) Expertise in Psychotherapy: An Elusive Goal, American Psychologist, Vol. 69, No. 3, 218-229.  "In a review of expertise across professions, Shanteau (1992) identified several professions in which practitioners develop expertise, which he defined as increased quality of performance that is gained with additional experience. These professions, which demonstrate there can be a relation between experience and skill, include astronomers, pilots, chess masters, mathematicians, accountants, and insurance analysts. Shanteau also identified several professions for which expertise *was not demonstrated* [ including psychotherapists].

See also, Garb, H. N., & Boyle, P. A. (2003). Understanding why some clinicians use pseudoscientific methods:  Findings from research on clinical judgment. In S. O. Lilienfeld, S. J. Lynn, & J. M. Lohr (Eds.), Science and pseudoscience in clinical psychology (pp. 17–38). New. York, NY: Guilford Press.

See also, W. M. Grove and P. E. Meehl, Comparative Efficiency of Informal (Subjective, Impressionistic) and Formal (Mechanical, Algorithmic) Prediction Procedures:  The Clinical-Statistical Controversy, *Psychology, Public Policy, and Law* (1996) Vol. 2, No. 2,293-323 1076-8971/96/

As a former faculty member in major University Departments of Medicine (Surgery) and Psychology (Clinical-Developmental) and also Law, I am well aware that over the past century many components of the health care system — surgery, radiology,

laboratory testing, internal medicine, pharmacological systems — became science-driven and far more effective and reliable. Courts and families are too often unaware that this transformation — from the widespread use of unreliable methodologies (junk science) to the widespread use of reliable science-based methodologies has, in many ways, *not yet occurred in the* mental health system and investigation systems.   See, "A century ago, American medicine was an unregulated and unscientific craft, *with little research to support its practices*. In 1910, *The Flexner Report*, published by early 20th century Abraham Flexner of Harvard Medical School, under the auspices of the Carnegie Foundation for the Advancement of Teaching, exposed the sorry state of medical practice, leading to major reform of both the training and practice in medicine. Among other things, the report revealed that half of the nation's medical schools were sub-par, and many were closed down as a result. The remaining schools adopted rigorous admissions and training standards for their students, focusing on the scientific approach to medical education and practice that is still evident today. Tragically, unknown to many legal professionals, clinical psychology, social work, psychiatry, and counseling, are currently in a tenuous situation similar to where medicine was in the early 20th century. For example, the past President of the Association for Psychological Science, Prof. Walter Mischel, has stated *"the current disconnect between psychological science and clinical practice is an unconscionable embarrassment".* See, e.g., West, Catherine, 'An Unconscionable Embarrassment', Association for Psychological Science, Observer, October 2009; Also see, Mischel, W. Connecting Clinical Practice to Scientific Progress, Psychological Science in the Public Interest, Vol 9, No 2, 2009.  **This analysis applies to the CARE center advisors, therapists, and "counselors" including Monica Bloom.** Without recorded interviews there is no way to know how much manipulative-leading-suggestive-questioning and Dr Campbell's ideological damage was done to Jane Doe's "memories" at CARE.

See, also Baker, T., McFall, R. & Shoham, V., Current Status and Future Prospects of Clinical Psychology: Toward a Scientifically Principled Approach to Mental and Behavioral Health Care, Psychological Science in the Public Interest, Vol. 9, No. 2 (2009);

See also, Harrington, A., Mind Fixers: Psychiatry's Troubled Search for the Biology of Mental Illness, W. W. Norton & Company; 1st edition, April 16, 2019 ;

Dawes, R.M., House of cards: Psychology and psychotherapy built on myth, New York: Free Press (1997).

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied in this cased by Purdue's staff, investigators, VP or Dean.

***Basic Essential Science-History:***    **PTSD symptoms DSM diagnoses and other mental health symptoms are often NOT a *reliable* indication of actual trauma or abuse**.  PTSD symptoms are often NOT reliable indicators of actual, historic trauma events — such *symptoms also occur with FALSE-believed-in memories* as well as real memories of trauma and such symptoms are also easily faked. For example, most "flashbacks" are of unknown origin and traumatized veterans have reported dying and other impossibilities in their "flashbacks".

See, "Consistent, emotionally powerful, stories of memories from highly educated people — e.g. alien abduction "memories" -- can be quite consistent, filled with detail, and very compelling -- yet quite false."  See, McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. *Psychol. Sci.* 15: 493–497.].  During my clinical psychotherapy and assessment work at the Palo Alto VA Hospital/Stanford Medical School, I interviewed combat veterans who "died" in their "flashbacks" — obviously so-called "flashbacks" are NOT reliable depictions of accurate "real" memories.

In sum, competent, properly trained, science-informed investigators (cf. unlike the negligent, science-uninformed investigators involved in this case) readily admit that without actual, corroborative evidence they CANNOT reliably assess the accuracy of patient-witness verbal reports. It is a *serious licensing violation* for any therapist to claim they have ANY *reliable method for evaluating the origin or accuracy of abuse*

*allegations without corroborative evidence.*  (cf. compare this basic, essential knowledge to the incompetent, Confirmation Bias displayed in this case by Purdue staff.

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean.

***Basic Essential Science-History:***   **Human memory is a RECONSTRUCTIVE PROCESS NOT A RECORDING – not like a video recording and NOT a DVD record that can be "recovered" or played back at will.  Human memory is subject to post-event manipulation, contamination, and change via many processes but especially repetitive-leading interviews, improper-leading psychotherapy, or suggestive mis-information from media and other sources (e.g., all of which happened in this case).**  This is why proper interviewing methodology is ESSENTIAL to the integrity of the legal process.  *Psychological science has not yet developed a reliable way to classify memories as true or false in the absence of corroborative evidence.* In some of the most significant and important psychological research in history, Prof. E. Loftus has demonstrated that *ONE WORD in ONE QUESTION can induce a FALSE memory that did not exist prior to the ONE WORD in ONE question.*  This is why corroboration is so essential in accessing memories and this is why ALL conversations are potential sources of memory contamination and *why ALL interviews MUST BE RECORDED.*  Memory is malleable and subject to contamination.  "To reiterate the main points: memory is more prone to error than many people realize. Our memory system can be infused with compelling illusory memories of important events. These grand memory errors have contributed to injustices that could have been avoided or minimized."

See, Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

See Loftus, E., Our changeable memories: legal and practical implications. Science and Society. Nature Reviews: Neuroscience Volume 4, March 2003, page 231- 235;

See, Bruck, M. and Ceci, S. (1995). 'Amicus brief for the case of State of New Jersey v. Michaels presented by the committee of concerned social scientists. Psychology, Public Policy, and Law, 1, 272-322

See, Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498;

See, Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366.

See, Ofshe, R. and Watters, E., *Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria*. 2nd Edition. University of California Press, 1996;

See, Acocella, J., *The Politics of Hysteria*, The New Yorker, April 6, 1998, pg. 64-79; See also, Barden, R. C., Foreword in Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749 ; See also, Loftus, E. The Myth of Repressed Memory, False Memories and Allegations of Sexual Abuse, St. Martin's Press, 2013.

See, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749 ;

See, Loftus, E. *The Myth of Repressed Memory, False Memories and Allegations of Sexual Abuse,* St. Martin's Press, 2013; See, McNally, R.J. (2003) *Remembering Trauma*, Cambridge, MA: Belknap Press/Harvard University Press.

See, Pope H., Oliva P., and Hudson J., *'Repressed memories: The scientific status of research on repressed memories'* in Faigman, D.L., Kaye, D.H., Saks, M.J., and Sanders, J. (eds) (2012) *Science in the law: social and behavioral science issues*, St. Paul, MN: West Group, 807–913; and

See, Piper A., Lillevik L., and Kritzner R., *'What's wrong with believing in repression? A review for legal professionals'* (2008) 14 *Psychology Public Policy and Law*, 223–42.

See, Barden, R.C., *Memory and Reliability: Developments and Controversial Issues.* In *Witness Testimony in Sex Cases*, Eds. Pamela Radcliffe, Anthony-Heaton Armstrong, Gisli Gudjonsson, and David Wolchover, Consultant Editor: Sir Anthony Hooper, Oxford University Press, March 2016.

See, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749.

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean.

**_Basic Essential Science-History:_  It is essential for Investigators, Attorneys, Therapists, and Journalists to understand the _history_ of the "Memory Wars" and the collapse of the "Recovered Memory-Multiple Personality Disorder-Dissociative Ideology-Therapy Movement of the 1990s) (RRM-MPD-DISS).  History has documented that error-ridden RRM-MPD-DISS ideology, delivered to vulnerable patients-clients via science-uninformed-misinformed-or unethical-investigators-therapists can create horrific false "new memories" of abuse.**  See,  Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

The history of the "Memory Wars" —shows that _tens of thousands of families were destroyed by therapist-investigator induced false memories_ of abuse followed by lawsuits and licensing revocations — is well known and well documented in articles, textbooks, and international media. (See detailed citations below). See, Ofshe, R. and Watters, E., *Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria*. 2nd Edition. University of California Press, 1996; See, Acocella, J.  The Politics of Hysteria, The New Yorker,  April 6, 1998, pg. 64-79;  See also, Pendergrast, M., (2017) *The Repressed Memory Epidemic: How It Happened and What We Need to Learn from It*, Springer International Publishing, ISBN 9783319633749 ; See also, Loftus, E. The Myth of Repressed Memory, False Memories and Allegations of Sexual Abuse, St. Martin's Press, 2013**.**  In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was

never properly learned and/or never properly applied in this cased by Purdue's staff, investigators, VP or Dean.

### Basic Science-History, Psychotherapy Ethics, and Licensing Violations

**: Counseling or therapy with alleged "trauma" victims during an ongoing investigation and prior to trial should be carefully examined as a form of potential WITNESS TAMPERING – memories can be manipulated and radically changed. Due to her failure to record the ONLY investigative interviews with Jane Doe in this case, Monica Bloom has NO defense to the alternative hypothesis that SHE mis-interviewed Jane Doe producing unreliable, tainted "memories" of abuse.   See, Branaman, T. F. & Gottlieb, M. C.** *Ethical and Legal Considerations for Treatment of Alleged Victims: When Does It Become Witness Tampering?* **Professional Psychology: Research and Practice, 2013, Vol. 44, No. 5, 299–306.** In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied in this cased by Purdue's staff, investigators, VP or Dean.

### Basic Science, Psychotherapy Ethics, and Licensing Violations: **Improperly mis-trained, science uninformed psychotherapists too often violate international human rights (and licensing duties, statutory duties, ethics codes, and common-sense fairness) of patients by failing to obtain proper informed consent.  On the record of this case it appears that there is NO EVIDENCE that the therapists and counselors of the CARE center at Purdue professionally and competently, obtained proper informed consent from Jane Doe.  I have written on such issues in one of the leading journals in the world.  See, Barden, R.C., (2001) Informed Consent in Psychotherapy: A Multidisciplinary Perspective,** <u>The Journal of the American Academy of Psychiatry and the Law,</u> **Vol 29, No. 2, pgs. 160-166. I incorporate all references and citations in this publication into this report.   It is also crucial to understand that informed consent It is NOT just some statutory duty but rather** *a key Quality Control process in ALL psychotherapies which requires maintaining an honest, open, trustworthy relationship with the patient.* **Telling the patient negligent,**

false, misleading, harmful misinformation and failing to tell the patient the honest truth about the dangers of the proposed therapy is not just an informed consent violation it is a violation of the *Standard of Care for ALL psychotherapies*,

Note that a proper, ethical discussion MUST include *the known risks of Fervently-Believed-In-But-False-"Memories"* and the dangers of RRM-MPD-DISS ideology and methods. Such a documented discussion must include *a complex, detailed, proper, professional, and acceptable consent process which would require instruction and discussion about many things including:*

A) the nature of reconstructive memory subject to memory contamination (e.g., source confusion/amnesia, misinformation, multiple interviews, etc.

B) the history of the "Memory Wars" and the tsunami of tens of thousands of Fervently-Believed-In-But-False-"Memories", the harm of false abuse claims, etc.

C) the risk of mixing imagination-dreams-movie images with memory

D) *that the relevant scientific community views "recovered repressed memories" as a "pernicious myth"* and other critical information required for any patient to make an informed choice as to "counseling" treatments.

"Informed consent is the process in which a health care provider educates a patient about the risks, benefits, and alternatives of a given procedure or intervention. The patient must be competent to make a voluntary decision about whether to undergo the procedure or intervention.  Informed consent is both an ethical and legal obligation of medical practitioners in the US and originates from the patient's right to direct what happens to their body. Implicit in providing informed consent is an assessment of the patient's understanding, rendering an actual recommendation, and documentation of the process. *The Joint Commission requires documentation of all the elements of informed consent* "in a form, progress notes or elsewhere in the record." The following are the *required elements for documentation* of the informed consent discussion: (1) the nature of the procedure, (2) the risks and benefits and the procedure, (3) reasonable alternatives, (4) risks and benefits of alternatives, and (5) assessment of the patient's understanding of elements 1 through 4. It is the obligation of the provider to make it clear that the patient is participating in the decision-making process and avoid making the patient feel forced to agree to with the provider. The [health care] provider must make a recommendation and

43

provide their reasoning for said recommendation… Obtaining informed consent in medicine is process that should include: (1) describing the proposed intervention, (2) emphasizing the patient's role in decision-making, (3) discussing alternatives to the proposed intervention, (4) discussing the risks of the proposed intervention and (5) eliciting the patient's preference (usually by signature). *Discussion of all risks is paramount to informed consent in this context.* Most consent includes general risks, risks specific to the procedure, risks of no treatment and alternatives to treatment." See, Shah P, Thornton I, Turrin D, et al. Informed Consent. StatPearls Publishing; 2022 Jan. Available from: https://www.ncbi.nlm.nih.gov/books/NBK430827/.

Such essential, minimal informed consent rules, principles and requirements have been in effect for decades. Many of the "Memory Wars" lawsuits that shut down clinics and resulted in licensing revocations were based on just these kinds of informed consent violations.

The history of informed consent is instructive. See also, Jochen Vollmann, Rolf Winau, Informed consent in human experimentation before the Nuremberg code, BMJ's Nuremberg issue, British Medical Journal 1997;314:439  See also, The Nuremberg Code and the Declaration of Helsinki, See also, "Trials of War Criminals before the Nuremberg Military Tribunals under Control Council Law No. 10", Vol. 2, pp. 181-182. Washington, D.C.: U.S. Government Printing Office, 1949.] and Nuremberg Code text from: https://history.nih.gov/display/history/Nuremberg+Code

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was never properly learned and/or never properly applied  in this cased by Purdue's staff, investigators, VP or Dean.

### *Basic Essential Science-History:*  **Historical stages of the legal system investigating abuse cases.**

**Phase One** – Failure to Protect Victims:  Abuse was tragically and improperly ignored by the legal system for centuries.

**Phase Two** – Progress is made as Proper Investigations and Prosecutions ramp up in the 1960s and 1970s.  In the 1970s and 1980s and early 1990s abuse was finally being

properly prosecuted.  This hopeful progress was marred by a series of Abusive, Science-Illiterate, Confirmation Bias, Corrupt Investigations involving leading-suggetive-memory contaminative interviews  (See, the Amirault, Keller, McMartin, Wenatchee, Kelly Michaels cases, and many others. See, e.g. Journalist Dorothy Rabinowitz who wrote exposés of these dubious cases including the Amirault case in Malden, Massachusetts and a series of cases in Wenatchee, Washington and the Kelly Michaels case in New Jersey.  These exposés earned her a 2001 Pulitzer Prize Award and were the basis of her book *No Crueler Tyrannies: Accusation, False Witness, and Other Terrors of Our Times*.

These horrific mis-prosecutions involved law enforcement using the science-uninformed investigative procedures of the time – including mistaken notions about the nature of memory and virtually no knowledge at all of memory contamination and "Believed-In-But-False-Memories".  Such cases also involved manipulated evidence, threats to witnesses, repetitive mis-interviews, and other errors that produced false allegations and false convictions -- resulting in many appellate overturned cases.  These cases motivated the Scientific Community to begin a detailed study of Memory, Memory Contamination and Protocols for proper interviewing — and our investigation methodology of today has benefited from a science-law partnership.  (See, eg., US DOJ instructions and US NIH protocols as cited in this report).

**STANDARDS OF CARE DEVELOPED WITH SCIENCE and LAW ENFORCEMENT CONTRIBUTING:**

These horrific cases did, however, produce scientific interest, research progress in understanding the nature of memory/false memory and subsequently interview-investigation reforms including standard national science-informed requirements that :

A) ALL investigative interviews be properly ***recorded for review by experts and defense attorneys to assess alternative hypotheses of memory contamination by improper "advocacy" interviewing***, … failing such recordings the Investigators CANNOT do their job of investigating the alternative hypotheses = fatal Confirmation Bias and the Investigators, counselors cannot defend themselves against alternative

hypotheses of memory contamination via improper questioning and RRM-MPD-DISS ideology and others.

B) and questions should not be overly ***coercive, leading, and suggestive*** … failing to obtain proper recordings the Investigators CANNOT do their job of investigating the alternative hypotheses = fatal Confirmation Bias and the Investigators, counselors cannot defend themselves against alternative hypotheses of memory contamination via improper questioning and RRM-MPD-DISS ideology and others.

C) interviews be kept to a ***minimum number*** (1 or 2 at most) - on this record NOBODY documented the NUMBER of interviews experienced by Jane Doe. Did she have 20 interviews with Monica Bloom and other CARE "counselors" before her allegation memories were reported?

D) competent investigators understand ***they are NOT reliable human lie detectors*** and must therefore search for corroborative evidence and not rely upon "clinical experience" or "clinical judgment" - clearly violated in this case. In fact, multiple witnesses offering potentially disconfirming evidence were simply ignored.

E) competent investigators ***avoid Confirmation Bias*** by generating and testing ***alternative hypotheses*** of the case (including the alternative hypothesis that ***memory manipulation*** generated false/exaggerated pseudo-memories resulting from mis-interviews/improper therapy by psychotherapists, civil attorneys, and poorly trained/corrupt investigators.  This case is a classic, massive example of Confirmation Bias.

F) complex memory cases – especially those lacking corroborative evidence – should involve a competent ***SCIENCE EXPERT WITNESS in memory-false memory-contamination-the relevant history etc*** (not a local therapist) expert witness to properly instruct officials, investigators, committees, courts and juries how to evaluate and investigate complex memory cases.

***<u>On this record, in my opinion, the Purdue investigation and Purdue Equity Committee meeting and Dean/VP conduct violated ALL of these basic requirements</u>***:

**Phase Three** – The Memory Wars and Mental Health Reforms:  In the late 1980s and early 1990s, RRM-MPD-DISSOCIATION therapists-authors-presenters -- the worst

wave of quackery in the history of the US mental health system -- destroyed tens of thousands of families with induced false memories of horrific abuse. Science-uninformed therapists used hypnosis (guided imagery), coercive suggestions, imagination, confusion of mental images ("flashbacks", dreams), bogus notions of "trauma memories", quack practices such as "figuring out what body memories mean", and other forms of indoctrination to teach tens of thousands of patients to believe they had "recovered repressed memories" RRMs of horrific abuse by their parents.

**The FBI and the National Center for Child Abuse and Neglect debunked thousands of the RRM-MPD-DISSOCIATION allegations**. Criminal prosecutions and civil suits based on nothing more than "recovered memories" were widespread until THOUSANDS of abuse claims based on "recovered repressed memories" were investigated and debunked by the FBI (led by Special Agent K. Lanning and the National Center for Child Abuse and Neglect (led by Prof. G. Goodman) *finding essentially ZERO corroborating evidence for over 12,000 cases of recovered memory allegations of horrific abuse based on prototypic RRM-MPD-DISS ideologies and methods — like those taught by Dr R Campbell — Purdue's chose trainer.* Finally, after lengthy and expensive (tens of millions of dollars) investigations in many states, FBI Special Agent Kenneth Lanning held a press conference and said, "now the therapists have to explain why patients are claiming things that do not appear to be true". ( See, Ofshe/Watters, Pendergrast, Barden cited in this report and hundreds of national media articles available on the internet. )

**MALPRACTICE LITIGATION**:  I and colleagues put together, consulted on, and litigated as an attorney, lawsuits in dozens of states – together with international science and therapy experts who testified as expert witnesses – resulting in hundreds of successful ***malpractice lawsuits*** against "recovered repressed memory" RRM-MPD-DISS therapists.  See, e.g. Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014;  See, e.g. Belluck, P. Memory Therapy Leads to a Lawsuit and Big Settlement

[$10.6 Million], The New York Times, Page 1, Column 1, Nov. 6, 1997; See, Belluck, P. She Recovered Memories, Then 10 Millions in Damages, The New York Times, Nov 9, 1997, Sec. 4, Week in Review, page 2, Column 3 ; See, United Press International, Woman wins $10 M in false memory suit, Chicago, Ill. November 4, 1997; See, Gustafson, Paul. Jury awards $2.5 million in lawsuit against psychiatrist: 'Memories' were induced. Minneapolis/St. Paul Tribune, January 25, 1996, 1B ; See also, Guthrey, M. and Kaplan, T., 2nd Patient Wins Against Psychiatrist: Accusation of planting memories brings multi-million ($2.5) dollar verdict. St. Paul Pioneer Press, Jan. 25, 1996, 4B ; See, Ann Zimmerman, Cult of Madness: Seeking help for depression, Martha Hurt turned to therapists. That's when her insanity truly began, Dallas Observer Oct 14, 1999; See, also, Wallace, C.G., Idaho Falls Post Register, "State board suspends psychologist's license," July 3, 1996, p. A-8 ; See, Duran, Sarah. Man wins therapy lawsuit and $2.1 Million, Tacoma Washington, The News Tribune, January 13, 2001 ; See, Rovella, David E. , Malpractice suit nets $2.1 million in mental health case, THE NATIONAL LAW JOURNAL, February 22, 2001;  See, Mooney, Tom. Recovered Memory Rejected: Judge rules out key element in landmark case. The Providence Journal (Rhode Island). April 28, 1999 and many more.

**LICENSE REVOCATIONS**:  RRM-MPD-DISS  experts-therapists suffered many licensing prosecutions and _**revocations**_. See, e.g. Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.   I participated in many of these revocation processes to *protect the integrity of the mental health and legal systems.*

**THE RELEVANT SCIENTIFIC COMMUNITY REJECTED** claims of reliable RRM-MPD-DISS memories (See Amicus Briefs and Daubert rulings cited in this report).

**MULTIPLE COURTS IN MULTIPLE STATES REJECTED RRM-MPD-DISS IDEOLOGY-THEORIES and METHODS** FOLLOWING COMPETENT

FRYE, DAUBERT, KUMHO HEARINGS:   See full citations in this report including cases in RI, NH, NE, UT, MN, and TX.

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was clearly _not available nor properly applied by Purdue staff in this case._

**_Basic Essential Science-History:_   _DAUBERT-KUMHO Science Hearing processes were carefully_ designed by the US Supreme Court and implemented in MANY States, to _protect the integrity of the legal system_** from controversial, unproven, unreliable, pseudo-science, theories-methods-practices and evidence such as RRM-MPD-DISS. .  See, Grove, W. M. and Barden, R.C. (2000). '**_Protecting the integrity of the legal system: The Admissibility of Testimony from mental health experts under Daubert/Kumho analyses_**.' _Psychology, Public Policy and Law, 5(1)_, 234-242. Excerpts reprinted in Fisher, G. _Evidence_: University Casebook Series (2002), Foundation Press – West Group, New York, p. 688.

1994-2012 - A SERIES OF FRYE-DAUBERT-KUMHO RULINGS IN MULTIPLE JURISDICTIONS EXCLUDED TESTIMONY SUPPORTING THE PSEUDOSCIENTIFIC NOTIONS OF RRM-MPD-DISS IDEOLOGY:

I personally participated with law and science colleagues in a number of widely reported Frye-Daubert-Kumho hearings to exclude junk science notions and methodologies and thus protect the integrity of the legal system. For example:

See, e.g., <u>Hamanne, et al. v. Humenansky</u>, Ramsey County Minnesota File No. C4-94-203, Judge Betrand Poritsky, June 30, 1994, Transcript page 83-84. "The Frye hearing has been concluded and we are still on the record... It's my finding, first, that the theory a person can block out of awareness [repress or dissociate] a long stream of [traumatic] events and subsequently recall them accurately is not supported by experts in the field.  And further that there is no agreement by experts that there is general agreement that such [recovered memory] evidence is reliable and trustworthy. That's the Frye standard.  As to the Daubert standard, it is also my ruling that such [recovered memory] evidence is not reliable nor helpful to the jury."

See, <u>Carlson v. Humenansky</u> (Minnesota Trial Ct), Judge Betrand Poritsky (January, 1996). Judge Poritsky again found (as he had in Hamanne v. Humenansky) that repression and recovered memories were unreliable concepts, not accepted by the relevant scientific community, not helpful to a jury and thus inadmissible.

See, <u>Engstrom v. Engstrom</u> California App., 2nd App. Dist., Div 2, (CA 1997) "[Repressed memory] is not generally accepted as valid and reliable by a respectable majority of the pertinent scientific community..."

See, <u>State of New Hampshire v. Hungerford and State of New Hampshire v. Morahan</u> 698 A.2d 1244 (N.H. 1997) "The phenomenon of recovery of repressed memories has not yet reached the point where we may perceive these particular recovered memories as reliable."

See, <u>State of New Hampshire v. Walters</u> 697 A.2d 916 (N.H. 1997) "[W]e conclude, as we did in Hungerford , that " [t]he indicia of reliability present in the particular memories in [this] case[] do not rise to such a level that they overcome the divisive state of the scientific debate on the issue."

See, <u>Franklin v. Stevenson,</u> 987 P.2d 22 (1999). … Utah Supreme Court ruling … "Stevenson objected to the reliability of both the recovery techniques and Franklin's own testimony concerning the recovered memories, as well as to the experts' testimonies regarding both the theory of repressed memory and Franklin's memories in particular…. As we conclude below, the trial court erred in not finding the plaintiff's experts' testimonies [regarding "repressed memories"] inadmissible… On cross-examination in this case, Stevenson elicited concessions from both of Franklin's expert witnesses, Dr. Bessel van der Kolk, and Franklin's therapist, Dr. Laurie Hoover, regarding the lack of scientific foundation for the therapeutic techniques Dr. Hoover used with Franklin… Franklin's evidence clearly did not meet the initial foundational showing of reliability… Not only has this court held that unreliable techniques are inadmissible as evidence, but also that any expert testimony based upon unreliable techniques is also unreliable and inadmissible…. the necessary threshold reliability of these techniques was not established in the instant case."

See, <u>State of Rhode Island v. Quattrocchi,</u> C.A. No. P92-3759 (R.I. 1999) [on remand from the Rhode Island Supreme Court 681 A.2d 879 (R.I. 1999)] "The State

has not met its burden of establishing that repressed recollection is reliable and admissible as scientific evidence."

See, State of <u>New Hampshire vs. Bourgelais</u>,  Docket No. 02-S-2834, Judge T. Nadeau, April 4, 2005.   "the State's motion [to use repressed memory evidence at trial] is denied… the court determines, based on the law and the evidence, that the reliability of memory retrieval has not been sufficiently established…"

See, <u>Rivers v. Father Flanagan's Boys Town</u>, Doc 1024, Case No. 743, Nebraska State Court Judge Sandra L. Dougherty, November 25, 2005. "In conclusion, the Court finds and concludes that Rivers has not met his burden of establishing that repressed and recovered memory is reliable and admissible as scientific evidence or that it is properly applied in this case. The Plaintiff's evidence lacks the scientific reliability and proper application necessary to admission under Rule 702 and Daubert/Schaferman.  As a result, the Courts finds and concludes that the Defendants' Motion in Limine No. 1 (banning all testimony regarding repressed and recovered memories) shall be sustained."

See, Duffy v. <u>Father Flanagan's Boys Town</u>, Case No. 8:03CV31, United States District Court for the District of Nebraska, Memorandum and Order of January 26, 2006 by Hon. Laurie Smith Camp, U.S. District Judge.   "[Plaintiff] Duffy filed a motion of withdrawal of expert testimony on the issue of repressed memory.... [thus] judgment will be granted to [Defendant] as a matter of law."

See, Karen Franklin Ph.D., Multiple Personality Disorder (DID) Excluded in Twilight Rapist Insanity Case, Psychology Today Blog, Oct 14, 2011.  (Texas Rangers capture and prosecution of the "Twilight Rapist")… "After Dr. Barden's testimony that the condition is not generally accepted by the scientific community, despite the fact that it is listed in the DSM, District Judge Skipper Koetter ordered Dr. Ross's testimony on dissociative identity disorder stricken from the record." See, also Dissociative Identity Disorder: Multiple Personalities, Multiple Controversies" by Scott Lillienfeld & Steven Jay Lynn, Science and Pseudoscience in Clinical Psychology, The Guilford Press; First edition (2004).

and See, <u>John Doe (Keenan) v. Archdiocese of St. Paul</u>, Case No. 62-C9-06-003962, December 8, 2009, 2nd Judicial District, Judge Gregg E. Johnson after a detailed, complex hearing found, "Plaintiff failed to meet his burden of proof under the Frye-Mack

standard of showing that the concept of repressed and recovered memory is generally accepted in the relevant scientific community" …"Inclusion of the diagnosis of dissociative amnesia in the DSM-IV does not establish general acceptance of that diagnosis"… "Plaintiff failed to meet his burden of proof under the Frye-Mack standard of showing that the theory of repressed and recovered memory is reliable and trustworthy based on well-recognized scientific principles because of the significant methodological flaws in the studies presented by plaintiff in support of that theory and the lack of any test to show reliability. Defendant's Motion to Exclude Expert Testimony under the Frye-Mack standard is hereby GRANTED."    This decision was affirmed by the Minnesota Supreme Court on July 25, 2012,    John Doe (Keenan) v. Archdiocese of St. Paul, 817 N.W.2d 150 (Minn. 2012).

and others.

Daubert-Kumho doctrines were designed -- and have been properly used in very similar cases in multiple states (citations below) -- to protect the integrity of the legal system by excluding **unreliable,** junk science RRM-MPD-DISS ideology and associated interview-therapy practices.  I have previously published on these issues – in international publications – as well as given invited training lectures on such topics to the national conventions of Lawyers (ABA), Psychiatrists (APA), and Psychologists (APA) – as well as to a U.S. Federal Judicial Conference, to the FBI, and to Sex Crimes Investigators Associations as well as at multiple Universities, Law Schools, and Medical Schools and Continuing Educations reaching over 10,000 professionals in multiple states.  It is thus difficult to understand ***why nobody involved in this case*** seems to have had any competent or even basic-general knowledge or understanding regarding the essential, controversial memory issues in this case.

***The Essential History of the RRM-MPD-DISS MOVEMENT LEADERS was apparently unknown to Purdue investigators who gullibly believed training from Dr R Campbell.***

**For example, reportedly:**

— Dr Bennett Braun, MD. Former President of ISSD and Chief Editor of "Dissociation". Sued leading to a world record settlement, Dr Braun's clinic was closed,

his medical license was surrendered to the State of IL Licensing Bd following prosecution by Illinois Attorney General, he moved license surrendered again and this time permanently for drug offenses… In addition, Dr Braun has been on the losing end of multiple lawsuits. Several of these were listed by the State of Illinois in the formal complaint against Dr. Braun by the Attorney General's Office including but not limited to: Shanley v. Judith Peterson, Braun, et al. ; Schwidersky v. Peterson, Braun,. et al. ; Benoit v. Assoc. Mental Health Services ; Higgins v. Rush Presbyterian St Luke's Medical Center, Braun, et al. ; Becker v. Rush Presbyterian St Luke's Medical Center, Braun, et al. ; Bloom v. Braun, et al. ; Dale v. Braun, et al. ; Kreger v. Braun, et al. ; Doe v. Robins, Braun et al. ; Department v. Braun and others. This list includes the most famous of all "recovered memory" cases Burgus v. Braun, the largest psychiatric malpractice case in history. See, Belluck, P. (1997, November 6). Memory therapy leads to a lawsuit and big settlement. *The New York Times, page 1, col 1 ,* hundreds of stories appeared in AP publications and TV shows worldwide. Virtually all MPD and RMT clinics in North America were closed following this news.

— Dr Bessel van der Kolk, MD (VDK) was reportedly fired ("released", "let go", "contract not renewed") from Harvard Medical School for multiple reasons including reportedly a deposition conducted  by Dr RCB Barden in a RI federal case. The deposition documented serious misconduct (false statements to the NH v Hungerford court) and exposed serious questions about whether VDK ever actually conducted the research for his "Fragmentary Nature of Trauma Memories" research.  For example, VDK reportedly admitted that Danya Vardi, VDK's 2nd named author in the paper offered to the Hungerford court, was actually prosecuted and found guilty of *research fraud* by Federal/Harvard investigation panel prior to VDK giving their joint study to the court — the fraud conviction was apparently not honestly reported to the court in that NH criminal trial.  The Federal District Court in Rhode Island reportedly then ordered Dr. VDK to produce his alleged data for the "Fragmentary Nature of Trauma Memory" for review of accuracy and credibility. Dr. VDK reportedly refused to comply with the Federal Court order, fled from the process server, dropped out of the relevant cases and years later claimed in sworn deposition testimony that the "only copy of his data" on the essential "fragmentary nature of trauma memories" study was "burned up in a fire". A

53

fire VDK never reported to fire, police or hospital officials. No other witness to the alleged "fire" apparently exists.  See, pg 171 of the May 4, 2005, Videotaped deposition of B. van der Kolk, MD in Bonse v. Archdiocese of St Paul and Minneapolis, Court File No. 62-C4-02-11412, Second Judicial District, Ramsey County, Minnesota.  VDK was also reportedly fired from his Trauma Clinic amidst allegations that he abused employees. VDK's expert testimony and analysis was reportedly excluded as ***unreliable*** following a DAUBERT hearing in  State of New Hampshire v. Hungerford and State of New Hampshire v. Morahan 698 A.2d 1244 (N.H. 1997). VDK's expert testimony and analysis was also excluded as ***unreliable*** following a DAUBERT hearing in a Neb case, Rivers v. Father Flanagan's Boys Town, Doc 1024, Case No. 743, Nebraska State Court Judge Sandra L. Dougherty, November 25, 2005 resulting in another case dismissal, Duffy v. Father Flanagan's Boys Town, Case No. 8:03CV31, United States District Court for the District of Nebraska, Memorandum and Order of January 26, 2006.  VDK's expert opinions on "trauma memories" were reportedly again excluded as ***unreliable in Franklin v. Stevenson, 987 P.2d 22 (1999)*** as the Utah Supreme Court noted the "evidence clearly did not meet the initial foundational showing of ***reliability***" ... "Not only has this court held that ***unreliable*** techniques are inadmissible as evidence, but also that any expert testimony based upon unreliable techniques is also ***unreliable and inadmissible....*** the *necessary* threshold ***reliability*** of these techniques was not established in the instant case."

— Dr Renee Fredrickson, PhD. Author of the RMT foundational book "Repressed Memories". Dr RF was sued, paid settlement, and was punished by MN licensing bd with restriction on practice.  See, "Before the Minnesota Board of Psychology, Stipulation and Consent Order of May 7, 1999 In the Matter of Renee Fredrickson, Ph.D., L.P. License No. LP2653… "It is hereby ordered that the Licensee is placed in a RESTRICTED AND CONDITIONAL status and that all other terms of this stipulation are adopted and implemented by the Board this 7th day of May, 1999." See, e.g. American Psychological Association MONITOR, Recovered-memory lawsuit is settled out of court, Vol. 29, Number 9 -September 1998 ; See, Lerner, Maura, ***Psychologist barred from treating cases involving false memories***, Minneapolis/St. Paul Tribune, June 3, 1999.

— Dr George Greaves, PhD. RMT expert and Past President of Intl Society for the Stud of **Dissociation**. His *license was permanently revoked* for abusing multiple patients using hypnosis and "dissociation" to obtain sexual access to vulnerable patients…. "Despite his personal knowledge of the patient's extreme vulnerability due to emotional disorders.... [Dr Greaves} repeatedly hypnotized the patient for the purpose of engaging in sexual intercourse." See, "Before the Georgia State Board of Examiners of Psychologists, Docket Number 93-598 , AG NO. 64PB-CA-97300-92, In the Matter of George B. Greaves, Ph.D. , Consent to license revocation signed April 1, 1994.

— Dr Colin Ross, MD . Past President of ISSD. Dr Ross was sued, settlement, clinic closed, excluded from Tx v Harris for unreliable methods (junk science), excluded from Hamanne vs Humenansky for unreliable methods (junk science). See, Texas vs. Harris. Associated Press, "Texas man suspected of raping older women claims he suffers from multiple personality disorder", Washington Post, National Desk Sept. 19, 2011; and see, *Expert witnesses disagree on validity of multiple personality disorder*" by Sonny Long, Victoria Advocate News, September 20, 2011 Edna, Texas; and see, Platenberg, G. Jury sentences convicted rapist to life in prison. Victoria Advocate News, Sept. 30, 2011. The court excluded the testimony of the defense expert witness ( a psychiatrist ) who testified regarding the defendant's "multiple personalities", "dissociated memories", etc. The court found the testimony regarding Dissociative Identity Disorder (DID) [ ... a variant of Repressed Recovered Memory -Multiple Personality Disorder ] was controversial, unreliable, and not accepted by the relevant scientific community." Dr Ross has also shared bizarre theories about controlling "energy" from his eyes. See, "Dr. Colin Ross Demonstrates How He Sends a Beam of Energy From His Eyes" at  https://vimeo.com/1449829

— Dr Judith Herman, MD - *reportedly arrested by Federal agents for multiple drug violations*, *lost prescription privileges, punished by MA licensing bd, and paid huge fines*. See, July 5, 1995, Boston Globe, "US Attorney settles Drug Lawsuit with Cambridge Psychiatrist (fine paid and loss of prescription privileges). "The United States of America seeks civil penalties against the defendant for numerous violations of the Comprehensive Drug Abuse Prevention and Control act of 1970, 21 U.S.C. §§ 801 et seq.." . Federal Complaint at pg 2. "on numerous occasions during the period relevant to

this Complaint, Herman used her DEA registration to purchase controlled substances from wholesale drug distributors. Specifically, Herman purchased significant quantities of Schedule III narcotic and non-narcotic controlled substances, including Fiorinal with Codeine, Idenal, and Butalbital, and Schedule IV controlled substances such as Diazepam, Flurazepam, and Halcion. Each of these controlled substances has a high potential for abuse and poses a risk to the user of psychological or physical dependence" at pg. 3 of the Federal Complaint. "On March 16, 1994 representatives of the DEA and the Board visited the Collective and spoke with Dr. Herman. Dr Herman openly acknowledged her actions, voluntarily surrendered her DEA registration at that time..." See, page 4 of the MA ST Bd of Medicine Complaint.

— Dr Daniel Brown, PhD – opinions excluded from the RI vs. Quattrocchi case for **unreliable** expert testimony. [ His cross examination exposed apparent violations of ethics codes and negligent or corrupt misrepresentations of research]. See, State of Rhode Island v. Quattrocchi, C.A. No. P92-3759 (R.I. 1999) [on remand from the Rhode Island Supreme Court 681 A.2d 879 (R.I. 1999)]. No federal, state or private research grants, no tenure track jobs, no Editorial positions, no research awards.

— Dr Judith Peterson, PhD, was reportedly **indicted by a Federal Grand Jury in Texas and criminally prosecuted by the US DOJ for implanting "recovered memories" and thus creating "dissociated splits" (MPD) in order to charge insurance to treat the fabricated symptoms**. The case ended in a mistrial (too many jurors had to drop out of the very long trial). The co-defendant hospital was reportedly closed and sold. See, Criminal Charges Filed in Recovered Memory Case. December 1, 1997. Psychiatric Times, Psychiatric Times Vol 14 No 12, Volume 14, Issue 12. See, See, U.S.A. v. Judith Peterson, Ph.D., et al., U.S. Southern District of Texas, Crim. Case No. H-97-237, James H. Deatley, U. S. Attorney.

— Dr Constance Dalenberg, PhD – opinion excluded as **unreliable** following a DAUBERT hearing in Doe vs. Archdiocese (MN) [ See, John Doe v. Archdiocese of St. Paul, Case No. 62-C9-06-003962, December 8, 2009 and affirmed by the Minnesota Supreme Court on July 25, 2012, John Doe v. Archdiocese of St. Paul, 817 N.W.2d 150 (Minn. 2012). In testimony at that hearing, Dr Dalenberg admitted to refusing to permit

other scientists to review her most important data. She also admitted to later ***destroying the only copy of her most important data*** set and "nobody else" viewed such data.

— Dr Phillip Coons, MD. RMT expert psychiatrist.  Dr Coons admitted that ***he "destroyed" the only copy of his most important data*** on repressed memories and dissociation and that no one has ever seen Dr. Coons critical data except for Dr. Coons.   See, Barden, R.C., Deposition of P. Coons, Hurt v. Ash et al. (Tx) Sept 20, 2000 at page 223…  "8 Q. And do you still have the raw data for that 9 study? 10 A. No. 11 Q. Where did it go? 12 A. Well, as I said, I've -- I've not kept that 13 data. 14 Q. Meaning that it was destroyed? 15 A. Yeah, I -- I threw it out. 16 Q. So were you the one who personally destroyed 17 it, or did you hire somebody else to do it? 18 A. No, I personally destroyed it."

— Dr Rebecca Campbell, in my opinion, is following in the footsteps of her RRM-MPD-DISS companions by teaching, unproven, unreliable, pseudo-science to misinformed and thus hazardous investigators — as in this case.

In sum, on this record, basic, reliable, valid scientific-historical-methodological information essential for a competent-fair investigation in such cases was clearly *not available nor properly applied by Purdue staff in this case.*


**2011 - PRESENT :   ANOTHER WAVE OF PSEUDOSCIENTIFIC NOTIONS ABOUT "TRAUMA MEMORIES" CAME INTO BROAD USE IN TITLE IX INVESTIGATIONS GENERATING NATIONAL CONTROVERSIES. OFFICIALS RELIED UPON THE PSEUDOSCIENCE NOTIONS OF DR R. CAMPBELL and OTHERS TO CREATE "INVESTIGATIONS" THAT FAILED TO RECORD INTERVIEWS, FAILED TO OBTAIN SIGNED/DATED/RECORDED VICTIM STATEMENTS and OTHER PROCEDURES IN DIRECTLY VIOLATION OF MEMORY SCIENCE.**


"Sunlight is said to be the best of disinfectants" — Justice Louis Brandeis

"The procedures that are being adopted [ in University Title IX cases ] are taking us back to pre–Magna Carta, pre-due process procedures." — Harvard Law School Professor Janet Halley

Much like Naomi Wolf's pseudoscience claim that 150,000 women die of eating disorders annually (cf to the 525 actual deaths), a newer form of misinformation claimed that "1 in 4 (or 1 in 5) women on college campuses are assaulted or raped". As journalist E. Yoffe noted, " headlines in newspapers across the country trumpeted the troubling findings from a massive new survey on campus sexual assault. "1 in 4 Women Experience Sex Assault on Campus," declared the New York Times. "One in four female undergraduates reports sexual misconduct, survey finds," reported the Los Angeles Times. "More than 1 in 5 female undergrads at top schools suffer sexual attacks," offered the Washington Post.  Emily Yoffe, The Problem with Campus Sexual Assault Surveys, Slate, (Sept. 24, 2015) at https://slate.me/1KxQBH0  (accessed on June 5, 2018).  Apparently these journalists, failed to consult an actual science expert in such matters to discuss the methodological errors and limitations in such pseudoscientific, unreliable "research".

Even the original authors of this very controversial study debunked the hysterical narrative stating, "If you've followed the discussion about sexual assault on college campuses in America, it's likely you've heard some variation of the claim that 1 in 5 women on college campuses in the United States has been sexually assaulted or raped. Or you may have heard the even more incorrect abbreviated version, that 1 in 5 women on campus has been raped. As two of the researchers who conducted the Campus Sexual Assault Study from which this number was derived, we feel we need to set the record straight." See, Christopher Krebs & Christine Lindquist, Setting the Record Straight on '1 in 5', TIME Magazine, http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/ (accessed June 5, 2018).  These researchers go on to list sampling limitations, the broad definition used for "sexual contact" (e.g., "unwanted kissing" and "rubbing up against you over your clothes" — few rational people would label these acts as "rape" or "assault"), and a dismally low response rate of 42% ( Note that an AAU study on this topic had only a 19 percent response rate rendering it essentially worthless).

It is important to note that these "researchers were *not members of any credible "relevant scientific community"* and this controversial study was NOT funded by any scientific organization but rather by the National Institute of Justice — the US Dept of Justice — prosecutors.

The NIJ is apparently the very same science-challenged group that invited Dr R. Campbell of Michigan State to teach her <u>very</u> controversial — and apparently unreliable and pseudoscientific — notions about the "Neurobiology of Sexual Assault". The purpose of the NIJ as noted on its website in a related article is "To improve the likelihood that suspects will be identified, arrested, and convicted" — a worthy cause but hardly an unbiased motive for credible, valid, reliable "science". I note that author Krebs apparently has a Ph.D. in Criminology and is an expert in <u>corrections</u>. Dr Krebs is apparently NOT a member of any relevant scientific community. His resume web page apparently lists zero tenure or tenure track faculty positions, zero research awards and zero actual science grants. See, https://www.rti.org/expert/christopher-p-krebs  (accessed June 6, 2018). Similarly, co-author Dr. Christine Lindquist apparently has a Ph.D. in "medical sociology" and specializes in <u>prisoner re-entry</u>, as well as families and <u>incarceration</u>. She is also apparently NOT a member of a relevant scientific community. Her resume web page also apparently lists zero tenure or tenure track faculty positions, zero research awards and zero actual science grants. See, https://www.rti.org/expert/christine-h-lindquist  (accessed June 6, 2018). I look forward to learning more about these controversial researchers and their controversial work. I seek to review a full resume on all of them and to review the raw data from their "research".

In sharp contrast to Dept of Justice funded research, over 90% of the colleges and universities in the United States apparently reported ZERO of their students were raped in 2014. 91 Percent of Colleges Reported Zero Incidents of Rape in 2014, AAUW (Nov. 23, 2015), available at http://www.aauw.org/article/clery-act-data-analysis/ (last visited June 5, 2018). Consistent with this finding and contrary to the Dept of Justice funded study, A report from the Bureau of Justice Statistics entitled "Rape and Sexual Assault Victimization Among College-Age Females, 1995-2013" . . . found that contrary to frequent assertions by some elected officials about the particular dangers female college

students face, this study apparently reported college women were LESS likely to be victims of sexual assault than their peers who are not enrolled in college. More specifically, the report found . . . the incidence [of sexual assault] . . . was 0.76 percent for non-students and <u>0.61 percent for students thus far LESS than ONE percent</u> . . . not 1 in 5). Emily Yoffe, The Problem with Campus Sexual Assault Surveys, Slate, (Sept. 24, 2015), available at https://slate.me/1KxQBH0 (accessed on June 5, 2018). \

As Ms. Yoffe notes, "But if these heads of institutions of higher education truly believe the (1 in 5 ) survey results, their collective response constitutes a dereliction of duty. What the AAU survey describes is an epic criminal justice calamity that should prompt emergency action. If 1 in 4 women on their campuses can expect to be sexually victimized <u>each year</u>, college presidents should reinstate the long-abandoned sexual segregation of dorms; there should be a strictly enforced ban on underage drinking; and a large and visible law enforcement presence should prowl campus as a deterrent to sexual predators. But no college president is suggesting such things. I suspect that's in part because they recognize that there is a fundamental problem with these sexual assault surveys. These surveys are trying to describe the most intimate activities of people by forcing them to answer binary questions about behavior that can be ambiguous, complicated, and confusing."

This kind of confused, unreliable, junk science can lead to controversial government action including the "Dear Colleague" letter to colleges from the Obama administration leading to much controversy. See, "Harvard Law School Professors Sign Letter Slamming 'Victim-Centered' Sexual Harassment TITLE IX Policies" at https://www.thecrimson.com/article/2018/2/28/law-profs-sign-sexual-assault-letter/ (accessed on June 6, 2018).

"Two Harvard Law professors have joined nearly 140 professors from universities across the country in signing a public letter that critiques what the authors call "<u>victim-centered practices</u>" in higher education sexual harassment policies and procedures.

Law professors Janet E. Halley and Elizabeth Bartholet signed the letter, along with academics hailing from institutions including Northwestern University and the University of Pennsylvania Law School. "'<u>Victim-centered' practices… threaten to subvert the objective collection and presentation of evidence in administrative, civil, and</u>

criminal sexual assault proceedings," the letter reads.        The letter states these victim-centered practices are based in the "believe the victim" ideology they say sprang up in the 1990s. The document's authors assert that supporters of this ideology called for "swift and unquestioning judgments about the facts of [sexual] harassment without standard evidentiary procedures."        The letter culminates in a "call to restore due process and fundamental fairness" in university sexual harassment cases by ending the "use of victim-centered, trauma-informed, and believe the victim practices."

Halley and Bartholet also comprised two of the four Harvard Law School faculty members who submitted a memo to the U.S. Department of Justice last year asking for a review of the standards outlined in the 2011 "Dear Colleague" letter. That letter was an Obama-era order directed colleges and universities receiving federal funding to "use a lower standard of proof" in sexual assault cases as well as establishing a broader definition of the term sexual harassment. U.S. Secretary of Education Betsy DeVos rescinded those guidelines which might well be restored under the new Biden administration.

Professor Halley said in an interview that she signed the recent open letter because it aligned with her belief that the policies and procedures on sexual assault need to be revised. "I signed it because I thought it was correct. I've seen the bad effects of politically slanted training," Halley said. [ Emphasis added ].

Similarly, another Harvard Law School professor, Jeannie Suk Gersen, explained the thinking behind her 2015 New Yorker essay. "It is a near-religious teaching among many people today that if you are against sexual assault, *then you must always believe individuals who say they have been assaulted*. Questioning in a particular instance whether a sexual assault occurred violates that principle. Examining evidence and concluding that a particular accuser is not indeed a survivor, or a particular accused is not an assailant, is a sin [ against radical feminism ] that reveals that one is a rape denier, or biased in favor of perpetrators.. . . . Fair process for investigating sexual-misconduct cases, for which I, along with many of my colleagues, have fought, in effect *violates the tenet that you must always believe the accuser*…. (but ) …Fair process must be open to the possibility that either side might turn out to be correct. If the process is not at least open to both possibilities, we might as well put sexual-misconduct cases through no

process at all…. there are many advocates today to the "always believe" orthodoxy. We have seen recent high-profile instances in which that article of faith has led to damaging errors, as in *Rolling Stone's* reporting of a rape at the University of Virginia, or the prosecution of the Duke lacrosse case. The extent of the damage comes out of the fact that "always believe" unwittingly renders the stakes of each individual case impossibly high, by linking the veracity of any one claim to the veracity of all claims. When the core belief is that accusers never lie, if any one accuser has lied, it brings into question the stability of the entire thought system, rendering uncertain all allegations of sexual assault. But this is neither sensible nor necessary: that a few claims turn out to be false does not mean that all, most, or even many claims are wrongful. The imperative *to act as though every accusation must be true*—when we all know some number will not be—harms the over-all credibility of sexual assault claims… We should be attentive to our history and context, and be open to believing, disbelieving, agreeing, or disagreeing, in individual instances, *based on evidence*".   See, Gersen, J.S. "Shutting down Conversations about Rape at Harvard Law", New Yorker, Dec. 11, 2015.

In 2015, Janet Halley, the Royall Professor of Law at Harvard Law School starkly warned Title IX officials of *the dangers of giving "advocacy personnel" the power to adjudicate outcomes*.  She commented, "the only training provided to Harvard [ Title IX ] personnel handling sexual harassment claims directed to the social and psychological dynamics surrounding sexual assault [was] 100% aimed to *convince them to believe complainants*, precisely *when* they seem unreliable and incoherent." (Emphasis added).

She also suggested that "The best way to correct for this, in my view, is to reduce the Title IX Office to a compliance-monitoring role, and *get it out of the business of adjudicating cases*."…  "Cases should go to a body charged with *fairness to all members of our community.…"*  (Emphasis added).

She also noted, "I think feminist governors have to think hard about what they are doing when they try, through provisions like this and by advocating their expansive interpretation, *to predetermine women as victims and men as wrongdoers.*" (Emphasis added).

She also commented, "Cases Arising from the Breakup of Long-term Intimate Relationships:  Where there is *no evidence of physical abuse*, accusations of sexual

misconduct arising *after the breakup of long-term [sexual ] relationships* can — *and should be — very hard to sort out*. These cases involve not only what he or she says happened but what he or she says it *meant* in the private language of each relationship. The adjudicator steps into a *Rashomon*-like maze in which identical episodes have such dramatically different valences that both sides can be truthfully and credibly telling their own understandings and experiences *without offering a decision-maker any plausible basis of decision other than his or her own cultural assumptions and biases*." … "somehow we have imagined sexual harassment charges to be pure of distorting motives like these. None of this is to deny that some breakups are precipitated or accompanied by acute sexual harassment, everything from quid pro quo to subtle but disadvantaging use of institutional power. But *sometimes it's just an immiserating breakup, morphed into the form of a sexual misconduct charge*. (Emphasis added).

She also commented, "Increasingly, schools are being required to *institutionalize prevention,* to control the *risk* of harm, and to take regulatory action to protect the environment. Academic administrators are welcoming these incentives, which harmonize with their risk-averse, compliance-driven, and *rights-indifferent worldviews* and justify large expansions of the powers and size of the administration generally." (Emphasis added).

She also noted, "In a related development, OCR increasingly implies that the only adequate "interim measure" that can protect a complainant in the Title IX process is the exclusion of the accused person from campus pending resolution of the complaint. To be sure, in these cases the accused may eventually be found to be responsible for violations, sometimes very serious ones. *But advocates and the OCR are arguing that all complainants are trauma victims* subject to continuing trauma if the persons they accuse continue in school: merely "seeing" the harasser is deemed traumatic."… "These cases are becoming increasingly easy. Interim measures and environmental security provisions are justified as "merely administrative,*"* the equivalent of determining that more lights should be installed on campus walkways or that food safety certificates should be required for all vending machines. And like merely administrative acts conducive to public safety, they follow a strict liability model. But ending or hobbling someone's access to education should be much harder than that. It may well be that the only

effective way to convince people that this tendency is dangerous is to point to the rights they invade: rights to privacy, to autonomy, to due process. But the tendency *itself* is due for scrutiny. <u>*Assuming* danger,</u> risk, and holistic environmental contamination ensures that restrictions will go into effect even where the facts don't justify them. Will decision-makers — and in particular governance feminist decision-makers — be able to resist this trend?"

See,  Halley, Janet, **Trading the Megaphone for the Gavel in Title IX Enforcement** : Backing off the hype in Title IX enforcement, Commentary, Feb 18, 2015 128 Harv. L. Rev. F. 103  <u>https://harvardlawreview.org/2015/02/trading-the-megaphone-for-the-gavel-in-title-ix-enforcement-2/</u>

In my opinion, this analysis does not reduce the horrific and criminal nature of actual sexual assaults — a serious problem in America at any frequency.  However, the serious nature of this problem is most effectively and competently addressed without biased, hysterical, politicized, irrational, junk science,  pseudo-investigations and unrecorded, un-transcribed "Equity Committee adjudication meetings" applying methodologically improper methods and practices — such as the pseudoscience methods, procedures, and training procedures (eg. Dr Campbell's training) conducted by Purdue University in this case.


4A10.   ANOTHER WAVE OF POLITICIZED, UNRELIABLE, PSEUDOSCIENCE : Controversial pseudo-scientific concepts such as the "Neurobiology of Trauma",  "Neurobiology of Sexual Assault", "Fragmented Memories of Trauma", and claims that "less than 10% of assault allegations are false" in addition to other controversial, politically tainted, unreliable, controversial, pseudoscience notions, are, in my opinion, currently NOT accepted by the relevant scientific community, have NO known error rate, and are NOT supported by peer reviewed published research in competent journals. Nonetheless these, concepts have been recklessly disseminated into powerful investigative systems — including police and university Title IX systems.

For example, some reported "research" claims that "over 90 percent" of rape allegations are proven not to be fabrications.  More intelligent, logical and reliable is the conclusion of journalist E. Yoffe, who noted "<u>we simply don't know</u>" how often people

make false claims.   As Michelle J. Anderson, the president of Brooklyn College and a scholar of rape law, acknowledged in a 2004 paper in the Boston University Law Review, "There is no good empirical data on false rape complaints either historically or currently." The data have not improved since 2004.   The flaws in claims that false accusations are very rare should be obvious to any logical, rational, competent observer.   The fatal methodological flaw is that nobody in the justice system typically investigates false allegations in detail.   The accuser is NOT the subject of the investigation. Investigators might interview the accused's family and friends, co-workers, etc.,  but they RARELY do detailed background interviews on the accuser as the accuser is simply NOT thoroughly investigated in most cases. Similarly, while investigators might contact an accused's old love interests to find out if there is a pattern of prior sexual assaults, drug addiction, pornography or violence, investigators RARELY do such an investigation on the accuser to see if there is a history of false allegations or lack of credibility. In the real world, there is little or no funding and little or no time and little or no interest to do the kind of full, detailed, rigorous investigations of accusers in "dropped" or "failed" prosecutions that would permit anyone to hazard an intelligent guess as to the percentage of accusations that are actually false.   This lack of reliable data makes guessing about the "true percentage" of false allegations reckless and unethical speculation.   In my opinion,  any author, speaker, or "expert" who claims to know the actual percentage of false criminal assault allegations should face a licensing investigation and prosecution.   See also, E. Yoffee,  The Bad Science Behind Campus Response to Sexual Assault, September 8, 2017.  https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ (accessed June 5, 2018).

The history of such pseudoscience claims is instructive.  The oft reported claim that "only 2 percent of sexual assault reports are false" appears to be a politicized, unsupported claim by author Susan Brownmiller in her political ideology, non-science book, *Against Our Will*, where she reportedly wrote "female police officers found that only 2 percent of all rape complaints were false.".   See, Edward Greer, The Truth Behind Legal Dominance Feminism's Two Percent False Rape Claim Figure, 33 Loy. L.A. L. Rev. 947 (2000),

http://digitalcommons.lmu.edu/cgi/viewcontent.cgi?article=2216&context=llr (last

accessed June 5, 2018.[11][SEP]    Reportedly, the source notes from Brownmiller's book indicate this 98% accuracy claim came from a speech by Lawrence H Cooke, Appellate Division Justice, Before the Association of the Bar of the City of New York, January 16, 1974.  Reportedly, investigator Greer contacted Brownmiller and she provided a copy of the speech. The 2 percent figure allegedly came from the Commander of New York City's Rape Analysis Squad, who was offering a personal opinion about the occurrence of false rape claims.  Greer then reportedly contacted the speech author and no one in his office could recall how they arrived at the statistic nor could they recall any formal report on the matter.  There was apparently no publication, no report, no data, no reliable protocol for assessment, no science, no peer review, no research grant, no evidence of accuracy, no indicia of reliability, and this notion is clearly NOT accepted by the relevant scientific community. It was apparently simply a "personal" opinion and yet it has been recklessly repeated as reliable fact many times apparently to manipulate gullible, science illiterate audiences—including University Title IX investigative officials.

This is yet another example of the pseudoscience that infects the "trauma" field. From Wolf's claims of 150,000 dead each year from eating disorders, to Steinem's support of recovered memories of "satanic cult abuse", to the dangerous memory recovery methods of The Courage to Heal, to Dr. Braun's infamous theories of multiple personality disorder as caused by millions of victims of childhood abuse hidden in "repressed memories", to hysterical claims of 1 in 4 college women being sexually assaulted, to Brownmiller's unproven-untested-irrational claim that only 2% of abuse allegations are false, to Dr. R. Campbell's pseudoscience trainings to Title IX investigators on her notions of the "Neurobiology of Sexual Trauma" … this clear and dangerous pattern of politicized pseudoscience continues to pose dangers to the integrity of administrative and legal processes at many levels.  In my opinion, Dr. Campbell should be properly and professionally investigated for the potential damages she appears to have created to the justice and Title IX investigative systems. [ See, Neil Gilbert, The Phantom Epidemic of Sexual Assault, 103 PUB. INTEREST 54, 63 (1991) (stating that "estimates of sexual assault calculated by feminist researchers are advocacy numbers,

66

figures that embody less an effort at scientific understanding than an attempt to persuade the public that a problem is vastly larger than commonly recognized." ].

In contrast to politicized guessing, actual research by a Purdue University faculty member carefully documented a 41% rate of false rape allegations to police in a Midwestern city.  See,  Kanin, E. "False Rape Allegations", Archives of Sexual Behavior 23, no. 1 (1994). [ Note:  This 1994 study by _Purdue professor_ Eugene Kanin, using data from an unidentified Midwestern city, found that between 1978 and 1987 the police department concluded that _41 percent of rape allegations were proven false._ Prof. Kanin noted : "These false rape allegations appear to serve three major functions for the complainants: providing an alibi, _seeking revenge_, and obtaining sympathy and attention."  The police dept investigated all allegations of rape and only rated them as false if the complainant _recanted and confessed_ as to why they made the false charges.]. Clearly, more competent research is needed on this important, controversial topic.


4A11.  HOW PSEUDOSCIENCE AND CONFIRMATION BIAS DAMAGED TITLE IX INVESTIGATIONS — INCLUDING THIS CASE INVESTIGATION  — CLAIMS  OF "FRAGMENTED MEMORY" FOLLOWING ASSAULT and IRRATIONAL CLAIMS THAT ANY POST-ASSAULT BEHAVIORS BY WOMEN ARE CONSISTENT WITH ALLEGATIONS OF ABUSE:  … ( see, the junk science presentation on the "Neurobiology of Trauma" by "Feminist Scientist" R. Campbell a Ph.D. , a community psychologist, a subset of psychology that arose in the 1960s based on Marxist ideology and radical feminism.

In my opinion,  Dr. Campbell's expressed views — regarding the "Neurobiology of Trauma", or "Fragmentary Nature of Trauma Memories" (her claims that trauma memories are like "sticky post-it notes that have to be re-assembled into coherent memories"— are highly controversial, untested, unproven, highly _unreliable_, NOT accepted by the relevant scientific community, and have no known error rate.   See, Transcript "The Neurobiology of Sexual Assault", An NIJ Research for the Real World Seminar,  Rebecca Campbell , Ph.D. Professor of Psychology, Michigan State University, December 3, 2012.   See,  https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx (accessed June 6, 2018).

_**KEY EVIDENCE**_ :   See,  December 4, 2020,  Deposition of Purdue Employee Erin Oliver at pg 9

Q Did you receive any training in terms of trauma, of complainants? A Yes.

Q What was that training?

A _**Neurobiology of trauma**_. _**How brains code memories, do not code memories, during traumatic instances**_. That is really, all I recall from the trainings.

Q Do you recall who provided that kind of trauma training?

A I believe there was a _**faculty member from Michigan State University; Rebecca Campbell.**_ Videos and research that is the only one I recall off the top of my head.

Q You do recall Professor Campbell?

A Yes, I believe she has been the prominent person on that subject.


 In my opinion, Purdue University's acceptance and use of the very controversial, untested, and unproven notions of Dr. Rebecca Campbell to train Title IX's  investigators was a methodological error (See Deposition of Erin Oliver at pg 9) that  tainted the integrity of the investigation process.   Dr Campbell's controversial, unreliable ideology is a clear link in an historical chain of RRM-MPD-DISS unreliable pseudoscience regarding trauma, assault, and memory that have tainted the public, the legal system, and Title IX investigations for decades..  (e.g., Wolf's misinformation on eating disorders, B. Van der Kolk's pseudoscience of "fragmentary trauma memories", B. Braun's pseudoscience of RRM-MPD-DISS and related controversial and unreliable notions of how "brains do not code "trauma" memories)

Debunking RRM-MPD-DISS ideology including Dr Rebecca Campbell's theories on trauma memories:

Reportedly:

— The controversial notions regarding the "fragmentary nature of trauma memories" apparently originated from an "expert", Bessel van der Kolk, MD (VDK).

— Dr VDK was fired, not retained, or "let go" from Harvard Medical School for misconduct.

68

——- Dr. VDK's research assistant Danya Vardi was convicted of research fraud and banned from future funding by a federal investigation committee.

—— A Federal District Court in Rhode Island ordered Dr. VDK to produce his data on the "Fragmentary Nature of Trauma Memory" for review by attorney-scientist R.C. Barden, Ph.D., J.D.  Dr. VDK refused to comply with the Federal Court order, fled from the process server, dropped out of the relevant cases and years later claimed in sworn deposition testimony that the "only copy of his data" on the essential "fragmentary nature of trauma memories" study "burned up in a fire."  See, pg 171 of the May 4, 2005 Videotaped deposition of B. van der Kolk, MD by Attorney RC Barden in Bonse v. Archdiocese of St Paul and Minneapolis, Court File No. 62-C4-02-11412, Second Judicial District, Ramsey County, Minnesota.

—— The claim that trauma memories are "fragmented" like "post it notes" (according to Dr Campbell) and must be pieced back together  as a predictable outcome of assault and/or trauma is a very controversial, unproven, controversial  notion NOT accepted by the relevant scientific community. This controversial notion has NO known error rate.   (See detailed discussion of the science of memory in this report).

—— Prof. R. Campbell's training materials on the "Neurobiology of Sexual Assault"  include unreliable, unsupported pseudoscience research and ideology that are NOT accepted by the relevant scientific community and has NO known error rate.  On this record, Purdue University's reported use of Dr. Campbell's reckless notions in the training of TITLE IX investigators (See Deposition of Erin Oliver at page 9) without having such information properly reviewed and vetted by competent scientists was reckless and irrational and far below the standards for competent investigations at any level.  (See Deposition of Jacob Amberger). also See,  Transcript "The Neurobiology of Sexual Assault", An NIJ Research for the Real World Seminar  by Rebecca Campbell , Ph.D. Professor of Psychology, Michigan State University,  December 3, 2012 … See, https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx (accessed June 6, 2018).

**In my opinion, Dr. Campbell's presentations and training materials are classic pseudoscience including the RRM-MPD-DISS notion of "fragmented memories" like "post it notes" that are "pieced together" later — somehow this**

69

**process is claimed to be reliable while in reality it is clearly an inherently UNRELIABLE process that has been excluded by multiple courts following a proper Daubert hearing.**   Dr Campbell's junk science notion have damaged the integrity of the legal and educational systems that rely upon her controversial, unproven methods and ideas — including PURDUE UNIVERSITY's unreliable TITLE IX investigative practices in this case (e.g. no signed/dated victim statement, no video/audio recorded investigative interview, no investigation of alternative hypotheses).   As E. Yoffe has reported, as of 2014, Harvard Law's Title IX training for its disciplinary board included Campbell's PowerPoint slides. Janet Halley,  a professor at Harvard Law School, has written of the intended effect of the training on recipients: *"It is 100% aimed to convince them to believe complainants, precisely when they seem unreliable and incoherent."* — on this record the Purdue University TITLE IX investigators and Dean followed this pseudoscience diligently.

UNRELIABLE NOTIONS OF FRAGMENTED TRAUMA "MEMORIES":   Dr. Campbell's controversial, pseudoscience, unreliable notions ( see, e.g., the University of Michigan's Sexual Assault Prevention and Awareness Center webpage for students on the "Neurobiology of Trauma" based largely on Campbell's lecture) include claims that as a result of the "hormone soup" provoked by an assault, "the survivor cannot move and is rendered immobile by the traumatic event," and "survivors may have trouble accurately remembering the assault." Bowdoin College's Title IX webpage on "The Neurobiology of Sexual Assault," also based on Campbell's lecture, tells students that ***victims "also may exhibit <u>fragmented memory </u>recall due to the disorganized encoding that occurred during the incident."*** — a very controversial, pseudoscience theory.

[ Dr Campbell's ] information instructs young people *that they are biologically programmed to become helpless during unwanted sexual encounters and to suffer serious mental impairment afterward*.  Various initiatives have spread ideas about this alleged "syndrome" out into the collegiate world. In 2013, funding from the federal government established the National Center for Campus Public Safety, an educational resource for campus administrators that offers a "Trauma-Informed Sexual Assault Investigation and Adjudication" curriculum, and ***purveys the ideas popularized by Campbell and other***

*controversial trauma theorists*. In addition, the University of Texas at Austin released a state-funded report, "The Blueprint for Campus Police: Responding to Sexual Assault," with the hope of it becoming a national model. It codified "victim-centered and trauma-informed" investigations, asserting: *"Trauma victims often omit, exaggerate, or make up information* [**i.e. become an incompetent witness or perjurer!** ] when trying to make sense of what happened to them or to fill gaps in memory." See, E. Yoffe, The Bad Science Behind Campus Response to Sexual Assault, The Atlantic, Sept. 8, 2017 at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/ accessed June 5, 2018.

It is my opinion that Dr Campbell should come forward and produce peer reviewed, published, reliable and valid research studies in actual, competent science journals (not "trauma" journals or "feminist science" journals) to justify her controversial and apparently false, deceptive, misleading, and potentially damaging, politicized, pseudoscience lectures and speeches.

**It is my opinion that any competent and responsible University official would know or should have known as of January 2016 that Dr Campbell's pseudoscience" notions are unreliable, controversial, unproven and have never been accepted by the relevant scientific community and have no known error rates.** It is my opinion that any competent and responsible University official as of Jan 2016 would know or should have known that Dr Campbell's RRM-MPD-DISS ideology and claims would fail Frye-Daubert-Kumho minimal methodological standards of reliability and validity. Further, it is my opinion that any competent and responsible University official would know or should have known as of January 2016 that ***Dr Campbell's RRM-MPD-DISS ideology and claims notions should have been properly reviewed by competent experts and scientists as passing minimal reliability and validity tests BEFORE they were applied to the lives of people in real life assault investigations*** — *as in this case.*

**In my opinion, any competent University Title IX investigator or committee should have been aware of the NATIONAL CONTROVERSIES** regarding Title IX due process violations and uses of junk science methodologies such as RRM-MPD-DISS ideology and claims. Unprofessional reliance upon Dr Campbell's and other highly controversial and apparently pseudoscientific RRM-MPD-DISS ideology and claims

lectures and speeches could result in methodologically defective, unfair investigations — as in this case.

My analysis of Dr Campbell's theories and publications will continue and become more detailed over time. It appears, for example,  that <u>Dr. Campbell is NOT licensed in anything</u> and thus apparently <u>avoids obeying licensing ethics rules</u> requiring the honest and proper disclosure of limitations on Campbell's methodologies, theories, and instructions.

It has been widely reported that Dr Campbell has given misleading, false, and pseudoscientific presentations — much as the RRM-MPD-DISS and other "experts" have done over past decades  — offering unreliable, politicized, pseudoscience misinformation.  For example,  "[Dr. Campbell]  asserted that ***the damaged memory of a victim can be likened to "tiny Post-it notes" scattered randomly across "the world's messiest desk.***" For a sexual-assault victim to "***<u>reconstruct what happened</u>***" requires a sympathetic questioner who will give the victim the time and space to **"*<u>reassemble the Post-its in a coherent order</u>*". *It should be obvious to anyone aware of the Science of Memory that such a "reconstruction" process is an <u>INHERENTLY UNRELIABLE</u> process*** — as multiple courts have ruled following Daubert hearings. (See cites in this report).

Dr Campbell ***reportedly assures her audiences that <u>the story that emerges will be a true account of the crime.</u>*** [ NOTE: If Dr Campbell actually made such statements her conduct is be best viewed as a form of speculation and/or scientific fraud. ].

Dr Campbell ***reportedly assures her audiences that*** "What we know from the research is that ***the laying-down of that memory is accurate and the recall of it is accurate.***" [ NOTE: If Dr Campbell actually made such statements her conduct is best viewed as a form of speculation and/or scientific fraud. ].

Dr Campbell ***reportedly assures her audiences that*** "Tonic immobility", she said, is a "mammalian response ***that is in all of us***,"… "A victim's body freezes on them," she said, and not just for a moment or two. The victims go into an extended state in which they can't speak or move, and hence cannot fend off an assailant." [ NOTE: If Dr Campbell actually made such statements her conduct is best viewed as a form of reckless speculation and/or scientific fraud. ].

See,  E. Yoffe, The Bad Science Behind Campus Response to Sexual Assault, The Atlantic, Sept. 8, 2017  at https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/  accessed June 5, 2018.

**If media reports are accurate Dr. Campbell has already been recorded "backtracking" on her pseudoscientific training pronouncements.**  For example, " I spoke with Campbell about all of this last fall, and in our conversation, Campbell said the goal of her work on neurobiology was to give law-enforcement officers a more nuanced understanding of how a sexual-trauma victim <u>might</u> behave. Campbell has apparently <u>*backtracked*</u> to saying that if her work was used as <u>*a guide for campus investigations and adjudications*</u>— particularly to support the idea that no matter how a complainant behaves, she is almost certainly telling the truth—such use was unintended, Campbell says, and "would be an overreach." <u>Campbell has reportedly acknowledged that her talk incorrectly conflated freeze and tonic immobility</u>. "That is something in later presentations I've learned to correct," she said to journalists. While her lecture conveys certainty and assurance she told me that we don't know "as much as we'd like to" about tonic immobility and that there are "very valid questions" as to whether it occurs (at all) in humans."  Compare this <u>*backtracking*</u> to her previously quoted statements… "Tonic immobility", she said, is a "mammalian response <u>*that is in all of us*</u>,"  likely affecting close to 50 percent of sexual-assault victims.  See, https://www.theatlantic.com/education/archive/2017/09/the-bad-science-behind-campus-response-to-sexual-assault/539211/.  **We should note that actual international science experts in trauma and memory like Richard McNally of Harvard University and Elizabeth Loftus of the University of California sharply disagree with Campbell's politicized, unreliable RRM-MPD-DISS "theories".**

**In my opinion, Dr. Campbell should be properly and professionally investigated for misconduct and/or fraud.** One Investigative Hypothesis would be that Dr. Campbell has engaged in misconduct, reckless speculation, and/or fraud by misrepresenting herself as an "expert" in neurobiology and investigations, grossly misrepresenting the science of memory and memory contamination, deceitfully hiding the controversial nature of her work,  misrepresenting the science of "tonic immobility", and spreading misinformation damaging the integrity of the legal system and creating

increased risks of methodologically defective investigations in University Title IX investigations.

In sum, it is my opinion to a reasonable degree of certainty that Dr Campbell's views — as reported above — are controversial, unproven, untested, theoretical notions that have not been accepted by the relevant scientific community and have no known error rate. It is further my opinion that such controversial theories and practices are not supported — and often contradicted — by competent scientific research published in quality journals. (See science of memory summary below). My current investigative hypothesis on this issue is that Dr Campbell has engaged in deceptive misconduct in mischaracterizing the research in this field and she poses hazards to the integrity of the legal system and Title IX investigative system.

4B.    IN MY OPINION, PURDUE FAILED TO MEET MINIMAL STANDARDS FOR INVESTIGATIONS BY A) TRAINING PERSONNEL IN DR CAMPBELL's CONTROVERSIAL UNRELIABLE IDEOLOGY and BY B) ENGAGING IN MANY EXAMPLES OF THE METHODOLOGICAL ERROR KNOWN AS CONFIRMATION BIAS (ignoring disconfirming evidence, failing to generate and test alternative investigative hypotheses) —BOTH ARE CLEAR VIOLATIONS OF BASIC STANDARDS FOR COMPETENT INVESTIGATIONS :

ON THIS RECORD MUCH EVIDENCE DOCUMENTS PURDUE's NEGLIGENT CONFIRMATION BIAS:   Confirmation Bias in the Purdue University investigation includes ignoring disconfirming evidence such as Jane Doe's friendly and inviting texting messages seeking _MORE time and attention with John Doe_ WEEKS following an alleged felony criminal assault. On this case record, such disconfirming texts were simply ignored and not properly reported Purdue investigators. (See Depositions of Amberger and Oliver and others).

EVIDENCE OF JANE DOE's STATEMENTS TO HER MOTHER (Text of Dec 26, 2015 4:42 PM … pg 0282) WAS IGNORED:   Similarly, texting evidence documenting Jane Doe's clearly stated plan to "She's just ugh. I'm literally never talking to her once I graduate. _She will not be at my graduation. She will not be at my wedding._

*She will not see my children*.").  Emphasis added.  This essential disconfirming evidence was not properly documented, nor investigated by the Purdue Investigators and Adjudicators, another example of confirmation bias.

On this record, Defendant personnel ignored Jane Doe's texts to John Doe regarding Jane Doe's plan to use her parents to pay tuition and fees until graduation then ban her mother from attending her graduation and wedding and also ban the mother from seeing Jane Doe's future children.  See, e.g. the Text of Dec 26, 2015 4:42 PM … pg 0282 … From Jane Doe to John Doe:  "She's just ugh. I'm literally never talking to her (Jane Doe's mother) once I graduate.  *She will not be at my graduation. She will not be at my wedding.  She will not see my children*." (Emphasis added).  The manipulative, deceitful, and cruel nature of this documentary evidence should have been properly investigated . Did Purdue personnel deliberately ignore-bury-hide-cut/paste out this key evidence?  On this record, it appears that the Equity Committee and Dean did NOT review all texts but only the "selected" evidence supporting a "Believe Women" hypothesis, another example of confirmation bias.

EVIDENCE OF JANE DOE's LACK OF TRAUMA FROM A "STUN GUN" WAS IGNORED:  Similarly, Purdue investigators improperly ignored *multiple witnesses* who disconfirmed Jane Doe's claim of being abused or harassed by a stun baton (falsely labelled a "taser") as these witnesses agreed that Jane Doe's reaction to the stun baton was laughing and joking happily about the low powered shock device, another example of confirmation bias.

EVIDENCE DISCONFIRMING JANE DOE's CLAIMS OF JOHN DOE's "TEMPER" WAS IGNORED :  Similarly, Purdue investigators improperly ignored the *multiple witnesses* who disconfirmed Jane Doe's claim that John Doe had a temper problem, another example of confirmation bias.

EVIDENCE OF JANE DOE's UNPROVEN ALLEGATIONS OF MULTIPLE RAPES IN HIGH SCHOOL WAS IGNORED:  Similarly, Purdue investigators improperly ignored the extensive evidence *from multiple witnesses* and documented texting evidence supporting the investigative hypothesis that Jane Doe had been multiply-traumatized in high school (e.g., she reportedly alleged being the victim of multiple rapes in high school including one witnessed by her own parents). This

disconfirming evidence and alternative hypothesis was improperly ignored by Purdue personnel. On this record,  Jane Doe's parents were not even interviewed regarding such essential evidence,  another example of confirmation bias.

EVIDENCE INDICATING JANE DOE SUFFERED FROM SIGNIFICANT EMOTIONAL STRUGGLES WAS IGNORED:  Similarly, Purdue investigators improperly failed to document or investigate reports that Jane Doe made an actual suicide attempt at Purdue as well as discussed suicidal ideation as well as corroborative evidence provided in the testimony of John Doe's roommate.  The essential alternative hypothesis that Ms Doe demonstrated clear indications of severe emotional struggles (and/or mental illness) was, on this record, not properly investigated, another example of confirmation bias.

EVIDENCE INDICATING JANE DOE SUFFERED FROM SIGNIFICANT ALCOHOL ABUSE WAS IGNORED :  What did Purdue personnel do to investigate Jane Doe's reportedly serious alcohol abuse?

EVIDENCE OF A LONG-TERM SEXUAL RELATIONSHIP WAS IGNORED : Purdue's investigators failed to investigate and document the reported fully sexual relationship these students engaged in for weeks-months (reportedly 15-20 nights of full sexual intercourse reportedly initiated by Jane Doe)? (See, Declaration of John Doe).

EVIDENCE OF MULTIPLE-MONTHS LONG DELAY IN REPORTING — RESULTING IN MANY OPPORTUNITIES FOR JANE DOE MEMORY CONTAMINATION — WAS IGNORED :  Purdue investigators failed to properly ask Jane Doe about the timing of her allegations (5 MONTHS after the alleged event, after conversations/training by the CARE program, after John Doe reported Jane Doe for suicidal ideation and a suicide attempt, etc). See, Deposition of Amberger and Oliver and others).

EVIDENCE OF INVESTIGATIONAL TAINT — VIA PURDUE TRAINING USING R CAMPBELL's PSEUDO-SCIENCE METHODS — WAS IGNORED : On this record,  Purdue selected the very controversial, highly politicized, unreliable, junk science "expert" Dr R. Campbell's controversial  program to "train" Purdue investigators? (See, Deposition of Erin Oliver at pg 9 as cited in this report).

EVIDENCE OF INVESTIGATIONAL BIAS — BY PURDUE's STAFF ONLY INTERVIEWING JANE DOE (not John Doe) REGARDING VAGUE TEXTS — WAS IGNORED : On this record, Purdue investigators interviewed Jane Doe TWICE to obtain her interpretation of the vague text evidence while John Doe was IGNORED and not asked for his interpretation of the vague text evidence. This is clear evidence supporting the hypothesis that Purdue was pursuing a "Believe Women Only" strategy.

EVIDENCE OF INVESTIGATIONAL BIAS BY PURDUE's STAFF — CARE Director Bloom controlled (and potentially manipulated) the witness Jane Doe — WAS IGNORED : The Purdue investigators access to Jane Doe was quite controlled by CARE director Bloom and CARE director Bloom was apparently the ONLY source of Jane Doe's unsworn-unsigned-unrecorded alleged "victim statement". The egregious failure to produce any indicia of reliability for Jane Doe's statement included Purdue ignoring evidence of Jane Doe's long term alcohol abuse, thinking style, multiple exaggerated-false claims, and cruel-deceitful manipulation of her own parents. (See, text evidence and multiple depositions).

EVIDENCE THAT PURDUE's KEY DECISIONAL MEETING (Equity Committee) ATTENDEES NEGLIGENTLY FAILED TO PROPERLY CONSIDER ALTERNATIVE HYPOTHESES OR DISCONFIRMING EVIDENCE WAS IGNORED : On this record, the decisional meeting attendees clearly failed to consider, discuss, and review ANY ALTERNATIVE hypotheses or ANY DISCONFIRMING evidence — an egregious example of Confirmation Bias. They failed to have Jane Doe provide a signed/dated statement. They failed to have Jane Doe forensically interviewed with a video record. They failed to ask Jane Doe to appear and answer questions exploring alternative hypotheses in this case.

EVIDENCE THAT THE DEAN's ANALYSIS NEGLIGENTLY FAILED TO PROPERLY CONSIDER ALTERNATIVE HYPOTHESES OR DISCONFIRMING EVIDENCE WAS IGNORED :

On this record, the Dean failed to note and properly document consideration of any of the disconfirming evidence and also failed to document ANY rational discussion of the weighing back and forth of the pros and cons of the *alternative hypotheses* and *disconfirming evidence*. On this record, the Dean ONLY reviewed a Cut-and-Pasted file

77

of "selected" evidence *AND never once speak to Jane Doe and did NOT review ANY sworn/dated statements from alleged victim Jane Doe.*

On this record, the Dean and Equity Committee failed to have Jane Doe provide a signed/dated statement of allegations, failed to view a video/audio of Jane Doe being forensically interviewed and failed to ask Jane Doe to appear and answer questions exploring alternative hypotheses in this case, all examples of confirmation bias errors.

**EVIDENCE OF PURDUE's CONFIRMATION BIAS IN THIS CASE WAS NOT PROPERLY NOTICED AND CORRECTED — ON THIS RECORD THIS FAILURE WAS DEMONSTRATED BY ALL PURDUE STAFF AT ALL LEVELS :** Confirmation bias errors — very evident in this case — are serious investigation errors. On this record, Purdue's "investigators", "committee members", and Dean all failed to properly investigate the disconfirming evidence listed above and ALL *failed to generate and test proper alternative investigative hypotheses* in this complex case and all failed to obtain standard investigation evidence including a signed witness statement and/or video recorded allegation/investigatory interview.

The Purdue University Investigators and Title IX officials in this case, including the Dean of Students and others clearly demonstrated multiple examples of investigation-tainting, confirmation bias including failing to properly investigate a number of ALTERNATIVE hypotheses in this case such as:

THE FAILURE OF PURDUE PERSONNEL TO PROPERLY *RECORD* ESSENTIAL INTERVIEWS and MEETINGS: In this case, Purdue personnel committed one of the most fatal error of all errors in ANY investigation relying upon VERBAL STATEMENTS-ALLEGATIONS and lacking clear objective corroborative evidence — when they reportedly FAILED to properly record (video or audio) ANY interviews or committee meetings thus precluding a proper investigation of the alternative hypothesis that Purdue's "advocacy" and "support" officials, investigators, and "Equity Committee" members asked biased, manipulative, improper, leading, and manipulative questions consistent with radical feminist, identity politics, and Marxist

ideologies that tainted the "memories" of the alleged victim.  No "written notes" or other biased evidence — "created" by the very people whose investigative conduct should be evaluated — can compensate for missing RECORDINGS.  The alleged "memories" of any alleged victim of any age *cannot be properly evaluated with knowing each and every question asked and the sequence of such questions as documented in RECORDINGS* — See, basic memory research summary infra).   These egregious and reckless failures are consistent with the alternative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist sham to "Believe Women"and "attack the patriarchy" without regard to logic, rational analysis, appropriate investigative methodologies, or damage to falsely accused students.

THE FAILURE of PURDUE PERSONNEL TO OBTAIN SWORN-DATED-SIGNED WITNESS STATEMENT(S) FROM THE ALLEGED VICTIM:  On this record, it is quite unclear if the alleged victim even made an allegation of abuse. Of the over 1,000 investigations I have reviewed (state, federal, criminal, administrative, licensing prosecutions, civil claims, etc) I do not recall any that involved ZERO recordings (audio or video) of the witness' statements,  ZERO affidavits, and ZERO written-signed-dated statements of any kind.  It is not clear on this record if the alleged victim still believes her alleged "memories" (no deposition?).  Having worked on hundreds of cases in which the "memories" of abuse were later recanted I look forward to reviewing actual sworn testimony from the alleged victim.   These egregious and reckless (fraudulent) failures are consistent with the alternative hypothesis that the Purdue Title IX "investigation" system was simply a radical feminist front to "Believe Women"and "attack the patriarchy" without regard to logic, rational analysis, investigative methodologies, or damage to the falsely accused.

CONFIRMATION BIAS :  The PURDUE INVESTIGATORS, EQUITY COMMITTEE,  and DEAN of STUDENTS ALL FAILED TO SEE, HEAR, and PERSONALLY ASSESS THE TRUTHFULNESS of the ALLEGED VICTIM :  On this record, the finder of fact, the Dean of Students, failed to ever MEET, TALK TO, or PERSONALLY ASSESS the alleged victim.  On this record,  Purdue Univ. employee

79

Monica Bloom was the only person to speak to and assess Jane Doe failed to produce any indicia of reliability, that is, no sworn statement, no signed/dated affidavit, no video or audio recorded statement, no sworn "chain of custody of Jane Doe's memories" (that is the number of other interviews, therapy sessions, trauma book read, etc.).   These failures of Purdue's investigation are highly unusual or unprecedented in my experience.  (pg 0654)   On this record, Monica Bloom, Director of Purdue's Center for Advocacy, Response, and Education (CARE) was the sole source of Jane Doe's allegations of abuse.   *On this record, Jane Doe has never provided a sworn, recorded, signed statement of any kind at any time to anyone - an example of confirmation bias* error.

**_____On this record, there are obvious indications regarding the neutrality and investigational competence of Purdue's Center for Advocacy, Response, and Education (CARE).**  For example, on this record ZERO allegations of sexual assault were made by Jane Doe to anyone until MONTHS AFTER the alleged event and AFTER documented exposure to Monica Bloom and Purdue's Center for Advocacy, Response, and Education (CARE).  Note the opinion of the U.S. Seventh Circuit opinion in this case by Judge A.C. Barrett,  [The lack of allegations of abuse] "changed in April 2016, which was Sexual Assault Awareness Month. During that month, Purdue hosted over a dozen events to promote the reporting of sexual assaults. Many of the events were sponsored by the Center for Advocacy, Response, and Education (CARE), a university center dedicated to supporting victims of sexual violence. CARE promoted the events on its Facebook page, along with posts containing information about sexual assault. One of its posts was an article from The Washington Post titled "Alcohol isn't the cause of campus sexual assault. *Men are*." Emphasis added.   **On this record, there was no proper consideration or investigation of the alternative hypothesis that Jane Doe had ZERO "memories" of abuse until exposure to the Sexual Assault Awareness Month materials and "Advocacy" (not neutral)  training from Purdue's CARE office.   The hypothesis of memory contamination via improper "advocacy" interviewing-discussions by Monica Bloom and the CARE Center were never investigated by Purdue staff, the Equity Committee, or the Dean, more examples of Confirmation Bias errors.**

On this record, Jane Doe was never properly questioned nor cross examined regarding multiple alternative hypotheses about her statements (**as alleged — without recording or other indicia of reliable reporting — by Monica Bloom**).  See eg. Jane Doe's alleged statements according to Monica Bloom claiming that John Doe

> **"started to get overly attached and would _never_ leave me by myself" and**
>
> **"he _never_ left me alone" and**
>
> **"I was _always_ paranoid or scared" and**
>
> **"even just his presence would _make me cringe and drop my head_" and**
>
> **" I stopped going to class, I stopped sleeping, I stopped eating, _anything to keep from running into him_".**

**These statements were never properly investigated in light of disconfirming (supporting alternative hypotheses) evidence including**

**A) Jane Doe's own Texting Record which clearly and repeatedly documents Jane Doe _asking John Doe for more time and attention_, long after the alleged assault and**

**B) contrary witness testimony from John Doe and**

**C) contrary witness testimony from John Doe's roommate.**

**On this record, Purdue's investigators, Equity Committee and Dean all demonstrated _confirmation bias errors_ by failing to properly examine and cross examine Jane Doe in investigative interviews and/or at the Equity Committee regarding alternative hypotheses generated by multiple sources of disconfirming evidence.**

In addition, in Jane Doe's allegations according to Monica Bloom, Ms Doe asked "_How many other times could this have happened_? _What else_ could he have done to me?" *Ms. Doe's questions demonstrate a "belief" that her memory is "missing" important information — a key article of faith for "recovering repressed memories" and adopting RRM-MPD-DISS ideology*.  This questioning process is common in patients exposed to "trauma theory" "victim training" or "Believe Women" training and is often a precursor

81

to "recovered repressed memories".  See, Ofshe, R. and Watters, E. (1996)  Making Monsters: False Memories, Psychotherapy, and Sexual Hysteria. 2nd Edition. University of California Press, for a detailed explanation of how ideologically driven therapists, feminist support groups, and biased survivor counseling can instill "new false memories of abuse" turning once beloved family members, spouses, or lovers into hated monsters. On this record, Purdue's investigators, Equity Committee and Dean all demonstrated *confirmation bias errors* by failing to properly examine and cross examine Jane Doe in investigative interviews and/or at the Equity Committee regarding such alternative hypotheses generated by disconfirming evidence.

**In addition, in Jane Doe's allegations according to Monica Bloom, Jane Doe stated, " *he makes others feel unsafe, bullies them, hurts them, and takes advantage of their vulnerable states*" and "*he has a line of people behind him that he has hurt*".  In contrast to these statements, zero corroborative evidence was reported on this record corroborating claims that ANY other person claimed John Doe hurt them or "bullied others" or "takes advantage of their vulnerable states"**.  Jane Doe's statement according to Monica Bloom then is in contrast to other evidence on this record, yet Purdue's investigators, Equity Committee and Dean all demonstrated *confirmation bias errors* by failing to properly examine and cross examine Jane Doe in investigative interviews and/or at the Equity Committee regarding the alternative hypotheses generated by disconfirming evidence.

In addition,  John Doe's sworn-dated-signed witness declaration of Feb 18, 2021 includes numerous claims and statements that were offered to but not investigated by the Purdue investigators, Equity Committee, or Dean.  John Doe alleges he offered much key evidence in this case yet his evidence was not investigated - a confirmation bias error. John Doe alleges he was a conservative Christian and had no experience with a serious girlfriend nor sexual intercourse (he was a virgin) prior to meeting the sexually experienced Jane Doe at Purdue.  Three witnesses — John Doe, John Doe's roommate, and Jane Doe's statement appear to support his claim.

In his witness declaration, John Doe denied any "confession" *to any illegal or harassing activity* in his texts and offers detailed alternative explanations for texts that might have been misinterpreted as supporting Jane Doe's allegations.  For example, "I was apologizing to try and keep Jane Doe stable and because, at that time, I still had loving feelings for the first girlfriend in my life and the first girl with whom I had sexual relations, and because I was concerned about her mental well-being given her suicide attempt."  In addition, John Doe claimed,  "During the course of our relationship, Jane Doe told me that she had multiple sexual partners before college, and *claimed to have a personal history of rape and suicide attempts*. On multiple occasions during our relationship, she would, without me, go out to fraternity parties and get severely drunk, later returning to her room and inviting me over, only to spend the whole night vomiting into a toilet while I took care of her."  See, e.g. " Q Do you recall that in that interview, Mr. Uthuttan,  as a roommate, related to you that John Doe  was concerned about the suicide attempt that Jane Doe made? A Yes."  Deposition of Erin Oliver at pg 27. (Purdue Investigator, Associate Director of the Office of Institutional Equity).

John Doe also alleged, "December 13, 2015, I was contacted by Jane Doe. She was in her room in Wiley Hall, and requested that I meet her there. Upon arrival, I immediately saw that her room was in a severe state of disarray. *She was quite agitated, railing against her parents* and her uncertainty and unhappiness towards her life, and throwing her belongings against the walls. After I consoled her and she had calmed down, she asked to go out for a walk. I accompanied her, and she led us directly to the parking garage diagonally across the street from the armory. Jane Doe led us up to the top floor of the parking garage, and by this point her odd behavior began to give me cause for concern. *She then proceeded to try and throw herself off the ledge of the parking garage*, all the while trying to convince me to let her do so. This went on for approximately 45 minutes. At one point she had managed to swing her legs over the ledge, and she tried to break free from my grip and jump over the side. The experience upset me, and right after her outburst subsided, she behaved as though nothing of importance had happened." In addition, John Doe stated, that Jane Doe claimed to be sexually experienced, she claimed a history of previous sexual experiences in high school,  she claimed to have been raped

in high school,  and *Jane Doe was the initiator of their many full sexual intercourse consensual experiences* with John Doe at Purdue including spending many nights sleeping together.

    **Also, John Doe stated, "None of the 134 pages of text messages referred to what Jane Doe would accuse me of in April 2016.**  Our texts reflected the fact that Jane Doe and I did have a deeply personal relationship developed in part through sexual intercourse, and that Jane Doe was enforcing new physical boundaries between us. While doing this, our relationship was still intimate enough that she sent my family Christmas cookies, and we messaged one another frequently. These texts also reflected Jane Doe's difficult relationship with her mother and family, a fact she used at times to answer my questions to her about being unhappy, and also a fact that motivated her unfair behavior towards me. I became more apologetic towards Jane Doe the more she directed negativity towards me; her constant barrages eventually made me believe that I was in part somehow responsible for all her misfortune. Apologizing to placate Jane Doe was part of how I dealt with her tumultuous emotions throughout the relationship, even more so in the wake of her suicide attempt." (See, Feb 18, 2021, Declaration of John Doe ).  Failing to properly investigate such disconfirming evidence is a classic example of confirmation bias by Purdue investigators, officials, Committee, Dean, and VP.

    **Finally, John Doe wrote,  "The Purdue investigators *never questioned me regarding the contents of the texts after I provided them*, yet took the time to arrange *a second interview with Jane Doe,*** at the suggestion of Monica Bloom, in order to review the texts and hear HER (not his) interpretation of them.   On this record,  John Doe's statements were not properly nor fairly nor rationally investigated nor was any proper investigation of his claims documented by Purdue's investigators, thus further supporting the investigative hypothesis that Purdue investigators pursued a theory of "Believe Women"only.  Jane Doe was apparently on this record NOT even questioned about any of John Doe's statements again consistent with the hypothesis that Purdue investigators pursued a theory of "Believe Women"only.  Failing to properly investigate

such disconfirming evidence is a classic example of confirmation bias by Purdue investigators, officials, Committee, Dean, and VP.

**Depositions with Purdue Staff document multiple Confirmation Bias errors including failures of proper training, failures to generate and test alternative hypotheses, and failures to properly document actual investigations of disconfirming evidence.  See, e.g.,**

11 Q Okay. Have you, in the course of your time at Purdue, received training in Title IX matters? A Yes, I have. Q When was the last time you attended a training session? A I don't recall. Q Do you recall -- well, in the 12-year period you've been vice president for ethics and compliance, *do you know how many times you went to training sessions? A No, I don't.*" See, Deposition of A.C. Rollock.

See, " Q Okay. Do you recall any discussions in that general period of time with Dean Sermersheim about what Monica Bloom had emailed you and Dean Sermersheim? A I really don't recall. Q Do you recall, generally, *in the 2015/2016 school year, how many sexual misconduct disciplinary complaints there were? A No, I don't*. Q Do you have any general recollection whether it was 10? 20? 30? A I'm sorry, I don't. I don't." — really? See, Deposition of A.C. Rollock.

See, " 12 Q Okay. Let me ask a question: Is April, in the 2015/2016 school year, the sexual awareness month at Purdue? A I don't recall. I don't know." See, Deposition of A.C. Rollock.

See, 22 Q Okay. Do you recall talking at this period of time with Monica Bloom about what she had emailed you on that date? A No. I don't recall. Q Okay. Do you recall any discussions in that general period of time with Dean Sermersheim about what Monica Bloom had emailed you and Dean Sermersheim? A I really don't recall." See, Deposition of A.C. Rollock.

See, 14 Q Okay. *Did you have any substantive discussions (with the Dean of Students) about the case? A No, we did not.* Q Did -- do you recall any other conversations with Dean Sermersheim concerning the John Doe case in the months of June and July?  A No.  Q Do you recall any discussions concerning this John Doe case in

85

the months of June and July *with Monica Bloom? A No, I don't recall.*  See, Deposition of
A.C. Rollock.

Another confirmation bias error was the *failure of Purdue's staff to provide John
Doe with a copy of the investigation report prior to the Equity Committee hearing* in time
to obtain reactions and review, generate and test alternative hypotheses from issues, facts,
or disconfirming evidence produced by John Doe following review of the investigation
report.  See, e.g. Q Okay. And it's true, is it not, that John Doe was not provided access to
the investigation report done in this case at the time the proceeding was going on? A
That's correct.  …. Q Why wasn't it the policy at Purdue at that time, to allow a
respondent to review an investigation report providing what was the basis for a sexual
misconduct finding? A *The procedures at that time did not provide any party the
opportunity to review the report*." See, Deposition of A.C. Rollock.  Emphasis added.

Another investigation error was the highly unusual lack of knowledge of
investigators. E.g.   "Q Okay. And you -- were you aware at that time that plaintiff, John
Doe, had provided 133 pages of texts between he and complainant that went from mid-
December to -- all the way to March of 2016? Mid-December, 2015, the last one in
March of 2016? A No. Q Were you aware that Jane Doe -- that Jane Doe didn't provide
any documentation? A No." See, Deposition of A.C. Rollock.  Similarly,  "Q Okay. Were
you aware at the time that John Doe provided many pages of texts between he and John --
Jane Doe? A Not at the time I received his appeal. I knew there were text messages
between the parties. I don't know who provided or how many were provided." See,
Deposition of A.C. Rollock.

On this record, Purdue should have known their procedure of failing to generate a
Transcript in Equity Committee meetings — the procedure used in this case — was a
methodological error —later they reportedly reformed this defective procedure.  See, e,g,
Q With respect to the panel meeting of the equity committee panel members and the
dean, *is there any transcript that is normally made of those meetings? A No, there's not*. *If
I could clarify, starting August 14th, there is, but there was not at that time.* Q I fully

understand. The new regulations A I just wanted to be sure. Q -- went into effect. Under the new regulations, they have a requirement (for transcripts). I wanted, really, to ascertain in the 2015/2016 school here, *Purdue did not have a system in which there was a transcription of such a meeting*; correct? A Correct.   See, Deposition of A.C. Rollock (Purdue VP).

On this record, Purdue providing "trauma training" based on the pseudo-science, unproven, unreliable musings of Dr R. Campbell who is licensed in nothing and not considered a competent expert by the relevant scientific community. Further, Dr Campbell's work and publications contain her radical political ideology which has clearly tainted her reputation and serves as the unreliable foundation for her unreliable foundation.  (See detailed discussion below).    That Purdue would provide such defective training from a radical political ideologue demonstrates yet another failure to meet competent standards of training to conduct investigations.   See, e.g.  " Q Did you receive any training in terms of trauma, of complainants? A Yes. Q What was that training? A Neurobiology of trauma. How brains code memories, do not code memories, during traumatic instances. That is really, all I recall from the trainings.  Q Do you recall who provided that kind of trauma training? A I believe there *was a faculty member from Michigan State University; Rebecca Campbell.* Videos and research that is the only one I recall off the top of my head. Q You do recall Professor Campbell? A Yes, *I believe she has been the prominent person on that subject*.  — Deposition of Erin Oliver at page 9. (Purdue Investigator, Associate Director of the Office of Institutional Equity).

On this record, Purdue failed to properly record interviews with witnesses — a highly unusual failure unlike virtually all police investigations I've seen over 30 years in the USA in dozens of states.  See, e.g.  " Q Was there ever any video of these interviews that you took of people in your investigation? A No, not that I am aware of… Q Was it a practice of Purdue at the time in 2015/2016 not to take video or audio of interview witnesses? A Correct, we did not audio or video interviews"   See,  Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity). Having reviewed hundreds of investigations in dozens of states I do NOT recall more

than one or two other investigations in which NO audio or video was taken of ANY witness interview.  This level of investigation negligence is quite extreme in my 30 year experience.  Failing to video or audio record the interviews makes it IMPOSSIBLE to properly investigate the key alternative hypothesis — in all such cases — *that improper questioning changed and contaminated the witnesses memory* as per dozens of years of memory contamination science. (See detailed discussion of memory contamination science in this report).

**On this record, Purdue used an unprecedented, unreliable, subjective methodology for creating a "selected" (incomplete, manipulated) evidence base.** They admittedly crafted a "selected evidence file" and let the Equity Committee and Dean see ***ONLY texts the investigators FELT were relevant.***  Such a subjective methodology for the selection/manipulation of evidence is an unprecedented level of negligence in my 30 year experience.  See, e.g.  "A We would have pulled and identified text messages *that we felt were relevant* to the investigation. Q What do you mean by, relevant? A The things that spoke directly to the allegations or response to the allegations. Q How did you know if they did relate to the allegations? A I *don't recall the exact reasoning of the practice would have been*. I don't recall the specific conversation that Jacob or I had about what we included or did not include in the course of the investigation." Deposition of Erin Oliver at page 33,  (Purdue Investigator, Associate Director of the Office of Institutional Equity).

**ETHICS VIOLATIONS - A COMPETING DUAL ROLE VIOLATION BY MONICA BLOOM:**  On this record, Purdue permitted a highly unethical, dual role for Monica Bloom, a role that violated ethical restrictions against CONFLICTS OF INTEREST in the behavior of professionals.  **On this record, Monica Bloom acted as a LAWYER-ADVOCATE-SUPPORT PERSON for Jane Doe — with a duty to advocate for and support Jane Doe and ALSO at the SAME TIME act as the ONLY INVESTIGATOR in this case to interview and document Jane Doe's allegations - with an INCOMPATIBLE duty to provide neutral and accurate evidence for the tribunal.  Clearly, Monica Bloom's conduct was unethical , improper and a classic**

**"dual competing roles" boundary violation**.  I do not recall seeing such an egregious conflict of interest in a sole interviewing investigator's conduct in the past 30 years.  **It should be obvious to even the most poorly trained personnel that ONE person CANNOT simultaneously act as Victim Support Person and also as SOLE INVESTIGATIVE INTERVIEWER in the same case**.  See, eg.,  " Q Did you ever deal with Monica Bloom as director of CARE with JOHN DOE? A I recall her being the support person for JANE DOE, during the process. Outside of that no. Q Ms. Bloom was in CARE? When support person I would like to clarify you are referring to a support person for JANE DOE? A Correct.:  Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity). Note this ethical violation is ANOTHER example of confirmation bias error as **Ms Bloom did not and could not properly investigate the alternative hypothesis that Ms Bloom's incompetent, leading, and suggestive interview was the "cause" of Jane Doe's new "memory" reports of abuse.**

On this record, Purdue investigators failed to interview witnesses listed by John Doe, yet another example of Confirmation Bias as the failure to investigate the alternative hypothesis that John Doe's witnesses would provide disconfirming evidence.  This failure is yet another clear fact supporting the investigative hypothesis that Purdue was following a "Believe Women" (but not men) investigation strategy.   See, pg 42-43 of the Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity).

**On this record, Purdue investigators improperly failed to investigate reports that Jane Doe had DELETED EVIDENCE, attempted suicide, and discussed manipulating her mother to pay for her college then banning the mother from her graduation-wedding-children.** These failures are **more examples of Confirmation Bias as _an apparently total failure to investigate these alternative hypotheses regarding a lack of honesty and integrity of Jane Doe._**  See, e.g. , " Q Didn't you take into account as an adverse on credibility Jane Doe deleted the documents reflected the communication between John Doe  or and Jane Doe in December and January December

2015, January 2016? A I don't recall how that was considered." … They also ignored the suicide attempt and the text documenting Jane Doe's plan to ban her mother from her wedding or seeing children AFTER her parents paid for her schooling" They also ignored the months delayed reporting. " Q Did you ever ask Jane Doe why she waited five months according to her account between the time of the alleged incident and making a report to Purdue? A I do not recall asking that question." See, Deposition of Erin Oliver at pg 71, (Purdue Investigator, Associate Director of the Office of Institutional Equity).

   **On this record, Purdue investigators improperly scheduled the Equity Committee meeting so that Jane Doe would not have to appear at all.** See, " Q And below that says Jane Doe in a statement will not be in attendance, do you see that? A Yes. Q You were aware at the time that Jane Doe was not going to be in person in attendance on the June 6, meeting? A Yes." See, Deposition of Erin Oliver (Purdue Investigator, Associate Director of the Office of Institutional Equity). See eg., "Do you have any recollection as to what happened during this meeting? A I do not. Q Do you recall any questions that were asked of you? A I do not." … 1 Q Do you recall any questions asked about Jane Doe? A I do not. Q Do you recall any statements made by you? A I do not. Q Do you remember any statements made by Mr. Amberger? A I do not. Q Do you remember anything being said while you were in that meeting with Mr. Amberger about John Doe? A I do not. **Q *There was no court reporter, correct?* A Correct.** See, Deposition of Erin Oliver at pg 81, 82 (Purdue Investigator, Associate Director of the Office of Institutional Equity). This is yet another example of confirmation bias errors as Purdue vigorously investigated claims against John Doe but acted to PREVENT proper investigation of claims and allegations against Jane Doe thus supporting the hypothesis that Purdue was following a "Believe Women" (but not men) investigative strategy.

   On this record, the methodologically defective, confirmation biased Purdue investigators have potentially damaged the lives of hundreds of people. See, e.g. " Q You testified that you worked at Purdue as an Investigator in the Office of Institutional Equity.

Approximately how many investigations do you recall performing? You may be on mute. A I think it is fair to say, a few hundred maybe during my time there. Q *A few hundred investigations* of allegations received in the Office of Institutional Equity? A Correct." See, Deposition of Erin Oliver at pg 86, (Purdue Investigator, Associate Director of the Office of Institutional Equity).

On this record, Purdue investigators gave Jane Doe multiple interviews so she could explain her version of the Texts but did NOT provide the same time for John Doe. See, e.g. " Your testimony that you never asked John Doe specifically about this text? A I am sorry, can you repeat that? Q You never sat down with John Doe with this text and asked him any questions about it? A I have no recollection of doing that. Q There was no opportunity to determine from this text what John Doe would say concerning feeling shitty? A *I did not speak to him about it no he would not have had that opportunity*. Q There was no opportunity then to determine what John Doe had violated? A Again beyond the text message if I had not had that conversation, no. Q So, just a text message you are looking at correct? A I believe so, yes. Q Okay and so John Doe wasn't given an opportunity to say what he meant with that specific message? A I don't recall what conversation we had or didn't have about the text messages in our interview." See, Deposition of Erin Oliver at pg 102. (Purdue Investigator, Associate Director of the Office of Institutional Equity).

On this record, some of Purdue's investigation staff had actual experience doing police work — where all interviews are properly recorded.  Did he speak up? If not, why not?   See, e.g. " I worked with the Indiana State Excise Police from June of 1997 to February of 2000. February of 2000 to April of 2003, I worked for the Delphi Indiana Police Department. And then from April of 2003 to January of 2015, I worked for the Tippecanoe County Sheriff Department here in Lafayette, Indiana.   See, Deposition of Jacob Amberger (Purdue Investigator).

**On this record, the improper investigate strategy of "Believe Women" was used at Purdue's CARE center where Monica Bloom met Jane Doe and apparently**

**did ALL of the investigative interviews (none recorded) in this case.** "Believe Women" is a therapy strategy but a fatally defective investigation strategy as it guarantees Confirmation Bias. See, "Q Have you ever heard the phrase believe women? A I have, yes. Q In what context have you heard it? A Just I've heard believe women or start by believing just in the context of support for advocacy." … 1 Q Could you elaborate what you mean by support for advocacy? A I've heard it through the EVAWI, End Violence Against Women International, through some of their e-mails and training and things like that. I know that _CARE, the Center for Advocacy Response and Education here on campus, has conducted training, and I think that that_ **starts by believing or something along those lines has been a part of their outreaches or whatever they're running through their department.** Q Is the Center for Advocacy Response and Education known by its acronym CARE? A That is correct, CARE." See, Deposition of Jacob Amberger (Purdue Investigator).

Purdue investigators apparently interviewed Jane Doe's supportive witness — her boyfriend— but failed to interview John Does supportive witnesses — another clear example of Confirmation Bias consistent with the hypotheses that Purdue was following a "Believe Women" (but not men) investigative methodology. See, e.g. 18 Q Was he, then, the boyfriend of Jane Doe? A At the time we interviewed him in May of 2016, he was, yes. Q And you interviewed him on May 3, 2016, correct? A Correct." See, Deposition of Jacob Amberger (Purdue Investigator).

Purdue investigators failed to explore the most obvious and essential questions exploring alternative hypotheses in this case. See, e.g. " Q Did you ever ask Jane Doe _why it was five months before she said anything about the supposed event_? A If I do ask this question, I typically kind of write down a person's response in my notes. I don't recall seeing that in my notes. So _it most likely was not asked of her._" See, Deposition of Jacob Amberger (Purdue Investigator). Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

Purdue's investigator produced a highly selected "sample" of pro-prosecution Text Files and ignore the others — another example of Confirmation Bias. See, eg. "The texts from JOHN DOE were 133 pages when printed out? A Yes. There are more pages of texts that he  provided that are NOT attached to the report. Q Well, seven pages is less than 133, is it not? A It is, yes, sir."… 11 Q Now, when you produced your investigation report, you didn't attach all 133 pages of the texts that JOHN DOE provided you, did you? A We did not, no. See, Deposition of Jacob Amberger (Purdue Investigator).  Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

The Purdue General Counsel, Steve Schultz, appears to have made an error of analysis, judgment, and ethics in a Wall Street Journal Op-Ed on Oct. 12, 2020. Mr Schultz reportedly wrote that the case evidence includes "the male student's texted _confession_".  Having reviewed 134 pages of texts in this case (all of them apparently),  it is my opinion that Mr Shulz's public claim that John Doe "confessed" supports the ongoing investigative hypothesis that Purdue University has demonstrated — and continues to demonstrate — a striking example of Confirmation Bias consistent with the hypotheses that Purdue was following a "Believe Women" (but not men) investigative methodology.   By making such a public statement of opinion, was Mr. Shultz claiming to be an expert witness or a fact witness in this case? Was Mr. Schulz's highly unusual statement an improper attempt to contaminate the future jury pool?  Was Mr Schultz's conclusory attack against John Doe in a public news forum **beyond the liability protections of the litigation privilege**? Was General Counsel, Steve Schultz shown the ENTIRE text file or was he manipulated and only shown the "selected portion" investigators "felt" would be helpful to their case?   Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

A particularly egregious methodological and ethical quagmire in this case is the question of why was MONICA BLOOM — the woman in charge of what appears to be an ADVOCACY CARE Center at Purdue — controlling all investigator access to Jane

Doe? How was this possible given the obvious conflict of interest?  See, " Looking at Amberger 19, does it trigger your recollection on your part as to why you were sending this e-mail to Monica Bloom on May 9, 2016? A I'm trying to schedule a time to speak with Jane Doe again" See, Deposition of Jacob Amberger (Purdue Investigator).  Was Monica Bloom acting in this case as A) an advocate for the "Believe Women", therapy-counseling-political ideology but AT THE SAME TIME acting as the Sole Investigative Interviewing in an Abuse Investigation?  It is hard to imagine a more obvious or serious Conflict of Interest and Boundary Violation of serving Two Incompatible Roles at the same time.  Did the CARE center obtain  INFORMED CONSENT from Jane Doe for this arrangement? If so, where is the informed consent form in this case? Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

Another example of Confirmation Bias was the Purdue investigators' failure to ask Jane Doe questions about the alternative hypothesis that she accused John Doe of abuse as revenge for reporting her suicide attempt and suicidal thoughts. See e.g,,  "Q Did you ever ask Ms. ████ why it was five months before she said anything about the supposed event? A If I do ask this question, I typically kind of write down a person's response in my notes. I don't recall seeing that in my notes. So *it most likely was not asked of her*." Deposition of Jacob Amberger (Purdue Investigator).  Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

Another example of Confirmation Bias was the Purdue investigators lack of any coherent protocol or investigation strategy other than "Believe Women" (and not men). See, e.g., "How do you have a preponderance of the evidence supporting a finding, when on the one hand *you have a denial by the person John Doe* and the other person, *Jane Doe, doesn't have her own recollection of it?*  A That would be based on credibility, corroboration by witnesses or text messages or anything of information or statements that were given during the interviews. So it's kind of an aggregate of everything we gathered, not just specifically that one allegation." Deposition of Jacob Amberger (Purdue

Investigator).  Note that Mr Amberger's answer is *psychobabble ("kind of an aggregate")*, apparently relying on false assumptions about "clinical judgment" and pseudo science notions of a magical human ability to "aggregate" discordant information, and again supports the hypothesis that the Purdue investigative personnel were untrained and unprepared to conduct any kind of serious investigation.

Another example of Confirmation Bias and incompetence was the Dean's claim that :  ***"the purpose of the meeting" was to hear from the parties*** —- but that never happened. ***Jane Doe did NOT even attend the meeting*** **and Purdue Staff let her skip it** — more evidence of adhering to a defective "Believe Women" (but not men) investigative methodology.   As the Dean wrote, "We have reviewed the complaint, written responses, and the Investigator's Report. Accordingly, the purpose of the meeting is not to conduct another investigation but *simply to be able to hear directly from the parties* and get clarification on any questions we might have after having reviewed the written materials. Please contact me if you have any questions or concerns. I can be reached at ….."  (See, Letter from Dean of Students) — Key Question:  When (what date and time) did the Dean find out Jane Doe was NOT attending the hearing and had never been interviewed on record, and had never signed any witness statement of any kind.

Another example of Confirmation Bias and incompetence was the Dean's claim "***My interpretation as a professional in higher education for 30 years*** and in working with students and the student conduct, as I read and decipher the text messages and recently reviewed for the purposes of today, it is clear to me that…" See,  Deposition of Dean K. Sermersheim  = This appears to be a ***highly unreliable methodology - actually tested to be about 50% accurate — just the same as flipping coins***.  Clearly the Dean appears very uninformed regarding basic memory science, nor clinical judgment limitation science, nor methodological analyses of reliability and validity. In addition, on this record, the Dean permitted the FAILURE to video/audio record interviews with key witnesses. The Dean apparently knows little or nothing about the science of memory contamination and the dangers of mis-interviewing and repeated interviewing of witnesses. In addition, the Dean apparently permitted the FAILURE to video/audio record

or at least create a transcript for the "Equity Committee" meeting.  A key question is what evidence did the Dean review — the whole record or just the "selected" file created by Purdue investigators bases on what they "felt" would be relevant?  Such errors are consistent with the hypothesis that Purdue was following a defective "Believe Women" (but not men) investigative methodology.

Another example of Confirmation Bias and incompetence:   It appears on this record, that Purdue Personnel failed to document ALL previous interviews-therapy sessions and other potentially memory contaminating experiences.   In too many cases, even when videotaping is done, interviewers fail to ask sufficient questions to establish a "chain of custody" of the alleged victims reports of abuse (e.g. a recorded, documented statement of *the history of ALL interviews with the witness* ).  This lack of a video or audio record of ALL interviews/therapy sessions makes it difficult to refute the investigative hypothesis that *the alleged victim was mis-interviewed by friends, family, peer groups, CARE center psychotherapists and/or abuse counselors, or others — potentially multiple times*.   In sum, without an audio and videotaped record NOBODY can form a reliable opinion as to how many interviews and how many *manipulative* interviews the alleged victim experienced or, more specifically, how Jane Doe might have been properly or improperly questioned in "secret" untaped, interviews/therapy sessions with Purdue employees (e.g. CARE), investigators and/or psychotherapists.  Such errors are consistent with the hypothesis that Purdue was following a "Believe Women" (but not men) investigative methodology.

**In sum, this is one of the most methodological defective, improper, misinformed, uninformed, investigations I have seen in the USA having reviewed hundreds of investigations in dozens of states and federal jurisdictions over the past 30 years.**

**EXAMPLES OF ALTERNATIVE HYPOTHESES and ISSUES FOR FUTURE INVESTIGATION :**

1- Purdue University investigators/adjudicators/officers were poorly and improperly trained thus applying controversial and unreliable methodologies and failing to meet minimal standards for a rational, competent investigation.

2- Purdue University investigators/adjudicators/officers were operating under improper and unethical pressures to comply with a defective methodology ("Believe Women, but not men").

3 - Purdue University investigators/adjudicators/officers used unreliable investigational procedures intentionally and also manipulated evidence via "selected evidence files", failed to record ANY interviews, and failed to obtain ANY sworn statement of any allegation in order to manipulate and control the outcome of this case.

4 - Purdue University investigators/adjudicators/officers were duped and manipulated by improper, incompetent, unethical, and unreliable RRM-MPD-DISS junk science notions and ideas expressed in Title IX training seminars.  For example, Dr. R. Campbell has for years been teaching highly controversial, misleading, and unethical workshops on the "Neurobiology" of trauma, memory, and violence.  Who at Purdue selected Dr Campbell's controversial, unproven, junk science notions for training?

5 - Purdue University investigators/adjudicators/officers deliberately and intentionally failed to properly RECORD all interviews deliberately <u>to make it impossible to review their interviews for bias and advocacy and</u> determine A) how accurate the claimed notes and quotes were, B) how much of the information allegedly reported was contaminated and/or fabricated by improper leading, suggestive, confusing, repeated, or biased questioning.

6 - Purdue University investigators/adjudicators/officers were engaged in a "Believe Women" (not men) political advocacy project for what they perceived to be "social justice" and they never intending to conduct a fair, competent, investigation using reliable and valid measures and methods.

**These are investigational alternative hypotheses that should be properly investigated by the relevant authorities including licensing boards,  the US DOJ, and legislative oversight committees - both State and Federal.  I have offered to testify pro bono in all such investigations.**

**QUESTIONS:**  What Due Diligence did Purdue officials complete prior to obtaining training for investigators by Dr R Campbell?  How many times, if any, did Dr Campbell train investigation or other personnel at Purdue University?  Dr Campbell's highly politicized and controversial views are well known due to her publication, Campbell, R. and Wasco, S., *Feminist Approaches to Social Science: Epistemological and Methodological Tenets*,  American Journal of Community Psychology, Vol. 28, No. 6, 2000.   Did anyone review this publication prior to receiving "training in the Neurobiology of Trauma"

**DR CAMPBELL'S CONTROVERSIAL PUBLICATION:**  Consider the following selections from Dr Campbell's publication. See, **Campbell, R. and Wasco, S., Feminist Approaches to Social Science: Epistemological and Methodological Tenets, American Journal of Community Psychology, Vol. 28, No. 6, 2000**.

"Much like the field of community psychology, feminist scholarship is defined by its values and process. Informed by the political ideologies of the 1970s women's movement (liberal, radical, socialist feminism, and womanism), feminist scholars reinterpreted classic concepts in philosophy of science [ RCB:  Note the breathtaking arrogance involved in their "reinterpreting classic concepts in the philosophy of science". ] to create *feminist epistemologies* and methodologies. Feminist epistemologies, such as feminist empiricism, standpoint theory, and postmodernism, recognize women's lived experiences [ note the bias against men ] as legitimate sources of knowledge…

We view the traditions of community psychology and feminism as compatible and mutually informative… the chart lists "radical feminism", "socialist feminism", "feminist postmodernism", "critical theory" as foundational… We begin by defining the similarities and differences between four main forms of feminism—liberal, radical, and socialist feminism, and womanism…. At an epistemological level, feminist social science legitimates women's [ note the bias against men ] lived experiences as sources of knowledge. …

Socialist feminism is based on the belief that the economic and class structure of our society is inherently problematic, which leads to multiple forms of oppression. Rooted within Marxist ideology, socialism has traditionally focused on classism, and paid

less attention to racism and sexism…. socialist feminists remain focused on the inequalities created by capitalism more generally….

Radical feminism, on the other hand, distinguishes itself from other forms of feminism by drawing central attention to gender oppression [ note the bias against men ] and calling for restructured social institutions…. Radical feminists acknowledge that classism and racism intersect with sexism, but stipulate that the systematic marginalization of women [ note the bias against men ] is the fundamental form of inequality…."radical feminists are engaged in a power struggle with man [ note the bias against men ], and that the agent of our oppression is man [ note the bias against men ] insofar as he identifies with and carries out the supremacy privileges of the male role" (New York Radical Feminists, 1969, as cited Kramarae & Treichler, 1985, p. 379)….

Radical feminists argue that the entire social order must be reexamined and redefined … They believe that our society is sexist, racist, and classist, and therefore requires *substantial transformation*" … Therefore, feminist epistemologies accept women's stories of their lives as legitimate sources of knowledge, and feminist methodologies embody an ethic of caring through the process of sharing those stories."

"If one accepts the premise of objective reality, then the goal of science is to discover the structure and function of that singular world… if one accepted the ontological notion of an objective reality, then the knower (i.e., the scientist) must assume a position of objective detachment, *free from bias* so as to be able to capture that reality accurately. By contrast, if a (feminist) researcher rejected that notion of objectivity (an actual, objective reality) , then it is not necessary, or even desirable, to conduct research in a detached,  dispassionate manner."…

*Postpositivism/Critical Theory*. Critical theorists argue that ''reality" is interpreted through social, political, cultural, economic, ethnic, and gender values [ identity politics ] , and therefore there is no one objective reality (see Guba & Lincoln, 1994). What we consider to be knowledge is not "pure fact" because it is filtered through these various [ identity ]  lenses. The goal of research, therefore, is to understand how the values of both the researcher and the participants determine perceptions of the social world. As a result, *science cannot possibly be an objective enterprise* because values

enter into all phases of the research process. Thus, the _identity_ ( race, class, gender ) of the knower is of critical importance" …

    _Postpositivism/Constructivism_. Constructivists take critical theory a step further by explicitly arguing that _"reality" is socially constructed_ (see Guba & Lincoln, 1994). Social factors, such as gender, race, class, culture, and economics are not merely lenses through which we see reality, they are agents shaping how _we construct our visions of what constitutes our individual realities_. _There is no "real" reality_, no single truth, but multiple truths that are _individually constructed_"…

    " Similar to critical theory, the _identity_ of the knower is paramount because the scientist is actively involved in the social construction of the research reality. In this view, research is an _inherently subjective process_. … " some feminist epistemologies … do indeed _fundamentally reconceptualize how we constitute knowledge_" (Note: The arrogance is breathtaking" ) … Feminist Standpoint Theory. Feminist standpoint theory is based upon post-positivist critical theory informed by the traditions of radical and socialist feminism as well as womanism. Working from the ontological _assumption that there is no single objective truth_, this theory claims that class, race, gender, and sexual orientation structure a person's understanding of reality."… _Feminist Postmodernism_. Feminist postmodernism integrates post-positivist constructivism with radical feminism. Like other constructivist theorists, _feminist postmodernists reject the notion that there is a single truth or reality, in any form_. In fact, _these feminists regard the concept of truth as a "destructive illusion"_… See,  e.g.,  Campbell, R. and Wasco, S., Feminist Approaches to Social Science: Epistemological and Methodological Tenets,  American Journal of Community Psychology, Vol. 28, No. 6, 2000.

    OTHER RELIABLE and AUTHORITATIVE CITATIONS AND REFERENCES:

    Barden RC: Reforming the Mental Health System: Coordinated, Multidisciplinary Actions Ended "Recovered Memory" Treatments and Brought Informed Consent to Psychotherapy. Psychiatric Times. 2014;31(6): June 6, 2014.

    Grove, W. M. and Barden, R.C. (2000) Protecting the Integrity of the Legal System : The Admissibility of Testimony from Mental Health Experts Under Daubert/Kumho Analyses, Psychology, Public Policy and Law, Vol 5, No. 1, 234-

242.  Excerpts reprinted in Fisher, George (Prof. Stanford Law School), <u>Evidence</u>: University Casebook Series, Foundation Press - West Group, New York, 2002, pg. 688

Loftus, E. F. (2002) Memory Faults and Fixes. Issues in Science & Technology (publication of the National Academies of Science), 18, # 4, pp 41-50.

Loftus, E.F. & Davis, D. (2006) Recovered Memories. Annual Review of Clinical Psychology. 2, 469-498.

Loftus, E. F. (2005) Planting misinformation in the human mind: A 30-year investigation of the malleability of memory. Learning and Memory, 12, 361-366.

Mazzoni, G. and Memon, A.  Imagination Can Create False Autobiographical Memories, Psychological Science, Vol. 14, No. 2, March, 2003 pg. 186-193.

McNally, R.J., Lasko, N.B., Clancy, S.A., Macklin, M.L., Pitman, R.K., and Orr, S.P. 2004. Psychophysiological responding during script-driven imagery in people reporting abduction by space aliens. Psychol. Sci. 15: 493–497.

Nourkova, V.V., Bernstein D.M., and Loftus, E.F. 2004. Altering traumatic memories. Cognition and Emotion 18: 575–585.

Schacter, D.L. and Slotnick, S.D. 2004. The cognitive neuroscience of memory distortion. Neuron 44: 149–160. Schmolck, H., Buffalo, E.A., and Squire, L.R.

Thomas, A. K., Bulevich, J. B., & Loftus, E.F. (2003) Exploring the role of repetition and sensory elaboration in the imagination inflation effect. Memory & Cognition, 31, 630- 640.

"Achieving Best Evidence in Criminal Proceedings: Guidance on Interviewing Victims and Witnesses, and Using Special Measures," 2007 revision, Home Office – UK: http://www.cps.gov.uk/publications/docs/ achieving_best_evidence_final.pdf

Michael E. Lamb, Irit Hershkowitz, Yael Orbach, & Phillip W. Esplin, Tell Me What Happened: Structured Investigative Interviews of Child Victims & Witnesses,  Wiley Series in Psychology of Crime, Policing and Law, Sept. 2008 (and ALL citations and studies contained therein).

The U.S. Department of Justice training materials call the generation of — and investigation of — alternative hypotheses essential to the integrity of investigations.

Chris Newlin, Linda Cordisco Steele, et al , Child Forensic Interviewing: Best Practices, published by the U.S. Department of Justice… See,

http://www.ojjdp.gov/pubs/248749.pdf  September 2015,  U.S. Department of Justice, Office of Justice Programs,  Office of Juvenile Justice and Delinquency Prevention. "Alternative Hypotheses … Contextually appropriate questions that explore other viable hypotheses for a child's behaviors or statements *are essential to the overall integrity of the interview.*" ]

**Including all research cited in this report.**

5.    **IT IS MY OPINON TO A REASONABLE DEGREE OF PSYCHOLOGICAL CERTAINTY THAT THE ANALYSES AND CONCLUSIONS IN THIS REPORT ACCURATELY REFLECT KNOWLEDGE, RESEARCH, AND METHODOLOGIES THAT ARE WIDELY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY.**

In my opinion, the analyses and opinions in this affidavit reflect the knowledge, research and methodologies of the relevant scientific and professional communities.  The court is encouraged to consult with other national experts in the field if there is any doubt about the accuracy of the opinions expressed in this affidavit.

For example, I have written Amicus Briefs on complex science issues signed by many international leaders in the fields of psychology and psychiatry.  See e.g., also Barden, R. C. (2006) Amicus Curiae Brief of the National Committee of Scientists for Academic Liberty, for Defendants and Appellants, Elizabeth Loftus, et. al., Submitted to the Supreme Court of the State of California, Feb., 2006.    with AMICI Aaron T. Beck, Harrison G. Pope Jr., Richard McNally, James I. Hudson, Richard Ofshe, William M. Grove, Paul R. McHugh, Robert Perloff, Stephen J. Ceci, Henry L. Roediger, August Piper, B. Christopher Frueh, Steve Lynn, Peter von Koppen, John F. Kihlstrom, Gerald M. Rosen, Sally Satel, Maryanne Garry, Hans F.M. Cromberg, David F. Bjorkland, Phillip W. Esplin, James M. Wood, Richard Gist, Irving Kirsch, Steven Hayes, James D. Herbert, Robert Montgomery, Harald Merckelbach, James Ost, Scott O. Lillienfeld, Marc Sageman, Grant J. Devilly, Anthony Pratkanis, Jon D. Elhai, Timothy Tumlin, D. Stephen Lindsay, Paul A. Ornstein, Susan A. Clancy, John W. Bush, Paul R. Lees-Haley, Howard

D. Eisman, Mark Creamer, W. Jake Jacobs, Timothy Moore, Daniel David, Margaret Bruck, Amina Memon, Jeffrey M. Lohr, Giuliana Mazzoni, Jean-Roch Laurence, Elizabeth Meadows, Ron Acierno, Steven E. Clark, Saul Kassin, Richard Shiffrin, Michael Toglia, Robert V. Kail, J. Don Read, Loren Pankratz, Michael A. Persinger, Debra Poole, Charles A. Weaver III, Joseph de Rivera, David S. Holmes, Terence W. Campbell, Emily Carota Orne, John Cannell, Howard Fishman, Richard A. Leo, Deborah C. Beidel, James Coyne, Fred Frankel, Nora S. Newcombe, Gordon J. G. Asmundson, Howard N. Garb, William G. Reiner, Mahzarin Rustum Banaji, Robyn M. Dawes, Robert A. Karllin, Harold I. Lief, Daniel L. Schacter, Steven Pinker, Naomi Breslau and more.

6. **I HAVE PREVIOUSLY TESTIFIED REGARDING SIMILAR ISSUES IN A NUMBER OF JURISDICTIONS:**

I have testified in court and/or given depositions and/or submitted expert affidavits in a number of jurisdictions across the United States on similar subjects. I have also been invited to testify before several state legislatures. My testimony in these venues often focuses on a range of issues including but not limited to: child psychology, methodological errors and ethics violations, proper and improper investigation methods, standards of care in psychotherapy, improper questioning of witnesses, assessments of the reliability and validity of therapist-expert witness practices, parental alienation processes, coping and resilience in children, testing and assessment, psychopathology, the science of memory, family interactions, and related matters. See qualifications section at the beginning of this report.

7. **BASES FOR MY EXPERT OPINIONS IN THIS MATTER:** My opinions in this matter are based upon my education, knowledge, training, and years of experience in the fields of adult-clinical, child-clinical and forensic psychology as well as my extensive review of case materials in this matter. See qualifications section at the beginning of this report. My relevant experience in this field includes:

PSYCHOTHERAPY:  providing psychotherapy to numerous patients including children, families and adults (in schools, clinics, and hospitals), as well as training psychology graduate students in interviewing and psychotherapy standards and methods;

RESEARCH REVIEW AND ORIGINAL RESEARCH: reviewing hundreds of peer reviewed published research studies, serving editorial roles for leading professional journals and initiating, conducting and publishing original research in the leading journals in child psychology, social psychology, personality psychology, surgery, public policy and legislation. More specifically, I have published in, and/or served as an editor or reviewer for, several of the most highly regarded journals and texts in a number of professional fields including Developmental Psychology, Child Development, Psychological Bulletin, Ambulatory Pediatrics, Advances in Child Clinical Psychology, the Journal of Personality and Social Psychology, the Journal of the American Academy of Psychiatry and the Law, the Journal of Plastic and Reconstructive Surgery, the Harvard Journal of Law and Public Policy, and the Harvard Journal on Legislation;

RECIPIENT OF TWO NATIONAL RESEARCH AWARDS in PSYCHOLOGY: including the Foundation for Child Development National Award for Young Scholars in Social and Affective Development, 1982 - 1983 and the National W. T. Grant Foundation Faculty Scholar Award for Research in Mental Health, Stress and Coping 1987.  Both awards are quite relevant to my analysis in this case;

TEACHING AND TRAINING.  I have given invited addresses and advanced courses at major Ph.D. graduate programs, leading law schools, and continuing education courses for Psychologists, Psychiatrists and Attorneys. I have also trained investigators including F.B.I., Sheriffs Officers, and police staff.  I was an Invited Training Speaker at the Minnesota Sex Crimes Investigators Association (1994) and Invited Training Speaker at the Midwestern Sex Crimes Investigators Association.  I also served as a Special Assistant Attorney General of the State of Utah as a trainer and consultant on cases involving licensing prosecutions of mental health professionals;

PUBLIC SERVICE EXPERIENCE:    See also the attached Illustrative Exhibit

-- Psychology Practicum - University of Minnesota Medical School, Dept. of Psychiatry

-- Psychology Practicum - Stillwater Minnesota Maximum Security Correctional Facility

-- Psychology Practicum - Minneapolis, Minnesota Public Schools

-- APA Approved Psychology Internship - Palo Alto V.A. Med Ctr/ Stanford U. Med Ctr.

-- Psychology Consultant Craniofacial Surgical Team, Baylor Medical School, Dallas, Tx

-- Psychology Consultant Craniofacial Surgical Team, Primary Children's Hospital, SLC, UT

-- Harvard Law School Intern, Mass. A.G.'s Office, Crime Victim Compensation Program

-- Chief Author and Legislative Consultant,  Emergency Medical Systems for Children Act

-- Forensic Psychology Intern, Harvard Medical School/Harvard Law School Forensic Program, Massachusetts Mental Health Center

-- Member, Minnesota State Board of Psychology (Appointment of MN Governor)

-- Member, Minnesota Higher Education Coordinating Board (responsible for overseeing the MN. multi-billion dollar budget for all state colleges, universities and trade schools) by appointment of Governor Arne Carlson (1993-1994))

-- Invited Training Speaker, Minnesota Sex Crimes Investigators Association (1994)

-- Invited Training Speaker, Midwestern Sex Crimes Investigators Association (1995)

-- Invited Training Speaker, US Surgeon General's Conference

-- Consultation with the U.S. Attorneys Office, F.B.I., other national experts

-- Court appointed expert witness, St Croix, Wisconsin

-- Legislative Consultant,  Legislation to ban "Holding Therapy" in Utah

-- Legislative Consultant, Legislation to ban "Rebirthing Therapy" in Colorado

-- Author, Emergency Medical System for Children Act

-- Consultant, Minnesota law protecting patient's rights

-- Consultant to various State Boards re: licensing actions

-- Special Assistant Attorney General for the State of Utah (2004-2005).

-- Expert Witness for the Prosecution, State of Colorado v. Watkins, et al. (Newmaker "rebirthing therapy" case) 2001.

-- Expert Witness for the Prosecution, State of Texas v. Harris,  (MPD "Twilight Rapist" case) 2011.

-- Prosecution consultant King County, Seattle, Washington  (Green MPD case 2003).

-- Prosecution consultant U.S. Attorneys Office, Houston, Texas U.S. v. Peterson, et al.

-- Testifying and consulting expert witness, U.S. Federal Public Defenders Office

-- Consultation with national experts in law and psychology

-- President, Board Member - Character & Morality in Entertainment (CAMIE Awards) 2008-2010

-- Invited International Address on Performance Psychology, Beijing Olympics (Aug-2008)

-- Legislative Consultant,  Minnesota Legislation to ban abuse of incompetent patients in research studies  See, 253B.095 RELEASE BEFORE COMMITMENT (2012)  "The treating psychiatrist must not be the psychiatrist conducting the psychiatric clinical drug trial. The court must determine that, under the circumstances of the case, the patient is competent to choose to participate in the trial, that the patient is freely choosing to participate in the trial, that the compulsion of the stayed commitment is not being used to coerce the person to participate in the clinical trial, and that a reasonable person may choose to participate in the clinical trial."

-- Pro bono consultation and testimony for Prosecution and Public Defender cases in many states

-- Invited address, Center for Enhanced Performance, US Military Academy, West Point (4-2010)

-- Invited address, F.B.I. Midwest Regional Supervisor Training Conference, (9-2010)

-- Unanimously endorsed Republican Party Candidate for Attorney General of Minnesota (Nov. 2010 election, 839,033 votes)

- Invited address, F.B.I. Midwest Regional All-Employees Training Conf., (12-2010)

- 2012 - Captain,  US Air Force Auxiliary Civil Air Patrol - Viking Wing, MN

• Reforming the EMERGENCY MEDICAL SYSTEMS FOR CHILDREN

   -  See,  Barden, R. C., Kinscherff, R., George, W., Flyer, R., Seidel, J., & Henderson, D., (1993), Emergency Medical Care and Injury Prevention Systems for Children:  An Economic-Medical-Legal-Psychological Analysis and Legislative Proposals, Harvard

Journal on Legislation, Vol. 30, No. 2, pgs 461497.   Some version of this proposed legislation was reportedly enacted by the States of New Jersey (1992), Texas (1993), Utah (1994), Colorado (1995), Hawaii (1996), Louisiana (1996) and others.  These legislative ideas have continued to expand across the U.S.  As of July 1997 18 states reported the creation of a separate Emergency Medical System for Children Advisory Board (as required by this legislative proposal) and 15 states required pediatric representation on State EMS Advisory Boards. (See, EMSC News, Vol 10, No. 2, Summer 1997).

**EVIDENCE REVIEWED IN THIS CASE:**

- all articles, citations, and materials cited in this report as well as

Doe v Purdue 2015 Janet Halley "Trading the Megaphone for the Gavel in Title IX Enforcement Backing off the hype in Title IX enforcement"

Doe v Purdue Judge A.C. Barrett Decision University 928 F.3d 652.pdf

Doe v Purdue TEXT EVIDENCE JacobAmberger_27.pdf

Doe v Purdue 2016 4-11 NOTICE Ltr Information Summary Alysa Christmas Rollock_Ex_10.pdf

Doe v Purdue 2021 2-11 ECF 106 Plaintiff SurReply Navy Depos Sanctions 08 21 2020.pdf

DOE v PURDUE 2021 2-15 John Doe Declaration relationship with Jane Doe 02 15 2021.pdf

Doe v Purdue John Doe _MiniScript.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_1.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_2.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_3.pdf

Doe v Purdue DEAN's 1st DECISION Alysa Christmas Rollock_Ex_4.pdf

Doe v Purdue DEAN's 2nd DECISION LTR Alysa Christmas Rollock_Ex_7.pdf

Doe v Purdue DEPO John Doe _PDFTran.pdf

Doe v Purdue DEPO Elvin Uttuppan_Miniscript.pdf

Doe v Purdue PL's 1st APPEAL Alysa Christmas Rollock_Ex_5.pdf

Doe v Purdue PL's 2nd APPEAL & Demand for Records Alysa Christmas
Rollock_Ex_8.pdf

DOE v PURDUE Plaintiff Answers to Third Interrogatories to Plaintiff.pdf

Doe v Purdue VP AFFIRMS 2nd DECISION Alysa Christmas Rollock_Ex_9.pdf

Doe v Purdue VP requires REASONS for DECISION Alysa Christmas
Rollock_Ex_6.pdf

Doe v Purdue 2016 Aya Gruber Law Review on "Anti-Rape Culture".pdf

Doe v Purdue DEPO Records Custodian Trent Klingerman_MiniScript.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_11.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_14.pdf

Doe v Purdue Alysa Christmas Rollock_Ex_15.pdf

Doe v purdue Alysa Christmas Rollock_Ex_16.pdf

Doe v Purdue Alysa Christmas Rollock_MiniScript.pdf

Doe v Purdue DEPO Alysa Christmas Rollock_PDFTran.pdf

Doe v Purdue DEPO Erin Oliver Mini Script.pdf

Doe v Purdue DEPO ErinOliver_COND Mini Script.pdf

Doe v Purdue DEPO Jacob Amberger_Ex_25.pdf

Doe v Purdue DEPO Jacob Amberger_MiniScript.pdf

Doe v Purdue DEPO Katherine Sermershein_MiniScript.pdf

Doe v Purdue DEPO Monica Bloom_MiniScript.pdf

Doe v purdue DEPO Monique H. _MiniScript copy.pdf

Doe v Purdue DEPO Rodney Hutton_G.pdf

Doe v Purdue ECF 106 Plaintiff SurReply re Sanctions 08 21 2020.pdf

Doe v Purdue Jacob Amberger_Ex_10.pdf

Doe v Purdue Jacob Amberger_Ex_11.pdf

Doe v Purdue Jacob Amberger_Ex_14.pdf

Doe v Purdue Jacob Amberger_Ex_19.pdf

Doe v Purdue Jacob Amberger_Ex_20.pdf

Doe v Purdue Jacob Amberger_Ex_21.pdf

Doe v Purdue Jacob Amberger_Ex_22.pdf

Doe v Purdue Jacob Amberger_Ex_24.pdf

Doe v Purdue Jacob Amberger_Ex_29.pdf

Doe v Purdue Jacob Amberger_Ex_30.pdf

Doe v Purdue Jacob Amberger_Ex_31.pdf

Doe v Purdue Katherine Sermershein_ Ex_2.pdf

Doe v Purdue Katherine Sermershein_Ex_3.pdf

Doe v Purdue Katherine Sermershein_Ex_4.pdf

Doe v Purdue Katherine Sermershein_Ex_5.pdf

Doe v Purdue Katherine Sermershein_Ex_6.pdf

Doe v Purdue Katherine Sermershein_Ex_7.pdf

Doe v Purdue Katherine Sermershein_Ex_8.pdf

Doe v Purdue Katherine Sermershein_Ex_9.pdf

Doe v Purdue Katherine Sermershein_Ex_10.pdf

Doe v Purdue Katherine Sermershein_Ex_11.pdf

Doe v Purdue Katherine Sermershein_Ex_11 2.pdf

Doe v Purdue Katherine Sermershein_Ex_14.pdf

Doe v Purdue Katherine Sermershein_Ex_14 2.pdf

Doe v Purdue Katherine Sermershein_Ex_29.pdf

Doe v Purdue Katherine Sermershein_Ex_33.pdf

Doe v Purdue Katherine Sermershein_Ex_34.pdf

Doe v Purdue Katherine Sermershein_Ex_35.pdf

Doe v purdue Monica Bloom_Ex_1.pdf

Doe v Purdue Monica Bloom_Ex_2.pdf

Doe v Purdue Monica Bloom_Ex_3.pdf

Doe v Purdue Monica Bloom_Ex_17.pdf

Doe v purdue Monica Bloom_Ex_18.pdf

Doe v Purdue Monica Bloom_Ex_19.pdf

Doe v Purdue Monica Bloom_Ex_20.pdf

Doe v Purdue Monica Bloom_Ex_21.pdf

Doe v Purdue Monica Bloom_Ex_23.pdf

Doe v Purdue Monique H. _MiniScript.pdf

**All evidence and research as cited in this report.**

Articles, Publications, Research on Trauma, Mental Health and related topics including controversial works by by R. Campbell, Ph.D. and her colleagues including but not limited to those cited above and…

Presentation on "The Neurobiology of Trauma" by R. Campbell, Ph.D. , U.S. Department of Justice, Office of Justice Programs, National Institute of Justice NIJ, December 3, 2012. Transcript on the internet at https://nij.gov/multimedia/presenter/presenter-campbell/pages/presenter-campbell-transcript.aspx  ( accessed on June 4, 2018).

Campbell, R., Dworkin, E., and Cabral, G., An Ecological Model of the Impact of Sexual Assault on Women's Mental Health, _Trauma, Violence, and Abuse_, Vol. 10, No. 3, July 2009 225-246  DOI: 10.1177/1524838009334456

Extensive reviews of the science of memory, false memory, memory contamination and related science.  (See multiple citations in this report).

Kanin, E. "False Rape Allegations", Archives of Sexual Behavior 23, no. 1 (1994). [ Note:  This 1994 study by _Purdue professor_ Eugene Kanin, using data from an unidentified Midwestern city, found that between 1978 and 1987 the police department concluded that _41 percent of rape allegations were proven false._ Prof. Kanin noted : These false rape allegations appear to serve three major functions for the complainants: providing an alibi, _seeking revenge_, and obtaining sympathy and attention. The rape allegations were rated as false only when the complainant admitted they were false].

Extensive reviews of human "lie detector" research… discerning true from false statements based upon interviews lacking corroborative evidence.  (See citations above).

Extensive reviews of research on "clinical judgment" including the judgment of investigators. (See citations above).

and other evidence as it becomes available.


8.     **LIMITATIONS ON THIS REPORT and TESTIMONY** :  My opinions and hypotheses in this matter are subject to the limitations of all documentary and related evidence , the impossibility of absolute predictions, as well as the limitations of social science analysis. I have not met, nor interviewed,  nor evaluated, nor assessed, nor

produced any diagnoses nor psychological descriptions of anyone in this investigatory process.  As always, I have no expert opinions regarding the veracity of witnesses or the ultimate issues in this case.  I will continue to review evidence in this case and update opinions.  My opinions are thus subject to change at any time as new information becomes available to me including and especially my observations, analyses, and opinions at the trial of this matter. Time and cost limitations prevent a more complete analysis of all evidence in this case at this time.  I seek to review all relevant evidence in this matter.  I never offer opinions on guilt or innocence or the truthfulness of witnesses.  Only the trier of fact can determine the credibility of witnesses and how scientific research may or may not be related to the specific facts of any particular case.   A key role of an expert witness is to help the court, lawyers, parties, and the public understand and apply reliable and proper scientific, technical, and investigative principles, hypotheses, methods, and information. I have transmitted this initial expert witness report on FEB 19, 2021 to the offices of Attorney Philip A. Byler, J.D. , for use consistent with the laws of the relevant jurisdiction.

9.      My investigation of this complex and important matter continues.

This Expert Witness Report is Affirmed Under Oath.  I, R. Chris Barden, Ph.D., JD do swear and affirm the truthfulness of this Expert Witness Report as filed on March 16, 2023

*R Christopher Barden, Ph.D., JD*

Expert Witness in DOE v. PURDUE, et al

As an expert witness I will offer no legal opinions nor psychological treatment-diagnostic advice in this case.

"A key role of an expert witness is to help the court, lawyers, and/or parties understand and apply reliable scientific, technical, ethical, and investigative principles, methods, alternative hypotheses, and information."