**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| **JOHN DOE,**                                                    ) | |
| ) | **CIVIL ACTION** |
| Plaintiff,                               ) | |
| v.                                                                     ) | |
| ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** ) | |
| **DANIELS, JR.,** in his official capacity as President of ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK,** ) | No. 2:17-cv-33-GL |
| in her official capacity at Purdue University, **KATHERINE** ) | |
| **SERMERSHEIM,** in her official capacity at Purdue University, ) | |
| ) | |
| Defendants.                          ) | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE***

**LAW OFFICES OF PHILIP A. BYLER**
**Philip A. Byler, Esq.**
**11 Broadview Drive**
**Huntington, New York 17431**
**(631) 848-5175**
**pbyler1976@gmail.com**r
*Attorneys for Plaintiff John Doe*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF OPPOSITION EXHIBITS ("Opp. Ex.")………………………………….…………iii

TABLE OF AUTHORITIES………………………………………………………………....v

DISCUSSION OF DEFENDANT'S ARGUMENTS…………………………………….……...1

A.   The Expert Testimony of Dr. Barden and Dr. Smith Should Be Admitted At Trial ……….1

B.   Evidence of Defendants' Failure to Follow Fair Procedure Is Admissible:
     Defendants' Disciplinary Process Is Criticized By Justice Barrett In Upholding
     John's Title IX Claim and Is Properly At Issue As Irregularities Evidencing
     Sex Discrimination……………………………………………………………...……1

C.   Defendants' Arguments About John's Relief Claims Are Without Merit………………….5

     1. Bifurcation Hould Be Denied; Navy ROTC Evidence Is Highly Relevant………………5

     2. Arguments Regarding Expungement Is For The Court Following A Jury
        Verdict; the Seventh Circuit Upheld John's Right To Injunctive Relief,
        Including Expungement ……………………………………………………...………5
        .
     3. John's Supplementation Was Good; A Large Record Exists Showing The Loss
        of Navy ROTC and Navy Opportunity; John Has Disclosed His Employment and
        Educational History; Suspension Not A Subject Of Social Media and Current
        Employment……………………………………………………….….…..…...…6

     4. Emotional Damages Are Not Being Sought By John, But John's Mental State
        State Is Relevant To Post-Suspension Issues That Defendants Have Raised………….7

     5. John Seeks "Compensatory Damages", Not "Consequential Damages" ……….…..9

D.   Purdue Again Shows Its Rejection Of The Seventh Circuit Opinion: Purdue Wrongly
     Seeks Banning Mentioning The Seventh Circuit Opinion and The Procedural History
     Except For Spoliation (Which Is What Should Not Be Mentioned)…………………………10

E.   Statements In The Press and Opinions of Non-Parties Reflect The
     Public Interest In The Case and Criticism of Purdue's Position……………………...……13

F.   The Sexual Relationship That John and Jane Had Initiated By Jane Is Part Of
     The Facts of The Case and That Investigators Ignored It Points To Investigator Bias……..15

G.   Jane's Mental Health, Because of Her Suicide Attempt, Is
     Part Of The Facts of The Case and Points To Investigator Bias……………………………17

H.     John's Religious Upbringing Is Part Of The Facts of The Case and
       Helps Explain The John-Jane Texts…………………………………………………………….20

I.     The Impact On John's Family and Friends Is A Fair Subject For Testimony…………….21

J.     Exclusion Of Reference To Purdue's Liability Insurance Means Purdue Cannot
       Argue That A Damage Award Would Take Money Away From Education……………..…22

K.     Purdue Seeks To Insulate Purdue's Objections To John's Discovery
       While Falsely Claiming Spoliation Over 11 Irrelevant Snapchat Pictures……………….23

L.     Purdue Seeks To Ban "Offer of Judgment" and Settlement
       Discussions But Cannot Then Claim John Wants Only Money ………………………….23

M      Purdue's "Golden Rule" Objection Is Not For A Motion *In Limine*……………………..…23

N.     Argument About Sending A Message Is Not For
       A Motion *In Limine***.**………………………………………………………..……………………….23

O.     Purdue's Request To Ban Argument and Evidence Regarding Purdue's Other Title
       IX Cases Means Purdue Cannot Argue That This Case Is Abnormal For Purdue………..24

P.     Defendants Seek To Ban Evidence and Contentions About The History,
       Purpose or Intent of Title IX But Purdue's Proposed Jury Instruction No.
       14 on Title IX Does Not Include Instruction on the History, Purpose or Intent
       of Title IX …………………………….…………………………………………………..….24

CONCLUSION…………………………………………………………………...…...25

## <u>TABLE OF OPPOSITION EXHIBITS ("Opp. Ex.")</u>

Opp. Ex. A: *Doe v. Purdue* Opinion of the Seventh Circuit, June 28, 2019

Opp. Ex. B: Re-Argument Transcript, December 19, 2022

Opp. Ex. C: John's Supplementation, March 16, 2023

Opp. Ex. D: John's Memorandum of Law for Due Process Summary Judgment

Opp. Ex. E: John's Memorandum of Law In Opposition To Defendant's Motion
        For Summary Judgment

Opp. Ex. F: Plaintiff's Reply Memorandum of Law in Further Support of John's
        Motion for Due Process Summary Judgment

Opp. Ex. G: John Doe Deposition tr. 41-43, 71-73, 104-105, 113-124, 166-170, 191-192, 194-195

Opp. Ex. I: Noel Perry Deposition

Opp. Ex. H: Rodney Hutton Deposition tr. 14, 27, 49-50, 54-55, 71-73

Opp. Ex. J: Dr. Stan V. Smith Report

Opp. Ex. K: Chart of Cases Where Dr. Smith's testimony on hedonic damages admitted

Opp. Ex. L:  Chart of Cases Where Dr. Smith's testimony was ruled admissible

Opp. Ex. M: Revised Barden Report, March 16, 2023

Opp. Ex. N: Snapchat Listing Exhibit

Opp. Ex. O: Plaintiff John Doe's Mother Deposition tr. 44-46, 74-75, 94-101

Opp. Ex. P: Plaintiff John Doe's Father Deposition tr. 23, 31-32, 37, 40-41, 65-66

Opp. Ex. Q: Plaintiff John Doe's Roommate Deposition tr. 137-138, 140-141

Opp. Ex. R: Plaintiff Fourth Amended Rule 26 Disclosure Statement

Opp. Ex. S: Hutton Deposition Ex. I, Pl Opp DSJ Hutton Ex. I (NSTC 0005-0006)

Opp. Ex. T: John Declaration, February 18, 2021

Opp. Ex. U: SJM 33: 02/16/2016 Student of Concern Report (PU 32-33)

Opp. Ex. V: Sermersheim Deposition tr 12-14

Opp. Ex. W: Oliver Deposition tr. 24, 27, 49

Opp. Ex. X: Amberger Deposition tr 25-26, 67, 88

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715 (7th Cir.2001)………………………………….....13

*Cummings v. Premier Rehab Keller*, 596 U.S. 212 (2022) …………………….....….….….7, 8, 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)…………………………..1

*Desmond v. PNGI Charles Town Gaming LLC*, 630 F.3d 351 (4th Cir. 2011)………………………9
.
*Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016)………………………………………….……….2

*Doe v. Oberlin*, 963 F.3d 580 (6th Cir. 2020)……………………………………………………3

*Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858 (8th Cir. 2020)……………………..…….3

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) ……………………………………………*passim*

*Doe v. Regents of the Univ. Of Cal.*, 23 F.4th 930 (9th Cir. 2022)…………………………….3

*Doe v. Trs. Of Dartmouth College*, __F.Supp.3d __, 2023 WL 687937,
   2023 U.S. Dist. LEXIS 186793 (D.N. H. Oct. 18, 2023)…………………………………..10

*Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021),………………4

*Dura Auto Sys. Of Ind. v. CTS Corp.*, 285 F.3d 609 (7th Cir. 2002)………………………………..8

*In re General Motors LLC Ignition Switch Litigation,* 257 F.Supp.3d 372 (S.D.N.Y. 2017)………9

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
   2023 U.S. Dist. LEXIS 20323 (N.D. Ill. Feb. 7, 2023)……………………………………..8

*Keller v. United States,* 58 F.3d 1194 (7th Cir.1995)……………………….…………………13

*Luce v. United States,* 469 U.S. 38 (1984)…………...….……………………………………..3

*McCleland v. Montgomery Ward & Co.*, 1995 WL 571324 (N.D. Ill. Sept. 25, 1995)…………..17

*McQuiston v. Helms*, 2009 WL 554101 (S.D. Ind. Mar. 4, 2009)…………………………………22

*Menaker v. Hofstra*, 935 F.3d 20 (2d Cir. 2019)…………………………………………………3

*Neurografix v. Brainlab, Inc.*, 2021 U.S. Dist. LEXIS 20719 (N.D. Ill. Mar. 17, 2021)………….…13

*Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997)…………………………………………….4

*Park v. Secolsky*, 787 F. App'x 900 (7th Cir. 2019)……………………………………………17

*Smith v. United States,* 293 F.3d 984 (7th Cir.2002)……………………………………..…12

*State of Tennessee v. Cardona*, Civ. __F.Supp.3d __, 2024 WL
 3019146 (E.D. Tenn. June 17, 2024)…………………………………………………..2

*Stillman v. Norfolk & Western Railway Company*, 811 F.2d 834 (4th Cir. 1987)………………17

*Stokes v. John Deere Seeding Grp.*, DE 71 in No. 4:12-cv-4054-SLD-JAG,
 Opposition to Exclusion…………………………………………………………………7

*Stuhlmacher v. Home Depot USA, Inc.*, 2012 WL 5866297 (N.D. Ind. Nov. 19, 2012)…………8

*Taylor v. Union Pacific R.R. Co.*, 2010 WL 5343295 (S.D. Ill. Dec. 21, 2010)…………………17

*Van Houten-Maynard v, ANR Pipeline*, 1995 WL 317056, 1995 U.S. Dist.
 LEXIS 6751 (N.D.Ill. May 18, 1995)………………………………………………3, 5, 10, 11
                     23, 24

*Vukadinovich v. Hanover Community School Corporation,* 2016 WL 5939517
 (N.D. Ind. Oct 12, 2016)(Simon, J.)……………………………………………………..9

*Warren v. Prejean*, 301 F.3d 893 (8th Cir. 2002)………………………………….…......16-17

**Constitutional Provisions, Statutes, Regulations and Court Rules**

Americans with Disabilities Act, 42 U.S.C. §§ 1201 *et seq*…………………….…………………7

Rehabilitation Act, 29 U,S.C. §§ 791 *et seq*……………………………………………….…7

Rule 401, Federal Rules of Evidence………………………………………………...…21

Rule 402, Federal Rules of Evidence………………………………………………...…21

Rule 403, Federal Rules of Evidence……………………………………………...………21

Rule 412(a), Federal Rule of Evidence……………………………………………16, 17

Rule 702, Federal Rules of Evidence……………………………………………………1

Title IX, 20 U.S.C. §1681……………………………………….………………*passim*

34 CFR § 106.45……………………………...…………………………………………..2

**<u>Other Authorities</u>**

R. Posner, *Economic Analysis of Law*, at 184 (8th ed. 2010)…………………………………………… 1

"Secretary DeVos Announces New Title IX Regulation,"
      https://www.youtube.com/watch?v=hTb3yfMNGuA.........................................................2

U.S. Department of Education Press Release, "Secretary DeVos Takes Historic
      Action to Strengthen Title IX Protections for All Students," May 6, 2020………………2

Plaintiff John Doe ("John"), by counsel, respectfully submits this Memorandum of Law in opposition to Defendants' motion *in limine* various items of evidence and contentions at trial. Defendants' motion is a brazen attempt to deny John a fair trial by the improper exclusion of highly relevant evidence to prove sex discrimination, to distort the facts untruthfully, and to pave the way for false argument by Defendants and character assassination of John. The motion should be denied. References to the accompanying Exhibits to this Opposition will be shown by "Opp. Ex. __."

**DISCUSSION OF DEFENDANTS' ARGUMENTS**

**A.    The Expert Testimony of Dr. Barden and Dr. Smith Should Be Admitted At Trial.**

As explained in John's opposition to Defendants' motion to exclude the testimony of Dr. Barden and Dr. Smith, Defendants' motion should be denied.  The testimony of Dr. Barden and Dr. Smith is admissible per Rule 702 of the Federal Rules of Evidence and as *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Defendants ignore the fact that Judge Kolar in his August 11, 2022 opinion, while striking the Barden report, also expressly stated on page 11 of the slip opinion: "The Court is not barring any and all expert opinions Dr. Barden may offer."  (DE 206, p. 11.)  Dr. Barden's testimony on investigation methodology showing the badly flawed Purdue investigation, which allowed for sex discrimination, will assist the jury. Dr. Smith, an economist, calculates compensatory damages in two categories: (i) lost wages and benefits; and (ii) loss of value in life, what sometimes is called "hedonic damages," R. Posner, *Economic Analysis oof Law*, at 184 (8th ed.2010); that testimony will assist the jury. Defendants ignore the lists of cases where Dr. Smith's testimony was accepted, including for hedonic damages.  (Opp. Exs. K-L.)

**B.    Evidence of Defendants' Failure to Follow Fair Procedure Is Admissible: Defendants' Disciplinary Process Is Criticized By Justice Barrett In Upholding John's Title IX Claim and Is Properly At Issue As Irregularities Evidencing Sex Discrimination.**

Defendants move to exclude evidence or argument directed to procedural requirements, citing Judge Kolar's (erroneous) dismissal of the due process claim and the supposed immateriality

1

of the Department of Education due process regulations at 34 CFR § 106.45. (Df. Mem. 1-2.) Wrong, for six reasons.

*First*, this is a case in which the procedures employed by Defendants for Title IX enforcement were lambasted as wholly inadequate by the Seventh Circuit in an opinion by now Justice Barrett, *Doe v. Purdue*, 928 F.3d 652, 663-664 (7th Cir. 2019) ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension.") When then Education Secretary DeVos announced on May 6, 2020, what would be the current Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue* (which Secretary DeVos noted was from a panel of three women). "Secretary DeVos Announces New Title IX Regulation," https://www.youtube.com/watch?v=hT b3YfMNGuA; U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020. Those regulations, which went through the Administrative Procedure notice and comment provisions, apply to all universities and colleges, including Purdue, and are at 34 C.F.R. 106.45. Biden bureaucratic efforts to overturn those regulations have been rebuffed by courts, *see State of Tennessee v. Cardona*, Civ. __F.Supp.3d __, 2024 WL 3019146 (E.D. Tenn. June 17, 2024).

*Second*, the Seventh Circuit opinion by Judge Barrett in this case stated the following when upholding John's Title IX claim, *Doe v. Purdue*, 928 F.3d at 667-670 (7th Cir. 2019) (Opp. Ex. A):

> John has alleged such facts here, the strongest one being that Sermersheim chose to credit Jane's account without hearing directly from her. The case against him boiled down to a ''he said/she said''—Purdue had to decide whether to believe John or Jane. Sermersheim's explanation for her decision (offered only after her supervisor required her to give a reason) was a cursory statement that she found Jane credible and John not credible. Her basis for believing Jane is perplexing, given that she never talked to Jane. Indeed, Jane did not even submit a statement in her own words to the Advisory Committee. Her side of the story was relayed in a letter submitted by Bloom, a Title IX coordinator and the director of CARE.

For their part, the three panelists on Purdue's Advisory Committee on Equity were similarly biased in favor of Jane and against John. As John tells it—and again, we must accept his account as true—the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account. They made up their minds without reading the investigative report and before even talking to John. They refused to hear from John's witnesses, including his male roommate who maintained that he was in the room at the time of the alleged assault and that Jane's rendition of events was false. And the panel members' hostility toward John from the start of the brief meeting despite their lack of familiarity with the details of the case—including Jane's depression, suicide attempt, and anger at John for reporting the attempt—further supports the conclusion that Jane's allegation was all they needed to hear to make their decision.

It is plausible that Sermersheim and her advisors chose to believe Jane because she is a woman and to disbelieve John because he is a man. . . .

*Third*, it is established case law that an inference of sex discrimination may be drawn from procedural and adjudicative irregularities. *Menaker v. Hofstra,* 935 F.3d 20, 34 (2d Cir. 2019); *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 864-865 (8th Cir. 2020); *Doe v. Oberlin*, 963 F.3d 580, 588 (6th Cir. 2020) citing *Doe v. Purdue*; *Doe v. Regents of the Univ. Of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022) ("[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise.").

*Fourth,* a motion in limine is for the exclusion of evidence, not exclusion of argument. *Van Houten-Maynard v, ANR Pipeline*, 1995 WL 317056, *1, 1995 U.S. Dist. LEXIS 6751 (N.D.Ill. May 18, 1995)("*VanHouten-Maynard*"("Motions *in limine* refer to any motion, whether made before or during trial "to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States,* 469 U.S. 38, 40 n.2; 105 S.Ct. 460, 462 n. 2 (1984).To the extent that any ANR motion *in limine* does not address evidence, it is denied"). Evidence of procedural irregularities here is proper.

*Fifth,* during the oral argument on the motion for reconsideration, even Judge Kolar recognized that the evidence at a Title IX trial would be not much different as for a due process

3

trial.  (DE 221, Opp. Ex. B, Reconsideration Hearing tr 35) ("I haven't heard a lot here, frankly, where I think the trial is going to be significantly different than my Order contemplated.").  Judge Kolar's own August 11, 2022 opinion found evidence supporting sex discrimination reviewing the Seventh Circuit opinion, the 2011 Dear Colleague Letter, the investigators' conduct, and the adjudicators' behavior – which was not all such evidence.  (DE 206, pp. 18-23.)

*Sixth*, Defendants' argument is premised upon an errant due process claim dismissal ruling and that was based on the self-defamation theory rejected by Justice Barrett, hat ignored the severe consequences and  and that was one subject in the bias motion against Judge Kolar and that will not survive appellate scrutiny.   The Byler Declaration stated in pertinent part (DE 257-1 ¶¶31-34):

> 31.    The authorization to the NROTC for access to the Purdue disciplinary files was dated May 24, 2016, well after the NROTC learned of the disciplinary proceeding.  (DE183-5, John tr. 23; DE183-44.)  John Doe testified at his deposition that the Navy wanted "in the loop" (DE183-5, tr 21-22), and when John Doe was deposed by Purdue about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the NROTC, not self-defamation (which was never raised).  (DE208-1, DE208-2, tr 22-26.)

> 32.    The significance was explained by John Doe: "With Jane Roe having reported her accusation to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, I really was in no position to refuse the authorization." (DE208-1 ¶ 7.)  According to John: "Soon after Jane Roe complained to the Navy, I was put on interim leave of absence pending the university investigation.  If I had refused authorization, I would not only have looked bad, but I also would have been sanctioned in some way." (DE208-1 ¶¶ 3, 5.)  John thus had no choice but to authorize the Navy to be "in the loop" in the university disciplinary proceeding; it was not voluntary. John's case is "more like *DuPuy v. Samuels*." 928 F.3d at 662.  Purdue's authorization argument made no sense given the actual facts.. . .

> 33.    John's situation as a NROTC midshipman who was not in a position to refuse the authorization to the Navy is totally inapposite to the situation of a voluntary disclosure of a disciplinary record for a school transfer, as in *Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021), and to the situation of a voluntary disclosure of the reason for an employment discharge in *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997). Here, the obligation to disclose was not, as wrongly asserted by the Magistrate Judge, speculative. Rationalizing away the distinction between civilian and military life in this context amounts to willful blindness, which resulted in the Magistrate Judge incorrectly

treating John's authorization as voluntary and John's testimony the Navy "wanted in the loop" as not a legal obligation to authorize.  (DE221, p. 16; DE224, pp. 2-4.)

34.    Dismissing military realities as speculation, as the Magistrate Judge does, is erroneous at best.  The December 19 hearing exchanges lay bare the unreasonableness of the Magistrate Judge's opinion. . .

35.    Magistrate Judge Kolar essentially adopted Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to compel executing the authorization (DE221, p. 12).  That, however, leads to the absurd result that a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD has no due process rights.  Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.. . .

43.    . . . The August 10, 2016 PRB document showed the Board's finding was that John was suspended by Purdue and the recommendation was disenrollment of John.  (DE183-36: Aug. 10, 2016 Performance Review Board, p. 2.)

44.    The PRB document is made part of the student's file per the Navy ROD (DE208-3, section 6-13.5, pp. 6-20) and because it involved disenrollment is sent to Naval Operations per the Navy ROD section 6-13.6, p. 6-20.  Disciplinary disenrollment documents are part of his "permanent federal record" per Navy ROD (DE 208-3) section 6-16 (pp. 6-26 – 6-27):

> c. Disciplinary disenrollments become a matter of permanent federal record and may prejudice the individual for future military or civil employment.  Disciplinary disenrollments may be disqualifying for future federal security clearances that are often necessary for positions in private industry.  Disciplinary disenrollments may be prejudicial to their interests should they ever apply for a commission in the Armed Forces. . . .

## C   Defendants' Five Arguments About John's Relief Claims Are Without Merit,

### 1.   Bifurcation Should Be Denied; Navy ROTC Evidence Is Highly Relevant.

As explained in John's opposition to Defendants' bifurcation motion, there is no legal support for ordering bifurcation of liability and remedies in this case.  Further, Defendants' attempt to exclude the highly relevant evidence of the consequences of Defendants' erroneous disciplinary sanction to John's Navy ROTC position (Purdue's suspension was the one and only reason for the

disenrollment) should be rejected.  The Navy disenrolled John solely because of the university suspension that has been attacked in this case on both Title IX and due process grounds.  See discussion below, pp. 6-7.

### 2. Arguments Regarding Expungement Is For The Court Following A Jury Verdict; the Seventh Circuit Upheld John's Right To Injunctive Relief, Including Expungement.

Defendants seek to exclude evidence and argument concerning expungement.  (Df. Mem. 3.)  Again, a motion in limine is for the exclusion of evidence, not exclusion of argument.  *Van Houten-Maynard*, 1995 WL 317056, *1 ("To the extent that any ANR motion *in limine* does not address evidence, it is denied").  Here, argument concerning expungement concerning expungement of disciplinary records will be made to the Court following a jury verdict.  Defendants' argument that evidence going to expungement is a "waste of time" makes no sense because the evidence for expungement is the evidence showing the erroneous disciplinary decision resulting from sex discrimination. Judge Barrett's opinion is clear in upholding injunctive relief for the Title IX claim, 928 F.3d at 670, and that injunctive relief includes expungement, 928 F.3d at 667.

Also, Defendants should not be allowed to argue that John is out only for money damages, which is what Purdue counsel falsely asserted in oral argument to the Seventh Circuit.  Injunctive relief is critically important in this case, At oral argument, all the Seventh Circuit judges on the panel expressed belief that injunctive relief was available.

### 3. John's Supplementation Was Good; A Large Record Exists Showing The Loss of Navy ROTC and Navy Opportunity; John Has Disclosed His Employment and Educational History; Suspension Not A Subject Of Social Media and Current Employment.

Defendants cite another *Doe v. Purdue* case that was before Magistrate Judge Martin as if it were this case, saying undisclosed information and witnesses would not be permitted and then falsely asserting that John's Supplementation defied the requirement to supplement his discovery

responses and disclosures. (Df. Mem. 2-3.)  That is false.  John's Supplementation, which is provided here (Opp. Ex. C) but not in Purdue's motion to exclude papers, more than fully satisfies the obligation to supplement. A cursory examination of John's Supplementation shows it provides the requested supplementation as to damages, specific interrogatories and specific documents.

Defendants also falsely assert that John has disclosed no evidence for his claim of lost opportunity in Navy ROTC or Navy career.  That is false. A whole record was built with the Navy depositions that established the only reason for John's disenrollment, stated in the Navy documents, was the Purdue suspension.  This subject was briefed at length with record citations and quotations in John's motion for summary judgment (DE 183, Opp. Ex. D, pp. 23-28) and its supporting Statement of Material Facts (DE 183-1, pp. 23-29) and John's opposition to Defendants' motion for summary judgment (DE 187, Opp. Ex. E, pp. 24-30, 32-33) and John's supporting Statement of Facts and Genuine Dispute (DE 187-2, p. 23-29). John's Reply in further support of summary judgment on due process rejected the argument advanced by Defendants. (DE 191, Opp. Ex. F, pp. 11-14.)  John in deposition gave testimony that Purdue did the investigation upon which the Navy relied. (Opp. Ex. G, John Doe tr.194-195.)

Defendants assert that John has no record of having enrolled at Purdue or at any other educational institution since the end of 2017. John has made no claim that he did so enroll, only that he has limited financial means due to the loss of scholarships (which he has disclosed) and has suffered a difficulty in concentration (which among other things led him to seek counseling with Noel Perry), but John has testified in deposition he does intend to return to school once the distraction of this case is over.  (Opp. Ex. G, John Doe tr. 72, 166-170.)

Defendants mislead by saying there is no awareness of John's disciplinary suspension with his employers and on social media.  John produced all his social media, which shows he only used it for personal purposes (DE 155, DE 156, Opp. Ex. N), not broadcasting about what happened at

Purdue. The jobs John has been able to get have not required disclosure of the Purdue suspension, but disclosure will be required for federal or military jobs.

**4. Emotional Damages Are Not Being Sought By John, But John's Mental State Is Relevant To Post-Suspension Issues That Defendants Have Raised.**

Defendants slightly misstate *Cummings v. Premier Rehab Keller*, 596 U.S. 212 (2022) (Df. Mem. 3), which was a case brought under the Rehabilitation Act and Americans with Disabilities Act and not Title IX. The point, however, is valid that after that decision, a Title IX plaintiff may not seek emotional distress damages, as Title IX is a Spending Clause statute. John's Supplementation (Opp. Ex C), referencing John's Rule 26 Disclosures, identifies the kind of damages John seeks and the basis of their calculation; and emotional distress damages is not one kind of damages that John seeks. Since the April 2022 decision in *Cummings v. Premier Rehab Keller*, John has not been attempting to use emotional distress as a sword for damages.

What Defendants then do, however, is to engage in a *non sequitur* – to assert that also excluded should be references to John's anxiety and stress stemming from Jane's allegations, Purdue's investigation, Purdue's discipline and the impact of the distress on his education and career path. (Df. Mem. 4.) Wrong. There is nothing in *Cummings v. Premier Rehab Keller* that supports that result, and John has testified about his mental state as a **shield** in explaining the actions he took because Purdue called into question how he did at Purdue (the disciplinary proceeding negatively impacted his academic performance which was still above passing) and what John then did during post-suspension as to employment and education. (Opp. Ex. G, John Doe tr. 41-43, 71-73, 191-192; Opp. Ex. H: Perry Dep.; Opp. Ex. P: Plaintiff John Doe's Father Dep.; Opp. Ex. O: Plaintiff John Doe's Mother Dep.) Purdue has focused on post-suspension events; the Pre-Trial Order reflects, for example, Purdue's intention to call Taylor University witnesses about entirely post-suspension events. It is entirely improper to cut off John, his parents and Noel Perry from

8

telling the truth about such matters. In this connection, Defendants have referred to a Navy investigation, but the Navy did not conduct an investigation; rather, according to Commander Hutton, the Navy referred the matter to Purdue for investigation and the Navy exclusively relied on the Purdue investigation. (Opp, Ex. I, Hutton tr. 14, 27, 49-50, 71-73.)

Defendants raise a red herring when saying John is not equipped to give a clinical diagnosis. (Df. Mem. 4.) What Purdue calls John's self-diagnosis is his factual testimony about his mental state in response to questions posed by Purdue. While Purdue asserts that it anticipates John will testify about his mental state when questioned about his post-suspension employment and educational history, such testimony would be given in response to Purdue posing the questions, thereby opening the door; that testimony is not about side-stepping anything. Furthermore, Noel Perry gives testimony as a trained counsellor about John's mental state. (Opp. Ex. H: Perry Dep.) Exclusion of testimony about John's mental state is not proper.

### 5. John Seeks "Compensatory Damages", Not "Consequential Damages."

Defendants seek to exclude what they call "alleged consequential damages." (Dfs. Mem 8-11.) Defendants premise its argument on a misreading of *Cummings v. Premier Rehab Keller*, 596 U.S. 212, which disallowed punitive and emotional distress damages in a case brought under the Rehabilitation Act and Americans with Disabilities Act. There are two defects at the outset to Defendants' argument. *First*, Defendants misread *Cummings* to disallow not just punitive damages but also "consequential damages." What John seeks in lost wages and benefits are "compensatory damages," which are damages sufficient in amount to indemnify injured person for loss suffered. *Desmond v. PNGI Charles Town Gaming LLC*, 630 F.3d 351 (4th Cir. 2011); *Vukadinovich v. Hanover Community School Corporation,* 2016 WL 5939517 (N.D. Ind. Oct 12, 2016)(Simon, J.)(compensatory damages not limited to actual loss of money). This is in contrast to "consequential damages," which are generally defined as damages which arise from special circumstances that

9

make them probable, although they would be unusual apart from such circumstances. *In re General Motors LLC Ignition Switch Litigation,* 257 F.Supp.3d 372 (S.D.N.Y. 2017). Defendants argue that Title IX is limited to the usual forms of relief for breaching a legally enforceable contract, but that includes consequential damages. *Second*, Defendants are mistreating John's "compensatory damages," which satisfy the Williston definition of contractual damages, as "consequential damages" in order to assert that *Cummings*, as misread by Defendants, bars John's damages.

Defendants assert John has contended that he is entitled to an award of consequential damages (Dfs. Mem 9), but cites no document in which John has made such a contention. Instead, Defendants reel off a series of hypotheticals that bear little relation to reality. Defendants ask what if John had returned to Purdue following the suspension, but do so without considering that John was on a Navy scholarship and that he could not financially afford Purdue having lost the scholarship and his ROTC position solely as a result of the Purdue disciplinary suspension. Defendants question John's not pursuing a Navy career, disregarding the suspension and the Navy disenrollment documentation that stated John would not be recommended for any further ROTC participation. Defendants ask what if John enlisted in the Navy, ignoring that unlike an enlistee, an ROTC graduates as a commissioned officer. Defendants ask what if John had completed his coursework at another school as if it were an appropriate response of the university (which it is not) to speculate about John just going away. What these hypotheticals reflect is Purdue's effort to evade responsibility for its discriminatory behavior, not John's embrace of consequential damages.

The unofficially reported case law cited by Defendants is inapposite. In *Doe v. Trs. Of Dartmouth College*, __F.Supp.3d __, 2023 WL 687937, 2023 U.S. Dist. LEXIS 186793 (D.N. H. Oct. 18, 2023), it was irrelevant what plaintiff would have earned as a cardiologist when the record showed that plaintiff intended to be a primary care physician. In *Van Houten-Maynard v, ANR Pipeline*, 1995 WL 317056, a wrongful death suit, the defendant ANR made a series of motions *in*

*limine,* a number were denied;, but the Court granted one because absent the fatal accident, the deceased would have secured other employment.

Ironically, given the irrelevant hypotheticals posed and the inapposite case law cited, Defendants argue that John has failed to disclose facts to show a nexus to future outcomes. That is not true. The nexus is the disenrollment from Navy as a result of the university suspension; and as discussed above, John has properly provided supplementation.

**D.**    **Purdue Again Shows Its Rejection Of The Seventh Circuit Opinion: Purdue Wrongly Seeks Banning Mentioning The Seventh Circuit Opinion and The Procedural History Except For Spoliation (Which Is What Should Not Be Mentioned).**

In a request that reflects Defendants' continuing rejection of the Seventh Circuit opinion by Justice Barrett in this case and Defendants' knowledge that the procedural history of the case before this Court does not reflect well on Purdue, Defendants seek to ban mentioning the Seventh Circuit opinion and the procedural history of the case before this Court except for spoliation. (Df. Mem. 9-10.) A motion in limine, however, is for exclusion of evidence, not for restricting argument. *Houten-Maynard*, 1995 WL 317056, * 1 ("To the extent that any ANR motion *in limine* does not address evidence, it is denied").

It is particularly not appropriate for a District Court to ban mentioning the governing U.S. Court of Appeals opinion in the case. Defendants do disrespect the Seventh Circuit for its opinion in this case, but that is not something to which the Court should give expression. Nor does banning mentioning the procedural history of the case make any sense when it is not known how the subject would arise. Purdue's desire to escape the consequences of its scorched earth litigation excesses is not something to which the Court should give countenance. In response to Purdue's questions about his post-suspension plans, John may have to say that this case has taken longer than expected. In response to Purdue's questions about any purported failure to do discovery or in response to any spoliation, John may have to say that he produced all of the documents he had about the events of

11

the case and answered three sets of interrogatories, produced all of his Instagram posts and produced the 75 Snapchat videos and pictures he had.

If anything should be banned, it is the subject of spoliation. Judge Kolar never finalized his mistaken decision with an award to Defendants of attorneys' fees from John, and so now is the appropriate time to revisit the subject. The spoliation ruling was one subject in the bias motion against Judge Kolar. The Byler Declaration stated in pertinent part (DE 257-1 ¶¶16-21):

> 16. Purdue engaged aggressively in extensive discovery. Among other things, nineteen depositions were taken, including Navy personnel (establishing that the Navy relied upon the university investigation and the only basis for the disenrollment was the university suspension, DE 183-1), including John Doe's parents (establishing John Doe came from a loving home where he had two brothers and three sisters) and including (by Court Order) John's post-suspension mental health counsellor as to whom the Magistrate Judge Kolar said HIPPA did not apply (DE143) but whose testimony showed the emotional travail the Plaintiff' experienced as a result of the suspension based on false accusations and the consequent loss of his Navy ROTC position (DE187-18). Magistrate Judge Kolar, however, granted Purdue's motion for a protective order and did not allow Plaintiff to depose named Defendant President Daniels. (DE 73.)

> 17. Counsel for Plaintiff John Doe took depositions of the principal Purdue personnel (Sermersheim, Rollock, investigators, CARE Director Bloom), focusing on establishing the allegations of the Complaint using the documents relied upon in drafting the Complaint, and a 30(b)(6) deposition to identify the location of disciplinary files.

> 18. In response to Purdue's demands, Plaintiff John Doe personally produced all of the documents he had about the events of the case (including 133 pages of text message between Jane Doe and him), gave cell phone information and ten separate medical authorizations, answered three sets of interrogatories and gave a day-long deposition. In response to Purdue's demand for all of John's post-suspension social media posts, John produced all of his Instagram posts and produced the 75 Snapchat videos and pictures he had. (DE152, DE156; DE175.) Purdue had the Instagram and Snapchat production at the time of taking John's deposition but never marked any as deposition exhibits and never asked John any questions about them.

> 19. In the backdrop of Plaintiff factually building his due process and Title IX case, Purdue moved for sanctions against Plaintiff John Doe, making a plethora of inaccurate accusations about discovery and seeking (again) the due process claim be struck. (DE 148.) John Doe opposed, showing his compliance with discovery. (DE 152, DE 152-1, DE 152-2.) On February 22, 2021, the Court held a multi-hour evidentiary hearing on Purdue's motion. (DE 155.) John Doe testified under oath how 11 Snapchat documents were accidentally deleted when John cleared memory from

12

his cell phone without realizing deletion from his cell phone would affect his Snapchat account and that the deleted documents were more of the same of what was produced (DE156; Snapchat Memories received in evidence, A32-35; DE155). The Snapchat documents and indeed, all his social media were irrelevant, spanning years after the 2016 events at Purdue and relating only to personal matters (e.g., one of John's sisters playing piano).  Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001).

     20     On July 2, 2021, Magistrate Judge Kolar ruled there was spoliation, granting relief albeit different than requested because striking the due process claim was said to be disproportionate (but which Purdue sought because the record had established the due process claim).  The Magistrate Judge showed a lack of impartiality by strangely ignoring all the discovery Plaintiff John Doe complied with and focused on what little Plaintiff John Doe did not have.  The Magistrate Judge acknowledged "there is nothing in the record to indicate whether the files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not inconceivable" the 11 Snapchat personal posts might be potentially relevant to John Doe's desired Navy career without giving an explanation how it was conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing showed it wasn't (*see* A33-35 in Mandamus Appendix). The Magistrate Judge unjustly lambasted John Doe for the deletion, ordered payment of Purdue's attorney fees (which were claimed to be $30,000 and which would wrongly burden John Doe's effort to vindicate his due process and Title IX rights), and outlined jury instructions regarding what were totally irrelevant documents. (DE168.) However, adverse inference instructions require intentional destruction and relevance.  *Crabtree v. Nat'l Steel Corp.,* 261 F.3d at 721; *Keller v. United States,* 58 F.3d 1194 (7th Cir.1995) (collecting cases).  Such adverse jury instructions, although erroneously given, would wrongly impact John Doe at trial and further wrongly burden John Doe's effort to vindicate his due process and Title IX rights.  At a July 5, 2023 teleconference involving the transfer of responsibilities for Plaintiff's representation, the Magistrate Judge *sua sponte* brought up the spoliation sanction, even though it was irrelevant to to the teleconference and at that point it was clear the spoliation ruling was in error, as it concerned totally irrelevant post-suspension Snapchat memories.  The point appeared to be that the Magistrate Judge was quite prepared to do Purdue a favor and order Plaintiff to pay Purdue an amount that wrongly burden John Doe's effort to vindicate his due process and Title IX rights.

     21.As noted, John produced all of the documents he had about the events of the case (including 133 pages of text message between Jane Doe and him), gave cell phone information and ten separate medical authorizations, and answered three sets of interrogatories.  In response to Defendants' demand for all of John's post-suspension social media posts, John produced all of his Instagram posts and produced 75 Snapchat videos and pictures he had.  (DE152, DE156; DE175.) Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001). That did not happen here.

Defendants had the Instagram and Snapchat production at the time of taking John's deposition but never marked any as deposition exhibits and never asked John any questions about them. Defendants never used any of John's social media in the summary judgment papers. The whole spoliation argument strangely ignored all the discovery John complied with and focused on what little John did not have (11 Snapchat pictures out of 86). This Court acknowledged "there is nothing in the record to indicate whether the [deleted] files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not inconceivable" the 11 Snapchat personal posts might be potentially relevant to John's desired Navy career without giving an explanation how it was at all conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing in the spoliation hearing record showed it wasn't (Opp. Ex. N).

**E.      Statements In The Press and Opinions of Non-Parties Reflect The Public Interest In The Case and Criticism of Purdue's Position.**

Defendants seek exclusion of statements in the press and opinions of non-parties (Df. Mem. 10) in a request that reflects Purdue's awareness that there has been press coverage of the case and that Purdue's position has been criticized. When the *Doe v. Purdue* ruling of the Seventh Circuit was issued, there was reporting on it. M. Odendahl, "Purdue Ruling First In Flood Of Campus Sex Assault Appeals," *The Indiana Lawyer*, July 24, 2019. When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention. Defending Judge Barrett's opinion in the Wall Street Journal was noted Title IX commentator K.C. Johnson, "Sex, Due Process and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020. Purdue's response, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020, received a uniformly negative response from on-line comments.

There is nothing that John's counsel has said or done that would indicate John's counsel intends to try to put in evidence opinions of non-parties stated in the press (which excludes the qualified expert opinions of Dr. Barden and Dr. Smith). No such press statements and opinions published in the press are listed by John in the Pre-Trial Order. John's counsel is more concerned that Purdue's admissions in its Answer to the Second Amended Complaint are properly put in evidence.

14

**F.**      **The Sexual Relationship That John and Jane Had Initiated By Jane Is Part Of**
<u>**The Facts of The Case and That Investigators Ignored It Points To Investigator Bias.**</u>

Purdue tries to obfuscate by purporting to seek to exclude "Jane's sexual history" (Df. Mem.

16) when what Purdue seeks to exclude is part of the case that for months John and Jane had a

sexual relationship, which was initiated by Jane and which was the first in John's life (but not

Jane's), that their having a lengthy sexual relationship provided context to the accusations made in

April 2016 by Jane, and that the Purdue investigators in ignoring that sexual relationship showed

bias. John testified to the facts of that sexual relationship in a declaration that was part of the

summary judgment record:

> 3.      Both Jane Doe and I were freshmen in the Purdue Navy ROTC
> program. In mid- August 2015, we both arrived at Purdue. It was early September
> that at Jane Doe's initiation, she and I became interested in each other and started
> to spend time together, going to restaurants in town, walking around campus, and
> spending time in her room.  I did not have a girlfriend prior to college, and so Jane
> Doe was my first girlfriend.
>
> 4.      About 1 month after Jane Doe and I first began to spend time
> together, we started having sexual intercourse.  The first time, which happened in
> early October 2015, was in Jane Doe's single room in Wiley Hall.  Before that
> night, I was a virgin.  Jane Doe was the aggressor.  She engaged me in flirty and
> suggestive conversation with sexual overtones and was touchy to arouse my sexual
> desires.  Jane Doe led the way by taking off her clothes and helping me take off my
> clothes.
>
> 5.      Jane Doe and I had a sexual relationship from the early October to
> early December 2015. In that time period, we had sexual intercourse about 15-20
> times; several of those times, Jane Doe, at her initiation, performed fellatio on me.
> Aside from fellatio, our sexual relationship was vanilla and intimate. I had no
> interest in engaging in deviant sexual acts. All but one of those times having sexual
> intercourse occurred in Jane Doe's room, with the one exception taking place in my
> room in Tarkington Hall during the day when nobody was around. About 15-20
> times I stayed the night in her room. Jane Doe was almost always the one who
> initiated having sex.
>
> 6.      During the course of our relationship, Jane Doe told me that she had
> multiple sexual partners before college, and claimed to have a personal history of
> rape and suicide attempts. On multiple occasions during our relationship, she
> would, without me, go out to fraternity parties and get severely drunk, later
> returning to her room and inviting me over, only to spend the whole night vomiting

into a toilet while I took care of her. I never had sexual interactions with Jane Doe while she was under the influence of alcohol, and I never drank alcohol myself while underage, nor have I ever had more than two drinks in a night while of age. . . .

(Opp. Ex. T: DE 183-8, pp. 2-3.)

The Purdue investigators ignored the John-Jane consensual sexual relationship, which cast doubt on Jane's accusations of sexual assault and which points to investigator bias. Recognizing the John-Jane consensual sexual relationship and how it came about (i) undercuts Jane's two accusations of sexual molestation, as she was placing them in time when the two had consensual sexual intercourse, (ii) provides context that helps explain the John-Jane texts, and (iii) runs contrary to a notion that males alone are the predators and assaulters. Purdue objects that John's statements are hearsay, but John has given percipient testimony about his personal experience with Jane.

Purdue objects that Jane is not a party, and her statements are not party admissions. But her actions undercut Purdue's case, and Jane, unlike John, has never testified under oath.

Purdue invokes Federal Rule of Evidence 412(a), but that Rule does not render inadmissible John's account of what Jane told John about her sexual history. The objected to evidence is being offered to help discredit Jane's allegations about two instances of sexual molestation and show investigator bias in failing to address that John and Jane were engaged in a consensual sexual relationship. John's account is not the subject of Federal Rule of Evidence 412(a). Case law fully supports the admission of the objected to evidence. In *Warren v. Prejean*, 301 F.3d 893, 906 (8th Cir. 2002), the Eighth Circuit stated:

Warren's testimony about Westerman's statements concerning his own sexual history and preferences is not "other sexual behavior" excluded by Rule 412. By its introduction, Warren merely attempted to discredit Westerman's claims that Warren had sexually harassed him. This evidence dealt only with the relationship between Warren and Westerman and no "other" sexual behavior.

16

301 F.3d at 906.   In *McCleland v. Montgomery Ward & Co.*, 1995 WL 571324, at *4 (N.D. Ill. Sept. 25, 1995), the District Court stated:

> Rule 412 limits disclosure of a victim's sexual behavior or sexual predisposition. Rule 412 is inapplicable here because Montgomery Ward does not proffer plaintiffs' childhood abuse to prove sexual behavior or predisposition. Even if Rule 412 were applicable, Montgomery Ward shows that the evidence's probative value substantially outweighs danger of harm or unfair prejudice.

In *Park v. Secolsky*, 787 F. App'x 900, 906 (7th Cir. 2019), the Seventh Circuit stated:

> Park also argues that the district court erred by allowing the Board of Trustees' counsel to question her at trial about her medical records in which she revealed to her doctor that she had a "new partner." Although the court previously had granted Park's motion in limine to exclude evidence of her sexual predisposition, *see* Fed. R. Evid. 412(a), the court allowed the Board at trial to challenge Park's credibility through questioning about her partner. . . . The records were not impermissibly used to "prove that [Park] engaged in other sexual behavior." Fed. R. Evid. 412(a).

Purdue's objection that the sexual relationship has nothing to do with the issue for the jury is just wrong.  The issue before the jury is whether Purdue engaged in sex discrimination, the John-Jane sexual relationship undercut Jane's allegations and the investigator failure to recognize that relationship showed bias, and such investigator bias is potent proof that Purdue did discriminate against John on the basis of sex.

**G.**     **Jane's Mental Health, Because of Her Suicide Attempt, Is**
       <u>**Part Of The Facts of The Case and Points To Investigator Bias.**</u>

In a request that reflects Purdue's knowledge that Jane's suicide attempt timing undercuts her claim of sexual assault, Purdue seeks to exclude the subject of Jane's mental health, asserting that John's percipient testimony is inadmissible because there is no corroboration. (Df. Mem. 16-17.) Not true. John filed a report with Purdue that is part of the discovery record in this case.  (Opp. Ex. U, Sermersheim Dep. Ex. 33; Opp. Ex. V: Sermersheim Dep. tr 12-14.)   John gave testimony under oath about Jane's suicide attempt:

17

8.      On December 13, 2015, I was contacted by Jane Doe. She was in her room in Wiley Hall, and requested that I meet her there. Upon arrival, I immediately saw that her room was in a severe state of disarray. She was quite agitated, railing against her parents and her uncertainty and unhappiness towards her life, and throwing her belongings against the walls. After I consoled her and she had calmed down, she asked to go out for a walk. I accompanied her, and she led us directly to the parking garage diagonally across the street from the armory. Jane Doe led us up to the top floor of the parking garage, and by this point her odd behavior began to give me cause for concern. She then proceeded to try and throw herself off the ledge of the parking garage, all the while trying to convince me to let her do so. This went on for approximately 45 minutes. At one point she had managed to swing her legs over the ledge, and she tried to break free from my grip and jump over the side. The experience upset me, and right after her outburst subsided, she behaved as though nothing of importance had happened. She then proceeded to ask me inquisitively why it was that I was emotionally upset afterwards. She spent the 10-minute walk back to the dorms skipping and singing. From that point forward in our relationship, she implicitly established new physical touching boundaries and enforced them inconsistently. This contrasted sharply with her prior behavior over the previous three months. Jane Doe's personality and our relationship changed following her suicide attempt, although she would behave as though nothing was out of the ordinary. She would also refuse to provide me any explanation as to these changes, only expressing negativity towards me.

9.      The investigators, by downplaying Jane Doe's suicide attempt, lose sight of the context of the texts discussed below. Investigator Jacob Amberger wrote in his investigation notes "maybe suicide attempt in December" in response to my direct statement that she did undoubtedly try to kill herself. The investigation report mitigated this further in stating "[Jane Doe] made statements to him that led him to believe that [she] was considering suicide. He reported that he was concerned about [Jane Doe] so a few days after the statements were made, he invited [Jane Doe] to his residence hall room to watch a movie". These statements underplay the real concerns I had as a result of Jane Doe's suicide attempt.

(Opp. Ex. T: DE 183-8, pp. 3-4.)

John then explains Jane's suicide attempt was the backdrop of her behavior a few nights later when Jane stayed overnight in John's room with John's roommate present.

10.      Several nights after the events of December 13, 2015, Jane Doe did stay in my room with me and my roommate Elvin. As I was still seriously concerned for her well-being, I insisted Jane Doe stay in my room for the night after asking my roommate for his permission that she do so. Jane Doe slept on the couch. I slept on the floor with my head leaning against the couch. My roommate was in his bed. After I woke up in the morning, I reached behind me out of concern for Jane Doe, to be reassuring. Sex was not even a thought I had, especially with the recent events on my mind and my roommate in the room. All that was going

through my head was getting her through finals week in one piece and doing whatever I could to prevent her from trying to take her own life again. I considered reporting her suicide attempt then, but decided that doing so would likely cost Jane Doe her Navy career, which I believed would most definitely destabilize her mind further. I touched her on her knee (but nothing more), which woke her up, at which time Jane Doe left to return to her dorm, seemingly upset. She later told me that touching her then was not okay, but would not elaborate.

(Opp. Ex. T: DE 183-8, pp. 4-5.)  John in deposition gave extensive testimony explaining how the suicide report in February 2016 related to the false accusation of sexual assault which supposedly occurred in December 2015 but which was only made during Sexual Assault Awareness Month in April 2016, that the John-Jane texts showed there was not a sexual assault when considered in context and without sex bias, that the suicide attempt ended the sexual relationship and that Jane was upset with John for having reported the suicide attempt. (Opp. Ex. G, John Doe tr. 104-105, 113-124.)

John further explained in testimony about how the Purdue investigation showed sex bias in ignoring the facts of the John-Jane sexual relationship and Jane's suicide attempt in favor of a distortion of the John-Jane texts:

12.    Jane Doe never accused me in person or via text of what she accused me in the Purdue sexual misconduct proceeding that she initiated in April 2016, four months later.

13.    I provided to the Purdue investigators everything I could think of that was relevant to the false accusations leveled against me, including an extensive list of character references,  explanations countering all of Jane Doe's false statements, an explanation of her mental instability, suicide attempt, my reporting of that suicide attempt, a certificate from a suicide prevention course that I attended shortly after reporting the suicide attempt, and all of the text history I had between Jane Doe and I, which amounted to 134 pages. I also took the initiative and offered them contextual explanations for any texts that I thought looked ambiguous in regards to the short note of allegations that I had received. I took every measure of transparency and thoroughness I could think of, expecting to receive fair treatment from an unbiased investigation. I provided all these to Purdue's investigators at the time of my interview in late April 2016, believing that the amount and content of the information I provided would surely clear my name.

14.      The texts that I voluntarily provided to the Purdue investigators covered the period December 23, 2015 to March 15, 2016, with the majority of the texts dated from December 23, 2015 to January 28, 2016. This stream of communication between Jane Doe and I showed an ongoing intense personal relationship between us from mid-December 2015 well into January 2016, with amicable communications well into February. The Purdue investigators never questioned me regarding the contents of the texts after I provided them, yet took the time to arrange a *second* interview with Jane Doe, at the suggestion of Monica Bloom, in order to review the texts and hear her interpretation of them. For reference, Monica Bloom was the CARE sexual assault center Director at Purdue University, with a professional background as a lawyer.

15.      None of the 134 pages of text messages referred to what Jane Doe would accuse me of in April 2016. Our texts reflected the fact that Jane Doe and I did have a deeply personal relationship developed in part through sexual intercourse, and that Jane Doe was enforcing new physical boundaries between us. While doing this, our relationship was still intimate enough that she sent my family Christmas cookies, and we messaged one another frequently. These texts also reflected Jane Doe's difficult relationship with her mother and family, a fact she used at times to answer my questions to her about being unhappy, and also a fact that motivated her unfair behavior towards me. I became more apologetic towards Jane Doe the more she directed negativity towards me; her constant barrages eventually made me believe that I was in part somehow responsible for all her misfortune. Apologizing to placate Jane Doe was part of how I dealt with her tumultuous emotions throughout the relationship, even more so in the wake of her suicide attempt.

16.      It was only after the disciplinary proceeding was over was I able to review the investigation report. Out of the 134 pages of texts I voluntarily provided the Purdue investigation, the investigators attached only short portions of texts from December 23, 2015, December 28, 2015, and January 14, 2016. The Purdue investigators ignored their respective contexts, and came to the conclusion that my explanations for them were "uncomfortable, awkward, and unconfident", which as discussed below was not true. The investigators wrote what they did despite never asking me about anything, including my or their interpretation of these texts, and after talking to Jane Doe a 2nd time about their interpretation of the texts. The Purdue legal defense followed suit in this same approach on August 18, 2020, focusing on isolated slices of texts as evidence without considering the respective context and questioning me as if the Purdue investigators' misinterpretation of the texts was correct, which it was not. I did my best to provide context from memory in my testimony, seeing as the context completely changed the understanding from what they wanted the texts to infer.

(Opp. Ex. T: DE 183-8, pp. 5-7.)

Purdue's mistaken attempt to say Jane's credibility is not marred by the suicide attempt misses the larger point. The Purdue investigators gave short shrift to Jane Doe's suicide attempt (Opp. Ex. W: Oliver Dep. tr. 24, 27, 49; Opp. Ex. X: Amberger Dep. tr 25-26, 67, 88), even though it provided context to the John-Jane texts and called into question Jane's accusations, because the Purdue investigators were intent upon misreading the texts to support finding John responsible. That the Purdue investigators gave short shrift to Jane Doe's suicide attempt supports a finding that the investigators were sex biased in reporting John was responsible for sexual assault.

**H.    John's Religious Upbringing Is Part Of The Facts of The Case and Helps Explain The John-Jane Texts.**

In a request that reflects Purdue's knowledge that John's upbring in a conservative Christian home helps explain the John-Jane texts, Purdue seeks to exclude John's religious upbring, saying it is sensitive subject. (Df. Mem. 17-18.) Sensitive or not, John's religious upbringing is part of the facts of the case and helps explain the John-Jane texts. John testified:

> 2. My upbringing was in a conservative Evangelical Protestant home with brothers, sisters, a mother, and a father. In high school, I did not have the opportunity to engage in any sexual activity, and I was raised of the mind that I shouldn't engage in sex before marriage. Sex before marriage was a violation of both my religious obligations and the values my parents instilled in me. . . .
> 6. Given my conservative Christian upbringing, I had conflicting feelings about the relationship [with Jane].

(Opp. Ex. T: DE 183-8, pp. 1, 3.) John's upbringing helps explain the John-Jane texts about which John testifies; John felt guilty about having a sexual relationship outside of marriage with Jane, not about any sexual assault of Jane (which did not occur). (Opp. Ex. S: DE 183-8, pp. 16-23.)

**I.    The Impact On John's Family and Friends Is A Fair Subject For Testimony.**

In a request that reflects Defendants' knowledge that John's suspension adversely affected John's family and friends and that such adverse effect gives an understandable human dimension to the case, Purdue seeks its exclusion from trial. (Df. Mem. 11-12.) Purdue's rationale is that the impact of John's suspension on family and friends is not probative of gender bias. That, however,

misses the point of such evidence. The impact of John's suspension on is family and friends is relevant to reputational damages and the post-suspension events upon which Purdue focuses. It is not proper to allow Purdue to attack John over post-suspension educational and employment history but to disallow evidence as to how the suspension affected John's family and friends.

Purdue deposed John's parents and John's roommate; Purdue learned the strength of their testimony. John's mother testified John went from being a straight-A enthusiastic student playing soccer in high school to being depressed, unable to focus and concentrate, worrying about what happened at Purdue to John's parents taking him to counseling because John didn't want to talk to anybody about anything. (Opp. Ex. O, tr. 44-46, 74-75, 94-101.) John's father testified that John went from being a straight-A student and involved in athletics in high school to being traumatized by being suspended at Purdue, losing his scholarships and not being able to get back in ROTC and as a result, apprehensive around his family, struggling emotionally and depressed at Taylor. (Opp. Ex. P, tr. 23, 31-32, 37, 40-41, 65-66.) John's roommate testified that post-suspension, the subject of what happened at Purdue changed John's mood and John lost energy. (Opp. Ex. Q, tr. 136-137, 140-141.)

**J.    Purdue Seeks To Insulate Purdue's Objections To John's Discovery
While Falsely Claiming Spoliation Over 11 Irrelevant Snapchat Pictures.**

Purdue, perhaps with a guilty conscience, has "unclean hands" in seeking to ban reference to Purdue's objections to John's discovery. Purdue defends its objections to discovery on the ground of the Federal Rules of Evidence 401-403 without identifying what those objections were and asserts that such objections would be misunderstood by a lay jury, citing a 14-year old case from the Southern District of Indiana, *McQuiston v. Helms*, 2009 WL 554101, at *12 (S.D. Ind. Mar. 4, 2009). (Df. Mem. 15-16.) There, in a negligence case, the District Court summarily granted four groups of requests for exclusion, including objections to discovery, but did not face the

situation present in this case where Purdue at the same time wants to claim spoliation over 11 irrelevant Snapchat pictures.

**K.     Exclusion Of Reference To Purdue's Liability Insurance Means Purdue Cannot Argue That A Damage Award Would Take Money Away From Education.**

In a request that reflects Purdue's concern about damage liability, Purdue seeks to exclude reference to Purdue's liability insurance.  (Df. Mem. 14.)   John's counsel does not plan on mentioning Purdue's liability insurance unless Purdue were to argue that a money damage award would take money away from education, which given the liability insurance, it would not.

**L.     Purdue Seeks To Ban "Offer of Judgment" and Settlement Discussions But Cannot Then Claim John Wants Only Money.**

Purdue seeks to exclude mentioning Purdue's so-called "Offer of Judgment" and settlement discussions.  (Df. Mem. 18.)   As for the "Offer of Judgment," John's counsel does not plan on mentioning it, as it was perceived as not a bona fide offer and did not include any injunctive-type relief, even of the kind discussed in the settlement conference.  As for settlement discussions, they focused on injunctive-type relief. As noted above, what the Court should do is not allow Purdue to argue that John is out only for money damages, which is what Purdue counsel falsely asserted in oral argument to the Seventh Circuit.  Injunctive relief is critically important in this case. Judge Barrett's opinion is clear in upholding injunctive relief for the Title IX claim, 928 F.3d at 670, and that injunctive relief includes expungement, 928 F.3d at 667.  If Purdue argues that John is out only for money damages, the settlement discussions dispositively disprove that.

**M.      Purdue's "Golden Rule" Objection Is Not For A Motion *In Limine*.**

Purdue asks that John be precluded from making what Purdue calls a "Golden Rule" appeal – asking the jury to put itself in Plaintiff's position.  (Df. Mem. 8-9.)  This preclusion request is not the stuff of a motion *in limine*.  *Van Houten-Maynard*, 1995 WL 317056, *1 ("To the extent that any ANR motion *in limine* does not address evidence, it is denied"). Defendants' request is peculiar

23

because John's counsel has never said that he would make a request that members of the jury put themselves in John's position. John's counsel sees the task as persuading the jury of Purdue's violation of Title IX; at the same time, the facts do make for sympathy for John.

**N.      Argument About Sending A Message Is Not For A Motion *In Limine*.**

In a request that reflects Purdue's unease about being perceived accurately as a bad actor in this case, Purdue seeks to exclude argument to the jury about sending a message to Purdue. (Dfs. Mem. 10-11.) Again, a motion in limine is for the exclusion of evidence, not exclusion of argument. *Van Houten-Maynard*, 1995 WL 317056, *1 ("To the extent that any ANR motion *in limine* does not address evidence, it is denied"). Purdue's behavior has been most unwise and not what we want to see major institutions engage in.

**O.      Purdue's Request To Ban Argument and Evidence Regarding Purdue's Other Title IX Cases Means Purdue Cannot Argue That This Case Is Abnormal For Purdue.**

Defendants request banning argument and evidence regarding Purdue's other Title IX cases. (Df. Mem. 14.) John's counsel does not plan on citing other Title IX cases at Purdue unless Purdue claims that it is inappropriate to award damages and that this case is abnormal for Purdue; damages were ruled appropriate in *Mary Doe and Jane Roe v. Purdue*, 4: 18-cv-89, DE 188 (N.D. Ind.). Yet again, a motion in limine is for the exclusion of evidence, not exclusion of argument. *Van Houten-Maynard*, 1995 WL 317056, *1 (To the extent that any ANR motion *in limine* does not address evidence, it is denied").

**P.      Defendants Seek To Ban Evidence and Contentions About The History, Purpose or Intent of Title IX But Purdue's Proposed Jury Instruction No. 14 on Title IX Does Not Include Instruction on the History, Purpose or Intent of Title IX Question.**

Defendants seek to ban evidence and contentions about the history, purpose or intent of Title IX, citing two wholly inapposite railroad employee cases arising under the Federal Employers' Liability Act, *Stillman v. Norfolk & Western Railway Company*, 811 F.2d 834 (4th Cir. 1987), and

24

*Taylor v. Union Pacific R.R. Co.*, 2010 WL 5343295 (S.D. Ill. Dec. 21, 2010) (Df. Mem. 15), which were not Title IX cases.   Again, a motion in limine is for the exclusion of evidence, not exclusion of argument.  *Van Houten-Maynard*, 1995 WL 317056, *1 (To the extent that any ANR motion *in limine* does not address evidence, it is denied").  Purdue's requested exclusion must assume the Court instructs the jury on the law.  But Purdue's Proposed Jury Instruction No. 14 (DE 238, pp. 16-17) does not instruct the jury on the history, purpose or intent of Title IX; and Purdue's Proposed Jury Instruction Nos. 15-16 (DE 238, pp. 20-21) are intended to make Purdue's disciplinary process immune from Title IX challenge by a male university respondent/federal court plaintiff contrary to the text of Title IX (which is a non-discrimination statute) and contrary to Title IX as applied by the Seventh Circuit in *Doe v. Purdue*.  Plaintiff's Proposed Jury Instruction No. 14 does instruct the jury on the dispositive Title IX question: "The question is do the facts that you find show that the university discriminated against Plaintiff John Doe on the basis of sex?" (DE 238, pp. 18-19.)  The Court may choose to improve the Jury Instruction to discuss Title IX's history, purpose and intent.

<u>**CONCLUSION**</u>

For the reasons stated above, Defendants' motion *in limine* should be denied.

**Dated:  July 26, 2024**                    **Respectfully submitted,**
                                             **LAW OFFICES OF PHILIP A. BYLER**
                                             **By: /s/** *Philip A. Byler*
                                             **Philip A. Byler, Esq.**
                                             **11 Broadview Drive**
                                             **Huntington, New York 11743**
                                             **(631) 848-5175**
                                             **pbyler1976@gmail.com**
                                             *Attorneys for Plaintiff John Doe*

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that this document was served upon the attorneys of record for each party to the above-entitled cause at the address shown below on July 26. 2024:

William P. Kealey, Esq.
James Olds, Esq.
Scotty Teal, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900
P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com

*Attorneys for Defendants*

BY: ECF    ☐:    U.S. Mail    Federal Express

    ☐ Hand-Delivery    x    <u>Other: ECF</u>

        _____*Philip A. Byler, Esq.*_____
        Philip A. Byler, Esq.

26