**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| **JOHN DOE,** | ) | |
| | ) | **CIVIL ACTION** |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| **PURDUE UNIVERSITY, PURDUE UNIVERSITY** | ) | |
| **BOARD OF TRUSTEES, MITCHELL ELIAS** | ) | |
| **DANIELS, JR.**, in his official capacity as President of | ) | |
| Purdue University, **ALYSA CHRISTMAS ROLLOCK**, | ) | No. 2:17-cv-33-GSL |
| in her official capacity at Purdue University, **KATHERINE** | ) | |
| **SERMERSHEIM**, in her official capacity at Purdue University, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF JOHN DOE'S BRIEF**
**TO REINSTATE HIS DUE PROCESS CLAIM**

**Philip A. Byler, Esq.**
**LAW OFFICES OF PHILIP A. BYLER**
**11 Broadview Drive**
**Huntington, New York 11743**
**(631) 848-45175**
pbyler1976@gmail.com
*Attorneys for Plaintiff John Doe*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES…………………………………………………………....…iii

INTRODUCTION………………………………………………………………...…1

ARGUMENT………………………………………………………………………...…2

I.  The Practical Sensibility and Judicial Economy of Trying
The Due Process Claim With The Title IX Claim…………………………………………2

II.  The Allowance of This Motion Under The Law of the Case Doctrine……………………3

III.  Correcting The Error of Dismissing the Due Process Claim………………………………6

A.  Judge (Now Justice/) Barrett's Original Ruling on Stigma-Plus Liberty Interest……6

B.  The National Importance of Judge (Now Justice) Barrett's Due Process Opinion ….8

C.  Discovery Supported John's Stima-Plus Interest: The Navy Knew
About The Disciplinary Proceeding Before The Authorization and
Was Looking To Purdue's Investigation………………………………….…….…10

D.  Per Justice Barrett's Opinion , John Was Required and Legally
Obligated To Authorize Disclosure To The Navy ………..……………….…..……11

E.  The Navy ROD Made John's Disclosure Obligation Indisputable…………………12

1.  Navy Regulation Compelling Giving Authorization…………………………13

2.  Sanction Upon Refusing Authorization…………………………………………14

3.  Disciplinary Disenrollment in Permanent Federal Record………………….....14

F.  The Magistrate Judge's Narrow Legal Obligation Ruling Was At Odds
With Judge (Now Justice) Barrett's Opinion And Was Divorced From
Military Realities and The Military Law Contained  In The Navy ROD. ………….16

G  Magistrate Judge Kolar Ignored Contrary Northern District of Indiana
Precedent………………………………………………………………………...20

H.  John's Motion For Summary Judgment on Due Process…………………….…..21

1.  Jane Doe Never Testifying Versus John Doe Repeatedly Testifying……......22

i

2.    John-Jane Roe Texts……………………………………….……………..22

3.    The Investigation Report……………………………………………….24

4.    The Letter Purportedly Sent On Behalf Of Jane Doe To The
      Advisory Committee………………………………………….…...…24

.
CONCLUSION……………………………………………………………..…….25

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33  (1980)…………………………………………4

*Avitin v. Metropolitan Club of Chicago,*49 F.3d 1219 (7th Cir. 1995)……………………..………4

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185 (7th Cir. 1990)……………..12

*Brengetttcy v. Horton*, 423 F.3d 674 (7th Cir. 2005)………………………………..……1, 3, 4, 5, 19

*Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858 (8th Cir. 2020)……………………….…3

*Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) …………………………………………………3

*Doe v. Oberlin*, 963 F.3d 580 (6th Cir. 2020)…………………………………………………..3

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019)…………………………………...............……*passim*

*Doe v. Purdue*, 464 F. Supp.3d 989, 1001-1003 (N.D. Ind. 2020)………………………...……20

*Doe v. Regents of the Univ. of Cal.*, 23 F.4[th] 930 (9th Cir. 2022)………………………...…..3

*Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021)……………16

*Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005)……………………………………………..……8

*Flynn v. FCA US LLC*, 39 F.4[th] 946, 953 (7th Cir. 2022)……………………………...…..1, 3, 5

*Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012);………………………………...…….1, 4

*Gallimore v. Mo. Pac. R.R. Co.,* 635 F.2d 1165 (5th Cir.1981)…………………………….…..4

*Gilbert v. Illinois State Bd. of Education*, 591 F..3d 896, 902 (7th Cir. 2010)……...……1, 4, 5, 19

*Hinkle v. White*, 793 F.3d 764(7th Cir. 2015)………………………………………...…………6

*HK Systems v. Eaton Corp.*, 553 F.3d 1086 (7th Cir. 2009)…………………..…………….1, 4, 6

*Latino v. Kaizer,* 58 F.3d 310 (7th Cir.1995)…….………………………………………..……4

*Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136 (7th Cir. 1984)…………….....………7

*Mann v. Vogel*, 707 F.3d 872 (7th Cir. 2013)……………………………………………………..6

*MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*,
994 F.3d 869 (7th Cir. 2021)…………………………………………………………21

*Marconi Wireless Tel. Co. v. United States,* 320 U.S. 1 (1943)…...............................................4

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)……………………………………….…21

*Mary Doe and Nancy Roe v. Purdue*, 4:18-CV-89-JEM (N.D. Ind. Jan. 13, 2022)…………….20

*Menaker v. Hofstra,* 935 F.3d 20 (2d Cir. 2019);…………..…………………………..……..3

*Olivieri v. Rodriguez* illustrates the point. 122 F.3d 406 (7th Cir. 1997) …………….…...7, 9, 16

*Paul v. Davis*, 424 U.S. 693 (1976)……………………………………………….…6

*Pepper v. United States*, 562 U.S, 476 (2011)………………………………………...…3-4

*Peterson v. Lindner,* 765 F.2d 698 (7th Cir.1985) ………………………………..…………4

*State of Tennessee v. Cardona*, Civ. __F.Supp.3d __, 2024 WL 3019146
(E.D. Tenn. June 17, 2024),………………………………………………….……9

*Townsend v. Vallas*, 256 F.3d 661 (7th Cir. 2001)………………………………………..7

## **Constitutional Previsions, Statutes & Regulations**

Administrative Procedure Act, 5 U.S.C. §§ 551-559……………………………………….9. 19

Fourteenth Amendment, U.S. Constitution…………………………………………*passim*

Navy Regulation for Officer Development 2015-2016 ("ROD")…………..…………….6, 12-21

10 U,S.C. § 802………………………………………………….………………18

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681*et seq.* …………………*passim*

28 U.S.C. § 636 …………………………………………………………………5, 6

34 C.F.R. 106.45………………………………………………………………9, 11

Rule 54 (b), Federal Rules of Civil Procedure …………………………………...……1, 2, 4, 12

Rule 60, Federal Rules of Civil Procedure ………..…………………………………...…………….. 12


**<u>Other Authorities</u>**

"How Biden's Title IX Reform Became A Legal Morass, *Inside Higher Ed* (Aug 1, 2024)…….9

K.C. Johnson, "Sex, Due Process and Amy Coney Barrett,"
     Wall Street Journal, Oct. 1, 2020……………………………………………………………9

"Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion,"
     Wall Street Journal, Oct. 12, 2020……………………………………………….…..…9

Reuters Yahoo! News, "For now, the Supreme Court won't stop states from
     blocking Biden's  Title IX changes," Aug 16, 2024……………………….…………..……9

"*Secretary DeVos Announces New Title IX Regulation,"*
     *https://www.youtube.com/watch?v=hTb3yfMNGuA*…………………………….........8-9

U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action
     To Strengthen Title IX Protections for All Students," May 6, 2020………………………9

## INTRODUCTION

Plaintiff John Doe ("John") respectfully submits this Brief in support of his motion to reinstate for trial John's very meritorious and important due process claim, which was upheld in Judge (now Justice) Barrett's opinion for the Seventh Circuit, *Doe v. Purdue*, 829 F.3d 652 (7th Cir. 2019), an opinion relied upon by U.S. Department of Education Secretary Betsy DeVos in formulating due process infused Title IX regulations that went into effect in August 2020. John's due process claim, however, was incorrectly dismissed by Magistrate Judge Kolar based on the same theory as rejected by Justice Barrett – a dismissal that was one ground for the recusal for bias motion against Magistrate Judge Kolar (DE 257-1, pp. 12-21). Purdue Defendants may cry law of the case, but the law of the case doctrine is discretionary and allows for the incorrect ruling of the first judge on the case to be corrected by the successor judge, particularly with respect to an interlocutory order as involved here (a dismissal of one claim but not all claims) that is subject to Federal Rule of Civil Procedure 54(b), which provides that non-final orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." *Galvan v. Norberg*, 678 F.3d 581, 586-587 (7th Cir. 2012) (Flaum, J.); *Brengetttcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005) (Wood, J.); *Gilbert v. Illinois State Bd. of Education*, 591 F..3d 896, 902 (7th Cir. 2010) (Wood, J.); *HK Systems v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009) (Posner, J.). As discussed herein, the correction to reinstate John's due process claim is unquestionably called for, especially since John's Title IX claim greatly overlaps the proof for his due process claim.

John and John's counsel understand that the new judge on this case is in the process of getting up to speed on the case, in addition to contemplating the pending pre-trial motions. With that in mind, John and John's counsel are not trying to overburden anyone's workload with this

addition; however, as will be explained in this Brief, right now is far and away the best time to make and consider this matter.

This motion is made now so that, proper for this case, a Pretrial Order and a Pretrial Brief can be submitted to the Court per the Court's Scheduling, Pretrial Conference, and Trial Order (DE 325).  As evident from the discussion herein, John's due process claim belongs in this case and right now is the most proper time for its reinstatement.

## **ARGUMENT**

This Brief will discuss (I) the practical sensibility and judicial economy of trying the due process claim with the Title IX claim; (II) the allowance of this motion under the law of the case doctrine and Federal Rule of Civil Procedure 54(b); and (III) correcting the clear error of dismissing the due process claim.

**I.    The Practical Sensibility and Judicial Economy of Trying**
**      The Due Process Claim With The Title IX Claim._____**

This motion to reinstate the due process claim evolved out of John's response to Defendants' motion *in limine* to exclude evidence or argument directed to procedural requirement; that response (DE 342, pp. 1-5) was filed July 26, 2024, per Court order (DE 336). John's response to Defendants' motion *in limine* to exclude evidence or argument directed to procedural requirement; (DE 342, pp. 1-5)  reflected how the proof and the law supporting John's Title IX claim greatly overlaps the proof for his due process claim and how insensible it is to attempt, as Purdue Defendants do, to separate out the procedural deficiencies in Purdue Defendants' administration of Title IX in John's case.  (Pl. Mem. Opp. to Dfs. Motion *In Limine* 1-5.)

This is a case in which the procedures employed by the Purdue Defendants for Title IX enforcement were lambasted as wholly inadequate by the Seventh Circuit in an opinion by now Justice Barrett, *Doe v. Purdue*, 928 F.3d 652, 663-664 (7th Cir. 2019) ("Purdue's process fell short

of what even a high school must provide to a student facing a days-long suspension.") The Seventh Circuit opinion by Judge (now Justice) Barrett in this case, when upholding John's Title IX claim, *Doe v. Purdue*, 928 F.3d at 667-670, focused on the shortcomings of Dean Sermersheim's and the Advisory Committee' procedures and actions which provided the basis for an inference of sex discrimination.

Established case law is that an inference of sex discrimination may be drawn from procedural and adjudicative irregularities. *Menaker v. Hofstra,* 935 F.3d 20, 34 (2d Cir. 2019); *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016); *Doe v. Univ. of Arkansas-Fayetteville*, 974 F.3d 858, 864-865 (8th Cir. 2020); *Doe v. Oberlin*, 963 F.3d 580, 588 (6th Cir. 2020) citing *Doe v. Purdue*; *Doe v. Regents of the Univ. of Cal.*, 23 F.4th 930, 941 (9th Cir. 2022) ("[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise.").   During the oral argument on the motion for reconsideration of the dismissal of the due process claim, Judge Kolar recognized that the evidence at a Title IX trial would be not much different as a due process trial.  (DE 221, Opp. Ex. B, Reconsideration Hearing tr 35) ("I haven't heard a lot here, frankly, where I think the trial is going to be significantly different than my Order contemplated.").

The due process claim is not going away.  If not reinstated for trial now, the due process claim will be the subject of appeal that, given Justice Barrett's opinion and the discussion below, will result in reinstatement of the due process claim for an additional trial if not directed verdict. The interest of judicial economy is served by trying the due process claim with the Title IX claim.

## II.     The Allowance of This Motion Under The Law of the Case Doctrine.

As Chief Judge Sykes stated in *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022), the "law of the case is a discretionary doctrine, not a rigid bar," citing *Pepper v. United States*, 562

3

U.S, 476, 506 (2011). *Accord: Brengetttcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005); *Galvan v. Norberg*, 678 F.3d 581, 587 (7th Cir. 2012); *Gilbert v. Illinois State Bd. of Education*, 591 F..3d 896, 902 (7th Cir. 2010); *HK Systems v. Eaton Corp.*, 553 F.3d 1086, 1089 (7th Cir. 2009). There are two aspects to the law of the case doctrine, relevant here, that result in the application of the doctrine to this case to permit reinstatement of John's due process claim.

*First,* an interlocutory order, such as the grant of a new trial or an interlocutory grant of summary judgment not adjudicating all claims, is not insulated from revision by the law of the case doctrine, but by Rule 54(b) of the Federal Rules of Civil Procedure, may be revised at any time before entry of final judgment adjudicating all claims. As Judge Flaum wrote in *Galvan v. Norberg*, 678 F.3d at 586-587:

> The grant of a new trial (in civil cases) is a non-final, non-appealable order. *See Allied Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 34, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980); *Latino v. Kaizer,* 58 F.3d 310, 314 (7th Cir.1995). Federal Rule of Civil Procedure 54(b) provides that non-final orders "may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." FED.R.CIV.P. 54(b); *see also Marconi Wireless Tel. Co. v. United States,* 320 U.S. 1, 47, 63 S.Ct. 1393, 87 L.Ed. 1731 (1943). Because the grant of a new trial is an interlocutory order and thus subject to revision by the district court, the district court has the discretionary authority to reconsider a new trial order. *See Gallimore v. Mo. Pac. R.R. Co.,* 635 F.2d 1165, 1170–72 (5th Cir.1981); *see also Peterson v. Lindner,* 765 F.2d 698, 704 (7th Cir.1985) (stating that a judge has the power to reconsider an interlocutory order at any time before final judgment). Here, Judge Chang did not err by deciding to reconsider the new trial order. He properly relied on the order's interlocutory status as giving him the authority to reconsider and revise it.

At this point in his opinion, Judge Flaum dropped a footnote stating that "[b]ased on the interlocutory nature of an order granting a new trial, some courts have ruled that the law of the case doctrine [foreclosing revision of the order] has no force at all in this context." 678 F.3d at 587 n.4. In this case, Magistrate Judge Kolar issued what was an interlocutory order dismissing John's due process claim but not adjudicating all claims; leaving the Title IX claim for trial. (DE 206.)

The law of the case doctrine, if it applies at all, permits this Court to revisit the issue and correct what was a clear error with respect to the due process claim.

*Second* as Judge Wood wrote in *Brengettcy v. Horton*, 423 F.3d at 680 "the second judge may alter previous rulings if he is convinced they are incorrect. . . ."  Judge Wood wrote similarly in *Gilbert v. Illinois State Bd. of Education*, 591 F.3d at 902 Judge Posner wrote in *HK Systems v. Eaton Corp.*, 553 F.3d at 1089,  that '[a] judge may reexamine his earlier ruling (or the ruling of a judge previously assigned to the case, or of a previous panel if . . . he has a conviction at once strong and reasonable that the earlier ruling was wrong,. and if rescinding it would not cause undue harm to the party that had benefited from it," *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1227 (7th Cir.1995).  The discussion next in Point III of this Brief establishes the error committed and the correctness of reinstating John's due process claim, a reinstatement about which Defendants cannot fairly complain given that Magistrate Judge Kolar erroneously dismissed the due process claim after discovery and, as shown below in Part III of the Argument, was just wrong.

In this connection, there is another reason for this Court to reconsider Magistrate Judge Kolar's ruling dismissing John's due process claim.  During the recusal motion for bias, Magistrate Judge Kolar's authority under 28 U.S.C. § 636 came into question.  Magistrate Judge Kolar's opinion refusing recusal assumed he had consent pursuant to 28 U.S.C. § 636.  (DE 261, p. 1)] The Docket Entries regarding consent, however, establish that consent was not properly obtained. The first Docket Entry regarding consent states Magistrate Judge Kolar is assigned to the case, but the Docket Entry has no number and says the assignment is pursuant to a General Order.   The following Docket Entry 40, dated July 24, 2019, records an Order of Magistrate Judge Kolar that if the parties do not intend to object to the continued exercise of jurisdiction of Magistrate Judge

Kolar, to notify Magistrate Judge Kolar. (DE 40.) Docket Entry 41, dated August 1, 2019, then records the assignment of the case to Magistrate Judge Kolar upon the consent of the parties. (DE 41.) The Docket Entries, however, do not record the filing of signed consents of the parties required by 28 U.S.C. § 636 for Magistrate Judge Kolar to be the judge for all purposes, including for trial. There was none by John's counsel. At that point in the case, there was no indication of bias on the part of Magistrate Judge Kolar, or what would follow in subsequent years that would form the basis of John's pervasive bias motion. Without proper consent, however, Magistrate Judge Kolar did not have the legal authority to dismiss John's due process claim.

## III.    Correcting The Error of Dismissing the Due Process Claim.

As Judge (now Justice) Barrett originally ruled, 928 F.3d at 661-663, there was no self-defamation here so as to undermine the stigma-plus liberty interest triggering the due process requirement. Discovery after Judge Barrett's opinion – specifically, that the Navy knew about Jane Roe's complaint against John and the Purdue investigation as well as the obligations in the Navy Regulation for Officer Development 2015-2016 ("ROD") -- made unquestionably clear that John was required and legally obligated to disclose the university disciplinary file to the Navy ROTC.

### A.    Judge (Now Justice Barrett's Original Ruling on Stigma-Plus Liberty Interest: Rejection of Self-Defamation Theory As To John.

Judge (now Justice) Barrett ruled that John had a stigma-plus liberty interest to support a due process claim (928 F.3d at 661-662, emphasis supplied):

> To succeed on this theory, John must satisfy the "stigma plus" test, which requires him to show that the state inflicted reputational damage accompanied by an alteration in legal status that deprived him of a right he previously held. *See Mann v. Vogel*, 707 F.3d 872, 878 (7th Cir. 2013); *see also Paul v. Davis*, 424 U.S. 693, 708–09, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Hinkle v. White*, 793 F.3d 764, 767–68 (7th Cir. 2015). John argues that he has satisfied this test because he alleges that Purdue inflicted reputational harm by wrongfully branding him as a sex offender; that Purdue changed his legal status by suspending him, subjecting

6

him to readmission requirements, and causing the loss of his Navy ROTC scholarship; and that these actions impaired his right to occupational liberty by making it virtually impossible for him to seek employment in his field of choice, the Navy. *See Lawson v. Sheriff of Tippecanoe Cty., Ind.*, 725 F.2d 1136, 1138 (7th Cir. 1984) ("The concept of liberty in Fourteenth Amendment jurisprudence has long included the liberty to follow a trade, profession, or other calling."); *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001) (Liberty interests are impinged when someone's "good name, reputation, honor or integrity [are] called into question in a manner that makes it virtually impossible for ... [him] to find new employment in his chosen field.").

Purdue insists that John has not adequately alleged "stigma," much less the necessary "plus." The university maintains that it has not and will not divulge John's disciplinary record without his permission. The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began. Because John permitted the disclosure, Purdue says, he cannot complain that Purdue stigmatized him.

*Purdue cites no cases in support of its position*, but it is presumably trying to draw an analogy between John and a plaintiff who publishes damaging information about himself—because it is true that a plaintiff can't himself spill the beans and then blame the defendant for ruining his reputation. *Olivieri v. Rodriguez* illustrates the point. 122 F.3d 406 (7th Cir. 1997). There, a probationary police officer asserted a procedural due process claim against his superintendent after he was fired for sexually harassing other probationers. *Id.* at 407. We observed that "the defendant [had not] disclosed to anyone the grounds of the plaintiff's discharge." *Id.* at 408.. . .

We rejected Olivieri's claim, holding that a plaintiff who publicizes negative information about himself cannot establish that the *defendant* deprived him of a liberty interest. *Id.* As an initial matter, we noted that it was uncertain whether Olivieri's prospective employers would ever find out why he was discharged. *Id.* at 408–09 ("A prospective employer might not ask him—might ask only the Chicago Police Department, which for all we know might refuse to disclose the grounds of Olivieri's discharge; many former employers refuse to answer such inquiries, because of fear of being sued for defamation."). In addition, we explained that "[t]he principle of self-defamation, applied in a case such as this, would encourage [the plaintiff] to apply for a job to every police force in the nation, in order to magnify his damages; and to blurt out to each of the them the ground of his discharge in the most lurid terms, to the same end." *Id.* at 409.

John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, *John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510. In contrast to *Olivieri*, where disclosure was voluntary and speculative, it was compelled and certain in *Dupuy*. And in *Dupuy*, unlike in *Olivieri*, the disclosure was not self-published—it came from the defendant, even if the plaintiff had been obligated to authorize it. So too here: Purdue, not John, revealed to the Navy that it had found him guilty of sexual violence, and John had a legal obligation to authorize the disclosure.. . .

**B,    The National Importance of Judge (Now Justice) Barrett's Due Process Opinion.**

This motion is made not simply because of its importance in this case to John but because of the national importance of the due process ruling of then Judge (now Justice) Barrett in *Doe v. Purdue*, 928 F. 3d 652, 661-664, 667 (7th Cir. 2019), holding: (i) that John had pleaded a liberty interest; (ii) that Purdue's disciplinary process was woefully deficient and did not provide due process, citing among other things not giving John the investigation report and not holding a real hearing ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension"); and (iii) that the District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand").

When then Education Secretary DeVos announced on May 6, 2020, what would be the current Title IX due-process-infused regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue*, which Secretary DeVos noted was from a panel of three women with then Circuit Judge Amy Coney Barrett as the author of the opinion. "Secretary DeVos Announces New Title IX Regulation,"

https://www.youtube.com/watch?v=hTb3YfMNGuA; U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020. Those regulations, which went through the Administrative Procedure notice and comment are at 34 C.F.R. 106.45.  Biden Administration efforts to overturn those due process-infused regulations failed politically, resulting in the recent effort to simply promulgate Title IX rules that would allow again for kangaroo tribunals and do so without either Article II congressional legislation or even Administrative Procedure Act notice and opportunity to comment.  That arbitrary effort has been rebuffed by courts, *see State of Tennessee v. Cardona*, __F.Supp.3d __, 2024 WL 3019146 (E.D. Tenn. June 17, 2024), such that 26 states are not complying with it.  "How Biden's Title IX Reform Became A Legal Morass," *Inside Higher Ed* (Aug 1, 2024). The U.S. Supreme Court has declined to lift lower court injunctions that have blocked the Biden Administration from enforcing its Title IX regulation promulgated by fiat. Reuters, Yahoo! News, "For now, the Supreme Court won't stop states from blocking Biden's Title IX changes," Aug 16, 2024.  The due process rulings of *Doe v. Purdue* appear to have lasting effect.

When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention.  Defending Judge Barrett's opinion in the Wall Street Journal was K.C. Johnson, "Sex, Due Process and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020.  Purdue responded with its defense, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020.  Judge Barrett's due process opinion has been a thorn in Purdue's side.

**C.    Discovery Supported John's Stima-Plus Interest: The Navy Knew About The Disciplinary Proceeding Before The Authorization and Was Looking To Purdue's Investigation.**

Judge Kolar's Opinion and Order dated August 11, 2022, did not consider Purdue's due process violations and expungement of the disciplinary file.  Very differently, Judge Kolar threw out the due process claim on the ground John signed a form specifically "authoriz[ing] the release of all information" pertaining to Purdue's investigation and while John felt he was "in no position to refuse the authorization," to the Navy ROTC permitting it to have the university disciplinary files was not the same as having a legal requirement to disclose the university disciplinary files to the Navy ROTC.  (DE 206.)

The discovery record made Purdue's argument and Magistrate Judge Kolar's ruling about self-defamation wholly untenable.  Indisputably: (i) the NROTC knew about the disciplinary proceeding well before the May 24, 2016 authorization because on April 4, 2016, Jane Doe first went to the NROTC to make her accusations; (ii) Purdue first learned of Jane Doe's accusations from the NROTC; and (iii) the NROTC was looking to the Purdue investigation from the start. This was all totally contrary to Purdue's argument to the Seventh Circuit that the Navy knew about Jane Roe's allegations against John and the Purdue investigation only because of the authorization.

On April 4, 2016, Jane Doe (falsely) told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John, and Lieutenant Sheppard informed his superior officers Commander Hutton and Executive Officer Remaly about Jane Doe's allegations. (DE183-34: Shepard tr 21-25, 28-30; DE183-43:  Sheppard Ex 2; DE187: Sheppard tr 42-43.) Also on April 4, 2021, Commander Hutton reported Jane Doe's sexual misconduct allegations to Purdue's Office of the Dean of Students, reflecting the interrelationship of Purdue and the Purdue Navy ROTC.  (DE 187-6: Dfs. SJ Ex. K.)  When asked by Purdue counsel about the "investigation"

10

of the sexual misconduct allegations against John, Navy ROTC Commander Hutton responded "that investigation was referred to Purdue University." (DE 183-35: Hutton tr. 14.) On April 4, 2021, Purdue's Dean of Students Sermersheim advised Purdue's CARE Director Bloom of Jane Doe's allegations. (DE 187-6: Dfs. SJ Ex. K).)

On April 5, 2021, Commander Hutton sent a letter to John informing him that John was being placed on "an Interim Leave of Absence (ILOA) *due to your pending university investigation*" and that "[f]urther administrative action, potentially to include Performance Review Board (PRB), will be taken *on completion of the university investigation*." (DE 187-7; italics added.) The April 5, 2016 letter further stated that John was prohibited from participating in ROTC activities, but could remain enrolled in NROTC. (DE 187-7.)

The authorization to the NROTC for access to the Purdue disciplinary files was dated May 24, 2016, well after the Navy ROTC learned of the disciplinary proceeding. (DE183-5, John tr. 23; DE183-44.) John testified at his deposition that the Navy wanted "in the loop" (DE183-5, tr 21-22), and when John was deposed by Purdue about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the Navy ROTC, not self-defamation (which was never raised in the deposition). (DE208-1, DE208-2, tr 22-26.)

### D. Per Justice Barrett's Opinion, John Was Required and Legally Obligated To Authorize Disclosure To The Navy.

On the record facts, John was clearly legally obligated to authorize disclosure of Purdue's disciplinary records to the Navy per Justice Barrett's opinion. According to John, "[w]ith Jane Roe having reported her accusation to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, I really was in no position to refuse the authorization." (DE208-1 ¶ 7.) According to John: "Soon after Jane Roe complained to the Navy, I was put on interim leave of absence pending the university investigation. If I had refused authorization, I would not only have looked

bad, but I also would have been sanctioned in some way." (DE208-1 ¶¶ 3, 5.)  John thus had no choice but to authorize the Navy to be "in the loop" in the university disciplinary proceeding; it was not voluntary. John's case is "more like *DuPuy v. Samuels*." 928 F.3d at 662.  The position that John was not under a legal compulsion to authorize disclosure was and is a misreading of Justice Barrett's opinion and totally at odds with military realities and military law contained in the Navy ROD.

### E. The Navy ROD Made John's Disclosure Obligation Indisputable.

John moved for reconsideration of the dismissal of his due process claim and submitted the Navy Regulations for Officer Development ("ROD") that were in effect in the 2015-2016 school year, which had not been available for the Navy depositions (DE 221, tr.8).  John so moved based on Rules 54(b) and 60 of the Federal Rules of Civil Procedure and the recognition in Seventh Circuit  case law of the value of reconsideration . *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191-1192 (7th Cir. 1990)("A motion for reconsideration performs a valuable function where: the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. . . . Justice Cardozo also recognized the utility of the motion to reconsider to the misunderstood litigant.")

The Navy ROD made indisputable John's disclosure obligation.  The Navy ROD provided a framework for military discipline, the rights and responsibilities of officer candidates, and the procedures for various administrative matters. Navy Regulations have the force of law within the Navy, meaning that failure to comply with them can result in disciplinary action, In the circumstances of the Navy ROTC knowing about the disciplinary case that would be proceeding in investigation at the university, the Navy wanted "in the loop" (DE 183: SJM 5 (John Doe's Dep

tr 22)), and Purdue Navy ROTC Executive Officer Craig Remaly testified the authorization form

was one Purdue requested in this case (DE 187: Pl Opp DSJ 12 (Remaly Dep tr 26-27)).  With

Jane Doe having reported her accusations to the Navy ROTC and the Navy ROTC looking to

Purdue for the investigation, John was in no position to refuse the authorization. (DE 208: John

Doe 08/2022 Declaration ¶¶ 3, 7.)  What that meant is the following, which fully satisfied what

even Judge Kolar wrote about what would call for the denial of summary judgment.

### 1.     Navy Regulation Compelling Giving Authorization.

Authorization to disclose the Purdue disciplinary files was expected under the governing

Navy regulations at the time as a matter of "Honor" stated in the Navy ROD 2015-2016. Honesty

and respect to his superior officers called upon John to provide the authorization. The Honor Code

in the Navy ROD 2015-2016 at section 1-3 (pp. 1-3) provides that "Military systems, which often

operate under extreme duress, are built on a foundation of absolute trust and fidelity", that NROTC

must instill honor upon future officers during accession training and ensure that honor is carried

into fleet service", that "[t]hroughout its history, the Naval Service has successfully operated

through reliance on certain values held by its personnel", that "[c]ore values are Honor, Courage

and Commitment", that "Honor is a keen sense of ethical conduct, honesty, integrity, and

responsibility", that "Honor includes honesty, at all times no matter the outcome", and that "[i]t is

respect to both juniors and seniors."

Also, authorization to disclose the Purdue disciplinary files was expected under the

governing Navy regulations at the time as a matter of not showing a "disregard or contempt for

authority" and not showing a "lack of a sense of responsibility" that would constitute a "major

offense" per the Navy ROD 2015-2016, at section 3-19.2.a.(11) (pp. 3-40).  The Navy ROTC knew

there was a Purdue investigation of Jane Doe's accusations of sexual assault and wanted "in the

loop" (DE 183: SJM 5 (John Doe Dep tr 22); DE 208, Motion Ex. B, John Doe Dep 22).  It was

John's responsibility that the Navy ROTC be included "in the loop."

### 2. Sanction Upon Refusing Authorization.

In terms of what would have happened if John had refused to provide the authorization,

given how the Navy knew that Purdue was doing an investigation, an order to provide the

authorization would have been in order.  Also, when a Navy midshipmen is put on interim leave

of absence, which John was by Commander Hutton's order of April 5, 2016, the Navy ROD 2015-

2016 at section 6-7.3 (pp. 6-11 – 6-12) provides for a Performance Review Board ("PRB") "as

soon as possible."  Because John provided the authorization, the PRB was not held until the

completion of the university disciplinary case.  Without that authorization, a PRB is held in the

circumstance of John showing a "disregard or contempt for authority," a "lack of a sense of

responsibility," and a lack of "honor."  The interim leave of absence could then be converted into

a disciplinary leave of absence per the Navy ROD 2015-2016 at section 6-7.3 (pp. 6-12) that would

not be lifted unless John showed that he was exonerated by Purdue.  Magistrate Judge Kolar,

among other things, ignored this point about a sanction upon refusing authorization..

### 3. Disciplinary Disenrollment in Permanent Federal Record.

If John were to re-apply to the Navy ROTC, then of course he would have had to disclose

the disciplinary finding.  Exhibit H to the Hutton deposition was the August 2020 ROTC

Appointment Termination and Disenrollment Authorization (NSTC 0001-0004).  Commanding

Officer Hutton identified the document and when asked about it, testified that the only reason for

the ROTC disenrollment was the university suspension. (SJM 35: Hutton Dep tr 56, 66-67; SJM

36: Hutton H, August 2020 ROTC Appointment Termination and Disenrollment Authorization

(NSTC 0001-0004).) The August 10, 2020 PRB document showed that the Board's finding was

that John was suspended by Purdue and that the recommendation was disenrollment of John due

to his inability to complete consecutive years at the university. (SJM 36: Hutton G, p. 2, August

10, 2020 Performance Review Board, p. 2 (NSTC 0012).) A disciplinary disenrollment is for a

"major offense" per the Navy ROD 2015-2016 section 6-14.1.b(1) (p.6-21), which includes

"Sexual Harassment/Assault" the Navy ROD 2015-2016, at section 3-19.2.a.(11) (pp. 3-40 – 3-

41).

      The PRB document is made part of the student's file per the Navy ROD 2-15-2016 section

6-13.5 (pp. 6-20) and because it involved disenrollment is sent to Naval Operations per the Navy

ROD 2-15-2016 section 6-13.6 (p. 6-20). Disciplinary disenrollment documents are part of a

"permanent federal record" per Navy ROD section 6-16 (pp. 6-26 – 6-27):

> c. Disciplinary disenrollments become a matter of permanent federal record
> and may prejudice the individual for future military or civil employment.
> Disciplinary disenrollments may be disqualifying for future federal security
> clearances that are often necessary for positions in private industry. Disciplinary
> disenrollments may be prejudicial to their interests should they ever apply for a
> commission in the Armed Forces. . . .

Thus, should John Doe re-apply to the Navy ROTC or to any commission in the U.S. Armed

Forces, he would be honor-bound to disclose the disciplinary disenrollment that is part of

permanent federal record and if he did not and were found out, termination would be expected.

(*See* DE 208, John Doe 08/2022 Declaration ¶ 9.)

      There was and is ample good reason, then, to rule that John was obligated to disclose the

university disciplinary files to the Navy ROTC per Justice Barrett's opinion and thus there was no

self-defamation; and thus further, summary judgment could not be entered dismissing John's due

process claim. The due process rulings in Judge Barrett's opinion in *Doe v. Purdue* have national

importance and should not be undercut by the incorrect decision of Magistrate Judge Kolar which,

among other things, ignored this point about a permanent federal record.

**F.  The Magistrate Judge's Narrow Legal Obligation Ruling Was At Odds With Judge (Now Justice) Barrett's Opinion And Was Divorced From Military Realities and The Military Law Contained  In The Navy ROD.**

John's situation as a Navy ROTC midshipman who was not in a position to refuse the authorization to the Navy is totally inapposite to the situation of a voluntary disclosure of a disciplinary record for a school transfer, as in *Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021), and to the situation of a voluntary disclosure of the reason for an employment discharge in *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997). Here, the obligation to disclose was not, as wrongly asserted by the Magistrate Judge, speculative. (DE 224.) Rationalizing away the distinction between civilian and military life in this context amounts to at best willful blindness, which the Magistrate Judge's own words shows he  knew was wrong (p.18 below) and resulted in the Magistrate Judge incorrectly treating John's authorization as voluntary and John's testimony that the Navy "wanted in the loop" as not a legal obligation to authorize. (DE 221, p. 16; DE 224, pp. 2-4.)

Dismissing military realities and the application of military law as speculation, as the Magistrate Judge does, is erroneous at best.  The December 19, 2022 hearing exchanges lay bare the unreasonableness of the Magistrate Judge's opinion:

> [**MR. BYLER**]: . . .  The authorization was requested because the Navy – and this is the testimony – "wanted in the loop."  And that meant they wanted in the loop of the investigation. And they were put into the loop.
>
> And John Doe was not in a position to say no.  As ROTC midshipmen, respecting his Navy superiors, wanting a career in the Navy, you have a request; knowing that the Navy wants to be in the loop.  You don't say no.
>
> The suggestion that maybe he says no is just ridiculous.  I have combat officer sons, who, when asked this, of course you give the authorization. . . .
>
> **THE COURT**: But I see nothing.  I don't see your client saying, "I was given order."

I don't see any deposition . . . .

[**MR. BYLER**]: Well, excuse me. At his deposition, all he was asked about the authorization was to identify it.  The deposition then went off, "Well, could you have gotten the investigation report from the Navy." . . .

[Plaintiff John] was on scholarship.  He had to honor his commitments and obligations. . .  And that meant, when he gets a request for this kind of authorization, that kind of access, when the Navy knows and it's going to be relying on the [Purdue] investigation, yes, he has to give it.  He was in no position not to give it. . . .

The decision that Commander Hutton testified to was: We're going to rely on the Purdue investigation. . . .

And it was in that context in which John Doe knows that they're wanting to be in the loop because the investigation that's ongoing, he's requested by a superior officer for that access.

. . . .

[**THE COURT**]: I don't understand where in the record it has been shown that, if he had respectfully responded to his superior officer, "Sir," "ma'am," "Is this something I need to sign, or am I allowed to have the Navy determine whether I did anything wrong in their PRB,"

**MR. BYLER**: No.  You don't put a burden on a midshipman or an Army ROTC guy to press the point in order to have a situation which there is a liberty stigma-plus interest.  That's wholly – I'm sorry – misconceived.

If you're in the position where you have obligations of Navy midshipman – okay? You're a scholarship student.  You have to honor your obligations.  You've been asked, "Give us access."  You know they want in the loop.  And you're going to say no?

  And what I'm saying is, the suggestion that, well, he should have said no and maybe he could respectfully, I think is nonsense. . . .

. . . You're going to be in conflict with Judge Martin's decision if you go down that road, and I don't think that makes sense.  You're not making sense in terms of military reality.  When there's a request from a superior officer in these circumstances, you comply.

And certainly there's no question, if he had said no, he would have been subject to lawful order.  But it doesn't have to be pushed to that; it shouldn't have to be pushed to that.

(DE 221, tr.5-22.)

Curiously, Magistrate Judge Kolar seemed to recognize the difference between a civilian situation and a naval officer "request":

> There is a difference. And I spent time as an undergrad, and there is a difference. And I hear counsel that there is a difference, and I understand that there's a difference.
>
> And I think even this record shows, right, that there's a difference between a professor saying, "Hey, I want you to sign 'X,' or will you sign 'X,'" right? Certainly that, "I want you to," or, "I'm telling you to," from a professor is different than from a naval officer.
>
> So I just want to acknowledge that, and I think it's different, regardless of whether or not -- And I haven't peeled back the onion on when UCMJ would be applicable, but I don't think it's necessary because I agree with Mr. Byler to the point of the ROTC program is different. And if there was an order given or if it was phrased as an order, I think this case would be different, and specifically in the context of a motion for summary judgment, if it was established that there was a material issue of fact as to that.

(DE 221, tr. 36-37.)  The UCMJ does indeed apply to Navy midshipmen.10 U,S.C. § 802.

Given these exchanges, it was more than strange that the Magistrate Judge denied reconsideration, faulting John's counsel for not asking at John's deposition about the authorization (DE224, p. 3), ignoring that Purdue's counsel didn't ask in a deposition taken by Purdue. Magistrate Judge Kolar's reference to a PRB as somehow providing a mechanism for a midshipman to dispute a superior officer's demand for access to a university investigation file (DE224, p. 9, A314) disregards that a PRB is for determining sanctions for improper conduct and that Commander Hutton made it clear the Navy was relying upon the Purdue investigation. Magistrate Judge Kolar's denial of reconsideration opinion (DE 224) is a near incomprehensible collection of attacks on John and his counsel, distortions of the factual record (*see* pp. 21-25 below) and insensible rationalization for ignoring the compelled disclosure called for by the Navy ROD.

18

On summary judgment when denying a stigma plus liberty interest, Magistrate Judge Kolar acknowledged John's position he was "in no position to refuse the authorization but denied that was the same as an obligation for John to release the records. (DE 206, p. 17.)  Magistrate Judge Kolar indicated that John's claims would survive summary judgment if he had shown that any failure to provide authorization would have resulted in a sanction or lawful order, pointed to an NROTC regulation compelling his cooperation, or even shown that he would have had to make a disclosure of Purdue's finding to reapply to NROTC after his suspension.  (DE 208, p. 17.)  At the reconsideration oral argument, Magistrate Judge Kolar noted he had difficulties with requiring the "obligation" on John to provide the authorization to be a "legal obligation," noting that his order did not require a legal obligation (DE 221, tr. 34).  As discussed above (pp. 12-15), John, with the Navy ROD, made the very showing suggested by Magistrate /Judge Kolar (DE 208, p. 17).

Magistrate Judge Kolar nevertheless adopted on reconsideration Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD.  Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE 213, p. 12) and the Magistrate Judge's adoption of that position reflects how much at odds Purdue and the Magistrate Judge were and are with Justice Barrett's opinion and the DeVos due process infused Title IX regulations that were put into law by compliance with the Administrative Procedures Act notice and comment procedures.  Purdue's and Magistrate Judge Kolar's position that a Navy ROTC midshipman has no due process rights is absurd. The ruling by Magistrate Judge Kolar on summary judgment dismissing John's due process claim relied upon the notion of "voluntary authorization," which on reconsideration was moved to focusing on a very narrow conception of

"legal obligation" even though the Navy ROD alone proved that John indeed had a legal obligation to authorize disclosure of the Purdue investigation to his Navy superiors.

This is a case in which, to use Circuit Judge Wood's words, this Court should be convinced that the first judge, Magistrate Judge Kolar, is incorrect. *Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005); *Gilbert v. Illinois State Bd. of Education*, 591 F.3d 896, 902 (7th Cir. 2010).

### G.    Magistrate Judge Kolar Ignored Contrary Northern District of Indiana Precedent.

Magistrate Judge Kolar strangely omitted addressing the point for reconsideration that two Northern District of Indiana precedents are contrary to his ruling and that, in particular, Attorney Kealey, who has been counsel for the Purdue in this case and in *Mary Doe and Nancy Roe v. Purdue*, 4:18-CV-89-JEM (N.D. Ind. Jan. 13, 2022), did not advise the Magistrate Judge of Judge Martin's January 13, 2022 ruling (after the summary judgment briefing) upholding and sending to trial those plaintiffs' due process claim.  (DE214-1, DE72 in 4:18-CV-89-JEM.)  Judge Martin wrote:

> Roe asserts that she will be obligated to self-report this sanction to other institutions of higher education, including law schools, and by implication, bar admission authorities, meaning her stigma of a sanction will continue to be disseminated.
>
> As in *Doe v. Purdue Univ.*, supra, in which the plaintiff was required to authorize Purdue to release information about a sanction to his ROTC program and the Court of Appeals found that even with his permission to disclose, the disclosure satisfied the stigma-plus standard, the disclosure of Roe's sanction may impact her future education and employment opportunities. . . . Roe has asserted that the decision by Purdue, which she asserts was based on a flawed process, has resulted in a loss of future educational and employment opportunities, and a factfinder could agree.

(DE241-1, DE72 in 4:18-CV-89-JEM: Slip Op. at 20-21.)  In that case, Roe felt an obligation to self-report; this case is even stronger, as John Doe here had an obligation because he was in no position to not give authorization. A second Northern District of Indiana case also found stigma-plus liberty interest. *Doe v. Purdue*, 464 F. Supp.3d 989, 1001-1003 (N.D. Ind. 2020) (Springmann, J.).

**H.     John's Motion For Summary Judgment on Due Process.**

John moved for summary judgment on due process because discovery strengthened John's case that he was denied due process.  The depositions of Purdue employees with the documents that formed the basis of the allegations of the Complaint not only substantiated the allegations, but showed a process more flawed than what was alleged in the Complaint and presented to the Seventh Circuit.  Purdue never provided John with the evidence and the investigation report during the disciplinary case, there was no real hearing, and there was pre-judgment based upon treatment of Jane Doe's accusations.  Expungement of the disciplinary file was and is the proper remedy. (DE183-1 through 183-41; DE 183, pp. 6-33, 39-46.) The District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand"), but Magistrate Judge Kolar refused to do so, knowing how opposed Purdue had been to expungement.

Due process matters so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts."   *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). The Magistrate Judge, however, rationalized the jarring result of adopting Purdue's position that "whether Purdue complied with due process is immaterial."

The Magistrate Judge's ruling on stigma-plus liberty interest was erroneous, divorced from military chain of command realities and military law contained in thr Navy ROD  in order to avoid the grant of summary judgment on John's due process claim. Magistrate Judge Kolar's proof of falsity requirement to establish a stigma plus liberty interest, which the Seventh Circuit has never adopted, was also wrong: the August 14, 2022 opinion gave a purported review of triable issues that did not reflect the factual record.

**1.     Jane Doe Never Testifying Versus John Doe Repeatedly Testifying.**

Magistrate Judge Kolar strangely repeated what were the allegations of Jane Doe when in fact she never testified.  Summary judgment is not a time when allegations suffice. Proof is needed. Jane's allegations were not and are not proof.  *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (facts needed to defeat summary judgment).

In contrast, John Doe has repeatedly put himself under oath to state that Jane's accusations are false.  In the summary judgment record is John Doe's statement under oath saying:

> All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false.  I have maintained that all her claims were false from my initial statements in the Purdue disciplinary process at the start, all the way through to the appeals. I said so orally to Dean Sermersheim in June 2016.  I said so in my oral statements to Navy ROTC personnel, and I said so in my written statement in August 2016 to Navy ROTC at the time of my disenrollment (which was based solely upon my university suspension), and I have continued to maintain this truth for the past four and a half years of this legal case.

(ECF 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶ 30).)   John Doe did again on reconsideration.  (DE 208: John Doe 08/2/22 Declaration ¶ 10.)

**2.     John-Jane Doe Texts.**

There were 133 pages of John-Jane Doe texts, but Magistrate Judge Kolar presented them in accordance with Purdue's misreading that relied upon misleading excerpts without the context of those excerpts and without discussing John's testimony on the texts that he alone had provided to show Jane Roe's allegations were not true.

Magistrate Judge Kolar quoted passages of John-Jane Doe texts as if they were admissions of guilt. They weren't, and there was no evidence before Magistrate Judge Kolar to treat them as evidence of guilt.  That Magistrate Judge Kolar did so showed a lack of impartiality. In depositions, Purdue's Dean Sermersheim, Purdue's investigator Amberger and Purdue's investigator Oliver each admitted that there is no statement in the texts in which John admitted or Jane Doe accused

22

John of committing the sexual acts alleged in the Notice of Allegations.  (DE183-7: Sermersheim tr 34; DE183-14: Amberger tr. 70-72; DE187-9: Oliver tr. 50-57).)  Notably, before the alleged incidents, John and Jane Doe had a three-month relationship in which John and Jane Doe had a sexual relationship initiated by Jane, the first such relationship in John's life after being brought up in an Evangelical Christian home where he was taught sex was for marriage.  (DE183-8: John 02/18/2021 Affidavit ¶¶ 4-5; DE 208-1: Ex. A, John tr 92-93.)  John has put himself under oath as to the correct understanding of the texts (where the surrounding context makes them all clear, and in context, they don't support Jane Doe's allegations) yet Purdue hid the context when cherry-picking them); Jane Doe never testified. (DE208-1: John 08/2022 Declaration ¶ 11.)

To the investigators, John provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John and his family Christmas cookies after the supposed sexual assault occurred and after Jane Doe initially claimed the relationship had ended.  Jane Doe provided *no* texts to the investigators, telling them she had deleted the texts.   (DE183-3: Df. Answer ¶ 36; DE183-14: Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; DE183-11: Amberger 27, Texts (PU 206-339)); DE183-7: Sermersheim tr. 34; DE 183-5: John Dep. tr. 111-114.)

Yet, the investigation report included only short portions of 7 pages of the 133 pages of texts; the selected portions did not include texts showing an ongoing relationship after the incidents (falsely) claimed by Jane Doe.  Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators. (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.)   The

investigation report twisted the texts and contained many other inaccuracies, including the fabrication that John confessed to the allegations. Knowing this, it is no wonder they refused to let John view the investigation report and defend himself while at Purdue, something other schools typically provide, but not Purdue.  (DE183-8: John 02/18/2021 Affidavit ¶ 15; DE187, pp. 44-47.)

### 3.    The Investigation Report.

There was no good reason for Magistrate Judge Kolar to ignore: (i) Plaintiff John was not provided an opportunity to review the investigation report during the disciplinary case, (ii) the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship between John and Jane Doe), and (iii) Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators.  (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.)  Only a partisanship for Purdue explained why Magistrate Judge Kolar also ignored that the investigation report had twisted the texts and contained many other inaccuracies pointed out by John.  (DE183-8: John 02/18/2021 Affidavit ¶ 15; DE187, pp. 44-47.)

### 4.    The Letter Purportedly Sent On Behalf Of Jane Doe To The Advisory Committee.

On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim; instead, on June 5, 2016, Monica Bloom, Director of CARE and a lawyer, submitted a written statement said to come from Jane Doe, which was in the form of an e-mail. Bloom was asked in her deposition how, if Jane Doe did not have access to a computer, she e-mailed the statement to Bloom. Bloom said she (Bloom) did not recall (DE183-9, Bloom Dep tr

24

29-30; 183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement (PU653-654)).  The Magistrate Judge does not deal with this testimony, but rather incorrectly states it was undisputed the e-mail came from Jane Doe, the point was very much in dispute, and further, the Magistrate Judge also does not address the fact that the three-person panel of the Advisory Committee on Equity and Dean Sermersheim, never met and never heard any direct testimony from Jane Doe and did not have the opportunity to ask any questions of Jane Doe.  (DE183-3: Df. Answer ¶ 41; DE183-9: Bloom tr 28-32; DE183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement.)

## CONCLUSION

For the reasons stated above, John's motion to reinstate the due process claim should be granted, and the Court should grant such further and other relief as deemed just and proper.

**Dated:  August 29, 2024**                    **Respectfully submitted,**
**LAW OFFICES OF PHILIP A. BYLER**
By: /s/ *Philip A. Byler*
**Philip A. Byler, Esq.**
**11 Broadview Drive**
**Huntington, New York 11743**
**(631) 848-45175**
**pbyler1976@gmail.com**
*Attorneys for Plaintiff John Doe*

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served upon the attorneys of record for each party to the above-entitled cause at the address shown below on August 29, 2024.

William P. Kealey, Esq.
James F. Olds, Esq.
Scotty Teal, Esq.
Stuart & Branigin LLP
300 Main Street, Suite 900

25

P.O. Box 1010
Lafayette, IN 47902-1010
Email: wpk@stuartlaw.com
        jfo@stuartlaw.com
*Attorneys for Defendants*

BY:    ☐  U.S. Mail    ☐    Federal Express

       ☐  Hand-Delivery    x    Other: ECF

_____*Philip A. Byler, Esq.*_____
        Philip A. Byler, Esq.

26