## Exhibit B

No. __-___

IN THE

# Supreme Court of the United States

➤➤ ◄◄

JOHN DOE,

*Petitioner,*

*v.*

PURDUE UNIVERSITY, *et al.*,

*Respondents.*

———————

*On Petition for a Writ of Certiorari to
the United States Court of Appeals
for the Seventh Circuit*

## PETITION FOR A WRIT OF CERTIORARI

Philip A. Byler, Esq.
*Counsel of Record*
LAW OFFICES OF
   PHILIP A. BYLER
*Counsel for Petitioner*
11 Broadview Drive
Huntington, New York 11743
631-848-5175
pbyler1976@gmail.com

February 5, 2024



i

## QUESTIONS PRESENTED

1. Should this Court exercise its supervisory authority to preserve the appearance and fact of justice by requiring review now of a denial of recusal for bias shown pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455 that otherwise would mean a trial before a biased Magistrate Judge, the bias shown in his rulings and the extra-judicial bias in his nomination to the Seventh Circuit, who would then be a colleague of the Seventh Circuit judges at the time of an appeal from a final judgment?

2. Is it an important federal question for this Court's consideration whether denials of recusal for bias shown pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455 be subject to appellate review per the collateral order doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) and *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978), particularly given, as this Court held in *Rose v. Clark*, 478 U.S. 570, 577 (1986), that as a matter of constitutional law adjudication before a biased judge requires reversal regardless of the evidence and bias cannot effectively be adjudicated in an appeal of a final judgment?

ii

## PARTIES

Plaintiff-Petitioner John Doe ("John"), a Court authorized pseudonym, is a natural person who during the 2015-2016 school year, was a student at Defendant Purdue University ("Purdue") and a Navy ROTC midshipman living in Purdue's on-campus residence halls. Other than the case with Jane Doe, John had no other sexual misconduct disciplinary cases at Purdue. (Dist.Ct. DE 183: Def. Answer ¶¶ 4, 82; Dist.Ct. DE 6: Rollock Dep tr 56; Dist.Ct. DE 15: Oliver Dep tr 77.)

Purdue is a land grant university established by the State of Indiana and is located on a main campus in West Lafayette, Indiana and on three regional campuses in Indiana. Purdue has 13 colleges and schools. Purdue is audited by State of Indiana auditors, the beneficiary of state authorized bonds and the recipient of state and federal grants. Purdue received hundreds of millions of dollars of federal funding in 2016. (Dist.Ct. DE 3: Def. Answer ¶¶ 5, 118.)

## NO CORPORATE DISCLOSURE

There is no corporate disclosure required.

## RELATED PROCEEDINGS

The underlying action, *Doe v. Purdue*, No. 2:17-cv-33-JPK (N.D. Ind.), is pending in the Northern District of Indiana.

iii

## TABLE OF CONTENTS

*Page*

QUESTIONS PRESENTED............................ i

PARTIES................................................... ii

NO CORPORATE DISCLOSURE.................. ii

RELATED PROCEEDINGS ......................... ii

TABLE OF AUTHORITIES........................... vi

DECISION BELOW ...................................... 1

STATEMENT OF JURISDICTION ............... 1

STATUTORY PROVISIONS INVOLVED...... 1

STATEMENT OF FACTS .............................. 2

    A.   John's Mandamus Petition................. 2

    B.   Byler Declaration for Recusal Due
        To Bias .............................................. 2

        1.   Propaganda Piece One for
             Purdue: July 2, 2021 Opinion...... 4

        2.   Propaganda Piece Two for
             Purdue: August 11, 2022
             Opinion ....................................... 7

            a.   Overruling Justice Barrett ... 9

iv

*Page*

      b.   Massively Distorting The Record ................................... 17

     3.   Propaganda Piece Three for Purdue: February 14, 2023 Opinion ........................................ 22

  C.  Magistrate Judge Kolar's Denial of Recusal; John's Notice of Appeal ... 25

  D.  John's Motion To the Seventh Circuit To Stay The Proceedings Before Magistrate Judge Kolar .................... 28

  E.  Seventh Circuit Text Order .............. 29

ARGUMENT ................................................. 29

  A.  The Grounds For Granting The Petition ............................................... 29

  B.  The Glaring Defects of the Seventh Circuit Text Order .............. 30

  C.  The Problem of Bias In This Case...... 34

  D.  The Problems of Attempting To Treat Bias In A Final Judgment Appeal; The Adverse Consequences of Not Having Collateral Order Appellate Review .............................. 41

CONCLUSION .............................................. 42

v

*Page*

APPENDIX

Seventh Circuit Text Order,
Sev. Cir. 23-2764 Docket Entry 14..... 1a

Motion To Stay, Sev. Cir. 23-2764
Docket Entry 13 ................................ 4a

Kolar Decision Denying Recusal for
Bias, Dist. Ct. DE 261 ....................... 54a

Notice of Appeal, Dist. Ct. DE 267
(cross-referenced in John's
Jurisdiction Memorandum)................ 76a

Purdue Response to John's Jurisdiction
Memorandum, Sev. Cir. 23-2764
Docket Entry 11 ................................ 130a

Doe Jurisdiction Memorandum,
Sev. Cir. 23-2764 Docket Entry 9....... 134a

Doe Declaration in support of recusal
for bias, Dist. Ct. DE 257-2
(Identified in Seventh Circuit
Text Order)........................................ 143a

Denial Without Opinion of John's
Mandamus Petition,
Sev. Cir. 23-1310 Doc. Entry 3........... 153a

vi

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Cohen v. Beneficial Indus. Loan Corp.*,
  337 U.S. 541 (1949)................................    29

*Coopers & Lybrand v. Livesay*,
  437 U.S. 463 (1978)................................  29, 33

*Crabtree v. Nat'l Steel Corp.*,
  261 F.3d 715 (7th Cir.2001) .....................    6, 7

*Doe v. Purdue*,
  928 F.3d 652 (7th Cir. 2019) ................... *passim*

*Doe v. Trustees of Indiana University*,
  2021 WL 2213257 (S.D. Ind.
  May 4, 2021) ..........................................    15

*Dupuy v. Samuels*,
  397 F.3d 493 (7th Cir. 2005) ................... 12, 14

*Fowler v. Butts*,
  829 F.3d 788 (7th Cir. 2016) .......... 26, 27, 32, 33

*Hampton v. City of Chicago*,
  643 F.2d 478 (7th Cir. 1981) ................... 30, 31

*In re Gibson*,
  950 F.3d 919 (7th Cir. 2019) ................... *passim*

*Keller v. United States*,
  58 F.3d 1194 (7th Cir.1995) .....................    7

vii

*Page(s)*

*Liteky v. United States,*
    510 U.S. 540 (1994)................................... 3, 36

*MAO-MSO Recovery II, LLC v.*
    *State Farm Mut. Auto. Ins. Co.,*
    994 F.3d 869 (7th Cir. 2021) .................... 18

*Olivieri v. Rodriguez,*
    122 F.3d 406 (7th Cir.1997) ................ 11, 12, 15

*Rose v. Clark,*
    478 U.S. 570 (1986)............................ 29, 30, 34

*Smith v. United States,*
    293 F.3d 984 (7th Cir. 2002) .................... 6

*United States v. Henderson,*
    915 F.3d 1127 (7th Cir. 2019) ................. 32

**Statutes**

28 U.S.C. § 144 ............................................ 3, 29

28 U.S.C. § 455 ............................................ 3, 29

28 U.S.C. § 1254(1) ....................................... 1

Title 28 of the United States Code,
    § 455 (a) .................................................... 1

**Rules**

Federal Rule of Civil Procedure 21(a) ........... 31

viii

*Page(s)*

## Regulations

34 C.F.R. 106.45 ............................................    10

## Constitutional Provisions

Article III, Section 2 of
the U.S. Constitution. ..............................    1

## Other Authorities

K.C. Johnson,
"Sex, Due Process and Amy Coney Barrett,"
Wall Street Journal, Oct. 1, 2020 .............    10

Purdue Responds on Judge Amy Coney Barrett's
Title IX Opinion,"
Wall Street Journal, Oct. 12, 2020 ...........    10

*Secretary DeVos Announces New Title IX
Regulation" https://www.youtube.com/*
watch? *v*=hTb*3yfMNGuA*..........................    9, 10

U.S. Department of Education Press Release,
"Secretary DeVos Takes Historic Action
to Strengthen Title IX Protections for
All Students," May 6, 2020 ......................    9

White House Statement and Release,
"President Biden Announces
Thirty-Sixth Round of Judicial
Nominees" (July 27, 2023) ......................    37

ix

*Page(s)*

YouTube:
  *Circuit Court Judge Nominees Face*
  *Senate Judiciary Committee -*
  *YouTube* ..................................................     38

1

## DECISION BELOW

The Seventh Circuit Text Order dismissing John's appeal for lack of jurisdiction was issued November 6, 2023, and is located in the Seventh Circuit case file 23-2764 at Docket Entry 14. (1a-3a.) A Westlaw search failed to show any publication of the Seventh Circuit Text Order.

## STATEMENT OF JURISDICTION

This Court's jurisdiction is established by 28 U.S.C. § 1254(1) and Article III, Section 2 of the U.S. Constitution. The Seventh Circuit's Text Order was issued November 6, 2023.

## STATUTORY PROVISIONS INVOLVED

Title 28 of the United States Code, § 144 provides that "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

Title 28 of the United States Code, § 455 (a) provides that "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

2

## STATEMENT OF FACTS

### A.  John's Mandamus Petition.

On February 17, 2023, John filed a petition for
mandamus (Sev. Cir. 23-1310 Doc. Entry 1), follow-
ing over 3½ years of litigation since June 28, 2019,
when then Judge Barrett issued her opinion for the
Seventh Circuit upholding John's Complaint on the
grounds of denial of due process and Title IX sex
discrimination, 928 F.3d 652, and 3 days after the
Magistrate Judge denied reconsideration of dis-
missing John's due process claim (Dist. Ct. DE
224). The stated theory of the mandamus petition
was that the Magistrate Judge was exceeding his
jurisdiction by kowtowing to Purdue and, among
other things, (i) sanctioning John by purporting to
find spoliation where as a matter of law there was
none concerning 11 irrelevant post-suspension
Snapchat videos, (ii) overruling Judge Barrett's
opinion in *Doe v. Purdue*, 928 F.3d 652 (7th Cir.
2019), to throw out John's due process claim, and
(iii) ignoring the Navy Regulations for Officer De-
velopment ("ROD") that obligated John to provide
the authorization that Purdue wrongly postured as
self-defamation. The petition was denied without
opinion. (Sev. Cir. 23-1310 Doc. Entry 3). (153a.)

### B.  Byler Declaration for Recusal Due To Bias.

After pretrial order proceedings and settlement
conferences, John moved to recuse the Magistrate

3

Judge for bias pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455. The Byler Declaration in support of the motion (Dist. Ct. DE 257-2, 23a-52a), which is identified in the Seventh Circuit Text Order, explained:

> [W]hile Judge Kolar apparently has an extra-judicial bias, this is a case of "pervasive bias," *Liteky v. United States,* 510 U.S. 540, 551 (1994), not necessitating an extra-judicial bias. Magistrate Judge Kolar has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate Justice Barrett's opinion in this case, 928 F.3d 652 (7th Cir. 2019), even though as discussed below the U.S. Department of Education relied upon Justice Barrett's opinion in this case in formulating the current Title IX regulations containing due process protections.. . .

> Plaintiff is not relying upon the mere fact of adverse rulings but upon the manifestations of "judicial predispositions that go beyond what is normal and acceptable," and show a case of "pervasive bias." *Liteky v. United States,* 510 U.S. at 551. In particular, Magistrate Judge Kolar's July 2, 2021, August 11, 2022 and February 14, 2023 opinions mishandling the law in a way an impartial judge would not do, misstating the factual record in a way an im-

4

partial judge would not do, and do so all to Purdue's benefit, issuing what were propaganda pieces for Purdue, establishing Magistrate Judge Kolar won't be impartial due to pervasive bias.

The phrase "propaganda pieces" was not used rhetorically, but rather used to describe the essential nature of three of Judge Kolar's decisions reflecting how, in the eyes of someone who has practiced law for almost 50 years, those decisions departed from an impartial judicial norm. The extra-judicial bias became clear with Magistrate Judge Kolar's nomination to a judgeship on the Seventh Circuit. (4a-10a.)

### 1.   Propaganda Piece One for Purdue: July 2, 2021 Opinion.

Concerning the July 2, 2021 opinion, described as "Propaganda Piece One For Purdue: Irrelevancy Treated as Spoliation," the Byler Declaration stated (23a-26a), among other things:

18. In response to Purdue's demands, Plaintiff John Doe personally produced all of the documents he had about the events of the case (including 133 pages of text message between Jane Doe and him), gave cell phone information and ten separate medical authorizations, answered three sets of interrogatories and gave a day-long deposition. In response to Purdue's demand for all of John's post-suspension so-

5

cial media posts, John produced all of his
Instagram posts and produced the 75
Snapchat videos and pictures he had.
(DE152, DE156, DE175.) Purdue had the
Instagram and Snapchat production at the
time of taking John's deposition but never
marked any as deposition exhibits and
never asked John any questions about
them.

19. In the backdrop of Plaintiff factually
building his due process and Title IX case,
Purdue moved for sanctions against Plain-
tiff John Doe, making a plethora of inaccu-
rate accusations about discovery and
seeking (again) the due process claim be
struck. (DE 148.) John Doe opposed, show-
ing his compliance with discovery. (DE
152, DE 152-1, DE 152-2.) On February 22,
2021, the Court held a multi-hour eviden-
tiary hearing on Purdue's motion. (DE
155.) John Doe testified under oath how
11 Snapchat documents were accidentally
deleted when John cleared memory from
his cell phone without realizing deletion
from his cell phone would affect his Snap-
chat account; John Doe also testified under
oath that the deleted documents were more
of the same of what was produced (DE156;
Snapchat Memories received in evidence.
A32-35; DE155). The Snapchat documents
and indeed, all his social media were irrel-
evant, spanning years after the 2016

6

events at Purdue and relating only to personal matters (e.g., one of John's sisters playing piano). Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir. 2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001).

20. On July 2, 2021, Magistrate Judge Kolar ruled there was spoliation, granting relief albeit different than requested because striking the due process claim was said to be disproportionate (but which Purdue sought because the record had established the due process claim). The Magistrate Judge showed a lack of impartiality by strangely ignoring all the discovery Plaintiff John Doe complied with and focused on what little Plaintiff John Doe did not have. The Magistrate Judge acknowledged "there is nothing in the record to indicate whether the files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not inconceivable" the 11 Snapchat personal posts might be potentially relevant to John Doe's desired Navy career without giving an explanation how it was conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing showed it wasn't (*see* A33-35 in Mandamus Appendix). The Magistrate Judge unjustly lambasted John Doe

7

for the deletion, ordered payment of Purdue's attorney fees (which were claimed to be $30,000 and which would wrongly burden John Doe's effort to vindicate his due process and Title IX rights), and outlined jury instructions regarding what were totally irrelevant documents. (DE168.) However, adverse inference instructions require intentional destruction and relevance. *Crabtree v. Nat'l Steel Corp.,* 261 F.3d at 721; *Keller v. United States,* 58 F.3d 1194 (7th Cir.1995) (collecting cases). Such adverse jury instructions, although erroneously given, would wrongly impact John Doe at trial and further wrongly burden John Doe's effort to vindicate his due process and Title IX rights. . . . .

## 2. Propaganda Piece Two for Purdue: August 11, 2022 Opinion.

Concerning the August 11, 2022 opinion, described as "Propaganda Piece Two For Purdue: De Facto Rejection of Justice Barrett on Liberty Stigma-Plus Interest," the Byler Declaration stated (26a-43a), among other things:

21. John Doe moved for summary judgment on his due process claim and to dismiss Purdue's state police power counterclaim. . . . Summary judgment was premised on discovery having conclusively established the facts alleged in the Complaint that Judge Barrett had relied upon

8

in upholding Plaintiff's due process claim and additional facts that made the denials of due process even more egregious. Purdue moved for summary judgment to dismiss John's due process and Title IX claims. . . . Purdue never used any of John's social media production in the summary judgment briefing. (DE178, DE180.)

. . . .

22. On August 11, 2022, the Magistrate Judge showed a lack of impartiality when denying John Doe's motion for summary judgment on his due process claim on the ground there were issues of fact with respect to the stigma-plus liberty interest whether the stigma was false, even though the Seventh Circuit has never adopted a falsity element for a stigma-plus liberty interest and the record did not support that there were the issues purportedly identified. Purdue's motion for summary judgment dismissing the due process claim was granted, rejecting John Doe's stigma-plus liberty interest, reviving the self-defamation ground that Judge Barrett had rejected and requiring a narrow, unrealistic legal obligation divorced from military realities to authorize disclosure of the university disciplinary file to the Navy. . . . (DE206, A168-216.)

9

### a.   Overruling Justice Barrett.

Then Judge (now Justice) Barrett's *Doe v. Purdue* due process rulings had national importance (27a-29a):

> 23. The national importance of the due process rulings of then Judge (now Justice) Barrett in *Doe v. Purdue*, 928 F.3d 652, 661-664, 667 (7th Cir. 2019), cannot be understated, holding: (i) that John had pleaded a stigma-plus liberty interest; (ii) that Purdue's disciplinary process was woefully deficient and did not provide due process, citing among other things not giving John the investigation report and not holding a real hearing ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension"); and (iii) that the District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand").

> 24. When then Education Secretary DeVos announced on May 6, 2020, what would be the current due process Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue*. *"Secretary DeVos Announces New Title IX Regulation," https://www.youtube.com/watch?v=hTb3yfMNGuA;* U.S.

10

Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020; 34 C.F.R. 106.45. Secretary DeVos noted that it was a three-woman panel with then Circuit Judge Amy Coney Barrett as the author of the opinion. *"Secretary DeVos Announces New Title IX Regulation"* https://www.youtube.com/watch?v=hTb*3yfMNGuA*.

25. When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention. Defending Judge Barrett's opinion in the Wall Street Journal was K.C. Johnson, "Sex, Due Process and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020. Purdue responded with its defiant defense, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020. Judge Barrett's opinion has been a thorn in Purdue's side, and Purdue does not want to live in accordance with it.

26. The Magistrate Judge misstates John's argument as meaning the national importance of the *Doe v. Purdue* due process ruling by itself compels denial of summary judgment. (DE224, p. 10.) That is not Plaintiff's argument. It is that the Magistrate Judge's August 11 Opinion did not consider Purdue's due process viola-

11

tions and expungement of the disciplinary
file as contemplated in Judge Barrett's
opinion, but rather with insubordinate pet-
tifoggery dismissed the due process claim
(DE206, pp.16-18, DE224, pp. 2-4), by
adopting Purdue's self-defamation argu-
ment expressly rejected by Judge Barrett,
marginalizing chain of command military
realities and effecting an absurd result
wholly inconsistent with Judge Barrett's
opinion.

Judge Barrett rejected Purdue's self-defamation
argument (29a-30a):

27. Before the Seventh Circuit in 2019,
Purdue had argued that John had engaged
in self-defamation by authorizing the re-
lease of the university disciplinary files to
the Navy. That argument then was prem-
ised on the NROTC only learning of John's
disciplinary case because of John's author-
ization of disclosure to the Navy ROTC.
Judge Barrett stated in her opinion Pur-
due's position: "The university maintains
that it has not and will not divulge John's
disciplinary record without his permission.
The Navy knows about it only because
John signed a form authorizing the disclo-
sure after the investigation began." 928
F.3d at 661. Purdue cited *Olivieri v. Rodri-*
*guez,* 122 F.3d 406 (7th Cir.1997), where a
voluntary disclosure was the reason for an

12

employment discharge in a situation that the Seventh Circuit considered it speculative whether the disclosure would ever be called for. Judge Barrett, however, rejected Purdue's argument (928 F.3d at 652):

> John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510.

(928 F.3d at 662.)

28. The discovery record made Purdue's argument and Magistrate Judge Kolar's ruling about self-defamation wholly untenable. Indisputably: (i) the NROTC knew about the disciplinary proceeding well before the May 24, 2016 authorization because on April 4, 2016, Jane Doe first went to the NROTC to make her accusations; (ii)

13

Purdue first learned of Jane Doe's accusations from the NROTC; and (iii) the NROTC was looking to the Purdue investigation from the start.

The Navy's knowledge of Jane Doe's accusations and the Navy's intention to rely upon the Purdue investigation made Purdue's argument and Magistrate Judge Kolar's ruling about self-defamation wholly untenable (30a-32a):

29. On April 4, 2016, Jane Doe falsely told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John Doe, and Lieutenant Sheppard informed his superior officers Commander Hutton and Executive Officer Remaly about Jane Doe's allegations. (DE183-34: Shepard tr 21-25, 28-30; DE183-43: Sheppard Ex 2; DE187: Sheppard tr 42-43.) Also on April 4, 2021, Commander Hutton reported Jane Doe's sexual misconduct allegations to Purdue's Office of the Dean of Students, reflecting the interrelationship of Purdue and the Purdue Navy ROTC. (DE 187-6: Dfs. SJ Ex. K.) When asked by Purdue counsel about the "investigation" of the sexual misconduct allegations against John, NROTC Commander Hutton responded that "that investigation was referred to Purdue University." (DE 183-35: Hutton tr. 14.)

. . . .

14

31. The authorization to the NROTC for access to the Purdue disciplinary files was dated May 24, 2016, well after the NROTC learned of the disciplinary proceeding. (DE183-5, John tr. 23; DE183-44.) John Doe testified at his deposition that the Navy wanted "in the loop" (DE183-5, tr 21-22), and when John Doe was deposed by Purdue about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the NROTC, not self-defamation (which was never raised). (DE208-1, DE208-2, tr 22-26.)

32. The significance was explained by John Doe: "With Jane Roe having reported her accusation to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, I really was in no position to refuse the authorization." (DE208-1 ¶ 7.) According to John: "Soon after Jane Roe complained to the Navy, I was put on interim leave of absence pending the university investigation. If I had refused authorization, I would not only have looked bad, but I also would have been sanctioned in some way." (DE208-1 ¶¶ 3, 5.) John thus had no choice but to authorize the Navy to be "in the loop" in the university disciplinary proceeding; it was not voluntary. John's case is "more like *DuPuy v. Samuels.*" 928 F.3d

15

at 662. Purdue's authorization argument made no sense given the actual facts.

The Magistrate Judge's narrow legal obligation theory conflicted with Judge Barrett's opinion and military realities (32a-37a):

33. John's situation as a NROTC midshipman who was not in a position to refuse the authorization to the Navy is totally inapposite to the situation of a voluntary disclosure of a disciplinary record for a school transfer, as in *Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021), and to the situation of a voluntary disclosure of the reason for an employment discharge in *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997). Here, the obligation to disclose was not, as wrongly asserted by the Magistrate Judge, speculative. Rationalizing away the distinction between civilian and military life in this context amounts to willful blindness, which resulted in the Magistrate Judge incorrectly treating John's authorization as voluntary and John's testimony the Navy "wanted in the loop" as not a legal obligation to authorize. (DE221, p. 16; DE224, pp. 2-4.)

34. Dismissing military realities as speculation, as the Magistrate Judge does, is erroneous at best. The December 19 reconsideration hearing exchanges lay bare the

16

unreasonableness of the Magistrate
Judge's opinion; among those exchanges
were:

[**MR. BYLER**]: . . . The authorization
was requested because the Navy – and
this is the testimony – "wanted in the
loop." And that meant they wanted in
the loop of the investigation. And they
were put into the loop.

And John Doe was not in a position to
say no. As ROTC midshipmen, respect-
ing his Navy superiors, wanting a ca-
reer in the Navy, you have a request;
knowing that the Navy wants to be in
the loop. You don't say no. . . .

**THE COURT**: But I see nothing. I don't
see your client saying, "I was given or-
der."

[**MR. BYLER**]: . . . [Plaintiff] was on
scholarship. He had to honor his com-
mitments and obligations. . . And that
meant, when he gets a request for this
kind of authorization, that kind of
access, when the Navy knows and it's
going to be relying on the [Purdue] in-
vestigation, yes, he has to give it. He
was in no position not to give it. . . .

The decision that Commander Hutton
testified to was: We're going to rely on
the Purdue investigation. . . .

17

> And it was in that context in which
> John Doe knows that they're wanting
> to be in the loop because the investiga-
> tion that's ongoing, he's requested by a
> superior officer for that access.

(DE 221, tr.5-22.) . . .

35. . . . Purdue's position that whether
Purdue's disciplinary process complied
with Fourteenth Amendment due process
is "immaterial" (DE213, p. 12) and the
Magistrate Judge's adoption of that posi-
tion reflects how much at odds Purdue and
the Magistrate Judge are with Justice Bar-
rett's opinion.

### b.  Massively Distorting The Record.

Magistrate Judge Kolar's August 14, 2022 opin-
ion gave a purported review of triable issues that
did not reflect the factual record but that contrib-
uted significantly to the August 11 Opinion being a
propaganda piece for Purdue. The Byler Declara-
tion details:

### Cover Up of Jane Doe Never Testifying Versus John Doe Repeatedly Testify-ing.

39. Magistrate Judge Kolar, in a parti-
san slip, repeated what were the allega-
tions of Jane Doe when in fact she never
testified. Summary judgment is not a time
when allegations suffice. Proof is needed.

18

Jane's allegations were not and are not proof. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (facts needed to defeat summary judgment). . . .

40. In contrast, John Doe has repeatedly put himself under oath to testify that Jane's accusations are false. . . .

**John-Jane Doe Texts.**

. . . .

41. Magistrate Judge Kolar quotes passages of John Doe-Jane Doe texts as if they were admissions of guilt. They weren't; and there was no evidence before Judge Kolar to treat them as evidence of guilt. That Magistrate Judge Kolar does so, shows a lack of impartiality. In depositions, Purdue's Dean Sermersheim, Purdue's investigator Amberger and Purdue's investigator Oliver each admitted that there is no statement in the texts in which John admitted or Jane Doe accused John of committing the sexual acts alleged in the Notice of Allegations. (DE183-7: Semersheim tr 34; DE183-14: Amberger tr 70-72; DE187-9: Oliver tr. 50-57.) Notably, before the alleged incidents, John and Jane Doe had a three-month relationship in which John and Jane Doe had a sexual relationship initiated by Jane, the first such relationship in John Doe's life after

19

being brought up in an Evangelical Christian home where he was taught sex was for marriage. (DE183-8: John 02/18/2021 Affidavit ¶¶ 4-5; DE 208-1: Ex. A, John tr 92-93.) John Doe has put himself under oath as to the correct understanding of the texts (where the surrounding context makes them all clear, yet Purdue hid when cherry-picking them); Jane Doe never did. (DE208-1: John 08/2022 Declaration ¶ 11.)

42. To the investigators, John provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John and his family Christmas cookies after the supposed sexual assault occurred and after Jane Doe initially claimed the relationship had ended. Jane Doe provided *no* texts to the investigators, telling them she had deleted the texts. (DE183-3: Df. Answer ¶ 36; DE183-14: Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; DE183-11: Amberger 27, Texts (PU 206-339); DE183-7: Semersheim tr. 34; DE 183-5: John Dep. tr. 111-114.)

43. Yet, the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relation-

20

ship after Jane Doe's claims), and Vice
President Rollock and Dean Sermersheim
did not know that there were 133 pages of
texts submitted by John to the investiga-
tors. (DE183-3: Df. Answer ¶¶ 2, 37, 39;
DE183-14: Amberger Dep tr 49-50, 61-62;
DE183-6: Rollock Dep tr 30, 46-47; DE183-
7: Sermersheim Dep tr 21-23, 35; DE183-
41: Custodian Klingerman Dep tr 27-28.)
The investigation report twisted the texts
and contained many other inaccuracies in-
cluding the fabrication that John Doe con-
fessed to the allegations. Knowing this, it is
no wonder they refused to let John Doe
view the investigation report and defend
himself while at Purdue, something other
schools typically provide, but not Purdue.
(DE183-8: John 02/18/2021 Affidavit ¶ 15;
DE187, pp. 44-47.)

**The Investigation Report.**

44. There is no good impartial reason for
Magistrate Judge Kolar to ignore that: (i)
Plaintiff John was not provided an oppor-
tunity to review the investigation report
during the disciplinary case, (ii) the inves-
tigation report included only short portions
of 7 pages of the 133 pages of texts (the
selected portions did not include texts
showing an ongoing relationship after Jane
Doe's claims), and (iii) Vice President
Rollock and Dean Sermersheim did not
know that there were 133 pages of texts

21

submitted by John to the investigators. (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62; DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.) Only a partisanship for Purdue explains why Magistrate Judge Kolar also ignored that the investigation report had twisted the texts and contained many other inaccuracies pointed out by Plaintiff. (DE183-8: John 02/18/2021 Affidavit ¶ 15; DE187, pp. 44-47.)

**The Letter Sent On Behalf Of Jane Doe To The Committee.**

44. On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim; instead, on June 5, 2016, Monica Bloom, Director of CARE and a lawyer, submitted a written statement said to come from Jane Doe, which was in the form of an e-mail. Bloom was asked in her deposition how, if Jane Doe did not have access to a computer, she e-mailed the statement to Bloom. Bloom said she (Bloom) did not recall (DE183-9, Bloom Dep tr 29-30; 183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement (PU653-654)). The Magistrate Judge does not deal with this testimony, but rather incorrectly states it was undisputed the

22

e-mail came from Jane Doe, the point was very much in dispute, and further, the Magistrate Judge also does not address the fact that the three-person panel of the Advisory Committee on Equity and Dean Sermersheim, never met and never heard any direct testimony from Jane Doe and did not have the opportunity to ask any questions of Jane Doe. (DE183-3: Df. Answer ¶ 41; DE183-9: Bloom tr 28-32; DE183-26: Bloom 23, Bloom transmittal of June 5, 2016 statement.)

### 3.  Propaganda Piece Three for Purdue: February 14, 2023 Opinion.

Concerning the February 14, 2023 opinion, described as "Propaganda Piece Three For Purdue: The Reconsideration Decision: Ignoring the Navy ROD," the Byler Declaration stated (43a-51a):

> 47. . . . Magistrate Judge Kolar adhered to dismissing the due process claim, ruling that John Doe failed on summary judgment to show a legally obligated disclosure, that John Doe's position he was in no position to refuse authorization was insufficient even though the Navy ROD clearly substantiated that John could not properly refuse authorization. (DE208-3.)

> 48. The Navy ROD (which was not available at the time of the Navy depositions) clearly substantiates that John could not

23

properly refuse authorization. (DE208-3.) The Magistrate Judge showed a lack of impartiality in not addressing Plaintiff's full presentation of the Navy ROD.

The Navy ROD on "honor" and "respecting authority" and on sanctioning upon failures to show "honor" and "respecting authority" support the requirement to authorize disclosure, but perhaps most telling is the necessity per the Navy ROD to disclose the disciplinary finding that presently is part of a permanent federal record which John has. The Byler Declaration states:

> The PRB document is made part of the student's file per the Navy ROD (DE208-3, section 6-13.5, pp. 6-20) and because it involved disenrollment is sent to Naval Operations per the Navy ROD section 6-13.6, p. 6-20. Disciplinary disenrollment documents are part of his "permanent federal record" per Navy ROD (DE 208-3) section 6-16 (pp. 6-26 – 6-27). . . . Should John reapply to the NROTC or to any commission in the U.S. Armed Forces, he would be honor-bound to disclose the disciplinary disenrollment that is part of permanent federal record and if he did not and it were inevitably discovered in a mandatory background check, termination would be expected. (DE208-1 ¶ 9.) The permanent federal record exists only as a result of the university disciplinary case (DE209, pp. 8-

24

9); the Navy did not conduct its own inves-
tigation but relied 100% on the university
disciplinary suspension. (DE187-2, pp. 23-
27 and record citations therein.) The Mag-
istrate Judge's failure to address this point
is more than strange, it was a partisan
slip.

In the end, the denial of reconsideration led to an
absurdly erroneous result explained in the Byler
Declaration:

The Navy ROD compelled giving author-
ization, would make John subject to sanc-
tion upon refusing authorization, and
required disclosure upon re-application due
to a permanent federal record—which even
the Magistrate Judge's August 11 opinion
indicated would make summary judgment
inappropriate (DE206, pp. 16-17) but
which the Magistrate Judge avoided on re-
consideration, so much lacking in impar-
tiality Magistrate Judge Kolar had become.
Instead, the Magistrate Judge essentially
adopted Purdue's dismissal of the Navy
ROD as "a set of internal Navy rules, not
law" and Purdue's denial that the Navy
ROD had the force of law to compel execut-
ing the authorization (DE221, p. 12). That,
however, leads to the absurd erroneous re-
sult that a Navy ROTC midshipman who
acts per the requests of his Navy superiors
and the obligations reflected in the Navy

25

ROD has no due process rights. Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's effective adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.

## C. Magistrate Judge Kolar's Denial of Recusal; John's Notice of Appeal.

On August 14, 2023, Magistrate Judge Kolar issued an opinion denying John Doe's motion to recuse him for bias and did so without disclosing that he had been nominated to be a judge on the Seventh Circuit. (Dist. Ct. DE 261, 54a-75a.)

Magistrate Judge Kolar's opinion avoided the actual reasons establishing the pervasive bias in this case presented and certified in the Byler Declaration [Dist. Ct. DE 257-1], and instead gave rationalizations and inapposite general propositions to justify his functioning as a biased trial judge in an important case. Magistrate Judge Kolar's failure to disclose the nomination avoided the nomination to the Seventh Circuit being identified as the extra-judicial source of bias favoring Purdue documented in the Byler Declaration.

On September 7, 2023, John filed a Notice of Appeal [Dist. Ct. DE 267] (76a-129a) that invoked the Seventh Circuit case law establishing the jurisdiction of the Seventh Court for the appeal of what is

26

often called a collateral order and then dissected
Magistrate Judge Kolar's opinion denying recusal
for bias in order to demonstrate that Magistrate
Judge Kolar has avoided the actual reasons estab-
lishing the pervasive bias in this case presented in
the Byler Declaration and has no real answers to
the bias case against him.

The Seventh Circuit ordered jurisdiction memo-
randa from the parties, initially from John in a
September 23, 2023 order (Sev. Cir. 23-2764, Dock-
et Entry 3) and then from Purdue in a September
28, 2023 order (Sev. Cir. 23-2764, Docket Entry 10).

John's September 26, 2023 jurisdiction memo-
randum (Sev. Cir. 23-2764, Docket Entry 9, 134a-
139a) first argued that, as stated in the Notice of
Appeal (DCt DE 267), this is an appeal from what
other courts would call a collateral order and, in
the Seventh Circuit, might be called "a final deci-
sion"—here, denying recusal due to bias, and bias
of a trial judge is too important to be denied review
and too independent of the cause itself to require
that appellate jurisdiction be deferred until the
whole case is adjudicated.

John's jurisdiction memorandum (Sev. Cir. 23-
2764, Docket Entry 9, 134a-139a) further argued
that reading *In re Gibson*, 950 F.3d 919, 922 (7th
Cir. 2019), and *Fowler v. Butts*, 829 F.3d 788, 793
(7th Cir. 2016), as permitting review of a denied
recusal motion through appeal of the final judg-
ment is one thing, but it is quite another to read
those cases as requiring the appeal of denied

27

recusal motion through appeal of the final judgment. The words "can be" do not mean "can effectively be" and do not mean "must be." *In re Gibson* did not involve a recusal for bias motion but rather a mandamus petition where the facts did not warrant mandamus. The question of whether there was an appropriate occasion for a collateral order review was not presented, and immediate review was not called for in any event. *Fowler v. Butts* involved the denial of a federal habeas petition where the prisoner objected to the judge's handling of the conviction given that the judge as a state court judge had accepted the prisoner's state court guilty plea. The simple issue of bias there was readily identifiable and was not obscured by a mass of other issues relating to the underlying merits.

John's jurisdiction memorandum (Sev. Cir. 23-2764, Docket Entry 9, 134a-142a) also argued that the September 13, 2023 Order misidentified the mandamus petition's primary focus as seeking to reverse rulings of the Magistrate Judge. Differently, the mandamus petition challenged Magistrate Judge Kolar for exceeding his jurisdiction, particularly in effectively overruling Judge (now Justice) Barrett's nationally and federal regulatory significant opinion reported at 928 F.3d 652.

Purdue's September 29, 2023 jurisdiction memorandum (Sev. Cir. 23-2764, Docket Entry 11, 130a-132a) argued that John's arguments were addressed to alleged errors in Magistrate Judge Kolar's opinions and that bias could be addressed in an appeal from a final judgment.

28

### D.  John's Motion to the Seventh Circuit to Stay The Proceedings Before Magistrate Judge Kolar.

John's October 30, 2023 motion to the Seventh Circuit to stay the proceedings before Magistrate Judge Kolar stated the following "extraordinary circumstances" requiring the motion: "(i) Magistrate Judge Kolar was subject to a motion to recuse for pervasive bias for Purdue made by Plaintiff-Appellant John Doe on July 9, 2023, and is subject to a still pending appeal to this Court filed on September 7, 2023, of Magistrate Judge Kolar's denial of recusal for bias; (ii) Magistrate Judge Kolar, with four years' experience as a Magistrate Judge and none as an Article III District Judge, was nominated to be a judge on this Court on July 27, 2023, by the Biden Administration; (iii) when Magistrate Judge Kolar denied the recusal for bias motion on August 14, 2023, he did not disclose the fact that he was nominated to be a judge on this Court; (iv) when Magistrate Judge Kolar appeared on September 6, 2023, before a Senate Committee, he did not disclose that he had been subject to a motion to recuse for pervasive bias favoring Purdue; (v) Plaintiff-Appellant John Doe and his counsel first learned of Magistrate Judge Kolar's nomination to be a judge on this Court when the Northern District of Indiana federal court announced in a press release on October 11, 2023, that there would be an anticipated opening for a Magistrate Judge position given Magistrate Judge Kolar's nomination to be a judge on this Court; and (vi) Magistrate Judge

29

Kolar continues on insisting that he be the trial judge in this case and has scheduled a trial date." (John's Stay Motion, Sev. Cir. 23-2764 Doc. Entry 13-1, pp. 1-2.)

**E.  Seventh Circuit Text Order.**

The deficiencies of the Seventh Circuit Text Order denying jurisdiction is discussed below in Part B of the Argument.

## ARGUMENT

**A.  The Grounds For Granting The Petition.**

1. This Court should exercise its supervisory authority to require review now of a denial of recusal for bias shown pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455 that otherwise would mean a trial before a biased Magistrate Judge, the bias shown in his rulings and the extra-judicial bias in his nomination to the Seventh Circuit, who would then be a colleague of the Seventh Circuit at the time of an appeal from a final judgment.

2. It is an important federal question for this Court's consideration whether denials of recusal for bias shown pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455 be subject to appellate review per the collateral order doctrine of *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949) and *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978), particularly given, as this Court held in *Rose v. Clark*, 478 U.S. 570, 577 (1986), that

30

adjudication before a biased judge requires reversal regardless of the evidence and bias cannot effectively be adjudicated in an appeal of a final judgment.

## B. The Glaring Defects of the Seventh Circuit Text Order.

The Seventh Circuit Text Order dismissed John's appeal for lack of jurisdiction, stating: "[t]he collateral order doctrine does not allow review of a recusal order. *Hampton v. City of Chicago*, 643 F.2d 478, 479 (7th Cir. 1981)." (2a-3a.) The glaring defect in that statement is that *Hampton v. City of Chicago* does not support it. *Hampton v. City of Chicago* involved a *granted* recusal motion, prompting the Seventh Circuit to state: "At the outset we observe that we fail to conceive of any interest which the plaintiffs have as litigants for review of Judge Shadur's recusal order. The effect of his decision to step aside is merely to have the case reassigned to another judge of the district court. The order does not strip plaintiffs of a fair forum in which they can pursue their claims. . . . While plaintiffs have a right to have their claim heard by the district court, they have no protectable interest in the continued exercise of jurisdiction by a particular judge." In stark contrast, this case involves a *denied* recusal motion, raising the specter of a biased judge overseeing trial that would require reversal as a matter of constitutional law, *Rose v. Clark*, 478 U.S. 570, 577 (1986). There is a world of difference between the two situations, one raising

31

the specter of a constitutionally erroneous trial before a biased judge and one where there is a replacement judge to avoid bias, that disallows treating the two situations the same as to the availability of collateral order appellate review.

The Seventh Circuit Text Order, after citing only the inapposite case of *Hampton v. City of Chicago* for denying collateral order review of a denied recusal for bias motion, notes that "[a] denied recusal order may be reviewed before final judgment through a writ of mandamus, *In re Gibson*, 950 F.3d 919, 923 (7th Cir. 2019), but this court will not construe an appeal, like Doe's here, that does not comply with the requirements of Federal Rule of Civil Procedure 21(a), as a petition for writ of mandamus." There are three glaring defects to that broad assertion.

*First*, Federal Rule of Civil Procedure 21(a) has nothing to do whatsoever with mandamus, but rather states a permissive rule for joinder of parties: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." The Text Order makes no sense on this point.

*Second*, before moving for recusal due to bias, John filed a petition for mandamus, Sev. Cir. 23-1310 Doc. Entry 1, on the theory that the Magistrate Judge was exceeding his jurisdiction by kowtowing to Purdue and, among other things,

32

sanctioning John by purporting to find spoliation where as a matter of law there was none concerning 11 irrelevant post-suspension Snapchat videos, overruling Judge Barrett's opinion in *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019), to throw out John's due process claim, and ignoring the Navy Regulations for Officer Development ("ROD") that obligated John to provide the authorization that Purdue wrongly asserted was self-defamation. The petition was denied without opinion, Sev. Cir, 23-1310 Doc. Entry 3, but a review of the mandamus petition, about which the Seventh Circuit knew, shows it would provide a vehicle for review of bias in this case.

*Third*, the reference in the Text Order to what was a Seventh Circuit rule of using mandamus to review denied recusal motions, citing *United States v. Henderson*, 915 F.3d 1127, 1132 (7th Cir. 2019), reflects the need for more immediate review of such orders denying recusal due to bias. Judge Easterbrook described the mandamus rule as derived "from a belief that problems with the appearance of partiality should be resolved as early in the case as possible, coupled with a belief that the 'appearances' problem concerns the judiciary as a whole rather than the rights of any litigant." *Fowler v. Butts*, 829 F.3d 788, 792 (7th Cir. 2016).

The Text Order, however, instead notes and relies upon Seventh Circuit precedent for reviewing denied recusal motions in a direct appeal, citing *In re Gibson*, 950 F.3d 919, 923 (7th Cir. 2019), and *Fowler v. Butts*, 829 F.3d at 793. The cited two cas-

33

es do support allowing for a direct appeal to review a denial of recusal, but do not preclude a collateral order appeal of such a denial. *In re Gibson* involved a case in which a mandamus petition was brought for recusal of the district judge, but the recusal was ruled as not warranted given the facts of that case. In *Fowler v. Butts*, the ruling was the district court judge should have recused herself due to her having accepted petitioner's guilty plea while a state court judge; it was in that context it was also ruled that the district judge's denial of recusal could be challenged in a direct appeal and not just by mandamus.

The Seventh Circuit Text Order does not review the requirements for there to be collateral order appellate review, stated in *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978): "[t]o qualify for immediate review under this exception, an order 'must determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment." This is important because the Text Order does not explain how and why, but rather assumes, in a conclusory way, that bias can be effectively reviewed in an appeal of a final judgment: The Text Order blithely says only: "Any alleged harm caused by the denial of [John] Doe's motion to recuse can be addressed on appeal from a final decision." (3a.) There are two glaring defects to that statement.

*First*, it overlooks that a litigant must expend time and resources in a constitutionally erroneous

34

trial before a biased judge, which most definitely is harm that this Court should understand harm, having held in *Rose v. Clark*, 478 U.S. 570, 577 (1986), that as a matter of constitutional law adjudication before a biased judge requires reversal regardless of the evidence.

*Second*, bias cannot effectively be reviewed in an appeal of a final judgment. The Notice of Appeal asserts that the denial of recusal for bias is unreviewable on appeal and that bias of a trial judge is too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. (76a-80a.) There may be issues pertinent to bias, but not to the merits, such as the extrajudicial source of bias in the Seventh Circuit nomination and the spoliation ruling if the jury exercises its common sense and find Purdue's obsession with post-suspension social media to be irrelevant. There is also overloading an appeal. Bias, for example, is shown in the Magistrate Judge's jaundiced treatment of supposed triable issues as to stigma-plus, but the merits simply requires establishing legal error in going down the road of supposed triable issues as to stigma-plus.

## C.  The Problem of Bias In This Case.

In this disturbing period of our country's history, we do not need are judges who are promoted to a U.S. Court of Appeals judgeship for having greatly tilted the scales of justice in a case in favor of a big institutional litigant against an individual seeking

35

to vindicate due process and federal non-discrimination rights. But that is precisely what has happened in *Doe v. Purdue*.

On June 28, 2019, the Seventh Circuit, in an opinion written by then Judge (now Justice) Amy Coney Barrett, upheld an action brought by John Doe claiming due process violations and Title IX discrimination by Purdue when it suspended John Doe for alleged sexual misconduct with an ex-girlfriend. *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019). As explained in the Byler Declaration, the national importance of the due process rulings of then Judge (now Justice) Barrett in *Doe v. Purdue*, 928 F.3d at 661-664, 667, cannot be understated.

So, here it is December 2023, 4½ years after *Doe v. Purdue* was issued, and where are we? In that time, we have appeared before U.S. Magistrate Judge Joshua Kolar, who has been acting as the judge for all purposes and who in July 2023 was finally subjected to a motion to recuse for pervasive bias by John Doe because Magistrate Judge Kolar "has made common cause with Purdue counsel to frustrate John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate [current U.S. Supreme Court] Justice Barrett's opinion in this case" (Byler Decl., Dist. Ct. DE 257-1 p. 2). Strong language, yes, but the truth.

Upon learning of Magistrate Judge Kolar's nomination to the Seventh Circuit, John Doe moved in the Seventh Circuit to stay proceedings in the Dis-

36

trict Court, invoking the interests of judicial integrity and safeguarding the fairness of a trial in this case, given the extraordinary circumstances in the case. Magistrate Judge Kolar was subject to a motion to recuse for pervasive bias for Purdue made by John Doe on July 9, 2023, and is subject to a still pending appeal to the Seventh Circuit filed on September 7, 2023, of Magistrate Judge Kolar's denial of recusal for bias. Magistrate Judge Kolar, with four years' experience as a Magistrate Judge and none as an Article III District Judge, was nominated on July 27, 2023, to be a judge on the Seventh Circuit by the Biden Administration. When Magistrate Judge Kolar denied the recusal for bias motion on August 14, 2023, he did not disclose the fact that he was nominated to be a judge on the Seventh Circuit. When Magistrate Judge Kolar appeared on September 6, 2023, before a Senate Committee, he did not disclose that he had been subject to a motion to recuse for pervasive bias favoring Purdue.

The 34-page Declaration of John Doe's lawyer [Dist.Ct. DE 257-1] that was submitted in support of the motion to recuse Magistrate Judge Kolar for pervasive bias favoring Purdue details the bias case against Magistrate Judge Kolar. Importantly, the Byler Declaration states [DE 257-1, pp. 6-7]:

> Plaintiff is not relying upon the mere fact of adverse rulings but upon the manifestations of "judicial predispositions that go beyond what is normal and acceptable," and show a case of "pervasive bias." *Liteky*

37

*v. United States,* 510 U.S. at 551. In par-
ticular, Magistrate Judge Kolar's July 2,
2021, August 11, 2022 and February 14,
2023 opinions mishandled the law in a way
an impartial judge would not do, misstate
the factual record in a way an impartial
judge would not do, and do so all to
Purdue's benefit, establishing Magistrate
Judge Kolar won't be impartial due to per-
vasive bias.

The following is the chronology of pertinent
events presented to the Seventh Circuit by John
Doe's stay motion (John's Stay Motion, Sev. Cir.
23-2764 Doc. Entry 13-1, pp. 1-2):

–July 9, 2023: John Doe moves to recuse Magis-
trate Judge Kolar for bias, submitting Declarations
by John Doe and his lawyer. [Dist. Ct. DE 257, 257-
1, 257-2.]

–July 19, 2023: Purdue submitted a short Re-
sponse to the recusal for bias motion that did not
take on the facts presented and analysis in the
Byler Declaration. [Dist. Ct. DE 258.]

–July 25, 2023: John Doe submitted a Reply in
further support of the motion to recuse Magistrate
Judge Kolar for bias, replying to the few arguments
of Purdue. [Dist. Ct, DE 260.]

–July 27, 2023: The White House Briefing Room
announces in a White House Statement and Re-
lease, "President Biden Announces Thirty-Sixth
Round of Judicial Nominees" (July 27, 2023), that

38

Magistrate Judge Kolar is nominated to the Seventh Circuit.

–August 14, 2023: Magistrate Judge Kolar issues an opinion denying John Doe's motion to recuse Magistrate Judge Kolar for bias. In that opinion, Magistrate Judge Kolar does not disclose that he has been nominated to be a judge on the Seventh Circuit. [Dist. Ct. DE 261] Magistrate Judge Kolar sets a trial date of November 28, 2023. (Dist. Ct. DE 262.]

–September 6, 2023: Magistrate Judge Kolar appears before a Senate Judiciary Committee and does not disclose he had been subject to a motion to recuse for bias favoring Purdue in a case he had been overseeing for four years. YouTube: *Circuit Court Judge Nominees Face Senate Judiciary Committee - YouTube*.

–September 7, 2023: John Doe files a Notice of Appeal of Magistrate Judge Kolar's opinion denying John Doe's motion to recuse Magistrate Judge Kolar for bias. [Dist. Ct. DE 267.]

–September 11, 2023: John Doe's appeal of Magistrate Judge Kolar's denial of the motion to recuse for bias is assigned Seventh Circuit Court of Appeals Case Number 23-2764.

–September 13, 2023: Magistrate Judge Kolar issues an order requesting the parties to submit status reports whether the Court retains jurisdiction over the case in light of John Doe's Notice of Appeal. [Dist. Ct. DE 270.] This Court issues an Order

39

requesting John Doe to submit a "Jurisdictional Memorandum" by September 26, 2023.

–September 21, 2023: Purdue files a report in the District Court taking the positions that Magistrate Judge Kolar should await whether the Seventh Circuit accepts jurisdiction of Seventh Circuit Court of Appeals Case Number 23-2764 [Dist Ct. DE 271] and that Magistrate Judge Kolar should proceed with pretrial motions anyway based on in-apposite interlocutory cases (not collateral order cases).

–September 26, 2023: John Doe files in the Seventh Circuit the requested "Jurisdictional Memorandum" showing this Court has jurisdiction of Seventh Circuit Court of Appeals Case Number 23-2764. John Doe also files in the District Court the requested report showing that Magistrate Judge Kolar does not have jurisdiction of the case if the Seventh Circuit has jurisdiction of Seventh Circuit Court of Appeals Case Number 23-2764, but if the Seventh Circuit has jurisdiction, Magistrate Judge Kolar should not take any action as urged by Purdue, which would have Magistrate Judge Kolar proceed to decide pretrial issues critical to the fairness of a trial, particularly the motion *in limime*, while the Seventh Circuit is deciding whether Magistrate Judge Kolar has demonstrated bias and a lack of impartiality such that Magistrate Judge Kolar should be recused from deciding pretrial and overseeing the trial. [Dist. Ct. DE 272.]

40

–October 11, 2023: John Doe and his counsel first learn of Magistrate Judge Kolar's nomination to be a judge on the Seventh Circuit when the Northern District of Indiana federal court announced in a press release on October 11, 2023, that there would be an anticipated opening for a Magistrate Judge position given Magistrate Judge Kolar's nomination to be a judge on the Seventh Circuit.

–October 27, 2023: Magistrate Judge Kolar holds a status conference during which he announces that the trial set to begin November 28, 2023, is still on subject to whether the Seventh Circuit has jurisdiction of Seventh Circuit Court of Appeals Case Number 23-2764. [Dist. Ct. DE 277.] During the teleconference, Magistrate Judge Kolar again failed to address his nomination to be a Judge to the Seventh Circuit, even though counsel for John Doe in a pre-teleconference email inquired what the subjects of the teleconference would be given Magistrate Juge Kolar's highly relevant nomination.

Magistrate Judge Kolar's nomination to be a judge to the Seventh Circuit, with four years' experience as a Magistrate Judge and none as an Article III District Judge, has more than just the appearance of being the extra-judicial source of bias favoring Purdue; applying *res ipsa loquitur*, the nomination establishes the extra-judicial source of bias favoring Purdue.

41

**D. The Problems of Attempting to Treat Bias in a Final Judgment Appeal; The Adverse Consequences of Not Having Collateral Order Appellate Review.**

The key question in considering bias of a trial judge should be subject to collateral order appellate review is whether bias can effectively addressed in a final judgment, yet the Seventh Circuit gives only a back-of-the-hand treatment of the question, giving no explanation why bias can effectively be reviewed in an appeal of a final judgment and ignoring the complications from adding trial judge bias to the appeal of a final judgment. What is relevant to the merits and what is relevant to trial judge bias overlap, but are not identical. As noted above, there may be issues pertinent to bias, but not to the merits, such as the extra-judicial source of bias in the Seventh Circuit nomination and the July 2, 2021 spoliation ruling if the jury exercises common sense and finds Purdue's obsession with post-suspension social media to be irrelevant. There is also overloading an appeal. Bias, for example, is shown in the Magistrate Judge's jaundiced treatment of supposed triable issues as to stigma-plus, but the merits simply requires establishing legal error in going down the road of supposed triable issues as to stigma-plus.

42

## CONCLUSION

Based on the foregoing, this Court should grant the petition for a writ of certiorari and such other and further relief as deemed just and proper.

Dated:  New York, New York
        February 2, 2024

By: /s/ Philip A. Byler
    Philip A. Byler
       *Counsel of Record*
    LAW OFFICES OF
       PHILIP A. BYLER
    *Counsel for Petitioner*
    11 Broadview Drive
    Huntington, New York 11743
    631-848-5175
    pbyler1976@gmail.com

**APPENDIX**

1a

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

————————

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

**[SEAL]**

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

————————

## ORDER

November 6, 2023

*Before*

DIANE S. SYKES, *Chief Judge*
ILANA DIAMOND ROVNER, *Circuit Judge*
THOMAS L. KIRSCH II, *Circuit Judge*

————————

No. 23-2764

JOHN DOE,

Plaintiff-Appellant

v.

PURDUE UNIVERSITY, et al.,

Defendants-Appellees

————————

2a

**Originating Case Information:**

District Court No: 2:17-cv-00033-JPK
Northern District of Indiana, Hammond Division
Magistrate Judge Joshua P. Kolar

_____

The following are before the court:

1. **JURISDICTIONAL MEMORANDUM**, filed on September 26, 2023, by counsel for the appellant.

2. **REPONSE TO ORDER DATED SEPTEMBER 28, 2023**, filed on September 29, 2023, by counsel for the appellees.

3. **PLAINTIFF-APPELLANT JOHN DOE'S MOTION FOR STAY PENDING APPEAL**, filed on October 30, 2023, by counsel for the appellant.

4. **DECLARATION OF PLAINTIFF'S ATTORNEY PHILIP A. BYLER, ESQ. TO RECUSE MAGISTRATE JUDGE KOLAR AS TRIAL JUDGE**, filed on October 30, 2023, by counsel for the appellant.

**IT IS ORDERED** that this appeal is **DISMISSED** for lack of jurisdiction. The collateral order doctrine does not allow review of a recusal order. *Hampton v. City of Chicago,* 643 F.2d 478, 480 (7th Cir. 1981). A denied recusal order may be reviewed before final judgment through a writ of mandamus, *In re Gibson,* 950 F.3d 919, 923 (7th Cir. 2019), but this court will not construe an appeal, like Doe's here, that does not comply with the requirements of Federal Rule of Civil Procedure 21(a), as a petition for writ of mandamus. *United States v. Hen-*

3a

*derson,* 915 F.3d 1127, 1132 (7th Cir. 2019). Further, this court permits review of a denied recusal motion—under any provision of 28 U.S.C. § 455—through appeal of the final judgment. *In re Gibson,* 950 F.3d at 922 (citing *Fowler v. Butts,* 829 F.3d 788, 793 (7th Cir. 2016)). Any alleged harm caused by the denial of Doe's motion to recuse can be addressed on appeal from a final decision. Because there is no basis for jurisdiction over the appeal,

IT IS FURTHER ORDERED that the motion to stay is also DISMISSED for lack of jurisdiction.

4a

## IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

————————

No. 23-2764

————————

JOHN DOE,

Plaintiff-Appellant,

v.

PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD
OF TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his
official capacity as President of Purdue University,
ALYSA CHRISTMAS ROLLOCK, in her official capacity
at Purdue University, KATHERINE SERMERSHEIM,
in her official capacity at Purdue University,

Defendants-Appellees.

————————

## PLAINTIFF-APPELLANT JOHN DOE'S
## MOTION FOR A STAY PENDING APPEAL

Plaintiff-Appellant John Doe respectfully moves
for a stay pending appeal in the extraordinary cir-
cumstances presented here, which will serve the
interests of judicial integrity and safeguarding the
fairness of a trial in this case.

### I.  The Extraordinary Circumstances.

The extraordinary circumstances are: (i) Magis-
trate Judge Kolar was subject to a motion to recuse

5a

for pervasive bias for Purdue made by Plaintiff-Appellant John Doe on July 9, 2023, and is subject to a still pending appeal to this Court filed on September 7, 2023, of Magistrate Judge Kolar's denial of recusal for bias; (ii) Magistrate Judge Kolar, with four years' experience as a Magistrate Judge and none as an Article III District Judge, was nominated to be a judge on this Court on July 27, 2023, by the Biden Administration; (iii) when Magistrate Judge Kolar denied the recusal for bias motion on August 14, 2023, he did not disclose the fact that he was nominated to be a judge on this Court; (iv) when Magistrate Judge Kolar appeared on September 6, 2023, before a Senate Committee, he did not disclose that he had been subject to a motion to recuse for pervasive bias favoring Purdue; (v) Plaintiff-Appellant John Doe and his counsel first learned of Magistrate Judge Kolar's nomination to be a judge on this Court when the Northern District of Indiana federal court announced in a press release on October 11, 2023, that there would be an anticipated opening for a Magistrate Judge position given Magistrate Judge Kolar's nomination to be a judge on this Court; and (vi) Magistrate Judge Kolar continues on insisting that he be the trial judge in this case and has scheduled a trial date.

## II.  The Key Documents Pertaining To Bias.

Exhibit A to this Motion is the 33-page Declaration of Plaintiff-Appellant's lawyer Philip A. Byler [Dist.Ct. DE 257-1] that was submitted in support

6a

of the motion to recuse Magistrate Judge Kolar for pervasive bias favoring Purdue and that details the bias case against Magistrate Judge Kolar.

Exhibit B is Magistrate Judge Kolar's opinion denying the recusal for bias motion without disclosing the fact that he was nominated to this Court. [Dist. Ct. DE 261.] Magistrate Judge Kolar's opinion avoids the actual reasons establishing the pervasive bias in this case presented and certified in the Declaration of Philip A. Byler [Dist. Ct. DE 257-1], and instead gives rationalizations and inapposite propositions to justify his functioning as a biased trial judge in an important case. Magistrate Judge Kolar's failure to disclose avoided the nomination being identified as the extrajudicial source of bias favoring Purdue documented in the Byler Declaration.

Exhibit C is Plaintiff John Doe's Notice of Appeal [Dist. Ct. DE 267] that from pages 1 to 5 invokes the Seventh Circuit case law establishing the jurisdiction of this Court for the appeal and from pages 7 to 38 dissects Magistrate Judge Kolar's opinion denying the recusal for bias and demonstrates that Magistrate Judge Kolar yet again avoids the actual reasons establishing the pervasive bias in this case presented in the Byler Declaration and has no real answers to the bias case against him.

## III.  Chronology of Pertinent Events.

The chronology of pertinent events is as follows:

–July 9, 2023: Plaintiff-Appellant John Doe moves to recuse Magistrate Judge Kolar for bias,

7a

submitting Declarations by Plaintiff-Appellant John Doe and his lawyer Philip A. Byler. [Dist. Ct. DE 257, 257-1, 257-2.]

–July 19, 2023: Defendant-Appellee Purdue submitted a short Response to the recusal for bias motion that did not take on the facts presented and analysis in the Byler Declaration. [Dist. Ct. DE 258.]

–July 25, 2023: Plaintiff-Appellant John Doe submitted a Reply in further support of the motion to recuse Magistrate Judge Kolar for bias, replying to the few arguments of Defendant-Appellee Purdue. [Dist. Ct, DE 260.]

–July 27, 2023: The White House Briefing Room announces in a White House Statement and Release, "President Biden Announces Thirty-Sixth Round of Judicial Nominees" (July 27, 2023), that Magistrate Judge Kolar is nominated to this Court.

–August 14, 2023: Magistrate Judge Kolar issues an opinion denying Plaintiff-Appellant John Doe's motion to recuse Magistrate Judge Kolar for bias. In that opinion, Magistrate Judge Kolar does not disclose that he has been nominated to be a judge on this Court. [Dist. Ct. DE 261] Magistrate Judge Kolar sets a trial date of November 28, 2023. (Dist. Ct. DE 262.]

–September 6, 2023: Magistrate Judge Kolar appears before a Senate Judiciary Committee and does not disclose he had been subject to a motion to recuse for bias favoring Purdue in a case he had been overseeing for four years. YouTube: Circuit

8a

Court Judge Nominees Face Senate Judiciary Com-
mittee - YouTube.

 –September 7, 2023: Plaintiff-Appellant John
Doe files a Notice of Appeal of Magistrate Judge
Kolar's opinion denying Plaintiff-Appellant John
Doe's motion to recuse Magistrate Judge Kolar for
bias. [Dist. Ct. DE 267.]

 –September 11, 2023: Plaintiff-Appellant John
Doe is assigned Seventh Circuit Court of Appeals
Case Number 23-2764.

 –September 13, 2023: Magistrate Judge Kolar
issues an order requesting the parties to submit
status reports whether the Court retains jurisdic-
tion over the case in light of Plaintiff-Appellant
John Doe's Notice of Appeal. [Dist. Ct. DE 270.]
This Court issues an Order requesting Plaintiff-
Appellant John Doe to submit a "Jurisdictional
Memorandum" by September 26, 2023.

 –September 21, 2023: Defendant-Appellee Pur-
due files a report in the District Court taking the
positions that Magistrate Judge Kolar should
await whether this Court accepts jurisdiction of
Seventh Circuit Court of Appeals Case Number 23-
2764 [Dist Ct. DE 271] and that Magistrate Judge
Kolar should proceed with pretrial motions anyway
based on inapposite interlocutory cases.

 –September 26, 2023: Plaintiff-Appellant John
Doe files in this Court the requested "Jurisdiction-
al Memorandum" showing this Court has jurisdic-
tion of Seventh Circuit Court of Appeals Case
Number 23-2764. Plaintiff-Appellant John Doe also

9a

files in the District Court the requested report showing that Magistrate Judge Kolar does not have jurisdiction of the case if this Court has jurisdiction of Seventh Circuit Court of Appeals Case Number 23-2764, but if this Court has jurisdiction, Magistrate Judge Kolar should not take any action as urged by Purdue, which would have Magistrate Judge Kolar proceed to decide pretrial issues critical to the fairness of a trial, particularly the motion *in limime,* while this Court is deciding whether Magistrate Judge Kolar has demonstrated bias and a lack of impartiality such that Magistrate Judge Kolar should be recused from deciding pretrial issues and overseeing the trial. [Dist. Ct. DE 272.]

—October 11, 2023: Plaintiff-Appellant John Doe and his counsel first learn of Magistrate Judge Kolar's nomination to be a judge on this Court when the Northern District of Indiana federal court announced in a press release on October 11, 2023, that there would be an anticipated opening for a Magistrate Judge position given Magistrate Judge Kolar's nomination to be a judge on this Court.

—October 27, 2023: Magistrate Judge Kolar holds a status conference during which he announces that the trial set to begin November 28, 2023, is still on subject to whether this Court has jurisdiction of Seventh Circuit Court of Appeals Case Number 23-2764. [Dist. Ct. DE 277.] During the teleconference, Magistrate Judge Kolar again fails to address his nomination to be a Judge on this Court, even though counsel for Plaintiff-Appellant John Doe in a pre-teleconference email inquired

10a

what the subjects of the teleconference would be given Magistrate Juge Kolar's highly relevant nomination.

## CONCLUSION

Based on the foregoing, in the interests of judicial integrity and safeguarding the fairness of a trial in this case, the extraordinary circumstances of this case call for a stay pending the appeal in Seventh Circuit Court of Appeals Case Number 23-2764. Magistrate Judge Kolar failed to disclose his own nomination to be a judge on this Court when denying Plaintiff John Doe's motion to recuse for bias favoring Purdue. Magistrate Judge Kolar's nomination to be a judge on this Court, with four years' experience as a Magistrate Judge and none as an Article III District Judge, has the appearance of being the extra-judicial source of bias favoring Purdue and, applying *res ipsa loquitur,* establishes the extra-judicial source of bias favoring Purdue.

Respectfully submitted on this 30th day of October, 2023.

11a

Respectfully submitted,

LAW OFFICES OF
  PHILIP A. BYLER

By: /s/ PHILIP A. BYLER
Philip A. Byler, Esq.
11 Broadview Drive
Huntington, New York 11743
(631) 848-5175
pbyler1976@gmail.com
*Attorneys for Plaintiff*
  *John Doe*

12a

## CERTIFICATE OF SERVICE

I, PHILIP A. BYLER, hereby declare per 28 U.S.C. § 1746, that on October 30, 2023, I caused to be served by ECF upon William Kealey, counsel of record for the Purdue Defendants-Appellees, Plaintiff-Appellant John Doe's Motion For A Stay with its thre Exhibits A-C.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 30th day of October, 2023.

                   /s/ PHILIP A. BYLER     
                     **Philip A. Byler**

13a

# IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

————————

### CIVIL ACTION

————————

No. 2:17-cv-33-JPK

————————

### JOHN DOE,

Plaintiff,

v.

### PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his official capacity as President of Purdue University, ALYSA CHRISTMAS ROLLOCK, in her official capacity at Purdue University, KATHERINE SERMERSHEIM, in her official capacity at Purdue University,

Defendants.

————————

## DECLARATION OF PLAINTIFF'S ATTORNEY PHILIP A. BYLER, ESQ. TO RECUSE MAGISTRATE JUDGE KOLAR AS TRIAL JUDGE

**PHILIP A. BYLER**, hereby declares subject to the penalties of perjury pursuant to 28 U.S.C. § 1746:

14a

# Introduction

1. I am the lawyer for Plaintiff John Doe in this case, and I am admitted *pro hac vice* to this Court for this case. I have appeared in this action from its start, I drafted the original Complaint in this action that was upheld in *Doe v.* Purdue, 928 F.3d 652 (7th Cir. 2019) (Barrett, J.), and I am the signatory on Plaintiff's Second Amended Complaint.

2. I make this Declaration in support of Plaintiff's motion to recuse Magistrate Judge Kolar from being the judge for pre-trial proceedings and the trial judge in this case pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455. The facts of this matter show that Judge Kolar's "impartiality might reasonably be questioned" and that Magistrate Judge Kolar "has a personal bias or prejudice either against [Plaintiff John Doe] or in favor of the adverse party [Defendant Purdue University]." Indeed, while Judge Kolar apparently has an extra-judicial bias, this is a case of "pervasive bias," *Liteky v. United States,* 510 U.S. 540, 551 (1994), not necessitating an extrajudicial bias. Magistrate Judge Kolar has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate Justice Barrett's opinion in this case, 928 F.3d 652 (7th Cir. 2019), even though as discussed below the U.S. Department of Education relied upon Justice Barrett's opinion in this case in formulating the current Title IX regulations containing due process protections and even though

15a

Justice Barrett's opinion in this case has been widely adopted: *Doe v. University of Sciences*, 961 F.3d 203, 209 (3d Cir. 2020); *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 235 (4th Cir. 2021); *Doe v. Oberlin*, 963 F.3d 580, 588 (6th Cir. 2020); *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020); *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020); *Doe v. Univ. of Denver*, 1 F.4th 830, 838 (10th Cir. 2021) ("*Denver II*"); *Doe v. Samford Univ.*, 29 F.4th 675, 688 (11th Cir. 2022); *Doe v. Rice University*, 675 F.4th 702 (5th Cir. 2023).

## Professional Credentials

3. I begin with a statement of professional credentials because Plaintiff's motion is being made upon serious reflection and will likely be scrutinized. As such, as the author, I believe my professional background speaks for seriousness of the application.

4. I am a member of the Bars of, among others, the States of New York and Ohio, the U.S. District Courts for the Southern, Eastern, Northern and Western Districts of New York, the Southern District of Ohio, the District of Columbia and the District of Colorado, the U.S. Courts of Appeals for the First, Second, Third, Sixth, Seventh, Eighth, Ninth and Tenth Circuits and the U.S. Supreme Court.

5. I received my J.D. degree in 1976 from the Harvard Law School. From 1976 to 1978, I was law clerk to the Honorable Judge John W. Peck of the

16a

U.S. Court of Appeals for the Sixth Circuit. In 1978, I began the private practice of law as an associate in the Litigation Department of Cravath, Swaine & Moore in New York City working on antitrust, securities, First Amendment and civil rights litigations. In 1984, I moved to Weil Gotshal & Manges in New York City, where I worked on international trade, accounting fraud, First Amendment, RICO, ERISA, breach of contract and commercial litigations. In 1990, I established my own practice. From 2002 to recently¸ I was Senior Litigation Counsel at Nesenoff & Miltenberg LLP in New York City where I was engaged in federal court and complex state court practice, specializing in appeals and trials.

6. I have tried cases in New York state court and in federal court to decision. I have briefed and orally argued cases in the U.S. Courts of Appeals for the First, Second, Seventh, Eighth, Ninth and Tenth Circuits, the New York Court of Appeals, the New York Appellate Divisions for the First and Second Departments, and the Arizona Supreme Court. Among others, I briefed and orally argued *Immuno A.G. v. Moor-Jankowski*, 77 N.Y.2d 235, 567 N.E.2d 1270, 566 N.Y.S.2d 906 (Kaye, J.), *cert. denied*, 500 U.S. 954 (1991); *Doe v. Columbia*, 831 F.3d 46 (2d Cir. 2016) (Leval, J.); *Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) (Barrett, J.); and *Doe v. MIT*, 46 F.4th 61 (1st Cir. 2022) (Selya, J.).

7. I am and have been for 14 years a Delegate to Judicial Nominating Conventions for New York's 10th Judicial District. I am active in Bar Associa-

17a

tions, including the New York State Bar Association and the New York City Bar Association. I am and have been since 2007 a member of the Professional Discipline Committee of the New York State Bar Association, its Secretary since 2015 and its Chair of its Subcommittee on Fitness To Practice; and I am and have been since 2009 a member of the Professional Discipline Committee of the New York City Bar Association. For the last consecutive twelve years, I have been listed on the Thomson Reuters Super Lawyers list for the New York Metro region. I was given the Community Service Award by DePauw University in 2008.

8. As much as Plaintiff's counsel has done his best to get along with Magistrate Judge Kolar and does not relish making this motion, sadly the motion must be made because, in my professional opinion, Magistrate Judge Kolar should recuse himself from pre-trial proceedings and the trial and another judge step in to be the trial judge, given the history of the case as stated in the mandamus petition that showed Magistrate Judge Kolar kowtowing to Purdue and its implacable public rejection of Justice Barrett's nationally significant opinion. Even before trial, there are important pre-trial *in limine* and expert testimony motions that are pending that will impact the fairness of the trial, and those rulings as well as trial rulings should not be made by a judge who lacks impartiality.

18a

## The Legal Basis For This Recusal Motion

9. This motion to recuse Magistrate Judge Joshua Kolar as trial judge is based upon the application of two federal statutes that by their literal texts apply here: 28 U.S.C. § 144 and 28 U.S.C. § 455. 28 U.S.C. § 455(a) provides that "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 144 provides that "Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

10. The goal of section 455(a) is to avoid even the appearance of partiality. *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 860 (1988). "A violation of § 455(a)—which requires a judge to disqualify himself in any proceeding in which his impartiality might reasonably be questioned—is established when a reasonable person, knowing the relevant facts, would expect that a judge knew of circumstances creating an appearance of partiality," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 848 (1988).

11. As for the "extrajudicial source" doctrine, "there is not much doctrine to the doctrine." *Liteky v. United States*, 510 U.S. 540, 554 (1994). Estab-

19a

lishing an extrajudicial source of bias "is not a *necessary* condition for 'bias or prejudice' recusal." *Liteky v. United States,* 510 U.S. 540, 554 (1994) (emphasis in the original). This is because "'extrajudicial source' is . . . not the exclusive [basis for establishing disqualifying bias or prejudice], since it is not the *exclusive* reason a predisposition can be wrongful or inappropriate. A favorable or unfavorable predisposition can also deserve to be characterized as 'bias' or 'prejudice' because, even though it springs from the facts adduced or the events occurring at trial, it is so extreme as to display clear inability to render fair judgment. (That explains what some courts have called the 'pervasive bias' exception to the 'extrajudicial source' doctrine. See, *e.g.*, *Davis v. Board of School Comm'rs of Mobile County*, 517 F.2d 1044, 1051 (CA5 1975), cert. denied, 425 U.S. 944, 96 S.Ct. 1685, 48 L.Ed.2d 188 (1976).)" *Liteky v. United States*, 510 U.S. at 551 (emphasis in the original). "Recusal is required *whenever* there exists a genuine question concerning a judge's impartiality, and not merely when the question arises from an extrajudicial source." *Liteky v. United States*, 510 U.S. at 551 (emphasis in the original).

12. Plaintiff is not relying upon the mere fact of adverse rulings but upon the manifestations of "judicial predispositions that go beyond what is normal and acceptable," and show a case of "pervasive bias." *Liteky v. United States*, 510 U.S. at 551. In particular, Magistrate Judge Kolar's July 2, 2021, August 11, 2022 and February 14, 2023 opin-

20a

ions mishandling the law in a way an impartial judge would not do, misstating the factual record in a way an impartial judge would not do, and do so all to Purdue's benefit, issuing what were propaganda pieces for Purdue, establishing Magistrate Judge Kolar won't be impartial due to pervasive bias.

**February 13, 2023 Settlement Conference**

13. At the February 13, 2023 settlement conference, when conducting shuttle diplomacy, Magistrate Judge Kolar was insistent in telling Plaintiff and his counsel that things were not likely to go our way at trial. He strongly urged Plaintiff to take Purdue's offer that was unacceptable to Plaintiff because it did not deal with expungement of his disciplinary files, as Justice Barrett had directed be considered, and did not deal with accumulated legal fees under 42 U.S.C.§ 1988. This behavior was not consistent with the proper mediation efforts of a settlement judge, and is particularly concerning when added to the fact that Magistrate Judge Kolar also *insists* on overseeing the jury trial.

14. Respectfully, the problems go back to when the case was returned to the District Court by the Seventh Circuit. Over the course of four years since Justice Barrett sent *Doe v Purdue* back to the District Court, Judge Kolar has issued eight opinions in that time, and in every single one he has adopted Purdue's arguments or eventually adopted them, with the exception of reluctantly,with convoluted

21a

reasoning, dismissing Purdue's legally defective Counterclaim in his reconsideration decision.

## Purdue's Second Motion To Dismiss

15. On September 17, 2019, less than three months after Judge Barrett's opinion for the Seventh Circuit, reversing Magistrate Judge Cherry's dismissal of the case, Purdue moved to dismiss again, seeking dismissal of Plaintiff John Doe's due process claim, notwithstanding that Judge Barrett's opinion for the Seventh Circuit had upheld that due process claim, and seeking reduction of the case to a Title IX damages claim. (DE58, 60.) Plaintiff's opposition made clear that Purdue's second motion to dismiss was entirely out of order, suggesting sanctions for Purdue's motion in disregard of the then relatively recent Seventh Circuit's decision. (DE 63.) After the briefing was submitted, out of the blue, Purdue counsel felt comfortable submitting, to Judge Kolar by e-mail, an entire draft opinion that would grant Purdue's motion to dismiss to reduce the case to a Title IX damages case. Plaintiff objected to Purdue's unsolicited submission of an opinion by e-mail. Judge Kolar held a conference reminding the parties of their obligation for filing (DE 67); although Judge Kolar did not adopt the submitted opinion at that time, Purdue's action certainly seems to shed light on Judge Kolar's later opinions. Nine months later, on May 19, 2020, Magistrate Judge Kolar granted in part and denied in part Purdue's motion, trimming a few injunctive requests. (DE84.)

22a

**Propaganda Piece One For Purdue:
Irrelevancy Treated As Spoliation**

16. Purdue engaged aggressively in extensive
discovery. Among other things, nineteen deposi-
tions were taken, including Navy personnel (estab-
lishing that the Navy relied upon the university
investigation and the only basis for the disenroll-
ment was the university suspension, DE 183-1),
including John Doe's parents (establishing John
Doe came from a loving home where he had two
brothers and three sisters) and including (by Court
Order) John's post-suspension mental health coun-
sellor as to whom the Magistrate Judge Kolar said
HIPPA did not apply (DE143) but whose testimony
showed the emotional travail the Plaintiff experi-
enced as a result of the suspension based on false
accusations and the consequent loss of his Navy
ROTC position (DE187-18). Magistrate Judge
Kolar, however, granted Purdue's motion for a pro-
tective order and did not allow Plaintiff to depose
named Defendant President Daniels. (DE 73.)

17. Counsel for Plaintiff John Doe took deposi-
tions of the principal Purdue personnel (Sermer-
sheim, Rollock, investigators, CARE Director
Bloom), focusing on establishing the allegations of
the Complaint using the documents relied upon in
drafting the Complaint, and a 30(b)(6) deposition to
identify the location of disciplinary files.

18. In response to Purdue's demands, Plaintiff
John Doe personally produced all of the documents
he had about the events of the case (including 133

23a

pages of text message between Jane Doe and him),
gave cell phone information and ten separate med-
ical authorizations, answered three sets of inter-
rogatories and gave a day-long deposition. In
response to Purdue's demand for all of John's post-
suspension social media posts, John produced all of
his Instagram posts and produced the 75 Snapchat
videos and pictures he had. (DE152, DE156;
DE175.) Purdue had the Instagram and Snapchat
production at the time of taking John's deposition
but never marked any as deposition exhibits and
never asked John any questions about them.

19. In the backdrop of Plaintiff factually building
his due process and Title IX case, Purdue moved for
sanctions against Plaintiff John Doe, making a
plethora of inaccurate accusations about discovery
and seeking (again) the due process claim be
struck. (DE 148.) John Doe opposed, showing his
compliance with discovery. (DE 152, DE 152-1, DE
152-2.) On February 22, 2021, the Court held a
multi-hour evidentiary hearing on Purdue's
motion. (DE 155.) John Doe testified under oath
how 11 Snapchat documents were accidentally
deleted when John cleared memory from his cell
phone without realizing deletion from his cell
phone would affect his Snapchat account; John Doe
also testified under oath that the deleted docu-
ments were more of the same of what was produced
(DE156; Snapchat Memories received in evidence.
(A32-35; DE155). The Snapchat documents and
indeed, all his social media were irrelevant, span-
ning years after the 2016 events at Purdue and

24a

relating only to personal matters (e.g., one of John's sisters playing piano). Spoliation of evidence occurs when one party destroys evidence relevant to an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001).

20. On July 2, 2021, Magistrate Judge Kolar ruled there was spoliation, granting relief albeit different than requested because striking the due process claim was said to be disproportionate (but which Purdue sought because the record had established the due process claim). The Magistrate Judge showed a lack of impartiality by strangely ignoring all the discovery Plaintiff John Doe complied with and focused on what little Plaintiff John Doe did not have. The Magistrate Judge acknowledged "there is nothing in the record to indicate whether the files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not inconceivable" the 11 Snapchat personal posts might be potentially relevant to John Doe's desired Navy career without giving an explanation how it was conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing showed it wasn't (*see* A33-35 in Mandamus Appendix). The Magistrate Judge unjustly lambasted John Doe for the deletion, ordered payment of Purdue's attorney fees (which were claimed to be $30,000 and which would wrongly burden John Doe's effort to vindicate his due process and Title IX rights), and outlined jury instructions regarding what were totally irrelevant documents. (DE168.)

25a

However, adverse inference instructions require intentional destruction and relevance. *Crabtree v. Nat'l Steel Corp.,* 261 F.3d at 721; *Keller v. United States,* 58 F.3d 1194 (7th Cir.1995) (collecting cases). Such adverse jury instructions, although erroneously given, would wrongly impact John Doe at trial and further wrongly burden John Doe's effort to vindicate his due process and Title IX rights. At a July 5, 2023 teleconference involving the transfer of responsibilities for Plaintiff's representation, the Magistrate Judge *sua sponte* brought up the spoliation sanction, even though it was irrelevant to to the teleconference and at that point it was clear the spoliation ruling was in error, as it concerned totally irrelevant post-suspension Snapchat memories. The point appeared to be that the Magistrate Judge was quite prepared to do Purdue a favor and order Plaintiff to pay Purdue an amount that wrongly burden John Doe's effort to vindicate his due process and Title IX rights.

### Summary Judgment Briefing

21. John Doe moved for summary judgment on his due process claim and to dismiss Purdue's state police power counterclaim. DE183 is his memorandum of law, DE191 is his reply memorandum of law, and DE183-1 is Plaintiff's material statement of facts in support of summary judgment on due process. Summary judgment was premised on discovery having conclusively established the facts alleged in the Complaint that Judge Barrett had relied upon in upholding Plaintiff's due process

26a

claim and additional facts that made the denials of
due process even more egregious. Purdue moved for
summary judgment to dismiss John's due process
and Title IX claims. DE187 is John's opposition
memorandum of law, and DE187-2 is John's mate-
rial facts in opposition to Purdue's motion. Purdue
never used any of John's social media production in
the summary judgment briefing. (DE178, DE180.)

### Propaganda Piece Two for Purdue:<br>De Facto Rejection of Justice Barrett<br>on Liberty Stigma-Plus Interest

22. On August 11, 2022, the Magistrate Judge
showed a lack of impartiality when denying John
Doe's motion for summary judgment on his due
process claim on the ground there were issues of
fact with respect to the stigma-plus liberty interest
whether the stigma was false, even though the Sev-
enth Circuit has never adopted a falsity element
for a stigma-plus liberty interest and the record did
not support that there were the issues purportedly
identified. Purdue's motion for summary judgment
dismissing the due process claim was granted,
rejecting John Doe's stigma-plus liberty interest,
reviving the self-defamation ground that Judge
Barrett had rejected and requiring a narrow, unre-
alistic legal obligation divorced from military real-
ities to authorize disclosure of the university
disciplinary file to the Navy. Struck was Plaintiff's
expert report from Dr. R. Chris Barden, who had
critiqued and found seriously wanting Purdue's
gender biased investigation. Ignored in the August

27a

11 opinion was Plaintiff's motion to dismiss Purdue's legally defective state police power counterclaim that would allow Purdue to put Plaintiff John Doe on trial. (DE206, A168-216.) Judge Kolar's August 11th Opinion gave Purdue what Purdue sought in its 2019 second motion to dismiss, the dismissal of Plaintiff's due process claim.

**The National Importance of Judge (Now Justice) Barrett's Due Process Opinion.**

23. The national importance of the due process rulings of then Judge (now Justice) Barrett in *Doe v. Purdue*, 928 F.3d 652, 661-664, 667 (7th Cir. 2019), cannot be understated, holding: (i) that John had pleaded a stigma-plus liberty interest; (ii) that Purdue's disciplinary process was woefully deficient and did not provide due process, citing among other things not giving John the investigation report and not holding a real hearing ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension"); and (iii) that the District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand").

24. When then Education Secretary DeVos announced on May 6, 2020, what would be the current due process Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue*. *"Secretary DeVos Announces New*

28a

*Title IX Regulation,"* *https://www.youtube.com/*
*watch?v=hTb3yfMNGuA*; U.S. Department of Edu-
cation Press Release, "Secretary DeVos Takes His-
toric Action to Strengthen Title IX Protections for
All Students," May 6, 2020; 34 C.F.R. 106.45. Sec-
retary DeVos noted that it was a three-woman
panel with then Circuit Judge Amy Coney Barrett
as the author of the opinion. *"Secretary DeVos*
*Announces New Title IX Regulation"* https://
www.youtube.com/*watch*?v=*hTb*3yfMNGuA.

25. When Judge Barrett was nominated for the
U.S. Supreme Court, her *Doe v. Purdue* opinion
was a subject of attention. Defending Judge
Barrett's opinion in the Wall Street Journal was
K.C. Johnson, "Sex, Due Process and Amy Coney
Barrett," Wall Street Journal, Oct. 1, 2020. Purdue
responded with its defiant defense, "Purdue
Responds on Judge Amy Coney Barrett's Title IX
Opinion," Wall Street Journal, Oct. 12, 2020. Judge
Barrett's opinion has been a thorn in Purdue's side,
and Purdue does not want to live in accordance
with it.

26. The Magistrate Judge misstates John's argu-
ment as meaning the national importance of the
*Doe v. Purdue* due process ruling by itself compels
denial of summary judgment. (DE224, p. 10.) That
is not Plaintiff's argument. It is that the Magis-
trate Judge's August 11 Opinion did not consider
Purdue's due process violations and expungement
of the disciplinary file as contemplated in Judge
Barrett's opinion, but rather with insubordinate
pettifoggery dismissed the due process claim

29a

(DE206, pp.16-18, DE224, pp. 2-4), by adopting Purdue's self-defamation argument expressly rejected by Judge Barrett, marginalizing chain of command military realities and effecting an absurd result wholly inconsistent with Judge Barrett's opinion.

## Judge Barrett's Rejection of Self-Defamation for the Court.

27. Before the Seventh Circuit in 2019, Purdue had argued that John had engaged in self-defamation by authorizing the release of the university disciplinary files to the Navy. That argument then was premised on the NROTC only learning of John's disciplinary case because of John's authorization of disclosure to the Navy ROTC. Judge Barrett stated in her opinion Purdue's position: "The university maintains that it has not and will not divulge John's disciplinary record without his permission. The Navy knows about it only because John signed a form authorizing the disclosure after the investigation began." 928 F.3d at 661. Purdue cited *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997), where a voluntary disclosure was the reason for an employment discharge in a situation that the Seventh Circuit considered it speculative whether the disclosure would ever be called for. Judge Barrett, however, rejected Purdue's argument (928 F.3d at 652):

> John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers.

30a

Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy. That makes John's case more like *Dupuy v. Samuels*, 397 F.3d 493 (7th Cir. 2005), than *Olivieri*. In *Dupuy*, we held that the publication requirement of the stigma-plus test was satisfied when the plaintiffs were obligated to authorize a state agency to disclose its finding that they were child abusers to the plaintiffs' current and prospective employers. 397 F.3d at 510.

(928 F.3d at 662.)

28. The discovery record made Purdue's argument and Magistrate Judge Kolar's ruling about self-defamation wholly untenable. Indisputably: (i) the NROTC knew about the disciplinary proceeding well before the May 24, 2016 authorization because on April 4, 2016, Jane Doe first went to the NROTC to make her accusations; (ii) Purdue first learned of Jane Doe's accusations from the NROTC; and (iii) the NROTC was looking to the Purdue investigation from the start.

**The Navy Knew About The Disciplinary Proceeding Before Authorization and Was Looking To Purdue's Investigation.**

29. On April 4, 2016, Jane Doe falsely told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John Doe, and Lieutenant Sheppard informed his superior officers Commander Hutton and Executive Officer Remaly

31a

about Jane Doe's allegations. (DE183-34: Shepard
tr 21-25, 28-30; DE183-43: Sheppard Ex 2; DE187:
Sheppard tr 42-43.) Also on April 4, 2021, Com-
mander Hutton reported Jane Doe's sexual miscon-
duct allegations to Purdue's Office of the Dean of
Students, reflecting the interrelationship of
Purdue and the Purdue Navy ROTC. (DE 187-6:
Dfs. SJ Ex. K.) When asked by Purdue counsel
about the "investigation" of the sexual misconduct
allegations against John, NROTC Commander
Hutton responded that "that investigation was
referred to Purdue University." (DE 183-35: Hutton
tr. 14.) On April 4, 2021, Purdue's Dean of Stu-
dents Sermersheim advised Purdue's CARE Direc-
tor Bloom of Jane Doe's allegations. (DE 187-6: Dfs.
SJ Ex. K).)

30. On April 5, 2021, Commander Hutton sent a
letter to John informing him that John was being
placed on "an Interim Leave of Absence (ILOA) *due
to your pending university investigation"* and that
"[f]urther administrative action, potentially to
include Performance Review Board (PRB), will be
taken on *completion of the university investiga-
tion*." (DE 187-7; italics added.) The April 5, 2016
letter further stated that John was prohibited from
participating in ROTC activities, but would remain
enrolled in NROTC. (DE 187-7.)

31. The authorization to the NROTC for access to
the Purdue disciplinary files was dated May 24,
2016, well after the NROTC learned of the discipli-
nary proceeding. (DE183-5, John tr. 23; DE183-44.)
John Doe testified at his deposition that the Navy

32a

wanted "in the loop" (DE183-5, tr 21-22), and when John Doe was deposed by Purdue about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the NROTC, not self-defamation (which was never raised). (DE208-1, DE208-2, tr 22-26.)

32. The significance was explained by John Doe: "With Jane Roe having reported her accusation to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, I really was in no position to refuse the authorization." (DE208-1 ¶ 7.) According to John: "Soon after Jane Roe complained to the Navy, I was put on interim leave of absence pending the university investigation. If I had refused authorization, I would not only have looked bad, but I also would have been sanctioned in some way." (DE208-1 ¶¶ 3, 5.) John thus had no choice but to authorize the Navy to be "in the loop" in the university disciplinary proceeding; it was not voluntary. John's case is "more like *DuPuy v. Samuels*." 928 F.3d at 662. Purdue's authorization argument made no sense given the actual facts.

**The Magistrate Judge's Narrow Legal Obligation Ruling Is At Odds With Judge Barrett's Opinion And Is Divorced From Military Realities.**

33. John's situation as a NROTC midshipman who was not in a position to refuse the authorization to the Navy is totally inapposite to the situation of a voluntary disclosure of a disciplinary

33a

record for a school transfer, as in *Doe v. Trustees of Indiana University*, 2021 WL 2213257 (S.D. Ind. May 4, 2021), and to the situation of a voluntary disclosure of the reason for an employment discharge in *Olivieri v. Rodriguez*, 122 F.3d 406 (7th Cir.1997). Here, the obligation to disclose was not, as wrongly asserted by the Magistrate Judge, speculative. Rationalizing away the distinction between civilian and military life in this context amounts to willful blindness, which resulted in the Magistrate Judge incorrectly treating John's authorization as voluntary and John's testimony the Navy "wanted in the loop" as not a legal obligation to authorize. (DE221, p. 16; DE224, pp. 2-4.)

34. Dismissing military realities as speculation, as the Magistrate Judge does, is erroneous at best. The December 19 reconsideration hearing exchanges lay bare the unreasonableness of the Magistrate Judge's opinion:

> [MR. BYLER]: . . . The authorization was requested because the Navy—and this is the testimony—"wanted in the loop." And that meant they wanted in the loop of the investigation. And they were put into the loop.
>
> And John Doe was not in a position to say no. As ROTC midshipmen, respecting his Navy superiors, wanting a career in the Navy, you have a request; knowing that the Navy wants to be in the loop. You don't say no.
>
> The suggestion that maybe he says no is just ridiculous. I have combat officer sons, who,

34a

when asked this, of course you give the authorization. . . .

**THE COURT**: But I see nothing. I don't see your client saying, "I was given order."

I don't see any deposition . . . .

**[MR. BYLER]**: Well, excuse me. At his deposition, all he was asked about the authorization was to identify it. The deposition then went off, "Well, could you have gotten the investigation report from the Navy." . . .

[Plaintiff] was on scholarship. He had to honor his commitments and obligations. . . And that meant, when he gets a request for this kind of authorization, that kind of access, when the Navy knows and it's going to be relying on the [Purdue] investigation, yes, he has to give it. He was in no position not to give it. . . .

The decision that Commander Hutton testified to was: We're going to rely on the Purdue investigation. . . .

And it was in that context in which John Doe knows that they're wanting to be in the loop because the investigation that's ongoing, he's requested by a superior officer for that access.

. . . .

**THE COURT]**: I don't understand where in the record it has been shown that, if he had respectfully responded to his superior officer,

35a

"Sir," "ma'am," "Is this something I need to sign, or am I allowed to have the Navy determine whether I did anything wrong in their PRB,"

MR. BYLER: No. You don't put a burden on a midshipman or an Army ROTC guy to press the point in order to have a situation which there is a liberty stigma-plus interest. That's wholly—I'm sorry—misconceived.

If you're in the position where you have obligations of Navy midshipman—okay? You're a scholarship student. You have to honor your obligations. You've been asked, "Give us access." You know they want in the loop. And you're going to say no?

And what I'm saying is, the suggestion that, well, he should have said no and maybe he could respectfully, I think is nonsense. . . .

. . . You're going to be in conflict with Judge Martin's decision if you go down that road, and I don't think that makes sense. You're not making sense in terms of military reality. When there's a request from a superior officer in these circumstances, you comply.

And certainly there's no question, if he had said no, he would have been subject to lawful order. But it doesn't have to be pushed to that; it shouldn't have to be pushed to that.

(DE 221, tr.5-22.) Given these exchanges, it is more than strange that the Magistrate Judge faults John

36a

Doe's counsel for not asking at John Doe's deposition about the authorization (DE224, p. 3) when the point was that Purdue's counsel didn't ask in a deposition taken by Purdue. Magistrate Judge Kolar's reference to a PRB as somehow providing a mechanism for a midshipman to dispute a superior officer's demand for access to a university investigation file (DE224, p. 9, A314) disregards that a PRB is for determining sanctioning for improper conduct and that Commander Hutton made it clear the Navy was relying upon the Purdue investigation. What John Doe might have preferred was immaterial.

35. Magistrate Judge Kolar essentially adopted Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to compel executing the authorization (DE221, p. 12). That, however, leads to the absurd result that a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD has no due process rights. Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.

37a

## Discovery Strengthened The Denial
## of Due Process Case

36. Based on the allegations of the Complaint,
Judge Barrett wrote strongly about the denial of
due process in this case: "Purdue's process fell
short of what even a high school must provide to a
student facing a days-long suspension." 928 F.3d
663-664. Discovery strengthened John's case that
he was denied due process. The depositions of
Purdue employees with the documents that formed
the basis of the allegations of the Complaint not
only substantiated the allegations, but showed a
process more flawed than what was alleged in the
Complaint. Purdue never provided John Doe with
the evidence and the investigation report during
the disciplinary case, there was no real hearing,
and there was pre-judgment based upon treatment
of Jane Doe's accusations. Expungement of the dis-
ciplinary file was and is the proper remedy.
(DE183-1 through 183-41; DE 183, pp. 6-33, 39-46.)
The District Court on remand was to consider the
expungement of the disciplinary file ("we instruct
the court to address the issue of expungement on
remand"), but Magistrate Judge Kolar refuses to
do so, knowing how opposed Purdue is to expunge-
ment.

37. Due process matters so that cases are not
decided "on the basis of an erroneous or distorted
conception of the law or the facts." *Marshall v.
Jerrico, Inc.*, 446 U.S. 238, 242 (1980). The Magis-
trate Judge, however, rationalized the jarring

38a

result of adopting Purdue's position that "whether Purdue complied with due process is immaterial" by also adopting what are Purdue's gross misstatements of the record. It reflects the lack of impartiality on the part of the Magistrate Judge.

### The Non-Existent Alleged Triable Issues for Stigma Plus

38. As discussed, the Magistrate Judge's ruling on stigma-plus liberty interest was legally and factually erroneous, divorced from military chain of command realities in order to avoid the grant of summary judgment on Plaintiff John's due process claim. In addition, Magistrate Judge Kolar's proof of falsity requirement to establish a stigma plus liberty interest, which the Seventh Circuit has never adopted, was fundamentally flawed: the August 14, 2022 opinion gave a purported review of triable issues that did not reflect the factual record but that did reflect a lack of impartiality and that contributed significantly to the August 11 Opinion being a propaganda piece for Purdue.

### Cover Up of Jane Doe Never Testifying Versus John Doe Repeatedly Testifying.

39. Magistrate Judge Kolar, in a partisan slip, repeated what were the allegations of Jane Doe when in fact she never testified. Summary judgment is not a time when allegations suffice. Proof is needed. Jane's allegations were not and are not proof. *See MAO-MSO Recovery II, LLC v. State*

39a

*Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (evidentiary facts are required to defeat summary judgment).

40. In contrast, John Doe has repeatedly put himself under oath to testify that Jane's accusations are false. In the summary judgment record is John Doe's statement under oath saying:

> All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false. I have maintained that all her claims were false from my initial statements in the Purdue disciplinary process at the start, all the way through to the appeals. I said so orally to Dean Sermersheim in June 2016. I said so in my oral statements to Navy ROTC personnel, and I said so in my written statement in August 2016 to Navy ROTC at the time of my disenrollment (which was based solely upon my university suspension), and I have continued to maintain this truth for the past four and a half years of this legal case.

(ECF 183-8: SJM 8 (John Doe 02/18/2021 Affidavit ¶ 30).) John Doe did again on reconsideration. (DE208-1, Motion Ex. A: John Doe 08/2/22 Declaration ¶ 10.)

**John-Jane Doe Texts.**

41. Magistrate Judge Kolar showed a lack of impartiality when referring to what were 133 pages of John Doe-Jane Doe texts in accordance

40a

with Purdue's jaundiced misreading as admissions
of guilt (which they weren't) based on Purdue's
misleading excerpting without discussing John
Doe's testimony on the texts that he alone had
provided.

42. Magistrate Judge Kolar quotes passages of
John Doe-Jane Doe texts as if they were admis-
sions of guilt. They weren't; and there was no evi-
dence before Judge Kolar to treat them as evidence
of guilt. That Magistrate Judge Kolar does so, shows
a lack of impartiality. In depositions, Purdue's
Dean Sermersheim, Purdue's investigator Amberg-
er and Purdue's investigator Oliver each admitted
that there is no statement in the texts in which
John admitted or Jane Doe accused John of com-
mitting the sexual acts alleged in the Notice of
Allegations. (DE183-7: Semersheim tr 34; DE183-
14: Amberger tr 70-72; DE187-9: Oliver tr. 50-57).)
Notably, before the alleged incidents, John and
Jane Doe had a three-month relationship in which
John and Jane Doe had a sexual relationship initi-
ated by Jane, the first such relationship in John
Doe's life after being brought up in an Evangelical
Christian home where he was taught sex was for
marriage. (DE183-8: John 02/18/2021 Affidavit
¶¶ 4-5; DE 208-1: Ex. A, John tr 92-93.) John Doe
has put himself under oath as to the correct under-
standing of the texts (where the surrounding con-
text makes them all clear, yet Purdue hid when
cherry-picking them); Jane Doe never did. (DE208-
1: John 08/2022 Declaration ¶ 11.)

41a

43. To the investigators, John provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John and his family Christmas cookies after the supposed sexual assault occurred and after Jane Doe initially claimed the relationship had ended. Jane Doe provided *no* texts to the investigators, telling them she had deleted the texts. (DE183-3: Df. Answer ¶ 36; DE183-14: Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; DE183-11: Amberger 27, Texts (PU 206-339)); DE183-7: Semersheim tr. 34; DE 183-5: John Dep. tr. 111-114.)

44. Yet, the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship after Jane Doe's claims), and Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators. (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.) The investigation report twisted the texts and contained many other inaccuracies including the fabrication that John Doe confessed to the allegations. Knowing this, it is no wonder they refused to let John Doe view the investigation report and defend himself while at Purdue, something other schools

42a

typically provide, but not Purdue. (DE183-8: John 02/18/2021 Affidavit ¶15; DE187, pp. 44-47.)

**The Investigation Report.**

45. There is no good impartial reason for Magistrate Judge Kolar to ignore that: (i) Plaintiff John was not provided an opportunity to review the investigation report during the disciplinary case, (ii) the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship after Jane Doe's claims), and (iii) Vice President Rollock and Dean Sermersheim did not know that there were 133 pages of texts submitted by John to the investigators. (DE183-3: Df. Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep tr 49-50, 61-62); DE183-6: Rollock Dep tr 30, 46-47; DE183-7: Sermersheim Dep tr 21-23, 35; DE183-41: Custodian Klingerman Dep tr 27-28.) Only a partisanship for Purdue explains why Magistrate Judge Kolar also ignored that the investigation report had twisted the texts and contained many other inaccuracies pointed out by Plaintiff. (DE183-8: John 02/18/2021 Affidavit ¶15; DE187, pp. 44-47.)

**The Letter Sent On Behalf Of Jane Doe To The Committee.**

46. On June 6, 2016, Jane Doe would not appear in person before the Advisory Committee on Equity and Dean Sermersheim; instead, on June 5, 2016, Monica Bloom, Director of CARE and a lawyer,

43a

submitted a written statement said to come from
Jane Doe, which was in the form of an e-mail.
Bloom was asked in her deposition how, if Jane Doe
did not have access to a computer, she e-mailed the
statement to Bloom. Bloom said she (Bloom) did
not recall (DE183-9, Bloom Dep tr 29-30; 183-26:
Bloom 23, Bloom transmittal of June 5, 2016 state-
ment (PU653-654)). The Magistrate Judge does not
deal with this testimony, but rather incorrectly
states it was undisputed the e-mail came from Jane
Doe, the point was very much in dispute, and fur-
ther, the Magistrate Judge also does not address
the fact that the three-person panel of the Advisory
Committee on Equity and Dean Sermersheim,
never met and never heard any direct testimony
from Jane Doe and did not have the opportunity to
ask any questions of Jane Doe. (DE183-3: Df.
Answer ¶41; DE183-9: Bloom tr 28-32; DE183-26:
Bloom 23, Bloom transmittal of June 5, 2016 state-
ment.)

### Propaganda Piece Three for Purdue: The Reconsideration Decision: Ignoring the Navy ROD

47. On February 14, 2023, Magistrate Judge
Kolar yet again showed a lack of impartiality in his
reconsideration decision, another propaganda piece
for Purdue. Magistrate Judge Kolar adhered to dis-
missing the due process claim, ruling that John
Doe failed on summary judgment to show a legally
obligated disclosure, that John Doe's position he
was in no position to refuse authorization was

44a

insufficient even though the Navy ROD clearly sub-
stantiated that John could not properly refuse
authorization. (DE208-3.)

48. The Navy ROD (which was not available at
the time of the Navy depositions) clearly substanti-
ates that John could not properly refuse authoriza-
tion. (DE208-3.) The Magistrate Judge showed a
lack of impartiality in not addressing Plaintiff's
full presentation of the Navy ROD that established
the stigma-plus liberty interest.

## Navy Regulations Compelling Giving Authorization

40. Authorization to disclose the Purdue discipli-
nary files was expected under the governing Navy
regulations at the time as a matter of "Honor" stat-
ed in the Navy ROD. Honesty and respect to his
superior officers called upon John to provide the
authorization. The Honor Code in the Navy ROD
(DE208-3) at section 1-3 (pp. 1-3) provides that
"Military systems, which often operate under
extreme duress, are built on a foundation of
absolute trust and fidelity", that NROTC must
instill honor upon future officers during accession
training and ensure that honor is carried into fleet
service", that "[t]hroughout its history, the Naval
Service has successfully operated through reliance
on certain values held by its personnel", that
"Honor is a keen sense of ethical conduct, honesty,
integrity, and responsibility", that "Honor includes
honesty, at all times no matter the outcome", and
that "[i]t is respect to both juniors and seniors."

45a

The Magistrate Judge's belittling of the significance of the Honor Code is quite ill-considered.

41. Authorization to disclose the Purdue disciplinary files was also expected under the governing Navy regulations at the time as a matter of not showing a "disregard or contempt for authority" and not showing a "lack of a sense of responsibility" that would constitute a "major offense" per the Navy ROD (DE208-3), at section 3-19.2.a.(11) (pp. 3-40). The NROTC knew there was a Purdue investigation of Jane Doe's accusations of sexual assault and wanted "in the loop" (DE183: SJM 5, tr 22). It was John's responsibility that the NROTC be included in the loop. The Magistrate Judge's failure to address this point is unjustifiable.

## Sanction Upon Refusing Authorization

42. Had John refused to provide the authorization, there would have been an order to provide the authorization. Also, when a midshipmen student is put on interim leave of absence, which John was by Commander Hutton's order of April 5, 2016, the Navy ROD (DE208-3 at section 6-7.3, pp. 6-11 – 6-12) requires a Performance Review Board ("PRB") "as soon as possible." Because John provided the authorization, a PRB was not held, and when one was held after completion of the university disciplinary case, the PRB only concerned the university suspension. Had John shown a "disregard or contempt for authority," a "lack of a sense of responsibility," and a lack of "honor" by refusing authorization, an additional PRB would have been

46a

ordered. The interim leave of absence would have been converted into a disciplinary leave of absence per the Navy ROD at section 6-7.3, pp. 6-12. The Magistrate Judge's failure to address this point was unjustifiable.

**Required Disclosure Upon Re-Application**

43. If John were to re-apply to the NROTC, he would have to disclose the disciplinary finding. Commanding Officer Hutton identified the ROTC Appointment Termination and Disenrollment Authorization and testified the only reason for the ROTC disenrollment was the university suspension. (DE183-35: Hutton Dep tr 56, 66-67; DE 183-36: Hutton H, ROTC Appointment Termination and Disenrollment Authorization.) The August 10, 2016 PRB document showed the Board's finding was that John was suspended by Purdue and the recommendation was disenrollment of John. (DE183-36: Aug. 10, 2016 Performance Review Board, p. 2.)

44. The PRB document is made part of the student's file per the Navy ROD (DE208-3, section 6-13.5, pp. 6-20) and because it involved disenrollment is sent to Naval Operations per the Navy ROD section 6-13.6, p. 6-20. Disciplinary disenrollment documents are part of his "permanent federal record" per Navy ROD (DE 208-3) section 6-16 (pp. 6-26 – 6-27):

> c. Disciplinary disenrollments become a matter of permanent federal record and may preju-

47a

dice the individual for future military or civil employment. Disciplinary disenrollments may be disqualifying for future federal security clearances that are often necessary for positions in private industry. Disciplinary disenrollments may be prejudicial to their interests should they ever apply for a commission in the Armed Forces. . . .

45. Should John re-apply to the NROTC or to any commission in the U.S. Armed Forces, he would be honor-bound to disclose the disciplinary disenrollment that is part of permanent federal record and if he did not and it were inevitably discovered in a mandatory background check, termination would be expected. (DE208-1 ¶ 9.) The permanent federal record exists only as a result of the university disciplinary case (DE209, pp. 8-9); the Navy did not conduct its own investigation but relied 100% on the university disciplinary suspension. (DE187-2, pp. 23-27 and record citations therein.) The Magistrate Judge's failure to address this point is more than strange, it was a partisan slip.

### The Absurd, Erroneous Result Showing A Lack of Impartiality

46. The Navy ROD compelled giving authorization, would make John subject to sanction upon refusing authorization, and required disclosure upon reapplication due to a permanent federal record—which even the Magistrate Judge's August 11 opinion indicated would make summary judg-

48a

ment inappropriate (DE206, pp. 16-17) but which the Magistrate Judge avoided on reconsideration, so much lacking in impartiality Magistrate Judge Kolar had become. Instead, the Magistrate Judge essentially adopted Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to compel executing the authorization (DE221, p. 12). That, however, leads to the absurd, erroneous result that a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD has no due process rights. Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's effective adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.

**False Basis For Rejecting Reconsideration.**

47. Reconsideration here was sought based upon the texts of Rule 54(b) and 60(b) of the Federal Rules of Civil Procedure, *see* A. Scalia, *Reading Law: The Interpretation of Legal Texts* p. 56 (West Pub. 2012), and *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191-1192 (7th Cir. 1990), where it is stated:

A motion for reconsideration performs a valuable function where:

49a

the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. . . .

Justice Cardozo also recognized the utility of the motion to reconsider to the misunderstood litigant:

. . . A grievous wrong may be committed by some misapprehension or inadvertence by the judge for which there would be no redress, if this power did not exist.

48. The Magistrate Judge's mistreatment of the stigma-plus liberty interest was particularly untenable given the Navy ROD. The Magistrate Judge, in order to rely on inapposite case law more restrictive of reconsideration, treats authorization as a central issue in the summary judgment briefing. (DE224, 4-5.) It was not—far from it. The authorization was drowned in hundreds of pages of briefs on other issues and statements of material facts (*see* ¶ 21, p. 12 above), the reconsideration evidence was to provide an elaboration of what was originally submitted, and an entirely new argument was not raised.

50a

## Ignoring Contrary Northern District of Indiana Precedent

49. Magistrate Judge Kolar strangely did what an impartial judge would not do: omit addressing the point for reconsideration that two Northern District of Indiana precedents are contrary to his ruling and that, in particular, Attorney Kealey, who has been counsel for the Purdue in this case and in *Mary Doe and Nancy Roe v. Purdue*, 4:18-CV-89-JEM (N.D. Ind. Jan. 13, 2022), did not advise the Magistrate Judge of Judge Martin's January 13, 2022 ruling (after the summary judgment briefing) upholding and sending to trial those plaintiffs' due process claim. (DE214-1, DE72 in 4:18-CV-89-JEM.) Judge Martin wrote:

> Roe asserts that she will be obligated to self-report this sanction to other institutions of higher education, including law schools, and by implication, bar admission authorities, meaning her stigma of a sanction will continue to be disseminated.

> As in *Doe v. Purdue Univ.*, supra, in which the plaintiff was required to authorize Purdue to release information about a sanction to his ROTC program and the Court of Appeals found that even with his permission to disclose, the disclosure satisfied the stigma-plus standard, the disclosure of Roe's sanction may impact her future education and employment opportunities. . . . Roe has asserted that the decision by Purdue, which she asserts was

51a

based on a flawed process, has resulted in a loss of future educational and employment opportunities, and a factfinder could agree.

(DE241-1, DE72 in 4:18-CV-89-JEM: Slip Op. at 20-21.) In that case, Roe felt an obligation to self-report; this case is even stronger, as John Doe here had an obligation because he was in no position to not give authorization. A second Northern District of Indiana case also found stigma-plus liberty interest. *Doe v. Purdue,* 464 F. Supp.3d 989, 1001-1003 (N.D. Ind. 2020) (Springmann, J.).

50. Magistrate Judge Kolar did finally dismiss Purdue's Amended Counterclaim, albeit reluctantly, but Magistrate Judge Kolar refused to certify for appeal the due process ruling, a step that was appropriate here because of the importance of due process in this case and the national importance of Justice Barrett's opinion in this case. (DE224.) The petition for mandamus was then promptly brought.

## Settlement Conference Remarks

51. As noted above, at a February 13, 2023 settlement conference, when conducting shuttle diplomacy, Magistrate Judge Kolar was insistent in telling Plaintiff and his counsel that things would not go our way were we to continue on to trial. His attitude was not consistent with the mediation efforts of a settlement judge. He seemed rather determined in seeing Plaintiff take any sort of deal regardless of fairness, this coming from the judge that has behaved noticeably one-sided for 4 years

52a

now. Given the fact that Magistrate Judge Kolar appears insistent and persistent to oversee our trial, Plaintiff and his counsel have found this more than concerning.

52. Frankly, Plaintiff and I have found it rather strange that despite how obviously at odds we are with Magistrate Judge Kolar and the facts that he was subject to a mandamus petition and already oversaw a settlement conference, he is still insistent on pushing forward with overseeing our jury trial. Given the presence of our mandamus petition alone, he should have already recused himself from the trial. The fact that Magistrate Judge Kolar has NOT addressed the matter of his impartiality given the mandamus petition makes us all the more concerned.

## Conclusion

32. For the reasons discussed above, "a reasonable person, knowing the relevant facts, would expect that a judge kn[ows] of circumstances creating an appearance of partiality," *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. at 848—this is a case of pervasive bias, *Liteky v. United States*, 510 U.S. at 551, and therefore, Magistrate Judge Kolar should recuse himself from the pretrial proceedings and from being the trial judge in this case.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

53a

Executed on this 9th day of July, 2023.

                    ___/s/ PHILIP A. BYLER___
                         **Philip A. Byler**

54a

# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

————————

CAUSE NO.: 2:17-CV-33-JPK

————————

JOHN DOE,

Plaintiff,

v.

PURDUE UNIVERSITY, *et al.,*

Defendants.

————————

## OPINION AND ORDER

This matter is before the Court on Plaintiff John Doe's "Motion to Recuse" the undersigned pursuant to 28 U.S.C. § 144 and 28 U.S.C. § 455. [DE 257]. The motion is fully briefed. For the reasons described below, the motion is denied.

## BACKGROUND

John filed this lawsuit alleging that his constitutional and federal statutory rights were violated when Purdue University suspended him after an investigation into a former girlfriend's accusation of sexual misconduct. The underlying facts are set forth in previous opinions and orders in the case.[1]

————————

[1]    *See Doe v. Purdue Univ.,* No. 2:17-CV-33-JPK, 2022 WL 3279234 (N.D. Ind. Aug. 11, 2022), *on reconsideration in part,*

55a

For present purposes, the Court briefly sets forth relevant procedural history.

The previous magistrate judge assigned to the case dismissed John's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a legally sufficient claim for relief. In an opinion and order authored by then-Judge Amy Coney Barrett, the Seventh Circuit Court of Appeals reversed the dismissal order, finding that John had alleged facts sufficient to support claims under both the Fourteenth Amendment and Title IX. *See Doe v. Purdue Univ.,* 928 F.3d 652 (7th Cir. 2019). Upon remand for further proceedings, the case was reassigned to the undersigned magistrate judge, with the consent of the parties. *See* 28 U.S.C. § 636(c); [DE 40, 41].

A protracted discovery period ensued, during which numerous motions were filed and ruled upon, including another motion to dismiss. This was followed by a motion for judgment on the pleadings and cross-motions for summary judgment. On August 11, 2022, the undersigned entered an opinion and order granting summary judgment in favor of Purdue[2] on John's Fourteenth Amendment due process claim, while allowing

---

No. 2:17-CV-33-JPK, 2023 WL 1991698 (N.D. Ind. Feb. 14, 2023); *Doe v. Purdue Univ.,* No. 2:17-cv-33- JPK, 2020 WL 2542674 (N.D. Ind. May 19, 2020); *Doe v. Purdue Univ.,* 281 F. Supp. 3d 754 (N.D. Ind. 2017), *rev'd,* 928 F.3d 652 (7th Cir. 2019).

[2]  References to Purdue University include the individual defendants as well.

56a

John's Title IX claim to move forward to trial. [DE 206]. John filed a motion for reconsideration and, in the alternative, to permit an interlocutory appeal. Oral argument was held. In an opinion and order entered on February 14, 2023, the undersigned denied reconsideration of John's due process claim, concluding that John had not identified a manifest error of fact or law, and that the case did not meet the applicable standard for certification of an interlocutory appeal. [DE 224]. John then filed a petition for writ of mandamus with the Seventh Circuit, seeking to challenge the due process ruling before trial on the Title IX claim. *In re: John Doe,* Case No. 23-1310 (7th Cir. Feb. 17, 2023). The Seventh Circuit denied John's petition on March 6, 2023. *Doe,* Case No. 23-1310 (Doc. 3).

The undersigned also held a settlement conference on February 13, 2023, which was unsuccessful. A trial on John's Title IX claim was set for April 24, 2023, and the pretrial conference was held on March 14, 2023. The trial date was vacated, however, when the parties filed a joint motion to refer the case to a different magistrate judge for another settlement conference. That second settlement conference was held on June 7, 2023, but no settlement was reached. On July 5, 2023, the Court granted a motion to withdraw the appearance of one of John's attorneys at a telephonic status conference. On July 9, 2023, John filed the instant recusal motion.

57a

## DISCUSSION

John argues the undersigned should be recused because his "impartiality might reasonably be questioned" (28 U.S.C. § 455(a)), and he has a "personal bias or prejudice" (28 U.S.C. § 144) either against John or in favor of Purdue. [DE 257-1 at 2]. The asserted grounds for this contention include: (1) the undersigned's rulings on various motions filed in the case, especially the summary judgment ruling in favor of Purdue on John's due process claim; (2) the undersigned's handling of various discovery disputes, especially one involving the deletion of Snapchat data [DE 133]; (3) statements purportedly made by the undersigned during the February 13, 2023, settlement conference; and (4) John's mandamus petition[3] asking the Seventh Circuit to remand the case to an Article III District Judge for reconsideration of summary judgment on his due process claim and for trial.[4]

---

[3]    John's Petition For A Writ of Mandamus is not part of the record, but since John relies on it in his recusal motion, the undersigned cites to it here. *See In re: John Doe,* Case No. 23-1310, Doc. 1-1 (7th Cir. Feb. 17, 2023).

[4]    In addressing each matter, the undersigned will disregard inflammatory accusations in John's counsel's declaration made without factual content. E.g., [DE 257-1 at 2 (asserting that the undersigned "has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate [current Supreme Court] Justice Barrett's opinion in this case"); *id.* at 4 (asserting that the history of the case shows the undersigned "kowtowing to Purdue and its implacable public rejection of Justice

58a

John's recusal motion is brought pursuant to two statutory provisions: 28 U.S.C. § 455, and 28 U.S.C. § 144. *See* [DE 257]. Section 455 provides in relevant part as follows:

§ 455. Disqualification of justice, judge, or magistrate judge

(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

(b) He shall also disqualify himself in the following circumstances:

(1) Where he as a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding; . . . .

Section 144 is similar, and provides as follows:

§ 144. Bias or prejudice of judge

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

---

Barrett's nationally significant opinion"); *id.* at 7 (asserting that the undersigned's rulings are "propaganda pieces for Purdue")].

59a

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

Before addressing the substance of the allegations, the Court first turns to a threshold matter for the § 144 challenge, timeliness. A § 144 affidavit is untimely unless filed "at the earliest moment after [the movant acquires] knowledge of the facts demonstrating the basis for [] disqualification." *United States v. Sykes,* 7 F.3d 1331, 1339 (7th Cir. 1993). John's allegations of bias are premised on a series of events over the four years the undersigned has overseen this case, most recently the February 13, 2023, settlement conference, and John's February 17, 2023, petition for a writ of mandamus. Even granting John the benefit of the doubt, by counting from the most relevant recent event,[5] the motion is

_____

   [5]   Counsel's affidavit also discusses the July 5, 2023 status conference, during which the undersigned mentioned a July 2, 2021, opinion imposing sanctions against John for violating discovery orders. *See* [DE 257-1, ¶ 20]. While John and counsel restate their disagreement with the sanctions, there were no new facts at the July 5 conference "demonstrating the [alleged] basis for . . . disqualification." *Sykes,* 7 F.3d at 1339; *see also* [DE 260 ¶ 6] (John's argument that the motion

60a

almost five months late. *See United States v. Betts-Gaston,* 860 F.3d 525, 538 (7th Cir. 2017) ("The two affidavits defense counsel filed address events . . . four months before the filing. Those allegations were not timely."); *Sykes,* 7 F.3d at 1339 (affidavit filed "[t]wo months after the allegedly prejudicial statement" was untimely); *United States v. Barnes,* 909 F.2d 1059, 1072 (7th Cir. 1990). It appears that John's § 144 challenge comes too late.[6] However, the Court will address the substance of John's motion in the context of both § 455 and § 144.

The Supreme Court considered both § 455 and § 144 in *Liteky v. United States,* 510 U.S. 540 (1994). The Court held that the "impartiality" language in § 455(a) amounts to a "'catchall' recusal provision, covering both 'interest or relationship' and 'bias or prejudice' grounds" for recusal. *Id.* at

---

is timely because of "facts giving rise to the recusal motion" occurring, most recently, in February 2023).

6    Further, the statute requires the affidavit to be "accompanied by a certificate of counsel of record stating that it is made in good faith." 28 U.S.C. § 144. There is commentary in counsel's affidavit about "not relish[ing]" making the motion and doing so based on counsel's "professional opinion." [DE 257-1 ¶8]; *see also [id.* ¶3 (stating that the motion "is being made upon serious reflection")]. But counsel did not file a good faith certificate. Because § 144 is "a powerful tool that could easily be abused," its procedural requirements are strictly enforced. *United States v. Barr,* 960 F.3d 906, 919 (7th Cir. 2020). As a result, the failure to file the required good faith certification may be alternative grounds for denying the motion. *See Betts-Gaston,* 860 F.3d at 537-38 ("There is no [ ] certificate [from counsel of record] here. Counsel filed h[is] own affidavit, which is not sufficient.").

61a

548. Specific "interest or relationship" grounds for recusal are set out in subsections (b)(2)-(b)(5) of the statute, but none of those have been raised as a basis for recusal here. Instead, John alleges bias or prejudice as the reason the undersigned should recuse from the trial of this case. "Bias or prejudice" as a ground for recusal is expressly mentioned in § 455(b)(1) and § 144. Because the phrase "bias or prejudice" in § 144 "mirrors the language of" § 455(b)(1), *Brokaw v. Mercer Cnty.,* 235 F.3d 1000, 1025 (7th Cir. 2000), "judicial interpretations of 'personal bias or prejudice' under § 144 [are] equally applicable to § 455(b)(1)." *United States v. Balistrieri,* 779 F.2d 1191, 1202 (7th Cir. 1985).

John cites only subsection (a) of § 455 as a basis for his § 455 argument, and does not cite subsection (b)(1). As noted, the Supreme Court has interpreted the impartiality standard in § 455(a) as encompassing the concept of "bias or prejudice" expressly found in § 455(b)(1). *See Liteky,* 510 U.S. at 553 n.2 (explaining that "subsection (a) has a broader reach than subsection (b), but that the provisions obviously have some ground in common as well, and should not be applied inconsistently" (internal quotation marks and citation omitted)). In short, for the same reasons that recusal is or is not required under § 455(b)(1) and § 144, it is or is not required under § 455(a). Accordingly, the undersigned's discussion going forward applies to all three recusal provisions. *See id.* at 548 (explaining that subsections (a) and (b)(1) of § 455 "br[ing] into § 455 elements of general 'bias and prejudice'

62a

recusal that had previously been addressed only by § 144").

"Bias or prejudice" under all three recusal provisions is "to be evaluated on an objective basis." *Id.* (emphasis in original). In general, what matters "is not the reality of bias or prejudice but its appearance. Quite simply and quite universally, recusal [is] required whenever impartiality might reasonably be questioned." *Id.* at 548 (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)). For a party "to successfully seek [a judge's] recusal, he must show an objective, disinterested observer fully informed of the reasons for seeking recusal would entertain a significant doubt that justice would be done in the case." *United States v. Barr*, 960 F.3d 906, 919 (7th Cir. 2020) (internal quotation marks and citations omitted). That analysis is properly performed by the judge whose disqualification is sought. *See United States v. Perez*, 956 F.3d 970, 974 (7th Cir. 2020) (noting that § 455 expressly refers to the judge "disqualify[ing] himself"); *Watford v. LaFond*, 725 F. App'x 412, 414 (7th Cir. 2018) (rejecting the argument that § 144 "required the district judge to refer the recusal motion to a different judge"); *Balistrieri*, 779 F.2d at 1199-1200, 1202-03; *Cohee v. McDade*, 472 F. Supp. 2d 1082, 1084 (S.D. Ill. 2006) (citing Balistrieri).

John's argument implicates the "extrajudicial source" doctrine. That doctrine, in its "classic formulation," required that, for the alleged bias and prejudice to be disqualifying, it had to "stem from an extrajudicial source." *Liteky,* 510 U.S. at 544

63a

(quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 583 (1966)). In *Liteky,* however, the Supreme Court clarified that "extrajudicial source" does not necessarily mean "extrinsically acquired bias," as opposed to "court-acquired" bias. *Id.* at 550. Thus, John's counsel is correct in quoting *Liteky* for the proposition that "[e]stablishing an extrajudicial source of bias 'is not a *necessary* condition for bias or prejudice recusal.'" [DE 257-1 ¶11 (quoting *Liteky,* 510 U.S. at 554 (emphasis in original; internal quotation marks omitted)]. But neither are all unfavorable dispositions, whether based on extrajudicial matters or in-court matters, biased or prejudicial. Instead, the words "bias or prejudice" refer to specific kinds of unfavorable dispositions. *Liteky,* 510 U.S. at 551. The difference between unfavorable dispositions that are biased and prejudicial, and those that are not, is that the former "connote a favorable or unfavorable disposition or opinion *that is somehow wrongful or inappropriate,* either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess." *Id.* (emphasis added).[7]

_____

[7]  *Liteky* held that this interpretation of the term "bias and prejudice" applies equally to §455(a), even though that provision uses the term "impartiality" instead. As the Supreme Court explained, "there is an equivalent pejorative connotation, with equivalent consequences, to the term 'partiality.' . . . 'Partiality' does not refer to all favoritism, but only to such as is, for some reason, wrongful or inappropriate." *Liteky,* 510 U.S. at 552 (quoting AMERICAN HERITAGE DICTIONARY 1319 (3d ed. 1992) ("partiality" defined as "[f]avorable prejudice or bias")).

64a

John does not argue that the disputed decisions rest on knowledge that the undersigned ought not to possess. Instead, John's arguments fall into the first category of bias or prejudice: that the "unfavorable" rulings and statements in question are "undeserved." But as John acknowledges [DE 257-1 ¶ 11], the alleged bias or prejudice must be *"so extreme as to display clear inability to render fair judgment,"* also referred to in the pre-*Liteky* case law as the "'pervasive bias' exception to the 'extrajudicial source' doctrine." *Liteky,* 510 U.S. at 551 (emphasis added); *see also id.* at 550 (undeserved bias or prejudice must be "excessive in degree (for example, a criminal juror who is so inflamed by properly admitted evidence of a defendant's prior criminal activities that he will vote guilty regardless of the facts)"). And the Supreme Court and Seventh Circuit have stressed that predispositions of a judge based on the proceedings themselves will "rarely" fall into this "extreme" category. *Id.* at 555; *see Barr,* 960 F.3d at 920. Applying the above principles to the matters cited by John and his counsel, the undersigned concludes that none require the undersigned to recuse from this case.

### 1.   Disagreement with previous opinions

Most of the moving papers are dedicated to John and his counsel's disagreement with three opinions entered by the undersigned: the July 2, 2021, opinion sanctioning John for violating discovery orders [DE 168]; the August 11, 2022, opinion addressing the parties' summary judgment motions [DE 207];

65a

and the February 14, 2023, opinion on John's
motion to reconsider the summary judgment opin-
ion [DE 224]. *See* [DE 257-1 ¶¶ 12, 16-50]. John has
raised most of these arguments before, and the
matters need not be relitigated here. "[J]udicial
rulings alone almost never constitute a valid basis
for a bias or partiality motion. . . . [T]hey . . . can
only *in the rarest circumstances* evidence the
degree of favoritism or antagonism required . . . .
Almost invariably, they are proper grounds for
appeal, not for recusal." *Liteky,* 510 U.S. at 555
(emphasis added); *see also Montgomery v. Vill. of
Posen,* 711 F. App'x 343, 345 (7th Cir. 2018)
("[J]udges' adverse rulings or expressions of doubts
about the strength of a case do not establish bias or
partiality."); *In re City of Milwaukee,* 788 F.3d 717,
722 (7th Cir. 2015) ("[F]ederal judges sometimes
make mistakes or see factual or legal issues differ-
ently."). John's disagreement with the under-
signed's decisions—no matter how vehement or
how colorfully described—does not demonstrate
"personal bias or prejudice," nor does it constitute
a reasonable basis to question the undersigned's
impartiality.

John asserts that he is not relying upon the mere
fact of adverse rulings but upon the manifestations
of "judicial predispositions that go beyond what is
normal and acceptable," and show a case of "perva-
sive bias." [DE 257-1, ¶ 12]. In particular, he
asserts that the undersigned "mishandl[ed] the
law" and "misstat[ed] the factual record," "in a way
an impartial judge would not do." *[Id.].* But if the
undersigned did those things, John will be vindi-

66a

cated when he appeals a final judgment in this case to the Seventh Circuit. The concept of "impartiality" cannot be stretched to encompass an argument that the undersigned simply got it wrong (as in a mistaken interpretation of the law or facts, not as in based on "wrong*ful*" considerations). Perhaps in theory the concept exists of getting it so wrong that the wrongness becomes wrong*ful*, and thus, biased and prejudiced; but if it does, John's arguments do not demonstrate its application here.[8]

---

[8]    The crux of John's argument that the undersigned got it wrong is that the summary judgment ruling is supposedly contrary to the Seventh's Circuit's ruling on the allegations of the complaint. The issue turns on the following language in the opinion: "John's case is different. He does not claim simply that he might someday have to self-publish the guilty finding to future employers. Instead, John says that he had an obligation to authorize Purdue to disclose the proceedings to the Navy." 928 F.3d at 662. The passage, however, clearly begins with a statement of what John did "not claim" and "[i]nstead . . . sa[id]" (i.e., *alleged).* The court was required to accept as true what John alleged at the motion to dismiss stage. At the summary judgment stage, however, to avoid the entry of judgment on his deprivation of liberty claim, John was required to not just *allege* that he had an obligation to authorize Purdue to disclose the proceedings to the Navy; he needed to provide evidence of that allegation sufficient for a reasonable jury to rule in his favor on it. That the undersigned found against John based on the evidence in the record at the summary judgment stage does not mean that the undersigned contradicted a higher court's ruling in the context of a motion to dismiss and thereby engaged in "insubordinate pettifoggery." [DE 257-1 ¶ 26]. Indeed, John argues at length about evidence that he believes supports his view that he was compelled to disclose the investigation to the Navy, *see, e.g., [id.* at ¶¶ 27-35], which shows that the issue ultimate-

67a

More generally, John's counsel complains that the undersigned has "adopted Purdue's arguments" in all but one of the eight opinions issued in this case since the Seventh Circuit's remand. [DE 257-1 ¶ 14]. That overlooks several issues where the undersigned ruled in John's favor, including most significantly, denying Purdue's motion for summary judgment on John's Title IX claim. *See* [DE 206 at 18-23]. John repeatedly argues that the undersigned's decisions violated his "Title IX rights" as well as U.S. Department of Education regulations under Title IX, *see* [DE 257-1 ¶¶ 2, 24], but the summary judgment order *denied* Purdue relief from that claim, allowing it to proceed to trial.

Regardless, an alleged pattern of rulings against one party does not itself demonstrate bias. "Bias . . . must be grounded in some form of personal animus that the judge harbors against the litigant." *Barr,* 960 F.3d at 920. It "cannot be inferred from a mere pattern of rulings by a judicial officer, but requires evidence that the officer had it 'in' for the party for reasons unrelated to the officer's view of the law[.]" *McLaughlin v. Union Oil Co. of Cal.,* 869 F.2d 1039, 1047 (7th Cir. 1989); *see, e g., Epstein v. Epstein,* No. 14 C 8431, 2017 WL 3168975, at *2-3 (N.D. Ill. July 26, 2017) ("The plaintiff prefaces this chronology with his conclusion that 'both judges have consistently ruled against me and blocked my progress at every turn.' . . . A more complete review of the docket reveals a

---

ly turns on *evidentiary facts,* not allegations or issues of law resolved by the Seventh Circuit.

68a

number of additional rulings benefitting the plaintiff. Moreover, bias is not simply a matter of counting rulings against you and rulings in your favor.").

Beyond his disagreement with various opinions, counsel infers bias from "reasonable case-management decisions" *(United States v. Clinton,* No. 22-1130, 2023 WL 4446689, at *2 (7th Cir. July 11, 2023)), and misunderstandings of the applicable rules. For example, counsel infers bias from a proposed order that Purdue's counsel e-mailed to chambers. At a status conference, the undersigned explained that proposed orders are permitted under applicable rules, and the Court routinely accepts them. John objected to the length of the proposed order; in response, the undersigned allowed the parties to make additional filings on the pending motion. *See* [DE 67]. Nonetheless, counsel concludes without any factual support that "Purdue's action seems to shed light on [the undersigned's] later opinions." [DE 257-1 ¶ 15].

Counsel also accuses the undersigned of a "partisan slip" in the summary judgment opinion, since the opinion "repeated the allegations of [complainant Jane Doe] when in fact she never testified. Proof is needed. Jane's allegations were not and are not proof." *[Id.* ¶ 39]. The undesigned analyzed John's summary judgment motion by the applicable standard, which includes considering the evidence in the light most favorable to the non-movant, regardless of whether the underlying facts are "proven." *See* [DE 206 at 14-16]. The summary judgment ruling never assumed that Jane "testified," but described witness testimony and

69a

written records indicating that Jane reported to Purdue that John had sexually assaulted her, including John's own response to those allegations. *See [Id.* at 2-6]. The undersigned considered this along with other evidence, and ultimately concluded: "Without assessing the truth of these facts, this evidence creates a genuine issue of fact precluding summary judgment for John." *[Id.* at 15-16]. That decision does not resolve whether Purdue's investigation was adequate under all applicable laws, or whether Purdue was correct to suspend John. Whether Purdue's investigation violated John's rights remains an issue in the case through John's Title IX claim.

Essentially, John and counsel allege that almost every substantive decision that went against them over the past four years was the result of bias. Such arguments demonstrate why "[a]n objective standard is essential [to § 455(a)] . . . Because some people see goblins behind every tree, a subjective approach would approximate automatic disqualification." *Matter of Mason,* 916 F.2d 384, 386 (7th Cir. 1990); *see In re Sherwin-Williams Co.,* 607 F.3d 474, 477-78 (7th Cir. 2010) ("That [a person] focusing only on one aspect of the story[ ] might perceive a risk of bias is irrelevant."). And the argument ignores that the alleged bias or prejudice must be based on consideration of some *wrongful* or *inappropriate* matter. John disagrees with the decisions, but he does not show a wrongful or inappropriate basis for those decisions, and thus has not shown bias or prejudice within the meaning of either § 455 or § 144.

70a

## 2.  Discovery disputes

John alludes to a number of discovery disputes, including Purdue's motion seeking sanctions for spoliation of evidence. If anything, John's recitation of the facts behind the spoliation motion shows that the issue was litigated and resolved based on factual and legal considerations that were properly before the Court and not based on any wrongful or inappropriate matter. *See* [DE 257-1 ¶¶ 18-20]. To the extent John points to any perceived criticism of his own actions, in the context of spoliation or any other discovery issue, that also is not a basis for recusal. "[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky,* 510 U. S. at 555.

The Supreme Court identified one "rare" example of a "deep-seated favoritism or antagonism" meriting recusal; a judge in a World War I espionage case against German-American defendants said, "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Liteky,* 510 U.S. at 558 (quoting *Berger v. United States,* 255 U.S. 22, 28 (1921)). Nothing John

71a

points to comes anywhere close to that level. Any comments the undersigned might have made in ruling on the parties' discovery disputes were "within the bounds of what imperfect men and women. . . sometimes display." *Id.* at 555-56. "We do not reward defendants 'for success in baiting the judge,' and we 'allow reasonable latitude for normal human sensitivity' in responding to such provocation." *Betts-Gaston,* 860 F.3d at 534.

### 3. Settlement conference

John and counsel also object to remarks the undersigned allegedly made at the February 13, 2023, settlement conference. Specifically, counsel claims the undersigned "was insistent in telling [John] and his counsel that things were not likely to go our way at trial . . . and strongly urged [John] to take Purdue's offer that was unacceptable to [John]." [DE 257-1 ¶ 13]. John claims the undersigned "told me settling was in my best interest and tried to pressure me into taking a wholly inadequate offer." [DE 257-2 ¶ 14]. Considering the confidential nature of a settlement conference, the undersigned does not corroborate or deny any allegations of specific remarks or discuss anything else from the *ex parte* portions of the conference.

John and counsel do not explain exactly how the undersigned allegedly tried to "pressure" him. The undersigned infers that John disagreed with the undersigned about the chance of success at trial, was unsatisfied with Purdue's offer of settlement, and thus views the alleged suggestion that "set-

72a

tling was in [his] best interest" as improper pressure.[9] But "it is the nature of a settlement conference that in attempting to facilitate a resolution of the case, the judge informs both parties of [his] assessment of the strengths and weaknesses of their respective positions," and may "challenge the plaintiff's opinion" of his own case. *Epstein,* 2017 WL 3168975, at *5. And contrary to counsel's suggestion, the fact that the undersigned "already oversaw a settlement conference" [DE 257-1, ¶52] is not itself a reasonable basis to question his impartiality for a jury trial[10]. *See Montgomery v. Vill. of Posen,* No. 14 C 3864, 2017 WL 345547, at * 1 (N.D. Ill. Jan. 24, 2017), *aff'd,* 711 F. App'x 343 (7th Cir. 2018) ("Conducting a settlement conference—with the attendant *ex parte* communications with both sides—does not demonstrate a judge holds a bias toward either party . . . Similarly, any discussion of the merits of the parties' respective

―――――――

[9]   Counsel concludes that the undersigned "seemed determined in seeing John take any sort of deal regardless of fairness." [DE 257-1 ¶51]. The settlement discussions will remain confidential, but the record sharply contradicts counsel's suggestion that the undersigned was "determined" for the case to settle in a particular way. In fact, the undersigned explained before the conference that the "default" would be for another judge to conduct it, unless the parties agreed otherwise. [DE 212, 1:13-8:2 (September 1, 2022 status hearing)].

[10]   John demanded a jury trial [DE 160 at 1], and the undersigned clarified that if he did oversee the settlement conference, "we certainly will not do a bench trial." [DE 212, 3:7-11].

73a

cases during those discussions does not show par-
tiality."); *see also Bhatti v. Cnty. of Sacramento,*
No. CIV. S-05-0754WBSEFB, 2009 WL 1451709, at
*2-3 (E.D. Cal. May 22, 2009); *Bilello v. Abbott
Lab's,* 825 F. Supp. 475, 478-480 (E.D.N.Y. 1993).

### 4.  Mandamus petition

Finally, counsel argues that John's February 17,
2023, mandamus petition, which the Seventh Cir-
cuit has already denied, requires the undersigned's
recusal. [DE 257-1 ¶ 52 ("Given the presence of our
mandamus petition alone, he should have already
recused himself from the trial.")]. But a party can-
not compel recusal merely through the act of com-
plaining about the judge. That would effectively
allow litigants to switch judges at any time for any
reason. *See In re Mann,* 229 F.3d 657, 658 (7th Cir.
2000) (mandamus petition and misconduct com-
plaints did not require recusal: "Indeed, if that
were the rule, litigants displeased with Judge A's
adverse rulings could easily manipulate the system
by filing a misconduct complaint, thereby disquali-
fying Judge A from hearing the case, in the hopes
that the case would then be assigned to Judge B
who might be more sympathetic to their cause.");
*N.Y. City Dev. Corp. v. Hart,* 796 F.2d 976, 980 (7th
Cir. 1986) ("Section 455(a) [would] become[ ] a form
of peremptory challenge against the judge. The
statute does not create such a challenge, however.
That is the point of limiting disqualification to a
case where the judge's "impartiality might reason-
ably be questioned.").

74a

John states that the undersigned "strangely has yet to even address" the mandamus petition. [DE 257-2, ¶15]. That petition was not before this Court, and the Seventh Circuit denied it without seeking an answer from the undersigned. *See* Fed. R. App. P. 21(b)(1). It is not clear how or why the undersigned would have "addressed" the petition, or how *not* addressing it suggests bias or prejudice. Given John's mistaken belief that the mere filing of the petition required the undersigned's recusal, it does not appear that it would have been productive to do so.

One final note: The undersigned has considered whether this motion should be assigned to another judge. The better course here is to bring this matter to a close and proceed to trial. *See Watford,* 725 F. App'x at 414 (rejecting the argument that § 144 "required the district judge to refer the recusal motion to a different judge"). It is certainly conceivable that mistakes were made in this litigation, and perhaps at some time in the future a higher court will rule that one or more of those mistakes came from the front of the courtroom. Every litigant is entitled to a fair and impartial judge, but no judge is infallible. At the same time, the judge has a duty to resolve disputes and bring the litigation to an end. This matter will be set for trial. After judgment, all parties retain their right to an appeal.

75a

## CONCLUSION

As shown above, the grounds cited by John for the undersigned's recusal are inadequate under the principles applicable to the two recusal statutes as set forth by the Supreme Court. John's grounds "consist of judicial rulings, routine trial administration efforts, and ordinary admonishments (whether or not legally supportable) to counsel . . . All occurred in the course of judicial proceedings, *and* neither (1) relied upon knowledge acquired outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky,* 510 U. S. at 556. Accordingly, John's Motion to Recuse [DE 257] is **DENIED.**

So ORDERED this 14th day of August, 2023.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT

76a

# IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

―――――――――

## CIVIL ACTION

―――――――――

No. 2:17-cv-33-JPK

―――――――――

**JOHN DOE,**

Plaintiff,

v.

**PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF TRUSTEES, MITCHELL ELIAS DANIELS, JR.,** in his official capacity as President of Purdue University, **ALYSA CHRISTMAS ROLLOCK,** in her official capacity at Purdue University, **KATHERINE SERMERSHEIM,** in her official capacity at Purdue University,

Defendants.

―――――――――

## NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE SEVENTH CIRCUIT

Notice is hereby given that Plaintiff John Doe hereby appeals to the United States Court of Appeals for the Seventh Circuit from the August 14, 2023, Magistrate Judge's Opinion and Order (DE 261) denying the Plaintiff John Doe's Motion to recuse Magistrate Judge Joshua Kolar for bias (Dkts 257, 260). This is an appeal from "a final

77a

decision" denying recusal due to bias "which is separate from the merits and unreviewable on appeal." *Powers v. Chicago Transit Auth.,* 846 F.2d 1139, 1141 (7th Cir. 1988) (Easterbrook, J.). Bias of a trial judge is too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. *United States v. Henderson,* 915 F.3d 1127, 1130 (7th Cir. 2019) (Sykes, C.J.).

This appeal relies upon the guidance of such Seventh Circuit precedents in *United States v. Henderson*, 915 F.3d 1127, 1130–1132 (7th Cir. 2019)(Sykes, C.J.); *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.,* 707 F.3d 853, 868–869 (7th Cir. 2013) (Sykes, .C.J.); *Ott v. City of Milwaukee*, 682 F.3d 552, 554–555 (7th Cir. 2012) (Wood, J.); *United States v. J.J.K.*, 76 F.3d 870, 872 (7th Cir. 1996) (Posner, J.); *Powers v. Chicago Transit Auth.*, 846 F.2d 1139 (7th Cir. 1988) (Easterbrook, J.); and *R.R. Donnelley & Sons Co. v. F.T.C.*, 931 F.2d 430 (7th Cir. 1991) (Easterbrook, J.).

*United States v. Henderson,* 915 F.3d 1127, 1130–1132, recognized the immediate appealability of what was called a collateral order fixing security in *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546 (1949), as such orders "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. . . . To qualify for immediate review under this exception, an order 'must conclusively determine the dis-

78a

puted question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.'" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468 (1978). Here, the denial of recusal due to bias conclusively determines the disputed question, resolves (incorrectly) a critically important issue completely separate from the merits of the action, and is effectively unreviewable on appeal from a final judgment.

*JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.,* 707 F.3d 853, 868–869 (7th Cir. 2013), recognizes, as does this appeal, that "Collateral-order review is based on a practical construction of 28 U.S.C. § 1291; it is not an exception to the final-judgment rule." *Ott v. City of Milwaukee*, 682 F.3d 552, 554 (7th Cir.2012) (internal quotation marks omitted). *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.*, 707 F.3d at 868–869, also recognizes, as does this appeal, that we "'do not engage in an 'individualized jurisdictional inquiry.',"' *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009); *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 473 (1978)). The focus is on "'the entire category to which a claim belongs,'" (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)) and whether "the class of claims, taken as a whole, can be adequately vindicated by other means," 707 F.3d at 868–869.

Such review was recognized, for example, in *United States v. Henderson,* 915 F.3d at 1131, for a category including (1) an order denying bail, *Stack*

79a

*v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951); (2) an order denying dismissal based on double jeopardy, *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); (3) an order denying dismissal under the Speech or Debate Clause, *Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979); and (4) an order for the administration of psychotropic medication to render a defendant competent for trial, *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Such review was also recognized by the U.S. Supreme Court in *Mitchell v. Forsyth,* 472 U.S. 511 (1985), for the denial of summary judgment based on qualified immunity, but not by the Seventh Circuit in *Gosnell v. City of Troy, Ill.,* 979 F.2d 1257, 1260–61 (7th Cir. 1992), *as amended* (Nov. 17, 1992)

Such review has been denied: in *United States v. Henderson,* 915 F.3d at 1132, for an order of shackling; in *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.,* 707 F.3d 853, 868–69 (7th Cir. 2013), for an order staying enforcement of asset discovery for an order staying enforcement of the asset discovery and for an order denying a motion to quash a non-party subpoena for pretrial discovery; in *Ott v. City of Milwaukee,* 682 F.3d 552, 554–555 (7th Cir. 2012), for an order violating the attorney-client privilege; in *Powers v. Chicago Transit Auth.,* 846 F.2d 1139, for an order holding a person in civil contempt for failure to supply information in discovery; in *Judd v. First Federal Savings,* 599 F.2d 820 (7th Cir. 1979), for denial of permission to use mortgage company's computer-generated list of its

80a

mortgagors for class notification purposes; in *Judd v. First Fed. Sav. & Loan Ass'n of Indianapolis,* 599 F.2d 820, 822 (7th Cir. 1979), for an order decertifying a class; in *R.R. Donnelley & Sons Co. v. F.T.C.,* 931 F.2d 430 (7th Cir. 1991), for the denial of a motion for summary judgment and for the grant of discovery.

The denial of recusal due to bias does not fit in a category of claim for which the review has been denied per *Powers v. Chicago Transit Auth and United States v. Henderson*, and as stated above, the denial of recusal due to bias does satisfy the requirements of *Powers v. Chicago Transit Auth and United States v. Henderson.*

Magistrate Judge Kolar's opinion denying recusal for bias [DE 261] is a final order" within the meaning of *Powers v. Chicago Transit Auth.,* 846 F.2d 1139, 1141 (7th Cir. 1988) (Easterbrook, J.). that is too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. *United States v. Henderson,* 915 F.3d 1127, 1130 (7th Cir. 2019) (Sykes, C.J.). Magistrate Judge Kolar's opinion denying recusal for bias [DE 261] avoids the actual reasons establishing the pervasive bias in this case presented and certified in the Declaration of Philip A. Byler [DE 257-1], and instead gives rationalizations and inapposite propositions to justify his functioning as a biased trial judge in an important case.

81a

## I. Magistrate Judge Kolar's Avoidance of Discussing the Specifics of His Opinions.

Magistrate Judge Kolar acknowledges that the Byler Declaration relies on (i) "[r]ecusal [being] required *whenever* there exists a genuine question concerning a judge's impartiality" *Liteky v. United States,* 510 U.S. 540, 551 (1994) (emphasis in the original) [DE 257-1, p. 7], (ii) the "pervasive bias" theory recognized by *Liteky v. United States,* 510 U.S. at 551 [DE 257-1, p. 7], and (iii) the Byler Declaration's primary focus on three opinions that are presented as key points establishing evidence of bias—the July 2, 2021 spoliation opinion; the August 22, 2022 summary judgment opinion; and the February 14, 2023 reconsideration opinion [DE 257-1, pp. 8-31]. [DE 261, p. 8.] The details that Magistrate Judge Kolar has chosen to omit, alter and ignore in each and every opinion have consistently influenced his final decisions against Plaintiff John Doe, and the same CANNOT be said for his treatment of Purdue.

Magistrate Judge Kolar says he won't relitigate these opinions here (but in reality not at all) and further says, in a conclusory way, all that is involved is Plaintiff's "disagreement" with those opinions which he asserts is for appeal after trial [DE 261, p. 8]. That statement assumes a conclusion the Byler Declaration does not allow unless the Byler Declaration's details establishing evidence of bias are effectively ignored which, consistent in his bias against Plaintiff John, Magistrate Judge Kolar does ignore. No mere "disagreements"

82a

are involved here. The Byler Declaration states [DE 257-1, pp. 6-7]:

Plaintiff is not relying upon the mere fact of adverse rulings but upon the manifestations of "judicial predispositions that go beyond what is normal and acceptable," and show a case of "pervasive bias." *Liteky v. United States,* 510 U.S. at 551. In particular, Magistrate Judge Kolar's July 2, 2021, August 11, 2022 and February 14, 2023 opinions mishandled the law in a way an impartial judge would not do, misstate the factual record in a way an impartial judge would not do, and do so all to Purdue's benefit, establishing Magistrate Judge Kolar won't be impartial due to pervasive bias.

Magistrate Judge Kolar relegates attacks on the Byler Declaration and defends his rulings mostly within a series of footnotes, while in the text of his opinion rationalizes why he does not need to address the specifics in the Byler Declaration which overwhelmingly establish lack of impartiality and bias.

## II. Inadequately Documented Consent and Bias.

Magistrate Judge Kolar's opinion refusing recusal assumes he has consent pursuant to 28 U.S.C. § 636. [DE 261, p. 1.] The Docket Entries regarding consent, however, do not conclusively establish that consent was properly obtained. The first Docket Entry regarding consent states Magistrate Judge Kolar is assigned to the case, but the Docket Entry has no number and says the assign-

83a

ment is pursuant to a General Order. The following Docket Entry 40, dated July 24, 2019, records an Order of Magistrate Judge Kolar that if the parties do not intend to object to the continued exercise of jurisdiction of Magistrate Judge Kolar, to notify Magistrate Judge Kolar. [DE 40.] Docket Entry 41, dated August 1, 2019, then records the assignment of the case to Magistrate Judge Kolar upon the consent of the parties. [DE 41.] The Docket Entries, however, do not record the filing of signed consents of the parties required by 28 U.S.C. § 636 for Magistrate Judge Kolar to be the judge for all purposes, including for trial. There was no indication of bias then in July 2019 on the part of Magistrate Judge Kolar, who had seemingly good credentials, or what would follow in subsequent years that now form the basis of Plaintiff's pervasive bias motion. Despite his coverage of litigation, discovery, settlement conference, and partial pretrial, Magistrate Judge Kolar absolutely insists on also handling the rest of pretrial and trial. The obvious question to ask here is: why is Magistrate Judge Kolar so keen on handling this case all the way through trial?

### III. Footnote Attacks and Defenses Of Opinions; Text Rationalizations.

Magistrate Judge Kolar in a footnote asserts he will disregard Plaintiff's "inflammatory accusations" that Magistrate Judge Kolar says are without factual content [DE 261, p. 3 n. 4] Given his position here, Magistrate Judge Kolar may call them inflammatory, but to claim they are without

84a

factual content is far from the truth. We stand by our statements, which are directly stated factual assessments of Magistrate Judge Kolar's conduct that are supported by the detailed factual content of the 33-page Byler Declaration and that objectively establish Magistrate Judge Kolar's lack of impartiality and bias [DE 257-1]. What Magistrate Judge Kolar complains about are the statements in the Byler Declaration (i) that Magistrate Judge Kolar "has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate [current U.S. Supreme Court] Justice Barrett's opinion in this case" (DE 257-1 p. 2); (ii) that the history of the case shows Magistrate Judge Kolar "kowtowing to Purdue and its implacable public rejection of Justice Barrett's nationally significant opinion" (DE 257-1 p. 4); and (iii) that Magistrate Judge Kolar's rulings are "propaganda pieces for Purdue" (DE 257-1 p. 7). Direct language, yes; but true, as shown in the Byler Declaration and, more importantly, never directly addressed by Magistrate Judge Kolar.

Magistrate Judge Kolar in another footnote calls into question whether the Byler Declaration is a good faith affidavit and certificate. [DE 261, p. 5 n. 6.] The Byler Declaration is most certainly a good faith affidavit with its detailed discussions, and paragraphs 3 and 8 of the Byler Declaration essentially constitute the requisite certificate. (DE 257-1.) The Byler Declaration leaves no doubt that Magistrate Judge Kolar is biased and lacks impartiality. At the time the motion to recuse was made

85a

on July 9, 2023, the Attorney of Record was effectively Philip A. Byler because on July 5, 2023, Magistrate Judge Kolar granted Nesenoff & Miltenberg's motion to withdraw, leaving Philip A. Byler, operating in The Law Offices of Philip A. Byler, as the Attorney of Record for Plaintiff John Doe. [DE 255.]

Magistrate Judge Kolar in yet another footnote [DE 261, p. 4 n. 5] lashes out at the Byler Declaration's discussion of Magistrate Judge Kolar veering off topic in a July 5, 2023 teleconference, a conference that had been scheduled with the sole purpose of addressing John's change in representation. Instead of justifying his still unclear mention of sanctions related to the July 2021 spoliation opinion (where there was no spoliation), Magistrate Judge Kolar strangely pushed back in an attempt to strengthen his unrelated argument by saying that no new facts regarding spoliation were presented by John at the teleconference (no new facts are necessary to show bias with respect to the July 2, 2021 spoliation opinion). Magistrate Judge Kolar's line of logic here is nonsensical and puzzling to say the least, and his motive for doing so appeared to be an attempt to antagonize John and appease Purdue. The sanctions mentioned here would mean adverse jury instructions and awarding Purdue fees amounting to nearly $30,000 against John before the trial even began. The entire situation reveals further bias from Magistrate Judge Kolar.

Magistrate Judge Kolar cites the requirement that the moving party file at the earliest moment

86a

after the moving party acquires knowledge of the facts demonstrating the basis for disqualification, citing *United States v. Sykes,* 7 F.3d 1331, 1333 (7th Cir. 1993), *United States v. Betts-Gaston,* 860 F.3d 525, 538 (7th Cir.2017), and *United States v. Barnes,* 909 F.2d 1059, 1072 (7th Cir. 1990). Those cases, however, all involved much different circumstances — a relatively short period of a trial or a sentencing relating to courtroom annoyances, antagonistic relationships, possible baiting, or suppression of evidence. Those circumstances bore no relevance to the bias shown in Magistrate Judge Kolar's July 2, 2021 spoliation opinion, the August 11, 2022 summary judgment opinion and the February 14, 2023 reconsideration opinion.

Magistrate Judge Kolar noted that the bias motion is premised on a series of events over four years in which Plaintiff's counsel has been involved, but that is why the Byler Declaration can and did provide the good faith certificate for the bias motion. The conclusion that Magistrate Judge Kolar was biased developed as Judge Kolar went from the July 2, 2021 spoliation opinion where irrelevancy was mistreated as spoliation and there was no spoliation but John Doe was still threatened adverse jury instructions and Purdue awarded attorney fees, the August 11, 2022 summary judgment opinion where Magistrate Judge Kolar rationalized rejecting Justice Barrett's nationally recognized due process precedent that Purdue had publicly attacked, and the February 14, 2023 reconsideration opinion where Magistrate Judge Kolar embraced Purdue's positions that the Navy

87a

ROD and Purdue's due process violations are irrelevant. Although the major focus of Plaintiff's bias claim comes from the three opinions, of which the latest one was released in February 2023, Magistrate Judge Kolar's biased behavior has remained evident in the proceedings since.

Making a bias motion against someone who has clearly intended to be the trial judge would be no easy step. Purdue had no answer as to what would have been a timely bias motion, just an irate reaction to the effort to recuse Magistrate Judge Kolar and assign an Article III judge to the case and some false posturing about what was and is the strong case Plaintiff has. [DE 258, p. 2.] It was not reasonable to expect Plaintiff to have filed the bias motion before the June 7, 2023 settlement conference requested by Purdue and before the July 3, 2023 conference called by Magistrate Judge Kolar — then his conference remarks contributed to the case for bias. Magistrate Judge Kolar nevertheless treats the bias motion as late, which is a conclusion to run away from the fact he is actively seeking to be a biased trial judge after a series of decisions that are biased.

As Magistrate Judge Kolar recognizes, Plaintiff invokes § 144 and § 455(a), § 455(a) has broader reach than § 455(b), citing *Liteky v. United States,* 510 U.S. at 553 n. 2, and bias is to be evaluated on an objective basis. [DE 261, pp. 5-6]. The initial analysis may be performed by the judge whose disqualification is sought. Magistrate Judge Kolar argues that a bias motion premised on a judge's rulings will rarely be the basis of a proper bias

88a

motion [DE 261, pp. 7-8]. Even if that proposition were accepted, *arguendo,* this would be that rare case, something that Plaintiff's counsel has not seen in almost 50 years of practice.

## IV. Improper Communication: Purdue's Second Motion To Dismiss and E-Mailed Opinion To Magistrate Judge Kolar.

Magistrate Judge Kolar refers to "reasonable case management decisions" not showing bias and lack of impartiality, but his cover up misstatement about proposed orders being permitted to be emailed to Chambers [DE 261, p. 10] does show bias and lack of impartiality. "Reasonable case management decisions" [DE 261, p. 10] were not involved here. The Byler Declaration describes what really happened concerning what was Purdue's second motion to dismiss and an opinion (not an order) e-mailed by Purdue counsel to Magistrate Judge Kolar [DE 257-1, pp. 7-8]:

15. On September 17, 2019, less than three months after Judge Barrett's opinion for the Seventh Circuit, reversing Magistrate Judge Cherry's dismissal of the case, Purdue moved to dismiss again, seeking dismissal of Plaintiff John Doe's due process claim, notwithstanding that Judge Barrett's opinion for the Seventh Circuit had upheld that due process claim, and seeking reduction of the case to a Title IX damages claim. (DE58, 60.) Plaintiff's opposition made clear that Purdue's second motion to dismiss was entirely out of order, suggesting sanc-

89a

tions for Purdue's motion in disregard of the then relatively recent Seventh Circuit's decision. (DE 63.) After the briefing was submitted, out of the blue, Purdue counsel felt comfortable submitting, to Judge Kolar by email, an entire draft opinion that would grant Purdue's motion to dismiss to reduce the case to a Title IX damages case. Plaintiff objected to Purdue's unsolicited submission of an opinion by e-mail. Judge Kolar held a conference reminding the parties of their obligation for filing (DE 67); although Judge Kolar did not adopt the submitted opinion at that time, Purdue's action certainly seems to shed light on Judge Kolar's later opinions. Nine months later, on May 19, 2020, Magistrate Judge Kolar granted in part and denied in part Purdue's motion, trimming a few injunctive requests. (DE84.)

It is one thing for a Court to receive an emailed proposed order to formalize a decision the Court has made; there is no bias shown in that procedure. But it is quite another thing for a Court to receive and defend receiving a complete opinion with the litigant's desired result, which is what happened here.

Magistrate Judge Kolar tries to describe the event as John objecting to an overly long proposed order, which is contrary to the case docket entry indicating that the judge admonished the parties about email submissions [DE 67]. What happened is reflected in Docket Entry 67. What did NOT happen is what Magistrate Judge Kolar says in his

90a

denial of recusal for bias opinion. What Magistrate Judge Kolar says is that Purdue emailed a proposed order and John objected to the length of the proposed order [DE 261, p. 10]. That's false. As the Byler Declaration documents, the actual problem was Purdue's emailed submission of an opinion granting Purdue's proposed second motion to dismiss reducing the case to a Title IX damages case; the problem was not an overly long proposed order. [DE 257-1, pp. 7-8.]

Magistrate Judge Kolar's cover up misstatement does show bias. Purdue's strategy from the start after this Court ruled in June 2019 was somehow to get rid of John Doe's due process claim and oversee a strip trial of Plaintiff's Title IX claim with Purdue's state police power counterclaim [DE 91]. What Purdue sought in its second motion to dismiss, Magistrate Judge Kolar gave in his August 11, 2022 summary judgment opinion, a continuation of the bias that started becoming obvious after the July 2, 2021 spoliation opinion, and a bias that will certainly extend through trial if allowed to continue but not before showing what a biased trial judge, he would be in his July 2, 2021 spoliation opinion.

## V.  The July 2, 2021 Spoliation Opinion.

There was good reason for the Byler Declaration to include the fact that at a July 5, 2023 conference, Judge Kolar brought up the subject of his July 2, 2021 spoliation opinion. Paragraphs 19 and 20 of the Byler Declaration [DE 57-1, pp. 9- 11] dis-

91a

cuss the bias shown in Magistrate Judge Kolar's July 2, 2021 spoliation opinion, including Magistrate Judge Kolar's remarks at the July 5, 2023 conference. Magistrate Judge Kolar's assertion in his denial of bias opinion that he decided spoliation on the evidence before the Court [DE 261, p.12] is false and further evidence of his bias. It was not a matter of "mere disagreement":

19. In the backdrop of Plaintiff factually building his due process and Title IX case, Purdue moved for sanctions against Plaintiff John Doe, making a plethora of inaccurate accusations about discovery and seeking (again) the due process claim be struck. (DE 148.) John Doe opposed, showing his compliance with discovery. (DE 152, DE 152-1, DE 152-2.) On February 22, 2021, the Court held a multi-hour evidentiary hearing on Purdue's motion. (DE 155.) John Doe testified under oath how 11 Snapchat documents were accidentally deleted when John cleared memory from his cell phone without realizing deletion from his cell phone would affect his Snapchat account and that the deleted documents were more of the same of what was produced (DE156; Snapchat Memories received in evidence, A32-35; DE155). The Snapchat documents and indeed, all his social media were irrelevant, spanning years after the 2016 events at Purdue and relating only to personal matters (e.g., one of John's sisters playing piano). Spoliation of evidence occurs when one party destroys evidence relevant to

92a

an issue in the case. *Smith v. United States,* 293 F.3d 984, 988 (7th Cir.2002); *Crabtree v. Nat'l Steel Corp.,* 261 F.3d 715, 721 (7th Cir.2001).

20. On July 2, 2021, Magistrate Judge Kolar ruled there was spoliation, granting relief albeit different than requested because striking the due process claim was said to be disproportionate (but which Purdue sought because the record had established the due process claim). The Magistrate Judge showed a lack of impartiality by strangely ignoring all the discovery Plaintiff John Doe complied with and focused on what little Plaintiff John Doe did not have. The Magistrate Judge acknowledged "there is nothing in the record to indicate whether the files were in fact adverse to Plaintiff's case" (DE168, p. 29), but speculated "it was not inconceivable" the 11 Snapchat personal posts might be potentially relevant to John Doe's desired Navy career without giving an explanation how it was conceivable, much less actually relevant (DE168, p. 16), which a glance at the Snapchat listing showed it wasn't *(see* A33-35 in Mandamus Appendix). The Magistrate Judge unjustly lambasted John Doe for the deletion, ordered payment of Purdue's attorney fees (which were claimed to be $30,000 and which would wrongly burden John Doe's effort to vindicate his due process and Title IX rights), and outlined jury instructions regarding what were totally irrelevant docu-

93a

ments. (DE168.) However, adverse inference instructions require intentional destruction and relevance. *Crabtree v. Nat'l Steel Corp.,* 261 F.3d at 721; *Keller v. United States,* 58 F.3d 1194 (7th Cir.1995) (collecting cases). Such adverse jury instructions, although erroneously given, would wrongly impact John Doe at trial and further wrongly burden John Doe's effort to vindicate his due process and Title IX rights. At a July 5, 2023 teleconference involving the transfer of responsibilities for Plaintiff's representation, the Magistrate Judge *sua sponte* brought up the spoliation sanction, even though it was irrelevant to the teleconference and at that point it was clear the spoliation ruling was in error, as it concerned totally irrelevant post-suspension Snapchat memories. The point appeared to be that the Magistrate Judge was quite prepared to do Purdue a favor and order Plaintiff to pay Purdue an amount that wrongly burden John Doe's effort to vindicate his due process and Title IX rights.

Magistrate Judge Kolar so ruled without an evidentiary basis, reflected in the fact that Purdue never used any of John's social media production in the summary judgment briefing despite the extensive aggression into his personal life throughout discovery. (DE 178, DE 180.)

## VI. Summary Judgment Briefing.

Purdue has liked to posture that John just hasn't come forward with proof of his case, but the sum-

94a

mary judgment briefing very much dispels that false notion. The Byler Declaration states [DE 257-1, p. 12]:

> 21. John Doe moved for summary judgment on his due process claim and to dismiss Purdue's state police power counterclaim. DE183 is his memorandum of law, DE191 is his reply memorandum of law, and DE183-1 is Plaintiff's material statement of facts in support of summary judgment on due process. Summary judgment was premised on discovery having conclusively established the facts alleged in the Complaint that Judge Barrett had relied upon in upholding Plaintiff's due process claim and additional facts that made the denials of due process even more egregious. Purdue moved for summary judgment to dismiss John's due process and Title IX claims. DE 187 is John's opposition memorandum of law, and DE 187-2 is John's material facts in opposition to Purdue's motion. Purdue never used any of John's social media production in the summary judgment briefing. (DE178, DE180.)

The evidentiary material compiled and listed at DE 187 and organized in John's material fact statement at DE 187-2 powerfully supported John's Title IX case.

95a

## VII.  The August 11, 2022 Summary Judgment Opinion.

Magistrate Judge Kolar, in a footnote {DE 261, p. 9 n. 8], defended the dismissal of Plaintiff John's due process claim based on the difference between a motion to dismiss and a motion for summary judgment. Magistrate Judge Kolar's technical discussion of that difference simply does not address what was terribly wrong in his August 11, 2022 opinion that reflected a lack of impartiality and bias on the part of Magistrate Judge Kolar for Purdue. Judge (now Justice) Barrett's opinion made clear that Purdue's disciplinary procedures were woefully deficient and that expungement was to be considered, but Magistrate Judge Kolar ignored the procedural defects and the directive to consider expungement of the disciplinary file. This was not a matter of "mere disagreement"; this was not a matter of Plaintiff looking for "goblins" [DE 261, p. 11]; this was not a matter of ruling for Purdue and against Plaintiff. The Byler Declaration explained [DE 257-1, pp. 12-18]:

### De Facto Rejection of Justice Barrett on Liberty Stigma-Plus Interest

22. On August 11, 2022, the Magistrate Judge showed a lack of impartiality when denying John Doe's motion for summary judgment on his due process claim on the ground there were issues of fact with respect to the stigma-plus liberty interest whether the stigma was false, even though the Seventh Circuit

96a

has never adopted a falsity element for a stigma-plus liberty interest and the record did not support there were the issues identified. Purdue's motion for summary judgment dismissing the due process claim was granted, rejecting John Doe's stigma-plus liberty interest, reviving the self-defamation ground that Judge Barrett had rejected and requiring a narrow, unrealistic legal obligation divorced from military realities to authorize disclosure of the university disciplinary file to the Navy. Struck was Plaintiff's expert report from Dr. R. Chris Barden, who had critiqued and found seriously wanting Purdue's biased investigation. Ignored in the August 11 opinion was Plaintiff's motion to dismiss Purdue's legally defective state police power counterclaim that would allow Purdue to put Plaintiff on trial. (DE206, A168-216.) Judge Kolar's August 11th Opinion gave Purdue what Purdue sought in its 2019 second motion to dismiss, the dismissal of Plaintiff's due process claim.

**The National Importance of Judge (Now Justice) Barrett's Due Process Opinion.**

23. The national importance of the due process rulings of then Judge (now Justice) Barrett in *Doe v. Purdue,* 928 F.3d 652, 661-664, 667 (7th Cir. 2019), cannot be understated, holding: (i) that John had pleaded a stigma-plus liberty interest; (ii) that Purdue's disciplinary process was woefully deficient and

97a

did not provide due process, citing among other things not giving John the investigation report and not holding a real hearing ("Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension"); and (iii) that the District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on remand").

24. When then Education Secretary DeVos announced on May 6, 2020, what would be the current due process Title IX regulations, she pointed to three cases that were particularly instructive, one of which was the Seventh Circuit's decision in *Doe v. Purdue. "Secretary DeVos Announces New Title IX Regulation,"* https://www.youtube.com/watch?v=hTb3yfMN-GuA; U.S. Department of Education Press Release, "Secretary DeVos Takes Historic Action to Strengthen Title IX Protections for All Students," May 6, 2020; 34 C.F.R. 106.45. Secretary DeVos noted that it was a three-woman panel with then Circuit Judge Amy Coney Barrett as the author of the opinion. *"Secretary DeVos Announces New Title IX Regulation"* https://www. youtube.com/*watch*?v=*hTb*3yfMNGuA.

25. When Judge Barrett was nominated for the U.S. Supreme Court, her *Doe v. Purdue* opinion was a subject of attention. Defending Judge Barrett's opinion in the Wall Street Journal was K.C. Johnson, "Sex, Due Process

98a

and Amy Coney Barrett," Wall Street Journal, Oct. 1, 2020. Purdue responded with its defiant defense, "Purdue Responds on Judge Amy Coney Barrett's Title IX Opinion," Wall Street Journal, Oct. 12, 2020. Judge Barrett's opinion has been a thorn in Purdue's side, and Purdue does not want to live in accordance with it.

26. The Magistrate Judge misstates John's argument as meaning the national importance of the *Doe v. Purdue* due process ruling by itself compels denial of summary judgment. (DE224, p. 10.) That is not Plaintiff's argument. It is that the Magistrate Judge's August 11 Opinion did not consider Purdue's due process violations and expungement of the disciplinary file as contemplated in Judge Barrett's opinion, but rather with specious, insubordinate pettifoggery dismissed the due process claim (DE206, pp.16-18, DE224, pp. 2-4), by adopting Purdue's self-defamation argument expressly rejected by Judge Barrett, marginalizing chain of command military realities and effecting an absurd result wholly inconsistent with Judge Barrett's opinion.

**Judge Barrett's Rejection of Self-Defamation for the Court.**

27. Before the Seventh Circuit in 2019, Purdue had argued that John had engaged in self-defamation by authorizing the release of the university disciplinary files to the Navy. That argument then was premised on the NROTC

99a

only learning of John's disciplinary case
because of John's authorization of disclosure to
the Navy ROTC. Judge Barrett stated in her
opinion Purdue's position: "The university
maintains that it has not and will not divulge
John's disciplinary record without his permis-
sion. The Navy knows about it only because
John signed a form authorizing the disclosure
after the investigation began." 928 F.3d at 661.
Purdue cited *Olivieri v. Rodriguez,* 122 F.3d
406 (7th Cir.1997), where a voluntary disclo-
sure was the reason for an employment dis-
charge in a situation that the Seventh Circuit
considered it speculative whether the disclo-
sure would ever be called for. Judge Barrett,
however, rejected Purdue's argument (928 F.3d
at 652): John's case is different. He does not
claim simply that he might someday have to
self-publish the guilty finding to future
employers. Instead, John says that he had an
obligation to authorize Purdue to disclose the
proceedings to the Navy. That makes John's
case more like *Dupuy v. Samuels,* 397 F.3d 493
(7th Cir. 2005), than *Olivieri.* In *Dupuy,* we
held that the publication requirement of the
stigma-plus test was satisfied when the plain-
tiffs were obligated to authorize a state agency
to disclose its finding that they were child
abusers to the plaintiffs' current and prospec-
tive employers. 397 F.3d at 510. (928 F.3d at
662.)

100a

28. The discovery record made Purdue's argument and Magistrate Judge Kolar's ruling about self-defamation wholly untenable. Indisputably: (i) the NROTC knew about the disciplinary proceeding well before the May 24, 2016 authorization because on April 4, 2016, Jane Doe first went to the NROTC to make her accusations; (ii) Purdue first learned of Jane Doe's accusations from the NROTC; and (iii) the NROTC was looking to the Purdue investigation from the start.

**The Navy Knew About The Disciplinary Proceeding Before Authorization and Was Looking To Purdue's Investigation.**

29. On April 4, 2016, Jane Doe (falsely) told Navy Lieutenant Sheppard she had been subject to two instances of sexual misconduct by John, and Lieutenant Sheppard informed his superior officers Commander Hutton and Executive Officer Remaly about Jane Doe's allegations. (DE183-34: Shepard tr 21-25, 28-30; DE183-43: Sheppard Ex 2; DE187: Sheppard tr 42-43.) Also on April 4, 2021, Commander Hutton reported Jane Doe's sexual misconduct allegations to Purdue's Office of the Dean of Students, reflecting the interrelationship of Purdue and the Purdue Navy ROTC. (DE 187-6: Dfs. SJ Ex. K.) When asked by Purdue counsel about the "investigation" of the sexual misconduct allegations against John, NROTC Commander Hutton responded that "that investigation was referred to Purdue Univer-

101a

sity." (DE 183-35: Hutton tr. 14.) On April 4, 2021, Purdue's Dean of Students Sermersheim advised Purdue's CARE Director Bloom of Jane Doe's allegations. (DE 187-6: Dfs. SJ Ex. K).)

30. On April 5, 2021, Commander Hutton sent a letter to John informing him that John was being placed on "an Interim Leave of Absence (ILOA) *due to your pending university investigation"* and that "[f]urther administrative action, potentially to include Performance Review Board (PRB), will be taken *on completion of the university investigation."* (DE 187-7; italics added.) The April 5, 2016 letter further stated that John was prohibited from participating in ROTC activities, but would remain enrolled in NROTC. (DE 187-7.)

31. The authorization to the NROTC for access to the Purdue disciplinary files was dated May 24, 2016, well after the NROTC learned of the disciplinary proceeding. (DE183-5, John tr. 23; DE183-44.) John Doe testified at his deposition that the Navy wanted "in the loop" (DE183-5, tr 21-22), and when John Doe was deposed by Purdue about the authorization document, the questions were about whether he could have obtained the Purdue investigation report from the NROTC, not self-defamation (which was never raised). (DE208-1, DE208-2, tr 22- 26.)

102a

32. The significance was explained by John Doe: "With Jane Roe having reported her accusation to the Navy ROTC and the Navy ROTC looking to Purdue for the investigation, I really was in no position to refuse the authorization." (DE208-1 ¶ 7.) According to John: "Soon after Jane Roe complained to the Navy, I was put on interim leave of absence pending the university investigation. If I had refused authorization, I would not only have looked bad, but I also would have been sanctioned in some way." (DE208-1 ¶¶ 3, 5.) John thus had no choice but to authorize the Navy to be "in the loop" in the university disciplinary proceeding; it was not voluntary. John's case is "more like *DuPuy v. Samuels.*" 928 F.3d at 662. Purdue's authorization argument made no sense given the actual facts.

**The Magistrate Judge's Narrow Legal Obligation Ruling Is At Odds With Judge Barrett's Opinion And Is Divorced From Military Realities.**

33. John's situation as a NROTC midshipman who was not in a position to refuse the authorization to the Navy is totally inapposite to the situation of a voluntary disclosure of a disciplinary record for a school transfer, as in *Doe v. Trustees of Indiana University,* 2021 WL 2213257 (S.D. Ind. May 4, 2021), and to the situation of a voluntary disclosure of the reason for an employment discharge in *Olivieri v. Rodriguez,* 122 F.3d 406 (7th Cir.1997). Here,

103a

the obligation to disclose was not, as wrongly asserted by the Magistrate Judge, speculative. Rationalizing away the distinction between civilian and military life in this context amounts to willful blindness, which resulted in the Magistrate Judge incorrectly treating John's authorization as voluntary and John's testimony the Navy "wanted in the loop" as not a legal obligation to authorize. (DE221, p. 16; DE224, pp. 2-4.)

34. Dismissing military realities as speculation, as the Magistrate Judge does, is erroneous at best. The December 19 hearing exchanges lay bare the unreasonableness of the Magistrate Judge's opinion:

[MR. BYLER]: . . . The authorization was requested because the Navy—and this is the testimony—"wanted in the loop." And that meant they wanted in the loop of the investigation. And they were put into the loop.

And John Doe was not in a position to say no. As ROTC midshipmen, respecting his Navy superiors, wanting a career in the Navy, you have a request; knowing that the Navy wants to be in the loop. You don't say no.

The suggestion that maybe he says no is just ridiculous. I have combat officer sons, who, when asked this, of course you give the authorization. . . .

104a

THE COURT: But I see nothing. I don't see your client saying, "I was given order."

I don't see any deposition . . . .

[MR. BYLER]: Well, excuse me. At his deposition, all he was asked about the authorization was to identify it. The deposition then went off, "Well, could you have gotten the investigation report from the Navy." . . .

[Plaintiff] was on scholarship. He had to honor his commitments and obligations. . . And that meant, when he gets a request for this kind of authorization, that kind of access, when the Navy knows and it's going to be relying on the [Purdue] investigation, yes, he has to give it. He was in no position not to giveit. . . .

The decision that Commander Hutton testified to was: We're going to rely on the Purdue investigation. . . .

And it was in that context in which John Doe knows that they're wanting to be in the loop because the investigation that's ongoing, he's requested by a superior officer for that access. . . .

105a

## VIII. Judge Kolar's Allowance of Purdue's State Police Power Counterclaim (Putting John on Trial).

Magistrate Judge Kolar, in denying bias, points out he denied summary Judgment on John's Title IX claim [DE 261, p. 10; DE 206.] Magistrate Judge Kolar is not being fully candid. It would not be just a Title IX trial per the August 11, 2022 summary judgment opinion because Magistrate Judge Kolar also refused to dismiss Purdue's state police power counterclaim [DE 206] despite the lack of legal and factual merit to Purdue's state police power counterclaim [DE 183, pp. 43-47; DE 191, pp. 14-15] . In a Title IX/state police power trial sought by Purdue and then to be allowed by Magistrate Judge Kolar, an individual in John is put on trial, just as John had been with respect to spoliation. That the summary judgment record and papers would have made difficult dismissing John's Title IX claim [DE 177-178, 187, 192] is beside the point given Magistrate Judge Kolar's refusal to address and dismiss Purdue's state police power counterclaim in the August 11, 2022 summary judgment opinion.

## IX. Magistrate Judge Kolar's Partisan Slip in the August 11, 2022 Opinion.

Magistrate Judge Kolar does address what is called the "partisan slip" of treating Jane Roe as testifying, asserting that the August 11, 2022 summary judgment opinion never assumed that Jane Roe had testified. [DE 261, pp. 10-11.] That treatment is at odds with Magistrate Judge Kolar's own

106a

August 11, 2022 opinion. Further, the August 11, 2022 opinion showed bias and lack of impartiality with respect to the discovery related to summary judgment and with respect to Magistrate Judge Kolar's defective notion of triable issues for stigma plus. The Byler Declaration explains [DE 257-1, pp. 20-25]:

## Discovery Strengthened The Denial of Due Process Case

36. Based on the allegations of the Complaint, Judge Barrett wrote strongly about the denial of due process in this case: "Purdue's process fell short of what even a high school must provide to a student facing a days-long suspension." 928 F.3d 663-664. Discovery strengthened John's case that he was denied due process. The depositions of Purdue employees with the documents that formed the basis of the allegations of the Complaint not only substantiated the allegations, but showed a process more flawed than what was alleged in the Complaint. Purdue never provided John Doe with the evidence and the investigation report during the disciplinary case, there was no real hearing, and there was pre-judgment based upon treatment of Jane Doe's accusations. Expungement of the disciplinary file was and is the proper remedy. (DE183-1 through 183-41; DE 183, pp. 6-33, 39-46.) The District Court on remand was to consider the expungement of the disciplinary file ("we instruct the court to address the issue of expungement on

107a

remand"), but Magistrate Judge Kolar refuses to do so, knowing how opposed Purdue is to expungement.

37. Due process matters so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 242 (1980). The Magistrate Judge, however, rationalized the jarring result of adopting Purdue's position that "whether Purdue complied with due process is immaterial" by also adopting what are Purdue's gross misstatements of the record. It reflects the lack of impartiality on the part of the Magistrate Judge.

### The Non-Existent Alleged Triable Issues for Stigma Plus

38. As discussed, the Magistrate Judge's ruling on stigma-plus liberty interest was legally and factually erroneous, divorced from military chain of command realities in order to avoid the grant of summary judgment on Plaintiff John's due process claim. In addition, Magistrate Judge Kolar's proof of falsity requirement to establish a stigma plus liberty interest, which the Seventh Circuit has never adopted, was fundamentally flawed: the August 14, 2022 opinion gave a purported review of triable issues that did not reflect the factual record but that did reflect a lack of impartiality.

108a

### Jane Doe Never Testifying Versus John Doe Repeatedly Testifying.

39. Magistrate Judge Kolar strangely repeated what were the allegations of Jane Doe when in fact she never testified. Summary judgment is not a time when allegations suffice. Proof is needed. Jane's allegations were not and are not proof. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.,* 994 F. 3d 869, 876 (7th Cir. 2021) (facts needed to defeat summary judgment).

40. In contrast, John Doe has repeatedly put himself under oath to state that Jane's accusations are false. In the summary judgment record is John Doe's statement under oath saying:

> All of Jane Doe's claims made in April 2016, including that I touched her sexually without her consent or awareness, were and are false. I have maintained that all her claims were false from my initial statements in the Purdue disciplinary process at the start, all the way through to the appeals. I said so orally to Dean Sermersheim in June 2016. I said so in my oral statements to Navy ROTC personnel, and I said so in my written statement in August 2016 to Navy ROTC at the time of my disenrollment (which was based solely upon my university suspension), and I have con-

109a

tinued to maintain this truth for the past
four and a half years of this legal case.

(DE 183-8: SJM 8 (John Doe 02/18/2021 Affi-
davit ¶ 30).) John Doe did again on reconsider-
ation. (Motion Ex. A: John Doe 08/2/22
Declaration ¶ 10.)

**John-Jane Doe Texts.**

41. Magistrate Judge Kolar showed a lack of
impartiality when referring to what were 133
pages of John Doe-Jane Doe texts in accor-
dance with Purdue's misreading based on
Purdue's misleading excerpts without dis-
cussing John Doe's testimony on the texts that
he alone had provided.

42. The Court quotes passages of John Doe-
Jane Doe texts as if they were admissions of
guilt. They weren't; and there was no evidence
before Judge Kolar to treat them as evidence of
guilt. That Magistrate Judge Kolar does so
shows a lack of impartiality. In depositions,
Purdue's Dean Sermersheim, Purdue's investi-
gator Amberger and Purdue's investigator
Oliver each admitted that there is no state-
ment in the texts in which John admitted or
Jane Doe accused John of committing the sexu-
al acts alleged in the Notice of Allegations. (DE
183- 7: Semersheim tr 34; DE183-14: Amberger
tr 70-72; DE187-9: Oliver tr. 50-57).) Notably,
before the alleged incidents, John and Jane
Doe had a three-month relationship in which
John and Jane Doe had a sexual relationship

110a

initiated by Jane, the first such relationship in John Doe's life after being brought up in an Evangelical Christian home where he was taught sex was for marriage. (DE183-8: John 02/18/2021 Affidavit ¶¶ 4-5; DE 208-1: Ex. A, John tr 92-93.) John Doe has put himself under oath as to the correct understanding of the texts (where the surrounding context makes them all clear, yet Purdue hid when cherry-picking them); Jane Doe never did. (DE208-1: John 08/2022 Declaration ¶ 11.)

43. To the investigators, John provided 133 pages of text messages between John and Jane Doe covering the period December 23, 2015 to March 15, 2016; he testified he did so because the texts showed there had not been a sexual assault; the texts included that Jane Doe sent John and his family Christmas cookies after the supposed sexual assault occurred and after Jane Doe initially claimed the relationship had ended. Jane Doe provided *no* texts to the investigators, telling them she had deleted the texts. (DE183-3: Df. Answer ¶ 36; DE183-14: Amberger Dep tr 17-18, 33-34, 36-37, 43-44, 47-48, 56, 68-72, 103; DE183-11: Amberger 27, Texts (PU 206-339)); DE183-7: Semersheim tr. 34; DE 183-5: John Dep. tr. 111-114.)

44. Yet, the investigation report included only short portions of 7 pages of the 133 pages of texts (the selected portions did not include texts showing an ongoing relationship after Jane Doe's claims), and Vice President Rollock

111a

and Dean Sermersheim did not know that
there were 133 pages of texts submitted by
John to the investigators. (DE183-3: Df.
Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep
tr 49-50, 61-62); DE183- 6: Rollock Dep tr 30,
46-47; DE183-7: Sermersheim Dep tr 21-23, 35;
DE183-41: Custodian Klingerman Dep tr 27-
28.) The investigation report twisted the texts
and contained many other inaccuracies includ-
ing the fabrication that John Doe confessed to
the allegations. Knowing this, it is no wonder
they refused to let him view the investigation
report and defend himself while at Purdue,
something other schools typically provide, but
not Purdue. (DE183-8: John 02/18/2021 Affi-
davit ¶ 15; DE187, pp. 44-47.)

**The Investigation Report.**

45. There is no good reason for Magistrate
Judge Kolar to ignore: (i) Plaintiff John was
not provided an opportunity to review the
investigation report during the disciplinary
case, (ii) the investigation report included
only short portions of 7 pages of the 133 pages of
texts (the selected portions did not include
texts showing an ongoing relationship after
Jane Doe's claims), and (iii) Vice President Rol-
lock and Dean Sermersheim did not know that
there were 133 pages of texts submitted by
John to the investigators. (DE183-3: Df.
Answer ¶¶ 2, 37, 39; DE183-14: Amberger Dep
tr 49-50, 61-62); DE183-6: Rollock Dep tr 30,
46-47; DE183-7: Sermersheim Dep tr 21-23, 35;

112a

DE183-41: Custodian Klingerman Dep tr 27-
28.) Only a partisanship for Purdue explains
why Magistrate Judge Kolar also ignored that
the investigation report had twisted the texts
and contained many other inaccuracies pointed
out by Plaintiff. (DE183-8: John 02/18/2021
Affidavit ¶ 15; DE187, pp. 44-47.)

**The Letter Sent On Behalf Of Jane Doe
To The Committee.**

46. On June 6, 2016, Jane Doe would not
appear in person before the Advisory Commit-
tee on Equity and Dean Sermersheim; instead,
on June 5, 2016, Monica Bloom, Director of
CARE and a lawyer, submitted a written state-
ment said to come from Jane Doe, which was in
the form of an e-mail. Bloom was asked in her
deposition how, if Jane Doe did not have access
to a computer, she e-mailed the statement to
Bloom. Bloom said she (Bloom) did not recall
(DE183-9, Bloom Dep tr 29-30; 183-26: Bloom
23, Bloom transmittal of June 5, 2016 state-
ment (PU653-654)). The Magistrate Judge does
not deal with this testimony, but rather incor-
rectly states it was undisputed the e-mail came
from Jane Doe, the point was very much in dis-
pute, and further, the Magistrate Judge also
does not address the fact that the three-person
panel of the Advisory Committee on Equity and
Dean Sermersheim, never met and never heard
any direct testimony from Jane Doe and did
not have the opportunity to ask any questions
of Jane Doe. (DE183-3: Df. Answer ¶ 41;

113a

DE183-9: Bloom tr 28-32; DE183-26: Bloom 23,
Bloom transmittal of June 5, 2016 statement.)

## X.  The February 14, 2023 Reconsideration Opinion (Rejection of Navy ROD for Obligation).

Magistrate Judge Kolar does not have a footnote about reconsideration or even much discussion about the February 14, 2023 reconsideration opinion other than to say the reconsideration motion did not provide a basis for reconsideration. [DE 261, p. 8.] But the reconsideration motion provided more than a basis for reconsideration; the reconsideration opinion showed an alarming bias and an abject lack of impartiality with respect to the application of the Navy ROD establishing the obligation for stigma-plus. The legal requirement for stigma-plus advocated by Purdue and adopted by Magistrate Judge Kolar was not Judge (now Justice) Barrett's test. This was again no mere disagreement. The Byler Declaration explained [DE 257-1, pp. 26-29]:

### Ignoring the Navy ROD

47. On February 14, 2023, Magistrate Judge Kolar yet again showed a lack of impartiality in his reconsideration decision. Magistrate Judge Kolar adhered to dismissing the due process claim, ruling that John Doe failed on summary judgment to show a legally obligated disclosure, that John Doe's position he was in no position to refuse authorization was insuffi-

114a

cient even though the Navy ROD clearly sub-stantiated that John could not properly refuse authorization. (DE208-3.)

48. The Navy ROD (which was not available at the time of the Navy depositions) clearly substantiates that John could not properly refuse authorization. (DE208-3.) The Magis-trate Judge showed a lack of impartiality in not addressing Plaintiff's full presentation of the Navy ROD.

**Navy Regulations Compelling Giving Authorization**

49. Authorization to disclose the Purdue dis-ciplinary files was expected under the govern-ing Navy regulations at the time as a matter of "Honor" stated in the Navy ROD. Honesty and respect to his superior officers called upon John to provide the authorization. The Honor Code in the Navy ROD (DE208-3) at section 1-3 (pp. 1-3) provides that "Military systems, which often operate under extreme duress, are built on a foundation of absolute trust and fidelity", that NROTC must instill honor upon future officers during accession training and ensure that honor is carried into fleet service", that "[t]hroughout its history, the Naval Serv-ice has successfully operated through reliance on certain values held by its personnel", that "Honor is a keen sense of ethical conduct, hon-esty, integrity, and responsibility", that "Honor includes honesty, at all times no matter the

115a

outcome", and that "[i]t is respect to both juniors and seniors." The Magistrate Judge's belittling of the significance of the Honor Code is quite ill-considered.

50. Authorization to disclose the Purdue disciplinary files was also expected under the governing Navy regulations at the time as a matter of not showing a "disregard or contempt for authority" and not showing a "lack of a sense of responsibility" that would constitute a "major offense" per the Navy ROD (DE208-3), at section 3-19.2.a.(11) (pp. 3-40). The NROTC knew there was a Purdue investigation of Jane Doe's accusations of sexual assault and wanted "in the loop" (DE183: SJM 5, tr 22). It was John's responsibility that the NROTC be included in the loop. The Magistrate Judge's failure to address this point is unjustifiable.

**Sanction Upon Refusing Authorization**

51. Had John refused to provide the authorization, there would have been an order to provide the authorization. Also, when a midshipmen student is put on interim leave of absence, which John was by Commander Hutton's order of April 5, 2016, the Navy ROD (DE208-3 at section 6-7.3, pp. 6-11 – 6-12) requires a Performance Review Board ("PRB") "as soon as possible." Because John provided the authorization, a PRB was not held, and when one was held after completion of the university disciplinary case, the PRB only con-

116a

cerned the university suspension. Had John
shown a "disregard or contempt for authority,"
a "lack of a sense of responsibility," and a lack
of "honor" by refusing authorization, an addi-
tional PRB would have been ordered. The
interim leave of absence would have been con-
verted into a disciplinary leave of absence per
the Navy ROD at section 6-7.3, pp. 6-12. The
Magistrate Judge's failure to address this
point is unjustifiable.

## Required Disclosure Upon
## Re-Application

52. If John were to re-apply to the NROTC,
he would have to disclose the disciplinary find-
ing. Commanding Officer Hutton identified the
ROTC Appointment Termination and Disen-
rollment Authorization and testified the only
reason for the ROTC disenrollment was the
university suspension. (DE183-35: Hutton Dep
tr 56, 66-67; DE 183-36: Hutton H, ROTC
Appointment Termination and Disenrollment
Authorization.) The August 10, 2016 PRB doc-
ument showed the Board's finding was that
John was suspended by Purdue and the recom-
mendation was disenrollment of John. (DE183-
36: Aug. 10, 2016 Performance Review Board,
p. 2.)

53. The PRB document is made part of the
student's file per the Navy ROD (DE208-3, sec-
tion 6-13.5, pp. 6-20) and because it involved
disenrollment is sent to Naval Operations per

117a

the Navy ROD section 6-13.6, p. 6-20. Discipli-
nary disenrollment documents are part of his
"permanent federal record" per Navy ROD (DE
208-3) section 6- 16 (pp. 6-26 – 6-27):

> c. Disciplinary disenrollments become a
> matter of permanent federal record and
> may prejudice the individual for future
> military or civil employment. Disciplinary
> disenrollments may be disqualifying for
> future federal security clearances that are
> often necessary for positions in private
> industry. Disciplinary disenrollments may
> be prejudicial to their interests should
> they ever apply for a commission in the
> Armed Forces. . . .

54. Should John re-apply to the NROTC or to
any commission in the U.S. Armed Forces, he
would be honor-bound to disclose the discipli-
nary disenrollment that is part of permanent
federal record and if he did not and it were
inevitably discovered in a mandatory back-
ground check, termination would be expected.
(DE208-1 ¶ 9.) The permanent federal record
exists only as a result of the university discipli-
nary case (DE209, pp. 8-9); the Navy did not
conduct its own investigation but relied 100%
on the university disciplinary suspension.
(DE187-2, pp. 23-27 and record citations there-
in.) The Magistrate Judge's failure to address
this point is more than strange, it was a parti-
san slip.

118a

## XI. The February 14, 2023 Reconsideration Opinion (Erroneous Result and Ignoring Contrary Precedent).

Magistrate Judge Kolar's reconsideration opinion changed the goalposts as to what would be the basis for denying summary judgment, adopting a legal requirement for refusing authorization and rejecting the Navy ROD as just internal rules and not law, so as to render due process immaterial. This showed an alarming bias and an abject lack of impartiality with respect to the result which ignored contrary precedent on point. This was yet again no mere disagreement. The Byler Declaration explained [DE 257-1, pp. 29-32]:

### The Erroneous Result

55. The Navy ROD compelled giving authorization, would make John subject to sanction upon refusing authorization, and required disclosure upon re-application due to a permanent federal record—which even the Magistrate Judge's August 11 opinion indicated would make summary judgment inappropriate (DE206, pp. 16-17) but which the Magistrate Judge avoided on reconsideration, so much lacking in impartiality Magistrate Judge Kolar had become. Instead, the Magistrate Judge essentially adopted Purdue's dismissal of the Navy ROD as "a set of internal Navy rules, not law" and Purdue's denial that the Navy ROD had the force of law to compel executing the authorization (DE 221, p. 12). That, however,

119a

leads to the absurd result that a Navy ROTC midshipman who acts per the requests of his Navy superiors and the obligations reflected in the Navy ROD has no due process rights. Purdue's position that whether Purdue's disciplinary process complied with Fourteenth Amendment due process is "immaterial" (DE213, p. 12) and the Magistrate Judge's effective adoption of that position reflects how much at odds Purdue and the Magistrate Judge are with Justice Barrett's opinion.

### False Basis For Rejecting Reconsideration.

56. Reconsideration here was sought based upon the texts of Rule 54(b) and 60(b) of the Federal Rules of Civil Procedure, *see* A. Scalia, *Reading Law: The Interpretation of Legal Texts* p. 56 (West Pub. 2012), and *Bank of Waunakee v. Rochester Cheese Sales, Inc.,* 906 F.2d 1185, 1191-1192 (7th Cir. 1990), where it is stated:

A motion for reconsideration performs a valuable function where:

the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension. . . .

Justice Cardozo also recognized the utility of the motion to reconsider to the misunderstood litigant:

120a

. . . A grievous wrong may be committed by some misapprehension or inadvertence by the judge for which there would be no redress, if this power did not exist.

57. The Magistrate Judge's mistreatment of the stigma-plus liberty interest was particularly untenable given the Navy ROD. The Magistrate Judge, in order to rely on inapposite case law more restrictive of reconsideration, treats authorization as a central issue in the summary judgment briefing. (DE224, 4-5.) It was not —far from it. The authorization was drowned in hundreds of pages of briefs on other issues and statements of material facts *(see* ¶ 19, p. 10 above), the reconsideration evidence was to provide an elaboration of what was originally submitted, and a whole new argument was not raised.

### Ignoring Contrary Northern District of Indiana Precedent

58. Magistrate Judge Kolar strangely omitted addressing the point for reconsideration that two Northern District of Indiana precedents are contrary to his ruling and that, in particular, Attorney Kealey, who has been counsel for the Purdue in this case and in *Mary Doe and Nancy Roe v. Purdue,* 4:18-CV-89-JEM (N.D. Ind. Jan. 13, 2022), did not advise the Magistrate Judge of Judge Martin's January 13, 2022 ruling (after the summary judgment

121a

briefing) upholding and sending to trial those plaintiffs' due process claim. (DE214-1, DE72 in 4:18-CV-89-JEM.) Judge Martin wrote:

> Roe asserts that she will be obligated to self-report this sanction to other institutions of higher education, including law schools, and by implication, bar admission authorities, meaning her stigma of a sanction will continue to be disseminated.
>
> As in *Doe v. Purdue Univ.,* supra, in which the plaintiff was required to authorize Purdue to release information about a sanction to his ROTC program and the Court of Appeals found that even with his permission to disclose, the disclosure satisfied the stigma-plus standard, the disclosure of Roe's sanction may impact her future education and employment opportunities. . . . Roe has asserted that the decision by Purdue, which she asserts was based on a flawed process, has resulted in a loss of future educational and employment opportunities, and a factfinder could agree.

(DE241-1, DE72 in 4:18-CV-89-JEM: Slip Op. at 20-21.) In that case, Roe felt an obligation to self-report; this case is even stronger, as John Doe here had an obligation because he was in no position to not give authorization. A second Northern District of Indiana case also found stigma-plus liberty interest. *Doe v.*

122a

*Purdue,* 464 F. Supp.3d 989, 1001- 1003 (N.D. Ind. 2020) (Springmann, J.).

## XII. Magistrate Judge Kolar's Mischaracterization About His Pattern of Rulings, Adoption of Purdue Positions, Rulings Against Plaintiff and Plaintiff Looking for Goblins.

Magistrate Judge Kolar engages in mischaracterization when saying Plaintiff John Doe argues that his pattern of rulings, adoption of Purdue positions and rulings against Plaintiff are evidence of bias and that Plaintiff is looking for "goblins." [DE 261, p.11.] The implication by Magistrate Judge Kolar that Plaintiff is paranoid and overreacting to the relentless bias of his opinions despite Magistrate Judge Kolar himself refusing to address the specific details that Plaintiff continues to raise in regards to those rulings is frankly unjudicial and unbecoming.

It wasn't just the pattern of rulings, adoption of Purdue's positions and the rulings against Plaintiff; it was what paragraphs 22-34 of the Byler Declaration discussed, quoted above, about "Rejection of Justice Barrett on Liberty Stigma-Plus Interest," "The National Importance of Judge (Now Justice) Barrett's Due Process Opinion," "Judge Barrett's Rejection of Self-Defamation for the Court," "The Navy Knew About The Disciplinary Proceeding Before Authorization and Was Looking To Purdue's Investigation," "The Magistrate Judge's Narrow Legal Obligation Ruling Is At Odds

123a

With Judge Barrett's Opinion And Is Divorced From Military Realities." [DE 57-1, pp. 12-19.] This and the spoliation and reconsideration opinions are what specifically support the points that Magistrate Judge Kolar "has made common cause with Purdue counsel to frustrate Plaintiff John Doe's effort to vindicate his due process and Title IX rights and to undermine and eviscerate [current Supreme Court] Justice Barrett's opinion in this case" (DE 257-1 p. 2), and that the history of the case shows Magistrate Judge Kolar "kowtowing to Purdue and its implacable public rejection of Justice Barrett's nationally significant opinion" (DE 257-1 p. 4).

Second, Magistrate Judge Kolar's July 2, 2021 spoliation opinion; the August 22, 2022 summary judgment opinion, and the February 14, 2023 reconsideration opinion are propaganda pieces for Purdue. As discussed in the Byler Declaration, Magistrate Judge Kolar's July 2, 2021 spoliation opinion ignored John's otherwise complete compliance with extensive discovery and, without meeting the law's basic requirements, finds John guilty of spoliation over 11 irrelevant post-suspension Snapchat entries and speculates without reason that somehow they could relate to John's desired Navy career; and further, Magistrate Judge Kolar's July 2, 2021 spoliation opinion ordered adverse jury instructions and fees paid to Purdue. [DE 257-1, pp. 8-11]. That opinion was quite a propaganda piece for Purdue to falsely portray John as derelict in discovery. As discussed above and in the Byler Declaration, Magistrate Judge Kolar's August 22,

124a

2022 summary judgment opinion, with a legalistic approach misapprehending the discovery record. rejected Justice Barrett's due process opinion of national importance and exonerated Purdue from egregious due process violations despite military realities. That was quite a propaganda piece for Purdue. [DE 257-1, pp. 12-25]. As discussed above and in the Byler Declaration, Magistrate Judge Kolar's February 14, 2023 reconsideration opinion brushed aside the Navy ROD and Judge Martin's contrary precedent in the Northern District of Indiana applying stigma plus and exonerated Purdue from its due process violations. [DE 257-1, pp. 26-31]. That was a propaganda piece for Purdue.

## XIII.  Magistrate Judge Kolar On "Discovery Disputes".

Magistrate Judge Kolar engages in mischaracterization that is as false as false can be when asserting that the Byler Declaration only shows Magistrate Judge Kolar considered the evidence before him as to the alleged spoliation. [DE 261, p.12.] The Byler Declaration shows Magistrate Judge Kolar not considering the evidence before him and not considering the applicable law. [DE 57-1, pp. 9-11.] Magistrate Judge Kolar's July 2, 2021 spoliation opinion ignored John's compliance with discovery and, without meeting the law's basic requirements, finds John guilty of spoliation over 11 irrelevant post-suspension Snapchat entries and speculates without reason that somehow they could

125a

relate to John's desired Navy career. [DE 57-1, pp. 9-11.]

Magistrate Judge Kolar ignores giving a protective order against deposing Purdue President Mitch Daniels. [DE 137.] Daniels was a named defendant in his official capacity for the enforcement of injunctive relief under claims for denial of constitutional due process per *Ex Parte Young,* 209 U.S. 123 (1908). President Daniels as Defendant Purdue's President was pleaded as ultimately responsible for the university's compliance with a federal injunction. [DE 51, p. 4.]

Magistrate Judge Kolar ignores the discovery disputes in overriding HIPAA and ordering the deposition of Noel Perry, John's personal counsellor. [DE 143.] Noel Perry gave helpful testimony for John, but the issue of bias concerns the overriding of HIPAA, ordering the turnover of all notes concerning John's private sessions and ordering the deposition of John's personal counsellor at Purdue's request. Because of the invasion of John's privacy and disregard of HIPAA, John no longer uses such counseling.

Magistrate Judge Kolar ignores his striking the expert opinion of Dr. R. Christopher Barden. [DE 206.] Dr. Barden, a clearly qualified expert, has never been excluded from testifying; and here, Dr. Barden's testimony is proper under Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993). Dr. Barden is a licensed psychologist (MN and TX ) and licensed attorney, has testified and/or consulted as an expert witness in many jurisdictions with

126a

regard to a number of areas including investigative methodologies, standards of care in investigations including abuse cases, the science of memory-false memories-tainted memories, the science of investigative interviewing, misconduct and malpractice in investigations, clinical psychology, psychopathology, psychotherapy, diagnostic issues, coping-resilience science, the nature of science, Frye-Daubert-Kumho science analysis, history-methodology-standards of care in criminal and related investigations, the reliability of various scientific methodologies, investigative methods and procedures. [DE 199-1; 199-2.]

The original Barden report faults Purdue's "believe the woman" approach, citing the testimony of Purdue investigators Amberger and Oliver concerning their training as a factual reference point for Dr. Barden's testimony on "believe the woman." [DE 199-1.] When questioned about his training, investigator Amberger testified that he recognized the phrase "believe women," citing the use of the phrase by End Violence Against Women International ("EVAWI") in some of their e-mails and training and by Purdue's "Center for Advocacy Response and Education" ("CARE") when conducted training and running education on campus. (DE 187-26; Amberger Dep tr 9-10.) When questioned about her training, investigator Oliver testified about receiving training from Michigan State Professor Campbell on the neurobiology of trauma (DE 187-24, Erin Oliver Dep tr 9)—which Dr. Barden harshly criticizes as junk science. [DE 199-1; DE 199-2.] The original Barden report also discussed

127a

the Purdue CARE Facebook postings [DE 187-21; DE 199-1], the kind of which was referenced in Judge (now Justice) Barrett's opinion. 928 F.3d at 669. The original Barden report further rejects the 1 in 5 statistic and criticizes its effect leading to university victim-centered policies and procedures. [DE 199-1; DE 199-2.]

As a result of Magistrate Judge Kolar's striking the original Barden report and Plaintiff objecting, Plaintiff was ordered to provide a revised report by Dr. Barden, which was done with a March 16, 2023 report focusing on confirmation bias and defective investigative methodologies used by Purdue. [DE 234; DE 245-1.] Purdue moved to exclude the opinions in Dr. Barden's March 16, 2023 report [DE 240], and Plaintiff has opposed Purdue's motion [DE 245]. This is one of the important pre-trial motions for the trial judge.

So also is Purdue's general motion *in limine* seemingly intended to hamstring John's case. [DE 235.] Purdue's motion contains a laundry list of requested exclusions including: evidence or argument directed to Purdue's disciplinary process; the content of disciplinary records or expungement; John's claim of lost opportunity in Navy ROTC or Navy career; the economic value of the loss of enjoyment of life (hedonic damages) that Defendants' conduct caused John (which is the subject of Dr. Stan Smith's expert testimony); the Seventh Circuit opinion and the procedural history of the case before this Court except for spoliation; how John's suspension adversely affected John's family and friends; argument and evidence regarding edu-

128a

cation and career hypotheticals; evidence and contentions about the history, purpose or intent of Title IX; Purdue's objections to John's discovery; details about John's and Jane's relationship that provided essential context to the false accusations made in April 2016 by Jane; that the Purdue investigators ignored the John-Jane Doe sexual relationship; Jane's suicide attempt; John's religious upbringing. [DE 235.] Plaintiff has strenuously opposed that motion. [DE 242.] A trial judge has a certain amount of discretion with respect to such matters, and that discretion should not be in the hands of a biased judge lacking in impartiality.

## XIV. February 13, 2023 Settlement Conference and Mandamus.

Magistrate Judge Kolar's references to the settlement conference and mandamus [DE 261, pp. 1,14] ignore that John got the impression Magistrate Judge Kolar would not be fair at trial and that the mandamus petition challenged Magistrate Judge Kolar for exceeding his jurisdiction, not bias. That the mandamus petition was denied does not establish Magistrate Judge Kolar is not biased within his jurisdiction. A decision badly misreading Justice Barett's opinion can be within the jurisdiction of the Magistrate Judge's jurisdiction, but it can and is here evidence of bias and lack of impartiality.

129a

## XV.  Closing Question.

In the end, the question is why Magistrate Judge Kolar is so intent upon being the trial judge? Plaintiff's answer is to run a biased trial. An Article III judge should be assigned to be trial judge in this important case.

Respectfully submitted on this 7th day of September, 2023.

Respectfully submitted,

LAW OFFICES OF
  PHILIP A. BYLER

By: /s/ PHILIP A. BYLER
Philip A. Byler, Esq.
11 Broadview Drive
Huntington, New York 1174
(631) 848-5175
pbyler1976@gmail.com
philb@optonline.net
*Attorneys for Plaintiff*
  *John Doe*

130a

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

————————

No. 23-2764

————————

**JOHN DOE,**

Plaintiff,

v.

**PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF TRUSTEES, MITCHELL ELIAS DANIELS, JR.,** in his official capacity as President of Purdue University, **ALYSA CHRISTMAS ROLLOCK,** in her official capacity at Purdue University, **KATHERINE SERMERSHEIM,** in her official capacity at Purdue University,

Defendants.

————————

## RESPONSE TO ORDER
## DATED SEPTEMBER 28, 2023

This Court's Order dated September 28, 2023 directs Appellees to respond to the jurisdictional memorandum filed by Appellant on September 26, 2023 and address "the jurisdictional issue raised in the court's order of September 13, 2023."

Appellees state:

1. **Response to Appellant's discussion of the "first issue raised" and "second issue raised"**. Appellant cites no precedent holding that a trial judge's ruling on a

131a

recusal motion is a "final decision" which is "separate from the merits and unreviewable". (DE 9 p. 2) (quoting *Powers v. Chicago Transit Auth.*, 846 F.2d 1139, 1141 (7th Cir. 1988)).

a.  *Regarding separateness from the merits.* In substance, the Notice of Appeal asks this Court to sit in interlocutory review of alleged errors that might otherwise appear in an appeal from a final judgment. Appellant's argument that "bias of a trial judge is . . . independent of the cause itself" (DE 9 p. 2) is contradicted by the Notice of Appeal, which targets matters that would commonly be within the scope of an appeal from a final judgment, including the evidentiary merits (Notice pp. 13-37), "three opinions" (Notice p. 5), and "pretrial motions" (Notice p 37). Appellant alleges that the magistrate judge has an "intent . . . to run a biased trial" [Notice p. 37] and that "a biased trial would involve an unfairness to the disfavored litigant". (DE 9 p. 5). These assertions corroborate that the Notice of Appeal concerns the final judgment from a trial, and therefore is not "independent of the cause itself". Further, this Court has rejected the proposition that appellate review of a recusal determination is an occasion for opin-

132a

ing on the merits. In *Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016), this Court stated that recusal is "a form of structural error" that is unrelated to whether the case would "come out the same way" with a different judge. *Id*. at 794.

b.  *Regarding "unreviewable"*. Appellant does not contend that any of the arguments in the Notice of Appeal would be ineligible for consideration pursuant to a properly filed appeal from a final judgment. The pre-trial remedy that Appellant seeks is a different judge. (Notice of Appeal p. 37). *Fowler v. Butts, supra*, establishes that the same remedy is available post-judgment, in the form of vacation of the judgment and remand to a different district judge. *Id*. at 795. *In re Gibson*, 950 F.3d 919 (2019) affirms the availability of post-judgment review of denials of recusal. *Id*. at 923.

2.  **Response to Appellant's discussion of the "third issue raised"**. Appellant states that "the mandamus petition challenged Magistrate Judge Kolar for exceeding his jurisdiction" and then in the same paragraph appears to concede that Appellant's Writ of Mandamus "challenged" a decision that was "within the Magistrate Judge's jurisdiction". (DE 9 p. 6). This

133a

Court's September 13, 2023 Order correctly looked past that Writ's jurisdictional allegation and construed it as "seeking to reverse the rulings of the same magistrate judge". (DE 3 p. 2).

3. **Response to Appellant's discussion of the "fourth issue raised"**. Appellees concur with Appellant that the docket reflects that the parties consented to Magistrate Judge Kolar to conduct all proceedings, including the jury trial in the District Court. The parties' jointly filed, proposed Joint Final Pretrial Order in the District Court (DE 239) states on p. 1: "The Honorable Joshua Kolar, Magistrate Judge for the United States District Court for the Northern District of Indiana, conducts these proceedings pursuant to consent given pursuant to 28 U.S.C. § 636(c)."

Respectfully submitted,

/s/ William P. Kealey
William P. Kealey (18973-79)
Stuart & Branigin LLP
300 Main St., Ste. 900
P.O. Box 1010
Lafayette, IN 47902-1010
Telephone: 765-423-1561
Email: wpk@stuartlaw.com
      jfo@stuartlaw.com
*Attorney for Appellees*

134a

# IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

———————

No. 23-2764

———————

JOHN DOE,

Plaintiff-Appellant,

v.

PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his official capacity as President of Purdue University, ALYSA CHRISTMAS ROLLOCK, in her official capacity at Purdue University, KATHERINE SERMERSHEIM, in her official capacity at Purdue University,

Defendants-Appellees.

———————

## JURISDICTIONAL MEMORANDUM

This memorandum is respectfully submitted in response to the Order dated September 13, 2023, directing Plaintiff John Doe to state why the appeal should not be dismissed for lack of jurisdiction. (CA DE 3.) Four issues are raised in the September 13, 2023 Order. Respectfully, none of these issues justify dismissal of the proper appeal taken in the Notice of Appeal. (DCt DE 267.)

**The first issue raised in the September 13, 2023 Order:** A "preliminary review" of the short record seems to indicate the August 14, 2023 order

135a

appealed from is not a final judgment within the meaning of 28 U.S.C. § 1291 and that "[g]enerally, an appeal may not be taken in a civil case until a final judgment disposing of all claims against all parties is entered on the district court's civil docket pursuant to Fed. R. Civ. P. 58." (CA DE 3, p.1.) A preliminary review of the Notice of Appeal (DCt DE 267), however, shows that what is "generally" the case is not the legal basis for this appeal and not appropriate here.

As stated in the Notice of Appeal (DCt DE 267), this is an appeal from what other courts would call a collateral order and, in this Court, would be called "a final decision," here, denying recusal due to bias "which is separate from the merits and unreviewable on and in this Court appeal." *Powers v. Chicago Transit Auth.,* 846 F.2d 1139, 1141 (7th Cir. 1988) (Easterbrook, J.). As stated in the Notice of Appeal (DCt DE 267), bias of a trial judge is too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. *United States v. Henderson,* 915 F.3d 1127, 1130 (7th Cir. 2019) (Sykes, C.J.). A fair proceeding must always be a paramount concern for the law to be upheld and justice to be achieved.

As stated in the Notice of Appeal (DCt DE 267), this appeal relies upon the guidance of such Seventh Circuit precedents in *United States v. Henderson,* 915 F.3d 1127, 1130–1132 (7th Cir. 2019)(Sykes, C.J.); *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.,* 707 F.3d 853, 868–869 (7th Cir. 2013) (Sykes, .C.J.); *Ott v. City of Milwaukee,*

136a

682 F.3d 552, 554–555 (7th Cir. 2012) (Wood, J.); *United States v. J.J.K.,* 76 F.3d 870, 872 (7th Cir. 1996) (Posner, J.); *Powers v. Chicago Transit Auth.,* 846 F.2d 1139 (7th Cir. 1988) (Easterbrook, J.); and *R.R. Donnelley & Sons Co. v. F.T.C.,* 931 F.2d 430 (7th Cir. 1991) (Easterbrook, J.).

As stated in the Notice of Appeal (DCt DE 267), *United States v. Henderson,* 915 F.3d 1127, 1130–1132, recognized the immediate appealability of what was called a collateral order fixing security in *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546 (1949), as such orders "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate jurisdiction be deferred until the whole case is adjudicated. . . . To qualify for immediate review under this exception, an order 'must conclusively determine the disputed question, resolve an important issue completely separate from the merits of the action, and be effectively unreviewable on appeal from a final judgment.'" *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 468 (1978). Here, as stated in the Notice of Appeal (DCt DE 267), the denial of recusal due to bias conclusively determines the disputed question, resolves (incorrectly) a critically important issue completely separate from the merits of the action, and is effectively unreviewable on appeal from a final judgment.

As stated in the Notice of Appeal (DCt DE 267), *Asia Pulp & Paper Co.,* 707 F.3d 853, 868–869 (7th Cir. 2013), recognizes, as does this appeal, that

137a

"Collateral-order review is based on a practical construction of 28 U.S.C. § 1291; it is not an exception to the final-judgment rule." *Ott v. City of Milwaukee,* 682 F.3d 552, 554 (7th Cir.2012) (internal quotation marks omitted). *JPMorgan Chase Bank, N.A. v. Asia Pulp & Paper Co.,* 707 F.3d at 868–869, also recognizes, as does this appeal, that we "'do not engage in an 'individualized jurisdictional inquiry.',*" Mohawk Indus., Inc. v. Carpenter,* 558 U.S. 100 (2009); *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 546 (quoting *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 473 (1978)). The focus is on "'the entire category to which a claim belongs,'" (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994)) and whether "the class of claims, taken as a whole, can be adequately vindicated by other means," 707 F.3d at 868–869.

Such review was recognized, for example, in *United States v. Henderson,* 915 F.3d at 1131, for a category including (1) an order denying bail, *Stack v. Boyle,* 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3 (1951); (2) an order denying dismissal based on double jeopardy, *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); (3) an order denying dismissal under the Speech or Debate Clause, *Helstoski v. Meanor,* 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979); and (4) an order for the administration of psychotropic medication to render a defendant competent for trial, *Sell v. United States,* 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003). Such review was also recognized by the U.S. Supreme Court in *Mitchell v.*

138a

*Forsyth,* 472 U.S. 511 (1985), for the denial of summary judgment based on qualified immunity, but not by the Seventh Circuit in *Gosnell v. City of Troy, Ill.,* 979 F.2d 1257, 1260–61 (7th Cir. 1992), *as amended* (Nov. 17, 1992). The denial of recusal due to bias does not fit in a general category of claim for which the review has been denied per *Powers v. Chicago Transit Auth* and *United States v. Henderson.*

**The second issue raised in the September 13, 2023 Order:** Before a trial proceeds (which would be stayed pending the appeal either by operation of appellate jurisdiction or appellate stay), appellate review of the bias of the Magistrate Judge "can be" addressed on an appeal of a final judgment. The court is said "to permit" review of a denied recusal motion—under any provision of 28 U.S.C. § 455—through appeal of the final judgment, citing *In re Gibson,* 950 F.3d 919, 922 (7th Cir. 2019) (citing *Fowler v. Butts,* 829 F.3d 788, 793 (7th Cir. 2016)). (CA DE 3, p.2.) That statement, however, is incomplete and not entirely accurate, involving a misreading of *In re Gibson* and *Fowler v. Butts* and a disregard of how in cases such as this one a biased trial would involve an unfairness to the disfavored litigant and an ultimate waste of judicial resources.

Both *In re Gibson,* 950 F.3d 919, 922 (7th Cir. 2019), and *Fowler v. Butts,* 829 F.3d 788, 793 (7th Cir. 2016)), do NOT stand for a broad proposition that a denied recusal motion must be by an appeal of a final judgment. The words "can be" do not

139a

mean "can effectively be" and certainly do not mean "must be." The specific circumstances of cases must be considered to determine if the denied recusal motion "can effectively be" reviewed on an appeal of a final judgment.

*In re Gibson* did not involve a recusal for bias motion but rather a mandamus petition where the facts did not warrant mandamus. The question of whether there was an appropriate occasion for a collateral order review was not presented, and immediate review was not called for in any event.

*Fowler v. Butts* involved the denial of a federal habeas petition where the prisoner objected to the judge's handling of the conviction given that the judge as a state court judge had accepted the prisoner's state court guilty plea. The simple issue of bias there was readily identifiable and was not obscured by a mass of other issues relating to the underlying merits.

Both *In re Gibson,* 950 F.3d 919, 922 (7th Cir. 2019) and *Fowler v. Butts*—particularly *Fowler v. Butts*—involved relatively simple, identifiable issues. Neither case remotely involved the kind of circumstances in this case where the issue of bias cannot be effectively addressed in an appeal of a final judgment on the merits.

The Notice of Appeal (DCt DE 267) at pages 7-38 included a lengthy discussion of Magistrate Judge Kolar's opinion denying recusal for bias (DCt DE 261) in order to demonstrate not only the bias and lack of impartiality, but also why the issue of recusal for bias is not effectively reviewable or even reviewable at all in an appeal from a final judg-

140a

ment. Anyone taking the time to read through those pages will understand the problem. This is a case where appellate jurisdiction cannot properly and sensibly be deferred until the whole case is adjudicated. *United States v. Henderson,* 915 F.3d 1127, 1130 (7th Cir. 2019) (Sykes, C.J.).

**The third issue raised in the September 13, 2023 Order:** Plaintiff John Doe previously filed a petition for a writ of mandamus (No. 23-1310). (CA DE 3, p.2.) The September 13, 2023 Order, however, misidentifies the mandamus petition's primary focus as seeking to reverse rulings of the Magistrate Judge. Differently, the mandamus petition challenged Magistrate Judge Kolar for exceeding his jurisdiction, particularly in effectively overruling Judge (now Justice) Barrett's nationally and federal regulatory significant opinion reported at per se 928 F.3d 652 (7th Cir. 2019) (Barrett, J.). The mandamus petition was not premised on the separate issue of bias or erroneous rulings. That the mandamus petition was denied does not establish Magistrate Judge Kolar is not biased within his jurisdiction; a decision badly misreading Justice Barett's opinion can be within the Magistrate Judge's jurisdiction; however, it certainly can and certainly is evidence of bias and lack of impartiality here.

**The fourth issue raised in the September 13, 2023 Order:** The Magistrate Judge has asserted and the docket seems to reflect that the parties consented, but proper documentation may not have been obtained. (CA DE 3, p.2.)

141a

Magistrate Judge Kolar's August 14, 2023 Opinion and Order refusing recusal unequivocally asserts that he has consent pursuant to 28 U.S.C. § 636 (DCt DE 261, p. 1.) District Court Docket Entry 41, dated August 1, 2019, records the assignment of the case to Magistrate Judge Kolar upon the consent of the parties. (DCt DE 41.) There was no indication then of bias on the part of Magistrate Judge Kolar or what would follow in subsequent years that included, among other things, Plaintiff John Doe filing a mandamus petition against Magistrate Judge Kolar for exceeding his jurisdiction in, among other things, unlawfully finding spoliation against John without basis in law or evidence so as to order Plaintiff John Doe to pay money to Purdue, sidestepping HIPAA law to give Purdue unfettered access to all John's personal counseling records and effectively overruling Judge (now Justice) Barrett's opinion on due process requirements and the need for expungement, leaving only a Title IX claim to Plaintiff John Doe subject to Purdue's numerous motion *in limine* objections. (CA 23-1310.) The September 13, 2023 Order appears to accept that Magistrate Judge Kolar has consent, and Magistrate Judge Kolar's actions and rulings certainly presume that he has consent given his coverage of litigation, discovery, settlement conference, and partial pre-trial and his insistence on handling the rest of pre-trial and trial. Fairness of the trial takes precedence over dotting the "i"s and crossing the "t"s.

142a

Respectfully submitted on this 26th day of September, 2023.

**Respectfully submitted,**

**LAW OFFICES OF
PHILIP A. BYLER**

**By: /s/ Philip A. Byler**
**Philip A. Byler, Esq.**
**11 Broadview Drive**
**Huntington, New York 11743**
**(631) 848-5175**
pbyler1976@gmail.com
*Attorneys for Plaintiff*
*John Doe*

### DECLARATION OF SERVICE

I, PHILIP A. BYLER, hereby declare per 28 U.S.C. § 1746, that on September 26, 2023, I caused to be served by email upon William Kealey, counsel of record for the Purdue Defendants-Appellees, Plaintiff John Doe's Jurisdictional Memorandum e-filed on September 26, 2023.

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 26th day of September, 2023.

_____/s/ PHILIP A. BYLER_____
**Philip A. Byler**

143a

# IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

————————

### CIVIL ACTION

————————

No. 2:17-cv-33-JPK

————————

JOHN DOE,

Plaintiff,

v.

PURDUE UNIVERSITY, PURDUE UNIVERSITY BOARD OF TRUSTEES, MITCHELL ELIAS DANIELS, JR., in his official capacity as President of Purdue University, ALYSA CHRISTMAS ROLLOCK, in her official capacity at Purdue University, KATHERINE SERMERSHEIM, in her official capacity at Purdue University,

Defendants.

————————

## DECLARATION OF PLAINTIFF
## JOHN DOE TO RECUSE MAGISTRATE
## JUDGE KOLAR AS TRIAL JUDGE

————————

PLAINTIFF JOHN DOE, a Court authorized pseudonym, hereby declares subject to the penalties of perjury pursuant to 28 U.S.C. § 1746:

144a

## Introduction

1. I am John Doe and Plaintiff in the *Doe v. Purdue* Title IX/Due Process case that has become precedent throughout the United States since Justice Amy Coney Barrett and 2 other woman judges unanimously ruled in my favor at the 7th Circuit now 4 years ago. For some background, I grew up in a large Christian family with 2 fantastic parents, 2 brothers, and 3 sisters. Three of my siblings were adopted from Ukraine in 2008, which has always been a fun talking point about my family. While going through high school, I felt a conviction to serve my country. No one else in my immediate family had any military experience or interest, so I was going to be the first. I thus began my school application process with that in mind. While being narrowly rejected from the Naval Academy in Annapolis, MD, I was given a full-ride Navy ROTC scholarship offer from Purdue University, which I gladly accepted. I felt I had made the right decision as I began my schooling and Navy career in the ROTC. However, this trajectory came to a halt in my 2nd semester in spring 2016 when I was subject to an investigation over false allegations an ex-girlfriend of mine (also in Navy ROTC) filed with the school after she was directed there by Navy ROTC staff. While at Purdue University in 2016, I was subject to an investigation over false allegations an ex-girlfriend of mine filed with the school after being directed there by the Navy ROTC, which we were both a part of at the time. Even though her claims were untrue and without

145a

proof, the investigation was massively biased and flawed. In reality it was hardly an investigation at all. I was effectively disabled from defending myself properly, lied about by the school itself, and given a total charade by Purdue's Dean of Students and her associates. Despite the many holes in her story and no direct testimony from Jane herself, she was found a "credible witness" and I was found a "noncredible witness" and disrespectfully suspended from the university. This cost me my mental health, my friends, my full-ride Navy ROTC scholarship, and the ability to serve my country for the rest of my life.

2. Mr. Byler's Declaration reviews the law and the facts for recusal. I write this Declaration because I want people to understand that I sincerely believe that the current judge on my case is not impartial. Justice Barrett ruled that I could proceed with my Due Process and Title IX claims in an opinion that, in addition to becoming a precedent of national importance, was directly cited by Secretary of Education Betsy Devos when she reformed Title IX law by due process regulation.

3. As reflected in Mr. Byler's Declaration, in just 4 years, the Barrett opinion has become the most influential Title IX citation in all of U.S. law. In her opinion, Justice Barrett directed the District Court to "consider expungement on remand" of the disciplinary record when criticizing Purdue's serious violations of my due process rights – high schools do a better job than Purdue did to me, she said.

146a

4. As reflected in Mr. Byler's Declaration, in the 4 years since Judge Kolar was tasked with handling my case, he has universally ruled against me on most all issues. He has adopted every significant argument from Purdue, despite a discovery record that exposes many misstatements from Purdue and further strengthens my arguments that were adopted by Justice Barrett, Judge Sykes, and Judge St. Eve. Despite all of Purdue's scorched earth tactics spent looking for ways to attack me personally and undermine my credibility *ad hominem,* they have consistently failed, as shown by the evidence and by the discovery record.

5. When demanding all of my medical documents in discovery (none of which they ended up deposing me about or citing in their motions), Purdue was adamant over also gaining access to my private mental health counseling records. For reference, my counselor was a well-respected Purdue graduate in the process of getting his counseling license as he actively practiced. Every one of his clients, including me, was under the impression that our conversations were confidential as per the HIPPA standard, and they should have been treated as such. Purdue's arguments should not have been accepted, but Judge Kolar did so anyway. There was nothing within my counseling records to support Purdue's aggression towards me. Although my position was further strengthened from this, I am left feeling violated and disgusted by the intrusion of my privacy. Despite all their demands for materials that have been proven unjustified, Judge Kolar's sentiment towards Purdue remained

147a

unchanged, a trend that has stayed consistent in spite of the facts and behaviors of both parties.

6. In a contrasting issue, Purdue issued a protective order requesting that the president at the time, Mitch Daniels, be exempted from depositions. Although he was a named Defendant and our desire to include him in depositions, Judge Kolar again ruled in Purdue's favor.

7. The next issue that Magistrate Judge Kolar ruled on had to do with 11 of 86 pieces of Snapchat media, all 86 of which were completely irrelevant to the case and contained nothing that would reflect poorly on my character. For reference, Snapchat is considered a social media application, although much of its function is more accurately equated to a private messaging service and media created with the application is not necessarily shared. I had accidentally deleted several pieces of media from my Snapchat account while clearing memory on my cell phone which unbeknownst to me at the time, also affected my Snapchat account. In his ruling, Judge Kolar said several things. Although I can understand his position that whether intentional or not, I was under an obligation to preserve my files, he went too far when he ruled spoliation without fulfilling the basic requirements for spoliation. Judge Kolar gave us a completely speculative "relevance" explanation with no regard for the rest of my social media that I had disclosed, and in doing so again showed a clear lack of impartiality. In addition, he ordered me to pay Purdue's attorney fees for that entire process, which they claimed amounted to around

148a

$30,000. He also strangely raised the matter of these fees during a teleconference call in July 2023, the sole topic of which was my change in legal representation. This issue was never cited by Purdue and none of my social media was questioned by them in my deposition.

8. The discovery process ended up revealing that things were worse than what was known to the 7th Circuit. The facts showed clear violations of my due process rights and that I was obligated to disclose the school's investigation to the Navy, consistent with the 7th Circuit ruling. To combat the stiff adversity I was facing from Purdue's counsel in what has appeared as a years-long effort to run me financially dry, I had to borrow significant amounts of money from my family. I am blessed to have good people in my life and to have been raised in a large loving family, but this sort of malicious strain gone unchecked by the judge has certainly done no favors for me, my family, and my counsel.

9. We hired several highly reputable experts to further validate the case. These experts delivered some very damning reports that elaborated on just how bad Purdue University really was to me. Purdue did not protest when we submitted these reports. However, after we cited Dr. R. Christopher Barden's report in our Summary Judgment papers months later, Purdue submitted a motion to exclude the report. Judge Kolar approved their motion and told my counsel and I that we could submit a modified report as a basis for trial testimony, which we did. Given the clear judicial bias so far, I would prefer a different judge rule on that

149a

and all other pre-trial proceedings so that we are given a fair chance.

10. I feel as though I have been fighting both Purdue and Judge Kolar. Mr. Byler's Declaration explains the many problems with Judge Kolar's August 2022 and February 2023 opinions. In his August 2022 ruling, despite what he may say, Judge Kolar did indeed overrule Justice Barrett and the 7th Circuit. He sided with Purdue's previously rejected argument regarding "legal obligation" to disclose and thus supports the ideas that I self-stigmatized myself when fulfilling my Navy responsibilities, and my due process rights being violated was "irrelevant". Doing this allowed Judge Kolar to ignore the serious due process violations by Purdue that we rightly focused on. Judge Kolar's logic in his August 2022 and February 2023 opinions not only retroactively demanded a legal obligation of disclosure from me, they simultaneously denied any possibility of fulfilling that standard. Thus, he has unambiguously decided that neither I, nor anyone else in my position, deserve due process rights while at college in the Navy ROTC.

11. While I was present during live oral argument in December 2022, it seemed quite obvious during my counsel's presentation that, based on his live reaction to the points being made, Judge Kolar recognized the flaws in Purdue's illogical arguments and the problems of adopting them. Apparently, that did not translate to his changing his mind. Judge Kolar said in his August Opinion that had we supplied some sort of proof that I was

150a

required to disclose Purdue's investigation report to the Navy, he would have considered otherwise. Despite Purdue's excessive legal obligation standard never being accepted prior, we obliged the judge in reconsideration and pointed out multiple sections within the Navy ROD that showed exactly that. We also discovered and showed Judge Kolar two separate opinions that contended with his August 2022 ruling *from within his own Indiana district* and *which involved Purdue and the same Purdue counsel,* information Purdue withheld from us and the judge. Judge Kolar found no issue here and in his reconsideration, ignored both our fulfillment of Judge Kolar's obligation argument via the Navy ROD presentation, and Purdue's omission of the conflicting opinions.

12. In order to continuously deny my due process claim, Judge Kolar evolved his requirement for proof that my Navy authorization was involuntary to demanding proof that my Navy authorization was legally obligated. In addition to falsely concluding that I voluntarily authorized Navy disclosure (when in fact I had no choice but to comply with the request of my Navy superiors, regardless of how I was feeling at the time), Judge Kolar decided that some of my emotions at the time of giving authorization were more important than the Navy rules themselves. This allowed him to feel more comfortable claiming that the Navy ROD was insufficient grounds—ignoring the entire fact that this new argument effectively grants me and anyone else in my position no possibility of due process rights at all. He moved the goalposts of what was

151a

required in order to continue supporting Purdue's argument, denying my due process rights, and thereby overruling Justice Barrett & the 7th Circuit.

13. Despite doing our best to be reasonable and professional throughout the past 4 years that Magistrate Judge Kolar has been assigned to my case, it is impossible to deny his consistently biased behavior against me. This month marks the 4th year that Judge Kolar has sponsored Purdue's sick obsession to justify their actions against me and cause me further harm. They have lied about me and gone after me personally with absolutely no repercussions, and through lowly tactics have run my legal fees far higher than what is appropriate. This judge's actions have only emboldened Purdue and Mr. Kealey to continue. I am blessed to be represented and supported by great people, because without them Purdue would have succeeded in bankrupting me off my pursuit of justice long ago.

14. The actions of what should be an integrity-driven, prestigious school disturb me. The actions of what is supposed to be a fair judge in the United States of America disturbs me greatly. Purdue has cost me and my family hundreds of thousands of dollars in fees just from trying to clear my record, and neither Purdue nor (more importantly) Judge Kolar seem to care at all. In our settlement conference, Judge Kolar told me settling was in my best interest and tried to pressure me into taking a wholly inadequate offer from Purdue with no expungement and no attorneys fees, and not even enough money to cover the sanctions he ordered

152a

against me in his screwy Snapchat opinion.

15. Despite overseeing the discovery, a settlement conference, and being subject to a mandamus petition from my counsel and I, the same Judge Kolar now insists on overseeing my jury trial. He strangely has yet to even address our mandamus petition. The only thing Judge Kolar can do at this point is relinquish his position on this case to a more impartial judge. I absolutely do not consent to his overseeing of pre-trial and jury trial in my case. Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 9th day of July, 2023.

**/s/ John Doe, a pseudonym**
**John Doe, a pseudonym**

153a

# UNITED STATES COURT OF APPEALS
## For the Seventh Circuit

――――――――

Everett McKinley Dirksen
United States Courthouse
Room 2722 - 219 S. Dearborn Street
Chicago, Illinois 60604

**[Seal]**

Office of the Clerk
Phone: (312) 435-5850
www.ca7.uscourts.gov

――――――――

## ORDER

March 6, 2023

Before

Diane S. Sykes, *Chief Judge*

Amy J. St. Eve, *Circuit Judge***

――――――――

No. 23-1310

In Re:

John Doe,

                                    Petitioner

――――――――

――――――
  **[*]**   Circuit Judge Barrett was part of the panel in *Doe v. Purdue University,* 928 F.3d 652 (7th Cir. 2019). This petition is resolved by a quorum of that panel pursuant to 28 U.S.C. § 46(d).

154a

## Petition for Writ of Mandamus

District Court No: 2:17-cv-00033-JPK
Magistrate Judge Joshua Paul Kolar

——————————

Upon consideration of the **PETITION FOR A WRIT OF MANDAMUS,** filed on February 17, 2023, by counsel for the petitioner,

**IT IS ORDERED** that the petition for writ of mandamus is **DENIED.**